**Hearing Date & Time:**
**July 2, 2019 at 10:00 a.m. (AST)**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------X

| | |
|---|---|
| In re: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| | |
|     as representative of | No. 17-cv-1685-LTS |
| | No. 17-bk-3566-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | |
| | (Jointly Administered) |
| Debtors.[1] | |
| | **Re:  ECF Nos. 289, 292, 367, 371 & 505** |

------------------------------------------------------------X

CERTAIN ALLEGED SECURED CREDITORS
OF THE EMPLOYEES RETIREMENT SYSTEM
OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO,

                          Movant,

    -against-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO,

                        Respondent.

------------------------------------------------------------X

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................2

FACTUAL AND PROCEDURAL BACKGROUND.......................................................4

    I.      ERS and the ERS Bonds ........................................................................4

    II.     2017 Pension Reform...............................................................................9

    III.    The ERS Title III Case .........................................................................11

    IV.    Movants Renew Consideration of the Lift Stay Motion .......................16

ARGUMENT ...................................................................................................................17

    I.      Movants Cannot Demonstrate "Cause" Exists to Lift the Automatic Stay. ..........17

        A.    Movants Have Not Established the Nature and Extent of Their
             Alleged Collateral. ...............................................................................20

            i.      Movants' Alleged Interest in ERS's Assets Is Limited To
                 (at Most) the Pre-Petition Employers' Contributions and
                 the Accounts Receivable.............................................................21

            ii.     Movants Have No Security Interest in the Paygo Payments. ........22

        B.    Movants Do Not Establish a Value of Their Alleged Collateral as
             of the ERS Petition Date. ......................................................................30

        C.    Movants Do Not Face a Threat of Uncompensated Diminution and
             Are Adequately Protected. ....................................................................31

            i.      The ERS Petition Date Assets are Not at Risk of
                 Diminution and Are Adequately Protected....................................36

            ii.     The "Right to Receive" Employers' Contributions (Such
                 Right Allegedly Constituting the Paygo Payments) is Not at
                 Risk of Diminution and is Adequately Protected. ........................37

        D.    ERS Can Protect Movants' Interest Such that Movants Should Not
             Be Permitted to Lift the Stay. ...............................................................38

CONCLUSION.................................................................................................................39

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*1st Source Bank v. Wilson Bank & Tr.*,
735 F.3d 500 (6th Cir. 2013) ................................................26

*Altair Global Credit Opp., et al. v. Emps. Ret. Sys.*,
914 F.3d 694 (1st Cir. 2019)............................................14, 19

*Altair Global Credit Opportunities Fund (A), L.L.C. v. Garcia-Padilla*,
No. 16-cv-2696 (D.P.R. 2016) (J. Besosa) ........................12

*Banker Life Ins. Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.)*,
12 B.R. 803 (Bankr. D. Utah 1981) ....................................19

*Baybank-Middlesex v. Ralar Distribs., Inc.*,
69 F.3d 1200 (1st Cir. 1995)...............................................37

*Gen. Life Ins. Co. v. Universal Ins. Co.*,
838 F.2d 612 (1st Cir. 1988)...............................................27

*GMAC Bus. Credit, L.L.C. v. Ford Motor Co.*,
100 Fed. App'x 404 (6th Cir. 2004) ...................................29

*In re Blue Leopard, LLC*,
16-10686-MKN, 2016 Bankr. LEXIS 4700 (Bankr. D. Nev. Sept. 22, 2016) ........34

*In re CGE Shattuck, LLC*,
99-12287-JMD, 1999 Bankr. LEXIS 1880 (Bankr. D.N.H. Dec. 20, 1999) ..........32, 34

*In re Cont'l Airlines, Inc.*,
154 B.R. 176 (Bankr. D. Del. 1993) ..............................19, 22

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
899 F.3d 1 (1st Cir. 2018), *cert. denied sub nom. Peaje Invs. LLC v. The Fin. Oversight & Mgmt. Bd. for P.R.*, 139 S. Ct. 1169 (2019)......................19

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
899 F.3d 13 (1st Cir. 2018)........................................ passim

*In re Hunt's Pier Assocs.*,
143 B.R. 36 (Bankr. E.D. Pa. 1992) ...................................18

i

*In re Las Vegas Monorail Co.*,
  429 B.R. 317 (Bankr. D. Nev. 2010) ...........................................................................25, 26

*In re Rice*,
  82 B.R. 623 (Bankr. S.D. Ga. 1987) ..................................................................................18

*Metropolitan Nat. Bank v. La Sher Oil Co.*,
  101 S.W.3d 252 (Ark. App. 2003)......................................................................................24

*People's United Bank v. Lombardo's Ravioli Kitchen, Inc.(In re Lombardo's
  Ravioli Kitchen, Inc.)*,
  08-20774, 2009 Bankr. LEXIS 550 (Bankr. D. Conn. Feb. 20, 2009) ...................................34

*Van Diest Supply Co. v. Shelby County State Bank*,
  425 F.3d 437 (7th Cir. 2005) .............................................................................................24

## STATUTES

PROMESA § 315(b) ...................................................................................................................1

3 L.P.R.A § 761 ......................................................................................................................5

3 L.P.R.A. §§ 761–788 ........................................................................................................4, 6, 8

3 L.P.R.A. § 770(d) ................................................................................................................6

3 L.P.R.A § 775 ......................................................................................................................5

3 L.P.R.A § 779 ......................................................................................................................5

3 L.P.R.A. § 781 .....................................................................................................................5

3 L.P.R.A. § 787f ...................................................................................................................7

3 L.P.R.A. § 787g ...................................................................................................................7

19 L.P.R.A §§ 2001–2207 ........................................................................................................23

11 U.S.C. § 361 .................................................................................................................34, 35

11 U.S.C. § 362 .....................................................................................................................11

11 U.S.C. § 922 .....................................................................................................................11

11 U.S.C. § 362(d)(1) .......................................................................................................17, 34, 38

11 U.S.C. § 362(g) ..................................................................................................................32

11 U.S.C. § 363 .................................................................................................................35

11 U.S.C. § 364 .................................................................................................................35

11 U.S.C. § 552 ............................................................................................................passim

11 U.S.C.  § 552(a) ..............................................................................................2, 11, 14, 15

48 U.S.C. § 2161(a) ...........................................................................................................11

UCC § 9-102(a)(64) ....................................................................................................24, 26

UCC § 9-102(a)(64)(A) .....................................................................................................24

UCC § 9-102(a)(64)(C) ................................................................................................24, 25

UCC § 9-315 ...............................................................................................................23, 27

UCC § 9-315, Comment 3 .................................................................................................27

UCC § 9-315(a) .................................................................................................................23

UCC § 9-315(a)(1) .............................................................................................................23

UCC § 9-315(b)(2) .............................................................................................................27

**OTHER AUTHORITIES**

3 Collier on Bankruptcy ¶ 362.10 .....................................................................................32

Jonathan C. Lipson, *Financing Information Technologies: Fairness and Function*,
    2001 WIS. L. REV. 1067 (2001) ...............................................................................25

**DEBTOR'S SUPPLEMENTAL
OPPOSITION TO MOTION OF CERTAIN
SECURED CLAIMHOLDERS OF EMPLOYEES
RETIREMENT SYSTEM OF GOVERNMENT OF
COMMONWEALTH OF PUERTO RICO FOR RELIEF FROM AUTOMATIC STAY**

To the Honorable United States District Judge Laura Taylor Swain:

The Employees Retirement System of the Government of the Commonwealth of Puerto

Rico ("ERS," "System," or the "Debtor"), by and through the Financial Oversight and

Management Board (the "Oversight Board"), as the Debtor's representative pursuant to Section

315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2]

respectfully submits this supplemental[3] opposition to the *Motion of Certain Secured Creditors of*

*the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for*

---

[2] PROMESA has been codified at 48 U.S.C. §§ 2101–2241.

[3] The *Debtor's Opposition to Motion of Certain Secured Claimholders of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay* was originally filed on July 10, 2018 [ECF No. 292]. The Debtor incorporates by reference, such opposition, and other previous filings, including the *Debtor's Objection to Original Stay Relief Motion* [ECF No. 98]; *Adversary Complaint* [Adv. Proc. No. 17-00213, ECF No. 1]; *Employees Retirement System of the Government Commonwealth of Puerto Rico's Answer to Defendants' Counterclaims* [Adv. Proc. No. 17-00213, ECF No. 49]; *Memorandum in Support of Motion for Summary Judgment of Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [Adv. Proc. No. 17-00213, ECF No. 91]; *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment of Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [Adv. Proc. No. 17-00213, ECF No. 93]; *Opposition of Employees Retirement System of the Government of Commonwealth of Puerto Rico to ERS Bondholders' Motion for Summary Judgment* [Adv. Proc. No. 17-00213, ECF No. 115]; *Response of Employees Retirement System of the Government of the Commonwealth of Puerto Rico to ERS Bondholders' Statement of Undisputed Facts* [Adv. Proc. No. 17-00213, ECF No. 116]; *Reply Response of Employees Retirement System of Government of Commonwealth of Puerto Rico in Support of its Motion for Summary Judgment* [Adv. Proc. No. 17-00213, ECF No. 149]; *Post-Hearing Supplemental Brief of Employees Retirement System of the Government of the Commonwealth of Puerto Rico in Support of its Motion for Summary Judgment* [Adv. Proc. No. 17-00213, ECF No. 198]; *Reply Brief of Employees Retirement System of the Government of the Commonwealth of Puerto Rico to ERS Bondholders' Supplemental Memorandum* [Adv. Proc. No. 17-00213, ECF No. 205].

*Relief from the Automatic Stay* [ECF No. 289][4] (the "<u>Motion</u>"), filed by certain holders of ERS

bonds (the "<u>ERS Bondholders</u>" or "<u>Movants</u>").

<u>**PRELIMINARY STATEMENT**</u>[5]

1.      With limited exceptions—and even if the ERS Bonds were not issued *ultra vires*,

and section 552(a) of the Bankruptcy Code does not prevent any security interest from attaching

to Revenues received by ERS after the ERS Petition Date—beginning on July 1, 2017, no

additional collateral came into existence.  That is the day Act 106 was enacted, and the Employers'

Contributions discontinued.  This discontinuation was an ever-present risk.  The ERS Bondholders

knew of this risk prior to even purchasing the ERS Bonds, as it was set forth in bold and italicized

typeface in multiple locations in the Offering Statement.

2.      To the extent Movants have a perfected security interest in assets at ERS, the

relevant assets are adequately protected by the Pre-petition Segregated Account, which has already

been paid to the ERS Bondholders pursuant to the Adequate Protection Stipulation, and by the and

Post-petition Segregated Account, which holds $93.9 million and continues to earn interest.  Of

course, if the issuance of the ERS Bonds was *ultra vires*, there is no basis for relief, and accordingly

no need to untangle the issues of what constitutes the ERS Bondholders' collateral, and whether

such collateral is adequately protected.  All the same, ERS asserts any such collateral is adequately

protected, but even if the Court rejects all legal and factual arguments in the instant opposition, the

question of whether the ERS Bonds are *ultra vires* should be decided before the stay can be lifted.

---

[4] All ECF Nos. refer to the ERS Title III case (Case No. 17-bk-3566), unless otherwise indicated.

[5] All capitalized terms used but not defined herein shall have the meaning given to them in the
Motion, or are defined below.

3.      When determining if causes exists for relief from the automatic stay for lack of adequate protection, First Circuit precedent makes clear the movant must (i) establish the precise nature and extent of movant's collateral, (ii) make an assessment of the pre-petition value of movant's collateral (assuming any exists), (iii) establish that movant faces a threat of uncompensated diminution in such value, and (iv) if protection is warranted, establish that no protection can be provided short of allowing the movant to lift the stay to exercise its remedies, if any. *See infra* ¶ 44.

4.      Here, Movants have not provided evidence to support the foregoing findings. They describe the nature and extent of their collateral by merely referencing the Security Agreement and the underlying Resolution purporting to grant them a security interest. They do not seek to connect the definitions in the bond documents with any actual assets held by ERS or the Commonwealth. Nor do they connect any actual assets to a security interest perfected by the filing of a financing statement. They provide limited dollar value assessments of asserted collateral, and no assessment as of the ERS Petition Date, while asserting generally that their collateral is being diminished by the Commonwealth's actions (*i.e.*, the Post-Petition Legislation). And, they propose to commence a multitude of lawsuits outside of this Title III proceeding to collect on their alleged collateral, while overlooking other, less disruptive means by which Movants could have their asserted rights adjudicated. Moreover, even assuming Movants' chief legal theory is correct, and that the Paygo Payments are really Employers' Contributions subject to Movants' alleged security interest (which they are not), Movants still would not be entitled to relief from the stay.

5.      In fact, Movants' collateral extends only to (a) the prepetition Employers' Contributions that were on deposit in the Pre-petition Segregated Account (as of the ERS Petition Date) and have been paid to Movants, including $186.5 million in monthly interest payments made

3

from July 2017 through 2018, and (b) ERS's right to receive unpaid Employers' Contributions owed by covered employers on account of pre-petition work performed by covered employees to the extent any such right arose pre-petition (the "Accounts Receivable"), with a face value of approximately $105.4 million as of the ERS Petition Date.[6]  However, Movants believe their interests are much broader—that they extend to, among other things, the Paygo Payments being made by employers, *see* Post-Petition Legislation AP, and to substantially more of ERS's assets. *See* Lien-Challenge AP.  These disputes regarding the scope of the alleged security interest are subject to adjudication in separate proceedings pending in the Commonwealth's and ERS's Title III cases.

6.      As described more fully below, even if Movants were to have a perfected security interest in all Paygo Payments, that interest is adequately protected, by a substantial equity cushion in the Paygo Payments, which, projected at over $40 billion in the aggregate over the next 40 years, is more than sufficient to pay Movants in full.  In no circumstances do Movants need to be allowed to commence litigations outside of this Title III proceeding.  Accordingly, the stay should remain in place, and the Motion should be denied in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      ERS and the ERS Bonds

7.      According to Act 447 of May 15, 1951 (codified, as amended, at 3 L.P.R.A. §§ 761–788) (the "Enabling Act"), ERS is a trust established by the Commonwealth in 1951 for the economic well-being of public employees.  ERS is an agency of the government, separate and apart from the Commonwealth government and its other instrumentalities, *see* 3 L.P.R.A § 775,

---

[6] The Official Committee of Unsecured Creditors has taken the position that not even the Accounts Receivable are subject to the ERS Bondholders' security interest.  *See infra* n.12.

although it shares a common legal interest and other applicable privileges with the Commonwealth, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and the Oversight Board.  ERS was established to administer the payment of pensions and other benefits to officers and employees of the Commonwealth government, members and employees of the Puerto Rico Legislative Assembly (the "Legislature"), and officers and employees of public corporations and municipalities.  *See* 3 L.P.R.A § 761.

8.     ERS was funded in part by contributions from employers, the amount of which was determined by statute pursuant to a formula based on a contribution rate set by law and the amount of each employer's active employee payroll from time to time.  *See* March 21, 2018 *Declaration of Luis Collazo Rodriguez in Support of ERS's Supplemental Brief in Support of Motion for Summary Judgment* ("March 21, 2018 Collazo Decl.") ¶¶ 4–5 [Adv. Proc. No. 17-00213, ECF No. 198-1].  Annual required employer contributions were not determined on an actuarial basis and were not based on the exact dollar amount of payments made or to be made to current retirees or beneficiaries in any given year.  *See, e.g.*, 3 L.P.R.A. § 781.

9.     Until July 1, 2017, employees also contributed to ERS, which contributions were separate from the Employers' Contributions.  Employee contributions were withheld from paychecks and deposited into ERS's operating account.

10.    In addition to paying benefits, ERS was authorized to, and did, make personal and home mortgage loans ("Employee Loans") to employee participants and retirees.  *See* 3 L.P.R.A § 779.  As of May 21, 2017, the date of the filing of ERS's Title III Petition, ERS had approximately 100,000 Employee Loans outstanding with a principal amount outstanding of approximately $500 million.  Employee Loans were not made with proceeds of the ERS Bondholders' collateral.  Bank of New York Mellon, as fiscal agent (the "Fiscal Agent"), never

5

took possession of the notes evidencing Employee Loans, nor did any financing statement describe the Employee Loans as collateral.  ERS deposited such repayments of Employee Loans in its operating account (such payments, "Employee Loan Payments"), where they were combined with other funds.  *See* March 21, 2018 Collazo Decl. ¶ 6.  ERS stopped making new Employee Loans in 2016.  *Id.*

11.    The Enabling Act authorized ERS to (i) "seek a loan from any financial institution of the Government of Puerto Rico or the Federal Government of the United States of America" or through "the direct placement of debts" if authorized by its Board of Trustees, and (ii) under specified circumstances, issue debt secured by the assets of the System.  3 L.P.R.A. § 770(d).  The Enabling Act does not create any debt or security interests.

12.    On January 24, 2008, ERS issued bonds (the "ERS Bonds") purportedly pursuant to that certain *Pension Funding Bond Resolution*, adopted January 24, 2008 (the "Resolution,") attached as Appendix VI to the offering statement for the first series of ERS Bonds (the "Offering Statement"),[7] in the aggregate original principal amount of approximately $2.9 billion.

13.    The Resolution contemplated that the ERS Bonds would be secured, nonrecourse obligations of ERS, that would be "special obligations of the System payable solely from the Pledged Property without recourse against other assets of the System," and no ERS Bond "shall . . . be payable out of any funds or assets other than the Pledged Property."  Resolution § 201.  In connection with the issuance, ERS executed a security agreement, dated June 2, 2008 (the "Security Agreement"), which grants, for the benefit of holders of ERS Bonds, "a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property of the types

---

[7] The Offering Statement is available at
http://www.gdb.pr.gov/pdfs/public_corp/PensionBondsOS-Jan08-final.pdf.

6

included as Pledged Property, subject to application as permitted by the Resolution." The
definition of "Pledged Property" includes, among other things:

> 1. All Revenues.
>
> 2. All right, title and interest of the System in and to Revenues, and all right to receive the same.
>
> …
>
> 5. Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

*Id.* at VI-36. Revenues, in turn, includes "Employers' Contributions," which is defined as
"contributions paid from and after the date hereof that are made by Employers and any assets in
lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-
105 and 4-113 of the [Enabling] Act." *Id.* at VI-33.

14.     In fiscal year 2017, the last fiscal year Employers' Contributions were made,
employers were required to make periodic contributions to ERS on behalf of participating
employees equal to 15.525% of the compensation regularly received by actively employed eligible
employees. *See* 3 L.P.R.A. §§ 787f, 787g. The Legislature had increased the contribution rate to
10.275% on July 1, 2011, and mandated annual rate increases of 1% per year through June 30,
2016 and then 1.25% per year thereafter until June 30, 2021. *See* Act 116-2011, § 2-116(d); *see
also* Act 3-2013, § 5-106. At no time did ERS negotiate employer contribution rates. Rather, the
rates were set by the Legislature.

15.     The Enabling Act was amended by Act 106 (after the date of the Resolution) to
repeal Sections 2-116, 3-105, and 4-113, eliminating any further Employers' Contributions to ERS
(as well as all other contributions that were previously required pursuant to the Enabling Act).

7

16.     The risk of amendments to the Enabling Act that might have an adverse effect on the amount of contributions available to the ERS Bondholders was fully disclosed to the ERS Bondholders in the Offering Statement, and not prohibited by the Resolution.  *See, e.g.*, Offering Statement at 26 and 37 ("***The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.***") (emphasis in original).

17.     Further, beginning no later than 2011, bondholders were on notice that the ERS Bonds themselves may have been issued *ultra vires*.  In connection with the passage of Act 116-2011, the Legislature stated that the issuance of ERS Bonds "was illegally made by [ERS] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System."  Act 116-2011 at Statement of Motives.

18.     On March 12, 2019, the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed an *Omnibus Objection to Claims Asserted by Holders of Bonds Issued by ERS* [ECF No. 381], on the ground the bond issuance exceeded ERS's statutory authority and was thus *ultra vires,* rendering the ERS Bonds null and void.  On April 23, 2019, the Official Committee of Retired Employees of the Commonwealth of the Puerto Rico also filed an objection to the ERS Bondholders' claims against ERS and the Commonwealth, on the ground, among others, that the bond issuance was *ultra vires* [Case No. 17-3283, ECF No. 6482].  Further, on May 19, 2019, the Special Claims Committee of the Oversight Board and the Creditors' Committee commenced an adversary proceeding, on behalf of ERS, seeking a declaration that the ERS Bonds were issued *ultra vires* and thus are null and void, and to recover funds unlawfully

8

transferred to certain ERS Bondholders on account of principal and interest payments purportedly due on the ERS Bonds [Adv Pro. No. 19-00355, ECF No. 1].[8]

## II.    2017 Pension Reform

19.    In 2017, the incoming Rosselló administration and the Oversight Board moved to address the financial crisis at ERS and safeguard retirement benefits.

20.    On March 13, 2017, the Oversight Board adopted a resolution certifying the Fiscal Plan for Puerto Rico, dated that same day, including an amendment thereto providing for "progressively reduced total pension outlays by 10% by fiscal year 2020." *See* Board Resolution Adopted on March 13, 2017, at 3–4, available at https://oversightboard.pr.gov/documents/.

21.    On June 25, 2017, the Legislature passed the Joint Resolution for Other Allocations for Fiscal Year 2017-2018 ("Joint Resolution 188" or "J.R. 188").  On August 23, 2017, the Legislature passed and Governor Rosselló signed into law Act 106-2017 ("Act 106").

22.    Together, Act 106 and Joint Resolution 188 (collectively, the "Post-Petition Legislation") reformed Puerto Rico's retirement systems by, among other things, (a) having the Commonwealth assume ERS's obligations to pay pensioners, (b) having employers reimburse the Commonwealth (the "Paygo Payments") for payments actually made by the Commonwealth to the employers' current pensioners, and (c) because ERS would no longer be responsible for paying benefits, eliminating employers' obligations to contribute to ERS.  *See* Act 106, §§ 2.1(b), 2.4(e); J.R. 188, § 4.  As a result of the Post-Petition Legislation, ERS stopped receiving Employers' Contributions as of July 1, 2017, and was relieved of the obligation to administer and pay retiree benefits.  *See June 21, 2019 Declaration of Luis Collazo Rodriguez in Support of Debtor's*

---

[8] On November 17, 2017, in moving to dismiss certain ERS Bondholders' amended complaint in the Post-Petition Legislation AP, AAFAF also asserted that the 2008 issuance of ERS Bonds was *ultra vires.*  Post-Petition Legislation AP, [ECF No. 44].

*Supplemental Opposition to Motion of Certain Secured Claimholders of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay* (the "Collazo Declaration" or "Collazo Decl.," filed contemporaneously herewith), ¶¶ 7–8.

23.    As part of these reforms, ERS sold certain of its assets (none of which were collateral) and transferred the amounts received, in addition to any existing available funds, to the Puerto Rico Department of Treasury's general fund.  *See* Act 106, § 1.4; J.R. 188, § 2.  Consistent therewith, ERS transferred approximately $190.5 million of deposit account assets (the "Transferred Assets") to the Commonwealth.

24.    On November 8, 2017, after the passage of the Post-Petition Legislation, the ERS Bondholders filed their *Amended and Supplemented Adversary Complaint* in the adversary proceeding styled *Altair Global Credit Opportunities Fund (A), LLC, et al., v. Commonwealth of P.R., et al.*, Adv. Proc. No. 17-00219 (LTS) (D.P.R. July 27, 2017) (the "Post-Petition Legislation AP"), alleging, among other things, that the Post-Petition Legislation violated the automatic stay by "stripping" ERS of assets and "diverting" employer contributions elsewhere to avoid paying the ERS Bondholders.  The ERS Bondholders alleged, in eight separate counts, that: (i) the Post-Petition Legislation violated the ERS automatic stay and is void ab initio; (ii) they have perfected liens on assets of ERS; (iii) they have perfected liens on assets of the Commonwealth; (iv) the transfer of property from ERS to the Commonwealth mandated by the Post-Petition Legislation (A) unjustly enriches the Commonwealth at Plaintiffs' expense, and (B) is not a "public use" within the meaning of the United States and Puerto Rico Constitutions; and (v) the Post-Petition Legislation is (A) an unconstitutional taking of private property without just compensation, (B) resulting in a claim that cannot be discharged or compromised by any Title III plan of

adjustment, and (C) a violation of the "Contracts Clauses" of the United States and Puerto Rico
Constitutions.  Post-Petition Legislation AP, [ECF No. 39].

25.    The Court stayed the Post-Petition Legislation AP at the parties' request pending
resolution of the Lien-Challenge AP, without prejudice to any party's moving for relief to vacate
the stay, and, accordingly, has not yet ruled on any of the claims raised therein.  *See id.* [ECF Nos.
69 & 70].

### III.    The ERS Title III Case

26.    On May 3, 2017, a petition under title III of PROMESA was filed on behalf of the
Commonwealth with the United States District Court for the District of Puerto Rico.

27.    On May 21, 2017 (the "ERS Petition Date"), a petition under title III of PROMESA
was filed on behalf of ERS with the United States District Court for the District of Puerto Rico
(the "ERS Title III Case").  The commencement of the ERS Title III Case triggered the automatic
stay of creditor remedies against ERS.  48 U.S.C. § 2161(a) (incorporating 11 U.S.C. §§ 362 and
922 into PROMESA).

28.    On May 31, 2017, certain ERS Bondholders filed a motion (the "Adequate
Protection Motion") [ECF No. 26], seeking relief from the Title III automatic stay.  ERS opposed
the Adequate Protection Motion, asserting, among other things, that: (i) the security interests in
the Pledged Property claimed by the ERS Bondholders were not properly perfected; (ii) even if
the ERS Bondholders' asserted prepetition security interests were perfected, section 552(a) of the
Bankruptcy Code prevents any security interest from attaching to Revenues received by ERS after
the ERS Petition Date; and (iii) the ERS Bondholders are not entitled to adequate protection.

29.    Following negotiations, ERS and the ERS Bondholders ultimately agreed to a
stipulation (the "Adequate Protection Stipulation") [ECF No. 170], which was so-ordered by the
Court on July 17, 2017 [ECF No. 171].  The Adequate Protection Stipulation provided for adequate

protection of the ERS Bondholders' alleged security interests, requiring that "[i]nterest on the ERS Bonds shall be paid when due through the interest payment due on October 1, 2017 from the pre-petition segregated account (the "Pre-petition Segregated Account")" established pursuant to the Order and Stipulation dated January 17, 2017 (the "January Stipulation"),[9] and that no further transfers from ERS should be made to such account.  Adequate Protection Stipulation at 4.  It also authorized the creation of a new, post-petition segregated account (the "Post-petition Segregated Account") into which monthly deposits of $18.5 million were to be made from July 2017 through October 2017 and held by ERS as further adequate protection of the ERS Bondholders' alleged security interest pending the determination of the validity and perfection of such security interest. *Id.* at 5.

30.     The Adequate Protection Stipulation contemplated that ERS would file an adversary complaint by July 21, 2017 to resolve the issues raised in the context of the Adequate Protection Motion.  *Id.* at 4.  The Adequate Protection Stipulation provides that "[a]ll Parties reserve all rights and defenses with respect to such payments," *id.*, and further reserved all parties "respective rights and defenses concerning the validity, attachment, perfection, priority, and enforceability of the Creditors' liens and security interests to any payments, rights to payments, obligations or property affected by [Joint Resolution 188] or otherwise."  *Id.* at 6.

31.     ERS fully complied with the Adequate Protection Stipulation, and approximately $186.5 million in total was paid, after the ERS Petition Date, to the ERS Bondholders from the Pre-petition Segregated Account, subject to the aforementioned reservation of rights.  Including payments issued from before the ERS Petition Date, Movants have received approximately $214.2

---

[9] *Altair Global Credit Opportunities Fund (A), L.L.C. v. Garcia-Padilla*, No. 16-cv-2696 (D.P.R. 2016) (J. Besosa) [ECF No. 83].

million in payments from the Pre-petition Segregated Account (including interest).  Additionally, ERS deposited approximately $92.5 million in the Post-petition Segregated Account in compliance with the Adequate Protection Stipulation, which, accounting for accrued interest, totaled $93.9 million as of May 31, 2019.  Collazo Decl. ¶ 13(c).

32.     On July 21, 2017, ERS filed the adversary complaint as contemplated by the Adequate Protection Stipulation, styled *Employees Ret. Sys. of the Gov't of the Commonwealth of P.R.* v. *Altair Global Credit Opportunities Fund (A), LLC, et al.*, Adv. Proc. No. 17-00213 (LTS) (D.P.R. July 21, 2017) (the "Lien-Challenge AP").  On November 3, 2017, ERS and the ERS Bondholders filed cross-motions for summary judgment in the Lien-Challenge AP [ECF Nos. 91 & 94] (the "Summary Judgment Motions").

33.     On July 3, 2018, before the Court rendered its determination on the Summary Judgment Motions, ERS Bondholders filed the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay* [ECF No. 289] (the "Second Adequate Protection Motion"), requesting relief from the automatic stay imposed pursuant to Title III of PROMESA or, in the alternative, for adequate protection of their alleged liens on property of ERS in which the Commonwealth claims an interest.

34.     On August 17, 2018, the Court issued its *Opinion and Order Granting and Denying in Part Cross Motions for Summary Judgment* [ECF No. 215] (the "MSJ Order"), determining that the ERS Bondholders' security interests were unperfected and that there had been no violation of the January Stipulation.  The Court did not determine other issues raised in the Lien-Challenge AP, including (i) whether ERS Bondholders' asserted security interests with respect to the Employee Loans and post-petition collections are effective and enforceable and (ii) whether

13

section 552(a) of the Bankruptcy Code prevents the attachment of ERS Bondholders' asserted security interest in post-petition employer contributions. Additionally, the Court did not address the nature or extent of the security interests alleged. On August 21, 2018, and based upon the MSJ Order, the Court denied the Second Adequate Protection Motion [ECF No. 318].

35.    The ERS Bondholders appealed the MSJ Order, and, on January 30, 2019, the First Circuit issued an opinion affirming in part, reversing in part, and vacating in part, the MSJ Order. *Altair Global Credit Opp., et al. v. Emps. Ret. Sys.*, 914 F.3d 694 (1st Cir. 2019) (the "Lien-Challenge Opinion"). The First Circuit determined the ERS Bondholders met the requirements for perfection of the alleged security interests as of December 17, 2015 to the extent the financing statement of that date describes collateral in which the ERS Bondholders have an attached security interest and with respect to which the filing of a financing statement is an approved method of perfection under the UCC, and it remanded the Lien-Challenge AP to this Court for further consideration of certain of the ERS Bondholders' counterclaims. The First Circuit did not address the nature or extent of the security interests alleged, the proper method of perfection of any security interest, or whether section 552(a) of the Bankruptcy Code prevents the attachment of ERS Bondholders' asserted security interest to post-petition employer contributions.

36.    On April 2, 2019, ERS filed the *Motion of Debtor for Leave to File an Amended and Supplemented Adversary Complaint and Requesting Determination of Count Briefed But Not Decided By Title III Court's Order On Motions for Summary Judgment* (the "Motion to Amend") Lien-Challenge AP, [ECF No. 236], requesting the Court grant ERS leave to file an amended adversary complaint to raise issues concerning the nature or extent of the security interests alleged and the proper method of perfection of any security interest, and that it determine whether section 552(a) of the Bankruptcy Code operates to prevent the ERS Bondholders' asserted lien from

14

attaching to Employers' Contributions received post-petition (the section 552(a) issue being the "Undecided Issue").[10]

37.     On May 6, 2019, the Court denied in part and granted in part the Motion to Amend, granting ERS's request to determine the Undecided Issue, but denying ERS's motion insofar as it sought leave to amend the complaint in the Lien-Challenge AP, without prejudice to the filing of a new adversary complaint. In light thereof, on May 20, 2019, ERS and the Official Committee of Unsecured Creditors appointed in Title III Debtors' cases (other than COFINA) (the "Committee") filed a new adversary complaint, styled *The Financial Oversight and Management Board for Puerto Rico, as representative of Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Andalusian Global Designated Activity Company, et al.*, Adv. Proc. No. 19-00366 (LTS) (D.P.R. May 20, 2019) (the "Lien-Scope AP") [ECF No. 1],[11] which alleges the ERS Bondholders do not hold valid and enforceable security interests in any of ERS's

_____

[10] On April 30, 2019, ERS filed a petition for certiorari with the United States Supreme Court seeking to reverse the First Circuit's determination that the ERS Bondholders' properly perfected their security interests, to the extent any such security interests could be perfected by the filing of a financing statement and the financing statement has a description of the collateral in which the Bondholders have a security interest. The Clerk of the Supreme Court has requested that the ERS Bondholders file a response to such petition, which was filed on June 17, 2019, and, as of the date hereof, the Supreme Court has neither granted nor denied such petition.

[11] The Committee and Oversight Board serve as section 926 co-trustees and co-plaintiffs in the prosecution of that adversary proceeding pursuant to that certain *Stipulation and Agreed Order by and Among Financial Oversight and Management Board, Its Special Claims Committee, and Official Committee of Unsecured Creditors Related to Joint Prosecution of Certain Causes of Action of Puerto Rico Highways and Transportation Authority and Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [Case No. 17-bk-3283, ECF No. 6990] (the "926 Stipulation"). In order to account for conflicts that counsel for the Committee had with certain defendants in the Lien-Scope AP, a second, nearly identical adversary complaint was commenced contemporaneously therewith, with the primary difference being the naming of different defendants in the second complaint. *The Financial Oversight and Management Board for Puerto Rico, as representative of Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Glendon Opportunities Fund LP, et al.*, Adv. Proc. No. 19-00367 (LTS) (D.P.R. May 20, 2019).

15

remaining assets or the proceeds thereof (other than the Accounts Receivable).[12]  Those remaining

assets include, among other things, the (i) cash and investments held by ERS prior to the issuance

of the ERS Bonds or proceeds thereof, (ii) the supplemental contributions participating employers

made to ERS known as the "Additional Uniform Contributions" (commenced pursuant to a 2013

amendment to the Enabling Act and not included in the definition of Pledged Property in the

Resolution), and (iii) Employee Loans and Employee Loan Payments.  *Id.* ¶ 8.

38.     On May 22, 2019, the Commonwealth filed its objection to the Fiscal Agent's

claims against the Commonwealth (the "Commonwealth Claim Objection"), asserting, among

other things, that the Fiscal Agent had no right or security interest in the post-petition Employers'

Contributions paid to ERS (and no right or security interest in the Paygo Payments), or in the

Transferred Assets, and, *a fortiori*, no claim against the Commonwealth resulting from the Post-

Petition Legislation [Case No. 17-bk-3283, ECF No. 7075].

## IV.     Movants Renew Consideration of the Lift Stay Motion

39.     On February 21, 2019, and in light of the Lien-Challenge Opinion, the ERS

Bondholders filed an urgent motion seeking expedited consideration of the Motion, claiming,

among other things, that the "automatic stay prevent[ed] Movants from exercising remedies to

prevent the diversion and dissipation of their collateral"  [ECF No. 367, ¶ 13] (the "Urgent

Motion").  The Court granted the Urgent Motion, setting a deadline to file supplemental briefs in

connection with the Motion for March 18, 2019 at 5:00 p.m. (Atlantic Standard Time) [ECF No.

371 at ¶ 2(e)], which was later extended to May 13, 2019 at 3:00 p.m. (Atlantic Standard Time),

[ECF No. 393 at 2], and extended again to June 21, 2019 [ECF No. 505 at 3].  The May 13, 2019

---

[12] In accordance with paragraph 13 of the 926 Stipulation, the Committee exercised its right to
allege that Pledged Property also does not include the Accounts Receivable.  Lien-Scope AP, [ECF
No. 1 ¶ 156 n.13].

order also set forth the schedule pursuant to which ERS, AAFAF, and the ERS Bondholders were permitted to take discovery. *Id.*

40.     On May 17, 2019, the Oversight Board and AAFAF filed an urgent motion in limine to exclude evidence and argument regarding an alleged meeting between the ERS Bondholders' representatives and financial advisors to a prior Puerto Rico gubernatorial administration [ECF No. 513].  The Court granted the motion on June 5, 2019 [ECF No. 544].  In doing so, the Court stated:

> Based on the current record, the Court's view is that evidence of intent to circumvent rights in collateral is, at best, of marginal relevance to the central question to be considered at the Stay Relief Hearing: ***whether bondholders have any security interest in employer payments under the PayGo system established by the Pension Reform Legislation***.  As Movants correctly point out, this inquiry will involve application of Puerto Rico secured transactions law as well as interpretation of the Bond Resolution dated January 24, 2008 (the "Bond Resolution"), which granted Movants a security interest in, and lien on, certain "Pledged Property" of ERS. . . .
>
> The Court anticipates that the Stay Relief Hearing will focus to a significant degree on whether PayGo payments constitute "rights arising out of" or "identifiable proceeds" of the employer contributions referenced in the Bond Resolution such that Movants retain a security interest in, or lien on, those funds, and whether the conversion to PayGo constituted a species of disposition of ERS employer contributions.  These issues must be determined based on the legal effects of the Pension Reform Legislation rather than the parties' alleged intentions as to what those effects should be.

*Id.* at 5, 6 (emphasis added).

## ARGUMENT

### I.     Movants Cannot Demonstrate "Cause" Exists to Lift the Automatic Stay.

41.     Title III of PROMESA incorporates section 362(d)(1) of the Bankruptcy Code, which states that the court "shall" provide relief from the automatic stay "for cause, including the lack of adequate protection of [a creditor's] interest in property."  11 U.S.C. § 362(d)(1).  The burden of proof on a motion to lift the stay is a shifting one.  Movants first must make an initial

showing of cause.  Only if Movants meet this burden is the debtor required to show lack of cause.

*In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 13, 23 (1st Cir. 2018).

42.     ERS Bondholders, as the creditors requesting adequate protection, must prove the

validity and extent of their interests.  *See In re Hunt's Pier Assocs.*, 143 B.R. 36, 50 (Bankr. E.D.

Pa. 1992).  Should they fail to do so, they are not entitled to adequate protection.  A movant whose

liens are subject to material dispute is not entitled to adequate protection.  *See In re Rice*, 82 B.R.

623, 626 (Bankr. S.D. Ga. 1987) (issues to be litigated under § 362, including adequate protection,

should not be addressed where the court is "presented with evidence . . . that strongly supports an

inference that the lien might be held invalid"); *see also In re Hunt's Pier Assocs.*, 143 B.R. at 50

(explaining that if the debtor's creditor cannot establish that it has a valid security interest, it is

treated as an unsecured creditor for purposes of § 362).  Movants do not meet their burden.

43.     To begin with, if the Court finds the ERS Bonds' issuance to be *ultra vires*, as

asserted by the Oversight Board, Creditors' Committee, retiree committee, and AAFAF, *see supra*

¶ 18, it should deny the Motion on that ground alone.  If the ERS Bondholders have no valid claim

on behalf of their ERS Bonds, they cannot have a security interest, and where evidence strongly

supports an inference that a security interest may be invalid, adequate protection issues should not

be addressed.  *See In re Rice*, 82 B.R. at 626.  Indeed, even if the Court rejects all the arguments

set forth in this opposition, the Court should first address the *ultra vires* issue before determining

if the stay should be lifted, or if any additional adequate protection is justified.

44.     Further, even assuming Movants can meet their burden to establish a valid interest

in the Debtor's property, Movants' sole basis for relief is that their security interests are not

adequately protected.  Motion ¶ 27.  This means that Movants, under the First Circuit's decisions

applying PROMESA, must supply evidence for the Court to (i) determine "the precise nature and

18

extent of [the creditor's] collateral," *see In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 1, 13

(1st Cir. 2018), *cert. denied sub nom. Peaje Invs. LLC v. The Fin. Oversight & Mgmt. Bd. for P.R.*,

139 S. Ct. 1169 (2019), (ii) make an "assessment of the pre-petition value of the bondholders'

collateral (if any exists)," *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 23 (iii) determine

"whether the bondholders face a threat of uncompensated diminution in such value" as a result of

the automatic stay,[13] *id.*, and (iv) if protection were warranted, determine what protection can be

provided short of allowing the bondholder to lift the stay to exercise their remedies.  *Id.* (citing

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988)).

45.    Movants' burden to obtain stay relief does not end there.  While the Lien-Challenge

Opinion determined that the ERS Bondholders "satisfied the filing requirements for perfection as

of December 17, 2015,"  914 F.3d at 703, it did not address (let alone determine), whether section

552 prevents the ERS Bondholders' security interest from attaching to any interest of ERS in

property acquired after ERS's petition date, or in which assets ERS Bondholders had a valid and

perfected security interest, and remanded those issues to this Court for further consideration in

light of the Lien-Challenge Opinion.  *See id.* at 720.  It also did not address the *ultra vires* issue.

Accordingly, all questions previously raised regarding the extent of the ERS Bondholders' security

interests remain unresolved, and critically relevant to consideration of the Motion.

---

[13] As this Court has previously recognized, creditors cannot show cause to lift the stay as a result
of any diminution in their collateral, but only when the diminution "*result[s] from the automatic
stay*" [ECF No. 313 at 2] (emphasis added).  *See also Banker Life Ins. Co. of Neb. v. Alyucan
Interstate Corp. (In re Alyucan Interstate Corp.)*, 12 B.R. 803, 808–09 (Bankr. D. Utah 1981)
("From what is the "interest in property" being protected?  The short answer is from any
impairment in value attributable to the stay. . . .  [N]ot every decline in value must be recompensed,
only those which, but for the stay, could be and probably would be prevented or mitigated."); *In
re Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) ("Read together, sections 361(1)
and 362(d)(1) provide that a party in interest shall be granted adequate protection *when the
continuation of the automatic stay causes* that party to suffer a decrease in the value of its property
interest.") (citing *Timbers of Inwood Forest*, 484 U.S. at 369).

46.     In sum, the ERS Bondholders assert a perfected security interest in (1) assets held by ERS (both as of the ERS Petition Date and today), and (2) the Paygo Payments.  However, the ERS Bondholders have failed to identify the interests for which they need adequate protection.[14] Further, if necessary, ERS can protect any collateral from diminution without resorting to the relief requested by Movants (including allowing them to commence a barrage of lawsuits outside of ERS's Title III Case).  Accordingly, there is no cause to lift the stay.

**A.     Movants Have Not Established the Nature and Extent of Their Alleged Collateral.**

47.     Movants have had ample opportunity to explain to ERS and this Court the nature and extent of their collateral.  They have failed to do so.  The Motion should be denied on this ground alone.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 13.

48.     In ERS's first set of interrogatories served on Movants (attached as Exhibit A to *Urgent Motion of Financial Oversight and Management Board, as Representative of Debtor, to Compel Answers to Interrogatories (and Production of Related Documents) from Movants Relating to the Stay Relief Motion* [ECF No. 403], the "Motion to Compel"), ERS asked Movants to "Identify Your collateral or Pledged Property[,]" both as of the date of the Motion to Compel, and of the ERS Petition Date.  *See id.*, Exhibit A at 6.  Movants responded by reciting the definition of "Pledged Property" from the Resolution, which all parties agree the Security Agreement describes as Movants' collateral.  *See id.*, Exhibit D at 7–8.  However, this definition sheds no new information on which assets of the Debtor, exactly, constitute "Pledged Property" subject to Movant's alleged security interest.

---

[14] The scope of Movants' alleged security interests in ERS's assets will be determined through the Lien-Scope AP.

49.     Movants are similarly conclusory, unspecific, and circular in the Motion itself. They contend "Movants hold a constitutionally-protected property interest, unless and until this Court rules otherwise in the [Lien-Challenge AP].  The ERS Bond Resolution provides for the 'pledge and assignment of, and the grant of a security interest in and over, the Pledged Property.'" Motion ¶ 22.  Without establishing the nature and extent of their collateral in the first instance (and assuming the bond issuance was not *ultra vires*), it follows that Movants cannot demonstrate a diminution in value therefrom.

i.     **Movants' Alleged Interest in ERS's Assets Is Limited To (at Most) the Pre-Petition Employers' Contributions and the Accounts Receivable.**

50.     Pursuant to the Lien-Challenge Opinion, the ERS Bondholders' alleged security interest became perfected on December 17, 2015, to the extent that security interest is described in the financing statement and to the extent the filing of a financing statement is a proper way to perfect a security interest in the assets in which the ERS Bondholders assert a security interest.  As explained more fully in the Lien-Scope AP, ERS asserts that the majority of ERS assets (*i.e.*, everything other than prepetition Employers' Contributions and Accounts Receivable) are not subject to the ERS Bondholders' security interest, because (i) all cash and investments are commingled, and are not identifiable cash proceeds of a perfected security interest in any collateral, and (ii) once pre-petition Employers' Contributions were transferred by the Fiscal Agent to ERS, such transferred funds are not covered by the Resolution's description of the ERS Bondholders' security interest.

51.     ERS acknowledges that, pursuant to the Security Agreement, the ERS Bondholders were granted a security interest in Employers' Contributions, which as of the ERS Petition Date extended only to (a) the pre-petition Employers' Contributions on deposit in the Pre-petition Segregated Account (which have since been paid to the ERS Bondholders pursuant to the

21

Adequate Protection Stipulation), and (b) the Accounts Receivable.  As described below, *see infra* ¶ 79, those assets are not subject to a diminution in value; accordingly, there is no basis for the Court to lift the stay.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 23; *see also In re of Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) ("Read together, sections 361(1) and 362(d)(1) [both incorporated by PROMESA section 301] provide that a party in interest shall be granted adequate protection *when the continuation of the automatic stay causes* that party to suffer a decrease in the value of its property interest.") (emphasis in original) (citing *Timbers of Inwood Forest*, 484 U.S. at 365).  The ERS Bondholders do not require stay relief as to funds they have already been paid, and, as explained further below, are adequately protected as to the Accounts Receivable.

### ii.       Movants Have No Security Interest in the Paygo Payments.

52.      As explained more fully in the Commonwealth Claim Objection, the ERS Bondholders have no security interest in the Paygo Payments.  First, the Paygo Payments made to the Commonwealth are plainly different than the Employers' Contributions made to ERS, and are neither a transfer nor disposition of assets subject to the ERS Bondholders' security interest.  *See* Commonwealth Claim Objection ¶¶ 69–73.  Second, the Fiscal Agent never had an attached security interest in future Employers' Contributions, as the "right to receive" Employers' Contributions arose only from time to time and only when an employee actually performed work for the relevant employer and only with respect to the Employers' Contributions with respect to that completed work.  *See id.* ¶ 74; *see also* March 21, 2018 Collazo Decl. ¶¶ 4–5.  Third, even if the ERS Bondholders were to have an interest in the Paygo Payments, as set forth clearly in the Lien-Challenge AP and the Commonwealth Claim Objection, Bankruptcy Code section 552 prevents the Fiscal Agent's security interest from attaching to any interest of ERS in property acquired after ERS's petition date.  Section 552 thus precludes any asserted security interest from

22

attaching to Employers' Contributions resulting from post-petition work, and also precludes any security interest from attaching to the Paygo Payments, which did not exist until after the ERS Petition Date. *See* Commonwealth Claim Objection ¶¶ 75–80.

53. Further, even if the ERS Bondholders had an attached and perfected security interest in future Employers' Contributions, and even assuming there has been a disposition of future Employers' Contributions, the Paygo Payments are not the "identifiable proceeds" of such disposition, as is required under Puerto Rico Uniform Commercial Code ("UCC")[15] section 9-315 for the ERS Bondholders' security interest to remain attached thereto. Specifically, UCC section 9-315(a) provides that:

> (1) a security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest . . . ; and

> (2) a security interest attaches to any ***identifiable proceeds*** of collateral.

UCC § 9-315(a) (emphasis added). As explained above, pursuant to the Post-Petition Legislation, the future collection of Employers' Contributions were terminated, not disposed of, so section 9-315(a)(1) is not implicated.

54. Even assuming for the sake of argument that the Paygo Payments were subject to the ERS Bondholders' security interest—and ERS submits they are not—they must also be (1) proceeds of collateral (*i.e.*, the Employers' Contributions or the "right to receive" same) that are (2) identifiable. The Paygo Payments are neither.

55. "Proceeds" means the following property:

> (A) whatever is acquired upon the sale, lease, license, exchange, or ***other disposition of collateral***;

> (B) whatever is collected on, or distributed on account of collateral;

---

[15] The UCC is codified at 19 L.P.R.A §§ 2001–2207.

(C) *rights arising out of collateral*;

(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

UCC § 9-102(a)(64) (emphases added).   As relevant to the Paygo Payments, the questions presented are:  first, are the Paygo Payments acquired upon the alleged "disposition" of the Employers' Contributions, UCC § 9-102(a)(64)(A), and second, if not, do the Paygo Payments arise out of the Employers' Contributions.  UCC § 9-102(a)(64)(C).  The secured party bears the burden to prove that an asset is "proceeds" of original collateral.  *See, e.g.*, *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 440 (7th Cir. 2005) (secured party has burden of providing status of property as proceeds); *Metropolitan Nat. Bank v. La Sher Oil Co.*, 101 S.W.3d 252, 255 (Ark. App., 2003) ("it is established law that a secured creditor has the burden to trace and identify the funds as the proceeds from secured collateral") (citing *Ragland v. Davis*, 782 S.W.2d 560 (Ark. 1990)).

56.    The Paygo Payments are not proceeds as provided for by UCC section 9-102(a)(64)(A), because even if there had been a "disposition"[16] of the Employers' Contributions which were made pursuant to the Resolution, the Paygo Payments were not "acquired"—by ERS, the Commonwealth, or any entity—upon any such disposition.  The asset ERS "acquired" (if any) upon any "disposition" of the Employers' Contributions was the Commonwealth's assumption of

---

[16] Standing alone, a disposition of the Employers' Contributions provides no benefit to the ERS Bondholders, as the Employers' Contributions have been eliminated and therefore have no value as a result of the Post-Petition Legislation.

24

ERS's obligation to make retirement benefit payments to pensioners.  Under Act 106, ERS has no access to the Paygo Payments, which are remitted to the Puerto Rico Department of Treasury.  *See* Act 106, § 1.6(g).  Accordingly, any security interest in proceeds that the ERS Bondholders obtained would be, at most, in ERS's right to require the Commonwealth to make payments to its beneficiaries pursuant to the Post-Petition Legislation.  Therefore, the Paygo Payments made by employers pursuant to the Post-Petition Legislation were not "acquired" by ERS (or any other entity) "upon . . . disposition" of the Employers' Contributions.

57.    The Paygo Payments are likewise not proceeds within the meaning of UCC section 9-102(a)(64)(C), because the Paygo Payments do not "arise" out of the Employers' Contributions (as such contributions are defined in the Resolution).  The term of art "arising out of collateral" used in the definition of "proceeds" is intended to refer to things such as derivative rights in intellectual property.  *See* Jonathan C. Lipson, *Financing Information Technologies:  Fairness and Function*, 2001 WIS. L. REV. 1067, 1134–35 (2001).  It is not a catchall phrase meant to encompass any assets that could be conceivably related to the collateral.  *See In re Las Vegas Monorail Co.*, 429 B.R. 317, 335 (Bankr. D. Nev. 2010).

58.    In *In re Las Vegas Monorail Company*, municipal bonds were issued pursuant to an indenture between the indenture trustee ("Indenture Trustee") and a governmental agency (the "Agency").  *Id.* at 324.  The proceeds thereof were lent to the Las Vegas Monorail Corporation ("LVMC").  LVMC also entered into a franchise agreement with the local county government to obtain permission to operate the monorail (the "Franchise Agreement").  *Id.* at 331.  The Agency was granted a security interest in the "contract rights" of the LVMC, including those of the Franchise Agreement, *id.* at 333, and assigned that security interest to the Indenture Trustee.  *Id.* at 331.

25

59.     In LVMC's bankruptcy proceeding, the Indenture Trustee argued that its security interest "render[ed] all money derived from the operation of the monorail as 'proceeds' of the Franchise Agreement[,]" citing to the definition of proceeds in Nevada's version of the uniform commercial code (*i.e.*, UCC § 9-102(a)(64)).  *Id.* at 333.  According to the Indenture Trustee, since LVMC could not run the monorail or collect fares without the Franchise Agreement, all fares must be, among other things, "rights arising out of the collateral."  *Id.* (quoting [Nevada's version of] UCC § 9-102(a)(64)).  The court disagreed:

> LVMC's grant of a security interest in the contract rights of the Franchise Agreement must be a security interest in a subset of the more general rights that flow from LVMC's franchise to operate the monorail.  Put differently, [LVMC] granted a security interest in certain rights—"contract rights"—contained within the Franchise Agreement, but not in all the entitlements and privileges represented by that agreement. . . .

> . . . "contract rights under" the Franchise Agreement are not the same as the Franchise Agreement itself; rather, like a security interest in the proceeds of any sale of an FCC license, LVMC's grant of a security interest in its contract rights under the Franchise Agreement gave the [Agency] a limited subset of rights.  As LVMC has not implicated those rights, LVMC's cash is not proceeds of the security interest granted in those contract rights.

*Id.* at 335–36 (citing *State ex rel. Masto v. Second Jud. Dist. ex rel. Washoe*, 199 P. 3d 828, 832 (Nev. 2011)).  Put succinctly, "for rights to "arise out of collateral," they must have been obtained as a result of some loss or dispossession of the party's interest in that collateral, not simply by its use."  *1st Source Bank v. Wilson Bank & Tr.*, 735 F.3d 500, 504 (6th Cir. 2013).  As discussed herein, the Paygo Payments are an entirely different asset that is calculated differently from Employers' Contributions and not remitted to ERS; accordingly, the former did not "arise out of" the latter under the UCC.

60.     Nonetheless, even assuming the Paygo Payments are proceeds of the Employers' Contributions, those proceeds are not identifiable.  When "proceeds" are monies that have been

26

commingled with other, "non-proceeds" money, the proceeds are "identifiable" only to the extent the proceeds can be "traced" into the remaining commingled funds. This tracing is done by using the lowest intermediate balance method. *See* UCC § 9-315(b)(2) and Restatement (2d), Trusts § 202 [UCC § 9-315, Comment 3] ("Among the 'equitable principles' of [tracing identifiable proceeds] whose use other law may permit is the 'lowest intermediate balance rule.'"); *see also, e.g.*, *Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988). To the extent the Court finds the Paygo Payments are the proceeds of the Employers' Contributions, the ERS Bondholders would need to undertake a forensic accounting analysis of each deposit into and withdrawal from the Commonwealth's account into which the Paygo Payments are deposited, to determine, what, if any, proceeds deposited into its bank accounts are identifiable.

61.     Additionally, the ERS Bondholders (and their experts) claim that "pay-as-you-go" funding is conceptually the same as any actuarially-determined pre-funding of future retirement obligations, and that a change from a funded defined benefit system to a "pay-as-you-go" defined benefit system is a change only in the timing of contributions made by the sponsors of that system to support benefit payments. Accordingly, they argue that the Post-Petition Legislation is a transfer of the collateral subject to their security interest pursuant to UCC section 9-315. First of all, this is completely beside the point. ERS Bondholders do not have rights under the Resolution in a system conceptually the same as a funded defined benefit system. They have rights in Employers' Contributions in a specific statutory construct, and no promise that the construct would remain the same or even materially the same. Expert testimony on whether the systems are conceptually similar is not germane. Second, even if the foregoing were inaccurate, their assertion is mistaken.

27

62.     A pre-funded pension plan aspires to have contributions made today on an *actuarial* basis, plus income generated from the contributions, to provide for payments for future benefits. Such a pre-funded pension plan would rely on an actuarial cost method for funding, which is a procedure for assigning the total projected costs of providing plan benefits (and expenses) to time periods, based on actuarial assumptions such as annual rate of return on plan assets, rates of mortality, and rates of retirement.   *See Expert Rebuttal Report of Lawrence J. Sher*, filed contemporaneously herewith, ¶ 11 & ¶ 10 n.2.  If contributions (both sponsor and employees) are made each year equal to the actuarially determined amount, and all actuarial assumptions are realized each year, the actuarial accrued liability will equal the plan's assets in all years, and no additional contributions will be needed.  *Id.* ¶ 13.[17]  The plan can attribute costs (of both the sponsor and employees) to fund benefits in various ways, *id.* ¶ 15; however, no matter how such costs are attributed, the defining feature of an actuarial pension plan is that costs are assigned to periods of employment.  *Id.* ¶ 16.

63.     By contrast, a "pay-as-you-go" payment system provides for a completely different method for calculating and paying pension benefits:  if a former employee (or such employee's beneficiary) is supposed to be paid at a given point in time, the payer of the benefit simply pays it at that time.  This approach is a non-actuarial approach because the costs are not assigned to periods before expected retirement (*i.e.*, they are not funded during periods of active employment). Instead, costs are incurred and paid entirely after retirement when each payment is due.  In addition, in the case of the Paygo Payments here, there is no "plan" or "trust" to fund, and therefore no investment income to be included.  *Id.* ¶ 19.

---

[17] Invariably, some assumptions do not materialize, and the amount of contributions necessary to maintain the plan's actuarial solvency adjusts to reflect the difference in projected assumptions as compared to realized performance.

64.     These differences are not merely theoretical.  An actuarial funding approach and a pay-as-you-go system operate on a completely different basis.  For example, if a parent supports their child's college education by paying tuition in full each year it comes due from income earned that year, such approach is a "pay-as-you-go" system.  If that same parent invested money in a college savings fund years in advance based on the expected cost of the child's college education, and made payments to that fund over time, that would be an actuarial system.

65.     To take a further (extreme) example:   Assume that all retirees (and their beneficiaries) associated with a contributing employer experienced a mortality event tomorrow. Under a pre-funded pension approach, amounts payable to those individuals would still have a funded actuarial cost (resulting in a potential for surplus assets in a pre-funded pension plan). However, there would no longer be a "pay-as-you-go" cost.  Now consider how this example would apply here.  Under the pre–2017 ERS system, the Employers' Contribution obligations to ERS were based on a percentage of current payroll for active employees.  Collazo Decl. ¶ 7.  Thus, in this (extreme) example, a contributing employer would have a contribution obligation to ERS even if no current retirees (or beneficiaries) were receiving payments at that time.  On the other hand, "pay-as-you-go" payments have nothing to do with current payroll and only reflect the cost of pension payments that happen to be owed in any given year to retirees and beneficiaries, and a contributing employer (in the example) would have no pay-as-you-go payment to make. Accordingly, the benefits system in place under the Post-Petition Legislation is more than a "change only in the timing" of the Employers' Contributions, and, the Paygo Payments, as a factually and legally different asset than the Employers' Contributions, is not subject to the ERS Bondholders' security interest.  *Cf. GMAC Bus. Credit, L.L.C. v. Ford Motor Co.*, 100 Fed. App'x 404, 408–09 (6th Cir. 2004) (holding that where raw material (here, steel) is "transformed" into a

"wholly new product," it becomes a different asset than it was prior to such transformation). Here, the old assets—the Employers' Contributions—have been completely terminated, and an entirely new asset—the Paygo Payments—has been generated. This new asset did not arise from the old asset, and accordingly is not proceeds subject to the ERS Bondholders' security interest. Consistent with this is the undisputed fact that the Paygo Payments are calculated differently from the Employers' Contributions, and remitted to reimburse the Commonwealth for the payments it has assumed. Collazo Decl. ¶¶ 6–7.

66. Thus, when the Post-Petition Legislation was enacted, no asset of ERS was disposed of, including any supposed "right to receive" Employers' Contributions. Accordingly, Movants cannot obtain stay relief to seek payment of Employers' Contributions from employers who previously participated in ERS.[18]

**B.    Movants Do Not Establish a Value of Their Alleged Collateral as of the ERS Petition Date.**

67. Movants provide no information regarding the value of their alleged collateral as of the ERS Petition Date. *See* Motion to Compel, Exhibit D at 7–8. Without establishing the value of their collateral, it follows that Movants' also cannot establish that their collateral has been diminished.[19] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 23 (indicating that a case for adequate protection would "seem to require some assessment of the pre-petition value of the

---

[18] If the ERS Bondholders prevail on their section 552 theories, Employers' Contributions generated until the implementation of the Post-Petition Legislation would be subject to the ERS Bondholders' security interest. However, the ERS Bondholders' security interest would still not attach to the Paygo Payments.

[19] Movants do allege generally, however, that the Commonwealth has been dissipating their right to Employers' Contributions, and that "funds in ERS-related accounts decreased from $513 million as of November 30, 2017 to $375.9 million as of December 31, 2018." Motion to Compel, Exhibit D at 8. However, as explained above, Movants' alleged security interest in such assets are subject to dispute in the Lien-Scope AP. They do not constitute Movants' collateral.

30

bondholders' collateral (if any exists), [and] whether the bondholders face a threat of uncompensated diminution in such value").

68.     On the ERS Petition Date, as set forth in the Collazo Declaration, ERS held assets including (a) cash in the Pre-petition Segregated Account totaling $186.5 million, which consisted solely of pre-petition Employers' Contributions, and (b) Accounts Receivable with a face value of $105.4 million (the "ERS Petition Date Assets").

69.     As explained above, the extent of Movants' lien extends only to (a) the pre-petition Employers' Contributions, and (b) the Accounts Receivable, corresponding to the two categories of assets discussed immediately above and in the Collazo Declaration.  Accordingly, the value of Movants' collateral as of the ERS Petition Date is the sum of those two categories, totaling approximately $291.7 million.  As to the assets which are not subject to Movants' security interest, including (i) those assets that are the subject of the Lien-Scope AP, *see supra* ¶ 50, and (ii) assets in which section 552 prevents the attachment of the ERS Bondholders' asserted security interest, ERS does not need to show that such assets are adequately protected.  *See supra* ¶ 42.  Further, even if additional ERS Petition Date Assets are Movants' collateral, to the extent such collateral is proceeds, such proceeds are not identifiable.  *See supra* ¶ 60; *see also, supra* ¶ 9 (noting *employee* contributions—*i.e.*, not the ERS Bondholders' collateral (among other "non-collateral")—has been deposited with ERS).  Nonetheless, if the Court disagrees and rules further adequate protection must be provided in addition to that which ERS has and is already providing (through the Pre- and Post-petition Segregated Accounts), ERS and the Commonwealth will segregate assets sufficient to satisfy such adequate protection requirement.

**C.     Movants Do Not Face a Threat of Uncompensated Diminution and Are Adequately Protected.**

31

70.     Prior to its decision regarding perfection, on August 6, 2018, the Court entered an
order requiring the parties to file a joint statement identifying material disputed facts regarding the
"attribution of any diminution in value resulting from the automatic stay" [ECF No. 313 at 2].  The
ERS Bondholders have never identified such diminution; instead, since then, they alleged ERS
"divert[ed] and dissipate[d]" collateral presumably through implementation of the Post-Petition
Legislation.  Urgent Motion ¶ 13.

71.     Now, Movants assert that, "[i]n a hearing for relief from the automatic stay, ERS
as the debtor bears the burden of proof on the question of adequate protection[.]"  Motion ¶ 21
(citing 11 U.S.C. § 362(g)).  This misstates the appropriate allocation of the burden of establishing
entitlement to stay relief.  Bankruptcy Code section 362(g) "does not address the burden of going
forward with evidence, which is generally placed on the party seeking relief."  3 COLLIER ON
BANKRUPTCY ¶ 362.10 (Alan N. Resnick & Henry J. Sommer eds., 16th rev. 2017).  Rather, section
362(g) addresses "the ultimate burden of persuasion or risk of nonpersuasion once evidence on
both sides of an issue has been presented."  *Id.*; *see also, e.g.*, *In re CGE Shattuck, LLC*, 99-12287-
JMD, 1999 Bankr. LEXIS 1880, at *9 (Bankr. D.N.H. Dec. 20, 1999) ("If the movant fails to make
an initial showing of cause, the Court may deny relief without requiring any showing from the
debtor that it is entitled to continued protection.").  Movants' conclusory statement in their Motion
does not meet their burden of going forward with evidence.

72.     Movants summarily assert in the Motion that they are entitled to adequate
protection, stating, "[s]ince ERS's Title III filing, ERS and the Commonwealth have taken actions
that have resulted in a decrease in value of Movants' collateral."  Motion ¶ 25.  But, Movants have
not provided evidence in the Motion, nor in their depositions, responses to interrogatories, or
requests for admission, of the value of their purported collateral as of the ERS Petition Date and

by how much such value has purportedly diminished.  *See* Urgent Motion ¶ 13 (stating "Movants sought relief from the automatic stay more than seven months ago on the basis that the Commonwealth was diverting and dissipating their collateral without providing adequate protection payments[,]" without analyzing the purported collateral's value or diminishment thereof).

73.     Movants have had numerous opportunities, at every stage of this proceeding to show there has been diminution in the value of their alleged collateral.  On each occasion, they have failed to do so, much less show the value of their collateral in the first instance.  *See Movants' Responses and Objections to Debtor's First Set of Interrogatories*, March 8, 2019, at 5 ("Movants further state that they do not possess all the information necessary to . . . determine the exact value of the Pledged Property as of a given date, or . . . specifically identify all actions taken by ERS, the Commonwealth, and others in furtherance of the plan to deplete the value of the Pledged Property."); *Movants' Supplemental Responses and Objections to the Debtor's Interrogatory Numbers 5, 6, 8, and 9*, April 15, 2019, at 4–5 ("Movants are unable to state the value of their collateral or Pledged Property as of the first day of the month, for each month since the date on which the ERS Title III Case was commenced, May 21, 2017."); *Movants' Responses and Objections to the Oversight Board's First Set of Contention Interrogatories*, May 24, 2019, at 21 ("Movants are without all of the information they would need to determine the value of the Pledged Property as of May 21, 2017 and the later dates in this Interrogatory 5").

74.     Instead, Movants promised that the question of diminution in value of their alleged collateral would be addressed by their designated experts.  *Id.* at 15 ("Movants further state that the testimony of their designated experts will address whether there has been a diminution in value of the Pledged Property.").  When the time came, however, their experts were similarly silent on

the topic.  *See* Sabry Dep. Tr. 43:16–21, June 20, 2019 ("Q:  [C]an you point me to any statement in Exhibit 1 [Expert Report of Faten Sabry] where you say that it is your opinion one way or the other whether there has been diminution in value of collateral of ERS bonds?  Witness:  No.").

75.     Courts routinely deny stay relief when movants fail to provide sufficient evidence that the value of their collateral has diminished since the petition date, as Movants have failed to do so here.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 23; *see also, e.g.*, *In re Blue Leopard, LLC*, 16-10686-MKN, 2016 Bankr. LEXIS 4700, at *9 (Bankr. D. Nev. Sept. 22, 2016) ("While [movant] has demonstrated that the Debtor lacks equity in the [collateral] by reference to admissions in the Debtor's real property Schedule D, [movant] has not provided evidence by way of any appraisal or another admission that the property has declined in value. Thus, [movant] has not met its burden of proof for obtaining relief for cause under section 362(d)(1)."); *People's United Bank v. Lombardo's Ravioli Kitchen, Inc.(In re Lombardo's Ravioli Kitchen, Inc.)*, 08-20774, 2009 Bankr. LEXIS 550, at *10 (Bankr. D. Conn. Feb. 20, 2009) ("[Movant], having failed to provide any evidence that the collateral is decreasing in value, has not made the requisite 'initial showing of cause' and is therefore entitled neither to relief from stay under § 362(d)(1) nor to adequate protection payments under § 361."); *In re CGE Shattuck, LLC*, 1999 Bankr. LEXIS 1880, at *9 ("Here, the movant failed to present sufficient evidence to make an initial showing that the value of its collateral had deteriorated since the petition date. Accordingly, relief from the automatic stay for cause under § 362(d)(1) is denied.").

76.     Significantly, Movants must carry their burden of going forward on the cause of any collateral value diminution, not just the diminution.  Bankruptcy Code section 361 provides adequate protection to protect against diminution arising from the automatic stay, use of the collateral under section 363 (which does not apply in Title III), and liens granted under section

34

364. Here, however, Movants are complaining about legislation by the Commonwealth creating a new pension system that does not generate Employers' Contributions. As such, neither the automatic stay, use of collateral under Bankruptcy Code section 363, nor granting liens under Bankruptcy Code section 364 are at issue.

77.     Moreover, Movants would have this Court ignore that, despite the meritorious challenges by ERS to their alleged security interests that have now been fully briefed (as well as the possibility that the ERS Bonds issuance was *ultra vires*), the ERS Bondholders have received $186.5 million in post-petition payments as adequate protection (and $214.2 million, including interest, in total payments from the Pre-petition Segregated Account), and have the benefit of an additional $93.9 million in adequate protection that has been set aside (and continues to earn interest) in the Post-petition Segregated Account pursuant to the Adequate Protection Stipulation. Given the substantial value Movants have received to date despite presenting zero evidence of diminution in value of their purported security interest from the causes listed in Bankruptcy Code section 361, which security interest may well be invalid and unenforceable, no further adequate protection (in addition to those funds in the Post-petition Segregated Account) is warranted and stay relief should not be granted.[20]

78.     Independent of which party must carry the burden on (1) diminution, and (2) the cause of any such diminution, there has been and will be no diminution of the ERS Bondholders' collateral. In contrast to the "nature and extent" of collateral, the determination that there is no diminution is not complex. The alleged collateral can be broken down into two categories: (a) the

---

[20]   Of course, the Debtor reserves all its rights regarding how such payments should be treated under any plan of adjustment involving the Debtor or as a result of any adversary proceeding involving the Debtor.

ERS Petition Date Assets; and (b) the "right to receive" Employers' Contributions that the ERS

Bondholders contend was transferred to the Commonwealth.

> ### i.  The ERS Petition Date Assets are Not at Risk of Diminution and Are Adequately Protected.

79.    The ERS Petition Date Assets subject to the ERS Bondholders' security interest are

not at risk of diminution as a result of the automatic stay.  The $186.5 of cash in the Pre-petition

Segregated Account has been paid to the Fiscal Agent for the benefit of ERS Bondholders.  Collazo

Decl. ¶ 13(a).  As of the ERS Petition Date, ERS had $105.4 million in Accounts Receivable.

ERS's auditors have given ERS an allowance for roughly $82.6 million of old, uncollectible

amounts such that ERS's accounting records now reflect $22.8 million in Accounts Receivable

owed from before July 1, 2017.  While this is merely an accounting update and not a diminution,

even if it were a diminution, taken together with the $93.9 million in the Post-petition Segregated

Account, the ERS Bondholders' security interests in the Accounts Receivable is protected as to

the whole $105.4 million.  *Id.* ¶ 13(b)–(c).  Accordingly, no diminution in value of these ERS

Petition Date Assets has occurred, and the ERS Bondholders are not entitled to adequate protection

thereto (or, if diminution has occurred, they are adequately protected by the assets in the Post-

petition Segregated Account, in addition to the Accounts Receivable).[21]

---

[21]  As ERS explained in *The Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Responses and Objections to ERS Bondholders' Amended Interrogatories*:

> ERS contends that Movants have no rights to Pay-Go fees remitted to the Commonwealth and that the ERS Bondholders' asserted security interests, if any, are adequately protected by the payments ERS has made from the Prepetition Segregated Account and the funds maintained in the Postpetition Segregated Account, which together equal or exceed the value of all protection to which the ERS Bondholders would be entitled.

*Id.* at 5.

36

ii.   The "Right to Receive" Employers' Contributions (Such Right
Allegedly Constituting the Paygo Payments) is Not at Risk of
Diminution and is Adequately Protected.

80.     The asserted security interest in Paygo Payments, which the Debtor disputes, is also
not diminishing.  If the ERS Bondholders establish a valid security interest in the Paygo Payments,
their claims will be amply secured.   In the eleven months starting with July of 2017, Paygo
Payments totaled $1.21 billion [ECF No. 307-17 at 4].[22]   As set forth in the *Declaration of Gaurav
Malhotra in Connection with Motion for Relief from the Automatic Stay*, filed contemporaneously
herewith, the certified fiscal plan for the Commonwealth of Puerto Rico (the "Fiscal Plan")
provides for annual Paygo Payments of approximately $47.7 billion on a nominal basis over the
next 40 years.  *Id.* ¶ 15.  These projections show that, if Movants were to have valid, perfected
security interests in Paygo Payments, such payments have a net present value ranging from $26.2–
26.9 billion (depending on the discount rate used).  *Id.* ¶¶ 14–18.  The value of such payments
provided for by the Fiscal Plan is far in excess of the payments required to pay in full the monies
owed to the ERS Bondholders on their $2.9 billion in outstanding ERS Bonds[23]—nearly a factor
of ten more than is necessary to satisfy the ERS Bondholders' asserted claim.  Accordingly,
Movants' asserted security interests are adequately protected, because the value of Paygo
Payments exceed the outstanding amount on the ERS Bonds.  *See Baybank-Middlesex v. Ralar
Distribs., Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995) ("A sufficient equity cushion is itself a

---

[22] This includes Paygo Payments from the central government of $983.0 million, from public
corporations of $179.7 million, and from municipalities of $47.0 million.

[23] The ERS Bondholders filed a claim in the amount of approximately $3.8 billion, which assumes
a right to both accreted and accrued interest.  *See* Proof of Claim No 16777, filed May 24, 2018
by the Bank of New York Mellon, as Fiscal Agent, against Debtor ERS.  Even assuming (without
conceding) that is the appropriate amount of the value of the ERS Bondholders' claim, the Paygo
Payments are likewise far in excess of that amounts needed to fully secure such asserted claim.

recognized form of adequate protection, thus collateral valuation is a logical step in making an

adequate protection determination."). Thus, the ERS Bondholders are adequately protected by an

"equity cushion."

81.     Because Movants have failed to establish any diminution in value of their alleged

collateral, and do not face any threat of an uncompensated diminution, Movants are not entitled to

stay relief due to lack of adequate protection pursuant to Bankruptcy Code section 362(d)(1).

**D.     ERS Can Protect Movants' Interest Such that Movants Should Not Be
Permitted to Lift the Stay.**

82.     Even assuming Movants have a security interest in collateral which is both (a) being

diminished, and (b) not currently being adequately protected, ERS can adequately protect that

interest without opening up ERS—and the Commonwealth and its instrumentalities—to the chaos

that would result if Movants are allowed to lift the stay.

83.     Movants foreshadow the barrage of litigation they intend to bring if the stay is

lifted. According to Movants:

> The automatic stay prevents Movants from exercising remedies to prevent the
> diversion and dissipation of their collateral, including, but not limited to, enforcing
> their liens, seeking relief under § 407 of PROMESA for unlawful inter-debtor
> transfers of property, and pursuing litigation against municipalities and public
> corporations not currently in Title III proceedings.

Urgent Motion ¶ 13. Movants previewed a similarly aggressive litigation strategy when they first

sought adequate protection before this Court. In the hearing on the ERS Bondholders' original

motion to lift the stay [ECF No. 26], the Court asked counsel for the bondholders "[what do] [y]ou

want relief from the stay to do?" June 28, 2017 Hr'g Tr. at 44:24 [ECF No. 159]. Counsel

responded by indicating they would commence a multitude of lawsuits in courts both inside and

out of this Title III proceeding:

> Your Honor, I think we would be enforcing rights in about five or ten different
> directions in many courts. What is being perpetrated here is—it's just an

38

outrageous series of takings, contract clause violations, breaches of duty, and we will—we will basically be seeking to enforce the rights of the ERS holders to the full extent of the law.

And I think some of that will happen here and some of it in other courtrooms. . . .

*Id.* at 45:1–9.

84.     ERS believes such a litigation offensive would be detrimental to both the ERS Bondholders' interests and ERS, by expending valuable resources on unnecessary litigation, and distracting the Commonwealth, and its public corporations and municipalities, from their critical work in running efficiently and returning the Commonwealth and its instrumentalities to solid fiscal footing.  In light of the outstanding *ultra vires* challenges, and the pendency of the Undecided Issue, lifting the stay to allow such litigation would be especially wasteful and inappropriate.[24]

## CONCLUSION

85.     For the foregoing reasons, the Court should deny the Motion in its entirety.

Dated: June 21, 2019
         New York, NY

                                             Respectfully submitted,

                                              */s/   Brian S. Rosen*
                                             Martin J. Bienenstock (*pro hac vice*)
                                             Brian S. Rosen (*pro hac vice*)
                                             Jeffrey W. Levitan (*pro hac vice*)
                                             Paul V. Possinger (*pro hac vice*)
                                             Joshua A. Esses (*pro hac vice*)
                                             **PROSKAUER ROSE LLP**
                                             Eleven Times Square
                                             New York, NY 10036
                                             Tel:  (212) 969-3000
                                             Fax:  (212) 969-2900
                                             Email:  mbienenstock@proskauer.com
                                             Email:  brosen@proskauer.com

---

[24] If the Court concludes the ERS Bondholders are entitled to additional adequate protection, ERS and the Commonwealth will deposit in segregated accounts the necessary amounts.  As always, any Budget or Fiscal Plan propounded by the Oversight Board will be in compliance with any order(s) of this Court resolving this Motion.  Accordingly, there is no cause to lift the stay to allow Movants to pursue remedies outside of this Title III case.

Email:  jlevitan@proskauer.com
Email:  ppossinger@proskauer.com
Email:  jesses@proskauer.com
*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

 */s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax. 787.722.1932
dvelawoffices@gmail.com

OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
434 Avenida Hostos
San Juan, PR 00918
Tel: (787) 751-6764/ 763-0565
Fax: (787) 763-8260

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli