# EXHIBIT JJ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

In re:
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,
                    as representative of
THE COMMONWEALTH OF PUERTO RICO, et al.
                    Debtor,
_____

In re:
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
                    as representative of
THE EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO,
                    Debtor.


Two Vesey Street

New York, New York

June 4, 2019 - 9:36 A.M.


     EXAMINATION BEFORE TRIAL of LUIS COLLAZO
RODRIGUEZ, the Witness herein, taken by the
attorneys for the respective parties, pursuant to
Notice, held at the above-stated time and place,
before Melissa Leonetti, RPR, a Notary Public of the
State of New York.

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

6

1                         L. COLLAZO

2     testified as follows:

3     EXAMINATION BY

4     MATTHEW PAPEZ, ESQ.:

5          Q.     Good morning, Mr. Collazo.

6          A.     Good morning.

7          Q.     Could you state your name for the record,

8     please.

9          A.     Luis Manuel Collazo Rodriguez.

10         Q.     We have an interpreter here for you

11    today, and you should feel free to ask for her

12    assistance as much as you would like.

13         A.     Very well.

14         Q.     However, if you don't need her assistance

15    for any question or -- we can proceed in English and

16    that may be quicker.

17         A.     Perfect.

18         Q.     Okay.  So why don't we do this.  I will

19    ask the questions in English, and if you understand

20    the question in English, answer it and let's stop

21    with the interpretation for a sec.

22                I will ask questions in English.  If

23    you understand in English, go ahead and answer.

24    If you answer in English, that's great.  If you

25    need to answer in Spanish, please do and we'll get

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

8

1                         L. COLLAZO

2      Is that fair?

3            A.    I understand, yeah.

4            Q.    If you don't understand a question that I

5      ask, just let me know and I will try to rephrase it.

6            A.    That's what I would do.

7            Q.    If you answer one of my questions, I'm

8      going to assume that you understood the question.

9            A.    Okay.

10           Q.    For the sake of the court reporter, we

11     need to be careful not to talk over each other.

12     That may be a little difficult with the interpreter,

13     but we'll both do the best we can.   Okay?

14           A.    Perfect.

15           Q.    What is your position at ERS?

16           A.    Well, currently I'm the administrator of

17     the system of retirement, and executive director of

18     the Committee for Retirees since 2018, August.

19     Retirement Board since August of 2018.

20           Q.    How old are you?

21           A.    33 years old.

22           Q.    When did you start working for ERS?

23           A.    In April of 2014 -- of 2014.

24           Q.    Please give me just a very brief

25     descriptions of the positions you have had at ERS

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

9

1                        L. COLLAZO

2    since 2014.

3        A.    Okay.  Well, as I mentioned, in April of

4    2014, I started as a lawyer in the division of

5    retirement.  I was there representing the retirement

6    funds in terms of the Administrative Board for

7    Retirement and in terms of the courts of Puerto

8    Rico, and other legal matters which were requested

9    of me.

10            I was working for three years as a

11   lawyer in the legal division until the date of the

12   1st of May of 2017, which is when I started

13   working for the Retirement Board, after having

14   been confirmed by the Retirement Board.

15            MR. PAPEZ:  Lodge a translation

16        objection.  I don't think the witness said

17        Retirement Board.  I think he said retirement

18        system, ERS.

19       A.    The system of retirement.  You're

20   correct.  May 1, 2017.  So then in August of 2018, I

21   was named to the Retirement Board as the executive

22   director.

23       Q.    Okay.  Just so I understand, in May of

24   2017, you began working for the -- I'm sorry.

25   That's not correct.  Let me start over.

Video Deposition of Luis Rodriguez, 6/4/2019

10

1                    L. COLLAZO

2           Tell me again the position you started

3    on May 1, 2017.

4        A.    Administrator of retirement systems.

5        Q.    I see.  And then you still have the title

6    of administrator of retirement systems today?

7        A.    Correct.

8        Q.    And in addition, now you are also the

9    executive director of the Retirement Board?

10        A.    Correct.

11        Q.    When you say administrator of retirement

12    systems, are you referring to ERS, the JRS, and the

13    TRS?

14        A.    When I refer to my role as administrator

15    of retirement systems, I'm referring to ERS and JRS.

16    However, on the other hand, as the executive

17    director of the board of retirement under that board

18    is also TRS.

19        Q.    My questions today are going to be about

20    ERS unless I broaden to cover TRS or JRS.

21        A.    Very well.

22        Q.    When you became the administrator of the

23    retirement systems in May of 2017, did you stop

24    providing legal services at that point?

25                    MR. POCHA:  Objection to the form of

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

15

1                           L. COLLAZO
2    could have had a conversation with some member of
3    the staff that I don't remember right now.
4         Q.    When you reviewed documents, did you --
5    what types of documents did you review?
6         A.    Well, there were so many documents.
7         Q.    Were they all provided by your lawyers?
8         A.    Correct, the ones that were offered to me
9    by my lawyers.
10        Q.    Did you ask to see any other documents
11   other than what were provided by your lawyers?
12        A.    No.
13        Q.    All right.
14              I want to see if we can agree on just
15   some basic background facts about ERS.  First of
16   all, ERS, before June of 2017, administered a
17   pension plan with three different benefit
18   structures; is that right?
19              MR. POCHA:  Objection to the form.
20        A.    Well, so far as I understand, there's two
21   main structures, one which is defined and the other
22   one which is for -- one is for defined benefits and
23   the other one is for defined contributions.
24              When I refer to defined benefits, I'm
25   referring to Law 447 and Law 1.  And when I refer

Video Deposition of Luis Rodriguez, 6/4/2019

16

                         L. COLLAZO

1

2    to defined contributions, I'm referring to the

3    reform number 2000 which later passed into the

4    defined contributions for Law 3 from 2013.

5        Q.    I've also seen references to a hybrid

6    program.  And again, this is just background.  It

7    doesn't really matter.

8              Is there a hybrid program?

9        A.    Well, yes, correct.  Well, it used to

10   exist from the 1st of July of 2013 to the 30th of

11   June of 2017.

12       Q.    All right.  I'm going to use the same

13   nomenclature that you did and refer to the system or

14   the Law 447 or Act 446 as the defined benefit

15   portion of the program.

16             For the defined contribution program,

17   I'll call that System 2000, if that's okay with

18   you.

19       A.    Okay.

20       Q.    All right.

21             Now, before June of 2017, I understand

22   that ERS would receive employer contributions from

23   various sources; is that correct?

24             MR. POCHA:  Objection to the form.

25       A.    He was saying employer benefit

17

                         L. COLLAZO

1

2    contributions.  Yes.  Before the 30th of June of

3    2017, ERS received employer contributions from

4    corporations and especially from corporations and

5    municipalities.

6         Q.    Before June 30 of 2017, was the

7    Commonwealth also obligated to make employer

8    contributions to ERS?

9              MR. POCHA:  Objection.  Calls for a

10        legal conclusion.

11        A.    It did have the requirement of making

12   employer contributions except that it didn't arrive

13   at -- it didn't get to ERS.  It would go directly to

14   an account that was within the Department of

15   Treasury.

16        Q.    Just so I understand, for the

17   Commonwealth's employer contributions, they would

18   not actually transfer funds into ERS but would

19   instead make accounting entries at the Department of

20   Treasury?

21              MR. POCHA:  Objection to the form.

22        Also scope.  If you could identify a time

23        period.

24        Q.    Before June 2017, do I understand you to

25   be saying that the Commonwealth's employer

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

18

1                         L. COLLAZO

2    contributions would not actually result in funds

3    being transferred into ERS?

4              MR. POCHA:  Objection.  Outside the

5         scope.

6    A.    So far as I understand, that is correct.

7    Q.    Before June 2017, would ERS invest its

8    revenues in investment assets?

9              MR. POCHA:  Objection to the form.

10   A.    Yes, some assets were invested in

11   different types of investments.

12   Q.    Okay.  Was one of the purposes of the

13   investment of the assets in order to build up a fund

14   to help pay pension benefits?

15   A.    Yes.  So far as I understand, yes.

16   Q.    Before June of 2017, were employer

17   contributions calculated based on a percentage of

18   each employer's payroll?

19   A.    Correct.

20   Q.    Between 2013 and June of 2017, did

21   employers also contribute what were known as

22   additional uniform contributions to ERS?

23             MR. POCHA:  Objection to the form and

24        also outside the scope.

25   A.    Law 3, which is established, confirms the

AD advanced depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

19

L. COLLAZO

1

2  obligations of returning the employer contributions

3  -- the additional uniform contribution.

4      Q.    Just so we're clear, in 2013, Law 3 was

5  enacted and it required, among other things, that

6  employers make additional uniform contributions to

7  ERS?

8              MR. POCHA:   Objection.   Outside the

9         scope.   Calls for a legal conclusion.

10     A.    Yes, Law 3 establishes additional uniform

11 contributions.

12     Q.    All right.   Just a little bit more

13 background.

14             The additional uniform contributions

15 were determined using an external actuary; is that

16 correct?

17             MR. POCHA:   Objection.   Outside the

18        scope.

19     A.    So far as I understand, yes.   It was

20 according to a formula that was through the

21 employer, and that was determined by the agent,

22 actuary.

23     Q.    Was the actuary Milliman, Inc.?

24     A.    So far as I do understand, it was in that

25 time Milliman, Inc.

AD advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

21

1                            L. COLLAZO

2              MR. PAPEZ:  No.

3       Q.    My first question is:  Do you recognize

4  this as the independent auditor's report for ERS as

5  of June 30, 2016?

6       A.    Yes.  So far as I understand, yes.

7       Q.    And KPMG was ERS' auditors in the -- for

8  the fiscal year ended June 2006?

9       A.    Yes.

10      Q.    Is KPMG still ERS' auditors?

11      A.    Correct.

12      Q.    Did ERS provide information to KPMG in

13 connection with the audit for fiscal year ended June

14 30, 2016?

15             MR. POCHA:  Objection.  Outside the

16       scope.

17      A.    So far as I understand, I understand that

18 that is yes.  That's the process, right, to be able

19 to work with the auditors, to be able to offer them

20 information.

21      Q.    If you could turn first to page 6 in the

22 audit report.

23      A.    (Witness complies.)

24      Q.    I just have a couple of questions on

25 this.  If you look in the liabilities section of the

22

1                         L. COLLAZO

2    table there, there's an entry for due to

3    Commonwealth of Puerto Rico, and it has entries for

4    -- let's just pick 2016 of $91 million.

5              My question is:  Do you know what those

6    liabilities due to the Commonwealth of Puerto Rico

7    are?

8              MR. POCHA:  Objection.  Outside the

9        scope.

10       A.    Are you referring to the 91,464-?

11       Q.    Yes.

12       A.    I would have to see the date when that

13   payment was emitted.

14       Q.    Down a few more lines on that same page,

15   do you see the entry for bonds payable?

16       A.    It's there.

17       Q.    Do you understand those entries to be

18   referring to the pension obligation bonds that ERS

19   issued in 2008?

20             MR. POCHA:  Objection.  Outside the

21       scope of deposition.

22       A.    I understand that to be so.

23       Q.    Okay.  Just so we're on the same page,

24   in 2008, ERS issued various pension obligation

25   bonds, correct?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

23

1                    L. COLLAZO

2      A.    Yes, correct.

3      Q.    And it received, ERS in return, around $3

4  billion from the issuance of the bonds?

5            THE INTERPRETER:  Can you --

6            MR. PAPEZ:  Let me rephrase that again.

7      Q.    ERS received approximately $3 billion in

8  return as a result of the issuance of the bonds?

9            MR. POCHA:  Objection to the form.

10     A.    Yes.  So far as I understand, yes.

11     Q.    Okay.  And in -- when it received the

12 pension obligation bonds -- sorry.

13           MR. PAPEZ:  Strike that question.

14     Q.    The pension obligation bonds required ERS

15 to make interest and pension payments on the pension

16 obligation bonds over the course of several decades,

17 correct?

18           MR. POCHA:  Objection.  Calls for a

19      legal conclusion.

20     A.    So far as I understand, yes.

21     Q.    When it issued the pension obligation

22 bonds, ERS granted the holders of the bonds a

23 security interest in various assets in ERS?

24           MR. POCHA:  Objection.  Also calls for

25      a legal conclusion.  And the bond resolution

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

24

                        L. COLLAZO

1
2      speaks for itself.

3          A.    To that effect, it exists.  There's a

4      bond resolution that exists.  That says what it

5      says, and it establishes what it establishes.

6          Q.    In your position as the administrator of

7      ERS, did you understand that certain bondholders

8      claimed a security interest in various assets of

9      ERS?

10         A.    Can you repeat the question.

11         Q.    I'm just asking you in your position as

12     the administrator of ERS before June of 2013, did

13     you understand that certain bondholders claimed that

14     they had a security interest on some of the assets

15     of ERS?

16         A.    I understand that there was a claim on

17     behalf of certain groups of bondholders.

18         Q.    And one of the assets that the

19     bondholders claimed was subject to the security

20     interest were the future employer contributions that

21     ERS was entitled to?

22              MR. POCHA:  Objection.  Calls for a

23         legal conclusion.

24         A.    So far as the security interest that's

25     alleged, it's something that the courts will have to

25

                          L. COLLAZO

1

2    confirm and decide on their day when this process

3    goes forward.

4        Q.    Just to be clear, I'm not asking you to

5    agree that the security interest is valid or exists.

6    I'm just asking was ERS aware that certain

7    bondholders claimed they had a security interest on

8    future employer contributions to ERS?

9        A.    Yes, I know that claim.

10       Q.    And you understood that before June of

11   2017?

12       A.    (No verbal response given.)

13       Q.    Did you understand that before June of

14   2017?

15       A.    Yes.  To the best of my knowledge, yes.

16       Q.    All right.  Going back to the time period

17   between -- let's say between January of 2017 and

18   June of 2017, would you agree that -- let's start

19   with the Commonwealth -- was not making the full

20   amount of employer contributions it was required to

21   make?

22            MR. POCHA:  Objection to the form of

23       the question.

24       A.    Are you referring to the Commonwealth

25   specifically?

Video Deposition of Luis Rodriguez, 6/4/2019

26

1                      L. COLLAZO

2       Q.     Yes, the Commonwealth central government.

3       A.     To the best of my knowledge, they were

4   making payments.  Of course, it's possible they did

5   have some type of debt.

6       Q.     Between -- well, let's start with the

7   municipalities, then.  Between January of 2017 and

8   June of 2017, were the municipalities making the

9   full amount of the employer contributions they were

10  required to make?

11      A.     Some municipalities would make their

12  entire payment and others, so far as I understand,

13  did have some type of debts.

14      Q.     With regard to the public corporations,

15  is it the same in the sense that some were making

16  the full amounts and some were not?

17              MR. POCHA:  Objection to the form.

18      A.     Yes, that's what I understand, too.

19      Q.     With regard to the additional uniform

20  contributions we talked about earlier, were all the

21  municipalities paying the full amount of AUCs that

22  were required?

23              MR. POCHA:  Objection.  Vague as to

24          time.

25      Q.     For your counsel's benefit, between


advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

27

```
 1                    L. COLLAZO
 2  January and June of 2017.
 3      A.     To the best of my knowledge, some were
 4  making partial payments, and yes, the others were
 5  making the full payments, which means that yes,
 6  there were some that were in debt and were not
 7  depositing the full amount.
 8      Q.     Okay.  Is the same true with regard to
 9  the public corporations in the same time period?
10      A.     To the best of my knowledge, yes.
11      Q.     All right.
12             I'm going to hand you what we marked
13  last week as Exhibit 4.  This is a very long
14  document.  I'm going to direct your attention to
15  various excerpts and ask you about them.
16             First, if you can turn to page 230.
17      A.     (Witness complies.)
18      Q.     In the paragraph that begins "pursuant to
19  the constitutional."
20      A.     Yeah.
21      Q.     The last sentence of that paragraph says:
22  The Commonwealth, however, has continued to
23  partially make its employer contribution to the ERS
24  subject to the offset of the amount of debt service
25  payable on the pension bonds discussed above.
```

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

29

1                          L. COLLAZO

2              Objection.   Outside the scope.

3        A.     To the best of my knowledge, I know of

4   the existence of this executive order, but beyond

5   this text, right, more than what it expresses, I

6   don't feel like I can offer an interpretation that's

7   further than what it states.

8        Q.     Okay.  If you can turn to page 232.

9        A.     (Witness complies.)

10       Q.     Top of -- or I guess the second full

11  paragraph starts "history funding shortfalls," it

12  says:  For several fiscal years, actual employer and

13  employee contributions to each of the retirement

14  systems have been lower than annual basic system

15  pension benefit payments and administrative

16  expenses.

17             My question is:  Do you agree with that

18  statement as of January 2017?

19             MR. POCHA:  Same objection.  Outside

20       the scope.

21       A.     Well, to the best of my knowledge, it may

22  indicate, yes.

23       Q.     All right.  If you look down to the next

24  paragraph -- I'm not going to read it all into the

25  record and ask you to read it to yourself.

Video Deposition of Luis Rodriguez, 6/4/2019

30

1                         L. COLLAZO

2        A.     Yes.

3        Q.     Just let me know when you're done.

4        A.     Okay.  Yes, I'm ready.

5        Q.     Do you agree that as of January of 2017,

6    ERS was covering its funding shortfalls with

7    investment income loans from financial institutions

8    and various nonrecurring sources of funds?

9               MR. POCHA:  Objection.  Outside the

10        scope.

11              THE INTERPRETER:  Can you repeat the

12        question.

13       Q.     Do you agree that as of January 2017, ERS

14   was covering its funding shortfalls with investment

15   income, loans from financial institutions, and

16   various nonrecurring sources of funds?

17              MR. POCHA:  Objection.  Outside the

18        scope.

19       A.     I have knowledge, to the best of my

20   knowledge, about the retirement system.  It was

21   using that to pay the pension from -- that's right,

22   from different sources, to be able to pay.  Yes.

23   Individual contributions, employer contributions,

24   proceeds of loans.  And yes, some other income

25   sources.

31

1                        L. COLLAZO

2       Q.     Okay.   In January of 2017, was ERS

3  selling its investment assets in order to fund

4  pensions?

5       A.     Yes.   According to the best of my

6  knowledge, it was operating.   Yes.   At the end of

7  fiscal year, they were liquidating assets to be able

8  to cover the amount of pensions that the system did

9  not have.

10      Q.     If you can turn to page 211 in that

11 document, please.

12      A.     (Witness complies.)

13      Q.     There's a paragraph that begins "as an

14 integral part."

15      A.     Uh-huh.

16      Q.     About halfway through that paragraph,

17 there's a statement that says:   Due to the worsening

18 fiscal crisis since the enactment of Act 3/2013,

19 however, the Commonwealth and other participating

20 employers have been unable to pay most of the ERS

21 AUC and, as a result, the ERS projects that it will

22 deplete its liquid assets during the current fiscal

23 year or first half of fiscal year 2018.

24              My question is:   As of January 2017, do

25 you agree with that statement?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

32

                        L. COLLAZO

1

2          MR. POCHA:  Objection.  Outside the

3      scope.

4      A.    Well, in general, I can be in agreement

5  with the basic premise.

6      Q.    Okay.  Was ERS in January of 2017

7  projecting that it would deplete its investment

8  assets, either later in 2017 or in the first half of

9  fiscal year 2018?

10         MR. POCHA:  Same objection.

11     A.    Well, the retirement system before that

12  date was already liquidating assets.  By January, it

13  wasn't acting as the administrator.  I understand

14  because of the fiscal aspect of the system, it had

15  to continue to being under consideration, the

16  liquidation of assets.

17     Q.    Just so I understand, in January of 2017,

18  ERS was liquidating its investment assets?

19         MR. POCHA:  Objection.  Outside the

20      scope.

21     A.    To the best of my knowledge, yes.

22     Q.    And in that time frame, did ERS

23  anticipate that it would run out of investment

24  assets sometime later in calendar year 2017?

25         MR. POCHA:  Objection.  Outside the

Video Deposition of Luis Rodriguez, 6/4/2019

33

                        L. COLLAZO

1

2      scope.

3            Also exclude any privileged

4      information.

5      A.    To the best of my knowledge, yes, it

6  could have been considering that possibility.

7      Q.    If you look back at Exhibit 4 on page 211

8  after the sentence that I read earlier, it says:  At

9  that point, assuming no liquidation of illiquid

10  assets and no payments of the ERS-UAC payable for

11  the current and prior fiscal years, the ERS would be

12  operating on a Pay-As-You-Go basis.

13            Then it goes on from there.

14      A.    Uh-huh.

15      Q.    My first question is:  Do you agree with

16  that statement that I just read?

17            MR. POCHA:  Same objection.

18      Q.    In the January 2017 time frame.

19            MR. POCHA:  Same objection.  Outside

20      the scope.

21      A.    By what do you mean that I should be

22  specifically in agreement with?

23      Q.    Well, do you agree that once ERS ran out

24  of its investment assets, it would be operating on a

25  pay-as-you-go basis, meaning that whatever funds

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

34

L. COLLAZO

1

2  came into ERS, ERS would have to use to pay current

3  retiree benefits?

4         MR. POCHA:  Same objection.  Outside

5     the scope.

6     A.    Well, the Pay-As-You-Go is a system

7  that's known that operates in other retirement

8  systems.  So as far as I understand from this

9  document and this sentence, I can see that it's a

10 possibility, right, or that it's under

11 consideration.  But from what I see, it's not

12 something that's deterministic at that moment.

13    Q.    In January of 2017, would you agree that

14 the funds coming in to ERS from public corporations,

15 municipalities, and then the Commonwealth's

16 accounting entries were not sufficient to completely

17 pay the retirement benefits that ERS was responsible

18 for paying at that moment?

19        MR. POCHA:  Objection.  Outside the

20    scope.

21    A.    Yes, in general, I could be in agreement

22 with that premise.

23    Q.    As we discussed earlier, as a result, in

24 order to be able to pay the retirement benefits, ERS

25 was selling its investment assets?

35

                        L. COLLAZO

1

2              MR. POCHA:  Objection.  Outside the

3        scope.

4        A.    Yes.  I already answered that.

5        Q.    Okay.  Once ERS ran out of investment

6   assets, isn't it true that everything that would

7   come into ERS in terms of funds from employers would

8   then have to be used almost immediately to pay the

9   retiree benefits?

10             MR. POCHA:  Objection.  Outside the

11        scope.  Calls for speculation.

12        A.    To be honest, I didn't understand that

13   premise in terms of the time, like so that I can I

14   understand what time period we're talking about.

15        Q.    Well, in January of 2017, we talked

16   earlier that ERS viewed it as a risk that it would

17   run out of investment assets sometime that calendar

18   year.

19             MR. POCHA:  Objection.

20        Mischaracterizes testimony.

21        Q.    Is that correct?

22             MR. POCHA:  Same objection.

23        A.    I had already answered this.  Yes.

24        Q.    Okay.  And ERS had an obligation to pay

25   retiree committee benefits in January 2017?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

36

                              L. COLLAZO

1

2       A.      Yes.  At that moment, yes.

3       Q.      Was ERS --

4               MR. PAPEZ:  Strike that.  Let me start

5       over.

6       Q.      Did ERS view it as a risk that once it

7    ran out of investment assets, it would no longer be

8    able to pay the retiree committee benefits that were

9    due unless additional funds came in?

10              MR. POCHA:  Objection.  Outside the

11      scope.

12      A.      Well, we could conclude that given the

13   reality of the fiscal system, it was something that

14   they should have had in mind.

15      Q.      Would you agree that once that happened,

16   every -- all the funds that would be going into ERS

17   would have to be going out in order to pay retiree

18   benefits?

19              MR. POCHA:  Objection.  Outside the

20      scope.  Calls for speculation.

21      A.      When you say go out, what do you mean?

22      Q.      Would you agree that once all of ERS'

23   assets have been sold, all the revenues from

24   employers that would be paid into ERS would then

25   have to be paid out almost immediately to fund the

37

L. COLLAZO

1

2  retiree benefits that ERS was obligated to pay?

3           MR. POCHA:  Same objection.  Improper

4      hypothetical.

5      A.    The money that was being received from

6  different sources, in fact, was to be able to pay

7  the pensions, and that's actually why ERS was

8  created as a trust, to be able to pay the pensions.

9      Q.    And once ERS no longer had investment

10 assets, it would have to have higher income levels

11 from the employers in order to pay the retirees it

12 was obligated to pay?

13          MR. POCHA:  Same objections.

14     A.    I'm sorry.  I didn't understand the

15 question.

16     Q.    Okay.

17          THE INTERPRETER:  I think he wants --

18     A.    I feel like we keep on going over the

19 same things.  Maybe if you could be more specific.

20     Q.    You already said that ERS considered it a

21 risk in January of 2017 that it would run out of

22 investment assets sometime in calendar year 2017,

23 correct?

24          MR. POCHA:  Objection.  Outside the

25     scope.

Video Deposition of Luis Rodriguez, 6/4/2019

38

L. COLLAZO

1

2     A.    I said that at that point it should have
3  been a consideration of theirs that that possibility
4  could happen under the financial realities of the
5  system.
6     Q.    Because ERS was obligated to pay retiree
7  benefits, it would have --
8          MR. PAPEZ:  Strike that question.
9     Q.    I also think that you testified earlier
10 -- correct me if I'm wrong -- that the employer
11 contributions being paid into ERS in January of 2017
12 were insufficient to pay the retiree benefits that
13 were then being paid out of ERS in January 2017?
14    A.    Yes, and not only employer contributions.
15 The other sources that were being received, like the
16 individual.  The loan proceeds.
17    Q.    The loan proceeds that you referred to,
18 are those from the pension obligation bonds we
19 talked about earlier?
20          MR. POCHA:  Objection.  Misstates
21     facts.  Also outside the scope.
22          THE INTERPRETER:  The interpreter needs
23     the entire question repeated if possible.
24    Q.    A few moments ago you referred to loan
25 proceeds, and I just want to know what loan proceeds

Video Deposition of Luis Rodriguez, 6/4/2019

39

                        L. COLLAZO

1

2   you're referring to.

3       A.    The loans that were made to the

4   participants in the system, yes, and that they were

5   paid monthly.

6       Q.    I see.  All right.

7             Getting back to where we were.  In

8   January of 2017, did ERS project that once it ran

9   out of investment assets, it would need higher

10  levels of contributions from employers in order to

11  continue to pay the full amount of pension retiree

12  benefits?

13            MR. POCHA:  Objection.  Outside the

14      scope.

15      A.    I think that's conclusive.  In that

16  moment, as the financial situation was in effect, I

17  understand there were many options being determined

18  and considering, right, knowing that the system's

19  assets were finishing to be able to pay the

20  pensions.

21            But it's conclusive that by January of

22  2017, there had been a final determination made

23  about that when we were finished with these

24  assets, we would have to take one alternative,

25  either this one or that one.  It was under

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

40

1                           L. COLLAZO

2    analysis, right?

3         Q.    Was one of the alternatives ERS was

4    considering an increase in employer contributions?

5              MR. POCHA:  I'm going to object on

6         privilege grounds.

7              To the extent you can answer without

8         disclosing privileged information, you can.

9         If you cannot, I instruct you not to answer.

10             MR. PAPEZ:  Just so I'm clear, which

11        privilege are you asserting?

12             MR. POCHA:  This is both

13        attorney-client and deliberate process

14        privilege, because the question is framed in

15        terms of what was considered.

16        A.    Correct.  To be honest, this is difficult

17   to answer this question without having to reveal

18   some type of privilege.

19        Q.    Are you able to answer it without

20   revealing any privilege?

21        A.    No.  We're going back over this again.  I

22   indicated that there were many things on the table

23   for consideration.  But going to what those specific

24   considerations were, it could be a breach of

25   privilege.

41

L. COLLAZO

1

2          THE INTERPRETER:  Can we take a break?

3          MR. PAPEZ:  Let's go ahead and take a

4      break.  It's a good time for one.

5          THE VIDEOGRAPHER:  We're going off the

6      video record, 10:56 a.m.

7          (Whereupon, there was a pause in the

8      proceeding.

9          (Whereupon, a report was marked as

10     Exhibit 35 for identification, as of this

11     date.)

12         THE VIDEOGRAPHER:  We're back on the

13     video record, 11:06 a.m.

14     Q.    Mr. Collazo, I'm handing you --

15     A.    I just want to go back to the question

16 you were asking about an increase in the employer

17 contributions.

18         It's important to note that the Law

19 Number 3, which was already in full activity,

20 fully enacted by January of 2017, had already

21 established increases from employer contributions

22 by law each year.  What I understand is that was

23 until 2021.  That increase in contributions, it's

24 actually enacted through law.

25     Q.    The increase in employer contributions

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 ▪ www.advanceddepositions.com

42

1                    L. COLLAZO

2    that you're referring to there, are those in

3    addition to the additional uniform contributions?

4         A.    Yes, they're in addition.  They're two

5    separate concepts.  I'm sorry.  I just wanted to

6    clarify, because I remembered that and I wanted to

7    just clarify.

8         Q.    I'm handing you what we marked as Exhibit

9    35.  My first question is:  Do you recognize this

10   document as the actuarial valuation report for ERS

11   for the fiscal year ended June 30, 2016, with some

12   addendums attached by Milliman?

13        A.    Yes.

14        Q.    First question is:  Is ERS required to

15   publish actuarial valuation reports from time to

16   time?

17             MR. POCHA:  Objection.  Outside the

18        scope.

19        A.    Yes.  To the best of my knowledge, it's

20   published at the end on our website.

21        Q.    And Milliman is ERS' actuarial advisor --

22             MR. PAPEZ:  Well, let me just strike

23        that.  It was a bad question.

24        Q.    How long, to best of your knowledge, has

25   Milliman been ERS' actuarial advisor?

Video Deposition of Luis Rodriguez, 6/4/2019

43

                          L. COLLAZO

1

2      A.    To the best of my knowledge, they've been

3  doing that for many years.  Many years in that role.

4      Q.    Does ERS provide information to Milliman

5  in order for Milliman to complete its actuarial

6  evaluation?

7      A.    Yes.

8      Q.    What types of information does ERS

9  provide to Milliman for that purpose?

10          MR. POCHA:  Objection.  Outside the

11      scope.

12      A.    We submit information that Milliman needs

13  to be able to compose their analysis.  The data.

14  Like, for example, from the population, from all the

15  other participants, from the -- from all different

16  ages, all different genders.  That's one of the

17  things that we offer is all the census data and any

18  type of specific numbers that are requested.

19          They might ask us for some particular

20  information from a particular agency.  And any

21  other information that Milliman requests that

22  deems necessary or clarification that Milliman

23  might need related to any type of topic to be able

24  to emit their reports to work the gaps or -- no,

25  not that basically.  Yes.

44

1                     L. COLLAZO

2      Q.    We'll talk about this more a little bit

3   later, but I understand that Milliman also assists

4   in determining the Pay-Go charge that is charged to

5   each of the employers after July 1, 2017; is that

6   correct?

7             MR. POCHA:   Objection to the form.

8      A.    No, that's not correct.

9      Q.    Does Milliman have a role in the Pay-Go

10  system that was implemented after July 1, 2017?

11            MR. POCHA:   Objection to the form.

12     A.    So far as I know, I don't know what kind

13  of specific role they might have.   If you can be

14  more specific, I can tell you if they played that

15  role or not or if they had that role or not.

16     Q.    In calculating the Pay-Go charge for each

17  employer, does ERS provide information to AAFAF for

18  that purpose?

19     A.    Yes, they provided information to AAFAF.

20     Q.    What type of information does ERS provide

21  to AAFAF for purposes of calculating the Pay-Go

22  charge?

23     A.    It's basically the information from our

24  pension years and our beneficiaries per employer and

25  the quantity of benefits that are received by those

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 ▪ www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

45

                        L. COLLAZO

1

2    pensioners or beneficiaries to be able to know how

3    much has to be paid -- to be able to know how much

4    has to be paid through their employer, through their

5    pensioners or their beneficiaries -- to their

6    employer.

7        Q.    The information that ERS provides to

8    AAFAF for calculating their Pay-Go charge, is that

9    similar to the information that ERS would provide

10   Milliman for purposes of calculating -- for purposes

11   of the actuarial reports?

12       A.    Yes.  Some information may be similar, as

13   it is with the pensioners and the beneficiaries, and

14   the cost of the pension that each one represents.

15       Q.    Getting back to the Exhibit 35, the 2016

16   actuarial valuation report, the document doesn't

17   have page numbers, but if you turn about ten pages

18   in, there's a page that says Puerto Rico Government

19   Employees Retirement System, June 30, 2016,

20   actuarial valuation report, and then there's a big

21   black box with white letters.

22            And I have seen you've turned to that,

23   correct?

24       A.    Correct.

25       Q.    The text in the big black box, the first


advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

46

1                          L. COLLAZO

2    sentence says:  PRG ERS net assets became negative

3    in the 2014-2015 fiscal year.

4              And then it goes on from there.  The

5    first question is:  PRG ERS, you understand that

6    to be ERS?

7         A.    Yes, Puerto Rico Government Retirement

8    System, yeah.

9         Q.    Do you have an understanding of what it

10   means that ERS' net assets became negative in the

11   2014-2015 fiscal year?

12             MR. POCHA:  Objection.  Outside the

13        scope.

14        A.    What I can understand from what it says

15   here is that the net assets from the system were

16   going to be less than the obligations.

17        Q.    The next sentence in that black box says:

18   If the increasing Act 1/16/2011 employer

19   contributions --

20             I will tell you what:  Instead of

21   reading that full sentence into the record, I'm

22   going to ask you to read that sentence to yourself

23   beginning "if the increasing act 1/16/2011

24   employer contributions."

25        A.    (Witness complies.)

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

47

1                          L. COLLAZO

2       Q.    My question is:  As of January 2017,

3   would ERS have agreed with that statement?

4              MR. POCHA:  Objection.  Outside the

5       scope.

6       A.    From what I understand with that

7   statement is that there was an assumption being

8   made, and right -- well, in 2017 in January there

9   was a reality, right?  Yes.

10      Q.    So you agree with that statement,

11  correct?

12             MR. POCHA:  Objection.  Outside the

13      scope.

14      A.    Well, the thing is -- one thing is the

15  assumption of the statement, and another thing is

16  the reality taking place in January of 2017.  Now,

17  whether or not I can believe this assumption was

18  reflected in January of 2017, it's reality of the

19  system in January of 2017, it's well-known.

20      Q.    When Milliman prepares the actuarial

21  valuation, does it provide a draft to ERS for review

22  and comment before the actuarial valuation becomes

23  final?

24             MR. POCHA:  Objection.  Outside the

25      scope.

Video Deposition of Luis Rodriguez, 6/4/2019

48

                        L. COLLAZO

1

2       A.     Yes.  To the best of my knowledge, yes.

3       Q.     Does ERS, if it has any comments or

4   requested revisions, communicate those to Milliman?

5              MR. POCHA:  Objection.  Outside the

6       scope.

7       A.     Yes.  It can offer commentary or it can

8   signal if there's a mistake made, yes.

9       Q.     How about after the actuarial valuation

10  report was published?  Does ERS review it to make

11  sure that it doesn't have any comments or

12  clarifications to make to the report?

13             MR. POCHA:  Okay.  Outside the scope.

14      A.     Yes, always.  Of course there's a final

15  review.

16      Q.     If you turn to page -- now we have page

17  numbers -- page 11 of the actuarial valuation

18  report, which is Exhibit 35.

19      A.     Uh-huh.

20      Q.     All right.  There's a section that says

21  commentary on Pay-As-You-Go funding.

22             Do you see that?

23      A.     Yes, I see it.

24      Q.     Okay.  The last paragraph there says:

25  The Pay-Go funding needed in a given year is the

Video Deposition of Luis Rodriguez, 6/4/2019

50

                        L. COLLAZO

1

2    ERS are in establishment according to whatever the

3    payroll is.

4               THE INTERPRETER:  Is that correct?  The

5          interpreter is having a brain fuzz right now.

6          A.    (In English)  Can I answer in English?

7               MR. PAPEZ:  Yes.

8          A.    (In English) contributions to ERS are

9    primarily based -- that's what it says in the

10   document -- on statutory percentage of payroll.

11   That was through with the employer contribution, not

12   with the Pay-Go charge.

13              That's basically the discrepancies I

14   might have with wording of this statement,

15   basically.

16         Q.    Are you aware of any correction or

17   revision that ERS has requested to the statements

18   we've just gone over on page 11?

19              MR. POCHA:  Objection.  Outside the

20         scope.

21         A.    To the best of my knowledge, up until

22   this date, they may be able to remember if they've

23   had any type of conversation or they've made any

24   type of note specifically in relation to this point.

25              I can't categorically affirm either

Video Deposition of Luis Rodriguez, 6/4/2019

51

L. COLLAZO

1

2    that we did not make the commentary, either by

3    phone or via written form, or that we did not.  We

4    talked about many topics and we maintain ourselves

5    in conversation.  Yes.

6        Q.    All right.  The bullet on page 11 there

7    says:  Contributions to PRG ERS are primarily based

8    on statutory percentages of payroll.

9              From what I understand your earlier

10   testimony to be -- correct me if I'm wrong -- is

11   that referring to the system that was in place

12   before June of 2017?

13             MR. POCHA:  Objection.  Outside the

14       scope.  The question lacks foundation.

15       A.    Yes.  I'm going to refer once again to my

16   previous statement that, to the best of my

17   knowledge, the statutory percentage of the payroll

18   was calculated according to employer contributions

19   before June of 2017.

20             The Pay-Go, it is not based on

21   statutory percentages of the payroll.

22       Q.    Pay-Go is based on the current benefits

23   that are owed at any particular point in time; is

24   that correct?

25       A.    Correct.  The real cost of the pensioners

52

                              L. COLLAZO
1
2    and the beneficiaries, that varies according from
3    time to time, according to when you have new
4    pensioners and when they pass away.
5         Q.    Does ERS provide the information about
6    the current benefits and the beneficiaries to AAFAF
7    in order so that AAFAF can calculate the Pay-Go fee
8    that is owed?
9              MR. POCHA:  Objection.  Outside the
10        scope.
11        A.    Yes, that's correct.  We offer that
12   information so they can make the calculations with
13   that data.
14        Q.    And as you understand the system, does
15   AAFAF provide that information to -- who?
16        A.    I don't -- AAFAF is our fiscal agent.
17   And who they share the data which we give them is
18   not something I can articulate or specify.
19        Q.    Let me try a different question.  That
20   was a bad question.
21              When AAFAF calculates the Pay-Go fee
22   that is owed, who does AAFAF communicate that
23   amount to?
24              MR. POCHA:  Objection.  Outside the
25        scope.  Lacks foundation.

53

L. COLLAZO

1

2      A.     I can't affirm with that information who
3  AAFAF provides that information to.  But being
4  sincere and based on my experience, I understand
5  that they should share that with the Office of
6  Management and Taxes, Office of Management and
7  Budget, and probably also with the Department of
8  Treasury, OMB and the Department of Treasury,
9  without excluding other entities that may benefit
10  from that information.
11      Q.     Who sends the invoices with the Pay-Go
12  fees to each of the employers?
13      A.     We do, the retirement system.
14      Q.     Go to page 12 in Exhibit 35.  There's a
15  bullet that says disbursements are comprised of
16  benefit payments, administrative expenses, and
17  pension obligation bond debt service.
18      A.     Yes.
19      Q.     Before June of 2017, were those the three
20  primary categories of disbursements from ERS?
21          MR. POCHA:  Objection.  Outside the
22      scope.  Lacks foundation.
23      A.     Yes.  To the best of my knowledge, I
24  understand that that is, yes.
25      Q.     After July of 2017, does ERS continue to


advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

54

1                         L. COLLAZO

2    have administrative expenses?

3         A.    Yes, that's correct.

4         Q.    After July of 2017, benefit payments owed

5    to pensioners are still being paid, correct?

6              MR. POCHA:  Objection to the form.

7         Outside the scope.

8         A.    Not by ERS, but they are continuing to be

9    paid.

10        Q.    And they are continuing to be paid

11   through the Pay-Go fee charges that we discussed

12   earlier, correct?

13             MR. POCHA:  Objection to the form.

14        A.    Yes, correct.

15        Q.    Are the administrative expenses paid --

16             MR. PAPEZ:  Let me strike that.

17        Q.    How are the administrative expenses for

18   ERS paid after July of 2017?

19        A.    Yes.  They continue being paid from our

20   operations account, which is the remaining of the

21   funds that at some point entered into the system.

22        Q.    Would ERS also use those same funds to

23   pay administrative expenses before July of 2017?

24             MR. POCHA:  Objection to the form.

25        A.    Yes, from that same operations account.

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

55

                          L. COLLAZO

1

2      Q.     Is ERS still paying pension allocation

3  debt service after July of 2017?

4          MR. POCHA:  Objection to the form.

5      A.     No, and that's why we're in the middle of

6  this process of Title 3.

7      Q.     You can set that document aside.

8          (Whereupon, a report was marked as

9          Exhibit 36 for identification, as of this

10         date.)

11     Q.     I'm handing you what I've marked as

12  Exhibit 36.

13         My first question is:  Do you recognize

14  this as the actuarial valuation report for ERS as

15  of June 30, 2017?

16     A.     Yes.

17     Q.     If you turn to the second page of the

18  document or the exhibit, there's a letter from

19  Milliman addressed to you.  It's dated March 26,

20  2019.

21         My question is:  Is that when the final

22  actuarial valuation report from the year ended

23  June 30, 2017, was finally published?

24         MR. POCHA:  Objection.  Outside the

25         scope.

58

L. COLLAZO

1

2      A.     Like, for example, which calculations are
3  you talking about specifically?  All of the
4  calculations being made?

5      Q.     Let's just move on.  I'm handing you what
6  was marked last week as Exhibit 11.  This is the
7  Commonwealth of Puerto Rico fiscal plan dated
8  October 14, 2016.

9             Do you see that, sir?

10     A.     Yes, I can see that.

11     Q.     Was ERS involved in preparing this
12  October 2016 draft of the Commonwealth fiscal plan?

13             MR. POCHA:  Objection.  Outside the
14      scope of the deposition.

15     A.     I would have to speculate in relation to
16  this, because this was under the last administration
17  and in no way was I participating in any public
18  political charge.

19             To be able to affirm who participated
20  in this fiscal plan, it's not something that I
21  would have any knowledge about.

22     Q.     Who held the position of the
23  administrator of ERS before you did?

24     A.     Pedro Ortiz Cortes.

25     Q.     Did Mr. Cortes hold that position until



62

L. COLLAZO

1
2     outside the scope of the deposition.
3            MR. PAPEZ:  We have a disagreement
4     about that.
5     A.    The question is why not?
6     Q.    Yes.  Two questions.  Let me do one at a
7     time.
8            Did you make an inquiry about whether
9     ERS was involved in putting together the October
10    2016 Commonwealth fiscal plan?
11           MR. POCHA:  Same objections as before.
12           Don't disclose privileged information.
13    You can answer yes or no to the best of your
14    memory.
15    A.    I don't remember having asked that
16    question.
17    Q.    Okay.  Second question is why not?
18           MR. POCHA:  Same objections.
19           Don't disclose privileged information.
20    You can answer if you can do so without
21    disclosing conversations with counsel.
22    A.    So actually, I will take my lawyer's
23    advice, and I won't be answering due to the
24    possibility of having some type of privilege
25    revealed.

63

L. COLLAZO

1

2    Q.    Can you turn to page 83 of Exhibit 11.

3    A.    I'm there.

4    Q.    There's a column on the right that says

5    base projection outflow bill.

6          Do you see that?

7    A.    Yes.

8    Q.    Second box down says AAC AUC, and then

9    (INCR. retirement system fundings).

10   A.    Yes.

11   Q.    And then it has an 11.0, representing $11

12   billion, correct?

13   A.    Yes, that's what I understand.  Oh, yes.

14   Q.    Referring to the box in the far right in

15   that same row, do you understand that $11 billion to

16   represent the amount of funds required to adequately

17   fund the ERS, TRS, and JRS retirement systems?

18        MR. POCHA:  Interpose an objection to

19        the scope and speculation.

20   A.    Well, to begin with, that would be to

21   speculate about this issue.  And secondly, to be

22   able to answer that question today would be

23   academic, since the fiscal plan is from 2016 and

24   today, well, there's another reality.

25   Q.    As you sit here today, you cannot provide

64

L. COLLAZO

1

2    me any testimony about what the text I just referred

3    to on page 83 means from ERS' perspective, correct?

4             MR. POCHA:   Objection.   Outside the

5         scope.   Also vague.

6         A.    Well, if you could be more specific in

7    your question.

8         Q.    All right.

9         A.    Because if you're asking if I'm in

10   agreement more specifically in relation to --

11        Q.    Okay.   Let me try it this way.   As of

12   July 1, 2017, the Pay-Go system went into effect,

13   correct?

14        A.    Correct.

15        Q.    And under the Pay-Go system, Pay-Go fees

16   are paid --

17            MR. PAPEZ:   Strike that.   Let me start

18        over.

19        Q.    Under the system that went into effect on

20   July 1, 2017, the Pay-Go fees are paid into an

21   account maintained by the Treasury Department,

22   correct?

23        A.    Correct.

24        Q.    Is ERS aware that in the October 2016

25   fiscal plan the proposal from the Commonwealth was

65

L. COLLAZO

1

2      not to have Pay-Go fees paid to treasury but instead

3      to have increased retirement system funding going

4      into ERS?

5              MR. POCHA:  Objection.  Document speaks

6          for itself.  Also outside the scope.

7          A.    I think that explains itself.

8          Q.    So, yes, the Commonwealth was proposing

9      increased funding levels to ERS in the October 2017

10     fiscal plan, at least according to Exhibit 11,

11     correct?

12             MR. POCHA:  Same objections.

13         A.    Well, assuredly I can't confirm that was

14     being proposed because of this text.  I could think

15     that it was something that was under consideration,

16     under some consideration.

17         Q.    And as you sit here today, you don't have

18     any reason to disagree with the statement that as of

19     October 2016, the Commonwealth was proposing

20     increased retirement system funding levels to ERS,

21     correct?

22             MR. POCHA:  Objection.  Outside the

23         scope.

24         A.    Once again, I can't affirm that was being

25     proposed, because this text appears in a fiscal

66

L. COLLAZO

1

2   plan, right?  Notably.  It was probably something

3   that was under some type of consideration, and how

4   serious that consideration was according to this

5   proposal, I cannot explain.

6        Q.    You can set that aside.

7              I'm handing you what was marked last

8   week as Exhibit 5.  My first question, and it may

9   be my only question, is whether you're aware of

10  whether ERS received a copy of Exhibit 5 sometime

11  in or around November of 2016?

12       A.    No, I do not have that knowledge.

13       Q.    Okay.  If you go to page 3, point 3,

14  paragraph 3 there.

15       A.    Uh-huh.

16       Q.    It says:  Incorporate a revised baseline

17  forecast to reflect Pay-Go funding for pension

18  benefits.

19              And then it goes on.  My question is:

20  is ERS aware of whether the direction to switch

21  from an actuarially funded pension system to a

22  Pay-Go funding system, whether that decision was

23  requested by Financial Oversight and Management

24  Board?

25       A.    To the best of my knowledge, that was

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

67

L. COLLAZO

1

2    under consideration, right, and that's the dynamic

3    that has to do with tailoring these fiscal plans

4    normally between the government and the fiscal

5    Oversight Management Committee.  Right?  There's

6    usually a conversation between those two entities to

7    be able to tailor the fiscal plan with different

8    perspectives, those from the board as well as those

9    from the government.

10             So to take this as like a manual, I

11   don't know if that would be appropriate.  It could

12   demonstrate that this Board of Oversight,

13   Financial Oversight, had some type of vision for

14   the Pay-Go as like a type of alternative based on

15   what the text says.

16        Q.    Okay.  You can set that document aside.

17             I'm handing you what was marked last

18   week as Exhibit 21.  You'll see it's a document

19   titled Revised Baseline Projections and dated

20   December 20, 2016.

21             Do you see that, sir?

22        A.    Yes.  Yes.

23        Q.    My first question is:  Was ERS aware of

24   these revised baseline projections in or around

25   December of 2016?

71

L. COLLAZO

1

2      Q.     ERS maintains information about the size

3  of its active membership, correct?

4      A.     Correct.

5      Q.     And it's actually one of ERS'

6  responsibilities to maintain information about the

7  size of its active membership, correct?

8             MR. POCHA:  Objection to the form.

9      A.     Yes.  We maintain information about

10  active members.

11     Q.     Are you aware of any other entity or

12  instrumentality in the Commonwealth that maintains

13  information about the size of ERS' active

14  membership?

15     A.     Each employer and precisely the database

16  for the retirement system feeds off of the

17  information that employers offer us.

18     Q.     Each employer would maintain information

19  about its own retirees, correct?

20            MR. POCHA:  Objection.  Lacks

21     foundation.

22     A.     No.  In terms of the retirees, the

23  information is maintained by the system.  Yes, by

24  the retirement system, correct.

25     Q.     Are the active members in ERS current

72

                              L. COLLAZO

1   employees?  Is that what that's referring to?

2   A.    No.  Well, an active participant of the

3   system is either an employee or someone that left a

4   job from service but still keeps some benefits from

5   the system that it hasn't used yet, which is called

6   an inactive participant.

7   Q.    Can you turn to page 7, please, of

8   Exhibit 21.

9   A.    (Witness complies.)

10  Q.    There's a column on the right that says

11  Revised Baseline Projections Assumption.

12  A.    I see it.

13  Q.    Okay.  The first bullet, there's two

14  sentences.  The first sentence says that the revised

15  baseline projections assume that the Commonwealth no

16  longer makes AUC/AAC payments, including past due

17  amounts?

18  A.    Yes, that's what it says.

19  Q.    Okay.  Are AAC payments that would --

20  were historically made to the TRS and the JRS?

21            MR. POCHA:  Objection.  Vague.  I'm

22        sorry.  I'm confused.

23  Q.    Okay.  Let's start it this way.  Earlier

24  we talked about annual uniform contributions.

74

1                         L. COLLAZO

2         Q.    So then getting back to the bullet point

3    that I read earlier on page 7, is it correct that

4    the revised baseline projections were assuming that

5    the Commonwealth would no longer make the AAC

6    payments to ERS?

7              MR. POCHA:  Objection.  Lacks

8         foundation.

9              MR. PAPEZ:  Let me withdraw that.

10        Q.    So getting back to the bullet point that

11   I read earlier on page 7, is it correct that the

12   revised baseline projections were assuming the

13   Commonwealth would no longer make the AUC payments

14   to ERS?

15             MR. POCHA:  Objection.  Lacks

16        foundation.

17        A.    That's what it says.  That's what it says

18   there.

19        Q.    Instead of those payments, existing

20   pension system assets, employer contributions, and

21   investment income would be used to fund benefit

22   payments, correct?

23             MR. POCHA:  Objection.  Lacks

24        foundation.

25        A.    That is what the text says.


advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

75

                         L. COLLAZO

1

2       Q.     Okay.  And if you look at footnote 2

3    there, it refers to Pay-Go projections.

4            Do you see that, sir?

5       A.     Yes, I see it.

6       Q.     All right.  Are the Pay-Go projections

7    referred to in footnote 2 the same as the employer

8    contributions referred to in the text?

9            MR. POCHA:  Objection.  Calls for

10          speculation.  Lacks foundation.

11      A.     No, it's not the same.

12      Q.     Okay.  What are the difference between

13   the employer contributions as referred to in the

14   text of page 7 and the Pay-Go fees -- Pay-Go

15   projections that are referred to in footnote 2?

16          MR. POCHA:  Objection.  Lacks

17          foundation.  Calls for speculation.

18      A.     Yes.  Basically there's many differences.

19   The first is how the employer contributions are

20   calculated as is seen in the text of page 7.  It's

21   not the same way that the Pay-Go is calculated.

22            Secondly, those employer contributions

23   that are mentioned on page 7, the purpose is

24   different than the purpose for the Pay-Go.

25            And the employer contributions are to

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

76

L. COLLAZO

1 fund the system, the retirement system, to be able

2 to comply with future payments of the system.

3           On the other hand, the Pay-Go is to

4 satisfy the real and present payment of the

5 pensioners and -- of the current pensioners and

6 beneficiaries.

7           And thirdly, those employer

8 contributions were already determined by law, and

9 the way that it was going to be calculated -- and

10 the Pay-Go is calculated according to the cost of

11 pension and the way that it varies, according to

12 the current pensioners and those that are passing

13 away.

14     Q.    Let me take those in sort of reverse

15 order and ask a few questions about each of them.

16           You first said that employer

17 contributions were determined by law, but the

18 Pay-Go were calculated according to the cost of

19 the pensions and how that cost varies according to

20 the pensioners and to the folks who pass away,

21 correct?

22     A.    Correct.

23     Q.    Okay.  Is there any -- well, first of

24 all, who does the calculation today about the cost

Video Deposition of Luis Rodriguez, 6/4/2019

77

1                          L. COLLAZO
2      of the pensions and how it varies according to the
3      current pensioners and the folks who pass away?
4          A.    That calculation is done by the
5      retirement system.  Because we have the pensioners
6      database.  So having received communication with the
7      -- and analyze the information from the fiscal
8      agent, AAFAF, so in conversation with the fiscal
9      agent and AAFAF.
10         Q.    So I understand, ERS does the calculation
11     for the Pay-Go cost --
12             MR. PAPEZ:  Strike that.  That's wrong.
13         Q.    The first point you made when I asked you
14     the differences was how the employer contributions
15     were calculated was not the same as how the Pay-Go
16     fees are calculated, correct?
17         A.    Correct.
18         Q.    Isn't that what we were just discussing
19     in terms of the third point you made that employer
20     contributions were determined by law, but Pay-Go
21     fees were calculated differently?  Basically my
22     question is:  Your point one and your point three
23     earlier, aren't they the same?
24             MR. POCHA:  Objection.  Vague.
25         A.    Yes, it's possible they bear


advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

78

1                         L. COLLAZO

2    similarities.  Yes.

3         Q.    The second point you made when I asked

4    you about the differences between employer

5    contributions and Pay-Go fees -- and correct me if

6    I'm wrong -- is that employer contributions were

7    intended to fund the retirement system to comply

8    with future benefit rights, whereas the Pay-Go

9    system is intended to fund the system to satisfy the

10   current pension benefits; is that correct?

11             MR. POCHA:  Objection.  Vague.  Also

12        assumes facts.

13        A.    Yes, basically the explanation.

14        Q.    And as we talked about at the beginning

15   of the deposition, as of January 2017, the employer

16   contributions were not sufficient to continue to

17   fund the retirement system, and as a result, the

18   retirement system was selling its investment assets,

19   correct?

20        A.    Correct.

21        Q.    And once those investment assets had been

22   completely sold, the money that would come into the

23   ERS system in the form of employer contributions

24   would then be funding current retirement benefits,

25   correct?

79

                      L. COLLAZO

1

2           MR. POCHA:  Objection.  Asked and

3       answered.  Also speculation.

4       A.    Yes.  You actually answered the question.

5       Q.    Okay.  All right.

6           MR. PAPEZ:  Let's go off the record.

7           THE VIDEOGRAPHER:  Going off the video

8       record, 12:50 p.m.

9           (Whereupon, a lunch recess was taken.)

10          THE VIDEOGRAPHER:  We are back on the

11      video record.  It is 1:36 p.m.

12      Q.    Mr. Collazo, I'm going to hand you what

13  was previously marked as Exhibit 6 last week.

14      A.    Yeah.

15      Q.    Do you see this as the fiscal plan for

16  the Commonwealth dated as of February 27, 2017?

17      A.    Yes.

18      Q.    Did ERS provide input into this fiscal

19  plan?

20      A.    In that sense, I wouldn't be able to

21  affirm that, that assertion, because I can't confirm

22  that ERS has any role, played any role in this

23  fiscal plan.

24      Q.    If you turn to page 62, please.

25      A.    Yes.


advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

82

                          L. COLLAZO

1

2   fiscal plan for the Commonwealth dated as of March

3   13, 2017?

4        A.    Yes.

5        Q.    Which exhibit did I give you?

6        A.    22.

7        Q.    If you turn to page 13 of Exhibit 22, do

8   you see row 5?  It talks about required Pay-Go

9   contribution: ERS, TRS, and JRS.

10             Do you see that?

11       A.    Yes, I see it.

12       Q.    In March of 2017, was ERS aware of

13  considerations about moving to a Pay-As-You-Go

14  system to fund retirement benefits?

15             MR. POCHA:  Objection.  Privileged.

16             You can answer without disclosing any

17       privileged information, so yes or no.

18       A.    To the best of my knowledge, I cannot

19  affirm that ERS was aware of this transformation at

20  that time and up to what point and to what extent it

21  was.

22       Q.    All right.  The bullet I just read

23  suggests that the required Pay-Go contributions

24  would be paid into ERS.

25             First of all, do you agree with that?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

85

                         L. COLLAZO

1
2    shortly thereafter?
3         A.     Once again, we return.  We return to the
4    same.  It's not something that I can affirm.
5    Because by March, the person who was undertaking the
6    role of the interim administrator was someone who
7    was beneficiary who belonged to the last
8    administration, so I have no way of knowing if they
9    had received information about this.
10        Q.     Okay.  You can set that aside.
11   Generally, before --
12             MR. PAPEZ:  Describing that.
13        Q.     You've heard of Joint Resolution 188,
14   correct?
15        A.     Correct.
16        Q.     Before Joint Resolution 188 was passed,
17   employer contributions were paid into a trust fund
18   held by ERS, correct?
19             MR. POCHA:  Objection to the form.
20        A.     So the employer contributions were
21   deposited to an operational account that was part of
22   the system.
23        Q.     Okay.  And the operational account was
24   part of ERS, correct?
25        A.     Yes.

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

86

L. COLLAZO

1

2      MR. POCHA:  Objection to the form.

3      Q.    After Joint Resolution 188 went into

4  effect, Pay-Go fees are paid into an account held by

5  the Treasury Department, correct?

6      A.    Yes, since July 1st of 2017.

7      Q.    When did ERS first become aware of

8  discussions about whether Pay-Go fees would be paid

9  into an account held by the Treasury Department

10  instead of an account held by ERS?

11          MR. POCHA:  Objection.  Privilege.

12          You can answer just disclosing

13      privileged conversations.

14      A.    Well, basically everything -- we have our

15  agent, our control agent, which is AAFAF -- fiscal

16  control agent, which is AAFAF.

17          Well, let me ask you this question:

18  Are you asking when we became aware of that

19  resolution Joint Resolution 188?

20      Q.    No.  Let me start it this way.  Was there

21  a time before Joint Resolution 188 was passed that

22  ERS became aware of a decision that Pay-Go fees

23  would be paid into an account held by the Treasury

24  Department instead of an account held by ERS?

25          MR. POCHA:  Objection.  Same objection

87

1                         L. COLLAZO

2        as before.

3                Exclude privileged discussions.

4        A.    No.  We weren't aware before this

5   resolution 188, no.

6        Q.    Because your attorney interposed an

7   objection, I want to make sure I'm clear.

8                Are you saying that you're not aware at

9   all or you're unable to answer consistent with

10  your attorney's objection?

11       A.    I'm sorry.  Any knowledge about --

12       Q.    So I want -- what I'm trying to ask is

13  whether ERS knew before Joint Resolution 188 was

14  passed that a final decision had been made that the

15  Pay-Go fees would be held into an account held by

16  the Treasury Department instead of ERS?

17       A.    No, we weren't aware of that final

18  decision.

19       Q.    When did ERS become aware of a decision,

20  a final decision, that Pay-Go fees would be paid

21  into an account held by the Treasury Department

22  instead of an account held by the ERS?

23                MR. POCHA:  Objection to the form.

24       A.    Well, a final decision was made about

25  this after the passing of the law 106.217.  We did

Video Deposition of Luis Rodriguez, 6/4/2019

88

                        L. COLLAZO

1

2    know there were some considerations, and we were

3    looking to analyze this issue, but when it's finally

4    approved.  It's with the Law 106 from the year 2017.

5         Q.    What was ERS' understanding of why the

6    decision was made to pay Pay-Go fees held by the

7    Treasury Department instead of an account at held by

8    the ERS?

9              MR. POCHA:  Objection.  Privilege.

10             I'm instructing you not to disclose

11        attorney/client privilege or process

12        privilege.

13        A.    It's impossible to answer that question

14   without having exposed some type of privilege that

15   was already discussed.  Deliberative process was

16   already discussed.

17        Q.    I'm handing you a copy of Exhibit 8 that

18   was marked last week.  The first few pages are an

19   English translation of Joint Resolution 188, and

20   then the Spanish version is attached in the last

21   several pages.

22        A.    Yes.

23        Q.    Based on -- well, let me just ask:  Was

24   ERS involved in the drafting of Joint Resolution

25   188?

89

1                    L. COLLAZO

2       A.    We did not participate.

3       Q.    Did ERS review any drafts of Joint

4  Resolution 188?

5       A.    We did not participate.

6       Q.    You understand that Joint Resolution 188,

7  one of the effects was to eliminate employer

8  contributions to ERS, correct?

9            MR. POCHA:  Objection.  The law speaks

10       for itself.

11      A.    Well, I think the best explanation of

12 that is the statement of legislative intent, which

13 is in the law.

14      Q.    Putting aside the statute -- I'm not

15 asking you for a legal interpretation -- was ERS'

16 understanding of the effect of Joint Resolution 188

17 that employer contributions would be eliminated?

18           MR. POCHA:  Same objection.  And asked

19       and answered.

20      A.    Once again, what I understand is not

21 material, because the resolution was passed and

22 approved.  And here you can find what's established

23 and why it's established and what the purpose is.

24      Q.    You can set -- well, let me go about it

25 this way:  After July 1, 2017, did ERS receive any

90

1                             L. COLLAZO

2     further employer contributions?

3          A.    Can you repeat that again.  Just to

4     figure out the time frame.

5          Q.    Sure.

6                After July 1, 2017, did ERS receive any

7     further employer contributions?

8          A.    Well, by the the 1st of July, in terms of

9     the month of July, what I understand is we did

10    receive an employer contribution by an employer that

11    was made by mistake.

12               The way that this whole employer

13    contribution system worked is that the retirement

14    system would receive -- for example, in June, they

15    would receive the employer contribution from May,

16    and in July, that from June.

17               So the month of June, there was still

18    the retirement of depositing that employer

19    contribution, but then there was the transition to

20    the Pay-Go, so one employer made a deposit into

21    our account.

22               It's important to make note that that

23    contribution was not just a contribution, an

24    employer contribution, because within one payment,

25    the employer would submit various concepts,

91

1                    L. COLLAZO

2    individual contributions, loans, employer

3    contributions, disability insurance.

4            So we did identify the mistake and we

5    reversed the transaction.

6        Q.    All right.  What I'm getting at, Mr.

7    Collazo, is actually just much simpler.  I want to

8    be able to agree with you, if we can, that joint

9    resolution eliminated employer contributions into

10   ERS.  I'm not looking for a legal conclusion.

11           I just want to know whether ERS

12   understood that after Joint Resolution 188 went

13   into effect, employers no longer made

14   contributions into ERS.

15           MR. POCHA:  Same objections as before.

16       A.    Yes, well, in reference to that, I'm

17   referring to section 4, bullet 3 of the resolution.

18       Q.    Okay.  And section 4, subparagraph 3 of

19   the Joint Resolution 188 eliminated employer

20   contributions by the central government, public

21   corporations, and municipalities to ERS, correct?

22       A.    That's what it says, yes.

23       Q.    All right.  If you look over at section

24   4, subpart 4, the obligation to pay additional

25   uniform contributions was also eliminated, correct?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

92

L. COLLAZO

1

2      A.     That's what it says, yes.

3      Q.     All right.  As far as you understand --

4    and by you, I mean ERS -- did Joint Resolution

5    create any new pension benefits for retirees?

6             MR. POCHA:  Objection.  Calls for a

7         legal conclusion.  Also, the law speaks for

8         itself.

9      A.     Once again, we go back to the same point.

10   The resolution speaks for itself.  I don't see

11   anything textually here that says there's a new

12   benefit being established in any way it's trying to

13   convey that's what's said.

14     Q.     And I think we agree on this, but I just

15   need to make sure that ERS has the same

16   understanding, and that's that the pension benefits

17   that ERS was obligated to pay to its retiree

18   pensioners were not increased following the passage

19   of Joint Resolution 188.  Is that correct?

20            MR. POCHA:  Same objections.  Calls for

21        a legal conclusion.  The law speaks for

22        itself.

23     A.     I don't notice or see any new benefit.

24     Q.     Okay.  Before July 1, 2017, ERS would

25   calculate and determine what benefits were owed

Video Deposition of Luis Rodriguez, 6/4/2019

93

                          L. COLLAZO

1   under the Act 447 to its -- the members that were

2   participating in that defined benefit program,

3   correct?

4           MR. POCHA:  Objection to the form.

5       A.    Yes, and defined contributions as well.

6       Q.    Right now I'm only going to be talking

7   about the defined benefit program.

8           After July 1, 2017, ERS still

9   determines what benefits are owed under Act 447 to

10  the members of the defined benefit program,

11  correct?

12          MR. POCHA:  Objection to the form.

13      A.    Well, it's important to point out that

14  those benefits are determined by law.  The

15  retirement system's job is to calculate the pension

16  in agreement with whatever's established by the law.

17      Q.    Okay.  Between June 2017 and July 2017,

18  did ERS change how it calculated the benefit

19  payments it owed to members of the defined benefit

20  program?

21          MR. POCHA:  Objection to the form.

22      A.    The way in which benefits for pensions

23  were calculated didn't change.  They haven't

24  changed.  We continue performing that according to

94

L. COLLAZO

1

2    what is said in the law.

3        Q.    Okay.  And the law --

4            MR. PAPEZ:  Strike that.

5        Q.    When ERS is calculating benefits, it

6    follows the law; is that what you said?  Correct?

7        A.    Yes, the law establishes how benefits are

8    to be calculated according to the law.

9        Q.    Okay.  Did Joint Resolution 188 change

10   the pension benefits owed to members of the defined

11   benefit program?

12           MR. POCHA:  Objection.  Calls for legal

13       conclusion.

14           MR. PAPEZ:  He just testified that he

15       follows the law, that ERS follows the law.

16       You know, you're coaching your witness.

17       Stop.  Let's let him testify and we'll go

18       much quicker.

19           MR. POCHA:  I'm preserving objections.

20       But you can ask the position of ERS.  That

21       might be easier to say, what is ERS' position

22       or what has ERS done in response to the law.

23       A.    With all that translation --

24       Q.    Okay.  Let me go at it this way:  Are the

25   pension benefits that are paid to members of the

95

L. COLLAZO

1

2    defined benefit program the same in June 2017 as in

3    July 2017?

4        A.    Yes.   The pensioner who receives a

5    certain payment in June receives the same payment in

6    July.

7        Q.    So can we agree that ERS' position is

8    that Joint Resolution 188 did not change the pension

9    benefits that were owed to members of the defined

10   benefit program?

11       A.    There's nothing inside of that Joint

12   Resolution 188 that changes the benefits of the

13   defined benefit program.

14       Q.    If you look at section 4, subsection 1 in

15   Joint Resolution 188, it says:  The general fund

16   through the pay-as-you-go system shall assume any

17   payments that the three retirement systems cannot

18   make.

19           My question is:  Does ERS know why the

20   general fund assumed those benefit payments

21   instead of just increasing the fund level to ERS

22   so ERS could continue to make the benefit payment?

23           MR. POCHA:  Objection on privilege

24       grounds.

25           Exclude any privileged information.

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

97

L. COLLAZO

1
2   reform the system.  It was insolvent.  The
3   government make a definite decision, you know, to
4   guarantee the pension payments.
5        Q.     Well, did ERS have an understanding of
6   why the government assumed the payments through the
7   general fund instead of just guaranteeing those
8   pension payments by increasing the funding to ERS?
9             MR. POCHA:  Objection.  Privilege.
10            You can answer if you exclude
11        privileged information.
12        A.     By then, Law 3 already established those
13   increases, progressive increases to the employer
14   contributions.  And on top of that, they added this
15   -- the uniform additional contribution.  And those
16   funds weren't arriving as they should have been or
17   as they imagined they would.
18             So increasing the contributions even
19   more than what it had already been thought of --
20   what had already been established based on the
21   experience that had already been had.
22             We had to ask ourselves if it was
23   logical and reasonable, if it was a reasonable
24   idea to continue -- if it was a real -- if it was
25   a real option and if it was a reasonable option to

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 · www.advanceddepositions.com

98

L. COLLAZO

1
2    continue increasing the employer contributions.

3        Q.    Can we agree that whether the input into
4    the pension benefit is employer contributions or
5    Pay-Go fees, the money to pay that, the retirement
6    benefits, has to come from somewhere?

7            MR. POCHA:  Objection to the form.

8        A.    Yes.

9        Q.    Okay.  Before July of 2017, the employer
10   contributions were made in part by the Commonwealth,
11   correct?

12       A.    The Commonwealth made their employer
13   contributions, but it didn't arrive into the ERS.

14       Q.    After July of 2017, the general fund
15   assumed the payments that ERS could not take,
16   correct?

17       A.    Correct.

18       Q.    Okay.  And the general fund is the
19   Commonwealth General Fund, correct?

20       A.    Correct.

21       Q.    Is ERS aware of any reason why the
22   general fund after July of 2017 can pay the defined
23   benefit pensioners that it could not pay in adequate
24   levels before July of 2017?

25           MR. POCHA:  Objection.  Vague.

AD advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

99

1                          L. COLLAZO

2              To the extent you can answer without

3          disclosing privileged information, you can

4          answer.

5          A.      So are you asking why it would be able to

6     pay that in July and not before?

7          Q.      Yes.

8              MR. POCHA:  Same objections.

9          A.      Because that's the way that it was

10    established, right, that it would start from the 1st

11    of July forward.

12         Q.      Okay.  Is ERS aware of any reason why the

13    general fund could not put adequate money into ERS

14    in order to fund the payment of benefits after July

15    1, 2017?

16             MR. POCHA:  Same objection as before.

17             To the extent you can answer without

18         disclosing privileged information, please do.

19         A.      Well, that was a determination made by

20    public policy, and I would like to just go back to

21    my previous answer.  So to continue unsuccessfully

22    funding a system, that wasn't a consideration.

23         Q.      Before Joint Resolution 188 went into

24    effect, ERS would use some of its income and assets

25    in part to pay debt service on the pension

100

                              L. COLLAZO

1      obligation bonds; is that correct?

2          A.    When you say before, what date are you

3      referring to?

4          Q.    Let's say May of 2017.

5              MR. POCHA:  Objection.  Vague as to

6          time within May.

7          A.    In May?  Are you asking if the debt was

8      being paid in May?

9          Q.    Well, sure.  Let's start with that

10     question.

11         A.    May of 2017?  Well, some payments were

12     being made from the pre-petition account.

13         Q.    Did ERS have an understanding of what

14     effect Joint Resolution 188 would have on its

15     ability -- ERS' ability to pay debt service on the

16     ERS debt obligation bonds?

17             MR. POCHA:  Objection.  Privilege.

18         A.     No.  Definitely the possible effects were

19     discussed with our lawyers, from which I understand

20     is privileged information.

21         Q.    Well, as of today, does ERS have enough

22     money to make interest payments on the pension

23     obligation bonds?

24             MR. POCHA:  Objection to the form.

Video Deposition of Luis Rodriguez, 6/4/2019

101

1              L. COLLAZO

2       A.     To be able to be making those payments or

3    not is something that has to be determined by the

4    courts.  And it's something that's being -- it's

5    under litigation at the moment.  And it's in the

6    hands of our lawyers.

7       Q.     What is the total asset value of ERS as

8    of today?

9       A.     Approximately $1 billion.

10      Q.     And what assets -- or what assets

11   comprise that estimate?

12      A.     Well, we have about 90 million in our

13   operational account.  An estimate of the private

14   equity that we have is around 80 million.  There is

15   a 92 million in the post-petition account that are

16   restricted.

17             And our loan portfolio is estimated

18   around 380 million right now, 109 million from our

19   liquidation of assets, which is also a restricted

20   account.  Approximately -- that's it, basically,

21   yes.  And there's other cash amounts and varying

22   amounts in other places, in other concepts.

23      Q.     The loan portfolio you referred to, is

24   that loans that ERS made to its members?

25      A.     To the best of my knowledge, the loans

AD advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

102

1                          L. COLLAZO

2    that the system offered to its members, which was

3    until 2015, 2016, where personal and cultural loans

4    are stored, and real estate -- mortgage.

5         Q.    So the 380 million of the loan portfolio

6    are accounts receivable to ERS?

7         A.    Yes.

8         Q.    The private equity you mentioned for $80

9    million, what is that?

10        A.    Investments.  System investments --

11   investments that were held by the system.

12        Q.    Are those not liquid investments?

13        A.    They're investments that are not liquid.

14        Q.    Where did the $90 million in the

15   operational account come from?

16        A.    From the -- from the different accounts

17   that the system received until -- from the different

18   income that the system received until the date of

19   the 30th of June of 2017.

20        Q.    So that would have been from the employer

21   contributions before June 30, 2017?

22        A.    (In English)  Employer, employee, loans,

23   disability insurance, and other concepts.

24        Q.    Okay.  Does ERS have any source of income

25   today?

Video Deposition of Luis Rodriguez, 6/4/2019

103

                              L. COLLAZO

1

2        A.    ERS?  No, we don't receive any income.

3        Q.    So today it has no revenues then,

4   correct?

5              MR. POCHA:  Objection to the form.

6        A.    Revenues, no.

7        Q.    Before July 1, 2017, ERS did have income

8   and revenues, correct?

9              MR. POCHA:  Objection to the form.

10       A.    Before answering that question, let me

11  clarify something in terms of if ERS has any type of

12  income.  Because since we still have private equity,

13  every once in a while we do receive distributions,

14  so then --

15       Q.    Okay.  So let me go back to income that

16  ERS receives today.

17             My understanding -- and correct me if

18  I'm wrong -- is that it, ERS, may receive some

19  investment income from its private equity

20  investments?

21       A.    Uh-huh.

22       Q.    But it does not receive, for example, any

23  contributions or revenues from municipalities or

24  public corporations; is that correct?

25       A.    (In English)  That's correct.

104

L. COLLAZO

1

2          Q.     Now, before July 1st of 2017, ERS did
3     receive revenues from public corporations and
4     municipalities, correct?
5                MR. POCHA:  Objection to the form.
6          A.     Some concepts were deposited into our
7     operational account, employer/employee
8     contributions, loans.
9          Q.     And as we talked about earlier, ERS is
10    aware that some of the pension bondholders claim a
11    security interest on ERS' future employer
12    contributions, correct?
13         A.     We have knowledge of the claims.
14         Q.     Okay.  Did ERS form an understanding of
15    what effect Joint Resolution 188 would have on the
16    employer contributions that the ERS bondholders
17    claimed a security interest in?
18                MR. POCHA:  Objection.  Privileged.
19                You can answer yes or no, but exclude
20         any privileged information.
21         A.     I believe I answered that question
22    before.  And the possible effects that these could
23    have did come up with the lawyers, but that's
24    privileged information.
25         Q.     So does ERS have a position on what

Video Deposition of Luis Rodriguez, 6/4/2019

105

1                         L. COLLAZO

2    effect Joint Resolution 188 had on the employer

3    contributions that the ERS bondholders claimed a

4    security interest in?

5              MR. POCHA:  Objection.  Asked and

6         answered.  Same objections.

7         A.    Yes.  I already answered this.

8         Q.    Okay.  Well, what is the position ERS

9    has?

10             MR. POCHA:  Objection.  Asked and

11        answered.

12             MR. PAPEZ:  I don't think so.  I would

13        like an answer again, please.

14             MR. POCHA:  Same objections.

15        A.    I'm sorry.  The position about?

16        Q.    What is ERS' position about what effect

17   Joint Resolution 188 had on the employer

18   contributions that ERS bondholders claimed the

19   security interest in?

20             MR. POCHA:  Same objections.  Calls for

21        privileged information.

22        A.    The position that ERS has or may have in

23   relation to the effects of this joint resolution

24   once again may be revealing privileged information.

25   The position that we had or that we may have does

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

106

1                           L. COLLAZO

2    not emerge from a vacuum, but rather from the

3    conversations that we've had with our lawyers.

4         Q.    Are you saying you cannot provide an

5    answer without disclosing privileged information?

6         A.    Yes, correct.

7         Q.    Does ERS have a position on whether Joint

8    Resolution 188 would adversely affect the pension

9    bondholders?

10              MR. POCHA:   Same objections as before.

11        A.    In that sense, ERS' position, which means

12   that if this resolution had not passed, it could

13   have had an adverse effect on our pensioners when

14   we're talking about priorities and public policy

15   and keeping in mind what the retirement system was

16   created for.  Our focus was what was on what type of

17   adverse effects can be caused by not passing of that

18   resolution on our pensioners.

19        Q.    Did ERS prioritize the payment of

20   pensioners over the payment of its obligations on

21   the pension obligation bonds?

22              MR. POCHA:   Same objections as before.

23              Exclude privileged information?

24        A.    Once again, I wouldn't say what could be

25   the rights of the bondholders, if there is any.  The

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

107

L. COLLAZO

1
2 courts will determine that on their day in court,
3 and that's why we're in this process. Right? It's
4 not trying to go above or trying to go below. It
5 was a matter of prioritizing, right, the support and
6 the payment of benefits to our pensioner.
7     Q. And prioritizing those over the
8 obligations to pay debt service on the pension
9 obligation bonds?
10     A. What may have been the obligations, and
11 the contract says what it says and it establishes
12 what it establishes, and it says what is established
13 and that will be interpreted by the court.
14        (Whereupon, a memorandum was marked as
15       Exhibit 37 for identification, as of this
16       date.)
17     Q. I'm going to hand you what has been
18 marked as Exhibit 37. I'm handing you, Mr. Collazo,
19 a copy of the offering memorandum for one of the
20 series of pension bonds we've been referring to.
21     A. Yes.
22     Q. There are Bates numbers at the bottom. I
23 would ask you to turn to the page ending Bates
24 number 886.
25     A. Yes.

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

108

                        L. COLLAZO

1

2       Q.    Do you see this is -- probably 2886.  You

3    got it.  There you go.

4            You see this is a copy of the bond

5    resolution that authorizes the issuance of the

6    pension obligation bonds?

7       A.    Yes.

8       Q.    All right.  And I would like you to turn

9    to page Bates number 2901, and I'm going to refer

10   you to section 709, subparagraph 2.

11           Do you see that?

12      A.    Yes.

13      Q.    All right.  It says:  The system shall

14   oppose any attempt by the legislature of the

15   Commonwealth to reduce the employer's contribution

16   rate or to make any other change in the act or any

17   other relevant legislation that would have a

18   material adverse effect on the bondholders.

19           Did you see that, sir?

20      A.    Yes.

21      Q.    Did ERS make any effort to oppose the

22   passage of Joint Resolution 188?

23      A.    Well, as I indicated in a previous

24   answer, certainly ERS -- we found out about this

25   resolution once it had been passed, once it had been

109

1                              L. COLLAZO

2    approved.

3         Q.    ERS did not make any effort to oppose

4    Joint Resolution 188, correct?

5              MR. POCHA:   Objection.   Asked and

6         answered.

7         A.    Yes.  I already answered that.

8         Q.    And it's correct you didn't make any

9    efforts, correct?

10             MR. POCHA:   Same objection.

11        A.    I had responded that we didn't

12   participate, that we didn't make a commentary, that

13   we didn't see drafts, that we didn't see anything.

14        Q.    Did ERS make any effort to oppose the

15   passage of Act 106 in August of 2017?

16        A.    No, we made no effort to oppose it, since

17   that would mean that we would have -- that could

18   have potentially meant that we would have left the

19   thousands or hundreds of thousands of pensioners

20   unprotected.

21        Q.    After Joint Resolution 188 went into

22   effect, did ERS inform anybody at the Commonwealth

23   that reductions in employer contributions may

24   adversely affect the ability of ERS to comply with

25   its obligations under the pension obligation bonds?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 ▪ www.advanceddepositions.com

110

L. COLLAZO

1

2      MR. POCHA:  Objection.  Form.

3      A.    No, not to the best of my knowledge.  We

4  didn't inform -- we didn't make any commentary about

5  the text in this section.

6      Q.    I'm not talking about the text in this

7  section.  I'm just asking you whether ERS ever told

8  anybody at the Commonwealth that reducing the

9  employer contributions would adversely affect the

10  ability of ERS to comply with its obligations under

11  the bonds.

12      MR. POCHA:  Objection to the form.

13  Exclude privileged conversations.

14      A.    To the best of my knowledge, that wasn't

15  informed, and what could have been the obligations

16  under the protection of that section -- under that

17  section, not protection -- that comes out of

18  conversations with lawyers.

19      Q.    You can set that aside.

20          I'm handing you what was marked last

21  week as Exhibit 25.  The attachment -- I'm happy

22  to pass it out -- is this Exhibit 26.  It was

23  marked separately last week.  It's in Spanish.

24  Last week we did not have a translation of this

25  particular Bates number.  We had a different

Video Deposition of Luis Rodriguez, 6/4/2019

112

L. COLLAZO

1   Exhibit 38, because I don't read Spanish, but I know
2   you read both, so whichever you prefer.
3
4           First of all, I guess looking at
5   Exhibit 26, is that your signature on the third
6   page of the document?
7       A.   So far as my knowledge -- to the best of
8   my knowledge, yes.
9       Q.   Did you read this document before you
10  signed it?
11      A.   Yes.
12      Q.   And did you have an opportunity to
13  comment and review it and make any corrections you
14  would like to make before you signed it?
15      A.   So far as I know, yes.
16      Q.   Okay.  Was the general purpose of this
17  document to describe how the Pay-Go system was going
18  to work?
19      A.   What was that?
20      Q.   Just the general purpose of this
21  document, was that to explain to various employers
22  how the Pay-Go system was going to work?
23           MR. POCHA:   Objection.
24           Exclude any privileged information.
25      A.   Yes, the purpose of this document was to

Video Deposition of Luis Rodriguez, 6/4/2019

113

                         L. COLLAZO

1
2    inform the employers about the new Pay-Go system.

3         Q.    All right.  And in communicating to the

4    employers about the new Pay-Go system, did you try

5    to be accurate in your description of the system?

6              MR. POCHA:  Objection to the form.

7         A.    Yes.  We always try to be as precise as

8    possible.

9         Q.    You can set that aside.

10             (Whereupon, a presentation was marked

11        as Exhibit 39 for identification, as of this

12        date.)

13        Q.    I'm handing you what I'm marking as

14   Exhibit 39.

15        A.    Yes.

16        Q.    Exhibit 39 is a presentation.  The first

17   part of it is an English translation that we had

18   done and certified and the second half is the

19   Spanish version.

20        A.    Yes, I notice that.

21        Q.    Is this a presentation that you yourself

22   gave about the implementation of Pay-Go on or about

23   June 29, 2017?

24             MR. POCHA:  I instruct the witness to

25        make sure he reads this document.

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

114

1                          L. COLLAZO

2        A.     Yes.

3        Q.     Did you actually give the presentation to

4   people?  You know, present it?

5        A.     Yes, to the best of my knowledge and

6   according to my memory, we made a presentation for a

7   staff from corporations and from municipalities.

8        Q.     Did you yourself put this together or did

9   people assist you in putting this together?

10       A.     It was a collaboration amongst all the

11  staff.

12       Q.     If you turn to Bates number 5064, please.

13       A.     Yes.

14       Q.     The first bullet there says:  Payroll

15  reports that they send us through Web Remesa monthly

16  cannot include information on the employer

17  contribution for active employees.

18              My first question is what's Web Remesa?

19       A.     Web Remesa is an application created by

20  the retirement system.  Basically it's an electronic

21  file with which we match the money that we received

22  with detail from Web Remesa.

23              So we're going to receive 1 million

24  pesos, but we need to know who those million

25  dollars belong to.  Like individually, like in

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

115

                          L. COLLAZO

1   loans, et cetera.

2        Q.    When you say that those reports cannot

3   include information on the employer contributions

4   for active employees, why were you saying that?

5        A.    That it couldn't be included because that

6   was no longer going to exist, the requirement for

7   this employer beginning in July 2012 moving forward.

8        Q.    All right.  The second bullet there says

9   the electronic file format is not going to change,

10  but the column for the employer contribution

11  information has to be at zero.

12        Is the reason the employer contribution

13  information has to be at zero also because as of

14  July 1, 2017, there would be no more employer

15  contributions?

16        A.    For that same reason.

17        Q.    Other than changing the employer

18  contribution information to zero, is there anything

19  else about this Web Remesa monthly report that

20  changed between June 2017 and July 2017?

21        A.    To the best of my knowledge, yes.  Now

22  the report was going to include the detail about the

23  Pay-Go.

24        Q.    Okay.  So other -- and the Pay-Go would

Video Deposition of Luis Rodriguez, 6/4/2019

116

                            L. COLLAZO

1

2   be a new addition to this web report, correct?

3       A.    Correct.

4       Q.    Other than setting employer contribution

5   to zero and adding in information about the Pay-Go

6   charge, is there anything else this exchanged about

7   this Web Remesa report?

8       A.    No, no other detail, to the best of my

9   knowledge.

10            (Whereupon, a Memorandum was marked as

11        Exhibit 40 for identification, as of this

12        date.)

13      Q.    I'm going to hand you Exhibit 40.  Just

14  for the record, last week we marked as an exhibit,

15  Exhibit 9, which was another copy of the memorandum

16  of understanding that was unsigned.

17      A.    Yes.

18      Q.    Exhibit 40, if you'll look, Mr. Collazo,

19  it appears it was signed by you.

20      A.    Yes.

21      Q.    My first question, sir, is:  Do you know

22  whether this memorandum of understanding was ever

23  signed by the other two individuals on page 5?

24      A.    To the best of my knowledge, no.  No, it

25  wasn't signed.

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

117

                          L. COLLAZO

1

2      Q.    My understanding of this MOU is that it

3  sort of established the different obligations

4  between the parties in terms of implementing Pay-Go.

5            My question is:  Is that generally

6  correct?

7      A.    To the best of my knowledge, it was, yes.

8  The purpose of the memorandum, which it actually

9  wasn't able to take effect or culminate --

10     Q.    Did the parties generally follow this MOU

11 even though they didn't actually fully sign it?

12           MR. POCHA:  Objection to the form.

13     A.    To the best of my knowledge, the MOU was

14 circulated so the parties would sign it.  But

15 afterwards, it kind of became diluted.  A short time

16 afterwards, the Law 106 came into effect, to the

17 best of my knowledge, so then it became unnecessary

18 to sign the document.

19     Q.    I'm going to use this as a bit of a guide

20 to talk about the implementation of the Pay-Go

21 system.  If you look at paragraph 2A, it says:  ERS

22 will continue to handle all administrative matters

23 for the proper calculation of retirement benefits

24 payable to beneficiaries.

25     A.    Uh-huh.

Video Deposition of Luis Rodriguez, 6/4/2019

118

                        L. COLLAZO

1

2      Q.    Does ERS still do that today?

3      A.    Yes.

4      Q.    Did ERS also do that before June of 2017?

5      A.    Yes.

6      Q.    Look at subparagraph B.  It says:  ERS

7  will provide to AAFAF such information as AAFAF may

8  require to calculate the Pay-Go charge.

9            Does ERS still do that today?

10     A.    Well, we don't do that by ourselves.  ERS

11 doesn't do that by ourselves.  As I mentioned, we

12 have the data for each pensioner, and we share that

13 with AAFAF.  They review it and so then they give

14 the green light.

15     Q.    All right.  Paragraph 2C talks about ERS

16 submitting an invoice to each employer for the

17 Pay-Go charge.

18            My question is:  Does ERS do that

19 today?

20     A.    Yes, we continue invoicing employers.

21     Q.    Okay.  You can set that aside.

22            As far as you're aware, Act 106 did not

23 create any new pension benefits for members of

24 ERS; is that correct?

25            MR. POCHA:  Objection.  Calls for a

ad advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

119

                          L. COLLAZO

1

2      legal conclusion.

3           A.   What I can establish is that Law 106

4      created a new plan for contributions that were

5      definite -- defined contributions.

6           Q.   Okay.  So Act 106, one of the effects was

7      that employee contributions would be segregated into

8      separate individual accounts similar to 401K

9      accounts; is that right?

10          A.   Correct.

11          Q.   Whereas before 106 went into effect, the

12     employee contributions for the defined benefit

13     program were not in separate individual accounts,

14     correct?

15          A.   Correct.

16          Q.   As far as you know, did Act 106 create

17     any new defined benefit, pension benefits, for

18     retirees?

19               MR. POCHA:  Same objection as before.

20          A.   No.

21          Q.   Joint Resolution 188 directed ERS to

22     liquidate its assets, correct?

23          A.   Correct.

24          Q.   I'm handing you Exhibit 28, which was

25     marked last week.

120

                        L. COLLAZO

1

2          Do you see this is a letter to you from

3    the executive director of AAFAF?

4          A.    Yes.

5          Q.    And he directs you in the second

6    paragraph to sell ERS' assets, correct?

7          A.    To liquidate immediately all the liquid

8    investments from the retirement system.

9          Q.    Okay.  Did ERS do that in and around July

10   2017?

11         A.    We liquidated our liquid investments.

12         Q.    How much was the proceeds from that

13   liquidation?

14         A.    Approximately 296 million.

15         Q.    You'll see in the second to the last

16   paragraph the director of AAFAF instructs you to

17   transfer at least 190,480,000 of the proceeds from

18   the sale of the investment and to transfer that to

19   the treasury.

20          Do you see that?

21         A.    Yes.

22         Q.    And did ERS do that?

23         A.    Yes.

24         Q.    Okay.

25         A.    We transferred the quantity that's

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 ▪ www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

121

                          L. COLLAZO

1   requested in the letter.

2       Q.    The remaining 150 or so million dollars

3   from the sale of the proceeds, what happened to

4   that?

5       A.    Yes.   When I mentioned the assets that

6   the system had before, I mentioned the quantity 109

7   million.   That quantity we have inside of a

8   restricted account because we liquidated it, yes.

9   It's inside that account, that amount.   That was --

10  that amount was not transferred to the Department of

11  the Treasury.

12      Q.    Why was that amount not transferred to

13  the Department of Treasury?

14              MR. POCHA:   Objection.

15              Exclude any privileged information.

16      You can answer if you can.

17      A.    Well, certainly I received a letter to

18  send a first amount.   I haven't received any other

19  instructions from my physical agent, which is AAFAF,

20  which would be to remit the remaining amount.   And

21  it's important to mention that Resolution 188 also

22  doesn't set a set amount of time, a determined

23  amount of time to be able to transfer that.   Right?

24  It's like we're waiting for instructions.   Right?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

122

                              L. COLLAZO

1          Q.     Is that money in an interest-bearing bank

2     account?

3          A.     It's generating interest, yes.

4                 (Whereupon, a letter was marked as

5          Exhibit 41 for identification, as of this

6          date.)

7          Q.     I'm going to hand you what I'm marking as

8     Exhibit 41.  This one should be quick.  Is this a

9     letter from you to an individual at Banco Popular

10    instructing him to transfer 190,480,000 from ERS to

11    the Department of Treasury?

12         A.     Yes.

13         Q.     And you transferred that 190,480,000

14    pursuant to this letter?

15         A.     What letter?  This one?

16                MR. PAPEZ:  Let me withdraw that

17         question.

18         Q.     As far as you know, did Mr. Garcia Alvira

19    transfer the 190,480,000 you requested to the

20    Department of Treasury?

21         A.     To the best of my knowledge, the quantity

22    was transferred.

23         Q.     I'm handing you what was marked as

24    Exhibit 18.

Video Deposition of Luis Rodriguez, 6/4/2019

123

                         L. COLLAZO
1
2          You see it's a letter from the
3    Financial Oversight Board of Puerto Rico addressed
4    to Mr. Maldonado Gautier and to you?
5          A.    Yes.
6          Q.    Did you read this letter when it came in
7    about two months ago?
8          A.    Yes.
9          Q.    Okay.  Have you had any conversations
10   with anybody at the Financial Oversight and
11   Management Board about this letter?
12              MR. POCHA:  Interpose a privilege
13          objection.
14              It's a yes or no, excluding privileged
15          conversation.
16         A.    With the members of the Financial
17   Oversight Board, no.  But after having admitting
18   this letter, we did have some periodic meetings that
19   we've had for a long time with advisors and --
20   advisors from the board.  They're implementation
21   meetings.  Yes, we did discuss the reach of the
22   letter.
23         Q.    Do you understand in general that the
24   letter was raising issues with the fact that many
25   public corporations and municipalities were not

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

124

1                       L. COLLAZO

2    paying the full amount of Pay-Go fees that they

3    owed?

4         A.    The letter speaks for itself.  The text

5    is very clear.  And yes, that's one of the topics

6    raised by the letter.

7         Q.    If you see on page 3 of the letter

8    towards the bottom, it says:  Accordingly, the

9    Retirement Board's designee or the managing entity

10   shall certify the debt of each delinquent entity and

11   request in writing -- and then it goes on and has

12   three bullet points that carry onto the fourth page.

13            My question is whether ERS has -- or

14   the Retirement Board has taken any of these

15   actions that were requested by The Financial

16   Oversight and Management Board?

17        A.    Yes, at the level of the Board of Retired

18   -- at the level of the Retirement Board, we did.

19        Q.    Okay.  What did the Retirement Board do?

20        A.    (In English)  We sent letters to

21   municipalities and corporations that ask individual

22   employee contribution debt to pay they owe amount in

23   a ten-business-day period and advising them if they

24   didn't make the payment, we were going to record the

25   money through the CRIM in case of the municipalities

Video Deposition of Luis Rodriguez, 6/4/2019

125

                              L. COLLAZO

1

2     and through the Department of Treasury in case of

3     the public corporations.

4          Q.    Did you raise any issues about the Pay-Go

5     fees that had not been paid?

6               MR. POCHA:   Interpose a scope

7          objection.   I believe the witness is talking

8          about the Retirement Board.

9          A.    (In English)  Yes.  We sent last week --

10    best of my knowledge, Thursday or Friday.  We sent a

11    letter regarding, in this case, the Pay-Go charge

12    telling the employees, municipality and corporation,

13    to make either two things in a period of ten

14    business days, either to make the payment of the

15    amount owed or to engage in a payment plan with the

16    Retirement Board.  So if they do not make any of

17    both alternative, then the same, we were going to

18    recover the amount owed through the CRIM in case of

19    municipality and through the Department of Treasury

20    in case of public corporations.

21         Q.    Have you received any responses from any

22    of the municipalities or public corporations with

23    regard to your statements about the Pay-Go fees that

24    they owe?

25         A.    (In English)  Not yet, because the letter

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

126

1                        L. COLLAZO

2    was sent -- or last Friday or this Monday or

3    yesterday.

4         Q.    Okay.

5         A.    (In English)  Okay?  So the letter that

6    we sent first were the letters of the individual

7    contribution, so the ten business days are running

8    right now regarding the Pay-Go debt.

9         Q.    Let's take a quick break.

10              THE VIDEOGRAPHER:  3:41 p.m.

11              (Whereupon, there was a pause in the

12         proceeding.)

13              THE VIDEOGRAPHER:  We are back on the

14         video record, 3:49 p.m.

15              (Whereupon, two documents were marked

16         as Exhibits 42 and 43 for identification, as

17         of this date.)

18         Q.    Mr. Collazo, I am handing you Exhibits 42

19    and 43.  43 is a compilation of bank statements that

20    were produced to us by ERS for the pre-petition

21    segregated account.

22              Do you see that?

23         A.    Yes.

24         Q.    And I actually emailed Exhibit 42 and 43

25    to your counsel yesterday.  Did you have a chance to

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

127

1                        L. COLLAZO

2    review these documents before today?

3         A.    Yes, I believe so.

4         Q.    If you look at Exhibit 42, the first

5    paragraph notes that the current amount of funds as

6    of January 31, 2019, in the pre-petition segregated

7    account was $2,588; is that correct?

8         A.    To my understanding, yes.

9         Q.    And have you had a chance to verify that?

10        A.    To verify in what way?

11        Q.    To confirm that was the amount?

12        A.    Yes.  Yes.  We understand that, yes.

13        Q.    And then paragraph 3 lists several

14   transfers into the pre-petition segregated account

15   between January 2017 and January 2019, correct?

16        A.    Yes.

17        Q.    Did you have a chance to confirm that

18   those amounts listed in paragraph 3 on Exhibit 42

19   were correct?

20        A.    We verified them and we understand they

21   are correct.

22        Q.    And then paragraph 4 refers to 16

23   withdrawals from the pre-petition segregated account

24   between January 2017 and January 2019.

25              My question is:  Did you have a chance

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

133

1                      L. COLLAZO

2       A.    Yes, that's not just one withdrawal.

3  Well, there you have things that are included like

4  the payroll withdrawal, the operational expenses.

5       Q.    Okay.  Just general operating expenses

6  and payroll and things like that?

7       A.    Yes.  There might be other transactions,

8  too.  The thing is you would have to go to the

9  detail of the transaction to see.  Yes.

10      Q.    I think you described this account

11 earlier as the operational account of the ERS?

12      A.    Yes, yes.

13      Q.    In general, what types of expenses does

14 ERS have today that it pays out of this operational

15 account?  Just in general.

16      A.    Professional expenses, payroll expenses.

17 Some benefits.  Like the $1,000, that might be

18 available for funeral expenses.  That's established

19 by the law.  Reimbursement for contributions, if the

20 person is entitled to that according to the

21 reimbursement law.  Rental expenses for the

22 building.  That would be it, basically.

23      Q.    All right.  One thing I wanted to ask you

24 about.  In August of 2017 --

25      A.    Yes.

Video Deposition of Luis Rodriguez, 6/4/2019

134

1                       L. COLLAZO

2       Q.      -- there were some large deposits that if

3  you look in Exhibit 45, Bates number 2064 --

4       A.      26 --

5       Q.      2064.  If you look on August 16th and

6  August 17th, there's three total transfers into this

7  account that total total 190,480,000, which is the exact

8  amount of the withdrawal.

9              Why were you -- why was ERS receiving

10 190,480,000 in August of 2017?

11             MR. POCHA:  Objection to the form.

12      A.      To the best of my knowledge, once we

13 liquidated the investments, they're deposited into

14 the account and later they're transferred to

15 treasury.  That's why you're seeing it here as a

16 deposit, those 190 million.

17             And here in July --

18      Q.      In July, it was already paid to Treasury?

19      A.      In July, it's liquidated.  Let me put it

20 in perspective.  You would have to go to the detail

21 of the transaction.  You would have to see the

22 detail of the transaction, because I can't -- you

23 would have to go to the transfer.  You would have to

24 go to the detail to see what's going on exactly.

25      Q.      So as of today, you can't tell me what's

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

135

                        L. COLLAZO

1   going on with that $190 million transfer in

2   mid-August of 2017?

3              MR. POCHA:  Objection to the form.

4        A.    That's the transfer that was made to the

5   Department of Treasury.  It has to do with the

6   liquidation of the investments.  Now, to be able to

7   give you the details about it, I would have to

8   verify it.  The tract and the detail, I would have

9   to verify that.

10       Q.    All right.  Let me just ask a few more

11  questions in general.  You can put this aside.

12             As of July --

13             MR. PAPEZ:  Strike that.

14       Q.    As of today, June 4, 2019, does ERS have

15  a right to receive employer contributions from

16  employers?

17             MR. POCHA:  Objection.  Calls for

18        privileged information.

19             But you can state whatever you

20        understand ERS' position to be, excluding

21        privileged information.

22       A.    To the best of my knowledge, ERS did have

23  the right to receive employer contributions until

24  the date of the 30th of June of 2017.

Video Deposition of Luis Rodriguez, 6/4/2019

136

1                      L. COLLAZO

2        Q.     Then after that date, ERS' position,

3    anyways, is it no longer is entitled to receive

4    employer contributions?

5               MR. POCHA:  Same objection.

6               Exclude any privileged information.

7        A.     Yes.  After that date, the Pay-Go charges

8    already began, and they don't enter the same, but

9    rather they go to the Pay-Go account in the Treasury

10   Department.

11       Q.     Has ERS ever attempted to place a value

12   on the Pay-Go fees that are due from employers after

13   June 30, 2017?

14               MR. POCHA:  Objection to the form.

15       A.     A value?

16       Q.     Yes, a value.

17       A.     The Pay-Go is a quantity.  I don't know

18   what you mean by putting a value to that quantity or

19   that amount.

20       Q.     As far as you know, Pay-Go fees are an

21   obligation for employers to pay monthly, sometime

22   into the future, correct?

23       A.     Correct, yes.

24       Q.     Has ERS ever attempted to say at any

25   point after July 1, 2017, that that future treatment

Video Deposition of Luis Rodriguez, 6/4/2019

137

1                           L. COLLAZO

2      of payments has a present value of X dollars on X

3      date?

4               MR. POCHA:  Objection.  Vague.

5          A.    To be honest, I still haven't managed to

6      understand.

7          Q.    You understand a future stream of revenue

8      can have a present value today?

9          A.    Yes.

10         Q.    Has ERS ever attempted to place a present

11     value on the future stream of Pay-Go fees?

12              MR. POCHA:  Objection to the form.

13         A.    Yes.  Well, based on my knowledge, no.

14              MR. PAPEZ:  Thank you.  I pass the

15         witness.

16     EXAMINATION BY

17     JESSE GREEN, ESQ.:

18         Q.    Good afternoon.  I'm Jesse Green from

19     White & Case on behalf of the Puerto Rico Funds.

20              Earlier you testified that in early

21     2017, ERS was not being funded as it should have

22     been; is that correct?

23              MR. POCHA:  Objection.  The record

24         speaks for itself.

25              You can answer.

AD  advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Luis Rodriguez, 6/4/2019

138

1                        L. COLLAZO

2        A.    Yes.   The record speaks for itself.   It's

3   well-known that the system was underfunded for

4   years.

5        Q.    Now, there were statutory mechanisms in

6   place to force employers to comply with their

7   obligations to contribute to ERS, correct?

8              MR. POCHA:   Objection.   Vague.

9        A.    Can you reformulate that.   I would like

10  to hear the question or have a new question.

11       Q.    Do you have an understanding what the ERS

12  Enabling Act is?

13       A.    Yes, Law 447.

14       Q.    Do you understand that there's a

15  provision in that act related to penalties to

16  employers?

17       A.    Penalties for what?

18       Q.    For not making employer contributions to

19  ERS?

20       A.    Yes, to the best of my knowledge, there

21  are some dispositions to that effect.

22       Q.    For example, the Enabling Act provides

23  for criminal penalties to heads of public

24  corporations and municipalities that fail to remit

25  payments to ERS, correct?