## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------X

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

                 Debtors.[1]

-------------------------------------------------------------X

CERTAIN ALLEGED SECURED CREDITORS
OF THE EMPLOYEES RETIREMENT SYSTEM
OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO,

               Movant,

     -against-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO,

               Respondent.

-------------------------------------------------------------X

PROMESA
Title III

No. 17-cv-1685-LTS
No. 17-bk-3566-LTS

**Re:  ECF Nos. 289, 292, 367, 371 & 505**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**NOTICE OF SUBMISSION OF DECLARATIONS IN SUPPORT OF SUPPLEMENTAL
OPPOSITION BY THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

To the Honorable United States District Court Judge Laura Taylor Swain:

The Employees Retirement System of the Government of the Commonwealth of Puerto

Rico ("ERS," "System," or the "Debtor"), by and through the Financial Oversight and

Management Board (the "Oversight Board"), as the Debtor's representative pursuant to Section

315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2]

hereby respectfully states the following:

1.      On May 13, 2019, Judge Swain entered the *Order Granting Urgent Motion

Regarding the Scheduling of Discovery and Briefing in Connection with the Motion of Certain

Secured Creditors of the Employees Retirement System of the Government of the Commonwealth

of Puerto Rico for Relief from the Automatic Stay* [ECF No. 505][3] (the "Scheduling Order").

2.      The Scheduling Order directed each party to file declarations in support, in addition

the supplemental opposition filed contemporaneously herewith, by June 21, 2019.  *Id.* at 3.  In

compliance with the Scheduling Order, ERS hereby submits:

   a.   **Exhibit A**:  Declaration of Gaurav Malhotra in Connection with Motion for Relief

        from the Automatic Stay, dated May 30, 2019.

---

[2] PROMESA has been codified at 48 U.S.C. §§ 2101–2241.

[3] Unless otherwise specified, ECF numbers refer to Case No. 17-bk-03566.

b.   **Exhibit B**: Rebuttal Declaration of Gaurav Malhotra in Response to Expert Report of Faten Sabry in Connection with Motion for Relief from the Automatic Stay, dated June 12, 2019.

c.   **Exhibit C**: Expert Rebuttal Report of Lawrence J. Sher, F.S.A., F.C.A., M.A.A.A., E.A., dated June 12, 2019.

d.   **Exhibit D**: Declaration of Luis Collazo Rodriguez in Support of Debtor's Supplemental Opposition to Motion of Certain Secured Creditors of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay, dated June 21, 2019.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

Dated: June 21, 2019
San Juan, Puerto Rico

/s/ Margaret A. Dale
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Joshua A. Esses (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
Email:  brosen@proskauer.com
Email:  jlevitan@proskauer.com
Email:  ppossinger@proskauer.com
Email:  mdale@proskauer.com
Email:  jesses@proskauer.com

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

/s/ Luis F. del Valle-Emmanuelli
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax. 787.722.1932
dvelawoffices@gmail.com

OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
434 Avenida Hostos
San Juan, PR 00918
Tel: (787) 751-6764/ 763-0565
Fax: (787) 763-8260

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement*

4

*System of the Government of the*
*Commonwealth of Puerto Rico*

## Exhibit A

**Declaration of Gaurav Malhotra in Connection with Motion for Relief from the Automatic Stay, dated May 30, 2019**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br><br>Title III<br><br><br>Case No. 17-bk-03283 (LTS) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>        Debtor. | PROMESA<br><br>Title III<br><br>**Re:  ECF No. 289**<br><br><br>Case No. 17-cv-01685 (LTS)<br><br>Case No. 17-bk-03566 (LTS) |

**DECLARATION OF GAURAV MALHOTRA IN CONNECTION WITH
MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

I, Gaurav Malhotra, hereby declare under penalty of perjury:

1.   I am a Principal with Ernst & Young LLP ("EY") and the leader of its Restructuring

Advisory Services practice, and I have been retained by counsel to the Financial Oversight and

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Management Board for Puerto Rico ("Oversight Board") in connection with a motion by certain
alleged creditors of ERS for stay relief and adequate protection [ECF No. 289 in Case No. 17-bk-
03566] (the "Stay Relief Motion").

2.   I am familiar with the matters addressed in this declaration (the "Declaration").  I submit
this Declaration in connection with the Stay Relief Motion.

3.   Except as otherwise indicated, all facts set forth in this Declaration are based upon my
personal knowledge; my review of relevant documents and information concerning the Debtors'
operations, financial affairs, and restructuring initiatives, which are identified in the Materials
Considered list appended hereto; or my opinions based on my experience and knowledge.

4.   I may supplement the opinions expressed herein should additional information become
available to me after the filing of this report.

5.   I am being compensated for my time at my hourly rate of $870. In addition, EY staff
working on this specific engagement are compensated based upon experience level, at an hourly rate
ranging from $245 to $870. Neither I nor EY has any financial interest in the outcome of these
proceedings.

6.   If called as a witness, I would testify competently to the statements set forth in this
Declaration as the information in this Declaration is accurate to the best of my knowledge subject to
the qualifications noted in Paragraph 7 of this Declaration.

<u>Introduction</u>

7.   In connection with this Declaration, I have been asked to calculate the net present value
("NPV") of projected retirement benefit payments to be paid by the Commonwealth to pensioners
who participated in the ERS retirement system under the "pay as you go" funding arrangement
established by Act 106-2017 ("PayGo Projections") and to compare that NPV to the amount of
asserted ERS bondholder claims.  The PayGo Projections do not include projected payments to
pensioners who participated in the Teachers' Retirement System or Judiciary Retirement System.
Unless otherwise noted, the PayGo Projections used in the NPV calculation are based primarily upon

2

the same information used in the development of the GASB Actuarial Valuation Reports prepared by the System Actuary (as described below).

Baseline Data

8. The ERS administrator has engaged an independent actuarial firm ("System Actuary") to prepare pension valuation reports for several years, including the most recent valuation report as of June 30, 2017 and dated March 26, 2019. This report was based on census data as of July 1, 2016 for use in the development of the June 30, 2017 Total Pension Liability for GASB 67 reporting purposes and the Actuarial Accrued Liability under GASB 45.

Key Assumptions and Inputs

9. Census Data and demographic assumptions – Actual census data, as of July 1, 2016, was obtained from the System Actuary and utilized for the baseline projections of PayGo payments to retirees. With the exception of the mortality assumption noted below, all of the demographic assumptions used by the System Actuary based on historical plan experience were used to project participant behaviors (e.g., rates of, or, age at termination) from July 1, 2016 through the projection period. To the extent that demographic experience post-July 1, 2016 differs from both short and long-term expectations, the estimates contained in this analysis would vary based upon the use of actual current or future census data. In particular, the June 30, 2017 valuation does not reflect members who have retired under Act 211-2015. In my opinion, these demographic changes would not materially impact the overall NPV comparison conclusions within this specific analysis.

10. Plan provisions – Unless otherwise impacted by any cut to pension benefits, plan provisions were valued as summarized in the System Actuary's actuarial valuation report, including the freeze of the defined benefit portion of the ERS plan in 2013 via Act 3-2013. The results of the analysis were generally consistent with the results provided by the System Actuary.

11. Proposed pension cut – A 10% average reduction in pensions has been proposed in the Fiscal Plan, which is structured to reduce pensions progressively by using a formula that protects retirees from falling into poverty (the "Pension Cut Formula"), combined with a Threshold (defined

below) which sets a floor for monthly amounts received by pensioners pursuant to the Fiscal Plan.
Although the average benefit reduction will be 10%, there will be no reduction for those with total
retirement plan benefits (including assumed Social Security of $400 per month for non-police ERS
members for whom the employer pays Social Security taxes) below the poverty line level of $1,000
per month (the "Threshold"). For those with retirement benefits above the Threshold, retirement
benefits will be reduced by up to 25%; however, total retirement benefits will not be cut below the
Threshold. In summary, any retiree with total retirement benefits above the $1,000 Threshold will see
some level of reduction.

12.  Pension Cut Date – The Commonwealth Fiscal Plan, certified as of May 9, 2019,
includes a formula-based pension cut with an effective date of July 1, 2020.  The approximate 10%
cut proposed by the Oversight Board would apply to benefits of pensioners who participated in ERS,
and impact certain current and future retirees based upon the Pension Cut Formula.  Benefits earned
after the Commonwealth's Title III petition date would not be subject to the cut.

13.  Mortality – The PayGo Projections use the same base mortality table used by the System
Actuary and a recent Society of Actuaries mortality improvement scale that smooths mortality
improvement experience over multiple years.

Results and NPV Methodology

14.  The table in Exhibit 1A shows the estimated PayGo Projections for the next forty years.
These PayGo Projections were developed by applying the actuarial assumptions related to dates of
benefit commencement and life expectancy to each individual member record in the census data
listing to produce a stream of benefits payable over the lifetime of the member using standard
actuarial projection techniques.  The estimated PayGo Projections reflect all benefits for the ERS
defined benefit plan members included in the GASB 67 liability (Basic System Benefits and System
Administered Benefits) and the GASB 45 liability (medical insurance plan contribution) as noted in
the June 30, 2017 actuarial valuation, after all adjustments for the Pension Cut Formula.

**EXHIBIT 1A**

| Employer ($ in billions) | PayGo – Nominal (FY19-FY58) | PayGo – NPV @ 3.58% | PayGo – NPV @ 3.79% |
|---|---|---|---|
| FP Agencies | $31.9 | $18.0 | $17.5 |
| FP Corporations | $6.4 | $3.7 | $3.6 |
| Municipalities | $5.8 | $3.2 | $3.1 |
| Non-FP Corporations | $3.6 | $2.0 | $2.0 |
| **ERS Total** | **$47.7** | **$26.9** | **$26.2** |

15.   The total PayGo Projections payable over the next 40 years is estimated to be $47.7 billion[2] on a nominal basis. Utilizing the 3.58% discount rate based on the June 30, 2017 Actuarial Valuation Report for ERS[3] results in a NPV of $26.9 billion for the 40 years of annual PayGo Projections.

16.   The 3.58% discount rate is based upon the single weighted discount rate under GASB 67 and was selected by the System Actuary in reference to the Bond Buyer 20-Bond Municipal Bond Index.  Further analysis utilizing a more recent discount rate for the referenced Bond Buyer 20-Bond Municipal Bond Index rate as of March 31, 2019 of 3.79% results in a NPV of $26.9 billion for the 40 years of annual PayGo Projections.

17.   The NPVs above significantly exceed the asserted ERS bondholder claim of $3.8 billion.[4]

18.   The $47.7 billion noted above includes PayGo payments made by the Commonwealth on behalf of municipalities.  Should municipalities no longer be required to make PayGo payments under Act 29-2019, the $47.7 billion would still be fully paid by the Commonwealth.  However, the Commonwealth would not receive approximately $5.8 billion in PayGo reimbursement from the municipalities it otherwise would have during this 40-year period.

---

[2] Source: Commonwealth of Puerto Rico Certified Fiscal Plan dated May 9, 2019.

[3] Source: http://www.retiro.pr.gov/wp-content/uploads/PRGERS_Val_June302017.pdf

[4] Source: Claim # 16777 filed May 24, 2018 by The Bank of New York Mellon, as Fiscal Agent, Debtor Name: Employers Retirement System of the Government of the Commonwealth of Puerto Rico

Analysis / Conclusion

19.  The NPV of annual PayGo Projection payment streams over the 40-year period exceeds the asserted $3.8 billion claim related to bond debt held by the ERS bondholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  May 30, 2019

Gaurav Malhotra

**EXHIBIT 2A**



**Gaurav Malhotra**
Principal, US Restructuring
Leader
Ernst & Young LLP

**Contact information**
155 North Wacker Drive
Chicago, Illinois 60606
United States

Office:  +1 312 879 4020
Email:
gaurav.malhotra@ey.com

**Education**
‣ MBA – Case Western
  Reserve University
‣ University of Delhi

**Certifications**
‣ Chartered Financial Analyst.
‣ Member of the Turnaround
  Management Association
  and the Association of
  Insolvency and
  Restructuring Advisors.

## Background

Gaurav Malhotra is a Principal at Ernst & Young US, LLP and the leader of EY's US Restructuring Practice. He is also the State and Local Government Sector Leader for EY Transaction Advisory Services.  He has more than 18 years of financial and operational restructuring experience and has served numerous state and local governments facing stress and distress.

## Engagement Experience

Mr. Malhotra was the lead partner for EY representing the City of Detroit as its financial restructuring advisor.

He testified as an expert witness several times in bankruptcy court on a variety of issues pertinent to the City's restructuring plan predominantly focused on cash flows, 10/40-year financial projections, labor settlements, legacy retiree obligations, financing transactions etc. He was involved in assisting the City in evaluating alternate pension restructuring scenarios that included investment return assumptions, benefit modifications, alternate sources of funding, plan structure, restoration assumptions etc.

Mr. Malhotra was also the lead partner representing Detroit Public Schools in its restructuring efforts including cash flow forecasting, education strategy, labor related initiatives, facility rationalization and long-term forecasting.

Mr. Malhotra recently represented a large transportation system in the evaluation of their labor and benefit costs over the next ten years.  He analyzed the impact of alternate restructuring scenarios for pension obligations over the next decade.

Mr. Malhotra was involved in undertaking the financial assessment of a city in Florida that included a multi-billion-dollar pension funding shortfall that was addressed through legislation for new funding sources.

Mr. Malhotra was involved in reviewing the long term financial profile of a county in Michigan with significant underfunded pension and retiree healthcare obligations.  These retiree obligations have been restructured on a consensual basis.

Over the last few years, Mr. Malhotra has also spent significant time in restructuring large public-sector entities including cities, counties and school districts.

Mr. Malhotra is currently serving as a financial advisor to the Financial Oversight and Management Board ("FOMB") in the restructuring efforts of Puerto Rico, providing analysis of long-term Fiscal Plan projections, assisting in labor and retiree negotiations, and providing analysis of Puerto Rico's pension systems, including ERS.

**EXHIBIT 3A**

Publications for last 10 years

1) "Triumph in Turnaround: municipal restructuring", EY.com, 2015
2) "Rising from the Ashes once more: How Detroit recovered from bankruptcy", Citizen Today, August 2015

**EXHIBIT 4A**

Cases testified at deposition or trial in the last 4 years

1) In re City of Detroit, Michigan, Case No. 13-53846 (TJT), United States Bankruptcy Court, Eastern District of Michigan
2) Confidential arbitration, public transit authority with $1 billion+ liabilities

**EXHIBIT 5A**

Materials considered

1) Puerto Rico Government Employees Retirement System June 30, 2017 Actuarial Valuation Report
2) Puerto Rico Government Employees Retirement System June 30, 2016 Actuarial Valuation Report
3) Milliman letter re: PRGERS Estimated Projected Benefit Payments reflecting Act 106-2017 – CONFIDENTIAL, dated December 8, 2017
4) Milliman letter re: PRGERS Estimated Projected Benefit Payments reflecting Act 106-2017 – Agencies Covered by the Fiscal Plan Only – revised - CONFIDENTIAL, dated December 21, 2017
5) Milliman letter re: PRGERS Estimated Benefit Projection Payments, dated April 4, 2019
6) Milliman ERS census data, PRGERS_July12016ParticipantData_forJune302017Valuation_forEY
7) 2015 ERS Active census from PTA
8) 2015 Inactive census from PTA
9) Commonwealth of Puerto Rico Certified Fiscal Plan, dated May 9, 201
10) Commonwealth of Puerto Rico Certified Fiscal Plan, dated October 28, 2018
11) Explanatory memorandum on pension reform, dated August 4, 2017
12) Mortality Improvement Scale MP-2018
13) 20 Year AA Municipal Bond Quarterly Rates
14) Bond Buyer 20-year monthly index of FRB_H15

## Exhibit B

**Rebuttal Declaration of Gaurav Malhotra in Response to Expert Report of Faten Sabry in
Connection with Motion for Relief from the Automatic Stay, dated June 12, 2019**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br>Case No. 17-bk-03283 (LTS) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor. | PROMESA<br><br>Title III<br><br>**Re:  ECF No. 289**<br><br>Case No. 17-cv-01685 (LTS)<br><br>Case No. 17-bk-03566 (LTS) |

**REBUTTAL DECLARATION OF GAURAV MALHOTRA IN RESPONSE TO EXPERT**
**REPORT OF FATEN SABRY IN CONNECTION WITH**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

**I, Gaurav Malhotra, hereby declare under penalty of perjury:**

1.   I have been asked by counsel for the Oversight Board to review and respond to certain

aspects of the expert report submitted by Faten Sabry, Ph.D. ("Sabry") on behalf of the pension

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

1

obligation bondholders in the litigation of the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay*.

2. Certain responses below elaborate on research reported in my first expert declaration, submitted May 30, 2019, as well as correct one typographical error in that declaration.

## I.  PAYGO FEES ARE SUFFICIENT TO SATISFY THE PROJECTED AMORTIZATION OF ALLEGED BOND CLAIM

3. While Sabry outlines a calculation approach to identify that PayGo payments will decline by 72 percent over the remaining life of the bonds, no context is provided regarding the starting level of PayGo costs. An important aspect to consider is the relative magnitude of the currently expected PayGo costs to the estimated amount of the bondholders' claim.  In addition, the timeframe over which this decline is expected to take place is lengthy.   See Exhibit B for year-by-year detail related to the following nominal and net present value ("NPV") amounts as previously provided:

| Employer ($ in billions) | PayGo – Nominal (FY19-FY58) | PayGo – NPV @ 3.58% | PayGo – NPV @ 3.79% |
|---|---|---|---|
| ERS Total | $47.7 | $26.9 | $26.2 |

4. Based on these PayGo projections, I have the following findings:

    a. Nominal PayGo costs in each of the first 10 years, at a projected level of $1.5 billion or higher, represent on an annual basis, more than 1/3 of the total estimated bondholder claim.

    b. Exhibit A demonstrates that PayGo costs for each year exceed the amount of debt service that would be scheduled to be paid for that year through 2058.

2

Exhibit A: Projected ERS debt service and paygo costs



    c.   While the PayGo costs do in fact decline over time, they are projected to remain at a level which is at least 80% of current levels for over 20 years on a nominal basis and then gradually decline to levels such as those described by Sabry in her report, reaching approximately 1/4 of 2019 levels only at the end of a 40-year projection period.

5.   Based on the statement by the bondholders that the amount of the bond claim represents $3.8 billion, I compared this amount to the net present value of future PayGo costs over varying timeframes.  See Exhibit B for this comparison which identifies that the ratio remains above 120% ($4.56 billion) until 2043 for all ERS PayGo costs.

6.   There is a typographical error in the last sentence of paragraph 16 of my May 30, 2019 declaration.  The sentence should read as follows:  "Further analysis utilizing a more recent discount rate for the referenced Bond Buyer 20-Bond Municipal Bond Index rate as of March 31, 2019 of 3.79% results in a NPV of **$26.2** billion for the 40 years of annual PayGo Projections."   In the original paragraph, the number $26.9 billion was mistakenly included.

3

I declare under penalty of perjury that the foregoing is true and correct.


Executed on:  June 12, 2019


_____
Gaurav Malhotra

4

**EXHIBIT B**

### Year-by-year PayGo costs ($000's)* for all entities that had participated in ERS based on May 9, 2019 fiscal plan

| Fiscal Year End | Total ERS Annual Projected PayGo Costs | Present Value at 3.58% | Present Value at 3.79% | Present value of future PayGo costs at 3.58% | Present value of future Paygo costs at 3.58% as a % of the $3.8 billion claim | Fiscal Year end | Total ERS Annual Projected PayGo Costs | Present Value at 3.58% | Present Value at 3.79% | Present value of future PayGo costs at 3.58% | Present value of future PayGo costs at 3.58% as a % of the $3.8 billion claim |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/30/2019 | $1,648,080 | $1,536,124 | $1,529,914 | $26,941,871 | 709% | 6/30/2040 | $1,295,688 | $576,972 | $550,711 | $5,730,503 | 151% |
| 6/30/2020 | 1,740,659 | 1,566,340 | 1,556,852 | 25,405,747 | 669% | 6/30/2041 | 1,255,114 | 539,587 | 513,986 | 5,153,531 | 136% |
| 6/30/2021 | 1,533,960 | 1,332,633 | 1,321,880 | 23,839,407 | 627% | 6/30/2042 | 1,210,578 | 502,453 | 477,645 | 4,613,944 | 121% |
| 6/30/2022 | 1,521,023 | 1,275,723 | 1,262,869 | 22,506,774 | 592% | 6/30/2043 | 1,163,518 | 466,229 | 442,313 | 4,111,491 | 108% |
| 6/30/2023 | 1,508,970 | 1,221,870 | 1,207,112 | 21,231,051 | 559% | 6/30/2044 | 1,115,454 | 431,521 | 408,557 | 3,645,262 | 96% |
| 6/30/2024 | 1,499,803 | 1,172,473 | 1,155,968 | 20,009,181 | 527% | 6/30/2045 | 1,064,683 | 397,644 | 375,721 | 3,213,741 | 85% |
| 6/30/2025 | 1,494,132 | 1,127,669 | 1,109,545 | 18,836,708 | 496% | 6/30/2046 | 1,013,463 | 365,432 | 344,586 | 2,816,097 | 74% |
| 6/30/2026 | 1,500,611 | 1,093,415 | 1,073,664 | 17,709,039 | 466% | 6/30/2047 | 961,718 | 334,788 | 315,052 | 2,450,665 | 64% |
| 6/30/2027 | 1,502,289 | 1,056,804 | 1,035,615 | 16,615,624 | 437% | 6/30/2048 | 909,846 | 305,784 | 287,175 | 2,115,877 | 56% |
| 6/30/2028 | 1,501,248 | 1,019,571 | 997,107 | 15,558,820 | 409% | 6/30/2049 | 857,039 | 278,081 | 260,630 | 1,810,093 | 48% |
| 6/30/2029 | 1,500,146 | 983,610 | 959,992 | 14,539,249 | 383% | 6/30/2050 | 805,465 | 252,314 | 236,001 | 1,532,012 | 40% |
| 6/30/2030 | 1,495,996 | 946,986 | 922,378 | 13,555,639 | 357% | 6/30/2051 | 753,682 | 227,933 | 212,765 | 1,279,698 | 34% |
| 6/30/2031 | 1,490,420 | 910,848 | 885,383 | 12,608,653 | 332% | 6/30/2052 | 702,553 | 205,127 | 191,089 | 1,051,765 | 28% |
| 6/30/2032 | 1,482,897 | 874,928 | 848,747 | 11,697,805 | 308% | 6/30/2053 | 653,853 | 184,309 | 171,349 | 846,638 | 22% |
| 6/30/2033 | 1,471,788 | 838,360 | 811,628 | 10,822,877 | 285% | 6/30/2054 | 606,252 | 164,985 | 153,073 | 662,329 | 17% |
| 6/30/2034 | 1,457,493 | 801,523 | 774,395 | 9,984,517 | 263% | 6/30/2055 | 560,427 | 147,243 | 136,336 | 497,344 | 13% |
| 6/30/2035 | 1,441,255 | 765,199 | 737,805 | 9,182,994 | 242% | 6/30/2056 | 516,702 | 131,063 | 121,109 | 350,101 | 9% |
| 6/30/2036 | 1,420,518 | 728,123 | 700,635 | 8,417,795 | 222% | 6/30/2057 | 474,682 | 116,243 | 107,197 | 219,038 | 6% |
| 6/30/2037 | 1,395,737 | 690,693 | 663,274 | 7,689,672 | 202% | 6/30/2058 | 434,793 | 102,795 | 94,603 | 102,795 | 3% |
| 6/30/2038 | 1,367,570 | 653,364 | 626,158 | 6,998,979 | 184% | | | | | | |
| 6/30/2039 | 1,333,596 | 615,112 | 588,306 | 6,345,615 | 167% | **Total** | **$47,663,701** | **$26,941,871** | **$26,169,125** | | |

- As table is in $000's, small rounding differences may exist

5

108894395v1

**EXHIBIT C**

Materials considered

1) Puerto Rico Government Employees Retirement System June 30, 2017 Actuarial Valuation Report
2) Puerto Rico Government Employees Retirement System June 30, 2016 Actuarial Valuation Report
3) Milliman letter re: PRGERS Estimated Projected Benefit Payments reflecting Act 106-2017 – CONFIDENTIAL, dated December 8, 2017
4) Milliman letter re: PRGERS Estimated Projected Benefit Payments reflecting Act 106-2017 – Agencies Covered by the Fiscal Plan Only – revised - CONFIDENTIAL, dated December 21, 2017
5) Milliman letter re: PRGERS Estimated Benefit Projection Payments, dated April 4, 2019
6) Milliman ERS census data, PRGERS_July12016ParticipantData_forJune302017Valuation_forEY
7) 2015 ERS Active census from PTA
8) 2015 Inactive census from PTA
9) Commonwealth of Puerto Rico Certified Fiscal Plan, dated May 9, 2019
10) Commonwealth of Puerto Rico Certified Fiscal Plan, dated October 28, 2018
11) Explanatory memorandum on pension reform, dated August 4, 2017
12) Mortality Improvement Scale MP-2018
13) 20 Year AA Municipal Bond Quarterly Rates
14) Bond Buyer 20-year monthly index of FRB_H15
15) PR Pension Bonds 2008 Series A OS
16) PR Pension Bonds 2008 Series B OS
17) PR Pension Bonds 2008 Series C OS
18) From proval export.xls

108894395v1

**Exhibit C**

**Expert Rebuttal Report of Lawrence J. Sher, F.S.A., F.C.A., M.A.A.A., E.A.,
dated June 12, 2019**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-----------------------------------------------------------------------x
                                                    :
In re:                                              :
                                                    :
THE FINANCIAL OVERSIGHT AND                         :   Case No. 3:17:bk-03283 (LTS)
MANAGEMENT BOARD FOR PUERTO RICO,                   :
              as a representative of                :
                                                    :
THE COMMONWEALTH OF PUERTO RICO, et al.,            :
                                                    :
              Debtors.                              :        PROMESA
                                                    :        Title III
------------------------------------------------------------------ :
                                                    :
In re:                                              :
                                                    :   Case No. 3:17:cv-01685 (LTS)
THE FINANCIAL OVERSIGHT AND                         :   Case No. 3:17:bk-03566(LTS)
MANAGEMENT BOARD FOR PUERTO RICO,                   :
              as a representative of                :
                                                    :
THE EMPLOYEES RETIREMENT SYSTEM OF THE              :
GOVERNMENT OF THE COMMONWEALTH OF                   :
PUERTO RICO,                                        :
                                                    :
              Debtor.                               :
                                                    :
-----------------------------------------------------------------------x

EXPERT REBUTTAL REPORT OF
Lawrence J. Sher, F.S.A., F.C.A., M.A.A.A., E.A.

June 12, 2019

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION..............................................................................1

II.     SUMMARY OF OPINIONS...............................................................2

III.    ACTUARIALLY DETERMINED CONTRIBUTIONS........................3

IV.     ACTUARIAL FUNDING VS. PAY-AS-YOU-GO  ............................6

V.      REBUTTAL OF REPORT OF ANDREW A. SAMWICK ..................7


APP. 1.   PROFESSIONAL BACKGROUND................................................i

APP. 2.   DOCUMENTS REVIEWED.......................................................iv

APP. 3.   PROFESSIONAL BIOGRAPHY.................................................vi

## I.    <u>INTRODUCTION</u>

1.      I am a partner in October Three Consulting LLC, an actuarial and employee benefits consulting firm.  I am a Fellow of the Society of Actuaries, an Enrolled Actuary, a Fellow of the Conference of Consulting Actuaries, and a member of the American Academy of Actuaries.  I am a Past President of the Conference of Consulting Actuaries.  I have served on the Board of Directors of the American Academy of Actuaries, and I have served on both the Council of U.S. Presidents and the North American Actuarial Council.  For six years, I was a member of the Actuarial Standards Board, serving as vice-chair for four of those years.  The Actuarial Standards Board issues standards of practice that apply to virtually all actuaries practicing in the United States.

2.      I have practiced as an actuary since the 1970s.  I have extensive experience with respect to the actuarial valuation of defined benefit pension plans, including the selection of actuarial assumptions and funding methods.  I was the Chief Actuary at three firms and involved in actuarial standards and policies at three other firms.  I was a member of the New Jersey Pension and Health Benefit Study Commission, appointed by Governor Christie in August 2014, which issued four reports that analyzed the pension and health benefit programs sponsored by New Jersey and its municipalities, and made recommendations that would improve the funded status of the pension plans.   Appendix 1 includes more information on my professional background, publications, and involvement in other cases; and Appendix 3 provides my professional biography.

3.      The documents that I have reviewed in preparing this Report are listed in Appendix 2.

4.      My firm is being compensated for my time at my standard hourly rate of $680.

5.      I was engaged by counsel representing the Financial Oversight and Management Board of Puerto Rico to respond to the Expert Report of Andrew A. Samwick, Ph.D., dated May 30, 2019 ("Samwick report"), in particular his assertions comparing actuarial funding with a "pay-as-

you-go" approach.  Before doing so, I provide background on actuarial cost methods for funding pensions and how they contrast with a pay-as-you-go mechanism.

6.     The analyses presented in this Report were prepared by me or under my supervision and, except where indicated, based on assumptions and methods that I consider to be reasonable and appropriate for the purposes at hand.  In my opinion, this Report conforms to generally accepted actuarial principles and practices, and is in accordance with applicable Actuarial Standards of Practice.

7.     My comments and opinions in this Report are based on my review of the pertinent documents listed in Appendix 2 and my considerable experience as a practicing actuary, as Chief Actuary at three actuarial firms and as a member of the Actuarial Standards Board.  I reserve the right to supplement this Rebuttal Report and the opinions expressed herein in light of any further discovery as well as to respond to any subsequent reports issued by Dr. Samwick or by any other expert retained in this case.

## II.     SUMMARY OF OPINIONS

8.     Actuarial cost methods used for purposes of funding pension obligations generally require that payments to fund the projected costs to provide the benefits be made into a trust (which is anticipated to earn income on its assets) by employer (and possibly employee) contributions in a systematic manner during the years of employment of plan participants as their benefits are being earned.

9.     In contrast, under a pay-as-you-go approach there are no contributions or funding to pay for participants' future pension benefits.  Instead, current pensions are paid directly from general assets of the responsible entities (and possibly by employees) when each payment is due.

## III.   ACTUARIALLY DETERMINED CONTRIBUTIONS

10.   When recommending contributions to fund a defined benefit pension plan, a qualified actuary in the U. S. is subject to the applicable Actuarial Standards of Practice ("ASOPs") promulgated by the Actuarial Standards Board.[1]  Generally, funding recommendations are updated annually in "actuarial valuations." This involves collecting updated participant data, asset information, plan benefit provisions and then applying actuarial assumptions[2] and methods.  A key actuarial method in determining the amount of recommended funding contributions is the "actuarial cost method."

11.   An actuarial cost method is a procedure for assigning the total projected costs of providing plan benefits (and expenses) to time periods.  In accordance with ASOP No. 4, *Measuring Pension Obligations and Determining Pension Plan Costs or Contributions[3],* an actuarial cost method must assign a plan participants' projected pension benefits to time periods that "begin no earlier than the date of employment and should not extend beyond the last assumed retirement age."[4]  The actuarial present value of the benefits assigned to the current year is called the "normal cost" and the present value of the benefits assigned to all prior years is called the "actuarial accrued liability."

12.   The normal cost is a component of the actuary's recommended funding contribution for the current year.  Normal costs cease when a participant retires or otherwise terminates employment or when the active participant reaches the latest assumed retirement age.  Thus, for a participant who is retired or otherwise terminated employment, the actuarial accrued liability is

---

[1] http://www.actuarialstandardsboard.org/
[2] A key actuarial assumption is the annual rate of return on plan assets (which may also be used to discount projected future pension payments to the valuation date).  Other key assumptions are rates of mortality (to estimate how long participants will live to receive benefits) and rates of retirement to estimate the ages at which participants will retire and begin benefits.  These and other assumptions are used to determine the actuarial present value of future benefits for plan participants.
[3] http://www.actuarialstandardsboard.org/asops/measuring-pension-obligations-determining-pension-plan-costs-contributions/
[4] Ibid, section 3.13(a)

equal to the actuarial present value of all future plan benefits – i.e., that is the amount currently

needed in a trust to fund all of the participant's future plan benefits, assuming all of the actuary's

assumptions are realized.

13.     If contributions (sponsor and employees) are made each year equal to the total

normal cost, and all actuarial assumptions are realized each year, the actuarial accrued liability will

equal the plan's assets in all years and no additional contributions will be needed  However,

invariably there are differences between the actuarial accrued liability and the plan's assets – the

difference commonly referred to as an unfunded liability if the actuarial accrued liability exceeds

the value of the plan's assets.  One cause of such a difference is that actuarial assumptions will

almost certainly not be realized in any given year or even over extended periods.  The result will be

actuarial gains or losses.  For example, if the investment return on assets in a given year is less than

the actuary's assumed rate of return, there will be an actuarial loss equal to the return shortfall

which caused the value of plan assets to be lower than anticipated.  As another example, if in a given

year fewer retired participants die than anticipated based on the actuary's assumed mortality

tables, there will be an actuarial loss due to the higher than expected actuarial accrued liability.

Another cause of an unfunded (or overfunded) liability is the sponsor contributing less (or more)

than the recommended amounts.

14.     If there is an unfunded actuarial accrued liability in a given year, only a portion of

such amount is typically funded in the current year.   This unfunded liability ordinarily is

"amortized" like a home mortgage over a specified period or periods.  Thus, the total recommended

funding contribution for a given year will be the sum of the normal cost and the amortization cost.

15.     While ASOP No. 4 provides flexibility on how benefits are attributed to years of

service under an actuarial cost method, historically, actuaries in the public sector usually applied a

cost method for funding consistent with the rules for determining annual pension costs for financial accounting purposes promulgated by the Governmental Accounting Standards Board ("GASB").[5] The term historically used by the GASB for the resulting pension cost is the Annual Required Contribution ("ARC").[6] Although the GASB did not and could not require plan contributions to be equal to corresponding accounting costs recorded on financial statements, most actuaries used the same actuarial methods and assumptions in determining recommended funding contributions, at least until GASB Statement Nos. 67 and 68 became effective in the 2014 fiscal year.  For pre-2014 fiscal years, a commonly used actuarial method for GASB purposes (and for determining recommended funding contributions) was the "projected unit credit" cost method whereby a participant's projected retirement benefits are assigned equally to each year of service.  GASB Statements 67 and 68 require a more "conservative" actuarial cost method referred to as "entry age normal," whereby an equal amount of cost (rather than benefits) in dollar amount or percentage of covered pay is allocated to each year of service for each active participant.  Under that method, more of the projected benefits are assigned to earlier years of service, resulting in a generally greater actuarial accrued liability than under the projected unit credit method before participants retire or terminate employment.

16.      The bottom line, however, is that no matter how projected benefits are assigned to years of service, for a cost method to be considered "actuarial" it must assign costs to periods of **employment**.  The only exception is with respect to the amortization of any unfunded actuarial liability, although even for that purpose, ASOP No. 4 requires that the actuary should select procedures that are ". . .consistent with the plan accumulating adequate assets to make benefit payments when due, assuming that all actuarial assumptions will be realized and that the plan's

---

[5] https://www.gasb.org/home
[6] Ibid, Statement No. 25, paragraph 19.

sponsor or other contributing entity will make actuarially determined contributions when due. . ."[7] Thus, amortization periods may have to be limited if a participant group is becoming "super-mature" – i.e., where the active workforce is reducing and ageing and/or the retired population is growing.

17.     For pension systems in the public sector, pension funding contributions are often prescribed in some way by law or by other government actions.   Frequently, the result is contributions that are lower than what the actuary recommends.   Jurisdictions where that is the case are the ones that have recently been grappling with how to deal with rising unfunded liabilities (falling funding ratios), escalating recommended funding contributions and the prospect of the fund running out of money.

## IV.     ACTUARIAL FUNDING VS. PAY-AS-YOU-GO

18.     An alternative approach to pay pension plans is to forego any advance funding and simply pay benefits to participants from general assets when each payment is due.  This so-called "pay-as-you-go" approach is a non-actuarial approach because the costs are not assigned to periods before expected retirement but, instead, are incurred entirely after retirement when each payment is due.  In addition, there is no "plan" or "trust" to fund and therefore no investment income to be included.  In fact, ASOP 4 explicitly excludes the pay-as-you-go approach in the definition of Actuarial Cost Method: "For purposes of this standard, a pay-as-you-go method is not considered to be an actuarial cost method."[8]

19.     Under a pay-as-you-go approach, the sponsor makes no contributions on behalf of any participant – i.e., there is no trust fund to receive and invest contributions.  When a participant's

---

[7] ASOP No. 4, section 3.14.1
[8] ASOP No. 4, section 2.2.

pension begins, payments are made directly from general assets because there are no segregated assets to pay benefits. By contrast, under any actuarial cost method for funding pension plan benefits, normal costs ordinarily would begin to arise as soon as the employee becomes a pension plan participant, typically at or shortly after employment begins. Assuming that the normal costs are actually contributed, the resulting accumulation of plan assets held in trust provides substantial benefit security for plan participants. The more assets that are accumulated before employees retire, the less reliance there will be on the ability and willingness of future funding sources to come up with potentially rising funding requirements.

20.     It is my understanding that in Puerto Rico, public sector employers previously made contributions to a trust to pay future pension benefits, including contributions based on a percentage of the payroll of current employees. Under a pay-as-you-go approach, no such contributions are made to fund a trust. Consistent with that, it is my understanding that under Puerto Rico's PayGo system, the Commonwealth of Puerto Rico now makes the payments to cover the actual cost of pension payments, as they come due, for current retirees.

## V.     REBUTTAL OF REPORT OF ANDREW A. SAMWICK

21.     Dr. Samwick repeatedly tries to minimize the difference between actuarial funding and a pay-as-you-go approach.[9] His opinion on this issue is captured in Section III (Summary of Findings and Opinions), paragraph 8d which reads:

> "Conceptually, a change from a funded defined benefit system to a Pay-As-You-Go defined benefit system is a change only in the timing of contributions made by the sponsor of that system to support benefit payments. By itself, it is not a change in the claims that participants and other creditors have on that system. The change to Pay-Go did not improve or alter benefit payments or the cost of paying accrued pension benefits."

---

[9] See paragraphs 8d, 8e, 18, 21 and 22.

22.     I disagree with the first and third sentences and have no opinion on the second sentence because that is strictly a legal matter.

23.     I disagree with the first sentence because under a pay-as-you-go approach there are no contributions and no funding.  There are no contributions to fund a trust to pay for participants' pension benefits.   Rather, pension benefits are made directly to retired participants from general (i.e., non-segregated) assets as each payment comes due.  Thus, the amount of money required to pay the benefit payments must be determined by calculating the amount of current pension payments.

24.     I disagree with the third sentence because the cost of paying benefits under a funded defined benefit system can be materially lower in the long-term (when compared to a pay-as-you-go approach) on account of the earnings of the plan's assets.  Said another way, under a pay-as-you-go approach, the relevant costs are the actual, current pension benefits, as opposed to actuarially determined pension funding contributions.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  June 12, 2019

Lawrence J. Sher, F.S.A., F.C.A., M.A.A.A, E.A.

## <u>APPENDIX 1:  PROFESSIONAL BACKGROUND</u>

I am a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries, a Member of the American Academy of Actuaries and an Enrolled Actuary.  I am also a partner with October Three Consulting LLC.

I have worked as a pension actuary for over 40 years, specializing in defined benefit plan issues.  I received my bachelor's degree in mathematics from Rutgers University in 1973.  I then joined Kwasha Lipton and attained my fellowship in the Society of Actuaries in 1978.  I was promoted to principal in 1983 and then to partner in 1986.  I became the firm's chief actuary, responsible for actuarial standards of practice and related responsibilities.  In 1997, when Kwasha Lipton was acquired by Coopers & Lybrand, I became the chief actuary of the merged actuarial practice.  That role continued when PricewaterhouseCoopers LLP (PwC) was formed as a result of the 1998 merger of Coopers & Lybrand and Price Waterhouse.  In January 2002, I became an employee of Buck Consultants, Inc., a subsidiary of Mellon Financial Corporation, as a result of an acquisition of certain PwC businesses.  In May 2005, Affiliated Computer Services acquired certain businesses of Mellon, including Buck Consultants.  In April 2008, I joined Hewitt Associates LLC as a principal in their National Resource Group.  After leaving Hewitt in December 2010, I founded my own firm, Sher Actuarial Consulting LLC, in Morristown, NJ.  In October 2011, I joined the firm October Three LLC as a partner.

For more than 20 years I have devoted a significant portion of my time to issues relating to creative defined benefit plan designs, including providing technical assistance and advice to my firms' consultants and clients on all aspects of these plans, including communications, as well as to government officials, initiating and supervising research

activities, speaking at professional conferences, publishing articles, and responding to questions from the media.

I have given many speeches on defined-benefit subjects at actuarial and benefits conferences, including: Glasser Legalworks Seminars on Cash Balance Plans, May 1999; American Bar Association –Center for Continuing Legal Education, October 1999 session on Cash Balance Plans; Southern Employee Benefits Conference, "Cash Balance Plans: The Upside", May, 2000; The Conference Board, "When It Comes to Benefits Is Your World Still Flat?," March and April 2002; and numerous sessions at actuarial conferences sponsored by the Society of Actuaries, the Conference of Consulting Actuaries, the American Academy of Actuaries and the American Society of Pension Actuaries.

I have been active in the actuarial profession, including: as vice-chair of the American Academy of Actuaries Pension Practice Council; a member of the American Academy of Actuaries Pension Committee; a member of the Pension Committee of the Actuarial Standards Board; a member (and vice-chair) of the Actuarial Standards Board, which promulgates standards of practice for U.S. actuaries; and a member (and chairman) of the Enrolled Actuaries Meeting Program Committee.  I served on the Board (and am a past President) of the Conference of Consulting Actuaries and served on the Board of the American Academy of Actuaries.  I was also a member of Council of U.S. Presidents and of the North American Actuarial Council.

## Publications

"Cash-balance Plans Foil Longevity Risk," *Pensions & Investments*, July 9, 2012 (co-authored with Brian C. Donohue).

"The Cash Balance De-Risking Solution," *PLANSPONSOR, U.S. Edition* http://www.plansponsor.com/OpinionsArticle.aspx?id=6442497322&page=2, March 26, 2014 (co-authored with Brian C. Donohue).

"A Modern Defined Benefit Plan," *Plan Sponsor Magazine*, November 2015 (co-authored with Jeffrey W. Stevenson).

"Let the Retirement Pendulum Swing Freely to a Better Place for All," *October Three*, January 2017.  http://www.octoberthree.com/let-the-retirement-pendulum-swing-freely-to-a-better-place-for-all/

"A Better 401(k) Alternative," *Human Resource Executive*, March 2017 print and digital issues (letter to the editor);  http://www.humanresourceexecutive-digital.com/humanresourceexecutive/march_2017?pg=4#pg4

"Accommodating Life Annuities in a Defined Contribution World," *Workforce*, March 27, 2018;  http://www.workforce.com/2018/03/27/accommodating-life-annuities-defined-contribution-world/
.

"Lump sums vs. life annuities: Leveling the playing field," *Employee Benefit Adviser*, March 28, 2019;  https://www.benefitnews.com/opinion/lump-sums-or-life-annuities-for-retirees?feed=00000152-1385-d1cc-a5fa-7fff30f50000

## Expert Testimony

*Geoffrey Osberg, et al., v. Foot Locker, Inc. and Foot Locker Retirement Plan*, 07 CV 1358 (KBF); United States District Court for the Southern District of New York.

*Gene R. Romero, et al., v. Allstate Insurance Company, et al.*, No. 01-3894-MAK (Consolidated with Nos. 01-6764, 03-6872, 15-1017, 15-1049, 15-1190, 15-2602, 15-2961, 15-3047); United States District Court for the Eastern District of Pennsylvania.

*Severstal Columbus Holdings, LLC v. Willis of Wisconsin, Inc.*, Case No. 15-CV-1629; State of Wisconsin Circuit Court, Waukesha County.

## <u>APPENDIX 2:  DOCUMENTS REVIEWED</u>

June 30, 2001 Actuarial Valuation Report of the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities, Buck Consultants, February 4, 2003

June 30, 2009 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System, Milliman, April 9, 2010

June 30, 2010 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System, Milliman, March 8, 2011

June 30, 2011 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System, Milliman, June 7, 2012

June 30, 2012 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System, Milliman, July 31, 2013

June 30, 2013 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System, Milliman, June 27, 2014

June 30, 2014 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System (revised), Milliman, October 16, 2015

June 30, 2015 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System (revised), Milliman, August 31, 2016

June 30, 2017 Actuarial Valuation Reports for the Puerto Rico Government Employees Retirement System (revised), Milliman, March 26, 2019

Financial Statements as of June 30, 1997 and June 30, 1996 Together with Auditors' Report, Employees' Retirement System of the Government and its Instrumentalities, Arthur Andersen LLP, September 29, 1997

Financial Statements as of June 30, 1999 and June 30, 1998 Together with Auditors' Report, Employees' Retirement System of the Government and its Instrumentalities, Arthur Andersen LLP, December 10, 1999

Financial Statements as of June 30, 1999 and June 30, 1998 Together with Auditors' Report, Employees' Retirement System of the Government and its Instrumentalities, Arthur Andersen LLP, December 10, 1999

Basic Financial Statements for the Year Ended June 30, 2009, Required Supplementary Information for the Year Ended June 30, 2009, and Independent Auditors' Report, Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, Deloitte & Touche LLP, April 26,2010

Basic Financial Statements for the Year Ended June 30, 2010, Required Supplementary Information for the Year Ended June 30, 2010, and Independent Auditors' Report, Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, Deloitte & Touche LLP, March 18, 2011

Basic Financial Statements for the Year Ended June 30, 2011, Required Supplementary Information for the Year Ended June 30, 2011, and Independent Auditors' Report, Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, Deloitte & Touche LLP, April 27,2012

Basic Financial Statements for the Year Ended June 30, 2012, Required Supplementary Information for the Year Ended June 30, 2012, and Independent Auditors' Report, Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, Deloitte & Touche LLP, August 27, 2013

Basic Financial Statements and Required Supplementary Schedules, June 30, 2013 with Independent Auditors' Report, Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, KPMG LLP, June 30, 2014

Basic Financial Statements and Required Supplementary Schedules, June 30, 2014 with Independent Auditors' Report, Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, KPMG LLP, June 1, 2016

Basic Financial Statements and Required Supplementary Schedules, June 30, 2016 with Independent Auditors' Report, Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, KPMG LLP, October 5, 2018

Act No. 106-2017, Approved August 23, 2017

Expert Report of Andrew A. Samwick, Ph.D., May 30, 2019

Expert Report of Faten Sabry, PhD., May 30, 2019

## APPENDIX 3:  PROFESSIONAL BIOGRAPHY

Lawrence J. Sher
Partner
October Three LLC
163 Madison Avenue, Suite 220
Morristown, NJ  07960

Phone: 212-804-6996
Cell:    917-848-6103
Email:  lsher@octoberthree.com

Larry Sher is a leader in the U.S. actuarial profession, having served as Chief Actuary at major consulting firms and on the Boards of the Actuarial Standards Board, the Conference of Consulting Actuaries and the American Academy of Actuaries.  Larry has over forty years of experience as a consulting actuary focusing primarily on defined benefit and defined contribution plans.  He is recognized as a national expert on innovative retirement programs, particularly cash balance plans.  Larry has written several articles, has made numerous presentations at professional conferences, has provided input to regulators and members of Congress at private meetings and in written and oral testimony, and has provided litigation support to major companies in lawsuits involving retirement plans.

**Education**

Rutgers University, New Brunswick NJ; BA in Mathematics

**Actuarial Credentials**

Fellow of Society of Actuaries
Enrolled Actuary
Member of American Academy of Actuaries
Fellow of Conference of Consulting Actuaries

**Employment**

October Three Consulting LLC, 2011
- Partner and Member of Leadership Team
- Leader of Dispute Resolution Practice
- Consulting on innovative retirement plans

Sher Actuarial Consulting LLC, 2010 to 2011
- Founder and President
- Litigation support involvement in major class action lawsuits
- Consulting on defined benefit issues, specializing in innovative plans

Hewitt Associates, 2008 to 2010
- Principal in National Retirement Resource Actuaries group

- Responsible for research activities, internal training, actuarial policy and standards, and communicating with internal and external audiences.
- Member of innovative plan design team
- Litigation support in major class action lawsuits

Buck Consultants, 2002 to 2008
- Through Mellon acquisition of group from PricewaterhouseCoopers
- Principal and Director of Research and Retirement Policy
- Member of Leadership Group
- Responsible for research activities, including internal and external communications on actuarial related matters and employee benefits surveys.
- Responsible for developing firm positions on key retirement policy matters
- Litigation support in major class action lawsuits

PricewaterhouseCoopers, 1998 to 2002
- Through merger of Price Waterhouse and Coopers & Lybrand
- Principal and Chief Actuary
- Continued roles at Kwasha Lipton and Coopers & Lybrand
- Litigation support in major class action lawsuits

Coopers & Lybrand, 1997 to 1998
- Through acquisition of Kwasha Lipton
- Principal and Chief Actuary
- Continued roles at Kwasha Lipton

Kwasha Lipton, 1973 to 1997
- Principal 1983, Partner 1986, Chief Actuary 1992
- Responsible for actuarial practice and standards
- Developed and communicated firm positions on key actuarial and pension matters to internal and external audiences including the media
- Provided technical assistance and advice to the firms' consultants, clients and to government officials
- Testified at government hearings
- Initiated and supervised research activities

**Professional and Industry Involvement**

American Academy of Actuaries
- Member (and vice-chair) of the Pension Practice Council
- Member of the Pension Committee
- Member of the Board of Directors, 2008-2010
- Member of Council of US Presidents, 2008-2010
- Member of North American Actuarial Council, a group that includes leaders of US, Canadian and Mexican actuarial organizations, 2008-2010

Actuarial Standards Board
- Member of the Pension Committee
- Board member (and vice-chair), 2003-2008

Conference of Consulting Actuaries
- Member of Board of Directors 2003-2012
- President in 2010
- Member of Executive Committee 2008-2011
- Member of Annual Meeting Program Committee
- Member of Seminar Committee

Enrolled Actuaries Meeting
- Member of the program committee
- Chair of Meeting
- Originator of IRS Gray Book and Committee Chair for 10 years
- Member of PBGC Blue Book Committee

Industry Groups
- American Benefits Council (ABC)
- ERISA Industry Committee (ERIC)

**Dispute Resolution**
- Expert testimony by deposition or at trial in the following cases:

  Esden v. Bank of Boston
  Lyons v. Georgia Pacific
  Cooper v. IBM
  Berger v. Xerox
  Amara v. CIGNA
  Hirt v. The Equitable
  Engers v. AT&T
  Sunder v. U.S. Bank
  Conkright v. Frommert
  Stevenson v. The Bank of New York
  Allen v. Honeywell
  Osberg v. Foot Locker
  Johnson v. Meriter
  Frazier v. Honeywell
  Romero v. Allstate
  Severstal v. Willis of Wisconsin

- Consulting support to counsel in other lawsuits involving retirement plans
- Consulting support to counsel in pre-litigation disputes, including ones involving multiemployer plan withdrawal liabilities
- Consulting support on pension plan matters in a major bankruptcy
- Arbitrator in pension disputes between companies in sales of businesses
- Expert report in state court dispute involving pension and OPEB benefits in sale of business, including collective bargaining agreements and due diligence
- Member of NJ Pension and Health Benefit Study Commission appointed by Governor Christie

**Speaking Engagements**

- Society of Actuaries 1992 Las Vegas Meeting, Bankruptcy and Benefit Plans, Moderator and Panelist; Record of Society of Actuaries, 1992 Vo. 18 No. 1B.
- Glasser Legalworks Seminars on Cash Balance Plans, May 1999
- American Bar Association –Center for Continuing Legal Education, October 1999 session on Cash Balance Plans
- Southern Employee Benefits Conference, "Cash Balance Plans: The Upside", May, 2000
- The Conference Board, "When It Comes to Benefits Is Your World Still Flat?, March and April 2002
- ABA Tax Mid-Winter 2007 Meeting, "Hybrid Plans" January 2007
- Numerous sessions at the annual Enrolled Actuaries Meetings and Conference of Consulting Actuaries Meetings, and at other professional meetings

**Publications**

- "Next Year's Model: Plotting the future of defined benefit plans*," Plan Sponsor Magazine"*, April 1998
- "A Benefit Value Comparison of A Cash Balance Plan With A Traditional Final Average Pay Defined-Benefit Plan", *Pension Forum*, Society of Actuaries, October 1998
- "Cash balance: Best of both worlds*?" Plan Sponsor Magazine*, April 1999
- "A Workable Alternative to Defined Benefit Plans", *Contingencies Magazine*, American Academy of Actuaries, October 1999
- "Survey of Cash Balance Conversions," *Benefits Quarterly*, 1st Quarter 2001
- "Do Actuaries Need a Standard for Illustrating Projected Retirement Benefits?", *Contingencies Magazine*, American Academy of Actuaries, September/ October 2001
- "Cash Balance Plans and Other Evolving Hybrid Pension Plans," *Handbook of Employee Benefits, Fifth Edition (2001), Chapter 28,* Jerry S. Rosenbloom Editor (co-authored with Dennis R. Coleman)
- "Choice Hybrid?  Cash balance plan with a twist," *Plan Sponsor Magazine*, February 2002
- "A Call for a Measured Approach to Analysing US Defined Benefit Plan Restructurings," *Labor and Employee Benefits*, Global Counsel Handbooks 2004/05 Edition.
- "Do Defined Benefit Plans Have a Future?" *Pension and Compensation: Risk and Opportunities in Company Rewards, 2006, commemorating Dr. Boy-Jurgen Andresen*, published by Dr. Otto Schmidt, 2006 (co-authored with T. Fessler).
- "A Different View of the ASB," *The Actuary Magazine*, Society of Actuaries, April/May 2007.
- "Cash-balance Plans Foil Longevity Risk," *Pensions & Investments*, July 9, 2012 (co-authored with Brian C. Donohue).
- ""The Cash Balance De-Risking Solution," *PLANSPONSOR*, U.S. Edition http://www.plansponsor.com/OpinionsArticle.aspx?id=6442497322&page=2, March 26, 2014 (co-authored with Brian C. Donahue)
- "A Modern Defined Benefit Plan," *Plan Sponsor Magazine*, November 2015 (co-authored with Jeff Stevenson)

- "Let the Retirement Pendulum Swing Freely to a Better Place for All," *October Three*, January 2017."
- "A Better 401(k) Alternative," *Human Resource Executive*, March 2017 print and digital issues (letter to the editor).
- "Accommodating Life Annuities in a Defined Contribution World," *Workforce*, March 27, 2018;
- "Lump sums vs. life annuities: Leveling the playing field," *Employee Benefit Adviser*, March 28, 2019;

**Exhibit D**

**Declaration of Luis Collazo Rodriguez in Support of Debtor's Supplemental Opposition to Motion of Certain Secured Creditors of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay, dated June 21, 2019**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

-------------------------------------------------------------X

IN RE:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et
al.*,

               Debtors.[1]

|                          |                          |
|--------------------------|--------------------------|
| PROMESA                  |                          |
| Title III                |                          |
|                          |                          |
| No. 17 CV 1685-LTS       |                          |
| No. 17 BK 3566-LTS       |                          |

-------------------------------------------------------------X

CERTAIN CREDITORS OF THE EMPLOYEES
RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO,

               Movant,

     -against-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO,

               Respondent.

-------------------------------------------------------------X

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**DECLARATION OF LUIS COLLAZO RODRIGUEZ IN SUPPORT OF DEBTOR'S
SUPPLEMENTAL OPPOSITION TO MOTION OF CERTAIN
SECURED CREDITORS OF EMPLOYEES RETIREMENT
SYSTEM OF GOVERNMENT OF COMMONWEALTH OF
<u>PUERTO RICO FOR RELIEF FROM AUTOMATIC STAY</u>**

I, Luis Collazo Rodriguez, pursuant to 28 U.S.C. § 1746, hereby declare that the following

is true to the best of my knowledge, information and belief:

1.      I am the Administrator of the Employees Retirement System of the Government of

the Commonwealth of Puerto Rico ("ERS") and the Executive Director of the Retirement Board

of the Government of Puerto Rico.  I have served as Administrator since May 1, 2017, and

Executive Director of the Retirement Board since August 16, 2018.  Before then, I was a lawyer

in the ERS legal division from April 14, 2014 until April 30, 2017.  As ERS's Administrator, I am

responsible for overseeing ERS's operations and public policy, among other work.

2.      I submit this declaration in support of *Debtor's Supplemental Opposition to Motion
of Certain Creditors of Employees Retirement System of Government of Commonwealth of Puerto
Rico for Relief from Automatic Stay* (the "<u>Objection</u>").[2]  Except as otherwise indicated, I have

personal knowledge of the matters stated herein, including through my review of information

gathered at my direction and materials cited below, and, if called and sworn as a witness, could

testify competently thereto.

**<u>Historic Purpose of ERS and Failed Reform Efforts</u>**

3.      Under the ERS Enabling Act, ERS is a trust established in 1951 for the economic

well-being of public employees.  *See* 3 L.P.R.A § 761.  ERS was established to administer the

payment of pensions and other benefits to officers and employees of the Commonwealth

government, members and employees of Puerto Rico's Legislative Assembly, and officers and

---

[2] Capitalized terms utilized but not otherwise defined herein shall have the meaning ascribed to them in the Objection.

employees of public corporations and municipalities.  *See* 3 L.P.R.A § 761.  ERS's purpose has

been to make payments to public employee pensioners and beneficiaries.  Under Act 447 of May

15, 1951, all government employees whose retirement benefits were administered by ERS were to

receive defined benefits based on a statutory formula that considered factors including the

employee's salary and years of service.  *See* 3 L.P.R.A. § 761, *et seq.* (2016).  Until the passage of

Joint Resolution 188 and Act 106, ERS discharged those duties by making benefit and pension

payments to eligible system participants.

4.    Puerto Rico's public pension system has been in a financial crisis for years.  By

1999, ERS's defined benefit plan was significantly underfunded.  As of June 30, 1998, ERS was

in "critical condition with an actuarial deficit that exceed[ed] five point nine billion dollars,

according to the projections of [ERS's] actuaries."  *See* Act 305 of September 24, 1999, Statement

of Legislative Intent ("Act 305-1999").  Act 305-1999 was one of many attempts to reform the

retirement system and sought to address structural underfunding at ERS by establishing a defined

contribution model for new employees hired on or after January 1, 2000, and for current employees

who elected to transfer from the existing defined benefit plan ("System 2000").

5.    Notwithstanding the System 2000 reforms, ERS's financial system and the health

of Puerto Rico's public employee retirement and pension system continued to deteriorate.  In 2013,

additional measures were taken to address ERS's dire financial situation.  *See* Act 3 of April 4,

2013 ("Act 3-2013").  But these efforts failed to arrest ERS's financial decline.  As Congress

found, as of June 30, 2015, ERS was "in a negative funded position" and "at risk of becoming

insolvent."  *See* Congressional Task Force on Economic Growth in Puerto Rico, Report to the

House    and    Senate,    114th    Congress    (Dec.    20,    2016),    *available    at*

https://www.finance.senate.gov/imo/media/doc/Bipartisan%20Congressional%20Task%20Force

2

%20on%20Economic%20Growth%20in%20Puerto%20Rico%20Releases%20Final%20Report.p

df.  The Task Force further reported that as of June 30, 2015, ERS had a "net pension liability of

$33.2 billion with a funded ratio of [negative] 1.8 percent." *Id*. at 12.

### PayGo Reform

6.      In January 2017, when the Rosselló administration took office, Puerto Rico's

retirement systems faced an imminent liquidity crisis that threatened their ability to continue

paying retirees' benefits.  To respond to the crisis, the Puerto Rico Legislature passed Joint

Resolution 188 on June 24, 2017, and Act 106 on August 23, 2017.  Together, Act 106 and Joint

Resolution 188 reformed Puerto Rico's retirement systems by creating a pay-as-you-go system

whereby the Commonwealth assumed the pension obligations of the covered employers, who must

reimburse the Commonwealth for payments to pensioners.

7.      Joint Resolution 188 and Act 106 also created a new "Pay-Go Fee," which is a fee

payable by "the Government, the Municipalities, the Legislative Branch, Court Administration and

Public Corporations and other covered entities" to the Puerto Rico Treasury.  Act 106, § 2.1(b).

Pay-Go fees equal the "amount actually paid to Pensioners and Beneficiaries from each covered

entity." *Id.*  In contrast, Employers' Contributions were payable directly to ERS and were a

percentage of each employer's then-current employee payroll, as opposed to the actual amounts

paid to current pensioners and beneficiaries.  *Compare id.*, *with* 3 L.P.R.A. § 787f.

8.      Since July 1, 2017, employers have not been obligated to remit Employers'

Contributions to ERS, which is no longer responsible for making pension payments.  Employers

must reimburse, through Pay-Go fees, the Commonwealth for the actual amount of the payments

the Commonwealth pays each month to employers' current pensioners and beneficiaries.

**ERS Bond Resolution**

9.      Under the ERS Bond Resolution, the term "Employers' Contributions" is defined by the Resolution as "contributions paid from and after the date hereof that are made by Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the [Enabling] Act." *Id.* at V-35.  Employers' Contributions that ERS received were deposited in its Operational Bank Account, combined with employee contributions, loan payments, investment proceeds and other funds.  ERS used the Employers' Contributions that it received in its Operational Bank Account as the source of funds for making debt service payments to bondholders.

10.     In addition, the Operational Bank Account would include excess Employers' Contributions remitted to ERS by the Fiscal Agent after ERS had met its debt service payments for the fiscal year under the ERS Bond Resolution.  After Employers' Contributions were transferred to the Fiscal Agent for debt service, the Fiscal Agent was required to deposit the Employers' Contributions in the "Revenue Account" and certain debt service and reserve accounts, including the "General Reserve Account."  After the debt service requirements were met for the fiscal year, the Fiscal Agent could withdraw funds from the "General Reserve Account" and transfer them to ERS under ERS Bond Resolution sections 509.6 and 509.8.  Such funds were deposited in ERS's Operational Bank Account, along with other funds.  ERS has not received any funds pursuant to ERS Bond Resolution sections 509.6 or 509.8 since July 2016.

**Creation of Pre- and Post-petition Segregated Accounts**

11.     On September 21, 2016, certain Movants filed a motion with the U.S. District Court for the District of Puerto Rico seeking to lift the initial stay under section 405 of PROMESA.  On January 17, 2017, ERS and certain Movants entered into a joint stipulation to resolve the stay

motion, which the District Court entered as an order (the "January Stipulation"). Under the January Stipulation, ERS transferred Employers' Contributions received by ERS during the pendency of the section 405 stay to a segregated account (the "Pre-petition Segregated Account").

12.     On May 21, 2017, the Oversight Board filed a petition under PROMESA Title III on ERS's behalf. On May 31, 2017, certain Movants filed a motion seeking relief from the automatic stay. The Oversight Board, ERS, and certain Movants entered into a joint stipulation with respect to the stay motion, which the Title III court entered as an order on July 17, 2017 (the "July Stipulation"). Under the July Stipulation, pending final determination of the validity of the ERS Bondholders' asserted security interests, if any, ERS (i) agreed to remit funds sufficient to make scheduled monthly debt payments on the ERS Bonds to the Fiscal Agent from the Pre-petition Segregated Account and (ii) make five deposits of $18.5 each in a new segregated account established under the July Stipulation (the "Post-petition Segregated Account").

<u>**Relevant ERS Assets on ERS Petition Date and Now**</u>

13.     As explained above, the obligation to remit Employers' Contributions to ERS ended as of July 1, 2017 and any amounts received before then were deposited in the Operational Bank Account where they were combined with other funds. The relevant ERS assets are as follows:

    a.      **<u>Pre-petition Segregated Account</u>**.  As of the ERS Petition Date, approximately $186.5 million in cash was on deposit in the Pre-petition Segregated Account. From July 2017 through July 2018, ERS remitted payments on a monthly basis to the Fiscal Agent until the funds in the Pre-petition Segregated Account were exhausted. After the final interest payment was made in July 2018, the Pre-petition Segregated Account received $2,588.15 in accrued interest, which remains in the account. In total,

5

ERS has made approximately $214.2 million in payments from the Pre-Petition Segregated Account from April 2017 through July 2018 to bondholders, including roughly $351,000 in accrued interest.

b.     **Accounts Receivable**.     As of the ERS Petition Date, ERS had approximately $105.4 million in accounts receivable for Employers' Contributions. ERS's auditors have given ERS an allowance for roughly $82.6 million of old, uncollectible amounts such that ERS's accounting records now reflect roughly $22.8 million in accounts receivable for Employers' Contributions owed from before July 1, 2017, when the obligation of employers to remit such contributions ended.

c.     **Post-petition Segregated Account**.   The Post-petition Segregated Account was created on July 18, 2017, into which ERS made five deposits of $18.5 million each from July through October 2017, totaling $92.5 million.   Those monies have accrued roughly $1.4 million in interest and the total deposited in that account as of May 31, 2019 was approximately $93.9 million.   The monies in the Post-petition Segregated Account continue to earn interest on a go-forward basis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in San Juan, Puerto Rico on June 21, 2019.

_____
Luis Collazo Rodriguez

6