# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO<br><br>-and-<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtors. | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br><br><br>No. 17 BK 3567-LTS<br><br>THIS PLEADING RELATES ONLY TO THESE TITLE III CASES[2] |

# THE DRA PARTIES' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR RELIEF FROM THE AUTOMATIC STAY, OR IN THE ALTERNATIVE, ORDERING PAYMENT OF ADEQUATE PROTECTION

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747).

[2] The Movants make this clarification in accordance to the Court's *Order (A) Pursuant to PROMESA Section 304(G), Directing Joint Administration of Initial Title III Cases and Additional Title III Cases, and (B) Pursuant to Section 105(A) of The Bankruptcy Code, Making Certain Orders Entered on First Day Pleadings Applicable to the Additional Title III Cases. See* Dkt. No. 167 at ¶ 5 (June 29, 2017).

**TABLE OF CONTENTS**

                                                                                                  **Page**

**PRELIMINARY STATEMENT** ........................................................................ 1-3

**BACKGROUND** ...................................................................................... 3-17

    I.    The Commonwealth and HTA Seek Protection Under Title III of
        PROMESA ........................................................................................ 3-4

    II.   The DRA Becomes HTA's Largest Creditor .................................... 4-7

        A.     Pre-Title VI, GDB Makes Significant Loans to HTA ............. 4-6

        B.     The GDB Owns $200 Million in HTA Secured Bonds ........... 6-7

    III.  GDB Restructures its Debt Under Title VI of PROMESA and Transfers
        Payments on HTA's Debt Obligations to the DRA ............................ 8

    IV.  The Puerto Rico Constitution and Statutes Protect Revenues Pledged for
        Service of HTA's Debt Obligations Owed to the DRA .................... 9-11

        A.     The Puerto Rico Constitution Permits Use of Available Resources
             Only to Repay Interest and Amortization of General Obligation
             Bonds in Certain Circumstances ............................................ 9

        B.     The OMB Act Establishes the Priority of Payment Under the
             Puerto Rico Constitution .................................................... 9-10

        C.     The Commonwealth May Only Use Pledged Revenues for Other
             Purposes on a Limited Basis ............................................ 10-11

    V.   The Commonwealth Unlawfully Diminishes the DRA's Collateral .............. 12-15

    VI.  The DRA's Prepetition Liens Extend Post-Petition ........................................ 15-17

**RELIEF REQUESTED** ................................................................................... 17

**ARGUMENT** ..................................................................................... 18-32

    I.    The Court Should Lift the Automatic Stay Under Section 362(d) of the
        Bankruptcy Code ........................................................................... 18-29
        A.     The Automatic Stay Should Be Lifted for "Cause" Under Section
             362(d)(1) of the Bankruptcy Code Because the Debtors Have
             Failed to Provide the DRA with Adequate Protection. ................. 18-23
        B.     Stay Relief is Also Warranted Because Debtors Do Not Possess a
             Property Interest over the collateral .................................. 23-29
    II.   The Court Should Mandate Payment of Adequate Protection ................... 29-30

i

III.    Absent Adequate Protection, the DRA Parties are Entitled to an
Administrative Expense Claim ...................................................................... 30-32

**CONCLUSION**...................................................................................................................32

**NOTICE OF TIME TO RESPOND**.............................................................................33

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Am. Props., Inc.*, 8 B.R. 68 (Bankr. D. Kan. 1980) ………………………29

*Application of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority, Pursuant to Section 601(M)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act, for Approval of the Qualifying Modification for GDB*, Dkt. No. 1 of Civil Case No. 18-01561 (LTS) …………..…………4,8

*Asociación de Subscripcion Conjunta Del Seguro De Responsibilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007) ………………………25

*Assured Guar. Corp. v. Carrion (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121 (1st Cir. 2019) ………………………..17

*In re Builders Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013) ..………………………20

*In re Builders Grp. & Dev. Corp.*, 2013 WL 6198203 (Bankr. D.P.R. Nov. 27, 2013) …………………………27

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508 (D.P.R. 2016) ..…………………………19

*In re City of Columbia Falls*, 143 B.R. 750 (Bankr. D. Mont. 1992) ....………………25,26,28

*In re Chatham Parkway Self Storage, LLC*, No. 12-42153, 2013 WL 1898058 (Bankr. S.D. Ga. Apr. 25, 2013) …………………………29

*FDIC v. Casady*, 106 F.2d 784 (10th Cir. 1939) …………………………26

*Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13 (1st Cir. 2018) …………………………23

*Fin. Oversight & Mgmt. Bd. v. Puerto Rico*, No. 18-1214, 2019 U.S. App. LEXIS 18763 (1st Cir. June 24, 2019) …………………………,23

*In re La Electronica, Inc.*, 995 F.2d 320 (1st Cir. 1993) …………………………30

*In re Lally*, 38 B.R. 622 (Bankr. N.D. Iowa 1984) ……………………27,28

*In re Lan Tamers, Inc.*, 281 B.R. 782 (Bankr. D. Mass. 2002) …………………………26

*Lebron v. Mechem Fin. Inc.*, 27 F.3d 937 (3d Cir. 1994) …………………………30

*LNC Invs., Inc. v. First Fid. Bank*, 247 B.R. 38 (S.D.N.Y. 2000) …………………………19

*In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir. 1976) …………………………30

*Matter of Spencer*, 115 B.R. 471 (D. Del. 1990). …………………………27

*In re MJS Las Croabas Props.*, No. 12-05710 (ESL), 2013 Bankr. LEXIS 2256 (Bankr. D.P.R. May 29, 2013) …………………………28

*In re Montreal, Maine & Atl. Ry., Ltd.*, 888 F.3d 1 (1st Cir. 2018), ……………………………24

*In re Moore*, 267 B.R. 111 (Bankr. E.D. Pa. 2001) …………………………26,27

*In re Nat'l Promoters & Servs., Inc.*, 499 B.R. 192 (Bankr. D.P.R. 2013). ………………………20

*Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017). …...……………………..23

*Peaje Invs. LLC v. Garcia-Padilla*, No. 16-2365 (FAB), 2016 U.S. Dist. LEXIS 153711 (D.P.R. Nov. 2, 2016) ………………………19

*Ruiz v. First Bank of P.R. (In re Ruiz)*, 2017 Bankr. LEXIS 714 (Bankr. D.P.R. Mar. 17, 2017) …………………………24

*In re Schaffer*, 597 B.R. 777 (Bankr. E.D. Pa. 2019) …………………………26

*In re Smithville Crossing, LLC*, No. 11-02573-8-JRL, 2011 Bankr. LEXIS 4605 (Bankr. E.D.N.C. Sept. 28, 2011)). …………………………20

*In re Townley*, 256 B.R. 697 (Bankr. D.N.J. 2000). …..……………………19

*U.S. Bank, Nat'l Ass'n v. Roberts (In re Roberts)*, 367 B.R. 677 (Bankr. D. Colo. 2007) …………………………26,27

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988). …..………………20, 27-28

*In re Valentin*, 2014 Bankr. LEXIS 2885 (Bankr. D.P.R. July 3, 2014) …………………………28

*Velasquez v. Hanes PR, Inc. (In re Velasquez)*, No. 09-03057, 2010 Bankr. LEXIS 2448 (Bankr. D.P.R. July 2, 2010). …..……………………18

*Xifaras v. Morad (In re Morad)*, 328 B.R. 264, 272 (B.A.P. 1st Cir. 2005) …..……………………30

## Statutes

U.S. Const. Art. IV, § 3, cl. 2. …………………………3-4

11 U.S.C. § 362 …...…-3,17-20,23-24,26-29,32

11 U.S.C. § 503 …...……………...3,30-32

11 U.S.C. § 552 …………………………15-17

11 U.S.C. § 902 …...………………………16-17

11 U.S.C. § 928 …………………………15-17

48 U.S.C. § 2161 …..……4,15-16,18,20,29-30

P.R. Const. Art. VI, § 7. ……………………………9

P.R. Const. Art. VI, § 8. …..…………..9-10,15,21,25-26,28

Act No. 17-1948 ……………………………4

Act No. 30-2013 (June 25, 2013) ……………………………5

Act No. 31-2013 (June 25, 2013) ……………………………5

*Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018 ............................1,4

*Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, Act. No. 21-2016 ...…….….……..4-5,13,14

*Puerto Rico Financial Emergency and Fiscal Responsibility Act*, Act No. 5-2017 (January 29, 2017) ……..……..……14, 21

*Puerto Rico Management and Budget Office Organic Act*, Act. No. 147 (Jun. 18, 1980) ….…………………..1,9

9 L.P.R.A. § 2002 .…..……………………4

9 L.P.R.A. § 2004 ..…………………………4

9 L.P.R.A. § 2021 …..………………...11,25

9 L.P.R.A. § 5681 ..………………………11,25

13 L.P.R.A. § 31751 ..………………………..11

23 L.P.R.A. § 104 ..………………….10, 26

**Other Authority**

3 Collier on Bankruptcy ¶ 362.01 (16th ed. 2019) ………………………18-19

3 Collier on Bankruptcy ¶ 362.03[4][a] (16th ed. 2019) …………………………32

6 Collier on Bankruptcy ¶ 944.03 (16th ed. 2019) ……………………………31

iii

**COMES NOW** AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "Collateral Monitor", and together with the Servicer, collectively, the "DRA Parties") which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018, and the approved Qualifying Modification for the Government Development Bank for Puerto Rico (the "GDB")[3] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act*, by and through the undersigned legal counsel, and respectfully submits the DRA Parties' Motion and Memorandum of Law in Support of their *Motion for Relief from the Automatic Stay or, in the Alternative, Ordering Adequate Protection* against the Commonwealth and HTA.

## PRELIMINARY STATEMENT

The DRA succeeded GDB as the lender of more than $1.7 billion in principal loans to HTA and the holder of more than $200 million of principal in Series 1998 HTA bonds. HTA secured DRA's obligations with an assortment of revenue streams including gasoline taxes, gas oil and diesel oil taxes, motor vehicle and license fees, toll revenues, petroleum products taxes and cigarette taxes. The DRA has a lien on these assets – plain and simple.

The Commonwealth and the FOMB have simply and systematically stripped every stream of that collateral in recent years from the DRA. This has violated the plain terms of the Puerto Rico Constitution and the statutes authorizing the pledge of HTA revenues to service debt. Now the DRA is entitled to adequate protection as a result of this unlawful diversion.

---

[3] *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).

4131-2622-5180.24

The Puerto Rico Constitution permits the Commonwealth to use pledged revenues (like HTA revenues), but only to pay interest and amortization with respect to GO bonds. The authorizing statutes for the HTA pledges acknowledge this so-called "claw-back", but state the Commonwealth may only use those revenues to pay for GO debt. Additionally, the authorizing statutes permit HTA to use these revenues only to pay "principal and interest" on HTA bonds. No other use is permitted.

Nevertheless, the Commonwealth has enacted a series of moratoria and executive orders that have steered the pledged HTA revenues elsewhere for other purposes. This has diminished the DRA's collateral thoroughly.

As the Commonwealth and HTA depleted the value of those assets, they failed to provide the necessary adequate protection. Therefore, the Court must either permit the DRA to lift the automatic stay and pursue remedies, or require the Debtors to provide the DRA Parties with adequate protection from the risk of any such diminution.[4] The Court should remedy this risk in one of the following ways.

First, the Court should grant the DRA relief from the automatic stay. Under section 362(d)(1) of the Bankruptcy Code the Court has cause to do so due to the Debtors' depletion of the DRA's collateral without providing the necessary adequate protection. This alone constitutes cause for relief from the automatic stay so that the DRA can pursue applicable remedies. The Court should lift the stay and permit the DRA to exercise remedies to ensure that its collateral is appropriately safeguarded and so the DRA can seek recompense.

---

[4] The DRA Parties intend to conduct discovery in connection with this Motion to determine the amount of its collateral that has been used by the Commonwealth and HTA.

4131-2622-5180.24

Additionally, the Court should also lift the stay because the Commonwealth and HTA each lack any property interest in the revenues pledged to service the debt owed to the DRA. This fact constitutes further cause for relief from the stay under section 362(d)(1) of the Code. Further, the Debtors do not possess any equity in the pledged revenues because HTA and the Commonwealth merely hold these funds for the benefit of creditors, which funds, in turn, cannot be considered as "necessary" to either Debtor's reorganization. They merely hold these funds for the benefit of creditors.

<u>Second</u>, in the alternative, rather than lift the automatic stay the Court should order the Debtors to provide adequate protection for their diminution of the DRA's collateral. In this case, adequate protection should take the form of current interest under the terms of applicable debt documents.

<u>Finally</u>, if the Court refuses to lift the stay or grant adequate protection, the Court could grant the DRA an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code in the Commonwealth (and HTA) Title III case equal to the amount of the DRA's pledged revenues that have been diverted to pay for post-petition general expenses of the Commonwealth and/or HTA in contravention of applicable law. While this does not constitute adequate protection, it would provide a means for recompense in the future.[5]

## BACKGROUND

## I.     The Commonwealth and HTA Seek Protection Under Title III of PROMESA

1.     The Commonwealth of Puerto Rico is an unincorporated territory of the United States of America subject to the Territorial Clause of the United States Constitution. U.S. Const.

---

[5] In compliance with Local Bankr. R. 4001-1(a), as adopted in these Title III proceedings pursuant to the *Ninth Amended Notice, Case Management, and Administrative Procedures* (Dkt. No. 7115 of Case No. 17-03283 (LTS) (May 28, 2019)), the DRA Parties are concurrently filing with this Motion a request for leave to seek additional remedies beside relief from stay and adequate protection.

art. IV, § 3, cl. 2.

2.      HTA is a public corporation created by Act No. 74-1965 (the "HTA Enabling Act")
to assume responsibility for the construction of highways and other transportation systems in
Puerto Rico.   *See* 9 L.P.R.A. § 2002.   The HTA Enabling Act authorizes HTA to incur
indebtedness and secure its debt obligations through a pledge of certain of its revenues, as more
fully described below. *See* 9 L.P.R.A. § 2004(*l*).  Congress enacted PROMESA on June 30, 2016.
Section 301 of PROMESA established the FOMB. *See* 48 U.S.C.S. § 2161 (2019).

3.      The FOMB commenced a Title III case under PROMESA for the Commonwealth
on May 3, 2017, and for HTA on May 21, 2017. *See Title III Petition for the Commonwealth of
Puerto Rico*, Dkt. No. 1 of Case No. 17-03283 (LTS), and *Title III Petition for Puerto Rico
Highways and Transportation Authority (HTA)*, Dkt. No. 1 of Case No. 17-03567 (LTS).

## II.      The DRA Becomes HTA's Largest Creditor

### A.      Pre-Title VI, GDB Makes Significant Loans to HTA

4.      The Government Development Bank is a public corporation that is an
instrumentality of the Commonwealth organized under Act No. 17-1948.   Historically, GDB
functioned as a banking institution and depository of funds for the Commonwealth, its
instrumentalities, public corporations, and municipalities. *See Application of the Government
Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory
Authority, Pursuant to Section 601(M)(1)(D) of the Puerto Rico Oversight, Management, and
Economic Stability Act, for Approval of the Qualifying Modification for GDB*, Dkt. No. 1 of Civil
Case No. 18-01561 (LTS) at ¶ 8 (Aug. 10, 2018).  It also acted as a fiscal agent, paying agent, and
financial advisor to the Commonwealth and its instrumentalities, public corporations, and
municipalities until Act No. 21-2016, the *Puerto Rico Emergency Moratorium and Financial*

4

*Rehabilitation Act* (the "First Moratorium Act"), transferred its responsibilities to the Puerto Rico Fiscal Agency and Financial Advisory Authority. *Id.* at ¶¶ 8, 11; *see also infra at* ¶ 31.

5.      Prior to the commencement of the Title III cases, GDB and HTA entered into individual loan agreements pursuant to each of these loans, and HTA issued 23 separate promissory notes to GDB as evidence of HTA's indebtedness. Those loans had, as of July 1, 2018, an aggregate outstanding principal balance in excess of $1.7 billion and not less than $537 million in outstanding interest, fees and expenses. *See* **Exhibit A**; *see also* Offering Memorandum for GDB Debt Recovery Authority Bonds (Taxable) Due 2040, dated as of November 7, 2018, at 128-29, attached hereto as **Exhibit B**.

6.      On August 28, 2013, GDB and HTA executed a Loan Agreement and an Assignment and Security Agreement (the "Security Agreement"). *See* **Exhibit D**. Pursuant to Section 1.1 of the Security Agreement, HTA "absolutely, irrevocably, and unconditionally assign[ed], convey[ed] and transfer[red] without recourse, to [GDB all of its] rights, title, obligations and interest in" the following revenues (collectively, the "30-31 Revenues"):

      (a)      The motor vehicle license fees described by Act No. 30-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("Act 30");

      (b)      Up to $20,000,000 per fiscal year of the excise tax on cigarettes described by Act No. 31-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("Act 31");

      (c)      The proceeds of the sixteen cents per gallon gasoline tax described by Act 31;

      (d)      The proceeds of the first four cents of the gas and diesel oil excise tax described by Act 31; and

      (e)      The proceeds of the petroleum products excise tax described by Act 31.

*Id.*

7.      Under Section 1.2 of the Security Agreement, HTA also assigned, pledged and granted to GDB "[a]s security for the prompt and complete payment and performance when due

of all of its Obligations … a continuing security interest … in all of the right, title and interest of [HTA] in the [30-31 Revenues], whether presently held or hereafter acquired and wherever located." *See* **Exhibit D**. This agreement defines "Obligations" broadly—it does not limit this term to the obligations related to the corresponding loan agreement, nor even to *all of the loans* that GDB extended to HTA. *Id.*

8.      Instead, the agreement defines "Obligations" to include "*all indebtedness*, obligations and liabilities (including, without limitation, guarantees and other contingent liabilities) *of [HTA] to [GDB]*." *Id.* at § 5.1 (emphasis added). Thus, the pledge of this Security Agreement secures *any* indebtedness that HTA owes to GDB, notwithstanding and in addition to any other separate security agreement's pledge of security between GDB and HTA. Pursuant to Section 1.2 of this agreement, GDB's security interest in the 30-31 Revenues is only subordinate "to the outstanding bonds of [HTA] issued pursuant to the Bond Resolutions…."[6]

### B.      The GDB Owns $200 Million in HTA Secured Bonds

9.       In addition, HTA issued bonds and other obligations under Resolution No. 98-06, adopted by HTA on February 26, 1998. *See* **Exhibit C**; *see also* HTA Revised Fiscal Plan 2018-2023 at 88 (June 29, 2018), attached hereto as **Exhibit I**. The DRA holds $200,000,000 in aggregate original principal amount of Puerto Rico Highway and Transportation Authority, Transportation Revenue Bonds (Series A), which HTA issued under the 1998 Bond Resolution. *See* **Exhibit E**; *see also* **Exhibit B** at 128-29. As of July 1, 2018, HTA owed GDB not less than $19,989,041 in interest, fees and expenses related to these HTA bonds. *Id.*

---

[6] According to the introductory paragraph of the Security Agreement, "terms not otherwise defined hereof shall have the meanings ascribed to them in the [corresponding] Loan Agreement." Section 2.6 of this loan agreement defines the "Bond Resolutions" to include only the 1998 Bond Resolution (discussed at Background, Section II.B of the Motion) and the 2013 Bond Resolution.

10.     Pursuant to Section 601 of the 1998 Bond Resolution, HTA pledged "Revenues and other moneys deposited to the credit of the Revenue Fund and from any funds received by [HTA] for that purpose from the Commonwealth" to the payment of the bonds and other obligations issued under the 1998 Bond Resolution. *See* **Exhibit C**. Section 101 of the 1998 Bond Resolution defines the "Revenues" pledged to the repayment of the bonds issued thereunder to include "all moneys received by [HTA] on account of the [petroleum products excise tax], all Existing Tax and Fee Revenues upon the repeal and cancellation of the [1968 Bond Resolution], any tolls or other charges imposed by [HTA] for the use of any of the Toll Facilities other than Existing Toll Facilities Revenues received by [HTA] prior to the repeal and cancellation of the [1968 Bond Resolution]…." *See* **Exhibit C**. The 1998 Bond Resolution defines "Existing Tax and Fee Revenues" to include the gasoline tax proceeds, the gas and diesel oil tax proceeds, and the proceeds of the first $15 of pledged motor vehicle license fees. *Id.*

11.     Under the 1998 Bond Resolution, "Revenues" also include "the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to [HTA] and expressly authorize [HTA] to pledge to the payment of the principal of and interest on bonds or other obligations of [HTA] and which are pledged by [HTA] to the payment of the principal of and interest on bonds or other obligations issued under the provisions of this Resolution…." *Id.*

12.     The Security Agreement was duly perfected through the filing of UCC Financing Statement No. 2013004677 at the Puerto Rico Department of State on August 29, 2013, as amended on March 31, 2015 (the "30-31 Financing Statement"). *See* **Exhibit F-1**.

13.     The collateral under the 1998 Bond Resolution is further perfected through the filing of UCC Financing Statement No. 2014003809 at the Puerto Rico Department of State on August 4, 2014. *See* **Exhibit F-2**.

7

4131-2622-5180.24

**III.     GDB Restructures its Debt Under Title VI of PROMESA and Transfers Payments on HTA's Debt Obligations to the DRA**

14.     On July 12, 2017, the FOMB issued a resolution authorizing GDB to use Title VI of PROMESA.  *See* Dkt. No. 1 of Civil Case No. 18-01561 (LTS) at ¶ 18 (Aug. 10, 2018).  On August 10, 2018, GDB and AAFAF initiated a proceeding to restructure GDB's debt obligations pursuant to Title VI of PROMESA.  *Id. generally*.

15.     Pursuant to GDB's Title VI restructuring, on November 5, 2018 the FOMB certified GDB's Qualifying Modification under PROMESA, which Qualifying Modification this Court subsequently approved by Order dated November 7, 2018.  *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS).  The GDB Restructuring Act created the DRA as a statutory public trust and governmental instrumentality of the Commonwealth to facilitate the restructuring of certain of GDB's indebtedness pursuant to the Qualifying Modification.  *See* Act No. 109-2017 at Arts. 201 and 204.  The DRA received GDB's transferred assets and shall liquidate them to satisfy the DRA's obligations under the New Bonds.  *See* Act No. 109-2017 at Arts. 204 and 207.

16.     To secure the DRA's obligations under the New Bonds, GDB transferred a substantial portion of its assets, including the loans to HTA set forth above and the 1998 HTA bonds, to the DRA.  *See* Act No. 109-2017 ; *see also* Master Transfer Agreement, dated November 29, 2018 between GDB and DRA, at § 2, attached hereto as **Exhibit G**; *see also* **Exhibit B** at 100-137.[7]

---

[7] Because the DRA obtained all of GDB's right, title and interest in the HTA loans and 1998 bonds (*see* **Exhibit G** at § 2), references in this Motion to the DRA's rights with respect to these assets necessarily include those rights held by GDB prior the transfer of such assets to the DRA.

8

## IV. The Puerto Rico Constitution and Statutes Protect Revenues Pledged for Service of HTA's Debt Obligations Owed to the DRA

### A. The Puerto Rico Constitution Permits Use of Available Resources <u>Only</u> to Repay Interest and Amortization of General Obligation Bonds in Certain Circumstances

17.     Article VI of Puerto Rico's Constitution requires that the Commonwealth's annual appropriations not exceed its annual revenues, and when the Commonwealth's resources are insufficient to cover its annual appropriations, it requires the Commonwealth to satisfy fiscal-year interest and amortization on general obligation bonds before it satisfies other obligations.

18.     Article VI, Section 7 of Puerto Rico's Constitution provides, "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." P.R. Const. art. VI, § 7.  Section 7 requires the Commonwealth to increase tax revenue whenever necessary to provide sufficient revenues to cover appropriations, including fiscal-year operating expenses and general obligation debt service. Section 7 also prohibits the Commonwealth from rolling budget shortfalls into successive fiscal years.

19.     Article VI, Section 8 of the Puerto Rico Constitution creates an ostensible GO priority on an annual basis by providing that "[i]n case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8.

### B. The OMB Act Establishes the Priority of Payment Under the Puerto Rico Constitution

20.     Section 4(c) of the *Management and Budget Office Organic Act*, Act. No. 147 (Jun. 18, 1980) (the "<u>OMB Act</u>") creates a waterfall of the priorities of payment for "when the available

9

funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year." Under this provision, if there are insufficient funds for the fiscal year, the Commonwealth should apply available funds as follows:

    (a)    First-priority status applies to the "payment of interest and amortizations corresponding to the public debt." 23 L.P.R.A. § 104(c)(1).

    (b)    Second-priority status applies to the payment of "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico." 23 L.P.R.A. § 104(c)(2). These obligations include HTA's debt obligations.

    (c)    Third-priority status applies to the payment of "[r]egular expenses" related to government operations, including payments for "[c]onservation of public health," "[p]rotection of persons and property," "[p]ublic education programs," "[p]ublic welfare programs", pension obligations and any "remaining public services." 23 L.P.R.A. § 104(c)(3).

    (d)    Fourth priority status applies to expenditures for "construction of capital works or improvements" and fifth priority status applies to "contracts and commitments contracted under special appropriations." 23 L.P.R.A. § 104(c)(4)–(5).

## C.    The Commonwealth May Only Use Pledged Revenues for Other Purposes on a Limited Basis

21.    The Legislative Assembly enacted statutes authorizing HTA to incur debt and pledge certain of its revenues for its repayment. These statutes expressly recognize the potential application of Article VI, Section 8 of the Puerto Rico Constitution but make clear that the Commonwealth can use revenues pledged for HTA's debt service obligations only to pay the GO debt if *all other available resources for the fiscal year are insufficient to pay the GO debt*. The Commonwealth may only use those funds to pay GO debt under the circumstances set forth at Article VI, Section 8 of the Constitution, and otherwise only to pay obligations of HTA. The Commonwealth may not use the HTA revenues as a general fund for all purposes.

22.    For example, with respect to vehicle license fee revenues:

10

[HTA] is hereby authorized to pledge or pignorate the proceeds of the collection thus received, to the payment of the principal and interest on bonds and other obligations of the Authority, or for any other legal purpose of the Authority; and said pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; *provided, however,* That *the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt,* as provided in said § 8, until the other resources available, referred to in said section, are insufficient [*sic*] for such purposes, ***otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority,*** and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations.

*See* 9 L.P.R.A. § 2021 (emphasis added); *see also* 9 L.P.R.A. § 5681.

23.     Similar conditions apply to the pledge of petroleum product and cigarette excise taxes:

The proceeds from such taxes shall be solely used for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes.  ***Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority*** and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations.

*See* 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C) (emphasis added).

24.     When read together, Article VI, Section 8 of the Puerto Rico Constitution and the foregoing legislation make clear that the Commonwealth may use HTA revenues like those noted above only to provide an additional source of payment for GO debt, and only when the fiscal year begins with a balanced budget and all other available resources do not satisfy the GO debt obligations.  **The Commonwealth violates the DRA's rights under the Commonwealth's laws and Constitution when it diverts payments that are earmarked for HTA's debts to fund government operations or other expenditures.**

## V.      The Commonwealth Unlawfully Diminishes the DRA's Collateral

25.      Then-Governor Alejandro Garcia-Padilla issued Executive Order 2015-046 on December 1, 2015, which ordered the Treasury Secretary to "retain the revenues assigned to [HTA] for the payment of certain [HTA] obligations …." *See* Admin. Bulletin OE-2015-046 at 2.  This order unlawfully contradicted Article VI, Section 8 of the Puerto Rico Constitution because it failed to apply the HTA revenues only to repay GO debt.  *See id.* at 3 ("The Department of the Treasury shall only retain such revenues that are necessary for the payment of public debt, *while continuing to provide essential services* ….") (emphasis added).

26.      On December 8, 2015, the then-Governor Garcia-Padilla issued Executive Order 2015-049, which stated that the Governor or the Director of the Office of Management and Budget "may establish budgetary reserves and restrict those resources that are at the disposal of government entities in the manner that they see fit, when deemed necessary in the course of executing and controlling the budget" and that the Director shall "make any budget adjustments necessary in the allocations contained in the Budget in order to match them with available resources." *See* Admin. Bulletin OE-2015-049 at 2, 3.  Therefore, this executive order unlawfully authorized the Commonwealth to use pledged HTA revenues to pay virtually any other general expense ahead of GO debt.

27.      To provide guidelines for the disbursement of HTA and other revenues recovered pursuant to these executive orders, the Department of Treasury issued Circular Letter No. 1300-15-16 on December 17, 2015. This letter directed Commonwealth officials to disburse pledged HTA revenues to pay for:

(a)      essential services;

(b)      payroll and pensioned persons;

(c)      any other expense previously provided which at the discretion of the Secretary of the Treasury is necessary to guarantee the operation,

12

continuity, and stability of the central government of the Commonwealth of Puerto Rico, such as those that are necessary to guarantee the welfare of the inhabitants of the country; and

(d)     expenses arising from an emergency motivated by a catastrophe, acts of nature, fortuitous accidents, or which in any manner impact the security, health education or welfare of the citizens.

28.     On April 6, 2016, the Commonwealth approved the First Moratorium Act, Act No. 21-2016.  Pursuant to the authority granted to him by this act, then-Governor Garcia-Padilla issued Executive Order 2016-030 on June 30, 2016 to: (i) suspend the repayment of HTA's debts; (ii) continue to withhold various of the government's source of revenues (including the DRA's collateral); and (iii) redirect the withheld funds to satisfy the operating expenses of the Commonwealth.  *See* Admin. Bulletin OE-2016-030.

29.     Between May 17 and June 30, 2016, the Then-Governor issued three executive orders that suspended repayments of HTA's debt obligations, including those owed to GDB (and, subsequently, to the DRA):

(a)     On May 17, 2016, Administrative Bulletin OE-2016-018 declared a state of emergency over HTA until June 30, 2016, stopped the flow of all Toll and non-Toll Revenues to the HTA Revenue Bonds, and stayed all litigation arising from nonpayment of HTA Covered Obligations.

(b)     On June 30, 2016, Administrative Bulletin EO-2016-030 declared a state of emergency over the Commonwealth, imposed a moratorium on Commonwealth debt payments except GDB loan payments to be applied to "essential services", extended the HTA state of emergency until January 31, 2017, halted all payments on HTA's debt obligations; and stayed all creditor lawsuits against HTA.

(c)     On June 30, 2016, Administrative Bulletin EO-2016-031 halted transfers of HTA Toll and non-Toll Revenues to HTA's fiscal agent, suspended HTA's obligation to repay debts except GDB loan payments to be applied to "essential services", suspended the Commonwealth's obligation to transfer revenues to HTA unless it was necessary to pay HTA operating expenses or "essential services"; and stayed litigation arising from nonpayment of HTA debts.

13

30.     Each of these executive orders violated the priority of debt payments set forth in the Puerto Rico Constitution, OMB Act and other law by elevating the payment of general expenses over the payment of HTA's senior secured debts, including the HTA loans and the 1998 HTA bonds.

31.     On January 29, 2017, the Commonwealth approved a second moratorium act, Act No. 5-2017, known as the *Puerto Rico Financial Emergency and Fiscal Responsibility Act*.  While this second moratorium act repealed or replaced certain portions of the First Moratorium Act, it maintained the Governor's ability to seize pledged revenues during an "Emergency Period," during which it authorized the Governor to "designat[e] the priority for the use of available resources to pay for the essential services the Governor deems necessary to provide for health, safety, and welfare of the residents of Puerto Rico…."  *See* Art. 202 of Act No. 5-2017.  Article 208(e) of the second moratorium act provides that the executive orders issued shall remain in place until they are either amended, rescinded or substituted.  *Id.* at Art. 208(e).

32.     These actions violated the Puerto Rico Constitution and the terms of the DRA's pledged HTA revenues because they used those revenues to pay for obligations other than the Commonwealth's GO bond obligations or HTA's secured debt obligations.  For example, in fiscal year 2019, the Commonwealth retained approximately $333 million in pledged HTA revenues that were neither applied to GO or HTA debt service.  *See* Treasury Single Account Cash Flow Report as of June 7, 2019, at 1, attached hereto as **Exhibit H**.  The Commonwealth's retention in fiscal year 2019 of funds that it has not used to pay GO debt or HTA debt violates the pledges made in the loans from GDB to HTA and in HTA secured bonds.

33.     In addition, today the Commonwealth appears to run a budgetary surplus. Therefore it cannot satisfy the conditions set forth in the Puerto Rico Constitution for the use of the pledged

14

HTA revenues.  *See* 2019 Fiscal Plan for Puerto Rico:  Restoring Growth and Prosperity at 24-25 (May 9, 2019), attached hereto as **Exhibit J**.  As noted above, the Commonwealth may only use available resources such as the pledged HTA revenues to pay GO debts in a fiscal year when the available resources "are insufficient to meet the appropriations made <u>for that year</u>."  P.R. Const. art. VI, § 8 (emphasis added).  That certainly does not appear to be the case in the current fiscal year.[8]

34.     However, the diminution of DRA's collateral remains in effect, as the current Governor, Hon. Ricardo Rosello-Nevares, has neither replaced, rescinded nor amended the "clawback" provisions of the executive orders.[9]  Consequently, the DRA's collateral continues to be unlawfully diverted for purported payment of "essential services" pursuant to the terms of the Governor's executive orders and the moratorium legislation.

**VI.     The DRA's Prepetition Liens Extend Post-Petition**

35.     As set forth above in Section III.A of this Motion, the DRA possesses a secured interest over the revenues that HTA pledged as debt service on the HTA loans and the 1998 bonds. The scope of the DRA's security interest extends to post-petition HTA revenues by operation of section 928(a) of the Bankruptcy Code.

36.     Section 552(a) of the Bankruptcy Code establishes a general rule that a debtor's after-acquired property is not subject to a secured creditor's prepetition lien.  Section 301 of PROMESA incorporates this provision into Title III.

---

[8] The DRA Parties intend to take discovery and determine which years the Commonwealth failed to meet this requirement.

[9] Although the Governor extended the Emergency Period until June 30, 2019 by virtue of executive orders numbers 2017-031, 2017-076, 2018-023, and 2018-053, none of these orders amended, substituted or rescinded the improper provisions of the Executive Orders.

4131-2622-5180.24

37.     However, section 928(a) carves out an exception to this rule (incorporated into Title III at section 301 of PROMESA).  Section 928(a) states that "[n]otwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

38.     Section 902 of the Bankruptcy Code defines "special revenues" as:

(A)     receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems;

(B)     special excise taxes imposed on particular activities or transactions;

(B)     incremental tax receipts from the benefited area in the case of tax-increment financing;

(D)     other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions; or

(E)     taxes specifically levied to finance one or more projects or systems, excluding receipts from general property, sales, or income taxes (other than tax-increment financing) levied to finance the general purposes of the debtor.

11 U.S.C. § 902(2).

39.     The DRA's collateral, which consists of pledged (a) gasoline tax; (b) gas oil and diesel oil tax; (c) motor vehicle and license fees; (d) toll revenues; (e) petroleum products tax; and (f) cigarette taxes, constitutes special revenues within the context of section 902(2) of the Bankruptcy Code.

40.     Specifically, each revenue stream fits within one or more of:  "receipts derived from the ownership [or] operation… of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services …";  "special excise taxes imposed on particular activities or transactions" (*e.g.*, petroleum products and

16

cigarette sales); or "other revenues or receipts derived from particular functions of the debtor…."

11 U.S.C. § 902(2)(A), (B) and (D).

41. The DRA's property interests stem, in part, from the Security Agreement that GDB and HTA voluntarily agreed upon and executed. The Security Agreement covers *any* indebtedness that HTA owes to GDB notwithstanding, including the HTA loans and the 1998 bonds. *See* **Exhibit D** § 1.2. Under the plain language of section 928(a), the DRA's lien "remain[s] in place after the filing of the petition, despite the fact that Section 552(a) generally protects property acquired after the petition from being subject to prepetition liens." *Assured Guar. Corp. v. Carrion (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121, 128 (1st Cir. 2019).

42. Therefore, the DRA possesses a valid lien over both the pre and post-petition sources of collateral for HTA's obligations, for which HTA has provided no adequate protection to DRA whatsoever pursuant to sections 361 and 362(d)(1) of the Bankruptcy Code. 11 U.S.C. §§ 361 and 362(d)(1).

## RELIEF REQUESTED

43. The DRA Parties seek an order of this Court, substantially in the form attached hereto as **Exhibit M**, that lifts the automatic stay under Section 362(d)(1) and/or (d)(2) of the Bankruptcy Code so that the DRA Parties may initiate, continue and conclude any foreclosure proceedings over their collateral and exercise any applicable contractual and legal remedies under applicable law.

44. In the alternative, the DRA Parties seek an order requiring the DRA be provided with adequate protection on account of the diminution in value of its collateral, or, to the extent the Court does not grant the DRA Parties' request for adequate protection, the DRA Parties seek an order granting them an allowed administrative expense claim.

## ARGUMENT

### I.    The Court Should Lift the Automatic Stay Under Section 362(d) of the Bankruptcy Code

45.    Section 301(a) of PROMESA, 48 U.S.C.S. § 2161(a) (2019), incorporates the protections afforded by the automatic stay under 11 U.S.C. § 362.  The automatic stay is a form of injunctive relief which:

> provides for a broad stay of litigation, lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims. It also stays a wide range of actions that would affect or interfere with property of the estate, property of the debtor or property in the custody of the estate.

3 Collier on Bankruptcy ¶ 362.01 (16th ed. 2019); *Velasquez v. Hanes PR, Inc. (In re Velasquez)*, No. 09-03057, 2010 Bankr. LEXIS 2448, at *4-5 (Bankr. D.P.R. July 2, 2010).

46.    While the automatic stay may be broad in scope, its protection is not unlimited:

> Section 362 [ ] recognizes circumstances in which a party subject to the stay may be entitled to relief.  It provides grounds for seeking relief from the stay and, in conjunction with Bankruptcy Rule 4001, provides a procedure for seeking such relief.

Collier on Bankruptcy at ¶ 362.01.

47.    The Court should grant the DRA Parties relief from the automatic stay in accordance with section 362(d)(1) and (d)(2) of the Bankruptcy Code, Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 4001-1.

### A.    The Automatic Stay Should Be Lifted for "Cause" Under Section 362(d)(1) of the Bankruptcy Code Because the Debtors Have Failed to Provide the DRA with Adequate Protection.

48.    Section 362(d) states, in pertinent part, that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

18

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362(d)(1).

### 1. The Debtors Have Denied the DRA Parties Adequate Protection

49.     The Debtors have improperly seized all of the DRA's collateral and failed to provide the DRA with adequate protection.  This alone constitutes cause for the Court to lift the automatic stay.

50.     An entity is entitled to adequate protection as a matter of right…when [it] is stayed from enforcing its interest [in its collateral or property]."  Collier on Bankruptcy at ¶ 361.02.  The Bankruptcy Code provides for adequate protection "as a matter of policy" and "as a matter of constitutional law."  *Id.*; *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000).

51.     "The concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court."  *LNC Invs., Inc. v. First Fid. Bank*, 247 B.R. 38, 44 (S.D.N.Y. 2000) (citation omitted).  "The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in its particular collateral during the period of use by the debtor."  *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 532 (D.P.R. 2016); *Peaje Invs. LLC v. Garcia-Padilla*, No. 16-2365 (FAB), 2016 U.S. Dist. LEXIS 153711, at *20 (D.P.R. Nov. 2, 2016).  The debtor must provide adequate protection "to insure that the creditor receives the value for which [it] bargained prebankruptcy."  *Id*.  "[A]dequate protection in the context of relief from the automatic stay is a flexible concept which requires a Court to make decisions on a case-by-case basis, after full consideration of the peculiar characteristics common to each proceeding."  *Brigade*, 217 F. Supp. 3d at 532 (internal quotation marks omitted).

19

52.     As the Supreme Court has explained, adequate protection safeguards "the right of a secured creditor to have the security applied in payment of the debt."  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, *Ltd.*, 484 U.S. 365, 370 (1988).  It is well-settled that "adequate protection" is required "'to the extent' [that a] debtor's use of the property results in a decrease of value of such entity's interest in such property."[10]  *In re Nat'l Promoters & Servs., Inc.*, 499 B.R. 192, 208 (Bankr. D.P.R. 2013).  For instance, in *In re Builders Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013), a bankruptcy court in this district held that a debtor's diversion of the property encumbered by a secured creditor's lien to a party other than the secured creditor is:

> clearly a diminution of the secured party's interest in [such property, and a]ny such decrease attributable to the [d]ebtor's usage, therefore, must be protected by cash payments from another source, an additional or replacement lien, or other such indubitable equivalent

*Id.* (*citing In re Smithville Crossing, LLC*, No. 11-02573-8-JRL, 2011 Bankr. LEXIS 4605, at *29 (Bankr. E.D.N.C. Sept. 28, 2011)).

53.     While the Bankruptcy Code does not define adequate protection, section 361 of the Bankruptcy Code (also incorporated into Title III at section 301 of PROMESA) provides three non-exclusive examples.  Adequate protection can take the form of: (1) periodic cash payments; (2) additional or replacement liens; and (3) the granting of such other relief which will result in the realization of the "indubitable equivalent" of the entity's interest in the property under consideration.  11 U.S.C. § 361.  HTA bears the burden of proving that the DRA's lien is adequately protected.  *See* 11 U.S.C. § 362(g)(1), (2).

---

[10] The DRA Parties will provide detail on the exact diminution of its interest upon completion of discovery and expects to present appropriate evidence to support this argument.

54.     They cannot do that.  The Commonwealth and HTA have depleted the value of the DRA's collateral (which, as noted above, extends post-petition), necessitating the provision of adequate protection.  The Puerto Rico Constitution permits the diversion of available resources only to pay interest and amortization of the GO bonds of the Commonwealth and only in a fiscal year where funds are not sufficient to satisfy the obligations for that year.  P.R. Const. art. VI, § 8. Moreover, the statutes authorizing the pledge of HTA's revenues permit the use of these diverted revenues only to repay the GO bonds or the HTA secured interests.  *See supra* Background, Section IV.C.

55.     But here, as set forth in Section V above, Article 208(e) of the second moratorium act improvidently authorizes the improper use HTA pledged revenues for satisfaction of expenses beyond the repayment of the GO debt obligations.  This unlawful usage diminishes the value of the DRA's lien by materially and substantially increasing the risk that the pledged revenues will not be sufficient to repay the obligations owed to the DRA.  Despite these diversions of cash, the DRA has not received any cash payments or been provided any other form of adequate protection.

56.     Moreover, pursuant to the second moratorium act, the Governor is required to use the diverted HTA revenues to "pay debt service *to the extent possible after all…essential services of the [Commonwealth] have been provided for*…."  *See* Art. 203 of Act No. 5-2017 (emphasis added).  While Art. 202 of the second moratorium act states that the Governor will pay those "essential services the Governor deems necessary to provide for health, safety, and welfare of the residents of Puerto Rico…" (*id.* at Art. 202), to date, neither the Governor nor FOMB has defined what constitutes "essential services," which gives the Commonwealth free reign to tailor and

21

modify the definition of this as it sees fit—even if it contravenes the Puerto Rico Constitution and other law.[11]

57.     Because the DRA has been deprived of its collateral, the Debtors must demonstrate to the Court that the DRA is adequately protected by virtue of its lien on a perpetual revenue stream.  However, the Debtors will be unable to make this showing because HTA's certified and revised fiscal plan for 2019-2024 assumes that the Commonwealth will retain all of the HTA pledged revenues and that they will not be applied for debt service.  *See supra* ¶ 33; *see also* **Exhibits I** and **J**.  This is consistent with the expressions made by counsel for the FOMB during the June 12, 2019 Omnibus Hearing, in which the FOMB informed the Court that they intend to file a Commonwealth plan of adjustment of debt within the next thirty (30) days and that they are

---

[11] During the *Sixteenth Public Meeting of the Oversight Board* held at the Puerto Rico Convention Center on May 9, 2019, a participant asked the FOMB, "what are the essential services?", and the FOMB's legal counsel, Mr. Jaime El Koury, responded that the FOMB "have not defined" that term.  *See* Transcript of the FOMB Hearing attached hereto as **Exhibit K** at pp. 56, lines 12 – 15, and p. 57, lines 18 – 19.  Mr. El Koury then posited that the FOMB would rather not define essential services and "coming up with a strict nomenclature for that", and that he "*think[s] it is in the benefit of the people of Puerto Rico actually not to define essential services….*"  *Id.* at p. 57, lines 24 – 25, and p. 58 at lines 1 – 6 (emphasis added).

In addition, the Commonwealth's ex-officio member to the FOMB, Mr. Christian Sobrino, stated:

> Regarding the question on central services, we've addressed this also with some members of the press and in other forms stating that essential services depends on the amount of resource that -- how much -- what you classify as essential *depends on the amount of resources you have available to allocate. So in a context we have a lot of resources.  You can deem many things essential and you can -- but it's not only the categories.  Within each category there are actions, there's contracting, there's different things you allocate to.  And what we've always stated is that essential services are defined on a budget-by-budget basis on a fiscal plan-by-fiscal plan basis, depending on the amount of resources that are available for that allocation*.

> And I think if we look at what's happened today we can see that what we indicated before actually works.  I might not be happy with large parts of the Fiscal Plan, but what I can recognize is that in August of last year we identified the need for additional resources in the police and in public safety.  We had private and public debates that I'm sure were as frustrating to everybody on this table as it was for me.  And the result of that is that we have reached a number of more resources for public safety.

> And the same in education. And the same in health. Areas that nobody in this room will doubt are essential services. Right?  *So we have to recognize that the definition would be used by our opponents, opponents of Puerto Rico, to pigeonhole our work and not help us use the process to actually allocate resources where we need*. So I just wanted to add that to the comments.

*Id.* at pp. 62 – 64 (emphasis added).

22

"going to provide that [GO holders] get clawback funds, because we have to pay them out of something…" *See* Transcript of June 12, 2019 hearing attached hereto as **Exhibit L**, at p. 142, lines 6 – 10.

### 2.    The Court Must Lift the Automatic Stay For Cause.

58.    In light of the Debtors' failure to provide adequate protection, the Court must lift the automatic stay for cause under section 362(d)(1) of the Bankruptcy Code.  "Section 362(d)(1) guards against the possibility that the automatic stay could deprive a creditor of its property interest by precluding the creditor from exercising any rights it possesses to protect that interest from destruction." *Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13, 20 (1st Cir. 2018).  The DRA Parties should not be forced "to stand by helplessly as the debtor [spends] the creditor's collateral, leaving the debt entirely unsecured." *Id.* (*referencing Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511-512 (1st Cir. 2017)).

59.    Here the lack of adequate protection constitutes cause under section 362(d)(1) of the Bankruptcy Code – and the Court should lift the automatic stay.  Furthermore, this relief is consistent with the First Circuit's recent decision in *Fin. Oversight & Mgmt. Bd. v. Puerto Rico*, No. 18-1214, 2019 U.S. App. LEXIS 18763, at *18 (1st Cir. June 24, 2019), where the court made clear that "…nothing in our holding today suggests that [a party] cannot seek traditional stay relief pursuant to 11 U.S.C. § 362" to raise its constitutional and statutory arguments concerning the Commonwealth and HTA's unlawful diversion of the HTA pledged revenues under the moratoriums and executive orders.

**B.** **Stay Relief is Also Warranted Because Debtors Do Not Possess a Property Interest over the Collateral**

60.     The automatic stay under section 362(a) protects only the Debtors and their property and does not extend beyond Debtors' property interests. *See In re Rivera*, 2018 Bankr. LEXIS 2993, at *7 (Bankr. D.P.R. Sep. 21, 2018); s*ee also Ruiz v. First Bank of P.R. (In re Ruiz)*, 2017 Bankr. LEXIS 714, at *4-5 (Bankr. D.P.R. Mar. 17, 2017) ("The automatic stay protects property of the [debtor] and provides for a broad stay of litigation, lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims. It also stays a wide range of actions that would affect or interfere with…property of the debtor or property in the custody of the [debtor].")

61.     Here, the Debtors do not have an interest in the pledged revenues. Specifically, HTA has no interest in the revenues pledged for payment of obligations owed to the DRA because HTA acts as a mere custodian for these funds, which, under applicable statutes, must be applied to debt service.   Likewise, the Commonwealth has no interest in these funds because, under applicable law, they must be used <u>only</u> to pay GO debt, to the extent they are retained by the Commonwealth.

62.     In *In re Montreal, Maine & Atl. Ry., Ltd*., 888 F.3d 1, 9 (1st Cir. 2018), the First Circuit held, in the context of assessing a preference action, that "the principal determinant of whether the debtor has an interest in the property is the degree of control a debtor exercises over the property transferred." (internal quotation marks omitted).  Therefore, when a debtor is solely the temporary custodian of, and conduit for, the funds, with no equitable interest in them, and the funds are not assets of the debtor's estate, the debtor's estate has no interest in the property.  *Id.*

63.     Outside of the bankruptcy context, the First Circuit has held that when funds are statutorily earmarked for a restricted purpose, they must be used for that purpose and not diverted

24

elsewhere.  In *Asociacion de Subscripcion Conjunta Del Seguro De Responsibilidad* Obligatorio v. Flores *Galarza,* 484 F.3d 1 (1st Cir. 2007), the First Circuit ruled that a statute requiring the Secretary of the Treasury of the Commonwealth to collect motor vehicle insurance premiums and hold them for an unspecified time period before transferring them to a private association did not entitle the Secretary to own or control said premiums.  There, the authorizing statute provided that the Commonwealth "shall transfer" the premiums to a private association (the JUA) that "shall receive" the premiums.  *Id.* at 29.

64.     The First Circuit concluded that:

> [w]hile the Secretary collects the insurance premiums and holds them for some unspecified amount of time before relinquishing them to the JUA, the Secretary is not an insurer – he is merely the custodian of these funds.  As a custodian, the Secretary has no entitlement to the premiums, and his woefully undeveloped argument that the premiums do not vest in the JUA until the Secretary transfers them does not convince us otherwise.

*Id*; *see also In re City of Columbia Falls*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992) (holding that a municipality that receives tax revenues that it has pledged to bondholders holds the revenues in trust to apply them to the bond payments).

65.     In this case, the statutes authorizing HTA to incur debt and pledge certain of its revenues *require* HTA to remit the funds for HTA debt service or, if the Commonwealth invokes Art. VI, Section 8 of the Puerto Rico Constitution, for GO debt service.  *See* 9 L.P.R.A. § 2021 and 9 L.P.R.A. § 5681, *supra* at ¶ 22. They do not provide Debtors with the ability to use or otherwise divert these funds for other purposes, *supra* Background, Section IV.C.

66.     Accordingly, under applicable law, HTA has no property interest in the pledged revenues because it serves as a mere custodian of those funds with the statutory duty to use the funds for payment of its debt service obligations. Similarly, the Commonwealth has no property interest in the pledged revenues because it must use such funds to pay GO debt only if the available

25

resources for a given fiscal year prove to be insufficient.  P.R. Const. art. VI, § 8; 23 L.P.R.A. § 104(c)(1).

> **1.      Debtors Lack of Property Interest in the Pledged Revenues Constitutes Further "Cause" to Lift the Stay Under Section 362(d)(1)**

67.      Because HTA and the Commonwealth merely hold these funds in trust for the benefit of the HTA creditors, they cannot possibly have a property interest in the pledged revenues. *See Columbia Falls*, 143 B.R. at 762 ("The municipality is merely a custodian" of funds it holds "in trust," and "its duties relative to such funds are purely ministerial. *It may not use or divert them.*" (emphasis in original)); *see also FDIC v. Casady*, 106 F.2d 784, 788 (10th Cir. 1939) (holding that structure through which city held sinking funds for bondholders created relationship in which city was trustee and bondholders were cestui que trustent); s*ee also In re Lan Tamers, Inc.*, 281 B.R. 782, 793 (Bankr. D. Mass. 2002) ("[W]hen a debtor is a mere conduit for funds to travel from one party to another, it lacks equitable interest in the monies." (internal quotation marks and citation omitted)).

68.      Here, Debtors' lack of a property interest in the pledged revenues is sufficient "cause" for relief from stay under section 362(d)(1). *See In re Schaffer*, 597 B.R. 777, 794 n.23 (Bankr. E.D. Pa. 2019) (*ref. In re Moore & White Co*., 83 B.R. 277, 280-81 (Bankr. E.D. Pa. 1988)) ("… where the Debtor has no right of ownership or contractual right to possession, relief from the automatic stay is readily granted for cause pursuant to § 362(d)(1) *unless the Debtor demonstrates some need to retain possession and offers to adequately protect the owner's interest in the property.*" (emphasis added)); *see also U.S. Bank, Nat'l Ass'n v. Roberts (In re Roberts)*, 367 B.R. 677, 688 (Bankr. D. Colo. 2007) (cause exists to lift the stay under section 362(d)(1) when debtor's interest is one of "bare possession" of the property).

2.    **Relief from Stay Should Also be Granted Under Section 362(d)(2) Because Debtors Hold No Equity Over the Pledged Revenues and the Pledged Revenues are** Not Necessary **for** an Effective Reorganization

69.    Section 362(d)(2) of the Bankruptcy Code permits a party to seek relief from the automatic stay if "(A) the debtor does not have an equity in [the] property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). The moving party bears the burden of demonstrating that the debtor lacks equity in the property and the debtor has the burden to prove that the property in question is necessary for its plan. 11 U.S.C. § 362(g); *see In re Builders Grp. & Dev. Corp.*, 2013 WL 6198203, at * 7 (Bankr. D.P.R. Nov. 27, 2013).

70.    The courts have found that relief from stay is appropriate under section 362(d)(2) in situations such as the foregoing, where neither HTA nor the Commonwealth hold a property interest over the pledged revenues, because the Debtors do not possess any equity over the pledged revenues. *See U.S. Bank*, 367 B.R. at 688 (debtor's lack of ownership interest in the property was sufficient to demonstrate to the court that the debtor has no equity in the property); *In re Lally*, 38 B.R. 622, 626 (Bankr. N.D. Iowa 1984) ("[C]ause exists to justify termination of the stay" because debtors "armed only with a 'naked legal title'" in the property "clearly do 'not have equity'" in the property); *see also In re Moore*, 267 B.R. 111, 118 (Bankr. E.D. Pa. 2001) (cause to lift stay exists where "naked legal title to property has passed into the estate but the equitable title is held by another party'") (quoting *Matter of Spencer*, 115 B.R. 471, 476 (D. Del. 1990)).

71.    Because the Commonwealth and HTA merely hold these funds in trust for creditors, neither HTA nor the Commonwealth have any equity in the pledged revenues. Even if the Court were to find that HTA or the Commonwealth somehow have equity in the pledged revenues (which they do not), neither party can meet its burden to demonstrate that the pledged revenues are necessary for their effective reorganization. *See Timbers of Inwood Forest Assocs.*, 484 U.S. at

27

375-76 (holding that, to fend off stay relief under Section 362(d)(12), the debtor must establish a "reasonable possibility of a successful reorganization within a reasonable time," and that the property at issue is necessary to that reorganization). The Debtors cannot satisfy this burden because the pledged revenues (which are part of the DRA's collateral) are pledged in their entirety to the HTA and GO creditors. *See, e.g., Columbia Falls*, 143 B.R. at 762 (debtor "may not use or divert" funds held in trust); *Lally*, 38 B.R. at 626 (debtors "armed only with a 'naked legal title'" in the property may not "utilize the property … to achieve an *effective* reorganization" (emphasis in original)).

72.     When a property's value is pledged entirely to secured creditors, that property is not necessary to a debtor's effective reorganization. *See In re MJS Las Croabas Props*., No. 12-05710 (ESL), 2013 Bankr. LEXIS 2256, at *15 (Bankr. D.P.R. May 29, 2013) (finding that property was not necessary to an effective reorganization when applicable security agreement required the debtor to apply *all* income from operating or selling the pledged property to satisfying the secured claim); *In re Valentin*, 2014 Bankr. LEXIS 2885, at *4 (Bankr. D.P.R. July 3, 2014) (granting a secured creditor relief from stay because "no benefit would accrue to the estate" if the debtor sold the pledged property to a third party, as the applicable security agreement required the debtor to pay all sale proceeds to the secured creditor).

73.     With respect to HTA, the terms of the loan and bond documents, and the provisions of applicable law, require HTA to direct its pledged revenues to secured creditors, subject only to Art. VI, Section 8 of the Puerto Rico Constitution. *See supra* Background at Sections II and IV.C. To the extent the Commonwealth retains any of the pledged revenues, Art. VI, Section 8 of the Puerto Rico Constitution and applicable law require the Commonwealth to apply such revenues to

28

pay GO debt (to the amount necessary) and to use the remaining funds for satisfaction of HTA's secured creditors.

74.     HTA and the Commonwealth are constitutionally and statutorily barred from using these funds for any other purpose and must turn over the pledged revenues to the secured creditors. In view of the above, the revenues pledged to the DRA are not necessary for either Debtor's effective reorganization and the stay must be lifted pursuant to section 362(d)(2) of the Bankruptcy Code.

## II.     The Court Should Mandate Payment of Adequate Protection

75.     In the event the Court does not lift the automatic stay, it should require HTA and the Commonwealth to provide the DRA Parties with adequate protection on account of the diminution in value of their collateral.  As detailed above, the Commonwealth and HTA have diminished the DRA's collateral and are entitled to adequate protection. *See supra* Argument, Section I.A.

76.     The DRA Parties respectfully request that the Court require HTA and the Commonwealth to provide them with adequate protection in the form of current interest under the rate set forth under the HTA loans and 1998 bonds.  *See* 11 U.S.C. § 361(1); 48 U.S.C.S. § 2161(a) (2019) (incorporating 11 U.S.C. § 361 into PROMESA); *In re Am. Props., Inc.*, 8 B.R. 68, 72 (Bankr. D. Kan. 1980) ("[I]n order to meet the requirement of adequate protection as set forth in 11 U.S.C. § 361(1), the debtor must pay FNB on a monthly basis the decrease in value of its security interest, *i.e.*, the contract interest due on the notes held by TBT and USB."); *see also In re Chatham Parkway Self Storage, LLC*, No. 12-42153, 2013 WL 1898058, at *7 (Bankr. S.D. Ga. Apr. 25, 2013) ("Debtor's monthly adequate protection payment …, which matches the prepetition partial interest payment, is sufficient.").

77.     To the extent this court is not willing to award adequate protection in an amount equal to the current interest rate, the DRA Parties respectfully request it to order adequate protection in any of the other forms permitted under section 361 of the Bankruptcy Code.

## III.     Absent Adequate Protection, the DRA Parties are Entitled to an Administrative Expense Claim

78.     Section 503(b)(1)(A) of the Bankruptcy Code (incorporated into Title III at section 301 of PROMESA) provides administrative priority status for "the actual, necessary costs and expenses of preserving the estate."  Courts within the First Circuit will grant a claim administrative expense status when "the consideration supporting the claimant's right to payment must be supplied to and beneficial to the debtor-in-possession in the operation of the business." *See In re La Electronica, Inc.*, 995 F.2d 320, 322 (1st Cir. 1993).  Post-petition liabilities arising under contractual arrangements with a debtor give rise to administrative expense priority claims. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976).

79.     In addition, section 503(b)(3)(D) of the Bankruptcy Code allows administrative expense priority to those "actual, necessary expenses…incurred by…a creditor…in making a substantial contribution in a case under chapter 9…of this title".  To determine whether a creditor contribution is substantial, a court "balances the dual objectives of encouraging ''meaningful creditor participation in the reorganization process,' . . . and 'keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors.''" *Xifaras v. Morad (In re Morad)*, 328 B.R. 264, 272 (B.A.P. 1st Cir. 2005) (quoting *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (citation omitted)).

80.     The Commonwealth and HTA have improperly diverted the DRA's pledged revenues for their own benefit to pay general expenses during the pendency of their Title III cases. In fiscal year 2018 alone, the Commonwealth retained approximately $333 million in HTA

30

pledged special revenues that it improperly withheld from payments on HTA's debt obligations in fiscal year 2019 and did not apply to GO debt. *See* Treasury Single Account Cash Flow Report as of June 7, 2019, at 1, attached hereto as **Exhibit H**; Circular Letter No. 1300-15-16 (Dec. 17, 2015) (directing Commonwealth officials to disburse pledged HTA revenues to pay for essential services and other non-GO debt expenses).

81.     As stated at *supra* Argument, Section I.B, neither the Commonwealth nor the HTA have any property interest over the DRA's collateral. Upon information and belief, the Debtors have diverted and used the DRA's pledged revenues for their operational expenses pursuant to the moratoriums and executive orders, which expenses include the costs associated with pursuing the Commonwealth and HTA's Title III proceedings.

82.     The DRA is entitled to an administrative expense claim under both Bankruptcy Code section 503(b)(1)(a) against the Commonwealth and HTA in an amount equal to the revenues that each Debtor has used to pay their general/operational expenses[12] due to the fact that these revenues were used by the Commonwealth and HTA for the preservation of their respective assets and operations during the course of these Title III proceedings. Moreover, these revenues should be treated as a "substantial contribution" under section 503(b)(3)(d) of the Bankruptcy Code because they have constituted a "meaningful creditor participation" in the Commonwealth Title III – by virtue of funding significant operating functions of the Commonwealth. *See*, *In re Morad*, 328 B.R. at 272.

---

[12] The DRA Parties reserve the right to conduct discovery to determine the amount of its collateral that has been used by the Commonwealth and HTA post-petition. *See supra* n. 5. In addition, at a minimum, a debt adjustment plan of HTA or the Commonwealth cannot discharge any post-petition liability on account of the diverted pledged revenues, as such a plan only adjusts prepetition liabilities. *See* 6 Collier on Bankruptcy ¶ 944.03 (16th ed. 2019) (Section 944, which is incorporated into PROMESA discharges only prepetition debts of a municipal debtor).

83.     However, it should be noted that the granting of an administrative claim is insufficient to constitute adequate protection – and this request should not replace the request for adequate protection.  *See* 3 Collier on Bankruptcy ¶ 361.03[4][a] (16th ed. 2019) (citing 11 U.S.C. §361(3)).

## <u>CONCLUSION</u>

In light of the foregoing, the DRA Parties hereby respectfully request this Court enter an order lifting the automatic stay under Section 362(d)(1) and/or (d)(2) of the Bankruptcy Code so that the DRA Parties may initiate, continue and/or conclude any and all foreclosure proceedings over their collateral and/or the exercise of any applicable contractual and legal remedies under the applicable debt documents.

In the alternative, the DRA Parties seek an order that the Debtors provide adequate protection on account of the diminution in value of the DRA's collateral.  Further in the alternative, the DRA Parties seek an order that the Court grant them an allowed administrative expense claim under section 503(b) of the Code, to the extent the Court does not grant the DRA Parties' request for adequate protection.

**WHEREFORE**, the DRA Parties respectfully request this Court to enter an order granting the relief requested herein and further granting such other relief as may be just and proper.

4131-2622-5180.24

## NOTICE OF TIME TO RESPOND

Pursuant to ¶ III.S of the Court's *Ninth Amended Notice, Case Management, and Administrative Procedures* (Dkt. No. 7115 of Case No. 17-03283 (LTS) (May 28, 2019)) (the "CMP Order"), unless otherwise ordered by the Court, the Objection Deadline with respect to the Motion shall be the later to occur of (i) fifteen (15) calendar days after the date of filing and service of the Stay Relief Motion and (ii) eight (8) calendar days prior to the hearing scheduled with respect thereto (*i.e.*, _____); effectively, this means that the Objection Deadline will be eight (8) calendar days prior to the hearing scheduled with respect to the Stay Relief Motion (*i.e.*, _____), except in certain situations where an expedited hearing is scheduled with respect to the Stay Relief Motion.

**WE HEREBY CERTIFY** that on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case. We further certify that, on this same date, we served the foregoing upon all the Standard Parties as identified and defined the Court's CMP Order, as well as upon all of the parties identified in the Master Service List maintained at https://cases.primeclerk.com/puertorico/.

4131-2622-5180.24

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 25th day of June, 2019.

**C. CONDE & ASSOC. LAW OFFICES**

By: */s/ Carmen D. Conde Torres*

Carmen D. Conde Torres
(USDC No. 207312)
254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel. 787-729-2900
Fax. 787-729-2203
E-Mail: condecarmen@condelaw.com

*-and-*

**ORRICK, HERRINGTON &
SUTCLIFFE LLP**

By: */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted pro hac vice)
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone:  (202) 339-8400
Facsimile:  (202) 339-8500
E-mail:    dmintz@orrick.com

By: */s/ Peter Amend*
Peter Amend (admitted pro hac vice)
51 West 52nd Street
New York, N.Y. 10019
Telephone:  (212) 506-5000
E-mail:      pamend@orrick.com

*Attorneys for Cantor-Katz Collateral
Monitor LLC, as Collateral Monitor for
GDB Debt Recovery Authority*

*-and-*

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
PO Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: 787-250-5632
Facsimile:  787-759-9225

By: */s/Arturo J. García-Solá*
Arturo J. García-Solá
USDC No. 201903
Email: ajg@mcvpr.com

By: */s/Nayuan Zouairabani*
Nayuan Zouairabani
USDC No. 226411
Email: nzt@mcvpr.com

*Attorneys for AmeriNational Community
Services, LLC as servicer for the GDB Debt
Recovery Authority*

34