(1)

## CERTIFICATE OF PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY AS TO LIQUIDITY FACILITY RESOLUTION

I, Grace Santana Balado, Secretary of Puerto Rico Highways and Transportation Authority (the "Authority"), DO HEREBY CERTIFY that attached hereto is a true and correct copy of Resolution No. 08-26, which was adopted by the Secretary of Transportation and Public Works of the Commonwealth of Puerto Rico on May 23, 2008. I DO FURTHER CERTIFY that said Resolution has not been in any way amended, annulled, modified, rescinded or revoked since its adoption and is still in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Authority this 27th day of May, 2008.

(SEAL)

_____
Secretary of Puerto Rico
Highways and Transportation Authority

NYI 664164lv.3

## RESOLUTION AUTHORIZING THE EXECUTION AND DELIVERY OF A REIMBURSEMENT AGREEMENT IN CONNECTION WITH THE DELIVERY BY THE AUTHORITY OF AN ALTERNATE LIQUIDITY FACILITY UNDER RESOLUTION NO. 98-07 RELATING TO THE AUTHORITY'S TRANSPORTATION REVENUE BONDS (SERIES A) AND RELATED MATTERS

**WHEREAS,** Puerto Rico Highways and Transportation Authority (the "Authority") has heretofore issued and there are currently outstanding $1,129,643,740 aggregate principal amount of Transportation Revenue Bonds (Series A) (the "1998 Bonds"); and

**WHEREAS,** a portion of the 1998 Bonds, maturing on July 1, 2028 in the principal amount of $200,000,000 (the "1998 Variable Rate Bonds"), was issued as variable rate bonds bearing interest at a Weekly Rate (as defined in Resolution 98-07, adopted by the Authority on February 26, 1998, supplementing Resolution No. 98-06, adopted by the Authority on the same date, authorizing the issuance of the 1998 Bonds (collectively, the "Authorizing Resolution")); and

**WHEREAS,** beneficial owners of the 1998 Variable Rate Bonds have the option to tender them for purchase by the Authority upon the giving of seven days' notice, and they are subject to mandatory tender for purchase by the Authority upon the occurrence of certain events as set forth in the Authorizing Resolution; and

**WHEREAS,** under a remarketing agreement, dated March 19, 1998 (the "Original Remarketing Agreement"), between PaineWebber Incorporated (now UBS Securities LLC) and the Authority, UBS Securities LLC (the "Remarketing Agent") must, among other things, use its best efforts to remarket any such tendered 1998 Variable Rate Bonds at a price of par plus accrued interest to their respective dates of tender for purchase; and

**WHEREAS,** should the Remarketing Agent be unable so to remarket any such 1998 Variable Rate Bonds, they will be purchased with funds drawn under a Standby Bond Purchase Agreement, dated as of March 1, 1998 (the "Current Liquidity Facility"), with The Bank of Nova Scotia, acting through its New York Agency (the "Bank"); and

**WHEREAS,** the 1998 Bonds currently are insured under a Bond Insurance Policy (the "Policy") issued by AMBAC Assurance Corp. ("AMBAC"); and

**WHEREAS,** as a result of such insurance and because of certain market dislocations the current scope of which has been extensively described in various media and which are related to the problems in the "sub prime" mortgage market (whose problems have also been similarly extensively described), the Authority has been advised by Government Development Bank for Puerto Rico ("Development Bank"), the Remarketing Agent and other advisors to the Authority that the interest cost to the Authority on the 1998 Variable Rate Bonds is higher than would be expected had such Bonds not been so insured; and

**WHEREAS,** AMBAC has informed the Authority that it is willing to allow the Policy to be returned to AMBAC and no longer serve as a portion of the security for the 1998 Variable Rate Bonds upon an exchange of the 1998 Variable Rate Bonds in connection with a mandatory tender of such Bonds; and

NY1 6634675v.5

**WHEREAS,** on May 5, 2008, the Remarketing Agent announced that in the aftermath of a strategic reorganization conducted by its management, it would be unable to continue to serve as Remarketing Agent; and

**WHEREAS,** as a consequence of the foregoing, the Authority and the Remarketing Agent have determined to terminate the Original Remarketing Agreement; and

**WHEREAS,** the Authority and Morgan Stanley & Co. Incorporated (the "successor Remarketing Agent") have agreed to enter into a replacement remarketing agreement (the "Replacement Remarketing Agreement") under which the successor Remarketing Agent will, among other things, use its best efforts to remarket any tendered 1998 Variable Rate Bonds at a price of par plus accrued interest to their respect dates of tender for purchase; and

**WHEREAS,** the Authority has been further advised by Development Bank, the Remarketing Agent and the successor Remarketing Agent that the use of a direct pay letter of credit rather than the Current Liquidity Facility will result in a lower overall interest cost on the 1998 Variable Rate Bonds; and

**WHEREAS,** the Bank has advised the Authority that it is willing to terminate the Current Liquidity Facility and deliver in substitution therefor an irrevocable, direct pay letter of credit in a stated amount sufficient to pay the tender purchase price of the 1998 Variable Rate Bonds and the principal of and interest on said Bonds as the same become due and payable, which letter of credit will constitute an Alternate Liquidity Facility as defined in said Resolution No. 98-07; and

**WHEREAS,** in connection with such delivery of an Alternate Liquidity Facility, the 1998 Variable Rate Bonds will, as provided in said Resolution No. 98-07 become subject to mandatory tender for purchase on a date 5 business days before the date of such substitution because the Authority will not obtain by the date of substitution a Rating Confirmation Notice as defined in said Resolution No. 98-07; and

**WHEREAS,** the Authority has determined, on the basis of such advice and information, to accept the substitution of an Alternate Liquidity Facility for the Current Liquidity Facility, to cause the 1998 Variable Rate Bonds to be subject to mandatory tender as aforesaid and in connection therewith has prepared and the Executive Director has given a notice of such mandatory tender to The Bank of New York, successor fiscal agent under the Authorizing Resolution (the "Fiscal Agent"), together with a form of notice of mandatory tender to be given to the owners of the 1998 Variable Rate Bonds (collectively, the "Notices of Tender");

**WHEREAS,** in connection with such substitution and delivery, I have been advised by counsel that it is necessary to amend the aforementioned Resolution No. 98-07 in order to address the return of the Policy and the delivery of the letter of credit and provide authorization and direction to the Fiscal Agent under said resolution as to the making of draws under the letter of credit and certain other matters; and

**WHEREAS,** I have been further advised by counsel that it is necessary and convenient at this time to amend and restate Appendix A of Resolution No. 98-07 in order to include the

changes described above relating to the letter of credit and I have determined so to proceed; **now, therefore,**

**BE IT RESOLVED** by Puerto Rico Highways and Transportation Authority:

**Section 1.** The Notices of Tender and their delivery to the Fiscal Agent are hereby ratified, approved and confirmed.

**Section 2.** The distribution and use of the Preliminary Remarketing Circular, dated May 22, 2008, of the Authority in connection with the remarketing of the 1998 Variable Rate Bonds, in the form presented to me this date by the Replacement Remarketing Agent is hereby, in all respects, ratified, confirmed and approved. The form of the Remarketing Circular, dated May 27, 2008, to be used by the Replacement Remarketing Agent in connection with the remarketing of the 1998 Variable Rate Bonds is hereby approved and the Replacement Remarketing Agent is authorized to distribute and use said Circular for such purpose, with such changes, insertions and omissions as may be approved by the Executive Director of the Authority, his execution of the Replacement Remarketing Agreement to be conclusive evidence of any such approval.

**Section 3.** The execution and delivery by the Executive Director of the Authority of the Replacement Remarketing Agreement are hereby authorized, and the Replacement Remarketing Agreement shall be substantially in the form presented to me on the date of this Resolution and shall be executed in the manner therein set forth, subject to such changes, insertions and omissions as may be approved by the person executing the same, his execution of the Replacement Remarketing Agreement to be conclusive evidence of any such approval.

**Section 4.** The execution and delivery by the Executive Director of the Authority of a letter of credit and reimbursement agreement, dated as of May 1, 2008 (the "Reimbursement Agreement"), with the Bank are hereby authorized, and the Reimbursement Agreement shall be substantially in the form presented to me on the date of this Resolution and shall be executed in the manner therein set forth, subject to such changes, insertions and omissions as may be approved by the person executing the same, his execution of the Reimbursement Agreement to be conclusive evidence of any such approval.

**Section 5.** The Secretary of Transportation and Public Works, and the Executive Director and Secretary of the Authority are hereby authorized and directed in connection with the aforementioned mandatory tender to execute with their manual or facsimile signatures, one or more 1998 Variable Rate Bonds substantially in the form provided therefor in the Authorizing Resolution and deliver the same to the Fiscal Agent for authentication, and the Fiscal Agent is hereby authorized and directed to authenticate and deliver such Bonds as may be provided in the Remarketing Agreement and in the Authorizing Resolution.

**Section 6.** The execution and delivery by the Executive Director of the Authority of an endorsement and release agreement, to be dated as of May 27, 2008 (the "Termination Agreement"), with AMBAC, the Fiscal Agent, The Bank of Nova Scotia, acting through its New York Agency, and the Replacement Remarketing Agent are hereby authorized, and the Termination Agreement shall be substantially in the form presented to me on the date of this

3

Resolution and shall be executed in the manner therein set forth, subject to such changes, insertions and omissions as may be approved by the person executing the same, his execution of the Termination Agreement to be conclusive evidence of any such approval, and the Fiscal Agent is hereby authorized and directed to execute and deliver the Termination Agreement.

**Section 7.**     The Fiscal Agent is hereby directed to cancel the 1998 Variable Rate Bonds duly tendered to it in accordance with the provisions of said Resolution No. 98-07.  The bond form for the remarketing of such tendered 1998 Variable Rate Bonds is attached hereto as Exhibit I.

**Section 8.**     Resolution No. 98-07 is hereby modified in the following respects:

A.  Section 15 of Resolution No. 98-07 is hereby deleted in its entirety; and Sections 16 through 20 are renumbered as Sections 15 through 19.

B.  Appendix A of Resolution No. 98-07 is hereby amended and restated to read in its entirety as follows:

**APPENDIX A**

Unless the context otherwise requires, the terms defined below in this Appendix A shall have the meanings defined herein, the following definitions to be equally applicable to both the singular and plural forms of any of the terms defined herein:

Alternate Facility

"Alternate Facility" means an Successor Credit Facility or an Alternate Liquidity Facility as the context requires.

Alternate Liquidity Facility

"Alternate Liquidity Facility" has the meaning specified in Section 24 hereof.

Alternate Rate

"Alternate Rate" means, on any Rate Determination Date, the rate per annum specified in the index for seven (7) day variable rate demand bonds (the "Index") published by the Indexing Agent and in effect on such Rate Determination Date.  The Index shall be based upon yield evaluations at par of bonds, the interest on which is excluded from gross income for federal income tax purposes, of not less than five "high grade" component issuers selected by the Indexing Agent which issuers shall include, without limitation, issuers of general obligation bonds and which issuers may be changed from time to time by the Indexing Agent in its discretion and which bonds on which the Index is based shall not include any bonds the interest on which is subject to a "minimum tax" or similar tax under the Code, unless all tax-exempt bonds are subject to such tax.

NY1 6634675v.5

If no Index satisfying the requirements of the preceding paragraph is published, the Alternate Rate for an Interest Period shall be the rate per annum specified in the most recently published Index for a comparable Interest Period.

## Authorized Denominations

"Authorized Denominations" means (i) with respect to Series A Variable Rate Bonds in a Weekly Mode, $100,000 and any multiple of $5,000 thereof above $100,000, and (ii) with respect to Bonds in a Fixed Rate Mode, $5,000 and any multiple thereof.

## Available Commitment

"Available Commitment" shall have the meaning specified in the Facility Agreement.

## Bank

"Bank" means the provider of a Facility.

## Bank Interest Rate

"Bank Interest Rate" means the interest rate, not to exceed the Maximum Rate, payable on Bank-Owned Bonds and determined pursuant to the Facility Agreement.

## Bank-Owned Bonds

"Bank-Owned Bonds" has the meaning specified in Section 23 hereof.

## Bond Counsel

"Bond Counsel" means any firm of nationally recognized municipal bond attorneys selected by the Authority and experienced in the issuance of municipal bonds and matters relating to the exclusion of the interest thereon from gross income for federal income tax purposes.

## Business Day

"Business Day" means a day on which the Fiscal Agent, the Remarketing Agent, the Bank or banks or trust companies in New York, New York, are not authorized or required to remain closed and on which the New York Stock Exchange is not closed; provided, however, that solely for purposes of Section 3.03 of the Standby Agreement, a Business Day shall also be a day on which banks in London, England are open for business.

## Credit Facility

"Credit Facility" has the meaning given to it in Section 21(f) hereof.

## Credit Facility Fund

"Credit Facility Fund" has the meaning given to it in Section 21(g) hereof.

5

Credit Tender Price

"Credit Tender Price" means an amount equal to the principal amount of any Series A Variable Rate Bonds (or portions thereof) purchased on a Mandatory Credit Tender Date, plus, accrued interest, if any, to the Mandatory Credit Tender Date, unless such Date is an Interest Payment Date in which case no accrued interest will be included in the Credit Tender Price if the applicable Facility Agreement so provides.

Facility

"Facility" means a Credit Facility or a Liquidity Facility as the context requires.

Electronic Means

"Electronic Means" means telecopy, telegraph, telex, facsimile transmission or other similar electronic means of communication, including a telephonic communication confirmed by writing or written transmission.

Expiration Tender Date

"Expiration Tender Date" means the day five Business Days before the then outstanding Standby Agreement is to expire or terminate.

Facility

"Facility" means a Standby Agreement or Credit Facility as the context requires.

Facility Agreement

"Facility Agreement" means a Standby Agreement or a Reimbursement Agreement, as the context requires.

Favorable Opinion of Bond Counsel

"Favorable Opinion of Bond Counsel" means, with respect to any action the occurrence of which requires such an opinion, an unqualified Opinion of Counsel, which shall be Bond Counsel, to the effect that such action is permitted under the Enabling Act and this resolution and will not impair the exclusion of interest on the Series A Variable Rate Bonds from gross income for purposes of Federal income taxation (subject to the inclusion of any exceptions similar to those contained in the opinion delivered upon original issuance of the Series A Variable Rate Bonds).

Fixed Rate

"Fixed Rate" means the per annum interest rate or rates to be borne by the Series A Variable Rate Bonds on and after a Mode Change Date, which rate or rates shall be determined in accordance with Sections 7 and 10 hereof.

## Fixed Rate Bonds

"Fixed Rate Bonds" means the Series A Variable Rate Bonds during the Fixed Rate Mode.

## Fixed Rate Mode

"Fixed Rate Mode" means the Mode during which the Series A Variable Rate Bonds bear interest at a Fixed Rate.

## Indexing Agent

"Indexing Agent" means Kenny Information Systems, a corporation duly organized and existing under the laws of the State of New York, and its successors and assigns, except that if such corporation shall be dissolved or liquidated or shall no longer publish the indices referred to in the definition of Alternate Rate, then the term "Indexing Agent" shall be deemed to refer to any other entity selected by the Authority publishing similar indices and approved by the Bank and the Remarketing Agent.

## Indicative Rate

"Indicative Rate" means the interest rate or rates determined by the Remarketing Agent on the Indicative Rate Determination Date as the lowest fixed rate or rates which would in the sole judgment of the Remarketing Agent, under existing market conditions, result in the sale of the Series A Variable Rate Bonds on such Rate Determination Date at a price equal to the Purchase Price.

## Indicative Rate Determination Date

"Indicative Rate Determination Date" means the thirty-fourth (34th) day next preceding the Mode Change Date with respect to a change to the Fixed Rate Mode.

## Interest Accrual Period

"Interest Accrual Period" means the period during which the Series A Variable Rate Bonds accrue interest payable on any Interest Payment Date. Each Interest Accrual Period shall commence on the last Interest Payment Date to which interest has been paid (or, if no interest has been paid in such Mode, from the date of original authentication and delivery of the Series A Variable Rate Bonds, or the Mode Change Date, as the case may be) to, but not including, the Interest Payment Date on which interest is to be paid.

## Interest Payment Date

"Interest Payment Date" means (i) with respect to the Fixed Rate Mode each January 1 and July 1; and (ii) with respect to the Weekly Mode, the first Business Day of each month, commencing April 1, 1998; (iii) with respect to Bank-Owned Bonds, the dates required under the applicable Facility Agreement; (iv) any Mode Change Date; and (v) the Maturity Date.

7

Interest Period

"Interest Period" means the period of time that an interest rate remains in effect.

Mandatory Credit Tender

"Mandatory Credit Tender" means the mandatory tender of the Variable Rate Bonds pursuant to clause (2) of the second sentence of the first paragraph of Section 15 hereof upon receipt by the Registrar of written notice from the Bank that an event has occurred which gives the Bank the option to terminate its Credit Facility upon notice.

Mandatory Credit Tender Date

"Mandatory Credit Tender Date" has the meaning given it in Section 15 hereof.

Mandatory Purchase Date

"Mandatory Purchase Date" means (i) the Mode Change Date, (ii) the Substitution Tender Date, (iii) the Expiration Tender Date and (iv) the Mandatory Credit Tender Date.

Maturity Date

"Maturity Date" means July 1, 2028 and, upon a change to the Fixed Rate Mode, any Serial Maturity Date established pursuant to Section 7.

Maximum Rate

"Maximum Rate" means, on any day, the maximum rate permitted by Puerto Rico law but in no event shall such rate exceed the rate used in calculating the Available Commitment in the applicable Facility Agreement, but in no event shall such rate exceed the rate used in calculating the amount of interest on the Series A Variable Rate Bonds included in the stated amount of the Credit Facility.

Mode

"Mode" means, as the context may require, the Weekly Mode or the Fixed Rate Mode.

Mode Change Date

"Mode Change Date" means the day following the last day of the Weekly Rate Mode on which the Fixed Mode begins.

Mode Change Notice

"Mode Change Notice" means the notice from the Authority to the other Notice Parties of the Authority's intention to change Modes.

8

## Moody's

"Moody's" means Moody's Investors Service, a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, and its successors and assigns, except that if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, then the term "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency selected by the Authority and approved by the Bank.

## Notice Parties

"Notice Parties" means the Authority, the Remarketing Agent, the Fiscal Agent and the Bank.

## Opinion of Counsel

"Opinion of Counsel" means a written legal opinion from a firm of attorneys experienced in the matters to be covered in the opinion and acceptable to Moody's and S&P.

## owner

"owner" means the registered owner of a Series A Variable Rate Bond.

## Principal Payment Date

"Principal Payment Date" means any date upon which the principal amount of Series A Variable Rate Bonds is due hereunder, including the Maturity Date, any Serial Maturity Date, any Redemption Date, or the date the maturity of any Bond is accelerated (including on account of a purchase pursuant to clause (2) of the last sentence of the first paragraph of Section 15 hereof) pursuant to the terms hereof or otherwise.

## Purchase Account

"Purchase Account" means the account by that name created in Section 21 hereof.

## Purchase Date

"Purchase Date" means with respect to Series A Variable Rate Bonds (i) during the Weekly Mode, any Business Day on which the owners of Series A Variable Rate Bonds have elected to have their Bonds (or portion thereof) purchased in accordance with Section 13 and (ii) with respect to Bank-Owned Bonds, any Business Day on which the Remarketing Agent is able to sell such Bonds.

## Purchase Fund

"Purchase Fund" means the Puerto Rico Highways and Transportation Authority Series A Variable Rate Bonds Purchase Fund, the special fund created and designated in Section 21 hereof.

9

Purchase Price

"Purchase Price" means (i) an amount equal to the principal amount of any Series A Variable Rate Bonds (or any portions thereof) purchased on any Purchase Date, plus, in the case of any purchase of Series A Variable Rate Bonds (or portions thereof) in the Weekly Mode, accrued interest, if any, to the Purchase Date, or (ii) an amount equal to the principal amount of any Series A Variable Rate Bonds (or portions thereof) purchased on a Mandatory Purchase Date, plus, accrued interest, if any, to the Mandatory Purchase Date, unless in either case the Purchase Date is an Interest Payment Date in which case no accrued interest will be included in the Purchase Price if the applicable Facility Agreement so provides.

Rate Determination Date

"Rate Determination Date" means the date on which the interest rate or rates on the Series A Variable Rate Bonds shall be determined, which, (i) in the case of the Weekly Mode, shall be March 12, 1998 and each Tuesday thereafter, commencing March 24, 1998, or, if Tuesday is not a Business Day, the next succeeding day or, if such day is not a Business Day, then the Business Day next preceding such Tuesday; and (ii) in the case of the Fixed Rate Mode, shall be a date determined by the Remarketing Agent which shall be at least one Business Day and not more than twenty days prior to the Mode Change Date.

Rating Confirmation Notice

"Rating Confirmation Notice" means a written notice from each rating agency then rating the Series A Variable Rate Bonds confirming that the rating on such Bonds will not be lowered below A-1 by S&P and VMIG-1 by Moody's in respect of any short-term ratings or withdrawn (other than a withdrawal of a short-term rating upon a change to the Fixed Rate Mode) as a result of the action proposed to be taken.

Record Date

"Record Date" means (i) with respect to Series A Variable Rate Bonds in the Weekly Mode, the day (whether or not a Business Day) next preceding each Interest Payment Date, and (ii) with respect to Series A Variable Rate Bonds in the Fixed Rate Mode, the fifteenth (15th) day (whether or not a Business Day) of the month next preceding an Interest Payment Date.

Redemption Date

"Redemption Date" means the date fixed for redemption of Series A Variable Rate Bonds.

Redemption Price

"Redemption Price" means an amount equal to the principal of and premium, if any, and accrued interest, if any, on the Series A Variable Rate Bonds to be paid on the Redemption Date.

Reimbursement Agreement

10

"Reimbursement Agreement" means the agreement pursuant to which the Credit Facility is issued or otherwise provided.

## Remarketing Agent

"Remarketing Agent" means PaineWebber Incorporated, or any other successor investment banking firm performing the duties of the Remarketing Agent as provided in Section 26 hereof.

## Remarketing Agreement

"Remarketing Agreement" means that certain Remarketing Agreement relating to the Series A Variable Rate Bonds, dated as of March 19, 1998, by and between the Authority and the Remarketing Agent or any similar agreement between the Authority and any successor Remarketing Agent, as it may be amended or supplemented from time to time in accordance with its terms.

## Remarketing Proceeds Account

"Remarketing Proceeds Account" means the account by that name created in Section 21 hereof.

## Renewal Date

"Renewal Date" means the date which is sixty (60) days prior to the Stated Expiration date of the applicable Facility.

## Seasoned Funds

"Seasoned Funds" means (i) moneys derived from the remarketing of Series A Variable Rate Bonds or the purchase of said Bonds under the Standby Agreement pursuant to Section 16 hereof, (ii) moneys received by the Fiscal Agent and held in funds and accounts created under the Bond Resolution or this resolution for a period of at least one hundred twenty-four (124) consecutive days and not commingled with any moneys so held for less than said period and during and prior to which period no petition in bankruptcy was filed by the Authority under the United States Bankruptcy Code, (iii) in respect of any Series A Variable Rate Bonds having the benefit of any Facility, any moneys paid by the Bank to the Fiscal Agent pursuant to a draw under the Credit Facility to the extent not otherwise covered in this definition and which moneys were not commingled with any other moneys held by the Fiscal Agent, and (iv) any proceeds of any bonds issued to refund the Series A Variable Rate Bonds or any other moneys with respect to which in either case, the Fiscal Agent shall have received an Opinion of Counsel experienced in matters pertaining to the United States Bankruptcy Code, in form and substance acceptable to any rating agency then rating the Series A Variable Rate Bonds, that the contemplated use of such moneys would not constitute a transfer of property voidable under Section 544 or 547 of the United States Bankruptcy Code should the Authority become a debtor under such Code and (vi) investment income derived from the investment of moneys described in clause (i), (ii) or (iv).

11

Serial Bonds

"Serial Bonds" shall be the Series A Variable Rate Bonds maturing on the Serial Maturity Dates, as determined pursuant to Section 6(iii) hereof.

Serial Maturity Date

"Serial Maturity Date" has the meaning giving it in Section 6(iii) hereof.

Serial Payment

"Serial Payment" means the payment of principal of the Serial Bonds on a Serial Maturity Date.

S&P

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., a corporation duly organized and existing under and by virtue of the laws of the State of New York, and its successors and assigns, except that if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, then the term "S&P" shall be deemed to refer to any other nationally recognized securities rating agency selected by the Authority and approved by the Bank.

Standby Agreement

"Standby Agreement" means that certain Standby Bond Purchase Agreement, dated as of March 1, 1998, by and among the Bank, the Fiscal Agent and the Authority or, if an Alternate Liquidity Facility has been delivered, the corresponding agreement, if any, in connection with such Alternate Liquidity Facility.

Stated Expiration Date

"Stated Expiration Date" shall have the meaning given such term in the Facility or in the Facility Agreement.

Substitution Date

"Substitution Date" means the date on which an Alternate Facility is to be executed by and delivered to the Fiscal Agent.

Substitution Tender Date

"Substitution Tender Date" means the date five Business Days prior to the Substitution Date.

Successor Credit Facility

"Successor Credit Facility" has the meaning given it in Section 21(j) hereof.

12

Weekly Mode

"Weekly Mode" means the Mode during which the Weekly Rate is in effect.

Weekly Rate

"Weekly Rate" means the per annum interest rate on any Series A Variable Rate Bond in the Weekly Mode determined pursuant to Section 5 hereof which, initially, shall be in effect from and including the date of delivery of and payment for the Series A Variable Rate Bonds to and including the following Tuesday and, thereafter, from and including each Wednesday to and including the following Tuesday.

SECTION 1.   Form and Denominations.   The Series A Variable Rate Bonds shall be issued in the form of fully registered Bonds in Authorized Denominations.

SECTION 2.   Principal Amount; Maturity; Amortization Requirements; Place of Payment; and Dating of Series A Variable Rate Bonds.   The Series A Variable Rate Bonds shall be issued in the aggregate principal amount of $200,000,000 and shall be stated to mature, subject to the right of prior redemption as hereinafter set forth and to the serialization of said Bonds as permitted in Section 6 hereof, on the 1st day of July, 2028.

The interest on the Series A Variable Rate Bonds shall be paid on the Interest Payment Dates by wire transfer of immediately available funds to an account specified by the owner in a writing delivered to the Fiscal Agent in the case of Series A Variable Rate Bonds in the Weekly Mode. Any such request shall remain in effect until revoked or revised by such owner by an instrument in writing delivered to the Fiscal Agent. The principal of and premium, if any, on each Series A Variable Rate Bond shall be payable on the applicable Principal Payment Date, upon presentation and surrender thereof at the principal corporate trust office of the Fiscal Agent.

The Remarketing Agent may treat the owner of a Series A Variable Rate Bond as the absolute owner thereof for all purposes and to the same extent as the Authority and the Fiscal Agent may by virtue of Section 205 of the Bond Resolution.

The Series A Variable Rate Bonds shall be dated the date of authentication and delivery thereof.

SECTION 3.   All Times to be New York City Time.   All times set forth in this Appendix by which actions must be taken, shall be understood to be New York City time.

SECTION 4.   Calculation and Payment of Interest.   (a)  When the Weekly Mode is in effect, interest shall be calculated on the basis of a 365/366 day year for the actual number of days elapsed. When the Fixed Rate Mode is in effect, interest shall be calculated on the basis of a 360 day year consisting of twelve 30-day months. Payment of interest shall be made on each Interest Payment Date for unpaid interest accrued during the Interest Accrual Period.

(b)   The Series A Variable Rate Bonds shall initially be in the Weekly Mode and may be converted in whole to the Fixed Rate Mode at the time and in the manner hereinafter provided. Subsequent to such conversion in Mode, the Fixed Rate Mode shall be in effect until

13

the Maturity Date and may not be changed. In connection with but prior to the change to the Fixed Rate Mode, the Authority must deliver to the Fiscal Agent a Favorable Opinion of Bond Counsel with respect to such change.

(c) Absent manifest error, the interest rates contained in the records of the Fiscal Agent shall be conclusive and binding upon the Authority, the Remarketing Agent, the Fiscal Agent, the Bank and the owners.

(d) · In the absence of manifest error, the determination of interest rates by the Remarketing Agent shall be conclusive and binding upon the Remarketing Agent, the Fiscal Agent, the Bank, the Authority and the owners.

SECTION 5. Determination of Interest Rate During the Weekly Mode. The interest rate for the Series A Variable Rate Bonds in the Weekly Mode shall be the rate of interest per annum (not exceeding the Maximum Rate) determined by the Remarketing Agent on and as of the Rate Determination Date as that minimum rate of interest which, in the judgment of the Remarketing Agent under then existing market conditions, would result in the sale of all such Bonds on the Rate Determination Date at a price equal to the Purchase Price.

The Remarketing Agent shall determine the Weekly Rate by 4:00 p.m. on each Rate Determination Date. The Remarketing Agent shall make the Weekly Rate available (i) after 4:00 p.m. on the Rate Determination Date by telephone to the Fiscal Agent, any owner or other Notice Party requesting such rate and (ii) by Electronic Means to the Fiscal Agent not later than the second Business Day immediately succeeding the Rate Determination Date.

SECTION 6. Determination of Fixed Rate(s). The Remarketing Agent shall determine the Fixed Rate and any Serial Maturities in the manner and at the times described below:

(i) Not later than 4:00 p.m. on the Indicative Rate Determination Date, the Remarketing Agent shall determine an Indicative Rate or, if Serial Bonds are created, as described in clause (iii) below, Indicative Rates and shall give notice of such Rate or Rates to the Fiscal Agent by Electronic Means not later than 4:30 p.m. on such Date, and the Fiscal Agent shall then immediately notify the Authority by Electronic Means of the Rate or Rates so determined.

(ii) Not later than 4:00 p.m. on the Rate Determination Date, the Remarketing Agent shall determine the Fixed Rate for the Series A Variable Rate Bonds. The Remarketing Agent shall make the Fixed Rate available by telephone to any Notice Party requesting the same.

(iii) In connection with the establishment of the Fixed Rate, the Remarketing Agent shall, at the request of the Authority, designate such principal amount of the Series A Variable Rate Bonds corresponding to one or more of the Amortization Requirements to mature on July 1 (any such July 1, a "Serial Maturity Date") immediately after the fiscal year to which such Amortization Requirement relates and to designate a Fixed Rate for such principal amount; provided, that the Authority may specify another method of establishing the principal amounts of the Series A Variable

14

Rate Bonds and Serial Maturity Dates upon receipt by the Fiscal Agent and the Remarketing Agent of a Favorable Opinion of Bond Counsel.

SECTION 7.   Alternate Rate for Interest Calculation.   If with respect to the Series A Variable Rate Bonds during the Weekly Mode the Remarketing Agent fails or is unable to determine the Weekly Rate or the method of determining the Weekly Rate is held to be unenforceable by a court of competent jurisdiction, the Series A Variable Rate Bonds shall thereupon, until such time as the Remarketing Agent again makes such determination or until there is delivered an Opinion of Counsel to the effect that the method of determining such rate is enforceable, bear interest at the Alternate Rate (not exceeding the Maximum Rate) from the last date on which such Weekly Rate was effective.

SECTION 8.   Interest on Bank-Owned Bonds.   Subject to the provisions of the last paragraph of Section 23 below, each Bank-Owned Bond shall bear interest on the principal amount thereof at the Bank Interest Rate for each day from and including the date any Series A Variable Rate Bond becomes a Bank-Owned Bond to, but not including, the date such Bond is paid in full or earlier remarketed.

If the rate of interest payable on Bank-Owned Bonds shall exceed the Maximum Rate for any period for which interest is payable, (a) interest at the Maximum Rate shall be due and payable with respect to such period, and (b) interest at the rate equal to the difference between (i) the rate of interest calculated in accordance with the Facility Agreement and (ii) the Maximum Rate (the "Excess Interest") shall be deferred until such date as the rate of interest calculated in accordance with the Facility Agreement ceases to exceed the Maximum Rate, at which time the Authority shall pay to the Bank such portion of the deferred Excess Interest as will cause the rate of interest then paid to the Bank on such Bank-Owned Bonds to equal the Maximum Interest Rate, which payments of deferred Excess Interest shall continue until all deferred Excess Interest is fully paid to the Bank.  If Bank-Owned Bonds are transferred by the Bank or the principal amount thereof is paid before payment in full to the Bank of the Excess Interest, the provisions of this Section shall continue to apply until all Excess Interest owing the Bank for all periods during which it held such Bank-Owned Bonds has been paid in accordance with the provisions of the Facility Agreement.

Interest on Bank-Owned Bonds shall be calculated and payable as provided in the Standby Agreement.  Bank-Owned Bonds shall not bear interest at the Bank Interest Rate after such Bonds have been remarketed unless such Bonds shall again become Bank-Owned Bonds.

SECTION 9.   Change to Fixed Rate Mode.   Subject to the provisions of this Section, the Authority may effect a change to the Fixed Rate Mode with respect to the Series A Variable Rate Bonds by following the procedures set forth in this Section.

Not less than forty-five (45) days (or such shorter time as may be agreed to by the Authority, the Fiscal Agent and the Remarketing Agent) before the proposed Mode Change Date, the Authority shall give written notice to the Notice Parties stating that the Mode will be changed to the Fixed Rate Mode and setting forth the proposed Mode Change Date.

15

Any such change in Mode shall be made as follows:

(i)      The Mode Change Date shall be a Business Day.

(ii)      Not less than 30 days before the proposed Mode Change Date, the Fiscal Agent shall cause a notice of such proposed change, signed in the name of the Authority by the Fiscal Agent, to be mailed, postage prepaid, to the owners stating:

(A)      that the Mode will be changed to the Fixed Rate Mode;

(B)      the proposed Mode Change Date;

(C)      the expected Indicative Rate(s), together with a statement that the actual Fixed Rate may be greater than or less than the Indicative Rate(s) and, if the Authority has requested the Remarketing Agent to designate Serial Maturities pursuant to Section 6(iii) above, a listing of such expected Maturities;

(D)      the date by which the Fixed Rate and Serial Maturities will be determined and the procedure, which may include providing a telephone number which an owner may call, for informing the owner of such Fixed Rate and Maturities;

(E)      the Interest Payment Dates for the payment of interest at the Fixed Rate;

(F)      that the Series A Variable Rate Bonds will be subject to redemption at the option of the Authority at the times and at the redemption prices set forth in such notice and corresponding to the second paragraph of Section 10;

(G)      that, subject to such owner's right to elect to retain such owner's Series A Variable Rate Bonds after the proposed Mode Change Date, such owner is required to tender his Series A Variable Rate Bonds for purchase on the Mode Change Date (describing the procedures to be followed to exercise such election to retain including the election deadline);

(H)      that from and after the Mode Change Date, the Standby Agreement will no longer be in effect and the anticipated ratings on the Bonds;

(I)      if the Authority has requested the Remarketing Agent to serialize all or a portion of the Series A Variable Rate Bonds as set forth in Section 6(iii) above, and an owner elects to retain his Series A Variable Rate Bonds in the Fixed Rate Mode, such retained Bonds shall mature on the first Serial Maturity designated unless a later Maturity may be accommodated;

16

(J)     the conditions to the effectiveness of the change in Mode as set forth in clause (iii) below; and

(K)     if all conditions precedent to the effectiveness of the change in Mode are not met, the Series A Variable Rate Bonds will remain in the Mode applicable thereto prior to the proposed change.

(iii)     The change to the Fixed Rate Mode shall not occur unless there shall have been delivered to the Fiscal Agent and the Remarketing Agent on the proposed Mode Change Date a Favorable Opinion of Bond Counsel dated the Mode Change Date and addressed to the Fiscal Agent and the Remarketing Agent.

(iv)     If any of the conditions precedent have not been satisfied on or prior to the proposed Mode Change Date, the Fixed Rate Mode shall not become effective, and all Series A Variable Rate Bonds will remain in the Weekly Mode.

SECTION 10.  Redemption Provisions.  Prior to the conversion to the Fixed Rate, the Series A Variable Rate Bonds at the time outstanding may be redeemed prior to maturity on any Interest Payment Date at the option of the Authority from any Seasoned Funds (other than moneys deposited in the Senior Bond Sinking Fund (as defined in the Bond Resolution) in respect of an Amortization Requirement (as defined in the Bond Resolution)) either in whole or in part, at the principal amount of the Series A Variable Rate Bonds to be redeemed, together with the interest accrued thereon to the date fixed for redemption, without premium; provided, however, that an amount of the Series A Variable Rate Bonds equal to the Amortization Requirements therefor may be redeemed from moneys in the Senior Bonds Sinking Fund on July 1, 2019 and on July 1 in each year thereafter (to the extent Serial Maturities have not been established as set forth in Section 6(iii)) at par and accrued interest, without premium.

While the Series A Variable Rate Bonds bear interest at a Fixed Rate, the Series A Variable Rate Bonds at the time outstanding shall be subject to redemption, in whole or in part in Authorized Denominations, at the option of the Authority from any available moneys (other than moneys deposited in the Senior Bond Sinking Fund in respect of an Amortization Requirement) at the respective prices (expressed as percentages of the principal amount of the Series A Variable Rate Bonds to be redeemed) set forth below, together with accrued interest, if any, to the date fixed for redemption for the periods indicated:

| Original Length of Fixed Rate Period (Years) | Commencement of Redemption Period | Redemption Price as a Percentage of Principal |
| --- | --- | --- |
| More than 12 years | July 1 immediately after 9th anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |

17

| Original Length of Fixed Rate Period (Years) | Commencement of Redemption Period | Redemption Price as a Percentage of Principal |
|---|---|---|
| More than 10 years but not more than 12 years | July 1 immediately after 7th anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 8 years but not more than 10 years | July 1 immediately after 5th anniversary of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 6 years but not more than 8 years | July 1 immediately after 3rd anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 4 years but not more than 6 years | July 1 immediately after 2nd anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 3 years but not more than 4 years | July 1 immediately after 2nd anniversary of commencement of Fixed Rate Period | 100.5% declining to 100% on next July 1 and thereafter 100% |
| More than 2 years but not more than 3 years | July 1 immediately after 1st anniversary of commencement of Fixed Rate Period | 100.5% declining to 100% on next July 1 and thereafter 100% |

SECTION 11. <u>Selection of Bonds for Redemption</u>. Notwithstanding the last paragraph of Section 301 of the Bond Resolution, Bank-Owned Bonds shall be selected for redemption prior to the selection of any other Series A Variable Rate Bonds if less than all the Series A Variable Rate Bonds shall be called for redemption.

SECTION 12. <u>Notice of Redemption</u>. The Fiscal Agent shall give a copy of each notice of redemption of any Series A Variable Rate Bonds to the Bank and the Remarketing Agent and each such notice, in addition to the information required by Section 302 of the Bond Resolution, shall contain a statement to the effect that the redemption to which such notice relates is conditioned upon the deposit with the Fiscal Agent on or prior to the applicable redemption date of sufficient Seasoned Funds to pay the redemption price of the Series A Variable Rate Bonds then being redeemed, plus accrued interest, if any.

NYI 6634675v.5

SECTION 13.  Optional Tenders of Series A Variable Rate Bonds in the Weekly Mode. Each owner of Series A Variable Rate Bonds in the Weekly Mode may elect to have his Series A Variable Rate Bonds (or portions thereof in Authorized Denominations) purchased on any Business Day at a price equal to the Purchase Price, upon delivering irrevocable written notice of tender or irrevocable telephonic notice of tender to the Remarketing Agent and the Fiscal Agent, promptly confirmed in writing to the Remarketing Agent and the Fiscal Agent, not later than 4:00 p.m. on a Business Day not less than seven (7) days before the Purchase Date specified by the owner in such notice; and delivering such Bonds (with all necessary endorsements) to the principal corporate trust office of the Fiscal Agent in the Borough of Manhattan, City and State of New York, not later than 12:00 noon on such Purchase Date. Each notice of tender shall state the CUSIP number, Bond number and the principal amount of such Bond (or portion thereof) and that such Bond (or portion thereof) shall be purchased on the Purchase Date specified above. The Remarketing Agent shall promptly return any written notice that is incomplete or improperly completed or not delivered within the times required by this resolution to the person or persons submitting any such notice upon surrender of the receipt, if any, issued therefor.  The Remarketing Agent shall deliver to the Fiscal Agent a copy of each notice of tender delivered to the Remarketing Agent in accordance with this Section.  The Remarketing Agent's determination of whether a notice is properly completed or delivered on a timely basis shall be binding on the Notice Parties and the owner of the Series A Variable Rate Bond submitting such notice. All Series A Variable Rate Bonds so purchased shall be delivered (with all necessary endorsements) at or before 12:00 noon on the Purchase Date at the principal corporate trust office of the Fiscal Agent in the Borough of Manhattan, City and State of New York; provided, however, that payment of the Purchase Price shall be made pursuant to this Section only if the Bond so delivered conforms in all respects to the description thereof in the notice described in this Section. Payment of the Purchase Price with respect to purchases under this Section shall be made to the owners of tendered Bonds by wire transfer in immediately available funds by the Fiscal Agent by the close of business on the Purchase Date but only upon such delivery. An owner who gives the notice of tender as set forth above may repurchase the Bonds (or portions thereof) so tendered on any such Purchase Date if the Remarketing Agent agrees to sell the Bonds (or portions thereof) so tendered to such owner. If such owner decides to repurchase such Bonds (or portions) and the Remarketing Agent agrees to sell the specified Bonds (or portions) to such owner, the delivery requirements set forth above shall be waived.

SECTION 14.  Mandatory Purchase on Change to Fixed Rate.  The Series A Variable Rate Bond shall be subject to mandatory purchase on the date on which the Fixed Rate will become effective at the Purchase Price as provided in this Section; provided that the owners of such Bonds may elect to retain such Bonds (or portions thereof in Authorized Denominations) in accordance with the provisions of Section 9.   Series A Variable Rate Bonds (or portions) purchased pursuant to this Section shall be delivered by the owners (with all necessary endorsements) to the principal corporate trust office of the Fiscal Agent in the Borough of Manhattan, City and State of New York, at or before 12:00 noon on the date on which the Fixed Rate will become effective and, subject to such delivery, payment of the Purchase Price shall be made by wire transfer of immediately available funds by the close of business on the mode change date on which the Fixed Rate will become effective. The Fiscal Agent shall give notice of such mandatory purchase as part of the notice of change of Mode to be sent to the owners pursuant to Section 9 above.

19

SECTION 15.  Mandatory Purchase Upon Facility Agreement Termination or Expiration or Substitution of Alternate Facility.  If by the Renewal Date the Authority has not caused the then existing Facility Agreement to be extended or an Alternate Facility to be executed by the Fiscal Agent pursuant to Section 24 or Section 21(i) below, as the case may be, and in either case the Authority has not delivered a Mode Change Notice relating to a change to the Fixed Rate Mode, or in the event that on or prior to the forty-fifth (45th) day next preceding the Substitution Date the Authority has failed to deliver to the Fiscal Agent a Rating Confirmation Notice to the effect that the ratings on the Bonds will not be reduced or withdrawn in connection with the proposed execution by and delivery to the Fiscal Agent of an Alternate Facility, the Series A Variable Rate Bonds shall be subject to mandatory purchase in whole on the Expiration Tender Date or Substitution Tender Date, as the case may be.  In addition, the Series A Variable Rate Bonds are subject to mandatory purchase in whole on the date specified by the Bank in a written notice given to the Fiscal Agent that an (1) Event of Termination (as defined in the Standby Agreement), other than an Event of Termination specified in Section 7.01(a), (c) or (d), has occurred and is continuing, or (2) Event of Default (as defined in the Reimbursement Agreement) has occurred and is continuing, which date shall be a Business Day not later than the next Interest Payment Date occurring not later than fifteen days after the date the Fiscal Agent receives such notice (but not less than five (5) Business Days before the date of termination of the Facility) and not earlier than two Business Days after receipt of such notice by the Fiscal Agent or in the case of clause (2) above, the Business Day not later than the next Interest Payment Date succeeding the date the Fiscal Agent receives the notice mentioned below (not later than the tenth day following receipt of such notice in the case of a failure of the Bank to reinstate the Credit Facility with respect to interest) and not earlier than one Business Day following receipt of such notice by the Fiscal Agent from the Bank (but in any case not later than two Business Days prior to the termination of the Credit Facility) (the date determined in accordance with clause (2) of this paragraph being the "Mandatory Credit Tender Date").

The Fiscal Agent shall give notice of such mandatory purchase by mail to the owners of the Series A Variable Rate Bonds no less than thirty (30) days (or such shorter period as may apply in connection with a Mandatory Credit Tender) prior to the Mandatory Purchase Date.

Each such notice shall state the Mandatory Purchase Date, the Purchase Price, that if sufficient Seasoned Funds are held on such Mandatory Purchase Date in separate accounts by the Fiscal Agent in trust for the owners of the Series A Variable Rate Bonds, interest on the Series A Variable Rate Bonds shall cease to accrue from and after the Mandatory Purchase Date and such Bonds shall no longer be deemed to be outstanding to the owners of the Series A Variable Rate Bonds under the Bond Resolution, that the Series A Variable Rate Bonds shall be required to be surrendered to the Fiscal Agent on the Mandatory Purchase Date, and that if any such Bond is not so tendered, it shall be deemed to have been tendered on such Date.  Failure to mail any such notice with respect to any Bond shall not affect the validity of the mandatory purchase of any other Bond.  Any notice mailed will be conclusively presumed to have been given, whether or not actually received by any owner.

Series A Variable Rate Bonds purchased pursuant to this Section shall be delivered by the owners (with all necessary endorsements) to the principal corporate trust office of the Fiscal Agent in New York, New York, at or before 12:00 noon on the Mandatory Purchase Date, and, subject to such delivery, payment of the Purchase Price of such Bonds shall be made by wire

NY1 6634675v.5

transfer in immediately available funds by the Fiscal Agent by the close of business on such Mandatory Purchase Date.

SECTION 16.   Remarketing of Series A Variable Rate Bonds.

(a)   Remarketing of Bonds.  The Remarketing Agent shall use its best efforts to offer for sale:

(i)   all Series A Variable Rate Bonds or portions thereof as to which notice of tender pursuant to Section 13 has been given;

(ii)   all Series A Variable Rate Bonds required to be purchased pursuant to Sections 14 and 15, except for Series A Variable Rate Bonds to be changed to the Fixed Rate Mode whose owners have exercised the election to retain in the manner described in Section 20 below; and

(iii)   all Bank-Owned Bonds (other than Bank-Owned Bonds purchased on any Principal Payment Date), subject to any limitations contained in the Remarketing Agreement

on the Purchase Date specified or determined by the Remarketing Agent with respect to any Bank-Owned Bonds at the best price available but not at a price less than the principal amount of such Bonds (or portion thereof) plus accrued interest to such date, if any.  The Remarketing Agent may sell such Bonds at such premium necessary to adjust for changes in prevailing market conditions between the date on which the rate of interest then borne by such Bond was established and the date of sale.  No such Bonds shall be remarketed unless there is in effect in respect of such Bonds a Standby Agreement covering purchases of such Bonds.

(b)   Transfer of Purchase Price to Fiscal Agent.  The Remarketing Agent shall transfer to the Fiscal Agent in immediately available funds amounts equal to the aggregate Purchase Price of Series A Variable Rate Bonds (or portions thereof) sold by the Remarketing Agent pursuant to subsection (a) of this Section.  Such transfer shall occur before 11:30 a.m. on each appropriate Purchase Date or Mandatory Purchase Date (assuming with respect to any remarketing of Bank-Owned Bonds (or portions thereof) for purposes of such transfer that such Bank-Owned Bonds bear interest at the rate at which the Series A Variable Rate Bonds (other than Bank-Owned Bonds) bore interest during the period that such Bank-Owned Bonds were held by or on behalf of the Bank).  The Fiscal Agent shall upon receipt of such amounts immediately deposit such amounts to the credit of the Remarketing Proceeds Account pursuant to Section 21(a) below.

(c)   Notice of Remarketing; Registration Instructions; New Series A Variable Rate Bonds.  On each Purchase Date or Mandatory Purchase Date, as the case may be:

(i)   Unless the Remarketing Agent has notified the Fiscal Agent otherwise, the Remarketing Agent shall notify the Fiscal Agent by Electronic Means not later than 11:30 a.m. of the aggregate principal amount of tendered Series A Variable Rate Bonds which were remarketed, the names of the tendering owners and the registration

instructions (i.e., the names, addresses and taxpayer identification numbers of the purchasers and the desired Authorized Denominations) with respect thereto;

(ii)     the Authority shall execute and the Fiscal Agent shall authenticate new Series A Variable Rate Bonds in an aggregate principal amount equal to the principal amount set forth in paragraph (i) of this subsection (c), registered in the names of the respective purchasers thereof, regardless of whether the former owners of the Series A Variable Rate Bonds (or portions thereof) being purchased have delivered such Bonds to the Fiscal Agent, which new Bonds shall be picked up by the Remarketing Agent not later than 1:30 p.m.;

(iii)     if Series A Variable Rate Bonds are purchased by the Fiscal Agent for the benefit of the Bank under the Standby Agreement, the Authority shall execute and the Fiscal Agent shall authenticate new Series A Variable Rate Bonds in an aggregate principal amount equal to the Series A Variable Rate Bonds (or portions thereof) purchased with moneys described in Section 17(b) below, registered in the name of the Bank or its nominee for delivery in accordance with Section 18(b) below; and

(iv)     an aggregate principal amount of Series A Variable Rate Bonds equal to the Bonds or portions thereof purchased with moneys described in Section 17(c) below shall be delivered to the Fiscal Agent for cancellation.

(d)     Method of Purchasing of Bank-Owned Bonds.  In the event that the moneys held to the credit of the Remarketing Proceeds Account on any Purchase Date or Mandatory Purchase Date shall be insufficient to purchase all tendered Series A Variable Rate Bonds on such Date, the Fiscal Agent will request funds under the Standby Agreement in an amount sufficient, together with the moneys then held to the credit of the Remarketing Proceeds Account, to purchase all such tendered Series A Variable Rate Bonds on such Date by providing written notice to the Bank on such date prior to the deadline set forth in the Standby Agreement in order to receive timely on any Purchase Date or Mandatory Purchase Date the necessary funds to effect such purchase.  No such Notice shall be provided in respect of any Series A Variable Rate Bonds that are not also eligible to be purchased under the Standby Agreement.  The Series A Variable Rate Bonds purchased with amounts made available under the Standby Agreement shall be registered in the name of the Bank or its designee and shall be held as Bank-Owned Bonds in trust by the Fiscal Agent for the benefit of the Bank or such designee.

(e)     Transfer of Funds.  On each Purchase Date or Mandatory Purchase Date, as the case may be:

(i)     the Remarketing Agent shall give notice to the Fiscal Agent of receipt of the aggregate Purchase Price of remarketed Bonds by 11:30 a.m.; and

(ii)     the Fiscal Agent shall cause the Bank, in accordance with the procedures set forth in paragraph (d) above, to purchase at the Purchase Price all Series A Variable Rate Bonds tendered or deemed tendered less the aggregate amount of remarketing proceeds notice of the receipt of which was given to the Fiscal Agent by the Remarketing Agent pursuant to clause (i) of this Section 16(c) and shall deposit any moneys received

from the Bank in respect of the payment of the Purchase Price in the Purchase Account of the Purchase Fund.

(f)     Subsequent Remarketings.   In the event that the Remarketing Agent is able to remarket any Series A Variable Rate Bonds (or portions thereof) required to be purchased pursuant to Sections 13 though 15 above after the time on which the Remarketing Agent is required to provide notice to the Fiscal Agent as specified in Section 16(c)(i), or in the event the Remarketing Agent is able to remarket any Bank-Owned Bonds (or portions thereof), the Remarketing Agent shall give to the Fiscal Agent notice by Electronic Means in the manner and containing the details set forth in Section 16(c)(i) (assuming with respect to any remarketing of Bank-Owned Bonds (or portions thereof) for purposes of such notice that such Bank-Owned Bonds bear interest at the rate at which the Series A Variable Rate Bonds (other than Bank-Owned Bonds) bore interest during the period that such Bank-Owned Bonds were held by the Bank or its nominee).

(g)     No Reissuance Intended.   It is the express intention of the Authority that any purchase, sale or transfer of Series A Variable Rate Bonds, as provided in this Appendix A, shall not constitute or be construed to be the extinguishment of any Series A Variable Rate Bonds or the indebtedness represented thereby or the reissuance of any Series A Variable Rate Bonds.

SECTION 17. Source of Funds for Purchase of Series A Variable Rate Bonds; Termination or Suspension of Obligation of Bank to Cause Moneys to be Deposited in Purchase Account.

(1)     By the close of business on the Purchase Date or the Mandatory Purchase Date, as the case may be, the Fiscal Agent shall purchase tendered Series A Variable Rate Bonds from the tendering owners at the Purchase Price by wire transfer in immediately available funds.  Funds for the payment of such Purchase Price shall be derived solely from the following sources in the order of priority indicated, and neither the Fiscal Agent nor the Remarketing Agent shall be obligated to provide funds from any other source:

(a)     immediately available funds on deposit in the Remarketing Proceeds Account;

(b)     immediately available funds on deposit in the Purchase Account; and

(c)     any other Seasoned Funds available therefor.

(2)     Upon the occurrence of an Event of Termination specified in subsections (a) through (d) of Section 7-01 of the Standby Agreement (or the equivalent provisions, if any, of any agreement relating to an Alternate Liquidity Facility), the obligation of the Bank to provide moneys for deposit to the credit of the Purchase Account pursuant to Section 16(d) will terminate or be suspended without notice to the Fiscal Agent or the owners.

SECTION 18. Delivery of Series A Variable Rate Bonds.  On each Purchase Date or Mandatory Purchase Date, as the case may be, new Series A Variable Rate Bonds shall be delivered as follows:

23

(a)     Subject to the provisions of paragraph (b) of this Section in respect of the remarketing of Bank-Owned Bonds, Series A Variable Rate Bonds sold by the Remarketing Agent and for which funds are on deposit as specified in Section 17(a) above shall be delivered by the Remarketing Agent to the purchasers of those Bonds by 3:00 p.m.; and

(b)     Series A Variable Rate Bonds purchased by the Bank with moneys described in Section 17(b) above shall be delivered to the Bank or its nominee on or before the close of business on the applicable purchase date.  In respect of Bank-Owned Bonds purchased on a date other than a Principal Payment Date, the Fiscal Agent shall not authenticate any other Series A Variable Rate Bonds in lieu thereof until the Fiscal Agent receives notification from the Bank that the reduction in the Available Commitment in respect of such Bank-Owned Bonds has been reversed as provided in the Facility Agreement.  Upon receipt of such notification the Fiscal Agent shall cancel such Bank-Owned Bonds in accordance with the provisions of Section 413 of the Bond Resolution.

SECTION 19.  Undelivered Bonds.  If Series A Variable Rate Bonds to be purchased are not delivered by the owners to the Fiscal Agent by 12:00 noon on the Purchase Date or the Mandatory Purchase Date, as the case may be, the Fiscal Agent shall hold any funds received for the purchase of those Bonds in trust in separate accounts and shall pay such funds to the former owners of such Bonds upon presentation and surrender thereof.  Such undelivered Series A Variable Rate Bonds shall cease to accrue interest as to the former owners on the Purchase Date or the Mandatory Purchase Date, as the case may be, if such funds received for such purchase and held in trust shall be sufficient to pay the Purchase Price thereof, and moneys representing such Purchase Price shall be available against delivery of such Bonds at the corporate trust office of the Fiscal Agent in the Borough of Manhattan, City and State of New York; provided, however, that any funds which shall be so held by the Fiscal Agent and which remain unclaimed by the former owner of a Series A Variable Rate Bond not presented for purchase for a period of two (2) years after delivery of such funds to the Fiscal Agent shall be paid to the Authority or to such officer, board or body as may then be entitled by law to receive the same and thereafter the former owner of such Bond shall look only to the Authority or to such officer, board or body, as the case may be, for payment and then only to the extent of the amounts so received without any interest thereon and the Fiscal Agent shall have no further responsibility with respect to such moneys.

SECTION 20.  Election to Retain Series A Variable Rate Bonds to be Changed to Fixed Rate Mode.  (a)  The owner of a Series A Variable Rate Bond subject to mandatory purchase pursuant to Section 14(b) upon a change to the Fixed Rate Mode may elect to retain such Bond (or a portion thereof in Authorized Denominations) after the Mandatory Purchase Date by giving an irrevocable written notice to the Fiscal Agent prior to 4:00 p.m. on the fifteenth (15th) day (or the next succeeding Business Day if such fifteenth (15th) day is not a Business Day) next preceding the Mandatory Purchase Date, which notice shall (i) state that the person delivering the notice is an owner, (ii) specify the numbers and principal amount of Series A Variable Rate Bonds (or portions thereof) to be retained, (iii) acknowledge that such owner has received the notice of Mode change, including the notice of the Indicative Rate(s) and expected Serial Maturities, if applicable, (iv) direct the Fiscal Agent not to purchase the Series A Variable Rate Bonds (or portions thereof) so specified, and (v) acknowledge that the ratings on the Series A Variable Rate Bonds (or portions thereof) may be reduced or withdrawn after the Mode change.

24

(b)     Any such notice delivered to the Fiscal Agent shall be irrevocable and binding upon the owner delivering the notice and upon subsequent owners of such Bonds, including any Series A Variable Rate Bonds issued in exchange therefor or upon registration of transfer thereof.

(c)     Not later than 11:00 a.m. on the Business Day following the receipt of an irrevocable written notice of an election described in this Section, the Fiscal Agent shall notify the Remarketing Agent, the Bank and the Authority by Electronic Means of the principal amount of Series A Variable Rate Bonds to be retained and shall promptly thereafter mail to the Remarketing Agent, the Bank and the Authority a copy of such notice.

SECTION 21.  Purchase Fund.    (a) Creation of Purchase Fund. There is hereby established with the Fiscal Agent a special fund designated "Puerto Rico Highways and Transportation Authority Series A Variable Rate Bonds Purchase Fund" in which the Fiscal Agent shall establish two accounts to be known as the "Purchase Account" and the "Remarketing Proceeds Account". Amounts to the credit of the Purchase Fund shall be held by the Fiscal Agent in trust and applied as hereinafter provided and, pending such application, shall be subject to a lien and charge in favor of the owners of the outstanding Series A Variable Rate Bonds, including Bank-Owned Bonds, and for the further security of such owners until paid out as herein provided.

(b)     Remarketing Proceeds Account.  Upon receipt of the proceeds of a remarketing of Series A Variable Rate Bonds on any Purchase Date or Mandatory Purchase Date, the Fiscal Agent shall deposit such proceeds in the Remarketing Proceeds Account for application to the Purchase Price of the Series A Variable Rate Bonds. Notwithstanding the foregoing, upon the receipt of the proceeds of a remarketing of Bank-Owned Bonds, the Fiscal Agent shall immediately pay such proceeds to the Bank to the extent of any amount owing to the Bank.

(c)     Purchase Account.  Upon receipt from the Bank of the immediately available funds under the Standby Agreement pursuant to Section 17(b) hereof, the Fiscal Agent shall deposit such money in the Purchase Account for application solely to the Purchase Price of the Series A Variable Rate Bonds to the extent that the moneys on deposit in the Remarketing Proceeds Account shall not be sufficient to pay the Purchase Price of such Series A Variable Rate Bonds in accordance with paragraph (b). Any amount deposited in the Purchase Account and not needed with respect to any Purchase Date or Mandatory Purchase Date for the payment of the Purchase Price for any Series A Variable Rate Bonds shall be immediately returned to the Bank.

(d)     Investment. Amounts held in the Purchase Fund shall be held uninvested.

(e)     Remaining Moneys.   Any moneys remaining in the Remarketing Proceeds Account or the Purchase Account after making the payments specified in Section 17 shall be returned to the depositors thereof as promptly as practicable (and in the case of the Bank in immediately available funds) after 3:00 p.m. on any Purchase Date or Mandatory Purchase Date.

(f)     Delivery of Credit Facility.   The Authority shall concurrently with the remarketing of the Series A Variable Rate Bonds on May, 27, 2008, provide for the delivery to

25

the Fiscal Agent of an irrevocable, transferable, direct pay letter of credit (each such letter of credit and any Successor Credit Facility (hereinafter mentioned) delivered to the Fiscal Agent in substitution for the letter of credit then outstanding being herein called the "Credit Facility") issued by The Bank of Nova Scotia, acting through its Hato Rey Branch (such issuer and the issuer of any Successor Credit Facility being herein called the "Bank") in an amount equal to the principal of the Series A Variable Rate Bonds plus an aggregate amount equal to 52 days' interest accrued on such Bonds and with a stated expiration date not earlier than May 27, 2011.

(g)    Credit Facility Fund; Administration Thereof.   There is hereby established with the Fiscal Agent a special fund designated "Puerto Rico Highways and Transportation Authority Series A Variable Rate Bonds Credit Facility Fund" (the "Credit Facility Fund") to the credit of which the Fiscal Agent shall deposit all the proceeds of drawings under the Credit Facility as provided in this Section. Amounts to the credit of the Credit Facility Fund shall be held by the Fiscal Agent in trust and applied as hereinafter provided, and pending such application shall be subject to a lien and charge in favor of the owners of the outstanding Series A Variable Rate Bonds and for the further security of such owners until paid out as herein provided.

The Fiscal Agent shall on each Interest Payment Date, Principal Payment Date or Mandatory Credit Tender Date draw under the Credit Facility on or before the times required therein to make timely payment on any such date an amount sufficient to pay all of the interest on or the principal or Credit Tender Price of all of the Series A Variable Rate Bonds. The Fiscal Agent shall deposit the proceeds of each such drawing in the Credit Facility Fund. The Fiscal Agent shall apply all amounts held to the credit of the Credit Facility Fund solely to the payment of the interest on and the principal of the Series A Variable Rate Bonds on the applicable Interest Payment Date or Principal Payment Date of such Bonds and to the payment of the Credit Tender Price on the Mandatory Credit Tender Date. Proceeds of drawings under the Credit Facility shall remain uninvested, and the Fiscal Agent shall have no lien on any of such moneys. Amounts on deposit in the Credit Facility Fund shall not be commingled with any amounts held by the Fiscal Agent under this Resolution or otherwise. The Fiscal Agent shall not draw under any Credit Facility to pay Bank-Owned Bonds or Series A Variable Rate Bonds which are registered in the name of the Authority or, to the knowledge of the Fiscal Agent, any nominees for (or any person who owns such Variable Rate Bonds for the sole benefit of) any of the foregoing. Upon any payment with the proceeds of a drawing under the Credit Facility of interest on any Interest Payment Date and principal at maturity of any Series A Variable Rate Bond by the Fiscal Agent, the Bank shall be deemed to have acquired from the owners of such Bonds their right to receive payment of such interest and principal from the Authority. In the event of such a payment with a draw under the Credit Facility, the Bank will be subrogated pro tanto to the rights of the Fiscal Agent and the owners of the Series A Variable Rate Bonds in and to all funds and security held by the Fiscal Agent under the Bond Resolution and this Resolution for the payment of the Series A Variable Rate Bonds, including without limitation, the pledge of revenues set forth in Section 601 of the Bond Resolution. In addition, the Bank shall have any and all other subrogation rights available to it at law or in equity.

If any Series A Variable Rate Bonds required to be purchased pursuant to clause (2) of the last sentence of the first paragraph of Section 15 hereof shall not be presented to the Fiscal Agent, the Fiscal Agent shall segregate in the Credit Facility Fund and, subject to Section 19 hereof, hold the moneys for the purchase price of such Bonds in trust, uninvested and without

26

liability for interest thereon, for the benefit of the former owners of such Bonds, who shall, except to the extent provided below, thereafter be restricted exclusively to such moneys for the satisfaction of any claim for the purchase price of such Bonds.

The Fiscal Agent shall maintain a record of the Series A Variable Rate Bonds tendered for purchase pursuant to clause (2) of the last sentence of the first paragraph of Section 15 hereof but not properly presented, together with the names and addresses of the former owners thereof. The Fiscal Agent agrees to accept delivery of all Series A Variable Rate Bonds surrendered to it in accordance with such third paragraph, and to hold such Bonds in trust for the benefit of the respective owners that shall have so surrendered such Bonds, until the Credit Tender Price of such Bonds shall have been delivered to or for the account of or to the order of such owners or otherwise held by the Fiscal Agent pursuant to this subsection.

(h)   Revocation of Tender.  If sufficient funds to purchase all Variable Rate Bonds on the Mandatory Credit Tender Date are not held by the Fiscal Agent, the tender for purchase of all such Bonds shall be cancelled, and the Fiscal Agent shall return each Variable Rate Bond surrendered to it to the appropriate tendering Bondholder.

(i)   Source of Payment of Variable Rate Bonds.  Notwithstanding anything to the contrary herein, payment of interest on and principal of the Series A Variable Rate Bonds on any date shall be made first from proceeds of a drawing under the Credit Facility, second from other Seasoned Funds and third from moneys held to the credit of the Sinking Fund.

(j)   Successor Credit Facility.  At any time prior to the expiration of the Credit Facility then outstanding, the Authority may at his option provide for the delivery to the Fiscal Agent of a successor letter of credit or similar Credit Facility (the "Successor Credit Facility"). Any Successor Credit Facility must be for a term at least as long as the remaining term of the Credit Facility which is being replaced (but in any event not less than the earlier of one year and the final maturity date of the Series A Variable Rate Bonds), shall be in an aggregate principal amount equal to the principal of the Series A Variable Rate Bonds plus 52 days' accrued interest thereon (or such other number of days as may be required by each Rating Agency then rating the Series A Variable Rate Bonds) and shall contain administrative provisions reasonably acceptable to the Fiscal Agent.

The Fiscal Agent shall not accept delivery of any Successor Credit Facility unless it shall have received on or prior to the delivery thereof the following documents:

(1)   an executed copy of the Reimbursement Agreement authorizing such Successor Credit Facility;

(2)   (A) if the applicable Bank is not a domestic commercial bank, an opinion of Counsel reasonably satisfactory to the Authority and any Remarketing Agent, if applicable, that no registration of a security is required under the Securities Act, and no qualification of an indenture is required under the Trust Indenture Act, or that all applicable registration or qualification requirements have been fulfilled and (B) an opinion of Counsel satisfactory to the Authority and such Remarketing Agent to the effect that such Successor Credit Facility is a valid and enforceable obligation of the issuer thereof.

NY1 6634675v.5

(B)     In lieu of the opinion of Counsel required by clause (A) of subparagraph (2) above, there may be delivered an opinion of Counsel reasonably satisfactory to the Authority and any Remarketing Agent, if applicable, to the effect that either (i) at all times during the term of the Successor Credit Facility, the Series A Variable Rate Bonds will be offered, sold and held by owners in transactions not constituting a public offering of any security under the Securities Act, and accordingly no registration or a security under the Securities Act, nor qualification of an indenture under the Trust Indenture Act, will be required in connection with the issuance and delivery of the Successor Credit Facility or the remarketing of the Series A Variable Rate Bonds with the benefits thereof, or (ii) the offering and sale of any such security has been registered under the Securities Act and any indenture required to be qualified with respect thereto under the Trust Indenture Act has been so qualified.   If the opinion described in clause (A) of this subparagraph (2) is given, the Series A Variable Rate Bonds and the Bond Register shall contain such restrictions on sale and transferability described in clause (A);

(3)     an opinion of a recognized firm of municipal bond attorneys to the effect that the delivery of such Successor Credit Facility to the Fiscal Agent is authorized under this Resolution and complies with the terms of this Resolution and will not adversely affect the exclusion from gross income for income tax purposes of the interest on the Series A Variable Rate Bonds and the Fixed Rate Bonds;

(4)     written evidence from each Rating Agency then rating the Series A Variable Rate Bonds to the effect that such Rating Agency has reviewed the proposed Successor Credit Facility and that the substitution of the proposed Successor Credit Facility for the Credit Facility then in effect will not, by itself, result in a reduction or withdrawal of its ratings of the Series A Variable Rate Bonds from those which then prevail; and

(5)     such other documents and opinions as the Fiscal Agent may reasonably request.

If at any time prior to the expiration of the Credit Facility there shall have been delivered to the Fiscal Agent a Successor Credit Facility and the documents mentioned above, then the Fiscal Agent shall accept such Successor Credit Facility and surrender any previously held Credit Facility to the Bank for cancellation in accordance with its terms.   If at any time all the Series A Variable Rate Bonds shall be deemed to have been paid within the meaning and with the effect expressed in this Resolution, the Fiscal Agent shall surrender any Credit Facility relating thereto to the Bank for cancellation in accordance with its terms.   The Fiscal Agent shall comply with the procedures set forth in any Credit Facility relating to the termination thereof.

(k)     <u>Notices from Authority</u>.   The Authority shall give notice to the Fiscal Agent promptly upon the occurrence of any of the following events with respect to the Credit Facility:

(A)  ·  the extension of the Stated Expiration Date; and

(B)     the execution of a Successor Credit Facility.

(l)     <u>Notices from Fiscal Agent to Owners of Series A Variable Rate Bonds</u>.   The Fiscal Agent shall, promptly upon receipt of notice from: (A) the Authority of the occurrence of an event listed in subparagraph (k) above, give notice to the owners of outstanding Variable Rate Bonds of the occurrence of the applicable event and (B) the Bank of the occurrence of an event

28

specified in the definition of "Mandatory Credit Tender," give notice to the Authority and the owners of outstanding Series A Variable Rate Bonds of the occurrence of the Mandatory Credit Tender with the information set forth in Section 15 hereof.

SECTION 22. No Commingling of Moneys in Purchase Fund; Authority Funds Not to be Deposited Therein. Amounts on deposit in the Purchase Account or the Remarketing Proceeds Account of the Purchase Fund shall not be commingled with any amounts held by the Fiscal Agent under this resolution, the Bond Resolution or otherwise. No funds provided by or on behalf of the Authority thereof shall be accepted for deposit to the credit of either of said Accounts, nor shall any such funds if deposited therein by mistake or otherwise be used for the payment of the Purchase Price of the Series A Variable Rate Bonds.

SECTION 23. Bank-Owned Bonds. (a) Notwithstanding anything to the contrary contained herein or in the Series A Variable Rate Bonds, Series A Variable Rate Bonds which are purchased by the Bank (herein called "Bank-Owned Bonds") shall be owned by the Bank and shall not be deemed to be paid by the Authority within the meaning of the Bond Resolution, and such Bank-Owned Bonds shall remain in full force and effect in all respects and shall bear interest at the Bank Interest Rate until such time as the principal of and interest on such Bonds is paid by the Authority to the Bank in the manner and in the amounts set forth in the Standby Agreement.

(b) All Bank-Owned Bonds purchased by the Bank pursuant to Section 16 above shall remain outstanding and unpaid until payment in full to the Bank of all amounts owing thereunder. The Fiscal Agent shall not release Bank-Owned Bonds until the Bank has provided the Fiscal Agent with notice that the Credit Facility has been reinstated for the full amount of such Bank-Owned Bonds.

(c) In accordance with Section 16 above, Bank-Owned Bonds may be sold by the Remarketing Agent at a Purchase Price equal to the principal amount of such Bank-Owned Bonds plus accrued interest at the rate at which the Series A Variable Rate Bonds (other than Bank-Owned Bonds) bore interest during the period that such Bank-Owned Bonds were held by or on behalf of the Bank. The Fiscal Agent shall transfer to the Bank the proceeds from such sale deposited to the Remarketing Proceeds Account in accordance with Section 21(b) above. If the amount so transferred shall be insufficient to reimburse the Bank for the interest accrued on such Bank-Owned Bonds through the date of sale, the Fiscal Agent shall withdraw from the Senior Bond Service Account and transfer to the Bank an amount equal to the difference in interest between the Bank Interest Rate on such Bank-Owned Bonds and the rate at which the Series A Variable Rate Bonds (other than Bank-Owned Bonds) bore interest during the period that such Bank-Owned Bonds were held by or on behalf of the Bank.

(d) Bank-Owned Bonds held by the Bank on the Stated Expiration of the Facility Agreement shall, subject to the terms and conditions of the Facility Agreement, bear interest during any "term out" or similar period at the interest rate provided therefor in the Standby Agreement. Such interest shall be payable on the date or dates provided therefor in the Standby Agreement. Principal on such Bank-Owned Bonds shall be paid at the respective times and in the respective amounts set forth in the applicable Facility Agreement.

To the extent that the Bank makes payment of interest on any Series A Variable Rate Bonds, it shall be fully subrogated to all of the owner's rights thereunder, including the owner's right to payment thereof. Upon the payment of the interest on any Series A Variable Rate Bonds with funds drawn under the Credit Facility all covenants, agreements and other obligations of the Authority to the owners shall continue to exist, and the Bank shall be fully subrogated to all of the rights of such owners in accordance with the previous sentence and the Reimbursement Agreement. To evidence such subrogation, the Fiscal Agent shall note the Bank's rights as subrogee on the Authority's bond registration books upon such payment of interest on such Series A Variable Rate Bonds with amounts drawn under the Credit Facility.

SECTION 24.   Alternate Liquidity Facility.   At any time prior to the expiration of the Standby Agreement then outstanding, the Authority may at its option provide for the delivery to the Fiscal Agent of an Alternate Liquidity Facility providing for the payment of the Purchase Price of Series A Variable Rate Bonds (collectively, the "Alternate Liquidity Facility"). Any Alternate Liquidity Facility must be for a term at least as long as the remaining term of the Standby Agreement which is being replaced, and shall contain administrative provisions reasonably acceptable to the Fiscal Agent. The Authority shall give written notice of such delivery to the Fiscal Agent at least forty-five (45) days before its scheduled delivery. At least thirty (30) days before such scheduled delivery, notice of such proposed delivery stating the name of the provider of the Alternate Liquidity Facility, the proposed delivery date and (if such information has been provided to the Fiscal Agent) the ratings of such provider assigned by S&P and Moody's shall be given by the Fiscal Agent to the owners by mail, postage prepaid.

The Fiscal Agent shall not accept delivery of any Alternate Liquidity Facility unless it shall have received on or prior to the delivery thereof the following documents:

(1)   an executed copy of the agreement relating to the Alternate Liquidity Facility;

(2)   an opinion of counsel or counsels to the effect that (A) either (i) the acceptance by the Fiscal Agent of the Alternate Liquidity Facility will not require that the Bonds or the Alternate Standby Agreement be registered under the Securities Act of 1933, as amended, or the qualification of any indenture under the Trust Indenture Act of 1939, as amended, or (ii) any registration statement required to be filed under the Securities Act of 1933, as amended, with respect to the Bonds or the Alternate Liquidity Facility is effective under such Act, and any such indenture has been duly qualified under the Trust Indenture Act of 1939, as amended, and (B) the Alternate Liquidity Facility is a legal, valid and binding obligation or agreement of the Bank;

(3)   a Favorable Opinion of Bond Counsel;

(4)   a Rating Confirmation Notice from Moody's if the Series A Variable Rate Bonds are then rated by Moody's, and S&P if the Series A Variable Rate Bonds are then rated by S&P;

30

(5)      written evidence satisfactory to the Fiscal Agent of the purchase of all Bank-Owned Bonds, at a price equal to the principal amount thereof plus accrued and unpaid interest, and payment of all amounts owing to the Bank under the Standby Agreement; and

(6)      such other documents and opinions as the Fiscal Agent may reasonably request.

If at any time prior to the expiration of the Standby Agreement there shall have been delivered to the Fiscal Agent an Alternate Liquidity Facility and the documents mentioned above, then the Fiscal Agent shall execute the agreement relating to the Alternate Liquidity Facility. The Fiscal Agent shall comply with the procedures set forth in any Standby Agreement relating to the termination thereof.

The Fiscal Agent shall not consent to any amendment or modification of any provision of the Standby Agreement which would reduce the amount of any payment required to be made thereunder to the Fiscal Agent, or would postpone the time of any such payment, or would alter the conditions under which any such payment is made, or any other amendment or modification which would adversely affect the security of the owners of the Series A Variable Rate Bonds.

In the event of a default by the Bank, the Fiscal Agent is hereby authorized and required to enforce all of its rights in and under the Standby Agreement, by such actions, at law or in equity, as it deems necessary in order to protect the interest of the owners of the Series A Variable Rate Bonds.  No default by the Bank under the terms of its Standby Agreement shall relieve or reduce any obligations of the Authority under this resolution or the Bond Resolution.

SECTION 25.  <u>Concerning Tendered Series A Variable Rate Bonds</u>.  With respect to any Bonds or portions thereof required to be purchased pursuant to Sections 13 through 15 above as to which sufficient funds to accomplish such purchase are available to the Fiscal Agent at the respective times at which payment of the Purchase Price was to be made as provided herein:

(a)      Such Bonds or portions thereof shall be deemed to have been purchased, for all purposes of this resolution, irrespective of whether or not such Bonds shall have been presented to the Fiscal Agent, and the former owner or owners of such Bonds shall have no claim under this resolution or otherwise for any amount other than the Purchase Price thereof (and in the same manner and to the same extent provided in Section 303 of the Bond Resolution, to receive Series A Variable Rate Bonds for any unpurchased portion thereof), and such Bonds or portions thereof shall cease to be entitled to any lien, benefit or security under the Bond Resolution or this resolution.

(b)      In the event that any Series A Variable Rate Bonds or portions thereof required to be purchased pursuant to Sections 13 through 15 shall not be presented to the Fiscal Agent, the Fiscal Agent shall segregate in the Remarketing Proceeds Account and the Purchase Account, as appropriate, and, subject to Section 19 of this Appendix A, hold the moneys for the Purchase Price of such Bonds or portions thereof in trust, uninvested and without liability for interest thereon, for the benefit of the former owners of such Bonds, who shall, except as provided below, thereafter be restricted exclusively to such

31

moneys for the satisfaction of any claim for the Purchase Price of such Bonds or portions thereof.

(c)     The Fiscal Agent shall maintain a record of the Series A Variable Rate Bonds or portions thereof tendered for purchase pursuant to Section 13 but not properly presented and any Series A Variable Rate Bonds or portions thereof required to be tendered for purchase in accordance with Sections 13 through 15 together with the names and addresses of the former owners thereof.

(d)     In case any Series A Variable Rate Bonds or portions thereof which have been deemed purchased as provided in paragraph (a) above are delivered to the Fiscal Agent subsequent to the date and time specified for such delivery for payment of the Purchase Price thereof accompanied by an instrument of transfer thereof, in form satisfactory to the Fiscal Agent, executed in blank by the owner thereof with the signature of such owner guaranteed by a bank, trust company or member firm of the New York Stock Exchange, on any Business Day, the Fiscal Agent shall, subject to the provisions of Section 19 of this Appendix A, pay the Purchase Price of such Bond or portion thereof to the owner no later than 3:00 p.m. on such Business Day if the owner thereof presents his Series A Variable Rate Bond by 10:00 a.m. on such Business Day, or no later than 12:00 noon on the next Business Day if the owner thereof presents his Series A Variable Rate Bond after 10:00 a.m. on the previous Business Day, and, if appropriate, shall also deliver to such owner a new Series A Variable Rate Bond or Bonds in Authorized Denominations, in an aggregate principal amount equal to the portion of any Series A Variable Rate Bond or portion thereof not so purchased, bearing interest in the same Mode. Any such Series A Variable Rate Bonds so delivered to the Fiscal Agent shall be cancelled.

(e)     The Fiscal Agent agrees to accept delivery of all Series A Variable Rate Bonds surrendered to it in accordance with Sections 13 through 15 of this Appendix A, and to hold such Bonds in trust for the benefit of the respective owners that shall have so surrendered such Bonds, until the Purchase Price of such Bonds shall have been delivered to or for the account of or to the order of such owners or otherwise held by the Fiscal Agent pursuant to Section 18.

(f)     In purchasing Series A Variable Rate Bonds hereunder, the Fiscal Agent shall be acting as a conduit and shall not be purchasing bonds for its own account and in the absence of written notice from the Authority shall be entitled to assume that any Series A Variable Rate Bond tendered to it or deemed tendered to it for purchase is entitled under this resolution to be so purchased.

SECTION 26. <u>Appointment of Remarketing Agent</u>. The Authority hereby appoints the Remarketing Agent to remarket Series A Variable Rate Bonds pursuant to this resolution, and to keep such books and records as shall be consistent with prudent industry practice and to make such books and records available for inspection by the Bank, the Authority and the Fiscal Agent at all reasonable times.

NYI 6634675v.5

The Remarketing Agent may at any time resign and be discharged of the duties and obligations created by this resolution by giving at least thirty (30) days' notice to the Authority, the Fiscal Agent and the Bank. The Remarketing Agent may be removed at any time, at the direction of the Authority by an instrument filed with the Remarketing Agent, the Fiscal Agent and the Bank and upon at least thirty (30) days' notice to the Remarketing Agent. Any successor Remarketing Agent shall be selected by the Authority and shall be a member of the National Association of Securities Dealers, Inc., shall have a capitalization of at least fifteen million dollars ($15,000,000), and shall be authorized by law to perform all the duties set forth in this resolution. The Authority shall obtain the Bank's consent to the appointment of any such successor Remarketing Agent. The Authority's delivery to the Fiscal Agent of a certificate setting forth the effective date of the appointment of a successor Remarketing Agent and the name of such successor shall be conclusive evidence that (i) if applicable, the predecessor Remarketing Agent has been removed in accordance with the provisions of this resolution and (ii) such successor has been appointed and is qualified to act as Remarketing Agent under the terms of this resolution.

SECTION 27. Certain Notices. The Authority agrees to give written notice to Moody's and S&P of the occurrence of the following events: (i) any resignation or removal of the Fiscal Agent or the Remarketing Agent, (ii) any material amendments to this Appendix A or the Standby Agreement, (iii) the extension, termination, substitution or expiration of the Standby Agreement, (iv) the conversion of the interest rate on the Series A Variable Rate Bonds to the Fixed Rate, (v) any mandatory tender of the Series A Variable Rate Bonds not covered in clause (iv) above, (vi) the payment in full of the Series A Variable Rate Bonds (whether by redemption, payment or deemed payment in accordance with the Resolution), and (vii) the expiration, termination, substitution or extension of the Credit Facility.

SECTION 28. Amendments or Supplements to Resolution. So long as the Facility Agreement remains in effect, neither this resolution nor the Bond Resolution shall be amended or supplemented in any manner that affects the Series A Variable Rate Bonds without the written consent of the Bank, which consent shall not be unreasonably withheld or delayed.

SECTION 29. No Defeasance of Series A Variable Rate Bonds Prior to Conversion to Fixed Rate. Prior to the conversion to the Fixed Rate, the Authority shall not effect any transaction which would cause the Series A Variable Rate Bonds to be treated as deemed paid within the meaning of Section 1001 of the Bond Resolution; provided, however, that this sentence shall not affect the ability of the Authority to treat all or any portion of such Bonds as no longer being outstanding upon satisfaction of the conditions set forth in Section 306 of the Bond Resolution.

Section 9. The Executive Director and all other officers, employees and agents of the Authority and the Fiscal Agent are authorized to take all such further actions, to execute and deliver such further instruments and documents in the name and on behalf of the Authority in order to carry out and give effect to the termination of the Current Liquidity Facility and the delivery of the Alternate Liquidity Facility and the Credit Facility (as each is defined in Appendix A of Resolution No. 98-07, adopted by the Authority on February 19, 1998, as amended) and the other transactions contemplated by this Resolution, the Reimbursement Agreement and the Termination Agreement, and all actions taken by the foregoing persons in

33

connection with the transactions contemplated by this Resolution are hereby ratified, approved and confirmed.

**Section 10.** All terms used in this Resolution and not otherwise defined herein shall have the respective meanings given to them by the Authorizing Resolution.

**Section 11.** Notwithstanding anything in Appendix A of Resolution No. 98-07, as amended to the contrary, the Substitution Date in connection with the mandatory tender of the Series A Variable Rate Bonds pursuant to the first paragraph of Section 15 of said Appendix A shall occur on the same day as the Substitution Tender Date related thereto.

**Section 12.**  This Resolution shall take effect immediately after the mandatory tender pursuant to the first paragraph of Section 15 of Appendix A of Resolution No. 98-07, as amended and immediately prior to the remarketing of the Series A Variable Rate Bonds on May 27, 2008 upon the delivery on said date of the Credit Facility referred to in said Appendix A.

_____
Secretary of Transportation and
Public Works

NY1 6634675v.5

EXHIBIT I

No. RA-22                                                                    $200,000,000

United States of America
Commonwealth of Puerto Rico

PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
Transportation Revenue Bond (Series A Variable Rate)

| **Interest Rate:** | **Maturity Date:** | **CUSIP No.** |
|---|---|---|
| Variable | July 1, 2028 | 745190Y85 |

**Principal Amount:**    TWO HUNDRED MILLION DOLLARS

**Registered Owner:**    Cede & Co.

Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, for value received hereby promises to pay, solely from the special fund provided therefor as hereinafter set forth, to the Registered Owner shown above, or registered assigns or legal representative, on the Maturity Date specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof at the principal corporate trust office of the Fiscal Agent (hereinafter mentioned), the Principal Amount shown above and to pay to the Registered Owner hereof, from said special fund, interest on said Principal Amount as set forth below from the date hereof, or except as provided in the Resolution (hereinafter mentioned), from the interest payment date next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is an interest payment date to which interest shall have been paid, in which case, from such date, such interest being payable as set forth hereinafter until payment of said Principal Amount.  The interest so payable and punctually paid, or duly provided for, on any interest payment date will be paid to the person in whose name this bond (or one or more predecessor bonds, as defined in the Resolution) is registered at the close of business on the Record Date (as defined in the Resolution) next preceding such interest payment date, by check mailed to such person at his address as it appears on the bond registration books of the Authority maintained by the Fiscal Agent or in certain circumstances as set forth herein, by wire transfer of immediately available funds.  All such payments shall be made in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts.

This bond shall not be deemed to constitute a debt of the Commonwealth of Puerto Rico or of any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any such political subdivision shall be liable thereon, nor shall this bond or the interest thereon be

NY1 6634675v.5

payable out of any funds other than those pledged for the payment thereof pursuant to the Resolution.

This bond is one of a duly authorized series of bonds of the Authority designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds (Series A)" aggregating One Billion One Hundred Twenty-Nine Million Six Hundred Forty-Three Thousand Seven Hundred Forty Dollars ($1,129,643,740), consisting of $311,598,740 bonds maturing in annual installments on July 1 in each of the years 1999 through 2018, inclusive (herein called the "serial bonds") and $818,045,000 bonds maturing on July 1, 2028 and July 1, 2038 (herein called the "term bonds"). A portion of the term bonds maturing in the year 2028 in the principal amount of $200,000,000 were issued as variable rate bonds (the "Series A Variable Rate Bonds"). The bonds are issued by the Authority for the purpose of paying the cost of constructing highways and other traffic and transportation facilities, as such term is defined in the Enabling Act hereinafter mentioned, including payment of notes heretofore issued by the Authority for such purpose and the refunding of certain highway revenue bonds issued by the Authority under the 1968 Resolution (hereinafter mentioned) for such purpose and to provide a reserve for the payment of the bonds. All of the bonds are issued pursuant to Resolution No. 98-06 adopted by the Authority on February 26, 1998 (said Resolution together with all supplemental resolutions therein permitted being herein called the "Resolution"), reference to which is hereby made for the provisions, among others, with respect to the application of the proceeds of bonds issued under the Resolution, the collection and disposition of revenues, the funds charged with and pledged to the payment of the interest on and the principal of the bonds, the nature and extent of the security, the rights, duties and obligations of the Authority and of the Fiscal Agent under the Resolution and the rights of the owners of the bonds, and, by the acceptance of this bond, the Registered Owner hereof assents to all of the provisions of the Resolution. A certified copy of the Resolution is on file at the principal corporate trust office of The Bank of New York, successor fiscal agent (said fiscal agent and any successor fiscal agent under the Resolution being herein called the "Fiscal Agent"), in the Borough of Manhattan, City and State of New York. The Resolution provides for the issuance, from time to time, under the conditions, limitations and restrictions therein set forth, of additional bonds designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds" for any lawful purpose of the Authority and form the purpose of refunding, among others, any bonds issued by the Authority under the provisions of the Resolution or Resolution 68-18, adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution") (such bonds and the bonds being herein collectively called the "senior bonds").

The Authority by resolution adopted May 23, 2008 has amended the provisions of Resolution No. 98-07, adopted by the Authority on February 26, 1998 fixing the details of this bond ("Resolution No. 98-07"), among other things, to provide for the delivery to the Fiscal Agent on May 27, 2008 of the Credit Facility and an Alternate Liquidity Facility immediately after the mandatory tender of the Series A Variable Rate Bonds pursuant to the first paragraph of Section 15 of Appendix A of Resolution No. 98-07. Each purchaser in the remarketing of said Bonds on May 27, 2008 pursuant to Section 16 of said Appendix A, by its acceptance of its Series A Variable Rate Bond, consents to the aforesaid amendments made to Resolution No. 98-07.

Any term used herein as a defined term but not defined herein shall be defined as in the Resolution and in Resolution No. 98-07.

The Series A Variable Rate Bonds are also payable from moneys drawn under an irrevocable, transferable Letter of Credit expiring May 27, 2011 (subject to extension and earlier termination as therein described), and issued by The Bank of Nova Scotia, acting through its Hato Rey, Puerto Rico Branch (together with any successor thereto as permitted by the Resolution No. 98-07, the "Credit Provider"), in favor of the Fiscal Agent in an amount equal to the principal amount of the Series A Variable Rate Bonds and 52 days' interest accruing thereon at the Maximum Rate (together with any successor credit support obtained in accordance with the terms of the Resolution, the "Credit Facility").

Interest on the Series A Variable Rate Bonds will accrue initially at a rate adjusted weekly as described below (the "Weekly Rate"), subject to the right of the Authority to convert the interest rate on the Series A Variable Rate Bonds to a fixed interest rate or rates to maturity (the "Fixed Rate") in accordance with the terms of Resolution No. 98-07, and at the Bank Rate (as defined in the Facility Agreement) in respect of any Series A Variable Rate Bonds that are Bank-Owned Bonds; provided, however, that no Series A Variable Rate Bond shall bear interest at a rate higher than the Maximum Rate. If the Authority is unable to satisfy the conditions in Resolution No. 98-07 relating to the establishment of the Fixed Rate, this bond shall continue to accrue interest at the Weekly Rate.

Prior to the establishment of the Fixed Rate, interest on this bond will be calculated on the basis of a 365/366 day year and the actual number of days elapsed; otherwise interest will be calculated on the basis of a 360 day year comprised of twelve 30-day months. When this bond bears interest at the Bank Rate, interest will be calculated as provided in the Facility Agreement.

Prior to the establishment of the Fixed Rate, the interest rate on the Series A Variable Rate Bonds will be determined weekly (generally on Tuesday of each week and effective on Wednesday) and shall be the rate of interest per annum determined by the Remarketing Agent as the minimum rate of interest which would in its judgment result in the sale of all such Bonds at par plus accrued interest. Such interest will be payable on the first Business Day of each month to the owner of record on the preceding day.

In addition, unpaid interest accrued from the last Interest Payment Date to which interest has been paid or duly provided for will be payable on the date of conversion to the Fixed Rate and, with respect to Bank-Owned Bonds bearing interest at the Bank Rate, as provided in the Facility Agreement.

Prior to the establishment of the Fixed Rate, the owner may elect to have this bond (or any portion thereof in Authorized Denominations), purchased on any Business Day at a price equal to the principal amount of this bond or such portion plus accrued interest, if any, by delivering

(i)  an irrevocable written or telephonic notice, promptly confirmed in writing, to the Remarketing Agent and the Fiscal Agent, by 4:00 p.m. on a Business Day not less than

seven days before the Purchase Date specified by the owner, stating the CUSIP number, bond number, the principal amount to be purchased, and the Purchase Date; and

(ii)     this bond (with all necessary endorsements) to the corporate trust office of the Fiscal Agent in the Borough of Manhattan, New York, New York, on or before 12:00 noon on the Purchase Date.

Payment of the Purchase Price shall be made as described above only if this bond so delivered conforms in all respects to the description thereof in the notice of optional tender.

OWNERS MAY REPURCHASE BONDS SUBJECT TO NOTICE OF OPTIONAL TENDER IF THE REMARKETING AGENT SO AGREES, IN WHICH CASE THE REQUIREMENT TO DELIVER THE BOND SHALL BE WAIVED.

This bond is subject to mandatory purchase at the Principal Amount set forth above together with accrued interest thereon to the date fixed for such purchase and must be delivered to the corporate trust office of the Fiscal Agent in the Borough of Manhattan, New York, New York, on or before 12:00 noon on the following dates:

(i)     on the date on which the Fixed Rate will become effective;

(ii)     on the Expiration Tender Date or Substitution Tender Date, as the case may be, if in either case the Authority has not effected a conversion to the Fixed Rate, and if (A) by the Renewal Date the Authority has not caused the then existing Facility Agreement to be extended or an Alternate Facility to be delivered to the Fiscal Agent or (B) on or prior to the forty-fifth (45th) day next preceding the Substitution Date, the Authority has failed to deliver to the Fiscal Agent a Rating Confirmation Notice to the effect that the ratings on the Series A Variable Rate Bonds will not be reduced or withdrawn in connection with the delivery of an Alternate Facility; or

(iii)     on the date specified in a written notice given to the Fiscal Agent that (A) an Event of Termination (as defined in the Standby Agreement) other than an Event of Termination specified in Section 7.01(a), (c) or (d), has occurred and is continuing, or (B) an Event of Default (as defined in the Reimbursement Agreement, dated as of May 1, 2008, by and among the Authority, The Bank of Nova Scotia, acting through its New York Agency and the Credit Provider) has occurred and is continuing, (which date shall be a Business Day not later than the next Interest Payment Date occurring not later than 15 days after the date the Fiscal Agent receives such notice (but not less than five (5) Business Days before the date of termination of the Facility) and not earlier than two Business Days after receipt of such notice by the Fiscal Agent or in the case of clause (2) above, the Business Day not later than the next Interest Payment Date succeeding the date the Fiscal Agent receives the notice mentioned below (not later than the tenth day following receipt of such notice in the case of a failure of the Bank to reinstate the Credit Facility with respect to interest) and not earlier than one Business Day following receipt of such notice by the Fiscal Agent from the Bank (but in any case not later than two Business Days prior to the termination of the Credit Facility).

Each of such dates is hereinafter referred to as a "Mandatory Purchase Date". Notice of any such mandatory purchase and tender shall be given at the times and in the manner provided in Resolution No. 98-07.

BY ACCEPTANCE OF THIS BOND, THE REGISTERED OWNER AGREES TO TENDER THIS BOND FOR PURCHASE ON ANY MANDATORY PURCHASE DATE AND ACKNOWLEDGES THAT INTEREST WILL CEASE TO ACCRUE ON THIS BOND ON SUCH MANDATORY PURCHASE DATE, PROVIDED THAT FUNDS FOR SUCH PURCHASE ARE ON DEPOSIT WITH THE FISCAL AGENT ON SUCH MANDATORY PURCHASE DATE.

Prior to conversion to the Fixed Rate, Series A Variable Rate Bonds may be redeemed prior to maturity on any Interest Payment Date at the option of the Authority from any Seasoned Funds (other than moneys deposited in the Senior Bond Sinking Fund (as defined in the Resolution) in respect of an Amortization Requirement (as defined in the Resolution)) either in whole or in part, at the principal amount of the Series A Variable Rate Bonds to be redeemed, together with the accrued thereon to the date fixed for redemption, without premium.

The Series A Variable Rate Bonds shall also be subject to redemption in part in an amount equal to the Amortization Requirements therefor may be redeemed from moneys in the Sinking Fund on July 1, 2019 and on July 1 in each year thereafter (to the extent Serial Maturities have not been established in connection with the establishment of the Fixed Rate as set forth in Resolution No. 98-07) at par and accrued interest, without premium.

While the Series A Variable Rate Bonds bear interest at the Fixed Rate, the Series A Variable Rate Bonds at the time outstanding shall be subject to redemption, in whole or in part, at the option of the Authority from any available moneys (other than moneys deposited in the Senior Bond Sinking Fund in respect of an Amortization Requirement) at the respective prices (expressed as percentages of the principal amount of the Series A Variable Rate Bonds to be redeemed) set forth below, together with accrued interest, if any, to the date fixed for redemption for the periods indicated:

| Original Length of Fixed Rate Period (Years) | Commencement of Redemption Period | Redemption Price as a Percentage of Principal |
|---|---|---|
| More than 12 years | July 1 immediately after 9th anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 10 years but not more than 12 years | July 1 immediately after 7th anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |

| Original Length of Fixed Rate Period (Years) | Commencement of Redemption Period | Redemption Price as a Percentage of Principal |
|---|---|---|
| More than 8 years but not more than 10 years | July 1 immediately after 5th anniversary of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 6 years but not more than 8 years | July 1 immediately after 3rd anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 4 years but not more than 6 years | July 1 immediately after 2nd anniversary of commencement of Fixed Rate Period | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 3 years but not more than 4 years | July 1 immediately after 2nd anniversary of commencement of Fixed Rate Period | 100.5% declining to 100% on next July 1 and thereafter 100% |
| More than 2 years but not more than 3 years | July 1 immediately after 1st anniversary of commencement of Fixed Rate Period | 100.5% declining to 100% on next July 1 and thereafter 100% |

The moneys in the Sinking Fund available for the purchase or redemption of senior bonds shall be allocated to all series of senior bonds outstanding under the Resolution in the manner provided in the Resolution.

If less than all of the bonds of any one maturity shall be called for redemption, the particular bonds or portions of bonds to be redeemed shall be selected by the Fiscal Agent in such manner as it shall deem fair and appropriate.

At least thirty (30) days before the redemption date of any Series A Variable Rate Bonds to be redeemed, whether such redemption be in whole or in part, the Fiscal Agent shall cause a notice of such redemption to be mailed, by first class mail, postage prepaid, to all registered owners of Series A Variable Rate Bonds to be redeemed at their addresses appearing upon the bond registration books of the Authority. The failure to mail such notice to any registered owner of Series A Variable Rate Bonds or any defect in any notice so mailed shall not affect the validity of the proceedings for the redemption of Series A Variable Rate Bonds of other registered owners. On the date fixed for redemption, notice having been given as aforesaid, the Series A Variable Rate Bonds or portions thereof so called for redemption shall become and be due and payable at the redemption price provided for the redemption of such Series A Variable Rate Bonds or portions thereof on such date, and, if sufficient moneys, or certain securities permitted under the Resolution, the principal of and interest on which securities when due will provide sufficient moneys, for payment of such redemption price and the accrued interest are

held by the Fiscal Agent, as provided in the Resolution, interest on the Series A Variable Rate Bonds or the portions thereof so called for redemption shall cease to accrue, such Series A Variable Rate Bonds shall cease to be entitled to any lien, benefit or security under the Resolution, and the registered owners thereof shall have no rights in respect of such Series A Variable Rate Bonds except to receive payment of the redemption price thereof and the accrued interest so held by the Fiscal Agent and, in the manner provided by the Resolution, Series A Variable Rate Bonds for unredeemed portions of Series A Variable Rate Bonds. If a portion of this Series A Variable Rate Bond shall be called for redemption, a new Series A Variable Rate Bond or Series A Variable Rate Bonds in an aggregate principal amount equal to the unredeemed portion hereof will be issued to the Registered Owner hereof or his legal representative upon the surrender hereof; said new Series A Variable Rate Bond or Series A Variable Rate Bonds shall be of any authorized denomination or denominations (as hereinafter defined) and shall be of the same series and maturity and shall bear interest at the same rate as the Series A Variable Rate Bonds surrendered for partial redemption.

Upon the occurrence of certain events, and on the conditions, in the manner and with the effect set forth in Resolution No. 98-07 and the Facility Agreement, the principal of all Bank-Owned Bonds may become due and payable before the stated maturity thereof, together with the interest accrued thereon and the rights of the owners of Series A Variable Rate Bonds to have such Bonds purchased with moneys provided to the Fiscal Agent under the Facility Agreement may be terminated without the requirement of a mandatory tender.

Modifications or alterations of the Resolution or of any resolution supplemental thereto may be made only to the extent and in the circumstances permitted by the Resolution.

The Series A Variable Rate Bonds are issuable only as fully registered bonds in denominations of $100,000 and any multiple of $5,000 thereof above $100,000 with respect to Series A Variable Rate Bonds in a Weekly Mode, and denominations of $5,000 and any multiple thereof with respect to Series A Variable Rate Bonds after conversion to the Fixed Rate ("Authorized Denominations"). At the principal corporate trust office of the Fiscal Agent, in the manner and subject to the conditions provided in the Resolution and without cost to the registered owners thereof except for any tax or other governmental charge, Series A Variable Rate Bonds may be exchanged for an equal aggregate principal amount of Series A Variable Rate Bonds of the same series and maturity and of Authorized Denominations.

The transfer of this bond is registrable and this bond may be exchanged by the registered owner hereof in person or by his attorney or legal representative at the corporate trust office of the Fiscal Agent but only in the manner and subject to the limitations and conditions provided in the Resolution and upon surrender and cancellation of this bond. Upon any such registration of such transfer or exchange, the Authority shall execute and the Fiscal Agent shall authenticate and deliver in exchange for this bond, a new Series A Variable Rate Bond or Series A Variable Rate Bonds registered in the name of the transferee, of Authorized Denominations, in an aggregate principal amount equal to the principal amount of this bond, of the same series and maturity and bearing interest at the same rate. No fee or service charge shall be made to any bondholder for any such exchange or registration of transfer, but the Authority or the Fiscal Agent may make a reasonable service charge to such bondholder for every such exchange or registration sufficient

to reimburse it for any tax or other governmental charge required to be paid with respect to such exchange or registration of transfer.

After the establishment of the Fixed Rate, the Fiscal Agent shall not be required to exchange or register any transfer of this bond during the fifteen (15) days immediately preceding the date of mailing of notice of any redemption of bonds, or after this bond has been selected for redemption.

This bond is issued and the Resolution and Resolution No. 98-07 was adopted under and pursuant to the Puerto Rican Federal Relations Act and the Constitution and laws of the Commonwealth of Puerto Rico, particularly Act No. 74, approved June 23, 1965, as amended (said Act as amended being herein called the "Enabling Act"). The Resolution provides for the creation of a special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"), and, subject to the limitations of the next two sentences of this paragraph, for the deposit to the credit of said special fund of all moneys received by the Authority (a) from the taxes on crude oil and derivative products heretofore allocated to the Authority by Act No. 34, approved July 16, 1997, as amended, (b) from the taxes on gasoline and gas oil and diesel oil heretofore allocated to the Authority by Subtitle B of Act No. 120, approved October 31, 1994, as amended), (c) from certain receipts of annual motor vehicle license fees allocated to the Authority by the Vehicle and Traffic Law of Puerto Rico (Act No. 141, approved July 20, 1960, as amended), (d) from any tolls or other charges imposed by the Authority for the use of any Transportation Facilities (other than until the 1968 Resolution is repealed and cancelled, any such Facilities financed under the 1968 Resolution and any extensions, improvements or betterments thereof however financed or otherwise paid for (such Facilities being herein called the "Existing Toll Facilities")) and (e) from the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority to pledge to the payment of the principal of and interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the principal of and interest on bonds or other obligations issued under the provisions of the Resolution. The proceeds of the taxes on crude oil and derivative products so allocated to the Authority by said Act No. 34, the proceeds of the taxes on gasoline and gas oil and diesel oil so allocated to the Authority by said Act No. 120, the proceeds of the license fees so allocated to the Authority by said Vehicle and Traffic Law of Puerto Rico and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose. The 1968 Resolution provides for the prior deposit to the credit of a special fund designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein called the "1968 Construction Fund") of the moneys referred to in clauses (b), (c) and, with respect to the Existing Toll Facilities, (d) after the required deposits of such moneys have been made to the credit of the Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund. In the Resolution, the Authority has covenanted to deposit monthly to the credit of the Revenue Fund until the outstanding 1968 Resolution Bonds (hereinafter mentioned) have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution Bonds (hereinafter mentioned) have been paid or provision has been made for their payment and the

repeal and cancellation of the 1968 Resolution, all unencumbered moneys held to the credit of the 1968 Construction Fund.

The Resolution provides for the creation of another special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund" (herein called the "Sinking Fund") and for the deposit into the Sinking Fund of a sufficient amount of the funds on deposit to the credit of the Revenue Fund to pay the principal of and the interest on all senior bonds issued under the Resolution as the same become due and payable and to create a reserve for such purpose, which special fund is pledged to and charged with the payment of the principal of and the premium, if any, and the interest on the senior bonds.

The Authority has heretofore issued under the provisions of the 1968 Resolution Puerto Rico Highways and Transportation Authority Highway Revenue Bonds (herein, with any additional bonds which hereafter may be issued under the provisions of the 1968 Resolution, called the "1968 Resolution Bonds"). Until all of the 1968 Resolution Bonds have been paid or provision shall have been made for their payment and the repeal and cancellation of the 1968 Resolution, the moneys referred to in clauses (b), (c) and to the extent therein specified, (d) of the second preceding paragraph are pledged to the extent required to the payment of the principal of and the premium, if any, and the interest on the outstanding 1968 Resolution Bonds.

Subject to the provisions for registration contained in the Resolution, nothing contained in this bond or in the Resolution shall affect or impair the negotiability of this bond. As declared by the Enabling Act, this bond shall be negotiable in accordance with the remaining and for all intents and purposes of the negotiable instruments law of Puerto Rico.

All acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of the Commonwealth of Puerto Rico, including the Enabling Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the issuance of this Series A Variable Rate Bond and the adoption of the Resolution have happened, exist and have been performed as so required.

This bond is issued with the intent that the laws of the Commonwealth of Puerto Rico shall govern its construction.

This bond shall not be valid or become obligatory for any purpose or be entitled to any lien, benefit or security under the Resolution herein described until the certificate of authentication endorsed hereon shall have been duly executed by the Fiscal Agent.

IN WITNESS WHEREOF, Puerto Rico Highways and Transportation Authority has caused this bond to bear the facsimile signatures of the Secretary of Transportation and Public Works of the Commonwealth of Puerto Rico and of the Executive Director and the Secretary of Puerto Rico Highways and Transportation Authority and a facsimile of its corporate seal to be imprinted hereon, all as of the 27th day of May, 2008.

NY1 6634675v.5

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY

By: _____
   Secretary of Transportation and Public Works

By: _____
   Executive Director

By: _____
   Secretary

This is one of the bonds of the series designated therein and issued under and secured by the provisions of the within mentioned Resolution.

The Bank of New York,
as Successor Fiscal Agent

By: _____
   Authorized Officer

Date of authentication: _____

NYI 6634675v.5

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ his attorney to register the transfer of the within bond on the books
kept for registration thereof with full power of substitution in the premises.


Dated: _____        Signature: _____

                             NOTICE: The signature on this assignment must
                             correspond with the name as it appears on the face of the
                             within bond in every particular, without alteration or
                             enlargement or any change whatever.


Social Security Number or
Employer Identification Number of
Transferee:

Signature Guaranteed:


                             NOTICE: Signatures must be guaranteed by a member
                             firm of the New York Stock Exchange or a commercial
                             bank or a trust company.

B

## CONSENT OF THE REMARKETING AGENT

The undersigned, as remarketing agent under the Remarketing Agreement, dated May 27, 2008, by and between the undersigned and Puerto Rico Highways and Transportation Authority (the "Authority") relating to the $200,000,000 Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds (Series A) maturing July 1, 2028, CUSIP No. 745190 Y85 issued pursuant to Resolution No. 98-06, adopted by the Authority on February 26, 1998, as supplemented (including as supplemented by Resolution No. 98-07, adopted by the Authority on February 26, 1998, collectively, the "Resolution"), which bonds have this day been remarketed by the undersigned in accordance with said Agreement, and holder of said bonds on the date hereof hereby consents to and approved the adoption by the Authority of Resolution No. 08-_26_ on May _23_, 2008 in the form attached hereto amending certain provisions of the Resolution.

Dated May 27, 2008

MORGAN STANLEY & CO.
INCORPORATED

By: _Thomas Falcone_

Name:   Thomas Falcone
Title:   Vice President

**EXHIBIT I**

(See item 1(a))

REIMBURSEMENT AGREEMENT


Dated as of May 1, 2008


among


PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,


THE BANK OF NOVA SCOTIA,
acting through its Hato Rey Branch,
as the Bank


and


THE BANK OF NOVA SCOTIA,
acting through its New York Agency, as Arranger


Relating to
Puerto Rico Highways and Transportation Authority
Transportation Revenue Bonds (Series A)

REIMBURSEMENT AGREEMENT

(This Table of Contents is not a part of
this Reimbursement Agreement
and is only for
convenience of reference)

| SECTION | DESCRIPTION | PAGE |
|---|---|---|
| PARTIES | | 1 |
| ARTICLE ONE | DEFINITIONS | 2 |
| Section 1.1. | Definitions | 2 |
| ARTICLE TWO | LETTER OF CREDIT | 9 |
| Section 2.1. | Issuance of Letter of Credit | 9 |
| Section 2.2. | Letter of Credit Drawings | 9 |
| Section 2.3. | Reimbursement of Liquidity Drawings Creating Liquidity Advances under the Letter of Credit; Mandatory Prepayment; Interest | 9 |
| Section 2.4. | Reimbursement of Drawings Other Than Liquidity Drawings Creating Liquidity Advances under the Letter of Credit | 11 |
| Section 2.5. | Fees | 11 |
| Section 2.6. | Manner and Place of Payments; Interest Calculation | 12 |
| Section 2.7. | Substitute Letter of Credit | 13 |
| Section 2.8. | Late Payments | 13 |
| Section 2.9. | Source of Funds | 13 |
| Section 2.10. | Extension of Stated Expiration Date. | 13 |
| Section 2.11. | Amendments upon Extension | 14 |
| Section 2.12. | Recapture | 14 |
| Section 2.13. | Increased Cost | 14 |
| Section 2.14. | Taxes | 16 |
| Section 2.15. | Obligations Absolute | 17 |
| Section 2.16. | Liability of Bank | 18 |
| ARTICLE THREE | CONDITIONS PRECEDENT | 19 |
| Section 3.1. | Conditions Precedent to Issuance of Letter of Credit | 19 |
| Section 3.2. | Conditions Precedent to Liquidity Advances | 20 |
| Section 3.3. | Condition Subsequent to Closing | 21 |
| ARTICLE FOUR | REPRESENTATIONS AND WARRANTIES | 21 |
| Section 4.1. | Power and Authority | 21 |
| Section 4.2. | No Violation | 21 |
| Section 4.3. | Authorization | 21 |
| Section 4.4. | Binding Agreements; Payment | 21 |

| | | |
|---|---|---|
| Section 4.5. | No Litigation | 22 |
| Section 4.6. | Accuracy of Official Statement | 22 |
| Section 4.7. | Compliance | 22 |
| Section 4.8. | General Obligation; Pledge | 22 |
| Section 4.9. | Incorporation of Representations and Warranties by Reference | 23 |
| Section 4.10. | Maximum Rate | 23 |
| Section 4.11. | No Immunity | 23 |
| Section 4.12. | Financial Statements. | 23 |
| Section 4.13. | Accuracy and Completeness of Information. | 23 |
| Section 4.14. | Liens, Etc. | 24 |
| ARTICLE FIVE | COVENANTS | 24 |
| Section 5.1. | Accounting Records | 24 |
| Section 5.2. | Access to Books and Records | 24 |
| Section 5.3. | Compliance with Related Documents | 25 |
| Section 5.4. | Waiver of Immunity | 25 |
| Section 5.5. | Use of Proceeds | 25 |
| Section 5.6. | Income Taxation and Tax Status of Interest on Bonds | 25 |
| Section 5.7. | Fiscal Agent; Remarketing Agent | 25 |
| Section 5.8. | Financial and Event Reporting | 25 |
| Section 5.9. | Further Assurances | 26 |
| Section 5.10. | Enforceability of the Agreement and the Letter of Credit Note. | 26 |
| Section 5.11. | Voluntary Redemption | 26 |
| Section 5.12. | Alternate Liquidity Facility or Conversion to a Non-Covered Interest Rate | 26 |
| Section 5.13. | Incorporation of Covenants | 27 |
| Section 5.14. | Maintenance and Approvals; Filings, Etc. | 27 |
| Section 5.15. | Resolution a Contract | 27 |
| Section 5.16. | Liens, Etc. | 27 |
| ARTICLE SIX | DEFAULTS | 28 |
| Section 6.1. | Events of Default and Remedies | 28 |
| Section 6.2. | Remedies | 30 |
| Section 6.3. | No Waiver of Remedies | 30 |
| Section 6.4. | Remedies Not Exclusive | 30 |
| ARTICLE SEVEN | MISCELLANEOUS | 30 |
| Section 7.1. | Method of Payment of Amount Due | 30 |
| Section 7.2. | Addresses for Notices, etc | 30 |
| Section 7.3. | Assignments; Participations | 32 |
| Section 7.4. | Reserved | 34 |
| Section 7.5. | Severability | 34 |
| Section 7.6. | Amendments, etc. | 34 |

Section 7.7.    Indemnification ......................................................... 34
Section 7.8.    Fees and Expenses ...................................................... 35
Section 7.9.    Right of Set-Off. ...................................................... 35
Section 7.10.   Counterparts............................................................ 36
Section 7.11.   Governing Law; Jurisdiction; Venue; Waiver of Jury Trial ................... 36
Section 7.12.   Complete Statement of Agreement ....................................... 36
Section 7.13.   Heading................................................................ 37
Section 7.14.   USA Patriot Act. ...................................................... 37

Signature ................................................................................ 1

## REIMBURSEMENT AGREEMENT

REIMBURSEMENT AGREEMENT, dated as of May 1, 2008, among the PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY (the *"Authority"*), THE BANK OF NOVA SCOTIA, acting through its Hato Rey Branch (the *"Bank"*) and The BANK OF NOVA SCOTIA, acting through its New York Agency (the *"Arranger"*).

## RECITALS

A.     Pursuant to Resolution No. 98-06, duly adopted on February 26, 1998, as amended by Resolution No. 98-07, adopted on February 26, 1998 and as further amended by that certain Resolution, adopted on May 23, 2008 (collectively, the *"Resolution"*), the Authority issued its Transportation Revenue Bonds (Series A) (the *"Bonds"*).

B.     Pursuant to that certain Standby Bond Purchase Agreement, dated as of March 1, 1998 (the *"Existing Agreement"*), between the Authority and the Arranger, the Arranger agreed, subject to the terms of the Existing Agreement, to purchase Bonds tendered for purchase pursuant to the terms of the Resolution which were not remarketed as provided for therein.

C.     Prior to the Effective Date (as hereinafter defined), the payment of the principal of and interest on the Bonds was insured by a policy for municipal bond insurance (the *"Insurance Policy"*) issued by AMBAC Assurance Corp. (the *"Bond Insurer"*).

D.     As a result of the reduced credit rating of the Bond Insurer, the Authority has provided for the cancellation of the Insurance Policy and has requested the Bank to enter into this Agreement, which Agreement shall constitute an Alternate Liquidity Facility under the Resolution and will be substituted for the Existing Agreement.

E.     The Authority has requested the Bank to issue a letter of credit for the payment by The Bank of New York, as the fiscal agent under the Resolution (referred to herein in such capacity as the *"Fiscal Agent"*), when and as due, of the principal or purchase price of and interest on the Bonds, and to provide a liquidity facility through the making by the Bank of one or more Liquidity Advances (as hereinafter defined) under the Letter of Credit (as hereinafter defined).

F.     The Bank is willing to issue the Letter of Credit and to provide the liquidity facility upon the terms and conditions provided herein.

## AGREEMENTS

NOW, THEREFORE, in consideration of the premises and in order to induce the Bank to issue the Letter of Credit, the parties hereto agree as follows:

# ARTICLE ONE

## DEFINITIONS

*Section 1.1.    Definitions.*  As used in this Agreement:

*"Act"* - means Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended.

*"Affiliate"* - means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  *"Control"* means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  *"Controlling"* and *"Controlled"* have meanings correlative thereto.

*"Agreement"* - means this Reimbursement Agreement, as amended or supplemented from time to time in accordance with the terms hereof.

*"Alternate Liquidity Facility"* - has the meaning set forth in the Resolution.

*"Alternative Base Rate"* - means, for any day, the higher of (i) the Scotiabank Base Rate and (ii) the Maximum Bond Interest Rate.

*"Amortization Commencement Date"* - means, with respect to each Liquidity Advance, the earlier to occur of (a) 180 days from the date the related Liquidity Advance was made and (b) the Termination Date; *provided, however*, that an Amortization Commencement Date shall occur only if on such Amortization Commencement Date (x) no Potential Default or Event of Default shall have occurred and be continuing and (y) all representations of warranties contained in Article IV hereof are true and correct, in each case, on the related Amortization Commencement Date.

*"Applicable Law"* - means the applicable provisions of all constitutions, statutes, rules, regulations and orders of all governmental and non-governmental bodies, all Governmental Approvals and all orders, judgments and decrees of all courts and arbitrators.

*"Arranger Payment Account"* - means the following account, or such other account as may be designated by the Arranger in writing to the Authority and the Fiscal Agent:

> The Bank of Nova Scotia, New York Agency
> ABA # 026-002-532
> Account No.: 2308363CORBK77
> Reference:  Puerto Rico Highways and Transportation Authority
> Transportation Revenue Bonds (Series A)
> Attention:  Loan Operations

*"Authority"* has the meaning set forth in the introductory paragraph hereof.

*"Authorized Representative"* - means any of the representatives of the Authority set forth in the Authorized Representative Certificate.

*"Authorized Representative Certificate"* - means the certificate attached to this Agreement substantially in the form of Appendix II hereto.

*"Available Amount"* - has the meaning set forth in the Letter of Credit.

*"Bank"* - means The Bank of Nova Scotia, acting through its Hato Rey Branch, as issuer of the Letter of Credit, and its successors and assigns.

*"Bank Bond"* - means any Bond purchased with funds disbursed pursuant to a Liquidity Drawing in accordance with the Resolution.

*"Bank Rate"* - means, with respect to any Liquidity Advance, a rate per annum equal to (i) for the period from and including the date such Liquidity Advance was honored by the Bank to but not including the earlier to occur of (x) the Amortization Commencement Date and (y) the date which is thirty-one (31) calendar days immediately succeeding the date such Liquidity Advance was honored by the Bank, the Alternative Base Rate from time to time in effect plus 1.0%, (ii) for the period from and including the date which is thirty-one (31) days immediately succeeding the date such Liquidity Advance was honored by the Bank to but not including the earlier to occur of (x) the Amortization Commencement Date and (y) the date which is one hundred eighty-one (181) days immediately succeeding the date such Liquidity Advance was honored by the Bank, the sum of the Alternative Base Rate from time to time in effect plus 2.00%, and (iii) from and after the Amortization Commencement Date, the sum of the Alternative Base Rate from time to time in effect plus 3.0%; *provided* that from and after the occurrence of an Event of Default (and without any notice given with respect thereto), and during the continuance of such Event of Default, *"Bank Rate"* shall mean the Default Rate.

*"Bankruptcy Law"* - means Title 11, U.S. Code, as amended or supplemented, any successor statute thereto, or any similar Federal, state or foreign law for the relief of debtors.

*"Bond Documents"* - means the Resolution, the Remarketing Agreement, the Official Statement and the Bonds.

*"Bonds"* - has the meaning set forth in the Recitals hereof.

*"Business Day"* - means any day other than a Saturday, a Sunday, or a day on which banks located in New York, New York or the cities in which the principal offices of the Bank and of the Fiscal Agent are located are authorized by law to close or a day on which the New York Stock Exchange is closed.

*"Cap Interest Rate"* - has the meaning set forth in the Letter of Credit.

*"Code"* - means the United States Internal Revenue Code of 1986 and the rules and all promulgated (including temporary) regulations thereunder.

*"Commonwealth"* - means the Commonwealth of Puerto Rico.

*"Conversion Date"* - means the date after which interest on all the Bonds is payable at a Non-Covered Interest Rate pursuant to the Resolution.

*"Debt"* - of any Person means at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business, (d) all obligations of such Person as lessee under capital leases, (e) all Debt of others secured by a lien on any asset of such Person, whether or not such Debt is assumed by such Person, (f) all Guarantees by such Person of Debt of other Persons and (g) net obligations of such person under any Swap Contract.

*"Default Rate"* - means the rate per annum provided for in Section 2.8 hereof.

*"Dollars"* and *"$"* - mean lawful money of the United States.

*"Downgrade"* - means each rating reduction by any Rating Agency then maintaining a rating on any Debt of the Authority secured by or payable from Revenues senior to or on a parity with the Bonds below "Ba2" (or its equivalent) by Moody's or "BB" (or its equivalent) by S&P. For example, a reduction by S&P from "BB" to "BB-" is one Downgrade, and a reduction by S&P from "BB+" to "BB-" is two Downgrades.

*"Drawing"* - means any drawing under the Letter of Credit as described in the first paragraph thereof.

*"DTC"* - means The Depository Trust Company and its successors and assigns.

*"Effective Date"* - means the date on which the Letter of Credit is issued by the Bank hereunder.

*"Eligible Assignee"* - has the meaning set forth in Section 7.3(f) hereof.

*"Environmental Laws"* - shall mean any and all federal, state and local laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or to emissions, discharges or releases of pollutants, contaminants, petroleum or petroleum products, chemicals or industrial, toxic or hazardous substances or wastes into the environment including, without limitation, ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use treatment, storage, disposal, transport or handling of Hazardous Materials.

*"ERISA"* - means the Employee Retirement Income Security Act of 1974, as amended from time to time.

*"Event of Default"* - has the meaning set forth in Section 6.1 hereof.

*"Fiscal Agent"* - has the meaning set forth in the recitals hereof.

*"GAAP"* - means generally accepted accounting principles in the United States of America from time to time as set forth in (a) the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and (b) statements and pronouncements of the Financial Accounting Standards Board, as modified by the opinions, statements and pronouncements of any similar accounting body of comparable standing having authority over accounting by governmental entities.

*"Governmental Approval"* - means an authorization, consent, approval, license, or exemption of, registration or filing with, or report to any Governmental Authority.

*"Governmental Authority"* - means any nation or government, any state, territory, province, locality or other political subdivision thereof, or any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

*"Gross Available Amount"* – means, as of any date, the Available Amount without taking into account any temporary reductions thereto in effect on such date.

*"Gross-Up Amount"* - has the meaning set forth in Section 2.14 hereof.

*"Guarantee"* - by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement condition or otherwise) or (b) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part).

*"Indemnified Liabilities"* - has the meaning set forth in Section 7.7 hereof.

*"Indemnified Person"* - has the meaning set forth in Section 7.7 hereof.

*"Investment Grade"* - means a rating of "Baa3" (or its equivalent) or better by Moody's, "BBB-" (or its equivalent) or better by S&P, as applicable.

*"Law"* - means any statute, treaty, rule, guideline, regulation, ordinance, code or administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

*"Lending Office"* - means the office or offices of the Bank described in the Bank's signature page hereof, or such other office or offices as the Bank may from time to time specify to the Authority.

*"Letter of Credit"* - means the irrevocable, transferable, direct pay letter of credit issued by the Bank for the account of the Authority in favor of the Fiscal Agent in the form of Appendix I hereto with appropriate insertions, as amended.

*"Letter of Credit Fee Rate"* - has the meaning set forth in Section 2.5(a) hereof.

*"Letter of Credit Fees"* - has the meaning set forth in the Section 2.5(a) hereof.

*"Liquidity Advance"* - has the meaning set forth in Section 2.3(a) hereof.

*"Liquidity Drawing"* - means a drawing under the Letter of Credit resulting from the presentation of a certificate in the form of Exhibit E to the Letter of Credit.

*"Maximum Bond Interest Rate"* - means the maximum tax-exempt rate of interest on the Bonds which are not Bank Bonds as provided in the Resolution.

*"Maximum Rate"* - means the lower of (i) 12% and (ii) the maximum non-usurious lawful rate of interest permitted by applicable law.

*"Moody's"* - means Moody's Investors Service, Inc. and its successors and assigns.

*"Non-Covered Interest Rate"* - means a rate of interest on the Bonds other than the Weekly Mode.

*"Obligations"* - means the fees relating to the Letter of Credit, any and all Reimbursement Obligations (including interest on such Obligations), and all other obligations of the Authority owed to the Bank or any of its Affiliates or Participants arising under or in relation to this Agreement or any Related Document.

*"Official Statement"* - means the Official Statement Supplement, dated March 16, 1998, as supplemented by the Remarketing Circular, relating to the Bonds.

*"Original Stated Amount"* - has the meaning set forth in Section 2.1 hereof.

*"Other Taxes"* - has the meaning set forth in Section 2.14(b) hereof.

*"Owner"* - or words of similar meaning means, in the case of any Bond, the registered holder of such Bond as reflected on the register for the Bonds established pursuant to the terms of the Resolution.

*"Parent"* - has the meaning set forth in Section 2.13(b) hereof.

*"Participant"* - has the meaning set forth in Section 7.3(d) hereof.

*"Payment Account"* - means the following account, or such other account as may be designated by the Bank in writing to the Authority and the Fiscal Agent:

> The Bank of Nova Scotia, Hato Rey Branch
> JP Morgan Chase Bank - New York
> ABA # 021000021
> Account No.: 001058739
> Reference:  Puerto Rico Highways and Transportation Authority
> Transportation Revenue Bonds (Series A)
> Attention:  Ricardo Marrero, Business Support Centre

*"Person"* - means an individual, a corporation, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or any agency or instrumentality thereof.

*"Plan"* - means a pension plan providing benefits for employees of any Person.

*"Potential Default"* - means an event or condition which, but for the lapse of time or the giving of notice, or both, would constitute an Event of Default.

*"Protective Provisions"* - has the meaning set forth in Section 7.3(b) hereof.

*"Rating Agency"* - means either Moody's or S&P, and *"Rating Agencies"* - means both Moody's and S&P.

*"Reimbursement Obligations"* - means the obligations of the Authority to reimburse the Bank for any Drawing under the Letter of Credit or any Liquidity Advance under this Agreement.

*"Related Documents"* - means this Agreement, the Letter of Credit, the Bond Documents and any other agreement or instrument relating thereto.

*"Release Agreement"* means that certain Endorsement and Release Agreement dated as of May 27, 2008, by and among Ambac Assurance Corporation, the Fiscal Agent, the Remarketing Agent, The Bank of Nova Scotia, acting through its New York Agency and the Issuer.

*"Remarketing Agent"* - means Morgan Stanley & Co. Incorporated, as Remarketing Agent under the Resolution and the Remarketing Agreement, and its successors and assigns pursuant thereto.

*"Remarketing Agreement"* - means the Remarketing Agreement dated May 27, 2008, between the Remarketing Agent and the Authority, as amended or supplemented in accordance with the terms hereof and thereof, and any successor agreement thereto entered into by the Authority and a successor Remarketing Agent.

*"Remarketing Circular"* means the 2008 Variable Rate Bond Supplement, dated May 23, 2008, relating to the Bonds.

*"Resolution"* – has the meaning set forth in the recitals hereof.

*"Revenue Secured Debt"* - means all Debt of the Authority secured by a lien on and pledge of Revenues of the Authority on a parity with or senior to the Bonds.

*"Revenues"* - has the meaning set forth in the Resolution.

*"S&P"* - means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors and assigns.

*"Scotiabank Base Rate"* - means, for any day, the per annum rate of interest for such day announced by the Bank from time to time as its base rate or equivalent rate for United States dollar denominated loans, with any change in such prime rate or equivalent to be effective on the date of such change, it being understood that such rate may not be the best or lowest rate offered by the Bank.

*"Secretary"* - means the Secretary of Transportation and Public Works of Puerto Rico.

*"Swap Contract"* - means (a) any and all rate swap transactions, basis swap transactions, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swap transactions or options, bond or bond price or bond index swap transactions or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a *"Master Agreement"*), including any such obligations or liabilities under any Master Agreement.

-8-

*"Tax Indemnity Amount"* - has the meaning set forth in Section 2.14(c)(1) hereof.

*"Taxes"* - shall mean all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities with respect thereto, imposed by the Commonwealth or the United States of America, excluding, in the case of the Bank, taxes imposed on or measured by its net income or taxable income, and franchise taxes imposed on it (in lieu of net income taxes).

*"Stated Expiration Date"* - has the meaning set forth in the Letter of Credit.

*"Termination Date"* - has the meaning set forth in the Letter of Credit.

*"United States"* and *"U.S."* - mean the United States of America.

*"U.S. Governmental Authority"* - means any Governmental Authority in the U.S.

*"Weekly Mode"* - has the meaning set forth in the Resolution.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms. Any capitalized terms used herein which are not specifically defined herein shall have the same meanings herein as in the Resolution. All references in this Agreement to times of day shall be references to New York time unless otherwise expressly provided herein. Unless otherwise inconsistent with the terms of this Agreement, all accounting terms shall be interpreted, all accounting determinations hereunder shall be made and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP.

## ARTICLE TWO

### LETTER OF CREDIT

Section 2.1.    *Issuance of Letter of Credit.*  The Bank agrees, on the terms, subject to the conditions and relying upon the representations and warranties set forth in this Agreement or incorporated herein by reference, to issue the Letter of Credit on the Effective Date. The Letter of Credit shall be in the original stated amount of $203,419,179 (the *"Original Stated Amount"*), which is the sum of (i) the aggregate principal amount of the Bonds on the Effective Date, plus (ii) accrued interest on such principal amount at the Cap Interest Rate for a period of fifty-two (52) days.

Section 2.2.    *Letter of Credit Drawings.*  The Fiscal Agent is authorized to make drawings under the Letter of Credit in accordance with the terms thereof. The Authority hereby directs the Bank to make payments under the Letter of Credit in the manner therein provided. The Authority hereby irrevocably approves reductions and reinstatements of the Available Amount as provided in the Letter of Credit.

Section 2.3.    *Reimbursement of Liquidity Drawings Creating Liquidity Advances under the Letter of Credit; Mandatory Prepayment; Interest.*  (a) If the conditions precedent contained

in Section 3.2 hereof are satisfied at the time of payment by the Bank of any Liquidity Drawing, such Liquidity Drawing shall constitute an advance (*"Liquidity Advance"*) to the Authority. The Authority hereby promises to pay to the Bank each Liquidity Advance on the earliest to occur of (i) the date on which any Bonds purchased with funds disbursed under the Letter of Credit in connection with such Liquidity Drawing are redeemed, prepaid or cancelled pursuant to the Resolution, (ii) the date on which any Bonds purchased with funds disbursed under the Letter of Credit are remarketed pursuant to the Resolution, (iii) the date on which the Letter of Credit is replaced by an Alternate Liquidity Facility pursuant to the terms of the Resolution and (iv) subject to the term out provisions set forth below, the 180th calendar day immediately succeeding the date such Liquidity Advance was made. Subject to Section 2.12 hereof, the Authority hereby also promises to pay to the Bank interest on the unpaid principal amount of each Liquidity Advance from the date such Liquidity Advance is made until it is paid in full as provided herein, at a rate per annum equal to the Bank Rate from time to time in effect, payable in arrears on the first Business Day of each calendar month and on the date that the final principal installment of such Liquidity Advance is payable as herein provided. Unless otherwise paid in full on the date provided above and so long as the conditions precedent contained in Section 3.2 hereof are satisfied on Amortization Commencement Date, each Liquidity Advance shall be payable by the Authority in quarterly installments (*"Quarterly Principal Payments"*) on the one year anniversary of the date the related Liquidity Advance was made and each three month anniversary of such date, with the final installment in an amount equal to the entire then outstanding principal amount of such Liquidity Advance due and payable on the third (3rd) anniversary of the date the related Liquidity Advance was made (the *"Amortization End Date"*) (the period commencing on an Amortization Commencement Date and ending on the related Amortization End Date is herein referred to as the *"Amortization Period"*). Each Quarterly Principal Payment shall be in an amount of principal which will result in equal (or nearly equal) aggregate Quarterly Principal Payments over the applicable Amortization Period; *provided, however,* that the outstanding principal amount of any such Liquidity Advance shall be payable in full on the Amortization End Date.

(b)     Any Liquidity Advance may be prepaid in whole or in part on the day such Liquidity Advance is made. Any Liquidity Advance created pursuant to paragraph (a) above may be prepaid in whole or in part without premium or penalty on any Business Day upon one (1) Business Day's prior written notice.

(c)     Upon the Bank's receipt of a payment or prepayment of any Liquidity Advance, the amount of such Liquidity Advance shall be reduced by the amount of such payment or prepayment.

(d)     Upon the Bank honoring any Liquidity Drawing, the Bank shall be purchasing the Bonds in respect of which such Liquidity Drawing is made, and the Authority shall cause the Fiscal Agent to (i) hold such Bonds for the benefit of the Bank and register such Bonds (which shall become Bank Bonds) in the name of the Bank or its designated nominee, or (ii) in the event such Bonds are held in book-entry form, to cause such Bonds to be credited for the account of the Bank on the books of a direct or indirect participant of DTC, or (iii) otherwise deliver such Bonds as directed by the Bank. During such time as the Bank is the owner of any Bonds, it shall have all the rights granted to an Owner of Bonds under the Resolution and such additional rights

as may be granted to the Bank hereunder.  To the extent that the Bank actually receives payment in respect to principal of or interest on any Bond held by it, the Liquidity Advance made in connection with the purchase of such Bond shall be deemed to have been reduced *pro tanto*, with the Bank crediting any payment on such Bond received by it, first to the payment of any outstanding interest accrued on the related Liquidity Advance, and second to the payment of the principal of such Liquidity Advance.  Any such payment or prepayment to be applied to principal of Liquidity Advances hereunder shall be applied to the prepayment of Liquidity Advances in chronological order of their incurrence hereunder, and within each Liquidity Advance in inverse order of the principal installments payable thereon.  Following the occurrence of an Event of Default, any payments received by the Bank hereunder shall be applied by the Bank to the payment of the Obligations in such order as the Bank shall in its sole discretion determine.

Section 2.4.   *Reimbursement of Drawings Other Than Liquidity Drawings Creating Liquidity Advances under the Letter of Credit*.  The Authority hereby agrees to reimburse the Bank for the full amount of any Liquidity Drawing (but only if the conditions precedent contained in Section 3.2 hereof are not satisfied on the date of payment by the Bank of such Liquidity Drawing) and all other Drawings made under the Letter of Credit immediately upon payment by the Bank of each such Drawing and on the date of each such payment.  If the Authority does not make such reimbursement on such date, such Reimbursement Obligation shall bear interest at the rate per annum specified in Section 2.8 hereof.

Section 2.5.   *Fees*.   (a) The Authority agrees to pay to the Bank for the period commencing on the Effective Date and ending on the Termination Date, a non-refundable letter of credit fee (the *"Letter of Credit Fee"*) payable quarterly in arrears on the first Business Day of each January, April, July and October (commencing on July 1, 2008, for the period from and including the Effective Date to and including June 30, 2008) occurring prior to the Termination Date and on the Termination Date in an amount equal to the rate per annum associated with the Rating (as defined below) (the *"Letter of Credit Fee Rate"*) on the Gross Available Amount of the Letter of Credit (without any temporary reductions of the stated Amount of the Letter of Credit) during each related period:

| LEVEL | MOODY'S RATING | S&P RATING | LETTER OF CREDIT FEE RATE |
|---|---|---|---|
| Level I: | Baa3 or above | BBB+ or above | 0.90% |
| Level II: | Baa3 | BBB | 1.15% |
| Level III: | Baa3 | BBB- | 1.50% |
| Level IV: | Ba1 | BB+ | 2.00% |
| Level V: | Ba2 or below | BB or below | 2.50% |

In the event that a Rating is suspended, withdrawn or otherwise unavailable from either of S&P or Moody's or upon each Downgrade, the Letter of Credit Fee Rate shall be the sum of the Letter of Credit Fee Rate in effect immediately prior to such rating being suspended, withdrawn, becoming otherwise unavailable or such Downgrade, plus 1.0%.  In the event that the long-term, unenhanced rating assigned to any Debt of the Authority secured by or payable from the

Revenues are "Baa3" by Moody's and "BBB+," the Letter of Credit Fee Rate shall be the rate set forth in Level I. In all other cases, the term *"Rating"* as used above shall mean the lower of the long-term unenhanced ratings assigned to any Revenue Secured Debt (without regard to bond insurance or any other form of credit enhancement) by either of Moody's or S&P. Any change in the Letter of Credit Fee Rate resulting from a change in a Rating shall be and become effective as of and on the date of the announcement of the change in such Rating. References to Ratings above are references to rating categories as presently determined by the Rating Agencies and in the event of adoption of any new or changed rating system by any such Rating Agency, each of the Ratings from the Rating Agency in question referred to above shall be deemed to refer to the rating category under the new rating system which most closely approximates the applicable rating category as currently in effect. The Authority acknowledges that as of the Effective Date the Letter of Credit Fee Rate is that specified above for Level I. The Letter of Credit Fee shall be payable in quarterly in arrears, together with interest on the Letter of Credit Fee from the date payment is due until payment in full at the Default Rate. Such fee shall be payable in immediately available funds and computed on the basis of a year of 360 days and the actual number of days elapsed.

(b)    In addition to the fees provided for in Section 2.5(a) above, the Authority hereby agrees to pay to the Bank, (i) on the date of each Drawing, a draw fee in an amount equal to $300, (ii) on the date any successor Fiscal Agent is appointed a processing fee in an amount equal to $1,500 and (iii) as of the date this Agreement is amended, an amendment fee in an amount equal to $1,500, plus the reasonable fees and expenses of any legal counsel retained by the Bank in connection therewith.

(c)    In addition to the fees provided for in Section 2.5(a) and 2.5(b), the Authority hereby agrees to pay to the Arranger on the Effective Date, an arranger fee in an amount equal to $203,419.18 (e.g., 0.10% of the Original Stated Amount of the Letter of Credit) payable to the Arranger Payment Account.

*Section 2.6.    Manner and Place of Payments; Interest Calculation.* (a) Unless otherwise specified herein, all payments by the Authority under this Agreement shall be effective only if made to the Bank in lawful money of the United States and in immediately available funds by wire transfer to its Payment Account.

(b)    Unless otherwise specified herein, all payments by or on behalf of the Authority hereunder shall be made to the Bank not later than 3:00 p.m. on the applicable due date to its Payment Account. If any payment hereunder becomes due and payable on a day other than a Business Day, the due date for such payment shall be extended, without penalty, to the next succeeding Business Day, and such extended time shall be included in the computation of interest and fees. If the date for the payment of principal is extended by operation of law or otherwise, interest and fees thereon shall be payable for such extended time. Unless otherwise provided herein, all payments not received by 3:00 p.m. on the date due shall bear interest for each day from the due date until payment in full at the Default Rate.

(c)    All computations of interest shall be made on the basis of a year of 365 days and actual days elapsed and all computation of fees and other amounts due hereunder shall be made

on the basis of a year of 360 days and actual days elapsed. Whenever a payment is due to the Bank under this Agreement, the Authority shall be deemed to have made such payment at the time such payment is received by the Bank; *provided, however,* that any payment made by the Authority to the Bank after the time specified in clause (b) above shall be deemed to have been made on the following Business Day.

(d)     All payments to the Bank under this Agreement and the other Related Documents shall be made in Dollars and in immediately available funds at the place of payment without counterclaim, defense, set-off, condition or qualification.

Section 2.7.     *Substitute Letter of Credit.*     Notwithstanding any provisions of the Resolution to the contrary, the Authority agrees not to replace or terminate the Letter of Credit prior to the date which is one year following the Effective Date, except that the Authority may replace or terminate the Letter of Credit and this Agreement prior to such date (i) if the Bonds are then rated by Moody's, Moody's shall have lowered or withdrawn either the long-term rating on the Bonds backed by the Letter of Credit below *"Aa3"* (or its equivalent) or the short-term rating on the Bonds backed by the Letter of Credit below *"VMIG-1"* (or its equivalent), (ii) if the Bonds are then rated by S&P, S&P shall have lowered or withdrawn either the long-term rating on the Bonds backed by the Letter of Credit below *"AA-"* (or its equivalent) or the short-term rating on the Bonds backed by the Letter of Credit below *"A-1"* (or its equivalent) or (iii) the Authority pays to the Bank a termination fee in an amount equal to the positive difference, if any, between one year's Letter of Credit Fees and the amount of Letter of Credit Fees received by the Bank pursuant to the terms of the Fee Letter on or prior to such date. On and after the date which is one year following the Effective Date, the Authority may replace or terminate the Letter of Credit without payment or penalty. In connection with any termination or replacement of the Letter of Credit pursuant to this Section 2.7, the Authority shall (x) pay to the Bank, all Obligations due and owing hereunder and (y) provide the Bank with thirty (30) days prior written notice of its intent to terminate this Agreement and the Letter of Credit; *provided* that all payments to the Bank referred to in clauses (iii) and (x) above shall be made immediately available funds and such termination or replacement of this Agreement and the Letter of Credit shall be in compliance with the terms and conditions of the Resolution.

Section 2.8.     *Late Payments.* If the principal amount of any Obligation is not paid when due, such Obligation shall bear interest at a rate per annum equal the Alternative Base Rate from time to time in effect plus 4.0% per annum, calculated on the basis of a year of 365 days and actual days elapsed until paid in full.

Section 2.9.     *Source of Funds.* All payments made by the Bank pursuant to the Letter of Credit shall be made from funds of the Bank and not from the funds of any other Person.

Section 2.10.     *Extension of Stated Expiration Date.* At any time after the first (1st) anniversary of the Effective Date and not later than one hundred twenty (120) days prior to the then current Stated Expiration Date of the Letter of Credit, the Authority may in writing request the Bank to extend the then current Stated Expiration Date for a period specified in such written request. In the event the Bank shall fail to notify the Authority that it agrees to such extension within ninety (90) days following the Bank's receipt of such request, the Bank shall be deemed

to have refused to grant such extension. If the Bank, in its sole discretion, elects to extend the Stated Expiration Date then in effect, it shall deliver to the Fiscal Agent a Notice of Extension in the form of Exhibit J to the Letter of Credit (herein referred to as a *"Notice of Extension"*) designating the date to which the Stated Expiration Date is being extended. Such extension of the Stated Expiration Date shall be effective, after receipt of such notice, on the Business Day following the date of delivery of such Notice of Extension, and thereafter all references in this Agreement to the Stated Expiration Date shall be deemed to be references to the date designated as such in the most recent Notice of Extension delivered to the Fiscal Agent. Any date to which the Stated Expiration Date has been extended in accordance with this Section 2.10 may be subsequently extended in like manner.

Section 2.11. *Amendments upon Extension.* Upon any extension of the Stated Expiration Date pursuant to Section 2.10 of this Agreement, the Bank and the Authority each reserves the right to renegotiate any provision hereof.

Section 2.12. *Recapture.* If the rate of interest payable hereunder shall exceed the Maximum Rate for any period for which interest is payable, then (i) interest at the Maximum Rate shall be due and payable with respect to such interest period and (ii) interest at the rate equal to the difference between (A) the rate of interest calculated in accordance with the terms hereof and (B) the Maximum Rate (the *"Excess Interest"*), shall be deferred until such date as the rate of interest calculated in accordance with the terms hereof ceases to exceed the Maximum Rate, at which time the Authority shall pay to the Bank, with respect to amounts then payable to the Bank that are required to accrue interest hereunder, such portion of the deferred Excess Interest as will cause the rate of interest then paid to the Bank to equal the Maximum Rate, which payments of deferred Excess Interest shall continue to apply to such unpaid amounts hereunder until all deferred Excess Interest is fully paid to the Bank. Upon the termination of the Letter of Credit, in consideration for the limitation of the rate of interest otherwise payable hereunder, to the extent permitted by law, the Authority shall pay to the Bank a fee equal to the amount of all unpaid deferred Excess Interest.

Section 2.13. *Increased Cost.* (a) If on or after the date hereof, the adoption of any law, rule or regulation, or any change therein, or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance by the Bank or any of its Affiliates or Participants with any request or directive made on or after the date hereof (whether or not having the force of law) of any such Governmental Authority:

(i)       Shall subject the Bank or any of its Affiliates or Participants to any duty or other charge with respect to this Agreement, or the Letter of Credit, or any agreement to issue or participate in the Letter of Credit; or

(ii)       Shall impose, modify or deem applicable any reserve (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) or similar requirement against the assets of, deposits with or for the account of, or credit extended by, the Bank or any of its Affiliates or Participants or shall impose on the Bank or any of its Affiliates or Participants any other condition affecting its obligations under this Agreement or the Letter of Credit;

and the result of any of the foregoing is to increase the cost to the Bank or such Affiliate or Participant of performing its obligations under this Agreement or the Letter of Credit, or to reduce the amount of any sum received or receivable by the Bank or such Affiliate or Participant under this Agreement or the Letter of Credit, by an amount deemed by the Bank or such Affiliate or Participant to be material, then, within 30 days after demand by the Bank or such Affiliate or Participant (or, if such increased costs will continue to be incurred by the Bank or such Affiliate or Participant, in arrears on a monthly basis or such other period as agreed between the Authority and the Bank or such Affiliate or Participant), the Authority shall pay to the Bank or such Affiliate or Participant such additional amount or amounts as are reasonably determined by the Bank, Affiliate or Participant to be necessary to compensate the Bank or such Affiliate or Participant for such increased cost or reduction.

(b)     If the Bank or any of its Affiliates or Participants shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, has or would have the effect of reducing the rate of return on capital of the Bank or such Affiliate or Participant (or of any Person controlling the Bank or such Affiliate or Participant (a *"Parent"*)) relating to the Bank's or such Affiliate's or Participant's obligations hereunder or under the Letter of Credit, and such adoption, change, request or directive (taking into consideration its policies with respect to capital adequacy) will reduce the Bank's or such Affiliate's or Participant's or Parent's rate of return on capital by a material amount, then from time to time, within 30 days after demand by the Bank or such Affiliate or Participant (or if such additional costs of the Bank or such Affiliate or Participant will continue to be suffered by the Bank or such Affiliate or Participant, in arrears on a monthly basis or such other period as agreed between the Authority and the Bank or such Affiliate or Participant), the Authority shall pay to the Bank or such Affiliate or Participant such additional amount or amounts as are reasonably determined by the Bank, Affiliate or Participant to be necessary to compensate the Bank or such Affiliate or Participant for such additional costs.

(c)     The Bank or any of its Affiliates or Participants will use its best efforts to notify the Authority within 30 days of the Bank's or such Affiliate's or Participant's obtaining actual knowledge of any event occurring after the date hereof that will entitle the Bank or such Affiliate or Participant to compensation pursuant to this Section. The failure of the Bank or such Affiliate or Participant to notify the Authority within such 30 day period shall not relieve the Authority from any liability for payment of such compensation; *provided* that the Authority shall not be required to compensate the Bank, Affiliate or Participant pursuant to the foregoing provisions of this Section 2.13 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date the Bank, Affiliate or Participant notifies the Authority of the event giving rise to such increased costs or reductions and of the Bank's, Affiliate's or Participant's intention to claim compensation therefor (except that, if the event giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended, if necessary, to include the period of retroactive effect thereof). A certificate of the Bank or any of its Affiliates or Participants claiming compensation under this Section 2.13 and setting forth the additional amount or amounts to be paid to it hereunder and attaching such information in

reasonable detail as may be reasonably requested by the Authority shall be conclusive in the absence of manifest error.  In determining such amount, the Bank or such Affiliate or Participant may use any reasonable average and attribution methods.

(d)     No Affiliate or Participant or other transferee of the Bank's rights shall be entitled to receive any greater payment under this Section 2.13 or under Section 2.14, 7.7 or 7.8 hereof than the Bank would have been entitled to receive with respect to the rights transferred, unless such transfer is made with the Authority's prior written consent.

*Section 2.14.     Taxes.* (a) If the Authority or the Fiscal Agent shall be required by any Law to deduct and withhold at source any Taxes from or in respect of any sum payable under any Related Document to the Bank, (i) the sum payable shall be increased as necessary so that after making all required deductions and withholding (including deductions applicable to additional sums payable under this Section 2.14), the Bank receives an amount equal to the sum it would have received had no such deductions and withholding at source been made; (ii) the Authority shall make such deductions and withholding at source; (iii) the Authority shall pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Laws; and (iv) within thirty (30) days after the date of such payment, the Authority shall furnish to the Bank the original or a certified copy of a receipt evidencing payment thereof (the amount of the increase required by (i) shall be referred to as a *"Gross-Up Amount"*).

(b)     In addition, the Authority agrees to pay any and all present or future stamp, court or document taxes and any other excise or property taxes or charges or similar levies which arise from any payment made under any Related Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Related Document (hereinafter referred to as *"Other Taxes"*).

(c)     (1) The Authority agrees, to the maximum extent permitted by law, to indemnify the Bank for (i) the full amount of Taxes and Other Taxes imposed on amounts paid by the Bank under this Section 2.14; and (ii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant U.S. Governmental Authority (the amounts in (i) and (ii) being collectively referred to as *"Tax Indemnity Amounts"*). Payment under this Section 2.14(c) shall be made within thirty (30) days after the date the Bank makes a demand therefor.

(2)     If the Bank receives a refund or is granted a credit of any Taxes or Other Taxes which the Bank determines in good faith is attributable to a Tax Indemnity Amount or Gross-Up Amount paid by the Authority to or for the account of the Bank under this Section 2.14, the Bank shall reimburse the Authority in an amount as the Bank shall determine, in its discretion exercised in good faith, as will leave the Bank, after the reimbursement, in no better or worse position than it would have been in if payment of the Tax Indemnity Amount or Gross-Up Amount had not been required.  Nothing herein contained shall interfere with the right of the Bank to arrange its tax affairs in whatever manner it thinks fit or oblige the Bank to disclose any information relating to its tax affairs or any computations in respect thereof (except with respect

to the specific calculation); *provided, however,* that upon any such reimbursement becoming due to the Authority, the Bank shall promptly notify the Authority of such amount.

*Section 2.15.   Obligations Absolute.*   The obligations of the Authority under this Agreement as they relate to the Bank and the Letter of Credit shall be primary, absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including without limitation the following circumstances:

(a)   Any lack of validity or enforceability of the Letter of Credit;

(b)   Any amendment to, waiver of or consent to departure from any provision of, the Letter of Credit or any Related Document;

(c)   The existence of any claim, set-off, defense or other right which the Authority may have at any time against the Bank, any beneficiary of the Letter of Credit (or any Persons for whom the Fiscal Agent, any such beneficiary or any such transferee may be acting) or any other Person, whether in connection with this Agreement, the Letter of Credit, the other Related Documents or any unrelated transaction, *provided* that nothing herein shall prevent the assertion of any such claim, defense or other right by separate suit or compulsory counterclaim;

(d)   Any breach of contract or other dispute between the Authority and the Bank, any beneficiary or transferee of the Letter of Credit (or any Person for whom the Fiscal Agent, any such beneficiary or any such transferee may be acting), any holder of any Bond or any other Person;

(e)   Any demand, statement or any other document or instrument presented under the Letter of Credit or hereunder proving to have been forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(f)   Payment by the Bank under the Letter of Credit against presentation of a draft or certificate which does not comply strictly with the terms of the Letter of Credit;

(g)   Any non-application or misapplication by the Fiscal Agent or any tender agent or otherwise of the proceeds of any drawing under the Letter of Credit;

(h)   The failure by the Bank to honor any drawing under the Letter of Credit or to make any payment demanded under the Letter of Credit, on the grounds that the demand for such payment does not conform strictly to the terms and conditions of the Letter of Credit; or

(i)   Any delay, extension of time, renewal, compromise or other indulgence or modification granted or agreed to by the Bank with or without notice to or approval by the Authority in respect of any of the Authority's obligations hereunder.

Section 2.16.     *Liability of Bank.* The Authority assumes all risks of the acts or omissions of the Fiscal Agent and any transferee of the Letter of Credit with respect to its use of the Letter of Credit; *provided* that this assumption with respect to the Fiscal Agent and any transferee of the Letter of Credit is not intended to, and shall not, preclude the Authority from pursuing such rights and remedies as it may have against the Fiscal Agent or any such transferee at law or under any other agreement.  None of the Bank, its affiliates or any of its officers, directors, employees or agents shall be liable or responsible for:

> (a)     The use that may be made of the Letter of Credit or for any acts or omissions of the Fiscal Agent or any transferee of the Letter of Credit in connection therewith;

> (b)     The form, validity, sufficiency, accuracy or genuineness of any of the Related Documents, or of any endorsements thereon, even if such Related Documents should prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged;

> (c)     Payment by the Bank to or for the account of the Fiscal Agent or any transferee of the Letter of Credit against presentation of documents that do not comply strictly with the terms of the Letter of Credit, including failure of any documents to bear any reference or adequate reference to the Letter of Credit;

> (d)     The validity or sufficiency of any instrument transferring or purporting to transfer the Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason;

> (e)     Errors, omissions, interruptions or delays in transmission or delivery of any messages pertaining to the Letter of Credit, by telex, mail, cable, telegraph, facsimile or otherwise, whether or not they have been in cipher, including any drawings under, the Letter of Credit;

> (f)     Errors in interpretation of technical terms used in the Letter of Credit; or

> (g)     Any consequences arising from causes beyond the control of the Bank, including, without limitation, any government acts;

*provided* that, notwithstanding anything in the preceding clauses (a) through (g) to the contrary, the Authority shall have a claim against the Bank and the Bank shall be liable to the Authority, to the extent, but only to the extent, of any direct, as opposed to consequential, damages (any right by the Authority to receive consequential, special, indirect or punitive damages being hereby waived to the fullest extent permitted under applicable law) suffered by the Authority that the Authority proves were caused by (A) the Bank's failure to pay under the Letter of Credit after the presentation to it by or for the account of the Authority of a sight draft and certificate strictly complying with the terms and conditions of the Letter of Credit or (B) the Bank's willful or grossly negligent payment or nonpayment under the Letter of Credit as determined by a court of competent jurisdiction.

In furtherance of and not in limitation of the foregoing, the Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary; *provided* that, if the Bank shall receive written notification from the Fiscal Agent that sufficiently identifies documents to be presented to the Bank that are not to be honored, the Bank agrees that it will not honor such documents thereafter.

## ARTICLE THREE

### CONDITIONS PRECEDENT

*Section 3.1.    Conditions Precedent to Issuance of Letter of Credit.*  The obligations of the Bank under this Agreement and the obligation of the Bank to issue the Letter of Credit have been undertaken in reliance upon the due performance by the Authority of its obligations and agreements to be performed hereunder and under the other Related Documents and the accuracy of and compliance with the representations, warranties, covenants, agreements and duties of the Authority contained herein and that no Default or Event of Default shall have occurred and be continuing, in each case on and as of the Effective Date. The obligations of the Bank hereunder and the obligation of the Bank to issue the Letter of Credit are also subject to the fulfillment of the following conditions precedent on or before the Effective Date, in form and substance satisfactory to the Bank and its U.S. counsel, Chapman and Cutler LLP:

(a)    The Bank shall have received (i) an executed original counterpart of the Authority of this Agreement and (ii) true and correct executed or certified copies, as applicable, of the other Related Documents;

(b)    The Bank shall have received an opinion, dated the Effective Date, of Sidley Austin LLP, addressed to the Bank;

(c)    The Bank shall have received a certificate of the Authority signed by an Authorized Representative, dated the Effective Date, certifying the names and true signatures of the officers of the Authority authorized to execute on behalf of the Authority, this Agreement and any of the other Related Documents to which the Authority is a party;

(d)    The Bank shall have received a certificate of the Authority signed by the Executive Director of the Authority, stating that:  (i) the representations and warranties set forth in Article 4 of this Agreement and in all other Related Documents are true and correct in all material respects as of the date of this Agreement and as of the Effective Date (except to the extent any such representations and warranties expressly relate to an earlier date); and (ii) no material adverse change has occurred in the financial position or results of operation of the Authority between June 30, 2007, and the Effective Date;

(e)    The Bank shall have received a certified copy of the Resolution stating that such Resolution has not been amended, modified, rescinded or revoked;

(f)     The Bank shall have received a copy of the Official Statement in form and substance reasonably satisfactory to the Bank;

(g)     All other legal matters pertaining to the execution and delivery of this Agreement, the other Related Documents and the issuance of the Bonds shall be reasonably satisfactory to the Bank and its counsel, Chapman and Cutler LLP;

(h)     The Bank shall have received confirmation from S&P that the Bonds shall have been rated "AA-" and "A-1+";

(i)     The Bank shall have received the Authority's annual report containing the audited financial statements of the Authority for the fiscal year 2007;

(j)     The Authority shall have made payment of all amounts due under Section 2.5(c) and Section 7.8 hereof on the Effective Date;

(k)     The Bank shall have received an executed original of the Authorized Representative Certificate;

(l)     The Authority shall provide the Bank with written evidence satisfactory to the Bank that a CUSIP number has been obtained and reserved for Bank Bonds;

(m)     *AMBAC Assurance Corp. Insurance Policy.* The Bank shall have received written evidence of (i) the delivery to the Fiscal Agent by AMBAC Assurance Corp. of an endorsement to its insurance policy issued to support the payment of the Bonds on the date of their original issuance limiting the coverage of such insurance policy to obligations other than the Bonds, (ii) an acknowledgement from the Fiscal Agent of the receipt of such endorsement and (iii) the amendment of the Related Documents to reflect the execution by the Executive Director of the Authority of this Agreement and the issuance of the Letter of Credit; and

(n)     The Bank shall have received such other documents, certificates, opinions, approvals and filings with respect to this Agreement and the other Related Documents as the Bank may reasonably request.

*Section 3.2.     Conditions Precedent to Liquidity Advances.* Following any payment by the Bank under the Letter of Credit pursuant to a Liquidity Drawing, a Liquidity Advance shall be made available to the Authority *only if* on the date of payment of such Liquidity Drawing by the Bank the following statements shall be true:

(a)     the representations and warranties of the Authority contained in Article Four of this Agreement and in the other Related Documents are correct in all material respects on and as of the date of such payment as though made on and as of such date, except that the representations and warranties in Section 4.12 hereof shall be to the most recent financial statements provided to the Bank by the Authority under Section 5.9 hereunder; and

(b)     no event has occurred and is continuing, or would result from such payment, which constitutes a Potential Default or Event of Default.

Unless the Authority shall have previously advised the Bank in writing or the Bank has actual knowledge that one or more of the above statements is no longer true, the Authority shall be deemed to have represented and warranted on the date of such payment that the above statements are true and correct.

*Section 3.3.    Condition Subsequent to Closing.* (a) Thirty (30) days after the Effective Date, the Bank shall have received confirmation from Moody's that the Bonds shall have been rated "Aa1" and "VMIG1." In the event that the Bank does not receive such confirmation by the applicable deadline, such failure shall constitute an Event of Default hereunder.

## ARTICLE FOUR

## REPRESENTATIONS AND WARRANTIES

The Authority by its acceptance hereof represents, warrants and agrees with the Bank as follows:

*Section 4.1.    Power and Authority.* The Authority has all requisite power and authority to adopt the Resolution and to execute, deliver and perform all of its obligations under the Related Documents, to issue the Bonds, and to adopt, execute and deliver any and all instruments and documents required to be adopted, executed or delivered pursuant to or in connection herewith or therewith and to perform each and all of the matters and things provided for herein and therein.

*Section 4.2.    No Violation.* The execution and delivery (and adoption, in the case of the Resolution) and performance by the Authority of the Related Documents and any and all instruments or documents required to be executed in connection therewith have been duly authorized and do not and will not (i) violate any provision of the Constitution of the Authority or any Laws having applicability to the Authority or (ii) result in a breach of or constitute a default under any indenture, loan, credit agreement or any other agreement, lease or instrument to which the Authority is a party or by which the Authority is bound, except where in any such case the same would not have a material adverse effect on the ability of the Authority to perform its obligations under the Related Documents.

*Section 4.3.    Authorization.* No authorization, consent, approval, license, exemption from or registration with any U.S. Governmental Authority, other than those which have been or will by the Effective Date be obtained, will be necessary for the valid adoption of the Resolution or the execution, delivery and performance by the Authority of any of the Related Documents.

*Section 4.4.    Binding Agreements; Payment.* This Agreement is entered into pursuant to the Resolution and the Act, and together with each of the other Related Documents constitute the legal, valid and binding obligations of the Authority, enforceable against the Authority in accordance with their respective terms, except as such enforceability may be limited by

insolvency, moratorium or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally, by application of equitable principles, or by application of Authority laws regarding claims against the Authority, and payment of the Obligations is and shall continue to be an obligation of the Authority. The Bonds have been issued under and in accordance with the Act and the Resolution.

Section 4.5.    *No Litigation*. There is no action, suit, or proceeding at law or in equity before or by any court, arbitrator, governmental or other board, body or official, pending with service of process having been accomplished or, to the Authority's knowledge, threatened, against or affecting the Authority, that in any manner draws into question the validity or enforceability of any of the Related Documents or in any way contests the existence, organization or powers of the Authority or any elected official thereof to adopt, execute and deliver any of the Related Documents or perform the obligations thereunder or contemplated thereby or which, if adversely determined, would have a material adverse effect on the financial condition of the Authority or its ability to perform its obligations hereunder or under the Related Documents.

Section 4.6.    *Accuracy of Official Statement*. The Official Statement describing the Bonds was true and correct in all material respects on and as of the date thereof and did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

Section 4.7.    *Compliance*. The Authority is in compliance with the terms and conditions of each of the Related Documents, and no breach of the terms thereof nor any Event of Default has occurred and is continuing, and no event, act or omission has occurred and is continuing which, with the lapse of time, the giving of notice, or both, would constitute an Event of Default or a breach of the terms hereof or thereof.

Section 4.8.    *Pledge*. (a) The Resolution creates for the benefit of the owners of the Bonds and the Obligations owed the Bank hereunder, the legally valid, binding and irrevocable lien on and pledge of the Revenues. There is no lien on the Revenues other than the liens created by or in accordance with the Resolution. The Resolution does not permit the issuance of any debt secured by the Revenues to rank senior to the Bonds or the Obligations. The payment of the Obligations ranks on a parity with the payment of the principal of and purchase price, premium, if any, and interest on the Bonds, is not subordinate to any obligation of the Authority secured by a lien on the Revenues and is prior as against all other Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of such lien. No filing, registration, recording or publication of the Resolution is required to establish the pledge provided for thereunder or to perfect, protect or maintain the lien created thereby on the Revenues to secure the Bonds and the Obligations.

(b)    The Reimbursement Obligations of the Authority under this Agreement shall have the benefit and security of the Resolution as provided in the Resolution, and in the event of one or more Drawings under the Letter of Credit and the application of the proceeds thereof to the payment of Bonds, the Bank will be subrogated *pro tanto* to the rights of the Fiscal Agent and

the holders of the Bonds in and to all funds and security held by the Fiscal Agent under the Resolution for the payment of the Bonds, including without limitation, being secured by and payable from the Revenues. In addition, the Bank shall have any and all other subrogation rights available to the Bank at law or in equity.

Section 4.9.   *Incorporation of Representations and Warranties by Reference.* The Authority hereby makes to the Bank the same representations and warranties made by the Authority in each Related Document to which the Authority is a party, which representations and warranties, as well as the related defined terms contained therein, are hereby incorporated by reference in this Section 4.9 for the benefit of the Bank with the same effect as if each and every such representation and warranty and defined term were set forth in this Section 4.9 in its entirety. No amendment to such representations and warranties or defined terms made pursuant to any Related Document shall be effective to amend such representations and warranties and defined terms as incorporated by reference in this Section 4.9 without the prior written consent of the Bank.

Section 4.10.   *Maximum Rate.* The interest rate payable on any drawing made under the Letter of Credit, any Liquidity Advance, any Bank Bond and the Authority's Obligations to the Bank hereunder is not subject to any limitation under the laws or Constitution of the Commonwealth that would cause the maximum rate of interest to be less than twelve percent (12%) (which, as of the date hereof, is the maximum rate permitted by applicable law).

Section 4.11.   *No Immunity.* With respect to actions, obligations or contracts which constitute proprietary functions, the Authority is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues (irrespective of their use or intended use) from (i) suit, (ii) relief by way of injunction, order for specific performance or for recovery of property or (iii) execution or enforcement of any judgment to which it or its revenues might otherwise be made subject in any suit, action or proceedings relating to this Agreement or the Letter of Credit brought validly in the courts of any jurisdiction and no such immunity (whether or not claimed or not claimed) may be attributed to such party or its revenues.

Section 4.12.   *Financial Statements.* The financial statements of the Authority as of June 30, 2007, and the related statement of revenues and expenses and changes in financial position for the years then ended and the auditors' reports with respect thereto and the balance sheets of the Authority as of June 30, 2007, and the related statements of revenues and expenses and changes in financial position for the period then ended, copies of which have heretofore been furnished to the Bank, are complete and correct and fairly present the financial condition, changes in financial position and results of operations of the Authority at such dates and for such periods, and were prepared in accordance with generally accepted accounting principles in the United States. Except as disclosed in the Official Statement, since June 30, 2007, there has been no material adverse change in the financial condition of the Authority.

Section 4.13.   *Accuracy and Completeness of Information.* All information, reports and other papers and data furnished by the Authority to the Bank were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the

recipient a true and accurate knowledge of the subject matter. No fact is known to the Authority which has had or in the reasonable judgment of the Authority may in the future have a material adverse effect upon the financial condition of the Authority or on this Agreement which has not been set forth in the financial statements referred to in Section 4.12 or in such information, reports or other papers or data or otherwise disclosed in writing to the Bank prior to the date hereof. No document furnished or other written statement made to Bank in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain any untrue statement of a fact material to the creditworthiness of the Authority or omits or will omit to state such a material fact necessary in order to make the statements contained therein not misleading.

*Section 4.14.   Liens, Etc.* The Authority has not created or suffered to exist any lien upon or with respect to any of the funds or accounts created under the Resolution except those liens specifically permitted under the Resolution and no Lien on the Revenues securing any swap termination payments payable pursuant to any hedging agreement is first in priority or *pari passu* to the lien securing the Bonds and Reimbursement Obligations owed the Bank hereunder.

## ARTICLE FIVE

### COVENANTS

So long as the Letter of Credit remains outstanding and until all Obligations shall have been paid in full and satisfied, the Authority shall comply with the following covenants:

*Section 5.1.   Accounting Records.* The Authority will maintain adequate books, accounts and records in order to present its financial statements as required by the laws of the Authority.

*Section 5.2.   Access to Books and Records.* To the extent permitted by law and with reasonable prior written notice, the Authority will permit any person designated by the Bank, to visit any of the executive offices of the Authority during normal business hours to examine the books and financial records, including minutes of meetings of any relevant governmental committees or agencies, and make copies thereof or extracts therefrom, and to discuss the affairs, finances and accounts of the Authority with authorized officers of the Authority, all at such reasonable times and as often as the Bank may reasonably request. The Bank agrees to maintain the confidentiality of all such books, records and information regarding the Authority that is not otherwise publicly available; *provided, however*, that the Bank shall not be precluded from disclosing such information or the contents of such books and records (i) to its officers, directors, employees, agents, attorneys, regulators, auditors and accountants who have a need to know such books, records or information in accordance with customary insurance, reinsurance and banking practices and who receive such books, records or information having been made aware of the restrictions set forth in this Section 5.2; (ii) to any actual or proposed Eligible Assignee or Participant that has agreed in writing to be bound by the provisions of this Section 5.2; (iii) to the extent disclosure is required by applicable law, statute, rule, regulation or judicial process or in connection with any action or proceeding by the Bank to enforce rights or remedies against the Authority; or (iv) upon the lawful demand of any court or agency having proper jurisdiction over the Bank or any Eligible Assignee or Participant.

Section 5.3.    *Compliance with Related Documents*.  The Authority will take all necessary steps to assure that the Bonds will be issued in compliance with this Agreement, the Resolution and all other Commonwealth Laws, including the Commonwealth's Constitution.  The Authority agrees that it will not amend the Resolution or any other Related Document to which it is a party in any manner adversely affecting the Bonds without the consent of the Bank.

Section 5.4.    *Waiver of Immunity*.  The Authority agrees that it will not assert any immunity (sovereign or otherwise) it may have as a governmental entity against lawsuits brought in contract under the Law of the Commonwealth under this Agreement, the Letter of Credit, any Related Document or in connection herewith or therewith.

Section 5.5.    *Use of Proceeds*.  The Authority will use the proceeds of the Bonds for the purposes set forth in the Resolution.

Section 5.6.    *Income Taxation and Tax Status of Interest on Bonds*.  The Authority will not take any action, or fail to take any action, if such action or failure to take such action would adversely affect the exclusion from gross income of the interest payable on the Bonds for federal income tax purposes.

Section 5.7.    *Fiscal Agent; Remarketing Agent*.  The Authority will not dismiss, replace or permit the resignation of the Fiscal Agent or Remarketing Agent unless it has appointed a successor tender agent or remarketing agent, as applicable, and, prior to such appointment, shall have received the prior written consent of the Bank.

Section 5.8.    *Financial and Event Reporting*.  The Authority will deliver to the Bank:

(a)    Within ten days after it becomes available, but in no event later than 90 days after the end of the fiscal year of the Authority, a copy of the Authority's annual report containing the audited financial statements of the Authority for the preceding fiscal year;

(b)    Promptly after it becomes available, a copy of each official statement of the Authority describing any Debt of the Authority secured by or payable from the Revenues that is being offered for sale by the Authority (or notice as to where the official statement can be retrieved electronically);

(c)    Promptly, if an Event of Default occurs, a certificate of the Authority stating that an Event of Default has occurred;

(d)    Promptly after service of process against the Authority is accomplished, notice of litigation pending against the Authority challenging the validity or enforceability of any Related Document, the existence, organization or powers of the Authority or the authority of any elected official thereof to perform the obligations under any Related Document;

(e)     Promptly after the Authority receives credible written notice of a threatened action, suit, or proceeding at law or in equity before or by any court, arbitrator, governmental or other board, body or official challenging the validity or enforceability of any Related Document; and

(f)     Such other information relating to the financial condition, business or properties of the Authority as the Bank may reasonably request.

Section 5.9.   *Further Assurances*.  The Authority will execute any and all further documents, agreements and instruments, and take all further action that the Bank may reasonably request in order to effectuate the transactions contemplated by this Agreement and the other Related Documents.

Section 5.10.   *Enforceability of the Agreement*.  The Authority covenants and agrees to undertake any and all actions necessary to provide for the enforceability of each of the obligations of the Authority under this Agreement.  It is, and at all times consistently has been, the Authority's position that this Agreement is not subject to any filing requirement with the Office of the Comptroller of the Commonwealth pursuant to Act No. 18 of October 30, 1975, as amended by Act No. 127 of May 31, 2004 (collectively, *"Act No. 18"*).  If it is determined, however, by a U.S. Governmental Authority with standing to impose such filing requirement upon the Authority, that this Agreement must be filed with the Office of the Comptroller of the Commonwealth, the Authority covenants and agrees to promptly complete such filing in full compliance with the requirements of Act No. 18.  Within five (5) Business Days of such filing, the Authority shall provide the Bank, a stamped copy of or stamped receipt evidencing such recording or written certification thereof.  Furthermore, in no event shall the Authority (i) assert as a defense to any of its obligations under this Agreement a failure to make any such filing or (ii) fail to pay any obligation under this Agreement as a result of any such filing requirement failure.

Section 5.11.   *Voluntary Redemption*.  The Authority shall select, or cause to be selected, for redemption or purchase (pursuant to Section 11 or 23 of Appendix A of the Resolution) any and all Bank Bonds prior to selecting, or causing to be selected, for redemption or such purchase any Bonds that are not Bank Bonds.  The Authority shall not declare, instruct the Fiscal Agent to declare or permit an optional redemption of the Bonds pursuant to the Resolution unless the Authority has all of the funds available for such optional redemption and such optional redemption will be funded from sources other than moneys provided by the Bank under this Agreement, without the prior written consent of the Bank.

Section 5.12.   *Alternate Liquidity Facility or Conversion to a Non-Covered Interest Rate*. (i) The Authority agrees to use its best efforts to obtain an Alternate Liquidity Facility to replace this Agreement and the Letter of Credit or to convert all of the Bonds to a Non-Covered Interest Rate in the event (A) the Bank shall determine not to extend the Stated Expiration Date (such replacement or conversion to occur on or before the mandatory purchase date established pursuant to the Resolution), (B) a mandatory purchase of Bonds shall have been effected with any funds made available under this Agreement, or (C) the Authority terminates this Agreement and the Letter of Credit pursuant to Section 2.7 hereof.

(ii)    The Authority agrees that, as a condition to the effectiveness of any Alternate Liquidity Facility, the provider of the Alternate Liquidity Facility will provide funds, to the extent necessary, in addition to other funds available, on the date the Alternate Liquidity Facility becomes effective for the repayment of all Liquidity Advances and the purchase of all Bank Bonds at a purchase price of par plus accrued interest (at the Bank Rate) through the purchase date, and that as a condition to the effectiveness of the conversion to a Non-Covered Interest Rate all Liquidity Advances and Bank Bonds will be purchased on the conversion date at a purchase price of par plus accrued interest (at the Bank Rate) through the purchase date. On the effective date of such Alternate Liquidity Facility or conversion to a Non-Covered Interest Rate, as the case may be, the Authority shall pay in full all other amounts due under this Agreement (including the Excess Interest and unpaid interest thereon).

(iii)    The Authority shall not permit an Alternate Liquidity Facility to become effective with respect to less than all of the Bonds without the prior written consent of the Bank.

Section 5.13.    *Incorporation of Covenants.* The covenants of the Authority set forth in each of the Related Documents to which the Authority is a party are hereby incorporated by reference in this Agreement for the benefit of the Bank. To the extent that any such incorporated provision permits any Person to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to any Person, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Bank and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Bank.

Section 5.14.    *Maintenance and Approvals; Filings, Etc.* The Authority shall at all times maintain in effect, renew and comply with all the terms and conditions of all consents, licenses, approvals and authorizations as may be necessary or appropriate under any applicable law or regulation for its execution, delivery and performance of this Agreement and the Related Documents to which it is a party.

Section 5.15.    *Resolution a Contract.* The provisions of the Resolution constitute a contract between the Authority and the owner or owners of the Bonds, and any such owner or owners, may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the Authority as a result of issuing the Bonds.

Section 5.16.    *Liens, Etc.* The Authority shall not create or suffer to exist any lien upon or with respect to any of the funds or accounts created under the Resolution except these liens specifically permitted under the Resolution; *provided, however,* that in no event shall any Lien on the Revenues securing any swap termination payments payable pursuant to any hedging agreement be first in priority or *pari passu* to the lien securing the Bonds and Reimbursement Obligations owed the Bank hereunder.

# ARTICLE SIX

## DEFAULTS

*Section 6.1.* *Events of Default and Remedies*. If any of the following events shall occur, each such event shall be an *"Event of Default"*:

(a) default in the payment when due of (i) any payments required to be made by the Authority for reimbursement to the Bank of any drawings, (ii) any principal or interest with respect to any Bank Bonds or any Liquidity Advance or (iii) any other amount owing by the Authority under this Agreement and such default under this subsection (iii) continues for a period of ten (10) Business Days; or

(b) (i) the Authority shall default in the performance or observance of any term, covenant, condition or agreement on its part to be performed or observed under Section 5.3, 5.4, 5.5, 5.6, 5.7, 5.8(a), 5.8(b), 5.10, 5.11, 5.12, 5.15 or 5.16 hereof or (ii) the Authority shall default in the performance or observance of any other term, covenant, other condition or agreement on its part to be performed or observed and such default in this clause (ii) shall continue unremedied for thirty (30) days after written notice thereof shall have been given to the Authority by the Bank; or

(c) any of the Authority's representations or warranties made herein or in any statement or certificate at any time made or deemed made by or on behalf of the Authority pursuant hereto or in connection herewith, and/or in any of the Related Documents is false or misleading in any material respect when made or deemed made; or

(d) (i) the Authority shall commence any case, proceeding or other action under any existing or future Law (A) relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or the Authority shall make a general assignment for the benefit of its creditors; or

(ii) there shall be commenced against the Authority any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in an order for such relief or in the appointment of a receiver or similar official or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or

(iii) there shall be commenced against the Authority any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets, which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

(iv)    the Authority shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or

(v)    the Authority shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts; or

(vi)    the Authority or any other Governmental Authority having jurisdiction over the Authority imposes a debt moratorium, debt restructuring, or comparable restriction on the repayment when due an payable of the principal of or interest on any Revenue Secured Debt of the Authority; or

(e)    the occurrence of any "event of default" on the part of the Authority under any of the Related Documents to which it is a party shall have occurred and be continuing; or

(f)    one or more judgments or orders for the payment of money in an aggregate amount in excess of $10,000,000 payable from the Revenues shall be rendered against the Authority and such judgments or orders shall remain undischarged or unstayed for a period of thirty (30) days, or any action shall be taken by a judgment creditor to levy upon assets or properties of the Authority to enforce any such judgment or order; or

(g)    any material provision of this Agreement or any other Related Document to which the Authority is a party shall at any time for any reason cease to be valid and binding on the Authority, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by the Authority, or a proceeding shall be commenced by any Governmental Authority having jurisdiction over the Authority seeking to establish the invalidity or unenforceability thereof, or the Authority shall deny that it has any or further liability or obligation under this Agreement or any other Related Document to which it is a party; or

(h)    the Authority shall fail to pay when due and payable any Revenue Secured Debt that rank senior to or on a parity with the Bonds and Bank Bonds and such failure shall continue beyond any applicable period of grace specified in any underlying resolution, indenture, contract or instrument providing for the creation of or concerning such Revenue Secured Debt, or pursuant to the provisions of any such resolution, indenture, contract or instrument, the maturity of any such Debt, as a result of the occurrence of a default in the payment of principal or interest by the Authority on any Revenue Secured Debt that rank senior to or on a parity with the Bonds and Bank Bonds, may be accelerated, or may be required to be prepaid prior to the stated maturity thereof; or

(i)    The rating assigned by S&P or Moody's to any Debt of the Authority secured by or payable from the Revenues that ranks senior to or on a parity with the Bonds (without taking into account third party credit enhancement) is withdrawn,

-29-

suspended or reduced below BBB- (or its equivalent rating) by S&P or Baa3 (or its equivalent rating) by Moody's.

Section 6.2.   *Remedies*.  Upon the occurrence and during the continuance of any Event of Default, the Bank at its option may, upon notice to the Fiscal Agent and the Authority, do any one or more of the following:

(a)   require, in accordance with the Resolution, the Fiscal Agent to give notice of mandatory tender of Bonds and to purchase all such Bonds at a price equal to the principal amount thereof and interest accrued with respect thereto (each, a *"Mandatory Tender Date"*) and to register the Bonds in the name or at the direction of the Bank, thereby causing the Letter of Credit to expire 15 days thereafter; or

(b)   declare all other amounts payable to the Bank by the Authority hereunder immediately due and payable on the applicable Mandatory Tender Date, whereupon the same shall be immediately due and payable on such Mandatory Tender Date; or

(c)   exercise any or all rights provided or permitted by law or granted pursuant to any of the Related Documents in such order and in such manner as the Bank may, in its sole judgment, determine.

Section 6.3.   *No Waiver of Remedies*.  No waiver of any breach of or default under any provision of any of the Related Documents shall constitute or be construed as a waiver by the Bank of any subsequent breach of or default under that or any other provision of any of the Related Documents.

Section 6.4.   *Remedies Not Exclusive*.  No remedy herein conferred upon the Bank is intended to be exclusive of any other remedy  herein or in any other agreement between the parties hereto or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

### ARTICLE SEVEN

### MISCELLANEOUS

Section 7.1.   *Method of Payment of Amount Due*.  Despite any provisions to the contrary contained in the Bonds, the Authority will pay to the Bank, all amounts payable to the Bank in respect of the Reimbursement Obligations by wire transfer to the Payment Account of the Bank.

Section 7.2.   *Addresses for Notices, etc*. (a) Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or (subject to subsection (c) below) electronic mail address, and all notices to and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

| | |
|---|---|
| If to the Authority: | Puerto Rico Highways and Transportation Authority<br>c/o Government Development Bank for<br>  Puerto Rico<br>Roberto Sanchez Vilella Government Center<br>Avenida De Diego, Parada 22<br>San Juan, Puerto Rico 00940<br>Tax Identification Number:  660433808<br>Attention:    President<br>Telephone:    (787) 722-2525, ext: 2001<br>Facsimile:    (787) 721-1443 |
| If to the Fiscal Agent: | The Bank of New York<br>101 Barclay Street, Suite 21W<br>New York, New York  10286<br>Attention:    Corporate Trust Administration<br>Division<br>Telephone:    (212) 815-6955<br>Facsimile:    (212) 815-5595 |
| If to the Remarketing Agent: | Morgan Stanley & Co. Incorporated<br>1221 Avenue of the Americas, 30th Floor<br>New York, New York  10020<br>Attention:    Municipal Short-Term Products<br>Telephone:    (212) 762-8263<br>Facsimile:    (212) 507-1937 |
| If to the Bank: | The Bank of Nova Scotia, Hato Rey Branch<br>273 Ponce de Leon Avenida, 2nd Floor<br>Hato Rey, Puerto Rico 00917<br>Attention:    Dionor Ramirez or José A. Maldonado<br>Telephone:    (787) 758-8989 ext. 7897 or 7820<br>Facsimile:    (787) 766-7829<br>Reference:    Puerto Rico Highways and<br>              Transportation Authority (Series A) |
| With a copy to: | The Bank of Nova Scotia, New York Agency<br>c/o The Bank of Nova Scotia<br>WBO Loan Operations<br>720 King Street West, 3rd Floor<br>Toronto, Ontario  M5V ZT3<br>Attention:    NYA Loan Operations<br>Telephone:    (212) 225-5706<br>Facsimile:    (212) 225-5708<br>Reference:    Puerto Rico Highways and<br>              Transportation Authority (Series A) |

With a copy to:                    The Bank of Nova Scotia
                                   New York Agency
                                   One Liberty Plaza, 26th Floor
                                   New York, New York 10006
                                   Attention:    Public Finance Department
                                   Telephone:    (212) 225-5478
                                   Facsimile:    (212) 225-5274
                                   Reference:    Puerto Rico Highways and
                                                 Transportation Authority (Series A)

(b)     All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of subsection (d) below), when delivered; *provided, however,* that notices and other communications to the Bank pursuant to Sections 2 and 3 shall not be effective until actually received by such Person. In no event shall a voicemail message be effective as a notice, communication or confirmation hereunder.

(c)     Documents may be transmitted and/or signed by facsimile. The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually-signed originals and shall be binding on the Authority and the Bank. The Bank may also require that any such documents and signatures be confirmed by a manually-signed original thereof; *provided, however,* that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

(d)     Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in Section 5.8 hereof, and to distribute documents for execution by the parties thereto, and may not be used for any other purpose.

(e)     The Bank shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Authority even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Authority shall, to the maximum extent permitted by applicable Law, indemnify the Bank from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Authority. All telephonic notices identified as such by the Person giving such notice on behalf of the Authority to the Bank may be recorded by the Bank, and each of the parties hereto hereby consents to such recording.

*Section 7.3.    Assignments; Participations.* (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Authority may not assign or otherwise transfer any

of its rights or obligations hereunder without the prior written consent of the Bank; and (ii) prior to the Termination Date the Bank may not assign or otherwise transfer any of its rights or obligations hereunder except (A) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section 7.3; (B) by way of participation in accordance with the provisions of subsection (d) of this Section 7.3; or (C) by way of pledge or assignment of a security interest pursuant to the restrictions of subsection (e) of this Section 7.3 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (e) of this Section and, to the extent expressly contemplated hereby, the Indemnified Persons) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Prior to the Termination Date, the Bank may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement, *provided* that (i) the Bank may not assign any of its obligations under the Letter of Credit without (A) the prior written consent of the Authority, (B) written notice from each Rating Agency that such assignment will not result in a suspension, lowering or withdrawal of the rating on the Bonds and (C) written notice of such assignment given by the Bank to the Fiscal Agent and the Secretary of the Treasury at least twenty-five (25) days prior to such assignment; and (ii) the parties to each assignment shall execute and deliver to the Bank an assignment and assumption agreement. Subject to acceptance and recording thereof by the Bank, from and after the effective date specified in each assignment and assumption agreement, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such assignment and assumption agreement, have the rights and obligations of the Bank under this Agreement, and the Bank thereunder shall, to the extent of the interest assigned by such assignment and assumption agreement, be released from its obligations under this Agreement (and, in the case of an assignment and assumption agreement covering all of the Bank's rights and obligations under this Agreement, the Bank shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 7.7 and 7.8 hereof (collectively, the *"Protective Provisions"*) with respect to facts and circumstances occurring prior to the effective date of such assignment).

(c)     Reserved.

(d)     The Bank may at any time, without the consent of, or notice to, the Authority, sell participations to any Person (other than a natural person or the Authority) (each, a *"Participant"*) in all or a portion of the Bank's rights and/or obligations under this Agreement, *provided* that (i) the Bank's obligations under this Agreement and the Letter of Credit shall remain unchanged; (ii) the Bank shall remain solely responsible to the other parties hereto for performance of such obligations; and (iii) the Authority shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations under this Agreement. Any agreement or instrument pursuant to which the Bank sells such a participation shall provide that the Bank shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement. Subject to subsection (g) of this Section 7.4, the Authority agrees that each Participant shall be entitled to the benefits of Sections 2.13, 2.14, 7.7 and 7.8 hereof to the same extent as if it were a Bank and had acquired its interest by assignment pursuant to subsection (b) or (c) of this Section.

(e)   The Bank may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Bank, including any pledge or assignment to secure obligations to a Federal Reserve Bank, *provided* that no such pledge or assignment shall release the Bank from any of its obligations hereunder or substitute any such pledgee or assignee for such Bank as a party hereto.

(f)   As used herein, the following terms have the following meanings:

(i)   *"Eligible Assignee"* means (A) an Affiliate of the Bank; (B) an Approved Fund; and (C) any other Person (other than a natural person) approved by the Authority, unless an Event of Default has occurred and is continuing (each such approval not to be unreasonably delayed); *provided* that notwithstanding the foregoing, "Eligible Assignee" shall not include the Authority.

(ii)   *"Fund"* means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

(iii)   *"Approved Fund"* means any Fund that is administered or managed by (A) an Affiliate of the Bank; or (B) an entity or an Affiliate of an entity that administers or manages the Bank.

(g)   No Affiliate or Participant or other transferee of the Bank's rights shall be entitled to receive any greater payment in respect of any of the Protective Provisions than the Bank would have been entitled to receive with respect to the rights transferred, unless such transfer is made with the Authority's prior written consent.

Section 7.4.   *Reserved*

Section 7.5.   *Severability*. If any provision of this Agreement shall be held to be invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions, or in all jurisdictions because it conflicts with any provisions of any constitution, statute, rule of public policy, or any other reason, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstances, or of rendering any other provision or provisions of this Agreement invalid, inoperative or unenforceable to any extent whatever.

Section 7.6.   *Amendments, etc*. No amendment or waiver of any provision of this Agreement or any other Related Document, and no consent to any departure by the Authority therefrom, shall be effective unless in writing signed by the Bank, the Arranger and the Authority, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.7.   *Indemnification*. To the maximum extent permitted by applicable law, the Authority agrees to indemnify the Bank and each of their respective employees, officers, directors, agents and Affiliates (each, an *"Indemnified Person"*), and to hold each harmless

from, and none of them shall be liable to the Authority for, any claims, damages, losses, liabilities or reasonable costs or expenses arising as a result of, or in connection with, this Agreement, the Letter of Credit, the other Related Documents or the transactions contemplated hereby and/or thereby (collectively, *"Indemnified Liabilities"*); *provided, however,* that the Authority shall not be required to indemnify an Indemnified Person, and the Authority shall have a claim against any such Indemnified Person, individually, to the extent of direct claims, damages, losses, liabilities or reasonable costs or expenses suffered by the Authority, to the extent any such claims, damages, losses, liabilities or reasonable costs or expenses are determined by a court of competent jurisdiction in a final, non-appealable judgment, to have been caused by the gross negligence or willful misconduct of such Indemnified Person. Payment under this Section 7.7 shall be made within thirty (30) calendar days after the date on which the Bank makes demand therefor.

Section 7.8. *Fees and Expenses.* The Authority shall pay upon receipt of an invoice the expenses of the Bank actually incurred in connection with the preparation, execution and delivery of the Related Documents. The Authority shall pay upon receipt of an invoice the reasonable fees and expenses of special U.S. counsel to the Bank in connection with the preparation, execution and delivery of the Related Documents (in an amount not to exceed $50,000 plus reasonable disbursements), local counsel to the Bank in connection with the preparation, execution and delivery of the Related Documents (in an amount not to exceed $5,000 plus reasonable disbursements) and Canadian counsel to the Bank in connection with the preparation, execution and delivery of the Related Documents (in an amount not to exceed $3,000). The Authority shall also pay within ten (10) days of written request therefor to the Bank in immediately available funds all reasonable fees, costs and expenses of counsel to the Bank in connection with any amendment or waiver of, or consent under, this Agreement, the other Related Documents and any other documents delivered hereunder, whether or not any such amendment, waiver or consent is executed. In addition, the Authority shall pay within ten (10) days of written request therefor to the Bank in immediately available funds all reasonable costs and expenses incurred by the Bank (including reasonable attorneys' fees, costs and expenses) in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement and the other Related Documents and any other documents delivered hereunder, whether or not suit is filed and whether or not an Event of Default exists.

Section 7.9. *Right of Set-Off.* Upon the occurrence of an Event of Default hereunder, the Bank may, at any time and from time to time, without notice to the Authority or any other Person (any such notice being expressly waived), set off and appropriate and apply, against and on account of, any obligations and liabilities of the Authority to the Bank arising under or connected with this Agreement, the Letter of Credit and the other Related Documents, without regard to whether or not the Bank shall have made any demand therefor, and although such obligations and liabilities may be contingent or unmatured, any and all deposits (general or special, including but not limited to indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other indebtedness at any time held or owing by the Bank to or for the credit or the account of the Authority.

*Section 7.10.   Counterparts.* This Agreement may be executed in several counterparts and by facsimile or electronic signature, each of which shall be regarded as an original and all of which shall constitute one and the same document.

*Section 7.11.   Governing Law; Jurisdiction; Venue; Waiver of Jury Trial.* (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(b)   The Authority and the Bank hereby consent to the jurisdiction of the United States District Court for the Southern District of New York for purposes of actions brought in contract arising out of, under and/or pertaining to this Agreement or the Letter of Credit or any document related hereto that are properly filed and served on the Authority and/or the Bank, as the case may be, pursuant to the terms of this Agreement or the Letter of Credit.  To the extent permitted by law, the parties hereto hereby irrevocably waive any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens*, which they may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

(c)   The parties hereto further irrevocably consent, to the extent permitted by law, to the service of process of the aforementioned court in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such parties at their respective address for notices pursuant to Section 7.2 hereof, such service to become effective 30 days after such mailing.

(d)   THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY PARTIES ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER RELATED DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO.  The scope of this waiver is intended to be all encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims.  The Authority and the Bank each acknowledge that this waiver is a material inducement to enter into a business relationship, that each has already relied on the waiver in entering into this Agreement and the other Related Document, and that each will continue to rely on the waiver in their related future dealings.  The Authority and the Bank further warrant and represent that each has reviewed this waiver with its legal counsel, and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER RELATED DOCUMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

*Section 7.12.   Complete Statement of Agreement.* This Agreement, together with the other Related Documents, is the complete and exclusive statement of the terms of the agreement among the parties hereto.

*Section 7.13.    Heading.*   Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

*Section 7.14.    USA Patriot Act.*   The Bank hereby notifies the Authority that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the *"Patriot Act"*), it is required to obtain, verify and record information that identifies the Authority, which information includes the name and address of the Authority and other information that will allow the Bank to identify the Authority in accordance with the Patriot Act, and the Authority hereby agrees to take any action necessary to enable the Bank to comply with the requirements of the Patriot Act.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

Puerto Rico Highway and Transportation Authority

By: _____
    Name: Luis Trinidad
    Title: Executive Director

THE BANK OF NOVA SCOTIA, acting through its Hato Rey Branch

By: _____
    Name:     Paul V. Molinaro
    Title:     Authorized Officer

THE BANK OF NOVA SCOTIA, acting through its New York Agency, as arranger

By: _____
    Name:     William R. Collins
    Title:     Managing Director

S-1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

AUTHORITY OF PUERTO RICO

By:_____
    Name:   _____
    Title:    _____

THE BANK OF NOVA SCOTIA, acting through its
    Hato Rey Branch

By_____
    Name:      Paul V. Molinaro
    Title:       Authorized Officer

THE BANK OF NOVA SCOTIA, acting through its
    New York Agency, as arranger

By:_____
    Name:      William R. Collins
    Title:       Managing Director

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

By:_____
    Name:  _____
    Title:  _____

THE BANK OF NOVA SCOTIA, acting through its Hato Rey Branch

By:_____
    Name:     Paul V. Molinaro
    Title:    Authorized Officer

THE BANK OF NOVA SCOTIA, acting through its New York Agency, as arranger

By:_____
    Name:     William R. Collins
    Title:    Managing Director

S-1

APPENDIX I

IRREVOCABLE TRANSFERABLE LETTER OF CREDIT

May 27, 2008

**U.S. $203,419,179

Letter of Credit No. 13185/S0015

The Bank of New York, as fiscal agent (the *"Fiscal
  Agent"*)
101 Barclay Street, Suite 21W
New York, New York  10286

Attention:  Corporate Trust Administration Division

Ladies and Gentlemen:

The Bank of Nova Scotia, acting through its Hato Rey Branch (the *"Bank"*), hereby establishes in the Fiscal Agent's favor, as Fiscal Agent for the benefit of the holders of the Bonds (as hereinafter defined), the Bank's irrevocable transferable Letter of Credit No. 13185/S0015 for the account of the Puerto Rico Highways and Transportation Authority (the *"Authority"*), whereby the Bank hereby irrevocably authorizes the Fiscal Agent to draw on the Bank from time to time, from and after the date hereof to and including the earliest to occur of the Bank's close of business on:  (i) May 27, 2011 (the *"Stated Expiration Date"*), (ii) the earlier of (A) the date which is five (5) days following the Conversion Date with respect to all of the Bonds, as such date is specified and defined in a certificate delivered to the Bank in the form of Exhibit A hereto (the *"Conversion Date"*) and (B) the date on which the Bank honors a drawing under the Letter of Credit on or after the Conversion Date, (iii) the date which is fifteen (15) days following receipt from the Fiscal Agent of a certificate in the form set forth as Exhibit B hereto, and (iv) the date which is fifteen (15) days following receipt by the Fiscal Agent of a written notice from the Bank in the form of Exhibit K attached hereto specifying the occurrence of an Event of Default under the Reimbursement Agreement dated as of May 1, 2008 (the *"Reimbursement Agreement"*), between the Authority and the Bank, and directing the Fiscal Agent to cause a mandatory tender of the Bonds (the earliest of the foregoing dates referred to herein as the *"Termination Date"*), a maximum aggregate amount not exceeding Two Hundred Three Million Four Hundred Nineteen Thousand One Hundred Seventy-Nine United States Dollars (U.S. $203,419,179 - the *"Original Stated Amount"*) to pay the principal and accrued interest with respect to, or the purchase price of, the Authority's Transportation Revenue Bonds (Series A) (the *"Bonds"*), in accordance with the terms hereof, and of the Original Stated Amount, (a) up to $200,000,000 (the *"Principal Portion"*) may be drawn with respect to payment of the unpaid principal amount of the Bonds, or the portion of the purchase price equal to the principal amount of Bonds, and (b) up to $3,419,179 (the *"Interest Portion"*) may be drawn with respect to payment of up to 52 days' interest actually accrued on the principal amount of the Bonds, or the portion of the purchase price equal to the interest actually accrued on the principal amount of the Bonds (assuming a maximum interest rate of 12% per annum (the *"Cap Interest Rate"*)).  This

credit is available to the Fiscal Agent against presentation of the following documents (the *"Payment Documents"*) presented to the Bank, at the Bank's office at The Bank of Nova Scotia, Hato Rey Branch, Scotiabank Plaza, Business Support Center, 9th Floor, Hato Rey, Puerto Rico 00917, Attention: Victor Andino or Carlos Rodriguez, Telephone: (787) 758-8989 extension 7897, Telecopy: (787) 766-7829 (or such other place as the Bank may from time to time specify):

> A certificate (with all blanks appropriately completed) (i) in the form attached as Exhibit C hereto, to allow the Fiscal Agent to pay accrued interest on the Bonds on an Interest Payment Date pursuant to Section 21(g) of Appendix A of the Resolution (an *"Interest Drawing"*), (ii) in the form attached as Exhibit D hereto, to allow the Fiscal Agent to pay the principal amount of and accrued interest on the Bonds in respect of any redemption of the Bonds pursuant to Section 301 of the Resolution (a *"Redemption Drawing"*), *provided* that in the event the date of redemption coincides with an Interest Payment Date (as defined in the Resolution) the Redemption Drawing shall not include any accrued interest on the Bonds (which interest is payable pursuant to an Interest Drawing), (iii) in the form attached as Exhibit E hereto, to allow the Fiscal Agent to pay the purchase price of Bonds tendered for purchase pursuant to Section 13, 14 or 15 of Appendix A of the Resolution which have not been successfully remarketed or for which the purchase price has not been received by the Fiscal Agent by 11:00 A.M., New York time, on the purchase date (a *"Liquidity Drawing"*), *provided* that in the event the purchase date coincides with an Interest Payment Date, the Liquidity Drawing shall not include any accrued interest on the Bonds (which interest is payable pursuant to an Interest Drawing), or (iv) in the form attached as Exhibit F hereto to pay the principal amount of Bonds maturing on July 1, 2028 (a *"Stated Maturity Drawing"*). Each certificate described above shall state therein that no drawings are being made under this Letter of Credit for Bank Bonds or for Bonds bearing interest at a rate other than a Weekly Mode (as defined in the Reimbursement Agreement) or Bonds owned by or on behalf of the Authority.

Each certificate described above shall state therein that it is given by the Fiscal Agent's duly authorized officer and dated the date such certificate is presented hereunder. No drawings shall be made under this Letter of Credit for Bonds purchased with funds disbursed pursuant to a prior Liquidity Drawing and that are currently registered in the name of the Bank or its designee pursuant to the terms of the Resolution (such Bonds being defined herein as *"Bank Bonds"*).

All drawings shall be made by presentation of each Payment Document at the Bank's office at The Bank of Nova Scotia, Hato Rey Branch, Scotiabank Plaza, Business Support Center, 9th Floor, Hato Rey, Puerto Rico 00917, as aforesaid, or by telecopier (at telecopier

number (787) 766-7829, Attention: Victor Andino or Carlos Rodriguez, without further need of documentation, including the original of this Letter of Credit, it being understood that each Payment Document so submitted is to be the sole operative instrument of drawing. The Fiscal Agent shall use its best efforts to give telephonic notice of a drawing to the Bank at (787) 758-8989 extension 8016 or 7897, on the Business Day preceding the day of such drawing (but such notice shall not be a condition to drawing hereunder and the Fiscal Agent shall have no liability for not doing so).

The Bank agrees to honor and pay the amount of any Interest Drawing, Redemption Drawing, Liquidity Drawing or Stated Maturity Drawing if presented in compliance with all of the terms of this Letter of Credit. If such drawing, other than a Liquidity Drawing, is presented prior to 2:00 P.M., New York time, on a Business Day, payment shall be made to the account number or address designated by the Fiscal Agent of the amount specified, in immediately available funds, by 11:00 A.M., New York time, on the following Business Day. If any such drawing, other than a Liquidity Drawing, is presented at or after 2:00 P.M., New York time, on a Business Day, payment shall be made to the account number or address designated by the Fiscal Agent of the amount specified, in immediately available funds, by 2:30 P.M., New York time, on the following Business Day. If a Liquidity Drawing is presented prior to 11:30 a.m. New York time on a Business Day, payment shall be made to the account number or address designated by the Fiscal Agent of the amount specified, in immediately available funds, by 2:30 p.m., New York time, on the same Business Day. If a Liquidity Drawing is presented at or after 11:30 a.m. New York time, payment shall be made to the account number or address designated by the Fiscal Agent of the amount specified, in immediately available funds, by 11:00 a.m., New York time, on the following Business Day. Payments made hereunder shall be made by wire transfer to the Fiscal Agent or by deposit into the Fiscal Agent's account with the Bank in accordance with the instructions specified by the Fiscal Agent in the drawing certificate relating to a particular drawing hereunder. *"Business Day"* means any day other than a day on which banking institutions in the city in which the principal corporate trust office of the Fiscal Agent or the principal office of the Remarketing Agent (as defined in the Resolution) is located, or in New York, New York, are required or authorized by law or executive order to close, or other than a day on which the New York Stock Exchange is closed.

The Available Amount (as hereinafter defined) of this Letter of Credit will be reduced automatically by the amount of any drawing hereunder; *provided, however,* that the amount of any Interest Drawing hereunder, less the amount of the reduction in the Available Amount of this Letter of Credit attributable to interest as specified in a certificate in the form of Exhibit D or G hereto, shall be automatically reinstated on the fifth calendar day following any Interest Drawing if the Fiscal Agent shall not have received notice from the Bank in the form of Exhibit K prior to such time that the Bank has not been reimbursed for such Interest Drawing or that any Event of Default has occurred under the Reimbursement Agreement and, as a result thereof, the amount of such Interest Drawing shall not be reinstated and the Bank shall direct the Fiscal Agent to cause a mandatory tender of the Bonds pursuant to the Resolution. After payment by the Bank of a Liquidity Drawing, the amount available to be drawn under this Letter of Credit will be automatically reduced by the amount specified in the related Liquidity Drawing certificate. In addition, prior to the Conversion Date, in the event of the remarketing of the Bonds (or portions thereof) previously purchased with the proceeds of a Liquidity Drawing, the amount available to

be drawn hereunder will be automatically reinstated concurrently upon the Fiscal Agent providing a certificate in the form of Exhibit L to the Bank and when and to the extent, but only when and to the extent, that the Bank is reimbursed for any amount drawn hereunder pursuant to such Liquidity Drawing.

Upon receipt by the Bank of a certificate of the Fiscal Agent in the form of Exhibit D or G hereto, the Letter of Credit will automatically and permanently reduce the amount available to be drawn hereunder by the amount specified in such certificate. Such reduction shall be effective as of the next Business Day following the date of delivery of such certificate.

Upon any permanent reduction of the amounts available to be drawn under this Letter of Credit, as provided herein, the Bank may deliver to the Fiscal Agent a substitute Letter of Credit in exchange for this Letter of Credit or an amendment to this Letter of Credit substantially in the form of Exhibit H hereto to reflect any such reduction. If the Bank delivers to the Fiscal Agent such a substitute Letter of Credit, the Fiscal Agent shall simultaneously surrender to the Bank for cancellation the Letter of Credit then in the Fiscal Agent's possession. The *"Available Amount"* shall mean the Original Stated Amount (i) less the amount of all prior reductions pursuant to Interest Drawings, Redemption Drawings, Liquidity Drawings or Stated Maturity Drawings, (ii) less the amount of any reduction thereof pursuant to a reduction certificate in the form of Exhibit D or G hereto to the extent such reduction is not already accounted for by a reduction in the Available Amount pursuant to (i) above, (iii) plus the amount of all reinstatements as above provided.

Prior to the Termination Date, the Bank may extend the Stated Expiration Date from time to time at the request of the Authority by delivering to the Fiscal Agent an amendment to this Letter of Credit in the form of Exhibit J hereto designating the date to which the Stated Expiration Date is being extended. Each such extension of the Stated Expiration Date shall become effective on the Business Day following delivery of such notice to the Fiscal Agent, and thereafter all references in this Letter of Credit to the Stated Expiration Date shall be deemed to be references to the date designated as such in such notice. Any date to which the Stated Expiration Date has been extended as herein provided may be extended in a like manner.

Upon the Termination Date this Letter of Credit shall automatically terminate and be delivered to the Bank for cancellation.

This Letter of Credit is transferable in whole only to the Fiscal Agent's successor as Fiscal Agent. Any such transfer (including any successive transfer) shall be effective upon receipt by the Bank (which receipt shall be subsequently confirmed in writing to the transferor and the transferee by the Bank) of a signed copy of the instrument effecting each such transfer signed by the transferor and by the transferee in the form of Exhibit I hereto (which shall be conclusive evidence of such transfer) and, in such case, the transferee instead of the transferor shall, without the necessity of further action, be entitled to all the benefits of and rights under this Letter of Credit in the transferor's place; *provided* that, in such case, any certificates of the Fiscal Agent to be provided hereunder shall be signed by one who states therein that he is a duly authorized officer or agent of the transferee. Transfer fees shall be payable by the Authority. Notwithstanding the foregoing, this Letter of Credit may not be transferred to any person with

whom U.S. persons are prohibited from doing business under U.S. Foreign Assets Control Regulations or other applicable U.S. laws and regulations.

Communications with respect to this Letter of Credit shall be addressed to the Bank at Scotiabank Plaza, Business Support Centre, 9th Floor, 273 Ponce de León Avenue, Hato Rey, Puerto Rico  00917, Attention: Victor Andino or Carlos Rodriguez, specifically referring to the number of this Letter of Credit.

To the extent not inconsistent with the express terms hereof, this Letter of Credit shall be governed by, and construed in accordance with, the terms of the Uniform Customs and Practice for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600 (the *"Uniform Customs"*), except for Article 32 and the first sentence of Article 38(d) thereof.  As to matters not governed by the Uniform Customs, this Letter of Credit shall be governed by and construed in accordance with the laws of the State of New York, including without limitation the Uniform Commercial Code as in effect in the State of New York.

All payments made by the Bank hereunder shall be made from the Bank's funds by the Bank and not with the funds of any other person.

This Letter of Credit sets forth in full the terms of the Bank's undertaking, and such undertaking shall not in any way be modified or amended by reference to any other document whatsoever.

THE BANK OF NOVA SCOTIA, acting through its Hato Rey Branch

By:_____

    Name:      Paul V. Molinaro

    Title:       Authorized Officer

EXHIBIT A
TO
THE BANK OF NOVA SCOTIA,
HATO REY BRANCH
LETTER OF CREDIT

NO. 13185/S0015

NOTICE OF CONVERSION DATE

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

Ladies and Gentlemen:

  The undersigned individual, a duly authorized representative of The Bank of New York (the *"Beneficiary"*), hereby CERTIFIES on behalf of the Beneficiary as follows with respect to (i) that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, in favor of the Beneficiary; (ii) those certain Bonds (as defined in the Letter of Credit); and (iii) that certain Resolution (as defined in the Letter of Credit):

  The undersigned hereby certifies and confirms that on **[insert date]**, the interest rate on the Bonds will be converted to a Non-Covered Interest Rate (such term is defined in the Resolution) (the *"Conversion Date"*), and, accordingly, said Letter of Credit shall terminate five (5) days after such Conversion Date in accordance with its terms.

  All defined terms used herein which are not otherwise defined herein shall have the same meaning as in the Letter of Credit.

       THE BANK OF NEW YORK, as Fiscal Agent


       By _____
           Authorized Signatory

EXHIBIT B
TO
THE BANK OF NOVA SCOTIA,
HATO REY BRANCH
LETTER OF CREDIT

No. 13185/S0015

NOTICE OF TERMINATION

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

Ladies and Gentlemen:

The undersigned individual, a duly authorized representative of The Bank of New York (the *"Beneficiary"*), hereby CERTIFIES on behalf of the Beneficiary as follows with respect to (i) that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, in favor of the Beneficiary; (ii) those certain Bonds (as defined in the Letter of Credit); and (iii) that certain Resolution (as defined in the Letter of Credit):

The undersigned hereby certifies and confirms that (i) no Bonds remain Outstanding within the meaning of the Resolution, (ii) all drawings required to be made under the Resolution and available under the Letter of Credit have been made and honored, or (iii) an Alternate Liquidity Facility has been issued to replace the Letter of Credit pursuant to the Resolution, and, accordingly, the Letter of Credit shall be terminated in accordance with its terms.

All defined terms used herein which are not otherwise defined shall have the same meaning as in the Letter of Credit.

THE BANK OF NEW YORK, as Fiscal Agent

By _____
Authorized Signatory

By Telecopy
**EXHIBIT C**
**TO**
**THE BANK OF NOVA SCOTIA,**
**HATO REY BRANCH**
**LETTER OF CREDIT**

**No. 13185/S0015**

**INTEREST DRAWING CERTIFICATE**

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

The undersigned individual, a duly authorized representative of The Bank of New York (the *"Beneficiary"*), hereby CERTIFIES on behalf of the Beneficiary as follows with respect to (i) that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, in favor of the Beneficiary; (ii) those certain Bonds (as defined in the Letter of Credit); and (iii) that certain Resolution (as defined in the Letter of Credit):

1.    The Beneficiary is the Fiscal Agent under the Resolution.

2.    The Beneficiary is entitled to make this drawing under the Interest Portion of the Letter of Credit in the amount of $_____ pursuant to the Resolution with respect to the payment of interest due on all Bonds Outstanding on the Interest Payment Date (as defined in the Letter of Credit) occurring on [insert applicable date], other than Bank Bonds (as defined in the Letter of Credit) and Bonds bearing interest at a Non-Covered Interest Rate.

3.    The amount of the drawing is equal to the amount required to be drawn by the Fiscal Agent pursuant to Section 21(g) of Appendix A of the Resolution.

4.    The amount of the drawing specified in paragraph 2 of this Certificate does not exceed the amount available on the date hereof to be drawn under the Interest Portion of the Letter of Credit in respect of the payment of interest accrued and unpaid on the principal amount of the Bonds through the above-referenced Interest Payment Date.

5.    The amount of the drawing made by this Certificate was computed in compliance with the terms of the Resolution and, when added to the amount of any other drawing under the Letter of Credit made simultaneously herewith, does not exceed the Available Amount of the Letter of Credit.

6.     Payment by the Bank pursuant to this drawing shall be made to _____, ABA  Number  _____,  Account  Number  _____,  Attention: _____, Re: _____.

7.     No drawings are being made for Bank Bonds or for Bonds bearing interest at a rate other than a Weekly Mode or Bonds owned by or on behalf of the Authority.

IN WITNESS WHEREOF, this Certificate has been executed this \_\_\_\_ day of _____, \_\_\_\_.

THE BANK OF NEW YORK, as Fiscal Agent


By _____
                Authorized Signatory

By Telecopy
**EXHIBIT D**
**TO**
**THE BANK OF NOVA SCOTIA,**
**HATO REY BRANCH**
**LETTER OF CREDIT**


No. 13185/S0015

**REDEMPTION DRAWING AND REDUCTION CERTIFICATE**

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

The undersigned individual, a duly authorized representative of The Bank of New York (the *"Beneficiary"*), hereby CERTIFIES on behalf of the Beneficiary as follows with respect to (i) that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, in favor of the Beneficiary; (ii) those certain Bonds (as defined in the Letter of Credit); and (iii) that certain Resolution (as defined in the Letter of Credit):

1.    The Beneficiary is the Fiscal Agent under the Resolution.

2.    The Beneficiary is entitled to make this drawing in the amount of $_____ under the Letter of Credit pursuant to Section 301 of the Resolution.

3.    (a) The amount of this drawing is equal to (i) the principal amount of Bonds to be redeemed pursuant to Section 301 of the Resolution on [insert applicable date] (the *"Redemption Date"*) other than Bank Bonds (as defined in the Letter of Credit), plus (ii) interest on such Bonds accrued from the immediately preceding Interest Payment Date (as defined in the Letter of Credit) to the Prepayment Date, *provided* that in the event the Redemption Date coincides with an Interest Payment Date this drawing does not include any accrued interest on such Bonds.

(b)    Of the amount stated in paragraph 2 above:

(i)    $_____ is drawn under the Principal Portion of the Letter of Credit in respect of payment of the principal amount of the Bonds referred to in subparagraph (a) above; and

(ii)    $_____ is drawn under the Interest Portion of the Letter of Credit in respect of payment of accrued interest on the principal amount of such Bonds.

4. Payment by the Bank pursuant to this drawing shall be made to _____, ABA Number _____, Account Number _____, Attention: _____, Re: _____.

5. The amount of the drawing made by this Certificate was computed in compliance with the terms and conditions of the Resolution and, when added to the amount of any other drawing under the Letter of Credit made simultaneously herewith, does not exceed the Available Amount of the Letter of Credit.

6. Upon payment of the amount drawn under the Principal Portion of the Letter of Credit, the Bank is hereby directed to permanently reduce the Principal Portion of the Letter of Credit by $[insert amount of reduction] and the Principal Portion of the Letter of Credit shall thereupon equal $[insert new Principal Portion].

7. Upon payment of the amount drawn under the Interest Portion of the Letter of Credit, the Bank is hereby directed to permanently reduce the Interest Portion of the Letter of Credit by $[insert amount of reduction] (calculated as 52 days of interest on the amount of the reduction of the Principal Portion as provided above at the Cap Interest Rate) and the Interest Portion of the Letter of Credit shall thereupon equal $[insert new Interest Portion].

8. The amount of the reduction in the Available Amount of the Letter of Credit has been computed in accordance with the provisions of the Letter of Credit.

9. Following the reduction, the Available Amount of the Letter of Credit shall be at least equal to the aggregate principal amount of the Bonds outstanding (to the extent such Bonds are not Bank Bonds and Bonds bearing interest at a Non-Covered Interest Rate) plus 52 days' interest thereon at the Cap Interest Rate.

10. No drawings are being made for Bank Bonds or for Bonds bearing interest at a rate other than a Weekly Mode or Bonds owned by or on behalf of the Authority.

IN WITNESS WHEREOF, this Certificate has been executed this _____ day of _____, ____.

THE BANK OF NEW YORK, as Fiscal Agent

By _____
                    Authorized Signatory

By Telecopy
**EXHIBIT E**
**TO**
**THE BANK OF NOVA SCOTIA,**
**HATO REY BRANCH**
**LETTER OF CREDIT**

**No. 13185/S0015**

**LIQUIDITY DRAWING CERTIFICATE**

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

The undersigned individual, a duly authorized representative of The Bank of New York (the *"Beneficiary"*), hereby CERTIFIES on behalf of the Beneficiary as follows with respect to (i) that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, in favor of the Beneficiary; (ii) those certain Bonds (as defined in the Letter of Credit); and (iii) that certain Resolution (as defined in the Letter of Credit):

1.     The Beneficiary is the Fiscal Agent under the Resolution.

2.     The Beneficiary is entitled to make this drawing under the Letter of Credit in the amount of $_____ with respect to the payment of the purchase price of Bonds tendered for purchase in accordance with Section [13] [14] [15]* of Appendix A of the Resolution and to be purchased on [insert applicable date] (the *"Purchase Date"*) which Bonds have not been remarketed as provided in the Resolution or the purchase price of which has not been received by the Fiscal Agent by 11:00 A.M., New York time, on said Purchase Date.

3.     (a) The amount of the drawing is equal to (i) the principal amount of Bonds to be purchased pursuant to the Resolution on the Purchase Date other than Bank Bonds (as defined in the Letter of Credit) and Bonds bearing interest at a Non-Covered Interest Rate, plus (ii) interest on such Bonds accrued from the immediately preceding Interest Payment Date (as defined in the Letter of Credit) (or if none, the date of issuance of the Bonds) to the Purchase Date, *provided* that in the event the Purchase Date coincides with an Interest Payment Date this drawing does not include any accrued interest on such Bonds.

---

* Insert appropriate subsection

(b)    Of the amount stated in paragraph (2) above:

(i)    $_____ is drawn under the Principal Portion of the Letter of Credit in respect of the principal portion of the purchase price of the Bonds referred to in subparagraph (2) above; and

(ii)    $_____ is drawn under the Interest Portion of the Letter of Credit in respect of payment of the interest portion of the purchase price of such Bonds.

4.    The amount of the drawing made by this Certificate was computed in compliance with the terms and conditions of the Resolution and, when added to the amount of any other drawing under the Letter of Credit made simultaneously herewith, does not exceed the Available Amount of the Letter of Credit.

5.    The Beneficiary will register or cause to be registered in the name of the Bank or its nominee, upon payment of the amount drawn hereunder, Bonds in the principal amount of the Bonds being purchased with the amounts drawn hereunder and will deliver such Bonds to or upon the order of the Bank in accordance with the Resolution.

6.    Payment by the Bank pursuant to this drawing shall be made to _____, ABA Number _____, Account Number _____, Attention: _____, Re: _____.

7.    No drawings are being made for Bank Bonds or for Bonds bearing interest at a rate other than a Weekly Mode or Bonds owned by or on behalf of the Authority.

IN WITNESS WHEREOF, this Certificate has been executed this _____ day of _____, _____.

THE BANK OF NEW YORK, as Fiscal Agent

By _____
Authorized Signatory

By Telecopy
**EXHIBIT F**
**TO**
**THE BANK OF NOVA SCOTIA,**
**HATO REY BRANCH**
**LETTER OF CREDIT**

**No. 13185/S0015**

**STATED MATURITY DRAWING CERTIFICATE**

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

The undersigned individual, a duly authorized representative of The Bank of New York (the *"Beneficiary"*), hereby CERTIFIES on behalf of the Beneficiary as follows with respect to (i) that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, in favor of the Beneficiary; (ii) those certain Bonds (as defined in the Letter of Credit); and (iii) that certain Resolution (as defined in the Letter of Credit):

1.    The Beneficiary is the Fiscal Agent under the Resolution.

2.    The Beneficiary is entitled to make this drawing in the amount of $_____ under the Letter of Credit pursuant to Section 21(g) of Appendix A of the Resolution.

3.    The amount of this drawing is equal to the principal amount of Bonds outstanding on July 1, 2028, the maturity date thereof as specified in Section 3(b) of the Resolution, other than Bank Bonds (as defined in the Letter of Credit).

4.    The amount of this drawing made by this Certificate was computed in compliance with the terms and conditions of the Resolution and, when added to the amount of any other drawing under the Letter of Credit made simultaneously herewith, does not exceed the Available Amount of the Letter of Credit.

5.    Payment by the Bank pursuant to this drawing shall be made to _____, ABA Number _____, Account Number _____, Attention: _____, Re: _____.

6.    No drawings are being made for Bank Bonds or for Bonds bearing interest at a rate other than a Weekly Mode or Bonds owned by or on behalf of the Authority.

IN WITNESS WHEREOF, this Certificate has been executed this _____ day of
_____, _____.

THE BANK OF NEW YORK, as Fiscal Agent


By _____
                   Authorized Signatory

EXHIBIT G
TO
THE BANK OF NOVA SCOTIA,
HATO REY BRANCH
LETTER OF CREDIT

No. 13185/S0015

### REDUCTION CERTIFICATE

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

      The undersigned individual, a duly authorized representative of The Bank of New York (the *"Beneficiary"*), hereby CERTIFIES on behalf of the Beneficiary as follows with respect to (i) that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), issued by The Bank of Nova Scotia, acting through its Hato Rey Branch, in favor of the Beneficiary; (ii) those certain Bonds (as defined in the Letter of Credit); and (iii) that certain Resolution (as defined in the Letter of Credit):

    1.    The Beneficiary is the Fiscal Agent under the Resolution.

    2.    Upon receipt by the Bank of this Certificate, the Principal Portion (as defined in the Letter of Credit) of the Letter of Credit shall be reduced by $_____ and the Principal Portion of the Letter of Credit shall thereupon equal $_____.

    3.    Upon receipt by the Bank of this Certificate, the Interest Portion (as defined in the Letter of Credit) of the Letter of Credit shall be reduced by $_____ and the Interest Portion of the Letter of Credit shall thereupon equal $_____.

    4.    The amount of the reduction in the Available Amount of the Letter of Credit has been computed in accordance with the provisions of the Letter of Credit.

    5.    Following the reduction, the Available Amount of the Letter of Credit shall be at least equal to the aggregate principal amount of the Bonds outstanding (to the extent such Bonds are not Bank Bonds, as defined in the Letter of Credit or Bonds bearing interest at a Non-Covered Interest Rate) plus 52 days' interest thereon at the Cap Interest Rate (as defined in the Letter of Credit).

IN WITNESS WHEREOF, this Certificate has been executed this _____ day of
_____, ____.

THE BANK OF NEW YORK, as Fiscal Agent


By _____
        Authorized Signatory

**EXHIBIT H**
**TO**
**THE BANK OF NOVA SCOTIA,**
**HATO REY BRANCH**
**LETTER OF CREDIT**

**No. 13185/S0015**

**NOTICE OF AMENDMENT**

The Bank of New York
101 Barclay Street, Suite 21W
New York, New York

Attention: Corporate Trust Administration Division

Ladies and Gentlemen:

Reference is hereby made to that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), established by the Bank in the Fiscal Agent's favor as Beneficiary. The Bank hereby notifies the Fiscal Agent that, in accordance with the terms of the Letter of Credit and that certain Reimbursement Agreement, dated as of May 1, 2008, between Authority of Puerto Rico and the Bank, the Available Amount of the Letter of Credit has been reduced to $_____.

This letter should be attached to the Letter of Credit and made a part thereof.

THE BANK OF NOVA SCOTIA, acting through its
Hato Rey Branch

By _____
Its _____

Page 19 of 26 Pages

**EXHIBIT I**
**TO**
**THE BANK OF NOVA SCOTIA,**
**HATO REY BRANCH**
**LETTER OF CREDIT**

**No. 13185/S0015**

**TRANSFER CERTIFICATE**

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

Ladies and Gentlemen:

Reference is made to that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), which has been established by the Bank in favor of The Bank of New York.

The undersigned, a duly authorized officer or agent of [Name of Transferor], has transferred and assigned (and hereby confirms to the Fiscal Agent said transfer and assignment) all of its rights in and under said Letter of Credit to [Name of Transferee] and confirms that [Name of Transferor] no longer has any rights under or interest in said Letter of Credit.

Transferor and Transferee have indicated on the face of said Letter of Credit that it has been transferred and assigned to Transferee.

The undersigned, a duly authorized officer or agent of the Transferee, hereby certifies that the Transferee is a duly authorized Transferee under the terms of said Letter of Credit and is accordingly entitled, upon presentation of the documents called for therein, to receive payment thereunder.

<div style="text-align:right">

_____
Name of Transferor


By _____
    [Name and Title of Authorized
    Officer of Transferor]


_____
Name of Transferee


By _____
    [Name and Title of Authorized
    Officer of Transferee]

</div>

EXHIBIT J
TO
THE BANK OF NOVA SCOTIA,
HATO REY BRANCH
LETTER OF CREDIT

No. 13185/S0015

NOTICE OF EXTENSION

The Bank of New York
101 Barclay Street, Suite 21W
New York, New York 10286

Attention: Corporate Trust Administration Division

Ladies and Gentlemen:

Reference is hereby made to that certain Irrevocable Transferable Letter of Credit No. 13185/S0015, dated May 27, 2008 (the *"Letter of Credit"*), established by us in your favor as Beneficiary. We hereby notify you that, in accordance with the terms of the Letter of Credit and that certain Reimbursement Agreement, dated as of May 1, 2008, between Puerto Rico Highways and Transportation Authority and us, the Stated Expiration Date of the Letter of Credit has been extended to _____, _____.

This letter should be attached to the Letter of Credit and made a part thereof.

THE BANK OF NOVA SCOTIA, acting through its
Hato Rey Branch

By _____

Its _____

**EXHIBIT K**
**TO**
**THE BANK OF NOVA SCOTIA,**
**HATO REY BRANCH**
**LETTER OF CREDIT**

**No. 13185/S0015**

**NOTICE OF MANDATORY TENDER**

[Date]

The Bank of New York
101 Barclay Street, Suite 21W
New York, New York  10286

Attention: Corporate Trust Administration Division

Ladies and Gentlemen:

The undersigned, a duly authorized officer of The Bank of Nova Scotia, acting through Hato Rey Branch (the *"Bank"*), hereby advises you, with reference to Irrevocable Transferable Letter of Credit No. 13185/S0015 (the *"Letter of Credit"*; any capitalized term used herein and not defined shall have its respective meaning as set forth in the Letter of Credit) issued by the Bank in your favor, that:

**[Insert one of the following paragraphs as appropriate]**

**[an *"Event of Default"* has occurred under Section 6.1 of the Reimbursement Agreement dated as of May 1, 2008, between the Bank and Puerto Rico Highways and Transportation Authority and the Bank has elected to direct the Fiscal Agent to cause a mandatory tender of the Bonds, whereby the Letter of Credit will terminate fifteen (15) days following the receipt by the Fiscal Agent of this Notice of Mandatory Tender.]**

**[the Bank has not been reimbursed for an Interest Drawing under the Letter of Credit or any *"Event of Default"* has occurred under Section 6.1 of the Reimbursement Agreement dated as of May 1, 2008, between the Bank and Puerto Rico Highways and Transportation Authority and, as a result thereof, the amount of such Interest Drawing will not be reinstated and the Bank has elected to direct the Fiscal Agent to cause a mandatory tender of the Bonds.]**

IN WITNESS WHEREOF, the undersigned, on behalf of the Bank, has executed and delivered this Notice of Mandatory Tender as of the __ day of _____, 20__.

THE BANK OF NOVA SCOTIA, acting through its
Hato Rey Branch

By _____
Its _____

EXHIBIT L
TO
THE BANK OF NOVA SCOTIA,
HATO REY BRANCH
LETTER OF CREDIT

No. 13185/S0015

NOTICE OF REMARKETING

The Bank of New York, as tender agent and registrar
   (referred to herein in both capacities as the *"Fiscal
   Agent"*)
101 Barclay Street, Suite 21W
New York, New York 10286

Attention: Corporate Trust Administration Division

Ladies and Gentlemen:

      The undersigned, a duly authorized officer of _____ [insert name of Fiscal Agent] (the *"Fiscal Agent"*), hereby notifies The Bank of Nova Scotia, acting through its Hato Rey Branch (the *"Bank"*), with reference to Letter of Credit No. 13185/S0015 (the *"Letter of Credit"*; terms defined therein and not otherwise defined herein shall have the meanings set forth in the Letter of Credit) issued by the Bank in favor of the Fiscal Agent as follows:

      1.  _____ is the Remarketing Agent under the Resolution for the holders of the Bonds.

      2.  The Fiscal Agent has been advised by the Authority or the Remarketing Agent that the amount of $_____ paid to the Bank today by the Authority or the Remarketing Agent on behalf of the Authority is a payment made to reimburse the Bank, pursuant to the Reimbursement Agreement, for amounts drawn under the Letter of Credit pursuant to a Liquidity Drawing.

      3.  Of the amount referred to in paragraph 2, $_____ represents the aggregate principal amount of Bank Bonds resold or to be resold on behalf of the Authority.

      4.  Of the amount referred to in paragraph 2, $_____ represents accrued and unpaid interest on such Bank Bonds.

IN WITNESS WHEREOF, the Fiscal Agent has executed and delivered this Certificate as of this _____ day of _____, _____.

THE BANK OF NEW YORK, as Fiscal Agent

By _____

Authorized Signatory

## APPENDIX II

### AUTHORIZED REPRESENTATIVE CERTIFICATE

The Bank of Nova Scotia, Hato Rey Branch
Scotiabank Plaza, Business Support Centre, 9th Floor
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico  00917
Attention:  Victor Andino or Carlos Rodriguez

     Re:       Puerto Rico Highways and Transportation Authority
                 Transportation Revenue Bonds (Series A)

Ladies and Gentlemen:

     Reference is made to that certain Reimbursement Agreement, dated as of May 1, 2008 (the *"Reimbursement Agreement"*), by and between Puerto Rico Highways and Transportation Authority (the *"Authority"*) and The Bank of Nova Scotia, acting through its Hato Rey Branch (the *"Bank"*).  All capitalized terms used herein shall have the same meaning herein as such terms are defined in the Reimbursement Agreement.  Listed below are the names, titles and genuine signatures of the representatives of the Authority authorized to give any and all notices to the Bank under the Reimbursement Agreement:

| TITLE | NAME | SIGNATURE |
|-------|------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

     The Bank shall be entitled to conclusively presume that the persons listed above continue to be authorized to act on behalf of the Authority until otherwise notified in writing by an officer of the Authority.

Dated as of May 27, 2008.

<div style="margin-left:45%">

PUERTO RICO HIGHWAYS AND TRANSPORTATION
   AUTHORITY


By _____
   Name _____
   Title _____

</div>

## FIRST AMENDMENT TO REIMBURSEMENT AGREEMENT

This FIRST AMENDMENT TO REIMBURSEMENT AGREEMENT (this *"Amendment"*) dated April 18, 2011 (the *"Effective Date"*), is between PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY (the *"Authority"*), THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS HATO REY BRANCH, as the Bank (the *"Bank"*) and THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS NEW YORK AGENCY, as Arranger (the *"Arranger"*). All terms used herein and not defined herein shall have the meanings assigned to such terms in the hereinafter defined Agreement.

### WITNESSETH

WHEREAS, the Authority, the Bank and the Arranger have previously entered into that certain Reimbursement Agreement dated as of May 1, 2008 (the *"Agreement"*), relating to the Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds (Series A);

WHEREAS, pursuant to Section 7.6 of the Agreement, the Agreement may be amended by a written amendment thereto, signed by the Authority, the Bank and the Arranger;

WHEREAS, the parties hereto wish to amend the Agreement;

NOW THEREFORE, in consideration of the premises, the parties hereto hereby agree as follows:



1.    AMENDMENTS.

Upon satisfaction of the conditions precedent set forth in Section 2 hereof, the Agreement shall be amended as follows:

1.01.    The definitions of the terms *"Alternative Base Rate," "Bank Rate," "Letter of Credit Fee," "Letter of Credit Fee Rate,"* and *"Related Documents"* set forth in Article One of the Agreement are hereby amended in their entireties and as so amended shall be restated to read as follows:

*"Alternative Base Rate"* means, for any day, the highest of (i) the Scotiabank Base Rate, (ii) the Federal Funds Rate plus 2.0%, (iii) the LIBOR Index Rate plus 2.0% and (iv) 8.0%.

*"Amortization Start Date"* has the meaning set forth in Section 2.3 hereof.

*"Bank Rate"* means, with respect to any Liquidity Advance, a rate per annum equal to (i) for the period from and including the date such Liquidity Advance was honored by the Bank to but not including the earlier to occur of (x) the Amortization Commencement Date and (y) the date which is thirty-one (31) calendar days immediately succeeding the date such Liquidity Advance was honored by the Bank, the Alternative

Base Rate from time to time in effect plus 1.0%, (ii) for the period from and including the date which is thirty-one (31) days immediately succeeding the date such Liquidity Advance was honored by the Bank to but not including the earlier to occur of (x) the Amortization Commencement Date and (y) the date which is one hundred eighty-one (181) days immediately succeeding the date such Liquidity Advance was honored by the Bank, the sum of the Alternative Base Rate from time to time in effect plus 2.00%, and (iii) from and after the Amortization Commencement Date, 9.0% per annum; *provided* that from and after the occurrence of an Event of Default (and without any notice given with respect thereto), and during the continuance of such Event of Default, *"Bank Rate"* shall mean the Default Rate.

*"Letter of Credit Fee"* has the meaning set forth in the Fee Letter.

*"Letter of Credit Fee Rate"* has the meaning set forth in the Fee Letter.

*"Obligations"* means the Reimbursement Obligations (which includes obligations of the Authority to repay all Liquidity Advances and all unreimbursed Drawings), the obligations of the Authority to pay all fees and other expenses specified in this Agreement and the Fee Letter and all other obligations of the Authority to the Bank arising under or in relation to this Agreement, the Fee Letter or any other Related Document, including in each instance all interest accrued thereon.

*"Related Documents"* means this Agreement, the Fee Letter, the Letter of Credit, the Bond Documents, and any other agreement or instrument relating thereto.



1.02.    Article I of the Agreement is hereby amended by the addition of the new defined terms *"Change of Law," "Debt Service Coverage Percentage," "Dodd-Frank Act," "Fee Letter," "LIBOR Index Rate," "Lien," "Long-Term Lease Arrangement," "Material Adverse Effect," "Property," "Reduction Fee," "Termination Fee," "2010 Audited Financial Statements," "1968 Resolution"* and *"1968 Resolution Revenues"* to be inserted in its appropriate place in the alphabetical sequence:

*"Change of Law"* means the adoption or implementation, after the Effective Date, of, or any change, after the Effective Date, in, any law, rule, treaty or regulation, or any policy, guideline or directive of, or any change, after the Effective Date, in the interpretation or administration thereof by any court, central bank or other administrative or Governmental Authority (in each case whether or not having the force of law), or compliance by the Bank with any request or directive of any such court, central bank or other administrative or Governmental Authority (whether or not having the force of law) or the occurrence of the effective date of any of the foregoing if adopted prior to the Effective Date or any change after the Effective Date in the application, interpretation or enforcement of any of the foregoing.

*"Debt Service Coverage Percentage"* means, for any period, the percentage derived by dividing (A) the sum of Revenues and the 1968 Resolution Revenues during the subject period by (B) the amount of the maximum Principal and Interest

Requirements (as defined in the Resolution) on account of all senior bonds theretofore issued and proposed to be issued under the Resolution during the subject period (including, in the case of a proposed Long-Term Lease Arrangement, any bonds proposed to be issued as a result of such Long-Term Lease Arrangement).  The Debt Service Coverage Percentage shall be calculated using the assumptions set forth in Section 5.26(b)(iii) hereof.

*"Dodd-Frank Act"* means the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as enacted by the United States Congress, and signed into law on July 21, 2010, and all statutes, rules, guidelines or directives promulgated thereunder.

*"Fee Letter"* means that certain Fee Letter Agreement dated April 18, 2011, between the Authority and the Bank, as the same may be amended and supplemented from time to time and any agreement entered into in substitution thereof.

*"LIBOR Index Rate"* means, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/1000 of 1%) for deposits in Dollars for a period equal to three months, which appears on the Reuters Page LIBOR01 Page as of 11:00 a.m. (London, England time) on such date (or, if such day is not a Business Day, on the immediately preceding Business Day).

*"Lien"* means, with respect to any Property, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.



*"Long-Term Lease Arrangement"* has the meaning set forth in Section 5.26(b) hereof.

*"Material Adverse Effect"* means, as to the Authority, any material adverse change in or effect on (i) the business, operations, assets, liabilities, condition (financial or otherwise) or results of operations of the Authority, (ii) the ability of the Authority to consummate the transactions contemplated by this Agreement, the Fee Letter or any of the other Related Documents, or (iii) the ability of Authority to perform any of its obligations under this Agreement, the Fee Letter or any of the other Related Documents.

*"Property"* means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, whether now owned or hereafter acquired.

*"Reduction Fee"* has the meaning set forth in the Fee Letter.

*"Termination Fee"* has the meaning set forth in the Fee Letter.

*"1968 Resolution"* has the meaning set forth in the Resolution.

*"1968 Resolution Revenues"* means, until the outstanding 1968 Resolution Bonds (as defined in the Resolution) have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount deposited to

the credit of the Revenue Fund (as defined in the Resolution) in accordance with the third sentence of the second paragraph of Section 401 of the Resolution.

"*2010 Audited Financial Statements*" has the meaning set forth in Section 5.27 hereof.

1.03.    Section 2.3 of the Agreement is hereby amended in its entirety and as so amended shall be restated as follows:

*Section 2.3.    Reimbursement of Liquidity Drawings Creating Liquidity Advances under the Letter of Credit; Mandatory Prepayment; Interest.*    (a) If the conditions precedent contained in Section 3.2 hereof are satisfied at the time of payment by the Bank of any Liquidity Drawing, such Liquidity Drawing shall constitute an advance (*"Liquidity Advance"*) to the Authority.  The Authority hereby promises to pay to the Bank each Liquidity Advance on the earliest to occur of (i) the date on which any Bonds purchased with funds disbursed under the Letter of Credit in connection with such Liquidity Drawing are redeemed, prepaid or cancelled pursuant to the Resolution, (ii) the date on which any Bonds purchased with funds disbursed under the Letter of Credit are remarketed pursuant to the Resolution, (iii) the date on which the Letter of Credit is replaced by an Alternate Liquidity Facility pursuant to the terms of the Resolution, (iv) the date on which the interest rate on all of the Bonds has been converted to a Non-Covered Interest Rate and (v) subject to the term out provisions set forth below, the earlier to occur of (A) the 90th calendar day immediately succeeding the date such  Liquidity Advance was made and (B) the Stated Expiration Date (each such date referred to herein as an "*Amortization Start Date*").  Subject to Section 2.12 hereof, the Authority hereby also promises to pay to the Bank interest on the unpaid principal amount of each Liquidity Advance from the date such Liquidity Advance is made until it is paid in full as provided herein, at a rate per annum equal to the Bank Rate from time to time in effect, payable in arrears on the first Business Day of each calendar month and on the date that the final principal installment of such Liquidity Advance is payable as herein provided.  Unless otherwise paid in full on any of the dates provided above and so long as the conditions precedent contained in Section 3.2 hereof are satisfied on the related Amortization Start Date, each Liquidity Advance shall be payable by the Authority in quarterly installments (*"Quarterly Principal Payments"*) commencing on the one hundred eightieth (180th) day immediately succeeding the date the related Liquidity Advance was made and on each three month anniversary of such date to occur thereafter, with the final installment in an amount equal to the entire then outstanding principal amount of such Liquidity Advance due and payable on the fifth (5th) anniversary of the date the related Liquidity Advance was made (the "*Amortization End Date*") (the period commencing on an Amortization Start Date and ending on the related Amortization End Date is herein referred to as the "*Amortization Period*").  Each Quarterly Principal Payment shall be in an amount of principal which will result in equal (or nearly equal) aggregate Quarterly Principal Payments over the applicable Amortization Period; *provided, however,* that the outstanding principal amount of any such Liquidity Advance shall be payable in full on the Amortization End Date.

1.04.    Section 2.5 of the Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

> *Section 2.5.     Fees.*  The Authority hereby agrees to pay, or cause to be paid, to the Bank a non-refundable Letter of Credit Fee at the times and in the amounts set forth in the Fee Letter.  The Authority shall also pay to the Bank all other amounts set forth in the Fee Letter at the times and in the amounts set forth therein.  The terms of the Fee Letter are hereby incorporated herein by reference as if fully set forth herein.

1.05.    Section 2.6 of the Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

> *Section 2.6.     Manner and Place of Payments; Interest Calculation.*  (a) Unless otherwise specified herein, all payments by the Authority under this Agreement and the Fee Letter shall be effective only if made to the Bank in lawful money of the United States and in immediately available funds by wire transfer to its Payment Account.



> (b)     Unless otherwise specified herein, all payments by or on behalf of the Authority hereunder and under the Fee Letter shall be made to the Bank not later than 3:00 p.m. on the applicable due date to its Payment Account.  If any payment hereunder or under the Fee Letter becomes due and payable on a day other than a Business Day, the due date for such payment shall be extended, without penalty, to the next succeeding Business Day, and such extended time shall be included in the computation of interest and fees.  If the date for the payment of principal is extended by operation of law or otherwise, interest and fees thereon shall be payable for such extended time.  Unless otherwise provided herein, all payments hereunder and under the Fee Letter not received by 3:00 p.m. on the date due shall bear interest for each day from the due date until payment in full at the Default Rate.

> (c)     All computations of interest shall be made on the basis of a year of 365 days and actual days elapsed and all computation of fees and other amounts due hereunder and under the Fee Letter shall be made on the basis of a year of 360 days and actual days elapsed.  Whenever a payment is due to the Bank under this Agreement or the Fee Letter, the Authority shall be deemed to have made such payment at the time such payment is received by the Bank; *provided, however,* that any payment made by the Authority to the Bank after the time specified in clause (b) above shall be deemed to have been made on the following Business Day.

> (d)     All payments to the Bank under this Agreement and the Fee Letter shall be made in Dollars and in immediately available funds at the place of payment without counterclaim, defense, set-off, condition or qualification.

1.06.    Section 2.7 of the Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

Section 2.7.    *Substitute Letter of Credit.*  Notwithstanding any provisions of the Resolution to the contrary, the Authority agrees not to replace or terminate the Letter of Credit or reduce the Original Stated Amount of the Letter of Credit except in accordance with Section 1.3 of the Fee Letter.  In connection with any termination or replacement of the Letter of Credit pursuant to this Section 2.7, the Authority shall (x) pay to the Bank, all Obligations due and owing hereunder on the date of termination or replacement of the Letter of Credit and (y) provide the Bank with thirty (30) days prior written notice of its intent to terminate the Letter of Credit; *provided* that all payments to the Bank in connection with the termination of the Letter of Credit or the reduction of the Original Stated Amount of the Letter of Credit shall be made in immediately available funds and such termination or replacement of the Letter of Credit shall be in compliance with the terms and conditions of the Resolution.

1.07.    Section 2.13 of the Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

Section 2.13.    *Increased Cost.*    (a) If the Bank or any of its Affiliate or any Participant shall have determined that a Change of Law:



    (i)    shall subject the Bank or any of its Affiliates or Participants to any duty or other charge with respect to this Agreement, the Fee Letter or the Letter of Credit, or any agreement to issue or participate in the Letter of Credit; or

    (ii)    shall impose, modify or deem applicable any reserve (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) or similar requirement against the assets of, deposits with or for the account of, or credit extended by, the Bank or any of its Affiliates or Participants or shall impose on the Bank or any of its Affiliates or Participants any other condition affecting its obligations under this Agreement, the Fee Letter or the Letter of Credit;

and the result of any of the foregoing is to increase the cost to the Bank or such Affiliate or Participant of performing its obligations under this Agreement, the Fee Letter or the Letter of Credit, or to reduce the amount of any sum received or receivable by the Bank or such Affiliate or Participant under this Agreement, the Fee Letter or the Letter of Credit, by an amount deemed by the Bank or such Affiliate or Participant to be material, then, within thirty (30) days after demand by the Bank or such Affiliate or Participant (or, if such increased costs will continue to be incurred by the Bank or such Affiliate or Participant, in arrears on a monthly basis or such other period as agreed between the Authority and the Bank or such Affiliate or Participant), the Authority shall pay to the Bank or such Affiliate or Participant such additional amount or amounts as are reasonably determined by the Bank, Affiliate or Participant to be necessary to compensate the Bank or such Affiliate or Participant for such increased cost or reduction.

(b)     If the Bank or any of its Affiliate or any Participant shall have determined that a Change of Law has or would have the effect of reducing the rate of return on capital of the Bank or such Affiliate or Participant (or of any Person controlling the Bank or such Affiliate or Participant (a *"Parent"*)) relating to the Bank's or such Affiliate's or Participant's obligations hereunder, the Fee Letter or under the Letter of Credit, and such adoption, change, request or directive (taking into consideration its policies with respect to capital adequacy) will reduce the Bank's or such Affiliate's or Participant's or Parent's rate of return on capital by a material amount, then from time to time, within 30 days after demand by the Bank or such Affiliate or Participant (or if such additional costs of the Bank or such Affiliate or Participant will continue to be suffered by the Bank or such Affiliate or Participant, in arrears on a monthly basis or such other period as agreed between the Authority and the Bank or such Affiliate or Participant), the Authority shall pay to the Bank or such Affiliate or Participant such additional amount or amounts as are reasonably determined by the Bank, Affiliate or Participant to be necessary to compensate the Bank or such Affiliate or Participant for such additional costs.



(c)     The Bank or any of its Affiliates or Participants will use its best efforts to notify the Authority within thirty (30) days of the Bank's or such Affiliate's or Participant's obtaining actual knowledge of any Change of Law that will entitle the Bank or such Affiliate or Participant to compensation pursuant to this Section. The failure of the Bank or such Affiliate or Participant to notify the Authority within such 30 day period shall not relieve the Authority from any liability for payment of such compensation; *provided* that the Authority shall not be required to compensate the Bank, Affiliate or Participant pursuant to the foregoing provisions of this Section 2.13 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date the Bank, Affiliate or Participant notifies the Authority of the event giving rise to such increased costs or reductions and of the Bank's, Affiliate's or Participant's intention to claim compensation therefor (except that, if the event giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended, if necessary, to include the period of retroactive effect thereof). A certificate of the Bank or any of its Affiliates or Participants claiming compensation under this Section 2.13 and setting forth the additional amount or amounts to be paid to it hereunder and attaching such information in reasonable detail as may be reasonably requested by the Authority shall be conclusive in the absence of manifest error. In determining such amount, the Bank or such Affiliate or Participant may use any reasonable average and attribution methods.

(d)     Notwithstanding the foregoing, for purposes of this Section 2.13, (i) all requests, rules, guidelines or directives in connection with the Dodd-Frank Act shall be deemed to be a Change of Law, regardless of the date enacted, adopted or issued, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) or any Governmental Authority shall be deemed a Change of Law regardless of the date enacted, adopted or issued.

(e)     No Affiliate or Participant or other transferee of the Bank's rights shall be entitled to receive any greater payment under this Section 2.13 or under Section 2.14, 7.7 or 7.8 hereof than the Bank would have been entitled to receive with respect to the rights transferred, unless such transfer is made with the Authority's prior written consent.

1.08.     Section 2.15 of the Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

*Section 2.15.  Obligations Absolute.*  The obligations of the Authority under this Agreement and the Fee Letter as they relate to the Bank and the Letter of Credit shall be primary, absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including without limitation the following circumstances:

(a)     Any lack of validity or enforceability of the Letter of Credit;

(b)     Any amendment to, waiver of or consent to departure from any provision of, the Letter of Credit or any Related Document;



(c)     The existence of any claim, set-off, defense or other right which the Authority may have at any time against the Bank, any beneficiary of the Letter of Credit (or any Persons for whom the Fiscal Agent, any such beneficiary or any such transferee may be acting) or any other Person, whether in connection with this Agreement, the Fee Letter, the Letter of Credit, the other Related Documents or any unrelated transaction, *provided* that nothing herein shall prevent the assertion of any such claim, defense or other right by separate suit or compulsory counterclaim;

(d)     Any breach of contract or other dispute between the Authority and the Bank, any beneficiary or transferee of the Letter of Credit (or any Person for whom the Fiscal Agent, any such beneficiary or any such transferee may be acting), any holder of any Bond or any other Person;

(e)     Any demand, statement or any other document or instrument presented under the Letter of Credit or hereunder proving to have been forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(f)     Payment by the Bank under the Letter of Credit against presentation of a draft or certificate which does not comply strictly with the terms of the Letter of Credit;

(g)     Any non-application or misapplication by the Fiscal Agent or any tender agent or otherwise of the proceeds of any drawing under the Letter of Credit;

(h)     The failure by the Bank to honor any drawing under the Letter of Credit or to make any payment demanded under the Letter of Credit, on the grounds that the demand for such payment does not conform strictly to the terms and conditions of the Letter of Credit; or

(i)     Any delay, extension of time, renewal, compromise or other indulgence or modification granted or agreed to by the Bank with or without notice to or approval by the Authority in respect of any of the Authority's obligations hereunder.

1.09.     Article Four of the Agreement is hereby amended by the incorporation of Sections 4.15, 4.16 and 4.17 to read as set forth below:

*Section 4.15.     Margin Regulations.*     (a) The Authority is not engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock as defined in Regulation U of the Board of Governors of the Federal Reserve System.



*Section 4.16.     Pending Legislation and Decisions.*     There is no amendment, or to the knowledge of the Authority, proposed amendment to the Constitution of the Commonwealth, or any law of the Commonwealth or any administrative interpretation of any such Constitution or law, or any legislation that has passed the Legislature of the Commonwealth or any judicial decision interpreting any of the foregoing, the effect of which will materially adversely affect the security for any of the Bonds or the Obligations owed to the Bank hereunder, under the Fee Letter or under any of the other Related Documents, or the Authority's ability to repay when due its obligations under this Agreement, the Fee Letter any of the Bonds or any of the other Related Documents.

*Section 4.17.     Tax Exempt Status.*     The Authority has not taken any action or omitted to take any action, and knows of no action taken by any Governmental Authority, which action, if taken or omitted, would adversely affect the exclusion of interest on the Bonds from gross income for purposes of federal income taxation.

1.10.     Sections 5.3, 5.7 and 5.16 of the Agreement are hereby amended in their entireties and as so amended shall be restated as follows.

*Section 5.3.     Compliance with Related Documents.*     The Authority will take all necessary steps to assure that the Bonds will be issued in compliance with this Agreement, the Resolution and all other Commonwealth Laws, including the Commonwealth's Constitution.     The Authority agrees that it will not amend the Resolution or any other Related Document to which it is a party in any manner which would adversely effect the ability of the Authority to pay the principal or interest on the Bonds or any Obligations owed to the Bank hereunder or under the Fee Letter or the security therefor without the prior written consent of the Bank.

*Section 5.7.     Remarketing Agent; Fiscal Agent.*     The Authority will not, without the prior written consent of the Bank, appoint or permit the appointment of a successor

Remarketing Agent or Fiscal Agent.   The Authority shall at all times maintain a Remarketing Agent and a Fiscal Agent pursuant to the terms of the Resolution.  If the Remarketing Agent fails to remarket Bonds for sixty (60) consecutive days, then the Authority agrees, at the written request of the Bank, to cause the Remarketing Agent to be replaced with a Remarketing Agent reasonably satisfactory to the Bank.  Any remarketing agreement with a successor Remarketing Agent shall provide that (a) such remarketing agent may resign upon at least 60-days prior written notice to the Fiscal Agent, the Bank and the Authority, (b) such remarketing agent shall use its best efforts to remarket the Bonds without regard to the Bank Rate (i.e., whether or not the rate to be borne by the Bonds is less than the Bank Rate) and (c) such remarketing agent shall offer the Bonds for remarketing at the maximum rate permitted under the Related Documents prior to such Bonds being tendered for purchase pursuant to a Liquidity Drawing.

Section 5.16.  *Liens, Etc.*  (a)  The Authority shall not create or suffer to exist any Lien upon or with respect to any of its Property except (i) liens that are subordinate to the lien on Revenues securing the Bonds and the Reimbursement Obligations and (ii) the lien on Revenues securing the Obligations owed to the Bank hereunder and under the Fee Letter.



(b)    In no event shall (i) any Lien on the Revenues or on the 1968 Resolution Revenues securing any swap termination payments be first in priority to or *pari passu* with the Lien granted in support of the Bonds and the Reimbursement Obligations or (ii) the Authority grant a Lien on any Property of the Authority other than Revenues granted to secure the counterparty to any Swap Contract.

1.11.    Article Five of the Agreement is hereby amended by the incorporation of Sections 5.17, 5.18, 5.19, 5.20, 5.21, 5.22, 5.23, 5.24, 5.25, 5.26 and 5.27 to read as set forth below:

Section 5.17.  *Preservation of Existence, Etc.*  The Authority will maintain its existence.  The Authority will not amend any constituting document or any agreement governing its operations or management in a manner that could have a Material Adverse Effect.

Section 5.18.  *Maintenance of Properties.*  The Authority will maintain, preserve and keep its Property in good repair, working order and condition (ordinary wear and tear excepted), except to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

Section 5.19.  *Credit Facilities.*  In the event that the Authority shall, directly or indirectly, enter into or otherwise consent to any credit agreement, liquidity agreement or other agreement or instrument (or any amendment, supplement or modification thereto) under which, directly or indirectly, any Person or Persons undertakes to make loans or extend credit or liquidity to the Authority, which such agreement (or amendment thereto) provides such Person with more restrictive or different covenants, additional events of default or greater rights and remedies than are provided to the Bank in this Agreement, the Authority shall provide the Bank with a copy of each such agreement (or amendment

thereto) and such more restrictive or different covenants, additional events of default or greater rights and remedies shall automatically be deemed to be incorporated into this Agreement and the Bank shall have the benefits of such more restrictive or different covenants, additional events of default or greater rights and remedies as if specifically set forth herein. Upon the request of the Bank, the Authority shall promptly enter into an amendment to this Agreement to include such more restrictive or different covenants, additional events of default or greater rights and remedies (*provided* that the Bank shall have and maintain the benefit of such more restrictive or different covenants, additional events of default or greater rights and remedies even if the Authority fails to provide such amendment).

Section 5.20. *Maintenance of Ratings.*   The Authority shall maintain an underlying rating on the long-term, unenhanced indebtedness of the Authority secured by a Lien on Revenues on a parity with the Lien on Revenues securing the Bonds and the Reimbursement Obligations by each of Moody's and S&P.

Section 5.21. *Rating on Bank Bonds.*  The Authority shall at all times maintain a rating on the Bank Bonds by either of Moody's or S&P.



Section 5.22. *Indebtedness.*  The Authority shall not create, incur, assume or suffer to exist any Debt, unless (a) such Debt (i) is issued pursuant to the terms of the Resolution and (ii) is subordinate to the lien on Revenues securing the Bonds and the Reimbursement Obligations and (b) the issuance of such Debt could not reasonably be expected to result in a Material Adverse Effect.

Section 5.23. *Use of Proceeds.*  The Authority shall not use the proceeds of any credit extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose, in each case in violation of, or for a purpose which violates, or would be inconsistent with, Regulation T, U or X of the Board of Governors of the Federal Reserve System.

Section 5.24. *Tax Status of Bonds.*  The Authority shall not take any action or suffer any action to be taken by others that will impair the tax-exempt status of the Bonds.

Section 5.25. *Debt Service Coverage Percentage.*   On each June 30 and December 31, the Authority shall deliver to the Bank written evidence demonstrating that the Debt Service Coverage Percentage for the four preceding fiscal quarters of the Authority is not less than 125%.

Section 5.26. *Sale of Assets; Lease.* (a) The Authority shall not sell, transfer, or convey (whether in a single transaction or a series of transactions) all or any substantial part of its Property.

(b)     In the event that the Authority determines to enter into a long-term lease with respect to the operation and maintenance of all or any substantial part of its Property or otherwise ceases to operate and maintain all or any substantial part of its Property (each such event, referred to herein as a "*Long-Term Lease Arrangement*"), the Authority shall cause, on or before the date of the financial close for such Long-Term Lease Arrangement (the "*Financial Close Date*"), any of the following to occur:

(i)     any and all amounts owing under this Agreement and the Fee Letter to be paid in full to the Bank, and the Letter of Credit to be cancelled by the Fiscal Agent and returned to the Bank, in each case, on or prior to the date on which the Authority enters into such Long-Term Lease Arrangement;

(ii)     a substitute letter of credit to be issued and in effect pursuant to the Resolution, all amounts owing under this Agreement and the Fee Letter to be paid in full to the Bank, and the Letter of Credit to be cancelled by the Fiscal Agent and returned to the Bank, in each such case, on or prior to the date on which the Authority enters into such Long-Term Lease Arrangement; or



(iii)     (1)(x) at least 15 days but no more than 30 days prior to the Financial Close Date, the Bank shall have received (x) a certificate required to be delivered to the Fiscal Agent pursuant to Section 208(c) of the Resolution (which is in the form attached as Exhibit A hereto), (y) rating confirmation from each rating agency then rating any bonds secured by the Revenues or the 1968 Resolution Revenues that the bonds, as applicable, will be rated by such rating agency following such Long-Term Lease Arrangement and such ratings will not be withdrawn, suspended or otherwise reduced as a result of the Long-Term Lease Arrangement and (z) a no adverse tax opinion of bond counsel to the Authority; and (2) additionally, from and after such Financial Close Date, on June 30 and December 31 to occur thereafter, the Authority shall deliver to the Bank written evidence demonstrating that the Debt Service Coverage Percentage for the four preceding fiscal quarter of the Authority is not less than 150%; *provided, however*, that for any June 30 or December 31 which is less than four quarters from the Financial Close Date, such written evidence shall demonstrate that the Debt Service Coverage Percentage since the Financial Close Date is not less than 150%.

For purposes of calculating the Debt Service Coverage Percentage as set forth in Section 5.26(b)(iii) hereof in connection with a proposed Long-Term Lease Arrangement, the amount of Revenues or 1968 Resolution Revenues may be adjusted to give effect to legislation enacted on or prior to the effective date of the Long-Term Lease Arrangement that would have increased the Revenues or the 1968 Resolution Revenues if such legislation (x) had been in effect throughout the subject period, (y)

allocates additional moneys to the Authority and (z) expressly permits the Authority to pledge such additional moneys to the Bonds and the Reimbursement Obligations, and the Authority has expressly pledged such additional moneys to such payment on or prior to the effective date of the Long-Term Lease Arrangement.

Section 5.27.   Delivery of 2010 Audited Financial Statements.  (a)  The Authority will deliver to the Bank not later than May 31, 2011, a copy of the Authority's annual report for fiscal year 2010 containing the audited financial statements of the Authority for fiscal year 2010 (the "2010 Audited Financial Statements").

1.12.   Sections 6.1(a) and (b) of the Agreement are hereby amended in their entireties and as so amended shall be restated to read as follows:

(a)   default in the payment when due of (i) any payments required to be made by the Authority for reimbursement to the Bank of any Drawings, (ii) any principal or interest with respect to any Bank Bonds or any Liquidity Advance or (iii) any other amount owing by the Authority under this Agreement or the Fee Letter and such default under this subsection (iii) continues for a period of ten (10) Business Days; or



(b)(i)   the Authority shall default in the performance or observance of any term, covenant, condition or agreement on its part to be performed or observed under Section 5.3, 5.4, 5.5, 5.6, 5.7, 5.8(a), 5.8(b), 5.10, 5.11, 5.12, 5.15, 5.16, 5.17, 5.18, 5.20, 5.21, 5.22, 5.23, 5.24, 5.25, 5.26 or 5.27 hereof or (ii) the Authority shall default in the performance or observance of any other term, covenant, other condition or agreement on its part to be performed or observed and such default in this clause (ii) shall continue unremedied for thirty (30) days after written notice thereof shall have been given to the Authority by the Bank; or

1.13.   Section 6.1 of the Agreement is hereby amended by the incorporation of the following clauses (j) and (k) to immediately follow clause (i) set forth therein and to read as follows:

(j)   any event which results in an interruption of any of (A) the crude oil tax allocated to the Authority by Act No. 34, approved July 16, 1997, as amended, (B) all Existing Tax and Fee Revenues (as defined in the Resolution) upon the repeal and cancellation of the 1968 Resolution (as defined in the Resolution), (C) any tolls or other charges imposed by the Authority for the use of any of the Toll Facilities (as defined in the Resolution) other than Existing Toll Facilities Revenues (as defined in the Resolution) received by the Authority prior to the repeal and cancellation of the 1968 Resolution; provided, however, it shall not be an Event of Default hereunder if any interruption in the receipt of the amounts described in clause (C) results from the Authority entering into a Long-Term Lease Arrangement, (D) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority under the Resolution and

which are pledged by the Authority to the payment of the principal of and interest on bonds or other obligations issued under the provisions of this Resolution, and (E) investment earnings on deposits to the credit of funds and accounts established hereunder, except for the Construction Fund (as defined in the Resolution), in each case, which could reasonably be expected to result in the Authority failing to pay the principal or interest on the Bonds or any of the Obligations owed to the Bank hereunder or under the Fee Letter;

(k)    No Material Adverse Effect shall have occurred (as demonstrated in the 2010 Audited Financial Statements) since the date the Bank received the unaudited financial statements for fiscal year 2010.

2.    CONDITIONS PRECEDENT.

This Amendment shall be deemed effective on the Effective Date subject to the satisfaction of or waiver by the Bank of all of the following conditions precedent (such satisfaction to be evidenced by the Bank's execution and delivery of this Amendment):

2.01.    Delivery by the Authority of an executed counterpart of this Amendment.

2.02.    Delivery by the Authority of an executed counterpart of that certain Fee Letter Agreement dated the date hereof (the "*Fee Letter*") between the Authority and the Bank.



2.03.    The following statements shall be true and correct as of the date hereof:

(a)    the representations and warranties of the Authority contained in Article Four of the Agreement and in each of the Related Documents are true and correct on and as of the date hereof as though made on and as of such date (except to the extent the same expressly relate to an earlier date); and

(b)    no Potential Default or Event of Default has occurred and is continuing or would result from the execution of this Amendment or the Fee Letter Agreement.

2.04.    Payment to the Bank on the Effective Date of a non-refundable amendment fee in an amount equal to $1,500.

2.05.    Payment to the Bank on the Effective Date of the reasonable legal fees and expenses of counsel to the Bank (in an amount not to exceed $15,000).

2.06.    Delivery to the Bank of an opinion of counsel to the Authority addressed to the Bank and in form and substance satisfactory to the Bank and its counsel.

2.07.    The Bank shall have received written evidence satisfactory to the Bank that Bank Bonds (and their related CUSIP Numbers) shall have been assigned a long term rating of at least investment grade by Moody's.

2.08.   All other legal matters pertaining to the execution and delivery of this Amendment shall be satisfactory to the Bank and its counsel.

3.   REPRESENTATIONS AND WARRANTIES OF THE AUTHORITY.

In addition to the representations given in Article Four of the Agreement, the Authority hereby represents and warrants as follows:

3.01.   The execution, delivery and performance by the Authority of this Amendment and the Agreement, as amended hereby, and the Fee Letter are within its powers, have been duly authorized by all necessary action and do not contravene any law, rule or regulation, any judgment, order or decree or any contractual restriction binding on or affecting the Authority.

3.02.   No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the Authority of this Amendment or the Agreement, as amended hereby and the Fee Letter (other than those authorizations, approvals or other actions with any governmental authority obtained by the Authority on or prior to the date hereof).



3.03.   This Amendment and the Agreement, as amended hereby, and the Fee Letter constitute valid and binding obligations of the Authority enforceable against the Authority in accordance with their respective terms, except that (i) the enforcement thereof may be limited by bankruptcy, reorganization, insolvency, liquidation, moratorium and other laws relating to or affecting the enforcement of creditors' rights and remedies generally, the exercise of judicial discretion in appropriate cases and by the limitations on legal remedies against the Authority, and (ii) no representation or warranty is expressed as to the availability of equitable remedies.

4.   REQUEST FOR EXTENSION OF STATED EXPIRATION DATE.

The Authority hereby requests that the Bank (i) waive the 120 day notice requirement with respect to request for extension of the Stated Expiration Date and (ii) extend the Stated Expiration Date to May 27, 2013, and the Bank agrees to (i) waive such notice requirement and (ii) such extension request and the Bank will deliver to the Fiscal Agent a Notice of Extension substantially in the form attached hereto as Exhibit A to effectuate such extension.

5.   MISCELLANEOUS.

Except as specifically amended herein, the Agreement shall continue in full force and effect in accordance with its terms. Reference to this Amendment need not be made in any note, document, agreement, letter, certificate, the Agreement or any communication issued or made subsequent to or with respect to the Agreement, it being hereby agreed that any reference to the Agreement shall be sufficient to refer to the Agreement, as hereby amended. In case any one or more of the provisions contained herein should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired hereby. All capitalized terms used herein without definition

shall have the same meanings herein as they have in the Agreement.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

This Amendment may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.



IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers hereunto duly authorized as of the Effective Date.

PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

By:

Name: Javier Hernandez Simeco

Title: Senior Deputy Executive Director

THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS HATO REY BRANCH, as the Bank

By: _____

Name: _____

Title: _____

THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS NEW YORK AGENCY, as the Arranger

By:

Name: James E. Cubbon

Title: Director

[Signature Page to First Amendment to Reimbursement Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers hereunto duly authorized as of the Effective Date.

PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

By: _____
    Name: _____
    Title: _____

THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS HATO REY BRANCH, as the Bank

By: _____
    Name:   Ricardo Fishman
    Title:   Authorized Officer

THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS NEW YORK AGENCY, as the Arranger

By: _____
    Name:   James E. Cubbon
    Title:   Director



[Signature Page to First Amendment to Reimbursement Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers hereunto duly authorized as of the Effective Date.

PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

By: _____
    Name: _____
    Title: _____

THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS HATO REY BRANCH, as the Bank

By: _____
    Name: _____
    Title: _____

THE BANK OF NOVA SCOTIA, ACTING THROUGH ITS NEW YORK AGENCY, as the Arranger

By: _____
    Name:   James E. Cubbon
    Title:   Director

[Signature Page to First Amendment to Reimbursement Agreement]

**EXHIBIT A**

**FORM OF**

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

**SECTION 208(C) COMPLIANCE CERTIFICATE**

**FOR A FINANCIAL CLOSE DATE OF** _____ , 20___

The Bank of Nova Scotia,
  acting through its Hato Rey Branch

Ladies and Gentlemen:

This certificate is delivered to you in compliance with the requirements of Section 208(c) of that certain Resolution No. 98-06 adopted on February 26, 1998 by the Secretary of Transportation and Public Works of the Commonwealth of Puerto Rico (the *"Commonwealth"*) and approved by the Governor of the Commonwealth (the *"Resolution"*) and Section 5.26(b)(iii) of that certain Reimbursement Agreement dated as of May 1, 2008, as amended (the *"Agreement"*), among the Puerto Rico Highways and Transportation Authority (the *"Authority"*), The Bank of Nova Scotia, acting through its Hato Rey Branch, as the Bank (the *"Bank"*) and The Bank of Nova Scotia, acting through its New York Agency, as Arranger (the *"Arranger"*), relating to the Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds (Series A). Capitalized terms used herein and not otherwise defined herein shall have the same meanings as in the Resolution and the Agreement, as applicable.

The undersigned, _____ , does hereby certify that:

1.     [He][She] is the duly appointed, qualified and acting Executive Director of the Authority, and that as such Executive Director, [s]he has reviewed the relevant terms of the Agreement and the Resolution and has made, or has caused to be made, under [his][her] supervision, a review of the transactions and conditions of the Authority from the beginning of the annual period covered by the financial statements being furnished to you on the date hereof to the date hereof.

2.     Attached hereto as Schedule I are the computations that establish that the Authority is in compliance with the requirements of Section 208(c) of the Resolution.

3.     The information contained in Schedule I hereto is true and correct as of the date hereof.

Dated: _____ _____, 20

PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY

By: _____

Name: Javier Hernandez Gómez

Title:     Executive Director

A-2

**SCHEDULE I TO COMPLIANCE CERTIFICATE**

Compliance Calculations for
Section 208(c) of Resolution No. 98-06
and
Section 5.26(b)(iii) of Reimbursement Agreement
dated as of May 1, 2008, as amended

**CALCULATION AS OF _____, 20__**



| | | | | |
|---|---|---|---|---|
| I. | | Sum of Revenues and available 1968 Resolution Revenues | | |
| | A. | Revenues received by the Authority in each of the fifteen (15) months immediately preceding the month in which this certificate is signed (*"Subject Month"*) are set forth below: | | |
| | | 1. | Revenues received by the Authority in _____ (which is the fifteenth (15th) month preceding the Subject Month) | |
| | | 2. | Revenues received by the Authority in _____ (which is the fourteenth (14th) month preceding the Subject Month) | |
| | | 3. | Revenues received by the Authority in _____ (which is the thirteenth (13th) month preceding the Subject Month) | |
| | | 4. | Revenues received by the Authority in _____ (which is the twelfth (12th) month preceding the Subject Month) | |
| | | 5. | Revenues received by the Authority in _____ (which is the eleventh (11th) month preceding the Subject Month) | |
| | | 6. | Revenues received by the Authority in _____ (which is the tenth (10th) month preceding the Subject Month) | |
| | | 7. | Revenues received by the Authority in _____ (which is the ninth (9th) month preceding the Subject Month) | |
| | | 8. | Revenues received by the Authority in _____ (which is the eighth (8th) month preceding the Subject Month) | |
| | | 9. | Revenues received by the Authority in _____ (which is the seventh (7th) month preceding the Subject Month) | |
| | | 10. | Revenues received by the Authority in _____ (which is the sixth (6th) month preceding the Subject Month) | |
| | | 11. | Revenues received by the Authority in _____ (which is the fifth (5th) month preceding the Subject Month) | |
| | | 12. | Revenues received by the Authority in _____ (which is the fourth (4th) month preceding the Subject Month) | |
| | | 13. | Revenues received by the Authority in _____ (which is the third (3rd) month preceding the Subject Month) | |
| | | 14. | Revenues received by the Authority in _____ (which is the second (2nd) month preceding the Subject Month) | |

| | | | | |
|---|---|---|---|---|
| | | 15. | Revenues received by the Authority in _____ (which is the first (1st) month preceding the Subject Month) | |
| | B. | | Sum of Revenues for any twelve (12) consecutive months shown in Line I.A.1 *through* Line I.A.15 | |
| | C. | | Until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount deposited to the credit of the Revenue Fund in accordance with the third sentence of the second paragraph of Section 401 of the Resolution (the *"Monthly 1968 Deposit"*) in each of the fifteen (15) months immediately preceding the month in which this certificate is signed are set forth below: | |
| | | 1. | Monthly 1968 Deposit in _____ (which is the fifteenth (15th) month preceding the Subject Month) | |
| | | 2. | Monthly 1968 Deposit in _____ (which is the fourteenth (14th) month preceding the Subject Month) | |
| | | 3. | Monthly 1968 Deposit in _____ (which is the thirteenth (13th) month preceding the Subject Month) | |
| | | 4. | Monthly 1968 Deposit in _____ (which is the twelfth (12th) month preceding the Subject Month) | |
| | | 5. | Monthly 1968 Deposit in _____ (which is the eleventh (11th) month preceding the Subject Month) | |
| | | 6. | Monthly 1968 Deposit in _____ (which is the tenth (10th) month preceding the Subject Month) | |
| | | 7. | Monthly 1968 Deposit in _____ (which is the ninth (9th) month preceding the Subject Month) | |
| | | 8. | Monthly 1968 Deposit in _____ (which is the eighth (8th) month preceding the Subject Month) | |
| | | 9. | Monthly 1968 Deposit in _____ (which is the seventh (7th) month preceding the Subject Month) | |
| | | 10. | Monthly 1968 Deposit in _____ (which is the sixth (6th) month preceding the Subject Month) | |
| | | 11. | Monthly 1968 Deposit in _____ (which is the fifth (5th) month preceding the Subject Month) | |
| | | 12. | Monthly 1968 Deposit in _____ (which is the fourth (4th) month preceding the Subject Month) | |
| | | 13. | Monthly 1968 Deposit in _____ (which is the third (3rd) month preceding the Subject Month) | |
| | | 14. | Monthly 1968 Deposit in _____ (which is the second (2nd) month preceding the Subject Month) | |
| | | 15. | Monthly 1968 Deposit in _____ (which is the first (1st) month preceding the Subject Month) | |
| | D. | | Total amounts deposited to the credit of the Revenue Fund in accordance with the third sentence of the second paragraph of | |





|  |  | Section 401 of the Resolution - Sum of Total Monthly 1968 Deposits for any twelve (12) consecutive months shown in Line I.C.1 *through* Line I.C.15 |  |
|  | E. | Any increase to amounts in Line I.B and Line I.D (for the twelve (12) consecutive months chosen) if legislation enacted on or prior to the Financial Close Date that would have increased the Revenues or the amounts deposited to the credit of the Revenue Fund from the 1968 Construction Fund if such legislation (x) had been in effect throughout the fifteen (15) month subject period, (y) allocates additional moneys to the Authority and (z) expressly permits the Authority to pledge to the payment of the bonds issued under the provisions of the Resolution or the 1968 Resolution until the 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution and the Authority has expressly pledged such additional moneys to such payment on or prior to the date of this certificate |  |
|  | F. | Total Adjusted Sum of Revenues and the 1968 Resolution Revenues (Line I.B *plus* Line I.D *plus* Line I.E) |  |
| II. |  | Senior Bond Principal and Interest Requirements |  |
|  | A. | Amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds heretofore issued under the provisions of the Resolution and currently Outstanding |  |
|  | B. | Amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds requested to be delivered |  |
|  | C. | Total Senior Bond Principal and Interest Requirements (Line II.A *plus* Line II.B ) |  |
| III. |  | Senior and Subordinated Bond Principal and Interest Requirements |  |
|  | A. | Amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and subordinated bonds heretofore issued under the provisions of the Resolution and currently Outstanding |  |
|  | B. | Amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds requested to be delivered |  |
|  | C. | Total Senior and Subordinated Bond Principal and Interest Requirements (Line III.A *plus* Line III.B ) |  |
| IV. | A. | 1. Debt Service Coverage Percentage - Senior Bonds (Line I.F |  |

| | | | | |
|---|---|---|---|---|
| | | | *divided by* Line II.C) | |
| | | 2. | Compliance if Line IV.A.1 >/= 150% (Yes/No) | |
| | B. | 1. | Debt Service Coverage Percentage - Senior and Subordinated Bonds (Line I.F *divided by* Line III.C) | |
| | | 2. | Compliance if Line IV.B.1 >/= 100% (Yes/No) | |

