# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS<br><br>**SUPPLEMENTAL REPLY BRIEF OF THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO IN OPPOSITION TO THE MOTION OF CERTAIN SECURED CREDITORS OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO FOR RELIEF FROM THE AUTOMATIC STAY** |

---

[1] The Debtors in these jointly-administered PROMESA Title III cases (these "**Title III Cases**"), along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................2

I.    Cause Does Not Exist To Modify The Automatic Stay..........................................................2

      A.    Movants' Supplemental Brief Contains Numerous Misstatements. .........................2

           1.    The First Circuit Has Not "Previously Rejected Two Of The Debtors' Attempts to Deny The Bondholders Adequate Protection." ........................ 2

           2.    The First Circuit Has Not "Resolved Any Uncertainty" About Movants' Alleged Liens. ................................................................................................ 3

           3.    Movants Do Not Need Stay Relief To Challenge Act 106. ......................... 4

           4.    Movants Were Not Harmed By The Automatic Stay. ................................. 6

      B.    As An Initial Matter, the Court Should Find That Movants' Alleged Interests In ERS's Assets Are Adequately Protected. ..............................................6

      C.    A Substantial Equity Cushion Protects Any Alleged Interest In PayGo Fees. ...........................................................................................................................7

           1.    *Peaje* Does Not Entitle Movants To Stay Relief. ......................................... 7

           2.    Movants' Alleged PayGo Fee "Risks" Are Unquantified And Speculative. ................................................................................................... 8

           3.    Movants' Attacks On Malhotra's Valuation Are Unavailing. ..................... 9

II.    Movants Do Not Have A Colorable Claim To The PayGo Fees. .......................................10

      A.    The ERS Bond Documents Do Not Grant Movants A Lien In PayGo Fees. ........10

      B.    The UCC Does Not Give Movants A Colorable Claim To PayGo Fees. .............12

CONCLUSION ..............................................................................................................................15

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*1st Source Bank v. Wilson Bank & Tr.*,
735 F.3d 500 (6th Cir. 2013) ................................................................................................. 13

*Avitia v. Metro. Club of Chicago, Inc.*,
49 F.3d 1219 (7th Cir. 1995) ................................................................................................... 1

*Baybank-Middlesex v. Ralar Distributors, Inc.*,
69 F.3d 1200 (1st Cir. 1995) .................................................................................................... 7

*In re American Cartage, Inc.*,
656 F.3d 82 (1st Cir. 2011) .............................................................................................. 13, 14

*In re Cont'l Airlines, Inc.*,
154 B.R. 176 (Bankr. D. Del. 1993) ........................................................................................ 6

*In re Dynaco Corp.*,
162 B.R. 389 (Bankr. D.N.H. 1993) ........................................................................................ 2

*In re Financial Management & Oversight Board of Puerto Rico*,
899 F.3d 13 (1st Cir. 2018) .................................................................................................. 3, 5

*In re Financial Oversight & Management Board for Puerto Rico*,
914 F.3d 694 (1st Cir. 2019) ................................................................................................ 3, 4

*In re Gateway Access Sols., Inc.*,
368 B.R. 428 (Bankr. M.D. Pa. 2007) ................................................................................... 11

*In re Ionosphere Clubs, Inc.*,
922 F.2d 984 (2d Cir. 1990) .................................................................................................... 5

*In re Lady Madonna Indus., Inc.*
99 B.R. 536 (S.D.N.Y. 1989) ........................................................................................... 14, 15

*In re Las Vegas Monorail Co.*,
429 B.R. 317 (Bankr. D. Nev. 2010) ..................................................................................... 13

*In re Mellor*,
734 F.2d 1396 (9th Cir. 1984) ................................................................................................. 2

*In re Mills Int'l Inc.*,
2015 WL 1517520 (Bankr. E.D.N.C. Mar. 27, 2015) ............................................................. 1

*In re Nashua Trust Co.*,
73 B.R. 423 (Bankr. D.N.J. 1987) ........................................................................................... 2

*In re Smithfield Estates, Inc.*,
  48 B.R. 910 (Bankr. D.R.I. 1985) .................................................................................... 9

*In re Sonnax Indus.*,
  907 F.2d 1280 (2d Cir. 1990) ................................................................................... 3, 5

*In re SW Boston Hotel Venture LLC*,
  449 B.R. 156 (Bankr. D. Mass. 2011) ............................................................................. 2

*Matter of Celotex Corp.*,
  152 B.R. 667 (Bankr. M.D. Fla. 1993) ........................................................................... 5

*Matter of Mendoza*,
  111 F.3d 1264 (5th Cir. 1997) ......................................................................................... 2

*Peaje Investments LLC v. García-Padilla*,
  845 F.3d 505 (1st Cir. 2017) ................................................................................... 3, 7, 8

*United States v. Banisadr Bldg. Joint Venture*,
  65 F.3d 374 (4th Cir. 1995) ............................................................................................ 2

**STATUTES**

11 U.S.C. §552 ......................................................................................................................... 4

31 L.P.R.A. § 3471 ................................................................................................................. 11

19 L.P.R.A. §2212(a)(64) ...................................................................................................... 13

19 L.P.R.A. § 2265 ................................................................................................................. 15

**INTRODUCTION**

Noticeably absent from Movants' Supplemental Brief is any discussion about why ERS's decision to freeze the assets it was holding as of its petition date (less those previously paid to Movants) pending a final determination of Movants' alleged interests in those assets does not adequately protect Movants. Movants do not even mention the monies that ERS and Treasury are holding for their benefit should Movants prevail. These funds are not going anywhere and have not decreased in value to date (except to the extent that those funds have been paid to Movants). Because Movants' alleged collateral is not declining in value and is being held for Movants' benefit pending a final determination of the dispute over their claim, the Court should find that Movants are adequately protected and deny the Motion. *See, e.g., In re Mills Int'l Inc.*, 2015 WL 1517520, at *4 (Bankr. E.D.N.C. Mar. 27, 2015) (escrow serves as adequate protection).

Instead of focusing on those assets in which Movants might actually have a colorable interest—*i.e.*, the Employer Contributions made pursuant to the ERS Enabling Act that ERS held as of its petition date—Movants devote much of their Supplemental Brief to attempting to establish an interest in post-petition PayGo fees. As explained below, Movants have not and cannot establish a colorable interest in the PayGo fees. But even if the Court assumes that they could do so, the value of those PayGo fees provides a sufficient equity cushion to protect Movants' interests.

The evidence at the hearing will be that, even if one assumes that Movants have an interest in PayGo fees, the net present value of the PayGo fees is ▮▮▮▮ the amount owed to Movants. Movants offer no alternative valuation. Instead, like a defendant in a civil case that offers no alternative measure of damages, Movants simply take pot-shots at the Oversight Board's expert. But when a party "goes for broke" like Movants do here and only swipes at the other side's valuation instead of offering their own valuation, they engage in a risky strategy. *See Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1230 (7th Cir. 1995).

Movants' risky strategy fails here for the simple reason that, even using the discount rate Movants' expert suggests should be used, the net present value of the PayGo fees is still ▮ the amount of Movants' claim. Because discount rates account for risk, Movants' suggested discount rate presumably accounts for all of the risks Movants identify. *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 379 (4th Cir. 1995) ("The purpose of applying a discount rate is to reflect the degree of risk in the undertaking involved"). Using Movants' higher rate (and thus accounting for the risks Movants identify), still yields an equity cushion of ▮, which is more than sufficient adequate protection. *See, e.g.*, *In re SW Boston Hotel Venture LLC*, 449 B.R. 156, 176 (Bankr. D. Mass. 2011) (12.3% equity cushion sufficient adequate protection); *In re Dynaco Corp.*, 162 B.R. 389, 398 (Bankr. D.N.H. 1993) (17% adequate); *accord Matter of Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (20% adequate); *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (same); *In re Nashua Trust Co.*, 73 B.R. 423, 434 (Bankr. D.N.J. 1987) (50% adequate).

In sum, notwithstanding Movants' efforts to make what should be a simple issue overly complicated, Movants' Motion fails because their alleged collateral, however it is defined, is not declining in value and requires no additional adequate protection.

## ARGUMENT

### I. Cause Does Not Exist To Modify The Automatic Stay.

#### A. Movants' Supplemental Brief Contains Numerous Misstatements.

As an initial matter, the Retiree Committee addresses four fundamental misstatements found in Movants' Supplemental Brief.

##### 1. The First Circuit Has Not "Previously Rejected Two Of The Debtors' Attempts to Deny The Bondholders Adequate Protection."

Movants proclaim that the "First Circuit has rejected two of the debtors' attempts to deny the Bondholders adequate protection" implying that the appellate court has previously directed the

2

Oversight Board to make the adequate protection payments that Movants want this Court to order. (*See Supplemental Brief in Support of Motion of Certain Secured Creditors of The Employees System of The Government of The Commonwealth of Puerto Rico For Relief From The Automatic Stay* (Mov.Supp.Br. ¶1).) This is simply not so.

In the first case Movants cite, *Peaje Investments LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017), all the First Circuit did was remand a pre-Title III lift stay motion for an evidentiary hearing. It reached absolutely *no* conclusions about the merits of Movants' adequate protection arguments. *Id.* at 514. The second case, *In re Financial Oversight & Management Board for Puerto Rico,* 914 F.3d 694 (1st Cir. 2019), also does not address adequate protection at all except to affirm this Court's ruling that the Oversight Board had *not* violated a pre-Title III adequate protection stipulation with Movants.

To the extent that the First Circuit's decisions address adequate protection, those decisions do not support Movants. In *Peaje*, the First Circuit made clear that an equity cushion can constitute sufficient adequate protection, contrary to Movants' argument that any protection short of current interest payments is inadequate. 845 F.3d at 512. In a subsequent decision involving PREPA bonds, *In re Financial Management & Oversight Board of Puerto Rico*, 899 F.3d 13 (1st Cir. 2018), the First Circuit cited with approval the consideration of the so-called *Sonnax* factors—all of which favor keeping the stay in place here, when the only point of the lift stay motion will be to transfer litigation disputing the creditor's claim out of the bankruptcy court and into another forum. *Id.* at 23 (citing *In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir. 1990)).

### 2. The First Circuit Has Not "Resolved Any Uncertainty" About Movants' Alleged Liens.

Movants argue that the "First Circuit resolved any uncertainty" about Movants' liens. (Mov.Supp.Br. ¶31.) While it is true that the First Circuit has held that Movants' 2008 financing

3

statements were sufficient to perfect a lien, the lien the First Circuit was addressing was a lien in pre-Title III Employer Contributions received by ERS. The First Circuit did not address a whole host of other issues. Critically for purposes of the instant Motion, the First Circuit did not decide whether 11 U.S.C. §552 cuts-off Movants' alleged liens in post-petition assets, expressly remanding that issue to this Court. 914 F.3d at 720. If §552 cuts-off Movants' liens, Movants' claimed interest in PayGo fees necessarily fails. The First Circuit also did not address Movants' novel claim that Movants have a secured interest in PayGo fees, notwithstanding the facts that: (a) the ERS Bond Resolution on its face eliminates all recourse against the Commonwealth (Ex. B, Bond Resol., §201); (b) neither the Commonwealth nor the other employers that pay PayGo fees granted Movants a secured claim in those monies; and (c) the Bond Resolution limits the Bondholders' liens to Employer Contributions "payable to [ERS] pursuant to Section 2-116, 3-105 and 4-113 of [Act 447 of the Legislative Assembly of Puerto Rico]" (Ex. B, Bond Resol., at 37), and the PayGo fees are *not* paid to ERS and are *not* paid pursuant to Act 447.[2]

### 3. Movants Do Not Need Stay Relief To Challenge Act 106.

Movants argue that stay relief is necessary so that they can pursue a claim that Act 106 is void. (Mov.Supp.Br. ¶33.) But Movants are already pursuing that claim in this Court. In Adversary Proceeding 17-219, Movants allege, as they do in their Supplemental Brief, that Act 106 violated the automatic stay and is void. (*Compare* Mov.Supp.Br. at ¶33, *with* Adv.Pro. 17-219, Dkt. 1, ¶¶4-5, 94-103.) Obviously Movants do not need stay relief to pursue claims they have already made.

In fact, given the many pending disputes over the extent and validity of Movants' claims, the most efficient course is to keep the automatic stay intact. If the stay is modified, the Oversight

---

[2] Exhibit references are to the exhibits attached to the Retiree Committee's Supplemental Objection (Case No. 17-bk-3283, Dkt. 7554; Case No. 17-bk-3566, Dkt. 576.)

4

Board and the Commonwealth will likely defend against any enforcement action by raising all of the same challenges to Movants' claims that are currently pending in this Court. As a result, all lifting the stay would do is move that litigation from this Court, which is most familiar with the issues and has all of the affected parties before it, to another district or territorial court, where the litigation would start anew.

When the point of a lift stay proceeding is simply to allow litigation in another court to proceed, the First Circuit has held that the Court should consider the so-called *Sonnax* factors. *Fin. Oversight & Mgmt. Bd.*, 899 F.3d at 23. All of the relevant *Sonnax* factors, 906 F.2d at 1286, favor keeping the stay intact:

- Stay relief will only result in a partial resolution of the issues because, for among other reasons, Movants do not hold all of the ERS bonds and depending on the outcome, other ERS bondholders may challenge what Movants do in another forum. In contrast, this Court has the ability to bind all ERS Bondholders in a plan.

- Allowing Movants to litigate in another forum will necessarily interfere with the Title III cases. Pensions are Puerto Rico's single largest liability. PayGo is critical to solving Puerto Rico's pension crisis. Moving litigation over a critical component of the Commonwealth's restructuring to another forum not tasked with overseeing the restructuring necessarily will interfere with these Title III cases.

- There is no specialized tribunal that is better situated to hear Movants' claims. This Court is the only specialized tribunal and it is best situated to decide Movants' claims.

- Movants' proposed litigation will prejudice other creditors. Movants repeatedly refer to retirees as "subordinated creditors" receiving PayGo funds. (*See, e.g.*, Mov.Supp.Br. ¶¶5, 52.) As allegedly "subordinated creditors," retirees have a stake in the outcome of any litigation that Movants would file elsewhere attacking PayGo.

- Movants have not commenced any litigation in any other forum challenging PayGo, so there are no economies to be achieved from lifting the stay. In fact, just the opposite is true. Movants have challenged PayGo in the Title III court. Because there is already a pending case here, rather than advancing Movants' interests in a speedy resolution of their claims, lifting the stay would only cause delay and expense as new suits are filed and additional parties joined to a new suit. That alone is reason to deny stay relief. *See Matter of Celotex Corp.*, 152 B.R. 667, 677 (Bankr. M.D. Fla. 1993) (bankruptcy court "more appropriate forum to handle competing claims over property of a bankruptcy estate"); *see also In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("[T]he automatic stay allows the bankruptcy court to centralize all disputes concerning

5

property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas").

- Lifting the stay will throw these Title III cases into chaos as a major cornerstone of the Commonwealth's fiscal plan—PayGo—is challenged in another court. Movants, on the other hand, will suffer no harm if the stay is not lifted. ERS is holding the funds in which Movants facially have a lien pending resolution of their lien rights and they have a forum in which to litigate their challenges to PayGo—a forum they have already availed themselves of by filing their suit challenging PayGo. Balancing the harms favors keeping the stay intact.

### 4. Movants Were Not Harmed By The Automatic Stay.

Finally, Movants argue that the automatic stay has harmed them because it has prevented them from "exercising remedies to prevent the ongoing diversion and dissipation of their collateral, including, but not limited to, enforcing their liens, seeking relief under § 407 of PROMESA for unlawful inter-debtor transfers of property, and pursuing litigation against municipalities and public corporations." (Mov.Supp.Br. ¶51.) Movants ignore the fact that the Commonwealth passed Act 106 to comply with a fiscal plan the Oversight Board certified pursuant to PROMESA §201. Movants' argument that—absent the automatic stay, they could have somehow stopped the PayGo legislation—strains credulity. In fact, if this legislation actually harmed their interest (which it could not have, because ERS warned Movants that this could occur and they nonetheless invested), Movants' harm is caused by the legislation itself, not the existence of the automatic stay. *See e.g., In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993).

### B. As An Initial Matter, the Court Should Find That Movants' Alleged Interests In ERS's Assets Are Adequately Protected.

Movants pay no attention to the steps ERS has taken to protect Movants' interests in the Employer Contributions ERS was holding on its petition date, tacitly conceding that ERS's actions in freezing those funds adequately protects Movants' interests. Holding funds in escrow pending litigation over who is entitled to them is a form of adequate protection. In *Mills International*, for example, the court held that creating an escrow to hold funds that might be subject to a creditor's

6

judicial lien was sufficient adequate protection. 2015 WL 15175320, at *4. Thus, the Court should deny the Motion to the extent it seeks stay relief to enforce Movants' claims against ERS's funds.

### C. A Substantial Equity Cushion Protects Any Alleged Interest In PayGo Fees.

As the First Circuit has explained, "one common form" of adequate protection is "the existence of an equity cushion." *Peaje*, 845 F.3d at 512. "If the value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim[,]" no further protection beyond the existence of the equity cushion is required. *Id.*; *accord Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995). Here, the Oversight Board's expert, Gaurav Malhotra, has calculated the net present value of the PayGo fees to be between ▮ ▮ the value of the ERS Bondholders' $3.8 billion claim. (Ex. M, Gaurav Malhotra Dec., ¶15; Claim No. 16777.) Movants have not offered their own valuation and their criticisms of Malhotra's testimony, even if accepted, do not change the bottom line: there is a substantial equity cushion here that protects Movants.

#### 1. *Peaje* Does Not Entitle Movants To Stay Relief.

Movants first argue that adequate protection is necessary because "Joint Resolution 188 and Act 106 permanently diverted the Bondholders' collateral from ERS and the Fiscal Agent to the Commonwealth Treasury." (Mov.Supp.Br. ¶53.) The First Circuit, however, was clear in *Peaje* that mere dissipation is insufficient where, as here, there is an ongoing stream of alleged collateral (PayGo fees) absent a showing "that these future funds would be insufficient" to pay the lien. 845 F.3d at 514. Given this clear holding in a case involving Movants, their reliance on a 1935 Second Circuit case is peculiar and irrelevant. (*See* Mov.Supp.Br. ¶72 (citing *In re Murel Holding Corp.*, 75 F.2d 941, 942-43 (2d Cir 1935), for the proposition that "payment in the future 'is not generally the equivalent of payment now'").)

The fact that the Commonwealth deposits the PayGo fees into a Treasury account also is

7

irrelevant. In *Peaje*, toll revenues that were supposed to be deposited with a fiscal agent were deposited elsewhere, but the First Circuit nonetheless kept the stay intact because "[a]ny particular toll revenue not allocated to the…bonds today could simply be made up for by toll revenues collected tomorrow." 845 F.3d at 514. So too here. Finally, Act 106 did *not* permanently divert Movants' collateral as Movants' actual collateral—the Employer Contributions in ERS's accounts as of its petition date—are either still there or have been turned over to Movants.

### 2. Movants' Alleged PayGo Fee "Risks" Are Unquantified And Speculative.

Movants argue that the stream of PayGo funds is too risky to adequately protect their interests for three reasons. ***First***, Movants argue that the payment of future PayGo fees are uncertain because some municipalities have failed to pay all of their PayGo obligations. (Mov.Supp.Br. ¶¶56-59.) But the biggest payer by far, the Commonwealth, has made all of its payments, making this concern a red herring. In fact, even if every municipality stopped paying all together, the present value of the Commonwealth's PayGo fees would still be between $21 billion and $21.6 billion, creating an equity cushion of 500%. (*See* Ex. W.)

***Second***, Movants state that the "Commonwealth's fiscal troubles" call the validity of the PayGo fees into question. (Mov.Supp.Br. ¶56.) But every debtor generally has fiscal troubles; otherwise there would be no need for bankruptcy. Unsurprisingly, Movants cite no cases where a debtor's financial troubles was a basis to lift the stay.

***Third***, Movants claim "[t]here is also significant uncertainty surrounding future legislative action to harm the Bondholders or evade payment on the ERS Bonds, such as further changes to the pension system." (Mov.Supp.Br. ¶61.) Again, however, Movants do not cite any case which holds that the fact that a legislature could change the law in a manner that negatively impacts a creditor supports stay relief. More fundamentally, by claiming they need protection against the

8

risk of future adverse legislation, Movants are asking the Court to improve their position by eliminating a risk ERS warned Movants about when they purchased their bonds, and that is not the function of adequate protection. *See In re Smithfield Estates, Inc.*, 48 B.R. 910, 914 (Bankr. D.R.I. 1985) (adequate protection is "not designed or intended to place an unsecured or minimally secured creditor in a better position than it was in before the stay.").

Underscoring the fact that Movants' "pot shots" at the Oversight Board's valuation to do not materially change that valuation is the fact that Movants offer no valuation of their own. In fact, as Malhotra testifies, "[n]ominal PayGo costs in each of the first 10 years, at a projected level of $1.5 billion or higher, represent on an annual basis, more than 1/3 of the total estimated bondholder claim." (*See* Ex. N, Malhotra Rebuttal Dec., ¶4(a).) The only way to reduce the value of the PayGo fees below the debt service would be to use a discount rate greater than 31.67%—a rate that it is rarely, if ever, used in sophisticated bond markets. (*See* Ex. Y, Analysis Based on MALHOTRA000179, attached hereto.) To put that rate in perspective, 31.67% is almost ▮▮▮▮ that Movants' expert suggested Malhotra should have used. (*See* Ex. O, Faten Sabry Report, ¶ 22). In short, there is simply no plausible scenario where the present value of PayGo fees would be insufficient to cover the ERS bond debt plus leave a comfortable cushion.

### 3. Movants' Attacks On Malhotra's Valuation Are Unavailing.

Unable or unwilling to provide their own valuation, Movants are left with attempting to undercut Malhotra's valuation. Movants contend that Malhotra's analysis is irrelevant because he "valued the pension payments themselves" and not PayGo fees. (Mov.Supp.Br. ¶66.) That is a distinction without a difference. As Act 106 makes clear, PayGo fees are equal to the pension payments that are paid out. (Ex. D, Act 106, §2.1(b).) So, by definition when Malhotra valued the stream of future pension payments, he was valuing PayGo fees.

Movants argue that PayGo fees are riskier than pension payments because some

9

municipalities are not paying what they owe. (Mov.Supp.Br. ¶63.). But even if that were true, because the Commonwealth's PayGo fees are worth over $21 billion and the Commonwealth has never missed a PayGo payment, Movants still enjoy a comfortable equity cushion. (Ex. W.)

Movants also claim that Malhotra erred in choosing the discount rates of 3.58% and 3.79% because those rates are not appropriate "with a distressed credit like Puerto Rico's." (Mov.Supp.Br. ¶67.) Movants argue that if Malhotra had used the rate suggested by their expert Sabry, Mulhotra's "estimate would have fallen by 71.5%." (*Id.*) But what Movants leave out is that even if that discount rate is used, the present value of PayGo fees would still be ▮▮▮ what ERS Bondholders are owed. (Ex. O, Sabry Rebuttal Report, ¶23, n.30.)

In sum, the evidence will establish that Movants are adequately protected.

**II.     Movants Do Not Have A Colorable Claim To The PayGo Fees.**

Because the net present value of the PayGo fees exceeds by a comfortable margin the amounts owed to Movants and because there has been no diminution in Movants' collateral at ERS (other than as result of payments to Movants), the Court need not address whether Movants possess a colorable claim to the PayGo fees. If it reaches this issue, however, it should hold that Movants do not possess a colorable claim. The First Circuit requires a creditor to show "a reasonable likelihood that it has a meritorious claim, and the court may consider any defenses or counterclaims that bear on whether this reasonable likelihood exists." *Grella*, 42 F.3d at 34. Movants have not (and cannot) make that showing with respect to the PayGo fees.

**A.     The ERS Bond Documents Do Not Grant Movants A Lien In PayGo Fees.**

Movants concede that the Bond Resolution provides them with a security interest in only "*certain property of ERS.*" (Mov.Supp.Br. ¶10 (emphasis supplied); *see also* Ex. B, Bond Resol., §201 ("The Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility")). This puts Movants in a troublesome spot. If their security interest is limited to certain property of

10

*ERS*, and if the Commonwealth has no liability for the bonds, then how can Movants claim that funds received by the *Commonwealth* are Movants' "collateral" to which they are entitled to adequate protection? As it turns out, the only way to do so is to disregard carefully defined terms and ignore the plain language of the Bond Resolution.

Indeed, Movants' argument hinges on this Court accepting their argument that "Employers' Contributions"—a defined term in the Bond Resolution—are the same thing as PayGo fees. (Mov.Supp.Br. ¶¶34-44.) But start with that definition. The Bond Resolution defines "Employers' Contributions" as "contributions paid from and after the date [of the Bond Resolution] that are made by the Employers and any assets in lieu thereof or derived thereunder *which are payable to [ERS] pursuant to Section 2-116, 3-105 and 4-113 of the [ERS Enabling] Act.*" (Ex. B, Bond Resol., at 37 (emphasis supplied).) The emphasized clause is particularly problematic for Movants, as it is undisputed that PayGo fees are neither paid to ERS nor are they paid pursuant to the ERS Enabling Act. Movants ignore this problem with their argument.

Movants seem to suggest that this Court should embrace a looser definition of "Employers' Contributions," one that would encompass "payments owed by participating employers to cover the accrued pension liabilities of their former employers." (Mov.Supp.Br. ¶37.) But Movants provide no authority for why this Court should read the definition of Employer Contributions in a way that renders an entire clause superfluous, and Puerto Rico law instructs otherwise. *See* 31 L.P.R.A. § 3471 (where language is not ambiguous, "the literal sense of [the contract's] stipulations shall be observed"). Moreover, where a creditor's interest could have been protected "by different loan document drafting," it is not this Court's duty to protect the creditor from itself. *In re Gateway Access Sols., Inc.,* 368 B.R. 428, 533-34 (Bankr. M.D. Pa. 2007).

Without any legal support, Movants also argue that certain emails and other documents

11

created years after the Bond Resolution override the Bond Resolution's narrow definition of Employer Contributions. (Mov.Supp.Br. ¶¶41-44.) But none of these documents qualify as amendments to the Bond Resolution under the procedures established in Article X of the Bond Resolution or even suggest that their authors were attempting to amend the Bond Resolution.

Because the plain language of the Bond Resolution directly refutes Movants' argument that PayGo fees are Employer Contributions, Movants cannot demonstrate the level of reasonable likelihood of success that the First Circuit requires to lift the automatic stay. *Grella*, 42 F.3d at 34.

**B.     The UCC Does Not Give Movants A Colorable Claim To PayGo Fees.**

Movants also argue that the UCC gives them a colorable claim to the PayGo fees. But Movants' UCC arguments are rooted in the same flawed premise that dooms their other arguments—that PayGo fees are Employer Contributions or proceeds thereof.

***First***, Movants cite a number of cases for the uncontroversial proposition that when a creditor's collateral is wrongly transferred to a third party, UCC 9-315(a)(1) protects the creditor's security interest in the hands of the third party. (Mov.Supp.Br. ¶47.) But for these cases to be applicable, ERS would have had to transfer the Employer Contributions it was holding as of the its petition date to the Commonwealth. If that had occurred (and no one is arguing that it did), then Movants' liens pursuant to UCC 9-315(a)(1) would have traveled with their collateral. In fact, ERS has either paid the proceeds of Employer Contributions to Movants or those funds are being held for Movants' benefit pending this Court's resolution of the lien dispute.

***Second***, Movants argue that even if PayGo fees are not themselves Employer Contributions, they are subject to Movants' liens as "identifiable proceeds" of Movants' collateral. (Mov.Supp.Br. ¶¶3,46,48.) Here (and putting aside the fact that §552(a) cuts-off Movants' alleged interest in any post-petition proceeds), Movants are doubly wrong, as PayGo fees are neither proceeds nor identifiable. The Bond Resolution provides that Movants' lien in Employer

12

Contributions includes "any and all cash and non-cash-proceeds" of the Employer Contributions, which includes any proceeds generated from the "transfer ... disposition ... substitution or replacement" of the Employer Contributions. (Ex. B, Bond Resol., at VI-30.) The UCC defines "proceeds," in relevant part, as (a) "whatever is *acquired* upon the ... disposition of collateral"; and (b) "whatever is *collected* on, or *distributed* on account of, collateral." UCC §9-102(a)(64)(A), (B), 19 L.P.R.A. §2212(a)(64)(A), (B) (emphasis added). As the First Circuit made clear in *In re American Cartage, Inc.*, 656 F.3d 82, 88-89 (1st Cir. 2011), "'proceeds' refers to the secured creditor's right to *value derived from [its] collateral*, not to the mere act of attempting to recover that value" (emphasis added); *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 335 (Bankr. D. Nev. 2010); *1st Source Bank v. Wilson Bank & Tr.*, 735 F.3d 500, 504 (6th Cir. 2013); *see also* The Law of Secured Transactions, §1.02[5][w] (3d ed. 2018) (Clark and Clark) (the "term 'proceeds'...represent[s] a special category of collateral that derives from the original collateral.")

Movants also cite to §9-102(a)(64)(C) which includes in the definition of proceeds "rights arising out of collateral" but provide no explanation for how this provision could apply given that the Bond Resolution is clear that ERS had no right to continue to receive Employer Contributions. (Mov.Supp.Br. ¶48.) Bond Resolution §709.2, for example, required ERS to oppose laws that would reduce Employers' Contributions or have a material adverse effect on ERS Bondholders, thereby recognizing that such laws might be passed. (Ex. B, Bond Resol., §709.2.) The Bond Offering Statement also emphasized this fact in bold. (Ex. C, Bond Offering Statement, at 26.)

Because any "proceeds" must derive from the collateral itself, it bears repeating that Movants' collateral is "Employers' Contributions *received by [ERS]* or the Fiscal Agent" that *are payable to ERS* under Section 2-116, 3-105 and 4-113 of the ERS Enabling Act. (*Id.* at 36-37 (emphasis added).) And where have those funds gone? They either went into the Prepetition

13

Segregated Account, which has been fully liquidated to pay Bondholders, or they remain in accounts that will be released to Bondholders should the Court ultimately rule in Movants' favor. (Ex. J; Case No. 17-bk-03283, Dkt. 7075, at ¶68 n.20.) Neither the Legislature nor any other party has converted or otherwise disposed of the Employer Contributions.

What Act 106 did instead, as part of the change to a new pension system, was to eliminate the obligation of government employers to pay future (but as of yet unearned and unpaid) Employer Contributions to ERS. Critically, nothing was generated from that termination. Thus Movants' theory that PayGo fees derive from the Bondholders' collateral and are therefore "proceeds" is a factual impossibility. A simple analogy explains why this is so. Assume that a subsidiary corporation (but not its parent corporation) granted a creditor a security interest in the subsidiary's accounts receivable owed by customer X. Later, the subsidiary terminated its contract with customer X and no further receivables were generated. Subsequently, the parent entered into a contract with customer X. The secured creditor could not argue that the parent's accounts receivable are proceeds of the creditor's collateral because the new accounts receivables are not "derived" from the disposition of the old receivables. *See American Cartage*, 656 F.3d at 88-89. That is essentially what Movants claim happen here.

Movants should not be permitted to expand their collateral to include PayGo fees as proceeds of the no longer existing Employer Contributions. *In re Lady Madonna Indus., Inc.* 99 B.R. 536 (S.D.N.Y. 1989) is instructive. In that case, the security agreement granted a security interest in general intangibles that were "related to" accounts receivable and contract rights. *Id.* at 539. The secured party argued that its security interest included the debtor's trademarks. *Id.* at 540 Although neither party disputed that trademarks were a form of general intangibles, the trustee argued that the secured party did not have a security interest in the debtor's trademarks, because

14

trademarks are not "related to" accounts receivable. *Id.* The bankruptcy court agreed with the trustee, and the district court affirmed on appeal. *Id.* at 541. Both courts looked no further than the text of the definition to reach their conclusion and refused to consider parole evidence: "Because the Court finds that they Security Agreements unambiguously failed to include trademarks as collateral, extrinsic evidence as to the parties' intent is inadmissible." *Id.* Here, the case for holding the Movants to the language in the Bond Resolution is even stronger, given that it is clear through the statements in the Bond Resolution and Bond Offering that the parties' intent was in fact to limit the collateral to Employer Contributions made pursuant to the Enabling Act.

Further, as the Oversight Board argues, even if this Court were to find that the PayGo fees are somehow proceeds of Employer Contributions, they are not "identifiable" proceeds under UCC 9-315(b)(2) because they have been commingled with other Commonwealth funds. (FOMB Supp. Br. ¶60.) Movants have not made any efforts to trace their so-called "proceeds" and thus their security interest does not attach in the PayGo fees that have been deposited with the Commonwealth. UCC 9-315(b)(2); 19 L.P.R.A. § 2265(b)(2).

## CONCLUSION

For all of the foregoing reasons, the Motion should be denied.

Dated: June 25, 2019

JENNER & BLOCK LLP

By: */s/ Robert Gordon*
Robert Gordon (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654

Respectfully submitted,

BENNAZAR, GARCÍA & MILIÁN, C.S.P.

By: */s/ A.J. Bennazar-Zequeira*
A.J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Francisco del Castillo Orozco
Edificio Union Plaza,
1701 Avenida Ponce de León #416
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org

15