**Hearing Date & Time:**
**July 2, 2019 at 10:00 a.m. (AST)**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------X

| | |
|---|---|
| In re: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
|     as representative of | No. 17-cv-1685-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | No. 17-bk-3566-LTS |
| Debtors.[1] | (Jointly Administered) |

-------------------------------------------------------------X

| | |
|---|---|
| CERTAIN ALLEGED SECURED CREDITORS OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, | **Re:  ECF Nos. 289, 292, 367, 371 505, 579 & 583** |
| Movant, | |
|    -against- | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
|     as representative of | |
| EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, | |
| Respondent. | |

-------------------------------------------------------------X

### DEBTOR'S REPLY TO SUPPLEMENTAL BRIEF IN
### SUPPORT OF MOTION OF CERTAIN SECURED CREDITORS OF
### THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
### COMMONWEALTH OF PUERTO RICO FOR RELIEF FROM AUTOMATIC STAY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ....................................................................................................................3

    I.      Movants Cannot Make An Initial Showing of Cause, As Movants Fail to
Demonstrate They Have an Interest in the Debtors' Property. ...............................3

          A.      Movants Do Not Have Even a Colorable Claim to Property of the
Debtors. .....................................................................................................4

          B.      Movants Have No Security Interest in the Paygo Payments. .....................4

                 i.      The Paygo Payments Are Not Covered By the Language
Granting the Bondholders' Alleged Security Interest. ....................4

                 ii.     The Reformed Retirement System Under Act 106 Is
Different than the Prior Retirement System. ...................................7

                 iii.    The Paygo Payments are Not "Identifiable Proceeds" of
Movants' Alleged Security Interest. ...............................................9

    II.     Movants Do Not Face a Threat of Uncompensated Diminution As A
Result of the Automatic Stay and Are Adequately Protected. ..............................11

          A.      Movants' Alleged Collateral Is Not Being Diminished. ..........................11

          B.      Diminution Must Result from the Automatic Stay; It Is Not
Sufficient for Diminution to Occur Merely While the Automatic
Stay Is In Effect. .....................................................................................12

          C.      Even If There Is Diminution, Movants' Security Interest Is
Adequately Protected. ..............................................................................13

CONCLUSION.................................................................................................................15

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Grella v. Salem Five Cent Savs. Bank,*
  42 F. 3d 26 (1st Cir. 1994) ...................................................................................4

*In re Big3D, Inc.,*
  438 B.R. 214 (B.A.P. 9th Cir. 2010) ....................................................................12

*In re Cont'l Airlines, Inc.,*
  154 B.R. 176 (Bankr. D. Del. 1993) .....................................................................12

*In re Hunt's Pier Assocs.,*
  143 B.R. 36 (Bankr. E.D. Pa. 1992) ......................................................................4

*In re Gamma Center, Inc.,*
  489 B.R. 688, 696 (Bankr. N.D. Ohio 2013) ........................................................10

*In re S. Vill., Inc.,*
  25 B.R. 987 (Bankr. D. Utah 1982) ......................................................................13

*In re Shriver,*
  33 B.R. 176 (Bankr. N.D. Ohio 1983) ..................................................................13

*In the Matter of Holly's, Inc.,*
  140 B.R. 643 (Bankr. W.D. Mich. 1992) ..............................................................12

*Sharma v. INS,*
  89 F.3d 545 (9th Cir. 1996) ....................................................................................6

STATUTES

3 L.P.R.A. § 766 .............................................................................................................6

3 L.P.R.A. § 781 ........................................................................................................6, 8

3 L.P.R.A. § 787 .............................................................................................................5

11 U.S.C. § 361(2) .......................................................................................................12

11 U.S.C. § 362(d) ..........................................................................................................4

11 U.S.C. §§ 362(d)(1) ...................................................................................................3

i

11 U.S.C. §§ 362(g)(1) ..........................................................................................................3

11 U.S.C. § 362(g)(2) ...........................................................................................................4

11 U.S.C. § 552 ....................................................................................................................2

UCC § 1-302, Comment 1 ..................................................................................................10

UCC § 9-102(a)(64) ..............................................................................................................9

UCC § 9-102(a)(64)(B) .......................................................................................................10

UCC § 9-203 ....................................................................................................................6, 10

UCC § 9-203(f) ...................................................................................................................10

UCC § 9-315(b), Comment 3 .............................................................................................11

ii

To the Honorable United States District Judge Laura Taylor Swain:

ERS, by and through the Oversight Board, as the Debtor's representative pursuant to Section 315(b) of PROMESA, respectfully submits this reply to the *Supplemental Brief in Support of Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay* [ECF No. 583][2] (the "Supplemental Brief" or "Supp. Br."), filed by the ERS Bondholders.

## PRELIMINARY STATEMENT[3]

1.      As Movants have framed the issues, to prevail on their Motion, Movants must demonstrate <u>first</u>, the Paygo Payments are their collateral, <u>second</u>, their collateral is being diminished, <u>third</u>, that diminution is the result of the automatic stay, and <u>fourth</u>, that diminution is not being adequately protected.  If they fail to demonstrate any one of the foregoing, the Motion should be denied.  In fact, none of these propositions are true.

2.      Movants spend much of their Supplemental Brief arguing, in essence, that because, in their view, the Paygo Payments *look* like the Employers' Contributions previously made to ERS and that they *support* the purposes of ERS (*i.e.*, paying benefits to retirees), Paygo Payments should be treated *legally* the same as Employers' Contributions to ERS.  However, the Paygo Payments simply do not acquire the status of Employers' Contributions as a matter of law.  As this Court has acknowledged, that issue is <u>first</u>, a question of contract interpretation (Are the Paygo Payments subject to the Resolution and Security Agreement's alleged grant of a security interest to the ERS Bondholders?), and <u>second</u>, a question of interpretation and application of the relevant

---

[2] All ECF Nos. refer to the ERS Title III case (Case No. 17-bk-3566), unless otherwise indicated.

[3] All capitalized terms used but not defined herein shall have the meaning given to them in the *Debtor's Supplemental Opposition to Motion of Certain Secured Claimholders of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay* (the "Supplemental Opposition" or "Supp. Opp.") [ECF No. 579], or are defined below.

provisions of the UCC (Are the Paygo Payments a disposition of or "proceeds" of the Employers' Contributions?). The Paygo Payments are not Movants' collateral under either interpretation.

3.      Even if the Court looks past the language of the Resolution, Security Agreement, and UCC, a comparison of the pre– and post–Act 106 retirement benefit regimes reveals they are anything but the same. Among other differences, under Act 106 (1) the Commonwealth (not ERS) both makes and guarantees the benefits payments, thereby ensuring that pensioners get paid (unlike the prior system where there was a risk of underfunding the ERS trust, which primarily depended on the funds from employers), and (2) Paygo Payments must be remitted to the Commonwealth to reimburse it for the amount of actual pension payments the Commonwealth makes for covered employers (and are not based on a percentage of active payroll to fund a trust to be used to pay anticipated benefits to retirees, as was the case before).

4.      Movants' repeated protestations (*e.g.*, Supplemental Brief ¶ 32) that counsel for the Oversight Board stated—in 2016, prior to the ERS Petition Date—that holders of ERS Bonds had a valid and enforceable lien *at that time* are not relevant to this proceeding for at least three reasons: (1) ERS's Title III petition had not yet been filed (including, among other things, the operation of Bankruptcy Code section 552); (2) allegations that the issuance of the ERS Bonds were *ultra vires* had not yet been raised in court; and (3) Act 106 had not yet been enacted, which prevents any future Employers' Contributions from being created from and after July 1, 2017. Movants' attempt to catch the Oversight Board in a contradiction therefore falls short, and no such "judicial admission" precludes any argument ERS is making. Furthermore, the existence of these disputed issues show that Movants cannot demonstrate any entitlement to adequate protection or relief from stay.

5.      In any event, the point of the Oversight Board's counsel's 2016 statements (that

cash flows to pay pensioners would be sufficient to pay Movants in full) remains correct today—
<u>if</u> the Paygo Payments are Movants' collateral (they are not) in which they have a perfected
security interest (they do not), <u>then</u> the ERS Bondholders' security interest is adequately protected.
Movants' attempts to dissect the written declarations, and deposition testimony of the Oversight
Board's expert, Gaurav Malhotra, cannot avoid the conclusion that, if Movants have a security
interest in the Paygo Payments, those amounts will satisfy in full the principal and interest
payments on the ERS Bonds.  Accordingly, if the Court makes the determination that the Paygo
Payments are subject to Movants' security interest, any such interest would be adequately
protected and is not at risk of diminishment, and there is no cause to lift the stay.[4]

## **ARGUMENT**

### I.    **Movants Cannot Make an Initial Showing of Cause, As Movants Fail to Demonstrate They Have an Interest in the Debtors' Property.**

6.    To make an initial showing that cause exists to lift the automatic stay, Movants
must carry the burden to show that Movants have an interest in the Debtors' property, 11 U.S.C.
§§ 362(d)(1) & (g)(1), including any property in which Movants allegedly have a security interest
pursuant to the UCC.  Supp. Opp. ¶ 55.  Therefore, to establish the Paygo Payments are Movants'
collateral, Movants must demonstrate that the Paygo Payments are (1) included in the collateral
granted by the Security Agreement, (2) a disposition of such collateral, or (3) proceeds of such
collateral.  *Id.* ¶ 40.  Only after Movants have made such a showing does the burden then shift to
the Debtors on all other issues, including that any property interest is adequately protected.  11
U.S.C. § 362(g)(2).  Movants have failed to carry their burden to show that they have any security

---

[4] Movants focus their Supplemental Brief exclusively on their assertion that the Paygo Payments
are Movants' collateral, and that it is not being adequately protected.  Movants do not allege they
lack adequate protection with regard to any of ERS's assets.  Accordingly, the Debtor does not
discuss further that Movants' interest (if any) in ERS's assets is adequately protected.

interest in the Paygo Payments, so the Motion should be denied for lack of cause, and the Court

need not even reach issues of adequate protection (although ERS believes if Movants have any

property interest, that interest is adequately protected).

### A.   Movants Do Not Have Even a Colorable Claim to Property of the Debtors.

7.      Movants argue that they need only a "colorable claim" to the Debtors' property,

and that the First Circuit's ruling that "the Bondholders satisfied the filing requirements for

perfection as of December 17, 2015" provides them with claims "far more than merely

'colorable.'"  Supp. Br. ¶¶ 30–31.  However, Movants fail to explain that, as applied, when the

Court examines if a creditor has a "colorable claim," the Court "may take into account any

matter . . . that clearly refutes a creditor's claim to the property."  *Grella v. Salem Five Cent Savs.

Bank*, 42 F. 3d 26, 34 (1st Cir. 1994).

8.      Movants have failed to connect how the First Circuit's finding that a security

interest was perfected demonstrates they have an interest in the Paygo Payments.  As explained

above (at ¶ 6), because Movants have the burden of proving their security interest in the Debtors'

property is effective, "serious doubt about the validity of [Movants'] security interest . . . weighs

heavily upon the court's determination of a § 362(d) motion."  *In re Hunt's Pier Assocs.*, 143 B.R.

36, 50 (Bankr. E.D. Pa. 1992) (collecting cases).  Here, because the Paygo Payments are not

Movants' collateral (or, at a minimum, serious doubts have been raised that they are not), Movants'

claim is not colorable, and stay relief is inappropriate.

### B.   Movants Have No Security Interest in the Paygo Payments.

####   i.   The Paygo Payments Are Not Covered By the Language Granting the
             Bondholders' Alleged Security Interest.

9.      When the Commonwealth enacted Act 106, it repealed Sections 2-116 and 3-105

4

of the Enabling Act,[5] eliminating any further Employers' Contributions to ERS, and Movants'
security interest with it.[6]  Movants note that Section 4-113 of the Enabling Act, which provides
that "the contributions required from the employer, as well as all annuities, benefits,
reimbursements, and administration expenses, shall constitute obligations of the employer[,]"
remains in effect today.  Supp. Br. ¶ 36.[7]  Accordingly, they argue that "even when ERS moved to
a pay-as-you-go system, the employers remained liable to pay the entire costs of the pension, and
their contributions . . . still would have constituted 'Employers' Contributions' subject to the
Bondholders' liens under the Bond Resolution."  *Id.* ¶ 37.  ERS did not move to a "pay-as-you-
go" system.  The Commonwealth did.  This alone makes Movants wrong.

10.      Movants also misstate both prior and current Puerto Rico law.  Prior to enactment
of the Post-Petition Legislation, the obligations pursuant to the Enabling Act included (1) the
contribution obligation of the covered employers to contribute to ERS a percentage of their payroll
to fund the ERS trust (3 L.P.R.A. § 781), and (2) the payment obligation of ERS to make, out of
assets and income from its trust (generated from, among other things, the Employers'
Contributions), payments to retirees and beneficiaries.  3 L.P.R.A. § 766.

11.      Act 106 changed this structure by guaranteeing that the Commonwealth would

---

[5] In ERS's Supplemental Opposition, ERS mistakenly stated that Section 4-113 of the Enabling
Act, had been repealed by Act 106.  Section 4-113 remains in effect.

[6] Movants assert that "Joint Resolution 188 and Act 106 are void for violating the automatic stay
and the Contracts Clause."  Supp. Br. ¶ 33.  As ERS has previously explained, among other
reasons, the Post-Petition Legislation did not violate the automatic stay or the Contracts Clause
because the government always retains the ability to exercise its police and regulatory powers for
the benefit of its citizens.  *See, e.g.*, Post-Petition Legislation AP, [ECF No. 41, pp.13–20] (Post-
Petition Legislation does not violate automatic stay); Commonwealth Claim Objection ¶¶ 81–101
(Post-Petition Legislation does not violate Contracts Clause).

[7] Movants omit that Section 4-113 is a statement of intent; it does not, of itself, provide for the
payment of any contributions—Employers' Contributions or otherwise.  3 L.P.R.A. § 787 ("It is
the intent of §§ 761 *et. seq.*, of this title . . .") (Westlaw English Translation, 2016).

make pension payments to retirees for which it would receive reimbursements from covered employers. Act 106, § 2.1(f). Consistent therewith, all obligations of employers to remit Employers' Contributions (and all other contributions) to fund the ERS trust were eliminated, as was ERS's obligations to make payments to retirees and beneficiaries.

12.     Additionally, before the enactment of the Post-Petition Legislation, the only right ERS had (with respect to which a security interest could be granted) was in the contribution obligation of the covered employers to contribute to ERS. However, Act 106 discontinued that obligation, such that ERS no longer has any rights to such payments. Therefore, the obligation of employers to contribute is to ERS is gone, and Section 4-113 is a nullity, because there are no more contributions to ERS from which the Movants can derive any additional security.[8] *See also, e.g.*, *Sharma v. INS*, 89 F.3d 545, 547 (9th Cir. 1996) ("When two statutes conflict the general rule is that the statute last in time prevails as the most recent expression of the legislature's will."). Furthermore, although the obligation to make pension benefit payments resides now with the Commonwealth (instead of ERS), the beneficiaries of such obligation were always the retirees (and their related beneficiaries), and ERS was and remains unable to grant any such security interest to Movants in that obligation, as it was not ERS's property to begin with. *See* UCC § 9-203. Paygo Payments merely reflect benefits owed by the various employers (and paid by the Commonwealth) to retirees (and their related beneficiaries). As such, they are not part of a "contribution" obligation to ERS or any other system. They are simply a payment obligation of the Commonwealth in which ERS cannot grant a security interest.

13.     The Resolution did not grant a security interest to the holders of ERS Bonds in any

---

[8] For similar reasons, Movants' allegation that Section 2-116 imposes any actuarial deficiency of the Debtor as an obligation of the employer, Supplemental Brief ¶ 36 & n.5, is inapposite, because the employers no longer have an obligation to fund any actuarial deficiency.

6

future payments by employers simply because they are related to pension payments; instead, the grant was to a specific contribution under Sections 2-116 and 3-105 of the Enabling Act.  The Legislature's provision of Employers' Contributions was always subject to change or even elimination.  All ERS Bondholders knew (or were on notice) of this possibility when they made their purchases.  The Offering Statement states it expressly:

> ***The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions***.  The Bonds are being issued pursuant to general authority contained in the Act, **which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders.**  In addition, as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act.  Therefore, **the Legislature could make changes to the Act that are adverse to the Bondholders,** including reducing the rate at which participating Government Employers are required to contribute to the System.  **If any such change is made, the ability of the System to pay debt service on Bonds when due could be adversely affected.**  It is impossible to predict at this time the conditions that could cause the Legislature of Puerto Rico to reduce the Employer Contribution rate, but those conditions could include situations (i) where the System's unfunded accrued liability has been reduced or eliminated, which could lead the Legislature to the conclusion (if it did not take into consideration the need to pay the Bonds) that additional Employer Contributions are not required, or (ii) where there is severe financial stress affecting one or more of the Government Employers.

Offering Statement at 26 (underlined emphases added; italicized emphasis original).

14.     In 2017, the Legislature did exactly what the Offering Statement warned the Legislature could do in enacting the Post-Petition Legislation, adversely affecting ERS Bondholders.  At the time they invested in the ERS Bonds, Movants considered (or should have considered) the risk and invested anyway.  Now that the risk has materialized, they are seeking assistance from the courts to re-write the terms of their investment to the detriment of the other creditors of the Commonwealth.

> **ii.     The Reformed Retirement System Under Act 106 Is Different than the Prior Retirement System.**

7

15.     Even if it were relevant to an analysis what property is subject to Movants' alleged security interest, the Paygo Payments are not equivalent to the Employers' Contributions, and there are material differences between the two retirement benefit systems.[9]  Movants allege that:

> [Joint Resolution 188 and Act 106] did not defeat the Bondholders' liens because PayGo fees and employer contributions are one and the same. . . . [and] PayGo fees are paid by same employers, for the same purpose, and in amounts employers were already obligated to pay as employer contributions under the ERS Enabling Act.

Supplemental Brief ¶ 3.  This allegation is mistaken on multiple accounts.[10]

16.     As explained in the Supplemental Opposition (*see* ¶¶ 62–65) and the Commonwealth Claim Objection [Case No. 17-bk-3283, ECF No. 7075] (*see* ¶¶ 69–73), the benefits system in place under Act 106 differs in material respects from the previous system, including that (1) covered employers are now responsible for making Paygo Payments each month to reimburse the Commonwealth for its payment of retirees' current pension benefits; they do not contribute amounts to ERS based on a percentage of the then–current payroll of active employees in order to fund an account to be invested in order to pay retiree benefits,[11] (2) reimbursement payments are now made by covered employers directly to the Commonwealth, and not to ERS, and (3) all other employer–mandated payment obligations (*i.e.*, Employers' Contributions and the AUC) have been terminated.  As a result of the Post-Petition Legislation, covered employers do

---

[9] To begin with, Movants display an incorrect understanding of what the Enabling Act provided, by stating it "*required* employers to make contributions sufficient to fund the system under actuarial principles."  Supp. Br. ¶ 8 (emphasis in original).  At best, that goal was merely aspirational, as the setting of the Employers' Contribution rate (and later, the AUC rate) expressly did not consider the amounts necessary to actuarially fund the system.  *See* 3 L.P.R.A. § 781.

[10] Movants' observation that certain people working in the Commonwealth's Treasury department incorrectly described the differences between the Employers' Contributions and Paygo Payments, Supplemental Brief ¶ 41, does not change the fact that such payments are not the same.

[11] Therefore, it is false—as Movants say—that "PayGo fees are paid by the same employers, for the same purpose, and in amounts employers were already obligated to pay."  Supp. Br. ¶ 3.

not pay the same amounts as they did before (due to the different calculation methodology) and no longer remit payments to ERS or have any contribution obligations to fund the ERS trust.

### iii.   The Paygo Payments Are Not "Identifiable Proceeds" of Movants' Alleged Security Interest.

17.     If the Paygo Payments are not collateral granted by the Security Agreement, then under the UCC, Movants must demonstrate that (i) the Paygo Payments are "proceeds" of collateral in which Movants have a perfected security interest, and (ii) that any such proceeds are "identifiable." *See* Supp. Opp. ¶¶ 53–60.

### a)   The Paygo Payments Are Not "Proceeds."

18.     Movants argue that, pursuant to the Resolution, Movants' alleged security interest extends broadly to, among other things, the asserted substitution of the Pledged Property, and that the Paygo Payments are plainly "proceeds" of such substitution of the Pledged Property.  Supp. Br. ¶ 46.  However, Movants quote the definition of "proceeds" from the Resolution, and not the statutory definition of "proceeds," which does not include the word "substitution" or a synonym thereof.  UCC § 9-102(a)(64).  While a contract like the Resolution can grant a security interest in whatever the counterparties agree to (subject to the scope limits of the UCC), it cannot expand the statutory definition of "proceeds."  UCC § 1-302, Comment 1 ("The meaning of the statute itself must be found in its text . . . it cannot be varied by agreement.").  Here, this means that any alleged substitutions for Movants' collateral (*i.e.*, the Pledged Property) can be collateral.  However, the Resolution does not (and cannot) make "substitutions" of collateral "proceeds" of collateral as that term is defined in the UCC.  Thus, even if the Paygo Payments are found to be substitutions of Movants' collateral under the Resolution, they are not the property of ERS; they are Commonwealth property.  Accordingly, ERS cannot grant Movants a security interest therein, as

9

a party can grant a security interest only in its own property.  UCC § 9-203.[12]

19.    Movants additionally argue that the Paygo Payments are made "on account" of their collateral, such that they are "proceeds" of such collateral as defined in the UCC.  Supp. Br. ¶ 48.  However, Movants' quotation of the UCC's definition of proceeds egregiously omits the word "collected," UCC § 9-102(a)(64)(B), ("'Proceeds' . . . means . . . whatever is collected on, or distributed on account of, collateral"); their partial quote apparently strives to convey the idea that "on account of" encompasses property that "arises" out of other property.  The omitted word "collected," however, makes clear that concept is intended to cover money received when collecting a debt of some sort (a note, an account receivable, *etc.*).  *See In re Gamma Center, Inc.*, 489 B.R. 688, 696 (Bankr. N.D. Ohio 2013).[13]

### b)    The Paygo Payments Are Not "Identifiable."

20.    Even if the Paygo Payments are "proceeds," Movants have the additional burden to show such payments are "identifiable."  Movants argue that because the Paygo Payments are "discrete payments that *are to be* paid into the 'Accumulated Pensions Payment Account,' . . . there is no basis to conclude that they are not 'identifiable.'"  Supp. Br. ¶ 48 (emphasis added).  Movants, however, focus on the wrong question; it matters not where the Paygo Payments *are supposed to be* deposited, but where they are *in fact* deposited.  UCC § 9-315(b), Comment 3.  Therefore, the relevant question is whether any such proceeds are identifiable following their deposit into the Department of Treasury's General Fund, and Movants have not carried their

---

[12] The only relevant possible exception is that the grantor of a security interest can grant a security interest in the "proceeds" (as defined in the UCC) of original collateral owned by the grantor, even if the grantor does not own the proceeds.  UCC § 9-203(f).  This exception does not help Movants here, however, as the claim the Paygo Payments are "proceeds" of the Pledged Property is what Movants are trying to prove in the first instance.

[13] Movants also assert that the Pledged Property "aris[e] out of collateral."  Supp. Br. ¶ 48.  As explained in ERS's Supplemental Opposition (*see* ¶¶ 57–59), this is incorrect.

10

burden on this issue.  *See supra* ¶ 6.  Accordingly, and for the reasons set forth in ERS's
Supplemental Opposition (*see* ¶ 60), any alleged "proceeds" of the Pledged Property are not
"identifiable."

## II.   Movants Do Not Face a Threat of Uncompensated Diminution As A Result of the Automatic Stay and Are Adequately Protected.

### A.   Movants' Alleged Collateral Is Not Being Diminished.

21.     Even assuming the Paygo Payments are Movants' collateral (which ERS
vehemently disputes), the Paygo Payments are not being diminished, so there is no cause to lift the
stay.  *See* Supp. Opp. ¶ 75 ("Courts routinely deny stay relief when movants fail to provide
sufficient evidence that the value of their collateral has diminished since the petition date. . . .")
(citations omitted).  Movants complain that the Post-Petition Legislation "permanently diverted"
their collateral.  Supp. Br. ¶ 53.  However, if they are right that their alleged security interest in the
Paygo Payments follows such payments, the fact that the Paygo Payments reside now with the
Commonwealth, and not at ERS, does not lower its value.  It is incorrect to say (as Movants do)
that a "lien[] on future PayGo fees do[es] not constitute adequate protection."  Supp. Br. ¶ 72.  All
Movants ever had (if anything) was a promise of future payments; if they remain entitled to such,
their collateral is not diminishing.[14]

22.     As far the as quantum of Paygo Payments being made to reimburse the
Commonwealth, Movants complain that certain public corporations and municipalities are in
arrears on their invoiced payments.  Supp. Br. ¶¶ 56–58.  However, the Commonwealth remains
current on its obligations to make Paygo Payments, and is in fact the guarantor of all such

---

[14] Alternatively, if Movants have a security interest in the Paygo Payments, the Commonwealth
can be considered to grant them a "replacement lien" in such payments as adequate protection as
allowed for by Bankruptcy Code section 361(2).

11

payments, Act 106, § 2.1(f), so there is no diminution in value with regard to such payments. Further, as to the non–Commonwealth Paygo Payments, actions are being taken to collect on these unpaid invoices.  Movants cite certain letters and documents as evidence that payments of Paygo Payments invoices are uncertain, *see* Supplemental Brief ¶ 61; however, these letters and public documents indicate just the opposite:  that the Oversight Board takes the remittance and collection of Paygo Payments invoices seriously, and is taking enforcement actions to collect them.[15]

> **B.** **Diminution Must Result from the Automatic Stay; It Is Not Sufficient for Diminution to Occur Merely While the Automatic Stay Is In Effect.**

23.    Movants assert that the Debtor—and this Court—are being "frivolous" when asserting "that the automatic stay be *the cause* of any diminution in collateral value[,]" and instead state that the standard for when adequate protection is required is when "collateral is decreasing in value *while the automatic stay is in effect.*"   Supp. Br. ¶ 51 (emphases in original).  However, precedent makes clear that a creditor may be permitted to lift the stay only when—but for the automatic stay—the creditor would have been able to protect its collateral against a diminution in value.  There is no protection against exogenous causes of depreciation of collateral.  *See In re Big3D, Inc.*, 438 B.R. 214, 224 (B.A.P. 9th Cir. 2010) (upholding bankruptcy court's decision denying request for adequate protection because decline in value of creditors' property (here, equipment) was caused by "deteriorating economic conditions" that occurred regardless of the debtor's decision to reorganize its affairs in bankruptcy and the loss was not due to the automatic stay); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 369 (1988)); *In the*

---

[15] *See, e.g.*, Letter from Natalie A. Jaresko, Exec. Dir., Oversight Board, to Hon. Raúl Maldonado Gautier, Esq., CFO, Gov't of P.R., and Luis Collazo Rodríguez, Admin. and Exec. Dir., Ret. Bd. & Emps. Ret. Sys. (Apr. 30, 2019) (available at https://drive.google.com/file/d/1jGz3cotsGds4-1G5-X0MN0C-A01drDse/view?usp=drivesdk).

*Matter of Holly's, Inc.*, 140 B.R. 643, 696 (Bankr. W.D. Mich. 1992); *In re Shriver*, 33 B.R. 176,

182 (Bankr. N.D. Ohio 1983); *In re S. Vill., Inc.*, 25 B.R. 987, 989 (Bankr. D. Utah 1982).

24.     First, the enactment of the Post-Petition Legislation is not something the automatic

stay prevents Movants from challenging.   In fact, they have already sought to enjoin the

implementation of the Post-Petition Legislation in these Title III proceedings.   Post-Petition

Legislation AP, [ECF No. 39].   Second, as described above, action is being taken to collect

outstanding Paygo Payments.  *See supra* ¶ 22.  The "precarious" financial position of the covered

employers making Paygo Payments did not result from the automatic stay, Supplemental Brief

¶ 63; if anything, lifting the stay will only make such employers' financial position more

precarious.   Accordingly, any diminution in value that exists in the Paygo Payments is not the

result of the stay.   Third, the risk of legislative changes that decrease the amount of Paygo

Payments, or otherwise adversely affect Movants' alleged collateral, is an ever-present risk.  It was

a risk when Movants first purchased their ERS Bonds.  *See supra* ¶ 13.  Any risks and uncertainties

that exist to the alleged collateral now are the same as those that existed before, and are not caused

by the automatic stay.

### C.     Even If There Is Diminution, Movants' Security Interest Is Adequately Protected.

25.     As stated in the Supplemental Opposition, an "equity cushion" provides Movants

adequate protection, such that even if (a) the Paygo Payments are Movants' collateral, and (b) the

Commonwealth is not adequately seeking reimbursement for all Paygo Payments from non-

Commonwealth employers (*i.e.*, municipalities and public corporations), there remains sufficient

Paygo Payments to pay Movants in full with room to spare.  *See* Supp. Opp. ¶ 80.

26.     Movants first claim they are not adequately protected because there is a risk Paygo

Payments will be interrupted or cease at some undefined point in the next 40 years.  *See* Supp. Br.

13

¶ 63.  Even putting aside the speculative nature of that claim, Movants characterize the flow of Paygo Payments as "all or nothing" with no evidence quantifying that risk or its effect.  Sabry Depo. Tr. 72:21–73:1 [no quantification of risk factors]; 83:23–84:4 [no evaluation of likelihood of potential future changes to retirement benefits].

27.     Movants next claim the Commonwealth's failure to collect all monies owed by public corporations and municipalities when due is evidence their collateral is diminishing.  Supp. Br. ¶ 56.  However, they ignore that Paygo Payments include payments made by all covered entities—*including Commonwealth employers*—based on their retired employees receiving benefits.  *See* Act 106, §§ 1.4(b); 1.6(g) (indicating the "Government" will make Paygo Payments).

28.     As set forth in the *Declaration of Gaurav Malhotra in Connection with Motion for Relief from the Automatic Stay*, Paygo Payments made from Commonwealth employers (*i.e.*, "FP [Fiscal Plan] Agencies") over the next forty years are projected to be $31.9 billion dollars in nominal terms, with a net present value ranging from $17.5–18.0 billion.  *Id.* ¶ 14.  Accordingly, even assuming that the precise amount of future Paygo Payments is uncertain, *see* Supplemental Brief ¶¶ 56–59, it strains credulity to believe that they will drop to a low enough amount to be unable to satisfy the principal and interest payments on the roughly $3 billion in outstanding ERS Bonds.  Further, Movants completely mischaracterize Mr. Malhotra's testimony in footnote 10 of the Supplemental Brief.  Mr. Malhotra never assumed that the Commonwealth was not responsible for making Paygo Payments.  His point was that the Commonwealth is responsible for paying the retiree benefits under the "pay-as-you-go" system, so there is no need for the Commonwealth to reimburse itself.  *See* Malhotra Dep. Tr. 88:3–17.

29.     Movants allege that Mr. Malhotra's analysis contains multiple errors which renders it unusable; most fundamentally, that Mr. Malhotra valued the pension payments to retirees

14

themselves, and not the Paygo Payments reimbursed by the Government, municipalities, and public corporations to the General Treasury.  Supp. Br. ¶ 66.  However, Movants are seizing on a distinction without a difference.  Under a "pay-as-you-go" benefits system, Paygo Payments are invoiced based on amounts paid to retirees and that is the operative measure of the amount of money needed and available.  *See* Act 106, § 2.1(b) ("The Pay-Go fee . . . shall be equal to the amount paid to Retirees and Beneficiaries of each covered entity.").  Accordingly, Mr. Malhotra valued the correct payment stream.

30.       Movants additionally fault Mr. Malhotra for using a discount rate in his net present value analysis that is too low for the risk they allege exists with regard to the collectability of the Paygo Payments.  Supp. Br. ¶ 67.  But, Movants: (i) fail to quantify the risks they say Mr. Malhotra should have accounted for (Sabry Depo. Tr. 72:21–73:1) [no quantification of risk factors]; 83:23–84:4 [no evaluation of likelihood of potential future changes to retirement benefits]; (ii) fail to perform any calculation of net present value accounting for those risks (*id.* 88:10–16); and (iii) fail to offer any opinion as to an appropriate discount rate (*id.* 88:19–89:2).  However, the risk that the Government does not make Paygo Payments is exceedingly low.  Among other reasons, Paygo Payments are "above the line" expenditures in the Commonwealth's Fiscal Plan, which indicates they are priority payments.  *See* Commonwealth of Puerto Rico Certified Fiscal Plan, dated May 9, 2019, at 148.  Further, even assuming (without conceding) that the discount rate used for public corporations or municipalities is too low, the Paygo Payments from the Commonwealth, by itself, are sufficient to protect Movants' alleged security interests.  *See supra* ¶ 28.

## CONCLUSION

31.       For the foregoing reasons, the Court should deny the Motion in its entirety.

Dated: June 25, 2019
New York, NY

Respectfully submitted,

 /s/  Margaret A. Dale
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
Email:  brosen@proskauer.com
Email:  jlevitan@proskauer.com
Email:  ppossinger@proskauer.com
Email:  jesses@proskauer.com

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

 /s/ Luis F. del Valle-Emmanuelli
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax. 787.722.1932
dvelawoffices@gmail.com

OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
434 Avenida Hostos
San Juan, PR 00918
Tel: (787) 751-6764/ 763-0565
Fax: (787) 763-8260

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
