## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| as representative of | ) | Case No. 3:17-bk-03283 (LTS) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| Debtors. | ) | |
| _____ | ) X | |
| In re: | ) | |
| | ) | |
| THE FINANCIAL OVERSIGHT AND | ) | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | Title III |
| as representative of | ) | Case No. 3:17-cv-01685 (LTS) |
| | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| Debtor. | ) | |
| -------------------------------------------------------- | ) X | |

**REPLY IN SUPPORT OF OBJECTIONS OF CERTAIN ERS BONDHOLDERS TO THE
MAGISTRATE JUDGE'S JUNE 6, 2019 ORDER ON MOTIONS TO COMPEL AND
JUNE 20, 2019 ORDER ON THE RENEWED MOTION TO COMPEL**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    Judge Dein's Denial of the Bondholders' Motion to Compel and Renewed
Motion to Compel Documents Withheld Under the Deliberative Process
Privilege Motion is Clear Error and Contrary to Law. .......................................... 3

    A.    The Bondholders Have Substantial Need For The Withheld
Documents ................................................................................................... 3

    B.    The Board Fails To Meet Its Burden That Privileged Information Is
Non- Segregable ........................................................................................... 7

    C.    Materials Dated After March 13, 2019 Are Post-Decisional ..................... 8

    D.    The Oversight Board's Communications With AAFAF and the
Commonwealth Are Not Privileged .......................................................... 10

II.   Judge Dein's Denial of the Bondholders' Motion to Compel and Renewed
Motion to Compel Documents Withheld Under the Attorney-Client
Privilege is Clear Error and Contrary to Law. ..................................................... 12

III.  Judge Dein's Denial of the Bondholders' Motion to Compel and Renewed
Motion to Compel Documents Withheld Under the Work-Product
Doctrine is Clear Error and Contrary To Law. .................................................... 15

CONCLUSION ................................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Aurelius Inv., LLC v. Puerto Rico,*
  915 F.3d 838 (1st Cir. 2019) ................................................................................5

*Bhatia Gautier v. Gobernador,*
  199 D.P.R. 59 (P.R. 2017) ...............................................................................3, 5

*Cavallaro v. United States,*
  284 F.3d 236 (1st Cir. 2002) ..............................................................................13

*Columbia Data Prods., Inc. v. Autonomy Corp.,*
  No. 11-12077-NMG, 2012 WL 6212898 (D. Mass. Dec. 12, 2012) ....................13

*Crowley v. L.L. Bean, Inc.,*
  2001 U.S. Dist. LEXIS 3726 (D.Me. Feb. 1, 2001) ............................................14

*Data Gen. Corp v. Grumman Sys. Support Corp.,*
  139 F.R.D. 556 (D. Mass. 1991) ........................................................................15

*In re Grand Jury Proceedings,*
  417 F.3d 18 (1st Cir. 2005) ................................................................................14

*In re Warner,*
  87 B.R. 199 (Bankr. M.D. Fla. 1988) .................................................................14

*Jordan v. U.S. Dep't of Justice,*
  591 F.2d 753 (D.C. Cir. 1978) ...........................................................................10

*Noel v. City of New York,*
  No. 15-cv-05236 (LTS) (KHP), 2018 WL 6649969 (S.D.N.Y. Dec. 18, 2018) ....................10

*People for Am. Way Found. v. U.S. Dep't of Educ.,*
  516 F. Supp. 2d 28 (D.D.C. 2007) ......................................................................10

*Shell Oil Co. v. IRS,*
  772 F. Supp. 202 (D. Del. 1991) ........................................................................10

*Stalcup v. CIA,*
  768 F. 3d 65 (1st Cir. 2014) .................................................................................7

*Texaco P.R., Inc. v. Dep't of Consumer Affairs,*
  60 F.3d 867 (1st Cir. 1995) ..................................................................................3

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*U.S. v. Graf*,
   610 F.3d 1148 (9th Cir. 2010) ...................................................................................14

### STATUTES AND OTHER AUTHORITY

3 L.P.R.A. § 775 .........................................................................................................11

48 U.S.C. § 2141(c) ...................................................................................................8, 9

48 U.S.C. § 2141(e)(2).................................................................................................9

48 U.S.C. § 2195.........................................................................................................11

### OTHER AUTHORITIES

Federal Rule of Civil Procedure 30(b)(6) .....................................................................5

To the Chambers of the Honorable Judge Laura Taylor Swain:

Pursuant to the Court's scheduling order dated June 24, 2019 [Dkt. No. 585][1], the Bondholders submit this reply in support of the *Objection of Certain ERS Bondholders to the Magistrate Judge's June 6, 2019 Order on Motion to Compel* [Dkt. No. 566] (the "First Objection"), and the *Objection of Certain ERS Bondholders to the Magistrate Judge's June 20, 2019 Order on the Renewed Motion to Compel* [Dkt. No. 584] (the "Second Objection, and collectively with the First Objection, the "Objections").[2]

## INTRODUCTION

1.      This Court should overturn Judge Dein's June 6 and June 20 Orders, which unduly limit discovery in the proceedings related to the Bondholders' Stay Relief Motion, set for a final hearing on July 2, 2019.  Judge Dein clearly erred when deciding to overlook Puerto Rico law and accept the Board's assertions of privilege, allowing the Board to withhold relevant documents relating to issues that are central to this case.  Specifically, Judge Dein clearly erred by disregarding the exceptionally narrow deliberative process privilege applicable under Puerto Rico law, and allowed the Board to withhold from discovery documents that do not meet the strict standards for attorney-client privilege and work-product doctrine applicable in the First Circuit.

2.      As explained in the First Objection, the Board ostensibly completed its document production on May 1, 2019. The Board's document production, however, did not meet the standard required by the Federal Rules. While the Board's initial production consisted of 284 pages, 264 of these pages were completely blank. *See* Stewart Decl., ¶ 8 [Dkt. No. 512-1]. The Board's later productions disclosed little more; most of the Board's production was a single document—ostensibly a budget for the Commonwealth—that contained over 3,900 pages of accounting detail.

---

[1] All references to docket entries ("Dkt. No.") are to Case No. 17-bk-03566, unless otherwise noted herein.

[2] Defined terms not defined herein have the same meaning as they had in the Objections.

Stewart Decl., ¶ 11(a); FOMB_ERS00002527-6463. Thus, the information produced by the Board had no clear relevance to anything, was non-responsive anything the Bondholders had asked for, and consisted largely of filler material designed to inflate the size of the Board's document production. Likewise, hundreds of other pages the Board produced were simply isolated strings of text, or graphics with no context. Stewart Decl., ¶ 11(b). And the Board's remaining production was simply the same handful of documents produced again and again. This included 15 copies of the Legislature's Resolution 186, another 15 copies of Resolution 187, 9 copies of Resolution 189, and 16 copies of the March 13, 2017 Fiscal Plan. Stewart Dec l., ¶ 11(c). Thus, the Board never intended to produce relevant material, and its production of largely irrelevant and duplicative material only furthers that strategy. Judge Dein's rulings effectively endorses the Board's decision to withhold relevant material, allowing the Board to withhold material based on conclusory and unsubstantiated assertions of privilege.[3] This Court should reverse and direct the Board to produce the requested material.

## **ARGUMENT**

3.      Judge Dein clearly erred in applying the First Circuit's strict standards for withholding relevant information sought in discovery. Throughout the discovery proceedings ordered by this Court in connection with the Stay Relief Motion, the Oversight Board has overtly stonewalled discovery, refusing to produce material relevant to the issues in this contested matter, and instead pursuing tactics designed to introduce delay and prevent disclosure of documents,

---

[3]   The Board's privilege logs are obviously at issue in the Objections and the Board's responses thereto. Notwithstanding, and despite a request from Bondholders' counsel that the Board put its logs into the record, the Board has yet to file them in redacted form and has not moved to file them under seal. Because the Board produced its privileged logs with the "CONFIDENTIAL" designation, the Bondholders are thus filing them in redacted form pursuant to Paragraph 11 of the confidentiality stipulation that the parties have agreed to for these proceedings [*see* Docket No. 60 in Case No. 17-ap-00213] and will file them in unredacted form in the event that the Board does not move to file them under seal within 5 business days or in the event that any such motion is denied. A redacted copy of the Board's April 29, 2019 privilege log is attached here as **Exhibit A**; a redacted copy of the Board's May 1, 2019 privilege logs is attached here as **Exhibit B**; a redacted copy of the Board's June 12, 2019 privilege log is attached here as **Exhibit C**; a redacted copy of the Board's June 17, 2019 privilege log is attached here as **Exhibit D**.

notwithstanding orders from this Court finding that the material requested by the Bondholders is relevant (First Objection ¶ 2).  As explained below, Judge Dein's denial of the Bondholders' motions to compel the production of relevant material is contrary to law, and should be reversed.

I.    **JUDGE DEIN'S DENIAL OF THE BONDHOLDERS' MOTION TO COMPEL AND RENEWED MOTION TO COMPEL DOCUMENTS WITHHELD UNDER THE DELIBERATIVE PROCESS PRIVILEGE MOTION IS CLEAR ERROR AND CONTRARY TO LAW.**

4.    The Board argues that (i) the Bondholders have not shown substantial need for the documents withheld on the basis of deliberative process privilege, (ii) the Board has demonstrated that the factual information in the withheld documents cannot be segregated from the privileged documents, (iii) any withheld documents dated after March 13, 2017 are "post-decisional," and (iv) the Board did not waive privilege with respect to materials shared with the Commonwealth and/or AAFAF.  None of these arguments has merit.

### A.    The Bondholders Have Substantial Need For The Withheld Documents

5.    The deliberative process privilege is narrow and protects only materials that "actively contribute to the agency's decisionmaking process."  *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995).  The deliberative process privilege does not shield "post-decisional documents [that] explain[] or justify[] a decision already made."  *Id*.

6.    Even if the deliberative process privilege could apply here—and it does not—the Court still must "make an analysis of balance of interests," weighing the government's interest in confidentiality against the many interests favoring disclosure—such as  "the interests of the private litigant," "the need for accurate judicial fact finding," and "the role of the government in the litigation." *Bhatia Gautier v. Gobernador*, 199 D.P.R. 59, 88 (P.R. 2017)

7.    In their Objections, the Bondholders explained that they have a substantial need for the withheld materials because the directive ordering the Puerto Rico government to replace ERS

with the PayGo system comes from the Board itself, and a central issue in the Stay Relief Motion is the Bondholders' statutory right to adequate protection of the collateral securing the bonds in which they invested. The Board's thought process behind, and details of, that decision are relevant and material (First Objection ¶¶ 26-33). Specifically, evidence that the Board engaged in a sleight-of-hand whereby it ostensibly eliminated employer contributions and replaced them with mandatory assessments of PayGo fees from the same employers, would demonstrate that the Board oversaw measures which had the purpose of defeating the Bondholders' liens.

8.      As an initial matter, and contrary to the Board's arguments, the Bondholders have no other source for this information. As the Board itself concedes, the Board's decisions were informed by its various consultants (Resp. at 21). Yet the Board's document production consists mainly of irrelevant filler and largely-redacted documents, and does not disclose communications with these third parties (First Objection ¶ 6).

9.      Moreover, the Board's argument in favor of withholding the documents are without basis. First, there is no better evidence of the equivalence of employer contributions and PayGo fees than evidence that the designers of the PayGo system considered them to be equivalent, or took steps to hide their equivalence (First Objection ¶ 24). The Board does not respond to this argument, and instead seeks to prevent discovery of documents pertaining precisely to this issue (First Objection ¶ 27). Second, the fact that the authors of the PayGo system expressed intent to divert the Bondholders' collateral is compelling evidence that the PayGo fees are diversions of the employer contributions (First Objection ¶ 25). Finally, evidence that a motivation behind PayGo was to avoid paying the Bondholders the value they are owed, while continuing to make employer contributions, demonstrates that the PayGo plan is a pretext and that employer contributions were

never eliminated in the first instance; rather, the creation of PayGo was a plan to avoid further payments to the Bondholders.

10.    The Board argues that "[e]ven if intent were somehow relevant to the Stay Relief Motion, the Court should reject the Bondholders' '"substantial need" argument on the grounds that it is little more than a thin disguise for a fishing expedition" (Resp. at 10).  But while the Board argues that the Bondholders "cannot point to a single entry . . . to suggest that the withheld or redacted documents are probative of intent" (*id.*), they fail to explain how the Bondholders are at fault for the inadequate entries on the Board's privilege logs. In any event, because it is undisputed that the decision to implement PayGo was made by the Board, it is necessarily true that documents withheld based on the decisional process privilege would be probative of the intent behind that decision.

11.    The Board also argues that the Bondholders cannot cite any evidence of intent "despite the completion of document discovery and a Rule 30(b)(6) of the Oversight Board" (*id.*), even though the Board has withheld relevant documents and refused to answer questions probative of its intent.

12.    The Board also distorts the holding of *Bhatia Gautier v. Gobernador*, 199 D.P.R. 59, 89 (P.R. 2017), which held that because "the right of . . . citizens" "to have access to public information [is] a fundamental right of constitutional rank," "claims of privilege by the government "must be scrutinized with particular zealousness," and that when "claiming the confidentiality of official information, it is the *government* that has to prove *in a precise and unequivocal manner* the applicability of the privilege." *Id.* (emphasis added).

13.    Thus, it is the Board's burden to show that the deliberative process privilege applies.  The Board claims that the requested material is not relevant, while ignoring the test's

focus on other factors, including the constitutional interest of citizens in accessing public information (Resp. at 11). And the Board cannot explain why evidence that the Board crafted a plan to restructure the pension system to defeat the Bondholders' liens is not relevant to this contested matter.  As explained in the First Objection, the thinking behind, and details of, the decision to convert to the PayGo system are relevant and material. That decision came at a time when Puerto Rico was in dire financial shape and desperately short of money. The central feature of the new PayGo system—indeed, the only significant change—was that the Commonwealth would now confiscate ERS's liquid assets, and deposit them in the Commonwealth Treasury (First Objection ¶ 20).

14.     Moreover, in determining whether documents are discoverable, the Court must "make an analysis of balance of interests," weighing the government's interest in confidentiality against the many interests favoring disclosure—such as "the interests of the private litigant," "the need for accurate judicial fact finding," and "the role of the government in the litigation." *Bhatia Gautier I*, 199 D.P.R. at 88.  The government's interests here cannot outweigh the interests favoring disclosure.  The Board instituted this litigation, the private litigants have substantial interests in the litigation, and the accuracy of the ultimate judicial fact finding in this case will be severely undermined if the Board is permitted to withhold these documents.

15.     The Board also asserts that the information requested is "available from other sources."  But the Bondholders have no other source for the information sought in the motions to compel. The decisions at issue were made by the Board, with the help of its various consultants, and ERS and the Commonwealth merely accepted the Board's decision after it was forced on them in March 2017 (First Objection ¶ 22).  The Board's document production also does not answer these inquires (*id.*).

**B.     The Board Fails To Meet Its Burden That Privileged Information Is Non-Segregable**

16.     The June 20 Order found that the Board adequately supported its assertion of deliberative process privilege over factual information, relying exclusively on the conclusory statements in the Supplemental Declaration.  This was clear error.  The Board first argues that the Bondholders challenge to the "specific descriptions in Paragraphs 3(a)-(l) of the [Supplemental Declaration]" was somehow "late" (Resp. at 12).  The Bondholders' arguments were not "late"; they were responsive.  The Bondholders argued from the outset that the Supplemental Declaration contained nothing more than conclusory statements that failed to explain how any factual information for any particular document was so intertwined it could not be segregated and produced.  *See* Renewed Motion to Compel ¶ 11.  When the Board relied on the information in Paragraphs 3(a)-(l) of the Supplemental Declaration in response, the Bondholders replied by pointing out that those again contained nothing more than generic descriptions of categories of documents withheld, followed by bald assertions that producing the factual information would reveal deliberative process.

17.     And the paragraphs cited by the Bondholders fail to establish that privilege information is non-segregable.  First, the Board's Response cites the language in Paragraph 3(a) of the Supplemental Declaration to demonstrate that it has met its burden, yet the Bondholders are not even challenging the withholding of any factual information cited in this paragraph. The Board's reliance on the Paragraph 3(e) is similarly misplaced (*id.*), as nothing in this paragraph explains why the attachments contained in the emails the Bondholders identified in that group (Docs. 84 and 210) cannot be segregated.  For example, Doc. 84 is an email with attachments relating to a fiscal plan that has *already been certified*, and the email and attachments were withheld in their entirety without any explanation as to why that factual information could not be

segregated.  At best, the Supplemental Declaration shows that factual information may be related to deliberative material, but that does not satisfy the standard.  *See Stalcup v. CIA*, 768 F. 3d 65, 70 (1st Cir. 2014) ("The question is …the degree *to which the facts are indissolubly linked* to the broad analysis) (emphasis added).

### C.    Materials Dated After March 13, 2019 Are Post-Decisional

18.    The Board defends its decision to withhold post–March 13, 2019 material on the basis that these documents relate to decisions protected by the deliberative process privilege (Resp. at 8-9). The Board concedes that "a document is considered pre-decisional for purposes of the deliberative process privilege where the agency claiming the privilege (a) specifies the agency decision to which the document relates; (b) establishes the document was prepared to assist with making the decision; and (c) verifies that the document predates the decision." (Resp. at 14) (*citing Providence Journal Co. v. Dept. of Arm*y, 981 F.2d 522, 557 (1st Cir. 1992); *New Hampshire Right to Life v. U.S. Dept. of Health and Human Services*, 778 F.3d 43 (1st Cir. 2015)).

19.    As the Bondholders have explained, the deliberations underlying the decision to abandon the ERS system for the PayGo system are critically important because, among other things, evidence that the creators of the PayGo system considered them equivalent (or took steps to hide that fact) is probative of the equivalence of employer contributions and PayGo.  Second, evidence that those who designed PayGo intended to divert the Bondholders' collateral is compelling evidence that the PayGo fees *are* diverted employer contributions. Finally, evidence that those who designed PayGo intended to avoid payment to the Bondholders the value they were owed—while continuing to make employers contribute to the pension plan—demonstrates that the PayGo plan is pretextual and that Respondents never actually eliminated employer contributions (First Objection at 12-13).

20.     In any event, the record demonstrates that the Board's arguments that the deliberative process privilege applies to documents created subsequent to March 13, 2017 are wrong.  Under PROMESA, the Governor cannot submit a budget to the Commonwealth legislature until the Board has certified a fiscal plan. 48 U.S.C. § 2141(c). The Board has the "sole discretion" to determine if the Governor's proposed fiscal plan meets PROMESA's requirements for purposes of Title III. *Id.* § 2141(c)(3). If the Board determines that a fiscal plan is deficient, PROMESA requires it to so inform the Governor and include specific recommendations for revisions to the fiscal plan to correct the deficiencies. *Id.* If the Governor fails to submit a fiscal plan that meets PROMESA's requirements, the Board can step in, develop its own plan, and submit it to the Governor and the legislature. *Id.* § 2141(d)(2). That fiscal plan is "deemed approved by the Governor." *Id.* § 2141(e)(2).

21.     Thus, once the Board certified the new fiscal plan on March 13, 2017, the Commonwealth and ERS were required by PROMESA to comply, and there was nothing left for them to deliberate about. 48 U.S.C. § 2141(e)(2). Potential revisions to the March 13, 2017 fiscal plan, corrections to the March 13, 2017 fiscal plan, later versions of the fiscal plan, and the 2018 and 2019 territory budgets merely implemented the changes already imposed by the March 13, 2017 fiscal plan.  Any communications regarding those matters do not reflect the give-and-take of governmental deliberations; the parameters of any discussions were already set by the Board.

22.     Thus, documents withheld by the Board concern post-decisional materials explaining or carrying out the decisions the Board had already made: to dissolve ERS, take its assets, and establish a "new" pension system to circumvent the Bondholders' liens. By the time these documents were generated, the time for deliberation was over. These post-decisional documents should therefore be produced, and the Board makes no effort to explain why the cases

cited by the Bondholders are to the contrary. *See Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) ("Communications that occur [a]fter a policy has already been settled upon for example, a communication promulgating or implementing an established policy [a]re not privileged."); *Noel v. City of New York*, No. 15-cv-05236 (LTS) (KHP), 2018 WL 6649969, at *4 (S.D.N.Y. Dec. 18, 2018) (finding that withheld documents "do not reflect any pre-decisional deliberative process and fall into the category of post-decision communications [and] post-decision strategy for implementation of decided policy. . . .").

### D. The Oversight Board's Communications With AAFAF and the Commonwealth Are Not Privileged

23.     The Board asks the Court to accept that its communications with AAFAF and the Commonwealth are privileged, and claims that arguments to the contrary are "confused at best" (Resp. at 16).  To the contrary, the Bondholders have explained that "the Commonwealth, its advisors, and AAFAF have divergent interests from those of the Board, and sharing documents with those entities constituted waiver of any attorney-client privilege" (Resp. at 24).  The deliberative process privilege may be waived by knowing disclosure to other entities, especially where those entities have interests adverse to one another. *See, e.g., People for Am. Way Found. v. U.S. Dep't of Educ.*, 516 F. Supp. 2d 28, 35–42 (D.D.C. 2007) (materials shared among government agency, D.C. Mayor's Office, and grant recipients were subject to disclosure); *Shell Oil Co. v. IRS*, 772 F. Supp. 202, 203–04 (D. Del. 1991) (no privilege over information that was read aloud at a private "meeting of government Deland oil industry officials").  Thus, the Board must therefore disclose any materials that it shared with the Commonwealth, the Commonwealth's advisors, or AAFAF. *See* First Objection ¶34.

24.     Here, the Board is a distinct legal entity that is not even part of the Puerto Rico government.  The Board continues to claim otherwise in this proceeding, but admitted as much

when it sent a letter to Congress on March 12, 2018, in which it stated "the Commonwealth and its instrumentalities . . . have retained their own counsel and other advisors for the Title III proceedings, on the grounds that the Commonwealth and its instrumentalities often have divergent interests from those of the [Board]." Dkt. No. 446-4, ¶ 36.

25.     Meanwhile, the Board does not dispute that ERS is "a trust," governed by its own, independent Board of Trustees, that is "independent and separate from other" Commonwealth agencies. 3 L.P.R.A. § 775, or that its Title III proceedings are separate from the Commonwealth's. The Board also does not dispute that PROMESA expressly prohibits inter-debtor transfers between ERS and the Commonwealth, 48 U.S.C. § 2195.

26.     Contrary to the Board's assertion that, as governmental entities, "the Commonwealth, ERS, and AAFAF, together with the Oversight Board, are part of the same government and share the deliberative process privilege when making joint decisions" (Resp. at 17), in 2008 ERS committed itself to take *the Bondholders*' side in any pension reform debate touching on the Bondholders' interests (First Objection ¶ 37).  Specifically, ERS promised that it would "oppose any attempt by the Legislature of the Commonwealth to reduce he Employers' Contribution Rate or *to make any* other *change in the Act or any other relevant legislation that would have a material adverse effect on Bondholders.*"  Bond Resolution § 709 (emphasis added).

27.     Given the obligation of ERS to oppose any changes to legislation that would have a material adverse effect on Bondholders, documents shared among ERS, the Board, the Commonwealth and AAFAF on precisely that issue cannot be protected by the pre-decisional privilege.  Indeed, regardless of ERS's conflict, the Board is not part of the Puerto Rico government at all, and it cites no authority for an *inter*-government privilege. The Court should therefore reverse.

11

## II.    JUDGE DEIN'S DENIAL OF THE BONDHOLDERS' MOTION TO COMPEL AND RENEWED MOTION TO COMPEL DOCUMENTS WITHHELD UNDER THE ATTORNEY-CLIENT PRIVILEGE IS CLEAR ERROR AND CONTRARY TO LAW.

28.    The Board claims that its descriptions accompanying its invocations of the attorney-client privilege "make abundantly clear that the communications and attachments relate primarily to the legal advice being solicited and given" and accuses the Bondholders of "attempting to get around" that obstacle "by selectively quoting" its privilege log entries (Resp. at 19).  Contrary to the Board's assertions, the Bondholders assert that the Board attempted to remedy its defective privilege log descriptions by inserting general phrases such as "soliciting legal advice" into its revised descriptions (Second Obj. ¶ 17).  But, as the Bondholders state in their objection, inserting "magic language" into a description does not by itself protect the entire communication and all attachments on the grounds of attorney-client privilege" (*Id*.).

29.    The Board nonetheless claims that its communications with third parties are protected on the basis of attorney-client privilege.  The First Circuit has never recognized the *Kovel* exception to the general rule that communications with third parties destroy the attorney-client privilege, and this Court should not recognize it here. Even if the *Kovel* exception did apply, however, the Board must show that (1) the third-party communications must be necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit; (2) the third party's communication must serve to translate information between the client and attorney; and (3) the third party's communication must be made for the purpose of rendering legal advice, rather than business advice.

30.    The Board fails to meet its burden under *Kovel*.  The Board asserts that it has "limited staff" and "relies on its advisors" in connection with its rendering of legal advice, but the relevant question under *Kovel* is not whether the Board has retained advisors in connection with

its work; rather, the court must consider whether the inclusion of a third-party on privileged communications was "necessary" or "highly useful" for effective consultation between the Board and its lawyers. *Columbia Data Prods., Inc. v. Autonomy Corp.*, No. 11-12077-NMG, 2012 WL 6212898, at *14 (D. Mass. Dec. 12, 2012). The Board does not attempt to meet its burden on this point, and instead blankets all communications with third party advisors with attorney-client privilege. The Board instead tries to protect such communications from discovery by claiming that its advisors cannot consider the "ramifications of litigation" without considering "analysis from its advisors."

31.     The Board effectively asks this Court to adopt an exception that would swallow the rule that advice from third party advisors is not protected by the attorney-client privilege, even if that advice is reviewed by lawyers. *Cavallaro*, 284 F.3d at 240 ("Assuming *arguendo* that this circuit would adopt the *Kovel* rule, we conclude that the documents are not privileged . . . *Kovel* requires that to sustain a privilege an accountant must be "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." Here, no party hired Ernst & Young for this purpose." *Cavallaro v. United States*, 284 F.3d 236, 240 (1st Cir. 2002) (citations omitted).

32.     The Board also claims that the "sheer complexity and magnitude of Puerto Rico's restructuring requires the Oversight Board to rely on specialists with expertise to work with counsel to obtain legal advice" (Resp. at 22). But the Bondholders do not dispute that the Board may hire advisors; what the Bondholders dispute is that the Board's invocation of privilege as to all communications between the Board, its counsel, and those advisors, regardless of the context.

33.     The Board also claims that even its communications with third parties do not met the test established by *Kovel*, "an additional exception exists for advisors who are the functional

13

equivalent of employees."  Such a rule has not been recognized by the First Circuit, and in any event is not applicable here, as there is no indication—on the Board's privilege logs, its declarations, or otherwise—that outside third party consultants acted as the "primary agent in its communications with corporate counsel." *U.S. v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010).  The Board's citation to *Crowley v. L.L. Bean, Inc.*, 2001 U.S. Dist. LEXIS 3726 (D.Me. Feb. 1, 2001) is precisely on point, and undermines their argument.  There, the court found, notwithstanding arguing that in certain circumstances a third party could be a protected "insider," that "there is simply no basis for arguing that whatever [ ] may have said in [the third party's] presence comes within the attorney-client privilege." *Id*. at *8.

34.    Finally, the Board claims that the crime-fraud exception does not operate to destroy the privilege because it claims that the Oversight Board did not engage in fraud (Resp. at 23).  But that begs the question.  The Board does not dispute that it communicated with others, including AAFAF, about the plan to create the PayGo system, the resultant transfer of employer contributions away from ERS to the Commonwealth, and the diversion of the Bondholders' collateral.  The Bondholders do not have to prove that these efforts constitute a fraud to obtain relevant discovery; if that were the standard, the crime-fraud exception to the attorney-client privilege would never be invoked.  The Bondholders do not have to prove their claim in order to obtain evidence in support of their claim, and none of the Board's cases are to the contrary— indeed, the cases cited by the Board *support* the Bondholders' requested relief.  *See In re Grand Jury Proceedings*, 417 F.3d 18, 23 (1st Cir. 2005) (ordering the production of documents on the basis of the crime-fraud exception, noting that "the requirements for access cannot be set too high. And, if the communications were innocent," the court's review would not "damage the client."); *In re Warner*, 87 B.R. 199 (Bankr. M.D. Fla. 1988) ("Although the Committee has not yet proven

14

debtor's intent in regard to the various transactions, it has at least raised the inference that the transfers may have been fraudulent.").

### III.   JUDGE DEIN'S DENIAL OF THE BONDHOLDERS' MOTION TO COMPEL AND RENEWED MOTION TO COMPEL DOCUMENTS WITHHELD UNDER THE WORK-PRODUCT DOCTRINE IS CLEAR ERROR AND CONTRARY TO LAW.

35.     The Board does not dispute that documents shared with adversaries are not entitled to work-product protection.  And, as explained above, ERS and the other Respondents are adverse to the Board with respect to the subject matter of the documents withheld on the basis of the work-product doctrine. *See, e.g., Data Gen. Corp v. Grumman Sys. Support Corp.*, 139 F.R.D. 556, 558 (D. Mass. 1991) ("Since the policy behind work product immunity is to bolster the adversarial system, disclosure of a document to an adversary is fundamentally inconsistent with this policy.").

36.     The Board also does not dispute that the work-product doctrine is a qualified privilege that can be overcome upon a showing of need; as explained above, the Bondholders have demonstrated that the documents sought are at the heart of the Stay Relief Motion, and only the Board and the other Respondents are in possession of these critical materials.  Instead, the Board claims that the Bondholders "fail to assert which [additional] privileges do not apply to documents" for which the Board claims work process privilege (Resp. at 25), but, as explained above, the Board's assertions of deliberative process and attorney-client privileges are also defective, and thus do not constitute an independent basis for withholding the documents at issue.

### CONCLUSION

For the forgoing reasons, the Court should reverse Judge Dein's June 6 Order and June 20 Order, and compel the production of documents withheld as privileged.

In San Juan, Puerto Rico, today July 26, 2019.

By:

*/s/ Alfredo Fernández-Martínez*
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

*/s/ Geoffrey S. Stewart*
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

16

/s/ Alicia I. Lavergne-Ramírez
 José C. Sánchez-Castro
 USDC-PR 213312
 jsanchez@sanpir.com

 Alicia I. Lavergne-Ramírez
 USDC-PR 215112
 alavergne@sanpir.com

 Maraliz Vázquez-Marrero
 USDC-PR 225504
 mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Cheryl T. Sloane
 John K. Cunningham (*pro hac vice*)
 Glenn M. Kurtz (*pro hac vice*)
 WHITE & CASE LLP
 1221 Avenue of the Americas
 New York, NY 10036
 Tel. (212) 819-8200
 Fax (212) 354-8113
 jcunningham@whitecase.com
 gkurtz@whitecase.com

 Jason N. Zakia (*pro hac vice*)
 Cheryl T. Sloane (*pro hac vice*)
 WHITE & CASE LLP
 200 S. Biscayne Blvd., Suite 4900
 Miami, FL 33131
 Tel. (305) 371-2700
 Fax (305) 358-5744
 jzakia@whitecase.com
 csloane@whitecase.com

17

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*