differential is eliminated over the next ten years. In this scenario, covered payroll reaches only $33.6 billion in fiscal year 2059, instead of the $39.5 billion projected by the base case scenario.

*The population of Puerto Rico may not increase as projected.* One of the components of the projected growth of employment in the ERS participating sector is population growth. The Global Insight model assumes in its projections that the population of Puerto Rico will increase from approximately 3.9 million in 2007 to approximately 4.3 million by 2059, an increase of 0.2% per year. If the population of Puerto Rico does not grow as projected, the number of government employees, and as a result covered payroll, may not grow as projected. Puerto Rico already has over 1,000 inhabitants per square mile, one of the highest population densities in the world. Most residents of Puerto Rico are United States citizens by birth and hence have unrestricted access to the United States mainland. As a result, the population of Puerto Rico may not grow as projected or may decrease, which could result in lower government employment and hence in lower Employer Contributions.

*Government revenues may decrease, resulting in forced reductions in payroll; there may be a reduction in the demand for government services, or in the number of people required to provide these services.* The tax and other revenues of the government of Puerto Rico may decrease for a number of reasons, including a reduction in tax rates as a result of taxpayer pressure leading to legislative action or otherwise, other reasons related to the factors discussed above, and other reasons that may not be anticipated, particularly considering the 50-year term of the Bonds. Any such reduction could eventually require a reduction in government expenses, including payroll expenses, which represent a significant percentage of government expenses in Puerto Rico. In addition, the demand for many of the services currently provided by the government may decrease, or an increase in employee productivity may make it possible to provide the same services with fewer employees. If any of these things happen, government employment and government payroll may be lower than projected, and hence there could be lower Employer Contributions than projected to pay debt service on the Bonds.

*The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.* The Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders. In addition, as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act. Therefore, the Legislature could make changes to the Act that are adverse to the Bondholders, including reducing the rate at which participating Government Employers are required to contribute to the System. If any such change is made, the ability of the System to pay debt service on Bonds when due could be adversely affected. It is impossible to predict at this time the conditions that could cause the Legislature of Puerto Rico to reduce the Employer Contribution rate, but those conditions could include situations (i) where the System's unfunded accrued liability has been reduced or eliminated, which could lead the Legislature to the conclusion (if it did not take into consideration the need to pay the Bonds) that additional Employer Contributions are not required, or (ii) where there is severe financial stress affecting one or more of the Government Employers.

BH-ERS-EX-008714

**Public Debt of the Commonwealth Must be Paid Before Employer Contributions of Central Government Agencies and Departments**

The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used to pay public debt before being used for other purposes. Public debt, which as of May 7, 2008 amounted to $49.4 billion, includes $10.9 billion in bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth with respect to bonds and notes guaranteed by the Commonwealth, and bonds and notes issued by its public corporations. The $49.4 billion excludes certain bonds and notes payable from available moneys of GDB. The Bonds do not constitute public debt. This Constitutional restriction does not apply to Employer Contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not "available resources" of the Commonwealth.

**The Remedies that the Fiscal Agent May Pursue May be Limited**

The remedies available to the Fiscal Agent and the holders of the Bonds upon an Event of Default do not include the right to declare all amounts immediately due and payable and are in many respects dependent upon regulatory and judicial actions which are often subject to discretion and delay. Such remedies may also not be readily available or may be limited, and the legal opinions rendered in connection with this financing will be qualified to the extent that enforceability of provisions of the Bonds and the Resolution are affected by such limitations, including as such enforceability may be limited by insolvency or other laws generally affecting creditors' rights.

**A redemption may adversely affect the return of bondholders on the Bonds**

The System may choose to redeem some or all of the Series C Bonds, or some of the Series C Bonds may be redeemed to satisfy sinking fund requirements, at times when prevailing interest rates are lower than when the Series C Bonds were issued. If this happens, Bondholders may not be able to reinvest the proceeds received in a comparable security at an effective interest rate as high as that of the Bonds.

**The market value of the Bonds may be affected by a negative change in the ratings of the Bonds**

The ratings initially assigned to the Series C Bonds may be lowered or withdrawn. Such rating changes could adversely affect the value of and market for the Bonds.

**Absence of secondary market for the Bonds**

There is currently no secondary market for the Series C Bonds, and there can be no assurances that a secondary market will develop, or if it does develop, that it will provide Bondholders with liquidity for their investment or that it will continue for the life of the Series C Bonds. The Underwriters do not have a legal obligation to maintain a market for the Series C Bonds.

**Risks related to hedging transactions**

The System may enter into interest rate swap agreements and other derivative transactions to hedge its exposure to interest rate changes and may enter into currency swap agreements in the event it issues Bonds denominated in other currencies. If the counterparties to these agreements fail to perform

BH-ERS-EX-008715

their obligations, the System may be exposed to unanticipated interest rate changes and currency fluctuations that may reduce the amount of funds available to pay debt service on the Bonds.

## RECENT DEVELOPMENTS RELATING TO
## THE COMMONWEALTH OF PUERTO RICO

Currently, approximately 64% of Employer Contributions are made by agencies or departments of the Commonwealth's central government, and are funded in part from the central government's General Fund. The financial condition of the central government is, therefore, relevant to an evaluation of the risks associated with an investment in the Series C Bonds. For that reason, this Official Statement incorporates by reference (i) the Commonwealth's Financial Information and Operating Data Report, dated January 2, 2008 (the "Commonwealth Report"), which is included as an appendix to the Official Statement for the Commonwealth's Public Improvement Refunding Bonds, Series 2008 C, dated April 25, 2008, and (ii) the Commonwealth's Comprehensive Annual Financial Report for the fiscal year ended June 30, 2006, as amended (the "Commonwealth's Annual Financial Report"), prepared by the Department of the Treasury of Puerto Rico, which report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2006 (the "Commonwealth Financial Statements"), which have been audited by KPMG LLP, independent auditors, as stated in their report dated August 1, 2007, accompanying such financial statements. KPMG LLP did not audit the financial statements of the Public Buildings Authority's capital project fund or The Children's Trust special revenue fund (major funds), and certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and its opinions, insofar as they relate to the amounts included for activities, funds, and component units, separately identified in its report, are based solely on the reports of the other auditors. The report of KPMG LLP contains an explanatory paragraph referring to the Commonwealth's adoption of Governmental Accounting Standards Board (GASB) Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for the Insurance Recoveries*, as of June 30, 2006. The Official Statement that includes the Commonwealth Report and the Commonwealth's Annual Financial Report were filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR").

This section supplements and amends the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Fiscal Year 2008 Projected Revenues and Expenditures

As discussed in greater detail in the Commonwealth Report, the General Fund budget for fiscal year 2008 is $9.227 billion. General Fund revenues for the ten-month period ending on April 30, 2008 totaled $7.002 billion, which is $42 million less than the Department of the Treasury's estimate for that period. This amount includes $3.726 billion in revenues from individual and corporate income taxes, $923 million from non-resident withholding taxes, $715 million from excise taxes and $755 million of sales tax revenues. The Commonwealth currently anticipates that for the full fiscal year 2008, General Fund revenues will total $8.671 billion, while total expenditures will roughly equal the budgeted amounts of expenditures. The difference between revenues and expenses for fiscal year 2008 will be covered by a recovery of approximately $287 million more in federal funds (already received) than had been budgeted, $150 million from the sale of certain government properties, approximately $60 million in delinquent income tax receivables, cash flow savings resulting from certain refunding transactions, and certain cash management procedures, which include delaying payments to certain vendors for a short period of time (carrying them over into the next fiscal year). The federal funds recovery represented reimbursement of amounts advanced by the Commonwealth's Department of Education during fiscal years 2006 and 2007.

27

BH-ERS-EX-008716

Expenditures relating to the Health Insurance Program could exceed their budgeted amounts. The Commonwealth's economic team is working together to enforce spending control measures that have been established to attempt to minimize this possibility.

**Fiscal Year 2009 Projected Revenues and Expenditures**

On March 13, 2008, the Governor submitted a proposed General Fund budget for fiscal year 2009 of $9.488 billion, or approximately $261 million more than the estimated expenditures for fiscal year 2008 of $9.227 billion. The increase in expenditures over fiscal year 2008 is mainly due to University of Puerto Rico, judiciary and municipal formula increases and salary increases mandated by law or collective bargaining agreements. An additional $42.3 million is budgeted for the State Election Commission. The General Fund revenue projection for fiscal year 2009 is $8.488 billion, a decrease of $183 million, or 2.1%, from estimated net revenues for fiscal year 2008 of $8.671 billion. The Commonwealth's budgeted expenditures for fiscal year 2009 of $9.488 billion exceed projected revenues of $8.488 by approximately $1 billion. The Commonwealth's economic team is working together to enforce spending control measures that have been established to attempt to minimize the budget risk. In addition, the Governor has proposed two special measures which are expected to generate close to $1 billion in fiscal year 2009. These measures consist of tax receivable financings and proceeds received from a concession agreement for operation of the lottery. Legislation authorizing these two measures was submitted by the Governor to the Legislature along with the budget. No assurance can be given that either of these measures will be enacted, or that if enacted, they will be in the forms recommended by the Governor.

**Indictment of Governor of Puerto Rico**

On March 27, 2008, the Governor of Puerto Rico and several other individuals were named in federal grand jury indictments relating to the use of political contributions and campaign funds during the period when the Governor was Resident Commissioner in Washington, D.C. The Governor has denied any wrongdoing and has stated his intention to remain in his position and present his defense. It is not expected that such developments will have any impact on the fiscal affairs of the Commonwealth or on the payment of any obligations issued by the Commonwealth.

**Proposed Sales Tax and Excise Tax Changes**

On February 6, 2008, the Governor, in his State of the Commonwealth address, proposed suspending a portion of the current sales and use tax, for a reduction from 7% to 2.5%, and re-instituting a revamped excise tax on goods imported into Puerto Rico to help stimulate the Commonwealth's economy. The proposal will require passage of legislation to become law, and includes provisions that will continue the earmarking of sales tax revenues equal to 1% of the total sales tax rate to the Dedicated Sales Tax Fund and other mechanisms currently in place to ensure the security for the outstanding bonds of the Puerto Rico Sales Tax Financing Corporation ("COFINA"). See "Tax Reform" under *Puerto Rico Taxes, Other Revenues and Expenditures*, "Government Development Bank for Puerto Rico – Sales Tax Financing Corporation" under *Public Corporations* and "Public Sector Debt" under *Debt* in the Commonwealth Report. On February 7, 2008, the Governor stated that any proposal from his administration would not impair the rights of bondholders and that he will veto any counter-proposal from the Legislature of Puerto Rico that would constitute a possible impairment of the rights of bondholders. On February 7, 2008, Standard & Poor's Ratings Service ("S&P") placed the COFINA bonds on CreditWatch Negative and Fitch Ratings Ltd. ("Fitch") placed the same bonds on Rating Watch. On March 14, 2008, the Governor submitted to the Legislature a proposed bill establishing the conditions for suspending the collection of the 4.5% sales and use tax (which is the portion of the total sales and use tax to be collected for the General Fund), establishing and funding a debt service reserve fund for the benefit

28

BH-ERS-EX-008717

of the COFINA bonds and re-instituting the revamped excise tax. Said bill has been structured to safeguard the rights of COFINA bondholders and is aimed at preserving the current rating of the COFINA bonds. This action is expected to be revenue neutral for the General Fund. No assurance can be given that the above proposal will be enacted, or that if it is enacted, it will be in the form recommended by the Governor.

**Planning Board Revised Economic Growth Estimates**

On February 21, 2008, the Planning Board, as part of its final review of fiscal year 2007 economic statistics, indicated that it expected to reduce the 2007 economic growth rate to -1.8% from -1.4% and that the forecast for fiscal years 2008 and 2009 will be lowered on account of the projected length of the current recession. The factors that influenced the Board's fiscal year 2007 indication included reductions in retail sales, private investment (especially in the construction sector) and government investment. Price increases in certain key areas such as energy and raw materials contributed to the Board's numbers as well.

**Additional Debt Issued or Guaranteed by the Commonwealth**

On May 7, 2008, the Commonwealth issued $1,099,125,000 aggregate principal amount of its Public Improvement Refunding Bonds, Series 2008 A, 2008 B and 2008 C. These bonds were issued for the purpose of (i) reducing the Commonwealth's market risk associated with certain types of variable rate products, including auction rate securities and variable rate demand obligations insured by monoline bond insurers that have recently been downgraded by the rating agencies, and (ii) realizing debt service savings.

On March 18, 2008, Puerto Rico Aqueduct and Sewer Authority issued $159,055,000 of Revenue Refunding Bonds, 2008 Series A, and $125,700,000 of Revenue Refunding Bonds, 2008 Series B, guaranteed by the Commonwealth of Puerto Rico. Although these bonds were not issued by the Commonwealth, the payment of principal of and interest on said bonds is guaranteed by the Commonwealth.

BH-ERS-EX-008718

## THE SERIES C BONDS

**General**

The following summary is qualified by reference to the General Resolution and the Supplemental Resolution, copies of which are set forth in Appendices V and VI, respectively. Capitalized terms not defined below are defined in the Resolution.

The Resolution authorizes the issuance of Senior Bonds and Subordinated Bonds. The Series C Bonds are Senior Bonds.

The Series C Bonds will be dated their date of delivery and will be issued as term bonds (the "Term Bonds") and as capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of the Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Series C Bonds will accrue, or compound (in the case of the Capital Appreciation Bonds), from their date of delivery. Interest on the Term Bonds will be payable monthly on the first day of each month, commencing on August 1, 2008. Interest on the Capital Appreciation Bonds will not be paid on a current basis, but will be added to the principal of the Capital Appreciation Bonds on each January 1 and July 1, commencing on January 1, 2009 (each, a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. The principal amount of the Capital Appreciation Bonds on each Compounding Date (also referred to as their "Accreted Amount") is set forth in Appendix IX. Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Accreted Amount thereof.

The Series C Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount (or maturity amount in the case of the Capital Appreciation Bonds) and integral multiples thereof. The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described in Appendix VIII. Bond certificates will not be delivered to purchasers of the Series C Bonds. Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "Book entry system" on Appendix VIII.

**Redemption**

*Optional Redemption.* The Series C Bonds are subject to redemption at the option of the System from any source, in whole or in part, at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of the Capital Appreciation Bonds, the Accreted Amount) of the Series C Bonds, plus accrued interest to the redemption date, and without premium.

*Mandatory Sinking Fund Redemption.* The Term Bonds shall be redeemed in part, by lot, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Series C Bonds due

BH-ERS-EX-008719

on each of the dates specified below, there shall be due, and the System shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following table the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of such Series C Bonds:

### Term Bonds maturing

| Sinking Fund Installment Date | Sinking Fund Installment |
|---|---|
| | |

*Notice of Redemption.* In the event any Series C Bonds are called for redemption, the System shall give the Fiscal Agent notice ("Notice") at least 40 days prior to the date fixed for redemption (or such shorter period which is acceptable to the Fiscal Agent), and the Fiscal Agent shall give notice, in the name of the System, at least 30 days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued as described herein, to the registered owners of the Series C Bonds or portions thereof to be redeemed (with copies to the Fiscal Agent); *provided, however*, that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series C Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series C Bonds or portions thereof so called for redemption at the place or places of payment, such Series C Bonds or such portion shall be redeemed.

The Notice shall (a) specify (i) the Series C Bonds or portions thereof to be redeemed, (ii) the redemption date, (iii) the redemption price, (iv) the place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Fiscal Agent), and (v) if less than all of the Series C Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series C Bonds, and the portions of the Series C Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series C Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Accreted Amount thereof shall cease to increase).

Any notice of optional redemption of Series C Bonds may be made conditional upon receipt by the Fiscal Agent on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Accreted Amount, in the case of the Capital Appreciation Bonds) and interest on such Series C Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given

BH-ERS-EX-008720

may be rescinded at any time before payment of such principal of (or Accreted Amount, in the case of the Capital Appreciation Bonds) and interest on such Series C Bonds or such portions thereof if any such condition so specified is not satisfied or if any such other event shall not occur.  Notice of such rescission shall be given by the System to the Fiscal Agent at least two Business Days prior to the scheduled date of redemption, and the Fiscal Agent shall give notice of such rescission to affected owners of Series C Bonds at least one Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Fiscal Agent to provide for the payment of the principal of (or Accreted Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Series C Bonds (or portions thereof) to be redeemed, then the Series C Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Accreted Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Amendment of Resolution**

The System may adopt a Supplemental Resolution amending or supplementing the Resolution for any of the following purposes without the consent of any Bondholder:

(i)     to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)     to add to the covenants and agreements of the System in the Resolution other covenants and agreements to be observed by the System which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iii)     to add to the limitations and restrictions in the Resolution other limitations and restrictions to be observed by the System which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)     to surrender any right, power or privilege reserved to or conferred upon the System by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)     to authorize Bonds of a Series and, in connection therewith, specify and determine various matters which are not contrary to or inconsistent with the Resolution;

(vi)     to confirm, as further assurance, any pledge and assignment under, and the subjection to any lien, assignment or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)     to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form;

(viii)     to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix)     if Bonds of such Series are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or the

BH-ERS-EX-008721

Supplemental Resolution authorizes a Qualified Hedge on Bonds previously issued, to add provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Bonds, for purposes of the Debt Service Reserve Requirement and the additional Bonds tests;

(x)     to provide such provisions with respect to Subordinated Bonds as are necessary and desirable, *provided*, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(xi)     to provide for a security interest on the Pledged Property for the payment and as security for Credit Facilities, Liquidity Facilities and Qualified Hedges; or

(xii)     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect.

In addition, the System may amend the Resolution and modify the rights and obligations of the System and of the Owners of the Bonds by a Supplemental Resolution, with the written consent (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Accreted Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Accreted Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Accreted Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Fiscal Agent without its written consent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons. A Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Fiscal Agent may, but shall not be obligated to, determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution, and any such determination if reasonable and in good faith shall be binding and conclusive on the System and all Owners of Bonds.

**Events of Default and Remedies**

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto in the Currency in which such Bond, Parity Obligation or Subordinate Obligation is payable, after the same shall have become due, whether at maturity or upon call for redemption or otherwise; or

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) above; provided, however, that with respect to any failure to observe or refusal to comply with the

33

covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of 30 days after written notice, specifying such failure and requesting that it be remedied, is given to the System by the Fiscal Agent or any Beneficiary. If prior to the expiration of the above mentioned 30-day period, the System shall request in writing an extension of time and the System shall certify in such request that the failure stated in the notice cannot be remedied within such 30-day period, then such 30-day period shall be extended for an additional 30 days if corrective action has been instituted by the System and is being diligently pursued.

Upon the occurrence of an Event of Default, the Fiscal Agent may, and upon the written request of the Owners of not less than 25% in principal amount of the Outstanding Bonds shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies as the Fiscal Agent, being advised by counsel, shall deem most effectual to protect and enforce such rights:

        (i)    by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the System to collect Revenues adequate to carry out the covenants, agreements and assignments with respect thereto contained in the Resolution and to require the System to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

        (ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged and assigned under the Resolution;

        (iii)    by action or suit in equity, to require the System to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property pledged and assigned under the Resolution as shall be within its control; and

        (iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

**The maturity of the Bonds is not subject to acceleration for any reason, including non payment of debt service of the Bonds or any other Event of Default.**

In the enforcement of any remedy under the Resolution, the Fiscal Agent shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming and at any time remaining, due from the System for principal, Redemption Price, interest or otherwise for Bonds under any provision of the General Resolution or the Supplemental Resolution or of or on the Bonds, and unpaid with interest on overdue payments, to the extent permitted by law, at the rate or rates of interest specified in the Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under the Bonds, without prejudice to any other right or remedy of the Fiscal Agent or of the Bondowners, and to recover and enforce judgment or decree against the System for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

After making provision for the payment of any reasonable expenses of the Fiscal Agent and its agents and attorneys necessary in the opinion of the Fiscal Agent to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Fiscal Agent and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Fiscal Agent shall be insufficient for the payment of interest and principal or Accreted Amount or Redemption Price then due on the Bonds in the Currency or Currencies in which such Bonds are payable, respectively, and other

BH-ERS-EX-008723

amounts payable as described in clauses FIRST through SEVENTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Fiscal Agent and any moneys or other property distributable in respect of the System's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Ancillary Bond Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Senior Bonds and the interest component of Parity Obligations then due, and thereafter, in the order such installments are due, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of the Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and the Parity Obligations;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Senior Bonds and the unpaid principal component of Parity Obligations, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of all installments of interest on the Subordinated Bonds and the interest component of Subordinate Obligations then due, and thereafter, in the order such installments are due, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Subordinate Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of Subordinate Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Subordinate Obligations;

FIFTH: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Subordinated Bonds and the unpaid principal component of Subordinate Obligations for the Subordinated Bonds, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Subordinate Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

SIXTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the System under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the

35

BH-ERS-EX-008724

Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

SEVENTH: to the payment to the Persons entitled thereto of amounts payable by the System under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clauses FIRST through SIXTH of this paragraph.

**Bondowners' Direction of Proceedings**

Except as otherwise provided in the Resolution, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Fiscal Agent, to direct the method of conducting remedial proceedings to be taken by the Fiscal Agent, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, and that the Fiscal Agent shall have the right to decline to follow any such direction which in the opinion of the Fiscal Agent would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Fiscal Agent in personal liability.

**Limitation on Rights of Bondowners**

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Fiscal Agent written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Fiscal Agent after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Fiscal Agent a reasonable opportunity either to proceed to exercise the powers granted under the Resolution or under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Fiscal Agent reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Fiscal Agent shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared under the Resolution in every such case to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law.

No one or more Owners of the Bonds or other Beneficiary secured under the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution shall affect or impair the right of any Bondowner to enforce the payment of the principal (or Accreted Amount, if any) of and interest on such Owner's Bonds or the obligation of the System to pay the principal (or Accreted Amount, if any) of and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Each Owner of any Bond by such Bondowner's acceptance thereof shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Fiscal Agent for any action taken or omitted by it as Fiscal Agent, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits

36

BH-ERS-EX-008725

and good faith of the claims or defenses made by such party litigant; but the preceding limitation shall not apply to any suit instituted by the Fiscal Agent, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds then Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

**Book Entry Only System**

The information contained in Appendix VIII to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the System and the Underwriters believe to be reliable, but neither the System nor the Underwriters take responsibility for the accuracy thereof.

The System cannot and does not give any assurances that DTC or DTC direct or indirect Participants will distribute to the Beneficial Owners of the Series C Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series C Bonds; (ii) confirmation of ownership interest in the Series C Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series C Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the System nor the Fiscal Agent or any agent of the System or the Fiscal Agent will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series C Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series C Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series C Bonds. See Appendix VIII - Book-Entry System.

**Definitive Bonds**

In the event the System determines that it is in the best interest of the Beneficial Owners that they be able to obtain Series C Bond certificates, the System may notify DTC and the Fiscal Agent, whereupon DTC will notify the Participants, of the availability through DTC of the Series C Bond certificates, subject to DTC procedures. In such event, the System shall issue, and the Fiscal Agent shall transfer and exchange, Series C Bond certificates as requested by DTC and any other Series C Bond owners in appropriate amounts. DTC may determine to discontinue providing its services with respect to the Series C Bonds at any time by giving notice to the System and the Fiscal Agent and discharging its responsibilities with respect thereto under applicable law. Under such circumstances (if there is no successor securities depositary), the System and the Fiscal Agent shall be obligated to deliver Series C Bond certificates as described in the General Resolution. In the event Series C Bond certificates are issued, the provisions of the General Resolution shall apply to, among other things, the transfer and exchange of such certificates and the method of payment of principal and Redemption Price of and interest on such certificates. Whenever DTC requests the System and the Fiscal Agent to do so, the Fiscal Agent and the System will cooperate with DTC in taking appropriate action after reasonable notice (i) to make available one or more separate certificates evidencing the Series C Bonds to any DTC Participant having Series C Bonds credited to its DTC account or (ii) to arrange for another securities depositary to maintain custody of certificates evidencing the Series C Bonds.

37

BH-ERS-EX-008726

Upon surrender by DTC of the definitive Series C Bonds and instructions for registration, the System will issue the definitive Bonds, and thereafter the Fiscal Agent will recognize the registered holders of the definitive Series C Bonds as Bondholders under the Resolution.

The Fiscal Agent will make payments of principal of and interest on the Series C Bonds directly to Bondholders in accordance with the procedures set forth in the Resolution. The Fiscal Agent will make interest payments and principal payments to Bondholders in whose names the definitive Series C Bonds were registered at the close of business on the related record date. The Fiscal Agent will make payments by check mailed to the address of the Bondholder as it appears on the register maintained by the Fiscal Agent or in such other manner as may be provided in the Resolution, except that certain payments will be made by wire transfer as described in the Resolution. The Fiscal Agent will make the final payment on any Series C Bond (whether definitive Series C Bonds or registered in the name of Cede & Co.), however, only upon presentation and surrender of the Series C Bond on the final payment date at the office or agency that is specified in the notice of final payment to Bondholders.

Definitive Series C Bonds will be transferable and exchangeable at the offices of the transfer agent and registrar, which initially will be the Fiscal Agent. There will be no service charge for any registration of transfer or exchange, but the transfer agent and registrar may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith.

## SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

The following summary is qualified by reference to the General Resolution and the Supplemental Resolution, copies of which are set forth in Appendices V and VI, respectively.

### Bonds are Limited, Non-Recourse Obligations of the System

The Bonds are limited, non-recourse obligations of the System, payable solely from and secured solely by Employer Contributions made after January 31, 2008, which was the date of issuance of the first series of Bonds, and funds on deposit with the Fiscal Agent in the various accounts established under the Resolution. The Bonds are not general obligations of the System and are not payable from contributions made to the System by participating employees, or from the assets acquired with the proceeds of the Bonds, or from Employer Contributions released by the Fiscal Agent to the System after funding of required reserves, or from any other assets of the System. The Bonds are not obligations, general, special or otherwise, of the Commonwealth, do not constitute a debt of the Commonwealth or any of its other political subdivisions or instrumentalities, and are not payable out of any moneys of the Commonwealth other than future Employer Contributions.

The Employer Contributions are those contributions that Government Employers must contribute to the System pursuant to the Act. The Act requires that Employer Contributions cover the difference between (i) the benefits provided by the System to its beneficiaries, plus administrative costs, and (ii) the contributions that employees are required to make to the System. The Act further provides that the employers must contribute every year at least 9.275% of the wages and salaries paid to their employees.

### The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions; Safeguards for Payment of Employer Contributions to the System

The Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to

BH-ERS-EX-008727

Bondholders. In addition, as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act. Therefore, the Legislature could make changes to the Act that are adverse to the Bondholders, including reducing the rate at which participating Government Employers are required to contribute to the System. If any such change is made, the ability of the System to pay debt service on Bonds when due could be adversely affected.

The following factors may, however, provide some protection to Bondholders:

- In a 1987 case dealing with the retirement system of the University of Puerto Rico, the Puerto Rico Supreme Court ruled that government retirement system participants have a contractual vested right to their pension benefits on account of their employment and participation in the retirement system. The Court further ruled that as a result, the Legislature may not alter public employees' pension rights unless the proposed amendments are reasonable and promote the actuarial solvency of the retirement system. In its decision, the Court upheld amendments that established a minimum retirement age, increased employee contributions, and reduced the pension benefits received by participants who retired before a certain age, because these were reasonable and necessary to save the actuarial solvency of the system, which at the time was in a "serious actuarial crisis." Although the case dealt with the ability of the government to affect the retirement benefits and not with their funding or the rights of bondholders, and, therefore, Bondholders may not have standing under the holding of this case to challenge any proposed amendment to the Act that adversely affects Bondholders, Bondholders may benefit indirectly from the actions of System participants in the event the Legislature proposes to reduce Employer Contributions and System participants challenge such proposed reduction on the basis of the above ruling.

- The System is required under the Resolution to uphold, enforce and defend its rights to receive the current statutorily required Employer Contributions under the Act. If the Legislature attempts to decrease Employer Contributions, the System must use its best efforts to prevent the adoption of such decrease and to challenge in court legislation that reduces statutorily required Employer Contributions that the System feels is contrary to applicable law including, but not limited to, the Commonwealth's Constitution and the rulings of the Puerto Rico Supreme Court.

- Although the Legislature is not legally required to take into account the System's opposition to any proposed amendment to the Act, the Legislature has never taken any action that had the effect of impairing the ability of a Puerto Rico government instrumentality to pay its debt, and has always appropriated funds required to pay debt service, even if not legally obligated to do so.

- The Legislature has not reduced the Employer Contribution rate since 1960, and the last employer increase occurred in 1990, which contribution rate is still in effect.

The Act provides the System with special powers to compel employers to make required contributions to the System. The System has the power to notify and require employers to make required contributions or show cause why they are prevented from making them. The head of an agency, the mayor of a municipality or the head of a public corporation that is a participating employer and does not comply with these requests is guilty of a felony punishable by imprisonment.

In addition, the System is authorized to suspend pre-retirement benefits (loans) to a participating employer's employees if its Employer Contributions are three months past due.

39

BH-ERS-EX-008728

**Bonds are Issued Pursuant to Resolution**

The Series C Bonds are being issued pursuant to the to the General Resolution and the Supplemental Resolution, copies of which are set forth in Appendices V and VI, respectively. The Resolution appoints The Bank of New York as Fiscal Agent, with certain duties and responsibilities relating to the authentication and payment of the Series C Bonds, the deposit of future Employer Contributions in the various funds and accounts established under the Resolution, and other matters.

Capitalized terms not defined herein shall have the meaning ascribed to them in the General Resolution and the Supplemental Resolution.

**Pledge of Employer Contributions Pursuant to Security Agreement**

As provided in the Resolution, the System entered into a Security Agreement with the Fiscal Agent for the benefit of the Bondholders, pursuant to which the System will pledge to the Fiscal Agent, and will grant to the Fiscal Agent a security interest in, Employer Contributions made after January 31, 2008, which was the date of issuance of the first series of Bonds, and the funds on deposit with the Fiscal Agent under the various accounts established under the Resolution.

The Resolution and the Security Agreement constitute a contract between the System and the Fiscal Agent, on behalf of the owners of the Bonds. The pledge, covenants and agreements of the System set forth in the Resolution and the Security Agreement shall be for the equal benefit, protection and security of the owners of all the Bonds, regardless of time or times of their issuance or maturity, and shall be of equal rank, without preference, priority or distinction of any of the Bonds over any other Bond, except as expressly provided in or permitted by the Resolution. The pledge by the System of the Pledged Funds, which consist of all Employer Contributions that are made after January 31, 2008, which was the date of issuance of the first series of Bonds, in accordance with the Act and amounts on deposit in the different accounts created pursuant to the Resolution for the benefit of the owners of the Bonds, is irrevocable so long as any Bonds are outstanding under the terms of the Resolution.

**Deposit of Employer Contributions with the Fiscal Agent**

The System has agreed to deposit all Employer Contributions made after January 31, 2008, which was the date of issuance of the first series of Bonds, with the Fiscal Agent on the last Business Day of each month.

**Funds and Accounts**

The Resolution creates the Project Fund, and within such Fund it creates the Capitalized Interest Account, the Revenue Account, the Senior Bonds Debt Service Account, the Senior Bonds Debt Service Reserve Account, the Subordinated Bonds Debt Service Account, the Subordinated Bonds Debt Service Reserve Account, the General Reserve Account, and the Redemption Account. All accounts and subaccounts created pursuant to the Resolution and the monies held in such accounts or subaccounts are pledged to the payment of the Bonds.

**Revenue Account.** All Revenues, including the Employer Contributions, shall be deposited in the Revenue Account. After payment to the Fiscal Agent of all amounts payable to the Fiscal Agent, amounts on deposit from time to time in the Revenue Account shall be used to make the following payments and deposits or for the following purposes in the following order:

BH-ERS-EX-008729

first, to the Senior Bonds Debt Service Account, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount, until the amount on deposit in the Senior Bonds Debt Service Account shall equal the Accrued Payment Obligation (as defined below) related to all Senior Bonds and Parity Obligations;

second, to the Senior Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Senior Bonds, which is equal to 50% of the average Accrued Payment Obligation of the Senior Bonds as of the first Business Day of each Bond Year for each of the five Bond Years following the year on which the deposit is being made;

third, if there are Subordinated Bonds outstanding, to the Subordinated Bonds Debt Service Account, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount until the amount on deposit in the Subordinated Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Subordinated Bonds and Subordinate Obligations;

fourth, if there are Subordinated Bonds outstanding, to the Subordinated Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Subordinated Bonds, which is equal to 50% of the average Accrued Payment Obligation of the Subordinated Bonds for each of the five Bond Years following the year on which the deposit is being made;

fifth, to the payment of Operating Expenses, which include reasonable out-of-pocket expenses of the System related to the issuance of the Bonds (including, without limitation, the out-of pocket costs of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, and insurance premiums, deductibles and retention payments), legal fees, fees and expenses incurred for professional consultants and fiduciaries, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility; and

sixth, to the General Reserve Account, all Employer Contributions remaining after the deposits required by subparagraphs first to fifth above have been made in full. A portion of the funds held in the General Reserve Account will be released to the System after the end of each Bond Year, free and clear of the lien of the Resolution and the Security Agreement, upon the satisfaction of the following conditions: (i) during the Bond Year, there has been no withdrawal from any Debt Service Reserve Account to fund the Debt Service Account for any Class of Bonds; (ii) the balance in the Debt Service Account for each Class of Bonds is not less than the amount required to pay in full the next principal and interest obligation due on each Class of Bonds; (iii) the balance in the Debt Service Reserve Account for each Class of Bonds is not less than the Debt Service Reserve Requirement for such Class of Bonds; (iv) there are no outstanding amounts due to the Fiscal Agent under the Resolution or any Supplemental Resolution; and (v) on the last Business Day of the Bond Year,  the balance in the General Reserve Account is not less than ten percent (10%) of the next Bond Year's Accrued Payment Obligation (net of capitalized interest) for all Outstanding Bonds. (Only amounts in excess of this 10% may be released to the System.)

"Accrued Payment Obligation" shall mean, with respect to any Class of Bonds and the related Parity Obligations and Subordinate Obligations, and for any Bond Year, as of any date, the aggregate of the Principal Installments of and interest on such Bonds, and the principal and interest components of such related Parity Obligations and Subordinate Obligations, due and unpaid during such Bond Year (or, in the case of Debt Service Account deposits, for Bonds with scheduled payments due more frequently than semi-annually, the current Bond Year and the first three months of the following Bond Year, and for all other Bonds, the current Bond Year); *provided* that in the case of Bonds that are not fixed rate Bonds

41

or Bonds that are not denominated in U.S. dollars, the interest shall be based on the Assumed Interest Rate. For purposes of this definition, principal, interest or other obligations for the payment of which the Fiscal Agent shall hold in escrow sufficient funds in a separate account (including the Capitalized Interest Account and any escrow for the payment of Bonds that are defeased as provided in this Resolution) shall not be taken into consideration.

**Senior Bonds Debt Service Account.** The Fiscal Agent shall pay out of the interest subaccount in the Senior Bonds Debt Service Account, to the Persons entitled thereto, (i) the interest on the Senior Bonds as and when due and payable, and (ii) the interest component of the Parity Obligations related to the Senior Bonds, at the times, in the manner and on the terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent. In addition, the Fiscal Agent shall pay out of the principal subaccount in the Senior Bonds Debt Service Account, to the Persons entitled thereto, (i) each Principal Installment due on the Senior Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, and (ii) the principal component of Parity Obligations related to the Senior Bonds, at the times, in the manner and on the other terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent.

In the event of the refunding of any Senior Bonds, the Fiscal Agent shall, upon the written direction of the System to the Fiscal Agent, withdraw from the Senior Bonds Debt Service Account all or any portion of the amounts accumulated therein with respect to the Senior Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Senior Bonds being refunded shall be deemed to have been paid.

**Senior Bonds Debt Service Reserve Account.** At the time any Senior Bonds are delivered pursuant to the Resolution or any Supplemental Resolution, the System shall pay into the Senior Bonds Debt Service Reserve Account from the proceeds of the Senior Bonds or other available funds, an amount equal to the aggregate of the Debt Service Reserve Requirements established in the Resolution for the Outstanding Senior Bonds, after giving effect to any Senior Bonds Reserve Account Cash Equivalent, which is defined as a letter of credit, insurance policy, surety, guarantee or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or investment securities in the Debt Service Reserve Account, calculated immediately after the delivery of such Bonds. The Senior Bonds Debt Service Reserve Amount is equal to 50% of the average Accrued Payment Obligation (net of capitalized interest) of the Senior Bonds as of the first Business Day of each Bond Year for each of the five Bond Years following the year on which the deposit is being made.

Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the Senior Bonds Debt Service Reserve Account shall be applied, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to the Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Senior Bonds and the principal and interest components of the Parity Obligations related to the Senior Bonds.

**Subordinated Bonds Debt Service Account.** In the event the System issues Subordinated Bonds, the Fiscal Agent shall pay out of the interest subaccount in the Subordinated Bonds Debt Service Account, to the Persons entitled thereto, (i) the interest on the Subordinated Bonds as and when due and payable, and (ii) the interest component of the Subordinate Obligations related to the Subordinated Bonds, at the times, in the manner and on the terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent. In addition, the Fiscal Agent shall pay out of the principal subaccount in the Subordinated Bonds Debt Service Account, to the Persons entitled thereto,

42

BH-ERS-EX-008731

(i) each Principal Installment due on the Subordinated Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, and (ii) the principal component of the Subordinate Obligations related to the Subordinated Bonds, at the times, in the manner and on the other terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent. Amounts in the Subordinated Bonds Debt Service Account are available to pay debt service on the Senior Bonds if funds in the Senior Bond Debt Service Account, the Senior Bonds Debt Service Reserve Account and the General Reserve Account are insufficient therefor.

In the event of the refunding of any Subordinated Bonds, the Fiscal Agent shall, upon the written direction of the System to the Fiscal Agent, withdraw from the Subordinated Bonds Debt Service Account all or any portion of the amounts accumulated therein with respect to the Subordinated Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Subordinated Bonds being refunded shall be deemed to have been paid.

**Subordinated Bonds Debt Service Reserve Account.** At the time any Subordinated Bonds are delivered pursuant to the Resolution, the System shall pay into the Subordinated Bonds Debt Service Reserve Account from the proceeds of the Subordinated Bonds or other available funds, an amount equal to the aggregate of the Debt Service Reserve Requirements established in the Resolution for the Outstanding Subordinated Bonds, after giving effect to any Subordinated Bonds Reserve Account Cash Equivalent, which is defined as a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities in the Subordinated Bonds Debt Service Reserve Account. The Subordinated Bonds Debt Service Reserve Amount is equal to 50% of the average Accrued Payment Obligation (net of capitalized interest) of the Subordinated Bonds for each of the five Bond Years following the year in which the deposit is being made.

Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the Subordinated Bonds Debt Service Reserve Account shall be applied, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to the Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Subordinated Bonds and the principal and interest components of the Subordinate Obligations related to the Subordinated Bonds.

Amounts in the Subordinated Bonds Debt Service Reserve Account are available to pay debt service on the Senior Bonds if funds in the Senior Bond Debt Service Account, the Senior Bond Debt Service Reserve Account and the General Reserve Account are insufficient therefor.

**General Reserve Account.** There shall be transferred from the Revenue Account, after all deposits to the Senior Bonds Debt Service Account, the Senior Bonds Debt Service Reserve Account, the Subordinated Bonds Debt Service Account, and the Subordinated Bonds Debt Service Reserve Account have been made and operating expenses have been paid to the Fiscal Agent, all excess moneys into the General Reserve Account.

Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the General Reserve Account shall be applied, to the extent funds are not available therefor in the Debt Service Account or Debt Service Reserve Account of any particular class of Bonds, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related class and

43

BH-ERS-EX-008732

the principal and interest components of Parity Obligations related to that class of Bonds.  Funds in the
General Reserve Account may also be used to pay Subordinate Obligations.

**Covenants Concerning Employer Contributions**

In the Resolution, the System covenants that it will diligently take all action necessary to collect
Employer Contributions when due and will pursue all remedies provided by the Act and other applicable
law to collect Employer Contributions.

In order to reduce the risk of any adverse change to the Act, the Resolution contains the System's
covenant to oppose any reduction in the Employer Contributions rate or any other change in the Act that
would have a material adverse effect on Bondholders.

**Limitation on Issuance of Additional Senior Bonds**

The System may issue, from time to time, one or more Series of additional Senior Bonds, which
are payable from and secured by the Pledged Property on a parity with the Series A Bonds, the Series B
Bonds, the Series C Bonds and any additional Senior Bonds that may be subsequently issued, upon
satisfaction of the requirements of the Resolution before such issuance.  No additional Senior Bonds may
be issued unless the Fiscal Agent receives (i) a report from a nationally recognized independent economic
consultant, dated no earlier than 12 months from the date of issuance of the additional Bonds, identifying
the projected Employers' Contributions for each Bond Year through the final Maturity of all outstanding
Senior Bonds, including the Senior Bonds then proposed to be issued; and (ii) a certificate of an
authorized officer of the System certifying that, after taking into consideration the issuance of the
additional Senior Bonds proposed to be issued, the projected Employers' Contributions in every Bond
Year are equal to or greater than 140% of the Accrued Payment Obligation due on the Senior Bonds,
including such additional Senior Bonds, in such year.

**Limitation on Issuance of Additional Subordinated Bonds**

The System may issue, from time to time, one or more Series of Subordinated Bonds, which are
payable from and secured by the Pledged Property on a subordinated basis with the Series A Bonds, the
Series B Bonds, the Series C Bonds and any other Senior Bonds that may be subsequently issued, upon
satisfaction of the requirements of the Resolution before such issuance.  No Subordinated Bonds may be
issued unless the Fiscal Agent receives (i) a report from an independent economic consultant, dated no
earlier than 12 months from the date of issuance of the additional Bonds, identifying the projected
Employers' Contributions for each Bond Year through the final Maturity all outstanding Bonds, including
the Subordinated Bonds then proposed to be issued; and (ii) a certificate of an authorized officer of the
System certifying that, after taking into consideration the issuance of the additional Subordinated Bonds
proposed to be issued, the projected Employers' Contributions in every Bond Year are equal to or greater
than 125% of the Accrued Payment Obligation due on all Bonds, including such additional Subordinated
Bonds, in such year.

**Issuance of Additional Refunding Bonds**

The System may also issue additional Bonds without complying with the requirements described
above to refund in whole or in part any Bonds outstanding under the Resolution provided that the System
certifies that: (a) the annual principal and interest payments for all Senior and Subordinated Bonds
outstanding immediately after the issuance of such proposed refunding Bonds and the refunding of the
refunded Bonds for the current and each future fiscal year, separately calculated for the Senior Bonds and

44

the Subordinated Bonds, is no greater than (b) the annual principal and interest payments for all Senior and Subordinated Bonds outstanding immediately prior to such issuance during the same fiscal years, separately calculated for the Senior Bonds and the Subordinated Bonds.

**Issuance of Derivative Instruments**

The System may enter into swap agreements and other derivative instruments on a parity with the Bonds for the purpose of hedging its exposure to interest rates and exchange rates and managing the relationship between Employer Contributions and debt service on the Bonds.

## RATINGS

The Series C Bonds have received a rating of "_____" on the U.S. Municipal Scale and "_____" on the Global Scale from Moody's Investors Services Inc., a U.S. public finance rating of "_____" from Standard & Poor's Rating Services, and a U.S. public finance rating of "_____" from Fitch Ratings Services. According to Moody's, its municipal ratings measure the intrinsic ability and willingness of an entity to pay its debt service. Moody's global scale ratings, on the other hand, measure "expected loss," defined as the probability of default times the amount of the loss upon default. Fitch's ratings on U.S. public finance debt securities measure credit quality relative to other U.S. public finance debt securities. According to Fitch, loss rates of most Fitch-rated U.S. public finance debt securities have historically been significantly lower, and are expected to continue to be significantly lower, than other debt instruments rated comparably by Fitch on its international ratings scale.

The ratings reflect only the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by any or all of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Series C Bonds.

## TAX MATTERS

The following is a summary of the opinion of Bond Counsel regarding certain Puerto Rico tax and United States Federal income tax consequences of the ownership of the Series C Bonds. This section does not purport to cover all of the Puerto Rico tax and United States federal income tax consequences arising from the purchase and ownership of the Series C Bonds, and is based upon laws and regulations now in effect and is subject to change. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion set forth below.

The discussion in connection with the Puerto Rico tax considerations is based on the current provisions of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code"), and the regulations promulgated or applicable thereunder (the "P.R. Code Regulations") issued by the Treasury Department of Puerto Rico (the "Treasury Department"), the Puerto Rico Municipal Property Tax Act of 1991, as amended (the "MPTA") and the regulations promulgated thereunder; the Municipal License Tax Act, as amended (the "MLTA") and the regulations promulgated thereunder; and certain industrial and incentive tax acts described below. The U. S. federal income tax discussion is based on the current provisions of the United States Internal Revenue Code of 1986, as amended (the "Code") and the regulations promulgated thereunder (the "Code Regulations").

This discussion deals only with Series C Bonds held by original investors as capital assets within the meaning of Section 1121 of the P.R. Code and Section 1221 of the Code.

45

ALL PROSPECTIVE INVESTORS ARE ENCOURAGED TO CONSULT THEIR TAX ADVISORS REGARDING THE PUERTO RICO TAX CONSEQUENCES AND FEDERAL INCOME TAX CONSEQUENCES OF PURCHASING, OWNING AND DISPOSING OF THE SERIES C BONDS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES, AS WELL AS THE EFFECT OF ANY FOREIGN, STATE, LOCAL OR OTHER LAWS.

The existing provisions of the statutes, regulations, judicial decisions, and administrative pronouncements, on which this summary is based, are subject to change (even with retroactive effect) and could affect the continued validity of this summary. An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Puerto Rico Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained.

### Puerto Rico Taxation

In the opinion of Bond Counsel, based on the laws of Puerto Rico now in force:

1. Interest on the Series C Bonds is excluded from gross income and exempt from Puerto Rico income and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the P. R. Code;

2. The Series C Bonds are exempt from property taxes imposed by the MPTA, and interest thereon is exempt from the municipal license tax imposed by the MLTA;

3. The transfer of the Series C Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4. Gain recognized from the sale or exchange of a Series C Bond will be subject to income tax under the P.R. Code for taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

5. The Series C Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6. Interest on the Series C Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, each as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Series C Bonds with "eligible funds," as such term is defined in the respective Acts.

BH-ERS-EX-008735

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Series C Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Treasury Department, the Accretion Amount is treated as interest.

Prospective owners of the Series C Bonds, including but not limited to financial institutions, should be aware that ownership of the Series C Bonds may result in having a portion of their interest and other expenses attributable to interest on the Series C Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

### United States Federal Taxation

**Disclosure pursuant to U. S. Internal Revenue Service Circular No. 230: This tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Series C Bonds. Each prospective purchaser of the Series C Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.**

Except as specifically provided below with respect to Puerto Rico Corporations (as such term is defined below), the following discussion is limited to U.S. federal income tax consequences of the ownership and disposition of the Series C Bonds by Puerto Rico Corporations, Puerto Rico Holders, and U.S. Holders, as such terms are defined below, who purchase the Series C Bonds upon initial issuance.

As used herein, the term "U.S. Holder" means a beneficial owner of Series C Bonds that is, for United States federal income tax purposes:

- a citizen or resident of the United States;
- a corporation organized in the Unites States or under the laws of a state of the United States;
- a corporation organized under the laws of the United States ;
- an estate, the income of which is subject to United States federal income taxation regardless of its source; or
- a trust, if a court within the United States is able to exercise primary supervision over its administration and one or more United States citizens or residents, or a corporation or partnership organized under the laws of the United States, or any of its states has the authority to control all substantial decisions of the trust, or a trust that was in existence on August 20, 1996 and validly elected to be treated as a domestic trust.

The discussion does not address all tax consequences that may be applicable to a Puerto Rico Corporation, a Puerto Rico Holder and a U.S. Holder (including alternative minimum tax consequences, if any) that is a beneficial owner of Series C Bonds nor does it address the tax consequences to:

- persons that are not Puerto Rico Corporations, Puerto Rico Holders or U.S. Holders;
- persons to whom special treatment may be applied under United States federal income tax law, such as banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts, tax-exempt organizations, traders in securities that elect to mark to market and dealers in securities or currencies;

47

BH-ERS-EX-008736

- persons that will hold Series C Bonds as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for United States federal income tax purposes;
- persons whose functional currency is not the United States dollar; or
- persons that do not hold Series C Bonds as capital assets.

The term "U.S. Holder" does not include a Puerto Rico Holder or a Puerto Rico Corporation. As used herein, the term "Puerto Rico Holder" means a Puerto Rico individual that is a bona fide resident of Puerto Rico during the entire taxable year within the meaning of Section 937 of the Code and the regulations thereunder, including the year in which the Series C Bonds are acquired by such individual. The term "Puerto Rico Corporations" means corporations organized under the laws of Puerto Rico.

This summary also does not address the consequences to holders of the Series C Bonds under state, local or foreign tax laws.

## Puerto Rico Holders and Puerto Rico Corporations

### Interest

Interest on the Series C Bonds is not excludable from the gross income of the recipient thereof for Federal income tax purposes under Section 103(a) of the Code.

Interest on the Series C Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a Puerto Rico Holder during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to Section 933(1) thereof.

Interest on the Series C Bonds received by, or original issue discount accrued to a Puerto Rico Corporation, is not subject to income taxation under the Code provided such interest or original issue discount is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

Prospective owners of the Series C Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," or "passive foreign investment companies," as such terms are defined by the Code.

### Sale or other disposition of the Series C Bonds

In general, pursuant to the provisions of Section 1.937-2 of the Regulations issued under the Code, the source of the income from the sale of personal property by a bona fide resident of Puerto Rico within the meaning of Section 937 of the Code shall be determined under the rules of Section 865 of the Code. Accordingly, the gain recognized on the sale or exchange of the Series C Bonds (excluding "original issue discount" under the Code as of the date of the sale or exchange) by a Puerto Rico Holder during the entire taxable year in which the source of the gain must be determined will constitute Puerto Rico source income and, therefore, qualify for exclusion under Section 933(1) of the Code.

A Puerto Rico Corporation generally will not be subject to income or withholding tax under the Code on a gain realized on the sale or exchange of Bonds, unless the gain is effectively connected with

BH-ERS-EX-008737

the conduct by the Puerto Rico Corporation of a trade or business in the United States and other requirements are satisfied.

*Gift and Estate Taxes*

The transfer of the Series C Bonds by death or gift will not be subject to estate or gift tax under the Code in the case of decedents or donors who, at the time of death or gift, are (i) residents of Puerto Rico and (ii) (x) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (y) not United States citizens.

**U. S. Holders**

*Interest*

Interest on the Series C Bonds is not excludable from the gross income of U.S. Holders for federal income tax purposes under Section 103(a) of the Code. In general, interest on the Series C Bonds is included in gross income for Federal income tax purposes according to the accounting method of the holder of the Series C Bonds.

*Original Issue Discount.* The following summary is a general discussion of the U.S. federal income tax consequences to U.S. Holders of the purchase, ownership and disposition of Series C Bonds issued with OID ("Discount Bonds"). The following summary is based upon final Treasury Regulations (the "OID Regulations") released by the IRS under the OID provisions of the Code.

For U.S. federal income tax purposes, OID is the excess of the stated redemption price at maturity of a Series C Bond over its issue price, if such excess equals or exceeds a *de minimis* amount (generally 1/4 of 1% of the Series C Bond's stated redemption price at maturity multiplied by the number of complete years to its maturity from its issue date). The issue price of each Series C Bond in an issue of Series C Bonds equals the first price at which a substantial amount of such Series C Bonds has been sold (ignoring sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). The stated redemption price at maturity of a Series C Bond is the sum of all payments provided by the Series C Bond other than "qualified stated interest" payments. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate. In general, if the excess of a Series C Bond's stated redemption price at maturity over its issue price is less than .25 percent of the Series C Bond's stated redemption price at maturity multiplied by the number of complete years to its maturity (the "de minimis amount"), then such excess, if any, constitutes de minimis OID, and the Series C Bond is not treated as being issued with OID and all payments of stated interest (including stated interest that would otherwise be characterized as OID) is treated as qualified stated interest, as described below. However, under the OID Regulations, if a Series C Bond bears interest for one or more accrual periods at a rate below the rate applicable for the remaining term of such Series C Bond (*e.g.*, Bonds with teaser rates or interest holidays), and if the greater of either the resulting foregone interest on such Series C Bond or any "true" discount on such Series C Bond (*i.e.*, the excess of the Bond's stated principal amount over its issue price) equals or exceeds a specified *de minimis* amount, then the stated interest on the Series C Bond would be treated as OID rather than qualified stated interest.

Payments of qualified stated interest on a Series C Bond are taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the U.S. Holder's regular method of tax accounting). A U.S. Holder of a Discount Bond must include OID in income as ordinary interest for U.S. federal income tax purposes as it accrues under a constant yield

BH-ERS-EX-008738

method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting. In general, the amount of OID included in income by the initial U.S. Holder of a Discount Bond is the sum of the daily portions of OID with respect to such Discount Bond for each day during the taxable year (or portion of the taxable year) on which such U.S. Holder held such Discount Bond. The "daily portion" of OID on any Discount Bond is determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. An "accrual period" may be of any length and the accrual periods may vary in length over the term of the Discount Bond, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period. The amount of OID allocable to each accrual period is generally equal to the difference between (i) the product of the Discount Bond's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a Discount Bond at the beginning of any accrual period is the sum of the issue price of the Discount Bond plus the amount of OID allocable to all prior accrual periods minus the amount of any prior payments on the Discount Bond that were not qualified stated interest payments. Under these rules, U.S. Holders generally will have to include in income increasingly greater amounts of OID in successive accrual periods.

A U.S. Holder that purchases a Discount Bond for an amount that is greater than its adjusted issue price as of the purchase date and less than or equal to the sum of all amounts payable on the Discount Bond after the purchase date, other than payments of qualified stated interest, will be considered to have purchased the Discount Bond at an "acquisition premium." Under the acquisition premium rules, the amount of OID which such U.S. Holder must include in its gross income with respect to such Discount Bond for any taxable year (or portion thereof in which the U.S. Holder holds the Discount Bond) will be reduced (but not below zero) by the portion of the acquisition premium properly allocable to the period.

The Series C Bonds are redeemable at the option of the System prior to their stated maturity (a "call option"). Series C Bonds containing such features may be subject to rules that differ from the general rules discussed above. Investors intending to purchase Series C Bonds with such features should consult their own tax advisors, since the OID consequences will depend, in part, on the particular terms and features of the purchased Series C Bonds.

U.S. Holders may generally, upon election, include in income all interest (including stated interest, acquisition discount, OID, de minimis OID, market discount, de minimis market discount, and unstated interest, as adjusted by any amortizable bond premium or acquisition premium) that accrues on a debt instrument by using the constant yield method applicable to OID, subject to certain limitations and exceptions.

*Market Discount.* If a U.S. Holder purchases a Series C Bond, other than a Discount Bond, for an amount that is less than its issue price or, in the case of a Discount Bond, for an amount that is less than its adjusted issue price as of the purchase date, such U.S. Holder will be treated as having purchased such Series C Bond at a "market discount," unless the amount of such market discount is less than a specified *de minimis* amount.

Under the market discount rules, a U.S. Holder will be required to treat any partial principal payment (or, in the case of a Discount Bond, any payment that does not constitute qualified stated interest) on, or any gain realized on the sale, exchange, redemption, retirement or other disposition of, a Series C Bond as ordinary income to the extent of the lesser of (i) the amount of such payment or realized

BH-ERS-EX-008739

gain or (ii) the market discount which has not previously been included in income and is treated as having accrued on such Series C Bond at the time of such payment or disposition. Market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the Series C Bond, unless the U.S. Holder elects to accrue market discount on the basis of semiannual compounding.

A U.S. Holder may be required to defer the deduction of all or a portion of the interest paid or accrued on any indebtedness incurred or maintained to purchase or carry a Series C Bond with market discount until the maturity of the Series C Bond or certain earlier dispositions, because a current deduction is only allowed to the extent the interest expense exceeds an allocable portion of market discount. A U.S. Holder may elect to include market discount in income currently as it accrues (on either a ratable or semiannual compounding basis), in which case the rules described above regarding the treatment as ordinary income of gain upon the disposition of the Series C Bond and upon the receipt of certain cash payments and regarding the deferral of interest deductions will not apply. Generally, such currently included market discount is treated as ordinary interest for U.S. federal income tax purposes. Such an election will apply to all debt instruments acquired by the U.S. Holder on or after the first day of the first taxable year to which such election applies and may be revoked only with the consent of the IRS.

*Premium.* If a U.S. Holder purchases a Series C Bond for an amount that is greater than the sum of all amounts payable on the Series C Bonds after the purchase date other than payments of qualified stated interest, such U.S. Holder will be considered to have purchased the Series C Bond with "amortizable bond premium" equal in amount to such excess. A U.S. Holder may elect to amortize such premium using a constant yield method over the remaining term of the Series C Bond and may offset interest otherwise required to be included in respect of the Series C Bond during any taxable year by the amortized amount of such excess for the taxable year. However, if the Series C Bond may be optionally redeemed after the U.S. Holder acquires it at a price in excess of its stated redemption price at maturity, special rules would apply which could result in a deferral of the amortization of some bond premium until later in the term of the Series C Bond. Any election to amortize bond premium applies to all taxable debt instruments acquired by the U.S. Holder on or after the first day of the first taxable year to which such election applies and may be revoked only with the consent of the IRS.

*Disposition of a Series C Bond.* Except as discussed above, upon the sale, exchange, redemption, retirement or other disposition of a Series C Bond, a U.S. Holder generally will recognize taxable gain or loss equal to the difference between the amount realized on the sale, exchange, redemption, retirement, or other disposition (other than amounts representing accrued and unpaid interest) and such U.S. Holder's adjusted tax basis in the Series C Bond. A U.S. Holder's adjusted tax basis in a Series C Bond generally will equal such U.S. Holder's initial investment in the Series C Bond increased by any OID included in income (and accrued market discount, if any, if the U.S. Holder has included such market discount in income) and decreased by the amount of any payments, other than qualified stated interest payments, received and amortizable bond premium taken with respect to such Series C Bond. Such gain or loss generally will be long-term capital gain or loss if the Series C Bond had been held at the time of disposition for more than one year.

*Defeasance.* U.S. Holders of the Series C Bonds should be aware that, for federal income tax purposes, the deposit of moneys or securities with the Fiscal Agent in such amount and manner as to cause the Series C Bonds to be deemed to be no longer outstanding under the Indenture (a "defeasance"), could result in a deemed exchange under Section 1001 of the Code and a recognition by a U.S. Holder of a Series C Bond of taxable income or loss, without any corresponding receipt of moneys. In addition, for federal income tax purposes, the character and timing of receipt of payments on the Series C Bonds subsequent to any such defeasance could also be affected. Upon such a defeasance, the System will

BH-ERS-EX-008740

provide to the owners of the Series C Bonds information about the defeasance necessary to enable such owners of the Series C Bonds information about the defeasance necessary to enable such owners to determine their federal income tax liability as a result of the defeasance. U.S. Holders of the Series C Bonds are advised to consult with their own tax advisors regarding the consequences of a defeasance for federal income tax purposes, and for state and local tax purposes.

*Backup Withholding and Information Reporting.* In general, information reporting requirements will apply to non-corporate U.S. Holders of Series C Bonds with respect to payments within the United States of the principal of and interest on the Series C Bonds and proceeds of sale of such Series C Bonds before maturity. Backup withholding will apply to such payments unless the U.S. Holder: (i) is a corporation or other exempt recipient and, when required, demonstrates that fact; or (ii) provides a correct taxpayer identification number, certifies under penalties of perjury when required that such U.S. Holder is not subject to backup withholding and has not been notified by the IRS that it has failed to report all interest and dividends required to be shown on its United States federal income tax returns.

In addition, upon the sale of a Series C Bond to (or through) a broker, the broker must report the sale and withhold on the entire purchase price, unless either (i) the broker determines that the seller is a corporation or other exempt recipient or (ii) the seller certifies that such seller is a non-U.S. Holder (and certain other conditions are met). Certification of the registered owner's non-U.S. status would be made normally on an IRS Form W-8BEN under penalties of perjury, although in certain cases it may be possible to submit other documentary evidence.

Any amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's U.S. federal income tax provided the required information is furnished to the IRS.

### Other Taxes

Bond Counsel will not opine as to the tax consequences of the ownership and disposition of the Series C Bonds under the law of any state or other jurisdiction, and a purchaser of the Series C Bonds must consult his, her or its tax advisor as to such tax consequences.

### ERISA CONSIDERATIONS

The Employees Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code generally prohibit certain transactions between an "employee benefit plan" as defined in and subject to ERISA, a "plan" (such as a tax-qualified retirement plan or an individual retirement account or an individual retirement annuity) as defined in and subject to Section 4975(e)(1) of the Code, certain entities deemed to be holding the assets of such an "employee benefit plan" or "plan" (collectively, "Plans") and persons who, with respect to a Plan, are fiduciaries or other "parties in interest" within the meaning of ERISA or "disqualified persons" within the meaning of the Code. All fiduciaries of Plans, in consultation with their advisors, should carefully consider the impact of ERISA and the Code on an investment in any Series C Bonds.

BH-ERS-EX-008741

## LEGAL MATTERS

The form of opinion of Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico, Bond Counsel, is set forth in Appendix VII to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Sidley Austin LLP, New York, New York, and O'Neill & Borges, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Series C Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## GOVERNMENT DEVELOPMENT BANK

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank for Puerto Rico ("Government Development Bank") has acted as financial advisor to the System in connection with the issuance of the Series C Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series C Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series C Bonds from the System at an aggregate discount of $_____ from the initial public offering prices of the Series C Bonds set forth or derived from information set forth on the inside cover page hereof. The obligations of the Underwriters are subject to certain conditions precedent set forth in the purchase contract with the System, and they will be obligated to purchase all the Series C Bonds if any Series C Bonds are purchased. The Series C Bonds may be offered and sold to certain dealers (including dealers depositing Series C Bonds into investment trusts) and institutional purchasers at prices lower than or yields higher than such public offering prices and yields, and such offering prices may be changed, from time to time, by the Underwriters. The System has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Federal securities laws.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the System and the Commonwealth have agreed to the following:

1. Each of the System and the Commonwealth has agreed to file within 305 days after the end of each fiscal year, beginning with its fiscal year ending on June 30, 2007, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the System and the

BH-ERS-EX-008742

Commonwealth, as the case may be, and information as to revenues, expenditures, financial operations and indebtedness of the System and the Commonwealth, as the case may be, in each case, generally found or incorporated by reference in this Official Statement; and

2.      The System has agreed to file, in a timely manner, with each NRMSIR or with the MSRB and with any SID, notice of any failure to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the Series C Bonds if, in the judgment of the System or its agent, such event is material:

(a)     principal and interest payment delinquencies; non-payment related defaults;

(b)     unscheduled draws on debt service reserves reflecting financial difficulties;

(c)     unscheduled draws on credit enhancements reflecting financial difficulties;

(d)     substitution of credit or liquidity providers, or their failure to perform;

(e)     adverse tax opinions or events affecting the tax-exempt status of the Series C Bonds;

(f)     modifications to rights of the holders (including Beneficial Owners) of the Series C Bonds;

(g)     bond calls;

(h)     defeasances;

(i)     release, substitution, or sale of property securing repayment of the Series C Bonds; and

(j)     rating changes.

With respect to the following events:

Events (c) and (d).  For a description of the Series C Bonds, see "The Series C Bonds." The System does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series C Bonds, unless the System applies for or participates in obtaining the enhancement.

Event (e).  For information on the tax status of the Series C Bonds, see "TAX MATTERS."

Event (g).  The System does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "The Series C Bonds-Redemption of the Bonds," (ii) the only open issue is which Series C Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondholders as required under the terms of the Series C Bonds or the Resolution, and (iv) public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 3423856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Series C Bonds.

The Commonwealth expects to provide the information described in (1) above by delivering the first bond Official Statement of the Commonwealth or of any instrumentality of the Commonwealth that includes its financial statements for the preceding fiscal year and operating data generally containing the information set forth in the Commonwealth Report or, if no Official Statement is issued by the 305-day deadline, by delivering such Commonwealth Report and the Commonwealth Annual Financial Report by such deadline.

The Commonwealth has made similar continuing disclosure covenants in connection with prior bond issuances.  During the prior five fiscal years, the Commonwealth has complied with these covenants

BH-ERS-EX-008743

in fiscal year 2004, but was unable to comply with these covenants in fiscal years 2003, 2005, 2006 and 2007. In 2003, the Commonwealth's audited financial statements were filed after the filing deadline because of delays in finalizing such financial statements resulting from the implementation of Governmental Accounting Standards Board Statement No. 34 ("GASB 34"). In 2005 and 2006, the Commonwealth's audited financial statements were filed after the filing deadline because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying the submission of the Commonwealth's audited financial statements. The Commonwealth expects to file its audited financial statements for fiscal 2007 in June 2008. The Commonwealth was unable to file its 2007 financial statements prior to the filing deadline because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying the submission of the Commonwealth's audited financial statements.

As of the date of this Official Statement, there is no Commonwealth SID, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's, Securities Evaluation, Inc., 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn. NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The System may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above, whether or not such other events are material with respect to the Series C Bonds, but the System does not undertake to provide any such notice of the occurrence of any event, except those events, if material, listed above.

The Commonwealth and the System acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Series C Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the System's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the System and the Commonwealth written notice of any request to cure such breach, and the System or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all Beneficial Owners of the outstanding Series C Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Sections 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth, and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the System or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied

55

BH-ERS-EX-008744