UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

RECEIVED & FILED
2019 JUN 28 PM 1: 15
CLERK'S OFFICE
U.S. DISTRICT COURT
SAN JUAN, P.R.

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

   as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

   Debtors.

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

-------------------------------------------------------------------x

**[Response to Docket 7528 and 7524]**

**RESPONSE OF INDIVIDUAL GENERAL OBLIGATION BONDHOLDER TO
URGENT JOINT MOTION OF FOMB AND UCC TO
(i) CONTINUE HEARING ON MOTION TO ESTABLISH CLAIM OBJECTION
PROCEDURES AND (ii) EXTEND RELATED DEADLINES [Response to #7528]
and
INFORMATIVE MOTION – JUNE 28, 2019 HEARING [Response to #7524]**

Dated: June 24, 2019

## TABLE OF CONTENTS

INFORMATIVE MOTION – JUNE 28, 2019 HEARING (RESPONSE TO
     DOCKET#7524).................................................................................................................1

RESPONSE AND OBJECTION TO "URGENT JOINT MOTION" (RESPONSE TO
     DOCKET#7528).................................................................................................................2

    A.    FOMB's Failure to Provide Notice of the "Urgent Joint Motion" to Me
and Other Individual Bondholders Underscores the Necessity of the
Procedural Relief Sought by Me..........................................................................2

    B.    The Overreaching and Illegitimate Terms of the Plan Support Agreement
Underscore the Necessity of the Procedural Relief Sought by Me.........................2

EXHIBIT A (attached)

EXHIBIT B (attached)

## INFORMATIVE MOTION – JUNE 28, 2019 HEARING
## (RESPONSE TO DOCKET#7524)

Peter C. Hein, pro se, will attend the June 28, 2019 hearing in the New York courtroom (17C). Peter C. Hein requests the opportunity to speak on the following matters.

(1)     [Docket #7137 and #7154] Amended motion of FOMB and UCC to (A) extend deadlines and (B) establish revised procedures with respect to omnibus objections.

Note that my response (now docketed at #7540) was served and sent to the Puerto Rico District Court's Clerk's Office on Saturday, June 15, 2019 (even before the June 17, 2019 deadline for responses to #7137 and #7154) and, per the U.S. Postal Service tracking, was received by the Puerto Rico District Clerk's office on Monday, June 17. The fact my response was received on June 17 by the Clerk's office is confirmed by the "JUN 17 PM 3:33" time stamp on Docket#7540, *see* #7540-page-1; *see also* #7540-3-page-1. I supplied a clipped copy (in addition to a stapled copy) to facilitate scanning and docketing. #7540-3-page-1-of-1. However, my papers were not docketed by the clerk's office in the court docket until June 21, 2019 at about 4:42 pm — despite multiple calls by me to the Puerto Rico District Clerk's office (in a number of cases, I could only reach voicemail, but in those cases I left detailed voicemails explaining that I was calling because my response was not yet docketed). I have not been given an explanation for why it took over four business days after receipt to docket my papers.

(2)     [Docket#7528] "Urgent Joint Motion" of FOMB and UCC to continue hearing on motion to establish claim objection procedures and extend related deadlines.

My response and objection to the "Urgent Joint Motion" appears below.

(3)     Other matters that are on the agenda or that may arise that affect my interests.

-1-

## RESPONSE AND OBJECTION TO "URGENT JOINT MOTION" (RESPONSE TO DOCKET#7528)

**A.    FOMB's Failure to Provide Notice of the "Urgent Joint Motion" to Me and Other Individual Bondholders Underscores the Necessity of the Procedural Relief Sought by Me**

Despite the fact I had served and sent to the clerk's office on Saturday, June 15, 2019 a response to Docket#7137 and #7154, to the best of my knowledge, I was never served with Docket#7528 (the "Urgent Joint Motion"), which FOMB filed around noon on Friday, June 21, 2019. (I learned of it from reviewing the Prime Clerk docket of all filings.) Reading the "Urgent Joint Motion," it states at Docket 7528-page-9-of-11-¶21, under "Notice", that notice was provided to all parties that **"filed"** an objection to the 2012-2014 GO Procedures Motion or the Amended Procedures Motion.

Perhaps — despite my timely service of my June 15, 2019 response, and the fact the Clerk's office "clocked" it in on June 17 3:33 pm (see above) — because the Clerk's office had not **"docketed"** my response until June 21 4:42 pm (after even the "Urgent Joint Motion" was filed), I was excluded from those served with the "Urgent Joint Motion". I was also not contacted about the "Urgent Joint Motion," in contrast to FOMB's asserted efforts to reach counsel for some large bondholders, *see* #7528-page-9-of-11-¶23. And it does not appear that any effort whatsoever was made to notify other individual bondholders — including those who filed notices of participation and provided their email addresses — of the FOMB's "Urgent Joint Motion." Whatever the reason I (and other individuals) were not served or contacted, what transpired underscores the necessity for the procedural relief sought in #7540 to ensure that I (and other individual bondholders) have actual notice and a meaningful opportunity to be heard on matters that may affect our rights.

**B.    The Overreaching and Illegitimate Terms of the Plan Support Agreement Underscore the Necessity of the Procedural Relief Sought by Me**

The concerns about FOMB's plans and intentions that I expressed in my June 15, 2019 response appear to be well-based. In my June 15, 2019 response, I expressed the concern that

-2-

the "game" FOMB and UCC are playing is to (1) begin these invalidation proceedings to create a (contrived) "litigation" risk excuse that can be used in another secret "negotiation" process (like that used in the COFINA situation), or in Plan confirmation, to bolster their efforts to cut some part of the debt, yet (2) (as in the COFINA situation) avoid a final legal adjudication, which would reject their assertions. I also noted that FOMB's counsel had stated at the June 12, 2019 hearing that negotiations were going on with some parties — however, neither I nor (to my knowledge) other individual bondholders had been included in such negotiations.

Now, based on FAFAA's EMMA posting on June 17, 2019,[1] we learn that as of **May 31, 2019** — that is the date of the Plan Support Agreement (a date almost two weeks before the June 12 hearing) — FOMB, as representative of the Commonwealth, had entered into a Plan Support Agreement ("PSA") with approximately ten fund managers. This PSA is (among other concerns) extraordinarily unfair to individual investors, such as me, who purchased Commonwealth GO bonds, pre-PROMESA, in good faith, at a time that Puerto Rico professed the sanctity of its commitments (as well as its compliance with applicable law).

The terms of the PSA echo the nature of the COFINA plan:

- Negotiated in secret, with confidentiality agreements between the "Government Parties" and self-selected bondholders and secret negotiations apparently going as far back as at least March 14, 2019 (Term Sheet p. 1).

- Up to $300 million of fees to be shared by the self-selected bondholder negotiators, at least a portion of which (the "Consummation Costs") are stated to be computed as 1.25% of the "aggregate" amounts of PBA Bond Claims and CW Bond Claims — *i.e.*, bondholder negotiators will be paid Consummation Cost fees calculated based on the amount **my** holdings and claims (and the holdings and claims of all other

---

[1] Go to EMMA website and type into Google "EMMA Municipal Securities Rulemaking Board"; type in a GO CUSIP (*e.g.*, 74514LB63, a series 2012A CUSIP); click on "Disclosure Documents"; scroll down to "Event Filings", and click on 6/17/2019 filing. The Plan Support Agreement begins at PDF page 3 of the 6/17/2019 event filing; and the attached term sheet begins PDF page 53.

bondholders), but only the bondholder negotiators who signed the PSA by May 31, 2019 (before it was even disclosed to other bondholders) get such fees. (Term Sheet pp. 18-19, PSA p. 23 § 7.1).

- If the bondholder negotiators have $2,764.5 million of GO (and PBA) bonds (*see* Docket#4817 and #7465, discussed in footnote 2 below), and receive the $300 million maximum of fees, this would represent over 10.8% of the par amount of their holdings. If those holdings were acquired at the depressed prices that have prevailed at times since PROMESA was enacted, the fees alone could cover one-half of the cost paid by a PSA signatory for some of their bonds (*e.g.*, certain bonds traded at prices as little as 20% of the par amount ($20 per $100 par), or less, at times (*see* Docket#7540-1-page-18-to-19-of-70, showing prices for 6% coupon bonds originally sold by Puerto Rico in 2009). Even if the $300 million maximum is not received, a 1.25% Consummation Cost fee calculated based on the "aggregate amount of PBA Bond Claims and CW Bond Claims" (apparently $10,856,000,000 of claims in the aggregate) (*see* FOMB's 6/16/19 promotional powerpoint p. 10) would be $135,700,000, or almost 5% of the par amount of the holdings of bond negotiators.

- Recoveries are skewed to the particular bonds that (surprise of all surprises) bondholder negotiators happen to have bought up. The Term Sheet indicates bondholder negotiators may recover up to 89.4% of their claims (which are based on the par amount of the bonds) + hundreds of millions of dollars of fees (which could push bondholder negotiator recoveries at or above par, even for bonds the negotiators bought at depressed post-PROMESA prices), and perhaps even more (Term Sheet pp. 7, 18-19). Indeed, the Term Sheet is express that "[f]or the avoidance of doubt, neither the Consummation Costs nor the PSA Restriction Fee will be included for purposes of calculating the Bond Recovery Cap." (Term Sheet "M" last sentence, p. 19). Meanwhile, non-negotiators who bought pre-PROMESA, paying at or about par, may receive recoveries of as little as 45% or 35% or worse (Term Sheet pp. 6-7).

-4-

- Information on bondholder negotiators' holdings is blacked-out, and thus concealed, in the publicly-filed version of the PSA (PSA pp. 29-38) and no information is provided in the PSA filing as to when bondholder negotiators acquired their bonds. However, as was the case for the members of the senior COFINA bondholder coalition and other funds in the COFINA situation, the PSA bondholder negotiator purchases were no doubt largely post-PROMESA, at distressed prices – thus producing large profits at the proposed recovery levels for bondholder negotiators, whereas by contrast non-negotiators who bought pre-PROMESA at or above par suffer large losses.[2]

- Despite the fact that disfavored GO bonds were issued with the same unequivocal Constitutional "irrevocable pledge" and "first claim" on available Commonwealth resources as favored GO bonds (*see, e.g.*, Docket#7540-page-16-to-17-of-19) – under the PSA and anticipated plan classes are gerrymandered to segregate and discriminate against disfavored GO bonds (Term Sheet pp. 12-15) and disfavored bondholders "shall **not** be entitled to vote" (Term Sheet pp. 13-14).

So FOMB is not satisfied with invoking the PROMESA "voting" mechanism to unconstitutionally retroactively abrogate rights and interests of those to whom the Commonwealth made an "irrevocable pledge" of a "first claim" on its available resources and who bought pre-PROMESA at or about par. Rather, those disfavored bondholders, including individuals like me whom FOMB did not include in its secret negotiations, would not even be allowed to vote their disfavored bond claims. And,

---

[2] For example, based on the limited information that is available, members of the QTCB Noteholder Group (3 PSA signatories, Canyon, Davidson Kempner and OZ Management) which first filed a disclosure of their holdings on August 16, 2017 (Docket#1053), increased their holdings of uninsured GO bonds from $680.5 million on August 16, 2017 (Docket#1053, #3778) to $1,482.6 million as of January 18, 2019 (Docket#4871). The so-called "Lawful Constitutional Debt Coalition," first filed a disclosure on February 26, 2019 showing that its 3 members (Golden Tree, Whitebox and Monarch) held $741.6 million of uninsured GOs (Docket#5252). By June 17, 2019, that group had 7 members and a total of $1,281.9 million of uninsured GOs (Docket#7465).

Case:17-03283-LTS Doc#:7732 Filed:06/28/19 Entered:06/28/19 13:28:32 Desc: Main
Document Page 8 of 10

in any event, segregating disfavored bondholders – despite all having the same security – into separate classes could have the same pernicious effect even if those disfavored bondholders were allowed to vote within their segregated class.[3]

- Section 7.4 of the PSA states that the parties to the PSA "at all times" "acted" "solely for themselves." No kidding! While one cannot credit the parties' self-serving claim to have engaged in good faith negotiations, it is plain that the PSA negotiators were – as they admit – acting "solely for themselves." (PSA p. 24).

- The PSA sponsored by FOMB is accompanied by a promotional powerpoint imprinted with FOMB's seal, with a chart that purports to compare Puerto Rico's "Debt Service as a % of Own-Source Revenues" to that of states, purporting to show Puerto Rico in 2015 as having a 28.1% debt-service-to-own-source-revenue ratio in 2015.[4] But FOMB's chart is misleading: FOMB ignores the rather critical fact that Puerto Rico residents generally do **not** pay federal income taxes and thus do **not** bear the burden of paying the federal debt. A proper, apples-to-apples "comparison of the public debt levels of Puerto Rico with the states" — used by the Commonwealth itself when selling its debt — "should include state, local and federal debt". These are **not** my words; these are the words **the Commonwealth itself** used when seeking to sell bonds to investors. *See* Exhibit A hereto (Docket#4606-8-page-57-of-180; full document at #4606-8-page-1-of-180 et seq.).

---

[3] While here I point out the pernicious and discriminatory aspects of FOMB's plans to deprive bondholders of any vote, and to segregate disfavored bondholders into gerrymandered classes, an overarching Constitutional barrier to FOMB's scheme also exists. PROMESA cannot retroactively change the rules for bonds bought pre-PROMESA, and a "vote" by some cannot constitutionally alter the rights and interests of pre-PROMESA purchasers. *See* Docket#7540-page-15-to-18-of-19.

[4] FAFAA 6/17/2019 Event Disclosure, on EMMA, FOMB promotional powerpoint dated 6/16/2019, p. 5 (this is PDF page 93 in the 6/17/2019 FAFAA Event Disclosure on EMMA that is referenced in footnote 1).

When selling bonds to investors, the Commonwealth correctly pointed out that:

> **If one factors in the federal debt load, PR would rank last in outstanding debt per capita among all US jurisdictions.**
> (Ex. A hereto and Docket#4606-8-page-57-of-180)

And, the Government Development Bank for Puerto Rico, in its official website discussion of Puerto Rico's GO debt, was express that the constitutional "**debt limitation has never been reached.**" See Exhibit B hereto, a screenshot from the GDB website, p. 2.[5]

The course of conduct embarked upon by FOMB is illegitimate and unlawful, and I object to it. FOMB appears to be on course to repeat the violations of Due Process and other constitutional rights of individual bondholders that occurred in the COFINA situation. *E.g.*, Docket#7211 and prior filings cited therein (#7211-page-5-of-24). To put it in Hamilton's words: rather than act in "good faith" to honor the Commonwealth's debt, so as to remain "respected and trusted", FOMB has pursued "an opposite conduct." Docket#7540-page-18-of-19.

Particularly in light of the FOMB's course of conduct to date, the only way to avoid a reoccurrence of the abuse of individual pre-PROMESA bondholders that occurred in the COFINA situation, and to uphold the rule of law, is to have final adjudications — by judicial decisions filed in the public record, followed by any necessary appellate rulings — of any (contrived) issues about validity **before** any Plan is proposed. No stay or delay of the adjudication of FOMB's (contrived) validity challenges should be permitted on account of FOMB's assertions that it will be offering a Plan premised on the PSA.

The fact that FOMB appears intent on reprising the same illegitimate and unconstitutional course of action taken in the COFINA situation also underscores that the measures I have urged in Docket#7540 — and my prior filings referenced therein, including Docket#6128, 6487, 4913,

---

[5] Type into Google "Investor Resources – Government Development Bank Puerto Rico – Tax Exempt Securities by Issuer"; click on "Commonwealth".

5103, 5377 and 6151 — are essential in order to have a process that is even potentially fair to individual, pre-PROMESA purchasers, like me. FOMB should not be permitted to act in concert with funds who purchased at distressed prices, post-PROMESA, to further injure individuals who bought pre-PROMESA, in good faith.

Any delay in leveling the playing field will further prejudice individual investors like me. I object to the relief sought by FOMB and reserve and assert all of my rights, including my rights under the U.S. Constitution, and specifically including but not limited to my previously expressed position that the FOMB was appointed in violation of the Appointments Clause, that FOMB's actions are void, and that, among other things, these proceedings should be dismissed. *See, e.g.,* #5377-1-page-1-of-1; #6128-1-page-10-to-11-of-11.

June 24, 2019

Respectfully Submitted,

*/s/ Peter C. Hein*

Peter C. Hein, Pro Se
101 Central Park West, Apt. 14E
New York, NY 10023
petercheinsr@gmail.com