# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| as representative of | ) | Case No. 3:17-bk-03283 (LTS) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| Debtors. | ) | |
| ———————————————————————— X | ) | |
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| as representative of | ) | Case No. 3:17-cv-01685 (LTS) |
| | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| Debtor. | ) | |
| -------------------------------------------------------------------- X | | |

## SUPPLEMENTAL BRIEF IN SUPPORT OF
## MOTION OF CERTAIN SECURED CREDITORS OF THE EMPLOYEES
## RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF
## PUERTO RICO FOR RELIEF FROM THE AUTOMATIC STAY

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 4

I.    Factual Background ................................................................................... 4

    A.    ERS ............................................................................................... 4

    B.    The Bondholders' Security Interests In ERS's Property ....................... 5

    C.    Joint Resolution 188 and Act 106 ................................................... 7

II.    Procedural Background.............................................................................. 10

    A.    The First Circuit Adequate Protection Decision................................. 10

    B.    The Bondholders' Stay Relief Motion.............................................. 10

    C.    Discovery Proceedings.................................................................. 12

ARGUMENT ................................................................................................... 13

I.    Title III of PROMESA Instructs Courts To Lift The Automatic Stay In The Absence Of Adequate Protection ................................................................ 13

II.    The Bondholders Have Constitutionally-Protected Interests In Property Of The Debtors ................................................................................................... 14

    A.    Stay Relief Is Appropriate Where A Creditor Has Even A Colorable Claim To Property Of The Debtor................................................... 14

    B.    The Bondholders' Claims Against The Debtors Are Far More Than Colorable.................................................................................... 14

    C.    Joint Resolution 188 and Act 106 Did Not Terminate The Bondholders' Liens......................................................................................... 15

        i.    PayGo Fees Are Paid By Employers That Participated In ERS To Cover Liabilities Accrued Under ERS That Would Otherwise Have Been Covered By The Employer Contributions That Are Subject To The Bondholders' Liens ...................................... 16

        ii.    Respondents Themselves Have Referred to PayGo Fees As Employer Contributions.................................................... 21

        iii.    In Practice, There Is Little Difference In The Funding Structure Under The ERS And Paygo Systems.................................... 23

        iv.    Under The Bond Resolution And Puerto Rico Law, The Bondholders' Liens Extend To PayGo Fees........................... 24

III.    The Bondholders Are Not Adequately Protected ......................................... 27

# TABLE OF CONTENTS

(CONTINUED)

PAGE

A.  The Automatic Stay Results In A Decrease In The Value Of Collateral When It Prevents The Creditor From Taking Action That Could Prevent Or Remedy The Decrease In Value ...................................................... 27

B.  The Bondholders' Collateral Is Declining In Value ............................................. 29

   i.   The Bondholders' Collateral Has Been Permanently Diverted And Is Being Dissipated On A Monthly Basis ................................................ 29

   ii.  Future PayGo Fees Are Uncertain ............................................................ 31

        a.   Fiscal Uncertainty ............................................................ 32

        b.   Legislative Uncertainty .................................................... 34

   iii. Mr. Malhotra's Contrary Conclusions Are Unsupported And Wrong ............................................................................................ 35

C.  ERS And The Commonwealth Are Not Providing Adequate Protection ............ 40

CONCLUSION .......................................................................................................... 41

-ii-

## TABLE OF AUTHORITIES

**Page**

CASES

*Amegy Bank N.A. v. Deutsche Bank Corp.*,
    917 F. Supp. 2d 1228 (M.D. Fla. 2013)....................................................................25

*Bank of the W. v. Comm. Credit Fin. Servs., Inc.*,
    852 F.2d 1162 (9th Cir. 1988) .................................................................................25

*BMW Fin. Servs., NA, LLC v. Rio Grande Valley Motors, Inc.*,
    No. CIV.A. M-11-292, 2012 WL 4623198 (S.D. Tex. Oct. 1, 2012)......................26

*Conner v. Reilly*,
    No. 16-CV-336-SLC, 2017 WL 213840 (W.D. Wis. Jan. 18, 2017) ......................25

*Estate Constr. Co. v. Miller & Smith Holding Co.*,
    14 F.3d 213 (4th Cir. 1994) ....................................................................................14

*Grella v. Salem Five Cent Sav. Bank*,
    42 F.3d 26 (1st Cir. 1994).......................................................................................14

*Hanley Implement Co. v. Riesterer Equip., Inc.*,
    441 N.W.2d 304 (Wis. Ct. App. 1989) ...................................................................25

*In re Builders Grp. & Dev. Corp.*,
    502 B.R. 95 (Bankr. D.P.R. 2013)......................................................................39, 40

*In re Buttermilk Towne Ctr., LLC*,
    442 B.R. 558 (B.A.P. 6th Cir. 2010).......................................................................40

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    914 F.3d 694 (1st Cir. 2019)............................................................................ *passim*

*In re Gellert*,
    55 B.R. 970 (Bankr. D.N.H. 1985) .........................................................................14

*In re Jefferson Cty.*,
    474 B.R. 228 (Bankr. N.D. Ala. 2012) ...................................................................40

*In re Johnson*,
    756 F.2d 738 (9th Cir. 1985) ..................................................................................14

*In re Las Torres Dev., LLC*,
    413 B.R. 687 (Bankr. S.D. Texas 2009) ...................................................................40

*In re May*,
    169 B.R. 462 (Bankr. S.D. Ga. 1994) ......................................................................40

*In re Murel Holding Corp.*,
    75 F.2d 941 (2d Cir. 1935).........................................................................................40

*In re Pappas*,
    55 B.R. 658 (Bankr. D. Mass. 1985) ........................................................................14

*In re Pratt*,
    462 F.3d 14 (1st Cir. 2006)........................................................................................26

*In re Putnal*,
    483 B.R. 799 (Bankr. M.D. Ga. 2012)......................................................................40

*In re Quality Elec. Ctrs., Inc.*,
    57 B.R. 288 (Bankr. D.N.M. 1986) ...........................................................................14

*In re Shehu*,
    128 B.R. 26 (Bankr. D. Conn. 1991) .........................................................................14

*In re Stearns Bldg.*,
    165 F.3d 28, 1998 WL 661071 (6th Cir. 1998) .........................................................40

*In re Stembridge*,
    394 F.3d 383 (5th Cir. 2004) .....................................................................................28

*In re Tally Well Serv., Inc.*,
    45 B.R. 149 (Bankr. E.D. Mich. 1984) ......................................................................14

*In re Vitreous Steel Prods. Co.*,
    911 F.2d 1223 (7th Cir. 1990) ...................................................................................14

*Metter Banking Co. v. Fisher Foods, Inc.*,
    359 S.E.2d 145 (Ga. Ct. App. 1987)..........................................................................25

*Nat'l Westminster Bank, U.S.A. v. Ross*,
    130 B.R. 656 (Bankr. S.D.N.Y. 1991), *aff'd*, 962 F.2d 1 (2d Cir. 1992) ................14

*Peaje Invs. LLC v. García-Padilla*,
    845 F.3d 505 (1st Cir. 2017)....................................................................1, 10, 13, 28

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988)...........................................................................................3, 28

**STATUTES**

3 L.P.R.A. § 761a...........................................................................................17

3 L.P.R.A. § 781 (2008)...........................................................................4, 17

3 L.P.R.A. § 787...................................................................................4, 5, 17

3 L.P.R.A. § 787q(a)...........................................................................................18

19 L.P.R.A. § 2212(64)...........................................................................................26

19 L.P.R.A. § 2265(a)............................................................................... *passim*

11 U.S.C. § 361 ....................................................................................... *passim*

11 U.S.C. § 361(3)...........................................................................................40

11 U.S.C. § 362 ....................................................................................... *passim*

48 U.S.C. 2161(a)...........................................................................................39

To the Chambers of the Honorable Judge Laura Taylor Swain:

The Bondholders submit this supplemental brief in support of the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay*, Docket No. 3418 in Case No. 17-bk-03273 and Docket No. 289 in Case No. 17-bk-03566 (the "Stay Relief Motion").[1]

## INTRODUCTION

1.      For almost a year, the debtors have denied the Bondholders the adequate protection they are entitled to under both the Constitution and the Bankruptcy Code. The First Circuit has rejected two of the debtors' attempts to deny the Bondholders adequate protection—first making clear that even the temporary diversion of the Bondholders' collateral and the resulting uncertainty about the ability to repay the ERS Bonds established a legally sufficient claim that the Bondholders lacked adequate protection, *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017), and, more recently, holding that the Bondholders are perfected secured creditors, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d 694 (1st Cir. 2019). Those decisions make clear that the Bondholders are entitled to either adequate protection or relief from the automatic stay.

2.      *First*, the Bondholders have constitutionally-protected interests in property of the debtors. Though the First Circuit requires only a showing of a "colorable" claim in property of a debtor for stay relief to be granted, the Bondholders' interest in property of the debtors are far more than colorable. The First Circuit made that clear when it held that the Bondholders possess perfected and non-voidable security interests in ERS's property, in which the Commonwealth now claims an interest. And, of course, the debtors and the Oversight Board have admitted both in this

---

[1] This brief is redacted based on provisions of the *Stipulation and Order for the Production for the Production and Exchange of Confidential Information*, Docket No. 60 in Case No. 17-ap-00213, entered into by the parties.

Court and the First Circuit that the Bondholders not only hold valid and enforceable liens, but also, in fact, are oversecured creditors.

3.      Contrary to these admissions, the debtors now claim that the Bondholders have no collateral because of Joint Resolution 188 and Act 106, two laws that are said to have changed a pension system that had been in place for more than 60 years. According to the debtors, the Bondholders' liens simply evaporated because Joint Resolution 188 and Act 106 replaced the employer contributions that secured the debt with a new route for pension funding called "PayGo fees." This transfer of property from one affiliated entity to another while both entities are in bankruptcy proceedings was an egregious violation of the automatic stay, and, in any event, should be subjected to exacting scrutiny. More fundamentally, it did not defeat the Bondholders' liens because PayGo fees and employer contributions are one and the same. There was no meaningful change in the pension system, since the same beneficiaries received the same benefits, calculated the same way, and paid the same way and on the same schedule. From the standpoint of funding the pensions, PayGo fees are paid by the same employers, for the same purpose, and in amounts employers were already obligated to pay as employer contributions under the ERS Enabling Act. Under the Bond Resolution and Puerto Rico's version of the Uniform Commercial Code, 19 L.P.R.A. §§ 2265(a), 2212(64), the Bondholders' liens continue on PayGo fees, which are either just another version of employer contributions or are proceeds of employer contributions arising from the disposition of the Bondholders' collateral. At bottom, Joint Resolution 188 and Act 106 are nothing more than a hollow effort by the Oversight Board and the debtors to evade the Bondholders' liens.

4.      *Second*, having established their interests in the debtors' property, the Bondholders easily make a *prima facie* showing of diminution in value of their collateral during the automatic

stay, and the debtors cannot establish, as they must, that the Bondholders are not entitled to adequate protection. 11 U.S.C. § 362(g). There is no requirement that diminution in collateral value be *the result of* the automatic stay, as the Oversight Board has argued. Instead it is well-established that the automatic stay results in a decrease in the value of collateral where it prevents a secured creditor from taking action that could prevent or remedy the decrease in value of collateral. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988).

5.      There is no question that the Bondholders' collateral is declining in value while the automatic stay is in effect. Joint Resolution 188 and Act 106 purport to permanently divert the Bondholders' collateral from ERS and the Fiscal Agent to the Commonwealth Treasury, and the Commonwealth is dissipating that collateral to pay subordinate creditors monthly or even daily. Moreover, there is an abundance of unrebutted record evidence that the stream of PayGo fees is uncertain. The debtors themselves have warned of that uncertainty because of the Commonwealth's fiscal troubles. And it has become clear that the other obligors of PayGo fees—Puerto Rico's public corporations and municipalities—are not a reliable source of funding, either. In fact, in light of significant, accumulated defaults on PayGo fees, the Puerto Rico legislature recently enacted legislation to excuse municipalities altogether from paying PayGo fees in fiscal years 2019 and 2020. The permanent diversion and ongoing dissipation of the Bondholders' collateral, coupled with the uncertainty surrounding future PayGo fees, make it clear that the Bondholders' collateral is declining in value during the stay.

6.      The debtors cannot establish otherwise. The Oversight Board's expert, Mr. Gaurav Malhotra, has opined that the net present value ("NPV") of the annual PayGo projections over a 40-year period exceeds the debt owed to the Bondholders. But Mr. Malhotra's opinion suffers from a series of mistakes. Most fundamentally, Mr. Malhotra revealed in deposition that he valued the

wrong thing. Rather than calculating the NPV of the PayGo fees that fund the pension system, Mr. Malhotra instead calculated the NPV of the stream of pension payments retirees are scheduled to receive. This and other mistakes in his analysis render Mr. Malhotra's opinion irrelevant to the question of the Bondholders' entitlement to adequate protection.

## BACKGROUND

### I.    Factual Background

#### A.    ERS

7.      ERS "is a trust and government agency created in 1951 by an Act of the Commonwealth . . . to provide pensions and other retirement benefits to employees and officers of the Commonwealth government, members and employees of the Commonwealth's Legislative Assembly, and officers and employees of the Commonwealth's municipalities and public corporations." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d at 704. ERS "is designated as 'independent and separate' from other Commonwealth agencies." *Id.* "Until legislation that went into effect on July 1, 2017, [ERS] was funded by mandatory contributions from employees and employers, and by [ERS's] investment earnings." *Id.* The largest component of ERS's principal assets were contributions from employers and the right to receive those contributions. The minimum amounts of these contributions were set by statute, but employers were always obligated by ERS's Enabling Act to make contributions to ERS in amounts necessary to pay benefits plus administrative costs, less contributions by employees. 3 L.P.R.A. § 787; *see also id.* § 781 (2008).

8.      ██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ Expert Report

of Faten Sabry, Ph.D. ¶ 10 (Sooknanan Decl., Ex. QQ).[2] ERS was structured as an actuarially

funded system—that is, one where employer contributions would be sufficient to pay for ERS's

current expenses and outflows and create a surplus which (along with income from investing that

surplus) would be sufficient to pay required benefits when employees retired many years later.

ERS's organic statute—the Enabling Act— *required* employers to make contributions sufficient

to fund the system under actuarial principles. 3 L.P.R.A. § 787. ███████████████

██████████████████ Sabry Report ¶¶ 29–37; Expert Report of Andrew A. Samwick, Ph.D.

¶ 11 (Sooknanan Decl., Ex. PP); Pena Dep. Tr. 43:7–9 (May 30, 2019) (Sooknanan Decl., Ex. II)

("I understand that the system had a debt, and that it was underfunded."); Collazo Dep. Tr., 138:2–

4 (June 4, 2019) (Sooknanan Decl., Ex. JJ) ("It's well-known that the system was underfunded for

years."); El Koury Dep. Tr., 26:25–27:4 (June 6, 2019) (Sooknanan Decl., Ex. KK). The Oversight

Board's actuarial expert agrees. Sher Dep. Tr. 61:25–62:8 (June 20, 2019) (Sooknanan Decl., Ex.

OO) (agreeing that "ERS by the start of 2017 had very substantial unfunded accrued actuarial

liabilities," at least in part "because contributions in at least some prior years were not made at

adequate levels.").

### B.     The Bondholders' Security Interests In ERS's Property.

9.     In 2008, in an effort to address its funding challenges and "to decrease an unfunded

liability of approximately $9.9 billion," *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d at

704, ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ Sabry Report ¶¶ 38–39. The Bondholders are holders of ERS Bonds.

---

[2] ██████████████████████████████████████████████████████
██████████

10.     An integral part of ERS's bond issuance was an extensive security package designed to protect the Bondholders' investment. Those security interests were granted in a Bond Resolution dated January 24, 2008. The Bond Resolution granted the Bondholders, through a Fiscal Agent, a security interest in and lien on certain property of ERS ("Pledged Property"), which was defined broadly to include, *inter alia*, all employer contributions received by ERS and "any assets in lieu thereof or derived thereunder which are payable to [ERS] pursuant to [the ERS Enabling Act]"; all "right, title and interest of [ERS] in and to" those contributions and "all rights to receive the same"; and "any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property," including, "without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of" such property. Bond Resolution § 501 & Ex. B, VI-33, VI-36, VI-37 (Sooknanan Decl., Ex. A). ERS was required to use the Pledged Property to make timely principal and interest payments on the ERS Bonds before it spent or used any of the funds for any other purpose. *Id.* §§ 501, 701, & Ex. B, VI-36.

11.     The ERS Enabling Act and Bond Resolution established the following mechanisms:

   a.   ERS calculated monthly employer contributions based on statutory measures and employers were required to remit those contributions to ERS on a monthly basis.

   b.   ERS was required to transfer all employer contributions to the Fiscal Agent on the last business day of the month. Bond Resolution § 504. The Fiscal Agent immediately deposited the funds into specified accounts for the benefit of ERS Bondholders. *Id.* The Fiscal Agent made interest and principal payments to Bondholders from these accounts when due. *Id.* § 505(4), (5).

   c.   Employer contributions transferred to the Fiscal Agent were released to ERS only if all reserve accounts were funded at certain levels specified in the Bond Resolution. *Id.* § 504(1); Sabry Report ¶ 15.

   d.   After employer contributions were released from the Fiscal Agent to ERS, ERS transferred contributions to the Commonwealth for payment to pensioners. Pena Dep. Tr. 74:17–75:22.

6

12. 

Sabry Report ¶ 40.

Sabry Report ¶ 40, Ex. 6.

13.     There is no provision in the Bond Resolution for acceleration of the principal or interest in the event ERS does not pay installments of interest or repay installments of principal when due. Bond Resolution §§ 1101, 1102; Sabry Report ¶ 15. Past due amounts accrue interest at the stated interest rate for the underlying bonds. Bond Resolution § 1102(2).

**C.     Joint Resolution 188 and Act 106**

14.     The legislature also passed measures in 2011 and 2013 to address ERS's underfunding, Samwick Report ¶ 13; Sabry Report ¶ 16–18,

Sabry Report ¶ 30. Meanwhile, ERS funded payments to retirees by diverting employee contributions from another benefit plan and by taking money from its investment accounts. Samwick Report ¶ 12; Collazo Dep. Tr. 30:13–31:9, 32:17–33:6, 34:13–22. By 2016, it had become apparent that these resources soon would be exhausted, at which point ERS's funding would inevitably come solely from the current contributions it received. Samwick Report ¶¶ 14–15; Pena Dep. Tr. 50:22–51:20; Sher Dep. Tr. 36:20–37:5. In the common parlance of the retirement benefits field, this is generally known as a "pay-as-you-go" system. Samwick Report ¶ 16; *see* Sher Dep. Tr. 22:10–20.

15.     After the filing of PROMESA Title III petitions by the Commonwealth on May 3, 2017, and ERS on May 21, 2017, and while both of those cases remained pending, the Oversight Board and the Puerto Rico legislature passed two measures—Joint Resolution 188 and Act 106—

to reroute payments and to give this payment system the name "PayGo." The basic features of PayGo were unremarkable: they provided, at bottom, that the same beneficiaries would receive the same benefits as they always had, calculated the same way, and funded as before by monies contributed by the same group of employers. However, the Commonwealth included small changes to the flow of funds from these employers in the PayGo scheme, with the obvious purpose and hoped-for effect of defeating the Bondholders' security interests and, thus, avoiding payment on the ERS Bonds. Collazo Dep. Tr. 53:14–55:6.

16.     Joint Resolution 188 was passed by the legislature on June 25, 2017, "pursuant to the actions required under the scope of [PROMESA] and the Fiscal Plan approved and certified by the Financial Oversight Board," J.R. 188 § 4 (Sooknanan Decl., Ex. FF), and adopted by the Oversight Board on behalf of the Governor a few days later. It made three changes relevant here. It required employers who had been making contributions to ERS to instead send their contributions directly to the Commonwealth General Fund, J.R. 188 § 4; it ordered ERS to sell its assets and transfer the net cash proceeds, along with any other available funds, into the Puerto Rico Treasury Secretary's account, *id.* § 1–3; and it directed AAFAF to "establish and implement all mechanisms necessary so that the Central Government, the Municipalities, and the Public Corporations may contribute to financing the 'pay-as-you-go' system," *id.* § 4.

17.     On August 18, 2017, the Puerto Rico legislature passed Act 106, which the Governor signed into law on August 23, 2017. Act 106 carried out the plan mandated in Joint Resolution 188. The law recited that Joint Resolution 188 had "eliminated" "the employer contributions being made until now," and purported to set up a new "'Pay-Go' Fee" to be paid into the Accumulated Pensions Payment Account within the General Fund. Act 106 § 1.4, pp. 13–14

(Sooknanan Decl., Ex. GG). Tellingly, the substitution of PayGo fees for employer contributions was done in a single sentence:

> As of July 1, 2017, the Government of Puerto Rico, public corporations, . . . and other covered entities shall no longer be required to make employer contributions, including the Uniform Additional Contribution, . . . but they will be required to pay the applicable "Pay-Go" Fee, as applicable to each one based on the parameters established in this Law.

§ 2.4(e). Those parameters, set forth in § 2.1(b), were that each employer could pay a fee "equal to the amount actually paid to Pensioners and Beneficiaries from each covered entity." In effect, the PayGo fee was the means by which the Commonwealth, public corporations and municipalities would reimburse the Treasury for the benefits it would pay to retirees. Pena Dep. Tr. 98:23–100:17.

18.  Act 106 established the following mechanisms for the PayGo system:

a.  As before, the Commonwealth Treasury would disburse retirement benefits to pensioners and beneficiaries. Pena Dep. Tr. 97:10–20, 98:23–99:21.[3] However, ERS no longer would act as a conduit for collecting the monies that funded these benefits. Instead, those contributions would be paid directly to the Treasury. Act 106 § 1.6(g); Collazo Dep. Tr. 85:16–86:6; Pena Dep. Tr. 101:6–103:9.

b.  ERS, working with its actuary, would collect information on the expected amounts the Treasury would pay to the "Pensioners and Beneficiaries from each covered entity." Act 106 § 2.1(b). ERS would then provide this information to AAFAF so AAFAF could calculate the PayGo fee for each entity. Collazo Dep. Tr. 52:5–13, 118:6–14; Yassin Dep. Tr. 91:17–18, 97:10–98:7 (Sooknanan Decl., Ex. HH). ERS would then generate a monthly invoice for the PayGo fee and send it to employers. Collazo Dep. Tr. 53:11–13, 118:6–20; Yassin Dep. Tr. 99:3–5; Pena Dep. Tr. 132:8–10. The fees were due the 15th day of the following month. Mem. of Understanding, § 2 (Sooknanan Decl., Ex. B); Circular 1300-46-17, p. 2 (Sooknanan Decl., Ex. C); Yassin Dep. Tr. 175:15–17.

c.  Act 106 provided that the PayGo fees were to be deposited directly into a segregated trust account maintained by the Treasury called the "Accumulated Pensions Payment Account." Act 106 § 1.6(j). However, the Commonwealth soon ignored this requirement, instead sweeping the PayGo fees each night into the Treasury's main account. Pena Dep. Tr. 102:10–103:9, 118:16–119:21; Government of Puerto Rico, Puerto Rico Fiscal Agency and Financial Advisory Authority, *Summary of Bank Account Balances for the Government of Puerto Rico*

---

[3] The actual disbursement of pension benefits had, for years, been handled by the Treasury, and not by ERS directly. *See* Act 32-2013, p. 2; Collazo Dep. Tr. 85:16–25.

*and its Instrumentalities: Information as of March 29, 2019*, April 30, 2019, p. 8
(Sooknanan Decl., Ex. D).

    d.    Because it was intended that the invoiced PayGo fees would match the monthly
outflows of pension payments, the monies received from the employers usually
were spent soon after they were received. Pena Dep. Tr. 102:20–103:9, 119:7–21;
Yassin Dep. Tr. 136:6–10; Sabry Report ¶ 53 n.102.

## II.    Procedural Background

### A.    The First Circuit Adequate Protection Decision

19.    In September 2016, after the PROMESA automatic stay went into effect, the

Bondholders moved for relief from the stay in the absence of adequate protection and the District

Court denied the motion. On appeal, the First Circuit vacated the denial and remanded the case for

further proceedings. *Peaje Invs. LLC*, 845 F.3d at 509, 514. The First Circuit recognized that even

"prior to the enactment of the current bankruptcy stay provision, the Supreme Court had

recognized that creditors are constitutionally entitled to protection to the extent of the value of

the[ir] property." *Id.* at 511–12 (internal quotations omitted). It held that even a *temporary*

diversion of the Bondholders' collateral and the resulting uncertainty about ERS's ability to repay

the ERS Bonds established a legally sufficient claim that the Bondholders lacked adequate

protection. *Id.* at 514. Indeed, the First Circuit described the Bondholders' request for adequate

protection as "quite modest." *Id.* at 514 n.5.

20.    After the First Circuit's decision, the parties entered into a series of stipulations to

provide the Bondholders with adequate protection. *See* Case No. 16-cv-2696, Docket No. 83; Case

No. 16-cv-2696, Docket No. 86, at 3; Case No. 17-bk-03566, Docket No. 171.

### B.    The Bondholders' Stay Relief Motion

21.    On July 3, 2018, the Bondholders filed the Stay Relief Motion, seeking relief from

the automatic stay or, in the alternative, adequate protection of their liens on property of ERS, in

which the Commonwealth now claims an interest. The Bondholders argued that, as secured

creditors, they were entitled to adequate protection or relief from the automatic stay on account of actions by ERS and the Commonwealth that decreased the value of their collateral.

22.     In opposition, the Oversight Board, on behalf of the debtors, argued that the Bondholders were not entitled to relief from the automatic stay because of Joint Resolution 188 and Act 106. In particular, notwithstanding prior judicial admissions that the ERS Bonds were valid, enforceable, and oversecured, *see infra* ¶ 32, the Oversight Board argued that the Bondholders no longer had any collateral meriting protection because the new legislation had irrevocably altered the Bond Resolution's system for the remittance and handling of employer contributions. *E.g.*, *Debtor's Opp'n to Mot. of Certain Secured Claimholders of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay* at 12, Docket No. 3465 in Case No. 17-bk-03283 and Docket No. 292 in Case No. 17-bk-03566.

23.     At a preliminary hearing on July 25, 2018, the Court determined that the Bondholders had not made an initial showing of diminution in the value of the Bondholders' collateral "resulting from the effect of the automatic stay." *See* July 25, 2018 Omnibus Hr'g Tr., Case No. 17-bk-03283, at 80:19–24; *see also id.* 81:9–11 (finding a "lack of a showing relative to diminution of the value of collateral by reason of the automatic stay"). As a result, the Court ordered that the automatic stay remain in effect pending the final hearing on the Stay Relief Motion, which was to be set for September 2018. *Id.* at 81:9–18.

24.     On August 17, 2018, the Court held that the Bondholders' security interests in ERS's property were unperfected and therefore avoidable pursuant to § 544 of the Bankruptcy Code. *See Op. and Order Granting and Denying in Part Cross Motions for Summ. J.*, Adv. Proc.

No. 17-ap-00213-LTS, Docket No. 215 (Aug. 17, 2018); Order, Case No. 17-bk-03566, Docket

No. 318 (Aug. 21, 2018). Among other things, this decision resolved the Stay Relief Motion.

25.     The First Circuit reversed, finding that the Bondholders possess perfected and non-

voidable security interests in ERS's property. It held "that the Bondholders satisfied the filing

requirements for perfection as of December 17, 2015," and "PROMESA's incorporation of the

Bankruptcy [C]ode does not allow for the avoidance of perfected liens." *In re Fin. Oversight &*

*Mgmt. Bd. for P.R.*, 914 F.3d at 703, 721. It remanded the matter to the Court, leading to the

renewal of the Stay Relief Motion.

        **C.     Discovery Proceedings**

26.     The Court referred the discovery proceedings to Magistrate Judge Judith G. Dein.

From the outset, Respondents refused to produce anything related to the creation and enactment

of Joint Resolution 188 and Act 106, lodging sweeping objections to the Bondholders' discovery

requests. After the Bondholders moved to compel, *see* Docket 5972 in Case No. 17-bk-03283 and

Docket 402 in Case No. 17-bk-03566, Judge Dein overruled those objections and ordered

Respondents to produce documents, *see* Docket 6111 in Case No. 17-bk-03283 and Docket 431 in

Case No. 17-bk-03566.

27.     Then, Respondents proceeded to withhold nearly all relevant materials on grounds

of the deliberative process privilege, the executive privilege, the attorney-client privilege, the work

product doctrine, and the common interest doctrine without substantiating those claims. The

Bondholders again moved to compel, filing four separate motions in an attempt to uncover

evidence at the heart of the Stay Relief Motion. Docket Nos. 6253, 6320, 6998, 7483 in Case No.

17-bk-03283 and Docket Nos. 443, 446, 512, 562 in Case No. 17-bk-03566. These motions were

largely denied and the Bondholders have been left with effectively no discovery concerning the

genesis of and reasons for the transition of the pension system from a system overseen by ERS for

more than 60 years to the current PayGo system—evidence solely in the possession of the government parties and the Oversight Board. The Bondholders objected to Judge Dein's rulings under Federal Rule of Civil Procedure 72(a) and those objections remain outstanding. *See* Docket Nos. 7035, 7518 in Case No. 17-bk-03283 and Docket Nos. 518, 566 in Case No. 17-bk-03566. The Bondholders also intend to object to the ruling entered by Judge Dein yesterday, on June 20, 2019. *See* Docket No. 7523 in Case No. 17-bk-03283 and Docket No. 568 in Case No. 17-bk-03566.

## **ARGUMENT**

**I.     Title III of PROMESA Instructs Courts To Lift The Automatic Stay In The Absence Of Adequate Protection.**

28.     Adequate protection is a constitutional imperative that protects the property rights of secured creditors. As the First Circuit explained earlier in this litigation, "prior to the enactment of the current bankruptcy stay provision, the Supreme Court had recognized that creditors are constitutionally entitled to protection to the extent of the value of their property." *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017). Consequently, § 362(d)(1) of the Bankruptcy Code, incorporated into PROMESA, states that "the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.SC. § 362(d)(1).

29.     In a hearing for relief from the automatic stay, ERS and the Commonwealth, as the debtors, bear the burden of proof on the question of adequate protection. *See* 11 U.S.C. § 362(g) ("In any hearing . . . concerning relief from the stay . . . the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; . . . and the party opposing such relief has the burden of proof on all other issues"); 3 COLLIER ON BANKR. ¶ 362.10 (16th 2019).

Indeed, if the debtors fail to meet this burden, the automatic stay is lifted by operation of statute. *See* 11 U.S.C. § 362(e)(1).

## II.   The Bondholders Have Constitutionally-Protected Interests In Property Of The Debtors.

### A.   Stay Relief Is Appropriate Where A Creditor Has Even A Colorable Claim To Property Of The Debtor.

30.     The First Circuit has held that § 362 hearings to lift the automatic stay "do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate." *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 32 (1st Cir. 1994); *accord In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1234 (7th Cir. 1990) ("Questions of the validity of liens are not generally at issue in a § 362 hearing, but only whether there is a *colorable* claim of a lien on property of the estate." (emphasis in original)). The First Circuit reasoned that "[t]he limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings" have led most courts to reach the same conclusion. *Grella*, 42 F.3d at 32 (citing cases).[4]

### B.   The Bondholders' Claims Against The Debtors Are Far More Than Colorable.

31.     The Bondholders have claims against the debtors' property that are far more than merely "colorable." The First Circuit resolved any uncertainty on this score when it held in January that the Bondholders possess perfected and non-voidable security interests in ERS's property. It held "that the Bondholders satisfied the filing requirements for perfection as of December 17,

---

[4] *E.g.*, *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 219 (4th Cir. 1994); *In re Johnson*, 756 F.2d 738, 740 (9th Cir. 1985); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 670 (Bankr. S.D.N.Y. 1991), *aff'd*, 962 F.2d 1 (2d Cir. 1992); *In re Quality Elec. Ctrs., Inc.*, 57 B.R. 288, 290 (Bankr. D.N.M. 1986); *In re Pappas*, 55 B.R. 658, 660–61 (Bankr. D. Mass. 1985); *In re Gellert*, 55 B.R. 970, 974–75 (Bankr. D.N.H. 1985); *In re Tally Well Serv., Inc.*, 45 B.R. 149, 151–52 (Bankr. E.D. Mich. 1984); *In re Shehu*, 128 B.R. 26, 28–29 (Bankr. D. Conn. 1991).

2015," and that "PROMESA's incorporation of the Bankruptcy [C]ode does not allow for the avoidance of perfected liens." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d at 703, 721.

32.     And, of course, as the First Circuit also noted earlier this year, *id.* at 708 n.8, ERS, the Commonwealth, and the Oversight Board have all previously admitted in this Court and the First Circuit that the Bondholders hold valid and enforceable liens. *E.g.*, *Resp't Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Br. in Opp'n to Mot. for Relief From the PROMESA Automatic Stay* in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro García Padilla, et al*., No. 16-cv-2696, Docket 52, at 10 (Oct. 26, 2016) (The Bondholders hold "valid and enforceable liens over hundreds of millions of dollars of ERS revenue, which [would] continue to grow."); *Resp'ts' Br. in Opp'n to Mot. for Relief From the PROMESA Automatic Stay* in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro García Padilla, et al*., No. 16-cv-2696, Docket 53, at 5 (Oct. 26, 2016) ("The security interest and lien in favor of ERS bondholders is indefinite, and ends only upon satisfaction of the ERS's outstanding debt obligations."); *Br. of Amicus Curiae Financial Oversight and Management Board for Puerto Rico in Supp. of Resp'ts-Appellees Urging Affirmance of the District Ct. Order* at 7, No. 16-2433 (1st Cir. Dec. 23, 2016) (The Bondholders' lien is a "perpetual, replenishing revenue stream[].").

### C.     Joint Resolution 188 and Act 106 Did Not Terminate The Bondholders' Liens.

33.     Ignoring these prior judicial admissions, the Oversight Board now claims that the Bondholders have no collateral at all because Joint Resolution 188 and Act 106 terminated employer contributions and replaced them with PayGo fees. But at the outset, this ignores that Joint Resolution 188 and Act 106 are void for violating the automatic stay and the Contracts Clause. *See* Docket No. 39 in Case No. 17-ap-00219, ¶¶ 99–110, 137–176; Docket No. 50 in Case No. 17-ap-00219, at 27–34, 44–71. The Bondholders are entitled to relief from the automatic stay

so that they can pursue their remedies based on their contention that those statutes are void. In any event, even if Joint Resolution 188 and Act 106 are valid, the Bondholders' liens continue on PayGo fees, which are either just employer contributions, renamed and redirected in an obvious effort to circumvent the Bondholders' liens, or proceeds of employer contributions arising from the disposition of employer contributions effectuated by Joint Resolution 188 and Act 106.

      i.     <u>PayGo Fees Are Paid By Employers That Participated In ERS To Cover Liabilities Accrued Under ERS That Would Otherwise Have Been Covered By The Employer Contributions That Are Subject To The Bondholders' Liens.</u>

34.     The two key features of PayGo fees are that they (1) are paid by employers that participated in ERS (2) to cover accrued pension liabilities under ERS that would otherwise have been covered by the employer contributions that are subject to the Bondholders' liens. The first feature follows directly from Act 106, which created PayGo fees and defined them as fees paid by "entities considered employers under the Puerto Rican Government Employee Retirement System," along with the separate retirement system for teachers. Act 106-2017 § 1.6(g). The second flows from the interaction between Act 106 and the laws that governed ERS before the summer of 2017.

35.     By 2017, ERS was on the verge of running out of money. *See* Collazo Dep. Tr. 31:6–9 ("At the end of fiscal year, they were liquidating assets to be able to cover the amount of pensions that the system did not have."); Yassin Dep. Tr. 38:19–21 ("Our understanding and concern was that . . . ERS was running out of liquidity to meet [its] pension obligations sometime in early fiscal '17-'18."); Sher Dep. Tr. 36:20–37:5 (by 2017, "there was a significant danger, absent some intervention, that the [ERS] plan would run out of money"). In fact, ERS's actuary— in vivid bold print on the front cover of its June 30, 2017 Actuarial Valuation Report—warned that "PRGERS net assets became negative in the 2014-2015 fiscal year" and that "PGERS gross assets as of June 30, 2017 are less than one year of expected benefit payments." *See* Sooknanan Decl.,

Ex. BB, Milliman, *Puerto Rico Government Employees Retirement System June 30, 2017 Actuarial Valuation Report*, cover page; *see also* Collazo Dep. Tr. 30:13–31:9, 32:17–33:6, 34:13–22. As the Bondholders' expert Professor Andrew Samwick explained, the economic consequence of ERS exhausting its investments was clear: "Once ERS had depleted its investments, paying benefits to which members were entitled would have required increasing employer contributions to levels sufficient to operate ERS as a Pay-As-You-Go system." Samwick Report ¶ 16; *see also* Collazo Dep. Tr. 39:7-40:25; Sher Dep. Tr. 22:10–13.

36.     Significantly, employers were already liable to pay those greater amounts to ERS—as employer contributions—if necessary to fund benefits. Under section 4-113 of Act 447, 3 L.P.R.A. § 787, which remains in force today, "the contributions required from the employer, as *well as all annuities, benefits*, reimbursements, and administration expenses, shall constitute obligations of the employer." (emphasis added). Moreover, the vast majority of ERS's accrued pension liabilities accrued before those plans were frozen in July 2013. *See* Sooknanan Decl., Ex. BB at 16 (showing total accrued pension liability of $27.3 billion, of which $26 billion is associated with Act 447 and Act 1); Act 3-2013 §§ 16, 17, *see also id.* at 18 (preamble explaining that the Act "eliminat[es] the granting of new benefits under the present System" as of its July 1, 2013 effective date). Under section 2-116 of Act 447, 3 L.P.R.A. § 781 (2008), which was in force throughout the time period when those benefits accrued, "any difference between" the minimum percentage of payroll that employers in fact paid ERS and the much higher actuarially required level "shall constitute a deficiency in the employer contribution" that "shall constitute an actuarial deficit of the System and an obligation of the employer." *Id.* § 781(a), (d), (e).[5]

---

[5] Although Section 2-116 was repealed in 2013 when benefits under ERS's defined benefit plans were frozen, its repeal was not intended to change the requirements for employer contributions, and the repeal did not purport to eliminate the existing liabilities that had accrued under Section 2-116 up to the date of repeal. *See* 3 L.P.R.A. §§ 761a ("The provisions of Chapters 1, 2, and 3 shall remain in effect to preserve the code of laws applicable to all transactions carried out or to be carried out on or before June 30, 2013 . . . ."). The legislative history notes that the Percentage of

37.     The Bond Resolution defines "Employers' Contributions" as "the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105, and 4-113 of" Act 447. Bond Resolution at VI-33. The additional payments that would have been required to fund ERS as a pay-as-you-go system would have been no different in form or function from other Employers' Contributions—they would have been payments owed by participating employers to cover the accrued pension liabilities of their former employees. Thus, under the provisions of Act 447, even when ERS moved to a pay-as-you-go system, the employers remained liable to pay the entire costs of the pensions, and their contributions—now increased because of the chronic underfunding of ERS—still would have constituted "Employers' Contributions" subject to the Bondholders' liens under the Bond Resolution.

38.     The enactment of Joint Resolution 188 and Act 106 did nothing to change this. Joint Resolution 188 purported to eliminate "employer contributions . . . to the Puerto Rico Government Employee Retirement System" and to have "the General Fund . . . assume any payments that [ERS] cannot make." Joint Resolution 188, § 4(1), (3). That stop-gap budgetary structure was quickly superseded by Act 106, which created the PayGo fees to fund pension payments. Those PayGo fees are paid by employers that participated in ERS to cover the costs of pension benefits for their former employees—precisely the benefits that those employers' previous employer contributions were inadequate to cover, and that the greater employer contributions required to fund ERS as a pay-as-you-go system would have covered. *See* Samwick Report ¶¶ 23–24; Collazo Dep. Tr. 94:24–95:13, 119:16–20. Under Act 106, each participating employer, including "the [Central]

---

Payroll Contribution did not cover ERS's cash flow needs or eliminate its actuarial deficit. *See* Act 3 Statement of Motives; *see also* 3 L.P.R.A. § 787q(a) ("In order *to make up [ERS'] cash flow deficit* . . . [ERS] shall receive a contribution equal to the Additional Uniform Contribution." (emphasis added)). And, of course, Section 4-113 was not repealed or modified.

Government, the Municipalities . . . and Public Corporations," is liable to pay a Pay-Go fee "equal to the amount actually paid to Pensioners and Beneficiaries from each covered entity." Act 106 § 2.1(b). The amount owed by each employer corresponds directly with the unfunded accrued pension liabilities for each employers' former employees, *see* Samwick Report ¶ 24, an amount which each employer was already liable to cover through employer contributions to ERS under sections 2-116 and 4-113 of Act 447. Indeed, even before the enactment of Act 106, by 2017 all of the employer contributions being made to ERS were already just  "helping to pay off the unfunded liability," because benefits had been frozen so "the only need [ERS] had was to build up the assets from where they were to what [it was] going to need to pay all the future benefits that had been accrued." Sher Dep. Tr. 66:7–67:7.

39.     These points are explained at a higher level in the expert report of Professor Samwick. ERS, like any other public defined benefit plan, is required by law to pay the benefits it has promised and these benefits are ordinarily funded by contributions from the employers who sponsor the plan. Samwick Report, ¶¶ 22, 24.b. In an actuarially funded system, the employer contributions in early years are larger than the amounts needed to pay the current retirees, and the surplus is saved to pay for the obligation to pay the future benefits that workers have accrued. This obligation is known as an "accrued actuarial liability" ("AAL"). *Id*. ¶ 11.d. In a fully-funded system, the inflows are in balance with the AAL and, as the system matures, the surplus is used to pay the accrued benefits. In an underfunded system, this obligation to pay future benefits is called an "unfunded accrued actuarial liability" ("UAAL") and it must be met at some point in order for the system to make the benefit payments it is required to make as the years go by. Where, as here, the employers are legally responsible for funding the system, their obligation boils down to the need to retire the UAAL, which they can do either before the system runs out of money (by

increasing the amount of their current contributions) or after it runs out of money and devolves

into a pay-as-you-go system. *Id*. ¶ 8.c & e. The employers will pay more if the system has become

pay-as-you-go because the UAAL has become greater, but offsetting the increase in the amount of

their contributions is the fact that the employers have, in the meantime, had the use of their money

in the intervening years. *Id*. ¶¶ 19–21. At bottom, under either alternative, the responsibility of the

employers is to retire the UAAL, and whether they label the contributions employer contributions

or PayGo fees makes no economic difference. Instead, as Professor Samwick concluded,

> The change to PayGo changed only the timing of contributions to fund those benefits.
> Under a funded defined benefit plan, benefit accruals are funded immediately, and any
> underfunding is amortized gradually over time. Under a Pay-As-You-Go system,
> contributions are deferred until benefit payments are due.

*Id*. ¶ 21. "In economic terms, the PayGo system reflects only inconsequential changes from the

pre-2017 ERS pension system." *Id*. ¶ 22.

      40.    The Oversight Board offered a report from an actuary, Lawrence Sher, purportedly

to rebut this analysis. But Mr. Sher's report addresses only the possible differences in theory

between pay-as-you-go and funded pension systems; he does not identify any meaningful—or

actual—differences between employer contributions as of May 2017 and the PayGo fees adopted

in Act 106. Sher Report ¶¶ 18–20. Mr. Sher's summary of his opinions discusses neither Puerto

Rico nor ERS, specifically, but rather "describe[s] differences in general between a funded system

and a Pay as You Go system." Sher Dep. Tr. 43:4–20. Only one paragraph of Mr. Sher's report

even refers to Puerto Rico, and neither that paragraph nor anything else in the report mentions

PayGo fees. *See* Sher Report ¶ 20; Sher Dep. Tr. 50:18–51:3, 51:17–19, 56:10–16. Ultimately, Dr.

Samwick explained that to the extent Mr. Sher's report is intended to address Puerto Rico, it is

"just a refusal to acknowledge that there are such thing as PayGo fees, the way they are calculated,

and the way they will be paid off." Samwick Dep. Tr. 158:16–20 (Sooknanan Decl., Ex. LL). And

while Mr. Sher's central opinion seems to involve a description of "the difference between actuarial funding versus Pay as You Go," Sher Dep. Tr. 28:13–15, he conceded that "Puerto Rico was not funding ERS on an actuarial basis before 2017," either, *id.* at 65:14–17. As a result, whatever hypothetical "actuarial funding" system Mr. Sher's report contrasts with a pay-as-you-go system, it is not pre-2017 ERS.

ii.      <u>Respondents Themselves Have Referred to PayGo Fees As Employer Contributions.</u>

41.     As limited as it is, the evidence Respondents turned over in discovery confirms that even they considered PayGo fees and employer contributions as the same. For example, a July 7, 2017, email among Treasury officials states that under Act 106, "the only thing that changes is that the withholdings from employees and the employer contribution will be being deposited in the bank accounts that are established in the circular letter." Sooknanan Decl., Ex. E (ERS-CW_LS0000304). The official Circular implementing PayGo stated that the PayGo fee is a "substitute[]" for employer contributions. Sooknanan Decl., Ex. F (ERS-CW_LS0000305); *see also* Sooknanan Decl., Ex. G (ERS_LS0005056) (presentation titled "Implementation of the 'PayGo' Retirement System" issued on June 29, 2017 by Luis Collazo Rodriguez, administrator of ERS, that states that employer contributions were "substituted" with PayGo fees); Sooknanan Decl., Ex. H (ERS-CW_LS0000386) (Email from Conway Mackenzie to representatives of the Commonwealth, ERS, and AAFAF stating that "the pension numbers did not change relative to the previous budget; the fund distribution and the total numbers are still the same. What changed was the presentation–now all pension expenditures are in the custody of OMB, whereas previously the employer contributions resided at the entity level."); Sooknanan Decl., Ex. I (ERS-AAFAF_LS0001523) (Email stating that "[b]udgeting: 90% completed. Paygo number

considering employer contributions and special laws corresponding to Central Government, Agencies, Public Corporations and Municipalities.").

42.    Similarly, a September 11, 2017, email from Conway Mackenzie to the Commonwealth about "detail[s] of budgeted Pay-Go by agency" states: "The attached file is a summary of *employer contributions* in the June 1st version of the budget by fund and agency. This summary was completed by BDO. As you are aware, in the final approved budget, *the employer contributions were moved* to Agency 17 (under the custody of OMB)." Sooknanan Decl., Ex. J (ERS-CW_LS000397) (emphasis added). And a report titled "Paygo contributions related to the pension plan in excess of asset balance, consistent with the Fiscal Plan" is broken down to refer to "Employer Contributions" for each retirement system. Sooknanan Decl., Ex. K (ERS_LS0008279).

43.    Even Joint Resolution 188 and Act 106 refer to PayGo fees as employer contributions. Joint Resolution 188 states that AAFAF "shall establish and implement all mechanisms necessary so that the Central Government, the Municipalities, and the Public Corporations may *contribute* to financing the 'pay-as-you-go' system." J.R. 188 § 4.5 (emphasis added). And § 3.5 of Act 106, which discusses PayGo fees, is titled "Employer Contributions, Penalties." Act 106 § 3.5. Section § 2.5 of Act 106 also provides that the payment of PayGo fees reduces employer contributions owed to ERS, reinforcing that employer contributions and PayGo fees are the same thing. Act 106 § 2.5 ("Payments made to the Accumulated Pensions Payment Account will be deducted from the Contributions Owed and any other debt that, as of the effective date of this Law, is held by governmental entities and other entities covered by the Retirement Systems, including the Government, the Municipalities, Public Corporations, the Legislative Assembly and the Court Administration, as applicable.").

   iii.  <u>In Practice, There Is Little Difference In The Funding Structure Under The ERS And Paygo Systems.</u>

  44. Unsurprisingly, as a matter of economics, there is little difference in the allocation of funding among the three main classes of employers (the Commonwealth, public corporations, and municipalities) under the new PayGo system as compared with ERS. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Sabry Report ¶ 45–49.

████████████████████████████████

████████████████████████████████████████████████

iv.      Under The Bond Resolution And Puerto Rico Law, The Bondholders'
Liens Extend To PayGo Fees.

45.      Ultimately, then, the only difference between the PayGo fees and the employer

contributions required under the ERS Enabling Act is that the PayGo fees are, under Act 106, paid

to a special account at the Treasury—the "Accumulated Pensions Payment Account," Act 106

§ 1.6(j)—rather than to ERS. That, however, simply does not matter. Under both the Bond

Resolution and Puerto Rico law, the Bondholders' property rights cannot be evaded so easily.

46.      Under the Bond Resolution, the Bondholders' liens extend broadly to "[a]ny and

all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged

Property . . . including, without limitation, those from the sale, exchange, transfer, collection, loss,

damage, disposition, substitution or replacement of any of the foregoing." Bond Resolution Ex. B,

VI-36. PayGo fees are plainly "proceeds" of the Pledged Property—"those from the . . . 'transfer,'

'disposition,' 'substitution or replacement'" of Pledged Property. Indeed, the official Circular

implementing PayGo stated that the PayGo fee is a "substitute[]" for employer contributions.

Sooknanan Decl., Ex. F (ERS-CW_LS0000305); *see also* Sooknanan Decl., Ex. G

(ERS_LS0005056) (presentation by ERS stating that employer contributions were "substituted"

with PayGo fees); *supra* ¶¶ 41–43.

47.      Similarly, the Bondholders' liens extend to PayGo fees under UCC § 9-315. It is

difficult to imagine a broader statute. Section 9-315 was designed to ensure that perfected liens are

protected in all circumstances where collateral is transferred or somehow altered. It protects a

security interest in collateral after any "sale, lease, license, exchange, or other disposition thereof,"

and it also protects "any identifiable proceeds" of that collateral. 19 L.P.R.A. § 2265(a). Nothing

about this statutory language is narrow or restrictive. It protects perfected liens after *any*

disposition of collateral. *Id.* Indeed, debtors frequently seek to evade liens by transferring property

subject to liens to third parties, and "a security interest would be meaningless if the secured party could not reach the collateral in the hands of a third party or sue for conversion when the debtor disposes of it without authorization." *Section 9-315:1 [Rev] Continuity of Security Interest in Collateral*, 9B HAWKLAND UCC SERIES § 9-315:1 [REV]. Thus, the fact that PayGo fees are paid to the Treasury cannot mean that they are not subject to the Bondholders' liens when, substantively, they are "Employers' Contributions" under the Bond Resolution. The Bondholders' liens continue notwithstanding the "disposition" of that collateral. 19 L.P.R.A. § 2265(a). Case law makes this abundantly clear. *See, e.g.*, *Bank of the W. v. Comm. Credit Fin. Servs., Inc.*, 852 F.2d 1162, 1168 (9th Cir. 1988) (where holder of security interest did not expressly authorize transfer of collateral to another corporation, security interest in collateral and its proceeds was still valid on third party corporation that now held the collateral); *Conner v. Reilly*, No. 16-CV-336-SLC, 2017 WL 213840, at *5 (W.D. Wis. Jan. 18, 2017) (where purchaser of vehicle never acquired a proper release of lien from the owner of a previous security interest, vehicle was still subject to lien despite being transferred to new owner); *Hanley Implement Co. v. Riesterer Equip., Inc.*, 441 N.W.2d 304, 305 (Wis. Ct. App. 1989) ("It is established law that a security interest continues in the collateral despite its sale unless the secured party authorizes the disposition."); *Metter Banking Co. v. Fisher Foods, Inc.*, 359 S.E.2d 145, 147 (Ga. Ct. App. 1987) ("It was certainly not intended that the debtor could defeat entirely the bank's perfected interest in its accounts receivable by giving away its product to another creditor with an interest in the product which is inferior in point of perfection."); *Amegy Bank N.A. v. Deutsche Bank Corp.*, 917 F. Supp. 2d 1228, 1236–38 (M.D. Fla. 2013) (noting right of secured party under U.C.C. § 9-315 to bring conversion claim when debtor disposed of collateral to pay debt owed to third party).

25

48.     Even if the Court were to conclude that PayGo fees are not themselves Employers'
Contributions under UCC § 9-315, they would still be subject to the Bondholders' liens as
"identifiable proceeds" of the Bondholders' collateral. 19 L.P.R.A. § 2265(a). *See, e.g.*, *In re Pratt*,
462 F.3d 14, 20 (1st Cir. 2006) (recognizing secured creditor has right to proceeds under Maine's
version of UCC § 9-315); *BMW Fin. Servs., NA, LLC v. Rio Grande Valley Motors, Inc.*, No.
CIV.A. M-11-292, 2012 WL 4623198, at *10 (S.D. Tex. Oct. 1, 2012) ("[A] security interest does
not cease to attach to collateral merely because the collateral is converted into proceeds."); *Section
9-315:2 [Rev]Attachment of security interest to proceeds*, 9B HAWKLAND UCC SERIES § 9-315:2
[REV] ("The automatic attachment of the security interest to identifiable proceeds gives double
protection to the secured party who has not in the security agreement or otherwise authorized a
disposition because, unless Article 9 provides otherwise, the secured party can enforce the security
interest either against the collateral in the hands of the purchaser or against the proceeds of the
collateral in the hands of the debtor.");. "Proceeds" include, *inter alia*, "[w]hatever is acquired
upon the sale, lease, license, exchange, or other disposition of collateral," "whatever is collected
on, or distributed on account of, collateral," or "rights arising out of collateral." 19 L.P.R.A.
§ 2212(64). As just explained, the PayGo fees were "acquired upon the . . . disposition of" the
Bondholders' collateral, and are "on account of" the Bondholders' collateral or "aris[e] out of" the
same. *Id.* PayGo fees serve precisely the same purpose as employer contributions and are paid by
the same entities in approximately the same proportions. And because the PayGo fees are discrete
payments that are to be paid into the "Accumulated Pensions Payment Account," an "account in
trust, separate from general assets and Government accounts," Act 106 § 1.6(j), there is no basis
to conclude that they are not "identifiable."

49.     Thus, whether the PayGo fees are proceeds of the Pledged Property under the Bond Resolution, or themselves Employers' Contributions or the identifiable proceeds of that collateral under 19 L.P.R.A. § 2265(a), the Bondholders' liens continue, despite Act 106's renaming of employer contributions as PayGo fees and the redirection of those payments from ERS to the Treasury's "Accumulated Pensions Payment Account."

## III.    The Bondholders Are Not Adequately Protected.

### A.    The Automatic Stay Results In A Decrease In The Value Of Collateral When It Prevents The Creditor From Taking Action That Could Prevent Or Remedy The Decrease In Value.

50.     The Oversight Board has previously argued, and the Court preliminarily agreed, that the Bondholders are not entitled to relief from the automatic stay because any diminution in collateral value is not the result of the automatic stay, but the result of Joint Resolution 188 and Act 106, which the Oversight Board claims eliminated the Bondholders' collateral. *See* July 25, 2018 Omnibus Hr'g Tr., Case No. 17-03283, at 87:11–13 ("the evidentiary record is not one that shows adequately the automatic stay linked diminution of collateral"); 82:11–14 (requiring a showing "as to what the precise equity is that you claim and how it is that the automatic stay, as distinguished from anything else, has resulted in its diminution"); *Debtor's Opp'n to Mot. of Certain Secured Claimholders of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay* at 12, Docket No. 3465 in Case No. 17-bk-03283 and Docket No. 292 in Case No. 17-bk-03566 ("Movants are complaining about legislation by the Commonwealth creating a new pension system that does not generate Employers' Contributions. Indeed, certain holders of ERS Bonds have sued the United States in the Court of Claims. . . . The automatic stay, use of collateral under Bankruptcy Code section 363, and granting liens under Bankruptcy Code section 364 are not at issue.").

51.     But this argument is completely frivolous. There is no requirement—in the Bankruptcy Code or elsewhere—that the automatic stay be *the cause* of any diminution in collateral value. Under § 361 of the Bankruptcy Code, the automatic stay "results in a decrease in the value" of collateral when it prevents a secured creditor from taking action that could prevent or remedy the decrease in value of collateral. *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988) ("It is common ground that the 'interest in property' referred to by § 362(d)(1) . . . is not adequately protected if the security is depreciating during the term of the stay."); *In re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004) ("[T]he code specifically ensures the protection of a secured creditor's assets against any decrease in value from the beginning of the automatic stay."). In other words, § 361 is satisfied if the collateral is decreasing in value *while the automatic stay is in effect*. Here, the automatic stay prevents the Bondholders from exercising remedies to prevent the ongoing diversion and dissipation of their collateral, including, but not limited to, enforcing their liens, seeking relief under § 407 of PROMESA for unlawful inter-debtor transfers of property, and pursuing litigation against municipalities and public corporations not currently in Title III proceedings.

### B.     The Bondholders' Collateral Is Declining In Value.

52.     There is no question that the Bondholders' collateral has decreased in value during the automatic stay. In litigation commenced prior to ERS's Title III filing, the First Circuit held that even a temporary diversion of the Bondholders' collateral and the resulting uncertainty about ERS's ability to repay the ERS Bonds established a legally sufficient claim that the Bondholders were entitled to relief from the automatic stay. *Peaje*, 845 F.3d at 514 (The Bondholders "included in their district court filings a 2014 statement by ERS that uncertainty about future employer contributions could affect the repayment of the ERS's bond payable."); *see also* Unofficial Tr., *Altair Global Credit Opportunities Fun (A), LLC, et al., v. Garcia-Padilla, et al.*, No. 16-2433, at

36:21–37:1 (Sooknanan Decl., Ex. EE) ("But I'm just having great difficulty with your argument that there's this seven-month window where the government can entirely, entirely destroy the value of collateral a hundred percent and yet that wouldn't in and of itself be good cause [to lift the stay]."). The Bondholders face an even greater peril here. ███████████████████

████████████████████████████████████████████████████████ Sabry

Report ¶¶ 51–53. ██████████████████████████████████████████████

███████████████████████████████████ *Id.* at 64–72.

       i.     <u>The Bondholders' Collateral Has Been Permanently Diverted And Is Being Dissipated On A Monthly Basis.</u>

    53.    Joint Resolution 188 and Act 106 permanently diverted the Bondholders' collateral from ERS and the Fiscal Agent to the Commonwealth Treasury. Under the mechanisms created by the Bond Resolution, employer contributions were paid to ERS on a monthly basis and transferred to the Fiscal Agent for the benefit of the Bondholders. *Supra* ¶ 11. ██████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Sabry

Report ¶ 25; Samwick Report ¶ 23; *supra* ¶ 18.

    54.    Moreover, PayGo fees are dissipated every month. █████████████

███████████████████████████████████████████████████████████████

██████████████████████████ Sabry Report ¶ 53; *see also id.* ¶ 51

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████    Rebuttal Expert Report of Faten Sabry, Ph.D ¶¶ 16–17

(Sooknanan Decl., Ex. RR); Collazo Dep. Tr. 51:22–52:4; Sher Dep. Tr. 57:11–15 (The

Accumulated Pensions Payment Account "wasn't intended to be a fund that was going to amass

more than the current benefits would require. If that much. Assuming everybody actually paid it.");

*id.* at 60:6–8 ("if I understand it right, it's going to have little or no balance over time, because

money is coming in and out").

55.    More troubling is evidence that the Commonwealth may be dissipating PayGo fees

daily. PayGo fees should be paid into, and kept in, a separate account until used to pay benefits.

Act 106 § 2.1. But the Commonwealth has admitted that these funds are, instead, dissipated and

swept into the Treasury's main account every day. Pena Dep. Tr. 118:16–119:21.

ii.    Future PayGo Fees Are Uncertain.

56.    Both ERS and the Commonwealth have long warned that the revenue stream

securing the ERS Bonds was uncertain because of the Commonwealth's fiscal troubles.[6] Moreover,

---

[6] *See, e.g.*, ERS's *Basic Financial Statements and Required Supplementary Information* for the period ending June 30, 2014 at 9 (released on June 2, 2016) (Sooknanan Decl., Ex. N) ("The Commonwealth and other participating employers have been facing a number of fiscal and economic challenges in recent years due, among other factors, to continued budget deficits, a prolonged economic recession, high unemployment, population decline, and high levels of debt and pension obligations. If the Commonwealth's financial condition does not improve as a result of fiscal and budgetary measures it is taking, its ability to repay its obligations, including its regular employer contributions to the [ERS] and its additional contribution as provided by Act No. 32 of 2013, for the upcoming years, may continue to be adversely affected, and could also affect the payment of benefits and the repayment of the [ERS's] bond payable."); Commonwealth of Puerto Rico Financial Information and Operating Data Report at 60–61 (December 18, 2016) (Sooknanan Decl., Ex. P) ("The Commonwealth and other participating employers have been unable to make most of the additional annual employer contributions required by the reform legislation as a result of the worsening fiscal crisis since the enactment of the reforms. . . . If the Retirement Systems begin operating solely on a "pay-as-you-go" basis, the Commonwealth and other participating employers may not have sufficient resources to cover the amount by which benefits exceed employee and employer contributions. In this scenario, because of the economic and social implications of not being able to satisfy pension payments, the Commonwealth is likely to seek to prioritize payments to pensioners over other stakeholders, including [general obligation] bondholders, by pursuing all options available to it under applicable law, including through the mechanisms afforded by PROMESA."); ERS's *Basic Financial Statements and Required Supplementary Information* for the period ending June 30, 2016 at 8 (released on October 5, 2018) (Sooknanan Decl., Ex. Q) ("The Commonwealth and the other participating employers have faced fiscal and economic challenges in recent years due, among other factors, to continued budget deficits, a prolonged economic

since the implementation of Joint Resolution 188 and Act 106, there has been plenty of evidence that certain municipalities and public corporations are unwilling or unable to remit PayGo fees. The PayGo system was premised on the assumption that the monthly contributions from the Commonwealth, public corporations, and municipalities would match the payments the Treasury was to make to retirees. But this is not what happened. Instead, some of the public corporations and many of the municipalities soon defaulted upon their obligations. In March 2019, Governor Rosselló was quoted stating that "[t]he fiscal reality is if the numbers continue as they are, the municipalities will be inoperable within five years." Sooknanan Decl., Ex. L.

57.     By April 2019, the Oversight Board determined that various public corporations owed the Treasury $187 million and thirteen municipalities owed $127 million. Sooknanan Decl., Ex. M. And in May 2019, the Puerto Rico legislature preempted efforts to collect money from municipalities by enacting a bill that purports to excuse municipalities altogether from having to remit PayGo fees to the Treasury. Sabry Report ¶ 72; Act 29-2019, § 4 (Sooknanan Decl., Ex. AA).[7] It states that "as of fiscal year 2019-2020, the Municipalities shall not have any obligation to pay the 'Pay as you Go,' [and] the Collection Center for Municipal Revenues (CRIM), [will not have] the obligation to remit payments for those [purposes]." Act 29-2019, § 4.

58.     ███████████████████████████████████████████████████
███████████████████████████████████████████████ Sabry Report Ex.
9. The fact that public corporations have failed to remit the PayGo fees invoiced to them indicates that they are not a reliable source of funding for the Bondholders. Similarly, the Puerto Rico

---

recession, high unemployment, population decline, and high levels of debt and pension obligations."); *see also* Commonwealth of Puerto Rico *Fiscal Plan* at 39 (October 14, 2016) (Sooknanan Decl., Ex. O).

[7] It appears the Commonwealth and the Oversight Board are now in a dispute about the status of this law, which is currently unresolved. Sooknanan Decl., Ex. DD.

legislature's decision to exempt municipalities altogether from the system for the past and next fiscal year indicates that the municipalities, too, are not a reliable source of funding.

59.     In sum, there is an abundance of unrebutted record evidence showing that the stream of payments securing the ERS Bonds is uncertain:

Fiscal Uncertainty

60.     There is plenty of evidence highlighting the Commonwealth's fiscal troubles, as well as uncertainty surrounding the ability of  municipalities and public corporations to remit PayGo fees. *See supra* ¶¶ 56–58.[8] In addition:

- The Municipality of Ponce Audit Report (Mar. 4, 2019) (Sooknanan Decl., Ex. T) states the municipal government of Ponce has built up a debt of $32.6 million in outstanding obligations to the Employee Retirement System, the Puerto Rico Aqueduct and Sewer Authority, the Puerto Rico Electric Power Authority and the U.S. Internal Revenue Service.

- On May 9, 2019, the Oversight Board sent a letter to Governor Rosselló (Sooknanan Decl., Ex. U) stating that the "fiscal situation of the Commonwealth" "has led the Government and the Oversight Board to agree to phase out the municipal subsidy as a measure to prioritize much-needed General Fund funding" and providing that the "Oversight Board designated all 78 municipalities as Covered Territorial Instrumentalities subject to the requirements of PROMESA."

- On May 29, 2019, the municipality of San Juan filed a complaint against ERS, the Treasury Department, the Retirement Board of the Government of Puerto Rico, and the heads of the entities in their official capacity seeking, among other things, a preliminary and permanent injunction against the defendants to

---

[8] *See also* AAFAF *PayGo and Individual Contribution Debt by Entity* (April 15, 2019) (Sooknanan Decl., Ex. R) (reporting that as of March 31, 2019 for the fiscal year 2019 to date, PayGo invoices to the Central Government totaled $562 million, to public corporations totaled $227.1 million, and to municipalities totaled $112.7 million, but the full amount had been collected from the central government, while only $113.9 million and $31.6 million had been collected from public corporations and municipalities respectively); Oversight Board Press Release, *Urgent Action to Collect $340 Million due from Municipalities and Public Corporations in PayGo and Individual Employee Payroll Withholding* (Sooknanan Decl., Ex. S) ("the government must take immediate action to secure reimbursement from several municipalities and public entities that have failed to pay their share of PayGo pensions for their retirees," "the municipalities of San Juan, Ponce, Carolina, and Toa Baja as well as the public corporations PRASA, the Ports Authority, and the State Insurance Fund"); Letter from the Oversight Board to the Commonwealth (April 30, 2019) (Sooknanan Decl., Ex. M) (stating that the Board is "very concerned with . . . the failure of many municipalities and public corporations to remit their required monthly PayGo fees," reporting "that there is approximately $340 million in accrued debt from 28 public corporations and 66 municipalities since implementation of the PayGo system in 2017").

preclude any attempt to collect Pay-Go fees from San Juan until the alleged deficiencies and legal defects in the Pay-Go billing outlined in the complaint are resolved (Sooknanan Decl., Ex. V).

- On June 10, 2019, the defendants to the lawsuit by the municipality of San Juan filed a Motion to Dismiss and, In the Alternative, In Opposition to Preliminary and Permanent Injunction and Mandamus Petition (Sooknanan Decl., Ex. W). It states that "up to today, and in contravention to the law, the Municipality has refused to pay even one cent of any of the pensions it has the responsibility to pay, including those of which there is no controversy." *Id.* at 3.

- An article titled *San Juan Mayor Discusses Order in Local Pay-Go Lawsuit, Skips Oversight Board Meeting at CRIM Based on City's Pending Lawsuit Against Board* (Sooknanan Decl., Ex. X), published by Reorg Research, Inc. and dated June 11, 2019, states that San Juan Mayor Carmen Yulín Cruz's statement expressed that "Judge Anthony Cuevas Ramos called the request of San Juan to review the records 'reasonable and legitimate' given that the city's pay-go bill jumped to $54 million from $33 million in the course of one year."

*Legislative Uncertainty*

61.     There is also significant uncertainty surrounding future legislative action to harm the Bondholders or evade payment on the ERS Bonds, such as further changes to the pension system. The legislature already purported to abolish ERS, and might try to do the same to PayGo. In addition:

- On August 5, 2018, the Puerto Rico legislature enacted Law No. 177 (Sooknanan Decl., Ex. Y) "to authorize agencies, instrumentalities, and public corporations of the Government of Puerto Rico to establish payment plans with the municipalities." The legislature notes that the "serious economic crisis that the Government is undergoing, including municipalities, is commonly known." *Id.* at 1. Article 1 provides that the "agencies, instrumentalities and public corporations of the Government of Puerto Rico are hereby authorized to establish payment plans with the municipalities, according to their specific circumstances, without being subject to any specific requirement contained in any general or special law or any regulations." *Id.* art. 1.

- On July 27, 2018, El Nuevo Dia published an article titled *Mayors denounce errors in the PayGo* (Sooknanan Decl., Ex. Z). The article discusses various errors in the invoicing of PayGo payments and notes that, "in an attempt to help the municipalities, . . . Governor Rosselló presented Senate Bill 1032 so that municipalities can enter into payment plans with government agencies and public corporations." *Id.*

33

- On May 17, 2019, Governor Rosselló signed Senate Bill 1258 into law as Act 29 (Sooknanan Decl., Ex. AA). In the Statement of Purpose, the legislature states that "[i]t is no secret that the municipalities are going through an enormous fiscal crisis, as is the Government of Puerto Rico." *Id.* at 1. Article 2 states that the "Law is adopted with the purpose of reducing the administrative responsibility of the municipalities regarding the payments they make to the health plan of the Government of Puerto Rico and to the system 'Pay as you Go.'" *Id.* art. 2. Article 4 states that "from the fiscal year 2019-2020, the municipalities will not have an obligation to pay the 'Pay as you Go.'" *Id.* art. 4 (amending art. 3.5 of Act 106).

- On May 17, 2019, the Oversight Board sent a letter to Governor Rosselló, the President of the Senate of Puerto Rico and the Speaker of the House of Representatives of Puerto Rico (Sooknanan Decl., Ex. CC) regarding the legislature's recent passage of Senate Bill 1258, which exempts municipalities from paying their "PayGo pension obligation for their retirees, without identifying an alternate source of funding, thereby implying that the Commonwealth's General Fund will subsidize this expense." It also states that "[b]ased on our preliminary review of the Bill, the Oversight Board estimates the potential fiscal impact to be approximately $311 million for FY20 and $1.7 billion over the next five fiscal years (FY20-FY24)". *Id.*

- On June 12, 2019, the Oversight Board sent a letter to Governor Rosselló, President of the Senate Schatz, and Speaker of the House Méndez (Sooknanan Decl., Ex. DD) regarding the certification submitted pursuant to Section 204(a) of PROMESA that Act 29 is not significantly inconsistent with the Commonwealth's Fiscal Plan. It states that the "Oversight Board concludes that the Compliance Certification for Act 29 failed to provide the formal estimate of the fiscal impact that the law will have." *Id.* at 1. It further states that "the Oversight Board considers Act 29 to be significantly inconsistent with the Commonwealth Fiscal Plan." *Id.* at 2.

iii.     <u>Mr. Malhotra's Contrary Conclusions Are Unsupported And Wrong.</u>

62.     Much of Respondents' defense to this motion is premised upon a theory that the Bondholders are oversecured and, therefore, are in no danger of having the value of their collateral diminished. This argument rests on two propositions. The first is that the flow of PayGo fees will be sufficient, uninterrupted, and certain for the next 39 years. The second is that the net present value of that stream of PayGo fees substantially exceeds the amounts the Bondholders are owed.

34

63.     The first of these assumptions is simply unfounded. As pointed out above, the financial condition of the Commonwealth and Puerto Rico's public corporations and municipalities remains precarious. *See supra* Part III.B.ii. Moreover, there is a long and troubling history of the legislature interfering with the assessment, collection, and assignment of the funding for ERS, which suggests that the legislature will soon again attempt to interfere with the flow of PayGo fees. Indeed, the legislature seems to be working on such proposals at this very time.

64.     The second assumption is equally flawed. The Oversight Board's expert, Mr. Gaurav Malhotra, has opined that "[t]he [Net Present Value ("NPV")] of annual PayGo Projection payment streams over the 40-year period exceeds the asserted $3.8 billion claim related to bond debt held by the ERS bondholders." Malhotra Decl. ¶ 19. He reached this conclusion by calculating "[NPV] of projected retirement benefit payments to be paid by the Commonwealth to pensioners who participated in the ERS retirement system under the 'pay as you go' funding arrangement established by Act 106-2017 ('PayGo Projections') and to compare that NPV to the amount of asserted ERS bondholder claims." *Id*. ¶ 7.

65.     Net Present Value is a standard financial formula used to determine the value today of a stream of expected payments in the future. *See* Amy Gallo, *A Refresher on Net Present Value*, Harv. Bus. R. (Nov. 19, 2014), https://hbr.org/2014/11/a-refresher-on-net-present-value. The main inputs into the formula are the amount of each of the future payments, the date each payment is expected, when the stream of payments begins and ends, and the applicable discount rate. *Id*. In projecting the retirement benefit payments to be paid by the Commonwealth to pensioners who participated in the ERS retirement system, Mr. Malhotra relied upon projections prepared by ERS's actuary, Milliman, which he loaded into an Excel spreadsheet. Malhotra Decl. ¶¶ 8–13.

Using two different discount rates, Mr. Malhotra used the standard formula to determine the NPV of this stream of payments. *Id.* ¶¶ 14–15.

66.     There are a series of errors in Mr. Malhotra's analysis. *First*, and most fundamentally, Mr. Malhotra valued the wrong thing. Rather than valuing the PayGo fees that the Bondholders claim as their collateral—that is, the payments made by employers to the Accumulated Pension Payment Account for use to pay pensions—Mr. Malhotra valued the pension payments themselves. Mr. Malhotra made this mistake because he misunderstood what the "PayGo fees" he was asked to value were—he thought that they were the pension payments themselves. *See* Malhotra Dep. Tr. 53:10-13 (Sooknanan Decl., Ex. NN) (Q. "Where does the Pay-Go money come from? A. It comes from the Commonwealth's budget. Q. From any other source? A. No."); 125:16-18 ("Q. And Pay-Go, as you've used it here, is the money being paid out to retirees? A. That's correct."); *see also id.* 87:22-88:2 ("Q. Now, in conducting your analysis, the – let's stay on Exhibit 8 – Pay-Go numbers that you used were the numbers that Hacienda was expected to pay to retirees in all of those years, correct? A. That is correct."); *id.* 109:23-110:2 ("A. We did not do any analysis to compare reimbursements from municipalities with any form of bondholder payments. We did not conduct any analyses like that."). Having been told to assume that PayGo fees were the stream of payments the Puerto Rico Treasury made to retirees, Mr. Malhotra then used very low discount rates (3.58% and 3.79%) to calculate the NPV of that stream, reasoning that—whatever other problems the Puerto Rico might have—it would reliably make its payments to retirees. Malhotra Report ¶ 14 & Ex. 1A. From this, Mr. Malhotra calculated the NPV of the *Treasury's* obligation to make retirement payments to *retirees*. He did not calculate the NPV of

the obligation of Puerto Rico's central government, public corporations, and municipalities to

remit PayGo fees as Act 106 requires.[9]

> Q. Let me ask you this: If you were asked to use a discount rate solely for the stream of reimbursements going to Hacienda from public corporations and from municipalities, would you use the same discount rate to reach a net present value of that stream of payments?

> A. I would have to think about that. Because the question on – there is a higher degree of risk for – given what we have seen for reimbursements to the municipalities from Hacienda.

> But that is not a topic in terms of how I have looked at it, because in my view, what I have looked at the payments that go to retirees regardless of – the appointments that go to the retirees or the municipalities or the corporations have the same risk profile as that of the Commonwealth regardless of the reimbursement that is coming from the municipalities of the Commonwealth.

Malhotra Dep. Tr. 101:24-102:18. The net result of this mis-assignment to Mr. Malhotra is that

the number he derived is simply irrelevant. The stream of pension payments to retirees is not the

same thing as the stream of PayGo fees to the Treasury, and (as Mr. Malhotra indicated in his

testimony) calculating a NPV of the stream of PayGo fees (which he referred to as

"reimbursements") would require a higher discount rate because of the higher risk.

67.     *Second*, Mr. Malhotra's focus upon the wrong data set also resulted in his use of

incorrect discount rates. Mr. Malhotra ran his analysis using two discount rates of 3.58% and

3.79%. Malhotra Decl. ¶ 16. Each was taken from an index published by the Bond Buyer for a

basket of 20 municipal bonds, each with a maturity of 20 years. *Id.* ███████████████

████████████████████████████████████████████████

████████████████████████████ Sabry Rebuttal Report ¶¶ 19–20. Mr.

---

[9] In fact, Mr. Malhotra testified that he had not seen or read Act 106. Malhotra Dep. Tr. 51:7-16. Mr. Malhotra did not understand the term PayGo fee to mean the monies paid into the Treasury by central government, the public corporations and the municipalities, as Act 106 defines the term. Act 106, § 1.6(g). Instead, he referred to those payments as "reimbursements." Malhotra Dep. Tr. 56:22-57:25.

Malhotra justified his use of those low rates because he "view[ed] the stream of payments *going to the retirees* in the Commonwealth as a pretty strong credit in terms of the security of making sure those retirees will get those checks." Malhotra Dep. Tr. at 96:3–6 (emphasis added); *see also id.* at 96:3–97:3 ("I view the payment stream to retirees under a completely different lens.").



Sabry Rebuttal Report ¶ 23.

68. ██████████████████████████████████████

██████████████████████ *Id.* ¶¶ 12–15. As noted above, those risks are substantial and real. However, it was not something Mr. Malhotra considered in his opinion, or could have since he examined a different payment stream.

69.     *Fourth*, even if Mr. Malhotra had valued the correct stream of income, the NPV approach is the wrong one to use here because it assumes the conclusion it is trying to prove—that is, that the Bondholders will be paid in full because there will be enough collateral to satisfy the Bondholders' claims in later years. But the Oversight Board has repeatedly asserted that the Commonwealth's obligations to pensioners are merely prepetition, unsecured claims, that other creditors of the Commonwealth have asserted primacy over the Commonwealth's payments to pensioners, and that there will be uncertainty with respect to the Commonwealth's payments to pensioners unless and until there is a confirmed plan of adjustment. Further, the Oversight Board, on behalf of ERS in this very litigation, has asserted that "because the Commonwealth cannot afford to make employer contributions based on the fiscal emergency existing on the ERS Title III petition date, there will be no revenues to which [the Bondholders'] lien can attach." Docket No. 98 in Case No. 17-bk-03566.

70.     In sum, the analysis Respondents offer from Mr. Malhotra is almost wholly irrelevant to the issue before the Court. The question to be answered is whether the value of the Bondholders' collateral has diminished during the term of the stay. The NPV Respondents offer is whether the value of the retirees' expected pension benefits have diminished, or will. This mistaken assumption not only has resulted in a misleading projection of the Bondholders' collateral, but also has resulted in other errors as well. As mentioned, it allowed Mr. Malhotra to use a wildly inappropriate discount rate and to completely overlook the credible evidence that the stream of PayGo fees payable by the Commonwealth, public corporations, and municipalities is subject to serious diminution.[10]

## C.     ERS And The Commonwealth Are Not Providing Adequate Protection.

71.     Under § 361 of the Bankruptcy Code, a debtor may provide adequate protection in one of three ways when the automatic stay results in a decrease in the value of a secured creditor's interest in property: (1) by making cash payments or periodic cash payments in an amount equal to the decrease in the value of the secured creditor's interest in property, (2) by providing an additional or replacement lien to replace the property, or (3) by providing other relief "as will result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(1)–(3); 48 U.S.C. § 2161(a); *see also In re Builders Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013) (any decrease in collateral value "attributable to the [d]ebtor's usage" of rents pledged as collateral "must be protected by cash payments from another source, an additional or replacement lien, or other such indubitable equivalent").

---

[10] In view of the essential mistake in the approach Respondents assigned Mr. Malhotra, the Bondholders do not believe it is necessary at this point to also address other flaws in the methodology and assumptions relied upon by Mr. Malhotra. Foremost among these, however, was his apparent assumption that the Commonwealth itself is not responsible for making PayGo fees. *See* Malhotra Dep. Tr. 88:3-17. That, however, is directly contrary to the provisions of Act 106, and the Bondholders maintain that the Commonwealth's PayGo contributions are as much a part of their collateral package as the PayGo fees remitted by Puerto Rico's public corporations and municipalities.

72.     ERS and the Commonwealth are not providing any adequate protection under § 361. Critically, the Bondholders' liens on future PayGo fees do not constitute adequate protection. A promise of future payment does not provide adequate protection for a debtor's diversion of a secured creditor's property today because it does not "result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3). A speculative, future payment is simply not a "suitable substitute" such that it satisfies the adequate protection requirement because payment in the future "is not generally the equivalent of payment now." *In re Murel Holding Corp.*, 75 F.2d 941, 942–43 (2d Cir. 1935).

73.     A promise of future payment is an especially inappropriate form of adequate protection where the secured creditor already has a lien on those very same future payments. After all, a debtor cannot give a creditor a replacement lien on future payments when the creditor's security interest already extends to those payments. *See* 3 COLLIER ON BANKRUPTCY ¶ 361.03[3] (16th ed. 2016) ("Courts have also considered whether a replacement lien in postpetition rents provides adequate protection to a creditor holding a lien on prepetition rents. Most courts conclude that it does not because the creditor already has a lien on postpetition rents under section 552."); *see also In re Putnal*, 483 B.R. 799, 804 (Bankr. M.D. Ga. 2012); *In re Stearns Bldg.*, 165 F.3d 28 (Table), 1998 WL 661071 (6th Cir. 1998); *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558 (B.A.P. 6th Cir. 2010); *In re Jefferson Cty.*, 474 B.R. 228, 272 (Bankr. N.D. Ala. 2012); *In re Builders Grp. & Dev. Corp.*, 502 B.R. at 122); *In re May*, 169 B.R. 462, 472 (Bankr. S.D. Ga. 1994); *In re Las Torres Dev., LLC,* 413 B.R. 687, 696–97 (Bankr. S.D. Texas 2009).

## CONCLUSION

For the foregoing reasons, the Bondholders respectfully request that the Court enter an order granting relief from the debtors' automatic stays and any further relief as the Court may deem proper.

In San Juan, Puerto Rico, today June 21, 2019.

By:

| | |
|---|---|
| */s/ Alfredo Fernández-Martínez* | */s/ Bruce Bennett* |

Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Jason N. Zakia

John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*