# EXHIBIT OO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


In re:
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,
                    as representative of
THE COMMONWEALTH OF PUERTO RICO, et al.
                    Debtor,
----------------------------------------X
In re:
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
                    as representative of
THE EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO,
                    Debtor.

                          450 Park Avenue
                          New York, New York
                          June 20, 2019
                          2:03 P.M.


     EXAMINATION BEFORE TRIAL of LAWRENCE SHER, an
Expert Witness herein, taken by the attorneys for
the respective parties, pursuant to Notice, held at
the above-stated time and place, before Melissa
Leonetti, RPR, a Notary Public of the State of New
York.



advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

5

1                     L. SHER

2           THE VIDEOGRAPHER:  We are now on the

3      record.  This is the video deposition of

4      Lawrence Sher in the matter of In Re:

5      Financial Oversight and Management Board for

6      Puerto Rico, et al., held at the offices of

7      Jones Day, 450 Park Avenue, New York, New

8      York, on Thursday, June 20th, at

9      approximately 2:03 p.m.

10          I am Chris Ritona, the videographer

11     with Advanced Depositions.  The court

12     reporter today is Missy Leonetti, also with

13     Advanced Depositions.  We are from the office

14     in Philadelphia, PA.

15          All counsel will be noted on the

16     stenographic record.  The court reporter will

17     now please swear in the witness.

18  LAWRENCE J. SHER, after having first

19  been duly sworn by a Notary Public of the State of

20  New York, was examined and testified as follows:

21  EXAMINATION BY

22  DAVID R. FOX, ESQ.:

23     Q.    Dr. Sher, can you please state your name

24  for the record.

25     A.    Lawrence J. Sher.



Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

13

                              L. SHER

1

2     Pay as You Go, but I understand them to be the same.

3         Q.    How do you understand the term?  I'm

4     sorry.

5         A.    The Pay-Go term is very specific to this

6     case.  I don't think I've heard it quite expressed

7     like that before.  I understand it's quite analogous

8     to what you would say a Pay-Go type of arrangement.

9         Q.    Today would you understand if I use the

10    term Pay-Go to refer specifically to Puerto Rico's

11    Pay as You Go system and Pay as You Go to refer to

12    as a Pay as You Go system in general?  Does that

13    make sense?

14        A.    That's okay.

15        Q.    Have you heard the term Pay-Go fee?

16        A.    Yes.

17        Q.    What do you understand that term to refer

18    to?

19        A.    Again, in the context of this case, it is

20    a fee, an amount of money that's assessed to various

21    employers who previously were participating

22    employers in ERS to -- to help finance the current

23    benefit payments to former participants in ERS.

24        Q.    Do you know who the Pay-Go fee is paid

25    to?

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

14

1                         L. SHER

2         A.    My understanding is that's it's paid to

3    the Commonwealth.

4         Q.    You used the word "contributions" in your

5    report.  Does that have a specific meaning to you as

6    an actuary or does it depend on the context?

7         A.    Well, I think it could depend upon the

8    context.  I can tell you generally how I view that.

9               MS. DALE:  Wait for a question.

10        Q.    Same question about the word "funding."

11   You used the term "funding" a few times in your

12   report.  Is that a term that has a specialized

13   meaning to you as an actuary or is that also --

14        A.    As a general term, yes.

15        Q.    What is that meaning?

16        A.    Funding, to me, means from the standpoint

17   of work I'm familiar with, which is pension

18   actuarial work.

19              When you fund something, you have a

20   trust fund that's set aside, segregated from other

21   assets typically of the employer, that is

22   receiving contributions from the employer and

23   sometimes from employees and is earmarked to

24   provide certain benefits to the plan's

25   participants over time.

Video Deposition of Lawrence Sher, 6/20/2019

21

1                          L. SHER

2    pension plans involved in New Jersey.  They were

3    sponsored either by the state or by some of the

4    municipalities.

5             By the way, that also encompasses the

6    study of healthcare benefits for retirees.  And

7    the purpose of the study was to try to come up

8    with alternative ways of funding or providing

9    benefits under the program to make it, you know,

10   more sound from a financial perspective.

11        Q.    What role did pension obligation bonds

12   play in that work?

13        A.    Well, it had -- it came up because they

14   had entered into them, and there were some

15   discussions about the possibility as you were going

16   along of introducing them again.

17        Q.    What was the nature of those discussions?

18        A.    I think it was just together with a whole

19   bunch of other possibilities.  It wasn't as if it

20   was -- it wasn't singled out as a likely prospect.

21   It was just on the list of things that we were

22   considering.

23        Q.    Was any consideration given as part of

24   your work in New Jersey to a transition to a Pay as

25   You Go system?

Video Deposition of Lawrence Sher, 6/20/2019

22

L. SHER

1

2      A.    I would say no, although there was a

3   concern that some of the funds would run out of

4   money.  That's one of the things that triggered the

5   study.

6      Q.    Why did you mention the concern that some

7   of the funds would have run out of money in response

8   to my question about a transition to a Pay as You Go

9   system?

10     A.    Because what would happen is if it ran

11  out of money, it might very well -- one possibility

12  would be that it would have to transition over to a

13  Pay as You Go system.  That's one possibility.

14     Q.    Why is that?  Can you explain that.

15     A.    Well, because if the fund -- if the fund

16  is run dry and there's no more money, either someone

17  has to come up with money to continue to fund the

18  plan or they would -- something else would have to

19  give.  One of the other possibilities would be the

20  pension payments would be ceased.

21     Q.    You mentioned two possibilities.  One is

22  someone coming up with money to fund the plan; is

23  that right?

24     A.    Right.  We talked about increasing taxes,

25  reducing services in some areas, increasing

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

23

                              L. SHER

1    assessments to the -- you know, to the various

2    employers.

3              There was real concern, though, that if

4    it ran out of money that whatever they were to do

5    they ought to do it sooner rather than later,

6    because they didn't really want to have to deal

7    with some of the extreme possibilities.

8         Q.    If the fund did run out of money and it

9    wanted to continue to pay pension benefits as they

10   were owed, is there an alternative to a transition

11   to a Pay as You Go system under those circumstances?

12             MS. DALE:  Objection.  Are we talking

13        about his work in New Jersey or just

14        hypothetically or --

15             MR. FOX:  Hypothetically.

16        A.    I would say yes, it's pension payments

17   and --

18        Q.    Other than that?

19        A.    Pension benefits are reduced, and they,

20   again, try to find some other kind of funding.  Free

21   up money from -- one of the things they considered

22   was freeing up money from healthcare, because the

23   healthcare benefits were considered to be very rich.

24             They would have to find money elsewhere

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

24

1                        L. SHER
2    in the budget or raise taxes, which they could do
3    at that point.  I mean, they -- they were talking
4    about raising taxes in various ways.
5          Q.    Going back for a moment to Appendix 3 in
6    Exhibit 1.  You have a list of publications in this
7    document?
8          A.    Yes.
9          Q.    Were any of these published in an
10   academic periodical?
11               MS. DALE:  Objection to the form.
12         A.    I would say -- you want me to go through
13   them one by one?  That's what I'm going to have to
14   do to answer your question.
15         Q.    If you don't know, you can say you don't
16   know.
17         A.    As I sit here now, I -- I know there are
18   some.  The answer is some.
19         Q.    Okay.  Do you know if any of them relate
20   to a Pay as You Go pension system?
21         A.    I don't think so.
22         Q.    Are you an economist?
23         A.    No.
24         Q.    Are you qualified to render an economic
25   opinion?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

25

1                          L. SHER

2        A.    I would say no.

3        Q.    And you're not a lawyer, right?

4        A.    No.

5        Q.    So you're not qualified to offer a legal

6    opinion?

7        A.    That's correct.

8        Q.    Have you ever drafted pension reform

9    legislation?

10       A.    I would say yes.

11       Q.    And is what you're thinking of your work

12   in New Jersey?

13       A.    No.  I didn't draft any legislative

14   language in that case, so no.

15       Q.    What are you thinking of when you say

16   you've drafted pension reform legislation?

17       A.    That's something pretty recently where I

18   was asked by an attorney to draft some language for

19   a particular -- to amend a particular section of

20   ERISA and the internal revenue code that would be

21   consistent with changes that some of us want to see

22   happen.

23            So I was asked by this person who was

24   then in turn going to show it to congressional

25   staff.

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

26

L. SHER

1

2     Q.    Is this a change to legislation that
3  governs private sector pensions?

4     A.    That would be, yes.

5     Q.    Are you an expert on the Uniform
6  Commercial Code?

7     A.    I would say no.

8     Q.    Is that something you consider as an
9  actuary?

10     A.    Generally not.

11     Q.    Is it something you considered in your
12  report in this case?

13     A.    No.

14     Q.    Have you heard of section 9315 of the
15  Uniform Commercial Code?

16     A.    No.

17     Q.    Are you an expert on the legal documents
18  that govern bonds?

19     A.    No.

20     Q.    Did you consider any of the legal
21  documents that govern the bonds at issue in this
22  case?

23     A.    No.

24     Q.    So you have no opinion on whether
25  anything in this case is Pledged Property under

Video Deposition of Lawrence Sher, 6/20/2019

27

                            L. SHER

1                           L. SHER

2    those documents?

3        A.    No.

4        Q.    Employers Contributions?

5             MS. DALE:   Objection to the form.

6        A.    You're sort of jumping from one thing to

7    another.

8             Whether I'm -- you're asking me whether

9    I'm familiar within --

10            MS. DALE:   Let him rephrase.

11            MR. FOX:   Let me rephrase the question.

12       Q.    Do you have an opinion on whether

13   anything in this case is Employers Contributions as

14   defined in the bond documents in this case?

15       A.    No.

16       Q.    How about Revenues as defined in the bond

17   documents in this case?

18       A.    No.

19       Q.    You said you've been deposed -- I think

20   you said about 15 times?

21       A.    Estimated.

22       Q.    How many times do you think you've

23   written expert reports?

24       A.    More than 15.  I would say probably over

25   20.

28

1                     L. SHER

2        Q.    Do you know if a court has ever excluded

3   your expert testimony, in whole or in part?

4        A.    I don't believe it has.

5        Q.    How did you first learn about this

6   matter?

7        A.    I received, I believe, an email from one

8   of the attorneys at Proskauer.

9        Q.    Do you know when you received that email?

10       A.    It was during the week of June 3rd.

11       Q.    Do you know what you were told they were

12  looking for?

13       A.    Yes.  I think what they were looking for

14  was an actuary who could explain the difference

15  between actuarial funding versus Pay as You Go.

16       Q.    In your report, you say that you were

17  engaged to respond to a report by Dr. Andrew

18  Samwick; is that right?

19       A.    Continuing that sentence, I said

20  particularly with respect to the issues that I'm --

21  that I opined on.

22       Q.    Did counsel tell you what they meant by

23  "respond"?

24            MS. DALE:  Just answer that yes or no.

25       A.    No.



Video Deposition of Lawrence Sher, 6/20/2019

34

1                        L. SHER

2       Q.    You said you wanted in particular the

3   actuarial valuation reports.

4            Why was that?

5       A.    Well, I'm an actuarial expert, and I knew

6   that this case has something to do with the funding

7   of the -- of the ERS, so I thought it would be

8   appropriate for me to, for no other reason, to get

9   some background to see what the actuarial reports

10  looked like.

11      Q.    Does anything in your report rely on the

12  actuarial reports?

13      A.    I don't think so.  I mean, I would have

14  to review it to be sure, but I don't recall there

15  being anything that relates at least directly to

16  them.

17      Q.    Does anything in your report rely on Act

18  Number 106 2017?

19      A.    I don't think so.

20      Q.    Does anything in your report rely on the

21  expert report of Dr. Sabry?

22      A.    No.

23      Q.    Did you reach any opinion about the

24  expert report of Dr. Sabry?

25      A.    No.

36

L. SHER

1

2          The fact that's what our standards of

3     practice instruct us to do, using a term that can

4     be interpreted in a variety of different ways like

5     that.

6          Q.    Give me an example of one way you might

7     interpret that term.

8          A.    I think one possibility would be -- in

9     one extreme would be if over a period of time that

10    the plan is not being funded in a reasonable

11    actuarial way, to -- with the -- especially if

12    there's a potential of the fund running out of

13    money.  If that's becoming imminent, there aren't

14    protections that would be of concern, I don't know

15    that I would use the term "it's not actuarially

16    sound."

17          What I would prefer to do is state what

18    the facts are and not use a term that's so

19    potentially misleading.

20          Q.    That description that you just gave of a

21    plan that's not being funded in a reasonable

22    actuarial way with the fund running out of money, do

23    you have an opinion whether that's described the ERS

24    in 2017 before the change to Pay as You Go?

25          A.    I would say certainly at that point in



advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

37

L. SHER

1

2    time there was a significant danger, absent some

3    intervention, that the plan would run out of money,

4    not being funded in a reasonable actuarial way at

5    that point.

6        Q.    Going back for a moment to Appendix 2 to

7    Exhibit 1, am I correct that you did not look at any

8    statutes other than Act 106 2017?

9        A.    I believe that's true.

10       Q.    So you did not look at any other statutes

11   that governed the ERS before act 106 was passed?

12       A.    I don't recall looking at any others, no.

13       Q.    Have you ever used the term "actuarially

14   sound" or "not actuarially sound" to refer to a

15   pension plan in the condition that we were just

16   talking about, that is --

17       A.    I don't --

18       Q.    Do you understand what I mean?

19       A.    I understand what you mean, and I don't

20   recall using that term.

21       Q.    You also looked at a number of financial

22   statements for ERS, right?

23       A.    Or in part, yes.

24       Q.    Is anything in your report based on your

25   review of those financial statements?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

38

1                        L. SHER

2        A.    I don't believe so.

3        Q.    And I think you've already said this, but

4    you did not look at any of the documents that govern

5    the ERS bonds?

6        A.    That's correct.

7        Q.    Have you looked at any deposition

8    testimony in this case?

9        A.    I looked at Dr. Samwick's deposition

10   testimony.

11       Q.    And aside from Dr. Samwick's deposition

12   testimony, have you looked at any additional

13   documents since you served this report?

14       A.    Not that I recall.

15       Q.    You said that you wrote this report,

16   right?

17       A.    Yes.

18       Q.    Did you provide a draft?

19       A.    Yes.

20       Q.    Who did you provide a draft to?

21       A.    Counsel.

22       Q.    Did you receive comments?

23       A.    Yes.

24       Q.    Did they ask you to add anything?

25             MS. DALE:  You can answer that yes or

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 ▪ www.advanceddepositions.com

43

                              L. SHER
1
2    on the next page?
3         A.    Yes.
4         Q.    Are paragraphs 8 and 9 the full summary
5    of opinions in this case?
6         A.    Yes.  Summary of my opinions.  In some
7    cases I elaborate as you get into the report, but
8    it's intended to be a summary of my opinions.
9         Q.    Of course.
10             Do you agree with me that nothing in
11   paragraph 8 or paragraph 9 discuss Puerto Rico
12   specifically?
13        A.    Yes, I agree.
14        Q.    Do you agree with me that nothing in
15   paragraph 8 or 9 discuss ERS specifically?
16        A.    I agree, yes.
17        Q.    Am I right that paragraphs 8 and 9
18   describe differences in general between a funded
19   system and a Pay as You Go system?
20        A.    Yes.
21        Q.    Am I right that they describe those
22   differences in terms of a plan in which benefits are
23   still being accrued?
24        A.    I would say as a general matter, yes.
25        Q.    When you say as a general matter, is

50

1                          L. SHER
2    this is just a matter of convenience for some
3    reason to put it in the plan rather than to pay
4    people directly.  The money's going right out, I
5    would say that's Pay as You Go.
6          Q.    And you would say that's not a
7    contribution?
8          A.    That's correct.
9                MR. FOX:  We've been going for about an
10         hour.  Let's take a break.
11               MS. DALE:  Sure.
12               THE VIDEOGRAPHER:  3:07.  We are off
13         the video record.
14               (Whereupon, there was a pause in the
15         proceeding.)
16               THE VIDEOGRAPHER:  3:16.  We are on the
17         video record.
18         Q.    Dr. Sher, before we took a break, we were
19    talking about paragraphs 8 and 9 in your report.
20               Moving beyond paragraphs 8 and 9, do
21    you agree with me that paragraph 20 of your report
22    is the only part that talks about Puerto Rico
23    specifically?
24         A.    I believe that in addition to that
25    paragraph, paragraph 24 is responding to Dr.

Video Deposition of Lawrence Sher, 6/20/2019

51

1                   L. SHER
2  Samwick's quoted language in paragraph 21, the third
3  sentence where he refers to Pay-Go.
4       Q.    Your response in paragraph 24 says that
5  the cost of paying benefits under a funded defined
6  benefit system can be materially lower in the long
7  term.
8             And then it goes on.  Do you see that?
9       A.    I'm sorry.  Which paragraph are we
10 looking at now?
11      Q.    24.
12            MS. DALE:  In the second line.
13      A.    Yes, I do see that.
14      Q.    Does anything in paragraph 24 say whether
15 --
16            MR. FOX:  Let me rephrase that.
17      Q.    Does anything in paragraph 24 say
18 anything about Puerto Rico specifically?
19      A.    Not directly.
20      Q.    Does it do so indirectly?
21      A.    I would say that it does in the sense
22 that -- the third sentence of the quoted language in
23 paragraph 21.  There's an implication that I took
24 from that sentence that if the system, the ERS
25 system, had always been Pay as You Go that

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

52

                              L. SHER

1

2    everything would have been the same.  It wouldn't

3    have mattered.

4            All it is is timing.  The costs of the

5    benefits would have been the same.  That's why I

6    responded to it the way I did.  It sounds like a

7    general response, but it also is directly in

8    response to what he's saying there and the

9    implication that I took from that, or the

10   inference, I guess.

11       Q.   Do you say in paragraph 24 whether the

12   change to Pay-Go improved or altered benefit

13   payments or the cost of paying benefits in Puerto

14   Rico?

15            THE WITNESS:  Can you read that back,

16       please.

17            (Whereupon, the requested portion of

18       the record was read.)

19       A.   No.

20       Q.   In paragraph 24, you say that the cost of

21   paying benefits under a funded system can be lower

22   than under a Pay as You Go system; is that right?

23       A.   Yes, lower in the long term, yes.

24       Q.   Can you think of a circumstance in which

25   the cost under Pay as You Go --

54

                            L. SHER

1             But assuming that everybody's receiving

2   the same benefits, there wouldn't be an effect on

3   the actual benefits, assuming they're all paid

4   for, that all those payments are made.

5             So in terms of the cost -- I mean,

6   right now the costs that are being incurred are

7   the Pay as You Go costs.  It would be hypothetical

8   at this point to say what would have the costs

9   been if this plan continued as opposed to what the

10  Pay as You Go costs are going to be.  Is that what

11  you're getting at?

12      Q.    Yes.  As an actuary, you estimate what

13  future costs will be, right?

14      A.    You estimate the value of future benefits

15  and then you do some type of allocation to time

16  periods in order to finance them.

17      Q.    So my question to you is:  As an actuary,

18  do you have any reason to think that the switch to

19  the Pay-Go system saved money itself?  Saved money

20  on benefit payments?

21            MS. DALE:  Objection to the form.

22      A.    I don't know.

23      Q.    Can you think of a way in which it would

24  have had that effect?



advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

55

L. SHER

1

2      A.     If the benefits are cut back, it

3  certainly would.

4      Q.     Aside from a change to the benefits, can

5  you think of any other way?

6      A.     Again, when you're saying save money, as

7  compared to what?  What am I comparing the save

8  money to?  They ran out of money.  There's -- I can

9  no longer compare it to something.

10            If they had funded the plan on a full

11  actuarial basis, then we're in a hypothetical.

12  They didn't do that.  When you say save, it has to

13  be relative to something.

14      Q.     Suppose that instead of converting to the

15  Pay-Go system, they had increased employer

16  contributions to ERS sufficient to fund current

17  benefits.  That's what I want you to compare it to.

18      A.     Sufficient to fund it now or have they

19  done that in the past?

20      Q.     Now.  In 2017.

21      A.     And how would one have determined that

22  funding?  To be putting in how much?  All the money

23  right up that you need to fund all the future

24  benefits with no amortization?  Or to fund a part of

25  it now and some in the future?

AD advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

56

L. SHER

1

2      Q.    The amount they would have needed in

3  order to pay ERS benefits that year.

4      A.    That's Pay as You Go.

5      Q.    So it would be the same amount of money?

6      A.    I don't know.  If it's not invested and

7  all they're doing is putting the money in and taking

8  it right back out, I can't see how it would be any

9  different.

10     Q.    Does anything in paragraph 20 -- going

11 back to paragraph 20 -- refer to the Pay-Go fee?

12     A.    I didn't use that term.  I talked about

13 the Pay-Go system.  But I think my intention was

14 making the payments to cover the actual cost of

15 pension plan payments as they come due, that the

16 intention of the Pay-Go fee was to provide for that.

17     Q.    Who do you understand the Pay-Go fee to

18 be paid to?

19     A.    The Commonwealth General Fund.

20     Q.    Have you heard of something called the

21 accrued pension payment account?

22     A.    Yes.

23     Q.    What do you understand that to be?

24     A.    I understand that to be a mechanism where

25 money that is coming in from the Pay-Go fees would

AD
advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

57

                              L. SHER

1

2    temporarily reside with the idea of, you know, then

3    somebody writing out checks or sending them in some

4    electronic way to participants and would come right

5    back out.  It might have received some money, seed

6    money, up front from sort of residual assets that

7    the pension systems had.  Some may be illiquid

8    assets that had to be liquidated, but that would be

9    just a one-time thing.

10            But over the long term, the way I

11   viewed that was that it was a convenience.  It

12   wasn't intended to be a fund that was going to

13   amass more than the current benefits would

14   require.  If that much.  Assuming everybody

15   actually paid it.

16        Q.    You agree there's a risk that not all

17   those fees would be paid, right?

18        A.    I think there is a risk, and my

19   understanding is if that were to happen, the

20   Commonwealth would be responsible for the

21   difference.

22        Q.    When you say the Commonwealth would be

23   responsible for the difference, do you mean they

24   would pay the Pay-Go fees or that they would pay the

25   pensions?

59

1                           L. SHER
2       the language at this point as to exactly what it
3       says, but I know that the outcome was that the
4       employees would -- if those Pay-Go fees were not
5       paid to some degree, that employees nevertheless --
6       retirees would receive their full benefits.
7           Q.    Do you agree that Pay-Go fees are a
8       source of funding for the pension benefits that are
9       owed to retirees?
10          A.    I would say they're not funding in the
11      normal sense.  There's money that is being
12      transferred over to pay out the benefits.  I
13      wouldn't necessarily call it funding, but again, I
14      view funding as -- you know, I'm funding for my
15      kids' education.  I'm not doing that in the first
16      year that he's going to college.  That would be
17      taking money out of my current income.  You know,
18      funding has an advance connotation to me more than
19      just paying it in and out.
20          Q.    Let me rephrase the question.
21                Are Pay-Go fees a source of money to
22      pay the pension benefits owed to retirees?
23          A.    Yeah.  Yes.
24          Q.    We were talking about the accrued pension
25      payment account.  Do you know if that is part of the

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 · www.advanceddepositions.com

60

                        L. SHER
1
2    General Commonwealth Fund?
3         A.    I think it is.  I saw language to the
4    extent that it's segregated.  I don't know what the
5    point of segregating it really is, because it's
6    going to have -- I think, if I understand it right,
7    it's going to have little or no balance over time,
8    because money is coming in and out.
9              I mean, it's something that -- it
10   sounds like it's something that may be more than
11   what it's really doing.  It's not really setting
12   aside a lot of money to pay things in the future
13   where there might be some fear that it could be
14   raided for other purposes.  I don't know how you
15   raid something when money's coming in and out.
16        Q.    But you did see that it's supposed to be
17   segregated?
18        A.    Whether the word "segregated," it was
19   something like that.
20        Q.    Did you see a reference to it being a
21   trust?
22        A.    I don't recall that.
23        Q.    Could you turn to paragraph 13 of your
24   report.
25        A.    (Witness complies.)

61

L. SHER

1

2      MR. FOX:  For the record, that's

3   Exhibit 1.

4      Q.    Is it fair to say that this paragraph

5   describes as unfunded accrued actuarial liability

6   can occur if actuarial assumptions are not realized?

7      A.    Well, that's one of the potential causes

8   that's mentioned here.

9      Q.    You also mention that investment returns

10  can be different than expected?

11     A.    Yes, and that would be one of the

12  actuarial assumptions not being realized.

13     Q.    What else do you mention here other than

14  actuarial assumptions not being realized?

15     A.    If contributions are not made at a

16  certain level, you could very well have an increase

17  in an unfunded liability.

18     Q.    Can you point me to where that is in

19  paragraph 13.

20     A.    The very last sentence.

21     Q.    Do you have an opinion about whether the

22  cause --

23     MR. FOX:  Let me back up.

24     Q.    Do you agree that ERS by the start of

25  2017 had very substantial unfunded accrued actuarial

**advanced
depositions**

Nationwide Court Reporting & Trial Support

855-204-8184 ▪ www.advanceddepositions.com

62

1                          L. SHER

2    liabilities?

3         A.    I would agree with that.

4         Q.    Do you have an opinion on the cause of

5    those unfunded accrued actuarial liabilities?

6         A.    I have a general opinion that at least a

7    portion of it was because contributions in at least

8    some prior years were not made at adequate levels.

9         Q.    Do you know if the unfunded accrued

10   actuarial liabilities were primarily the result of

11   that or of actuarial assumptions not being realized?

12        A.    I didn't get into that kind of analysis.

13        Q.    But you agree that sufficient

14   contributions were a part of it?

15        A.    From what I saw, looking at the actuarial

16   valuation reports, that appears to be the case.

17        Q.    Can you turn to paragraph 16.

18        A.    (Witness complies.)

19        Q.    You write in the first sentence:  The

20   bottom line, however, is that no matter how

21   projected benefits are assigned to years of service,

22   for a cost method to be considered, quote,

23   actuarial, end quote, it must assign costs to

24   periods of employment.

25             Do you see that?

63

1                          L. SHER

2          A.    Yes.

3          Q.    What is the significance to you of

4    whether a cost method is actuarial or not?

5          A.    Well, if I as an actuary are going to

6    make a recommendation, which the actuaries,

7    actually, I think, were doing here, albeit

8    indirectly, I would want the user to know I followed

9    actuarial principles and practices.

10         Q.    You're not suggesting here that whether a

11   cost method is actuarial has some legal

12   significance, are you?

13         A.    No.

14         Q.    You're not suggesting it has some broader

15   economic significance?

16         A.    Well, I would say it has -- it does have

17   significance for accounting purposes, for financial

18   statement purposes.  You know, employers, if they're

19   going to comply with accounting standards, certify,

20   get a clean audit, they're going to have to comply

21   with accounting standards, and accounting standards

22   are actually are what all those actuarial reports

23   were primarily focusing on.

24               They weren't focusing so much on

25   funding, not directly, because funding was

64

L. SHER

1

2   determined, predetermined by law.

3       Q.    When you talk about accounting standards,

4   you're talking about GASB 67 primarily?

5       A.    That's the current standard.

6       Q.    But to go back to my question, you're not

7   suggesting that whether a cost method is actuarial

8   has some economic significance, are you?

9       A.    Certainly not directly.  I think using an

10  appropriate actuarial cost method is, I think,

11  advisable as -- you know, if it could be followed, I

12  think it is much more likely that the benefits

13  ultimately can be paid and that there won't be any

14  major disruption to the system.

15           That's really the purpose, to come up

16  with a rational series of contributions that are

17  fairly predictable, fairly stable, and you don't

18  have to rely on future stockholders or future

19  taxpayers.  That's the purpose of funding on an

20  actuarial basis.

21      Q.    That description that you just gave of a

22  rational series of contributions that are fairly

23  predictable, fairly stable, and you don't have to

24  rely on future stockholders and future taxpayers, do

25  you know if that describes the contributions to ERS

65

1                          L. SHER

2     before 2017?

3          A.    They were not funding on an actuarial

4     basis.  That was -- you know, I can tell that much

5     from reading the actuarial reports and the warnings

6     that were provided in the later years.

7                So yes, any system in Puerto Rico is by

8     no means alone.  This is going on in New Jersey

9     and all over, particularly in the public sector,

10    where actuaries make recommendations and

11    legislators don't follow them, and a lot of them

12    have gotten themselves into financial

13    difficulties.

14         Q.    To be clear, you agree that Puerto Rico

15    was not funding ERS on an actuarial basis for 2017;

16    is that right?

17         A.    I would say that's true.

18         Q.    You say -- going on in paragraph 16 --

19    that there was an exception with respect to the

20    amortization of any unfunded actuarial liability.

21               Do you see that?

22         A.    Yes.

23         Q.    Do you know whether ERS as of 2017 had

24    any --

25               MR. FOX:  Let me rephrase.

66

1                           L. SHER

2        Q.    Do you know whether ERS as of 2017 had

3    new benefits accruing under the traditional defined

4    benefit pension plans?

5        A.    I don't believe -- I think all benefits

6    had been frozen at that point.

7        Q.    Is it fair to say the only contributions

8    being made before 2017, but leading up to 2017, were

9    amortization of unfunded accrued actuarial

10   liabilities?

11       A.    Once benefits were frozen, the only

12   requirement, the only need you had was to build up

13   the assets from where they were to what you're going

14   to need to pay all the future benefits that had been

15   accrued.

16            So that difference has got to get into

17   the plan in some way at some time.  Before the

18   fund runs out of money, preferably.

19       Q.    And so I think that's in agreement with

20   my question, which is that the only contributions

21   being made were the amortization of unfunded accrued

22   actuarial liabilities.

23            Do you agree?

24       A.    Well, I agree in the sense that that's a

25   practical effect of it.  I think the contributions

67

                           L. SHER

1

2    were statutorily required.  I don't think the

3    legislature thought about that those contributions

4    were being earmarked to do any one thing or another.

5            You know, in actuality, yes, the only

6    thing they're doing is helping to pay off the

7    unfunded liability.

8        Q.    What I'm trying to get at here, in the

9    first paragraph you state a rule of what's required

10   for cost methods to be actuarial, right?

11       A.    Yes.  I state -- where are we?

12       Q.    16.  Sorry.  Let me rephrase that

13   question.

14            In the first sentence you state a rule

15   for what is required for cost methods to be

16   actuarial?

17       A.    And then I indicate what the only

18   exception is.

19       Q.    Right.  I think we agree that the

20   exception applied to ERS leading up to 2017?

21       A.    Yes.  Once the plan was frozen, that's

22   true.

23       Q.    In paragraph 18, you describe a Pay as

24   You Go approach as a nonactuarial approach.

25            Do you see that?  It's on the third

68

1                           L. SHER

2    line.

3         A.    Yes.

4         Q.    What is the significance to you of a Pay

5    as You Go approach being nonactuarial?

6         A.    Well, I would say that there's no

7    prefunding of benefits as they were being earned.

8    There's no fund.  There's no contributions.  There's

9    only once somebody retires, you pay them the

10   benefits.  That's not an actuarial approach.

11            An actuarial method would -- with the

12   exception of the amortization I mentioned -- call

13   for funding all of the benefits that are accruing

14   for any individual during their working career

15   before they retire.

16        Q.    But you agree that by 2017, ERS was

17   covered by that exception that you mentioned, right?

18        A.    I mean, I agree that by 2017, the

19   funding, any of the funding there was being made to

20   the plan, was being made to -- for the purpose of

21   amortizing the unfunded liability.  It's not a

22   Pay-Go at that point.  All right?  It's funding.

23        Q.    But you agree that the employer

24   contributions -- I think you said earlier -- being

25   made were nonactuarial as well before 2017?  Right?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 ▪ www.advanceddepositions.com

Video Deposition of Lawrence Sher, 6/20/2019

69

                              L. SHER

1

2      A.    They were not satisfying an actuarial

3 approach, because they were not, in some systemic

4 way, funding all of the benefits as they were being

5 earned.

6      Q.    And that remained true --

7            MR. FOX:   Withdraw that.

8      Q.    If you look at paragraph 19.  I'm not

9 going to read this to you, but do you agree this is

10 discussing a Pay as You Go in general and not the

11 Pay-Go system in Puerto Rico specifically?

12     A.    Yes.  It is not referring to Puerto Rico.

13     Q.    Do you see on page 7 there's a sentence

14 that begins "by contrast"?

15           MS. DALE:   Second line.

16     A.    Yes.

17     Q.    And that, I take it, is not describing

18 ERS, but is describing a funded system in general?

19     A.    Well, I would say yes with the caveat

20 that it's better to have some assets accumulated

21 than have no assets accumulated.

22           The last sentence says:  The more

23 assets that are accumulated before employees

24 retire, the less reliance there will be on the

25 ability and willingness of future funding sources

Video Deposition of Lawrence Sher, 6/20/2019

70

                        L. SHER

1
2     to come up with potentially rising funding
3     requirements.
4              So yes, they were not funding on an
5     actuarial basis, but they were -- apparently for a
6     very long time, maybe since the 1950s -- funding
7     at something less than -- or maybe they were
8     funding perfectly for a while.  I don't know.  I
9     don't know when they diverted from that.  I don't
10    have that information.
11             But at least in recent years, they were
12    not funding on what I would call an actuarial
13    method.
14        Q.    By 2017, do you agree that they were on
15    the verge of running out of money?
16             MS. DALE:  Now we're talking about ERS,
17        correct?
18             MR. FOX:  Correct.
19        A.    I believe that's true.
20        Q.    If you turn to paragraph 21.  Now we
21    start to get into your disagreement with Dr.
22    Samwick; is that right?
23        A.    Yes.
24        Q.    Do paragraphs 21 to 24 fully describe
25    your disagreements with Dr. Samwick's report?

71

L. SHER

1

2     A.     I think they describe my disagreements

3     with his report to the degree that it deals with the

4     issues that I was asked to opine on.

5     Q.     Are there any opinions about Dr.

6     Samwick's report that you intend to give in this

7     matter that are not in paragraphs 21 to 24?

8     A.     Not as I sit here now.  I don't believe

9     so.

10    Q.     In paragraph 23, the first sentence, you

11    write:  I disagree with the first sentence, because

12    under a Pay as You Go approach, there are no

13    contributions and no funding.

14           Do you see that?

15    A.     Yes.

16    Q.     And I think we discussed earlier that you

17    used the word "funding" to refer to funds that are

18    invested; is that right?

19    A.     Well, I'm referring to a fund where

20    normally the money -- unless it's going right in and

21    out, normally you would expect the monies would be

22    invested, yes.

23    Q.     So why do you say there's no funding

24    under a Pay as You Go system?

25    A.     Because there are -- the monies are


AD advanced depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

72

L. SHER

1
2    either going directly to participants or they're

3    going -- flitting through some account that probably

4    would have no opportunity to invest or very limited

5    opportunity to invest.

6             In other words, the purpose of having

7    any kind of account like that is really a matter

8    of convenience so one can write out the checks.

9    It's basically an administrative function, not an

10   investment function.

11        Q.    When you say no contributions, I think

12   it's for a similar reason.  Because the money is not

13   being contributed to be invested for the future; is

14   that right?

15        A.    Yeah.  A contribution, to me, has to be

16   something that is intended to be invested and to be

17   applied at some future date to make payments

18   sometime in the future, not to be making them

19   currently.

20        Q.    Paragraph 23 is a description of a Pay as

21   You Go system in general?

22        A.    I would say so, yes.

23        Q.    Nothing in there about Pay-Go

24   specifically?

25        A.    Not in there specifically, no.



advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

73

1                         L. SHER

2      Q.     Paragraph 24 we talked about a little bit

3  already, right?

4      A.     I believe we did.

5      Q.     And I believe you agreed that this a

6  description of a funded system in general and not

7  ERS specifically, right?

8      A.     Yes.

9      Q.     Do you recall from your review of Dr.

10 Samwick's report if Dr. Samwick also reached

11 conclusions about ERS specifically and Pay-Go

12 specifically?

13     A.     I recall there being some confusion at

14 points where -- sometimes either in the same

15 paragraph or maybe even sentence where it wasn't

16 clear.  He capitalized the word "system," for

17 example.  I recall this from his deposition.

18              Other than that, I'm not sure how to

19 answer your question.  I think he bounced back and

20 forth, perhaps.

21     Q.     You did see some discussion of Pay-Go and

22 ERS specifically?

23     A.     Yes.

24     Q.     Fair to say there's no criticism of that

25 discussion in your report?

74

L. SHER

1

2      A.    I -- I don't -- I'm not sure.  I mean, to

3  the extent it's beyond what I've indicated here,

4  there is no discussion of it.  But I'm not sure

5  exactly what you're referring to in his report.

6      Q.    But you agree that what you have in

7  paragraphs 21 to 24 is about Pay as You Go in

8  general and funded systems in general?

9          MS. DALE:  Objection.  Misstates his

10      testimony.

11      A.    Well, there's nothing directly in my 21

12  to 24 that focuses on Pay-Go.  I view Pay-Go as a

13  Pay as You Go system.  So to the extent what I'm

14  saying deals with Pay as You Go, it would

15  necessarily deal with Pay-Go.  But I stated these as

16  general propositions.

17      Q.    In terms of ERS, there's nothing in 21 to

18  24 that addresses ERS specifically?

19      A.    I don't believe so, no.

20      Q.    Do you agree that ERS by 2017 did not

21  always follow sound actuarial practices?

22          MS. DALE:  Objection to the form.

23      A.    Well, we're back to the "sound" word.

24          MR. FOX:  Let me rephrase.

25      Q.    What term would you use to describe a

75

                        L. SHER

1   pension plan that follows actuarial requirements?

3        A.    I would say that the plan is being funded

4   in accordance with actuarial standards of practice.

5        Q.    Do you agree that by 2017, ERS was not

6   being funded in accordance with actuarial standards

7   of practice?

8        A.    I would agree with that.

9        Q.    Is it within your expertise as an actuary

10  to put a dollar value on future uncertain

11  liabilities?

12       A.    Well, certainly an actuary is called upon

13  to make calculations of financial promises like

14  pensions or insurance, you know, financial

15  instruments like those, by making assumptions

16  regarding the future, all kinds of assumptions.

17            The actuary generally would have the

18  expertise to do the research or find other ways to

19  come up with assumptions that he or she feels are

20  reasonable.  They're not predictions.  They're

21  assumptions.

22       Q.    Would you describe that process that you

23  just described as valuation?

24       A.    Well, a valuation certainly does that

25  type of thing.  It takes employee data for the

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

76

1                          L. SHER

2      participants who are covered under the plan, whether

3      they be active or retired, and they take into

4      account the benefit provisions of the plan or plans

5      and they make assumptions as to what might happen in

6      the future in terms of demographics, the

7      individuals, how long are they going to work, how

8      long are they going to live, what are they going to

9      get paid.

10               And then, of course, there's the

11     discounting approach, coming up with present

12     values.  And then it's a distribution of that over

13     time, the funding method.

14          Q.    Does the purpose of the valuation affect

15     what sort of assumptions are reasonable?

16          A.    It can.

17          Q.    Do you agree that when --

18               MR. FOX:  Let me back up.

19          Q.    Is one of the things an actuary does

20     discounting the future liabilities of a pension

21     plan?

22          A.    Well, it's one of the things.  It's

23     discounting the projected benefits along with

24     discounting for outlet contingencies that might

25     arise, both before benefits start and while they're

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

77

L. SHER

1

2  being paid, discounting the value -- you know, the

3  amounts of those benefits potentially payable to a

4  current year or date.  That's all part of the

5  process.

6          Q.     When an actuary does that, do they assume

7  that the pension benefits will be paid as required?

8          A.     They generally do.  Certainly the

9  starting point is the benefits that current exist,

10  you know, in some type of a legal document, plan

11  document, typically.

12              To the extent that there's any need to

13  reflect different plan provisions because there

14  are changes that are forecasted to occur in the

15  future or that hypothetically might occur in the

16  future, you know, the actuary might provide

17  various scenarios.

18              But normally it would be, you know,

19  reflect as a starting point the benefits that are

20  being promised.

21          Q.     Would the actuary consider the

22  possibility that the plan would default on the

23  payment of its benefits?

24          A.     I would say normally no, that most

25  actuarial work is done on the presumption that the

78

L. SHER

1  -- that the benefits are going to stay the same and

2  that the funding source is going to be able to pay

3  those benefits, unless the actuary -- unless

4  something actually happens to change that or the

5  actuary is instructed to make some other kind of

6  calculation.

7          Q.    Do actuaries also value assets?

8          A.    In a limited way.  I would say most of

9  the time these days, actuaries just take the market

10  value of assets, assuming they're reported to them

11  by a trustee and they're all marketable securities

12  and there aren't any special kind of valuations that

13  need to be done on illiquid assets.

14              Sometimes actuaries introduce an

15  averaging or a smoothing technique in an attempt

16  to try to stabilize the resulting financial values

17  and costs.

18              If the assets tend to fluctuate widely,

19  there's one school of thought that a better

20  approach is to smooth those ups and downs.  But I

21  would say the trend is towards reflecting the

22  current or market value of the assets.

23          Q.    You referred to special kinds of

24  valuations that need to be done on illiquid assets.

82

                        L. SHER

1      assets?

3          A.    They certainly -- when they're valuing

4      the value of a business, when they're valuing --

5      when an investment banker is trying to put a value

6      on a business, they would -- one of the methods is

7      to discount future projected cash flows coming from

8      the business.

9              In the pension scheme, generally you

10     have to choose a rate or rates to discount the

11     value of the projected benefits to get a

12     liability, or what you're calling a liability.

13             But the assets themselves are valued at

14     market.  That's what's done for accounting

15     purposes as well.

16         Q.    If you know, when an investment banker is

17     using the process that you described of discounting

18     future projected cash flows, does the discount rate

19     they use reflect the risk of those cash flows?

20         A.    Well, I'm not an investment banker, and

21     it's been a while since I've worked directly with

22     one.  I would think it's very possible that they do,

23     but I don't have any direct knowledge or

24     recollection at this point.

25         Q.    Going back a little bit, I think you said



83

L. SHER

1
2       earlier that if an actuary faces uncertain

3       possibilities, one thing they might do is assess

4       various scenarios and describe the outcome under

5       those various scenarios; is that right?

6           A.    They could if they're asked to do that.

7       If whoever's paying their fees wants them to do some

8       type of a risk assessment as to what would happen in

9       the future under various different scenarios, they

10      could be economic scenarios.  They could be

11      workforce scenarios.  Actuaries certainly do that.

12          Q.    What is the purpose of providing

13      information about different scenarios?

14                MS. DALE:  Objection to the form.

15          A.    When I've been asked to do that in the

16      past, it's usually because the -- whoever's asking

17      for that -- usually it's a financial person, a CFO

18      or a treasurer, for example -- wants to understand

19      the range of reasonable outcomes that might occur

20      over a period of time.  Usually it's over a five- to

21      ten-year period, in my experience.

22                They would want to do some forecasting

23      perhaps to fit in with other forecasting that

24      they're doing for other parts of their business,

25      and they would ask the actuary to do projections

84

1                          L. SHER

2      of contribution requirements, of accounting costs,

3      benefit payouts.

4              That's done quite often, I would say.

5          Q.    Is there an actuarial standard that

6      governs where one pension plan ends and another

7      pension plan begins?

8          A.    I'm not sure -- can you be more specific

9      as to what you mean, when one pension plan ends and

10     one pension plan begins?

11         Q.    If you're looking at a set of pension

12     benefits as an actuary, how do you know if you have

13     one pension plan or two pension plans?

14         A.    Well, I think you get documents that

15     embody the pension benefits that you are about to

16     make calculations on.  Usually it's a plan document.

17     Sometimes there may be more than one where there's

18     some kind of coordination of benefits, say, between

19     two plans where one plan may be determining a

20     benefit and the benefit from the other plan is being

21     offset from the first plan's benefit.

22              In that case, you would have to

23     understand what that second plan is providing in

24     addition to what the first plan is providing.

25         Q.    Have you ever advised a pension plan on

Video Deposition of Lawrence Sher, 6/20/2019

86

L. SHER

1    a different version of the same pension plan?

3         A.    Let me make sure I understand.  So it's

4    the same terms of the plan?  The same funding

5    source?  Just covering different people?

6         Q.    So it's the same benefits being paid to

7    the same people.

8         A.    Okay.

9         Q.    From the same sponsors.

10        A.    Why would there be more than one plan?

11        Q.    That's my question to you.  Is that the

12   same pension plan or a different pension plan?

13        A.    I guess I can't think of a scenario where

14   I've run into something like that.  I wouldn't know

15   why it's being set up that way.

16        Q.    Suppose that there was some change made

17   in the contribution formula.

18        A.    Employee contribution formula?

19        Q.    The employer contribution formula.

20        A.    All right.  Sounds like you're getting

21   very specific.  Is this totally hypothetical or are

22   you trying to relate this to something in this case?

23        Q.    I'm asking you a hypothetical.

24             If you have a pension plan and then a

25   change is made to the contribution formula that

87

1                          L. SHER

2    employers pay but the benefits are the same,

3    they're paid to the same people, and the employers

4    who fund the plan are the same employers, my

5    question to you is does that sound like the same

6    pension plan or a different pension plan?

7        A.    That sounds like a legal -- you're into a

8    legal question, you know, what does it mean to be in

9    the same pension plan?  Does it mean -- does not

10   have anything to do with what might happen if the

11   assets were to run down or -- I just can't really

12   think of a scenario in the real world that I've run

13   into that fits what, at least I understand, you're

14   describing.

15       Q.    So you can't think of an actuarial

16   standard that would distinguish under those

17   circumstances between the -- that would suggest

18   that, as an actuarial matter, there's a separate

19   plan?

20            MS. DALE:  Objection to the form of the

21       question.

22       A.    I don't -- I don't think there's an

23   actuarial standard that deals with something along

24   the lines as you're describing, at least as I

25   understand it.

Video Deposition of Lawrence Sher, 6/20/2019

92

L. SHER

1

2      Q.     Anything other than the change in source

3   that you can think of?

4      A.     I can see a retiree having some at least

5   perception of once the source is different, you

6   know, whether that would -- you know, a particular

7   retiree would feel more or less comfortable with one

8   source versus another.

9      Q.     Are you offering any opinion about

10   whether the Pay-Go fees are a substitute for

11   employer contributions?

12      A.     I don't believe so.

13      Q.     Any opinion about whether the Pay-Go fees

14   are proceeds of employer contributions?

15      A.     Whether they are proceeds of employer

16   contributions?

17      Q.     Yes.

18      A.     Well, I don't think -- I wouldn't

19   characterize them as contributions, so I don't know

20   how they would be proceeds of contributions.

21      Q.     You're not offering any opinion about

22   whether Pay-Go fee are the economic equivalent of

23   employer contributions?

24      A.     No.

25      Q.     We agreed you're not an expert economist?



advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

93

1                          L. SHER

2        A.     Yes.

3               MS. DALE:  We have agreed that.

4        Q.     Footnote 9 -- if you turn back to Exhibit

5    1, do you see footnote 9 on page 7 of your report?

6        A.     Yes.

7        Q.     You list there five paragraphs from Dr.

8    Samwick's report?

9        A.     Yes.

10       Q.     Is your disagreement with Dr. Samwick in

11   those five paragraphs fully expressed in paragraphs

12   21 through 24?

13       A.     I would say so.  I would say that the --

14   his language was similar to what I've quoted here,

15   which was from his summary.  I think the other

16   sections are actually in the body of his report, the

17   other paragraphs.  I think they're analogous -- my

18   comments and issue here would be analogous of the

19   other paragraphs.

20              MR. FOX:  Thank you.  That's all I

21       have?

22              MR. WEDOFF:  Nothing from the

23       retirement committee.

24              MS. DALE:  We don't have anything.

25              THE VIDEOGRAPHER:  4:45 p.m.  We are