**Hearing Date:** July 24, 2019 at 9:30 a.m. (Prevailing Atlantic Time)
**Objection Deadline:** July 9, 2019 at 4:00 p.m. (Prevailing Atlantic Time)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF HEARING ON RENEWED MOTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS, UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 502 AND BANKRUPTCY RULE 3007, ESTABLISHING PROCEDURES WITH RESPECT TO OMNIBUS CONDITIONAL OBJECTION TO CLAIMS FILED OR ASSERTED BY THE PUBLIC BUILDINGS AUTHORITY, HOLDERS OF PUBLIC BUILDINGS AUTHORITY BONDS, AND HOLDERS OF CERTAIN COMMONWEALTH GENERAL OBLIGATION BONDS

    **PLEASE TAKE NOTICE** that a hearing on the *Renewed Motion of the Ad Hoc Group of General Obligation Bondholders, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Conditional Objection to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, dated April 1, 2019 (the "Motion"), will be held before the Honorable Judge Laura Taylor Swain, United States District Court Judge, at the United States District Court for the District of Puerto Rico, in Room 3, 150 Carlos Chardón Street, Federal Building, Office 150, San Juan, Puerto Rico 00918-1767 on **July 24, 2019 at 9:30 a.m. (Prevailing Atlantic Time).**[2]

**PLEASE TAKE FURTHER NOTICE** that any responses or objections ("Objections") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the District of Puerto Rico, shall be filed with the Court in accordance with Rule 5 of the Local Rules for the District of Puerto Rico, to the extent applicable, and shall be served in accordance with the Ninth Amended Case Management Procedures, Dkt. No. 7115-1, so as to be so filed and received no later than **July 9, 2019 at 4:00 p.m. (Prevailing Atlantic Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if an Objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the District Court may enter an order granting the relief sought without a hearing pursuant to the Ninth Amended Case Management Procedures, Dkt. No. 7115-1.

*[Remainder of page intentionally left blanks.]*

---

[2] Members of the Ad Hoc Group of General Obligation Bondholders file this notice exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

Dated: July 2, 2019

/s/ Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

/s/ Lawrence S. Robbins
Lawrence S. Robbins
Mark T. Stancil
Gary A. Orseck
Kathryn S. Zecca
Donald Burke
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Email: lrobbins@robbinsrussell.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## RENEWED MOTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS, UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 502 AND BANKRUPTCY RULE 3007, ESTABLISHING PROCEDURES WITH RESPECT TO OMNIBUS CONDITIONAL OBJECTION TO CLAIMS FILED OR ASSERTED BY THE PUBLIC BUILDINGS AUTHORITY, HOLDERS OF PUBLIC BUILDINGS AUTHORITY BONDS, AND HOLDERS OF CERTAIN <u>COMMONWEALTH GENERAL OBLIGATION BONDS</u>

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Jurisdiction, Venue, And Statutory Bases ................................................................. 7

Background ................................................................................................................ 7

    A.   The Selective Claim Objection ................................................................. 7

    B.   The GO Group's Conditional Objection And The Initial Procedures Motion .............. 8

    C.   Other Bond Invalidation Litigation ........................................................... 10

    D.   The PSA And The Stay Motion ................................................................ 11

Relief Requested ...................................................................................................... 17

Argument ................................................................................................................. 18

    A.   The Conditional Objection Presents A Ripe Controversy ......................... 18

    B.   The Requested Procedural Relief Is Warranted ........................................ 21

Notice ...................................................................................................................... 25

Conclusion ............................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Official Comm. of Equity Sec. Holders v. Mabey,*
    832 F.2d 299 (4th Cir. 1987) ............................................................................... 19

*Third Nat'l Bank & Tr. Co. of Springfield v. United States,*
    228 F.2d 772 (1st Cir. 1956) ............................................................................... 19

## Rules and Statutes

11 U.S.C. § 105(a) ................................................................................................ 7, 24

11 U.S.C. § 502 ........................................................................................................ 7

11 U.S.C. § 502(a) .................................................................................................. 19

## TABLE OF AUTHORITIES—Continued

**Page**

48 U.S.C. § 2161(a) .................................................................................................7

48 U.S.C. § 2166(a) .................................................................................................7

48 U.S.C. § 2167(a) .................................................................................................7

48 U.S.C. § 2170 .....................................................................................................7

Fed. R. Bankr. P. 2002(m) ................................................................................22, 23

Fed. R. Bankr. P. 3007(d) .......................................................................................7

Fed. R. Bankr. P. 3018(a) .......................................................................................5

Fed. R. Bankr. P. 3021 ...........................................................................................19

Fed. R. Bankr. P. 9007 ...........................................................................................23

Local Bankruptcy Rule 3007-1 ...............................................................................22

The Ad Hoc Group of General Obligation Bondholders (the "<u>GO Group</u>")[2] hereby files
this renewed motion (the "<u>Motion</u>"), pursuant to Sections 105(a) and 502 of Title 11 of the United
States Code (the "<u>Bankruptcy Code</u>"), made applicable to these Title III cases by Section 301(a)
of the Puerto Rico Oversight, Management, and Economic Stability Act ("<u>PROMESA</u>"), 48
U.S.C. § 2101, *et seq.*, and Rule 3007 of the Federal Rules of Bankruptcy Procedure, made
applicable to these Title III cases by Section 310 of PROMESA, requesting entry of an order,
substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Proposed Order</u>"), establishing
procedures for the resolution of the *Omnibus Conditional Objection of the Ad Hoc Group of
General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority,
Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General
Obligation Bonds* (Dkt. No. 6099, the "<u>Conditional Objection</u>") and related relief.

In support of the motion, the GO Group respectfully states the following:

## PRELIMINARY STATEMENT

1.      The GO Group's Conditional Objection should now be permitted to proceed
because it addresses an indisputably ripe controversy.  In a forthcoming plan of adjustment to be
filed in the coming weeks, the Financial Oversight and Management Board for Puerto Rico (the
"<u>Oversight Board</u>") proposes to treat as disputed $6 billion in face amount of general obligation
bonds ("<u>GO Bonds</u>") issued by the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") in 2012
and 2014 (the "<u>Selectively Challenged GO Bonds</u>").  By the Board's lights, the holders of
Selectively Challenged GO Bonds should be disenfranchised from voting on the plan, and if they
elect not to accept the Board's absurdly low "settlement" offer, their plan distributions will be

---

[2] Members of the GO Group file this motion exclusively on their own behalves and do not
assume any fiduciary or other duties to any other creditor or person.

withheld pending their victory in the claim objection filed by the Oversight Board and the Official Committee of Unsecured Creditors (the "UCC").  See Dkt. No. 4784 (the "Selective Claim Objection").  At the same time, other bondholders whose claims are also implicated by the Selective Claim Objection's "logic"—including a great many whose claims the Oversight Board itself has now *conceded* are subject to the same challenge—would be treated as entirely undisputed under the plan and would be entitled to vote and receive plan distributions as normal.  There is thus a ripe controversy, with immediate and concrete stakes, as to whether these additional claims must also be treated as disputed so long as the Oversight Board and UCC continue to pursue their misguided attack on the Selectively Challenged GO Bonds.  The Court should take up that controversy by allowing the Conditional Objection to proceed, thus confirming that the Oversight Board cannot use its Selective Claim Objection as a club to bludgeon holders of the Selectively Challenged GO Bonds into accepting severe discounts to their claims while simultaneously shielding similarly situated bondholders from challenge on the same basis.

2.     In its Conditional Objection, the GO Group conditionally seeks to disallow (i) all claims filed or asserted against the Commonwealth based on or relating to the Commonwealth's obligations in connection with leases entered into by the Puerto Rico Public Buildings Authority (the "PBA," and such leases, "PBA Leases") and the Commonwealth's guaranty of bonds issued by the PBA (the "PBA Bonds"), or failing that, (ii) all claims asserted against the Commonwealth based on or relating to certain GO Bonds and PBA Bonds issued beginning in fiscal year 2010 insofar as such issuances are determined to have violated the Commonwealth's constitutional debt limit (with all such conditionally challenged claims referred to herein as the "Conditionally Challenged Claims").

2

3.        The GO Group maintains that the Selective Claim Objection is meritless, and we are confident that the Court will reject its unprecedented attempt to invalidate the Selectively Challenged GO Bonds based on a retroactive recalculation of the Commonwealth's constitutional debt limit.  The Conditional Objection, however, assumes that certain premises of the Selective Claim Objection could be established, and further assumes that the Selective Claim Objection's arguments could be applied retroactively against bonds issued years ago.  Taking the Selective Claim Objection on its own terms, the Conditional Objection explains why the only correct remedy would be to invalidate all claims asserted against the Commonwealth based on or relating to the PBA Bonds and PBA Leases, or, failing that, to apply to all of the PBA Bonds and GO Bonds the logic (such as it is) of the Selective Claim Objection in order to see whether all of those bonds (not just the ones selected by the Board and the UCC) comply with the constitutional debt limit.

4.        On May 10, 2019, the Court issued its *Memorandum Opinion and Order Denying Motion of the Ad Hoc Group of General Obligation Bondholders for Entry of an Order Establishing Conditional Omnibus Claims Objection Procedures* (Dkt. No. 6891, the "Procedures Order"), in which it denied without prejudice the GO Group's initial application to proceed with its Conditional Objection on an omnibus basis and to establish litigation procedures for the Conditional Objection (Dkt. No. 6104, the "Initial Procedures Motion").  In reaching that conclusion, the Court primarily reasoned that the Conditional Objection "appears to present a hypothetical request for relief instead of an actual case or controversy," and "appears to seek an advisory opinion that would not be justiciable in the present posture of the matter."  Procedures Order 7.  The Court also concluded that "it would not be prudent to commence giving notice" to the holders of the GO Bonds and PBA Bonds that are implicated by the Conditional Objection, as

the initial litigation procedures proposed by the GO Group had contemplated, because "no party in interest actually advocate[d]" for the relief requested in the Conditional Objection. *Id.* at 8.

5. While the GO Group respectfully disagrees with the Court's Procedures Order, there is no need to revisit that decision in order to grant this renewed application and permit the GO Group to proceed with its Conditional Objection. To the contrary, the landscape has changed dramatically in the weeks since the Procedures Order was issued, and it is now imperative that the Conditional Objection proceed.

6. The first and most important development is the Oversight Board's recent announcement of a plan support agreement (the "PSA") with a small subset of bondholders holding a small fraction of the Commonwealth's public debt. The PSA is directly premised on the perverse selectivity of the Selective Claim Objection: It contemplates a plan of adjustment for the Commonwealth under which holders of the Selectively Challenged Bonds would be required to elect between (i) receiving no recovery upon confirmation of the Commonwealth's plan and instead litigating the Selective Claim Objection to a final resolution, or (ii) accepting an absurdly reduced "settlement" proposal. If these bondholders choose the first option and elect to defend their rights by litigating the Selective Claim Objection, then their claims will be treated as disputed, and they will not be entitled to receive any distribution under the plan until the conclusion of that litigation—which the PSA seeks to delay, in the hope of bludgeoning these bondholders into accepting severe discounts of their bona fide claims. The distributions to which they would otherwise be entitled will be held in reserve pending a final resolution of the Selective Claim Objection. By contrast, other creditors—including a great many whose claims the Conditional Objection demonstrates are squarely implicated by the Oversight Board's misguided theory of invalidity—would be treated as holders of undisputed claims and would be entitled to receive

4

immediate distributions under the plan. Moreover, the PSA contemplates that holders of the Selectively Challenged Bonds will be disenfranchised from voting on the Commonwealth's plan of adjustment, while other creditors—again, a great many of whom hold claims implicated the GO Group's Conditional Objection—would be entitled to vote in full. In short, the PSA reflects a sweetheart deal with preferred creditors and a blatant attempt to disenfranchise and coerce other bondholders who seek to defend their constitutionally protected rights.[3]

7. What is more, there now can be no doubt that the "logic" of the Selective Claim Objection reaches far beyond the GO Bonds issued in 2012 and 2014 that it expressly targets. On May 2, 2019, the Oversight Board and the UCC filed actions seeking to recover payments of principal and interest payments on purportedly invalid bonds. See Adv. Proc. Nos. 19-281 to 19-288 (the "Clawback Actions"). But the bonds targeted in these Clawback Actions were not limited to the Selectively Challenged Bonds. Rather, those actions also targeted all PBA and GO Bonds issued in March 2011 and forward, seeking a declaration that those bonds are "null and void" under precisely the same debt-limit calculations that are the basis of the Selective Claim Objection. *E.g.*, Dkt. No. 1 in Adv. Proc. No. 19-281, ¶ 106.

8. At the time the Clawback Actions were filed, and when the Court issued its Procedures Order, it was unclear whether the Clawback Actions were meant to include an objection to the PBA Bonds and pre-2012 GO Bonds that were not then subject to a separate claim objection. Since this Court ruled, however, the Oversight Board has acknowledged in a status report filed jointly with the UCC and the GO Group (Dkt. No. 7550, the "Joint Status Report") that the "complaints filed . . . in the Clawback Actions include an objection to the validity" of *all*

---

[3] The Oversight Board's attempt to disenfranchise holders of the 2012 and 2014 GO Bonds is meritless, given the Court's authority under Federal Rule of Bankruptcy Procedure 3018(a) to allow a creditor's claim for voting purposes notwithstanding a pending objection to the claim.

GO Bonds and PBA Bonds issued beginning in March 2011.  *Id.* ¶ 9.c.  Thus, it is now undisputed that the "logic" of the Selective Claim Objection extends far beyond the bonds it targets expressly. The Conditional Objection proceeds from that now-conceded premise.

9.     Under these circumstances, there is plainly a ripe dispute with respect to whether holders of the Conditionally Challenged Claims should be deemed to have allowed claims for purposes of voting on and receiving distributions under a plan of adjustment.  To be sure, the GO Group contends that no bondholders' claims should *ultimately* be disallowed based on the logic of the Selective Claim Objection.  That is the respect in which the GO Group's Conditional Objection is conditional—and it was on that basis that the Court reasoned that the Conditional Objection did not present a justiciable controversy.  But that conclusion has no bearing on whether—*today*—the holders of the Conditionally Challenged Claims have demonstrated an entitlement to an allowed claim against the Commonwealth.  Given the Oversight Board and UCC's continued pursuit of arguments that, if accepted, would require invalidation of the Conditionally Challenged Claims, holders of such claims have not demonstrated that they should be allowed.  Yet the PSA generally purports to ignore the fact that the Conditionally Challenged Claims are actually disputed, and thus envisions that all holders of those claims may vote on the plan of adjustment and would receive immediate distributions under a confirmed plan.

10.     It is therefore vital that the GO Group be permitted to pursue its Conditional Objection, if only to eliminate any conceivable doubt that all of the Conditionally Challenged Claims *are* currently disputed—a question of critical and imminent importance in light of the anticipated filing of a plan of adjustment in the coming weeks.  Article III poses no barrier to such a proceeding, which will present an adversarial dispute with concrete and immediate stakes: The GO Group will contend that the Conditionally Challenged Claims should not (now) be allowed

claims, while holders of the Conditionally Challenged Claims will surely contend that their claims should be allowed.

11.     The Motion should accordingly be granted, and the GO Group should be permitted to proceed with its Conditional Objection on an omnibus basis. The Court should also approve the Notice of Conditional Objection annexed to the Proposed Order as Exhibit 1, the Conditional Objection Procedures annexed to the Proposed Order as Exhibit 2, and the form of Notice of Participation annexed to the Proposed Order as Exhibit 3 (collectively, the "Conditional Objection Procedure Documents").

## JURISDICTION, VENUE, AND STATUTORY BASES

12.     The United States District Court for the District of Puerto Rico has subject matter jurisdiction over this matter pursuant to Section 306(a) of PROMESA, 48 U.S.C. § 2166(a).

13.     Venue is proper pursuant to Section 307(a) of PROMESA, 48 U.S.C. § 2167(a).

14.     The statutory bases for the relief requested herein are Sections 105(a) and 502 of the Bankruptcy Code, 11 U.S.C. §§ 105(a), 502, made applicable to these Title III cases by Section 301(a) of PROMESA, 48 U.S.C. § 2161(a), and Bankruptcy Rule 3007(d), made applicable to these Title III cases by Section 310 of PROMESA, 48 U.S.C. § 2170.

## BACKGROUND

### A.     The Selective Claim Objection

15.     The Oversight Board and the UCC filed their Selective Claim Objection on January 14, 2019.

16.     The core premise of the Selective Claim Objection is that the PBA is a "transparent sham[] designed to circumvent" the Commonwealth's "constitutional debt limits." *Selective Claim Objection* ¶ 5 (emphasis omitted). Rather than contending that the remedy for this sham is to invalidate any Commonwealth obligation to the PBA or its bondholders, the Selective Claim

7

Objection maintains that all debt service on the PBA Bonds—even if not payable for many years—must be included in each calculation of the Commonwealth's constitutional debt limit, to the exclusive detriment of holders of GO Bonds issued in 2012 and 2014. *Id.* ¶ 86. The Selective Claim Objection contends that, once all PBA debt service is so taken into account, the debt limit calculation for each issuance of Selectively Challenged GO Bonds would exceed the 15% limit. *Id.* ¶ 63-64. Thus, according to the Selective Claim Objection, the bonds issued pursuant to the alleged sham should not only be immunized, but should receive a windfall at the expense of bonds not issued through the sham.

17.    Shortly after the filing of the Selective Claim Objection, the Oversight Board and the UCC filed an urgent motion to establish procedures with respect to the Selective Claim Objection, in which they represented that over "4,000 individuals or entities have filed 'bond' claims," and that it was likely that the number of claims on the Selectively Challenged GO Bonds exceeded one hundred, especially since "not all such claims have been filed." Dkt. No. 4788 ¶¶ 2, 12. The Court granted that motion and entered an order authorizing the Oversight Board and the UCC to proceed with its objection in an omnibus fashion and establishing procedures for resolution of the Selective Claim Objection on February 15, 2019. See Dkt. No. 5143 (the "Selective Claim Objection Procedures Order").

**B.    The GO Group's Conditional Objection And The Initial Procedures Motion**

18.    The GO Group filed its Conditional Objection on April 2, 2019, conditionally objecting to all claims asserted against the Commonwealth based on or relating to the PBA Bonds or the PBA Leases, as well as claims based on or relating to GO Bonds issued beginning in fiscal year 2010.

19.    As the Conditional Objection explains, acceptance of the Selective Claim Objection's premise that the PBA is a sham to evade the Commonwealth's constitutional debt limit

(as well as its premise that such a conclusion should be applied retroactively to invalidate previously issued bonds) would require invalidation of all claims relating to the PBA Bonds or the PBA Leases, which would in turn eliminate the Selective Claim Objection's primary basis for challenging the validity of the Selectively Challenged GO Bonds.  Conditional Objection 3-4, 19-26.  In the alternative, accepting the misguided "logic" of the Selective Claim Objection would require that all GO Bonds and PBA Bonds—not just the Selectively Challenged Bonds—be tested against the constitutional debt limit, thus making GO Bonds and PBA Bonds issued beginning in Fiscal Year 2010 subject to potential invalidation.  *Id.* at 4-6, 26-34.

20.     The Conditional Objection emphasized that consistent application of the Selective Claim Objection's methodology is particularly important because, if bonds issued prior to the Selectively Challenged Bonds were invalid, then those prior bonds could not then count against the debt limit when calculating whether the Selectively Challenged Bonds were valid.  Conditional Objection 5-6.

21.     Concurrently with the Conditional Objection, the GO Group filed its Initial Procedures Motion, in which it sought authorization to proceed with the Conditional Objection on an omnibus basis and to establish procedures for litigating the Conditional Objection.

22.     On May 10, 2019, the Court issued the Procedures Order, in which it denied the GO Group's Initial Procedures Motion without prejudice.  The Court primarily reasoned that, because the GO Group does not endorse the premises of the Selective Claim Objection, the Conditional Objection "appears to present a hypothetical request for relief instead of an actual case or controversy," and "appears to seek an advisory opinion that would not be justiciable in the present posture of the matter."  Procedures Order 7.  The Court also concluded that, under these circumstances, "it would not be prudent to commence giving notice" to the holders of the GO

Bonds and PBA Bonds that are implicated by the Conditional Objection, as the initial litigation procedures proposed by the GO Group had contemplated. *Id.* at 8.

### C.    Other Bond Invalidation Litigation

23.    On May 2, 2019, the Oversight Board and the UCC filed the Clawback Actions, seeking avoidance of certain payments of principal and interest on certain GO Bonds and PBA Bonds.  The complaints in the Clawback Actions each define the term "Challenged Bonds" to include all GO Bonds and PBA Bonds issued beginning in March 2011 (*e.g.*, Dkt. No. 1 in Adv. Proc. No. 19-281, ¶¶ 16-22, 30) and seek a declaration that the "[t]he Challenged Bonds are null and void" because the Commonwealth had exceeded its constitutional debt limit at the time the Challenged Bonds were issued (*e.g.*, *id.* ¶ 106).  Each of these complaints included, as an appendix, a chart purporting to demonstrate that the same calculations underlying the Selective Claim Objection would also require invalidation of each of these additional series of GO Bonds and PBA Bonds. *E.g.*, *id.*, Appendix 1.

24.    On May 21, 2019, the UCC—but not the Oversight Board—filed an omnibus claim objection targeting GO Bonds issued beginning in March 2011.  See Dkt. No. 7057 (the "<u>2011 GO Bond Objection</u>").  Each of the series of bonds targeted by the 2011 GO Bond Objection are among the Conditionally Challenged Claims implicated by the GO Group's Conditional Objection.

25.    In connection with the 2011 GO Bond Objection, the UCC and Oversight Board also filed a motion seeking authorization for the 2011 GO Bond Objection to proceed on an omnibus basis, to establish procedures for the litigation of that objection, to consolidate it with the proceedings on the Selective Claim Objection, and to revise the procedures for litigation of the Selective Claim Objection.   See Dkt. No. 7154 (the "<u>2011 GO Bond Objection Procedures Motion</u>").  The 2011 GO Bond Objection Procedures Motion is scheduled to be heard at the July 24, 2019 Omnibus Hearing.  See Dkt. No. 7660.

26.     On June 21, 2019, the Oversight Board, the UCC, and the GO Group filed the Joint Status Report in response to this Court's prior order to show cause why the GO Group's Conditional Objection should not be dismissed in light of the Court's ruling in the Procedures Order (see Dkt. No. 6935) and a related colloquy with the Court at the June 12, 2019 Omnibus Hearing.  In the Joint Status Report, the Oversight Board acknowledged that its complaints in the Clawback Actions Proceeding "include an objection to the validity" of *all* GO Bonds and PBA Bonds issued beginning in March 2011.  See Joint Status Report ¶ 9.c.  Each of those series of GO Bonds and PBA Bonds are among the Conditionally Challenged Claims implicated by the GO Group's Conditional Objection.[4]

**D.     The PSA And The Stay Motion**

27.     On the evening of June 16, 2019, the Oversight Board announced that it had reached agreement on the PSA with a small subset of bondholders holding roughly 17% of outstanding GO Bonds and PBA Bonds.[5]  The PSA's terms make clear that the Oversight Board has exploited the

---

[4] The Conditionally Challenged Claims also include claims against the Commonwealth relating to the PBA Leases; all claims relating to all PBA Bonds, including those issued prior to March 2011; and claims relating to an additional five series of GO Bonds issued prior to March 2011. See Conditional Objection 3-5.

[5] The Oversight Board has posted the PSA to its public website at the following link: https://drive.google.com/file/d/1gpPPd1gnFjvpQ5aY6ZwdeG42dAvzQggz/view.  A copy of the PSA is attached hereto as Exhibit B.

In a summary presentation also posted to its public website, the Oversight Board disclosed that PSA signatories held approximately $3.0 billion in GO Bond and PBA Bond claims. See *Commonwealth of Puerto Rico Title III Case:  Plan Support Agreement* 1 (June 16, 2019), https://drive.google.com/file/d/1vVUT722_ai0VOfrzYbEwWHCwzhsMrvWH/view (the "PSA Summary Presentation," attached hereto as Exhibit C).  The same presentation discloses approximately $17.69 billion in aggregate claims for GO Bonds and PBA Bonds. *Id.* at 10.  While the GO Group does not endorse the claim calculations stated therein, the Oversight Board's figures lead to the 17% estimate set forth in the text.  Including other claims on purported Commonwealth general obligations (including the Commonwealth's guaranty of bonds issued by the Port of Americas Authority and bond anticipation notes issued by the Puerto Rico Infrastructure Financing Authority, as well as loans from the Government Development Bank to the Commonwealth

overhang of that litigation to "negotiate" a proposed plan of adjustment with a small subset of its preferred creditors and has premised that "deal" on selective litigation against certain other bondholders.

28.     Several of those PSA terms are pertinent here.  First, the plan contemplated by the Plan Support Agreement would represent a sweetheart deal for the Oversight Board's preferred creditors:  Holders of PBA Bonds would receive recoveries far in excess of what holders of GO Bonds would receive.  The Oversight Board's own calculations reflect a minimum recovery of 72.6% for "Vintage PBA" claims, as compared to a minimum recovery of 64.3% for "Vintage GO" claims.  See PSA Summary Presentation 10.[6]  This differential in recovery is driven by the PSA's allocation of a *$1.073 billion* "administrative expense claim" to the PBA "for the benefit of holders of Allowed PBA Claims," PSA at Ex. E, § I.B—an amount that appears to *exceed* the Commonwealth's unpaid rental obligations to PBA since the filing of its Title III case.

29.     Moreover, the Oversight Board's public comparisons significantly understate the true differential in recovery between GO Bonds and PBA Bonds because the PSA presumes that PBA bondholders' claims on the Commonwealth's guaranty—but *not* claims on GO Bonds— should include interest that has accrued since the Commonwealth's Title III filing.[7]  On an apples-

---

Treasury) would yield a percentage figure of approximately 16.3%.  See PSA at Ex. E, p.10 (setting forth claim amounts for these claims in the definition of "Other CW Guarantee Claims").

[6] The Oversight Board's base recovery calculations assume that holders of GO Bonds and PBA Bonds do not receive any "Excess Cash," as defined in the PSA.  See PSA Summary Presentation 8 n.2.  Under the PSA, that amount is likely to reach $900 million.  See PSA Ex. E, at pp. 8-9.

[7] See PSA at Ex. E, p.11 (defining a "Vintage CW Guarantee Bond Claim" with respect to "Vintage PBA Bonds" as the "amount of such holder's Vintage PBA Bond Claims minus the amount of such holder's PBA Bond Distribution on account of Vintage PBA Bonds"); *id.* at 3 (providing for deemed allowance of "PBA Bond Claims" in an amount including "accrued and unpaid interest . . . during the period up to, but not including, the date on which the *PBA PROMESA Proceeding* is commenced") (emphasis added).

to-apples basis, the PSA contemplates a base recovery of approximately 81% of PBA bondholders' pre-petition claim against the Commonwealth, as compared to a 64.3% base recovery for "Vintage GO" claims.  The PSA's so-called "Bond Recovery Cap"—advertised by the Board as 89.4%, PSA Summary Presentation 8—would in fact represent a recovery of *99.8%* of PBA bondholders' pre-petition claim against the Commonwealth.  And even that figure does not account for the $300 million in so-called "Consummation Costs" and "PSA Restriction Fees" that would be paid to the collaborating bondholders who have agreed to the PSA.  See PSA at Ex. E, § II.M.

30.    **Remarkably, the PBA Bonds that stand to benefit from that preferred position would include bonds whose validity the Oversight Board itself now acknowledges it has challenged on the same basis as the challenge against Selectively Challenged Bonds issued in 2012 and 2014.**  Although the Oversight Board now acknowledges that its Clawback Actions contain objections to the validity of the Series R PBA Bonds, the Series S PBA Bonds, Series T PBA Bonds, and the Series U PBA Bonds (see Joint Status Report ¶ 9.c), the PSA envisions that all but the Series U PBA Bonds, issued in June 2012, would recover without *any discount at all* on account of the Oversight Board's challenge.[8]

31.    By contrast, the plan contemplated by the PSA would require holders of the Selectively Challenged Bonds to elect between litigating the Selective Claim Objection to completion or accepting a substantially reduced "settlement" proposal of 45% (in the case of GO

---

[8] See PSA at Ex. E, p.12 (defining "Vintage PBA Bonds" as PBA Bonds issued prior to 2012); *id.* § II.E (providing for *pari passu* recovery on claims against the Commonwealth on account of "Vintage" GO Bonds and its guaranty of "Vintage" PBA Bonds).

Although the guaranty portion of bondholders' claims on the Series U PBA Bonds, issued in June 2012, would be treated as disputed, see PSA at Ex. E, § II.E (establishing treatment for Class 6, "2012 CW Guarantee Bond Claims"), such bondholders would still recover their ratable portion of the cash payment contemplated to be paid from the Commonwealth to PBA, see *id.* (setting treatment for Class 1, which encompasses *all* "PBA Bond Claims").

Bonds issued in 2012) or 35% (in the case of GO Bonds issued in 2014). See PSA Summary Presentation 8. Bondholders who do not elect to accept the "settlement" would be required to litigate the Selective Claim Objection until completion, with their plan distributions held in reserve pending successful resolution of the litigation.[9] Other bonds whose validity the Oversight Board has concededly challenged—including the Series R, S, and T PBA Bonds, and four series of GO Bonds issued in 2011—would be entitled to immediate plan distributions.

32.    What is more, the terms of that "settlement" proposal—as well as the maximum recovery envisioned in the PSA for the Selectively Challenged Bonds upon ultimate victory in the Selective Claim Objection—were negotiated not with substantial holders of the bonds that are actually subject to the Selective Claim Objection, but rather with two bondholder groups whose holdings are concentrated in the bonds that are to receive disproportionately *favorable* recoveries under the Oversight Board's plan.[10] To the extent that any holders of Selectively Challenged Bonds elect to accept the plan's "settlement" proposal, the financial spoils would be split between the Commonwealth and certain bondholders—with one third going to the Commonwealth, and two thirds to creditors with allowed claims for GO Bonds and PBA Bonds.[11]

---

[9] See PSA at Ex. E, § II.E (establishing plan treatment for Class 4, "2012 CW Bond Claims," and Class 8, "2014 CW Bond Claims").

[10] The PSA was negotiated with the self-proclaimed "Lawful Constitutional Debt Coalition" (the "SPLCDC") and the "QTCB Group." See PSA at pp. 6-7. The SPLCDC has filed a notice of participation *in support* of the Selective Claim Objection. See Dkt. No. 6180. The QTCB Group's filings make clear that the group's mission is to represent its members' interests as "holders . . . of those certain Qualified School Construction Bonds and Qualified Zone Academy Bonds *issued by the Puerto Rico Public Buildings Authority*." Dkt. No. 7659, at 1 (emphasis added).

[11] PSA at Ex. E, § II.F.

33.     The PSA also provides that the Selectively Challenged Bonds would be treated as disputed and disenfranchised from voting on the Commonwealth's plan of adjustment.[12]   Once again, bonds whose validity the Oversight Board has concededly challenged would be permitted to vote in full.

34.     The PSA's utterly arbitrary line-drawing is illustrated by the following chart, which sets forth the various bond series that have been challenged in one or more bond-invalidation proceedings and the proposed treatment of those series under the PSA.


[*Remainder of page intentionally left blank.*]

---

[12] See PSA at Ex. E, § II.E (providing that bondholders in Class 4, "2012 CW Bond Claims," and Class 8, "2014 CW Bond Claims," "shall not be entitled to vote to accept or reject the Plan"). As we have explained above, this attempt to disenfranchise holders of the Selectively Challenged Bonds is meritless.  See note 3, *supra*

### Status of Bond-Invalidation Challenges
### and Proposed Treatment in Plan Support Agreement

| Bond Series | Date Issued | Disputed in Conditional Objection? | Disputed in Selective Claim Objection? | Disputed in 2011 GO Bond Objection? | Disputed in Clawback Actions? | Treated as Disputed in PSA? |
|---|---|---|---|---|---|---|
| 2014 GO Bonds | March 17, 2014 | -- | Yes | -- | Yes | *Yes* |
| Series U PBA Bonds | June 21, 2012 | Yes | No | No | Yes | **Partially Disputed**[13] |
| 2012 A GO Bonds | April 3, 2012 | -- | Yes | -- | Yes | *Yes* |
| 2012 B GO Bonds | March 29, 2012 | -- | Yes | -- | Yes | *Yes* |
| Series T PBA Bonds | December 22, 2011 | Yes | No | No | Yes | **No** |
| Series R PBA Bonds | August 24, 2011 | Yes | No | No | Yes | **No** |
| Series S PBA Bonds | August 24, 2011 | Yes | No | No | Yes | **No** |
| 2011 GO Bonds | July 12, 2011 | Yes | No | Yes | Yes | **No** |
| 2011 D GO Bonds | July 12, 2011 | Yes | No | Yes | Yes | **No** |
| 2011 E GO Bonds | July 12, 2011 | Yes | No | Yes | Yes | **No** |
| 2011 C GO Bonds | March 17, 2011 | Yes | No | Yes | Yes | **No** |
| 2011 A GO Bonds | February 17, 2011 | Yes | No | No | No | **No** |
| 2009 C GO Bonds | December 16, 2009 | Yes | No | No | No | **No** |
| 2009 B GO Bonds | November 17, 2009 | Yes | No | No | No | **No** |

---

[13] See note 8, *supra* (describing treatment of Series U PBA Bonds under PSA).

| Series Q PBA Bonds | October 28, 2009 | Yes | No | No | No | **No** |
|---|---|---|---|---|---|---|
| 2009 A GO Bonds | September 17, 2009 | Yes | No | No | No | **No** |
| 2007 A-4 GO Bonds | September 17, 2009[14] | Yes | No | No | No | **No** |
| Series P PBA Bonds | July 1, 2009 | Yes | No | No | No | **No** |
| Series K PBA Bonds | July 1, 2009[15] | Yes | No | No | No | **No** |
| All PBA Bonds issued before FY 2010 | -- | Yes | No | No | No | **No** |

35.     Moreover, despite relying on the arbitrary lines drawn by the Selective Claim Objection for the basic structure of its contemplated plan of adjustment, the PSA requires the Oversight Board to seek a stay of the Selective Claim Objection.  See PSA § 4.1.  In furtherance of that transparent attempt to frustrate the efforts of holders of the bonds subject to that objection to dispel the cloud of uncertainty that has been cast over their claims by the Oversight Board and UCC's irresponsible decision to challenge the Commonwealth's own constitutionally protected debt, the Oversight Board filed its motion seeking a stay on June 25, 2019.  See Dkt. No. 7640.  That motion is scheduled to be heard at the July 24, 2019 Omnibus Hearing.

### RELIEF REQUESTED

36.     By this Motion the GO Group seeks the entry of an order authorizing the GO Group to proceed with the Conditional Objection in accordance with the Conditional Objection

---

[14] Date remarketed.

[15] Date remarketed.

Procedures annexed to the Proposed Order attached hereto as Exhibit A, which would allow the GO Group to conditionally object to all of the Conditionally Challenged Claims without having to strictly comply with all provisions of Bankruptcy Rule 3007 and file numerous objections seeking nearly identical relief with respect to the PBA's claims, the claims of individual holders of PBA Bonds, and the claims of individual holders of GO Bonds.  In addition, the GO Group requests that litigation of the Conditional Objection be consolidated with the Selective Claim Objection and with the UCC's 2011 GO Bond Objection (to the extent that the UCC is authorized to proceed with that matter).

## ARGUMENT

37.     In its Procedures Order, the Court denied the GO Group's Initial Procedures Motion without prejudice because, the Court concluded, the Conditional Objection did not state a ripe controversy.  Recent developments, however, have made that conclusion untenable.  Moreover, the relief requested herein represents an appropriate response to the logistical challenge associated with litigating a claim objection against a large number of creditors on a common legal basis, and it closely tracks the relief this Court has already ordered in connection with the Selective Claim Objection.  The GO Group's Motion should accordingly be granted.

### A.     The Conditional Objection Presents A Ripe Controversy

38.     The Court denied the GO Group Initial Procedures Motion because the Court concluded that the Conditional Objection did not state a ripe, justiciable controversy.  The Court instead reasoned that the Conditional Objection "appears to present a hypothetical request for relief instead of an actual case or controversy."  Procedures Order 7.

39.     That conclusion is no longer tenable in light of the Oversight Board's announcement of the PSA and the imminent filing of a plan of adjustment for the Commonwealth.

18

At this point, it is critical to know which claims against the Commonwealth are undisputed and which ones are subject to dispute.

40. That distinction will have concrete, immediate consequences. For example, a claim as to which an objection is pending may not be deemed an allowed claim, see 11 U.S.C. § 502(a), and only allowed claims may receive distributions in a plan of adjustment, see Fed. R. Bankr. P. 3021; *Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987). Holders of disputed claims—*i.e.*, those as to which an objection remains pending—must be reserved for, but they are not entitled to receive distributions until the dispute has been resolved.

41. Indeed, the PSA itself illustrates the importance of these issues. Under the plan contemplated by the PSA, holders of Selectively Challenged Bonds who decline to accept an absurdly reduced "settlement" will be treated as disputed, and they will not be entitled to receive any distribution under the plan until the conclusion of that litigation. The plan distributions to which they would otherwise be entitled will be held in reserve pending a final resolution of the Selective Claim Objection. By contrast, other creditors—including a great many whose claims are implicated by the GO Group's Conditional Objection because their claims would appropriately be targeted by the arguments urged in the Selective Claim Objection—would be treated as holders of undisputed claims and would be entitled to receive immediate distributions under the plan.

42. With those concrete, immediate consequences in view, there can be no question that the Conditional Objection presents a justiciable controversy—that is, a request to "settle a concrete controversy between actively adversary parties." *Third Nat'l Bank & Tr. Co. of Springfield v. United States*, 228 F.2d 772, 773 (1st Cir. 1956). Simply put, the GO Group contends that—at least at this time—the Conditionally Challenged Claims must be treated as disputed, rather than as allowed claims entitled to share in distributions under a plan. Holders of

the Conditionally Challenged Claims will surely take the opposite view.  The parties' dispute thus

has the adversarial character necessary to establish a "case or controversy" under Article III.

43.      Recent developments also undermine the Court's prior conclusion that it would not

be prudent to begin the process of providing notice to the holders of the Conditionally Challenged

Claim.  See Procedures Order 8.  The Court's prior decision appears to have been based on the

Court's belief that, while the issues raised by the Selective Claim Objection *might* implicate claims

beyond the Selectively Challenged Bonds expressly challenged therein, that result was not

inevitable, and it was therefore sensible to await additional proceedings in the Selective Claim

Objection before providing notice to additional bondholders.  But the Oversight Board has now

confirmed that the logic of the Selective Claim Objection extends far beyond the Selectively

Challenged Bonds by conceding that it has objected to the validity of *all* GO Bonds and PBA

Bonds issued beginning in March 2011.  See Joint Status Report ¶ 9.c.  Thus, there is nothing to

be gained by further delay.

44.      To the contrary, allowing the GO Group to proceed with the Conditional Objection

would have the salutary effect of creating a comprehensive procedure for resolving *all* of the issues

raised by the Oversight Board and UCC's debt-limit attack.  As the Conditional Objection explains

(at pp. 5-6), such a comprehensive procedure is warranted because of the interrelatedness of the

debt-limit calculations across various issuance of bonds.  In particular, re-testing the validity of

any one bond issuance—whether under the novel understanding of the Commonwealth's debt limit

proposed by the Oversight Board and the UCC, or any other basis—would require re-testing all

prior issuances, because if any prior bonds would be invalid under the same logic, then those prior

bonds could not then count against the debt limit for any subsequent issuances.

20

45.     Indeed, since the Court issued its Procedures Order, the Oversight Board itself has acknowledged the necessity of such a comprehensive procedure for adjudication of debt-limit challenges.  During the status report delivered at the June 12, 2019 Omnibus Hearing, counsel for the Board observed that "[e]very holder of debt sought to be invalidated may raise as a defense [that] certain prior issued debt was invalid, . . . thereby creating more debt capacity to make subsequent debt valid."  6/12/2019 Hearing Tr. 13.  Counsel further acknowledged that challenged bondholders "can raise that defense concerning any defendant regardless of whether the Oversight Board or Creditors' Committee has sought to invalidate the debt raised as a defense."  *Id.*  And while the Oversight Board has not taken a position with respect to the validity of this sequential invalidation approach, its counsel acknowledged that, "[t]o avoid inconsistent rulings," these proceedings "should probably be consolidated for trial," with "notice . . . given to all parties when appropriate about all the debt that may be attacked."  *Id.*

46.     In sum, the most efficient path forward is to provide prompt notice to *all* stakeholders whose claims have been put at issue by the Oversight Board and UCC's pursuit of its debt-limit challenge.  Because that is precisely what the GO Group's Conditional Objection seeks to accomplish, this Motion should be granted.

### B.     The Requested Procedural Relief Is Warranted

47.     None of the responses to the GO Group's Initial Procedures Motion meaningfully contested the appropriateness of the procedures proposed therein, which were identical in almost all respects to the procedures approved by the Court for the Selective Claim Objection.  The GO Group now requests that the Court approve the Conditional Objection Procedures annexed to the Proposed Order as Exhibit 2, which are modeled on the revised procedures proposed by the

Oversight Board and UCC in connection with their pending 2011 GO Bond Objection Procedures

Motion after meeting and conferring with participants in the Selective Claim Objection.[16]

48.     As we explained in the Initial Procedures Motion, this Court unquestionably has

authority to authorize the GO Group to proceed with its Conditional Objection on an omnibus

basis.  That relief is also clearly appropriate here:  Otherwise, the GO Group would have to prepare

and file, and the Court would have to review, potentially hundreds of individual objections to

Conditionally Challenged Claims—a time-consuming, expensive, and unnecessarily duplicative

endeavor.[17]

49.     The same is true of the Proposed Order's procedures for providing notice to holders

of the Conditionally Challenged Claims and the Notice of Conditional Objection annexed to the

Proposed Order as Exhibit 1, which also track those approved by the Court in connection with the

Selective Claim Objection.   For purposes of notifying unknown claimants of the Conditional

Objection, the Bankruptcy Rules give the Court substantial discretion in determining how such

notice may be accomplished.  Specifically, Bankruptcy Rule 2002(m) provides that "[t]he court

---

[16] The Conditional Objection Procedures proposed herein reflect modifications to the Oversight Board and UCC's proposed procedures as required to reflect the consolidation of the Conditional Objection with the Selective Claim Objection and the 2011 GO Bond Objection.  A redline comparing the proposed Conditional Objection Procedures with the procedures annexed to the 2011 GO Bond Objection Procedures Motion is attached hereto as Exhibit D.

Nothing herein is intended to limit the ability of the GO Group to subsequently object to the Conditionally Challenged Claims on grounds other than those set forth in the Conditional Objection, and the Proposed Order so provides.

[17] In addition, without the relief sought herein, it would be impossible for the GO Group to comply with Local Bankruptcy Rule 3007-1, which states that a party objecting to a claim "must also certify whether or not the claimant is a servicemember as required by § 201(b)(1) of the Servicemembers Civil Relief Act of 2003."  The GO Group cannot possibly determine which of the potentially thousands of holders of conditionally challenged PBA Bonds or GO Bonds, if any, are servicemembers.  Similarly, it would be cost-prohibitive, if not impossible for the GO Group to determine which of the bond claims posted on Prime Clerk's website are PBA Bond or GO Bond claims.

may from time to time enter orders designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent except as otherwise provided by these rules." Fed. R. Bankr. P. 2002(m); see also Fed. R. Bankr. P. 9007 ("When notice is to be given under these rules, the court shall designate, if not otherwise specified herein, the time within which, the entities to whom, and the form and manner in which the notice shall be given.").

50.     Under the present circumstances, holders of Conditionally Challenged Claims that have not filed a claim or otherwise appeared in these cases can be notified with the assistance of Prime Clerk LLC, the Title III Debtors' solicitation, notice, and claims agent ("Prime Clerk"), and DTC, and through publication notice.   The Court should order DTC to post the Conditional Objection Procedure Documents to its Legal Notification System, and Prime Clerk should be ordered to mail the Conditional Objection Procedure Documents to the DTC Participants for delivery to the beneficial holders of Conditionally Challenged Claims.  In addition, the same form of the Conditional Objection Notice should be published (a) in *El Nuevo Dia* in Spanish (primary circulation in Puerto Rico), (b) in *Caribbean Business* in English (primary circulation in Puerto Rico), (c) in *El Diario* and *El Nuevo Herald*, both in Spanish (primary circulation in New York and Miami, respectively), (d) in *The Bond Buyer*, and (e) on the municipal bond website EMMA, https://emma.msrb.org/Home.  These were the same publications in which the Court ordered that notice of the Selective Claim Objection be provided.[18]  Other than EMMA, they are also the same publications used for notification of the Bar Date in the Bar Date Order.

---

[18] In the Selective Claim Objection Procedures Order, movants were required to cause the publication of the notice in such publications, other than *Caribbean Business*, within five (5) days of entry of such Order. Dkt No. 5143 ¶ **7**.  The Proposed Order modifies this requirement slightly by providing that the GO Group will cause the publication of the Conditional Objection Notice to occur within five (5) business days following the entry of the order for all such publications and within fourteen (14) days for *Caribbean Business*.

51.     Finally, the Court has discretion under Section 105(a) of the Bankruptcy Code to enter general procedural orders governing the administration of its cases and the litigation of issues concerning claim objections.  To that end, the GO Group requests that the Court enter an order approving the initial Conditional Objection Procedures for resolving the Conditional Objection, including setting the date that is sixty (60) days following the date of the entry of an order granting this Motion as the deadline for filing Notices of Participation with respect to the Conditional Objection.  The GO Group further requests that the Court consolidate litigation of the Conditional Objection with the Selective Claim Objection and the 2011 GO Bond Objection (assuming the UCC is authorized to proceed with that matter), in light of the substantial common issues of law and fact raised by these proceedings.[19]

52.     As the Oversight Board and the UCC have previously argued in connection with the 2011 GO Bond Objection Procedures Motion, the GO Group respectfully submits that no delay in the litigation deadlines applicable to the Selective Clam Objection is warranted while bondholders receive notice of the Conditional Objection.  See 2011 GO Bond Objection Procedures Motion ¶¶ 16-17.  Given that the existing participants in the Selective Claim Objection appear to include substantial holders of the Conditionally Challenged Claims, those existing parties can adequately represent the interests of holders of the Conditionally Challenged Claims for the limited purpose of developing proposals for litigation procedures to govern the consolidated proceeding.

---

[19] The GO Group's Initial Procedures Order did not request consolidation, although the Conditional Objection itself explains that it should be litigated in coordination with the Selective Claim Objection.  See Conditional Objection 5-6.  At the time, the GO Group anticipated that coordination of the two proceedings would be the subject of the parties' proposals for litigating the Conditional Objection.  At this point, however, the benefits of consolidation appear sufficiently obvious that consolidation is warranted at the outset.

## NOTICE

53.     Notice of this Motion has been provided to the following entities, or their counsel,
if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto
Rico; (iii) the Oversight Board, (iv) the Puerto Rico Fiscal Agency and Financial Advisory
Authority; (v) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico;
(vi) insurers of bonds issued or guaranteed by the Commonwealth; (vii) counsel to certain ad hoc
groups of holders of bonds issued or guaranteed by the Commonwealth; (viii) Cede & Co., as
depository for GO Bonds and PBA Bonds; (ix) DTC; (x) the PBA; (xi) U.S. Bank Trust National
Association and U.S. Bank National Association, as fiscal agents for the PBA Bonds, and (xii) all
parties that have filed a notice of appearance in the above-captioned Title III cases.

## CONCLUSION

54.     For the foregoing reasons, the GO Group respectfully requests that the Court enter
the Proposed Order, substantially in the form attached hereto as Exhibit A.

Dated: July 2, 2019

/s/ Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

Respectfully submitted,

/s/ Lawrence S. Robbins
Lawrence S. Robbins
Mark T. Stancil
Gary A. Orseck
Kathryn S. Zecca
Donald Burke
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Email: lrobbins@robbinsrussell.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*