# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>**Re: ECF No. 1235**<br>Case No. 17-BK-4780-LTS<br><br>**This Pleading relates only to PREPA, and shall be filed in the lead Case No. 17-BK-3283-LTS, and PREPA's Title III case (Case No. 17-BK-4780-LTS)** |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

i

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, as
representative of PUERTO RICO ELECTRIC POWER
AUTHORITY, and PUERTO RICO FISCAL
AGENCY AND FINANCIAL ADVISORY
AUTHORITY,

                Movants,

v.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, *et al.*,

                Respondents.

**SUPPLEMENTAL MEMORANDUM OF LAW AND
FACTS IN SUPPORT OF JOINT MOTION OF PUERTO
RICO ELECTRIC POWER AUTHORITY AND AAFAF
PURSUANT TO BANKRUPTCY CODE SECTIONS 362,
502, 922, AND 928, AND BANKRUPTCY RULES 3012(A)(1)
AND 9019 FOR ORDER APPROVING SETTLEMENTS
EMBODIED IN THE RESTRUCTURING SUPPORT
AGREEMENT AND TOLLING CERTAIN LIMITATIONS PERIODS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................2

RELEVANT FACTUAL SUPPORT ..........................................................................8

    **A.**    Summary of Accompanying Declarations ........................................... 8

    **B.**    The Government Parties' Settlement Goals....................................... 10

    **C.**    Terms and Economics of RSA............................................................ 12

    **D.**    Benefits of RSA to PREPA and Its Stakeholders ............................. 17

    **E.**    Limitations of Amended Proposed Order ........................................... 24

    **F.**    Consummation of the Exchange ......................................................... 25

SUPPLEMENTAL ARGUMENT ............................................................................26

    **A.**    Satisfaction of Requirements for Approval of Settlements ................. 26

        1.    The RSA is a Reasonable Compromise Given the Uncertain Probability of Success and Significant Consequences of an Adverse Outcome in Pending and Anticipated Litigation ......................................................................28

        2.    The RSA is a Reasonable Compromise Given the Solid Benefits to PREPA and the Elimination of the Complexity, Risk, Expense, and Inconvenience of Litigation ....................................................................33

        3.    The RSA is in the Paramount Interest of PREPA's Creditors and Stakeholders ...............................................................................................38

    **B.**    Authority of the Court to Approve RSA Terms................................... 41

        1.    The Court has the Authority to Issue the Amended Proposed Order ........41

        2.    The Court has the Authority to Approve the Interim Payments ...............45

    **C.**    Irrelevance of Potential Impact on Theoretical Third Party Recoveries.............. 50

CONCLUSION.........................................................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C. (In re Tama Beef Packing, Inc.),*
290 B.R. 90 (B.A.P. 8th Cir. 2003)........................................................................48

*Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico),*
919 F.3d 121 (1st Cir. 2019)................................................................................46

*Barton v. Barbour,*
104 U.S. 126 (1881)............................................................................................43

*Carter v. Rodgers,*
220 F.3d 1249 (11th Cir. 2000) ...........................................................................43

*Crossland F.S.B. v. Braniff Int'l Airlines (In re Braniff Int'l Airlines),*
1996 U.S. App. LEXIS 14183 (2d Cir. June 12, 1996) ..........................................48

*Energy Future Holdings Corp. v. Del. Trust Co.,*
648 Fed. Appx. 277 (3d Cir. 2016).......................................................................41

*Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. For P.R.),*
899 F.3d 13 (1st Cir. 2018)................................................................................1, 33

*Gardner v. State of N.J.,*
329 U.S. 565 (1947).............................................................................................41

*Houston Sportsnet Finance, L.L.C. v. Houston Astros, L.L.C. (In re Houston Reg'l Sports Network, L.P.),*
886 F.3d 523 (5th Cir. 2018) ...............................................................................31

*In re Adelphia Commc'ns Corp.,*
327 B.R. 143 (Bankr. S.D.N.Y. 2005), aff'd 337 B.R. 475 (S.D.N.Y. 2006) (Kaplan, J.), appeal dismissed, 222 Fed. Appx. 7, 2006 WL 3826700 (2d Cir. 2006), *cert. denied*, 552 U.S. 941 (2007)........................................................53

*In re Ahlers,*
794 F.2d 388 (8th Cir. 1986), *rev'd on other grounds sub nom.*, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988) ...................31

*In re Am. Cartage, Inc.,*
656 F.3d 82 (1st Cir. 2011).................................................................................38

*In re Apollo Steel Co.*,
   1994 Bankr. LEXIS 1983 (Bankr. N.D. Ill. 1994)...................................................42

*In re Capmark Fin. Grp. Inc.*,
   438 B.R. 471 (Bankr. D. Del. 2010) ......................................................................51

*In re Celotex Corp.*,
   227 F.3d 1336 (11th Cir. 2000) ..............................................................................48

*In re Chemtura Corp.*,
   Case No. 09-11233-REG, ECF No. 3527 (Bankr. S.D.N.Y. Aug. 9, 2010)...........44

*In re City of Detroit*,
   2014 Bankr. LEXIS 5439 (Bankr. E.D. Mich. 2014) .............................................42

*In re City of Stockton*,
   478 B.R. 8 (Bankr. E.D. Cal. 2012)........................................................................45

*In re City of Stockton*,
   486 B.R. 194 (Bankr. E.D. Cal. 2013) ..............................................................42, 45

*In re Dana Corp.*,
   Case No. 06-10354-BRL, ECF 3441 (Bankr. S.D.N.Y. Aug. 2, 2010)...............42, 49

*In re Delphi Corp.*,
   Case No. 15-44481-RDD, ECF No. 6589 (Bankr. S.D.N.Y. Jan. 12, 2007)...........49

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   360 F. Supp. 3d 65 (D.P.R. 2019)................................................................... passim

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   914 F.3d 694 (1st Cir. 2019)...................................................................................30

*In re Healthco Int'l, Inc.*,
   136 F.3d 45 (1st Cir. 1998)...............................................................................27, 41

*In re Heritage Highgate, Inc.*,
   679 F.3d 132 (3d Cir. 2012)....................................................................................31

*In re Nat'l Heritage Found., Inc.*,
   478 B.R. 216 (Bankr. E.D. Va. 2012).....................................................................43

*In re Richmond Unified School Dist.*,
   133 B.R. 221 (Bankr. N.D. Cal. 1991) ...................................................................45

*In re Sea Containers, Ltd.*,
   No. 06-11156 (KJC), 2008 Bankr. LEXIS 2363 (Bankr. D. Del. Sep. 19,
   2008) .......................................................................................................................52

*In re Smart World Techs., LLC,*
  423 F.3d 166 (2d Cir. 2005)........................................................................51

*In re Tronox Inc.,*
  Case No. 09-10156, ECF No. 3441 (Bankr. S.D.N.Y. Aug. 2, 2009) ....................................44

*In re Washington Lane Associates,*
  79 B.R. 241 (Bankr. E.D. Pa.1987) ....................................................48

*Jeffrey v. Desmond,*
  70 F.3d 183 (1st Cir. 1995)................................................26, 32, 35, 37

*Matter of Baldwin-United Corp.,*
  79 B.R. 321 (Bankr. S.D.Ohio 1987)................................................48

*Matter of Cont'l Airlines, Inc.,*
  154 B.R. 176 (Bankr. D. Del. 1993) ................................................35

*Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v.
  Anderson,*
  390 U.S. 414 (1968), In *TMT*................................................26

*Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp.
  Health Tr.),*
  25 F.3d 1281 (5th Cir. 1994) ................................................51

*United States v. Villalobos (In re Villalobos),*
  2011 Bankr. LEXIS 4329 (B.A.P. 9th Cir. July 21, 2011) ....................................48

*Yacovi v. Rubin & Rudman, L.L.P. (In re Yacovi),*
  411 Fed. Appx. 342 (5th Cir. 2011)................................................27

## STATUTES

11 U.S.C. § 105(a) ................................................................45

11 U.S.C. § 361 ................................................................41, 45

11 U.S.C. § 362(a) ................................................................1, 45, 46

11 U.S.C. § 362(d) ................................................................45, 47

11 U.S.C. § 363 ................................................................1, 45, 48

11 U.S.C. § 365 ................................................................1, 42, 45

11 U.S.C. § 502 ................................................................1, 41

11 U.S.C. § 503 ................................................................41, 42

11 U.S.C. § 503(b)(3)(D) ........................................................................................48

11 U.S.C. § 506(b) .....................................................................................41, 46, 49

11 U.S.C. § 541 ........................................................................................................51

11 U.S.C. § 544(a) .............................................................................................36, 44

11 U.S.C. § 922 ...................................................................................................1, 45

11 U.S.C. § 928 ...................................................................................................1 ,5

PROMESA § 301(c)(5) ...........................................................................................51

PROMESA § 301(c)(7) ...........................................................................................44

PROMESA § 305 ........................................................................................16, 42, 45

PROMESA § 310 .....................................................................................................41

PROMESA § 314 .....................................................................................................54

PROMESA § 314(b)(6) .......................................................................................6, 28

## OTHER AUTHORITIES

UCC Art. 9 ..............................................................................................................37

Fed. R. Bankr. P. 3012(a)(1) ....................................................................................1

Fed. R. Bankr. P. 9019 ..............................................................................................1

6 COLLIER ON BANKRUPTCY ¶ 901.04[12][a] (16th ed. 2019) .......................................45

To The Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), in its capacity as the sole representative of the Puerto Rico Electric Power Authority ("PREPA" or the "Debtor") in the Title III case pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] and the Puerto Rico Fiscal Agency and Financial Authority ("AAFAF," and together with the Oversight Board and PREPA, "Movants" or the "Government Parties"), as the entity authorized to act on behalf of PREPA pursuant to the authority granted to it under the *Enabling Act of the Fiscal Agency and Financial Advisory Authority*, Act 2-2017, respectfully submit this supplemental memorandum of law and facts (the "Supplemental Memorandum"), as directed by the Court at the June 12, 2019 conference (the "June 12 Conference"), in support of the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Periods* [ECF No. 1235] (the "Rule 9019 Motion"), as the relief requested in such motion is limited by the new proposed order filed with the *Supplemental Joint Status Report* [ECF No. 1361], with the Rule 9019 Motion hereby incorporated by reference as if fully set forth herein. The Rule 9019 Motion seeks approval of certain aspects of the RSA[2] entered into among the Government Parties and certain holders and insurers of PREPA bonds (together, the "Parties"). Movants are also filing concurrently herewith the Declaration of David Brownstein (the "Brownstein Declaration"), the Declaration of Frederic Chapados (the "Chapados Declaration"), the Declaration of Christian Sobrino (the "Sobrino

---

[1]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[2]   Capitalized terms used but not otherwise defined shall have the meaning given to them in the Rule 9019 Motion or the RSA.

Declaration"), and the Declaration of Natalie Jaresko (the "Jaresko Declaration," and collectively
with the Brownstein Declaration, the Chapados Declaration, and the Sobrino Declaration, the
"Declarations"), each in support of the Rule 9019 Motion.

## **PRELIMINARY STATEMENT**

1.    In Brief.    The Oversight Board, as PREPA's representative in the Title III
proceedings, and AAFAF, as PREPA's Fiscal Agent under Puerto Rico law, have together
negotiated a settlement with holders of the vast majority of PREPA's uninsured secured debt and
with its bond insurers.   The settlement achieves three key objectives:  (i) it caps the amount
electricity prices can be raised to pay debt; (ii) it transforms the existing debt into new debt having
no receiver remedy, no rate covenant, and no payment default remedies[3] for underpayment of
required debt service as long as the revenues from the Transition Charge (no matter how small)
are paid to the bondholders – thus shifting to creditors the demand-risk formerly borne by PREPA
and its customers; and (iii) it discounts the original debt to save PREPA between $2 billion and $3
billion in cash flow.   While the savings are substantial, one of the benefits of the deal is that the
amount of debt going forward matters much less now because the key remedies and default risk
are eliminated.   Thus, the RSA also allows all potential private investors/operators engaged in the
process to "transform" PREPA to know exactly what portion of revenues will be devoted to old
debt, while eliminating the risk and downside of price hikes resulting from defaults.   It is an
outstanding deal that facilitates Transformation.   Notably, because the plan transaction
contemplated in the RSA may not close for another year as the Transformation process unfolds,

---

[3]    As provided in § X of the Recovery Plan Term Sheet (RSA, Exhibit C), holders of Securitization Bonds will have
no remedy upon default for failure to pay debt service.  Annex A to the Recovery Plan Term Sheet (RSA, Exhibit
C) specifically provides that "[n]either the Transition Charge levels (including the TC Cap), duration, nor
applicable coupon rates on the Securitization Bonds shall change as a result of an event of default."  See Annex A
at 8. Section XI only provides, upon default, the right to replace the Transition Charge servicer and the right to
enforce the Securitization Bonds' trust agreement, servicing agreement, and non-impairment covenants..

the Supporting Holders and insurers are willing to lock themselves into the deal as long as the Court approves: (1) allowance of their claims in discounted amounts, (2) adequate protection and similar interim payments that are part of the deal, and (3) PREPA's release of its lien challenge as against the settling debt holders and settling insurers, all as set forth in the RSA.

2.      The anticipated objectors are certain fuel line lenders, the Official Committee of Unsecured Creditors ("UCC"), and PREPA's major labor union.  No relief requested here impacts their rights.  No confirmation issues are being resolved.  At confirmation, either they will be paid what the law requires and the Court can confirm a Plan, or the Court will not confirm if the objectors are underpaid.  Likewise, if the RSA parties would be overpaid under the Plan, the Court will not confirm it.

3.      The Rule 9019 Motion Only Seeks Approval of Certain Components of the RSA. In response to the Court's direction at the June 12 Conference, the Government Parties submitted an amended proposed order in respect of the 9019 Motion [ECF No. 1361-1] (the "Amended Proposed Order," or "Order") that clarifies and limits the relief requested by the Government Parties to approvals of certain aspects of the RSA comprising the settlements of secured claims, but not confirmation issues, rate issues, or other issues that are left to the Puerto Rico Legislature or PREPA's regulator.

4.      The Amended Proposed Order: (a) allows the asserted secured claims of the Supporting Holders in the discounted amounts under the terms of the RSA; (b) approves the accrual of Administrative Claims under the RSA terms; (c) approves Settlement and Adequate Protection Payments required by the RSA prior to plan confirmation; (d) exculpates the Supporting Holders and the Bond trustee for acts and omissions in furtherance of the RSA; (e) requires the Supporting Holders to vote in favor of a Plan consistent with the RSA (upon receipt of an approved

Disclosure Statement); and (f) dismisses the Receiver Motion [ECF No. 975] as to settling movants thereunder.

5.        The Amended Proposed Order does <u>not</u>: (a) approve or implement rate increases; (b) impose the Settlement Charge or Transition Charge; (c) implement any Demand Protections or Securitization Protections; or (d) make any findings whether any aspect of a Plan, including treatment of the settled claims, is confirmable.  The Amended Proposed Order expressly preserves for the confirmation hearing all confirmation objections of all parties in interest.

6.        <u>The Settlement is Beneficial to PREPA and its Customers</u>.  As set forth in the Rule 9019 Motion, in addition to cash flow savings of approximately $2 billion to $3 billion on PREPA's bond indebtedness (Brownstein Decl. ¶ 39), the Securitization Bonds provided for by the RSA include terms that provide tremendous and unprecedented value to PREPA and its ratepayers.

7.        One of the Government Parties' principal goals in entering into the RSA was to insulate PREPA and its customers from rate increases in the event future system revenues were insufficient to satisfy regular debt service payments.  Jaresko Decl. ¶ 25.  Under the current bond documents (and as is standard in municipal debt), if PREPA has insufficient revenues to make debt service payments it is obligated (outside Title III) to raise rates to a level sufficient to pay in full operating expenses and annual debt service.  *See* Trust Agreement § 502 (the "<u>Rate Covenant</u>"). The Government Parties designed the RSA to prevent that from happening; it protects Puerto Rico and its residents from unknown and uncapped future increases in electric rates to pay debt service. Jaresko Decl. ¶ 26.  Although subject to certain Demand Protections, the RSA does not contain a "rate covenant" and there is no true up mechanism or "floating charge" to ensure payments to holders of the new bonds, irrespective of revenue shortfalls resulting from decreased demand for

electricity.  Instead, the RSA provides for a fixed schedule of transition charges for each year, subject to Demand Protections, which transfers the risk that long-term electricity demand will be insufficient to service bond payments from ratepayers to bondholders. This structure, and its risk shifting, is unprecedented.  Brownstein Decl. ¶ 43.

8.     Further protecting ratepayers, under the Securitization Bonds, bondholders would not be able to declare a default on the basis that the Transition Charge is insufficient to pay debt service.  Brownstein Decl. ¶ 55.  Even if bondholders do not receive scheduled debt service payments due to reduced electricity demand, neither PREPA nor the securitization vehicle/issuer will be in default on the bonds, bondholders will not be able to seek a receiver or other remedies against PREPA, and PREPA should not need any future debt restructuring.  *Id.* ¶¶ 55, 59.

9.     <u>The Settlement Eliminates Significant Litigation Risk, Cost, and Delay</u>.  The settlement embodied by the RSA will resolve all pending and potential litigation among the Government Parties and the Supporting Holders.  The Government Parties sought and obtained this concession to avoid costly and time-consuming legal proceedings, as well as the risk to PREPA of higher debt service, loss of control to bondholders, indefinite delay of Transformation, and inability to exit Title III.  In particular the RSA disposes of the pending Receiver Motion, which is the precursor to the monoline insurers' effort to put PREPA into the hands of an unknown receiver whose appointment, authority (including the power to increase rates) and tenure would be subject to a Puerto Rico court (and would likely involve further litigation given the scope of this Court's own jurisdiction).

10.    The RSA also resolves a complex dispute regarding the Supporting Holders' argument that their claims against PREPA are oversecured and entitled to full payment of principal, interest, and fees under any Plan.  It further resolves their contention that their collateral

constitutes "special revenues" for purposes of Bankruptcy Code section 928 that cannot be impaired.  Movants dispute this position and have commenced an adversary proceeding against the Trustee [Adv. Pro 19-391, ECF No. 1] ("Adversary Complaint"), seeking, *inter alia*, a declaration that the Bonds are not secured or, if they are secured, the collateral is limited to cash on deposit in certain accounts as of the Petition Date.[4]  However, these issues would be subject to extensive litigation and result in significant costs to PREPA and other Government Parties, as well as a significant diversion of attention from important Transformation activities.  The RSA will moot this dispute as between the Government Parties and the Supporting Holders.

11.    The Supporting Holders have also contended that, in the context of Plan confirmation, PREPA could not satisfy the "best interests test" of PROMESA section 314(b)(6)[5] because outside Title III they have special rights that other PREPA creditors do not – namely, to enforce the Rate Covenant to raise rates sufficient to reinstate debt service on the Bonds.  PREPA asserts among other things that (a) it is unclear whether the applicable regulatory authorities would raise rates or whether doing so would result in PREPA being unable to continue to operate, (b) there would be a contest as to whether increasing the rates to pay Bondholders in full would in fact provide full payment in the long run if businesses and consumers would be deterred from remaining in the Commonwealth by the higher rates, (c) the requirement to consider recoveries under Commonwealth law does not make those recoveries a minimum requirement for plan treatment, and (d) the requirement is to consider "recovery for the creditors," which includes all creditors, and thereby does not require consideration of what each individual creditor would

---

[4]    This Supplemental Memorandum is not intended to set forth in full the Supporting Holders' arguments in favor of their secured status or the Government Parties' arguments against such status.

[5]    Section 314(b)(6) requires the "court to consider whether available remedies under non-bankruptcy law and the constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."

receive.  The RSA settles these issues.

12.     The litigation of these claims and disputes, Movants' challenges to the bondholders' asserted security interests, and ultimately Plan confirmation, complicates not only PREPA's restructuring but that of the Commonwealth.  Each of these disputes involves complex legal issues with billions of dollars at stake. The parties' experience across the Title III cases informs that litigating these matters through all appeals may well take years, involve millions or tens of millions of dollars in expenses, and risk leaving PREPA and its customers in a much worse position.  It will also delay Movants' primary goal of transforming Puerto Rico's power utility, a fundamental measure for the recovery of Puerto Rico's economy.

13.     Under the RSA, all Supporting Holders withdraw their requests for stay relief, commit not to request other Bondholder remedies while PREPA, the Oversight Board and AAFAF abide by the RSA, and commit to accept Plan treatment on account of a discounted claim.   The Supporting Holders will not have the right to cause rates to rise beyond the amounts dictated under the RSA even if they will otherwise not be paid in full on their discounted recovery.  In exchange, the Government Parties have agreed to allowance of the Supporting Holders' claims as fully secured claims in a materially discounted amount (for purposes of Plan confirmation), to propose a Plan consistent with the RSA, and to make certain payments and allow certain administrative claims in favor of the Supporting Holders pending confirmation of the Plan.  The RSA provides that if the Oversight Board is unable to confirm a Plan after multiple, good-faith efforts, the Government Parties may terminate the RSA at their election and the parties substantially revert to their pre-RSA rights.  *See* RSA § 9(c)(6).

14.     The RSA is the product of hard-fought, arm's-length bargaining among sophisticated parties and their counsel and advisors over an extended period. *See* Brownstein Decl. ¶¶ 16-22.

15.     For the reasons set forth in the Rule 9019 Motion, the Declarations, and herein, the settlement provisions set forth in the RSA for which Movants seek approval through the Amended Proposed Order are fair and reasonable under the relevant circumstances and should be approved by the Court.

## RELEVANT FACTUAL SUPPORT

### A.  Summary of Accompanying Declarations

16.     The Government Parties are concurrently submitting declarations of four key fact witnesses, three of whom were directly involved with the Government Parties' negotiation of the RSA and another who is directly involved in the ongoing PREPA Transformation:

17.     Jaresko Declaration.  Natalie Jaresko is the Oversight Board's Executive Director and participated in discussions with the members of the Oversight Board and its financial and legal advisors concerning negotiation and execution of the RSA.  Ms. Jaresko explains how achievement of the Oversight Board's primary goals for the RSA (including (i) reducing PREPA's indebtedness; (ii) insulating ratepayers from indiscriminate rate increases; and (iii) mitigating litigation risk) ultimately led to a compromise that is economically reasonable in the Oversight Board's considered judgment.  Ms. Jaresko also explains how the RSA is structured to facilitate a successful Transformation and why the limited and capped rate increases contemplated by the RSA are consistent with the Oversight Board's projections for the economic future of Puerto Rico.

18.     Sobrino Declaration.  Christian Sobrino is the Chief Executive Officer of AAFAF, a member of PREPA's Governing Board, and an *ex officio* member of the Oversight Board.  Mr.

Sobrino oversaw and directed AAFAF's negotiation of the RSA for PREPA. Mr. Sobrino discusses in his declaration the benefits of the RSA and why he concluded, on behalf of AAFAF and PREPA, that the financial consideration provided to Supporting Holders in the RSA is beneficial to PREPA and recommended to the boards of AAFAF and PREPA that they approve the RSA. In addition, he describes the advantages of the anticipated resolution of the Receiver Motion and why avoidance of continued receivership litigation benefits PREPA and, ultimately, the ongoing Transformation.

19. <u>Brownstein Declaration</u>. David Brownstein is a Managing Director and Head of Municipal Banking at Citigroup Global Markets Inc. ("<u>Citi</u>"). He was the primary financial advisor acting on the Oversight Board's behalf, alongside AAFAF's advisors, in the negotiation of the RSA for the last two years. After providing an overview on the negotiation and execution of the RSA, Mr. Brownstein explains how the Government Parties' key economic objectives guided the negotiation and ultimate structure of the RSA, including specifically how its key terms meet those objectives and why the additional consideration provided in the RSA constitutes a reasonable concession in light of the terms agreed. Mr. Brownstein's declaration includes financial analyses to demonstrate why the ultimate compromise reached is not only reasonable but ultimately beneficial to PREPA and its ratepayers by, among other things, achieving a substantial reduction in debt owed to Supporting Holders and protecting ratepayers by implementing a capped, predictable Transition Charge *with no rate covenant*—a feature of the deal that is particularly unique in the industry and represents a significant concession by the Supporting Holders.

20. <u>Chapados Declaration</u>. Frederic Chapados is a Director at Citi and the person at Citi directly responsible for overseeing the Transformation, for which Citi is the Government Parties' lead financial advisor. After providing an overview on the current status of the

Transformation, Mr. Chapados explains how the restructuring of PREPA's legacy debt contemplated by the RSA, which he understands may resolve the receivership litigation and will facilitate the path to confirmation of a Title III Plan of Adjustment for PREPA, is required for achieving Transformation.

**B.  The Government Parties' Settlement Goals**

21.     In commencing PREPA's Title III case in July 2017, the Government Parties were keenly focused on the need to restructure the utility's $8.25 billion in obligations to its bondholders, representing *over two-thirds* of PREPA's total outstanding debt.  Jaresko Decl. ¶ 18. The  Government Parties deemed the restructuring of legacy bond debt as essential to PREPA's ultimate ability to confirm a Plan and emerge from Title III.  *Id.*

22.     The Government Parties' key goals in restructuring PREPA's bond debt included:

a.   Reducing PREPA's legacy debt obligations;

b.   Insulating PREPA's rate payers from unknown and unlimited potential future rate increases;

c.   Avoiding the prospect of PREPA re-entering Title III in the future; and

d.   Establishing certainty regarding PREPA's future financial obligations and resolving outstanding litigation thereby paving the way to Plan confirmation and transformation of the utility.

*Id.* at ¶ 19.

23.     Reducing PREPA's indebtedness to its bondholders is a component of a broader range of interdependent initiatives designed to pave the way to Plan confirmation and transformation of the utility.  The RSA contains a number of elements designed to ensure certainty and predictability with respect to future electricity rates and protect the island's businesses and

residents from the risks of unrestrained rate increases in the event revenues are inadequate to cover ongoing debt service.   Jarekso Decl. at ¶ 22.

24.      The Government Parties took all these factors into account in exercising their considered judgment that the RSA constitutes a reasonable settlement of Supporting Holder claims.  Jaresko Decl. ¶¶ 22, 39; Brownstein Decl. at ¶¶ 68-71; Sobrino Decl. ¶¶ 24-25.  In that regard, the Government Parties recognize they have strong legal arguments that Supporting Holders' security interests were limited as of the Petition Date.   Jaresko Decl. ¶ 33. Correspondingly, the Government Parties also took into account Supporting Holders' claim they were oversecured on the Petition Date and, as a consequence, they are entitled to full payment of principal, interest (including post-petition interest), and fees under any Plan.  This argument, if successful, would have an adverse impact on PREPA and its ability to emerge from Title III because electricity rates would be subject to unrestrained increases to pay debt service.  *Id.*  In weighing the risks and benefits of the settlement embodied in the RSA, the Government Parties determined the reduction in indebtedness, coupled with the material concessions in structuring the Securitization Bonds agreed to by the Supporting Holders, adequately accounted for the strengths of the Government Parties' legal arguments measured against the possibility of an adverse result. This is particularly the case because, as noted, Movants view the RSA as an important step in confirming a Plan for PREPA and facilitating Transformation. *Id*.

25.      Underlying all of this is the Government Parties' goal to transform and modernize the utility, which they have determined must include bringing in an experienced operator (the "Operator") from the private sector to run it.  Jaresko Decl. ¶¶ 8, 34.  Any firm performing the risk-benefit analysis to determine whether to undertake this project, would look for a clear picture of the legal, financial, operational and regulatory environments in which it would be investing and

operating should its proposal be successful. Chapados Declaration ¶ 17.  While there will always
be unknowns, a potential Operator would want to obtain the best possible understanding of the
legal and financial challenges, such as (a) the projected costs that will need to be included in
PREPA's rates to customers post-closing, including any additional charges to satisfy restructured
legacy debt; (b) resolution of the Receiver Motion; and (c) ultimately, PREPA's prospects and
timing for exiting Title III. *Id.*

26.     As described herein and in the Declarations, the RSA furthers each of these goals
and thus provides ample value to PREPA and its ratepayers in addition to the discount of
Supporting Holders' claims, some or all of which might not be available absent the settlement.

**C. Terms and Economics of RSA**

27.     The RSA is a comprehensive and complicated settlement agreement that addresses
the economic issues facing its parties. Restructuring billions of dollars of public debt is critical to
the interests of PREPA and the people and businesses of Puerto Rico, as well as the holders and
insurers of the vast sums involved.  The Rule 9019 Motion summarizes each of the material terms
and provides a description of the operative provisions of the RSA and how they interrelate.   Rule
9019 Motion at 18-29.  In furtherance of the Court's directions at the June 12 Conference, set forth
below is an additional explanation of the economics of the RSA.

28.     <u>Tranche A Bonds</u>.  The RSA requires PREPA to propose a Plan providing the
Supporting Holders, Tranche A bonds equal in amount to 67.5% of their respective "Applicable
Bond Claims" which is the sum of the Supporting Holders' Petition Date claims plus interest
accrued between the Petition Date and May 1, 2019.[6]  The RSA also entitles certain Supporting

---

[6]   As of the Petition Date (July 2, 2017) the Bondholders' claims were $8,508,396,331 (Brownstein Decl. ¶ 38).
Pursuant to the RSA, the claims of the Bondholders on which Securitization Bonds will be issued under the RSA
include accrued postpetition interest through May 1, 2019.  As of May 1, 2019, the aggregate Bond claim with
postpetition interest was $9,300,344,424.  *Id*.  The face of amount of Securitization Bonds that will be issued on

Holders to an additional settlement fee (the "Waiver and Support Fee") in the form of additional Tranche A Bonds in the amounts set forth in Section 4 of the RSA.    In total, the Waiver and Support Fees add approximately 1.62% to the Supporting Holders' aggregate recovery on their Applicable Bond Claims, (which translates into approximately $151 million in Tranche A Bonds). Brownstein Decl. ¶ 36-37.  These additional Tranche A bonds, like all other Tranche A bonds, are only distributable upon the effective date of a Plan, and PREPA's obligation to provide them to the Supporting Holders does not survive termination of the RSA.

29.    Tranche B Bonds.    The RSA provides for the Supporting Holders to receive Tranche B bonds with a face amount equal to 10% of their Applicable Bond Claims.  The Tranche B bonds are "contingent debt" because they do not pay unless and until the Tranche A bonds are repaid in full (over a maximum term of 47 years).  Brownstein Declaration ¶ 42.  The Tranche B bonds will be canceled whether they are paid off on or before the end of the 47 year term of the Tranche A bonds, or if no payments are ever made on the Tranche B bonds due to depressed demand over the life of the bonds.  Movants estimate the Tranche B bonds will yield a recovery of approximately 5.5% on the Applicable Bond Claims, not the full 10% face amount.  *Id.* n. 12. If demand *decreases* by 18% or more over the same period, there will be no payments on the Tranche B bonds.  Brownstein Decl. 11.

30.    "Non-Default" Securitization Structure and Limited Remedies.  The RSA contains a unique securitization structure where (i) the Tranche A and B bonds are issued by a separate, special purpose entity, rather than the utility itself; and (ii) there is no default on the Tranche A or

_____

this claim amount is $6,277,732,486 in Tranche A bonds and $930,034,442 in Tranche B bonds.  An additional $393,764,759 in Tranche A bonds will be issued in satisfaction of the Administrative Claim (including the Settlement Payments), assuming all holders are entitled to accrue this claim starting May 1, 2019, (further assuming a July 1, 2020 effective date).  *Id.* at ¶ 37.

13

Tranche B bonds if the Transition Charge does not yield sufficient funds to pay debt service.[7]
Unlike the prepetition Bonds, the Tranche A and B bonds will not provide their holders the right
to seek a receiver or other remedies if the Transition Charge revenues are insufficient to pay
regularly scheduled debt service.  Additionally, the holders will have no right to seek to increase
the Transition Charge or otherwise raise rates, other than the adjustments contemplated by the
Demand Protections.  Currently, Commonwealth law and the Trust Agreement provide rates must
be increased, without limit, as necessary to pay its operating expenses plus full debt service.  The
RSA ends that unquantifiable risk to ratepayers.  Holders' rights under the Tranche A and B bonds
are limited to payment of whatever revenues the Transition Charge actually yields.  Such issuer-
favorable limitations on rights of bondholders are unprecedented in municipal debt issuances.
Brownstein Decl. ¶ 43.  These provisions mean the Supporting Holders, not the ratepayers, are
assuming the risk of low demand.  This was a significant concession by Supporting Holders for
obvious reasons, but also for not such obvious reasons as it may impair the market value of the
Securitization Bonds.  The Government Parties insisted on achieving the Supporting Holders'
agreement to this provision.  It is one of the most significant components of the deal reached in
the RSA and was critical among the Government Parties' key objectives.  *Id*.

31.     Pre-Confirmation Consideration:  The parties to the RSA recognized that the
pending Transformation process might delay PREPA's exit from Title III, and thus delay the
corresponding issuance of Securitization Bonds to Supporting Holders.  In an ordinary utility
restructuring, creditors would not wait more than a few months after the restructuring support
agreement is signed before the exchange of publicly tradeable bonds.  Brownstein Decl. ¶ 58.
Here, however, PREPA has not paid any debt service to the Supporting Holders for two years (*i.e.*,

---

[7]     *See* RSA, Recovery Plan Term Sheet, § X.

14

since the Petition Date). It has already been two months since the RSA was signed, and Supporting

Holders will have to wait approximately another year before the proposed exchange will close. *Id*.

32.     To compensate Supporting Holders for this significant delay in receiving debt

service and an exchange of bonds under a plan, including the Supporting Holders' forbearance

from asserting their alleged rights, the RSA provides Supporting Holders the following between

approval of the RSA and Plan confirmation:

> a.  <u>Accruing Administrative Claim</u>:  Each initial Supporting Holder and other
> Supporting Holders who joined the RSA by May 31, 2019 is entitled to an allowed
> post-petition administrative claim in an amount equal to interest on the Tranche A
> Bonds to which such Supporting Holder would be entitled to receive on account of
> its Applicable Bond Claim, accrued from May 1, 2019 through the Effective Date
> of the Plan or termination of the RSA,[8] <u>minus</u> the amount of any cash Settlement
> Payments received (described next).  The administrative claim, however, will be
> disallowed and expunged upon termination of the RSA, unless the Government
> Parties terminate the RSA due to the Oversight Board's failure to obtain Plan
> confirmation after two attempts, in which case the administrative claim shall stop
> accruing as of the date of denial of the first confirmation attempt.  The
> administrative claim is payable in Tranche A Bonds, or in cash—at the sole
> discretion of the Government Parties.[9]
>
> b.  <u>Settlement Payments</u>:  The Supporting Holders will receive monthly cash
> payments, commencing as of August 30, 2019, of their pro rata share of an amount
> equal to the number of kilowatt hours billed by PREPA in the prior month,
> multiplied by 0.92 cents.  These payments shall be funded from a charge of 1 cent
> per kilowatt hour added to PREPA's bills to customers.  These cash payments will
> reduce the administrative claims of the Supporting Holders described above.  If the
> RSA is terminated, no further Settlement Payments will be made and the parties
> reserve all rights regarding whether Settlements Payments made to date will be
> credited towards treatment under a subsequent plan or deemed made on account of
> post-petition interest.  PREPA believes it can charge the 1 cent per kilowatt-hour

---

[8]   A Supporting Holder that joins the RSA after May 31, 2019 and prior to the entry of the 9019 Order shall receive
the Administrative Claim that starts accruing on the date the 9019 Order is entered; and a Supporting Holder that
joins the RSA after the date the 9019 Order is entered and prior to September 1, 2019 shall receive the
Administrative Claim that starts accruing on September 1, 2019.

Supporting Holders that join the RSA after September 1, 2019 shall not be entitled to an Administrative Claim or
any Settlement Payment, but shall receive the same treatment that Supporting Holders receive with respect to their
Bonds under the Plan.

[9]   Assuming all Bondholders joined on May 1, 2019, the administrative claim that will accrue until July 1, 2020, (if
no Settlement Payment are made) will be approximately $394 million.

without further legislative or Court approval, and the Court is not being asked to authorize, approve, or direct implementation of the charge.

c. <u>Increased Settlement Payments</u>:  If a Plan has not been confirmed by March 31, 2021, PREPA would (subject to any required legislative and regulatory approvals) put into effect a charge on customer bills equal to the full initial Transition Charge under the RSA.  Collections on account of the increased charge would be paid monthly and on a *pro rata* basis to each Supporting Holder who joins the RSA prior to September 1, 2019.  These increased payments would be funded by the addition of this incremental Transition Charge to customer bills, which would require legislative action of the Puerto Rico legislature.  These payments would be applied to payment of accrued administrative expense claims.  The Court is not being asked to authorize or approve this Transition Charge, only the payment of the Increased Settlement payments to the Supporting Holders.

d. <u>Adequate Protection Payments</u>:  If a Plan has not been confirmed by March 31, 2021 *and* the Puerto Rico legislature fails to enact legislation to implement the Transition Charge as described in the prior subsection, in lieu of the Increased Settlement Payments, PREPA will be obligated to make monthly cash payments to Supporting Holders in the same amount as the Increased Settlement Payments.  These payments would be funded from PREPA's revenues, and would be required pursuant to the 9019 Order (to which the Oversight Board consents pursuant to PROMESA § 305 and the Oversight Board, AAFAF and PREPA consented under the RSA).  Any such payments would be credited towards the treatment of Supporting Holders under a Plan to ensure Bondholders' overall recovery is unchanged.  *See* RSA § 2(e)(v).

e. If the RSA is terminated as to all Supporting Holders or any individual Supporting Holder, all parties reserve all rights regarding the application of the foregoing cash payments or payments on account of the administrative claims.

33.     <u>Stipulated Treatment</u>:  If the Government Parties determine the issuance of the

Tranche A and B bonds would interfere with or have an adverse impact on Transformation, they

can exercise a "Securitization Termination,"[10] in which case each Supporting Holder's claim will

---

[10]   Any Government Party may declare a Securitization Termination if any of Oversight Board, the governing board of PREPA, or AAFAF determines the Securitization Bond Treatment will impede or have an adverse impact on Transformation or the terms of the Restructuring are inconsistent with the Transformation. If a Securitization Termination occurs, the Government Parties are no longer obligated to issue Securitization Bonds and all other rights and obligations of the RSA shall terminate to the extent they relate to the Securitization Bonds. However, all other terms of the RSA survive, including the obligation of the Government Parties to provide Supporting Holders with the Stipulated Treatment, the Supporting Holders' RSA obligations to vote for a plan providing the Stipulated Treatment, and the Supporting Holders' entitlement to Administrative Claims, Settlement Payments, and other required payments.

be allowed in the amount of 73.25% of its Applicable Bond Claim.  This amount corresponds to the RSA parties' estimate of the value of the Tranche A and B bonds at the current demand projections.[11]  This enables PREPA to retain the benefit of the discount of the Supporting Holders' claims while protecting the fundamental goal of Transformation.  In this scenario the Oversight Board can propose a Plan providing the Supporting Holders a recovery of 73.25% on their Applicable Bond Claims, in whatever manner they choose.  RSA at § 2(c).

### D.  Benefits of RSA to PREPA and Its Stakeholders

34.     The RSA fulfills each of the Government Parties' goals with respect to the PREPA restructuring: a material reduction of debt and corresponding reduction of the burden on the ratepayers, a fixed debt charge insulated from downward fluctuations in demand and revenues, avoidance of future defaults and litigation risks, and Transformation.

35.     <u>Debt Reduction</u>.  The RSA will achieve a substantial reduction of the PREPA bond debt.  On its face, the RSA would provide a 67.5% recovery on the Applicable Bond Claim (which includes post-petition interest through May 1, 2019) in Tranche A bonds, a contingent 10% recovery on the Applicable Bond Claim on Tranche B bonds, plus (a) the interim Settlement Payments and additional Tranche A bonds on account of the administrative claim, which constitute a settlement of the Supporting Holders' claim to post-petition interest through the plan effective date, a settlement of Supporting Holders' pending and potential litigation on account of the Bonds, and compensation to the Supporting Holders for the time lag to plan effectiveness, and (b) the Waiver and Support Fees (1.62% of the Applicable Bond Claims), which constitute consideration for early execution of the RSA.  However, the true recovery to Supporting Holders is likely

---

[11]   *See* Brownstein Decl. ¶¶ 34-35 & n.12 (explaining that Tranche A claims will be paid in full at 67.5% and Tranche B claims are expected to be paid at 5.5%, which if added together results in a total recovery of ~73%).

materially lower.  The RSA parties estimate the Tranche B value at approximately 5.5% of the Applicable Bond Claim at current demand projections, not 10%.  Brownstein Decl. n.12.  This reduces the aggregate recovery in Tranche A and B bonds to approximately 73%.  *See id.* ¶¶ 34-35.  If demand declines more than anticipated, the value of the Tranche B bond recovery will be even lower, and possibly reduced to zero.

36.     Moreover, the aggregate recovery to the Supporting Holders (assuming 100% Bondholder participation in the RSA) under the RSA is approximately $6.82-$7.75 billion (depending on the value of the Tranche B Bonds).  Brownstein Decl. ¶ 38.  This includes the face amounts of the Tranche A and B bonds issued on account of the Applicable Bond Claims, plus the amounts of the Waiver and Support Fees, the Settlement Payments, and the Administrative Claims.  The total Bond claim, with accrued interest through the estimated exit date of July 1, 2020, is over $9.8 billion.  *Id.*  Thus, the maximum recovery to the Supporting Holders under the RSA is over $2 billion less than the claim to which the Supporting Holders assert they are entitled.  The discount could be even greater depending on the amount recovered on the Tranche B bonds.  For example, at a recovery equal to the estimated value of the Tranche B bonds at current demand projections (5.5% of the Applicable Bond Claims), the aggregate recovery to Supporting Holders is $2.5 billion less than the claim amount with full postpetition interest.  At zero recovery on the Tranche B bonds (a distinct possibility), the recovery is over $3 billion less.  *Id.*

37.     Finally, the aggregate recovery to the Supporting Holders on a present value basis shows a far more significant debt reduction under the RSA.  The present value of the debt service under the contractual terms of the legacy Bonds and the relending Bonds is higher than the present value of expected debt service on the Tranche A and B bonds by more than 41% (assuming (i) a 5.25% discount rate; (ii) unpaid principal and interest on the legacy bonds through 2021 is re-

amortized through their existing maturity as level debt service; and (iii) the baseline PREPA Fiscal

Plan energy usage projections).   Brownstein Decl. ¶¶ 49-50.   Because the RSA has a capped

charge, subject to the Demand Protections, this reduction will be even more substantial if future

PREPA energy usage declines further than projected, since the RSA shifts this demand risk from

ratepayers (who were subject to the Rate Covenant) to the Bondholders.  *Id*.   If future usage of

the utility declines 10% more than projected by the PREPA fiscal plan, the present value of the

contractual legacy bond debt service is higher than the present value of resulting debt service on

the Securitization Bonds by approximately 57%, assuming that same 5.25% discount rate and

assumptions as mentioned previously.  If future usage of PREPA energy declines 20% more than

projected by the PREPA fiscal plan, the present value of the legacy bond debt service is higher

than the present value of PREPA's expected debt service on the new bonds by approximately 76%,

assuming the same 5.25% discount rate and assumptions as mentioned previously.  *Id.*

       38.    <u>Preventing Unknown and Uncertain Rate Increases</u>. As described above, the

Securitization Bonds that replace the prepetition bonds do not have a rate covenant or similar "true

up" mechanism.  The RSA thus guards against unknown and uncertain potential rate increases by

requiring a fixed and predictable Transition Charge that does not vary based on demand (other

than as detailed in the Demand Protections) or any downturn in the Commonwealth's economy.

Jaresko Decl. ¶ 26.

       39.    The RSA also provides that, upon issuance of the Securitization Bonds, the

legislature will enact certain demand protection measures intended to provide reasonable

assurances that the Transition Charges will be paid by Customers and that the future Government

policies, for example, will not reduce Transition Charge revenues otherwise contemplated by the

Parties. The Demand Protection Term Sheet[12] describes the mechanics through which the Transition Charges are to be assessed on all of the Customers (provided that grandfathered behind-the-meter generation Customers will not be charged for their behind-the-meter electricity generation but will be charged for any power purchased from PREPA).  Under certain specific circumstances the Transition Charge could increase for paying Customers as a result of nonpayment by other Customers in three scenarios: (i) if the Government provides subsidies or exemptions from paying the full electric rate; (ii) if the Government or instrumentalities fail to pay the power bills in full; or (iii) if the general public fails to pay their bills in full (subject to a non-payment allowance of 1.5% for the general public). The point of these measures is to ensure the debt service on the Securitization Bonds is not impaired by nonpayment of electric bills.  In such circumstances, the Transition Charge would only increase for the following year, in an amount sufficient to recover past due amounts resulting from these scenarios. Once recovered the Transition Charge will be reduced back to the scheduled amount.  With a private Operator in place, the Government Parties believe the impact of non-payment or non-collection will be minimal—unlike PREPA historically, a private Operator will implement penalties such as cutting off power for nonpayment.  Brownstein Decl. ¶ 44.

40.     The difference in the potential rate burden between servicing the prepetition Bonds and the Securitization Bonds is stark.  To service the Tranche A and B bonds, the average transition charge over the term of the new bonds is fixed at 3.998 cents per kWh.  The maximum charge is 4.552 cents per kWh.  By contrast, to service the prepetition Bonds through maturity under the terms of the Trust Agreement, at the current demand projections set forth in PREPA`s certified

---

[12]   RSA, Exhibit C (Recovery Plan Term Sheet), Annex A (Securitization Term Sheet), Schedule I-A (Demand Protection Term Sheet).

fiscal plan, the average increase in rates would have to be approximately 6.19 cents per KWh, with

a maximum increase of 7.731 cents per kWh, solely to cover debt service.  Brownstein Decl. ¶ 49.

The average rate increase to service the prepetition Bonds at current demand projections is 55.2%

higher than the Transition Charge. *Id.*  If utilization declines, the difference is even greater.  At a

10% reduction in demand, the Transition Charge remains the same.  The rate increase required to

service the prepetition Bonds, however, would grow to an average of 6.878 cents, with a maximum

of 8.59 cents.   The average rate increase to service the prepetition Bonds would need to be 72.4%

higher.  *Id.* at ¶ 50.  At a 20% reduction in demand, the Transition Charge again remains the same.

The rate increase required to service the prepetition Bonds, however, would grow to an average of

7.737 cents, with a maximum of 9.663 cents, or an average of 94% higher.  *Id.* at ¶ 51.  The RSA

therefore provides a far lower burden to Puerto Rico's ratepayers than would payment in full plus

accrued postpetition interest on the prepetition bonds.

41.    Avoidance of Future Defaults.  Holders of Securitization Bonds cannot declare a

payment default if the Transition Charge does not yield sufficient funds.  Even if the issuer of the

new bonds (which will not be PREPA) does not make scheduled debt service payments (for

whatever reason other than a failure to turn over collected Transition Charge Revenues), neither

PREPA nor the securitization vehicle/issuer will be in default.  Holders of the new bonds will not

be able to invoke a rate covenant (as there will not be any rate covenant), seek receivership (there

will be no receiver remedy), or seek payment remedies. As a result, it is very unlikely PREPA will

be faced with the prospect of re-entering Title III as a result of the new securitization bonds.

42.    Avoidance of Litigation Risk.  The RSA eliminates the risk that Supporting Holders

will be successful in establishing they are oversecured and entitled to 100% payment of interest,

principal, and fees.  Supporting Holders have advanced this argument aggressively and, even if

rejected by the Court, the decision would likely be appealed, resulting in further risk, costs, and delay. The Government Parties have concluded that the RSA's elimination of this risk with respect to the Supporting Holders is a significant benefit and, along with other RSA benefits, supports the reasonableness of the RSA. Jaresko Decl. at ¶ 25; Sobrino Decl. at ¶ 24.

43.     Additionally, the RSA effectively disposes of the Receiver Motion, including the risk it poses to the Transformation process. Prospective Operators would likely question how the interests of the receiver may or may not align with the Operator's own objectives and priorities in the future management of PREPA, and how matters will be resolved in the event there are conflicting views or priorities. Prospective Operators would also likely be concerned about the effect of a receiver on the restructuring of PREPA's debt, the resulting cost to consumers, and the timing of PREPA's exit from Title III. These and other uncertainties inherent in the installation of a receiver would likely undermine prospective operator's confidence in the ultimate success of the transformation process, and its role in that process. *See* Chapados Decl. ¶ 23-24. The RSA not only resolves these uncertainties, but affirmatively requires Supporting Holders to support Transformation. Sobrino Decl. ¶ 19; RSA Section 1 (cxxi).

44.     While the Government Parties believe the Receiver Motion would ultimately be unsuccessful, they cannot predict its outcome with certainty. The Receiver Motion has included competing testimony of experts and substantial documentary and deposition discovery, which remains incomplete. If the RSA is approved, Assured is obligated to withdraw from the Receiver Motion, which will leave its proponents with insufficient holdings to maintain the motion under Section 808 of the Trust Agreement.[13] If Syncora and National, the two remaining Receiver

---

[13]     *See Financial Oversight and Management Board and AAFAF's Memorandum of Law in Support of Motion Pursuant to Fed. R. Civ. P. 12(b)(6) to Dismiss Insurers' Motion for Relief from the Automatic Stay to Seek Appointment of a Receiver* [ECF No. 975].

Motion proponents, sign on to the RSA, the Receiver Motion will be withdrawn in its entirety.[14] Eliminating the risk of placing PREPA into receivership via some future Puerto Rico court proceeding is a significant benefit to PREPA and its ratepayers, as well as Transformation. Chapados Decl. ¶ 25.

45.     Benefits to Transformation.   In addition to the benefits to Transformation of avoiding the receiver litigation, the RSA will help provide prospective Transformation counterparties with desired certainty in proceeding to complete their diligence, structure bids, and ultimately consummate the transaction.     *First*, in evaluating a potential investment, an economically rational hypothetical operator would want to understand the extent to which PREPA or its ratepayers will be responsible for payment of PREPA's pre-petition debt obligations. Chapados Declaration ¶ 20. The RSA resolves uncertainty regarding PREPA's future exposure to legacy bondholders by providing certain, quantified payments at a discount to outstanding prepetition bond debt. *Id* at *¶* 27. *Second*, a clear understanding of future financial obligations and responsibilities would be important for a potential operator, as will understanding the components of the electricity rates they would need to charge customers to satisfy operating costs, Operator compensation, and other financial obligations of the system.     *Id.* at ¶ 23. The RSA advances this goal because it establishes the rate component that will provide an acceptable recovery to supporting bondholders. *Id.*   *Third*, because the RSA is an important step towards confirming a Plan for PREPA, it furthers Transformation because an operator will likely require a confirmation order protecting it against legacy liabilities. *Id.* at ¶¶ 26-27.

---

[14]   Counsel for Syncora announced at the June 12 omnibus hearing it has reached an agreement in principal with the Government Parties. Discussions with National remain ongoing.

### E.  Limitations of Amended Proposed Order

46.    As explained in the Supplemental Joint Status Report filed in this Title III case on June 18, 2019 (ECF No. 1361), the Amended Proposed Order limits and clarifies the relief requested by the Government Parties, and should narrow the necessary and appropriate scope of discovery and the conduct and scope of the hearing on the Rule 9019 Motion.  The Amended Proposed Order does not seek approval of the RSA in its entirety, but only those aspects of the RSA that fall within the purview of the Court.  Specifically, the Amended Proposed Order would:

a.    **Not** rule on, approve, or implement rate increases, imposition of the Settlement Charge or Transition Charge, or implementation of Demand Protections or Securitization Protections.

b.    **Not** determine whether the Plan PREPA will propose for the disputed secured claims being settled is confirmable or not confirmable.

c.    Preserve for the confirmation hearing all confirmation objections of all parties in interest.

d.    Find that the settlement of disputed secured claims falls within the range of reasonableness and above the lowest guidepost of that zone.  (Amended Proposed Order ¶3.)

e.    Dismiss as to Assured and Syncora the monoline insurers' motion for stay relief to enable them to seek a receiver for PREPA.  (Amended Proposed Order ¶ 4.)

f.    Approve the Settlement Payments and Adequate Protection Payments to be made before confirmation.  (Amended Proposed Order ¶ 5.)

g.    Approve the granting of certain Administrative Claims.  (Amended Proposed Order ¶ 6.)

h.    Allow secured claims of the Supporting Holders to the extent set forth in the RSA. (Amended Proposed Order ¶ 7.)

i.    Approve the accrual of Administrative Claims after the Delayed Implementation Date.  (Amended Proposed Order ¶ 8.)

j.    Expunge and disallow Administrative Claims on certain conditions. (Amended Proposed Order ¶ 9.)

k.     Exculpate certain parties for acts and omissions in connection with the Stay Motion, Settlement Motion, Dismissal Motion, the RSA and the Tolling Agreement.  (Amended Proposed Order ¶ 10.)

l.     Require that, following Court approval of the Disclosure Statement, each Supporting Holder vote in favor of the Plan.  (Amended Proposed Order ¶ 13.)

m.     Provide that no party other than Government Parties shall bring a lien challenge while the RSA is in effect.  (Amended Proposed Order ¶ 11.)

## F.  Consummation of the Exchange

47.     To address specific topics raised by the Court and various parties at the June 12 Conference, Movants reiterate that the Amended Proposed Order does not implement any of the measures required to impose and collect the Settlement Charge or the Transition Charge,  issue the Tranche A and B bonds or consummate the exchange.  The Rule 9019 Motion does not seek approval of the Settlement Charge or the Transition Charge; PREPA will implement those charges consistent with Puerto Rico law, and will obtain the requisite approvals (if any) from the Puerto Rico Energy Bureau ("PREB") and/or the Puerto Rico Legislature, as applicable.  The Rule 9019 Motion also does not seek approval of the securitization vehicle and its various securitization protections and provisions or the demand protection measures, because these terms will be implemented in connection with confirmation and consummation of an eventual Plan through legislation, the issuer's by-laws, and the other transaction documents supporting confirmation and the issuance of the new bonds once approved by the confirmation order.  RSA Ex. C (Recovery Plan Term Sheet- includes Transition Charge); Schedule I-A (Demand Protections), Schedule I-B (Securitization Protections).  While the Government Parties have agreed to propose a Plan that includes the Transition Charge, Demand Protections, and Securitization Protections, and the Supporting Holders have agreed to support a proposed Plan consistent with the RSA, the RSA itself does not implement these provisions. The Government Parties agree to take steps to implement these items, but they will not take effect unless and until (1) supporting legislation

25

(either a new act or an amendment to existing law) is passed and (2) this Court enters an order confirming a Plan. To the extent any creditors or third parties have concerns about the Transition Charge, Demand Protection, and Securitization Protections, they will have an opportunity to be heard (1) by participating in the legislative process before the Puerto Rico Legislature with respect to supporting legislation; or (2) at plan confirmation proceedings before this Court, as may be permitted by the Court consistent with the relevant legal standards.

## SUPPLEMENTAL ARGUMENT

### A. Satisfaction of Requirements for Approval of Settlements

48.     A motion to approve a compromise or settlement pursuant to Bankruptcy Rule 9019 requires the Court to assess "whether the [proposed] settlement falls below the lowest point in the range of reasonableness." *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,* 360 F. Supp. 3d 65, 68 (D.P.R. 2019) (hereinafter, "*Whyte*") (quoting *Ars Brook, LLC v. Jalbert (In re Servisence.com, Inc.)*, 382, F.3d 68, 71-82 (1st Cir. 2004)). Here, the question presented by the 9019 Motion to the Court is narrow: whether the settlement of the disputed secured claims of Supporting Holders is anywhere in the range of reasonableness. *Whyte*, at 68.

49.     To guide courts in determining the reasonableness of a Rule 9019 settlement, the Supreme Court has set forth a multi-factor test to assess the value of the claim being settled and balance it against the value to the debtor of the approval of the settlement. *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).[15]  In the context of commercial bankruptcies, courts in the First Circuit have adopted the test from *TMT*

---

[15]  In *TMT Trailer*, the Supreme Court set forth the following factors: (a) the probability of success in the litigation; (b) the complexity, expense and likely duration of the litigation; (c) the possibilities of collecting on any judgment which might be obtained; (d) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and (e) whether the proposed compromise is fair and equitable to the debtors, their creditors, and other parties in interest. *Id.*

*Trailer* to consider four factors in assessing the reasonableness of a settlement: "(i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection [of the disputed funds]; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views . . . ." *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995); *Whyte* at 75 (quoting *Jeffrey*).

50.      In performing its inquiry, the Court should not impose its own view of what the optimal resolution of the dispute could have been.  *Whyte* at 75.  Rather, the Court should be deferential to the judgment of the Government Parties and consider "whether the parties whom the U.S. Congress and the people of Puerto Rico have empowered to make decisions for the Commonwealth (that is, the Oversight Board and Puerto Rico's governor and legislature) have reached a negotiated result that is within the range of reasonable results."  *Id.*

51.      Moreover, the Court need not explore whether the RSA leaves PREPA with "enough resources to reorganize its own financing" because such concerns "are not pertinent to the one question that is before the Court on this motion practice: the reasonableness of this settlement."  *Whyte*, at 78.  The question of whether PREPA "can gather or generate sufficient additional resources to propose a feasible plan of adjustment is one to be addressed in the future and does not weigh in the evaluation of this Settlement."  *Id.* at 78-79.   Indeed, while it is easy to understand why objectors want to know how much more PREPA can pay before the objectors negotiate, the issue of 'what's left' is no more material to the instant motion than it is appropriate for PREPA to announce before it negotiates.  As explained above, at the confirmation hearing, the Court will find either the Plan pays objectors enough, or it does not.  That issue is not ripe now.  It

is ironic that objectors are the ones attempting to introduce confirmation issues into a hearing on settlement of the disputed secured claims.

52.     Here, all four *Jeffrey* factors demonstrate the limited components of the RSA the Court is being asked to approve are within the range of reasonableness.

> **1.     The RSA is a Reasonable Compromise Given the Uncertain Probability of Success and Significant Consequences of an Adverse Outcome in Pending and Anticipated Litigation**

53.     The first *Jeffrey* factor concerns "the probability of success in the litigation being compromised."   In examining this factor, courts look to the legal and evidentiary obstacles to litigating the claim. *In re Healthco Int'l, Inc*., 136 F.3d 45, 50 (1st Cir. 1998).   In addition, the probability of success is measured against the "definitive, concrete and immediate benefit" that a settlement provides against the uncertainty and delay of litigation. *See Yacovi v. Rubin & Rudman, L.L.P. (In re Yacovi)*, 411 Fed. Appx. 342, 346-47 (5th Cir. 2011) (citing *In re Healthco Int'l, Inc.*, 136 F.3d 45, 50 (1st Cir. 1998)).

54.     In its consideration of the first *Jeffrey* factor in *Whyte*, this Court recognized that "[b]oth sides presented strong arguments in the litigation, and success was far from certain for the Commonwealth."   Importantly, the Court took into account the significant consequences of an adverse outcome in the litigation, observing that "[i]n the absence of a consensual resolution…a litigated outcome would likely have produced an 'all-or-nothing' result.   If the litigation had proceeded, the result for the Commonwealth could have been significantly worse than the compromise presented."  *Whyte*, at 77.

55.     Here, the "litigation being compromised" includes the Receiver Motion and all potential litigation that could stem from Supporting Holders' assertion they are oversecured, entitled to 100 cents on the dollar (plus interest and fees), and their security extends to covenants under the Trust Agreement.

56.     In assessing the probability of success, the Government Parties considered its many strong arguments against the creditors' arguments.  For instance, with respect to the secured claim objections, while the Government Parties believe that net revenues were negative at all relevant junctures, the creditors may argue that PREPA's cash flows have improved since the Petition Date (meaning, there are net revenues), that the bondholders' lien continues to float pursuant to section 928(a) of the Bankruptcy Code, that certain expenses are not payable as Current Expenses under the Trust Agreement or as necessary operating expenses under section 928(b), and that Puerto Rico law mandates that revenues must be sufficient to cover debt service and certain operating expenses. With respect to confirmation, creditors would argue that Title III's best interest test requires the Court to consider what creditors would recover under Puerto Rico law, which requires rates be adjusted to cover debt service on the bonds and related obligations.  Significantly, PROMESA § 314(b)(6) speaks in terms of considering what all creditors recover and not one particular class, and the requirement to "consider" that amount is different from that amount constituting a floor. Nevertheless, it was obvious there were real risks under a new, uninterpreted statute, and the Government Parties could avoid future confirmation risks by having creditors agree in advance to cap their allowed claims at material discounts.

57.     In determining the reasonableness of the RSA settlement, the Government Parties weighed the considerable benefits of the RSA discussed in Part D above, against the consequences of losing pending and potential litigation, as well as the prospect of the Supporting Holders' inevitable objections to PREPA's plan for adjustment.

58.     The benefits of the RSA the Government Parties considered are extensive, and include, among other things: (i) reduction of PREPA's total secured debt (assuming accrued interest through July 2020) by $2-3 billion or 20-30%, (ii) dismissal of the pending Receiver

Motion as to Supporting Holders (and likely dismissal as to the remaining Movants), (iii) elimination of litigation risk through the settlement of all of Supporting Holders' rights under the Bonds, (iv) a fixed Transition Charge that insulates PREPA's ratepayers from uncapped future rate increases for debt service, (v) a "no payment default" bond structure that limits the prospect of PREPA reentering Title III in the future, and (vi) certainty regarding PREPA's future financial obligations, thereby paving the way to a plan of confirmation and Transformation.  *See* Jaresko Decl. ¶ 19; Sobrino Decl. ¶¶ 20-23.

59.     Conversely, the Government Parties recognized that a failure to obtain approval for the RSA could lead to a myriad of negative consequences that, in the Government Parties' judgment, harm PREPA and its stakeholders.  *First*, failure to approve the RSA would cost PREPA the significant benefits of the RSA described herein, and would enable Supporting Holders to proceed with the Receiver Motion and other potential litigation and pursuit of contractual and statutory remedies against PREPA as if no deal had ever been reached.  The continuance of time-consuming and resource-intensive litigation drains all parties' resources, unravels the considerable progress towards an exit from Title III that has occurred to date, and clouds PREPA's future prospects for Transformation due to the possibility of a receiver, and reducing clarity as to PREPA's restructuring of its legacy obligations. *See* Chapados Decl. ¶ 25.    Even if the Government Parties succeed in defeating the Receiver Motion, the Lien Challenge, or in a confirmation fight, the Government Parties recognized that a lengthy appeal process would likely ensue with its attendant risk.  Jaresko Decl. ¶ 29; Sobrino Decl. ¶¶ 21, 23; *see also In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 914 F.3d 694 (1st Cir. 2019) (holding financing statement amendments filed by ERS bondholders, together with initial statements, satisfied requirements for perfection of bondholders' security interest) (*certiorari* petition pending).

60.     *Second*, continued litigation of the Receiver Motion poses a risk for PREPA even though the Government Parties believe the motion is unlikely to be successful.  Imposition of a receiver would disrupt PROMESA's delicate power-sharing arrangement between the Commonwealth government and Oversight Board that this Court has repeatedly recognized by inserting a receiver into the mix arguably beholden to a subset of creditor interests. In addition, PREPA's day-to-day operations require close cooperation between PREPA's management team and multiple government agencies.  Inserting a receiver, who would have no pre-existing relationship with any of these entities, would necessarily cause disruption, confusion, and uncertainty that would harm PREPA.  The need to get a receiver up-to-speed on PREPA's myriad ongoing operational improvement initiatives would also compromise those efforts. Sobrino Decl. ¶¶ 9-10. On its face, the receivership statute allows the receiver to exercise overarching operational and governance powers[16] that may interfere with the Oversight Board's and AAFAF's ability to carry out their respective statutory authority (under PROMESA and Puerto Rico law, respectively), and would likely prejudice the Government Parties' goals for PREPA's restructuring and Transformation.

---

[16]   The receivership statute provides:

> The receiver so appointed shall forthwith, directly or by his agents and attorneys, enter into and upon and take possession of such undertakings and each and every part thereof, and may exclude the Authority, its Board, officers, agents, and employees and all persons claiming under them, wholly therefrom and shall have, hold, use, operate, manage, and control the same and each and every part thereof, and, in the name of the Authority or otherwise, as the receiver may deem best, shall exercise all the rights and powers of the Authority with respect to such undertakings as the Authority itself might do. Such receiver shall maintain, restore, insure, and keep insured, such undertakings and from time to time shall make all such necessary or proper repairs as such receiver may deem expedient, shall establish, levy, maintain, and collect such rates, fees, rentals, and other charges in connection with such undertakings as such receiver may deem necessary, proper and reasonable, and shall collect and receive all income and revenues and deposit the same in a separate account and apply the income and revenues so collected and received in such manner as the court shall direct.

Authority Act § 17.

61.     *Third,* establishing Bondholders' collateral either has no value or has not
diminished in value as a result of the automatic stay (as PREPA asserted in its defense of the initial
receiver motion) is a far different inquiry than valuation of secured claims for confirmation
purposes, where Bondholders will likely contend, among other things, that net revenues will be
positive in the future, that (under the "best interests" test) their statutory and contractual rights
would entitle them to take measures outside of Title III that would increase their collateral value,
and that, as special revenues backed by a continuing stream of revenue, the full present value of
their future worth must be paid.[17]  Even if the Government Parties were to succeed on these issues
in this Court and in any appeal, Bondholders would still potentially hold unsecured claims and
would be provided with *pro rata* recoveries under a Plan that meets the requirements of
PROMESA.  The degree to which PREPA's victory in these matters would reduce Supporting
Holders' treatment to a level below the treatment provided for in the RSA is therefore unclear.

62.     In determining whether the settlement of the Supporting Holders' claims under the
RSA fits within the "goal posts" of reasonable outcomes without the settlement, the Government
Parties were cognizant they would have to "run the board," and be successful in all potential
litigations against Bondholders to reduce Bondholders' recoveries, and the extent of such reduction
even if the Government Parties succeed in all these disputes is unclear.  Jaresko Decl. ¶ 33.  Even
a complete victory would come at great expense to PREPA, would likely come too late to avoid

---

[17]  *See, e.g., In re Heritage Highgate, Inc.*, 679 F.3d 132, 143 (3d Cir. 2012) (affirming the bankruptcy court's
conclusion "that the fair market value of the [collateral] as of the confirmation date controls whether the [creditor's]
claims are secured or not"); *In re Ahlers*, 794 F.2d 388, 400 n.14 (8th Cir. 1986), *rev'd on other grounds sub nom.*,
*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988) ("[t]he allowed
secured claim will equal the value of the collateral at the time the plan is confirmed" in a Chapter 11 cram-down);
*Houston Sportsnet Finance, L.L.C. v. Houston Astros, L.L.C. (In re Houston Reg'l Sports Network, L.P.)*, 886 F.3d
523, 531 (5th Cir. 2018) ("That § 506(a) valuations may be made at different times under different circumstances
does not lessen the force of the Third and Eighth Circuit holdings that the appropriate valuation date is the date of
plan confirmation in the Chapter 11 cramdown context.").

delaying Transformation, and would bring no assurances the Supporting Holders would not interfere with Transformation.[18]

63.     Moreover, while the Government Parties recognized they had strong legal arguments that Supporting Holders' security interests were limited as of the Petition Date, success is not guaranteed.  Jaresko Decl. ¶ 33.  If Supporting Holders' were to succeed in persuading the Court they are oversecured and, as a consequence, entitled to full payment of principal and interest (including post-petition interest) under any Plan, it would have a devastating impact on PREPA and its ability to emerge from Title III and it would subject PREPA's electricity rates to unrestrained increases to pay debt service.  *See* Brownstein Decl. ¶ 45.

## 2.     The RSA is a Reasonable Compromise Given the Solid Benefits to PREPA and the Elimination of the Complexity, Risk, Expense, and Inconvenience of Litigation

64.     The third *Jeffrey* factor,[19] which is closely related to the first, involves an analysis of "the complexity of the litigation involved, and the expense, inconvenience and delay attending it."  Here, the complexity of the unresolved issues between PREPA and its Bondholders is evident by not only the difficulty of the several legal issues involved, but also the number of parties involved, the multiple actions that have been filed, the significant costs incurred, and the ramifications of delay in resolving the pending and anticipated contested matters. The issues presented by the pending and anticipated litigation are novel and complex, hotly disputed

---

[18]   Sobrino Decl. ¶ 21.  Moreover, a complete victory by PREPA in the Adversary Complaint could also preclude PREPA's ability to obtain financing in the future, which could arguably harm PREPA's ability to finance its operations and improvements to its system.  See In re City of Detroit Mich., 524 B.R. 147, 190 (Bankr. E.D. Mich. 2014) (noting that in context of UTGO settlement pursuant to Bankruptcy Rule 9019, if the City had prevailed in its litigation the "City may have lost access to the capital markets when it emerges from bankruptcy or it may have been required to pay higher interest rates for bond debt."); PROMESA § 101(a) (The purpose of the Oversight Board is to provide a method for a covered territory to achieve…access to capital markets.").

[19]   The second *Jeffrey* factor, which requires the court to consider the difficulties, if any, to be encountered in the matter of collection (70 F.3d at 185) is not implicated here because PREPA is not seeking to collect on any claim against the Supporting Holders.

(including by competing expert viewpoints) and raise mixed questions of federal and Puerto Rico law.

65. <u>The Initial Receiver Motion</u>. The Supporting Holders originally sought stay relief in July 2017 to appoint a receiver to take control of PREPA and raise rates (the "<u>Initial Receiver Motion</u>"). This Court denied relief. But, by the time the First Circuit heard the creditors' appeal, significant facts had changed and the appellate court ruled that if the creditors wanted a new hearing the Court should consider (i) the prepetition value of the Bondholders' collateral (if any valid security interests exist); (ii) whether the bondholders face a threat of uncompensated diminution in such value; (iii) whether the bondholders are seeking the protection of existing collateral or, instead, the creation of new collateral; and (iv) what, if any, adequate protection PREPA can offer short of a receiver being appointed to manage it if protection is warranted. *See Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. For P.R.)*, 899 F.3d 13 (1st Cir. 2018) The First Circuit also approved the Court's consideration of the Second Circuit's *Sonnax* factors *Id.* at 23-24.

66. <u>The Receiver Motion</u>. Through the Receiver Motion, certain monoline insurers of PREPA Bonds seek an order lifting the Title III stay to request appointment of a receiver with sweeping powers that would assume full operational control over PREPA's day-to-day affairs. In conducting the *Sonnax* analysis, the Court would likely need to consider arguments regarding the pros and cons of the appointment of a receiver. The monolines assert that such relief is warranted, because, among other things, PREPA has purportedly engaged in a pattern of mismanagement and political interference that has resulted in significantly depressed revenues, deficient recovery efforts post-Hurricanes Irma and Maria, and below industry-standard efficiency and operations.

67.     While the monolines assert that professional and independent management is sorely needed at PREPA, even in the best case scenario, a receiver "no matter how technically qualified or professionally experienced…would face a daunting task in comprehending the status of myriad ongoing initiatives, assessing their merit and formulating his or her best strategy for the future." Sobrino Decl. ¶ 11.  The Government Parties believe a receiver would greatly interfere with PREPA's Transformation as it would inject yet another player into an already complicated mix at a critical juncture,[20] and such receiver would be beholden to the interests of a subset of creditors rather than to PREPA's mandate to promote the general welfare and prosperity of Puerto Rico.

68.     Per the First Circuit's instructions on remand, consideration of the merits of the Receiver Motion will require an intensive analysis of the scope of Bondholders' collateral (including any perfection issues related thereto), the prepetition value of such collateral, if any, whether such collateral has diminished in value or may diminish in value due to PREPA's alleged mismanagement, and whether the creditors were trying to protect existing collateral value or to create new collateral value.  Analysis regarding the diminution of the value of collateral as a result of the automatic stay could be considerably complex as it may account for any diminution to PREPA's revenues caused by Hurricanes Irma and Maria and "back out" any diminution allegedly caused by PREPA's mismanagement, if any.[21]  Moreover, because the monolines have also alleged

---

[20]   *See* Sobrino Declaration ¶ 10 ("Injecting a receiver, who would not have any preexisting relationship with any of these agencies, into PREPA's operations would necessarily cause disruption, confusion, and uncertainty that would harm PREPA.").

[21]   A creditor is entitled to adequate protection only to the extent the automatic stay has resulted in a decrease in the value of their collateral.  A creditor is not entitled to adequate protection for diminution in collateral value due to other factors, such as *force majeures*, unrelated to the stay.  *See Matter of Cont'l Airlines, Inc.,* 154 B.R. 176, 180 (Bankr. D. Del. 1993) ("Read together, sections 361(1) and 362(d)(1) provide that a party in interest shall be granted adequate protection *when the continuation of the automatic stay causes* that party to suffer a decrease in the value of its property interest. In other words, a party can be granted relief from the stay if his interest is not adequately protected; if that request for relief from the stay is not granted, and the value of the collateral is declining, adequate protection may be required.")(citing *United Savings v. Timbers of Inwood Forest,* 484 U.S. 365 (1988)) (emphasis in original).

35

that cause generally exists to lift the automatic stay (independent from any lack of adequate protection), the Court will also need to analyze the merits of the monolines' factually intensive allegations of mismanagement and political interference and weigh it against the strides PREPA believes it has made under post-petition management to rectify past inefficiencies and move towards Transformation.

69.     In addition to the morass of complex legal and factual issues the Court could evaluate to determine the merits of the Receiver Motion, continued prosecution of the motion would result in significant "expense, inconvenience, and delay." *Jeffrey*, at 185.  Litigation regarding a receivership has been ongoing for nearly two years.  During this time, the parties have engaged in substantial deposition and documentary discovery, with more discovery set to take place should the Court not grant the pending motion to dismiss.  If the Receiver Motion proceeds to hearing on the merits, an evidentiary hearing with numerous fact and expert witnesses would be required.  If the Government Parties prevail, appeal to the First Circuit would likely ensue.  Alternatively, if the monolines prevail in lifting the stay, they would still need to apply to the appropriate court in Puerto Rico to seek appointment of a receiver.  In such circumstance, not only would the Government Parties likely appeal the Title III Court's decision, they would also heavily litigate the case before the Puerto Rico court.  That decision, too, may be the subject of appeal.  During this period, the Transformation and PREPA's restructuring would be caught in limbo.  Moreover, the expense of litigating these issues alone would be enormous.  The Oversight Board and AAFAF have incurred millions of dollars in legal, advisory, and professional fees in litigation issues relating to the receiver motion.  The RSA thus spares PREPA from substantial additional litigation expenses and delay, with such resources being available to facilitate PREPA's transformation and other restructuring efforts.

70.    Lien Challenge.  The Bondholders have asserted their claims are backed by a perfected pledge of all PREPA's revenues—not just PREPA's current "depressed" revenues but PREPA's future, improved revenues—and that such revenues constitute "special revenues" under the Bankruptcy Code.  As "special revenues," Bondholders assert their secured claims cannot be impaired through a plan of adjustment, and that, under the U.S. Constitution, they have a constitutional right to have rates set to protect their capital investment.  Bondholders further assert their collateral consists of a statutory receiver remedy (the "Receiver Remedy") and certain covenants, including the Rate Covenant and PREPA's promise to make reasonable efforts to collect on bills rendered for its services (the "Collection Covenant").  They believe they have a blanket lien on gross revenues and that their agreement to permit payments on certain current expenses does not subordinate them to current expenses in Title III.  While the Government Parties believe the Bondholders are wrong on virtually each of the foregoing issues, there is substantial litigation risk, as there always is in any complex litigation.  If, as discussed below, the Government Parties were to prevail on their argument that Bondholders' collateral is confined to PREPA's net revenues actually deposited in a Sinking Fund and does not include contractual obligations of PREPA, then a Bondholder appeal would certainly follow.

71.    The Government Parties assert that, pursuant to the Trust Agreement, Bondholders' security interest is confined to monies actually deposited in a Sinking Fund.  The Government Parties also assert the Bondholders' collateral does not include contractual covenants such as the Rate Covenant and Collection Covenant, nor does it include the statutory Receiver Remedy.  The Government Parties' position is more fully set forth in Adversary Complaint.

72.    There is much at stake in the Lien Challenge.  If the Bondholders prevail, they will have a secured claim of almost $10 billion (with accrued interest through July 2020).  Brownstein

Decl. at ¶ 38.  If the Government Parties fully prevail, the secured claim will be limited to the cash in certain specified accounts.  The result could also fall in the middle, e.g. a lien on all net revenues, with a value greater than the cash in the Sinking Fund, but potentially less than the full claim.  Litigating to a conclusion either way, including appeals, will be complex, expensive, time-consuming, and risky.  Settling the secured claim under the terms discussed above represents a reasonable outcome to the risk-benefit analysis.

### 3.   The RSA is in the Paramount Interest of PREPA's Creditors and Stakeholders

73.   Under the fourth *Jeffrey* factor, courts consider the paramount interest of the creditors and accord proper deference to their reasonable views.  *Jeffrey*, 70 F.3d at 185.  In interpreting this factor in the context of the Commonwealth-COFINA Dispute, this Court considered "the best interests of the Commonwealth's creditors, including its employees, retirees, recipients of public benefits and services."  *Whyte*, at 78.  There, even though the Court noted that the compromise was "deeply disappointing to countless citizens of Puerto Rico and investors in Commonwealth bonds" (*Whyte*, at 69), it nonetheless approved the settlement because it found (i) creditors will receive a substantial portion of sales tax revenues, (ii) the risk of a judgment that might have left creditors with none of the sales tax revenues was negated, and (iii) creditors will benefit from relief from costly litigation that would otherwise continue and eat away at the financial resources available to service the Commonwealth's obligations."  *Whyte*, at 78.  As the First Circuit observed in approving a Bankruptcy Rule 9019 settlement: "[s]ettling quickly for $12,000 allowed the trustee to distribute something to creditors.  In bankruptcy, as in life, half a loaf is sometimes better than none." *In re Am. Cartage, Inc.*, 656 F.3d 82, 93 (1st Cir. 2011).

74.   As a preliminary point, the RSA is in the best interests of holders of PREPA's largest liability—its Bondholders—who hold over 82% of all PREPA's debt.  It resolves costly

and uncertain litigation (as discussed in detail above), in return for a substantial reduction in their claims and myriad other benefits described herein. Notably, approximately 72% of PREPA's bondholders have already joined the deal, thus evidencing that they have evaluated the strengths and weaknesses of their claims and believe the compromises embodied by the RSA—including the significant haircut to their allowed claims, the "no payment default" structure of the Securitization Bonds, and the lack of industry-standard rate and collection covenants—to be acceptable even though they assert they are entitled to 100% of their claims, plus interest, and that such claims are unimpairable in bankruptcy. Brownstein Decl. ¶ 22. Furthermore, an agreement in principle has been reached with Syncora, which is expected to be formalized in an amendment to the RSA to be executed prior to the hearing on the 9019 Motion. *Id.* Discussions with National are also ongoing, though an agreement in principle with National has not yet been reached. That Bondholders are gradually joining the RSA while others initially opposed the RSA or remain reluctant to do so indicates the RSA constitutes a fair compromise from all parties' perspective.

75.    The RSA is also in the best interests of PREPA's objecting creditors and stakeholders more broadly. *First,* Supporting Holders have agreed to a substantial discount on their bond claims. *Id.* ¶ 36. Assuming all PREPA bonds are subject to the RSA, PREPA reduces its liability on its total secured debt by $2 billion to $3 billion, or 20-30%. *Id.* ¶ 39.

76.    *Second*, by binding the Supporting Holders to support a Plan containing the treatment specified in the RSA, it negates the risk of a valuation fight with Bondholders that could result in a finding that Bondholders are fully secured and entitled to 100% of their principal claims plus interest. As detailed in the Brownstein Declaration, if PREPA had to issue a bond to service such obligations, it would likely be a revenue bond that would require an increase to rates by 6.19

39

– 7.731 kWh at current load projections.  Such a result would be far more burdensome to PREPA's ratepayers.

77.     *Third*, the RSA settles the Receiver Motion as to the Supporting Holders and provides for the Supporting Holders' forbearance from exercising any rights under the Bonds, including attempts to invoke the Receiver Remedy, Rate Covenant, and Collection Covenant, during the pendency of the Title III case.  This outcome provides PREPA and its stakeholders the benefit of stability going forward, relief from costly litigation and thus preserves financial resources otherwise available for creditors' recovery.

78.     *Fourth*, the RSA will help further PREPA's Transformation—a critical initiative to transform PREPA into a dependable and efficient energy provider that will redound to the benefit of all of Puerto Rico's stakeholders.  As detailed in the Chapados Decl., the RSA facilitates Transformation by providing a potential Operator with clarity on, among other things, (i) PREPA's future emergence from Title III, (ii) a resolution of PREPA's substantial legacy debt, (iii) Supporting Holders' attempt to impose a receiver on PREPA; and (iv) the projected costs that will need to be included in PREPA's rates to customers post-closing, including any additional charges to satisfy restructured debt.  Chapados Decl. ¶ 17.

79.     *Fifth*, the RSA benefits PREPA's ratepayers by protecting against rate spikes through a fixed transition charge that gradually increases on a set schedule for the next 40 years. Brownstein Decl. ¶ 32.  The gradual increases have been published in the publicly available RSA and will remain available to PREPA customers.  *Id.*  The Transition Charge will not continue in perpetuity, rather it will only continue on PREPA bills until the Tranche A bonds are satisfied in full, or until the Tranche B mature (forty-seven years from issuance, if not already paid off), whichever is later.  *Id.*  PREPA's other creditors and stakeholders are benefitted by this structure,

which avoids higher, floating rates required to comply with the Trust Agreement and thus will enhance customer collections.

80.     *Finally*, the "no payment default" structure of the Securitization Bonds is a significant benefit.  It protects against the possibility PREPA would re-enter Title III on account of a default on the Bonds.  Such a result benefits all PREPA's stakeholders and Puerto Rico's citizens by providing added assurance of a restructured and transformed PREPA's ability to maintain operations and service its debts without the specter of a spike in rates or the imposition of a receiver potentially beholden to creditors' interests.

**B.  Authority of the Court to Approve RSA Terms**

81.     The RSA contemplates both an interim truce and a permanent peace agreement. The peace agreement – allowance and treatment of bondholder claims – is permanent only upon consummation of a plan, since the Government Parties have the right to terminate the RSA if the Oversight Board fails to confirm a plan after good faith efforts, as set forth in the RSA.  The truce – settlement of pending motions for relief from stay and agreement not to litigate in the future – is effective immediately.   In return, the Government Parties have agreed PREPA will make the Settlement Payments and, as needed, Increased Settlement Payments or Adequate Protection Payments (together, the "Interim Payments"), plus accrual of administrative claims as described above.

**1.      The Court has the Authority to Issue the Amended Proposed Order**

82.     Under PROMESA, the Court has the power to approve the limited components of the RSA that are the subject of the Amended Proposed Order as part of a Rule 9019 settlement. *See* PROMESA § 310 (applying the Bankruptcy Rules, including Rule 9019, to a PROMESA Title III case).  Because a trustee's power to settle compromises is contained in Rule 9019 and not by

any provision in the Bankruptcy Code, the terms of any such settlement cannot be contrary to any provision of the Code. *See Hicks, Muse & Co. v. Brandt (In re Healthco Int'l)*, 136 F.3d 45, 50 n.4 (1st Cir. 1998) ("Although Bankruptcy Rule 9019 purports to empower the bankruptcy court to approve settlements, it may not 'abridge, enlarge, or modify any substantive right [enacted in the Code].') (citing 28 U.S.C. § 2075 (emphasis added)). Here, each of the limited RSA components that are part of the "peace agreement" for which approval is sought are rooted in and supported by the Court's powers under PROMESA, the Bankruptcy Code, and the applicable jurisprudence:

83.     <u>Allowance and Settlement of Supporting Holders' Claims and Litigation (Order at ¶¶ 4, 7)</u>. The RSA allows Supporting Holders' secured claims at a substantial discount in exchange for the settlement of Supporting Holders' rights under the Bonds. The Court has the power to approve settlements of proofs of claims and claims to adequate protection under sections 361, 502, 503, 506(b) and Rule 9019,[22] as indicated by the approval by many courts of such settlements in other bankruptcy cases. *See, e.g., Energy Future Holdings Corp. v. Del. Trust Co.*, 648 Fed. Appx. 277, 285 (3d Cir. 2016) (affirming approval under Rule 9019 of holistic settlement of secured creditors' claims); *In re Dana Corp.*, Case No. 06-10354-BRL, ECF 3441 (Bankr. S.D.N.Y. Aug. 2, 2010) (approving plan support agreement that settled claims under collective bargaining agreement); *In re Apollo Steel Co.*, 1994 Bankr. LEXIS 1983 at *21 (Bankr. N.D. Ill. 1994) (approving settlement of secured claims under Rule 9019); *In re City of Stockton*, 486 B.R. 194, 199-200 (Bankr. E.D. Cal. 2013) (approving settlement of litigation under Rule 9019 in Chapter 9

---

[22]     *See Gardner v. State of N.J.*, 329 U.S. 565 (1947) ("Through the appropriate exercise of [the power to compromise], the court may authorize the trustee to compromise claims, secured or unsecured, and may approve equitable adjustments of them, and so reduce or otherwise affect the participation that the claimant, whether a State or another, may have in the res which is in custodia legis.").

case after debtor consented under section 904); *In re City of Detroit*, 2014 Bankr. LEXIS 5439

(Bankr. E.D. Mich. 2014) (approving settlement under Rule 9019 in chapter 9 case).

84.     Waiver and Support Fees (Order ¶ 7).  The RSA contemplates allowance of a claim

for fees to be paid to Supporting Holders on the effective date of a Plan.  Under PROMESA section

305, and because PROMESA does not incorporate Bankruptcy Code section 363, PREPA is

entitled to use its property without court approval and thus could pay the Waiver and Support Fee

today in cash.  Despite PREPA's ability to pay, the Government Parties are asking the Court to

exercise its authority to approve the Waiver and Support Fees as an allowed claim now for two

important reasons: first, it allows PREPA to defer its obligation to pay until after confirmation,

and second, it allows the Government Parties to make final allowance of the Waiver and Support

Fee contingent on confirmation of a Plan.

85.     The Government Parties believe that payment of these fees is a reasonable exercise

of their judgment, in recognition of past and ongoing contributions that Supporting Holders made

to PREPA's restructuring and costs incurred in doing so, including in the negotiations of the

RSA.[23]  The amount of the waiver and support fees are reasonable.  In total, those fees represent

only 1.6% of the face amount of undiscounted bonds claims as of May 1, 2019.

86.      Exculpation (Order at ¶ 10).  The Amended Proposed Order provides for a limited

exculpation of the Trustee and Supporting Holders for actions concerning the entry into of the

RSA.  The Court has the power to grant releases and exculpations under Rule 9019, as this Court

has held before.  *See Memorandum Opinion and Order Approving Settlement Between

Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation*, Case No. 17-

---

[23]   Certain Supporting Holders have given up real economic consideration in exchange for entering into the RSA.
For example, its members voluntarily agreed to lock up their bonds for months at a time – first from May through
July 2018, and then from October 2018 through May 2019.

3283, ECF 5045 (D.P.R. Feb. 2, 2019) (approving releases in settlement pursuant to Rule 9019).

The Court may grant exculpation pursuant to the doctrine set forth in *Barton v. Barbour*, 104 U.S.

126 (1881), which provides the court has the power to adjudicate the liability of court-approved or

court-appointed officers.   Cases have used this doctrine to justify exculpation provisions in

reorganization plans.   *See, e.g., In re Nat'l Heritage Found., Inc.*, 478 B.R. 216 (Bankr. E.D. Va.

2012) (finding that proposed exculpation provision was consistent with the Barton Doctrine, which

requires leave of court before a receiver or bankruptcy trustee or its professionals can be sued);

*Carter v. Rodgers*, 220 F.3d 1249, 1252 n.4 (11th Cir. 2000) (finding *Barton v. Barbour* doctrine

applied to any court approved officials or professionals).   Here, the exculpations are limited and

entirely justified, extending only to the Supporting Holders' and Trustee's actions *relating to the

RSA*.   They are not as expansive as the exculpation or third party release terms usually contained

in chapter 11 plans, which often exculpate all debtors' and certain other parties' agents and

professionals.   Moreover, there is a clear need for these exculpations, to ensure the exculpated

parties are not subject to liability by (*e.g.* non-settling Bondholders) for taking actions to settle

their claims.

87.     Obligation to Vote for the Plan (Order at ¶ 13).   The RSA binds each of the

Supporting Holders to support a Plan that provides them the treatment provided in the RSA if

PREPA is otherwise in compliance with the RSA.   This obligation arises from contract, and a Title

III debtor retains its rights in bankruptcy to enter into contracts in or out of the ordinary course.

The Court has the power to approve this aspect of the settlement pursuant to Rule 9019.   Indeed,

numerous bankruptcy courts have approved plan support agreements binding settling creditors to

support a plan of adjustment, similar to the RSA.   *See, e.g., In re Chemtura Corp.*, Case No. 09-

11233-REG, ECF No. 3527 (Bankr. S.D.N.Y. Aug. 9, 2010) (approving plan support agreement

with obligation to vote in favor of plan providing certain treatment); *In re Tronox Inc.*, Case No.

09-10156, ECF No. 3441 (Bankr. S.D.N.Y. Aug. 2, 2009) (same).

88.    <u>Lien Challenge Standing (Order at ¶ [11])</u>.  Under the RSA, the Government Parties

have agreed not to permit any other party to bring a Lien Challenge relating to the PREPA bonds.

Under PROMESA section 301(c)(7), the Oversight Board is the sole "trustee" of the debtor for

purposes of those Bankruptcy Code sections referring to a trustee incorporated in Title III, and

therefore the sole entity capable of wielding the Bankruptcy Code's trustee powers, including

section 544(a), to bring a Lien Challenge.[24]   As a critical term of the RSA, the Court has power

under Rule 9019 to approve the Oversight Board's agreement to refrain from transferring its trustee

powers.   Such relief is necessary to effectuate the settlement of the Lien Challenge as to the

Supporting Holders.[25]  It would make no sense to permit a party to prosecute the Lien Challenge

while the RSA is in effect and would result in unnecessary expense and judicial waste.

### 2.    The Court has the Authority to Approve the Interim Payments

89.    <u>Adequate Protection Payments (Order at ¶ 5)</u>.  Because Bankruptcy Code 363 does

not apply in Title III, PREPA can, pursuant to PROMESA § 305, use its property inside and outside

its ordinary course without Court approval.[26]  Here, PREPA's agreement to make payments is part

---

[24]   *See infra* n.34.

[25]   In recognition of the importance of this provision to the overall settlement, the Court denied the UCC's bid to have
itself appointed as co-trustee of the Lien Challenge (see ECF No. 1404), and instead approved the stipulation
between the Oversight Board and AAFAF permitting it to serve as co-trustee. *See Stipulation and Agreed Order
Between Special Claims Committee of Financial Oversight and Management Board and Official Committee of
Unsecured Creditors Related to Joint Prosecution of Causes of Action of Puerto Rico Electric Power Authority*
[ECF No.1403].

[26]   *In re City of Stockton*, 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012) ("[T]he Bankruptcy Code's restrictions on use, sale
or lease of property do not apply in chapter 9."); *In re City of Stockton*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013)
(Rule 9019 review of settlements not required in chapter 9 although debtor may seek it; a chapter 9 debtor "can
expend its property and revenues during the chapter 9 case as it wishes."); *In re Richmond Unified School Dist.*,
133 B.R. 221, 224 (Bankr. N.D. Cal. 1991) ("[A] Chapter 9 debtor is not subject to the reporting and other general
duties of a Chapter 11 debtor-in-possession under section 1107, and pursuant to section 904, may borrow and
spend without court authority."); *see* 6 COLLIER ON BANKRUPTCY ¶ 901.04[12][a] (16th ed. 2019) (Given the

of the settlement of the stay litigation and the secured claims, and therefore those payments can be approved as part of those settlements.  Certain of the Supporting Holders have asserted a lack of adequate protection due to, among other things, alleged mismanagement at PREPA.  Through the RSA, the Supporting Holders are settling any right to seek stay relief to pursue any rights or remedies under the Trust Agreement, including for lack of adequate protection.  In exchange, the Government Parties have agreed to provide the Supporting Holders with Adequate Protection Payments consisting of limited monthly cash payments only if a PREPA Plan has not been confirmed by March 31, 2021 *and* the Puerto Rico legislature fails to enact legislation to implement the Transition Charge as described in the prior subsection.  Bankruptcy Code sections 361 and 362(d) and Rule 9019 enable the Court to approve a settlement providing Supporting Holders with adequate protection payments that the Government Parties have agreed to make.  *See, e.g.*, *Order Approving Joint Stipulation Regarding (I) Motion of Certain Secured Claimholders of Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Adequate Protection and Stay Relief and Reservation of Rights and (II) Motion of Debtors Pursuant to PROMESA Section 201(a) and Bankruptcy Code Sections 105(a), 362(a), 365, and 922 for Entry of an Order Confirming Application of the Automatic Stay, Stay of Prepetition Lawsuits and Actions and Application of Contract Protections*, Case No. 17-3283, ECF No. 655 (D.P.R. Jul 17, 2018) (approving adequate protection payments).

90.    Settlement Payments (Order at ¶¶ 5, 8).  The Government Parties have determined the timing of the plan confirmation process must be keyed to the Transformation process.  Jaresko Decl. ¶¶ 34-35.  Supporting Holders must therefore wait for the privatization transaction to close

---

omission of Section 363 and enactment of Section 904, "there is no doubt that a chapter 9 debtor can 'spend [money] without Court authority.'").

before receiving their treatment under a plan, *i.e.* issuance of Securitization Bonds.  To compensate Supporting Holders for the time-value of money, their forbearance from exercising their rights to pursue adequate protection payments and post-petition interest,[27] settlement of the Receiver Motion, their commitment to support a Plan consistent with the RSA, and the risk a plan is ultimately not confirmed, under the RSA the Government Parties have agreed to provide Supporting Holders with Settlement Payments during the pendency of the Title III Case. The Amended Proposed Order authorizes the Settlement Payments and Increased Settlement Payments.

91.     While Movants believe PREPA has the power under PROMESA to make such payments without Court approval, it seeks Court approval of the payments because it is unclear whether the Supporting Holders have the power to receive such payments without violating the automatic stay.  *Cf. Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 919 F.3d 121, 132 (1st Cir. 2019) (finding that, absent section 922(d), "there is ample reason to believe that Section 362(a) stayed a creditor from accepting voluntary payments from a debtor") (rehearing petition pending).  Whether or not section 362(a) prohibits the Supporting Holders from receiving Interim Payments without court approval, there is no question that Section 362(d) provides authority for the Court to approve such payments as part of stay relief.

92.     If the Plan is not ultimately confirmed, any Settlement Payments to Supporting Holders' may be recouped from plan distributions. Under the RSA, the parties specifically reserve

---

[27]   Supporting Holders also argued that they are oversecured. Under Bankruptcy Code 506(b) oversecured claimholders are entitled to post-petition interest payments.  The RSA also settles the scope of the Supporting Holders' security interest as a special revenue.

all rights regarding whether any Interim Payments made shall be credited towards treatment under a subsequent plan or made on account of post-petition interest.  RSA § 2(d)(v).

93.   <u>Administrative Expenses (Order at ¶¶ 6, 8).</u>  The Supporting Holders and the Government Parties have agreed to settle and defer the Supporting Holders' asserted right to adequate protection and post-petition interest in exchange for allowance of the administrative claim in the amount of interest on their share of the Tranche A bonds from May 1, 2019 to consummation,[28] <u>minus</u> the amount of any cash Settlement Payments received.  As detailed above, the Settling Holders' "truce" comprising of a settlement of pending litigation, forbearance from exercising any rights under the Bonds, commitment to support Transformation, and agreement to vote for a Plan consistent with the RSA, constitutes a substantial contribution to PREPA's Title III Case as it helps pave the way to an exit from Title III and removes the cloud of receivership that may impact a potential operator's interest in investing in PREPA, as well as the risk of the Court ordering PREPA to provide Bondholders with adequate protection during the pendency of the case.  In doing so, the Supporting Holders have incurred actual, material costs—including from agreeing to various transfer restrictions "locking-up" their Bonds for months at a time and settling their ability to assert rights based on their Bonds.  As this Court has found once before, it has authority to approve the agreed administrative expense payments to Supporting Holders to reimburse them for these expenses on account of the "substantial contribution" that Supporting Holders' forbearance, settlement of claims, and agreement to vote for a Plan, brings to the Title III case.[29]

---

[28]   *See supra* n.8. Supporting Holders that join the RSA after September 1st shall not be entitled to an Administrative Claim or any Settlement Payment, but shall receive the same treatment that Supporting Holders receive with respect to their Bonds under the Plan.

[29]   *See* 11 U.S.C. § 503(b)(3)(D). For example, in *In re The Puerto Rico Sales Tax Financing Corp.*, D.P.R., Case No. 17-3283 (plan confirmed Feb. 4, 2019), the plan support agreement provided that parties to the agreement would receive payment equal to 2% of such party's claim on account of the cost of negotiation, confirmation, and

94.     While it is clear that PREPA has the power to make interim cash payments without court approval, Court approval of the administrative expense claims is requested because it is not as clear whether the Oversight Board has the power to agree to allowance of an administrative expense claim without court approval.

95.     In addition, the Surviving Administrative Claims[30] should be authorized as a permissible "break-up" fee to compensate the Supporting Holders for the risk that the RSA may be terminated after sitting on their rights for a significant period of time to enable the Government Parties to proceed with transformation.  As described above, should the Court approve the RSA and the Oversight Board fail to confirm a Plan containing the Stipulated Treatment after multiple good faith efforts, the Government Parties may elect to terminate the RSA.  Under that circumstance, all components of the RSA fall away—including the allowance of claims, all accrued and unpaid Administrative Claims, and all entitlements to any Interim Payments—except for a Surviving Administrative Claim comprising of Administrative Expenses accrued up to the first attempt to confirm a Plan.  In this scenario, the Surviving Administrative Claim serves as a break-up fee: it compensates the Supporting Holders for cooperating with the Government Parties

---

consummation of the debtor's plan.  In return, parties to the plan support agreement agreed to, among other things, certain trading restrictions, to support and assist the confirmation of the plan, and to waive the right to seek reimbursement of expenses through other means, such as substantial contribution claims.  The court found that such reasons justified payment of the consummation costs to the creditor parties.  *See Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No.  5053; Case No.17-3283] (Feb. 5, 2019); *see also, e.g., In re Washington Lane Assocs*, 79 B.R. 241 (Bankr. E.D. Pa.1987) (approving "substantial contribution" administrative expense claims for creditor for services rendered benefitting estate); *In re Celotex Corp.*, 227 F.3d 1336 (11th Cir. 2000) (same); *Matter of Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D.Ohio 1987) (same).

[30]  RSA § 2(c)(iv)("In the event of an Individual Termination (as to such applicable holder) or a Stipulated Treatment Termination (as to all Supporting Holders), any accrued and unpaid Administrative Claim shall be disallowed; provided that, with regard to a Stipulated Treatment Termination under Section 9(c)(i)(6), Supporting Holders will be entitled to an Administrative Claim that will have accrued through the date the Title III Court first denied confirmation of a Plan where such denial is not solely on grounds raised in an objection by PREPA or AAFAF ('Surviving Administrative Claim')").

during the pendency of the Title III Case, for not asserting their rights during the case, and for assuming the risk that the RSA treatment is ultimately not confirmed under a Plan.  The Court has the power to approve such break-up fee.  *See In re Dana Corp.*, Case No. 06-10354-BRL, ECF 3441 (Bankr. S.D.N.Y. Aug. 2, 2010) (approving various payments, including break-up fees, pursuant to plan support agreement); *see also In re Delphi Corp.*, Case No. 15-44481-RDD, ECF No. 6589 (Bankr. S.D.N.Y. Jan. 12, 2007) (approving various fees and payments, including break-up fees, in connection with approval of plan framework support agreement).

96.     In sum, PROMESA provides PREPA the authority to provide, and the Court the authority to approve, the Interim Payments and the Administrative Claim.

## C.  Irrelevance of Potential Impact on Theoretical Third Party Recoveries

97.     The settlement in the RSA only settles the claims of the Supporting Holders.  It does not settle the claims of any other bondholder or any other creditor. While the RSA provides an obligation by the Oversight Board to propose a plan that will provide Supporting Holders with treatment consistent with the RSA, it does not dictate or provide for the treatment of any other claimholder.  Non-settling creditors' rights to object to their treatment and the Supporting Holders' treatment under a future plan are fully preserved.  To that end, the Amended Proposed Order states: "[w]hether the treatment the RSA provides for the claims of the Supporting Holders as allowed hereby is confirmable under a plan of adjustment is not determined by this Order…All confirmation objections of all parties in interest are preserved . . ." Order ¶ 2.

98.     Despite this clarifying language in the Amended Proposed Order, certain objectors have argued that the Settlement will adversely affect their legal position and ultimate recoveries under a plan.  For example, the UCC and certain unsecured claimholders have argued (or will likely argue):

a. Settling the Lien Challenge will be detrimental to their potential recovery under a future, hypothetical plan because, if the Lien Challenge succeeds and bondholders are found to be substantially undersecured or unsecured, then unsecured claimholders will enjoy a higher pro rata share of PREPA's available assets. Conversely, if the Lien Challenge is unsuccessful, the UCC asserts unsecured claimholders are no worse off.  In other words, the UCC argues the settlement of the Lien Challenge eliminates the unsecured claimholders' litigation strategy and harms their potential upside.

b.  The RSA appears to commit all of PREPA available economic capacity to satisfying bondholder claims (even if Movants were to exercise their rights to enter into an alternative transaction), thus ensuring that no other stakeholders of PREPA could receive a recovery. In this way, the RSA appears to render impossible any alternative plan of adjustment and foreclose other resolutions to the myriad problems confronting PREPA.[31]

99.     These arguments fail.  That some creditors want PREPA to take risks is not a reason not to settle for other substantial benefits.  That some creditors want to know what is left for them has no bearing on settlement because the Court will not confirm the Plan if it leaves too little value for the objecting creditors.

100.     *First*, PREPA, and not its creditors, own the causes of action, including those asserted in the Lien Challenge.[32]  Thus, it is within the discretion of the Government Parties to determine whether to pursue PREPA's causes of action.  The rights of creditors to bring causes of action on behalf of a debtor are limited in bankruptcy, and even more so under PROMESA.   The debtor is the only entity that can settle these causes of action.[33] And the mere fact that the creditors

---

[31]  *See Official Committee of Unsecured Creditors' Omnibus Motion to Compel Production of Documents in Connection With PREPA Rsa Rule 9019 Settlement Motion* [ECF No. 1269] ¶ 1.

[32]  Only the Oversight Board may assert causes of action belonging to a Title III Debtor, which constitute property of the debtor. In chapter 11, an estate is created under 541 which holds the claims and causes of action of the debtor. PROMESA does not incorporate section 541, and PROMESA section 301(c)(5) defines "property of the estate" as "property of the debtor." Because there is no estate, all claims and causes of action that can be asserted by the Title III Debtors constitute "property of the debtor." It is well settled that causes of action are property of a debtor's estate and the trustee has exclusive standing to assert such claims. *See Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994) (citing *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153-54 (5th Cir.1987)).

[33]  *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005) ("Rule 9019, which by its terms permits only the debtor-in-possession to move for settlement, is in complete harmony with the provisions of the Bankruptcy Code delineating the chapter 11 debtor's role. It is the debtor-in-possession who controls the estate's property,

51

would have liked PREPA to roll the dice and litigate is an insufficient reason to block a settlement even if it may affect other creditors' recoveries. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement. A *per se* rule would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies. Instead, a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the Martin factors, including the paramount interests of creditors, weighs in favor of settlement").

101.     *Second*, whether the RSA forecloses PREPA's ability to enter into other deals, will leave the debtor with insufficient funds, or makes confirmation of a plan not "feasible," is not the question before the Court. In *Whyte*, this Court held that despite concerns raised by certain objectors as to the effect of the settlement on the Commonwealth's ability to provide sufficient services to the residents of Puerto Rico, such considerations were not properly before the Court at the 9019 stage. 360 F. Supp. 3d at 68. Rather, the Court limited its inquiry to the reasonableness of the settlement. *Id*. Similarly, in language applicable here, the Court stated "[t]he question of whether the Commonwealth can gather or generate sufficient additional resources to propose a feasible plan of adjustment is one to be addressed in the future and does not weigh in the evaluation of this Settlement. PROMESA and the Bankruptcy Rules do not impose a 'feasibility' requirement for the approval of settlement agreements." *Id*. at 78-9. Thus, any attack on the effect of the RSA on the treatment of other claimholders, or confirmability of a subsequent plan is not before the Court and immaterial to the Rule 9019 analysis.

---

including its legal claims, and it is the debtor-in-possession who has the legal obligation to pursue claims or to settle them, based upon the best interests of the estate.").

102.    Here, the vast bulk of all payments to the Supporting Holders will not be made unless the Plan is confirmed.  No one seriously contends the interim payments will leave PREPA with too little value to confirm a plan.  Therefore, under the instant facts, this issue is a straw man.  And, even if the RSA has an indirect effect on other claimholders' recoveries, that does not preclude the Court from approving the settlement.  *See In re Sea Containers, Ltd*., No. 06-11156 (KJC), 2008 Bankr. LEXIS 2363, at *33 (Bankr. D. Del. Sep. 19, 2008) (approving settlement over objection of creditors most impacted by settlement where creditors failed to convince court "the settlement so affects their position as to be unfair.").  Indeed, if the Court were unable to approve a Rule 9019 settlement because it could indirectly affect other claimholders' recoveries, settlements could never be confirmed as any settlement necessarily affects the resources the debtor has available for distribution to stakeholders.  The applicable jurisprudence confirms that settlements can be approved where the settlement affects other creditors.  For example, in *Adelphia*, the debtor sought approval of a settlement with the U.S. government, which had been litigating with the debtor over a variety of crimes and civil violations.  *See In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 166 (Bankr. S.D.N.Y. 2005), aff'd 337 B.R. 475 (S.D.N.Y. 2006) (Kaplan, J.), appeal dismissed, 222 Fed. Appx. 7, 2006 WL 3826700 (2d Cir. 2006), cert. denied, 552 U.S. 941 (2007).  The government had the ability to effect a forfeiture on the debtors' assets, which would have destroyed most of the debtors' value.  To forestall these harmful consequences, the debtor settled the government's claims, agreeing to pay $715 million into a settlement fund to pay equity holders.  Notably, the $715 million came out of value the debtors would otherwise be able to distribute to unsecured claimholders.  In the face of several objections, the Court nonetheless confirmed the settlement under Rule 9019.  *Id*. at 175.  The court stressed the fact that, as the settlement only covered the government's claims, the court was not being asked to confirm

a plan of reorganization, only a settlement of complex litigation. *Id*. at 168. The fact the settlement dictated how the debtors dealt with a substantial proportion of their assets (inevitably depressing distributions to other creditors) did not change this fact and even when these funds were ultimately going for a subordinated claimants.

103. The situation here is comparable to *Adelphia*. The RSA is a settlement of Supporting Holders' claims and complex litigation, not a plan of adjustment that dictates the treatment of any other class of claimholders. It only affects the claims of PREPA bondholders that join the deal (*i.e.* Supporting Holders), not any other creditors. It does not dictate other creditors' treatment under a plan, does not affect their legal rights, including their ability to object to the Plan, and, indeed, only pays the Supporting Holders out of a special, new charge that is being created pursuant to the RSA to deal with PREPA bond debt. It therefore does not materially or directly affects the recoveries of other creditors of PREPA (none of whom could demand that PREPA raise its rates to pay their debt). But even if it did, it would be confirmable as a reasonable settlement with holders of a substantial majority of PREPA's pre-petition obligations, and arguably only indirectly affects the recoveries of other creditors, just as in *Adelphia*.

104. Critically, the RSA preserves creditors' rights to argue at confirmation the RSA leaves PREPA with insufficient funds to satisfy other creditors legal entitlements under PROMESA §§ 314 and section 1129 of the Bankruptcy Code. If the Court finds their arguments persuasive, at the time, the plan will not be confirmed. If the Oversight Board is unable to confirm a plan after multiple, good-faith efforts, the Government Parties may terminate the RSA at their election. *See* RSA § 9(c)(6). Thus, approval of the RSA as a reasonable settlement under Rule 9019 need not include considerations of the confirmability of a plan embodying the Supporting Holders' agreed-upon treatment.

## <u>CONCLUSION</u>

105.    For the reasons set forth herein, in the Declarations, and in the Rule 9019 Motion, the aspects of the RSA for which Movants seek Court approval pursuant to the Amended Proposed Order are fair and reasonable, and such approval should be granted.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE Movants respectfully request the Court to grant the relief requested herein and in the Rule 9019 Motion (as amended pursuant to the Amended Proposed Order), and any other relief as is just and proper.

Dated: July 2, 2019
      San Juan, Puerto Rico

Respectfully submitted,

/s/ Martin J. Bienenstock

Martin J. Bienenstock (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel S. Desatnik *(pro hac vice* pending*)*
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Commonwealth of Puerto Rico and the Puerto Rico Electric Power Authority*

**LUIS F. DEL VALLE-EMMANUELLI**

By: /s/ *Luis F. Del Valle-Emmanuelli*
By: Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897

**O'MELVENY & MYERS LLP**

By: /s/ *Nancy A. Mitchell*
    John J. Rapisardi*
    Nancy A. Mitchell*
    7 Times Square
    New York, NY 10036
    Telephone: (212) 326-2000
    Facsimile: (212) 326-2061
    Email:    jrapisardi@omm.com
            nmitchell@omm.com

    Peter Friedman*
    1625 Eye Street, NW
    Washington, DC 20006
    Telephone: (202) 383-5300
    Facsimile: (202) 383-5414
    Email:    pfriedman@omm.com

    Elizabeth L. McKeen*
    610 Newport Center Drive, 17th Floor
    Newport Beach, CA 92660
    Telephone: (949) 823-6900
    Facsimile: (949) 823-6994
    Email:    emckeen@omm.com

    * admitted pro hac vice

*Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory
Authority*

**MARINI PIETRANTONI MUNIZ, LLC**

By: /s/ *Luis C. Marini-Biaggi*
    Luis C. Marini-Biaggi
    USDC No. 222301
    MCS Plaza, Suite 500
    255 Ponce de León Ave.
    San Juan, PR 00917
    Telephone: (787) 705-2171
    Facsimile: (787) 936-7494
    Email: lmarini@mpmlawpr.com

*Attorneys for the Puerto Rico Fiscal Agency and
Financial Advisory Authority*