# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>             Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>             Debtor. | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 4780-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of PUERTO RICO ELECTRIC POWER AUTHORITY, and PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,<br><br>             Movants,<br><br>   v.<br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS, *et al.*<br><br>             Respondents. | |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

**DECLARATION OF DAVID BROWNSTEIN
IN SUPPORT OF JOINT MOTION OF PUERTO RICO
ELECTRIC POWER AUTHORITY AND AAFAF PURSUANT
TO BANKRUPTCY CODE SECTIONS 362, 502, 922, AND 928, AND
BANKRUPTCY RULES 3012(A)(1) AND 9019 FOR ORDER APPROVING
SETTLEMENTS EMBODIED IN THE RESTRUCTURING SUPPORT AGREEMENT**

Pursuant to 28 U.S.C. § 1746, I, David Brownstein, hereby declare as follows under penalty of perjury under the laws of the United States of America:

1.      I am a Managing Director and Head of Municipal Banking at Citigroup Global Markets Inc. ("Citi"). For decades, Citi has consistently been ranked as a top underwriter of municipal bonds.

2.      The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the representative of the Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Electric Power Authority ("PREPA"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), retained Citi to serve as investment banker and financial advisor to the Oversight Board in connection with the Oversight Board's statutory duties under PROMESA and its task of helping the Commonwealth and its instrumentalities achieve debt burdens that are sustainable. Citi has substantial expertise in municipal finance, capital markets, restructuring, and infrastructure and utility finance.

3.      I have been at Citi for 25 years and actively involved in the municipal market for a total of 35 years, serving as underwriter or advisor to over 200 municipal issuers on both revenue and general obligation bonds with a total par amount in excess of $30 billion. In addition to a Bachelor's Degree from Beloit College, I hold a number of professional licenses from the Financial Industry Regulatory Authority. These include:

- General Securities Principal, Series 24;
- General Securities Representative, Series 7;

2

- Municipal Securities Principal, Series 53; and
- Municipal Securities Representative, Series 52.

4.      I also served as past Vice-Chairman and then Chairman of the Municipal Executive Committee of the Securities Industry and Financial Markets Association ("SIFMA") from 2007 to 2008.  For my work in connection with this role, I received the SIFMA 2012 Honor Roll Award.

5.      I have been directly involved in assisting distressed governments and have served as a banker to Jefferson County, Alabama on its 2013 sewer refinancing and Detroit, Michigan on its 2014 water and sewer debt restructuring, and in getting both cases out of bankruptcy.  These two debt restructurings were each a significant component of the total debt restructured as part of the largest bankruptcies in the history of the municipal market at the time.

6.      With respect to Puerto Rico, I have been directly involved in the Oversight Board's ongoing efforts to restructure debt of the Commonwealth and its publicly-owned corporations and utilities, including PREPA and the Puerto Rico Sales Tax Financing Corporation ("COFINA"), among others.  In COFINA, I participated in a lead role in the negotiations with claimholders and efforts that ultimately led to COFINA's successful plan of adjustment [Case No. 17-3284, ECF No. 561].

7.      With respect to PREPA, I have been in a lead role in most aspects of Citi's engagement as a financial advisor to the Oversight Board, [2] including (i) reviewing the PREPA Fiscal Plan; (ii) serving as lead advisor in all negotiations on behalf of the Oversight Board in

---

[2] I am not directly involved in Citi's engagement with respect the ongoing efforts of the Puerto Rico Public-Private Partnership Authority (the "P3 Authority") to transform and modernize PREPA through private ownership or operation of the utility by a private operator ("Transformation"), which is led by a different team at Citi helmed by Sandip Sen and Frederic Chapados.  I understand that Mr. Chapados will be concurrently submitting a declaration in support of the 9019 Motion and the positive effect the RSA is likely to have on the ongoing Transformation (the "Chapados Declaration").

conjunction with Proskauer Rose LLP ("Proskauer Rose"), and working with AAFAF[3] and PREPA and their advisors O'Melveny & Myers LLP ("O'Melveny") and Ankura Consulting LLC ("Ankura") to negotiate with claimholders regarding the resolution of their claims; (iii) structuring the new bonds that will be issued and exchanged for the legacy bonds (the "Securitization Bonds"); (iv) providing assistance to Proskauer Rose in drafting financial aspects of the May 3, 2019 Definitive Restructuring Support Agreement ("RSA"); and (v) making recommendations to the Oversight Board regarding acceptance of the material terms of the RSA.

8.      I submit this declaration in support of the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928 and Bankruptcy Rules 3012(A)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement* [ECF No. 1235] (the "9019 Motion"), which seeks approval of the RSA.

9.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge based upon my work on behalf of the Oversight Board with respect to PREPA and its financial condition, as well as financial analyses performed by Citi employees at my direction, as well as my personal knowledge of the industry.  If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

### Background on Negotiation and Execution of RSA

10.      I am aware that PREPA currently has in excess of $10 billion of outstanding liabilities.  These liabilities include financial indebtedness comprised of, among other things,

---

[3] "AAFAF" is the Puerto Rico Fiscal Agency and Financial Authority, which together with the Oversight Board and PREPA are hereinafter referred to as the "Government Parties".

$8.259 billion in bond debt, which does not include unpaid interest accrued since the Petition Date.[4]

11.     Approximately $6 billion (in face amount) of these bonds are uninsured.  Holders of PREPA's uninsured bonds include members of the Ad Hoc Group of PREPA Bondholders ("Ad Hoc Group").[5]  I am further aware that $2.25 billion in outstanding PREPA bonds are guaranteed by certain monoline insurance companies, specifically National Public Finance Guarantee Corp. ("National"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured"), and Syncora Guarantee Inc. ("Syncora") (collectively, the "Monolines").

12.     PREPA's bonds are governed by a 1974 trust agreement, which has been amended from time to time (the "Trust Agreement").  I am aware that, prior to the execution of the RSA, the Monolines and the Ad Hoc Group argued that the Bonds are fully secured and holders are entitled to receive payment in full of their principal, plus unpaid interest under a plan of adjustment.[6]  The Trust Agreement also includes a rate covenant, which is a contractual promise by the utility to raise rates as necessary to pay in full operating expenses and debt service obligations—in the case of the Trust Agreement's rate covenant, PREPA was obligated to set a higher charge, specifically one sufficient to cover operating expenses and 120% of debt service (the "Trust Agreement Rate Covenant").  The Trust Agreement Rate Covenant imposes the risk of reduced energy sales on PREPA ratepayers, exposing them to uncapped and unpredictable rate

---

[4] Adding interest accrued on the $8.259 billion prepetition balance of the bonds, including approximately $250 million in unpaid interest accrued prepetition, this total liability is currently in excess of $9.3 billion.  *See* Table 2 below.

[5] The membership of the Ad Hoc Group changes from time to time.  The identity of members at the time the RSA was executed is reflected in Annex A thereto.

[6] I further understand that Monoline representatives testified to this position at depositions that took place during the Receivership Motion.

increases if revenues at current rates are insufficient to meet expenses and debt service, for example due to declining usage. As a practical matter, because the cost of power directly impacts the cost of living and doing business in Puerto Rico, unpredictable rate increases make the creation of a sustainable economy materially less likely.

13.     Over the past decade, PREPA was faced with many challenges, including, among other things, a prolonged recession that led to a drop in energy sales and deferral of essential maintenance of and improvements to the system. As the Commonwealth's and PREPA's financial condition worsened, PREPA faced an increasing debt crisis with its revenues falling short of the amount necessary to meet debt service and expenses. While PREPA was at that time essentially in *revenue* default of the Trust Agreement Rate Covenant (*i.e.*, PREPA was not raising revenues to meet its obligations, much less with a 20% cushion to debt service), it was able temporarily to avoid defaulting *on payment* because the Monolines and certain members of the Ad Hoc Group agreed to advance additional bond debt (which I refer to herein as "relending bonds") sufficient (with cash on hand) to continue to make debt service. To the best of my knowledge, these relending bond advances were made (i) in response to PREPA informing its advisors and creditors that default could cause its power plants to go dark because its fuel providers were threatening to require payment in advance for deliveries if PREPA defaulted on its debt obligations (a demand PREPA was not able to meet), and (ii) with the understanding that PREPA would repay these relending bonds almost immediately. As of the date of this Declaration, PREPA has only repaid the first series of the relending bonds; approximately $375 million remain outstanding and are included in the $8.259 billion prepetition balance noted above.

14.     These factors ultimately led to the filing of a voluntary petition for relief for PREPA pursuant to PROMESA section 304(a), commencing a case under Title III thereof on July 2, 2017

(the "Petition Date").  PREPA has made no payments on the bonds since that date.  PREPA's payment default has caused the Monolines to pay debt service on the bonds they guaranty.

15.    Shortly after PREPA commenced its Title III case, the bond trustee, members of the Ad Hoc Group, the Monolines, and many other PREPA bondholders filed proofs of claim, each of which contend their claims to repayment by PREPA are fully secured and that they are entitled to payment of 100% of par on the outstanding bonds, plus interest (and fees) since the Petition Date.

16.    PREPA has negotiated with certain of its stakeholders to address its principal financial indebtedness.  I have been involved in these negotiations and have been the lead advisor negotiating for the Oversight Board, acting at its direction and based on its guidance.  In this role, I interfaced at arms-length with counsel, principals, and financial advisors to PREPA's stakeholders.

17.    Among those stakeholders are the members of the Ad Hoc Group, with whom I understand PREPA has engaged in negotiations to restructure its debt for over four years.  I have been personally involved in those negotiations for the last two years.  These protracted and complex negotiations ultimately led to the execution of a preliminary restructuring support agreement on July 30, 2018 (the "Preliminary RSA").  At the inception of Citi's engagement, I and others presented the Oversight Board and AAFAF with various options to approach a potential resolution.  The structure of the Preliminary RSA was designed to meet the Government Parties' views and key objectives, which are further detailed below (¶¶ 24-29).  I, along with Proskauer Rose, acted on behalf of the Oversight Board, and O'Melveny and Ankura acted on behalf of PREPA and AAFAF, in negotiating the Preliminary RSA in hard-fought negotiations with representatives of the Ad Hoc Group—principally their counsel, Kramer Levin, and financial

advisor, Houlihan Lokey.  The Preliminary RSA contained the material economic terms of the securitization structure established by the RSA.

18.     During the months leading up to the execution of the Preliminary RSA, we regularly interfaced with the Oversight Board and AAFAF as issues would arise and the negotiations progressed.  Throughout this process, I telephonically and personally attended periodic strategy sessions with the members of the Oversight Board and the Board's Executive Director, Natalie Jaresko, and other advisors to the Oversight Board, including Proskauer Rose. At these meetings I provided updates to the Oversight Board as to the status of the negotiations with the Ad Hoc Group, particularly the "bid and ask" on an aggregate recovery from securitization bonds funded through a Transition Charge, and the amounts of the Transition Charge at various recovery levels.  In response to the Oversight Board's views, I advised on how the new bonds could be structured, and how to effectuate the key objectives identified by the Oversight Board.  I also regularly participated in discussions with Christian Sobrino, the Chief Executive Officer of AAFAF, and advisors to AAFAF and PREPA.

19.     Following execution of the Preliminary RSA, the parties continued to negotiate toward a definitive restructuring support agreement, which took over nine months to accomplish. During this period, I along with Proskauer Rose continued to act pursuant to the Oversight Board's direction and, along with O'Melveny and Ankura on behalf of AAFAF and PREPA, interfaced with counsel and financial advisors for many of PREPA's stakeholders, including each of the Monolines, regarding their potential joinder to the RSA.

20.     After several months of negotiations with the Monolines, discussions with Assured proved productive.  My discussions took place primarily with Jorge Gana, Managing Director at Assured, who to the best of my knowledge conferred with Assured's counsel at Cadwalader,

Wickersham & Taft and its financial advisors at Lazard.  Near the end of March 2019, Assured

had come on board to the key terms of the structure that would result in the execution of the RSA

on May 3, 2019.

21.     Beginning with the negotiations leading to the Preliminary RSA, and continuing

until finalization of the RSA, Proskauer Rose and I conferred and coordinated with O'Melveny

and Ankura.  We also conferred with the Oversight Board regarding settlement discussions with

PREPA stakeholders.  This included regular consultation with Ms. Jaresko, and weekly update

calls with the members of the Oversight Board, to update the members on the progress of the

negotiations, and in particular to explain how the key features of the negotiation were proceeding

in line with the Oversight Board's objectives for resolving PREPA's indebtedness.  Citi also held

one-on-one conferences with individual members of the Oversight Board, both before and after

these weekly updates, to walk through any questions they might have regarding the terms of the

negotiated structure.  During these meetings and conferences, which led to the Oversight Board's

final decision to approve the RSA, members of the Oversight Board asked probing questions and

provided guidance in structuring the overall transaction.  Citi also presented Ms. Jaresko and the

Oversight Board with financial analyses regarding the securitization structure.

22.     Negotiations with PREPA's stakeholders have continued following the execution

of the RSA.  Approximately 72% of PREPA's bondholders (including Assured) have now joined

the RSA.  Additionally, an agreement in principle has been reached with Syncora,[7] which I expect

will be formalized in an amendment to the RSA to be executed prior to the hearing on the 9019

Motion that will add Syncora as Supporting Holders.  Assuming Syncora signs onto the RSA,

---

[7] The Government Parties are also in discussions with National to include it in the RSA and are optimistic it will join
as well, although as of the date of this Declaration discussions have not resulted in an agreement in principle.

holders and insurers of over 74% of the outstanding PREPA bonds will have signed on to the RSA.[8]

23.     The bondholders or bond insurers that have joined, or are shortly expected to join, the RSA are collectively referred to as the "Supporting Holders".

## Key Economic Goals of the RSA

24.     The Government Parties approached potential resolution of PREPA's bond indebtedness with clear objectives in mind.  These objectives shaped the terms and structure of the ultimate agreement consummated in the RSA.

25.     First, any recovery by PREPA's creditors had to be secondary to the Commonwealth's overall economic recovery, for which the recovery of PREPA plays an important role.  That meant any agreed repayment of legacy debt could not outpace revitalization of the island's overall economy, and in particular the ability of PREPA's customers to pay any increased rates or additional charges required to service restructured PREPA debt.

26.     Another key objective was to protect the Commonwealth and PREPA ratepayers by stabilizing rates and providing as much transparency and certainty as possible in future expected energy costs, so that consumers would not be subject to unexpected and unrestrained rate hikes. This meant ratepayers needed to be insulated from any potential lag in the economic recovery, or other developments that could negatively impact utilization of PREPA's grid and with it revenues needed to service bond debt.

27.     Any agreement reached also needed to protect PREPA by facilitating its exit from Title III, fostering a healthy economic outlook for the future of the utility, including eliminating

---

[8] The RSA does not establish plan treatment of claims of the bondholders (or for that matter any entities) that are not parties to it.

(or nearly eliminating) the threat of re-entering Title III in the future.  The Government Parties would not approve a transaction that saddled PREPA with massive ongoing financial liabilities or the potential for being subject to extreme remedies under the specter of a future default.

28.    These considerations included another basic point for the negotiations:  reducing PREPA's debt obligations.  There could be no agreement unless PREPA's stakeholders were willing to agree to a voluntary reduction in the amount of their claims as well as a reduction of the present value of PREPA's total debt service obligations.  The Government Parties went into negotiations recognizing that the discount would be hard-fought.  The parties had dramatically differing legal positions on whether the bonds were secured, with the Supporting Holders adamantly maintaining that they were fully secured and thus entitled to full repayment of their debt plus interest, and the Government Parties contending that they were secured by a limited amount of collateral and thus undersecured.

29.    Finally, the Government Parties were not willing to agree to a restructuring that would negatively impact Transformation of PREPA, a goal the Oversight Board and the Government of Puerto Rico jointly regard as of paramount importance to PREPA's future and that of the Commonwealth itself.  This goal ran in tandem with the other goals to reduce the overall financial burden and risk on PREPA and its ratepayers, but added an additional key component to any agreement that would be reached:  to avoid disruption to the Transformation bid process, Supporting Holders would have to stay patiently on the sidelines and wait until the effective date of a confirmed plan of adjustment before receiving the new securitization bonds.  Plan effectiveness, in turn, is conditioned upon consummation of the Transformation currently in process and expected to occur in mid-2020.[9]

---

[9] *See* Chapados Declaration, ¶ 14.

## The Elements of the RSA Satisfied the Key Economic Goals

30.     The ultimate agreement PREPA reached with the Supporting Holders satisfied each of the above key objectives, leading to the Oversight Board's decision to approve the RSA.

31.     *Overview*.  As further detailed below, the RSA more than meets the Government Parties' original goals.  In addition to reducing the debt by at least $2 billion and reducing the present value of PREPA's debt service by over 40% (and potentially much higher, depending on utilization), the RSA caps rate increases to pay debt and very substantially eliminates risk of default because payment of less than what is due simply results in extending the debt maturity and not the possible imposition of crippling remedies.  RSA, Exhibit C (Recovery Plan Term Sheet), § X(a) provides there is no default for paying less than required as long as the transition charge is paid to bondholders, no matter how small the charge is.  Put differently, the debt to be issued under the RSA is wholly different from the existing debt and is so much more benign that its amount matters less because consumers are protected against rate increases.

32.     The RSA avoids the possibility of a receivership remedy and resolves legal disputes with the Supporting Holders, who also commit to accept plan treatment designed to satisfy only a discounted allowed claim for plan purposes and to avoid the right to trigger increases in electricity prices beyond a fixed amount (even if they will not otherwise be paid in full).  In exchange, PREPA commits to propose a plan of adjustment that provides for the discounted allowed claim. Additionally, the Government Parties' agreed to allow certain payments and accrue certain administrative claims between approval of the RSA and plan confirmation.

33.     *Reduction of Claimed Legacy Debt*.[10]  The RSA provides that Supporting Holders will exchange legacy bonds for new securities to be issued by a bankruptcy remote special purpose

---

[10] *See* RSA, Recovery Plan Term Sheet §§ II, IV-VI.

vehicle (the "Securitization SPV") with materially less than a 100% exchange ratio and an even greater reduction in the present value of PREPA's debt service obligations.  This is significant because the Supporting Holders claim, not only that they are entitled to 100% par on their legacy bonds, but that they are additionally entitled to post-petition interest (and fees).

34.     The legacy bonds will be exchanged for two different classes of Securitization Bonds, with Tranche A bonds exchanged at 67.5% of principal amount of outstanding bonds (including accrued and unpaid interest from the Petition Date through May 1, 2019 of approximately $791 million) and Tranche B at 10% of principal amount of outstanding bonds. There is no cash flow (payment) on the Tranche B bonds until the Tranche A bonds are paid in full, which means that if electricity utilization is so low that the Tranche A bonds fail to pay off in 47 years, the Tranche B bonds will not receive any debt service at all.  The Tranche B bonds may never be paid in full because "[a]ny amounts on such Tranche B Bonds not paid with Transition Charge Revenues imposed prior to the stated final maturity of the Tranche B Bonds shall not be recoverable by Bondholders."  RSA, Recovery Plan Term Sheet § VI(a)(vi).  The Tranche A and B bonds will yield a recovery of no more than 77.5% of the bond claims (with accrued and unpaid interest from the Petition Date through May 1, 2019), and the Tranche A and B bonds should be worth materially less than 77.5% of the bond claims when issued because collection is contingent and remedies are limited.

35.     Because payment under the Tranche B bonds is contingent upon payment of the Tranche A bonds, there are three scenarios for Supporting Holder recovery:  (i) no payments made on account of the Tranche B Bonds, in which case the only recovery is on Tranche A bonds, at

67.5% of par plus accrued interest through May 1, 2019;[11] (ii) the expected cash flow based on the April 2018 fiscal plan load projections; and (iii) the maximum recovery provided to Tranche B bonds (payment up to their top exchange ratio of 10%) in the event actual load projections outperform the fiscal plan projections,[12] in which case the total recovery on the bond claims at par plus accrued interest though May 1, 2019 would be 77.5%.

36.     In negotiating the terms of the RSA, it was also necessary to compensate Supporting Holders in consideration of their prepetition relending bonds that remain outstanding and forbearance from exercising any rights or remedies, or seeking stay relief to do so, pending implementation of the RSA—a delay that could total two years from execution of the Preliminary RSA.[13]  As illustrated below (¶¶ 60-67), Supporting Holders are entitled to a Waiver and Support Fee, an Administrative Claim, and Settlement Payments (which reduce the amount of the Administrative Claim).  The Waiver and Support Fees are a designated percentage of 1.62% of the bond claims calculated as principal plus accrued interest through May 1, 2019.  Supporting Holders will also receive a Settlement Payment in monthly cash disbursements equal to 0.92 cent/kWh from September 1, 2019 through the implementation date.  They will also be entitled to an Administrative Claim in the amount of interest they would have received on their Tranche A Bonds at 5.25% starting May 1, 2019 for those who joined the RSA by May 31, 2019, less the cash Settlement Payments they receive as described above.  In aggregate, the Administrative Claim and

---

[11] If utilization is lower than current projections by approximately 18% or more over the 47 year term of the Tranche B bonds there will be no cash flow to Tranche B.

[12] The Oversight Board views this as unlikely, and the fiscal plan utilization projections suggest that recovery on the Tranche B would instead be approximately 5.5%, not the full 10%.

[13] As compared to COFINA for example, where the settlement was executed in August 2018 and the plan was confirmed and consummated approximately six months later.  [Case No. 17-3284, ECF. No. 561].

Settlement Payments represent 4.23% of the bond claims again calculated based on par plus accrued interest through May 1, 2019.

37. To understand the overall reduction in liability on PREPA's bond indebtedness the RSA will yield, Table 1 below describes the total amount of consideration to bondholders contemplated by the RSA, differentiated based on the three Tranche B scenarios discussed in ¶ 35:

Table 1

| Case | Tranche B (i): No Cash Flow | Tranche B (ii): Expected Cash Flow | Tranche B (iii): Full Value |
|---|---|---|---|
| Tranche A | $6,277,732,486 | $6,277,732,486 | $6,277,732,486 |
| Tranche B | $0 | $508,061,103 | $930,034,442 |
| Waiver & Support Fee (Tranche A) | $151,079,902 | $151,079,902 | $151,079,902 |
| Administrative Claim or Settlement Payment (from May 1, 2019 through July 1, 2020)[14] | $393,764,759 | $393,764,759 | $393,764,759 |
| Total payout: | $6,822,577,147 | $7,330,638,250 | $7,752,611,589 |

38. Table 2 below describes the total contemplated payout under the RSA (again under the three Tranche B scenarios set forth in ¶ 35) as compared to the total existing indebtedness on the legacy bonds, as calculated (a) assuming accrued interest only through the Petition Date, (b) assuming accrued interest through May 1, 2019, and (c) assuming accrued interest through the expected plan effective date of July 1, 2020:

---

[14] As further described below, a Settlement Payment is also contemplated by the RSA, but it would reduce the total amount of the Administrative Claim. To simplify the calculation, this analysis reflects any Settlement Payment amounts as part of the Administrative Claim (stated without crediting the Settlement Payments).

Table 2

| Case | Tranche B: No Cash Flow | Tranche B: Expected Cash Flow | Tranche B: Full Value |
|---|---|---|---|
| Total Claims (Principal Plus Interest) through July 1, 2020[15] | $9,828,735,876 | $9,828,735,876 | $9,828,735,876 |
| Total Claims (Principal Plus Interest) through May 1, 2019 | $9,300,344,424 | $9,300,344,424 | $9,300,344,424 |
| Total Claims (Principal Plus Interest) through July 2, 2017 (Petition Date) | $8,508,396,331 | $8,508,396,331 | $8,508,396,331 |
| Total Dollars Payable Under RSA to Holders through July 1, 2020 | $6,822,577,147 | $7,330,638,250 | $7,752,611,589 |
| Difference between the Total Claim (through July 1, 2020) and Total RSA Payout | $3,006,158,729 | $2,498,097,626 | $2,076,124,287 |

39.     As reflected by the Table 2 calculations, after taking into account all amounts payable in cash and new bonds under the RSA through July 1, 2020, assuming all of the PREPA bonds are subject to the RSA, the RSA reduces PREPA's liability on its total secured debt accrued through an assumed exit date of July 1, 2020 by at least $2 billion and up to $3 billion, depending on the ultimate recovery on the Tranche B bonds.  If, however, as the Supporting Holders contend, PREPA's legacy bond debt is fully secured, PREPA's total secured debt outside would be approximately $9.8 billion (including three years of post-petition interest accrual).  Therefore, the

---

[15] Certain of the legacy bonds have variable rates that are not capable of presently being known.  This analysis assumes the rate going forward will be equal to the historical average of the last year to calculate the accrued interest.

RSA provides a savings of more than 20% on PREPA's bond indebtedness with interest through the estimated plan effective date, at the low end, and more than 30%, at the high end.

40.     This substantial reduction in the par amount of the bonds does not account for the additional substantial reduction in the present value of PREPA's debt service obligations, which are further explored in the next section.  As reflected in Tables 3 through 5, depending on whether ratepayer utilization meets fiscal plan projections or declines by 20%, the present value of the debt service to be implemented by the RSA will amount to a decrease of between 41.2% and 76.5%— a significant discount to PREPA in the present value of the total debt service.

41.     _Capped, Predictable Transition Charge with No Rate Covenant_.[16]   The RSA provides for a new rate structure that will include a predictable and capped transition charge—a separate charge that will be added to all PREPA ratepayers' bills beginning at the effective date of plan confirmation[17] and allocated to service the Securitization Bond indebtedness (the "Transition Charge").  Unlike the legacy bonds, the RSA provides that the Transition Charge is a capped charge that will gradually increase in set amounts over the first twenty-four years after issuance of the new bonds.  The RSA sets forth the periodic increases, with the charge beginning at 2.768 cents per kilowatt-hour ("kWh") and rising to a maximum of 4.552 cents per/kWh,[18] but the actual amounts will be set at plan confirmation and may vary slightly from these stated numbers based on the timing of the plan effective date and the final percentage of bondholders who join the RSA and receive any of the pre-exit benefits described above that are payable in Tranche A bonds[19].

---

[16] _See_ RSA, Recovery Plan Term Sheet § III.

[17] Or March 31, 2021, whichever is earlier.  RSA, Recovery Plan Term Sheet § III(b).

[18] RSA, Recovery Plan Term Sheet § III(a)(i)-(xviii).

[19] I believe that, if anything, the final Transition Charge amounts will be lower than set forth in the RSA, as it assumes 100% participation of bondholders with the full Administrative Claim accruing starting May 1, 2019.  RSA, Recovery Plan Term Sheet, fn 2.

As a unique feature of the Securitization Bonds the Government Parties negotiated, the capped Transition Charge, although subject to the Demand Protections as described below, will not otherwise be subject to increase even if electricity usage or revenues are lower than projected, and insufficient to cover scheduled debt service on the Securitization Bonds.  The precise amounts of the gradual Transition Charge increases will be set at plan confirmation, and those amounts will be published and will remain available to PREPA customers.

42.     The Transition Charge will not continue in perpetuity; rather, it will only appear on ratepayer bills until the later of the date the Tranche A bonds are satisfied in full, or the Tranche B bond maturity date (forty-seven years from issuance, if not already paid off).[20]  As a result, the Tranche B bonds are contingent debt, and the Supporting Holders may never be paid in full on the Tranche B bonds.

43.     The RSA contains a feature that, in my experience, provides an unprecedented benefit to ratepayers.  Unlike standard municipal debt (including, for example, the legacy bonds), there is no provision in the RSA for a Securitization Bond rate covenant, which means the RSA does not contractually obligate PREPA to increase rates to ratepayers above the Transition Charge to cover debt service, subject only to the Demand Protections.

44.     With respect to Demand Protections specifically, the RSA provides that, upon issuance of the Securitization Bonds, the legislature will enact certain demand protection measures intended to provide reasonable assurances that the Transition Charges will be paid by Customers and that the future Government policies, for example, will not reduce Transition Charge revenues

---

[20] RSA, Recovery Plan Term Sheet § X(c).  Tranche A and Tranche B bonds have different exchange rates, as further set forth in ⁋ 34 above.

otherwise contemplated by the Parties. The Demand Protection Term Sheet[21] describes the mechanics through which the Transition Charges are to be assessed on all Customers (provided that grandfathered behind-the-meter generation Customers will not be charged for their behind-the-meter electricity generation but will be charged for any power purchased from PREPA). Accordingly, under certain specific circumstances the Transition Charge could increase for paying Customers as a result of nonpayment by other Customers in three scenarios: (i) if the Government provides subsidies or exemptions from paying the full electric rate to certain categories of Customers; (ii) if the Government or instrumentalities fail to pay their own power bills in full; or (iii) if the general public fails to pay their bills in full (subject to a non-payment allowance of 1.5% for the general public).  The point of these measures is to ensure the debt service on the Securitization Bonds is not impaired by nonpayment of electric bills.  In such circumstances, the Transition Charge would only increase for the following year, in an amount sufficient to recover past due amounts resulting from these scenarios.  Once recovered, the Transition Charge will be reduced back to the scheduled amount.  With a private operator in place, the Government Parties believe the impact of non-payment or non-collection will be minimal—unlike PREPA historically, a private operator will be more likely to implement penalties such as cutting off power for nonpayment.

45.    The inclusion of a fixed Transition Charge and omission of a rate covenant is a significant advantage for PREPA ratepayers over the Trust Agreement.  As is typically the case, the existing Trust Agreement Rate Covenant has the practical effect, under Commonwealth law, of a floating charge—obligating PREPA to raise its rates, uncapped, to ensure payment of debt

---

[21] RSA, Exhibit C (Recovery Plan Term Sheet), Annex A (Securitization Term Sheet), Schedule I-A (Demand Protection Term Sheet).

service and expenses (plus a cushion of 20% for debt service), leading to increased rates in cases of reduced energy use and revenues, and potential unpredictable spikes in energy bills.

46.     By eliminating the existing Trust Agreement Rate Covenant and including a fixed Transition Charge that does not float, the RSA protects ratepayers in the event of reduced demand for energy on the island due to population decrease, economic downturn, or technological innovation.[22]  As a result, even if demand for PREPA's services decreases as a result of these or other circumstances, the rates imposed by the Transition Charge on ratepayers are fixed and known, allowing PREPA consumers to budget for the gradual increases that are intended to rise in step with the Commonwealth's overall economic recovery.

47.     As noted, the omission of a security structure that ensures timely repayment (either with a coverage requirement and/or a true up mechanism) in municipal debt instruments is, to my knowledge, unprecedented.  I am unaware of any similar circumstance where the bond indenture does not require the utility to raise rates and charges to cover debt if utilization or revenues decline. The RSA thus shifts the risk of low demand, resulting in reduced system revenues, from ratepayers to Supporting Holders.  Achieving the Supporting Holders' agreement to this unique structure was one of the most significant components of the agreement reached in the RSA, and was critical in achieving the Government Parties' key objectives.

48.     To illustrate the value to ratepayers in achieving the fixed Transition Charge with no rate covenant, the analyses contained in Table 3, Table 4 and Table 5 illustrates how the RSA maintains a lower average rate for ratepayers, particularly in cases of reduced utilization.

---

[22] PREPA also agreed to include specific terms in the RSA, referenced as "Demand Protections," in case utilization of the grid decreased as a result of "behind the meter generation" for example, in the case of use of alternative energy sources.  In that event, customers will either pay a fixed charge on their bill based on average prior usage or will pay the transition charge based on a special revenue grade meter that will measure the amount of electricity that is generated by the meter.  *See* RSA, Exhibit C (Recovery Plan Term Sheet), Annex A (Securitization Term Sheet), Schedule I-A (Demand Protection Term Sheet).

49.     First, working off baseline utilization projections from the April 2018 PREPA fiscal

plan, the average Transition Charge under the RSA is significantly lower than would be required

under Commonwealth law.

Table 3

| Rate Comparison FY 2020-Term (Commonwealth law vs. RSA) if Fiscal Plan Projections Are Met | | | |
|---|---|---|---|
| | Avg. Transition Charge (c/kWh) | Max Charge (c/kWh) | PV of debt service, at 5.25% discount |
| RSA | 3.988 | 4.552 | 7,596,549 |
| Legacy Power Revenue Bonds (including relending) | 6.190 | 7.731 | 10,729,633 |
| Legacy % higher than RSA | 55.2% | 69.8% | 41.2% |

50.     If utilization is 10% lower than the fiscal plan projections, then, as shown in Table

4, the RSA provides an even greater benefit to ratepayers.

Table 4

| Rate Comparison FY 2020-Term (Commonwealth law to RSA) if Utilization Decreases by 10% | | | |
|---|---|---|---|
| | Avg. Transition Charge (c/kWh) | Max Charge (c/kWh) | PV of debt service, at 5.25% discount |
| RSA | 3.988 | 4.552 | 6,836,894 |
| Legacy Power Revenue Bonds (including relending) | 6.878 | 8.590 | 10,729,633 |
| Legacy % higher than RSA | 72.4% | 88.7% | 56.9% |

51.     If utilization is 20% lower than the fiscal plan projections, then, as shown in Table

5, the RSA provides a greater benefit still to ratepayers.

Table 5

| Rate Comparison FY 2020-Term (Commonwealth law to RSA) if Utilization Decreases by 20% | | | |
|---|---|---|---|
| | Avg. Transition Charge (c/kWh) | Max Charge (c/kWh) | PV of debt service, at 5.25% discount |
| RSA | 3.988 | 4.552 | 6,077,239 |
| Legacy Power Revenue Bonds (including relending) | 7.737 | 9.663 | 10,729,633 |
| Legacy % higher than RSA | 94.0% | 112.3% | 76.5% |

52.     Note, in particular, that although under the Table 4 and Table 5 scenarios there is

significantly reduced usage and revenues, under the RSA the Transition Charge does not change,

and holders of Tranche B bonds would receive little to no cash flow.

53.     As reflected in Table 3, the present value of the legacy contractual power revenue

bond and relending bond debt service is higher than the present value of PREPA's RSA expected

debt service by more than 41% (assuming (i) a 5.25% discount rate; (ii) unpaid principal and

interest through 2021 is re-amortized through the existing term as level debt service; and (iii) the

baseline PREPA Fiscal Plan energy usage projections).  Because the RSA has a capped charge,

this reduction will be even more substantial if future PREPA energy usage declines further than

projected, since the RSA shifts this demand risk to the bondholders.  Again, by contrast, under the

legacy bond fixed debt service obligations and rate covenant, this risk was borne entirely by

PREPA residential and business ratepayers.

54.     To illustrate the significant value of this aspect of the RSA to ratepayers, if future usage of PREPA energy declines 10% more than projected by the PREPA fiscal plan, the present value of the legacy contractual power revenue bond and relending bond debt service is higher than the present value of PREPA's RSA expected debt service by approximately 57% (assuming that same 5.25% discount rate and assumptions as mentioned previously).  If future usage of PREPA energy declines 20% more than projected by the PREPA fiscal plan, the present value of the legacy contractual power revenue bond and relending bond debt service is higher than the present value of PREPA's RSA expected debt service by approximately 76%, (again, assuming that same 5.25% discount rate and assumptions).

55.     *"Non-Default" Securitization Structure*.   The RSA also provides for a unique securitization structure where (i) the exchanged bonds are issued by a separate entity, the Securitization SPV, rather than the utility itself; and (ii) a failure to pay debt service due to insufficient Transition Charge revenues will not result in default on the Tranche A or Tranche B bonds.[23]

56.     The conventional way to restructure municipal debt, such as PREPA's bond debt, would be for the utility to exchange old bonds by reissuing new, restructured revenue bonds.  In this case, however, we sought to avoid several problems inherent in that typical structure:  (i) it would retain the possibility of future default on the new bonds and PREPA re-entering Title III; and (ii) it would put Transformation at risk (as it would continue to saddle PREPA with significant legacy debt to service, and the risk of untenable rate increases and possible default, with which

---

[23] *See* RSA, Exhibit C (Recovery Plan Term Sheet), § X(a) ("No default on Tranche A Bonds for failure to pay scheduled debt service prior to maturity so long as full amount collected under the Transition Charge (minus administrative fees) is used to pay debt service.  Interest shall continue to accrue (and compound, as applicable) at the original Coupon rate."); *id.* § X(b) (same for Tranche B bonds except "[i]nterest shall continue to accrue (and pay-in-kind, as applicable) and accrete at the original Coupon rate.").

any rational investor or operator/manager would be wary to involve itself).   Under the RSA, however, because PREPA itself is not issuing or guaranteeing the new bonds, any failure to pay those bonds will not be a default by PREPA, thereby avoiding the threat of returning to Title III in the future.

57.     It is also typical for municipal debt instruments to provide for certain rights and remedies when debt service is not timely paid.   This will not be the case for the new Securitization Bonds.   Failure to make payments on the bonds when due will not, as noted above, trigger either an increase to the Transition Charge or raise interest rates on the bonds.   Under the terms of the Securitization Bonds set forth in the RSA, the interest accrued for any period is paid only to the extent receipts from the Transition Charge during such period are sufficient to pay debt service; interest otherwise accrues until the next payable period.   Principal is amortized in any period only to the extent of available receipts from the Transition Charge after payment of interest.[24]   Because the new bonds are structured so that if there is not enough revenue generated from the Transition Charge to pay debt service in a given period, the entitlement waterfalls to the next period, the structure is a "no default" structure.[25]   In addition, PROMESA provides for the ability to restructure debt through a creditor collective action under Title VI.   During negotiations, bondholders were insistent that their debt be restructured through a Title VI process that would be consummated immediately—before a plan was proposed, much less confirmed.

---

[24] *See* RSA, Exhibit C (Recovery Plan Term Sheet), § II (describing that change shall occur on the Effective Date, which is defined in RSA Section 1(a)(xlviii) to be "the date upon which all the conditions to the effectiveness of the Plan have been satisfied or waived . . . .").

[25] Technically, there still can be a "default" if the servicer does not perform, but the sole remedy will be to change the servicer.  RSA, Exhibit C (Recovery Plan Term Sheet), § XI(a) (Remedies . . . will include, at a minimum, the right to replace the Transition Charge servicer and the right to enforce the Securitization Bonds' trust agreement' the servicing agreement, and non-impairment covenants.  Requirements for replacement [of] servicer to be mutually agreed upon as part of Definitive Documentation.").

58.   _No Exchange of Marketable Securities Until Plan Confirmation_.  Another unique feature of the RSA is that Supporting Holders have been substantially delayed in receiving any recovery on their legacy bonds, and will likely be further delayed for another year.  In an ordinary utility restructuring, the creditors would only wait six to twelve months after the restructuring support agreement is signed before the exchange of publicly tradeable bonds.  Here, however, Supporting Holders bondholders have not received any debt service payments for two years (_i.e._, since the Petition Date), and are also owed repayment on a significant amount of outstanding relending bonds.  This situation is not about to change imminently.  It has already been two months since RSA Parties signed the RSA, and the Supporting Holders will have to wait at least another year before they can exchange their existing bonds for the Tranche A and Tranche B bonds.  That is because the Government Parties did not want to restructure the Bonds through a Title VI proceeding until it was able to complete Transformation, and plan consummation is not contemplated until Transformation is ready to close.  The Administrative Claims, Settlement Payments, and Waiver and Support Fees are intended to reasonably compensate Supporting Holders for agreeing to lock in to plan treatment through an RSA that will have lasted at least two years, and the significant delay in any debt service (which would otherwise be three years at the time of expected Title III exit and consummation).

59.   _Litigation Resolved and Avoided_.[26]   The RSA also expressly resolves pending litigation, while other provisions reduce the likelihood of litigation.  The RSA requires all Supporting Holders to withdraw any pending requests for stay relief, commit not to request other remedies while PREPA abides by the RSA, and commit to accept plan treatment designed to satisfy only a discounted, allowed claim.  Moreover, by exchanging the legacy bonds for new

---

[26] _See_ RSA §§ 2(b), 3(m).

Securitization Bonds issued by the SPV, the holders are giving up their rights of enforcement that accompanied the legacy bonds—in particular the rate covenant and receiver remedy, which are not features of the new bonds contemplated by the RSA. The elimination of these rights reduces the likelihood of the cost and delay attendant to litigation and the uncertainty in outcome. This also provides a benefit to any future private owner or manager of PREPA.[27]

### Additional Economic Terms Necessary to Achieve Agreement

60.     To reach consensus, and in particular to obtain concessions that were critical to the Government Parties' key objectives as expressed above, the Government Parties compromised and agreed to compensate Supporting Holders due to the delayed timing in resuming principal and interest payments, and their ability to exercise or assert any rights or remedies under the Trust Agreement or other applicable law pending effectiveness of a Plan for PREPA (as so long as the RSA is in effect). These payments do not reduce the balance of the prepetition bond claims, nor do any of them undermine the Government Parties' key objectives stated above. To the contrary, they were a necessary component of the bargaining process to reach the overall settlement.

61.     *Accruing Administrative Claim*.[28] Supporting Holders that join the RSA before September 1, 2019 will be entitled to a post-petition administrative claim in an amount equal to interest under the Tranche A bonds, with accrual beginning on various dates depending on the date the holder joined the RSA.[29] (Accruing Administrative Claims shall be reduced by the amount of

---

[27] *See* Chapados Declaration, ¶¶ 25, 27.

[28] *See* RSA §§ 2(d)(iii)-(iv).

[29] Specifically, a Supporting Holder who joins the RSA by May 31, 2019 is entitled to an allowed post-petition administrative claim in an amount equal to interest on the Tranche A bonds to which such Supporting Holder would be entitled to receive on account of its claim, accrued from May 1, 2019 through the Effective Date of the plan or termination of the RSA. Supporting Holders that join the RSA after May 31, 2019 and prior to entry of the order approving the RSA shall receive the Administrative Claim that starts accruing on the date the order is entered. Supporting Holders that join the RSA after the date the order is entered and prior to September 1, 2019 shall receive the Administrative Claim that starts accruing on September 1, 2019. Since the hearing on the Rule 9019 Motion is

any Settlement Payments, which are further described below.)  Termination of the RSA terminates a party's right to receive the Administrative Claim, except in the case where plan confirmation is not achieved after two attempts, in which case the Administrative Claim shall stop accruing as of the date the first failed confirmation attempt.  The Administrative Claim is payable in Tranche A bonds or cash, at the discretion of the Government Parties.

62.     The Administrative Claim is meant to compensate Supporting Holders for reaching an early resolution to their claims in light of the time PREPA will remain in Title III pending completion of the concessionaire process, thereby minimizing litigation and disruption, including in particular with respect to PREPA's ongoing efforts to privatize.  This expense also benefits PREPA by incentivizing early buy-in to the terms of the RSA.

63.     *Settlement Payments*.[30]  Supporting Holders that join the RSA before September 1, 2019 will receive a monthly cash payment funded from a 1 cent per kWh charge, which will be added to PREPA's bills starting July 1, 2019.[31]  If the RSA terminates due to certain circumstances,[32] no further Settlement Payments will be made and the parties reserve all rights regarding how such payments would be credited.

64.     The RSA provides that, if plan confirmation is not achieved by March 31, 2021, the Settlement Payments will increase and be paid from implementation of the full initial

---

not until after September 1, 2019, the date of entry of the order will no longer have any bearing on calculation of the administrative claim of any holder under the RSA.

[30] *See* RSA §§ 2(d)(i)-(ii).

[31] The RSA provides that payment will commence on August 30, 2019 (subject to a thirty day cure period), but I understand this date may change in light of the adjourned hearing date on the 9019 Motion (and the fact that under the RSA, no Settlement Payments are due before the Court approves the 9019 Motion).  The amount Supporting Holders are entitled to will be commensurate with their pro rata share of an amount equal to the number of kilowatt hours billed by PREPA in the prior month, multiplied by $0.0092.

[32] Specifically if a "Stipulated Treatment Termination" occurs.  *See* RSA §9(c).

Transition Charge (subject to legislative approval).  Collections would be paid monthly on a pro rata basis to each Supporting Holder who signs on to the RSA before September 1, 2019.

65.     The purpose of the Settlement Payments is to provide a relatively small amount of cash flow to Supporting Holders who have not received any debt service for the two years since PREPA filed Title III and will likely otherwise receive nothing for another year.  Settlement Payments will be credited against and reduce the amount of the Administrative Claims, and are thus not duplicative consideration.  These payments were a necessary component to the agreement in light of the Supporting Holders' previously-described concessions, which facilitated the Government Parties achieving their key objectives through the RSA.

66.     *Adequate Protection Payments*.[33]  If PREPA's plan of adjustment is not confirmed by March 31, 2021, and the legislature does not act to approve the Transition Charge to cover increased settlement payments referred to at ¶ 64 above, PREPA will be obligated to use system revenues to fund the increased monthly cash payments.

67.     *Waiver and Support Fee*.[34]  Certain Supporting Holders who were early parties to the RSA are entitled to an additional settlement fee in the form of Tranche A bonds, which will be payable on plan effective date.  This fee provided an incentive to reach a settlement, which was intended to (and has) provided momentum for broader holder buy-in to the RSA.

## Reasonableness of Settlement

68.     In approaching potential settlement, I repeatedly discussed with the Oversight Board, Proskauer Rose, Mr. Sobrino, O'Melveny, and Ankura the best and worst case scenarios and worked within those parameters in negotiating a resolution with the Supporting Holders.  In

---

[33] *See* RSA § 2(e)(vii).

[34] *See* RSA § 4.

my judgment, the settlement achieved and formalized in the RSA was well within the range of a reasonable settlement, considering the Government Parties' key objectives and the differing legal positions of the parties and the risks to PREPA regarding the amount of and security for their claims and the receivership litigation.  I expressed that view to the members of the Oversight Board and Ms. Jaresko.

69.     The value to the Commonwealth and PREPA's ratepayers of avoiding an uncapped, floating transition charge or other uncapped rate adjustments in favor of the RSA's fixed, predictable Transition Charge cannot be overstated.  This was the Government Parties' primary goal in negotiating with Supporting Holders and, I believe, the RSA achieves the Government Parties' goals for the people and businesses of Puerto Rico.  That accomplishment, paired with (i) an anticipated savings of approximately $2 to $3 billion on face amount (*i.e.*, par plus accrued interest) of bond indebtedness; and (ii) the no-default securitization structure, have greatly reduced the burden on PREPA, which ultimately benefits the Commonwealth at large.

70.     For the Government Parties to achieve their goals, the Supporting Holders have waited and must continue to wait to be repaid less and with significantly less recourse than was provided under the Trust Agreement.  That necessitated, as part and parcel of the arms-length negotiating process, agreeing to the additional consideration that is beneficial to the Supporting Holders, while not undermining the Government Parties' key economic objectives.

71.     While there likely are myriad other settlement permutations that perhaps could have been reached, as well as the possibility of not reaching any settlement at all, the settlement negotiated by the RSA Parties and is embodied in the RSA was a reasonable middle ground accommodation of the parties' disputes.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Dated:   July 2, 2019                    /s/ David M. Brownstein
         New York, New York             David M. Brownstein
                                        Managing Director
                                        Citigroup Global Markets Inc.

30