# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>Case No. 17 BK 4780-LTS<br><br>**Court Filing Relates Only to PREPA and Shall Only Be Filed in Case No. 17 BK 4780-LTS** |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*, Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF CHRISTIAN SOBRINO VEGA

Pursuant to 28 U.S.C. § 1746, I, Christian Sobrino Vega, hereby declare as follows under penalty of perjury under the laws of the United States of America:

1. I am the Chief Executive Officer of the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), a member of the Governing Board of the Puerto Rico Electric Power Authority ("PREPA"), and an *ex officio* member of the Financial Oversight and

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

1

Management Board for Puerto Rico ("FOMB"). I am over 18 years of age, have personal knowledge of the matters set forth herein, and if called upon and sworn as a witness, I could and would testify competently thereto.

2. AAFAF is the "fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico" and the "government entity responsible for the collaboration, communication, and cooperation" between the Elected Government and the Oversight Board.[2] AAFAF also "oversee[s] all matters relating to the restructuring, renegotiation or adjustment of any existing or future obligation . . . of the Government of Puerto Rico."[3] Furthermore, AAFAF is the "only entity of the Government of Puerto Rico authorized to, on behalf of the Government of Puerto Rico or any component thereof, negotiate, restructure and/or enter into Creditors' Agreements," which are defined by statute to include "a consented debt restructuring agreement" like the RSA.[4]

3. AAFAF, as the Fiscal Agent for PREPA, negotiated the Definitive Restructuring Support Agreement dated May 3, 2019, entered into by and among PREPA, AAFAF, the FOMB (collectively, the "Government Parties"), the Ad Hoc Group of PREPA Bondholders ("Ad Hoc Group") and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively "Assured") (the "RSA") on PREPA's behalf. PREPA's management did not have any significant involvement in negotiating the RSA.

4. As Chief Executive Officer of AAFAF, and a member of PREPA's Governing Board, I oversaw and directed AAFAF's efforts to negotiate the RSA for PREPA, which included extensive discussions with PREPA's creditors. AAFAF also coordinated closely with and

---

[2] Act 2-2017, § 5(a).
[3] *Id.* § 5(c).
[4] *Id.* §§ 3(b), 8(q).

provided feedback to the Oversight Board and its advisors regarding the negotiations. AAFAF participated in the RSA negotiations primarily through outside counsel, Nancy Mitchell and Maria DiConza of O'Melveny & Myers LLP, who worked, under my direction, to represent both AAFAF and PREPA. A team from Ankura Consulting LLC ("Ankura") worked at counsel's direction to advise AAFAF and PREPA regarding certain aspects of the RSA. While I was the key decision-maker for AAFAF and PREPA, the day-to-day negotiation with the Ad Hoc Group and Assured and other interested parties were handled by Ms. Mitchell and Ms. DiConza, with support from Ankura.

5. As CEO of AAFAF and a member of PREPA's Governing Board, I am also involved in ongoing efforts to transform PREPA. I, along with Natalie Jaresko, the Executive Director of the FOMB, co-head PREPA's Transformation Supervisory Committee. This Committee provides feedback regarding ongoing efforts to transfer to a private party the operation and management of PREPA's Transmission and Distribution System to the Puerto Rico Public-Private Partnerships Authority ("P3 Authority"), who is overseeing the selection process.

6. Through the RSA, the bondholders who have joined the agreement (the "Supporting Holders") agreed, among other things, (1) to vote for any PREPA plan of adjustment that would provide them with Tranche A Bonds in principal amount equal to 67.5% of total Applicable Bond Claims, and Tranche B Bonds in principal amount equal to 10% of the total Applicable Bond Claims (together, the "Securitization Bonds"); (2) that the Securitization Bonds would not contain certain protections accorded to bondholders that might otherwise be standard, such as a rate covenant and defaults if revenues are insufficient to pay debt service, instead, providing a Transition Charge that would be capped, subject to the Demand Protections, irrespective of whether system revenues were sufficient to pay debt service; and (3) to support

3

dismissal of the Renewed Lift Stay Motion,[5] and to refrain from pursuing or directing the Trustee to pursue, any future receivership litigation.[6] In exchange, the Government Parties have agreed not to challenge the Supporting Holders' claims in a reduced amount, as described above, except in the limited circumstances set forth in the RSA. Although the Government Parties have commenced a lawsuit challenging the PREPA Bondholders' liens (the "Lien Challenge") to preserve statutes of limitation, pursuant to the provisions of the RSA, the Government Parties are simultaneously moving to stay such action.

7. The Government Parties' agreement to a stipulated treatment of the Supporting Holders' claims, and securing the Supporting Holders' resulting support for an eventual plan of adjustment, pave the way for PREPA's exit from Title III proceedings, and reduce litigation risk and costs attendant to the Title III case.

8. It is my understanding that the RSA will effect a settlement with the Supporting Holders of the Renewed Lift Stay Motion and of any other attempt to seek appointment of a receiver (the "Receivership Litigation"). As Chief Executive Officer of AAFAF and a PREPA Board Member, I monitored developments in the receivership litigation, including the Renewed Lift Stay Motion, and considered the effect that appointment of a receiver, or even protracted litigation over the potential appointment of a receiver would have on PREPA. I determined that a consensual resolution of receivership litigation is of great value to PREPA.

9. As a PREPA Board Member, I am keenly aware of the disruption the appointment of a receiver would cause to PREPA's day-to-day operations. For instance, key aspects of PREPA's hurricane recovery efforts, and day-to-day operations, require close cooperation between

---

[5] *Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed*, No. 17-4780, ECF No. 975 (D.P.R. Oct. 3, 2018).
[6] RSA, Section 1 (xxxvi), (xxxiv), Section 3(a),(d).

PREPA's management team and multiple governmental agencies, including without limitation, the Oversight Board, the Office for Contracts and Procurement Compliance, ("OCPC"), the Puerto Rico Energy Bureau ("PREB"), the Central Office for Recovery, Reconstruction and Resiliency ("COR3"), and the P3 Authority.

10. Both AAFAF and the Oversight Board have an oversight role with respect to budgeting and Fiscal plan compliance. With respect to procurement, the OCPC supervises PREPA's procurement process, and PREPA's regulator asserts power to review certain procurements. PREPA has also received significant federal disaster aid following Hurricanes Maria and Irma, and obtaining federal reimbursements for hurricane restoration work requires coordination with COR3, and its advisor, Navigant Consulting. P3 Authority manages contracts and projects involving private funding, including the planned concession of PREPA's Transmission and Distribution system to a private partner (the "T&D Concession"). As CEO of AAFAF and as a member of PREPA's Governing Board, I have witnessed this cooperation firsthand, and have been uniquely positioned to understand how vital seemly intergovernmental cooperation is to PREPA's functions. Injecting a receiver, who would not have any pre-existing relationship with any of these agencies, into PREPA's operations would necessarily cause disruption, confusion, and uncertainty that would harm PREPA.

11. Replacing PREPA's management with a receiver would also be a setback to the efforts PREPA's management is currently undertaking to improve its operations. PREPA is in the process of implementing a number of reforms and operational improvements aimed at improving PREPA's performance and efficiency. Replacing the current management team and advisors that are up-to-speed on these measures and invested in their success has the potential to delay, derail, or impair progress. No matter how technically qualified or professionally experienced, a receiver

5

would face a daunting task in comprehending the status of myriad ongoing initiatives, assessing their merit and formulating his or her strategy for the future. As a PREPA Board Member, I am concerned that a receiver would, at best, be ineffective and, at worst, potentially derail, delay or impair PREPA's ability to implement many of these initiatives.

12. Appointment of a receiver would also impose a significant expense to PREPA. An expert retained by the Movants to the Renewed Receiver Motion estimated a receiver would cost "between $15 and $20 million per year," by using the projected annual cost in the Fiscal Plan of the T&D Concession, and the annualized cost of services billed to PREPA by two consultants: FEP and by Alix Partners.[7] The cost of a receiver, with whom PREPA's management would not have the same bargaining power that it has with other contract counterparties, could be significantly more.

13. Importantly, even if PREPA were to prevail in the receivership litigation, the path to a litigation victory would be costly to PREPA, both in terms of the financial cost of protracted litigation, and the disruptive impact ongoing litigation could have on the T&D Concession.

14. The Receivership Litigation has been ongoing for nearly two years.[8] On July 18, 2017, the Supporting Holders, together with National Public Finance Guarantee Corporation ("National") and Syncora Guarantee Inc. ("Syncora") filed the First Receiver Motion, which asked the Court to lift the automatic stay in PREPA's Title III case to allow the movants to initiate proceedings in Puerto Rico court to pursue appointment of a receiver over PREPA. On September

---

[7] Expert Declaration of Sandra Ringelstetter Ennis, ¶ 155, No. 17-04780, ECF No. 1106 ¶ 156 n.195.
[8] *Motion of Ad Hoc Group of PREPA Bondholders, National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed*, No. 17-04780, ECF No. 74 (D.P.R. July 18, 2017) (the "First Receiver Motion"); *Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed*, No. 17-4780, ECF No. 975 (D.P.R. Oct. 3, 2018) (the "Renewed Receiver Motion").

14, 2017, this Court denied the First Receiver Motion.[9] PREPA and the FOMB's victory did not stop the litigation. The Bondholders appealed this Court's ruling, and, on August 8, 2018, nearly a year after this Court's initial order, the First Circuit vacated and remanded this Court's decision.[10]

15. Receivership litigation started anew shortly thereafter when, on October 3, 2018, Assured, National, and Syncora filed the Renewed Receiver Motion.[11] The Renewed Receiver Motion alleged that the Movants were entitled to relief from the automatic stay to pursue appointment of a receiver on the ground that PREPA had allegedly mismanaged its operations and hurricane relief efforts. Litigating this dispute put virtually every aspect of PREPA's operations at issue. Defending this litigation was expensive to PREPA, both in terms of the amount spent on legal fees, and of the amount of time that mounting PREPA's defense required from PREPA's management and consultants, who should have been able to dedicate one hundred percent of their time and resources on transforming and improving PREPA.

16. Contentious litigation and wide-ranging, costly discovery continued for months, until PREPA and the Oversight Board reached a deal with Assured. Specifically, on May 3, 2019, while the Renewed Receiver Motion was in the midst of fact and expert discovery, the Government Parties, the Ad Hoc Group, and Assured finalized the RSA. On May 9, 2019, this Court stayed further litigation, over National's objection, on the Renewed Receiver Motion pending the conclusion of litigation on the Government Parties' Rule 9019 Motion and Motion to Dismiss the Renewed Receiver Motion.[12] Absent the settlement of the Receiver Litigation in the RSA,

---

[9] *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 301 F. Supp. 3d 278 (D.P.R. 2017).
[10] *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13 (1st Cir. 2018).
[11] Effective July 30, 2018, just nine days before the First Circuit's Order, the Government Parties had agreed to a Preliminary RSA with the Ad Hoc Group. Accordingly, the Ad Hoc Group did not join the Renewed Receiver Motion.
[12] *Order Extending the Deadlines Applicable to the Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from Automatic Stay*, No. 17-4780, ECF No. 1230 (D.P.R. May 9, 2019).

litigation of the Renewed Receiver Motion would have continued before this Court, likely to be followed by another year of litigation before the First Circuit, and, if the Movants prevailed in obtaining an order lifting the automatic stay in PREPA's Title III case, another round of litigation in the Puerto Rico Courts regarding whether a receiver should be appointed under Puerto Rico law.

17. This prolonged litigation has been costly to PREPA. If it were to continue, it would cast a cloud of uncertainty over the Government's negotiations with outside parties to modernize PREPA's infrastructure, including through the T&D Concession. The ongoing threat that PREPA's operations could be turned over to a receiver appointed at the behest of the Bondholders complicates the T&D Concession.

18. For instance, if a receiver is appointed to oversee PREPA's operations, whether the Government could subsequently turn PREPA's operations over to a concessionaire, and the extent to which a receiver would have authority over the concessionaire could all become subjects of more litigation. Settling the Receivership Litigation facilitates the T&D Concession by removing this uncertainty.

19. In addition to agreeing not to pursue the Receivership Litigation, the Supporting Holders have also agreed to support any Transformation Transaction, defined broadly in the RSA to include "any and all transactions supported by the Government Parties whereby PREPA or the Government of Puerto Rico establishes one or more sales, leases, public-private partnerships, management contracts, concessions, or similar arrangements or transactions related to any of PREPA's functions, assets, services, or facilities, including without limitation, any 'PREPA Transaction' as defined in the Puerto Rico Electric Power System Transformation Act, Act 120-2018 (approved June 21, 2018)."[13]

---

[13] RSA, Section 1 (cxxi)

20. Accordingly, by settling the Receivership Litigation and securing an agreement to support Transformation Transactions, the RSA provides some assurance to potential bidders that consummation of the Transformation Transactions will not be impeded by litigation with legacy debtholders.

21. Prevailing in the Receivership Litigation would take months or years of litigation beyond the two years PREPA has already spent litigating. Even a complete victory would come at great expense to PREPA, would come too late to have any meaningful benefit to the Transformation Transactions, and would bring no assurances that the Supporting Holders would not interfere with the Transformation Transactions. Conversely, if the Bondholders prevailed in the Receivership Litigation, a receiver could potentially remain in place at PREPA until the PREPA bonds are fully repaid, which would impose significant harm to PREPA and could interfere with the Government's efforts to negotiate and implement Transformation Transactions.

22. The RSA provides benefits to PREPA that justify the financial consideration the RSA provides to Supporting Holders. Under the Trust Agreement, PREPA's Bondholders argue they have a right to be repaid from PREPA's net revenues, have a right to appoint a receiver to enforce a covenant to raise rates to cover debt service. By contrast, the Securitization Bonds will be paid solely through a Transition Charge, which is capped, subject to the Demand Protections, the Securitization Bonds cannot be declared in default if the Transition Charge is insufficient to pay debt service, and the bondholders' remedies will be enforceable only against a special purpose vehicle ("SPV"), not PREPA. Accordingly, this new bond structure avoids the prospect that PREPA could be placed back into Title III.[14]

---

[14] The RSA also provides that Supporting Bondholders receive certain post-petition payments on account of their agreement to forbear from exercising any remedies during the lengthy period between RSA approval and ultimate plan confirmation.

23.     Moreover, on July 1, 2019, the Government Parties filed the Lien Challenge. Litigating the Lien Challenge would run the risk that the Bondholders would prevail (and therefore potentially be entitled to 100% recovery), and would take as long as the Receivership Litigation to litigate to its conclusion, if not longer. The compromise with the Supporting Bondholders in the RSA would avoid the expense and uncertainty of continuing the Lien Challenge. In addition, under the RSA the Supporting Bondholders are agreeing to take meaningful haircuts on their claims. As noted above, the Supporting Bondholders have agreed to vote for any PREPA plan of adjustment that would provide them with Tranche A Bonds in principal amount equal to 67.5% of total Applicable Bond Claims, and Tranche B Bonds in principal amount equal to 10% of the total Applicable Bond Claims. In other words, the Supporting Holders have agreed to a significant reduction of their claims, and the RSA delivers a potential impaired accepting class to facilitate plan confirmation.

24.     Accordingly, as Chief Executive Officer of AAFAF, and a member of PREPA's Governing Board, I determined, taking all of these factors into account, that the compromise set forth in the RSA is reasonable. On April 17, 2019, I, along with Nancy Mitchell (AAFAF and PREPA's outside counsel), made a presentation to a joint session with AAFAF's Board of Directors and PREPA's Governing Board, explaining the key provisions of the RSA, the above-described benefits, and countervailing considerations, including the possibility that the Government Parties could prevail in the Lien Litigation. Upon considering that presentation, on August 17, 2019, AAFAF's Board of Directors issued a resolution determining the RSA to be reasonable and necessary, approving the RSA, authorizing PREPA to enter the RSA and execute its rights thereunder, and authorizing me to execute the RSA on behalf of AAFAF. That same day, PREPA's Governing Board issued a resolution determining the RSA is in the best interest of

PREPA, and authorizing either PREPA's Executive Director or Director of Finance to execute the RSA on its behalf.

25. On May 3, 2019, I executed the RSA on behalf of AAFAF and PREPA's Executive Director, Jose F. Ortiz, executed the RSA on behalf of PREPA. As CEO of AAFAF and a member of PREPA's Government Board, I believe that the RSA is a reasonable compromise of complicated disputes, and that the RSA is in PREPA's best interest.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 2nd day of July 2019 at San Juan, Puerto Rico.

_____
Christian Sobrino Vega