# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION<br><br>    Movant,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Respondent. | Case No. 17-BK-4780-LTS<br><br>**Re: ECF No. 7176** |

# OPPOSITION OF
# THE COMMONWEALTH OF PUERTO RICO
# TO AMBAC ASSURANCE CORPORATION'S MOTION
# CONCERNING APPLICATION OF THE AUTOMATIC STAY [ECF NO. 7176]

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (*i*) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (*ii*) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (*iii*) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (*iv*) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (*v*) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 2

FACTUAL BACKGROUND ................................................................................................... 7

    A.   PRIFA and the Rum Taxes ................................................................................ 7

    B.   PRIFA's Authority to Pledge Security for Bonds Issued Pursuant to the Enabling Act .... 9

    C.   The Trust Agreement and Pledged Revenues ................................................... 12

    D.   The No-Action Clause (Trust Agreement § 705) ............................................. 14

    E.   PRIFA Resolutions ........................................................................................... 17

    F.   The PRIFA Retention Action and U.S. Treasury Action are Automatically Stayed by the Commonwealth's Commencement of this Title III Case ....................................... 17

    G.   Emergency Moratorium Legislation and Executive Orders Provided for the Commonwealth's Retention of Allocable Revenues ................................................ 18

ARGUMENT ......................................................................................................................... 20

    I.   THE MOTION SHOULD BE DENIED BECAUSE MOVANTS LACK STANDING ..... 20

    A.   Movants Lack Standing Under the No-Action Clause and are Barred from Initiating Any Suit on the Bonds ........................................................................................ 21

    B.   Movants Lack Standing to Assert PRIFA's Rights, If Any, Against the Commonwealth 24

    II.   AMBAC IS ESTOPPED FROM CHALLENGING THE DISTRICT COURTS' DETERMINATION THAT THE AUTOMATIC STAY APPLIES ........................................... 27

    III.   MOVANTS' SECURITY INTEREST, IF ANY, IS LIMITED TO MONIES DEPOSITED INTO THE SINKING FUND, AND MOVANTS HAVE NO LIEN AGAINST COMMONWEALTH PROPERTY ................................................................................... 31

    A.   The Trust Agreement, at Most, Creates a Pledge Only in Monies Deposited in the Sinking Fund .......................................................................................................... 32

    B.   Movants Have No Security Interest on the Retained Rum Tax Remittances .................. 34

    C.   Movants Have No Equitable Lien on Rum Tax Remittances .......................................... 37

    IV.   THE RUM TAX REMITTANCES ARE PROPERTY OF THE COMMONWEALTH UNTIL TRANSFERRED TO PRIFA ...................................................................................... 41

    A.   The Statutory Framework and Documents Demonstrate the Commonwealth's Property Interest in the Rum Taxes .................................................................................. 44

    B.   The Rum Tax Remittances are Subject to the Commonwealth's Retention Powers ........ 45

    C.   PROMESA Pre-Empts the Enabling Act's Allocation of Rum Tax Remittances to PRIFA ...................................................................................................................... 47

ii

D.    The Commonwealth's Retention of the Rum Tax Remittances Gives Rise to, at Best a Dischargeable, Unsecured Claim in Favor of PRIFA ................................................................. 49

E.    The Enabling Act Can be Amended or Repealed ........................................................... 51

F.    The Commonwealth Is Not a "Mere Conduit." ............................................................. 54

CONCLUSION ........................................................................................................................ 55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acevedo v. Solivellas & Co.,*
  49 D.P.R. 633 (P.R. 1936) ........................................................................................38

*Am. Fid. Fire Ins. Co. v. Construcciones Werl, Inc.,*
  407 F. Supp. 164 (D.V.I. 1975) ................................................................................39

*Ambac Assurance Corp. v. Commonwealth of P.R.,*
  No. 18-1214, 2019 WL 2574061 (1st Cir. June 24, 2019) ........................................2

*Asociacion de Subscripcion Conjunta Del Seguro De Responsibilidad Obligatorio v.
  Flores Galarza,*
  484 F.3d 1 (1st Cir. 2007) .........................................................................................54

*BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
  301 F. Supp. 3d 306 (D.P.R. 2017) .....................................................................20, 25

*Chicago Title Ins. Co. v. Lerner,*
  435 B.R. 732 (S.D. Fla. 2010) ..................................................................................28

*Cobb v. City of Stockton (In re City of Stockton),*
  909 F.3d 1256 (9th Cir. 2018) ...................................................................................51

*Collins v. Greater Atl. Mortg. Corp. (In re Lazarus),*
  478 F.3d 12 (1st. Cir. 2007) ......................................................................................42

*Commonwealth of P.R. v. Blumenthal,*
  642 F.2d 622 (D.C. Cir. 1980) ..................................................................................35

*Den Norske Bank AS v. First National Bank of Boston,*
  75 F.3d 49 (1st Cir. 1996) .........................................................................................37

*Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.),*
  765 F.2d 343 (2d Cir. 1985) ......................................................................................28

*FCC v. NextWave Pers. Commc'ns Inc.,*
  537 U.S. 293 (2003)...................................................................................................51

*Fletcher v. Peck,*
  10 U.S. 87 (1810).......................................................................................................52

iv

*Gold v. Interstate Fin. Corp. (In re Schmiel)*,
    319 B.R. 520 (Bankr. E.D. Mich. 2005) ...................................................................49

*Gottlieb v. Elkwood Assocs., LLC (In re Yashouafar)*,
    No. 17-ap-01404-MT, 2019 Bankr. LEXIS 255 (Bankr. C.D. Cal. Jan. 25, 2019) ...................37

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) ...................................................................................52

*Hunter v. Bank of N.Y. (In re Anderson)*,
    266 B.R. 128 (Bankr. N.D. Ohio 2001) ................................................................39

*In re Anders*,
    151 B.R. 543 (Bankr. D. Nev. 1993) ..................................................................47

*In re Babcock & Wilcox Co.*,
    250 F.3d 955 (5th Cir. 2001) .........................................................................26

*In re Barry Estates*,
    49 B.R. 1002 (S.D.N.Y. 1985) ........................................................................50

*In re Comcoach Corp.*,
    19 B.R. 231 (Bankr. S.D.N.Y. 1982) ..................................................................27

*In re Comcoach Corp.*,
    698 F.2d 571 (2d Cir. 1983) ..........................................................................27

*In re Dairy Mart Convenience Stores, Inc.*,
    351 F.3d 86 (2d Cir. 2003) ...........................................................................26

*In re Greer*,
    242 B.R. 389 (Bankr. N.D. Ohio 1999) ................................................................47

*In re Innkeepers USA Tr.*,
    448 B.R. 131 (Bankr. S.D.N.Y. 2011) .................................................................22

*In re James Wilson Assocs.*,
    965 F.2d 160 (7th Cir. 1992) .........................................................................25

*In re LAN Tamers, Inc.*,
    329 F.3d 204 (1st Cir. 2003) .........................................................................54

*In re M.W. Sewall & Co.*,
    431 B.R. 526 (Bankr. D. Me. 2010) ...................................................................55

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
    140 B.R. 969 (N.D. Ill. 1992) .......................................................................28

v

*In re Refco Inc.*,
   505 F.3d 109 (2d Cir. 2007)..................................................................................25

*In re S. Biotech, Inc.*,
   37 B.R. 318 (Bankr. M.D. Fla. 1983) ...................................................................26

*In re Soares*,
   107 F.3d 969 (1st Cir. 1997)................................................................................41

*In re Stanley-Snow*,
   405 B.R. 11 (B.A.P. 1st Cir. 2009) ......................................................................30

*In re T. Brady Mech. Servs., Inc.*,
   129 B.R. 559 (Bankr. N.D. Ill. 1991) ..................................................................39

*In re Tower Park Props., LLC*,
   803 F.3d 450 (9th Cir. 2015) ...............................................................................24

*In re Xenon Anesthesia of Texas, PLLC*,
   510 B.R. 106 (S.D. Tex. 2014) ............................................................................41

*Kane v. Coulson (In re Price)*,
   575 B.R. 461 (Bankr. D. Haw. 2017) ..................................................................50

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2002)..................................................................................24

*Manigault v. Springs*,
   199 U.S. 473 (1905)..............................................................................................52

*McAllister v. Resolution Trust Corp.*,
   201 F.3d 570 (5th Cir. 2000) ...............................................................................49

*McRoberts v. Transouth Fin. (In re Bell)*,
   194 B.R. 192 (Bankr. S.D. Ill. 1996) ..................................................................40

*Mitchell v. Hawley*,
   83 U.S. 544 (1872)................................................................................................42

*Mizuho Corporate Bank, LTD. v. Enron Corp. (In re Enron Corp.)*
   302 B.R. 463 (Bankr. S.D.N.Y. 2003), *aff'd* 2005 U.S. Dist. LEXIS 2134
   (S.D.N.Y., Feb. 14, 2005) ....................................................................................22

*Municipality of San Juan v. Commonwealth of P.R.*,
   919 F.3d 565 (1st Cir. 2019).....................................................................28, 29, 30

*Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight &
    Mgmt. Bd. for Puerto Rico)*,
    330 F. Supp. 3d 685 (D.P.R. 2018) ...................................................................43, 48

*Ohio v. Kovacs*,
    469 U.S. 274 (1985) ...........................................................................................50

*Pa. Dep't of Pub. Welfare v. Davenport*,
    495 U.S. 552 (1990) ...........................................................................................50

*Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
    Mgmt. Bd. for P.R.)*,
    899 F.3d 1 (1st Cir. 2018) ..................................................................................41

*Picco v. Global Marine Drilling Co.*,
    900 F.2d 846 (5th Cir. 1990) ..............................................................................28

*Pointsett Lumber Mfg. v. Drainage District No. 7*,
    119 F.2d 270 (8th Cir. 1941) ..............................................................................51

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*,
    490 F.3d 86 (1st Cir. 2007) ................................................................................30

*Reichelderfer v. Quinn*,
    287 U.S. 315 (1932) ...........................................................................................52

*Ross v. Thousand Adventures*,
    675 N.W.2d 812 (Iowa 2004) ............................................................................37

*Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*,
    145 B.R. 719 (Bankr. D. Mass. 1992) ...............................................................40

*S. Blvd., Inc. v. Martin Paint Stores*,
    207 B.R. 57 (S.D.N.Y.1997)..............................................................................25

*Soriano v. United States*,
    494 F.2d 681 (1974)............................................................................................34

*United States v. Friedman*,
    143 F.3d 18 (1st Cir. 1998).................................................................................38

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996)............................................................................................52

*Wal-Mart P.R., Inc. v. Zaragoza-Gomez*,
    174 F. Supp. 3d 585 (D.P.R. 2016), *aff'd*, 834 F.3d 110 (1st Cir. 2016) ...................................19

**STATUTES**

11 U.S.C. § 361 .................................................................................................................26

11 U.S.C. § 362 .............................................................................................................30, 41

11 U.S.C. § 502(d) ........................................................................................................38, 40

11 U.S.C. § 544 .......................................................................................................38, 40, 41

11 U.S.C. § 922(d) ..........................................................................................................2, 42

11 U.S.C. § 1109 ....................................................................................22, 24, 25, 26

26 U.S.C. § 7652 ........................................................................................................8, 35, 36

PROMESA § 4 ....................................................................................................................6

PROMESA § 201 ...............................................................................................................47

PROMESA § 202 .....................................................................................................6, 47, 48

PROMESA § 301 .........................................................................................................30, 40

PROMESA § 315(b) ...........................................................................................................1

PROMESA § 405(m)(1)-(3) .............................................................................................19

PROMESA § 407 ..............................................................................................................18

Pub. L. 106-170 § 512(a) .................................................................................................53

Pub. L. 107-147, § 609(a) .................................................................................................53

Pub. L. 108-311, § 305(a) .................................................................................................53

Pub. L. 109-432, Div. A, § 114(a) ...................................................................................53

Pub. L. 110-343, Div. C, § 308(a) ...................................................................................53

Pub. L. 111-312, § 755(a) .................................................................................................53

Pub. L. 112-240, § 329(a) .................................................................................................53

Pub. L. 113-295, Div. A, § 140(a) ...................................................................................53

Pub. L. 114-113, Div. Q, § 172(a) ...................................................................................53

Pub. L. No. 115-97 .................................................................................................36

Pub. L. 115-123, Div. D, § 41102(a)(1) ................................................................53

UCC Art. 9 ............................................................................................................37

UCC § 9-203 ..........................................................................................................36

Fed. R. App. Proc. 4(a)(1) ....................................................................................28

Fed. R. Civ. P. 59 ..................................................................................................28

Fed. R. Civ. P. 60 ..................................................................................................28

3 L.P.R.A. § 10 ......................................................................................................50

3 L.P.R.A. § 1901 ...............................................................................................5, 8

3 L.P.R.A. § 1903 ....................................................................................................8

3 L.P.R.A. § 1906 .......................................................................................9, 34, 41

3 L.P.R.A. § 1907 .......................................................................................... passim

3 L.P.R.A. § 1910 ..................................................................................................39

3 L.P.R.A. § 1911 .....................................................................................11, 34, 35

3 L.P.R.A. § 1914 .......................................................................................... passim

13 L.P.R.A. § 12 ..............................................................................................20, 44

13 L.P.R.A. § 2271v(a)(4) .....................................................................................39

13 L.P.R.A. § 10042(i)(3) ......................................................................................37

15 L.P.R.A. § 75 ....................................................................................................37

19 L.P.R.A. § 2212(a)(52) .....................................................................................40

19 L.P.R.A. § 2267(a)(2) .......................................................................................40

Act No. 56-2007 (July 5, 2007) ............................................................................20

## CONSTITUTIONS

U.S. Const. Art. III, § 2 ........................................................................................20

P.R. Const. Art. II, § 19 ....................................................................................................52

P.R. Const. Art. VI, § 8.............................................................................................. passim

**OTHER AUTHORITIES**

H.R. Rep. No. 77, 64th Congress, 1st Sess. 1-2 (1916)....................................................36

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal
Texts* (Minn, Thompson West 2012) .............................................................................52

W. Raushenbush, BROWN ON PERSONAL PROPERTY § 15.5 (3d ed. 1975) .........................4

To the Honorable United States District Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "FOMB"), as sole representative of Debtor and Respondent the Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this opposition (the "Opposition") to *Ambac Assurance Corporation's Motion and Memorandum of Law in Support of Its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 7176] (the "Motion"), filed by Movant Ambac Assurance Corporation ("Ambac"), and Financial Guaranty Insurance Company's Joinder in Ambac's Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds [ECF No. 7546] (the "FGIC Joinder"), filed by Financial Guaranty Insurance Company ("FGIC" and together with Ambac, the "Movants").

Pursuant to the Court's *Order Regarding Argument and Discovery in Connection with Ambac Assurance Corporations' Motion Concerning Application of the Automatic Stay* [ECF No. 7420] (the "Briefing Order"), this Opposition is limited to the legal issues of standing and secured status, and the Oversight Board's factual submissions are limited to legal documents relevant to the parties' standing and collateral security arguments.  Because, as discussed below, Ambac, even with FGIC's support, lacks standing to bring the Motion and has no property or security interest in the monies remitted to the Commonwealth by the federal government from federal excise taxes collected on rum produced in Puerto Rico, the Motion should be denied, and briefing, discovery, and an evidentiary

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

hearing on the additional issues raised in the Motion (including adequate protection) should be unnecessary.

## PRELIMINARY STATEMENT

1.       Previously, by complaint dated July 7, 2017 [ECF No. 35],[3] Ambac accused the Oversight Board, the Governor, and the balance of the Commonwealth government of "lawlessness" and "theft", principally on the ground defendants were violating Bankruptcy Code section 922(d) by failing to abide by its purported command to turn over certain revenues to creditors.  As it turned out, this Court and the unanimous appellate court (four judges in total) could not find such a command in section 922(d), and this Court's denial of Ambac's claim to the revenues was affirmed.[4]

2.       Now, it appears Ambac has retooled its form complaint into its Motion.  It repeats its accusation of lawlessness and vents a fair amount about the Court not having exercised subject matter jurisdiction it did not have in prior matters.  But, this time, instead of accusing respondents of lawlessness for failing to abide by a nonexistent statutory requirement, Ambac accuses respondents of lawlessness for not pretending the material facts do not exist.  The undisputed facts are the federal government imposes and collects rum excise taxes and has a statute requiring it annually to remit certain of its collections to the Commonwealth, with no strings attached.  The Commonwealth has a statute annually appropriating certain of those monies to PRIFA for its corporate purposes (also, no strings attached).  PRIFA has a contractual obligation on receipt of the monies to transfer certain of them into an account encumbered by a security interest held by the bond trustee.  Ambac's Motion expresses its wrath that Respondents do not ignore the transfer to the Commonwealth and the

---

[3]   *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00159-LTS.

[4]   *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, No. 18-1214, 2019 WL 2574061 (1st Cir. June 24, 2019).

subsequent transfer to PRIFA, as if they vanished.  Ambac contends it should be allowed to intercept the monies directly from the federal government, as if none of the intermediate transfers and rights of the Commonwealth and PRIFA matter.  Motion ¶¶ 32-38.  But, they do matter.

3.      Movants, as bond-insurers and bondholders of non-debtor PRIFA, request a ruling the Commonwealth's automatic stay does not apply, or, alternatively request stay relief, to pursue "certain anticipated lawsuits relating to PRIFA bonds."  The actions would seek to force into escrow or otherwise control some of the federal excise rum taxes collected by the federal government before being remitted to the Commonwealth and deposited into the Commonwealth Treasury and later transferred by the Commonwealth Treasury to PRIFA for its general corporate purposes and then subdivided into other accounts for PRIFA bondholders (the "Actions").   To control the money at issue, Movants' claim either (a) the money remitted to the Commonwealth is never the Commonwealth's money and somehow morphs from being the federal government's money into money in an account they encumber at PRIFA, or (b) they should be allowed to grab the money when owned by the Commonwealth as if the Commonwealth had pledged it to them, although it never did and Movants proffer no document to the contrary.

4.      Ambac's ambitious, if not magical agenda requiring facts to vanish begins with its standing being an apparition.  Neither Movant has standing.  First, the Trust Agreement's[5] no-action clause categorically bars bondholders from initiating or maintaining any action on the Bonds (defined below).  Second, the Bonds are issued by PRIFA, not the Commonwealth.  Movants, as creditors of (at most) a creditor (PRIFA) of the Commonwealth, lack standing to assert PRIFA's purported rights

---

[5]   *See* Trust Agreement dated October 1, 1988 between PRIFA and Citibank, N.A., as Trustee (the "Trust Agreement").  A true and correct copy of the Trust Agreement dated October 1, 1988 is attached and marked as **Exhibit A**.

vis-à-vis the Commonwealth to control the remedies and outcome for PRIFA and all PRIFA's bondholders.

5.      The Court denied without prejudice the Commonwealth's motion to dismiss Ambac's Motion for lack of standing, preferring to have the standing issue raised here.  *See Order Denying Oversight Board's Urgent Motions with Respect to Ambac Assurance Corp.'s Motion Concerning Application of the Automatic Stay* [ECF. No. 7324].  As the Court may recall from the emails in the prior motion practice, the Oversight Board had requested Ambac to dismiss its Motion due to lack of standing or to explain why it believes it has standing.  Ambac neither dismissed its Motion nor provided its reasoning.  Accordingly, Ambac imposed on the Court and the Oversight Board the needlessly and gratuitously inefficient situation whereby the Oversight Board must file this brief without knowledge of Ambac's argument.  Depending on the nature of the argument Ambac will presumably unveil for the first time in its reply, the Oversight Board may have to request permission to file a sur-reply.  Alternatively, the Court may hold Ambac to its representation in paragraph 2 of Ambac's opposition [ECF No. 7785], to the Board's motion for extra pages.  There, Ambac represented its Motion "included legal briefing of all of the issues implicated by Ambac's motion, not just issues of standing and whether Ambac is a secured creditor."   Accordingly, the Court may determine to consider only the standing arguments Ambac represented are inside its Motion.  To our knowledge, there are none.

6.      Even assuming, arguendo, Movants had standing, the first prong of the Motion and FGIC Joinder should be denied because they rest on a false premise: that excise tax proceeds the Unites States Treasury collects on rum produced in Puerto Rico (the "Rum Taxes") and remits to the Commonwealth (once so remitted the "Rum Tax Remittances") are the property of PRIFA, not the Commonwealth, and is subject to PRIFA bondholders' security interest even if not transferred to

PRIFA by the Commonwealth and transferred by PRIFA to the account encumbered by the bond trustee's security interest.[6]  This false premise, in turn, is based on Movants' cherry picked and misleading interpretation of PRIFA's enabling act, Act 44-1988,  3 L.P.R.A. §§ 1901-1923 (the "Enabling Act") and is directly contradicted by the Trust Agreement pursuant to which PRIFA issued the bonds (and which the Enabling Act defers to for determining bondholders' rights).  Far from *creating* a security interest in the Rum Taxes or the Rum Tax Remittances for PRIFA bondholders, the Enabling Act merely *authorizes* PRIFA to pledge certain monies the Commonwealth *transfers to PRIFA*, subject to the Commonwealth's (clawback) powers under Section 8 of Article VI of the Puerto Rico Constitution ("Retention Powers"), and only to the extent specified in a trust agreement. Here, the operative Trust Agreement shows PRIFA granted Bondholders a security interest only in monies deposited into a Sinking Fund (defined below).  PRIFA bondholders' have no security interest in the monies subject to this Motion: federal rum excise taxes, present or future, remitted to the Commonwealth by the federal government that have not been transferred to PRIFA by the Commonwealth (the "Retained Rum Tax Remittances").  PRIFA itself has no property interest in the Retained Rum Tax Remittances.

7.      The relief requested by Movants—an order the automatic stay does not apply because the Retained Rum Tax Remittances are not property of the Commonwealth, or, alternatively, stay relief—flows from, and is necessarily predicated on Movants' flawed premise that the Commonwealth does not have a property interest in the Retained Rum Tax Remittances, and they are subject to PRIFA bondholders' security interest once paid to the Commonwealth by the federal

---

[6]   The second prong of Movants' motion – that if the Commonwealth does own an interest in the Rum Taxes transferred to it, Movants should be granted stay relief in the Commonwealth case – must also be denied because Movants have no secured claims against the Commonwealth and have not shown any.

government.   The Rum Taxes, however, are property of the Commonwealth when remitted to the Commonwealth Treasury by the federal government, i.e. they become Rum Tax Remittances.  Even the Rum Tax Remittances the Commonwealth may transfer to PRIFA are at all times expressly subject to the Commonwealth's Retention Powers and its police powers.  Moreover, the Enabling Act provision regarding the subsequent transfer by the Commonwealth to PRIFA of a certain portion of the Rum Tax Remittances (subject to the Commonwealth's Retention Powers) is nothing more than a budgetary appropriation preempted by the Oversight Board's budgetary powers under PROMESA.  *See* PROMESA §§ 4, 202.

8.      In sum and substance, Movants are arguing that, because the federal government is bound by a statute (unless and until Congress changes or repeals it) to remit certain Rum Tax proceeds to the Commonwealth, and because the Commonwealth has a statute on the books calling for annual appropriations of certain Rum Tax Remittances to PRIFA for its corporate purposes (subject to the Commonwealth's clawback powers), the Court should rule the Commonwealth and PRIFA have no interest in those monies, and only an encumbered account at PRIFA does have an interest in them.  Here, the Commonwealth receives the Rum Tax Remittances with no strings attached by the federal government, the Commonwealth may or may not transfer the money to PRIFA, the Commonwealth can repeal the statute appropriating the money to PRIFA (if the statute is not already preempted), and the Commonwealth can claw back the money even if the statute is not preempted.  With all those rights to the money, it is impossible to argue the Commonwealth does not have a property interest in the Rum Tax Remittances when received from the federal government. The Commonwealth may have had obligations to transfer the money depending on whether the

obligations are valid or preempted.  But, the Commonwealth's obligations, if any, do not negate ownership before transfer.  It is that simple.

9.     While the foregoing facts establish the Commonwealth's interest in the Rum Tax Remittances, so does the absence of facts negating it.  As demonstrated below, Puerto Rico knew when it wanted to transfer ownership of funds, and deployed language to accomplish it.  When it created COFINA, Puerto Rico enacted statutes providing the sales and use taxes transferred to COFINA would not be "available resources" of the Commonwealth.  Puerto Rico did not do that for the rum taxes received by the Commonwealth.  When it created COFINA, Puerto Rico arguably did not provide the sales and use taxes would be subject to its Retention Powers pursuant to the Puerto Rico constitution.  But, Puerto Rico expressly made subject to its Retention Powers the funds appropriated by the Commonwealth to PRIFA.

10.     Finally, although unmentioned by Ambac, the issue of whether the automatic stay applies to the Actions already has been determined by the respective U.S. District Courts in which the Actions were commenced and the period to appeal those determinations expired two years ago. Movants cannot get a second bite of the apple by asking the Title III court sitting in the District of Puerto Rico to relitigate and overturn final, non-appealable orders entered in the District of Puerto Rico and District of Columbia.

## FACTUAL BACKGROUND

**A.     PRIFA and the Rum Taxes**

11.     PRIFA was created by the Enabling Act in June 1988 to provide financial, administrative, consulting, technical, advisory, and other assistance to public corporations, governmental instrumentalities, political subdivisions and municipalities authorized to develop

infrastructure facilities and establish alternate means for financing them.  *See* 3 L.P.R.A. §§ 1901, 1903.

12.     In previous years, PRIFA has received funding from, among other sources, Commonwealth budgetary appropriations pursuant to PRIFA's Enabling Act.  The Rum Taxes are excise taxes imposed by the federal government on rum manufactured in Puerto Rico, and sold on the mainland,  "covered into" (*i.e.* deposited into) the "treasury of Puerto Rico" by the federal government.[7]  26 U.S.C. § 7652.

13.     Of the approximately $430 million in Rum Tax Remittances each fiscal year, the first $117 million remitted to the Commonwealth is transferred to the Commonwealth Treasury and deposited into the Treasury Single Account ("<u>TSA</u>"), the Commonwealth's main operational account and commingled with other Governmental public funds.

14.     Pursuant to the Enabling Act, the Commonwealth conditionally authorized the appropriation to PRIFA of the first $117 million of Rum Tax Remittances in the TSA, subject to the Commonwealth's Retention Powers, and deposited such funds into a special fund at PRIFA designated as the "Puerto Rico Infrastructure Fund" (the "<u>PRIFA Infrastructure Fund</u>") to be used by PRIFA for its corporate purposes. 3 L.P.R.A. § 1914.[8]

---

[7]   Section 7652(e)(1) provides, in full: "All taxes collected under section 5001(a)(1) on rum imported into the United States (less the estimated amount necessary for payment of refunds and drawbacks) shall be covered into the treasuries of Puerto Rico and the Virgin Islands." 26 U.S.C. § 7652(e)(1).

[8]   Section 1914 of the Enabling Act provides that "the first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a) (3) of the United States Internal Revenue Code of 1986, as amended, for up to a maximum amount of thirty million dollars ($30,000,000)… and in subsequent years until Fiscal Year 2056-57, the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which when received by the Department of the Treasury of Puerto Rico, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', and be used by the Authority for its corporate purposes." *Id.*

15.     3 L.P.R.A. § 1914 authorizes PRIFA to "segregate a portion of [the funds covered into the PRIFA Infrastructure Fund] into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority." *Id.* As described below, pursuant to the Trust Agreement, PRIFA established a segregated "Sinking Fund" held by the bond trustee.  PRIFA is contractually obligated under the Trust Agreement to deposit funds from the PRIFA Infrastructure Fund into the Sinking Fund for the payment of principal and interest on the bonds.  *See* Trust Agreement § 401.  Thus, one of the magic tricks Ambac is attempting here is to convert PRIFA's contractual obligation to deposit unencumbered funds into the Sinking Fund to make them encumbered into something other than a contractual obligation.

16.     Approximately 46% of the remaining Rum Tax Remittances not transferred to the TSA are disbursed to various sources, including various on-island rum manufacturers and producers ("Rum Producers") to promote continued production of rum from which the Rum Taxes are generated.  Unlike the funds the Commonwealth has historically appropriated from the TSA to the PRIFA Infrastructure Fund, the Rum Tax Remittances disbursed to Rum Producers are *not* (i) first deposited into the TSA and (ii) transferred subject to the Commonwealth's Retention Powers.

**B.      PRIFA's Authority to Pledge Security for Bonds Issued Pursuant to the Enabling Act**

17.     The Enabling Act *authorizes* PRIFA to pledge as security for bonds, subject to the Commonwealth's Retention Powers, funds received by PRIFA that the Commonwealth may appropriate from the TSA and transfer to the PRIFA Infrastructure Fund.  Under 3 L.P.R.A. § 1906(m), PRIFA's general powers include the power to:

9

The Authority shall have all the necessary and convenient powers to carry out and accomplish the purposes and provisions of this chapter, including but without being limited to the following:

…

(m) Mortgage or pledge any property for the payment of the principal of and interest on any bonds issued by the Authority, or bonds issued by a benefited entity, and pledge all or a portion of such revenues as the Authority may receive including, but not limited to, and **subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico**, all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority

(emphasis added).   3 L.P.R.A. § 1907 authorizes PRIFA to issue bonds as it deems necessary to provide sufficient funds for its corporate purposes.   3 L.P.R.A. § 1907(a) provides, in relevant part:

The bonds issued by the Authority may be payable from all or any part of the gross or net revenues and other income derived by the Authority which, **subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico**, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth **as provided in the trust agreement or resolution whereby the bonds are issued**. The principal of, and interest on, the bonds issued by the **Authority may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth, all as provided in the trust agreement or resolution under which the bonds are issued**. Such pledge shall be valid and binding from the time it is made without the need for a public or notarized instrument. The revenues so pledged, including those subsequently received by the Authority, shall immediately be subject to said lien without the need of the physical delivery thereof or any other act, and said lien shall be valid and binding and shall prevail against any third party having any kind of claim against the Authority for damages, breach of contract or other reasons, regardless of whether such third party has been so notified. Neither the trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's rights on any revenues are pledged or assigned shall have to be presented or recorded in order to perfect the lien thereon against any third party except in the records of the Authority. The resolution or resolutions authorizing the bond issue or the trust agreement securing the bonds may contain provisions which shall be part of the contract with the holders of the bonds issued under such resolution or resolutions or under such trust agreement regarding the pledge and creation of liens on the Authority's revenues and assets, the creation and maintenance of redemption and reserve funds, limitations concerning the purposes to which bond proceeds may be applied, limitations concerning the issuance of additional bonds, limitations

concerning the introduction of amendments or supplements to such resolution or resolutions, or to the trust agreement, the granting of rights, powers and privileges and the imposition of obligations and responsibilities upon the trustee under any trust agreement or resolution, the rights, powers, obligations and liabilities that shall arise in the event of a default of any obligation under such resolution or resolutions or under such trust agreement, or in connection with any rights, powers or privileges conferred on the bondholders as security for the bonds in order to enhance their marketability.

(emphasis added).

18.      Section 1911 reinforces that the trust agreement pursuant to which all bonds are issued "shall contain **all** such provisions as the Authority may deem reasonable and proper for the protection of the bondholders." 3 L.P.R.A. § 1911 (emphasis added).[9]

19.      The Enabling Act merely authorizes PRIFA to pledge certain property, it does not effectuate any grant of a security interest.  It makes clear the scope of any asserted security interest rests on the words of the trust agreement or resolution pursuant to which PRIFA grants such interest.  Any pledge of property PRIFA may make pursuant to a trust agreement or resolution is subject to the Commonwealth's Retention Powers under § 8 of Article VI of the Puerto Rico Constitution.  This fact is underscored by the offering statements for each series of Bonds issued by PRIFA under the Trust Agreement (the "Offering Statements")[10] informing bondholders: "the Federal Excise Taxes

---

[9]   3 L.P.R.A. § 1911 provides in full:

In the discretion of the Authority, any bonds issued under the provisions of this chapter shall be secured by a trust agreement by and between the Authority and any bank or trust company described in the following paragraph, which may be a bank or trust company within or without the Commonwealth. Notwithstanding any provision of law to the contrary, said trust agreement need not be constituted pursuant to a public deed in order to be a valid trust under the laws of the Commonwealth.

It shall be lawful for any bank or trust company incorporated under the laws of the Commonwealth, the United States of America or any state of the United States of America which may act as depository of the proceeds of the bonds, revenues or other moneys, to provide such indemnity bonds or to pledge such securities as may be required by the Authority. In addition to the above, the trust agreement shall contain all such provisions as the Authority may deem reasonable and proper for the protection of the bondholders.

[10]   The Offering Statements are available at https://emma.msrb.org/MD410020.pdf and https://emma.msrb.org/MD501151.pdf.

securing the Bonds are subject to a number of factors, including the continued imposition and

remittance by the United States of such taxes to the Commonwealth and conditions affecting the

Puerto Rico rum industry," and further noting: [t]he Federal Excise Taxes and other revenues

received from the Commonwealth . . . are subject to being applied first to the payment of general

obligation debt or debt guaranteed by the Commonwealth, if other Commonwealth revenues are not

sufficient therefor.

**C.**      **The Trust Agreement and Pledged Revenues**

20.      Pursuant to the Enabling Act, PRIFA issued approximately $1.612 billion in bonds

("<u>Bonds</u>," and holders of such Bonds, "<u>Bondholders</u>") under the Trust Agreement.

21.      Unlike the Enabling Act, which merely *authorizes* PRIFA to pledge certain revenues

pursuant to a trust agreement or resolution, the Trust Agreement effectuates a grant to Bondholder of

a security interest (if any) only in certain "Pledged Revenues" *on deposit in the Sinking Fund*.

22.      Section 601 of the Trust Agreement provides the principal, interest and premium, if

any, on Bonds issued by PRIFA are to be paid only from "Pledged Revenues" in the manner and to

the extent specified in the prior sections of the Trust Agreement:

> SECTION 601.   <u>Payment of Principal, Interest and Premium; Pledge of Pledged
> Revenues</u>.  The Authority covenants that it will promptly pay the principal of and the
> interest on every Bond issued hereunder and secured hereby at the places, on the dates
> and in the manner specified herein and in said Bonds and any premium required for
> the retirement of said Bonds by purchase or redemption, according to the true intent
> and meaning thereof. <u>Except as in this Agreement otherwise provided, such principal,
> interest and premium, if any, are payable solely from the Pledged Revenues, which
> Pledged Revenues are hereby pledged to the payment thereof *in the manner and to
> the extent hereinabove particularly specified*</u>. Nothing in the Bonds or in this
> Agreement shall be deemed to constitute the Bonds a debt or obligation of the
> Commonwealth of Puerto Rico or any of its political subdivisions, and neither the
> Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable for
> the payment of the principal of or the interest on the Bonds.

Trust Agreement § 601 (emphasis added).

23.     Section 101 defines "Pledged Revenues" as "Special Tax Revenues and any other moneys that ***have been deposited to the credit of the Sinking Fund***." Trust Agreement § 101 (emphasis added).  "Special Tax Revenues" are defined as the "Offshore Excise Taxes ***deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act***." *Id.*  (emphasis added). "Offshore Excise Taxes" are defined, in turn, as "the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and ***remitted to the Puerto Rico Treasury Department*** pursuant to the Code and other provisions of law."   *Id.*    Thus, under the plain language of the Trust Agreement, Rum Tax Remittances which have not been transferred to PRIFA, and "deposited to the credit of the Sinking Fund," are not "Pledged Revenues."

24.     Article IV of the Trust Agreement further sets forth the manner and extent to which Pledged Revenues (if any) are pledged to the PRIFA Bondholders. Section 401 creates a Sinking Fund held by the Trustee, and contractually obligates PRIFA to transfer monies from the PRIFA Infrastructure Fund, which is held by the Authority, to the Sinking Fund.  Section 401 provides:

> "The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund.  As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority, shall withdraw an amount of such Special Tax Revenues and other moneys to make the following deposits…(a) to the credit of the Bond Service Account…"

13

Moreover, in section 601, PRIFA Bondholders waive their right to assert a claim against the Commonwealth on account of the Bonds.[11]  Pursuant to section 402, monies in the Bond Service Account, a sub-account of the Sinking Fund, are used to pay interest and principal.

25.     Thus, under the plain language of the Trust Agreement, Bondholders' security interest (if any) is limited to monies PRIFA actually receives and deposits to the credit of the Sinking Fund.

**D.      The No-Action Clause (Trust Agreement § 705)**

26.     Article VII of the Trust Agreement sets forth the rights and remedies available to Bondholders and the Trustee.  Section 705 is a no-action clause, expressly denying Bondholders (including Movants) any right to institute, appear in, defend, or maintain any action:

> SECTION 705. <u>Restrictions Upon Actions by Individual Bondholders</u>. **No Holder of any of the Bonds shall have any right to institute, appear in or defend any suit, action or proceeding in equity or at law on any Bond or for the execution of any trust hereunder or for any other remedy hereunder**. It is understood and intended that **no one or more Holders of the Bonds** hereby secured shall have any right in any manner whatever by his or their action to affect, disturb, or prejudice the security of this Agreement, or **to enforce any right hereunder**, that **all suits, actions and proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all holders** of such outstanding Bonds, and that any individual right of action or other right given to one or more of such holders by law is restricted by this Agreement to the rights and remedies herein provided.

Trust Agreement § 705 (emphasis added) (the "<u>No-Action Clause</u>").

27.     Section 701 of the Trust Agreement expressly provides that only the Trustee may institute and maintain a suit, action, or proceeding:

> SECTION 701. <u>Enforcement of Remedies</u>. **At the request of the Holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then**

---

[11] "Nothing in the Bonds or in this Agreement shall be deemed to constitute the Bonds a debt or obligation of the Commonwealth of Puerto Rico or any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable for the payment of the principal of or the interest on the Bonds."  *Id*. § 601.

14

**Outstanding, the Trustee shall proceed, subject to the provisions of Section 802 hereof, to protect and enforce its rights and the rights of the Holders under the laws of the Commonwealth or under this Agreement, including all rights with respect to funds and other moneys pledged hereunder, by such suits, actions or special proceedings in equity or at law,** or by proceedings in the office of any board or officer having jurisdiction, either for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted or for the enforcement of any proper legal or equitable remedy, **as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights**. In the enforcement of any remedy under this Agreement the Trustee shall be entitled to sue for, enforce payment of and recover judgment for, in its own name and as trustee of an express trust, any and all amounts then or after any default becoming, and at any time remaining, due from the Authority for principal, premium, if any, interest or otherwise under any of the provisions of this Agreement or of the Bonds and unpaid, with interest on overdue payments of principal; premium, if any, and interest at the rate or rates of interest specified in the Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under the Bonds and maintain a suit, action or special proceeding in equity or at law against the Authority for any deficiency, all without. prejudice to any other right or remedy of the Trustee or of the Holders, and to recover and enforce any judgment or decree against the Authority, but solely as provided herein and in the Bonds, for any portion of such amounts remaining unpaid and interest, costs and expenses as above provided, and to collect, in any manner provided by law, the moneys adjudged or decreed to be payable.

Trust Agreement § 701 (emphasis added).

28.     The Trustee is required to exercise its remedial powers under section 701 *only* (i) upon the request of 20% of Bondholders, and (ii) if such Bondholders provide the Trustee an indemnity satisfactory to it, consistent with Trust Agreement section 802.[12] The Trustee, and not the requesting Bondholders, determines the most effectual means to protect and enforce such rights.

---

[12]   Section 802 provides, in relevant part that: "Any other provisions of this Agreement to the contrary notwithstanding . . . the Trustee shall be under no obligation to institute any suit, or to take any remedial proceeding under this Agreement, or to enter any appearance or in any way defend in any suit in which it may be made defendant, or to take any steps in the execution of the trusts hereby created or in the enforcement of any rights and powers hereunder, until it shall be indemnified to its satisfaction against any and all costs and expenses, outlays and counsel fees and other reasonable disbursements, and against all liability . . ."

29.     Section 704 is the only provision providing Bondholders with any influence on remedial actions taken *by the Trustee*.  Section 704 enables Bondholders holding a majority of the Bond debt, "by an instrument in writing executed and delivered to the Trustee, to direct the time, method, and place of conducting all remedial proceedings to be taken by the Trustee," *but only if* the Bondholders provide satisfactory indemnity to the Trustee under section 802.  The Trust Agreement does not authorize or empower a Bondholder to commence any action on his, her or its own (even if the Trustee declines or unreasonably refuses to protect Bondholder rights, and even if the Bondholders hold the requisite amount of bonds to direct the trustee), or to otherwise control the method of enforcement.

30.     Ambac alleges it is a holder and/or insurer of $529 million or ~33% of Bonds.  Motion ¶ 1.  Ambac claims it directly owns $136 million of "those rum tax bonds," (Motion ¶ 26) and is subrogated to the rights of $167 million of Bonds.  Assuming no overlap between the Bonds it alleges it owns and the Bonds it alleges it is subrogated to, Ambac owns or is subrogated to ~18.8% of Bonds—below the No-Action Clause's 20% threshold.  Ambac does not allege in the Motion that it can exercise the rights of Bonds it merely insures, but if it did, it would not alter Ambac's lack of standing under the No-Action Clause.

31.     FGIC alleges it insures the payment of principal of and interest on approximately $357 million or 21.6% of Bonds.  FGIC Joinder ¶ 11.  FGIC asserts that, under the relevant insurance policy, it is deemed to be the sole owner of the Bonds it insures for the purposes of, or otherwise has control rights over, consents and other bondholder actions, including exercising rights and remedies of Bondholders.  FGIC Joinder ¶ 12.

32.     Neither Movant has provided any proof of ownership of Bonds or the relevant insurance policies and/or agreements they allege give them the ability to assert or control the rights

16

of Bonds they insure.  But, as discussed below, even assuming FGIC and Ambac own the Bonds they

allege they own, and, further, there is no overlap between the bonds they own and the bonds they

insure, and even assuming that outstanding interest payment is counted for the threshold calculation,

Ambac and FGIC lack standing to bring this Motion or pursue the Actions.  Under the No-Action

Clause, only the Trustee "has any right to institute, appear in or defend any suit, action or proceeding

in equity or at law on any Bond . . ."  Trust Agreement § 705.  Movants also lack standing to request

or direct the Trustee to take action under Sections 701 and 704 as they have not provided any proof

they executed an instrument in writing and delivered it to the Trustee, provided the Trustee with an

indemnity or the Trustee accepted such indemnity, all of which is required by Section 802.

**E.      PRIFA Resolutions**

33.      PRIFA entered into Resolution 8386, approved June 2, 2005, (the "**2005 Resolution**,"

attached hereto as **Exhibit B**) authorizing the issuance of Series 2005A, 2005B, and 2005C bonds.

34.      PRIFA entered into Resolution 2006-55, approved September 14, 2007, (the "**2006**

**Resolution**," attached hereto as **Exhibit C**) authorizing the issuance of Series 2006 bonds.

35.      Neither the 2005 Resolution nor the 2006 Resolution grants Bondholders a pledge of

any interest in the Rum Taxes beyond monies that PRIFA deposits in the Sinking Fund.

**F.      The PRIFA Retention Action and U.S. Treasury Action are Automatically Stayed by
the Commonwealth's Commencement of this Title III Case**

36.      When the Commonwealth commenced its Title III case on May 3, 2017, Ambac had

three pending lawsuits challenging the Commonwealth's Retained Rum Tax Remittances. The first

two lawsuits were brought against Commonwealth officials.  *See Assured Guar. Corp. v. García-*

*Padilla*, No. 3:16-cv-01037 (D.P.R., filed Jan. 7, 2016); *Ambac Assurance Corp. v. Rosselló Nevares*,

No. 3:17-cv-01568 (D.P.R., filed May 2, 2017) (together, the "PRIFA Retention Action").  The

PRIFA Retention Action seeks (i) a declaration that certain executive orders and laws regarding the transfer of Rum Tax Remittances are unconstitutional, and (ii) an injunction prohibiting enforcement of the executive orders and laws based on the same.  The PRIFA Retention Action also seeks a declaration that any transferee of property pursuant to such executive and laws is liable for the value of such transfers under PROMESA section 407.

37.     The U.S. District Court, District of Puerto Rico determined the Commonwealth's commencement of this Title III case automatically stayed the PRIFA Retention Action.  *See Ambac Assurance Corp. v. Rosselló Nevares*, No. 3:17-cv-01568 (D.P.R. May 17, 2017) [ECF No. 7]; *Assured Guar. Corp. v. Garcia Padilla*, No. 1:17-cv-01037 (D.P.R. May 17, 2017) [ECF No. 82].

38.     The third action named as defendants the U.S. Department of the Treasury and the Treasury Secretary, and sought an equitable lien against the Rum Taxes and an injunction precluding the defendants from transferring any Rum Taxes to the Commonwealth until the other actions were resolved. *See Ambac Assurance Corp. v. U.S. Dep't of Treasury*, No. 1:17-cv-00809 (D.D.C., filed May 2, 2017) (the "U.S. Treasury Action").

39.     The U.S. District Court, District of Columbia entered a minute order determining the U.S. Treasury Action was automatically stayed pending resolution of the Commonwealth's bankruptcy proceedings. *Id.* [ECF. No. 8].

**G.     Emergency Moratorium Legislation and Executive Orders Provided for the Commonwealth's Retention of Allocable Revenues**

40.     The fiscal emergency in Puerto Rico required the Commonwealth to take extraordinary measures to balance payment of Puerto Rico's debt obligations with the

Commonwealth's duty to protect the life, health and general welfare of its people.[13] Congress implanted its findings in PROMESA that (a) there is a fiscal emergency in Puerto Rico, the Commonwealth is unable to provide its citizens with effective services, and the fiscal emergency has contributed to the accelerated outmigration of residents and businesses. *See* PROMESA § 405(m)(1)-(3). In light of that, the Commonwealth took certain emergency measures.

41.     One such measure has been the retention by the Commonwealth of certain of its revenues (the "Allocable Revenues") previously allocated to certain Commonwealth instrumentalities, including PRIFA.[14] The Commonwealth provided the Allocable Revenues to the instrumentalities subject to its rights to retain such revenues under certain circumstances pursuant to section 8 of article VI of the Puerto Rico Constitution (*i.e.* its Retention Powers) and police powers.

42.     Any rights PRIFA may have to Allocable Revenues only arise *after* they have been collected by the Commonwealth and then transferred to PRIFA, because prior to their transfer, the portion of Rum Taxes to be transferred to PRIFA are "available resources" of the Commonwealth subject to the Retention Powers.[15] This situation is obviously different from other instances where the Commonwealth transferred property out of the Commonwealth and were arguably no longer "available resources."

---

[13]  The Commonwealth is "insolvent and no longer able to pay its debts as they become due." *Wal-Mart P.R., Inc. v. Zaragoza-Gomez*, 174 F. Supp. 3d 585, 592 (D.P.R. 2016), *aff'd*, 834 F.3d 110 (1st Cir. 2016); *see also* Puerto Rico Financial Emergency and Fiscal Responsibility Act, Act 5-2017, as amended (the "Financial Emergency Act") at 21 (acknowledging that the Commonwealth is voluntarily negotiating with creditors to reorganize and settle repayment of its debt obligations).

[14]  *See, e.g.*, Act 21-2016 (as amended).

[15]  Section 8 of Article VI provides: "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8.

43.     For example, when the Commonwealth wanted to transfer ownership in certain funds to COFINA, the Legislature deployed special language in the Legislation creating COFINA (the "COFINA Enabling Act") explicitly stating the monies would not be "available resources" of the Commonwealth and instead would be property of COFINA.  Section 12 of the COFINA Enabling Act states a portion of the sales and use tax collected "shall be directly deposited in [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico.  13 L.P.R.A. § 12.  The COFINA Enabling Act was amended in 2007 to further emphasize the Dedicated Sales Tax Fund, all the funds deposited therein on the effective date of the Enabling Act and all future funds that must be deposited therein, "are hereby transferred to, and shall be the property of COFINA."  Act No. 56-2007 (July 5, 2007).  In contrast, the statutory language governing the Commonwealth's appropriation of funds to PRIFA, does not contain similar terminology.  3 L.P.R.A. § 1907(a) instead authorizes PRIFA to issue bonds that "may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds *which may be made available to the Authority by the Commonwealth*, all as provided in the trust agreement or resolution under which the bonds are issued" (emphasis added).

## **ARGUMENT**

## I.     **THE MOTION SHOULD BE DENIED BECAUSE MOVANTS LACK STANDING**

44.     Pursuant to Article III, Section 2 of the U.S. Constitution, the Court may only exercise judicial power over cases and controversies which, in turn, requires a plaintiff to demonstrate standing.  *See BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306,

20

311 (D.P.R. 2017) ("To meet its burden of establishing that the district court has the constitutional power to adjudicate a case, a plaintiff must demonstrate that it has standing to assert its claim, such that the matter presents a 'case[] or controvers[y]' within the meaning of Article III of the Constitution.") (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)); *see also Opinion and Order Granting the Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6)*, Adv. Proc. No. 17-AP-159-LTS [ECF No. 156] at 12 ("The party invoking federal jurisdiction[,] bears the burden of establishing [constitutional standing].") (internal citations and quotation marks omitted).  Here, Movants lack standing, and the Motion should be denied, for two reasons.  First, Movants are barred as a matter of law by the Trust Agreement's No-Action Clause (section 705).  Second, as alleged creditors of a creditor (PRIFA) of the Commonwealth, Movants cannot stand in PRIFA's shoes to exercise PRIFA's rights (if any) against the Commonwealth.

## A.    Movants Lack Standing Under the No-Action Clause and are Barred from Initiating Any Suit on the Bonds

45.    The No-Action Clause precludes Bondholders from enforcing their rights (or maintaining an action enforcing such rights) independently of the Trustee. Trust Agreement § 705. In all circumstances, only the Trustee may exercise Bondholder remedies.  Trust Agreement § 701. As the Court saw in the motion practice concerning the timing of the Commonwealth's ability to raise the standing issue,[16] the Oversight Board asked Ambac to dismiss its Motion for lack of standing

---

[16]    *See Urgent Motion of the Financial Oversight and Management Board for Order Setting Briefing Schedule in Connection with its Motion to Dismiss for Lack of Standing Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 7263] ¶¶ 5-7; *Ambac Assurance Corporation's Opposition to Urgent Motion of the Financial Oversight and Management Board for Order Setting Briefing Schedule in Connection with its Motion to Dismiss for Lack of Standing Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 7297] ¶ 10; *Financial Oversight and Management Board's Reply to Ambac Assurance Corporation's Opposition to Urgent Motion Setting Briefing Schedule in Connection with Motion to Dismiss* [ECF No. 7313] ¶¶ 3-4.

or to explain why it had standing.  Ambac refused to dismiss its Motion and to provide an explanation as explained in paragraph 5 above.

46.    Courts have long recognized "no-action" provisions like that contained in section 705 are enforceable in bankruptcy cases.  *See In re Innkeepers USA Tr.,* 448 B.R. 131, 144 (Bankr. S.D.N.Y. 2011) (holder of certificated interests in loan lacked standing to object to motion to authorize debtor to enter into a commitment letter because of no action clause in servicing agreement); *Mizuho Corporate Bank, LTD. v. Enron Corp. (In re Enron Corp.)* 302 B.R. 463, 472-73 (Bankr. S.D.N.Y. 2003), *aff'd* 2005 U.S. Dist. LEXIS 2134 (S.D.N.Y., Feb. 14, 2005) ("*Enron*") (motion for relief from automatic stay denied because movants barred by no-action clause in credit and security agreement and therefore lacked standing).

47.    As in *Enron*, and as this Court held in the context of a PREPA bondholders' lift stay motion [ECF No. 974], a movant who fails to comply with a trust agreement's no-action clause lacks standing.  *See* Transcript of November 7, 2018 Omnibus Hearing ("Nov. 7 Hr'g Tr."), attached hereto as **Exhibit D**, at 49:13-19 ("Here, as in that case, the operative agreement defines and limits bondholders' rights and centralizes powers to take actions with respect to the bonds. The Court, therefore, finds that notwithstanding the broad provisions of Bankruptcy Code section 1109, movant lacks standing to bring the present motion in violation of the Trust Agreement's no-action clause.").

48.    Like the lift-stay motion denied in *PREPA* and *Enron*, the Motion is an action to enforce remedies under the Trust Agreement expressly prohibited by the No-Action Clause. Movants, as alleged holders and/or insurer of Bonds, seek either (i) a ruling the automatic stay does not apply to the U.S. Treasury and PRIFA Retention Action, (ii) an order lifting the stay to permit Movants to continue to pursue the Actions, or (iii) adequate protection payments for bondholders' purported collateral.  Motion ¶¶ 1, 84.  As described by Movants, the Actions "relat[e] to PRIFA

22

bonds" (*id.* ¶ 1) and seek orders escrowing or otherwise controlling Rum Taxes that Movants allege form collateral for the Bonds.  The Actions directly violate the No-Action's Clause prohibition that "[n]o Holder of any of the Bonds shall have any right to institute, appear in or defend any suit, action or proceeding in equity or at law on any Bond or for the execution of any trust hereunder or for any other remedy hereunder" and "no one or more Holders of the Bonds hereby secured shall have any right in any manner whatever by his or their action to affect, disturb, or prejudice the security of this Agreement, or to enforce any right hereunder."  Trust Agreement § 705.  Movants' request for adequate protection payments is, by definition, based on their purported security interest as Bondholders, and thus also constitutes an attempt by Movants to exercise remedies in violation of the No-Action Clause.

49.     Only the Trustee may pursue the type of relief and remedies sought by Movants. *See* Trust Agreement § 701.  Moreover, the Trustee is only required to pursue such action upon request of not less than 20% of the Bonds, and provision of indemnity satisfactory to the Trustee.  Trust Agreement §§ 701, 802.  In such case, the Trustee retains its sole discretion to determine the most effectual way to proceed to protect Bondholders.  Trust Agreement § 701.

50.     The FGIC Joinder clearly is an attempt to push Movants' collective holdings past the 20% threshold in section §701.  FGIC asserts it has an insurance agreement giving it control rights over the $357 million Bonds it allegedly insures.  FGIC Joinder ¶ 11.  As shown below, the addition of FGIC makes no difference, but additionally, FGIC does not provide the relevant insurance agreement, cite to any language in the agreement that would actually provide it with such rights, provide the Court with any reason why an insurer should be deemed a "Bondholder" under the Trust Agreement (defined in section 101 as "any person who shall be the registered owner of any

23

Outstanding Bond or Bonds") or provide evidence indemnity was provided to and accepted by the Trustee.

51.     Even if the Court were to accept Ambac and FGIC's naked assertions of their purported holdings and control rights, the Motion is still barred by the Trust Agreement.  Section 705 makes clear that only the *Trustee*, and not *Bondholders*, may initiative or maintain an action on the Bonds.  Even if Movants could establish they have the requisite 20% holdings to request the Trustee take certain remedial actions under section 701, the Trustee still need not proceed with the Motion if it is not satisfied with indemnity provided by Movants or if it determines the Motion is not the most effectual way to protect and enforce Bondholder rights.  Since Movants have failed to provide indemnity or satisfy the Trustee it should bring or maintain the Motion, the Motion must be denied.

**B.     Movants Lack Standing to Assert PRIFA's Rights, If Any, Against the Commonwealth**

52.     As alleged PRIFA Bondholders, Movants lack standing to hijack PRIFA's rights (if any) and seek to control the remedies and outcome for PRIFA and all PRIFA Bondholders.

53.     Party-in-interest standing under Bankruptcy Code § 1109(b) is confined to parties whose interests are directly (not indirectly or derivatively) affected by a Title III case.[17]  Under the prudential standing doctrine, a party must demonstrate its claims are "premised on [their] own legal rights (as opposed to those of a third party)."  *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2002) (internal citations omitted).  Moreover, section 1109 was not "intended to waive other limitations on

---

[17]  Party-in-interest status under Bankruptcy Code § 1109(b) is a necessary prerequisite to bankruptcy standing.  *In re Tower Park Props., LLC*, 803 F.3d 450, 452 (9th Cir. 2015) (citing *In re Thorpe Insulation Co.*, 677 F.3d 869, 884 (9th Cir. 2012)).  "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).

standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim." *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992).

54.      Movants lack prudential standing to pursue the Motion for two reasons. *First,* Movants, as creditors of (at most) a creditor of the Commonwealth, are precluded from asserting PRIFA's rights derivatively under the Enabling Act.  As this Court previously held, a party lacks prudential standing to appear and be heard in an action where it seeks to assert the rights of another. *BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306 (D.P.R. 2017). There, the Ad Hoc Group of General Obligation Bondholders in the Commonwealth's Title III case (the "GO Group") sought to intervene in the interpleader action filed by the Bank of New York Mellon against COFINA.  The Court denied intervention, on the ground that members of the GO Group lacked prudential standing to intervene because they were creditors of a creditor and had no direct claim over the interpleaded funds at issue.  *Id.* at 311–12.

55.      Circuit courts have consistently held party-in-interest standing under section 1109(b) does not arise if a party seeks to assert a right that is purely derivative of another party's rights in the bankruptcy proceeding.  *See In re Refco Inc.*, 505 F.3d 109, 118 (2d Cir. 2007) ("Bankruptcy court is a forum where creditors and debtors can settle their disputes *with each other.* Any internal dispute between a creditor and that creditor's investors belongs elsewhere.") (emphasis in original); *S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61–62 (S.D.N.Y.1997) ("The concept [of party-in-interest standing] does not, according to the Second Circuit, encompass a creditor of one of the debtor's creditors. . . [Appellant] cannot establish standing by raising another person's legal rights.") (internal quotation marks and citations omitted).  Party-in-interest status does not include a creditor of a creditor of a debtor.  This reasoning is obvious—the creditor whose rights the creditor of the creditor

attempts to prosecute, may not agree with what the other creditor is trying to do with its rights.  Here, it is clear AAFAF and PRIFA do not agree with Movants' attempt to assert PRIFA's purported rights.

56.     Movants purport to assert PRIFA's alleged right to Retained Rum Tax Remittances. Through the Actions, Ambac seeks to escrow funds it contends are *PRIFA's property*, or injunctive relief to ensure the funds continue to be transferred *to PRIFA*.  Movants incorrectly argue the Retained Rum Tax Remittances are property of PRIFA before they are ever transferred to PRIFA. *See* Motion ¶ 34.  Movants are wrong, but even assuming *arguendo* the funds are property of PRIFA, this does not give PRIFA's claimholders a security interest in the Retained Rum Tax Remittances. Indeed, the Commonwealth is not a party to the Trust Agreement and the relevant statutes and documentation do not give rise to a debtor-creditor relationship between the Commonwealth and PRIFA Bondholders.  Moreover, Bondholders have already waived any right to assert a claim against the Commonwealth on account of the Bonds. *See* Trust Agreement § 601 (quoted above in fn. 11). As a result, any rights that Movants attempt to assert against the Commonwealth necessarily belong to PRIFA, and Movants cannot establish they have party-in-interest standing for purposes of section 1109(b) or the constitution.

57.     *Second,* only a claimholder of the debtor may seek stay relief, and only a secured claimholder of the debtor may seek adequate protection from the debtor.[18]  In the context of the PRIFA Bonds, Movants are not claimholders of the Commonwealth, let alone secured claimholders. At most, PRIFA is an unsecured claimholder of the Commonwealth, and Movants are alleged

---

[18]   Unsecured claimholders do not have the right to adequate protection payments. *In re S. Biotech, Inc.*, 37 B.R. 318, 324 (Bankr. M.D. Fla. 1983); *see also In re Babcock & Wilcox Co.*, 250 F.3d 955, 961 n.12 (5th Cir. 2001); *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 90-91 (2d Cir. 2003) (concluding that an unsecured claimholder was ineligible to receive adequate protection under section 361 of the Bankruptcy Code; rather, the adequate protection provision of section 361 only protects secured claimholders).

claimholders of non-debtor PRIFA.  The sections of the Bankruptcy Code relating to stay relief and

adequate protection (§§ 361-364) are intended to protect secured claimholders of a debtor, not alleged

secured claimholders of a creditor of a debtor.  Movants are "not intended beneficiaries" of these

sections of the Bankruptcy Code and therefore lack prudential standing:  "A noncreditor of a debtor,

even though owed a debt by a creditor of the debtor, does not have standing *to seek relief from the*

*automatic stay* for the purpose of recovering on its claim." *In re Comcoach Corp.*, 19 B.R. 231, 234

(Bankr. S.D.N.Y. 1982) (emphasis added).  As articulated by the Second Circuit in *Comcoach*:

"Support for this view is found in the Code's legislative history which suggests that, notwithstanding

the use of the term 'party in interest', [sic] it is only creditors who may obtain relief from the

automatic stay."  *In re Comcoach Corp.*, 698 F.2d 571, 573–74 (2d Cir. 1983) (citing H.R. Rep. No.

95–595, 95th Cong., 1st Sess. 175, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 6136).

58.     Indeed, *none* of the cases Movants cite involves a situation where a creditor of a

creditor of the debtor seeks a determination that they lack of adequate protection vis-à-vis the debtor.

*See* Motion ¶¶ 40-54, 63-85.  PRIFA, and not the Commonwealth, is a *debtor* to PRIFA bondholders.

The Commonwealth made no pledge of property to PRIFA bondholders.  Movants, in their capacity

as PRIFA Bondholders, are not secured claimholders of the Commonwealth.  Movants do not have

standing to seek to lift the automatic stay due to lack of adequate protection or, in the alternative,

provision of adequate protection, and the Motion should be denied.

## II.      AMBAC IS ESTOPPED FROM CHALLENGING THE DISTRICT COURTS' DETERMINATION THAT THE AUTOMATIC STAY APPLIES

59.     In addition to lacking standing to bring the Motion, Ambac cannot use the Title III

Court to collaterally attack and overturn orders by United States District Courts that the automatic

stay applies to the Actions.  Ambac did not object to or appeal those courts' application of the stay,

27

and the applicable periods to request reconsideration or appeal have expired.  Fed. R. Civ. P. 59 and

60; Fed. R. App. Proc. 4(a)(1) (stating time to file notice of appeal is 30 days after entry of order or

60 days if federal government individual or entity is a party); *Municipality of San Juan v.

Commonwealth of P.R.,* 919 F.3d 565, 574 (1st Cir. 2019) (holding orders regarding application of

the automatic stay were final, appealable orders, because they "conclusively determine[d] the

disputed question" of applicability of the stay and were expected to be the final word on the subject

addressed.)  Foreclosed from challenging the District Courts' orders, Ambac now seeks, after sitting

on the issue for two years, a do-over by asking the Title III Court to determine in a collateral attack

the stay's applicability to the Actions.  Such request fails because Ambac is collaterally estopped

from seeking reconsideration of issues that have already been determined by other courts.

60.    "[O]ther district courts retain jurisdiction to determine applicability of the stay to

litigation pending before them and to enter orders not inconsistent with that stay."  *Picco v. Global

Marine Drilling Co.*, 900 F.2d 846, 850 (5th Cir. 1990); *see also Chicago Title Ins. Co. v. Lerner*,

435 B.R. 732, 735 (S.D. Fla. 2010) ("Federal district courts have jurisdiction concurrent with the

originating bankruptcy court to determine the applicability of the bankruptcy court's automatic

stay."); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig*., 140 B.R. 969, 973-74

(N.D. Ill. 1992) (district court had authority to construe automatic stay and decide its effect).

61.    In *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*,

765 F.2d 343 (2d Cir. 1985), a third-party complaint was filed in the Southern District of New York

against a debtor whose chapter 11 cases were pending in the Bankruptcy Court for the Southern

District of Ohio.  The Second Circuit held the district court, which would "unquestionably" have

jurisdiction over the third-party complaint "if the automatic stay did not exist," had jurisdiction to

determine the applicability of the stay:  "Whether the stay applies to litigation otherwise within the

28

jurisdiction of a district court or court of appeals is an issue of law within the competence of both the court within which the litigation is pending, and the bankruptcy court supervising the reorganization." *Id.* at 347 (internal citations omitted). The First Circuit has embraced this analysis and extended it to the PROMESA context. *Municipality of San Juan*, 919 F.3d at 575 ("[W]e see no basis for concluding that the rule [that a district court has concurrent jurisdiction with a bankruptcy court to decide whether the automatic stay applies to its own proceedings] is otherwise with respect to . . . the Title III Court, and the PROMESA automatic stay.").

62. Here, United States District Courts in the District of Columbia and the District of Puerto Rico already determined the automatic stay applies to the Actions. In the PRIFA Retention Action, the Oversight Board informed the District of Puerto Rico that Ambac's requested relief "falls within the scope of the automatic stay because, among other things, (*i*) it asserts claims against Defendants for funds allegedly owed on bonds issued by [PRIFA] . . . and (*ii*) it seeks an injunction preventing Defendants from implementing the certified fiscal plan for the Commonwealth . . ." *Ambac Assurance Corp. v. Commonwealth of P.R.*, Case No. 3:17-cv-01568-FAB, *Financial Oversight and Management Board's Statement Regarding Title III Case and Automatic Stay of Proceedings* [ECF No. 6], ¶ 6. Shortly thereafter, the Oversight Board made a similar filing in the U.S. Treasury Action in the District of Columbia. *Ambac Assurance Corp. v. U.S. Dep't of Treasury*, Case No. 1:17-cv-00809-RBW, *Statement of Financial Oversight and Management Board for Puerto Rico, as Representative of the Commonwealth of Puerto Rico as Title III Debtor, Regarding Title III Automatic Stay of Proceedings* [ECF No. 8], ¶ 6 (case was "within the scope of the automatic stay because . . . it asserts an equitable lien against Defendants for funds allegedly owed on bonds issued by [PRIFA]; and . . . it seeks an injunction preventing Defendants from taking . . . any action to remit Rum [T]axes payable to the . . . Commonwealth . . . or in the alternative, appointing a receiver to

29

hold all Rum [T]axes in escrow until Plaintiff's claims are resolved").  Ambac did not object to either filing, and both district courts entered orders finding that the PROMESA automatic stay applied.  Case No. 3:17-cv-01568-FAB, *Order* [ECF No. 7]; No. 1:17-cv-00809-RBW, *Minute Order* [May 25, 2017].  Ambac did not file motions for reconsideration or otherwise appeal either order.

63.     Ambac—and, by joining with Ambac in the Motion, FGIC—are collaterally estopped from challenging those orders.  Collateral estoppel requires the following:  (i) the issue sought to be precluded in the later action is the same as that involved in the earlier action, (ii) the issue was actually litigated, (iii) the issue was determined by a valid and binding final judgment, and (iv) the determination of the issue was essential to the judgment.  *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007).  For both the PRIFA Retention Action and the U.S. Treasury Action, all these elements are met.  The issue – whether the automatic stay in Bankruptcy Code § 362, as imported by PROMESA § 301(a), applies to the relief sought by Ambac and joined by FGIC – is identical.  This issue was actually litigated in both cases; the Oversight Board filed statements explaining the application of the automatic stay and Ambac, having previously participated extensively in both actions, did not object.  *Cf. In re Stanley-Snow*, 405 B.R. 11 (B.A.P. 1st Cir. 2009) (finding default judgment entered against defendant qualified as final judgment for collateral estoppel purposes because, although defendant failed to appear for trial, had participated extensively in prior litigation).  In both cases, application of the stay was determined by a valid and binding district court order.  *See Municipality of San Juan*, 919 F.3d at 573-74 (district court's order on PROMESA automatic stay is a final, appealable order).  The determination of the stay's application was essential to the orders.  *Id.* (noting that "the order denying the applicability of the statutorily-prescribed automatic stay conclusively determines the disputed question and that it was made with the expectation that it would be the final word on the subject addressed") (internal quotation marks and

citations omitted).   Movants are therefore collaterally estopped from asserting here the automatic stay does not apply to the Actions.

## III.   MOVANTS' SECURITY INTEREST, IF ANY, IS LIMITED TO MONIES DEPOSITED INTO THE SINKING FUND, AND MOVANTS HAVE NO LIEN AGAINST COMMONWEALTH PROPERTY

64.   The Motion rests on the singular premise that the Retained Rum Tax Remittances, present and future, are property of PRIFA and subject to Bondholders' lien even prior to their transfer. Motion ¶¶ 48, 49.   It contends the Enabling Act and Trust Agreement working together provide a lien on the Retained Rum Tax Remittances.   However, the statute and Trust Agreement make clear this argument is without merit.

65.   Movants cherry-pick certain provisions of the Enabling Act in their attempt to argue the Enabling Act itself effectuates a pledge to Bondholders of Retained Rum Tax Remittances the Commonwealth purportedly should have, but did not, transfer. *Id.*  This argument quickly falls apart when the Enabling Act is read in full: it merely *authorizes* PRIFA to grant a security interest in certain revenues it receives (subject to the Commonwealth's Retention Powers), and to effectuate such pledge through a trust agreement or resolution.  *See* 3 L.P.R.A. § 1907(a) ("the bonds issued by the Authority *may* be secured by a pledge . . . *all as provided in the trust agreement or resolution under which the bonds are issued*.") (emphasis added).  Indeed, even FGIC recognizes that the "Legislative Assembly through the Enabling Act *authorized* PRIFA to issued bonds 'secured by a pledge of all or part of any of its revenues' including the Rum Taxes."   FGIC Joinder ¶ 4 (emphasis added). Accordingly, the scope of any security interest actually granted to Bondholders is limited to, and must be determined with reference to, the operative trust agreement and/or resolutions, and not by reference to PRIFA's powers in the abstract.

31

A.     **The Trust Agreement, at Most, Creates a Pledge Only in Monies Deposited in the Sinking Fund**

66.     The Trust Agreement makes clear the Bondholders' security interest, if any, is confined to Rum Tax Remittances deposited in a Sinking Fund.   Indeed, the Motion acknowledges (at ¶ 48) section 601 of the Trust Agreement provides at most a security interest that only "attaches to the monies deposited with the trustee."

67.     As described above, section 601 is the operative clause in the Trust Agreement arguably containing a grant of a security interest (and no other provision grants a security interest in any property other than the Pledged Revenues): the "principal, interest and premium [on the Bonds], if any, are payable solely from the Pledged Revenues, which Pledged Revenues are hereby pledged to the payment thereof *in the manner and to the extent hereinabove particularly specified*."   Trust Agreement § 601 (emphasis added).   Pledged Revenues are defined as "Special Tax Revenues and any other moneys that *have been deposited to the credit of the Sinking Fund*." Trust Agreement § 101 (emphasis added).   "Special Tax Revenues" are defined as "Offshore Excise Taxes *deposited* to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act."   *Id.*   The repeated use of the word "deposited" in these defined terms is critical because it means that, whether or not PRIFA could pledge its *right to receive* Rum Tax Remittances from the Commonwealth, it did not do so.   Instead it pledged only the monies *actually received* by PRIFA from the Commonwealth (in the PRIFA Infrastructure Fund) and subsequently *deposited* by PRIFA to the Sinking Fund.   Neither prerequisite occurred here with respect to the Retained Rum Tax Remittances (or future Rum Tax Remittances).

68.     Article IV of the Trust Agreement sets forth the manner and the extent to which the Pledged Revenues are pledged to PRIFA Bondholders.   Section 401 creates the Sinking Fund held by the Trustee and contractually obligates PRIFA to transfer monies from the PRIFA Infrastructure

Fund (held by PRIFA) to the Sinking Fund.  Pursuant to section 402, monies in the Bond Service

Account (a sub-account of the Sinking Fund) are to be used to pay interest and principal on the Bonds.

The manner and extent to which the monies are to be applied to the payment of interest and principal

on the Bonds under the Trust Agreement reinforces the conclusion that any security interest in

"Pledged Revenues" is confined to monies actually received by PRIFA and deposited into the

Sinking Fund held by the Trustee.

69.    The Trust Agreement could not, and does not, pledge Rum Tax Remittances before

they are appropriated to PRIFA, transferred to PRIFA and deposited into the Sinking Fund.

70.    The language of the Trust Agreement's "NOW, THEREFORE" clause supports the

limited nature of any pledge by limiting it to the definition of Pledged Revenues:

> "NOW, THEREFORE, THIS AGREEMENT WITNESSETH….in order to secure the
> performance and observance of all the covenants, agreements and conditions therein
> and herein contained, the Authority has executed and delivered this Agreement and
> *has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined
> herein) and as security for the payment of the Bonds and the interest and premium, if
> any, thereon and as security for the satisfaction of any other obligation assumed by it
> in connection with such Bonds*…"

71.    Finally, the Offering Statements leave no doubt that Bondholders' security interest is

limited to monies deposited in the Sinking Fund.  Under the heading "Security for the Bonds" the

first sentence provides: "The Bonds [] are payable solely from, and secured by a pledge of, the

revenues and other moneys *deposited in the [Sinking Fund]*…"  Under the same heading "Pledged

Revenues" are defined as "(i) such proceeds of the federal excise tax imposed on rum and other

articles produced in Puerto Rico and sold in the United States that are transferred to the

Commonwealth . . . and *deposited to the credit of the Sinking Fund*…"  *See* Offering Statement at 9.

33

B.     **Movants Have No Security Interest on the Retained Rum Tax Remittances**

72.     Movants selectively cite from the Enabling Act to argue erroneously the first $117 million in Rum Tax Remittances received by the Commonwealth are subject to PRIFA Bondholders' purported security interest even before transfer to PRIFA. Motion ¶ 48.  The Enabling Act merely *allows* PRIFA to grant a security interest in the proceeds of any taxes "made available to it by the Commonwealth."  Critically, such grant is limited to whatever pledge is specifically provided for in the Trust Agreement.  *See* 3 L.P.R.A. §§ 1906, 1907, 1911.  Accordingly, the Enabling Act provides the outer scope of PRIFA's authority to pledge property while the Trust Agreement provides the actual pledge (in this case, at most monies paid to PRIFA and then deposited in a Sinking Fund).

73.     3 L.P.R.A. § 1906(m), describing PRIFA's "general powers" authorizes PRIFA to "pledge all or a portion of such revenues as the Authority *may* receive including, but not limited to, and *subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico*, all or any portion of the federal excise taxes or other funds which *should have* been transferred by the Commonwealth to the Authority"[19] (emphasis added).  By stating PRIFA "*may* receive" federal excise taxes, and such funds "*should* have" been transferred by the Commonwealth (as opposed to simply "transferred"), the statute explicitly recognizes the Commonwealth can retain its appropriation to PRIFA by not transferring the funds in the first place.

74.     Movants cite 3 L.P.R.A. § 1907(a) to argue "whenever PRIFA pledges revenues to secure bonds, a lien automatically attaches to the pledged revenues 'immediately' and regardless of

---

[19]   Absent language that grants PRIFA its powers, PRIFA would not have been authorized to issue secured debt.  As a public corporation, without a specific grant of power by the legislature it has none. *See Soriano v. United States*, 494 F.2d 681, 683 (1974) (noting that "an administrative agency is a creature of statute, having only those powers expressly granted to it by Congress").

whether the funds are delivered to PRIFA."  Motion ¶ 50.   But, Movants ignore critical limiting language.  Section 1907(a) more fully provides: "The Authority is hereby *authorized* to issue bonds from time to time…[issue] bonds [that] may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, *may* include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth, **all as provided in the trust agreement or resolution under which the bonds are issued**" (emphasis added). At most, Section 1907(a) and the Enabling Act provide PRIFA with the *authority* to make a pledge, a power PRIFA did not exercise in the Trust Agreement or resolutions beyond pledging monies deposited in a PRIFA account.

75.    Indeed, FGIC acknowledges the Enabling Act merely *authorizes* PRIFA to enter into the Trust Agreement (FGIC Joinder ¶ 6), and cites 3 L.P.R.A. § 1911 providing the trust agreement "shall contain all such provisions as the Authority may deem reasonable and proper for the protection of the bondholders."  FGIC Joinder ¶ 6.

76.    Movants also concoct self-serving definitions to argue certain words and phrases provide PRIFA with a property interest where none exists.  By way of example, Movants incorrectly argue the use of the phrase "cover into" in 26 U.S.C. § 7652 and in the Enabling Act means the "transfer of ownership (to the Commonwealth and PRIFA, respectively) [] is mandatory, immediate, and self-effectuating."  Motion ¶ 16.  Movants are wrong.  The phrases "cover over" and "cover into" mean "deposited into," and do not grant PRIFA property rights in the Rum Taxes prior to their transfer.  *See Commonwealth of P.R. v. Blumenthal*, 642 F.2d 622, 623 n.1 (D.C. Cir. 1980) ("The phrase 'covered into' means, literally, 'deposited into.' In practical terms, the provision requires the United States to rebate to the Puerto Rican treasury the same amount of funds as it collected through

taxation of Puerto Rican articles [under section 7652(a)(3)].")[20]  Indeed, the Spanish version of the

Enabling Act uses the verb "ingresar" or the noun "los ingresos," which respectively translate as "to

deposit" or "deposits," in the relevant sections of the Enabling Act. *See Ley Núm. 44 de 21 de Junio*

*de 1988 §§ 1906, 1907, 1914* (attached hereto as **Exhibit E**).[21]

77.    Movants also mischaracterize the word "participation," erroneously arguing

"PRIFA's ownership in the Pledged Rum Taxes is further evidenced by the Enabling Act's

description of PRIFA's right as a 'participation,' which equates to ownership under Puerto Rico law."

Motion ¶ 16 n.8.  The word "participation" in 3 L.P.R.A. § 1914 clearly does *not* provide any

ownership interest.  Section 1914 simply states the "maximum amount" of Rum Tax Remittances

that may be transferred each fiscal year, as demonstrated by the fact that, in years prior to FY 2008-

09, section 1914 used the phrase "maximum amount" in place of the word "participation."  If

"participation" conferred any special property rights, then, under Movants' theory, no such property

interest was conferred in fiscal years prior to 2008-2009—an absurd result.  Moreover, as discussed

above in ¶ 43, when the Commonwealth Legislature has wanted to transfer ownership of a future

revenue stream (as it comes into existence) to a bond issuer, as it attempted to do with COFINA, it

has done so explicitly using clear terms rather than the word "participation."

---

[20]  The definition of "covered into" being the same as "deposited into" is consistent with the Jones Act (enacted in 1917), and consistent with the prior usage of the relevant laws dealing with Puerto Rico, see H.R. Rep. No. 77, 64th Congress, 1st Sess. 1-2 (1916) (using "covered into" and "pay into" somewhat interchangeably).  Similarly, in a recent Congressional reports dealing with the excise tax, the Conference Committee (for the recent tax reform bill) stated that "[a]mounts covered over to Puerto Rico and the U.S. Virgin Islands [which have a cover over provision for excise tax on rum that mirrors that of Puerto Rico] are deposited into the treasuries of the two possessions for use as the possessions determine." (H.R. Rep. No. 115-466, Conference Committee Report to Accompany H.R. 1, Tax Cuts and Jobs Act (Pub. L. No. 115-97).  (emphasis supplied)).

[21]  Movants' claim that "a lien automatically attaches to the pledged revenue . . . regardless of whether the funds are delivered to PRIFA" (Motion ¶ 50) also is contrary to UCC § 9-203.  Under Section 9-203, any security interest would not attach until PRIFA has "rights" in the collateral—i.e., the Rum Taxes have been transferred to PRIFA.

78.     Movants' argument also fails because section 1914 discusses "participation" of the *Commonwealth Treasury*—not PRIFA: "[T]he first proceeds of *the federal excise taxes remitted to the Department of the Treasury of Puerto Rico* on each fiscal year…the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which when *received by the Department of the Treasury of Puerto Rico*, shall be covered into a Special Fund to be maintained by or on behalf of the Authority . . .". Thus, even accepting Movants' interpretation of "participation" for argument's sake supports the *Commonwealth's* ownership of the Rum Tax Remittances.[22]

## C.     Movants Have No Equitable Lien on Rum Tax Remittances

79.     Movants contend Bondholders have "an equitable lien on the Pledged Rum Taxes because Puerto Rico law purportedly imposes an equitable lien on any funds that are earmarked for the purpose of paying a particular debt."  Motion ¶¶ 63-65.  Movants are wrong for at least three reasons: (i) Puerto Rico law does not recognize the existence of equitable liens,[23] (ii) even if it did, the Commonwealth has never promised to set aside any money to pay PRIFA Bondholders and, as a result, it is impossible for Movants to contend PRIFA Bondholders have any equitable lien on funds

---

[22]  Movants argue that "PRIFA's ownership in the Pledged Rum Taxes is further evidenced by the Enabling Act's description of PRIFA's right as a 'participation,' which equates to ownership under Puerto Rico law."  *See* Motion ¶ 16 n.8.  Movants are wrong, and the authorities it cites are entirely distinguishable.  15 L.P.R.A. § 75 and 13 L.P.R.A. § 10042(i)(3) both are concerned with shares of equity in corporations and/or partnerships, and have no relevance to the case at hand.  *See* 13 L.P.R.A.  § 10042(i)(3) (referring to distributions from the "stock of corporations or participations in partnerships"); 15 L.P.R.A. § 75 (limiting transfer of equity in corporations and partnerships with gaming licenses).  Similarly, *Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d 49, 51 (1st Cir. 1996), cited for the proposition that "'participation' [is] indicative of ownership in commercial lending transactions," relates to a loan participation agreement—something far removed from the current case—and does not appear to make any statement that participation is indicative of ownership.  Moreover, the case applied Massachusetts law, not Puerto Rico law.  Notably also, loan participations do not amount to assignments of ownership rights.  *See, e.g., Ross v. Thousand Adventures*, 675 N.W.2d 812, 817 (Iowa 2004) ("the participation agreement in this case, like loan participation agreements, is not an assignment"); *Gottlieb v. Elkwood Assocs., LLC (In re Yashouafar)*, No. 17-ap-01404-MT, 2019 Bankr. LEXIS 255, at *21 (Bankr. C.D. Cal. Jan. 25, 2019) (noting distinction between an assignment and a participation agreement).

[23]  The UCC also does not recognize equitable liens.  UCC Article 9 displaces equitable liens, and allowing equitable liens between ordinary creditors and borrowers would undermine the UCC's public notice requirement.

retained by the Commonwealth, and (iii) no equitable liens can be enforced in bankruptcy against the

Commonwealth pursuant to Bankruptcy Code sections 544 and 502(d).

80.     <u>First</u>, Movants' claim fails because Puerto Rico law does not recognize the concept of

an "equitable lien."  As the Puerto Rico Supreme Court explained in *Acevedo v. Solivellas & Co*, 49

D.P.R. 633 (P.R. 1936) in dismissing a bank's claim it possessed an equitable lien on a mortgage

credit that had been pledged under an agreement:

> In support of its right of priority the intervener National City Bank
> alleges in its brief that the right constituted in its favor is in the nature
> of an equitable lien. **But the doctrine of equitable liens invoked by
> the intervener is not in force in Puerto Rico. In Puerto Rico just as
> in the State of Louisiana, no legal existence is recognized to implied
> liens, created by presumptions, such as equitable liens.**

*Id*., 49 D.P.R. 633 (citing, among other authorities, *Estate of Romero v. Willoughby*, 10 D.P.R. 71

(P.R. 1906); *Ramis v. The Registrar*, 19 D.P.R. 747 (P.R. 1913)) (emphasis added).

81.     <u>Second</u>, even assuming, for the sake of argument, Puerto Rico recognized equitable

liens, the prerequisites for an equitable lien are not present here. Even the cases Movants cite hold

"[a]n equitable lien arises . . . from . . . **a written contract which shows an intention to charge

some particular property with a debt or obligation**. . ." *United States v. Friedman*, 143 F.3d 18,

23 (1st Cir. 1998) (applying Massachusetts law and quoting Black's Law Dictionary 539 (6th ed.

1990)) (emphasis added); *see also* Motion ¶¶ 64-65 (citing cases where specific property was

contractually promised to repay a debt).

82.     The *Commonwealth* has not promised or shown any intent to create a lien (of any sort)

on its property for the benefit of PRIFA's claimholders, negating the existence of an equitable lien.

The Commonwealth's statutes do not give any security interest or other property right to PRIFA

bondholders.  To the contrary, 3 L.P.R.A. § 1914 states that any Rum Tax Remittances transferred

to PRIFA are to "be used by the Authority for **its corporate purposes**"—not to pay bondholders (emphasis added).[24]  The Enabling Act further makes clear the Commonwealth will not be indebted to PRIFA Bondholders in any respect, or liable on account of the PRIFA bonds.[25]  This prevents Commonwealth property from securing PRIFA bonds.

83.     As discussed above, the Trust Agreement is the only instrument that purportedly grants Bondholders any interest in the Rum Tax Remittances, with such interest being limited to monies deposited in a Sinking Fund.  But, the Commonwealth is not a party to the Trust Agreement (only PRIFA is), and is not to be held liable on account of the Bonds.[26]  Movants cannot use the concept of an equitable lien to expand what is already in the Trust Agreement.  *Am. Fid. Fire Ins. Co. v. Construcciones Werl, Inc.*, 407 F. Supp. 164, 203 (D.V.I. 1975) ("[E]quitable lien principles cannot create vested rights . . . which are contrary to express and implied contractual undertakings.").

84.     Equitable liens also are disfavored and rarely granted in bankruptcy.  As one court explained: "in a bankruptcy case, there is nothing equitable about taking money away from unsecured creditors and giving it to a creditor that failed to protect its own interests when it had a chance to do so."  *In re T. Brady Mech. Servs., Inc.*, 129 B.R. 559, 563 (Bankr. N.D. Ill. 1991); *see also Hunter v. Bank of N.Y. (In re Anderson)*, 266 B.R. 128, 134 (Bankr. N.D. Ohio 2001) ("equitable liens are not

---

[24] *Compare* 13 L.P.R.A. § 2271v (a)(4) (requiring that certain taxes allocated to a different instrumentality be "maintained by the Bank in the name of the Authority **for the benefit of the bondholders**").

[25] 3 L.P.R.A. § 1910:  "The bonds issued by the Authority shall not constitute an indebtedness of the Commonwealth nor of any of its political subdivisions, and neither the Commonwealth nor any of its political subdivisions shall be liable therefor, and such bonds shall be payable solely out of those funds pledged for the payment thereof."  Similar language is also included in the template bonds in the Trust Agreement and the granting clause of the bondholders' security interest.  *See* Trust Agreement at 4; § 601.

[26] Trust Agreement § 601 ("Nothing in the Bonds or in this Agreement shall be deemed to constitute the Bonds a debt or obligation of the Commonwealth of Puerto Rico or any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable for the payment of the principal of or the interest on the Bonds.").

favored in bankruptcy") *Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*, 145 B.R. 719, 727 (Bankr. D. Mass. 1992) ("Business failures cause hardships that cannot and should not be rectified by the misapplication of equitable principles permitting the imposition of constructive trusts and the creation of equitable liens.  One of the fundamental precepts of our bankruptcy laws is the even-handed treatment of similarly situated unsecured creditors.").

85.     Third, even if the Court could create an "equitable lien," it would be (i) disallowable under section 502(d) as a lien avoidable under section 544(a) and (ii) subordinate to the Commonwealth's interest in the Rum Tax Remittances under 19 L.P.R.A. § 2267(a)(2).  Equitable liens, by nature, are subject to and avoidable by a 'lien creditor', which, pursuant to Bankruptcy Code section 544(a) and 19 L.P.R.A. § 2212(a)(52), includes a trustee in bankruptcy.  *See, e.g., McRoberts v. Transouth Fin. (In re Bell)*, 194 B.R. 192, 196 (Bankr. S.D. Ill. 1996) ("equitable liens arising under state law are contrary to the letter and purpose of the Bankruptcy Code").[27]

86.     As PROMESA section 301(c)(7) gives the Oversight Board the powers of a bankruptcy "trustee" in those Bankruptcy Code sections incorporated into Title III that refer to a trustee, including in connection with section 544, the Oversight Board is empowered to avoid any equitable lien under Bankruptcy Code section 544(a).  Moreover, 19 L.P.R.A. § 2267(a)(2) gives the Oversight Board, as "trustee" and representative of the Commonwealth, priority over the same

---

[27] *See also e.g.,* W. Raushenbush, BROWN ON PERSONAL PROPERTY § 15.5 (3d ed. 1975) ("equitable pledges" are ineffective against lien creditors without knowledge of the interest).  Notably, any equitable lien Movants may be held to have would be unperfected as it was not granted by any of the statutes governing the Rum Taxes (which would have created a statutory lien, not an equitable lien) or granted by PRIFA (which would have granted a security interest, not equitable lien), and therefore would not be saved by the automatic perfection provision of 3 L.P.R.A. § 1907(a).  Such equitable liens would be unperfected and subject to avoidance under Bankruptcy Code section 544.

interests a lien creditor could avoid under Bankruptcy Code section 544.  For each of these reasons, Movants' claims to an equitable lien should be rejected.[28]

## IV.   THE RUM TAX REMITTANCES ARE PROPERTY OF THE COMMONWEALTH UNTIL TRANSFERRED TO PRIFA

87.     In seeking an order the automatic stay does not apply, Movants have the burden to show the Rum Tax Remittances not yet deposited into PRIFA accounts are not property of the Commonwealth, are property of PRIFA and are pledged to its Bondholders. *In re Soares*, 107 F.3d 969, 976 (1st Cir. 1997) (burden is on offending creditor to validate action taken in contravention of automatic stay).  Moreover, in seeking to lift the stay under section 362(d)(2),  Movants have the burden of proof on the issue of the "debtor's [lack of] equity [interest] in [such] property." 11 U.S.C. § 362(g); *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 111 (S.D. Tex. 2014).  Movants cannot meet their burden of demonstrating the Commonwealth lacks an equity interest in the Rum Tax Remittances.

---

[28] Movants also appear to argue that the Trust Agreement and Enabling Act together give rise to a "consensual lien" on the "first $117 million of run taxes each fiscal year, regardless of whether or not received by PRIFA or deposited into the bondholder trust account."  Motion ¶¶ 48-51.  However, the First Circuit has held that liens are divided into *only* "three mutually exclusive categories:  judicial liens, statutory liens, and security interests."  *Peaje Investments LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 1, 11 (1st Cir. 2018). If Movants are arguing that it has some sort of fourth kind of "consensual lien" (*cf.* Motion Heading II.A.1.a) that is neither a "security interest" nor a "statutory lien," Movants are therefore incorrect.  To the extent Movants are attempting to show through this argument that it has a statutory lien, it cannot do so, as the Enabling Act does not create a lien arising solely by force of a statute.  Instead, the Enabling Act "provisions permit [PRIFA] to secure the payment of bonds by making a pledge of revenues, but they do not require that it do so."  *In re Fin. Oversight & Mgmt. Bd.*, 899 F.3d at 10.  Specifically, 3 L.P.R.A. § 1907 provides, in relevant part, that "the principal of, and interest on, the bonds issued by the Authority *may be secured by a pledge of all or part of any of its revenues* . . ." 3 L.P.R.A. § 1907(a) (emphasis added).  This section only gives PRIFA authority to pledge its revenues to pay bondholders, to the extent PRIFA chooses to do so.  Similarly, 3 L.P.R.A. § 1906(m), provides "[t]he Authority *shall have all the necessary and convenient powers* to carry out and accomplish the purposes and provisions of this chapter, including . . . pledge all or a portion of such revenues as the Authority may receive including . . . all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority." 3 L.P.R.A. § 1906(m).  Again, as the First Circuit recently held, 1906(m) is clear any lien "arises only when the Authority chooses to grant it."  *In re Fin. Oversight & Mgmt. Bd.*, 899 F.3d at 12.  Therefore, the Enabling Act neither creates a statutory lien nor controls the scope of any security interest—it only gives PRIFA power to grant security interests in its property to an extent determined by PRIFA in the Trust Agreement.

88.     The Commonwealth must have an ownership interest in the Rum Tax Remittances. If it did not, then under the legal doctrine of *nemo dat quod non habet*, the Commonwealth could not provide PRIFA with a property interest in the Rum Tax Remittances.  *Mitchell v. Hawley*, 83 U.S. 544, 550 (1872).  Even if Movants argue the Commonwealth once had an interest in the Rum Tax Remittances but transferred it away by enacting a statute appropriating Rum Tax Remittances annually to PRIFA, the argument cannot hold up for many reasons.  First, the Commonwealth retains its Retention Powers, which provide the Commonwealth a continuing interest.  Under "earmarking" doctrine, if a debtor has a "right" to use money advanced other than to pay a particular creditor, money advanced is property of debtor.  *See Collins v. Greater Atl. Mortg. Corp. (In re Lazarus)*, 478 F.3d 12, 15 (1st. Cir. 2007), citing *In re Superior Stamp & Coin Co.*, 223 F.3d 1004, 1010 (9th Cir. 2000).  Second, the appropriations are articulated as the first $117 million of each year's receipts of Rum Tax Remittances.  Annual appropriations cannot be made unless the Commonwealth receives Rum Tax Remittances to appropriate each year.  Third, the Commonwealth did not use any of the language it used in connection with COFINA to evidence an intent to make the Rum Tax Remittances not "available resources" of the Commonwealth.   Fourth, as explained below (at Part IV.D.), no legislature can impose appropriations on future legislature that the future legislature is not free to repeal or otherwise change.

89.     Movants argue the Commonwealth acts as a "mere conduit" for the Rum Tax Remittances, without any control or ownership over the funds.[29]  Motion ¶¶ 35, 37.  Movants'

---

[29]  Movants argue they hold "special revenue" bonds, and, as a result, Bankruptcy Code section 922(d) makes the automatic stay inapplicable to their Actions seeking to escrow or otherwise control the Rum Tax Remittances purportedly securing their Bonds.  Motion ¶ 39. While the Oversight Board disagrees with both the characterization of the Bonds held by Movants as backed by special revenues and Movants' legal conclusions regarding applicability of the stay to actions to enforce payment on special revenue bonds, these issues are not before the Court at this stage. Movants' argument, moreover, is inconsistent because, on the one hand, they argue the "Pledged Rum Taxes do not

contention is wrong; the Rum Tax Remittances are property of the Commonwealth when remitted to the Commonwealth Treasury.  The fact the Commonwealth enacted a statute (which it can repeal) that appropriates each year certain Rum Tax Remittances to PRIFA for corporate purposes, reinforces that the Commonwealth intended to own Rum Tax Remittances each year that it could appropriate. In fact, the venerable principle that one legislature cannot bind future legislatures defeats Ambac's case all on its own.  As shown below, the Legislature that enacted the statute requiring annual appropriations could not bind future legislatures to make those appropriations or to leave the statute intact.  Moreover, if the Commonwealth were only a conduit, there would be no need for the Commonwealth to provide for appropriations of Rum Tax Remittances each year.  Indeed, it would have no power over them whatsoever.  Moreover, the Commonwealth continues to hold its Retention Powers and police powers, it retains a reversionary interest even in the portion of Rum Tax Remittances it deposits into PRIFA's Infrastructure Fund.  PRIFA's Enabling Act does not pass title or ownership of the Rum Tax Remittances to PRIFA, it merely creates a conditional budgetary appropriation of a certain portion of the Rum Tax Remittances until FY 2056-57.  As this Court has already determined in the context of the Commonwealth Governor identifying prior year authorizations for spending and deploying them in the current year, such reprogramming would be inconsistent with the Oversight Board's certified budget and preempted by, PROMESA.[30]  Moreover, the Commonwealth's purported noncompliance with the Enabling Act does not provide PRIFA or its

---

belong to the Commonwealth," but on the other hand, argue that the bonds are backed by a "special revenue" pledge. Motion ¶ 39.  The Commonwealth cannot pledge property it purportedly does not own.  *See* Uniform Commercial Code § 9-203 (permitting a debtor to grant a security interest only in property the debtor "has rights in").

[30] *Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 330 F. Supp. 3d 685, 704 (D.P.R. 2018).

Bondholders with a right to turnover of the Rum Tax Remittances, it merely gives rise to, if anything, a dischargeable unsecured PRIFA claim against the Commonwealth.

**A.    The Statutory Framework and Documents Demonstrate the Commonwealth's Property Interest in the Rum Taxes**

90.    As discussed above, the Enabling Act and Trust Agreement do not purport to transfer all current and future rum taxes to PRIFA.  Instead, they merely depend on transfers from the Commonwealth and provide PRIFA with the power to pledge certain Rum Tax Remittances, as provided in a trust agreement or resolution, with such pledge subject to the Commonwealth's Retention Power.  The statutory framework contains a number of features that demonstrate the Rum Tax Remittances are property of the Commonwealth because (i) all monies that reside in the TSA are "available revenues" subject to the Commonwealth's police powers and Retention Powers, (ii) rather than provide for a dedicated stream of revenue, only a small portion of the ~$430 million Rum Tax Remittances are appropriated under the Enabling Act, (iii) the fact the Commonwealth can subject the Rum Tax Remittances to its Retention Powers demonstrates they are Commonwealth property in the first instance, and (iv) the Commonwealth can repeal the Enabling Act.

91.    Contrasting the PRIFA statutory framework with the framework in COFINA illustrates that the Enabling Act does not establish a structure whereby the Commonwealth arguably relinquished its property rights in the Rum Taxes:

a.    Act 56 specifies that the account wherein certain sales and use taxes ("SUT") are deposited (the "Dedicated Sales Tax Fund") is transferred to and property of COFINA:   "The [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this law *are hereby transferred to*, and *shall be the property of COFINA*."  13 L.P.R.A. § 12 (emphasis added).

b.    Unlike the Rum Taxes, which are deposited in the TSA and are expressly made subject to the Commonwealth's Retention Powers, Act 56 provides that the pledged

44

SUT "*shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute
resources available to the Commonwealth of Puerto Rico*, nor shall these be available
for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico." *Id.*
(emphasis added).

92.     Other provisions in the Trust Agreement also indicate the Commonwealth's property

interest.  For example, section 814 of the Trust Agreement provides reporting requirements, with

such reporting limited to disbursements and investments of PRIFA's accounts and trust.  If the Trust

Agreement provided rights against the Commonwealth or its monies, one would think the reporting

would include reports of monies sent to the Commonwealth and the Commonwealth's distributions

to PRIFA. Instead, the absence of such reporting requirements evidences that Bondholders have no

property rights in the Rum Tax Remittances that reside with the Commonwealth.

93.     Further, section 601 of the Trust Agreement provides nothing in the Bonds or

agreement shall be a "debt or obligation" of the Commonwealth.  Thus, not only are the Bonds not a

debt of the Commonwealth, but the Commonwealth has no obligation under the agreement to transfer

Rum Tax Remittances to PRIFA.  That obligation arises out of 3 L.P.R.A. § 1914, which (as

discussed below) is a statute the Commonwealth can repeal any time.

**B.     The Rum Tax Remittances are Subject to the Commonwealth's Retention Powers**

94.     That the Commonwealth, at a minimum, has a reversionary property interest in the

Rum Tax Remittances transferred to the PRIFA Infrastructure Fund is shown by the fact the Rum

Tax Remittances have always been subject to retention by the Commonwealth to fund its own

expenses, pursuant to both section 8 of Article VI of the Constitution and the Commonwealth's police

power.  Moreover, if the Commonwealth had no property interest in the Rum Tax Remittances at any

stage, as Ambac asserts, it could not have subjected PRIFA's rights to the Rum Tax Remittances to

the Commonwealth's Retention Powers in the first place.  The fact the transfer of Rum Tax

45

Remittances is made subject to the Retention Powers demonstrates (i) the Commonwealth has

ownership and control over them while in its possession and is not a "mere conduit" for the funds,

and (ii) the Commonwealth has a continuing property interest in even those funds that are transferred.

95.     The applicable statute and official statements for the Bonds make clear the Rum Tax

Remittances are always subject to retention by the Commonwealth if available revenues are

insufficient to meet appropriations (including to Commonwealth's general obligation bondholders)

in any given year.  The Offering Statements provide "*Prior to* their application to pay principal of

and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution."

Specifically, 3 L.P.R.A. § 1914 provides PRIFA is only empowered to grant security interests in the

Rum Tax Remittances "subject to the provisions of Section 8 of Article VI of the Constitution of the

Commonwealth,"[31] meaning the Commonwealth may retain those revenues if needed to pay

Commonwealth expenses.  3 L.P.R.A. § 1907(a) also provides any pledge of Rum Tax Remittances

will be "subject to the provisions of §  8 of Article VI of the Constitution of the Commonwealth of

Puerto Rico."   Bondholders had full knowledge any pledge was subject to the Commonwealth's

Retention Powers, the Rum Tax Remittances were "available revenues" of the Commonwealth once

remitted to the Treasury, and the transfer of Rum Tax Remittances could be suspended or undone.

96.     The Rum Tax Remittances are thus "property of the debtor" for purposes of analyzing

the applicability of the automatic stay.  The reversionary interest in Rum Taxes transferred to PRIFA

also is "property of the Commonwealth" and actions to interfere with this reversionary interest are

---

[31] Section 8 of Article VI provides that "[i]n case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. Art. VI, § 8.  In this context, it allows the Commonwealth to retain the Rum Tax Remittances if other "available revenues" "are insufficient to meet the [Commonwealth's] appropriations" in any fiscal year.

barred by the automatic stay.   *See In re Anders*, 151 B.R. 543, 545 (Bankr. D. Nev. 1993) ("[A]ll

legal or equitable interests of a debtor in property as of the commencement of the case are property

of the estate…. [T]he conditional, future, speculative, or equitable nature of an interest does not

prevent it from becoming property of the bankruptcy estate."); *see also In re Greer*, 242 B.R. 389,

396-97 (Bankr. N.D. Ohio 1999) ("contingent interests are clearly property of the bankruptcy estate).

## C.   PROMESA Pre-Empts the Enabling Act's Allocation of Rum Tax Remittances to PRIFA

97.     The Enabling Act's conditional requirement that a certain portion of Rum Tax

Remittances in the TSA be transferred to PRIFA each fiscal year until FY 2056-57 is nothing more

than a forward-looking budgetary appropriation that is preempted by PROMESA.[32]  Indeed, FGIC

acknowledges the Enabling Act is an "appropriation" of certain funds by the Legislative Assembly.[33]

98.     Congress gave the Oversight Board extensive powers to develop and certify fiscal

plans and budgets for the Commonwealth and its instrumentalities, *see* PROMESA §§ 201, 202, and

provided that "the provisions of [PROMESA] shall prevail over any general or specific provisions

of territory law, State law, or regulation that is inconsistent with [PROMESA]."  PROMESA § 4.

99.     Fiscal plans for the Commonwealth and Commonwealth budgets from April 2017

through 2019 were certified by the Oversight Board, pursuant to its federal statutory powers under

---

[32]   In the same way that Movants assert "Congress preempted all Commonwealth moratorium laws" through PROMESA (Motion ¶ 24), PROMESA preempts prior Commonwealth laws purporting to make budgetary allocations.

[33]   The FGIC Joinder states at ¶ 3 "Beginning with the fiscal year 1988-89 and continuing until fiscal year 2056-57, the Legislative Assembly assigned, **appropriated**, and pledged to PRIFA certain first proceeds of the federal excise taxes remitted to the Treasury of Puerto Rico." While FGIC is correct the Enabling Act merely appropriates certain funds for PRIFA, as discussed above, FGIC is wrong such funds were pledged by the Commonwealth to PRIFA or its Bondholders.

PROMESA.  They all require continued retention of the Allocable Revenues.[34]  For instance, the latest fiscal plan, certified on May 9, 2019 ("May 2019 Fiscal Plan"), requires the Commonwealth to retain the Allocable Revenues to meet cash flow projections and fund required expenditures.  May 2019 Fiscal Plan at 27 and 148.  Moreover, on June 30, 2018, the Oversight Board certified a budget for the Commonwealth for the current Fiscal Year 2018-2019 (the "Certified FY19 Budget"), predicated on the use of Allocable Revenues.[35]  Under PROMESA, the Certified FY19 Budget is deemed to be "in full force and effect," PROMESA § 202(c)(3)(C).  Indeed, this Court has already ruled, "a budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are preempted."  *Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018).  Moreover, in *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 330 F. Supp. 3d at 704, this Court recognized:

> A budget must cover a specific fiscal year or years. It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year. Since a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget. **A prior year authorization for spending that is not covered by the budget is inconsistent with PROMESA's declaration that the Oversight Board-certified budget for the fiscal year is in full force and effect, and is therefore preempted by that statutory provision by force of Section 4 of PROMESA.**

---

[34]  *See also* the "October 2018 Fiscal Plan" which explicitly listed the Allocable Revenues as revenues used by the by the Commonwealth.  *See* Revenue Forecast Letter, dated May 31, 2018 ("FY19 Revenue Letter"), available at https://oversightboard.pr.gov/documents/.

[35]  The Certified FY19 Budget requires the Commonwealth to retain and use of certain of the Allocable Revenues otherwise conditionally allocated to the Authorities to fund the Commonwealth's expenses.  For instance, in connection with the Excise Taxes otherwise conditionally allocated to HTA, the Certified FY19 Budget expressly provides that "[n]otwithstanding any other legal provisions to the contrary" the Excise Taxes are to be retained by the Commonwealth and used to fund certain of the Commonwealth's operations.  Certified FY19 Budget, Ex. 1 at 1.

100.     This is precisely what has occurred here: the Enabling Act's prior year authorization for allocation of Rum Tax Remittances to PRIFA is inconsistent with the Certified FY19 Budget.  If the Oversight Board's budgetary powers under PROMESA did not preempt pre-existing Commonwealth laws that effectuated budgetary allocations, its powers would be rendered nugatory and it would lack the ability to fulfill its mission under PROMESA to achieve fiscal responsibility for Puerto Rico. As a result, the Certified FY19 Budget has preempted the Enabling Act's allocation of certain Rum Tax Remittances to PRIFA, thereby also eliminating any rights PRIFA or its claimholders could have to those revenues.

**D.      The Commonwealth's Retention of the Rum Tax Remittances Gives Rise to, at Best a Dischargeable, Unsecured Claim in Favor of PRIFA.**

101.     Movants argues the Rum Taxes are not property of the Commonwealth because 3 L.P.R.A. § 1914 requires the Commonwealth to transfer a portion of the Rum Tax Remittances to PRIFA.  The Commonwealth's purported noncompliance with its obligation to transfer a portion of the Rum Taxes, at most, gives PRIFA (and not its claimholders) an unsecured claim that is dischargeable.  It affords neither PRIFA nor PRIFA Bondholders any property rights or security interest in the retained Rum Taxes, and no "title" to or "ownership" of the Rum Taxes passes to PRIFA or its claimholders so long as they remain with the Commonwealth.

102.     It is hornbook bankruptcy law that a promise to pay simply gives rise to an unsecured claim—it does not create a property interest in such monies nor require turnover of such moneys.. *McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 579 (5th Cir. 2000) (entity with "unsecured promise to pay . . . has no rights against any assets other than the rights of a general unsecured creditor of the company") (quoting *Westport Bank & Trust Co. v. Geraghty*, 90 F.3d 661, 669 (2d Cir. 1996)); *Gold v. Interstate Fin. Corp. (In re Schmiel)*, 319 B.R. 520, 530 (Bankr. E.D. Mich. 2005) ("Interstate

is left with merely a pre-petition unsecured promise to pay. That pre-petition unsecured promise to pay is dischargable by the Debtors."). Here, the Commonwealth's obligation to transfer a portion of the Rum Tax Remittances to PRIFA is at most a promise to pay PRIFA a certain sum of money. *Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (holding a promise to pay a debt from a particular fund does not create a contractual lien in the fund nor an equitable lien). The Commonwealth's purported noncompliance with the Enabling Act would be tantamount to a breach of contract, and thus would provide Movants an unsecured claim at best.

103.    Indeed, the case law makes clear that a breach of a promise to pay embodied in a statute is no different for bankruptcy purposes than a breach of a similar promise in an ordinary contract, as both give rise to an unsecured claim. *See, e.g., Ohio v. Kovacs,* 469 U.S. 274, 279 (1985) (holding that breach of statute and court order gave rise to dischargeable unsecured claim, and rejecting argument that breach should be treated differently because it "was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim" that was dischargeable in bankruptcy); *Pa. Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552 (1990) (statutory criminal restitution obligation dischargeable as unsecured claim); *In re Barry Estates,* 49 B.R. 1002 (S.D.N.Y. 1985) (penalty for violating statute regarding rent limits dischargeable). Ambac itself believes the Commonwealth's alleged breach of the Enabling Act is nothing more than a breach of contract, as it describes the Enabling Act as "creat[ing] a contract whereby the Commonwealth 'shows an intention' that the Pledged Rum Taxes will be available for and used to pay debt service on PRIFA's bonds." Motion ¶ 65. FGIC too points to 3 L.P.R.A. § 10 to argue that the Legislative Assembly, through the Enabling Act, "*covenanted*" with bondholders. FGIC Joinder ¶ 5. Consequently, a breach of statute reducible to money damages, as is the case here, gives rise to a dischargeable unsecured claim. *See, e.g., Kovacs*, 469 U.S. at 279 (because breach of statute was

reducible to money damages, court order for performance "had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy," not a continuing obligation to obey law); *FCC v. NextWave Pers. Commc'ns Inc*., 537 U.S. 293, 302 (2003) (continuing right under statute to pay installment payments for FCC license is dischargeable unsecured claim). Therefore, the Commonwealth's alleged noncompliance with the Enabling Act is, at best, tantamount to a breach of contract, affording PRIFA no more rights than a breach of contract claim.[36]

104.    Because Movants have no property rights in the Rum Tax Remittances, they cannot have a constitutional claim for the Commonwealth's actions through its Fiscal Plans, budgets, and moratorium acts. But, in any event, a claim for just compensation based on the Takings Clause is also dischargeable. *Cobb v. City of Stockton (In re City of Stockton)*, 909 F.3d 1256 (9th Cir. 2018) (Takings Clause claim could be treated as unsecured claim and discharged in bankruptcy); *Pointsett Lumber Mfg. v. Drainage District No. 7*, 119 F.2d 270 (8th Cir. 1941) (Takings Clause claims are dischargeable in bankruptcy).

**E.    The Enabling Act Can be Amended or Repealed**

105.    Even without the budgetary power provided to the Oversight Board, which preempts any Puerto Rico law to the contrary, *see* Section VI.C., *supra*, as a matter of general law, the Enabling Act providing for the transfer of Rum Tax Remittances can be amended or repealed by the Commonwealth. "The one body whose future actions a legislature has no power to affect is the

---

[36]   Moreover, Movants cannot properly rely on the Commonwealth's "promise" to collateralize the Rum Tax Remittances, because Movants are merely a creditor of a creditor and, as such, is not a party-in-interest entitled to be heard in a bankruptcy case. *See* Part I.B. The federal government has a personal obligation to transfer Rum Tax Remittances to the Commonwealth and the Commonwealth has a personal obligation to transfer Rum Tax Remittances to PRIFA. As a creditor of PRIFA and not the Commonwealth, Movants hold no right to the Commonwealth's property – at best, Movants have only the right to sue the Commonwealth for breach of its personal obligation, which is merely an unsecured claim.

legislature itself… [L]egislators cannot make their laws irrepealable or disable themselves or their successors from taking action…" Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (Minn, Thompson West 2012), at p. 278. As Chief Justice Marshall wrote: "[O]ne legislature cannot abridge the powers of a succeeding legislature…The correctness of this principle, so far as respects general legislation, can never be controverted." *Fletcher v. Peck*, 6 Cranch 87, 10 U.S. 87, 135 (1810); *accord Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932); *Manigault v. Springs*, 199 U.S. 473, 487 (1905); *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996) (Souter, J., plurality opinion).

106.   Additionally, the Commonwealth's police power grants the Legislature broad powers to protect life, health, and general welfare of the people of Puerto Rico.   Pursuant to Article II, section 19 of the Commonwealth Constitution, "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively." *See* P.R. Const. Art. II, § 19. In addition, section 18 of Article II recognizes the authority of the Legislative Assembly to approve laws for grave emergency situations when there is a clear danger to public health and safety or to the delivery of essential services.

107.   In *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 437 (1934), the Supreme Court observed a state's police powers enabled it to impair the obligation of contracts:

> 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal[th], or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals.'

108.    The Supreme Court further found any contract with a state necessarily incorporates such reservation of state power: The reservation of state power appropriate to such extraordinary conditions may be deemed to be as much a part of all contracts as is the reservation of state power to protect the public interest in the other situations to which we have referred.  *Id.* at 439.

109.    Accordingly, beyond its general power to repeal prior statutes (see above ¶ 105) the Commonwealth can repeal any law—including laws appropriating Rum Tax Remittances to PRIFA—if the Commonwealth determines to take such actions to provide for the general welfare of Puerto Rico's citizens.  Indeed, the federal excise tax law has been frequently amended.[37]  There is no guarantee it will remain in effect or that the federal government or Commonwealth will not enact laws that may reduce or prohibit the production, manufacture, or consumption of alcoholic products and thus undercut the source of tax revenues.[38]

---

[37] From 1951 to 1985, the excise tax on distilled spirits remained unchanged at $10.50 per gallon, which had been increased from $9 per gallon by Part V., Section 451 of the Revenue Act of 1951 (P.L. 82-183). In October 1985, the rate was raised again from $10.50 to $12.50 per gallon by the Deficit Reduction Act of 1984 (P.L. 98-369), however Section 2682 provided that the amount covered into the treasury of Puerto Rico shall not exceed $10.50 per gallon. Under section 13227(e) of the Omnibus Budget Reconciliation Act of 1993 (OBRA93; P.L. 103-66), the cover over cap was temporarily increased to $11.30 per gallon for shipments of rum brought into the U.S. between October 1, 1993 and September 30, 1998. Upon the expiration of OBRA93's temporary increase, the cap returned to $10.50. Section 512(a) of Pub. L. 106-170 temporarily increased the cap to $13.25 for rum brought into the U.S. after June 30, 1999 and before January 1, 2002. This temporary increase has been subsequently extended by the following laws. Pub. L. 107-147, Sec. 609(a); Pub. L. 108-311, Sec. 305(a); Pub. L. 109-432, Div. A, Sec. 114(a); Pub. L. 110-343, Div. C, Sec. 308(a); Pub. L. 111-312, Sec. 755(a); Pub. L. 112-240, Sec. 329(a); Pub. L. 113-295, Div. A, Sec. 140(a); Pub. L. 114-113, Div. Q, Sec. 172(a); Pub. L. 115-123, Div. D, Sec. 41102(a)(1) extended the $13.25 per gallon cover over cap until January 1, 2022, at which time the cap will return to $10.50 absent a subsequent legislative extension. The excise tax has decreased at certain times due to the expiration of the extension prior to further extensions being granted.  This occurred most recently from May 2017 to January 2018, when the amount collected was $10.50 instead of $13.25.

[38] The Offering Statement informs Bondholders of such reservation of power, noting: "the Federal Excise Taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance by the United States of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry."

53

**F.**      **The Commonwealth Is Not a "Mere Conduit."**

110.      The cases Movants cite in support of their contention that the Commonwealth is a "mere conduit" for the Rum Tax Remittances (Motion ¶ 37) are inapposite.   In *LAN Tamers*, the First Circuit observed that the debtor had "absolutely no freedom to do anything with the reimbursements except forward them to Springfield within ten days. LAN Tamers was explicitly barred from 'tendering or making use of' the payment from USAC before Springfield was reimbursed." *In re LAN Tamers, Inc.*, 329 F.3d 204, 212 (1st Cir. 2003).  The debtor even signed an acknowledgment recognizing its status as a mere delivery vehicle and foregoing any beneficial interest in the reimbursement payments.  *Id.*  The First Circuit thus held the property was excluded from the estate because the "debtor merely receives property in order to deliver it to its intended recipient without *any* control or ownership over it" and it "lacks any equitable interest" in the property it delivers. *Id.* at 210.   Here, the Commonwealth receives the Rum Tax Remittances and deposits them in the TSA.   While the Enabling Act requires that it transfer a portion to the PRIFA Infrastructure Fun, the Commonwealth retains a reversionary interest as such funds are subject to the Retention Powers and police powers.  As demonstrated by the Commonwealth's retention of the Rum Tax Remittances, it certainly exercises "control" over the funds while such funds reside in the TSA. Moreover, today, the Commonwealth retains all the Rum Tax Remittances because the Oversight Board's certified budgets do not appropriate them to PRIFA.

111.      Similarly, Movants cite *Asociacion de Subscripcion Conjunta Del Seguro De Responsibilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007), for its "mere conduit" proposition, but there, the entity at issue was, as Movants admit, a "private association" (Motion ¶ 36) that therefore had constitutional rights against the Commonwealth.  Furthermore, the funds held by the Commonwealth were insurance premiums the Commonwealth had collected from insureds for

insurers for the association's benefit.[39]  Here, PRIFA is a public entity which therefore cannot assert

constitutional rights against the Commonwealth.  And the Retained Rum Tax Remittances at issue

are the Commonwealth's own funds, not monies it is merely holding for another party.

112.    The circumstances present here are more akin to the case of *In re M.W. Sewall & Co.*,

431 B.R. 526, 530 (Bankr. D. Me. 2010), where the court held a chapter 11 debtor was not a mere

conduit for funds gained from selling tickets because the funds were commingled with other funds

and were available for debtor's use for any purpose.  In the same way, the Rum Tax Remittances are

deposited into the TSA where they are commingled with other monies in the General Fund.  The

Commonwealth must subsequently appropriate and transfer the monies to PRIFA, who must

subsequently deposit such monies into the Sinking Fund before they are subject to Bondholders'

security interest (if any).

## **CONCLUSION**

For the reasons set forth herein, the Commonwealth respectfully submits the Motion be

denied in its entirety.

*[Remainder of page intentionally left blank.]*

---

[39]  With respect to the same insurance premium funds at issue in *Flores Galarza*, this Court recently held that there is a
dispute over the ownership of these funds in the context of a lift-stay motion, in which the Commonwealth argued that
these funds were not held in a valid trust pursuant to Puerto Rico Law (Act 219-2012).  *Memorandum Order Granting
in Part and Denying in Part Motion Requesting Relief from Stay Under Section 362(d)(1) of the Bankruptcy Code*,
Case No. 17-3283-LTS [ECF No. 2858].  In any case, the analysis that was done in the First Circuit's 2007 opinion
did not take into account the Commonwealth's solvency.

Dated: July 3, 2019                          Respectfully submitted,


San Juan, Puerto Rico


/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com


Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel S. Desatnik (*pro hac vice pending*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: brosen@proskauer.com
Email: sratner@proskauer.com
Email: tmungovan@proskauer.com
Email: ebarak@proskauer.com


Michael A. Firestein (*pro hac vice*)
Lary Alan Rappaport (*pro hac vice*)
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 557-2900
Fax: (310) 557-2193
Email: mfirestein@proskauer.com
lrappaport@proskauer.com


*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Commonwealth of
Puerto Rico*


56

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF

participants in this case.


*/s/ Hermann D. Bauer*
Hermann D. Bauer