**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | | |
|---|---|---|
| _____ ) | | |
| In re: | ) | |
| | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| | ) | Case No. 3:17-bk-03283 (LTS) |
| as representative of | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ X | | |
| | ) | |
| In re: | ) | |
| | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| | ) | Case No. 3:17-cv-01685 (LTS) |
| as representative of | ) | Case No. 3:17-bk-03566 (LTS) |
| | ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| | ) | |
| Debtor. | ) | |
| -------------------------------------------------- X | | |

**NOTICE OF FILING OF UNREDACTED DOCUMENTS**

**TO THE HONORABLE COURT:**

**PLEASE TAKE NOTICE:** Pursuant to the provisions of the *Stipulation and Order for the Production and Exchange of Confidential Information* [Docket No. 60 in Case No. 17-ap-00213], Movants,[1] by and through their undersigned counsel, hereby respectfully submit the following document:

1.      *Supplemental Reply Brief in Support of Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay.* A redacted version was originally filed at Docket No. 7657 in Case No. 17-bk-03283 and Docket No. 599 in Case No. 17-bk-03566. The redactions remaining in the document are pursuant to the Court's *Order Granting Urgent Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to File Under Seal Unredacted Expert Reports* [Docket No. 7598 in Case No, 17-bk-03283 and Docket No. 588 in Case No. 17-bk-03566].

---

[1]      Movants include Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund L.P., Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., SV Credit, L.P., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.

In San Juan, Puerto Rico, today July 3, 2019.

By:

/s/ Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon
Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P.,
Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Jason N. Zakia

John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ———————————————————————— ) | |
| In re: ) | |
| ) | PROMESA |
| ) | Title III |
| THE FINANCIAL OVERSIGHT AND ) | |
| MANAGEMENT BOARD FOR PUERTO RICO, ) | Case No. 3:17-bk-03283 (LTS) |
| ) | |
| as representative of ) | |
| ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, ) | |
| ) | |
| Debtors. ) | |
| ) | |
| ———————————————————————— X ) | |
| In re: ) | |
| ) | |
| ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO ) | |
| ) | Case No. 3:17-cv-01685 (LTS) |
| as representative of ) | Case No. 3:17-bk-03566 (LTS) |
| ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE ) | |
| GOVERNMENT OF THE COMMONWEALTH OF ) | |
| PUERTO RICO, ) | |
| ) | |
| Debtor. ) | |
| ) | |
| --------------------------------------------------------------------- X | |

**SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF
MOTION OF CERTAIN SECURED CREDITORS OF THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO FOR RELIEF FROM THE AUTOMATIC STAY**

## TABLE OF CONTENTS

                                                                                        **Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.  The Bondholders Have Established Interests In Property Of The Debtors ..................... 2

    A.  The Bondholders' Liens Extend To PayGo Fees .................................................. 2

    B.  The Section 552 And *Ultra Vires* Arguments Are Improper In
        This Proceeding ............................................................................................ 9

II. The PayGo Fees Are Diminishing In Value And The Bondholders Are
    Not Adequately Protected ............................................................................... 10

    A.  The Debtors Ultimately Bear The Burden Of Proof On
        Adequate Protection .................................................................................... 10

    B.  The PayGo Fees Are Diminishing In Value ...................................................... 11

    C.  The "Equity-Cushion" Theory Ignores The Uncertainty Of
        PayGo Fees ................................................................................................ 12

    D.  Prior Adequate Protection Payments Do Not Absolve The Debtors
        Of Their Obligation To Provide Adequate Protection Now .............................. 15

III. The Bondholders Are Also Entitled To Relief In The Commonwealth Title III
     Case ........................................................................................................... 15

CONCLUSION ....................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ambac Ins. Corp. v. Puerto Rico, et al.*,
No. 18-1214 (1st Cir. June 24, 2019)........................................................14

*Cadle Co. v. Schlichtmann*,
267 F.3d 14 (1st Cir. 2001)......................................................................10

*Genesee Reg'l Bank v. Palumbo*,
9 Misc. 3d 823 (N.Y. Sup. Ct. 2005) ........................................................5

*Grella v. Salem Five Cent Sav. Bank*,
42 F.3d 26 (1st Cir. 1994)........................................................................10

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
914 F.3d 694 (1st Cir. 2019)..................................................................1, 2

*In re Hunt's Pier Assocs.*,
143 B.R. 36 (Bankr. E.D. Pa. 1992) .......................................................10

*In re Jorenby*,
393 B.R. 663 (Bankr. W.D. Wis. 2008)..................................................3, 5

*In re Las Vegas Monorail Co.*,
429 B.R. 317 (Bankr. D. Nev. 2010) .........................................................8

*In re Rice*,
82 B.R. 623 (Bankr. S.D. Ga. 1987) .......................................................10

*In re Vitreous Steel Prods. Co.*,
911 F.2d 1223 (7th Cir. 1990) ...................................................................2

*Peaje Invs. LLC v. García-Padilla*,
845 F.3d 505 (1st Cir. 2017)........................................................1, 11, 14

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
484 U.S. 365 (1988)..................................................................................12

*Wright v. Union Cent. Life Ins. Co.*,
311 U.S. 273 (1940)..................................................................................14

STATUTES

3 L.P.R.A. § 781 (2008)..............................................................................4, 7

3 L.P.R.A. § 787 ..........................................................................................4, 7

19 L.P.R.A. § 2212 ..........................................................................................8

19 L.P.R.A. § 2265 ......................................................................................3, 9

11 U.S.C. § 362.....................................................................................1, 10, 14

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

**OTHER AUTHORITIES**

§ 9-315:2 [Rev] Continuity of security interest in collateral,
9B HAWKLAND UCC SERIES § 9-315:2 [Rev] (2019)...............................................................3

## INTRODUCTION

1.     Few things are clearer in the Bankruptcy Code than its command that a secured creditor is entitled to prompt relief when it moves for relief from the automatic stay in the absence of adequate protection. 11 U.S.C. § 362(d)–(e). Yet the Bondholders have spent nearly three years seeking this basic relief. Twice, they have been required to appeal to the First Circuit, and twice the court of appeals has emphasized the fundamental importance of the Bondholders' legal rights. *See Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d 694 (1st Cir. 2019). Now, Respondents toss out a flurry of irrelevant or misleading arguments in hopes of distracting the Court from the evidence in the record establishing the Bondholders' rights to their bargained-for, constitutionally-protected property interests. And Respondents also suggest that there should be even more delay by insinuating that the Court should put this motion to one side and instead consider invalidating the Bondholders' liens altogether under Bankruptcy Code § 552 (which they cite eleven times) or declaring that the ERS bonds were issued *ultra vires* (a point mentioned thirteen times).

2.     But the issues here are straightforward.  For the past year, the Bondholders have been without adequate protection—which is required under both the Constitution and the Bankruptcy Code—while the debtors and the Board have diverted and dissipated the Bondholders' collateral. The Oversight Board and the Committees argue that the Bondholders are not entitled to stay relief or adequate protection because the Bondholders have no collateral and, in any event, should not worry about being paid because the stream of contributions for pension payments is certain and valued at approximately $47.7 billion over the next 40 years. These arguments, of course, are difficult to credit for many reasons. First, the Board's newly minted theory of why the Bondholders have no collateral is at odds with both the Bond Resolution and Puerto Rico's Uniform Commercial Code. Second, the Board's promise that there will be billions of dollars

available to repay the ERS Bonds in full is directly contradictory to the Board's previous representations in these very proceedings that the revenue stream was valued at zero, and it is further at odds with an abundance of record evidence that the revenue stream is uncertain. In these circumstances, the Court is required to lift or condition the automatic stay.

## ARGUMENT

### I.   The Bondholders Have Established Interests In Property Of The Debtors.

3.      The Bondholders have met their burden of establishing interests in property of the debtors that are more than merely "colorable." *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1234 (7th Cir. 1990); *see* Suppl. Br. Part II. The First Circuit made that clear earlier this year when it held that the Bondholders have perfected and non-voidable liens in ERS's property, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d 694, 721 (1st Cir. 2019), and the Bondholders have argued that Joint Resolution 188 and Act 106 are void for violating the automatic stay and the Contracts Clause, such that there was never a transfer of ERS's property to the Commonwealth in the first place. *See* Docket No. 39 in Case No. 17-ap-00219, ¶¶ 99–110, 137–176; Docket No. 50 in Case No. 17-ap-00219, at 27–34, 44–71. In any event, even if Joint Resolution 188 and Act 106 are valid, the Bondholders have established that their liens continue on PayGo fees.

#### A.   The Bondholders' Liens Extend To PayGo Fees.

4.      The Board and the Committees argue that the Bondholders have no security interest in PayGo fees because, they say, the Bondholders' security interests in employer contributions have disappeared by legislative fiat under Joint Resolution 188 and Act 106. Bd. Suppl. Opp. ¶¶ 52–66; Retirees' Suppl. Obj. ¶¶ 38–48. But this argument is facile and easily overcome. As the Bondholders explained in their Supplemental Brief, the Bondholders have a lien on PayGo fees because PayGo fees *are* employer contributions or the proceeds of them, just rerouted and renamed

in a transparent effort to avoid the Bondholders' security interests.[1] The redirection of employer contributions from ERS and the Fiscal Agent to the Commonwealth's Accumulated Pension Payment Account does nothing to defeat the Bondholders' liens.

5.     In arguing otherwise, the Oversight Board makes a basic legal error at the outset by contending that for the Bondholders' liens to cover PayGo fees, they must not only be "subject to the ERS Bondholders' security interest" but "must *also* be (1) proceeds of collateral . . . that are (2) identifiable." Bd. Suppl. Opp. ¶ 54 (emphasis added). But this is simply wrong.  Under § 9-315, "(1) a security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof . . . *and* (2) a security interest attaches to any identifiable proceeds of collateral." 19 L.P.R.A. § 2265(a). In other words, after the "sale, lease, license, exchange, or other disposition" of collateral, *both* the collateral *and* the proceeds of the "sale, lease, license, exchange, or other disposition" of it are subject to the creditor's security interest. *E.g.*, *In re Jorenby*, 393 B.R. 663, 665 (Bankr. W.D. Wis. 2008) (the creditor "may retain a security interest in the tractor *and* in identifiable proceeds from the sale of the tractor" (emphasis added)). In this way, the secured party has "double protection" against the unauthorized disposition of its collateral, because "the secured party can enforce the security interest *either* against the collateral in the hands of the purchaser *or* against the proceeds of the collateral in the hands of the debtor." § 9-315:2 [Rev] Continuity of security interest in collateral, 9B HAWKLAND UCC SERIES § 9-315:2 [Rev] (2019) (emphasis added). Thus, the Bondholders have a lien on PayGo fees under § 9-315 if PayGo

---

[1] No one would doubt that if the express purpose of these statutes' changing the destination and name of employer contributions was to evade the Bondholders' liens, the statutes are not effective. That may well be what happened with PayGo, but the denial of discovery concerning the adoption of PayGo—including the withholding of hundreds of responsive documents—prevents the Bondholders from showing that is so. The absence of any *other* explanation for the shift to PayGo is, however, notable. Indeed, the Board's own pension expert was baffled when asked about the significance of a change in pension systems that left "the same benefits being paid to the same people . . . from the same sponsors," explaining that he could not "think of a scenario where [he had] run into something like that," and he "wouldn't know why it's being set up that way." Sher Dep. Tr. 86:6–15.

fees are *either* the Bondholders' collateral or the identifiable proceeds of that collateral—there is no requirement that PayGo fees be *both*, as the Board contends.

6.      As we demonstrated at length in our Supplemental Brief, there is little daylight between the historic employer contributions and the purportedly "new" PayGo fees. The PayGo fees are paid by precisely the same entities as the employer contributions. Act 106 § 1.6(g). They fund precisely the same benefits to the same pensioners and participants as employer contributions funded. Act 106 § 1.6(q), (r), (s). And they are for amounts that, even before Act 106, employers were already liable to cover as employer contributions. *See* 3 L.P.R.A. § 787 (Act 447, § 4-113, providing that "the contributions required from the employer, as well as all annuities, benefits, reimbursements, and administration expenses, shall constitute obligations of the employer."); 3 L.P.R.A. § 781 (2008) ("any difference between" the minimum percentage of payroll that employers in fact paid ERS and the much higher actuarially required level "shall constitute a deficiency in the employer contribution" that "shall constitute an actuarial deficit of the System and an obligation of the employer"). Of equal importance is the fact that, for all intents and purposes, the ERS system already was a pay-as-you-go system by the time the Puerto Rico Legislature passed Act 106 on August 23, 2017. Both ERS's auditors and its actuary Milliman pointed out a year before that ERS's assets were close to total depletion. *See* Sooknanan Decl., Ex. N, Ex. BB. As KPMG cautioned, "[i]f the System becomes insolvent, it would be operating solely on a 'pay-as-you-go' basis . . . ." Sooknanan Decl., Ex. N, at 9. Thus, as the Bondholders' expert, Andrew Samwick, explained, "[i]n economic terms, the PayGo system reflects only inconsequential changes from the pre-2017 ERS pension system," and the PayGo fees are payments of the very same liabilities as the employer contributions were. Samwick Report ¶¶ 22,

24. The Board's expert does not seriously disagree with this opinion; instead he simply says that, in theory, not all systems would necessarily work this way. *See* Sher Report ¶¶ 23 & 24.

7.      The point is not that ERS and PayGo are "conceptually similar," Bd. Suppl. Opp. ¶ 61, but that they are *the same system*, ostensibly transferred to a new agency—the same liabilities to pensioners, funded by the same employers. The entire purpose of UCC § 9-315(a) is to ensure that collateral transferred to a new owner remains subject to a creditor's lien. Here, essentially what happened was that the employer contributions subject to the Bondholders' liens were given a new label and redirected to the Commonwealth. The Board implicitly concedes that the "loss or dispossession of [a] party's interst in . . . collateral" is a disposition of that collateral under UCC § 9-315. Bd. Suppl. Opp. ¶ 54 (quoting *1st Source Bank v. Wilson Bank & Tr.*, 735 F.3d 500, 504 (6th Cir. 2013)). That is what happened to ERS's interest in employer contributions. Such a transfer does not invalidate the Bondholders' liens any more than the unauthorized sale of a car invalidates a lender's right to repossess it. *E.g.*, *Genesee Reg'l Bank v. Palumbo*, 9 Misc. 3d 823, 831 (N.Y. Sup. Ct. 2005) (security interest of lender in vehicle continued after sale and was effective against purchasers of collateral); *In re Jorenby*, 393 B.R. at 665.

8.      With no answer to this clear showing, the Board resorts to misdirection. Relying on its actuarial expert's report, the Board contrasts PayGo with a hypothetical "pre-funded pension plan" that "would rely on an actuarial cost method for funding" and amass sufficient assets so that "the actuarial accrued liability will equal the plan's assets in all years, and no additional contributions will be needed." Bd. Suppl. Opp. ¶¶ 61–65. But this, of course, is irrelevant: the Board's actuarial expert admitted that ERS leading up to 2017 was nothing like the Board's hypothetical "pre-funded pension plan." To the contrary, ERS in those years was not being "fund[ed] on an actuarial basis" at all, Sher Dep. Tr. 64:21–65:4, 65:14–17, 70:4–13 ("at least in

5

recent years, they were not funding [ERS] on what I would call an actuarial method"), and it was

"on the verge of running out of money," *id.* at 70:14–19. Moreover, by 2017 "all benefits had been

frozen," so employer contributions to ERS were being used solely to help "pay off the unfunded

liability." *Id.* at 66:2–6, 66:19–67:7. The Board's expert admitted that the "defining feature of an

actuarial pension plan" that the Board relies on in contrasting ERS with PayGo—"that costs are

assigned to periods of employment," Bd. Suppl. Opp. ¶ 62—did not even apply to employer

contributions to ERS when PayGo was adopted in 2017. Sher Dep. Tr. 67:8–22.

9.      Nor does it make any difference that ERS was not at that time being "fund[ed] on

an actuarial basis" or assigning costs to periods of employment. Sher Dep. Tr. 64:21–65:4, 67:8–

12. Nothing in the Bond Resolution restricts the Bondholders' liens to *actuarially funded* employer

contributions. And so the fact that the PayGo fees are likewise not actuarially funded does nothing

to distinguish them from employer contributions or to defeat the Bondholders' security interests.

Put differently, the Board's objection that PayGo is a "non-actuarial" pension system, Bd. Suppl.

Opp. ¶ 63, does nothing to distinguish it from pre-2017 ERS, because pre-2017 ERS was itself a

non-actuarial pension system. Sher Dep. Tr. 64:21–65:4, 65:14–17, 70:4–13. Just as employer

contributions to ERS in 2017 were subject to the Bondholders' liens, so too must PayGo fees be.

10.      The Board's college savings example illustrates this nicely. Bd. Suppl. Opp. ¶ 64.

The Board wants to compare a parent who saves in advance for college with a parent who does

not save in advance. But ERS by 2017 *was that latter parent*, just like PayGo is, because whatever

the intention, ERS did not save nearly enough in advance; by 2017 it was out of investments and

was going to have to pay pensions from current contributions, not savings, just like PayGo does.

Samwick Report ¶¶ 14, 16; Sher Dep. Tr. 70:14–19. And so, unless ERS was going to dramatically

cut benefits, it would have had to raise contributions to the level needed to fund current benefits

even without Act 106—and it could have done so because employers were already liable by statute for those amounts. Samwick Report ¶¶ 14, 16, 24.b.; *see* 3 L.P.R.A. §§ 787, 781. For the same reason, the Board's "extreme" example does not distinguish ERS from PayGo either, because by 2017, with ERS out of money, the system was going to be pay-as-you-go either way. Samwick Report ¶¶ 14, 16, 24.b; *see also* Sher Dep. Tr. 22:6–20.[2] All that Act 106 did was rename the employer contributions that would have funded an ERS pay-as-you-go system "PayGo fees" and redirect them to the Commonwealth instead of to ERS. Under § 9-315(a), that disposition did not eliminate the Bondholders' liens.

11.     The Retirees' Committee takes a slightly different tack, but it ends up in the same place. It argues that "[n]o matter how similar PayGo fees are to Employer Contributions . . . , PayGo fees are not 'payable to the System pursuant to Section 2-116, 3-105 and 4-113 of [Act 447]' and thus, they can never fit within the definition of Employer Contributions as set forth in the Bond Resolution." Retirees' Suppl. Obj. ¶ 43. But this argument ignores the effect of UCC § 9-315(a), which provides that the transfer of the Bondholders' collateral such that it is no longer "payable to the System" does not invalidate the Bondholders' liens. It ignores that the Bondholders' security interests include not only "Employers' Contributions" but also "proceeds . . . including, without limitation, those from the . . . disposition, substitution or replacement" of Employers' Contributions. Bond Resolution at VI-36. It also ignores the fact that Sections 2-116 and 4-113 of Act 447 in fact *do* create the very liability that the PayGo fees are covering—the difference between the percentage-of-payroll contributions and the system's actual actuarial needs. Samwick Report ¶¶ 14, 24.b. And it further ignores that, as a matter of grammar, the enumerated section

---

[2] *See also* Sooknanan Decl., Ex. P, ("At that point (assuming no liquidation of illiquid assets, which totaled $616.0 million as of November 14, 2016, and no additional annual contributions), the ERS would be operating on a 'pay-as-you-go' basis, which means that the ERS would be unable to pay benefits that exceed the actual employer and employee contributions (net of administrative and other expenses), unless the Commonwealth and other participating employers provide additional funding on a timely basis to meet such retirement benefits in full.").

numbers at most modify "assets . . . derived" from "contributions paid," and not "contributions paid" themselves. *See* Docket No. 206 in Case No. 17-ap-00213, ¶ 33.[3]

12.     Alternatively, if the PayGo fees are not themselves the Bondholders' collateral, then they are the "identifiable proceeds" of that collateral. The PayGo payments were created in the very same sentence in the statute that purported to terminate employer contributions. Act 106 § 2.4(e). The Commonwealth therefore "acquired" the right to receive PayGo fees, and the PayGo fees that have since been made, upon the "disposition of" ERS's right to receive employer contributions, and the employer contributions that would otherwise have been made to ERS. 19 L.P.R.A. § 2212(a)(64)(A); *see also id.* § 2212(a)(64)(B), (C) ("Proceeds" include "rights arising out of collateral" and "whatever is collected on, or distributed on account of, collateral"). Under Act 106, payment of PayGo fees expressly eliminates liability for employer contributions. Act 106 § 2.5. The point is not that the PayGo fees are "conceivably related" to employer contributions, Bd. Suppl. Opp. ¶ 57, but rather that they are a payment of the same liability, by the same obligors, for the same purpose, as employer contributions, and were created as a direct replacement for employer contributions simultaneously when employer contributions were purportedly eliminated.

13.     In arguing otherwise, the Board relies heavily on the irrelevant case of *In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2010). The Court's holding in *Las Vegas Monorail* turned on the specific language of the financing agreement that created the security interest in that case, which created a lien only on certain "contract rights," "net revenues," and other items that the court held did not include the right to operate the monorail system at issue. *Id.* at 333–38. The Bond Resolution here includes an entirely different collateral package, and it

---

[3] The Retirees' Committee also argues that the Bondholders cannot seek recourse against property held by the Commonwealth, ignoring that the Bondholders are doing so only because their collateral has been unlawfully transferred there. Of course a lender usually cannot seek to enforce a loan against property of a third party, either, but that changes when the lender's collateral has been transferred to that third party.

specifically includes, among other things, employer contributions. And the Board's argument that "for rights to arise out of collateral, they must have been obtained as a result of some loss or dispossession of the party's interest in that collateral, not simply by its use," Bd. Suppl. Opp. ¶ 59, is equally unhelpful because ERS very clearly suffered the "loss or dispossession of" its interest in employer contributions, which used to be paid to ERS and now go to the Commonwealth instead. Even under the Board's framework, then, the PayGo fees are proceeds. The Retirees' Committee tries the opposite approach and argues that PayGo fees cannot be "proceeds" because of the Bondholders' collateral because "by statute" the collateral has been eliminated, Retirees' Suppl. Opp. ¶ 44, but the whole purpose of the UCC's protection for proceeds is to cover scenarios in which the original collateral has been disposed of in some way, *see* 19 L.P.R.A. § 2265(b).

14.     Finally, while the Board argues that PayGo fees are not identifiable, its argument that identifying PayGo fees will require a "forensic accounting analysis of each deposit into and withdrawal from the Commonwealth's account into which the Paygo Payments are deposited" is wholly unsupported. Bd. Suppl. Opp. ¶ 60. Act 106 requires the PayGo fees to be deposited into the Accumulated Pensions Payment Account, a "trust fund separate from the general assets and accounts of the Government." Act 106 § 2.1. Since the Commonwealth must surely be complying with its own law, the payments should be easily identifiable. But given the Board's argument, adequate protection must include precise record-keeping as to all PayGo payments, wherever made.

**B.     The Section 552 And *Ultra Vires* Arguments Are Improper In This Proceeding.**

15.     The Board and the Committees argue that the Court must address issues raised elsewhere that (a) § 552 of the Bankruptcy Code terminates the Bondholders' liens and (b) the bond issuance was *ultra vires* before determining if the stay should be lifted or adequate protection

9

is required.[4] They are wrong. The First Circuit has made clear that hearings to lift the stay "do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate." *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 32 (1st Cir. 1994); Suppl. Br. ¶ 30. As the First Circuit reasoned, "[t]he limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings" have led most courts to reach the same conclusion. *Grella*, 42 F.3d at 32. By the time of the July 2 hearing, the Bondholders' motion would have been pending for a full year. Further delay would be in complete contravention of § 362(e)(1). None of the Board's cases say otherwise. In *In re Rice*, 82 B.R. 623, 627 (Bankr. S.D. Ga. 1987), the court ordered adequate protection payments, and in *In re Hunt's Pier Assocs.*, 143 B.R. 36, 50-51 (Bankr. E.D. Pa. 1992), the court had already found that the creditor's security interests were subordinate to another creditor and avoidable by the trustee. The Board is simply wrong when it says that the Bondholders are not entitled to adequate protection because the debtors are challenging the Bondholders' liens.

## II.   The PayGo Fees Are Diminishing In Value And The Bondholders Are Not Adequately Protected.

### A.   The Debtors Ultimately Bear The Burden Of Proof On Adequate Protection.

16.     The Board wrongly argues that the Bondholders misstate the burden of proof on the question of adequate protection. Bd. Suppl. Opp. ¶ 71. In fact, under § 362(g), the debtors ultimately bear the burden of proof on the question of adequate protection. 11 U.S.C. § 362(g); *see*

---

[4] The § 552 issue has been fully briefed by the parties and is under consideration by the Court. *See* Docket No. 248 in Case No. 17-ap-00213; Docket No. 247 in Case No. 17-ap-00213 (pleadings identified in Exhibit B). Notably, the Board raises § 552 without addressing binding First Circuit precedent that forecloses its arguments that § 552 terminates the Bondholders liens. *Cadle Co. v. Schlichtmann*, 267 F.3d 14, 20 (1st Cir. 2001) (holding that any contingency concerning the receipt of proceeds of collateral, any indefiniteness in the amount that will be realized from the collateral, and the fact that efforts of a debtor are required to collect collateral are all irrelevant to the § 552 analysis). Due to their own failure to progress the proceedings, the Committees' claim objections raising the *ultra vires* issue have not matured past the initial filings. In fact, the UCC and the Retirees' Committee have not even filed combined proposed procedures and the Bondholders have not had an opportunity to conduct discovery.

*also Peaje*, 845 F.3d at 513 ("In the bankruptcy context . . . Congress . . . enact[ed] an express burden-shifting framework under which the movant 'has the burden of proof on the issue of the debtor's equity in property,' but the debtor 'has the burden of proof on all other issues.'" (quoting 11 U.S.C. § 362(g))). The Bondholders must make only an initial showing of the lack of adequate protection, which they have plainly done. "[T]he burden of going forward and the ultimate burden of persuasion is on the party opposing the relief to show that the collateral is not declining in value, [that the Bondholders are] adequately protected by periodic cash payments, an equity cushion, replacement liens or otherwise, or that there is a significant likelihood of a successful reorganization in a reasonable time."  3 COLLIER ON BANKRUPTCY ¶ 362.10 (16th ed. 2018).

**B.    The PayGo Fees Are Diminishing In Value**

17.    There can be no serious question that the Bondholders' collateral is diminishing in value during the automatic stay. The Board tries to muddy the issue by claiming that the Bondholders' interrogatory responses tacitly admit that they cannot show the value of their collateral. Bd. Suppl. Opp. ¶ 73. But this is a straw man. The Bondholders have explained, again and again, that information about collateral value is in the exclusive possession of the government parties. The Board seems to think that, without this information, the Bondholders cannot make an initial showing that their collateral is diminishing in value. That, though, is obviously incorrect.

18.    Unlike the toll revenues in *Peaje*, 845 F.3d at 514, the PayGo fees are a limited, non-perpetual source of funds because they are made to support pension payments to a fixed group of current and future retirees. ███████████████████████████████████

Sabry Report ¶¶ 50, 54–57 & Ex. 10. ████████████████████████████████████

████████████████████████████████████████████████████████ *Id.* ¶¶ 51,

53. ███████████████████████████████

████████████████████████████████████████████████████████████

███████████   *See id.* And the Accumulated Pension Payment Account into which PayGo fees must be deposited, according to the Board's own expert, is "going to have little or no balance over time, because money is coming in and out." Sher Dep. Tr. 60:8–8. Thus, with every passing month, the limited supply of PayGo fees diminishes. The debtors offer no contrary evidence.

19.     The Board contends that the Bondholders must also show that the automatic stay *caused* the diminution in collateral value. Bd. Suppl. Opp. ¶ 76. It cites no supporting precedent for this argument. Under § 361, the automatic stay "results in a decrease in the value" of collateral when it prevents a secured creditor from taking action that could prevent or remedy the decrease in value of collateral. *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988) ("It is common ground that the 'interest in property' referred to by § 362(d)(1) . . . is not adequately protected if the security is depreciating during the term of the stay."); Suppl. Br. ¶¶ 50–51. But in any event, the argument is wrong. The stay *is* causing the diminution in value of the Bondholders' collateral because without it the Bondholders could take steps to attach the PayGo fees before they are irrevocably lost by paying current benefits.

**C.     The "Equity-Cushion" Theory Ignores The Uncertainty Of PayGo Fees.**

20.     Alternatively, the Board and the Retirees' Committee argue that the Bondholders have an adequate equity cushion because the value of PayGo fees exceeds the outstanding amount of the ERS Bonds. But this theory ignores the abundant evidence establishing the uncertainty of future PayGo fees. The Commonwealth, ERS, and the Board have all made clear that this Court cannot rely on future PayGo fees as a revenue source for the ERS Bonds.

21.     At the outset, the Board's position on the certainty of PayGo fees keeps shifting as convenient. In these very proceedings, the Board previously argued that *the Commonwealth* would not be able to make contributions to fund the pension system:

> [B]ecause the Commonwealth cannot afford to make employer contributions based on the fiscal emergency existing on the ERS Title III petition date, there will be no revenues to which Movants' lien can attach. Therefore, even if Section 552 did not cut off Movants' alleged lien against postpetition employer contributions, the value of Movants' lien against employer contributions was zero or *de minimis* on ERS's petition date and there was and is nothing to protect. In any event, if Movants are correct, and the bondholders' lien attaches to claims against the Commonwealth and other employers for future employer contributions, the value of such claims would need to be established and adequate protection fashioned to maintain the value of the bondholders' interest in such claims. These claims would need to be valued in the context of the Commonwealth's fiscal emergency.

Docket No. 98 in Case No. 17-bk-03566, ¶ 90. And this is not the only such inconsistent statement the Board has made before.[5]

22.     As we explained, there is plenty of evidence establishing that future PayGo fees from the Commonwealth and it public corporations and municipalities are uncertain. Suppl. Br. ¶¶ 56–61. Moreover, there is even more uncertainty surrounding future legislative action to evade payment on the ERS Bonds. Joint Resolution 188 and Act 106 were openly lawless transfers during pending Title III cases with the sole purpose and effect of avoiding payment on the ERS Bonds. The legislature clearly believes that it is free to meddle in pension finances at its whim, and no reasonable person would conclude that the legislature will not soon again look for new ways to undermine the Bondholders' liens. In fact, even this week, the legislature approved a measure that would help exempt municipalities from paying PayGo fees. Second Sooknanan Decl., Ex. A.

23.     The Board's reliance on Mr. Malhotra's net present value analysis, and his analysis of the nominal pension payments over time, does nothing to change this. Mr. Malhotra's analyses

---

[5] *E.g.*, Second Sooknanan Decl., Ex. B ("The Oversight Board does not doubt the Governor's sincere desire to pay pensions in full, now and forever, but the unfortunate reality is that the Commonwealth does not have the money to do so. . . . The Oversight Board also notes that under PROMESA's Title III process, pensioners are considered unsecured creditors whose treatment under a plan of adjustment will have to be approved by a court."); Docket No. 4797 in Case No. 17-3283 (describing pension claims as "unsecured"); Explanatory memorandum on pension reform at 7 (Aug. 4, 2017) (Second Sooknanan Decl., Ex. C) ("Retirement plan participants, like other unsecured creditors, will have a reduction in the amounts paid to them by the Commonwealth"); 2019 Fiscal Plan for Puerto Rico at 131 (May 9, 2019) (Second Sooknanan Decl., Ex. D) ("Retirement plan participants, like other unsecured claimholders, face a reduction in the amounts paid to them by the Commonwealth.").

valued the pension payments to retirees, not the PayGo fees to the pension system, and he assumed that the pension payments would continue to be paid. Suppl. Br. ¶¶ 62–70. In fact, he did not directly deal with PayGo fees at all, instead mis-defining them as a synonym for "payments to retirees." Nor did he account for the substantial risks facing the future stream of PayGo fees, including the possibility that the legislature will attempt further changes to the pension system to harm the Bondholders' liens. As a result of these mistakes, the net present value of the currently-forecasted stream of PayGo fees does not dispel the clear and substantial risk that the PayGo fees will be discontinued, reduced, or once again diverted long before the bonds are paid off.

24.     In any event, there is clear guidance from the court of appeals. In prior litigation between the parties, the First Circuit held that a temporary diversion of the Bondholders' collateral and the resulting uncertainty about ERS's ability to repay the ERS Bonds established a legally sufficient claim that the Bondholders were entitled to relief from the stay. *Peaje*, 845 F.3d at 514. This is even more true today. In light of the actions of the government parties and the Board, the Bondholders "face the prospect of being left with a mere unsecured claim"; the debtors "provide[] no authority for the proposition that such a claim may constitute adequate protection." *Id.*

25.     Finally, the Board claims that even if the Bondholders' collateral is diminishing in value and the Bondholders are not adequately protected, the Court should not lift the stay because of "the chaos that would result" from a "barrage of litigation." Bd. Suppl. Opp. ¶¶ 82–84. This argument flies in the face of the Constitution, which requires adequate protection for secured creditors, *e.g.*, *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940), and § 362, which states that a court "shall" lift the stay in the absence of adequate protection, 11 U.S.C. § 362. *See also Ambac Ins. Corp. v. Puerto Rico, et al.*, No. 18-1214 (1st Cir. June 24, 2019) (acknowledging that creditors may seek relief from the automatic stay to pursue constitutional and statutory claims).

**D.      Prior Adequate Protection Payments Do Not Absolve The Debtors Of Their Obligation To Provide Adequate Protection Now.**

26.      The Board and the Retirees' Committee appear to make the puzzling argument that, because the Bondholders received adequate protection payments earlier in these proceedings, no further adequate protection is warranted. Bd. Suppl. Opp. ¶ 77; Retirees' Suppl. Obj. ¶ 24. But they fail to explain why, in the face of continuing payment obligations to the Bondholders, past adequate protection payments absolve the debtors from making constitutionally-required adequate protection payments going forward.[6] The debtors are obligated to provide adequate protection for the duration of the stay when there is a decrease in the value of collateral. As the Bondholders' collateral continues to be diverted and spent, the value of that collateral continues to decrease.

**III.      The Bondholders Are Also Entitled To Relief In The Commonwealth Title III Case.**

27.      The Retirees' Committee alone argues that the Bondholders' motion, brought in both the ERS and Commonwealth Title III cases, should be denied as to the Commonwealth because the ERS Bonds are not debt of the Commonwealth. Retirees' Suppl. Obj. ¶¶ 49–50. The Committee is wrong. The Bondholders have perfected and non-voidable security interests in the Pledged Property, wherever it has been diverted, and any and all proceeds. Joint Resolution 188 and Act 106 purport to transfer that property to the Commonwealth, and the Commonwealth is currently dissipating that property to pay subordinate creditors. The Bondholders' motion for relief from the stay was properly brought in both Title III cases. For its part, the Board does not argue otherwise. In fact, it appears that the Board has only opposed stay relief on behalf of ERS.

<u>**CONCLUSION**</u>

The Bondholders respectfully request that the Court enter an order granting relief from the debtors' automatic stays and any further relief as the Court may deem proper.

---

[6] The joint stipulation expressly provided that the Bondholders could seek adequate protection after October 31, 2017.  *See* Docket No. 170, Case No. 17-bk-03566 at 4 (July 14, 2017).

In San Juan, Puerto Rico, today June 25, 2019.

By:

| */s/ Alfredo Fernández-Martínez* | */s/ Bruce Bennett* |
|---|---|
| Alfredo Fernández-Martínez | Bruce Bennett (*pro hac vice*) |
| DELGADO & FERNÁNDEZ, LLC | JONES DAY |
| PO Box 11750 | 555 South Flower Street |
| Fernández Juncos Station | Fiftieth Floor |
| San Juan, Puerto Rico 00910-1750 | Los Angeles, California 90071 |
| Tel. (787) 274-1414 | Tel. (213) 489-3939 |
| Fax: (787) 764-8241 | Fax: (213) 243-2539 |
| afernandez@delgadofernandez.com | bbennett@jonesday.com |
| USDC-PR 210511 | |
| | Benjamin Rosenblum (*pro hac vice*) |
| | JONES DAY |
| | 250 Vesey Street |
| | New York, New York 10281 |
| | Tel. (212) 326-3939 |
| | Fax: (212) 755-7306 |
| | brosenblum@jonesday.com |
| | Geoffrey S. Stewart (*pro hac vice*) |
| | Matthew E. Papez (*pro hac vice*) |
| | Sparkle L. Sooknanan (*pro hac vice*) |
| | JONES DAY |
| | 51 Louisiana Ave. N.W. |
| | Washington, DC 20001 |
| | Tel. (202) 879-3939 |
| | Fax: (202) 626-1700 |
| | gstewart@jonesday.com |
| | mpapez@jonesday.com |
| | ssooknanan@jonesday.com |
| | David R. Fox (*pro hac vice*) |
| | JONES DAY |
| | 100 High Street, Floor 21 |
| | Boston, MA 02110 |
| | Tel. (617) 960-3939 |
| | Fax: (617) 449-6999 |
| | drfox@jonesday.com |

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Jason N. Zakia

John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*