# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | X ) |
| | ) |
| THE FINANCIAL OVERSIGHT AND | ) |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) |
| as representative of | ) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) |
| Debtors. | ) |
| | X |

PROMESA
Title III

Case No. 3:17-bk-03283 (LTS)

## AFFIDAVIT OF MARGUERITE M. MELVIN

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | SS.: |
| COUNTY OF NEW YORK | ) | |

I, Marguerite M. Melvin, being duly sworn, deposes and says:

1.      I am employed by Jones Day, 250 Vesey Street, New York, NY 10281.  I am over 18 years of age and not a party to the above captioned proceeding.

2.      On May 24, 2018, I prepared, on behalf of Oaktree Value Opportunities Fund Holdings, L.P., an original proof of claim (the "Claim"), to be filed against the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, along with an identical copy to be retained by Jones Day.

3.      At my direction, a Jones Day employee delivered the original and copy to Prime Clerk at its Brooklyn, New York office on May 24, 2018.  The messenger waited for the copy of the Claim to be stamped "filed", and then returned it to the firm.

4.      A true and correct copy of the Claim is maintained in the file room of Jones

Day's, New York office, and is attached hereto.

*/s/ Marguerite M. Melvin*
Marguerite M. Melvin

Sworn to before me on this
9th day of July, 2019

*/s/ Dolly Waters*
Dolly Waters, Notary Public

Notary Public, State of New York
No. 01WA4877730
Qualified in Nassau County
Commission Expires November 17, 2022

**<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO / TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO

| Fill in this information to identify the case (Select only one Debtor per claim form). / Llene esta información para identificar el caso (seleccione sólo un deudor por formulario de reclamación). | | |
|---|---|---|
| ❑ Commonwealth of Puerto Rico<br>El Estado Libre Asociado de Puerto Rico | Case No. 17-bk-03283 | Petition Date: May 3, 2017 |
| ❑ Puerto Rico Sales Tax Financing Corporation (COFINA)<br>La Corporación del Fondo de Interés Apremiante de Puerto Rico | Case No. 17-bk-03284 | Petition Date: May 5, 2017 |
| ❑ Puerto Rico Highways and Transportation Authority<br>La Autoridad de Carreteras y Transportación de Puerto Rico | Case No. 17-bk-03567 | Petition Date: May 21, 2017 |
| ☒ Employees Retirement System of the Government of the Commonwealth of Puerto Rico<br>El Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico | Case No. 17-bk-03566 | Petition Date: May 21, 2017 |
| ❑ Puerto Rico Electric Power Authority<br>La Autoridad de Energía Eléctrica de Puerto Rico | Case No. 17-bk-04780 | Petition Date: July 2, 2017 |

RECEIVED

MAY 2 4 2019

PRIME CLERK LLC

Modified Official Form 410 / Formulario Oficial 410 Modificado

# Proof of Claim / Evidencia de reclamación

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a Title III case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy or subject to confidentiality on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

Lea las instrucciones antes de completar este formulario. Este formulario está diseñado para realizar una reclamación de pago en un caso en virtud del Título III. No utilice este formulario para solicitar el pago de un gasto administrativo que no sea una reclamación que reúna los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b) (9) del U.S.C. Ese tipo de solicitud debe realizarse de conformidad con el Título 11 § 503 del U.S.C.

Quienes presenten la documentación deben omitir o editar información que reúna los requisitos para ser tratada con privacidad o confidencialidad en este formulario o en cualquier otro documento adjunto. Adjunte copias editadas de cualquier otro documento que respalde la reclamación, tales como pagarés, órdenes de compra, facturas, balances detallados de cuentas en funcionamiento, contratos, resoluciones judiciales, hipotecas y acuerdos de garantías. No adjunte documentos originales, ya que es posible que los documentos adjuntos se destruyan luego de analizarlos. En caso de que los documentos no estén disponibles, explique los motivos en un anexo.

Fill in all the information about the claim as of the Petition Date.

Complete toda la información acerca de la reclamación a la fecha en la que se presentó el caso.

| Part 1 / Parte 1 | Identify the Claim / Identificar la reclamación |
|---|---|

**1. Who is the current creditor?**

**¿Quién es el acreedor actual?**

Oaktree Value Opportunities Fund Holdings, L.P.

Name of the current creditor (the person or entity to be paid for this claim)
Nombre al acreedor actual (la persona o la entidad a la que se le pagará la reclamación)

Other names the creditor used with the debtor
Otros nombres que el acreedor usó con el deudor _____

**2. Has this claim been acquired from someone else?**

¿Esta reclamación se ha adquirido de otra persona?

☒ No / No

☐ Yes. From whom?

Sí. ¿De quién? _____

---

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

¿A dónde deberían enviarse las notificaciones al acreedor?

Norma federal del procedimiento de quiebra (FRBP, por sus siglas en inglés) 2002(g

**Where should notices to the creditor be sent?**
¿A dónde deberían enviarse las notificaciones al acreedor?

c/o Oaktree Capital Management, L.P.; Attn: Emily Stephens
Name / Nombre

333          South Grand Ave., 28th Floor
Number / Número    Street / Calle

Los Angeles  CA        90071
City / Ciudad   State / Estado   ZIP Code / Código postal

213-830-6466
Contact phone / Teléfono de contacto

estephens@oaktreecapital.com
Contact email / Correo electrónico de contacto

**Where should payments to the creditor be sent?** (if different)
¿A dónde deberían enviarse los pagos al acreedor? (En caso de que sea diferente)

The Bank of New York Mellon
Name / Nombre

2          Hanson Place, 7th Floor
Number / Número    Street / Calle

Brooklyn  NY        11217
City / Ciudad   State / Estado   ZIP Code / Código postal

Ann Marie Campbell (a/c 278868) / (718) 315-3757
Contact phone / Teléfono de contacto

ocmcustody@bnymellon.com
Contact email / Correo electrónico de contacto

---

**4. Does this claim amend one already filed?**

¿Esta reclamación es una enmienda de otra presentada anteriormente?

☒ No / No

☐ Yes.  Claim number on court claims registry (if known)

Sí.  Número de reclamación en el registro de reclamaciones judiciales (en caso de saberlo)_____

Filed on / Presentada el _____(MM /DD/YYYY) / (DD/MM/AAAA)

---

**5. Do you know if anyone else has filed a proof of claim for this claim?**

¿Sabe si alguien más presentó una evidencia de reclamación para esta reclamación?

☒ No / No

☐ Yes. Who made the earlier filing?

Sí. ¿Quién hizo la reclamación anterior?_____

---

| Part 2 / Parte 2: | Give Information About the Claim as of the Petition Date |
|---|---|
| | Complete toda la información acerca de la reclamación desde la fecha en la que se presentó el caso. |

**6. Do you have a claim against a specific agency or department of the Commonwealth of Puerto Rico?**

¿Tiene una reclamación en contra de algún organismo o departamento específico del Estado Libre Asociado de Puerto Rico?

☒ No / No

☐ Yes.  Identify the agency or department and contact name. (A list of Commonwealth of Puerto Rico agencies and departments is available at: https://cases.primeclerk.com/puertorico/.)

Sí.  Identifique el organismo o departamento y nombre del representante. (Una lista de agencias y departamentos del Estado Libre Asociado de Puerto Rico está disponible en: https://cases.primeclerk.com/puertorico/).

---

**7. Do you supply goods and / or services to the government?**

¿Proporciona bienes y / o servicios al gobierno?

☒ No / No

☐ Yes. Provide the additional information set forth below / Sí. Proporcionar la información adicional establecida a continuación:

Vendor / Contract Number | Número de proveedor / contrato: _____

List any amounts due after the Petition Date (listed above) but before June 30, 2017:

Anote la cantidad que se le debe después de la fecha que se presentó el caso (mencionados anteriormente), pero antes del 30 de junio de 2017  $ _____

| | |
|---|---|
| **8.  How much is the claim?**<br><br>¿Cuál es el importe de la reclamación? | $ <u>See Addendum</u>                    . Does this amount include interest or other charges?<br>¿Este importe incluye intereses u otros cargos?<br>☐  No / No<br>☐  Yes. Attach statement itemizing interest, fees, expenses, or other<br>       charges required by Bankruptcy Rule 3001(c)(2)(A).<br>       Sí. Adjunte un balance con intereses detallados, honorarios,<br>       gastos u otros cargos exigidos por la Norma de Quiebras<br>       3001(c)(2)(A). |
| **9.  What is the basis of the claim?**<br><br>¿Cuál es el fundamento de la reclamación? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Por ejemplo: Venta de bienes, préstamo de dinero, arrendamiento, prestación de servicios, lesiones personales u homicidio culposo, o tarjetas de crédito. Adjunte copias editadas de cualquier documento que respalde la reclamación conforme a lo exigido por la Norma de Quiebras 3001(c). Limite la divulgación de información que reúne los requisitos para ser tratada con privacidad, tal como información sobre atención médica.<br><br>    <u>See Addendum</u>                                                          |
| **10.  Is all or part of the claim secured?**<br><br>¿La reclamación está garantizada de manera total o parcial? | ☐  No / No<br>☒  Yes. The claim is secured by a lien on property.<br>     Sí. La reclamación está garantizada por un derecho de retención sobre un bien.<br><br>         Nature of property / Naturaleza del bien:<br>         ☐  Motor vehicle / Vehículos<br><br>         ☒  Other. Describe:<br>             Otro. Describir:        **See Addendum**                          <br><br>         **Basis for perfection / Fundamento de la realización de pasos adicionales:**  <u>See Addendum</u><br>                                                                                       <br><br>         Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>         Adjunte copias editadas de documentos, si los hubiere, que demuestre la realización de pasos adicionales para hacer valer un derecho de garantía (por ejemplo, una hipoteca, un derecho de retención, un certificado de propiedad, una declaración de financiamiento u otro documento que demuestre que se ha presentado o registrado un derecho de retención.)<br><br>         **Value of property / Valor del bien:**        $  <u>See Addendum</u>                <br><br>         **Amount of the claim that is secured /**<br>         **Importe de la reclamación que está garantizado:** $ <u>See Addendum</u>          <br><br>         **Amount of the claim that is unsecured /**<br>         **Importe de la reclamación que no está garantizado:** $ <u>0.00</u>             <br>         (The sum of the secured and unsecured amounts should match the amount in line 7.)<br>         (La suma del importe garantizado y no garantizado debe coincidir con el importe de la línea 7.)<br><br>         **Amount necessary to cure any default as of the Petition Date /**<br>         **Importe necesario para compensar toda cesación de pago a la fecha que se presentó el caso :** $_____<br>          <u>See Addendum</u>                                           <br><br>         **Annual Interest Rate** (on the Petition Date)<br>         **Tasa de interés anual** (cuando se presentó el caso)  <u>See Addendum</u>     <br>         ☐  Fixed / Fija<br>         ☐  Variable / Variable |
| **11.  Is this claim based on a lease?**<br><br>¿Esta reclamación está basada en un arrendamiento? | ☒  No / No<br>☐  Yes. Amount necessary to cure any default as of the Petition Date.<br>     Sí. Importe necesario para compensar toda cesación de pago a partir de la que se presentó el caso$ _____ |

| 12. Is this claim subject to a right of setoff?<br><br>¿La reclamación está sujeta a un derecho de compensación? | ☐ No / No<br><br>☐ Yes. Identify the property /<br>SI. Identifique el bien:   **See Addendum** |
|---|---|

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?<br><br>¿La reclamación, total o parcial, cumple los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b)(9) del U.S.C.? | ☐ No / No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the Petition Date in these Title III case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.<br><br>SI. Indique el importe de la reclamación que surge del valor de cualquier bien recibido por el deudor dentro de los 20 días anteriores a la fecha de inicio en estos casos del Título III, en el que los bienes se han vendido al deudor en el transcurso normal de los negocios del deudor. Adjunte la documentación que respalda dicha reclamación. | $ **See Addendum** |

## Part 3 / Parte 3:   Sign Below / Firmar a continuación

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**La persona que complete esta evidencia de reclamación debe firmar e indicar la fecha. FRBP 9011(b).**

Si presenta esta reclamación de manera electrónica, la FRBP 5005(a)(2) autoriza al tribunal a establecer normas locales para especificar qué se considera una firma.

Check the appropriate box / Marque la casilla correspondiente:

☑ I am the creditor. / Soy el acreedor.

☐ I am the creditor's attorney or authorized agent. / Soy el abogado o agente autorizado del acreedor.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. / Soy el síndico, el deudor o su agente autorizado. Norma de quiebra 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. / Soy el garante, fiador, endosante u otro codeudor. Norma de quiebra 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

Comprendo que una firma autorizada en esta *Evidencia de reclamación* se considera como un reconocimiento de que al calcular el importe de la reclamación, el acreedor le proporcionó al deudor crédito para todo pago recibido para saldar la deuda

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

He leído la información en esta *Evidencia de reclamación* y tengo motivos razonables para suponer que la información es verdadera y correcta.

I declare under penalty of perjury that the foregoing is true and correct. / Declaro bajo pena de perjurio que lo que antecede es verdadero y correcto.

Executed on date / Ejecutado el     05/22/2018     (MM/DD/YYYY) / (DD/MM/AAAA)

Signature / Firma

**Print the name of the person who is completing and signing this claim / Escriba en letra de imprenta el nombre de la persona que completa y firma esta reclamación:**

| Name | Steven Tesoriere | / | | Jennifer Box |
|---|---|---|---|---|
| | First name / Primer nombre | | Middle name / Segundo nombre | Last name / Apellido |
| Title / Cargo | Managing Director | / | | Managing Director |
| Company / Compañía | Oaktree Capital Management, L.P. | | | |

*Oaktree Value Opportunities Fund Holdings, L.P.

By: Oaktree Value Opportunities Fund GP, L.P.
Its: General Partner

By: Oaktree Value Opportunities Fund GP Ltd.
Its: General Partner

By: Oaktree Capital Management, L.P.
Its: Director

Identify the corporate servicer as the company if the authorized agent is a servicer.
Identifique al recaudador corporativo como la compañía si el agente autorizado es un recaudador.

| Address / Dirección | 333 | S. Grand Avenue, 28th Floor | | |
|---|---|---|---|---|
| | Number / Número | Street / Calle | | |
| | Los Angeles | | CA | 90071 |
| | City / Ciudad | | State / Estado | ZIP Code / Código postal |

Contact phone / Teléfono de contacto  213-830-6300     Email / Correo electrónico  estephens@oaktreecapital.com

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                 12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

## How to fill out this form

- **Fill in all of the information about the claim as of the petition date.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child (John Doe, parent, 123 Main St., City, State)*. See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form or contact the Claims and Noticing Agent at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), or by email at puertoricoinfo@primeclerk.com. You may view a list of filed claims in the Title III cases by visiting the Claims and Noticing Agent's website at https://cases.primeclerk.com/puertorico.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. § 503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the petition date, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the petition date. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy or confidential information. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

---

**Do not file these instructions with your form**

---

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

**If by first class mail:**
Commonwealth of Puerto Rico
Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4708
New York, NY 10163-4708

**If by overnight courier or hand delivery:**
Commonwealth of Puerto Rico
Claims Processing Center
c/o Prime Clerk, LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

# Instrucciones para la Evidencia de reclamación

Tribunal de Quiebras de los Estados Unidos                                    12/15

**Estas instrucciones y definiciones explican la ley de forma general. En ciertas circunstancias, tales como casos de quiebra que los deudores no presentan de forma voluntaria, se pueden aplicar excepciones a estas normas generales. Debe considerar la posibilidad de obtener el asesoramiento de un abogado, en especial si no conoce el proceso de quiebra y las reglamentaciones de privacidad.**

## Cómo completar este formulario

- **Complete toda la información acerca de la reclamación a la fecha en la que se presentó el caso.**

- **Complete el título en la parte superior del formulario.**

- **Si la reclamación se ha adquirido de otra persona, indique la identidad de la última parte** que fue propietaria de la reclamación o fue titular de la reclamación y que la transfirió a usted antes de que se presente la reclamación inicial.

- **Adjunte cualquier documento de respaldo a este formulario.**
  Adjunte copias editadas de cualquier documento que demuestre que la deuda existe, que un gravamen garantiza la deuda, o ambos. (Ver la definición de *edición* en la siguiente página).

  También adjunte copias editadas de cualquier documento que demuestre el perfeccionamiento de un derecho de garantía o cualquier cesión o transferencia de la deuda. Además de los documentos, puede agregarse un resumen. Norma federal del procedimiento de quiebra (denominada "Norma de quiebra") 3001(c) y (d).

- **No adjunte documentos originales, ya que es posible que los documentos adjuntos se destruyan luego de examinarlos.**

- **Si la reclamación se basa en la prestación de bienes o servicios de atención médica, no divulgue información de atención médica confidencial. Omita o edite la información confidencial tanto en la reclamación como en los documentos adjuntos.**

- **El formulario de *Evidencia de reclamación* y los documentos adjuntos solo deben mostrar los últimos 4 dígitos de un número de seguridad social, el número de identificación tributaria de una persona o un número de cuenta financiera, y solo el año de la fecha de nacimiento de una persona.** Ver la Norma de quiebra 9037.

- **En el caso de un menor, complete solamente las iniciales del menor y el nombre completo y la dirección del padre o madre o el tutor del menor.** Por ejemplo, escriba *A.B., un menor* (*John Doe, padre, calle 123, ciudad, estado*). Ver la Norma de quiebra 9037.

## Confirmación de que se ha presentado la reclamación

Para recibir una confirmación de que se ha presentado la reclamación, puede adjuntar un sobre autodirigido y estampillado y una copia de este formulario o comunicarse con el representante de reclamaciones y notificaciones al (844) 822-9231 (número gratuito para EE. UU. y Puerto Rico) o al (646) 486-7944 (para llamadas internacionales), o por correo electrónico a puertoricoinfo@primeclerk.com. Para ver una lista de las reclamaciones presentadas en los casos del Título III, visite el sitio web del representante de reclamaciones y notificaciones en https://cases.primeclerk.com/puertorico.

## Comprenda los términos utilizados en este formulario

**Gastos administrativos:** En términos generales, gastos que se generan luego de presentar un caso de quiebra en relación con el manejo, la liquidación o la distribución del patrimonio de la quiebra.
Título 11 § 503 del Código de los Estados Unidos (U.S.C.).

**Reclamación:** El derecho de un acreedor a recibir un pago por una deuda del deudor a la fecha en la que el deudor solicitó la quiebra. Título 11 §101 (5) del U.S.C. Una reclamación puede estar garantizada o no garantizada.

**Reclamación de conformidad con el Título 11 § 503(b)(9) del U.S.C.:** Una reclamación que surge del valor de cualquier bien recibido por el Deudor dentro de los 20 días anteriores a la fecha en la que se presentó el caso , en el que los bienes se han vendido al Deudor en el transcurso normal de los negocios del Deudor. Adjunte la documentación que respalde dicha reclamación.

**Acreedor:** Una persona, una sociedad anónima u otra entidad con la que el deudor tiene una deuda que se contrajo en la fecha en la que el deudor solicitó la quiebra o con anterioridad. Título 11 § 101 (10) del U.S.C.

**Deudor:** Una persona, una sociedad anónima u otra entidad que está en quiebra. Utilice el nombre del deudor y el número de caso tal como se muestran en el aviso de quiebra que recibió. Título 11 § 101 (13) del U.S.C.

**Prueba de pasos adicionales:** La prueba de la realización de pasos adicionales para hacer valer un derecho de garantía puede incluir documentos que demuestren que se ha presentado o registrado un derecho de garantía, tal como una hipoteca, un derecho de retención, un certificado de propiedad o una declaración de financiamiento.

**Información que debe mantenerse en privado:** El formulario de *Evidencia de reclamación* y los documentos adjuntos solo deben mostrar los últimos 4 dígitos de un número de seguridad social, el número de identificación tributaria de una persona o un número de cuenta financiera, y solo las iniciales del nombre de un menor y el año de la fecha de nacimiento de una persona. Si una reclamación se basa en la prestación de bienes o servicios de atención médica, limite la divulgación de los bienes o servicios a fin de evitar la incomodidad o la divulgación de información de atención médica confidencial. Es posible que, más adelante, se le solicite que brinde más información si el síndico u otra persona de interés se opone a la reclamación.

**Evidencia de reclamación:** Un formulario que detalla el monto de la deuda que el deudor mantiene con un acreedor a la fecha de la presentación. El formulario debe ser presentado en el distrito donde el caso se encuentra pendiente de resolución.

**Edición de información:** Ocultamiento, corrección, o eliminación de cierta información para proteger la privacidad o la información confidencial. Quienes presenten la documentación deben editar u omitir información sujeta a **privacidad** en el formulario de *Evidencia de reclamación* y en cualquier documento adjunto.

**Reclamación garantizada en virtud el Título 11 § 506(a) del U.S.C.:** Una reclamación respaldada por un derecho de retención sobre un bien en particular del deudor. Una reclamación está garantizada en la medida que un acreedor tenga el derecho a recibir un pago proveniente del bien antes de que se les pague a otros acreedores. El monto de una reclamación garantizada generalmente no puede ser mayor que el valor del bien en particular sobre el cual el acreedor mantiene un derecho de retención. Cualquier monto adeudado a un acreedor que sea mayor que el valor del bien generalmente se lo considera una reclamación no garantizada. Sin embargo, existen excepciones; por ejemplo, el Título 11 § 1322(b) del U.S.C., y la oración final de § 1325(a).

Algunos ejemplos de derechos de retención sobre bienes incluyen una hipoteca sobre un inmueble o un derecho de garantía sobre un automóvil. Un derecho de retención puede ser otorgado de manera voluntaria por un deudor o puede obtenerse a través de un procedimiento judicial. En algunos estados, una resolución judicial puede ser un derecho de retención.

**Compensación:** Ocurre cuando un acreedor se paga a sí mismo con dinero que pertenece al deudor y que mantiene en su poder, o cuando el acreedor cancela una deuda que mantiene con el deudor.

**Reclamación no garantizada:** Una reclamación que no cumple con los requisitos de una reclamación garantizada. Una reclamación puede no estar garantizada en parte en la medida que el monto de la reclamación sea mayor que el valor del bien sobre la cual un acreedor tiene un derecho de retención.

## Ofrecimiento de compra de una reclamación

Algunas entidades compran reclamaciones por un monto menor que su valor nominal. Estas entidades pueden contactar a acreedores para ofrecerles la compra de sus reclamaciones. Algunas comunicaciones por escrito de estas entidades pueden confundirse fácilmente con documentación judicial oficial o con comunicaciones del deudor. Estas entidades no representan al tribunal de quiebras, al síndico de la quiebra, ni al deudor. Un acreedor no tiene obligación alguna de vender su reclamación. Sin embargo, si decide hacerlo, cualquier transferencia de esa reclamación está sujeta a la Norma de Quiebras 3001(e), a las correspondientes disposiciones del Código de Quiebras (Título 11 § 101 y subsiguientes del U.S.C.) y a cualquier resolución del tribunal de quiebras que corresponda al caso.

## Envíe la(s) Evidencia(s) de reclamación completa(s) a:

**Si por correo de primera clase:**
Commonwealth of Puerto Rico
Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4708
New York, NY 10163-4708

**Si por el mensajero de una noche o la entrega de mensajero a mano:**
Commonwealth of Puerto Rico
Claims Processing Center
c/o Prime Clerk, LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

---

**No presente estas instrucciones con su formulario**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

-----------------------------------------------------------------X
)
In re:                                                          )        PROMESA
)        Title III
THE FINANCIAL OVERSIGHT AND                                     )
MANAGEMENT BOARD FOR PUERTO RICO                                )        Case No. 3:17-cv-03283 (LTS)
)
as representative of                          )        (Jointly Administered)
)
THE COMMONWEALTH OF PUERTO RICO, *et al.*,)
)
Debtors.[1]                          )
)
-----------------------------------------------------------------X
In re:                                                          )
)        PROMESA
THE FINANCIAL OVERSIGHT AND                                     )        Title III
MANAGEMENT BOARD FOR PUERTO RICO                                )
)        Case No. 3:17-cv-03566 (LTS)
as representative of                          )
)
THE EMPLOYEES RETIREMENT SYSTEM OF                              )
THE GOVERNMENT OF PUERTO RICO                                   )
)
Debtor.                             )
X
-----------------------------------------------------------------

## ADDENDUM TO PROOF OF CLAIM OF ERS BONDHOLDER

---

[1]    The Debtors in these Title III cases, along with each Debtor's Bankruptcy Court case number
and last four (4) digits of each Debtor's federal tax identification number are (i) The
Commonwealth of Puerto Rico (Bankr. Case No. 17-bk-3283 (LTS)) (Last Four Digits of
Federal Tax ID: 3481); (ii) The Employees Retirement System of the Government of the
Commonwealth of Puerto Rico (Bankr. Case No. 17-bk-3566 (LTS)) (Last Four Digits of
Federal Tax ID: 9686); (iii) Puerto Rico Sales Tax Financing Corporation (Bankr. Case No.
17-bk-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iv) Puerto Rico Highways
and Transportation Authority (Bankr. Case. No. 17-bk-3567 (LTS)) (Last Four Digits of
Federal Tax ID:  3808).

1.      This Proof of Claim is filed by Oaktree Value Opportunities Fund Holdings, L.P. (the "Claimant") as a secured creditor and holder of secured bonds issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") in 2008, against the Commonwealth of Puerto Rico (the "Commonwealth") and ERS.

## Background

2.      The ERS is a trust created by Act No. 447 of May 15, 1951 of the Legislature of the Commonwealth (the "ERS Enabling Act") to provide pension and other benefits to officers and employees of the Commonwealth, members and employees of the Legislature, and officers and employees of certain public corporations and municipalities of the Commonwealth. 3 L.P.R.A. § 761. The ERS Enabling Act gave ERS's Board of Trustees blanket authorization to incur debt on behalf of ERS and to secure such debt with ERS's assets. *See* 3 L.P.R.A. § 779(d).

3.      ERS is funded by employer contributions, employee contributions, and investment earnings on its undistributed funds. Employer contributions are the largest component of this income stream, and they constitute a legal asset of ERS. ERS has a statutory right to receive these employer contributions, and employers are required by statute to make them. ERS receives employer contributions both from the Commonwealth and from various municipalities within, and public corporations of, the Commonwealth.

4.      For decades, the Commonwealth has failed to make the amount of employer contributions required by law. This, among other things, has resulted in severe underfunding of ERS. In 2008, ERS sought to address its financial problems by issuing secured bonds (the "ERS Bonds"), which infused approximately $3 billion into ERS.

5.      The Claimant holds $13,160,000 in principal amount at stated maturity of capital appreciation ERS Bonds and $89,145,000 in principal amount of term ERS Bonds (collectively, the "Principal Amount").

6.      ERS issued the ERS Bonds pursuant to the authority of a resolution (as thereafter supplemented, the "ERS Bond Resolution"). It is the ERS Bond Resolution and the related security agreement that govern the contractual relationship between ERS and the holders of the ERS Bonds (the "ERS Bondholders") with respect to the ERS Bonds, specify the times and amounts of payment of interest and repayment of principal, and set forth the collateral ERS provided as security for payment. Specifically, the collateral underlying the security package was called "Pledged Property," as that term is defined in the ERS Bond Resolution, and included, among other things, employer contributions and ERS's right to receive employer contributions. ERS Bond Resolution § 501 & Exh. B, VI-33, VI-36, VI-37. ERS was required to use the Pledged Property to make timely principal and interest payments on the ERS Bonds before it spent or used any of the funds for any other purpose. *Id.* §§ 501, 701, & Exh. B, VI-36. To assure that the Pledged Property would remain available to secure the ERS Bonds, the ERS Bond Resolution explicitly required ERS to pursue all available legal remedies to collect employer contributions that were delinquent or inadequate. *Id.* §§ 701, 709.

7.      As the Financial Oversight and Management Board of the Commonwealth of Puerto Rico (the "Oversight Board"), ERS, and the Commonwealth have previously acknowledged, the ERS Bonds are oversecured.[2]

---

[2] *See, e.g.*, Brief of Amicus Curiae Fin. Oversight and Mgmt. Bd. for Puerto Rico in Support of Respondents-Appellees Urging Affirmance of the District Court Order in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et al.*, No. 16-2433, ECF No. 65, at 18 (1st Cir. Dec. 23, 2016) ("The [ERS Bondholders] have a substantial equity cushion as a result of the reserve accounts and the perpetual revenue streams.");

8.      On May 3, 2017, the Oversight Board approved and certified the filing of a petition for the Commonwealth to restructure the Commonwealth's debts pursuant Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").

9.      On May 21, 2017, the Oversight Board approved and certified the filing of a separate PROMESA Title III petition for ERS.  PROMESA incorporates the automatic stay provisions of § 362 of title 11 of the United States Code (the "Bankruptcy Code").  Pursuant to these provisions, the filing of the ERS Title III case on May 21, 2017, operated as a stay against all efforts by any person (including the Commonwealth) to obtain or exercise control over property of ERS.

10.     On June 25, 2017, the Puerto Rico Legislature passed Joint Resolution for Other Allocations for Fiscal Year 2017-2018 ("Joint Resolution 188") and the Oversight Board adopted it on behalf of the Governor on June 30, 2017.  Joint Resolution 188 ordered ERS to sell its assets and to transfer the net cash proceeds, in addition to any available funds, into an account as part of the General Fund for fiscal year 2017-2018 to make benefit payments to pensioners. Joint Resolution 188 §§ 1, 2, 3.  Joint Resolution 188 also provided, in relevant part, that the Commonwealth, its public corporation, and its municipalities would stop making employer

---

(continued...)

Respondent Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et al.*, No. 16-cv-2696, ECF No. 52, at 10-11 (Oct. 26, 2016) ("[T]he security interests held by the ERS Bondholders provide them with future protection more than sufficient to address any concern, real or imagined."); Respondents' Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro García Padilla, et al.*, No. 16-cv-2696, ECF No. 53, at 18 ("Given its size and indefinite duration, the security interest provides Movants with the adequate protection they purport is required to ensure payment on their bonds, certainly through the expiration of the PROMESA stay and, indeed, for as long as the bonds remain outstanding.").

contributions to ERS and, instead, would make employer contributions to the Commonwealth. No consideration was provided to ERS or the ERS Bondholders in exchange for the collateral transferred to the Commonwealth's General Fund.

11.     On August 18, 2017, the Puerto Rico legislature passed Act 106-2017 ("Act 106") and the Governor signed it into law on August 23, 2017. Act 106 provided that, in accordance with Joint Resolution 188, on July 13, 2017 the Commonwealth became the "direct payer of our retirees' pensions." Act 106, § 1.4. Act 106 also reiterated that, in accordance with Joint Resolution 188, ERS would contribute its assets to the Commonwealth and that the Commonwealth, its public corporations, and its municipalities would stop making employer contributions to ERS. *Id.*, §§ 1.3, 1.4.

## Basis for Proof of Claim

12.     This Proof of Claim by the Claimant against ERS and the Commonwealth is predicated upon secured claims arising under, relating to, or in connection with (a) ERS's breach of its obligation to pay principal and interest on the ERS Bonds; (b) ERS's numerous breaches of its obligations under the ERS Bonds, the ERS Bond Resolution and the security agreement, including, without limitation, (i) ERS's failure to promptly collect and remit employer contributions to the Fiscal Agent, (ii) ERS's failure to pursue all available legal remedies to collect employer contributions that are delinquent or inadequate, (iii) ERS's failure to transfer employer contributions to the respective collateral accounts on a monthly basis, (iv) ERS's breach of its obligation to oppose the enactment of Joint Resolution 188 and Act 106 (collectively, the "Post-Petition Legislation"), and (v) ERS's failure to defend, preserve, and protect the assignment of the Pledged Property and the rights of the ERS Bondholders; (c) the unjust enrichment of ERS at the ERS Bondholders' expense; (d) the Commonwealth's enactment

of the Post-Petition Legislation and/or receipt of the Pledged Property from ERS, including, without limitation, (i) the Commonwealth's violation of the automatic stay in ERS's Title III case when it enacted the Post-Petition Legislation diverting employer contributions from ERS to the Commonwealth and requiring ERS to liquidate its assets and transfer the proceeds to the Commonwealth, (ii) the Commonwealth's acquisition of the Pledged Property that remains subject to the Claimant's liens under the UCC, (iii) the Commonwealth's violation of the Fifth Amendment to the United States Constitution and Article II, Section 9 of the Puerto Rico Constitution when it enacted the Post-Petition Legislation; (iv) the Commonwealth's violation of Article I, § 10 of the United States Constitution and Article II, § 7 of the Puerto Rico Constitution when it enacted the Post-Petition Legislation; (v) the unjust enrichment of the Commonwealth at the ERS Bondholders' expense resulting from the transfer of the Pledged Property under the Post-Petition Legislation; and (vi) the Commonwealth's violation of PROMESA, including, without limitation, the Commonwealth's violation of Section 407 of PROMESA when it enacted the Post-Petition Legislation; (e) the Commonwealth's failure to pay prepetition employer contributions; (f) the Commonwealth's and ERS's breach of the *Order Approving Stipulation, Setting Aside Hearing and Dismissing Case* entered by Judge Besosa on January 17, 2017, in Case No. 16-cv-02696 [Dkt. No. 83]; and (g) any other claims the Claimant may have against ERS or the Commonwealth in connection with the Post-Petition Legislation, the ERS Bonds, the ERS Bond Resolution, the passage of various unlawful acts and/or executive orders, and/or any other unlawful actions.

13.     ***Claims Asserted in Adversary Case***.   Attached hereto as <u>Exhibit A</u> is the ERS Bondholders' *Amended and Supplemented Adversary Complaint* filed in *Altair Global Credit Opportunities Fund (A), LLC, et al. v. The Commonwealth of Puerto Rico, et al.*, Adv.

Proc. Nos. 17-219 and 17-220 (D.P.R.) [Dkt. No. 39], which sets forth certain claims by the ERS Bondholders against ERS and the Commonwealth (the "Adversary Complaint Claims," and together with the claims identified in ¶ 12, the "Claims"). The Claimant hereby incorporates the Adversary Complaint Claims into this Proof of Claim and asserts them against ERS and the Commonwealth.

14.      ***ERS's Breach of Its Obligation to Pay Principal and Interest on the ERS Bonds.***  ERS is obligated to pay principal and interest on the ERS Bonds pursuant to the ERS Bond Resolution.  ERS Bond Resolution § 701.  ERS breached this obligation at various times, including, without limitation, after the enactment of the Post-Petition Legislation.

15.      ***ERS's Breach of Its Obligation to Promptly Collect and Remit Employer Contributions to the Fiscal Agent.***  ERS is obligated to "promptly collect and remit" all employer contributions to the Fiscal Agent in accordance with its statutory obligations.  *Id.* § 701.  ERS breached this obligation at various times, including, without limitation, after the enactment of the Post-Petition Legislation.

16.      ***ERS's Breach of Its Obligation to Pursue All Available Legal Remedies to Collect Employer Contributions That Are Delinquent or Inadequate.***  ERS is obligated to perform all acts and enforce all its powers . . . in order to promptly collect and remit the Employers' Contributions" for payment of the ERS Bonds.  *Id.*; *see also* § 709(1).  ERS breached this obligation at various times, including, without limitation, after the enactment of the Post-Petition Legislation.

17.      ***ERS's Breach of Its Obligation to Transfer Employer Contributions to the Respective Collateral Accounts on a Monthly Basis.***  ERS is obligated to transfer employer contributions to the Fiscal Agent in accordance with certain provisions of the ERS Bond

Resolution. *Id.* §§ 504, 505, 506. ERS breached this obligation at various times, including, without limitation, after the enactment of the Post-Petition Legislation.

18. ***ERS's Breach of Its Obligation to Oppose the Enactment of the Post-Petition Legislation.*** ERS is obligated to "oppose any attempt by the Legislature of the Commonwealth . . . to make any other change in the [ERS Enabling Act] or any other relevant legislation that would have a material adverse effect on [the ERS] Bondholders." *Id.* § 709(2). ERS breached this obligation at various times, including, without limitation, after the enactment of the Post-Petition Legislation.

19. ***ERS's Failure to Defend, Preserve, and Protect the Assignment of the Pledged Property and the Rights of the ERS Bondholders.*** ERS is obligated, "at all times, to the extent permitted by law, [to] defend, preserve and protect the assignment of the Pledged Property and all the rights of the Fiscal Agent, the Beneficiaries and the [ERS Bondholders] under [the ERS Bond] Resolution against all claims and demands of all persons whomsoever." *Id.* § 705. ERS breached this obligation at various times, including, without limitation, after the enactment of the Post-Petition Legislation.

20. ***Unjust Enrichment of ERS.*** The ERS Bondholders provided approximately $3 billion to ERS to help pay pension and other benefits. In exchange, ERS promised to pay principal and interest on the ERS Bonds and granted the ERS Bondholders liens on the Pledged Property. To the extent ERS is permitted to evade all of the responsibilities it voluntarily assumed in issuing the ERS Bonds, while also retaining the $3 billion it obtained, this results in an unjust enrichment of ERS at the ERS Bondholders' expense.

21. ***The Commonwealth's Violation of the ERS Automatic Stay.*** The Commonwealth enacted the Post-Petition Legislation after the commencement of ERS's Title III

case.  The Post-Petition Legislation required ERS to (1) liquidate its assets and transfer the proceeds to the Commonwealth, and (2) divert employer contributions to which ERS has a statutory right away from ERS to the Commonwealth.  The Commonwealth is an entity separate from ERS that owed payment obligations to ERS.  Accordingly, the enactment of the Post-Petition Legislation was action by the Commonwealth to obtain possession of property of ERS and from ERS, and to exercise control over property of ERS, in violation of the ERS automatic stay.  The Commonwealth's violation of the ERS automatic stay caused ERS to be unable to fulfill its obligation to pay principal and interest on the ERS Bonds and deprived the ERS Bondholders of their property interests in the Pledged Property.

22. ***The Pledged Property Remains Subject to the Claimant's Liens Under the UCC.***  The Puerto Rico Uniform Commercial Code (both in 2008 and today) provides that "[a] security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien," and also that "a security interest attaches to any identifiable proceeds of collateral."  19 L.P.R.A. § 2265(a); *see also* 19 L.P.R.A. § 2106(2) (2008) ("[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.").  Nothing in PROMESA alters, amends, or preempts these laws.  The Post-Petition Legislation transfers the Pledged Property from ERS to the Commonwealth.  The Claimant has secured claims in the Pledged Property acquired by the Commonwealth and therefore holds secured claims against the Commonwealth with respect to any Pledged Property in the Commonwealth's possession.

23.    *The Commonwealth's Taking of the ERS Bondholders' Property Without Just Compensation.* The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V (the "U.S. Takings Clause"). Article II, Section 9 of the Puerto Rico Constitution provides that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law." P.R. Const. art. II, § 9 (the "P.R. Takings Clause"). The ERS Bondholders possess a constitutionally protected property interest in the form of valid, perfected security interests in and liens on the Pledged Property as well as the contractual right to timely payment of principal and interest. The Post-Petition Legislation ordered ERS to sell its assets and to transfer its funds to the Commonwealth. The Post-Petition Legislation also ordered the Commonwealth and non-Commonwealth public employers (such as municipalities and public corporations) to cease paying employer contributions to ERS and instead make these payments to the Commonwealth's General Fund. The Post-Petition Legislation provided no compensation of any kind for the transfer of the ERS Bondholders' property to the Commonwealth and therefore constitutes an unconstitutional taking of the Pledged Property. At all relevant times, the ERS Bondholders have been oversecured. Accordingly, the amount of just compensation required for the taking of the ERS Bondholders' collateral is no less than the principal amount of the ERS Bonds and any and all interest accruing thereon until the date compensation is paid. In addition, as explained above, impairing the ERS Bondholders' just compensation claims in a Title III plan would violate the Fifth and Fourteenth Amendments to the United States Constitution.

24.    *The Commonwealth's Violation of the United States and Puerto Rico Contracts Clauses.* Article I, § 10 of the United States Constitution provides that "[n]o State

shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1.
Article II, § 7 of the Puerto Rico Constitution provides that "[n]o laws impairing the obligation
of contracts shall be enacted." P.R. Const. art. II, § 7. The ERS Bond Resolution created a
contractual relationship between ERS and the ERS Bondholders. The ERS Bondholders have a
contractual right to timely payment of principal and interest by ERS. ERS Bond Resolution
§ 701. Moreover, the ERS Bondholders have a contractual right and security interest in the
Pledged Property. *Id.* § 501. The Post-Petition Legislation required ERS to liquidate its assets
and pay the proceeds to the Commonwealth's General Fund, and divert the stream of employer
contributions from ERS to the Commonwealth. Accordingly, the Post-Petition Legislation
substantially impairs contractual obligations of ERS. This substantial impairment is neither
reasonable nor necessary to an important purpose of the Commonwealth government.

      25. ***Unjust Enrichment of the Commonwealth.*** The Post-Petition Legislation
required ERS to transfer the Pledged Property, the ERS Bondholders' collateral, to the
Commonwealth without providing any consideration, without the ERS Bondholders' consent,
and in violation of United States and Puerto Rico law. To the extent the Commonwealth
possesses the Pledged Property pursuant to the Post-Petition Legislation, the Commonwealth is
intentionally and wrongfully holding the ERS Bondholders' property without their consent,
which results in an unjust enrichment of the Commonwealth at the ERS Bondholders' expense.

      26. ***The Commonwealth's Violation of Section 407 of PROMESA.*** Section
407 of PROMESA provides:

> While an Oversight Board for Puerto Rico is in existence, if any property of any
> territorial instrumentality of Puerto Rico is transferred in violation of applicable
> law under which any creditor has a valid pledge of, security interest in, or lien on
> such property, or which deprives any such territorial instrumentality of property in
> violation of applicable law assuring the transfer of such property to such territorial

instrumentality for the benefit of its creditors, then the transferee shall be liable
for the value of such property.

48 U.S.C. § 2195(a). ERS has a statutory right to receive employer contributions from the Commonwealth and non-Commonwealth public employers. The ERS Bondholders possess valid, perfected security interests in and liens on the Pledged Property, which includes, among other things, employer contributions and the right to receive employer contributions. The Post-Petition Legislation required ERS to sell and transfer its assets and funds, all of which are subject to the ERS Bondholders' liens on the Pledged Property. The Post-Petition Legislation also required the Commonwealth and non-Commonwealth public employers to cease paying employer contributions to ERS and instead to make these payments to the Commonwealth's General Fund. Employer contributions and the right to receive employer contributions are subject to the ERS Bondholders' liens on the Pledged Property. The Commonwealth has provided no compensation of any kind for these transfers, in violation of United States and Puerto Rico law. As transferee of the property, the Commonwealth is liable for the value of the property.

27. *The Commonwealth's Failure to Pay Prepetition Employer Contributions.* ERS has a statutory right to receive employer contributions, and employers, including the Commonwealth, are required by statute to make them. These contributions are used to make timely payment of principal and interest on the ERS Bonds and the ERS Bondholders have liens on, among other things, all employer contributions and the right to receive them. Historically, the Commonwealth has been responsible for approximately 59 percent of the employer contributions to which ERS is entitled. Despite the importance of employer contributions, the Commonwealth has never paid enough to satisfy its contribution requirements. As a result, as of the filing of the Commonwealth's Title III case, the

Commonwealth owed ERS hundreds of millions of dollars in past due unpaid employer contributions. *See*, *e.g.*, Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Annual Financial Information Fiscal Year 2016, at 13, n 1, *available at* https://emma.msrb.org/ER1050099-ER822796-ER1223828.pdf. The Claimant has standing to assert this claim under the ERS Bond Resolution and applicable law. *See, e.g.,* ERS Bond Resolution § 1102(1)(i) (authorizing a "suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require [ERS] to collect Revenues adequate to carry out the covenants, agreements and assignments with respect thereto contained in this Resolution").

28. ***The Commonwealth's and ERS's Breach of the Order Approving Stipulation, Setting Aside Hearing and Dismissing Case Entered by Judge Besosa on January 17, 2017.*** On January 17, 2017, Judge Besosa entered an order approving a stipulation entered into by the Claimant, ERS, the Commonwealth, and the Oversight Board (the "Order"). *See* Order Approving Stipulation, Setting Aside Hearing and Dismissing Case, No. 16-cv-02696, Dkt. No. 83. The Order required ERS to transfer any employer contributions received from the Commonwealth to a specified bank account. *See id.* at 2-3 ("To the extent that ERS receives any Commonwealth central government Employers' Contributions, unless otherwise agreed in writing by the undersigned parties, such contributions shall be retained in the Segregated Account pending further order of the Court, provided, however, the undersigned parties agree that such matter may be heard by the Court upon motion and at an expedited hearing."). ERS later admitted that it received employer contributions from the Commonwealth and did not transfer those amounts to the specified account, in violation of the Order. *See* DiPompeo Decl., D.I. 96 in Adv. Proc. No. 17-213, Ex. A at 307:2-310:6.

29.     ***Additional Claims.***   ERS and the Commonwealth also damaged the Claimant through the Post-Petition Legislation, the passage of various unlawful acts and executive orders, including, without limitation, the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act or Act No. 21-2016, Executive Order 2016-31, and the Fiscal Responsibility Act or Act. No. 5-2017, and other unlawful actions, that violated (a) Puerto Rico law, including, without limitation, the law of fraudulent transfer, conversion, tortious interference, alter ego, subrogation, avoidance, breach of fiduciary duty, promissory estoppel, breach of express and implied warranty, negligent misrepresentation or omission, and fraudulent misrepresentation or omission, (b) the United States Bankruptcy Code, (c) PROMESA, (d) various securities laws, and (e) the United States and Puerto Rico Constitutions.

## Supporting Documentation

30.     Copies of following supporting documents are attached hereto: (1) the ERS Bond Resolution as Exhibit B; (2) the Security Agreement, dated June 2, 2008, as Exhibit C; and (3) the Uniform Commercial Code filings made in connection with the ERS Bonds as Exhibit D.  The Claimant reserves the right to supplement these documents.

## Nature of Claims

31.     The Claimant is owed the Principal Amount, plus accrued interest and attorney's fees and expenses, plus unliquidated and contingent amounts to be determined.  The Claims are fully secured and entitled to administrative expense priority.  In addition, the claims for just compensation on account of the Commonwealth's unconstitutional taking of the Claimant's property cannot be impaired or discharged pursuant to a Title III plan of adjustment.

## Secured Claims

32.     The Claims are all secured under 11 U.S.C. § 506(a)(1) of the Bankruptcy
Code.  Pursuant to the ERS Bond Resolution, the security agreement, and appropriately-filed
financing statements, the Claimant is a secured creditor with valid, perfected liens on the Pledged
Property.

33.     The Claims are all secured against the Commonwealth pursuant to 19
L.P.R.A. § 2106(2) and 19 L.P.R.A. § 2265(a).  Because the Commonwealth acquired property
subject to the Claimant's valid, perfected liens on the Pledged Property, the Claimant is a
secured creditor to the full extent of its claims against the Commonwealth.

## Administrative Expense Claims

34.     The Post-Legislation was enacted after the commencement of the ERS
Title III case and the Commonwealth Title III case.  The Claims arising from the post-petition
conduct of ERS and the Commonwealth are entitled to administrative expense status under 11
U.S.C. § 503, as incorporated into PROMESA by Section 301.

35.     The filing of this Proof of Claim in no respect waives, alters or otherwise
affects any rights that the Claimant may have with regard to any other claims created or
otherwise arising on or subsequent to the date on which ERS or the Commonwealth commenced
these Title III cases.  The Claimant reserve all rights to argue that any right to payment is a post-
petition claim.

## Non-Dischargeable Claims

36.     The claims under the Fifth Amendment to the United States Constitution
and Article II, Section 9 of the Puerto Rico Constitution resulting from the Commonwealth's
unconstitutional taking of the Claimant's property cannot be impaired by a PROMESA plan of

adjustment. PROMESA cannot be construed to violate the United States Constitution. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."). Accordingly, as the United States has previously explained, this Court cannot confirm a plan that would "impair [a] constitutional claim for just compensation." *In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014).[3] Unsurprisingly, PROMESA's framework is consistent with this view. First, 11 U.S.C § 1129(b)(2)(A), incorporated by Section 301(a) of PROMESA, 48 U.S.C. § 2161(a), provides constitutionally rooted property protections for secured claims. Second, Section 314 of PROMESA prohibits the Court from confirming a plan if the debtor is "prohibited by law"—such as the Constitution—"from taking any action necessary to carry out the plan." 48 U.S.C. § 2174 (b)(3). Finally, 11 U.S.C. § 944(c)(1), also incorporated by PROMESA, permits the Court to order a takings claim nondischargeable. *See Detroit*, 524 B.R. at 270.

### Reservation of Rights

37.     The Claimant does not waive, and expressly reserves, all rights and remedies at law or in equity that it has or may have against ERS and the Commonwealth and/or any other person or entity. The Claimant reserves the right to amend or supplement this Proof of Claim at any time and in any respect, including, without limitation, as necessary or appropriate to amend, quantify or correct amounts, to provide additional detail regarding the claims set forth in this Proof of Claim or the basis therefor, to fix the amount of any contingent or unliquidated

---

[3] *Accord* Br. for the United States at 6-7, *Detroit*, 524 B.R. 147 (No. 13-53846), Dkt. No. 6664 ("To the extent that the Plan proposes . . . to pay less than the full amount of a claim based on a just compensation award, regardless of when that award or the facts giving rise to it occur, i.e., prepetition or postpetition, such treatment would raise substantial constitutional questions. The Just Compensation Clause would appear to require these claims to be treated as nondischargeable.").

claim and/or to assert that all or any part of the claim(s) set forth in this Proof of Claim are entitled to be treated as an administrative expense or other priority. The Claimant further reserves the right to file and assert any additional claims or requests for payment of administrative expense of whatever kind or nature that may be or later become due from ERS and the Commonwealth under any other agreement or otherwise, including, without limitation, any secured, priority, administrative expense or general unsecured claims under the Bankruptcy Code or otherwise, whether known or unknown, liquidated or unliquidated, choate or inchoate, disputed or undisputed or contingent or fixed.

38.     The filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a waiver or release of the Claimant's rights against any person, entity or property, including any of the other debtors in these Title III cases, that may be liable for all or part of the claims set forth in this Proof of Claim; (b) an election of remedies; (c) an acknowledgment that the Claimant received adequate notice of any bar date fixed in these cases; (d) a waiver of the Claimant's right to assert additional administrative expense claims or an acknowledgment that all or any part of the claim(s) set forth in any Claim or herein or any other claim are not entitled to administrative or other priority; or (e) an admission that any valid claims or causes of action exist against the Claimant. The filing of this Proof of Claim is not and shall not be deemed or construed as a waiver of any such setoff or recoupment rights, and any such right of setoff or recoupment shall survive the closing of the Title III cases.

39.     The Claimant does not waive any right to any security held by or for it or any right with respect to any specific assets or any right or rights of action that it has or may have against the Commonwealth and ERS or any other person or persons who may be liable for all or any part of the claim(s) set forth in any Claim or herein.

**Notices**

40.     Copies of all notices and communications concerning this Proof of Claim

should be sent to:

> Oaktree Value Opportunities Fund Holdings, L.P.
> c/o Oaktree Capital Management, L.P.
> 333 South Grand Ave., 28th Floor
> Los Angeles, CA 90071
> Tel. 213.830.6466
> Attention:  Emily Stephens

With a copy to:

> Jones Day
> 250 Vesey Street
> New York, NY 10281
> Tel. 212.326.8312
> Attention:  Benjamin Rosenblum, Esq.

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

```
-------------------------------------------------------------X
                                                             )
In re:                                                       )    PROMESA
                                                             )    Title III
THE FINANCIAL OVERSIGHT AND MANAGEMENT                       )
BOARD FOR PUERTO RICO,                                       )    Case No. 3:17-bk-03283 (LTS)
                                                             )
        as representative of                                 )    (Jointly Administered)
                                                             )
THE COMMONWEALTH OF PUERTO RICO, et al.,                     )
                                                             )
        Debtors.¹                                            )
                                                             )
                                                             )
                                                             X
-----------------------------------------------------        )
                                                             )
In re:                                                       )
                                                             )    PROMESA
THE FINANCIAL OVERSIGHT AND MANAGEMENT                       )    Title III
BOARD FOR PUERTO RICO,                                       )
                                                             )    Case No. 3:17-bk-03566 (LTS)
        as representative of                                 )
                                                             )
THE EMPLOYEES RETIREMENT SYSTEM OF THE                       )
GOVERNMENT OF THE COMMONWEALTH OF                            )
PUERTO RICO,                                                 )
                                                             )
        Debtor.                                              )
                                                             )
-----------------------------------------------------        X
                                                             )
ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND                      )    Adv. Proc. No. 17-00219 (LTS)
(A), LLC, ANDALUSIAN GLOBAL DESIGNATED                       )    Adv. Proc. No. 17-00220 (LTS)
ACTIVITY COMPANY, GLENDON OPPORTUNITIES                      )
FUND, L.P., MASON CAPITAL MASTER FUND LP,                    )    AMENDED AND
NOKOTA CAPITAL MASTER FUND, L.P., OAKTREE-                   )    SUPPLEMENTED
FORREST MULTI-STRATEGY, LLC (SERIES B),                      )    ADVERSARY COMPLAINT
```

---

¹ The Debtors in these Title III cases, along with each Debtor's Bankruptcy Court case number and last four (4) digits of each Debtor's federal tax identification number are (i) The Commonwealth of Puerto Rico (Bankr. Case No. 17-bk-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) The Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankr. Case No. 17-bk-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (iii) Puerto Rico Sales Tax Financing Corporation (Bankr. Case No. 17-bk-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iv) Puerto Rico Highways and Transportation Authority (Bankr. Case. No. 17-bk-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808).

OAKTREE OPPORTUNITIES FUND IX, L.P., OAKTREE )
OPPORTUNITIES FUND IX (PARALLEL 2), L.P., )
OAKTREE VALUE OPPORTUNITIES FUND, L.P., )
OCHER ROSE, L.L.C., PUERTO RICO AAA )
PORTFOLIO BOND FUND, INC., PUERTO RICO AAA )
PORTFOLIO BOND FUND II, INC., PUERTO RICO )
AAA PORTFOLIO TARGET MATURITY FUND, INC., )
PUERTO RICO FIXED INCOME FUND, INC., PUERTO )
RICO FIXED INCOME FUND II, INC., PUERTO RICO )
FIXED INCOME FUND III, INC., PUERTO RICO FIXED )
INCOME FUND IV, INC., PUERTO RICO FIXED )
INCOME FUND V, INC., PUERTO RICO GNMA & U.S. )
GOVERNMENT TARGET MATURITY FUND, INC., )
PUERTO RICO INVESTORS BOND FUND I, PUERTO )
RICO INVESTORS TAX-FREE FUND, INC., PUERTO )
RICO INVESTORS TAX-FREE FUND, INC. II, PUERTO )
RICO INVESTORS TAX-FREE FUND III, INC., PUERTO )
RICO INVESTORS TAX-FREE FUND IV, INC., PUERTO )
RICO INVESTORS TAX-FREE FUND V, INC., PUERTO )
RICO INVESTORS TAX-FREE FUND VI, INC., PUERTO )
RICO MORTGAGE-BACKED & U.S. GOVERNMENT )
SECURITIES FUND, INC., SV CREDIT, L.P., TAX-FREE )
PUERTO RICO FUND, INC., TAX-FREE PUERTO RICO )
FUND II, INC., AND TAX-FREE PUERTO RICO )
TARGET MATURITY FUND, INC., )
                                                                  )
                    Plaintiffs,                                   )
                                                                  )
                    -against-                                     )
                                                                  )
THE COMMONWEALTH OF PUERTO RICO, THE                              )
FINANCIAL OVERSIGHT AND MANAGEMENT                                )
BOARD OF THE COMMONWEALTH OF PUERTO                               )
RICO, THE PUERTO RICO FISCAL AGENCY AND                           )
FINANCIAL ADVISORY AUTHORITY, THE                                 )
EMPLOYEES RETIREMENT SYSTEM OF THE                                )
GOVERNMENT OF THE COMMONWEALTH OF                                 )
PUERTO RICO, GOVERNOR RICARDO ROSSELLÓ                            )
NEVARES in his official capacity as the Governor of the           )
Commonwealth of Puerto Rico, RAÚL MALDONADO in                    )
his official capacity as the Secretary of Treasury of the         )
Commonwealth of Puerto Rico,                                      )
                                                                  )
                    Defendants.                                   )
                                                                  )
-------------------------------------------------------------------X

## AMENDED AND SUPPLEMENTED ADVERSARY COMPLAINT

TO THE HONORABLE COURT:

NOW COMES Plaintiffs Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund LP, Nokota Capital Master Fund, L.P., Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Value Opportunities Fund, L.P., Ocher Rose, L.L.C., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., SV Credit, L.P., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc., by and through their attorneys, and respectfully state, allege and pray as follows:

## PRELIMINARY STATEMENT

1. This is an action for declaratory judgment and equitable relief brought pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. § 105(a), and Federal Rule of Civil Procedure 57 for the purpose of determining a substantial and actual controversy between the parties.

2. Plaintiffs are owners of secured bonds issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "ERS") in 2008. The

proceeds of these bonds (the "ERS Bonds" or the "Bonds") were used to pay benefits to retirees and to reduce the ERS's unfunded accrued actuarial liabilities. The ERS Bonds were granted liens on, among other things, all employer contributions from Puerto Rico government employers (including municipal employers, public corporations and the central government of Puerto Rico) and the ERS's legal right to receive those contributions. The collateral pledged to support the ERS Bonds was sufficient to service the interest on the Bonds for the life of the bond issue and to repay the principal amount of the Bonds in full at maturity. The ERS Bond Resolution gave plaintiffs the contractual right to guaranteed timely payment of principal and interest by the ERS. Indeed, just months ago, in prior litigation, the ERS, the Commonwealth, and the Financial Oversight and Management Board of the Commonwealth of Puerto Rico ("Oversight Board" or the "Board") asserted that the Bonds are oversecured.

3. In June 2017, the Puerto Rico legislature passed, and the Oversight Board adopted, Joint Resolution 188. Joint Resolution 188 required the ERS to liquidate its assets for distribution to the Commonwealth General Fund, and directs participating employers to make future employer contributions to the Commonwealth General Fund, rather than the ERS. On August 23, 2017, Puerto Rico enacted Act 106 to establish procedures for increasing employer contributions to make payments equal to the obligations to employees as mandated by the Fiscal Plan for Puerto Rico and established in Joint Resolution 188. Although the ostensible purpose of Joint Resolution 188 as supplemented by Act 106 (together, the "Post-Petition Legislation") was to address the pension system's lack of liquidity, this could have been accomplished more directly by simply increasing employer contributions to the ERS within the existing statutory framework. The purpose and effect of such Post-Petition Legislation was to strip the ERS of its assets and to attempt to divert the ERS's employer contributions away from the reach of

plaintiffs, all of which was pursued with the purpose of evading the ERS's obligations to plaintiffs.

4.     In this action, plaintiffs seek a determination that they remain secured creditors of the ERS and/or the Commonwealth notwithstanding Joint Resolution 188 and Act 106, or, in the alternative, a declaration that the diversion of plaintiffs' collateral violated several provisions of the United States and Puerto Rico Constitutions. In particular, because the enactment of Joint Resolution 188 and the further supplementation by Act 106 violated the ERS Title III automatic stay, such laws were void ab initio. But even if such post-petition efforts were not void ab initio, the Puerto Rico Uniform Commercial Code provides that a lien follows collateral transferred without the consent of the secured creditor, and thus continues in any property received by the Commonwealth pursuant to such laws. For these reasons, plaintiffs remain secured creditors of the ERS and/or the Commonwealth notwithstanding Joint Resolution 188 and Act 106.

5.     In the alternative, if the Post-Petition Legislation was effective in stripping the ERS of its assets and diverting the ERS's employer contributions away from the reach of plaintiffs without compensation, then such actions violated the Takings and Contracts Clauses of the United States and Puerto Rico Constitutions. The Post-Petition Legislation effected the taking of the collateral and of the contractual right to timely payment of principal and interest by the ERS and impaired contractual rights. As a result of defendants' actions, plaintiffs are entitled to, among other things, a claim for just compensation that cannot be impaired in any Title III plan of adjustment or order confirming a Title III plan of adjustment. And because plaintiffs were oversecured at all relevant times, their unimpairable claim equals the full principal amount of the ERS Bonds, together with all interest accrued to the date of payment.

## THE PARTIES

6. Plaintiff Altair Global Credit Opportunities Fund (A), LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1888 Century Park East, Los Angeles, CA 90067-1702.

7. Plaintiff Andalusian Global Designated Activity Company is a designated activity company limited by its shares incorporated under the laws of Ireland located at 70 Sir John Rogerson's Quay, Dublin 2, Ireland.

8. Plaintiff Glendon Opportunities Fund, L.P. is a limited partnership organized and existing under the laws of the Cayman Islands located at Ugland House, South Church Street, Grand Cayman, Cayman Islands, KY1-1104.

9. Plaintiff Mason Capital Master Fund, LP is a limited partnership organized and existing under the laws of the Cayman Islands located at PO Box 309, Ugland House, George Town KY1-1104.

10. Plaintiff Nokota Capital Master Fund, L.P. is a limited partnership organized and existing under the laws of Cayman Islands with its principal place of business at 1330 Avenue of the Americas, 26th Floor, New York, NY 10019.

11. Plaintiff Oaktree-Forrest Multi-Strategy, LLC (Series B) is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, CA 90071.

12. Plaintiff Oaktree Opportunities Fund IX, L.P. is a limited partnership organized and existing under the laws of the Cayman Islands with its principal place of business located at 333 South Grand Avenue, 28th Floor, Los Angeles, CA 90071.

13.    Plaintiff Oaktree Opportunities Fund IX (Parallel 2), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, CA 90071.

14.    Plaintiff Oaktree Value Opportunities Fund, L.P. is a limited partnership organized and existing under the laws of the Cayman Islands with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, CA 90071.

15.    Plaintiff Ocher Rose, L.L.C. is a Delaware limited liability company located at P.O. Box 1226, New York, NY 10150.

16.    Plaintiff Puerto Rico AAA Portfolio Bond Fund, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

17.    Plaintiff Puerto Rico AAA Portfolio Bond Fund II, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

18.    Plaintiff Puerto Rico AAA Portfolio Target Maturity Fund, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

19.    Plaintiff Puerto Rico Fixed Income Fund, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

20. Plaintiff Puerto Rico Fixed Income Fund II, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

21. Plaintiff Puerto Rico Fixed Income Fund III, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

22. Plaintiff Puerto Rico Fixed Income Fund IV, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

23. Plaintiff Puerto Rico Fixed Income Fund V, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

24. Plaintiff Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

25. Plaintiff Puerto Rico Investors Bond Fund I is an investment trust organized and existing under the laws of Puerto Rico with its principal place of business at Banco Popular Center, Suite 1112, 209 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

26. Plaintiff Puerto Rico Investors Tax-Free Fund, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at Banco Popular Center, Suite 1112, 209 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

27.    Plaintiff Puerto Rico Investors Tax-Free Fund, Inc. II is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at Banco Popular Center, Suite 1112, 209 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

28.    Plaintiff Puerto Rico Investors Tax-Free Fund III, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at Banco Popular Center, Suite 1112, 209 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

29.    Plaintiff Puerto Rico Investors Tax-Free Fund IV, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at Banco Popular Center, Suite 1112, 209 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

30.    Plaintiff Puerto Rico Investors Tax-Free Fund V, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at Banco Popular Center, Suite 1112, 209 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

31.    Plaintiff Puerto Rico Investors Tax-Free Fund VI, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at Banco Popular Center, Suite 1112, 209 Munoz Rivera Avenue, Hato Rey, Puerto Rico 00918.

32.    Plaintiff Puerto Rico Mortgage-Backed & U.S. Government Securities is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza, 10th Floor, 250 Munoz Rivera Ave., San Juan, Puerto Rico 00918.

33.    Plaintiff SV Credit, L.P. is a limited partnership organized and existing under the laws of Delaware located at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

34.    Plaintiff Tax-Free Puerto Rico Fund, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza Building, 10th Floor, 250 Munoz Rivera Avenue, San Juan, Puerto Rico 00918.

35.    Plaintiff Tax-Free Puerto Rico Fund II, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza Building, 10th Floor, 250 Munoz Rivera Avenue, San Juan, Puerto Rico 00918.

36.    Plaintiff Tax-Free Puerto Rico Target Maturity Fund, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at American International Plaza Building, 10th Floor, 250 Munoz Rivera Avenue, San Juan, Puerto Rico 00918.

37.    Defendant The Commonwealth of Puerto Rico is a United States territory subject to the laws of the United States and the plenary jurisdiction of Congress.

38.    Defendant Oversight Board is an entity created pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") to assist the Commonwealth, including certain of its instrumentalities, in managing their public finances, and for other purposes.

39.    Defendant The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") is an entity created pursuant to the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, P.R. Act No. 2-2017, for the purpose of acting as fiscal agent, financial advisor, and reporting agent of the Commonwealth, its agencies, instrumentalities, subdivisions, public corporations, and municipalities.

40.     Defendant the ERS is a trust created by the Legislature of the Commonwealth of Puerto Rico to provide pension and other benefits to employees of the government of the Commonwealth, members and employees of the Legislature, and employees of certain municipalities and public corporations in Puerto Rico.

41.     Defendant Ricardo Rosselló Nevares is the Governor of the Commonwealth of Puerto Rico and is being sued in his official capacity.

42.     Defendant Raúl Maldonado is the Secretary of Treasury of the Commonwealth of Puerto Rico and is being sued in his official capacity.

## JURISDICTION AND VENUE

43.     This action arises under the United States Constitution, the Puerto Rico Constitution, 42 U.S.C. § 1983, and 48 U.S.C. § 2126.  This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and federal statutes.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims arising under the Puerto Rico Constitution because they are so related to the claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

44.     This Court also has jurisdiction over all claims and causes of action in this adversary proceeding pursuant to 48 U.S.C. § 2166(a)(2) because they are "related to" the above-captioned Title III cases.

45.     This action is an actual controversy within the jurisdiction of this Court under 28 U.S.C. § 2201.

46.     This Court has personal jurisdiction over all of the Defendants pursuant to 48 U.S.C. § 2166(c).

47.     Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b) because it is the judicial district in which a substantial part of the events giving rise to the claims herein occurred.  Venue is also proper under 48 U.S.C. § 2167 because this adversary proceeding is brought in a Title III case.

48.     This Court may provide declaratory relief, injunctive relief, and damages pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. § 105(a), and Federal Rule of Civil Procedure 57.

## FACTUAL ALLEGATIONS

**I.      THE ERS**

       **A.**      <u>The ERS Enabling Act</u>

49.     The ERS is a trust created by Act No. 447 of May 15, 1951 of the Legislature of the Commonwealth (the "ERS Enabling Act") to provide pension and other benefits to officers and employees of the Commonwealth, members and employees of the Legislature, and officers and employees of certain public corporations and municipalities of the Commonwealth. 3 L.P.R.A. § 761.  The ERS was established as an independent, self-governing entity separate from the Commonwealth and from the Commonwealth's agencies and instrumentalities. 3 L.P.R.A. § 775.  The ERS Enabling Act provided that the ERS is to be governed by an eleven-member Board of Trustees, which is responsible for setting policy for, and overseeing the operations of, the ERS. *Id.*

50.     The ERS Enabling Act gave the Board of Trustees blanket authorization to incur debt on behalf of the ERS and to secure such debt with the ERS's assets.  Specifically, it authorized the Board of Trustees to "seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the [ERS]." 3 L.P.R.A. § 779(d).

- 12 -

B.    Underline{Employer Contributions}

51.    The ERS is funded by employer contributions, employee contributions, and investment earnings on its undistributed funds.    Employer contributions are the largest component of this income stream, and they constitute a legal asset of the ERS. The ERS has a statutory right to receive these employer contributions, and employers are required by statute to make them.

52.    The ERS receives employer contributions both from the Commonwealth and from various municipalities within, and public corporations of, the Commonwealth.    The Commonwealth is responsible for approximately 59 percent of the employer contributions the ERS receives, while municipalities and public corporations account for the rest.    As of the commencement of the ERS Title III case, the Commonwealth did not hold or own any interest in employer contributions owed by municipalities or public corporations to ERS.

53.    By statute, employer contributions must be sufficient to maintain the actuarial integrity of the ERS—*i.e.*, they must cover the difference between the total cost of benefits provided by the ERS and administrative costs, reduced by contributions made by employees themselves. One type of employer contribution is calculated based on a percentage of payroll. Prior to July 1, 2017, each employer was obligated to contribute a minimum of 15.525 percent of the compensation regularly received by eligible employees on a monthly basis. 3 L.P.R.A. § 787f. These amounts were scheduled to increase annually. *Id.* The employer contributions by the Commonwealth, municipalities, and public corporations now required to be paid on account of retirement obligations to retirees covered by ERS are greater than they were prior to the commencement of the ERS Title III case.

54.     The critical importance of employer contributions to the ERS, and the ERS's
authority to enforce its rights, are reflected in a series of provisions in the ERS Enabling Act.
For example, an employer's failure to pay timely its contributions to the ERS may be punishable
as a misdemeanor. 3 L.P.R.A. § 781a(e), (f). If an employer's contributions to the ERS are in
arrears for more than 30 days, the ERS's claim to those contributions has priority over any other
outstanding debt of that employer. *Id.* § 781a(h). If a municipality does not make its employer
contributions to the ERS, the ERS has the power to intercept or garnish the municipality's
property tax revenues. *Id.* § 781a(g). If agencies, public corporations, and instrumentalities of
the Commonwealth fail to make employer contributions, the ERS is authorized to issue a
certificate of debt for immediate payment of the arrearages from the Department of Treasury. *Id.*
§ 781a(h). The ERS also is entitled to receive interest on these delinquent contributions. *Id.*

## II.     THE COMMONWEALTH'S FAILURE TO FUND THE ERS

55.     The underfunding facing the ERS is nothing new. To the contrary, it is the result
of the Commonwealth's decades of underfunding, its enactment of politically opportunistic
benefit increases without allocating the funds to pay for them, and its repeated failure to address
the growing pension problems despite many warnings. The Commonwealth's failure to make
even the payments required by law has forced the ERS to exhaust its assets, including the
proceeds of the 2008 bond issuance, in order to make pension payments to retirees.

56.     The ERS's funding problems result in part from the original design of the ERS.
As originally designed, the pension benefit payments owed by the ERS were fixed by the ERS
Enabling Act and did not depend on the amount of contributions made by employers/employees
or actuarial/economic changes that affected the ERS's funding level. Although the law
contemplated that additional contributions might be necessary to maintain a proper funding level,
for decades the Commonwealth has not made the employer contributions required by law.

- 14 -

57.     The Commonwealth compounded these problems when it passed a series of "special laws" between 1960 and 2013 that increased pension benefits without providing for mandatory increased contributions to pay for them. These "special laws" included a summer bonus, a medication bonus, a Christmas bonus, contributions to health insurance plans, certain other minimum pension benefits, certain other minimum death benefits, cost of living allowances, and certain additional death and disabilities benefits. The cost of the benefits granted by these special laws was at least $212 million per year in 2013.[2]

58.     Facing a significant underfunding and lacking the necessary support from the Commonwealth, the ERS in 2008 sought to address its financial problems by issuing pension funding bonds (discussed more fully below). This financing led to an infusion of $3 billion in much-needed cash into the ERS, in exchange for the ERS's promise to make principal and interest payments to the bondholders. These obligations, in turn, were secured by liens on, among other things, the employer contributions the ERS was entitled to receive.

59.     Even this amount proved insufficient to solve the ERS's funding problems. By 2011, the ERS's actuaries were issuing warnings to the Commonwealth about the ERS's lack of funds. Rather than taking responsible steps to address the ERS's dire situation, the Commonwealth enacted politically expedient, superficial remedies. For example, through Act No. 116-2011, the Commonwealth enacted a staggered increase of employer contributions from 10.275% in 2011 to 21% by 2021. But according to the ERS's actuaries, this staggered increase in employer contributions was not sufficient to meet the ERS's cash flow needs, let alone reduce the ERS's actuarial deficit.[3] Then, in 2013, the Commonwealth enacted Act No. 3-2013, which, among other things, sought to freeze certain pension benefits and to require the Commonwealth

---

[2] *See* Act of Apr. 4, 2013, No. 3-2013 (Statement of Motives).

[3] *See id.*

to make additional contributions to reduce the ERS's actuarial deficit. Once again, however, the Commonwealth failed to make the payments required of it by law. As a result of this chronic underfunding, the ERS has never built a surplus of assets and instead has continued to use employer contributions to pay current benefits.

## III. PENSION FUNDING BONDS ISSUED BY THE ERS

### A. The ERS Bond Resolution

60.     The ERS issued bonds pursuant to the authority of a resolution (the "ERS Bond Resolution") of its Board. *See* Pension Funding Bond Resolution (Jan. 24, 2008) (attached as Exhibit A). It is the ERS Bond Resolution that governs the contractual relationship between the ERS and plaintiffs with respect to the ERS Bonds, specifies the times and amounts of payment of interest and repayment of principal, and sets forth the collateral the ERS provided as security for payment.

61.     The ERS Bond Resolution constitutes a valid, binding contract between the ERS and holders of ERS Bonds. ERS Bond Resolution § 102. It affirms that the ERS Bonds are valid, legally binding obligations of the ERS, *id.* §§ 201, 705.

### B. Issuance of the ERS Bonds

62.     The ERS issued bonds on the following dates:

    a.  "Series A" Bonds totaling $1,588,810,799.60 on January 31, 2008.

    b.  "Series B" Bonds totaling $1,058,634,613.05 on June 2, 2008.

    c.  "Series C" Bonds totaling $300,202,930 on June 30, 2008.

63.     Most of the ERS Bonds were sold to individual residents of the Commonwealth and to local businesses.

64.     All of the bond issues' net proceeds (after costs of issuance and required reserves) were used to pay benefits to retirees or invested to provide for future benefit payments.

- 16 -

65.     As of February 2017, the aggregate principal amount of the interest-bearing ERS Bonds plus the accreted[4] value of the zero coupon or capital appreciation ERS Bonds totaled approximately $3,156,000,000.[5]

66.     Plaintiffs together are beneficial holders of approximately $2 billion of these Bonds.

C.     The "Pledged Property"

67.     The foundation of the ERS bond transaction was an extensive security package necessary to protect the investment made by holders of ERS Bonds.  Without this security package, it would have been impossible for the ERS to sell the Bonds in the first place.

68.     The collateral underlying the security package was called "Pledged Property." The ERS Bond Resolution defined Pledged Property to include:

>   a.  all "Revenues," including, among other things, all employer contributions paid from and after the date of the ERS Bond Resolution received by the ERS or the Fiscal Agent "and any assets in lieu thereof or derived thereunder which are payable to [the ERS] pursuant to [the ERS Enabling Act]";
>
>   b.  all "right, title, and interest of [the ERS] in and to" the "Revenues" and "all rights to receive the same";
>
>   c.  the funds, accounts, and subaccounts held for the benefit of bondholders;

---

[4] The accreted value of the capital appreciation ERS Bonds refers to the accrued portion of the face amount.

[5] Government of Puerto Rico: Puerto Rico Fiscal Agency and Financial Advisory Authority, Fiscal Plan for Puerto Rico, at 26 (March 13, 2017), https://junta.pr.gov/wp-content/uploads/wpfd/50/58c71815e9d43.pdf.

- 17 -

    d.   any and all other rights and personal property of every kind pledged and

assigned by the ERS for additional security; and

    e.   "any and all cash and non-cash proceeds, products, offspring, rents and

profits from any of the Pledged Property," including, "without limitation,

those from the sale, exchange, transfer, collection, loss, damage,

disposition, substitution or replacement of" such property.

ERS Bond Resolution § 501 & Exh. B, VI-33, VI-36, VI-37.

69.     The security interests in and liens on the Pledged Property are "valid and binding

as against all parties having claims of any kind in tort, contract or otherwise against the [ERS],

irrespective of whether such parties have notice thereof." *Id.* § 501.

70.     The Pledged Property was required to be and, as of the commencement of the

PROMESA Title III case for the ERS on May 21, 2017 was, free and clear of any other pledge,

lien, charge, or encumbrance. *Id.* § 705.

71.     The ERS was required to use the Pledged Property to make timely principal and

interest payments on the ERS Bonds before it spent or used any of the funds for any other

purpose. *Id.* §§ 501, 701, & Exh. B, VI-36.

72.     To assure that the Pledged Property would remain available to secure the Bonds,

the Bond Resolution explicitly required the ERS to pursue all available legal remedies to collect

employer contributions that were delinquent or inadequate. *Id.* §§ 701, 709.

73.     The Oversight Board, the ERS, and the Commonwealth have previously asserted

that the ERS Bonds are oversecured.[6]

---

[6] *See, e.g.*, Brief of Amicus Curiae Fin. Oversight and Mgmt. Bd. for Puerto Rico in
Support of Respondents-Appellees Urging Affirmance of the District Court Order in *Altair
Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et
al.*, No. 16-2433, ECF No. 65, at 18 (1st Cir. Dec. 23, 2016) ("The [ERS Bondholders] have a

D.     <u>Transfer of Contributions to Fiscal Agent</u>

74.     The ERS Bond Resolution established the mechanism by which the employer contributions were to be accounted for, deposited, and distributed. The ERS Bond Resolution provided that a "Fiscal Agent" would be responsible for administering these matters. At all relevant times, the Bank of New York Mellon has served as the Fiscal Agent.

75.     The ERS Bond Resolution requires the ERS to transfer employer contributions to the Fiscal Agent on the last business day of each month. *Id.* § 504. By the next business day, the Fiscal Agent must deposit the employer contributions into the "Revenue Account," except in limited circumstances not relevant here. *Id.* Monies in the Revenue Account are to be applied, in order of priority, (a) to an account to make debt service on senior bonds, (b) to a reserve account for senior bonds, (c) to an account to make debt service on subordinated bonds, (d) to a reserve account for subordinated bonds, (e) to pay operating expenses, and (f) to a general reserve account. *Id.* The Fiscal Agent is then responsible for making timely interest and principal payments to ERS Bondholders from these accounts. *Id.* § 505(4), (5).

---

(continued...)

substantial equity cushion as a result of the reserve accounts and the perpetual revenue streams."); Respondent Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et al.*, No. 16-cv-2696, ECF No. 52, at 10-11 (Oct. 26, 2016) ("[T]he security interests held by the ERS Bondholders provide them with future protection more than sufficient to address any concern, real or imagined."); Respondents' Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro García Padilla, et al.*, No. 16-cv-2696, ECF No. 53, at 18 ("Given its size and indefinite duration, the security interest provides Movants with the adequate protection they purport is required to ensure payment on their bonds, certainly through the expiration of the PROMESA stay and, indeed, for as long as the bonds remain outstanding.").

## IV. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT ("PROMESA")

76. On June 30, 2016, Congress passed PROMESA. The stated purpose of PROMESA was to "establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes." H.R. 5278, 114th Cong. (2016) (preamble).

77. The enactment of PROMESA automatically triggered an initial stay of creditor remedies against the Commonwealth and its instrumentalities, modeled on the Bankruptcy Code's automatic stay. 48 U.S.C. § 2194. The stay began on June 30, 2016, and initially lasted until February 15, 2017, but the Oversight Board extended the stay until May 1, 2017, at the Commonwealth's request. *Id.* § 2194(d),

78. On August 3, 2016, plaintiffs requested that the ERS provide adequate protection of their security interests in and liens on the Pledged Property while the initial automatic stay was in effect. By letter dated August 16, 2016, the ERS denied that request. In response, plaintiffs filed a motion before this Court to lift the initial PROMESA stay on the ground that plaintiffs' liens were not adequately protected. The ERS and the Commonwealth opposed the motion, arguing, among other things, that plaintiffs were adequately protected because of their "valid and enforceable liens over hundreds of millions of dollars of ERS revenue, which [would] continue to grow."[7] This Court agreed that plaintiffs were entitled to adequate protection but concluded that plaintiffs were adequately protected by the stream of employer contributions to

---

[7] Respondent Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et al.*, No. 16-cv-2696, ECF No. 52, at 10 (Oct. 26, 2016); *see also* Respondents' Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et al.*, No. 16-cv-2696, ECF No. 53, at 5 (Oct. 26, 2016) (Commonwealth's brief making similar statements).

the ERS. On appeal, the United States Court of Appeals for the First Circuit ruled that plaintiffs were entitled to a hearing on whether their interests were adequately protected during the initial PROMESA stay, expressing doubts about the constitutionality of any action by the Commonwealth or the ERS that would eliminate the employer contributions or take the ERS's assets without compensating plaintiffs.

## V.      TITLE III CASES

79.     Title III of PROMESA authorized the Oversight Board to file a petition to restructure the debts of a government instrumentality in a court-supervised adjustment process similar to Chapter 9 of the Bankruptcy Code.

80.     On May 3, 2017, the Oversight Board approved and certified the filing of a PROMESA Title III petition for the Commonwealth.[8]

81.     On May 21, 2017, the Oversight Board approved and certified the filing of a separate PROMESA Title III petition for the ERS.[9]

82.     PROMESA incorporates the automatic stay provisions of § 362 of the Bankruptcy Code.  Pursuant to these provisions, the filing of the ERS Title III case on May 21, 2017, operated as a stay against all efforts by any person (including the Commonwealth) to obtain or exercise control over property of the ERS.  That automatic stay has remained in effect during all times relevant to this action.

---

[8] Financial Oversight and Management Board, Oversight Board Certifies Title III Filings (May 3, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/590a09096cd13.pdf.

[9] Financial Oversight and Management Board for Puerto Rico, Oversight Board Certifies Title III Filings (May 22, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/5923379dd9dfc.pdf.

## VI. "JOINT RESOLUTION FOR OTHER ALLOCATIONS FOR FISCAL YEAR 2017-2018" ("JOINT RESOLUTION 188").

83.    The Puerto Rico legislature passed Joint Resolution 188[10] on June 25, 2017, and the Oversight Board adopted it on behalf of the Governor on June 30, 2017.[11]

84.    The ostensible purpose of Joint Resolution 188 was to address the pension system's lack of liquidity and insolvency and the need for increased funding to pay benefits owed by the ERS to retirees.  To accomplish this ostensible purpose, the Oversight Board required the Commonwealth to draft Joint Resolution 188 to bypass the ERS entirely and required employers to make increased employer contributions directly to the Commonwealth General Fund.  Yet, the means to accomplish this goal were neither reasonable nor necessary as there were more narrowly tailored and appropriate moderate alternatives: it could have been accomplished by increasing employer contributions to the ERS within the existing statutory scheme.  The actual purpose appears to be and indeed the effect of Joint Resolution 188 was, then, to confiscate plaintiffs' constitutionally-protected property interests in Pledged Property, in which they had legally protected reliance interest.

85.    In addition, Joint Resolution 188 ordered the ERS to sell its assets and to transfer the net cash proceeds, in addition to any available funds, into the Puerto Rico Treasury

---

[10] An unofficial English translation of Joint Resolution 188 is attached as Exhibit B.  The official Spanish version is available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59591daabd5eb.pdf.

[11] The Oversight Board adopted House Resolution 186, House Resolution 187, and House Resolution 188 as part of the Commonwealth's budget pursuant to §§ 202(d)(2) and 202(e)(3) of PROMESA.  The Board "deemed" the budget, along with the various resolutions, "to be approved by the Governor and the Legislature" and "in full force and effect beginning on July 1, 2017."  Exhibit A to Letter from Financial Oversight and Management Board to Governor Rosselló, at 2 (June 30, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59591daabd5eb.pdf.  House Resolution 186 and House Resolution 187 address other matters related to the Commonwealth's budget, but they also include the full text of House Resolution 188.  To avoid repetition, the Complaint refers to House Resolution 188 only.

Secretary's account as part of the General Fund for fiscal year 2017-2018 to make benefit payments to pensioners. Joint Resolution 188 §§ 1, 2, 3.

86.    Joint Resolution 188 also provided in relevant part that:

    a.    the Commonwealth would assume any payments that Puerto Rico's retirement systems, including the ERS, could not make;

    b.    the ERS would continue to meet its obligations to beneficiaries and pensioners by contributing its available funds and any funds arising from its asset sales to the Commonwealth's General Fund;

    c.    the Commonwealth, its public corporations, and its municipalities would stop making employer contributions to the ERS;

    d.    AAFAF would establish procedures so that the Commonwealth, its public corporations, and its municipalities would make employer contributions to the Commonwealth.

*Id.* § 4.

87.    No consideration was provided to the ERS or the ERS Bondholders in exchange for the collateral transferred to the Commonwealth's General Fund.

88.    Joint Resolution 188 was approved by the Puerto Rico legislature pursuant to the Fiscal Plan for Puerto Rico approved and certified by the Oversight Board. *Id.* § 4.

## VII. "LAW TO GUARANTEE PAYMENT TO OUR PENSIONERS AND ESTABLISH A NEW PLAN FOR DEFINED CONTRIBUTIONS FOR PUBLIC SERVANTS" ("ACT 106").

89.    The Puerto Rico legislature passed Act 106-2017[12] on August 18, 2017, and the Governor signed it into law on August 23, 2017.

90.    Act 106 established procedures for increasing employer contributions to make payments equal to the obligations to employees as mandated by the Fiscal Plan for Puerto Rico and established in Joint Resolution 188. The law declares that "as of July 1, 2017, in accordance with House Joint Resolution 188 of 2017, as certified by the Fiscal Oversight Board, on July 13, 2017 the Government of Puerto Rico became the direct payer of our retirees' pensions." Act 106, § 1.4.

91.    Act 106 contains provisions that specify the mechanisms by which the Commonwealth will pay all of the benefits due to employees each year. For example, it provides for the treatment and the payment terms of accumulated pensions and associated accounts. *id.* at ch. 2; establishes a defined contribution program, *id.* at ch. 3; creates a retirement board to replace the existing boards of the retirement systems, *id.* at ch. 4; provides transition rules, *id.* at ch. 5, and makes changes to existing laws, *id.* at ch. 6. The Act also reiterates that in accordance with Joint Resolution 188 the Commonwealth would assume any payments that the ERS could not make, *see* Act 106, §§ 1.3, 1.4, that the ERS would contribute its assets to the Commonwealth, *id.*, and that the Commonwealth, its public corporations, and its municipalities would stop making employer contributions to the ERS, *id.*

92.    Act 106 also states that unless an extension is granted the Board of Trustees for the ERS is to be dissolved by December 31, 2017, *id.* § 5.1(b), that the new retirement board will

---

[12] A certified copy of an unofficial English translation of Act 106 is attached as Exhibit C. The official Spanish version is available at http://www.oslpr.org/2017-2020/leyes/doc/ley-106-23-Ago-2017.doc.

have the authority to dispose of all of ERS's property and equipment, *id.*, §§ 4.1 and 5.3, and that all of ERS's employees will be terminated and transferred to other posts, *id.* § 5.2.

## VIII. IMPROPRIETY OF JOINT RESOLUTION 188 AND ACT 106.

93.     There was no emergency to justify the stripping of the ERS's assets. The ERS's inability to pay beneficiaries was both foreseeable and avoidable. It was caused by the Commonwealth's chronic underfunding of the ERS and its failure to establish and pay sufficient employer contributions to ensure the ERS's ability to make payments to pension beneficiaries over a period of many years.

94.     Moreover, the ERS had or could have appropriately obtained sufficient resources to comply with its debt service obligations as originally scheduled. Employer contributions include not only those of the central government, but those of public corporations and municipalities. Public corporations and municipalities are responsible for approximately 41 percent of employer contributions, and those contributions alone are sufficient to fully service the ERS Bonds.

95.     Even if the Commonwealth's past failures to address the ERS's funding level required it to make changes, less drastic and lawful measures were available. For example, a more moderate and reasonable course of action would have been for the Commonwealth to raise employer contributions through the existing statutory structure and to continue to direct employer contributions to the ERS for payment to beneficiaries. Instead, the Commonwealth and the Oversight Board appear to have enacted the confiscatory legislation of Joint Resolution 188 and later Act 106 solely to evade the ERS's obligation to make payments on the ERS Bonds and to deprive plaintiffs of their constitutionally protected property interests.

96.     Moreover, this Post-Petition Legislation was not appropriately tailored to the resolution of the problem it purported to solve: stripping the ERS of its assets certainly will not

help *the ERS* to meet *its* obligations. Rather, the Commonwealth and the Oversight Board appear to have enacted the Post-Petition Legislation for the purpose of providing *the Commonwealth* with additional funds to use for purposes specified in the Fiscal Plan for Puerto Rico. Thus, not only did the Commonwealth enact the Post-Petition Legislation to deprive plaintiffs of their constitutionally protected property, it did so to advantage itself at the expense of the ERS.

97.     Nor does the Post-Petition Legislation spread the burden of restoring the Commonwealth's fiscal health across various sectors of society. Rather, the legislation deprives the ERS of the ability to pay its creditors, including plaintiffs, and instead allows the Commonwealth to use ERS assets. Act 106, moreover, contemplates that pension beneficiaries will receive 100% of the amount they are owed while ERS Bondholders will receive pennies on the dollar. This, in effect, reverses the priorities established by the statutory and contractual provisions governing the ERS and the ERS Bonds.

98.     In sum, this Post-Petition Legislation was unreasonable and unnecessary in light of the surrounding circumstances and imposed a substantial, indeed drastic, impairment when an evident and more moderate course would serve its purposes equally well.

## **FIRST CLAIM FOR RELIEF**

*Request for a Declaration that the Post-Petition Legislation Violated the ERS Automatic Stay, Was Void Ab Initio, and Cannot Be Implemented*

99.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 98 above.

100.     The ERS is an independent, self-governing entity separate from the Commonwealth and from the Commonwealth's agencies and instrumentalities. 3 L.P.R.A. § 775.

- 26 -

101. Pursuant to 11 U.S.C. § 362(a), made applicable to the ERS Title III case by 48 U.S.C. § 2161(a), the commencement of the ERS Title III case operated as an automatic stay of any actions by third parties "to obtain possession of property of the [ERS] or of property from the [ERS] or to exercise control over property of the [ERS]." 11 U.S.C. § 362(a)(3).

102. Actions taken in violation of the automatic stay are void ab initio.

103. Joint Resolution 188 purports to (i) require the ERS to liquidate its assets and transfer the proceeds to the Commonwealth; and (ii) divert employer contributions to which the ERS has a statutory right away from the ERS to the Commonwealth.

104. Act 106 reiterates those requirements and provides procedures to further implement the increase in amount of employer contributions.

105. The enactment of the Post-Petition Legislation was action by the Commonwealth to obtain possession of property of the ERS and from the ERS, and to exercise control over property of the ERS.

106. The Post-Petition Legislation was enacted by the Commonwealth after the commencement of the ERS Title III case.

107. The Commonwealth is an entity separate from the ERS that owes payment obligations to the ERS.

108. The non-Commonwealth public employers (such as municipalities and public corporations) are also entities separate from the ERS that owe payment obligations to the ERS.

109. The Commonwealth violated the ERS automatic stay when it passed the Post-Petition Legislation.

110. The Post-Petition Legislation is therefore void ab initio and cannot be implemented.

## SECOND CLAIM FOR RELIEF

### *Request for a Determination of Secured Status in the ERS Title III Case Pursuant to 11 U.S.C. § 506(a)*

111.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 110 above.

112.    Section 506(a)(1) of the Bankruptcy Code, 11 U.S.C. § 506(a), made applicable to the ERS Title III Case by § 301 of PROMESA, 48 U.S.C. § 2161, provides that "[a]n allowed claim of a creditor secured by a lien on property in which the [debtor] has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property."

113.    Pursuant to the ERS Bond Resolution, security agreement and appropriately filed financing statements, plaintiffs possess valid, perfected security interests in and liens on the Pledged Property.

114.    Because the Post-Petition Legislation violated the automatic stay, the Post-Petition Legislation is void ab initio.

115.    The ERS therefore retains full ownership rights in the Pledged Property, including any Pledged Property in possession of the Commonwealth pursuant to Joint Resolution 188 and/or Act 106.

116.    The value of the property subject to plaintiffs' valid, perfected liens is greater than the value of plaintiffs' claims against the ERS.

117.    Therefore, pursuant to 11 U.S.C. § 506(a)(1), plaintiffs are secured creditors to the full extent of their claims against the ERS.

### THIRD CLAIM FOR RELIEF

*Request for a Determination of Secured Status in the Commonwealth Title III Case Pursuant
to 11 U.S.C. § 506(a)*

118.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in
paragraphs 1 through 117 above.

119.   Section 506(a)(1) of the Bankruptcy Code, 11 U.S.C. § 506(a), made applicable to
the ERS Title III Case by § 301 of PROMESA, 48 U.S.C. § 2161, provides that "[a]n allowed
claim of a creditor secured by a lien on property in which the [debtor] has an interest . . . is a
secured claim to the extent of the value of such creditor's interest in the estate's interest in such
property."

120.   Pursuant to the ERS Bond Resolution, security agreement and appropriately filed
financing statements, the ERS granted plaintiffs valid, perfected security interests in and liens on
the Pledged Property.

121.   The ERS bondholders' liens extend to the "proceeds" of Pledged Property,
including the proceeds of employer contributions previously received by the ERS as well as the
proceeds of the ERS's right to receive future employer contributions.

122.   The Puerto Rico Uniform Commercial Code (both in 2008 and today) provides
that "[a] security interest or agricultural lien continues in collateral notwithstanding sale, lease,
license, exchange, or other disposition thereof unless the secured party authorized the disposition
free of the security interest or agricultural lien," and also that "a security interest attaches to any
identifiable proceeds of collateral."  19 L.P.R.A. § 2265(a); *see also* 19 L.P.R.A. § 2106(2)
(2008) ("[A] security interest continues in collateral notwithstanding sale, exchange or other
disposition thereof unless the disposition was authorized by the secured party in the security
agreement or otherwise, and also continues in any identifiable proceeds including collections

received by the debtor."). Nothing contained in PROMESA alters, amends, or preempts these laws.

123. Joint Resolution 188 orders the ERS to "sell [its] assets and to transfer the net cash proceeds, in addition to any available fund[s], into the Treasury Secretary's account." Joint Resolution 188 § 2. The "assets" and "fund[s]" of the ERS, and any cash proceeds resulting from their sale, are the proceeds of past employer contributions or other Pledged Property and are subject to plaintiffs' liens on the Pledged Property. The sale of the ERS's assets and transfer of its funds is a "disposition" of plaintiffs' collateral.

124. Joint Resolution 188 also orders the Commonwealth and non-Commonwealth public employers (such as municipalities and public corporations) to cease paying employer contributions to the ERS and instead to make these payments to the Commonwealth's General Fund. The ERS's "right to receive" employer contributions from these non-Commonwealth public employers is subject to plaintiffs' liens on the Pledged Property, and Joint Resolution 188 has effectively transferred this "right to receive" employer contributions from the ERS to the Commonwealth. This transfer of the ERS's "right to receive" employer contributions thus amounts to a "disposition" of plaintiffs' collateral.

125. In the alternative and/or in addition, Act 106 directed the sale of the ERS's assets and transfer of its funds and the transfer of the ERS's "right to receive" employer contributions and, in each case, such sale and transfer represented a "disposition" of plaintiffs' collateral.

126. Plaintiffs have not consented to these or any other dispositions of their collateral.

127. Defendants failed to act in good faith in causing the ERS to dispose of plaintiffs' collateral to the Commonwealth for no consideration.

128.     Therefore, pursuant to 19 L.P.R.A. § 2106(2) (2008) and 19 L.P.R.A. § 2265(a) (2017), if the Post-Petition Legislation was not void ab initio, all assets or cash proceeds of the ERS transferred to the Commonwealth and any future employer contributions made to the Commonwealth's General Fund remain subject to plaintiffs' liens on the Pledged Property.

129.     To the extent that the Commonwealth acquires property subject to plaintiffs' liens, such acquisition gives rise to a secured claim in favor of the ERS bondholders against the Commonwealth in its Title III case.

130.     The value of the property subject to plaintiffs' valid, perfected liens is greater than the value of plaintiffs' claims against the Commonwealth.

131.     Therefore, pursuant to 11 U.S.C. § 506(a)(1), plaintiffs are secured creditors to the full extent of their claims against the Commonwealth.

## FOURTH CLAIM FOR RELIEF

*Request for a Declaratory Judgment That Any Transfer of Pledged Property Pursuant to the Post-Petition Legislation Will Result in an Unjust Enrichment of the Commonwealth*

132.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 131 above.

133.     To the extent that the Post-Petition Legislation transfers Pledged Property from the ERS to the Commonwealth, such laws do so for the sole purpose of evading the ERS bondholders' liens on the Pledged Property and the ERS's obligation to repay plaintiffs.

134.     Defendants failed to act in good faith in purporting to transfer plaintiffs' collateral to the Commonwealth for no consideration through the Post-Petition Legislation.

135.     Because the Post-Petition Legislation is void ab initio, dispose of plaintiffs' property without their consent, and are unconstitutional, to the extent that the Commonwealth obtains Pledged Property pursuant to the Post-Petition Legislation, the Commonwealth will be

intentionally and wrongfully holding property of plaintiffs without their consent, in violation of United States and Puerto Rico law.

136. Plaintiffs are entitled to a declaration that any transfer of Pledged Property pursuant to the Post-Petition Legislation will result in an unjust enrichment of the Commonwealth at plaintiffs' expense.

## FIFTH CLAIM FOR RELIEF

*Request for a Declaratory Judgment That the Transfer of Plaintiffs' Collateral And Right To Receive Principal and Interest Was Not for a "Public Use" Within the Meaning of the United States and Puerto Rico Constitutions*

137. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 136 above.

138. The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V (the "U.S. Takings Clause"). The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 1.

139. Article II, Section 9 of the Puerto Rico Constitution provides that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law." P.R. Const. art. II, § 9 (the "P.R. Takings Clause").

140. Plaintiffs possess a constitutionally protected property interest in the form of valid, perfected security interests in and liens on the Pledged Property as well as the right to receive principal and interest.

141. Joint Resolution 188 orders the ERS to "sell [its] assets and to transfer the net cash proceeds, in addition to any available fund[s], into the Treasury Secretary's account." Joint Resolution 188 § 2. The "assets" and "fund[s]" of the ERS, and any cash proceeds resulting from their sale, are the proceeds of past employer contributions and are subject to plaintiffs' liens

on the Pledged Property. Joint Resolution 188 therefore requires the ERS to transfer plaintiffs' collateral to the Commonwealth.

142.    Joint Resolution 188 also orders the Commonwealth and non-Commonwealth public employers (such as municipalities and public corporations) to cease paying employer contributions to the ERS and instead to make these payments to the Commonwealth's General Fund. Joint Resolution 188 therefore effectively transfers plaintiffs' collateral – *i.e.*, the "right to receive" employer contributions – from the ERS to the Commonwealth. Joint Resolution 188 also deprives plaintiffs of the right to receive principal and interest.

143.  · In the alternative and/or in addition, Act 106 directed the sale of the ERS's assets and transfer of its funds and the transfer of the ERS's "right to receive" employer contributions. Act 106 also deprives plaintiffs of the right to receive principal and interest.

144.    The Post-Petition Legislation provides no compensation of any kind for the transfers of plaintiffs' property to the Commonwealth.

145.    To the extent that the Post-Petition Legislation is not void ab initio and plaintiffs' liens do not continue in the Pledged Property when transferred to the Commonwealth, the transfer of the ERS's assets and the ERS's "right to receive" employer contributions amounts to a "taking" of plaintiffs' collateral.

146.    The Post-Petition Legislation, however, was not enacted for a "public purpose" within the meaning of the U.S. and P.R. Takings Clauses. Rather, the Post-Petition Legislation was enacted in order to divert assets to the General Fund so that the Commonwealth can use such assets for purposes specified in the Fiscal Plan for Puerto Rico.

147.    Under the U.S. and P.R. Takings Clauses, defendants may not take property from private parties unless the taking is for a "public use." Taking property from senior creditors in

order to give it to junior creditors is not a "public use" within the meaning of the U.S. and P.R.

Takings Clauses.

148.     To the extent that the Post-Petition Legislation is not void ab initio and plaintiffs'

liens do not continue in any collateral transferred from the ERS to the Commonwealth, the Post-

Petition Legislation violates the U.S. and P.R. Takings Clauses and cannot be implemented.

## SIXTH CLAIM FOR RELIEF

*Request for a Declaratory Judgment that the Post-Petition Legislation, On Its Face,*
*Constitutes an Unconstitutional Taking of Private Property Without Just Compensation in*
*Violation of the U.S. and P.R. Takings Clauses*

149.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1

through 148 above.

150.     The U.S. Takings Clause provides that "private property [shall not] be taken for

public use, without just compensation." U.S. Const. amend. V. The U.S. Takings Clause applies

to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment. *See*

U.S. Const. amend. XIV, § 1.

151.     The P.R. Takings Clause provides that "[p]rivate property shall not be taken or

damaged for public use except upon payment of just compensation and in the manner provided

by law." P.R. Const. art. II, § 9.

152.     Plaintiffs possess a constitutionally protected property interest in the form of

valid, perfected security interests in and liens on the Pledged Property and in the contractual right

to timely payment of principal and interest by the ERS, Bond Resolution § 701 ("The [ERS]

shall duly and punctually pay or cause to be paid the principal of and premium, if any, on every

Bond and the interest thereon . . . .").

153.     Joint Resolution 188 orders the ERS to "sell [its] assets and to transfer the net

cash proceeds, in addition to any available fund[s], into the Treasury Secretary's account." Joint

- 34 -

Resolution 188 § 2. The "assets" and "fund[s]" of the ERS, and any cash proceeds resulting from their sale, are the proceeds of past employer contributions and are subject to plaintiffs' liens on the Pledged Property. Joint Resolution 188 therefore requires the ERS to transfer plaintiffs' collateral to the Commonwealth.

154. Joint Resolution 188 also orders the Commonwealth and non-Commonwealth public employers (such as municipalities and public corporations) to cease paying employer contributions to the ERS and instead to make these payments to the Commonwealth's General Fund. Joint Resolution 188 therefore effectively transfers plaintiffs' collateral – *i.e.*, the "right to receive" employer contributions – from the ERS to the Commonwealth and deprives plaintiffs of their contractual right to receive principal and interest.

155. In addition or in the alternative, Act 106 directed the sale of the ERS's assets and transfer of its funds and the transfer of the ERS's "right to receive" employer contributions.

156. The Post-Petition Legislation provides no compensation of any kind for the transfers of plaintiffs' property to the Commonwealth, either the collateral or the contractual right to receive principal and interest.

157. Plaintiffs are therefore entitled to a declaration that, to the extent (i) the Post-Petition Legislation is not void ab initio, (ii) plaintiffs' liens and the right to receive contractual payments of principal and interest do not continue in any Pledged Property transferred to the Commonwealth pursuant to the Post-Petition Legislation, and (iii) taking the Pledged Property and the right to receive contractual payments of principal and interest to pay junior creditors qualifies as a "public use" within the meaning of the U.S. and P.R. Takings Clauses, the Post-Petition Legislation, on its face, constitutes an unconstitutional taking of their Pledged Property without just compensation in violation of the U.S. and P.R. Takings Clauses.

## SEVENTH CLAIM FOR RELIEF

*Request for a Declaration that Any Award of Just Compensation or Damages for Violation of the Takings Clauses Cannot Be Impaired by a PROMESA Plan or an Order Confirming a PROMESA Plan*

158.   Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 157 above.

159.   The Post-Petition Legislation violates the U.S. and P.R. Takings Clauses by taking plaintiffs' property without providing just compensation.

160.   If the Post-Petition Legislation is implemented, Plaintiffs will be entitled to an award of damages and/or just compensation for these constitutional violations.

161.   Because plaintiffs were oversecured at all times relevant to this action, the amount of just compensation required for the taking of plaintiffs' collateral and their right to receive principal and interest pursuant to the Post-Petition Legislation is no less than the principal amount of the ERS Bonds and any and all interest accruing thereon until the date compensation is paid.

162.   Impairing plaintiffs' constitutional claims in a Title III plan would violate the Fifth and Fourteenth Amendments to the United States Constitution and Article II of the Puerto Rico Constitution.

163.   Plaintiffs are therefore entitled to a declaration that any award of just compensation or damages for violation of the U.S. and P.R. Takings Clauses cannot be impaired by a PROMESA plan of adjustment or an order confirming a PROMESA plan of adjustment.

## EIGHTH CLAIM FOR RELIEF

*Request for a Declaratory Judgment That the Post-Petition Legislation, As Applied Here, Violates the Contracts Clauses of the United States and Puerto Rico Constitutions*

164. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 163 above.

165. Article I, § 10 of the U.S. Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1 (the "U.S. Contracts Clause").

166. Article II, § 7 of the Puerto Rico Constitution provides that "[n]o laws impairing the obligation of contracts shall be enacted." P.R. Const. art. II, § 7 (the "P.R. Contracts Clause").

167. The ERS Bond Resolution created a contractual relationship between the ERS and plaintiffs. Plaintiffs relied on the ERS's promises in the ERS Bond Resolution when they acquired ERS Bonds.

168. Under Section 701 of the ERS Bond Resolution, plaintiffs have a contractual right to timely payment of principal and interest by the ERS. Bond Resolution § 701 ("The [ERS] shall duly and punctually pay or cause to be paid the principal of and premium, if any, on every Bond and the interest thereon . . . ."). Moreover, under Section 501 of the ERS Bond Resolution, plaintiffs have a contractual right and security interest in the Pledged Property.

169. The Post-Petition Legislation requires the ERS to liquidate its assets and pay the proceeds to the Commonwealth's General Fund, and divert the stream of employer contributions from the ERS to the Commonwealth. The Post-Petition Legislation thereby substantially impairs contractual obligations of the ERS by depriving the ERS of the funds necessary to pay the

principal and interest due to plaintiffs and by depriving plaintiffs of their rights and security interest in the Pledged Property.

170. The impairment of the ERS's contractual obligations is substantial. The ERS's obligation to make timely principal and interest payments was its central undertaking in the ERS Bond Resolution, and the security interest in the Pledged Property the ERS granted the ERS Bondholders was the foundation of the transaction. These promises substantially induced ERS bondholders to purchase ERS Bonds, and without them, bondholders would not have invested in ERS Bonds.

171. The Post-Petition Legislation's substantial impairment of contractual obligations is neither reasonable nor necessary to an important purpose of the Commonwealth government. The ERS's underfunding problem was both foreseeable and avoidable, and was caused by the Commonwealth's chronic underfunding of the ERS. The ERS does not lack sufficient resources to comply with its debt service obligations as originally scheduled. Moreover, the increase in employer contributions enacted by the Post-Petition Legislation could have been accomplished within the existing statutory scheme, without eliminating the ERS.

172. Nor does the Post-Petition Legislation spread the burden of restoring the Commonwealth's fiscal health across various sectors of society. Rather, such laws deprive plaintiffs of their property and ability to get repaid while enabling payments to the Commonwealth's creditors and to pension beneficiaries.

173. This legislation is unreasonable in light of the surrounding circumstances and imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well.

174. Neither PROMESA nor any other federal law authorizes or allows the Commonwealth or the Court to impair contracts in the manner implemented by the Post-Petition Legislation.

175. The Commonwealth's substantial impairment of the ERS's contractual obligations to the plaintiffs therefore constitutes a violation of the U.S. and P.R. Contracts Clauses and cannot be implemented.

176. To the extent that the Post-Petition Legislation is implemented, plaintiffs will suffer damages in an amount equal to the principal owed to each of plaintiffs, plus the interest accrued until the time of payment.

## **PRAYER FOR RELIEF**

177. **WHEREFORE**, based on the above and foregoing, plaintiffs pray that this Honorable Court enter an order:

  a. Enforcing the automatic stay and declaring that the Post-Petition Legislation was void ab initio.

  b. Determining that plaintiffs hold a secured claim to the full extent of their allowed claim against the ERS.

  c. Determining that plaintiffs hold a secured claim to the full extent of their allowed claim against the Commonwealth.

  d. Declaring that plaintiffs' lien continues in any Pledged Property transferred to the Commonwealth from the ERS.

  e. Declaring that any transfer of Pledged Property to the Commonwealth without plaintiffs' consent pursuant to the Post-Petition Legislation will result in an unjust enrichment of the Commonwealth at plaintiffs' expense.

f.  Declaring that transfer of the Pledged Property and the right to receive principal and interest from the ERS to the Commonwealth pursuant to the Post-Petition Legislation was not for a "public use" within the meaning of the U.S. and P.R. Takings Clauses.

g.  Declaring that transfer of the Pledged Property and the right to receive principal and interest from the ERS to the Commonwealth pursuant to the Post-Petition Legislation, on its face, constitutes an unconstitutional taking of private property without just compensation within the meaning of the U.S. and P.R. Takings Clauses.

h.  Declaring that any award of just compensation or damages for violation of the U.S. and P.R. Takings Clauses cannot be impaired by a PROMESA plan of adjustment or an order confirming a PROMESA plan of adjustment.

i.  Declaring that the Post-Petition Legislation substantially interferes with plaintiffs' contract rights with the ERS in violation of the U.S. and P.R. Contracts Clauses.

j.  Awarding attorneys' fees and costs incurred in prosecuting this action in favor of plaintiffs.

k.  Awarding any and all other relief as the Court deems just and proper in these circumstances.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, November 8, 2017.

By:

/s/ Alfredo Fernández-Martínez

Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

*Counsel for Plaintiffs Altair Global Credit
Opportunities Fund (A), LLC, Andalusian
Global Designated Activity Company, Glendon
Opportunities Fund, L.P., Mason Capital
Management, LLC, Nokota Capital Master
Fund, L.P., Oaktree-Forrest Multi-Strategy,
LLC (Series B), Oaktree Opportunities Fund
IX, L.P., Oaktree Opportunities Fund IX
(Parallel 2), L.P., Oaktree Value Opportunities
Fund, L.P., Ocher Rose, L.L.C., and SV Credit,
L.P.*

/s/ Bruce Bennett

Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Beth Heifetz (*pro hac vice*)
Christopher J. DiPompeo (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
bheifetz@jonesday.com
cdipompeo@jonesday.com
ssooknanan@jonesday.com

*Counsel for Plaintiffs Altair Global Credit
Opportunities Fund (A), LLC, Andalusian
Global Designated Activity Company,
Glendon Opportunities Fund, L.P., Mason
Capital Management, LLC, Nokota Capital
Master Fund, L.P., Oaktree-Forrest Multi-
Strategy, LLC (Series B), Oaktree
Opportunities Fund IX, L.P., Oaktree
Opportunities Fund IX (Parallel 2), L.P.,
Oaktree Value Opportunities Fund, L.P.,
Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ José C. Sánchez-Castro

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*Counsel for Puerto Rico AAA Portfolio
Bond Fund, Inc., Puerto Rico AAA
Portfolio Bond Fund II, Inc., Puerto Rico
AAA Portfolio Target Maturity Fund, Inc.,
Puerto Rico Fixed Income Fund, Inc.,
Puerto Rico Fixed Income Fund II, Inc.,
Puerto Rico Fixed Income Fund III, Inc.,
Puerto Rico Fixed Income Fund IV, Inc.,
Puerto Rico Fixed Income Fund V, Inc.,
Puerto Rico GNMA & U.S. Government
Target Maturity Fund, Inc., Puerto Rico
Investors Bond Fund I, Puerto Rico
Investors Tax-Free Fund, Inc., Puerto
Rico Investors Tax-Free Fund, Inc. II,
Puerto Rico Investors Tax-Free Fund III,
Inc., Puerto Rico Investors Tax-Free Fund
IV, Inc., Puerto Rico Investors Tax-Free
Fund V, Inc., Puerto Rico Investors Tax-
Free Fund VI, Inc., Puerto Rico
Mortgage-Backed & U.S. Government
Securities Fund, Inc., Tax-Free Puerto
Rico Fund, Inc., Tax-Free Puerto Rico
Fund II, Inc., and Tax-Free Puerto Rico
Target Maturity Fund, Inc.*

/s/ Jason N. Zakia

Glenn M. Kurtz (*pro hac vice*)
John K. Cunningham (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Puerto Rico AAA Portfolio
Bond Fund, Inc., Puerto Rico AAA
Portfolio Bond Fund II, Inc., Puerto Rico
AAA Portfolio Target Maturity Fund, Inc.,
Puerto Rico Fixed Income Fund, Inc.,
Puerto Rico Fixed Income Fund II, Inc.,
Puerto Rico Fixed Income Fund III, Inc.,
Puerto Rico Fixed Income Fund IV, Inc.,
Puerto Rico Fixed Income Fund V, Inc.,
Puerto Rico GNMA & U.S. Government
Target Maturity Fund, Inc., Puerto Rico
Investors Bond Fund I, Puerto Rico
Investors Tax-Free Fund, Inc., Puerto
Rico Investors Tax-Free Fund, Inc. II,
Puerto Rico Investors Tax-Free Fund III,
Inc., Puerto Rico Investors Tax-Free Fund
IV, Inc., Puerto Rico Investors Tax-Free
Fund V, Inc., Puerto Rico Investors Tax-
Free Fund VI, Inc., Puerto Rico
Mortgage-Backed & U.S. Government
Securities Fund, Inc., Tax-Free Puerto
Rico Fund, Inc., Tax-Free Puerto Rico
Fund II, Inc., and Tax-Free Puerto Rico
Target Maturity Fund, Inc.*

# Exhibit B

**GEOTEXT**
Translations

translations@geotext.com
www.geotext.com

STATE OF CALIFORNIA )
)
)
COUNTY OF SAN FRANCISCO )      ss

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached Text for Final Approval by the

House, dated June 23, 2017.

Mel Valentin, Project Manager
Geotext Translations, Inc.

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this 31st day of October , 20 17 ,

by ___Mel valentin_____ ,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature: _____

KURT ADAM SHULENBERGER
Commission No. 2208160
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires AUGUST 27 2021

New York
t: +1.212.631.7432

London
t: +44.20.7553.4100

Washington, D.C.
t: +1.202.828.1267

Paris
t: +33.1.42.68.51.47

Chicago
t: +1.312.242.3756

Stockholm
t: +46.8.463.11.87

Houston
t: +1.713.353.3909

Frankfurt
t: +49.69.7593.8434

San Francisco
t: +1.415.576.9500

Hong Kong
t: +852.2159.9143

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 75 of 291
Exhibit B Page 3 of 11

A-38

**(TEXT FOR FINAL APPROVAL BY THE HOUSE)**
**(JUNE 23, 2017)**

---

GOVERNMENT OF PUERTO RICO

18TH Legislative Assembly                                1st Ordinary Session

**HOUSE OF REPRESENTATIVES**

# House Joint Resolution 188

JUNE 6, 2017

Presented by Representatives *Méndez Núñez, Torres Zamora, Rodríguez Aguiló, Hernández Alvarado, Alonso Vega, Aponte Hernández, Banchs Alemán, Bulerín Ramos, Charbonier Chinea, Charbonier Laureano, Del Valle Colón, Franqui Atiles, González Mercado, Lassalle Toro, Lebrón Rodríguez, Mas Rodríguez, Meléndez Ortiz, Miranda Rivera, Morales Rodríguez, Navarro Suárez, Pagán Cuadrado, Parés Otero, Peña Ramírez, Pérez Cordero, Pérez Ortiz, Quiñones Irizarry, Ramos Rivera, Rivera Guerra, Rivera Ortega, Rodríguez Hernández, Rodríguez Ruiz, Santiago Guzmán, Soto Torres, and Torres González*

Concerning the Committee for Treasury, Budget, and for Puerto Rico Oversight, Management, and Economic Stability "PROMISE"

**JOINT RESOLUTION**

To allocate, under the custody of the Office of Management and Budget, the amount of three hundred ninety million, four hundred eighty thousand dollars ($390,480,000) for payment of pensioners in the Central Government and Judiciary Retirement Systems and the Teachers' Retirement System, arising from the sale of assets or available funds from the Central Government and Judiciary Retirement System and the Teachers' Retirement System, which will form part of the Consolidated Budget charged against the General Fund for Fiscal Year 2017-2018; to order the Retirement Systems to sell their assets and transfer the net cash proceeds or any available funds into the Treasury Secretary's account; and to authorize the Treasury Secretary to receive and record [such amounts] as part of the General Fund for Fiscal Year 2017-2018; and for other related purposes.

2

## STATEMENT OF LEGISLATIVE INTENT

The recommended Budget for Fiscal Year 2018 involved new challenges and changes throughout its formulation process. First, in passing Executive Order 2017-005, we adopted a Zero-Based Budget. This budgetary method requires Government agencies and instrumentalities to carefully evaluate and justify projected expenses, thereby ensuring fulfillment of their mission and maintaining the quality of services provided. Moreover, by implementing the Zero-Based Budget we ensure that agencies will record accounting entries correctly, by assigning such entries where they actually belong.

The Recommended Budget for Fiscal Year 2017-2018 reflects reductions in payroll and operating expenses pursuant to current regulations and the Fiscal Plan. It does, however, contain an allocation for payment of pensions for retirees in the Central [Government] and Judiciary Retirement System and in the Teachers' Retirement System, with funding to come from various sources, including the sale of assets from the Central [Government] and Judiciary Retirement System. The present measure allows for allocation, under the custody of the Office of Management and Budget, of the amount of three hundred ninety million, four hundred eighty thousand dollars ($390,480,000) for payment of pensioners in the Central Government and Judiciary Retirement Systems and the Teachers' Retirement System, arising from the sale of assets or available funds from the Central Government and Judiciary Retirement Systems and the Teachers' Retirement System.

Several attempts were made in the past to reform the three Retirement Systems. However, these measures were unsuccessful and their results insufficient, which has led to a lack of liquidity and insolvency in these systems. Moreover, given the profound and severe fiscal crisis we are currently experiencing, the Government is prevented from shoring up the three Retirement Systems. This Joint Resolution, therefore, puts forth the pay-as-you-go system as a new method for safeguarding pensions for Government retirees.

*THE LEGISLATIVE ASSEMBLY OF PUERTO RICO HEREBY RESOLVES:*

1   Section 1. The amount of three hundred ninety million, four hundred eighty thousand dollars

2   ($390,480,000) is allocated, under the custody of the Office of Management and Budget, for payment of

3   pensioners in the Central Government and Judiciary Retirement Systems and the Teachers' Retirement

4   System, arising from the sale of assets or available funds from the Central Government and Judiciary

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39   Affidavit:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit B   Page 5 of 11

Page 77 of 291

3

1    Retirement System and the Teachers' Retirement System. Such allocation shall form part of the

2    Consolidated Budget charged against the General Fund for Fiscal Year 2017-2018.

3    　　　　Section 2. The Central Government and Judiciary Retirement System and the Teachers'

4    Retirement System are ordered to sell their assets and to transfer the net cash proceeds, in addition to any

5    available funds, into the Treasury Secretary's account.

6    　　　　Section 3. The Secretary of the Treasury Department is authorized to receive, and record as part

7    of the General Fund for Fiscal Year 2017-2018, all funds arising from the sale of assets or available funds

8    from the Central Government and Judiciary Retirement System, and from the Teachers' Retirement

9    System, so that they may be utilized in accordance with Section 1 of this Joint Resolution.

10   　　　　Section 4. With the approval of this Joint Resolution, the following points are ordered and

11   adopted, as it is necessary and reasonable:

12   　　　　1)   the General Fund, through the pay-as-you-go system, shall assume any payments that the

13   　　　　　　　three Retirement Systems cannot make;

14   　　　　2)   the three Retirement Systems shall continue to meet their obligations to their

15   　　　　　　　beneficiaries and pensioners by contributing available funds and funds arising from the

16   　　　　　　　sale of their assets to the General Fund;

17   　　　　3)   employer contributions by the Central Government, Public Corporations, and

18   　　　　　　　Municipalities to the Puerto Rico Government Employee Retirement System and to the

19   　　　　　　　Teachers' Retirement System shall be eliminated, given the burden that the respective

<div align="center">4</div>

1                    payments to these systems' pensioners places on the General Fund;

2        4)      the obligation to pay the Additional Uniform Contribution shall be eliminated; and

3        5)      the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF) shall

4                    establish and implement all mechanisms necessary so that the Central Government, the

5                    Municipalities, and the Public Corporations may contribute to financing the "pay-as-you-

6                    go" system.

7        The provisions of this Section are approved through the exercise of power accorded to the State

8    and for the protection of the lives, health, and wellbeing of the People of Puerto Rico during the fiscal

9    emergency at hand. These are also approved pursuant to the actions required under the scope of the Puerto

10   Rico Oversight, Management and Economic Stability Act (PROMESA) and the Fiscal Plan approved and

11   certified by the Financial Oversight Board. These provisions shall therefore take precedence over and

12   suspend the operation of any other provision that is contrary to them.

13        Section 5. This Joint Resolution shall be known as the "Joint Resolution for Other Allocations for

14   Fiscal Year 2017-2018."

15        Section 6. This Joint Resolution shall take effect on July 1, 2017.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:392-1 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Page 80 of 291
Exhibit B Page 8 of 11

A-38

**(TEXTO DE APROBACION FINAL POR LA CAMARA)**
**(23 DE JUNIO DE 2017)**

GOBIERNO DE PUERTO RICO

18va. Asamblea
Legislativa

1ra. Sesión
Ordinaria

## CÁMARA DE REPRESENTANTES

# R. C. de la C. 188

### 6 DE JUNIO DE 2017

Presentada por los representantes *Méndez Núñez, Torres Zamora, Rodríguez Aguiló, Hernández Alvarado, Alonso Vega, Aponte Hernández, Banchs Alemán, Bulerín Ramos, Charbonier Chinea, Charbonier Laureano, Del Valle Colón, Franqui Atiles, González Mercado, Lassalle Toro, Lebrón Rodríguez, Mas Rodríguez, Meléndez Ortiz, Miranda Rivera, Morales Rodríguez, Navarro Suárez, Pagán Cuadrado, Parés Otero, Peña Ramírez, Pérez Cordero, Pérez Ortiz, Quiñones Irizarry, Ramos Rivera, Rivera Guerra, Rivera Ortega, Rodríguez Hernández, Rodríguez Ruiz, Santiago Guzmán, Soto Torres y Torres González*

Referida a la Comisión de Hacienda, Presupuesto y de la Supervisión, Administración y Estabilidad Económica de Puerto Rico, "PROMESA"

### RESOLUCIÓN CONJUNTA

Para asignar bajo la custodia de la Oficina de Gerencia y Presupuesto la cantidad de trescientos noventa millones cuatrocientos ochenta mil ($390,480,000) dólares, para el pago de los pensionados de los Sistemas de Retiro de Gobierno Central y la Judicatura; y del Sistema de Retiro para Maestros proveniente de la venta de activos o fondos disponibles del Sistema de Retiro de Retiro de Gobierno Central y la Judicatura; y del Sistema de Retiro para Maestros, la cual formará parte del Presupuesto Consolidado con cargo al Fondo General para el año fiscal 2017-2018; para ordenar a los Sistemas de Retiro a vender sus activos y pasar el producto líquido neto o cualquier fondo disponible a la cuenta del Secretario de Hacienda; y para autorizar al Secretario de Hacienda a ingresar y contabilizar como parte del Fondo General para el año fiscal 2017-2018; y para otros fines relacionados.

EXPOSICIÓN DE MOTIVOS

El Presupuesto recomendado para el Año Fiscal 2018 conllevó nuevos retos y cambios en el proceso para su formulación. Primeramente, con la promulgación de la Orden Ejecutiva 2017-005, adoptamos un Presupuesto Base Cero. Bajo esta metodología presupuestaria, se les requiere a las agencias e instrumentalidades del Gobierno evaluar con detenimiento los gastos proyectados y justificar los mismos, asegurándose de cumplir con su misión y manteniendo la calidad en los servicios prestados. Asimismo, mediante la implementación del Presupuesto Base Cero nos aseguramos que las agencias contabilizarán las partidas correctamente, asignándolas donde realmente deben ser destinadas.

El Presupuesto recomendado para el Año Fiscal 2017-2018 refleja reducciones en nómina y en los gastos operacionales, conforme con la normativa vigente y el Plan Fiscal. Sin embargo, contiene una asignación para el pago de las pensiones de los retirados del Sistema de Retiro Central y la Judicatura; y del Sistema de Retiro para Maestros proveniente de diversos orígenes de recursos, entre los cuales se encuentra la venta de activos del Sistema de Retiro Central y la Judicatura. Mediante la presente medida, se asigna bajo la custodia de la Oficina de Gerencia y Presupuesto la cantidad de trescientos noventa millones cuatrocientos ochenta mil ($390,480,000) dólares para el pago de los pensionados de los Sistemas de Retiro de Gobierno Central y la Judicatura; y del Sistema de Retiro para Maestros proveniente de la venta de activos o fondos disponibles del Sistema de Retiro de Retiro de Gobierno Central y la Judicatura; y del Sistema de Retiro para Maestros.

Ya en el pasado se intentó reformar en varias ocasiones los tres Sistemas de Retiro. Sin embargo, esas medidas no funcionaron y resultaron insuficientes, lo que ha llevado a que los mismos se encuentren sin liquidez e insolventes. Además, debido a la actual profunda y grave crisis fiscal por la cual atravesamos, el Gobierno se ve impedido de solventar los tres Sistemas de Retiro. Por tal razón, esta Resolución Conjunta promueve el sistema de *pay as you go*, como nuevo método para garantizar las pensiones a los retirados del Gobierno.

*RESUÉLVESE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

1    Sección 1.-Se asigna bajo la custodia de la Oficina de Gerencia y Presupuesto la

2    cantidad de trescientos noventa millones cuatrocientos ochenta mil ($390,480,000)

3    dólares para el pago de los pensionados de los Sistemas de Retiro de Gobierno Central y

4    la Judicatura; y del Sistema de Retiro para Maestros proveniente de la venta de activos o

1    fondos disponibles del Sistema de Retiro de Gobierno Central y la Judicatura; y del

2    Sistema de Retiro para Maestros.   Dicha asignación formará parte del Presupuesto

3    Consolidado con cargo al Fondo General para el Año Fiscal 2017-2018.

4           Sección 2.-Se ordena al Sistema de Retiro de Gobierno Central y la Judicatura; y

5    al Sistema de Retiro para Maestros a vender sus activos y pasar el producto líquido

6    neto, así como cualquier fondo disponible a la cuenta del Secretario de Hacienda.

7           Sección 3.-Se autoriza al Secretario del Departamento de Hacienda a ingresar y

8    contabilizar como parte del Fondo General para el Año Fiscal 2017-2018, los fondos

9    provenientes de la venta de los activos o fondos disponibles del Sistema de Retiro del

10   Gobierno Central y la Judicatura; y del Sistema de Retiro para Maestros, para que sean

11   utilizados según se dispone en la Sección 1, de esta Resolución Conjunta.

12          Sección 4.-Con la aprobación de esta Resolución Conjunta, se dispone y adopta,

13   por resultar necesario y razonable, lo siguiente:

14          1)   que el Fondo General, a través del sistema de *pay as you go* asuma los

15               pagos que los tres Sistemas de Retiro no puedan realizar;

16          2)   que los tres Sistemas de Retiro sigan cumpliendo con sus obligaciones

17               hacia sus beneficiarios y pensionados aportando al Fondo General sus

18               fondos disponibles y los fondos provenientes de las liquidaciones de sus

19               activos;

20          3)   que se eliminen las aportaciones patronales del Gobierno Central, las

21               Corporaciones Públicas y los Municipios al Sistema de Retiro de

22               Empleados del Gobierno de Puerto Rico y al Sistema de Retiro para

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-2   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit B   Page 11 of 11

4

1      Maestros debido al peso que supone sobre el Fondo General realizar los

2      pagos correspondientes a los pensionados de estos sistemas;

3      4)    que se elimine la obligación de pagar la Aportación Adicional Uniforme,

4      y

5      5)    que la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico

6      (AAFAF) establezca e implemente todos los mecanismos necesarios para

7      que el Gobierno Central, los Municipios y las Corporaciones Públicas

8      contribuyan al financiamiento del sistema "pay as you go".

9      Las disposiciones de esta Sección se aprueban en el ejercicio del poder de razón

10  del Estado y en protección de la vida, salud y bienestar del Pueblo de Puerto Rico

11  durante la emergencia fiscal que atravesamos. Además, se aprueban en virtud de las

12  acciones requeridas bajo el palio de la Ley Federal *Puerto Rico Oversight, Management*

13  *and Economic Stability Act* (PROMESA) y del Plan Fiscal aprobado y certificado por la

14  Junta de Supervisión Fiscal. Por esta razón, estas disposiciones tendrán primacía y

15  suspenden la vigencia de cualquier otra que resulte contraria a las mismas.

16  Sección 5.-Esta Resolución Conjunta se conocerá como la "Resolución Conjunta

17  de Otras Asignaciones para el Año Fiscal 2017-2018".

18  Sección 6.-Esta Resolución Conjunta comenzará a regir el 1 de julio de 2017.

# Exhibit C



translations@geotext.com
www.geotext.com

STATE OF NEW YORK          )
                           )    ss
                           )
COUNTY OF NEW YORK         )

### CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached Law No. 106, dated August 23,

2017.

Lynda Green, Senior Managing Editor
Geotext Translations, Inc.

Sworn to and subscribed before me

this 12th day of October, 20 17.

HOA WIN LY
Notary Public, State of New York
No. 01LY6323702
Qualified in New York County
Term Expires April 27, 2019

New York
t: +1.212.631.7432

London
t: +44.20.7553.4100

Washington, D.C.
t: +1.202.828.1267

Paris
t: +33.1.42.68.51.47

Chicago
t: +1.312.242.3756

Stockholm
t: +46.8.463.11.87

Houston
t: +1.713.353.3909

Frankfurt
t: +49.69.7593.8434

San Francisco
t: +1.415.576.9500

Hong Kong
t: +852.2159.9143

**(Senate Bill 603)**

# LAW NO. 106
# AUGUST 23, 2017

To establish the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," for the purpose of reforming the Puerto Rican Government Employee Retirement System, and the Teacher Retirement System, according to the economic and fiscal reality in Puerto Rico and the provisions of the Fiscal Plan for Puerto Rico, certified in accordance with the provisions of Public Law 114-187, known as the "Puerto Rico Oversight, Management and Economic Stability Act" or "PROMESA;" establish that the General Fund, via the "pay as you go" system, will take over the payments that the Puerto Rican Government Employee Retirement System, the Teacher Retirement System and Judiciary Retirement Systems are unable to make; order the three Retirement Systems to continue to meet their obligations to their beneficiaries and pensioners by contributing their available funds and the funds from the sale of their assets to the General Fund; establish the New Plan for Defined Contributions and provide for its administration; create the Retirement Board, delegate its powers and duties; amend Section 2 of Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act;" amend Articles 1-1.04 and 4-101, repeal subsections 11 and 12 and renumber subsections 13, 14 and 15 as 11, 12 and 13, respectively, of Article 4-103 of Law No. 447 of May 15, 1951, as amended, known as the "Commonwealth of Puerto Rico Government Employee Retirement System Law"; amend Articles 1.1, 2.3 and repeal Articles 2.4, 2.5 and 2.6 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Teachers Retirement System Law;" amend Section 1081.01 of Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico;" repeal Law 211-2015, as amended, known as the "Voluntary Pre-retirement Program Law," guarantee the benefits for Pre-retirees and provide for employees that have requested such benefits to complete the process; authorize the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF) to design, implement and oversee an incentivized voluntary redundancy program for public servants in the Executive Branch; and other related purposes.

# STATEMENT OF LEGISLATIVE INTENT

Puerto Rico is currently experiencing an unprecedented financial and social crisis. This crisis arose, in part, due to the lack of spending controls, sustainable development measures and management information systems that would provide clarity and transparency in government management.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 4 of 87

2

According to data provided by the Federal Department of the Treasury, Puerto Rico has experienced a cumulative economic contraction of 14.6% of the Gross State Product (real GSP) and is predicted to contract by an additional 3% over the next two years. Since the early 21st Century, the Puerto Rican Government has operated with a structural deficit that has been financed by issuing bonds and loans to the Government Development Bank. However, the serious financial situation cut off the Government's access to the financial markets, affecting its ability to obtain short- and long-term financing. As a result, the Government of Puerto Rico has lacked liquidity for more than a year. The previous Administration therefore used the refunds belonging to taxpayers, contractor payments, money from retirement funds and intragovernmental loans as replacement sources of liquidity to spend more than the available funds. The Government Development Bank has been in default of its obligations to bond holders since May 1, 2016, and no longer performs its function of providing the Government with liquidity. As if this were not enough, the Puerto Rican Government Employee Retirement System, the Teacher Retirement System and Judiciary Retirement System are insolvent.

As an example of the misguided government policies that led to this fiscal situation, note that from 2001 to 2008, government payroll costs increased by 64% and despite efforts to curb this problem, after a 33% reduction between 2009 and 2012, there was another substantial increase in the 2013-2016 four-year period. To finance this excessive expense, between 2000 and 2008, government debt increased by 134%. In addition, between 2013 and 2016, measures were implemented based on a policy of "first default, then tax, and then cut." This philosophy fostered continued excessive spending and the rejection of public policies that would have allowed the Puerto Rican Government to efficiently manage its fiscal affairs, all without having taken the necessary steps to achieve greater operational efficiency within the Government, or cutting excessive government spending. Moreover, while securities plunged and the economic debacle gained speed, the Central Government was unable to generate the necessary financial data to analyze and understand the depth of the problem and provide accurate information to the United States Congress and other entities with an interest in the matter. As a result of all of the foregoing, Puerto Rican Government debt, and that of its instrumentalities, was downgraded several times in a short period of time, triggering negative effects across all sectors of the economy.

This crisis has hit Puerto Rican families very hard. The greatest sacrifices have been demanded from the most vulnerable members of our society and have caused thousands of Puerto Ricans to abandon the Island for other parts of the United States in search of better opportunities. The resulting drop in population has become one of the challenges we are now facing on the road to recovery.

## Puerto Rico's Status as a Colony

Our colony status hinders our ability to meet and resolve this crisis, since we lack the sovereign authority that states have to regulate local affairs under the Tenth Amendment to the United States Constitution. "[t]o the United States Supreme Court, the [adoption of the Puerto Rican] Constitution did not represent a change in the fundamental basis of the constitutional relations between Puerto Rico and the United States. The Supreme Court continued to treat Puerto Rico as a political entity subject to the Territorial Clause of the Constitution of the United States." *See* The People of Puerto Rico v. Sánchez Valle et al., 192 D.P.R. 594, 631 (2015).

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 5 of 87

3

"[T]here was never a transfer of sovereignty, only a delegation of powers." Ibid. at p. 635. "That delegation of power does not constitute an irrevocable renunciation nor a termination of the power of Congress. The People of the United States granted Congress, through the Constitution, ample power to manage the territories. For this reason, the Congress cannot irrevocably renounce a power that was conferred on it by the People of the United States." Ibid. at p. 638.

Thus, "Congress can allow for the Commonwealth to remain as a political system indefinitely and, on the other hand, it has the constitutional authority to amend or revoke the powers exercised the Government of Puerto Rico to manage its internal affairs. In other words, Puerto Rico's internal government system is entirely subject to the political will and legal authority of Congress." Ibid. at p. 641.

The sad truth is that our colonial status places us in such a defenseless position that our United States citizenship, which the overwhelming majority of Puerto Ricans cherish, and which we have enjoyed since 1917, is not even guaranteed to us. The fact is that Congress has the legislative discretion to grant privileges to citizens born in the territories, including US citizenship, but this right can be revoked at any time. In fact, the Federal Government has argued in court that in the territories there is no right to citizenship, but it is rather a legislative grace on the part of Congress. *See, e.g.*, Tuaua v. United States, 788 F.3d 300, (D.C. Cir. 2015).

With regard to the particular matter before us, as an example of the limitations imposed upon us by our colonial status, we note that states can avail themselves of the protections offered by the Federal Bankruptcy Code, but Puerto Rico was excluded from said statute and, given the fact that we lack full representation in Congress, there is little or nothing we can do about it. Nor can we legislate a local bankruptcy because the same federal law that fails to protect us occupies the field and preempts any local legislation. *See* Puerto Rico v. Franklin Cal. Tax-Free Tr. 136 S. Ct. 1938 (2016) (declaring unconstitutional the "Puerto Rico Public Corporation Debt Enforcement and Recovery Law," Law 71-2014, known colloquially as the "Recovery Law").

## The direct result of our colonial status: PROMESA

The policies of the past, and our defenseless colonial status, led the United States Congress to enact the law known as the "Puerto Rico Oversight, Management and Economic Stability Act," (known by its acronym, "PROMESA,") Pub. L. 114-187, and delegated broad powers to a Financial Oversight and Management Board (hereinafter, the "Oversight Board").

Once again, lacking full representation in Congress, said Act was passed without any real participation on the part of our people. Under PROMESA, Puerto Rico's ongoing fiscal planning activities, budget, legislative and executive actions, in addition to the debt restructuring, whether consensual or not, and the issue, securing, swapping, modification, buyback and redemption of debt are all subject to the oversight of the body created for said purpose.

Section 4 of PROMESA clearly provides that its provisions shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act. Thus, the United States Congress expressly manifested its intention that said Act should supersede any state law in conflict with PROMESA. This is also provided by Section 8 (2) of PROMESA, which provides that the Government of Puerto Rico may not enact, implement, or

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 89 of 291
Exhibit C   Page 6 of 87

4

enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Oversight Board. As such, we are unable to enact any legislation that would invalidate PROMESA or undermine its provisions or scope.

At this juncture, we must stress that under the Tenth Amendment to our Federal Constitution, the Federal Government cannot impose on a State the sort of things the Federal PROMESA Act allows it to impose on territories. Congress was thus able to impose a Board on Washington D.C., which is not a state and is under Congress' direct jurisdiction. Similarly, the Board of the City of New York was created by its own state legislature and not Congress. Detroit, which is a city and not a state, participated in a voluntary bankruptcy proceeding. In short, we cannot lose sight of the fact that the current situation and the imposition of the Oversight Board is just another consequence of our colonial status that has constrained our development for more than five hundred years and remained completely unchanged following the adoption of the Puerto Rican Constitution in 1952, as authorized by Congress.

Regrettably, our status as a colony and consequent lack of political power exacerbates the fact that Congress has imposed a Federal Law on us that supersedes all local legislation, including our Constitution, without giving us the opportunity to vote on it or even vote for the President who approved it. This illustrates the fact that in order to get out of the economic quagmire we are in, we must resolve the problem of our political status. However, it is also an indisputable fact that we have to work within the parameters of PROMESA to begin Puerto Rico's economic and fiscal recovery.

On October 30, 2016, the Oversight Board designated the Government of Puerto Rico, the Government Employee Retirement System, Judiciary Retirement System, Teacher Retirement System, the University of Puerto Rico and 21 public corporations in Puerto Rico as "covered entities" subject to financial supervision under PROMESA. Section 405(b) of PROMESA imposed a temporary stay of any lawsuits or claims against the Government of Puerto Rico and its instrumentalities on various matters, in the hope that the Government of Puerto Rico, on its own behalf and on behalf of its instrumentalities, would enter into voluntary negotiations with their creditors to reorganize and settle the repayment of their debt obligations and simultaneously undertake a responsible restructuring of the Government of Puerto Rico and its instrumentalities that would realign the essential services required for the health, safety and wellbeing of the residents of Puerto Rico, with the timely repayment of its debt obligations. The stay expired on May 1, 2017. Following its expiration, this matter is already being aired in various federal venues including the Federal Court for the District of Puerto Rico.

After investing millions of dollars in specialized consulting services, in 2016 the previous Administration presented a deficient fiscal plan that was immediately rejected by the Oversight Board, as it failed to resolve the fiscal problems caused by the previous Administration.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 7 of 87

5

## A New Government: Responsibility to the Oversight Board

As a result of all of the foregoing, when we took the reins of the Government on January 2, 2017, we inherited a cash deficit of more than $7.6 billion, as certified by the Federal Treasury and the Oversight Board. This was a Government without access to capital markets, with junk bond status, no liquidity, no transparency in public finances, with high government spending and debts totaling billions of dollars. Moreover, Governor Ricardo A. Rosselló Nevares was facing the colossal task of regaining credibility in the financial markets and with the Oversight Board.

It is our responsibility to guarantee a Government in which expenditures are based on actual revenue. That is why, since the start of our Administration, we have implemented a concerted plan to control government spending, reactivate our economy and facilitate the creation of more and better private sector jobs. On February 28, 2017, the Governor presented a complete, all encompassing, real Fiscal Plan, which at the same time is sensitive to the needs of our People and the most vulnerable among us. On March 13, 2017, the Oversight Board accepted and certified the Fiscal Plan, along with a series of contingencies that guarantee that there will be no layoffs of government employees or changes in the workday, maintaining our People's access to health care and protecting the pensions of our most vulnerable citizens. The Certified Fiscal Plan is the only alternative to avoid the layoff of public employees, elimination of the right to health care, to meet our obligations to pensioners, keep the Government running and be sufficient to avoid more stringent measures that are part of the contingencies of the Certified Fiscal Plan approved by the Oversight Board.

The validation of the Fiscal Plan is an acknowledgment of the credibility of the new Government. The changes we are putting into place will not be easy and will take time, but will also begin to yield results in the first two years of their implementation. Now it is up to us to implement the contingencies that the Fiscal Plan requires the Government to fulfill. We must ensure that we have sufficient access to liquid resources to avoid impacting the wages of government employees, the health care of our People or the income of our pensioners.

This Law seeks to safeguard the wellbeing of our pensioners and public servants, while faithfully implementing the Fiscal Plan certified by the Oversight Board. It is promulgated in order to adjust the legal and judicial framework so as to meet the requirements demanded by the Oversight Board in the Fiscal Plan approved under the Federal PROMESA Act. In view of the foregoing, by virtue of the reasoning power of the State and in accordance with Article II, Sections 18-19 and Article VI, Section 7-8 of the Constitution of Puerto Rico, this serious economic and fiscal emergency in Puerto Rico necessitates the passage of this Law so that the State can finance the pension benefits for public servants who have already retired and those that will do so in the future. We exercise this reasoning power of the State to take the necessary steps to comply with the Fiscal Plan and place Puerto Rico on the road to economic recovery. Implementing this Plan is a pressing need on the part of the State so as to maintain its operations and protect our most vulnerable citizens.

As defined by the Supreme Court of Puerto Rico, the reasoning power of the State is "that power inherent to the State that is used by the Legislature to prohibit or regulate certain

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39   Affidavit   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 8 of 87

6

activities for the purpose of fostering or protecting the public peace, ethics, health and general wellbeing of the community, which may be delegated to the municipalities." Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Our High Court ruled that steps taken to deal with an emergency that are reasonable and necessary to advance important government interests are valid. See, Trinidad v. E.L.A. 188, D.P.R. 828 (2013) and Domínguez Castro v. E.L.A. supra, pp. 88-89. Similarly, the Supreme Court recognized the "precariousness of the economy as a reality that necessarily influences the definition of the scope of the government's action under the reasoning power of the State," and that in the exercise of said power, "the Legislature has broad authority to pass economic regulations aimed at promoting the wellbeing of the community." Domínguez Castro v. E.L.A. supra, p. 37. On behalf of the Court, Associate Justice Kolthoff Caraballo pointed out that like the rest of the world, our jurisdiction is "going through a very tumultuous economic and financial period. It would seem that the economies of countries around the world are intertwined and tied to the tail of a kite that just cannot get off the ground." Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 415 (2010) certiorari denied, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). Thus the Supreme Court recognized that it had to be aware of the current reality, which it termed "harsh and unfriendly." Faced with such a historic scenario, our Court deemed it necessary to aspire to altruism in the pursuit of "collective economic wellbeing, at the expense of individual wellbeing." This Court also reiterated the recognition of an economic crisis in our jurisdiction in Herrero et al. v. E.L.A. 179, D.P.R. 277 (2010) and stressed, in the context of providing a remedy that involved the disbursement of public funds to refund money to taxpayers, that it was not "unaware of the difficult state of public finances in our country." Ibid. at p. 309.

The Supreme Court upheld Law 3-2013, as amended, on the Puerto Rican Government Employee Retirement System in Trinidad Hernández v. E.L.A., supra, holding that the Legislature had exercised the reasoning power of the State to halt the insolvency of the Puerto Rican Government Employee Retirement System. The Supreme Court reasoned that "the statement of legislative intent ... shows that the measures adopted are necessary and reasonable to adequately address the financial crisis that is imperiling the actuarial solvency of this system." It added that "it certainly constitutes an important public interest since guaranteeing the economic solvency of the system benefits all of the Participants and addresses, in part, the financial crisis the Country is facing by protecting the wellbeing of all Puerto Ricans." Trinidad Hernández v. E.L.A. supra, p. 837. It concluded that the rule is constitutional "because, although it substantially impairs the contractual obligations in dispute, the measures taken are reasonable and necessary to salvage the actuarial soundness of the Retirement System and there are no less onerous measures to achieve that end." Ibid., p. 839.

Similarly, in Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico [Puerto Rico Teachers' Association v. Puerto Rican Teachers Retirement System], 190 D.P.R. 854 (2014), the Supreme Court passed judgment on the measures adopted by Law 160-2013 to resolve the crisis in the Teachers Retirement System and ruled that the Law did not advance the important State interest as required by our constitutional system in cases involving retirement system reform: that of guaranteeing the solvency of the system itself. It therefore ruled that Law 160-2013, insofar as the impairment of contractual obligations is concerned, is unreasonable and, therefore, unconstitutional. Ibid., p. 12. On that occasion, the Court emphatically stressed that measures passed will be considered constitutional if they are

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Exhibit C Page 9 of 87

7

reasonable and necessary "to advance its actuarial soundness and there are no less onerous measures to achieve that end." Ibid., p. 8.

Based on the legal framework set forth above, this Legislative Assembly believes that the measures taken in this Law are necessary and reasonable to adequately address the fiscal crisis and actuarial insolvency of the Retirement Systems for Puerto Rican Government Employees, the Judiciary and for Teachers. It also creates the legal framework that will facilitate compliance with the provisions and targets related to the Retirement Systems included in the Fiscal Plan certified by the Oversight Board in accordance with the Federal PROMESA Act. Said Plan establishes fiscal adjustments aimed at stabilizing Government finances in times when there is no access to the financial markets. If we do not implement these measures, Puerto Rico's economic and social wellbeing will suffer irreparable damage, and as such implementing this reform as part of the Fiscal Plan is a pressing interest of the State to protect the public interest.

## Government Restructuring

Furthermore, the Plan for Puerto Rico promoted by this Administration that was endorsed by the Puerto Rican People in the last general elections via the democratic exercise of the vote, proposes the implementation of a new government structure that would significantly reduce public spending and substantially improve function. Achieving this requires a conscientious assessment of the services provided by the Government, so as to determine which of these can be consolidated, delegated to the private sector, or eliminated because they are no longer necessary, all without involving government employee layoffs, but rather by mobilizing them in accordance with our citizens' need for services.

In keeping with the above, and as part of the first steps taken by this Administration to curtail the fiscal crisis by re-engineering the government structure, Law 8-2017 was enacted, as amended, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act." This Law makes the Government a Single Employer so that public servants become employees of the Government rather than of their various entities, thereby facilitating the best use of human resources where there is a pressing need via the mechanism of mobility, without any employees having to resign from their positions and start over at another government instrumentality. With the concept of mobility, we seek to reinforce the understanding of the balance between the workforce and the rendering of public services. In this way, we efficiently distribute Government human resources and create a streamlined government structure, based on continuously assessing needs and helping public servants to make the adjustments and adaptations required by the current fiscal crisis and future challenges.

## PROMESA and the Supremacy Clause

On the other hand, it is important to highlight the application and mandate that the United States Congress, by virtue of its plenary governing power over the Territory of Puerto Rico, imposed on us in enacting PROMESA, which creates the Oversight Board, tasked with approving and overseeing the execution of a Fiscal Plan for the economic stabilization of Puerto Rico, among other missions.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3 filed:11/08/17 Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 10 of 87

8

Said law enacted on May 4, 2016, contains the following supremacy clause:

Sec. 1 "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA." (SEC. 4. SUPREMACY. **The provisions of this Act shall prevail over any general or specific provisions of territory law,** State law, **or regulation that is inconsistent with this Act.** (Emphasis added).

Under Sec. 101 of PROMESA, the Oversight Board, at its sole discretion, may at any time designate any territorial instrumentality as a covered instrumentality subject to the obligations of said Act. At this time, the Oversight Board has designated all public corporations as covered entities. Moreover, under Section 205 of PROMESA, the Oversight Board may at any time submit recommendations to the Governor or the Legislature on actions that the territorial Government should take to ensure compliance with the Fiscal Plan or otherwise promote financial stability, economic growth, management responsibility and the efficient delivery of services. After such recommendations have been made, the Governor will be required to submit a statement indicating whether the Government will adopt the recommendation. Should it not adopt them, the Governor will have to explain to the President of the United States and to Congress the reasons why they were not adopted.

Note that PROMESA enjoys supremacy over any laws passed in the territory of Puerto Rico that are incompatible with the intent, responsibilities, missions and objectives of the federal law and the Oversight Board as the body in charge of implementing them.

Based on this legal framework, the Legislative Assembly believes that the measures taken in this Law are necessary and reasonable to adequately address the fiscal crisis and actuarial insolvency of the Retirement Systems and are a valid exercise of legislative power. Moreover, this Legislative Assembly is committed to faithful compliance with the Fiscal Plan certified by the Fiscal Oversight Board on March 13, 2017. Specifically, this law is rooted in the provisions on pension reform in the Fiscal Plan, as set forth below:



PENSION REFORM

### Segmentation of the defined contribution structure will protect the retirement savings of government employees

## Retirement Systems

The Puerto Rican Government Employees Retirement System, Puerto Rican Teachers Retirement System and the Puerto Rican Judiciary Retirement System (collectively, the "Retirement Systems") are facing a serious fiscal emergency, in that their liquid assets are about to run out and soon they will not have the necessary resources to cover their obligations to pensioners.

This crisis began decades ago and has become more acute as the years have gone by, culminating in the current emergency. In attempts to resolve it, the Government has reformed the Retirement Systems on several occasions. In one such attempt in 2000, under the Administration of Dr. Pedro Rosselló, the Government Employees Retirement System was reformed and a defined contribution system was established, better known as "Reform 2000," for public employees who began to make contributions as of January 1, 2000. In addition to this reform, which was positive for our public servants, the Administration of Dr. Pedro Rosselló injected hundreds of millions of dollars into the Puerto Rican Government Employees Retirement System to help alleviate the actuarial deficit.

During the Administrations of Governor Sila M. Calderón and Governor Aníbal Acevedo Vilá, the fiscal health of the Retirement Systems continued to worsen. As an example, we can point to the dire consequences that the bond issues in 2008 had on the Puerto Rican Government Employees Retirement System.

Under the mandate of Governor Luis G. Fortuño Burset, contributions by employers to the Retirement Systems were increased to help fund them. Subsequently, another major reform was made to the Retirement Systems in 2013 to try to save them. However, this reform was

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3 Affidavit Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 12 of 87

10

harmful to our public servants, because it significantly reduced their benefits, increased the retirement age and altered the conditions under which they can retire. As if that were not enough, the Administration of Governor Alejandro García Padilla committed to making additional contributions to the Retirement Systems through the establishment of the Uniform Additional Contribution to public corporations, among others, but it failed to comply, which continued to worsen the fiscal health of the Retirement Systems. That is, during the last four years, they reduced benefits to our public servants and did not meet the obligations of the Government to those Systems.

For multiple reasons, including inadequate contributions, the passage of special laws, early retirement programs, changes in Participants' life expectancy, failed investments, mismanagement, bond issues that did not turn a profit,[1] the different reforms did not work and were not sufficient to save the Retirement Systems. These Systems consequently remain on the edge of insolvency, which means that the payment of pensions to our retirees is seriously threatened if we do not act promptly. It is important to note that both the Central Government, and the Puerto Rican Government Employees Retirement System are currently undergoing a restructuring process under Title III of PROMESA.

Despite the fact that the reforms implemented in the past have not been effective, doing nothing is not an option. The wellbeing of public servants and our retirees is a priority for this Administration. However, the steps that the Government could take must be assessed and placed in the current historical context. As discussed above, Puerto Rico is experiencing the largest and most severe fiscal crisis in modern history. This has led the Federal Government to enact PROMESA and set up an Oversight Board for the Island. Under said law, a Fiscal Plan for the Government of Puerto Rico was certified, establishing the parameters to be followed to attain fiscal responsibility. Budgets passed from now on must be fully aligned with said certified Fiscal Plan. Otherwise, the Oversight Board has the power and authority to take corrective action. Our guiding principle will always be that the elected local Government should be the one to make decisions for Puerto Rico, as difficult as they may be. Leaving the decision-making authority in the hands of an entity that was not elected by the People is not an option.

This being the case, all available viable options for dealing with the current crisis in the Retirement Systems have been carefully analyzed. First, due to the imminent insolvency of the Retirement Systems, this Legislative Assembly considers it reasonable and necessary that the General Fund would assume responsibility to cover the payments that the Retirement Systems are unable to make to our pensioners. For this 2017-2018 fiscal year, the General Fund will be disbursing approximately $2 billion for the payments of Accumulated Pensions for our public servants (this represents a significant increase, given that before July 1, 2017, the Government just made annual employer contributions of about $660 million in contributions). This demonstrates the commitment of this Administration to our pensioners. To do otherwise would deprive our retirees of their pensions, with all the consequences this would involve for them, as well as for the Government and society in general.

---

[1] For a detailed discussion of this matter, see the three (3) reports submitted by the Public Service Retirement Systems Committee of the Puerto Rico House of Representatives regarding House Resolution 417 of 2009.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 13 of 87

11

As such, this law establishes a "pay as you go" system whereby disbursements will continue to be made for all current pensions in the Retirement Systems, using resources from the General Fund, as contemplated in the certified Fiscal Plan, in addition to the transfers that the Retirement Systems will continue to make out of their available funds, and the proceeds from the liquidation of their assets. Secondly, due to the impact and heavy burden this will place on the available resources in the General Fund, this Legislative Assembly deems it necessary and reasonable to eliminate the employer contributions the Government is currently required to make to the Retirement Systems. Thirdly, this Legislative Assembly considers it necessary and reasonable to prospectively establish a New Plan for Defined Contributions, to be supported by the contributions made by public servants. In this way, we will safeguard the contributions that they make for their retirement. Thus, they will be able to enjoy a dignified retirement, without limiting the Central Government's ability to provide essential services to the citizens, or requiring the implementation of measures that would impact the most vulnerable. The groundwork for the new system of defined contributions began to be laid with the passage by the legislature of House Joint Resolutions 186, 187 and 188 in 2017.

Mindful of the state of emergency the Puerto Rican Government Employee Retirement Systems are in, which is affecting public servants at Central Government agencies, municipalities, public corporations, teachers and judges, this Legislative Assembly, in the exercise of the reasoning power of the State, adopts this reform aimed at protecting the pensions of public servants who contributed to the development of Puerto Rican society, while protecting the Government's ability to provide critical services to the citizens.

In short, this Law ensures that the pensioners of Puerto Rico will receive the pensions that, with so much sacrifice and effort, they were able to obtain by giving their best years to the service of the People of Puerto Rico. The General Fund of Puerto Rico will assume the full payment of these pensions, after the liquidation of the assets of the Retirement Systems, with more than two (2) billion dollars earmarked for this commendable effort. In the spirit of solidarity and gratitude, the current Puerto Rican workforce will not allow our retirees to be deprived of their basic needs and a better quality of life. The present legislation is an example of putting collective interests above the interests of the individual and of being loyal to larger and nobler causes than their own. With self-denial and sacrifice, the Government of Puerto Rico shall spare no resources to guarantee the pensions of our already retired. Our debt to them is an indispensable commitment.

On the other hand, with this legislation, we have imposed parameters and controls on the administrators of the retirement funds of current Participants and public servants. We cannot allow Participants to fall victim to retirement fund administrators with no experience and no constraints imposed by law that could put the investments of our valuable public servants at risk. In addition, we have established stringent penalties and sanctions on the heads of public agencies or officials who fail to comply with their ministerial duties to promptly remit contributions to the accounts of the Participants. Today, more than ever, we cannot allow the poor performance of ministerial duties to jeopardize the dignified retirement of thousands of public employees and other employees covered by the three Retirement Systems. Furthermore, no person, whether

natural or legal, shall have legal immunity in the face of an intentional or negligent act that puts the future sustenance of thousands of public servants at risk.

For all of the reasons mentioned above, we recognize and take on the great challenges facing our retirement systems through a public policy that will guarantee and defend the pensions that are accrued today, at all costs. Furthermore, a new system of defined contributions is created, which will give Participants a cause of action to defend their contributions and in which the requirements of extensive experience and competence will be imposed on the administrators of the investments of our public servants.

## BE IT DECREED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:

## CHAPTER 1 - GENERAL PROVISIONS

**Section 1.1** This Act is to be known as the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants."

**Section 1.2** – Primacy of this Law.

This Act is enacted in the exercise of the reasoning power of the State, and by the constitutional authority vested in the Legislative Assembly in Article II, Sections 18 and 19 of the Constitution of Puerto Rico, to pass laws for the protection of the life, health and wellbeing of the People, and in cases of serious emergencies when the health, public safety or essential government services are clearly in jeopardy, and under Sections 7 and 8 of Article VI of the Constitution of Puerto Rico. For this reason, this Act will enjoy supremacy over any other State law.

**Section 1.3** Declaration of a State of Emergency with regard to the Retirement Systems.

It is hereby determined and declared that the Puerto Rican Government Employees Retirement System, the Puerto Rican Judiciary Retirement System and the Puerto Rican Teachers Retirement System are in a state of financial emergency. As a result of this state of financial emergency, it is estimated that by August 2017 the Government Employees Retirement System will have no liquid funds with which to meet its obligations. The Teachers Retirement System is likewise expected to run out of liquid funds in September 2017 and the Judiciary Retirement System will run out of liquid funds by February 2018.

The financial situation of these three government Retirement Funds in Puerto Rico was one of the reasons why the Federal Government passed the Law known as the "Puerto Rico Oversight, Management, and Economic Stability Act," Pub. L. 114-187 (PROMESA). Said Act puts in place, among other things, measures to help the Government of Puerto Rico and its instrumentalities attain fiscal responsibility and access to capital markets. On March 13, 2017, the Fiscal Oversight Board created by PROMESA approved and certified the Fiscal Plan for the Government of Puerto Rico.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39 Affidavit Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Exhibit C Page 15 of 87

13

On May 21, 2017, the Fiscal Oversight Board, acting on behalf of the Government of Puerto Rico, filed a petition to allow the Puerto Rican Government Employees Retirement System to avail itself of the protections offered by Title III of PROMESA. The filing of the petition under Title III of PROMESA triggered a process of restructuring the obligations of said system under the oversight of the United States District Court for the District of Puerto Rico. Given this situation, reasonable and necessary steps must immediately be taken to ensure that the pensioners continue to receive their pensions, the individual contributions of our public servants, and the future of the same, are protected.

Several attempts were made in the past to reform the three Retirement Systems. Said measures were unsuccessful and ultimately insufficient, which has led these systems to virtual insolvency. Moreover, given the severe fiscal crisis Puerto Rico is currently experiencing, the Government is prevented from shoring up the three Retirement Systems. It is therefore necessary and reasonable that the Accumulated Pension Payment Account, which will largely be supported by the General Fund, should take over the payments that the three Retirement Systems cannot make, using the "pay as you go" mechanism. The three Retirement Systems must continue to meet their obligations to their beneficiaries by contributing their available funds and the proceeds from the liquidation of their assets to the General Fund, except for the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated. Employer contributions and similar contributions made to the three Retirement Funds will also be eliminated due to the burden it would place on the General Fund to both make the payments to the pensioners while simultaneously disbursing said contributions, as established in House Joint Resolutions 186, 187 and 188 of 2017. Moreover, as a corrective measure, contributions made by public servants will have to be segregated and a new Defined Contribution Plan established that will secure the future of our public servants. In this way, we are taking steps that consonant with our fiscal reality that do not affect the Government's ability to deliver essential services to the citizens.

**Section 1.4** – Public Policy.

It is hereby declared to be the public policy of the Government of Puerto Rico to protect the pensions of all public service retirees who participated in the three aforementioned Retirement Systems. Thus, as of July 1, 2017, in accordance with House Joint Resolution 188 of 2017, as certified by the Fiscal Oversight Board, on July 13, 2017, the Government of Puerto Rico became the direct payer of our retirees' pensions. Due to the burden this places on the General Fund, which is estimated to run in the billions of dollars per year, the employer contributions being made until now to the three Retirement Systems were eliminated, as was the Uniform Additional Contribution in accordance with the provisions of House Joint Resolutions 186, 187 and 188 of 2017. The Retirement Systems shall contribute their available funds and the net proceeds from the sale of their assets to the General Fund to help pay the Accumulated Pensions, except for the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated. After the Retirement Systems exhaust their resources, the Accumulated Pensions Payment Account, in large part supported by the General Fund, as provided herein, shall take over and guarantee the payment of the Accumulated Pensions as set forth herein. The foregoing notwithstanding, the Municipalities, Legislative Branch, Public Corporations, the Government

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 99 of 237
Exhibit C   Page 16 of 87

14

and the Court Administration shall be required to pay the "Pay-Go" Fee, according to each one to support the Accumulated Pensions Payment Account.

It is also declared to be public policy to protect our public servants' futures. With this Law, we ensure that they will have a retirement that is dignified and free of uncertainty by segregating their personal contributions, guaranteeing them and establishing a new defined contribution plan, in trusts or a similar instrument, which will allow them to protect and guarantee their contributions in separate accounts.

**Section 1.5** Applicability of this Law to the Retirement Systems.

This Law shall apply to the Puerto Rican Government Employees Retirement System and the Puerto Rican Teachers Retirement System. In relation to the Judiciary Retirement System, only Chapter 2, except as provided in Section 2.6 of this Law, which establishes the "Pay as you Go" as set forth below, shall apply. Furthermore, the Judiciary Retirement System must adhere to all the provisions of said Chapter in relation to the Retirement Systems.

**Section 1.6** Definitions.

The following words and terms, when used or referred to in this Law, shall have the following meanings, unless context clearly indicates otherwise. The tenses used herein shall also include the future, and the masculine gender shall also include the feminine, except where such an interpretation would be absurd. Singular shall include the plural and vice versa.

(a)     **AAFAF:** Puerto Rico Fiscal Agency and Financial Advisory Authority created by Law 2-2017.

(b)     **Retirement System Administrators**: the Administrator of the Puerto Rican Government Employees Retirement System as established by Law No. 447 of May 15, 1951, as amended, and the Executive Director of the Puerto Rican Teachers Retirement System, as established by Law 160-2013.

(c)     **Owed Contributions**: amounts that the Government, Municipalities or Public Corporations and other entities considered employers under any of the Retirement Systems covered by this law owe to the Retirement Systems, the Accumulated Pensions Payment Account and/or the New Defined Contribution Plan.

(d)     **Individual Contributions:** sums that have been or will be withheld from the basic remuneration received by the Participant, that are to be credited to their Defined Contributions Account, as defined in Section 1.6(u).

(e)     **Beneficiary:** any person who receives any pension, annuity or benefit, as set forth herein.

(f)     **Administrative Fee:** a fee that the Retirement Board, or its appointee, may charge and collect, to be paid by the Government, the Judicial Branch, Legislative Branch, Public Corporations, and other entities considered employers under the Puerto Rican Government Employee Retirement System and the Teachers Retirement System, in

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 100 of 291
Exhibit C   Page 17 of 87

15

accordance with this Law to finance the operations of the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account, except the Municipalities.

(g) **"Pay-Go" Fee:** a fee to be established and imposed by the AAFAF and paid by the Government, the Municipalities, Judicial Branch, Legislative Branch and the Public Corporations, and other entities considered employers under the Puerto Rican Government Employee Retirement System and the Teachers Retirement System, in accordance with Chapter 2 of this Law. The fee shall be collected by the Secretary of the Treasury or his or her appointee, as set forth herein.

(h) **Code:** Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico."

(i) **Defined Contributions Account:** account in trust, separate from general assets and Government accounts, to be created after July 1, 2017 in the name of each Participant as set forth in Chapter 3 herein.

(j) **Accumulated Pensions Payment Account:** account in trust, separate from general assets and Government accounts, designed to pay the Accumulated Pensions for the Puerto Rican Government Employee Retirement System, the Teacher Retirement System and Judiciary Retirement Systems under a "pay as you go" system as set forth in Chapter 2 of this Law. The account in trust will be centralized and segregated from general assets and Government accounts by the Treasury Department and dedicated solely and exclusively to the purposes set forth herein, and subject to the terms and conditions set out herein.

(k) **Public Enterprise or Corporation:** all government instrumentalities of the Government of Puerto Rico that have been created or may be created in the future. This shall not include, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Retirement Board, do not have a clear employer-employee relationship with the Government of Puerto Rico. Any public servant or employee that participated in the Retirement Systems and later became an officer or employee of a subsidiary enterprise of any public enterprise or corporation without any interruption of service, shall retain the same rights and privileges as a Participant, even if said subsidiary is not covered by the three Retirement Systems.

(l) **Administrative Body:** person or legal entity selected by the Retirement Board to manage the Accumulated Pensions Payment Account and/or the New Defined Contribution Plan. The Administrative Body must be a recognized company with at least ten (10) years of experience in the administration of retirement plans, which has a good reputation in the financial industry and which contractually guarantees the Government that it will generate savings of at least twenty-five percent (25%) of the current operating expenses incurred in operating the Retirement Systems. This does not preclude the Government or any of its instrumentalities from assuming and exercising the functions of the Administrative Body, if it is deemed necessary and appropriate, always taking into consideration the best interests of the Participants, Retirees and Beneficiaries and the protection and guarantee of the balance of their Individual Contributions.

Case:17-03283-LTS  Doc#:7890-1  Filed:07/09/19  Entered:07/09/19 15:16:15  Desc:
Case:17-00219-LTS  Doc#:39-3  Filed:11/08/17  Entered:11/08/17 15:31:05  Desc:
Affidavit C  Page 101 of 291
Exhibit C  Page 18 of 87

16

(m) **Government of Puerto Rico or Government:** the Government of Puerto Rico and all of its departments, divisions, bureaus, offices, and agencies, for the purposes of this definition, to include the Puerto Rican Department of Education. For the purposes of this Law, this term includes other governmental or non-governmental bodies, whose employees currently contribute to Retirement Systems.

(n) **Retirement Board:** board created under the provisions of Chapter 4 herein.

(o) **Teacher:** a professional who teaches in a classroom, Directors of schools and any other titles or categories of teachers that currently exist or may exist in the future in the nomenclature of the Department of Education of the Government of Puerto Rico, alternate officers, and those employees or officers who avail themselves of the benefits of Law 160-2013, in accordance with the provisions of said law, provided they hold a valid certification to work as teachers.

(p) **New Defined Contribution Plan:** new plan for defined contributions in which the Participants will participate, as provided in Chapter 3 herein.

(q) **Participants:** active employees of the Government of Puerto Rico, Teachers and members of the Teachers Retirement System, Municipal employees, and the employees of Public Corporations, with the exception of employees of the University of Puerto Rico and the Electric Power Authority. In addition, it includes those employees who work or who have worked within a Public Private Partnership and any member of the Puerto Rican Government Employee Retirement System that has made contributions to said System and these contributions have not been reimbursed. This term includes former employees of the Government of Puerto Rico who left public service and were not reimbursed for their contributions and/or any accrued benefit up to the date of separation.

(r) **Accumulated Pension:** annuity, benefit or defined benefit to which Participants will be entitled upon retiring from service based on the contributions and rules applicable to their respective Retirement Systems, calculated as of the moment this Act takes effect.

(s) **Pensioner:** a person who receives a pension or annuity in accordance with the provisions of this Act or those created by the various Retirement Systems.

(t) **Pre-retiree:** Any person enrolled in the Voluntary Pre-retirement Program created by Law 211-2015, as amended, known as the "Voluntary Pre-retirement Program Law."

(u) **Remuneration:** gross cash compensation earned by an employee. When calculating remuneration, all bonuses paid in excess of wages, such as payment for overtime hours, will be excluded.

(v) **Retirement Systems:** the Puerto Rican Government Employees Retirement System as established by Law No. 447 of May 15, 1951, as amended, and the Puerto Rican Teachers Retirement System, as established by Law 160-2013.

(w) **Judiciary Retirement System:** the Judiciary Retirement System, created by Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act."

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 102 of 291
Exhibit C Page 19 of 87

17

## CHAPTER 2 – ACCOUNT FOR THE PAYMENT OF PENSIONS ACCUMULATED BY THE RETIREMENT SYSTEMS

**Section 2.1** – Accumulated Pensions Payment Account.

The Accumulated Pensions Payment Account is hereby created under the auspices of the Treasury Department, which will be kept in a trust fund separate from the general assets and accounts of the Government, which will operate under a "pay as you go" system for the payment of the Pensions Accumulated by the Retirement Systems, including the Judiciary Retirement System, as of the time this Law takes effect. As of July 1, 2017, the Accumulated Pension payments made by the Retirement Systems must be disbursed from the funds deposited into this account, which must come from the following sources:

(a) The net liquid proceeds from the liquidation of Retirement System assets, including those of the Judiciary Retirement System, in accordance with House Joint Resolution 188 of 2017, as approved in accordance with PROMESA, except for the segregated funds in the Teachers Retirement System Defined Contribution Program established by Law 160-2013, as amended, and the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated, in accordance with current Retirement System Obligations;

(b) "Pay-Go" Fee determined and imposed by the AAFAF on the Government, the Municipalities, the Legislative Branch, Court Administration and Public Corporations and other covered entities. This fee shall be equal to the amount actually paid to Pensioners and Beneficiaries from each covered entity. The Secretary of the Treasury or the person or entity appointed by the latter shall have the authority to collect the "Pay-Go" Fee. In the case of the Municipalities, the administrative charges of the "pay as you go" scheme shall not be included in the calculation of the "Pay-Go" Charge. Regardless of the payment of the "Pay-Go" Fee by the employer, the disbursement of the benefits of all Pensioners and Beneficiaries are guaranteed by the General Fund through the "pay as you go" scheme, with the responsibility of the entities to remit the payment of the said Fee in compliance with its obligations under this Law remaining;

(c) Puerto Rican Government budget expenditure allocations, the special allocations to finance shortfalls in the payment of pensions and special laws passed for such purposes;

(d) Donations, bequests and any other contribution made by any public or private entity to the account, by virtue of any other law;

(e) Funds from twenty-five percent (25%) of the initial payment or periodic payments of Public Private Partnership contracts, as established in subsection (e) of Section 17 of Law 29-2009, as amended, known as the "Private Public Partnership Law," as determined from time to time; and

(f) Other funds and revenue that the Legislative Assembly may allocate for these purposes.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 20 of 87

18

The Management and Budget Office may withhold from any of the allocations to the agencies of the Government of Puerto Rico the amounts necessary for the payment of the "Pay-Go" Fee, whenever it determines that this withholding is necessary to ensure compliance with this obligation by the covered entities. Furthermore, each government entity must record the funds necessary for the payment of the "Pay-Go" Fee every year in its general expenditure budget.

In the case of Participants, Beneficiaries or Pensioners whose employer ceases or has ceased to exist, those who move or have moved to a Public Private Partnership and those whose employer will, for some reason, not pay the "Pay-Go" Fee, their pensions, as well as all pensioners of the Retirement Systems, shall be guaranteed by the Government through the "pay as you go" system.

**Section 2.2** – List of Accumulated Pensions.

(a)   A list will be kept and updated of each Participant, Beneficiary and Pensioner of the Retirement Systems that will reflect in detail the amount due each one as an Accumulated Pension in accordance with the respective Retirement Systems until the date that this Law enters into effect. It shall detail, without this being understood as a limitation, the accumulated benefit to which the Participant is entitled, the employment history and the contributions made, according to each applicable retirement law in which the Participant, Beneficiary or Pensioner contributed. Based on the content of said list, the corresponding payments on the Accumulated Pensions will be made to those who are entitled to payment in accordance with the payment terms applicable until such time as this Law enters into effect, and in accordance with the Retirement Systems to which each of the Participants, Beneficiaries or Pensioners belongs. However, the provisions regarding the list of Accumulated Pensions for judges contributing to the Judiciary Retirement System and teachers and members of the Teachers Retirement System who are contributing under the provisions of Law 91-2004 will be followed for informational purposes only since they will continue to contribute under their respective systems as they were doing prior to the enactment of this Law.

(b)   Retirement System Administrators, including the Judiciary Retirement System, in coordination with the AAFAF, shall be required to produce the list described in subsection (a) above as follows:

1.   Within sixty (60) days of the passage of this Law they shall produce a list of all the Beneficiaries and Pensioners in all three Retirement Systems; and

2.   Within one hundred eighty (180) days of the passage of this Law they shall produce a list of all Participants, including the Accumulated Pension for each from all three Retirement Systems at the time this Law takes effect, and the payment terms of the same. The three Retirement Systems must take all necessary steps to ensure that the list contains true and exact information with respect to each Participant, Beneficiary and Pensioner.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:31:05 Desc:
Affidavit C Page 104 of 291
Exhibit C Page 21 of 87

19

3. After the list is produced, each Participant, Beneficiary and Pensioner will be notified of the content thereof via efficient and reliable means (it may include a notification by mail, accessibility to information through a portal on the AAFAF website or the creation of the Retirement Board for these purposes, the publication of a legal notice in a widely-circulated newspaper and, where appropriate, for the active Participants, personal notification), and they shall in turn have forty-five (45) days, beginning on the notification date, to present reliable evidence to the Retirement System Administrators that any of the information contained in the list is incorrect or inaccurate. Copies of personnel records, copies of retirement records, pay slips, W-2 forms, copies of returns, certifications by employers or any combination thereof, among other official documents, shall be understood as reliable evidence, without being understood as a limitation. The Government, Municipalities, Judicial Branch, Legislative Branch, Public Corporations and Retirement Systems shall, as part of their ministerial duty, diligently produce the documents requested by a Participant, Beneficiary or Pensioner in order to provide evidence regarding any inaccuracies contained in the list. If a requested document is not available, a certification must be issued stating this circumstance. AAFAF can serve as a facilitator in obtaining these documents and establish mechanisms to receive and promptly process applications received for these purposes. The delay of an entity in producing the information requested shall not adversely affect the Participant and shall not affect the calculation of the aforementioned forty-five (45) days. It shall be understood that the term of forty-five (45) days shall not run as long as a request for reliable evidence before a governmental entity is pending and it is not produced, or it is certified that it does not exist or is not available. The Retirement System Administrators shall analyze any evidence so presented and provide written notice of their decision to the Participant. If a Participant, Beneficiary or Pensioner does not present to the Retirement System Administrators any reliable evidence that the information contained in the list is incorrect within the aforementioned period, said information shall be understood to be true and exact and as such the corrected list shall not be subject to revision.

4. If a Participant, Beneficiary or Pensioner is dissatisfied with the Retirement System Administrators' decision under the preceding subsection, he or she must submit an application for reconsideration within twenty (20) days of the notification of the decision of the Retirement System Administrators. If no such application is submitted, the decision will become final and firm.

5. If a Participant, Beneficiary or Pensioner disagrees with the final decision of the Retirement System Administrators, or if the Administrators fail to issue their decision within ninety (90) days of having received the application for reconsideration, they may file an appeal with the Retirement Board within thirty (30) days from the date of notification or the time when the aforementioned term of ninety (90) days elapses. If no such appeal is filed, the decision will become final and firm.

6. The Retirement Board shall have a period of ninety days (90) to issue a determination on any appeal submitted by a Participant, Beneficiary or Pensioner. In the event that the Board does not express its views on the matter within that period, or if a Participant, Beneficiary or Pensioner is dissatisfied with the final decision of the

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 105 of 291
Exhibit C   Page 22 of 87

20

Retirement Board, he or she may file a motion for judicial review with the Court of Appeals in accordance with Court of Appeals Regulations to review the administrative decisions.

(c) Nothing in this Section shall be construed to interfere in any way with any procedure or claim under the "Puerto Rico Oversight, Management, and Economic Stability Act" ("PROMESA"), Public Law 114-187.

**Section 2.3** – Payment Terms of the Accumulated Pensions.

The payment terms of the Accumulated Pensions of each Participant, Beneficiary or Pensioner shall be calculated in accordance with the terms set forth in the statutes of their respective Retirement Systems at the time this Law enters into effect. Payment terms for disability pensions, death benefits, payments to beneficiaries, reimbursement of contributions, and any sums owed or benefits of a similar nature, shall also be calculated based on the terms set forth in the statutes of the respective Retirement Systems at the time this Law enters into effect. Those employees who, at the time this Law is approved, are in the process of applying for disability benefits or any other benefits, they may conclude said process according to the provisions set out in the applicable law in force at the time the process was initiated.

**Section 2.4** – Accumulated Pensions.

(a) When this Law enters into effect, the benefits of the Accumulated Pensions of the Retirement System Participants who began working before the Law took effect will be preserved and guaranteed by the Government.

(b) Those Participants who, at the time this Law enters into effect, are entitled to retire and receive some sort of pension and/or annuity under the provisions applicable to their respective Retirement Systems may retire at any later date and will be entitled to receive the Accumulated Pension they are due, as calculated under the provisions applicable to their respective Retirement Systems up to the time this Law enters into effect, in the terms set forth therein.

(c) As of the time this Law enters into effect, Participants will not accumulate any additional benefits for years of service, compensation or any other reason, in the Retirement Systems. For the purpose of calculating their pension or retirement benefits in their respective Retirement System, Participants will not receive recognition for services for which no contributions were made after this Law enters into effect; they may not transfer contributions or return contributions for periods worked at or prior to the time this Law enters into effect. Those employees who have contributed or are actively contributing to another retirement system not covered by this Law, may request the transfer of contributions to their retirement system of origin or to which they are entitled at the time of retirement, as long as fiscal resources so allow, according to the Certified Fiscal Plan.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Page 106 of 291
Exhibit C Page 23 of 87

21

(d)     As of July 1, 2017, Participants will no longer make any individual contributions or payment to the Accumulated Pensions Payment Account or any additional contributions to their respective Retirement Systems.

(e)     As of July 1, 2017, the Government of Puerto Rico, Public Corporations, Municipalities, Legislative Branch, Judicial Branch and other covered entities shall no longer be required to make employer contributions, including the Uniform Additional Contribution, and the Teacher's Justice Uniform Contribution, to the Accumulated Pensions Payment Account or the Retirement Systems, but they will be required to pay the applicable "Pay-Go" Fee, as applicable to each one based on the parameters established in this Law.

**Section 2.5** – Compensation for Owed Contributions.

Payments made to the Accumulated Pensions Payment Account will be deducted from the Contributions Owed and any other debt that, as of the effective date of this Law, is held by governmental entities and other entities covered by the Retirement Systems, including the Government, the Municipalities, Public Corporations, the Legislative Assembly and the Court Administration, as applicable.

**Section 2.6** – Special Provisions.

Without prejudice to the provisions of this Law, it is hereby provided, as an exception, that teachers who are contributing to the Teachers Retirement System under the provisions of Law 91-2004, as amended, known as the "Teachers Retirement System Act of the Commonwealth of Puerto Rico," shall continue to make contributions in accordance with the provisions of said statute. The Accumulated Pensions of said teachers shall be calculated based on the terms and conditions set forth in said law. Similarly, it is hereby provided that the Accumulated Pensions of judges who are contributing to the Judiciary Retirement System and those who are newly enrolled in the Judiciary Retirement System, having been appointed after this Law enters into effect, shall continue to contribute under the provisions of Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act," applicable to each judge. It is expressly provided that said Accumulated Pensions, and the payment terms thereof, shall not be affected or modified in any way by the provisions of this Law. However, the individual contributions made by these teachers, members of the Teachers Retirement System and judges will remain as they were prior to the enactment of this Law and will be deposited into the Accumulated Pensions Payment Account as determined by the Retirement Board.

Those teachers, members of the Teachers Retirement System and judges who wish to participate in the New Defined Contribution Plan may do so voluntarily, as determined by the Retirement Board. In said event, in addition to their current individual contribution, they must make the contribution described in Section 3.4 of this Law.

## CHAPTER 3.- DEFINED CONTRIBUTION PROGRAM

**Section 3.1** – New Defined Contribution Plan.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:31:05 Desc:
Affidavit Page 107 of 291
Exhibit C Page 24 of 87

22

(a)    A New Defined Contribution Plan is hereby created, to consist of the establishment of a trust fund, which will not be subject to the provisions of Law 219-2012, as amended, known as the "Trust Act," which will contain an individual account for each Participant in the Retirement Systems that becomes part of said program, as provided in this Chapter. Contributions made to the New Defined Contribution Plan by each Participant will be credited to the individual accounts, in addition to the return on investment in accordance with Section 3.6 herein. The benefit related to these contributions that will be provided to each Participant when they leave public service, either due to retirement or for any other reason, will depend on the total contributions made to their accounts in the New Defined Contribution Plan since the time this Law enters into effect, or the date on which the Participant joined the Defined Contribution Plan, and their rate of return.

(b)    The following persons shall participate in the New Defined Contribution Plan:

(1)    All active Participants in the Retirement Systems as of the time this Law takes effect, with the exception of those teachers and members of the Teachers Retirement System who are contributing under the provisions of Law 91-2004 and the judges who are contributing under the Judiciary Retirement System who will not become part of the New Defined Contribution Plan and shall instead continue to contribute to their respective Retirement Systems as they have been doing to date, except as provided for in Section 2.6.

(2)    All Participants who enter public service for the first time on or after the date this Law is enacted.

(3)    Participation in the new Defined Contribution Plan shall be optional for the Governor of Puerto Rico, all Cabinet Members, Heads of Government Agencies and Instrumentalities, assistants and advisors to the Governor, members of Committees and Boards appointed by the Governor, members of the Legislative Assembly, employees and officers of the Legislative Assembly, the Office of Legislative Services, the Capitol Superintendent's Office and the Comptroller of Puerto Rico.

(4)    Participation in the New Defined Contribution Plan shall be optional for the employees of the departments, divisions, bureaus, offices, agencies, public corporations and instrumentalities of the Government of Puerto Rico who work and reside outside of Puerto Rican territory.

(5)    Any public enterprise or corporation whose employees do not participate in the Retirement Systems at the time this Law is enacted, may, by resolution adopted by their Board of Directors or supreme governing body, as the case may be, join the New Defined Contribution Plan created by this Law. The Retirement Board shall establish the requirements and procedures for joining the New Defined Contribution Plan.

**Section 3.2** – Transferring to the Plan.

As of the time this Law enters into effect, all active Participants who are enrolled in the Retirement Systems, regardless of the date of their first Government appointment, shall become part of the new Defined Contribution Plan, except as provided by Section 3.1(b)(1) herein.

**Section 3.3** – Establishment of Contribution Accounts for the New Defined Contribution Plan.

(a)     The individual contributions made by the Participants shall be funneled to a New Defined Contribution Plan, in which a Defined Contribution Account shall be set up and maintained, in trust, separate from the general assets and accounts of the Government, as an individual account for each Participant, and credited and debited as set forth in this Chapter. The individual contributions and funds in each Defined Contribution Account shall be the exclusive property of the corresponding Participant, shall not be subject to any class of contribution, or embargo and shall be exempt from the singular or collective action of the creditors of the Participant, with the debts of the Participants with the Retirement Systems, the employer and the Government excluded from this exemption.

(b)     The accounts of those Participants in the Defined Contributions Program in the Teachers Retirement System that have balances accumulated in said plan at the time this Law takes effect will immediately be transferred to their respective Defined Contribution Accounts.

(c)     Between the time this Law is enacted and the time the Retirement Board contracts the services of an Administrative Entity to manage the New Defined Contribution Plan, and said Administrative Entity begins to perform its functions under the contract signed for said purpose, the Secretary of the Treasury shall have the authority and power to collect and deposit into a trust fund, which will not be subject to the provisions of Law 219-2012, as amended, known as the "Trust Act," which will be separated from the general assets and accounts of the Government, with the Individual Contributions made by Participants under his or her supervision. After the Administrative Entity begins to provide its services, the Secretary of the Treasury will transfer to it the funds from the Individual Contributions to be deposited into each Participant's Defined Contribution Account. The Administrative Entity shall establish a trust for such purposes, which shall not be subject to the provisions of Law 219-2012, as amended, known as the "Trust Act." Any amount that has been segregated as of July 1, 2017 will be treated in the same way as described in this subsection.

(d)     The income and earnings accrued in each Defined Contribution Account shall be exempt from all class of contributions, taxes, charges or fees as long as they are maintained in the Defined Contribution Accounts. The distributions of the Defined Contribution Accounts shall be subject to taxation for the Participant or Beneficiary, in accordance with the provisions of Section 1081.01(b) of the Code as a distribution of an exempt trust under the provisions of Section 1081.01(a) of the Code and said distributions shall be subject to the exceptions of taxation, tax withholdings and the filing of disclosure statements provided in Section 1081.01 (b) of the Code.

**Section 3.4** – Contributions by Participants in the New Defined Contribution Plan.

As of the date this Law takes effect, all Participants in the Retirement Systems will be required to contribute at least eight point five percent (8.5%) of their monthly remuneration to their Defined Contribution Account. They may voluntarily contribute additional sums, as permitted by the Code. When this Law takes effect, Participants in the New Defined

Contribution Plan will have the right to adjust their current contribution to the Retirement Systems to the minimum authorized by this Section. The Participants in the New Plan for Defined Contributions may change the percentage they wish to contribute to said Plan from time to time, but it may never be less than the minimum required herein.

**Section 3.5** – Employer Contributions, Penalties.

All employers of Participants in the New Defined Contribution Plan shall have the following obligations:

(1) **Obligation to Withhold and Transfer Contributions** – All employers of Participants in the New Defined Contribution Plan shall withhold from the Participant's wages the contributions required under Section 3.4 of this Law and immediately transfer them to the New Defined Contribution Plan for deposit into the Defined Contribution Account. The Secretary of the Treasury or any employer paymaster is hereby authorized to perform the withholding, even if the wages to be paid to the Participant are reduced to less than any legally-prescribed minimum wage as a result of said withholding. The Retirement Board will establish the form and manner in which the contributions will be remitted.

(2) **Penalties and Special Measures regarding Owed Contributions** – Employers who fail to remit the Individual Contributions of Participants in the New Defined Contribution Plan and/or the "Pay-Go" Fees as provided herein within the established time period, as well as any other remittance related to the Participants, shall be subject to the following corrective measures:

    a. The Retirement Board, or its appointee, or the Administrative Entity shall submit a written request, accompanied by an official debt certification:

        i. For employers in default to transfer the Contributions Owed.

        ii. For the Secretary of the Treasury to offset and/or make adjustments to the accounts, obligations and advance payments that the Treasury Department must send to the defaulting employer, and transfer the sums constituting the Contributions Owed to the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account, as applicable.

        iii. For the Center for the Collection of Municipal Revenue (CRIM) to send, within seven (7) days of the written notice, the sums constituting the Contributions Owed by the Municipal employer, to the New Defined Contribution Plan and/or the Accumulated Contribution Payment Account; any unencumbered balance of the property taxes and other revenue that the Municipalities are entitled to receive under Law No. 80-1991, as amended, known as the "Center for the Collection of Municipal Revenue Act." As of the date this Law takes effect, a senior lien will automatically and permanently be created on said unencumbered balance in favor of the Retirement Board and/or the Administrative Entity to collect the Contributions Owed, without the need for any other act, possession or control of the same.

iv. The Management and Budget Office may withhold from any of the allocations to the agencies of the Government of Puerto Rico the amounts needed for the payment of the "Pay-Go" Fee, when it determines that this withholding is necessary to ensure compliance with this obligation by the entities concerned.

b. The Retirement Board or the Administrative Entity shall send written notice to any Office Holder, or Head of an Agency, Public Enterprise or Municipality, or other covered entity that ceases to withhold employee contributions and/or ceases to send the corresponding amounts for each purpose to the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account. Said defect must be cured within no more than ten (10) working days of said notice. In the event that an Office Holder or Head or any official bearing responsibility of an Agency, Public Enterprise, Municipality or covered entity knowingly and without just cause ceases to make the corresponding payments to the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account, it shall be committing a misdemeanor subject to a six (6) month prison term or five thousand dollar ($5,000) fine, or both, at the Court's discretion. Said fine will be paid by the Office Holder or Head or any official bearing responsibility of the Agency, Public Enterprise or Municipality out of its own funds. The Government of Puerto Rico and its instrumentalities shall not provide legal representation to the official in the legal proceeding to put this provision into effect.

c. Each Beneficiary, Participant or Pensioner shall have a personal collection action against each Office Holder or Agency Head, Budget or Finance Director, or any official bearing responsibility, of the Government, Public Enterprise or Municipality to claim the contributions owed as from the date that this Law enters into effect and demand that they be properly paid. The Government shall ensure that said contributions are made and, if funds are to be disbursed for the payment of the corresponding amounts owed as from the date that this Law enters into effect, an action for collection or reimbursement shall be filed against the Office Holder or Agency Head, Budget or Finance Director or any official bearing responsibility who has failed to remit said payments. The Government of Puerto Rico and its instrumentalities shall not provide legal representation to the official in these proceedings. This provision shall enjoy supremacy over any other statute. The provisions of this subsection shall not be understood as excluding or releasing the Government, Public Corporations, Municipalities or other covered entities from their responsibility and ministerial duty to pay the contributions owed in a timely manner, as provided for in this Law. The Participant shall have the option to initiate the corresponding action for collection against the Government, according to the regulations established by the Board for these purposes.

**Section 3.6** – Credits to the Defined Contribution Account, Return on Investment and Rights to the Defined Contribution Account.

(a) Credits.- The following shall be credited to the Defined Contribution Account of each Participant in the New Defined Contribution Plan:

(1) Participant's Individual Contribution. Individual contributions made by the Participant in the New Defined Contribution Plan as required by this Law shall be credited as soon as they are remitted by the employer.

(2) Return on Investment. The return on investment shall be subject to the investments selected by the Participant, based on his or her preferences and risk profile. Participants will be offered various diversified investment options, to be determined by the Retirement Board. Among these alternatives, at least one option will be provided to guarantee all the individual contributions made by the Participant, preserving the principal thereof. The said option shall be automatically selected if the employee does not choose another option of its choice. The Participant shall have the option to choose another alternative from those offered from time to time. Basic and reasonable management fees shall be borne by the Puerto Rican Government. However, the return on investment shall be credited to the account of each Participant and will be net of the additional or extraordinary management fees, as determined by the Retirement Board, making sure that they are reasonable. Periodically, and at least once a year, Participants must be provided with reports of the Activity in their Defined Contribution Account, either with a paper statement or a statement in an accessible format on a Government website.

(3) Transfers of any balances from the Teachers Retirement System's Defined Contribution Program that have accumulated since August 1, 2014, as applicable.

(4) Balances segregated as of July 1, 2017 under House Joint Resolutions 186, 187 and 188 of 2017.

(b) Rights to the Defined Contribution Accounts.- Participants in the New Defined Contribution Plan shall have erga omnes ownership of the balances in their Defined Contribution Accounts.

**Section 3.7** – Debits against the Defined Contribution Account.

The following shall be debited against the Defined Contribution Account set up for each Participant in the New Defined Contribution Plan: those sums used for the payment of benefits or to make a lump sum distribution to a given Participant, as decreed by the Retirement Board. After the entire balance of a Defined Contribution Account has been distributed, the account will cease to exist.

**Section 3.8** – Benefits upon Leaving Public Service.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 112 of 291
Exhibit C Page 29 of 87

27

In the event a Participant leaves public service, his or her Defined Contribution Account may remain in the New Defined Contribution Plan, be transferred to a qualified Defined Contribution Plan exempt under Section 1081.01 (a) of the Code, or the Participant may request the disbursement of the balance, subject to the payment of applicable taxes, according to the Code, payable at the time of disbursement of the funds and the regulations established by the Retirement Board for this purpose.

**Section 3.9** – Death Benefits.

(a) Death of Participant in Active Service. – Upon the death of a Participant in active service who had a balance available in his or her Defined Contribution Account, said balance will be disbursed to the Beneficiaries designated by the Participant in writing, duly acknowledged and filed, or by his or her heirs, in the event no such designation was made, subject to the same requirements set forth in subsection (b) below.

(b) Death of a Retiree.- In situations in which a pensioner dies without having exhausted the balance of all of his or her Defined Contribution Plan, his or her designated Beneficiaries, or heirs, in the event there is no designated Beneficiary, may file a written request, presenting a declaration of heirs or will, and any other document established by the Board, for the disbursement of said balance in a lump sum payment, subject to any withholding or tax in accordance with the law or with the code.

## CHAPTER 4 – RETIREMENT BOARD AND ADMINISTRATIVE ENTITY

**Section 4.1** – Retirement Board of the Government of Puerto Rico.

(a) The Retirement Board of the Government of Puerto Rico is hereby created as a new body of the Government of Puerto Rico, independent and separate from all others, which must be appointed within the term of sixty (60) days from approval of this Law and which is to consist of thirteen (13) members, as described below:

1. The Executive Director of the AAFAF, who shall also serve as the Chairman of the Committee, in his or her absence, it may be represented by an AAFAF official appointed by him or her;

2. The Secretary of the Treasury, or his or her representative;

3. The Director of the Office of Management and Budget, or his or her representative;

4. The Director of the Office of Management and Transformation of Human Resources in the Government of Puerto Rico, or his or her representative;

5. One (1) teacher representative of the Department of Education, who will be an active teacher of the Department of Education, appointed by the Governor for a term of five (5) years, who shall remain in office until a successor is appointed and takes up the post;

6.  One (1) representative of the public corporations, appointed by the Governor for a term of five (5) years, who shall remain in office until a successor is appointed and takes up the post;

7.  One (1) representative from the Judicial Branch, appointed by the full court of the Supreme Court of Puerto Rico, who shall serve at the latter's discretion;

8.  The President of the Federation of Mayors, or his or her representative;

9.  The President of the Association of Mayors of Puerto Rico, or his or her representative; and

10. Four (4) representatives of the public interest, appointed by the Governor for a term of five (5) years, who shall remain in office until a successor is appointed and takes up the post. One (1) of these representatives of the public interest shall be a Pensioner of the Teachers Retirement System, one (1) shall be a Pensioner of the Puerto Rican Government Employees Retirement System, one (1) representative of the members of the Puerto Rican Police who shall be appointed by the Governor, in consultation with bona fide organizations representing that sector and duly authorized by law and one (1) shall be freely selected by the Governor;

The persons designated under subsections (5) and (6) shall serve for an initial term of two (2) years. The persons designated under subsection (10) shall serve an initial term of three (3) years. As the initial term of each of these members expires, their successors shall be appointed in accordance with the provisions of this Section. Members of the Retirement Board shall serve ad honorem.

(b) The persons selected to occupy the posts appointed by the Governor and the full court of the Supreme Court of Puerto Rico shall have knowledge and experience in the administration and operation of financial systems or in human resources management and be of good moral character.

(c) Seven (7) members of the Retirement Board shall constitute a quorum for resolving any matter put before it for consideration and all resolutions adopted by the committee must be approved by the majority of those members. The members may attend said meetings by videoconference, telephone or similar means.

(d) The Retirement Board shall pass regulations establishing the necessary provisions for its operation and compliance with this Law, including the duties and functions of its members.

(e) The Retirement Board may appoint an Executive Director, set his or her salary and establish his or her powers, authority and duties, as well as employ the necessary personnel to carry out its functions under this Law.

(f) Law 1-2012, as amended, known as the "2011 Puerto Rico Government Ethics Act," shall apply to all members of the Retirement Board, except Chapter V of said Act.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:392-3 Filed:11/08/17 Entered:11/08/17 15:31:05 Desc:
Affidavit Page 114 of 291
Exhibit C Page 31 of 87

29

**Section 4.2** – Powers, Authority and Duties of the Retirement Board.

For the purpose of performing its duties as provided by this Law, the Retirement Board shall have the following powers, duties and authority:

(a) To act as the supreme governing body of the Retirement Systems. As such, the Board shall have and exercise all the powers, duties and authority granted to the Boards of Trustees of the Retirement Systems. When this Law enters into effect, these powers and authority will automatically be permanently transferred to the Retirement Board. Consequently, the Boards of Trustees of the Retirement Systems shall be dissolved when this Law takes effect. Any reference to the Boards of Trustees of the Retirement Systems shall be understood to refer to the Retirement Board. All provisions and regulations adopted by the Boards of Trustees of the Retirement Systems shall remain in effect following the enactment of this Law until amended or modified by the Retirement Board and any reference in those regulations to the Boards of Trustees of the Retirement Systems shall be understood to refer to the Retirement Board. All of the foregoing is subject to the provisions of Chapter 7 of this Law. Furthermore, the Retirement Board shall have and exercise all the powers, duties and authority necessary for the administration and management of the New Defined Contribution Plan and the supervision of any Administrative Entity, including the power to establish the rules and requirements for receiving benefits under the New Defined Contribution Plan.

(b) Contract via a competitive selection process the services of one or more Administrative Entities to manage the Accumulated Pensions Payment Account and/or the New Defined Contribution Plan. The selection process for said entity or entities will involve the mechanism of "request for proposals" under the rules established by the Retirement Board, safeguarding the best interests of the Government and the Participants, in accordance with the best industry standards. Any reference to the Administrators of the Retirement Systems shall be understood to refer to the Administrative Entities. All provisions and regulations adopted by the Retirement System Administrators shall remain in effect after this Law is enacted until they are amended or modified by the Administrative Entities or the Retirement Board. All of the foregoing is subject to the provisions of Chapter 7 of this Law.

(c) Adopt all rules, regulations, standards and procedures for its organization and operation, and for the implementation of this Law.

(d) Collect withholdings in addition to the Participants' Individual Contributions up to a maximum of 0.25%, which is what is currently withheld according to their respective Retirement Systems to pay for other benefits such as disability insurance.

(e) Establish and collect an Administration Fee to be calculated based on the expenses incurred in operating and administering the Accumulated Pensions Payment Account and the new Defined Contribution Plan.

Case:17-03283-LTS  Doc#:7890-1  Filed:07/09/19  Entered:07/09/19 15:16:15  Desc:
Case:17-00219-LTS  Doc#:39-3  Filed:11/08/17  Entered:11/08/17 13:31:05  Desc:
Affidavit  Page 115 of 291
Exhibit C  Page 32 of 87

30

(f) Establish, implement and oversee the best practices of prudence, integrity, diligence and rules applicable to the New Defined Contribution Plan, with regard to its operation, Participants' rights, administrator responsibilities, fiduciary duties and any other applicable rule contained in the "Employee Retirement Income Security Act," Public Law 93-406, of September 2, 1974 or any other analogous or relevant statute.

(g) Enter into reasonable and appropriate agreements, memoranda of understanding and documents, including trust incorporation deeds, that are necessary and convenient to implement the provisions of this Law, taking into account the current economic and fiscal situation of the Government of Puerto Rico.

(h) Appoint whatever commissions, boards or committees it considers necessary to best achieve the objectives of this Law.

(i) File suit and be sued, even in the name of the Retirement Systems.

(j) Exercise all the powers necessary for compliance with this Law and with the regulations adopted pursuant to the same.

## CHAPTER 5 – TRANSITORY PROVISIONS

**Section 5.1** – Transition Period.

(a) Until such time as the Retirement Board is duly constituted with the quorum required by this Law, the Executive Director of the AAFAF shall have and exercise all the powers corresponding to the Retirement Board, including making the relevant decisions in relation to the creation of the Defined Contribution Plan and the structuring of the "pay as you go" program, as set forth in this Law or in any other applicable statute.

(b) The Retirement System Administrators shall continue to perform their functions, discharging their duties and shall be required to provide all necessary support to the Retirement Board and the AAFAF during the implementation of this Law, until such time as the AAFAF certifies via a Resolution adopted by its Board of Directors that the transition ordered by this Law is complete, which must take place on or before December 31, 2017. However, said date may be extended for a reasonable time if necessary by resolution of the AAFAF. As of said date, all the powers, duties and authority of the Retirement System Administrators will be permanently transferred to the Administrative Entities, the Executive Director of the Retirement Board or other person determined by the Retirement Board.

(c) Retirement System Administrators must take all necessary steps to liquidate their assets and transfer the proceeds to the General Fund and/or the Accumulated Pensions Payment Account, as applicable, except the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated; transfer the Participants' and Pensioners' files, including their balances, to the Retirement Board, coordinate the movement of their employees in accordance with Law 8-2017, as amended,

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 33 of 87

31

known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," and other applicable provisions. As of the time this Law takes effect, the AAFAF shall have all the necessary powers and authority in conjunction with the Retirement System Administrators to take the necessary steps to adjust the operation of the Retirement Systems for purposes of compliance with the provisions of this Law and the Certified Fiscal Plan, so that the orderly transition can take place. Details should be provided to the employees of both the Retirement Systems and those career employees of the Boards of Trustees of said Systems about the mobility plans, the new headquarters and other pertinent information within the period of thirty (30) days prior to the expiration of the term for transition, in order to avoid any uncertainty regarding the changes proposed.

(d) The Retirement Board, in coordination and with the assistance and resources of the Retirement System Administrators, shall formulate and implement an education campaign addressed to the Participants, Pensioners and Beneficiaries regarding the provisions contained herein.

(e) The Retirement System Administrators, as well as Retirement System employees, shall continue to carry out their duties during the transition period.

**Section 5.2** – Retirement System Employees.

The Office of Administration and Transformation of Human Resources of the Government of Puerto Rico, the Office of Management and Budget and the AAFAF shall establish a plan to move the employees of the Retirement Systems to other agencies and instrumentalities of the Government of Puerto Rico, in compliance with the provisions of Law 8-2017, as amended, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," or in accordance with the procedure established for said purpose via regulations, procedures, circulars, etc. However, employees shall continue to carry out their duties during the transition period established herein, as determined by the Board.

Transferred employees shall retain their salaries and all vested rights in accordance with applicable laws, rules and regulations that are compatible with the provisions of Law 26-2017, known as the "Fiscal Plan Compliance Act."

**Section 5.3** – Transfer of Property and Equipment.

The Retirement Board shall have the authority to administer and dispose of all property and equipment owned by the Retirement Systems.

## CLAUSE 6. AMENDMENT CLAUSES

**Section 6.1** – Section 2 of Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act" is hereby amended so that it shall read as follows:

"Section 2. – Definitions.

The terms and phrases as used in this Law shall have the meanings ascribed to them below, except as context clearly requires otherwise:

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 117 of 291
Exhibit C   Page 34 of 87

32

(1) Administrator – Shall mean the person or entity that the Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," selects to perform the functions of System Administrator.

...

(9)   Board – Shall mean the Retirement Board created via the "Law to Guarantee Payment to our Pensioners and Establish a New Defined Contributions Plan for Public Servants."

..."

**Section 6.2** – Section 1-1.04 of Law No. 447 of May 15, 1951, as amended, is hereby amended so that it shall read as follows:

"Section 1-1.04. -Definitions.

The following terms and phrases as used in this Law shall have the meanings ascribed to them below, except as context clearly requires otherwise:

1) Board. – Shall mean the Retirement Board created via the "Law to Guarantee Payment to our Pensioners and Establish a New Defined Contributions Plan for Public Servants."

2) Administrator. – Shall mean the person or entity that the Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," selects to perform the functions of System Administrator.

..."

**Section 6.3** – Section 4-101 of Law No. 447 of May 15, 1951, as amended, is hereby amended so that it shall read as follows:

"Section 4-101. – Administration,

The System created by this Law shall be considered a trust. Any change to the benefits structure involving an increase in the amount of the annuity or other benefits must be substantiated with prior actuarial studies determining their cost and the corresponding legislation shall provide for the financing thereof.

The System created by this Law shall be organized as a body of the Government of Puerto Rico, independent and separate from all others. The Retirement Board shall not be subject to the provisions of Plan 3-2011, as amended, known as the "General Services Administration Reorganization Plan of 2011," or to the "Organic Law of the Government Office of Management and Budget," and shall be governed by Law 8-2017, as amended, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act."

The Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," shall be responsible for ensuring that the provisions of this Law are implemented."

**Section 6.4** – Subsections 11 and 12 are repealed and clauses 13, 14 and 15 are renumbered as 11, 12 and 13, respectively, of Section 4-103 of Law No. 447 of May 15, 1951, as amended.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-8   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 118 of 291
Exhibit C   Page 35 of 87

33

**Section 6.5** – Section 1.1 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Teachers Retirement System Act," shall read as follows:

"Section 1.1. Definitions.

The following words and terms, when used or referred to in this Law, shall have the following meanings, unless context clearly indicates otherwise. The tenses used herein shall also include the future, and the masculine gender shall also include the feminine, except where such an interpretation would be absurd. Singular shall include the plural and vice versa.

(a)        ...

..

(f) Executive Director – the person or entity that the Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," selects to perform the functions of System Administrator.

...

(k) Board of Trustees. – the Retirement Board, created by the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public        Servants."

..."

**Section 6.6** – Section 2.3 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Government Teachers Retirement System," is hereby amended so that it shall read as follows:

"Section 2.3. – System Board of Trustees.

The powers and authority of the System and the responsibility for establishing the administrative organization and proper functioning of the same shall be vested in the Retirement Board, created through the "Law to Guarantee the Payment to Our Pensioners and Establish a New Plan of Defined Contributions for Public Servants."

**Section 6.7** – Sections 2.4, 2.5 and 2.6 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Teachers Retirement System Act," are hereby repealed and Sections 2.7 and 2.8 shall be renumbered as 2.4 and 2.5 respectively.

**Section 6.8** – Paragraphs (3), (8), (9), (11) and (14) of part (a) and parts (b) and (d) of Section 1081.01 of Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," are hereby amended so that they shall read as follows:

"Section 1081.01.- Employee Trusts.

(a) Exemption.- A trust organized under the laws of Puerto Rico as part of an employer's retirement plan, profit sharing plan, stock incentives or pensions for the exclusive benefit of its employees residing in Puerto Rico or who render services primarily in Puerto Rico, and their beneficiaries; and a trust organized under the laws of Puerto Rico or that is considered a domestic trust under the United States Internal Revenue Code of 1986, as amended, or any

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Exhibit C Page 36 of 87

34

successor legal provision, that forms a part of an employer's retirement plan, profit sharing, stock incentive or pensions, for the exclusive benefit of its employees residing in Puerto Rico or employees residing in Puerto Rico and the United States and their beneficiaries, and that with respect to their participants and beneficiaries in the United States, meets the qualification requirements under Section 401(a) of the United States Internal Revenue Code, as amended (hereinafter referred to for the purposes of this Section as the "Federal Code") shall not be taxable under this Subchapter and no other provision of this Subchapter shall be applicable with respect to said trust or the beneficiaries thereof, subject to the terms and operation thereof meeting the following qualification requirements.-

(1)     ...

(2)     ...

(3)     if the trust, or two (2) or more trusts, or the trust or trusts and the annuity plan or plans are designed by the employer as part of a plan that meets the minimum requirements for coverage set forth in this paragraph.

    (A)     ...

    (B)     ...

    (C)     ...

    (D)     ...

    (E)     Special Rule for Qualified Plans in the United States. If the trust is organized in the United States and with respect to all of its participants, including those who are residents of Puerto Rico, for one year of the plan the retirement plan meets the coverage requirements under Section 410(b) of the Federal Code, it shall be understood that for that same year the plan itself meets the requirements under Section 1081.01(a)(3), provided the plan has been duly certified by the Secretary as a qualified plan under this section.

    (F)     Exclusion of Government Plans.- The coverage requirements under Section 1081.01(a)(3) shall not apply to retirement plans established by the Government of Puerto Rico, the United States Government or their respective municipalities, agencies, instrumentalities and public corporations.

(4)     ...

(5)     ...

(6)     ...

(7)     ...

(8)     In the case of any plan that provides contributions or benefits to employees, all or some of which are employee-owners (as defined in paragraph (e)) a trust that forms a part of said plan shall constitute a qualified trust under this Section only if it meets the requirements under

paragraph (f). With regard to the loss of exemption in the case of employee trusts under certain circumstances, *see* Sections 1102.06 and 1102.07.

(9)     The plan must also be in compliance with any applicable provisions of the Federal "Employee Retirement Income Security Act of 1974," known as "ERISA."

(10)     ...

(11)     For tax years beginning after January 1, 2012, a trust does not constitute an exempt trust under paragraph (a) of this Section if the plan of which the trust is a part grants benefits or payouts to a participant in excess of the following parameters:

(A)     ...

(B)     In the case of a defined contribution plan, the annual contributions made by the employer and other additions in relation to a participant, not including contributions transferred from another qualified retirement plan, cannot exceed:

(i)     the applicable limit for determining the tax year under Section 415(c) of the Federal Code, as adjusted by the Federal Internal Revenue Service, or

(ii)     one hundred percent (100%) of the compensation paid to the participant by the employer during the calendar or plan year, at the employer's discretion. The participant's compensation shall include the contributions made by a participant into a qualified plan under a cash or deferred contributions arrangement for that year.

(C)     ...

(12)     ...

(13)     ...

(14)     Employers' Association

(A)     ...

(B)     ...

(C)     Exclusion of Government Plans. – The employer aggregation requirements under Section 1081.01(a)(13) shall not apply to retirement plans established by the Government of Puerto Rico, the United States Government or their respective municipalities, agencies, instrumentalities and public corporations.

(15)     ...

(b)     Taxes Payable by Beneficiaries

(1)     In general, the amount actually distributed or placed at the disposal of any participant or beneficiary by an employee trust exempt under Section 1081.01(a) shall be taxable

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 121 of 291
Exhibit C   Page 38 of 87

36

for said participant or beneficiary in the year in which it was so distributed or placed at their disposal and the rules of Section 1031.01(b)(11)(A) were applied to it as though it were an annuity whose price or consideration is the amount of voluntary contributions made by the participant, excluding any investment gains attributable to the same and those amounts on which the participant previously paid income tax in Puerto Rico.

      (A)    Full Distributions made prior to January 1, 2018.- If the entire amount of the benefits under the trust with regard to a participant is paid or placed at the participant's disposal or that of his or her beneficiary within a single tax year, as a result of the participant leaving public service for any reason, or the termination of the plan (hereinafter referred to for the purposes of this paragraph as a "full distribution"), the amount of said distribution, in excess of the amount contributed by the participant, on which the participant paid taxes, shall be considered a long-term capital gain subject to a tax rate of twenty percent (20%). Without prejudice to the foregoing, in the case of full distributions made by a trust as part of a pension plan, profit sharing plan or stock incentive or stock purchase plan for employees, if:

      (i)  the trust is established under the laws of the Government of Puerto Rico, or has a trustee that resides in Puerto Rico and uses said trustee as a paymaster; and

      (ii) At least ten percent (10%) of all the assets in the trust attributable to participants residing in Puerto Rico, calculated based on the average balance of the investments in the trust during the plan year in which the distribution is made and each one of the two plan years prior to the distribution date have been invested with registered investment firms organized under the Laws of Puerto Rico and taxable under Section 1112.01 of the Code, fixed or variable annuities issued by a domestic insurance company or a foreign insurance company that for three calendar years prior to the date of the distribution derived more than eighty percent (80%) of their gross income from Puerto Rican sources, deposits into interest-bearing accounts at commercial and mutualist, cooperative, savings associations authorized by the Federal Government or the Government of Puerto Rico or at any other banking organization based in Puerto Rico, including but not limited to certificates of deposit or any other property that based on regulations or circulars the Secretary qualifies as property located in Puerto Rico, then the amount of said distribution in excess of the amount contributed by the participant on which the latter paid taxes, shall be considered a long-term capital gain subject to the ten percent (10%) rate. In the case of defined contribution plans in which a separate account is maintained for each participant or beneficiary, the requirement to invest in "property located in Puerto Rico" in relation to the assets credited to the account of the participant or beneficiary may be met. In the case of transfers from a qualified plan under part (a) of this Section (the transferring plan) to another qualified plan under part (a) of this Section, the requirement to invest in property located in Puerto Rico under this subsection (B) with respect to the transferring plan must be met, taking into consideration the period of time the transferring plan or the account of the participant in the transferring plan met the investment requirement set forth in this subsection (B). The Secretary may via regulations, circular, administrative decision or final resolution determine the way in which the requirement to invest in Puerto Rico will be met.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:32-13   Affidavit 11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 39 of 87

37

(B)   Total Distributions made after December 31, 2017.- If the entire amount of the benefits under the trust with regard to a participant is paid or placed at the participant's disposal or that of his or her beneficiary within a single tax year, as a result of the participant leaving public service for any reason, or the termination of the plan (hereinafter referred to for the purposes of this paragraph as a "full distribution"), the amount of said distribution, in excess of the amount contributed by the participant, on which the participant paid taxes, shall be considered ordinary income subject to the types of contributions described in Section 1021.01. However, in the case of total distributions with respect to which the obligation to withhold at the source has been met as set forth in Section 1081.01(b)(3)(A), in addition to the deposit obligations under Section 1081.01(b)(4), instead of the tax rates provided under Section 1021.01, the twenty percent (20%) rate shall apply. However, if the requirements set forth in clauses (i) and (ii) of subsection (A) above are met, the ten percent (10%) rate will apply.

(C)   Other Distributions.- If any part of the benefits under the trust with respect to a participant are paid or placed at the disposal of the participant or his or her beneficiary via an option or form of payment or distribution that is not a full distribution or nontaxable loan, the amount of said payment or distribution, insofar as it exceeds the amount contributed by the participant, which the participant already paid taxes on, and if applicable the exempt income under Section 1031.02(a)(13), shall be considered ordinary income subject to the tax rates set forth in Section 1021.01.

(2)   Exception and Special Rule.-

(A)   The participant or beneficiary may elect to have the provisions of paragraph (1) above not to apply to that portion or to the entire full distribution that the plan of which the exempt trust is a part transfers directly or that the participant contributes to an individual retirement account or annuity under the provisions of Section 1081.02, to an individual retirement account that is non-deductible under the provisions of Sections 1081.03 or to a qualified retirement plan under the provisions of part (a) of this Section for the benefit of said participant or beneficiary no more than sixty (60) days after having received said payment or distribution. In the case of a transfer to a non-deductible individual retirement account, the exception to which this paragraph refers shall only apply to those distributions described in Section 1081.03(d)(5)(A). The foregoing notwithstanding, contributions by transfers to non-deductible individual retirement accounts are subject to taxation under Section 1081.03(d)(5) and for the purposes of this paragraph, in order to meet the criteria for the same it shall be sufficient to contribute to the non-deductible individual retirement account an amount equal to the total amount received from the qualified trust by a participant or beneficiary less the tax withheld as set forth in Section 1081.03(d)(5) as provided therein.

(B)    …

(3)    Obligation to deduct and withhold.-

(A)    Total distributions.- Any person acting in any capacity that makes total distributions payable with regard to any participant or beneficiary shall deduct and withhold from said distributions, made prior to January 1, 2018, an amount equal to twenty percent (20%) of the amount of the same in excess of the amounts contributed by the participant to the plan on which the latter has paid taxes. Said deduction and withholding shall be ten percent (10%) if the trust meets the criteria set forth in subsections (A) and (B) of paragraph (1) of this part. With the proviso that, for total distributions made after December 31, 2017, the contribution to be withheld shall be ten percent (10%). For distributions made prior to January 1, 2018, employers whose employees participate in the plan or the plan administrator shall certify to the person making such distributions from the trust that the requirement to invest in "property located in Puerto Rico" has been met. Upon receipt of said certification issued by the employer, the person making such distributions from the trust shall not be responsible for the payment of any tax, interest or penalties in the event this requirement has not been met, but he or she shall be responsible for deducting and withholding the ten percent (10%).

(B)    …

(C)    …

(D)    …

(E)    …

(i)    …

(ii)    …

(4)    Obligation to pay or deposit taxes deducted or withheld.- Anyone required to deduct and withhold any tax under the provisions of paragraph (3) and to pay said tax to the Secretary shall pay the amount of the tax that was deducted and withheld at the Internal Revenue Collection Offices of the Puerto Rican Department of the Treasury, deposit said tax in any of the depository banking institutions designated to receive public funds that have been authorized by the Secretary to receive said tax contribution, or deposit it via electronic means as instructed by the Secretary via regulations, administrative decision, circular or informative bulletin of a general nature. The tax must be paid or deposited no later than the 15th day of the month after the date on which the distribution was made.

(5)    …

(6)    …

(7)    …

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:31:05 Desc:
Affidavit Page 124 of 291
Exhibit C Page 41 of 87

39

(8)     Penalty.- In the event any person fails to deposit the taxes deducted and withheld under paragraph (3) within the time frame established by paragraph (4) of this part (b), said person shall be subject to a penalty of two percent (2%) of the amount of the shortfall if the omission is for thirty (30) days or less and two percent (2%) for each additional thirty (30) day period or fraction thereof while the omission persists, without exceeding a total of twenty-four percent (24%). For the purposes of this paragraph, the term "shortfall" means the excess amount of tax that ought to have been deposited over the amount, if any, of tax that was deposited on or before the due date. For the purposes of this paragraph, the omission shall not be deemed to persist after the date on which the tax is paid.

(9)     ...

(10)     ...

(c)     ...

(d)     Cash or Deferred Contribution Arrangement

(1)     ...

(2)     ...

(3)     Share Request and Rules Governing Discrimination

(A)     ...

...

(F)     Exclusion of Government Plans.- The rules governing discrimination in Section 1081.01 (d)(3), including the tax imposed in Section 1081.01(d)(6)(D), shall not apply to retirement plans established by the Government of Puerto Rico, the United States Government or their respective municipalities, agencies, instrumentalities and public corporations.

(4)     Other requirements.

(A)     Benefits other than matched contributions shall not be conditional upon the choice to defer.- Any employer cash or deferred payment agreement shall not be considered a qualified cash or deferred contribution agreement if any other benefit established by the employer is directly or indirectly conditional upon the employee's choice to have the employer make contributions under the plan rather than receiving them in cash. The foregoing does not apply to any matching contribution made based on said choice.

(5)     ...

(6)     ...

(7)     ...

...

(e)      …

….”

## CHAPTER 7 – FINAL PROVISIONS

**Section 7.1** – Voluntary Pre-retirement Program.

(a)     Law 211-2015, as amended, known as the "Voluntary Pre-retirement Program Act" is hereby repealed. However, all rights and obligations created under this statute are guaranteed.

(b)     The Pre-retirees who are participating in the Voluntary Pre-retirement Program at the time that this Law is enacted shall continue to benefit from it according to the provisions established under Law 211-2015, as amended.

(c)     Requests for Pre-retirement, in accordance with the Voluntary Pre-retirement Program duly submitted by the Participants on the date of approval of this Law, will continue the ordinary procedure. The review mechanisms, as provided in Law 211-2015, as amended, and any other applicable statute will be guaranteed.

(d)     Participants whose Pre-retirement benefits have previously been approved by the Office of Management and Budget, according to the provisions of Law 211-2015, as amended, shall be guaranteed the benefits of the Program.

**Section 7.2** – Preservation of Benefits.

Except as otherwise expressly provided herein, the right to receive the Accumulated Pensions, the retirement age and other benefits provided by special laws, shall not be affected by this statute and shall be guaranteed by the Government

**Section 7.3** – Incentive Programs, Opportunities and Retraining for public servants.

The AAFAF is hereby authorized to design, implement, and oversee incentivized public service voluntary separation programs, volunteer programs involving opportunities outside of public service for government employees in the Executive Branch for any employee that so requests who meets the requirements set forth in internal regulations not subject to Law 38-2017, known as the "Government of Puerto Rico Uniform Administrative Procedure Act." They may include, among other incentives, retraining programs, tax breaks up to the amount of the employee's tax liability for a certain period and/or tax breaks for private sector entities or persons who recruit and/or offer benefits to said government employees. These tax break programs will be established and implemented by the internal decision of the Secretary of the Department of the Treasury. In designing and implementing such a program, care must be taken to remain in compliance with the Fiscal Plan certified under PROMESA. The authority delegated to the AAFAF shall not include the establishment of early retirement programs or windows.

**Section 7.4** – Regulation.

All regulations, orders, resolutions, circulars, and other administrative documents governing the operation of the Retirement Systems that are in effect at the time this Law takes effect, provided they are

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 126 of 291
Exhibit C Page 43 of 87

41

consonant with it, shall remain valid until they are expressly altered, modified, amended, repealed, or replaced.

The AAFAF and the Department of the Treasury are hereby authorized to establish the necessary regulations and procedures to use the powers granted under this Law to safeguard the best interests of the Participants, Beneficiaries, and Retirees. The powers granted in this Section include the authority to take any necessary steps to ensure an orderly transition, in accordance with the provisions of this Law.

**Section 7.5 – Applicability of the Uniform Securities Act.**

The interest of any Participant in the New Defined Contribution Plan shall not constitute a security for the purposes of Law No. 60 of June 18, 1963, as amended, known as the "Uniform Securities Act."

**Section 7.6 – Loan Programs.**

All loan programs of any nature that the Retirement Systems may have had in place at the time this Law takes effect are hereby suspended. Loans that have already been granted shall be governed by the laws under which they were granted, with the proviso that the Retirement Board and the AAFAF are authorized to outsource such programs and everything related to the servicing thereof.

**Section 7.7 – Matching the Defined Contribution Account.**

The AAFAF is hereby granted the authority to determine that the fiscal situation of the Government has stabilized and that based on the condition of the treasury, upon the Governor's recommendation and in coordination with the Retirement Board, it will be possible to allocate a certain amount in the budget for the purpose of matching Participant contributions to the Defined Contribution Account. This determination must be made in accordance with the certified Fiscal Plan and the provisions of PROMESA.

**Section 7.8 – Liability.**

No natural or legal person, including officials of the Puerto Rico Government, Public Corporations and Municipalities, who carry out duties under or arising from this Law, shall enjoy immunity that frees him or her from personal liability for failure to comply with his or her duties imposed by this Law. This provision shall prevail over any other legal provision, whether special or general.

**Section 7.9 – Municipalities.**

For municipalities, the calculation of the amount to be paid shall be made excepting the uniform additional contribution.

**Section 7.10 – Supremacy.**

The provisions of this Law and any rules or regulations adopted in accordance herewith shall prevail over any other legal provision, regulation, or rule that is not in harmony with the former.

**Section 7.11 – Severability.**

If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law were to be annulled or declared

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 13:51:05   Desc:
Affidavit   Page 127 of 291
Exhibit C   Page 44 of 87

42

unconstitutional, the decision, order or judgment to such effect will neither affect, impair nor invalidate the remainder of this Law. The effect of any such order shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law so annulled or declared unconstitutional. If the application to a person or circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law, were to be annulled or declared unconstitutional, decision, order or judgment to such effect will neither affect nor invalidate the application of the remainder of this Law to such persons or circumstances to which it may be validly applied. It is the express and unequivocal intent of this Legislative Assembly that the courts of law enforce the provisions and application of this Law to the greatest possible extent, even if any of its parts is annulled, invalidated, affected, or declared unconstitutional, or even if the application thereof to any person or circumstance is annulled, invalidated, or declared unconstitutional.

**Section 7.12 – Effect.**

This Law will take effect immediately upon passage; however, the provisions that are so indicated herein shall have retroactive effect.

**(P. del S. 603)**

# LEY NUM. 106
## 23 DE AGOSTO DE 2017

Para establecer la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos", a los fines de reformar el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros, de acuerdo a la realidad económica y fiscal de Puerto Rico y a las disposiciones del Plan Fiscal para Puerto Rico, certificado conforme a las disposiciones de la Ley Pública 114-187, conocida como *"Puerto Rico Oversight, Management, and Economic Stability Act"* o *"PROMESA"*, por sus siglas en inglés; establecer que el Fondo General, a través del sistema de *"pay as you go"*, asuma los pagos que el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para Maestros y el Sistema de Retiro para la Judicatura no puedan realizar; disponer que los tres Sistemas de Retiro sigan cumpliendo con sus obligaciones hacia sus beneficiarios y pensionados aportando al Fondo General sus fondos disponibles y los fondos provenientes de las liquidaciones de sus activos; establecer el Nuevo Plan de Aportaciones Definidas y proveer para su administración; crear la Junta de Retiro, delegarle facultades y deberes; enmendar el Artículo 2 de la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como "Ley de Retiro de la Judicatura"; enmendar los Artículos 1-1.04 y 4-101, derogar los incisos 11 y 12 y renumerar los incisos 13, 14 y 15 como 11, 12 y 13, respectivamente, del Artículo 4-103 de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, conocida como "Ley del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico"; enmendar los Artículos 1.1, 2.3 y derogar los Artículos 2.4, 2.5 y 2.6 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico"; enmendar la Sección 1081.01 de la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico"; derogar la Ley 211-2015, según enmendada, conocida como "Ley del Programa de Preretiro Voluntario", garantizar los beneficios a los Preretirados y proveer para que empleados que hayan solicitado dichos beneficios pueda concluir el trámite; autorizar a la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico a diseñar, implementar y fiscalizar un programa de separación incentivada del servicio público de los empleados de la Rama Ejecutiva; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

Actualmente, Puerto Rico atraviesa una crisis fiscal y social sin precedentes. Esta crisis fue causada, en parte, porque faltaron controles sobre el gasto, medidas de desarrollo sustentable y sistemas de información gerencial que promuevan claridad y transparencia en la gestión gubernamental.

Según datos provistos por el Departamento del Tesoro Federal, Puerto Rico sufre una contracción económica cumulativa de 14.6 % en el Producto Estatal Bruto (PEB real) con una

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 130 of 291
Exhibit C   Page 47 of 87

2

predicción de una contracción adicional de 3 % para los próximos dos años. Desde principios del Siglo XXI, el Gobierno de Puerto Rico ha operado con un déficit estructural que ha sido financiado con emisiones de bonos y préstamos al Banco Gubernamental de Fomento. No obstante, la grave situación fiscal cerró el acceso del Gobierno a los mercados financieros, afectando su capacidad de obtener financiamiento a corto y a largo plazo. A consecuencia de ello, hace más de un año que el Gobierno de Puerto Rico carece de liquidez. La pasada Administración utilizó los fondos de reintegros que pertenecían a los contribuyentes, de los pagos de los contratistas, el dinero de los pensionados y préstamos intragubernamentales, para sustituir las fuentes de liquidez y hacer gastos mayores a los fondos disponibles. El Banco Gubernamental de Fomento incumplió sus obligaciones con los bonistas desde el 1 de mayo de 2016, y desde entonces no cumple su rol de proveer liquidez al Gobierno. Como si fuera poco, los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico, para Maestros y para la Judicatura están insolventes.

Como ejemplo de las políticas erradas de administración pública que nos trajeron a la presente situación fiscal, puede destacarse que desde el año 2001 al 2008 ocurrió un aumento de 64 % en los gastos de la nómina gubernamental y, a pesar de los avances para atender este problema luego de una reducción de 33 % entre los años 2009 y 2012, hubo otro aumento sustancial en el cuatrienio 2013-2016. Para financiar ese gasto desmedido, entre los años 2000 y 2008 la deuda pública aumentó en 134 %. Por otro lado, las medidas implantadas entre los años 2013 y 2016 fueron bajo la filosofía de "primero impago, luego impuestos y después recortes". Esta filosofía propició la continuación del gasto desmedido y el rechazo a políticas públicas que hubiesen permitido manejar eficientemente los asuntos fiscales del Gobierno de Puerto Rico. Esto, sin haberse concretado las acciones necesarias para lograr una mayor eficiencia operacional en el Gobierno, ni recortes al excesivo gasto gubernamental. Además, mientras se precipitaban los valores y la debacle económica, el Gobierno Central fue incapaz de generar la información financiera necesaria para analizar y comprender la profundidad del problema y presentar información certera ante el Congreso de los Estados Unidos, y ante otras entidades con interés en el asunto. A raíz de todo lo antes expuesto, se materializaron varias degradaciones consecutivas de las clasificaciones de la deuda del Gobierno de Puerto Rico y sus instrumentalidades en un periodo de tiempo corto, lo que ha desencadenado un impacto adverso a través de todos los sectores de la economía.

Esta crisis ha golpeado fuertemente a las familias puertorriqueñas. Los sacrificios más severos han recaído sobre los más vulnerables en nuestra sociedad y ha provocado que miles de puertorriqueños abandonen la Isla hacia otras jurisdicciones de Estados Unidos en busca de mejores oportunidades. La consecuente reducción poblacional se ha convertido en uno de los retos para encaminarnos hacia la recuperación.

### La Situación Colonial en Puerto Rico

La situación colonial afecta nuestra capacidad para afrontar y resolver esta crisis pues carecemos de los poderes soberanos que tiene un estado para regular sus asuntos locales bajo la Enmienda X de la Constitución de los Estados Unidos. "[P]ara el Tribunal Supremo Federal, la adopción de la Constitución no representó un cambio en la base fundamental de las relaciones constitucionales entre Puerto Rico y Estados Unidos. El Tribunal Supremo siguió tratando a Puerto Rico como un ente político sujeto a la cláusula territorial de la Constitución Federal."

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-2 Filed:11/08/17 Entered:11/08/17 15:31:05 Desc:
Affidavit Page 131 of 291
Exhibit C Page 48 of 87

3

Véase <u>Pueblo v. Sánchez Valle y otros, 192</u> D.P.R. 594, 631 (2015). "[N]unca hubo una cesión de soberanía, lo que hubo fue una delegación de poderes." *Id.* a la pág. 635. "Esa delegación de poder no constituye una renuncia irrevocable ni una terminación del poder del Congreso. El Pueblo de Estados Unidos le otorgó al Congreso, por medio de la Constitución, un poder amplio para administrar los territorios. Por esa razón, el Congreso no puede renunciar de manera irrevocable a un poder que le fue conferido por el Pueblo de Estados Unidos". *Id.* a la pág. 638.

Así pues, "el Congreso puede permitir que el Estado Libre Asociado permanezca como sistema político de forma indefinida, o por el contrario, tiene la autoridad constitucional para enmendar o revocar los poderes de administración interna que ejerce el Gobierno de Puerto Rico. Dicho de otro modo, el sistema de gobierno que rige internamente en Puerto Rico está sujeto por completo a la voluntad política y la autoridad legal del Congreso." *Id.* a la pág. 641.

La triste realidad es que la situación colonial nos coloca en un estado de indefensión tal, que ni la ciudadanía americana que atesoramos la abrumadora mayoría de los puertorriqueños y que disfrutamos desde el año 1917, está garantizada. En ese sentido, el Congreso tiene la discreción legislativa para conceder privilegios a los ciudadanos nacidos en los territorios, incluyendo la ciudadanía americana, pero ese derecho puede ser revocado en cualquier momento. De hecho, el Gobierno Federal ha sostenido ante los tribunales que en los territorios no existe un derecho a la ciudadanía, sino que se trata, más bien, de una gracia legislativa del Congreso. Véase, por ejemplo, <u>Tuaua v. United States</u>, 788 F.3d 300, (D.C. Cir. 2015).

En cuanto al asunto particular que nos ocupa, como ejemplo de las limitaciones que la situación colonial nos impone, tenemos que señalar que los estados pueden obtener las protecciones del Código de Quiebras Federal, pero Puerto Rico fue excluido de dicho estatuto y, por no tener representación plena en el Congreso, es poco o nada lo que podemos hacer al respecto. Tampoco podemos legislar una quiebra local pues la misma ley federal que no nos protege ocupa el campo y previene la legislación local. *Véase* <u>Puerto Rico v. Franklin Cal. Tax-Free Tr.</u>, 136 S. Ct. 1938 (2016) (declarando inconstitucional la "Ley para el Cumplimento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico", Ley 71-2014, conocida coloquialmente como la "Ley de Quiebra Criolla").

### El resultado directo de nuestra situación colonial: PROMESA

Las políticas del pasado, junto a nuestra indefensión colonial, llevaron al Congreso de los Estados Unidos a promulgar la ley denominada *"Puerto Rico Oversight, Management, and Economic Stability Act"* ("PROMESA", por sus siglas en inglés), Ley Pública 114-187, y delegó amplísimos poderes en una Junta de Supervisión Fiscal (en adelante "Junta de Supervisión").

Nuevamente, por no tener representación plena en el Congreso, dicha Ley se aprobó sin una verdadera participación de nuestro Pueblo. Conforme a PROMESA, las continuas acciones de planificación fiscal, las acciones presupuestarias, legislativas y ejecutivas de Puerto Rico, así como las reestructuraciones de deuda, consensuales o no, y la emisión, garantía, intercambio, modificación, recompra o redención de deuda están sujetas a supervisión del ente creado a esos fines.

La Sección 4 de PROMESA dispone claramente que sus disposiciones prevalecerán sobre cualquier disposición específica o general de las leyes territoriales, estatales o reglamentos territoriales o estatales que sea incompatible con esta Ley. De esta manera, el Congreso de los

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 16:15:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 132 of 291
Exhibit C Page 49 of 87

4

Estados Unidos de forma expresa, hizo manifiesta su intención de que dicha Ley desplazaría cualquier legislación estatal que choque con PROMESA. Esto queda igualmente reconocido en la Sección 8(2) de PROMESA, la cual establece que el Gobierno de Puerto Rico no puede adoptar, implementar o hacer cumplir cualquier estatuto, resolución, política o regla que pueda menoscabar o anular los propósitos de PROMESA, según lo determine la Junta de Supervisión. Así pues, estamos imposibilitados de promulgar legislación que deje sin efecto a PROMESA, o que menoscabe sus disposiciones y su alcance.

En esta coyuntura, precisa resaltar que, bajo la Décima Enmienda de nuestra Constitución Federal, el Gobierno Federal, no puede imponerle a un estado lo que la Ley Federal PROMESA permite para los territorios. Por eso el Congreso pudo imponer una Junta a Washington, DC, que no es estado, y que está bajo la jurisdicción directa del Congreso. Del mismo modo, la Junta que operó en la ciudad de New York fue una creación de su propia legislatura estatal y no del Congreso. Detroit, que es una ciudad y no un estado, participó de un proceso voluntario de quiebra. En fin, no puede perderse de vista que la situación que atravesamos y la imposición de la Junta de Supervisión es otra de las consecuencias de nuestra situación colonial que ha limitado nuestro desarrollo por más de quinientos años y que no tuvo cambio alguno con la adopción de la Constitución de Puerto Rico en el año 1952, según autorizada por el Congreso.

Lamentablemente, nuestra situación colonial y consustancial carencia de poderes políticos, exacerba la realidad de que nos han impuesto una ley federal que es suprema a toda legislación local, incluso nuestra Constitución, sin que tuviéramos la oportunidad de votar sobre la misma, ni votar por el Presidente que la aprobó. Esto pone de manifiesto que para poder salir del atolladero económico en el que nos encontramos es imprescindible solucionar el problema del estatus político. Sin embargo, también es un hecho irrefutable que tenemos que trabajar dentro de los parámetros de PROMESA para iniciar la recuperación económica y fiscal de Puerto Rico.

El 30 de octubre de 2016, la Junta de Supervisión designó al Gobierno de Puerto Rico, al Sistema de Retiro de los Empleados del Gobierno, al Sistema de Retiro para la Judicatura, al Sistema de Retiro para Maestros, a la Universidad de Puerto Rico y 21 corporaciones públicas de Puerto Rico como "entidades cubiertas", sujetas a supervisión fiscal a tenor con PROMESA. La Sección 405(b) de PROMESA impuso una paralización temporera de los litigios y las reclamaciones contra el Gobierno de Puerto Rico y sus instrumentalidades sobre distintos asuntos, con la esperanza de que el Gobierno de Puerto Rico, a nombre propio y a nombre de sus instrumentalidades, estableciera negociaciones voluntarias con sus acreedores para reorganizar y transigir el repago de sus obligaciones de deuda y simultáneamente emprendiera una reestructuración responsable del Gobierno de Puerto Rico y sus instrumentalidades que reajuste los servicios esenciales requeridos para la salud, seguridad y bienestar de los residentes de Puerto Rico con el repago puntual de sus obligaciones de deuda. El término de esa paralización venció el 1 de mayo de 2017. Luego de vencido este término, ya este asunto se está ventilando en diferentes foros federales, incluyendo el Tribunal Federal para el Distrito de Puerto Rico.

Luego de invertir millones de dólares en consultores especializados, la pasada Administración presentó en el año 2016 un plan fiscal deficiente, que fue rechazado por la Junta de Supervisión de forma inmediata, pues no resolvía los problemas fiscales provocados por la pasada Administración.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:46:15   Desc:
Case:17-00219-LTS   Doc#:39-2   Filed:11/08/17   Entered:11/08/17 15:31:05   Desc:
Affidavit   Exhibit C   Page 50 of 87

5

## Un Nuevo Gobierno: Responsabilidad ante la Junta de Supervisión

Como resultado de todo lo anterior, cuando asumimos las riendas del Gobierno el 2 de enero de 2017, encontramos un déficit en caja de más de $7,600 millones, según certificado por el Tesoro Federal y la Junta de Supervisión. Se trataba de un Gobierno sin acceso a los mercados de capital, con un crédito de categoría chatarra, sin liquidez, sin transparencia en las finanzas públicas, con un gasto gubernamental exagerado y con deudas de miles de millones de dólares. Además, el gobernador Ricardo A. Rosselló Nevares, enfrentaba la titánica tarea de recuperar la credibilidad ante los mercados financieros y ante la Junta de Supervisión.

Es nuestra responsabilidad garantizar un Gobierno donde los gastos respondan a la realidad de los ingresos. Por eso, desde comienzos de la presente Administración, hemos estado implementando un plan concertado para controlar el gasto gubernamental, reactivar nuestra economía y facilitar las condiciones para la creación de más y mejores empleos en el sector privado. El 28 de febrero de 2017, el Gobernador presentó un Plan Fiscal completo, abarcador, real y, a la vez, sensible a las necesidades de nuestro Pueblo y de los más vulnerables. El 13 de marzo de 2017, la Junta de Supervisión aceptó y certificó el Plan Fiscal, acompañado de una serie de contingencias que garantizan que no habrá despidos de empleados públicos, sin afectar la jornada laboral, manteniendo el acceso a servicios de salud a nuestro Pueblo y protegiendo las pensiones de los más vulnerables. El Plan Fiscal Certificado es la única alternativa para evitar el despido de empleados públicos, la eliminación del derecho a la salud, cumplir con los pensionados, manteniendo un Gobierno operacional y que cumpla con los parámetros para evitar medidas más severas que son parte de las contingencias del Plan Fiscal Certificado aprobadas por la Junta de Supervisión.

La validación del Plan Fiscal representa un reconocimiento a la credibilidad del nuevo Gobierno. Los cambios que estamos encaminando no serán fáciles y tomarán tiempo, pero también tendrán sus resultados en los primeros dos años de su implementación. Ahora nos compete ejecutar las contingencias que el Plan Fiscal le requieren al Gobierno cumplir. Debemos asegurar que tengamos el dinero accesible y líquido para no afectar el salario de los empleados públicos, la salud del Pueblo y los ingresos de los pensionados.

Esta Ley persigue salvaguardar el bienestar de nuestros pensionados y servidores públicos, mientras damos fiel cumplimiento al Plan Fiscal Certificado por la Junta de Supervisión. La misma se promulga para atemperar el marco legal y jurídico para poder cumplir con las exigencias que nos hiciera la Junta de Supervisión en el Plan Fiscal aprobado en virtud de la Ley Federal PROMESA. En atención a lo anterior, en virtud del poder de razón de Estado y de conformidad con el Artículo II, Secciones 18-19, y el Artículo VI, Secciones 7-8, de la Constitución de Puerto Rico, ante la existencia de una situación de urgencia económica y fiscal grave en Puerto Rico, se hace necesaria la aprobación de la presente Ley para que el Estado pueda financiar los beneficios de pensión de los servidores públicos que ya se acogieron al retiro o que lo harán en el futuro. Ejercemos este poder de razón de Estado para tomar las medidas necesarias para dar cumplimiento al Plan Fiscal y colocar a Puerto Rico en el camino de la recuperación económica. Cumplir con este Plan constituye un interés apremiante del Estado para mantener sus operaciones y proteger a los más vulnerables.

Según definido por el Tribunal Supremo de Puerto Rico, el poder de razón de Estado es "aquel poder inherente al Estado que es utilizado por la Legislatura para prohibir o reglamentar

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:03 Desc:
Affidavit Page 134 of 291
Exhibit C Page 51 of 87

6

ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios". Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Nuestro más Alto Foro dispuso que eran válidas las medidas tomadas para atender una emergencia que sean necesarias y razonables para adelantar el interés gubernamental importante. Véase, Trinidad v. E.L.A., 188 D.P.R. 828 (2013) y Domínguez Castro v. E.L.A., supra, págs. 88-89. De igual forma, el Tribunal Supremo reconoció "la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado" y que en el ejercicio de dicho poder, "la Legislatura goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad". Domínguez Castro v. E.L.A., supra, pág. 37. Por voz del Juez Asociado, señor Kolthoff Caraballo, el Tribunal llamó la atención a que tanto nuestra jurisdicción como el resto del mundo "vive momentos muy convulsos en el aspecto económico y financiero. Parecería que las economías de los países del mundo se encuentran entrelazadas y atadas al rabo de una chiringa que no consigue finalmente elevarse." Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 415 (2010) certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). De ese modo, el Tribunal Supremo reconoció que debía ser consciente que existía una realidad que describió como "dura y antipática". Confrontado con tal escenario histórico, nuestro Tribunal estimó que resultaba necesario aspirar a un interés altruista en el que se persiguió el "bienestar económico colectivo, a expensas del bienestar individual." Además, este Tribunal reiteró el reconocimiento en torno a una crisis económica en nuestra jurisdicción en el caso Herrero y otros v. E.L.A., 179 D.P.R. 277 (2010) y destacó, en el contexto de la provisión de un remedio que implicaba desembolso de fondos públicos a fin de restituir dinero a contribuyentes, que no estaba "ajeno al difícil estado de las finanzas públicas en nuestro país". Id. a la pág. 309.

El Tribunal Supremo validó la Ley 3-2013, según enmendada, sobre el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico en el caso Trinidad Hernández v. E.L.A., supra, entendiendo que la Legislatura había ejercido el poder de razón de Estado para detener la insolvencia del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico. El Tribunal Supremo razonó que "de la exposición de motivos... se desprende que las medidas adoptadas son necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema". Añadió que, "ello ciertamente constituye un interés público importante pues, al garantizar la solvencia económica del sistema, se beneficia a todos sus Participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños". Trinidad Hernández v. E.L.A., supra, pág. 837. Concluyó que la norma es constitucional "porque, a pesar de que existe un menoscabo sustancial de las obligaciones contractuales en controversia, las medidas implantadas son razonables y necesarias para salvaguardar la solvencia actuarial del Sistema de Retiro, y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 839.

Del mismo modo, en el caso Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico, 190 D.P.R. 854 (2014), el Tribunal Supremo pasó juicio sobre las medidas aprobadas mediante la Ley 160-2013 para solventar la crisis del Sistema de Retiro para Maestros y determinó que la Ley no adelantaba el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema. Por ello, resolvió que la Ley 160–2013, en lo que respecta al

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 135 of 291
Exhibit C   Page 52 of 87

7

menoscabo de obligaciones contractuales, es irrazonable y, por lo tanto, inconstitucional. Íd., pág. 12. En esa ocasión, el Tribunal fue enfático al destacar que las medidas aprobadas serán constitucionales si son razonables y necesarias "para adelantar su solvencia actuarial y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 8.

Usando como base el marco legal antes discutido, esta Asamblea Legislativa entiende que las medidas que se toman en esta Ley, son necesarias y razonables para atender de forma adecuada la crisis fiscal e insolvencia actuarial que enfrentan los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico, para la Judicatura y para Maestros. Así mismo, se trata de la creación del marco legal que permitirá cumplir con las disposiciones y metas relacionadas a los Sistemas de Retiro incluidas en el Plan Fiscal certificado por la Junta de Supervisión de conformidad con la Ley Federal PROMESA. Dicho Plan establece ajustes de índole fiscal para estabilizar las finanzas del Gobierno en tiempos que no existe acceso al mercado financiero. De no implementar estas medidas, el bienestar social y económico de Puerto Rico sufrirá daños irreparables por lo que implementar esta reforma como parte del Plan Fiscal constituye un interés apremiante del Estado para velar por el bienestar del interés público.

### Reestructuración Gubernamental

Por otro lado, el Plan para Puerto Rico que impulsa esta Administración y que fue refrendado por el Pueblo de Puerto Rico en las pasadas elecciones generales por medio del ejercicio democrático del voto, propone implementar una nueva estructura de gobierno que baje significativamente el gasto público y mejore sustancialmente sus funciones. Para lograr esto, se requiere la evaluación concienzuda de los servicios que provee el Gobierno, a fin de determinar cuáles pueden ser consolidados, delegados al sector privado o eliminados porque ya no son necesarios. Todo ello, sin que conlleve despidos de empleados públicos, sino la movilización de los mismos, acorde con la necesidad de servicios de nuestros ciudadanos.

Cónsono con lo anterior y, como parte de las primeras medidas tomadas por esta Administración para atajar la crisis fiscal mediante la reingeniería de la estructura gubernamental, se aprobó la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico". Esta Ley, convierte al Gobierno en un Empleador Único para que los funcionarios públicos pasen a ser empleados del Gobierno y no de sus diferentes entidades, permitiendo así la mejor utilización de los recursos humanos donde exista una necesidad apremiante mediante el mecanismo de movilidad, sin que el empleado tenga que renunciar al puesto que ocupa y comenzar de nuevo en otra instrumentalidad gubernamental. Mediante la movilidad, se pretende reforzar el entendimiento de lo que significa el equilibrio entre la fuerza laboral y la prestación de servicios públicos. De esta manera, obtenemos una distribución eficiente del recurso humano del Gobierno y creamos una estructura gubernamental ágil, basada en la evaluación continua de necesidades y ayudando a los servidores públicos a realizar los ajustes y adaptaciones requeridas por la actual crisis fiscal y los retos futuros.

### PROMESA y la Cláusula de Supremacía

Por otra parte, es importante recalcar la aplicación y el mandato que el Congreso de los Estados Unidos de América, en virtud de sus poderes plenarios sobre el Territorio de Puerto Rico, nos impuso cuando aprobó PROMESA que crea la Junta de Supervisión a la cual, dentro

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-2 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Exhibit C Page 53 of 87

8

de una serie de encomiendas, le confirió la de aprobar y supervisar la ejecución de un Plan Fiscal para la estabilización económica de Puerto Rico.

Dicha norma aprobada el 4 de mayo de 2016, establece una cláusula de supremacía que citamos:

> Sec. 1 "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA". (SEC. 4. SUPREMACY. **The provisions of this Act shall prevail over any general or specific provisions of territory law,** State law, **or regulation that is inconsistent with this Act.** (Énfasis nuestro).

Conforme al Art. 101 de PROMESA, la Junta de Supervisión, a su plena discreción, en el momento que considere apropiado, podrá designar a cualquier instrumentalidad territorial como una instrumentalidad territorial cubierta y sujeta a las obligaciones de la referida Ley. Al momento, la Junta de Supervisión ha designado todas las corporaciones públicas como entidades cubiertas. Por otro lado, conforme al Artículo 205 de PROMESA, la Junta de Supervisión podrá someter en cualquier momento recomendaciones al Gobernador o a la Legislatura sobre acciones que el Gobierno territorial deba tomar para garantizar el cumplimiento del Plan Fiscal o para promover de alguna otra manera la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la prestación de servicios. Hechas las recomendaciones, el Gobernador tendrá que someter una declaración indicando si el Gobierno adoptará la recomendación. Si no la adopta, el Gobernador deberá explicar al Presidente de los Estados Unidos y al Congreso sus razones para no adoptarlas.

Recordemos que PROMESA goza de supremacía sobre cualquier legislación del territorio de Puerto Rico incompatible con los motivos, responsabilidades, encomiendas y objetivos que tiene la norma federal y la Junta de Supervisión como ente encargado de su ejecución.

Usando como base este marco legal, esta Asamblea Legislativa está convencida que las medidas que se toman en esta Ley son necesarias y razonables para atender de forma adecuada la crisis fiscal y solvencia actuarial de los Sistemas de Retiro y representan un ejercicio legislativo válido. Además, esta Asamblea Legislativa está comprometida con cumplir fielmente con el Plan Fiscal certificado por la Junta de Supervisión Fiscal el pasado 13 de marzo de 2017. En particular, esta legislación está anclada en las disposiciones sobre reforma de pensiones incluidas en el Plan Fiscal, según se expone a continuación:

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:393   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 137 of 291
Exhibit C   Page 54 of 87

9



## Los Sistemas de Retiro

El Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para Maestros del Gobierno de Puerto Rico y el Sistema de Retiro para la Judicatura de Puerto Rico (en conjunto "los Sistemas de Retiro") confrontan una grave emergencia fiscal, toda vez que sus activos líquidos están próximos a terminarse y próximamente los mismos no tendrán los recursos necesarios para pagar sus obligaciones con los pensionados.

Esta crisis comenzó hace décadas y se ha agravado con el pasar de los años, hasta llegar a la emergencia actual. Para intentar resolver la misma, el Gobierno ha reformado los Sistemas de Retiro en varias ocasiones. Entre éstas, en el año 2000, bajo la Administración del Dr. Pedro Rosselló, se reformó el Sistema de Retiro de los Empleados del Gobierno y se estableció un plan de contribución definida, mejor conocido como "Reforma 2000", para los empleados públicos que comenzaron a cotizar a partir del 1 de enero de 2000. Además de esa reforma, la cual fue positiva para nuestros servidores públicos, la Administración del Dr. Pedro Rosselló le inyectó al Sistema de Retiro de los Empleados del Gobierno de Puerto Rico cientos de millones de dólares para ayudar a paliar el déficit actuarial.

Durante las Administraciones de la gobernadora Sila M. Calderón y el gobernador Aníbal Acevedo Vilá, la salud fiscal de los Sistemas de Retiro continuó empeorando. A modo de ejemplo, podemos mencionar las nefastas consecuencias que tuvieron para el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico las emisiones de bonos que se realizaron en el año 2008.

Bajo el mandato del gobernador Luis G. Fortuño Burset, se aumentaron las aportaciones patronales a los Sistemas de Retiro para ayudar a solventar los mismos. Posteriormente, en el 2013, se hizo otra reforma significativa a los Sistemas de Retiro para intentar salvarlos. Esa reforma fue nefasta para nuestros servidores públicos, pues redujo significativamente sus beneficios, aumentó la edad de retiro y alteró las condiciones bajo las cuales éstos se pueden

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Page 138 of 291
Exhibit C Page 55 of 87

10

retirar. Como si fuera poco, la Administración del gobernador Alejandro García Padilla se comprometió a hacer aportaciones adicionales a los Sistemas de Retiro a través del establecimiento de la Aportación Adicional Uniforme a las corporaciones públicas, entre otras, pero incumplieron, lo que continuó empeorando la salud fiscal de los Sistemas de Retiro. Es decir, durante el cuatrienio pasado, le redujeron beneficios a nuestros servidores públicos y no se cumplieron con las obligaciones del Gobierno a dichos Sistemas.

Debido a múltiples razones, entre éstas: aportaciones inadecuadas, aprobación de leyes especiales, programas de retiro temprano, cambios en la expectativa de vida de los Participantes, inversiones fallidas, mala administración, emisiones de bonos que no resultaron en beneficios,[1] las distintas reformas no funcionaron y no fueron suficientes para salvar a los Sistemas de Retiro. Consecuentemente, en estos momentos se encuentran al borde de la insolvencia, lo que significa que el pago de las pensiones a nuestros retirados está seriamente amenazado si no actuamos con prontitud. Es menester mencionar que tanto el Gobierno Central, como el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico se encuentran actualmente en un proceso de reestructuración bajo el Título III de PROMESA.

A pesar de que las reformas que se han hecho no han sido efectivas, dejar de actuar no es una opción. El bienestar de los servidores públicos y de nuestros retirados es una prioridad para esta Administración. No obstante, las medidas que puede tomar el Gobierno deben evaluarse y enmarcarse en el contexto histórico por el que atravesamos. Como se indicó anteriormente, Puerto Rico atraviesa por la crisis fiscal más grande y severa en su historia moderna. Ello llevó al Gobierno Federal a aprobar PROMESA y a establecer una Junta de Supervisión para la Isla. Conforme a dicho estatuto, se certificó un Plan Fiscal para el Gobierno de Puerto Rico, el cual establece los parámetros a seguirse para alcanzar la responsabilidad fiscal. Los presupuestos aprobados de ahora en adelante deben estar totalmente alineados con dicho Plan Fiscal certificado. De lo contrario, la Junta de Supervisión tiene el poder y la autoridad de tomar medidas correctivas. Nuestro norte siempre será que sea el Gobierno local electo quien tome las decisiones por Puerto Rico, por difíciles que sean. Dejar el poder decisional en manos de una entidad que no fue electa por el Pueblo no es una opción.

Dentro de ese cuadro, se han analizado con sumo detenimiento las alternativas disponibles y viables para atender la crisis actual de los Sistemas de Retiro. Primero, debido a la insolvencia inminente de los mismos, esta Asamblea Legislativa considera razonable y necesario que el Fondo General asuma la responsabilidad y pague las cantidades que los Sistemas de Retiro no puedan asumir para hacer los pagos correspondientes a nuestros pensionados. Para este año fiscal 2017-2018, el Fondo General estará desembolsando aproximadamente $2,000 millones para el pago de las Pensiones Acumuladas de nuestros servidores públicos (esto representa un aumento significativo, pues antes del 1 de julio de 2017, el Gobierno apenas realizaba aportaciones patronales anuales de alrededor de $660 millones en aportaciones). Esto demuestra el compromiso de esta Administración con nuestros pensionados. De lo contrario, nuestros retirados se quedarían desprovistos de sus pensiones, con las consecuencias que ello supone para ellos, así como para el Gobierno y la sociedad en general.

---

[1] Para una discusión en detalle sobre este asunto, véase los tres (3) informes presentados por la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico con relación a la Resolución de la Cámara 417 de 2009.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 18:51:05   Desc:
Affidavit   Page 139 of 291
Exhibit C   Page 56 of 87

11

A esos fines, se establece mediante esta legislación el sistema conocido en inglés como *"pay as you go"*, a través del cual se continuarán realizando los desembolsos para todas las pensiones actuales de los Sistemas de Retiro utilizando para ello los fondos del Fondo General, según contemplado en el Plan Fiscal certificado, así como las transferencias que continuarán haciendo los Sistemas de Retiro de sus fondos disponibles, así como del producto de la liquidación de sus activos. Segundo, debido al impacto y carga tan grande que lo anterior supone sobre los fondos disponibles en el Fondo General, esta Asamblea Legislativa entiende necesario y razonable eliminar las aportaciones patronales que el Gobierno viene obligado a hacer a favor de los Sistemas de Retiro en este momento. Tercero, esta Asamblea Legislativa considera necesario y razonable establecer prospectivamente un Nuevo Plan de Aportaciones Definidas, el cual se nutrirá con las aportaciones que realicen los servidores públicos. Así, salvaguardamos las aportaciones que estos realizan para su retiro. De esta forma, éstos podrán gozar de un retiro digno, sin que esto limite la capacidad del Gobierno Central de proveer servicios esenciales a la ciudadanía, ni requiera la implantación de medidas que afecten a los más vulnerables. Las bases para ese nuevo sistema de aportaciones definidas comenzaron a establecerse con la aprobación por esta Legislatura de las Resoluciones Conjuntas de la Cámara 186, 187 y 188 de 2017.

Consciente del estado de emergencia que atraviesan los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico, que afecta a los servidores públicos en las agencias del Gobierno Central, los municipios, las corporaciones públicas, los maestros y los jueces, esta Asamblea Legislativa, en el ejercicio del poder de razón del Estado, adopta la presente reforma en aras de proteger las pensiones de los servidores públicos que aportaron al desarrollo de la sociedad puertorriqueña, al tiempo que protegemos la capacidad del Gobierno de proveer servicios esenciales a la ciudadanía.

En síntesis, mediante esta Ley se salvaguarda que los pensionados de Puerto Rico reciban las pensiones que con tanto sacrificio y esfuerzo lograron obtener al entregar sus mejores años al servicio del Pueblo de Puerto Rico. El Fondo General de Puerto Rico asumirá el pago total de dichas pensiones, luego de la liquidación de los activos de los Sistemas de Retiro, teniéndose que destinar más de dos (2) billones de dólares para dicho encomiable esfuerzo. En un espíritu de solidaridad y agradecimiento, la actual fuerza laboral de Puerto Rico no permitirá que nuestros retirados queden desprovistos de sus necesidades básicas y no puedan tener una mejor calidad de vida. La presente legislación es un ejemplo de anteponer los intereses colectivos sobre los individuales y de tener lealtades a causas más grandes y nobles que las propias. Con abnegación y sacrificio, el Gobierno de Puerto Rico no escatimará recursos para garantizar las pensiones de nuestros ya retirados. Nuestra deuda hacia ellos es un compromiso ineludible.

Por otra parte, mediante esta legislación, le hemos impuesto parámetros y controles a los administradores de los fondos de retiro de los actuales Participantes y servidores públicos. No podemos permitir que los Participantes sean víctimas de administradores de fondos de retiro sin experiencia y sin delimitaciones impuestas por ley que puedan poner en riesgo las inversiones de nuestros tan valiosos servidores públicos. Además, hemos establecido penalidades y sanciones rigurosas contra los jefes de agencia o funcionarios públicos que no cumplan con sus deberes ministeriales de remitir a tiempo las aportaciones a las cuentas de los Participantes. Hoy más que nunca, no podemos permitir que el deficiente descargo de funciones ministeriales ponga en riesgo el digno retiro de miles de empleados públicos y otros empleados cobijados por los tres Sistemas de Retiro. Por otro lado, ninguna persona, natural o jurídica, tendrá inmunidad ante la

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:391-1   Filed:11/08/17   Entered:11/08/17 13:55:05   Desc:
Affidavit   Page 140 of 291
Exhibit C   Page 57 of 87

12

ley sobre algún acto intencional o negligencia que ponga en riesgo el sustento futuro de miles de servidores públicos.

Por todo lo antes esbozado, reconocemos y asumimos los grandes retos que enfrentan nuestros sistemas de retiro mediante una política pública que garantizará y defenderá las pensiones que hoy se devengan, a toda costa. También, se crea un nuevo sistema de aportaciones definidas, el cual le dará causas de acción a los Participantes para defender sus aportaciones y donde se le impondrá requisitos de vasta experiencia y competencia a los administradores de las inversiones de nuestros servidores públicos.

## DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:

## CAPÍTULO 1 - DISPOSICIONES GENERALES

**Artículo 1.1 -** Esta Ley se conocerá como la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos".

**Artículo 1.2 -** Primacía de esta Ley.

Esta Ley se aprueba en el ejercicio del poder de razón del Estado, así como en la facultad constitucional que tiene la Asamblea Legislativa, reconocida en el Artículo II, Secciones 18 y 19 de la Constitución de Puerto Rico, de aprobar leyes en protección de la vida, la salud y el bienestar del Pueblo, así como en casos de grave emergencia cuando estén claramente en peligro la salud, la seguridad pública o los servicios gubernamentales esenciales, así como al amparo de la Secciones 7 y 8 del Artículo VI de la Constitución de Puerto Rico. Por esta razón, esta Ley tendrá supremacía sobre cualquier otra ley estatal.

**Artículo 1.3 -** Declaración de Estado de Emergencia de los Sistemas de Retiro.

Por la presente se determina y declara que el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para la Judicatura del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros del Gobierno de Puerto Rico se encuentran en un estado de emergencia financiera. A consecuencia de este estado de emergencia financiera, se estima que para agosto de 2017 el Sistema de Retiro de los Empleados del Gobierno no tendrá fondos líquidos para cumplir con sus obligaciones. Del mismo modo, se estima que el Sistema de Retiro para Maestros quedará sin fondos líquidos en septiembre de 2017 y que el Sistema de Retiro para la Judicatura no tendrá fondos líquidos suficientes para febrero de 2018.

La situación financiera de estos tres Sistemas de Retiro gubernamentales en Puerto Rico fue una de las razones para que el Gobierno Federal aprobara la Ley conocida como *"Puerto Rico Oversight, Management, and Economic Stability Act"*, Pub. L. 114-187 (PROMESA). Dicha Ley establece, entre otras cosas, medidas para asistir al Gobierno de Puerto Rico y sus instrumentalidades a alcanzar la responsabilidad fiscal y acceder a los mercados de capital. El 13 de marzo de 2017, la Junta de Supervisión Fiscal creada por PROMESA, aprobó y certificó el Plan Fiscal para el Gobierno de Puerto Rico.

El 21 de mayo de 2017, la Junta de Supervisión Fiscal, en representación del Gobierno de Puerto Rico, presentó una petición para que el Sistema de Retiro de Empleados del Gobierno de

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Page 141 of 291
Exhibit C Page 58 of 87

13

Puerto Rico se acogiera a las protecciones del Título III de PROMESA. Con la presentación de la petición bajo el Título III de PROMESA, se inició un proceso de restructuración de las obligaciones de dicho sistema bajo la supervisión del Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico. Ante esta situación, de forma inmediata se deben tomar medidas razonables y necesarias para asegurar que los pensionados continúen recibiendo sus pensiones, se protejan las aportaciones individuales de nuestros servidores públicos y se proteja el futuro de los mismos.

Ya en el pasado se intentó reformar en varias ocasiones estos tres Sistemas de Retiro. Las medidas tomadas no funcionaron y resultaron insuficientes, lo que ha llevado a que los mismos se encuentren virtualmente insolventes. Además, debido a la actual grave crisis fiscal que enfrenta Puerto Rico, el Gobierno se ve impedido de solventar los tres Sistemas de Retiro. Por consiguiente, resulta necesario y razonable que la Cuenta para el Pago de las Pensiones Acumuladas, la cual se nutrirá en gran medida del Fondo General, a través del mecanismo de *"pay as you go"*, asuma los pagos que los tres Sistemas de Retiro no puedan realizar. Los tres Sistemas de Retiro deben seguir cumpliendo con sus obligaciones hacia sus beneficiarios aportando al Fondo General sus fondos disponibles y los fondos provenientes de las liquidaciones de sus activos, exceptuando el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar. De igual forma, se eliminan las aportaciones patronales, y aportaciones análogas, que se realizan a los tres Sistemas de Retiro debido al peso que supone sobre el Fondo General realizar los pagos correspondientes a los pensionados y desembolsar simultáneamente dichas aportaciones, conforme se estableció en la Resoluciones Conjuntas de la Cámara Núm. 186, 187 y 188 de 2017. Además, como medida correctiva, se tienen que segregar y proteger las aportaciones de los servidores públicos y establecer un Nuevo Plan de Aportaciones Definidas que asegure el futuro de nuestros servidores públicos. De esta forma, se toman medidas que se ajustan a la realidad fiscal que vivimos y que no afectan la capacidad del Gobierno de proveer servicios esenciales a la ciudadanía.

**Artículo 1.4 -** Política Pública.

Se declara como política pública del Gobierno de Puerto Rico la protección de las pensiones de todos los retirados del servicio público que fueron Participantes en los tres Sistemas de Retiro mencionados anteriormente. Por ello, a partir del 1 de julio de 2017, conforme a la Resolución Conjunta de la Cámara Núm. 188 de 2017, según certificada por la Junta de Supervisión Fiscal el 13 de julio de 2017, el Gobierno de Puerto Rico se convirtió en el pagador directo de las pensiones de nuestros retirados. Ante el peso que ello supone sobre el Fondo General, el cual se estima en miles de millones de dólares al año, se eliminaron las aportaciones patronales que se realizaban hasta ese momento a los tres Sistemas de Retiro, así como la Aportación Adicional Uniforme, conforme a lo dispuesto en la Resoluciones Conjuntas de la Cámara Núm. 186, 187 y 188 de 2017. Los Sistemas de Retiro deberán aportar sus fondos disponibles y el producto neto de la liquidación de sus activos al Fondo General para ayudar al pago de las Pensiones Acumuladas, exceptuando el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar. Una vez los Sistemas de Retiro agoten sus activos, la Cuenta para el Pago de las Pensiones Acumuladas, la cual se nutrirá en gran medida del Fondo General, según dispuesto en esta Ley, asumirá y garantizará el pago de las Pensiones Acumuladas conforme se establece en esta Ley. No obstante, los Municipios, la Rama

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 13:51:05   Desc:
Affidavit   Page 142 of 291
Exhibit C   Page 59 of 87

14

Legislativa, las Corporaciones Públicas, el Gobierno y la Administración de los Tribunales estarán obligados a pagar el Cargo "Pay-Go" según corresponde a cada uno para nutrir la Cuenta para el Pago de las Pensiones Acumuladas.

Igualmente, se declara como política pública proteger el futuro de nuestros servidores públicos. Mediante esta Ley nos aseguramos que éstos puedan tener un retiro digno, libre de incertidumbre, segregando sus aportaciones personales, garantizando las mismas y estableciendo un nuevo plan de aportaciones definidas, en fideicomiso o instrumento similar que les permitirá proteger y garantizar sus aportaciones en cuentas separadas.

**Artículo 1.5** – Aplicabilidad de esta Ley a los Sistemas de Retiro.

Esta Ley será de aplicación al Sistema de Retiro de los Empleados de Gobierno de Puerto Rico y al Sistema de Retiro para Maestros de Puerto Rico. Con relación al Sistema de Retiro para la Judicatura, únicamente le serán de aplicación las disposiciones del Capítulo 2, exceptuando lo dispuesto en el Artículo 2.6, de esta Ley que establecen el sistema *"Pay as you Go"*, sujeto a lo que se dispone más adelante. Asimismo, el Sistema de Retiro para la Judicatura deberá cumplir con todo lo dispuesto en dicho Capítulo con relación a los Sistemas de Retiro.

**Artículo 1.6** - Definiciones.

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación a menos que del contexto surja claramente otro significado. Los tiempos usados en el presente incluyen también el futuro, y el género masculino incluye el femenino, salvo en aquellos casos que tal interpretación resultase absurda. El número singular incluye el plural y el plural el singular.

(a) **AAFAF:** la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico creada por la Ley 2-2017.

(b) **Administradores de los Sistemas de Retiro:** el Administrador del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico según establecido por la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, y el Director Ejecutivo del Sistema de Retiro para Maestros de Puerto Rico, según establecido por la Ley 160-2013.

(c) **Aportaciones Adeudadas:** cantidades que el Gobierno, los Municipios, las Corporaciones Públicas y otras entidades consideradas patronos bajo cualquiera de los Sistemas de Retiro cobijados por esta Ley le adeuden a los Sistemas de Retiro, a la Cuenta para el Pago de las Pensiones Acumuladas y/o al Nuevo Plan de Aportaciones Definidas.

(d) **Aportaciones Individuales:** aquellas cantidades que se hayan descontado o se descontarán de la retribución base percibida por el Participante, para ser acreditadas a su Cuenta de Aportaciones Definidas, según definidas en el Artículo 1.6(u).

(e) **Beneficiario:** toda persona que recibe cualquier pensión, anualidad o beneficio, según dispuesto en esta Ley.

(f) **Cargo Administrativo:** cargo que podrá establecer y cobrar la Junta de Retiro, o su designado, y que deberán pagar el Gobierno, la Rama Judicial, la Rama Legislativa, las Corporaciones Públicas y aquellas otras entidades consideradas patrono bajo los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros de conformidad con esta Ley para financiar las operaciones del Nuevo Plan de

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 143 of 291
Exhibit C Page 60 of 87

15

Aportaciones Definidas y/o la Cuenta para el Pago de las Pensiones Acumuladas; excepto los Municipios.

(g) **Cargo "Pay-Go":** cargo que establecerá e impondrá la AAFAF y que deberán pagar el Gobierno, los Municipios, la Rama Judicial, la Rama Legislativa, las Corporaciones Públicas y aquellas otras entidades consideradas patrono bajo los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros de conformidad al Capítulo 2 de esta Ley. Este cargo será cobrado por el Secretario de Hacienda o su designado, de acuerdo a lo establecido en esta Ley.

(h) **Código:** la Ley 1-2011, según enmendada, conocida como "Código de Rentas Internas para un Nuevo Puerto Rico".

(i) **Cuenta de Aportaciones Definidas:** cuenta en fideicomiso, separado de los activos generales y cuentas del Gobierno, que se creará a partir del 1 de julio de 2017 a nombre de cada Participante, conforme a lo establecido en el Capítulo 3 de esta Ley.

(j) **Cuenta para el Pago de las Pensiones Acumuladas:** cuenta en fideicomiso, separado de los activos generales y cuentas del Gobierno, designada para pagar las Pensiones Acumuladas por el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para Maestros y el Sistema de Retiro para la Judicatura bajo el esquema de "*pay as you go*", según establecido en el Capítulo 2 de esta Ley. Esta cuenta, en fideicomiso, estará centralizada y segregada de los activos generales y cuentas del Gobierno, a cargo del Departamento de Hacienda y se dedicará única y exclusivamente a los fines dispuestos en esta Ley, y sujeto los términos y condiciones establecidos en ésta.

(k) **Empresa o Corporación Pública:** toda instrumentalidad gubernamental del Gobierno de Puerto Rico que haya sido creada o que en el futuro se cree. No incluirá, sin embargo, aquellas empresas subsidiarias de instrumentalidades gubernamentales cuyos empleados, a juicio de la Junta de Retiro, no tuvieran una clara relación de empleado y patrono con el Gobierno de Puerto Rico. Cualquier funcionario o empleado que fuere Participante en los Sistemas de Retiro y pasare o hubiere pasado a ser funcionario o empleado de una empresa subsidiaria de cualquier empresa o corporación pública sin que haya interrupción en el servicio, continuará gozando de los mismos derechos y privilegios como Participante, aunque dicha empresa subsidiaria no esté cubierta por los tres Sistemas de Retiro.

(l) **Entidad Administradora:** persona o entidad jurídica seleccionada por la Junta de Retiro para administrar la Cuenta para el Pago de las Pensiones Acumuladas y/o el Nuevo Plan de Aportaciones Definidas. La Entidad Administradora deberá ser una empresa reconocida, con al menos diez (10) años de experiencia en la administración de planes de retiro, que goce de buena reputación en la industria financiera y que garantice al Gobierno contractualmente que logrará generar un ahorro de al menos veinticinco por ciento (25 %) de los gastos operacionales actuales incurridos en operar los Sistemas de Retiro. Ello, no descarta que el Gobierno o alguna de sus instrumentalidades asuma y ejerza las funciones de la Entidad Administradora, de entenderse necesario y apropiado, siempre tomando en consideración los mejores intereses de los Participantes, Retirados y Beneficiarios y la protección y garantía del balance de sus Aportaciones Individuales.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 144 of 291
Exhibit C Page 61 of 87

16

(m) **Gobierno de Puerto Rico o Gobierno:** el Gobierno de Puerto Rico y todos sus departamentos, divisiones, negociados, oficinas, agencias y dependencias, para fines de esta definición, incluye el Departamento de Educación de Puerto Rico. Para fines de esta Ley, este término incluye otras entidades gubernamentales o no gubernamentales, cuyos empleados cotizan actualmente en los Sistemas de Retiro.

(n) **Junta de Retiro:** junta creada al amparo de las disposiciones del Capítulo 4 de esta Ley.

(o) **Maestro:** profesional que enseña en los salones de clase, los Directores de escuela y demás denominaciones y categoría de maestros que existan o puedan existir dentro de la nomenclatura del Departamento de Educación del Gobierno de Puerto Rico, el Secretario de Educación y funcionarios alternos, y aquellos otros empleados o funcionarios que se acojan a los beneficios de la Ley 160-2013, de acuerdo con las disposiciones de la misma, siempre que posean un certificado válido para trabajar como maestros.

(p) **Nuevo Plan de Aportaciones Definidas:** nuevo plan de aportaciones definidas del que participarán los Participantes, según establecido en el Capítulo 3 de esta Ley.

(q) **Participantes:** empleados activos del Gobierno de Puerto Rico, los Maestros y miembros del Sistema de Retiro para Maestros, los empleados de los Municipios, y los empleados de las Corporaciones Públicas, excepto los empleados de la Universidad de Puerto Rico y la Autoridad de Energía Eléctrica. Además, incluye a aquellos empleados que pasen o hayan pasado a laborar dentro de una Alianza Público Privada y todo aquel miembro del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico que haya realizado aportaciones a dicho Sistema y éstas no se le hayan reembolsado. Este término incluye a los ex empleados del Gobierno de Puerto Rico que se separaron del servicio público y que no se le reembolsaron sus aportaciones y/o cualquier beneficio acumulado hasta la fecha de separación.

(r) **Pensión Acumulada:** anualidad, beneficio o beneficio definido, al cual el Participante tendría derecho al momento de retirarse del servicio a tenor con las aportaciones y reglas aplicables a sus respectivos Sistemas de Retiro, computadas hasta el momento en que entre en vigor la presente Ley.

(s) **Pensionado:** toda persona que reciba una pensión o anualidad de acuerdo con las disposiciones de esta Ley o de las que crean los diferentes Sistemas de Retiro.

(t) **Preretirado:** toda persona acogida al programa de Preretiro Voluntario creado mediante la Ley 211-2015, según enmendada, conocida como "Ley del Programa de Preretiro Voluntario".

(u) **Retribución:** recompensa bruta y en efectivo que devenga un empleado. Al computar la retribución se excluirá toda bonificación concedida en adición al salario, así como todo pago por concepto de horas extraordinarias de trabajo.

(v) **Sistemas de Retiro:** el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico según establecido por la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, y el Sistema de Retiro para Maestros de Puerto Rico, según establecido por la Ley 160-2013.

(w) **Sistema de Retiro para la Judicatura:** El Sistema de Retiro para la Judicatura, creado mediante la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como "Ley de Retiro de la Judicatura".

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Exhibit C   Page 62 of 87

17

## CAPÍTULO 2 - CUENTA PARA EL PAGO DE LAS PENSIONES ACUMULADAS POR LOS SISTEMAS DE RETIRO

**Artículo 2.1** - Cuenta para el Pago de las Pensiones Acumuladas.

Se crea, bajo la custodia del Departamento de Hacienda, la Cuenta Para el Pago de las Pensiones Acumuladas, la cual será mantenida en un fondo de fideicomiso separado de los activos generales y cuentas del Gobierno, la cual funcionará bajo un esquema de *"pay as you go"* para el pago de las Pensiones Acumuladas por los Sistemas de Retiro, incluyendo el Sistema de Retiro para la Judicatura, al momento en que entre en vigor la presente Ley. A partir del 1 de julio de 2017, los pagos de las Pensiones Acumuladas de los tres Sistemas de Retiro se deben desembolsar de los fondos depositados en dicha cuenta, la cual se debe nutrir de las siguientes fuentes:

(a) El producto neto líquido de las liquidaciones de los activos de los Sistemas de Retiro, incluyendo el Sistema de Retiro para la Judicatura, conforme a la Resolución Conjunta de la Cámara 188-2017, según aprobada conforme a PROMESA, excepto los fondos segregados del Programa de Aportaciones Definidas del Sistema de Retiro para Maestros establecido mediante la Ley 160-2013, según enmendada, y el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar, de conformidad con las obligaciones actuales de los Sistemas de Retiro;

(b) El Cargo *"Pay-Go"* que determine e imponga la AAFAF al Gobierno, los Municipios, la Rama Legislativa, la Administración de Tribunales, las Corporaciones Públicas y otras entidades cubiertas. Este cargo será equivalente a la cantidad en efecto pagada a los Pensionados y Beneficiarios provenientes de cada entidad cubierta. El Secretario de Hacienda o la persona o entidad que éste designe estará autorizado a cobrar el Cargo *"Pay-Go"*. En el caso de los Municipios, los cargos administrativos del esquema *"pay as you go"* no serán incluidos en el cómputo del Cargo *"Pay-Go"*. Independientemente del pago del Cargo *"Pay-Go"* por parte del patrono, el desembolso de los beneficios de todos los Pensionados y Beneficiarios están garantizados por el Fondo General a través del esquema *"pay as you go"*, subsistiendo la responsabilidad de las entidades de remitir el pago de dicho Cargo en cumplimiento con sus obligaciones bajo esta Ley;

(c) Las asignaciones en el presupuesto de gastos del Gobierno de Puerto Rico, las asignaciones especiales para financiar las deficiencias para el pago de las pensiones y las leyes especiales aprobadas a estos fines;

(d) Las donaciones, legados y cualquier otra aportación que cualquier entidad, pública o privada, haga a esta cuenta en virtud de cualquier otra ley;

(e) Fondos provenientes del veinticinco por ciento (25 %) del pago inicial o pagos periódicos de contratos de Alianza Público Privada, según establecido en el inciso (e) del Artículo 17 de la Ley 29-2009, según enmendada, conocida como la "Ley de Alianzas Público Privadas", según se determine de tiempo en tiempo; y

(f) Otros fondos e ingresos que la Asamblea Legislativa destine para estos propósitos.

La Oficina de Gerencia y Presupuesto podrá retener cualquiera de las asignaciones a las agencias del Gobierno de Puerto Rico, las cantidades necesarias para el pago del Cargo *"Pay-Go"*, cuando determine que esta retención es necesaria para asegurar el cumplimiento con esta

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:38-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 146 of 291
Exhibit C Page 63 of 87

18

obligación por parte de las entidades cubiertas. Además, cada entidad gubernamental deberá consignar cada año en su presupuesto general de gastos los fondos necesarios para el pago del Cargo *"Pay-Go"*.

En el caso de Participantes, Beneficiarios o Pensionados cuyo patrono deje o haya dejado de existir, aquéllos que pasen o hayan pasado a una Alianza Público Privada y aquellos cuyo patrono, por alguna razón, no pagare el Cargo *"Pay-Go"*, sus pensiones, al igual que todos los pensionados de los Sistemas de Retiro, estarán garantizadas por el Gobierno a través del sistema *"pay as you go"*.

**Artículo 2.2** - Registro de las Pensiones Acumuladas.

(a) Se creará y mantendrá un registro de cada Participante, Beneficiario y Pensionado de los Sistemas de Retiro que reflejará detalladamente las cantidades que le corresponde a cada uno como Pensión Acumulada según sus respectivos Sistemas de Retiro hasta la fecha en que entre en vigor la presente Ley. Detallará, sin que esto se entienda como una limitación, el beneficio acumulado al que tiene derecho el Participante, el historial de empleo y las aportaciones realizadas, de acuerdo a cada ley de retiro aplicable en la cual cotizó el Participante, Beneficiario o Pensionado. De acuerdo a lo contenido en el registro, se emitirán los pagos correspondientes de las Pensiones Acumuladas a las que tienen derecho, conforme a los términos de pago aplicables hasta el momento en que entre en vigor la presente Ley y de acuerdo a los Sistemas de Retiro a los que pertenezcan cada uno de los Participantes, Beneficiarios o Pensionados. No obstante, lo relativo al registro de la Pensión Acumulada para los jueces que cotizan bajo el Sistema de Retiro para la Judicatura y los maestros y miembros del Sistema de Retiro para Maestros que se encuentran cotizando bajo las disposiciones de la Ley 91-2004, se harán para fines informativos, ya que estos continuarán cotizando bajo sus respectivos sistemas como lo hacían antes de la aprobación de la presente Ley.

(b) Los Administradores de los Sistemas de Retiro, incluyendo el Sistema de Retiro para la Judicatura, en coordinación con la AAFAF, estarán obligados a producir el registro mencionado en el inciso (a) de este Artículo de la siguiente forma:

1. En un término de sesenta (60) días a partir de la aprobación de esta Ley deberán producir un listado de todos los Beneficiarios y Pensionados de los tres Sistemas de Retiro; y

2. En un término no mayor de ciento ochenta (180) días a partir de la aprobación de esta Ley deberán producir un registro de todos los Participantes, que incluya la Pensión Acumulada a cada uno por los tres Sistemas de Retiro al momento en que entre en vigor la presente Ley y los términos de pago de la misma. Los tres Sistemas de Retiro deberán tomar todas las medidas necesarias para garantizar que el registro contenga información fiel y exacta respecto a cada Participante, Beneficiario y Pensionado.

3. Una vez se produzca el registro, se le notificará a cada Participante, Beneficiario y Pensionado el contenido del mismo utilizando un método certero, eficaz e idóneo (podrá incluir una notificación por correo postal, accesibilidad a la información a través de un portal en la página de Internet de la AAFAF o la que cree la Junta de Retiro a estos fines, la publicación de un edicto en un periódico de circulación

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:38-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 147 of 291
Exhibit C Page 64 of 87

19

general y, en los casos que sea apropiado para los Participantes activos, notificación personal), quienes a su vez, tendrán un término de cuarenta y cinco (45) días, a partir de la fecha de notificación, para presentarle a los Administradores de los Sistemas de Retiro evidencia fehaciente que demuestre que la información contenida en el registro es incorrecta o inexacta. Se entenderá como evidencia fehaciente, sin que esto se entienda como una limitación, copias de expedientes de personal, copias de expediente de retiro, talonarios de pago, formularios W-2, copias de planillas, certificaciones por parte de los patronos o cualquier combinación de éstos, entre otros documentos oficiales. El Gobierno, los Municipios, la Rama Judicial, la Rama Legislativa, las Corporaciones Públicas y los Sistemas de Retiro deberán, como parte de su deber ministerial, producir diligentemente los documentos solicitados por parte de un Participante, Beneficiario o Pensionado para efectos de proveer evidencia sobre cualquier inexactitud contenida en el registro. De no estar disponible algún documento solicitado, se deberá emitir una certificación que así lo haga constar. La AAFAF podrá servir de facilitador en la obtención de dichos documentos y establecer mecanismos para recibir y tramitar con prontitud las solicitudes recibidas a tales fines. La demora de una entidad de producir la información que le sea solicitada no afectará negativamente al Participante y no afectará tampoco el cómputo de los cuarenta y cinco (45) días antes mencionados. Se entenderá que el término de cuarenta y cinco (45) días no discurrirá mientras esté pendiente una solicitud de evidencia fehaciente ante una entidad gubernamental y ésta no sea producida o se certifique que ésta no existe o no está disponible. Los Administradores de los Sistemas de Retiro deberán analizar la evidencia presentada y notificar al Participante su decisión respecto al asunto, por escrito. Si un Participante, Beneficiario o Pensionado no le presenta a los Administradores de los Sistemas de Retiro evidencia fehaciente de que la información contenida en el registro es incorrecta dentro del término provisto en este inciso, se entenderá que dicha información es fiel y exacta, por lo que la corrección del registro no será revisable.

4. Si un Participante, Beneficiario o Pensionado queda insatisfecho con la determinación de los Administradores de los Sistemas de Retiro bajo el inciso anterior, deberá presentar una solicitud de reconsideración dentro de un término de veinte (20) días contados a partir de la notificación de la decisión de los Administradores de los Sistemas de Retiro. De no presentarse la reconsideración, la determinación advendrá final y firme.

5. Si un Participante, Beneficiario o Pensionado no está de acuerdo con la decisión final de los Administradores de los Sistemas de Retiro, o si éstos no emiten su determinación dentro de noventa (90) días de haber recibido la solicitud de reconsideración, podrán presentar una apelación a la Junta de Retiro dentro de un término de treinta (30) días contados a partir de la notificación o del momento en que transcurra el término antes mencionado de noventa (90) días. De no presentarse la apelación, la determinación advendrá final y firme.

6. La Junta de Retiro tendrá un periodo de noventa días (90) para emitir una determinación sobre cualquier apelación presentada por un Participante,

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39 Filed:11/08/17 Entered:11/08/17 15:31:05 Desc:
Affidavit Exhibit C Page 65 of 87 Page 148 of 291

20

Beneficiario o Pensionado. En la eventualidad de que la Junta no se exprese al respecto en dicho periodo o si un Participante, Beneficiario o Pensionado queda insatisfecho con la determinación final de la Junta de Retiro, podrá presentar un recurso de revisión judicial ante el Tribunal de Apelaciones conforme el Reglamento del Tribunal de Apelaciones para la revisión de decisiones administrativas.

(c) Nada de lo dispuesto en este Artículo deberá entenderse como que interfiere de forma alguna con cualquier procedimiento o reclamo bajo el *Puerto Rico Oversight, Management, and Economic Stability Act*" ("PROMESA", por sus siglas en inglés), Ley Pública 114-187.

**Artículo 2.3. -** Términos de Pago de las Pensiones Acumuladas.

Los términos de pago de las Pensiones Acumuladas de cada Participante, Beneficiario o Pensionado serán computados según los términos dispuestos en los estatutos de sus respectivos Sistemas de Retiro al momento en que entre en vigor la presente Ley. Los términos de pago de las pensiones por incapacidad, pagos de beneficio por muerte, pago a beneficiarios, pagos por concepto de reembolso de aportaciones, y cualquier cantidad adeudada o beneficio de similar naturaleza, también serán computados según los términos dispuestos en los estatutos de los respectivos Sistemas de Retiro al momento en que entre en vigor la presente Ley. Aquellos empleados que al momento de aprobarse esta Ley se encuentren tramitando una solicitud de beneficios por incapacidad o cualquier otro beneficio, podrán concluir dicho trámite según establecido en la ley aplicable vigente al momento de comenzar dicho trámite.

**Artículo 2.4. -** Pensiones Acumuladas.

(a) Al entrar en vigor esta Ley, se preservarán y garantizarán por el Gobierno los beneficios de las Pensiones Acumuladas de los Participantes de los Sistemas de Retiro que comenzaron a trabajar antes de entrar en vigor la presente Ley.

(b) Aquellos Participantes que al momento de entrar en vigor la presente Ley tengan derecho a retirarse y recibir algún tipo de pensión y/o anualidad bajo las disposiciones aplicables a sus respectivos Sistemas de Retiro, podrán retirarse en cualquier fecha posterior y tendrán derecho a recibir la Pensión Acumulada que le corresponda, según calculada bajo las disposiciones aplicables a sus respectivos Sistemas de Retiro hasta el momento de entrar en vigor la presente Ley y en los términos allí contemplados.

(c) A partir del momento en que entre en vigor la presente Ley, el Participante no acumulará beneficios adicionales, sea por años de servicio, compensación o cualquier otra razón, en los Sistemas de Retiro. Para propósitos del cómputo de su pensión o beneficios de retiro en su respectivo Sistema de Retiro, no recibirá reconocimiento por servicios no cotizados posterior al momento de la vigencia de la presente Ley, no podrá transferir aportaciones o devolver aportaciones por periodos trabajados en o antes del momento en que entre en vigor la presente Ley. Aquellos empleados que hayan cotizado o estén activamente cotizando en otro sistema de retiro no cubierto por la presente Ley, podrán solicitar la transferencia de aportaciones a su sistema de retiro de origen o a aquel al que tengan derecho al momento de retirarse, siempre y cuando los recursos fiscales lo permitan, conforme al Plan Fiscal Certificado.

Case:17-03283-LTS   Doc#:7890-1   Filed:07/09/19   Entered:07/09/19 15:16:15   Desc:
Case:17-00219-LTS   Doc#:39-3   Filed:11/08/17   Entered:11/08/17 15:51:05   Desc:
Affidavit   Page 149 of 291
Exhibit C   Page 66 of 87

21

(d) A partir del 1 de julio de 2017, el Participante no hará aportaciones individuales ni pagos a la Cuenta para el Pago de las Pensiones Acumuladas, ni aportaciones adicionales a sus respectivos Sistemas de Retiro.

(e) A partir del 1 de julio de 2017, el Gobierno de Puerto Rico, las Corporaciones Públicas, los Municipios, la Rama Legislativa, la Rama Judicial y otras entidades cubiertas no vendrán requeridas a realizar aportaciones patronales, incluyendo la Aportación Adicional Uniforme y la Aportación Uniforme de Justicia Magisterial, a la Cuenta para el Pago de las Pensiones Acumuladas ni a los Sistemas de Retiro, pero vendrán obligados a satisfacer el Cargo *"Pay-Go"* que les sea aplicable, según corresponde a cada uno a base de los parámetros establecidos en esta Ley.

**Artículo 2.5.** - Compensación por Aportaciones Adeudadas.

Los pagos que se realicen de la Cuenta para el Pago de las Pensiones Acumuladas se deducirán de las Aportaciones Adeudadas y cualquiera otra deuda que a la fecha de vigencia de esta Ley tengan las entidades gubernamentales y otras entidades cubiertas con los Sistemas de Retiro, incluyendo el Gobierno, los Municipios, las Corporaciones Públicas, la Asamblea Legislativa y la Administración de los Tribunales, respectivamente.

**Artículo 2.6.** - Disposiciones especiales.

No obstante lo dispuesto en esta Ley, se dispone, a modo de excepción, que los maestros y miembros del Sistema de Retiro para Maestros que se encuentran cotizando al Sistema de Retiro para Maestros bajo las disposiciones de la Ley 91-2004, según enmendada, conocida como la "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", continuarán cotizando conforme a las disposiciones del referido estatuto. Las Pensiones Acumuladas de dichos maestros y miembros del Sistema de Retiro para Maestros serán las que se computen a base de los términos y condiciones dispuestos en dicha Ley. Del mismo modo, se dispone que las Pensiones Acumuladas de los jueces que se encuentran cotizando y aquellos de nuevo ingreso al Sistema de Retiro para la Judicatura que sean nombrados luego de la vigencia de esta Ley, se continuarán computando conforme a las disposiciones de la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como la "Ley de Retiro de la Judicatura", aplicable a cada juez. Se dispone expresamente que dichas Pensiones Acumuladas, así como los términos de pago de las mismas, no serán afectadas o modificadas de forma alguna por las disposiciones de esta Ley. No obstante, las aportaciones individuales de estos maestros, de los miembros del Sistema de Retiro para Maestros y de los jueces se mantendrán tal como existían antes de la aprobación de la presente Ley y se depositarán en la Cuenta para el Pago de las Pensiones Acumuladas, conforme lo establezca la Junta de Retiro.

Aquellos de estos maestros, miembros del Sistema de Retiro para Maestros y jueces que deseen participar del Nuevo Plan de Aportaciones Definidas podrán hacerlo voluntariamente, según lo determine la Junta de Retiro. Para ello, además de su actual aportación individual, deberán realizar la aportación dispuesta en el Artículo 3.4 de esta Ley.

## CAPÍTULO 3 - PROGRAMA DE APORTACIONES DEFINIDAS

**Artículo 3.1.** - Nuevo Plan de Aportaciones Definidas.

(a) Se crea el Nuevo Plan de Aportaciones Definidas, el cual consiste en el establecimiento de un fondo de fideicomiso, que no estará sujeto a las disposiciones de la Ley 219-2012, según enmendada, conocida como la "Ley de Fideicomisos", que contendrá una cuenta

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:31:05 Desc:
Affidavit Exhibit C Page 67 of 87

22

individual para cada Participante de los Sistemas de Retiro que pase a formar parte de dicho programa, según dispuesto en este Capítulo. Se acreditarán a las cuentas individuales las aportaciones al Nuevo Plan de Aportaciones Definidas de cada Participante y la rentabilidad de inversión de conformidad con el Artículo 3.6 de esta Ley. El beneficio relacionado a estas aportaciones que se le proveerá a cada Participante luego de su separación del servicio, ya sea por retiro o por otra causa, dependerá de la totalidad de las aportaciones al Nuevo Plan de Aportaciones Definidas acumuladas en su cuenta a partir del momento en que entre en vigor la presente Ley, o la fecha en que el Participante ingresó al Plan de Aportaciones Definidas y la rentabilidad de éstas.

(b) Las siguientes personas participarán en el Nuevo Plan de Aportaciones Definidas:

(1) Todo Participante activo de los Sistemas de Retiro al momento de entrar en vigor esta Ley; con excepción de los maestros y miembros del Sistema de Retiro para Maestros que se encuentran cotizando bajo las disposiciones de la Ley 91-2004 y los jueces que cotizan bajo el Sistema de Retiro para la Judicatura, quienes no formarán parte del Nuevo Plan de Aportaciones Definidas y, en cambio, continuarán cotizando a sus referidos Sistemas de Retiro como hasta el momento, salvo lo dispuesto en el Artículo 2.6.

(2) Todo Participante que ingrese al servicio público por primera vez en o después de la aprobación de la presente Ley.

(3) La participación en el Nuevo Plan de Aportaciones Definidas será opcional para el Gobernador de Puerto Rico, para todos los Secretarios de Gobierno, Jefes de Agencia e Instrumentalidades Públicas, los ayudantes y asesores del Gobernador, los miembros de Comisiones y Juntas nombrados por el Gobernador, los miembros de la Asamblea Legislativa, los empleados y funcionarios de la Asamblea Legislativa, de la Oficina de Servicios Legislativos y de la Superintendencia del Capitolio y para el Contralor de Puerto Rico.

(4) La participación en el Nuevo Plan de Aportaciones Definidas será opcional para los empleados de los departamentos, divisiones, negociados, oficinas, dependencias, corporaciones públicas, e instrumentalidades del Gobierno de Puerto Rico que trabajen y residan fuera de los límites territoriales de Puerto Rico.

(5) Cualquier empresa o corporación pública cuyos empleados no participen de los Sistemas de Retiro al momento de aprobarse la presente Ley, podrá, mediante resolución adoptada por su Junta de Directores o máximo organismo rector, según sea el caso, unirse al Nuevo Plan de Aportaciones Definidas creado por esta Ley. La Junta de Retiro establecerá los requisitos y procedimientos con los que se deberán cumplir para unirse al Nuevo Plan de Aportaciones Definidas.

**Artículo 3.2** - Transferencia al Plan.

A partir del momento en que entre en vigor la presente Ley, todos los Participantes activos que son parte de la matrícula de los Sistemas de Retiro, independientemente de la fecha de su primer nombramiento en el Gobierno, pasarán a formar parte del Nuevo Plan de Aportaciones Definidas, excepto lo dispuesto en el Artículo 3.1(b)(1).

**Artículo 3.3** - Establecimiento de Cuentas de Aportaciones para el Nuevo Plan de Aportaciones Definidas.

(a) Las aportaciones individuales de los Participantes serán dirigidas a un Nuevo Plan de Aportaciones Definidas, en el cual se establecerá y mantendrá una Cuenta de Aportaciones Definidas, en fideicomiso, separado de los activos generales y cuentas del Gobierno, individual para cada Participante, la cual será acreditada y debitada de conformidad con este Capítulo. Las aportaciones individuales y fondos en cada Cuenta de Aportaciones Definidas serán de la exclusiva propiedad del Participante correspondiente, no estarán sujetos a contribución de clase alguna, ni a embargo y quedan exentos de la acción singular o colectiva de los acreedores del Participante, exceptuando de esta exención las deudas de los Participantes con los Sistemas de Retiro, del patrono y del Gobierno.

(b) Las cuentas de los Participantes del Programa de Aportaciones Definidas del Sistema de Retiro para Maestros que al momento en que entre en vigor la presente Ley tengan balances acumulados en ese plan, serán transferidas inmediatamente a sus respectivas Cuentas de Aportación Definida.

(c) Durante el periodo de tiempo que transcurra entre la aprobación de esta Ley y el momento en que la Junta de Retiro contrate los servicios de una Entidad Administradora para manejar el Nuevo Plan de Aportaciones Definidas, y dicha Entidad Administradora comience a descargar sus funciones conforme al contrato que se otorgue a esos fines, el Secretario de Hacienda tendrá la autoridad y facultad para recaudar y depositar en un fondo de fideicomiso, que no estará sujeto a las disposiciones de la Ley 219-2012, según enmendada, conocida como la "Ley de Fideicomisos", que será separado de los activos generales y cuentas del Gobierno, bajo su custodia las Aportaciones Individuales de los Participantes. Una vez comience a ofrecer sus servicios la Entidad Administradora, el Secretario de Hacienda le transferirá los fondos de las Aportaciones Individuales para ser depositados en las Cuentas de Aportaciones Definidas de cada Participante. La Entidad Administradora establecerá para tales fines un fideicomiso, que no estará sujeto a las disposiciones de la Ley 219-2012, según enmendada, conocida como la "Ley de Fideicomisos". Cualquier cantidad que se haya segregado a partir del 1 de julio de 2017 se tratará de igual forma a lo dispuesto en este inciso.

(d) Los ingresos y ganancias devengados en cada Cuenta de Aportaciones Definidas estarán exentos de toda clase de contribuciones, impuestos, arbitrios o cargas mientras se mantengan en las Cuentas de Aportaciones Definidas. Las distribuciones de las Cuentas de Aportaciones Definidas estarán sujetas a tributación para el Participante o Beneficiario de conformidad con las disposiciones de la Sección 1081.01(b) del Código como una distribución de un fideicomiso exento bajo las disposiciones de la Sección 1081.01(a) del Código y dichas distribuciones estarán sujetas a las excepciones de tributación, retenciones contributivas y radicación de declaraciones informativas provistas en dicha Sección 1081.01(b) del Código.

**Artículo 3.4** - Aportaciones de los Participantes del Nuevo Plan de Aportaciones Definidas.

A partir de la vigencia de la presente Ley, todo Participante en los Sistemas de Retiro tendrá que aportar obligatoriamente a su Cuenta de Aportaciones Definidas un mínimo de ocho punto cinco por ciento (8.5 %) de su retribución mensual, hasta el tope que establece el Código. Además, podrá aportar de forma voluntaria cantidades adicionales, según lo permita el Código.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 152 of 291
Exhibit C Page 69 of 87

24

Al entrar en vigor esta Ley, los Participantes del Nuevo Plan de Aportaciones Definidas tendrán el derecho de ajustar su actual aportación a los Sistemas de Retiro al mínimo autorizado por este Artículo. Los Participantes del Nuevo Plan de Aportaciones Definidas podrán variar el porciento que desean aportar a dicho Plan de tiempo en tiempo, pero nunca podrá ser menos del porciento mínimo requerido por esta Ley.

**Artículo 3.5** - Obligaciones del Patrono, Sanciones.

Todo patrono de un Participante del Nuevo Plan de Aportaciones Definidas tendrá las siguientes obligaciones:

(1) **Obligación de Deducir y Transferir las Aportaciones** - Todo patrono de un Participante del Nuevo Plan de Aportaciones Definidas deberá deducir del salario del Participante las aportaciones que se disponen en el Artículo 3.4 de esta Ley y transferirlas de inmediato al Nuevo Plan de Aportaciones Definidas para ser depositadas en la Cuenta de Aportación Definida. Se autoriza al Secretario de Hacienda o a cualquier oficial pagador del patrono a realizar los descuentos, aunque el salario que hubiere que pagarse al Participante como resultado de estos descuentos quede reducido a menos de cualquier mínimo prescrito por ley. La Junta de Retiro establecerá la forma y manera en que se remitirán las aportaciones.

(2) **Penalidad y Medidas Especiales sobre Aportaciones Adeudadas** - Todo patrono que no remita las Aportaciones Individuales de los Participantes del Nuevo Plan de Aportaciones Definidas y/o los Cargos *"Pay-Go"*, según dispuesto en esta Ley, dentro del término establecido para ello, así como cualquier otra remesa relacionada a los Participantes, estará expuesto a las siguientes medidas correctivas:

a. La Junta de Retiro, su designado o la Entidad Administradora solicitará por escrito, y acompañado por una certificación oficial de deuda:

i. A los patronos deudores, la transferencia de las Aportaciones Adeudadas.

ii. Al Secretario de Hacienda, que realice cualquier compensación y/o ajuste entre las cuentas, obligaciones y anticipos que Hacienda debe remitir al patrono deudor, y transfiera las cantidades de las Aportaciones Adeudadas al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas, según corresponda.

iii. Al Centro de Recaudación de Ingresos Municipales (CRIM), que remese, dentro de los siete (7) días siguientes a la notificación por escrito, al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas, las cantidades de las Aportaciones Adeudadas por el patrono Municipal, del remanente no comprometido de las contribuciones sobre el valor de la propiedad y demás ingresos que los Municipios tengan derecho a recibir de conformidad a la Ley 80-1991, según enmendada, conocida como "Ley del Centro de Recaudación de Ingresos Municipales". A partir de

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Page 153 of 291
Exhibit C Page 70 of 87

25

la vigencia de esta Ley, automática y permanentemente, se constituye un gravamen legal preferencial sobre dicho remanente no comprometido en favor de la Junta de Retiro y/o la Entidad Administradora para el cobro de las Aportaciones Adeudadas, sin la necesidad de cualquier otro acto, posesión o control sobre los mismos.

iv. La Oficina de Gerencia y Presupuesto podrá retener cualquiera de las asignaciones a las agencias del Gobierno de Puerto Rico, las cantidades necesarias para el pago del Cargo "*Pay-Go*", cuando determine que esta retención es necesaria para asegurar el cumplimiento con esta obligación por parte de las entidades concernidas.

b. La Junta de Retiro o la Entidad Administradora deberá notificar por escrito a todo Titular o Jefe de una Agencia, Empresa Pública, Municipio y otra entidad cubierta que dejare de retener a sus empleados las aportaciones y/o que dejare de remitir al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas las cantidades correspondientes para cada concepto. Dicha deficiencia notificada deberá subsanarse en un término no mayor a diez (10) días laborables. En caso de que el Titular, Jefe o cualquier funcionario con responsabilidad de una Agencia, Empresa Pública, Municipio, o entidad cubierta, a sabiendas, y sin causa justificada, dejare de hacer los pagos correspondientes al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas, incurrirá en delito menos grave y se le impondrá una pena de reclusión de seis (6) meses o pena de multa de cinco mil dólares ($5,000) o ambas penas, a discreción del Tribunal. Dicha multa la pagará el Titular, Jefe de Agencia o cualquier funcionario con responsabilidad, Empresa Pública o Municipio con su propio pecunio. El Gobierno de Puerto Rico y sus instrumentalidades no le brindarán representación legal al funcionario en el procedimiento judicial para poner en vigor esta disposición.

c. Cada Beneficiario, Participante o Pensionado tendrá una acción personal de cobro contra cada Titular, Jefe de Agencia, Director de Presupuesto o Finanzas o cualquier funcionario con responsabilidad, del Gobierno, Empresa Pública o Municipio para reclamar las aportaciones adeudadas a partir de la vigencia de esta Ley y exigir que las mismas sean pagadas según correspondan. El Gobierno velará por la realización de dichas aportaciones y, si tuviese que desembolsar fondos para el pago de las cantidades correspondientes adeudadas a partir de la vigencia de esta Ley, se instará, sin espacio a discreción, una acción de cobro o reembolso contra el Titular o Jefe de Agencia, Director de Presupuesto o Finanzas o cualquier funcionario con responsabilidad que haya dejado de remitir dichos pagos. El Gobierno de Puerto Rico y sus instrumentalidades no le brindarán representación legal al funcionario en estos procedimientos. Esta disposición tendrá supremacía sobre cualquier otro estatuto. Las disposiciones de este inciso no se entenderán como que excluyen o liberan al Gobierno, las Corporaciones Públicas, los Municipios u otras entidades cubiertas de su responsabilidad y deber ministerial de pagar las aportaciones adeudadas a tiempo, según se dispone en

Case:17-03283-LTS Doc#:7899-1 Filed:08/09/19 Entered:11/08/09/15:51:95 Desc:
Case:17-00219-LTS Doc#:380-1 Filed:11/08/19 Entered:11/08/09/15:15:15 Desc:
Exhibit C Page 154 of 291

26

esta Ley. El Participante tendrá la opción de incoar la acción correspondiente de cobro contra el Gobierno, según la reglamentación que establezca la Junta a estos efectos.

**Artículo 3.6** - Créditos a la Cuenta de Aportaciones Definidas, Rentabilidad de Inversión y Derechos sobre la Cuenta de Aportaciones Definidas.

(a) Créditos.- Se acreditarán a la Cuenta de Aportaciones Definidas de cada Participante del Nuevo Plan de Aportaciones Definidas las siguientes partidas:

(1) Aportación Individual del Participante.- Las aportaciones individuales hechas por el Participante del Nuevo Plan de Aportaciones Definidas, según requiere esta Ley, se acreditarán una vez sean remitidas por el patrono.

(2) Rentabilidad de Inversión.- La rentabilidad de inversión estará sujeta a la elección de inversiones del Participante, según su preferencia y su perfil de riesgo. Se le proveerán a los Participantes varias alternativas de inversión diversificadas entre sí, según determine la Junta de Retiro. Entre estas alternativas, se proveerá al menos una opción que garantice la totalidad de las aportaciones individuales realizadas por el Participante, preservando el principal de los mismos. Dicha opción será automáticamente seleccionada si el empleado no escogiese otra opción de su preferencia. El Participante tendrá la opción de escoger otra alternativa de las ofrecidas de tiempo en tiempo. Los gastos de manejo (*"management fees"*) básicos y razonables serán sufragados por el Gobierno de Puerto Rico. No obstante, la rentabilidad de la inversión será acreditada a la cuenta de cada Participante y será neta de los gastos de manejo adicionales o extraordinarios, según determine la Junta de Retiro, asegurándose este que los mismos sean razonables. Se le deberá proveer a los Participantes periódicamente, y por lo menos una vez al año, informes de la actividad de su Cuenta de Aportaciones Definidas, sea en papel o en formato accesible en un portal de internet del Gobierno.

(3) Las transferencias de balances del Programa de Aportaciones Definidas del Sistema de Retiro para Maestros acumulados desde el 1 de agosto de 2014, según aplicables.

(4) Los balances segregados a partir del 1 de julio de 2017, conforme las Resoluciones Conjuntas de la Cámara 186, 187 y 188 de 2017.

(b) Derechos Sobre la Cuenta de Aportaciones Definidas.- Los Participantes del Nuevo Plan de Aportaciones Definidas tendrán derecho de propiedad *erga omnes* sobre los balances de su Cuenta de Aportaciones Definidas.

**Artículo 3.7** - Débitos a la Cuenta de Aportaciones Definidas.

Se debitará de la Cuenta de Aportaciones Definidas que se establezca para cada Participante del Nuevo Plan de Aportaciones Definidas aquellas sumas utilizadas para el pago de beneficios o para hacer una distribución global al Participante correspondiente, según provea la Junta de Retiro. Una vez se distribuya el balance total de la Cuenta de Aportaciones Definidas, la misma cesará de existir.

**Artículo 3.8** - Beneficios a la Separación del Servicio.

En caso de que el Participante se separe del servicio público, su Cuenta de Aportación Definida puede permanecer en el Nuevo Plan de Aportaciones Definidas, puede ser transferida a un plan de aportaciones definidas cualificado exento bajo la Sección 1081.01(a) del Código, o el Participante puede solicitar el desembolso del balance, sujeto al pago de los impuestos aplicables, según el Código, pagaderos al momento del desembolso de los fondos y a la reglamentación que la Junta de Retiro establezca a estos efectos.

**Artículo 3.9** - Beneficios por Muerte.

(a) Muerte de Participante en Servicio Activo. - A la muerte de un Participante que esté prestando servicios y que tuviere un balance disponible en su Cuenta de Aportación Definida, dicho balance será desembolsado a los Beneficiarios que el Participante hubiere designado por orden escrita debidamente reconocida y presentada, o por sus herederos, si tal designación no hubiere sido hecha, sujetas a los mismos requisitos establecidos en el inciso (b) posterior.

(b) Muerte de un Retirado.- En aquellos casos en que fallezca un pensionado sin antes haber agotado el balance de su Cuenta de Aportación Definida, sus Beneficiarios designados o los herederos del Participante, en caso de no existir Beneficiario designado, podrán solicitar por escrito, presentando una declaratoria de herederos o testamento, y cualquier otro documento que establezca la Junta, el desembolso de dicho balance en un pago global, sujeto a cualquier deducción o impuesto correspondiente por ley o por el Código.

## CAPITULO 4 - JUNTA DE RETIRO Y ENTIDAD ADMINISTRADORA

**Artículo 4.1** - Junta de Retiro del Gobierno de Puerto Rico.

(a) Se crea la Junta de Retiro del Gobierno de Puerto Rico, como un nuevo organismo del Gobierno de Puerto Rico, independiente y separado de otros, el cual deberá ser designado dentro del término de sesenta días (60) de aprobada esta Ley y estará integrado por trece (13) miembros, según se detalla a continuación:

1. El Director Ejecutivo de la AAFAF, quien, además, será su Presidente. En su ausencia, lo podrá representar un funcionario de la AAFAF designado por éste;

2. El Secretario del Departamento de Hacienda, o su representante;

3. El Director de la Oficina de Gerencia y Presupuesto, o su representante;

4. El Director de la Oficina de Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico, o su representante;

5. Un (1) representante de los maestros del Departamento de Educación, quien será un maestro activo del Departamento de Educación, designado por el Gobernador por un término de cinco (5) años, quien ejercerá sus funciones hasta que se nombre un sucesor y éste tome posesión del cargo;

6. Un (1) representante de las corporaciones públicas, designado por el Gobernador por un término de cinco (5) años, quien ejercerá sus funciones hasta que se nombre un sucesor y éste tome posesión del cargo;

7. Un (1) representante de la Rama Judicial, designado por el Pleno del Tribunal Supremo de Puerto Rico, quien servirá a la discreción del mismo.

Case:17-09219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Case:17-03283-LTS Doc#:7893-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Exhibit C Page 156 of 291
Affidavit

28

8. El Presidente de la Federación de Alcaldes, o su representante;

9. El Presidente de la Asociación de Alcaldes de Puerto Rico, o su representante; y

10. Cuatro (4) representantes del interés público, designados por el Gobernador por un término de cinco (5) años, quienes ejercerán sus funciones hasta que se nombre al sucesor y éste tome posesión del cargo. Uno (1) de estos representantes del interés público será un maestro Pensionado del Sistema de Retiro para Maestros, uno (1) será un Pensionado del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, uno (1) será un representante de los miembros de la Policía de Puerto Rico quien será nombrado por el Gobernador, en consulta con organizaciones *bona fide* que representen dicho sector y estén debidamente autorizadas por ley y uno (1) será de libre selección por parte del Gobernador.

Las personas designadas conforme a los incisos (5) y (6) servirán por un término inicial de dos (2) años. Las personas designadas conforme al inciso (10) servirán por un término inicial de tres (3) años. Según expire el término inicial de cada uno de estos miembros, sus sucesores serán nombrados conforme con lo dispuesto en este Artículo. Los miembros de la Junta de Retiro servirán *ad honorem*.

(b) Las personas seleccionadas para ocupar las posiciones designadas por el Gobernador y el Pleno del Tribunal Supremo de Puerto Rico deberán contar con conocimiento y experiencia en la administración y funcionamiento de sistemas financieros o en la administración de recursos humanos y deberán gozar de buena reputación moral.

(c) Siete (7) miembros de la Junta de Retiro constituirán quórum para resolver cualquier asunto ante su consideración y toda resolución adoptada por el mismo deberá ser aprobada por mayoría de los presentes. Los miembros podrán asistir a dichas reuniones mediante mecanismos de videoconferencias, llamadas telefónicas o métodos similares.

(d) La Junta de Retiro establecerá por reglamento aquellas disposiciones necesarias para su funcionamiento y cumplimiento con esta Ley, incluyendo las funciones y deberes de sus integrantes.

(e) La Junta de Retiro podrá nombrar un Director Ejecutivo, y además fijar su sueldo y establecer sus poderes, facultades y deberes, así como emplear el personal necesario para desempeñar sus funciones bajo esta Ley.

(f) La Ley 1-2012, según enmendada, conocida como la "Ley de Ética Gubernamental de Puerto Rico de 2011", le será de aplicación a todos los miembros de la Junta de Retiro, exceptuado el Capítulo V de dicha Ley.

**Artículo 4.2** - Poderes, Facultades y Deberes de la Junta de Retiro.

A los fines de llevar a cabo los deberes que dispone esta Ley, la Junta de Retiro tendrá los siguientes poderes, deberes y facultades:

(a) Fungir como el máximo ente rector de los Sistemas de Retiro. A esos fines, la Junta tendrá y ejercerá todos los poderes, deberes y facultades conferidos a las Juntas de

Síndicos de los Sistemas de Retiro. Al entrar en vigor esta Ley, estos poderes y facultades se transferirán automática y permanentemente a la Junta de Retiro. Consecuentemente, las Juntas de Síndicos de los Sistemas de Retiro quedarán disueltas al entrar en vigor esta Ley. Cualquier referencia a las Juntas de Síndicos de los Sistemas de Retiro se entenderá que se refiere a la Junta de Retiro. Todos las disposiciones y reglamentos adoptados por las Juntas de Síndicos de los Sistemas de Retiro continuarán en vigor luego de la aprobación de esta Ley hasta que estos sean enmendados o modificados por la Junta de Retiro y cualquier referencia en estos reglamentos a las Juntas de Síndicos de los Sistemas de Retiro se entenderá que es una referencia a la Junta de Retiro. Todo lo anterior estará sujeto a las disposiciones del Capítulo 7 de esta Ley. Además, la Junta de Retiro tendrá y ejercerá todos los poderes, deberes y facultades necesarios para la administración y manejo del Nuevo Plan de Aportaciones Definidas y la supervisión de cualquier Entidad Administradora, incluyendo la facultad para establecer las reglas y requisitos para recibir los beneficios bajo el Nuevo Plan de Aportaciones Definidas.

(b) Contratar mediante procesos competitivos los servicios de una o varias Entidades Administradoras para administrar la Cuenta para el Pago de las Pensiones Acumuladas y/o el Nuevo Plan de Aportaciones Definidas. El proceso de selección de dicha entidad y/o entidades se realizará bajo el mecanismo de solicitud de propuestas *request for proposals*" bajo las reglas que establezca la Junta de Retiro, velando por los mejores intereses del Gobierno y los Participantes, de forma cónsona con los mejores estándares de la industria. Cualquier referencia a los Administradores de los Sistemas de Retiro se entenderá que se refiere a las Entidades Administradoras. Todas las disposiciones y reglamentos adoptados por los Administradores de los Sistemas de Retiro continuarán en vigor luego de la aprobación de esta Ley hasta que estos sean enmendados o modificados por las Entidades Administradoras o la Junta de Retiro. Todo lo anterior estará sujeto a las disposiciones del Capítulo 7 de esta Ley.

(c) Adoptar todas las reglas, reglamentos, normas y procedimientos para su organización y funcionamiento; y para la implementación de esta Ley.

(d) Cobrar las deducciones adicionales a las Aportaciones Individuales de los Participantes hasta el máximo de 0.25 % que es lo que actualmente se les descuenta según sus respectivos Sistemas de Retiro para sufragar otros beneficios, tales como seguros por incapacidad.

(e) Establecer y cobrar un Cargo Administrativo, el cual se computará a base de los gastos en los que se incurra para operar y administrar la Cuenta para el Pago de las Pensiones Acumuladas y el Nuevo Plan de Aportaciones Definidas.

(f) Establecer, implantar y fiscalizar las mejores prácticas de prudencia, lealtad, diligencia, y reglas aplicables al Nuevo Plan de Aportaciones Definidas, en cuanto a su operación, derechos de los Participantes, responsabilidades de los administradores, deberes fiduciarios y cualquier otra norma aplicable del *Employee Retirement Income Security Act*", Public Law 93–406, del 2 de septiembre de 1974 o de otro estatuto análogo o pertinente.

(g) Suscribir los acuerdos razonables y apropiados, memoriales de entendimiento y documentos, incluyendo escrituras de constitución de fideicomiso, que sean necesarios y

convenientes para implementar las disposiciones de esta Ley, tomando en consideración la actual situación económica y fiscal del Gobierno de Puerto Rico.

(h) Nombrar aquellas comisiones, juntas y comités que estime necesarios para el mejor logro de los objetivos de esta Ley.

(i) Demandar y ser demandado, incluso a nombre de los Sistemas de Retiro.

(j) Llevar a cabo todos los poderes necesarios para cumplir con esta Ley y con los reglamentos que se adopten conforme a la misma.

## CAPÍTULO 5- DISPOSICIONES TRANSITORIAS

**Artículo 5.1** - Periodo de Transición.

(a) Mientras la Junta de Retiro no esté constituida debidamente conforme al *quorum* requerido por esta Ley, el Director Ejecutivo de la AAFAF tendrá y ejercerá todos los poderes correspondientes a la Junta de Retiro, incluyendo tomar las decisiones pertinentes en relación a la creación del Nuevo Plan de Aportaciones Definidas y la estructuración del programa *"pay as you go"*, según dispuestos en esta Ley o en cualquier otro estatuto aplicable.

(b) Los Administradores de los Sistemas de Retiro continuarán ejerciendo sus funciones, descargando sus deberes y tendrán la obligación de brindarle todo el apoyo necesario a la Junta de Retiro y a la AAFAF durante la implementación de esta Ley, hasta la fecha en que la AAFAF certifique mediante Resolución de su Junta de Directores que se ha completado la transición ordenada por esta Ley, la cual deberá ser en o antes del 31 de diciembre de 2017. No obstante, esa fecha se podrá prorrogar por un término razonable de ser necesario, mediante resolución de AAFAF. A partir de esa fecha, todos los poderes, deberes y facultades de los Administradores de los Sistemas de Retiro se transferirán permanentemente a las Entidades Administradoras, al Director Ejecutivo de la Junta de Retiro o la persona que la Junta de Retiro determine.

(c) Los Administradores de los Sistemas de Retiro deberán realizar todas las gestiones necesarias para la liquidación de sus activos y transferencia al Fondo General y/o la Cuenta para el Pago de las Pensiones Acumuladas, según aplicable, excepto el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar; la transferencia de los expedientes de los Participantes y pensionados, incluyendo sus balances, a la Junta de Retiro, la coordinación para la movilidad de sus empleados conforme a la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", y otras disposiciones aplicables. Al entrar en vigor esta Ley, la AAFAF tendrá todas las facultades y poderes necesarios para, en colaboración con los Administradores de los Sistemas de Retiro, llevar a cabo las gestiones necesarias para ajustar las operaciones de los Sistemas de Retiro a lo dispuesto en esta Ley y al Plan Fiscal Certificado, de forma que se pueda cumplir con la transición ordenada. Se deberán ofrecer los detalles a los empleados, tanto de los Sistemas de Retiro como aquellos empleados de carrera de las Juntas de Síndicos de dichos Sistemas, sobre los planes de movilidad, nueva sede y demás información concerniente dentro del periodo de treinta

(30) días previo al vencimiento del término para la transición, esto en aras de evitar cualquier incertidumbre ante los cambios propuestos.

(d) La Junta de Retiro, en coordinación y con la asistencia y recursos de los Administradores de los Sistemas de Retiro, deberán formular e implementar una campaña de educación dirigida a los Participantes, Pensionados y Beneficiarios respecto a las disposiciones de esta Ley.

(e) Los Administradores de los Sistema de Retiro, al igual que los empleados de los Sistemas de Retiro, continuarán ejerciendo sus funciones durante el periodo de transición.

**Artículo 5.2** - Empleados de los Sistemas de Retiro.

La Oficina de Administración y Transformación de los Recursos Humanos del Gobierno de Puerto Rico, la Oficina de Gerencia y Presupuesto y la AAFAF establecerán un plan para efectuar la movilidad de los empleados de los Sistemas de Retiro a otras agencias e instrumentalidades del Gobierno de Puerto Rico, a tenor con las disposiciones de la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico" o según los procedimientos que se establezcan para esos fines mediante reglamentos, procedimientos, cartas circulares, entre otros. No obstante, los empleados continuarán ejerciendo sus funciones durante el periodo de transición que por esta Ley se establece, según sea determinado por la Junta.

Los empleados transferidos conservarán sus salarios y todos los derechos adquiridos conforme a las leyes, normas y reglamentos que les sean aplicables, y que sean compatibles con lo dispuesto en la Ley 26-2017, conocida como "Ley de Cumplimiento con el Plan Fiscal".

**Artículo 5.3** - Transferencia de Equipo y Propiedad.

La Junta de Retiro tendrá la facultad de administrar y disponer de todo el equipo y la propiedad de los Sistemas de Retiro.

## CAPÍTULO 6 –CLÁUSULAS ENMENDATORIAS

**Artículo 6.1** – Se enmienda el Artículo 2 de la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como "Ley de Retiro de la Judicatura"; para que lea como sigue:

"Artículo 2. – Definiciones.

Los términos o frases según se usan en esta Ley tendrán los significados que a continuación se expresan, salvo cuando el contexto indique claramente otro significado:

(1) Administrador – Significará la persona o la entidad que la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos", designe para ejercer las funciones de Administrador del Sistema.

…

(9) Junta – Significará la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos".

…"

**Artículo 6.2** – Se enmienda el Artículo 1-1.04 de la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, para que lea como sigue:

"Artículo 1-1.04. – Definiciones.

Los siguientes términos y frases, según se usan en esta Ley tendrán los significados que a continuación se expresan, salvo cuando el contexto indique claramente otro significado:

1) Junta. – Significará la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos".

2) Administrador. – Significará la persona o la entidad que la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos", designe para ejercer las funciones de Administrador del Sistema.

…"

**Artículo 6.3** - Se enmienda el Artículo 4-101 de la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, para que lea como sigue:

"Artículo 4-101. – Administración.

El Sistema creado por esta Ley se considerará un fideicomiso. Cualquier cambio en la estructura de beneficios que conlleve un aumento en el importe de la anualidad u otros beneficios deberá estar sustentado con estudios actuariales previos donde se determine su costo y la legislación correspondiente proveerá para su financiamiento.

El Sistema creado por esta Ley se organizará como un organismo del Gobierno de Puerto Rico, independiente y separado de otros. La Junta de Retiro no estará sujeta a las disposiciones del Plan 3-2011, según enmendado, conocido como "Plan de Reorganización de la Administración de Servicios Generales de 2011", ni de la "Ley Orgánica de la Oficina de Gerencia y Presupuesto del Gobierno", y se regirán por la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico".

La Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos", será responsable de ver que se pongan en vigor las disposiciones de esta Ley."

**Artículo 6.4** – Se derogan los incisos 11 y 12 y se renumeran los incisos 13, 14 y 15 como 11, 12 y 13, respectivamente, del Artículo 4-103 de la Ley Núm. 447 del 15 de mayo de 1951, según enmendada.

**Artículo 6.5** – Se enmienda el Artículo 1.1 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", para que lea como sigue:

"Artículo 1.1. – Definiciones.

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación a menos que del contexto surja claramente otro significado. Los tiempos usados en el presente incluyen también el futuro, y el

Case:17-03283-LTS Doc#:7800-1 Filed:07/09/19 Entered:07/09/19 15:55:15 Desc:
Case:17-00219-LTS Doc#:393-1 Filed:11/08/19 Entered:11/08/19 15:05:15 Desc:
Exhibit C Page 161 of 291

33

género masculino incluye el femenino, salvo en aquellos casos que tal interpretación resultase absurda. El número singular incluye el plural y el plural el singular.

(a) …

…

(f) Director Ejecutivo.-la persona o la entidad que la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos", designe para ejercer las funciones de Administrador del Sistema.

…

(k) Junta de Síndicos.-la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos".

…"

**Artículo 6.6** - Se enmienda el Artículo 2.3 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", para que lea como sigue:

"Artículo 2.3. – Junta de Síndicos del Sistema.

Los poderes y facultades del Sistema y la responsabilidad de establecer la organización administrativa y buen funcionamiento del mismo recaerá sobre la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos".

**Artículo 6.7** - Se derogan los Artículos 2.4, 2.5 y 2.6 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", y se renumeran los Artículos 2.7 y 2.8 como 2.4 y 2.5, respectivamente.

**Artículo 6.8** - Se enmiendan los párrafos (3), (8), (9), (11) y (14) del apartado (a) y los apartados (b) y (d) de la Sección 1081.01 de la Ley 1-2011, según enmendada, conocida como "Código de Rentas Internas para un Nuevo Puerto Rico", para que lea como sigue:

"Sección 1081.01.- Fideicomisos de Empleados.

(a) Exención.- Un fideicomiso organizado bajo las leyes de Puerto Rico que forme parte de un plan de retiro de un patrono, de participación en ganancias, bonificación en acciones o pensiones, para el beneficio exclusivo de sus empleados residentes en Puerto Rico o que rindan servicios principalmente en Puerto Rico, y de los beneficiarios de éstos y un fideicomiso organizado bajo las leyes de Puerto Rico o que sea considerado un fideicomiso doméstico bajo el Código de Rentas Internas de los Estados Unidos de 1986, según enmendado, o cualquier disposición legal sucesora, que forme parte de un plan de retiro de un patrono, de participación en ganancias, bonificación en acciones o pensiones, para el beneficio exclusivo de sus empleados residentes en Puerto Rico o empleados residentes en Puerto Rico y Estados Unidos y de los beneficiarios de éstos y que, con respecto a sus participantes y beneficiarios de los Estados Unidos, cumpla con los requisitos de cualificación de la Sección 401(a) del Código de Rentas Internas de los Estados Unidos, según enmendado (en adelante referido para propósitos de esta Sección como el "Código Federal") no será tributable bajo este Subcapítulo y ninguna otra

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:393-3 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Page 162 of 291
Exhibit C Page 79 of 87

34

disposición de este Subcapítulo será aplicable con respecto a dicho fideicomiso o a sus beneficiarios, sujeto a que en sus términos y operación cumpla con los siguientes requisitos de cualificación.-

    (1)   …

    (2)   …

    (3)   si el fideicomiso, o dos (2) o más fideicomisos, o el fideicomiso o fideicomisos y el plan o planes de anualidades son designados por el patrono como parte de un plan que cumpla con los requisitos mínimos de cubierta dispuestos en este párrafo.

        (A)   …

        (B)   …

        (C)   …

        (D)   …

        (E)   Regla Especial para Planes Cualificados en los Estados Unidos.- Si el fideicomiso está organizado en los Estados Unidos y, con respecto a todos sus participantes, incluyendo aquellos que son residentes de Puerto Rico, para un año del plan, el plan de retiro cumple con los requisitos de cubierta de la Sección 410(b) del Código Federal, se entenderá que para ese mismo año del plan el mismo cumple con los requisitos de esta Sección 1081.01(a)(3), siempre y cuando el plan haya sido debidamente certificado por el Secretario como un plan cualificado bajo esta sección.

        (F)   Exclusión de Planes de Gobierno. - Los requisitos de cubierta de la Sección 1081.01(a)(3) no han de aplicar a aquellos planes de retiro establecidos por el Gobierno de Puerto Rico, el Gobierno de los Estados Unidos, y sus respectivos municipios, agencias, instrumentalidades y corporaciones públicas.

    (4)   …

    (5)   …

    (6)   …

    (7)   …

    (8)   En el caso de cualquier plan que provee aportaciones o beneficios para empleados, todos o algunos de los cuales son empleados-dueños (según se definen en el apartado (e)) un fideicomiso que forme parte de dicho plan constituirá un fideicomiso cualificado bajo esta Sección solamente si el mismo reúne los requisitos del apartado (f). Para la pérdida de la exención en el caso de fideicomisos de empleados, bajo ciertas circunstancias, véanse las Secciones 1102.06 y 1102.07.

    (9)   El plan deberá también cumplir con las disposiciones que le sean aplicables de la Ley Federal de Seguridad en el Ingreso por Retiro ("*Employee Retirement Income Security Act of 1974*", conocida como "*ERISA*", por sus siglas en inglés).

    (10)   …

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Page 163 of 291
Exhibit C Page 80 of 87

35

(11)     Para los años contributivos comenzados a partir del 1 de enero de 2012, un fideicomiso no constituirá un fideicomiso exento bajo el apartado (a) de esta Sección si el plan del cual el fideicomiso es parte concede beneficios o aportaciones con respecto a un participante en exceso de los siguientes límites -

(A)     …

(B)     En el caso de un plan de aportaciones definidas, las aportaciones anuales del patrono y del participante y otras adiciones en relación a un participante, sin incluir aportaciones transferidas de otro plan de retiro cualificado, no pueden exceder de lo menor de:

(i)     el límite aplicable para determinado año contributivo bajo la Sección 415(c) del Código Federal, según ajustado por el Servicio de Rentas Internas Federal, o

(ii)     cien por ciento (100 %) de la compensación del participante pagada por el patrono durante el año natural o el año del plan, según seleccionado por el patrono.  La compensación del participante incluye las aportaciones que el participante hace a un plan cualificado bajo un acuerdo de aportaciones en efectivo o diferidas para ese año.

(C)     …

(12)     …

(13)     …

(14)     Agrupación de Patronos.-

(A)     …

(B)     …

(C)     Exclusión de Planes de Gobierno. - Los requisitos de agregación de patronos de la Sección 1081.01(a)(13) no han de aplicar a aquellos planes de retiro establecidos por el Gobierno de Puerto Rico, el Gobierno de los Estados Unidos, y sus respectivos municipios, agencias, instrumentalidades y corporaciones públicas.

(15)     …

(b)     Tributación del Beneficiario.-

(1)     En general.-  La cantidad realmente distribuida o puesta a disposición de cualquier participante o beneficiario por un fideicomiso de empleados exentos según la Sección 1081.01(a) será tributable a dicho participante o beneficiario en el año en el cual sea así distribuida o puesta a su disposición y le aplicarán las reglas de la Sección 1031.01(b)(11)(A) como si fuera una anualidad cuyo precio o consideración es el monto de las aportaciones voluntarias hechas por el participante, excluyendo las ganancias de inversión atribuibles a las mismas, y aquellas cantidades sobre las cuales el participante previamente pagó contribuciones sobre ingresos de Puerto Rico.

(A)     Distribuciones Totales efectuadas antes del 1 de enero de 2018.- Si la totalidad de los beneficios bajo el fideicomiso con respecto a un participante es

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/18 15:06:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Exhibit C Page 81 of 87
Exhibit C Page 164 of 291

36

pagada o puesta a la disposición del participante o su beneficiario dentro de un solo año contributivo de éste debido a la separación del servicio del participante por cualquier razón, o la terminación del plan (en adelante referida para propósitos de este apartado como una "distribución total"), el monto de dicha distribución, en la cantidad que exceda el monto aportado por el participante, que ya haya sido tributado por éste, será considerado como una ganancia de capital a largo plazo sujeta a una tasa de veinte por ciento (20 %). No obstante lo anterior, en el caso de distribuciones totales realizadas por un fideicomiso que forme parte de un plan de pensiones, participación en ganancias, de bonificación en acciones o de adquisición de acciones para empleados, si:

(i) el fideicomiso está organizado bajo las leyes del Gobierno de Puerto Rico, o tiene un fiduciario residente de Puerto Rico y utiliza a dicho fiduciario como agente pagador; y

(ii) al menos un diez por ciento (10 %) del total de los activos del fideicomiso atribuibles a los participantes residentes de Puerto Rico, computado a base del balance promedio de las inversiones del fideicomiso durante el año del plan durante el cual se realiza la distribución y cada uno de los dos años del plan precedentes a la fecha de la distribución, han estado invertidos en compañías inscritas de inversión organizadas bajo las leyes de Puerto Rico y sujetas a tributación bajo la Sección 1112.01 del Código, anualidades fijas o variables emitidas por una compañía de seguros doméstica o una compañía de seguros extranjera que durante los tres años calendarios anteriores a la fecha de la distribución derivó más del ochenta por ciento (80 %) de sus ingresos brutos de fuentes de Puerto Rico, depósitos en cuentas que devenguen intereses en bancos comerciales y mutualistas, cooperativas, asociaciones de ahorro autorizadas por el Gobierno Federal o por el Gobierno de Puerto Rico o en cualquier otra organización de carácter bancario radicada en Puerto Rico, incluyendo, pero no limitado a, certificados de depósito, o cualquier otra propiedad que mediante reglamento o carta circular el Secretario cualifique como propiedad localizada en Puerto Rico, entonces el monto de dicha distribución en exceso del monto aportado por el participante, que haya sido tributado por éste, será considerado como una ganancia de capital a largo plazo sujeta a una tasa de diez por ciento (10 %). En el caso de planes de aportación definida donde se mantiene una cuenta separada para cada participante o beneficiario, se podrá cumplir con el requisito de inversión en "propiedad localizada en Puerto Rico" en relación con los activos acreditados a la cuenta del participante o beneficiario. En el caso de transferencias de un plan cualificado bajo el apartado (a) de esta Sección (el plan cedente) a otro plan cualificado bajo el apartado (a) de esta Sección, se cumplirá con el requisito de inversión en "propiedad localizada en Puerto Rico" de este inciso (B) con respecto al plan cedente tomando en consideración el período de tiempo durante el cual el plan cedente, o la cuenta del participante en el plan cedente, cumplió con el requisito de inversión de este inciso (B). El Secretario podrá mediante reglamento, carta circular, determinación administrativa o acuerdo final

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 13:51:05 Desc:
Affidavit Page 165 of 291
Exhibit C Page 82 of 87

37

disponer la manera en que se cumplirá con el requisito de inversión en Puerto Rico.

(B) Distribuciones Totales efectuadas después del 31 de diciembre de 2017.- Si la totalidad de los beneficios bajo el fideicomiso con respecto a un participante es pagada o puesta a la disposición del participante o su beneficiario dentro de un solo año contributivo de éste debido a la separación del servicio del participante por cualquier razón, o la terminación del plan (en adelante referida para propósitos de este apartado como una "distribución total"), el monto de dicha distribución, en la cantidad que exceda el monto aportado por el participante, que ya haya sido tributado por éste, será considerado como ingreso ordinario sujeto a los tipos contributivos provistos en la Sección 1021.01. Sin embargo, en el caso de distribuciones totales con respecto a las cuales se ha cumplido con las obligaciones de retención en el origen de la Sección 1081.01(b)(3)(A) y el depósito de la Sección 1081.01(b)(4), en lugar de los tipos contributivos provistos en la Sección 1021.01, aplicará a la tasa del veinte por ciento (20 %). No obstante, si se cumplen los requisitos dispuestos en las cláusulas (i) y (ii) del inciso (A) de este párrafo, aplicará a la tasa de diez por ciento (10 %).

(C) Otras Distribuciones.- Si cualquier parte de los beneficios bajo el fideicomiso con respecto a un participante son pagados o puestos a disposición del participante o su beneficiario mediante una opción o forma de pago o distribución que no es una distribución total o un préstamo no tributable, el monto de dicho pago o distribución, en la cantidad que exceda el monto aportado por el participante, que ya haya sido tributado por éste y, de ser aplicable, la exención de ingreso de la Sección 1031.02(a)(13), será considerado como ingreso ordinario sujeto a los tipos contributivos provistos en la Sección 1021.01.

(2)     Excepción y regla especial.-

(A)     A elección del participante o beneficiario, las disposiciones del párrafo (1) de este apartado no aplicarán a aquella porción o a la totalidad de una distribución total que el plan del cual el fideicomiso exento forma parte transfiera directamente o que el participante aporte a una cuenta o anualidad de retiro individual bajo las disposiciones de la Sección 1081.02, a una cuenta de retiro individual no deducible bajo las disposiciones de la Sección 1081.03 o a un plan de retiro cualificado bajo las disposiciones del apartado (a) de esta Sección para beneficio de dicho participante o beneficiario no más tarde de los sesenta (60) días después de haber recibido dicho pago o distribución. En el caso de una transferencia a una cuenta de retiro individual no deducible, la excepción a la cual se refiere este párrafo sólo aplicará a aquellas distribuciones descritas en la Sección 1081.03(d)(5)(A). No obstante lo anterior, las aportaciones por transferencias a cuentas de retiro individual no deducibles estarán sujetas a la tributación dispuesta en la Sección 1081.03(d)(5) y, para propósitos de este párrafo se considerará que se cumple con los requisitos del mismo si se aporta a la cuenta de retiro individual no deducible una cantidad igual a la cantidad total recibida del fideicomiso cualificado por el participante o beneficiario reducida por la contribución dispuesta en dicha Sección 1081.03(d)(5) que haya sido retenida, según allí se dispone.

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Case:17-00219-LTS Doc#:39-2 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Affidavit Exhibit C Page 83 of 87

38

(B)     ...

(3)     Obligación de deducir y retener.-

(A)     Distribuciones totales.- Toda persona, cualquiera que sea la capacidad en que actúe, que efectúe distribuciones totales pagaderas con respecto a cualquier participante o beneficiario deberá deducir y retener de dichas distribuciones, efectuadas antes del 1 de enero de 2018, una cantidad igual al veinte (20%) por ciento del monto de las mismas en exceso de las cantidades aportadas por el participante al plan que hayan sido tributadas por éste. Esta deducción y retención será de diez por ciento (10 %) si el fideicomiso cumple con los requisitos dispuestos en los incisos (A) y (B) del párrafo (1) de este apartado. Disponiéndose que, para distribuciones totales efectuadas luego del 31 de diciembre de 2017, la contribución que deberá ser retenida será de diez por ciento (10 %). Para distribuciones efectuadas antes del 1 de enero de 2018, el patrono cuyos empleados participan en el plan o el administrador del plan deberá certificarle a la persona que efectúe las distribuciones del fideicomiso que se ha cumplido con el requisito de inversión en "propiedad localizada en Puerto Rico". Una vez se reciba la certificación emitida por el patrono, la persona que efectúe las distribuciones del fideicomiso no será responsable del pago de contribución, intereses o penalidades en caso de que no se haya cumplido con este requisito, pero será responsable de deducir y retener el diez por ciento (10 %).

(B)     ...

(C)     ...

(D)     ...

(E)     ...

(i)     ...

(ii)     ....

(4)     Obligación de pagar o depositar contribuciones deducidas o retenidas.- Toda persona que venga obligada a deducir y retener cualquier contribución bajo las disposiciones del párrafo (3) y a entregar en pago de dicha contribución al Secretario deberá pagar el monto de la contribución así deducida y retenida en las Colecturías de Rentas Internas de Puerto Rico del Departamento de Hacienda, depositarla en cualesquiera de las instituciones bancarias designadas como depositarias de fondos públicos que hayan sido autorizadas por el Secretario a recibir tal contribución, o depositarla utilizando medios electrónicos sujeto a lo que establezca el Secretario mediante reglamento, determinación administrativa, carta circular o boletín informativo de carácter general. La contribución deberá ser pagada o depositada no más tarde del decimoquinto (15to.) día del mes siguiente a la fecha en que se efectuó la distribución.

(5)     ...

(6)     ...

(7)     ...

(8)     Penalidad.- En caso de que cualquier persona dejare de depositar las

Case:17-03283-LTS Doc#:7890-1 Filed:07/09/19 Entered:07/09/19 15:15:05 Desc:
Case:17-00219-LTS Doc#:39-3 Filed:11/08/17 Entered:11/08/17 15:15:05 Desc:
Affidavit Exhibit C Page 84 of 8791

39

contribuciones deducidas y retenidas bajo el párrafo (3) dentro del término establecido por el párrafo (4) de este apartado (b), se impondrá a tal persona una penalidad del dos por ciento (2 %) del monto de la insuficiencia si la omisión es por treinta (30) días o menos y dos por ciento (2 %) por cada período o fracción del período adicional de treinta (30) días mientras subsista la omisión, sin que exceda de veinticuatro por ciento (24 %) en total. Para fines de este párrafo, el término "insuficiencia" significa el exceso del monto de la contribución que debió ser depositada sobre el monto, si alguno, de la misma que fue depositada en o antes de la fecha prescrita para ello. Para fines de este párrafo, la omisión no se considerará continuada después de la fecha en que la contribución sea pagada.

(9) ...

(10) ...

(c) ...

(d) Acuerdo de Aportaciones en Efectivo o Diferidas.-

(1) ...

(2) ...

(3) Solicitud de participación y normas de discriminación.-

(A) ...

...

(F) Exclusión de Planes de Gobierno.- Las normas de discriminación de la Sección 1081.01(d)(3), incluyendo la contribución impuesta en la Sección 1081.01(d)(6)(D), no han de aplicar a aquellos planes de retiro establecidos por el Gobierno de Puerto Rico, el Gobierno de los Estados Unidos, y sus respectivos municipios, agencias, instrumentalidades y corporaciones públicas.

(4) Otros requisitos.-

(A) Beneficios que no sean las aportaciones pareadas no se condicionarán a la elección para diferir.- Un acuerdo de aportaciones en efectivo o diferidas de cualquier patrono no se considerará como un acuerdo cualificado de aportaciones en efectivo o diferidas si cualquier otro beneficio establecido por el patrono está condicionado directa o indirectamente a la elección por el empleado para que el patrono le efectúe o no aportaciones bajo el plan en vez de recibirlas en efectivo. La oración anterior no aplica a ninguna aportación pareada efectuada por razón de dicha elección.

(5) ...

(6) ...

(7) ...

...

(e) ...

...."

Case:17-03283-LTS Doc#:7999-1 Filed:08/03/19 Entered:08/03/19 15:15:05 Desc:
Case:17-00219-LTS Doc#:399-1 Filed:08/03/19 Entered:08/03/19 15:15:05 Desc:
Affidavit Page 35 of 173
Exhibit C Page 168 of 291

40

# CAPÍTULO 7 - DISPOSICIONES FINALES

**Artículo 7.1** - Programa de Preretiro Voluntario.

(a) Se deroga la Ley 211-2015, según enmendada, conocida como "Ley del Programa de Preretiro Voluntario". No obstante, se garantizan todos los derechos y obligaciones creados al amparo de dicho estatuto.

(b) Aquellos Preretirados que se encuentran participando del Programa de Preretiro Voluntario al momento de aprobarse la presente Ley, continuarán disfrutando del mismo de acuerdo a las disposiciones establecidas bajo la Ley 211-2015, según enmendada.

(c) Las solicitudes de Preretiro, conforme al Programa de Preretiro Voluntario que hayan presentado debidamente los Participantes a la fecha de aprobación de esta Ley, continuarán el trámite ordinario. Se garantizarán los mecanismos de revisión, según dispuestos en la Ley 211-2015, según enmendada, y cualquier otro estatuto aplicable.

(d) Se les garantizará a los Participantes cuyos beneficios de Preretiro hayan sido previamente aprobados por la Oficina de Gerencia y Presupuesto, de acuerdo a lo dispuesto en la Ley 211-2015, según enmendada, el acogerse a los beneficios de dicho Programa.

**Artículo 7.2** - Preservación de beneficios.

Salvo por lo que se dispone expresamente en esta Ley, el derecho a recibir las Pensiones Acumuladas, la edad de retiro y otros beneficios dispuestos por leyes especiales, no se verá afectado por este estatuto, y se garantizan por el Gobierno

**Artículo 7.3** - Programa de Incentivos, Oportunidades y Readiestramiento para los servidores públicos.

Se faculta a la AAFAF a diseñar, implementar y fiscalizar programas de separación voluntaria incentivada del servicio público, programas voluntarios de oportunidades fuera del servicio público para empleados públicos de la Rama Ejecutiva, para el empleado que así lo solicite y cumpla con los requisitos establecidos mediante reglamentación interna no sujeta a la Ley 38-2017, conocida como "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico". Los mismos podrán incluir, entre otros incentivos, programas de readiestramiento, beneficios contributivos hasta el monto de la responsabilidad contributiva del empleado para determinado periodo y/o beneficios contributivos a entidades o personas del sector privado que recluten y/o ofrezcan beneficios a estos empleados públicos. Estos programas de beneficios contributivos serán establecidos e implementados por el Departamento de Hacienda. Al diseñar e implementar dicho programa, se deberá velar por el cumplimiento con el Plan Fiscal certificado conforme a PROMESA. La facultad aquí delegada a la AAFAF no incluirá el establecimiento de programas o ventanas de retiro temprano.

**Artículo 7.4** - Reglamentación.

Todos los reglamentos, órdenes, resoluciones, cartas circulares y demás documentos administrativos que gobiernan la operación de los Sistemas de Retiro que estén vigentes al entrar esta Ley en vigor, siempre que sean cónsonos con la misma, continuarán vigentes hasta tanto los mismos sean expresamente alterados, modificados, enmendados, derogados o sustituidos.

Case:17-00219-LTS Doc#:29-3 Filed:11/08/17 Entered:11/08/17 15:51:05 Desc:
Case:17-03283-LTS Doc#:789-1 Filed:07/09/19 Entered:07/09/19 15:16:15 Desc:
Exhibit C Page 86 of 87
Affidavit Page 169 of 291

41

Se faculta a la AAFAF y al Departamento de Hacienda a establecer la reglamentación y los procedimientos necesarios para la ejecución de las facultades concedidas por virtud de esta Ley de tal forma que se salvaguarden los mejores intereses de los Participantes, Beneficiarios y Retirados. Las facultades concedidas por este Artículo incluyen la autoridad de tomar cualquier medida necesaria para garantizar una transición ordenada, conforme a las disposiciones de esta Ley.

**Artículo 7.5 -** Aplicabilidad de la Ley Uniforme de Valores.

El interés de cualquier Participante en el Nuevo Plan de Aportaciones Definidas no constituirá un valor para propósitos de la Ley Núm. 60 de 18 de junio de 1963, según enmendada, conocida como la "Ley Uniforme de Valores".

**Artículo 7.6 -** Programas de Préstamos.

Por la presente se suspenden todos los programas de préstamos, por todos los conceptos, que tengan los Sistemas de Retiro al entrar en vigor esta Ley. Los préstamos ya otorgados se regirán por lo dispuesto por las leyes bajo las cuales fueron otorgados, disponiéndose que la Junta de Retiro y la AAFAF estarán facultados para externalizar estos programas, así como todo lo relacionado al servicio de los mismos.

**Artículo 7.7 -** Pareo a la Cuenta de Aportaciones Definidas.

Se autoriza a la AAFAF, tras hacer una determinación de que la situación fiscal del Gobierno se ha estabilizado y que la condición del fisco lo permite, a recomendar al Gobernador, en coordinación con la Junta de Retiro, que se incluya en el presupuesto una cantidad para parear las aportaciones de los Participantes a las Cuentas de Aportaciones Definidas. Esta determinación deberá hacerse de conformidad al Plan Fiscal certificado y a las disposiciones de PROMESA.

**Artículo 7.8 –** Responsabilidad.

Ninguna persona natural o jurídica, incluyendo funcionarios del Gobierno de Puerto Rico, las Corporaciones Públicas y los Municipios, que ejerza funciones al amparo o que emanan de esta Ley gozará de inmunidad alguna que le libere de responsabilidad personal por el incumplimiento con sus deberes impuestos por esta Ley. Esta disposición prevalecerá sobre cualquier otra disposición de ley, sea esta especial o general.

**Artículo 7.9 –** Municipios.

Para los municipios, el cómputo de la cantidad a pagar se hará exceptuando la contribución adicional uniforme.

**Artículo 7.10 -** Supremacía.

Las disposiciones de esta Ley y los reglamentos o normas que se adopten de conformidad con la misma, prevalecerán sobre cualquier otra disposición de ley, reglamento o norma que no estuviere en armonía con los primeros.

**Artículo 7.11 -** Separabilidad.

Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará,

42

perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha sentencia quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas personas o circunstancias en las que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley en la mayor medida posible, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

**Artículo 7.12 - Vigencia.**

Esta Ley comenzará a regir inmediatamente luego de su aprobación, no obstante, tendrán vigencia retroactiva aquellas disposiciones de esta Ley que así lo indican.

# EXHIBIT B

**Appendix VI**

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

PENSION FUNDING BOND RESOLUTION

Adopted on January 24, 2008

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| ARTICLE I | STATUTORY AUTHORITY | 1 |
| SECTION 101. | Authority for this Resolution | 1 |
| SECTION 102. | Resolution to Constitute Contract | 1 |
| ARTICLE II | AUTHORIZATION AND ISSUANCE OF BONDS | 1 |
| SECTION 201. | Authorization of Bonds | 1 |
| SECTION 202. | General Provisions for Issuance of Bonds | 3 |
| SECTION 203. | Special Provisions Concerning Capital Appreciation Bonds and Convertible Capital Appreciation Bonds | 4 |
| SECTION 204. | Special Provisions for Refunding Bonds | 4 |
| SECTION 205. | Delegation of Officers and Committees | 4 |
| SECTION 206. | Credit and Liquidity Facilities; Rights of Credit Facility Providers | 5 |
| SECTION 207. | Qualified Hedges | 5 |
| SECTION 208. | Parity Obligations and Subordinate Obligations | 5 |
| ARTICLE III | GENERAL TERMS AND PROVISIONS OF BONDS | 5 |
| SECTION 301. | Medium of Payment; Form and Date | 5 |
| SECTION 302. | Legends | 5 |
| SECTION 303. | Execution and Authentication | 5 |
| SECTION 304. | Negotiability, Transfer and Registry | 5 |
| SECTION 305. | Registration of Transfer of Bonds | 6 |
| SECTION 306. | Regulations with Respect to Exchanges and Registration of Transfers | 6 |
| SECTION 307. | Bonds Mutilated, Destroyed, Stolen or Lost | 6 |
| SECTION 308. | Preparation of Definitive Bonds; Temporary Bonds | 6 |
| SECTION 309. | Tender of Option Bonds or Fixed Tender Bonds | 6 |
| SECTION 310. | Book-Entry-Only System | 6 |
| ARTICLE IV | REDEMPTION OF BONDS | 6 |
| SECTION 401. | Privilege of Redemption and Redemption Price | 6 |
| SECTION 402. | Redemption at the Election of the System | 7 |
| SECTION 403. | Redemption in Satisfaction of Sinking Fund Installments | 7 |
| SECTION 404. | Selection of Bonds to be Redeemed in Partial Redemption | 7 |
| SECTION 405. | Notice of Redemption | 7 |
| SECTION 406. | Payment of Redeemed Bonds | 8 |
| SECTION 407 | Cancellation and Disposition of Bonds | 8 |
| ARTICLE V | PLEDGE, ASSIGNMENT AND SECURITY INTEREST; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF | 8 |
| SECTION 501. | Pledge, Assignment and Security Interest | 8 |
| SECTION 502. | Establishment of Fund and Accounts | 8 |
| SECTION 503. | Capitalized Interest Account | 9 |
| SECTION 504. | Revenue Account | 9 |
| SECTION 505. | Debt Service Account | 10 |
| SECTION 506. | Debt Service Reserve Account | 11 |
| SECTION 507. | Satisfaction of Sinking Fund Installments | 12 |
| SECTION 508. | Redemption Account; Amounts to be Deposited Therein | 13 |
| SECTION 509. | General Reserve Account | 13 |
| ARTICLE VI | SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS | 13 |
| SECTION 601. | Security for Deposits | 13 |
| SECTION 602. | Investment of Funds, Accounts and Subaccounts Held by the Fiscal Agent | 14 |
| SECTION 603. | Valuation and Sale of Investments | 14 |
| ARTICLE VII | PARTICULAR COVENANTS OF THE SYSTEM | 14 |
| SECTION 701. | Payment of Obligations | 14 |
| SECTION 702. | Extension of Payment of Bonds | 15 |
| SECTION 703. | Offices for Servicing Bonds | 15 |
| SECTION 704. | Further Assurance | 15 |

i

# TABLE OF CONTENTS

**Page**

SECTION 705.    Power to Issue Bonds and Assign Funds and Accounts..................................................15
SECTION 706.    Creation of Liens..................................................15
SECTION 707.    Accounts and Reports..................................................15
SECTION 708.    Issuance of Additional Bonds..................................................15
SECTION 709.    General..................................................16

ARTICLE VIII    CONCERNING THE FISCAL AGENT..................................................16

SECTION 801.    Fiscal Agent Appointment and Acceptance of Duties..................................................16
SECTION 802.    Responsibilities of Fiscal Agent..................................................17
SECTION 803.    Evidence on Which Fiscal Agent May Act..................................................17
SECTION 804.    Compensation and Indemnification..................................................17
SECTION 805.    Certain Permitted Acts..................................................17
SECTION 806.    Resignation of Fiscal Agent..................................................17
SECTION 807.    Removal of Fiscal Agent..................................................18
SECTION 808.    Appointment of Successor Fiscal Agent..................................................18
SECTION 809.    Transfer of Rights and Property to Successor Fiscal Agent..................................................18
SECTION 810.    Merger or Consolidation..................................................18
SECTION 811.    Adoption of Authentication..................................................18
SECTION 812.    Accounting by Fiscal Agent; Nonpetition Covenant..................................................18
SECTION 813.    Appointment of Co-Fiscal Agent19

ARTICLE IX    SUPPLEMENTAL RESOLUTIONS..................................................19

SECTION 901.    Supplemental Resolutions Effective upon Filing with the Fiscal Agent..................................................19
SECTION 902.    Supplemental Resolutions Effective with Consent of Bondowners..................................................20
SECTION 903.    Reserved..................................................20
SECTION 904.    General Provisions..................................................20

ARTICLE X    AMENDMENTS..................................................20

SECTION 1001.    Mailing and Publication..................................................20
SECTION 1002.    Powers of Amendment..................................................20
SECTION 1003.    Consent of Bondowners..................................................21
SECTION 1004.    Modifications by Unanimous Consent..................................................21
SECTION 1005.    Modification Before Bonds Outstanding..................................................21
SECTION 1006.    Exclusion of Bonds..................................................21
SECTION 1007.    Notation on Bonds..................................................21

ARTICLE XI    DEFAULTS AND REMEDIES..................................................22

SECTION 1101.    Events of Default..................................................22
SECTION 1103.    Priority of Payments After Event of Default..................................................22
SECTION 1104.    Termination of Proceedings..................................................23
SECTION 1105.    Bondowners' Direction of Proceedings..................................................23
SECTION 1106.    Limitation on Rights of Bondowners..................................................23
SECTION 1107.    Possession of Bonds by Fiscal Agent Not Required..................................................24
SECTION 1108.    Remedies Not Exclusive..................................................24
SECTION 1109.    No Waiver of Default..................................................24
SECTION 1110.    Notice of Event of Default..................................................24

ARTICLE XII    SUBORDINATION PROVISIONS..................................................24

SECTION 1201.    Subordination..................................................24
SECTION 1202.    Liability of Fiscal Agent and successor Fiscal Agent in respect of Subordination..................................................25
SECTION 1203.    When Payment of Subordinated Bonds and Subordinate Obligations Allowed..................................................26
SECTION 1204.    Subrogation of Owners of Subordinated Bonds and Subordinate Obligations..................................................26
SECTION 1205.    Treatment of Ancillary Bond Facilities..................................................26
SECTION 1206.    Amendments to Senior Bonds and Parity Obligations not Requiring Consent of Owners of Subordinated Bonds and Subordinate Obligations..................................................26

ARTICLE XIII MISCELLANEOUS..................................................26

SECTION 1301.    Defeasance..................................................26
SECTION 1302.    Evidence of Signatures of Bondowners and Owners of Bonds..................................................28

ii

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| SECTION 1303. | Moneys Held for Particular Bonds | 28 |
| SECTION 1304. | Preservation and Inspection of Documents | 28 |
| SECTION 1305. | Parties Interested Herein | 28 |
| SECTION 1306. | No Personal Liability | 28 |
| SECTION 1307. | Successors and Assigns | 28 |
| SECTION 1308. | Severability of Invalid Provisions | 28 |
| SECTION 1309. | Headings | 28 |
| SECTION 1310. | Conflict | 28 |
| SECTION 1311. | Governing Law | 28 |
| SECTION 1312. | Notices | 28 |
| SECTION 1313. | Jury Trial Waiver | 29 |
| SECTION 1314. | Effective Date | 29 |

## BOND RESOLUTION

**WHEREAS,** Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") is a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico;

**WHEREAS,** by virtue of the Act, the System has, among others, the duties and powers

(i)     to incur debt secured by the assets of the System;

(ii)     to receive and collect Employers' Contributions;

(iii)     to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers; and

(iv)     to sue and be sued, complain and defend in all courts of justice and administrative bodies;

**WHEREAS,** as of June 30, 2005, the System had an unfunded liability of approximately $9.9 billion pursuant to the System's actuarial evaluation report;

**WHEREAS,** the System's statutory right to receive Employers' Contributions is an obligation of the Employers and a legal asset of the System;

**WHEREAS,** as a legal asset of the System, the Employers' Contributions may be pledged to secure the debt of the System; and

**WHEREAS,** in order to decrease the unfunded liability of the System, the System wishes to issue limited, non-recourse obligations in the form of Bonds, payable solely from the Pledged Property (as defined below), which includes the Employers' Contributions; now, therefore,

**BE IT RESOLVED** by the Board of Trustees of the System, as follows:

## ARTICLE I
## STATUTORY AUTHORITY

SECTION 101.     Authority for this Resolution. This Resolution is adopted pursuant to the provisions of the Act.

SECTION 102.     Resolution to Constitute Contract. In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, this Resolution shall be deemed to be and shall constitute a contract among the System, the Owners from time to time of the Bonds and the Ancillary Facility Providers; and the security interest created in this Resolution and the covenants and agreements therein set forth to be performed on behalf of the System shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Ancillary Facility Providers, all of which shall be of equal rank without preference, priority or distinction of any of the Bonds and Ancillary Facility Providers over any other thereof, except as expressly provided in or permitted by this Resolution.

## ARTICLE II
## AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201.     Authorization of Bonds. The System may issue hereunder one or more series of Bonds of the System to be designated as "Pension Funding Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in this Resolution or in a Supplemental Resolution or as may be limited by law. There is hereby further created by this Resolution, in the manner and to the extent provided herein, a security interest and lien on the Pledged Property to secure the full and timely payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution or any Supplemental Resolution. The Bonds shall be special obligations of the System payable solely from the Pledged Property without recourse against other assets of the System. The Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202.     General Provisions for Issuance of Bonds.

1.     The Bonds may, if and when authorized by the System pursuant to one or more Supplemental Resolutions, be issued in one or more Series, as Senior Bonds or Subordinated Bonds, and the designation thereof, in addition to the name "Pension Funding Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the System may determine, including designations of Classes. Each Bond shall bear upon its face the designation so determined for the Series to which it belongs. Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, or any combination of the foregoing, or any other type of Bond that may legally be issued by the System, which in each case may include Serial Bonds or Term Bonds, or any combination thereof.

2.     Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

(i)     the authorized principal amount and designation of such Series of Bonds;

(ii)     the purpose or purposes for which such Series of Bonds are being issued, which shall be one or more of the following, to the extent then permitted by applicable law and the provisions of this Resolution:  (a) to provide sufficient funds in order to fund the System and decrease the unfunded liability of the System; (b) to refund or otherwise prepay any Bonds or other evidences of indebtedness issued by the System; (c) to pay or provide for the payment of Financing Costs, including

VI-1

but not limited to the costs of issuance; (d) to fund debt service reserves and other reserve accounts; and/or (e) for such other purposes as may be authorized by the Act, as the same may be amended and then in effect.

(iii) the date or dates, maturity date or dates and amounts of each maturity of the Bonds of such Series;

(iv) the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, and zero interest rate bonds), or the manner of determining such interest rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which and the methods by which any such rates shall be adjusted;

(v) the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, or Fixed Tender Bonds;

(vi) the designation of Bonds of such Series as Senior Bonds or as Subordinated Bonds;

(vii) the Record Date, if any, which shall be the 15th day of the month preceding the date of payment, whether or not a Business Day, if no other Record Date is specified;

(viii) the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix) if so determined by the System, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x) the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi) the Redemption Price or Prices, and the Currency in which such Prices are payable, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), *provided* that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this paragraph shall in any event be redeemable, or payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

(xii) the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for the Bonds of like maturity of such Series;

(xiii) the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv) the amount, if any, or method of determining the costs of issuance to be delivered to GDB at Closing;

(xv) if so determined by the System, provisions for the application of any moneys available therefor to the purchase or redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi) if so determined by the System, provisions for the sale of the Bonds of such Series;

(xvii) provisions for the execution and authentication of the Bonds of such Series;

(xviii) the respective forms of the Bonds of such Series and of the Fiscal Agent's certificate of authentication;

(xix) if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Maximum Interest Rate for such Bonds;

(xx) if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof, in the Currency in which the Bonds of such Series are payable;

(xxi) if Bonds of such Series are Capital Appreciation Bonds or Convertible Capital Appreciation Bonds, provisions for including the principal and interest portions of the Accreted Amount in the calculation of accrued and unpaid and accruing interest or Principal Installments for purposes of the definition of Accrued Payment Obligation;

(xxii) if Bonds of such Series are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or the Supplemental Resolution authorizes a Qualified Hedge on Bonds previously issued, provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or the Bonds hedged or to be hedged by such Qualified Hedge, as the case may be, for purposes of the Debt Service Reserve Requirement and the additional Bonds tests of Sections 204 and 708;

(xxiii) if so determined by the System, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such

VI-2

Series for the only purpose of adding resources to Revenues or Pledged Property for the benefit of the Bondowners;

(xxiv) deposits into Funds, Accounts and Subaccounts as may be required or permitted by this Resolution and not otherwise provided for above;

(xxv) if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxvi) if the amount of principal of (and premium, if any) or interest on the Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined;

(xxvii) the book-entry-only systems of registration to be chosen with respect to the Bonds of such Series, and the procedures regarding such registration and, if applicable, the rules and regulations of the book-entry-only system depository; and

(xxvii) any other provisions deemed advisable by the System, not in conflict with the provisions of this Resolution or the Act as each is then in effect.

3. Except in the case of the Series A Bonds being issued pursuant to the First Supplemental Resolution, each Series of Bonds issued by the System must satisfy the conditions contained in Section 708 in connection with the issuance of additional Bonds or in Section 204 in connection with the issuance of Refunding Bonds. Each Series of Bonds shall be executed by the System for issuance under this Resolution and delivered to the Fiscal Agent and thereupon shall be authenticated by the Fiscal Agent and delivered to the System and upon the receipt by the Fiscal Agent of:

(i) a copy of this Resolution, certified by an Authorized Officer of the System;

(ii) an Opinion of Counsel to the effect that (A) the System has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the System, is in full force and effect and is valid and binding upon the System and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid security interest for the benefit of the Owners of the Bonds on the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special, non-recourse obligations of the System as provided in the Resolution,

enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii) a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the System;

(iv) a copy of the Supplemental Resolution authorizing such Series, certified by an Authorized Officer of the System;

(v) a certificate of an Authorized Officer of the System stating that (A) the System is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the System, and (B) the System has not violated the provisions of Article VII of this Resolution; and

(vi) such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution adopted pursuant to Article IX.

SECTION 203.    Special Provisions Concerning Capital Appreciation Bonds and Convertible Capital Appreciation Bonds.

Except as otherwise may be provided in a Supplemental Resolution:

1. For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2. For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended redemption.

3. For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended exchange or substitution.

4. For purposes of Section 406, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount.

5. For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to be equal its Accreted Amount as of the date of the intended application of the subject assets.

6. For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the most recent Accretion Date.

7. For purposes of Section 1301, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

SECTION 204.  Special Provisions for Refunding Bonds.

1. Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, and only for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid purpose of the System. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2. The Refunding Bonds of such Series shall be authenticated and delivered by the Fiscal Agent only upon receipt by the Fiscal Agent (in addition to the requirements of Section 202) of:

(i) irrevocable instructions to the Fiscal Agent, in form reasonably satisfactory to it, to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii) if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication of the Refunding Bonds, irrevocable instructions to the Fiscal Agent, to provide notice in the manner provided in Section 1301 with respect to the payment of such Bonds pursuant to such Section 1301;

(iii) either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of paragraph 3 of Section 1301, which moneys and Defeasance Securities shall be held in trust and used only as provided in paragraph 3 of Section 1301; and

(iv) a certificate of an independent certified public accountant certifying that (A) the amounts described in paragraph (iii) above are sufficient, without any reinvestment, to pay or redeem all of the Bonds to be refunded, and (B) the principal and interest payable with respect to the Refunding Bonds in each year while the Refunding Bonds are Outstanding is less than the principal and interest payable with the respect to the Bonds being refunded, provided that the certificate of the independent certified public accountant shall not be required to cover the matters described in this clause (B) if the Refunding Bonds are issued in compliance with the additional Bonds test set forth in Section 708.

3. Refunding Bonds may be issued upon compliance with Section 708 in lieu of compliance with this Section.

SECTION 205.  Delegation of Officers and Committees. A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer of the System the power to issue Bonds from time to time in compliance with the provisions of this Resolution and to fix the details of any such Bonds by a certificate of such Authorized Officer. Any such action by an Authorized Officer of the System shall be in writing. Each such action by an Authorized Officer of the System with respect to any Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

SECTION 206.  Credit and Liquidity Facilities; Rights of Credit Facility Providers.

1. In connection with any Bonds, the System may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of this Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

2. Any Supplemental Resolution may provide that (i) so long as a Credit Facility is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under this Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid in the Currency in which the Bonds of such Series are payable under the provisions of a Credit Facility, all covenants, agreements and other obligations of the System to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such

Owners in accordance with the terms of such Credit Facility.

SECTION 207.   Qualified Hedges.   The System may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, *provided* that payments by the System under the Qualified Hedges do not commence until the date any Bonds to which such Qualified Hedge of Qualified Hedges relate are expected to be issued, or (iii) after the issuance of such Bonds.

SECTION 208.   Parity   Obligations   and Subordinate Obligations.   For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; *provided, however*, that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

### ARTICLE III
### GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301.   Medium of Payment; Form and Date.

1.   The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the Supplemental Resolution authorizing the issuance thereof.

2.   The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3.   Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4.   Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5.   If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of a Series authorized to be issued by such Supplemental Resolution may be issued in book entry form without definitive Bonds delivered to each beneficial owner thereof.

SECTION 302.   Legends.   The Bonds of each Series may contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of this Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the System prior to the authentication and delivery thereof.

SECTION 303.   Execution and Authentication.

1.   The Bonds shall be executed in the name of the System by the manual or facsimile signature of an Authorized Officer of the System and its seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary or an Assistant Secretary.   In case any

one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Fiscal Agent, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices.   Any Bond of a Series may be signed and sealed on behalf of the System by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the System, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

2.   The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Fiscal Agent.   Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under this Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Fiscal Agent.   Such certificate of the Fiscal Agent upon any Bond executed on behalf of the System shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under this Resolution and that the Owner thereof is entitled to the benefits of this Resolution.

SECTION 304.   Negotiability.   Transfer   and Registry.   All Bonds issued under this Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in this Resolution and in the Bonds.   So long as any of the Bonds shall remain outstanding, the Fiscal Agent shall maintain and keep, at the Corporate Trust Office, books for the registration and registration of transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Fiscal Agent shall register or cause to be registered therein, under such reasonable regulations as it or the Fiscal Agent may prescribe, any Bond entitled to registration or registration of transfer.   So long as any of the Bonds remain Outstanding, the Fiscal Agent shall also make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305.   Registration of Transfer of Bonds.

1.   The transfer of each Bond shall be registrable only upon the books of the System, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney.   Upon the registration of transfer of any such Bond, the System shall issue, and the Fiscal Agent shall authenticate, in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2.   The System and the Fiscal Agent may deem and treat the person in whose name any Bond shall be registered upon the books of the System as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the System nor the Fiscal Agent shall be affected by any notice to the contrary.

VI-5

The System agrees to indemnify and save the Fiscal Agent harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under this Resolution, in so treating such Owner.

SECTION 306.   Regulations with Respect to Exchanges and Registration of Transfers. In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the System shall execute and the Fiscal Agent shall authenticate and deliver Bonds in accordance with the provisions of this Resolution. All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Fiscal Agent. For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the System or the Fiscal Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in this Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the System nor the Fiscal Agent shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307.   Bonds Mutilated, Destroyed, Stolen or Lost. In case any Bond shall become mutilated or be destroyed, stolen or lost, the System shall execute, and thereupon the Fiscal Agent shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated, destroyed, stolen or lost or in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Fiscal Agent evidence satisfactory to the System and the Fiscal Agent that such Bond has been destroyed, stolen or lost and upon furnishing the System and the Fiscal Agent with indemnity satisfactory to it and complying with such other reasonable regulations as the System and the Fiscal Agent may prescribe and paying such expenses as the System and Fiscal Agent may incur. All Bonds so surrendered to the Fiscal Agent shall be canceled by it. Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the System, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under this Resolution, in any moneys or securities held by the System or the Fiscal Agent for the benefit of the Bondowners.

SECTION 308.   Preparation of Definitive Bonds; Temporary Bonds.

1.      Until the definitive Bonds of any Series are prepared, the System may execute, in the same manner as is provided in Section 303, and, upon the request of the System, the Fiscal Agent shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the System, and with such omissions, insertions and variations as an Authorized Officer of the System may deem

appropriate to temporary Bonds. The System at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Fiscal Agent shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to this Resolution.

2.      All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Fiscal Agent.

SECTION 309.   Tender of Option Bonds or Fixed Tender Bonds. Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.

SECTION 310.   Book-Entry-Only   System. Notwithstanding any other provision of this Resolution, the System may employ one or more book-entry-only systems of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and, if applicable, the rules and regulations of the book-entry-only system depository. Any provisions of this Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

## ARTICLE IV
## REDEMPTION OF BONDS

SECTION 401.   Privilege of Redemption and Redemption Price. Series of Bonds subject to redemption prior to maturity pursuant to the Supplemental Resolution authorizing such Series shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms, in addition to and consistent with the terms contained in this Article IV, as may be specified in such Supplemental Resolution.

SECTION 402.   Redemption at the Election of the System. In the case of any redemption of Bonds otherwise than as provided in Section 403, the System shall give written notice to the Fiscal Agent of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the System and the Fiscal Agent shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Maturity Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed, which principal amount (or Maturity Amount, if applicable) shall be determined by the System in its sole discretion, subject to any limitations with respect thereto contained in any Supplemental Resolution. Such notice shall be given at least forty (40) days prior to the redemption date or such shorter period as shall be acceptable to the Fiscal Agent. In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Fiscal Agent of moneys sufficient to pay the Redemption Price, in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other

VI-6

event as shall be stated in such notice, the System shall, prior to the redemption date, pay or cause to be paid to the Fiscal Agent an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Fiscal Agent, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds (or portions thereof) to be redeemed.

SECTION 403.    Redemption in Satisfaction of Sinking Fund Installments.

1.    In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Accreted Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2.    In the case of any redemption of Bonds out of Sinking Fund Installments, the System shall, in the case of each Sinking Fund Installment, give written notice to the Fiscal Agent of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 507) and (iii) the particular Series and maturity of the Bonds then being redeemed out of such Sinking Fund Installment.    Such notice shall be given at least forty (40) days prior to the date of such redemption, or such shorter period as shall be acceptable to the Fiscal Agent.

3.    The System shall, and hereby covenants that it will, on or prior to 11:00 a.m. (New York City time) on the date of such redemption, pay to the Fiscal Agent an amount in cash which, in addition to other moneys, if any, available therefor held by the Fiscal Agent, will be sufficient to redeem at such redemption date, at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404.    Selection of Bonds to be Redeemed in Partial Redemption.

1.    In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the System shall designate the maturities of the Bonds to be redeemed.

2.    If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, the Fiscal Agent shall select the Bonds or portions of Bonds to be redeemed in the appropriate authorized denominations by lot or by such other manner as it deems appropriate.    For purposes of this Section 404, Bonds (or portions thereof) which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405.    Notice of Redemption.

1.    When the Fiscal Agent shall receive notice from the System of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Fiscal Agent shall give notice, in the name of the System, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such redemption is conditioned upon the satisfaction of the conditions specified as provided in 2 below.    Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond (or portion thereof) to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date in the Currency in which the Bonds of such Series are payable, and that from and after such date, sufficient moneys being held by the Fiscal Agent in trust for the payment of such Redemption Price, interest thereon shall cease to accrue and be payable on the Bonds (or portions thereof) to be redeemed, unless, in the case of any conditional notice, the requisite conditions are not satisfied, and it will further state that the notice will comply with the requirements of the Securities Exchange Act of 1934, as amended, Release No. 34-23856, dated December 3, 1986, as long as such Release shall be in effect.    The Fiscal Agent shall mail a copy of such notice, postage prepaid, no less than thirty (30) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books.    Failure so to mail any such notice to any particular Owner shall not affect the validity of the proceedings for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such notice shall not affect the validity of the proposed redemption of Bonds.

2.    Any notice of optional redemption of Bonds given pursuant to this Section may be made conditional upon receipt by the Fiscal Agent of moneys sufficient to pay the Redemption Price of such Bonds in the Currency in which the Bonds of such Series are payable or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events.    Any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition is not satisfied or if any such other event does not occur.    Notice of such rescission shall be given by the Fiscal Agent to affected Owners of Bonds, in the same manner as the conditional notice of redemption was given, as promptly as practicable after the System shall have notified the Fiscal Agent of the failure of such condition or the occurrence of such other event.

SECTION 406.    Payment of Redeemed Bonds. Notice having been given in the manner provided in Section 405, the Bonds (or portions thereof) so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date in the Currency in which the Bonds of such Series are payable, and upon presentation and surrender thereof at the office specified in such notice, such Bonds (or portions thereof) shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date in the Currency in which the Bonds of such Series are payable, except to the extent the same shall not

VI-7

occur on account of a failure to comply with a condition or event stated in the notice to the Fiscal Agent pursuant to Section 402 and in the notice of redemption pursuant to Section 405. If there shall be called for redemption less than all of a Bond, the System shall execute and the Fiscal Agent shall authenticate and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the redemption date, moneys for the redemption of all the Bonds (or portions thereof) of any like Series and maturity and interest rate to be redeemed, together with interest to the redemption date, shall be held by the Fiscal Agent so as to be available therefor on said date and if notice of redemption shall have been provided as aforesaid, and, with respect to any conditional notice of redemption, the conditions stated in the notice of redemption shall have been met and satisfied, then, from and after the redemption date, interest on the Bonds (or portions thereof) of such Series and maturity and interest rate so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds (or portions thereof) shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

SECTION 407.    Cancellation    and Disposition of Bonds. All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Fiscal Agent when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled shall be disposed of by the Fiscal Agent, in accordance with the Fiscal Agent's standard procedures, and, upon request from the System, the Fiscal Agent shall execute a certificate of disposition in duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of, and one executed certificate shall be delivered to the System and the other executed certificate shall be retained by the Fiscal Agent.

**ARTICLE V**
**PLEDGE, ASSIGNMENT AND SECURITY INTEREST;**
**ESTABLISHMENT AND MAINTENANCE OF FUNDS AND**
**ACCOUNTS AND APPLICATION THEREOF**

SECTION 501.    Pledge, Assignment and Security Interest.

1.    The pledge and assignment of, and the grant of a security interest in and over, the Pledged Property, subject to Section 804, in favor of the Fiscal Agent for the benefit of the Bondholders and for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges is hereby authorized, created and granted in accordance with the terms and provisions of this Resolution and subject to the provisions of this Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in this Resolution, and in each case subject to the provisions regarding priority of payment as between the Senior Bonds and the Subordinated Bonds. Nothing contained herein shall prevent a Credit Facility or Liquidity Facility from being provided with respect to any particular Bonds and not others. To further evidence such pledge, assignment and grant of security interest, the Fiscal Agent and the System shall execute the Security Agreement and the System shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

2.    To the fullest extent provided by the Act and other applicable law, the pledge, assignment and grant

of security interest provided by this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, assignment and security interest without any physical delivery thereof or further act, and the lien of this pledge, assignment and security interest shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the System, irrespective of whether such parties have notice thereof.

SECTION 502.    Establishment of Fund and Accounts.

1.    The "Project Fund" is hereby created and the following Accounts and Subaccounts are hereby created and established within the Project Fund, each of which shall have as a prefix "Employees Retirement System of the Government of the Commonwealth of Puerto Rico" and shall be held by the Fiscal Agent:

(1)    Capitalized Interest Account,

(2)    Revenue Account,

(3)    Debt Service Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds, and each of which shall contain therein a Principal Subaccount and an Interest Subaccount,

(4)    Debt Service Reserve Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds,

(5)    General Reserve Account, and

(6)    Redemption Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds.

2.    The System may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

3.    Amounts held by the System or by the Fiscal Agent at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate Accounts and Subaccounts and shall be applied only in accordance with the provisions of this Resolution and the Act.

SECTION 503.    Capitalized Interest Account.

1.    There shall be deposited in the Capitalized Interest Account amounts, if any, determined as set forth in a Supplemental Resolution and as required by paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

2.    Moneys in the Capitalized Interest Account or any Subaccount thereof shall be transferred to the corresponding Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment

Date in accordance with the requirements of the applicable Supplemental Resolution.

3. Any amounts on deposit in the Capitalized Interest Account or any Subaccount thereof and not set aside by the System, or set aside but determined by the System to be no longer required, to pay interest on a Series of Bonds, shall be withdrawn from such Account or Subaccount by the Fiscal Agent and deposited in the Revenue Account, as directed in writing by the System.

4. In the event of the refunding of any Bonds, the System may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to such Bonds and deposit such amounts as provided in a written direction of the System; *provided, however*, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301.

SECTION 504.     Revenue Account.

1. On the last Business Day of the month, the System will transfer the Employers' Contributions to the Fiscal Agent. Immediately thereafter, but in any case no later than the next Business Day following the transfer by the System of the Employers' Contributions, all Revenues shall be deposited into the Revenue Account except as provided by Section 602.3; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by this Resolution to be so deposited. After payment to the Fiscal Agent of all amounts payable to the Fiscal Agent pursuant to Section 804, amounts on deposit from time to time in the Revenue Account shall be withdrawn and deposited as follows and in the following order of priority:

FIRST: to the Senior Bonds Debt Service Account, allocated between the Principal Subaccount and the Interest Subaccount, pro rata on the basis of the maximum amount required be held in each such Subaccount at the time of deposit, all amounts until the amount on deposit in the Senior Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

SECOND: to the Senior Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Senior Bonds;

THIRD: to the Subordinated Bonds Debt Service Account, allocated between the Principal Subaccount and the Interest Subaccount, pro rata on the basis of the maximum amount required be held in each such Subaccount at the time of deposit, all amounts until the amount on deposit in the Subordinated Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Subordinated Bonds and Parity Obligations;

FOURTH: to the Subordinated Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the

Subordinated Bonds;

FIFTH: to the payment of Operating Expenses; and

SIXTH: to the General Reserve Account, subject to the requirements established in Section 509 below, the balance of the amount so withdrawn.

2. Investment and interest earnings in each Fund, Account or Subaccount shall be applied to such Fund, Account or Subaccount pursuant to Section 602.

3. In the event that amounts are required to be paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the System shall provide written notice thereof to the Fiscal Agent so that such amounts are paid from the General Reserve Account, subject to the provisions of Section 509 hereof.

4. Operating Expenses shall be paid by the Fiscal Agent to the System pursuant to a requisition form signed by an Authorized Officer of the System and delivered to the Fiscal Agent detailing those expenses to be paid and that such expenses are permitted Operating Expenses payable under the Resolution.

SECTION 505.     Debt Service Account.

1. There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs FIRST and THIRD of Section 504.1.

2. There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Supplemental Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the General Reserve Account pursuant to Section 509.2 for the payment of interest on the Bonds and the interest component of Parity Obligations.

(iii) Amounts transferred from any Debt Service Reserve Account pursuant to Section 506.2 for the payment of interest on the Bonds and the interest component of Parity Obligations, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available to pay when due the interest on such Bonds and the interest component of Parity Obligations.

3. There also shall be deposited into the Principal Account of a Debt Service Account, if necessary, the following:

(i) Amounts transferred from the General Reserve Account pursuant to Section 509.2 for the payment of Principal Installments on the Bonds and the principal component of Parity Obligations.

(ii) Amounts transferred from the Debt Service Reserve Account pursuant to Section 506.2 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations, to the extent other funds (including, but not limited to any amounts in the General Reserve Account and the Redemption Account (see (ii) below)) are not available to pay when due the Principal Installments of such Bonds and the principal component of Parity Obligations.

(iii) Amounts transferred from the Redemption Account pursuant to Section 508 for the payment of Principal Installments of any Bonds.

4. The Fiscal Agent shall pay out of the Interest Account, to the Persons entitled thereto, in the Currency in which the Bonds of such Series are payable, (i) the interest on the Bonds as and when due and payable, and (ii) the interest component of Parity Obligations [at the times, in each case in the manner and on the other terms and conditions as determined by the System and set forth in written directions of an Authorized Officer of the System delivered to the Fiscal Agent]; *provided, however,* that amounts deposited to the Interest Account pursuant to clause (i) of paragraph 2 of this Section shall not be used to pay the interest component of Parity Obligations; and *provided further, however,* that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Fiscal Agent shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5. The Fiscal Agent shall pay out of the Principal Account, to the Persons entitled thereto, in the Currency in which the Bonds of such Series are payable, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, and (ii) the principal component of Parity Obligations, in each case described in this clause (ii) at the times, in the manner and on the other terms and conditions as determined by the System and set forth in written directions of an Authorized Officer of the System delivered to the Fiscal Agent; *provided, however,* that amounts deposited to the Principal Account pursuant to clause (ii) of paragraph 3 of this Section shall not be used to pay the principal component of Parity Obligations; and *provided further, however,* that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Fiscal Agent shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

6. In the event of the refunding of any Bonds, the Fiscal Agent shall, upon the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; *provided, however,* that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301.

7. If there is a deficiency in any Debt Service Account identified in connection with the valuation performed by the Fiscal Agent pursuant to Section 603, the Fiscal Agent shall immediately thereafter, and in any case no later than five Business Days prior to the date any payment obligation is due on the Bonds, notify the System of such deficiency. The System hereby instructs the Fiscal Agent to cover any such deficiency by transferring moneys first, from the General Reserve Account, and if such moneys are not sufficient to cover such deficiency, second, from the Debt Service Reserve Account for such Class of Bonds. In the case of a deficiency in the Debt Service Account for the Senior Bonds, if moneys in the General Reserve Account or the Senior Bonds Debt Service Account are not sufficient to cover any deficiency, the System hereby instructs the Fiscal Agent to transfer moneys first, from the Subordinated Bonds Debt Service Account and second, from the Subordinated Bonds Debt Service Reserve Account.

SECTION 506.    Debt Service Reserve Account.

1. At the time any Series of Bonds is delivered pursuant to this Resolution or any Supplemental Resolution, the System shall pay into the applicable Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to all Outstanding Bonds of such Class plus such additional Bonds being delivered, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Bonds.

2. Except as otherwise provided by any Supplemental Resolution, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer, in the Currency in which such Outstanding Bonds are payable, to the Debt Service Account or the Redemption Account, as applicable. To the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Senior Bonds and the principal and interest components of Parity Obligations, the Fiscal Agent shall, and is hereby directed by the System to transfer, amounts on deposit in the Subordinated Bonds Debt Service Reserve Account and the Subordinated Bonds Debt Service Account to the Senior Bonds Debt Service Account, before being applied to the payment of the Principal Installments and Redemption Price of and the interest on the Outstanding Subordinated Bonds and the Subordinate Obligations.

3. Whenever the amount in any Debt Service Reserve Account for a particular Class of Bonds exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Fiscal Agent shall, and is hereby directed by the System to, withdraw from such Debt Service Reserve Account the amount of such excess and deposit the moneys so withdrawn into the Revenue Account.

4. To the extent funds are not available in other funds or accounts, moneys may and, upon the

VI-10

written direction of an Authorized Officer of the System delivered to the Fiscal Agent, shall be withdrawn from the Debt Service Reserve Account by the Fiscal Agent and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, *provided* that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Fiscal Agent shall, upon the written direction of an Authorized Officer of the System, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; *provided, however*, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

5.        If, as of the last Business Day of each calendar month, a deficiency exists in the Senior Bonds Debt Service Reserve Account, identified in connection with the valuation performed by the Fiscal Agent pursuant to Section 603 hereof, the Fiscal Agent shall transfer from the General Reserve Account to the Senior Bonds Debt Service Reserve Account the amount, if any, required to cause the balance in said Account to equal the Debt Service Reserve Requirement for the Senior Bonds after giving effect to any Reserve Account Cash Equivalent. Thereafter, if, as of the last Business Day of each calendar month, a deficiency exists in the Subordinated Bonds Debt Service Reserve Account, the Fiscal Agent shall transfer from the General Reserve Account to the Subordinated Bonds Debt Service Reserve Account, after all deposits required by paragraphs FIRST, SECOND, THIRD and FOURTH of Section 504.1 have been made, the amount, if any, required to cause the balance in said Account to equal the Debt Service Reserve Requirement for the Subordinated Bonds, after giving effect to any Reserve Account Cash Equivalent.

6.        Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent.

7.        Reserve Account Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the System may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of

retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the System may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to paragraph 3 of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the System shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account moneys in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by paragraph 5 of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the System shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient moneys, or a combination of such alternatives, at the times and in the amounts required by paragraph 5 of this Section.

8.        Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then the providers of such Credit Facility or Reserve Account Cash Equivalent shall be subrogated to the rights of the relevant Bondholders, and amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied, to the extent such amounts would have been used for such purpose in accordance with the priorities set forth herein, to reimburse the provider of such Credit Facility or Reserve Account Cash Equivalent for the amounts so obtained.

SECTION 507.        Satisfaction of Sinking Fund Installments.

1.        Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the System, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Fiscal Agent prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

(i)        to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Maturity Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Fiscal Agent shall determine; or

(ii)        to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Maturity Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

2. Upon the purchase or redemption of any Bond pursuant to paragraph 1 of this Section, an amount equal to the principal amount (or Maturity Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited by the Fiscal Agent against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the System at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the System shall deliver to the Fiscal Agent a certificate of an Authorized Officer of the System specifying (i) principal amount (or Maturity Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Maturity Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3. In satisfaction, in whole or in part, of any Sinking Fund Installment, the System may deliver to the Fiscal Agent at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Fiscal Agent in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Maturity Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the System shall deliver to the Fiscal Agent a certificate of an Authorized Officer of the System specifying (i) principal amount (or Maturity Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Accreted Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4. In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, the Fiscal Agent shall credit the principal amount (or Accreted Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; *provided, however,* that the System shall have delivered to the Fiscal Agent, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the System specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Accreted Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5. The Fiscal Agent shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Accreted Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Fiscal Agent shall redeem such Bonds pursuant to Section 403.

SECTION 508. Redemption Account; Amounts to be Deposited Therein.

1. The following, upon receipt thereof, shall be deposited into the Redemption Account for the purpose of redeeming Outstanding Bonds at the option of the System:

(i) amounts determined pursuant to paragraph 3 of Section 504; and

(ii) amounts transferred from the Debt Service Reserve Accounts pursuant to Section 506 for the payment of the Redemption Price of Bonds.

2. Subject to the limitations contained in paragraph 4 of this Section, if, on the last Business Day preceding any interest payment date for the Senior Bonds, Principal Installment due date for such Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Senior Debt Service Account shall be less than the interest on such Bonds due on such interest payment date, the Principal Installment for such Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after taking into account transfers from the General Reserve Account, the Senior Bonds Debt Service Reserve Account, the Subordinated Bonds Debt Service Reserve Account and the Subordinated Bonds Debt Service Reserve Account, then the Fiscal Agent, shall, and is hereby instructed by the System to, transfer from the Senior Bonds Redemption Account to the Senior Bonds Debt Service Account an amount (or all of the moneys in the Senior Bonds Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Senior Bonds Debt Service Account.

3. Subject to the limitations contained in paragraph 4 of this Section, if, on the last Business Day preceding any interest payment date for the Subordinated Bonds, Principal Installment due date for such Bonds, or due date of interest or principal components of Subordinate Obligations, the amount on deposit in the Subordinated Debt Service Account shall be less than the interest on such Bonds due on such interest payment date, the Principal Installment for such Bonds due on such Principal Installment due date, or the interest or principal components of Subordinate Obligations due on the due date thereof, then the Fiscal Agent, shall, and is hereby instructed by the System to, transfer from the Subordinated Bonds Redemption Account to the Subordinated Bonds Debt Service Account an amount (or all of the moneys in the Subordinated Bonds Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Subordinated Bonds Debt Service Account.

4. To the extent not required to make up a deficiency as required in paragraph 2 of this Section, amounts in the Redemption Account shall be applied by the Fiscal Agent, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the System, to the purchase or redemption (including the payment of redemption premium, if any) of any particular Class of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the System from moneys held in the General Reserve Account.

VI-12

5.      The transfers required by paragraph 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 509.      General Reserve Account.

1.      There shall be transferred from the Revenue Account, after all deposits required by paragraphs FIRST through FIFTH of Section 504.1 have been made, all excess moneys into the General Reserve Account pursuant to paragraph SIXTH of Section 504.1.

2.      Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the General Reserve Account shall be applied, to the extent funds are not available therefor in the Debt Service Account of any particular Class of Bonds, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer, in the Currency in which such Outstanding Bonds are payable to such Debt Service Account or Redemption Account, as applicable.

3.      Any moneys remaining in the General Reserve Account at any time and not deposited, transferred or retained as set forth in Section 504.1, may be (i) transferred to the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, (II) the purchase of Bonds, or (III) any combination of the foregoing, in each case as directed in writing by an Authorized Officer of the System to the Fiscal Agent.

4.      Purchases of Bonds shall be made upon the written direction of an Authorized Officer of the System, with or without advertisement and with or without notice to other Owners of Bonds pursuant to the provisions of Section 507. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the System, then the Fiscal Agent, upon written instructions from an Authorized Officer of the System, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the System at the time of such purchase.

5.      Whenever the amount in the General Reserve Account, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the General Reserve Account shall be transferred, in the Currency in which such Bonds are payable, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, to the Debt Service Account established for the same Class. Prior to said transfer, all investments held in the General Reserve Accounts shall be liquidated, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

6.      Except as provided in paragraph 509.7 below, as long as any Bonds are Outstanding, moneys held in the General Reserve Account may only be transferred to the System once per year as of the last Business Day of the Bond Year, if (i) during the Bond Year, there has been no withdrawal from a Debt Service Reserve Account to fund the Debt Service Account for any Class of Bonds; (ii) the balance in the Debt Service Account for each Class of Bonds is not less than the amount required to pay in full the next Accrued Payment Obligation due on each Class of Bonds; (iii) the balance in the Debt Service Reserve Account for each Class of Bonds is not less than the corresponding Debt Service Reserve Requirement; (iv) there are no outstanding amounts due to the Fiscal Agent under this Resolution or any Supplemental Resolution; and (v) the balance in the General Reserve Account is not less than ten percent (10%) of the next Bond Year's Accrued Payment Obligation for all Outstanding Bonds on the last Business Day of the Bond Year. If these conditions are met, the Fiscal Agent may withdraw from the General Reserve Account and transfer to the System the amount in excess of ten percent (10%) of such Accrued Payment Obligation.

7.      Notwithstanding the preceding paragraph, there may be no transfers from the General Reserve Account to the System during any period in which the Employers' Contribution Rate is below 9.275% of Covered Payroll. The System shall notify the Fiscal Agent of any reduction of the Employers' Contribution Rate.

8.      Assuming compliance with paragraph 5 and 6 above, should the balance to the credit of the General Reserve Account exceed (a) twenty-five percent (25%) or (b) if Subordinated Bonds are Outstanding, fifty percent (50%) of the next Bond Year's Accrued Payment Obligation for all Classes of Bonds Outstanding, transfers may be made by the Fiscal Agent to the System at any time during a Bond Year upon written notice from the System to the Fiscal Agent and Government Development Bank for Puerto Rico. No such transfer may, however, reduce the General Reserve Account balance below (1) ten percent (10%) or (2) if Subordinated Bonds are Outstanding, twenty-five percent (25%) of the next Bond Year's Accrued Payment Obligation for all Classes of Bonds Outstanding.

## ARTICLE VI
## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601.      Security for Deposits. All moneys held hereunder by the Fiscal Agent shall be continuously and fully secured, for the benefit of the System and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal, Commonwealth or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Fiscal Agent; *provided, however*, that it shall not be necessary, unless required by applicable law, for the Fiscal Agent to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Fiscal Agent to give security for any moneys which shall be represented by obligations purchased under the provisions of this Resolution as an investment of such moneys. The Fiscal Agent shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

SECTION 602.   Investment of Funds, Accounts and Subaccounts Held by the Fiscal Agent.

1.      Moneys in any Fund, Account or Subaccount held by the Fiscal Agent shall be continuously invested and reinvested or deposited and redeposited by the Fiscal Agent upon the written direction of an Authorized Officer of the System.  The System shall direct the Fiscal Agent to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Fiscal Agent in Investment Obligations so that the maturity date or date of redemption of such Investment Obligations shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended hereunder, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another.  The Investment Obligations purchased by the Fiscal Agent shall be held by it, or for its account as Fiscal Agent.  The Fiscal Agent, at the written direction of the System as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment hereunder whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount.  The Fiscal Agent shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the System as to specific investments.  The Fiscal Agent shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the System and except that the Fiscal Agent shall invest such money as required pursuant to written direction of an Authorized Officer of the System) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the System) incurred on the sale of such investments.  The Fiscal Agent shall advise the System in writing on or before the twentieth (20th) day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2.      Investment Obligations purchased under the provisions of this Resolution as an investment of moneys in any Fund, Account or Subaccount shall be deemed at all times to be a part of such Fund, Account or Subaccount and, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, the income or interest earned and gains realized in excess of losses suffered by any Fund, Account or Subaccount due to the investment thereof shall be deposited in such Fund, Account or Subaccount.  The Fiscal Agent shall keep records of all such amounts deposited in any such Fund, Account or Subaccount to indicate the source of the income or earnings.

3.      The Fiscal Agent shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the System to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another.

4.      Nothing in this Resolution shall prevent any Investment Obligations acquired hereunder from being held in book-entry form on the books of the Treasury of the United States or of any national securities depository.

5.      In the event that the Fiscal Agent has not, prior to 11:00 a.m. (Eastern time) on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Fiscal Agent shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the System.

SECTION 603.   Valuation and Sale of Investments.

1.      In computing the amounts in any Fund, Account or Subaccount, obligations purchased as an investment of moneys therein shall be valued by the Fiscal Agent at Amortized Value on the last Business Day of each month.  Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

2.      Immediately after each such valuation performed pursuant to Section 603.1, any balance in any Debt Service Reserve Account in excess of the applicable Debt Service Reserve Fund Requirement, shall be transferred by the Fiscal Agent to the Revenue Account.

3.      The Fiscal Agent shall immediately notify the System in writing of any deficiency in the Debt Service Account or Debt Service Reserve Account that appears from the valuation performed by the Fiscal Agent pursuant to Section 603.1.

4.      The Fiscal Agent shall not be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article.

### ARTICLE VII
### PARTICULAR COVENANTS OF THE SYSTEM

The System covenants and agrees with the Fiscal Agent and the Bondowners as follows:

SECTION 701.   Payment of Obligations.  The System shall duly and punctually pay or cause to be paid the principal of and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, on the date(s), at the place(s) and in the manner mentioned in the Act, this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201.  Furthermore, the System covenants to perform all acts and enforce all its powers under the Act in order to promptly collect and remit the Employers' Contributions to the System.  In addition, the System covenants to enter into a Memorandum of Understanding with Government Development Bank for Puerto Rico to establish inter-agency mechanisms in order to make sure that Employers are current in their payments to the System.

VI-14

SECTION 702.  Extension of Payment of Bonds.
The System shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement. Nothing herein shall be deemed to limit the right of the System (i) to issue Option Bonds or Refunding Bonds as provided in herein, and such issuance shall not be deemed to constitute an extension of maturity of Bonds, or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703.  Offices for Servicing Bonds.
The Fiscal Agent shall at all times maintain one or more offices or agencies where notices, demands and other documents may be served upon the System in respect of the Bonds or of this Resolution. The System hereby appoints the Fiscal Agent as its agent to receive such notices, demands and documents.

SECTION 704.  Further Assurance.  At any and all times the System shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the System may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705.  Power to Issue Bonds and Assign Funds and Accounts.  The System is duly authorized under the Act to create and issue the Bonds and to adopt this Resolution and to create a security interest on the Pledged Property in the manner and to the extent provided in this Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by this Resolution, and all action on the part of the System to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the System, enforceable in accordance with their terms and the terms of this Resolution. The System shall at all times, to the extent permitted by law, defend, preserve and protect the assignment of the Pledged Property and all the rights of the Fiscal Agent, the Beneficiaries and the Bondowners under this Resolution against all claims and demands of all persons whomsoever.

SECTION 706.  Creation of Liens.  Until the security interest created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1301, the System shall not (i) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by the Pledged Property, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by this Resolution, nor (ii) at any time when the System is in default in making any payment required to be made under this Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by this Resolution, set apart or appropriate and pay any amount from any Fund, Account or Subaccount, except as required by this Resolution. The System may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The System, in its discretion, may determine to execute and deliver Subordinated Bonds or Subordinate Obligations, subject to compliance with Section 708 or 204 hereof.

SECTION 707.  Accounts and Reports.

1.  The System shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under this Resolution, and which, together with all books and papers of the System relating to the issuance of the Bonds, shall at all reasonable times during normal business hours be subject to the inspection of the Fiscal Agent (it being understood that the Fiscal Agent shall have no duty so to inspect).

2.  The System shall file with the Fiscal Agent and the Ancillary Facility Providers forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, in the performance by the System of any covenant, agreement or condition contained in this Resolution, a certificate signed by an Authorized Officer of the System specifying such Event of Default or other event as described in this paragraph, and if any such Event of Default or other such event shall so exist, specifying the nature and status of such Event of Default or other such event.

SECTION 708.  Issuance of Additional Bonds.
The System may issue additional Bonds, from time to time, in one or more Series within any Class, on a parity with each such Series of Bonds within such Class, and secured by the Pledged Property, upon meeting the following requirements:

1.  There shall have been delivered to the Fiscal Agent the following documents:

(i)  a report (the "Consultant's Report") from a nationally recognized, independent, economic consultant, dated no earlier than 12 months before the date of issuance of the additional Bonds, identifying the projected Employers' Contributions for each Bond Year through the final Maturity of all outstanding Bonds proposed to be issued, and the assumptions used in such projections, it being agreed that the report, dated January 11, 2008, of Global Insight, Inc. delivered in connection with the issuance of the Series A Bonds (the "Global Insight Report") shall satisfy the obligations of the System under this paragraph (i) if delivered to the Fiscal Agent in connection with the delivery of any additional Bonds or Parity Obligations hereunder prior to January 1, 2009;

(ii)  a Supplemental Resolution adopted pursuant to requirements of Section 202; and

(iii)  a certificate of an Authorized Officer of the System setting forth for each Bond Year listed in the report in clause (i) above the Accrued Payment Obligation for the additional Bonds proposed to be issued and all Bonds and Parity Obligations to be Outstanding immediately after the issuance of said additional Bonds. The certificate shall state that (a) the System has reviewed the Consultant's Report and believes that the assumptions used are reasonable (provided

that this requirement should not apply to the Global Insight Report mentioned in paragraph (i) above prior to January 1, 2009 when used during 2008); and (b) (I) in the case of Senior Bonds, for each Bond Year, the projected Employers' Contributions for such year are equal to or greater than 140% of the corresponding Accrued Payment Obligation for the additional Senior Bonds proposed to be issued and the Senior Bonds and corresponding Parity Obligations outstanding immediately after the issuance of such additional Bonds; or (II) in the case of Subordinated Bonds, for each Bond Year, the projected Employers' Contributions for such year are equal to or greater than 125% of the corresponding Accrued Payment Obligation for the additional Subordinated Bonds proposed to be issued and the Senior Bonds, Subordinated Bonds and corresponding Parity Obligations outstanding immediately after the issuance of such additional Bonds.

2. Refunding Bonds issued pursuant to Section 204 of this Resolution which generate savings in every Bond Year are exempt from complying with the coverage tests required by (iii) above.

SECTION 709. General.

1. The System shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the System under the provisions of the Act and this Resolution. Specifically, the System shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the System with regards to the collection of the Employers' Contributions as provided in the Act.

2. The System shall oppose any attempt by the Legislature of the Commonwealth to reduce the Employers' Contribution Rate or to make any other change in the Act or any other relevant legislation that would have a material adverse effect on Bondholders. Such opposition shall include delivering written position papers to the Legislature of the Commonwealth, appearing before Legislative committees, and contacting individual legislators and other government officials to make legislators and other government officials aware that such reductions in the Employers' Contribution Rate or other changes may adversely affect the ability of the System to comply with its obligations and may ultimately have an adverse effect on the credit of the Commonwealth.

3. Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and this Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the System, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**ARTICLE VIII**
**CONCERNING THE FISCAL AGENT**

SECTION 801. Fiscal Agent Appointment and Acceptance of Duties. The Bank of New York is hereby appointed as Fiscal Agent under this Resolution. The Fiscal Agent shall signify its acceptance of the duties and obligations imposed upon it by this Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Fiscal Agent shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in this Resolution.

SECTION 802. Responsibilities of Fiscal Agent. The Fiscal Agent undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Fiscal Agent. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the System and the Fiscal Agent assumes no responsibility for the correctness of the same. The Fiscal Agent makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Fiscal Agent shall incur no liability in respect thereof. The Fiscal Agent makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the System therein, or the security provided thereby or by this Resolution. The Fiscal Agent shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Fiscal Agent shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the System. The Fiscal Agent shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law. No provision of this Resolution shall be deemed to impose any duty or obligation on the Fiscal Agent to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Fiscal Agent shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Fiscal Agent shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Fiscal Agent shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Fiscal Agent security or indemnity satisfactory to the Fiscal Agent against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Fiscal Agent to take actions enumerated in this Resolution shall not be construed as a duty. The Fiscal Agent shall not be liable in connection with the performance of its duties under this Resolution except for its own gross negligence or willful misconduct. The Fiscal Agent shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Fiscal Agent, unless it shall be proved that the Fiscal Agent was grossly negligent in ascertaining the pertinent facts. The Fiscal Agent shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Fiscal Agent or exercising any trust or power conferred upon the Fiscal Agent under this Resolution. The Fiscal Agent shall not be liable for any action taken, suffered, or

omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Fiscal Agent be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Fiscal Agent has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Fiscal Agent shall be subject to the provisions of this Article VIII.

SECTION 803.    Evidence on Which Fiscal Agent May Act.

1.      The Fiscal Agent may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Fiscal Agent may consult with counsel, who may or may not be of counsel to the System, and the opinion or advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under this Resolution in good faith and in reliance thereon; provided, however, that such opinion or advice of counsel shall not relieve the Fiscal Agent from obtaining an Opinion of Counsel when and if required under this Resolution.

2.      Whenever the Fiscal Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under this Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the System, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of this Resolution in reliance thereon. The Fiscal Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3.      Except as otherwise expressly provided in this Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the System to the Fiscal Agent shall be sufficiently evidenced if executed in the name of the System by an Authorized Officer of the System.

SECTION 804.    Compensation and Indemnification. The System shall pay to the Fiscal Agent from time to time reasonable compensation for all services rendered under this Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a fiscal agent or trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under this Resolution. The System further agrees to indemnify and save the Fiscal Agent harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Fiscal Agent), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any

claim (whether asserted by the System or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Fiscal Agent incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Fiscal Agent" for purposes of this Section 804 shall include any predecessor Fiscal Agent; provided, however, that the negligence, willful misconduct or bad faith of any Fiscal Agent hereunder shall not affect the rights of any other Fiscal Agent hereunder. The obligations of the System and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of this Resolution or the earlier resignation or removal of the Fiscal Agent. The Fiscal Agent shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of this Resolution. The Fiscal Agent shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under this Resolution.

SECTION 805.    Certain Permitted Acts. The Fiscal Agent may become the owner of any Bonds, with the same rights it would have if it were not the Fiscal Agent. To the extent permitted by law, the Fiscal Agent may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or this Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Fiscal Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Fiscal Agent shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Fiscal Agent, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Fiscal Agent in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806.    Resignation of Fiscal Agent. The Fiscal Agent may at any time resign and be discharged of the duties and obligations created by this Resolution by giving not less than forty-five (45) days' written notice to the System (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the System or the Bondowners as provided in Section 808, in which event such resignation shall take effect immediately on the appointment of such successor. The Fiscal Agent shall also mail a copy of the notice required to be given by this Section, postage prepaid, to the Owners of the Bonds, at their last addresses appearing on the registry books.

SECTION 807.    Removal of Fiscal Agent. The Fiscal Agent may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to

the Fiscal Agent, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the System, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Fiscal Agent and signed by an Authorized Officer of the System; *provided, however*, that in each case that a successor Fiscal Agent shall be simultaneously appointed with the filing of such instrument.

SECTION 808. Appointment of Successor Fiscal Agent.

1. In case at any time the Fiscal Agent shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Fiscal Agent, or of its property, shall be appointed, or if any public officer shall take charge or control of the Fiscal Agent, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the System, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Fiscal Agent; notification thereof being given to the System and the predecessor Fiscal Agent; *provided, nevertheless*, that unless a successor Fiscal Agent shall have been appointed by the Bondowners as aforesaid, the System by a duly executed written instrument signed by an Authorized Officer of the System shall forthwith appoint a Fiscal Agent to fill such vacancy until a successor Fiscal Agent shall be appointed by the Bondowners as authorized in this Section. The Fiscal Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Fiscal Agent appointed by the System shall, immediately and without further act, be superseded by a Fiscal Agent appointed by the Bondowners.

2. If in a proper case no appointment of a successor Fiscal Agent shall be made pursuant to the foregoing provisions of this Section within thirty (30) days after the Fiscal Agent shall have given to the System written notice as provided in Section 806 or after a vacancy in the office of the Fiscal Agent shall have occurred by reason of its inability to act or its removal under Section 807, the Fiscal Agent or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Fiscal Agent. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Fiscal Agent.

3. Any Fiscal Agent appointed under the provisions of this Section in succession to the Fiscal Agent shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000 (or whose obligations hereunder are guaranteed by a bank or trust company duly authorized to exercise corporate trust powers and subject to examination by federal or state authority, of good standing, and having at the time of the appointment of such Fiscal Agent, a combined capital and surplus of at least such amount), if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by this Resolution.

SECTION 809. Transfer of Rights and Property to Successor Fiscal Agent. Any successor Fiscal Agent appointed under this Resolution shall execute, acknowledge and deliver to its predecessor Fiscal Agent, and also to the System, an instrument accepting such appointment, and thereupon such successor Fiscal Agent, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Fiscal Agent, with like effect as if originally named as Fiscal Agent; but the Fiscal Agent ceasing to act shall nevertheless, on the written request of the System, or of the successor Fiscal Agent, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Fiscal Agent all the right, title and interest of the predecessor Fiscal Agent in and to any property held by it under this Resolution, and shall pay over, assign and deliver to the successor Fiscal Agent any money or other property subject to the trusts and conditions herein set forth but subject to Section 804. Should any deed, conveyance or instrument in writing from the System be required by such successor Fiscal Agent for more fully and certainly vesting in and confirming to such successor Fiscal Agent any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the System.

SECTION 810. Merger or Consolidation. Any company into which the Fiscal Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Fiscal Agent may sell or transfer all or substantially all of its corporate trust business, *provided* such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by this Resolution, shall be the successor to the Fiscal Agent without the execution or filing of any paper or the performance of any further act.

SECTION 811. Adoption of Authentication. In case any of the Bonds contemplated to be issued under this Resolution shall have been authenticated but not delivered, any successor Fiscal Agent may adopt the certificate of authentication of any predecessor Fiscal Agent so authenticating such Bonds and deliver such Bonds so authenticated, and in case any of the said Bonds shall not have been authenticated, any successor Fiscal Agent may authenticate such Bonds in the name of the successor Fiscal Agent; and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in this Resolution provided that the certificate of authentication of the Fiscal Agent shall have.

SECTION 812. Accounting by Fiscal Agent; Nonpetition Covenant. The Fiscal Agent shall, upon receipt of a written request therefor from the System, provide to the System an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under this Resolution as of the date of such accounting. Notwithstanding any prior termination of this Resolution, the Fiscal Agent shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the System to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the System under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the System or any

substantial part of its property, or ordering the winding up or liquidation of the affairs of the System.

### SECTION 813. Appointment of Co-Fiscal Agent.

(a) Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Fiscal Agent shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-fiscal agent or co-fiscal agents, or separate fiscal agent or separate fiscal agents (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Fiscal Agent may consider necessary or desirable (including title to the Pledged Property or any part thereof). Each co-fiscal agent or separate fiscal agent hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Fiscal Agent shall, at the expense of the System, provide prompt notice to holders of the appointment of any co-fiscal agent or separate fiscal agent.

(b) Every separate fiscal agent and co-fiscal agent shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Fiscal Agent shall be conferred or imposed upon and exercised or performed by the Fiscal Agent and such separate fiscal agent or co-fiscal agent jointly (it being understood that such separate fiscal agent or co-fiscal agent is not authorized to act separately without the Fiscal Agent joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Fiscal Agent shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Fiscal Agent;

(ii) no fiscal agent hereunder shall be personally liable by reason of any act or omission of any other fiscal agent hereunder; and

(iii) the Fiscal Agent may at any time accept the resignation of or remove any separate fiscal agent or co-fiscal agent.

(c) Any notice, request or other writing given to the Fiscal Agent shall be deemed to have been given to each of the then separate fiscal agent and co-fiscal agent, as effectively as if given to each of them. Every instrument appointing any separate fiscal agent or co-fiscal agent shall refer to this Resolution and the conditions of this Section 813. Each separate fiscal agent and co-fiscal agent, upon its acceptance of the

trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Fiscal Agent or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Fiscal Agent. Every such instrument shall be filed with the Fiscal Agent.

(d) Any separate fiscal agent or co-fiscal agent may at any time constitute the Fiscal Agent its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Fiscal Agent, to the extent permitted by law, without appointment of a new or successor fiscal agent.

### ARTICLE IX
### SUPPLEMENTAL RESOLUTIONS

### SECTION 901. Supplemental Resolutions Effective upon Filing with the Fiscal Agent. For any one or more of the following purposes and at any time or from time to time, the System may adopt a Supplemental Resolution, which, upon the filing with the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System, and without the need to obtain the consent of any Bondholder, shall be fully effective in accordance with its terms:

(i) to close this Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in this Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii) to add to the covenants and agreements of the System in this Resolution, other covenants and agreements to be observed by the System which are not contrary to or inconsistent with this Resolution as theretofore in effect;

(iii) to add to the limitations and restrictions in this Resolution, other limitations and restrictions to be observed by the System which are not contrary to or inconsistent with this Resolution as theretofore in effect;

(iv) to surrender any right, power or privilege reserved to or conferred upon the System by this Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v) to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with this Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi) to confirm, as further assurance, any pledge and assignment under, and the subjection to any lien, assignment or pledge created or to be created by, this Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of this Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

(viii)    to cure any ambiguity, defect or inconsistent provision in this Resolution;

(ix)    if such Supplemental Resolution authorizes Bonds of a Series that are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or authorizes a Qualified Hedge on Bonds previously issued, to add provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Bonds, for purposes of the Debt Service Reserve Requirement and the additional Bonds tests of Sections 204 and 708;

(x)    to provide such provisions with respect to Subordinated Bonds as are necessary and desirable, *provided*, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

(xi)    to provide for a security interest on the Pledged Property for the payment and as security for Credit Facilities, Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

(xii)    as permitted by Section 1005;

(xiii)    to insert such provisions clarifying matters or questions arising under this Resolution as are necessary or desirable and are not contrary to or inconsistent with this Resolution as theretofore in effect; or

(xiv)    to modify any of the provisions of this Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, *provided* that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902.    Supplemental    Resolutions Effective with Consent of Bondowners. At any time or from time to time, the System may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 903.    Reserved.

SECTION 904.    General Provisions.

1.    This Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X. Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the System to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the System to execute and deliver to the Fiscal Agent any instrument which elsewhere in this Resolution it is provided shall be delivered to the Fiscal Agent.

2.    Any Supplemental Resolution referred to and permitted or authorized by Section 901 may be adopted by the System without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Section. The copy of every Supplemental Resolution when delivered to the Fiscal Agent shall be accompanied by an Opinion of Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of this Resolution, is authorized or permitted by this Resolution, and is valid and binding upon the System and enforceable in accordance with its terms. Before any Supplemental Resolution becomes effective under this Article, the System shall mail to the Owners a notice briefly describing such Supplemental Resolution; *provided, however*, the failure to give such notice, or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.    The Fiscal Agent is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901 or 902 and to make all further agreements and stipulations which may be therein contained, and the Fiscal Agent, in taking such action in good faith, shall be fully protected in relying on an Opinion of Counsel that such Supplemental Resolution is authorized or permitted by the provisions of this Resolution.

4.    No Supplemental Resolution shall change or modify any of the rights or obligations of the Fiscal Agent without its written assent thereto.

ARTICLE X
AMENDMENTS

SECTION 1001.    Mailing and Publication.

1.    Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the System, and (ii) to the Fiscal Agent.

2.    In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by this Resolution, then such notification as shall be made with the approval of the Fiscal Agent shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002.    Powers of Amendment. Any modification or amendment of this Resolution and of the rights and obligations of the System and of the Owners of the Bonds may be

made by a Supplemental Resolution, with the written consent, given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; *provided, however*, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Accreted Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Accreted Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Accreted Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Fiscal Agent without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of this Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Fiscal Agent may, but shall not be obligated to, determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of this Resolution, and any such determination if reasonable and in good faith shall be binding and conclusive on the System and all Owners of Bonds.

SECTION 1003.   Consent of Bondowners.   The System may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 902, to take effect when and as provided in this Section. A copy of such Supplemental Resolution (or brief summary thereof or reference thereto in form approved by the Fiscal Agent) together with a request to Bondowners for their consent thereto in form satisfactory to the Fiscal Agent, shall be mailed by the System to all affected Bondowners. Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Fiscal Agent (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002, and (b) an Opinion of Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the System in accordance with the provisions of this Resolution, is authorized or permitted by this Resolution, and is valid and binding upon the System and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided. Ownership of Bonds shall be conclusively presumed by the registration books of the System. Any such consent shall be binding upon the Owner of the Bonds giving such consent, and anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Fiscal Agent, prior to the time when the written statement of the Fiscal Agent hereinafter

in this Section provided for is filed. At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Fiscal Agent shall make and file with the System a written statement that the Owners of such required percentage of the aggregate principal amount of Bonds have filed such consents. Such written statement shall be conclusive that such consents have been so filed. At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the System on a stated date, a copy of which is on file with the Fiscal Agent) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds and will be effective as provided in this Section, shall be given Bondowners by the System by mailing such notice to Bondowners. The System shall file with the Fiscal Agent proof of the mailing of such notice. A record, consisting of the papers required or permitted by this Section 1003 to be delivered to the Fiscal Agent, shall be proof of the matters therein stated.

SECTION 1004.   Modifications by Unanimous Consent.   The terms and provisions of this Resolution and the rights and obligations of the System and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the System with the Fiscal Agent of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

SECTION 1005.   Modification Before Bonds Outstanding.   Prior to the issuance and delivery of the first Series of Bonds under this Resolution, the terms and conditions of this Resolution and the rights and obligations of the System and of the Owners of the Bonds may be modified or amended in any respect without the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System.

SECTION 1006.   Exclusion of Bonds.   Bonds owned or held by or for the account of the System shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the System shall not be entitled with respect to such bonds to give any consent or take any other action provided for in this Article. At the time of any consent or other action taken under this Article, the System shall furnish the Fiscal Agent a certificate of an Authorized Officer, upon which the Fiscal Agent may rely, describing all Bonds so to be excluded.

SECTION 1007.   Notation on Bonds.   Bonds authenticated and delivered after the effective date of any action taken as provided in Article IX or this Article may, and, if the Fiscal Agent so determines, shall, bear a notation by endorsement or otherwise in form approved by the System and the Fiscal Agent as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and presentation of his Bond for the purpose at the Corporate Trust Office of the Fiscal Agent, suitable notation shall be made on such Bond by the Fiscal Agent as to any such action. If the System or the Fiscal Agent shall so determine, new Bonds so modified to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

VI-21

## ARTICLE XI
## DEFAULTS AND REMEDIES

SECTION 1101.    Events of Default.

Each of the following events shall constitute an Event of Default under this Resolution:

(i)    There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto in the Currency in which such Bond, Parity Obligation or Subordinate Obligation is payable, after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)    There shall occur a failure to observe, or a refusal to comply with, the terms of this Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this paragraph; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in this Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the System by the Fiscal Agent or any Beneficiary. If prior to the expiration of the abovementioned thirty (30) day period, the System shall request in writing an extension of time and the System shall certify in such request that the failure stated in the notice cannot be remedied within such 30-day period, then such thirty (30) day period shall be extended for an additional thirty (30) days if corrective action has been instituted by the System and is being diligently pursued;

provided, that all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

SECTION 1102.    Remedies.

1.    The Fiscal Agent may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Fiscal Agent, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)    by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the System to collect Revenues adequate to carry out the covenants, agreements and assignments with respect thereto contained in this Resolution and to require the System to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged and assigned under this Resolution;

(iii)    by action or suit in equity, to require the System to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property pledged and assigned under this Resolution as shall be within its control; and

(iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2.    In the enforcement of any remedy under this Resolution, but subject to Sections 201, 501 and 1206, the Fiscal Agent shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and, at any time remaining, due from the System for principal, Redemption Price, interest or otherwise for Bonds under any provision of this Resolution or any Supplemental Resolution or of or on the Bonds, and unpaid, with interest on overdue payments, to the extent permitted by law, at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Fiscal Agent or of the Bondowners, and to recover and enforce judgment or decree against the System for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

SECTION 1103.    Priority of Payments After Event of Default.

1.    Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Fiscal Agent and its agents and attorneys necessary in the opinion of the Fiscal Agent to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Fiscal Agent and its agents and attorneys in the performance of their duties under this Resolution, in the event that the funds held by the Fiscal Agent shall be insufficient for the payment of interest and principal or Accreted Amount or Redemption Price then due on the Bonds in the Currency or Currencies in which such Bonds are payable, respectively, and other amounts payable as described in clauses FIRST through FIFTH of this paragraph 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Fiscal Agent and any moneys or other property distributable in respect of the System's obligations under this Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Ancillary Bond Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Senior Bonds and the interest component of Parity Obligations then due, and thereafter, in the order of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the

payment of any interest due and payable after maturity on such Bonds and the interest component of the Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Senior Bonds and the unpaid principal component of Parity Obligations, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of all installments of interest on the Subordinated Bonds and the interest component of Parity Obligations then due, and thereafter, in the order of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations;

FIFTH: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Subordinated Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

SIXTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the System under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

SEVENTH: to the payment to the Persons entitled thereto of amounts payable to the System under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clauses FIRST through SIXTH of this paragraph.

2. The provisions of this Section are in all respects subject to the provisions of Section 702.

3. Whenever moneys are to be applied by the Fiscal Agent pursuant to this Section, such moneys shall be applied by the Fiscal Agent at such times, and from time to time, as provided above. The deposit of such moneys with the Fiscal Agent, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Fiscal Agent and the Fiscal Agent shall incur no liability whatsoever to the System, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Fiscal Agent acts without gross negligence or willful misconduct. Whenever the Fiscal Agent shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Fiscal Agent shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Accreted Amount, if any) to be paid on such date shall cease to accrue. The Fiscal Agent shall give such notice as it may deem appropriate for the fixing of any such date. The Fiscal Agent shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Fiscal Agent for appropriate endorsement or for cancellation if fully paid.

SECTION 1104. Termination of Proceedings. In case any proceeding taken by the Fiscal Agent on account of any Event of Default has been discontinued or abandoned for any reason, other than payment in full, then in every such case the System, the Fiscal Agent, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Fiscal Agent shall continue as though no other such proceeding had been taken.

SECTION 1105. Bondowners' Direction of Proceedings. Except as otherwise provided in this Resolution, the Owners of a majority in principal amount of the Bonds in order of Class Priority then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Fiscal Agent, to direct the method of conducting remedial proceedings to be taken by the Fiscal Agent with respect to the Bonds of such Class Priority, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, and that the Fiscal Agent shall have the right to decline to follow any such direction which in the opinion of the Fiscal Agent would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Fiscal Agent in personal liability.

SECTION 1106. Limitation on Rights of Bondowners.

1. No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Fiscal Agent written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds in the order of Class Priority then Outstanding shall have made written request of the Fiscal Agent after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Fiscal Agent a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Fiscal Agent reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Fiscal Agent shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and

offer of indemnity are hereby declared in every such case to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or that this Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal (or Accreted Amount, if any) of and interest on such Owner's Bonds or the obligation of the System to pay the principal (or Accreted Amount, if any) of and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2.     Anything to the contrary contained in this Section notwithstanding, or any other provision of this Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under this Resolution, or in any suit against the Fiscal Agent for any action taken or omitted by it as Fiscal Agent, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Fiscal Agent, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds in the order of Class Priority then Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107.     Possession of Bonds by Fiscal Agent Not Required.  All rights of action under this Resolution or under any of the Bonds, enforceable by the Fiscal Agent, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Fiscal Agent shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108.     Remedies Not Exclusive.  No remedy herein conferred upon or reserved to the Fiscal Agent or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

SECTION 1109.     No Waiver of Default.  No delay or omission of the Fiscal Agent, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein, and every power and remedy given by this Resolution to the Fiscal Agent and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110.     Notice of Event of Default.  The Fiscal Agent shall give to the Bondowners and the Beneficiaries

notice of each Event of Default hereunder known to the Fiscal Agent within ninety (90) days after actual knowledge by an Authorized Officer of the Fiscal Agent of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice.  However, except in the case of default in the payment of the principal (or Accreted Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Fiscal Agent shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Fiscal Agent in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Fiscal Agent by mailing written notice thereof:  (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the registry books kept by the Fiscal Agent, (ii) to each of the Rating Agencies, and (iii) to such other Persons as may be required by law.

## ARTICLE XII
## SUBORDINATION PROVISIONS

SECTION 1201.     Subordination.

(a)     Subordinated Bonds and Subordinate Obligations shall to the extent provided in this Article be subordinate and subject in right of payment to the prior payment in full of the Senior Bonds and Parity Obligations, and the owner of any Subordinated Bond and Subordinate Obligation, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provision. The Fiscal Agent shall be entitled to all rights set forth in this Article with respect to any Senior Bonds and Parity Obligations at any time held by it, to the same extent as any other Owner of Senior Bonds and Parity Obligations. Notwithstanding anything to the contrary contained in this Article XII, in no event shall any amounts payable to the Fiscal Agent under Section 804 be subject to the provisions of this Article XII.

(b)     Upon any payment or distribution of assets of the System upon any dissolution or winding up or total or partial liquidation of the System whether in bankruptcy, insolvency or receivership proceedings, or otherwise,

(1)     all Senior Bonds and Parity Obligations shall first be paid or duly provided for to the extent of such payment or distribution before any payment is made upon the indebtedness evidenced by the Subordinated Bonds or Subordinate Obligations;

(2)     any payment or distribution of assets of the System of any kind or character, whether in cash, property or securities, to which the owners of the Subordinated Bonds or Subordinate Obligations or the Fiscal Agent (on behalf of the Owners of the Subordinated Bonds or the Subordinate Obligations) would be entitled except for the provisions of this Article XII, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness or other obligations of the System being subordinated to the payment of the Subordinated Bonds and Subordinate Obligations, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the owners of Senior Bonds and Parity Obligations, to the extent necessary to pay or provide for the payment of all Senior Bonds and Parity Obligations in full before any payment is made upon the indebtedness

evidenced by the Subordinated Bonds and Subordinate Obligations; and

(3) notwithstanding the foregoing, in the event that, upon any such dissolution or winding up or liquidation, any payment or distribution of assets of the System of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness or other obligations of the System being subordinate to the payment of the Subordinated Bonds and Subordinate Obligations, shall be received by the Fiscal Agent or by the owners of the Subordinated Bonds or Subordinate Obligations (or by the Fiscal Agent on behalf of the Owners of the Subordinated Bonds or the Subordinate Obligations) before all Senior Bonds and Parity Obligations are paid or duly provided for in full, such payment or distribution shall be paid over to the owners of such Senior Bonds and Parity Obligations for application to the payment thereof until such Senior Bonds and Parity Obligations shall have been paid or provision for such payment shall have been made in full.

Upon any payment or distribution of assets of the System referred to in this Section 1201, the Fiscal Agent and the owners of the Subordinated Bonds and Subordinate Obligations shall be entitled to rely upon (i) any order or decree of a court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending or (ii) a certificate of the liquidating trustee or agent or other person making any payment or distribution to the Fiscal Agent or the owners of the Subordinated Bonds and Subordinate Obligations for the purpose of ascertaining the persons entitled to participate in such payment or distribution, the owners of Senior Bonds and Parity Obligations and other indebtedness of the System, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto, or to this Article.

(c)     (1)     In the event that moneys available to pay Bonds shall not be sufficient to pay in full all amounts due on the Bonds, the owners of all Senior Bonds and Parity Obligations then Outstanding shall be entitled to receive payment in full of all principal of and interest on all such obligations then due and payable before the owner of any Subordinated Bond or Subordinate Obligation is entitled to receive any payment from the Pledged Property of principal (and premium, if any) or interest upon such Subordinated Bond and Subordinate Obligation.

(2)     The provisions of subsection (b) and (c) are solely for the purpose of defining the relative rights of the owners of Senior Bonds and Parity Obligations on the one hand, and the owners of Subordinated Bonds and Subordinate Obligations on the other hand, and nothing therein shall impair, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, the obligation of the System, which is unconditional and absolute, to pay to the owners thereof the principal thereof and premium, if any, and interest thereon in accordance with their terms, nor shall anything therein prevent the owners of the Subordinated Bonds and Subordinate Obligations from exercising all remedies otherwise permitted by applicable law or thereunder upon default thereunder, subject to the rights under subsections (b) and (c) of the owners of Senior Bonds and Parity Obligations to receive cash, property or securities from the funds pledged to Senior Bonds and Parity Obligations under this Resolution otherwise payable or deliverable to the owners of the Subordinated Bonds and Subordinate Obligations; and insofar as a trustee, fiscal agent or paying agent for such Subordinated Bonds and Subordinate Obligations is concerned, the foregoing provisions shall not prevent the

application by such trustee, fiscal agent or paying agent of any moneys deposited with such trustee, fiscal agent or paying agent for the purpose of the payment of or on account of the principal (and premium, if any) and interest on such Subordinated Bonds and Subordinate Obligations if such trustee, fiscal agent or paying agent did not have knowledge at the time of such application that such payment was prohibited by the foregoing provisions.

(d)     No owner of Senior Bonds and Parity Obligations shall be prejudiced in this right to enforce subordination of the Subordinated Bonds and Subordinate Obligations by any act or failure to act on the part of the System.

(e)     Any issue of Subordinated Bonds and Subordinate Obligations may have such rank or priority with respect to any other issue of Subordinated Bonds and Subordinate Obligations as may be provided herein, in the applicable Supplemental Resolution or other instrument securing such issue of Subordinated Bonds and Subordinate Obligations and may contain such other provisions as are not in conflict with the provisions of this Resolution.

SECTION 1202.     Liability of Fiscal Agent and successor Fiscal Agent in respect of Subordination.

With respect to the Owners of Senior Bonds and Parity Obligations, the Fiscal Agent undertakes to perform or to observe only such of its covenants and objectives as are specifically set forth in this Resolution, and no implied covenants or obligations with respect to the owners of Senior Bonds and Parity Obligations shall be read into this Resolution against the Fiscal Agent. Neither the Fiscal Agent nor any successor Fiscal Agent shall be deemed to owe any fiduciary duty to the owners of Subordinated Bonds and Subordinate Obligations and shall not be liable to such owners if it shall mistakenly pay over or transfer to owners of Senior Bonds and Parity Obligations, the System or any other person, moneys to which any owners of Subordinated Bonds and Subordinate Obligations shall be entitled by virtue of this Section 1202 or otherwise; provided, however, that neither the Fiscal Agent nor any successor Fiscal Agent shall be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct. Notwithstanding any of the provisions of this Section 1202 or any other provision of this Resolution, neither the Fiscal Agent nor any such successor Fiscal Agent shall at any time be charged with knowledge of the existence of any facts that would prohibit the making of any payment of moneys to or by the Fiscal Agent or any such successor Fiscal Agent in respect of Subordinated Bonds and Subordinate Obligations or of any default in the payment of the principal of or premium, if any, or interest on any Subordinated Bonds and Subordinate Obligations, unless and until the Fiscal Agent or such successor Fiscal Agent shall have received written notice thereof from the System or the owners of a majority in principal amount of any class or category of any Subordinated Bonds and Subordinate Obligations or from any fiscal agent or other fiduciary therefor and any financial institution that provides credit or security for any Subordinated Bonds and Subordinate Obligations; and before the receipt of any such written notice, the Fiscal Agent shall be entitled in all respects to assume that no such facts exist; provided, however, that if the Fiscal Agent shall not have received the notice provided for in this Section 1202 at least two Business Days prior to the date upon which by the terms hereof any money may become payable for any purpose (including, without limitation, the payment of the principal of, any premium or interest on any Bond of such series), then, anything herein contained to the contrary notwithstanding, the Fiscal Agent shall have full power and authority to receive such money and to apply the same to the purposes for which they were received, and shall not be affected by any notice to the contrary that may be received by it within two Business Days prior to such date.

SECTION 1203. When Payment of Subordinated Bonds and Subordinate Obligations Allowed.

Nothing contained in this Resolution or in any Senior Bonds and Parity Obligations or Subordinated Bonds and Subordinate Obligations shall (a) affect the obligation of the System to make, or prevent the System from making, at any time, except as provided in Section 1201, payments of principal of or premium, if any, or interest on Senior Bonds and Parity Obligations or the Subordinated Bonds and Subordinate Obligations, or (b) prevent the application by the Fiscal Agent of any moneys deposited with it hereunder for such purpose to the payment of or on account of the principal of or premium, if any, or interest on Senior Bonds and Parity Obligations or the Subordinated Bonds and Subordinate Obligations, if, at the time of such payment or deposit, the Fiscal Agent did not have at least two Business Days' written notice or actual knowledge of any event prohibiting the making of such deposit by the System.

SECTION 1204. Subrogation of Owners of Subordinated Bonds and Subordinate Obligations.

Subject to the payment in full of all Senior Bonds and Parity Obligations as provided in Section 1201, the owners of the Subordinated Bonds and Subordinate Obligations shall be subrogated to the rights of the owners of Senior Bonds and Parity Obligations to receive payments or distributions of assets of the System made on Senior Bonds and Parity Obligations until the Subordinated Bonds and Subordinate Obligations shall be paid in full, and no payments or distributions to the owners of Senior Bonds and Parity Obligations by the System or by the owners of the Subordinated Bonds and Subordinate Obligations shall, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, be deemed to be a payment by the System to or on account of the Subordinated Bonds and Subordinate Obligations, it being understood that the provisions of this Article are and are intended solely for the purpose of defining the relative rights of the owners of the Subordinated Bonds and Subordinate Obligations and of Senior Bonds and Parity Obligations and nothing in this Article shall or is intended to, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, impair the obligation of the System, which is unconditional and absolute, to pay from the sources herein provided to the owners of the Subordinated Bonds and Subordinate Obligations the principal of and premium, if any, and interest on the Subordinated Bonds and Subordinate Obligations in accordance with their terms, nor shall anything in this Article XII prevent the Fiscal Agent or the owner of any Subordinated Bond and Subordinate Obligation from exercising all remedies otherwise permitted by applicable law upon default hereunder, subject to the rights, if any, under this Article XII of the owners of Senior Bonds and Parity Obligations in respect of cash, property or securities of the System received upon the exercise of any such remedy.

SECTION 1205. Treatment of Ancillary Bond Facilities.

Any payment made under any Ancillary Bond Facility, to the owners of the Subordinated Bonds or Subordinate Obligations having the benefit of such Ancillary Bond Facility, by the appropriate obligor thereof shall be retained by such owners for their own account, and no owner of Senior Bonds or Parity Obligations is to have any right with respect to any such payment so made.

As between the obligor whose Ancillary Bond Facility, secures any Subordinated Bond and Subordinate Obligation and the owner of such Subordinated Bonds and Subordinate Obligations, any payment made on such Subordinated Bond and

Subordinate Obligation by the System which, under the subordination provisions of this Article, is required to be paid over to the owners of the Senior Bonds or Parity Obligations, shall not constitute a payment on such Subordinated Bond or Subordinate Obligation but, instead, shall be treated for all purposes of such Ancillary Bond Facility, as though such payment had not been made by the System. Until the owner of the Subordinated Bond or Subordinate Obligation so guaranteed has received from the System, or from such obligor, moneys which such owner is entitled to retain for its own account, equal in the aggregate to the principal amount of his Subordinated Bond or Subordinate Obligation and any accrued and unpaid interest thereon, such obligor shall remain liable on its Ancillary Bond Facility, and, unless otherwise provided in such Ancillary Bond Facility, shall not be subrogated to any of the rights of the owner of such Subordinated Bond or Subordinate Obligation.

SECTION 1206. Amendments to Senior Bonds and Parity Obligations not Requiring Consent of Owners of Subordinated Bonds and Subordinate Obligations.

Unless otherwise provided therefor in the Senior Bonds and Parity Obligations, the owners of the Senior Bonds and Parity Obligations may extend, renew, modify or amend the terms of Senior Bonds or Parity Obligations or any security therefor and release, sell or exchange such security and otherwise deal freely with the System, all without notice to or consent of the owners of the Subordinated Bonds and Subordinate Obligations and without affecting the liabilities and obligations of the System or the owners of the Subordinated Bonds and Subordinate Obligations.

**ARTICLE XIII**
**MISCELLANEOUS**

SECTION 1301. Defeasance.

1. Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section, unless otherwise provided in a Supplemental Resolution. Defeasance provisions, if any, for Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Supplemental Resolution. The System shall pay and indemnify the Fiscal Agent against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2. If the System shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in this Resolution, then, at the option of the System, expressed in an instrument in writing signed by an Authorized Officer of the System and delivered to the Fiscal Agent, the covenants, agreements and other obligations of the System to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Fiscal Agent and all Beneficiaries shall have been fully paid, the Fiscal Agent shall, upon the request of the System, execute and deliver to the System such instruments as may be desirable to evidence such discharge and satisfaction and the Fiscal Agent shall pay over or deliver to the System all money, securities and funds held by it pursuant to this Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

3.    Bonds (or any portion thereof) for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Fiscal Agent at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph 2 of this Section.  Any Outstanding Bond (or portion thereof) shall, prior to the maturity or redemption date thereof, be deemed to have been paid within the meaning and with the effect expressed in paragraph 2 of this Section 1301 if (a) in case said Bond (or portion thereof) is to be redeemed on any date prior to its maturity, the System shall have given to the Fiscal Agent irrevocable instructions to give notice of redemption on said date of such Bond as provided in Article IV of this Resolution, (b) there shall have been deposited with the Fiscal Agent either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Fiscal Agent at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bond (or portion thereof) on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bond is not by its terms subject to redemption or maturity within the next succeeding sixty (60) days, the System shall have given the Fiscal Agent irrevocable instructions to give, not less than seven (7) days after receipt of such instructions, a notice to the Owner of the Bond (or portion thereof) which is to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Fiscal Agent and that said Bond (or portion thereof) is deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, of and interest on said Bond (or portion thereof).  Such notice shall be mailed, postage prepaid, to the Owner of said Bond (or portion thereof) at its last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bond and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bond (or portion thereof) as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Fiscal Agent pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, of and interest on said Bond (or portion thereof); *provided* that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Fiscal Agent, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Fiscal Agent at the written direction of the System in Defeasance Securities maturing at the time or times and in the amount or amounts sufficient to pay when due the principal or Redemption Price, if applicable, of and interest to become due on said Bond (or portion thereof) on and prior to such redemption date or maturity date thereof, as the case may be.  Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, of and interest on such Bond (or portion thereof), shall be deposited as realized by the Fiscal Agent in the Revenue Account.  To the extent required by the provider of a Credit Facility, Bonds to which such Credit Facility relates shall not be deemed paid hereunder unless there shall have been delivered to the Fiscal Agent and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, of and interest on Bond (or portion thereof) to the dates scheduled

for such payment, and (b) an Opinion of Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed to be paid under this Section 1301.

4.    For purposes of determining whether an Adjustable Rate Bond (or any portion thereof) shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Defeasance Securities and moneys, if any, in accordance with the second sentence of paragraph 3 of this Section, the interest to come due on such Adjustable Rate Bond (or portion thereof) on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Maximum Interest Rate permitted by the terms thereof; *provided, however*, that if on any date, as a result of such Adjustable Rate Bond (or portion thereof) having borne interest at less than such Maximum Interest Rate for any period, the total amount of moneys and Defeasance Securities on deposit with the Fiscal Agent for the payment of interest on such Adjustable Rate Bond (or portion thereof) is in excess of the total amount which would have been required to be deposited with the Fiscal Agent on such date in respect of such Adjustable Rate Bond (or portion thereof) in order to satisfy the second sentence of paragraph 3 of this Section, the Fiscal Agent shall, if requested by the System, pay the amount of such excess to the System free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

5.    An Option Bond (or any portion thereof) shall be deemed to have been paid in accordance with the second sentence of paragraph 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Fiscal Agent moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bond (or portion thereof) which could become payable to the Owner of such Bond upon the exercise of any options provided to said Owner; *provided, however*, that if, at the time a deposit is made with the Fiscal Agent pursuant to paragraph 3 of this Section, the options originally exercisable by said Owner are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this paragraph 5.  If any portion of the moneys deposited with the Fiscal Agent for the payment of the principal of and premium, if any, and interest on said Option Bond (or portion thereof) is not required for such purpose, the Fiscal Agent shall, if requested by the System in writing, pay the amount of such excess to the System free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

6.    Anything in this Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Fiscal Agent in trust for the payment of the principal of or premium, if any, or interest on any Bond which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, shall, at the written request of the System, be repaid by the Fiscal Agent to the System, as its absolute property and free from trust, and the Fiscal Agent shall thereupon be released and discharged with respect thereto and the Bondowner shall look only to the System for the payment of such principal, premium, if any, or interest, as the case may be; *provided, however*, that before being required to make any such payment to the System, the Fiscal Agent shall, at the expense of the System, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in

said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the System.

SECTION 1302. Evidence of Signatures of Bondowners and Owners of Bonds.

1. Any request, consent, revocation of consent or other instrument which this Resolution may require or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing. The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2. The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3. Any request or consent by the Owner of any Bond shall bind all future Owners of such Bond in respect of anything done or suffered to be done by the System or the Fiscal Agent in accordance therewith.

SECTION 1303. Moneys Held for Particular Bonds. The amounts held by the Fiscal Agent for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1304. Preservation and Inspection of Documents. All documents received by the Fiscal Agent under the provisions of this Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the System, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1305. Parties Interested Herein. Nothing in this Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any Person, other than the System, the Fiscal Agent, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in this Resolution contained by and on behalf of the System shall be for the sole and exclusive benefit of the System, the Fiscal Agent, the Beneficiaries, and the Owners of the Bonds.

SECTION 1306. No Personal Liability. Neither the members of the System nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1307. Successors and Assigns. Whenever in this Resolution the System is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in this Resolution contained by or on behalf of the System shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1308. Severability of Invalid Provisions. If any one or more of the covenants or agreements provided in this Resolution on the part of the System or the Fiscal Agent to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions, of this Resolution.

SECTION 1309. Headings. The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

SECTION 1310. Conflict. All resolutions or parts of resolutions or other proceedings of the System in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1311. Governing Law. This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Fiscal Agent, any paying agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1312. Notices. Any notice, demand, direction, request or other instrument authorized or required by this Resolution to be given to or filed with the System or the Fiscal Agent shall be deemed to have been sufficiently given or filed for all purposes of this Resolution if and when delivered:

To the System: Employees Retirement System of the Government of the Commonwealth of Puerto Rico
P.O. Box 42003
San Juan, Puerto Rico 00940

437 Ponce de León Avenue
Stop 32½
Hato Rey, Puerto Rico 00918

Telephone: (787) 754-4545
Fax:        (787) 250-7251
Attn.:      Administrator

To the Fiscal Agent:  The Bank of New York
101 Barclay Street
Floor 7W
New York, New York 10286

Telephone: (212) 815-6955
Fax:        (212) 815-5595 or 5596
Attn.:      Northern Municipals Department

The System or the Fiscal Agent by notice to the other may designate additional or different addresses for subsequent notices or communications. Notwithstanding the foregoing, any notice, demand, request or other instrument to be given or filed

with the Fiscal Agent shall be effective only upon receipt by the Fiscal Agent.

The Fiscal Agent shall have the right, but shall not be required, to rely upon and comply with instructions and directions sent by e-mail, facsimile and other similar unsecured electronic methods by persons believed by the Fiscal Agent to be authorized to give instructions and directions on behalf of the System. The Fiscal Agent shall have no duty or obligation to verify or confirm that the person who sent such instructions or directions is, in fact, a person authorized to give instructions or directions on behalf of the System; and the Fiscal Agent shall have no liability for any losses, liabilities, costs or expenses incurred or sustained by the System as a result of such reliance upon or compliance with such instructions or directions. The System agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Fiscal Agent, including without limitation the risk of the Fiscal Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

SECTION 1313. Jury Trial Waiver. EACH PARTY HERETO, AND EACH BONDOWNER AND BENEFICIARY BY ITS ACCEPTANCE OF THE BENEFITS OF THIS RESOLUTION, HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS RESOLUTION.

SECTION 1314. Effective Date. This Resolution shall take effect immediately upon its adoption.

VI-29

## EXHIBIT A

### SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of _____, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. __, adopted on _____, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). Capitalized words not defined herein shall have the meaning ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and payment to Beneficiaries and the Fiscal Agent in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in all Revenues; all right, title and interest of the System in and to Revenues, and all rights to receive the same; the Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in the Resolution; any and all other rights and real or personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations; and, any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described herein, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By : _____
　　　　　　　Name and Title:

THE BANK OF NEW YORK, as Fiscal Agent under the Resolution

By : _____
　　　　　　　Name and Title:

VI-30

## EXHIBIT B

### DEFINITIONS

The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**Administrator** shall mean the Administrator of the System pursuant to the Act.

**Account or Accounts** shall mean any account or accounts, including, without limitation, bank, deposit or securities accounts, as the case may be, established and created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**Accreted Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Accretion Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compounded amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Accreted Amount on any day which is not a Accretion Date shall be determined on the assumption that the Accreted Amount accrues in equal daily amounts between Accretion Dates.

**Accretion Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Accreted Amount, as set forth in the related Supplemental Resolution.

**Accrued Payment Obligation** shall mean, with respect to any Class of Bonds and the related Parity Obligations or Subordinate Obligations, and for any Bond Year, as of any date, the aggregate of the Principal Installments of and interest on such Bonds, and the principal and interest components of such related Parity Obligations or Subordinate Obligations, due and unpaid during such Bond Year (or, in the case of Debt Service Account deposits, for Bonds with scheduled payments due more frequently that semi-annually, the current Bond Year and the first three months of the following Bond Year); provided that in the case of Adjustable Rate Bonds or Bonds other than fixed rate Bonds denominated in U.S. dollars, the interest shall be based on the Assumed Interest Rate. For purposes of this definition, principal, interest or other obligations for the payment for which the Fiscal Agent shall hold in escrow sufficient funds in a segregated account (including the Capitalized Interest Account and any escrow for the payment of Bonds that are defeased as provided in this Resolution) shall not be taken into consideration.

**Act** shall mean Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented.

**Adjustable Rate** shall mean a variable, adjustable, convertible or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; and provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the System and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the System in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate.

**Adjustable Rate Bond** shall mean any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be deemed to bear interest at an Adjustable Rate.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Fiscal Agent, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the System under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the System that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Maximum Interest Rate established therefor and the Legal Maximum Interest Rate. The Supplemental Resolution relating to Bonds other than fixed rate Bonds denominated in U.S. dollars may include other provisions for determining the Assumed Interest Rate.

**Authorized Officer** shall mean (i) in the case of the System, the Administrator, and when used with reference to any act or document, any other person authorized by resolution of the System to perform such act or sign such document (the Fiscal Agent may request that the System deliver an

officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Fiscal Agent, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Fiscal Agent located at the Corporate Trust Office, or such other address as the Fiscal Agent may designate from time to time by notice to the System, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the thirteenth sentence of Section 802 of this Resolution shall also include any other officer of the Fiscal Agent to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202 or 708.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the System.

**Bond Year** shall mean a twelve-month period commencing on the second day of July in any calendar year and ending on the first day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Fiscal Agent, Ancillary Facility Providers (if any), the Remarketing Agent (if any), the Tender Agent (if any), or the Auction Agent (if any) is located are authorized or required by law or executive order to remain closed.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Supplemental Resolution; *provided, however,* that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity or earlier redemption or acceleration of maturity, in amounts determined by reference to the Accreted Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the designation of Bonds by whether they are Senior Bonds or Subordinated Bonds.

**Class Priority** shall mean, at any time that there shall be Subordinated Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 504, and payment of Bonds upon an Event of Default under Article XI, funding or payment of the total amount then owing, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinated Bonds and Subordinate Obligations of

the highest payment priority next until full funding or payment thereof.

**Code** shall mean the United States Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Fiscal Agent at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Fiscal Agent may designate from time to time by notice to the System, or the principal corporate trust office of any successor Fiscal Agent (or such other address as such successor Fiscal Agent may designate from time to time by notice to the System).

**Covered Payroll** shall mean the payroll of all employees of an Employer, other than its irregular and transitory employees, and other than the employees who are covered by one of the Commonwealth's other retirement systems (it being understood that the payroll of employees covered by the System's defined contribution plan constitutes Covered Payroll).

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the System, which secures the payment of any Bond, or pursuant to which the System is entitled to obtain moneys to pay, in the Currency in which the Bonds of such Series are payable, the principal or Redemption Price of Bonds (or any related Qualified Hedges) due in accordance with their respective terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the System is in default under this Resolution; *provided,* that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and *provided further,* that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the

Person who has executed a Credit Facility with the System, or otherwise has provided a Credit Facility at the request of the System, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the periodic compounding of interest ceases and on and after which date interest is payable currently on the Accreted Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall mean, as of any date of calculation, fifty percent (50%) of the average of the Accrued Payment Obligation as of the first Business Day of each Bond Year for each of the following five (5) Bond Years.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the System's funds:

(i)     Government Obligations;

(ii)    Defeased Municipal Obligations;

(iii)    certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; *provided, however,* that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and *provided further, however,* that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(iv)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, without reinvestment, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent acceptable to the Fiscal Agent, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** or **$** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Employers** shall mean, pursuant to the Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth.

**Employers' Contributions** shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the Act.

**Employers' Contribution Rate** shall mean the rate of contribution of each Employer to the System, initially 9.275% of the Covered Payroll.

**Event of Default** shall mean an event described in paragraph 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing the Bonds.

VI-33

**First Supplemental Resolution** shall mean the First Supplemental Pension Funding Bond Resolution, adopted by the System on [January 24, 2008], in connection with the issuance of the Series A Bonds.

**Fiscal Agent** shall mean the bank, trust company or national banking association appointed pursuant to Section 801, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of this Resolution.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the System prior to the stated maturity thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean any fund or funds established and created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**GDB** shall mean Government Development Bank for Puerto Rico and its successors and permitted assigns.

**General Reserve Account** shall mean the Account by that name established by Section 509.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the System's funds created by this Resolution for the benefit of the Bondowners:

    (i)    Defeasance Obligations;

    (ii)    Defeased Municipal Obligations;

    (iii)    public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each

case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or territory or any public agencies or municipalities which are obligations rated in the highest Rating category by a Rating Agency;

    (iv)    direct and general obligations of any state or territory of the United States to the payment of the principal of and interest on which the full faith and credit of such jurisdiction is pledged which obligations are rated in either of the two highest Rating categories by a Rating Agency;

    (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

    (vi)    prime commercial paper of a corporation incorporated under the laws of any state or territory of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

    (vii)    money market shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which company has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Fiscal Agent or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

    (viii)    deposits evidenced by certificates of deposit issued by banks (which may include the Fiscal Agent) that are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to the amount of such bank deposits so secured, including interest;

    (ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, *provided* that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to (or for) the account of the Fiscal Agent to be held therein during the term of the agreements;

    (x)    investment agreements, secured or unsecured, with any Person whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

    (xi)    any other obligations conforming to System guidelines for investment as provided by the System to the Fiscal Agent from time to time, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Federal National Mortgage Association or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal, state or Commonwealth agency or instrumentality approved by the System, pursuant to which the System is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bonds; *provided*, that the use of the Liquidity Facility shall not result, at the time it is delivered, in a reduction in the Rating of any Bonds Outstanding; and *provided further* that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is being made, and (ii) will not, in and of itself, result in a Rating of any Bonds Outstanding lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person who has executed a Liquidity Facility with the System, or otherwise has provided a Liquidity Facility at the request of the System, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Accreted Amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond due as of the stated maturity thereof.

**Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Expenses** shall mean the reasonable out-of-pocket expenses of the System related to the issuance of the Bonds (including, without limitation, the out-of-pocket costs of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, and insurance premiums, deductibles and retention payments,), legal fees, fees and expenses incurred for professional consultants and fiduciaries, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505, a certificate of an Authorized Officer of the System, stating that such amount constitutes "Operating Expense" as defined in this Resolution, shall be delivered to the Fiscal Agent. Operating

Expenses shall not include those expenses owed to the Fiscal Agent under Section 804.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the System) of recognized standing in the field of law relating to municipal bonds selected by the System and satisfactory to the Fiscal Agent.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption or purchase by (or for the account of) the System prior to the stated maturity thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the original principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond at the date of original issuance, as stated in the Supplemental Resolution relating to such bonds.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of this Resolution, except:

    (i) any Bonds canceled by or surrendered for cancellation to the Fiscal Agent at or prior to such date;

    (ii) Bonds deemed to have been paid as provided in Section 1301;

    (iii) Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

    (iv) Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon through such date shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the System or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

    (v) as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

*provided, however*, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (i) Bonds owned by the System shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Fiscal Agent shall be protected in relying upon any such request, demand, authorization,

VI-35

direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Fiscal Agent knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Fiscal Agent the pledgee's right so to act with respect to such Bonds and that the pledgee is not the System, and (ii) the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Accreted Amount thereof except as otherwise provided in this Resolution.

**Owner** or **Owner of Bonds** shall mean each Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to a Series of Bonds pursuant to the terms of the related Supplemental Resolution, fixed and scheduled payments by the System under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of such non-recurring amounts.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to a Series of Bonds pursuant to the terms of the related Supplemental Resolution, fixed and scheduled payments due from the System to any Credit Facility Provider or Liquidity Facility Provider, as provided by Section 206, whether such reimbursements or payments are made to the Credit Facility Provider or Liquidity Facility Provider as a Bondowner, as a subrogee or otherwise. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Revenues.

    2.    All right, title and interest of the System in and to Revenues, and all rights to receive the same.

    3.    The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in this Resolution and to the provisions of Sections 1301 and 1303.

    4.    Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

    5.    Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Accreted Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 507) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Public Enterprise** shall mean any government instrumentality or public corporation of the Commonwealth.

**Qualified Hedge** shall mean, with respect to particular Bonds, (i) any financial arrangement (a) which is entered into by the System with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the System, and (c) which has been determined as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer and delivered to the Fiscal Agent, and (ii) any Credit Facility securing the obligations of the System under any financial arrangement described in clause (i) above. Each Qualified Hedge shall provide that the System and the Qualified Hedge Provider shall provide not less than ten-days' prior written notice of any amendment to the Fiscal Agent.

**Qualified Hedge Provider** shall mean a Person whose long-term obligations, other unsecured, long-term obligations, financial program rating, counterparty rating, or claims paying ability, or whose payment obligations under an agreement that would be a Qualified Hedge are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, or whose payment obligations under an interest rate exchange agreement are collateralized in such manner as to cause such agreement to be rated, at the time of the execution of such Qualified Hedge, either (i) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds subject to such Qualified Hedge (without reference to bond

VI-36

insurance, if any), or (ii) any such lower Rating Categories which each such Rating Category indicates in writing to the System and the Fiscal Agent will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the System and the Fiscal Agent by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of this Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the System.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating within any such category by a numerical modifier or otherwise.

**Record Date** shall mean, with respect to each payment of interest on a Bond, each date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond, or if no such date is specified, the 15th day of the month preceding the date of such payment.

**Redemption Account** shall mean the Account by that name established by Section 502.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond) or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, and, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, shall mean the Accreted Amount on the date of redemption of such Bond (or portion thereof) plus the applicable premium, if any, payable in either case upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 204 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Supplemental Resolution.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 506. Each such arrangement shall be provided by a Person whose claims paying ability has been assigned a rating from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured, long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining

term measured from the date it is provided not exceeding one year).

**Resolution** shall mean this Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenues** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Employers' Contributions received by the System or the Fiscal Agent.

2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of this Resolution.

3. Net amounts received by the System pursuant to a Qualified Hedge.

4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.

5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of this Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.

**Security Agreement** means the Security Agreement dated as of January 31, 2008 between the System and the Fiscal Agent, in the form appended hereto as Appendix A.

**Senior Bonds** shall mean the Series A Bonds and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of the Series A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installment.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to a Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amounts, interest rates or other provisions.

**Series A Bonds** shall mean the System's Senior Pension Funding Bonds, Series A, the initial Series of Bonds to be issued under this Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Accreted Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** shall mean an agreement by and between the System and another Person pursuant to which such Person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Standby Purchase Provider** shall mean the Person who has executed a Standby Purchase Agreement with the System.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, in each case which may be in the form of a separate account, established or created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**Subordinated Bonds** shall mean Bonds of a Series, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds.

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Supplemental Resolution, payment obligations to Persons of the type that otherwise would be classified under this Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Supplemental Resolutions, to subordination to Parity Obligations under this Resolution on the terms and conditions set forth in such Supplemental Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the System in accordance with Articles IX and X.

**Term Bonds** shall mean Bonds having a single stated maturity date, some of which may have Sinking Fund Installments to be specified in a Supplemental Resolution.

The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms as used in this Resolution, refer to this Resolution. All references to Articles and Sections in this Resolution refer to the Articles and Sections hereof unless otherwise expressly stated.

VI-38

---

**EMPLOYEE RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

---

**AMENDED AND RESTATED
FIRST SUPPLEMENTAL PENSION FUNDING BOND RESOLUTION**


**authorizing**


**SENIOR PENSION FUNDING BONDS
SERIES A**

---


Adopted on January 29, 2008

# TABLE OF CONTENTS

Page

ARTICLE I   DEFINITIONS AND STATUTORY AUTHORITY ............................................ 1

SECTION 1.1.   Supplemental Resolution ................................................... 1
SECTION 1.2.   Definitions.................................................................... 1
SECTION 1.3.   Interpretation ................................................................ 2
SECTION 1.4.   Authority for this Supplemental Resolution ................................. 2


ARTICLE II   AUTHORIZATION OF SERIES A BONDS........................................... 3

SECTION 2.1.   Principal Amount, Designation and Series ................................. 3
SECTION 2.2.   Purposes ..................................................................... 3
SECTION 2.3.   Details of Series A Bonds ................................................. 3
SECTION 2.4.   Redemption ................................................................. 4
SECTION 2.5.   Book-Entry Provisions...................................................... 5
SECTION 2.6.   Form of Series A Bonds.................................................... 7


ARTICLE III   DISPOSITION OF PROCEEDS OF SERIES A BONDS AND OTHER FUNDS 8

SECTION 3.1.   Deposits to Accounts or Transfers........................................ 8


ARTICLE IV   MISCELLANEOUS                                                              9

SECTION 4.1.   Headings...................................................................... 9
SECTION 4.2.   Governing Law ............................................................. 9
SECTION 4.3.   Effective Date ............................................................... 9
SECTION 4.4.   No Representations of Fiscal Agent ....................................... 9
SECTION 4.5.   Notices ....................................................................... 9
SECTION 4.6.   Invalid Provisions ......................................................... 10


EXHIBIT A.     BOND FORMS ............................................................... A-1

i

# AMENDED AND RESTATED
# FIRST SUPPLEMENTAL PENSION FUNDING BOND RESOLUTION

## authorizing

## SENIOR PENSION FUNDING BONDS
## SERIES A

BE IT RESOLVED by the Employee Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), as follows:

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

SECTION 1.1. <u>Supplemental Resolution</u>. This Amended and Restated First Supplemental Pension Funding Bond Resolution (this **"Supplemental Resolution"**) is supplemental to, and is adopted in accordance with, Article II and Article IX of the Employee Retirement System of the Government of the Commonwealth of Puerto Rico Pension Funding Bond Resolution, as amended, adopted by the System on January 24, 2008 (the **"General Resolution"**). The General Resolution and this Supplemental Resolution are hereinafter collectively referred to as the **"Resolution"**.

SECTION 1.2. <u>Definitions</u>. (a) All terms which are defined in *Exhibit B* of the General Resolution or Section 1.1 hereof, unless otherwise defined in subsection (b) of this Section, shall, for all purposes of this Supplemental Resolution, have the same meanings as such terms are given in *Exhibit B* of the General Resolution or Section 1.1 hereof, respectively, unless the context shall clearly indicate some other meaning.

(b) The following terms shall, for all purposes of this Supplemental Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**"Beneficial Owner"** means, whenever used with respect to a Series A Bond, the Person in whose name such Series A Bond is recorded as the beneficial owner of such Series A Bond by a Participant on the records of such Participant or such Person's subrogee.

**"Capital Appreciation Bonds"** mean the Series A Bonds in the aggregate principal amount of $12,264,907.55 and $32,775,892.05, each maturing July 1, 2028, as to which interest is not paid on a current basis but is accrued and compounded as Accreted Amount.

**"Cede & Co."** means Cede & Co., the nominee of DTC, and any successor of DTC with respect to the Series A Bonds.

**"Interest Payment Date"** means the first day of each month, commencing March 1, 2008; *provided*, that if any Interest Payment Date is a day that is not a Business Day, interest accrued to that day shall be paid on the next succeeding Business Day, without any additional interest on the amount so paid.

VII-1

       **"Participants"** means those broker-dealers, banks and other financial institutions for which DTC holds Series A Bonds as securities depositary.

       **"Record Date"** means the fifteenth calendar day (whether or not a Business Day) next preceding such Interest Payment Date.

       **"Series A Bonds"** means the System's Senior Pension Funding Bonds, Series A, authorized by Article II of this Supplemental Resolution.

       **"Term Bonds"** means the Series A Bonds maturing July 1, 2023, 2031, 2032, 2033, 2038, 2039, 2040, 2041, 2042, 2055, 2056, 2057, and 2058.

       SECTION 1.3.  <u>Interpretation</u>.  Unless the context clearly otherwise requires, this Supplemental Resolution shall be interpreted in accordance with applicable provisions of the General Resolution.

       SECTION 1.4.  <u>Authority for this Supplemental Resolution</u>.  This Supplemental Resolution is adopted pursuant to the provisions of the Act and the General Resolution.

# ARTICLE II

## AUTHORIZATION OF SERIES A BONDS

SECTION 2.1. Principal Amount, Designation and Series. Pursuant to the provisions of the General Resolution, a Series of Bonds to be designated as "Senior Pension Funding Bonds" which shall be entitled to the benefit, protection and security of such provisions is hereby authorized, further designated "Series A" in the aggregate initial principal amount at issuance of $1,588,810,799.60. All of such Bonds shall constitute "Senior Bonds" under the Resolution.

SECTION 2.2. Purposes. The Series A Bonds are being issued for the purpose of providing the System with funds (i) to increase the total assets currently available to pay benefits under the System's defined benefit plan that has been closed to new participants since December 31, 1999, (ii) to reduce the unfunded accrued actuarial pension liability of this benefit plan, (iii) to fund the Capitalized Interest Account for the payment of interest on the Series A Bonds until January 31, 2009, (iv) to fund the Debt Service Reserve Account, up to the Debt Service Reserve Requirement, and (v) to pay Financing Costs, including but not limited to Costs of Issuance.

SECTION 2.3. Details of Series A Bonds. (a) The Series A Bonds shall be dated as of, and shall bear interest (or their interest shall compound) initially from, the initial date of delivery thereof and payment therefor, and shall mature in the years and in the principal amounts, and (except for Capital Appreciation Bonds) bear interest payable on each Interest Payment Date at the interest rates per annum, as set forth below:

### $ 45,040,799.60 Capital Appreciation Bonds

$12,264,907.55 Capital Appreciation Bonds due July 1, 2028 (maturity value $42,665,000)
$32,775,892.05 Capital Appreciation Bonds due July 1, 2028 (maturity value $114,015,000)

### $1,543,770,000 Term Bonds

$200,000,000 5.85% Term Bonds due July 1, 2023
$3,000,000 6.15% Term Bonds due July 1, 2031
$4,500,000 6.15% Term Bonds due July 1, 2032
$4,000,000 6.15% Term Bonds due July 1, 2033
$667,500,000 6.15% Term Bonds due July 1, 2038
$167,920,000 6.20% Term Bonds due July 1, 2039
$89,750,000 6.20% Term Bonds due July 1, 2040
$37,550,000 6.20% Term Bonds due July 1, 2041
$37,550,000 6.20% Term Bonds due July 1, 2042
$86,950,000 6.45% Term Bonds due July 1, 2055
$83,350,000 6.45% Term Bonds due July 1, 2056
$80,850,000 6.45% Term Bonds due July 1, 2057
$80,850,000 6.45% Term Bonds due July 1, 2058

VII-3

(b)    The Series A Bonds shall consist of the Term Bonds and the Capital Appreciation Bonds.

(c)    Interest on the Term Bonds, and Accreted Amount on the Capital Appreciation Bonds, shall be computed on the basis of a 360-day year of twelve 30-day months. Interest on the Term Bonds shall be payable on each Interest Payment Date. Accreted Amounts on the Capital Appreciation Bonds shall be computed each July 1 and January 1, commencing July 1, 2008.

(d)    The Series A Bonds shall be issuable in denominations of $5,000 principal amount ($5,000 maturity amount for Capital Appreciation Bonds) or integral multiples thereof. Each Series A Bond shall be lettered "AR" and shall be numbered consecutively from (1) upwards in order of authentication by the Fiscal Agent or otherwise in such manner as the Fiscal Agent in its discretion shall determine.

(e)    The Series A Bonds shall be issued with the intention that interest thereon is included in gross income for federal income tax purposes.

(f)    *Except* as otherwise provided in Section 2.5, the principal of and premium, if any, on any Series A Bond shall be payable upon presentation and surrender of such Bond at the Corporate Trust Office of the Fiscal Agent. *Except* as otherwise provided in Section 2.5, interest on the Series A Bonds shall be paid by check or draft of the Fiscal Agent mailed to the Owners thereof as of the applicable Record Date at their respective addresses as shown on the registration books of the System maintained by the Fiscal Agent, or, at the option of the Owner of $1,000,000 or more in principal amount at maturity of the Series A Bonds, by written notice to the Fiscal Agent from such Owner at least fifteen (15) calendar days prior to the related payment date, by wire transfer.

SECTION 2.4.  Redemption.  (a)    The Series A Bonds due on July 1, 2023 and July 1, 2038 shall be redeemed in part through application of Sinking Fund Installments as provided in Sections 403 and 507 of the General Resolution, in each case at a Redemption Price equal to the principal amount of such Bond or portion thereof to be redeemed together with interest accrued to the date fixed for redemption.  Subject to the provisions of Section 507 of the General Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to such Bond, there shall be due and the System shall in any and all events be required to payy on each Sinking Fund Installment date set forth in the following table the amount set opposite such date, and said amount is hereby established and shall constitute a Sinking Fund Installment for the retirement of such Bond; *provided, however*, that the principal amount set opposite the maturity date in said table shall be payable on such date and shall not constitute a Sinking Fund Installment:

VII-4

**Term Bonds maturing July 1, 2023**

| Sinking Fund Installment Date | Sinking Fund Installment |
|---|---|
| 07/01/2021 | $50,000,000 |
| 07/01/2022 | 70,000,000 |
| 07/01/2023 | 80,000,000* |

*Maturity Date.

**Term Bonds maturing July 1, 2038**

| Sinking Fund Installment Date | Sinking Fund Installment |
|---|---|
| 07/01/2034 | $133,500,000 |
| 07/01/2035 | 133,500,000 |
| 07/01/2036 | 133,500,000 |
| 07/01/2037 | 133,500,000 |
| 07/01/2038 | 133,500,000* |

*Maturity Date.

(b)  The Term Bonds shall be subject to redemption at the option of the System from any source, including without limitation the proceeds of refunding Bonds or other financing provided by the System, in whole or in part in any order of maturity determined by the System, at any time on and after July 1, 2018, at a Redemption Price equal to the principal amount thereof plus interest, if any, accrued to the redemption date, without premium.

(c)  The Capital Appreciation Series A Bonds shall be subject to redemption at the option of the System from any source, including without limitation the proceeds of refunding Bonds or other financing provided by the System, in whole or in part in any order of maturity determined by the System, at any time on and after July 1, 2018, at a Redemption Price equal to the Accreted Amount thereof, without premium.

SECTION 2.5.  Book-Entry Provisions.  (a) *Except* as provided in subsection (d) of this Section, the Owner of all of the Series A Bonds shall be Cede & Co., as nominee for DTC, and the Series A Bonds shall be registered in the name of Cede & Co., as nominee for DTC.  Payment of interest on any Series A Bond registered in the name of Cede & Co. shall be made by wire transfer of Federal or equivalent same day funds to the account of Cede & Co. on the Interest Payment Date for the Series A Bonds at the address indicated for Cede & Co. in the registration books of the System maintained by the Fiscal Agent.

(b)  The Series A Bonds initially shall be issued in the form of separate single authenticated fully registered Bonds in the amount of each separate stated maturity and for each separate "CUSIP" number within a maturity of the Series A Bonds.  Upon initial issuance, the ownership of the Series A Bonds shall be registered in the registration books of the System maintained by the Fiscal Agent in the name of Cede & Co., as nominee of DTC.  The Fiscal Agent and the System may treat DTC (or its nominee) as the sole and exclusive Owner of the

Series A Bonds registered in its name for the purposes of payment of the principal or Redemption Price of or interest on the Series A Bonds, selecting the Series A Bonds or portions thereof to be redeemed, giving any notice permitted or required to be given to Owners of the Series A Bonds under the General Resolution or this Supplemental Resolution, registering the transfer of the Series A Bonds, obtaining any consent or other action to be taken by Owners of the Series A Bonds and for all other purposes whatsoever, and neither the Fiscal Agent nor the System shall be affected by any notice to the contrary. The Fiscal Agent and the System shall not have any responsibility or obligation to any Participant, any Person claiming a beneficial ownership interest in the Series A Bonds under or through DTC or any Participant, or any other Person which is not shown on the registration books as being an Owner of the Series A Bonds, with respect to the accuracy of any records maintained by DTC or any Participant; the payment of DTC or any Participant of any amount in respect of the principal or Redemption Price of or interest on the Series A Bonds; any notice which is permitted or required to be given to Owners of the Series A Bonds under the General Resolution or this Supplemental Resolution; the selection by DTC or any Participant of any Person to receive payment in the event of a partial redemption of the Series A Bonds; or any consent given or other action taken by DTC as Owner of the Series A Bonds.

(c)     The Fiscal Agent shall pay all principal of, and premium, if any, and interest on the Series A Bonds only to or "upon the order of" Cede & Co., as nominee for DTC, and all such payments shall be valid and effective to fully satisfy and discharge the System's obligations with respect to the principal of, and premium, if any, and interest on the Series A Bonds to the extent of the sum or sums so paid. No person other than DTC shall receive an authenticated Series A Bond for each separate stated maturity or separate "CUSIP" number within a maturity evidencing the obligation of the System to make payments of principal of and premium, if any, and interest on the Series A Bonds pursuant to the General Resolution and this Supplemental Resolution. Upon delivery by DTC to the Fiscal Agent of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions herein with respect to transfers, the word "Cede & Co." in this Supplemental Resolution shall refer to such new nominee of DTC.

(d)     In the event the System determines that it is in the best interest of the Beneficial Owners that they be able to obtain Series A Bond certificates, the System may notify DTC and the Fiscal Agent, whereupon DTC will notify the Participants, of the availability through DTC of the Series A Bond certificates, subject to DTC procedures. In such event, the System shall issue, and the Fiscal Agent shall transfer and exchange, Series A Bond certificates as requested by DTC and any other Series A Bond owners in appropriate amounts. DTC may determine to discontinue providing its services with respect to the Series A Bonds at any time by giving notice to the System and the Fiscal Agent and discharging its responsibilities with respect thereto under applicable law. Under such circumstances (if there is no successor securities depositary), the System and the Fiscal Agent shall be obligated to deliver Series A Bond certificates as described in the General Resolution. In the event Series A Bond certificates are issued, the provisions of the General Resolution shall apply to, among other things, the transfer and exchange of such certificates and the method of payment of principal and of and Redemption Price interest on such certificates. Whenever DTC requests the System and the Fiscal Agent to do so, the Fiscal Agent and the System will cooperate with DTC in taking appropriate action after reasonable notice (i) to make available one or more separate certificates evidencing the

Series A Bonds to any DTC Participant having Series A Bonds credited to its DTC account or (ii) to arrange for another securities depositary to maintain custody of certificates evidencing the Series A Bonds.

(e)     Notwithstanding any other provision of the General Resolution or this Supplemental Resolution to the contrary, so long as any Series A Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to the principal of, and premium, if any, and interest on such Series A Bond and all notices with respect to and surrender or delivery of such Series A Bond shall be made and given, respectively, to or by DTC as provided by DTC's operating procedures. Bondholders shall have no lien or security interest in any rebate or refund paid by DTC to the Fiscal Agent which arises from the payment by the Fiscal Agent of principal of or interest on the Series A Bonds in accordance with existing arrangements with DTC.

(f)     In connection with any notice or other communication to be provided to Owners of Series A Bonds pursuant to the General Resolution or this Supplemental Resolution by the System or the Fiscal Agent with respect to any consent or other action to be taken by Owners of Series A Bonds, the System or the Fiscal Agent, as the case may be, shall establish a record date for such consent or other action and give DTC notice of such record date not less than 15 calendar days in advance of such record date to the extent possible. Notice to DTC shall be given only when DTC under this subsection (f) is the sole Owner of the Series A Bonds.

SECTION 2.6.  Form of Series A Bonds.  Subject to the provisions of the General Resolution, the Series A Bonds shall be in substantially the form of Exhibit A, with necessary and appropriate variations, omissions and insertions as permitted by the General Resolution and this Supplemental Resolution.

# ARTICLE III

# DISPOSITION OF PROCEEDS OF SERIES A BONDS AND OTHER FUNDS

SECTION 3.1. <u>Deposits to Accounts or Transfers</u>. Upon receipt from the Underwriters of the proceeds of sale of the Series A Bonds in the amount of $1,588,810,799.60, there shall be deposited by the System in or transferred by the System:

1. by wire, directly, to the account of the System, the amount of $1,426,002,361.71; and

2. by wire, directly, to the account of Government Development Bank, the amount of $3,669,689.48 for costs of issuance; provided, that portions of this amount shall be wired to recipients thereof as directed to the Fiscal Agent in writing by Government Development Bank; and

3. by wire, directly to the Fiscal Agent, the amount of $93,737,392.13 for credit to the Capitalized Interest Account, which amount shall be used to pay interest on the Series A Bonds on each Interest Payment Date until the balance of such account is zero; and

4. by wire, directly to the Fiscal Agent, the amount of $46,982,352.66 for credit to the Debt Service Reserve Account.

VII-8

## ARTICLE IV

## MISCELLANEOUS

SECTION 4.1. <u>Headings</u>.  The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Supplemental Resolution.

SECTION 4.2. <u>Governing Law</u>.  This Supplemental Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that to the maximum extent permitted by applicable law, the rights, privileges and duties of the Fiscal Agent shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 4.3. <u>Effective Date</u>.  This Supplemental Resolution shall take effect immediately upon adoption by the System; *provided, however,* that this Supplemental Resolution shall only be binding upon the Fiscal Agent upon filing of a copy hereof with the Fiscal Agent.

SECTION 4.4. <u>No Representations of Fiscal Agent</u>.  The recitals of fact contained herein and in the Series A Bonds shall be taken as the statements of the System and the Fiscal Agent assumes no responsibility for the correctness of the same.  The Fiscal Agent makes no representations as to the validity or sufficiency of the General Resolution or this Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or this Supplemental Resolution, and the Fiscal Agent shall incur no liability in respect thereof.  The Fiscal Agent shall, however, be responsible for its representation contained in its certificate of authentication on the Series A Bonds.

SECTION 4.5. <u>Notices</u>.  Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, telecopy or other electronic means, except in the case of communications given to the Fiscal Agent, which shall be effective only upon actual receipt addressed as follows:

To the Fiscal Agent:

The Bank of New York
101 Barclay Street—7W
New York, New York 10286

Attention: Northern Municipals

Phone: (212) 815-6955
Fax: (212) 815-5595/5596

VII-9

To the System:

Employee Retirement System of the Government
of the Commonwealth of Puerto Rico
P.O. Box 42003
San Juan, Puerto Rico 00940

437 Ponce de León Avenue
Stop 32½
Hato Rey, Puerto Rico 00918

Attention:    Administrator

Phone: (787) 754-4545
Fax:    (787) 250-7251

with a copy to:

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico  00940

Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

Attention:    Executive Vice President and Financing Director

Phone: (787) 722-2525
Fax:    (787) 728-0975

      SECTION 4.6. <u>Invalid Provisions.</u>  In case any provision in this Supplemental Resolution or the Series A Bonds shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

EXHIBIT A

**FORM OF TERM BONDS**

No. AR-__                                                    $_____

**EMPLOYEE RETIREMENT SYSTEM OF THE**
**GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**
**SENIOR PENSION FUNDING BOND**
**SERIES A**

| DATED DATE | MATURITY DATE | INTEREST RATE | CUSIP NO. |
|---|---|---|---|
| January __, 2008 | _____ 1, ____ | ____% | _____ |

**REGISTERED OWNER:**   Cede & Co.

**PRINCIPAL AMOUNT:**   _____ DOLLARS

EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO (herein sometimes called the "System"), a trust
created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and
other benefits to retired employees of the central government, municipalities and public
corporations of the Commonwealth of Puerto Rico (the "Commonwealth"), acknowledges itself
indebted, and for value received, hereby promises to pay to the REGISTERED OWNER named
above or registered assigns or legal representative, upon presentation and surrender of this Series
A Bond at the Corporate Trust Office (as defined in the General Resolution hereinafter
mentioned) of the Fiscal Agent hereinafter mentioned on the MATURITY DATE specified
above (unless redeemed prior thereto as hereinafter provided), the PRINCIPAL AMOUNT
specified above, and to pay interest thereon from the most recent interest payment date to which
interest has been paid, or, if no interest has been paid, from the DATED DATE specified above,
until the earlier of the maturity or redemption of this Series A Bond, at the per annum
INTEREST RATE specified above, payable on each Interest Payment Date (as defined in the
Supplemental Resolution hereinafter mentioned), commencing March 1, 2008. Both the principal
of and the interest on this Series A Bond are payable in any coin or currency of the United States
of America which, on the respective dates of payment thereof, shall be legal tender for the
payment of public and private debts. Payment of the interest on this Series A Bond on any
interest payment date will be made to the person appearing on the registration books of the
System maintained by the Fiscal Agent as the registered owner hereof as of the fifteenth calendar
day (whether or not a business day) next preceding such interest payment date, such interest to
be paid by check mailed to the registered owner at such registered owner's address or, at the
option of a registered owner of at least $1,000,000 in aggregate principal amount of the Series A
Bonds (hereinafter defined) who so requests the Fiscal Agent in writing at least 15 calendar days
prior to such interest payment date, by wire transfer.

This Series A Bond is payable by the System solely from the Pledged Property held under the Resolution and does not constitute a debt, obligation or pledge of the full faith, credit and taxing power of the Commonwealth or any of its municipalities or political subdivisions or of instrumentalities (other than the System), and neither the Commonwealth nor any of its municipalities or political subdivisions or instrumentalities (other than the System) shall be liable for the payment thereof.

This Series A Bond is one of the bonds of a duly authorized series of bonds in the aggregate principal amount at issuance of $1,588,810,799.60 designated "Senior Pension Funding Bonds, Series A" (herein called the "Series A Bonds") authorized to be issued pursuant to an Employee Retirement System of the Government of Puerto Rico Pension Funding Bond Resolution, adopted by the System on January 24, 2008 (herein called the "General Resolution") and a First Supplemental Pension Funding Bond Resolution, adopted by the System on January 29, 2008 (the "Supplemental Resolution," and together with the General Resolution, the "Resolution"), for the purposes set forth in the Resolution. This Series A Bond and any additional bonds issued under the Resolution are herein referred to collectively as the "Bonds."

The Bonds are special obligations of the System. There is pledged to the payment of the principal or redemption price of, if any, and interest on the Bonds in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution, subject only to the provisions of the Resolution permitting the use and application thereof for the purposes and on the conditions set forth in the Resolution. Such pledge and other obligations of the System may be discharged, wholly or in part, at or prior to the maturity of the Bonds upon the making of provision for the payment of the principal or redemption price of, if any, and interest on the Bonds pursuant to the terms and conditions set forth in the General Resolution.

At the option of the System, and upon 40 days' prior notice, the Series A Bonds maturing on or after July 1, 2018 are subject to redemption from any moneys available for that purpose (other than from moneys set aside with respect to Sinking Fund Installments) prior to maturity, in whole or in part, at a redemption price equal to the principal amount of the Series A Bonds, plus accrued interest (in the case of the Capital Appreciation Bonds, the Accreted Amount) to the redemption date, and without premium.

If notice of redemption is given and if sufficient funds are on deposit with the Fiscal Agent to provide for the payment of the principal of and premium, if any, and interest (or Accreted Amount, in the case of the Capital Appreciation Bonds) on the Series A Bonds (or portions thereof) to be redeemed, then the Series A Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Accreted Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

Copies of the Resolution are on file at the office of the System, and at the Corporate Trust Office of The Bank of New York, as Fiscal Agent under the Resolution (including its successors, herein called the "Fiscal Agent"), and reference to the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and

additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent 'and in the manner permitted by the terms of the General Resolution, the provisions of the Resolution or any resolution amendatory thereof or supplemental thereto may be modified or amended.

The registered owner of this Series A Bond shall have no right to enforce the provisions of the Resolution, to institute action to enforce the provisions of the Resolution or to institute, appear in or defend any suit or other proceeding with respect thereto, *except* as provided in the Resolution.

This Series A Bond is transferable, as provided in the Resolution, only upon the books of the System maintained for that purpose at the Corporate Trust Office of the Fiscal Agent by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Series A Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series A Bond or Bonds in the same aggregate principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the General Resolution and upon the payment of the charges, if any, therein prescribed. The System and the Fiscal Agent may treat and consider the person in whose name this Series A Bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price, if any, hereof and interest due hereon and for all other purposes whatsoever.

This Series A Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Resolution until the Certificate of Authentication hereon shall have been signed by the Fiscal Agent.

**IT IS HEREBY CERTIFIED, RECITED AND DECLARED** that all acts, conditions and things required by the Constitution and statutes of the Commonwealth and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of this Series A Bond, exist, have happened and have been performed in due time, form and manner as required by law and that the issue of the Bonds, together with all other indebtedness of the System, is within every debt and other limit prescribed by law.

VII-13

**IN WITNESS WHEREOF,** the EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO has caused this Series A Bond to be executed in its name by the manual or facsimile signature of an authorized representative, as of the DATED DATE specified above.

**EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By: _____
        Executive Director

[SEAL]

Attest:

_____
Secretary or Assistant Secretary

## CERTIFICATE OF AUTHENTICATION

This Bond is one of the Series A Bonds described in the within-mentioned Resolution.

**THE BANK OF NEW YORK**, as Fiscal Agent

By: _____
        Authorized Signatory

Date of Authentication:

# ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto

_____

(please print or typewrite name and address of transferee)

_____

(please insert social security or other identifying number of assignee)

(For computer record only)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ Attorney to transfer the within
Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature Guaranteed

_____     _____

_____     _____

By: _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Fiscal Agent, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Fiscal Agent in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

# FORM OF CAPITAL APPRECIATION BONDS

No. AR-__                                                    $_____

### EMPLOYEE RETIREMENT SYSTEM OF THE
### GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO
### SENIOR PENSION FUNDING BOND
### SERIES A

| **DATED DATE** | **MATURITY DATE** | **CUSIP NO.** |
|---|---|---|
| January __, 2008 | _____ 1, ____ | _____ |

**REGISTERED OWNER:**     Cede & Co.

**INITIAL PRINCIPAL
AMOUNT:**     _____ DOLLARS

**PRINCIPAL AMOUNT
AT MATURITY:**     _____ DOLLARS

**EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO** (herein sometimes called the "System"), a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico (the "Commonwealth"), acknowledges itself indebted, and for value received, hereby promises to pay to the REGISTERED OWNER named above or registered assigns or legal representative, upon presentation and surrender of this Series A Bond at the Corporate Trust Office (as defined in the General Resolution hereinafter mentioned) of the Fiscal Agent hereinafter mentioned on the MATURITY DATE specified above (unless redeemed prior thereto as hereinafter provided), the PRINCIPAL AMOUNT AT MATURITY specified above. The principal (consisting of Accreted Amount) of this Series A Bond is payable in any coin or currency of the United States of America which, on the date of payment thereof, shall be legal tender for the payment of public and private debts. Interest on this Series A Bond shall not be payable on a current basis but shall be compounded, and added to principal, on each July 1 and January 1, commencing July 1, 2008 such that the INITIAL PRINCIPAL AMOUNT specified above shall accrete to equal the PRINCIPAL AMOUNT AT MATURITY specified above on the MATURITY DATE specified above. The Table of Accreted Amounts is attached hereto as Exhibit A.

This Series A Bond is payable by the System solely from the Pledged Property held under the Resolution and does not constitute a debt, obligation or pledge of the full faith, credit and taxing power of the Commonwealth or any of its municipalities or political

A-17

subdivisions or of instrumentalities (other than the System), and neither the Commonwealth nor any of its municipalities or political subdivisions nor instrumentalities (other than the System) shall be liable for the payment thereof.

This Series A Bond is one of the bonds of a duly authorized series of bonds in the aggregate principal amount at issuance of $1,588,810,799.60 designated "Senior Pension Funding Bonds, Series A" (herein called the "Series A Bonds") authorized to be issued pursuant to an Employee Retirement System of the Government of Puerto Rico Pension Funding Bond Resolution, adopted by the System on January 24, 2008 (herein called the "General Resolution") and a First Supplemental Pension Funding Bond Resolution, adopted by the System on January 29, 2008 (the "Supplemental Resolution," and together with the General Resolution, the "Resolution"), for the purposes set forth in the Resolution. This Series A Bond and any additional bonds issued under the Resolution are herein referred to collectively as the "Bonds."

The Bonds are special obligations of the System. There is pledged to the payment of the principal or redemption price of, if any, and interest on the Bonds in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution, subject only to the provisions of the Resolution permitting the use and application thereof for the purposes and on the conditions set forth in the Resolution. Such pledge and other obligations of the System may be discharged, wholly or in part, at or prior to the maturity of the Bonds upon the making of provision for the payment of the principal or redemption price of, if any, and interest on the Bonds pursuant to the terms and conditions set forth in the General Resolution.

At the option of the System, and upon 40 days' prior notice, the Series A Bonds maturing on or after July 1, 2018 are subject to redemption from any moneys available for that purpose (other than from moneys set aside with respect to Sinking Fund Installments) prior to maturity, in whole or in part, at a redemption price equal to the principal amount of the Series A Bonds, plus accrued interest (in the case of the Capital Appreciation Bonds, the Accreted Amount) to the redemption date, and without premium.

If notice of redemption is given and if sufficient funds are on deposit with the Fiscal Agent to provide for the payment of the principal of and premium, if any, and interest (or Accreted Amount, in the case of the Capital Appreciation Bonds) on the Series A Bonds (or portions thereof) to be redeemed, then the Series A Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Accreted Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

Copies of the Resolution are on file at the office of the System, and at the Corporate Trust Office of The Bank of New York, as Fiscal Agent under the Resolution (including its successors, herein called the "Fiscal Agent"), and reference to the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the

manner permitted by the terms of the General Resolution, the provisions of the Resolution or any resolution amendatory thereof or supplemental thereto may be modified or amended.

The registered owner of this Series A Bond shall have no right to enforce the provisions of the Resolution, to institute action to enforce the provisions of the Resolution or to institute, appear in or defend any suit or other proceeding with respect thereto, *except* as provided in the Resolution.

This Series A Bond is transferable, as provided in the Resolution, only upon the books of the System maintained for that purpose at the Corporate Trust Office of the Fiscal Agent by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Series A Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series A Bond or Bonds in the same aggregate principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the General Resolution and upon the payment of the charges, if any, therein prescribed. The System and the Fiscal Agent may treat and consider the person in whose name this Series A Bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price, if any, hereof and interest due hereon and for all other purposes whatsoever.

This Series A Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Resolution until the Certificate of Authentication hereon shall have been signed by the Fiscal Agent.

**IT IS HEREBY CERTIFIED, RECITED AND DECLARED** that all acts, conditions and things required by the Constitution and statutes of the Commonwealth and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of this Series A Bond, exist, have happened and have been performed in due time, form and manner as required by law and that the issue of the Series A Bonds, together with all other indebtedness of the System, is within every debt and other limit prescribed by law.

**IN WITNESS WHEREOF**, the EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO has caused this Series A Bond to be executed in its name by the manual or facsimile signature of an authorized representative, as of the DATED DATE specified above.

<div style="margin-left:40%">

**EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By: _____
        Executive Director

</div>

[SEAL]

Attest:

_____
Secretary or Assistant Secretary

<div style="text-align:center">A-20</div>

## CERTIFICATE OF AUTHENTICATION

This Bond is one of the Series A Bonds described in the within-mentioned Resolution.

**THE BANK OF NEW YORK,** as Fiscal Agent

By: _____
        Authorized Signatory

Date of Authentication:

# ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto

_____

(please print or typewrite name and address of transferee)

_____

(please insert social security or other identifying number of assignee)
(For computer record only)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ Attorney to transfer the within
Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature Guaranteed

_____            _____

_____            _____

By:

Signatures must be guaranteed by an "eligible
guarantor institution" meeting the
requirements of the Fiscal Agent, which
requirements include membership or
participation in the Security Transfer Agent
Medallion Program ("STAMP") or such other
"signature guarantee program" as may be
determined by the Fiscal Agent in addition to,
or in substitution for, STAMP, all in
accordance with the Securities Exchange Act
of 1934, as amended.

Form of Opinion of Bond Counsel

**FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.**

ATTORNEYS AND COUNSELLORS AT LAW

PO BOX 363507

SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
6TH FLOOR
SAN JUAN, PUERTO RICO 00918

January 31, 2008

Employees Retirement System of the Government
   of the Commonwealth of Puerto Rico
437 Ponce de León Avenue
San Juan, Puerto Rico

     Re:    **$1,588,810,799.60**
         **Employees Retirement System of the Government of the**
         **Commonwealth of Puerto Rico**
         **Pension Funding Bonds, Series A Bonds**

Ladies and Gentlemen:

     We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended and supplemented (the "Act"), creating the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") as a trust, to provide pension and other benefits to retired employees of the central government, municipalities and public Systems of the Commonwealth.

     We have also examined a certified copy of a Pension Funding Bond Resolution (the "General Resolution"), adopted by the Board of Trustees of the System on January 24, 2008, and a First Supplemental Pension Funding Bond Resolution, adopted by the Board of Trustees of the System on January 24, 2008, and readopted, amended and restated on January 29, 2008 (the "Supplemental Resolution," and together with the General Resolution, the "Resolution"), and other proofs submitted relative to the issuance of the System's Senior Pension Funding Bonds, Series A in the aggregate principal amount of $1,588,810,799.60 (the "Bonds").

     The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

     The Bonds are issued under and pursuant to the Resolution for the purpose of (i) increasing the total assets currently available to pay benefits under the System's largest defined benefit plan, (ii) reducing the unfunded accrued actuarial pension liability of the benefit plan, and (iii) making deposits in various funds and accounts established under the Resolution.

The Bonds are limited, non-recourse obligations of the System, payable solely from and secured by a pledge and assignment of Employer Contributions and all other Revenues (as defined in the Resolution) derived therefrom, certain funds held under the Resolution, together with income earned thereon (collectively referred to herein as the "Pledged Property"), pledged therefor under the Resolution.

The Bonds bear interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York.  The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the System on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)     The Act is valid in all respects material to this opinion, and the System is a duly constituted governmental instrumentality of the Commonwealth, deemed as a trust.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding upon, the System, enforceable in accordance with its terms.

(3)     The Bonds have been duly authorized by the System and constitute legal, valid and binding limited obligations of the System payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions or instrumentalities (other than the System), and neither the Commonwealth nor any of its municipalities or political subdivisions or instrumentalities (other than the System), shall be liable for the payment thereof.

(5)     Interest on the Bonds is excluded from gross income and exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

(6)     The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

(7)     The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made, and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico, and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

(8)     Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth.

VIII-2

(9)     The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions, and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

(10)     Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(1)     Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof.

(2)     Interest received or accrued, or original issue discount, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico ("Puerto Rico Corporation") or any foreign country and such interest is not effectively connected with the conduct of a trade or business in the United States by such corporation, such corporation is not a foreign personal holding company, a controlled foreign corporation or a passive foreign investment company under the U.S. Code, and such corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

(3)     Interest on the Bonds is not excludable from the gross income of the recipient thereof for federal income tax purposes under Section 103(a) of the U.S. Code.

(4)     Pursuant to the provisions of Section 1.937-2T of the Regulations issued under the U.S. Code ("Temporary Regulations"), the source of the income from the sale of personal property by a bona fide resident of Puerto Rico within the meaning of Section 937 of the Code shall be determined under the rules of Section 865 of the U.S. Code. Accordingly, the gain on the sale or exchange of the Bond recognized by an individual who is a *bona fide* resident of Puerto Rico, within the meaning of Section 937 of the U.S. Code, during the entire taxable year will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under Section 933(1) of the U.S. Code, provided (i) that such Bonds do not constitute inventory in the hands of such individual and (ii) if the Bonds were owned before the individual became a bona fide resident of Puerto Rico, that for any of the 10 years preceding the taxable year for which the source of the gain must be determined, the individual was not a resident of the United States (other than a bona fide resident of Puerto Rico).

A Puerto Rico Corporation that invests in the Bonds will be subject to U.S. federal income tax on a gain from a disposition of Bonds only if the gain is effectively connected to a U.S. trade or business carried on by the Puerto Rico Corporation.

(5)    The transfer of the Bonds by death or gift will not be subject to estate or gift tax under the U.S. Code in the case of decedents or donors who, at the time of death or gift, are (a) residents of Puerto Rico and (b) (i) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (ii) not United States citizens.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes; and (c) the U.S. Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the U.S. Code.

In connection with the foregoing statements about certain United States federal tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(a)    These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service.

(b)    These statements were written in connection with the promotion or marketing of the Bonds.

(c)    Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

We express no opinion regarding any other federal, Commonwealth or state tax consequences with respect to the Bonds.  We are rendering our opinion under existing statutes and court decisions, and regulations as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Very truly yours,

VIII-4

# BOOK-ENTRY SYSTEM

## The Depository Trust Company

DTC will act as securities depository for the Series A Bonds. The Series A Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Series A Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES A BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE SERIES A BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES A BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Series A Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series A Bonds on DTC's records. The ownership interest of each actual purchaser of the Series A Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Series A Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners

will not receive certificates representing their ownership interests in the Series A Bonds, except in the event that use of the book-entry system for the Series A Bonds is discontinued.

To facilitate subsequent transfers, the Series A Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series A Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series A Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series A Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Series A Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Series A Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series A Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Series A Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Fiscal Agent on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Fiscal Agent, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Fiscal Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Series A Bonds at any time by giving reasonable notice to the Corporation or the Fiscal Agent. Under such circumstances, in the event that a successor depository is not obtained, Series A Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Series A Bond certificates will be printed and delivered to DTC.

NONE OF THE CORPORATION, THE FISCAL AGENT OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES A BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES A BONDS.

**Appendix X**

### Table of Accreted Amounts

| Date | 2028 CAB 7/1/2028 6.20% | 2028 CAB 7/1/2028 6.20%[†] |
|---|---|---|
| 1/31/2008 | 1,437.35 | 1,437.35 |
| 7/1/2008 | 1,474.40 | 1,474.40 |
| 1/1/2009 | 1,520.10 | 1,520.10 |
| 7/1/2009 | 1,567.25 | 1,567.25 |
| 1/1/2010 | 1,615.80 | 1,615.80 |
| 7/1/2010 | 1,665.90 | 1,665.90 |
| 1/1/2011 | 1,717.55 | 1,717.55 |
| 7/1/2011 | 1,770.80 | 1,770.80 |
| 1/1/2012 | 1,825.70 | 1,825.70 |
| 7/1/2012 | 1,882.30 | 1,882.30 |
| 1/1/2013 | 1,940.65 | 1,940.65 |
| 7/1/2013 | 2,000.80 | 2,000.80 |
| 1/1/2014 | 2,062.85 | 2,062.85 |
| 7/1/2014 | 2,126.80 | 2,126.80 |
| 1/1/2015 | 2,192.70 | 2,192.70 |
| 7/1/2015 | 2,260.70 | 2,260.70 |
| 1/1/2016 | 2,330.75 | 2,330.75 |
| 7/1/2016 | 2,403.00 | 2,403.00 |
| 1/1/2017 | 2,477.50 | 2,477.50 |
| 7/1/2017 | 2,554.30 | 2,554.30 |
| 1/1/2018 | 2,633.50 | 2,633.50 |
| 7/1/2018 | 2,715.15 | 2,715.15 |
| 1/1/2019 | 2,799.30 | 2,799.30 |
| 7/1/2019 | 2,886.10 | 2,886.10 |
| 1/1/2020 | 2,975.55 | 2,975.55 |
| 7/1/2020 | 3,067.80 | 3,067.80 |
| 1/1/2021 | 3,162.90 | 3,162.90 |
| 7/1/2021 | 3,260.95 | 3,260.95 |
| 1/1/2022 | 3,362.05 | 3,362.05 |
| 7/1/2022 | 3,466.25 | 3,466.25 |
| 1/1/2023 | 3,573.75 | 3,573.75 |
| 7/1/2023 | 3,684.50 | 3,684.50 |
| 1/1/2024 | 3,798.75 | 3,798.75 |
| 7/1/2024 | 3,916.50 | 3,916.50 |
| 1/1/2025 | 4,037.90 | 4,037.90 |
| 7/1/2025 | 4,163.10 | 4,163.10 |
| 1/1/2026 | 4,292.15 | 4,292.15 |
| 7/1/2026 | 4,425.20 | 4,425.20 |
| 1/1/2027 | 4,562.40 | 4,562.40 |
| 7/1/2027 | 4,703.80 | 4,703.80 |
| 1/1/2028 | 4,849.65 | 4,849.65 |
| 7/1/2028 | 5,000.00 | 5,000.00 |

[†]Not reoffered

# EXHIBIT C

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

By _____
Name:
Title:

THE BANK OF NEW YORK, as Fiscal Agent under the Resolution

By _____
Name:
Title:

...STRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2: 07

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By _____
Name:
Title:

**THE BANK OF NEW YORK**, as Fiscal Agent under the Resolution

By _____
Name: Steven Vaccarello
Title: Vice President

# EXHIBIT D

2009001812

DE ESTADO
ERTO RICO
FINANCIAMIENTO
FINANCING *STATEMENT*

Favor de seguir cuidadosamente las instrucciones indicadas al dorso de esta forma
*Please follow carefully the instructions indicated on the reverse side of this form.*

Espacio oficial de archivo / *Reserved for the filing officer*

Sello de fecha y hora: / *Date and time stamp*

Número de registro: / *Registration number:*

08 JUN 24 PM 2:36

**A. DEVOLVER COPIA A:** *I RETURN COPY TO:* (Nombre y dirección postal / *Name and mailing address)*

Anita del Toro, Esq.
Fiddler, González & Rodríguez
PO Box 363507
San Juan, Puerto Rico 00936-3507

**1. NOMBRE DEL PRIMER DEUDOR /** *FIRST DEBTOR'S NAME* Complete sólo un nombre (a o b) / *Insert only one name (a or b)*

| a. Apellido del individuo/*Individual's last name* | Segundo Apellido/*Second surname* | Primer nombre/*First name* | Segundo nombre/*Middle name* | Sufijo/*Suffix* |
|---|---|---|---|---|

b. Nombre de la entidad / *Entity name*   EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO (the "System")

| c. Dirección postal / *Mailing address* | Ciudad / *City* | Estado/*State* | País/*Country* | Código postal/*Zip code* |
|---|---|---|---|---|
| 437 Ponce de León Avenue Stop 32½ | SAN JUAN | PR | USA | 00918 |

| d. Número de seguro social o patronal /*Social security or tax-id number* | e. (Opcional) Información adicional sobre la entidad /(Optional) *Additional information about the entity* |
|---|---|

**2. NOMBRE DE DEUDOR ADICIONAL /** *ADDITIONAL DEBTOR'S NAME* Complete sólo un nombre (a o b) / *Insert only one name (a or b)*

| a. Apellido del individuo/*Individual's last name* | Segundo Apellido/*Second surname* | Primer nombre/*First name* | Segundo nombre/*Middle name* | Sufijo/*Suffix* |
|---|---|---|---|---|

b. Nombre de la entidad / *Entity name*

| c. Dirección postal / *Mailing address* | Ciudad / *City* | Estado/*State* | País/*Country* | Código postal/*Zip code* |
|---|---|---|---|---|

| d. Número de seguro social o patronal /*Social security or tax-id number* | e. (Opcional) Información adicional sobre la entidad /(Optional) *Additional information about the entity* |
|---|---|

**3. NOMBRE DEL ACREEDOR GARANTIZADO/SECURED PARTY'S NAME** Complete sólo un nombre (a o b)/*Insert only one name (a or b)*

| a. Apellido del individuo/*Individual's last name* | Segundo Apellido/*Second surname* | Primer nombre/*First name* | Segundo nombre/*Middle name* | Sufijo/*Suffix* |
|---|---|---|---|---|

b. Nombre de la entidad / *Entity name*   The Bank of New York, as fiscal agent under a Pension Funding Bond Resolution
adopted by the System on January 24, 2008, as supplemented by a Second Supplemental Pension Funding
Bond Resolution, adopted by the System on May 27, 2008, providing for the issuance of $1,058,634,613.05
aggregate principal amount of the System's Senior Pension Funding Bonds, Series B

| c. Dirección postal / *Mailing address* | Ciudad / *City* | Estado/*State* | País/*Country* | Código postal/*Zip code* |
|---|---|---|---|---|
| 101 Barclay Street, 7 West | New York | New York | USA | 10286 |

**4. ESTA DECLARACION DE FINANCIAMIENTO CUBRE LAS SIGUIENTES CLASES O ARTICULOS DE PROPIEDAD:**
*THIS FINANCING STATEMENT COVERS THE FOLLOWING TYPES OR ITEMS OF PROPERTY:*

The pledged property described in the Security Agreement attached as **Exhibit A** hereto and by this reference
made a part hereof.

**5. MARQUE SI APLICA /** *CHECK IF APPLICABLE* (Describa la propiedad en el apéndice / *Describe the real estate in the addendum)*

☐ Los bienes anteriores habrán de convertirse en inmuebles por su destino. Esta declaración se presentará para registro en el Registro de la Propiedad.
*The goods described above are to become fixtures. This Financing Statement will be filed for record in the Real Estate Registry.*

**6. FIRMA(S) /** *SIGNATURE(S)*

| Primer deudor / *First debtor* | Deudor adicional / *Additional debtor* | Acreedor garantizado / *Secured party* |
|---|---|---|
| SEE RIDER / ATTACHED HERETO | | |

**7. NOTARIA** (Opcional) / *NOTARY* (Optional)
**AFFIDAVIT NUMBER/NUMBER:** 344

Jurado y suscrito ante mi / sworn to and suscribed before me by: Minia Gonzalez Alvarez,
Ober in her capacity as Acting Administrator of the Employees
Retirement System of the Government of the Commonwealth of Puerto Rico,

En / *In:* San Juan, Puerto Rico
Fecha / *Date:* Jun 24 2008

Notario Público / *Notary Public*

ABOGADO-NOTARIO

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By _____
Name:
Title:

**THE BANK OF NEW YORK,** as Fiscal Agent under the Resolution

By _____
Name:
Title:

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By _____
Name:
Title:

**THE BANK OF NEW YORK**, as Fiscal Agent under the Resolution

By _____
Name: Steven Vaccarello
Title: Vice President

Case:17-03283-LTS Doc#:160-1 Filed:12/08/17 Entered:12/08/17 19:04:15 Desc:
Exhibit 1 Page 11 of 51 pgt

DEPARTAMENTO DE ESTADO
GOBIERNO DE PUERTO RICO

**DECLARACION DE FINANCIAMIENTO**

**2009001811**

Reservado para el oficial de archivo / *Reserved for the filing officer*

Sello de fecha y hora: / *Date and time stamp*

Número de registro: / *Registration number:* ...2 PM 3:29

*Please follow carefully the instructions indicated on the reverse side of this form.*

---

**A. DEVOLVER COPIA A:** / *RETURN COPY TO:* (Nombre y dirección postal / *Name and mailing address*)

Anita del Toro, Esq.
Fiddler, González & Rodríguez
PO Box 363507
San Juan, Puerto Rico 00936-3507

---

**1. NOMBRE DEL PRIMER DEUDOR/** *FIRST DEBTOR'S NAME* Complete sólo un nombre (a o b) / *Insert only one name (a or b)*

a. Apellido del individuo/*Individual's last name* | Segundo Apellido/*Second surname* | Primer nombre/*First name* | Segundo nombre/*Middle name* | Sufijo/*Suffix*

b. Nombre de la entidad / *Entity name* **EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO (the "System")**

| c. Dirección postal / *Mailing address* | Ciudad / *City* | Estado/*State* | País/*Country* | Código postal/*Zip code* |
|---|---|---|---|---|
| 437 Ponce de León Avenue Stop 32½ | SAN JUAN | PR | USA | 00918 |

d. Número de seguro social o patronal /*Social security or tax-id number* | e. (Opcional) Información adicional sobre la entidad/*(Optional) Additional information about the entity*

---

**2. NOMBRE DE DEUDOR ADICIONAL/** *ADDITIONAL DEBTORS NAME* Complete sólo un nombre (a o b)/ *Insert only one name (a or b)*

a. Apellido del individuo/*Individual's last name* | Segundo Apellido/*Second surname* | Primer nombre/*First name* | Segundo nombre/*Middle name* | Sufijo/*Suffix*

b. Nombre de la entidad / *Entity name*

| c. Dirección postal / *Mailing address* | Ciudad / *City* | Estado/*State* | País/*Country* | Código postal/*Zip code* |
|---|---|---|---|---|
| | | | | |

d. Número de seguro social o patronal /*Social security or tax-id number* | e. (Opcional) Información adicional sobre la entidad /(*Optional) Additional information about the entity*

---

**3. NOMBRE DEL ACREEDOR GARANTIZADO/SECURED PARTY'S NAME** Complete sólo un nombre (a o b)/insert only one name (a or b)

a. Apellido del individuo/*Individual's last name* | Segundo Apellido/*Second surname* | Primer nombre/*First name* | Segundo nombre/*Middle name* | Sufijo/*Suffix*

b. Nombre de la entidad / *Entity name* The Bank of New York, as fiscal agent under a Pension Funding Bond Resolution adopted by the System on January 24, 2008, as supplemented and amended from time to time (the "Resolution"), which fiscal agent is representing the Owners from time to time of the Senior Pension Funding Bonds of the System issued from time to time pursuant to the Resolution and other Beneficiaries under the Resolution.

| c. Dirección postal / *Mailing address* | Ciudad / *City* | Estado/*State* | País/*Country* | Código postal/*Zip code* |
|---|---|---|---|---|
| 101 Barclay Street, 7 West | New York | New York | USA | 10286 |

---

**4. ESTA DECLARACION DE FINANCIAMIENTO CUBRE LAS SIGUIENTES CLASES O ARTICULOS DE PROPIEDAD:**
*THIS FINANCING STATEMENT COVERS THE FOLLOWING TYPES OR ITEMS 0 PROPERTY:*

The pledged property described in the Security Agreement attached as **Exhibit A** hereto and by this reference made a part hereof.

---

**5. MARQUE SI APLICA / CHECK IF APPLICABLE** (Describa la propiedad en el apéndice / *Describe the real estate in the addendum*)

☐ Los bienes anteriores habrán de convertirse en inmuebles por su destino. Esta declaración se presentará para registro en el Registro de la Propiedad. *The goods described above are to become fixtures. This Financing Statement will be filed for record in the Real Estate Registry.*

---

**6. FIRMA(S) / SIGNATURE(S)**

| Primer deudor / *First debtor* | Deudor adicional / *Additional debtor* | Acreedor garantizado / *Secured party* |
|---|---|---|
| | | |

SEE RIDER A ATTACHED HERETO

---

**7. NOTARIA** (Opcional) / *NOTARY (Optional)*
AFFIDAVIT NUMERO/ *NUMBER:* 517

Jurado y suscrito ante mí por: /sworn and subscribed before me by: Mivia González Alvarez, of legal age, single, resident of San Juan, Puerto Rico, acting as Acting Administrator of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, to me personally known, in San Juan, Puerto Rico, this 30th day of June, 2008.

En / *In:* San Juan, Puerto Rico
Fecha / *Date:* June 30, 2008

*Notario Público/Notary Public*

attached to and made part of
Uniform Commercial Code ("UCC")
Financing Statement, Form UCC-1

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By _____
Name:
Title:

**THE BANK OF NEW YORK,** as Fiscal Agent under the Resolution

By _____
Name: Steven Vaccarello
Title:  Vice President

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO

By _____

Name:

Title:

THE BANK OF NEW YORK, as Fiscal Agent under the
Resolution

By _____

Name:

Title:

ESTADO LIBRE ASOCIADO DE
**PUERTO RICO**
DEPARTAMENTO DE ESTADO
Registro de Transacciones Comerciales

ENMIENDA DECLARACIÓN DE FINANCIAMIENTO
*FINANCING STATEMENT AMENDMENT*

SIGA INSTRUCCIONES / *FOLLOW INSTRUCTIONS*



**A. NOMBRE Y TELÉFONO DE PRESENTANTE** (opcional) / *NAME & PHONE OF CONTACT AT FILER (optional)*

**B. CORREO ELECTRÓNICO DE PRESENTANTE** (opcional) / *E-MAIL CONTACT AT FILER (optional)*

**C. ENVÍE CONFIRMACIÓN A:** (nombre y dirección) / *SEND*

CT CORPORATION SYSTEM
PO BOX 9022946
SAN JUAN, PR 00902-2946

EL ESPACIO ARRIBA ES PARA USO DEL OFICIAL DE REGISTRO SÓLAMENTE
*THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY*

**1a. NÚMERO DE REGISTRO DE DECLARACIÓN DE FINANCIAMIENTO INICIAL** / *INITIAL FINANCING STATEMENT FILE NUMBER*

**2009001811**

**1b.** Esta ENMIENDA DE DECLARACIÓN DE FINANCIAMIENTO se presentará (para inscripción) en el REGISTRO DE LA PROPIEDAD / *This FINANCING STATEMENT AMENDMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS* Presentante: anejo Anejo de Enmienda (Forma UCC3AdPR) y provea el nombre del Deudor en el renglón 13 *Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13*

2. ☐ **TERMINACIÓN:** La efectividad de la Declaración de Financiamiento arriba identificada es terminada con respecto a la colateral del Acreedor Garantizado que autoriza esta Declaración de Terminación / *TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement*

3. ☐ **CESIÓN** (total o parcial): Provea nombre del Cesionario en renglón 7a o 7b y su dirección en el renglón 7c y nombre del Cedente en el renglón 9. Para cesión parcial, complete renglón 7 y 9 y también indique la colateral afectada en el renglón 8 / *ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9. For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8*

4. ☐ **CONTINUACIÓN:** La efectividad de la Declaración de Financiamiento identificada arriba con respecto al interés en la colateral del Acreedor Garantizado que autoriza esta Declaración de Continuación es continua por el periodo adicional provisto por ley / *CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by law*

5. ☑ **CAMBIO DE INFORMACIÓN DE PARTE:** *PARTY INFORMATION CHANGE:*

Marque una de las dos opciones: *Check one of these two boxes:* Y Marque una de estas tres opciones: *AND Check one of these three boxes:*

Este Cambio afecta ☐ Deudor o ☑ Acreedor Garantizado de record
*This Change affects ☐ Debtor or ☑ Secured Party of record*

6. **INFORMACIÓN ACTUAL DE EXPEDIENTE:** Complete para Cambio de Información de Parte – provea sólo un nombre (6a o 6b) / *CURRENT RECORD INFORMATION:* Complete for Party Information Change - provide only one name (6a or 6b)

**6a. NOMBRE DE ENTIDAD** / *ORGANIZATION'S NAME*

OR

| 6b. APELLIDO / *INDIVIDUAL'S SURNAME* | NOMBRE / *FIRST PERSONAL NAME* | SEGUNDO NOMBRE / *ADDITIONAL NAME* | SUFIJO / *SUFFIX* |
|---|---|---|---|

7. **INFORMACIÓN CAMBIADA O AGREGADA:** Complete para Cesión o Cambio de Información de Parte – provea sólo un nombre (7a o 7b) (use nombre completo o exacto; no corrija, modifique o abrevie ninguna parte del nombre del Deudor) / *CHANGED OR ADDED INFORMATION:* Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

**7a. NOMBRE DE ENTIDAD** / *ORGANIZATION'S NAME*

The Bank of New York Mellon (as successor to The Bank of New York) as fiscal agent

OR

| 7b. APELLIDO / *INDIVIDUAL'S SURNAME* | | | |
|---|---|---|---|
| NOMBRE / *INDIVIDUAL'S FIRST PERSONAL NAME* | | | |
| SEGUNDO NOMBRE / *INDIVIDUAL'S ADDITIONAL NAME* | | | SUFIJO / *SUFFIX* |

| 7c. DIRECCIÓN POSTAL / *MAILING ADDRESS* | CIUDAD / *CITY* | ESTADO / *STATE* | CÓDIGO POSTAL / *POSTAL CODE* | PAÍS / *COUNTRY* |
|---|---|---|---|---|
| 101 Barclay Street | New York | NY | 10286 | USA |

8. ☑ **CAMBIO DE COLATERAL:** *COLLATERAL CHANGE:*

☐ AGREGA colateral *ADD collateral* ☐ ELIMINA colateral *DELETE collateral* ☑ REFORMULA colateral cubierta *RESTATE covered collateral* ☐ CEDE colateral *ASSIGN collateral*

Indique colateral: / *Indicate collateral:*

The Pledged Property and all proceeds thereof and all after-acquired property as described more fully in Exhibit A attached hereto and incorporated by reference.

# EXHIBIT A TO FINANCING STATEMENT

**DEBTOR:**  **SECURED PARTY:**

| | |
|---|---|
| Employees Retirement System of the Government of the Commonwealth of Puerto Rico<br>437 Ponce de León Avenue<br>Stop 32 ½<br>San Juan, Puerto Rico 00917 | The Bank of New York Mellon, as Fiscal Agent<br>101 Barclay Street<br>New York, New York 10286 |

## Description of Collateral

The collateral described in this financing statement is all present and future right, title and interest of the System in and to (i) the Pledged Property and (ii) all proceeds thereof and all after-acquired property, as set forth in the Security Agreement attached hereto as Annex 1.

## Definitions[1]

"**Account**" or "**Accounts**" shall mean any account or accounts, including, without limitation, bank, deposit or securities accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

"**Act**" shall mean Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented.

"**Bond**" or "**Bonds**" shall mean the initial Series of Bonds and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202 or 708 of the Resolution.

"**Commonwealth**" shall mean the Commonwealth of Puerto Rico.

"**Credit Facility**" shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the System, which secures the payment of any Bond, or

---

[1]   Capitalized terms not defined herein shall have the meanings assigned to them in the Resolution (as defined below).

pursuant to which the System is entitled to obtain moneys to pay, in the Currency in which the Bonds of such Series are payable, the principal or Redemption Price of Bonds (or any related Qualified Hedges) due in accordance with their respective terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the System is in default under this Resolution, provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**"Debt Service Reserve Account"** shall mean the Account by that name established by Section 502 of the Resolution.

**"Employers"** shall mean, pursuant to the Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth.

**"Employers' Contributions"** shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the Act.

**"Fiscal Agent"** shall mean the bank, trust company or national banking association appointed pursuant to Section 801 of the Resolution, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

**"Fund"** or **"Funds"** shall mean any fund or funds established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

**"Parity Obligations"** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**"Pledged Property"** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Revenues.

2. All right, title and interest of the System in and to Revenues, and all rights to receive the same.

3. The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1301 and 1303 thereof.

4. Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

5. Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

"**Public Enterprise**" shall mean any government instrumentality or public corporation of the Commonwealth.

"**Qualified Hedge**" shall mean, with respect to particular Bonds, (i) any financial arrangement (a) which is entered into by the System with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the System, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer and delivered to the Fiscal Agent, and (ii) any Credit Facility securing the obligations of the System under any financial arrangement described in clause (i) above. Each Qualified Hedge shall provide that the System and the Qualified Hedge Provider shall provide not less than ten-days' prior written notice of any amendment to the Fiscal Agent.

"**Qualified Hedge Provider**" shall mean a Person whose long-term obligations, other unsecured, long-term obligations, financial program rating, counterparty rating, or claims paying ability, or whose payment obligations under an agreement that would be a Qualified Hedge are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, or whose payment obligations under an interest rate exchange agreement are collateralized in such manner as to cause such agreement to be rated, at the time of the execution of such Qualified Hedge, either (i) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds subject to such Qualified Hedge (without reference to bond insurance, if any), or (ii) any such lower Rating Categories which each such Rating Agency indicates in writing to the System and the Fiscal Agent will not, by itself, result in a reduction or withdrawal of its Rating (without

- 3 -

reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the System and the Fiscal Agent by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

"**Reserve Account Cash Equivalent**" shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 506 of the Resolution. Each such arrangement shall be provided by a Person whose claims paying ability has been assigned a rating from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured, long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term measured from the date it is provided not exceeding one year).

"**Resolution**" shall mean the Pension Bond Resolution adopted by the System on or about January 24, 2008, as amended and/or supplemented from time to time.

"**Revenues**" shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.      All Employers' Contributions received by the System or the Fiscal Agent.

2.      With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of the Resolution.

3.      Net amounts received by the System pursuant to a Qualified Hedge.

4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of the Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

"**Subaccount**" or "**Subaccounts**" shall mean any subaccount or subaccounts, as the case may be, in each case which may be in the form of a separate account, established or created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

Case:17-00213-LTS Doc#:160-1 Filed:12/08/17 Entered:12/08/17 19:38:14 Desc:
Affidavit 1 Page 20 of 51

"**Supplemental Resolution**" shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the System in accordance with Articles IX and X of the Resolution.

- 5 -

ESTADO LIBRE ASOCIADO DE
**PUERTO RICO**
DEPARTAMENTO DE ESTADO
Registro de Transacciones Comerciales

## ENMIENDA DECLARACIÓN DE FINANCIAMIENTO
## FINANCING STATEMENT AMENDMENT
SIGA INSTRUCCIONES / FOLLOW INSTRUCTIONS

A. NOMBRE Y TELÉFONO DE PRESENTANTE (opcional) / NAME & PHONE
OF CONTACT AT FILER (optional)

B. CORREO ELECTRÓNICO DE PRESENTANTE (opcional) / E-MAIL
CONTACT AT FILER (optional)

**CT CORPORATION SYSTEM**
**PO BOX 9022946**
**SAN JUAN, PR 00902-2946**

Radicaciones
17 DEC 2015
CUS
San Juan

3:55pm

EL ESPACIO ARRIBA ES PARA USO DEL OFICIAL DE REGISTRO SÓLAMENTE
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. NÚMERO DE REGISTRO DE DECLARACIÓN DE FINANCIAMIENTO INICIAL / INITIAL FINANCING STATEMENT FILE NUMBER

**2009001812**

Esta ENMIENDA DE DECLARACIÓN DE FINANCIAMIENTO se presentará para inscripción en el REGISTRO DE LA PROPIEDAD / This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Presente la copia Anejo de Enmienda (Form UCC3APR) y provea el nombre del Deudor en el renglón 13
File: [attach] Amendment Addendum (Form UCC3AD) and provide Debtor's name in item 13

2. ☐ **TERMINACIÓN:** La efectividad de la Declaración de Financiamiento arriba identificada se termina con respecto al interés en la colateral del Acreedor Garantizado que autoriza esta Declaración de Terminación / TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **CESIÓN** (total o parcial): Provea nombre del Cesionario en renglón 7a ó 7b y su dirección en el renglón 7c y nombre del Cedente en el renglón 9. Para cesión parcial, complete renglón 7 y 9 y también incluya la colateral afectada en el renglón 8 / ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9. For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUACIÓN:** La efectividad de la Declaración de Financiamiento identificada arriba con respecto a la colateral del Acreedor Garantizado que autoriza esta Declaración de Continuación se continúa por el período adicional provisto por ley / CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by law

5. ☑ **CAMBIO DE INFORMACIÓN DE PARTE; PARTY INFORMATION CHANGE:**
Marque una de las dos opcionales: Check one of these two boxes: ☑ Marque una de estas tres opcionales: AND Check one of these three boxes:

B. INFORMACIÓN ACTUAL DE EXPEDIENTE: Consider para Cambio de Información de Parte - provea sólo un nombre (6a o 6b) / CURRENT RECORD INFORMATION:
Complete for Party Information Change - provide only one name (6a or 6b)

6a. NOMBRE DE ENTIDAD/ORGANIZATION'S NAME

OR | 6b. APELLIDO / INDIVIDUAL'S SURNAME | NOMBRE / FIRST PERSONAL NAME | SEGUNDO NOMBRE / ADDITIONAL NAME | SUFIJO SUFFIX

7. INFORMACIÓN CAMBIADA O AGREGADA: Complete para Cesión o Cambio de Información de Parte - provea sólo un nombre (7a o 7b) (use nombre completo, modifique o elimine ninguna parte del nombre del Deudor) / CHANGED or ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. NOMBRE DE ENTIDAD/ORGANIZATION'S NAME
**The Bank of New York Mellon (as successor to The Bank of New York) as fiscal agent**

OR | 7b. APELLIDO / INDIVIDUAL'S SURNAME

NOMBRE / INDIVIDUAL'S FIRST PERSONAL NAME

SEGUNDO NOMBRE / INDIVIDUAL'S ADDITIONAL NAME | SUFIJO SUFFIX

| 7c. DIRECCIÓN POSTAL / MAILING ADDRESS | CIUDAD / CITY | ESTADO / STATE | CÓDIGO POSTAL / POSTAL CODE | PAÍS / COUNTRY |
|---|---|---|---|---|
| **101 Barclay Street** | **New York** | NY | **10285** | USA |

8. ☑ **CAMBIO DE COLATERAL:** También subraye una de estas opciones / COLLATERAL CHANGE: Also check one of these four boxes:
☐ AGREGADA colateral / ADD collateral ☐ ELIMINA colateral / DELETE collateral ☑ REFORMULA colateral colateral / RESTATE collateral ☐ ASIGNA colateral / ASSIGN collateral
Indique colateral / Indicate collateral:
**The Pledged Property and all proceeds thereof and all after-acquired property as described more fully in Exhibit A attached hereto and incorporated by reference.**

9. NOMBRE DE ACREEDOR GARANTIZADO EN RECORD AUTORIZANDO ESTA ENMIENDA: Provea sólo un nombre (9a o 9b) (nombre de Cesionario, si es una Cesión) (si es una Enmienda autorizada por un Deudor, marque aquí ☐ y provea el nombre del Deudor autorizante) / NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment) (if this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor)

9a. NOMBRE DE ENTIDAD/ORGANIZATION'S NAME
**The Bank of New York Mellon (as successor to The Bank of New York) as Fiscal Agent**

OR | 9b. APELLIDO / INDIVIDUAL'S SURNAME | NOMBRE / FIRST PERSONAL NAME | SEGUNDO NOMBRE / ADDITIONAL NAME | SUFIJO SUFFIX

10. DATOS OPCIONALES DE REFERENCIA PARA PRESENTANTE / OPTIONAL FILER REFERENCE DATA:

COPIA OFICINA DE REGISTRO — ENMIENDA DE DECLARACIÓN DE FINANCIAMIENTO (Forma UCC3PR) (Rev. 05/11/14)

EXHIBIT A TO FINANCING STATEMENT



**DEBTOR:**

**SECURED PARTY:**

| Employees Retirement System of the Government of the Commonwealth of Puerto Rico 437 Ponce de León Avenue Stop 32 ½ San Juan, Puerto Rico 00917 | The Bank of New York Mellon, as Fiscal Agent 101 Barclay Street New York, New York 10286 |
|---|---|

## Description of Collateral

The collateral described in this financing statement is all present and future right, title and interest of the System in and to (i) the Pledged Property and (ii) all proceeds thereof and all after-acquired property, as set forth in the Security Agreement attached hereto as Annex 1.

## Definitions[1]

"**Account**" or "**Accounts**" shall mean any account or accounts, including, without limitation, bank, deposit or securities accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

"**Act**" shall mean Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented.

"**Bond**" or "**Bonds**" shall mean the initial Series of Bonds and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202 or 708 of the Resolution.

"**Commonwealth**" shall mean the Commonwealth of Puerto Rico.

"**Credit Facility**" shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the System, which secures the payment of any Bond, or

---

[1] Capitalized terms not defined herein shall have the meanings assigned to them in the Resolution (as defined below).

pursuant to which the System is entitled to obtain moneys to pay, in the Currency in which the Bonds of such Series are payable, the principal or Redemption Price of Bonds (or any related Qualified Hedges) due in accordance with their respective terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the System is in default under this Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

"**Debt Service Reserve Account**" shall mean the Account by that name established by Section 502 of the Resolution.

"**Employers**" shall mean, pursuant to the Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth.

"**Employers' Contributions**" shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the Act.

"**Fiscal Agent**" shall mean the bank, trust company or national banking association appointed pursuant to Section 801 of the Resolution, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

"**Fund**" or "**Funds**" shall mean any fund or funds established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

"**Parity Obligations**" shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

"**Pledged Property**" shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.     All Revenues.

2.     All right, title and interest of the System in and to Revenues, and all rights to receive the same.

3.  The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1301 and 1303 thereof.

4.  Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

5.  Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**"Public Enterprise"** shall mean any government instrumentality or public corporation of the Commonwealth.

**"Qualified Hedge"** shall mean, with respect to particular Bonds, (i) any financial arrangement (a) which is entered into by the System with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the System, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer and delivered to the Fiscal Agent, and (ii) any Credit Facility securing the obligations of the System under any financial arrangement described in clause (i) above. Each Qualified Hedge shall provide that the System and the Qualified Hedge Provider shall provide not less than ten-days' prior written notice of any amendment to the Fiscal Agent.

**"Qualified Hedge Provider"** shall mean a Person whose long-term obligations, other unsecured, long-term obligations, financial program rating, counterparty rating, or claims paying ability, or whose payment obligations under an agreement that would be a Qualified Hedge are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, or whose payment obligations under an interest rate exchange agreement are collateralized in such manner as to cause such agreement to be rated, at the time of the execution of such Qualified Hedge, either (i) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds subject to such Qualified Hedge (without reference to bond insurance, if any), or (ii) any such lower Rating Categories which each such Rating Agency indicates in writing to the System and the Fiscal Agent will not, by itself, result in a reduction or withdrawal of its Rating (without

- 3 -

reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the System and the Fiscal Agent by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

"**Reserve Account Cash Equivalent**" shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 506 of the Resolution. Each such arrangement shall be provided by a Person whose claims paying ability has been assigned a rating from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured, long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term measured from the date it is provided not exceeding one year).

"**Resolution**" shall mean the Pension Bond Resolution adopted by the System on or about January 24, 2008, as amended and/or supplemented from time to time.

"**Revenues**" shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Employers' Contributions received by the System or the Fiscal Agent.

2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of the Resolution.

3. Net amounts received by the System pursuant to a Qualified Hedge.

4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of the Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

"**Subaccount**" or "**Subaccounts**" shall mean any subaccount or subaccounts, as the case may be, in each case which may be in the form of a separate account, established or created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

-4-

**"Supplemental Resolution"** shall mean any resolution supplemental to or amendatory of the
Resolution or any Supplemental Resolution, adopted by the System in accordance with Articles
IX and X of the Resolution.

- 5 -

ESTADO LIBRE ASOCIADO DE
**PUERTO RICO**
DEPARTAMENTO DE ESTADO
Registro de Transacciones Comerciales

**REGISTRO DE TRANSACCIONES COMERCIALES**

**ENMIENDA DECLARACIÓN DE FINANCIAMIENTO**
*FINANCING STATEMENT AMENDMENT*
SIGA INSTRUCCIONES / FOLLOW INSTRUCTIONS

16 JAN 19 PM 2: 07

A. NOMBRE Y TELÉFONO DE PRESENTANTE (opcional) / NAME & PHONE OF CONTACT AT FILER (optional)

B. CORREO ELECTRÓNICO DE PRESENTANTE (opcional) / E-MAIL CONTACT AT FILER (optional)

C. ENV
ACKN

CT CORPORATION SYSTEM
PO BOX 9022946
SAN JUAN, PR 00902-2946

EL ESPACIO ARRIBA ES PARA USO DEL OFICIAL DE REGISTRO SÓLAMENTE
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. NÚMER...
*FINANCING STATEMENT FILE NUMBER*

**2009001811**

1b. ☐ Esta ENMIENDA DE DECLARACIÓN de Financiamiento se presentará (para inscripción) en el REGISTRO DE LA PROPIEDAD / *This FINANCING STATEMENT AMENDMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS* Presentante: anote Anejo de Enmienda (Forma UCC3APR) y provea el nombre del Deudor en el renglón 13 *Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13*

2. ☐ TERMINACIÓN: La efectividad de la Declaración de Financiamiento arriba identificada es terminada con respecto al interés de la colateral del Acreedor Garantizado que autoriza esta Declaración de Terminación / *TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement*

3. ☐ CESIÓN (total o parcial): Provea nombre del Cesionario en renglón 7a o 7b y su dirección en el renglón 7c ... / *ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c ...*

4. ☐ CONTINUACIÓN: La efectividad de la Declaración de Financiamiento identificada arriba con respecto al interés en la colateral del Acreedor Garantizado que autoriza esta Declaración de Continuación se continúa por el periodo adicional provisto por ley / *CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by law*

5. ☑ CAMBIO DE INFORMACIÓN DE PARTE: *PARTY INFORMATION CHANGE:*

6. INFORMACIÓN ACTUAL DE EXPEDIENTE: Complete para Cambio de Información de Parte – provea sólo *un* nombre (6a o 6b) / *CURRENT RECORD INFORMATION:*

| 6a. NOMBRE DE ENTIDAD / ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. APELLIDO / INDIVIDUAL'S SURNAME | NOMBRE / FIRST PERSONAL NAME | SEGUNDO NOMBRE / ADDITIONAL NAME | SUFIJO SUFFIX |
| | | | |

7. INFORMACIÓN CAMBIADA O AGREGADA: / *CHANGED OR ADDED INFORMATION:*

7a. NOMBRE DE ENTIDAD / ORGANIZATION'S NAME
The Bank of New York Mellon (as successor To The Bank of New York) as fiscal agent

| 7b. APELLIDO / INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| NOMBRE / INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| SEGUNDO NOMBRE / INDIVIDUAL'S ADDITIONAL NAME | | | SUFIJO SUFFIX |

| 7c. DIRECCIÓN POSTAL / MAILING ADDRESS | CIUDAD / CITY | ESTADO STATE | CÓDIGO POSTAL POSTAL CODE | PAÍS COUNTRY |
|---|---|---|---|---|
| 101 Barclay Street | New York | NY | 10286 | USA |

8. ☑ CAMBIO DE COLATERAL: *COLLATERAL CHANGE:* ☑ REFORMULA colateral cubierta / *RESTATE covered collateral*

Indique colateral / Indicate collateral:
The Pledged Property and all proceeds thereof and all after-acquired property as described more fully in Exhibit A attached hereto and incorporated by reference.

9. NOMBRE DE ACREEDOR GARANTIZADO EN RECORD AUTORIZANDO ESTA ENMIENDA: Provea sólo *un* nombre (9a o 9b) ... / *NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT:*

9a. NOMBRE DE ENTIDAD / ORGANIZATION'S NAME
The Bank of New York Mellon (as successor to The Bank of New York), as Fiscal Agent

| 9b. APELLIDO / INDIVIDUAL'S SURNAME | NOMBRE / FIRST PERSONAL NAME | SEGUNDO NOMBRE / ADDITIONAL NAME | SUFIJO SUFFIX |
|---|---|---|---|
| | | | |

10. DATOS OPCIONALES DE REFERENCIA PARA PRESENTANTE: / *OPTIONAL FILER REFERENCE DATA:*

COPIA OFICINA DE REGISTRO — ENMIENDA DE DECLARACIÓN DE FINANCIAMIENTO (Forma UCC3PR) (Rev. 05/11/14)

Case:17-03283-LTS Doc#:7880-1 Filed:07/09/19 Entered:07/09/19 13:38:45 Desc:
Affidavit 1 Page 270 of 291

REGISTRO DE TRANSACCIONES
COMERCIALES

## EXHIBIT A TO FINANCING STATEMENT 16 JAN 19 PM 2:07

| DEBTOR: | SECURED PARTY: |
|---|---|
| Employees Retirement System of the Government of the Commonwealth of Puerto Rico 437 Ponce de León Avenue Stop 32 ½ San Juan, Puerto Rico 00917 | The Bank of New York Mellon, as Fiscal Agent 101 Barclay Street New York, New York 10286 |

### Description of Collateral

The collateral described in this financing statement is all present and future right, title and interest of the System in and to (i) the Pledged Property and (ii) all proceeds thereof and all after-acquired property, as set forth in the Security Agreement attached hereto as Annex 1.

### Definitions[1]

"**Account**" or "**Accounts**" shall mean any account or accounts, including, without limitation, bank, deposit or securities accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

"**Act**" shall mean Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented.

"**Bond**" or "**Bonds**" shall mean the initial Series of Bonds and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202 or 708 of the Resolution.

"**Commonwealth**" shall mean the Commonwealth of Puerto Rico.

"**Credit Facility**" shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the System, which secures the payment of any Bond, or

---

[1] Capitalized terms not defined herein shall have the meanings assigned to them in the Resolution (as defined below).

US_ACTIVE-124916808

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2: 07

pursuant to which the System is entitled to obtain moneys to pay, in the Currency in which the Bonds of such Series are payable, the principal or Redemption Price of Bonds (or any related Qualified Hedges) due in accordance with their respective terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the System is in default under this Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**"Debt Service Reserve Account"** shall mean the Account by that name established by Section 502 of the Resolution.

**"Employers"** shall mean, pursuant to the Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth.

**"Employers' Contributions"** shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the Act.

**"Fiscal Agent"** shall mean the bank, trust company or national banking association appointed pursuant to Section 801 of the Resolution, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

**"Fund"** or **"Funds"** shall mean any fund or funds established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

**"Parity Obligations"** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**"Pledged Property"** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Revenues.

    2.    All right, title and interest of the System in and to Revenues, and all rights to receive the same.

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

3.  The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1301 and 1303 thereof.

4.  Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

5.  Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

"**Public Enterprise**" shall mean any government instrumentality or public corporation of the Commonwealth.

"**Qualified Hedge**" shall mean, with respect to particular Bonds, (i) any financial arrangement (a) which is entered into by the System with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the System, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer and delivered to the Fiscal Agent, and (ii) any Credit Facility securing the obligations of the System under any financial arrangement described in clause (i) above. Each Qualified Hedge shall provide that the System and the Qualified Hedge Provider shall provide not less than ten-days' prior written notice of any amendment to the Fiscal Agent.

"**Qualified Hedge Provider**" shall mean a Person whose long-term obligations, other unsecured, long-term obligations, financial program rating, counterparty rating, or claims paying ability, or whose payment obligations under an agreement that would be a Qualified Hedge are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, or whose payment obligations under an interest rate exchange agreement are collateralized in such manner as to cause such agreement to be rated, at the time of the execution of such Qualified Hedge, either (i) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds subject to such Qualified Hedge (without reference to bond insurance, if any), or (ii) any such lower Rating Categories which each such Rating Agency indicates in writing to the System and the Fiscal Agent will not, by itself, result in a reduction or withdrawal of its Rating (without

-3-

⊃ DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2: 07

reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the System and the Fiscal Agent by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**"Reserve Account Cash Equivalent"** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 506 of the Resolution. Each such arrangement shall be provided by a Person whose claims paying ability has been assigned a rating from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured, long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term measured from the date it is provided not exceeding one year).

**"Resolution"** shall mean the Pension Bond Resolution adopted by the System on or about January 24, 2008, as amended and/or supplemented from time to time.

**"Revenues"** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Employers' Contributions received by the System or the Fiscal Agent.

2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of the Resolution.

3. Net amounts received by the System pursuant to a Qualified Hedge.

4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of the Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

**"Subaccount"** or **"Subaccounts"** shall mean any subaccount or subaccounts, as the case may be, in each case which may be in the form of a separate account, established or created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

- 4 -

GIRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

"**Supplemental Resolution**" shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the System in accordance with Articles IX and X of the Resolution.

Case 10-30621-TLS Doc#3660-1 Filed 12/08/17 Entered 12/08/17 19:38:14 Desc:
Exhibit 1 Page 33 of 51

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

# Annex 1

[Security Agreement]

RO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:08

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO

By _____
Name:
Title:

THE BANK OF NEW YORK, as Fiscal Agent under the Resolution

By _____
Name:
Title:

REGISTRO DE TRANSACCIONES
COMERCIALES

·16 JAN 19 PM 2:08

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By _____
Name:
Title:

**THE BANK OF NEW YORK,** as Fiscal Agent under the Resolution

By _____
Name: Steven Vaccarello
Title: Vice President

ESTADO LIBRE ASOCIADO DE
**PUERTO RICO**
DEPARTAMENTO DE ESTADO
Registro de Transacciones Comerciales

**ENMIENDA DECLARACIÓN DE FINANCIAMIENTO**
**FINANCING STATEMENT AMENDMENT**
SIGA INSTRUCCIONES / FOLLOW INSTRUCTIONS

**REGISTRO DE TRANSACCIONES COMERCIALES**

16 JAN 19 PM 2:07

A. NOMBRE Y TELÉFONO DE PRESENTANTE (opcional) / NAME & PHONE OF CONTACT AT FILER (optional)

B. CORREO ELECTRÓNICO DE PRESENTANTE (opcional) / E-MAIL CONTACT AT FILER (optional)

C. ENVÍE CONFIRMACIÓN A: (nombre y dirección) / SEND ACKN

CT CORPORATION SYSTEM
PO BOX 9022946
SAN JUAN, PR 00902-2946

EL ESPACIO ARRIBA ES PARA USO DEL OFICIAL DE REGISTRO SÓLAMENTE
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. NÚM. FINANC.
**2009001812**

1b. Esta ENMIENDA DE DECLARACIÓN DE FINANCIAMIENTO se presentará (para inscripción) en el REGISTRO DE LA PROPIEDAD / This FINANCING STATEMENT AMENDMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS

2. ☐ **TERMINACIÓN:** La efectividad de la Declaración de Financiamiento arriba identificada es terminada con respecto al interés en la colateral del Acreedor Garantizado que autoriza esta Declaración de Terminación / **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **CESIÓN (total o parcial):** Provea nombre del Cesionario en renglón 7a o 7b y su dirección en el renglón 7c

4. ☐ **CONTINUACIÓN:** La efectividad de la Declaración de Financiamiento identificada arriba con respecto al interés en la colateral del Acreedor Garantizado que autoriza esta Declaración de Continuación es continua por el período adicional provisto por ley / **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by law

5. ☑ **CAMBIO DE INFORMACIÓN DE PARTE; PARTY INFORMATION CHANGE:**

6. **INFORMACIÓN ACTUAL DE EXPEDIENTE:** Complete para Cambio de Información de Parte / CURRENT RECORD INFORMATION:

6a. NOMBRE DE ENTIDAD / ORGANIZATION'S NAME

6b. APELLIDO / INDIVIDUAL'S SURNAME | NOMBRE / FIRST PERSONAL NAME | SEGUNDO NOMBRE / ADDITIONAL NAME | SUFIJO SUFFIX

7. **INFORMACIÓN CAMBIADA O AGREGADA.** Complete para Cesión o Cambio de Información de Parte / CHANGED OR ADDED INFORMATION:

7a. NOMBRE DE ENTIDAD / ORGANIZATION'S NAME
The Bank of New York Mellon (as successor to The Bank of New York) as fiscal agent

7b. APELLIDO / INDIVIDUAL'S SURNAME

NOMBRE / INDIVIDUAL'S FIRST PERSONAL NAME

SEGUNDO NOMBRE / INDIVIDUAL'S ADDITIONAL NAME | SUFIJO SUFFIX

7c. DIRECCIÓN POSTAL / MAILING ADDRESS: 101 Barclay Street | CIUDAD/CITY New York | ESTADO STATE NY | CÓDIGO POSTAL POSTAL CODE 10286 | PAÍS COUNTRY USA

8. ☑ **CAMBIO DE COLATERAL:** Indique colateral / *indicate collateral:*
The Pledged Property and all proceeds thereof and all after-acquired property as described more fully in Exhibit A attached hereto and incorporated by reference.

9. **NOMBRE DE ACREEDOR GARANTIZADO EN RECORD AUTORIZANDO ESTA ENMIENDA:** / NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT:

9a. NOMBRE DE ENTIDAD / ORGANIZATION'S NAME
The Bank of New York Mellon (as successor to The Bank of New York) as Fiscal Agent

9b. APELLIDO / INDIVIDUAL'S SURNAME | NOMBRE / FIRST PERSONAL NAME | SEGUNDO NOMBRE / ADDITIONAL NAME | SUFIJO SUFFIX

10. DATOS OPCIONALES DE REFERENCIA PARA PRESENTANTE / OPTIONAL FILER REFERENCE DATA:

COPIA OFICINA DE REGISTRO — ENMIENDA DE DECLARACIÓN DE FINANCIAMIENTO (Forma UCC3PR) (Rev. 05/11/14)

REGISTRO DE TRANSACCIONES
COMERCIALES

# EXHIBIT A TO FINANCING STATEMENT '16 JAN 19 PM 2:07

**DEBTOR:**

**SECURED PARTY:**

| Employees Retirement System of the Government of the Commonwealth of Puerto Rico 437 Ponce de León Avenue Stop 32 ½ San Juan, Puerto Rico 00917 | The Bank of New York Mellon, as Fiscal Agent 101 Barclay Street New York, New York 10286 |
|---|---|

## Description of Collateral

The collateral described in this financing statement is all present and future right, title and interest of the System in and to (i) the Pledged Property and (ii) all proceeds thereof and all after-acquired property, as set forth in the Security Agreement attached hereto as Annex 1.

## Definitions[1]

**"Account"** or **"Accounts"** shall mean any account or accounts, including, without limitation, bank, deposit or securities accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

**"Act"** shall mean Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented.

**"Bond"** or **"Bonds"** shall mean the initial Series of Bonds and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202 or 708 of the Resolution.

**"Commonwealth"** shall mean the Commonwealth of Puerto Rico.

**"Credit Facility"** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the System, which secures the payment of any Bond, or

---

[1] Capitalized terms not defined herein shall have the meanings assigned to them in the Resolution (as defined below).

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

pursuant to which the System is entitled to obtain moneys to pay, in the Currency in which the Bonds of such Series are payable, the principal or Redemption Price of Bonds (or any related Qualified Hedges) due in accordance with their respective terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the System is in default under this Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**"Debt Service Reserve Account"** shall mean the Account by that name established by Section 502 of the Resolution.

**"Employers"** shall mean, pursuant to the Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth.

**"Employers' Contributions"** shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the Act.

**"Fiscal Agent"** shall mean the bank, trust company or national banking association appointed pursuant to Section 801 of the Resolution, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

**"Fund"** or **"Funds"** shall mean any fund or funds established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

**"Parity Obligations"** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**"Pledged Property"** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

　　1.　　All Revenues.

　　2.　　All right, title and interest of the System in and to Revenues, and all rights to receive the same.

- 2 -

REGISTRO DE TRANSACCIONES
COMERCIALES
JAN 19 PM 2:07

3. The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1301 and 1303 thereof.

4. Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

5. Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**"Public Enterprise"** shall mean any government instrumentality or public corporation of the Commonwealth.

**"Qualified Hedge"** shall mean, with respect to particular Bonds, (i) any financial arrangement (a) which is entered into by the System with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the System, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer and delivered to the Fiscal Agent, and (ii) any Credit Facility securing the obligations of the System under any financial arrangement described in clause (i) above. Each Qualified Hedge shall provide that the System and the Qualified Hedge Provider shall provide not less than ten-days' prior written notice of any amendment to the Fiscal Agent.

**"Qualified Hedge Provider"** shall mean a Person whose long-term obligations, other unsecured, long-term obligations, financial program rating, counterparty rating, or claims paying ability, or whose payment obligations under an agreement that would be a Qualified Hedge are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, or whose payment obligations under an interest rate exchange agreement are collateralized in such manner as to cause such agreement to be rated, at the time of the execution of such Qualified Hedge, either (i) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds subject to such Qualified Hedge (without reference to bond insurance, if any), or (ii) any such lower Rating Categories which each such Rating Agency indicates in writing to the System and the Fiscal Agent will not, by itself, result in a reduction or withdrawal of its Rating (without

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the System and the Fiscal Agent by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

"**Reserve Account Cash Equivalent**" shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 506 of the Resolution. Each such arrangement shall be provided by a Person whose claims paying ability has been assigned a rating from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured, long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term measured from the date it is provided not exceeding one year).

"**Resolution**" shall mean the Pension Bond Resolution adopted by the System on or about January 24, 2008, as amended and/or supplemented from time to time.

"**Revenues**" shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1. All Employers' Contributions received by the System or the Fiscal Agent.

2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of the Resolution.

3. Net amounts received by the System pursuant to a Qualified Hedge.

4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of the Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of the Resolution, subject to the provisions of Sections 1301 and 1303 thereof.

"**Subaccount**" or "**Subaccounts**" shall mean any subaccount or subaccounts, as the case may be, in each case which may be in the form of a separate account, established or created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301 thereof.

- 4 -

GISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

"**Supplemental Resolution**" shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the System in accordance with Articles IX and X of the Resolution.

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2: 07

# Annex 1

[Security Agreement]

REGISTRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

By _____
Name:
Title:

THE BANK OF NEW YORK, as Fiscal Agent under the Resolution

By _____
Name:
Title:

...STRO DE TRANSACCIONES
COMERCIALES

16 JAN 19 PM 2:07

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 2, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the Debtor's Pension Funding Bond Resolution adopted by the Debtor's Board of Trustees on January 24, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries under the Resolution, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). All capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and its payment of amounts due to the Owners of the Pension Funding Bonds and other Beneficiaries in accordance with the terms of the Pension Funding Bonds and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds and the other Beneficiaries are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By_____
Name:
Title:

**THE BANK OF NEW YORK,** as Fiscal Agent under the Resolution

By_____
Name: Steven Vaccarello
Title:  Vice President



Government of Puerto Rico

# CERTIFICATION OF COPIES

I, **Luis G. Rivera Marín**, Secretary of State of the Government of Puerto Rico; CERTIFY: That the attached copies are a true and exact representation of all financing statements and related subsequent documentation for the information searched as filed with the Puerto Rico Department of State, Uniform Commercial Code Division, as of the date 6th day of December 2017.



IN WITNESS WHEREOF, the undersigned by virtue of the authority vested by law, hereby issues this certificate and affixes the Great Seal of the Government of Puerto Rico, in the City of San Juan, Puerto Rico, today, 7th day of December 2017.

Luis G. Rivera Marín
Secretary of State



Government of Puerto Rico

# CERTIFICATION OF REPORT

I, **Luis G. Rivera Marín**, Secretary of State of the Government of Puerto Rico; CERTIFY: That the attached report is a true and exact representation of all financing statements and related subsequent documentation for the information searched as filed with the Puerto Rico Department of State, Uniform Commercial Code Division, as of the date 6th day of December 2017.



IN WITNESS WHEREOF, the undersigned by virtue of the authority vested by law, hereby issues this certificate and affixes the Great Seal of the Government of Puerto Rico, in the City of San Juan, Puerto Rico, today, 7th day of December 2017.

Luis G. Rivera Marín
Secretary of State

Good Through Date: 6th day of December 2017
Standard RA9 Search

## Filer Information

Name: Sims James

Email: rsims@jonesday.com

If you have any questions or concerns regarding this Search Report, please contact a UCC specialist at (787) 722-2121 ext. 4401.

## Search Criteria

### Name as Provided:

Organization Name      Employees Retirement System of the Government of the Commonwealth of Puerto Rico

### Name Searched:

Organization Name      Employees Retirement System of the Government of the Commonwealth of Puerto Rico

| | |
|---|---|
| Lien Type Searched: | UCC |
| Lien Status Type Searched: | Active |
| Address: | [Not Provided] |

Case:17-03283-LTS Doc#:860-1 Filed:07/28/17 Entered:07/28/17 19:58:15 Desc:
Affidavit Page 290 of 291

## Search Results

### Financing Statement

| | |
|---|---|
| File Number | 2009001811 |
| File Number | UCC Financing Statement |
| Filing Date | Wed Jul 02 00:00:00 AST 2008 |
| Lapse Date | Mon Jul 02 00:00:00 AST 2018 |

Debtor
| | |
|---|---|
| Name | EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

Secured Party
| | |
|---|---|
| Name | THE BANK OF NEW YORK MELLON (AS SUCCESSOR TO THE BANK OF NEW YORK) AS FISCAL AGENT |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

Debtor
| | |
|---|---|
| Name | EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

Secured Party
| | |
|---|---|
| Name | THE BANK OF NEW YORK MELLON (AS SUCCESSOR TO THE BANK OF NEW YORK) AS FISCAL AGENT |
| Address | 101 BARCLAY STREET,7 WEST, NEW YORK, NY, 10286,US |

Debtor
| | |
|---|---|
| Name | EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

Secured Party
| | |
|---|---|
| Name | THE BANK OF NEW YORK MELLON (AS SUCCESSOR TO THE BANK OF NEW YORK) AS FISCAL AGENT |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

### History

| Filing Number | Filing Name/Type | Filed Date | Number of Pages |
|---|---|---|---|
| 2009001811 | UCC1 - UCC Financing Statement | 07/02/2008 | 4 |
| 2009001811-1 | UCC3 - UCC Financing Statement Amendment (Amendment) | 12/17/2015 | 6 |
| 2009001811-2 | UCC3 - UCC Financing Statement Amendment (Amendment) | 01/19/2016 | 9 |

### Financing Statement

| | |
|---|---|
| File Number | 2009001812 |
| File Number | UCC Financing Statement |
| Filing Date | Tue Jun 24 00:00:00 AST 2008 |
| Lapse Date | Sun Jun 24 00:00:00 AST 2018 |

Debtor
| | |
|---|---|
| Name | EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

Secured Party
| | |
|---|---|
| Name | THE BANK OF NEW YORK MELLON (AS SUCCESSOR TO THE BANK OF NEW YORK) AS FISCAL AGENT |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

Debtor
| | |
|---|---|
| Name | EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

Secured Party

| | |
|---|---|
| Name | THE BANK OF NEW YORK MELLON (AS SUCCESSOR TO THE BANK OF NEW YORK) AS FISCAL AGENT |
| Address | 101 BARCLAY STREET,7 WEST, NEW YORK, NY, 10286,US |

**Debtor**

| | |
|---|---|
| Name | EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO |
| RICO | |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

**Secured Party**

| | |
|---|---|
| Name | THE BANK OF NEW YORK MELLON (AS SUCCESSOR TO THE BANK OF NEW YORK) AS FISCAL AGENT |
| Address | NOT_AVAILABLE, NOT_AVAILABLE, PR, 00000,US |

## History

| Filing Number | Filing Name/Type | Filed Date | Number of Pages |
|---|---|---|---|
| 2009001812 | UCC1 - UCC Financing Statement | 06/24/2008 | 3 |
| 2009001812-1 | UCC3 - UCC Financing Statement Amendment (Amendment) | 12/17/2015 | 6 |
| 2009001812-2 | UCC3 - UCC Financing Statement Amendment (Amendment) | 01/19/2016 | 9 |