UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br>Case No. 17 BK 3283 (LTS)<br><br>(Jointly Administered) |

**OBJECTION AND RESERVATION OF RIGHTS OF ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP. WITH RESPECT TO MOTION TO STAY CONTESTED MATTERS PENDING CONFIRMATION OF COMMONWEALTH PLAN OF ADJUSTMENT**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

# **TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES ................................................................................................ii-iii

OBJECTION AND RESERVATION OF RIGHTS....................................................................1

CONCLUSION..........................................................................................................................11

## **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

Ashcroft v. Mattis,
 431 U.S. 171 (1977)...........................................................................................................4

Bos. Teachers Union, Local 66, AFT, AFL-CIO v. Edgar,
 787 F.2d 12 (1st Cir. 1986)................................................................................................4

Cambridge Literary Props, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG.,
 510 F.3d 77 (1st Cir. 2007)................................................................................................4

CFTC v. Chilcott Portfolio Mgmt., Inc.,
 713 F.2d 1477 (10th Cir. 1983) .........................................................................................2

Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund,
 748 F.2d 42 (1st Cir. 1984)................................................................................................5

In re Am. Cap. Equip., LLC,
 688 F.3d 145 (3d Cir. 2012)...............................................................................................5

In re Beebe,
 No. 95-20244, 1995 WL 337666 (5th Cir. May 15, 1995).............................................10

In re Goldstein,
 114 B.R. 430 (Bankr. E.D. Pa. 1990) .............................................................................10

In re Hanish, LLC,
 570 B.R. 4 (Bankr. D. N.H. 2017 ......................................................................................5

In re Pecht,
 53 B.R. 768 (Bankr. E.D. Va. 1985)..................................................................................5

Landis v. N. Am. Co.,
 299 U.S. 248 (1936)...........................................................................................................2

Osediacz v. City of Cranston,
 414 F.3d 136 (1st Cir. 2005)..............................................................................................4

Rosco, Inc. v. Mirror Lite Co.,
 No. CV-96-5658(CPS), 2017 WL 2296827 (E.D.N.Y. Aug. 6, 2007)......................................2

Walsh Constr. Co. P.R. v. United Sur. & Indem. Co.,
 No. 12-1401 (SEC), 2015 WL 13548470 (D.P.R. Sept. 28, 2015) ...........................................2

## STATUTES AND OTHER AUTHORITIES

P.R. CONST. art. VI § 2 ...........................................................................................................1

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") hereby submit this Objection and Reservation of Rights (the "Objection and Reservation of Rights") with respect to the *Motion to Stay Contested Matters Pending Confirmation of Commonwealth Plan of Adjustment* (ECF No. 7640,[2] the "GO Stay Motion")[3] as filed by the Financial Oversight and Management Board for Puerto Rico ("FOMB") on June 25, 2019, and respectfully state as follows:

## OBJECTION AND RESERVATION OF RIGHTS

1. Assured is an insurer of both general obligation ("GO") bonds and Puerto Rico Public Buildings Authority ("PBA") bonds and, as an insurer of GO Bonds issued in 2012, is a respondent to the claim objection (ECF No. 4784, the "Claim Objection") filed by FOMB and the Official Committee of Unsecured Creditors (the "UCC") on January 14, 2019, that is the subject of the GO Stay Motion.[4] The Claim Objection is based on the erroneous theory that revenue bonds issued by PBA are subject to the constitutional debt limit contained in the Puerto Rico constitution (see P.R. CONST. art. VI § 2).

2. In addition, Assured is a defendant-intervenor in Adversary Proceeding Number 18-149-LTS (the "PBA Adversary Proceeding"), which forms the basis of the Claim Objection.[5]

---

[2] Unless otherwise indicated, references to ECF numbers in this Objection and Reservation of Rights refer to the docket in Case No. 17-3283-LTS.

[3] Capitalized terms used in this Objection and Reservation of Rights but not defined herein have the meanings ascribed to them in the GO Stay Motion.

[4] In addition, the GO Stay Motion references a subsequent claim objection filed solely by the UCC (ECF No. 7057). See GO Stay Motion ¶ 8. The arguments in this Objection and Reservation of Rights apply to the GO Stay Motion as it relates to this subsequent objection by the UCC as well as to the original Claim Objection.

[5] As this Court has already recognized, "[t]he GO Bond Claim Objection builds on the allegations of the PBA Adversary Proceeding." See Case No. 17-03283-LTS, ECF No. 6891 at 3. Because the Claim Objection "builds on the allegations" of the PBA Adversary Proceeding, the PBA Adversary Proceeding is foundational to the Claim Objection.

3. On June 25, 2019, FOMB filed the GO Stay Motion, which seeks to justify an indefinite stay of the litigation of the Claim Objection on the grounds that FOMB has signed a so-called "Plan Support Agreement" (the "PSA") with a minority of PBA and Commonwealth bondholders holding, by FOMB's admission, only "40% of the outstanding principal amount of PBA Bonds and roughly **10%** of the outstanding principal amount of GO Bonds." See Adv. Proc. No. 18-149-LTS, ECF No. 99 ¶ 1 (emphasis added).

4. In deciding whether to grant a stay, courts must generally "balance the equities" and consider the "potential prejudice that [a stay] may entail to each party. See Walsh Constr. Co. P.R. v. United Sur. & Indem. Co., No. 12-1401 (SEC), 2015 WL 13548470, at *4 (D.P.R. Sept. 28, 2015). In particular, in considering a litigation stay request, a court must consider whether "a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party." See Rosco, Inc. v. Mirror Lite Co., No. CV-96-5658(CPS), 2017 WL 2296827, at *3 (E.D.N.Y. Aug. 6, 2007). Here, particularly in light of the low level of creditor support for the PSA, FOMB in the GO Stay Motion has failed to carry its "heavy" burden of justifying a stay. See Landis v. N. Am. Co., 299 U.S. 248, 256 (1936) (holding that "the burden of making out the justice and wisdom of a departure from the beaten track lay heavily" on the party seeking a stay); see also CFTC v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir. 1983) (the "underlying principle clearly is that 'the right to proceed in court should not be denied except under the most extreme circumstances.'") (citation omitted). FOMB offers four principal reasons for a stay; none offers valid justification.

5. First, FOMB contends that a stay will "allow[] key stakeholders to continue discussions and provides an opportunity to garner further support for the restructuring framework in the PSA." See GO Stay Motion at ¶ 3; see also id. ¶16 ("[S]taying the GO Objections will maintain the status quo while [FOMB] continues discussions with additional parties to gather

further support for the framework of a plan of adjustment"). These repeated references to the need for "further support" constitute an admission that the PSA does not currently have sufficient support to serve as the basis for a confirmable plan. If the PSA plan does not have enough support to be confirmed, though, then why should consideration of the substantive issues in these Title III cases be halted in anticipation of a supposed confirmation hearing that, as matters stand, might never happen? FOMB says the stay will allow it to "continue" discussions (id.), but this again proves that FOMB is already engaging in discussions now. FOMB does not need a stay in order to "continue" those discussions.

6. The likely reason FOMB wants a stay while it "continues" discussions is because it realizes that, given the infirmities of the litigations—the Claim Objection and the PBA Adversary Proceeding—around which it has built the PSA, the litigation "landscape" absent a stay is likely to rapidly turn against it, leaving FOMB without enough leverage to attempt to corral additional creditors into the "restructuring framework" represented by the PSA. While FOMB's desire to paralyze its adversaries so that it can retain the upper hand in negotiations is understandable, it is not a legitimate reason for requesting a stay.

7. FOMB's current position is clearly strategical rather than logical. Indeed, FOMB conceded in the Claim Objection itself that "**[t]he issues raised in this [Claim] Objection are gating issues for the Commonwealth's plan of adjustment process . . . [W]hether more than $6 billion of GO bondholder claims should be disallowed is unquestionably a critical gating issue**." See Claim Objection ¶ 10 (emphasis added). Given these concessions, the GO Stay Motion should not be permitted to *close* the gate on the admitted "gating issues" raised in the Claim Objection before the plan process has even commenced.

8. Indeed, given that FOMB has failed to carry its burden of showing that a confirmation hearing is currently likely or even possible, any stay granted based on the mere

*hypothesis* that FOMB *might* in the future garner enough support for the PSA to hold a confirmation hearing would be an impermissible advisory opinion based on a purely hypothetical set of facts. See, e.g., Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005) ("Federal courts . . . are not empowered to offer advisory opinions."); Ashcroft v. Mattis, 431 U.S. 171, 172 (1977) (holding that "there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.'") (citation omitted); Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG., 510 F.3d 77, 86 (1st Cir. 2007) (refusing to consider one of the issues presented by plaintiff because it "is a hypothetical question on the facts of this case, and we do not give advisory opinions"); Bos. Teachers Union, Local 66, AFT, AFL-CIO v. Edgar, 787 F.2d 12, 16 (1st Cir. 1986) (explaining that if the district court ruled on a controversy that was demonstrated to not be live it "would have been rendering a purely advisory opinion based on hypothetical facts, forbidden by Article III.").

9. Therefore, under present circumstances, the GO Stay Motion is at best premature and must be denied. If, at some point in the future, FOMB were to garner sufficient support for a restructuring proposal to actually hold a confirmation hearing, FOMB would be free to file a renewed stay motion at that time, and the parties could then debate the merits of the renewed stay motion under those new and very different facts.

10. Beyond what FOMB admits is a lack of sufficient creditor support to hold a confirmation hearing, there are other ways in which FOMB has failed to carry its burden of establishing that confirmation of a plan based on the PSA is likely. Specifically, as Assured has pointed out in a previous filing (see Adv. Proc. No. 18-149, ECF No. 93), the plan currently contemplated by the PSA is patently unconfirmable on its face. As just one example, in an effort to compensate for the lack of creditor support described above, the PSA is premised on a transparent attempt to "gerrymander" an impaired consenting class by artificially separating

substantially identical claims into distinct classes in violation of Section 301(e) of PROMESA and First Circuit case law. See Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, 748 F.2d 42, 46 (1st Cir. 1984) ("[T]he general rule regarding classification is that 'all creditors of equal rank with claims against the same property should be placed in the same class.'") (citation omitted). One of the most fundamental prohibitions in all of bankruptcy law is "'thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.'" See, e.g., In re Hanish, LLC, 570 B.R. 4, 15 (Bankr. D. N.H. 2017) (citation omitted). Yet the PSA, through the illegal classification scheme set forth on pages 13-15 of its associated term sheet (see Adv. Proc. No. 18-149-LTS, ECF No. 99-3 at pp. 64-66 of 86), violates even this elementary precept.[6]

11.    FOMB may attempt to argue that confirmation of a plan based on the PSA is not currently before the Court, but FOMB has *put* the issue of the plan's confirmability before the Court by asking for a stay premised on the theory that there may be a confirmed plan based on the PSA. If FOMB is unwilling or unable to make a showing that the plan contemplated by the PSA is confirmable, then it has simply failed to carry its burden of justifying the stay.[7]

---

[6] If forced to respond to a plan premised on the PSA, Assured will set forth in detail the myriad additional aspects of such a plan's unconfirmability. These include, among many other things, the fact that the PSA is premised on illicit "sweeteners" to be paid to the creditors supporting the PSA in the form of so-called "PSA Restriction Fees." See Adv. Proc. No. 18-149-LTS, ECF No. 99-3 ¶ M at pp. 69-70 out of 86. This Objection and Reservation of Rights focuses on the PSA's gerrymandered classification scheme simply because that is a particularly striking example of illegality that leaps from the page upon even a cursory review of the PSA and term sheet.

[7] Notably, even prior to the confirmation hearing "a bankruptcy court may address the issue of plan confirmation where it is obvious . . . that a later confirmation hearing would be futile because the plan . . . is patently unconfirmable." In re Am. Cap. Equip., LLC, 688 F.3d 145, 154-55 (3d Cir. 2012); see also In re Pecht, 53 B.R. 768, 769-70 (Bankr. E.D. Va. 1985). Similarly, FOMB conceded at the last Omnibus Hearing the possibility of considering plan-related issues prior to the confirmation hearing, emphasizing to the Court while previewing the PSA that "to the extent there are overarching issues . . . we might ask Judge Swain to tee up some of the issues . . . [prior to the confirmation hearing] at the disclosure statement stage . . . because we know they're overarching. They have to be resolved." See June 12, 2019 Hr'g Tr. at 142:22-143:2. By filing the GO Stay Motion premised on the hypothesis that the PSA might lead to a confirmed plan, FOMB has now "teed up" the issue of the underlying plan's confirmability, and there is no reason the Court cannot consider the PSA plan's patent unconfirmability in its deliberations concerning the Stay Motion.

12. Second, FOMB submits that a stay would "conserve[] the resources of the parties and the Court." See GO Stay Motion at ¶ 3. By FOMB's own admission, however, this would at best be true only "if the Court confirms the plan and approves the Proposed Settlement" (see GO Stay Motion §3), and FOMB has conceded that it does not currently have sufficient support for this to occur.

13. In any event, FOMB fails to establish that even confirmation of the plan contemplated in the PSA would result in any conservation of resources, because the plan envisioned by the PSA would not resolve the Claim Objection, and instead would simply farm the prosecution of the Claim Objection out to a new "Litigation Trust." See Adv. Proc. No. 18-149-LTS, ECF No. 99-3 ¶¶ H & I at pp. 66-67 of 86. Indeed, the GO Stay Motion itself acknowledges that the PSA is not a recipe for an end to litigation with respect to the Claim Objection, but rather a recipe for further litigation, stating that "[t]he PSA indicates that holders of GO Bonds subject to the GO Objection will have the option of (a) settling at a given percentage of the bonds' par value, *or* (b) *litigating* the [Claim Objection and related litigation], and if successful in *defending* against the GO Objections and other Bond Litigation, receiving a maximum recovery equivalent to that provided to holders of bonds not subject to the GO Objections." See GO Stay Motion ¶ 12 (emphasis added). The GO Stay Motion further states that "[t]he PSA does not provide details as to how *the Bond Litigation would proceed* with respect to non-settling parties," but predicts that FOMB "will meet and confer with the [UCC] and certain large groups of bondholders to develop *proposed litigation procedures* for the GO Objection and related Bond Litigation on a post-effective date basis." See id. ¶ 13 (emphasis added). At best, therefore, the PSA *defers* rather than prevents litigation, and FOMB provides no evidence that the PSA or a plan based on the PSA will result in any substantial total *decrease* in litigation.

-6-

14. While the PSA admittedly does contemplate a settlement *offer* to holders of GO Bonds challenged in the Claim Objection, the proposed settlement is at a steep discount to what other GO Bondholders would receive,[8] making it unlikely that many, much less all, holders of challenged GO Bonds would accept this settlement offer. Instead, it is virtually inevitable that the Claim Objection will need to be litigated even in the unlikely event that the plan contemplated in the PSA were somehow to be confirmed. Indeed, the holders of challenged GO Bonds most likely to be intimidated by the Claim Objection into settling their claims are relatively small and/or retail holders who lack the resources to contest the Claim Objection, and any settlements by such holders are unlikely to materially conserve resources, as such small holders would have been unlikely to participate actively in the litigation in any event. By contrast, major holders with the resources to litigate will undoubtedly do so notwithstanding FOMB's unappetizing "settlement" offer. The GO Stay Motion therefore fails to establish any realistic prospect of "a settlement that may resolve core issues" (cf. GO Stay Motion ¶16), and instead presages only a continuation of the litigation frenzy that FOMB and the UCC unleashed with the filing of the PBA Adversary Proceeding, the Claim Objection, and their many subsequent litigations.

15. FOMB also argues that since the Claim Objection is purportedly still in its "relatively early stages," a stay should be granted. See GO Stay Motion ¶ 17. This ignores the fact that FOMB filed the Claim Objection nearly half a year ago (on January 14, 2019), and that the reason the litigation is still in its "early stages" is that FOMB itself has requested numerous extensions of its deadlines for complying with the "exclusive" procedures that FOMB itself

---

[8] For example, the PSA contemplates offering settling holders of 2012 GO Bonds a 45% recovery on the face amount of their claims, as opposed to a 64.3% base recovery for GO Bonds that are not subject to the Claim Objection or challenged GO Bonds that do not settle and succeed in defeating the Claim Objection. The PSA also provides non-settling GO Bond holders with the opportunity to obtain additional recoveries not available to challenged GO Bond holders who settle, including in the form of (i) so-called "Settlement Savings" (essentially, value recovered from holders of bonds subject to the Claim Objection who can be induced to settle) and (ii) distributions from the "Litigation Trust" in the event the Litigation Trust succeeds in using the Claim Objection to invalidate some challenged GO Bonds but not others. See Adv. Proc. No. 18-149-LTS, ECF No. 99-3 ¶¶ H & I at pp. 66-67 of 86.

proposed for litigating the Claim Objection. See GO Stay Motion ¶ 7 n. 7 (noting extensions of deadlines requested by FOMB). Therefore, FOMB is essentially arguing that the Court should reward it for the delay it engendered by granting the GO Stay Motion. That would not be an equitable result.[9]

16. Third, FOMB claims that the interests of non-parties will be promoted by a stay because "a stay will reduce the litigation costs incurred by [FOMB], which are paid out of the Commonwealth's . . . budget." See GO Stay Motion ¶ 18. However, this would again be true only if (i) the PSA itself enjoyed broad creditor support, such that a confirmation hearing would be largely uncontested and would not simply give rise to additional, incremental litigation on top of, and possibly dwarfing, the Claim Objection, and (ii) the PSA had a reasonable prospect of resulting in a confirmed plan that would obviate the need for other litigation. Neither of these preconditions to a savings in litigation costs is currently satisfied, however, because as matters stand any confirmation hearing would be massively contested and therefore multiply rather than reduce litigation costs. Moreover, this massive new litigation unleashed by the PSA and the ill-conceived plan it envisions would have no realistic prospect of ending in a confirmed plan, both because of a lack of the requisite creditor votes and because any plan based on the PSA would be unconfirmable on its face. Therefore, as matters stand, there is no realistic prospect of a confirmed plan that would resolve the issues in the Claim Objection, and the Claim Objection will still need

---

[9] Notably, after knowingly deciding to challenge the bonds of thousands of retail bondholders, FOMB now argues that "[d]ue to the sheer number of [challenged bondholders]" a "'meet and confer' process has been impossible to carry out." See GO Stay Motion ¶ 7. Yet FOMB itself has already proposed a creative and efficient method for involving those retail holders in the meet and confer process by establishing a special website for that purpose. See ECF No. 7154 ¶ 18 (describing the "GO Claim Objection Website"). If FOMB had simply proceeded to obtain Court approval for the proposed website, litigation of the Claim Objection might have significantly advanced by this point—instead, FOMB sought (see ECF No. 7528) and obtained (see ECF No. 7660) a continuance of the hearing at which the Court could have approved the website, and now apparently proposes to scrap entirely its own proposed "exclusive" procedures for litigating the Claim Objection in favor of some other, yet-to-be negotiated procedure. See ECF No. 4788 (joint urgent motion by FOMB and the UCC seeking Court approval of "exclusive" procedures governing the Claim Objection). This sequence of events demonstrates that FOMB's purported reasons for not proceeding with the litigation of the Claim Objection are largely pre-textual, and that FOMB is merely engaging in a strategy of delay designed to frustrate the ability of challenged bondholders to clear the cloud of the Claim Objection hanging over their bonds.

-8-

to be litigated, and the attendant costs incurred, one way or another. If FOMB wants to save on litigation costs, it could do so by not wasting time and resources trying to confirm the flawed plan contemplated in the PSA, or by not bringing meritless litigations like the Claim Objection and the PBA Adversary Proceeding in the first instance.

17. FOMB also argues that "should the resolution embodied in the [PSA] fail to come to fruition, the non-moving parties will be in the exact same position as when the stay was entered and no worse off." See GO Stay Motion ¶ 19. This statement ignores the harm that a stay will cause to Assured and other holders of challenged GO Bonds *within* the vote solicitation and plan confirmation process contemplated by the PSA. Specifically, FOMB's disclosure of the PSA has revealed that a major purpose of the Claim Objection is apparently to disenfranchise Assured and other holders of the challenged GO Bonds by characterizing their claims as "disputed" and therefore not entitled to vote. For example, Assured insures GO Bonds issued in 2012. The term sheet attached to the PSA purports to classify bonds issued in 2012 separately from other GO Bonds as Class 4, "2012 CW Bond Claims." The PSA term sheet also provides that "2012 CW Bond Claims are subject to the [Claim Objection] and . . . **shall not be entitled to vote to accept or reject the plan**." See Adv. Proc. No. 18-149-LTS, ECF No. 99-3 at p. 64 of 86 (emphasis added).

18. Just as a major purpose of the Claim Objection itself is to disenfranchise Assured and other holders of "disputed" bonds, a major purpose of the GO Stay Motion is to ensure that Assured and other challenged bondholders *remain* disenfranchised by ensuring that the Claim Objection is not resolved prior to vote solicitation and that Assured and other holders in Class 4 (and in other "disputed" classes) are not permitted to vote.

19. Like FOMB's gerrymandering of classes in the PSA, both the Claim Objection and the GO Stay Motion should therefore be understood first and foremost as

mechanisms designed to compensate for the lack of meaningful creditor support for the PSA by disenfranchising many of Puerto Rico's largest GO Bond creditors. The Court should not countenance this attempt at disenfranchisement, and instead should resolve the Claim Objection prior to considering any disclosure statement or plan of adjustment so that it is clear prior to solicitation who is entitled to vote on any plan. See, e.g., In re Goldstein, 114 B.R. 430, 434 (Bankr. E.D. Pa. 1990) (delaying confirmation hearing in order to clarify voting rights by first conducting a "hearing on the validity" of a large disputed claim).

20. The harm that Assured and other holders of challenged GO Bonds would suffer through being deprived of their right to vote on a plan greatly outweighs the minimal supposed harm—consisting of nothing but the possible incurrence of additional legal fees—that FOMB inaccurately posits could be avoided through a stay. See, e.g., In re Beebe, No. 95-20244, 1995 WL 337666, at *4 (5th Cir. May 15, 1995) (finding that equities weighed in favor of the party opposing a stay where "the only hardship" identified by the party favoring the stay was that it "*could* incur unnecessary litigation expenses"). To avoid inflicting on Assured and other holders of challenged bonds the harm of disenfranchisement, the Court should permit the Claim Objection to proceed expeditiously so that challenged bond claims are no longer "disputed" at the time of vote solicitation, and so that FOMB cannot use their "disputed" status to strip holders of challenged bonds of the right to vote.

21. In addition, Assured incorporates herein by reference all arguments made in its objection to the stay motion (Adv. Proc. No. 18-149-LTS, ECF No. 99) filed by FOMB in the PBA Adversary Proceeding. Assured reserves all of its rights with respect to the Claim Objection and the GO Stay Motion, including specifically the right to join in any other responses or objections to the GO Stay Motion.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, the GO Stay Motion should be denied in its entirety.

Dated: July 9, 2019
New York, New York

| CASELLAS ALCOVER & BURGOS P.S.C. | CADWALADER, WICKERSHAM & TAFT LLP |
|---|---|
| /s/ *Heriberto Burgos Pérez* | /s/ *Howard R. Hawkins, Jr.* |
| Heriberto Burgos Pérez | Howard R. Hawkins, Jr.* |
| USDC-PR No. 204,809 | Mark C. Ellenberg* |
| Ricardo F. Casellas-Sánchez | William Natbony* |
| USDC-PR No. 203,114 | Ellen M. Halstead* |
| Diana Pérez-Seda | Thomas J. Curtin* |
| USDC–PR No. 232,014 | Casey J. Servais* |
| E-mail: hburgos@cabprlaw.com | 200 Liberty Street |
| rcasellas@cabprlaw.com | New York, New York 10281 |
| dperez@cabprlaw.com | Tel.: (212) 504-6000 |
| | Fax: (212) 406-6666 |
| P.O. Box 364924 | Email: howard.hawkins@cwt.com |
| San Juan, PR 00936-4924 | mark.ellenberg@cwt.com |
| Tel.: (787) 756-1400 | bill.natbony@cwt.com |
| Fax: (787) 756-1401 | ellen.halstead@cwt.com |
| | thomas.curtin@cwt.com |
| *Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* | casey.servais@cwt.com |
| | * admitted pro hac vice |
| | *Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* |

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, 9th day of July, 2019.

                                                   By: /s/ *Howard R. Hawkins, Jr.*
                                                           Howard R. Hawkins, Jr.*
                                                           * admitted pro hac vice