# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : |  |
|  | : |  |
| THE FINANCIAL OVERSIGHT AND | : | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : | Title III |
|  | : |  |
| as representative of | : | Case No. 17-BK-3283 (LTS) |
|  | : |  |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : | (Jointly Administered) |
|  | : |  |
| Debtors.[1] | : |  |

------------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| THE FINANCIAL OVERSIGHT AND | : |  |
| MANAGEMENT BOARD FOR PUERTO RICO, | : |  |
|  | : |  |
| as representative of | : | Adv. Proc. No. 18-00149 |
|  | : |  |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| THE OFFICIAL COMMITTEE OF UNSECURED | : |  |
| CREDITORS OF ALL TITLE III DEBTORS (OTHER | : |  |
| THAN COFINA), | : |  |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| THE OFFICIAL COMMITTEE OF RETIRED | : |  |
| EMPLOYEES OF PUERTO RICO, | : |  |
|  | : |  |
| Plaintiff-Intervenor, | : |  |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

v.                                                    :
                                                      :
PUERTO RICO PUBLIC BUILDINGS AUTHORITY                :
                                                      :
            Defendant                                 :
                                                      :
            and                                       :
                                                      :
PBA FUNDS, ASSURED GUARANTY CORP.,                    :
ASSURED GUARANTY MUNICIPAL CORP.,                     :
THE QTCB NOTEHOLDER GROUP,                            :
NATIONAL PUBLIC FINANCE GUARANTEE                     :
CORPORATION, AMBAC ASSURANCE                          :
CORPORATION, AND THE LAWFUL                           :
CONSTITUTIONAL DEBT COALITION,                        :
                                                      :
            Defendant-Intervenors.                    :
                                                      :
------------------------------------------------------------------ x
                                                      :
THE FINANCIAL OVERSIGHT AND                           :
MANAGEMENT BOARD FOR PUERTO RICO, AS                  :
REPRESENTATIVE OF THE COMMONWEALTH                    :
OF PUERTO RICO                                        :
                                                      :
            Movant.                                   :
                                                      :
------------------------------------------------------------------ x


**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS OBJECTION
TO (A) MOTION TO STAY CONTESTED MATTERS [DOCKET NO. 7640 IN CASE
NO. 17-3283 (LTS)] AND (B) MOTION TO STAY PBA ADVERSARY PROCEEDING
[DOCKET NO. 99 IN ADV. PROC. NO. 18-149 (LTS)] PENDING CONFIRMATION OF
<u>COMMONWEALTH PLAN OF ADJUSTMENT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ....................................................................................................... 5

I.   OVERSIGHT BOARD'S AND COMMITTEE'S GO CLAIM OBJECTIONS.............. 5

II.  GO GROUP'S CONDITIONAL OBJECTION TO CLAIMS BASED ON
     ADDITIONAL GO AND PBA BONDS............................................................ 6

III. PBA ADVERSARY PROCEEDING ................................................................ 7

IV.  COMMONWEALTH PLAN SUPPORT AGREEMENT.................................... 9

ARGUMENT ......................................................................................................... 18

I.   PROPOSED PLAN IS PATENTLY UNCONFIRMABLE ................................. 18

II.  STAY IS NOT NECESSARY TO PRESERVE PROPOSED PLAN........................ 22

III. STAY WOULD NOT AVOID UNNECESSARY CONSUMPTION OF TIME
     AND RESOURCES.................................................................................... 25

IV.  STAY WOULD NOT PROMOTE NON-MOVANTS' INTERESTS....................... 26

V.   STAY WOULD PREJUDICE NON-MOVING PARTIES .............................. 27

VI.  PSA IS NOT RESULT OF NEGOTIATIONS WITH KEY STAKEHOLDERS.......... 28

VII. LIMITED STAY OF DISCOVERY IN PBA ADVERSARY PROCEEDING
     MAY BE APPROPRIATE ......................................................................... 28

CONCLUSION...................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Efron, v. Candelario (In re Efron)*,
    529 B.R. 396 (B.A.P. 1st Cir. 2015) .......................................................18

*Gardner v. New Jersey*,
    329 U.S. 565 (1947) ...............................................................................26

*In re City of Detroit*,
    524 B.R. 147 (Bankr. E.D. Mich. 2014) ...............................................20

*In re CS Mining, LLC*,
    574 B.R. 259 (Bankr. D. Utah 2017) .....................................................26

*In re Hanish, LLC*,
    570 B.R. 4 (Bankr. D.N.H. 2017) ..........................................................18

*In re Mahoney Hawkes, LLP*,
    289 B.R. 285 (Bankr. D. Mass. 2002) ...................................................18

*In re Nat'l Energy & Gas Transmission, Inc.*,
    Nos. 03–30459PM, 03–30461-64, 03–30686-87, 2006 WL 5217797 (Bankr.
    D. Md. Feb. 21, 2006), aff'd in relevant part, *Steering Comms of Lake Rd. &
    La Paloma Project Lenders v. Nat'l Energy & Gas Transmission, Inc.*, Civil
    Action No. AW–06–766, 2007 WL 2609430 (D. Md. May 10, 2007) ...................15

*In re Valrico Square Ltd. P'ship*,
    113 B.R. 794 (Bankr. S.D. Fla. 1990) ...................................................18

*Landis, v. N. American Co.*,
    299 U.S. 248 (1936)................................................................................18

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
    390 U.S. 414 (1968)................................................................................25

*Walsh Constr. Co. P.R. v. United Surety & Indemnity Co.*,
    Civil No. 12-1401 (SEC), 2015 WL 13548470 (D.P.R. Sept. 28, 2015)................17

**Other Authorities**

David A. Skeel, Jr., What is a Lien? Lessons From Municipal Bankruptcy, 2015
    U. Ill. L. Rev. 675, 676-77 ....................................................................19

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) (the "Committee") hereby submits this omnibus objection (the "Objection") to (a) the motion to stay contested matters [Docket No. 7640 in Case No. 17-3283 (LTS)][1] (the "GO Stay Motion") and (b) the motion to stay the PBA adversary proceeding [Docket No. 99 in Adv. Proc. No. 18-149 (LTS)] (the "PBA Stay Motion" and, together with the GO Stay Motion, the "Stay Motions")[2] pending confirmation of a Commonwealth plan of adjustment.  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Oversight Board seeks an indefinite, unconditional, and global stay of all pending challenges to certain GO and PBA bonds, as well as the pending PBA "lease" challenge, bringing the Commonwealth's Title III case to a screeching halt that could last easily six months and potentially a year or more.  The ostensible rationale for this drastic relief is that a global stay is "essential" to the Oversight Board's efforts to gather additional support for a proposed plan of adjustment based on the framework embodied in a plan support agreement dated May 31, 2019 (the "PSA") entered into between the Oversight Board and a small group of holders of Commonwealth GO bonds and PBA bonds (the "PSA Creditors").  The real purpose of the stay, however, is to hold non-supporting creditors hostage and force them into settlements based on a proposed plan of adjustment that provides outrageously preferential treatment (including *de facto* releases) in favor of the PSA Creditors in the Oversight Board's desperate attempt to secure an impaired accepting class (which is a prerequisite to confirming a Commonwealth plan of adjustment under Title III of PROMESA).

---

[1]   Unless otherwise indicated, docket numbers refer to the docket entries in the Commonwealth's Title III case, *i.e.*, Case No. 17-3283 (LTS).

[2]   Capitalized terms used but not defined in this Objection have the meanings set forth in the Stay Motions.

2.      At the outset, it bears emphasizing that the grant of a stay is not a condition to the PSA or the contemplated Commonwealth plan of adjustment.  **In fact, the PSA only requires the Oversight Board to seek a stay, not to obtain it, and the failure to do so is not grounds for terminating the PSA.**  Accordingly, the Court need not grant the requested stay to preserve the PSA deal, as the Oversight Board has discharged its obligations under the PSA by filing the Stay Motions.  Moreover, while the granting of a stay is in the Court's discretion and in certain circumstances may be beneficial, the Committee believes that an indefinite, unconditional, and global stay would be ill-advised for the simple reason that the contemplated plan of adjustment is dead on arrival.  Thus, far from conserving resources, the requested stay would do nothing but delay this case and prejudice parties in interest.

3.      Contrary to the impression created by the Oversight Board in its Stay Motions, the PSA Creditors do not represent a broad cross-section of GO bondholders, but, instead, are a small group of hedge funds holding predominantly **pre-2012** PBA and GO bonds.[3]  These are the very bonds that would receive a preferential recovery under the proposed plan of adjustment, while the holders of GO and PBA bonds issued in 2012 and 2014 would litigate the validity of their bonds post-confirmation (unless settled at a substantial discount).  There is no justification (and neither the PSA nor the Stay Motions offer any) for the distinction between bonds issued before 2012 and bonds issued in and after 2012.  In fact, GO and PBA bonds issued in 2011 are subject to the same constitutional challenge as the bonds issued in 2012 and 2014, including the challenges asserted by (i) the Committee in its objection to the validity of GO bonds issued in 2011 and (ii) the Oversight Board and the Committee in their jointly filed adversary proceedings

---

[3]      The PSA Creditors are the members of the Lawful Constitutional Debt Coalition (the "LCDC") and the QTCB Noteholder Group (the "QTCB Group").  The LCDC filed a notice of participation in support of the 2012-2014 GO Claim Objection (as defined below).  *See* Docket No. 6180.  The QTCB Group filings make clear that the group's mission is to represent its members' interests as "holders . . . of those certain Qualified School Construction Bonds and Qualified Zone Academy Bonds issued by the Puerto Rico Public Buildings Authority," which bonds were issued in 2011.  *See* Docket No. 7659 at 1.

2

seeking to recover principal and interest payments on GO and PBA bonds issued in 2011 and thereafter.[4]

4.      Under the proposed plan of adjustment, the PSA Creditors stand to receive (all in) close to **100 cents on the dollar** for their PBA bonds after taking into account that the PBA bonds will have accrued approximately $480 million in interest after the Commonwealth's petition date (May 3, 2019).[5]  By not filing a contemporaneous Title III petition for the PBA, hundreds of millions of dollars in interest continue to accrue against the PBA for no reason (other than, perhaps, to make the proposed recovery for PBA bondholders seem less outrageous). And in no event should the PBA bondholders' guarantee claim against the Commonwealth include interest that accrued on the PBA bonds since the Commonwealth's petition date.  The near full recovery provided to PBA bondholders under the proposed plan does not even include the $300 million in consent and restriction fees that the PSA Creditors would receive upon consummation of the proposed plan, which would push the recovery on their PBA bonds well over 100% of their **face amount**.  And this is to say nothing of their recovery calculated based on the deeply discounted prices at which these bonds were purchased in the secondary market.

5.      More fundamentally, the proposed plan is built on the premise that the GO bondholders' constitutional priority over all other Commonwealth creditors is incorporated into Title III—the exact opposite of the position taken by the Oversight Board throughout this Title III case.  Furthermore, the proposed plan transforms the GO priority, which, by its terms, is triggered only when there is a revenue shortfall in a given fiscal year, into a permanent priority that operates as a *de facto* disallowance and permanent discharge of other creditors' claims.  To

---

[4]     The Oversight Board acknowledged in a recent joint status report [Docket No. 7550] that these adversary proceedings include an objection to the validity of GO and PBA bonds issued beginning in March 2011.

[5]     Indeed, the Committee notes that neither the PBA nor its guarantor, the Commonwealth, has made any payments on its bonds since July 2016, well before the Commonwealth's May 3, 2017 petition date.  Nor does the PBA have any significant sources of funding other than the "rental" income paid by the Commonwealth.

be clear, this is not a settlement of the GO priority issue in any meaningful sense of the word. Bluntly stated, it is a capitulation by the Oversight Board and a 180-degree reversal of its previously steadfast position, which remains as strong on the merits as ever.

6.      In stark contrast to the proposed recovery for the PSA Creditors, the proposed 9% recovery for "other [disfavored] creditors" reflects a blended recovery rate, with the Committee's constituents, the general unsecured creditors, likely receiving something closer to 1% of their claims.  To put this in perspective, the PSA Creditors' consent and restriction fees would be **larger than the entire distribution to general unsecured creditors** under the proposed plan. These fees are particularly inappropriate given that the PSA Creditors are not involuntary creditors of the Commonwealth that have had the Title III case thrust upon them.  Rather, they are hedge funds that actively sought to buy their bonds at steep discounts in the secondary market in order to engage in speculation and litigation arbitrage.  These parties should not be compensated for remaining restricted when it was their choice to immerse themselves in this case and to enter into the PSA.

7.      The Oversight Board also made no effort to consult or negotiate with the Committee regarding the PSA's proposed treatment of general unsecured creditors.  Nor, for that matter, did the Oversight Board consult with the Committee regarding economic terms of the proposed settlements with GO and PBA bondholders, which was a clear violation the Oversight Board's January 14, 2019 cooperation agreement with the Committee, in which the Oversight Board promised to "consult with the Committee in good faith regarding any potential [GO-related] settlement" (however it might arise).

8.      Meanwhile, the purported settlement of the PBA "lease" challenge is no settlement at all.  Under the proposed plan, the PBA bondholders would receive payment from the Commonwealth on an administrative "rent" claim in an amount that appears to be close, if

4

not equal, to the full than the post-petition "rents" asserted by the PBA to be due from the Commonwealth.

9.      Finally, it bears noting that the Committee had been urging the Oversight Board for more than a year to join the Committee in filing the PBA "lease" challenge and the GO claim objection, but the Oversight Board refused to do so until December 2018 and January 2019, respectively, based on the false premise that the Kobre & Kim report would shed some light on these issues (which it did not).  Thus, the delay in getting to plan confirmation lies squarely at the Oversight Board's feet, and it is simply too late now to put this case on an extended and indefinite hold while the Oversight Board attempts to corral support for a plan that is patently unconfirmable.  The Commonwealth's Title III case must continue to progress toward a plan of adjustment that can actually be confirmed, which will require rulings on a handful of basic legal issues.

10.      For all these reasons and the other reasons discussed below, the Oversight Board's Stay Motions should be denied.

## BACKGROUND

### I.      Oversight Board's and Committee's GO Claim Objections

11.      On January 14, 2019, the Oversight Board, acting through its Special Claims Committee, and the Committee (together, the "Objectors") filed an omnibus objection [Docket No. 4784] (the "2012-2014 GO Claim Objection") to claims asserted on account of GO bonds issued in 2012 and 2014 (the "2012-2014 GO Bonds").  In the 2012-2014 GO Claim Objection, the Objectors assert, among other things, that the issuance of the 2012-2014 GO Bonds violated

the debt service limit in the Puerto Rico Constitution and that the claims by purported holders of the 2012-2014 GO Bonds for principal and interest should therefore be disallowed.[6]

12.    On May 21, 2019, the Committee filed its omnibus objection [Docket No. 7057] (the "2011 GO Claim Objection" and, together with the 2012-2014 GO Claim Objection, the "GO Claim Objections") to claims asserted on account of certain GO bonds issued in 2011 (the "2011 GO Bonds").  The 2011 GO Claim Objection asserts, among other things, that the issuance of the 2011 GO Bonds violated Puerto Rico's constitutional debt service limit and that the claims by purported holders of 2011 GO Bonds for principal and interest should therefore be disallowed.[7]

13.    In connection with the GO Claim Objections, the Oversight Board and the Committee also commenced a series of adversary proceedings (the "Clawback Actions") seeking the avoidance and recovery of certain payments of principal and interest on GO and PBA bonds issued beginning in March 2011.  The Clawback Actions also seek a declaration that such bonds are "null and void" as having been issued in violation of Puerto Rico's constitutional debt service limit.  By order dated June 13, 2019 [Docket No. 7426], the Court stayed the Clawback Actions until September 1, 2019.

## II.    GO Group's Conditional Objection to Claims Based on Additional GO and PBA Bonds

14.    On April 2, 2019, the GO Group filed a "conditional" objection [Docket No. 6099] (the "Conditional Claim Objection") to claims based on PBA bonds and, alternatively, additional GO and PBA bonds issued beginning in fiscal year 2010.  In its Conditional Claim

---

[6]    In addition, the Committee also asserted that the 2012-2014 GO Bonds violated the balanced budget clause of the Puerto Rico Constitution, an argument in which the Oversight Board did not join.

[7]    The 2011 GO Claim Objection incorporated by reference the 2012-2014 GO Claim Bond Objection because both GO Claim Objections are premised upon substantially similar facts and law with respect to the Commonwealth's issuances of the GO Bonds subject to the GO Claim Objections.

Objection, the GO Group asserted, among other things, that, if the Court were to accept the premise underlying the GO Claim Objections, additional GO and PBA bonds are also subject to challenge on debt limit grounds.  The GO Group concurrently filed a motion to establish procedures with respect to the Conditional Claim Objection [Docket No. 6104].  That motion was denied by the Court on May 10, 2019 [Docket No. 6891] (the "Order Denying Conditional Objection Procedures Motion") because the GO Group did not support the relief requested in the GO Claim Objections and because the Conditional Claim Objection "appear[ed] to present a hypothetical request for relief instead of an actual case or controversy" and "appear[ed] to seek an advisory opinion that would not be justiciable in the present posture of the matter."[8]

15.    On June 21, 2019, the Oversight Board, the Committee, and the GO Group submitted a joint status report [Docket No. 7550] (the "Joint Status Report") in relation to the Conditional Claim Objection.  In that report, the Oversight Board acknowledged, for the first time, that the complaints in the Clawback Actions "include an objection to the validity" of **all GO and PBA bonds issued beginning in March 2011**.[9]

16.    In light of this acknowledgement, the GO Group recently renewed its motion [Docket No. 7814] (the "Renewed Conditional Objection Procedures Motion") to establish procedures for the Conditional Claim Objection by incorporating their challenge to additional bonds into the Objection Procedures.  The Renewed Conditional Objection Procedures Motion is scheduled to be heard at the July 24, 2019 omnibus hearing.

### III.    PBA Adversary Proceeding

17.    On December 21, 2018, the Oversight Board and the Committee (together, the "Plaintiffs") filed a complaint [Docket No. 1 in Adv. Proc. No. 18-149 (LTS)] (the "PBA

---

[8]    Order Denying Conditional Obj. Proc. Mot., at 7.

[9]    *See* Joint Status Rep. ¶ 9.c (emphasis added).

Complaint") seeking a declaratory judgment that purported leases (the "PBA Leases") between

the PBA, on the one hand, and various of the Commonwealth's departments, agencies,

instrumentalities, authorities, public corporations, and municipalities on the other hand, are not

"true leases" but rather disguised financing transactions.  As further detailed in the PBA

Complaint, the PBA therefore has no right under PROMESA or the Bankruptcy Code to receive

post-petition "rent" payments from the Debtors or to assert administrative claims against the

Commonwealth.

18.      On March 12, 2019, the Court entered an order [Docket No. 54 in Adv. Proc. No.

18-149 (LTS)] allowing certain PBA bondholders and monoline insurers (collectively, the

"Defendant Intervenors") to intervene as defendants in the PBA Adversary Proceeding on a

limited basis.[10]  On March 21, 2019, certain of the Defendant Intervenors—namely, the QTCB

Group (whose members are signatories to the PSA), the PBA Funds, and Assured—moved for

judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure [Docket No.

63 in Adv. Proc. No. 18-149 (LTS)] (the "Motion for Judgment on the Pleadings"), arguing that

the Plaintiffs' claims for relief fail as a matter of law.  On June 6, 2019, the Plaintiffs' filed their

opposition to the Motion for Judgment on the Pleadings [Docket No. 88 in Adv. Proc. No. 18-

149 (LTS)] ("Opposition to Motion for Judgment on the Pleadings"), reiterating, among other

things, that the PBA Leases "are not 'true leases,' but merely the vehicle by which the

Commonwealth transferred debt service payments through an intermediary (PBA) to the

bondholders."[11]

---

[10]     The Defendants Intervenors are the QTCB Group, the LCDC, the PBA Funds, Assured Guaranty Corp.
("AGC") and Assured Guaranty Municipal Corp. ("AGM," and together with AGC, "Assured"), Ambac
Assurance Corporation ("Ambac"), and National Public Finance Guarantee Corporation ("National").

[11]     Opp. to Mot. for J. on the Pleadings ¶ 4.

19.     The Court's scheduling order, dated April 16, 2019 [Docket No. 72 in Adv. Proc.

No. 18-149 (LTS)] (the "Scheduling Order"), required, among other things, that the Defendant

Intervenors file their replies in support of their Motion for Judgment on the Pleadings on or

before July 12, 2019 and that the Plaintiffs file their replies in support of their motions to dismiss

the Counterclaims on before the same date.  The Scheduling Order also established a timeline for

discovery, with document production to be completed by August 1, 2019, fact depositions to be

completed by October 1, 2019, and expert depositions to be completed by November 15, 2019.

20.     In light of the PSA (as further detailed below), the Oversight Board filed a motion

on June 21, 2019 [Docket No. 91 in Adv. Proc. No. 18-149 (LTS)] (the "PBA Tolling Motion")

requesting that all deadlines in the Scheduling Order be briefly tolled pending this Court's ruling

on the PBA Stay Motion, which is scheduled to be heard at the July 24, 2019 omnibus hearing.[12]

The Committee consented to the interim stay requested in the PBA Tolling Motion.  On June 28,

2019, the Court issued an order [Docket No. 101 in Adv. Proc. No. 18-149 (LTS)] (the "PBA

Tolling Order") granting the PBA Tolling Motion.

## IV.    Commonwealth Plan Support Agreement

21.     On June 16, 2019, the Oversight Board announced that it had entered into the

PSA[13] with the PSA Creditors, which hold a total of approximately $3 billion in PBA bonds and

GO bonds (or approximately 17% of the PBA and GO bond claims outstanding, as per the

PSA).[14]  When the PSA was announced, the Oversight Board also released a summary

presentation of the PSA (the "PSA Summary Presentation"), setting forth, among other things,

---

[12]   The Committee, as well as other parties to the PBA Adversary Proceeding, consented to the limited relief
sought in the PBA Tolling Motion.

[13]   A copy of the PSA, including the related term sheet, is attached hereto as **Exhibit A**.

[14]   The PSA Creditors include the members of the LCDC and the QTCB Group.  The amount of support for the
PSA is likely overstated because one PSA Creditor (Davidson Kempner Capital Management LP, whose funds
hold more than $400 million in GO and/or PBA bonds, as per the latest Rule 2019 Statement) has the free
option to terminate the PSA as to itself, in its sole discretion, during a specified time period prior to the deadline
for filing objections to confirmation of the Proposed Plan.

recovery estimates for the various classes of creditors under the proposed Commonwealth plan

of adjustment.[15]  Neither AAFAF nor the Government of Puerto Rico are parties to the PSA.  In

fact, they oppose certain fundamental aspects of it, including the PBA becoming a debtor under

Title III of PROMESA.[16]

22.      In general, the PSA contemplates (i) a settlement (the "Proposed PBA

Settlement") of all disputes between the Commonwealth and the PBA, including the PBA

Adversary Proceeding, which settlement is to be submitted for Court approval pursuant to a

forthcoming Rule 9019 motion,[17] and (ii) a Commonwealth plan of adjustment (the "Proposed

Plan") that would provide for the treatment of the various series of GO and PBA bonds (and the

related guaranty claims against the Commonwealth), including a mechanism for settling or

litigating the 2012-2014 GO Claim Objection.

A.      Proposed PBA Settlement

23.      The Proposed PBA Settlement purports to settle all disputes between the

Commonwealth and the PBA[18] in exchange for (i) granting the PBA an allowed administrative

expense claim in the amount of $1.073 billion in the Commonwealth's Title III case (the

"Allowed PBA Administrative Expense Claim"), (ii) allocating certain Commonwealth excess

cash, if any, to the PBA on the effective date of the Proposed Plan, and (iii) transferring certain

---

[15]   A copy of the PSA Summary Presentation is attached hereto as **Exhibit B**.

[16]   *See Objection of Elected Government Parties Regarding Plaintiff Financial Oversight and Management Board
for Puerto Rico's Motion to Stay PBA Adversary Proceeding Pending Confirmation of Commonwealth Plan of
Adjustment* ¶ 2 [Docket No. 102 in Adv. Proc. No. 18-149 (LTS)].

[17]   PSA, Ex. E, Term Sheet at 3.  The PSA provides little indication as to when such a 9019 motion would be filed.
It merely notes that PBA's Title III case "shall be commenced prior to or contemporaneously with the filing of
such motion." *Id.*

[18]   The disputes that would be settled under the Proposed PBA Settlement include (i) the PBA Adversary
Proceeding, (ii) the amount, if any, of administrative rent that the Commonwealth may owe PBA for the use and
occupancy of PBA facilities (the "PBA Facilities") during the period from the commencement of the
Commonwealth's Title III case up to an including the date on which the Proposed Plan would become effective,
and (iii) the ownership of the PBA Facilities and other property for which title currently resides in PBA, as
between the Commonwealth and PBA, and claims that PBA may assert against the Commonwealth under
leases, agreements, and applicable law (the "PBA Property").  *See id.*

PBA property to the Commonwealth or entities designated by the Commonwealth, at the Commonwealth's discretion.[19]  The Allowed PBA Administrative Expense Claim would be paid in cash by the Commonwealth to the PBA for the benefit of PBA bondholders (as further detailed below).

24.     The amount of the Allowed PBA Administrative Expense Claim is close, if not equal, to the full amount of the PBA's asserted administrative "rent" expense claim for the period from the Commonwealth's petition date (May 3, 2017) to the anticipated consummation date under the Proposed Plan (February 2020).  While the precise "rent" numbers are not available to the Committee, the Committee understands, based on historic data, that the PBA received "rent" payments at an average monthly rate of approximately $35 million, which translates into approximately $1.2 billion for the relevant period.  In addition, the Committee understands that the Commonwealth's payments to the PBA have historically been greater than the contractual amount due from the Commonwealth pursuant to the PBA "leases."  Thus, the purported "settlement" of the PBA's administrative rent claim is no settlement at all.  The Oversight Board has simply decided to give the PBA an administrative expense claim for the full (or nearly full) amount of the Commonwealth's post-petition "rent" payments, notwithstanding the PBA Adversary Proceeding and the serious questions raised regarding the true nature of the PBA's "leases" with the Commonwealth.

25.     The rationale for the payment is clear: it allows the Oversight Board to provide a higher recovery to a favored accepting class (*i.e.*, holders of PBA bonds), while preserving the optics that Commonwealth bondholders do not recover more than 64.3% under the Proposed Plan.  As discussed below, the recoveries of PBA bondholders will actually be much higher.

---

[19]     *Id.*

B.    Proposed Plan

26.    In essence, the Proposed Plan divides the GO and PBA bonds into two groups,

with each group receiving starkly different treatment:

(1)    holders of "vintage" GO and PBA bonds issued **prior to 2012** (the
"Vintage Bonds") would receive a preferential recovery (as further
detailed below); and

(2)    holders of recent GO and PBA bonds issued **in or after 2012** (the "2012-
2014 Bonds") would have the option to either (i) settle their bond claims
for a significantly lower recovery rate or (ii) continue to litigate the
challenge to the validity of their bonds.

This dividing line between the Vintage Bonds and the 2012-2014 Bonds does **not** correspond to

the line between challenged bonds and unchallenged bonds.  As noted above, (i) in the 2011 GO

Claim Objection, the Committee has challenged the validity of the 2011 GO Bonds, (ii) in the

Clawback Actions, the Oversight Board and the Committee have challenged the validity of PBA

and GO bonds issued beginning in March 2011, and (iii) in the Conditional Claim Objection, the

GO Group has conditionally challenged the validity of PBA and GO bonds issued beginning in

2009 (fiscal year 2010).  The PSA offers no rationale for why 2012 marks the dividing line

between GO and PBA bonds that should receive a preferential recovery and GO and PBA bonds

that should remain subject to constitutional challenge (unless the holders of such bonds opt into

the Proposed Plan's settlement).  Instead, this structure appears to be driven entirely by the fact

that the PSA Creditors predominantly hold Vintage Bonds and have agreed to support the

Proposed Plan in exchange for preferential treatment, including a release of claims against them.

*i.    Treatment of Vintage Bonds*

27.    Under the Proposed Plan, holders of bonds issued by the PBA prior to 2012 (the

"Vintage PBA Bonds"), including 2011 PBA bonds that are subject to a pending challenge,

would receive, according to the Oversight Board's calculations, a minimum recovery of 72.6%,[20] which recovery would include a 23.4% **all cash** recovery on account of their primary claims against the PBA.[21]  This cash payment would be funded through the Commonwealth's payment of the $1.073 billion Allowed PBA Administrative Expense Claim.[22]  The guaranty claim against the Commonwealth on account of the Vintage PBA Bonds would be satisfied through a combination of newly issued GO bonds, Commonwealth cash, and additional distributions based on (i) the amount of 2012-2014 Bonds participating in the settlement mechanism under the Proposed Plan, (ii) the outcome of the 2012-2014 GO Claim Objection, and (iii) the amounts recovered through the Clawback Actions (such additional distributions, the "Additional Distributions").[23]  Taking into account the Additional Distributions, total recoveries on account of Vintage PBA Bonds could increase up to a maximum of 89.4%, according to the Oversight Board's own calculation.[24]  However, as further detailed below, this recovery rate significantly understates the bondholders' actual recoveries, which may very well exceed 100% (at least for some PBA bondholders).

---

[20]   *See* PSA Summary Presentation, at 10.

[21]   PSA Term Sheet, at 13.  All PBA bonds, including the PBA bonds issued in 2012, would receive the 23.4% cash recovery on account of their primary claim.  *Id.*  As noted below, the PBA bonds issued in 2012 would (unless settled) be subject to challenge as having been issued in violation of Puerto Rico's debt service limit; however, such a challenge, if successful, would only invalidate their guaranty claim against the Commonwealth and it would not affect the 23.4% recovery on account of the primary claim against PBA.  It is hard to conceive that such bonds could, on the one hand, be held to be void, but nevertheless, on the other hand, be allowed against the PBA.

[22]   *See* PSA Term Sheet, at 10 (definition of PBA Bond Distribution).

[23]   *See* PSA Term Sheet, at 13.  Additional Distributions to holders of Vintage PBA Bonds include (a) two-thirds of the settlement savings resulting from holders of 2012-2014 Bonds opting into the plan settlement (with one-third of such savings to be received by the Commonwealth), (b) all proceeds from the Clawback Actions, and (c) all amounts (up to a specified threshold) remaining in the "Late Vintage Reserve" (i.e., the reserve to be set up for non-settling holders of 2012-2014 Bonds) following a final ruling on the challenge to the 2012-2014 Bonds (and with all amounts above the specified threshold to be shared two-thirds to one-thirds with the Commonwealth).

[24]   *See id.* at 7 (definition of Bond Recovery Cap).

13

28.     Meanwhile, holders of "vintage" GO bonds issued prior to 2012 (the "Vintage GO Bonds"), including 2011 GO bonds that are subject to a pending challenge, would receive, according to the Oversight Board's calculations, a minimum recovery of 64.3%,[25] with their claims to be satisfied through a combination of newly issued GO bonds, Commonwealth cash, and Additional Distributions that could similarly increase the total recoveries up to a maximum of 89.4%.[26]

            ii.      *Treatment of 2012-2014 Bonds*

29.     By contrast, holders of the 2012-2014 Bonds would have the option to either (i) settle their claims against the Commonwealth at a recovery rate of 45% (for 2012 GO/PBA bonds) or 35% (for 2014 GO bonds) or (ii) continue to litigate the constitutional challenges to their bonds.[27]  Bondholders opting to litigate would, if the Court were to rule that their bonds are valid, receive the same recovery as holders of Vintage Bonds, with their distribution to be held in the Late Vintage Reserve (as defined in the PSA) pending resolution of that litigation.[28]  If, however, the Court were to rule that their bonds are invalid, they would receive no recovery (except for the 2012 PBA bond claims against PBA) and remain subject to the Clawback Actions.

30.     Thus, the Proposed Plan only contemplates the continued litigation of the 2012-2014 GO Claim Objection, not the 2011 GO Claim Objection or any other challenge to the validity of GO and PBA bonds issued prior to the 2012.  Instead, holders of pre-2012 PBA and GO bonds would be released from any challenge to the constitutionality of their bonds.

---

[25]    *See* PSA Summary Presentation at 10.

[26]    *See* PSA Term Sheet at 13.

[27]    *See* PSA Term Sheet at 13-14; PSA Summary Presentation at 10.

[28]    *See* PSA Term Sheet at 13-14; *see also* PSA Term Sheet at 9 (definition of Late Vintage Reserve).

iii.    *Oversight Board Understates Recoveries on Vintage PBA Bonds*

31.    The Oversight Board's calculation of the recovery rates for the Vintage PBA

Bonds significantly understates the actual recoveries for three reasons.  First, the Oversight

Board's calculation does not account for the fact that the PBA bonds have been accruing interest

since the Commonwealth's petition date (May 3, 2017), resulting in artificially inflated claim

amounts.  Had a PBA Title III case been commenced at the same time as the Commonwealth's

case, the amount of PBA bond claims would be approximately **$480 million lower**.  This

additional interest increases the maximum recovery for holders of Vintage PBA Bonds from

89.4% to **99.8%**.

32.    Second, the guaranty claim against the Commonwealth on account of the Vintage

PBA Bonds includes interest that accrued on the PBA bonds since the Commonwealth's May 3,

2017 petition date.[29]  Regardless of when the PBA, as the direct obligor, files its own Title III

petition, section 502(b)(2) of the Bankruptcy Code prohibits interest that has accrued on the PBA

bonds after the Commonwealth's Title III petition date from being included in a claim against

the Commonwealth.[30]  Even if post-May 3, 2017 accrued, but unpaid interest is included as part

of the primary PBA bond claim against the PBA, excluding such interest from the guaranty claim

against the Commonwealth increases the maximum recovery for holders of Vintage PBA Bonds

from 89.4% to, at least, the mid-90s.

33.    Third, the Oversight Board's calculation does not account for the fact that holders

of Vintage Bonds that are also PSA Creditors would receive up to **$300 million in consent and**

---

[29]    *See* PSA at 3 (defining CW Guarantee Bond Claims to include "accrued, but unpaid, interest during the period
up to, but not including, the PBA Filing Date").

[30]    *See In re Nat'l Energy & Gas Transmission, Inc.*, Nos. 03–30459PM, 03–30461-64, 03–30686-87, 2006 WL
5217797, at *1 (Bankr. D. Md. Feb. 21, 2006) ("The claim for postpetition interest arises under the Guarantee
Agreements.  This is a 'claim' against the debtor" and prohibited by section 502(b)(2) and to "hold otherwise
would be contrary to the plain and unambiguous language of § 502(b)(2). . . ."), *aff'd in relevant part*, *Steering
Comms of Lake Rd. & La Paloma Project Lenders v. Nat'l Energy & Gas Transmission, Inc.*, Civil Action No.
AW–06–766, 2007 WL 2609430 (D. Md. May 10, 2007).

**restriction fees** upon the consummation of the Proposed Plan.  This additional consideration pushes total recoveries for PSA Creditors holding Vintage PBA Bonds to well above 100%.  In particular, the PSA provides that, upon the consummation of the Proposed Plan, the PSA Creditors will receive a cash payment (the "Consummation Costs") equal to 1.25% of the aggregate amount of PBA and GO bond claims, or approximately $220 million.[31]  In addition, the PSA Creditors and any other parties that execute the PSA within 60-days (*i.e.*, by July 30, 2019) will also receive a restriction fee (the "PSA Restriction Fee").[32]  According to the PSA, the PSA Restriction Fee is intended to compensate holders for agreeing to "lock up" their bonds.[33] The aggregate amount of the Consummation Costs and the PSA Restriction Fee is capped at $300 million.[34]

### iv.    Treatment of General Unsecured Creditors

34.    The PSA itself provides no information regarding the treatment of general unsecured creditors.  However, according to the Oversight Board's Summary PSA Presentation released concurrently with the PSA, the blended recovery rate for non-GO/PBA creditors would be **only 9%**.[35]  The Committee understands that this blended rate reflects recoveries on account of a variety of different claims (including inter-governmental claims and claims of HTA and ERS bondholders) and that the recovery rate for general unsecured creditors is contemplated to be approximately 1%.

35.    In that event, the $300 million in consent and restriction fees to be paid to the PSA Creditors would far exceed the **entire** distribution to general unsecured creditors.  While the

---

[31]    *See* PSA Term Sheet at 18.

[32]    *See id.* at 18-19.

[33]    *See id.* at 18.

[34]    *See id.* at 19.

[35]    *See* PSA Summary Presentation at 6.

precise amount of general unsecured claims remains to be determined, the following table illustrates total distributions to general unsecured creditors based on various sizes of the unsecured claims pool.

|  | $1 Billion in Claims | $2 Billion in Claims | $3 Billion in Claims | $4 Billion in Claims |
|---|---|---|---|---|
| 1% Recovery Rate | $10 million | $20 million | $30 million | $40 million |
| 2% Recovery Rate | $20 million | $40 million | $60 million | $80 million |
| 3% Recovery Rate | $30 million | $60 million | $90 million | $120 million |

     *v.*    *Covenant to Seek Stay of PBA Adversary Proceeding and GO Claim Objections*

36.    Under the PSA, the Oversight Board agreed to take a number of steps in support of the Proposed Plan, including filing a motion or motions to stay the PBA Adversary Proceeding, the GO Claim Objections (which, again, includes the 2011 GO Claim Objection filed by the Committee on its own), and the Clawback Actions.[36]  However, the Oversight Board is not required to obtain such a stay, and the failure to do so is **not** grounds for terminating the PSA.

     *vi.*    *Minimum Support for PSA*

37.    The PSA provides that (i) the Oversight Board or (ii) the LCDC and the QTCB Group, by joint action, may terminate the PSA in the event that, by the 120th day after execution of the PSA (*i.e.*, September 28, 2019), the PSA is not supported by holders of at least 50% of the Vintage PBA Bonds outstanding.[37]  It is unclear, whether, as of this time, that 50% threshold has been reached.

---

[36]  PSA § 4.1.

[37]  *Id.* § 6.1(d).

## ARGUMENT

38.    As the cases cited by the Oversight Board acknowledge, "a stay should only be entered in extraordinary circumstances,"[38] and "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside when a litigant in another settles the rules of law that will define the rights of both."[39]  In such circumstances, a stay is appropriate only where the failure to grant one would be "a scandal to the administration of justice."[40]  The Oversight Board has not shown (and cannot show) extraordinary circumstances justifying an unconditional and global stay of indefinite duration, and allowing the case to move forward, at least with respect to pivotal legal issues, would be far from scandalous.  The Oversight Board proffers four justifications for the requested stay, all of which wither under scrutiny, as demonstrated below.  But even if the proffered justifications were otherwise meritorious, it would be counterproductive to halt all progress in this case for the sake of a proposed plan that will never be confirmed.

## I.    **Proposed Plan is Patently Unconfirmable**

39.    Courts have recognized that there is no sense in pursuing a plan that is "a clearly fruitless venture."[41]  This is especially true here, where the Proposed Plan is patently

---

[38]  *Walsh Constr. Co. P.R. v. United Surety & Indemnity Co.,* Civil No. 12-1401 (SEC), 2015 WL 13548470, at *4 (D.P.R. Sept. 28, 2015).

[39]  *Landis, v. N. American Co.*, 299 U.S. 248, 255 (1936)

[40]  *Id.*

[41]  *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties."); *see also Efron, v. Candelario (In re Efron)*, 529 B.R. 396, 403 (B.A.P. 1st Cir. 2015) ("By not curing all post-petition DSO payments, Debtor's plan is patently unconfirmable from its face.  The Court granted Debtor one last opportunity to comply with the DSO order, which he flagrantly disregarded."); *In re Hanish, LLC*, 570 B.R. 4, 12 (Bankr. D.N.H. 2017) (affirming bankruptcy court's denial of the debtor's Amended Third Disclosure Statement because "the classification structure rendered the Amended Third Plan patently unconfirmable"); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002) (denying the debtor's motion to approve a disclosure statement because the plan provided for inappropriate releases and injunctions and was therefore patently unconfirmable).

unconfirmable for numerous reasons.[42]  First, at this stage, the Proposed Plan does not come close

to having sufficient support, and it is questionable whether it ever will.

40.     Second, the Proposed Plan reflects a virtual abandonment of the Oversight Board's

longstanding and eminently meritorious position (with which the Committee agrees) that the GO

bondholders' constitutional priority of payment does not apply in Title III.  From the beginning of

these Title III cases, the Oversight Board has consistently argued, in opposition to various parties,

and in various circumstances, that "nowhere in PROMESA does it import state law priorities."[43]

To the contrary, in the words of the Oversight Board, "Title III preempts territorial priorities."[44]

As the Oversight Board has explained, PROMESA "incorporates only one priority into Title III:

Bankruptcy Code § 507(a)(2), which grants priority to administrative claims.  No other priorities

exist in Title III."[45]  Accordingly, the Oversight Board has consistently taken the position that

PROMESA's directive that the Oversight Board respect lawful priorities when certifying a fiscal

plan "does not override powers to . . . restructure debt in PROMESA."[46]

41.     The Oversight Board has never wavered from this position and, in fact, has

reconfirmed it on numerous occasions beyond the instances quoted above.[47]  Indeed, the

---

[42]    The Committee reserves all its right to object to confirmation of the Proposed Plan or any other plan of
adjustment on any grounds.

[43]    *See*  Aug. 9, 2017 Hr'g Tr. at 165:15-21.  Relevant excerpts of this hearing transcript are attached hereto as
**Exhibit C**.

[44]    *See Defendant's Reply in Support of Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and
12(b)(6), at 5, ACP Master, LTD. v. Puerto Rico,* Adv. Proc. No. 17-189-LTS (Bankr. D.P.R. Nov. 13, 2017)
[Docket No. 78].

[45]    *See Brief for Defendants-Appellees*, *ACP Master, LTD. v. Puerto Rico,* Case No. 18-1108 (1st Cir. Jul. 2, 2018).

[46]    *See Brief for Defendants-Appellees, Peaje Investments LLC v. The Fin. Oversight &Mgmt. Bd. for P.R.,* Case
No. 17-2165 (1st Cir.  Apr. 23, 2018).

[47]    *See, e.g., Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. 12(b)(1) and (b)(6), at 4-5, Ambac
Assurance Corp. v. Puerto Rico,* Adv. Proc. No. 17-159-LTS, (Bankr. D.P.R. July 28, 2017) [Docket No. 48],
("Ambac's Complaint pretends that Congress adopted Puerto Rico's claim priorities as PROMESA's claim
priorities."); *Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. 12(b)(1) and (b)(6), at 15, ACP
Master, LTD. v. Puerto Rico,* Adv. Proc. No. 17-189-LTS (Bankr. D.P.R. Aug. 21, 2017), [Docket No. 35], ("It
would have been easy for Congress to provide in PROMESA that the Title III priorities shall be the non-
bankruptcy law priorities.  Congress did not do that.").

Oversight Board's position that state law priorities are not enforceable in a bankruptcy predates the filing of these Title III cases.  Oversight Board member David Skeel has argued that "[a]s similar as liens and priorities are, the bankruptcy laws have long drawn a sharp distinction between state-created liens, which are honored in bankruptcy; and state-created priorities, which are not."[48]  Notwithstanding this steadfast position (of which the above quotes are just a sample), the Proposed Plan starts from the exact opposite premise, as it offers some general obligation bondholders as much as 89.4% of their claims (by the Oversight Board's own calculation), while general unsecured creditors would receive something on the order of just 1%.  This dramatic reversal of the Oversight Board's position is inexplicable except as the desperate pursuit of an impaired accepting class.[49]

42.     The Proposed Plan is also patently unconfirmable because it draws arbitrary lines between pre-2012 Vintage Bonds, which are offered a preferential recovery and a full release, and the later-issued 2012-2014 Bonds, which are offered the option between a lower settlement recovery and continued litigation, even though the 2011 GO bonds and the 2011 and 2012 PBA bonds are subject to the same constitutional debt limit challenge as the 2012 and 2014 GO bonds. The obvious explanation for this seemingly arbitrary line-drawing is that the PSA Creditors predominantly hold pre-2012 PBA and GO bonds.  **In other words, the recovery on these bonds was determined, not by their relative legal risk of invalidation on constitutional grounds, but by the identity of the parties holding them.**  Meanwhile, the GO Group has taken the

---

[48]    *See* David A. Skeel, Jr., *What is a Lien? Lessons From Municipal Bankruptcy*, 2015 U. Ill. L. Rev. 675, 676-77.

[49]    The Committee notes that this dramatic reversal is also not supported by the relevant case law.  In *Detroit*, certain holders of general obligation bonds asserted that "they were entitled to priority over other unsecured creditors because the City had to pay them as a 'first budget obligation' under state law."  *In re City of Detroit*, 524 B.R. 147, 191 (Bankr. E.D. Mich. 2014).  The court noted that if this argument were successful, "the City could have been required to pay them before it paid for its operating expenses."  *Id.*  However, and approving a settlement that paid such bondholders 41% on their claims, the "**Court conclude[d] that the City has a substantial likelihood of prevailing in [litigation with these bondholders], perhaps a 75% chance**."  *Id.* (emphasis added).

20

position that, if the debt limit was exceeded (which the GO Group disputes), it was exceeded in 2009, not 2011.  Accordingly, the issue of when the debt limit was exceeded (and which bonds face potential invalidation) must be resolved before the fairness of any plan can be determined.

43.     Perhaps the most damning aspect of the Proposed Plan, however, is the possibility that post-confirmation litigation of the 2012-2014 GO Claim Objection could result in a ruling that **all outstanding PBA bonds are invalid**, which would mean that the PBA bondholders, the favored class under the PSA, should not have recovered anything, let alone 100 cents on the dollar.  As noted above, under the Proposed Plan, the Court would not be asked to rule on the 2012-2014 GO Claim Objection until after confirmation.  In that context, the holders of the 2012-2014 GO Bonds will assert, in defense of the validity of their own bonds, that the PBA bonds are invalid.  In fact, the GO Group has already argued in its Conditional Claim Objection that, if the Court were to rule that the PBA financing structure is a sham, the proper result is not the inclusion of PBA bond debt service in the debt limit calculation and the invalidation of their bonds on debt limit grounds, but rather the disallowance of all PBA related claims on the grounds that all PBA bonds are invalid.[50]  If the Court were to accept that defense, **neither** the 2012-2014 GO Bonds (which would be shielded by this defense) **nor** the pre-2012 GO and PBA bonds (which would be shielded under the Proposed Plan) could be invalidated even if the Court were to conclude that the PBA financing structure is a sham.[51]  The GO Group has also argued in the alternative that, under the logic of the 2012-2014 GO Claim Objection, GO and PBA bonds issued as far back as 2009 should also be invalidated, which, if the Court were to accept that

---

[50]   *See* Conditional Claim Obj. at 5 ("the filing of the Selective Claim Objection inevitably entails an inquiry into whether, on the Selective Claim Objection's own logic, *prior* bond issuances must be treated as invalid and cannot be included in the calculation of the constitutional debt limit").

[51]   As set forth in the 2012-2014 GO Claim Objection, the Committee believes that the 2014 GO bonds were issued in violation of the debt service limit even if debt service on PBA bonds is not included in the calculation.

argument, would mean that the PSA Creditors should have received nothing on account of those bonds.

44.     The Committee believes that the challenges to the validity of GO and PBA bonds are a valuable asset of the Commonwealth, and, in the end, the Committee is agnostic as to which particular bonds are invalidated, as long as there is an avenue to invalidate those bonds that are ultimately determined to have been issued in violation of the constitutional debt service limit.  The Committee cannot fathom, however, that the Court would grant an unconditional and indefinite stay of the GO Claim Objections and thereby embark on a process that could, albeit unintentionally, protect **all** GO and PBA bonds from invalidation, even if billions of dollars of such bonds have been issued in violation of the constitutional debt service limit.  A more prejudicial outcome is difficult to imagine.

45.     For this reason, the Court should not stay the GO Claim Objections, but allow the parties to go forward now on critical legal issues, including as to whether the holders of the 2012-2104 GO Bonds would be able to defend against the constitutional challenge to their bonds by arguing for the invalidation of other bonds.

## II.     **Stay Is Not Necessary to Preserve Proposed Plan**

46.     The Oversight Board's first proffered justification for an indefinite, global stay is that it would "maintain the status quo while the Oversight Board continues discussions with additional parties to gather further support for the framework of a plan of adjustment."[52] According to the Oversight Board, "without a stay, parties could be forced to take positions as to the GO Objections, or even take positions simply on the procedures to govern the GO Objections

---

[52]     GO Stay Mot. ¶ 16; *see also* PBA Stay Mot. ¶ 2 ("Following the filing of a plan of adjustment, the Oversight Board will continue discussions with creditor parties to gather additional support.") and ¶ 17 (claiming that the stay "will maintain the status quo").

litigation, that are fundamentally at odds with aspects of the overall compromise and settlement embodied in the PSA."[53]

47.     As an initial matter, the requested stay is not necessary to preserve the Proposed Plan.  Although the Oversight Board committed to seek the requested stay, **the PSA is not conditioned on the Court granting the stay**.  Nor is the requested stay otherwise "essential."  The Oversight Board does not explain how parties "tak[ing] positions," even as to procedural matters, would create an "unwelcome environment" that could "unravel the hard-fought benefits of the Proposed Settlement."[54]  The Oversight Board itself has taken positions "fundamentally at odds" with the Proposed Plan, not least the position that the GO bondholders are unsecured and have no priority over other unsecured creditors in a Title III case.  (One wonders why the Oversight Board is suddenly uncomfortable with the prospect of having to take positions that the Oversight Board, until now, has vigorously supported, including that state law priorities are not incorporated into Title III.)  More to the point, parties enter into settlements while taking adverse positions all the time.  Indeed, compromises and settlements usually emerge, not despite parties taking positions, but as a result of parties taking positions and going some distance down the litigation path.

48.     The stay issued in the Commonwealth-COFINA dispute is particularly instructive.  While the Oversight Board points to this stay as showing that "the Court has previously acknowledged the benefits of a stay to facilitate settlement,"[55] there is no comparison between the

---

[53]   GO Stay Mot. ¶ 16; *see also* PBA Stay Mot. ¶ 3 ("Conversely, if this adversary were allowed to proceed, various parties may need to take positions directly at odds with the fundamental aspects of the PBA Global Settlement, and they could once again become adversaries – and of equal importance, the landscape of the litigation could change.").

[54]   GO Stay Mot. ¶ 16; *see also* PBA Stay Mot. ¶ 14 (claiming that "litigating the issues raised in this adversary proceeding would threaten to undermine or unravel" the proposed settlement).

[55]   GO Stay Mot. ¶ 16; *see also* PBA Stay Mot. ¶ 18 ("[T]his Court previously recognized as much when it granted a stay to facilitate settlement in the context of the dispute between the Commonwealth and COFINA . . . .").

situation in the Commonwealth-COFINA dispute and the situation here.  In the Commonwealth-COFINA dispute, the stay was issued after the two agents, which were vested with full settlement authority, had briefed and argued cross-motions for summary judgment and signed an agreement in principle to resolve the dispute over the ownership of Commonwealth sales and use taxes.  The stay was issued so that the Court would not rule while the agents were the finalizing the settlement and preparing the definitive documents.[56]  In stark contrast, the PSA is supported by only a minority of creditors, whose bonds are (for the most part) not even subject to the pending objections and proceedings that the Oversight Board seeks to stay, and who would receive preferred treatment under a plan of adjustment that is patently unconfirmable.  If anything, continued progress in the litigation of key issues concerning the validity of GO and PBA bonds will provide much-needed clarity and is perhaps the surest way to a confirmable plan of adjustment.

49.     In any event, it is unclear at this point whether even the required 50% of Vintage PBA Bonds will sign onto the PSA by September 28, 2019.  If that condition is not satisfied, the PSA may end up being terminated, in which case a stay will have accomplished nothing but delay.  Moreover, the 50% condition is telling: at this stage, the Proposed Plan is merely a "trial balloon" that the Oversight Board hopes will garner support from other creditors.  While there is nothing wrong with this approach, the fact that the Proposed Plan has yet to garner any significant creditor support should counsel against granting a global and unconditional stay of the GO Claim Objections and the PBA Adversary Proceeding.

---

[56]   *See generally Order Holding Decision on Motions for Summary Judgment in Abeyance for 60-Day Period,
Puerto Rico v. P.R. Sales Tax Fin. Corp.*, Adv. Proc. No. 17-00257 (Bankr. D.P.R. June 11, 2018) [Docket No.
492] (granting stay of decision in light of imminent settlement), [Docket No. 544] (dismissing, without
prejudice, cross-motions for summary judgment) (D.P.R. Sept. 27, 2018).

## III.  Stay Would Not Avoid Unnecessary Consumption of Time and Resources

50.     The Oversight Board's second proffered justification is that a stay pending
confirmation of a joint plan of adjustment "will avoid unnecessary consumption of the Court's
and parties' limited time and resources."[57]  With regard to the GO Claim Objections, the
Oversight Board asserts that a stay would avoid "issues and involve filings by potentially over
1,600 parties that might never come before the Court were it to stay the matters and allow parties
to resolve their claims through the Proposed Plan."[58]  This is a red herring.  As the Oversight
Board well knows, there will be substantive filings by only a small number of parties that have
long been active in these Title III cases, and, under the revised procedures proposed by the
Oversight and the Committee (Court approval pending), only those parties will be required to
meet and confer.

51.     Nor would a stay avoid any "issues," as the validity of the challenged GO bonds,
as well as the validity of the bondholders' alleged liens and whether the PBA leases are true
leases, are issues **that must be addressed in determining the reasonableness of the settlements
embodied in the Proposed Plan**.[59]  Furthermore, the Committee is entitled to a determination of
its 2011 GO Claim Objection, and the issues raised in that objection are the same as in the 2012-
2014 GO Claim Objection filed jointly by the Committee and the Oversight Board.  Moreover, as
reflected in the Joint Status Report, the Oversight Board has acknowledged that the Clawback

---

[57]  GO Stay Mot. ¶ 17; *see also* PBA Stay Mot. ¶ 20 (claiming that a stay would "avoid unnecessary consumption of the Court's and parties, limited time and resources").

[58]  GO Stay Mot. ¶ 17; *see also* PBA Stay Mot. ¶ 20 ("Here, this adversary proceeding raises issues the Court would not have to consider were it to stay the matter and allow the Commonwealth and PBA to obtain approval of the compromise and settlement pursuant to a joint plan of adjustment . . . .").

[59]  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968) (recognizing that an "informed and independent judgment as to whether a proposed compromise is fair and equitable [cannot be made] until the bankruptcy judge has apprised [herself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated").

Actions also seek to invalidate GO and PBA Bonds issued beginning in 2011.  The Oversight

Board cannot "un-ring that bell."

52.      The Proposed Plan itself gives holders of 2012-2014 Bonds the option of litigating

the 2012-2014 GO Claim Objection post-confirmation rather than accepting the offered

settlements.  The GO Group, which holds 2012 and 2014 GO bonds, has indicated its intention to

exercise that option should the proposed plan somehow be confirmed.  "Avoiding unnecessary

consumption of time and resources" is thus no justification for the requested stay, especially when

the litigation procedures still to be negotiated among the meet-and-confer parties and approved by

the Court can ensure that dispositive legal issues are litigated first.

## IV.    Stay Would Not Promote Non-Movants' Interests

53.      The Oversight Board's third proffered justification is that "the interests of non-

parties will be promoted" because "[a] stay will reduce the litigation costs incurred by the

Oversight Board, which are paid out of the Commonwealth's limited budget." [60]  This adds

nothing to the second justification except to point out that the Oversight Board's litigation costs

are funded from the Commonwealth's "limited recourses."  While the Commonwealth's resources

should, of course, be conserved, the Oversight Board's potential litigation costs, which cannot be

entirely avoided in any event, are immaterial in the context of the egregiously unfair treatment of

"other creditors" under the Proposed Plan.  To say that the interests of such creditors will be

"promoted" by avoiding litigation costs when they are being offered next to nothing for their

claims borders on disingenuous.

---

[60]      GO Stay Mot. ¶ 18; *see also* PBA Stay Mot. ¶ 21 (arguing that a "stay will reduce the litigation costs incurred
by the Oversight Board, which are paid out of the Commonwealth's limited budget").

## V.    **Stay Would Prejudice Non-Moving Parties**

54.     The Oversight Board's fourth proffered justification is that "the non-moving parties will not be prejudiced by a stay, and in fact would benefit." [61]  The non-moving parties beg to differ.  For starters, the requested stay is part of an effort (ill-fated as it is) to hold non-supporting creditors hostage and force them into settlements based on a proposed plan built on preferential treatment of hedge funds holding predominantly pre-2012 PBA and GO bonds.

55.     Beyond that, the requested stay would prejudice the Committee (and the holders of challenged claims) for the simple reason that it would deprive the Committee of its rights under the Bankruptcy Code in an unprecedented way and for an indefinite period.  Section 502(b) of the Bankruptcy Code provides that, if a party objects to a claim, the court "shall determine" the amount of that claim.  As the Supreme Court has explained, "[w]hen objections are made, [the court] is duty bound to pass on them."[62]  Thus, the Committee is entitled by law to a ruling on its 2011 GO Claim Objection, which the Oversight Board did not join.  Indeed, some courts have held that this is an absolute right such that "bankruptcy courts would be required to resolve claim objections before approving a settlement."[63]  Although some courts have held that a debtor can settle an objection by one creditor to the claim of another, there is no proposed settlement of the Committee's 2011 GO Claim Objection.  The Proposed Plan offers the **same recovery** for the 2011 GO bonds as the unchallenged, earlier-issued GO bonds.[64]  In other words, the Committee's objection is not being settled, but completely ignored for the Oversight Board's own purposes.

---

[61]   GO Stay Mot. ¶ 19; *see also* PBA Stay Mot. ¶ 22 (arguing that "non-moving parties will not be prejudiced by a stay, and in fact would benefit").

[62]   *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947).

[63]   *In re CS Mining, LLC*, 574 B.R. 259, 281 (Bankr. D. Utah 2017) (denying settlement motion while creditor's claim objection was pending).

[64]   As noted above, Proposed Plan also offers the same recovery for 2011 PBA bonds as the unchallenged, earlier-issued PBA bonds.

56.     A global stay of indefinite duration is inherently prejudicial, and certainly of no benefit, given the patent unconfirmability of the Proposed Plan.

## VI.     PSA Is Not Result of Negotiations with Key Stakeholders

57.     At the end of its Stay Motions, the Oversight Board reiterates that the PSA "is the result of months of negotiations with key stakeholders" and that "[t]hose efforts have resulted in the potential to resolve the GO Objections."[65]   This is misleading at best.   As discussed above, the PSA Creditors comprise a small minority of creditors that have essentially been bought off with preferential treatment and full releases under a proposed plan that has no realistic chance of being confirmed.   There is not nearly enough "potential" to justify bringing this case to a standstill.

58.     In this regard, it is particularly unfortunate that the Oversight Board made no effort to consult or negotiate with the Committee regarding the PSA's proposed treatment of general unsecured creditors.   Nor, for that matter, did the Oversight Board consult with the Committee regarding the economic terms of the proposed settlements with GO and PBA bondholders, which was a clear violation the Oversight Board's January 14, 2019 cooperation agreement with the Committee, in which the Oversight Board promised to "consult with the Committee in good faith regarding any potential [GO-related] settlement" (however it might arise).

## VII.     Limited Stay of Discovery in PBA Adversary Proceeding May Be Appropriate

59.     Although the global stay requested by the Oversight Board is entirely unjustified, the Committee would not be opposed, in concept, to a limited stay of discovery in the PBA Adversary Proceeding given the pending Motion for Judgment on the Pleadings.   In the Committee's view, it is likely that the Court's ruling on that motion will shed light on type of

---

[65]     GO Stay Mot. ¶ 20.

discovery needed and lead to more realistic expectations regarding any settlement of the "true lease" issue.

60.     In no event will the Committee support a settlement of the PBA Adversary Proceeding that, as the Proposed PBA Settlement contemplates, would provide the PBA with, in essence, full recovery of its asserted administrative "rent" claim.  A cash payment of $1.073 billion is not a settlement of the PBA Adversary Proceeding, given that, at most, the PBA has accrued approximately $1.2 billion in post-petition "rent" receivables (from the Commonwealth's petition date through the anticipated confirmation date of the Proposed Plan), a currently unknown portion of which was contractually due from non-Commonwealth entities. Additionally, this "settlement" payment also assumes that the PBA Leases are "true leases," which the Committee vehemently disputes.  The Committee reserves all of its right to oppose any 9019 motion seeking approval of such a "settlement."

## **CONCLUSION**

61.     For the foregoing reasons, the Committee respectfully requests that the Court deny the Oversight Board's Stay Motions and allow this case to continue progressing toward a confirmable plan of adjustment.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Committee respectfully requests that the Court deny the Stay

Motions.

Dated: July 9, 2019                        By:  _/s/ Luc A. Despins_____

                                           PAUL HASTINGS LLP
                                           Luc. A. Despins, Esq. *(Pro Hac Vice)*
                                           James R. Bliss, Esq. *(Pro Hac Vice)*
                                           James B. Worthington, Esq. *(Pro Hac Vice)*
                                           G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
                                           200 Park Avenue
                                           New York, New York 10166
                                           Telephone:  (212) 318-6000
                                           lucdespins@paulhastings.com
                                           jamesbliss@paulhastings.com
                                           jamesworthington@paulhastings.com
                                           alexbongartz@paulhastings.com

                                           *Counsel to the Official Committee of Unsecured
                                           Creditors*

                                           By:  _/s/ Juan J. Casillas Ayala_____

                                           CASILLAS, SANTIAGO & TORRES LLC
                                           Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
                                           Israel Fernández Rodríguez, Esq. (USDC - PR
                                           225004)
                                           Juan C. Nieves González, Esq. (USDC - PR 231707)
                                           Cristina B. Fernández Niggemann, Esq. (USDC - PR
                                           306008)
                                           PO Box 195075
                                           San Juan, Puerto Rico 00919-5075
                                           Telephone: (787) 523-3434 Fax: (787) 523-3433
                                           jcasillas@cstlawpr.com
                                           ifernandez@cstlawpr.com
                                           jnieves@cstlawpr.com
                                           crernandez@cstlawpr.com

                                           *Local Counsel to the Official Committee of Unsecured
                                           Creditors*