UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>　　　　　　　　as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>　　　　　　　　　Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**AMBAC ASSURANCE CORPORATION'S OBJECTION TO THE
MOTION TO STAY CONTESTED MATTERS PENDING CONFIRMATION OF
COMMONWEALTH PLAN OF ADJUSTMENT**

Ambac Assurance Corporation ("Ambac"), by and through its attorneys, Ferraiuoli LLC and Milbank LLP, hereby submits this objection (the "Objection") to the *Financial Oversight and Management Board for Puerto Rico's Motion to Stay Contested Matters Pending Confirmation of Commonwealth Plan of Adjustment* (Dkt. No. 7640, the "Motion" or "Mot.") in the above-captioned proceeding. In support of its Objection, Ambac respectfully submits as follows:

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## **OBJECTION**

1. On January 14, 2019, the Oversight Board, acting through its Special Claims Committee, and the Official Committee of Unsecured Creditors of All Title III Debtors other than COFINA (the "UCC;" together with the Special Claims Committee, the "Objectors") filed the *Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*. (Dkt. No. 4784.) In the 2012-2014 GO Bond Objection,[2] the Oversight Board and the UCC contend, among other things, that the 2012-2014 GO Bonds violated Puerto Rico's constitutional debt limit, and that claims arising from the 2012-2014 GO Bonds should be disallowed. The UCC has also challenged certain GO Bonds issued in 2011 on the same grounds. (Dkt. No. 7057.) Ambac filed a notice of participation in the litigation of the 2012-2014 GO Bond Objection (Dkt. No. 6169), thereby becoming a "Joint Objector" pursuant to the Objection Procedures, and filed a related statement of position articulating its position in some detail.[3]

2. As set forth in its Statement of Position, Ambac agrees that the PBA Bonds are "direct obligations" of the Commonwealth for purposes of calculating the debt limit imposed by

---

[2] Capitalized terms not defined herein have the same meaning as in the Motion.

[3] *See Ambac Assurance Corporation's Statement of Position in Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*, No. 17-3283-LTS (Dkt. No. 6171) (the "Statement of Position"). As the Statement of Position made clear, Ambac's view concerning the constitutionality of the 2012-2014 GO Bonds does ***not*** turn on the nature of the PBA leases. Contrary to the allegations of the Objectors in a separate adversary proceeding, *see Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Puerto Rico Pub. Bldgs. Auth.*, No. 18-ap-149-LTS (D.P.R.) (the "PBA Adversary Proceeding"), Ambac believes that the PBA leases are "true leases," not "disguised financings," and thus should be afforded administrative expense priority under Section 365 of the Bankruptcy Code (as incorporated by Section 301(a) of PROMESA). The true lease question, however, is matter of bankruptcy law that is distinct from the question of Puerto Rico constitutional law presented by the 2012-2014 GO Bond Objection. Ambac's position on the Oversight Board's request for a stay of the PBA adversary proceeding is addressed in a separate brief to be filed contemporaneously herewith.

Article VI, Section 2 of the Puerto Rico Constitution; that the PBA Bonds thus should be included in the calculation of the constitutional debt limit; and that when they are, the 2012-2014 GO Bonds violated the constitutional debt limit and should be declared null and void, with all claims based thereon disallowed.[4]

3. On June 16, 2019, the Oversight Board announced it had entered into a plan support agreement ("PSA") with a small minority of holders of PBA and GO Bonds[5] purportedly providing a framework for a to-be-proposed plan of adjustment for the Commonwealth. Among its myriad barriers to confirmability, the plan envisioned by the PSA would require the continued taking of monies belonging to Puerto Rico's secured revenue bondholders; violate Section 407 of PROMESA and, thus, require the debtor to engage in illegal conduct; provide for recoveries inferior to what would be available under Commonwealth law, in violation of section 314(b) of PROMESA; effects impermissible vote-buying; and relies on inaccurate fiscal plan projections and estimates.

4. The PSA also purports to reflect an agreement to "settle" the 2012-2014 GO Bond Objection—a claim objection that has the potential to invalidate $6 billion in GO Bonds. And it does so notwithstanding the fact that the parties to the PSA are the Oversight Board and vintage GO holders, meanings parties who are all on the same side of the 2012-2014 GO Bond Objection—raising questions as to how they can somehow force or dictate the terms of a settlement of that litigation. Moreover, Ambac, a Joint Objector in that proceeding, was completely shut out of any discussions concerning the PSA and does not agree to the proposed settlement of its objection—a

---

[4] Ambac will articulate its position concerning the 2011 GO Objection at the appropriate time pursuant to any Order of this Court on the Amended Procedures Motion.

[5] The creditors that have signed onto the PSA largely consist of the LCDC and the QTCB Noteholder Groups, which collectively hold bonds totaling less than 10% of the Commonwealth's bond debt.

3

settlement that would leave on the table billions of dollars that could be made available for other purposes through litigation of the 2012-2014 GO Bond Objection.

5. Notably, even the Puerto Rico government whose obligations are proposed to be restructured does not support it.[6] The Oversight Board argues that the Court should ignore these and other confirmability issues because "confirmation of a plan of adjustment is not before this Court." (Mot. at 11 n.10.) Ambac agrees that confirmation of a plan is not before the Court on this Motion; Ambac will be articulating its vigorous objections to the plan contemplated by the PSA in due course. But the litigation stay proposed by the Oversight Board cannot be artificially divorced from the forthcoming plan of adjustment; indeed, the proposed stay is a centerpiece of the Oversight Board's misguided strategy of plowing ahead with an illegal plan of adjustment while excluding key creditors with massive exposures from the discussions. The issues surrounding confirmability of that plan are certainly a key consideration the Court may take into account in determining the advisability of a stay.

6. In any event, the arguments marshalled by the Oversight Board in favor of a stay of the 2012-2014 GO Bond Objection are meritless.

7. First, the Oversight Board argues that a stay will preserve the "*status quo*" and thereby facilitate ongoing discussions and "gather further support for the framework of a plan of adjustment." (Mot. ¶ 16.) Presumably the Oversight Board has in mind not just any plan of adjustment, but the one contemplated by the PSA (otherwise the Commonwealth will be subject

---

[6] *See* Press Release, AAFAF, Authorized Statement of Christian Sobrino Vega, CEO and Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, Regarding Draft Plan Support Agreement for the Commonwealth and PBA (June 16, 2019); *see also Objection of Elected Government Parties Regarding Plaintiff Financial Oversight and Management Board for Puerto Rico's Motion to Stay PBA Adversary Proceeding Pending Confirmation of Commonwealth Plan of Adjustment*, Adv. Pro. No. 18-00149 (Dkt. No. 102) (arguing that the PSA "is deeply flawed").

to an egregious $100 million termination fee for failing to comply with the PSA). Given the flaws in that plan, it hardly merits freezing litigation of key gating issues such as the constitutionality of $6 billion in GO Bonds, resolution of which is essential to a proposed plan that might actually be in the best interests of creditors (unlike the currently contemplated one). In this regard, the Oversight Board's comparison of the proposed stay to that entered by the Court in connection with COFINA's restructuring is fundamentally inapposite, because in COFINA (unlike here) litigation of the key gating issues was fully briefed and argued and all major parties to the litigation were involved the settlement that precipitated the request for a stay. Here, by the Oversight Board's own admission, "the GO Bond Objections are still in their relatively early stages" (*id.* ¶ 17), and the negotiations concerning the contemplated settlement affirmatively **excluded** numerous major creditors. It seems plain that the 2012-2014 GO Bond Objection was brought to create currency to be traded in a settlement, rather than to truly endeavor to flesh out legal rights and negotiate a compromise that reasonably reflects the relative strength of positions.

8. The Oversight Board's contention that parties to the PSA may, if the litigation proceeds, have to take positions that "are fundamentally at odds with aspects of the overall compromise and settlement embodied by the PSA" (*id.* ¶ 16) is incorrect and in any event irrelevant. The relevant PSA provision only requires the Oversight Board to **seek** a stay. Surely the PSA parties did not presume—much less agree among one another—that the Court would necessarily grant the stay at the Oversight Board's say-so. Thus, it seems questionable at best that continuing to litigate upon the Court's denial of a stay would somehow constitute a breach of the PSA. Even if it did, that fact cannot be used as a cudgel to require **non-PSA** creditors to lay down their arms, especially where, as here, the PSA at issue reflects nothing close to the kind of broad consensus in support of a proposed plan that would warrant the imposition of a stay.

5

9. Second, the Oversight Board predictably argues that a stay will preserve resources. (Mot. ¶ 17.) But the only waste of resources here is that caused by the Oversight Board's headlong rush into plan proceedings that have meager support and no hope of resulting in a confirmable outcome. Nor can the Oversight Board advert to the "filings by potentially over 1,600 parties" in connection with the GO Objections as a purported excuse (*id.*), as the Oversight Board has itself already proposed amended procedures for ensuring a manageable litigation of the GO Objections—procedures which have been fully presented for the Court's consideration at the July 24 omnibus hearing.

10. Third, the Oversight Board argues that a stay will benefit non-parties essentially by reducing the Commonwealth's litigation costs. (Mot. ¶ 18.) But if the Commonwealth fisc is the issue, it is not at all clear why a stay is beneficial. As noted, the plan confirmation proceedings that will soon be initiated (according to the Oversight Board) will prove to be a colossal waste of the Commonwealth's resources, provoking a flurry of objections and related litigation in service of a plan that is manifestly unconfirmable. Furthermore, the Oversight Board's strategy of launching the 2012-2014 GO Bond Objection, then purporting to settle it away with a small group of creditors without having litigated the objection anywhere near to fruition, is hardly in the interest of the Commonwealth fisc. Rather, it simply throws in the towel on a legitimate—and in Ambac's view highly persuasive—legal challenge that could have the effect of eliminating billions of dollars of purported obligations to GO Bondholders, freeing up those monies for other uses.

11. Fourth, and finally, the Oversight Board argues that a stay will not prejudice non-moving parties. Wrong again. As an initial matter, the Oversight Board's attempt to strong-arm a settlement of the GO Objections with a small group of creditors—all of whom are on the same side as the Oversight Board—prejudices not only the parties who are the target of those objections, but also Joint Objectors (such as Ambac) who do not support the proposed settlement but were cut

out of the relevant negotiations and are now told they should not be able to pursue their interest in seeing the litigation through to its fruition. Moreover, the PSA treats disputed claims far less favorably—holders of disputed claims are disenfranchised from voting on the plan, and if they elect not to accept the Oversight Board's laughably low settlement offer, their plan distributions will be withheld pending a favorable resolution in another forum.

12. In sum, numerous antecedent "gating" issues should be resolved before any proceedings related to a plan or disclosure statement commence. These issues must reach their proper conclusion—whether through a formal adjudication by this Court or a negotiated outcome that fairly includes *all* significant parties, not a small group of favored creditors—before the Oversight Board can appropriately ask this Court to preside over a proposed restructuring of $35 billion in Commonwealth debt.

## CONCLUSION

For the foregoing reasons, Ambac respectfully requests that the Court deny the Motion and proceed with an adjudication of the Amended Procedures Motion as currently contemplated by existing deadlines.

*(Remainder of Page Left Intentionally Blank)*

Dated: July 9, 2019
      San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: */s/ Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile: (787) 766-7001
    Email: rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

**MILBANK LLP**

By: */s/ Atara Miller*
    Dennis F. Dunne
    Andrew M. Leblanc
    Atara Miller
    Grant R. Mainland
    (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile: (212) 530-5219
    Email: ddunne@milbank.com
          aleblanc@milbank.com
          amiller@milbank.com
          gmainland@milbank.com

*Attorneys for Ambac Assurance Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com