## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re: | |
| | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA<br>Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, et al., | (Jointly Administered) |
| Debtors.[1] | Re: Docket No. 7640 |

## OBJECTION TO MOTION TO STAY CONTESTED MATTERS PENDING CONFIRMATION OF COMMONWEALTH PLAN OF ADJUSTMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

I.     The Oversight Board and UCC File Objections Challenging More Than Half of the
       Commonwealth's GO Bonds ....................................................................................... 4

II.    The Board's Entry into the Plan Support Agreement ..................................................... 6

III.   The Oversight Board Allies with Co-Plaintiffs to Preemptively "Settle" Certain of the Debt
       Limit Objections ........................................................................................................ 7

OBJECTION ........................................................................................................................ 10

I.     A Stay of the Debt Limit Objections is Premature, and Would be Highly Prejudicial to the
       Extent that Defendants are Denied the Opportunity to Respond and be Heard ................ 10

       A.     Challenged Bondholders will be Prejudiced by a Stay at this Time .................... 11

       B.     The Oversight Board has not Justified the Extraordinary Relief Sought by the
              Motion ......................................................................................................... 13

       C.     A Stay of the Debt Limit Objections is Premature and will not Promote a
              Settlement .................................................................................................... 15

II.    Other Considerations Weigh in Favor of Denying the Motion ....................................... 18

       A.     An Indefinite Stay is Unwarranted ................................................................... 19

       B.     A Stay of the Debt Limit Objections will not Conserve Judicial Resources ........ 20

       C.     Continuation of the Debt Limit Objections will Serve the Public Interest ........... 22

CONCLUSION .................................................................................................................... 23

ny-1691863

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Air West, Inc.*,
542 F.2d 522 (9th Cir. 1976) ....................................................................11, 19, 20

*Austin v. Unarco Indus., Inc.*,
705 F.2d 1 (1st Cir. 1983) ......................................................................................11

*In re Bjolmes Realty Trust*,
134 B.R. 1000 (Bankr. D. Mass. 1991) .................................................................17

*Cherokee Nation of Oklahoma v. U.S.*,
124 F.3d 1413 (Fed. Cir. 1997)..............................................................................19

*Colon v. Blades*,
711 F. Supp. 2d 228 (D.P.R. 2010).........................................................................16

*In re ConAgra Foods, Inc.*,
Case No. 11-05379 (MMM), 2014 WL 12580052 (C.D. Cal. Dec. 29, 2014)......11, 14, 19, 20

*Granada Wines v. New England Teamsters & Trucking Industry Pension Fund*,
748 F.2d 42 (1st Cir. 1984).....................................................................................16

*Hewlett-Packard Co. v. Berg*,
61 F.3d 101 (1st Cir. 1995).....................................................................................14

*Katchen v. Landy*,
382 U.S. 323 (1966).................................................................................................11

*Landis v. North American Co.*,
299 U.S. 248 (1936).........................................................................................10, 11, 12

*Microfinancial, Inc. v. Premier Holidays International, Inc.*,
385 F.3d 72 (1st Cir. 2004)..............................................................................10, 11, 12, 13

*Musselman v. Home Insurance Co. of Indiana (In re Finlye, Kumble, Heine,
Underberg, Manley, Myserson & Casey)*,
Case No. 90-2747 (JMC), 1990 WL 123840 (S.D.N.Y. 1990) ..............................14

*Official Commitee of Unsecured Creditors v. Whyte (In re Commonwealth of
Puerto Rico)*,
Case No. 17-03283 (LTS), Adv. Pro. 17-00257 (D.P.R. Jun. 11, 2018) ..........................14, 19

*Ramirez Lluveras v. Pagan Cruz*,
Case No. 08-1486 (FAB), 2010 WL 11679649 (D.P.R. Aug. 5, 2010)...................12

ii

*Ramos-Martir v. Astra Merck, Inc.*,
    Case No. 05-2038 (PG), 2005 WL 3088372 (D.P.R. Nov. 17, 2005) ....................................14

*Rivera v. Puerto Rico Telephone Co.*,
    Case No. 09-1723 (JP), 2009 WL 3160839 (D.P.R. Sep. 29, 2009) ................................10, 14

*Rosco, Inc. v. Mirror Lite, Inc.*,
    Case No. 96-5658 (CPS), 2007 WL 2296827 (E.D.N.Y. Aug. 6, 2007) .........................12, 13

*Taunton Gardens Co. v. Hills*,
    557 F.2d 877 (1st Cir. 1977) ........................................................................................ *passim*

*Total Petroleum Puerto Rico Corp. v. T.C. Oil, Corp.*,
    Case No. 09-1105 (JP), 2010 WL 11545626 (D.P.R. May 10, 2010) ........................14, 18, 19

*U.S. Bank N.A. v. Stark (In re South Side House, LLC)*,
    470 B.R. 659 (Bankr. E.D.N.Y. 2012) ..........................................................................19, 20

*Villafañe–Colon v. B Open Enterprises, Inc.*,
    932 F. Supp. 2d 274 (D.P.R. 2013) ..........................................................................................10

*Walsh Construction Co. Puerto Rico v. United Surety & Indemnity Co.*,
    Case No. 12-1401 (SEC), 2015 WL 13548470 (D.P.R. Sep. 28, 2015) ...........................10, 14

**Statutes**

11 U.S.C. § 1129 ....................................................................................................................15, 16

**Other Authorities**

FED. R. BANKR. P. 1001 ..........................................................................................................11, 20

P.R. Const., Art. VI, §§ 2 and 8 ....................................................................................................15

Puerto Rico, "Oversight Board Reaches Agreement on a Framework to Restructure
    $35 Billion of Liabilities" (Jun. 16, 2019), *available at*
    https://oversightboard.pr.gov/oversight-board-reaches-agreement-on-a-frame
    work-to-restructure-35-billion-of-liabilities/ ...........................................................................6

ny-1691863

The Ad Hoc Group of Constitutional Debtholders (the "Objectors")[2] submit this objection

(the "Objection") to the *Motion to Stay Contested Matters Pending Confirmation of*

*Commonwealth Plan of Adjustment* [Docket No. 7640] (the "Motion").[3]

## **PRELIMINARY STATEMENT**

1.      Just a few short weeks ago, counsel for the Oversight Board stood before this Court

and sought to downplay concerns raised by counsel for Ambac Assurance Corp. regarding the

direction of these cases, stating:

> I was shocked to hear about . . . the Oversight Board's strategy and
> intentions.  I don't know where [Ambac] got this from, but they
> ended up saying that we [are taking] some very small agreements
> with some small classes with the intent of ramming through a
> confirmation.  Well, how could anybody be so silly as to think that
> Judge Swain would ever let us do that?[4]

2.      Days later, the Oversight Board publically unveiled a long-rumored plan support

agreement (the "PSA")—dated nearly *two weeks prior* to Counsel's statements described

above—detailing the contours of a plan of adjustment that tracked precisely the terms that were so

presciently described at the June 12 hearing.  The PSA outlined a plan of adjustment formulated

and entered into with parties holding less than 15% of the Commonwealth's public debt, without

any negotiations with other major creditor constituencies in these cases.

3.      As will be demonstrated in due course, that plan is patently unconfirmable under

First Circuit law.  More fundamentally, the PSA is the natural consequence of the Oversight Board

shirking its duty to compel the Commonwealth to enact fiscal reforms and grow the economic pie,

---

[2] *See Third Supplemental Verified Statement of the Ad Hoc Group of Constitutional Debtholders Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 6067].

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the body of the Objection or the Motion, as applicable.

[4] Hr'g. Tr. (Jun. 12, 2019) at 142:13-20.

in favor of pursuing a divide-and-conquer litigation strategy that unjustifiably places the sole risk of loss on a select group of creditors.

4.      Now, the Board seeks to use the PSA to justify an indefinite stay of litigation challenging the validity of half of the Commonwealth's outstanding general obligation bonds, all before the defendants in that litigation have had the chance to file a substantive response. The Board does so because a crucial component of the PSA is a proposed compromise of the objection[5] lodged by the Oversight Board and UCC challenging in excess of $6 billion of general obligation bonds issued in 2012 and 2014 (along with other objections to GO bonds on the basis of the constitutional debt limit, the "Debt Limit Objections"). This "compromise," as it were, was negotiated almost exclusively among parties that lack adversity: the creditor parties that support the PSA (half of whom are plaintiffs in the debt limit litigation)[6] do not hold Challenged Bonds in any significant amount, and will therefore be largely unaffected by any settlement of the Debt Limit Objections.[7]

5.      The lack of adversity in the PSA's negotiation is apparent in its economics. The proposed recoveries for holders of 2012 and 2014 GO Bonds do not at all reflect the true litigation risks faced by the parties. In this sense—and contrary to the assertions of the Motion—the proposed debt limit settlement is not a fully-baked deal negotiated among adversaries, but is instead akin to a joint offer of settlement from plaintiffs that lacks any meaningful connection to

---

[5] *See Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* [Docket No. 4784]. The UCC filed an additional objection to general obligation bonds issued in 2011 on identical grounds. *See Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds* [Docket No. 7057]. Remarkably, the PSA does not acknowledge this objection to an additional $1.5 billion of general obligation bonds, and treats such bonds as undisputed and entitled to the same treatment as so-called "vintage" general obligation bonds that are not subject to any pending challenge.

[6] *See* Docket No. 6180 (the "LCDC Position Statement").

[7] Except to the extent that they may share in the upside of any "Settlement Savings." *See* PSA at 13-15.

the merits of the Debt Limit Objections.  And given the dubious merits of those Objections, this offer (which would provide recoveries to Challenged Bondholders that are up to eighteen cents *lower* than the current trading prices for the bonds at issue)[8] will be rejected by the vast majority of—if not all—Challenged Bondholders.

6.      As the Objectors intend to show, the core premise of the Debt Limit Objections—that the PBA is a "sham"—fails as a matter of law, and is directly contrary to First Circuit and P.R. Supreme Court precedent (not to mention prior representations made by the Commonwealth).  That failed premise may therefore be summarily resolved on a motion to dismiss.  The Objectors submit that the weakness of the Oversight Board's legal position is further reflected in the economic terms of the other component of the Global Settlement concerning the PBA adversary proceeding, which proceeds from the same faulty premise (that the PBA is a sham).  That the Oversight Board has proposed to settle the PBA litigation for in excess of $1 billion is, if not an outright admission, then at the very least a tacit acknowledgement that the PBA is not a sham entity—an acknowledgement that is fatal to the Board's theory of the debt limit and, therefore, the Debt Limit Objections.

7.      To be clear, the Oversight Board and its co-plaintiffs are entitled to offer a compromise and settlement of litigation, and defendants—including the Objectors—may evaluate the proposal and decide for themselves whether to accept it.  What the Oversight Board and its allies should not be permitted to do is unilaterally formulate a settlement proposal, and then use that proposal as a cudgel to silence defendants before they have an opportunity to respond to the Debt Limit Objections on their merits.

---

[8] Based on trading prices as of July 10, 2019, as reported by the Municipal Securities Rulemaking Board's Electronic Municipal Market Access Website, *available at* https://emma.msrb.org/.

8.     Given the scope, complexity, and volume of issues in these Title III cases, the prospect of a global stay of litigation undoubtedly appears attractive.  But that does not mean that a stay is warranted at the present time, nor does the mere possibility of a settlement outweigh the interests of Challenged Bondholders in a just and speedy resolution of the Debt Limit Objections.

9.     Throughout these cases, the Court has strived to ensure that all parties have the opportunity to be heard, and thereby maintain a level playing field.  That is all that the Objectors ask for now.  Challenged Bondholders should be afforded the opportunity to file (and argue) a motion to dismiss the Debt Limit Objections.  Insofar as it would prejudice bondholders' ability to do so, the Motion should be denied.

## **BACKGROUND**

## I.     **The Oversight Board and UCC File Objections Challenging More Than Half of the Commonwealth's GO Bonds**

10.    On January 14, 2019, the Oversight Board and the UCC filed an objection to all claims asserted or that could be asserted on account of GO Bonds issued between 2012 and 2014 on the basis that those Bonds were issued in violation of the Commonwealth's constitutional debt limit.  *See* Docket No. 4784 (the "Original Debt Limit Objection").

11.    Thereafter, the Court entered an order establishing initial case management procedures with respect to the Original Debt Limit Objection.  *See* Docket No. 5143 (the "Procedures Order").  Under the Procedures Order, any holder of 2012 or 2014 GO Bonds that wished to participate in the litigation of the Original Debt Limit Objection as a defendant—or, in the alternative, any party that wished to join the Oversight Board and UCC as a co-plaintiff—was required to file a "notice of participation" with the Court by April 16, 2019.

12.    Numerous bondholders and other parties in interest filed notices of participation, the majority of them electing to defend the validity of the 2012 and 2014 GO Bonds.  *See* Docket

No. 6464 (listing parties that elected to participate in Original Debt Limit Objection).  Certain

parties, including the LCDC, chose to participate as a co-plaintiff.  *See* LCDC Position Statement.

13.      The Procedures Order contemplated that parties would exchange initial briefing

proposals on May 7, and in the event a consensual briefing schedule could not be agreed upon,

competing proposals would be presented to the Court by May 28, 2019.  Those deadlines have

since been extended on multiple occasions, and initial briefing schedules are currently due to be

exchanged on or about August 1, 2019.[9]

14.      Subsequently, the UCC filed a separate objection to all GO Bonds issued in 2011

on substantially identical grounds to the Original Debt Limit Objection, *i.e.*, that those Bonds were

also issued in violation of the constitutional debt limit, *see* Docket No. 7057, and requested that the

litigation of that objection be consolidated with the Original Debt Limit Objection.  *See* Docket

No. 7154.  That request will be considered alongside the Motion (and this Objection) at the hearing

scheduled for July 24, 2019.

15.      Because the Court has yet to establish a briefing schedule—indeed, nearly six

months after the Original Debt Limit Objection was filed, parties have not yet even exchanged

initial *proposals* for briefing that objection—the holders of GO Bonds subject to the Debt Limit

Objections (collectively, and along with the holders of all other bonds that may be subject to

similar challenge, "Challenged Bondholders") have not yet had the opportunity to respond to those

Objections.  If the present Motion is granted, Challenged Bondholders will not be able to file such

a response until months or potentially years in the future.

---

[9] *See* Docket No. 7153 (initial proposals to be exchanged 5 business days after the Court issues order regarding request to consolidate Debt Limit Objections, which will be considered on July 24, 2019).

ny-1691863

## II.        The Board's Entry into the Plan Support Agreement

16.        On June 16, 2019, the Oversight Board announced its entry into a PSA that describes the "framework for a plan of adjustment" for the Commonwealth's debt.  *See* Financial Oversight and Management Board for Puerto Rico, *Oversight Board Reaches Agreement on a Framework to Restructure $35 Billion of Liabilities* (Jun. 16, 2019), *available at* https://oversightboard.pr.gov/oversight-board-reaches-agreement-on-a-framework-to-restructure-35-billion-of-liabilities/.  The PSA is currently supported by holders of approximately 15% of the Commonwealth's public debt—*i.e.*, debt issued or guaranteed by the Commonwealth—and has been publically opposed by the UCC, the Commonwealth government, and a substantial portion of the Commonwealth's financial creditors.  *See, e.g., id.* (stating current level of support for PSA); Docket No. 7528 (noting that UCC does not support PSA); Adv. Pro. No. 18-00149, Docket No. 102 (noting AAFAF opposition to PSA and intent to withhold consent for PBA Title III filing); "Assured Rejects PSA, Says Terms Violate Puerto Rico Law, Commonwealth Constitution and PROMESA," REORG RESEARCH (Jun. 18, 2019); *Response of Individual General Obligation Bondholder to Motion of FOMB to Stay Contested Matters Pending Confirmation of Commonwealth Plan of Adjustment*, Case No. 17-03283 (LTS) [Docket entry pending] (Jul. 9, 2019) (the "Hein Objection").

17.        The PSA is predominantly structured around the settlement of litigation brought by the Oversight Board and UCC challenging the independence of the PBA and alleging that the PBA's leases are in reality disguised financings.  *See* PSA at 4-5.

18.        This premise, as well as the contention that the PBA is a "sham" sixty-years running, is similarly central to the Debt Limit Objections, which the PSA also proposes to settle. Specifically, the PSA contemplates that Challenged Bondholders may elect to receive between 35 and 45 cents on the dollar on account of their 2012 and 2014 GO Bond claims in settlement of the

6

Debt Limit Objections—recoveries that are substantially below the current trading prices for those bonds. *See* PSA at 6, 7. The PSA settlement would also effectively foreclose the ability of Challenged Bondholders (even those who vote to reject the plan) to litigate the issue of GO priority, by capping all recoveries at 89.4%. *Id.* at 7.

19.     Curiously, however, the PSA glosses over the fact that an additional $1.5 billion of GO Bonds are subject to challenge by the UCC (but not the Board) on the same grounds, *i.e.*, that they were issued in violation of the constitutional debt limit. Instead, the PSA provides those bonds with *the exact same recoveries* offered to so-called "vintage" GO Bonds that are not subject to any pending objection. *See* PSA at 13-15. In other words, the PSA effectively proposes to "settle" the objection to 2011 GO Bonds for nearly twice as much as the identical Original Debt Limit Objection. This aspect of the PSA removes any doubt that the Oversight Board's challenge to 2012 and 2014 GO Bonds was a purely tactical maneuver undertaken with a view to impermissibly structuring a "cram-down" plan of adjustment.

### III.    The Oversight Board Allies with Co-Plaintiffs to Preemptively "Settle" Certain of the Debt Limit Objections

20.     The Oversight Board has never reached out to the Objectors—or, it appears, any other major holder of Challenged Bonds—to engage in substantive negotiations on a plan of adjustment, or to participate in settlement discussions regarding the Debt Limit Objections. Instead, the Oversight Board has worked with parties whose economic interests are largely non-adverse to formulate a settlement of the Debt Limit Objection that does not at all reflect the parties' respective litigation risks.

21.     The PSA's proposed "compromise" of the Debt Limit Objections was negotiated exclusively among the Board, the LCDC, and the QTCB Noteholder Group—parties that either (in the case of the Board and LCDC) expressly identify as plaintiffs in the prosecution of the Debt

Limit Objections or (in the case of the QTCB Noteholder Group) represent bondholders whose interests will be largely unaffected by the potential invalidation of billions of dollars of lawfully-issued public debt.

22.     It also bears noting that the PSA settlement was reached with many of the same investment funds that received preferential recoveries in connection with the COFINA plan of adjustment, and not with the long-term holders of GO bonds that have been ignored by the Board for years.  *Compare Amended and Restated Plan Support Agreement*, No. 17-032884 (LTS), Docket No. 371-2, at 9 (D.P.R. Nov. 26, 2018) (listing "Senior Ad Hoc Holders" receiving plan support fees) *with Second Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 7465] (LCDC's most recent Rule 2019 disclosure statement).  Now, many of these very same creditors stand to gain up to $300 million in the aggregate in exchange for their support of the PSA and plan.  PSA at 18-19.

\*      \*      \*

23.     It appears that the Oversight Board never had any intention of prosecuting the Debt Limit Objections.  Much as it has done time and again throughout these cases, rather than move forward with the litigation it commences the Oversight Board has instead sought to postpone the resolution of key legal issues until plan confirmation (and perhaps beyond).[10]  In this way, the Debt Limit Objections have only served to provide a pretext for the Oversight Board to formulate a plan of adjustment that provides recoveries to certain favored creditors at the expense of others.  At the same time, the Oversight Board has failed to press for the reforms that the Board itself says

---

[10] *See, e.g.,* Docket No. 6857 (Oversight Board's motion to indefinitely stay prosecution of (a) lien avoidance actions filed with respect to all outstanding GO Bonds and (b) complaints seeking to claw back payments of principal and interest on Challenged Bonds); Docket No. 7060 (motion to stay adversary proceedings challenging HTA bonds); Docket No. 7061 (motion to stay adversary proceedings challenging ERS bonds).

are vital,[11] or to provide a true accounting of available cash so that appropriate recoveries can be paid to all creditors holding identical claims.[12]

24.     Now, the Oversight Board seeks an indefinite stay of the Debt Limit Objections while it attempts to garner support for its plan, all before Challenged Bondholders have a chance to mount a meaningful defense to those objections.  As the Motion acknowledges, the proposed stay is key to the Oversight Board's strategy, as it will ensure that the settlement enshrined in the PSA is not "disrupted by a shifting litigation landscape."[13]  On this point, the Oversight Board is correct.  The litigation landscape will indeed be disrupted if and when Challenged Bondholders are permitted to respond to the supposed merits of the Debt Limit Objections, because that response will lay bare the failings of the Board's legal theory.

25.     Setting aside that the Debt Limit Objections ignore the actual text of the Commonwealth constitution and seek unprecedented relief in the form of retroactive invalidation of funded debt, the Oversight Board's debt limit theory is entirely reliant on the notion that the PBA—a sixty year old public works corporation that owns hundreds of buildings and employs thousands—is a sham.  But that theory (and along with it, the Debt Limit Objections) is dead on arrival, because no less than six state and federal courts have held that the opposite is true.[14]  Given these weaknesses, a shift in the litigation landscape is inevitable, and may be exactly what is needed to bring the Oversight Board to the table to negotiate with parties in interest.  The Objectors

---

[11] *See* 2019 Fiscal Plan for Puerto Rico (May 9, 2019) at 9-11, 16.

[12] The cash report previously released by the Board improperly relied upon the Commonwealth's self-reported cash restrictions, and therefore does not provide an accurate overview of the Commonwealth's available cash reserves.  *See generally* IFAT Report on Title III Bank Accounts (Mar. 12, 2019).

[13] Motion, ¶ 2.

[14] Certain of the PSA parties have coalesced around an alternative theory of the debt limit that would not require a finding that the PBA is a sham, *see* LCDC Position Statement, but the Oversight Board's objection is the only one properly before the Court.  In any event, that alternative theory is similarly misguided in its reliance on a willful misreading of the text and purpose of the Commonwealth constitution.

submit that it is better to level set the Board and other PSA parties' expectations now and proceed towards a plan settlement that is both consensual and realistic.

26.     The Oversight Board and its allies are no doubt aware of the substantial flaws in their litigation strategy, as reflected by the PSA's proposed settlement of the PBA adversary, which came on the heels of PBA bondholders' motion to summarily dispose of that proceeding.[15] Once Challenged Bondholders are permitted to respond in kind to the Debt Limit Objections, the weakness of the Board's legal theory will also be reflected in the economics of any arms'-length settlement thereof.  Unless and until it is, the Objectors respectfully submit that no stay is warranted, and the Motion should be denied.

## OBJECTION

I.     **A Stay of the Debt Limit Objections is Premature, and Would be Highly Prejudicial to the Extent that Defendants are Denied the Opportunity to Respond and be Heard**

27.     A stay of litigation "should only be entered in extraordinary circumstances." *Walsh Constr. Co. P.R. v. United Sur. & Indem. Co.*, No. 12-1401 (SEC), 2015 WL 13548470, at *4 (D.P.R. Sep. 28, 2015); *see Microfinancial, Inc. v. Premier Holidays Int'l., Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (party requesting a stay bears "heavy burden"); *Rivera v. P.R. Tel. Co.*, No. 09-1723 (JP), 2009 WL 3160839, at *1 (D.P.R. Sep. 29, 2009).  In considering whether to grant a stay, a court must "exercise [its] judgment," and "weigh competing interests and maintain an even balance." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936) (citation omitted).  The potential prejudice faced by the non-moving party is of paramount importance.  *Id.* at 255; *see also Villafañe–Colon v. B Open Enters., Inc.*, 932 F. Supp. 2d 274, 280 (D.P.R. 2013).

---

[15] *See* Adv. Pro. No. 18-00149, Docket No. 63.

28.     The party seeking a stay has the burden of demonstrating a "clear case of hardship or inequity in being required to go forward, if there is even a fair possibility" that a stay may "work damage to some one [sic] else." *Landis*, 299 U.S. at 255; *see Microfinancial*, 385 F.3d at 79.  The mere obligation to prosecute or defend a lawsuit "does not constitute hardship." *In re ConAgra Foods, Inc.*, No. 11-05379 (MMM) (AGRx), 2014 WL 12580052 at *8 (C.D. Cal. Dec. 29, 2014).

29.     A stay of the Debt Limit Objections would prejudice Challenged Bondholders, who have not yet had the opportunity to respond to those Objections, which are fatally flawed.  And as a matter of case management, a stay at this early juncture would be imprudent; experience in these Title III cases has shown that consensus is brokered when parties have developed their arguments and face an imminent risk of an adverse ruling.  Because the Oversight Board has not shown that it would suffer "hardship or inequity in being required to go forward" with the litigation that the Board itself chose to commence, the Motion should be denied.

### A.    Challenged Bondholders will be Prejudiced by a Stay at this Time

30.     The stay requested by the Board would prejudice Challenged Bondholders, who have an undisputed interest in a timely resolution of the objections to their claims.  *See, e.g., Microfinancial*, 385 F.3d at 78 (recognizing interest of parties "in proceeding expeditiously with . . . civil litigation"); *Anderson v. Air West, Inc.*, 542 F.2d 522, 524 (9th Cir. 1976); *see also Katchen v. Landy*, 382 U.S. 323, 330 (1966) (noting that Congress intended that "objections to claims [] be heard and determined as soon as the convenience of the court and the bests interests of the estates and the claimants will permit") (citation omitted); FED. R. BANKR. P. 1001 ("These rules shall be construed . . . to secure the just, speedy, and inexpensive determination of every case and proceeding").  This is especially so given that under the PSA, Challenged Bondholders will be forced to wait years before receiving a distribution on account of their claims.  *See Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (denying stay where non-moving party would be

prejudiced by "financial hardship of being forced to wait for an undefined but potentially lengthy period before receiving the money to which she may be entitled.").[16]

31.     It now appears that the Oversight Board only initiated the debt limit litigation as a pretext for a plan of adjustment centered around a coercive settlement that would provide Challenged Bondholders with materially diminished recoveries.  The request for an indefinite stay is a transparent attempt to continue to use that litigation as leverage in further plan negotiations. The Board's gamesmanship should not be countenanced by the Court.  *See Rosco, Inc. v. Mirror Lite Co.*, No. 96-5658 (CPS), 2007 WL 2296827, at *3 (E.D.N.Y. Aug. 6, 2007) (denying stay where it would "present a clear tactical disadvantage to the nonmoving party") (emphasis and citation omitted); *Microfinancial*, 385 F.3d at 79 (upholding denial of tactical request for indefinite stay where "the foot-dragging that already had occurred" by the moving party "gave the court good reason for skepticism about the requested stay"); *cf. Ramirez Lluveras v. Pagan Cruz*, No. 08-1486 (FAB), 2010 WL 11679649, at *7 (D.P.R. Aug. 5, 2010) (denying joint motion to stay where parties requesting the stay appear to have tactically "colluded to bring about the very prejudices they claim they will suffer").

32.     More generally, it is fundamentally unfair for *any* plaintiff to seek to impose a stay of litigation before the defendants ever have a chance to respond.  As the Supreme Court stated in *Landis*—a case cited by the Oversight Board in the Motion—in considering a motion to stay the court should "weigh competing interests and maintain an even balance."  299 U.S. at 255 (citation omitted).  Denying defendants the right to even file a responsive pleading, and thus giving the plaintiff the effective last word, is hardly maintaining an even balance.

---

[16] Delay of the litigation has an added benefit for the parties that stand to gain from "Settlement Savings" under the PSA, as continued postponement of the Debt Limit Objections will reduce the amount necessary to induce Challenged Bondholders to settle.  This is because the longer Challenged Bondholders must wait to receive a distribution on account of their claims, the lower the present value of that future distribution will be.

33.     For its part, the Oversight Board argues that Challenged Bondholders will suffer no prejudice because a stay will merely "maintain the status quo."  *See* Motion, ¶ 16.[17]  But this ignores that the status quo is *itself* prejudicial to Challenged Bondholders, who have seen the value of their investments drop precipitously due to the Board and UCC's baseless litigation (and which will continue to decline in value the longer the Debt Limit Objections are delayed).  In other words, a stay would "present a clear tactical disadvantage" to Challenged Bondholders, and should be viewed with skepticism.  *Rosco*, 2007 WL 2296827, at *3; *see Microfinancial*, 385 F.3d at 79.

34.     By contrast, the Oversight Board faces *no* prejudice in the absence of a stay.  That is because the Oversight Board has already committed to reserve sufficient currency to provide the same recoveries to Challenged Bondholders that "vintage" bondholders will receive.  *See* PSA at 13-15.  In other words, the money is already there—the only consequence of a changing litigation landscape will be a shift in the timing of *when* Challenged Bondholders may receive that money (*i.e.*, whether as a settlement paid on the effective date of the plan, or down the road when those bondholders ultimately prevail in the debt limit litigation).

35.     In sum, the Oversight Board asks this Court to ignore the very real prejudice that Challenged Bondholders would endure in the event of a stay, while failing to demonstrate that the Board would be harmed in its absence.  For that reason, the Motion should be denied.

###     B.     The Oversight Board has not Justified the Extraordinary Relief Sought by the Motion

36.     Although the Oversight Board presents the Motion as requesting run-of-the-mill relief granted in the ordinary course, an indefinite stay at the outset of litigation is anything but.

---

[17] The Motion further argues, contrary to established law, that because there is "effectively no deadline or statute of limitations," parties have no "legal right to have the GO Objections heard within any particular timeframe," and therefore cannot suffer any prejudice from the granting of a stay.  Motion, ¶ 19, n. 10.  Incredibly, the Oversight Board follows up this unsupported contention with an admission that the Debt Limit Objections could be "withdrawn now and re-filed later."  *Id.*  Respectfully, if Challenged Bondholders will suffer no prejudice in having litigation held over their heads indefinitely, then the Board would be similarly unharmed by withdrawing its objections now.

The irregularity of the relief sought is highlighted by the authority cited by the Board in support of that request.

37.     In each of the cases cited in the Motion where a stay was granted, the request for a stay was made either: (a) with the benefit of substantive briefing on the merits of the underlying legal issues, *Walsh Constr. Co.*, 2015 WL 13548470, at *1 (stay granted after parties had filed competing motions for summary judgment); *Official Comm. of Unsecured Creditors v. Whyte (In re Commonwealth of P.R.)*, Adv. Pro. No. 17-00257, Docket No. 492 (D.P.R. Jun. 11, 2018) (decision on summary judgment motions held in abeyance for 90 days after oral argument pending definitive documentation of formal settlement); or (b) where the existence of parallel litigation threatened the possibility of inconsistent rulings by multiple tribunals,  *Hewlett-Packard Co. v. Berg*, 61 F.3d 101 (1st Cir. 1995) (stay of confirmation of arbitration award pending new arbitration of related issues); *Taunton Gardens Co. v. Hills*, 557 F.2d 877 (1st Cir. 1977) (stay of litigation pending related appeal); *Total Petroleum P.R. Corp. v. T.C. Oil, Corp.*, No. 09-1105 (JP), 2010 WL 11545626 (D.P.R. May 10, 2010) (same); *Rivera*, 2009 WL 3160839 (same); *Ramos-Martir v. Astra Merck, Inc.*, No. 05-2038 (PG), 2005 WL 3088372 (D.P.R. Nov. 17, 2005) (stay granted to allow related multi-district litigation to proceed); *but see ConAgra Foods,* 2014 WL 12580052, at *9 (denying request for indefinite stay, notwithstanding pending appeal of related issue).[18]  Neither scenario exists here.

38.     That the Oversight Board has failed to cite a single case where a court has granted a plaintiffs' request to stay litigation under the present circumstances (*i.e.*, to pursue a settlement negotiated with non-adverse parties before defendants are permitted to file a responsive pleading)

---

[18] The Oversight Board also cites *Musselman v. Home Ins. Co. of Ind. (In re Finlye, Kumble, Heine, Underberg, Manley, Myserson & Casey)*, No. 90-2747 (JMC), 1990 WL 123840 (S.D.N.Y. 1990) in support of the Motion. *Musselman*, however, involved the stay of litigation that was commenced by the trustee solely for the purposes of preserving avoidance actions prior to the expiration of the relevant statutes of limitation, and is therefore also inapposite.  *Id.* at *1.

is telling.  The Motion requests extraordinary relief, and the Oversight Board has failed to demonstrate the corresponding "extraordinary circumstances" that would justify granting it.

###### C.   A Stay of the Debt Limit Objections is Premature and will not Promote a Settlement

39.     As a matter of pure case management, a stay of the Debt Limit Objections at this time would be unproductive and premature.  As the Oversight Board itself once acknowledged, the resolution of the Debt Limit Objections represents a key "gating issue[] for the Commonwealth's plan of adjustment."  Original Debt Limit Objection, ¶ 10.  Now, in a stunning about-face, the Board seeks to ignore this "unquestionably [] critical" issue, *id.*, and charge ahead with an irreparably flawed PSA that enjoys minimal support—indeed, it is not only opposed by creditors, but by the Commonwealth itself, which has announced its intention to vigorously oppose that plan once presented for the Court's approval.  *See* Adv. Pro. 18-00149, Docket No. 102.

40.     The flaws in the PSA and associated plan are manifold.  Among other things, the plan:

- violates the absolute priority rule, which requires, among other things, that secured creditors receive the full value of the collateral securing their claims and prohibits recoveries to junior creditors until senior creditors are paid in full (another critical and unaddressed gating issue that must be resolved before a plan is solicited for a vote);[19]

---

[19] *See* 11 U.S.C. § 1129(b)(2) (absolute priority rule); *see also* P.R. CONST., Art. VI, §§ 2 and 8 (setting forth first priority of public debt and pledging Commonwealth's available resources to the payment thereof).  For further discussion of the collateral securing the Commonwealth's public debt, see *Certain Defendants' Corrected Motion to Dismiss Plaintiffs' Complaint Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)*, Adv. Pro. No. 19-00291, Docket No. 10 (D.P.R. Jun. 12, 2019).

- fails to respect the lawful liens and priorities under the Commonwealth constitution and statutory laws,[20] insofar as the Oversight Board has proposed to provide junior creditors with recoveries in excess of those offered to holders of the Commonwealth's public debt;

- is neither fair and equitable nor in the best interests of creditors,[21] given the Commonwealth's failure to enact commonsense reforms that the Oversight Board has stated would free up billions of dollars of additional value for both the Commonwealth and its creditors;[22]

- purports to disenfranchise holders of validly-issued bonds that are subject to meritless objections, and would deem Challenged Bondholders that do not expressly "opt out" to have consented to materially reduced recoveries; and

- stratifies identical public debt claims against the Commonwealth across eight different classes, contrary to the First Circuit's strict prohibition on separate classification of substantially similar claims.[23]

41.   Contrary to the Oversight Board's assertion in a footnote, the (un-)confirmability of the plan described by the PSA is of the utmost relevance.  In considering whether to grant a stay, the Court can and should examine whether that stay will be used productively, or if it would merely enable the Board to proceed on the frolic and detour of prosecuting an infirm plan.  *See Colon v. Blades*, 711 F. Supp. 2d 228, 231 (D.P.R. 2010) (a stay is inappropriate if it serves no

---

[20] *See* PROMESA § 201(b)(1)(N) (fiscal plan must respect lawful liens and priorities); *id.*, § 314(b)(7) (plan of adjustment must be consistent with certified fiscal plan).  The determination of the secured status of public debt is another litigation that the Board has sought to indefinitely postpone.  *See* Docket No. 6857.

[21] *See* 11 U.S.C. § 1129(b) (nonconsensual plan must be "fair and equitable" to dissenting creditors); PROMESA § 314(b)(6) (plan must be in the best interests of creditors).

[22] *See* 2019 Fiscal Plan for Puerto Rico (May 9, 2019), at 16.

[23] *See Granada Wines v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984).

ny-1691863

purpose other than to "insert a monkey wrench into the machinery of the ongoing litigation") (citation omitted); *cf. In re Bjolmes Realty Tr.*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991) ("It is permissible, moreover, for the court to pass upon confirmation issues where, as here, it is contended that the plan is so fatally and obviously flawed that confirmation is impossible.").

42.     A stay is also premature because it would fail to advance the goal that the Board purportedly seeks—the implementation of a settlement of the Debt Limit Objections.  In fact, a stay would have the opposite effect at this time.  The PSA "settlement" was negotiated almost exclusively among parties that lack adversity or a concrete interest in the outcome of the Debt Limit Objections, and should be seen for what it is: a mere offer to compromise, not a compromise in and of itself.  The inchoate nature of the settlement is perhaps best illustrated by the fact that no party—not even the Board's co-plaintiff, the UCC—supports a stay of the Debt Limit Objections at this time (except, of course, those parties contractually obligated to do so under the PSA).[24]  To prematurely crystallize the PSA as the de facto "best and final" offer would all but ensure that parties remain entrenched in their litigation positions, and diminish the likelihood of consensus.

43.     Taking the Oversight Board at its word—that it seeks to build consensus—experience gleaned from these Title III cases shows that the way to do so is to let litigation proceed to briefing (and, to the extent necessary, discovery):

- The COFINA settlement was reached with the benefit of discovery, briefing, oral arguments on cross motions for summary judgment, and months of mediation.  Further, the resulting stay of litigation was requested

---

[24] *See, e.g.,* Docket No. 7899 (UCC objection to the Motion); Docket No. 7902 (Ambac objection); Docket No. 7892 (Assured objection); Hein Objection (objection of individual bondholder).

by both the court-appointed agents and adverse creditor groups representing billions of dollars of COFINA and Commonwealth bonds.[25]

- The PREPA RSA was supported by a majority of stakeholders and the parties were on the eve of trial when the underlying litigation was stayed.[26]

- The proposed settlement of the PBA litigation embodied in the PSA did not materialize until parties (including certain of the Objectors) had engaged in dispositive motion practice going to the heart of that litigation's merits.[27]

44.    If the Oversight Board truly wishes to reach a settlement that reflects reality and enjoys widespread support, the Debt Limit Objections should proceed and Challenged Bondholders should be permitted to respond, including by filing a motion to dismiss the objections as a matter of law.  Until then, there is no basis to grant a stay, and the Motion should be denied.

## II.    Other Considerations Weigh in Favor of Denying the Motion

45.    In addition to those discussed above, courts consider a number of other factors when determining the propriety of a stay of litigation, including the duration of the stay, whether a stay would conserve judicial resources, and whether a stay would be in the public interest.  *See Taunton Gardens*, 557 F.2d at 879; *Total Petroleum*, 2010 WL 11545626, at *1.

46.    Here, each of these considerations weighs in favor of the Objectors: an indefinite stay would be highly prejudicial to Challenged Bondholders (who have yet to detail all the reasons why the Debt Limit Objections fail); would not conserve judicial resources, but at best merely delay their expenditure; and would not be in the public interest.

---

[25] *See* Adv. Pro. 17-00257, Docket No. 492.

[26] *See* Case No. 17-03283, Docket No. 6881.

[27] *See* Adv. Pro. 18-00149, Docket No. 63.

### A.   An Indefinite Stay is Unwarranted

47.   Because any potential delay in resolving litigation presents a risk of prejudice to the non-moving parties, "[i]n determining whether to impose a stay, courts should look at the duration of the stay requested." *Total Petrol. P.R. Corp.*, 2010 WL 11545626, at *1; *see Anderson*, 542 F.2d at 524 ("The law presumes injury from unreasonable delay.") (citations omitted). That risk of prejudice is only magnified where, as here, a party seeks an indefinite stay of litigation. *See ConAgra*, 2014 WL 12580052 at *7; *see also Cherokee Nation of Okla. v. U.S.*, 124 F.3d 1413, 1416 (Fed. Cir. 1997) ("immoderate or indefinite" stays disfavored). Accordingly, a party seeking to stay litigation for an indeterminate period of time bears "a heavy burden." *Taunton Gardens*, 557 F.2d at 879 (noting that defendant bore heavy burden of justifying indefinite stay of litigation pending outcome of related lawsuit). As a result, courts have regularly declined to grant indefinite stays of litigation. *See, e.g., ConAgra*, 2014 WL 12580052 at *7; *U.S. Bank N.A. v. Stark (In re South Side House, LLC)*, 470 B.R. 659, 688 (Bankr. E.D.N.Y. 2012) (denying indefinite stay of litigation pending plan confirmation); *Cherokee Nation*, 124 F.3d 1413 (indefinite stay was abuse of trial court discretion); *cf. Fin. Oversight & Mgmt. Bd. for P.R. v. Autonomy Master Fund Ltd.*, Adv. Pro. No. 19-00291, Docket No. 11 (D.P.R. Jun. 13, 2019) (denying lengthy stay requested by Board and UCC, in favor of brief extension of time for service of summons); *compare Taunton Gardens*, 557 F.2d at 879 (stay appropriate where "the duration . . . is adequately circumscribed").

48.   Although the Motion acknowledges in a cursory fashion that courts consider "the duration of the stay requested" to be a relevant factor, *see* Motion, ¶ 15, the Oversight Board is silent as to that factor's application here. The Board's proposed order makes clear that the Debt Limit Objections (which have already been pending for nearly six months) would be stayed "indefinitely." But the Oversight Board has failed to persuasively show that *any* stay is necessary, let alone demonstrate the existence of the extenuating circumstances that are necessary to justify

an indefinite stay (and the resulting prejudice to Challenged Bondholders). *See ConAgra*, 2014 WL 12580052, at *7. Simply put, more than the possibility of a settlement with a minority of defendants should be required to justify an indefinite stay of litigation as to all others.

49. Challenged Bondholders have an undeniable interest in a just and speedy resolution of the debt limit litigation, *see Anderson*, 542 F.2d at 524; Fed. R. Bankr. P. 1001, and until there is a settlement on the table that has a reasonable prospect of acceptance, a stay of that litigation will remain unwarranted.

### B. A Stay of the Debt Limit Objections will not Conserve Judicial Resources

50. Courts also consider whether a stay would preserve resources or otherwise further the interests of judicial economy. *See Taunton Gardens*, 557 F.2d at 879; *see also South Side House*, 470 B.R. at 687 ("Another factor to be considered is the interests of the courts and judicial economy"). Here, resources will not be conserved by granting a stay at this juncture.

51. The PSA's proposed settlement of the Debt Limit Objections does not reflect the relative merits of the parties' respective legal positions or their economic risk. In fact, it proposes recoveries to Challenged Bondholders that are significantly lower than the current trading prices for 2012 and 2014 GO Bonds. For these reasons, the settlement offer embodied in the PSA will not be acceptable to the vast majority of Challenged Bondholders. Accordingly, a stay would not conserve any judicial resources; to the contrary, it would merely delay the expenditure of those resources to a future date, as the PSA contemplates that the Debt Limit Objections will be spun off to a litigation trust to be tried in this very Court. *See* PSA at 16, 19.

52. By contrast, permitting the Debt Limit Objections to proceed in parallel with plan negotiations will not cause any undue delay, nor will it require a large commitment of resources by any party. The exchange of proposed briefing schedules by the parties (and, to the extent there is

disagreement, the imposition of a briefing schedule by the Court) is the last remaining obstacle to the Objectors' ability to file a substantive response to the debt limit objections. *See* Docket No. 7153 (setting forth deadlines for filing briefing proposals). The Objectors have been ready and willing to engage in this exchange of proposals for more than two months (May 7 was the original deadline to do so), and presumably the Oversight Board and UCC have been as well.[28] Once a briefing schedule is entered by the Court, the burden will be on Challenged Bondholders (and not the Board) to move forward with a motion to dismiss—a burden the Objectors are eager to bear.

53.      The Oversight Board also ignores that if the Debt Limit Objections are allowed to proceed, and parties are thereby enabled to make more informed settlement decisions, this may well reduce the number of contested issues surrounding the plan. In turn, this would obviate the need for a heavily-contested confirmation hearing and trial (and reduce the number parties that would participate in post-effective date litigation of the debt limit). Resolving key gating issues sooner rather than later is much more likely to conserve judicial resources.

54.      Finally, allowing the Debt Limit Objections to proceed will not necessarily entail any delay; the Objectors strongly believe that the Debt Limit Objections may be summarily disposed of on a motion to dismiss. In the event that the Objectors prove to be mistaken in that regard, the Oversight Board may simply renew its request for a stay after dispositive motions are briefed, argued, and / or decided. For now, however, that request should be denied.

---

[28] The Oversight Board and UCC have sought to delay the exchange of proposals on the grounds that it had proven infeasible to "meet and confer" with the more than 1,600 creditors that filed notices of participation in response to the debt limit objections. Although the Objectors recognize that due process requires that all of these parties have the opportunity to be heard in connection with the merits of the Debt Limit Objections, as the Board, the UCC, and the Court have observed, the interests of all bondholders have been well represented to date by the ad hoc groups and other institutional holders in these case, and will not suffer any prejudice in having such parties negotiate a briefing schedule. *See, e.g.,* Docket No. 7154, ¶¶ 16-17; Hr'g. Tr. (Apr. 24, 2019) at 195:25-196:4 (Court denying motion to establish individual bondholder committee and observing that "there already are numerous parties . . . with sophisticated counsel . . . that are aligned with the interests of" individual retail holders). Further, the Objectors submit that all Challenged Bondholders, regardless of the size of their holdings, will benefit from Objectors' efforts to summarily dismiss the Debt Limit Objections.

**C.      Continuation of the Debt Limit Objections will Serve the Public Interest**

55.      Finally, in considering whether to grant a stay, a court should also be mindful of the effect such a stay would have on the public interest. *Taunton Gardens*, 557 F.2d at 879.  Here, the public interest militates against a stay.

56.      The Debt Limit Objections raise serious issues of Commonwealth constitutional law that will impact the Commonwealth's ability to obtain financing in the future.  Specifically, the Debt Limit Objections present the question of whether the debt limit should be calculated as it has for decades to include only directly-issued, general obligation debt and payments made on guaranteed debt, or whether other obligations—such as performing guaranteed bonds, lease obligations, or derivative payments—must also be included.

57.      This question is not merely academic, but is in fact of paramount importance to the viability of the Oversight Board's proposed restructuring of the Commonwealth.  The PSA contemplates that a significant amount of currency to be distributed under a plan will take the form of new, general obligation bonds.  *See* PSA at 16.  But how can a reasonable investor ever determine the creditworthiness of the Commonwealth if there is no delineation of the Commonwealth's ability to issue full faith and credit obligations in the future?  And for that matter, how can the Commonwealth continue to make good faith disclosures of its debt limit calculations in connection with future issuances when the propriety of those calculations is subject to unresolved challenges?

58.      The Debt Limit Objections also allege facts that, if true, would implicate the Commonwealth, current and former members of government, and countless professionals and advisors in a monumental scheme to defraud the public securities markets.  The public has an undeniable interest in seeing these allegations fully and promptly resolved.

## <u>CONCLUSION</u>

59.     In making its case for a stay, the Oversight Board offers the false narrative that the Motion presents a chance for the Court to put an end to contentious litigation, preserve a "hard-fought" settlement, and "ensure . . . progress towards confirmation of a Commonwealth plan of adjustment."  The prospect of peace for our time is no doubt attractive, but at this juncture remains illusory.

60.     That is because imposing a stay of the Debt Limit Objections would not put an end to litigation; at most, it would merely put off resolution of key issues for another day.  Similarly, the PSA is not a hard-fought settlement negotiated by adversaries, but rather a first offer of compromise formulated among co-plaintiffs.  And a hard truth learned in these cases is that true progress towards a consensual plan of adjustment will not occur until parties—the Board and bondholders alike—have developed their legal positions and face their risk of loss.

61.     For these reasons, the Court should deny the Motion, and allow Challenged Bondholders the opportunity, long overdue, to respond fully to the Debt Limit Objections.

*[Signature page follows]*

Dated: July 11, 2019

**G. CARLO-ALTIERI LAW OFFICES, LLC**

By: */s/ Gerardo A. Carlo*
Gerardo A. Carlo
USDC PR No. 112009
Telephone: (787) 247-6680
gacarlo@carlo-altierilaw.com

By: */s/ Kendra Loomis*
Kendra Loomis
USDC PR No. 227408
Telephone: (787) 370-0255
loomislegal@gmail.com

254 San Jose St., Third Floor
San Juan, Puerto Rico 00901
Telephone: (787) 247-6680
Facsimile: (787) 919-0527

**MORRISON & FOERSTER LLP**

By: */s/ Gary S. Lee*
James M. Peck (admitted *pro hac vice*)
Gary S. Lee (admitted *pro hac vice*)
Grant J. Esposito (admitted *pro hac vice*)
David J. Fioccola (admitted *pro hac vice*)
James A. Newton (admitted *pro hac vice*)
Andrew R. Kissner (admitted *pro hac vice*)

250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jpeck@mofo.com
glee@mofo.com
gesposito@mofo.com
dfioccola@mofo.com
jnewton@mofo.com
akissner@mofo.com

*Counsel for the Ad Hoc Group of Constitutional Debtholders*