**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                 Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS'
OBJECTION TO MOTION TO STAY CONTESTED MATTERS PENDING
CONFIRMATION OF COMMONWEALTH PLAN OF ADJUSTMENT**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ........................................................................................................6

ARGUMENT ...........................................................................................................15

A.  A Stay Is Warranted Only In Those Rare Circumstances In Which The Proponent Makes A Specific Showing Of Hardship That Is Not Outweighed By Competing Interests ...........................................................................................................15

B.  The Oversight Board Has Not Justified Entry Of A Stay ...................................16

  1.  The Oversight Board Has Failed To Demonstrate A Clear Case Of Hardship ............16

  2.  The Balance Of Equities Does Not Favor A Stay ........................................20

    a.  A Stay Would Substantially Prejudice Non-Moving Parties.....................20

    b.  A Stay Will Not Benefit The Court ..................................................26

    c.  The Public Interest Favors Prompt Resolution Of The Selective Claim Objection And Weighs Against A Stay ...........................................................29

    d.  The Oversight Board's Request For A Stay Of Indefinite Duration Also Weighs Against Its Motion ...........................................................30

CONCLUSION ........................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Austin v. Unarco Indus., Inc.,*
    705 F.2d 1 (1st Cir. 1983) ................................................................................................15, 26

*In re ConAgra Foods, Inc.,*
    No. CV-11-05379-MMM, 2014 WL 12580052 (C.D. Cal. Dec. 29, 2014) ....................15, 17

*Del Rio v. Northern Blower Co.,*
    574 F.2d 23 (1st Cir. 1978) .........................................................................................................19

*In re DeLuca,*
    194 B.R. 65 (Bankr. E.D. Va. 1996) .........................................................................................23

*Dependable Highway Express, Inc. v. Navigators Ins. Co.,*
    498 F.3d 1059 (9th Cir. 2007) ...................................................................................................16

*Edwards v. Oportun, Inc.,*
    193 F. Supp. 3d 1096 (N.D. Cal. 2016) ....................................................................................28

*In re Ellswick,*
    No. 15-41196-JJR13, 2016 WL 3582586 (Bankr. N.D. Ala. June 24, 2016)...................21, 23

*Fano v. Newport Heights Irrigation, District,*
    114 F.2d 563 (9th Cir. 1940) .....................................................................................................24

*In re Friedman's, Inc.,*
    No. 05-40129, 2006 WL 6902025 (Bankr. S.D. Ga. Jan. 25, 2006).........................................26

*In re Glen Eagle Square, Inc.,*
    No. 91-0300S, 1991 WL 111486 (Bankr. E.D. Pa. June 20, 1991)...................................21, 23

*Hewlett-Packard Co. v. Berg,*
    61 F.3d 101 (1st Cir. 1995).........................................................................................................26

*Horn v. D.C.,*
    210 F.R.D. 13 (D.D.C. 2002)......................................................................................................31

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.,*
    99 F. Supp. 3d 288 (E.D.N.Y. 2015) .........................................................................................28

*Keystone Coke Co. v. Pasquale,*
    No. CIV. A. 97-6074, 1999 WL 126917 (E.D. Pa. Mar. 9, 1999)....................................18, 23

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Konopca v. Comcast Corp.,*
  No. 15-6044, 2016 WL 1645157 (D.N.J. Apr. 26, 2016) .......................................30

*Landis v. N. Am. Co.,*
  299 U.S. 248 (1936) ........................................................................................ *passim*

*Lorber v. Vista Irrigation District,*
  127 F.2d 628 (9th Cir. 1942) .............................................................................24

*In re Mailman Steam Carpet Cleaning Corp.,*
  212 F.3d 632 (1st Cir. 2000) ..............................................................................18

*In re Metiom, Inc.,*
  318 B.R. 263 (S.D.N.Y. 2004) ...........................................................................26

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.,*
  385 F.3d 72 (1st Cir. 2004) .....................................................................4, 15, 20

*In re Phar-Mor, Inc. Sec. Litig.,*
  166 B.R. 57 (W.D. Pa. 1994) .............................................................................19

*PNC Bank v. GVTG, LLC,*
  No. 1:13-CV-00634-RLV, 2014 WL 12524648 (N.D. Ga. Mar. 4, 2014) .........................4, 19

*Ramos-Martir v. Astra Merck, Inc.,*
  No. 05-2038(PG), 2005 WL 3088372 (D.P.R. Nov. 17, 2005) ...............................................27

*Rivera v. Puerto Rico Tel. Co.,*
  No. 09-1723 (JP), 2009 WL 3160839 (D.P.R. Sept. 29, 2009) .......................................15, 27

*In re S. Side House, LLC,*
  470 B.R. 659 (Bankr. E.D.N.Y. 2012) .................................................................15

*Salinas v. City of San Jose,*
  No. 9-CV-04410 EJD, 2012 WL 2906052 (N.D. Cal. July 13, 2012) ...................................17

*SEC v. Fraser,*
  No. CV-09-00443-PHX-GMS, 2009 WL 1531854 (D. Ariz. June 1, 2009) ....................15, 22

*SEC v. Oakford Corp.,*
  181 F.R.D. 269, 273 (S.D.N.Y. 1998) .................................................................22

*Taunton Gardens Co. v. Hills,*
  557 F.2d 877 (1st Cir. 1977) ..............................................................................27

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Total Petroleum Puerto Rico Corp. v. T.C. Oil, Corp.,*
No. 09-1105 (JP), 2010 WL 11545626 (D.P.R. May 7, 2010)................................................27

*United States v. FINRA,*
607 F. Supp. 2d 391 (E.D.N.Y. 2009) ...............................................................17

*Walsh Constr. Co. P.R. v. United Sur. & Indem. Co.,*
No. 12-1401 (SEC), 2015 WL 13548470 (D.P.R. Sept. 28, 2015).........................................27

**Statutes**

11 U.S.C. § 1129(b)(1) ................................................................................24

11 U.S.C. § 1129(b)(1)(B) ............................................................................24

11 U.S.C. § 1129(b)(2)(A) ............................................................................24

48 U.S.C. § 2121(a) ......................................................................................6

48 U.S.C. § 2241 ........................................................................................24

**Other Authorities**

H.R. Rep. No. 686, 94th Cong., 2d Sess. 33 (1975) .....................................................24

The Ad Hoc Group of General Obligation Bondholders (the "GO Group")[2] hereby files this objection (the "Objection") to the *Motion to Stay Contested Matters Pending Confirmation of Commonwealth Plan of Adjustment* (Dkt. No. 7640, the "Stay Motion") filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board").  In support of its Objection, the GO Group respectfully states as follows:

## PRELIMINARY STATEMENT

The Oversight Board's Stay Motion is truly through the looking glass.  Having previously objected, on debt-limit grounds, to $6 billion face amount of general obligation bonds ("GO Bonds") issued by the Commonwealth of Puerto Rico (the "Commonwealth") in 2012 and 2014, the Oversight Board now seeks, by this motion, to delay the resolution of its own debt-limit objection until after confirmation proceedings have concluded.  The Board urges that the litigation should be stalled in deference to the purported "overall compromise and settlement" embodied in the Board's recently announced plan support agreement ("PSA") with a small subset of bondholders holding a small share of the Commonwealth's public debt, which the Board contends has "the potential to resolve the GO Objections."  Stay Motion ¶ 20.

But that core premise of the Stay Motion is demonstrably false:  The PSA is nothing like a global settlement, and it holds no prospect of resolving the Board's debt-limit objection and the related litigation it has spawned.  In fact, while the Board and its collaborating bondholders have taken great pains to obscure the point in both the Stay Motion and their public pronouncements, discovery in connection with the Stay Motion has revealed that the two bondholder groups that are signatories to the PSA ***collectively hold less than 4.6 percent of the 2012 and 2014 GO Bonds***

---

[2] Members of the GO Group file this Objection exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

*that are subject to the Oversight Board's objection.*[3]  Their holdings, unsurprisingly enough, are overwhelmingly weighted toward the so-called "Vintage" bonds that are proposed to receive favored treatment under the plan contemplated by the PSA—and skewed even more so toward bonds issued by the Puerto Rico Public Buildings Authority (the "PBA," and such bonds, "PBA Bonds"), for which these bondholders have negotiated a vastly greater recovery that may well approach 100 percent of their pre-petition claim against the Commonwealth.

Under the plan contemplated by the PSA, the Oversight Board's favored creditors would be entitled to receive their distributions promptly upon confirmation.  Challenged bondholders, by contrast, would be forced to elect between (i) accepting an absurdly low "settlement" offer or (ii) continuing to litigate the Board's objection until a successful conclusion, with their plan distributions held in reserve in the meantime.  Given that the PSA was negotiated with creditors holding only a trivial portion of the challenged bonds—and who would, under the terms of the PSA, be the primary beneficiaries of the Board's challenge—this supposed "settlement" offer is simply the next stage in the Board's attack on the challenged bonds, with the prospect of indefinite delay in recovery deployed as a cudgel in the hope of extracting acquiescence.  There were no meaningful negotiations with holders of the challenged bonds, none of the largest holders of the challenged bonds named by the Board in its claim objection is a party to the PSA, and holders of billions of dollars of GO Bonds have objected to the Stay Motion.  There is accordingly no reason to believe that it will be accepted by any meaningful share of the challenged bondholders.  At a minimum, the unsupported assertion that the PSA somehow has "the potential to resolve the GO Objections" (Stay Motion ¶ 20) disregards reality.

---

[3] Attached hereto as Exhibit A is a summary chart, obtained in response to the GO Group's discovery requests, detailing the aggregate holdings of GO Bonds and PBA Bonds of the two bondholder groups that are signatories to the PSA.

The PSA thus offers no valid basis for delaying resolution of the Board's objection. To the contrary, the PSA makes clear that the debt-limit objection is the *centerpiece* of the Board's forthcoming plan of adjustment for the Commonwealth, which purports to treat the Board's objection as the fault line dividing one set of favored creditors from another, disfavored set. As a consequence, the Oversight Board's debt-limit objection (and the related litigation it has spawned) are inextricably intertwined with plan confirmation. Given the debt-limit objection's centrality to the forthcoming plan, and the understandably vigorous opposition from the creditors the Oversight Board has targeted for discriminatory treatment, one might expect the Board to seek to *expedite* litigation of its debt-limit objection in order to resolve the matter and facilitate plan confirmation. Indeed, the Board's own objection contended that "[t]he issues raised in this Objection are gating issues for the Commonwealth's plan of adjustment process . . . .  [W]hether more than $6 billion of GO bondholder claims should be disallowed is unquestionably a critical gating issue." Dkt. No. 4784, ¶ 10. Yet the Board's Stay Motion requests precisely the opposite relief:  an indefinite stay of the Board's debt-limit objection, pending confirmation proceedings.

That procedural maneuver suggests that the Board is well aware that its debt-limit objection has no basis in law. Rather than allowing the litigation to proceed and face rejection by the Court—likely with fatal consequences for the grossly unfair sweetheart "deal" reflected in the PSA—the Board hopes to delay resolution of its objection for as long as possible. This is nothing more than a cynical bid for negotiating leverage over holders of the challenged bonds, which the Board (and its collaborating bondholders) hope to obtain by depriving the challenged bondholders of any opportunity to demonstrate the validity of their claims and thereby delaying their recoveries in the Commonwealth's Title III case. To make matters worse, this tactical ploy would (if allowed to succeed) inflict massive irreparable prejudice on challenged bondholders, diverting billions of

dollars out of the Commonwealth's Title III plan that might later be proven to have been paid to the wrong claimants.  It is one thing to settle a garden-variety dispute before confirmation; it is another thing altogether to insist on delaying resolution of a case-altering claim objection so that certain preferred creditors can avoid their own day of reckoning while siphoning massive value into their own pockets.

In these circumstances, the Stay Motion should be denied.  The Oversight Board never grapples with the demanding showing required for a litigant to obtain a contested stay, by meeting the "heavy burden" of "demonstrat[ing] a clear case of hardship." *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 78 (1st Cir. 2004) (internal quotation marks omitted).  To the contrary, the Board does not identify any cognizable hardship at all.  In four pages of conclusory argument, the Board offers a handful of platitudes and unsupported assertions to explain its *preference* for delay.  But the fact that the Board now finds the litigation it has unleashed to be "unwelcome" (Stay Motion ¶ 16) does not demonstrate hardship.  Likewise, the prospect that ongoing proceedings may require parties to stake out legal and factual positions (*id.*) is true in *all* litigation.  It cannot justify a stay here.

Nor can a stay be justified by a generalized policy in favor of settlement.  Once litigation has been commenced, parties are entitled to a timely adjudication of their legal rights, and "a potential settlement is not a legal basis for a stay." *PNC Bank v. GVTG, LLC*, No. 1:13-CV-00634-RLV, 2014 WL 12524648, at *2 (N.D. Ga. Mar. 4, 2014), *aff'd*, 592 F. App'x 775 (11th Cir. 2014).  What is more, there is no true settlement in prospect here, just a meager and discriminatory unilateral *offer* that the Oversight Board is attempting to push on its disfavored bondholders through a threat of indefinite delay.  To state the obvious, the Board's tactical preference for delay

4

is not a valid basis for staying this litigation and depriving the holders of $6 billion face amount of bonds issued into public markets of their day in court on a timely basis.

Moreover, even if the Oversight Board could make the required threshold showing of hardship, the "competing interests" would still preclude entry of a stay. *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). First, the delay associated with a stay would inflict substantial prejudice on the Board's disfavored bondholders, because it would inevitably delay their recoveries in the Commonwealth's Title III case. The requested delay would also lead to billions of dollars in near-term distributions to preferred creditors who might ultimately be proven to have no entitlement to those funds at all, if the Court subsequently determines that certain premises of the Board's debt-limit argument are correct but also rules (as the GO Group has urged) that those premises would necessarily lead to invalidation of other bonds before and instead of the ones the Board has cherry-picked for challenge. The Board and PSA parties inexplicably want to pay out billions of dollars under their plan before those questions are even considered—in short, the stay motion seeks to pretermit the question of *which* bondholders could possibly be the proper targets of the debt-limit objection, depriving the challenged bondholders of their rights to recover those distributions and giving those PSA bondholders an unlawful windfall recovery. Second, a stay would do nothing to conserve judicial resources or otherwise promote judicial economy. Precisely because the Board's debt-limit objection is central to the Board's contemplated plan, the Court will be required to confront its merit (or lack thereof) at multiple stages, including in connection with the disclosure statement and at confirmation. Rather than doing so piecemeal, as would be required if the Stay Motion were granted, the far more efficient path is to allow the objection and related litigation to proceed, so that the Court can confront the debt-limit issue once and for all, with the benefit of full briefing and argument. Third, the public interest would be undermined by a stay, which would

prolong uncertainty about how to calculate the debt limit and delay resolution of allegations that the Commonwealth and countless members of government engaged in a massive scheme to defraud investors and the public by issuing invalid debt. Finally, the indefinite term of the stay sought here also weighs against the Oversight Board's request.

The Stay Motion should accordingly be denied.

## BACKGROUND

A.   The current posture of the Commonwealth's Title III case is the regrettable result of the Oversight Board's utter failure to discharge its statutory mission of ensuring that Puerto Rico "achieve[s] fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a). To be sure, the Oversight Board has repeatedly *identified* reasonable and necessary economic reforms that would put Puerto Rico back on the path toward fiscal responsibility. Thus, the Board certified a fiscal plan for the Commonwealth in April 2018 and updated that fiscal plan in May 2018. In those plans, the Board provided a clear mandate: "Puerto Rico must urgently adopt a series of bold actions to improve its fiscal and economic trajectory."[4]

The Oversight Board yielded, however, as soon as the necessary reforms ran into political headwinds. Citing "lack of political will," the Board no longer insists that the Commonwealth must enact meaningful structural reform.[5] Instead, in its currently certified Fiscal Plan, the Board describes a set of "options" that the Commonwealth may "consider" to improve future fiscal results.[6] According to the Board's own estimates, the potential impact of these forgone reforms

---

[4]   May 30, 2018 Commonwealth Fiscal Plan 2, https://drive.google.com/file/d/1eHZ1_lM7Cb4yw_hrI_Ju-vW6Yd1kD2_k/view?usp=drivesdk.

[5]   May 9, 2019 Commonwealth Fiscal Plan 17, https://drive.google.com/open?id=13wuVn04--JKMEPKu-u-djZJHqTK-55aV.

[6]   *Id.* at 43.

may be as much as $40 billion if they are implemented in a timely fashion.[7]  But the Board has long since given up the ghost on requiring such reforms.  As a result, it now projects that, unless costs savings can be found somewhere else, the Commonwealth will run unsustainable long-term fiscal deficits.

B.  Left without the economic boost that would have come from meaningful economic reform, the Oversight Board changed tack and sought to make up the shortfall by attempting to eliminate public debt through a series of longshot litigations.  On January 14, 2019—more than a year-and-a-half into the Commonwealth's Title III case—the Oversight Board and the Official Committee of Unsecured Creditors (the "UCC") filed an objection selectively targeting $6 billion of GO Bonds issued by the Commonwealth in 2012 and 2014 (the "Selectively Challenged Bonds").  See Dkt. No. 4784 (the "Selective Claim Objection").  The Selective Claim Objection primarily alleged—based on nothing more than its interpretation of scattered cases from other jurisdictions—that the PBA was a "transparent sham[] designed to circumvent" the debt limit in the Commonwealth Constitution.  *Id.* ¶ 5.  In other words, the Board brazenly alleges that the Commonwealth fashioned a supposedly "transparent" decades-long scheme that somehow went unrecognized by every single elected official, buyer, advisor, and intermediary for more than five decades.  The Selective Claim Objection nonetheless argued that the constitutional remedy for this purported scheme was to *reward* holders of the bonds issued by the "sham" PBA:  Bonds marketed and sold by the PBA were to be retroactively reclassified as direct, primary obligations of the Commonwealth.  And, at least according to the Selective Claim Objection, that retroactive reclassification revealed that, unbeknownst to all, Puerto Rico had exceeded its debt limit by March 2012.  Based on that newly discovered (yet now nearly seven-year-old) news, the Selective

---

[7] *Id.*

7

Claim Objection sought to declare all of the Selectively Challenged Bonds "null and void" and to disallow entirely any claim whatsoever by their holders in this Title III action. *Id.* ¶ 7 (asserting that "bondholders have no remedy against the Commonwealth on account of such bonds").

Not surprisingly, the GO Group, which holds substantial amounts of the Selectively Challenged Bonds, vigorously disputes the Selective Claim Objection and maintains that it is meritless. To prevail on the Selective Claim Objection, the Oversight Board and UCC would face the daunting prospect of establishing that there was a massive conspiracy to fraudulently advertise and sell billions of dollars in PBA Bonds and GO Bonds for decades. They would also need to persuade the Court to take a truly unprecedented action by invalidating billions of dollars in publicly issued securities based on a retroactive recalculation of the debt limit that they assert would follow from this retroactive recharacterization of the PBA Bonds—something that has never been done before in any state or territory. But that is not all. Even if the Board and UCC could persuade the Court to strike out into uncharted legal territory, they would then have to establish that the Selectively Challenged Bonds (not PBA Bonds) should be invalidated as punishment for the *PBA's* fraud. And even if they could carry that burden, they would then still need to explain why the proper remedy is not to invalidate *earlier* PBA Bonds and GO Bonds that would have tripped the debt limit under their theory, with the result that those prior bonds would be logically excluded from the debt limit calculation for the Selectively Challenged Bonds. And they would have to prevail in arguing—contrary to logic, case law, and basic equity—that it would make sense to invalidate an entire bond series retroactively rather than to tailor the remedy to the extent of the violation of the debt limit as newly recalculated.

On April 2, 2019, the GO Group filed its own omnibus objection in response to the Selective Claim Objection. The GO Group's objection conditionally sought to disallow claims

based on PBA Bonds and other GO Bonds in the unlikely event that the Selective Claim Objection succeeded on the merits (the "Conditional Objection"). Dkt. No. 6099. Based on the assumption that certain premises in the Selective Claim Objection would be accepted, the Conditional Objection explains why the only correct remedy would be to invalidate all claims asserted against the Commonwealth based on or relating to the PBA Bonds and PBA Leases, or, failing that, to apply to all of the PBA Bonds and GO Bonds the logic (such that it is) of the Selective Claim Objection in order to see whether all of those bonds (not just the ones selected by the Board and the UCC) comply with the constitutional debt limit. Because of how the Commonwealth debt limit is calculated, any invalidation of earlier issuances would logically free up debt capacity for subsequent issuances, including the GO Bonds targeted in the Selective Claim Objection.

The GO Group sought to litigate the Conditional Objection in coordination with the Selective Claim Objection so that the validity of all potentially impacted claims could be decided in a single proceeding. The GO Group moved to proceed with the Conditional Objection on an omnibus basis and to establish procedures for that objection on April 2, 2019. Dkt. No. 6104. The Court denied that motion without prejudice on May 10, 2019, primarily reasoning that the Conditional Objection remained "hypothetical" and was not yet ripe for adjudication. Dkt. No. 6891. But based on recent developments—including actions filed by the Oversight Board and UCC challenging many more PBA Bonds and GO Bonds based on the expansive "logic" of the Selective Claim Objection—the GO Group recently renewed its motion to establish procedures to allow the Conditional Objection to go forward. Dkt. No. 7814. That motion is currently pending before the Court and is scheduled for consideration at the July 24, 2019 omnibus hearing.

C. Although it has been six months since the Oversight Board and UCC filed their Selective Claim Objection, they have made essentially zero progress toward resolving it either

through litigation or negotiation with the holders of the Selectively Challenged Bonds.  The Board and UCC proposed procedures that they claimed would "allow holders of [the Selectively Challenged Bonds] the ability to participate in the litigation . . . and streamline and organize the issues to be presented to this Court for decision."  Dkt. No. 4788 ¶ 14.  The Court approved those procedures by Order dated February 15, 2019.  Dkt. No. 5143.  Since then, the Board has done essentially nothing to litigate its Selective Claim Objection.

Instead, the Oversight Board used the intervening months of delay to negotiate a plan with holders of bonds that the Board did *not* target in its Selective Claim Objection.  More particularly, on the evening of June 16, 2019, the Board announced that it had entered into a Plan Support Agreement with a small subset of bondholders holding roughly 17% of outstanding GO Bonds and PBA Bonds (the "PSA").[8]  Far from being a true settlement of the Selective Claim Objection, the PSA was negotiated with one group of bondholders who had joined the Oversight Board in its Selective Claim Objection (the self-proclaimed "Lawful Constitutional Debt Coalition"

---

[8]   The Board has posted the PSA to its public website at the following link: https://drive.google.com/file/d/1gpPPd1gnFjvpQ5aY6ZwdeG42dAvzQggz/view.  A copy of the PSA has previously been filed by the GO Group at Dkt. No. 7814-2.  The terms of the plan of adjustment contemplated by the PSA are outlined in Exhibit E to the PSA (the "Term Sheet").

In a summary presentation also posted to its public website, the Board disclosed that PSA signatories held approximately $3.0 billion in GO Bond and PBA Bond claims.  See *Commonwealth of Puerto Rico Title III Case:  Plan Support Agreement* 1 (June 16, 2019), https://drive.google.com/file/d/1vVUT722_ai0VOfrzYbEwWHCwzhsMrvWH/view (the "PSA Summary Presentation," previously filed by the GO Group at Dkt. No. 7814-3).  The same presentation discloses approximately $17.8 billion in aggregate claims for GO Bonds and PBA Bonds.  *Id.* at 10.  While the GO Group does not endorse the claim calculations stated therein, the Board's figures lead to the 17% estimate set forth in the text.  Including other claims on purported Commonwealth general obligations (including the Commonwealth's guaranty of bonds issued by the Port of Americas Authority and bond anticipation notes issued by the Puerto Rico Infrastructure Financing Authority, as well as loans from the Government Development Bank to the Commonwealth Treasury) would yield a percentage figure of approximately 16.3%.  See Term Sheet 10 (setting forth claim amounts for these claims in the definition of "Other CW Guarantee Claims").

("SPLCDC")) and another group of PBA bondholders (the "QTCB Group") that would obtain a
windfall if the Selective Claim Objection succeeded and their supposedly fraudulent PBA Bonds
were converted into direct Commonwealth debt.   See Dkt. No. 6180; Dkt. No. 7659, at 1
Collectively, these two groups hold less than 4.6 percent in face amount of the Selectively
Challenged Bonds.  See Ex. A.  Moreover, these groups hold roughly 40.6 percent in face amount
of the outstanding PBA Bonds, as compared to just 10.6 percent of the Commonwealth's
outstanding GO Bonds—thus creating an incentive to prefer a plan that allocates recovery to PBA
Bonds at the expense of GO Bonds.

The terms of the PSA make clear that, in line with these incentives, the Oversight Board
has exploited the overhang of its Selective Claim Objection to "negotiate" a proposed plan of
adjustment with a small subset of its preferred creditors.  The plan contemplated by the PSA would
represent a sweetheart deal for the Board's preferred creditors at the expense of disfavored
creditors whose claims remain clouded by the unresolved Selective Claim Objection.

Holders of PBA Bonds would receive recoveries far in excess of what holders of GO Bonds
would receive.  The Oversight Board's own calculations reflect a minimum recovery of 72.6% for
"Vintage PBA" claims, as compared to a minimum recovery of 64.3% for "Vintage GO" claims.
See PSA Summary Presentation 10.[9]  This differential in recovery is driven by the PSA's allocation
of a *1.073 billion* "administrative expense claim" to the PBA "for the benefit of holders of
Allowed PBA Claims," Term Sheet § I.B—an amount that appears to *exceed* the Commonwealth's
unpaid debt-service rental obligations to PBA since the filing of the Commonwealth's Title III
case.

---

[9] The Board's base recovery calculations assume that holders of GO Bonds and PBA Bonds
do not receive any "Excess Cash," as defined in the PSA.  See PSA Summary Presentation 8 n.2.
Under the PSA, that amount is likely to reach $900 million.  See Term Sheet 8-9.

Moreover, the Oversight Board's public comparisons significantly understate the true difference in recovery between GO Bonds and PBA Bonds because the PSA presumes that PBA bondholders' claims on the Commonwealth's guaranty—but *not* claims on GO Bonds—should include interest that has accrued since the Commonwealth's Title III filing.[10]  On an apples-to-apples basis, the PSA contemplates a base recovery of approximately 81% on PBA bondholders' pre-petition claim against the Commonwealth, as compared to a 64.3% base recovery for "Vintage GO" claims.  The PSA's so-called "Bond Recovery Cap"—advertised by the Board as 89.4%, PSA Summary Presentation 8—would in fact represent a recovery of *99.8%* of PBA bondholders' pre-petition claim against the Commonwealth.  And even that figure does not account for the $300 million in so-called "Consummation Costs" and "PSA Restriction Fees" that would be paid to the collaborating bondholders who have agreed to the PSA.  See Term Sheet § II.M.

By contrast, the plan contemplated by the PSA would require holders of the Selectively Challenged Bonds to elect between litigating the Selective Claim Objection to completion or accepting a substantially reduced "settlement" proposal of 45% (in the case of GO Bonds issued in 2012) or 35% (in the case of GO Bonds issued in 2014).  See PSA Summary Presentation 8.  Bondholders that do not elect to accept the "settlement" would be required to litigate the Selective Claim Objection until completion and would receive no plan distributions held in reserve pending successful resolution of the litigation.[11]  Other bonds whose validity the Oversight Board has

---

[10] See Term Sheet 11 (defining a "Vintage CW Guarantee Bond Claim" with respect to "Vintage PBA Bonds" as the "amount of such holder's Vintage PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of Vintage PBA Bonds"); *id.* at 3 (providing for deemed allowance of "PBA Bond Claims" in an amount including "accrued and unpaid interest . . . during the period up to, but not including, the date on which the *PBA PROMESA Proceeding* is commenced") (emphasis added).

[11] See Term Sheet § II.E (establishing plan treatment for Class 4, "2012 CW Bond Claims," and Class 8, "2014 CW Bond Claims).

conceded challenged—including the Series R, S, and T PBA Bonds, and four series of GO Bonds issued in 2011—would be entitled to immediate plan distributions.

The vastly different recovery "offered" to the PBA Bonds and the Selectively Challenged Bonds bears no relation to the Oversight Board's comparative likelihood of success in its objections against each class. Indeed, the virtually full recovery offered to the PBA Bonds is all but a concession that the Board's claims against the PBA are meritless, as that recovery is to be financed by a massive cash payment to the PBA implying virtually no likelihood of success in the Board's bid to recharacterize the PBA's leases as disguised financings. But the Board's challenge to the PBA's leases rests on the same theory that underlies the Selective Claim Objection—namely, that the PBA is a sham entity that disguises financing transactions as real estate leases as part of a scheme to circumvent the debt limit. The Board's objections offer no explanation for that starkly different treatment. Right or wrong, the "sham" theory simply cannot simultaneously justify a massive windfall to one set of challenged claims (the PBA Bonds) and pennies-on-the-dollar for another set of claims facing the same challenge. Instead of making a serious offer and pushing for a true resolution, the plan contemplated in the PSA is nothing more than a coordinated attempt by the Board and one set of holders to extract recovery at the expense of other holders.

The PSA hopes to make holders of the Selectively Challenged Bonds an offer that they cannot refuse: Either accept the absurdly low "settlement" offer or face the prospect of indefinite delay, with their claims sitting in limbo while the Oversight Board slow-walks its Selective Claim Objection. In furtherance of that strategy, the PSA makes clear that the Oversight Board and its favored bondholders agreed to try to lock in the current favoritism by "filing a motion to stay" any further litigation "as soon as reasonably practicable." PSA §§ 4.1(e), 4.5(b)(ii), 5.1(a).

13

What is more, the Term Sheet attached to and incorporated by the PSA contained a further offensive provision. Class 6 and Class 8—which are to contain exclusively the claims of bondholders who reject the PSA's lowball settlement offers on the 2012 and 2014 GO Bonds, respectively—"shall not be entitled to vote to accept or reject the Plan" except by order of the Court or upon the Oversight Board's unilateral permission. Term Sheet § II.E. That is, on its face the PSA purported to disenfranchise holders of the Selectively Challenged Bonds, adding unlawful insult to the already pernicious injuries otherwise imposed on those bondholders by the PSA.

On July 8, 2019, however, the undersigned counsel were informed by counsel for the SPLCDC that this provision was included in error and would be corrected. On July 9, counsel for the Oversight Board made the same representation. On July 10, counsel for the SPLCDC averred in a public filing to this Court (Dkt. No. 7900, at 3 n.5) that "the PSA is being amended to clarify that holders of 2012 and 2014 GO Claims will be entitled to vote on the plan—such holders will be given the right to vote, as well as the right to accept a settlement or opt out."

As of this filing, this "error" has yet to be corrected, and it remains to be seen whether the correction delivers as promised or embodies some sleight of hand designed to further diminish the rights of holders of the Selectively Challenged Bond. We assume this correction will be made sufficiently in advance of the July 24 omnibus hearing to allow meaningful consideration of the revision, and we reserve the right to present a supplemental filing as appropriate. The GO Group further reserves the right to seek discovery as to whether this provision was included—in the public version or in some prior iteration of the PSA—in good faith or as part of an impermissible effort to manipulate the plan process and the public market for the Selectively Challenged Bonds. Suffice it to say for present purposes that if this provision is not fully removed, that is still further reason to deny the requested stay.

## ARGUMENT

**A.      A Stay Is Warranted Only In Those Rare Circumstances In Which The Proponent Makes A Specific Showing Of Hardship That Is Not Outweighed By Competing Interests**

While courts have the discretionary power to stay matters on their dockets, they should exercise that power "only . . . in rare circumstances." *Rivera v. Puerto Rico Tel. Co.*, No. 09-1723 (JP), 2009 WL 3160839, at *1 (D.P.R. Sept. 29, 2009). To obtain a discretionary stay, a litigant bears the "heavy burden" of "demonstrat[ing] 'a clear case of hardship.'" *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (quoting *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983)); see also *Landis v. North Am. Co.*, 299 U.S. 248, 255 (1936) (requiring a showing of "a clear case of hardship or inequity in being required to go forward"). Accordingly, "a stay is improper absent a specific showing of prejudice that cannot be remedied by anything other than a complete stay." *SEC v. Fraser*, No. CV-09-00443-PHX-GMS, 2009 WL 1531854, at *3 (D. Ariz. June 1, 2009) (stay of civil litigation). In attempting to make that showing, "conclusory assertions" will not suffice, *In re ConAgra Foods, Inc.*, No. CV-11-05379-MMM, 2014 WL 12580052, at *5 (C.D. Cal. Dec. 29, 2014); and the mere "possibility" of prejudice is not enough, *In re S. Side House, LLC,* 470 B.R. 659, 687 (Bankr. E.D.N.Y. 2012).

In addition to evaluating the prejudice to the movant absent a stay, courts considering a stay request also "weigh competing interests." *Landis*, 299 U.S. at 255. Among the other interests that a court should consider are the prejudice to non-movants, the benefit to the court of a stay, the public interest, and the duration of the stay sought. See *In re S. Side House, LLC*, 470 B.R. at 685; see also Stay Motion ¶ 15 (enumerating same factors). While judicial economy is certainly one factor among several, it is not "a sufficient ground to stay proceedings" absent a showing of hardship. *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (reversing stay).

**B.      The Oversight Board Has Not Justified Entry Of A Stay**

Far from establishing that this is one of the "rare" cases in which a stay is justified, the Oversight Board's motion reads as if stays are available as a matter of right and makes little effort to meet its burden.  Instead of demonstrating a "clear case of hardship" or a "specific showing of prejudice," the Board's motion rests solely on conclusory assertions, vague insinuations, and the general preference for resolving cases consensually.  That falls woefully short of the demanding burden required to stay an action over the opposing party's objection—particularly in litigation that is so essential to the basic fairness of these Title III proceedings.  And the remaining stay factors likewise cut strongly against granting the Board's motion.

**1.      The Oversight Board Has Failed To Demonstrate A Clear Case Of Hardship**

Unable to identify any actual prejudice that it would suffer absent a stay, the Oversight Board argues that a stay is necessary to "maintain the status quo" because litigation on the Board's Selective Claim Objection would now be "unwelcome."  Stay Motion ¶ 16.  And for good measure, the Board also implies that the prospects of settlement could slip through its hands because continuing litigation on its objection might result in "parties . . . be[ing] forced to take positions as to [the Selective Claim Objection], or even take positions simply on the procedures to govern the [Selective Claim Objection] that are fundamentally at odds with" the PSA.  *Id*.  Those vague insinuations fall far short of the necessary showing.  Likewise, the Board's invocation of a generalized preference in favor of settlement cannot support a stay, not least because there is in fact no settlement—or even negotiations—with holders of the Selectively Challenged Bonds here.

a.  While the Oversight Board may now see its own objection as "unwelcome," that does not justify a stay.  Indeed, the Board's own cited authorities recognize that "merely being required to defend the suit does not constitute hardship."  *In re ConAgra Foods*, 2014 WL 12580052, at *8; see also *Salinas v. City of San Jose*, No. 9-CV-04410 EJD, 2012 WL 2906052, at * 2 (N.D. Cal.

16

July 13, 2012) ("[T]he moving party must cite to something more than the intrinsic inconvenience arising from involvement in litigation.").  That is particularly true where, as here, the party seeking the stay initiated the litigation about which it now complains.  See *United States v. FINRA*, 607 F. Supp. 2d 391, 394 (E.D.N.Y. 2009).  A stay—particularly the indefinite one sought here—is not an appropriate response to a litigant's dissatisfaction with the proceeding it has brought.

b.  Nor is it clear how a stay would relieve parties of the purported burden of taking a position on the Selective Claim Objection or how parties taking a position would prejudice the Oversight Board.  Even with a stay, parties will take positions (directly or indirectly) on the objection in the course of deciding whether they want to stand on their rights or settle for the miserly recovery offered by the Board.  Moreover, the disparate treatment of the Selectively Challenged Bonds will presumably be one of the key hurdles to plan confirmation and will again require holders to take a position on the claim objection.

Regardless of whether there is a stay, these questions will need to be decided.  The notion that a stay will excuse parties from needing to take positions on these important questions defies common sense.  And it also shows that the purported benefits to judicial economy are illusory (as discussed more thoroughly in subsection 3, below).  In reality, stopping the claim objection litigation only makes those tasks more difficult by requiring claimants to make decisions based on their best assessment of the likely outcome; whereas denying a stay would provide more clarity on the legal merit of these objections, assist all parties in making informed and reasoned decisions, and make progress toward a confirmable plan of adjustment.

To the extent the Oversight Board's actual concern is over the burden of litigating the Selective Claim Objection, that concern is largely misplaced.  Significant progress (and perhaps total resolution) could be accomplished simply by resolving the threshold legal issues that underpin

the Selective Claim Objection.  More particularly, the GO Group (and other holders of Selectively Challenged Bonds) contend that there are critical legal flaws that would doom the Selective Claim Objection on a motion to dismiss or similar preliminary disposition.  If successful, such a motion would pretermit significant wasteful litigation over the plan that is premised on the Selective Claim Objection's purported merits.  And even if unsuccessful, a ruling from by this Court would offer valuable guidance, narrow the dispute, and streamline any remaining litigation.

Indeed, if the Oversight Board were confident in the merits of the Selective Claim Objection and serious about inducing holders of the Selectively Challenged Bonds to accept the lowball settlement set forth in the PSA, it should welcome prompt motion practice to demonstrate as much.  Because the determination of threshold legal issues would not require discovery, they could be resolved expeditiously without unduly delaying these proceedings or imposing unwarranted costs on the parties.  The Oversight Board's apparent eagerness to avoid that legal clarity is telling.  And it most certainly is not a hardship that can justify a stay.

c.  Nor does the Oversight Board's generic invocation of the preference for settlement in bankruptcy cases justify a stay.  The Board has not identified even a single case in which that background principle played any role in the stay analysis—indeed, the only case it did cite concerned whether a Chapter 7 trustee abused its discretion in settling a case.  See *In re Mailman Steam Carpet Cleaning Corp*., 212 F.3d 632, 635 (1st Cir. 2000).  The Board came up empty on that front because courts have repeatedly denied stays where a settlement "remain[s] speculative" and "would require judicial approval."  *Keystone Coke Co. v. Pasquale*, No. CIV. A. 97-6074, 1999 WL 126917, at *4 (E.D. Pa. Mar. 9, 1999).  While settlement might be preferable, parties may always bring a claim to court for judicial resolution, and they are entitled "to whatever judicial time is required to try it."  *Del Rio v. Northern Blower Co.*, 574 F.2d 23, 26 (1st Cir. 1978).  Absent

18

consent of both sides, "a potential settlement is not a legal basis for a stay." *PNC Bank v. GVTG, LLC*, No. 1:13-CV-00634-RLV, 2014 WL 12524648, at *2 (N.D. Ga. Mar. 4, 2014), *aff'd*, 592 F. App'x 775 (11th Cir. 2014); see also *In re Phar-Mor, Inc. Sec. Litig.*, 166 B.R. 57, 62-63 (W.D. Pa. 1994) (refusing to enjoin a parallel creditor action where debtor's allegation that continued litigation "diminishe[d] the possibility of settlement" was "mere speculation" and did "not rise to the level of irreparable harm").

That conclusion applies with added force in this case, where the Oversight Board's PSA does not even reflect a potential settlement of the debt-limit litigation that the Board now seeks to stay. The PSA's purported "settlement" offer is not the product of good-faith negotiations with *any* significant holders of the Selectively Challenged Bonds; those bondholders, including the GO Group, have been excluded from negotiations with the Board. It reflects the Board's agreement with two bondholder groups holding less than hold less than 4.6 percent in face amount of the Selectively Challenged Bonds—one of whom also happens to be a joint-objector *prosecuting* the Selective Claim Objection. See Ex. A. There is no true settlement here, just a meager *offer* that the Board is attempting to push on the holders of the Selectively Challenged Bonds—with the prospect of indefinite delay used as a cudgel to extract acquiescence from as many bondholders as possible. The unilateral offer and strongarm tactics in this case therefore bear no resemblance to the actual settlement reached by the parties in the COFINA dispute, which the Stay Motion misleading cites as a precedent for the stay requested here. See Stay Motion ¶ 16.

If the Oversight Board truly wanted to settle these cases, it would have included holders of the Selectively Challenged Bonds in the negotiations, rather than devising a plan behind closed doors with its preferred bondholders. While the GO Group would welcome a reasonable

consensual resolution of this matter, that would require the Board to negotiate with its adversaries, rather than just agreeing with its friends on a scheme to lowball other holders.

\* \* \*

The Oversight Board's failure to make the required showing of hardship is reason alone to deny its Stay Motion.  See *Landis*, 299 U.S. at 255; *Microfinancial*, 385 F.3d at 77.

### 2. The Balance Of Equities Does Not Favor A Stay

Even if the Oversight Board had made such a threshold showing (and it has not), the balance of equities would still cut against a stay.  Freezing an objection lodged against bondholders without permitting them to respond and validate their claims is inherently prejudicial.  It will also impose significant costs on the Court by requiring the Court to engage in multiple rounds of preliminary estimations on the merits of the claims, rather than proceeding expeditiously toward one definitive ruling to settle the matter.  Nor would the public interest be served by delaying resolution of this important dispute.

### a. A Stay Would Substantially Prejudice Non-Moving Parties

While the Oversight Board has shown little need for extraordinary relief under the circumstances, a stay would risk substantial prejudice to the GO Group and other holders of the Selectively Challenged Bonds.  Contrary to the Board's conclusory assertion, the GO Group and other holders of the Selectively Challenged Bonds have a substantial interest in prompt resolution of the objection and the validation of their claims.  By preventing holders from litigating the Selective Claim Objection, a stay would undermine that interest.  A stay would prejudice those holders by forcing them to wait an indeterminate amount of time to begin litigating the objection, thereby delaying their recovery, while diverting billions of dollars to PSA parties that might ultimately be proven to have no entitlement to a recovery at all.  The obvious upshot of this dynamic is to make challenged bondholders wait a long time to prove that they are entitled to

20

recover, but simultaneously attempting to eliminate the challenged bondholders' ability to recover the massive value that would be paid out to the wrong bondholders in the meantime. That substantial prejudice weighs heavily against a stay.

*First*, the GO Group has a strong interest in a prompt ruling on the validity of its claim. "[T]he multitude of interests to be served in a bankruptcy case require that resolution of contested issues . . . must move expeditiously." *In re Glen Eagle Square, Inc.*, No. 91-0300S, 1991 WL 111486, at *2 (Bankr. E.D. Pa. June 20, 1991) (denying stay). "Plan confirmation and [] distributions to creditors are interrelated with the allowance and disallowance of claims, and all should proceed with deliberate speed . . . ." *In re Ellswick*, No. 15-41196-JJR13, 2016 WL 3582586, at *1 n.3 (Bankr. N.D. Ala. June 24, 2016), *aff'd sub nom. Ellswick v. Quantum3 Grp., LLC*, No. 1:16-CV-01959-MHH, 2018 WL 1408536 (N.D. Ala. Mar. 21, 2018).

Here, the Selective Claim Objection seeks to disallow $6 billion face amount of GO Bonds—nearly half of all the outstanding GO Bonds. That is no small matter. Indeed, the Board itself highlights that the Selective Claim Objection impacts a large number of holders and that at least 1,670 of those holders have submitted Notices of Participation indicating that they wish to be heard on the Selective Claim Objection. Stay Motion ¶ 7. A stay would effectively shut the courthouse doors to those claimants and deny them a venue to test the Board's dubious and unprecedented legal arguments until after confirmation—whenever that might be. Instead, the Board hopes to put bondholders to a choice between unacceptable options—either (a) accept a low-ball settlement based on the Selective Claim Objection or (b) stand on their rights and be forced to wait an indeterminate amount of time to even restart litigation and wait even longer for any distribution after defeating the Board's meritless objection. The prejudice of putting holders in that bind should be obvious.

Tellingly, the Oversight Board makes no serious effort to dispute the enormous prejudice to which the GO Group and other holders will be subjected. Apart from a conclusory assertion that "non-moving parties will be in the exact same position," the Board (in a footnote) seems to admit that there will be some "prejudice resulting from the delay in adjudication of rights . . . ." Stay Motion at 11 & n.10. But the Board tells the Court it can ignore that prejudice because, in fact, parties facing objections have no "legal right to have the GO Objections heard within any particular timeframe." *Id.* Because there is "no deadline or statute of limitations for the GO Objections," the Board notes that it could have brought its objections "post-confirmation" and the objections "could be withdrawn now and re-filed later." *Id.* Based on that ability to time objections, the Board reasons that parties must not have any right to have claims heard on a particular timetable. The Board badly misses the mark.

The Oversight Board's entire argument is based on flawed reasoning. Even assuming that the Board can choose when to initiate an objection, that says nothing about the right of claimants to have those objections promptly resolved once the Board chooses to commence proceedings. The judicial machinery exists to resolve disputes, not to provide one party with a tactical advantage by initiating litigation and holding it in stasis for negotiating leverage. It is therefore an abuse of the federal courts to file allegations "that one has no intention of pursuing." *SEC v. Oakford Corp.*, 181 F.R.D. 269, 273 (S.D.N.Y. 1998) (allowing voluntary dismissal of civil case but criticizing the "doubtful practice" of filing such claims). "Defendants have a strong interest in being able to defend themselves" against civil allegations and in obtaining a "speedy resolution" of those claims. *Fraser*, 2009 WL 1531854, at *3. That remains true in the bankruptcy context. See *In re Ellswick*, 2016 WL 3582586, at *1 n.3; *In re Glen Eagle Square*, 1991 WL 111486, at *2. The Oversight Board offers no authority for its radical claim to the contrary.

22

The Oversight Board's argument also proves too much.  If parties truly had *no* right to have objections resolved in a timely manner, it would be difficult to see how the interests of non-moving parties could ever outweigh the Board's conclusory claims about pending settlement.  The upshot is that, under the Board's argument, it could seek and likely obtain a stay at any point simply by making a settlement offer.  But "[i]f courts were to impose a stay whenever a defendant was negotiating a potential settlement . . . litigation could be prolonged indefinitely."  *Pasquale*, 1999 WL 126917, at *5.

*Second*, beyond prolonging uncertainty, a stay would also further delay the recovery of holders who are unwilling to accept the Oversight Board's meager settlement offer.  On this point, *In re DeLuca*, 194 B.R. 65 (Bankr. E.D. Va. 1996), is instructive.  In that case, shortly after a bench trial on claims arising from the removal of the debtors as managers of a real estate concern, the debtors filed a "joint plan of reorganization . . . which would, if confirmed, resolve all existing controversies," and moved to stay the court's decision pending settlement.  *Id.* at 67 n.2.  The opposing parties objected and urged the court to decide the matter notwithstanding the proposed settlement because "the settlement is dependent upon plan confirmation, which is by no means assured."  *Id.*  The bankruptcy court agreed and denied the stay.  *Id.*  It noted that, while it perceived "an obvious judicial economy" in the stay proposal, "the court must consider the adverse effect of further delay on the administration of justice and on the rights of the parties if the proposed settlement is ultimately not consummated."  *Id.*  Because the plan was subject to confirmation, which was by no means assured, the *DeLuca* court determined that a stay would be improper.  *Id.*

So too here.  For starters, the PSA has not been approved, the parties to the PSA have already acknowledged that core elements of the voting and classification scheme of the plan terms embedded in the PSA are flawed and must be amended, and no plan or disclosure statement has

been filed.  The plan described in the PSA is unconfirmable and will surely face significant

objections and protracted litigation.  The Commonwealth itself has already announced that it will

vigorously oppose the plan once it is presented to the Court for confirmation.  See Dkt. No. 102 in

Adv. Proc. 19-149.  Moreover, bondholders are virtually certain to object to the plan on any number

of grounds, including its failure to meet the Commonwealth's obligation to take reasonable steps

to maximize creditor recoveries,[12] such as by implementing reforms that the Oversight Board itself

has projected would leads to tens of billions of dollars in additional fiscal surplus (see pp. 6-7,

*supra*); its violation of the absolute priority rule by allocating recoveries to junior creditors while

the Commonwealth's constitutionally senior public debt is not paid in full;[13] and its patent

violation of the Bankruptcy Code's prohibition against unfair discrimination.[14]  Having now

acknowledged that holders of the Selectively Challenged Bonds will be entitled to vote on the

forthcoming plan (see pp. 14-15, *supra*), the Oversight Board cannot seriously expect that it will

avoid the application of these cramdown standards in the upcoming confirmation proceedings.

---

[12] In municipal bankruptcy cases, the requirement that a plan be "fair and equitable" with respect to any non-accepting class of impaired creditors, 11 U.S.C. § 1129(b)(1), is understood to require the municipal debtor to take reasonable steps to maximize creditor recoveries.  "The court must find that the amount proposed to be paid under the plan was all that the creditors could reasonably expect under the circumstances."  H.R. Rep. No. 686, 94th Cong., 2d Sess. 33 (1975).  Thus, the debtor "must exercise its taxing power to the fullest extent possible for the benefit of its creditors."  *Id.*; see also, *e.g.*, *Fano v. Newport Heights Irrigation, District*, 114 F.2d 563, 565-66 (9th Cir. 1940) (plan was not "fair" or "equitable" where there was "no sufficient showing that the taxing power was inadequate to raise the taxes to pay" creditors); *Lorber v. Vista Irrigation District*, 127 F.2d 628, 639 (9th Cir. 1942) (confirmation plan reversed where lower court had not found that "the payments provided for in the plan . . . are all that the District is reasonably able to pay in the circumstances").  And by the same logic, a debtor must take reasonable steps to reduce its spending and promote growth; it cannot seek to impose the cost of excessive spending or anti-growth policies on its creditors.  Cf. 48 U.S.C. § 2241 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms . . . .").

[13] See 11 U.S.C. § 1129(b)(2)(A), (b)(1)(B).

[14] See 11 U.S.C. § 1129(b)(1)

The Selective Claim Objection has already been pending for nearly six months without any meaningful progress.  A stay of indeterminate duration (like the one sought here) would ensure that the claim objection would sit idle while these fights rage over plan confirmation.  In all likelihood, those proceedings will lead to the Court's rejection of the Board's patently flawed plan, with the result that many months have been wasted during which progress could have been made in resolving the Selective Claim Objection and the related debt-limit litigation.  But even in the unlikely event that the Board's plan is confirmed, the end result would be to inject even further delay into bondholders' efforts to vindicate their claims through litigation, with their recovery of those holders necessarily coming long after the plan distributions of other creditors.

But there is still more prejudice beyond the delay in proving that the challenged bondholders are entitled to recovery.  If the PSA parties have their way, the billions of dollars to be paid out to collaborating bondholders in the meantime will be gone for good.  As the Court is aware from the GO Group's Conditional Objection and related proceedings, it may well turn out that the "logic" of the claim objection requires invalidation of bonds prior to the Selectively Challenged Bonds targeted by the Board.  The Oversight Board has stated to this Court that the potential invalidity of those prior bonds may be raised in the *as a defense* in the course of responding to the Selective Claim Objection. See, *e.g.*, Dkt. No. 7879, at 5 n.5.  But the Board's Stay Motion aims to ensure that any such defense, if successful, would have an unfairly muted financial impact on the challenged bondholders' recoveries because billions of dollars would already have been paid out to the prior bonds under their plan.  The Oversight Board has now explicitly acknowledged that the "logic" of the claim objection could invalidate certain of the bonds that stand to reap large recoveries under the PSA, and we have explained how that effect is even more widespread (*i.e.*, it should invalidate all PBA claims against the Commonwealth).  But

25

the stay motion nonetheless seeks to pay those disputed bondholders before the Selective Claim Objection and the defenses are considered, even though doing so could put those billions of dollars in the wrong hands and (they will no doubt argue) beyond the reach of the rightful claimants. That is the deepest form of prejudice.[15]

For the Oversight Board, of course, all of this is a feature—not a bug. The Board hopes that, if its lowball "settlement" offer represents the only path for holders of the Selectively Challenged Bonds to secure a reasonably prompt recovery, some portion of those bondholders will be induced to accept it even though it bears no relationship to the Board's odds of success on the merits. But while putting the screws to creditors that defend their rights might give the Board tactical leverage, delaying recovery will also plainly cause "further harm" to the GO Group and other non-moving holders. *In re Friedman's, Inc.*, No. 05-40129, 2006 WL 6902025, at *2 (Bankr. S.D. Ga. Jan. 25, 2006) (citing *In re Metiom, Inc.*, 318 B.R. 263, 272 (S.D.N.Y. 2004)). The holders of the Selectively Challenged Bonds should not have to "wait until [the Commonwealth is] successfully reorganized in order to be able to pursue their claims." *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (denying stay).

### b.   A Stay Will Not Benefit The Court

Staying the Selective Claim Objection now will offer virtually no benefit to the Court.

i. The typical rationale for a discretionary stay under *Landis* "is the pendency of a related proceeding in another tribunal" that, when decided, would significantly narrow the issues and assist in the determination of legal questions. *Hewlett-Packard Co. v. Berg*, 61 F.3d 101, 105 (1st

---

[15] Tellingly, the holdings of the bondholder groups that have agreed to the PSA are heavily concentrated in PBA Bonds issued in 2011, which the Oversight Board has challenged in the recently filed adversary proceedings but are proposed to be treated as undisputed bonds—and thus recover without any discount attributable to that challenge—under the Board's contemplated plan. See Ex. A; Dkt. No. 7550, at ¶ 9.c.

Cir. 1995); see also *Landis*, 299 U.S. at 249 (recognizing "power of a court to stay proceedings in one suit until the decision of another").  But unlike the typical case (and nearly every case the Oversight Board has cited), the litigation here will pick up right where it left off when the stay expires because there is no second case, and no other decisions on these issues are likely to be forthcoming from other courts.  Contra *Taunton Gardens Co. v. Hills*, 557 F.2d 877, 879 (1st Cir. 1977) (stay pending resolution of nation-wide class action); *Walsh Constr. Co. P.R. v. United Sur. & Indem. Co.*, No. 12-1401 (SEC), 2015 WL 13548470, at *4 (D.P.R. Sept. 28, 2015) (stay pending decision in bankruptcy court proceeding); *Total Petroleum Puerto Rico Corp. v. T.C. Oil, Corp.*, No. 09-1105 (JP), 2010 WL 11545626, at *2 (D.P.R. May 7, 2010) (stay pending appeal in case raising similar issue); *Rivera*, 2009 WL 3160839, at *2 (same); *Ramos-Martir v. Astra Merck, Inc.*, No. 05-2038(PG), 2005 WL 3088372, at *1 (D.P.R. Nov. 17, 2005) (stay pending transfer decision by MDL panel).

Moreover, the Court will be required to confront the Selective Claim Objection's merits (at least in large part) even under the Oversight Board's proposed plan.  While the Board claims that a stay here "might" cause some issues to "never come before the Court," Stay Motion ¶ 17, that unsupported assertion is obviously incorrect.  Given the centrality of the Selective Claim Objection to the basic structure of the Board's forthcoming plan, it is virtually certain that the Court will need to confront the Selective Claim Objection's merits in addressing objections to approval of the Oversight Board's disclosure statement and before approving the "settlement" for PSA parties embodied in the plan.  Numerous parties in interest will undoubtedly challenge the arbitrary line-drawing of the Board's classification scheme and the resulting windfall provided to the Board's preferred holders—those who own PBA Bonds and "Vintage" GO Bonds—at the expense of the Selectively Challenged Bonds.

In short, far from conserving judicial effort, a stay will require the Court to consider the probable merit (or lack thereof) of the Selective Claim Objection multiple times, and in piecemeal and non-dispositive fashion, before finally resolving the objection post-confirmation. But without a stay, the Court can move expeditiously toward a final resolution now, rather than wasting time and expense in multiple rounds of non-binding preliminary litigation over its merit. Concerns of judicial economy therefore cut strongly against a stay or, at the very least, should play a minimal role here because the Court will need to address the merits of the Selective Claim Objection in any event. See *Edwards v. Oportun, Inc.*, 193 F. Supp. 3d 1096, 1102-03 (N.D. Cal. 2016) ("judicial economy is not served by granting a stay" under such circumstances).

ii. Denying a stay would also serve the Court's interests because continued progress in the Selective Claim Objection and the related debt-limit litigation has the potential to facilitate a truly consensual settlement that would in fact resolve the Oversight Board's debt-limit challenge in a comprehensive way. By providing both sides with clarity on the governing law and the validity of the claims at issue, the Court can significantly streamline this litigation, promote judicial economy, and preserve party resources. And that approach is more likely to result in an actual consensual resolution—rather than a strongarm settlement—because once the disputes are narrowed, the parties' settlement calculus may well change. Those findings would also allow the development of a full record that "may shed light on the adequacy of the proposed . . . settlement," *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 99 F. Supp. 3d 288, 315-16 (E.D.N.Y. 2015), or otherwise avoid wasted effort at the plan confirmation stage. Instead of further indulging the Oversight Board's self-destructive gamesmanship, the Court should set about resolving the Selective Claim Objection now.

iii.  And it bears repeating that the Oversight Board's effort to short circuit the litigation of its Selective Claim Objection also undermines the Court's interests by risking the spectacle of a Court-approved windfall recovery for holders of PBA Bonds, if the Court ultimately determines—only after confirmation of a plan of adjustment—that those bondholders were in fact the proper focus of the Oversight Board's debt-invalidation arguments all along.  In the unlikely event that the Court were to conclude that the PBA is a "sham" to evade the Commonwealth's debt limit and that such a holding could be applied retroactively to invalidate prior debt issuances, the proper remedy would be to invalidate PBA Bonds and related claims by PBA against the Commonwealth—not to elevate those fraudulent claims to lawful status, to the detriment of subsequent issuances of GO Bonds.  See Conditional Objection 3-4, 19-22.  If the Selective Claim Objection proceeds toward a timely resolution, the Court may confront that question before it is asked to confirm a plan under which holders of PBA Bonds may recover almost 100 percent of their pre-petition claim against the Commonwealth.  If the litigation is delayed, however, the Court may reach the determination that the PBA Bonds should be invalidated far too late—*after* the holders of those bonds have received the outsized recovery envisioned under the PSA.

Because the Court has no interest in approving such a blatant misallocation of the Commonwealth's financial resources, the risk of a post-confirmation ruling in the debt-limit litigation that is inconsistent with the Court's confirmation decision provides yet another reason to deny the requested stay.

### c.    The Public Interest Favors Prompt Resolution Of The Selective Claim Objection And Weighs Against A Stay

The Selective Claim Objection raises important constitutional issues that left unresolved threaten to jeopardize further the Commonwealth's ongoing ability to access financing on reasonable terms.  Without knowing the proper method to calculate the debt limit, no reasonable

investor would run the risk of lending to the Commonwealth and the Commonwealth could not, in good faith, make the necessary disclosures regarding its debt capacity. And even if an investor were willing to stomach that risk, the cost to do so would be astronomical to compensate for the risk (however small) that years later their loans might too be threatened with invalidation by some party with a new theory of the debt limit and an aggressive view towards retroactive recalculations. The longer this uncertainty lingers, the worse it is for Puerto Rico.

The Selective Claim Objection also makes serious allegations about efforts by the Commonwealth and members of government to perpetrate a fraud on the securities markets and the public at large. It further alleges that the government knowingly and intentionally erected a massive "sham" agency to avoid the constitutional borrowing constraints and, as a result, left the people of Puerto Rico burdened with a crushing debt load. The public has an undeniable interest in investigating and resolving those allegations.

### d.     The Oversight Board's Request For A Stay Of Indefinite Duration Also Weighs Against Its Motion

Finally, the duration of any stay must be "within the bounds of moderation." *Landis*, 299 U.S. at 256 (stay pending district court decision and any appeal exceeded "the limits of a fair discretion"). A request for an indefinite delay "weighs slightly against staying the case." *Konopca v. Comcast Corp.*, No. 15-6044, 2016 WL 1645157, at *4 (D.N.J. Apr. 26, 2016).

Curiously, the Oversight Board omits any analysis of this factor from its motion, despite claiming that "all relevant considerations weigh in favor of a stay." Stay Motion ¶ 15. Perhaps that is because the Board's requested stay—like the stay in *Konopca*—is of indeterminate length and therefore would cut against its request. While the Board (in a footnote) alternatively requests a stay of 120 days "without prejudice to requests for further extensions," Stay Motion ¶ 22 n.11, that alternative request is largely as indefinite as the original request, just broken into 120-day

30

chunks.  No matter how the Board dresses up its request—as an entirely indefinite one or a request for an arbitrary fixed term that it could seek to renew ad infinitum—it remains an indeterminate length and that weighs against a stay.  See *Horn v. D.C.*, 210 F.R.D. 13, 16 (D.D.C. 2002).

* * *

Because the balance of equities here tips solidly against a stay, the Stay Motion should be denied even if the Oversight Board could articulate some form of cognizable hardship (which it has not done).

## CONCLUSION

The Stay Motion should be denied.

Dated: July 11, 2019

Respectfully submitted,

/s/ J. Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

/s/ Lawrence S. Robbins
Lawrence S. Robbins
Mark T. Stancil
Gary A. Orseck
Kathryn S. Zecca
Donald Burke
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Email: lrobbins@robbinsrussell.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*