UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

RECEIVED & FILED
2019 JUL 12 PM 4:56
CLERK'S OFFICE
U.S DISTRICT COURT
SAN JUAN P.R.

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

   as representative of

THE COMMONWEALTH OF PUERTO RIC0,
*et al.*,

   Debtors.

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

---------------------------------------------------------------x

**[Response to Docket#7640 and #7667]**

**RESPONSE OF INDIVIDUAL GENERAL OBLIGATION BONDHOLDER TO
MOTION OF FOMB TO STAY CONTESTED MATTERS PENDING CONFIRMATION
OF COMMONWEALTH PLAN OF ADJUSTMENT**

Dated: July 9, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................................1

I. NO STAY SHOULD BE GRANTED, PARTICULARLY IN LIGHT OF THE OVERREACHING AND ILLEGITIMATE TERMS OF THE PLAN SUPPORT AGREEMENT, AND FOMB'S ABUSE OF THE TITLE III PROCESS TO ABROGATE INDIVIDUAL BONDHOLDER RIGHTS ...................................................2

    A. The overreaching and illegitimate terms of the Plan Support Agreement ...............2

    B. FOMB's abuse of the Title III process to abrogate bondholder rights ....................7

II. FOMB'S FAILURE TO NOTIFY INDIVIDUAL BONDHOLDERS OF ITS STAY MOTION (INCLUDING INDIVIDUALS FOMB HAS SUED), AND FOMB'S CONTINUED RESORT TO "URGENT MOTION" PRACTICE, UNDERSCORE THE NEED FOR THE PROCEDURAL RELIEF I HAVE SOUGHT ...............................................................................................................................11

CONCLUSION ............................................................................................................................15

HEIN DECLARATION AND ATTACHED EXHIBITS
    (Exhibits A through P, sequentially numbered 001 to 068)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*County of Moultrie* v. *Rockingham*,
    92 U.S. 631 (1875) .................................................................................................. 8

*Town of Coloma* v. *Eaves*,
    92 U.S. 484 (1875) .................................................................................................. 8

**Other Authorities**

Alexander Hamilton, Sec. Treasury, Report Relative to a Provision for the Support of
    Public Credit, January 9, 1790, available on Founders Online
    (https://founders.archives.gov/documents/Hamilton/01-06-02-0076-0002-0001) .................... 15

## PRELIMINARY STATEMENT

FOMB turns justice on its head with its backward "Plan-confirmation-judgment-first, adjudication-of-rights-afterward" gambit. FOMB moves to "stay contested matters" — such as the "GO Objections" — "in light of the proposed compromise and settlement of the issues embodied in the Plan Support Agreement and Proposed Plan." Docket#7640-page-5-of-20.

So who filed the "GO Objections" that FOMB seeks to stay? Well, none other than FOMB itself (joined by the UCC). Docket#7640-page-8-of-20. FOMB thus seeks to advert a ruling on the legal merits of its own asserted positions.

So why does FOMB now seek to stay adjudication of its own asserted positions? Well, says FOMB, "discussions with creditor parties in an attempt to gather additional support" for its proposed plan "would be frustrated if one of the fundamental pieces of groundwork for the proposed plan — the option to settle out of the GO Objections — were disrupted by a shifting litigation landscape." Thus, says FOMB, a stay of the GO Objections "pending confirmation of a plan" is "essential." Docket#7640-page-7-of-20.

But FOMB's phrase "shifting litigation landscape" is a euphemism for FOMB's tacit recognition that, if there is an adjudication, its contrived positions will be rejected.

FOMB says there have been "extensive negotiations" that have led to a "compromise and settlement" of the GO Objections. Docket#7640-page-6-of-20. But the "extensive negotiations" were with a number of funds that bought-up GO (or Commonwealth guaranteed) bonds at distressed prices and thus will actually profit from the supposed "compromise and settlement." *See, e.g.*, Docket#7540-page-12-to-13-of-19; Docket#7732-page-5-to-8-of-10; Section I.A, below. People who would lose from the supposed "compromise and settlement" — individual investors who purchased pre-PROMESA at or about par — were not included in the "extensive" (and secret) "negotiations" and are not parties to the "compromise and settlement."

A thought experiment: A, B, and C negotiate with a representative of the Commonwealth and agree to a settlement whereby X, Y, and Z (not part of the negotiations) will have their

property taken by the Commonwealth, and benefits from the taking will be shared between A, B, and C, on the one hand, and the Commonwealth, on the other hand. That is an unlawful taking — it is not a "compromise and settlement" in any legitimate sense of the term. And such an unlawful taking is what is proposed here.

FOMB's attempt to reprise its COFINA strategy — side-step adjudication of rights and instead use secret negotiations, in which special benefits are used to marshal support for a plan, followed by votes on a plan by self-interested parties who receive special benefits, all at the expense of unrepresented individual investors who bought pre-PROMESA — should be rejected. To allow FOMB to reprise its COFINA strategy, and thereby further victimize individual retail bondholders, like me, would be unconstitutional and unlawful, as well as extraordinarily unjust. The rule of law requires "adjudication-of-rights-first, Plan-confirmation-judgment-afterwards."

## I. NO STAY SHOULD BE GRANTED, PARTICULARLY IN LIGHT OF THE OVERREACHING AND ILLEGITIMATE TERMS OF THE PLAN SUPPORT AGREEMENT, AND FOMB'S ABUSE OF THE TITLE III PROCESS TO ABROGATE INDIVIDUAL BONDHOLDER RIGHTS

### A. The overreaching and illegitimate terms of the Plan Support Agreement

The concerns about FOMB's plans and intentions that I expressed in my June 15, 2019 response (Docket#7540) to FOMB's amended motion (#7154) to establish revised procedures are shown to have been well-based. In my June 15, 2019 response, I expressed concern that the "game" FOMB is playing is to (1) begin invalidation proceedings to create a (contrived) "litigation" risk excuse that can be used in another secret "negotiation" process (like that used in the COFINA situation), or in Plan confirmation, to bolster FOMB's efforts to cut some part of the debt, yet (2) (as in the COFINA situation) avoid a final legal adjudication, which would reject FOMB's assertions. I also noted that FOMB's counsel had stated at the June 12, 2019 hearing that negotiations were going on with some parties — however, neither I nor (to my knowledge) other individual bondholders had been included. Docket#7540-page-10-of-19.

Now, based on FAFAA's EMMA posting on June 17, 2019,[1] we learn that as of **May 31, 2019** — that is the date of the Plan Support Agreement (a date almost two weeks before the June 12 hearing) — FOMB, as representative of the Commonwealth, had entered into a Plan Support Agreement ("PSA") with approximately ten fund managers. This PSA is (among other concerns) extraordinarily unfair to individual investors, such as me, who purchased Commonwealth GO bonds, pre-PROMESA, in good faith, at a time that Puerto Rico professed the sanctity of its commitments (as well as its compliance with applicable law).

The terms of the PSA echo the nature of the COFINA plan:

1. Negotiated in secret, with confidentiality agreements between the "Government Parties" and self-selected bondholders, and secret negotiations apparently going as far back as at least March 14, 2019 (Term Sheet p. 1).

2. Up to $300 million of fees to be shared by the self-selected bondholder negotiators, at least a portion of which (the "Consummation Costs") are stated to be computed as 1.25% of the "aggregate" amounts of PBA Bond Claims and CW Bond Claims — *i.e.*, bondholder negotiators will be paid Consummation Cost fees calculated based on the amount **my** holdings and claims (and the holdings and claims of all other bondholders), but only the bondholder negotiators who signed the PSA by May 31, 2019 (before it was even disclosed to other bondholders) get such fees. (Term Sheet pp. 18-19, PSA p. 23 § 7.1).

3. If the bondholder negotiators have $2,764.5 million of GO (and PBA) bonds (*see* Docket#4871 and #7465, discussed in footnote 3 below), and receive the $300 million maximum of fees, this would represent over 10.8% of the par amount of their holdings. If those holdings were acquired at the depressed prices that have prevailed at times since PROMESA was enacted, the fees alone could cover one-half of the cost paid by a PSA signatory for some of their bonds

---

[1] Go to EMMA website and type into Google "EMMA Municipal Securities Rulemaking Board"; type in a GO CUSIP (*e.g.*, 74514LB63, a series 2012A CUSIP); click on "Disclosure Documents"; scroll down to "Event Filings", and then "Other Event-based disclosures", and click on 6/17/2019 filing. The Plan Support Agreement begins at PDF page 3 of the 6/17/2019 event filing; the attached term sheet begins PDF page 53; and the promotional PowerPoint begins PDF page 88.

(*e.g.*, certain bonds traded at prices as little as 20% of the par amount ($20 per $100 par), or less, at times (*see* Docket#7540-1-page-18-to-19-of-70, showing prices for 6% coupon bonds originally sold by Puerto Rico in 2009). A 1.25% Consummation Cost fee, calculated based on the "aggregate amount of PBA Bond Claims and CW Bond Claims" (apparently $17.794 billion) (*see* FOMB's 6/16/19 PowerPoint p. 10), would by itself be $222,425,000, or over 8% of the par amount of the holdings of bond negotiators.[2]

4. Recoveries are skewed to the particular bonds that (surprise of all surprises) bondholder negotiators happen to have bought up. The Term Sheet indicates bondholder negotiators may recover up to 89.4% of their claims (which are based on the par amount of the bonds) + hundreds of millions of dollars of fees (which could push bondholder negotiator recoveries at or above par, even for bonds the negotiators bought at depressed post-PROMESA prices), and perhaps even more (Term Sheet pp. 7, 8-9, 18-19).

5. The Term Sheet is express that "[f]or the avoidance of doubt, **neither** the Consummation Costs **nor** the PSA Restriction Fee will be included for purposes of calculating the Bond Recovery Cap." (Term Sheet "M" last sentence, p. 19, emphasis added).

6. Selected holders may also share up to $900 million of "Excess Cash". Term Sheet pp. 8-9, 11, 12. A complex formula — involving over 20 references to elsewhere-defined terms — must be navigated to figure out what more, on top of the Bond Recovery Cap, these lucky holders will receive. Term Sheet p. 7 & n.6.

7. Some holders share an over $1 billion "administrative expense" claim, and some holders receive an allowed claim that includes accrued and unpaid interest, while others do not. Term Sheet p. 3.

8. Meanwhile, non-negotiators who bought pre-PROMESA, paying at or about par, may receive recoveries of as little as 45% or 35% or worse (Term Sheet pp. 6-7).

---

[2] After serving Docket#7732, I realized *all* of the numbers in the "Claim" column on PowerPoint p. 10 should be aggregated.

-4-

9. Information on bondholder negotiators' holdings is blacked-out, and thus concealed, in the publicly-filed version of the PSA (PSA pp. 29-38), and no information is provided in the PSA filing as to when bondholder negotiators acquired their bonds or what series are held. However, as was the case for members of the senior COFINA bondholder coalition and other funds in the COFINA situation, the PSA bondholder negotiator purchases were no doubt largely post-PROMESA, at distressed prices – thus producing large profits at the proposed recovery levels for bondholder negotiators, whereas by contrast non-negotiators who bought pre-PROMESA at or above par suffer large losses.[3]

10. Despite the fact that disfavored GO bonds were issued with the same unequivocal statutory and Constitutional "irrevocable pledge" and "first claim" on available Commonwealth resources as favored GO bonds (*see, e.g.*, Docket#7540-page-16-to-17-of-19) – under the PSA and the anticipated Plan, classes are gerrymandered to segregate and discriminate against disfavored GO bonds (Term Sheet pp. 12-15) and disfavored bondholders "shall **not** be entitled to vote" (Term Sheet pp. 13-14).

So FOMB is not satisfied with invoking the PROMESA "voting" mechanism to unconstitutionally retroactively abrogate rights and interests of those to whom the Commonwealth made an "irrevocable pledge" of a "first claim" on its available resources and who bought pre-PROMESA at or about par. Rather, disfavored bondholders, including individuals whom FOMB did not include in its secret negotiations, would not even be allowed to vote their disfavored bond claims. And segregating disfavored bondholders – despite all having

---

[3] Based on the limited available information, members of the QTCB Noteholder Group (3 PSA signatories, Canyon, Davidson Kempner and OZ Management), which first filed a disclosure of holdings on August 16, 2017 (Docket#1053), increased holdings of uninsured GO bonds from $680.5 million on August 16, 2017 (Docket#1053, #3778) to $1,482.6 million as of January 18, 2019 (Docket#4871). The "Lawful Constitutional Debt Coalition" first filed a disclosure on February 26, 2019 showing that its 3 members (Golden Tree, Whitebox and Monarch) held $741.6 million of uninsured GOs (Docket#5252). By June 17, 2019, that group had 7 members and a total of $1,281.9 million of uninsured GOs (Docket#7465). The limited disclosures do not identify the particular series held or when or at what prices bonds were acquired.

the same security – into separate classes could have the same pernicious effect even if those disfavored bondholders were allowed to vote within their segregated class.[4]

11. Section 7.4 of the PSA states that the parties to the PSA "at all times" "acted" "solely for themselves." No kidding! While one cannot credit the parties' self-serving claim to have engaged in good faith negotiations, it is plain that the PSA negotiators were – as they admit – acting "solely for themselves." (PSA p. 24).

The PSA sponsored by FOMB is accompanied by a promotional PowerPoint, imprinted with FOMB's seal, with a chart that purports to compare Puerto Rico's "Debt Service as a % of Own-Source Revenues" to that of states, purporting to show Puerto Rico in 2015 as having a 28.1% debt-service-to-own-source-revenue ratio in 2015.[5] But FOMB's chart is misleading: FOMB ignores the critical fact that Puerto Rico residents generally do **not** pay federal income taxes and thus do **not** bear the burden of paying the federal debt. A proper, apples-to-apples "comparison of the public debt levels of Puerto Rico with the states" — used by the Commonwealth itself when selling its debt — "should include state, local and federal debt." These are **not** my words; these are the words **the Commonwealth itself** used when seeking to sell bonds to investors. *See* Hein Ex. A, 002 (Docket#4606-8-page-57-of-180; full document at #4606-8-page-1-of-180 et seq.).

When selling bonds to investors, the Commonwealth correctly pointed out that:

> **If one factors in the federal debt load, PR would rank last in outstanding debt per capita amongst all US jurisdictions.**
> (Ex. A, 002 and Docket#4606-8-page-57-of-180)

---

[4] While here I point out the pernicious and discriminatory aspects of FOMB's plans to deprive bondholders of any vote, and to segregate disfavored bondholders into gerrymandered classes, an overarching Constitutional barrier to FOMB's scheme also exists. PROMESA cannot retroactively change the rules for bonds bought pre-PROMESA, and a "vote" by some cannot constitutionally alter the rights and interests of other, pre-PROMESA, purchasers. *See* Docket#7540-page-15-to-18-of-19.

[5] FAFAA 6/17/2019 Event Disclosure on EMMA, FOMB promotional PowerPoint dated 6/16/2019, p. 5 (PDF page 93 in the Event Disclosure referenced in footnote 1).

And, the Government Development Bank for Puerto Rico, in its official website discussion of Puerto Rico's GO debt, was express that the constitutional **"debt limitation has never been reached."** Hein Ex. B, 004, 6/24/2019 screenshot from GDB website, p. 2.[6]

### B. FOMB's abuse of the Title III process to abrogate bondholder rights

The GO (and Commonwealth guaranteed) bonds were issued with a statutory and Constitutional "irrevocable pledge" and "first claim" on available Commonwealth resources. *See* Docket#7540-page-4,16-to-18-of-19; Docket#4913-page-2-to-4,6-to-7-of-10; Motion to dismiss filed by certain GO bondholders in, *e.g.*, Adversary 19-00291, Docket#10 (Points I, IV and V).[7]

Yet nothing has been paid on bonds issued with the Commonwealth's statutory and Constitutional "irrevocable pledge" and "first claim" on available Commonwealth resources, even while the Commonwealth pays virtually every expense imaginable — plus hundreds of millions of dollars of expenses for these Title III proceedings (on track to cost over $2 billion). *See, e.g.*, Docket#4585-page-33-to-39-of-43; #4673-page-12-to-13-of-17; #4606-3 to #4608-8, including #4606-3-page-11-of-13-¶¶ 44-48-and-Exhibits-V-to-AA. Thus:

- The proliferation of advertising, representation, artistic services and consulting contracts continues unabated. *See* https://contratos.ocpr.gov.pr (Office of Comptroller of Puerto Rico-Registry of Contracts); Docket#4585-page-36-of-43; #4606-3-page-11-of-33-¶¶ 46-47-and-exhibits-X,Y,Z; #4673-page-12-to-13-of-17.

- The Puerto Rico Comptroller's database shows 4,825 "Advertising, representation or artistic services" contracts since May 3, 2017 (when FOMB authorized the filing of

---

[6] Type into Google "Investor Resources – Government Development Bank Puerto Rico – Tax Exempt Securities by Issuer"; click on "Commonwealth".

[7] What appear to be similar motions to dismiss have been filed in Adversary 19-00292 (Docket #5), 19-00295 (Docket #6), 19-00296 (Docket #4), and 19-00297 (Docket # 5).

the Commonwealth's Title III Petition, Docket#1-page-4-of-16). Hein Ex. C, 009.[8]
The number in the year since July 1, 2018 is 2,618. Hein Ex. D, 013.

- Scrolling down the listed contracts, one sees contracts for what are described as "Advertising Services", "Artistic Services", "Camarógrafo Services", "Public Relations Services", "Photograph Services", "Press Officer Services", "Producer Services", "Media Monitoring Services", and the like. *See* Hein Ex. C (pdf screenshot is cut off on the right, but website shows the full descriptions).

- Change the "service category" to "consulting", and one finds 4,811 consulting contracts since May 3, 2017, and 2,315 since July 1, 2018. Hein Exs. E & F.

Just as a picture might be worth 1,000 words, paying photographers while nothing is paid on bonds — despite a statutory and Constitutional obligation to pay bondholders first — speaks volumes about what is going on here. The U.S. Supreme Court's criticism of tactics akin to those employed by FOMB here — stating that "it would be tolerating a fraud" (*County of Moultrie v. Rockingham*, 92 U.S. 631, 637 (1875)) to sanction the "dishonesty" (*Town of Coloma v. Eaves*, 92 U.S. 484, 485 (1875)) of a government that issues bonds, takes the money and then claims the bonds do not have to be repaid because the government itself (assertedly) lied to bondholders — is apt indeed.

Because nothing has been paid on the Commonwealth's GO (and guaranteed) bonds, even despite unchecked expenditures, cash balances continue to accumulate. The Commonwealth's TSA cash balance now exceeds $7.1 billion (Hein Ex. G, 022), and overall cash balances exceed $14 billion (Hein Ex. H, 026).[9] Notably, it appears that the

---

[8] Type into Google "contratos.ocpr.gov.pr."; in "Service Category" scroll down and click on "Advertising, representation or artistic services"; in field for "Effective Date" select May 3, 2017 to July 5, 2019; a screenshot of the first page of results is attached as Ex. C (the bottom of the page, 009, shows 4,825 responsive records).

[9] Excerpts are attached. Full versions of the TSA report and summary of account balances are available on the AAFAF website, under the Publications and Reports tab.

Commonwealth is not even earning interest on its $7.1+ billion TSA cash balance. *See* Docket#7211-1-page-26-to-27-of-146; Hein Exs. O and P.[10]

Because the Commonwealth has not been required, to date, to pay even interest on its debt — much less pay back principal — the worst instincts of politicians have been enabled. Why not spend money on "public relations services"? Why not pay Christmas bonuses to public employees (who are also voters) (as has occurred every year despite not paying debt service, *see* Docket#4585-page-36-of-43-&-n.16)? Why not let billions of dollars sit in local banks with the owners of the banks, not the Commonwealth, earning interest on the funds?

And the FOMB, too, is free to indulge its worst instincts: The expenses of these Title III proceedings are on track to exceed $2 billion. *See* Docket#4673-page-12-to-13-of-17. Adding to the extraordinary expenses of these proceedings, we now have a 750-page fee application from Brown Rudnick, retained as "Claims Counsel" (Docket#7756), seeking interim fees for the period through May 31, 2019 that will bring its total up to $6,159,895 for the 6 months since its retention on November 28, 2018. Docket#7756-page-5-of-58. As previously stated, I object to any payment of any litigation expenses for counsel for FOMB, the Commonwealth or the UCC, until the default on the GO bonds (and Commonwealth guaranteed bonds) is cured and payments on the bonds are brought up to date (*e.g.*, Docket#6128-1-page-6-of-11; #6151-page-2-of-3; #7540-page-10-to-11-of-19).

The unconstitutionally constituted FOMB — in place for almost three years now — has permitted hundreds of millions of dollars to be spent on efforts to evade debt obligations, yet one principal objective of PROMESA — to ensure prompt issuance of audited financial statements — has fallen by the wayside. As of this date, the last issued audited Commonwealth financial

---

[10] Hein Ex. O is contract 2018-00172 between Banco Popular and the PR Treasury, which provides in Section 7, last sentence: "The Bank will not pay interest to the customer ... ." 057. The contract (page 2, 054) references account 030-049458, also referred to in Circular Letter 1300-33-18, Item 8.c (page 3, 066) (Hein Ex. P). The contract and circular are signed by Raul Maldonado. (To find Ex. O, go to contratos.ocpr.gov.pr.; specify "1031 Department of Finance" in "Government entity" and "Banco Popular" in "Contractor". Scroll down to 2018-000172. Click on green "Documents" icon in right column.)

statement, for the fiscal year ending June 30, 2016, came out on May 3, 2019, 1037 days after the close of the fiscal year ended June 30, 2016. By contrast, before the Commonwealth adopted a refusal-to-pay-bonds strategy, the time from close of fiscal year end to issuance was 365 days.[11] And reports of mismanagement and corruption abound. As just one of many examples, *see, e.g.*, "FBI Is Probing Corruption in Puerto Rico Government Contracts," Bloomberg, 6/27/2019 (referencing comments by FBI special agent Douglas Leff) (Hein Ex. I, 027).

While spending is largely unrestrained, the tax burden in Puerto Rico continues to be significantly lower than the OECD country average and in the 50 states. *E.g.*, Docket#4585-page-35-of-43. Commonwealth tax incentives that result in low rates for preferred businesses and individuals remain in place. The government website (www.ddec.pr.gov/emprender-en-pr) lists some of the tax incentives, including a corporate tax rate of 4%, 100% exemption from taxes on dividends or distributions and 100% property tax exemption (under "Distribution").

The government website links to "Invest Puerto Rico" (www.investpr.org/articles/lets-get-to-work), which repeats a summary of the Act 20 tax incentives for export services businesses. Plus, there is an "Individual Investor Incentive," which includes a 100% tax exemption on all dividends, interest income and capital gains. The "Incentive for the Development of Puerto Rico" (Act 73) offers a 4% fixed income tax rate, 1% income tax rate for innovative firms and 100% tax exemption on dividend distribution. "Other Incentives" exist for private equity (Act 185), financial institutions (Act 273), international insurers and reinsurers (Act 399), young entrepreneurs (Act 135), tourism (Act 74) and renewable energy (Act 83).

In December 2018, the Commonwealth actually reduced taxes by billions of dollars. *See* Docket#4585-page-37-of-43; Docket#4606-8-page-167-to-170-of-180; #7211-1-page-25-to-26,81-90-of-146. And, now, the Commonwealth is going even further, reducing more taxes and providing more tax incentives. Act 60, the Puerto Rico Incentives Code, was signed into law at the end of June 2019 and includes: tax credits for the film industry (40% credit, but possible

---

[11] *Compare* June 30, 2016 financials (opinion is dated May 3, 2019) with June 30, 3013 financials (opinion is dated June 30, 2014). Hein Exs. J, 030-031 and K, 032-033.

additional credits of 15% and 20%); the exclusion of cryptocurrency from capital gains tax for individual resident investors; tax benefits for the video gaming and fantasy sports industries; and a $1,000 contribution to an account for each kindergarten student. The legislation is 500 pages long; an excerpt including the Statement of Motives and an article describing some of its provisions are submitted in Hein Exs. L and M.

So tax reductions and "incentives" for favored parties are adopted or continued even as the Commonwealth — despite $7.1+ billion in cash in its TSA account, and $14+ billion all together in various accounts — refuses to pay its GO (and Commonwealth guaranteed) debt, and ignores the statutory and Constitutional "irrevocable pledge" and "first claim" on available resources, and even as the FOMB, complicit in this refusal, does nothing to force payment.

## II. FOMB'S FAILURE TO NOTIFY INDIVIDUAL BONDHOLDERS OF ITS STAY MOTION (INCLUDING INDIVIDUALS FOMB HAS SUED), AND FOMB'S CONTINUED RESORT TO "URGENT MOTION" PRACTICE, UNDERSCORE THE NEED FOR THE PROCEDURAL RELIEF I HAVE SOUGHT

1. FOMB seeks to impose its backward "Plan-confirmation-judgment-first, adjudication-of-rights-afterward" gambit without notifying individual bondholders of its Motion to Stay (as best I can tell, based on FOMB's failure to serve both me and my wife, and failure to serve at least two others as well). Even individual bondholders who FOMB has actually sued, and who have filed Notices of Participation, were not served. This, alone, warrants denial of FOMB's motion. FOMB's multiple departures from appropriate process also underscore the necessity of the procedural relief I have sought. Thus:

a. FOMB continues to engage in supposed "urgent motion" practice — such as Docket#7528, that preceded FOMB's subject Motion to Stay (Docket#7640) — without providing individual bondholders notice and an adequate time to respond. As previously noted, despite the fact I had served and sent to the clerk's office on Saturday, June 15, 2019 a response to Docket#7137 and #7154, I was never served with Docket#7528 (the "Urgent Joint Motion"), which FOMB filed around noon on Friday, June 21, 2019. Docket#7732-page-3-to-4-of-10.

Perhaps — despite my timely service of my June 15, 2019 response, and the fact the Clerk's office "clocked" it in on June 17 3:33 pm (Docket#7540-page-1-of-19; *see also* #7540-3-page-1) — because the Clerk's office had not "**docketed**" my response until June 21 4:42 pm,[12] I was excluded from those served.

I was also not contacted about the "Urgent Joint Motion," in contrast to FOMB's efforts to reach counsel for some large bondholders, *see* #7528-page-9-of-11-¶23. And it does not appear that any effort was made to serve the "Urgent Joint Motion" on other individual bondholders — including those who filed notices of participation or whom FOMB has sued.

b. FOMB also failed to serve its Motion to Stay (#7640) and Amended Notice of Motion to Stay (#7667) on both me and my wife, suggesting FOMB also failed to serve other individual bondholders who FOMB has sued and/or who have filed Notices of Participation.[13] This failure is inexplicable because in my Response to #7528 — served by email on June 24, 2019 on, *inter alia*, multiple FOMB attorneys (#7732-2-page-1-to-4-of-5) — I expressly complained about FOMB's failure to serve the #7528 "Urgent Joint Motion" on me (and other individual bondholders). *See* #7732-page-4-of-10. FOMB's repeated failure to serve, even by email, individual bondholders who FOMB has sued or who have filed Notices of Participation, is doubly inexplicable because FOMB has available Prime Clerk, the noticing and claims agent for the Commonwealth, to effectuate service of its papers on all individual bondholders.

---

[12] My June 15 papers were not docketed by the clerk's office until June 21, 2019 at 4:42 pm, despite multiple calls to the Puerto Rico District Clerk's office. Docket#7732-page3-to-4-of-10.

[13] Docket#7640 asserts that notice was given to "all parties that filed a Notice of Participation relating to the Objection Procedures" (Docket#7640-page-16-of-20), but neither I nor my wife (who filed her own Notice of Participation, Docket#5378) received it. My wife did receive by email **other** papers served by UCC's counsel (*e.g.*, Docket#7583), so the fact that neither of us received #7640 and #7667 suggests that notice to "all parties that filed a Notice of Participation" did not occur. Two other GO bondholders who filed Notices of Participation have also told me they did not receive #7640 or #7667. Docket#7667 is the Amended Notice that actually specified the objection deadline and hearing date, and it does not include a statement with respect to whom it was served on. Certificates of service (#7754 and #7783) only refer to service on the "Master Service List," which does not appear to include all of the individuals who were sued by FOMB or who filed Notices of Participation.

c. It likewise appears that FOMB has not notified hundreds of individual bondholders, who FOMB has sued in adversary proceedings, of the fact they have been sued, much less serve them with motion papers (Docket#7528,#7640 and #7667) that affect them.[14]

d. FOMB's failure to provide notice of the Urgent Joint Motion, Motion to Stay and Amended Motion (#7528, #7640 and #7667) to (at least) all individual bondholders who FOMB has sued or who have filed Notices of Participation — even despite my prior complaints about lack of procedural due process — is reason enough to deny FOMB's Motion. Individual bondholders are entitled to advance notice of, and a meaningful opportunity to respond to, FOMB's "Plan-confirmation-judgment-first, adjudication-of-rights-afterward" gambit.

e. Notices to individual bondholders not only need to be given – they need to be comprehensible and provide clear and feasible instructions on what to do to respond. The dense, two or three pages of instructions in Docket#7640 and #7667 for how to serve a response are likely incomprehensible to most individual bondholders. There is no clear statement to the effect of "If you wish to respond to this motion, mail your response to: 'Clerk's Office, United States District Court, Federal Building, Room 150, 150 Carlos Chardon Avenue, San Juan, Puerto Rico 00918-1767'". And names and street addresses for over 30 attorneys are listed (in a dense format) but no email addresses are provided. When papers are served on individual bondholders,

---

[14] As I was preparing this response to Docket#7640 and #7667, I figured out how to navigate the Prime Clerk website to look for and find some of the motions to dismiss in adversary proceedings that I had heard mentioned in Court when I attended the June 12, 2019 hearing. As I read through this material over the July 4th holiday weekend, I noticed my name listed as a defendant in one of the lawsuits FOMB has filed. No one had notified me that I had been named as a defendant. I periodically search the Prime Clerk Commonwealth master docket (#3283) for my name, in order to check if my papers have been filed yet. Even my Notice of Participation (Docket#5377) comes up with such a search. But the fact FOMB had sued me did not come up through such searches of the docket. The adversary proceedings FOMB has filed appear to name literally hundreds of individuals, as well as institutions. The names are not listed in alphabetical (or any other intelligible) order. Someone would have to locate the potentially pertinent adversary proceedings (no easy task without first knowing the adversary proceeding number), then open and page through numerous potentially pertinent adversary proceedings, and then read through multiple long lists of defendants, to discover they had been named. Needless to say, I reserve all rights and objections, including to service, jurisdiction and otherwise.

there needs to be a **clear** statement of email address(es) to which responses are to be directed (and, if my proposal for designating a single email address for a party, such as Prime Clerk, who could then transmit documents to the Clerk's Office for filing and service is not adopted, a **clear** statement of the Court Clerk's mailing address). Any instructions also need to be self-contained, without cross-references to other documents. The absence of multiple individual objections to FOMB's Motion to Stay cannot be interpreted as satisfaction by individual bondholders with FOMB's conduct — rather, it is a function of FOMB's failure to provide notice and clear instructions on how individuals may respond.

2. FOMB's apparent repeated failure to serve papers on individual bondholders who FOMB has sued, or who have filed Notices of Participation, yet further underscores the necessity for the procedural relief sought by me in Docket#7540 (as well as my prior filings, including Docket#6128, 6487, 4913, 5103, 5377 and 6151) to ensure that I (and other individual bondholders) have both actual notice and a meaningful opportunity to be heard.

Puerto Rico local rules do not preclude the relief I have sought. For example, the 2014 Puerto Rico CM/ECF manual, while stating "Pro se litigants shall not file electronically" (page 5, 051), also states elsewhere that "The Court may also grant a pro se litigant access to file electronically in a particular case ..." (page 6, 052). *See* Exhibit N, 051-052. And local rule 9037-1 (focused on redaction of personal data) does not preclude making transcripts available to participants on an access-controlled website such as that FOMB proposed setting up (in Docket#7154-page-9-to-10-of-14). In any event, local rules must give way to the U.S. Constitution. For example, if the Court makes or explains its rulings on the record at hearings, individuals have a right to copies of the transcripts that contain rulings affecting their rights (or the Court's explanations thereof), without waiting 90 days or paying transcription fees.

Furthermore — even apart from FOMB's apparent repeated failure to provide notice and to serve its Motion to Stay papers on individual bondholders (even individuals FOMB has sued) — the fact that FOMB appears intent on reprising the same illegitimate and unconstitutional course of action taken in the COFINA situation also underscores that the measures I have urged

-14-

in Docket#7540 (and my prior filings referenced therein), are essential in order to have a process that is even potentially fair to individual, pre-PROMESA purchasers, like me. FOMB should not be permitted to continue to act in concert with funds who purchased at distressed prices, post-PROMESA, to further injure individuals who bought pre-PROMESA, in good faith. Any delay in leveling the playing field will further prejudice individual investors like me.

## CONCLUSION

In Hamilton's words: rather than act in "good faith" to honor the Commonwealth's debt, so as to remain "respected and trusted", FOMB has pursued "an opposite conduct." Docket#7540-page-18-of-19. FOMB is on course to repeat the violations of rights of individual bondholders that occurred in the COFINA situation. *E.g.*, Docket#7211 and prior filings cited therein (#7211-page-5-of-24).

The only way to avoid a reoccurrence of the abuse of individual pre-PROMESA bondholders that occurred in the COFINA situation, and to uphold the rule of law, is to have final adjudications — by judicial decisions filed in the public record, followed by any necessary appellate rulings — of any (contrived) issues about validity **before** any Plan is considered. No stay or delay of the adjudication of FOMB's (contrived) validity challenges should be permitted on account of FOMB's assertions that it will be offering a Plan premised on the PSA.

I reserve and assert all of my rights, including my rights under the U.S. Constitution, and specifically including my position that the FOMB was appointed in violation of the Appointments Clause, that FOMB's actions are void, and that these proceedings should be dismissed. *See, e.g.*, #5377-1-page-1-of-1; #6128-1-page-10-to-11-of-11. If these proceedings are not dismissed, FOMB's motion should be denied, and the procedural relief I have sought in Docket#7540 and in prior papers should be granted.

July 9, 2019

Respectfully Submitted,

*[signature]*

Peter C. Hein, Pro Se
101 Central Park West, Apt. 14E
New York, NY 10023
petercheinsr@gmail.com

-16-