## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| *In re*<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>                              Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## AMBAC ASSURANCE CORPORATION'S MOTION TO STRIKE CERTAIN PROVISIONS OF THE PLAN SUPPORT AGREEMENT BY AND AMONG THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, CERTAIN GO HOLDERS, AND CERTAIN PBA HOLDERS

**FERRAIUOLI LLC**

221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001

**MILBANK LLP**

55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5770
Facsimile:  (212) 822-5770

***Attorneys for Ambac Assurance Corporation***

---

[1]  The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................... 1

JURISDICTION AND STANDING ...................................................................... 4

ARGUMENT ........................................................................................................ 9

    I.    The PSA Is Inconsistent With The Oversight Board's Duties Under
    PROMESA.....................................................................................................9

        a.    The PSA denies creditor rights guaranteed in PROMESA...................... 10

        b.    The PSA delegates authority that Congress expressly reserved to
        the Oversight Board. ............................................................................. 13

        c.    The PSA improperly constrains the Oversight Board by tying it to
        an unconfirmable plan of adjustment...................................................... 15

    II.    The Court Should Strike The Breakup Fee Provision and Other Provisions
    Of The PSA That Violate PROMESA Now. .............................................19

CONCLUSION.................................................................................................... 20

CERTIFICATE OF SERVICE ........................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Eberly v. Moore*,
65 U.S. 147 (1860)................................................................................4

*In re Genco Shipping & Trading Limited*,
509 B.R. 455 (Bankr. S.D.N.Y. 2014).....................................................16

*In re Jefferson Cnty, Ala.*,
491 B.R. 277 (Bankr. N.D. Ala. 2013) ....................................................12

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) .....................................................18

**Statutes**

11 U.S.C. § 105 .........................................................................................4-5

11 U.S.C. § 362 .........................................................................................12

11 U.S.C. § 502 .........................................................................................11

11 U.S.C. § 922 .........................................................................................12

11 U.S.C. § 1109 ........................................................................................6

11 U.S.C. § 1125 ........................................................................................8

11 U.S.C. § 1129 ........................................................................................18

28 U.S.C. § 1331 ........................................................................................4

48 U.S.C. § 2121 ........................................................................................9

48 U.S.C. § 2126 ........................................................................................4

48 U.S.C. § 2141 ........................................................................................18

48 U.S.C. § 2147 ........................................................................................14

48 U.S.C. § 2161 ........................................................................................11, 12

48 U.S.C. § 2165 ........................................................................................5

48 U.S.C. § 2172 ........................................................................................13

48 U.S.C. § 2174..................................................................................................................17

48 U.S.C. § 2231..................................................................................................................11

**Other Authorities**

U.S. Const. Am. V................................................................................................................17

P.R. Const. Art. VI, sec. 8...................................................................................................16

Ambac Assurance Corporation ("Ambac") hereby submits this motion for an order, substantially in the form attached hereto as **Exhibit 1**, striking certain provisions of the Plan Support Agreement (the "PSA"),[2] dated as of May 31, 2019, by and among (a) the Oversight Board, as representative of the Commonwealth, (b) certain holders of GO Bond Claims and/or CW Guarantee Bond Claims (the "GO Holders"),[3] and (c) certain holders of PBA Bond Claims (the "PBA Holders," and together with the GO Holders, the "PSA Creditors")[4] as violative of PROMESA.  In support of its motion, Ambac respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      This motion to strike is aimed at irreversible issues associated with the PSA. Ambac will advance a fulsome objection to any proposed plan of adjustment premised on the PSA at the relevant time, and limits this motion only to those aspects of the PSA which violate PROMESA, will hinder the ability of the Oversight Board to effectively restructure the Commonwealth, and thus require immediate judicial intervention.

2.      Specifically, the Court should strike the breakup fee provision within the PSA— pursuant to which the Oversight Board commits the Commonwealth to pay $100 million to the PSA Creditors in the event the PSA is terminated—as an unlawful constraint on the Oversight Board, in violation of PROMESA.  The Court should also strike the provisions within the PSA that deprive non-signatory PBA creditors from the due exercise of their right to propose a "Modification" for PBA under Title VI (the voluntary restructuring process under PROMESA),

---

[2] Capitalized terms not defined herein have the same meaning as in the PSA.

[3] The GO Holders are defined in the PSA as holders of GO Bond Claims and/or CW Guarantee Bond Claims, each as defined therein, which may include the advisors or managers who are advising or managing a holder of GO Bond Claims on behalf of such holder as set forth on Exhibit "A" thereto.

[4] The PBA holders are defined in the PSA as holders of PBA Bond Claims, as defined therein, which may include the advisors or managers who are advising or managing a holder of PBA Bond Claims on behalf of such holder as set forth on Exhibit "B" thereto.

the provision within the PSA that purports to set aside the automatic stay with respect of certain actions, and the provisions within the PSA pursuant to which the Oversight Board has impermissibly delegated to the PSA Creditors a portion of its exclusive authority over plans of adjustment.

3.      The breakup fee provision within the PSA is particularly troubling because the PSA provides a framework for a plan that is not confirmable in a number of respects, including that: (1) the PSA contemplates a plan that will require the continued taking of monies belonging to the Commonwealth's secured revenue bondholders and transferring them to the unsecured PSA Creditors; (2) the proposed plan would violate section 407 of PROMESA; (3) the proposed plan fails to meet the requirements of section 314 of PROMESA; (4) the proposed plan will be based on a Commonwealth fiscal plan with demonstrably erroneous and misleading financial projections; and (5) the fees provided in the PSA constitute impermissible vote buying.  The Oversight Board cannot be allowed to bind itself and the Commonwealth to a deal that cannot be effectuated and risk incurring a breakup fee of up to $100 million, while also impermissibly circumventing creditor rights and delegating its sole authority, in contravention of the dictates of PROMESA.

4.      The fact that the Oversight Board has agreed to a PSA that provides for an unconfirmable plan is entirely inconsistent with its duties under PROMESA, which defines the Oversight Board's purpose as "provid[ing] a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).  There is no method by which a covered territory can achieve fiscal responsibility through the framework provided by the PSA.  Moreover, the PSA requires the Oversight Board to deny rights that PROMESA guarantees to creditors, while at the same time selectively awarding PSA Creditors rights that PROMESA expressly reserves to the Oversight Board.

5.     These issues with the PSA are compounded by the $100 million breakup fee, which is payable upon termination of the PSA—a virtual inevitability in light of various rights afforded to the PSA Creditors and the need for substantial modifications to the plan contemplated by the PSA in order for it to be anything close to confirmable.  The Oversight Board has committed to take all actions necessary to file a plan consistent with the PSA.  *See* PSA § 4.1.  And if the PSA is terminated, as we respectfully submit it must be, the Oversight Board will be required to pay the PSA Creditors up to $100 million.  *See* PSA Term Sheet, § II.M.  Thus, the Oversight Board now finds itself (and has placed the Commonwealth) in an untenable position:  It must either cleave to and support an unconfirmable plan of adjustment that violates the U.S. and Puerto Rico Constitutions and PROMESA, or breach the PSA, forcing the Commonwealth to dissipate $100 million in a gratuitous give-away to a small group of favored creditors.

6.     Without the breakup fee and other provisions that require the Oversight Board to violate PROMESA, the Oversight Board could use the PSA as a means of anchoring further negotiations regarding a potential plan of adjustment for the Commonwealth.  However, rather than engage in broad negotiations with all creditors, the Oversight Board decided to strike a deal with a small group of creditors that precludes it from further substantive negotiations.  And contrary to the representations of the Oversight Board at the June Omnibus Hearing (*see* Hearing Tr. 12:12-16 (June 12, 2019)), the Oversight Board is not prepared to engage in meaningful negotiations with interested parties.  Instead, it has boxed itself and other creditors into a "take it or leave it" deal.

7.     Ambac therefore moves the Court to exercise its equitable powers to enter an order striking (i) the breakup fee provision within the PSA; (ii) the provisions within the PSA that deprive non-signatory PBA creditors from the due exercise of their right to propose a

"Modification" for PBA under Title VI of PROMESA; (iii) the provision within the PSA that purports to set aside the automatic stay with respect of certain actions; and (iv) the provisions within the PSA that give PSA Creditors an impermissible veto over any plan of adjustment the Oversight Board proposes.  Action on these terms cannot wait until the plan confirmation stage or even until the disclosure statement is filed.  It is critical that the Court strike from the PSA those provisions that are contrary to PROMESA and the duties imposed on the Oversight Board now, before the Oversight Board moves forward with a PSA that effects a pre-wiring of a plan distribution through a breakup fee that impermissibly buys votes for a purported plan that cannot succeed.

## JURISDICTION AND STANDING

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this motion arises under PROMESA.  This Court also has jurisdiction under section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part."  48 U.S.C. § 2126(a).  Further, this Court has jurisdiction under section 306(a), which grants this Court original and exclusive jurisdiction of all cases under Title III of PROMESA and original jurisdiction of all civil proceedings arising under Title III of PROMESA or arising in or related to cases under Title III of PROMESA.  *Id.* § 2166(a)(2).

9.      In addition, Article III courts possess inherent equitable powers to award the relief that Ambac seeks here.  *See, e.g.*, *Eberly v. Moore*, 65 U.S. 147, 158 (1860) ("The equitable jurisdiction of the courts of the United States . . . [is used to] prevent hardship and injustice, and . . . is inherent in the organization of courts of justice."); *see also* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the

4

provisions of this title.").  Given that termination of the PSA is a virtual inevitability, the breakup fee provision of the PSA is an unconscionable give-away that confers to the Commonwealth no value in return, and thus, can be stricken by this Court.  The Court can similarly exercise its equitable powers to strike the other provisions described herein, which violate PROMESA.

10.    Section 305 of PROMESA does not limit the Court's ability to strike certain provisions of the PSA.  Section 305 provides that "the court may not, by any stay, order, or decree, in the case or otherwise, interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property."  48 U.S.C. § 2165.  However, section 305 does not interfere with the Court's ability to determine issues relating to a proposed plan of adjustment, such as approval of administrative claims or distribution of a breakup fee pursuant to a plan of adjustment. Here, through the PSA, the Oversight Board is purporting to pre-wire a plan distribution, rather than effecting some sort of interim distribution of Commonwealth property.  As such, striking the offending provisions of the PSA falls firmly within the ambit of the Court's authority.

11.    Further, even if the provision did apply here, section 305 of PROMESA provides an exception in cases where either "the Oversight Board consents or the plan so provides" for action by this Court.  The PSA plainly contemplates the Court's involvement and consents to the Court's action.  It does so most clearly in section 6.1(b), which provides that the PSA may be terminated in the event that "a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan."  PSA § 6.1. As the Oversight Board has consented to the Court's authority to terminate the PSA, the Court has authority to grant the more limited relief sought herein—to strike the commitment to pay the breakup fee in the event the PSA is terminated, and certain other limited provisions.

12.     Ambac has standing to bring this motion as a party in interest.  11 U.S.C. § 1109 (incorporated into Title III through PROMESA § 301(a)).  Section 1109(b) of the Bankruptcy Code provides that any "party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard *on any issue* in a case under this chapter."  11 U.S.C. § 1109(b) (emphasis added).  Thus, the sweep of section 1109(b) is broad and generous. Pursuant to section 1109(b), any party who can demonstrate any conceivable legal right to relief has standing to appear and be heard.

13.     As an insurer and/or holder of bonds issued by the Commonwealth, PBA, and other Commonwealth instrumentalities, Ambac is plainly a party in interest in these Title III proceedings.  As such, Ambac is entitled to object to any proposed plan of adjustment.  While Ambac will do so at the appropriate time, at this point Ambac is only asking the Court to prevent the Oversight Board from using the PSA to effectively pre-wire a distribution to a small group of favored creditors and to strike other PSA provisions that, if incorporated into a proposed plan, would make the plan fundamentally unconfirmable.  Ambac must seek relief now rather than wait until after a plan is filed, because at that point the Oversight Board will already be boxed into supporting a plan based on the PSA or expending a huge amount of the limited resources of the Commonwealth.  Therefore, Ambac moves this Court now for an order striking the provision of the PSA that provides for a breakup fee that improperly dissipates debtor assets in pursuit of a patently unconfirmable plan, as well as other provisions of the PSA that violate PROMESA.

## RELEVANT FACTUAL BACKGROUND

14.     On June 30, 2016, PROMESA was signed into law by the President of the United States (P.L. 114-187).  PROMESA created the Oversight Board and provided the Oversight Board

with certain powers over the finances and restructuring process of the Commonwealth and its instrumentalities.

15.     Pursuant to Act 2-2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") was appointed as the agent of and advisor to the Puerto Rico government, and granted authority with respect to the restructuring of any indebtedness issued by the Commonwealth and any governmental entity of the Commonwealth.

16.     On May 3, 2017, the Oversight Board filed a Title III petition on behalf of the Commonwealth in the United States District Court for the District of Puerto Rico.

17.     On June 16, 2019, the Oversight Board announced that it had reached an agreement with a small group of GO bondholders and PBA bondholders, on the framework for a plan of adjustment to address $35 billion of claims against the Commonwealth.  The bondholder groups that have signed on to the PSA largely consist of the LCDC and QTCB Noteholder Group, which collectively hold bonds totaling less than 10% of the Commonwealth's bond debt.

18.     At the same time that the PSA was announced, the Oversight Board announced that it expects to file a joint plan of adjustment for the Commonwealth within 30 days.

19.     The PSA contains the promises, covenants, and agreements entered into by the Oversight Board and the other PSA Creditors in anticipation of a proposed plan of adjustment. Further, the term sheet annexed to the PSA sets forth the principal terms and conditions for the classification and treatment of certain claims pursuant to the proposed plan.

20.     In the PSA, the Oversight Board represents and warrants that it is authorized to execute the PSA and perform its obligations thereunder.  *See* PSA § 3.1.

21.     In addition, the Oversight Board covenants in the PSA that it shall take "all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would,

or would reasonably be expected to, impede or preclude, the filing of the Plan[5] and the Disclosure

Statement,[6] the approval of the Disclosure Statement and entry of the Confirmation Order." *See*

PSA § 4.1.

22.    The PSA states that the forthcoming plan of adjustment will provide for the

distribution of (i) $2 billion in cash, (ii) the issuance of new secured full faith and credit general

obligation bonds (the "New Bonds"), (iii) excess cash, if any,[7] and (iv) litigation trust interests,

which will include any settlement amounts from the "Late Vintage Litigation." *See* PSA Term

Sheet, § II.A.

23.    The PSA also provides certain PSA parties with numerous bonus payments.

   a.    *First*, parties consenting to the PSA are to receive a pro rata share of cash in an

          amount equal to 1.25% of the aggregate amount of their claims (the

          "Consummation Costs").  PSA Term Sheet, § II.M.

   b.    *Second*, the PSA Parties and any additional parties that execute the PSA during the

          60-day period commencing upon the execution of the PSA are to receive an extra

          1.5% of their claim in cash for every 120 days following their joinder to the PSA

          (the "PSA Restriction Fee").  *Id.*

---

[5] The PSA defines the term "Plan" as "the joint plan of adjustment for the Commonwealth, the PBA, and in accordance with section 312 of PROMESA or, if applicable, a qualifying modification approved under section 601 of PROMESA and incorporating the terms and provisions herein and in the Term Sheet, the form and substance of which shall be reasonably satisfactory to each Party (including, without limitation, with respect to any matter relating to the Monolines) . . . ."

[6] The PSA defines the term "Disclosure Statement" as "the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the PROMESA Proceedings in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party."

[7] The PSA provides that the aggregate amount of excess cash shall not exceed $900 million.

      c. *Third*, in the event the PSA is terminated, the PSA Creditors are entitled to a fee of up to $100 million as an administrative expense claim under a plan of adjustment for the Commonwealth (the "<u>Breakup Fee</u>" and, together with the Consummation Costs and the PSA Restriction Fee, the "<u>PSA Fees</u>"). *Id.*

24.    AAFAF was not a signatory to the agreement.  In a press release issued shortly after the Oversight Board's announcement, Christian Sobrino Vega, AAFAF's CEO and President, stated that the Commonwealth government does not support the PSA and would not support a plan of adjustment premised on the PSA.  AAFAF further stated that "any financial consideration included in the PSA that seeks to incentivize support or subscription to the PSA should not be assumed to be available now or in the future given that the Government of Puerto Rico has not provided its consent to the same."  *See* Press Release, AAFAF, Authorized Statement of Christian Sobrino Vega, CEO and Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, Regarding Draft Plan Support Agreement for the Commonwealth and PBA (June 16, 2019).

## **ARGUMENT**

## I.    <u>The PSA Is Inconsistent With The Oversight Board's Duties Under PROMESA.</u>

25.    "The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a) (PROMESA § 101(a)).  The Oversight Board is thus charged with carrying out the provisions of PROMESA that are carefully calibrated to rehabilitate the financial health of the Commonwealth while protecting the rule of law and integrity of the markets.

26.    The Oversight Board's entry into the PSA flouts this charge.  The PSA both *denies* rights that PROMESA guarantees to creditors and selectively *awards* additional powers not

present in PROMESA to certain creditors, upsetting the balance Congress struck in crafting PROMESA and laying plain the gamesmanship at the heart of the Commonwealth's restructuring efforts.  In addition, the PSA constrains the Oversight Board in a manner inconsistent with PROMESA by tying it to an unconfirmable plan of adjustment and requiring it to pay the large Breakup Fee in the event the PSA is terminated.[8]

27.     Far from providing a path to restore access to the markets, the Oversight Board's actions will result in the further decline of market confidence, as the PSA ensures that the Commonwealth will continue to defy its own laws in violation of PROMESA and disregard creditor protections for the benefit of a favored few.  This is particularly true given that the PSA would require the Commonwealth to reject entirely the vast majority of its revenue bond obligations, rendering special revenue bondholders general unsecured creditors of the Commonwealth with materially less favored treatment under the PSA and any proposed plan than certain unsecured general obligation creditors.

a.     The PSA denies creditor rights guaranteed in PROMESA.

28.     While providing the Commonwealth significant powers and leverage in adjusting its debts, PROMESA also affords Commonwealth creditors certain powers and protections.  The

---

[8] As this Court is aware, the Supreme Court recently granted petitions for certiorari in connection with certain creditors' challenges to the constitutional validity of the appointment of the Oversight Board members.  It was imprudent at best for the Oversight Board to have entered into the PSA under the specter of the Appointments Clause litigation, which raises serious questions regarding the Oversight Board's authority under the *de facto* officer doctrine, especially with respect to the time period post-dating the First Circuit's decision.  Depending on the outcome of the Supreme Court's decision on the matter, the Oversight Board may well not be able to meet its obligations under the PSA (*see, e.g.*, PSA § 3.1), underscoring the recklessness with which it bound itself to the $100 million Breakup Fee.

PSA erodes these creditor safeguards, to the detriment of many.  Several examples of the PSA's abrogation of creditor rights follow.

29.    First, the Oversight Board covenants in the PSA to "tak[e] all reasonable efforts to *prevent any other person or entity*" from "commencing any action or proceeding or asserting any claim or objection against any GO Holder or PBA Holder relating to the GO Bonds or the PBA Bonds."  PSA § 4.1(h) (emphasis added).  The right to bring a claim objection is one guaranteed to any "party in interest" under Bankruptcy Code section 502(a), which PROMESA incorporates into Title III.  11 U.S.C. § 502(a); *see* 48 U.S.C. § 2161(a).  That the Oversight Board *covenants* to "prevent" any other person or entity—who may be a party in interest with requisite standing—from exercising its right to object to claims is remarkable.

30.    Second, the PSA deprives non-signatory PBA creditors from the due exercise of their right to propose a "Modification" for PBA under Title VI, the voluntary restructuring process under PROMESA.  PROMESA section 601(i) provides that a Modification "may be proposed by one or more holders" of the right to vote the relevant entity's bonds—a holder of the bond, or in the case of insured bonds, the insurer.  48 U.S.C. § 2231(i).  But the PSA contemplates that the Oversight Board—which, as Administrative Supervisor in Title VI (*see id.* § 601(a)(1)), is the entity ultimately responsible for submitting a Modification to creditors for a vote (*see id.* § 601(g), (h))—shall only consider PBA-related Modifications proposed by the LCDC or the QTCB Noteholder Group, original PSA parties.  In the PSA, the Oversight Board covenants to commence a restructuring proceeding for PBA—a "PBA PROMESA Proceeding"—on or after the date on which it files a disclosure statement and plan for the Commonwealth.  *See* PSA § 4.1(a).  But the definition of "PBA PROMESA Proceeding" states that only those Title VI Modifications proposed by the LCDC or QTCB Noteholder Group shall constitute PBA PROMESA Proceedings.  *See*

PSA § 1.2 (definition of "PBA PROMESA Proceeding").[9]  In other words, the Oversight Board will be in violation of its covenant in section 4.1(a) if it commences a Title VI proceeding based on the proposal of any other creditor—even if such creditor has full standing to submit such a proposal under section 601(i) of PROMESA, and even if the Oversight Board believes such creditor's proposal to be in the best interests of creditors.

31.    Additionally, the PSA purports to set aside the automatic stay with respect of certain actions, thereby setting aside a key creditor safeguard.  The Bankruptcy Code's automatic stay (11 U.S.C. §§ 362, 922), incorporated into PROMESA (48 U.S.C. § 2161(a)), is designed to protect not only debtors from creditor actions, but to protect creditors while the debtor restructures. *See In re Jefferson Cty., Ala.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013) (quoting H.R.Rep. No. 95–595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97) ("The automatic stay also provides creditor protection.  Without it, certain creditors would be able to pursue their own remedies against the debtor's property.  Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.  Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.  A race of diligence by creditors for the debtor's assets prevents that.").  The PSA, however, summarily provides that "[t]he automatic stay under Section 362 and 922 of the Bankruptcy Code . . . shall not prohibit a Party from taking any action necessary" to terminate the PSA.  PSA § 6.1(f).  As discussed below, the termination of the PSA has significant financial ramifications, namely, the payment of the Breakup Fee to the PSA signatories.  A unilateral declaration that the automatic stay does not

---

[9] Full definition: "'PBA PROMESA Proceeding' shall mean the Title III case commenced by the Oversight Board on behalf of PBA in the Title III Court or, in the event that the LCDC and the QTCB Group propose to the Oversight Board a modification of the PBA Bonds under Title VI of PROMESA, the application to approve a qualifying modification filed by the Oversight Board on behalf of PBA."

apply—and therefore no Court action or approval is needed—before a significant payment is made
is a serious infringement on longstanding creditor rights, and removes a critical check on the
process.

b.   <u>The PSA delegates authority that Congress expressly reserved to
the Oversight Board.</u>

32.     The PSA also selectively provides certain favored creditors with rights that are
reserved to the Oversight Board, further upsetting the balance PROMESA strikes between
creditors and the Commonwealth.

33.     Under PROMESA, the Oversight Board is the sole entity empowered to propose a
plan of adjustment for the Commonwealth.  *See* 48 U.S.C. § 2172(a) ("Only the Oversight Board,
after the issuance of a certificate pursuant to section 104(j) of this Act, may file a plan of adjustment
of the debts of the debtor.").  Like a Trustee in bankruptcy, the Oversight Board is charged as a
neutral third party with protecting the rights of the debtor and balancing the interests of all
creditors.  The Oversight Board should not, as it is here, be favoring a subset of creditors by
delegating to this small, non-representative group certain of the powers expressly provided to it by
PROMESA, without regard to what is in the best interests of all creditors under PROMESA and
debt restructuring laws generally.  Indeed, it is highly unlikely that this small subset of creditors
will exercise the rights being delegated to it by the Oversight Board with an eye toward what is
fair to all creditors, in the best interests of the debtor, and in furtherance of the goals of PROMESA.

34.     The PSA provides that the Oversight Board must defer to the signatories of the PSA
on the form and substance of the plan of adjustment.  Section 1.2 of the PSA requires that the
"Plan" that the Oversight Board covenants to file by October 15, 2019 (*see* PSA § 4.1(b)) be a
"plan of adjustment[,] . . . . the form and substance of which shall be reasonably satisfactory to

each Party"; the "Parties" are each of the signatories to the PSA as of May 31, 2019, including the
LCDC and the QTCB Noteholder Group. *See* PSA § 1.2. Thus, the PSA gives select GO and
PBA creditors that executed the PSA a veto over any plan of adjustment the Oversight Board
proposes.

35.     The PSA gives similar power to the LCDC and QTCB Noteholder Group with
respect to the New Bonds. Section II.A of the Term Sheet, attached as Exhibit E to the PSA,
requires the plan of adjustment the Oversight Board must file by October 15, 2019 (*see* PSA
§ 4.1(b)) to provide for New Bonds issued by the Commonwealth. According to the Term Sheet,
the New Bonds will be distributed to a wide variety of Commonwealth creditors on account of
their prepetition claims. *See* PSA Term Sheet § E (Treatment of Claims). PROMESA is clear that
the Commonwealth may not issue new debt without the consent of the Oversight Board. *See* 48
U.S.C. § 2147 (PROMESA § 207) ("For so long as the Oversight Board remains in operation, no
territorial government may, without the prior approval of the Oversight Board, issue debt or
guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect
to its debt."). But through the PSA, the Oversight Board gives PSA Creditors a veto over the form
of the New Bonds to be issued through the plan of adjustment. *See* PSA § 6.1(c) (allowing either
of the LCDC or QTCB Noteholder Group to terminate the PSA as to *all parties*—thereby
triggering the Breakup Fee—if "the New Bonds to be issued under the Plan have any terms that
have not been consented to by the LCDC or the QTCB Group").

36.     The PSA therefore awards certain select creditors of a small minority of
Commonwealth claims—namely, the LCDC and the QTCB Noteholder Group—an effective veto
of not only the New Bonds proposed to be issued under the eventual plan of adjustment, but also

the form and substance of the plan itself.  These are rights PROMESA reserves solely for the

Oversight Board, acting on behalf of the Commonwealth.

          c.       <u>The PSA improperly constrains the Oversight Board by tying it to
an unconfirmable plan of adjustment.</u>

37.     Most troubling of all is the Breakup Fee contained within section II.M of the Term

Sheet.  *See* PSA Term Sheet § M.  The Breakup Fee, capped at $100 million, is payable upon

termination of the PSA, which may occur upon any number of various conditions and be effected

by not only the Oversight Board but also the creditor signatories.  The Breakup Fee is objectionable

for many reasons, including, for example, that (i) the Breakup Fee constitutes impermissible vote-

buying of less than 10% of creditors; (ii) the PSA Creditors must consent to any definitive

documents (*see* PSA § 1.2, Definition of "Plan"), which means that any unresolved dispute could

lead to the payment of the fee; and (iii) AAFAF itself has expressed its disapproval of the Breakup

Fee (and other PSA Fees).  Further, given all the reasons that the plan contemplated by the PSA is

not confirmable, there is likely to be extensive litigation relating to any such proposed plan,

resulting in a delay beyond February 15, 2020—the date on which the Oversight Board can

terminate the PSA, thereby triggering the Breakup Fee.  In addition, the longer the delay and the

more litigation resulting from the plan, the higher the likelihood that modifications will need to be

made to resolve litigation, likewise triggering the Breakup Fee.

38.     But paramount among these reasons is that the Breakup Fee prevents the Oversight

Board from pursuing any other path towards the Commonwealth's reorganization.  And the

Breakup Fee not only constrains the Oversight Board from pursuit of alternative plan structures, it

effectively prohibits the Oversight Board from even discussing alternatives with other creditors,

even on plans that may provide better recoveries for all stakeholders.[10]   In effect, the Breakup Fee constitutes a pre-wired plan distribution to the PSA Creditors, resulting in the dissipation of Commonwealth assets without Commonwealth approval.

39.   Any plan based on the PSA will be unconfirmable because (among other reasons):

a.   *First*, the PSA contemplates a plan that will require the continued taking of monies belonging to Puerto Rico's secured revenue bondholders to the unsecured PSA Creditors, in violation of the U.S. Constitution, Puerto Rico Constitution, provisions of PROMESA, and plan confirmation requirements.   The PSA inverts well-established bankruptcy priorities by contemplating a plan where revenue bond debt secured by certain tax revenue streams are illegally taken by the Commonwealth and given to unsecured GO bondholders to fund their recovery, compensating those unsecured creditors nearly in full before secured revenue bondholders even receive a penny.   The PSA requires a plan that illegally transforms a short-term liquidity backstop in article VI, section 8 of the Puerto Rico Constitution into a permanent deep subordination of revenue bondholders.   That subordination finds no support in Puerto Rico law and violates the Fifth Amendment.

---

[10] This problem is generally remedied in chapter 11 cases in which a plan support agreement is in place by including a provision that allows the debtor to terminate the agreement without penalty if the debtor determines, in its business judgment, that another plan structure is preferable.   *See, e.g.*, *In re Genco Shipping & Trading Limited*, 509 B.R. 455, 464, 465, 469 (Bankr. S.D.N.Y. 2014) (approving PSA notwithstanding a termination fee because it included a "fiduciary out that [gave] the Debtors the ability to receive, review and negotiate unsolicited proposals for any better alternative transaction.").   There is no such provision in the PSA.   Although the Court should strike the Breakup Fee in part for this reason, alternatively, the Court can exercise its equitable powers to excuse compliance with the terms of the Breakup Fee where, as here, it would deter the Oversight Board from pursuing a plan of adjustment that is in the best interests of creditors and the debtor alike.

b. *Second*, a plan premised on the PSA would violate section 407 of PROMESA, which bars the Commonwealth from (i) diverting property from a Puerto Rico instrumentality that applicable law requires to be transferred to the instrumentality for the benefit of creditors, or (ii) transferring property of a Puerto Rico instrumentality to itself, to the extent creditors of the instrumentality have a valid lien on the transferred property (as revenue bondholders do here). Thus, a plan premised on the PSA cannot satisfy the requirement of section 314(b) of PROMESA, which, among other things, prevents confirmation of a plan that requires the debtor to engage in conduct that is "prohibited by law." 48 U.S.C. § 2174(b)(3). A plan proposed under the current framework set forth by the PSA would require the debtor to engage in illegal conduct, and therefore, cannot be confirmed.

c. *Third*, the proposed plan fails to meet the requirements of section 314(b)(6) of PROMESA, which makes clear that "the plan [must be] feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan . . . ." 48 U.S.C. § 2174(b)(6). Thus, the best interest test requires that before confirming a plan, the court must consider recoveries available outside of bankruptcy as compared to the recovery under the plan. This includes any recoveries that creditors could receive by pursuing available remedies under state law for the Commonwealth's actions impairing their bonds.

17

d. *Fourth*, any plan consistent with the PSA will be based on a Commonwealth fiscal plan with demonstrably erroneous and misleading financial projections, which also does not comply with the mandates of PROMESA. *See* 48 U.S.C. § 2141 (PROMESA § 201).

e. *Finally*, the PSA Fees constitute impermissible vote buying, which raises serious concerns about whether the plan is presented in good faith, a necessary condition to confirmation under Bankruptcy Code section 1129(a)(3). To be sure, PSA fees are common and can be valid if structured in an appropriate manner. Here, however, where the Oversight Board has solicited two groups that collectively own less than 10% of claims and paid them off to induce their support for a patently unconfirmable "strawman" plan of adjustment, there is clear evidence of impermissible vote buying, which should result in the votes being disallowed. *See In re Quigley Co., Inc.*, 437 B.R. 102, 132 (Bankr. S.D.N.Y. 2010) (disallowing votes procured in bad faith). The impropriety of the Oversight Board's gambit is especially evident in light of AAFAF's express disavowal of the PSA.[11] *See supra* ¶ 24. Put simply, the Oversight Board is buying votes through the PSA in order to circumvent its political problems with the very entities it is trying to restructure. No plan of adjustment can be confirmed under this framework.

---

[11] *See* Press Release, AAFAF, Authorized Statement of Christian Sobrino Vega, CEO and Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, Regarding Draft Plan Support Agreement for the Commonwealth and PBA (June 16, 2019); *see also Objection of Elected Government Parties Regarding Plaintiff Financial Oversight and Management Board for Puerto Rico's Motion to Stay PBA Adversary Proceeding Pending Confirmation of Commonwealth Plan of Adjustment*, Adv. Pro. No. 18-00149 (Dkt. No. 102) (arguing that the PSA "is deeply flawed").

40.     Without the Breakup Fee, the Oversight Board would still be free to pursue alternatives in good faith.  However, the PSA currently requires the payment of the fee in the event the PSA is terminated, which prevents the Oversight Board from walking away from the PSA's contemplated and unconfirmable plan without costing the Commonwealth—and its stakeholders—$100 million.  Because the Breakup Fee needlessly raises the transaction cost of pursuit of any other possible outcome for the Commonwealth's Title III case, and requires the Oversight Board to pay precious dollars to the PSA signatories in exchange for which the Commonwealth will receive nothing, the Breakup Fee should be stricken.

## II.     The Court Should Strike The Breakup Fee Provision and Other Provisions Of The PSA That Violate PROMESA Now.

41.     As described above, the PSA provides the framework for a plan that is not confirmable.  It is clear that a plan proposed pursuant to the PSA has no likelihood of succeeding, as such a plan would violate the U.S. Constitution, Puerto Rico Constitution, provisions of PROMESA, and plan confirmation requirements.

42.     Nevertheless, the Oversight Board has bound itself to the PSA, promising that it shall take "all actions necessary to obtain, and shall not, nor encourage any other person to, take any action with would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and entry of the Confirmation Order."  *See* PSA § 3.1.

43.     Further, the small group of hedge fund creditors who signed on to the deal will be entitled to claim $100 million from the Commonwealth as a Breakup Fee in the likely event that the PSA is terminated due to the contemplated plan's myriad flaws.  The Oversight Board's

decision to propose the PSA thus represents a clear dereliction of the Oversight Board's duties under PROMESA and renders dissipation of a substantial sum virtually inevitable.

44.     Accordingly, the Court should exercise its inherent equitable powers to strike the problematic provisions of the PSA now, prior to the filing of a proposed plan or disclosure statement.  Ambac notes that it is not asking the Court to strike the entire PSA.  Rather, Ambac respectfully submits that the Court should solely strike the provisions that improperly bind the Oversight Board to a plan that has no possibility of being confirmed and cause the Oversight Board to violate the requirements of PROMESA.  If these provisions are stricken, the Oversight Board would still be free to pursue alternatives in good faith without violating PROMESA or being required to pay an exorbitant sum to the PSA Creditors for nothing in return.

## <u>CONCLUSION</u>

For the reasons set forth herein, Ambac respectfully requests that the Court enter an order striking (i) the Breakup Fee provision within the PSA; (ii) the provisions within the PSA that deprive non-signatory PBA creditors from the due exercise of their right to propose a "Modification" for PBA under Title VI of PROMESA; (iii) the provision within the PSA that purports to set aside the automatic stay with respect of certain actions; and (iv) the provisions within the PSA that give PSA Creditors a veto over any plan of adjustment the Oversight Board proposes, and grant such further relief as the Court deems just and proper.

Dated: July 16, 2019
     San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
    Dennis F. Dunne
    Andrew M. Leblanc
    Atara Miller
    Grant R. Mainland
    (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5770
    Facsimile:  (212) 822-5770
    Email: ddunne@milbank.com
        aleblanc@milbank.com
        amiller@milbank.com
        gmainland@milbank.com

*Attorneys for Ambac Assurance Corporation*

21

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com