# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## AMBAC ASSURANCE CORPORATION AND FINANCIAL GUARANTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 4

I.    Movants Have Standing to Bring the Stay Motion and the Proposed
Lawsuits. ............................................................................................................ 4

    A.    The Collective Action Provision of the Trust Agreement Does Not
Apply to the Stay Motion or the Claims to Be Pursued............................ 4

        1.    Section 705 Only Covers Actions by Bondholders, Not
Bond Insurers. ................................................................... 5

        2.    Even if Section 705 Applied to Movants, Neither the Stay
Motion nor the Actions Contemplated Thereby Are Barred
by the Collective Action Provision. ................................. 7

    B.    Movants Seek to Advance Their Own Rights Under the U.S.
Constitution, PROMESA, and the Enabling Act, Not Claims
Derivative of PRIFA's Rights.................................................................... 9

II.    Respondents' Theory that Movants Have a Lien on an Empty Box Is
Meritless............................................................................................................ 12

    A.    Respondents Fail to Rebut Movants' Showing That PRIFA Owns
the Pledged Rum Taxes. .......................................................................... 12

    B.    Movants Have a Lien on the Pledged Rum Taxes In the Hands of
the Commonwealth. ................................................................................. 14

        1.    The Trust Agreement Expressly States that "Pledged
Revenues" Includes the "Special Tax Revenues," Whether
Deposited to the Sinking Fund or Not. ........................................ 15

        2.    "Special Tax Revenues" Include All Rum Taxes Deposited
to the Credit of the Puerto Rico Infrastructure Fund, Which
Occurs Under the Enabling Act When the Commonwealth
Receives the Taxes....................................................................... 17

        3.    The Trust Agreement and Covenant Between the
Commonwealth and PRIFA Bondholders Confirm That the
Special Deposit Provisions of the Enabling Act Are Part of
the Lien That PRIFA Granted....................................................... 20

III.    The Bondholders' Lien on the Pledged Rum Taxes Is a Property Right that
Cannot be Repealed or Preempted..................................................................... 22

    A.    The Puerto Rico Constitution Does Not Give the Commonwealth
Limitless "Retention Powers" Over the Pledged Rum Taxes.................. 22

B.    The Commonwealth's Transfer of the Pledged Rum Taxes to
      PRIFA Is Valid and Binding—Not Merely an "Appropriation"
      That Can Be Amended or Repealed Without Consequence. .................... 24

      1.    The PRIFA Bonds Are Special Revenue Bonds, Not
            "Appropriation Bonds." ................................................................ 24

      2.    Under Well-Settled Law, Legislatures Can Transfer and
            Make Binding Pledges of a Stream of Future Revenues. ............. 25

      3.    Vague Assertions of "Police Powers" Do Not Abrogate
            Constitutionally Protected Property Rights. ................................ 27

C.    PROMESA Does Not Authorize the Oversight Board to Preempt
      PRIFA Bondholders' Lien. ...................................................................... 28

**CONCLUSION** ........................................................................................................ 30

ii

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. United States*,
  391 F.3d 1212 (Fed. Cir. 2004)........................................................................25

*Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.*,
  677 F.3d 1286 (11th Cir. 2012) ........................................................................8

*Ambac Assurance Corp. v. Commonwealth (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  No. 18-1214, 2019 WL 2574061 (1st Cir. June 24, 2019) ...................................11

*Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  297 F. Supp. 3d 269 (D.P.R. 2018).....................................................................30

*Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v.
Flores Galarza*,
  484 F.3d 1 (1st Cir. 2007)....................................................................................12

*Assured Guar. Corp. v. García-Padilla*,
  No. 3:16-cv-01037 (D.P.R., May 17, 2017) .......................................................11

*Bank of N.Y. Mellon v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  301 F. Supp. 3d 306 (D.P.R. 2017).....................................................................10

*Barnhart v. Thomas*,
  540 U.S. 20 (2003)....................................................................................15, 16

*Butner v. United States*,
  440 U.S. 48 (U.S. 1979).......................................................................................28

*Citibank, N.A. v. Allied Mgmt. Grp.*,
  491 F. Supp. 2d 232 (D.P.R. 2007).....................................................................15

*City of Aransas Pass v. Keeling*,
  247 S.W. 818 (Tex. 1923).....................................................................................26

*In re City of Detroit*,
  524 B.R. 147 (Bankr. E.D. Mich. 2014) .............................................................26

*Cobb v. City of Stockton (In re City of Stockton, California)*
  909 F.3d 1256 (9th Cir. 2018) .............................................................................26

*Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. State of Wash.*,
  696 F.2d 692 (9th Cir. 1983) ...............................................................................26

*Cruden v. Bank of New York*,
   957 F.2d 961 (2d Cir. 1992)..................................................................................4

*Feldbaum v. McCrory Corp.*,
   Nos. 11866, 11920, 12006, 1992 WL 119095 (Del. Ch. June 2, 1992) .................................6

*In re Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Group of PREPA Bondholders, et
   al.* (*Fin. Oversight & Mgmt. Bd. for P.R.*),
   899 F.3d 13 (1st Cir. 2018) ..................................................................................8

*Fletcher v. Peck*,
   10 U.S. 87 (1810) ..........................................................................................26

*Flores Rodriguez v. Flores Toledo*,
   101 D.P.R. 61 (1973) ......................................................................................16

*Flushing Nat. Bank v. Mun. Assistance Corp. for City of N.Y.*,
   40 N.Y.2d 731 (1976) .....................................................................................27

*Franco v. Selective Ins. Co.*,
   184 F.3d 4 (1st Cir. 1999)..................................................................................11

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
   85 F. Supp. 3d 577 (D.P.R. 2015)..........................................................................26

*Friedman v. Chesapeake & Ohio Ry. Co.*,
   261 F. Supp. 728 (S.D.N.Y. 1966) ..........................................................................4

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934).......................................................................................27

*Louisiana ex rel. Hubert v. City of New Orleans*,
   215 U.S. 170 (1909).......................................................................................17

*Kurrus v. Priest*,
   29 S.W.3d 669 (Ark. 2000)................................................................................26

*In re LAN Tamers, Inc.*,
   329 F.3d 204 (1st Cir. 2003) ..............................................................................12

*Lange v. Citibank, N.A.*,
   No. 19245-NC, 2002 WL 2005728 (Del. Ch. Aug. 13, 2002)................................................8

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
   247 B.R. 38 (S.D.N.Y. 2000).........................................................................3, 9, 11

*Lockhart v. United States*,
   136 S. Ct. 958 (2016).....................................................................................15

*Lynch v. United States*,
292 U.S. 571 (1934)..........................................................................................25

*Missouri v. Jenkins*,
495 U.S. 33 (1990)............................................................................................17

*Mizuho Corp. Bank, Ltd. v. Enron Corp. (In re Enron Corp.)*,
302 B.R. 463 (Bankr. S.D.N.Y. 2003) ..............................................................8

*Monarch Life Ins. Co. v. Ropes & Gray*,
65 F.3d 973 (1st Cir. 1995) ..............................................................................11

*Estate of Muhammad v. First Pacific Bank of Chicago (In re Estate of Muhammad)*,
520 N.E.2d 795 (Ill. App. Ct. 1987) .................................................................14

*Negrón-Fuentes v. UPS Supply Chain Sols.*,
532 F.3d 1 (1st Cir. 2008).................................................................................11

*Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*,
330 F. Supp. 3d 685 (D.P.R. 2018)...................................................................28

*P.R. Telephone v. Tax Ct.*,
81 P.R.R. 948 (P.R. 1961) .................................................................................25

*Pierce Cty. v. State*,
148 P.3d 1002 (Wash. 2006)..............................................................................26

*Plaintiffs in All Winstar-Related Cases at Court v. United States*,
44 Fed. Cl. 3 (Fed. Cl. 1999) ...........................................................................10

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
91 F. Supp. 3d 267 (D.P.R. 2015)......................................................................22

*Pointsett Lumber Mfg. v. Drainage District No. 7*
119 F.2d 270 (8th Cir. 1941) ............................................................................26

*Quadrant Structured Prods. Co. v. Vertin*,
16 N.E.3d 1165 (N.Y. 2014)............................................................................4, 5

*RBC Capital Markets, LLC v. Educ. Loan Trust IV*,
No. 6297-CS, 2011 WL 6152282 (Del. Ch. Dec. 6, 2011)......................................4

*In re Refco Inc.*,
505 F.3d 109 (2d Cir. 2007)..............................................................................10

*Rodriguez Acevedo v. Solivellas & Co.*,
49 D.P.R. 633 (P.R. 1936) ................................................................................20

*Ruano v. Spellman*,
    505 P.2d 447 (Wash. 1973)........................................................................................26

*S. Blvd., Inc. v. Martin Paint Stores*,
    207 B.R. 57 (S.D.N.Y.1997)......................................................................................10

*In re Techs. Int'l Holdings, Inc.*,
    234 B.R. 699 (Bankr. E.D. Ky. 1999).........................................................................9

*In re Tronox Inc.*,
    855 F.3d 84 (2d Cir. 2017).......................................................................................10

*U.S. Tr. Co. of N.Y. v. New Jersey*,
    431 U.S. 1 (1977).......................................................................................21, 25, 27

*United States Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs., Inc.)*,
    332 B.R. 495 (Bankr. D.P.R. 2005).........................................................................20

*United States v. La Luz-Jimenez*,
    226 F. Supp. 3d 79 (D.P.R. 2017)............................................................................18

*United States v. President & Fellows of Harvard Coll.*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ......................................................................18

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982).................................................................................................3, 30

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996).................................................................................................26

*Von Hoffman v. City of Quincy*,
    71 U.S. 535 (1867)...................................................................................................17

*Wertheim, LLC v. Currency Corp., Inc.*,
    No. B270926, 2017 WL 3668985 (Cal. Ct. App. Aug. 25, 2017) ...........................18

*Winston v. City of New York*,
    759 F.2d 242 (2d Cir. 1985).....................................................................................26

**STATUTES**

3 L.P.R.A. § 1906 ...........................................................................................................13

3 L.P.R.A. § 1907 ...................................................................................................21, 25

3 L.P.R.A. § 1913 ...........................................................................................11, 20, 25

3 L.P.R.A. §1914 ..................................................................................................*passim*

3 L.P.R.A. § 1922 ...................................................................................................................19

13 L.P.R.A. § 4 ......................................................................................................................19

13 L.P.R.A. § 32126 ..............................................................................................................19

18 L.P.R.A. § 1026 ................................................................................................................19

19 L.P.R.A. § 2219 ................................................................................................................21

31 L.P.R.A. § 3478 ................................................................................................................18

11 U.S.C. § 361 ......................................................................................................................11

11 U.S.C. § 362 ......................................................................................................................11

26 U.S.C. § 7652 .............................................................................................................13, 17

48 U.S.C. § 2141 ....................................................................................................................29

48 U.S.C. § 2163 ................................................................................................................2, 29

48 U.S.C. § 2195 ....................................................................................................................10

Commercial Code § 9-104(e) (Act No. 241, adopted September 19, 1996) ................................21

**OTHER AUTHORITIES**

Puerto Rico Constitution...............................................................................................2, 4, 22, 23

156 A.L.R. 1264.......................................................................................................................26

10 Am. Jur. 2d Banks and Financial Institutions § 765 ...............................................................14

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012)..............15

BLACK'S LAW DICTIONARY (11th ed. 2019)........................................................................15, 18

1 GELFAND, STATE & LOCAL GOV'T DEBT FIN. §§ 3:32, 10:17, 11:15..........................................24

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2019) ............................18

Ambac[2] and the Financial Guaranty Insurance Company ("FGIC" and, together with Ambac, "Movants") respectfully submit this reply in further support of the Stay Motion, and to respond to (i) the Oversight Board's opposition (Dkt. No. 7827, "OB Br."), (ii) AAFAF's opposition (Dkt. No. 7829, "AAFAF Br."), and (iii) the partial joinder to the Oversight Board's opposition filed by the Official Committee of Unsecured Creditors of all Title III Debtors (Dkt. No. 7831, "UCC Br."). The Oversight Board and AAFAF are collectively referred to as the "Respondents." In support of their reply, Movants state as follows:

## PRELIMINARY STATEMENT

1. Many years ago, the Puerto Rico Legislative Assembly passed a statute providing that the first proceeds of the Rum Taxes, up to $117 million per annum, shall be transferred "when received" to PRIFA. The statute also authorized PRIFA to issue bonds and to pledge the Rum Taxes to secure those bonds. PRIFA did so to the tune of more than $1 billion. As Respondents emphasize, the Commonwealth is not "liable on account of the PRIFA bonds." (OB Br. ¶ 82.)

2. As the *quid pro quo* for the non-recourse nature of the debt, PRIFA bondholders were granted an immediate perfected lien on the tax revenue stream until the bonds are paid in full. The Commonwealth also contracted by legislation with PRIFA bondholders not to limit or impair PRIFA's rights to the Rum Taxes. This was more than just another promise in the "land of broken promises" that is bankruptcy. It was a governmental commitment giving rise to a property interest protected by the Fifth Amendment.

3. Now, the Oversight Board and the Commonwealth contend that PRIFA bondholders signed up for something fundamentally different. They ask this Court to accept that

---

[2] Unless otherwise specified, defined terms have the same meanings given to them in *Ambac Assurance Corporation's Motion and Memorandum of Law in Support of its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* (Dkt. No. 7176, the "Stay Motion").

the Commonwealth can simply flip a switch and turn off the revenue stream whenever it sees fit in the exercise of magical "retention powers" that are nowhere to be found in the Puerto Rico Constitution or any other source of law.  Ironically, Respondents' attempt to invalidate the transfer of revenue to PRIFA, reclaim the tax revenues, and negate the bondholder lien, has the effect of converting PRIFA bondholders into Commonwealth creditors.

4.      The Oversight Board goes a step further.  The Oversight Board argues that its power to certify fiscal plans and budgets under PROMESA "preempts" the Puerto Rico statute transferring the Rum Taxes to PRIFA and its bondholders (and virtually all other Puerto Rico revenue bonds)—irrespective of whether PROMESA itself actually conflicts with the statute or even ***permits*** such erasure.  At the stroke of the certification pen, the statute is gone, and with it the constitutionally protected covenants and liens—all with the added kicker that, according to the Oversight Board, neither this Court nor any other court can review the Oversight Board's decision.

5.      The Oversight Board's position makes a mockery of federal preemption doctrine.  It also makes a mockery of Section 303 of PROMESA, which preserves the Commonwealth's power "to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of [its] political or governmental powers."  48 U.S.C. § 2163.

6.      The arbitrariness of the Oversight Board's interpretation has been borne out in practice.  At the same time that the Oversight Board has imposed fiscal plans and budgets that require the confiscation of the Rum Taxes—and purport to "preempt" the Puerto Rico statute requiring that such funds flow to PRIFA and its bondholders—the Oversight Board has seen no need to exercise this awesome preemption power with respect to Puerto Rico's rum producers such as Bacardi Ltd.  Those rum producers—a favored political constituency—have continued to receive hundreds of millions of dollars in Rum Taxes during these Title III cases, even though

Puerto Rico law requires "first proceeds" of those Rum Taxes to flow to PRIFA, and the Commonwealth's own "incentives" agreement with Bacardi states the rum producers' interest in the Rum Taxes is subordinate to PRIFA bondholders' interest.  This "arrangement" is all the more alarming against the backdrop of the major corruption scandals currently unfolding in Puerto Rico.

7.      This cannot be the result intended by Congress.  If it was, Puerto Rico has a much bigger problem—the unconstitutionality of PROMESA itself, Puerto Rico's sole option for restructuring its debts.  *See United States v. Sec. Indus. Bank*, 459 U.S. 70 (1982).

8.      Setting aside these alarming flaws in the Oversight Board's worldview, Respondents' opposition papers identify no basis for this Court to deny the Stay Motion:

9.      *First*, Respondents' challenge to Movants' standing is entirely without merit.  The Trust Agreement restricts actions "on any Bond" by bondholders, but Movants—as Credit Facility providers, not mere bondholders—are not subject to this restriction, and the contemplated litigations do not involve an action "on any Bond."  Movants have direct causes of action against the Commonwealth, not claims that are merely derivative of PRIFA's rights.  Nor does collateral estoppel preclude this Court from considering whether the automatic stay applies to the lawsuits for several reasons, including that the issue was never actually litigated and the "final judgment" requirement is not met for any of the cases Respondents rely on.

10.     *Second*, Movants' lien extends to the Pledged Rum Taxes and attaches to the Pledged Rum Taxes in the hands of the Commonwealth.  The plain language of the Trust Agreement makes clear that bondholders have a lien on all Rum Taxes "deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the [Enabling] Act."  The Pledged Rum Taxes are "deposited to the credit of" the Infrastructure Fund by operation of law when they are received by the Commonwealth.  Moreover, Respondents ignore entirely the critical facts that (i) the Trust

Agreement expressly incorporates the Enabling Act into the definition of the pledged collateral, and (ii) the Commonwealth entered into a covenant with PRIFA bondholders that expressly pledged non-impairment of the Enabling Act. These provisions establish that the lien granted to bondholders attaches to the Pledged Rum Taxes held by the Commonwealth.

11. *Finally*, the Enabling Act transfers ownership of the Rum Taxes to PRIFA. Respondents' arguments to the contrary misconstrue the Enabling Act, the clawback provision of the Puerto Rico Constitution, or PROMESA.

## ARGUMENT

### I. MOVANTS HAVE STANDING TO BRING THE STAY MOTION AND THE PROPOSED LAWSUITS.

#### A. The Collective Action Provision of the Trust Agreement Does Not Apply to the Stay Motion or the Claims to Be Pursued.

12. Section 705 of the Trust Agreement (attached hereto as Exhibit 1)—known as a "collective action" provision—provides that "[n]o Holder of any of the Bonds shall have any right to institute, appear in or defend any suit, action or proceeding in equity or at law on any Bond or for the execution of any trust hereunder or for any other remedy hereunder." (Ex. 1, at 45.) The purpose of such provisions is to prevent individual bondholders from pursuing litigation that is not in the interests of a majority of the bondholders. *See, e.g.*, *RBC Capital Markets, LLC v. Educ. Loan Trust IV*, No. 6297-CS, 2011 WL 6152282, at *5 (Del. Ch. Dec. 6, 2011).

13. Collective action provisions are strictly construed. *Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992); *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728, 730 n.1 (S.D.N.Y. 1966), *aff'd*, 395 F.2d 663 (2d Cir. 1968); *Quadrant Structured Prods. Co. v. Vertin*, 16 N.E.3d 1165, 1172-1173 (N.Y. 2014).

4

1.      **Section 705 Only Covers Actions by Bondholders, Not Bond Insurers.**

14.      As noted, Section 705 provides that "[n]o ***Holder*** of any of the Bonds" shall have the right to take certain actions.  (Ex. 1, at 45 (emphasis added).)  A "Holder" is defined as "any person who shall be the registered owner of any Outstanding Bond or Bonds."  (*Id.* at 11.)  Holders are distinct from "Credit Facility" providers—defined as providers of, *inter alia*, "polic[ies] of municipal bond insurance."  (*Id.* at 12.)  Movants—both of whom have issued such policies for PRIFA bonds—are Credit Facility providers under the Trust Agreement.  Section 705, by its terms, only limits the rights of Holders to bring certain actions, not the rights of Credit Facility providers.  That ends the inquiry.  Section 705 does not apply.

15.      There can be no credible argument that the parties intended to limit the rights of Credit Facility providers but inadvertently neglected to mention them in Section 705.  The last line of Section 704—a sentence that *immediately precedes* the operative collective action provision in Section 705—expressly and extensively refers to Credit Facility providers, affording them the right to direct and control the Trustee, in lieu of the bondholders, to the extent they insure a majority of the PRIFA bonds (as Movants do here).  (Ex. 1, at 45.)  The Trust Agreement includes numerous provisions specifically governing Credit Facility providers.  (*See, e.g.*, Trust Agreement §§ 208, 209, 402, 501, 502, 704.)  When the parties wished to structure the rights and obligations of the Credit Facility providers, they knew how to do so, and the ***omission*** of such providers from the collective action provision must be given force and effect.  *See Quadrant*, 16 N.E.3d at 1172 ("if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission").

16.      Any residual doubt that bond insurers are excluded from Section 705 is conclusively put to rest by the bond resolution, which provides:

FGIC shall be included as a party in interest and as a party entitled to request the Trustee to intervene in judicial proceedings that affect the FGIC Insured Bonds or the security therefor . . . The Authority [i.e., PRIFA] shall pay or reimburse FGIC for any and all charges, fees, costs, and expenses that FGIC may reasonably pay or incur in connection with the following: (i) *the administration, enforcement, defense, or preservation of any rights or security hereunder or under the Trust Agreement*; (ii) *the pursuit of any remedies hereunder, under the Trust Agreement, or otherwise afforded by law or equity*, . . . or (vi) *any litigation or other dispute in connection with the Trust Agreement* or this Resolution or the transactions contemplated hereby or thereby . . . .

(PRIFA Resolution 2005-17 §§ 24(c), 14(h) (attached hereto as Exhibit 2) (emphasis added).) Thus, not only did PRIFA concede that a bond insurer was entitled to pursue litigation in respect of the PRIFA bonds, but it ***affirmatively agreed to reimburse*** fees and costs associated with such litigation. And notably, PRIFA agreed to reimburse the insurer for precisely the kinds of actions (among others) that Section 705 bars bondholders from pursuing. (*Compare* Ex. 1, at 45 (Trust Agreement § 705) (prohibiting bondholders from bringing actions "on any Bond or for the execution of any trust hereunder or for any other remedy hereunder"), *with* (Ex. 2, at 50 (PRIFA Resolution 2005-17 § 14(h)) (agreeing to reimburse FGIC for actions to enforce "any rights or security hereunder or under the Trust Agreement" or "the pursuit of any remedies hereunder, under the Trust Agreement, or otherwise afforded by law or equity").[3]

17.    That Section 705 applies to bondholders, but not bond insurers, is further supported by the policy underlying collective action provisions. As AAFAF acknowledges, collective action provisions "'protect against the exercise of poor judgment ***by a single bondholder or a small group of bondholders***, who might otherwise bring suit against the issuer that most bondholders would consider not to be in their collective economic interest.'" *Feldbaum v. McCrory Corp.*, Nos.

---

[3] The fact that the Bond Resolution affords this reimbursement right only to FGIC, not Ambac, has no bearing on whether Ambac may be pursue legal action consistent with the collective action provision. Section 14(h) of the Resolution is not the collective action provision itself, but rather confirms PRIFA's intent as a contracting party—amply reflected in the text of Section 705—that the collective action provision would not apply to bond insurers.

11866, 11920, 12006, 1992 WL 119095, at *6 (Del. Ch. June 2, 1992) (emphasis added), *cited in*

AAFAF Br. ¶ 6.  The concern that maverick individual bondholders will take action that conflicts

with the interests of the majority is not implicated in the case of bond insurers, who assume

exposure to wide swathes of the capital structure and are the most directly exposed creditors insofar

as they must make payments on the applicable financial guaranty policies in the event of a default

by the issuer.  Some series of PRIFA bonds are entirely insured by Movants, and the two insured

a majority of the PRIFA bonds outstanding.  For this very reason, the Trust Agreement itself (with

respect to wrapped bonds) looks to the bond insurers, not the bondholders, in determining who

may direct and control the Trustee in respect of any remedial proceedings.  (*See* Ex. 1, at 45 (Trust

Agreement § 705).)[4]

## 2.    Even if Section 705 Applied to Movants, Neither the Stay Motion nor the Actions Contemplated Thereby Are Barred by the Collective Action Provision.

18.    In any event, neither the Stay Motion, nor the contemplated U.S. Treasury Action

or PRIFA Clawback Action is an action "on any Bond or for the execution of any trust hereunder

or for any other remedy hereunder."  (Ex. 1, at 45 (Trust Agreement § 705).)

19.    As an initial matter, the only question before this Court is whether Movants lack

standing to bring the Stay Motion—not Movants' standing in the proposed lawsuits.  If this Court

grants the Stay Motion, it will fall to the alternative forum to resolve any standing disputes.

---

[4] Movants note that the question of standing is largely academic in any event, because Movants collectively insure a majority of the PRIFA bonds.  Under Section 704 of the Trust Agreement, "Holders [or Credit Facility provider, as applicable] of a majority in principal amount of the Bonds Outstanding" shall have the right, subject to certain conditions, to "direct the time, method and place of all remedial proceedings to be taken by the Trustee hereunder." (Ex. 1, at 445.)  Thus, Section 705 is irrelevant because even if it applied, Movants stand ready to direct, and provide the necessary indemnity to, the Trustee to pursue the same challenge pursuant to Section 704.

20.     Even if this Court were to consider Movants' standing with respect to both the Stay Motion and the contemplated lawsuits, none of them are precluded under the Trust Agreement. The contemplated lawsuits are not against PRIFA and thus by definition are not "on the bonds" or under the Trust Agreement. The cases cited by Respondents in which courts found bondholders lacked standing involved broadly worded collective action clauses that precluded bondholders from pursuing ***any*** "remedy with respect to" the bonds.[5] Unlike those cases, Section 705 of the Trust Agreement here does not preclude bondholders from bringing actions "related to" or "arising from" or "in respect of" the Trust Agreement. Rather, it narrowly prohibits suits (1) "on any Bond," or (2) "for the execution of any trust hereunder," or (3) "for any other remedy hereunder."

21.     The Stay Motion is plainly not an action on the PRIFA bonds or for a remedy under the Trust Agreement. An order lifting the stay does not afford substantive relief; it is a procedural decision that the bankruptcy court will "stand aside" and allow creditors to pursue relief in an alternative forum. *See In re Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Group of PREPA Bondholders, et al.* (*Fin. Oversight & Mgmt. Bd. for P.R.*), 899 F.3d 13, 19 (1st Cir. 2018). Movants' request for adequate protection (Mov. Br. Point III) also is not an action on the PRIFA bonds or for a remedy under the Trust Agreement; the right to adequate protection arises under the

---

[5] *See Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1289 (11th Cir. 2012) (collective action provision stating that noteholders "may not pursue any remedy ***with respect to*** this Indenture or the Securities" (emphasis added)), *cited in* AAFAF Br. ¶¶ 5, 6; *Lange v. Citibank, N.A.*, No. 19245-NC, 2002 WL 2005728, at *5 (Del. Ch. Aug. 13, 2002) ("A Securityholder may not pursue a remedy ***with respect to*** this Indenture or the Securities." (emphasis added)), *cited in* AAFAF Br. ¶ 9. Likewise, *Enron* involved a much more broadly worded collective action provision. *See Mizuho Corp. Bank, Ltd. v. Enron Corp. (In re Enron Corp.)*, 302 B.R. 463, 41 (Bankr. S.D.N.Y. 2003), *aff'd*, 2005 U.S. Dist. LEXIS 2134 (S.D.N.Y. Feb. 14, 2005), *cited in* OB Br. ¶ 48. The PREPA decision is also inapposite because the bondholders was attempting to exercise set-off rights that were covered by the no-action provision. *See* Motion for Relief from Stay to Execute Set-Off (Dkt. No. 4004); OB Br. Ex. D, at 48:10-15.

Bankruptcy Code and the Fifth Amendment, not the trust.  *See LNC Invs., Inc. v. First Fid. Bank, N.A.*, 247 B.R. 38, 44 (S.D.N.Y. 2000) (citation omitted).[6]

22.     Even if they were relevant to the standing analysis (they are not), the U.S. Treasury Action and PRIFA Clawback Action likewise are not actions on the PRIFA bonds or for remedies under the Trust Agreement.  They are actions to halt the ongoing unconstitutional dissipation of Movants' collateral.  The mere fact that those proposed actions might ***relate to*** the PRIFA bonds is insufficient:  A collective action provision will not preclude actions that merely "relate to" or are "with respect to" the bonds unless the contract says so.  (*See supra* ¶ 13.)

### B.     Movants Seek to Advance Their Own Rights Under the U.S. Constitution, PROMESA, and the Enabling Act, Not Claims Derivative of PRIFA's Rights.

23.     Respondents' argument that Movants are mere "creditors of a creditor," and thus lack standing as a party-in-interest under Section 1109(b) of the Bankruptcy Code, is also baseless. (*See* OB Br. ¶¶ 52-58.)  Contrary to Respondents' arguments, Movants are pursuing their own claims against the Commonwealth based on the Commonwealth's taking of Movant's property— not asserting claims that are "purely derivative" of PRIFA's own.  (*See id.* ¶ 54.)

24.     Movants are not seeking to advance PRIFA's claim for Rum Taxes of which it has wrongfully been deprived.  Rather, Movants are seeking to safeguard their own constitutionally protected property interest in the Pledged Rum Taxes by escrowing them at the U.S. Treasury or halting the Commonwealth's stripping of Movants' lien.  *See In re Techs. Int'l Holdings, Inc.*, 234 B.R. 699, 714-16 (Bankr. E.D. Ky. 1999) (enjoining post-petition enforcement of statute diverting statutory payments from debtor directly to its creditors).  Movants' proposed claims to protect their

---

[6] Movants likewise did not waive the right to pursue the actions contemplated by the Stay Motion under Section 601 of the Trust Agreement, as Respondents contend.  OB Br. ¶ 24.  That provision merely states that the Commonwealth is not liable "on the Bonds," consistent with the non-recourse nature of the revenue bond structure.  But as noted, the relief sought against the Commonwealth is not "on the Bonds."

own property rights are direct, not derivative, in nature. *In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir. 2017) ("[Direct] claims are personal to the individual creditor."); *Plaintiffs in All Winstar-Related Cases at Court v. United States*, 44 Fed. Cl. 3, 9-10 (Fed. Cl. 1999) (noting the direct nature of plaintiffs' constitutional claims).[7]

25.     Even if the Court concluded that the property belonged to PRIFA, not its creditors, Movants nonetheless would have a direct claim against the Commonwealth under PROMESA, which insulates Puerto Rico's creditors from, *inter alia*, transfers "which deprive[] any such territorial instrumentality [of Puerto Rico] of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors."  48 U.S.C. § 2195(a).  This is exactly what the Commonwealth has done to PRIFA, in depriving it of property in violation of applicable law (the Enabling Act).  Section 407(a) makes the transferee— here, the Commonwealth—"liable for the value of such [diverted] property."  48 U.S.C. § 2195(a). And it expressly grants creditors standing to "enforce rights under this section."  *Id.* § 2195(b).

26.     Notably, Respondents nowhere mention, and appear to have overlooked entirely, the non-impairment covenant between the Commonwealth and PRIFA's bondholders, in which the Commonwealth "pledge[d] and agree[d] with the holders of any bonds issued under this chapter" that it would "not limit or alter the rights hereby conferred to the Authority until such

---

[7] For this reason, the Opposition's reliance on cases about party-in-interest standing under Bankruptcy Code § 1109(b) is misplaced; in contrast to those cases, Movants here are asserting direct claims for which they have Article III standing. *See Bank of N.Y. Mellon v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306, 311-12 (D.P.R. 2017) (GO bondholders did not have standing to intervene in an intra-COFINA bondholder dispute over funds held by the COFINA trustee), *cited in* OB Br. ¶ 54; *In re Refco Inc.*, 505 F.3d 109, 118-19 (2d Cir. 2007) (investors in a defendant of a preference action were not parties-in-interest with standing to be heard with respect to settlement of the preference action between the debtor and the defendant), *cited in* OB Br. ¶ 55; *S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61–62 (S.D.N.Y.1997) (commercial tenant in same building as debtor did not have standing to object to the debtor's proposed assignment of the lease to a business in competition with tenant), *cited in* OB Br. ¶ 55.

bonds and the interest thereon are paid in full." 3 L.P.R.A. § 1913. The covenant provides yet another basis for a direct claim against the Commonwealth.

27.     Respondents' argument that, even if the claims are direct, Movants are not ***secured*** creditors of the Commonwealth, and therefore are not entitled to adequate protection, is also untenable. (OB Br. ¶¶ 57-58.) The Bankruptcy Code authorizes adequate protection "of an interest of an entity in ***property***." 11 U.S.C. § 361 (emphasis added). To the extent the Commonwealth has stripped Movants' lien (as alleged), that affects an interest in property that can give rise to a requirement of adequate protection. *See also infra* Sections III.A, III.C.[8]

---

[8] Respondents also argue that Movants are collaterally estopped. (OB Br. Point II) Collateral estoppel is entirely irrelevant to Movants' request that this Court lift the automatic stay under 11 U.S.C. § 362(d)(1) and order adequate protection. As Respondents do not dispute, Movants have not made any previous request for that relief. *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995). And in any event Movants plainly are not subject to collateral estoppel even on the narrow question of whether the automatic stay applies to the proposed lawsuits:

*First*, the applicability of the stay has never been "actually litigated." *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 (1st Cir. 1999). In all three of the cases that Ambac filed, district courts simply entered a "minute order" staying the case within days of the Oversight Board's representations that the case had to be stayed in light of a bankruptcy filing. *See Assured Guar. Corp. v. García-Padilla*, No. 3:16-cv-01037 (D.P.R., May 17, 2017) (Dkt. No. 82); *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, No. 3:17-cv-01568-FAB (D.P.R., May 17, 2017) (Dkt. No. 7); *Ambac Assurance Corp. v. U.S. Dep't of Treasury*, No. 1:17-cv-00809-RBW (D.D.C., May 25, 2017) (May 25, 2017 Minute Order citing Dkt. No. 8). Ambac was not afforded an opportunity to submit an opposition or litigate the issue.

*Second*, there has been no "final judgment" in any of the three cases, as necessary for estoppel to attach. *See Negrón-Fuentes v. UPS Supply Chain Sols.*, 532 F.3d 1, 8 (1st Cir. 2008). All three cases are still pending, and the "stays" were merely temporary and interim orders. In two cases in the District of Puerto Rico, the docket entry states, "[t]his case is stayed ***until further court order***"—making explicit the temporary and interim nature of the stay the district court ordered. *See García- Padilla*, No. 3:16-cv-01037, (D.P.R., May 17, 2017) (Dkt. No. 82) (emphasis added); *Commonwealth of P.R.*, No. 3:17-cv-01568-FAB (D.P.R., May 17, 2017) (Dkt. No. 7) (emphasis added).

*Third*, even if the previous courts had ruled on these issues, the circumstances have changed subsequent to those rulings. An opinion of this court, affirmed by the First Circuit, concluded that section 305 of PROMESA precludes the bankruptcy court from providing certain relief to creditors as part of the Title III proceeding. The First Circuit expressly suggested that Ambac's remedy (with respect to a Title III debtor) is to move for stay relief. *Ambac Assurance Corp. v. Commonwealth (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, No. 18-1214, 2019 WL 2574061, at *5 (1st Cir. June 24, 2019). This new guidance—unavailable when the Oversight Board initially moved for a stay— is sufficient justification to revisit the prospective application of any stay orders.

## II.   RESPONDENTS' THEORY THAT MOVANTS HAVE A LIEN ON AN EMPTY BOX IS MERITLESS.

### A.   Respondents Fail to Rebut Movants' Showing That PRIFA Owns the Pledged Rum Taxes.

28.   As Movants have shown (Stay Mot. ¶¶ 16-17), the Commonwealth transferred ownership of the Pledged Rum Taxes to PRIFA, and is now a "mere conduit" or "delivery vehicle," with no property interest in them.  (Mov. Br. ¶¶ 35-37.)[9]

29.   Moreover, as Movants have shown, even if the Commonwealth retained some interest in the Pledged Rum Taxes, it is at most bare legal title in what amount to "restricted funds" or funds held in trust for PRIFA.  (Mov. Br. ¶¶ 79-81.)  Remarkably, Respondents had no answer to Movants' "restricted funds" and "trust" arguments—none.

30.   That the Enabling Act transferred ownership of the Pledged Rum Taxes to PRIFA is evidenced by the statement that PRIFA's "***participation*** shall be for an amount of up to" $117 million.  3 L.P.R.A. §1914 (emphasis added).  As Movants have shown, "participation" means "ownership" in Puerto Rico law.  (Mov. Br. 8 n.8.)  The Oversight Board tried to distinguish cases Movants cited, arguing they are not factually identical to this case.  (OB Br. 37 n.22.)  But Movants never claimed they were—only that they show that the word "participation" in Puerto Rico means "ownership."  The Oversight Board has pointed to nothing undermining this point.

---

[9] Respondents attempt to distinguish the case law Movants cited on this point are unavailing.  The Commonwealth tried to distinguish *In re LAN Tamers, Inc.*, 329 F.3d 204, 212 (1st Cir. 2003), on the ground that, unlike the debtor in that case, the Commonwealth has "police powers" and purported constitutional clawback powers.  (OB Br. ¶ 110.) As discussed below, neither affords any basis for limiting PRIFA's property rights.  *See infra* Sections III.A, III.B.3. The Commonwealth also distinguished *Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007), on the grounds that the plaintiff, as a private association, had a Takings Clause claim against the Commonwealth, which PRIFA (a governmental unit) does not have.  (OB Br. ¶ 111.)  But the availability of a constitutional remedy for an unlawful taking of property is a separate question from whether a statute creates a property right; *Flores Galarza* recognizes that statutes like the special deposit provision of the Enabling Act create and transfer enforceable property rights.

31.     The Oversight Board also emphasizes that, prior to fiscal year 2008-2009, the statute used the phrase "maximum amount" to describe PRIFA's interest in the Pledged Rum Taxes, rather than the word "participation"—asserting that it would be absurd for the Oversight Board to suddenly grant an ownership interest to PRIFA in that fiscal year.  (OB Br. ¶ 77.)  But both "maximum amount" and "participation" can connote the portion of the Rum Taxes that PRIFA owns.  The legislature's use of the word "participation" starting in fiscal year 2008-2009 and the apparent interchangeability of the terms in the eyes of the legislature confirm the legislature's pre-existing understanding that PRIFA owned the Pledged Rum Taxes.[10]

32.     The Oversight Board next argues that PRIFA does not own the Pledged Rum Taxes because the Enabling Act states that "PRIFA '*may receive*' federal excise taxes."  (OB Br. ¶ 73.) This takes out of context a general enumeration of PRIFA's power to "pledge all or a portion of such revenues as [PRIFA] may receive, ***including, but not limited to*** . . . all or any portion of the federal excise taxes ***or other funds which should have been transferred by the Commonwealth to the Authority***."  3 L.P.R.A. § 1906(m) (emphasis added).  This section authorizes PRIFA to pledge any revenues it might receive—not only the Pledged Rum Taxes, which it ***will*** receive.[11]

33.     The Oversight Board also argues that the reporting requirements in Section 814 of the Trust Agreement are "limited"—contending that, if bondholders had a lien in the Pledged Rum Taxes, one would expect required reporting of monies sent to the Commonwealth, not merely reports of disbursements from PRIFA's accounts.  (OB Br. ¶ 92.)  But the reporting requirements

---

[10] The Oversight Board plainly misconstrues the statute in arguing that the reference to "the participation" in § 1914 refers to the "participation" of the Commonwealth Treasury.  Under 26 U.S.C. § 7652, all of the Rum Taxes are paid to the Puerto Rico Treasury.  The reference to "participation" is in a list of the "maximum amount" of the Rum Taxes for each fiscal year "which when received by the Department of the Treasury of Puerto Rico, shall be covered into" the Infrastructure Fund.  3 L.P.R.A. § 1914.  This plainly refers to PRIFA's ownership in the funds—not Treasury's.

[11] Moreover, while PRIFA owns the Pledged Rum Taxes, it is nevertheless accurate to state that PRIFA merely "may receive" such taxes:  As the Oversight Board acknowledges, there is no guarantee that the federal government will transfer Rum Taxes to the Commonwealth in every fiscal year.  (OB Br. ¶ 109.)

13

the Oversight Board points to are those applicable to the **Trustee**, not PRIFA itself.  PRIFA is subject to additional reporting requirements, set out in separate documents, including a Continuing Disclosure Agreement (attached hereto as Exhibit 3) and Bond Resolution 2005-17, § 23.

34.    The failure by the Treasury Department to assign control of the funds to PRIFA does not alter PRIFA's beneficial ownership of the funds, nor does it prevent those funds from becoming part of the Infrastructure Fund and PRIFA's property.  The Pledged Rum Taxes become beneficially owned by PRIFA, and credits to the Infrastructure Fund, by virtue of the express language in the Enabling Act transferring those funds to PRIFA, mandating that they be "covered into" the Infrastructure Fund, and covenanting that the Commonwealth will not impair PRIFA's rights to the funds.  Insofar as the Treasury Department fails to transfer the funds to the control of the Authority as required by the Enabling Act, it is simply misappropriating the funds—in the same way that a bank teller given cash to deposit would misappropriate those funds by crediting them to his or her own account instead of the account of the customer to which they belonged.  10 Am. Jur. 2d Banks and Financial Institutions § 765; *Estate of Muhammad v. First Pacific Bank of Chicago (In re Estate of Muhammad)*, 520 N.E.2d 795, 797 (Ill. App. Ct. 1987) ("[T]rue ownership of a deposit may be proved to be in another than the person in whose name it is made . . . .  The right of an owner to money belonging to him is not defeated by the fact that it is deposited in the name of another." (internal quotation marks omitted)).  Such unlawful action does not change the ownership of the funds at law; it is simply a misappropriation from which the bondholders remain protected since the Commonwealth holds the diverted funds subject to the bondholders' lien.

### B.    Movants Have a Lien on the Pledged Rum Taxes In the Hands of the Commonwealth.

35.    Respondents challenge the scope of PRIFA bondholders' lien in the Pledged Rum Taxes, arguing that PRIFA "pledged only the monies actually received by PRIFA from the

14

Commonwealth (in the PRIFA Infrastructure Fund) and subsequently deposited by PRIFA to the

Sinking Fund."  (OB Br. ¶ 67; *see also* UCC Br. ¶ 1.)  As shown below, Respondents' efforts to

limit bondholders' lien on the pledged special revenues to a now-empty "sinking fund" is meritless.

> **1.    The Trust Agreement Expressly States that "Pledged Revenues"**
> **Includes the "Special Tax Revenues," Whether Deposited to the**
> **Sinking Fund or Not.**

36.    As Respondents concede (OB Br. ¶ 21), the Trust Agreement grants a lien in the

"Pledged Revenues," which consists of "[1] the Special Tax Revenues and [2] any other moneys

that have been deposited to the credit of the Sinking Fund."  (Ex. 1, at 15.)

37.    The Oversight Board assumes that only "Special Tax Revenues" that have been

"deposited to the credit of the Sinking Fund" constitute "Pledged Revenues."  (OB Br. ¶ 23.)  This

interpretation would render nugatory the reference to "Special Tax Revenues" in the definition of

"Pledged Revenues."  If the Oversight Board's reading had been intended, "Pledged Revenues"

could have been defined as "moneys that have been deposited to the credit of the Sinking Fund."

Whether "moneys" are "Special Tax Revenues" would be irrelevant, and the definition of that term

mere surplusage.  "'It is well-established [under Puerto Rico law] that courts should avoid

interpretations that render a provision of an agreement surplusage.'"  *Citibank, N.A. v. Allied*

*Mgmt. Grp.*, 491 F. Supp. 2d 232, 237 (D.P.R. 2007) (quoting *P.R. Tel. Co. v. Advanced Cellular*

*Sys., Inc. (In re Advanced Cellular Sys., Inc.)*, 483 F.3d 7, 12 (1st Cir. 2007)).

38.    The Oversight Board's interpretation also must be rejected because it violates the

last-antecedent canon.  "[A] limiting clause or phrase . . . should ordinarily be read as modifying

only the noun or phrase that it immediately follows[.]"  *Barnhart v. Thomas*, 540 U.S. 20, 26

(2003); *see also Lockhart v. United States*, 136 S. Ct. 958, 960 (2016); *Rule of the Last Antecedent*,

Black's Law Dictionary (11th ed. 2019); A. Scalia & B. Garner, Reading Law: The

Interpretation of Legal Texts 144 (2012).  Under the canon, the limiting phrase ("that have

15

been deposited to the credit of the Sinking Fund") modifies only the noun that it immediately follows ("any other moneys"), **not** "Special Tax Revenues." *See Barnhart*, 540 U.S. at 27–28.

39.    Movants' interpretation gives effect to every word in the definition, and is consistent with the grammatical structure. Pledged Revenues are (i) "Special Tax Revenues" (a kind of "moneys") **plus** (ii) any "other moneys" that "have been deposited to the credit of the Sinking Fund." By way of example, "other moneys" might be deposited to the credit of the Sinking Fund if less than $117 million is received from the U.S. Treasury in a given fiscal year; when that occurs, "the Secretary of the Treasury is authorized to cover said deficiency with **any** funds available," even funds that are not Special Tax Revenues. 3 L.P.R.A. § 1914 (emphasis added).

40.    The governing bond resolution further confirms this interpretation. It provides: "The [Trust] Agreement also provides for the creation of a special fund designated 'Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund' (the 'Sinking Fund') and for the deposit to the credit of said special fund of a sufficient amount of the Pledged Revenues (as defined in the Trust Agreement) to pay the principal of and interest on all bonds issued under the Agreement as the same become due and payable . . . ." (Ex. 1, at 8.) The Oversight Board's interpretation would render this sentence nonsensical and circular: Because the Oversight Board defines "Pledged Revenues" as money deposited into an account titled "Sinking Fund," under the Oversight Board's interpretation, this sentence would require PRIFA to deposit into an account titled the Sinking Fund "a sufficient amount of" funds from an account titled Sinking Fund—an absurdity. *See Flores Rodriguez v. Flores Toledo*, 101 D.P.R. 61, 68-69 (1973) (contractual interpretations that result in an absurdity should be rejected).

41.    For these reasons, Respondents' attempt to equate "Pledged Revenues" with monies deposited to the Sinking Fund must be rejected. The only possible reading of the

agreement is that "Special Tax Revenues," whether deposited to the credit of the Sinking Fund or not, are "Pledged Revenues," and that "other moneys" deposited to the credit of the Sinking Fund (such as Commonwealth appropriations to make up a shortfall) also become Pledged Revenues.

### 2. "Special Tax Revenues" Include All Rum Taxes Deposited to the Credit of the Puerto Rico Infrastructure Fund, Which Occurs Under the Enabling Act When the Commonwealth Receives the Taxes.

42.     Having established that the Special Tax Revenues are Pledged Revenues irrespective of whether they have been deposited to the credit of the Sinking Fund, the question then becomes:  What are the Special Tax Revenues?  The Trust Agreement defines them as "the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund ***pursuant to the Act***."  (Ex. 1, at 21 (emphasis added).)  This is plainly a reference to, *inter alia*, 3 L.P.R.A. § 1914, which discusses the Puerto Rico Infrastructure Fund (the "<u>Infrastructure Fund</u>"):  "[T]he first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to [26 U.S.C. § 7652(a) (3)] . . . when received by the Department of the Treasury of Puerto Rico, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund,' and be used by the Authority for its corporate purposes . . . ." 3 L.P.R.A. § 1914.[12]

43.     The first proceeds of the Rum Taxes are "deposited" with the Puerto Rico Treasury Department, "to the credit of the Puerto Rico Infrastructure Fund"—thus making them "Special Tax Revenues," pledged under the Trust Agreement—as soon as the Rum Taxes are received and

---

[12] Statutes like this one create a mandatory and binding continuing duty.  *See Von Hoffman v. City of Quincy*, 71 U.S. 535, 554–55 (1867) ("where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied"); *see also Louisiana ex rel. Hubert v. City of New Orleans*, 215 U.S. 170, 177-78 (1909) ("The contract creditors of the [p]olice [b]oard were entitled to rely upon the benefit of the laws imposing taxation to make their obligations effectual. They could not, constitutionally, be deprived of such benefit. . . ."); *Missouri v. Jenkins*, 495 U.S. 33, 55-56 (1990) (reaffirming *Von Hoffman* and *Hubert* as "a long and venerable line of cases in which this Court held that federal courts could issue the writ of mandamus to compel local governmental bodies to levy taxes adequate to satisfy their debt obligations.").

accepted by the Puerto Rico Treasury Department.  Because the Commonwealth has transferred
ownership to the Pledged Rum Taxes to PRIFA, those funds are "deposited to the credit of the
Infrastructure Fund" as soon as the Commonwealth receives them.

44.     The word "deposit" merely means placing or giving property to someone who is
responsible for preserving it.  *See* BLACK'S LAW DICTIONARY (11th ed. 2019), *deposit* ("act of
giving money or other property to another who promises to preserve it or to use it and return it in
kind"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2019), *deposit* ("to
place, cache, or entrust especially seriously and carefully . . . to place in deposit in a bank or similar
institution").  Neither the Trust Agreement nor any other applicable legal principle requires more
than that for funds to be "deposited."  *See Wertheim, LLC v. Currency Corp., Inc.*, No. B270926,
2017 WL 3668985, at *7 (Cal. Ct. App. Aug. 25, 2017) (applying the "to place, cache, or entrust
especially seriously and carefully" definition of "deposit" to find that a check to pay a judgment
was "deposited" when it was delivered, and therefore entrusted, to the trial court (alteration
omitted)).[13]

45.     Moreover, the words "to the credit of" must be given effect.  This language
recognizes that it is sufficient that the funds "deposited" are intended for the benefit of the
Infrastructure Fund.  By law, the Treasury Department is entrusted with receiving these funds—
and when it receives them from the U.S. Treasury, those funds have been "deposited" with the

---

[13] While these provisions of the Trust Agreement make unambiguously clear that the PRIFA bondholders' lien extends
to funds held by the Commonwealth Treasury, to the extent that the Court perceives any ambiguity, the ambiguity
must be construed against the Commonwealth and PRIFA, which drafted the agreements.  *See* 31 L.P.R.A. § 3478
("The interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity."); *United
States v. La Luz-Jimenez*, 226 F. Supp. 3d 79, 83 (D.P.R. 2017); *United States v. President & Fellows of Harvard
Coll.*, 323 F. Supp. 2d 151, 163 (D. Mass. 2004) ("In construing the agreements, the rule of *contra proferentem*
requires that latent ambiguity in a government agreement be construed against the government as the drafter").  In
addition, to the extent that Respondents attempt to create ambiguity by advancing factual arguments based on the
manner in which funds flow through specific accounts, Movants must have an opportunity to obtain discovery on
those issues and make a full evidentiary presentation to the Court.

Puerto Rico Treasury and, by operation of law, are to the credit of the Infrastructure Fund. *See* OB Br. ¶ 13 ("[T]he first $117 million remitted to the Commonwealth is transferred to the Commonwealth Treasury and ***deposited*** into the Treasury Single Account." (emphasis added)). That is all that is required to subject these funds to the lien as set out in the Trust Agreement.

46.   This is consistent with other provisions of Commonwealth law, which similarly create "special funds," and clearly indicates that moneys are held "to the credit of" such funds at the Treasury Department.[14]   Notably, in contrast to requirements imposed elsewhere, the legislature did not mandate that the Infrastructure Fund "be deposited in an account denominated" in any particular way. *Cf.* 13 L.P.R.A. § 32126 (funds "shall be deposited in an account denominated the 'Puerto Rico Motion Picture Arts, Sciences, and Industry Development Fund,' in the books of the Department of the Treasury"). Nor did the legislature mandate, as it has for other PRIFA funds, that the Infrastructure Fund "be kept in separate accounts." 3 L.P.R.A. § 1922. It simply gave PRIFA a "participation" in (*i.e.*, "ownership of") the Pledged Rum Taxes—and assigned the Pledged Rum Taxes received by the Commonwealth to the Infrastructure Fund, no matter how those funds may be held, accounted for, or denominated.

47.   That PRIFA's "participation" under Section 1914 is limited to the first $117 million of the Rum Taxes helps to understand how the definitions in the Trust Agreement fit together to define the pledged collateral. The term "Offshore Excise Taxes" refers to all of the "federal excise taxes on rum . . . remitted to the Puerto Rico Treasury Department" (Trust Agreement at 14)—

---

[14] *See, e.g.*, 18 L.P.R.A. § 1026 ("said sum shall be transferred to a special fund to be known as 'Special Fund of the Public Corporation, Industries for the Blind, for the Mentally Retarded and Other Disabled Persons of Puerto Rico' . . .  All moneys under the control of the corporation shall be covered into the Treasury of Puerto Rico, to the credit of said Fund, to be drawn upon by the corporation against vouchers therefor."); 13 L.P.R.A. § 4 ("Any balances to the credit of the special fund previously created for the institution named in subsection (a) of this section, shown on the books of the Secretary of the Treasury at the time this section becomes effective, shall be transferred to the new revolving fund hereby created, and shall be used for the same purposes of supporting and operating the said institution, any surplus resulting from its operation to be deposited in the Commonwealth Treasury as miscellaneous receipts.").

which can be far in excess of $117 million.  The "Special Tax Revenues" are limited to the

"Offshore Excise Taxes *deposited to the credit of the Puerto Rico Infrastructure Fund pursuant*

*to the Act*," (Ex. 1, at 18 (emphasis added))—meaning the portion of the "Offshore Excise Taxes"

owned by PRIFA and required to be transferred to the Infrastructure Fund by law, *i.e.*, the first

$117 million of the Offshore Excise Taxes each year.  Any Offshore Excise Taxes in excess of

$117 million remains property of and available to the Commonwealth.[15]

### 3. The Trust Agreement and Covenant Between the Commonwealth and PRIFA Bondholders Confirm That the Special Deposit Provisions of the Enabling Act Are Part of the Lien That PRIFA Granted.

48.     Critically, the Enabling Act is not ordinary legislation but also a contract between

the Commonwealth and PRIFA bondholders.  It contains a covenant between the Commonwealth

and PRIFA's bondholders stating:  "The Commonwealth pledges and agrees with the holders of

any bonds issued under this chapter . . . it shall not limit or alter the rights hereby conferred to the

Authority until such bonds and the interest thereon are paid in full . . . ."  3 L.P.R.A. § 1913.  The

same statute further provides that PRIFA, "as an agent of the Commonwealth, is hereby authorized

to include this pledge on behalf of the Commonwealth on such bonds or contracts."  *Id.*

49.     The purpose and effect of this provision was to make the protections of PRIFA's

bondholders in the Enabling Act not mere statutory rights subject to change, but property rights

---

[15] While the foregoing sections unambiguously establish that PRIFA bondholders have a lien as a matter of law, in the alternative, PRIFA bondholders have an equitable lien.  *See* Stay Motion Point II.A.1.b.  In opposing this argument (OB Br. ¶¶ 79-86), the Oversight Board simply misrepresents case law.  Contrary to the Oversight Board's assertion, the Puerto Rico Supreme Court has not rejected equitable liens.  The language the Oversight Board quotes comes from the Supreme Court's description of a *lower court's* holding—on which the Supreme Court expressly declined to rule. *See Rodriguez Acevedo v. Solivellas & Co.*, 49 D.P.R. 633 (P.R. 1936) ("We shall not follow the parties throughout their full and interesting arguments as to whether or not we have in this island the so-called equitable liens."), *cited in* OB Br. ¶ 80.  Moreover, Respondents had no answer to *United States Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs., Inc.)*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005), which imposed an equitable lien under Puerto Rico law in a bankruptcy and awarded adequate protection.  The Commonwealth plainly has shown an intent to create a lien on the Pledged Rum Taxes, covenanting that it will not impair PRIFA bondholders' rights under the Enabling Act until the bonds are paid in full.  3 L.P.R.A. § 1913.

guaranteed by an agreement between the Commonwealth and PRIFA's bondholders.  *See U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").

50.     In this sense, the Trust Agreement, the "special deposit" provisions of the Enabling Act, and the "Covenant of Commonwealth to bondholders," work together:  PRIFA, with authority from the Commonwealth, granted a lien on the Pledged Rum Taxes, and the "special deposit" requirement of the Enabling Act was expressly incorporated into the definition of pledged revenues.  At the same time, the Commonwealth made explicit that the Enabling Act was not mere legislation but a covenant of the Commonwealth to bondholders—with the Commonwealth's transfer of the Rum Taxes to PRIFA, and PRIFA's grant of a lien in the Pledged Rum Taxes, pledged as security by PRIFA's grant of a lien to bondholders in the Trust Agreement.

51.     The Enabling Act allows PRIFA to decide whether to pledge revenues.  But once PRIFA chooses to pledge revenues, the Enabling Act mandates that those revenues "shall immediately be subject to said lien without the need of the physical delivery thereof or any other act."[16]  3 L.P.R.A. § 1907.  The Enabling Act also confirms that the lien created by the Trust Agreement "***shall be valid and binding from the time it is made*** without the need for a public or notarized instrument.  *Id.* (emphasis added).  Contrary to the Oversight Board's argument that the Enabling Act is permissive (OB Br. ¶¶ 65, 74), this language regulates the lien that PRIFA grants.  While some provisions of the Enabling Act state that PRIFA "*may*" choose to grant a lien in its

---

[16] For this reason, the Oversight Board's arguments that (i) any lien was not "perfected" (OB Br. 40 n.27), or that (ii) the lien does not comply with the Uniform Commercial Code (OB Br. 36 n.21, 37 n.23), are entirely misplaced. Puerto Rico's Uniform Commercial Code excludes governmental pledges from its scope where, as here, a specific statute governs the lien. 19 L.P.R.A. § 2219(c)(2) ("This chapter does not apply to the extent that . . . the constitution or another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state[.]"); *see also* Commercial Code § 9-104(e) (Act No. 241, adopted September 19, 1996) (same).

revenues or not, the language quoted above contrasts with those provisions in its use of the mandatory "shall." *See Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267, 285 (D.P.R. 2015) ("It is axiomatic that the word 'shall' has a mandatory connotation.").

### III. THE BONDHOLDERS' LIEN ON THE PLEDGED RUM TAXES IS A PROPERTY RIGHT THAT CANNOT BE REPEALED OR PREEMPTED.

#### A. The Puerto Rico Constitution Does Not Give the Commonwealth Limitless "Retention Powers" Over the Pledged Rum Taxes.

52.     Respondents argue the Pledged Rum Taxes belong to the Commonwealth, not PRIFA, because the Commonwealth supposedly enjoys general "retention powers" over those monies.  In Respondents' view, these alleged "powers" enable the Commonwealth to simply take the Pledged Rum Taxes whenever it sees fit, as it has in fact done since 2015, stripping Movants' lien in the process.  Article VI, Section 8 of the Puerto Rico Constitution allows no such thing.

53.     It provides:  "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const., art. VI, § 8.  This provision is triggered only if available resources in a given fiscal year are insufficient to meet appropriations.  If that occurs, the provision requires only that available resources be used to satisfy all general obligation debt before being applied to other expenses.  Only if any general obligation debt remains unpaid in that fiscal year may the Pledged Rum Taxes and funds belonging to other revenue bond issuers be used to cover the shortfall for that fiscal year.  Far from granting the Commonwealth unbounded "retention powers," Article VI, Section 8 provides a short-term liquidity backstop to ensure payment of general obligation debt when all else fails.  It exists for the benefit of the Commonwealth's general obligation bondholders—not for the Commonwealth.

54.     The triggering conditions for Article VI, Section 8 have never occurred.  At all relevant times, the Commonwealth has collected revenues that exceed the principal and interest owing on its public debt.  And even if the triggering conditions had occurred, neither Article VI, Section 8 nor the Enabling Act authorizes the Commonwealth to fail to cover the Pledged Rum Taxes into the Infrastructure Fund, or to transfer them back to the Commonwealth.  The Enabling Act merely provides that "moneys of the Special Fund may be used" to pay public debt.  3 L.P.R.A. § 1914.  The Commonwealth cannot obtain the Pledged Rum Taxes for its own benefit.[17]

55.     The Oversight Board also argues that ownership of the Pledged Rum Taxes was not transferred to PRIFA because the Enabling Act lacks certain provisions found in the COFINA Enabling Act.  (OB Br. ¶¶ 9, 43, 77, 88, 91.)  But the COFINA structure did two things—it transferred ownership of the taxes to COFINA, *and* it rendered those taxes beyond the reach of Article VI, Section 8—whereas the PRIFA structure merely transferred ownership of the Pledged Rum Taxes, without exempting them from the Article VI, Section 8.  All of the differences that the Oversight Board points to are explained by this distinction.  The provisions in the Enabling Act are more than sufficient to transfer ownership of the Pledged Rum Taxes to PRIFA.[18]

---

[17] It is the Commonwealth's burden to demonstrate that, as a matter of fact, the conditions for clawback have been triggered and that the monies have been applied solely to the repayment of public debt.  The Oversight Board and AAFAF have made no such showing, and given the current surplus in the General Fund of over $7.2 billion and the fact that GO debt has not been paid, no such showing could be made.

[18] In a telling illustration of the Oversight Board's cavalier attitude towards legally protected payment priorities, the Oversight Board contends that, while secured Rum Tax Bonds are subject to Clawback, voluntary subsidies that the Commonwealth pays to politically connected, on-island rum producers are not (OB Br. ¶ 16)—even though the Commonwealth expressly acknowledges in its subsidy agreement with Bacardi that subsidies can be paid only *after* the Rum Tax Bonds.  (*See* Agreement Between Bacardi Int'l Ltd. et al. and the Government of Puerto Rico et al. § 4.6.1 (attached hereto as Exhibit 4) (emphasis added).)  While the Enabling Act and Trust Agreement make clear that voluntary subsidies paid from Rum Taxes must be junior to the Rum Tax Bonds, the Oversight Board apparently has endorsed a scheme to divert the Rum Taxes to an off-balance sheet "lockbox" arrangement designed to ensure that the Commonwealth can continue subsidizing rum producers and insulate those payments from clawback.  Under the arrangement, Rum Taxes from the U.S. Treasury are deposited into a lockbox account at Citibank, which must transfer the first $117 million received in each fiscal year "to the [Puerto Rico] Secretary of Treasury for deposit to the credit of PRIFA," with much of the remaining funds set aside for rum producers.  Lockbox Agreement, Section 5(a), at 4 (attached hereto as Exhibit 5).

B.  **The Commonwealth's Transfer of the Pledged Rum Taxes to PRIFA Is Valid and Binding—Not Merely an "Appropriation" That Can Be Amended or Repealed Without Consequence.**

1.  **The PRIFA Bonds Are Special Revenue Bonds, Not "Appropriation Bonds."**

56.     Respondents mischaracterize the Rum Tax Bonds as "appropriation bonds," arguing the Enabling Act is nothing more than "a conditional budgetary appropriation."  (OB Br. ¶ 89)  It could not be clearer that the PRIFA bonds are secured revenue bonds.  Unlike general obligation bonds, which are backed by the municipal borrower's "full faith and credit," "appropriation" bonds are backed only by a promise that the municipality may seek during the periodic budgetary process to appropriate funds necessary for repayment of the debt.  1 GELFAND, STATE & LOCAL GOV'T DEBT FIN. §§ 3:32, 10:17, 11:15 (2d ed. 2017).

57.     Such "appropriation" bonds explicitly state that the legal remedies for nonpayment are limited.  Commonwealth instrumentalities have issued appropriation bonds:  The bond documents and official statements for those offerings make clear that the only source of payment for such bonds are discretionary appropriations, which might not be made.  *See* Offering Statement of Puerto Rico Municipal Finance Agency, 2005 Series A Bonds, 2005 Series B Refunding Bonds and 2005 Series C Refunding Bonds, dated December 9, 2005 ("The payment of such sum by the Commonwealth is subject to appropriation by the Legislature of Puerto Rico, which appropriation is authorized but not legally required to be made."), *available at* http://www.gdb.pr.gov/investors_resources/mfa.html.

58.     The PRIFA bonds share none of these characteristics.  Far from warning that payment is limited to appropriations that the Commonwealth might or might not make, the PRIFA bonds are secured by an express mandatory and continuing pledge of a specific revenue stream (the Pledged Rum Taxes), which the Enabling Act makes subject to a "valid and binding" lien in

24

favor of bondholders.  3 L.P.R.A. § 1907(a).  The stated purpose of the Act was to "endow[]the Authority with the needed resources to **ensure** the payment of the principal and interest on bonds." Enabling Act, Statement of Motives, No. 44. July 7, 1997, No. 32 (June 21, 1988) (emphasis added).  The Commonwealth also covenanted to PRIFA bondholders that it would not limit or alter the rights or powers vested in PRIFA until the PRIFA bonds are fully repaid.  3 L.P.R.A. § 1913.  These features make clear that PRIFA bonds are not mere appropriation bonds but special revenue bonds secured by a dedicated revenue stream.  *See P.R. Telephone v. Tax Ct.*, 81 P.R.R. 948, 962 (P.R. 1961) (assignment of special revenues to a special fund of a public authority is "perfectly valid" under Puerto Rico law).

### 2.    Under Well-Settled Law, Legislatures Can Transfer and Make Binding Pledges of a Stream of Future Revenues.

59.    The Oversight Board's argument that, even absent PROMESA, the legislature may simply repeal the property rights granted by the Enabling Act, ignores the fact that PRIFA bondholders have a lien on the Pledged Rum Taxes as well as a covenant from the Commonwealth pledging that PRIFA's rights in the Pledged Rum Taxes will not be impaired.  3 L.P.R.A. § 1913.

60.    To the extent that the Oversight Board presumes that legislatures are free to rescind property rights on their whim, its position is foreclosed by settled precedent recognizing that, where the government creates a public contract with a private person by statute of regulation that directly benefits the state, the government's covenants can create property rights that, if revoked, require the payment of just compensation under the Fifth Amendment.  *See U.S. Tr. Co. of N.Y.*, 431 U.S. at 19 n.16 ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").[19]

---

[19] *See also Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property" for purposes of the Takings Clause, "whether the obligor be a private individual, a municipality, a State, or the United States."); *Adams*

61.     Because the PRIFA bonds are binding, and secured by a stream of pledged special revenues, any legislation abrogating bondholders' lien would require just compensation.[20]  And critically, any such claim under the Takings Clause would not be subject to impairment in restructuring.  *See In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014).[21]

62.     In arguing that legislatures are free to simply repudiate secured debt at will, Respondents misconstrue *Fletcher v. Peck*, 10 U.S. 87, 135 (1810), *cited in* OB Br. ¶ 105, which—in the very next sentence following the one the Oversight Board quoted—confirms that "if an act be done under a law, a succeeding legislature cannot undo it.  The past cannot be recalled by the most absolute power. . . . When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights."  *Id.*; *see also United States v. Winstar Corp.*, 518 U.S. 839, 873-74 (1996) (Souter, J., plurality) (analyzing *Fletcher* ("[T]he National Government has some capacity to make agreements binding future Congresses by creating vested rights."), *cited in* OB Br. at ¶ 105.

---

*v. United States*, 391 F.3d 1212, 1221-22 (Fed. Cir. 2004) ("When the Government and private parties contract . . . the private party usually acquires an intangible property interest within the meaning of the Takings Clause in the contract."); *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 610-14 (D.P.R. 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015) ("Contracts are a form of property for purposes of the Takings Clause.").

[20] *See Winston v. City of New York*, 759 F.2d 242, 247 (2d Cir. 1985) ("Once a state creates a property interest it may not later say that the interest does not exist, because by then federal protections will have attached."); 156 A.L.R. 1264, § II(a) ("taxing power cannot be abrogated or substantially diminished while the obligations are outstanding." (collecting cases)); *see also Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. State of Wash.*, 696 F.2d 692, 700 (9th Cir. 1983); *Pierce Cty. v. State*, 148 P.3d 1002, 1007-09 (Wash. 2006) (repeal of motor vehicle excise tax invalid because the tax was pledged to repayment of transportation bonds); *Kurrus v. Priest*, 29 S.W.3d 669, 676 (Ark. 2000) (abolishing portion of sales and use tax pledged to bonds is "an impermissible impairment of contract"); *Ruano v. Spellman*, 505 P.2d 447, 451 (Wash. 1973); *City of Aransas Pass v. Keeling*, 247 S.W. 818, 821 (Tex. 1923).

[21] The Oversight Board cites no case where a debtor used bankruptcy to avoid a lien without providing adequate projection or just compensation.  *Pointsett Lumber Mfg. v. Drainage District No. 7* involved a claim that land was "damaged by water cast upon it by a floodway constructed by the debtor"—not an intentional taking.  119 F.2d 270, 271 (8th Cir. 1941).  In *Cobb v. City of Stockton (In re City of Stockton, California)*, the landowner agreed to "g[i]ve up all rights to" property in a pre-bankruptcy eminent domain proceeding prior to bankruptcy, but sued for additional compensation.  909 F.3d 1256, 1260-62 (9th Cir. 2018).  In that unique context—where the debtor had an unsecured claim for additional compensation that "was not tethered to the actual property interest he had when the bankruptcy was filed"—the claim was subject to impairment (and even that holding was *dicta*; the court also found that the appeal should have been dismissed as equitably moot).  *Id.* at 1266, 1268-69.

### 3.   Vague Assertions of "Police Powers" Do Not Abrogate Constitutionally Protected Property Rights.

63.     Respondents' argument that "the Commonwealth's police power grants the Legislature broad powers to protect life, health, and general welfare," and thus the power to repudiate the PRIFA bonds, fares no better.  (OB Br. ¶ 106.)  The government's "police power" does not extend to overturning constitutional and statutory protections on bond transactions.  As at least one court has recognized, "the invidious consequence [of repudiating a debt] may not be justified by fugitive recourse to the police power of the State or to any other constitutional power to displace inconvenient but intentionally protective constitutional limitations."  *Flushing Nat. Bank v. Mun. Assistance Corp. for City of N.Y.*, 40 N.Y.2d 731, 736 (1976).

64.     In arguing that "police powers" allow the Commonwealth to repudiate its debt, Respondents rely on *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934), *cited in* OB Br. ¶ 107.  But that case involved a state's right to regulate *private* contracts; it says nothing about public debt.  The Supreme Court has concluded that a government's lawful debts "cannot be questioned," and that "a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors."  *U.S. Tr. Co.*, 431 U.S. at 24, 28-29.

65.     Even if the Commonwealth's "police powers" were relevant, the Oversight Board has presented no evidence that enforcing bondholders' lien would pose a threat to "life, health, and general welfare."  The Commonwealth has more than $7 billion in cash on hand, and an annual operating budget of more than $9 billion.  Puerto Rico Dept. of Treasury: Treasury Single ("TSA") FY2019 Cash Flow as of June 28, 2019, at 5, *available at* http://www.aafaf.pr.gov/reports.html; FY20 Certified Budget for the Commonwealth of Puerto Rico (June 30, 2019), *available at* https://oversightboard.pr.gov/documents/.   The

Commonwealth budget funds a variety of programs that cannot even arguably be characterized as "essential services" (a category that the Oversight Board has steadfastly refused to define).

66.    To take the example most relevant to the rum tax bonds:  While refusing to make payments to PRIFA bondholders—who invested substantial sums in the expectation of repayment—the Commonwealth has continued to divert Rum Taxes to pay subsidies to rum producers, including huge business organizations such as Bacardi.  OVERVIEW OF FY20 CERTIFIED BUDGET FOR THE COMMONWEALTH OF PUERTO RICO at 9 (July 1, 2019) (indicating a budget of $179 million in rum cover-over payments to rum producers for Fiscal Year 2020); *see also* Ex. 4, § 7.2.2.  And it has done so notwithstanding the fact that Puerto Rico law ensures that ***PRIFA***, not the rum producers, is entitled to the "first proceeds" of the Rum Taxes up to $117 million—a fact that PRIFA's contract with Bacardi expressly recognizes. *Id.* § 4.6.1.  Even slightly trimming such giveaways to politically favored constituencies would be sufficient to protect the bondholders' rights—at no cost to the health or safety of anyone.

### C.    PROMESA Does Not Authorize the Oversight Board to Preempt PRIFA Bondholders' Lien.

67.    Finally, contrary to the Oversight Board's contention (OB Br. ¶¶ 97-100), PROMESA does not repeal, replace, or preempt the Enabling Act.  Consistent with its prior position, AAFAF specifically disavows the Oversight Board's preemption arguments.  (AAFAF Br. ¶ 11.)  *See generally Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico* (*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*), 330 F. Supp. 3d 685, 702-04 (D.P.R. 2018).

68.    The "basic federal rule" in bankruptcy is that "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (U.S. 1979) (marks omitted).  As an analog to chapter 9 of the Bankruptcy Code, PROMESA is replete with references to the basic federal rule.  The basic federal rule is most obviously embodied in Congress's mandate for the

Oversight Board to develop, approve, and certify fiscal plans that (i) are based on "applicable law," (ii) use assets, funds, or resources of an instrumentality only for the benefit of that instrumentality, and (iii) respects the priorities or liens established by the Commonwealth Constitution, applicable law, or applicable agreements.  48 U.S.C. § 2141(b)(1)(A), (M), and (N).

69.     Section 201(b)(1) of PROMESA specifically protects liens in fiscal plans.  "A Fiscal Plan developed under this section shall, with respect to the territorial government or covered territorial instrumentality, . . . *be based on . . . applicable laws[]* or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan[.]"  *Id.* § 2141(b)(1)(A) (emphasis added).  And a fiscal plan shall respect "lawful liens" granted under Puerto Rico law. *Id.* § 2141(b)(1)(N).  Section 303 preempts the moratorium laws that the Commonwealth has used to strip bondholders' liens, including the lien securing PRIFA's bonds.  48 U.S.C. § 2163.

70.     Perhaps more important, even if preemption were the proper template, the question would be whether the *statute* conflicts with the Enabling Act, not the Oversight Board's unilateral exercise of its "extensive powers to develop and certify fiscal plans and budgets for the Commonwealth and its instrumentalities."  (OB Br. ¶ 98.)  The Oversight Board cannot *cause* preemption by imposing fiscal plans and budgets that require repudiation of existing property rights, and then wipe its hands of any consequences by insisting that federal law requires the result. Such an interpretation, aside from making a mockery of PROMESA's reservation of the Commonwealth's self-governance powers in Section 303, simply misapprehends preemption doctrine.  A fiscal plan or budget certified by the Oversight Board cannot preempt an existing Puerto Rico statute unless the fiscal plan or budget is in fact consistent with, indeed required by, PROMESA—a question that would require careful inquiry by this Court as to whether the fiscal plan or budget in question complied with the numerous mandates of Section 201(b) of PROMESA.

Only after the Court makes such a determination, can it consider whether the fiscal plan and/or budget necessarily conflict with Commonwealth law such that it has to be deemed preempted.

71.    Moreover, the Oversight Board has repeatedly argued that the fiscal plan is a mere "blueprint" subject to ongoing evolution and that it is not legally binding.  *See, e.g.*, *Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 297 F. Supp. 3d 269, 278 (D.P.R. 2018) ("Defendants contend that . . . the Fiscal Plan serves merely as a 'blueprint' or 'business plan' . . . .").  Indeed, the Oversight Board has successfully advanced that argument in deferring any true reckoning with its misappropriation of revenue bondholders' collateral by invoking ripeness doctrine.  *Id.* at 278, 281.  That it now seeks to argue that this supposed "blueprint" has the effect of trumping virtually all Puerto Rico revenue bond statutes, rendering billions of dollars of bonds secured by empty boxes, comes with little grace.  Much as the Oversight Board would welcome the conclusion, having argued and prevailed on the argument that fiscal plans are not legally binding, the Oversight Board is collaterally estopped from advancing a contrary position here.  *Id.*

72.    Unless PROMESA itself conflicts with the Enabling Act—and it plainly does not—there is no preemption question here.  To the extent PROMESA does conflict with the Enabling Act in a manner that requires repudiation of existing property rights—as the Oversight Board contends—PROMESA is itself unconstitutional.  *Security Industrial Bank*, 459 U.S. at 81 ("No bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress.").

## **CONCLUSION**

73.    For the foregoing reasons, the Court should (i) overrule Respondents' standing challenge, (ii) find that Movants are secured creditors, and (iii) grant the Stay Motion.

Dated:  July 16, 2019
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ Roberto Cámara-Fuertes
   Roberto Cámara-Fuertes (USDC-PR No. 219002)
   Sonia Colón (USDC-PR No. 213809)
   221 Ponce de León Avenue, 5th Floor
   San Juan, PR 00917
   Telephone: (787) 766-7000
   Facsimile:  (787) 766-7001
   Email: rcamara@ferraiuoli.com
     scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ Dennis F. Dunne
   Dennis F. Dunne
   Andrew M. Leblanc
   Atara Miller
   Grant R. Mainland
   (admitted *pro hac vice*)
   55 Hudson Yards
   New York, NY 10001
   Telephone:  (212) 530-5000
   Facsimile:  (212) 530-5219
   Email: ddunne@milbank.com
     aleblanc@milbank.com
     amiller@milbank.com
     gmainland@milbank.com

**ARENT FOX LLP**

By: /s/ David L. Dubrow
   David L. Dubrow
   Mark A. Angelov
   (admitted *pro hac vice*)
   1301 Avenue of the Americas
   New York, NY  10019
   Telephone:  (212) 484-3900
   Facsimile: (212) 484-3990
   Email:  david.dubrow@arentfox.com
     mark.angelov@arentfox.com

Randall A. Brater (admitted *pro hac vice*)
1717 K Street, NW
Washington, DC  20006
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395
Email:  randall.brater@arentfox.com

**_Attorneys for Ambac Assurance Corporation_**


**REXACH & PICÓ, CSP**

By: /s/ María E. Picó
      María E. Picó
      USDC-PR 123214
      802 Ave. Fernández Juncos
      San Juan PR 00907-4315
      Telephone: (787) 723-8520
      Facsimile: (787) 724-7844
      E-mail: mpico@rexachpico.com

**BUTLER SNOW LLP**

By: /s/ Martin A. Sosland
      Martin A. Sosland (admitted *pro hac vice*)
      5430 LBJ Freeway, Suite 1200
      Dallas, TX 75240
      Telephone: (469) 680-5502
      Facsimile: (469) 680-5501
      E-mail: martin.sosland@butlersnow.com

      Jason W. Callen (admitted *pro hac vice*)
      150 3rd Ave., S., Suite 1600
      Nashville, TN 37201
      jason.callen@butlersnow.com
      Telephone:  615-651-6774
      Facsimile:  615-651-6701

**_Attorneys for Financial Guaranty Insurance
Company_**