# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**REPLY IN SUPPORT OF RENEWED MOTION OF THE AD HOC GROUP
OF GENERAL OBLIGATION BONDHOLDERS, UNDER BANKRUPTCY
CODE SECTIONS 105(a) AND 502 AND BANKRUPTCY RULE 3007,
ESTABLISHING PROCEDURES WITH RESPECT TO OMNIBUS
CONDITIONAL OBJECTION TO CLAIMS FILED OR ASSERTED BY THE
PUBLIC BUILDINGS AUTHORITY, HOLDERS OF PUBLIC BUILDINGS
AUTHORITY BONDS, AND HOLDERS OF CERTAIN
<u>COMMONWEALTH GENERAL OBLIGATION BONDS</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

The Ad Hoc Group of General Obligation Bondholders (the "GO Group")[2] respectfully submits this Reply in support of the *Renewed Motion of the Ad Hoc Group of General Obligation Bondholders, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures With Respect to Omnibus Conditional Objection to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, Dkt. No. 7814 (the "Renewed Procedures Motion").[3]

1. In the GO Group's Renewed Procedures Motion, we explained that subsequent developments have now overtaken this Court's conclusion that the GO Group's Conditional Objection presents only a hypothetical, unripe dispute. See Renewed Procedures Motion ¶¶ 38-46. In particular, the Oversight Board's announcement of its PSA with the SPLCDC and the QTCB Group—which treats the Board's strategically truncated debt-limit challenge as the centerpiece of a contemplated plan of adjustment—makes it vitally important that the Court now establish a comprehensive procedure to resolve the full implications of that challenge. That is

---

[2] Members of the GO Group file this Reply exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Renewed Procedures Motion.

[3] Through this Reply, the GO Group responds to the following filings: (a) the objection of the QTCB Noteholder Group (the "QTCB Group"), see Dkt. No. 7876; (b) the objection of the Financial Oversight and Management Board for Puerto Rico, acting through its Special Claims Committee (the "Oversight Board"), see Dkt. No. 7879; (c) the limited objection and reservation of rights of Assured Guaranty Corp., and Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "Assured"), Dkt. No. 7888; (d) the objection of the self-proclaimed "Lawful Constitutional Debt Coalition" (the "SPLCDC"), see Dkt. No. 7900; (e) the joinder of the Ad Hoc Group of Constitutional Debtholders (the "Constitutional Debtholders Group") in Assured's objection, see Dkt. No. 7923; and (f) the response of the Official Committee of Unsecured Creditors (the "UCC," and together with the QTCB Group, the Oversight Board, Assured, the SPLCDC, and the Constitutional Debtholders Group, the "Respondents"), see Dkt. No. 7945.

because the PSA seeks to transfer away billions of dollars in value to bonds that are expressly targeted by the Conditional Claim Objection; whether those bonds are entitled to such compensation (while the Selectively Challenged GO Bonds are offered fractional recoveries) could hardly be more ripe. *Id.* ¶¶ 41-42. Likewise, the Oversight Board's acknowledgment that it has challenged the validity of many bonds other than just the 2012 and 2014 GO Bonds that are the subject of its Selective Claim Objection makes it impossible (and deeply unfair) to confine the Board's debt-limit challenge to only the narrow subset of bonds that the Board has tactically chosen to target. *Id.* ¶¶ 43-45. Respondents lack any persuasive response to this showing.

### A. Recent Developments Establish That The Conditional Objection Presents A Concrete And Ripe Controversy

2. Respondents primarily contend that the recent developments cited in the Renewed Procedures Motion do not undermine this Court's prior decision. See QTCB Group Obj. ¶¶ 9-13; Oversight Board Obj. ¶¶ 18-26; Assured Obj. ¶¶ 8-9; SPLCDC Obj. ¶¶ 3-4; Constitutional Debtholders Group Joinder ¶ 3; UCC Response ¶ 3. They are incorrect.

3. The announcement of the PSA and the imminent filing of a plan of adjustment make clear that there is a present and non-hypothetical dispute as to which bond claims against the Commonwealth should be treated as allowed claims *at this time*. See Renewed Procedures Motion ¶¶ 9, 42. The resolution of that dispute will have concrete and immediate consequences, including for creditors' entitlement to receive distributions under a plan of adjustment. See *id.*[4] And that

---

[4] As explained in the Renewed Procedures Motion (¶¶ 6, 33), the PSA as announced by the Oversight Board contemplates that the Selectively Challenged GO Bonds would be disenfranchised, while generally providing that other bondholders whose claims are subject to challenge on the same grounds would be permitted to vote in full. As explained in further detail in the GO Group's objection to the Oversight Board's motion to stay litigation on the Selective Claim Objection (Dkt. No. 7640, the "Stay Motion"), counsel to the SPLCDC and the Oversight Board subsequently represented that the provisions purporting to disenfranchise holders of the Selectively Challenged GO Bonds had been included in the PSA in error and would be removed. See Dkt. No. 7938, at 14. The SPLCDC repeats that representation in its objection to the Renewed

2

dispute unquestionably has the adversarial character necessary to qualify as a "case or controversy" within the meaning of Article III: Holders of the Conditionally Challenged Claims will surely take the view that their claims should be allowed, while the GO Group maintains that those claims cannot be allowed while the Oversight Board and UCC continue to press a debt-limit challenge that could lead to their invalidation. The fact that the GO Group maintains that the Selective Claim Objection is meritless and thus agrees with holders of the Conditionally Challenged Claims that their claims should not *ultimately* be disallowed based on its misguided "logic" does not, as Respondents incorrectly contend, somehow transform that concrete and immediate dispute into an unripe or otherwise non-justiciable one. See Oversight Board Obj. ¶¶ 23-24; QTCB Group Obj. ¶ 3; SPLCDC Obj. ¶ 3.[5]

---

Procedures Motion (see SPLCDC Obj. ¶ 3 & n.5), though both the Board and the QTCB Group are silent on the point.

It has now been a month since the PSA was made public, at least two weeks since the Oversight Board and the PSA parties were alerted to this supposed error in the PSA, and a full week since the SPLCDC represented to this Court that a correction was forthcoming. As of the date of this filing, however, no correction has been made public, and the Oversight Board continues to publish the original (purportedly erroneous) version on its website. The fact that sophisticated bondholder groups and their counsel would allow the market for publicly traded securities to be influenced by such erroneous information for this extended period is disappointing enough. The fact that the Oversight Board would permit this situation to persist, despite its statutory mandate to ensure Puerto Rico's "access to the capital markets," 48 U.S.C. § 2121(a), and to "improve fiscal governance, accountability, and internal controls," *id.* § 2141(b)(1)(F), defies legitimate explanation.

Against this backdrop, the QTCB Group's contention that the GO Group has sought to "'weaponize' claim objections" to "pervert the voting process" (Dkt. No. 7966, ¶ 12) rings particularly hollow. Despite assurances that an amendment is forthcoming, the public terms of the PSA that the QTCB Group supports continue to provide that holders of the Selectively Challenged GO Bonds would be disenfranchised from voting on the proposed plan of adjustment. There is nothing improper about the GO Group's effort to ensure that the arguments deployed by the Board and its collaborators against the Selectively Challenged GO Bonds are applied in an even-handed manner.

[5] To the extent that Respondents read this Court's prior decision as resting on a categorical conclusion that a litigant's claim can never state a justiciable controversy so long as that litigant does not actually endorse each of the claim's premises, that understanding is flatly inconsistent

3

4. Indeed, it is hard to imagine a dispute more concrete than whether the Oversight Board can distribute billions of dollars to holders of bonds subject to the Conditional Claim Objection while refusing to offer identical treatment to holders of bonds targeted by the very same theory articulated in the Selective Claim Objection. The PSA articulates the very injury the Conditional Claim Objection seeks to address: Whether what is good for the goose is not (as the PSA parties would have it) good for the gander. Tellingly, the PSA parties are eager to avoid any litigation over both the Selective Claim Objection and the Conditional Objection precisely because they recognize that the PSA seeks to impose severe, real-world consequences on those who are not beneficiaries of the PSA's selective application of the Board's debt-limit "logic." How many billions of dollars have to change hands—and potentially wind up in the wrong hands as a matter of law—before Respondents will acknowledge a ripe legal dispute exists?

5. Respondents are similarly unsuccessful in their efforts to explain away the implications of the Oversight Board's own acknowledgment that its debt-limit challenge extends

---

with longstanding practice under Federal Rule of Civil Procedure 14. Under that Rule, "[a] defending party" may implead "a nonparty who is or *may be* liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a) (emphasis added). The original defendant may take that step even though it continues to defend against liability on the claim asserted against it, and thus argues that the third-party defendant should not ultimately be held liable either. In that scenario, the claim against the third-party defendant does not become impermissibly hypothetical or advisory merely because it is predicated on the plaintiff succeeding on its claim. Cf. *Lehman v. Revolution Portfolio LLC*, 166 F.3d 389, 395 (1st Cir. 1999) (the district court need not "determine the merits of all defenses potentially available to the original defendant as a precondition to allowing that defendant to file a third-party complaint"). Although this Court observed in its Procedures Order (at 8) that Rule 14 is not incorporated by default in contested matters and that a procedural rule cannot expand the scope of jurisdiction under Article III (see *id.*), neither observation diminishes the force of Rule 14 as an example in which it is entirely uncontroversial that a party may assert a conditional claim without endorsing each of the premises on which it is based. The same, in fact, may be said about Federal Rule of Civil Procedure 22, which allows a party to interplead two competing claimants (despite the fact that the plaintiff may not endorse the claims of either of those claimants), as well as the well-settled principle under Rule 8 permitting plaintiffs to allege claims in the alternative (where, again, the plaintiff may not endorse one of those inconsistent claims).

4

at least to all GO Bonds and PBA Bonds issued beginning in March 2011. See Renewed Procedures Motion ¶ 43. The SPLCDC appears to recognize that these additional claims *have* been challenged by the Board in its Clawback Actions, but it nevertheless asserts that this development does not render the Conditional Objection ripe because the bonds challenged by the Board are only a subset of those implicated by the Conditional Objection. See SPLCDC Obj. ¶ 4 (stating that these post-March 2011 GO and PBA Bonds are "subject to actual objections"). But we cited the Clawback Actions not to demonstrate that all of the Conditionally Challenged Claims have already been explicitly challenged by the Board, but rather to illustrate that, even on the Board's own account, the supposed "logic" of its debt-limit challenge cannot be confined to the 2012 and 2014 Bonds that are the subject of the Selective Claim Objection. See Renewed Procedures Motion ¶ 43. And that fact, in turn, demonstrates that there is nothing to be gained from further delay in establishing a comprehensive proceeding to adjudicate *all* of the implications of the Board's debt-limit challenge.

6. The QTCB Group, by contrast, insists that bondholders' claims in connection with the bonds implicated by the Clawback Actions have not *really* been disputed, because the complaints in those proceedings allege "only" that the underlying bonds were issued in violation of the constitutional debt limit and do not object to bondholder' claims on the bonds. See QTCB Group Obj. ¶ 11 n.5. That is the sheerest sophistry: A core premise of the Oversight Board's Selective Claim Objection is that, if any bonds were issued in violation of the constitutional debt limit, then bondholders have *no* claims in connection with such bonds. See, *e.g.*, Selective Claim Obj. ¶ 99 (contending that alleged violations of the Puerto Rico Constitution "render[]" the Selectively Challenged GO Bonds "null and void, and, *as a consequence*, the bondholders have no remedy") (emphasis added). Thus, on the Board's own "logic," the allegations in the Clawback

5

Actions that bonds are "null and void" (*e.g.*, Dkt. No. 1 in Adv. Proc. No. 19-281-LTS, ¶ 106) *necessarily* imply an objection to any associated bondholder claims. In any event, the QTCB Group's effort to minimize the formal consequences of the Clawback Actions is not responsive to our basic point that the Board's debt-limit challenge cannot be confined to the 2012 and 2014 Bonds that are the subject of the Selective Claim Objection.

7. Tellingly, the Oversight Board is completely silent with respect to the Clawback Actions. The Board apparently cannot bring itself to (re-)acknowledge that it has challenged the validity of many of the bonds that, under the terms of the PSA, are proposed to receive a preferential recovery. That silence speaks volumes, and it should not be permitted to persist.

8. Instead, the Oversight Board attempts to obfuscate the point through a series of vague generalities and misleading statements. The Board contends that its contemplated plan "would settle the claims relating to pre-2012 'Vintage Bonds' subject to the GO Group's Conditional Objection," and further claims that its "Proposed Settlement would require a significant haircut from holders of the Vintage Bonds." Oversight Board Obj. ¶¶ 10-11; see also SPLCDC Obj. ¶ 3 (asserting that the Conditionally Challenged Claims "are set to receive a less than par recovery"). As an initial matter, however, the PSA may not require *any* haircut at all from certain holders of PBA Bonds, at least after taking into account the "Consummation Costs" and "PSA Restriction Fees" that would be paid to the collaborating bondholders that have agreed to the PSA. See Renewed Procedures Motion ¶ 29. Moreover, any haircut that would be faced by holders of the Conditionally Challenged Claims is, at most, the same haircut that other, entirely undisputed, bondholders would receive.

9. Thus, the PSA is not a true "settlement" of the GO Group's challenges to pre-2012 bonds (or the Oversight Board's challenges to a subset of those bonds, for that matter), because

6

those bonds would recover without any discount *attributable to those challenges*. See Renewed Procedures Motion ¶ 30.

10. Under these circumstances, the PSA can be understood only as an *abandonment* of the Oversight Board's debt-limit challenge as to pre-2012 bonds. The Board has chosen to withdraw that challenge even though (i) it continues to press the exact same argument against 2012 and 2014 GO Bonds in the Selective Claim Objection, and (ii) it has acknowledged, in the Clawback Actions, that the Selective Claim Objection's mathematical "logic" would apply equally to all GO Bonds and PBA Bonds issued beginning in March 2011.

11. Not to worry, the Oversight Board assures, because the plan treatments contemplated by the PSA reflect the Board's "exercise of judgment . . . taking into account the strength of various arguments and claim objections." Oversight Board Obj. ¶ 9. That conclusory and unsupported assertion is difficult to take seriously. As we have just explained, the plan treatments contemplated by the PSA are fundamentally inconsistent with the Oversight Board's own debt-limit challenge—a challenge that the Board continues to press against its disfavored bondholders. Conveniently enough, however, the Board's supposed "exercise of judgment" just happens to perfectly track the economic incentives of the Board's hand-picked negotiating partners: The Board's collaborating bondholders hold a large proportion of PBA Bonds (see Dkt. No. 7938-1), so the PSA seeks to provide PBA's bondholders with an out-sized recovery. Conversely, the collaborating bondholders hold relatively little of the 2012 and 2014 GO Bonds targeted by the Selective Claim Objection (see *id.*), so those bonds are asked to elect between (i) a miserly "settlement" offer, and (ii) receiving no recovery at all until the successful resolution of the Selective Claim Objection—a resolution that, for good measure, the Board seeks to delay as long as possible, until after confirmation proceedings on its flawed plan and after it has distributed

7

billions of dollars to favored bondholders that might ultimately be proven to lack entitlement to any recovery at all. And, finally, because the collaborating bondholders' holdings of PBA Bonds are heavily concentrated in the series issued in 2011 whose validity the Board has challenged in the Clawback Actions (see *id.*), the Board has agreed to abandon any challenge to those bonds in exchange for the bondholders' support.

12. In the end, the Oversight Board and the SPLCDC urge that the GO Group's only recourse for this obvious gamesmanship is "the plan disclosure and confirmation process" for the Board's forthcoming plan of adjustment. Oversight Board Obj. ¶¶ 2; see also *id.* ¶¶ 19, 26; SPLCDC Obj. ¶ 3. It would be one thing if these Respondents meant that, although the Conditional Objection would be deferred, the GO Group would still be free to argue that the Conditionally Challenged Claims should be treated as disputed under the plan, without any prejudice to that argument arising from the deferral of the Conditional Objection. But their assurances that the GO Group will have an opportunity to object are far more circumspect, and in fact the SPLCDC's objection previews its position that most of the Conditionally Challenged Claims cannot be deemed disputed *precisely because they are not subject to a pending claim objection*. See SPLCDC Obj. ¶ 3. In other words, the opposition of the Oversight Board and its allies to allowing the GO Group to proceed with its Conditional Objection is yet another part of their strategy to insulate their flawed plan from challenge by other stakeholders and from appropriate review by this Court. The prejudice to the GO Group that would result from taking that step is obvious.

**B.     Respondents' Remaining Arguments Are Meritless**

13. Certain of the Respondents offer additional arguments against the Renewed Procedures Motion. None has merit.

14. *First*, the Oversight Board argues that the Conditional Objection would interfere with its authority to settle claims against the Commonwealth through a plan of adjustment. See

8

Oversight Board Obj. ¶¶ 3-17. But that argument puts the cart before the horse: The Oversight Board's claimed authority to settle an objection raised by the GO Group is not a sound ground on which to prevent the GO Group from pursuing that objection in the first place. Moreover, it is far from clear that the Oversight Board would have the authority to settle an objection filed by the GO Group. While the Board cites certain decisions endorsing that position (Oversight Board Obj. ¶ 7), other courts have reached the opposite result. See, *e.g.*, *In re CS Mining, LLC*, 574 B.R. 259, 280-82 (Bankr. D. Utah 2017); *In re C.P. Hall Co.*, 513 B.R. 540, 544 (Bankr. N.D. Ill. 2014); see also 11 U.S.C. § 502(b) (providing that, if an "objection to a claim is made, the court . . . *shall* determine the amount of such claim") (emphasis added). Finally, and in any event, the Oversight Board itself recognizes that any authority it may possess to propose a settlement of another party's claim would be effective only "[s]o long as the court approves." Oversight Board Obj. ¶ 7. Under the circumstances here, where the supposed "settlement" is illusory and in fact represents a withdrawal of any objection to pre-2012 bonds in order to suit the Board's strategic negotiating position, see ¶¶ 8-11, *supra*, the prospects for court approval are necessarily remote.

15. *Second*, certain Respondents urge that litigation on the Conditional Objection should be stayed pending confirmation proceedings on the plan of adjustment contemplated by the PSA, for the reasons articulated by the Oversight Board in its Stay Motion seeking to delay the Selective Claim Objection and the UCC's 2011 GO Bond Objection. See Oversight Board Obj. ¶ 15 & n.6; SPLCDC Obj. ¶ 5 & n.6; QTCB Group Obj. ¶ 8. That argument is meritless for all of the reasons explained in the GO Group's objection to the Board's Stay Motion (Dkt. No. 7938), which the GO Group incorporates herein by reference. In brief, despite purporting to offer "the potential to resolve the GO Objections" (Stay Motion ¶ 20), the Stay Motion is in fact nothing more than a bid by the Board and its collaborating bondholders to obtain negotiating leverage over

9

other creditors, using the threat of indefinite delay as a cudgel to extract acceptance of the lowball "settlement" offer contemplated by the PSA. The Oversight Board's PSA—agreed to with holders of just one sixth of the Commonwealth's public debt—cannot justify the prejudice that would be caused to holders of the Selectively Challenged GO Bonds if they are denied a timely resolution of the Board's challenges to their claims. The Stay Motion should be denied, and it offers no basis for delaying resolution of the Conditional Objection.

16. *Third*, and finally, the QTCB Group argues that there is somehow an inconsistency between the GO Group's renewal of its application to proceed with the Conditional Objection and the GO Group's acknowledgment that issues relating to the timing and sequencing of debt-limit litigation would appropriately be addressed in the context of the Oversight Board's Stay Motion. QTCB Group Obj. ¶ 14. Not so. The GO Group has noticed its Renewed Procedures Motion for the same omnibus hearing at which the Court will hear the Stay Motion. Accordingly, the Court will have the benefit of extensive briefing from relevant parties in interest as to both the Renewed Procedures Motion and the Stay Motion, and it will be well-positioned to make an informed judgment on the interrelated issues raised by the two pleadings.

\* \* \*

For the foregoing reasons, and those stated in our opening brief, the Renewed Procedures Motion should be granted.

| | |
|---|---|
| Dated: July 16, 2019 | Respectfully submitted, |
| /s/ Ramón Rivera Morales | /s/ Lawrence S. Robbins |
| J. Ramón Rivera Morales | Lawrence S. Robbins |
| USDC-PR Bar No. 200701 | Mark T. Stancil |
| Andrés F. Picó Ramírez | Gary A. Orseck |
| USDC-PR Bar No. 302114 | Kathryn S. Zecca |
| JIMÉNEZ, GRAFFAM & LAUSELL | Donald Burke |
| P.O. Box 366104 | ROBBINS, RUSSELL, ENGLERT, ORSECK, |
| San Juan, PR 00936 | UNTEREINER & SAUBER LLP |
| Telephone: (787) 767-1030 | 2000 K Street, N.W., 4th Floor |
| Facsimile: (787) 751-4068 | Washington, DC 20006 |
| Email: rrivera@jgl.com | Telephone: (202) 775-4500 |
| | Email: mstancil@robbinsrussell.com |

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

11