## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of,

THE COMMONWEALTH OF PUERTO RICO *et al.*,

     Debtors.[1]

PROMESA Title III

Case No. 17 BK 3283-LTS

(Jointly Administered)

**LIMITED JOINDER OF ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP. WITH RESPECT TO AMBAC ASSURANCE CORPORATION'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

LIMITED JOINDER AND STATEMENT IN SUPPORT OF MOTION .....................................1

A.    The Commonwealth's Interest in the Rum Taxes is At Best
Conditional With The Conditions Not Met Here..........................................1

B.    The Alleged Basis for the Commonwealth's Retention Powers Is
Preempted ....................................................................................................7

C.    Statutory Restrictions on Taxes Are Respected in Chapter 9 .....................8

D.    PROMESA Does Not Preempt Commonwealth Laws Governing
the Rum Taxes ..............................................................................................9

E.    FOMB's Preemption Arguments Would Render Titles II and III of
PROMESA Entirely Unconstitutional .......................................................12

# TABLE OF AUTHORITIES

**Page(s)**

*Altria Grp. Inc. v. Good*,
    555 U.S. 70 (2008) ........................................................................................11

*Asociacion de Subscripcion v. Flores Galarza*,
    484 F.3d 1 (1st Cir. 2007) ................................................................... *passim*

*Attrezzi LLC v. Maytag Corp.*,
    436 F.3d 32 (1st Cir. 2006) ............................................................................10

*City of Winter Haven v Summerlin*,
    114 Fla. 727 (1934) ..........................................................................................4

*Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*,
    75 F.2d 870 (5th Cir. 1938) .............................................................................3

*Fitzgerald v. Harris*,
    549 F.3d 46 (1st Cir. 2008) ............................................................................12

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995) ........................................................................................10

*In re City of Columbia Falls Mont. Special Improvement Dist. No. 25*,
    143 B.R. 750 (Bankr. D. Mont. 1992) .........................................................4, 8

*In re City of Detroit*,
    524 B.R. 147 (Bankr. E.D. Mich. 2014) .....................................................9, 12

*In re City of Detroit*,
    909 F.3d 147 (Bankr. E.D. Mich. 2014) .........................................................15

*In re City of San Bernardino*,
    499 B.R. 776 (Bankr. C.D. Cal. 2013) .............................................................8

*In re City of Stockton*,
    909 F.3d 1256 (9th Cir. 2018) ........................................................................15

*In re City of Vallejo*,
    2008 WL 4180008 (Bankr. E.D. Cal. Sept. 5, 2008), 408 B.R. 280, 285 (9th Cir. BAP
    2009) .................................................................................................................8

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
583 B.R. 626 (D. P.R. 2017) ................................................................10

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
899 F.3d 13 (1st Cir. 2018) ..............................................................13

*In re Joliet-Will Cty. Cmty. Action Agency*,
847 F.2d 430 (7th Cir. 1988) ............................................................2

*In re LAN Tamers Inc.*,
329 F.3d 204 (1st Cir. 2003) ............................................................2

*In re The Ground Round Inc.*,
482 F.3d 15  (1st Cir. 2007) ............................................................14

*Indemnity Ins. Co. of North America v. W & T Offshore Inc.*,
756 F.3d 347 (5th Cir. 2014) ............................................................5

*INS v. St. Cyr*,
533 U.S. 289 (2001) ......................................................................13

*Keyes v. City of Tacoma*,
12 Wash. 2d 54 (1941) ....................................................................4

*Knick v. Township of Scott*,
No. 17-647, 588 U.S. _____ (2019)........................................................13

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935) ......................................................................13

*Mission Product Holdings Inc. v. Tempnology LLC*,
587 U.S. _____ (2019)....................................................................2

*Town of Shattuck v. Barcafer*,
137 P.2d 238 (Ok. 1943) ..................................................................4

*United States v. Security Indus. Bank*,
459 U.S. 70 (1982) ......................................................................13

*United States v. Whiting Pools Inc.*,
462 U.S. 198 (1983) ......................................................................2

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Vickrey v. City of Sioux City*,
  104 F. 164 (C.C.W.D. Ia. 1900) ...............................................................................3

*Weaver's Cove Energy LLC v. R.I. Coastal Res. Mgmt. Council*,
  589 F.3d 458 (1st Cir. 2009) ...........................................................................10, 11

*Wulff-Hansen & Co. v. Silvers*,
  21 Cal. 2d 253 (1942) ..............................................................................................3

*ZEN42 LLC v. Washington and Lee Univ.*,
  Case No. 6:17-cv-00053, 2017 WL 4532580 (D. W.D. Va. 2017) ..........................5

## STATUTES:

3 L.P.R.A. § 1913 ........................................................................................................14

3 L.P.R.A. § 1914 ....................................................................................................6, 7

11 U.S.C. § 928(a) .....................................................................................................12

Mich. Comp. Laws § 141.2701(d)(1) .........................................................................9

48 U.S.C. § 2141(b)(1)(N) ........................................................................................11

PROMESA:

  §201(1)(b)(1)(N) .................................................................................................11

  §201(b)(1)(M) .....................................................................................................11

  § 314(b)(3),(5),(6) .................................................................................................8

  §§ 407...................................................................................................................11

## OTHER AUTHORITIES:

H.R. Rep. No. 114-602 (June 3, 2016) .....................................................................11

Memorandum of Full Committee Markup of H.R. 5278 Before the H. Comm. on Nat. Res.,
114th Cong. (2016),
http://naturalresources.house.gov/uploadedfiles/markup_memo_h.r._5278_05.24.16_05.25.16.pdf........11

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") hereby submit this limited joinder to and statement in support of *Ambac Assurance Corporation's Motion and Memorandum of Law in Support of its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* (Dkt. No. 7176) (the "Motion[2]") and respectfully state as follows:

### LIMITED JOINDER AND STATEMENT IN SUPPORT OF MOTION

1.      On July 3, 2019, Assured filed a reservation of rights, preserving its ability to join the Motion and respond to certain arguments raised by FOMB or AAFAF in their opposition briefs.  Having now reviewed those oppositions, it has become necessary to respond to a number of arguments contained therein.  In particular,  FOMB in its opposition brief (the "Opposition" or "Opp") argues that PROMESA preempts Puerto Rico laws governing disposition of the Rum Taxes, that the Commonwealth is not a mere conduit for the Rum Taxes, and that, despite statutory language to the contrary, the Commonwealth can use the Rum Taxes however it wishes.  *See* Opp. Part IV.  These arguments fall outside of the scope of the issues the Court has indicated it will consider at the July 24 omnibus hearing, but if the Court were to reach these issues, the Court should find that FOMB's arguments are without merit for the reasons set forth below.

**A.      The Commonwealth's Interest in the Rum Taxes is At Best Conditional With The Conditions Not Met Here**

2.      FOMB contends that the Commonwealth has unfettered discretion over the disposition of the Rum Taxes, and in light of such alleged discretion, the Rum Taxes are allegedly property of the Commonwealth.  FOMB is mistaken. The Enabling Act governs the disposition of the Rum Taxes, and makes clear that no discretion is afforded to the Commonwealth under that

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

statute: either (i) the Rum Taxes are used to pay general obligation bonds (subject to strict conditions that FOMB has not demonstrated are satisfied here) or (ii) the Rum Taxes are covered into a special fund for the payment of the Bonds. The Rum Taxes cannot be used by the Commonwealth for any other purpose, and the statutes provide the Commonwealth with no discretion as to their application and disposition.

3. As the Supreme Court recently held, "whatever limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, **but it does not expand, either**." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. _____ (2019), Slip. Op. 11 (emphasis added). Consequently, "if the not-yet debtor was subject to a counterparty's contractual right (say, to retain a copier or use a trademark), so too is the trustee or debtor once the bankruptcy petition is filed." *Id.* Put simply, the filing of a bankruptcy petition does not enhance a municipal debtor's rights or property interests. Property of the debtor does not include "property of others in which the debtor had some minor interest such as a lien **or bare legal title.**" *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n.8 (1983) (emphasis added). Thus, when property arises from or is subject to a statutory scheme, and where the statute restricts the disposition and use of such property, the debtor lacks any equitable or beneficial interest in the property. *See In re LAN Tamers Inc.*, 329 F.3d 204, 210 (1st Cir. 2003) (noting that "property is excluded from the estate where the debtor merely receives property in order to deliver it to its intended recipient without any control or ownership over it"); *In re Joliet-Will Cty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (finding that grants were not property of the debtor where the grants "impose minute controls on

the use of the funds, such that the recipient has very little discretion" and that "the grantee's

ownership is nominal, like a trustee's").[3]

4.     When special taxes, revenues, or assessments collected or acquired by a

municipality are required by statute to be transferred for particular purposes (such as to be

transferred into a special fund for payment of debt service), the municipality and its officers act as

the trustee of funds resulting from collection of such special taxes or assessments, and those funds

do not belong to the municipality.  *See, e.g.*, *Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*, 75

F.2d 870, 872-73 (5th Cir. 1938) (holding that pledged assessments were trust funds that could not

otherwise be applied by the municipality); *Vickrey v. City of Sioux City*, 104 F. 164, 166 (C.C.W.D.

Ia. 1900) ("It is equally true that, under the provisions of the act of the general assembly

authorizing the issuance of the bonds, the city assumed the duty of creating and properly applying

the sinking fund provided for in the act, and to that end was charged with the duty of levying the

special assessments called for by the act, collecting the same, and making proper payment thereof

to the bondholders. In these particulars the city is charged with a duty amounting to a trust.");

*Wulff-Hansen & Co. v. Silvers*, 21 Cal. 2d 253, 264 (1942) ("Any money that the city receives as

a result of the foreclosure actions, over and above authorized costs, is not city money but belongs

to bondholders, and the city is trustee for them as to such money.").  Rather, a "fund that is derived

from a special levy or one created for a specific purpose is in the hands of municipal officers in

trust.  The municipality is merely a custodian and its duties relative to such funds is purely

---

[3] FOMB attempts to distinguish *LAN Tamers* on the grounds that the debtor had no freedom to do anything with the reimbursements.  The same is true here, however.  Indeed, FOMB itself acknowledges that the "Enabling Act requires that [the Commonwealth] transfer a portion [of the Rum Taxes] to the PRIFA Infrastructure Fun[d]."  Opp. ¶ 111; *see also* Opp. at n. 8.  The Commonwealth has no discretion as to the disposition of such taxes—either they are used to pay the general obligation bonds when the conditions to the clawback are satisfied, or they are covered into the Special Fund.  No other uses are set forth or permitted under the statutory scheme.

ministerial.  *It may not use or divert them*."  *In re City of Columbia Falls, Mont., Special Improvement Dist. No. 25*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992) (emphasis added).

5.      Because such special taxes and revenues are often statutorily restricted, the municipality and its officers are thus charged with all related fiduciary duties with respect to such taxes and revenues.  *See*, *e.g.*, *Town of Shattuck v. Barcafer*, 137 P.2d 238 (Ok. 1943) (in the collection of money paid in by property owners for the retirement of the bonds, the municipality stands in relation of agent to the bondholders); *City of Winter Haven v, Summerlin*, 114 Fla. 727 (1934) ("It is well settled that, where a municipal corporation is charged by law with the duty of collecting special assessments and making proper payment thereof to bondholders to whom the assessments have been pledged as part of their security, the duty amounts to a trust that is cognizable in equity for the purpose of calling into account the municipality and its officers for the manner in which that trust has been performed.").  This is so even if such special taxes have been diverted and commingled with general funds.  *Keyes v. City of Tacoma*, 12 Wash. 2d 54 (1941).

6.      *Flores Galarza* is instructive on this issue.  In that case, the First Circuit addressed whether or not certain insurance premiums were property of the Commonwealth or of the plaintiffs.  Specifically, Law 253 provided that the Commonwealth's Secretary of Treasury "shall transfer" the premiums to a joint underwriting association (JUA).  *Asociacion de Subscripcion v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007).  The Court found that while "the Secretary collects the insurance premiums and holds them for some unspecified period of time before relinquishing them to the JUA, the Secretary **is…merely the custodian of these funds**."  *Id.* at 29 (emphasis added).  Thus, the First Circuit held that, as a mere custodian, the Secretary had no legal entitlement to those funds, and the monies were therefore property of the JUA.  Like the statutes in *Flores Galarza*, the Enabling Act expressly requires the Secretary of Treasury to transfer the Rum Taxes into a special fund for the benefit of PRIFA.  The statute thus contains

mandatory language providing for the transfer of the Rum Taxes to PRIFA, with no discretion afforded to the Commonwealth or its officers.

7.     FOMB attempts to distinguish *Flores Galarza* in two ways, but each constitutes a logical fallacy.  First, FOMB states that "the entity at issue in [*Flores Galarza*] was . . . a 'private association,'" whereas "[h]ere, PRIFA is a public entity which therefore cannot assert constitutional rights against the Commonwealth."  Opp. ¶ 111.  PRIFA's ability to "assert constitutional rights" is irrelevant to the issue of whether PRIFA has a property interest, however. It is true that the particular reason that the First Circuit in *Flores Galarza* needed to inquire into whether a property interest existed in that case was because the plaintiffs had asserted a violation of the Takings Clause of the Fifth Amendment, and "[t]o make a cognizable claim of a taking in violation of the Fifth Amendment, . . . plaintiffs must . . . show that they possess a recognized property interest." *Flores Galarza*, 484. F.3d at 27.  While it is true that a property interest must exist in order for a claim under the Takings Clause to exist, however, it does *not* follow from this that a claim under the Takings Clause must exist in order for a property interest to exist; in other words, the fact that a particular proposition is true does not mean that its converse is true.  *See, e.g.*, *Indemnity Ins. Co. of North America v. W & T Offshore, Inc.*, 756 F.3d 347, 355 n.5 (5th Cir. 2014) ("Underwriters are arguing that B A is the same as A B. This is the 'affirming the consequent' fallacy, and is simply incorrect"); *ZEN42 LLC v. Washington and Lee Univ.*, Case No. 6:17-cv-00053, 2017 WL 4532580, n.2 (D. W.D. Va. 2017) ("When presented with a conditional statement ('If P, then Q'), the reasoning 'Q, therefore P' does not necessarily follow."). The First Circuit's conclusion in *Flores Galarza* that a statute requiring the transfer of specific property gives rise to a property interest was therefore *independent of* and *antecedent to* its finding of a possible Takings Clause violation, and *Flores Galarza* supports the proposition that such a

statute gives rise to a property interest regardless of whether the beneficiary of that statute (here, PRIFA) could assert a claim under the Takings Clause.

8.    Second, FOMB attempts to distinguish *Flores Galarza* by arguing that "the [Rum Taxes] are the Commonwealth's own funds, not monies it is holding for another party." Opp. ¶ 111.  But that is just begging the very question that Ambac's citation to *Flores Galarza* is intended to answer, namely who the Rum Taxes belong to.  The answer *Flores Galarza* provides is that where a statute requires the transfer of specific funds to a particular recipient, such as PRIFA, those funds "***belong***" to that statutorily-mandated recipient (here, PRIFA).  *Flores Galarza*, 484. F.3d at 30.  FOMB's efforts notwithstanding, there is no valid or principled way of distinguishing *Flores Galarza*, and its principles apply here.

9.    The Rum Taxes are also not subject to any "appropriation" by the Commonwealth, because no further legislative action is required to effectuate their transfer. Instead, the Enabling Act expressly sets forth the amounts of Rum Taxes required to be transferred to PRIFA, and thereafter provides that such Rum Taxes "***<u>shall</u> be covered into a Special Fund to be maintained on or behalf of the Authority***."  3 L.P.R.A. § 1914 (emphasis added).  Nor is FOMB correct that the Commonwealth has the unfettered right to retain the Rum Taxes "to pay Commonwealth expenses." Opp. at 46.  Rather, the Rum Taxes are statutorily assigned to PRIFA, and the Commonwealth is required to deposit such monies into the Special Fund.  At best, the Commonwealth has a conditional right to retain such taxes ***solely to pay general obligation debt***. The Rum Taxes cannot legally be used for any other purpose.  It is beyond dispute that the Commonwealth has not used the Rum Taxes to pay general obligation debt.

10.    In addition to not using the Rum Taxes to pay general obligation debt, a separate condition to the Commonwealth's ability to "claw back" the Rum Taxes has not been satisfied.   Specifically, the Enabling Act provides that the "moneys of the Special Fund may be

used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8 [of the Puerto Rico constitution], ***only when the other resources available referred to in said Section are insufficient for such purposes.***"   3 L.P.R.A. § 1914 (emphasis added).   Although a more robust factual record will need to be presented to this Court on the issue of clawback if the Court is even to reach this issue, the Commonwealth's cash balances have consistently demonstrated that other available resources have always been available to pay for general obligation debt then due and owing for each fiscal year.   As of May 31, 2019, those cash balances have surpassed $14 billion,[4] and as of June 14, 2019, the Commonwealth's Treasury Single Account alone had a balance of over $7 billion.[5]   This flies in the face of numerous representations FOMB made to this Court in 2017 that the Commonwealth would run out of money within a matter of months.  *See* Hearing Tr. (June 28, 2017) at 114:8-13.

**B.      The Alleged Basis for the Commonwealth's Retention Powers Is Preempted**

11.     Notably, FOMB actually now admits that the moratorium laws are the reason why the Rum Taxes are being diverted and consumed.  However, these laws are preempted under PROMESA section 303(1) and (3) and cannot provide what FOMB admits is the purported basis for the diversions. As FOMB admits in its Opposition, the alleged "Retention Powers" are derived from the moratorium laws*.  See* Opp., FACTUAL BACKGROUND § G.  FOMB further asserts that as a result of "Retention Powers," the Rum Taxes can be depleted for any purpose, and that as a consequence of this illicit diversion and consumption,  PRIFA and its bondholders' rights to and property interests in the Rum Taxes are purportedly eliminated. *See* Opp. ¶¶100-03.  Put simply, FOMB admits that the moratorium laws both suspend payment on PRIFA's bonds by

---

[4] http://aafaf.pr.gov/assets/aafaf-bank-account-balances-government-pr-instrum-05-31-2019.pdf
[5] http://aafaf.pr.gov/assets/fy19-weeklytsacashflow-06-14-19.pdf

eliminating the sole source of payment for the Bonds (the Rum Taxes), and binds PRIFA's creditors by eliminating their property interests in those Rum Taxes.

12.     However, section 303(1) of PROMESA preempts any "moratorium law" that purports to "bind any creditor of a covered territory or any covered instrumentality thereof that does not consent to the composition *or moratorium*."   Moreover, the executive orders are unlawful under the Enabling Act, and in any event, are unconstitutional under the Takings Clause, among other constitutional provisions, and therefore are preempted under PROMESA section 303(3).  *See* Part E *infra*.  Because the source of the "Retention Powers" was preempted and is thus a nullity, the Commonwealth's property interest in the Rum Taxes never existed.

## C.     Statutory Restrictions on Taxes Are Respected in Chapter 9

13.     Even before the Supreme Court issued its decision in *Mission Products*, bankruptcy courts presiding over chapter 9 cases have recognized that when a statute earmarks taxes for a particular purpose, those taxes may not be diverted to the municipality's general fund to pay for its general expenses.  This is clear in the context of chapter 9 eligibility, where courts are required to determine if a debtor was insolvent when it filed its petition and have recognized that special funds and taxes cannot be utilized for general fund expenses.  *See, e.g.*, *In re City of Vallejo,* 2008 WL 4180008 at *5-9 (Bankr. E.D. Cal. Sept. 5, 2008) (finding that debtor was not able to pillage restricted funds to fund its general expenses), 408 B.R. 280, 285 (9th Cir. BAP 2009) (accepting testimony that funds were restricted and therefore could not be used to finance general fund expenses); *In re City of San Bernardino,* 499 B.R. 776, 789 (Bankr. C.D. Cal. 2013) (recognizing that the "City was legally prohibited by the California Constitution from using Water Department funds for general fund purposes").  The plain text of PROMESA confirms that this also applies to confirmation of any plan of adjustment.  PROMESA § 314(b)(3),(5),(6); *see also In re City of Columbia Falls, Mont.,* 143 B.R. at 762.

14.     Moreover, even prior to the filing of any plan of adjustment, such state law restrictions remain in effect during the bankruptcy.  *See* Ex. A, at 25-27 (*In re City of Detroit,* Case No. 13-53846, Jan. 16, 2014 Hearing Tr.) (holding that due to restrictions in Michigan gaming law, casino revenues could not be used as collateral for a DIP facility that would be used for general working capital needs).  This was underscored in *Detroit*, where the City attempted to divert certain special property taxes to fund its working capital needs, even though Michigan law required that those taxes be used to pay for certain unlimited tax general obligation (UTGO) bonds.  The City essentially argued that section 904 and the Bankruptcy Code gave it license to use those taxes however it wished regardless of state law.  Although this dispute was settled, the bankruptcy court expressed doubt that the City's arguments had merit, finding that the City's chances of success in litigation were at best "a coin toss."  *In re City of Detroit Mich.*, 524 B.R. 147 (Bankr. E.D. Mich. 2014).  Indeed, the Court in *Detroit* recognized that the UTGO bond insurers' argument "may have some merit," noting that "Michigan law provides strict controls and limitations over use of *ad valorem* taxes that are levied to retire debt."  *Id.* at 189.  Of relevance to the dispute here, the Court noted that one of those restrictions included the statutory requirement "to segregate the additional *ad valorem* taxes into separate accounts and use those monies to pay the debt service on the Prior UTGO Bonds."  *Id.* (citing Mich. Comp. Laws § 141.2701(d)(1)).  Thus, even before  the Supreme Court's *Mission Products* decision, courts had already held that state law restrictions on special taxes and revenues remained in effect in municipal bankruptcies.

**D.     PROMESA Does Not Preempt Commonwealth Laws Governing the Rum Taxes**

15.     Confronted with the proposition that bankruptcy does not expand a municipal debtor's rights and that state laws remain in effect in bankruptcy, FOMB is left to incorrectly assert that PROMESA preempts the laws governing the Rum Taxes.  It claims that the

fiscal plans and budgets can eviscerate other Commonwealth laws, and thereby eliminate any property interests.  This argument is not supportable.

16.     Preemption arguments are generally divided into three categories: express preemption, field preemption, and conflict preemption.  *See Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 472 (1st Cir. 2009).  Express preemption "results from language in a statute revealing an explicit congressional intent to preempt state law."  *Id.*  Field preemption only occurs when Congress intended that federal law "occupy the field" of a particular area of state law.  *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 41 (1st Cir. 2006) (citations omitted).  Conflict preemption occurs where "a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

17.     None of these categories of preemption apply here, and FOMB unsurprisingly does not even attempt to engage in a preemption analysis here.  First, there is no express language in PROMESA that preempts laws governing the Rum Taxes.  While FOMB points to section 4 of PROMESA as the basis for such alleged preemption, there is no express language in PROMESA preempting the laws at issue here.  Furthermore, when Congress did intend for PROMESA to preempt Commonwealth law, it said so expressly.  For example, section 303 of PROMESA expressly preempts, among other things, territory laws that prescribe a method of composition of indebtedness, moratorium laws, and certain executive orders.  Yet, PROMESA lacks any express preemption of Commonwealth statutory provisions regarding the Rum Taxes.[6]

---

[6] Indeed, this Court has recognized that nothing in PROMESA expressly allowed FOMB to override the governance structures imposed in PREPA's Enabling Act.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 583 B.R. 626, 636 (D. P.R. 2017).  Likewise, nothing in Titles I or II of PROMESA gives FOMB the right to override the Enabling Act.

18.     Nor did Congress indicate any preemptive intent through PROMESA's structure and purpose. *Altria Grp. Inc. v. Good*, 555 U.S. 70, 76-77 (2008); *Weaver's Cove*, 589 F.3d at 472-73. To the contrary, PROMESA makes clear that Congress intended to preserve—not preempt—Commonwealth statutory priorities and to prevent illegal inter-debtor transfers of property. Section 201(b)(1)(N) of PROMESA mandates that a fiscal plan "respect . . . lawful priorities or lawful liens." 48 U.S.C. § 2141(b)(1)(N). PROMESA's legislative history suggests that a fiscal plan is meant to "ensure the protection of the lawful priorities and liens as guaranteed by the territorial constitution and applicable laws, ***and prevent unlawful inter-debtor transfers of funds.***" H.R. Rep. No. 114-602, at 45 (June 3, 2016) ("H.R. Rep."). According to Congress, section 201(b)(1)(N) was added to "ensure fiscal plans keep intact the structural hierarchy of prioritized debt,"[7] and section 201(b)(1) "should not be interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders as established under the territory's constitution, laws, or other agreements." H.R. Rep. at 45. While PROMESA was largely modeled after the Bankruptcy Code, there is no parallel to section 201(1)(b)(1)(N) of PROMESA in chapters 9 or 11 of the Bankruptcy Code, further evidencing Congress's intent to ensure that PROMESA was clear that lawful priorities and liens must be respected.

19.     Numerous other provisions in PROMESA strongly signal Congress's intent to preserve Commonwealth law priorities and protect creditors' rights. *See* PROMESA §§ 407 (protecting creditors from inter-debtor transfers in violation of local laws); 201(b)(1)(M) (requiring fiscal plan to ensure that "assets, funds, or resources of a territorial instrumentality are not loaned to, or otherwise used for the benefit of a covered territory…unless permitted by the constitution of

---

[7]     Memorandum of Full Committee Markup of H.R. 5278 Before the H. Comm. on Nat. Res., at 3, 114th Cong. (2016),
http://naturalresources.house.gov/uploadedfiles/markup_memo_h.r._5278_05.24.16_05.25.16.pdf.

the territory, an approved plan of adjustment under subchapter III, or a qualifying modification under subchapter VI"). Finally, Congress incorporated section 928(a) of the Bankruptcy Code, which provides that special revenues "*shall remain* subject to any lien" arising from a prepetition security agreement. 11 U.S.C. § 928(a). Thus, the plain text of PROMESA and its context all point to Congressional intent to preserve prepetition laws governing disposition of bondholder collateral.

20.     Nor is there conflict preemption, which applies only "when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Fitzgerald v. Harris*, 549 F.3d 46, 53 (1st Cir. 2008) (citation omitted). Conflict preemption does not apply to PRIFA's Enabling Act because, as discussed above, compliance with both the Enabling Act and PROMESA is not only possible, it is required. Moreover, a central purpose of PROMESA is to ensure that the Commonwealth and its instrumentalities achieve fiscal responsibility ***and*** access to the capital markets. If PROMESA effectively eviscerated property interests and statutory assignments of taxes, PRIFA and other Commonwealth entities would be unable to access the capital markets, and/or their cost of borrowing would increase substantially. Indeed, Judge Rhodes recognized this risk in the context of the UTGO dispute in *Detroit*—noting that a victory by Detroit in eviscerating restrictions imposed on certain special property taxes "could have had negative consequences for the City. The City may have lost access to the capital markets when it emerges from bankruptcy or it may have been required to pay higher interest rates for bond debt." *See In re City of Detroit*, 524 B.R. 147, 190 (Bankr. E.D. Mich. 2014).

## E.     FOMB's Preemption Arguments Would Render Titles II and III of PROMESA Entirely Unconstitutional

21.     Even if there were any doubt as to whether PROMESA preempts Commonwealth priorities, the canon of "constitutional avoidance" requires a court to interpret

-12-

PROMESA in a manner that does not raise "serious constitutional problems."  *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.").  Consequently, PROMESA cannot be read to authorize constitutional violations, such as the unlawful taking of the Bondholders' property. [8]

22.     The Supreme Court has repeatedly stated that the federal bankruptcy power is subject to the Fifth Amendment.  *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."); *United States v. Security Indus. Bank*, 459 U.S. 70, 75 (1982).  Title III of PROMESA is no different.  *See In re Financial Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 13, 20 (1st Cir. 2018).

23.     The Supreme Court recently clarified that Takings claims arise immediately upon a taking of property and do not require an exhaustion of remedies by a litigant before pursuing a federal Takings claim.  Specifically, in *Knick v. Township of Scott*, the Supreme Court held that the "Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner."  *Knick v. Township of Scott,* No. 17-647, 588 U.S. ____ (2019), Slip. Op. at 7.  In so holding, the Court overturned in part its prior *Williamson County* decision,[9] stating:

---

[8] Importantly, there is no contention by the Movants that the Rum Taxes are impressed with a statutory lien.  Nevertheless, FOMB raises arguments in passing that no statutory lien exists.  Because Movants never raised that argument, FOMB is merely seeking an impermissible advisory opinion from the Court on that issue.  This Court should decline that invitation at this juncture.

[9] Notably, FOMB previously relied heavily on *Williamson County* to seek dismissal of federal Takings claims.  In any event, FOMB appears to have abandoned its prior ripeness arguments here by claiming that PROMESA, the fiscal plans, and the budgets all preempted statutory entitlements to the Rum Taxes.  Opp. ¶ 100.  Based on that admission, the claims would be ripe even absent *Knick v. Township of Scott*.  *See*

> A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place.  The violation is the only reason compensation was owed in the first place.  A bank robber might give the loot back, but he still robbed the bank.  The availability of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care.

*Id.* at 11.  Nevertheless, FOMB appears to believe that PROMESA itself eliminated whatever rights PRIFA and its bondholders had to the Rum Taxes.  Thus, under FOMB's interpretation of PROMESA, the statute has effectuated and otherwise authorizes taking of private property without the provision of any just compensation.  *See Flores Galarza*, 484 F.3d at 29 (where statute permitted Secretary of Treasury to divert and retain certain premiums, unlawful physical taking of property occurred in violation of Fifth Amendment).

24.     This constitutional infirmity is only underscored by FOMB's arguments that PRIFA merely holds an unsecured claim against the Commonwealth, and that any Takings Claims asserted by PRIFA's bondholders would be dischargeable. Opp. ¶¶ 101-04.[10]  Neither of FOMB's arguments withstands scrutiny.  First, the First Circuit has repeatedly recognized that a statutory entitlement to funds is not a contractual covenant; rather, such statutory entitlements give rise to property interests.  *Flores Galarza*, 484 F.3d at 29 ("JUA has successfully alleged an entitlement to the Earned Premiums under Law 253, *and therefore a property interest in those funds*.").  Indeed, the First Circuit has previously drawn a distinction between claims and property interests, and in particular has observed that the right to receive "specific property" from the debtor is not a "claim" and is non-dischargeable in bankruptcy.  *See In re The Ground Round Inc.*, 482

---

*Asociacion de Subscripcion v. Flores Galarza*, 484 F.3d 1, 9-10, 14-20 (1st Cir. 2007) (where plaintiff alleged that Commonwealth law authorized Secretary of Treasury to divert and withhold monies, plaintiffs alleged both facial statutory challenges and physical takings that were ripe for adjudication).

[10] FOMB's arguments that PRIFA bondholders are creditors of a creditor misses the mark.  The Enabling Act explicitly creates privity between PRIFA's bondholders and the Commonwealth.  3  L.P.R.A. § 1913.

F.3d 15, 20, & n. 6 (1st Cir. 2007) ("The non-debtor may or may not have a claim for the debtor's breach of contract…and that claim may or may not be dischargeable, but those issues simply do not relate to the question whether the non-debtor has a right in or to the *property* itself.") (citation omitted). Second, contrary to FOMB's suggestion that claims to just compensation are unsecured obligations that may be discharged in bankruptcy, courts have held that such claims are non-dischargeable. For example, in *Detroit*, the City proposed a plan that would pay certain Takings claim litigants a mere fraction of their just compensation claims, and sought to treat such claims as general unsecured claims. The *Detroit* court held that this treatment was improper, that confirmation of such a plan would violate the Fifth Amendment, and that the claims were therefore non-dischargeable. *In re City of Detroit Mich.*, 909 F.3d 147, 270 (Bankr. E.D. Mich. 2014).[11]

25.     This Court should reject FOMB's erroneous interpretation of PROMESA. Under FOMB's interpretation, PROMESA would effectuate unlawful takings of private property without just compensation by extinguishing liens and statutory entitlements to such funds, and, as a result, would therefore be rendered unconstitutional. This Court should avoid those constitutional infirmities by rejecting FOMB's arguments.

---

[11] The cases that FOMB relies upon are inapposite. For example, in *Stockton*, the appellant did not raise a timely challenge to the classification of its just compensation claims as general unsecured claims. *In re City of Stockton*, 909 F.3d 1256, 1266 (9th Cir. 2018). Further, *Stockton* elicited a minority opinion, which stated that a claim for just compensation under the Fifth Amendment should be excepted from discharge.

Dated:  July 16, 2019
New York, New York

CASELLAS ALCOVER & BURGOS P.S.C.

/s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
USDC-PR No. 204,809
Ricardo F. Casellas-Sánchez
USDC-PR No. 203,114
Diana Pérez-Seda
USDC–PR No. 232,014
E-mail: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

P.O. Box 364924
San Juan, PR 00936-4924
Tel.: (787) 756-1400
Fax: (787) 756-1401

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

CADWALADER, WICKERSHAM & TAFT
LLP

/s/ *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William Natbony*
Ellen M. Halstead*
Thomas J. Curtin*
Casey J. Servais*
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 504-6666
Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony @cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

* admitted pro hac vice
*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, 16th day of July 2019.


By: _/s/ Howard R. Hawkins, Jr_
      Howard R. Hawkins, Jr.*
      * Admitted pro hac vice