# EXHIBIT A

EXECUTION VERSION

## AGREEMENT

**THIS AGREEMENT** (this "Agreement"), dated as of the 31st day of December, 2010, is made by and among Bacardi International Limited ("BIL"), Bacardi Corporation ("Corp"), and their parent company Bacardi Limited ("BL") and the Government of Puerto Rico (the "Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico ("GDB"), the Executive Director of the Office of Management and Budget and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO") as authorized by Act No. 178 of December 1, 2010 (the "Enabling Act"). The Government, BIL, Corp and BL are collectively referred to as the "Parties" and individually as a "Party".

### RECITALS

WHEREAS, the Government is committed to promoting the growth, development and diversification of the economy of Puerto Rico ("Puerto Rico"); to promoting capital investment for the economic development of Puerto Rico; and to enhancing the business climate in Puerto Rico, all of which purposes and objectives are declared to be in the public interest; and

WHEREAS, since 1917, United States federal excise taxes on rum produced in Puerto Rico have been "covered-over" or transferred to Puerto Rico pursuant to Section 7652 of the U.S. Internal Revenue Code (the "Cover Over Revenues" as defined herein); and

WHEREAS, the Cover Over Revenues program was later extended to the United States Virgin Islands ("USVI"); and

WHEREAS, since 1999 the rate for the Cover Over Revenues has been set at $13.25 per proof gallon by periodic acts of Congress which have added $2.75 to the permanent cover over rate of $10.50 legislated in 1984; and

WHEREAS, in 2008 and 2009, the USVI entered into long-term agreements with two Bacardi competitors providing for significant incentives by using the Cover Over Revenues funds of the USVI (the "USVI Incentives"); and

WHEREAS, starting in 2012, this is expected to result in a significant competitive disadvantage for companies that produce their rum in Puerto Rico, including Bacardi, when compared to those USVI rum producers, as well as a significant decrease of over $135 million in Cover Over Revenues funds currently covered-over to Puerto Rico; and

WHEREAS, this reduction of over $135 million of the amount received of approximately $434 million in 2009 from all rum produced in Puerto Rico, represents a reduction of more than 30% in the annual Cover Over Revenues funds that Puerto Rico will lose permanently; and

WHEREAS, the BACARDI brand is the global leader among rum brands and the leading rum consumed in the United States and Corp has produced high quality rums in Puerto Rico since 1938; and

EXECUTION VERSION

WHEREAS, Corp's rum production in Puerto Rico and ultimate sale by BIL and its designated Affiliates in the United States generates currently approximately $258 million in Cover Over Revenues to Puerto Rico; and

WHEREAS, Puerto Rico has used such revenues from the Cover Over Revenues to fund infrastructure and public works programs, support expenditures of the central government, preserve and improve the environment by protecting certain vital ecosystems, support the development of the science and technology industry and promote the Puerto Rican rum industry through its Rums of Puerto Rico program ("ROPR") which is administered by PRIDCO; and

WHEREAS, the Government recognizes that the protection and promotion of the rum production industry in Puerto Rico will have a significant positive impact on the welfare of the community, including the potential for the creation of jobs in Puerto Rico, the protection and increase of Cover Over Revenues to the Puerto Rico treasury, the creation of additional economic opportunities and revenues for other Puerto Rico industries that will support and otherwise do business with Bacardi, and therefore the Government is desirous of maintaining Bacardi's operations in Puerto Rico; and

WHEREAS, BL is the ultimate parent of the Bacardi entities and is a Party to this Agreement to guarantee the performance of its Affiliates of its obligations under the Agreement; and

WHEREAS, BIL as the economic owner of the BACARDI trademark and other trademarks utilized on other rum-based products, is the Bacardi Party of interest in this Agreement; and has contracted with Corp for the production of rum, which BIL sells into the U.S. as BACARDI rum, or other branded rum-based products; and

WHEREAS, other than BIL, Corp has no other prospective purchaser for the amount of Puerto Rican rum that it currently sells to BIL; and Corp is a Party to this Agreement as the producer of rum in Puerto Rico; and

WHEREAS, the Government is entering into this Agreement with Bacardi in reasonable reliance upon the United States Congress ("Congress") longstanding commitment to assist Puerto Rico in attracting and protecting rum production in Puerto Rico through the availability of the rum Cover Over Revenues program; and

WHEREAS, the Parties recognize that Bacardi can locate its current bulk rum manufacturing operation in other jurisdictions or source its bulk rum requirements from existing facilities in other jurisdictions but agree that it would be in the best interests of all Parties if Bacardi maintains significant operations in Puerto Rico; and

WHEREAS, the Government of Puerto Rico understands the importance of taking the steps necessary to maintain Puerto Rico as a competitive jurisdiction for the rum industry especially during the present difficult economic conditions; and

WHEREAS, it is in the best interest of the Government and the people of Puerto Rico that the Government of Puerto Rico enter into this Agreement with Bacardi to assure the continuance of the benefits generated by the Cover Over Revenues program to Puerto Rico.

WHEREAS, in order to maintain, promote and grow the production of BACARDI rum in Puerto Rico and to protect the corresponding Cover Over Revenues, the Parties desire to enter into this long-term Agreement.

EXECUTION VERSION

NOW, THEREFORE, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## GENERAL PROVISIONS

### 1.1    Agreement Scope

Subject to the terms and conditions set forth herein, this Agreement shall become effective as of the date hereof, such date being herein after referred to as, the "Effective Date". This Agreement shall be recorded with the Office of the Comptroller of Puerto Rico, as required by Act No. 18 of October 30, 1975, as amended, within thirty (30) days after the full execution hereof. The Agreement includes this document and any exhibits, attachments, schedules or appendices attached hereto or referenced herein all of which are hereby incorporated by reference. This Agreement shall constitute the valid and binding obligation of the Parties, enforceable against any party in accordance with its terms.

### 1.2    Government Obligations

In consideration of Bacardi's long term commitment to produce rum in Puerto Rico as set forth in this Agreement, the Government agrees to fully perform its obligations as also set forth in this Agreement.   The Government shall not support any federal, or Puerto Rico and/or municipal legislation, executive order, regulation, agreement, obligation, legal instrument, or other undertaking which materially impairs or limits the Government's ability to fully perform its obligations as set forth in this Agreement.

### 1.3    No Additional Cost to Bacardi

The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Bacardi be responsible for or be required to incur or pay or reimburse any cost, charge or expense under this Agreement relating to those obligations other than the direct expenses incurred by Bacardi in the negotiation and preparation of this Agreement and those expenses that this Agreement (or the agreement executed pursuant hereto) specifically identifies as a cost, charge or expense to be borne or paid by Bacardi.

### 1.4    Inducement

The Parties acknowledge that (a) the grants, tax, production and marketing incentives granted by the Government hereunder constitute the main inducement for Bacardi to commit  to produce rum in Puerto Rico in the long term, (b) absent such grants, tax, production and marketing incentives, due to the USVI Incentives, among other reasons,   Bacardi would have serious competitive disadvantages in maintaining its rum producing operations in Puerto Rico for sale in the United States, and (c) Bacardi's development and operation plans with respect to the production of rum in Puerto Rico for sale in the United States rely on the continued availability of such incentives throughout the Term of this Agreement. The Parties also acknowledge that Bacardi's commitment to produce bulk rum in accordance with the terms of this Agreement constitutes one of the main inducements for the Government to provide Bacardi with the grants, tax, production and marketing incentives set forth in this Agreement, which the Parties deem equivalent to the benefits provided by USVI to Bacardi's competitors.

-3-

EXECUTION VERSION

1.5 **Bacardi Obligations**

In consideration of the Government granting the benefits and incentives to Bacardi under this Agreement, which consideration shall be acknowledged by Bacardi upon the full execution, adoption and filing of this Agreement by the Government, Bacardi agrees to obtain all necessary internal approvals prior to the execution of this Agreement and to fully perform its obligations as set forth in this Agreement. Bacardi shall not enter, and shall not cause or suffer its Affiliates to enter, into any contract, agreement, arrangement, undertaking or transaction that materially impairs or limits its ability to fully perform its obligations as set forth in this Agreement.

## ARTICLE II
## DEFINITIONS

2.1 **Defined Terms**

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Affiliate" shall mean with respect to Bacardi any entity which is controlled by or directly or indirectly owned in whole or in part by BL.

"Aggregate Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of all taxable rum sold in the United States during such Fiscal Year attributable to the bulk rum production in Puerto Rico, as reported in the Monthly Cover Over Reports for such Fiscal Year.

"Agreement" shall have the meaning specified in the preamble of this Agreement.

"Bacardi" shall mean BIL, and any affiliate of BIL (including BL or Corp) that is designated by BIL to perform "Bacardi" obligations under this Agreement.

"Bacardi Rum Sales" shall mean, with respect to any Fiscal Year, the number of proof gallons attributable to Bacardi's bulk rum manufacturing operations in Puerto Rico which is sold in the United States during such Fiscal Year, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U.S. Government) for such Fiscal Year under brand names owned or licensed by Bacardi and/or other third party brands including, but not limited to, other products ultimately to be sold to consumers in the United States and sold by Bacardi and/or for resale to Persons other than Bacardi, containing rum manufactured by Bacardi in Puerto Rico, which shall be counted cumulatively toward the incentives provided in this Agreement.

"Cover Over Rate" shall have the meaning specified in Section 4.7.1 hereof.

"Cover Over Revenues" shall mean the federal excise tax revenues payable to the Government by the U.S. Government pursuant to Section 7652(a) of the U.S. Internal Revenue Code or any other statute or regulation which may be substituted for such Section in the future. For purposes of this Agreement, Cover Over Revenues are deemed to be "payable to the Government" in respect of a Fiscal Year when all Monthly Cover Over Reports in respect of such Fiscal Year have been submitted by TTB to the U.S. Department of the Interior and a copy of each has been received by the Puerto Rico Department of the Treasury, and shall be determined without regard to the actual timing of such payment by the U.S. Government. The Cover Over Revenues attributable to any relevant rum sales during any Fiscal Year are determined by multiplying the number of proof gallons of relevant rum sales by a Dollar amount



EXECUTION VERSION

calculated in accordance with Section 7652 of the U.S. Internal Revenue Code, as applicable to Puerto Rico, and the regulations thereunder for such Fiscal Year.

"Disbursement Agent" shall have the meaning specified in Section 3.4 hereof.

"Dispute" shall have the meaning specified in Section 8.3.1 hereof.

"Economic Development Incentives" shall mean those incentives provided by the Government to Bacardi in accordance with Sections 5.1 and 5.2 hereof.

"Effective Date" shall have the meaning specified in Section 1.1 hereof.

"EPA" shall have the meaning specified in Section 3.3.1 hereof

"Environmental Laws" shall mean any statute, ordinance, rule, regulation, code, policy, interpretation, Permit, license, authorization, order, judgment, injunction, decree or case law principle or doctrine relating to pollution, Hazardous Substances, land use, or protection of human health or the environment.

"Event of Force Majeure" shall mean any act that (a) materially and adversely affects the affected Party's ability to perform the relevant obligations under this Agreement or delays such affected Party's ability to do so, (b) is beyond the reasonable control of the affected Party, (c) is not due to the affected Party's fault or negligence and (d) could not be avoided, by the Party who suffers it, by the exercise of commercially reasonable efforts, including the expenditure of any reasonable sum of money and, subject to the satisfaction of the conditions set forth in (a) through (d) above, an "Event of Force Majeure" shall include: (i) natural phenomena, such as storms, floods, hurricanes and earthquakes; (ii) wars, civil disturbances, revolts, insurrections, terrorism, sabotage and threats of sabotage or terrorism; (iii) transportation disasters, whether by ocean, rail, land or air, (iv) strikes or other labor disputes that are not due to the breach of any labor agreement by the affected Party; (v) fires; and (vi) actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions) that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Agreement or any Governmental Rule; provided, however, that under no circumstances shall an Event of Force Majeure include any of the following events: (A) economic hardship; (B) changes in market conditions; (C) any strike or labor dispute involving the employees of Bacardi or any Affiliate of Bacardi, other than industry or nationwide strikes or labor disputes; (D) ordinary weather conditions which could reasonably be managed by experienced contractors operating in the relevant location; (E) the occurrence of any manpower, material or equipment shortages; or (F) any delay, default, or failure (financial or otherwise) of the affected Party that is not the result of an event that would otherwise be an Event of Force Majeure; provided further, that upon the occurrence of any Event of Force Majeure, the affected Party shall promptly notify the unaffected Party and shall use commercially reasonable efforts to mitigate the effects thereof.

"Fiscal Year" shall mean the Government's fiscal year of July 1 through June 30.

"GDB" shall have the meaning specified in the preamble of this Agreement.

"Government" shall mean the government of the Commonwealth of Puerto Rico.

"Governmental Authority" shall mean any federal, Puerto Rico, commonwealth, state, municipal or local governmental entity, authority or agency, department, instrumentality, court, tribunal, regulatory



EXECUTION VERSION

commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) and any arbitrator to whom a dispute has been presented under Governmental Rule, pursuant to the terms of this Agreement or by agreement of the Parties.

"Governmental Function" means any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government or any of its instrumentalities is authorized or required to perform in its capacity as a Governmental Authority in accordance with Governmental Rules.

"Governmental Rule" shall mean any statute, law, treaty, rule, code, ordinance, regulation, permit, interpretation, certificate or order of any Governmental Authority, or any judgment, decision, decree, injunction, writ, order or like action of any court, arbitrator or other Governmental Authority.

"Hazardous Substances" shall mean any and all pollutants, contaminants, toxic, harmful or hazardous materials, substances or waste, or any other substances that: (a) might pose a hazard to health, safety or the environment, (b) the treatment, decontamination, containment or removal of which may be required; or (c) the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or migration of which is now or hereafter regulated, restricted, prohibited or penalized by any Environmental Law. Hazardous Substances include, without limitation, any substance, material or waste defined, listed or regulated by or in any statute, rule, regulation, Permit or order comprising Environmental Laws, and any other substance, material or waste that is regulated as hazardous, toxic, dangerous, harmful, a pollutant, a contaminant or words of similar meaning, or that because of the nature or characteristics of such substance, material or waste it requires special handling or care to prevent or mitigate a potential threat to human health or the environment.

"Historic Base Level" shall have the meaning specified in Section 4.7.1 hereof.

"Marketing Activities" shall have the meaning specified in Section 4.1.1 hereof.

"Marketing and Production Support Payment" shall have the meaning specified in Section 4.1.3 hereof.

"Material Default" shall mean (a) in the case of Bacardi (i) if Bacardi fails to meet the Minimum Rum Production Requirements by ten percent (10%) or more in any Fiscal Year during the first five Fiscal Years covered by this Agreement commencing on July 1, 2010 and by five percent (5%) or more in any Fiscal Year during the remaining term of this Agreement, in each case, after the expiration of the twelve (12) month cure period as provided in Section 4.7.2 hereof, or (ii) if Bacardi fails to rebuild its manufacturing plant and so re-commence production of bulk rum therein, as provided in Section 4.8.1 hereof, (iii) if any of BIL, BL and Corp provide a false lobbying certification under Section 8.21.1 hereof, (iv) if any of BIL, BL and Corp provide a certification and sworn statement which is found to be intentionally false, misleading, altered or forged under Section 8.21.5 hereof, and (v) if any of BIL, BL and Corp provide a criminal proceedings certification that is not correct in its entirety or in any of its parts under Section 8.21.8 hereof; (b) in the case of the Government (i) if the Refurbishment and Production Initiative payments are not made to Bacardi as provided in Section 3.1 hereof; (ii) the grant for the Treatment Plant is not paid by the Government as provided in Section 3.3 hereof, (iii) the Marketing and Production Support Payments are not paid by the Government as provided in Section 4.1.3 hereof, and (iv) if the Government fails to provide the obligations or other commitments agreed upon in Section 6.3.3 hereof; and (c) in the case of any Party, upon failure of the other Party to perform any other material obligation imposed upon that Party by the Agreement not listed in (a) and (b) above (including but not limited to failure to make a payment when due), if such failure or breach is not cured within ninety (90)





days following written notice, except for Bacardi's noncompliance with the applicable minimum production requirements, which remedies are specified in Section 7.2 hereof.

"Minimum Incentives" shall have the meaning specified in Section 4.1.3 (b) hereof.

"Minimum Rum Production Requirements" shall mean, for the first five (5) years of the Agreement commencing on July 1, 2010, the amount of proof gallons not less than those set forth in Exhibit F hereof, and thereafter, the minimum rum production requirements determined by Bacardi as provided in Section 4.7.1 hereof.

"Monthly Cover Over Reports" shall mean the report of actual monthly collections of federal excise tax revenues pursuant to Section 7652 of the U.S. Internal Revenue Code, which report is prepared immediately following the end of such month by TTB, a copy of which is delivered to the Puerto Rico Department of the Treasury approximately forty-five (45) days after the end of such month and/or any successor report providing the same information.

"Party" or "Parties" shall have the meaning specified in the introduction to this Agreement.

"Permit" or "Permits" means all consents, registrations, filings, licenses, permits, certificates, decrees, approvals, authorizations, qualifications, entitlements and orders of Governmental Authorities.

"Permitted Debt Service Reduction" shall mean for any Fiscal Year, the scheduled principal and interest paid or payable by the Government during such Fiscal Year in respect of any indebtedness issued by the Government on or after July 1, 2012 to finance the Refurbishment and Production Initiatives and, if applicable, the Treatment Plant, as may be reduced from time to time by the application of liquidated damage payments made by Bacardi under Section 7.2.1 hereof; provided, however, that in no event shall the Permitted Debt Service Reduction exceed (i) for the Fiscal Years beginning with the July 1, 2012 Fiscal Year, through the Fiscal Year beginning July 1, 2024, ten  percent (10%) of the Cover Over Revenues generated by the Bacardi Rum Sales and (ii) for the Fiscal Year beginning July 1, 2025, and each Fiscal Year thereafter, twelve percent (12%) of the Cover Over Revenues generated by Bacardi Rum Sales.

"Person" means any individual or entity (including any corporation, limited partnership, joint venture, limited liability company, estate, trust or other body).

"PRIDCO" shall have the meaning specified in the preamble of this Agreement.

"Production Activities" shall have the meaning specified in Section 4.1.2 hereof.

"Project" shall mean the design, construction, ownership and operation of a sugar-cane agricultural/industrial project and rum production facility in Puerto Rico as further described in Section 3.2.2 hereof, for the potential benefit of rum producers in Puerto Rico, including Bacardi.

"Project Site" shall mean up to 28,000 acres of land, on a site or sites selected by the Government assembled, dedicated and suitable for the Project.

"Puerto Rico" shall mean the Commonwealth of Puerto Rico.

"Puerto Rico Tax Code" shall mean the Puerto Rico Internal Revenue Code of 1994, as from time to time amended.

"Recapture Amount" shall have the meaning specified in Section 7.2.1 hereof.

"Refurbishment and Production Initiatives" shall have the meaning specified in Section 3.1 hereof.

"ROPR" shall have the meaning specified in the Recitals hereof.

"Tax or Taxes" shall mean any form of tax including alternative minimum tax or any levy, impost, duty, surcharge, contribution or withholding in the nature of tax (including without limitation; income tax, capital tax, gross receipts tax, volume of business tax (patente), excise tax, franchise tax, sales and use tax, value added tax, land or, mortgage registration tax or fee, recording and filing fees, among others, and real estate and personal property tax imposed, collected or assessed by, or payable to a Tax Authority and all interest, surcharges and penalties included in or related to any Tax.

"Tax Authority" shall mean any governmental or municipality body of Puerto Rico competent to impose or collect or assess any tax in Puerto Rico.

"Tax Free" shall mean that the grants and incentives granted and paid to Bacardi by the Government as Refurbishment and Production Initiatives, Treatment Plant Grant, and Marketing and Production Support Payments under Articles III and IV of this Agreement shall be totally exempt from the payment of any Taxes imposed by a Tax Authority.

"Term" shall have the meaning set forth in Section 8.15 of this Agreement.

"Treatment Plant" shall have the meaning specified in Section 3.3.1 hereof.

"TTB" shall mean the U.S. Alcohol and Tobacco Tax and Trade Bureau.

"United States" shall mean the continental United States, Hawaii and Alaska.

"U.S. Government" shall mean the federal government of the United States of America.

"USVI Incentives" shall have the meaning specified in the Recitals.

### ARTICLE III
### INFRASTRUCTURE SUPPORT FOR REFURBISHMENT AND RUM PRODUCTION; THE PROJECT AND THE TREATMENT PLANT

3.1     **Infrastructure Support**

3.1.1 Following the Effective Date, the Government will make available to BIL (or an Affiliate designated by BIL) a Ninety Five Million Dollar ($95,000,000.00) grant to refurbish Bacardi's rum producing facilities in Cataño, Puerto Rico, and to increase Bacardi's aging warehouse capacity as described in Exhibit A hereto (the "Refurbishment and Production Initiatives"). Such funds will be disbursed on a Tax Free basis by the Government to BIL (or an Affiliate designated by BIL) as agreed by the parties in accordance with the improvement and construction schedule described in Schedule 3.1 of this Agreement subject to BIL submitting the necessary certifications and/or backup invoices to the Disbursement Agent as described in Section 3.4 hereof. The Refurbishment and Production Initiatives payments will constitute non-shareholder capital contributions by the Government to BIL or to its designated Affiliate(s), as the case may be.




**EXECUTION VERSION**

3.1.2 The Government shall make all efforts and take such actions reasonably necessary, to the fullest extent permitted by law, to assist Bacardi (and, where applicable, its contractors and subcontractors), in Bacardi's expeditious filing of all applications for and obtaining, maintaining and renewing all Permits with respect to the Refurbishment and Production Initiatives. The Government shall take all feasible and lawful measures necessary to have all Permits under its jurisdiction issued in compliance with applicable law as soon as is practicable.

### 3.2 Development of the Project

3.2.1 Following the Effective Date, the Government will use its reasonable best efforts to develop the Project. In this respect, the Government's obligations to (x) acquire, through lease or purchase, the Project Site, (y) cause the Project to be designed, developed, constructed, and equipped, and (z) commence operations of the Project in a timely manner, are conditioned upon the following requirements:

(a) The economic, commercial and environmental feasibility of the Project itself to the Government, the EPA and Bacardi based upon a feasibility study which shall include, among other considerations, the items described in Schedule 3.2.1(a) of this Agreement and the following:

(i) the Project shall provide a long term solution for the disposition of distillery waste water (also known as vinasses), in accordance with EPA and EQB requirements;

(ii) the Project shall provide for the production of aguardiente and light cane distillate at a cost acceptable to the majority of the rum producers in Puerto Rico; and,

(iii) the Government will make its reasonable best efforts to develop a Project that shall be a financially viable independent business that can attract a professional third party to administer the same;

(b) The Government's ability to secure a Project Site in Puerto Rico on a commercially reasonable basis that is appropriate to develop the Project;

(c) The Government's ability to timely obtain such Permits as may be necessary to construct, equip and operate the Project; and

(d) The Government's ability to find a joint venture entity or third party to be selected by the Government and acceptable to the majority of the rum producers in Puerto Rico to operate the Project.

3.2.2 Subject to Section 3.2.1 above, the Government will use its reasonable best efforts to:



(a) identify among its own existing lands or acquire, through lease or purchase, an appropriate Project Site in Puerto Rico upon which the Project shall be developed to produce raw materials for the production of rum in Puerto Rico, including sugar, alcohol and energy, while integrating the disposal of by-products as described in Exhibit B hereto. The Government would own but not operate the Project. It is intended that the Government would enter into a long-term lease or concession agreement for the operation of the Project with a joint venture entity or third



EXECUTION VERSION

party to be selected by the Government and acceptable to the majority of rum producers in Puerto Rico; and

(b)      cause the Project to be designed, developed, constructed, equipped and operated in accordance with all applicable laws and regulations, including applicable Environmental Laws, as soon as reasonably practicable.

3.2.3    The Parties agree that it is in the Parties' best interests for the design, development, construction, equipping and operational start up of the Project to proceed on an expeditious basis. In this respect, the Project must be endorsed as a viable alternative to the Treatment Plant by the EPA on or before September 1, 2012 and shall be operational, as an acceptable alternative to the Treatment Plant, in accordance with a timetable agreeable to the Government, EPA and Bacardi.

3.2.4.    Bacardi shall reasonably cooperate with the Government in the design, feasibility analysis and development of the Project providing internal technical assistance and other internal resources to be determined by Bacardi, at no additional cost to Bacardi or the Government, to assist in the areas of industrial rum production and waste treatment, as provided in Schedule 3.2.4 of this Agreement.

3.3    **Treatment Plant**

3.3.1 The Parties acknowledge that in order for Bacardi to continue its operations in Puerto Rico, it needs a long term alternative for the treatment of vinasses, either an environmentally desirable alternative as described in the Project or engage in the construction of a waste water treatment plant as described in Exhibit C hereto (the "Treatment Plant") to fully comply with current and future requirements of the  Puerto Rico Environmental Quality Board ("EQB") and U.S. Environmental Protection Agency ("EPA"), at a currently estimated construction cost of approximately Fifty Million Dollars ($50,000,000.00). It is expected that Bacardi may not need to construct the Treatment Plant if the Project is completed on a timely basis. However, (a) if by September 1, 2012, there is not a final approval of the environmental impact review document of the Project by the Puerto Rico Permit Management Office, or, (b) if by September 1, 2012, after a complete review and assessment by the Government and Bacardi, the Project is deemed not to be feasible, from an economic perspective or otherwise, by the Government or Bacardi in their reasonable judgment, or (c) if after September 1, 2012, (i) the Project falls behind schedule to a degree that would preclude Bacardi from reasonably concluding that it will be in compliance with the applicable waste water treatment regulatory requirements of its operations in Cataño, Puerto Rico, (ii) despite Bacardi's and the Government's best efforts, Bacardi is unable to obtain the necessary extensions or permits from the environmental agencies to  account for the delays in the development schedule of the Project and a Treatment Plant could be completed and operational before the environmentally desirable alternative described in the Project would be completed, and (iii) the Government has not incurred costs associated with the Project in excess of Twenty Million Dollars ($20,000,000),  the Government will provide, at Bacardi's request,  a Tax Free grant of Fifty Million Dollars ($50,000,000.00) (subject to U.S. inflationary cost adjustments) to BIL, or an Affiliate designated by BIL, for the construction of the Treatment Plant in accordance with Schedule 3.1 hereof and such grant (the "Treatment Plant Grant") will constitute a non-shareholder capital contribution by the Government; provided, however, that upon the occurrence of (a), (b) or (c), above, the Government, at its sole discretion, may choose to discontinue the Project. For purposes of (c)(iii), above, the Government and Bacardi shall establish an estimated budget of costs, which shall be updated quarterly to reflect actual costs. Once the costs incurred by the Government associated with the Project have reached Fifteen Million Dollars ($15,000,000), Bacardi will have the right to request a monthly update of actual costs for the Project but no more than one update per month.




EXECUTION VERSION

3.3.2    The Government shall do all things and take such actions reasonably necessary, to the fullest extent permitted by law, to assist Bacardi (and, where applicable, its contractors and subcontractors), in Bacardi's expeditious filing of all applications for and obtaining, maintaining and renewing all Permits with respect to the Treatment Plant. The Government shall take all feasible and lawful measures necessary to have all Permits under its jurisdiction issued in compliance with applicable law as soon as it is practicable.

### 3.4    Disbursements of Incentives and Grant

The Refurbishment and Production Initiative payments  and the Treatment Plant Grant will be disbursed by PRIDCO (the "Disbursement Agent") following the Effective Date as Bacardi incurs the expenses described in Exhibit A and Exhibit C, and submits reasonable evidence and certifications to the Disbursement Agent of the equipment and materials ordered and /or the work performed. Payment will be made by the Disbursement Agent to Bacardi within thirty (30) days of the submission of such evidence.

## ARTICLE IV

## MARKETING AND PRODUCTION SUPPORT PAYMENTS

### 4.1    Marketing Activities; Production Activities; Marketing and Production Support Payments

#### 4.1.1    Marketing Activities.

(a)    Bacardi shall perform or shall cause its Affiliates to perform marketing activities, including, but not limited to, the marketing activities pre-approved by the Government which are specified in Exhibit D hereof (the "Marketing Activities").

(b)    Bacardi's Marketing Activities shall be in furtherance of its promotion of Bacardi's rum products (or any other third party products or brands in the United States utilizing the bulk rum produced by Bacardi in Puerto Rico for sale in the United States, and when advisable from a marketing standpoint, for the promotion of "Puerto Rican Rums".

(c)    Bacardi shall annually report to the Government on the content and effectiveness of the Marketing Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Bacardi to discuss the Marketing Activities and its progress in promoting Bacardi's rum products utilizing bulk rum produced in Puerto Rico for sale in the United States.

#### 4.1.2    Production Activities.

(a)    Bacardi shall perform or shall cause one of its designated Affiliates to perform production activities to support and promote the continued production of bulk rum by Bacardi in Puerto Rico (the "Production Activities").

(b)    Bacardi's Production Activities shall be in furtherance of its production of Bacardi's rum products (or any other third party products or brands) utilizing the bulk rum produced by Bacardi in Puerto Rico for sale in the United States.



(c)     Bacardi shall annually report to the Government on the content and effectiveness of the Production Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Bacardi to discuss the Production Activities and its progress in producing Bacardi's rum products (or any other third party products) in Puerto Rico for sale in the United States.

### 4.1.3   Marketing and Production Support Payments.

(a) So long as the Cover Over Revenues are paid or transferred to Puerto Rico, from the Effective Date of the Agreement, the Government agrees to make marketing and production support payments (the "Marketing and Production Support Payments") to BIL, or an Affiliate designated by BIL, of ten percent (10%), or such other higher percentage agreed upon as provided for in this Agreement, of the Cover Over Revenues attributable to Bacardi Rum Sales for each Fiscal Year. The Marketing and Production Support Payments to BIL, or an Affiliate designated by BIL, will be for each Fiscal Year covered by this Agreement beginning with the Fiscal Year commencing on July 1, 2010.

(b) The Parties acknowledge that, notwithstanding the Refurbishment and Production Initiatives described in Section 3.1 and the Marketing and Production Support Payments described in Section 4.1.3 (a) above, the USVI Incentives are expected to result in a competitive disadvantage for Bacardi. As a result, Bacardi and the Government agree to support joint efforts to promote legislation at the United States federal level to limit the direct and indirect assistance provided to companies producing rum in Puerto Rico or USVI and selling it in the United States *until December 31, 2011; provided that said support is reasonable and appropriate and such legal limits allow for the Government to provide Bacardi with, at least,  10% of the Cover Over Revenues attributable to Bacardi Rum Sales paid annually for Marketing and Production Support Payments (excluding any Permitted Debt Service Reduction) the Refurbishment and Production Initiatives and the Treatment Plant Grant, if any, to Bacardi* (the "Minimum Incentives").

(c) Bacardi and the Government agree that, to the extent that, despite the Parties' efforts, the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to a particular competitor on December 31, 2011, the Government will take the necessary action as contemplated in the Enabling Act to provide Bacardi, commencing in the Fiscal Year starting on July 1, 2012, with additional Marketing and Production Support Payments equivalent to forty-six percent (46%) of the Cover Over Revenues attributable to Bacardi Rum Sales in respect of such Fiscal Year less any Permitted Debt Service Reduction, as provided in Section 4.1.3 (g) hereof. In this respect, the Government may provide such additional Marketing and Production Support Payments from any available sources of revenue, in its sole discretion. All such grants to provide financial support for Marketing and Production Support Payments will constitute non-shareholder capital contributions by the Government to BIL or to its designated Affiliates(s), as the case may be.

(d) [Intentionally left in blank]

(e) If following the Effective Date, other incentives are granted by the Government to any Bacardi competitor which result, in the aggregate,  in a larger percentage of Cover Over Revenues or total economic incentives, provided to said  competitor than the percentage of the Cover Over Revenues provided to Bacardi under this Agreement, then additional benefits will be also granted to Bacardi, as necessary,  without any further amendment to the Agreement, unless such competitors sell in the United States less than five percent (5%) of Bacardi's proof gallons of rum produced in Puerto Rico for sale in the United States, in which case, the Government will

disclose to Bacardi the terms and conditions of any such incentives at the request of Bacardi, as permitted by law. If, following the Effective Date, incentives to Bacardi competitors in the USVI (including through a percentage of Cover Over Revenues and total economic incentives) are increased above forty seven point five percent (47.5%), the Parties agree to negotiate in good faith and, if necessary, amend the terms of this Agreement to provide additional Marketing and Production Support Payments to Bacardi. If, however, the Parties are not able to reach an agreement on the amount of such additional Marketing and Production Support Payments within ninety (90) days, Bacardi shall have the right to request a final thirty (30) day negotiation period with the Government. If the Parties cannot reach an agreement during this final 30-day negotiation period, Bacardi shall have the right to terminate the Agreement.

(f) If federal legislation is passed that places a limit on the direct or indirect assistance from Cover Over Revenues provided to companies producing rum in Puerto Rico and the USVI and selling it in the United States, the Parties agree to within sixty (60) days from the signing into law of the new legislation, to amend the Agreement accordingly, if necessary, to comply with such legislation and to provide Bacardi with grants, production and marketing incentives in such percentage of the Cover Over Revenues attributable to Bacardi Rum Sales which is equivalent to the benefits provided by USVI to Bacardi's largest competitor in that jurisdiction under such new limitations but which are, in no event, lower than the Minimum Incentives.

(g) The total amount of the Marketing and Production Support Payments due to be paid to BIL and its Affiliates in any Fiscal Year from July 1, 2010 to June 30, 2012, shall be ten percent (10%) of the Cover Over Revenues attributable to Bacardi Rum Sales in respect of such Fiscal Year, which amount shall be payable in full without any deduction, withholding or discount whatsoever. Beginning with the Fiscal Year commencing on July 1, 2012 and for each Fiscal Year thereafter, the total amount of Marketing and Production Support Payments due to be paid to BIL and its Affiliates in any Fiscal Year under this Agreement shall be forty six percent (46%) of the Cover Over Revenues attributable to the Bacardi Rum Sales in respect of such Fiscal Year, *less* the Permitted Debt Service Reduction, if any, for such Fiscal Year; provided, however, that the total amount of Marketing and Production Support Payments may be lowered to the extent permitted by Section 4.1.3 (f). If, in any Fiscal Year, the Permitted Debt Service Reduction exceeds the Marketing and Production Support Payment to which Bacardi is entitled, then the excess shall be rolled-over and applied as a reduction to the Marketing and Production Support Payment for the following Fiscal Year.

4.1.4.   The foregoing provision shall not give BIL any rights with respect to the Cover Over Revenues of the Government but the Government covenants that it will provide the Marketing and Production Support Payments set forth in this Agreement from any available sources of revenue, in its sole discretion.

4.1.5   If the Marketing and Production Support Payments are timely and properly made to Bacardi by the Government, PRIDCO or any other designated agency, and economic conditions in the United States improve as expected by Bacardi, then Bacardi expects to achieve, for each fiscal year covered by the initial 20-year term of the Agreement, the range of projections of Bacardi Rum Sales (in numbers of proof gallons) set forth in Exhibit E hereto. The Parties understand and agree that the immediately preceding sentence shall be deemed to be an indication of the anticipated normal business trajectory of Bacardi under facts currently known or anticipated, and shall not be deemed to be a legal commitment, representation, warranty, or guarantee of results except for the Minimum Rum Production Requirements.

## 4.2     Marketing and Production Activities

4.2.1 Subject to the limitations in Sections 4.2.2 and 4.2.3, BIL shall be permitted to use any such Marketing and Production Support Payments to fund any and all Marketing Activities and Production Activities for its rum products produced in Puerto Rico for sale in the United States market in any manner that is reasonably expected to promote or benefit Bacardi Rums Sales in the United States.

4.2.2     With respect to the Marketing and Production Support Payments, (i) any and all Marketing Activities and Production Activities funded with Marketing and Production Support Payments will be disbursed through the Government, PRIDCO or any other designated agency, and (ii) BIL shall file with the Government through PRIDCO or any other designated agency, an annual plan for the Marketing Activities for each Fiscal Year.

4.2.3     All advertisement (print, broadcast or otherwise) placed using the Marketing and Production Support Payments will be so placed through a media agency designated by the Government through PRIDCO or any other designated agency, which shall provide its services at competitive fees, including matching any fee by BIL's own U.S. advertising agency in compliance with Section 4.2.4 hereof.  Bacardi by itself or through an independent third party shall have the right, at its own cost, to make an annual audit of Bacardi's media campaign placed by the agency designated by the Government.

4.2.4     Both parties agree to the following mechanism to replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Bacardi's own U.S. advertising agency, if Bacardi is not satisfied with, among other criteria, the services, efficiency or fees offered by the media agency designated by the Government;

(a)     Bacardi shall use, at its own cost, an outside media agency to audit the Government's designated media agency's performance based on its media purchasing power, measured by its costs per Total Gross Rating Points ("TGRP's");

(b)     Bacardi shall compare the Government's agency media plan, as if said plan were to be executed by its US agency, and assess for efficiencies;

(c)     Bacardi shall evaluate the Government's media agency turnaround performance and/or media placement to be within industry standards;

(d)     Bacardi shall notify the Government of its media agency deficiencies and the Government's media agency shall have a thirty (30) day to cure said deficiencies; and

(e)     If the Government's designated media agency fails to cure the deficiencies notified by Bacardi or continuously fails to comply with the considerations described in this Section 4.2.4, Bacardi shall notify the Government of its dissatisfaction with said media agency and the Government shall replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Bacardi's own U.S. advertising agency.

Bacardi and the Government will work together to maximize media buying efficiencies for both parties.

EXECUTION VERSION

### 4.3    Use of Bacardi's Image

Use of Bacardi's intellectual property (including, without limitation, proprietary names, logos, bottle shapes, etc.) by ROPR will require Bacardi's prior written approval, which may be withheld, in its sole discretion.  The Parties agree that the marketing and advertisement of the Bacardi brand products shall be under the exclusive control of Bacardi.

### 4.4    Promotion of Bacardi's Rum Brand

BIL's Marketing Activities shall be in furtherance of its promotion of the Bacardi rum brand in the United States (or any other products utilizing bulk rum produced by Bacardi in Puerto Rico for sale in the United States), and when advisable from a marketing viewpoint, it may also promote  the  "Rums of Puerto Rico" brand, in the United States.

### 4.5    Labeling

The Secretary of the Treasury and the Executive Director of PRIDCO hereby allow Bacardi to exclude from the labels of all its bottled rum products produced in Puerto Rico for sale in the United States the words "Rums of Puerto Rico" and/or "Puerto Rican Rum". Bacardi and the Government agree within one hundred and twenty (120) days from the signing of this Agreement to work together to develop a quality seal of approval, or other written reference to Puerto Rico that will be included on the back label of those rum products, which promotes Puerto Rico.

### 4.6    Payment Procedure and Timing

4.6.1    Under current Act No. 119 of July 8, 2006 and existing contractual obligations, the first $117 million of Cover Over Revenues received by the Government in each Fiscal Year through fiscal 2057 are pledged and have to be transferred to the Puerto Rico Financing Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Pledged Cover Over Requirement). For Fiscal Year 2010-2011, upon completion of the Pledged Cover Over Requirement, the Government will pay to BIL on or before February 28, 2011, its corresponding percentage of the Cover Over Revenues attributable to Bacardi Rum Sales with respect to said $117 million in the form of Marketing and Production Support Payments from any available sources of revenue, in its sole discretion. Thereafter, including subsequent Fiscal Years, the Marketing and Production Support Payments will be paid on a monthly basis as the Government receives and identifies the Cover Over Revenues attributable to the Bacardi Rum Sales as further described below once the Pledged Cover Over Requirement is satisfied.

4.6.2    The Cover Over Revenues received by the Government are transferred monthly to the Puerto Rico Treasury Department by the Alcohol and Tobacco Tax and Trade Bureau of the U.S. Department of Treasury, based on the net rum excise tax collected in the previous months. The Cover Over Revenues are transferred to the Government via the Automated Clearing House network with a two month lag. The Monthly Cover Over Reports often reflect adjustments to the Cover Over Revenues previously received by the Government in the current or prior Fiscal Years (the "Federal Adjustment").

4.6.3    Upon receipt of the Monthly Cover Over  Report and other reports  containing information on Bacardi Rum Sales from the U.S. Government or Bacardi, including reports filed by Bacardi with the U.S. Government,  the Government shall cause the Marketing and Production Support Payment due to BIL from the Bacardi Rum Sales to be deposited in a segregated account to be established for such purpose and to be distributed to BIL within thirty (30) days.

4.6.4   The Parties agree that:

(a)   Bacardi will submit monthly reports to the Puerto Rico Treasury Department with copies to PRIDCO and  the GDB of the Bacardi  Rum Sales and the  federal excise taxes paid to the U. S. Government to facilitate the review and processing of the Marketing and Production Support Payments by the Government.

(b)   On September of each year, the Puerto Rico Treasury Department will prepare and  submit to Bacardi a certified report  on the Bacardi Rum Sales for the prior Fiscal Year  based on the Monthly Cover Over Reports or such other  reports from the U.S. Government that  contain  information on the Bacardi Rum Sales, in order to determine if, due to the Federal Adjustments, any true-up adjustments have to be made (upwards or downwards) on the Marketing and Production Support Payments paid during the immediately preceding Fiscal Year. If the adjustment is in favor of Bacardi and the adjustment does not exceed five percent (5%) of the total incentives paid by the Government to Bacardi under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid to Bacardi on or prior to October 30 of such year. If the adjustment is in favor of Bacardi and the adjustment exceeds five percent (5%) of the total incentives paid by the Government to Bacardi under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid in three (3) equal end of the month installments in October, November and December of such year.

## 4.7   Minimum Rum Production Requirements

4.7.1   Provided that (i) the Cover Over Revenue determined in accordance with Section 7652(a) of the U.S. Internal Revenue Code (the "Cover Over Rate") is not reduced below its historic base level of US $10.50 per proof gallon of  Bacardi Rum Sales with respect to Aggregate Rum Sales (the "Historic Base Level") and (ii) the incentives granted by the Government to Bacardi under sections 3.1, 3.3,4.1 and 5.1, as applicable, of this Agreement have not been materially reduced or made unavailable to Bacardi, Bacardi shall produce bulk rum for sale in the United States in amounts not less than those set forth in Exhibit F to this Agreement for the first five (5) Fiscal Years commencing on July 1, 2010, unless the occurrence of an Event of Force Majeure prevents such production during the duration of such Event of Force Majeure. Thereafter, for subsequent Fiscal Years during  the reminder of the initial 20-year term and any extension or renewal term, Bacardi shall determine its  minimum production requirements every five (5) years based upon the average of the bulk Bacardi Rum Sales for the previous five (5) year period, subject to Bacardi's right to adjust the minimum production requirements by up to twenty five percent (25%) above or up to twenty percent (20%) below the average of the bulk Bacardi Rum Sales for the previous five (5) year period. Each five (5) year estimate shall be delivered by Bacardi to the Government within sixty (60) days after the beginning of each five (5) year period.  For each such five (5) year period, Bacardi shall produce bulk rum in Puerto Rico for sale in the United States at least equal to the amounts so determined, unless the occurrence of an Event of Force Majeure prevents such production. Except as otherwise agreed in Section 4.7.3, any other changes in Minimum Rum Production Requirements shall require the mutual agreement of the parties.

4.7.2   If at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months or the Economic Development Incentives granted by the Government to Bacardi are materially reduced or unavailable to Bacardi (other than as a result of Bacardi's failure to comply with any contractual or legal requirements) for a period greater than twelve (12) months, Bacardi shall not be obligated to make Bacardi Rum Sales and may terminate this Agreement with thirty (30) day prior written notice to the Government.

EXECUTION VERSION

4.7.3   If Bacardi cannot perform the applicable Minimum Rum Production Requirements by reason of any Event of Force Majeure, the Government will waive Bacardi's compliance with the minimum production requirements during the duration of the Event of Force Majeure.  Upon the occurrence of a Event of Force Majeure, Bacardi shall promptly notify the Government and shall use commercially reasonable efforts to mitigate the effect thereof.

4.8   **Further Obligations**

4.8.1   After the completion of construction and commencement of commercial operation of the Refurbishment and Production Initiatives project or the Treatment Plant, as the case may be, and following the occurrence of fire or other damage to the Bacardi's manufacturing plant  resulting in a commercially significant reduction in the output of rum that can be produced  by Bacardi in Puerto Rico and that is caused by an event that is insurable at the time of the occurrence of the event at commercially reasonable rates, Bacardi agrees to rebuild  its manufacturing plant in Cataño, Puerto Rico and re-commence production of bulk rum therein as soon as reasonably possible after the occurrence of such event of loss at the levels of production required by this Agreement. If Bacardi fails to so rebuild its manufacturing plant and so re-commence production of bulk rum therein, such failure shall be a Material Default and the Government may terminate this Agreement.

4.8.2   Bacardi agrees to maintain commercially reasonable insurance against the property damage risks described in Section 4.8.1 above either as part of the global insurance program for the portfolio of facilities operated by  Bacardi or on a stand-alone basis, at the discretion of Bacardi. The proceeds from any claim made on such insurance shall be available to Bacardi toward the satisfaction of its obligations under this Agreement.

## ARTICLE V

## ECONOMIC DEVELOPMENT INCENTIVES AND OBLIGATIONS

5.1   **Economic Development Incentives; Tax Exemptions**

Bacardi currently enjoys certain tax exemptions pursuant to the Tax Grant No. 98-135- I-45 (the "Tax Grant") issued under Act No. 135 of December 2, 1997, as amended ("Law 135"), and under Act No. 78 of September 10, 1993, as amended ("Law 78"). The Government agrees that nothing in this Agreement shall adversely affect the rights of Corp to retain, enjoy and obtain the tax incentives and benefits described in the Tax Grant or under Law 135 and Law 78.

5.2   **Tax Free Payments.**

All payments made by the Government to Bacardi as Refurbishment and Production Initiatives, Treatment Plant Grant and Marketing and Production Support Payments pursuant to Article III and Article IV hereof shall be in the nature of non-shareholder contributions and shall be disbursed Tax Free to Bacardi and not be subject to any tax, deduction or withholding on the part of the Government or its Tax Authorities. The Government hereby acknowledges that Bacardi will be entitled to receive such Tax Free treatment without the need for any formal application procedure by Bacardi. Other than the terms of this Article V, there shall be no additional conditions or requirements imposed upon Bacardi that could result in the suspension, revocation or reduction of such Tax Free treatment.

EXECUTION VERSION

5.3    **No Adverse Actions.**

The Government hereby agrees and covenants with Bacardi that, except as otherwise provided in this Agreement and to the extent permitted by law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Bacardi to lose any applicable Tax, exemptions or benefits granted to Bacardi pursuant to this Agreement or any extension thereto.

5.4    **Effective Date**

The effective date of the benefits granted under Section 5.2 hereof shall be July 1, 2010.

# ARTICLE VI

## REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS

6.1    **Representations, Warranties and Acknowledgements**

6.1.1    The Government hereby represents and warrants to Bacardi as of the Effective Date that:

(a)    The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order or judgment;

(b)    The Government has: (i) the legal power, due authority and necessary and adequate funding ability to execute and deliver this Agreement, to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; (ii) duly obtained such approvals, authorizations, or consents in accordance with applicable law and procedures to the extent that the approval, authorization, or consent of the federal or any other local government or agency or any third party to make the representations and perform its obligations contained herein is required; and (iii) with respect to the funding commitments made by the Government hereunder, such funding commitment has been, or on or prior to the date of issuance and disbursement of any proceeds thereof, and throughout the period that the same is outstanding, shall be properly budgeted and authorized pursuant to all applicable law;

(c)    The Government knows of no material impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder; and

(d)    There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out its obligations under this Agreement.



**EXECUTION VERSION**

6.1.2    Each of BIL, BL and Corp hereby represents and warrants to the Government as of the Effective Date that:

(a)    BIL, BL and Corp are corporations duly organized and validly existing under the laws of their respective jurisdictions and have the corporate power and authority, and have taken all necessary action to authorize them, to execute and deliver this Agreement and to perform their obligations hereunder.

(b)    The execution, delivery and performance by BIL, BL and Corp of this Agreement do not violate or conflict with, or result in a default under, any material contract or agreement to which they are bound or any of their respective organizational documents.

(c)    Assuming due authorization, execution and delivery of this Agreement by the Government, this Agreement is the legal, valid and binding obligation of each BIL, BL and Corp, enforceable against each of them in accordance with its terms, subject to the effects of bankruptcy or insolvency or laws affecting creditors' rights generally.

(d)    There are no actions, suits or proceedings pending or, to the best of BIL, BL and Corp's knowledge, threatened against or affecting BIL, BL and Corp before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of BIL, BL and Corp to meet and carry out their obligations under this Agreement.

(e)    Neither BIL, nor BL nor Corp or their Affiliates is involved in any litigation, arbitration or claim against the Government.

## 6.2    Government Debt Financing

If the Government elects to use debt financing to fund the Refurbishment and Production Initiatives payments and the Treatment Plant Grant, if any, it will use its best efforts to obtain the best financing rate available to the Government, but shall be entitled, in its sole discretion, to determine the amortization period for the principal on such Government indebtedness.

## 6.3    Make-Whole Actions

6.3.1    The Government and Bacardi each assert that they enter into this Agreement based upon certain objectives and expectations, more specifically described below in this Section 6.3. The Government and Bacardi each further acknowledge and agree that it is not possible to predict, consider and provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, in order to preserve the basis upon which the Agreement is entered into by the Government and Bacardi, the Government and Bacardi each agree to the terms and conditions set forth in this Section 6.3.

6.3.2    Each of Bacardi and the Government acknowledges and agrees that each has entered into this Agreement in material reliance on each and all of the obligations and commitments of the other party under this Agreement, as a package and without exception, with the reasonable expectation that each of them will receive all of the benefits of such obligations and commitments, including, in the case of the Government, without limitation, the Minimum Production Requirements, and including, in the case of Bacardi, without limitation, receipt of benefits in the form of the Refurbishment and Production

**EXECUTION VERSION**

Initiatives, or the Treatment Plant Grant, if applicable, and the Marketing and Production Support Payments described in Articles III and IV of this Agreement and the Tax Free treatment described in Section 5.2 hereof.

6.3.3    The Government and Bacardi each further agree and acknowledge that it is not possible to predict, consider or provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, the Government represents, warrants and covenants to Bacardi that in the event of a change in local law, the imposition of any special, additional or new levy or Tax on Bacardi or any other act, event or circumstance (except the enactment of federal legislation affecting the amount of the Cover Over Revenues received by the Government), the result of which would be to diminish, impede, impair or prevent the full performance after the Effective Date of any or all of the obligations and commitments made by the Government under this Agreement, the Government, shall exercise its best efforts to, and to the extent permitted by law shall, provide Bacardi with another obligation or commitment reasonably acceptable to Bacardi and having economic effect equivalent to the commitment so lessened or removed. If the Government fails to provide such obligation or other commitment, such failure shall be a Material Default. In furtherance of the foregoing, in the event that Cover Over Revenues attributable to the Bacardi Rum Sales are for any reason received by the Government but are not available to satisfy the Government's payment obligations to Bacardi hereunder, the Government agrees to fund such obligations from other sources of revenue, to the extent permitted by law.

6.3.4    The Government agrees to use reasonable efforts to strenuously oppose any proposed legislation, initiative, act, event, plan or proposal which would otherwise have the effect of voiding or reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally necessary steps to defend the obligations and commitments contained herein.

6.3.5    Bacardi acknowledges and agrees that the Government has entered into this Agreement in material reliance on each and all of the obligations and commitments of Bacardi under this Agreement, as a package and without exception, with the reasonable expectation that the Government will receive all the benefits contemplated to inure to it under the terms of this Agreement.

6.3.6    The Government and Bacardi each acknowledge and agree that: (a) the objectives and expectations set forth in this Section 6.3 are reasonable; (b) the commitments and obligations set forth in this Section 6.3 are intended to be continuous throughout the duration of this Agreement and (c) that the terms and conditions set forth in this Section 6.3 are material to this Agreement and intended to be enforced to the maximum extent possible.

6.4    **Acknowledgements**

The Government and Bacardi agree and acknowledge that:

6.4.1    Bacardi would face serious competitive disadvantages to continue to produce rum in Puerto Rico due to the USVI Incentives, among other reasons, without the obligations and commitments to be provided by the Government hereunder for the entire period for which such obligations and commitments are to be made available during the Term of this Agreement.

6.4.2    The Government would not have considered granting the benefits and exemptions to be provided to Bacardi under the terms of this Agreement without the obligations and commitments to be provided by Bacardi as set forth in this Agreement.

6.4.3 The Parties will exercise their best efforts and take all actions to fulfill and maintain the obligations and commitments that they have made for the specific period reference herein.

6.4.4 Bacardi has relied upon the continued performance of the Government's obligations and commitments for their specified duration in connection with its decision to remain in Puerto Rico.

6.4.5 This Agreement has been the subject of arm's length negotiations between Bacardi and the Government and it is the intent of the Parties that this Agreement constitutes an enforceable contract.

6.5      **Negative Covenants**

Without the prior written consent of Bacardi, the Government, to the extent permitted by law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to adversely affect, diminish or impair the beneficial use, operation, utility or the ability of Bacardi to beneficially use, occupy, obtain, receive or otherwise enjoy any of (i) the physical sites, facilities and improvements developed as a result of  the Refurbishment and Production Initiatives, the Treatment Plant Grant, if applicable, and the Marketing and Production Support Payments, or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement.

6.6      **Maintenance and Audit of Records.**

6.6.1    During the term of this Agreement, Bacardi shall maintain accurate books, records and accounts of the Refurbishment and Production Initiatives, the Treatment Plant, if any, the Marketing Activities, the Production Activities, the Marketing and Production Support Payments and the Economic Development Incentives granted by this Agreement in order to assist the Government in auditing the use of such incentives by Bacardi. The Government and Bacardi shall cooperate to create a record keeping program reasonably acceptable to both Parties.

6.6.2    When so requested, Bacardi will provide the Government with information directly related to the incentives and activities described in Section 6.6.1 above and supporting documentation. The Government shall have the right, upon reasonable request during the term of this Agreement, to cause an audit of the books, records, and accounts specifically maintained by Bacardi pursuant to Section 6.1.1 above, to be performed by the Puerto Rico Department of the Treasury, or other agency designated by the Government upon prior written notice to Bacardi. The Government shall be responsible for the costs of such audits and the out-of-pocket expenses of Bacardi directly incurred in connection with such audit; provided, however, if the results of such audit demonstrate that Bacardi has materially failed to comply with the terms of this Section 6.6, Bacardi shall be responsible for the costs of such audit.

6.6.3    In the event of any discrepancy between the Government and Bacardi with respect to the result of any audit under this Section 6.6, any Party may seek to resolve such discrepancy as provided in Section 8.3 hereof.

## ARTICLE VII
## TERMINATION; REMEDIES

### 7.1    Termination

The Agreement may be terminated prior to term upon the occurrence of the following events:

7.1.1. By any Party, upon failure by the Government to file the Agreement with the Office of the Comptroller of Puerto Rico, as required by Act No.18 of October 30, 1975, as amended, within thirty (30) days after the full execution hereof.

7.1.2. By a non defaulting  Party, upon failure of the other party to cure any Material Default under the Agreement within the time allowed for a cure under the Agreement, except for Bacardi's noncompliance with the applicable minimum production requirements, which remedies are specified in Section 7.2 hereof;

7.1.3. By Bacardi, upon failure by the Parties to reach an agreement on the amount of any additional Marketing and Production Support payments  which could be granted by the Government to Bacardi under Section 4.1.3 (e) hereof.

7.1.4. By Bacardi, if following the Effective Date of the Agreement, (i) the Cover Over Revenues program is terminated; (ii) the Marketing and Production Support Payments to BIL are reduced below the amounts required to be paid by the Government at any given time under Section 4.1.3 of this Agreement; (iii) if at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months as provided in Section 4.7.2 hereof, or  (iv)  the Economic Development Incentives currently enjoyed by Bacardi under the Tax Grant, Law 135 and Law 78 as provided in Section 5.1 hereof, and the Tax Free treatment provided under Section 5.2 hereof, are materially reduced or unavailable to Bacardi (other than as a result of Bacardi's failure to comply with any contractual or legal requirements for a period greater than twelve (12) months  as provided in Section 4.7.2). In any of the abovementioned events in this Section 7.1.4 in which the Government is  responsible for the causes of termination, Bacardi will be entitled to retain any grants and incentives already paid by the Government, including the Refurbishment and Production Initiatives, the Treatment Plant Grant, if any, and Marketing and Production Support Payments without paying any Recapture Amount. If Bacardi terminates the Agreement because the Cover Over Revenues program has been terminated, it will have to pay the Recapture Amount, if any,   as defined in Section 7.2.1 unless Bacardi continues to  have in Puerto Rico sufficient economic  activity  thereafter (i.e. volume of business, employment and direct and indirect taxes, among other activities) to generate sufficient income for the Government to support the then outstanding debt obligations issued by the Government to fund the Refurbishment and Production Initiatives and the Treatment Plant Grant.

7.1.5. By Bacardi, if during the Term of this Agreement or any renewal thereof, the Tax Grant expires and  Bacardi is unable to obtain tax incentives and benefits under Law 135, Law 78 or any successor law, equivalent to the ones currently enjoyed under the Tax Grant, Law 135 and Law 78, even though Bacardi is offering to make substantially the same contractual commitments to the Government as exist in the current Tax Grant (unless the Project is developed, in which case, Bacardi's contractual commitments to the Government may be different from the ones under the current Tax Grant to reasonably reflect that some operations currently carried out by

EXECUTION VERSION

Bacardi will become part of the operations of the Project). This will not be considered an Event of Force Majeure but Bacardi shall have the right to terminate this Agreement, in which case it will be obligated to pay to the Government the Recapture Amount, if any, as defined in Section 7.2.

### 7.2    Remedies

The parties shall have the following remedies under the Agreement:

7.2.1. Upon a Material Default by Bacardi, the Government will be entitled to terminate the Agreement and/or to receive from Bacardi the payment of liquidated damages in the form of a recapture (by a straight line amortization over a 10 year period from each disbursement date until it reaches zero) of the unamortized balance of the subsidies granted by the Government for Refurbishment and Production Initiatives and the Treatment Plant Grant after deducting any principal amounts included in the Permitted Debt Service Reductions which have already occured (the "Recapture Amount"). Notwithstanding the above, if the Material Default consists of a reduction in the Minimum Production Requirement below the allowable percentage cushions included in the definition of "Material Default" herein, instead the following remedies shall apply after the expiration of the applicable twelve (12) month cure period, (i) if the reduction is of one percent (1%) to twenty percent (20%), the Government will be entitled to deduct from the Marketing and Production Support Payments payable to Bacardi, as liquidated damages, five percent (5%) of the Recapture Amount, if any, during the period of duration of said Material Default; (ii) if the reduction is of twenty percent (20%) or more but less than thirty percent (30%), the Government will be entitled to deduct from the Marketing and Production Support Payments payable to Bacardi, as liquidated damages, seven and one half percent (7.5%) of theRecapture Amount, if any, during the period of duration of said Material Default; (iii) if the reduction is of thirty percent (30%) or more but less than fifty percent (50%), the Government will be entitled to deduct from the Marketing and Production Support Payments payable to Bacardi, as liquidated damages, ten percent (10%) of the Recapture Amount, if any, during the period of duration of said Material Default; or (iv) if the reduction is of fifty percent (50%) or more, the Government will be entitled to terminate the Agreement and/or receive from Bacardi the payment, as liquidated damages, the Recapture Amount, if any,. Any reduction in the Marketing and Production Support Payments under the preceding sentence, shall be immediately applied by the Government (provided it does not terminate the Agreement pursuant to clause (iv) above) to reduce the principal amount of the obligations issued to provide Bacardi with the Refurbishment and Production Initiatives and the Treatment Plant Grant, if any, and such payment shall be taken into account in computing the amount of any future Permitted Debt Service Reductions, if any. The Parties recognize that the amount of the Marketing and Production Support Payments will be automatically reduced as a direct consequence of any reduction in the production of bulk rum in Puerto Rico for sale in the United States. The above remedies will be Bacardi's maximum exposure under the Agreement.

7.2.2. Upon a Material Default by the Government, Bacardi may seek specific performance or damages for failure to perform or breach of any representation or warranty, covenant or agreement, to the extent permitted by law and subject to the Government maximum exposure as stated in this Section, and/or termination of the Agreement. In case of said termination, Bacardi will be entitled to receive the full amount of any and all Marketing and Production Support Payments with respect to that fiscal year which remain unpaid as of the termination date and to keep as liquidated damages the subsidy payments already granted and paid by the Government as Refurbishment and Production Initiatives and the Treatment Plant Grant, if applicable. The above remedies will be the Government's maximum exposure under the Agreement. Bacardi may not terminate this Agreement for any default other than a Material Default.

7.2.3    The Parties expressly agree and recognize that, with respect to a breach on their part of certain of the covenants, agreements, representations, warranties or commitments contained herein, that

the non defaulting Party may not be fairly or adequately compensated by any legal remedy in an action for monetary damages. Therefore, the Parties agree that upon a breach of this Agreement by a Party, the non-defaulting Party, in accordance with the dispute resolution procedures set forth in Section 8.3 hereof, may seek the specific performance of any of the covenants, agreements, representations, warranties or commitments of the defaulting Party contained herein or may be awarded damages for failure of performance or breach of any representation or warranty, or both, on the part of the defaulting Party, to the extent permitted by this Agreement and applicable law. No action taken by such Party pursuant to the provisions of this Section 7.2.3 or pursuant to the provisions of any other Section of this Agreement shall be deemed to constitute an election of remedies, and all remedies set forth in this Agreement shall be cumulative and non-exclusive of any other remedy either set forth herein or available to a Party at law or in equity. Notwithstanding the foregoing, the sole remedies to Bacardi and the Government upon the occurrence of a Material Default of the other Party shall be the receipt of the liquidated damages and termination rights provided to each Party, respectively, under Sections 7.2.1 and 7.2.2 above.

7.2.4    No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

7.2.5    In the event that any Party breaches its obligations under this Agreement, and provided that the other Party has complied with its obligations under this Agreement, the Parties agree that the amount of the damages to be incurred by the non breaching Party may be difficult or impossible to determine and therefore the Parties agree that the payment of the liquidated damages specified in this Agreement by the breaching Party for such failure to perform its obligations hereunder is reasonable, adequate and practical under this Agreement.

### ARTICLE VIII
### MISCELLANEOUS

### 8.1    Counterparts

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

### 8.2    Governing Law

The governing law of this Agreement shall be the law of Puerto Rico. The Government hereby waives any right, forum, defense or limitation based upon it sovereign immunity for purposes of any action for breach of its obligations under this Agreement.

### 8.3    Dispute Resolution

8.3.1    Mutual Discussions. Except as otherwise provided in this Section 8.3, if a dispute or difference of any kind whatsoever shall arise among the Parties in connection with, relating to or arising out of this Agreement (each, a "Dispute"), one of such Parties shall notify the other of such Dispute. Such Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. Failing such resolution, the Governor of Puerto Rico and the

Chairman of BIL (or their duly appointed representatives) shall meet to resolve such Dispute and the joint decision of such individuals shall be binding upon the Parties hereto. If a settlement of any such Dispute or difference is not reached pursuant to this Section 8.3.1 within 60 days after such notice of Dispute is delivered, then the provisions of Section 8.3.2 hereof shall apply. The parties intend to cooperate in implementing Section 8.3.1; however, either Party may (i) decline to participate in negotiations pursuant to Section 8.3.1 or (ii) withdraw from negotiations at any time upon written notice to the other, and in either case, may institute mediation or arbitration proceedings pursuant to Section 8.3.2 or Section 8.3.3 respectively.

8.3.2    Mediation. If a settlement of any such Dispute or difference is not reached pursuant to Section 8.3.1, the Parties agree to submit the matter to mediation. Mediation shall take place at a time and place agreed by the Parties before a single neutral mediator approved by both Parties. Mediation shall be conducted in English. Following a proposal to mediate, either Party may initiate, at any time prior to or following the beginning of the mediation process, arbitration proceedings pursuant to Section 8.3.3 of this Agreement. If a Party intends to be accompanied by an attorney at a meeting in the context of negotiations or mediation, at least three (3) working days' notice of such intention shall be given and the other Party's may also be accompanied by an attorney. All discussions and exchanges of information pursuant to negotiation and mediation under Sections 8.3.1 and 8.3.2 are confidential and may not be used in the context of arbitration proceedings or in a court-of-law unless otherwise lawfully discoverable. The Parties intend to cooperate in implementing Sections 8.3.1 and 8.3.2; however, either Party may withdraw at any time upon written notice to the other from negotiations under Section 8.3.1 and may institute mediation or arbitration proceedings pursuant to Section 8.3.2 or 8.3.3 respectively; similarly, either Party may withdraw at any time upon written notice to the other from mediation under Section 8.3.2 and may institute arbitration proceedings pursuant to Section 8.3.3.

8.3.3    Arbitration. If a Dispute cannot be settled pursuant to Section 8.3.1 and 8.3.2 above, such Dispute shall be determined by arbitration administered by the American Arbitration Association ("AAA"). The number of arbitrators shall be three. Within thirty (30) days of delivery of the request for arbitration, each party shall appoint one (1) arbitrator. If the two party appointed arbitrators do not reach an agreement on the appointment of a third arbitrator who shall serve as the chairman of the tribunal within fifteen (15) days of their appointment, the AAA shall appoint the third arbitrator. The arbitration award shall be reasoned and in accordance with Puerto Rico law and shall be subject to the limitations provided in Section 7.2.3 of this Agreement. The language of the arbitration shall be English. Judgment upon any award(s) rendered by the arbitrators may be entered in any court having jurisdiction thereof. Nothing in this Agreement shall prevent Bacardi or the Government from seeking provisional measures from any court of competent jurisdiction, and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

8.3.4    Continued Performance. The Parties shall continue to perform their respective obligations under this Agreement during the existence of any Dispute under this Agreement or the pendency of any mediation or arbitration.

8.3.5    Commercial Acts. The Parties each agree that the execution, delivery and performance of this Agreement constitute private and commercial acts rather than public or governmental acts.

8.4    **Rules of interpretation**

In this Agreement, unless the context otherwise requires, headings are for convenience only and do not affect the interpretation of this Agreement; a reference to an Exhibit, Article or Section is a reference to that Exhibit to, or Article or Section of, this Agreement; a reference to a document includes any amendment or supplement to, or replacement or novation of, that document; a reference to the

**EXECUTION VERSION**

singular includes the plural and vice versa: the words "include," "includes," and "including" mean include, includes, and including "without limitation" and "without limitation by specification," and any list or series following any such term is: (a) not exhaustive and (b) not meant to be limited to elements or items of the same or similar kind; and the words "hereof", "herein" and "hereunder", or "thereof", "therein" and "thereunder" and words of similar import when used shall refer to this Agreement or any other agreement as a whole and not to any particular provision.

### 8.5    Construction

This Agreement shall not be construed more strictly against one Party than against any other Party merely by virtue of the fact that the Agreement may have been prepared by counsel for one of the Parties, it being recognized that all Parties have contributed substantially and materially to the preparation of this Agreement.

### 8.6    Conflicts

Subject to Section 8.2 hereof, all statutes, codes, ordinances, rules and regulations in effect in Puerto Rico as of the date hereof shall continue in effect in their current form during the entire Term of this Agreement, except as may otherwise be agreed to by Bacardi in writing and except to the extent of amendments mandated by Government or federal requirements. Notwithstanding the foregoing, if any statute, code, ordinance, rule or regulation is hereafter adopted, amended or interpreted so as to be less restrictive upon Bacardi than is currently the case, then at the option of Bacardi, such less restrictive amendment or interpretation shall control and become applicable without the requirement of an amendment to this Agreement.

### 8.7    Severability

In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect and for any reason whatsoever, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. In the event any such provision is held to be invalid, illegal or unenforceable, the Parties hereto shall make their best efforts to agree on a provision in substitution for such invalid, illegal or unenforceable provision that is as near in economic benefit as possible to the provision found to be invalid, illegal or unenforceable.

### 8.8    Notices

All communications and notices expressly provided for herein shall be sent, by registered first class mail, postage prepaid, by an internationally recognized overnight courier for delivery on the following business day or by telecopy (with such telecopy to be confirmed promptly in writing sent by mail or overnight courier as aforesaid), as follows:

GOVERNMENT OF
PUERTO RICO:

Secretary
Department of the Treasury
P. O. Box 9024140
San Juan, PR, 00902-4140
Intendente Ramírez Bldg.,
Stop 1 #10 Paseo Covadonga
San Juan, PR 00902-4140

EXECUTION VERSION

Telephone: 787-722-2121, 787-723-4344
Telefax: 787-725-7303

Secretary
Department of Economic Development and
Commerce
P. O. Box 362350
San Juan, PR, 00936-2350
#355 F. D. Roosevelt Ave.
Fomento Industrial Bldg.,
Suite 401, San Juan, PR 00918
Telephone: 787-758-4747, 787-765-2900
Telefax: 787-753-4094; 787-753-6874

Secretary
Department of Agriculture
P. O. Box 10163
San Juan, PR, 00908-1163
1309 Fernandez Juncos Ave.,
San Juan, PR 00908
Telephone: 787-721-2120, 787-722-0871
Telefax: 787-723-8512

President
Government Development Bank of Puerto Rico
P. O. Box 42001
San Juan, PR, 00940-2001
José de Diego Ave., Stop 22
Centro Gubernamental R. Sánchez Vilella
Santurce, PR 00940-2001
Telephone: 787-722-2525
Telefax: 787-721-1443

Executive Director
Office of Management and Budget
PO Box 9023228
San Juan, P.R., 00902-3228
Calle Cruz 254
San Juan, Puerto Rico
Telephone: 787-725-9420
Telefax: 787-722-0299

Executive Director
Puerto Rico Industrial Development Company
P. O. Box 362350
SAN JUAN, PR, 00936-2350
355 Ave. F.D. Roosevelt
Fomento Industrial Bldg., Suite 404
Hato Rey, PR, 00940
Telephone: 787-758-4747, 787-754-9481
Telefax: 787-764-1415

**EXECUTION VERSION**

WITH A COPY TO:                   Attorney General
                                 Puerto Rico Department of Justice
                                 P. O. Box 909192
                                 San Juan, PR, 00907
                                 Olimpo St. and corner of Lindbergh, Stop11
                                 San Juan, 00902-0192
                                 Telephone: 787-721-2900
                                 Telefax: 787-724-4770

                                 O'Neill & Borges
                                 American International Plaza
                                 250 Muñoz Rivera Avenue, Suite 800
                                 San Juan, Puerto Rico 00918-1813
                                 Tel: 787-764-8181
                                 Fax: 787-753-8944
                                 Attention: Managing Partner

BACARDI:                         Bacardi International Limited
                                 65 Pitts Bay Road
                                 Pembroke HM 08
                                 Bermuda
                                 Telephone: 441-295-4345
                                 Telefax: 441-295-5364
                                 Attention: Chairman

                                 Bacardi Limited
                                 65 Pitts Bay Road
                                 Pembroke HM 08
                                 Bermuda
                                 Telephone: 441-295-4345
                                 Telefax: 441-295-5364
                                 Attention: President and Chief Executive Officer

                                 Bacardi Corporation
                                 P.O. Box 363549
                                 San Juan, PR  00936-3549
                                 #200 State Rd. 165, Km. 6.2
                                 Cataño, PR 00962
                                 Telephone:  787-788-1500
                                 Telefax: 787-788-5075
                                 Attention: President

WITH COPIES TO:                  Bacardi North America/
                                 Bacardi U.S.A., Inc.
                                 2701 LeJeune Road
                                 Coral Gables, FL 33134
                                 Telephone: 786-264-8114
                                 Telefax: 305-573-2730
                                 Attention: General Counsel

> Fiddler, Gonzalez & Rodriguez, PSC
> P. O. Box 363507.
> San Juan, Puerto Rico 00936-3507
> 254 Muñoz Rivera Ave., Sixth Floor
> Hato Rey, Puerto Rico 00918
> Telephone: 787-753-3113, 787-759-3183
> Telefax: 787-759-3123
> Attention: President

or to such other address as the receiving Party shall have most recently forwarded to the sending Party pursuant to the provisions of this Section 8.8.

### 8.9 Press Communications

The Parties shall agree on the form and forum on how to communicate the completion of this Agreement and the mutual long-term commitment to Puerto Rico. The Parties agree to cooperate fully with each other in connection with all communications-related activities (i.e., public relations, media relations, press releases, news conferences, media advisories, news organizations, etc.) concerning this Agreement and the transactions contemplated hereunder.

### 8.10 Assignment

This Agreement is not assignable by the Government in whole or in part except where Bacardi consents, in its sole discretion, to such assignment in writing. Bacardi shall have the right at any time to assign all its rights and obligations, or any part thereof, in and to this Agreement, or any part thereof, to any Affiliate of Bacardi that agrees to assume the assigned obligations of Bacardi in and to this Agreement or applicable portion thereof; provided, however, that proof of the ability of such Affiliate to fulfill any assigned obligations shall be provided to the Government as part of the advance notice by Bacardi. The Government may object to such assignment if it reasonably appears that the Affiliate of Bacardi lacks such ability. Bacardi shall provide the Government at least sixty (60) days advance written notice of its intention to assign this Agreement. The Government shall receive a copy of the written agreement of the Affiliate of Bacardi to agree to assume all assigned obligations and shall acknowledge to the Government its ability to fulfill such obligations.

### 8.11 No Third Party Beneficiary

This Agreement is for the sole and exclusive benefit of the Government and Bacardi and, if applicable, any permitted successors, transferees or assigns thereof. No other persons or entities are intended third party beneficiaries of this Agreement, including, without limitation, any third parties that may, from time to time, have ownership, security or other interests in any real or personal property associated with the Refurbishment and Production Initiatives and Treatment Plant project, nor shall such third parties have any rights to enforce any of the provisions of this Agreement.

### 8.12 Contractual Relationship

None of the commitments or other obligations, agreements or provisions contained in this Agreement shall or shall be deemed to give the Government the right or power to exercise control over the affairs or management of Bacardi or any of its Affiliates, the Refurbishment and Production Initiatives, the Treatment Plant, or any part thereof. The relationship between the Government and

EXECUTION VERSION

Bacardi is, and at all times shall remain, contractual. No commitment or other obligation, agreement or provision of this Agreement, nor any agreement executed pursuant hereto, is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest between or among the Government and Bacardi or to create any equity interest in Bacardi for the Government. Notwithstanding any other provision of this Agreement or agreement executed pursuant hereto, the Government is not and shall not be construed as a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Bacardi, its stockholders, members, or partners.

### 8.13 Further Assurances

The Government and Bacardi agree to do all things and take all actions required, necessary or appropriate to carry out the terms of this Agreement and the implementation of the Parties' intent as reflected by the terms of this Agreement. Such things and actions include, but are not limited to, the obtaining, negotiation, execution and delivery of all necessary or desirable agreements, filings, consents, authorizations, approvals, licenses or deeds. Without limiting the generality of the foregoing, the Parties agree: (a) to take all actions, without exception, which are necessary and appropriate at any time to assure the binding effect, legality and enforceability of their respective obligations and commitments hereunder and (b) not to take any action which would affect adversely in any way whatsoever the binding effect, legality and enforceability of their respective obligations and commitments hereunder.

### 8.14 Survival of Representations and Warranties

The representations, warranties and covenants made by each of the Parties hereto and contained herein shall survive the performance of any obligations to which such representations, warranties and covenants relate.

### 8.15 Term of Agreement

The term of this Agreement (the "Term") shall commence on the Effective Date and continue in effect through the later to occur of the twentieth (20th) anniversary of the Effective Date which date for the term of this Agreement may be extended by Bacardi for a period of ten (10) additional years upon the delivery of written notice to the Government by Bacardi prior to the anticipated expiration of the Term. Except as otherwise provided in Sections 7.1 and 7.2, upon the expiration of the Term Bacardi shall retain, at no additional cost, the full amount of all payments disbursed by the Government to Bacardi under this Agreement, including, but not limited to, the Refurbishment and Production Initiatives, Treatment Plant Grant and the Marketing and Production Support Payments.

### 8.16 Binding Effect

This Agreement and all terms, provisions and obligations set forth herein shall be binding upon and shall inure to the benefit of the Government and Bacardi and their respective successors and assigns.

### 8.17 Waivers

Waiver of any of the obligations of a Party set forth in this Agreement may only be effected, in writing, by the other Party hereto. No delay or omission to exercise any right or power by any Party shall be construed to be a waiver. In the event any provision is waived by a Party, such waiver shall not be deemed to waive any other provision.

### 8.18    Entire Agreement

This Agreement is the entire agreement and supersedes all prior and collateral communications and agreements of the Parties relating to the subject matter.

### 8.19    Amendments

This Agreement may be amended only by a written modification duly executed by the Parties' authorized representatives.

### 8.20    Compliance with Laws.

The Parties shall comply in a reasonable and substantial manner with all applicable provisions of the laws of the United States and Puerto Rico and all their applicable rules and regulations; provided, however, that in the event of a conflict between the specific terms of this Agreement and the laws of the United States or Puerto Rico or their applicable rules and regulations, the specific terms of this Agreement shall control.

### 8.21    Government Contract Clauses

8.21.1    Lobbying Certification. Each of BIL, BL and Corp certifies that none of the funds from this Agreement  will be paid to any person for influencing or attempting to influence an official or employee of any Government agency and/or the Commonwealth Legislature in connection with this Agreement.

If any funds, other than funds provided by this Agreement, have been paid or will be paid to any person for lobbying before a member, an official or employee of the Commonwealth Legislature in connection with this Agreement, each of BIL, BL and Corp  shall complete and submit to PRIDCO Standard Form LLL "Disclosure Form To Report Lobbying" in accordance with its instructions, and Standard Form LLL.

Each of BIL, BL and Corp  shall require that this lobby certification clause be included in all sub-contracts entered into in the Commonwealth as a result of this Agreement. Each of BIL, BL and Corp acknowledges that a false certification by any of them constitutes a Material Default and may be grounds for termination of this Agreement.

8.21.2    No Payments or Gratuities. Neither BIL, BL or Corp nor their officers, directors or employees has made any payment, gift or anything of value to any Government employee or official to obtain a favorable evaluation or the execution of this Agreement.  If there occurs a violation of this Section 8.21.2, in addition to any other remedies available to the Government, the Government shall be entitled to recover any payments made or gratuities given.  No fee or gratuity will be paid to any such person in connection with this Agreement (except to attorneys and consultants engaged to advise Bacardi) to meet the requirements of the Agreement.

8.21.3    Conflicts of Interest. Each of BIL, BL and Corp hereby certifies that neither BIL,  BL or Corp  nor their directors, officers, members, partners or employees, has any interest nor shall they acquire any interest, directly or indirectly, in cases or issues which may conflict in any manner with its performance under this Agreement.

To the best knowledge of  BIL, BL and Corp (i) no public official or employee of the Government has participated in any decision relating to this Agreement which affects such official's or

-31-

employee's personal interest or the interest of any entity or business in which such officer or employee or any member of his family has or has had an economic interest, directly or indirectly, and (ii) no official or employee of the Government has any interest, direct or indirect, in this Agreement or any proceeds thereof.

Each of BIL, BL and Corp agrees to request Government's consent or waiver to any agreement described in this Section 8.21.3 prior to its execution which consent or waiver will not be unreasonably denied.

8.21.4 <u>Full Disclosure</u>. To the best of its knowledge, each of BIL, BL and Corp has furnished to the Government all material facts necessary to make the statements contained herein. To the best of its knowledge, as of the Effective Date, there are no issues, facts or matters that materially adversely affect, or which could materially adversely affect, the properties, business, operations or condition (financial or otherwise) of any of them or that will hinder their ability to perform their obligations under this Agreement.

8.21.5 <u>Compliance with Tax Laws</u>. Each of BIL, BL and Corp shall be responsible for retention, proper filing and payment of all social security, income tax, worker's compensation, unemployment insurance, disability insurance, and all other labor requirements arising under this Agreement, if applicable. Each of BIL, BL and Corp agrees that it will comply with the Commonwealth tax laws, rules and regulations. Each of BIL, BL and Corp will be responsible for filing its income tax returns and for making any necessary payments to the Department of the Treasury and the Internal Revenue Service of the United States of America, if applicable.

Corp certifies that it has filed all of its Tax returns for the past five (5) years, owes no Taxes and/or is up to date in any payment plan for such Taxes. Prior to the execution of this Agreement, Corp has submitted to the Government the following certifications and documents, in each case, dated within thirty (30) days of the Effective Date:

(a)    A certification of filing of income tax return for the past five (5) years, issued by the Department of the Treasury.

(b)    A negative debt certificate, or payment plan and compliance therewith, issued by the Commonwealth's Department of the Treasury.

(c)    A negative certificate of debt, or payment plan and compliance therewith, with respect to real and personal property taxes issued by the Municipal Revenue Collection Center ("CRIM" for its Spanish acronym).

(d)    A negative certificate of debt, or payment plan and compliance therewith, for unemployment insurance, temporary disability insurance and chauffeur's social security issued by the Puerto Rico Department of Labor and Human Resources.

(e)    A copy of the Workmen's Compensation Insurance policy issued by the State Insurance Fund.

(f)    A negative certificate of debt, or payment plan and compliance therewith, issued by the State Insurance Fund.

(g)    A good standing certificate from the Puerto Rico Department of State.

BIL and BL are not engaged in trade or business in Puerto Rico.   Prior to the execution of this Agreement, BIL and BL submitted to PRIDCO a good standing certificate issued by the Department of State of their place of organization and a notarized sworn statement in which each of BIL and BL certifies that:

    (a)    During the five (5) taxable years prior to the year of execution of this Agreement (the "Five Year Period"), it was not engaged in the conduct of trade or business in Puerto Rico, it did not derive any income effectively connected with a trade or business in Puerto Rico,  it was not required to file, and did not file, any income tax returns in Puerto Rico and it does not owe  income taxes to the Puerto Rico Department of the Treasury.

    (b)    During the Five Year Period it did not have any personal property in Puerto Rico and it was not required to file, and did not file, any personal property tax returns in Puerto Rico and it does not owe the CRIM any taxes.

    (c)    During the Five Year Period it did not have, and it currently does not have, any real property in Puerto Rico, it does not owe any real property taxes to the CRIM.

    (d)    It does not have any employees in Puerto Rico.  Therefore, it does not (1) owe any payments to the Puerto Rico Department of Labor and Human Resources in connection with unemployment, disability, or chauffeur's insurance; (2) have to obtain and maintain an insurance policy from the Puerto Rico State Insurance Fund; and (3) have the obligation as an employer to withhold and remit child support payments to the Puerto Rico Administration for the Sustenance of Minors (known as "ASUME" for its Spanish acronym).

    (e)    It is not required to withhold or pay any other taxes to the Government of Puerto Rico.

It is acknowledged that the certifications and sworn statements above  are essential conditions of this Agreement, and if found to be intentionally false, misleading, altered or forged, such finding shall constitute a Material Default and the Government shall have the right to terminate this Agreement.

    8.21.6 Business Documents; Evidence of Authority.  Prior to the execution of this Agreement each of BIL,  BL and Corp shall provide copies of its articles of incorporation, by-laws, or partnership or joint venture agreement, as applicable. Each of BIL, BL and Corp  shall deliver to the Government before the execution of this Agreement an original certificate of resolution evidencing the authorization to enter into this Agreement.

    8.21.7 Registration of the Agreement. The Government shall remit a copy of this Agreement to the Office of the Comptroller within thirty (30) days following the date of the execution of this Agreement and any subsequent amendment of this Agreement. No provision or consideration of services under this Agreement may be demanded until the same has been filed for registration with the Office of the Comptroller pursuant to Act No. 18 of October 30, 1975, as amended.

    8.21.8 Certification on Criminal Proceedings. Each of BL, BIL and Corp certifies that as of the date of this Agreement, it has not been convicted, or has no knowledge of being indicted in a criminal procedure for offenses against public integrity, embezzlement of public funds or for the felonies or misdemeanors mentioned in Act Number 458 of September 29, 2000, as amended, in the courts of the

Commonwealth, federal courts, or any other court with jurisdiction. It is acknowledged by the Parties that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute a Material Default and a cause for the Government to terminate this Agreement.

Each of BL, BIL and Corp shall immediately notify in writing the Government if it, or any of its officers and directors becomes indicted or convicted in a criminal procedure for any type of offense mentioned above. Failure to comply with this notice constitutes a Material Default and a cause for the Government to terminate this Agreement.

Corp will require compliance with the clauses described above to any consultant and/or subcontractor hired in the Commonwealth with the funds provided under this Agreement. If said certification is false, Corp will have just cause for terminating the agreement with the consultant or sub-contractor, and the consultant or sub-contractor will have to reimburse the Government any and all amounts received for services performed under this Agreement.

If the circumstances of the consultant or sub-contractor related to child support payments changes at any time during this Agreement, the consultant or sub-contractor shall obtain the necessary certification, inform Corp, immediately obtain the certification from ASUME and provide a copy to Corp.

8.21.9 Ethics Representations. In addition to any of the foregoing warranties and representations, each of BL, BIL and Corp acknowledges, represents and warrants that no official or employee of the Government has a direct or indirect economic interest in Bacardi's rights under this Agreement in accordance with the provisions of Act Number 84 of June 18, 2002, as amended, also known as the Code of Ethics for Contractors. Each of BIL, BL and Corp certifies that it has received a copy of the Code, read, understood, has complied and will subsequently continue to comply with it in its entirety.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGES FOLLOW]**

**WHEREFORE,** the Parties hereto have executed this Agreement as of the date first written above.

BACARDI INTERNATIONAL
LIMITED

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


**BACARDI LIMITED**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


BACARDI CORPORATION

By: _____

Name: Joaquin E. Bacardi

Title: President - CEO

By: _____

Name: Jorge Marcano

Title: VP Operations

WHEREFORE, the Parties hereto have executed this Agreement as of the date first written above.

BACARDI INTERNATIONAL LIMITED

By: _Julie Hendrix_

Name: _Julie Hendrix_

Title: _Vice President_

By: _____

Name: A. STEWART GUNN

Title: VICE PRESIDENT

BACARDI LIMITED

By: _____

Name: SEAMUS McBRIDE

Title: PRESIDENT & CEO

By: _M Maguire_

Name: Michael Maguire

Title: Assistant Vice President

BACARDI CORPORATION

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

EXECUTION VERSION

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By:

Name: Juan Carlos Puig
Title: Secretary

Department of Economic
Development and Commerce

By:

Name: José R. Pérez-Riera
Title: Secretary

Puerto Rico Industrial Development
Company

By:

Name: José R. Pérez-Riera
Title: Executive Director

Department of Agriculture

By:

Name: Javier A. Rivera Aquino
Title: Secretary

Office of Management and Budget

By:

Name: Maria Sánchez Bras
Title: Executive Director

Government Development Bank
for Puerto Rico

By:

Name: Carlos M. García
Title: President

EXECUTION VERSION

## EXHIBIT A

### BASIC COMPONENTS OF THE REFURBISHMENT AND PRODUCTION INITIATIVES

Plant improvements include the following activities to replace the actual production areas and to increase the capacity to 40,000,000 PG/yr. between the Cataño facility and the Puerto Nuevo port storage tank facility.

1. Blending Area Renovation
2. Rum Processing Equipment
3. Tank trucks loading and unloading area renovation
4. Port tanks Instrumentation
5. Environmental control equipment
6. Electric substation renovation
7. Electric underground system renovation
8. Blending and boiler water rationalization
9. Blending and Distillery compress air rationalization
10. Office building rationalization
11. Sprinklers system
12. Laboratory and Equipment
13. Demolition of obsolete equipment

Aging capacity includes the following investment to increase the capacity by 20%:

1. Aging Warehouses
2. Barrels
3. Barrels filling and empting machine improvements
4. Sprinklers
5. Barrels visitor area
6. Environment control equipment
7. Demolition of obsolete equipment

EXECUTION VERSION

## EXHIBIT B

### BASIC COMPONENTS OF THE PROJECT

The Project includes:

1. The Project should be able to provide a solution to integrate, in the project, as a valuable by-product any discharge from the distillery and the sugar mill.

2. The Main objective is to achieve zero discharge in the distillery and the Project.

3. The use of fossil fuel should be minimized in the Project.

4. Water usage and consumption in the Project should be as per the best technology available in the industry as described in the UNICA standards.

**EXECUTION VERSION**

## EXHIBIT C

### BASIC COMPONENTS OF THE TREATMENT PLANT

A new waste treatment plant to treat  25 MM pg/yr which includes:

1.      Evaporation equipment to concentrate the vinasse to CMS or any other technology that    will result in converting the vinasse to a useful byproduct.

2.      Carbonic Gas recovery plant overhaul.

3.      Waste Holding Tanks.

4.      CMS holding Tanks.

5.      Demolition of obsolete equipment.

EXECUTION VERSION

## EXHIBIT D

## MARKETING ACTIVITIES

**Potential Marketing Activities**

Media-Television

Media-Digital

Media-Other

Advertising Production

Creative Agency Fees

Relationship Marketing

Relationship Market Agency Fees

Consumer Public Relations

Trade Public Relations

Consumer Sponsorships

Innovation/Product Development

Brand Identification / Packaging Development

Consumer Planning and Research

Experimental Marketing / Sampling

Point of Sale

Consumer Promotions

Value Added Packaging

Commercial Advertising and Promotion

Discounts and consideration to customers

EXECUTION VERSION

## EXHIBIT E

### PROJECTED BACARDI RUM SALES

|       | Low | | Base | |
|-------|-----------|-----------------|------------|-----------------|
|       | YoY Growth | Volume (m PG)* | YOY Growth | Volume (m PG)* |
| 2011  | 1.0%      | 18.0            | 1.0%       | 18.0            |
| 2012  | 1.0%      | 18.2            | 3.0%       | 18.5            |
| 2013  | 0.5%      | 18.3            | 3.0%       | 19.1            |
| 2014  | 0.0%      | 18.3            | 3.0%       | 19.7            |
| 2015  | 0.0%      | 18.3            | 3.0%       | 20.3            |
| 2016  | 0.0%      | 18.3            | 2.0%       | 20.7            |
| 2017  | 0.0%      | 18.3            | 2.0%       | 21.1            |
| 2018  | 0.0%      | 18.3            | 2.0%       | 21.5            |
| 2019  | 0.0%      | 18.3            | 2.0%       | 21.9            |
| 2020  | 0.0%      | 18.3            | 2.0%       | 22.3            |
| 2021  | 0.0%      | 18.3            | 2.0%       | 22.8            |
| 2022  | 0.0%      | 18.3            | 1.0%       | 23.0            |
| 2023  | 0.0%      | 18.3            | 1.0%       | 23.2            |
| 2024  | 0.0%      | 18.3            | 1.0%       | 23.4            |
| 2025  | 0.0%      | 18.3            | 1.0%       | 23.6            |
| 2026  | 0.0%      | 18.3            | 1.0%       | 23.8            |
| 2027  | 0.0%      | 18.3            | 0.0%       | 23.8            |
| 2028  | 0.0%      | 18.3            | 0.0%       | 23.8            |
| 2029  | 0.0%      | 18.3            | 0.0%       | 23.8            |
| 2030  | 0.0%      | 18.3            | 0.0%       | 23.8            |

\* Sales are stated in millions of proof gallons per year.

EXECUTION VERSION

## EXHIBIT F

### MINIMUM RUM PRODUCTION REQUIREMENTS
### IN PROOF GALLONS (PG)

| Year | Minimum Production (PG)* |
|------|--------------------------|
| 2011 | 17,000,000 |
| 2012 | 17,136,000 |
| 2013 | 17,273,088 |
| 2014 | 17,411,272 |
| **2015 | 17,550,562 |

* Annual increase starting in fiscal year 2012 is based on a 0.8% annual U.S. population growth rate, as projected by the U.S. Census Bureau.

** From 2016 to the reminder of the initial 20-year term and any extension or renewal term, BIL shall determine the minimum production requirements every five (5) years based upon the average of the bulk Bacardi Rum Sales for the previous five (5) year period and BIL may further adjust up to twenty five percent (25%) above or up to twenty percent (20%) below the average of the bulk Bacardi Rum Sales for the previous five (5) year period. Any other changes in minimum production requirements shall be made by mutual agreement of the parties.

EXECUTION VERSION

Schedule 3.1 to the Agreement

**Disbursement Schedule for the Refurbishment and Production Initiatives**

|  | FY 2011 | FY 2012 | FY 2013 | FY 2014 | Total |
|---|---|---|---|---|---|
| Waste Water Plant |  | $ 7,000 | $ 25,000 | $ 18,000 | $ 50,000 |
| Refurbishing of Plant | 8,000 | 25,000 | 35,000 | 2,000 | 70,000 |
| Ageing for Growth | 2,000 | 11,000 | 8,000 | 4,000 | 25,000 |
| Total | $ 10,000 | $ 43,000 | $ 68,000 | $ 24,000 | $145,000 |

EXECUTION VERSION

Schedule 3.2.1 (a) to this Agreement

**Feasibility Study for the Project**

The feasibility study shall include, but not be limited to, the following items:

1. A capital investment plan for the agricultural and industrial operation.
2. A vinasses disposition process and capability study and plan.
3. An environmental impact review document of the Project.
4. All regulatory requirements including, but not limited to, environmental permits and conditions, permitting time schedule, etc.
5. Land availability, location and acquisition method for up to 28,000 acres of contiguous or adjacent land.
6. A sugar cane yield per acre study for the land selected.
7. Economic, profitability and market condition analyses of the Project based on the outputs of sugar, molasses, cane distillate, energy, and potentially others.
8. Potential business model for Third Party Operator.

**EXECUTION VERSION**

Schedule 3.2.4 to the Agreement

**Technical Assistance to the Project**

Bacardi will be able to provide the following assistance to the Government with respect to the Project:

1. Technical assistance regarding alcohol production.
2. Evaluation of engineering drawings for the alcohol production.
3. Specification evaluation for the Project.
4. Environmental permits process and evaluation of documents.
5. Selection of experts and consultant in sugar and alcohol production.
6. Design of the governance structure of the Project and business operation.
7. Providing information from markets regarding alcohol and sugar.