# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION<br><br>    Movant,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Respondent. | Case No. 17-BK-4780-LTS<br><br>**Re: ECF No. 7176, 8022** |

### SUR-REPLY OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD TO AMBAC ASSURANCE CORPORATION AND FINANCIAL GUARANTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR <u>MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY</u>

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (*i*) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (*ii*) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (*iii*) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (*iv*) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (*v*) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).  (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

# <u>TABLE OF CONTENTS</u>

**Page**

SUR-REPLY ........................................................................................................... 1

I.    MOVANTS FAIL TO ESTABLISH STANDING TO BRING THE STAY MOTION ......... 1

   A.    Movants, as Subrogrees of the Bondholders, are Barred By the No-Action Clause ........ 3

   B.    The No-Action Clause Bars the Motion .......................................................... 4

   C.    The Motion Improperly Asserts PRIFA's Rights, Not Movants' Rights ......................... 6

II.    MOVANTS ARE COLLATERALLY ESTOPPED FROM CHALLENGING THE
DISTRICT COURTS' DETERMINATION THAT THE STAY APPLIES .................................. 7

III.    THE TRUST AGREEMENT GRANTS A SECURITY INTEREST ONLY IN MONIES
ACTUALLY DEPOSITED IN THE SINKING FUND .................................................... 9

   A.    Movants Have No Property Interest in Monies Not Deposited in the Sinking Fund ..... 13

IV.    THAT PREEMPTION OR REPEAL OF THE ENABLING ACT MAY HAVE
"CONSEQUENCES" DOES NOT ALTER THE COMMONWEALTH'S PROPERTY
INTEREST IN THE RUM TAXES ......................................................................... 20

CONCLUSION ........................................................................... **Error! Bookmark not defined.**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio*
    *v. Flores Galarza*,
    484 F.3d 1 (1st Cir. 2007) ........................................................................................... 20

*Barnhart v. Thomas*,
    540 U.S. 20 (2003) ............................................................................................... 11, 12

*Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*,
    838 F.2d 612 (1st Cir. 1988) ..................................................................................... 18

*Demko v. United States*,
    44 Fed. Cl. 83 (Fed. Cl. 1999) .................................................................................. 10

*Den Norske Bank AS v. First Nat'l Bank of Bos.*,
    75 F.3d 49 (1st Cir. 1996) ......................................................................................... 16

*E.H. Ashley & Co. v. Wells Fargo Alarm Servs.*,
    907 F.2d 1274 (1st Cir. 1990) ..................................................................................... 2

*In re CRS Steam*,
    217 B.R. 365 (Bankr. D. Mass. 1998) ....................................................................... 10

*In re Hayes*,
    393 B.R. 259 (Bankr. D. Mass. 2008) ......................................................................... 1

*Lockhart v. United States*,
    136 S. Ct. 958 (2016) .......................................................................................... 10, 11

*Nevares v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight &*
    *Mgmt. Bd. for Puerto Rico)*,
    330 F. Supp. 3d at 704............................................................................................... 21

*Richmond Steel, Inc. v. Legal & Gen. Assur. Soc., Ltd.*,
    821 F. Supp. 793 (D.P.R. 1993) ................................................................................. 2

*Thomas v. Comm'r of Soc. Sec.*,
    294 F.3d 568............................................................................................................. 12

*United States v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235 (1989) ................................................................................................. 10

*Whitman v. American Trucking Association*,
    531 U.S. 457 (2001) ................................................................................................. 16

**STATUTES**

3 L.P.R.A. § 1907 .................................................................................................................. 4

3 L.P.R.A. § 1914 .................................................................................................................. 16

13 L.P.R.A. § 2271 ................................................................................................................ 12

31 L.P.R.A. § 13 .................................................................................................................... 17

11 U.S.C. § 362 ..................................................................................................................... 21

11 U.S.C. § 902 ..................................................................................................................... 20

26 U.S.C. § 7652 ................................................................................................................... 19

48 U.S.C. §§ 2101-2241 ......................................................................................................... 1

PROMESA § 106 ................................................................................................................... 22

PROMESA § 202 ................................................................................................................... 22

PROMESA § 407 ..................................................................................................................... 7

UCC § 1–201 ......................................................................................................................... 19

UCC § 9–109 ......................................................................................................................... 19

UCC § 9–203 ......................................................................................................................... 19

To the Honorable United States District Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "FOMB"), as sole representative of Debtor and Respondent, the Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this sur-reply to *Ambac Assurance Corporation* ["Ambac"] *and Financial Guaranty Insurance Company's* ["FGIC"] *Reply Memorandum of Law in Support of their Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 8022] (the "Reply").

### SUR-REPLY[3]

### I.    MOVANTS FAIL TO ESTABLISH STANDING TO BRING THE  MOTION

1.      Movants have the burden to establish standing to bring the Motion in which it requests either a declaration that Ambac can prosecute two actions without violating the automatic stay or stay relief to prosecute them.[4]   One action is already pending, but its district judge ruled it was automatically stayed.  There, Ambac sues the United States and Treasury Secretary Mnuchin for an equitable lien against the Rum Tax Remittances, or an injunction against the United States, barring it from transferring the Rum Taxes to the Commonwealth.  Ambac states the second action would enforce against the Commonwealth its lien against the excise taxes before they are appropriated for other purposes.  Both actions are premised on Bondholder rights Ambac owns or to which it is subrogated, especially since both actions are aimed at the excise taxes the Bondholders claim as their

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3]   Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the *Opposition of the Commonwealth of Puerto Rico to Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay [ECF No. 7176]* [ECF No. 7827] (the "Opposition")

[4]   *See* Opposition ¶ 41; *see also  In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) ("to have standing to seek relief from the automatic stay, [movant] was required to establish that it is a party in interest and that it is asserting its rights and not those of another entity.").

collateral.  Ambac's action against the United States admits that to the extent bond insurers make

payments on bonds "they become owners of the subject bonds and/or become subrogated to the rights

of the bondholders, ***effectively stepping into their shoes***."[5]  (Emphasis supplied).

2.      Against that admission Movants contend the Trust Agreement's prohibition against

Bondholders prosecuting or even appearing in actions on the Bonds does not apply to it because it is

a bond insurer, not a Bondholder.  That logic fails on its face because Movants cannot be subrogated

to better rights than its insured bonds have,[6] and Movants admit the Actions are aimed at controlling

the Rum Tax Remittances intended to pay the Bonds.  That logic also fails because Ambac overlooks

that section 705 of the Trust Agreement provides "that ***all*** suits, actions and proceedings at law or in

equity shall be instituted, had and maintained in the manner herein provided…" (emphasis supplied).

The Trust Agreement (sections 701 through 708) only provides for the Trustee to bring actions.[7]

Therefore, because "all" means "all," there is no action left for a bond insurer to bring.

3.      Movants' position also overlooks the chaos it creates.  *First*, Trust Agreement section

705 requires an action be brought "for the benefit of all holders of such outstanding Bonds."  Movants

could only bring an action for the Bonds it insures and may well settle on terms that do not benefit

other Bondholders.  Because the Trust Agreement authorizes the Trustee to bring actions (sometimes

subject to Bondholders' or insurer control of time, method, and place), Movants' position would mean

---

[5]  U.S. Treasury Action at ¶ 18.

[6]  Under Puerto Rico law, an insurer's subrogation rights are derivative in nature and are no greater than the insured's rights. *Richmond Steel, Inc. v. Legal & Gen. Assur. Soc., Ltd.*, 821 F. Supp. 793, 799 (D.P.R. 1993) ("The subrogated insurer stands in the same position as the subrogor insured; the insurer cannot have rights greater than those of the insured."); *see also E.H. Ashley & Co. v. Wells Fargo Alarm Servs.*, 907 F.2d 1274, 1277 (1st Cir. 1990) ("The subrogee has no greater rights against a third party by virtue of its status as the insurer.").  Such rights are subject to any limitations on those rights, such as contractual waivers or defenses. *Ashley*, at 1277 ("Aetna, as subrogee, cannot escape the limitation of liability clause in the service contract between its subrogor, Ashley, and Wells Fargo.").

[7]  "Enforcement of Remedies," *only the Trustee* has the power to "protect and enforce its rights and the rights of the Holders under the laws of the Commonwealth or under this Agreement, including *all* rights with respect to funds and other moneys pledged hereunder."  Trust Agreement § 701.

there can be dueling actions on the Bonds, one by Movants and one by the Trustee, and there is nothing in the Trust Agreement addressing how to align the two actions.  In fact, by Movants' logic, there can be four actions:  one by the Trustee, one by Ambac, one by FGIC, and one by Assured. Moreover, the Trust Agreement (section 704) empowers holders of a majority of the Bonds to control time, method, and place of the Trustee's action, but there is no provision allowing a majority to control Movants' actions.  It is inconceivable that majority Bondholders would be allowed to control the Trustee, but not an insurer acting for a minority slice of the bonds.

4.       Movants' citation to the PRIFA resolution reimbursing FGIC for pursuing remedies under the resolution and Trust Agreement proves nothing.  And, it overlooks what the resolution says. It starts by authorizing FGIC to request the Trustee to intervene in judicial proceedings affecting the bonds and collateral.  That is directly contrary to Movants' notion that FGIC could itself intervene. The only rational interpretation of the resolution is that it simply entitles FGIC to reimbursement for its expenses outside matters only the Trustee can litigate, and for exercising control rights the Trust Agreement allows Bondholders and insurers to exercise over litigation.

**A.  Movants, as Subrogees of the Bondholders, are Barred By the No-Action Clause**

5.       The insincerity of Movants' position is laid bare by their claim they have direct rights against the Commonwealth because, under the Enabling Act, the Commonwealth "pledge[d] and agree[d] with the *holders of any bonds…*that it would not limit or alter the rights hereby conferred to the Authority…"  Reply ¶ 26 (citing 3. L.P.R.A. § 1913) (emphasis added).  Indeed, throughout the Reply, Movants seek to assert rights as a Bondholder, not an insurer: "Movants are pursuing their *own claims* against the Commonwealth based on the Commonwealth's take of *Movants' property*". Reply ¶ 9.   Movants are happy to cast themselves into the role of "holder of bonds" in this context,

but denounce that the "Holder" designation applies to them in the context of the No-Action Clause.[8]

6.      Rather than demonstrate how the Trust Agreement gives "Credit Facility providers" standing to enforce remedies on behalf of all bondholders, Movants argue the converse, claiming the Trust Agreement does not foreclose "Credit Facility providers" from pursuing bondholder remedies.[9] We explain above why Movants' position is inconsistent with the Trust Agreement's express provisions.  The Enabling Act provides the only remedies available are those PRIFA has expressly agreed to under the Trust Agreement.[10]  Trust Agreement Article VII, entitled "Remedies," nowhere provides "Credit Facility providers," in their own capacity, with the affirmative power to supplant the Trustee in controlling the remedies of all Bondholders.

7.      Movants overlook the obvious in asserting "there can be no credible argument that the parties intended to limit the rights of Credit Facility providers" because "the last line of section 704 expressly and extensively refers to Credit Facility providers, affording them the right to direct and control the Trustee, in lieu of the bondholders, to the extent they insure a majority of the PRIFA bonds (as Movants do here)."  Reply ¶ 15.  Clearly, Section 704 refutes Movants by referring to the provider's right to control the Trustee, not to take the Trustee's place.

**B. The No-Action Clause Bars the Motion**

8.      Movants' further attempt to wriggle free from the No-Action Clause by arguing even

---

[8]  Notably, Movants concede the No-Action Clause forecloses Bondholders from enforcing remedies. Reply ¶ 12, 14.

[9]  Movants' assertion that the No-Action Clause bars Holders, but not Credit Facility providers is based on Movants' fabrication (Reply ¶ 14) that the Trust Agreement defines "Credit Facility providers" as "providers of, inter alia, 'polic[ies] of municipal bond insurance.'"  It does no such thing.  It defines "Credit Facility," but "Credit Facility providers" is not a defined term.  There is no basis in the Trust Agreement to infer its No-Action Clause was differentiating between Holders and Credit Facility providers.

[10]  *See* 3 L.P.R.A. § 1907(a) ("trust agreement securing the bonds may contain provisions which shall be part of the contract with the holders of the bonds issued under such resolution or resolutions or under such trust agreement regarding . . . powers and privileges and the imposition of obligations and responsibilities upon the trustee under any trust agreement . . . the rights, powers and obligations and liabilities that shall arise in the event of default of any obligation under . . . such trust agreement")

if it applies to them, the No-Action Clause does not bar the Motion or the Actions because such actions are not "on the Bonds." Reply ¶ 20.  They attempt to distinguish the phrase "on the Bonds" with language in other no-action clauses that precludes bondholders from pursuing actions "relating to," "arising from," or "with respect to the Bonds." *Id.*

9.      Movants' argument ignores the fact that, as explained above, pursuant to the Enabling Act and Trust Agreement, only the Trustee has been given the right to pursue *any* remedies.  Section 701 could not be more broadly worded: "the Trustee shall proceed, subject to the provisions of Section 802 hereof, to protect and enforce its rights and *the rights of the Holders under the laws of the Commonwealth or under this Agreement*, including *all rights* with respect to funds and other moneys pledged hereunder."  The No-Action Clause references back to Section 701,  stating  "No Holder of any of the Bonds shall have any right to institute, appear in or defend any suit, action or proceeding in equity or at law on any Bond or for the execution of any trust hereunder *or for any other remedy hereunder*."  Trust Agreement § 705.  "[A]ny other remedy hereunder" necessarily includes "protect[ing] and enforce[ing] the rights of the Holders under the laws of the Commonwealth or under this Agreement."

10.      The No-Action Clause goes on to provide:

It is understood and intended that no one or more Holders of the Bonds hereby secured shall have *any right in any manner whatever by his or their action to affect, disturb, or prejudice the security of this Agreement*, or to enforce any right hereunder, that all suits, actions and proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all holders of such outstanding Bonds, and that *any individual right of action or other right given to one or more of such holders by law is restricted by this Agreement to the rights and remedies herein provided*."

*Id.*.  At the very core of Movants' Motion and Actions  are actions that would "affect…the security of this Agreement."  Obviously, and despite Movants' conclusory statement, a request for adequate

protection directly implicates an alleged secured claimholder's security interest—without the Trust Agreement governing the Bond, Movants would not have alleged collateral to adequately protect).[11]

### C. The Motion Improperly Asserts PRIFA's Rights, Not Movants' Rights

11.     Movants argue they are not asserting PRIFA's rights, but instead " pursuing their own claims against the Commonwealth based on the Commonwealth's taking of *Movant's property*." Reply ¶ 23.  Movants (shifting to their role as alleged Bondholders) cannot make their minds as to whether Rum Tax Remittances are Bondholders' property or PRIFA's property.  *Contrast* Reply at 12 and Reply ¶ 34.  Movants' argument the Rum Tax Remittances are their property (or subject to their lien) is based on their incorrect analysis of the Enabling Act and the scope of any security pledged under the Trust Agreement.  Because, as discussed in the Opposition (at Part III) and below, Movants' security interest, if any, is confined to the Sinking Fund, there can be no "takings" claim.

12.     Hedging their bet, Movants argue "even if the Court concluded that the property belonged to PRIFA, not its creditors, Movants nonetheless would have a direct claim against the Commonwealth under PROMESA [section 407]." Reply ¶ 25.  But Movants have no claim under PROMESA section 407(a) because it only relates to "property…*transferred* in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property…" Movants' argument fails because (i) no money has been *transferred*, it is the purported *failure* to transfer that Movants decry, and (ii) Movants must establish they have a valid security interest in the property, which they cannot.  Movants cannot assume they are secured claimholders, when the their

---

[11] Contrary to Movants argument (at ¶19), an exploration as to whether Movants would have standing to pursue the Actions does matter because if they cannot pursue them, lifting the stay to permit them to pursue the Actions would afford them no relief.  Thus, even if Movants could establish an injury that is their own, they lack Article III standing because such an injury is not redressable by the relief they request.  The lack of standing to pursue litigation upon lifting the stay is also fatal to the  Motion as Movants could not  even satisfy the first  *Sonnax* factor (whether relief would result in partial or complete issue resolution), or apply the twelfth factor and the balancing test the Court must engage in: how can Movants be harmed by the stay if lifting the stay would afford them no relief?

secured status is at issue.  Moreover, even if Movants could make out a claim under section 407, they are not *moving* under it; Movants instead seek relief under the Bankruptcy Code.  Finally, PROMESA section 407(b) provides "a creditor may enforce rights under this section…*unless a stay under title III is in effect*."  PROMESA § 407(b) (emphasis added).  Movants may not use section 407 as a basis to lift the stay when application of section 407 is itself subject to the stay.

13.     Movants further argue they have a direct claim because of a supposed "non-impairment covenant" between the Commonwealth and PRIFA's bondholders in which the Commonwealth "pledge[d] and agree[d] with the holders of any bonds issued under this chapter" that it would "not limit or alter the *rights hereby conferred to the Authority* until such bonds and the interest thereon is paid in full."  Reply ¶ 26 (citing 3 L.P.R.A. § 1913) (emphasis added).  But all this provision confirms is that Bondholders' *only remedy* under the Enabling Act is for breach of this covenant, and any other rights under the Enabling Act are "hereby conferred to the Authority."  In other words, where the Legislature wanted to grant rights to Bondholders, it did so with specificity.  Because all other rights expressly belong to PRIFA, Movants lack prudential standing to exercise them. Further, even if there were a breach of such covenant it would merely give rise to an unsecured claim.  Movants cannot use standing for one unsecured claim to pile on litigation of *PRIFA's rights* against the Commonwealth, or their other purported rights as Bondholders (just as they cannot use status as a GO bond insurer to lift the stay as a PRIFA Bondholder).

14.     In response to the FOMB's prudential standing argument that a motion to lift the stay on the basis of lack of adequate protection can only be brought by a secured claimholder of the *debtor*, and Bondholders are, at best, secured claimholders of *PRIFA (* Opp.  ¶ 61),  Movants do not provide a single case where a creditor of a creditor of a debtor seeks a determination that they lack of adequate protection vis-à-vis the debtor.  Nor do they attempt to rebut the FOMB's case law that Bankruptcy

7

Code sections 361, 362, 363, and 364  are intended to protect secured claimholders of a debtor, not secured claimholders of a creditor of the debtor.  *Id.*

## II.      MOVANTS ARE COLLATERALLY ESTOPPED FROM CHALLENGING THE DISTRICT COURTS' DETERMINATION THAT THE STAY APPLIES

15.      Movants respond to the FOMB's collateral estoppel arguments (Opp. Part II) in a footnote. *See* Reply n.8.  They argue they are not subject to collateral estoppel because the applicability of the stay has never been litigated. *Id.* But it was litigated.  Ambac simply did not object. Movants provide no response to the FOMB's case law demonstrating that where a party participates extensively in an action (as Ambac unquestionably did), a failure to file a response qualifies as being litigated to final judgment for collateral estoppel purposes. Opp. ¶ 67.  Manifestly, that Ambac did not disagree with the FOMB's assertion the automatic stay applied, does not enable Ambac to claim now it was not litigated.

16.      Next, Movants argue there has been no "final judgment" because all three cases are still pending and the "stays" were merely temporary and interim orders.  If Movants believed their own argument, why not go back to the respective District Court and challenge the stay there? The answer is they cannot because the deadlines to respond or appeal expired.  The FOMB already identified that, in an identical posture, a district court's stay was a final, appealable order.[12]

17.      Finally, Movants argument that the "circumstances have now changed" because "the First Circuit concluded that section 305 of PROMESA precludes the bankruptcy court from providing certain relief to creditors as part of the Title III proceeding" has no bearing on the collateral estoppel analysis.  Ambac's claimed excuse for doing nothing for over two years does not affect the analysis of whether the stay applies to the Rum Tax Remittances.

---

[12] *See* Opposition ¶ 67 (citing *Municipality of San Juan v. Commonwealth of P.R.,* 919 F.3d 565, 574 (1st Cir. 2019) (holding orders regarding application of the automatic stay were final, appealable orders, because they "conclusively determine[d] the disputed question" of applicability of the stay and were expected to be the final word on the subject addressed.)).

### III.    THE TRUST AGREEMENT GRANTS A SECURITY INTEREST ONLY IN MONIES ACTUALLY DEPOSITED IN THE SINKING FUND

18.    In the Motion, Ambac avoided discussing the Trust Agreement, referencing it only three times.  If the Trust Agreement provided Movants with the expansive security interest they now assert, surely Ambac would have made the Trust Agreement the centerpiece of the Motion.  Instead, Movants soberly acknowledged (Motion at ¶ 48) that section 601 of the Trust Agreement provides at most a security interest that "only attaches to the monies deposited with the trustee."[13]

19.    Cognizant of the limited security pledge in the Trust Agreement,  the Motion instead argues  the *Enabling Act* creates a pledge on monies not yet made available to PRIFA.  *Id.*  The Opposition (Part III) demonstrates the Enabling Act merely *permits* PRIFA to grant a security interest and that such security interest must be determined with reference to the operative Trust Agreement (a point which Movants did not contest).  Tacitly conceding their original argument was without merit,  Movants now argue  the "Pledged Revenues" under the Trust Agreement consist of "[1] the Special Tax Revenues and [2] any other moneys that have been deposited to the credit of the Sinking Fund."  Reply ¶ 36.  Once again, Movants are wrong.  For starters, the definition of "Pledged Revenues" in section 101 of the Trust Agreement does not include "[1]" and "[2]."

20.    As a preliminary point, Movants do not dispute that they carry the burden of demonstrating a property interest in the Rum Taxes (see Opp. ¶ 90).  Far from meeting their burden, Movants' strained interpretation of the Trust Agreement and their purported property rights adheres to the adage "if you can't convince them, confuse them."

21.    Movants point to the "rule of the last antecedent," a canon of statutory interpretation stating that "a limiting clause or phrase ... should *ordinarily* be read as modifying only the noun or

---

[13] The Motion states in full: "The Trust Agreement grants a lien on Pledged Rum Taxes, which attaches to the monies deposited with the trustee, and pursuant to the Enabling Act, to monies not yet made available to PRIFA.  *See* Trust Agreement, Section 601."

phrase that it immediately follows," (*Lockhart v. United States*, 136 S. Ct. 958, 960 (2016)), as conclusive on the issue that the Trust Agreement grants a pledge on all "Special Tax Revenues" not just those revenues deposited in the Sinking Fund.  Reply ¶ 38.  Movants' application of the last antecedent canon is incorrect.  In *Ron Pair*, the Supreme Court held a limiting phrase at the end of a sentence did *not* modify earlier words ("interest on such claim") in the sentence because those words **were set off by commas**.  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989). ("[T]here shall be allowed to the holder of such claim, ***interest on such claim,*** and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.").  It reasoned:

> This reading of § 506(b) is also mandated by its grammatical structure. Since the phrase "interest on such claim" *is set aside by commas*, and separated from the reference to fees, costs, and charges by the conjunctive words "and any," that phrase stands independent of the language that follows.

*Id.* (emphasis added); *see also In re CRS Steam,* 217 B.R. 365, 373-74 (Bankr. D. Mass. 1998) (construing an antecedent clause to apply to both parts of a phrase because "[t]here are no commas or disjunctives separating the phrases here."); *See Demko v. United States*, 44 Fed. Cl. 83, 89-90 (Fed. Cl. 1999) (construing phrase "except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes" so that qualifying phrase at the end of the sentence applied to both "shotgun" and "shotgun shell" as phrase lacked commas).

22.     Similarly, in both cases Movants rely on for the last antecedent canon, the Supreme Court only applied the last antecedent canon to statutory text with phrases separated by commas.  *See Lockhart v. United States*, 136 S. Ct. 958 (2016) (applying canon only to the language that is between the commas); *Barnhart v. Thomas*, 540 U.S. 20, 23 (2003) (same).

23.     Resort to the last antecedent canon is only invoked "where the statute is ambiguous." *Lockhart*, at 960.  Here, there is no ambiguity.  The Trust Agreement clearly confirms, in numerous respects, that any security interest is confined to monies in the Sinking Fund.  *First,* Movants myopically focus on the *definition* of Pledged Revenues, which itself does not create a pledge, without

analyzing the *granting language* in Trust Agreement. As detailed in the Opposition (at ¶¶ 70-73), and which Movants fail to reply, section 601 of the Trust Agreement is the only operative clause containing a grant of a security interest.  It provides the "principal, interest and premium [on the Bonds], if any, are payable solely from the Pledged Revenues, which Pledged Revenues are hereby pledged to the payment thereof *in the manner and to the extent hereinabove particularly specified*." Trust Agreement § 601 (emphasis added).  Accordingly, only the Pledged Revenues *from which the Bonds are payable* are arguably pledged, and such pledge is further limited to the "manner and to the extent…hereinabove particularly specified" in the Trust Agreement (i.e. before section 601).

24.     Article IV of the Trust Agreement is the only operative section before Section 601 that sets forth the extent to which Pledged Revenues from which the Bonds are payable are pledged to PRIFA Bondholders.  Section 401 creates the Sinking Fund held by the Trustee and then contractually obligates PRIFA to transfer monies from the PRIFA Infrastructure Fund (which is held by PRIFA) to the Sinking Fund.  To the extent the PRIFA Infrastructure Fund contains Rum Tax Remittances, such monies were transferred to PRIFA to "be used by the Authority for *its corporate purposes*"—not necessarily to pay bondholders (emphasis added).[14]  Pursuant to Section 402, monies in the Bond Service Account, a sub-account of the Sinking Fund, are then to be used to pay interest and principal on the Bonds.  The extent to which the monies are to be applied to the payment of interest and principal on the Bonds under the Trust Agreement thus limits any pledge of "Pledged Revenues" to monies  actually received by PRIFA and deposited into the Sinking Fund held by the Trustee.

25.     *Second*, even if the last antecedent canon did apply, the "rule is not an absolute and can assuredly be overcome by other indicia of meaning." *Barnhart*, at 26.  Here, Movants not only completely read out the words "*any other*" in the definition of Pledged Revenues, but they also

---

[14] *Compare* 13 L.P.R.A. § 2271v (a)(4) (requiring that certain taxes allocated to a different instrumentality be "maintained by the Bank in the name of the Authority **for the benefit of the bondholders**").

repeatedly misrepresent the definition as "other moneys" instead of "any other monies." (*see* Reply ¶ 39, 41).  This sleight of hand shows Ambac knew the collateral is limited to the deposited monies: *"any other* monies" has the opposite meaning of "*other* monies." Miriam Webster defines "any other" as "in addition to the person or thing just mentioned,"[15] while "other" is defined as "being the one or ones distinct from that or those first mentioned or implied."[16]  While "any other" means the former is a species of the latter,[17] "other" means the former differs from the latter.  Thus, Pledged Revenues means the Special Tax Revenues and any other monies, including Special Tax Revenues, deposited in the Sinking Fund.  Conversely, Special Tax Revenues and other monies deposited in the Sinking Fund would mean Special Tax Revenues on the one hand and other monies (not Special Tax Revenues) deposited in the Sinking Fund.  The modifier, deposited in the Sinking Fund would only apply to "other monies" in the latter example.

26.     *Third,* ample evidence in the Trust Agreement, Form of Bonds, and Offering Statements confirms that any pledge of Pledge Revenues is confined to monies in the Sinking Fund.  The Form of Bond, which is part of the Trust Agreement, makes clear that it is the Sinking Fund that is pledged to and charged with the payment principal and interest on the Bonds:

> The Agreement also provides for the creation of a special fund designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" and for the

---

[15] (*Any Other*, Merriam-Webster Online Dictionary (2019), https://www.merriam-webster.com/dictionary/any%20other (last visited July 19, 2019)).

[16] (*Other,* Merriam-Webster Online Dictionary (2019), https://www.merriam-webster.com/dictionary/other (last visited July 19, 2019)).

[17] In *Thomas v. Comm'r of Soc. Sec.,* the Third Circuit observed:

> When a sentence sets out one or more specific items followed by "any other" and a description, the specific items must fall within the description. For example, it makes sense to say: "I have not seen a tiger or any other large cat" or "I have not read *Oliver Twist* or any other novel which Charles Dickens wrote." But it would make no sense to say, "I have not seen a tiger or any other bird" or "I have not read *Oliver Twist* or any other novel which Leo Tolstoy wrote." 294 F.3d 568, 572 (3d Cir. 2002), *rev'd sub nom. Barnhart,* 540 U.S. 20 (2003).

While the Supreme Court in *Barnhart* would overturn the Third Circuit's ruling on the basis of the last antecedent canon, the provision at issue contained commas whereas no commas separate "Special Tax Revenues" from "any other monies deposited to the credit of the Sinking Fund" in the definition of Pledged Revenues.  The Third Circuit's reasoning is the case thus applies.

deposit to the credit of said special fund of a sufficient amount of the Pledged Revenues (as defined in the Agreement) to pay the principal of and interest on all bonds issued under the Agreement as the same become due and payable and to provide a reserve therefor, *which special fund is pledged to and charged with the payment of such principal and interest*.

Trust Agreement at 6.

27.     The Offering Statements remove any possible doubt as to the proper interpretation of the definition of "Pledged Revenues" under the Trust Agreement.  Under the heading of "Pledged Revenues" it provides:

> Pledged Revenues consist of: (i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

Offering Statements at 9.[18]  Despite this same provision being quoted in the Opposition (¶ 75), Movants make no effort to address or reconcile the direct conflict of the Offering Statements' definition of Pledged Revenues with Movants' interpretation of the definition.

28.     Accordingly, the Offering Statements' definition of "Pledged Revenues," and not Movants' tortured definition, gives proper effect to these words and is consistent with the granting language of Section 601 and the structure of the Trust Agreement.

## A. Movants Have No Property Interest in Monies Not Deposited in the Sinking Fund

29.     The balance of Movants' argument regarding purported property rights in the Retained Rum Tax Remittances is predicated on the Trust Agreement granting them more than just funds deposited in the Sinking Fund.  *See* Reply ¶ 42.  Because, as described above, Bondholders' security interest, if any, is confined to monies deposited in the Sinking Fund, the rest of their arguments

---

[18] The Offering Statements are available at https://emma.msrb.org/MD410020.pdf and https://emma.msrb.org/MD501151.pdf

crumble.  Each of Movants' arguments contains its own fallacies or is otherwise without merit:

30.    *First,* Movants argue that the words "to the credit of" must be given effect and that "this language recognizes that it is sufficient that the funds 'deposited' are intended for the benefit of the Infrastructure Fund."  Reply ¶ 45.  According to Movants, monies do not actually have to be deposited, it is sufficient that they're supposed to be deposited.  Movants try to use the appearance of "to the credit of" in the definition of Pledged Revenues and Offshore Excise Taxes, respectively, to form an unbroken chain leading back to the Rum Taxes sitting with the Commonwealth.  Reply ¶ 47.  But Movants' interpretation of the phrase "to the credit of" is unfounded and inconsistent with the use of that term elsewhere in the Trust Agreement.

31.    Because bank accounts are a debt, the phrase "to the credit of" the depositor refers to the accounting entry that the bank makes to establish its debt to the depositor.  Section 401 confirms this interpretation: "moneys held *to the credit of* the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below."  The  Trustee cannot hold in trust or disburse funds that reside in an account that lies beyond the Trustee's control.  Section 401 provides a waterfall in which PRIFA is required to "withdraw an amount of such Special Tax Revenues and other moneys to make the following deposits in the following order: (a) *to the credit of* the Bond Service Account…(b) *to the credit of* the Redemption account…and (c)…*to the credit of* the Reserve Account."  No one could credibly argue that the withdrawals and deposits under this provision could be accomplished if PRIFA merely *intended* for such funds to be deposited as opposed to *actually* withdrawing and depositing the funds into the accounts.  Moreover, Section 502 requires the Trustee to invest "[m]oneys held *to the credit of* the Bond Service Account"; again, the Trustee cannot invest money that is not under its control and, as Movants argue, is in the General Fund.  Movants' self-serving definition of "to the credit of" would lead to absurd results and must be rejected.

32.    *Second*, in an attempt to establish they have a lien on Retained Rum Tax Remittances

14

in the General Fund, Movants argue (Reply ¶ 42) that "the first proceeds of the Rum Taxes are 'deposited' with the Puerto Rico Treasury Department, 'to the credit of the Puerto Rico Infrastructure Fund'—thus making them 'Special Tax Revenues' pledged under the Trust Agreement—as soon as the Rum Taxes are received and accepted by the Treasury Department."   In the confusion of this sentence, Movants attempt to hide their devious sleight of hand: it is *Offshore Excise Taxes* and not *Special Tax Revenues*, that are defined as "federal excise taxes on rum…collected by the United States government and remitted to the Puerto Rico Treasury Department…"   Under no interpretation of the Trust Agreement are "Offshore Excise Taxes" pledged.   Indeed, if the Trust Agreement intended to grant a lien on monies sitting with the Commonwealth, the Commonwealth would have needed to be a party to the Trust Agreement and the pledge language would have included the Offshore Excise Taxes.[19]

33.      *Third,* Movants argue that the reference to "pursuant to the Act" in the definition of Offshore Excise Taxes has the effect of expressly incorporating the "special deposit" requirement of the Enabling Act into the definition of Pledged Revenue.  *See* Reply ¶¶ 42, 50.  This leap is completely unjustified.   The reference to "pursuant to the Act" is merely descriptive and serves to specify that not all Rum Taxes constitute "Offshore Excise Taxes" but only a limited subset of such taxes.   If the parties to the Trust Agreement had wanted to expressly incorporate the "special deposit" requirement it would not have "hid an elephant in a mousehole" by sneaking it into the definition of Offshore Excise Taxes. *See Whitman v. American Trucking Association,* 531 U.S. 457, 468 (2001).[20]

---

[19] The rest of Movants' argument falls apart as each part can be negated (a) the Rum Tax Remittances are not "deposited to the credit of" the PRIFA Infrastructure Fund until they are *actually* deposited, and (b) even if they were, this would make them "Offshore Excise Taxes" (not "Special Tax Revenues" and certainly not "Pledged Revenues") that were never pledged under the Trust Agreement.

[20] Even if the parties had incorporated the entire Enabling Act into the Trust Agreement, it would not affect the scope of any pledge because, as extensively briefed in the Opposition (¶ 69), the Enabling Act only authorizes PRIFA to pledge certain properly as expressly provided in a trust agreement or resolution.

34.    *Fourth,* Movants continue to falsely assert the word "participation" in 3 L.P.R.A. §
1914 means ownership.  None of Movant's cases on support their argument that "'participation'
means 'ownership' in Puerto Rico law," as is demonstrated by the fact they fail to respond to the
Oversight Board's discussion of those cases (Opp. n. 24).[21]  Indeed, the very fact that Movants have
to resort (*see* Reply at ¶ 31) to arguing, again without a shred of support, that "maximum amount"
somehow also means "ownership" (it simply does not) shows the complete lack of merit to their
contention PRIFA owns the Rum Taxes based on the word "participation."[22]  In actuality, the Spanish
version of the Trust Agreement controls.  There, the word "participación" in this context translates to
"portion" or "share."[23]  This interpretation makes sense because under the Enabling Act, the General
Fund only receives a *portion* (e.g. $117 million) of all Rum Taxes (e.g. ~ $430 million) remitted to
the Commonwealth Treasury and placed in a lockbox account.[24]

---

[21] Indeed, the only actual case Movants cited, *Den Norske Bank AS v. First Nat'l Bank of Bos.*, 75 F.3d 49, 51 (1st Cir. 1996)
does not even apply Puerto Rico law, contrary to Movants' mischaracterizations.

[22] The cases Movants cite to interpret the term "participation" are irrelevant because as Movants admit, and as the Spanish
text of the Enabling Act evidences, "participation" and "maximum amount" are used interchangeably. (Rep. ¶ 31.) Both
terms are  used in the statute as phrases to describe the portion of Rum Tax Remittances the Commonwealth may allocate
to PRIFA. Movants' assertion that the interchangeability of the terms "confirm the legislature's pre-existing
understanding that PRIFA owned the Pledged Rum Taxes," is a non sequitur. (Rep. Br. ¶ 31.) Movants do not cite  any
support for this proposition and the history and text of the statute do not favor Movants' conclusion.

The word "participation" ("la participación" in Spanish) was not part of 3 L.P.R.A § 14 when the statute was originally
enacted in 1988. The phrase was added in the amendment to the Enabling Act on July 9, 2006, the second time that this
provision was amended to increase the maximum amount of money permissibly appropriated thereunder. *See* H.B. 2719
(No. 111) (Aug. 7, 2002); H.B. 2719 (No. 119) (Jul. 9, 2006)  In the 2006 amendment, the phrasing of the final enumerated
appropriation under this provision of the Enabling Act was changed from "up to a maximum amount" to "the participation
shall be for an amount of up to" without any stated reason by the legislature. The 2006 amendment "Statement of Motives"
includes no evidence of an intent to change the nature of the appropriation by adding the word "participation" or otherwise.
*See* H.B. 2719 (No. 119) (Jul. 9, 2006). The only logical interpretation of the statute's inclusion of the word "participation"
in 2006 is that it was a different way to phrase "maximum amount."

[23] Movants' appear to split the difference between their interpretation of participation and the sensible Spanish translation
of the word, stating that "'participation' can connote the portion of the Rum Taxes that PRIFA owns." Reply ¶ 31.

[24] In addition, the Spanish text of the Enabling Act makes it clear that the word "participation" is not a noun characterizing
PRIFA's interest, but is one word in a phrase regarding the portion of Rum Tax Remittances the Commonwealth may
allocate to PRIFA.  In the Spanish text, the phrase "which shall be deposited"  unquestionably  refers to the tax remittances
being deposited, not the "participation," because the text uses the masculine plural form of the word "which."  The Spanish
refutes, rather than supports, Ambac's position. *See* 31 L.P.R.A. § 13 (providing that to the extent a discrepancy exists
between the English translation and original Spanish version of a statute, the Spanish text shall be preferred).

16

35.     *Fifth,* Movants contend that "even if the Commonwealth retained some interest in the Pledged Rum Taxes, it is at most bare legal title in what amount to 'restricted funds' or funds held in trust for PRIFA." Reply ¶ 29.  This contention is without merit.  Under Puerto Rico law, for a money to be held in valid trust, a public deed of trust is required to be executed.  *See* Act 219-2012.[25] Movants make no allegation that there is a public deed of trust.  Even if a valid trust did exist (it does not) the $117 million of Rum Tax Remittances in the General Fund are commingled with other Commonwealth monies and are not earmarked for PRIFA or its Bondholders.  There can be no recovery from these funds because the $117 million cannot be clearly traced and identified separate from the other monies in the Sinking Fund.[26]

36.     *Sixth*, contrary to Movants' assertion (¶ 49), 3 L.P.R.A. § 1913 does not magically transform "the protections of PRIFA's bondholders in the Enabling Act" into "property rights guaranteed by an agreement between the Commonwealth and PRIFA's bondholders."  Movants cite cases holding a municipality's or state's termination of a tax intended to service bond debt was unconstitutional.  The unconstitutionality was the impairment of the bond contracts outside bankruptcy.  The violations give rise to claims.  Movants cite *U.S. Trust* for the proposition that "contract rights are a form of property and as such may be taken for public purpose provided that just compensation is paid." *Id.* (citing 431 U.S. 1 (1997)).  Here, the Commonwealth failed to carry out its promise to transfer excise taxes to PRIFA.  That is no more than breach of a promise to pay giving rise to an unsecured claim.  Moreover, *U.S. Trust* is inapposite because it did not involve a Fifth Amendment challenge, but rather involved a Contracts Clause challenge to a New Jersey statute that

---

[25] Prior to 2012 the requirement for a deed of trust was in Articles 834-874 of the Civil Code of Puerto Rico.

[26] *See Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 618 (1st Cir. 1988) ("the claimant must identify the trust fund or property and, where the trust fund has been commingled with general property of the bankrupt, sufficiently trace the property or funds—the res…[t]here can be no recovery ... where all that can be shown is enrichment of the trustee. [The trust property] must be clearly traced and identified in specific property. It is insufficient to show that trust property went into the general estate and increased the amount and value thereof.").

diverted to other uses revenues pledged as security for bonds without compensating the bondholders for impairment of New Jersey's contractual obligation to the bondholders.  Since PROMESA, like the Bankruptcy Code, is a federal law, it is not prohibited from impairing contracts, and *U.S. Trust* is inapplicable.

37.     *Seventh*, Movant's arguments (*see* Reply at ¶¶ 28-32) that PRIFA owns the Rum Taxes received by the Commonwealth fails.  Even if the Commonwealth agreed to transfer to PRIFA the Commonwealth's right to receive future Rum Taxesfrom the federal government, PRIFA's interest in those rights would have been cut off on the Petition Date by Bankruptcy Code section 552(a) and neither PRIFA nor Movants would have any right in the Rum Tax Remittances now held by the Commonwealth.[27]  Here, it is clear the Commonwealth cannot have any "rights" in the Rum Taxes until, at the very least, the Rum Taxes exist—that is, until rum is sold and taxes are generated.[28] Almost Ambac's entire argument is based on the reverse – that PRIFA was given ownership of future excise taxes before they come into existence. Before rum is sold, any potential Rum Taxes do not exist and any right to them is "inchoate" and cannot be transferred to PRIFA.  The situation is parallel to those in the ERS § 552 Opinion,[29] where this Court ruled ERS did not possess rights to future employer contributions until employees actually performed work, making any security interest in

---

[27] The Commonwealth's right to receive future Rum Tax revenues from the federal government is a "payment intangible" under Article 9 of the Uniform Commercial Code ("UCC").  *See* UCC § 9–109(a)(3) (Article 9 applies to "a sale of . . . payment intangibles").  Under Article 9, the sale of a "payment intangible" creates a "security interest."  *See* UCC § 1–201(a)(35).  Such a sale is not "effective" until the security interest "attaches" to the collateral—the payment intangible (§ 9–203)—and the security interest cannot "attach" until the debtor (here, the Commonwealth) has "rights" in the payment intangible.  UCC § 9–203(b)(2).

[28] *See* 26 U.S.C. § 7652(a)(3) (amount of tax to be transferred to Puerto Rico only calculated after rum taxes are "collected under the internal revenue laws of the United States" after being "transported to the United States . . . or consumed in the island" and the federal government has calculated and deducted "the estimated amount necessary for payment of refunds and drawbacks").  This provision makes it clear that the Puerto Rico treasury has no existing right to transfer (if it has any at all) until at least the federal government **collects** taxes *after* the Puerto Rico-originating merchandise is either transported to the U.S. or consumed on-island.

[29] *Opinion and Order Granting Plaintiff's Motion for Summary Judgment as to Count III and Counterclaims II and III, and Denying Defendants' Motion for Summary Judgment*, Case No. 17-213, ECF No. 251 ("ERS § 552 Opinion").

"future" (not currently existing but inchoate) contributions nonexistent.[30]  As a result, even if PRIFA

had been assigned the "payment intangible" of the Commonwealth's right to future Rum Taxes,

PRIFA's interest has been cut off as of the Petition Date and no longer attaches to funds received by

the Commonwealth pursuant to Bankruptcy Code section 552.[31]

38.     *Eighth*, Movants argument that the Commonwealth is a mere conduit fails (see Opp.

IV.F).  Movants cite to *Flores Galarza*[32] (n.9), which purportedly shows that a Puerto Rico statute

requiring the Commonwealth transfer funds means the Commonwealth is a conduit and ownership of

the funds lies with the transferee.  The facts of *Flores Galarza* are entirely distinguishable.  There,

the Commonwealth collected monies from motorists for auto insurance supplied by insurers.  The

First Circuit held the Commonwealth was acting as a collection agent for the insurance companies

whose insurance policies went into effect before the monies were turned over.   Here, the

Commonwealth is not acting as a collection agent.  Rather, the federal government appropriates Rum

Taxes to the Commonwealth for its own use.  The Commonwealth is only a conduit when it collects

money for someone else. The fact the Commonwealth decided it will send a portion of the Rum Taxes

to PRIFA does not render it a conduit. Notably, in the U.S. Treasury Action, Ambac also claims the

United States is a conduit.  According to Ambac, the federal taxes referred to in the Trust Agreement

---

[30] *See* ERS § 552 Opinion at 17 ("Until the post-petition computations are performed based upon post-petition facts, the receivable to ERS does not exist and ERS has no right to collect the particular contribution. Thus, the relevant right to payment only comes into existence as the result of and contemporaneously with post-petition acts, and the proceeds of that right are therefore the proceeds of post-petition property; ERS's right to payment of the post-petition property is not "property of the debtor acquired before the commencement of the case.").

[31] Notably, Movants argue that they are "special revenue" under 11 U.S.C. § 902(B), but they are wrong for multiple reasons. For purposes of this analysis, suffice it to say the Rum Taxes are not "special revenues" of the Commonwealth's and so section 928(a) does not apply.  The Rum Taxes are levied and collected by the federal government and then transferred to the Commonwealth pursuant to federal law.  It is impossible to consider them the Commonwealths "special revenues," and they are therefore not subject to section 928(a).

[32] *Asociación De Subs. Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007).

19

never belong to the federal government, even though it changes its allocation of those taxes to the Commonwealth at will over the years.

## IV.   THAT PREEMPTION OR REPEAL OF THE ENABLING ACT MAY HAVE "CONSEQUENCES" DOES NOT ALTER THE COMMONWEALTH'S PROPERTY INTEREST IN THE RUM TAXES

39.     In railing against the FOMB's arguments that PROMESA preempts the Enabling Act's allocation of Rum Taxes to PRIFA and that the Commonwealth could repeal of amend the statute, Movants lose sight of the narrow inquiry before the Court on the Motion: whether the Commonwealth has property interests in the Rum Tax Remittances.  Movants argue that the Commonwealth cannot repeal the Enabling Act without "consequences."  Reply at 24.  They also argue that the conditions have not been met for the Commonwealth to invoke its Retention Powers or police powers.  All these arguments miss the point: it does not matter whether the conditions have been met (the findings of Congress of a fiscal and humanitarian crisis in Puerto Rico even prior to Hurricane Maria show they have) or that there would be consequences from taking certain actions. All that matters is that there is a set of circumstances under which the Commonwealth owns the Rum Taxes.  A contingent or reversionary property interest is still a property interest.  And it is certainly sufficient to maintain the automatic stay.[33] More pointedly, Movants provide no response to the FOMB's argument that the mere fact that the Commonwealth could subject the Rum Tax Remittances to its Retention Powers demonstrates that the Commonwealth has ownership of the Rum Tax Remittances before they are transferred to PRIFA.

40.     Finally, PROMESA preempts the Enabling Act to the extent it purports to appropriate monies to PRIFA in future fiscal years.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 330

---

[33] Section 362(a)(3) of the Bankruptcy Code states: "Except as provided in subsection (b) of this section, a petition filed  . . .  operates as a stay, applicable to all entities, of . . .any act to obtain possession of property of the estate or of property *from* the estate or to exercise control over property of the estate;" (emphasis added).

F. Supp. 685, 704 (D.P.R. 2018)(recognizing "a budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are preempted."). The logic behind this decision is sound: if the Commonwealth had laws in place prior to PROMESA appropriating all monies in its General Fund, then FOMB's power to control the budget would be rendered nugatory as it would be unable reallocate or reduce any of the appropriations.

41. Movants try to avoid this outcome by arguing that "the Oversight Board has repeatedly argued that the fiscal plan is a mere 'blueprint' subject to ongoing evolution and that it is not legally binding." Reply ¶ 71. [34] Movants even go so far as to claim that the FOMB is collaterally estopped from arguing a contrary position. *Id.* Movants are mixing apples and oranges: while the fiscal plan may serve as a "blueprint," the certified budget is approved or deemed approved by the Governor and Legislative Assembly and in "full force and effect beginning on the first day of the applicable fiscal year." *See* PROMESA § 202 (e). The FOMB has always been consistent that the budget is the law. The Enabling Act conflicts with, and is preempted by, PROMESA and budgets certified thereunder, to the extent it appropriates monies to PRIFA for future fiscal years.

---

[34] Movants also argue that the fiscal plan must respect liens. Reply ¶ 69. As demonstrated above, Movants have no lien on Rum Tax Remittances in the General Fund. Moreover, the Oversight Board has sole discretion as to whether the fiscal plan complies with the requirements of PROMESA section 201(b) and such determination cannot be litigated by Movants. PROMESA § 106(e).

Dated: July 19, 2019                                  Respectfully submitted,
San Juan, Puerto Rico


                                                      */s/ Hermann D. Bauer*
                                                      Hermann D. Bauer
                                                      USDC No. 215205
                                                      **O'NEILL & BORGES LLC**
                                                      250 Muñoz Rivera Ave., Suite 800
                                                      San Juan, PR 00918-1813
                                                      Tel: (787) 764-8181
                                                      Fax: (787) 753-8944
                                                      Email: hermann.bauer@oneillborges.com

                                                      Martin J. Bienenstock (*pro hac vice*)
                                                      Brian S. Rosen (*pro hac vice*)
                                                      Ehud Barak (*pro hac vice*)
                                                      Daniel S. Desatnik (*pro hac vice pending*)
                                                      **PROSKAUER ROSE LLP**
                                                      Eleven Times Square
                                                      New York, NY 10036
                                                      Tel: (212) 969-3000
                                                      Fax: (212) 969-2900
                                                      Email: mbienenstock@proskauer.com
                                                      Email: brosen@proskauer.com
                                                      Email: ebarak@proskauer.com
                                                      Email: ddesatnik@proskauer.com

                                                      Michael A. Firestein (*pro hac vice*)
                                                      Lary Alan Rappaport (*pro hac vice*)
                                                      PROSKAUER ROSE LLP
                                                      2029 Century Park East
                                                      Suite 2400
                                                      Los Angeles, CA 90067-3010
                                                      Tel: (310) 557-2900
                                                      Fax: (310) 557-2193
                                                      Email: mfirestein@proskauer.com
                                                      lrappaport@proskauer.com

                                                      *Attorneys for the Financial Oversight and
                                                      Management Board for Puerto Rico, as
                                                      representative of the Commonwealth of Puerto
                                                      Rico*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF

participants in this case.


*/s/ Hermann D. Bauer*
Hermann D. Bauer