# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA<br>Title III<br><br>**Re: ECF No. 1235**<br>Case No. 17-BK-4780-LTS<br><br>**This Pleading relates only to PREPA, and shall be filed in the lead Case No. 17-BK-3283-LTS, and PREPA's Title III case (Case No. 17-BK-4780-LTS)** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, as
representative of PUERTO RICO ELECTRIC POWER
AUTHORITY, and PUERTO RICO FISCAL
AGENCY AND FINANCIAL ADVISORY
AUTHORITY,

                 Movants,

v.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, *et al.*,

                 Respondents.

**SECOND SUPPLEMENTAL MEMORANDUM
OF LAW AND FACTS IN SUPPORT OF JOINT MOTION OF PUERTO RICO
ELECTRIC POWER AUTHORITY AND AAFAF PURSUANT
TO BANKRUPTCY CODE SECTIONS 362, 502, 922, AND 928,
AND BANKRUPTCY RULES 3012(A)(1) AND 9019 FOR ORDER
APPROVING SETTLEMENTS EMBODIED IN THE RESTRUCTURING
<u>SUPPORT AGREEMENT AND TOLLING CERTAIN LIMITATIONS PERIODS</u>**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND .................................................................................................................8

SUPPLEMENTAL ARGUMENT ...........................................................................................9

    I.    THE RSA DOES NOT AFFECT OR PREJUDICE THIRD PARTY RIGHTS OR
THEIR POTENTIAL RECOVERIES UNDER A PLAN ..................................... 9

        A.    The RSA Does Not Affect Third Party Rights ............................................9

        B.    The RSA Does Not Have Any Impact on the Current Expense Claimants'
or Other Unsecured Claimholders' Recoveries Under a Plan ..................11

        C.    Unsecured Claimholders Such as Current Expense Claimants are Not
Prejudiced by the Payment of Settlement Payments to Bondholders Under
the RSA ......................................................................................................13

    II.    THE CURRENT EXPENSE CLAIMANTS HAVE NO ENFORCEABLE
PRIORITY RIGHTS........................................................................................ 17

        A.    The Current Expense Claimants are Not Third Party Beneficiaries of the
Trust Agreement, Have No Rights Under It, and Cannot Enforce Its
Provisions..................................................................................................17

        B.    The Trust Agreement Does Not Create a Payment Priority in Favor of
Current Expenses ......................................................................................20

        C.    The Fuel Line Lenders are Not Current Expenses Under the Trust
Agreement..................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amatucci v. N.H. Supreme Court,*
2014 U.S. Dist. LEXIS 61508 (D.N.H. May 2, 2014).............................................20

*Bco. Central Corp. v. Yauco Homes, Inc.,*
135 D.P.R. 858, 863-64 (P.R. 1994)...................................................................18

*BSR Landscape & Irrigation Contractors, Inc. v. Marriott Corp.,*
1988 U.S. Dist. LEXIS 6732 (M.D. Fla. 1988)....................................................31

*CFIP Master Fund Ltd v. Citibank NA,*
738 F. Supp. 2d 450 (S.D.N.Y. 2010)................................................................19

*Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.,*
85 F.3d 1198 (6th Cir. 1996) ............................................................................30

*Duraflex Sales & Serv. Corp. v. Mechanical,*
110 F.3d 927 (2d Cir. 1997).............................................................................19

*Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin.
Oversight & Mgmt. Bd. For P.R.),*
899 F.3d 13 (1st Cir. 2018).........................................................................1, 23

*Goodwin v. Branch Banking & Trust Co.,*
699 Fed. Appx. 274 (4th Cir. 2017)....................................................................31

*In re Amret, Inc.,*
174 B.R. 315 (M.D. Ala. 1994) .........................................................................27

*In re Best Prods. Co.,*
168 B.R. 35 (Bankr. S.D.N.Y. 1994)..............................................................24, 25

*In re Boston Generating LLC,*
440 B.R. 302 (Bankr. S.D.N.Y. 2010)................................................................25

*In re Charter Co.,*
68 B.R. 225 (Bankr. M.D. Fla. 1986) ...........................................................11, 17

*In re Chicago, S. S. & S. B. Railroad,*
146 B.R. 421 (Bankr. N.D. Ill. 1992) .................................................................24

*In re Cliff's Ridge Skiing Corp.,*
123 B.R. 753 (Bankr. W.D. Mich. 1991)..............................................................19

*In re Dow Corning Corp.*,
  244 B.R. 721 (Bankr. E.D. Mich. 1999), *rev'd on other grounds*, 255 B.R. 445
  (E.D. Mich. 2000), *aff'd*, 280 F.3d 648 (6th Cir. 2002) .................................................11, 17

*In re Financial Oversight & Mgmt. Bd*,
  360 F. Supp. 3d 65 (D. P.R. 2019).................................................................................6, 12

*In re Garland Corp.*,
  6 B.R. 456 (B.A.P. 1st Cir. 1980) ........................................................................................14

*In re Holly's, Inc.*,
  140 B.R. 643 (Bankr. W.D. Mich. 1992).............................................................3, 25, 26, 27

*In re Howland*,
  545 B.R. 653 (Bankr. D. Or. 2015).......................................................................................25

*In re Ideal Mortg. Bankers, Ltd.*,
  539 B.R. 409 (Bankr. E.D.N.Y. 2015) ..................................................................................13

*In re Lantana Motel*,
  124 B.R. 252 (Bankr. S.D. Ohio 1990) .................................................................................27

*In re Medomak Canning*,
  922 F.2d 895 (1st Cir. 1990) .................................................................................................16

*In re National Bickford Foremost, Inc.*,
  116 B.R. 351 (Bankr. D.R.I. 1990) .......................................................................................13

*In re La Paloma Generating Company*,
  595 B.R. 466 (Bankr. D. Del. 2018) .....................................................................................28

*Kobak v. Nat'l City Bank (In re Kobak)*,
  280 B.R. 164 (Bankr. N.D. Ohio 2002) ................................................................................19

*Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery L.P.)*,
  171 F.3d 249 (5th Cir. 1999) ................................................................................................24

*Marathon Asset Management v. Wilmington Trust N.A. (In re Energy Future
  Holdings Corp.)*,
  748 Fed. Appx. 455 (3d Cir. 2018)........................................................................................23

*New England Mut. Life Ins. Co. v. Harvey*,
  82 F. Supp. 702 (D. Mass. 1949) ..........................................................................................31

*Oppenheimerfunds Inc. v. TD Bank, N.A.*,
  2014 NY Slip. Op. 30379(U) (Sup. Ct. N.Y. County Feb. 10, 2014).....................................19

*PPM Fin., Inc. v. Norandal USA, Inc.*,
   392 F.3d 889 (7th Cir. 2004) ........................................................................15

*Real Legacy Assurance Co. v. Santori Trucking*,
   2008 WL 11357822 (D. P.R. July 29, 2008) ..............................................18

*Renco Grp., Inc. v. Wilmington Tr., N. A. (In re Magnesium Corp. of Am.)*,
   583 B.R. 637 (Bankr. S.D.N.Y. 2018) .......................................................11

*RWNIH-DL 122nd St. 1 LLC v. Futterman (In re Futterman)*,
   2019 Bankr. LEXIS 1872 (Bankr. S.D.N.Y. Jun. 20, 2019)........................11

*Schreibman v. Walter E. Heller & Co.*,
   446 F. Supp. 141 (D.P.R. 1978)............................................................11, 17

*Schuyler-Brown FS, Inc. v. Batterton (In re Batterton)*,
   2001 Bankr. LEXIS 2380 (Bankr. C.D. Ill. 2001) .....................................19

*Thomas v. Citimortgage, Inc. (In re Thomas)*,
   459 B.R. 708 (Bankr. E.D. Mich. 2011) ....................................................24

*Three River Bank of Mont. v. North End Timber Prods. LLC (In re North End
   Timber Prods. LLC)*,
   2007 Bankr. LEXIS 5113 (Bankr. D. Mont. Dec. 17, 2007) ......................19

*U.S. v. Security Mgt. Co.*,
   96 F.3d 260 (7th Cir. 1996) .......................................................................30

*UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*,
   Case No. K-AC2016-0291 (Dec. 19, 2016).......................................... passim

*Venn v. Goedert*,
   319 F.2d 812 (8th Cir. 1963) .....................................................................31

STATUTES

11 U.S.C. § 363..................................................................................2, 13, 14

11 U.S.C. § 510(a) .....................................................................21, 23, 24, 26

22 L.P.R.A. § 196 .......................................................................................32

31 L.P.R.A. § 3374 ......................................................................................18

PROMESA § 301(a) ....................................................................................24

PROMESA § 301(c)(7)................................................................................16

PROMESA § 305............................................................................2, 5, 13, 14

PROMESA § 315(b) ...............................................................................................................1

Fed. R. Bankr. P. 9019 ................................................................................................... passim

**OTHER AUTHORITIES**

1 COMMERCIAL FINANCE GUIDE § 15.03 ...............................................................27, 28

4-507 COLLIER ON BANKRUPTCY ¶ 507.02 (16th ed. 2017) ........................................26

*Act for the Revitalization of the Electric Power Authority*, Act No. 4-2016 ...............................20

*Enabling Act of the Fiscal Agency and Financial Advisory
    Authority*, Act No. 2-2017 ...........................................................................................1

*Model First Lien/Second Lien Intercreditor Agreement Task Force*, The Business
    Lawyer, vol. 65, No. 3, 2010 ...............................................................................27, 28

To The Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "FOMB"), in its capacity as representative of the Puerto Rico Electric Power Authority ("PREPA" or the "Debtor") in the Title III case pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] and the Puerto Rico Fiscal Agency and Financial Authority ("AAFAF," and together with the Oversight Board and PREPA, "Movants" or the "Government Parties"), as the entity authorized to act on behalf of PREPA pursuant to the authority granted to it under the *Enabling Act of the Fiscal Agency and Financial Advisory Authority*, Act 2-2017, respectfully submit this second supplemental memorandum of law and facts (the "Second Supplemental Memorandum") in support of the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Periods* [ECF No. 1235] (the "Rule 9019 Motion") and the *Supplemental Memorandum of Law and Facts* in support of the Rule 9019 Motion [ECF No. 1425] (the "First Supplemental Memorandum"), and the Declarations[2] submitted therewith, in accordance with the Court's direction at the July 11, 2019 conference ("July 11 Conference").

## **PRELIMINARY STATEMENT**

1.      This memorandum of law is submitted in response to the Court's direction at the July 11 Conference to address whether the Court can grant the relief Movants request without

---

[1]  PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the First Supplemental Memorandum.

eliminating PREPA's ability to fully compensate holders of the Fuel Line Lender[3] claims if they ultimately prevail on their contention that their claims are senior to the PREPA bondholders' claims. Putting aside that the Fuel Line Lender claims are unsecured and have no entitlement to adequate protection, the answer is "yes," they are protected in at least three ways. First, the transition charge the PREPA RSA contemplates using to pay the bondholders' claims is far greater than the charge that would be necessary (approximately 0.43 cents per kilowatt-hour) to pay the Fuel Line Lender claims. Thus, if the latter claims are senior, they can be fully paid by either deducting their claim amount from the future transition charge collections for the purportedly junior bondholders, or the transition charge can be increased by approximately 0.43 cents to cover the Fuel Line Lender claims. Second, because Bankruptcy Code section 363 is inapplicable in Title III cases and PROMESA § 305 is applicable, without court approval PREPA can already make the pre-plan Settlement Payments to the Supporting Holders, and section 305 requires the Court not to interfere with PREPA's use of its revenues to pay the Supporting Holders. Therefore, the Court's approval and order to make Settlement Payments to the Supporting Holders cannot interfere with the Fuel Line Lender's legal rights. To the contrary, the reason PREPA is requesting the Court to approve and order those payments that PREPA can make without a court order is that the Supporting Holders have agreed to have their claims allowed in reduced amounts and to vote for a plan that pays them between $2 billion and $3 billion less than full payment if the Court approves and orders the payments. Thus, the Court's order does not affect and cannot harm other creditors. Third, if the Fuel Line Lender claimholders have the seniority they say they have, neither the RSA nor the Amended Proposed Order releases the Supporting Holders from any claim of the

---

[3] The Fuel Line Lenders are: (i) Cortland Capital Market Services LLC, as Administrative Agent ("Cortland"), and (ii) SOLA LTD, Solus Opportunities Fund 5 LP, Ultra Master LTD, and Ultra NB LLC (together, "Solus" and together with Cortland, the "Fuel Line Lenders").

Current Expense Claimants for turnover of monies PREPA pays to them.  That said, this memorandum also explains why the Fuel Line Lender claims are not senior, and the Fuel Line Lenders have not pled a cognizable claim to the contrary.  They have not alleged, and cannot allege, the existence of any agreement signed by the PREPA bondholders or trustee granting the Fuel Line Lender claimholders the fundamental rights of a senior creditor.

2.      The Fuel Line Lenders, as well as UTIER and the PREPA retirement system (collectively, the "Current Expense Claimants"), assert seniority over the PREPA bondholders. Their seniority claim fails for a simple reason: they have no subordination agreement and there is no evidence that PREPA bondholder claims have been subordinated.  The law is very clear.  To be senior to another claim, a claimant needs a statute or a subordination agreement.  No one alleges there is a statute subordinating the PREPA bond claims.  Accordingly, the Fuel Line Lenders allege they have contractual seniority rights.  But, their own allegations show they do not.  They fail to allege the existence of any contract under which the PREPA bondholders agree that on default, they get paid only after the Fuel Line Lender claims and that they will turn over any monies they receive before the Fuel Line Lender claimholders are paid in full.  Without such a contract, there can be no subordination. Such an agreement between creditors is the hallmark of a subordination agreement.  *In re Holly's, Inc.*, 140 B.R. 643, 668 (Bankr. W.D. Mich. 1992) ("A subordination agreement is simply a contract in which a creditor (the 'subordinated' or 'junior' creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by; the subordinated creditor.").

3.      To attempt to construct their non-existent subordination contract, the Fuel Line Lenders first point to the Trust Agreement to which they are not parties and which provides there are no third-party beneficiaries.  The Trust Agreement simply provides that PREPA may pay

necessary and *current* operating expenses under annual budgets (a covenant in favor of *the bondholders* to ensure PREPA keeps investing in the system and thereby creating revenues) and no more, before transferring remaining net revenues to the bondholder trustee's account.  The Trust Agreement also provides on its first page that PREPA has authority to determine the "necessity for all its expenditures and the manner in which they shall be incurred, allowed and paid . . . ." which negates the Fuel Line Lender claimholders' assertion that they have a senior claim entitled to be paid before the bonds are paid when a default exists.  There is a world of difference between a bondholder contract with PREPA granting PREPA the unilateral ability to pay fuel and other operating expenses, as limited by PREPA's budgets, before bond claims (which contract PREPA and the bondholders can amend at will), and a bondholder contract with Fuel Line Lenders providing that when both the fuel claims and bondholder claims are in default, the fuel claims must be paid in full before the bonds are paid.  The latter contract does not exist.  In a valiant effort to create it, the Fuel Line Lender claimholders then point to a crazy quilt of other documents to supplement the seniority right they contend is in the Trust Agreement, as if they can manufacture a subordination agreement by pointing to snippets of other documents not signed by the bondholders they want to subordinate.  They start with their credit agreement with PREPA under which PREPA commits to pay the credit line as a Current Expense under the Trust Agreement.  But, the PREPA bondholders are not parties to it, and have nowhere agreed they are subordinate to it.  The PREPA bondholders' purported knowledge of the credit agreement and offering documents makes no difference.  Try as they might, the Fuel Line Lender claimholders have not and cannot allege a contract in which the PREPA bondholders agree their claims are subordinate and agree they shall not be paid before the Fuel Line Lenders' claims are paid.  Without that contract, the Fuel Line Lender claimholders' assertion of seniority is a wish, not a reality.

4.      UTIER and the PREPA retirement system similarly argue pension claims (the entire underfunded amount) must be treated as "Current Expenses" because their employees are part of the operations of PREPA or the definition includes payment to pensions or retirement funds, respectively.  But, none of the Current Expense Claimants allege they have an agreement with the Bondholders pursuant to which the Bondholders subordinated their bonds claims to those of the Current Expense Claimants.[4]

5.      Especially given the Fuel Line Lenders' claims being unsecured and protected as described above, the validity and extent of Current Expense Claimants' purported priority rights do not implicate the reasonableness of the RSA, which preserves their legal rights to be properly dealt with at Plan confirmation.  If they succeed in establishing priority at confirmation, PREPA will have to treat them accordingly under a Plan.  If PREPA cannot confirm such a Plan, the RSA can be terminated.  Neither scenario is relevant to the current inquiry regarding the approval of the settlements embodied in the RSA.

6.      The Current Expense Claimants' arguments that their purported priority rights prohibit approval of the RSA are incorrect for the following reasons:

7.      First, the Current Expense Claimants are not prejudiced by the RSA.  The RSA does not impact the legal rights of creditors other than the Supporting Holders, their claims against PREPA, or their treatment under a Plan.  The commencement of certain pre-Plan payments to the Supporting Holders under the RSA also does not prejudice Current Expense Claimants' purported priority rights.  As unsecured claimholders in bankruptcy, the Current Expense Claimants are not entitled to any current payments from PREPA nor, by virtue of PROMESA section 305, can they

---

[4]   AAFAF does not join any arguments concerning the status or priority of pension claims or the rights of pension holders.  AAFAF expressly reserves all rights with respect to pension claims, including the right to object to the treatment of pensions in any future plan of adjustment.  AAFAF agrees with the Oversight Board that the issue is beyond the scope of the Rule 9019 Motion.

obtain an order of this Court directing what PREPA does with its property.  Even assuming
*arguendo* they have the priority rights they claim, and PREPA would violate those rights by paying
Bondholders first, that scenario—at most—only provides them an unsecured damage claim for
breach of a prepetition contract against PREPA, payable (and adjustable) on the effective date of
the Plan.

8.      Second, if the Current Expense Claimants are really senior as they contend, they
retain any right to turnover of funds from the Supporting Holders.  Seniority and subordination are
between two parties – the senior creditors and the junior creditors. No relief is being requested that
would alter the contractual seniority rights between them.  The RSA/Amended Proposed Order
does not alter these rights—rendering the Current Expense Claimants' arguments as to their
purported priority status irrelevant to the reasonableness inquiry.  Moreover, any arguments of the
Current Expense Claimants regarding settlements leaving insufficient monies are simply not
relevant to the Motion and have nothing to do with the standard for approval of settlements.  *See
In re Financial Oversight & Mgmt. Bd*, 360 F. Supp. 3d 65, 68 (D. P.R. 2019) (finding that
arguments concerning the Commonwealth's ability to repay its creditors was not relevant to
Commonwealth-COFINA 9019 motion and would be more appropriately addressed in context of
Commonwealth plan of adjustment).

9.      Third, beyond the absence of priority rights arising from the Trust Agreement (or
any other contract or statute), the lack of priority has already been recognized and adjudicated by
the Court of First Instance in Puerto Rico.  The Court of First Instance in Puerto Rico has ruled
that UTIER, as a purported holder of a "Current Expense" debt, has no rights under the Trust
Agreement.[5]  The court concluded Current Expense claimholders are "strangers" to the contract

---

[5]  *UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*, Case No. K-AC2016-0291 at 72 (Dec. 19,
2016) ("it cannot be concluded that the trust granted a right to the plaintiffs [that is, UTIER]" as purported holders of

and cannot attempt to enforce its provisions.  As a result, any claims to rights as a "Current Expense" under the Trust Agreement must be rejected.

10.     Fourth, the Current Expense Claimants' claims are not even Current Expenses.  The Fuel Line Lenders' claims do not fall within the Trust Agreement's definition of Current Expenses (which nowhere contemplates that financing/debt obligations are Current Expenses).[6]  Moreover, only Current Expenses that fall within PREPA's annual budgets are subject to Trust Agreement section 505, and neither the Fuel Line Lenders' claims nor the alleged pension underfunding claim are featured in the current certified budget for PREPA (nor any other budget since the PREPA petition date).  Finally, if the Fuel Line Lenders are right and PREPA has "complete control" to determine what is and is not a current expense and when to pay them (*see* Adv. Pro. 19-00396, ECF No. 1, the "FLL Complaint," ¶ 27), PREPA has now determined the Current Expense Claimants' claims are not Current Expenses and that PREPA will not pay them pursuant to Trust Agreement section 505.  Indeed, Current Expenses are the "reasonable and necessary current expenses of maintaining, repairing, and operating the System"—but these legacy debt obligations

---

Current Expense debts).  A certified translation of the Court of First Instance's decision in Case No. K-AC2016-0291 is attached hereto as **Exhibit A**.

[6]   The Trust Agreement defines Current Expenses as PREPA's:

> reasonable and necessary current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to Capital Expenditures, engineering expenses relating to operation and maintenance, fees and expenses of the Trustee, the 1947 Trustee, the Paying Agents and of the paying agents under the 1947 Indenture, legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by the Authority under the provisions of the 1947 Indenture, this Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of the Authority and applicable in the circumstances but shall not include any deposits to the credit of the Sinking Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund or the 1947 Sinking Fund or deposits under the provisions of Sections 511, 512 and 513 of the 1947 Indenture and the Subordinate Obligation Fund.

Trust Agreement § 101.

cannot possibly be *necessary* to PREPA because PREPA continues to operate without paying them.

11.     Finally, leaving aside the limited scope of the relief sought in the 9019 Motion, UTIER and the PREPA retirement system cannot claim the Motion impairs pension rights.  In fact, the RSA expressly preserves the Government Parties' rights to establish a transition charge to fund the unfunded accrued actuarial liability of PREPA's pension plans.  In other words, the RSA contemplates potential payments of those claims.  *See* RSA, Securitization Term Sheet, p. 11-12 (permitting PREPA to establish a separate transition charge to repay unfunded liability); *see also* Schedule I-B (Securitization Protections) at I.C.1.e.  The size of that charge depends on the treatment of PREPA's pension liabilities under a Plan, but there is nothing in the RSA or in the Amended Proposed Order that precludes a plan of adjustment from providing a charge sufficient to pay those pensions.

## BACKGROUND

12.     On May 3, 2019, the Oversight Board, PREPA, AAFAF, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and holders of certain of PREPA's uninsured bonds issued and outstanding pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented, between PREPA and U.S. Bank National Association, entered into a Definitive Restructuring Support Agreement (as amended or supplemented, the "RSA").

13.     On May 10, 2019, Movants filed the Rule 9019 Motion, seeking approval of the settlements embodied in the RSA.

14.     On July 2, 2019, as directed by the Court at the June 12, 2019 conference, Movants filed their First Supplemental Memorandum.

15.     At the July 11 Conference, following argument by the Current Expense Claimants relating to their purported priority rights under the Trust Agreement, the Court directed Movants to "supplement your supplemental proffer to address the fuel line and compensation priority arguments and tell me what the legal basis and factual basis is of the government parties' position that this requested set of approvals of the 9019 does not adversely affect legal rights that these people have."  July 11, 2019 Hr'g Tr. at 55:1-6.

16.     Movants submit this Second Supplemental Memorandum to comply with the Court's direction at the July 11 Conference.

## SUPPLEMENTAL ARGUMENT

### I.     THE RSA DOES NOT AFFECT OR PREJUDICE THIRD PARTY RIGHTS OR THEIR POTENTIAL RECOVERIES UNDER A PLAN

#### A.     The RSA Does Not Affect Third Party Rights

17.     As previously briefed in both the Rule 9019 Motion (at ¶ 52) and the Supplemental Memorandum (at ¶¶ 97-104), the RSA does not affect third parties because it only settles the claims of Supporting Holders, not any other bondholder or other creditor.  While the RSA provides an obligation by the Oversight Board to propose a Plan that will provide Supporting Holders with treatment consistent with the RSA, it does not dictate or provide for the treatment of any other claim.  Non-settling claimholders' rights to object to their treatment and the Supporting Holders' treatment under a future plan are fully preserved.  To that end, the Amended Proposed Order makes explicitly clear: "[w]hether the treatment the RSA provides for the claims of the Supporting Holders as allowed hereby is confirmable under a plan of adjustment is not determined by this Order…All confirmation objections of all parties in interest are preserved . . ." Amended Proposed Order ¶ 2.

18.    Certain prospective objectors' arguments that their rights will be affected are inaccurate.  Notably, at the July 11, 2019 Conference, the UCC argued that the deal gives "veto rights" over unsecured creditors' treatment in a future plan of adjustment.  July 11, 2019 Hr'g Tr. at 31:2-3.  This is wrong.  The RSA does <u>not</u> give the Supporting Holders veto rights over any Plan or over other creditors' treatments—it just limits how PREPA can alter the Supporting Holders' treatment.  *See* RSA § 1(b)(v) (giving Supporting Holders the right to approve plan terms affecting their treatment); Securitization Term Sheet at 14 (permitting creation of other charges to pay other legacy debt).  Unsecured claimholders have no right to a Transition Charge to secure their claim, nor do they have a "legal right" to do a deal with PREPA that involves a Transition Charge.  As a result, their rights are not affected.  Further, the Court is not being asked to approve this aspect of the RSA.[7]

19.    Similarly, the contention made by counsel for the Fuel Line Lenders at the July 11, 2019 Conference that the provision in the Amended Proposed Order regarding the Lien Challenge infringes on creditors' legal rights, July 11, 2019 Hr'g Tr. at 44:1-21, is also wrong.  The Fuel Line Lenders have filed the FLL Complaint, commencing an adversary proceeding against the Government Parties and the bond trustee which asserts, among other things, a challenge to the bondholders' security interest.  The Government Parties do not concede the Fuel Line Lenders had the legal right or standing to bring this action[8] and will, as needed, address those issues at the

---

[7]    Moreover, as noted above, the RSA expressly makes allowance for a separate transition charge to cover unfunded pension liabilities to the extent the Oversight Board provides for recoveries on these claims under a Plan.  It is therefore difficult to discern exactly what UTIER and the PREPA retirement system are opposing.  Additionally, the RSA expressly provides that other transition charges are allowed to service other legacy obligations.  *See* Securitization Term Sheet at 14.

[8]    *See, e.g., Renco Grp., Inc. v. Wilmington Tr., N. A. (In re Magnesium Corp. of Am.)*, 583 B.R. 637, 653 (Bankr. S.D.N.Y. 2018) ("the right of one creditor to object to another creditor's claim is not absolute and is subject to judicial limitation . . . Policy considerations, including the necessity for an orderly and expeditious administration of the estate, have led the majority of courts that have addressed the issue to conclude that as a general rule, absent leave of court, the chapter 7 trustee alone may interpose objections to individual proofs of claim.") (internal cites and quotations omitted); *In re Charter Co.*, 68 B.R. 225, 227 (Bankr. M.D. Fla. 1986) ("Most courts, however, have

appropriate time.  The Government Parties, which include the Oversight Board as PREPA's representative in its Title III case, are seeking authority to settle the asserted secured claims of the Supporting Holders, which would resolve the lien challenge filed by the Fuel Line Lenders.  Given the pending 9019 Motion, the Fuel Line Lenders' right to challenge the security interests held by the bond trustee are, first, to oppose the settlements embodied in the RSA as not satisfying the standards for approval of settlements, and, if successful, pursuing whatever rights they retain to pursue their own claim or lien objections (subject to the Oversight Board's own rights with respect to any such challenge). *See RWNIH-DL 122nd St. 1 LLC v. Futterman (In re Futterman)*, 2019 Bankr. LEXIS 1872 at *13-14 (Bankr. S.D.N.Y. Jun. 20, 2019) (rights of a claimant objecting to another's claim that the trustee seeks to settle are limited to the rights that a party in interest has to object to the settlement).

### B. The RSA Does Not Have Any Impact on the Current Expense Claimants' or Other Unsecured Claimholders' Recoveries Under a Plan

20.    The RSA does not impact other creditors' legal rights, or their claims against PREPA, or dictate how they will be treated in a Plan.  If the Current Expense Claimants are successful at Plan confirmation in arguing they are entitled to payment in full before Bondholders recover, then PREPA will have to propose a Plan that treats them in accordance with their rights or the Court will not confirm the Plan.  If a Plan cannot be confirmed after two attempts, the

---

limited the right of a general creditor to object to the claim of another creditor in certain instances in order to promote a more orderly administration of the estate, *i.e.*, in cases where a trustee has been appointed to represent the interests of all general creditors."); *Schreibman v. Walter E. Heller & Co.*, 446 F. Supp. 141, 144 (D.P.R. 1978) ("It is a well settled rule that creditors cannot object to the claims of other creditors in straight bankruptcy proceedings . . . This is so because in such proceedings it is the duty of the trustee to represent all the creditors and object the allowance of such claims as may be improper."); *In re Dow Corning Corp.*, 244 B.R. 721, 751 (Bankr. E.D. Mich. 1999), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd*, 280 F.3d 648 (6th Cir. 2002) ("most courts . . . hold that where a trustee is charged with administering a bankruptcy estate, a creditor can object to the claim of another creditor only if, upon demand, the trustee refuses to do so and the court grants the creditor the right to act on behalf of the trustee . . . the result is, of course, the same in a chapter 11 case where the debtor fills the role of trustee.").

Government Parties' can terminate the RSA.  Under that circumstance, all components of the RSA fall away—including the allowance of claims, all accrued and unpaid Administrative Claims, and all entitlements to any Interim Payments—except for a Surviving Administrative Claim comprising of Administrative Expenses accrued up to the first attempt to confirm a Plan.[9]  The interim cash payments made to Supporting Holders will reduce the administrative claims accrued, and the RSA Parties reserve all rights regarding whether Settlements Payments made to date will be credited towards treatment under a subsequent plan or deemed made on account of post-petition interest.  Given that RSA termination will "reset" Supporting Holders' claims and rights and will offset their claims by payments already made, no party can seriously contend the interim payments will leave PREPA with too little value to confirm a Plan.  As a result, no third party's legal rights will be affected by the Court granting the Rule 9019 Motion.[10]  Accordingly, the issue of creditors' legal rights or the feasibility of any Plan are red herrings and are not properly before the Court as part of the Rule 9019 Motion.

21.     For the same reasons, the existence of the "most favored nation" clause in the RSA (§ 23, the "MFN Clause") does not affect third parties.  The MFN Clause does not foreclose the Oversight Board from reaching a deal with other creditors.  The MFN Clause merely gives the Supporting Holders a right to receive as favorable treatment as other claimholders—it does not take away any other claimholders' rights.  If other claimholders show at confirmation they are

---

[9] In this scenario, the Surviving Administrative Claim serves as a break-up fee: it compensates the Supporting Holders for cooperating with the Government Parties during the pendency of the Title III Case, for not asserting their rights during the case, and for assuming the risk that the RSA treatment is ultimately not confirmed under a Plan.  .  See Supplemental Memorandum at [_].

[10] Nonetheless, to provide 100% recovery to the Fuel Line Lenders in the same manner as the Bondholders it would only involve increasing the Transition Charge by 0.43 c/kWh.  *See* **Exhibit B** (calculation of cost of Fuel Line Lenders' claims).  However, the question of how much it would cost to pay other creditors is irrelevant in the context of this Rule 9019 Motion, as this Court has held once before.  *See In re Financial Oversight & Mgmt. Bd*, 360 F. Supp. 3d 65, 68 (D. P.R. 2019) (finding that arguments concerning the Commonwealth's ability to repay its creditors was not relevant to Commonwealth-COFINA 9019 motion and would be more appropriately addressed in context of Commonwealth plan of adjustment).

entitled to priority and payment in full before Bondholders, then the Oversight Board will either have to (i) give them legally appropriate treatment *and* honor the MFN Clause, or (ii) if that is not feasible and such a Plan cannot be confirmed, (A) amend the RSA, or (B) if (A) is not feasible terminate the RSA (for failure to confirm a plan). Either way, the approval of the RSA does not affect third party rights and inquiry into these issues is beyond the narrow reasonableness inquiry applicable to the Rule 9019 Motion.

### C. Unsecured Claimholders Such as Current Expense Claimants are Not Prejudiced by the Payment of Settlement Payments to Bondholders Under the RSA

22.     Even if the Current Expense Claimants have priority rights over the Bondholders (they do not, as discussed below), they will not be prejudiced by the commencement of Settlement Payments under the RSA:

23.     First, the Current Expense Claimants are not prejudiced by the RSA as they have no right to payment during PREPA's Title III case and payments can be made to the Supporting Holders even without Court approval. The Current Expense Claimants are <u>unsecured</u> claimholders—they have no right to present payment on their claims during bankruptcy. *See, e.g., In re Ideal Mortg. Bankers, Ltd.*, 539 B.R. 409, 442 (Bankr. E.D.N.Y. 2015) ("as a holder of a general unsecured claim against the estate, Global is not entitled to the immediate payment of its claim from estate assets"); *In re National Bickford Foremost, Inc.*, 116 B.R. 351, 352-53 (Bankr. D.R.I. 1990) (denying general unsecured claimholders' request for immediate payment on its claim). This is true regardless of whether PREPA elects to pay other creditors during the bankruptcy case or not. Moreover, the combination of the absence of Bankruptcy Code section 363 and the applicability of PROMESA section 305 authorize the debtor to use its property as it sees fit without the need for court approval due to the inapplicability of section 363 and without the Court being authorized to interfere with the use of its property due to section 305. The reason

PREPA is requesting an order approving and directing the pre-confirmation payments to the Supporting Holders is the Supporting Holders will agree to cap the allowance of their claims at reduced amounts and to vote for a plan of adjustment treating their claims in reduced amounts if the Court approves and directs the payments.  As a result, the Current Expense Claimants have neither: (i) a right to demand payment on their unsecured claims nor (ii) a right to interfere with PREPA's use of its property to make payments to Bondholders, and they are therefore not prejudiced by PREPA making Settlement Payments to other creditors under the RSA.[11] Importantly, the Current Expense Claimants are not entitled to adequate protection payments and even if PREPA promised to pay their debt before the Bondholders their only remedy as an unsecured claimholder is a prepetition claim for a breach of contract.  As explained above, if the Current Expense Claimants really had seniority rights, they would have rights against the Supporting Holders for turnover of any prior payments they receive, but they do not have an agreement granting them seniority rights.

24.     Second, in *UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*, Case No. K-AC2016-0291 at 72-73 (Dec. 19, 2016) (a certified translation of which is attached hereto as **Exhibit [A]**), UTIER argued that Act 4-2016[12] violated its (supposed) contractual rights to be paid as a Current Expense before Bondholders because it contemplated the creation of a

---

[11] Indeed, the First Circuit Bankruptcy Appellate Panel has held that unsecured claimholders have no right to complain of the debtor taking actions potentially materially reducing the recovery unsecured creditors, because they have no "right in specific property of the obligor." *See In re Garland Corp.*, 6 B.R. 456, 462-63 (B.A.P. 1st Cir. 1980) (holding that creditors' committee had no right to complain of actions harming the recovery of unsecured creditors as "there are no constitutional constraints inhibiting Congress in the exercise of its bankruptcy power from extinguishing the recovery rights of holders of unsecured claims, because an unsecured claim confers no right in specific property of the obligor . . . Any impairment of the recoupment anticipated by holders of unsecured claims from unencumbered assets of the estate is dependent for its redress upon congressional rather than constitutional prescription").

[12] Act 4-2016, the *Act for the Revitalization of the Electric Power Authority*, was enacted to facilitate the restructuring transactions envisioned in the restructuring support agreement originally entered into on November 5, 2015 by and between PREPA and various Bondholders.  On June 27, 2017, the Oversight Board declined to approve this restructuring support agreement, as amended.

transition charge that would go solely to pay legacy bond debt.  After holding that the Trust

Agreement did not create a priority scheme and that UTIER was not a third party beneficiary to

the Trust Agreement (as discussed below), the Court of First Instance also held UTIER had no

right to dispute the creation of a new, separate charge to pay bondholders that was separate from

PREPA's other revenues:

> With Act 4-2016's approval, the restructuring bonds that would
> substitute the bonds issued under the 1974 Trust would be paid with
> income from a transition charge imposed by PREPARC, an
> independent corporation, through the Restructuring Resolution. As
> discussed, Act 4 expressly provides that the income that will be used
> to pay the bonds will not come from PREPA income or from the
> general fund. This allows us to conclude that Act 4 is not in conflict
> with PREPA's obligations in the 1974 Trust [Agreement] . . . .

*Id.* at 72-73.  The rationale applies with equal force here.

25.     Third, the Current Expense Claimants are not prejudiced by the RSA because they

will retain any rights they have to recover from the Bondholders for violations of their alleged

priority rights.  If the Current Expense Claimants actually possess priority rights against the

Bondholders, then to the extent the Supporting Holders' receipt of Settlement Payments before the

Current Expense Claimants violates their (purported) priority, they will retain any right they have

against the Supporting Holders for turnover of the payments to the extent that there is an

enforceable turnover provision here.[13]  Nothing in the RSA or the Amended Proposed Order

releases any Bondholders from such liability.

26.     As a result, there is no scenario where Current Expense Claimants have a valid

concern relating to their purported priority rights due to the RSA.  Either (i) they have no such

rights, in which case the RSA does not harm them, or (ii) they have priority rights to be paid before

---

[13] *See, e.g., PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889 (7th Cir. 2004) (senior lender could sue junior lender
for turnover where debtor paid money to junior lender in derogation of subordination agreement).

the Bondholders, in which case they are not being barred from seeking turnover of the Settlement

Payments and any other RSA recoveries from the Supporting Holders.  Thus, the entire issue of

the Current Expense Claimants' priority rights is a red herring in the context of the 9019 Motion,

and simply part of a larger effort to leverage the existence of the Rule 9019 Motion for their own

benefit.[14]

27.     Additionally, because the pre-confirmation payments at issue can be made

independently of the PREPA RSA, the Current Expense Claimants' cannot identify any harm to

them from the granting of the narrowed relief being requested. As unsecured claimholders, the

rights of the UCC and the Current Expense Claimants to object to claims are not unlimited.

Claimants must look first to the estate representative (here, the Oversight Board) to administer the

estate, prosecute claims objections, and settle claims.  *See, e.g., In re Medomak Canning*, 922 F.2d

895, 902 (1st Cir. 1990) ("As unsecured creditors, appellants could not in these circumstances

evade the responsibility of looking to the Trustee in the first instance as their fiduciary and

representative to vindicate their interests, including even their interest in pursuing equitable

subordination beyond the hope of receiving a pro rata distribution of the estate along with other

general unsecured creditors").[15]

---

[14]  Notably also, on July 9, 2019, certain Fuel Line Lenders filed a complaint objecting to the Bondholders' claims and raising their purported priority rights under the Trust Agreement.  *See* Case No. 19-AP-396, ECF No. 1.  The FLL Complaint seeks the disallowance of the claims of all PREPA Bondholders to the extent they assert rights in anything other than the Sinking Fund.

[15]  *See also In re Charter Co.*, 68 B.R. 225, 227 (Bankr. M.D. Fla. 1986) ("Most courts, however, have limited the right of a general creditor to object to the claim of another creditor in certain instances in order to promote a more orderly administration of the estate, *i.e.*, in cases where a trustee has been appointed to represent the interests of all general creditors."); *Schreibman v. Walter E. Heller & Co.*, 446 F. Supp. 141, 144 (D.P.R. 1978) ("It is a well settled rule that creditors cannot object to the claims of other creditors in straight bankruptcy proceedings . . . This is so because in such proceedings it is the duty of the trustee to represent all the creditors and object the allowance of such claims as may be improper."); *In re Dow Corning Corp.*, 244 B.R. 721, 751 (Bankr. E.D. Mich. 1999), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd*, 280 F.3d 648 (6th Cir. 2002) ("most courts . . . hold that where a trustee is charged with administering a bankruptcy estate, a creditor can object to the claim of another creditor only if, upon demand, the trustee refuses to do so and the court grants the creditor the right to act on behalf of the trustee . . . the result is, of course, the same in a chapter 11 case where the debtor fills the role of trustee.").

28.     We recognize that the Current Expense Claimants oppose the proposed settlement made by the Oversight Board because they do not know how they will be treated.  That, however, is an inadequate reason to deprive PREPA of locking in a beneficial deal where it can convert all its secured debt into new debt not having rate-hike covenants or receivership remedies.  This is especially true where the Current Expense Claimants' rights are preserved.

29.     For the reasons explained above, however, the legal rights of the Current Expense Claimants are not being prejudiced even if they have seniority rights, although, as explained below, their seniority claims are bogus.

## II.   THE CURRENT EXPENSE CLAIMANTS HAVE NO ENFORCEABLE PRIORITY RIGHTS

### A.     The Current Expense Claimants are Not Third Party Beneficiaries of the Trust Agreement, Have No Rights Under It, and Cannot Enforce It.

30.     <u>The Current Expense Claimants are not third party beneficiaries entitled to enforce the Trust Agreement</u>.  Under Puerto Rico law, contracts are generally only valid between the parties that execute them.[16]  The Puerto Rico Supreme Court has made clear that a third-party can seek to enforce a contract under Puerto Rico law *only* if the parties that executed the agreement intended to grant that third party the direct right to seek the performance of the promises made in the agreement.  *Bco. Central Corp. v. Yauco Homes, Inc.*, 135 D.P.R. 858, 863-64 (P.R. 1994).  It is not enough that the contracting parties considered the interest of a third party and granted the third party some direct or indirect economic benefit.  *Id*. at 864; *see also Real Legacy Assurance Co. v. Santori Trucking*, 2008 WL 11357822, at *3 (D. P.R. July 29, 2008) ("party outside of the

---

[16] *See* 31 L.P.R.A. § 3374 ("Contracts shall only be valid between the parties who execute them and their heirs, except, with regard to the latter, the case in which the rights and obligations arising from the contract are not transmissible, either by their nature, or by agreement, or by provision of law.").

contractual relationship may demand performance of a contract **only if the contract contains a stipulation in its favor**.") (emphasis added).

31.     To avoid overlooking the obvious, one reason the Current Expense Claimants cannot enforce the Trust Agreement is that PREPA and the bondholders' trustee can amend it at will.   Moreover, it would be completely distortive to take PREPA's ability under the Trust Agreement to pay Current Expenses, subject to a covenant in favor of bondholders to pay only necessary operating expenses in accordance with its annual budgets, and to transform it into a mandatory weapon usable against bondholders by Current Expense Claimants.

32.     Trust Agreement section 1304 makes clear that the Trust Agreement does not give "any right, remedy or claim, legal or equitable" to any entity except the parties to the Trust Agreement, "[e]xcept as herein otherwise expressly provided."  Trust Agreement § 1304.[17]  The Current Expense Claimants are not parties to the Trust Agreement, and no provision of the Trust Agreement purports to give them "any right, remedy or claim" to enforce the Trust Agreement. The provisions governing the flow of PREPA's funds are no exception: they do not anywhere name the Current Expense Claimants or grant them any right against PREPA.  As a result, the Current Expense Claimants' assertion of priority based on the Trust Agreement must be dismissed because they are not third party beneficiaries and cannot rely on its terms. *See, e.g., Oppenheimerfunds Inc. v. TD Bank, N.A.*, 2014 NY Slip. Op. 30379(U) (Sup. Ct. N.Y. County Feb. 10, 2014) (party cannot enforce subordination/intercreditor agreement "unless the party has

---

[17]  Section 1304 provides in full:

Except as herein otherwise expressly provided, nothing in this Agreement expressed or implied is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto and the holders of the bonds issued under the provisions of this Agreement any right, remedy or claim, legal or equitable, under or by reason of this Agreement or any provisions hereof, this Agreement and all its provisions being intended to be and being for the sole and exclusive benefit of the parties hereto and the holders from time to time of the bonds issued hereunder.

Trust Agreement § 1304.

contractual privity or is a third party beneficiary of the agreement."); *CFIP Master Fund Ltd v. Citibank NA*, 738 F. Supp. 2d 450, 478-79 (S.D.N.Y. 2010) (party could not enforce swap confirmation that provided there would be no third party beneficiaries because there  was "no reason to disregard these clear provisions simply because many other agreements formed part of this single transaction.").[18]

33.     Significantly, the Puerto Rico Court of First Instance has already dismissed UTIER's claim to be a third party beneficiary of the Trust Agreement with priority rights.  In *UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*, Case No. K-AC2016-0291 at 7-73 (Dec. 19, 2016), UTIER claimed (among other things) that the *Act for the Revitalization of the Electric Power Authority*, Act No. 4-2016, violated the Contracts Clauses of the United States and Puerto Rico Constitutions because it allowed for the creation of a "Transition Charge" that would be used to pay Bondholders without requiring PREPA to fully fund its retirement system. UTIER claimed the retirement system had priority over the Bondholders as a Current Expense under the Trust Agreement, and that UTIER could enforce PREPA's obligation to pay this Current Expense before paying Bondholders.  *Id.* at 69.  The Court of First Instance disagreed: it rejected UTIER's claim to enforce the Trust Agreement as a Current Expense debtholder, holding "it cannot be concluded that the [Trust Agreement] granted a right to the plaintiffs [that is, UTIER]." *Id.* at 72.

---

[18] *See also, e.g., Kobak v. Nat'l City Bank (In re Kobak)*, 280 B.R. 164, 170 (Bankr. N.D. Ohio 2002) ("Fifth Third was not a party to the subordination agreement and therefore its position should not be impaired or enhanced by that agreement."); *Three River Bank of Mont. v. North End Timber Prods. LLC (In re North End Timber Prods. LLC)*, 2007 Bankr. LEXIS 5113 *25 (Bankr. D. Mont. Dec. 17, 2007) ("JNI's security interest can be neither impaired nor enhanced as it was not a party to the subordination agreement between TRB and JBC."); *Schuyler-Brown FS, Inc. v. Batterton (In re Batterton)*, 2001 Bankr. LEXIS 2380 *9 (Bankr. C.D. Ill. 2001) ("This Court is of the opinion that the better policy is to permit the second lienholder neither to suffer a detriment nor receive a benefit from a subordination agreement to which it is not a party."); *Duraflex Sales & Serv. Corp. v. Mechanical*, 110 F.3d 927, 935 (2d Cir. 1997) (not allowing lienholder to leapfrog priority based on subordination agreement); *In re Cliff's Ridge Skiing Corp.*, 123 B.R. 753, 767 (Bankr. W.D. Mich. 1991) ("Cliff's Ridge Dev.'s interest and its original priority position will not be adversely or beneficially affected by the other parties' subordination agreement.").

34.     This holding in *UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*—that UTIER lacked any rights under the Trust Agreement as a purported Current Expense—is not only controlling, it collaterally estops UTIER from attempting to relitigate the exact same issue in this Court.  *See, e.g., Amatucci v. N.H. Supreme Court*, 2014 U.S. Dist. LEXIS 61508 at *1-2 (D.N.H. May 2, 2014) ("Those claims were dismissed with prejudice, for failure to state a viable cause of action. Ms. Amatucci cannot relitigate them in a new proceeding, as they are now barred.").  UTIER is therefore barred from asserting it has priority rights as a Current Expense under the Trust Agreement.

35.     Moreover, the Fuel Line Lenders' claims to priority are substantively identical to UTIER's claims in *UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*—the Court of First Instance's decision that a purported Current Expense claimholder does not have rights under the Trust Agreement is directly on point as against the Fuel Line Lenders' claims and should be followed here to dispose of their arguments.

**B.     The Trust Agreement Does Not Create a Payment Priority in Favor of Current Expenses**

36.     The Current Expense Claimants' assertion of seniority must also be rejected because the Trust Agreement does not create a payment priority system in favor of Current Expense claimholders.  The Trust Agreement does not constitute a subordination agreement creating a payment priority system—it merely gives PREPA the ability to pay Current Expenses, subject to annual budgets, before transferring any funds to service bond debt.  Even if the Current Expense Claimants have promises from *PREPA* of being paid first by *PREPA* (and the Trust Agreement provides no such promise), they do not have an agreement from the *Bondholders* subordinating the Bondholders' rights.  That does not constitute a subordination agreement under section 510(a)—which is an agreement *between creditors*—but rather (to the extent it creates a

payment priority scheme at all) an unenforceable promise from a debtor to reorder PROMESA's priority scheme.

37.     As a preliminary matter, the Trust Agreement does not constitute a promise to pay Current Expense claimholders before Bondholders.  The Trust Agreement does not contain a pledge by PREPA to pay Current Expense claimholders before other debt.  The only relevant provision pointed to by the Fuel Line Lenders (*see* Complaint ¶ 33)—section 505—nowhere states that holders of Current Expense debt are entitled to demand payment before other parties, and, indeed, the Trust Agreement expressly states that "[a]ll moneys received by [PREPA] under the provisions of this Agreement . . . shall not be subject to lien or attachment by any creditor" other than the Bondholders and that no other parties shall be entitled to enforce the Trust Agreement.  Trust Agreement §§ 601, 1304.  Read as a whole, it is clear that the Trust Agreement's flow of funds provision (§ 505) is not a promise by PREPA to pay entities such as UTIER before Bondholders—it merely gives PREPA the ability to use its Revenues to pay for necessary operating expenses before transferring funds to other PREPA accounts.[19]  Even if the Trust Agreement is read as binding PREPA, it is simply a covenant by PREPA in favor of the bondholders to pay necessary expenses of maintaining and operating the utility as set forth in

---

[19]  Trust Agreement section 505 provides:

> The Authority covenants that moneys in the General Fund will be used first for the payment of the Current Expenses of the System, that such expenses will not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner, and that the total amount of Current Expenses in any fiscal year will not exceed the amount provided therefor in the Annual Budget for such fiscal year or any amendment thereof or supplement thereto unless such expenses shall be required by conditions beyond the control of the Authority happening during such fiscal year and which could not reasonably have been contemplated at the time of the adoption of the Annual Budget. If at any time the total amount theretofore expended during any fiscal year for Current Expenses shall exceed the total amount provided in the Annual Budget for Current Expenses for such fiscal year, the Authority covenants that it will report in writing the amount of such excess and the reason or reasons therefor to the Consulting Engineers and to the Trustee as soon as practicable but not later than the last day of the sixth month following the month in which such excess shall have occurred.

Trust Agreement § 505 (emphasis added).

budgets prepared by PREPA, and not to exceed those budgets without explaining why to the bondholders.  At bottom, the "waterfall" set forth in Section 505 is not enforceable by non-parties to the Trust Agreement.

38.     This was the view of the Trust Agreement adopted by the Puerto Rico Court of First Instance in UTIER, which already ruled that the Trust Agreement does not grant Current Expense claimholders an enforceable right to priority of payment from PREPA.  There, UTIER claimed that PREPA had an enforceable obligation to pay its retirement system as a Current Expense before it paid bondholders, and that UTIER could enforce this obligation.  The Court of First Instance rejected both arguments, holding that the Trust Agreement does not create any enforceable priority scheme:

> Then, contrary to what the plaintiffs argue, **the purpose of the [Trust Agreement] was not to establish a priority for payment of PREPA's possible debts with respect to current expenses**, but to establish that PREPA's obligations would be paid with the income deposited in the general fund and inform bondholders of such fact . . . **We understand that Section 505 of the trust agreement does not contemplate a priority in favor of the plaintiffs in the payment of the debts that PREPA may have with the retirement system. Nor does it provide a specific remedy to demand performance of the obligations agreed to by PREPA**, such as payment of its current expenses, in particular the contributions to its employees'' retirement plans. Therefore, it cannot be concluded that the trust granted a right to the plaintiffs.

*Id.* at 70-72 (emphasis added).

39.     The decision in *UTIER* is in line with other jurisprudence that holds a claim to priority cannot be made based solely on a defined term.  Specifically, in *Marathon Asset Management v. Wilmington Trust N.A. (In re Energy Future Holdings Corp.)*, 748 Fed. Appx. 455 (3d Cir. 2018), the Third Circuit addressed deposit letter of credit lenders' claims to priority under an intercreditor agreement that rested on a single defined term ("Obligations") in the intercreditor

agreement.  The Third Circuit declined to create structural priorities based solely on a defined term, stating "if these highly sophisticated parties had intended" the priority the letter of credit lenders claimed, then the parties "would have specifically said so in these operative provisions." *Id.* at 463.

40.     Even though the *UTIER* decision is entirely dispositive on the issue of Current Expense Claimants' lack of priority rights, the Current Expense Claimants have lodged their objections to the Rule 9019 Motion as if such decision did not exist.  The consequence of the *UTIER* decision is that under Puerto Rico law, which is the applicable nonbankruptcy law under the Trust Agreement (§ 1301), Current Expense Claimants do not have any rights, including priority rights, arising from the Trust Agreement.  Bankruptcy jurisprudence commands the same result.  Under Bankruptcy Code section 510(a) "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  As a result, Current Expense Claimants have the same priority rights in the Title III Case that they have outside of Title III: none whatsoever.  In fact, Bankruptcy Code section 510(a), made applicable by PROMESA § 301(a),  makes clear the *UTIER* decision, which held the Trust Agreement is not an enforceable subordination agreement under Puerto Rico law, cannot be enforceable in PREPA's title III case.  Even if it were an enforceable subordination agreement the Current Expense Claimants do not have standing to bring such actions as they are not a party to the Trust Agreement. *See, e.g., In re Chicago, S. S. & S. B. Railroad*, 146 B.R. 421, 427-28 (Bankr. N.D. Ill. 1992) ("While a bankruptcy court must enforce a subordination agreement enforceable under state law, it cannot be enforced by a trustee who has no interest in the agreement . . . Likewise in this case, the Trustee was not a party to the Subordination Agreement. It was a contract entered into solely between the Lenders and PB&T. Therefore, the Trustee has no standing pursuant to the

23

Bankruptcy Code to enforce the Subordination Agreement."); *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery L.P.)*, 171 F.3d 249, 257 (5th Cir. 1999) (holding section 510(a) "gave neither the debtor nor its Trustee standing to enforce [a subordination agreement's] terms because they were not a party to the agreement."); *Thomas v. Citimortgage, Inc. (In re Thomas)*, 459 B.R. 708, 711 (Bankr. E.D. Mich. 2011) ("With respect to the subordination agreement, Thomas was not a party to the agreement and does not have standing to challenge its validity.").

41.    <u>Even if the Trust Agreement did create a priority of payment in favor of Current Expense claimholders, it comprises of an unenforceable promise from PREPA to pay certain creditors before others, not an enforceable subordination agreement *between creditors* under Bankruptcy Code section 510(a)</u>.  The jurisprudence is clear that a subordination agreement enforceable under Bankruptcy Code section 510(a) is an agreement *between creditors* where one creditor agrees to subordinate its claim to another creditor.  *See, e.g., In re Best Prods. Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) ("A contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another."); *In re Howland*, 545 B.R. 653, 659 (Bankr. D. Or. 2015) (same); *In re Holly's, Inc.*, 140 B.R. 643, 668 (Bankr. W.D. Mich. 1992) ("A subordination agreement is simply a contract in which a creditor (the 'subordinated' or 'junior' creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by; the subordinated creditor.").  Subordination agreements are interpreted narrowly with a preference toward applying the Bankruptcy Code's priority provisions. *See, e.g., In re Boston Generating LLC*, 440 B.R. 302, 319 (Bankr. S.D.N.Y. 2010) (for a subordination agreement to be enforced it must be "clear beyond peradventure").

42.     The Trust Agreement does not fall within this definition.   It simply is not an agreement between creditors "whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another."   *In re Best Prods. Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994). The Bondholders nowhere promise to subordinate their claims to the claims of UTIER or the Fuel Line Lenders.   Indeed, the Fuel Line Lenders and UTIER are not even parties to the Trust Agreement.   At best, all the Trust Agreement amounts to is a contract between *the debtor* and one set of creditors (the Bondholders) whereby the debtor promises to pay certain other non-parties before it pays the Bondholders.   That is not a subordination agreement, nor enforceable in bankruptcy.

43.     If the Fuel Line Lenders only had PREPA's promise to pay them, no one would argue they have anything other than an unsecured claim.   Here, the Fuel Line Lenders point out they have PREPA's promise to pay them and PREPA's promise that it will pay them before paying other Bondholders.   Even if they are right, these are just unsecured, prepetition promises.   If a promise to pay someone first were enforceable in bankruptcy, then every debtor could create its own priority scheme.   That would undo the priorities imposed by the Bankruptcy Code and PROMESA Title III.[20]

44.     The case of *In re Holly's, Inc.*, 140 B.R. 643 (Bankr. W.D. Mich. 1992) is instructive.   In that case, the debtor entered into a contract with a creditor purporting to create an order of priority for the payment of "Gross Revenues" in certain situations (referred to by the court as the "partnership's negative promise"), similar to the Trust Agreement's.   The partnership's negative promise placed the creditor's claim 4th on the priority list, below several other items.[21]

---

[20] Notably, even priorities under state law are not enforceable under bankruptcy. *See* 4-507 COLLIER ON BANKRUPTCY ¶ 507.02 (16th ed. 2017) ("To the extent that a state statute purports to establish the priority of a claim over other claims, that statute is preempted by the Code and of no effect in the bankruptcy case.").

[21] The relevant clause (*viz.*, the "negative promise") read:

A different creditor and third party beneficiary to this contract, whose claim fell higher up on the priority list of the partnership's negative promise, sought to enforce the provision as a subordination agreement under Bankruptcy Code section 510(a).  The bankruptcy court refused to enforce the contract, in part because it would subvert the Bankruptcy Code's priority provisions. Notably, the court stated:

> The Partnership's negative promise is not a subordination agreement. The promise not to pay Holly's until other contractually higher priority creditors are first paid does not meet the definition of a subordination agreement quoted above . . . It does not create a common debtor—senior creditor—junior creditor relationship. This clause is nothing more than a negative covenant by the Partnership not to pay Holly's fee until other creditors are first paid . . .

> If the negative promise [to pay the moving creditor first] was enforced it would conflict with the Bankruptcy Code's equality of distribution principle which has been recognized by the Supreme Court for over one hundred years . . . If a court cannot judicially create priorities or subclasses of creditors within distribution classes mandated by Congress, *a fortiori*, the Partnership's [*i.e.* the debtor's] negative promise in the Management Agreement cannot do so.

*Id.* at 675.

45.    Just as in *In re Holly's, Inc.*, if the Trust Agreement is construed to grant the Fuel Line Lenders' or UTIER a priority, the Court cannot enforce it as it would subvert Title III's priority scheme.  The Trust Agreement is not a subordination agreement, just (at best) an unsecured

---

[The partnership] shall distribute the Gross Revenues of the Facility, to the extent funds are available in the Operating Accounts, for the payment of the following in accordance with the following priorities:

A. All costs of sales and operating expenses (excluding Management Fees including debt service) deducted from Gross Revenue to determine Total Income Before Fixed Charges.

B. Rent, property taxes, and fire and extended coverage insurance.

C. Actual expenditures made for Capital Improvements and for acquisition and replacement of furniture, fixtures and equipment.

D. The Management Fee due [the creditor] under this Agreement.

*Id.* at 666.

promise (unenforceable in bankruptcy) from PREPA to pay Current Expenses before the bondholders.

46.     The Trust Agreement further lacks customary subordination provisions found in a subordination agreement.  Agreements subordinating debt usually contain clear language in which the subordinated debtholders agree to their subordination and agree when they can no longer be paid.[22] These subordination agreements normally provide rules for what happens on default.  They differ.[23]  Some allow subordinated debt to receive securities before senior debt is paid in full in cash.  Some don't.  And, the indentures normally allow the senior debt to vote the junior debt's claims. But here the Trust Agreement, aside from not being signed by the alleged senior and junior creditors, provides no such rules.

47.     Moreover, in a typical subordination agreement, debt subordination is effectuated through a turnover provision, which will provide that if the subordinate creditor receives payments following an event of default, that subordinate creditor is required to turn over such monies or property to the senior creditor until the senior obligations have been fully repaid.  *See, e.g.,* 1 COMMERCIAL FINANCE GUIDE (Leichtling et al., 2019) § 15.03[1][e]; *Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force*, The Business Lawyer, Vol. 65, No. 3, 2010, pp. 809–883. JSTOR, www.jstor.org/stable/40688601, Model ICA § 4.3; *see also In re La*

---

[22] A debt subordination provision often will expressly provide that a subordinated creditor's right to payment "will be subordinate to the rights of another payment," and if "complete," will provide that upon an event of default the subordinated creditor is barred from receiving payments until the superior debt is paid in full.  *See* Model ICA § 4.1; *In re Lantana Motel*, 124 B.R. 252, 255-56 (Bankr. S.D. Ohio 1990); *In re Amret, Inc.*, 174 B.R. 315, 318-19 (M.D. Ala. 1994).

[23] *See, e.g.,* 1 COMMERCIAL FINANCE GUIDE § 15.03[2] (noting subordination agreements will usually (among other things): prohibit prepayment of subordinated debt; provide that the maturity debt for subordinated debt is later than the senior debt; provide for various cross-default provisions; provide rules on amendments to senior and subordinated debt documents; provide for rules on the insertion of legends on notes; and provide rules on refinancings and assignments.).

*Paloma Generating Company*, 595 B.R. 466, 471 (Bankr. D. Del. 2018) (debt subordination agreement contained turnover provision).

48.     Here, the Fuel Line Lenders simply do not have subordination rights and the Bondholders do not have those obligations.  The absence of such rights makes clear the Trust Agreement was not intended to be (and is not) a subordination agreement.  Even if the fuel line claims have some type of seniority, the terms of the seniority are nonexistent, which by itself suggests no seniority was created.  And, indeed, any seniority could be taken away at any time by PREPA and a majority of Bondholders, the only parties that are required to consent to any amendment to the Trust Agreement.  *See* Trust Agreement § 1102.  The Current Expense Claimants invite the Court to interpret the Trust Agreement to require PREPA pay their claims before the Bondholders, but the Trust Agreement requires no such thing, nor does it provide any other rules for what happens on default.  The Bondholders nowhere subordinate their claims to the Fuel Line Lenders' claims.[24]

49.     The contrast between sections 505 and 516 of the Trust Agreement further underscores this point.  Section 516 contemplates the incurrence of subordinated debt.  However, in order to incur such debt, the Trust Agreement explicitly states that any resolution or indenture would be required to contain a broad array of subordination provisions, including, agreements not to be paid anything in a bankruptcy case unless and until all principal and interest on the Bonds are paid.  *See* Trust Agreement § 516(c).  No such language appears in section 505 of the Trust Agreement, including no language that the Bondholders would subordinate their claims to all

---

[24] The Fuel Line Lenders' references to contracts with PREPA and official statements issued by PREPA stating they are Current Expenses entitled to priority miss the point.  Only the Bondholders can enter into a contract subordinating their claims to the Fuel Line Lenders' or UTIER's—PREPA cannot.  No document to which the Bondholders are parties does that, sinking the Fuel Line Lenders' claims.

principal and interest on the Fuel Lines, which are mentioned nowhere within the Trust Agreement. Section 505 merely permits PREPA to pay certain of its Current Expenses.

50.    The Fuel Line Lenders' contracts with PREPA do not assist them either.[25]  First, they are not signed by the purportedly junior creditors, the bondholders.  Second, the Fuel Line Facilities do not anywhere provide they are entitled to priority of payment.  One looks in vain for any provision in the Fuel Line Facilities actually providing for priority of payment over the Bonds (which would, in any event, be unenforceable as the Bondholders are not parties to the Fuel Line Facilities).[26]  Instead, the Fuel Line Facilities refer to <u>the Bonds</u> as "Senior Debt"[27] and lack any provision stating that the payment of the Bonds before payment of the loans qualifies as an event of default.   Nor is there any provision within the Trust Agreement or the Fuel Line Facilities that require turnover of revenues by the Bondholders to the Fuel Line Lenders if their lines of credit are not yet paid in full.

51.    As a result, the Fuel Line Lenders can point to no provision giving them priority enforceable against the PREPA bondholders, and their claims to priority must be rejected.

---

[25] The credit agreements governing the fuel line loans are: (i) that certain Credit Agreement, dated as of May 4, 2012, among PREPA, Scotiabank, and the lenders party thereto (as amended, the "Scotiabank Credit Agreement"), and (ii) that certain Trade Finance Facility Agreement, dated as of July 20, 2012, among PREPA and Citibank, N.A., as predecessor to the existing lenders thereunder (as amended, the "Citibank Credit Agreement" and together with the Scotiabank Credit Agreement, the "Fuel Line Facilities").  The Fuel Line Facilities are attached as Exhibits 1 and 2 to the FLL Complaint.

[26] The Fuel Line Lenders point to certain acknowledgements in the Fuel Line Facilities that the loans "constitute Current Expenses under the Trust Agreement, which Current Expenses are subject to the terms and conditions of the Trust Agreement and Resolution relating to priority of payments and the right to exercise remedies thereunder."  *See* FLL Complaint; Scotiabank Credit Agreement § 2.14; Citibank Credit Agreement §2.12.  However, these provisions only purport to recognize something already provided for—they do not purport to grant the Fuel Line Lenders a priority over the Bondholders (nor could it, as the Bondholders are not parties to the Fuel Line Facilities).  As the Trust Agreement does not provide for priority of payment for Current Expense claimholders, the acknowledgments do not assist the Fuel Line Lenders.  Moreover, the Scotiabank Credit Agreement only provides that "[t]he *Lenders* acknowledge and agree" they are Current Expenses—there is no acknowledgement from PREPA that the Lenders under the Scotiabank Credit Agreement are Current Expenses.  *See* Scotiabank Credit Agreement § 2.12.  As a result, the Scotiabank Credit Agreement acknowledgment does not bind PREPA.

[27] *See* Scotiabank Credit Agreement, § 101 (definition of "Senior Debt"); Citibank Credit Agreement, § 101 (definition of "Senior Debt").

### C. The Fuel Line Debt Is Not a Current Expense Under the Trust Agreement

52.     The Fuel Line Lenders' arguments relating to their supposed priority should be rejected because they do not hold "Current Expense" claims.

53.     First, the Fuel Line Lenders' claims do not fall within the definition of "Current Expenses" under the Trust Agreement.  The Trust Agreement defines Current Expenses as PREPA's "reasonable and necessary current expenses of maintaining, repairing and operating the System" and includes a long list of *direct* expenses to fund PREPA's operations.  Not once does the Trust Agreement or the definition of "Current Expenses" suggest that PREPA can take out long-term debt to *indirectly* finance the payment of Current Expenses and call that debt a "Current Expense" payable before Bondholders.  Such a construction should be rejected, both because it would markedly expand the definition of Current Expenses to include a host of debts very different from the ones actually listed in the definition, contrary to established rules of contractual construction,[28] but also because it would create a loophole in the Trust Agreement enabling PREPA to subordinate Bondholders to effectively limitless amounts of long-term debt just by saying such debt is to finance "Current Expenses."[29]

54.     Neither the Fuel Line Lenders' contracts with PREPA stating the Fuel Line Lenders are Current Expenses, *see* FLL Complaint at ¶¶ 23-25, nor PREPA's official statements suggesting

---

[28] *See, e.g., Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.*, 85 F.3d 1198, 1202 (6th Cir. 1996) ("Under the rule of 'ejusdem generis,' where general words follow the enumeration of particular classes of things, general words will be construed as applying only to things of the same general class as those enumerated."); *U.S. v. Security Mgt. Co.*, 96 F.3d 260, 265 (7th Cir. 1996) ("Under the *ejusdem generis* rule, where a general term . . . is preceded or followed by a series of specific terms, the general term is viewed as being limited to items of the same type or nature as those specifically enumerated.").

[29] Although PREPA's postpetition financing order [ECF 744] provided that the obligations under the postpetition financing would "be deemed" Current Expenses, this section of the order was inserted at the request of other parties and nowhere did the Oversight Board assert that (absent such a provision in the order) the postpetition financing would otherwise have qualified as a Current Expense.  Moreover, that order expressly stated that its finding regarding the DIP facility would not prejudice parties' rights to argue that such obligations are *not* Current Expenses and that it would not constitute a determination of such issue.  ECF No. 744 ¶ 9.

the Fuel Line Lenders are Current Expenses, *see* FLL Complaint at ¶ 29, make any difference to this analysis.  Most fundamentally, this is because PREPA acting alone cannot make the fuel line lender claims senior to the bonds, or amend the definition of Current Expenses to include things that are not Current Expenses under the Trust Agreement.[30]  To subordinate the Bondholders, the Fuel Line Lenders need an agreement with the Bondholders.  This they do not have.

55.     Moreover, even if the Fuel Line Facilities could once have been considered Current Expenses when they were originally issued, they are now long past-due, and cannot possibly continue to be considered Current Expenses.  The Fuel Line Lenders have extended PREPA's obligations for over half a decade.  Payment of these long overdue accounts cannot possibly be considered "reasonable and necessary current expenses of maintaining, repairing and operating the System" today.  *See* Trust Agreement § 101 (definition of Current Expenses).[31]

56.     Second, the Fuel Line Lenders do not have priority because only "budgeted" Current Expenses are given priority under Trust Agreement section 505, and their claims do not feature in PREPA's budget.  The Fuel Line Lenders claim that they are given priority over the Bondholders by virtue of Trust Agreement section 505, which states that "money in the General Fund will be used first for the payment of the Current Expenses of the System."  *See* FLL

---

[30] *See Venn v. Goedert*, 319 F.2d 812, 815 (8th Cir. 1963); *see also Goodwin v. Branch Banking & Trust Co.*, 699 Fed. Appx. 274, 276 (4th Cir. 2017) ("one party cannot unilaterally alter the term of a contract after it is formed"); *New England Mut. Life Ins. Co. v. Harvey*, 82 F. Supp. 702, 706 (D. Mass. 1949) ("One party to a contract cannot change the obligation of the other party to the contract by unilateral action."); *BSR Landscape & Irrigation Contractors, Inc. v. Marriott Corp.*, 1988 U.S. Dist. LEXIS 6732 *35 (M.D. Fla. 1988) ("One party cannot alone change, alter or modify the contract.").

[31] Indeed, the opinion letters that accompanied the Fuel Line Facilities (and which supported the idea the Fuel Line Facilities were Current Expenses) expressly hinged on PREPA paying the Fuel Line Facilities before the middle of 2013.  *See, e.g.,* Case No. 17-AP-232-LTS, ECF No. 26-5 at 3.  That never happened, and so if anything the opinion letters confirm the view the Fuel Line Facilities are not Current Expenses any longer.  This is true regardless of the inclusion of certain reservations of rights in the 16th, 17th, and 18th amendments to the Trust Agreement noting that , which applied only to certain conduct of the Lenders during the ***Amendment Period***, which did *not* include (i) actions taken by the lenders before the execution of the August 2014 forbearance agreements or (ii) actions taken *after* the expiration of that period. Here, the Lenders chose to extend their maturity dates ***before*** the Amendment Period and have failed to exercise remedies ***after*** the Amendment Period expired.

Complaint at ¶ 33.  However, section 505 makes clear PREPA is only authorized to "first pay" Current Expenses that are included within PREPA's budget.  *Id.* § 505 ("The Authority covenants that moneys in the General Fund will be used first for the payment of the Current Expenses . . . *and that the total amount of Current Expenses in any fiscal year will not exceed the amount provided therefor in the Annual Budget for such fiscal year . . . .*").[32]  Unbudgeted expenses, even if they meet the definition of "Current Expenses" are not subject to section 505.

57.     Neither the Fuel Line Lenders' nor UTIER's claims are included in PREPA's budget.  As a result, neither are *budgeted* Current Expenses that PREPA can pay first under section 505.  The omission of such legacy debt obligations from the budget demonstrates that such claims are not even *Current Expenses*: they are not necessary to the continued maintenance, repair, or operation of PREPA as evidenced by the fact that PREPA continues to operate without paying them.

58.     In addition, section 505 of the Trust Agreement is only a "covenant" of PREPA's to take a certain action.  Therefore, even if PREPA violates section 505, the only remedy the Fuel Line Lenders or UTIER are entitled to is an unsecured claim for breach of contract—nothing more.

---

[32] Trust Agreement section 505 provides, in full:

The Authority covenants that moneys in the General Fund will be used first for the payment of the Current Expenses of the System, that such expenses will not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner, and that the total amount of Current Expenses in any fiscal year will not exceed the amount provided therefor in the Annual Budget for such fiscal year or any amendment thereof or supplement thereto unless such expenses shall be required by conditions beyond the control of the Authority happening during such fiscal year and which could not reasonably have been contemplated at the time of the adoption of the Annual Budget. If at any time the total amount theretofore expended during any fiscal year for Current Expenses shall exceed the total amount provided in the Annual Budget for Current Expenses for such fiscal year, the Authority covenants that it will report in writing the amount of such excess and the reason or reasons therefor to the Consulting Engineers and to the Trustee as soon as practicable but not later than the last day of the sixth month following the month in which such excess shall have occurred.

Trust Agreement § 505.

59.     Third, by the Fuel Line Lenders' own admissions, the Trust Agreement empowers
PREPA to determine what are and what are not Current Expenses, as well as how and when to pay
them.  As the Fuel Line Lenders argue in their Complaint (*see* FLL Complaint at ¶ 27), PREPA
has the power "to determine the nature of and the need to incur all expenditures and the manner in
which such expenditures shall be incurred, authorized, and defrayed" under its enabling statute, 22
L.P.R.A. § 196, and that the Trust Agreement provides PREPA with "complete control and
supervision of any undertaking . . . including the power to determine the character of and necessity
for all its expenditures and the manner in which they shall be incurred, allowed and paid . . . and
such determination shall be final and conclusive upon all officers of the Commonwealth
Government . . . ."  Trust Agreement at 1 (Second Whereas Clause).  According to the Fuel Line
Lenders, these clauses mean that PREPA can determine the manner in which any expenses "shall
be incurred, allowed and paid," including Current Expenses.  But if this is true and the
characterization of Current Expenses and manner of payment is up to PREPA, then PREPA can
decide—now—what it wants to do with the Fuel Line Lenders' claims.  As a result, even if the
Fuel Line Lenders were once considered Current Expenses with payment priority (they were not),
PREPA can now use its "complete control" to determine that the Fuel Line Lenders are not Current
Expenses and will not be paid before Bondholders.  By the logic of the Fuel Line Lenders' own
argument, this determination is conclusive and eliminates any claim the Fuel Line Lenders may
have to an enforceable priority.

60.     Finally, even assuming that the Fuel Line Lenders' and UTIER's obligations are
Current Expenses, if PREPA is able to determine the amount of Current Expenses to be paid every
year, as it can under the Trust Agreement (§§ 101 (definition of Annual Budget), 504 (provision
governing creation of budget by PREPA)), and has "complete control" over how much is paid to

any obligation (Trust Agreement at 1) it can also determine how much, if any, of the "Current Expenses" claims purportedly due the Fuel Line Lenders and UTIER should be paid now.  As a result, any argument that *all* pension and fuel obligations are due in full today is wrong.  As argued by the Fuel Line Lenders themselves, PREPA (subject to the Oversight Board authority) is the only entity that can determine how much to spend on Current Expenses.

## III.  CONCLUSION

61.    For the foregoing reasons, the Amended Proposed Order would not impair any legal rights of the Current Expense Claimants and would not violate any contractual rights of any third parties under the Trust Agreement (as no such rights exist).

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE Movants respectfully request the Court enter the RSA, granting the relief

requested herein and any other relief as is just and proper.

Dated: July 19, 2019
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel S. Desatnik (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

**LUIS F. DEL VALLE-EMMANUELLI**

By: */s/  Luis F. Del Valle-Emmanuelli*
By: Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897

**O'MELVENY & MYERS LLP**

By: /s/ *Nancy A. Mitchell*
    John J. Rapisardi*
    Nancy A. Mitchell*
    7 Times Square
    New York, NY 10036
    Telephone: (212) 326-2000
    Facsimile: (212) 326-2061
    Email:     jrapisardi@omm.com
              nmitchell@omm.com

    Peter Friedman*
    1625 Eye Street, NW
    Washington, DC 20006
    Telephone: (202) 383-5300
    Facsimile: (202) 383-5414
    Email:     pfriedman@omm.com

    Elizabeth L. McKeen*
    610 Newport Center Drive, 17th Floor
    Newport Beach, CA 92660
    Telephone: (949) 823-6900
    Facsimile: (949) 823-6994
    Email:     emckeen@omm.com

    * admitted pro hac vice

*Attorneys for the Puerto Rico Fiscal*
*Agency and Financial Advisory*
*Authority*

**MARINI PIETRANTONI MUNIZ, LLC**

By: /s/ *Luis C. Marini-Biaggi*
    Luis C. Marini-Biaggi
    USDC No. 222301
    MCS Plaza, Suite 500
    255 Ponce de León Ave.
    San Juan, PR 00917
    Telephone: (787) 705-2171
    Facsimile: (787) 936-7494
    Email: lmarini@mpmlawpr.com

*Attorneys for the Puerto Rico Fiscal Agency and*
*Financial Advisory Authority*