## Exhibit A

**Certified Translation of *UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*, Case No. K-AC2016-0291 (Dec. 19, 2016)**

CERTIFIED TRANSLATION

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SAN JUAN PART

| | |
|---|---|
| ELECTRIC AND IRRIGATION INDUSTRY WORKERS' UNION ("UTIER", for its Spanish acronym), JOSÉ RIVERA-RIVERA AND ÁNGEL FIGUEROA JARAMILLO, <br><br> PLAINTIFFS, <br><br> v. <br><br> ELECTRIC POWER AUTHORITY OF PUERTO RICO, CORPORATION FOR THE REVITALIZATION OF THE ELECTRIC POWER AUTHORITY OF PUERTO RICO, ALBERTO BACÓ-BAGUÉ, JUAN ZARAGOZA-GÓMEZ, VÍCTOR SUÁREZ-MELÉNDEZ, PUERTO RICO ENERGY COMMISSION AND CÉSAR MIRANDA-RODRÍGUEZ, <br><br> DEFENDANTS. | CIVIL NO.: K AC2016-0291 (604) <br><br><br><br> ABOUT: <br><br><br> DECLARATORY JUDGMENT |

**JUDGMENT**

**I**

**Procedural Background**

On April 19, 2016, the Electric and Irrigation Industry Workers' Union (UTIER, for its Spanish acronym), its president Ángel Figueroa-Jaramillo and José Rivera-Rivera, who presides the UTIER Retirees Chapter (the "plaintiffs") submitted a complaint, which was later amended, in which they requested that Act No. 4-2016, known as the Act for the Revitalization of the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.        1

CERTIFIED TRANSLATION

Electric Power Authority (Act 4-2016), especially Chapter IV,[1] be declared completely null and, consequently, for all actions taken by the defendants to implement it to be declared null as well. Also, they requested payment for the costs and expenses of the litigation, as well as the award of attorney's fees.

In essence, the plaintiffs argued that Act 4-2016 is unconstitutional for contravening the following constitutional guarantees: the separation of the branches of government; the matters that should be considered in the title of a law; due process of law in its procedural form regarding the terms to challenge the validity of the legislation and/or the resolutions or orders that are carried out to implement them; the jurisdictional competence of the Court to hear the appeal of a judicial determination concerning the validity of the statute; the protection against impairment of existing contractual relationships and the equal protection of the laws.

The plaintiffs stated that the Trust of 1974, the Electric Power Authority of Puerto Rico (PREPA or Authority) recognized its authority to establish and charge reasonable tariffs to cover its current costs, which included the contributions to its employees' retirement plan. In the referenced agreement, a general fund was created to deposit all PREPA income and the order for the payment of current expenses was established. According to the plaintiffs, the payment of current or past due contributions to the retirement plan of PREPA employees has priority over any other expense or obligation for payment by the Authority.

The plaintiffs argued that the priority of PREPA payments was modified by an agreement subscribed by various creditors of the Authority, without considering the participation of the PREPA Retirement System, which is the entity that receives the employees' contributions. Also, they argued that the referenced agreement conditions the restructuring of PREPA's debt to the

---

[1] The complaint was amended on August 19, 2016.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.    2

CERTIFIED TRANSLATION

approval of a special legislation that would create an independent corporation that would impose and charge transition charges that would be exclusively used for the payment of the new bonds without considering this income as part of PREPA's general fund.

In their first cause of action, the plaintiffs alleged that the title of Act 2016 included different subjects that are not related to each other, many of which amended other statutes without adequately notifying citizens. In particular, [the plaintiffs] stated that the legislation amended Act No. 33-1985, legislation that establishes the challenge processes of the bills for essential public services, and Act. No. 29-2009 known as the Act of Public-Private Alliances by establishing special processes for expedited future energy projects. Likewise, [the plaintiffs] sustained that the title also did not mention the agreed upon creditors' agreement, information that is necessary so that the Legislative Assembly, as well as active or retired employees, can evaluate whether their rights or the provisions of Act No. 57-2014, known as the Transformation and Energy Relief Act of Puerto Rico, were compromised. [The plaintiffs] also stated that the Executive Branch exercised undue pressure that affected the independent criteria of the members of the Legislative Branch since Act 4-2016 was approved to favor an established condition in a creditors' agreement that was promoted by the Executive Branch.

On the other hand, the plaintiffs posed that Act 4-2016 infringed the due process of law in its procedural form by establishing unreasonable terms for challenging its validity and the determinations of the entities in charge of implementing it. Also, [the plaintiffs] stated that the legislation limited the access to justice by eliminating the jurisdictional competency of the Court of Appeals to revise the determination that the Court of First Instance may issue as to the referenced legislation.

CERTIFIED TRANSLATION

In its third cause of action, the plaintiffs argued that Act 4-2016 impaired PREPA's obligations established in the Trust of 1974 by imposing a new financing scheme that eliminated the preference of covering current costs, which includes the contributions to the employees' retirement plan, before fulfilling the payment to the bondholders. In their judgment, the established transition charge affected PREPA's capacity to budget and project in its general fund the payment of the contributions to the retirement plan of its employees, which is contrary to the provisions of the Trust of 1974.

Furthermore, [the plaintiffs] argued that the State, by only favoring the accrual of the PREPA bondholders, disregarded the public interest in maintaining the continuity and permanence of the PREPA employees and retirees' pension plan, who have a proprietary right over the pension benefits. According to the plaintiffs, the Legislative Assembly and PREPA had other measures available to guarantee the payment of its debt with the bondholders without affecting the order of the debt payments established in the Trust of 1974.

On September 16, 2016, an initial hearing for this case was held. The legal representatives of the co-defendant parties expressed that the controversies of the case as they were presented by the plaintiffs were strictly matters of law and, therefore, they requested a briefing schedule and the scheduling of an oral argument hearing, all in a short timeframe, given the high public interest in this case. After hearing the parties, the Court granted a term for the parties to submit their respective briefs and scheduled an oral argument hearing for November 16, 2016, in the morning hours.

On October 11, 2016, PREPA and the Corporation for the Revitalization of PREPA (CRAEE, for its Spanish acronym) presented a motion for summary judgment which Alberto Bacó-Bagué, Víctor Suárez-Meléndez and Juan Zaragoza-Gómez later joined in their official

CERTIFIED TRANSLATION

capacity as CRAEE Directors (the codefendants). In their motion, the codefendants numbered various essential facts for which no controversy exists and requested [the Court] to validate the challenged legislation and, at the same time, the dismissal of the entire complaint.

First, the codefendants explained that Act 4-2016 contains various measures that address PREPA's precarious economic situation, amongst these, the reduction of certain debts that it has with various creditors to avoid non-payment. Regarding the matters that Act 4-2016 discusses, [the codefendants] alleged that the Legislative Assembly does not have an obligation to provide a detail in the title of all the matters that are covered in the legislation, sufficing that the content relates to PREPA's transformation and revitalization; an action that requires amending various statutes that affect the operation and finances of the Authority. They recognize that in its origin, Act 4-2016 was an administration measure promoted by the Executive Branch, but that it was later adopted by the members of the Legislative Assembly, who presented a bill that met the corresponding legislative procedure as required by the Constitution of the Commonwealth of Puerto Rico (ELA Constitution).

At the same time, they argued that the challenged legislation provides expiration terms for two phases for challenges; the first to question the validity of the legislation and the second to challenge the Resolution and Restructuring Order that imposes the transition charge. They explained that the established terms allow citizens to file a cause of action and, at the same time, attempt to provide certainty to a legislation whose purpose is to immediately heed the Authority's access to the capital markets and provide it the necessary tools to turn it into a self-sufficient entity. They added that, unlike other statutes and complex regulations, the terms provided in Act 4-2016 are more favorable since these [terms] commence at the moment a notice to the general public is published, contrary to other complex statutes that have much shorter

CERTIFIED TRANSLATION

challenge terms that commence from the moment the legislation or dictum is approved. They emphasized that the statute allows access to justice since the Court of First Instance has jurisdiction to consider the challenge claims and guarantees the jurisdictional competence of the Supreme Court as the last appellate forum that will express itself as to the controversies.

In its motion, the codefendants emphasized that the plaintiffs are neither a contracting party nor bondholders of the Trust of 1974, which prevents them from invoking the constitutional protection against impairment of contractual obligations. As to this particular matter, they stressed that the purpose of the trust is to provide the terms and conditions for the issuance of PREPA bonds with the purpose of guaranteeing their payment, yet not to regulate the payments for current costs, amongst which are found the contributions to retirement plans. In the alternative, they stated that if an obligation for priority in the payment of the contributions to the retirement plan in favor of the plaintiffs existed, the implementation of the transition charge for the payment of the restructuring bonds does not constitute a substantial impairment of the trust. Finally, they rejected that Act 4-2016 infringes  upon the guarantee of equal protection under the law since a suspicious or irrational classification did not exist between similarly situated persons with respect to the purpose of the statute. As to this particular matter, they stated that the priority of the Legislative Assembly of prioritizing PREPA's debt with the bondholders does not imply a constitutional violation.

In response, on November 4, 2016, the plaintiffs submitted their opposition stating that there are facts in controversy that require for the case to continue in an ordinary course and for the parties to initiate discovery. In essence, they reiterated their previous allegations and, at the same time, requested for various other facts to be considered that, to their judgment, disallow the adjudication of a summary judgment in these stages of the litigation. To support their position

CERTIFIED TRANSLATION

they included in their motion, amongst other documents, an expert report prepared by Dr. José I. Alameda-Lozada and José Torres, Economists, in which they concluded that PREPA had other available alternatives to generate additional income, achieve administrative adjustments, and face the debt service without the necessity of approving Act 4-2016. Regarding the established transition charge, they stated that its effect could be contrary to the legislative purpose, as the sales and consumption of energy would be affected, which would negatively affect the income received in PREPA's general fund.

In their reply, the codefendants stated that the alleged controversies of fact invoked by the plaintiffs are based on an interpretation of the statutes and clauses of the Trust, which allows the Court to resolve the motion for summary judgment. Regarding the additional facts presented by the plaintiffs, the codefendants stated that they were immaterial and irrelevant facts since the controversies submitted in the amended complaint are issues of law and only require the Court's analysis. Regarding the expert report submitted by the plaintiffs, the codefendants argued that it should not be considered because it was hearsay and because they did not have the opportunity to evaluate this evidence beforehand.

On October 11, 2016, the Commonwealth filed a motion to dismiss through which, like the codefendants PREPA and CRAEE, they alleged that since Act 4-2016 was constitutionally valid, the amended complaint should be dismissed for failing to state a claim for which a remedy could be granted. In its motion, the Commonwealth submitted arguments similar to those provided by the codefendants in their motion for summary judgment. In their opposition, the plaintiffs adopted the arguments previously expressed in their motion opposing the motion for summary judgment.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.          7

CERTIFIED TRANSLATION

Finally, the Puerto Rico Energy Commission (Energy Commission) requested dismissal based on that the original complaint, as well as the amended complaint, did not state sufficient facts against it that justified granting of a remedy. In response, the plaintiffs provided that a remedy exists against the Energy Commission for having participated in the approval of the transition costs created by Act 4-2016 to guarantee the payment of the restructuring bonds. They also stated that the Commission made determinations to implement the new financial system, which prevents the dismissal of the allegation against it.

On November 16, 2016, the hearing took place in which all of the parties argued their respective positions and allegations.[2] Of the motions and allegations of the parties, the following controversies are pertinent and relevant.

## II

## UNDISPUTED FACTS

1.  On January 27, 2016, PREPA, the Government Development Bank for Puerto Rico and various other persons, including bondholders, creditors, and insurance companies regarding PREPA's debt, subscribed a contract titled *Restructuring Support Agreement* (RSA or creditors' agreement).

2.  In the RSA, as amended,[3] the following parties appeared:

THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT(including the annexes, exhibits and schedules attached hereto and as amended, supplemented or otherwise modified from time to time in accordance with the

---

[2] During the procedure carried out before the oral argument hearing was held, the parties requested the consolidation of other case with this case, specifically, K AC-2016-0292, K AC2016-0294 and K AC2016-0806. The consolidation was denied because differences existed between the causes of action and the remedies requested, according to the plaintiffs of each case, and because the cases were already in different procedural stages. See Order of September 23, 2016.

[3] See, Amended and Restated Restructuring Support Agreement, March 14, 2016, http://www.gdb-pur.com/investors_resources/prepa.html (last visit, December 19, 2016). It is important to emphasize that the referenced agreement was amended on March 23 and 29, 2016, but its essential clauses were maintained since the amendments were mainly done to substitute various agreed upon dates.

---

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     8

CERTIFIED TRANSLATION

terms hereof, this "*Agreement*" or "*RSA*"), dated as of March 14, 2016, is entered into by and among Puerto Rico Electric Power Authority ("*PREPA*"), Puerto Rico Electric Power Authority Revitalization Corporation (the "*Securitization SPV*"), National Public Finance Guarantee Corporation ("*National*"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "*Assured*"), Syncora Guarantee Inc. ("*Syncora*"), the undersigned members of the Ad Hoc Group of PREPA Bondholders identified on Annex A (the "*Ad Hoc Group*"), Scotiabank de Puerto Rico (in its capacity as administrative agent for the Scotiabank Lenders, "*Scotiabank*"), the lenders (the "*Scotiabank Lenders*") under that certain Scotiabank Credit Agreement (as herein defined), Solus Opportunities Fund 5 LP, SOLA LTD and Ultra Master LTD (collectively, "*Solus*" or the "*Solus Lenders*" and together with Scotiabank, the Scotiabank Lenders and any persons who execute a joinder to this Agreement pursuant to section 18(b) hereof in the form of Annex B-2, the "*Credit Agreements Lenders*"), and Government Development Bank for Puerto Rico ("*GDB*"). National and Assured will be referred to herein collectively as the "*Insurers*," and the Ad Hoc Group, together with persons who beneficially own or control Uninsured Bonds (as defined herein) and are party to this Agreement (including, for the avoidance of doubt, Solus) or execute a joinder to this Agreement pursuant to section 18(a) hereof in the form of Annex B-1, will be referred to herein collectively as the "*Holders*," and the Insurers, the Holders, Scotiabank, the Scotiabank Lenders, Solus and GDB will be referred to herein collectively as the "*Supporting Creditors*." The Supporting Creditors, together with PREPA, Syncora and the Securitization SPV, will be referred to herein collectively as the "*Parties*."

3.  In the recitals of the RSA, as amended, the parties agreed to the following:

A. **PREPA is the issuer of power revenue bonds (collectively, the "Revenue *Bonds*") and power revenue refunding bonds** (collectively with the Revenue Bonds, the "**Bonds**") issued and outstanding pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented through July 1, 2015, between PREPA and U.S. Bank National Association, as successor trustee (the "Trustee" and, with respect to said trust agreement, as amended, the "Trust Agreement"). Capitalized terms used but not defined in this Agreement shall have the meanings given to such terms in the Trust Agreement.

B. Each individual series of Bonds issued under the Trust Agreement was authorized pursuant to specific resolutions of PREPA authorizing the issuance of such series of Bonds.

C. **In connection with the issuance of certain of the Bonds (such Bonds, the "Insured Bonds"), PREPA entered into various insurance agreements with the Trustee corresponding to insurance policies issued by various insurers** including National Assured and Syncora (such insurance policies to which any of National, Assured or Syncora or any other person that insures Bonds is currently a party, and the insurance agreements related thereto, collectively, the "Bond *Insurance* Agreements" and, together with the Trust Agreement, the Bonds, the resolutions approving the Bonds, and any other

CERTIFIED TRANSLATION

agreements, supplements, amendments, or other documents executed or delivered in connection with the issuance or maintenance of the Bonds, including the TA Amendment (as defined herein), the "Bond Documents"). Any Bonds that are not Insured Bonds are referred to herein as "Uninsured Bonds."

D. **PREPA has requested, and the Insurers and Holders have agreed, subject to the terms and conditions of this Agreement, to consent to an amendment of the Trust Agreement in the form and substance reasonably acceptable to the Supermajority Holders**, the Supermajority Insurers and the Supermajority Credit Agreement Lenders and consistent with the form attached hereto as Annex C (the "TA Amendment").

E. The Bond Insurance Agreements provide the Insurers the sole right in lieu of the beneficial owners of the applicable Insured Bonds to consent to the TA Amendment in accordance with the terms of such Bond Insurance Agreements.

F. PREPA and the Solus Lenders are parties to that certain Trade Finance Facility Agreement, dated as of July 20, 2012, (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time, the "Solus Credit Agreement" and together with the Scotiabank Credit Agreement, the "Credit Agreements").

G. **PREPA, Scotiabank and the Scotiabank Lenders have entered into that certain Credit Agreement, dated as of May 4, 2012** (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time, the "Scotiabank Credit **Agreement**"), with Scotiabank as agent thereunder.

H.   **PREPA and GDB have entered into that certain Collateral Swap Loan Agreement,** dated as of June 21, 2013, (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "Collateral Swap Loan Agreement").

I.  PREPA and GDB have entered into that certain Isabela Dam Loan Agreement, dated as of March 26, 2004, (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "Isabela Dam Loan Agreement" and together with the Collateral Swap Loan Agreement, the "GDB Loan Agreements").

J. GDB is the fiscal agent under that certain **Loan Agreement, dated as of September 6, 2012, by and between Puerto Rico Infrastructure Financing Authority**, acting on behalf of the Commonwealth of Puerto Rico ("PRIFA"), and PREPA (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "Aguirre Loan Agreement").

K. GDB is the fiscal agent under that certain **Financial Agreement, dated as of September 27, 2013, by and between PRIFA and PREPA** (as amended, restated,

CERTIFIED TRANSLATION

extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "San Juan Water Financial Agreement").

L. **As of the date hereof, the total outstanding principal amount of Bonds insured by National under the Bond Insurance Agreements is $1,329,155,000**, the total outstanding principal amount of Insured Bonds that are beneficially owned by National is $0 and the total outstanding amount of Uninsured Bonds that are beneficially owned by National is $0.

M. **As of the date hereof, the total outstanding principal amount of Bonds insured by Assured under the Bond Insurance Agreements is $830,550,000**, the total outstanding principal amount of Insured Bonds that are beneficially owned by Assured is $0 and the total outstanding principal amount of Uninsured Bonds that are beneficially owned by Assured is $0.

N. **As of the date hereof, the total outstanding principal amount of Bonds insured by Syncora under the Bond Insurance Agreements is $197,405,000**, the total outstanding principal amount of Insured Bonds that are beneficially owned by Syncora and the total outstanding principal amount of Uninsured Bonds that are beneficially owned by Syncora are set forth on its respective signature page hereto.

O. PREPA and GDB have entered into certain depository and custodial agreements (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "*Custodial Agreements*" and, together with the Collateral Swap Loan Agreement, the Isabela Dam Loan Agreement, the Aguirre Loan Agreement, and the San Juan Water Financial Agreement, the "GDB Agreements").

P. As of the date hereof, $8,107,995,000.00 in principal amount of Bonds is outstanding. The total outstanding principal amount of Bonds as of any date shall be known hereunder as the "Bond Principal Amount."

Q. As of the date hereof, the total outstanding principal amount of Uninsured Bonds that are beneficially owned by each member of the Ad Hoc Group is set forth on their respective signature pages hereto.

R. As of the date hereof, the total outstanding principal amount of Uninsured Bonds that are beneficially owned by Solus is set forth on its respective signature page hereto.

S. **The Insurers and the Holders collectively control more than 60% of the total outstanding principal amount of the Bonds for purposes of consenting to the TA Amendment**.

T. **As of the date hereof, there is $549,950,000 in aggregate principal amount** (the "Scotiabank Principal Amount") (plus applicable accrued fees and interest) outstanding under the Scotiabank Credit Agreement (the loans outstanding thereunder, the

CERTIFIED TRANSLATION

"Scotiabank Loans") and the total outstanding principal amount of Uninsured Bonds that are beneficially owned or controlled by Scotiabank and the Scotiabank Lenders is $35,000.

U. As of the date hereof, **there is $146,041,914.24 in aggregate principal amount** (the "Solus Principal Amount", together with the Scotiabank Principal Amount, the "Credit Agreements Principal Amount," and the Credit Agreements Principal Amount collectively with the Bond Principal Amount, the "Outstanding Principal Amount") (plus applicable accrued fees and interest) outstanding under the Solus Credit Agreement (the loans outstanding thereunder, the "Solus Loans").

V. PREPA, the Holders, the Credit Agreement Lenders and GDB entered into a Restructuring Support Agreement on November 5, 2015 (as amended, the "Initial RSA"). W. PREPA, the Holders, the Credit Agreement Lenders, the GDB, National, Assured and Syncora entered into an Amended and Restated Restructuring Agreement dated as of December 23, 2015, (the "December RSA") which amended and restated the Initial RSA in its entirety.

X. The December RSA terminated on January 23, 2016.

Y. **PREPA, the Holders, the Credit Agreement Lenders, the GDB, National, Assured and Syncora entered into a new Restructuring Support Agreement dated as of January 27, 2016**, which incorporated by reference the terms and conditions of the December RSA, as expressly amended thereby (as amended by Amendment No. 1 dated as of February 19, 2016, the "New RSA").

Z. On February 16, 2016, the Legislative Assembly of Puerto Rico enacted, and the Governor of Puerto Rico signed into law, Act 4-2016, known as the PREPA Revitalization Act (the "Act"). The Act has been deemed to be reasonably acceptable and in Acceptable Form, as applicable, to the Supporting Creditors for purposes of sections 13(e)(vi) and 13(e)(viii).

(…) (Emphasis added).

4.  The RSA was available to the public through the Internet, specifically in the GDB's webpage and the *Electronic Municipal Market Access System* (EMMA). Also, the Office of the Controller of Puerto Rico published in its website that the creditors' agreements, identified with the number 2016-P0025E and 2016-P0025F, were before its consideration.

5.  On November 4, 2015, eighteen (18) Senators of the Puerto Rico Senate presented the SB 1523 which contained multiple dispositions to revitalize PREPA.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     12

CERTIFIED TRANSLATION

6.  That day, twenty-seven (27) House Representatives of Puerto Rico presented the HB 2742, which was equivalent to the SB 1523.

7.  The SB 1523 was referred to the Energy Affairs and Water Resources Commission of the Senate (Energy Affairs Commission), which held a public hearing on November 10, 2015, received presentations and held an executive meeting on February 4, 2016.

8.  The HB 2742 was referred to the Special Commission for a New Energy Policy, which held public hearings on November 11, 2015 and evaluated multiple presentations before giving its report.

9.  The HB 2742 was dismissed by its equivalent, SB 1523.

10. The Energy Affairs Commission and the Special Commission for a New Energy Policy of the House of Representatives issued a Positive Report after evaluating the SB 1523.

11. On February 10, 2016, the SB 1523 was approved by a majority of the Senate of Puerto Rico and afterwards sent to the House of Representatives.

12. On February 11, 2016, the Special Commission for a New Energy Policy of the House of Representatives, that had already evaluated the equivalent project HB 2742, issued a Positive Report regarding the SB 1523.

13. The Positive Report of the Energy Commission of the Senate of Puerto Rico to the SB 1523 is identical to the Positive Report of the Special Commission for a New Energy Policy prepared by the House of Representatives to the HB 2742.

14. In the Positive Report of the Special Commission for a New Energy Policy, as well as the one of the Energy Affairs Commission, the presentations of the following participants were evaluated: the Puerto Rico Electric Power Authority (PREPA); Lisa Donahue, PREPA's Chief Restructuring Officer; the Government Board of the Puerto Rico Electric Power

CERTIFIED TRANSLATION

Authority (PREPA); the Commonwealth Energy Public Policy Office (OEPPE for its Spanish acronym); the Puerto Rico Public-Private Partnerships Authority (AAPP for its Spanish acronym); PREPA's Active and Retired Employees Partnership (the Partnership); Luis R. Santini-Gaudier and Carlos Gallisá, representatives of the residential customers before PREPA's Government Board; Enid Monge, representative of industrial/commercial customers before the PREPA's Government Board; the Puerto Rico Mayors Association; the Puerto Rico Energy Commission (CEPR for its Spanish acronym); the Puerto Rico Mayors Federation; the Government Development Bank (GDB); the Puerto Rico Chamber of Commerce (CCPR for its Spanish acronym); Somos Solar; the Puerto Rico Renewable Energy Contractors Association (ACONER for its Spanish acronym); Puerto Rico Manufacturers Association (AIPR for its Spanish acronym); Association of Renewable Energy Producers (APER for its Spanish acronym); and Juan Rosario, past representative of the residential customers before the PREPA's Governing Board.

15. On February 15, 2015, the majority of the representatives of the House of Representatives of Puerto Rico voted in favor of the SB 1523.

16. On February 16, 2016, the majority of the senators of the Senate of Puerto Rico approved the SB 1523 with the proposed amendments by the House of Representatives.

17. On that same day, the presidents of both legislative bodies signed the legislative piece and sent the bill to the Governor for his consideration.

18. On February 16, 2016, the Governor signed the SB 1523 which was converted in Act 4-2016.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.        14

CERTIFIED TRANSLATION

19. The notice of the approval of Act 4-2016 was published on February 19 and 25 and March 3, 2016 in the newspaper of daily general circulation *El Nuevo Día* and in the newspaper of daily circulation *The Bond Buyer*.

20. There is no controversy between the parties regarding the content of the published notices regarding Act 4-2016's approval.[4]

21. On April 7, 2016, CRAEE filed before the Puerto Rico Energy Commission a petition of Order and Resolution under Art. 6.25A of Act No. 57-2014 known as the Energy Transformation and Relief Act, 9 L.P.R.A. Secs. 1051 *et seq.* to evaluate and approve the imposition of a transition charge and the mechanism of adjustment in relation with the issuance of Restructuring Bonds.

22. The administrative evaluation process of the Energy Commission included technical, evidentiary and public hearings. Also, it required presentations and writings of intervenors, experts and general public.

23. On June 21, 2016, the Energy Commission issued the Restructuring Order No. CEPR-AP-2016-0001, in which it approved the issuance of the Restructuring Resolution and determined, among other issues, that the debt of the imposition of transition charges and issuance of Restructuring Bonds will result in savings for PREPA.

24. In the referenced Restructuring Order, the Energy Commission explained:

> (…)
>
> 2. The Transition Charge is a mechanism designed to reduce the costs of the Authority's customers. **The bondholders of approximately $7,170 million dollars of existent debt of the Authority**, with an interest rate of approximately 5.86 percent, **have accepted a reduction of such debt**. Known as "Participant Bondholders," **these are non-secured bondholders who have committed, or will commit, to reduce the value**

---

[4] See, Exhibits 14 and 15 of the Motion for Summary Judgment filed by the co-defendants PREPA and CRAEE.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     15

CERTIFIED TRANSLATION

**of their loans to a 85% of the original amount, at the same time that they accept a lower interest rate of approximately 5.22 percent. They will stop receiving payments of the principal for five years**.

3. In simple terms, a portion of the preexistent debt of the Authority (that is usually denominated as 'historic debt,' to distinguish it from the future debt that the Authority will assume to finance new capital investments) will be replaced with the 'Restructured Debt.' The 'Restructured Debt' will have a lower nominal value and lower interest rate, in addition to a moratorium in the principal payments for five years. **This action will reduce the capital costs of the Authority -and, as a result, the costs for the Authority's customers- for approximately $867 million dollars.**
**4. These savings, however, are subject to a condition. Specifically, the bondholders are willing to reduce the payments that they receive only if the Commission increases the certainty that these payments will be made.** The mechanism to increase such certainty is known as 'Transition Charge.' The term Transition Charge has created many confusions. Although it will appear as a new item in each of the customer's invoice, this will not increase the cost of any customer more than what the customer would have paid if, once the Commission establishes new rates through a proceeding of rate revision, all the debt of the Authority would be seen reflected in their rates. The Transition Charge describes the portion of the total payment of each client (around 12 percent) that the Authority shall treat in a separate manner than the rest of the payment that the customer will make. Specifically, **the Authority shall separate the payments of the Transition Charge (which are property of the Corporation) from the rest of its income, to transfer those charges to the bondholders participants of the restructuring**, without exception and delay. This is the purpose of the Transition Charge mechanism: **separate the dollars pertaining to the Corporation and promised to the bondholders participants of the restructuring from the general funds of the Authority and assure that those dollars are transferred to their owners in law**. (Emphasis supplied).

25. On June 28, 2016, the CRAEE issued the Restructuring Resolution No. 2016-2009, which authorized the issuance of the Restructuring Bonds.

26. The notice of the referenced resolution was published in three occasions in the newspaper of general daily circulation *El Nuevo Día* and the newspaper of daily circulation *The Bond Buyer,* as of July 5, 2016.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.         16

CERTIFIED TRANSLATION

27. There is no controversy among the parties regarding the content of the published notifications on the Restructuring Resolution No. 2016-2009 which authorized the issuance of the Restructuring Bonds.[5]

28. On January 1st, 1974, the Fluvial Resources Authority (now PREPA) and the former Fiduciary First National City Bank signed a Trust Agreement.

29. In its origin, the Authority appeared in the Trust as a Trustor and First National City Bank as fiduciary.

30. Section 1201 of the Trust of 1974 establishes that the agreement will be in force while any bond issued under the agreement or the owed amounts are pending to be paid.

31. Section 1101 of Article XI of the Trust of 1974 allows amendments to the agreement through supplementary agreements, subject to the agreement of the parties and the notification to the bondholders, providing them with the right to consent.

32. In Section 1304 of Article XI of the referenced trust, the parties specified the way to acknowledge a right to third parties that were not a party to the agreement:

> **Except as herein otherwise expressly provided, nothing in this Agreement expressed or implied is intended or shall be constructed to confer upon any person, firm or corporation other than the parties hereto** and the holders of the bonds issued under the provisions of this Agreement any right, remedy or claim, **legal** or equitable, under or by its provisions being intended to be and being for the sole and exclusive benefit of the parties hereto and the holders from time to time of the bonds issued hereunder. (Emphasis added).

33. Article IX of the Trust of 1974 included various dispositions related with the figure of the trustee and that will provide the bondholders certain rights.

---

[5] See, Exhibits 19 and 20 of the Request of Summary Judgment filed by the co-defendants PREPA and CRAEE.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.          17

CERTIFIED TRANSLATION

34. There is no controversy among the parties that Art. 22 of Act 4-2016 amends Act No. 33 of June 27, 1985, known as the Act to Establish Minimal Procedural Requirements for the Suspension of Essential Public Services, 27 L.P.R.A. Sec. 262, *et seq.* (Act 33-2009).

35. There is no controversy among the parties that Art. 12 of Act 4-2016 amends Act No. 83 of May 2, 1941, as amended, 22 L.P.R.A. Sec. 191, *et seq.*, in including dispositions related to the Act of Public-Private Partnerships (Act 29-2009).

36. Act 4-2016's title does not include the citation of Act No. 33-2009 or of Act 29-2009.

37. The concept of current expenses was defined in Section 101 of Article I of the Trust of 1974, as amended by the supplementary agreements, as follows:

> The term "Current Expenses" shall means **the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality for the foregoing**, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to Capital Expenditures, engineering expenses relating to operation and maintenance, fee and expenses of the Trustee, the 1947 Trustee, the Paying Agents an of the paying agents under the 1947 Indenture, legal expenses, **any payment to pension or retirement funds,** and all other expenses required to be paid by Authority under the provisions of the 1947 indenture, this Agreement of law, or permitted by standard practices for public utility system, similar to the properties and business of the Authority an applicable in the circumstances but shall no include and deposits to the credit of the Sinking fund, the Reserve Maintenance Fund, the Self-insurance Fund and the Capital Improvement Fund or the 1947 Sinking Fund or deposits under the provisions of Sections 511, 512 and 513 of the 1947 Indenture. ( …), (Emphasis supplied).

38. Article I of the Trust of 1974, as amended, defines the concept "System" in Section 101 as follows:

> The **word** "System" shall mean all the properties presently owned and operated by the Authority as a single integrated system, together with all works and properties which may be hereafter acquired or constructed by the Authority in connection with the production, distribution or sale of electric energy and the acquisition or construction of which shall be finance in whole or in part from the proceeds of bonds issued under the

CERTIFIED TRANSLATION

provisions of the **1947** Indenture or this Agreement or from moneys deposited to the credit of the 1947 Construction Fund, Capital Improvement Fund, the Construction Fund or the Renewal and Replacement Fund or form Subordinate Obligations to the extent such works and properties have been included by the Authority as part of the System as provided in Section .516 hereof.

39. Section 502 of Article V of the referenced trust, as amended, establishes:

The Authority further covenants that it will at all times fix, charge and collect reasonable rates and charges **for the use of the services and facilities furnished by the System** and that form time to time, and as often as it shall appear necessary, **it will adjust such rates and charges so that the Revenues will at all times be sufficient**
(A) Until the outstanding 1947 Indenture Bond have been paid or provision has been made for their payment and the release of the 1947 indenture:

**(a) To pay the Current Expenses of the System and**

*        *        *        *        *        *        *        *

The Authority further covenants that if any time the Revenues shall not be sufficient to make such deposits, transfers and payments, it will revise the rates and charges for the services and facilities furnished by the System and, if necessary, it will revise its regulations in relation to the collection of bills for such services and facilities, so that such deficiency will be made up before the end of the next ensuing fiscal year. Should nay deficiency not be made up in such next ensuing fiscal year, the requirement thereof, except as to the payments which are required to be made in such fiscal year under subclause (4) of clause (b) of the paragraph (A) of this Section, shall he cumulative and the Authority shall continue to revise such rates until such deficiency shall have been completely made up, provided that during the Amendment Period, the Trustee may institute and prosecute such suit, action or proceeding only upon the written request of the holders of not less than the majority in the aggregate principal amount of bonds then outstanding.; provided that during the Special Period, the Trustee may institute and prosecute such suit, action or proceeding only upon the written request of the holders of not less than the majority in the aggregate principal amount of bonds then outstanding (…) (Emphasis supplied).

40. Section 505 of Article V of the Trust of 1974, as amended, establishes the creation of the

general fund of PREPA and in its Section 505 establishes the following:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.          19

CERTIFIED TRANSLATION

The Authority covenants that moneys hi the General Fund will he used first for the payment of the Current Expenses of the System, that such expenses will o exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner, and that the total amount provided thereof in the Annual Budget for such fiscal year or any amendment thereof or supplement thereto unless such expenses shall be required by conditions beyond the control of the Authority happening during the fiscal year ad which could not reasonably have been contemplated at the time of the adoption of the Annual Budget, if at any time the total amount theretofore expended during any fiscal year for Current Expenses shall exceed the total amount provided in the Annual Budget for Current Expenses for such fiscal year, the Authority covenants that it will report in writing that amounts of such excess and the reason or reasons therefor to the Consulting Engineers and to the Trustee as soon as practicable but not later than the last day of the sixth month following the month in which such excess shall have occurred. (...)

### III

### APPLICABLE LAW

**A. The Motion for Summary Judgment**

Rule 36.1 of Civil Procedure, 32 L.P.R.A. Ap. V R. 36.1 provides for a case to be resolved summarily, after one of the parties files a motion to the court stating the reasons of fact and law that justifies the resolution of the controversies or the case in its entirety in a summarily way. *Meléndez-González et al. v. M. Cuebas, Inc. et al.,* 193 D.P.R. 100 (2015). The procedural mechanism of the summary judgment seeks the rapid solution of such litigations that do not present substantial controversies of fact, and thus, do not require a judgment. *Abrams-Rivera v. E.L.A., D.T.O.P. and Others,* 178 D.P.R. 914 (2010); *Ramos-Pérez v. Univisión de P.R.,* 178 D.P.R. 200 (2010); *Quest Diagnostic v. Mun. San Juan,* 175 D.P.R. 994 (2009); *Sucn. Maldonado-Ortiz v. Sucn. Maldonado-Hernández,* 166 D.P.R. 154 (2005). The motion shall be based on sworn statements or other admissible evidence that demonstrates that there is no substantial controversy of essential and relevant facts for a summary judgment to be issued over the totality or any part of a claim. See, Rule 36.3 of Civil Procedure, 32 L.P.R.A. Ap. V, R. 36.3.

CERTIFIED TRANSLATION

The summary judgment will only be granted if the offered allegations, depositions, answers to interrogatories and admissions, together with any other sworn statement that is filed, if any, demonstrate that there is no real and substantial controversy over any essential and relevant fact and that, as a matter of law, it proceeds. Rule 36.3(e) of Civil Procedure, 32 L.P.R.A. Ap. V; *SLG Zapata-Rivera v. J.F. Montalvo,* 189 D.P.R. 414, 430 (2013). It is important to have present that the promoter of the summary judgment has the burden to establish the absence of a real controversy over the relevant facts and that the law favors it. *Hurlado v. Osuna,* 138 D.P.R. 801, 809 (1995).

On the other hand, no summary judgment will be issued in the following circumstances: 1) when there are contested material and essential facts; 2) there are affirmative allegations in the complaint that have not been refuted; 3) a real controversy regarding a material and essential fact appears from the documents attached to the motion; or 4) as a matter of law it does not proceed. *Pepsi-Cola v. Mun. Cidra et al.,* 186 D.P.R. 713, 757 (2012); *Nissen Holland v. Genthaller,* 172 D.P.R. 503 (2007); *Vera-Morales v. Bravo-Colón,* 161 D.P.R. 308 (2004).

The actual method under Rule 36.3 of Civil Procedure, *supra,* imposes to the parties the duty to identify the facts that they deem relevant and of stating their contrary version based on admissible evidence. *SLG Zapata-Rivera v. J.F. Montalvo,* supra, p. 434. To determine if a case shall be resolved through a summary judgment, "the documents attached to the motion, the documents included with the opposition, and those documents that are part of the file will be analyzed." *Abrams-Rivera v. E.L.A.,* supra, p. 933. This is extended to those documents in the case file that have not been part of the summary judgment. *Mejías, et als. v. Carrasquillo, et als.,* 185 D.P.R. 288 (2012). The petition will be granted when it is clear that "we have the truth of all the necessary facts to resolve the controversy." *Id.* p. 299.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.      21

CERTIFIED TRANSLATION

The fact that the other party did not include evidence contrary to the one filed by the moving party, does not necessarily imply that the summary judgment proceeds. *Vera-Morales v. Bravo-Colón,* supra, p. 331-332; *PFZ Props., Inc. v. Gen. Acc. Ins. Co.,* 136 D.P.R. 881, 912-913. This, because the documents attached to the motion for summary judgment must be interpreted in the most favorable way to the opposing party, granting the opposing party the benefit of any inference that may reasonably be derived from them. *Corp. Presiding Bishop v. Purcell,* 177 D.P.R. 714, 720.

The summary judgment will only proceed when it is clear that the opposing party cannot prevail under any set of facts and that the court has under its disposition all the necessary evidence to resolve the controversy before its consideration. Any doubt is not sufficient to deny the request of summary judgment; it must be a doubt that permits to conclude that there is a genuine and substantial controversy over relevant facts. *Nieves-Díaz v. González-Massas,* 178 D.P.R. 820, 848 (2010).

Under Rule 36.2 of Civil Procedure, *supra*, a party against which a claim has been filed can request a summary judgment at any moment since the party was served but no later than the 30 days following the deadline set by the Court to conclude discovery. When a motion for summary judgment is filed before the discovery procedure, the Court, in its exercise of discretion to resolve the controversies with justice, can adopt various measures in favor of the opposing party that did not have the opportunity of obtaining evidence to ground its essential facts. *Pérez v. El Vocero de PR,* 149 D.P.R. 427, 449 (1999). Among the measures, are the following: (1) deny the motion for summary judgment; (2) order the continuance of any hearing so that the party can obtain declarations or take depositions; (3) order that the other party delivers certain evidence; (4) postpone the evaluation of the motion; (5) issue any other order that is fair. See, Rule 36.6 of

CERTIFIED TRANSLATION

Civil Procedure; *Perez v. El Vocero de P.R.,* supra, págs. 449-450. We must have present in this analysis that resolving a premature motion "… can have the effect of depriving the opposing party of his rights without due process." *Id.*, p. 449.

In the scope of civil procedure, the trend is to facilitate the discovery, in a way that it positions the judge in the best position possible to resolve fairly. *Ward v. Tribunal Superior,* 101 D.P.R. 865, 867 (1974). Now, the fact that a motion of summary judgment is filed before discovery does not automatically impede the court from addressing and adjudicating the controversy before it. Regarding this issue, we should highlight the Supreme Court's expressions in *García-Rivera v. Enríquez-Marín,* 153 D.P.R. 323, 340 (2001) in which it stated the following:

> … if the court is before a premature request for summary judgment, it can, in its exercise of discretion, postpone the evaluation of the motion or deny it at that stage of the proceedings, being the purpose of the rules of civil procedure to make feasible that the courts make justice when resolving the controversies. **However, the Court of First Instance must take those measures that guarantee that Rule 36.6, supra, is not used as a mechanism to delay the final resolution of the issue.** Because of this, **the grounds stated by the opposing party must be reasonable and adequate.** Cuevas-Segarra comments that "it is reduced to establishing reasonability limits to the acts of the opposing party," and states that the probability of prevailing by the moving party shall not be considered at this stage.
>
> Regarding this issue, Wright and Miller states the following:
>
>> Thus Rule 56(e) [our Rule 36.5 of Civil Procedure] must be read in conjunction with the provision in Rule 56(f) [our Rule 36.6 of Civil Procedure] that the court may deny summary judgment and order a continuance when the opposing party shows why it cannot present facts necessary to justify opposition so as to allow time to pursue discovery and obtain the evidence required under Rule 56(e).
>> (citations omitted).

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     23

CERTIFIED TRANSLATION

Although it has been recognized that there are circumstances that merit discovery before considering a motion for summary judgment, this has only been applied to complex cases or when a moving party bases its motion on the insufficiency of the evidence over the essential facts of the case. *García-Rivera v. Enríquez-Marín,* supra; *Pérez v. El Vocero de P.R.,* supra.

## B.  <u>The Motion to Dismiss</u>

Rule 10.2 of Civil Procedure, 32 L.P.R.A. Ap. V., R. 10.2, allows an interested party to request the dismissal of a lawsuit filed against it, based on the following defenses: (1) lack of subject matter jurisdiction; (2) lack of jurisdiction over the person; (3) insufficiency of the summons; (4) insufficiency of process of service; (5) failure to state a claim for which a remedy could be granted, and; (6) failing to include an indispensable party. As can be concluded, the referenced rule allows the defendant party to request the dismissal of the complaint when the action fails to state a claim for which a remedy could be granted. *Torres v. Torres, et al.*, 179 D.P.R. 481, 501 (2010).

When analyzing this type of motion, the Court will assume as true all of the facts provided in the complaint, which will be considered in the light most favorable to the plaintiffs. *Id.* In these cases, [the Court] will apply experience and common sense to determine if, based on the alleged facts, the complaint establishes a plausible claim that justifies that the plaintiffs have the right to a remedy. R. Hernández Colón, *Práctica Jurídica de Puerto Rico. Derecho Procesal Civil*, 5ta Ed., San Juan, Lexis Nexis, 2010, pág. 268. It is the petitioner's responsibility to demonstrate with certainty that the plaintiffs do not have the right to any remedy under any state of law that could be established to support their claim, even when interpreting their cause of action in a liberal manner. *Rivera-Sanfeliz et al. v. Jta. Dir. First Bank*, 193 D.P.R. 38, 49 (2015); *Ortiz-Matías, et als. v. Mora Development*, 187 D.P.R. 649 (2013). This is not about

CERTIFIED TRANSLATION

examining whether the plaintiffs would prevail in their claim, but whether they have the right to offer evidence that justifies their claim, assuming as true the facts alleged in the complaint. J.A. Cuevas-Segarra, *Tratado de Derecho Procesal Civil*, 2da. ed., Lexis Nexis, San Juan, 2011, T. II, p. 530. The second paragraph of Rule 10.2, *supra*, allows for a motion to dismiss based in that it fails to state a claim for which a remedy could be granted, to be considered as a request for summary judgment when the following occurs:

> If, on a motion asserting defense number (5), **matters outside the pleading being challenged are presented to and not excluded by the court**, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 36 until its final disposition, and all parties shall be given reasonable opportunity to present all material relevant to the motion under said rule. (Emphasis added).

Regarding the conversion of a motion to dismiss, in *Torres-Capeles v. Rivera-Alejandro*, 143 D.P.R. 300, 309 (1997), the Court explained that

> …it can occur when any of the parties, the petitioner or the respondent, **submit matters that were not included in the allegations, such as depositions, admissions, certifications and responses to interrogatories.** The court has full discretion to accept or not the evidentiary matter that is annexed. This discretion is normally exercised taking into consideration whether the matter offered and the subsequent conversion would facilitate or not the dismissal of the matter before its consideration. (Emphasis added).

The request for dismissal will be granted unless it provides with certainty that the plaintiffs do not have a right to any remedy whatsoever under any state of facts that could be proven in support of their claim. *Consejo Titulares v. Gómez-Estremera, et als.*, 184 D.P.R. 407, 423 (2012); *El Día, Inc. v. Mun. de Guaynabo*, 18 D.P.R. 811 (2013). This doctrine is only applied to correctly alleged facts expressed in a conclusive manner, which on their face do not prompt any doubt whatsoever. *Colón v. Lotería*, 167 D.P.R. 625, 649 (2006).

### C.  Indispensable Party

Rule 16.1 of Civil Procedure allows for "people that have a common interest without whose presence the controversy could not be adjudicated, to become parties and be joined as plaintiffs



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     25

CERTIFIED TRANSLATION

or defendants, as required. When the individual that must be joined as a plaintiff refuses to do so, [he or she] could join as a defendant." 32 L.P.R.A. Ap. V., R. 16.1. A party is indispensable when the controversy cannot be adjudicated without his/her presence, since his/her rights would be affected. *Bonilla-Ramos v. Dávila-Medina*, 185 D.P.R. 667, 677 (2012). "In specific terms, an indispensable party is one that cannot be absent and whose interest in the matter is of such magnitude that a final judgment cannot be handed down between the other parties without radically affecting his/her rights." *García-Colón, et ala. v. Sucn. González*, 178 D.P.R. 527, 548 (2010). This is because the omission of this party violates the due process of law that must be guaranteed to the absent [person] in the lawsuit. *Id.*; *Colón-Negrón, et al. v. Mun. Bayamón*, 192 D.P.R. 499, 510-512 (2015). For this reason, it has been resolved that "if an indispensable party is absent; the court lacks jurisdiction to resolve the controversy." *Colón-Negrón, et als. v. Mun. Bayamón*, *supra*, p. 511. *Romero v. S.L.G. Reyes*, 164 D.P.R. 721, 734 (2005).

To determine if a party is or not indispensable, a pragmatic approach is required, that is, an individual evaluation according to the circumstances of each case in particular. *Romero v. S.L.G.*, *supra*, p. 732; *García-Colón et al. v. Sucn. González*, *supra*, p. 449-450. It will also be analyzed "whether the court [can] make justice and grant a final and complete remedy without affecting the interests of the absent [person]." *Romero v. S.L.G. Reyes*, *supra*, p. 733. The "common interest" that is referenced in Rule 16.1 of Civil Procedure, *supra*, is not any interest in the lawsuit, but "an interest of such order that impedes the creation of an adequate right without radically affecting or destroying his/her rights." *Pérez v. Morales Rosado*, 172 D.P.R. 216, 223 (2007). It must be real and immediate and cannot merely speculative or of a future interest: *Id.*

The absence of an indispensable party, "although is a reason to dismiss a lawsuit, is not an impediment so that, upon request by the interested party, the court could provide the opportunity

CERTIFIED TRANSLATION

to bring to the lawsuit the party originally omitted, as long as the court can acquire jurisdiction over the party." *Aponte v. Román*, 145 D.P.R. 477, 484-485 (1998) citing *Meléndez-Gutiérrez v. E.L.A.*, 113 D.P.R. 811, 816 (1983). This matter could be raised in any stage of the litigation since the judgment that is issued in the absence of an indispensable party is null. *Unysis P.R., Inc. v. Ramallo Brother Printing, Inc.*, 128 D.P.R. 842, 842 (1991); *Romero v. S.L.G.*, supra, p. 733.

### D.  Interpretation of the Statutes

The judicial power should make efforts to achieve congruent and compatible interpretations to maintain the constitutionality of a law. *Brau, Linares v. ELA et als.*, 190 D.P.R. 315, 337-338 (2015); *Banco Popular v. Municipio de Mayagüez*, 126 D.P.R. 653 (1990). In other words, as part of the established hermeneutic principle, the Court must ensure that no other possible reasonable explanation of the law exists. *Brau, Linares v. ELA et als.*, supra, p. 338. *Dept. de la Familia v. Soto*, 147 D.P.R. 618, 629 (1999); *Caquías-Mendoza v. Asociación de Residentes*, 134 D.P.R. 181, 188 (1993).

A statute will not be declared unconstitutional, unless it is strictly necessary and the controversy under its consideration cannot be adjudicated by other reasons. *Nadal-Arcelay v. DRNA*, 150 D.P.R. 715 (2000); *Pueblo v. Yip-Berríos*, 142 D.P.R. 386 (1997). The Court will abstain from adjudicating the constitutional arguments if the case can be resolved: (1) through a valid legal analysis; (2) in harmony with the criteria of the parties and in accordance with the best purposes of justice; (3) if a reasonable interpretation exists that allows avoiding the constitutional question and; (4) for other reasons. *AMPR et als. V. Sist. Retiro de Maestros*, 190 D.P.R. 854, 878 (2014); *Molina v. C.R.U.V.*, 114 D.P.R. 295, 297 (1983).

### E.  Contents of the title of the legislation

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       27

CERTIFIED TRANSLATION

Section 17 of Article III of the Constitution of the Commonwealth of Puerto Rico (ELA Constitution) provides that "…[n]o bill will be approved, except for those concerning the general budget, that contain more than one matter, which must be clearly expressed in its title, and any part of a law whose purpose has not been provided in the title will be null." 1 L.P.R.A. Art. III, Section 17.

When revising and interpreting this constitutional provision, the Supreme Court has adopted a reasonable and practical approach, rejecting that it should include a detailed index or a summary of the diverse procedures that became statutes. What the Constitution requires is that the subject, in other words, the theme or matter that the legislation is about, clearly appears in its title. In *Donante v. Wrangler de P.R.*, 145 D.P.R. 408, 428 (1998), the Supreme Court provided that:

> When interpreting the transcribed constitutional disposition, we have stated that only in a <u>clear and terminal</u> case it is justified to annul a law because its title suffers deficiencies….The purpose of the constitutional provision is:
>
> … to stop the inclusion in the law of incongruent and strange matters, and at the same time <u>guard against inadvertence, concealment, and fraud in the legislation,</u> … avoid the practice, common in all legislatures in which this provision does not exist, of including in the law incongruent matters that do not have any relationship with each other or with the subject specified in the title, in virtue of which measures are approved without being brought to [people's] attention that, if they had been seen, they would have been challenged and defeated. This seems to avoid surprises in legislation.
>
> In other words, the purpose of the constitutional requirements regarding the title of a bill, "is to inform the public in general and the legislators in particular the matter that is the purpose of the law, so that the first can oppose its approval if considered burdensome and the others [the legislators] can be in condition to cast their vote conscious of the matter object of the legislation." (Quotes omitted; emphasis supplied).

Previously, in *Cervecería Corona, Inc. v. J.S.M.*, 98 D.P.R. 801, 811-812 (1970), when considering a claim that a law violated Sec. 17 of Art. III of the Constitution, the Supreme Court stated:

> Pursuant to what we have said before, only in a clear and terminal case are we justified to annul a law for deficiencies in its title in violation of the transcribed

CERTIFIED TRANSLATION

constitutional provision, Rivera v. Corte, 62 D.P.R. 513 (1943); Sunland Biscuit Co. v. Junta Salario Mínimo, 68 D.P.R. 371, 381 (1948). It is worth remembering that the purpose of the constitutional requirement is to inform the public in general and the legislators in particular the matter that is the purpose of the law, so that the first can oppose its approval if considered burdensome and the others [the legislators] can be in condition to cast their vote conscious of the matter object of the legislation, Rodríguez v. Corte, 60 D.P.R. 919, 921-922 (1942); but this does not mean that the title must contain a detailed description of what is intended, but it is sufficient that in states its purpose in general terms; that it be an index of its contents, since it would be impractical to provide the diverse details that precisely constitute the proposed text. Pueblo v. Vázquez Bruno, 93 D.P.R. 540, 543 (1966). Together with what has been stated, [the purpose] is to try to avoid the inclusion of incongruent matters in the text, unrelated to [the matter] specified in the title, "that the legislature and the public may understand from the title that only matters like the ones expressed in it will be approved." (Emphasis added.)

Professor José Julián Álvarez has described the Supreme Court's position regarding this clause as "comprehensively lax, to not handcuff the legislator," J.J. Álvarez-González, *Derecho Constitucional de Puerto Rico*, Temis (2009), p. 244. This has been confirmed by the Supreme Court, citing with approval Professor Álvarez' statement and added that: "a strict interpretation of the constitutional provision could impede and block the legislative process since it would oblige the legislator to approve multiple laws to regulate only one or a general matter." *Herrero and others v. ELA*, 179 D.P.R. 277-295 (2010). The Supreme Court's position is, at the same time, coherent with its purpose, found in the Session Diary of the Constituent Convention where it was expressed that what was sought with the referenced portion of Section 17 was to "avoid the riders, avoid the creation of strange amendments [contrary to] the purpose of the bills and [to avoid] the adulteration of the purpose of a bill by surreptitiously approving something that the Legislative Assembly should not approve." *Herrero y otros v. ELA*, supra, p. 294, citing 2 *Sessions Diary of the Constituent Convention 896*, (1961).

This norm was reiterated and applied more recently to validate Act 7-2009 before a claim that the title did not describe all matters addressed in the law and that it was an "incongruent [law], that combined legislation about matters and that repeals a series of established laws,

CERTIFIED TRANSLATION

regulations, and public policy." See, *Bomberos Unidos v. Cuerpo de Bomberos*, 180 D.P.R. 723, 765 (2011). In fact, when reviewing and applying the law in that case, the Supreme Court emphasized that it has to been taken into account that in special legislation of an economic nature, the statute will have a broader reach and of the same manner, "…it presupposes that mechanisms of an economic nature will be used, such as income measures, cost reduction and financial cuts, without requiring for all of them be specifically addressed in the title of the law." *Id.*, pp. 765-766.

### F.   The separation of powers and the approval of bills

The ELA Constitution establishes a republican system of government characterized by the separation of three powers: executive, legislative, and judicial. Each one of these powers, although sovereign and independent regarding the exercise of the conferred power, relates to the others thereby wholly maintaining the authority of each one. *Domínguez-Castro v. ELA*, 178 D.P.R. 1, 91 (2010). The doctrine of separation of powers does not provide for the absence of interaction or absolute separation, but establishes itself over the principle that the power is delegated in the three branches of government to avoid the concentration of powers in only one branch, or the abuse of power by the other. *Id. Banco Popular v. Corte* 66 D.P.R. 66,71 (1944).

In this interaction of powers, the validity of projects promoted by the Executive so that they eventually become law has been recognized. The denominated *administration project* is a legislation promoted by the Governor that, when submitted to the legislative body, is considered as presented by the legislators affiliated to the party that the First Executive belongs to, even though they can accept or reject the bill. Regarding the projects proposed by the Executive, in *Noriega v. Hernández-Colón*, 126 D.P.R. 42, 53-54 (1990), the Supreme Court expressed that "all of our governors have proposed new legislation and changes in public policy to drive their

CERTIFIED TRANSLATION

respective electoral mandates and to address the country's most important problems." The consideration and approval of administration projects is in accordance with our Constitution and a routine event in our legislation. See, for example, *Brau v. ELA*, 190 D.P.R. 315, 320-321 (2014); *Pueblo v. Ruiz*, 159 D.P.R. 194, 207 (2003); *Pueblo v. Molina-Virola,* 141 D.P.R. 713, 722 (1996); *Ortiz v. Mun. de Lajas*, 153 D.P.R. 744, 754 (2001).

The legislation that originates in this manner neither has defects nor the appearance of being null, since it constitutes a legitimate exercise of the executive power in its interaction with the legislative [power]. What is imperative in these cases is for the requirements established by the ELA Constitution for the approval of laws be met. Article III, Section 17 of the Constitution requires all bills to be "read, sent to the commission, which will return it with a written report." To approve a bill it is required, also, the "majority of the number of members that comprise each chamber." ELA Constitution, Art. III, Section 19. Once approved by such majority, the bill should be submitted to the Governor and if the Governor signs it within ten (10) days, it will become law. *Id.*

### G.  Due process of law in its procedural form and access to justice

The purpose of the substantive form of due process of law is to protect and safeguard the fundamental rights of the people. On the other hand, due process of law in its procedural form imposes on the State the obligation to guarantee that the interference with the interests of liberty and property of the individual only occur through a just and equal procedure. *Vázquez-González v. Mun. San Juan*, 178 D.P.R. 636 (2010); *San Gerónimo Caribe Project, Inc. v. A.R.Pe.*, 174 D.P.R. 640 (2008); *Fuentes-González v. Badillo*, 160 D.P.R. 444 (2004); *Rosario & Assoc. V. Departamento de la Familia*, 158 D.P.R. 306 (2002); *U. Ind. Emp. A.E.P. v. A.E.P.*, 146 D.P.R.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.          31

CERTIFIED TRANSLATION

611 (1998); *Rivera-Rodríguez & Co. v. Lee Stowell, etc.*, 133 D.P.R. 881 (1993); *Rodríguez v. ELA*, 130 D.P.R. 562, 576 (1992).

To activate the protection that provides this right in its procedural form, the following two considerations must be present: (1) an interest in liberty or property, and (2) determining what is the due process of law. *Partido Acción Civil v. ELA*, 150 D.P.R. 359, 376 (2000). If the right to liberty or property is not identified, the State is not obligated to provide a due process of law.

In this context, and in what is pertinent to the case before us, Act 4-2016 establishes a procedure to challenge its provisions. See, Art .35, Chap. IV of the Act. Article 35(c)(1) establishes an expiration term of sixty (60) days to challenge Chapter IV about Securitization, which commences on the date of the first publication of the notice of approval of the law; such term expired last April 19th. The judicial action should be presented in the Court of First Instance, San Juan Part, to determine: (a) the validity of Chapter IV of the law; (b) if such Chapter results or not in violation or impairment of a contract or agreement granted by the ELA or the Authority with the bondholders or other creditors, or the taking of property by the ELA without just compensation; (c) if the funds that are received from the Transition Charge constitute income and rent from the CRAEE and not a tax or contribution, and if the right of the CRAEE to impose and charge the transition charge may or not be revoked; (d) if the income from the transition charges are subject to encumbrance or other from PREPA bondholders or other creditors or any other person; (e) any other matter regarding the aforementioned, including those related with the U.S. Constitution and the ELA Constitution.

Another expiration term of forty-five (45) days is established in Article 35(d)(1) to challenge the Second Phase of the implementation of the law. This is the one that relates to the validity of the Restructuring Order approved by the Energy Commission and the approval on behalf of the

CERTIFIED TRANSLATION

CRAEE of the Restructuring Bonds, among others. The term commences at the moment of the first publication of the notice about the approval of the Debt Restructuring Order Resolution. The judicial action must be presented, equally, before the Court of First Instance Courtroom of San Juan to determine the legality or validity of the aforementioned resolution.

The brief expiration terms do not represent problems of a constitutional nature, but are recognized as a valid exercise of the legislator to avoid prolonging the uncertainty of the state of law. Our system establishes expiration terms that are equally brief or even shorter to commence a judicial action, present defenses and claim rights. For example, see Article 1414 of the Civil Code, 31 L.P.R.A. Sec. 3924 about the term of nine (9) days to exercise the right of redemption of co-owners; Article 1425 of the Civil Code, 31 L.P.R.A. Sec. 3950, about the term of nine (9) days to exercise the right of redemption for a litigated credit; Article 630 of the Code of Civil Prosecution, as amended, 32 L.P.R.A. Sec. 2831 about the term of five (5) days to appeal a judgment of eviction in a summary procedure; the term of three (3) months to challenge the voluntary recognition of paternity, *González-Rosado v. Echevarría-Muñiz*, 169 D.P.R. 554 (2006); the term of thirty (30) days for claims against a vendor under the commercial code, *S.M.C. Coast, Inc. v. Master Concrete*, 143 D.P.R. 221 (1997); the term of twenty (20) days to challenge a municipal ordinance, *Acevedo v. Asamblea*, 125 D.P.R. 182 (1990). On the other hand, the Municipal Financing Act of Puerto Rico of 1996, 21 L.P.R.A Sec. 6010, establishes a very brief term of ten (10) days starting from the date of the Approval Notice to commence a judicial action geared to questioning an ordinance or resolution that authorizes an obligation approved by the Government Bank of Puerto Rico, including those related to the payment of bonds, notes or instruments.

CERTIFIED TRANSLATION

Thus, the purpose of the figure of expiration is to avoid the persistence of uncertainty of a relationship or legal situation. *González-Rosado v. Echevarría-Muñiz*, supra, p. 567.

## H. <u>Equal Protection of Laws</u>

Section 7 of Article II of the Constitution of the Commonwealth of Puerto Rico establishes the right to equal protection of laws. Where applicable, said Section provides that "[a]ny person shall be deprived of his liberty or property without due process of law, nor shall any person in Puerto Rico be denied equal protection of the laws." The equal protection of the law is based on the cardinal principle of similar treatment for similarly situated persons. This means that the government can make classifications between persons for any legitimate purposes as long as it observes that basic norm. R. Serrano Geyls, *Constitutional Law of United States and Puerto Rico*, San Juan, Ed. Puerto Rico Bar Association, 1988, Vol. II, p. 1082. The basis of this precept arises from the basic conception that in order to govern a society so complex and varied, in which there are different individual and group interests, and diverse social relations, it is necessary to establish classifications. *López v. ELA*, 165 D.P.R. 280-297 (2005). That is, to govern any society and especially a modern society without instituting classifications between people, without constructing inequalities that favor some and harms others, is impossible. Id. *Domínguez-Castro*, p. 70.

As a corollary to the above, the Supreme Court has stated that the constitutional principle of equal protection of laws does not require equal treatment of all citizens, but prohibits unjustified unequal treatment. *Alicea v. Córdova*, 117 D.P.R. 676, 696 (1986), *Pueblo v. Matías-Castro*, 90 D.P.R. 528, 531 (1961), quoted in *Domínguez*, p. 71. The State can make classifications between persons without breaking the usual principle, provided that the classification is reasonable and with the attainment or protection of a legitimate public interest.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       34

CERTIFIED TRANSLATION

*Zachary International v. Superior Court*, 104 D.P.R. 267 (1975). That is, the inequality that violates the Constitution is that which reflects a preference based on prejudice, not that which is based on a public interest. *Vda. De Miranda v. Srio de Hacienda*, 114 D.P.R. 11, 14 (1983). Hence, the main problem of applying equal protection of laws is to design rules that allow the government to establish classifications, but at the same time protect people against undue, unreasonable or hateful inequalities. Serrano Geyls, op. cit., p. 1081. Therefore, to carry out this task, it is necessary to make an analysis of the relationship between the purpose to be achieved and the means or classification used to achieve it; the effect of such a relationship on the right or interest from which the persons concerned are deprived must also be examined. *Id*.

When a court in Puerto Rico is faced with a constitutional analysis over the reasonableness of a legislative classification, the criterion or scrutiny it will use will be minimal or rational nexus scrutiny, or strict scrutiny. *López v. ELA*, supra, p. 298; *Velez v. Sec. of Justice*, supra, p. 537. Rational scrutiny is used in cases where economic and social regulations are challenged. In applying it, the constitutionality of the classification is presumed. *Domínguez-Castro*, supra, p. 72; *Rodriguez-Rodriguez v. ELA*, 130 D.P.R. 562, 582 (1992). In addition, the court has to adopt an approach of great deference towards the legislative action that is challenged. Although the classification does not appear to be the most appropriate, wise, and efficient way to advance any legislative purpose, the court must uphold its constitutionality once it is established that there is a rational relationship between them and the purpose outlined. Judicial intervention will be very limited, since it is the Legislature and not the Judicial Branch, which has the power to design classifications of the socioeconomic type. *Domínguez-Castro*, p. 72; *San Miguel Lorenzana*, supra, pp. 431-432, Consequently, the court cannot adjudicate the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     35

CERTIFIED TRANSLATION

functions of the legislature when examining the constitutionality of a statute pursuant to the guarantee of equal protection of laws. *Id*.

## I. Impairment of contractual obligations

Section 7 of Article II of the Constitution of the Commonwealth of Puerto Rico, like Section 10 of Article 10 of the United States Constitution, prohibits the adoption of laws that impair contractual obligations. This prohibition limits the government power to interfere with the contractual obligations between private parties, as well as the contractual obligations contracted by the State. *Dominguez-Castro*, supra, p. 80; *Energy Reserves Group v. Kansas Power & Light*, 459 US 400 (1983). In assessing the validity of statutes under this clause, the applicable scrutiny will depend on the type of contract, if private or public, whose obligation is claimed. This difference responds to the fact that when the change occurs in the context of public procurement, judicial scrutiny must be more careful to ensure that the State's action is not for its own benefit only. *Id*. That more severe scrutiny, however, does not prevent the State from exercising its regulatory power in the public interest. Thus, the function of the judicial forum in assessing the validity of legislation under this clause "is to establish a balance between the power of the State (police power) to safeguard the well-being and security of citizenship and the interest to protect contractual relations." *Domínguez-Castro*, supra, p. 81.

As an initial step in this evaluation, it must be determined whether there is a contractual obligation between the State and the party claiming it; if there is a contractual obligation, it will be examined whether the amendment of the obligation constitutes a substantial or severe impairment. When the amendment adversely affects the essential terms or conditions which mainly gave rise to the contract, thereby frustrating the reasonable expectations of the parties, there is a substantial or severe impairment that triggers a further analysis: assess whether the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     36

CERTIFIED TRANSLATION

modification seeks to advance an important interest for the benefit of the general welfare. Finally, it must be decided whether, in addition to being reasonable, the modification is necessary to advance the public interest. If the court finds that the amendment meets the criteria of necessity and reasonableness to advance the general interest, it must uphold the constitutional validity of the challenged law. *Domínguez-Castro*, supra, p. 84. A relevant criterion that provides for the final determination of reasonableness of the measure is that the legislation is approved in response to an emergency situation and that its application is temporary or transitory. *Id.*, p. 85.

## J. **The trust figure**

The 1974 trust fund was signed by the Authority before Act 219-2012, known as the Trust Act (12 L.P.R.A. Sec. 3351 et seq.), came into force, which we refer to the repealed articles of the Civil Code of Puerto Rico to discuss this figure.

Article 834 of the Civil Code established that "the trust is an irrevocable mandate under which certain goods are transferred to a person, called a fiduciary, to have them disposed of as ordered by the person who transfers them, called settlor, to benefit of the same or a third party called trustee." 31 L.P.R.A. Sec. 2541; *TOLIC v. Febles-Gordini*, 170 D.P.R. 804 (2007). The settlor is the person who creates a trust by an express manifestation of will, is the one who determines the end of the trust for the benefit of a third party, and is the person that constitutes the trust and designs the goods or rights necessary for the fulfillment of its purposes, transferring ownership to the fiduciary. Lugo Irizarry, Carmen Teresa, *The trust in Puerto Rico: a legal hybrid to the future*, First Book Publishing of P.R. 1996, p. 41. Under the repealed rule of law, the settlor could, among other stipulations, agree to: (1) state the trust assets; (2) appoint trustees; (3) reserve rights and impose conditions on the trust; (4) appoint substitutes and / or entrust the trustee to a third party with the appointment of a substitute; (5) dismiss the trustee when the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.      37

CERTIFIED TRANSLATION

trustee's personal interests are opposed to those of the trust, or when he fraudulently or maliciously mismanages the trustee assets, or when he/she is disabled or disqualified. Lugo Irizarry, op. cit., p. 41-42; Arts. 855 and 858 of the Civil Code, 31 L.P.R.A. Secs. 2562 and 2565.

This mandate could be established for any purpose that would not break the law or public morals. Art. 838 Civil Code, 31 L.P.R.A. Sec. 2547. A trust could be constituted on all kinds of movable or immovable property, corporeal and incorporeal, present or future. Art. 840 Civil Code, L.P.R.A. Sec. 2544. The trustor also was free to create a trust for any purpose and under any terms or conditions that do not violate the law or public morals or are not specifically prohibited by law. Art. 855 Civil Code, 31 L.P.R.A. Sec. 2562. Public trusts were those that are interested in general society or a considerable social sector, while the private trust is established for the benefit of specific individuals and individuals. Lugo Irizarry, op cit. p. 83, citing Batiza, Rodolfo, *The Trust: theory and practice*, 3rd. Ed. Libreria Porrúa, S.A. Mexico, 1976, pp. 22 et seq.

Because the trust is a form of contract, they must be interpreted as such, so that the true intention of the contracting parties prevails. In view of this, the contract clauses should be read in an integral way, interpreted one by the other, solving any ambiguity so that all its parts take effect. Art. 123.3-1241 of the Civil Code, 31 L.P.R.A. Secs. 3471-3479; *González v. Sucn. Cruz*, 163 D.P.R. 449, 437-458 (2004); *Caguas Plumbing v. Continental Const, Corp*., 155 D.P.R. 744, 753 (2001).

## K. General doctrine of contracts and clauses in favor of third parties

Contracts are legal businesses that exist since the requirements of consent, object and cause concur. From that moment, the contracts establish obligations that have force of law

CERTIFIED TRANSLATION

between the contracting parties. Arts. 1213 and 1144 of the Civil Code, 31 L.P.R.A. Secs. 3391 and 2994. See also, *Bosques v. Echevarría*, 162 D.P.R. 830, 836 (2004); *Master Concrete Corp. v. Fraya*, SE, 152 D.P.R. 616, 621-625 (2000). The contracting parties are not only bound by the agreement, but also to all consequences that are in accordance with good faith, use and law. Hence, contracts are a source of obligations that are perfected since the contracting parties voluntarily consent to their compliance. Art. 1210 of the Civil Code, supra, Sec. 3375. *López v. Gonzalez*, 163 D.P.R. 275, 281-282 (2004); *Amador v. Conc. Univ. Church of Jesus Christ*, 150 D.P.R. 571, 582 (2000). Contracts have the force of law between the parties, who must comply with the agreement, as long as the law, morality and public order are not violated. Art. 1207 of the Civil Code, supra, Sec. 3372; *Guadalupe Solís v. González-Durieux*, 172 D.P.R. 676 (2008); *Jarra Corp., v. Axxis Corp.*, 135 D.P.R. 764 (2001).

Concerning the interpretation of contracts, it has been reiterated that if the terms of a contract are clear and leave no room for doubt as to the intent of the contractors, it will be interpreted in the literal sense of its clauses, reason why the court is prevented from resolving on what the parties allegedly attempted to agree to at the time of contracting. *Fuentes v. Popular Leasing*, 184 D.P.R. 540, 568 (2012). If the terms of a contract are clear, it is not possible to resort to rules of interpretation. 31 L.P.R.A. Sec. 3471*; Residents Parkville Sur v. Diaz Luciano*, 159 D.P.R. 374, 385-386 (2003). It should be noted that although there is a generality in the terms of a contract, it should not be understood as including things different from those on which the interested parties proposed to contract. Art 1213 of Civil Code, 31 L.P.R.A. Sec. 3473; *Marcial v. Tome*, 144 D.P.R. 522, 539 (1997).

On the other hand, the contract clauses must be interpreted as a whole and not in isolation, seeking its true meaning and the interpretation of clauses in relation to others. Article

CERTIFIED TRANSLATION

1237 of the Civil Code, 11 L.P.R.A. Sec. 1475; *Guadalupe Solís v. González-Durieux* 172 D.P.R. 676, 685 (2007); *CNA Casualty of P. R. v. Torres-Diaz*, 141 D.P.R. 27 (1996). Consequently, although the intention of the parties to interpret contracts must be considered, interpretation must be consistent with the principle of good faith and cannot lead to incorrect, absurd and unjust results. *S.L.G Irizarry v. S. L.G Garcia*, 153 D.P.R. 713, 727 (2001).

In our civil law, as a general rule, contracts only have an effect between the parties that grant them and their heirs, unless they contain stipulations in favor of third parties. Article 1044 and 1209 of the Civil Code, 31 L.P.R.A. Secs. 2994, 3374. That is why a contract is not always indifferent to third parties. *Bco. Central Corp. v. Yauco Homes, Inc.*, 135 D.P.R. 858, 863 (1994). If the contract has a stipulation in favor of a third party it can demand its compliance provided that it has made known its acceptance to the obligor before the stipulation has been revoked. Id.; Art. 1209 of the Civil Code, 31 L.P.R.A. Sec. 3374; *Arsuaga, Inc, v. La Hood Construction*, 90 D.P.R. 104, 109-110 (1964). In a contract in favor of third-parties, the intention of the contractors is to grant the beneficiary the right to claim legal compliance with what was established. *Central Bank Corp. v. Yauco Homes Inc.*, supra, pg. 864. The Supreme Court, citing Diez-Picazo, has pointed out that contracts in favor of third parties "are only those that the parties enter into in order to directly or indirectly assign a right to a third party which, however, has not participated neither directly nor indirectly in the business and that is not therefore bound by it ... "and that" ... the reason of the stipulation for or the benefit of the third party lies in the existence of an interest of the stipulator in which the agreement is established and in which the promise is fulfilled for the beneficiary." L. Diez-Picazo, Foundations of Patrimonial Civil Law, Madrid, Ed. Ternos, 1979, Vol. I, pp. 265-274.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       40

CERTIFIED TRANSLATION

It is by the nature of the stipulant's interest that the third party is also legitimized to require the promise or to comply with the agreed favor. Furthermore, it is not necessary for the third party to accept the stipulation in his/her favor to acquire his right. *Central Bank corp. v. Yauco Homes, Inc.*, supra. As a general rule, it is the stipulator who has the sole power to revoke the provision for the benefit of the third party. *Id.* 864-865. The determination of whether a provision gives the third party the right to claim execution of the promise is a matter of fact. *Id.*, p. 866.

According to the aforementioned principle, "courts are empowered to ensure compliance with contracts and they should not relieve a party from the performance of its contractual obligation, where such contract is legal, valid and does not contain any defects." *Oriental Financial v. Nieves*, 172 D.P.R. 462, 471 (2007). Consequently, the contract, its rights, powers and obligations do not affect other third people, neither in its favor nor against it. *Muñiz-Olivari v. Stiefel Laboratories, Inc.*, 174 D.P.R. 813, 822 (2008).

## L. Trusts created for PREPA's bond emission

Since its inception, PREPA as a public corporation and autonomous governmental instrumentality of the Commonwealth of Puerto Rico has the power to borrow money, make and issue bonds either to advance its corporate purposes or guarantee the payment of its bonds by tax or pledging their contracts or income. See, Organic Law of PREPA, as amended, 22 LP.R.A. secs. 193 and 196 (0). The rights and obligations related to the issuance of PREPA bonds have been established through trusts agreements. The first issuance of PREPA bonds was regulated under the terms of the Trust Indenture 1947, which was amended by several supplementary agreements. The purpose of the revenue bonds was to provide additional funds to PREPA to refinance certain bonds and pay the cost of the capital improvement program in order to provide

CERTIFIED TRANSLATION

additional capacity to the system and extend the transmission and distribution of the electric system. See Exhibit 21 of the Motion for Summary Judgment, filed by the co-defendants PREPA and CRAEE, Trust of 1974, p. 2. The agreement established several funds in which the System's revenues would be distributed. *Id.,* p.7.

As far as we are concerned, PREPA undertook a second bond issuance through the 1974 Trust Agreement as there was a need to issue new income bonds to provide funds for the creation of additional facilities to generate, and distribute electricity and serve the current and future demand of the System. See, Exhibit 21, supra, p. 2 and 4. As in the 1954 trust, conditions, limitations and restrictions were also established for the issuance of the new bonds. *Id.,* p. 6. In addition, a number of provisions related to the figure of the fiduciary and in which the bondholders were given certain rights, so that their provisions govern the contractual relationship between PREPA and its bondholders. See Exhibit 21, supra, Article IX.

To understand the concept of what comprises the PREPA's System, Section 101 of Article I of the Trust of 1974[6] explains:

> The word "System" shall mean all properties presently owned and operated by the Authority as a single integrated system, together with all works and properties which may be hereafter acquired or constructed by the Authority in connection with the production, distribution or sale of electric 1947 Construction of the 1947 Construction Fund, Capital Improvement Fund, the 1947 Indenture or this Agreement or from the acquisition or construction of which shall be in whole or in part from the proceeds of the bonds issued under the provisions of the 1947 Construction Fund or the Renewal and Replacement Fund or Subordinate Obligations to the extent such works and properties have been included by the Authority as part of the System as provided in Section 516 hereof.

As part of the considerations for the issuance of bonds, Article V containing the provisions related to the management and administration of the revenue of the Authority was

---

[6] See Exhibit 21. Art.1

CERTIFIED TRANSLATION

included. In particular, a number of special funds were set up to deposit PREPA revenues and detailed how these funds would be managed. See, Exhibit 21, supra, Article V, Sections 303, 506 and 507.

In Sections 501 and 502 of Article V, PREPA reiterated its power to charge and impose reasonable tariffs for the use of the facilities of the System, as well as to adjust them so that its revenues are sufficient to pay, among other items, its current expenses. See, Exhibit 21, supra. Under the terms of this agreement, a General Fund was created in which, after the Authority fulfilled the outstanding payments of the bonds issued under the trust, all its income, other than income from the investments, was deposited and applied according to the terms of the contract. See, Exhibit 21, supra, Article V, Sections 501 and 502. According to the trust, the rent vouchers are payable on the net revenues of the Authority that come from the rates charged for the electricity service that is provided to the subscribers. Later, in Section 709 of Article VII, PREPA agreed that none of the gross income of the System would be used for purposes other than those agreed upon in the trusts. See, Exhibit 21, supra. In particular, the referenced Section provides:

> The Authority covenants and agrees that, as long as any of the bonds secured shall be outstanding, none of the gross proceeds of the System shall be used for any purpose other than those provided in the 1947 indenture and this Agreement, and that no contract or contract will be entered into or any action taken by which the rights or the Trustee or the bondholders might be impaired or diminished.

PREPA agreed that it would prepare and adopt an annual budget to cover its current expenditures. See Exhibit 21, supra, Article V, Section 504. It also specified how it would manage the income deposited in the general fund. Section 505 of the 1974 Trust, as amended, provides:

> The Authority covenants that the General Fund will be used first for the payment of the Current Expenses of the System, that such expenses will be an amount



which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical In accordance with the provisions of this Agreement, and in accordance with the provisions of this Agreement, and in accordance with the provisions of this Agreement. The total amount provided in the Annual Budget for Current Expenses for such fiscal year, the Authority covenants that it will report in writing that amounts to such excess and the reason or reasons for the Consulting Engineers and to the Trustee as soon as practicable but not later than the last day of the sixth month following the month in which such excess shall have occurred. (...) (Emphasis supplied).

In order to understand the items included in the current expenses, Section 101 of the

Trust Fund, as amended, specifies:

The term "Current Expenses" shall mean the Authority's reasonable and current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality for the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to Capital Expenditures, engineering expenses relating to operation and maintenance, and expenses of the Trustee, the 1947 Trustee, the Paying Agents of the paying agents under the 1947 Indenture, legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by Authority under the provisions of the 1947 Indenture, this Agreement of law, or by standard practice for public utility system, similar to the properties and business of the Authority (19), (19), (19), (19) and (19) and (19)) and the 1947 Sinking Fund, as well as the provisions of Sections 511, 5.12 and 513 of the 1947 Indenture. (…) Emphasis added).

It emerges from the foregoing that PREPA agreed that it would set and charge reasonable

rates to cover its current expenses, which included contributions to pension retirement plans.

Section 712 of Article VII states the obligation agreed by PREPA not to create a charge on the

revenues of the System as follows:

(a) The Authority covenants that so long as any bond shall be outstanding under the provisions of this Agreement and except as in this Agreement otherwise permitted, it will not sell, lease or otherwise dispose of or encumber the System or any part thereof and will not create or permit to be created any charge or lien on the Revenues ranking equally with or prior to the charge or line on the Revenues of the bonds issued under and secured by this Agreement. (…)

In Section 1304 the contracting parties will specify who could invoke a remedy, right or

claim. See Exhibit 21, supra. In particular, they agreed that:



CERTIFIED TRANSLATION

> **Except as herein otherwise expressly provided, nothing in this Agreement is expressly implied or intended to be construed to confer upon any person, firm or corporation other than the parties hereto and the holders of the bonds** issued under the provisions of this Agreement **any right, Remedy or claim, legal or equitable, under or by its provisions being intended to be and being for the sole and exclusive benefit of the parties hereto** and the holders from time to time of the bonds issued hereunder. (Emphasis added).

It is important to note that the provisions of Article VII of the 1974 Trust establish the remedies available to bondholders for non-compliance with the payment obligations related to the bonds issued. See, Exhibit 21, supra. Finally, Article XI of the 1974 Trust allows the agreement to be amended through supplementary agreements, subject to the contracting parties agreeing and notifying the bondholders, providing them with the right to consent.

## M. Act No. 4-2016

With the approval of Act 4-2016, the Legislature again faced the adverse consequences of the precarious economic situation facing Puerto Rico. This time, the precarious tax status of PREPA was taken into account when it was stated in the Statement of Motives that "[t]his legislation seeks to provide the Authority with the necessary tools to make it a self-sustaining entity that implements best practices in the electrical industry through the integrated planning of its resources." The Legislature also recognized that "[a] transformation of the Authority does not begin with the approval of this Act. This piece of legislation is another link in the chain of efforts that have been carried out and will continue to be carried out by this Administration in benefit of all consumers." See Exhibit A of the Motion for Summary Judgment filed by the co-defendants PREPA and CRAEE, Statement of Motives of Act 4-2016.

For decades, members of the Puerto Rico Legislature have made legislative efforts to address the precarious economic situation of PREPA in the long term. According to the Statement of Motives of Act 4-2016, with these measures

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       45

CERTIFIED TRANSLATION

> ... we have been able to identify areas of opportunity that have resulted in significant short-term savings. These efforts have improved the Authority's processes and controls in several areas, namely: fuel inventory, accounts receivable and collection operations, tendering, inventory management and security. Regarding the tender for the purchase of fuel, the Authority has implemented an integrated process through its various departments, which includes: periodic meetings, evaluation of inventory, purchasing controls and other practices that meet the standards in the industry. (...)

Nonetheless, the Legislature recognizes that, despite the existence of measures that have produced savings, the financial situation has reached a point where immediate action is required to achieve the solvency of PREPA, with a gap of almost $ 1 billion. See, Exhibit A, supra. That is why they point out that a transformation of the Authority is necessary since:

> ... the measures taken have not been sufficient. Within this fiscal year, **the Authority faces obligations that it cannot afford**. The Authority has an obligation to pay nearly $ 700 million under its fuel credit lines and approximately $ 763 million in principal and interest payments under its outstanding bonds. Although as of October 1, 2015, the Authority held approximately $ 367 million in cash for operating expenses, approximately $ 106 million in a special fund designed for construction projects and $ 101 million in a trust-controlled trust fund for its payment bonds of services to debt, **it is projected that there is a gap of more than almost $ 1 billion. This precarious financial situation requires immediate action so that the Authority can achieve financial solvency and can meet its obligations in an orderly and satisfactory manner to all its clients**. In order to achieve the transformation of the Authority, an integrated agreement has been reached with the creditors (Creditors Agreement) in order to balance the needs and interests of all the affected parties. The implementation of this Agreement requires the approval of this Law (Emphasis supplied).

See, Statement of Motives of Act 4-2016.

In addition to the above, "... the Authority has also confronted the accumulation of a budget deficit that needs to be dealt with in a responsible way." To illustrate the insolvency of the AEE, the Statement of Motives of Act 4-2016 adds:

> Over the years, **the accumulation of debt and the lack of capital to invest in infrastructure caused the Authority to deteriorate into an obsolete entity**. The high dependence on fossil fuels has caused inefficiency in productivity and a rise in energy costs. Likewise, partisan political influences have created a lack of trust

CERTIFIED TRANSLATION

and credibility in the Authority. **Currently, the Authority has a debt of over $ 9 billion** and during the summer of 2014 faced a maturity of approximately $700 million in fuel credit lines, **while it had no access to capital markets and could not secure other sources**, including Central government, to refinance them. (Emphasis added).

On the other hand, the Legislature notes the importance for the economy of Puerto Rico to achieve the self-sustainability of PREPA by stating that as part of the legislative purpose is to ensure that the Authority has "an opportunity to provide an efficient, safe, reliable, environmentally friendly service and above all of rate stability for its consumers [which] **will stimulate Puerto Rico's economic grow**th." (Emphasis added). See, Exhibit A, supra. In the same way it is sought to increase "... the supply of service and [that] its employees [enjoy] a work environment of which they can be proud and in which they can work safely and efficiently " Id.

Members of the Legislature also emphasize in the Statement of Motives of Act 4-2016 the importance of transforming PREPA to improve the economy of Puerto Rico by stating that:

> The Authority operates for the benefit of all of Puerto Rico and not for the benefit of a select group. There is a need to break cycles of resistance to change **so that the country's economy can thrive. This transformation represents the basis for a prosperous and growing Puerto Rico.** This is the opportunity to move forward with a plan based on facts and financial reality, but above all with great desire to maintain and protect the Authority as a heritage of all Puerto Ricans and Puerto Ricans. (Emphasis added).

That is why it is recognized that "[t] he implementation of the transformation efforts will allow an investment of $2.4 billion to modernize generators that, in turn, facilitate an era of renewable energy in Puerto Rico." Finally, the success of this transformation requires that all creditors, clients, employees and municipalities share the social and economic burden for the benefit of all Puerto Ricans, as well as future generations. Also it is explained that "… to comply with the mission of the Authority and of this Administration, it is necessary to transform the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.          47

CERTIFIED TRANSLATION

Authority **to provide resources that permit them to move forward**." (Emphasis supplied.)

See, Exhibit A, *supra.*

The importance of achieving Puerto Rico's economic development through PREPA's restructuring was reiterated in the public policy statement on restructuring. Specifically, Article 2 states:

> To assure the competitiveness and the economic development of the Commonwealth of Puerto Rico, it has been necessary to continue the transformation and reform of our electric sector. **However, such reform has had to be framed within the context of the financial reality of the Electric Power Authority, understanding that its finances, operations and government require evaluation and will to transform**. Having always as essential purpose the conservation of the Authority as an entity of the Commonwealth of Puerto Rico, an integrated agreement has been accomplished with the creditors (the "Creditors' Agreement") which requires the approval of this Act for its implantation. The fundamental purpose of implementing such agreements is to benefit all of the customers with a fair, reasonable and transparent rate that, also, permits to comply with the Authority's obligations and bring it to provide a world class service in medium and long term. (…) (Emphasis added).

As we have stated, the referenced legislative piece has the purpose of achieving PREPA's sustainability. According to the Statement of Motives of the Act, **to achieve this goal, it is necessary to place PREPA in a position to access the capital markets.** The implementation of this goal requires, at the same time, to lay the groundwork to reduce the load of PREPA's debts with its principal creditors, because this will permit it to assure other income sources so that it can comply with its obligations in the long term.

For the Legislative Assembly, PREPA's revitalization requires to address various objectives:

> (1) **reduce the load of the debt**; (2) reform the governance operations and structure assuring its independence; (3) implement significant operational savings; (4) encourage the private-public investments and establish the conditions for key investments in electric infrastructure, cleaner energy and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.        48

CERTIFIED TRANSLATION

diversification of power sources, including renewable; (5) maintain reasonable and accessible rates; (6) comply with state and federal regulations.

According to engineer Javier A. Quintana-Méndez, PREPA's Executive Director, these efforts are addressed to facilitate "… the investment of $2,400 million in fundamental infrastructure projects and [establishing] a legal framework for the issuance of restructuring bonds that will give financial sustainability to the Corporation." See, Exhibit 8of the Motion of Summary Judgment filed by the co-defendants PREPA and CRAEE, Positive Report of the SB 1523, p. 5. This, because "PREPA needs to modernize its infrastructure to produce more efficient power and thus, more economic." According to the Executive Director, if these measures are not approved "… the consequences will be immediate and devastating because the creditors will leave their agreements without effect which will cause that for summer 2016 it will have no liquidity and it cannot comply with the investment in infrastructure. As an immediate consequence, the Authority will have to increase the cost of the energy and thus, the rates." *Id.*

**Act 4-2016 does not address the immediate elimination of all PREPA's debts but proposes necessary measures to achieve its financial solvency.** As could be seen, one of the measures to achieve PREPA's restructuring and transformation requires the immediate action of reducing the load of debts.

To achieve this result, the Legislative Assembly addressed various issues that are summarized in the title of Act 4-2016 as follows:

> To establish the Electric Power Authority Revitalization Act; amend Sections 2, 4, and 5; add a new Section 5B; amend Sections 6 and 6A; repeal Section 6B; amend Section 6C and renumber it as Section 6B, **add a new Section 6C, amend Sections 7, 15, and 22 of Act No. 83 of May 2, 1941, as amended, known as the "Puerto Rico Electric Power Authority Act"**; amend Section 1.3; amend Sections 6.3, 6.16(c), 6.24, and 6.25; add a new Section 6.25A, amend Sections 6.27, 6.29(a); repeal Section 6.31; amend Section 6.32 and renumber it as Section 6.31, amend Section 6.33 and renumber it as Section 6.32, renumber Section 6.34

CERTIFIED TRANSLATION

through Section 6.45 as Section 6.33 through Section 6.44, respectively; amend renumbered Section 6.43 of Act No. 57-2014, as amended, known as the "Puerto Rico Energy Transformation and RELIEF Act"; amend Sections 4 and 5 of Act No. 114-2007, as amended, known as the "Net Metering Act," in order to adjust its definitions; provide for the administration, operation, and governance of the Authority; provide for the rate review and contracting processes; provide for the matters that shall govern the conduct of the members of the Board of Directors and employees of the Authority; clarify issues related to the contributions in lieu of taxes of municipalities; provide for transition charges; **clarify the energy bill review process**; clarify the duties and responsibilities of the Energy Commission and the Independent Consumer Protection Office; **provide for the matters that shall govern renewable energy projects**; create the "Puerto Rico Electric Power Authority Revitalization Corporation"; provide for the Authority's debt restructuring process and repayment mechanism, as well as the legal and judicial proceedings related thereto; **and for other related purposes**. (Emphasis added).

Among the tools considered by the Legislative Assembly to revitalize PREPA is the process of restructuring the debt and its payment mechanism. A group of bondholders that have 40% of PREPA's debt and creditors participated in the referenced agreement. See, Exhibit 4, *supra*, Positive Report of the SB 1523, p. 5. The new legislation considers the creditors' agreement previously agreed with certain bondholders to modify certain terms and conditions of the original debt and establish the process to effectuate a new bond emission with the purpose of acquiring capital. *Id.*

With these instruments, part of PREPA's millions in debt to the bondholders is modified, which establishes a ground to begin the restructuring process. See, Chapter IV of Act 4-2016. Regarding this issue, it is convenient to emphasize the statements of Mrs. Lisa Donahue, PREPA's Chief Restructuring Officer, in her presentation before the Special Commission for a New Power Policy,[7] in which she stated that:

---

[7] Positive Report regarding SB 1523 subscribed by the Energy Affairs and Water Resources Commission of the Senate of Puerto Rico, p. 8, Exhibit 4 of the Motion of Summary Judgment.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     50

CERTIFIED TRANSLATION

…**the challenges that PREPA faces is** (sic) **the actual debt of nine thousand millions that it has with the bondholders and with the credit lines for buying fuel.** The Forbearance Agreement that has been extended for more than a year has permitted a relief to the Authority of more than one thousand three hundred million dollars ($1,300,000,000). This agreement, in addition with the changes implemented until that moment, have been of help, however, they are not sufficient. On or before July 1, 2016, PREPA was compelled to pay around seven hundred million dollars ($700,000,000) in credit lines for buying fuel and seven hundred fifty million ($750,000,000) in debt to the bondholders. **At the time of the presentation to PREPA, it had approximately five hundred seventy five million ($575,000,000) in cash.** (Emphasis added).

She also mentioned that "with this agreement a large number of PREPA's creditors have agreed to help the Authority **to establish the grounds to begin a restructuring process** before July 1, 2016 which will permit to stabilize its finances, maintain stable rates and maintain a safe and efficient operation."[8] (Emphasis supplied). Also, states that "the concessions of these creditors are of approximately a thousand, four hundred million dollars ($1,400,000,000)."[9] Regarding the negotiation process with the creditors, Mrs. Donahue explains "… that the lack of a legal framework to restructure PREPA has complicated the negotiations with the creditors because there is no way of forcing the creditors to participate in negotiations."[10] We should highlight that PREPA had an immediate necessity of reaching an agreement with the creditors because "for the next January 1, 2016, certain bonds for the sum of two hundred seventy five million dollars ($275,000,000) will mature and for July 1, 2016, PREPA is forced to pay an approximate amount of four hundred twenty million dollars ($420,000,000)."[11]

The issuance of restructuring bonds established in Chapter IV must be held through securitization, which means that the payment obligation is guaranteed by a secured repayment

---

[8] *Id.*
[9] *Id.* p. 9.
[10] *Id.*
[11] *Id.* p. 11.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.      51

CERTIFIED TRANSLATION

source for the bondholders. See, Chapter IVI of Act 4-2016. Securitization is "an available tool

for the electric power companies to guarantee part of their debt. Said mechanism was used by the

Long Island Power Authority (LIPA) in New York State, with the purpose of restructuring part of

the debt through bonds classified as investment bonds by the accrediting houses, for the purpose

of reducing the costs of the debt service."[12]

In order to issue the new Restructuring Bonds, the legislative piece created the PREPA's

Revitalization Corporation for it to absorb the Authority's debt. See, Article 32 of Act 4-2016.

The following powers were granted to this non-profit new public corporation:

> (1) Adopt Restructuring Resolutions;
> (2) In consideration of **providing financial assistance to the Authority by payment of Approved Restructuring Costs, impose and collect Transition Charges in connection with the financing of Approved Restructuring Costs through the issue of Restructuring Bonds for the benefit of the Authority**, including (i) making such Transition Charges Mandatory or Non-bypassable to Customers, and (ii) approving an Adjustment Mechanism, subject to the Commission's approval in a Restructuring Order prior to the issue of the Restructuring Bonds;
> (3) **Issue Restructuring Bonds as stated in a Restructuring Resolution and to pledge the Restructuring Property to the payment thereof**. However, the Corporation may issue Restructuring Bonds to retire, defease, or refinance revenue bonds of the Authority that have been issued on or before December 31st, 2015 ("Revenue Bonds") only if, as a result of the issue of the Restructuring Bonds, the current value of the total debt service of said Restructuring Bonds is at least seven hundred twenty-five million dollars ($725,000,000) less than the current value of the total debt service of the Revenue Bonds of the Authority that have been issued on or before December 31st, 2015. For this calculation, the yield of the Restructuring Bonds shall be used, which bonds shall be issued as determined by the Corporation using typical assumptions, as determined by the Corporation in consultation with the advisors thereof. The aforementioned verification calculation shall be used only on the closing date of the Exchange Offer with respect to the restructuring transactions included in the Creditors' Agreement only and solely with respect to the issuance of the Restructuring Bonds issued for such purposes. For clarification purposes, any Restructuring Bond issued to defray the incidental costs of the initial issuance of Restructuring Bonds or to defease

---

[12] *Id.* p. 14.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     52

CERTIFIED TRANSLATION

the Revenue Bonds of the Authority shall not be subject nor included in the previous calculation.

**None of the foregoing shall prevent the Corporation from issuing Restructuring Bonds to retire, annul, or refinance revenue Bonds of the Authority that have been issued on or before December 31st, 2015, if, as a result of the issue of the Restructuring Bonds, the current value of the total debt service of said Restructuring Bonds is at least seven hundred twenty-five million dollars ($725,000,000) less than the current value of the total debt service of the Revenue Bonds of the Authority that have been issued on or before December 31st, 2015.**

(4) Provide for and direct the use of proceeds of Restructuring Bonds on behalf of the Authority in accordance with a Restructuring Resolution and a Trust Agreement entered into by the Corporation in connection with such Restructuring Bonds; and

(5) Contract for the administration and servicing of Restructuring Property and Restructuring Bonds, and for administrative services, including hiring a manager or administrator other than an employee of the Authority. (Emphasis supplied). (…)

See, Article 33 of Act 4-2016.

The Transition Charges established in Act 4-2016 are independent of those charges and rates imposed by PREPA and are not considered as PREPA's revenue. This is established in Article 31 of the law when defining this concept as follows:

(6) "Transition Charges" means those rates and charges that are independent from rates and charges of the Authority and that are imposed on Customers in accordance with a Restructuring Resolution to recover the Ongoing Financing Costs, and shall include a pro rata portion of any late payment fee imposed with respect to any past due electricity bill that includes therein a sum for Transition Charges.

(20) "Transition Charge Revenues" means any money and other property received or to be received, directly or indirectly, on account of the Transition Charges, and all proceeds of the investment thereof.

Also, section (i) of Article 35 states:

As soon as possible after receipt thereof, **all Transition Charge Revenues and the Authority's charges shall be paid or deposited in a special collection account with a bank** incorporated under and subject to the laws and regulations of the United States of America or any state thereof, and licensed to operate in the Commonwealth of Puerto Rico, selected by the Corporation **and not related to the Authority or the**

CERTIFIED TRANSLATION

**Commonwealth of Puerto Rico, or under the control of the Authority**. Such revenues shall be allocated and remitted to the Corporation or its assignees or creditors and to the Authority or its assignees or creditors on a daily basis in accordance with their respective interests. Any Servicing Agreement and depository agreement shall include the foregoing deposit and allocation requirements.

Under no circumstances, any Transition Charges imposed or Restructuring Property created by the Corporation to secure any Restructuring Bonds **shall be deemed to be collected on account of taxes, or be deemed to be revenues of the Authority or the Commonwealth of Puerto Rico, or be deemed to be received as a result of the Authority's ownership or operation of the System Assets**, nor shall any Restructuring Bonds be deemed to be a debt or other obligation of the Authority or the Commonwealth of Puerto Rico or any of its political subdivisions. (Emphasis added). (…)

Article 35 of Act 4-2016 establishes the proceeding for the CRAEE to issue valid Restructuring Bonds. In addition to reiterating CRAEE's authority to issue the Bonds and Transition Charges, the referenced article establishes a detailed process that implies:

(b) Approval Process.

(i) Except as otherwise provided by law, **the Corporation shall submit a petition to the Commission enclosed with a proposed Restructuring Resolution** and such other information as required in Section 6.25A of Act No. 57-2014. **Pursuant to Section 6.25A of Act No. 57-2014, the Commission shall review the proposed Restructuring Resolution and such other information to determine whether the calculation methodology followed by the Corporation for the Transition Charges and the Adjustment Mechanism to be applied to adjust the Transition Charges** is consistent with the cost allocation and other standards set forth in Section 6.25A of Act No. 57-2014, and is not arbitrary or capricious. **The Commission shall hold one or more public hearings in connection therewith, as provided in Section 6.25A of Act No. 57-2014. The Corporation may not adopt a Restructuring Resolution unless the Commission has either approved a Restructuring Order or the Commission has lost jurisdiction as provided in Section 6.25A of Act No. 57-2014. The Corporation shall adopt a Restructuring Resolution within five (5) business days after (A) the Commission has approved the corresponding Restructuring Order**, or (B) the date on which the Commission has lost jurisdiction, as provided in Section 6.25A of Act No. 57-2014.

(ii) Any judicial proceedings challenging a Restructuring Order or the findings and determinations stated in a Restructuring Resolution shall only be brought in accordance with the procedures set forth in subsection (d) of this Section, **and the Court shall review such findings and determinations under the standard of**

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     54

CERTIFIED TRANSLATION

**whether the Commission or the Corporation acted in a manner that was arbitrary or capricious.** (Emphasis supplied).

On the other hand, the aforementioned article specifies that the Court of First Instance has jurisdiction to review challenges to the validity of Chapter IV of Act 4-2016. As part of the measures to heed to the precarious financial situation in an expedited manner, Article 35 establishes with particularity a term of sixty (60) days to challenge its provisions as follows:

(c) Validation of this Chapter.

**(1) Within seven (7) days after the approval of this Act, the Corporation or the Government Development Bank for Puerto Rico shall publish in the manner provided in paragraph (2) of this subsection (c) a notice inviting any Interested Person to bring an action before the San Juan Part of the Court of First Instance of the Commonwealth of Puerto Rico** (the "Court"), to determine, among other things:

(A) The validity of this Chapter;

(B) That any provision of this Chapter, including the imposition of Transition Charges, neither results in the breach or impairment of any contract or agreement executed between the Commonwealth of Puerto Rico or the Authority and the bondholders or other creditors of the Authority, nor in the taking of property by the Commonwealth of Puerto Rico without just compensation;

(C) That the money to be received from Transition Charges by or on behalf of the Corporation or any Servicer constitute revenues and income of the Corporation and not of the Authority or any other Person, and shall not constitute available resources of the Commonwealth of Puerto Rico; and that Transition Charge shall not constitute a tax or contribution, and that the right of the Corporation to impose and collect Transition Charges may not be revoked or terminated;

(D) That the Transition Charge Revenues are not subject to any lien or levy whatsoever by bondholders or other creditors of the Authority or any other Person other than the lien or levy of the applicable Trust Agreement to be entered into in connection with the issuance of the applicable Restructuring Bonds; and

(E) Any matters relating to the foregoing including those pertaining to the Constitution of the United States or of the Commonwealth of Puerto Rico.

(2) **The Corporation**, or the Government Development Bank for Puerto Rico acting on behalf of the Corporation, **shall serve notice to all Interested Persons of the approval of this Act and the opportunity to challenge the validity of this Chapter through a notice for such purposes to be published once (1) a week for three (3) consecutive weeks in a newspaper of general circulation in the Commonwealth of Puerto Rico and in a newspaper of general circulation or a financial journal published or circulated in the city of New York.** In

CERTIFIED TRANSLATION

addition, (i) the Corporation, the Puerto Rico Government Development Bank, and the Authority shall post a copy of the notice on their websites not later than five (5) days after the first publication thereof; (ii) the Corporation or the Puerto Rico Government Development Bank acting on behalf of the Corporation shall (A) deliver or cause to be delivered a copy of the notice to those Interested Persons (to the extent known by the Corporation or the Government Development Bank for Puerto Rico) listed in paragraphs (a) through (e) of the definition of "Interested Person" established in Chapter IV of this Act, and (B) file or cause the Authority to file a copy of the notice with the Electronic Municipal Market Access maintained by the Municipal Securities Rulemaking Board (or its equivalent); (iii) the Authority shall deliver a copy of the notice referred to above to all Customers by means of (A) a direct mailing of such notice to such Customers not later than ten (10) days after the first such publication in a newspaper of general circulation in the Commonwealth of Puerto Rico and in a newspaper of general circulation or a financial journal published or circulated in the City of New York, or (B) an insert included in the next billing statement sent by the Authority to its Customers, after the first such publication, and to all Interested Persons listed in paragraph (g) of the definition of said term; and (iv) not later than fifteen (15) days after the first publication, the Corporation or the Authority shall deliver a copy of the notice to any Interested Person listed in paragraph (h) of the definition of "Interested Person" and, to the extent known by the Authority, in paragraph (i) of the definition of "Interested Person" established in this Section and Chapter IV of this Act.

(3) Upon the first publication of the notice in a newspaper of general circulation in the Commonwealth of Puerto Rico and in a newspaper of general circulation or a financial journal published or circulated in the City of New York, all Interested Persons shall be deemed to be aware or have reason to be aware of the approval of this Act and of any alleged damages or claims related to this Act. **A sixty (60)-day period to challenge this Chapter, as set forth in paragraph (1) of this subsection (c) shall begin to elapse on the date of the first publication of such notice in a newspaper of general circulation in the Commonwealth of Puerto Rico and in a newspaper of general circulation or a financial journal published or circulated in the City of New York** (and if not first published on the same date, the later date of the two publication dates shall be used for this purpose). The notice shall provide a detailed summary of the matter the Corporation seeks to validate. […]

(4) The Court shall have jurisdiction over any action related to the matters addressed in this subsection (c), and only if such action or contest is timely filed within the sixty (60)-day statute of repose. Any Interested Person may, within said sixty (60)-day period, appear and contest the legality or validity of any matter sought to be determined in relation to Chapter IV of the "Electric Power Authority Revitalization Act." No other court shall have jurisdiction over any action related to any of the matters addressed in this subsection (c). The Court shall lack jurisdiction if such action is brought after such sixty (60)-day period.

(5) If there is more than one action pending concerning similar contests brought in connection with Chapter IV of the "Electric Power Authority Revitalization Act,"

CERTIFIED TRANSLATION

such actions shall be consolidated to the extent possible, and the Court may order the consolidation of such actions as deemed necessary and proper to avoid unnecessary costs or delays. Such orders shall not be appealable to or reviewable by any court, except on appeal of the final judgment as provided in paragraph (7) of this subsection (c). Actions brought pursuant to this subsection (c) shall be entitled to liberal joinder and cross-claim rules and have priority over all other civil actions brought before the court with respect to docketing or consideration of motions, pleadings, hearings, or trial, and for the purpose of hearing and deciding such actions brought pursuant to the provisions of this subsection (c) promptly.

(6) No contest of any issue or matter under this subsection (c) related to Chapter IV of the "Electric Power Authority Revitalization Act" shall be made other than within the time and in the manner provided in this subsection (c),

except for any contest to be made in accordance with subsection (d) of this Section. None of the provisions of subsection (c) shall be construed in a manner that would preclude the use by the Corporation of any other remedy to determine the validity of any issue or matter, not regulated by this subsection (c).

(7) **A review of the final judgment of the Court may only be requested by filing an appeal with the Supreme Court of Puerto Rico, in the manner described in subsection (f)(2).** (Emphasis added).

Likewise, Article 35, *supra*, establishes the process to validate the issuance of Restructuring Bonds; it provides an expiration term of forty-five (45) days to challenge this action; and provides jurisdiction to the Court of First Instance to review challenges of the determinations of the corresponding entities. It is important to warn that both expiration terms commence from the date of the publication of the notice of approval of the statute. Similarly, in both causes of action for challenges [to the validity of the Act], the Legislative Assembly established that the review of the final judgment adjudicated by the Court could only be appealed to the Puerto Rico Supreme Court. To these ends, Article 35, *supra*, provides:

(d) Validation of the Issuance of Restructuring Bonds.

(1) After the Commission has approved the initial Restructuring Order and the Corporation has approved the initial Restructuring Resolution, and prior to issuing Restructuring Bonds, the Corporation shall publish in the manner set forth in paragraph (2) of this subsection (d) a notice inviting any Interested Person to bring an action in the Court to determine:

(A) **The validity of the Restructuring Order, the issuance of Restructuring Bonds by the Corporation**, including provisions for the payment of such Restructuring Bonds, the validity of such Restructuring

CERTIFIED TRANSLATION

Bonds, and of the outstanding debt of the Authority that is to be refinanced, retired, or annulled through such Restructuring Bonds, the creation of Restructuring Property, and the validity of the formula or formulas used to establish the amount of such Transition Charges for each Customer class, including the allocation of Financing Costs among Customer classes. Therefore, nothing provided in this Chapter IV shall hold the Authority or any of its agents or representatives or third parties harmless from any liability or cause for action that originates or is related to the illegality or nullity of the Authority's outstanding debt that is to be refinanced, retired, or annulled  through such Restructuring Bonds;

(B) **The validity and applicability of the Transition Charges and the Adjustment Mechanism and the revocability of the right of the Corporation to impose and collect Transition Charges;**

(C) That neither the issuance of the Restructuring Bonds (including the use of such Restructuring Bonds by the Authority to annul its outstanding debt) nor the amount of the Transition Charge results in the breach of any contract or agreement executed between the Commonwealth of Puerto Rico or the Authority and the bondholders or other creditors of the Authority, any fraudulent conveyance or any taking of property by the Commonwealth of Puerto Rico without just compensation or is otherwise subject to annulment or rescission; and

(D) Any or all other matters relating to the foregoing including any matters relating to the United States of America or the Commonwealth of Puerto Rico Constitutional law.

(2) The Corporation shall serve notice to all Interested Persons of the adoption of the Restructuring Resolution and the authorization of the Restructuring Bonds and the opportunity to challenge their validity through a notice for such purposes to be published once (1) a week for three (3) consecutive weeks in a newspaper of general circulation in the Commonwealth of Puerto Rico and in a newspaper of general circulation or a financial journal published or circulated in the City of New York. In addition, the Corporation, the Government Development Bank for Puerto Rico, and the Authority shall, not more than five (5) days after the first such publication, (A) deliver, or cause to be delivered, a copy of the notice to those Interested Persons (to the extent known by the Corporation or Government Development Bank for Puerto Rico) listed in paragraphs (a) through (e) of the definition of "Interested Person" provided in Chapter IV of this Act, and (B) file or cause the Authority to file a copy of the notice with the Electronic Municipal Market Access maintained by the Municipal Securities Rulemaking Board (or its equivalent). The Authority shall deliver a copy of the Corporation's notice referred to above to all Customers by means of (A) a direct mailing of such notice to such Customers not later than ten (10) days after the first such publication, or (B) an insert included in the next billing statement sent by the Authority after the first such publication and to all Interested Persons listed in paragraph (g) of said definition. Not later than fifteen (15) days after the first such publication, the Corporation or the Authority shall deliver a copy of the notice to any Interested

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.        58

CERTIFIED TRANSLATION

Person listed in paragraph (h) and, to the extent known by the Authority, in paragraph (i) of the definition of such term provided in Chapter IV of this Act.

(3) Upon the first publication of the notice in a newspaper of general circulation in the Commonwealth of Puerto Rico and in a newspaper of general circulation or a financial journal published or circulated in the City of New York, all Interested Persons and any other Person interested in the matter shall be deemed to be aware or have reason to be aware of the approval of this Act and of any damages or claims related to this Chapter. **A forty-five (45)-day statute of repose to bring an action as set forth in paragraph (1) of this subsection (d) shall begin to elapse from the date of the first publication of the notice in a newspaper of general circulation in the Commonwealth of Puerto Rico and in a newspaper of general circulation or a financial journal published or circulated in the City of New York** (and if not first published on the same date, the later date of the two publication dates shall be used for this purpose). The notice shall provide a detailed summary of the matter the Corporation seeks to validate. (…)

(4) **The Court shall have jurisdiction over any action related to the matters addressed in this subsection (d), and only if such challenge or contest is timely filed within the forty-five (45)-day statute of repose.** Any Interested Person may, within this forty-five (45)-day period, <u>appear and contest the legality or validity of any matter pertaining to the Restructuring Resolution sought to be determined</u>. No other court shall have jurisdiction over any action related to the matters addressed in this subsection (d).

(5) For purposes of this subsection (d), Restructuring Bonds and Transition Charges shall be deemed to be in existence upon their authorization and the Restructuring Bonds and Transition Charges shall be deemed to be authorized as of the date of adoption of the Restructuring Resolution by the Board of the Corporation.

(6) No contest of any issue or matter under this subsection (d) related to the Restructuring Resolution shall be made other than within the time and in the manner herein specified. Nothing in subsection (d) shall preclude the use by the Corporation of any other remedy to determine the validity of any thing or matter, not regulated by this subsection (d).

(7) **A review of the final judgment of the Court may only be requested by filing an appeal directly with the Supreme Court of Puerto Rico, in the manner described in subsection (f)(2).**

(e) If there is more than one action pending concerning similar contests which may be brought in connection with the Restructuring Resolution, such actions shall be consolidated <u>to the extent possible</u>, and the Court may order the consolidation of such actions as deemed necessary or proper to avoid <u>unnecessary costs or delays</u>. Such orders shall not be appealable to or reviewable by any court, except on appeal of the final judgment as provided in this Section. **Actions brought pursuant to this subsection** shall be entitled to liberal joinder and cross-claim rules and **have priority over all other civil actions before the Court with respect to docketing or consideration of motions, pleadings, hearings, or trial,** <u>and for the purpose of hearing and deciding such actions brought pursuant to the provisions of this Chapter promptly.</u> (Emphasis added). (…)

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.      59

CERTIFIED TRANSLATION

Finally, Article 35 (f) of Act 4-2016 provides the term to appeal to the Supreme Court the judgment of the Court of First Instance in the following manner:

> Notwithstanding any other provision of law to the contrary and any rule or regulation of the courts, **no judgment entered pursuant to this Chapter shall be appealed unless it is filed with the Supreme Court of Puerto Rico within thirty (30) days after the notice of entry of the judgment of the Court**, and failure to file such appeal within the specified period shall thereafter prevent any appeals court from exercising jurisdiction over the matters which could have been so appealed. (Emphasis added).

Based on the aforementioned doctrine, we proceed to resolve the controversies before us.

## IV

## Conclusions of Law

As a threshold matter, we address the argument of the Energy Commission to determine if the amended complaint includes sufficient allegations against it, which requires their presence in this case. Then we will analyze the arguments presented in the motion to dismiss and the motion for summary judgment, as well as the oppositions. We address the dispositive motions in this manner because both motions are based in the constitutional validity of Act 4-2016, which requires to evaluate if each of the allegations that are well argued in the complaint are warranted. Once we address the constitutional arguments regarding the challenged legislation, we are going to be in a position to determine if the complaint must be dismissed because it does not contain a claim that justifies a remedy.

After examining the allegations presented by the plaintiff in its amended complaint, we conclude that the issuance of the Restructuring Order by the Energy Commission, as required by Act 4-2016, is sufficient to determine that there is a claim against it that justifies a remedy. We reason that, according to the allegations in the complaint and the challenged legislation, the

CERTIFIED TRANSLATION

appearance of the Energy Commission in this case is necessary to grant a complete remedy. Let's see.

As the plaintiff states in its amended complaint, Article 6.25A of Act 4-2016 delegated to the Commission the authority to determine the rate and the revision of the transition charges, as well as the adjustment mechanism. Thus, CRAEE [Spanish acronym for PREPA's Revitalization Corporation] filed a petition before the Energy Commission which was resolved by a Restructuring Order. In such Order, the Commission approved the methodology of the calculation and the adjustment mechanism filed by CRAEE, which were used to impose the transition charges. Also, in the complaint, it is alleged that the Commission made other determinations to implement the new financial system for the restructuring of PREPA's debt. This means that the Commission made adjudications under Act 4-2016, the law that is constitutionally challenged in this case. In light of this, we hold that the presence of the Energy Commission is indispensable in this case so that a complete remedy can be granted, in case that the plaintiffs' allegations are valid and that we hold that the challenged legislation is unconstitutional. Thus, the motion to dismiss filed by the Energy Commission is denied.

The codefendant parties, PREPA, CRAEE, ELA [the Commonwealth of Puerto Rico] and the individual officers in their character as *ex officio* members of the CRAEE, also filed their dispositive motions regarding the validity of Act 4-2016, which required the evaluation of the constitutional allegations presented by the plaintiff. As we have stated, this case presents various controversies of constitutional rights that are of great public interest, which require the intervention of this Court. The Plaintiff, which represents employees and PREPA retirees, sustains that Act 4-2016 violates various constitutional guaranties and breaches contractual

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.      61

CERTIFIED TRANSLATION

obligations because it modifies or alters the order of payments agreed by PREPA in favor of the retirement plans.

Before we begin with the analysis of the controversies, we must have present that the case before us began with a petition of declaratory judgment filed by the plaintiff requesting that we declare Act 4-2016 unconstitutional, as well as the determinations issued by the organisms that implement it. A close examination of the allegations in the complaint leads us to the conviction that the controversies raised in this case are strictly of law. Although we acknowledge that in some cases it is necessary to begin a discovery procedure for adjudicating certain constitutional arguments, the admitted essential facts and the public documents related with Act 4-2016 in this case are sufficient to apply the relevant judicial rulings and resolve the case. In our opinion, the allegations of the complaint do not present controversies of fact that require postponing the adjudication of the dispositive motions until discovery is done. It is important to highlight that the documents filed by PREPA and CRAEE in their motion for summary judgment are public documents related with the processing and implementation of Act 4-2016, and judicial notice can be taken. See, Rule 202 of the Rules of Evidence of 2009, 32 LPRA Ap. VI, R. 202. Thus, the evidence before the Court was not only in possession of the plaintiff and/or does not require a discovery process for the plaintiff to have access to it.

When reaching this conclusion, we also considered that this case's adjudication does not require considering additional facts to the ones admitted and, thus, it is unnecessary to initiate discovery to consider expert witness reports.[13] This way, we comply with the principle that rules

---

[13] The expert report prepared by the economists Dr. José Alameda and Jorge L. Torres in which they conclude that there are other alternatives to return PREPA's operational sanity or its interpretation regarding the lack of reason or necessity of Act 4-2016 is immaterial and irrelevant in the analysis of the breach of contractual obligations in this case, because the plaintiffs were not a contracting party in the Trust of 1974 or the supplemental agreements. However, because of the conclusion that we reach in this case it is unnecessary to consider them.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.     62

CERTIFIED TRANSLATION

civil litigation proceedings that require the Court to exercise its discretion to reach the case resolution in the more efficient and expedited manner, guaranteeing always the rights of the parties.

Similarly, we are conscious that when analyzing an allegation of the unconstitutionality of a law, the doctrine that is firmly established in our legal system regarding this issue requires that we examine if there is an interpretation that permits to avoid such determination.

Lastly, the adjudication of the reasonableness of the legislative act is not a determination of fact that requires admission of evidence, but a determination of law that this Court has to adjudicate. We are going to do it, following the evaluation criteria and the precedent established by our Supreme Court.

Having addressed the issues above, we proceed to consider and resolve the claims contained in the Amended Complaint in light of the applicable law.

**A.**

**First claim or cause of action: Challenge of Act 4-2016 for insufficiencies in its title**

Plaintiff alleges that the law violates Section 17 of Article III of the Commonwealth's Constitution because its title does not clearly include all the issues included in the 95 pages of the bill. In particular, Plaintiff alleges that the title does not alert the legislators, consumers and workers of the imposition of charges in general, the transition charges, the guarantees of the debt that will be restructured, the elimination or weakening of the guarantees of citizen participation in the PREPA's government and in the rate process or the claims process. Also, Plaintiff alleges that the title is silent regarding other laws that are affected, as Act 33- 1985 of claims and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       63

CERTIFIED TRANSLATION

objections to the bills for public services, and Act 29-2009 of Public-Private Partnerships,[14] and it does not mention the Creditors 'Agreement, which was the reason for which the SB 1523 and its equivalent  HB 2742 was "settled."

First, Act 4-2016's title is extensive and it mentions various laws and numerous articles and topics, all related with PREPA and its restructuring objective. It specifically mentions by name PREPA's Enabling Act (Act 83-1941, as amended), the Transformation and Energy Relief Act and the Net Metering Act. It also mentions various topics included in Act 4-2016 dispositions: "provide for the administration, operation, and governance of the Authority;" "provide for the rate review and contracting processes;" "provide for transition charges;" "clarify the energy bill review process;" "provide for the matters that shall govern renewable energy projects;" "provide for the Authority's debt restructuring process and repayment mechanism, as well as the legal and judicial proceedings related thereto; and for other related purposes." Thus, the matters over which the Plaintiff alleges insufficiency in Act 4-2016 title, as the transition charges, the restructuring process and debt payment, and the process for rate review and revision of bills, are mentioned, and even specifically. The omission of mentioning by name the laws that establish the process of revision of bills and the public-private partnerships through which the projects of renewable energy could be channeled does not make the law unconstitutional, because their topic is mentioned in the title. These, in turn, are germane to PREPA's revitalization and restructuring pursued by Act 4-2016. Finally, it is unnecessary for the creditors' agreement to be mentioned specifically, because this issue is part of the debt's restructuring process and the payment of the debt, which are mentioned in the title.

---

[14] Act 4-2016 contains a disposition that establishes the special processes for the future projects of renewable energy that are done under this law.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.      64

CERTIFIED TRANSLATION

We conclude that according to the case-law on Section 17 of Article II of the Constitution, these references constitute <u>sufficient notice</u> of the matters included in the law. They are expressed in a simple language and easy to understand, for the legislators and the general public.

We must have present that the objective of the constitutional requirements regarding the title of a bill of law is to "inform the general public and the legislators of the particular issue that is object of the law, so that the first one can oppose to its approval if it is considered injurious and the second ones are in condition to issue their vote aware of the subject matter of legislation." Only when we are before a clear and definitive case in which the title contains matters that are not part of the legislation or are contrary to the purpose of the legislation, <u>or when its title does not mention the matters included in it</u>, the nullification of the law could be justified for deficiencies in its titles, for violating the mentioned constitutional disposition. *Cervecería Corona, Inc. v. J.S.M.,* supra. Because the Court understands that Act 4-2016 has a title that provides a complete index and notifies adequately all of the matters included in the legislation, Plaintiff's first cause of action or claim is not warranted according to law.

## B.

**Second claim or cause of action: the manner in which Act 4-2016 was enacted infringes upon the constitutional framework of separation of powers; the statutes of limitations set are unreasonably short and restricts the citizenship´s right to access to justice.**

Under this cause of action the plaintiffs allege, in the first place, that the manner in which Act 4-2016 was enacted undermined the Legislative Branch's independence of judgment, since the Executive Branch placed undue pressure on the members of the legislative bodies for the [bill's] passage. To those effects, plaintiffs highlight the swiftness with which SB 1523 was drafted, processed, and passed, becoming eventually Act 4-2016; They point out that only one

CERTIFIED TRANSLATION

public hearing was held in each legislative body and state that the Governor turned it into law the same day in which the bill was sent for his signature.[15] At the same time, they express that the bill originated as one of administration, which is permitted and very customary, but that the pressure exerted by the [Governor] over the members of the legislative bodies for them to approve it in a specific date and for being a condition for the implementation of the creditors' agreement, impaired the independence of judgment with which the legislators should perform their functions.[16]

As we stated in part II of this Judgment (Undisputed Facts), each legislative body referred the bill sent by the Governor to committee so that from there the corresponding evaluation was to be made and the discussion be taken to the corresponding public hearing. The bill was presented before both legislative bodies on November 4, 2015 as Administration Bill F-245; this was presented by the Senate majority as SB 1523.[17] The Senate Energy Affairs and Water Resources Commission held a public hearing on November 10, 2015 and the House Special Commission for a New Energy Policy held theirs on November 11, 2015. At the hearings, various comments were received. Three months later, on February 4, 2016, the Senate commission held an executive meeting. For its part, the aforementioned House commission issued a positive report after evaluating the comments received in public hearings and SB 1523. After various positive reports over SB 1523 were issued, on February 15 and 16, 2016, each body voted on the bill and approved [it] by a majority of their members. On February 16, 2016, the bill was signed by the presidents of both legislative bodies and sent to the Governor [for] signature, who converted it into law that same day.

---

15 See, Opposition to the Motion for Summary Judgment presented by the co-defendants PREPA and PREPARC on November 4, 2016, p. 23.
16 *Id*., pp. 26-27.
17 Undisputed Fact number 5.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       66

CERTIFIED TRANSLATION

The process described above shows that Act 4-2016 fulfilled the procedure and requirements established by the Commonwealth's Constitution for the enactment of laws, and that the members of the Legislative Assembly performed their function complying with what is required by the Constitution. The process followed, although expedited, did not omit the holding of a public hearing nor impeded that various comments be received that were object of evaluation by the Senate and House commissions. If PREPA has the need to achieve an agreement with its creditors and the absence of a legal framework complicated the panorama for the negotiations, nothing in the process described above reflects an undue pressure by  the Executive Branch that would impair the legislators from exercising their judgment in an impartial and independent manner. The Legislative Branch simply acted with the diligence and speed that PREPA's emergency situation required.

In any event, [we] conclude that it does not correspond to the plaintiffs to assume the "defense" of the legislators for alleged "undue pressure." In the last instance, and having the legislators exercised their function of considering and approving the measure, the argument is not susceptible to a remedy before the judicial forum. *Cfr. Córdova-Ituregui v. Cámara de Representantes*, 171 D.P.R. 787 (2007).

On the other hand, plaintiff challenges the fatal statutes of limitations established in the act for considering them unreasonably short and restrictive to the access to justice that every citizen has a right to. As we stated earlier, Act 4-2016 establishes two fatal statutes of limitations, one of sixty (60) days and another of forty-five days (45), to file judicial actions related to certain provision of the act. See, Chapter IV, subsections (c) and (d). It also provides that the Court of First Instance's final judgment on the matter may only be appealed before the Supreme Court within the thirty (30) days of entry of the judgment in the docket.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       67

CERTIFIED TRANSLATION

The fatal statutes of limitations fixed in this case do not result unreasonable if one keeps in mind that Act 4-2016 was enacted to attend to an emergency situation and procure an immediate action that would allow PREPA to attend to its precarious financial situation. The performance of PREPA's obligation in an orderly manner, reducing the amount of its debt and attending those obligations that impede PREPA from having access to capital markets is a matter of the highest public interest for its tangency with the country's economic development.[18] It is indisputable the necessity to impart certainty to the Authority's revitalization process and the restructuring of its debt. One should consider that the Creditors' Agreement, in which a substantial reduction of the debt and a moratorium of the repayment of the same was agreed[19], required the enactment of this act for its implementation. Article 2, Act 4-2016. The challenge of the legal provisions enacted for the achievement of this goal cannot be left to the mercy of a judicial proceeding that could prolong itself for years. It is evident that the reason for which the legislator adopted short and fatal time periods to resort to the judicial forums is that legal certainty should be achieved over this matter in a short term.

The fatal statutes of limitations of sixty (60) and forty [sic] (45) days does not result unreasonable in view of the high public interest that the law is vested with or impedes the access to justice. As an example of the foregoing, we highlight that the time period of sixty (60) days was not an impediment so that the plaintiffs could come before the Court of First Instance in the present case. It has also not been for the rest of the cases presented before this Forum.[20] In respect to the appeal before the Supreme Court of the final judgment that the Court of First Instance issues, far from causing prejudice to the party interested in appealing, the procedural

---

[18] See, Exhibit A, Request for Summary Judgment, Statement of Motives of the Act, p. 3.
[19] See, Article 33 of Act 4-2016.
[20] Refer to the cases mentioned in footnote 2 of this Judgment. [We] take judicial notice that there have been other cases have been presented before this Forum related with the same act.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       68

CERTIFIED TRANSLATION

vehicle established by the act benefits them because it grants them a direct access to the Forum of last instance in our judicial system and it avoids for them having to incur the costs of litigation that would entail previously presenting a writ before the Court of Appeals. What the other branches cannot do in respect to the approval and establishment of laws that affect the judicial process is handcuff the Supreme Court, limiting its constitutional and review function.  See, Alvarado Pacheco v. E.L.A., 188 D.P.R. 595 (2013).

For all of the foregoing, plaintiffs' second claim or cause of action is contrary to law.

## C.

**Third claim or cause of action:   Act 4-2016 is unconstitutional because it impairs contractual obligations that benefit PREPA employees and UTIER members, and because it violates equal protection of the law**

Plaintiffs claim that Act 4-2016 alters the payment priority established in the 1974 Trust, where PREPA General Fund moneys were to be used first to pay PREPA's current expenses, among which the trust expressly mentions payments to the employees' retirement or pension fund.  Plaintiffs argue that by establishing a transition charge that will be used to pay creditors that acquire restructuring bonds, Act 4-2016 has considerably diminished PREPA's economic capacity to budget and satisfy payment of its contribution to the employees' retirement system and has caused PREPA's debt with such system to potentially soon reach $190.0 million.[22]

Specifically, the plaintiffs argue that a contract between PREPA and its employees exists under the 1974 Trust, by virtue of which PREPA is bound to pay its current expenses as a priority and PREPA's contribution to the employees' pension fund is among such payments; that the clause was contemplated in all the bond issues since then and that the bonds' restructuring through securitization eliminates such priority.   It adds that the transition charge and other

---

[22] According to the plaintiff, the estimated debt for years 2015-2016 and 2016-2017 could reach $190.0 million. See, Opposition to Summary Judgment, page 12, subsection 18.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.        69

CERTIFIED TRANSLATION

charges authorized by Act 4-2016 put aside the public interest and infuse uncertainty to the retirement system and the employer's contribution, since such charges are directed only to pay the bondholders' debt; that Act 4-2016 should have preserved the payment priority and put the retirement system on a par with PREPA's creditors.  In the alternative, it argues that the Legislature should have considered other less onerous measures, such as collecting the debts of private businesses, government agencies and municipalities and eliminating subsidies, imposing a temporary assessment on customers, and increasing charges and rates.  Finally, it states that Act 4-2016's implementation discriminates against the retirement system and its beneficiaries and deprives them of their constitutional right to equal protection of the law.

We begin with the 1974 Trust, as it is the source of the alleged contractual relationship upon which the claim is based.

The 1974 Trust established a general fund into which all of PREPA's income would be deposited, except investment income.  PREPA acknowledged that in order to keep operating, it had to cover its current expenses before making interest payments to the bonds set forth in the trust.  Interpreting the trust's clauses as a whole, we understand that the primary purpose of this agreement is to regulate and establish the rights and obligations of PREPA and the original trustee and successor trustees with respect to bond issues.  In this type of financial instrument, an entity distributes securities to obtain financial resources to maintain and expand its operation. To compete in the market, the entity must clearly reveal its obligations and income, and its budget management so that possible bondholders may make an informed decision when purchasing bonds.

Then, contrary to what the plaintiffs argue, the <u>purpose</u> of the <u>trust</u> was not to establish a priority for payment of PREPA's possible <u>debts</u> with respect to <u>current expenses</u>, but to establish

CERTIFIED TRANSLATION

that PREPA's obligations would be paid with the income deposited in the general fund and inform bondholders of such fact.

We point out that in Sections 501 and 502 of the 1974 Trust, PREPA acknowledges that it is bound to charge for the power services it provides its customers, as well as to impose charges and rates for use of its facilities.   This authority does not originate from the trust agreement but from PREPA's Enabling Act. 22 LPRA Sec 196(l).   To show PREPA could guarantee payment of the bonds that would be issued under the 1974 Trust, a chapter was included that provided the manner in which PREPA's income and yearly current expenses budget would be managed.

Various special funds were created in PREPA by virtue of such agreement.   Section 503 created a general special fund in which all of PREPA's income would be deposited, except the income received from the bond sale. At that time, PREPA agreed that with the money deposited in the general fund it would pay the System's current expenses as well as bonds issued.   Since a business' current expenses are necessary for its operation, PREPA agreed that the general fund money would be used first to pay the System's current expenses.   The agreement provides for this when it states that the current expenses are the reasonable and necessary expenses to maintain, repair and operate PREPA's system, which includes, among other items, the payment of the contributions to the pension or retirement funds.

It cannot be doubted that the essence of Section 503, when interpreted in harmony with the clauses in Chapter V of the 1974 Trust, is to assure the continuity of PREPA'S operations. PREPA acknowledged the importance of directing the income from the System deposited into the general fund to the payment of its current expenses, including the contributions to its employee's retirement plans, before paying the bonds that would be issued.    With such

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.        71

CERTIFIED TRANSLATION

acknowledgment, PREPA assured its continuity and operation through the net income deposited in the general fund, which should have benefited both PREPA and the bondholders who invested in it.

We understand that Section 505 of the trust agreement does not contemplate a priority in favor of the plaintiffs in the payment of the debts that PREPA may have with the retirement system. Nor does it provide a specific remedy to demand performance of the obligations agreed-to by PREPA, such as payment of its current expenses, in particular the contributions to its employees' retirement plans. Therefore, it cannot be concluded that the trust granted a right to the plaintiffs.

However, we cannot deny that in such section, PREPA was bound to comply with paying its current expenses before proceeding to pay the bonds. That is, the clause has an indirect effect of favoring the retirement system, and thus benefits PREPA employees and pensioners, which ultimately are the beneficiaries of these contributions. Although we are conscious of the significant debt that PREPA may have with its employees' retirement plans,[23] we must analyze this obligation in the context of the general fund created in the trust. As discussed, in the 1974 Trust it was agreed that the current expenses and the bonds would be paid with PREPA's income deposited in the general fund. To assure continuity of operations, it was necessary to specify in the trust that current expenses would be paid first from such funds.

With Act 4-2016's approval, the restructuring bonds that would substitute the bonds issued under the 1974 Trust would be paid with income from a transition charge imposed by PREPARC, an independent corporation, through the Restructuring Resolution. As discussed, Act 4 expressly provides that the income that will be used to pay the bonds will not come from

---

[23] Id.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.        72

CERTIFIED TRANSLATION

PREPA income or from the general fund. This allows us to conclude that Act 4 is not in conflict with PREPA's obligations in the 1974 Trust, as the income to be used for paying the restructuring bonds comes from a transition charge that will <u>not</u> be deposited into the general fund or will be considered PREPA income. The creation of an independent entity in charge of receiving the income from the transition charge and of issuing restructuring bond payments promotes the Legislature's interest in dealing with PREPA's budget deficit, reducing its debts and obligations, allowing it access to markets, receiving the necessary capital for investing in its infrastructure and becoming a self-sustaining, globally competitive entity.

The act does not deal with all of PREPA's debts; <u>the purpose of the act, we repeat, is to provide PREPA with tools to gain access to capital markets and assure other sources of income.</u>[24] The Statement of Motives clearly states such purpose and its provisions are directed so that PREPA may reach such goal.  Its purpose is not dealing with the employee and pensioner retirement fund situation as the plaintiffs purport.

Nevertheless, plaintiffs' claims that Act 4-2016 is unconstitutional because it impairs the PREPA employees and retirees pension funds require that we examine  criteria established through case law to analyze socioeconomic legislation contested under Section 7, Article II of the Commonwealth Constitution.  On this subject, two recent decisions by our Supreme Court are particularly relevant, *Dominguez Castro v. ELA,* extensively cited in this Judgment and where the constitutionality of Act 7-2009, dealing with the fiscal emergency, was confirmed; and *Trinidad Hernández v*. ELA, 188 DPR 828 (2013), which confirmed the constitutionality of Act 3-2013 that reformed the retirement system and modified the pensions that Commonwealth employees will subsequently receive.

---

[24]  We note here that the debts modified by the creditor agreement are obligations that, if breached, would negatively affect PREPA's credit.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.      73

CERTIFIED TRANSLATION

We must point out that in such cases there <u>was</u> a <u>direct</u> contractual relationship between the government and the plaintiffs, by virtue of the appointment of public employees whereby employment conditions and rights were established, which is not the case here.  *Dominguez Castro* examined the constitutionality of Act 7-2009 regarding the firing of thousands of public employees, while *Trinidad Hernández* examined the constitutionality of Act 3-2013, which reformed the public employee pension system.  In this second case, the act affected pension amounts, bonuses granted through special laws and terms governing retirement of employees who retire after such act became effective.  Even when a direct contractual relationship existed in those cases, the Supreme Court upheld the constitutional validity of the socioeconomic acts in question, under the prevailing state interest standard, to deal with an emergency similar to this case's: the government and its entities' fiscal crisis and protecting the general welfare.  Act 4-2016, Article 2, *Trinidad-Hernández,* supra, pp. 836-837; *Dominguez-Castro,* supra, pp. 88-89.

We reiterate that this is not the case here, since the 1974 Trust was not signed with the plaintiffs directly, nor is Act 4 a law directed at modifying PREPA's retirement system.   Even so, we examine the contract impairment and equal protection claims.

As our Supreme Court has stated repeatedly, the *Prevailing State Interest Power* is the power acknowledged to be inherent to the State and is used to promote or protect public peace, morality, health and general welfare. *Dominguez-Castro*, page 36.  The state interest power is broad.  Therefore, when attempting to set limits to its scope, the circumstances and facts of each case must be considered.  Economic instability has been repeatedly recognized as a fact that weighs in defining the scope of government action under the prevailing state interest power. *Id,* page 37.  Thus, the legislature's broad authority to craft economic regulations that could result in impairment of contracts has been recognized, provided due process is guaranteed. Id. *Defendini-*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       74

CERTIFIED TRANSLATION

*Collazo v. ELA*, 134 D.P.R. 28, 74 (1993). Such guarantee requires that the socioeconomic statute may not be unreasonable or arbitrary and the means employed must be rationally related with the interest that the legislation seeks to further.   In other words, the test to be employed is the reasonability test, similar to the rational nexus test used under equal protection of laws claims. *Domínguez*, page 45. When the government is a contracting party, the scrutiny is more rigorous, so that the State's action cannot be exclusively in its own benefit.   That does not prevent the exercise of the prevailing state interest, but rather the public welfare and safety interest must be weighed against the interest in protecting contractual relationships. *Dominguez Castro*, p. 81.

PREPA's bond degradation and its precarious financial situation have closed access to financial markets, and left it in a state where it cannot cover its debts.[25]   Lack of liquidity and of access to financing jeopardize its existence and its key role as an instrument for the country's economic development.   In this evident emergency situation, the Executive and Legislative powers exercised their prevailing state interest authority and created the bill that became Act 4-2016 to revitalize PREPA and give it a mechanism to return to financial markets, so it can recover liquidity and financial solvency.   A first step was to reduce its large debt through the Creditors' Agreement and approval of Act 4-2016 as a mechanism to enable a restructuring process and to establish payment instruments.   For this purpose, the act establishes a framework by creating PREPARC and the transition charge, among other measures.   It must be concluded that Act 4-2016's terms are <u>directly</u> related to the purposes for which it was created: deal particularly, although partially, with the debt that prevents PREPA from having access to the bond market and improve its liquidity and financial situation.

---

[25] See, Statement of Motives, p. 2, *Purpose of the Law.*

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.       75

CERTIFIED TRANSLATION

Even assuming Act 4 impaired the contract between PREPA and the plaintiffs as to the pension fund, which we do not find, its validity would be sustained under the strictest test, because in addition to a real and substantial nexus, there is rational nexus to the prevailing state interest that is furthered. PREPA's revitalization and debt restructuring serves a general public interest, as its present financial condition not only harms its employees, but also affects all of us who live in Puerto Rico and the country's economic development.

Finally, we find that Act 4 does not violate equal protection of the law.  It does not create suspicious classifications among persons or groups related to  constitutionally protected categories or any fundamental rights, nor does it create a classification between the employees and pensioners and the bondholders or creditors. It creates a revitalization mechanism so PREPA can return to the capital markets.

Regarding the concern that the "competition" the transition charge and others may create in relation to PREPA's capacity to use more funds to pay the existing debt with the pension fund, we reiterate that Act 4 does not alter the priority of payments in the 1974 Trust, nor PREPA's authority to adopt measures that increase the general fund. PREPA is still obligated to pay its current expenses including its contribution to the pension fund. If PREPA can reduce part of its debt, reestablish its liquidity and improve its finances, it will be in a better position to continue paying its current expenses and contributions to the plaintiffs' pension plan.

*     *     *     *     *     *     *     *     *     *     *

In sum, after examining the well-plead allegations in the amended complaint in the light most favorable to the plaintiffs, we conclude that the complaint must be dismissed as the contested legislation is valid, and the complaint thus does not set forth a claim upon which relief may be granted.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.          76

CERTIFIED TRANSLATION

## V.

## JUDGMENT

In light of the facts, the applicable law and the conclusions of law stated above:

1. Act 4-2016 and the actions taken thereunder, including Restructuring Order entered by the Energy Commission and the Restructuring Resolution issued by PREPARC, are found constitutionally valid;

2. PREPA and PREPARC's motion for Summary Judgment is granted, which the officers in their official capacity joined;

3.  The Commonwealth's Motion to Dismiss is granted;

4. The complaint against the Energy Commission is denied as it does not state a claim upon which relief may be granted,

5. As a result of the foregoing, the complaint is dismissed in its entirety.

In San Juan, Puerto Rico, this day of December 19, 2016.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.   77