UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

```
-----------------------------------------------------------------x
In re:                                              :
                                                    :
THE FINANCIAL OVERSIGHT AND                         :
MANAGEMENT BOARD FOR PUERTO RICO,                   :   PROMESA
                                                    :   Title III
      as representative of                          :
                                                    :   Case No. 17-BK-3283 (LTS)
THE COMMONWEALTH OF PUERTO RICO et al.,             :
                                                    :   (Jointly Administered)
      Debtors.¹                                     :
-----------------------------------------------------------------x
```

**JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN AMBAC ASSURANCE CORPORATION'S MOTION TO STRIKE CERTAIN PROVISIONS OF PLAN SUPPORT AGREEMENT BY AND AMONG FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, CERTAIN GO HOLDERS, AND CERTAIN PBA HOLDERS [DOCKET NO. 8020]**

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (the "Committee") hereby files this joinder (the "Joinder") in certain of the relief sought by Ambac Assurance Corporation ("Ambac") in its *Motion to Strike Certain Provisions of the Plan Support Agreement by and Among the Financial Oversight and Management Board for Puerto Rico,*

---

¹ The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

*Certain GO Holders, and Certain PBA Holders* [Docket No. 8020] (the "Motion to Strike")[2] and respectfully states as follows:

## JOINDER

1. The Committee hereby joins in (a) Ambac's request that the Court strike the Breakup Fee provision and (b) paragraphs 37, 38, 39.e and 40 of the Motion to Strike.[3] The Committee believes that it is improper to have the Commonwealth pay up to $100 million to a small group of hedge funds in the event the PSA is terminated under certain scenarios. Because the proposed Commonwealth plan of adjustment, which would be based on the PSA, is patently unconfirmable[4] and will necessarily require substantial modification, it is virtually certain that the PSA will be terminated.

2. The mechanics of the Breakup Fee further demonstrate that it is improper to give a $100 million windfall to a small group of hedge funds that purchased GO and PBA bonds at steep discounts in the secondary market as part of their investment strategy in this Title case. In particular, the PSA provides that the Breakup Fee "shall be paid, in cash, as an administrative expense claim under a plan of adjustment for the Commonwealth" if the PSA is terminated under one of two scenarios. First, the Breakup Fee becomes payable if the PSA Creditors terminate the PSA under section 6.1(c)(i) of the PSA. *See* PSA Tem Sheet § II.M. This section allows the PSA Creditors to terminate the PSA if:

---

[2] Capitalized terms used but not defined in this Joinder have the meanings set forth in the Motion to Strike or the PSA (as applicable).

[3] The Committee does not join in, or take a position with respect to, the other relief sought in the Motion to Strike.

[4] The Committee incorporates by reference its omnibus objection to the Oversight Board's motion to stay the objections to certain GO bond claims and the PBA adversary proceeding [Docket No. 7899] (the "Omnibus Objection"). For the avoidance of doubt, the Committee does not join in Ambac's particular arguments in the Motion to Strike regarding the confirmability of the proposed plan. The Committee reserves all its rights in this regards.

3

> the Oversight Board (y) modifies any of the provisions in the Term Sheet, relating to (1) the 2012 CW Bond Settlement, the 2012 CW Guarantee Bond Settlement and the 2014 CW Bond Settlement or (2) the Classes set forth in the Term Sheet as of the date hereof, and any such modification materially negatively economically impacts the treatment afforded any GO Holder or PBA Holder, as applicable in the Term Sheet, or (z) files a Plan that is economically inconsistent with the treatment set forth in the Term Sheet, in each case without the consent of the LCDC and the QTCB Group.

PSA § 6.1(c)(1). In essence, any material adverse change in the treatment of **any holders of GO and PBA bonds** under the PSA Term Sheet, including as a result of changes to the settlement of the 2012-2014 GO bonds under the proposed plan, would allow the PSA Creditors to terminate the PSA. Given that the proposed plan is unconfirmable and faces widespread opposition (including from the Committee, the Puerto Rico government, bondholders, monoline insurers, and other creditors), it is irresponsible for the Oversight Board to commit the Commonwealth to pay a Breakup Fee of up to $100 million in the virtually inevitable event that the Oversight Board will need to modify the proposed plan (including the treatment of GO and PBA bondholders) to resolve objections by the various parties in interest and bring the plan into compliance with Title III of PROMESA and the Bankruptcy Code. **Indeed, the Breakup Fee is completely inconsistent with the Oversight Board's stated intention to negotiate all terms of a Commonwealth plan of adjustment.** If all terms were subject to further negotiation, this would surely trigger the Breakup Fee.

3. Second, the Breakup Fee also becomes payable if the Oversight Board terminates the PSA

> for any reason **other than** (i) a breach of PSA by a non-Governmental Party, (ii) the denial of confirmation of the Plan by the Title III Court, or (iii) a failure of the Oversight Board, the LCDC and the QTCB Group to reach agreement on the terms of the New Bonds.

4

PSA Tem Sheet § II.M (emphasis added). Thus, if the Oversight Board terminates the PSA for any reason other than those specifically enumerated, including because the proposed plan has not been confirmed on or before February 15, 2020, *see* PSA § 6.1(b), the PSA Creditors would also be entitled to the Breakup Fee. Again, given the widespread opposition to the proposed plan and the anticipated litigation regarding confirmation of the plan, it seems unlikely that the February deadline will be met.[5] Perhaps most notably, however, the PSA does **not** contain the standard "fiduciary out," *i.e.*, the ability of the Oversight Board to terminate the PSA without penalty if it determines, in the exercise of its fiduciary duties, that a different plan of adjustment better serves the interests of creditors. In other words, the Oversight Board is locked into the PSA even if there is a better alternative plan, unless either (a) the Commonwealth pays the Breakup Fee of up to $100 million or (b) the Oversight Board finds a way to terminate the PSA under one of the three enumerated exceptions in clauses (i) through (iii) above.

4. The Committee anticipates that the Oversight Board will argue that these three exceptions provide it with sufficient flexibility to terminate the PSA without triggering the Breakup Fee. For example, the Oversight Board could rely on clause (ii) and press forward with its unconfirmable plan, obtain an order denying confirmation of the plan, and then terminate the PSA without having to pay the Breakup Fee. However, this approach is not only extremely costly but also wasteful, as several months that could be spent on pursuing viable plan alternatives would need to be dedicated to an unconfirmable plan. The Oversight Board could also oppose payment of a Breakup Fee under clause (i) on the basis that the PSA Creditors breached the PSA or clause (iii) on the basis that the parties failed to reach agreement on the

---

[5] While the outside date may be extended to May 2020 by the Government Parties (which is defined to also include AAFAF and the Commonwealth), such an extension appears unlikely given that AAFAF and the Commonwealth oppose the PSA and the proposed plan.

5

terms of the New Bonds. However, such a "strategy" would, of course, depend on whether the factual predicates for these such termination events are present and, in any event, could easily result in costly litigation with the PSA Creditors, including over whether they breached the PSA or whether failure to reach agreement on the New Bonds, without more, is sufficient to avert the Breakup Fee.[6]

5.      Finally, the Committee notes that the Breakup Fee is virtually certain to reach the $100 million cap in short order (assuming that the Support Date occurs by July 30, 2019).[7] In particular, the Breakup Fee is equal to the PSA Restriction Fee (as defined in the PSA), which is intended to compensate the PSA Creditors for each 120 day period that their bonds remain restricted under the PSA. Specifically, this fee (a) is equal to 1.5% of the aggregate amount of the PSA Creditors' PBA and GO bond claims, (b) accrues on the date upon which such creditor executes the PSA, and (c) is fully earned on the first day of each incremental 120 day period thereafter. This means that the PSA Restriction Fee for the LCDC and the QTCB Group (whose members signed the PSA on May 31, 2019 and who, collectively, hold more than $2.9 billion in GO and PBA bonds) would be more than $44 million for the first 120 days (i.e., until September 28, 2019) and would then jump to more than $88 million on the 121st day (i.e., September 29, 2019). And depending on the amount of GO and PBA bonds held by additional PSA Creditors joining the PSA (and the exact timing of when they join the PSA), the $100 million cap could be

---

[6] In this regard, section 6.1 of the PSA (which sets forth the various termination events) does not appear to allow the Oversight Board to terminate the PSA on the basis that the parties failed to reach agreement on the terms of the New Bonds. Thus, it appears that if the Oversight Board wanted to take advantage of clause (iii), it would have to rely on the existence of another termination event.

[7] The PSA Creditors are only entitled to the PSA Restriction Fee if the Support Date (as defined in the PSA) occurs within the 60 day period commencing upon execution of the PSA, which period expires on July 30, 2019. The Support Date is the date upon which at least 50% in amount of outstanding pre-2012 PBA bond claims have executed the PSA or a joinder thereto. It is unclear whether this threshold has yet been met.

6

reached as early as October 2019. This type of fee is simply without any precedent and should not be tolerated.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Committee respectfully requests that this Court enter an order striking the Breakup Fee provision in the PSA.

Dated: July 22, 2019

By: *Luc A. Despins*

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
nicholasbassett@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

By: *Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434
Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
crernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*