# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re: | PROMESA |
|  | Title III |
| The Financial Oversight and Management Board for Puerto Rico, |  |
| as representative of | No. 17 BK 3283-LTS |
| The Commonwealth of Puerto Rico, *et al.*, |  |
| Debtors.[1] |  |
| In re: | PROMESA |
|  | Title III |
| The Financial Oversight and Management Board for Puerto Rico, | No. 17 BK 4780-LTS |
| as representative of | **Court Filing Relates Only to PREPA and Shall Only be Filed in Case No. 17 BK 4780-LTS and Main Docket 17 BK 3283-LTS** |
| The Puerto Rico Electric Power Authority, |  |
| Debtor. |  |

## THE AD HOC GROUP OF PREPA BONDHOLDERS' OBJECTION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RENEWAL OF THEIR MOTION TO COMPEL IN CONNECTION WITH PREPA AND AAFAF'S RULE 9019 SETTLEMENT MOTION

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT .................................................................................................................. 3

I. THE COURT SHOULD DENY THE PRONG OF THE MOTION TO COMPEL
THAT SEEKS DISCOVERY FROM FOUR CUSTODIANS AT TWO AD HOC
GROUP MEMBERS .............................................................................................. 3

    A.    Judge Swain's Explanation of the Scope of the 9019 Hearing and the
Committee's Own Arguments Show Additional  Discovery From the Ad
Hoc Group is Not Warranted .................................................................... 3

    B.    Even if the Committee Had Included the Government Parties' Negotiation
with the Ad Hoc Group In Its List of Seven Topics, the Ad Hoc Group
Members Should Not be Compelled to Produce Negotiation-Related
Communications Because Virtually All Negotiations Were Led by the Ad
Hoc Group's Professionals ........................................................................ 6

    C.    The Ad Hoc Group Should Not Be Required To Produce Text or Instant
Messages ................................................................................................... 9

II. THE AD HOC GROUP HAS PROPERLY ASSERTED THE COMMON
INTEREST PRIVILEGE .................................................................................... 11

CONCLUSION ............................................................................................................ 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Leslie Controls, Inc.*,
  437 B.R. 493 (Bankr. D. Del. 2010) ........................................................................13

*In re Tribune Co.*,
  No. 08-13141 (KJC), 2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ............... 12-13, 14, 15

**Rules**

Fed. R. Civ. P. 26(b)(1)..............................................................................................2, 9

Fed. R. Civ. P. 45(d)(1)..............................................................................................2, 9

To the Honorable United States Magistrate Judge Judith G. Dein:

The Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group") respectfully submits this objection to the Committee's renewal of its motion to compel (the "Renewal"). The Ad Hoc Group incorporates all the arguments it made in its original objection to the Committee's motion to compel (the "Motion") on June 7, 2019 (the "Objection") (Dkt. No. 1303) and will not repeat those arguments here.[1]

## PRELIMINARY STATEMENT

1.     The Committee effectively concedes that the very issues for which it says it needs more discovery (Renewal ¶ 4) do not require any additional discovery from the Ad Hoc Group or its members (*id.* ¶ 7). Thus:

- The Committee argues that "the central issue on the 9019 Motion is the reasonableness of the *Government Parties'* decision to enter into the RSA, which necessarily involves an assessment of *their* intentions and motivations" (*id.* ¶ 16) (emphasis added), not those of the Ad Hoc Group or its members.

- The Committee contends (contrary to Judge Swain's directions at the July 11, 2019 status conference) that it is entitled to "broad discovery" of the Government Parties' purportedly "sweeping" justifications for the proposed settlement. *Id.* ¶ 4. Those Government justifications have nothing to do with the Ad Hoc Group or its members.

- The Committee enumerates the specific discovery requests to which it seeks to compel responses. *Id.* ¶ 7. Tellingly, the Committee does not cite even a single request addressed to the Ad Hoc Group.

2.     The only subject as to which the Ad Hoc Group's documents could conceivably be relevant is whether the Government Parties negotiated their settlement with the Ad Hoc Group at arms' length and in good faith. But the Committee has never disputed that the Government Parties did so. In fact, the Committee itself has argued that the negotiations between the Government Parties and the Ad Hoc Group were at "arms' length," continued for "many months" and "at times

---

[1] Capitalized terms not defined here have the meanings set forth in the Objection.

became contentious." Motion ¶¶ 25-26. Accordingly, the Committee's motion should be denied as to the Ad Hoc Group.

3.    Even if the Committee were to try to raise a belated question now as to the arms' length or good faith nature of the Government Parties' negotiations with the Ad Hoc Group, that would not warrant the additional discovery the Committee now seeks from four custodians – the most senior responsible individual and the individual most involved on a day-to-day basis – at two Ad Hoc Group members. In the first place, that requested discovery has nothing to do with what Judge Swain already told the parties was the issue to be determined on the 9019 Motion: whether the settlement "is within a range of reasonable outcomes." Dkt. No. 1459 at 8-9. Moreover, the Ad Hoc Group's *professionals* (Kramer Levin and Houlihan) handled virtually all negotiations on behalf of the Group. Those professionals (four Kramer Levin custodians and one from Houlihan) have already produced non-privileged documents in response to the Committee's subpoena. The undue burden and expense of any additional discovery from the two Ad Hoc Group members, who are not parties to the 9019 Motion, would far outweigh its likely benefit and would not be proportional to the needs of the 9019 Motion. *See* Fed. R. Civ. P. 45(d)(1); *see also* Fed. R. Civ. P. 26(b)(1).

4.    The Committee contends that "documents produced by the Government Parties" in discovery "directly belie[]" the Ad Hoc Group's position that its professionals led its negotiations with the Government Parties. The Committee is incorrect. The Committee conceded, at a meet and confer, that it predicates this argument solely on *two* emails that the Committee contends show two Ad Hoc Group members "directly engaged" with the Government Parties. Renewal ¶ 15. However, neither of those emails contains a substantive discussion. Moreover, the two emails together are a drop in a very large bucket when compared to the *thousands* of pages of negotiation-

related communications between the Ad Hoc Group's professionals and the Government Parties
that have already been produced to the Committee, many of which are substantive.  Far from
providing a compelling need for discovery from four custodians at two Ad Hoc Group members,
the two emails confirm the opposite: the Ad Hoc Group's professionals led the negotiations.  In
these circumstances, the significant burden that discovery as to the negotiations would place on
the two Ad Hoc Group members would be unwarranted.

5.      There is also no merit to the Committee's renewed effort to invade the common
interest privilege of the Ad Hoc Group and the Government Parties.  The Committee argues that
because the Ad Hoc Group and the Government Parties continued to negotiate at "arms-length"
between July 27, 2018, when they entered into the Preliminary RSA, and May 3, 2019, when they
signed the Definitive RSA, they did not share a common interest during that period.  That too is
incorrect.  The Ad Hoc Group and the Government Parties have shared a common interest in
consummating and obtaining Court approval for their deal since July 27, 2018, when they agreed
on the structure and material terms of the RSA.  The deal has not changed materially since then.

## ARGUMENT

## I.   THE COURT SHOULD DENY THE PRONG OF THE MOTION TO COMPEL THAT SEEKS DISCOVERY FROM FOUR CUSTODIANS AT TWO AD HOC GROUP MEMBERS

### A.   Judge Swain's Explanation of the Scope of the 9019 Hearing and the Committee's Own Arguments Show Additional Discovery From the Ad Hoc Group is Not Warranted

6.      Judge Swain explained at the July 11, 2019 status conference that a "motion to
approve a compromise or settlement pursuant to Bankruptcy Rule 9019 requires a Court to assess
whether the proposed settlement falls below the lowest point in the range of reasonableness."  Dkt.
No. 1459 at 8 (citing *ARS Brook, LLC v. Jalbert* (*In re Servisense.com, Inc.*), 382 F.3d 68, 71-72

3

(1st Cir. 2004), which considers the range of reasonableness based on the costs and benefits *to the debtor*).  The Court's task "is not to determine whether the compromise embodied in portions of the RSA  . . . is the wisest possible outcome, but, rather, whether it is within a range of reasonable outcomes and, thus, the 9019 motion seeks limited relief under a review standard that is deferential to the choices made by *those empowered to guide the debtor's affairs*." *Id.* at 8-9 (emphasis added). *See also* cases cited in the Objection at ¶ 40.

7.      Judge Swain framed the issue to be heard as follows:  "Is it reasonable for [the Government Parties] to pay what they propose to pay, or make the concessions they propose to make, in exchange for the opportunity to pursue confirmation of a plan in the future, given their judgment that they believe this is a realistic and important opportunity . . . ." Dkt. No. 1459 at 28. That question concerns the Government Parties' judgment, not the Ad Hoc Group's.

8.      Judge Swain informed the parties that, "[i]n light of the limited scope of the questions presented by the Rule 9019 [M]otion, the deferential decisional standard, and . . . judicial efficiency and economy concerns," the 9019 hearing – which the Court limited to nine hours – should be "focused tightly on [1] identification of the range of reasonable settlement outcomes and whether the aspects of the agreement currently submitted for approval fall within that range and [2] facts directly relevant to any legal injury that a party contends it would suffer as a direct result" of the settlement.  *Id.* at 13.  This "limited scope of the questions presented" should guide this Court in determining the appropriate scope of discovery.  Nothing Judge Swain said suggests there is any justification for additional discovery from the Ad Hoc Group or its members.[2]

---

[2] The Committee's argument that Judge Swain has not narrowed the scope of the 9019 hearing or permissible discovery is wrong.  During the July 11, 2019 status conference, Judge Swain granted two motions *in limine* because the evidence proffered was outside the "narrow" scope of the 9019 Motion.  The Court also informed the parties that certain evidence and arguments, including

4

9.     The Committee itself argues that "[t]he central issue on the 9019 Motion is the reasonableness of the *Government Parties'* decision to entered into the RSA, which necessarily involves an assessment of *their* intentions and motivations."  Renewal ¶ 16 (emphasis added).  The Committee identifies seven topics it contends should be subject to "broad discovery:"  (i) "Puerto Rico's overall restructuring" and rates customers can afford to pay; (ii) whether the RSA will facilitate transformation; (iii) whether PREPA will ever enter Title III in the future; (iv) whether the RSA leaves PREPA a sustainable level of debt; (v) whether the RSA reduces the present value of PREPA's future debt service; (vi) whether, in the absence of a settlement, electrical rates may rise without limit; and (vii) whether the fees to be paid by PREPA under the RSA are intended to reasonably compensate supporting holders for delaying receipt of debt service.  *Id.* ¶ 4.  None of these topics has any connection to or warrants the additional discovery the Committee has requested from the Ad Hoc Group or its members.[3]

10.     The Committee's own submission on this motion makes clear that it does not need discovery from any Ad Hoc Group members in connection with these topics.  Thus, the Committee identifies the specific discovery requests it contends relate to the seven topics.  *Id.* ¶ 7.  The Committee's subpoena to the Ad Hoc Group, a non-party, does not contain any of those requests.  All are directed to other parties.

11.     The Committee never even attempts to explain how the documents it now seeks from four custodians at two Ad Hoc Group members relate to any of the seven topics.  *Id.* ¶ 15.

---

concerning the confirmability of a potential plan, macroeconomic matters, energy policy issues and additional action by the Puerto Rico government, are not relevant.  Dkt. No. 1459 at 9-12, 13.

[3] The Ad Hoc Group believes these topics are not within the scope of the 9019 hearing, as directed by Judge Swain at the July 11 status conference.

There is no such relationship.  Moreover, even if there was any limited value to discovery from the four custodians (and there is not), it would be far outweighed by the burden and expense of producing the documents.

**B.     Even if the Committee Had Included the Government Parties' Negotiation with the Ad Hoc Group In Its List of Seven Topics, the Ad Hoc Group Members Should Not be Compelled to Produce Negotiation-Related Communications Because Virtually All Negotiations Were Led by the Ad Hoc Group's Professionals**

12.     The documents the Committee now seeks from the Ad Hoc Group could conceivably bear on only one subject: whether the negotiation of the RSA was conducted at arms' length and in good faith.  However, although the Committee has filed three pleadings in support of its motion to compel (Dkt. Nos. 1269, 1318 and 1467), made substantive arguments concerning the settlement in two status reports (Dkt Nos. 1334 and 1361), and spoken at length at several pre-trial conferences (Dkt. Nos. 1351 and 1459), the Committee has *never* asserted that the negotiations between the Government Parties and the Ad Hoc Group were not conducted in good faith or at arms' length.  To the contrary, the Committee has argued that the negotiations *were* "at arms-length," continued for "many months," and "at times became contentious."  Motion ¶¶ 25-26.

13.     Even if the Committee had not conceded the negotiations were at arms' length, or RSA-negotiation communications were otherwise relevant, that would not mean there should be discovery from any Ad Hoc Group members.  The vast majority of the negotiations on behalf of the Ad Hoc Group were led by its professionals, not any of its individual members.  The Government Parties' supplemental submission in further support of the 9019 Motion confirms this. The declaration of their lead negotiator, David Brownstein, specifically states his "hard-fought negotiations" concerning the RSA were with "*representatives of the Ad Hoc Group – principally*

6

*their counsel, Kramer Levin, and financial advisor, Houlihan Lokey.*"   Dkt. No. 1426 at ¶ 17

(emphasis added).  That is consistent with the thousands of pages of documents the Government

Parties have produced concerning their negotiations with the Ad Hoc Group.  All but a handful

were with Kramer Levin and Houlihan, *not* any of the Ad Hoc Group members.  It is also consistent

with the thousands of pages of documents that the Ad Hoc Group has produced from the files of

its professionals – Kramer Levin and Houlihan Lokey – including the communications of the five

individuals who led the negotiations for the Ad Hoc Group.[4]

  14. Nevertheless, the Committee now argues that the Ad Hoc Group's position that its

production from the Kramer Levin and Houlihan custodians is sufficient has been "directly

belie[d]" by documents produced by the Government Parties, and an additional four custodians at

two Ad Hoc Group Members should produce documents.  Renewal ¶ 15.  The Committee's

argument is untenable and should be rejected for many reasons.

  15. *First*, the Ad Hoc Group's statement that most of the negotiations were handled by

its professionals is *not* "directly belie[d]" by the "documents."  The Committee predicates its

argument on *two* email chains (only one of which it attaches to its Renewal).  In contrast, there are

*thousands* of pages of documents that reflect communications between the Government Parties

and the Ad Hoc Group's professionals.[5]

---

[4] The Ad Hoc Group initially objected to producing its professionals' communications with the
Government Parties since the Committee can obtain those documents from the Government Parties
themselves.  At the Committee's request, and in an effort to compromise, the Ad Hoc Group
withdrew that objection.

[5] The Ad Hoc Group is aware of only three other emails the Government Parties produced in
discovery in which the Government Parties communicated with members of the Ad Hoc Group.
Those communications do not reflect negotiations – which no doubt explains why the Committee
did not cite them in the Renewal.

16.      *Second*, the only Government Party communication with a member of the Ad Hoc Group that the Committee attaches to its papers (Exhibit 10 to the Renewal) *confirms* that the negotiations *did* occur through the professionals.   A member of the Ad Hoc Group asked Kyle Rifkind, the Oversight Board's Restructuring Officer and Deputy General Counsel, to "catch up" to make sure nothing was lost in the settlement communications among the professionals. Obviously, no such request would have been made if the negotiations were being led by the principals themselves.   Moreover, a request to "catch up" is not a negotiation.   And the email shows that immediately after Mr. Rifkind received this "unsolicited" email from an Ad Hoc Group member, the Government Parties and Citi decided they did not want to discuss the issues raised by this member and their discussions with the Ad Hoc Group should instead continue on the basis of Citi's proposals.

17.      *Third*, there is no indication in the email that the "catch up" meeting ever occurred – because it did not.

18.      *Fourth*, the email was sent in early January 2019, more than five months *after* the parties agreed to the Preliminary RSA.   It therefore has nothing to do with the negotiation of the key material terms.

19.      *Fifth*, the Committee has not explained why a single request for a meeting should trigger a need for additional documents, let alone from four different custodians.   Even if there were a need (and there is not), the Committee has not explained why it is not sufficient to obtain documents about the request for a meeting from the Government Parties, who have made the 9019 Motion, instead of from a member of the Ad Hoc Group, which is not a party.

20.      Since (a) these communications are far afield from the issues that Judge Swain has directed should be addressed at the 9019 hearing, (b) the Committee has not included them in the

8

seven topics as to which it says it needs more discovery, and (c) they are a mere drop in a very large bucket when compared to the thousands of pages of direct communications between the Ad Hoc Group professionals and the Government Parties, the Court should deny the motion for discovery from these individual Ad Hoc Group members. The undue burden of searching for and producing documents far outweighs any limited (actually non-existent) potential benefit to the Committee. *See* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena"); *see also* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit"). The five custodians whose documents the Ad Hoc Group has already provided (four Kramer Levin lawyers and one Houlihan representative) are more than sufficient in these circumstances.

### C.     The Ad Hoc Group Should Not Be Required To Produce Text or Instant Messages

21.     The Renewal focuses exclusively on the text and instant messaging habits of individuals affiliated with the Government Parties. It does not provide any basis to require the production of such communications from the Ad Hoc Group or its members, who are not mentioned in any of the text messages among government officials that were published several weeks ago.

22.     The Ad Hoc Group explained in its original Objection (at ¶ 44) that it should not be required to produce text or instant messages. Producing such communications would be burdensome and significantly disruptive (much more so than emails, which can be collected remotely without disrupting a person's use of her computer). Imposing this burden and disruption

on the Ad Hoc Group, a non-party, is not warranted here.  The Ad Hoc Group's communications
are irrelevant to the 9019 Motion.  Each of the Ad Hoc Group's professionals whose documents
have been collected and produced has confirmed – at the Committee's request – that they did not
negotiate the Preliminary RSA, the Definitive RSA or the Settlement by text or instant message.

23.    The Committee's assertion that Exhibit 9 to the Renewal involves "a text message
communication regarding the potential of a settlement between the [Ad Hoc Group] and the
Oversight Board" is disingenuous.  Renewal ¶ 10.  Exhibit 9 to the Renewal is a communication
in which Natalie Jaresko describes a text concerning the settlement that Ms. Jaresko received from
the mediator, Chief Bankruptcy Judge Barbara J. Houser, *not* from the Ad Hoc Group.[6]

---

[6] The Committee's original Motion sought the production of certain valuation-related documents
and analyses (for example, valuations reflecting the Ad Hoc Group's subjective assessment of the
settlement, or the value of bondholders' collateral), and the Ad Hoc Group objected.  During a
meet and confer, the Committee agreed not to pursue these valuation documents to the extent they
are privileged or proprietary.  That covers all or virtually all of these documents.  The Ad Hoc
Group memorialized that agreement in supplemental and superseding responses and objections to
the Committee's subpoena (annexed as Exhibit A hereto, *see* ¶ 4), and the Committee's Renewal
does not address such documents.  Accordingly, the Ad Hoc Group believes there is no longer any
dispute about this issue.

If the Committee is still pursuing any valuation documents, however, its request should be denied
for all of the reasons previously discussed.  For example, the documents are privileged and
proprietary.  They are also irrelevant because they reflect, at most, the subjective views of the Ad
Hoc Group.   They do not reflect the *Government Parties'* assessment of the range of
reasonableness of the settlement, or even an objective assessment of that issue.   All of the
authorities relating to creditor valuation documents support the Ad Hoc Group's position that these
documents are irrelevant and off limits in discovery.  *See* Objection ¶¶ 38-43, and cases cited there.
The Committee has not cited a single decision to the contrary despite multiple opportunities to do
so.

KL3 3221287.1

## II.    THE AD HOC GROUP HAS PROPERLY ASSERTED THE COMMON INTEREST PRIVILEGE

24.    The Ad Hoc Group established in its original Objection that it has had a common interest with the Government Parties since July 27, 2018, the date on which the parties agreed (1) on the structure and material terms of their settlement (as reflected in the July 27, 2018 Term Sheet), and (2) to work together to consummate and obtain Court approval for the deal. The material terms of the deal have remained unchanged since then. Negotiations continued but, as detailed in the Ad Hoc Group's Objection, they did not address the fundamental deal structure or the material terms. They concerned how to implement the agreement, how best to memorialize and finalize the additional documents that the parties contemplated months earlier, and how best to present the deal to the Court for approval. All of this was complicated by the fact that the Government Parties were (and still are) in the midst of reviewing and considering massive changes to PREPA's generation system, and bringing in outside parties to further professionalize and privatize the management of its transmission and distribution system in what could be the largest privatization of a public utility in recent years. But the Government Parties and the Ad Hoc Group continued to have a common interest during those months of discussions: to create a RSA that was flexible enough to accommodate a long-dated Title III plan process and different potential PREPA operating structures, while ensuring that the Ad Hoc Group would receive the benefit of the bargain it struck in the Preliminary RSA. Although the process was lengthy and sometimes arduous, the parties arrived at their common goal on May 3, 2019, when they signed the Definitive RSA, a much more detailed document that addressed these challenges while leaving the structure and

11

material economic terms of the Preliminary RSA substantially unchanged.  Objection ¶¶ 6-14, 22-30.

25.     The Committee now argues that three documents produced in discovery (Exhibits 11, 12 and 13 to the Renewal) purportedly demonstrate that the Ad Hoc Group and the Government Parties did not share a common interest until after the Definitive RSA was executed on May 3, 2019, because the Preliminary RSA was "merely a non-binding step towards a definitive RSA," which the parties intended to be superseded by a more definitive document.  Renewal ¶ 20.

26.     The documents on which the Committee relies, like the documents the Committee annexed to its original Motion to Compel, do not support the Committee's argument.  As the Ad Hoc Group showed, those documents actually reflect the parties' agreement to make robust efforts to create an implementation structure for the RSA, finalize terms to implement the deal set forth in the Preliminary RSA, create a structure to incentivize other holders to join the RSA, and seek Court approval for the deal.  Objection ¶ 12.  None of them suggests that the parties did not agree to the material economic terms of the deal in the Preliminary RSA or did not share a common interest.

27.     To the contrary, as the Ad Hoc Group demonstrated in its Objection (at ¶ 9), the parties spent the months between the execution of the Preliminary RSA and the Definitive RSA in discussions and working together on how to implement the material terms of their deal, as contemplated by the Preliminary RSA.  *See* Preliminary RSA § 2 (which states the parties expected the Preliminary RSA to be superseded by a definitive RSA) and *id.* § 4.01(a) (which states the parties would "cooperate and coordinate activities . . . with the other Parties" to reach their common objective).  *See also In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *4-5 (Bankr. D. Del. Feb. 3, 2011) (common interest attached when the parties agreed on material

KL3 3221287.1

economic terms even if they "continued to negotiate and certain terms changed"); *In re Leslie Controls, Inc.*, 437 B.R. 493, 501-02 (Bankr. D. Del. 2010) (rejecting argument "that parties engaged in negotiations can never share a common interest," and holding that documents the negotiating parties exchanged regarding insurance were protected by the common interest doctrine even though plan negotiations were ongoing and an agreement was not signed). Whether the Preliminary RSA was binding or any party had the right to walk away is beside the point. No one *exercised* that right. The Committee has not cited any authority that ascribes any significance to the fact that a party *can* terminate a common interest agreement when it did not do so.

28. The other documents the Committee cites also fail to suggest, let alone show, that the common interest agreement had been terminated. For example, Exhibits 14 and 15 to the Renewal reflect discussions regarding ways to address issues that might arise if the new Securitization Bonds were found not to be tax-exempt, as originally contemplated. However, far from abandoning their common interest agreement, the parties cooperated in discussing proposed changes to the exchange rates to reflect a potentially changed economic reality. In the end, the parties did not change the exchange rate. As the Committee admits, "the same ratios [are] provided for" in both the Preliminary RSA and the RSA. Renewal ¶ 20.

29. Exhibit 16 to the Renewal does not relate to the material economic terms of the deal. It concerns discussions between the Oversight Board and the Ad Hoc Group about a possible "Plan B" to implement the RSA without AAFAF and PREPA if necessary. The Oversight Board professionals' skepticism about whether the parties could "get to a deal" in those hypothetical circumstances merely reflects that the Board was not willing to move forward without AAFAF and PREPA at that time. It does not suggest that the parties' interests in the RSA had diverged. Moreover, AAFAF and PREPA stayed in the deal, "Plan B" never progressed, and the parties

13

stuck with their original structure.  *See In re Tribune Company*, 2011 WL 386827, at *4 (even though settling parties were "not completely in accord," and "continued to negotiate and certain terms changed," they "share[d] the common legal interest of obtaining approval of their settlement and confirmation of the [] Plan, thereby resolving the legal disputes between and among them.").

30.     The Committee elevates form over substance when it argues that versions of a document titled "Summary of Open Business Points" (Exhibits 17, 18, 19 and 20 to its Renewal) demonstrate that there were still "open business items" in March 2019.  The word "business" simply meant the "points" required a final sign-off from a business person.  These "business points," however, plainly were not the material economic terms of the agreement.  The "points" were in almost all respects legal implementation issues, such as whether the Ad Hoc Group would be entitled to an administrative claim if the 9019 Order were reversed on appeal, whether a lien challenge proceeding would be brought if another bondholder challenged the transaction, and how a force majeure event would be handled.  Moreover, even if there had been a few open economic issues, that would not have negated the existence of a common interest.  *See In re Tribune Company*, 2011 WL 386827, at *4 (even though settling parties "continued to negotiate and certain terms changed" including an increase in the distributable enterprise value from $6.1 billion to $6.75 billion, they shared a common legal interest.)   None of the documents annexed to the Renewal undermines the Ad Hoc Group's showing that it shared a common interest with the Government Parties as of July 27, 2018.

31.     The Committee argues that the Ad Hoc Group could not share a common interest with the Government Parties because they "did not have close to an identical (or even nearly identical) legal interests."  Renewal ¶ 21.  Both that premise and the conclusion are incorrect.  The interest of the Government Parties and the Ad Hoc Group in completing the RSA on terms they

agreed to in July 2018, and in obtaining Court approval for that RSA, were substantially identical. Moreover, the Court already has held in these very proceedings that parties can share common interests in some issues even if their interests diverge elsewhere. *See* Memorandum Order Regarding Magistrate Judge's May 6, May 15 and May 30, 2019 Orders, No. 17-03283, Dkt. No. 7695, at 22-23 (affirming Judge Dein's ruling that although "ERS and Commonwealth may be adverse in some respects, with respect to the issues presently before the Court, they share a common interest," and finding that interest sufficiently the same to meet the common interest standard in the First Circuit); *see also In re Tribune Co.*, 2011 WL 386827, at *4 ("the community of interest privilege can apply to parties whose interests are not totally in accord").

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in the Objection, the Court should deny the Committee's Motion to Compel and Renewal in their entirety.[7]

---

[7] The Ad Hoc Group joins the Government Parties' and Assured's arguments in opposition to the Motion to Compel and Renewal to the extent they address the issues discussed here.

KL3 3221287.1

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, July 23, 2019.

<table>
<tr><td>

**TORO COLÓN MULLET P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

*s/ Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcm.law

*s/ Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcm.law

*s/ Nayda Perez-Roman*
NAYDA PEREZ-ROMAN
USDC–PR No. 300,208
E-mail: nperez@tcm.law

*Counsel for the Ad Hoc Group of PREPA Bondholders*

</td><td>

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000

*s/ Natan Hamerman*
AMY CATON*
THOMAS MOERS MAYER*
MICHAEL J. DELL*
NATAN HAMERMAN*
ALICE J. BYOWITZ*
Email: acaton@kramerlevin.com
        tmayer@kramerlevin.com
        mdell@kramerlevin.com
        nhamerman@kramerlevin.com
        abyowitz@kramerlevin.com
*Admitted Pro Hac Vice*

*Counsel for the Ad Hoc Group of PREPA Bondholders*

</td></tr>
</table>

KL3 3221287.1