Hearing Date: July 30, 2019 at 1:00 p.m. (ADT)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------- X
                                                      :

In re:                                                    :

                                                    :

THE FINANCIAL OVERSIGHT AND            : PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,  : Title III

                                                    :

            as representative of               : Case No. 17-BK-3283 (LTS)

                                                    :

THE COMMONWEALTH OF PUERTO RICO *et al.,*  : (Jointly Administered)

                                                    :

            Debtors.[1]                              : 
---------------------------------------------------------------- X
                                                       :

In re:                                                    :

                                                    :

THE FINANCIAL OVERSIGHT AND            : PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,  : Title III

                                                    :

            as representative of               : Case No. 17-BK-4780 (LTS)

                                                    :

PUERTO RICO ELECTRIC POWER AUTHORITY  : **This filing relates only to**
                                                    : **Case No. 17-BK-4780 (LTS)**

                                                    :

            Debtor.                                :
---------------------------------------------------------------- X

## OMNIBUS REPLY OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF RENEWED OMNIBUS MOTION TO COMPEL DISCOVERY IN CONNECTION WITH PREPA RSA RULE 9019 SETTLEMENT MOTION

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................. 3

    I.     Nonproducing Parties Must Expand the Scope of Their Review and
         Collection of Documents ................................................................ 3

         A.     Collections From Additional Custodians .................................... 3

         B.     Collections From Sources Other Than Official Email Accounts .............. 6

         C.     More Fulsome Responses to Certain of the Committee's Requests ......... 7

         D.     AAFAF and PREPA Must Correct Deficiencies in Their
              Productions ................................................................................ 9

    II.    Documents Produced in Receivership Motion Litigation Should Be
         Available for Use in Discovery ....................................................... 11

    III.   Respondents Had No Common Interest Prior to Definitive RSA ...................... 12

    IV.   Deliberative Process Claims Cannot Prevent Discovery of Documents
         Concerning Negotiation of or Decision to Enter into RSA .................................. 15

    V.    Assured's Loss Reserve Submissions to its New York Regulator Should
         Be Produced ................................................................................ 16

CONCLUSION ............................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*F.D.I.C. v. Odgen Corp.*,
   202 F.3d 454 (1st Cir. 2000) ................................................................................12

*Fed. Energy Regulatory Comm'n v. Silkman*,
   No. 16-205, 2017 WL 6597510 (D. Me. Dec. 26, 2017) ....................................9, 16

*In re Financial Oversight & Management Board for Puerto Rico*,
   No. 17-3566, 2019 WL 2636273 (D.P.R. June 27, 2019) ................................12, 13

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
   No. 14-4394, 2016 WL 5408171 (S.D.N.Y. Sept. 27, 2016) ..................................4

*In re Tribune*,
   No. 08-13141, 2011 WL 386827 (Bankr. D. Del. Feb 3, 2011) .............................14

To the Honorable Magistrate Judge Judith Gail Dein:

Pursuant to the revised scheduling order entered June 20, 2019 [Dkt. No. 1366] as subsequently modified at the July 11, 2019 pretrial conference, the Official Committee of Unsecured Creditors of all Title III Debtors (the "Committee")[1] hereby submits this omnibus reply (the "Reply") in response to the objections of the Government Parties [Dkt. No. 1500], the Ad Hoc Group [Dkt. No. 1498], and Assured [Dkt. No. 1495] (collectively, the "Objections") to the Committee's renewed motion to compel [Dkt. No. 1467] (the "Renewed Motion to Compel").  In support of its Reply, the Committee respectfully states as follows:

1.      The broad scope of discovery at issue in this dispute is largely of the Government Parties' own making.  The Government Parties could have argued—and, indeed, at one point did argue[2]—that all the Court need consider in ruling on the 9019 Motion is whether the amount of the proposed settlement is reasonable in light of the risks at issue in the litigation.  But the Government Parties have chosen not to take this path, presumably because they do not believe the Court could approve the settlement solely on that basis.  Instead, the Government Parties have submitted four expansive declarations that offer a wide variety of additional rationales for the settlement, including that it protects the interests of rate payers, supports the revitalization of the Puerto Rico economy, and will facilitate PREPA's proposed transformation.  As the Court recognized at the July 11 Conference, the Committee and other objectors have the right to fully explore these and all other purported rationales for the settlement in discovery.

---

[1]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Original Motion to Compel and Renewed Motion to Compel.

[2]      *See Urgent Motion in Limine to Exclude Testimony Offered by UTIER, SREAEE, and Windmar Renewable Energy*, dated June 7, 2019 [Dkt. No. 1301], at 2 ("The hearing on approval of the RSA should focus **only on whether the disputed secured claims are discounted enough** to put the settlement in the range of reasonableness.") (emphasis added).

2.     In their Objections, the Nonproducing Parties misconstrue the Court's comments at the July 11 Conference and criticize the Committee for not limiting the scope of its Renewed Motion to Compel in light of the Court's remarks.  They contend that certain of the Committee's requests are "unreasonable" and "immaterial" because they purportedly do not relate to any of the reasonableness factors that the Court will consider in ruling on the 9019 Motion.  But this is demonstrably not so.  The Committee's requests are directly related to the Court's analysis insofar as they seek to, among other things, (i) determine whether the settlement leaves no value for non-bondholder creditors and thus fails to satisfy the "paramount interests of creditors" prong of the reasonableness test, (ii) examine the value of the consideration that the Government Parties propose to relinquish in the settlement, and (iii) test the various purported benefits of the settlement as described in the Government Parties' declarations.  The Committee is thus fully justified in renewing its Motion to Compel in its entirety, as it has largely chosen to do.

3.     Moreover, several of the issues involved in the Renewed Motion to Compel relate not to the permissible subject matters for discovery but rather to the insufficiency of the Nonproducing Parties' collection efforts and their improper withholding of certain categories of documents as privileged.  The Court's remarks at the July 11 Hearing have little, if any, bearing on these issues.  To the extent the Committee's document requests fall within the permissible scope of discovery, the Nonproducing Parties must be required to review and produce documents from relevant sources and custodians in response to those requests and not be allowed to improperly withhold documents as privileged.

4.     Although the Committee made clear in its Renewed Motion to Compel that it is renewing and incorporating by reference its earlier Motion to Compel—and has submitted a Proposed Order to that effect—certain of the Nonproducing Parties have expressed confusion

over the scope of the relief the Committee seeks.  To respond to these concerns, and for the benefit of the Court, the Committee has attached as <u>Exhibit A</u> hereto a chart summarizing all of the issues presented by the Renewed Motion to Compel.

5.      The Committee addresses these issues below as necessary to respond to the Nonproducing Parties' objections.  For all the reasons discussed herein, in the Renewed Motion to Compel, and in the Committee's prior briefing, the Committee respectfully requests that the Renewed Motion to Compel be granted in full.

## ARGUMENT

### I.   Nonproducing Parties Must Expand the Scope of Their Review and Collection of Documents

6.      The Nonproducing Parties have not offered sufficient justification in their Objections for their continued refusal to collect documents from relevant custodians, to collect and review documents other than emails from official email accounts, and to respond to certain relevant aspects of the Committee's requests.  Moreover, AAFAF and PREPA ("<u>AAFAF/PREPA</u>") have failed to adequately explain their refusal to review or search entire categories of documents that they deem privileged.  The Renewed Motion to Compel should be granted as to these issues.

### A.  Collections From Additional Custodians

7.      Contrary to the Government Parties' assertions, the Court's comments at the July 11 status conference have no impact on whether or not the Nonproducing Parties should be required to collect from additional custodians.  The question is not whether the document requests at issue are relevant (indeed, the Nonproducing Parties have agreed to produce documents in response to the requests from some custodians), but whether the Committee has received productions from key individuals.  It has not.

8.      As the Nonproducing Parties admit in their Objections, the Committee has to date only received documents from the few custodians the Nonproducing Parties say have the most relevant communications.  But the Committee cannot simply rely on the Nonproducing Parties' unsupported representations to determine which custodians are relevant, particularly when entire categories of key custodians have been omitted.

9.      The Oversight Board, for its part, continues to refuse to produce the documents of a single board member, even though it has agreed to make one of those board members, David Skeel, available for deposition.[3]  The Oversight Board argues that the Committee has already received a few "agendas and presentations regarding Board meetings,"[4] but these documents are hardly a substitute for receiving board members' emails, text messages, and other relevant files. The Oversight Board's decision-makers are the board members themselves, and not its officers. As such, there can be no doubt that the decision makers' own documents are highly relevant. *See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-4394, 2016 WL 5408171 at *8 (S.D.N.Y. Sept. 27, 2016) (ordering directors to produce emails relating to corporate decision-making from non-corporate email accounts).

10.     AAFAF/PREPA continue to offer Christian Sobrino as their only non-advisor custodian.  This limitation is indefensible, particularly given that Christian Sobrino has resigned from office and, presumably, will no longer be testifying at the hearing.  The Committee is entitled to the documents of any replacement witness and to those of the other current officials that the Committee has identified.  AAFAF/PREPA contends that certain witnesses do not have relevant documents because they allegedly did not participate in RSA negotiations.  But this

---

[3]      The Government Parties' objection states that the Committee seeks thirteen additional custodians from the Oversight Board and Citi.  The only additional custodians the Committee seeks are the seven board members.  The Committee has resolved its dispute with Citi over its additional custodians.

[4]      *See* Government Parties' Objection ¶ 40.

assertion, even if true, has no bearing on whether these custodians have documents otherwise
relevant to the 9019 Motion, such as documents relating to PREPA's ability to increase
electricity rates, the effect of such rate increases on customers, and the status of the proposed
transformation.

11.     The Ad Hoc Group refuses to produce documents from a single employee of any
of its member funds.  The Ad Hoc Group justifies this refusal primarily by asserting that such
custodians would not have relevant documents because they were not involved in negotiating the
RSA.  The only "evidence" the Ad Hoc Group can point to in support of this assertion, however,
is the relative ***absence*** of significant communications with these individuals in the documents the
Ad Hoc Group has produced to date.  This proves nothing—the obvious reason the Committee
does not have many communications with these individuals is because the Ad Hoc Group has not
collected documents from them.  The Committee has reasonably limited its request to two
custodians from two member firms.  The Ad Hoc Group should be required to comply.

12.     Finally, in light of recent events, the Committee has asked each of the
Nonproducing Parties to ensure that it has produced to the Committee any and all documents
relating to Elias Sanchez—who is the former chairman of the governor's election campaign and
a central figure in recent reports of corruption within the government—and his associates and
their related organizations, to the extent such documents are otherwise responsive to the
Committee's requests.[5]  Identifying these documents may require collections from additional

---

[5]     For example, on July 19, 2019, the Center for Investigative Journalism published a report entitled "The
pillage of public funds in Puerto Rico going on behind the chat," in which it detailed a multi-million dollar
corruption network involving certain individuals, including Mr. Sanchez.  *See* Ex. 25 (*The pillage of public funds in
Puerto Rico going on behind the chat*, CPI (July 19, 2019), available at
http://periodismoinvestigativo.com/2019/07/the-pillage-of-public-funds-in-puerto-rico-going-on-behind-the-chat/).
In addition, on July 19, 2019, Reorg Research reported that the corruption within Puerto Rico's government likely
extends to "the PREPA bankruptcy proceedings in particular, as well as the planned privatization of the public
utility."  Ex. 26 (July 19, 2019 Reorg Research Alert titled "Puerto Rico Political Crisis Seen as Sparking Delays
But No Major Impact on Debt Restructuring Process").

custodians.  To date, however, the Nonproducing Parties have unjustifiably refused to perform any such additional collections.

### B.  Collections From Sources Other Than Official Email Accounts

13.     The Government Parties assert in their Objection that there is only a "small potential for relevant information exchanged through non-email channels."  Government Parties' Objection ¶ 33.  This assertion, given the events of the pasts few weeks, is not credible.  Indeed, the recent, highly publicized scandals prove that just the opposite is true:  Puerto Rico's government officials, ***including in particular at least one of the key custodians in this dispute***, are likely to send their ***most*** relevant communications by means other than email.

14.     The Government Parties also assert in a footnote that the Committee has failed to show that the group chats bear any relation to the RSA.  The Government Parties miss the point.  Regardless of whether it relates to the RSA, the nearly 900-page group chat shows that government officials, including Mr. Sobrino, routinely communicate by means other than email when conducting official business.  In addition, it is not accurate to say that the chat bears no relationship to PREPA or the issues involved in the 9019 Motion.  Indeed, recent news reports tie the group chat to broader corruption in the Puerto Rican government, including, potentially, corruption relating to PREPA's proposed transformation.  *See* n. 5, *supra*.

15.     In a further effort to justify their refusal to produce documents from sources other than official email accounts, the Government Parties point out that the relevant custodians "routinely communicated about the RSA negotiations through [official] email."  Government Parties' Objection ¶ 36.  But this proves nothing about whether these individuals ***also*** communicated by text message or other means.  Indeed, based on the recent scandal, it seems most likely that government officials in Puerto Rico would save the communications they do not expect people to see (i.e., their ***most*** revealing communications) for text messages or group chats.

6

16.     Any burden that would be associated with collecting these types of documents must be weighed against the magnitude of this dispute.  The 9019 Motion seeks to resolve nearly $9 billion in non-recourse bond claims by paying bondholders upwards of *$20 billion* over the next fifty years.  Asking the Nonproducing Parties to collect, review, and produce potentially relevant text messages and other similar forms of communication stored on custodians' individual devices is plainly proportionate to the relief requested.

### C.  More Fulsome Responses to Certain of the Committee's Requests

17.     As detailed in the Government Parties' Objection, the Government Parties have refused to comply with certain of the Committee's specific discovery requests, arguing they are not relevant or unduly burdensome.  These arguments lack merit for the following reasons:

- RFP Nos. 4 and 9:  In response to the Committee's request for all documents and communications regarding analyses of the impact of the RSA on creditors of PREPA (RFP No. 4) and the ability of Puerto Rico's electric system to absorb and pass on the Settlement Charge and Transition Charge (RFP No. 9), the Government Parties state in their Opposition that they have "agreed to produce responsive, non-privileged documents and communications," but not "all" such documents.  The Government Parties' Opposition is not clear, but based on prior meet-and-confer discussions the Committee understands that the Government Parties have agreed to produce the referenced analyses, but not communications concerning such analyses, purportedly on the basis that such communications are so overwhelmingly likely to be privileged that they should not even be reviewed for production.  The Committee submits that this is inappropriate.  If responsive non-privileged analyses exist, as they do, there is no reason to believe that non-privileged communications concerning such analyses – which address topics of core significance for the 9019 Motion – do not also exist, in which case they should be produced.

- RFP No. 8:  In refusing to produce documents and communications regarding "alternative restructuring or litigation strategies," the Government Parties claim that this is outside the scope of the hearing because the "[c]ourt will not decide 'whether the compromise embodied in the portions of the RSA presented for approval is the wisest possible outcome, but, rather' the question of 'whether [the settlement] is within a range of reasonable outcomes.'"  But the court cannot consider whether the settlement is within the range of reasonable outcomes without considering what other outcomes (i.e., what other alternative restructuring or litigation strategies) are available.  To the extent that non-privileged documents exist that consider the RSA in the broader context of alternative strategies available to the Government Parties, such

documents would be highly relevant to the 9019 Motion. If they are privileged, logging the documents will impose no undue burden, as the Government Parties have prepared categorical privilege logs.

- <u>RFP Nos. 10-12</u>: The Government Parties should produce all documents relating to the status of the Proposed Transformation as called for by these requests. The Government Parties' attempts to narrow the scope of their production are improper. The Oversight Board's agreement to produce documents that "refer to the effect of the RSA on the proposed transformation" is unduly narrow, as it would seemingly allow the Oversight Board to withhold responsive documents simply because the effect of the RSA was not expressly "referred to" in the document. Likewise, while AAFAF/PREPA contend that some responsive documents have been produced in connection with the Renewed Receivership Motion, they have not agreed that such documents may be used in this litigation. Moreover, these documents, even if available here, would not include the most recent, critical documents regarding the transformation, including those that were created leading up to and following the announcement of the RSA. Given the centrality of this topic to the justifications that the Government Parties have offered for the RSA, the Government Parties should be obligated to produce relevant materials that they have in their possession, even if some of the same documents would also be in the possession of the P3 Authority.

- <u>RFP Nos. 17-19</u>: The Committee is entitled to documents regarding regulatory and legislative implementation issues, which may indicate that the RSA will never be implemented, or that a confirmable plan will never follow from the RSA. In light of the huge costs that will be borne by PREPA once the 9019 order is issued, the court must take these risks into account in considering "the paramount interests of creditors." This is consistent with Judge Swain's guidance at the July 11 hearing that "[e]vidence and arguments that go *only* to . . . whether the matters requiring further action by Puerto Rico's elected government officials and agencies of the Puerto Rico government ought to be approved should not be offered at this juncture." (emphasis added). The discovery at issue here is relevant because it bears on the potential consequences of the RSA for PREPA's creditors, not because it relates to judicial approval of future action by the government of Puerto Rico.

- <u>RFP No. 20</u>: The Committee is also entitled to discovery concerning the nature and value of PREPA bondholders' security interests, which bears directly on the value of the bondholder claims that are being settled and whether the bondholders are entitled to post-petition interest, all of which is squarely relevant to the reasonableness (or unreasonableness) of the settlement.

- <u>RFP Nos. 25-26</u>: These requests seek projections and forecasts of key PREPA economic data and the impact upon PREPA of the proposed settlement, and are directly relevant to assessment of the potential value and risk of the RSA. The Oversight Board – which is not where such materials would normally be expected to originate – has agreed to produce documents sufficient to show such projections and forecasts in its possession. PREPA/AAFAF, by contrast have only agreed to produce

such documents to the extent that they were already produced in connection with the Receiver Motion, and have otherwise indicated that the Committee should rely entirely on Ankura to produce such documents.  Given the numerous developments concerning the RSA (and PREPA) that have occurred since the Receiver Motion, AAFAF/PREPA have no good justification for so limiting their responses, nor is it appropriate to require the Committee to rely entirely upon PREPA's financial advisor to produce basic economic data that would reasonably be expected to originate from PREPA/AAFAF themselves, in addition to whatever materials Ankura may have generated.

- <u>FOMB 2nd RFP No. 11; AAFAF/PREPA 2nd RFP No. 9</u>:  These requests seek economic and financial models supporting the figures provided in PREPA's June 27, 2019 Certified Fiscal Plan.  The Government Parties attached the 2019 PREPA Fiscal Plan to the Jaresko Declaration that they submitted in support of the 9019 Motion.  Having thus placed it at issue in this motion, they have no reasonable basis on which to refuse to produce the models that are the underpinning of the fiscal plan.

### D.  AAFAF and PREPA Must Correct Deficiencies in Their Productions

18.     The refusal by AAFAF/PREPA to search for and review entire categories of documents, including internal communications and communications with the Ad Hoc Group during certain time periods, is unjustifiable.  Tellingly, AAFAF/PREPA are the ***only*** parties that have employed this approach—all the other Nonproducing Parties have reviewed and logged privileged documents.  To be clear, the Committee is not simply asking AAFAF/PREPA to undertake the burden of creating a privilege log.  Rather, the Committee seeks to ensure that AAFAF/PREPA fulfill their obligations to review documents and determine whether they satisfy the legal requirements of an applicable privilege ***before*** withholding them from production.

19.     AAFAF/PREPA cite *Fed. Energy Regulatory Comm'n v. Silkman*, No. 16-205, 2017 WL 6597510 (D. Me. Dec. 26, 2017), in support of their position that AAFAF/PREPA needs not bear the burden of reviewing documents prior to asserting a privilege.  Unlike in that case, however, where the plaintiff sought discovery over FERC documents related to collateral investigations that were of marginal, at best, relevance to the matter at hand, the documents that AAFAF/PREPA are refusing to review here could be among the most relevant to this dispute.

Indeed, the withheld documents could show the views of AAFAF/PREPA on key issues relating
to the 9019 Motion that the Government Parties have placed at issue through their declarations,
including, for example, the effect (if any) that the RSA will have on the proposed transformation
and the sustainability of the proposed rate increases.

20.     AAFAF/PREPA's responses to the example documents that the Committee cited
in its Renewed Motion to Compel to demonstrate issues with their document productions are
revealing.  First, AAFAF/PREPA agree that their incomplete search protocol was the reason
Exhibit 21[6] had not been produced, which has led them to agree to search for and produce
additional non-privileged, responsive communications with an additional domain name.  Second,
although AAFAF/PREPA claim that 27 permutations of the email thread included as Exhibit 23
were produced, none of these permutations contain the most relevant part of the email chain,
which was produced only by the Ad Hoc Group.  The omitted portion is relevant because it
provides further proof that the Ad Hoc Group did not have a common interest with the
Government Parties in March 2019.  See Ex. 23.  AAFAF/PREPA have no explanation for why
this message was not produced, nor do they indicate what, if anything, they will do to ensure that
other responsive non-privileged documents were not withheld from production.[7]

21.     Perhaps the clearest indication of AAFAF/PREPA's failure to produce
responsive, non-privileged documents can be seen by comparing their document productions to
the documents that the Oversight Board has produced.  Specifically, the Oversight Board
emphasizes in the Objection that it "has produced or is producing all agendas and presentations

---

[6]     Exhibits 1-24 refer to the exhibits attached to the Renewed Motion to Compel.

[7]     The examples provided in the Renewed Motion to Compel are not the only examples of AAFAF/PREPA's
incomplete document production.  For example, the Oversight Board produced an April 17, 2019 email sent to
Gerard Gil at Ankura regarding the demand protection term sheet.  See Ex. 27 (FOMB_9019_00001997).  This
document was not produced by AAFAF/PREPA.  On March 29, 2019, Brownstein forwarded an email with
National to both Jaresko and Sobrino.  See Ex. 28 (FOMB_9019_00002236).  This document was produced by the
Oversight Board, but not AAFAF/PREPA.

regarding Board meetings at which the preliminary RSA and RSA were considered[.]" Government Parties' Objection ¶ 40. No such similar materials have been produced by AAFAF/PREPA. *Cf.* Original Motion to Compel ¶ 17. Thus, while AAFAF/PREPA have refused to review or collect internal government communications, the Oversight Board has not only undertaken that effort, but has produced certain internal communications after determining that they are not privileged.[8]

22.     For these reasons, AAFAF/PREPA must be ordered to collect and review all categories of potentially responsive documents and to produce those responsive documents that are not privileged to the Committee.

## II.     Documents Produced in Receivership Motion Litigation Should Be Available for Use in Discovery

23.     As the Committee has emphasized in prior briefing, the Court need not determine whether a document is relevant to a dispute before that document may be used in discovery. Rather, a party may use any document in discovery for any purpose—including documents received from sources unrelated to the litigation—subject to the rights of other parties to object to the admissibility of such document at the appropriate time. The Government Parties have that same right here. The Government Parties do not, however, have a preemptory veto right allowing them to prevent the use of a document in discovery at the outset of the litigation.

24.     For this reason, the Government Parties' proposal that the Committee obtain their approval for each document from the Renewed Receivership Motion discovery that the Committee seeks to use in the 9019 Motion discovery is entirely inappropriate. As an initial

---

[8]     For example, both the Oversight Board and Citi produced Exhibit 22, which is a November 20, 2018 email to all of the members of the Oversight Board, its staff, and its counsel, regarding the status of PREPA RSA negotiation. The Oversight Board has produced a number of additional purely "internal government communications," especially communications between Jaresko and Brownstein. *See, e.g.*, Ex. 9, Ex. 10, Ex. 16. Comparable documents would not have been collected or reviewed by AAFAF/PREPA, much less produced.

matter, this approach is prejudicial to the Committee, as the Committee should not have to reveal to the Government Parties every document it deems relevant from the Renewed Receivership Motion in advance of using the document in discovery (for example, in a deposition).  The approach is also unworkable as a practical matter, because the Committee is reviewing documents in the Renewed Receivership Motion in real-time and may not identify the documents that it wishes to use in discovery until the eve of the applicable deposition or other event.

25.    The Government Parties concede that there is no burden associated with allowing the Committee to use the Renewed Receivership Motion documents in discovery, because those documents are already in the Committee's possession.  Moreover, the Government Parties' concern that the Committee will seek to turn the 9019 Motion into a "discovery circus" is entirely unfounded.  The Committee has no interest in using irrelevant documents from the Renewed Receivership Motion in this dispute.  The only workable way to proceed, that protects all parties' rights, is to permit the Committee to use the Renewed Receivership Motion discovery in this dispute, subject to the rights of all other parties to object.

### III.    Respondents Had No Common Interest Prior to Definitive RSA

26.    At this point in the briefing, there should be no serious disagreement as to the legal standard governing common interest claims.  The First Circuit has narrowly defined common interest as "an identical (or nearly identical) legal interest as opposed to a merely similar interest."  *F.D.I.C. v. Odgen Corp.*, 202 F.3d 454, 461 (1st Cir. 2000).  The Government Parties' citation of the Court's recent decision in *In re Financial Oversight & Management Board for Puerto Rico*, No. 17-3566, 2019 WL 2636273 at *10 (D.P.R. June 27, 2019) does not (and cannot) modify this standard.  In that decision, the Court recognized the First Circuit's

stringent standard[9] but nonetheless found in the factual context of the ERS litigation that the

government entities shared a sufficient common interest in pension reform to claim the

protection with respect to communications on that subject.  That the First Circuit standard,

however, requires that parties share an identical (or nearly identical) legal interest with respect to

the subject over which common interest protection is claimed, is not (or should not be) in

dispute.

  27. Of course, the facts presented on the 9019 Motion are different from the facts in

the ERS dispute.  Here, the question presented by the Renewed Motion to Compel is whether the

Respondents shared a common interest with each other prior to the execution of the Definitive

RSA sufficient to protect communications concerning their RSA negotiations.  As discussed in

prior briefing, the answer is that they did not, for the parties continued for months to negotiate at

arms-length, with certain parties threatening to walk away from the deal at various points in time

and with material terms remaining unresolved right up until the signing of the Definitive RSA.

  28. The Nonproducing Parties do not seriously argue to the contrary, repeating only

the narrower mantra that agreement with the Government Parties as to the "material economic

terms"[10] of the RSA was complete as to the Ad Hoc Group with the Preliminary RSA on July 30,

2018 (which the Nonproducing parties agree was not a binding agreement) and as to Assured

with a "handshake deal" on March 25, 2019.  Assured and the Ad Hoc Group make essentially

the same argument as between themselves, asserting a common interest as of October 18, 2018.

But the purported "material economic terms" of the deal were far from comprehensive at any of

these dates prior to the completion of the Definitive RSA.  As the Government Parties' own

---

[9] "[T]he bondholders are correct that the standard in the First Circuit for evaluating whether there is a common interest is stricter than the standard cited by Judge Dein[.]"  *Id.*

[10] Government Parties' Objection ¶ 61; Ad Hoc Group's Objection ¶ 30.

submissions demonstrate,[11] any "agreement" existing at these points in time did not include key features of the final deal, such as demand protection provisions, remedies, securitization protections, and implementation provisions.  Importantly, it is exactly these provisions – particularly the securitization provisions and the limits on bondholder remedies – that the Government Parties now tout as their key successes in the negotiation of the RSA.  The Committee pointed out this fact in its Renewed Motion to Compel ¶¶ 22-23, and none of the Respondents seriously address it in their Objections.

29.     There can be no common interest under these circumstances.  The Nonproducing Parties' reliance upon *In re Tribune Co.* to argue for the contrary is misplaced, for *In re Tribune Co.* involved a settlement that actually resolved all material terms.[12]  The Committee does not contest the application of a common interest privilege once the Nonproducing Parties actually finalized the material terms of their deal – including the structural terms that they spent nine months negotiating, and which the Government Parties now highlight as their key accomplishment.  But this did not occur until the Definitive RSA was finalized.  The Court should direct that prior communications among the Respondents must be produced.[13]

---

[11]     Government Parties' Original Objection [Dkt. No. 1340], Appendix A at A-2.

[12]     *In re Tribune*, No. 08-13141, 2011 WL 386827 (Bankr. D. Del. Feb 3, 2011) ("Once the DCL Plan Proponents agreed upon material terms of a settlement, it is reasonable to conclude that the parties might share privileged information in furtherance of their common interest of obtaining approval of the settlement through confirmation of the plan.").  Moreover, *In re Tribune Co.* (like *In re Leslie Controls*, upon which it relies, 437 B.R. 493 (2010)), was decided under less stringent Third Circuit common interest standards, which require only that the parties share a "substantially similar legal interest" (*In re Tribune*, 2011 WL 386827 at *4) with respect to the subject of the communication, not the "identical (or nearly identical)" alignment of interests with respect to the subject of the communication that is required in the First Circuit.

[13]     For the avoidance of doubt, the Committee's position is that, given the continued negotiations over material terms, there was no common interest among *any* of the Respondents (i.e., between the Government Parties and the Ad Hoc Group, between the Government Parties and Assured, or between the Ad Hoc Group and Assured) with respect to the RSA until the agreement to the Definitive RSA.  Thus, Assured's suggestion that the Committee has not challenged the purported common interest between Assured and the Ad Hoc Group is not correct.

#### IV.     Deliberative Process Claims Cannot Prevent Discovery of Documents Concerning Negotiation of or Decision to Enter into RSA

30.     As an initial matter, the Committee remains in the dark as to the volume of documents actually withheld on the basis of deliberative process claims.  Although the FOMB has agreed to provide this information, it has not yet done so, while AAFAF/PREPA's wholesale objection to review of internal documents has resulted in the provision of a privilege log which identifies only 28 documents withheld for any reason.

31.     There does not appear to be any dispute between the parties that the deliberative process privilege does not apply where government officials' intent or state of mind is at issue. *See* Government Parties' Objection at n. 21.  The only dispute raised on this Renewed Motion to Compel is the extent to which the intentions or motivations of the Government Parties are relevant to the 9019 Motion.  The Government parties argue that they do not bear on any of the four reasonableness factors, and therefore are irrelevant.  They are wrong.

32.     The Government Parties' argument ignores the contents of the declarations submitted by the Government Parties in support of the 9019 Motion, which, among other things, ask the Court to approve the RSA because:

- The RSA was negotiated at "arms-length" with PREPA's stakeholders and the negotiations were "hard fought."  Brownstein Decl. [Dkt. No. 1426] ¶¶ 16-17

- The RSA allegedly satisfied the Government Parties' "key objectives," including that "any recovery by PREPA's creditors had to be secondary to the Commonwealth's overall economic recovery, for which the recovery of PREPA plays an important role."  Brownstein Decl. ¶¶ 25-30

- The "Administrative claims, Settlement Payments, and Waiver and Support fees are intended to reasonably compensate Supporting Holders for agreeing to lock in to plan treatment through an RSA[.]"  Brownstein Decl. ¶ 58

- "Based upon my [Natalie Jaresko's] personal involvement in the negotiations leading to the RSA, including communications with the Oversight Board's financial advisors, the RSA is the product of good faith and arms-length negotiations among the RSA parties."  Jaresko Decl. [Dkt. No. 1428] ¶ 13

33.     The apparent purpose of these representations by the Government Parties is to reassure the Court that, while the Government Parties were negotiating and considering the RSA, they had the broadly-defined best interests of the Commonwealth of Puerto Rico in mind.  By putting these alleged facts at issue, the Government Parties necessarily open the door to discovery into their decision-making process and cannot now shield the communications necessary to test their assertions behind a privilege claim.

34.     Finally, the relief sought by the Committee is neither overbroad nor unduly burdensome.  The Committee is not trying to invade the Government Parties' attorney-client or work product privileges; rather, it seeks only the production of documents withheld solely on the basis of a deliberative process claim relating to the negotiation of or decision to enter into the RSA.  The FOMB has already agreed to identify to the Committee the volume of such withheld communications.  If the documents can be identified, it should not be unduly burdensome for the Government Parties to produce them.[14]

## V.     Assured's Loss Reserve Submissions to its New York Regulator Should Be Produced

35.     In its Original Reply [Dkt. No. 1318], the Committee explained at length why Assured's loss reserve submissions to its New York regulator (the "Assured Loss Reserves") are not privileged.  In short:

- The Assured Loss Reserves were prepared in the ordinary course of business to satisfy regulatory requirements, and are thus not protected work product.  Original Reply ¶ 31.

- The Assured Loss Reserves were disclosed by Assured to its New York regulator, waiving any privilege protections.  Original Reply ¶ 32.  The New York regulator

---

[14]     The one case cited by the Government Parties in their argument on this point, *Silkman*, 2017 WL 6597510 at *8, is entirely inapposite, as it dealt with requests for materials subject to multiple privileges relating to the FERC's decision not to pursue enforcement action against a non-party.  Here, by contrast, the documents sought by the Committee are subject only to a claimed deliberative process protection, and relate to the very RSA that is the subject of the 9019 Motion.

is permitted to disclose such regulatory submissions publicly if it determines that the public interest will thereby be satisfied.  Original Reply at n. 14.  Assured therefore effectively gave up control of the documents when it submitted them, and the situation here is thus not analogous to disclosure pursuant to a confidentiality agreement.

- Assured's New York regulator has chosen not to assert a bank examiner privilege.

36.     Assured does not meaningfully address any of these points, instead relying primarily on Maryland's assertion of a bank examiner privilege as a basis to withhold these materials.  Assured again offers no authorities supporting such a position, and for good reason – it cannot be that Maryland has the power to restrict the use of documents provided to regulators in New York.

37.     Assured's arguments on relevance also miss the mark.  Assured continues to rely on this Court's previous determination that its loss reserves were irrelevant in the context of the Renewed Receiver Motion.  That decision, however, was premised on a finding that the "loss reserves at issue are based on potential litigation outcomes and not on a valuation of collateral." [Dkt. No. 1165, at 9].  Here, by contrast – and as Assured acknowledges – the question before the Court is whether the settlement falls within the range of reasonableness.  As an interested party, the assessments that Assured's regulator required it to prepare of likely litigation outcomes are directly relevant to that determination.  That such assessments were not prepared by the Government Parties does not render them irrelevant to assessment of the Government Parties' decision to settle – to the contrary, the independence of such assessments could potentially render them even more significant and helpful to resolution of the 9019 Motion.

[*Remainder of page intentionally left blank.*]

## **CONCLUSION**

For all of the foregoing reasons, the Renewed Motion to Compel should be granted in full.

Dated:  July 25, 2019

*/s/ Luc A. Despins*
PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel:  (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors*

- and -

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR
225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR
306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors*