# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
----------------------------------------------------------------- X
                                                                  :
In re:                                                            :
                                                                  :
THE FINANCIAL OVERSIGHT AND                                       :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                 :  Title III
                                                                  :
          as representative of                                    :  Case No. 17-BK-3283 (LTS)
                                                                  :
THE COMMONWEALTH OF PUERTO RICO et al.,                           :  (Jointly Administered)
                                                                  :
          Debtors.¹                                               :
----------------------------------------------------------------- X
                                                                  :
In re:                                                            :
                                                                  :
THE FINANCIAL OVERSIGHT AND                                       :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                 :  Title III
                                                                  :
          as representative of                                    :  Case No. 17-BK-4780 (LTS)
                                                                  :
PUERTO RICO ELECTRIC POWER AUTHORITY                              :  This filing relates only to
                                                                  :  Case No. 17-BK-4780 (LTS)
                                                                  :
          Debtor.                                                 :
----------------------------------------------------------------- X
```

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' URGENT (I) OBJECTIONS TO MAGISTRATE JUDGE'S AUGUST 2, 2019 ORDER ON MOTION TO COMPEL AND (II) ALTERNATIVE MOTION TO STRIKE AND TO EXCLUDE OUT-OF-SCOPE DECLARATION TESTIMONY AND RELATED EVIDENCE

---

¹ The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA")) (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and  (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ................................................................................................................ 4

ARGUMENT .................................................................................................................... 7

I.     Court Should Direct Discovery Denied by Magistrate Judge on Certain Topics to Go Forward or, Alternatively, Exclude Such Evidence From Hearing ........................... 8

    A.     Discovery Sought By Committee is Relevant and Necessary to Explore Facts That Government Parties Have Proffered in Support of Settlement ........... 8

        i.     Committee is Entitled to Discovery Concerning Sustainability of Rate Increases and Feasibility of Settlement ........................................... 10

        ii.     Committee is Entitled to Discovery Concerning Status of Proposed Transformation Transaction .................................................................... 11

        iii.     Committee is Entitled to Discovery Concerning Legislation and Regulations Necessary for Proposed Settlement .................................... 12

        iv.     Committee is Entitled to Discovery Concerning Potential Alternative Restructuring or Litigation Strategies or Transactions ........ 13

    B.     If Discovery is Not Permitted, Court Must Strike Applicable Portions of Declarations and Exclude Similar Evidence at Hearing on 9019 Motion .......... 14

II.     Government Parties and Ad Hoc Group Should Be Required to Produce Documents From Additional Custodians ................................................................... 18

    A.     Oversight Board Should Be Required to Produce Documents From all of its Board Members ............................................................................................ 18

    B.     PREPA Should Be Required to Produce Documents From Filsinger Energy Partners .............................................................................................. 19

    C.     Ad Hoc Group Should Be Required to Produce Documents from Certain Employees of its Group Members ..................................................... 20

III.     Government Parties and Supporting Holders Should Not Be Allowed to Assert a Common Interest Privilege Until, At Earliest, Date of RSA Term Sheet on March 26, 2019 ......................................................................................................... 21

IV.     Discovery Into Assured's Loss Reserves Should Be Permitted ..................................... 26

CONCLUSION.................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co.*,
No. 04-4309, 2006 WL 278131 (S.D.N.Y. Feb. 2, 2006)......................................27

*Asymmetrx Med., Inc. v. McKeon*,
No. CIV.A. 11-11079-NMG, 2013 WL 2181084 (D. Mass. May 16, 2013) ........................24

*Cavallaro v. United States*,
284 F.3d 236 (1st Cir. 2002) ................................................21

*E.E.O.C. v. Gen. Tel. Co. of Nw.*,
885 F.2d 575 (9th Cir. 1989) ................................................17

*F.D.I.C. v. Odgen Corp.*,
202 F.3d 454 (1st Cir. 2000) ................................................21

*Goat Island S. Condo. Ass'n, Inc. v. IDC Clambakes, Inc. (In re IDC Clambakes, Inc.)*,
727 F.3d 58 (1st Cir. 2013)................................................8

*In re JP Morgan Chase & Co. Sec. Litig.*,
No. 06 C 4674, 2007 WL 2363311 (N.D. Ill. Aug. 13, 2007)................................24

*Ken's Foods, Inc. v. Ken's Steak House, Inc.*,
213 F.R.D. 89 (D. Mass. 2002)................................................21

*In re Lyondell Chemical Co.*,
Case No. 09-10023 (Bankr. S.D.N.Y Jan. 11, 2010)................................................24

*Mullins v. Dep't of Labor of P.R.*,
269 F.R.D. 172 (D.P.R. 2010) ................................................27

*PowerShare, Inc. v. Syntel, Inc.*,
597 F.3d 10 (1st Cir. 2010)................................................8

*Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
No. 14-4394, 2016 WL 5408171 (S.D.N.Y. Sept. 27, 2016) ................................19

*In re Tribune Co.*,
No. 08-13141 (KJC), 2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ................................25

*U.S. v. Mass. Inst. of Tech.*,
129 F.3d 681 (1st Cir. 1997)................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*U.S. v. Textron Inc. & Subsidiaries*,
    577 F.3d 21 (1st Cir. 2009) .........................................................................27

*W. Holding Co. v. Chartis Ins. Co. of P.R.*,
    300 F.R.D. 48 (D.P.R. 2014) ........................................................................27

*Wis. Alumni Research Found. v. Apple, Inc.*,
    No. 14-CV-062-WMC, 2015 WL 13547000 (W.D. Wis. Sept. 30, 2015) ............................17

**Statutes**

28 U.S.C. § 636(b)(1)(A) ...............................................................................8

**Other Authorities**

Fed. R. of Civ. Proc.
    R. 26(b)(1).............................................................................................8
    R. 72(a) .............................................................................................1, 8
    R. 72(b) ...............................................................................................8

Local Rules for the United States District Court for the District of Puerto Rico
    72(c) ..................................................................................................1

To the Honorable United States District Judge Laura Taylor Swain:

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Rule 72(c) of the Local Rules for the United States District Court for the District of Puerto Rico, the Official Committee of Unsecured Creditors of all Title III Debtors (the "Committee")[1] respectfully submits these urgent objections (the "Objections") to the Order of Magistrate Judge Judith Gail Dein (the "Magistrate Judge"), entered on August 2, 2019 [Dkt. No. 1556] (the "August 2 Order"),[2] attached hereto as Exhibit A, resolving outstanding issues from the *Renewal of the June 3, 2019 Omnibus Motion of Official Committee of Unsecured Creditors to Compel in Connection with PREPA RSA Rule 9019 Settlement Motion* [Dkt. Nos. 1467 and 1517] (the "Renewed Motion to Compel").  As an alternative to certain of the relief sought in the Objections, the Committee also respectfully submits herein its Motion to Strike and to Exclude Out-of-Scope Declaration Testimony and Related Evidence (the "Motion to Strike").  In support of these Objections and the Motion to Strike, the Committee respectfully states as follows:

1.       In her August 2 Order, Magistrate Judge Dein issued several rulings that prevent the Committee from obtaining critical discovery relating to the 9019 Motion [Dkt. No. 1235], including discovery necessary to test the feasibility of the proposed settlement and its impact on other creditors.  This discovery is relevant not because it goes to so-called "macroeconomic" issues, but rather because it is necessary to assess the reasonableness of the provisions of the RSA that propose to distribute hundreds of millions of dollars in value to bondholders before the

---

[1]       Capitalized terms not defined herein shall have the meanings ascribed to them in the Original Motion to Compel and Renewed Motion to Compel.  For the avoidance of doubt, the term "Government Parties" as used herein includes the Oversight Board, PREPA, AAFAF, and their respective advisors, including without limitation Citigroup Global Markets, Inc., Filsinger Energy Partners, and Ankura Consulting Group.  All such advisors were among the "Nonproducing Parties" subject to the Original Motion to Compel and the Renewed Motion to Compel. They are therefore included in the Objections and Motion to Strike as well.

[2]       All docket entries referenced herein are filed in case No. 17-4780, unless otherwise noted.

settlement is fully implemented through a plan of adjustment and to explore the various

rationales for the settlement that the Government Parties have offered in their declarations.

2.      In particular, the Government Parties, perhaps recognizing that the benefits

conferred to the bondholders under the RSA cannot be justified by the benefits the Government

Parties believe they will receive without an eventual plan of adjustment, have touted an eventual

plan of adjustment as one of the cornerstones of the RSA.  This purported benefit of the RSA is

entirely illusory, however, if no plan predicated upon the RSA has a realistic possibility of being

confirmed, including because it is not feasible.  Moreover, if no plan is confirmable, it is not

reasonable for the Government Parties to confer more than one billion dollars in pre-

confirmation benefits upon the bondholders with no concomitant benefit to PREPA.  The

Committee must be permitted to explore these important issues in discovery.

3.      To be clear, the discovery the Committee seeks has nothing to do with policy

choices, such as whether solar or wind power should be preferred over fossil-fuel-generated

power or what possible impact increased electricity rates could have on Puerto Rico's economy

generally.  Rather, it deals directly with whether or not *the debtor, PREPA*, can sustain the rate

increases that the RSA contemplates.  This discovery also relates to whether the RSA leaves

room for recoveries for other creditors, which goes directly to whether or not the settlement is

consistent with the "paramount interests of creditors," which the Court has recognized as a factor

it must consider in ruling upon the 9019 Motion.

4.      The Committee has heard the Court loud and clear that the hearing on the 9019

Motion should not turn into a full-blown confirmation hearing.  At the same time, however, the

Government Parties have placed certain confirmation-related matters directly at issue by relying

upon them as a basis for approval of the settlement.  The Government Parties cannot have it both

2

ways.  They cannot advance a rationale in support of the settlement in their declarations and then prevent the Committee from seeking discovery on that rationale.  Nor can the Government Parties justify giving more than a billion dollars in pre-plan benefits to bondholders by touting the benefits of plan confirmation without allowing adequate discovery into whether such plan is realistically confirmable.  The law requires otherwise.  The Court seemed to agree at the July 11, 2019 preliminary conference (the "July 11 Conference") when it recognized that the Government Parties' declarations are, "of course," fair game for discovery.  *See* Ex. C (July 11, 2019 Hr'g Tr.) at 32:18-20.  The Magistrate Judge, however, disagreed.

5.     The inconsistencies in the Government Parties' positions—and the Magistrate Judge's ruling—are not limited to plan feasibility and other confirmation-related issues.  The Government Parties also repeatedly stress in their declarations that the settlement will facilitate PREPA's transformation process, that rates will rise absent a settlement, and that the settlement represents a reasonable middle ground compared to other alternatives.  Yet, at the Government Parties' request, the Magistrate Judge limited the Committee's discovery on these topics.  The Committee asks this Court to reverse these rulings.

6.     In the alternative, the Committee requests an order striking the specific portions of the Government Parties' declarations as to which the Committee has been denied adequate discovery and precluding the Government Parties from introducing evidence on similar topics at the hearing on the 9019 Motion.  These statements are not relevant to the Court's consideration of the 9019 Motion based on this Court's and the Magistrate Judge's prior rulings and by Government Parties' own admissions.  Indeed, the Government Parties have taken the position that the ***only*** issue the Court needs to consider on the 9019 Motion is whether the ***amount*** of the settlement falls within the range of reasonableness.  Regardless, even if the scope of the inquiry

3

is more expansive than this, the Court cannot allow facts into evidence if the Committee does not have an adequate opportunity to explore them in discovery.

7.      Finally, the Magistrate Judge also erred in issuing certain other rulings. Specifically, she (i) improperly rejected the Committee's requests for documents from additional custodians of the Government Parties and the Ad Hoc Group, (ii) applied an overbroad common interest privilege to communications among the Government Parties and the supporting bondholders, and (iii) improperly refused to permit the Committee to obtain discovery into Assured's loss reserves, which directly bear on Assured's assessment of the risks involved in the litigation being settled.  The Committee respectfully objects to these rulings and requests that this Court direct appropriate discovery to go forward, as detailed below.

## **BACKGROUND**

8.      On May 10, 2019, the Government Parties filed the 9019 Motion, which asked the Court to enter an order approving the settlement embodied in the RSA and tolling certain limitations periods.  *See* 9019 Motion.  Among other provisions, the RSA calls for the eventual transfer of more than $20 billion in total consideration over 47 years to the holders of PREPA's non-recourse bonds, which are secured only by funds in specific accounts containing only approximately $33 million as of the petition date.  The RSA also provides for the transfer of over one billion dollars in pre-plan benefits to the supporting bondholders, hundreds of millions of which will not be returned if the RSA is not fully implemented through a confirmed plan.

9.      On May 22, 2019, the Committee served its initial document requests on the Government Parties.  After conducting expedited meet and confer sessions with the Government Parties and others, the Committee filed its initial Motion to Compel on June 3, 2019.  *See* Mot. to Compel [Dkt. No. 1269].  The Government Parties filed their opposition to the Initial Motion to Compel on June 7, 2019.  *See* Gov't Parties Obj. to Mot. to Compel [Dkt. No. 1304].  In their

opposition, the Government Parties argued that "the hearing on approval of the RSA should

focus only on whether the disputed secured claims are discounted enough to put the settlement in

the range of reasonableness." *See id*. ¶ 1.  The Committee filed its reply on June 10, 2019.  *See*

Reply to Mot. to Compel [Dkt. No. 1318].

10.     On June 12, 2019, the Court held an initial status conference, in which the Court

explained that the initial 9019 Motion was filed without sufficient factual support for the relief

that it sought, and instructed the Government Parties to file supplemental memoranda and

declarations that would (if uncontroverted) demonstrate that the Government Parties are entitled

to the relief sought.  Ex. D (June 12, 2019 Hr'g Tr.) at 152:5 – 153:22.

11.     Pursuant to the Court's direction at the June 12 conference, on July 2, 2019, the

Government Parties filed their Supplemental Submission in support of the 9019 Motion.  *See*

Suppl. Submission [Dkt. No. 1425].  This Supplemental Submission was supported by four

written declarations from David Brownstein [Dkt. No. 1426], Frederic Chapados [Dkt. No.

1427], Natalie Jaresko [Dkt. No. 1428], and Christian Sobrino [Dkt. No. 1429].  These

Declarations proffer numerous statements purporting to support the reasonableness of the

settlement embodied in the RSA, including that it will (i) support the island's overall

restructuring efforts by paving the way for confirmation of a plan of adjustment and ensuring

that PREPA will not reenter Title III in the future; (ii) help facilitate the proposed

transformation; (iii) establish sustainable electricity rates for PREPA's customers; and

(iv) prevent electricity rates from rising in the future in the event the bondholders prevail in

litigation against PREPA.

12.     On July 11, 2019, the court held another preliminary conference.  *See* Ex. E

(July 11, 2019 Hr'g Tr.).  At this conference, the Court granted certain motions in limine,

excluding evidence that "relates primarily to macroeconomic and energy policy issues that are of limited potential probative value in the 9019 motion practice and are peripheral to the specific questions that are currently before the Court." *Id*. at 10:5-9. However, at the same hearing, counsel for the Committee and the Court had the following exchange, recognizing the Committee's right to seek discovery concerning assertions made in the Government Parties' declarations:

> Mr. Despins: I need to be able to engage on those issues that they're relying on, your Honor. That's really the main point we want to make.
>
> The Court: It's their burden, and if you have grounds for attacking their proffer in support of their burden, of course you can explore that. I have to consider that.

*Id*. at 32:15-20.

13.     On July 16, 2019, the Committee filed its renewed motion to compel discovery from the Government Parties. *See* Renewed Mot. to Compel [Dkt. No. 1467]. On the same day, the Oversight Board filed a motion for a protective order and motion in limine regarding the declaration and testimony of Andrew Wolfe, an economic advisor to the Oversight Board. *See Motion of the Financial Oversight and Management Board for (1) A Protective Order Pursuant to Fed. R. Civ. P. 26 from the Subpoena and Deposition Notice Issued to Andrew Wolfe by the Official Committee of Unsecured Creditors; and (2) an Order in Limine Precluding the Official Committee of Unsecured Creditors from Entering in Evidence at the 9019 Motion Hearing the July 2017 Declaration of Andrew Wolfe* [Dkt. No. 1464]. The Government Parties filed their opposition to the Renewed Motion to Compel on July 23, 2019. *See* Gov't Parties' Obj. to Renewed Mot. to Compel [Dkt. No. 1500]. In their opposition, the Government Parties again argued that the issue before the Court on the 9019 Motion is "the objective question of" whether the settlement is within the range of reasonableness. *Id*. ¶ 3. As a result, the Government Parties claimed that their "intentions and motivations" in entering into the RSA are irrelevant. *See id*. ¶¶

52-53.  The Committee filed its reply on July 25, 2019.  *See* Reply to Renewed Mot. to Compel
[Dkt. No. 1520].

14.     On July 29, 2019, the Court granted the motion for protective order and motion in
limine regarding Andrew Wolfe.  *See Memorandum Order Granting Motion for Protective
Order and Order In Limine Precluding Evidence in Connection with 9019 Motion* (the
"Protective Order") [Dkt. No. 1543].  In its decision, the Court stated "that evidence going to
macroeconomic projections of the future state of Puerto Rico's economy and the longterm
impact of full implementation of the RSA is outside the scope of the 9019 Motion and therefore
will not be admitted in connection with the hearing on that motion." *Id*. at 3.

15.     On July 30, 2019, Judge Dein heard oral argument on the Committee's Renewed
Motion to Compel.  On August 2, 2019, Judge Dein issued the August 2 Order, granting in part
and denying in part the Committee's Renewed Motion to Compel.

16.     As set forth below, the Committee objects to the August 2 Order to the extent it
(i) prevents the Committee from obtaining discovery in response to certain requests that seek
information relating to the Government Parties' factual proffers in support of the 9019 Motion;
(ii) did not direct the Government Parties or the Ad Hoc Group to produce documents from
certain relevant custodians; (iii) sustained the assertion of a common interest between the
Government Parties and the Ad Hoc Group from July 30, 2018 – March 26, 2019, during a
period when they continued to actively negotiate at arms-length; and (iv) refused to permit the
Committee to obtain relevant discovery relating to Assured's loss reserves.  The Committee does
not otherwise object to the conclusions of the August 2 Order.

## **ARGUMENT**

17.     Upon timely objections to a non-dispositive order issued by a magistrate judge,
like the August 2 Order, the Court must modify or set aside any part of the order that "is clearly

erroneous or contrary to law."  28 U.S.C.A. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a).  A

magistrate judge's rulings will be reviewed under the "contrary to law" standard when the issue

"turns on a pure question of law."  *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir.

2010).  "This means that, for questions of law, there is no practical difference between review

under Rule 72(a)'s 'contrary to law' standard and review under Rule 72(b)'s de novo standard."

*Id*.  Mixed questions of law and fact trigger a sliding scale of review pursuant to which:

> [t]he more fact intensive the question, the more deferential the level of review (though
> never more deferential than the 'clear error' standard); the more law intensive the
> question, the less deferential the level of review.

*Goat Island S. Condo. Ass'n, Inc. v. IDC Clambakes, Inc. (In re IDC Clambakes, Inc.)*, 727

F.3d 58, 64 (1st Cir. 2013) (internal citation omitted).

18.     For the reasons set forth below, the errors to which the Committee objects in the

August 2 Order are founded upon questions of law meriting de novo review under a "contrary to

law" standard.  Applying that standard, certain of the rulings in the August 2 Order were

incorrect as a matter of law and must be overturned.

## I.     Court Should Direct Discovery Denied by Magistrate Judge on Certain Topics to Go Forward or, Alternatively, Exclude Such Evidence From Hearing

### A.     Discovery Sought by Committee is Relevant and Necessary to Explore Facts That Government Parties Have Proffered in Support of Settlement

19.     Under Federal Rule of Civil Procedure 26, a party is entitled to broad discovery

regarding "any nonprivileged matter that is relevant to any party's claim or defense and

proportional to the needs of the case, considering [among other things] the importance of the

issues at stake in the action, the amount in controversy, . . . the importance of the discovery in

resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

likely benefit."  Fed. R. Civ. P. 26(b)(1).  As the Court properly recognized at the July 11 pretrial

conference, a party is, "of course," entitled to discovery underlying the facts that another party

has offered in support of its burden of proof in the litigation.  Ex. E (July 11, 2019 Hr'g Tr.)

at 32:18-20.

20.     As discussed above, the declarations that the Government Parties have submitted

in support of the 9019 Motion offer various rationales in support of the purported reasonableness

of the settlement beyond simply the amount of the discount to the face amount of the PREPA

bonds.  Among other things, the Government Parties argue that:

- The RSA will support Puerto Rico's overall restructuring efforts by paving the way for plan confirmation, preventing PREPA from reentering Title III in the future, and ensuring that PREPA's future electricity rates are sustainable by its customers.  *See, e.g.*, Brownstein Decl. ¶¶ 24-30; Jaresko Decl. ¶¶ 14, 18-22, 37.

- The RSA will facilitate the proposed transformation.  *See, e.g.*, Jaresko Decl. ¶ 14; Chapados Decl. ¶ 25.

- Absent the RSA, if the bondholders are successful in litigation against PREPA, rates may rise without limitation in the future.  *See, e.g.*, Jaresko Decl. ¶ 26.

- The RSA represents a reasonable middle ground among various alternative proposals.  *See, e.g.*, Brownstein Decl. ¶ 71.

21.     Yet, the Magistrate Judge in the August 2 Order rejected requests for discovery

related to each of these topics, finding them outside the scope of the 9019 Motion.  These rulings

are erroneous.  While the Committee does not necessarily agree that the various rationales the

Government Parties have offered in support of the RSA are valid or otherwise relevant to

the 9019 Motion, to the extent the Government Parties are permitted to proffer facts in support of

those rationales, the Committee must be allowed to explore them in discovery.

       ***i.***       ***Committee is Entitled to Discovery Concerning Sustainability of Rate Increases and Feasibility of Settlement***

22.      At issue in the Motion to Compel were several requests[3] relating to the sustainability and impact on PREPA of the increased electricity rates called for by the settlement.[4]  The Magistrate Judge held that these requests "address the macroeconomic impact of the RSA [and are therefore] outside the scope of the 9019 hearing."  Aug. 2 Order ¶ 16.  This ruling was improper and should be overturned.

23.      The Committee's requests seek to determine, among other things, whether PREPA's rates under the settlement are sustainable and whether they could be raised further to provide recoveries for other creditors.  These questions are relevant not because of "macroeconomic" issues, but because they relate to feasibility of the proposed settlement (and the plan of adjustment on which the RSA is based), the effect that the settlement may have on PREPA's creditors, and the validity (or invalidity) of the other purported rationales for the settlement that the Government Parties have raised in their declarations.

24.      For example, the Government Parties tout in their declarations that the settlement will pave the way for a Title III plan of adjustment.  *See, e.g.*, Jaresko Decl. ¶¶ 18-23.  A plan is not confirmable, however, unless it is feasible, and a plan is not feasible if the rate surcharges called for by the RSA are not sustainable by ratepayers.[5]  If this were not enough to permit the Committee to take discovery on this issue, one of the Government Parties' key witnesses, David

---

[3]      The Responses and Objections of PREPA, AAFAF and the FOMB to the Committee's First Set of Document Requests are attached as Exhibits F (PREPA), G (AAFAF), and H (FOMB), and the Responses and Objections of PREPA, AAFAF, and the FOMB to the Committee's requests for 30(b)(6) testimony are attached as Exhibits I (PREPA), J (AAFAF), and K (FOMB).

[4]      *See* FOMB/AAFAF/PREPA First Document Requests Nos. 4, 9, 25 and 26; FOMB/AAFAF/PREPA 30(b)(6) Topic No. 6, FOMB/AAFAF 30(b)(6) Topic No. 9/PREPA 30(b)(6) Topic No. 10.

[5]      Moreover, if a plan is not feasible, then it will not keep PREPA out of Title III in the future, as the Government Parties contend in their declarations.  *See, e.g.*, Brownstein Decl. ¶ 56.

Brownstein, specifically states in his declaration that ensuring "the ability of PREPA's customers to pay any increased rates or additional charges required to service restructured PREPA debt" was a "key economic goal" of the RSA.  *See* Brownstein Decl. ¶ 25.  If the Government Parties are allowed to proffer these alleged facts, the Committee is allowed to explore them in discovery.

25.     Finally, the Government Parties' declarations contain detailed calculations of the claimed cost savings of the RSA, which they say are contingent upon estimates of future PREPA utilization and rates.  *See* Brownstein Decl. ¶¶ 35, 40, 45-54.  Discovery into electricity rates and projections is therefore necessary to respond to these assertions as well.[6]

### ii.     *Committee is Entitled to Discovery Concerning Status of Proposed Transformation Transaction*

26.     The Committee's requests at issue in the Motion to Compel also sought information relating to the status of the proposed transformation and the anticipated effect that the RSA may have on the proposed transformation.[7]  In ruling upon these requests, the Magistrate Judge determined that the Committee "has not sufficiently shown that these documents are relevant to the 9019 hearing."  Aug. 2 Order ¶ 18.  She further found that, "to the extent PREPA's transformation is discussed in declarations before the Court in the context of the 9019 hearing, the UCC has not shown that it lacks the factual information needed to respond."  *Id*.  The Magistrate Judge was wrong on both counts.

---

[6]     In ruling in a different part of the August 2 Order that the Government Parties properly asserted a limited deliberative process privilege over deliberations relating to the Demand Protections Term Sheet attached to the RSA, the Court stated that good cause does not exist for overriding the privilege because "[t]he deliberations related to rate setting as reflected in the Demand Protections Terms Sheet are beyond the scope of the 9019 Motion hearing."  Aug. 2 Order ¶ 8.  To the extent this Court agrees with the Committee that documents relating to the setting of PREPA's rates are relevant to the 9019 Motion, then this ruling by the Magistrate Judge concerning the deliberative process privilege should also be reconsidered.

[7]     FOMB/AAFAF/PREPA First Document Requests Nos. 10-12.

27.     First, this discovery is unquestionably relevant to the 9019 Motion because the

Government Parties have touted the completion of the proposed transformation as one of the

RSA's key benefits, including by submitting an entire declaration devoted solely to that issue.[8]

28.     Second, the Committee does not have nearly enough factual information to

respond to these allegations.  The only information the Committee is receiving from the

Government Parties on this topic are documents of the Oversight Board that specifically

reference "the effect of the RSA on the proposed transformation."  The Committee will not,

however, receive any documents or information from the Government Parties relating to the

status of the proposed transformation more generally, including when, if ever, it is likely to be

completed.  Clearly, if the Committee were to find evidence that the transformation is likely to

be delayed significantly or fall apart entirely, such evidence would undermine one of the

Government Parties' key purported benefits of the RSA.[9]  These documents should be produced.

### iii.     Committee is Entitled to Discovery Concerning Legislation and Regulations Necessary for Proposed Settlement

29.     Other requests at issue in the Motion to Compel sought documents and deposition

testimony concerning the rate surcharges called for by the settlement and any associated

legislation or regulations.[10]  The Magistrate Judge recognized that the Committee will receive

---

[8]         See Chapados Decl.

[9]         The Committee is not able to obtain sufficient information on these issues from the P3 Authority alone.
Although the P3 Authority has agreed to produce some information in response to the Committee's discovery
requests relating to the proposed transformation, the P3 Authority is not the party seeking approval of the RSA and
is not the debtor bound by the RSA.  The Committee is entitled to document discovery on these topics from the
Government Parties and their relevant decision-makers, including the declarants, who have touted the transformation
as a key benefit of the settlement.  Moreover, it is plainly not sufficient, as suggested by the Magistrate Judge during
the hearing on the Motion to Compel, to permit the Committee only to take depositions on these topics.  The
Committee needs documents from the deponents and other relevant custodians prior to any deposition in order to be
able to conduct an effective examination and understand whether the documentary record contradicts the witness'
testimony.

[10]        See FOMB/AAFAF/PREPA First Document Request Nos. 17-19; FOMB/AAFAF 30(b)(6) Topic No.
10/PREPA 30(b)(6) Topic No. 11.

this discovery "[t]o the extent [it] is included in presentations or meeting agendas" that the
Government Parties are producing, but held that "[a]ny further documents or communications
are outside the scope of reasonable discovery for the 9019 Motion hearing."  Aug. 2 Order ¶ 19.
This ruling, like the others, improperly deprives the Committee of the opportunity to explore
facts proffered in support of the settlement and to test the settlement's feasibility.

30.     The Government Parties emphasize repeatedly in their declarations that the
settlement will benefit PREPA and its ratepayers by capping the electricity rates that will be used
to pay debt service on the bonds.  Any change to PREPA's rates, however, requires regulatory
and/or legislative approval.  The Committee is entitled to explore the likelihood that the
Government Parties will obtain such approvals, as they are necessary for the settlement's
implementation.  If the approvals are not likely to be obtained, it would not be reasonable for the
Government Parties to grant the supporting bondholders more than one billion dollars in pre-plan
benefits, before the settlement and its related plan of adjustment are implemented, as the RSA
proposes to do.

31.     The Committee is also entitled to this discovery to test the Government Parties'
assertions that, absent a settlement, PREPA's rates would likely rise without limitation in the
future if PREPA loses its litigation against the bondholders.  *See, e.g.*, Jaresko Decl. ¶ 26.
Indeed, discovery may show that the Puerto Rico Energy Bureau would ***not*** raise rates to pay
debt service on the bonds regardless of whether the bondholders prevail in litigation.

### iv.     *Committee is Entitled to Discovery Concerning Potential Alternative Restructuring or Litigation Strategies or Transactions*

32.     The Magistrate Judge similarly erred in denying the Committee adequate
discovery relating to potential alternative restructuring or litigation strategies or transactions

considered by the Government Parties.[11]  Specifically, the Magistrate Judge ordered only that responsive "formal presentations, vote records, or meetings agendas from the Government Parties . . . that the bondholders expressed an interest in as a potentially viable settlement option" must be produced.  Aug. 2 Order ¶ 17.  There is, however, no basis on which to limit such production only to formal presentations, vote records or agendas.  Given that it is the Government Parties' ultimate selection of a settlement strategy that is at issue in the 9019 Motion, and given that the government declarants tout the benefits of the RSA in contrast to other settlement strategies not ultimately pursued (Brownstein Decl. ¶¶ 17, 71), the Government Parties' communications on this subject—not just their formal presentations—are directly relevant to the motion and should be produced.

33.     In summary, all of the requests of the Committee that were denied in the August 2 Order bear directly on the factual support for the 9019 Motion proffered by the Government Parties in their declarations.  To the extent that the Court considers these statements proffered by the Government Parties when evaluating the 9019 Motion, it should permit the corresponding discovery to allow the Committee to test the validity and accuracy of these statements.  The Committee therefore respectfully requests that the Court reverse these rulings of the August 2 Order as to discovery scope and direct instead that the discovery be produced.

B.     <u>If Discovery is Not Permitted, Court Must Strike Applicable Portions of Declarations and Exclude Similar Evidence at Hearing on 9019 Motion</u>

34.     In the August 2 Order, the Magistrate Judge did not meaningfully address the clear inconsistency between this Court's instruction at the July 11 Conference that the Committee is entitled to discovery relating to the assertions in the Government Parties'

---

[11]     *See* FOMB/AAFAF/PREPA First Document Request No. 8; FOMB/AAFAF/PREPA 30(b)(6) Topic No. 4.

declarations and her denial of the Committee's discovery requests designed to accomplish that objective. The Magistrate Judge did, however, suggest that the Committee may bring a motion to strike certain of the Government Parties' allegations to the extent they fall outside the permissible scope of the hearing on the 9019 Motion. *See* Ex. C (July 30, 2019 Hr'g Tr.) at 127:7-8 ("if you have a concern about some testimony that you think is going in, feel free to move to strike it").

35.     Therefore, in the alternative to its request for discovery on the topics discussed in paragraphs 22-32 above, the Committee seeks an order from the Court striking all statements in the declarations relating to these topics and preventing the Government Parties from introducing related evidence at the hearing on the 9019 Motion. The specific paragraphs that the Committee asks the Court to strike from the declarations are highlighted in the copies of the declarations attached as Exhibit B hereto.[12]

36.     The Court has discretion to grant this relief as it has done on other occasions in connection with the 9019 Motion. Specifically, the Court recently granted the Government Parties' motion to exclude from evidence testimony of Andrew Wolfe relating to the effect of increased electricity rates on Puerto Rico's ratepayers and economy in general on the grounds that such "macroeconomic" issues are outside the scope of the hearing on the 9019 Motion. *See* Protective Order at 3 (stating that "evidence going to macroeconomic projections of the future state of Puerto Rico's economy and the long term impact of full implementation of the RSA is outside the scope of the 9019 Motion and therefore will not be admitted in connection with the hearing on that motion"). The Court previously granted two similar motions on the same basis.[13]

---

[12]     The Committee seeks to strike the entirety of the Chapados Declaration.

[13]     *See Order (A) Granting the Urgent Motion in Limine to Exclude Testimony Offered by the Energy Non-Profits, the Environmental Non-Profits, and Somos, (B) Granting in Part the Urgent Motion in Limine to Exclude*

37.     In addition to its orders excluding evidence on "macroeconomic" issues, the Court
has indicated that its inquiry on the 9019 Motion will be a narrow one.  Specifically, the Court
has described its analysis as limited to determining whether or not the settlement falls within the
range of reasonableness in accordance with applicable First Circuit case law.  The Court has
suggested, and the Government Parties have argued, that this means the Court should not look
beyond the value of the consideration being received by the Government Parties and the risk of
the litigation being settled.  Specifically, the Government Parties have taken the position that the
inquiry is a purely "objective" one that looks only at "whether the disputed secured claims are
discounted enough to put the settlement in the range of reasonableness."  *See* Gov't Parties' Obj.
to Mot. to Compel ¶ 1.  The Government Parties have further claimed that their "intentions and
motivations" in entering into the RSA are irrelevant.  *See* Gov't Parties' Obj. to Renewed Mot. to
Compel ¶¶ 52-53.

38.     If the Government Parties are correct in their view of the scope of the hearing—
and the Magistrate Judge appears to believe they are based on her rulings in the August 2
Order—then numerous paragraphs in their declarations are outside the scope of the hearing and
should be stricken from the record.  These paragraphs, highlighted in the declarations attached
hereto as Exhibit B, include all statements that address (i) the declarants' and the Government
Parties' subjective motivations in entering into the settlement; (ii) the extent to which the
settlement paves the way for a plan of adjustment; (iii) the effect of the settlement on the
proposed transformation; (iv) the effect of the settlement on the Puerto Rico economy and
PREPA's ability to avoid a future Title III filing; (v) the ability of PREPA's ratepayers to pay the

---

*Testimony Offered by UTIER, SREAEE, and Windmar, and (C) Modifying the Current Briefing Schedule Pertaining
to Discovery Motions* [Dkt. No. 1457].

surcharges contemplated by the RSA; (vi) the likelihood that electricity rates will rise absent a

settlement; and (vii) the benefits of the settlement embodied by the RSA as compared to other

settlements that the Government Parties considered but rejected. Based on the Government

Parties' own arguments as to the limited scope of the hearing, all of these statements are

irrelevant to the Court's inquiry and therefore not admissible.

39.     Moreover, courts have held that, if a party is not permitted to obtain discovery as

to certain allegations, then the evidence as to those allegations may not be admitted into evidence

by the party from whom discovery was sought. *See, e.g.*, *E.E.O.C. v. Gen. Tel. Co. of Nw.*, 885

F.2d 575, 578–79 (9th Cir. 1989) (holding that where district court "exempted from discovery

relevant self-critical materials thus leaving [plaintiff] ill-equipped to effectively cross-examine

[defendant's] witnesses," court erred in allowing defendant to introduce favorable evidence on

same topic at trial"); *Wis. Alumni Research Found. v. Apple, Inc.*, No. 14-CV-062-WMC, 2015

WL 13547000, at *4 (W.D. Wis. Sept. 30, 2015) (citing hearing transcript on motion for a

protective order, which was granted, where judge stated "[i]f the Court does not allow discovery

on a particular product or particular line of questioning or interrogatories or requests for

production of documents, that's a two-way street. Nobody uses it. So you don't have to worry

about being sandbagged."). Accordingly, regardless of whether the assertions at issue in the

declarations are relevant to the 9019 Motion, they must be excluded from evidence because the

Committee has been deprived of its rights to seek discovery of facts underlying those assertions.

40.     For these reasons, the Committee respectfully requests that the Court (i) strike the

identified paragraphs of the declarations set forth in Exhibit B, including the entirety of the

Chapados Declaration, which solely addresses the impact of the RSA on the proposed

transformation,[14] and (ii) enter an order precluding the Government Parties from submitting evidence on these same topics at the hearing on the 9019 Motion.

## II.   Government Parties and Ad Hoc Group Should Be Required to Produce Documents From Additional Custodians

41.     The August 2 Order also permitted the Government Parties and the Ad Hoc Group to improperly limit the custodians from whom they are required to collect documents.

### A.   Oversight Board Should Be Required to Produce Documents From all of its Board Members

42.     Although the Oversight Board is producing documents from three lawyers and two non-board-member custodians, the Magistrate Judge has only required the Oversight Board to produce documents from the files of one of its seven board members, David Skeel.  The question on this issue is not whether the Committee's document requests to the Oversight Board are relevant – for, regardless of the Court's disposition of the scope objection above, the Oversight Board has not contested the relevance of many of the Committee's requests – but whether the Committee has received productions from the key individuals who were ultimately responsible for the government's decision to enter into the RSA.  It has not.

43.     The Oversight Board argued to the Magistrate Judge that the Committee has already received "agendas and presentations regarding Board meetings,"[15] but these documents are hardly a substitute for receiving board members' emails, text messages, notes, and other relevant files.  The Oversight Board's decision-makers are the board members themselves, not its officers.  There can be no doubt that the decision makers' own documents are highly relevant, particularly where the question at issue on the 9019 Motion is whether the decision to enter into

---

[14]     The Government Parties have said they are withdrawing the Sobrino Declaration.  Nevertheless, the Court should issue an order excluding evidence relating to the statements in his declaration that fall outside the scope of the hearing or are otherwise inadmissible.

[15]     *See* Gov't Parties' Obj. to Renewed Mot. to Compel ¶ 40.

the RSA was reasonable.  *See, e.g., Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No.

14-4394, 2016 WL 5408171 at *8 (S.D.N.Y. Sept. 27, 2016) (ordering directors to produce

emails relating to corporate decision-making from non-corporate email accounts).  Documents

from all of the board members—not just one of them—should be produced.

> B.   PREPA Should Be Required to Produce Documents From
> Filsinger Energy Partners

44.   At the outset of discovery, PREPA and AAFAF offered as custodians only three

members of their outside counsel team, three employees of Ankura (their financial advisor), and

one now former government official, Christian Sobrino.  In its Motion to Compel, the Committee

requested five additional custodians:  (i) Jose Ortiz, PREPA's CEO; (ii) Eli Diaz, the Chairman

of PREPA's board; (iii) Gerardo Loran Butron, a member of the PREPA transformation team at

AAFAF; (iv) Nelson Morales, PREPA's CFO; and (v) a representative of Filsinger Energy

Partners ("FEP"), PREPA's chief financial advisor and effective manager of its day-to-day

operations.  The Magistrate Judge granted the Committee's motion in part, ordering PREPA and

AAFAF to designate Messrs. Ortiz and Diaz as additional custodians.

45.   Although the Committee believes that all of the requested individuals should have

been designated as custodians, for purposes of this Objection, in the interest of narrowing the

issues before the Court, the Committee seeks documents only from an additional FEP custodian.

Given its leading managerial role at PREPA, FEP is highly likely to have documents relevant to

the 9019 Motion, including documents relating to the sustainability of the proposed rate

increases and documents relating to the effect of the RSA on the proposed transformation.

46.   Documents the Committee has obtained thus far in discovery tend to back up this

supposition.  For example, the documents show that FEP provided feedback on documents

relating to the transformation process and participated in meetings related to the transformation.

Other documents indicate that FEP had involvement in other issues, including rate-setting

discussions.  Accordingly, the Committee asks that PREPA be required to designate Todd

Filsinger or another appropriate representative of FEP as an additional document custodian.

C.      Ad Hoc Group Should Be Required to Produce Documents from Certain
        Employees of its Group Members

47.     The Magistrate Judge was also wrong to conclude that the Committee is not

entitled to a single custodian from anyone at the Ad Hoc Group member funds.[16]  Unlike the

Government Parties and Assured, the Ad Hoc Group is the only party to the RSA that has

refused to produce documents from a single custodian that is not an attorney or financial

advisor.[17]  Like the members of the Oversight Board, where even the Magistrate Judge required

the addition of at least one board member as a custodian, the decision-makers for the Ad Hoc

Group are the member funds, not its attorneys or financial advisor.

48.     The Committee has repeatedly and significantly narrowed its request, offering to

seek only two custodians[18] from the two largest firms (by holdings) within the Ad Hoc Group.

For purposes of this Objection, the Committee is willing to further limit its request to only one

custodian from the two member firms.  The Committee's request for a single custodian from two

of the members of the Ad Hoc Group is reasonable in light of the group's central role in the

negotiation of both the Preliminary RSA and the RSA, and the fact that the Ad Hoc Group holds

approximately $3 billion in PREPA bonds.

---

[16]     The August 2 Order does not appear to address the Committee's request for custodians from the Ad Hoc
Group member funds.  However, during the July 30, 2019 hearing, the Magistrate Judge rejected without
explanation the Committee's request for custodians from the Ad Hoc Group.  *See* Ex. C (July 30, 2019 Hr'g Tr.) at
66:4-6 ("I don't believe any additional information or custodian is needed from the Ad Hoc Group.").

[17]     The Ad Hoc Group has agreed only to produce documents from certain of its counsel and its financial
advisor.

[18]     The two requested custodians from each firm are (1) the most senior responsible professional, and (2) the
professional most involved on a day to day basis.

**III.   Government Parties and Supporting Holders Should Not Be Allowed to Assert a Common Interest Privilege Until, At Earliest, Date of RSA Term Sheet on March 26, 2019**

49.     The common interest doctrine is "not an independent basis for privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." *Cavallaro v. United States*, 284 F.3d 236, 250 (1st Cir. 2002).  The First Circuit, like several other Circuits, applies a three-part test under which "the party asserting the [common interest] privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived." *Ken's Foods, Inc. v. Ken's Steak House, Inc*., 213 F.R.D. 89, 93 (D. Mass. 2002) (*quoting United States v. Bay State Ambulance and Hosp. Rental Serv. Inc*., 874 F.2d 20, 28 (1st Cir. 1989)).

50.     The First Circuit has narrowly defined a common interest as "an identical (or nearly identical) legal interest as opposed to a merely similar interest." *F.D.I.C. v. Odgen Corp*., 202 F.3d 454, 461 (1st Cir. 2000).  When the Magistrate Judge sustained the assertion by the Government Parties and the Ad Hoc Group of a common interest prior to their execution of a term sheet on March 26, 2019, however, she misapplied this standard.

51.     The basis for the August 2 Order is the finding that the Preliminary RSA "contained the material terms of the Definitive RSA" and therefore that the Government Parties and the Ad Hoc Group purportedly shared from that point forward an "identical (or nearly identical) legal interest in finalizing their agreement on material terms."  Aug. 2 Order at ¶ 11. This finding is clearly erroneous, for a number of reasons.

52.    First, as the Government Parties' own submissions to the Magistrate Judge demonstrated,[19] any "agreement" between the Government Parties and the Ad Hoc Group prior to their execution of the term sheet did not include key features of the final deal, such as demand protection provisions, remedies, securitization protections, and implementation provisions. Importantly, it is exactly these provisions – particularly the securitization provisions and the limits on bondholder remedies – that the Government Parties now tout in their declarations as their key successes in the negotiation of the RSA.  The Government Parties can hardly rely on these structural provisions as key government benefits justifying the RSA, while simultaneously claiming that a common interest arising from the purported conclusion of the transaction had already sprung into existence *before these terms had been agreed upon*.

53.    Thus, documents produced in discovery reveal that the original intent of the AHG and the Government Parties in entering the Preliminary RSA was that it was merely a non-binding step towards a definitive RSA.  Indeed, when it circulated a draft preliminary RSA, counsel for the Ad Hoc Group stated that "we view this RSA as a short term bridge to a complete RSA.  Accordingly, we have kept it as very bare bones as it will not serve as precedent for, and will be fully superseded by, a complete RSA in the near term."  *See* Ex. L (PROSK_9019_ 00000966); Ex. M (PROSK_9019_00000967);[20] Ex. N (PROSK_9019_00000985).

54.    Second, the negotiations between the Government Parties and the Ad Hoc Group lasted for eight months, during which time each side repeatedly threatened to walk away from the negotiations.

55.    For example, in October and November, 2018:

---

[19]    Gov't Parties' Obj. to Mot. to Compel, App. A at A-2.

[20]    Exhibits M and N have been filed under seal pursuant to the *Further Order on Motion to Seal*, dated July 24, 2019 [Dkt. No. 1507], which authorized their filing under seal in connection with the motion to compel briefing.

- A document titled "PREPA Discussion Materials" proposed changing the structure of the Tranche B bonds to better allocate returns into a two tranche structure.  Ex. O (PROSK_9019_00005034, 5037).[21]

- On October 19, counsel for the Ad Hoc Group responded by describing additional terms its clients would need "in order to accept the changes to [the parties'] original deal" and stated that the Ad Hoc Group was still considering the monolines' deal terms.  *Id.*

- On November 30, counsel for the Ad Hoc Group provided a list of "critical items" for which it needed agreement from the Oversight Board.  Ex. P (PROSK_9019_00005082).

56.     Negotiations continued to intensify after these exchanges.  On December 10, 2018, counsel for the Ad Hoc Group emailed counsel for the Government Parties, commenting on the significant divide between the parties' positions:



- ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████  Ex. Q (PROSK_9019_00005274) (emphasis added).

- ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████  *Id.* (emphasis added).

- ████████████████████████████████████████████████████
████████████████████  *Id.* at 2 (emphasis added).

57.     The negotiations carried over into 2019 as well:

- A PREPA Restructuring Proposal Comparison prepared by Houlihan Lokey, the Ad Hoc Group's financial advisor, in January 2019 identifies several key terms on which the parties had not reached agreement, including the amount of new bonds the existing bondholders would receive in return for their legacy claims, as well as the surcharges that would need to be imposed to satisfy the new bonds.  Ex. R (PROSK_9019_00005321, 5331).

---

[21]     Exhibits O through R have been filed under seal pursuant to the *Order Allowing Motion to Seal*, dated June 5, 2019 [Dkt. No. 1277], which authorized their filing under seal in connection with the motion to compel briefing. Certain quotations from those documents in paragraph 56 below have also been filed under seal.

- In January 2019, David Brownstein from Citi, the Oversight Board's advisor, told the Ad Hoc Group that the Oversight Board "really didn't see the ability to get to a deal." *See* Ex. S (FOMB_9019_00000816).

58.     <u>Third</u>, the Preliminary RSA was not binding on any party.  Under

section 10.02(a)(iv) of the Preliminary RSA, the Oversight Board, AAFAF, and PREPA each

had an absolute right to terminate the Preliminary RSA without any consequence if they

determined not to proceed with the transaction or to proceed with an inconsistent transaction.[22]

Making the point even clearer, section 11.13 provided that the sole remedy for a breach of the

preliminary agreement by any party was giving the non-breaching parties the right to walk away

(*i.e.*, there would be no damages for a breach).[23]  The frequently acrimonious negotiations

reflected in the correspondence above are consistent with this fact.

59.     There can be no common interest under these circumstances.  *See* Ex. T, Jan. 7,

2010 Hr'g Tr. at 15:3-17, *In re Lyondell Chemical Co.*, Case No. 09-10023 (Bankr. S.D.N.Y Jan.

11, 2010) [Dkt. No. 3592] (holding that until court approves settlement debtors and settling

financing parties are adverse and do not have common interest privilege); *Asymmetrx Med., Inc.*

*v. McKeon*, No. CIV.A. 11-11079-NMG, 2013 WL 2181084, at *2 (D. Mass. May 16, 2013)

(denying protective order based on claimed common interest for settlement communications

because settlement negotiations are between adverse parties); *In re JP Morgan Chase & Co. Sec.*

*Litig.*, No. 06 C 4674, 2007 WL 2363311, at *5 (N.D. Ill. Aug. 13, 2007) (holding no common

interest between parties while negotiating agreement, because "each company wanted to get the

best deal from the other company, and to the extent that one succeeded in its goal, the other

suffered").

---

[22]     *See* Ex. U (Restructuring Support Agreement, dated as of July 30, 2018, at 7).

[23]     *Id.* at 11.

60.     The Magistrate Judge's apparent reliance upon *In re Tribune Co*. (Aug. 2 Order at
¶ 11) to conclude the contrary is misplaced, for several reasons.  First, the logical premise of the
holding in *In re Tribune Co*. is that the parties sharing a common interest had actually "agreed
upon [the] material terms of [the] settlement" and therefore shared a "common interest [in]
obtaining approval of ***the settlement*** through confirmation of the plan."  *In re Tribune Co.*, No.
08-13141 (KJC), 2011 WL 386827 at \*5 (Bankr. D. Del. Feb. 3, 2011) (emphasis added).  Here,
by contrast, until the RSA term sheet was signed in March 2019, there was no "settlement" the
approval of which the Government Parties and Ad Hoc Group were aligned in seeking – to the
contrary, they continued to negotiate at arms' length with each other, and had not yet agreed
upon key terms, including the default remedies and securitization structure that they now tout as
key components of the deal.  Second, *In re Tribune Co*. was decided under less stringent Third
Circuit common interest standards, which require only that the parties share a "substantially
similar legal interest" (*In re Tribune*, 2011 WL 386827 at \*4) with respect to the subject of the
communication, not the "identical (or nearly identical)" alignment of interests with respect to the
subject of the communication that is required in the First Circuit.   Third, as even the *Tribune*
court recognized, "[w]hen the interests of the parties diverge to some extent the common interest
doctrine applies '***only insofar as their interests [are] in fact identical***; communications relating
to matters as to which they [hold] opposing interests ... lose any privilege.'"  *Id*. at \*4 (internal
citations omitted) (emphasis added).

61.     The Committee does not contest the application of a common interest privilege
once the parties actually finalized the material terms of their deal, but this did not occur until, at

the earliest, the signing of the term sheet on March 26, 2019.[24]  The Court should direct that prior communications among the Government Parties and the Ad Hoc Group, while they continued to negotiate, be produced.

## IV.   Discovery Into Assured's Loss Reserves Should Be Permitted

62.   In denying the Committee's request for the production of Assured's loss reserves, the Magistrate Judge relied on her earlier ruling in the receivership litigation that "loss reserves are not probative of the question of the value of the PREPA bondholders' collateral."  Aug. 2 Order ¶ 15.  In that earlier ruling, the Magistrate Judge held that "the Insurers [including Assured] have sufficiently shown that the loss reserves at issue are based on *potential litigation outcomes* and not on a valuation of collateral.  *See Memorandum of Decision and Order Denying Motion for Reconsideration* [Dkt. No. 1165], at 9 (emphasis added).  In this litigation, unlike in the receivership litigation, one of the factors the court will need to evaluate to determine whether the RSA is reasonable is the probability of success of the litigation being compromised.  Because the probability of litigation success is directly tied to the potential outcomes of that litigation, loss reserves based on those outcomes are plainly relevant to the issue before the Court.[25]  That Assured's loss reserves are based on its own subjective determinations regarding potential litigation outcomes does not somehow render them not relevant.  Indeed, given that Assured is

---

[24]    The Committee has previously argued that no common interest arose until the Definitive RSA was executed, on May 3, 2019, but for purposes of these Objections is limiting its arguments only to the period until the signature of the RSA term sheet, on March 26, 2019.

[25]    Likely recognizing the tension between her earlier ruling and this one, the Magistrate Judge stated in the August 2 Order that "Assured's loss reserves may show the entity's expectations given a set of different possible litigation outcomes, but that information is not probative of the question whether the settlement reached by the parties in this case is a reasonable one."  Aug. 2 Order ¶ 15.  Because the Magistrate Judge provided no reasoning or explanation for this conclusion, and because it is inconsistent with the factors at the center of the Court's reasonableness determination, it should not be relied upon by this Court.

the party actually litigating against the Government Parties, its views as to the outcome of the litigation are arguably more relevant than anyone's.

63.     Moreover, although not considered by the Magistrate Judge, Assured cannot prevent the disclosure of its loss reserves information on the grounds of any privilege or protection.  Assured's loss reserves were prepared in the ordinary course of business to satisfy regulatory requirements, and are thus not protected work product.  *See W. Holding Co. v. Chartis Ins. Co. of P.R.*, 300 F.R.D. 48, 50 (D.P.R. 2014); *Mullins v. Dep't of Labor of P.R.*, 269 F.R.D. 172, 174 (D.P.R. 2010).  The leading First Circuit case governing work product standards, *U.S. v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 26-30 (1st Cir. 2009), held that the work product privilege does not apply to materials that are "independently required by statutory and audit requirements," even if those documents are "prepared by lawyers and reflect[] legal thinking."  *Id.*  Here, although Assured's loss reserve calculations may reflect litigation valuation analysis, Assured created them because it is required by law to do so, not because of its participation in litigation.

64.     The loss reserves were also disclosed by Assured to its New York regulator, waiving any privilege protections.  *U.S. v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997) (work product protection forfeited, as "disclosure to the audit agency was a disclosure to a potential adversary"); *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co.*, No. 04-4309, 2006 WL 278131, at *2 (S.D.N.Y. Feb. 2, 2006) (disclosure of otherwise protected work product to New York Insurance Department, the predecessor of the NYDFS, would waive privilege).  The New York regulator is permitted to disclose such regulatory submissions publicly if it determines that the public interest will thereby be satisfied.[26]  Assured therefore

---

[26]     *See* Reply to Mot. to Compel at n. 14.

effectively gave up control of the documents when it submitted them, and the situation here is thus not analogous to disclosure pursuant to a confidentiality agreement.[27]

## CONCLUSION

For all of the foregoing reasons, the relief sought herein should be granted in full.

**Certification of Compliance with
Local Rule 9013-1 and the Tenth Amended Case Management Procedures**

Pursuant to Local Rule 9013-1 and ¶ I.H of the *Tenth Amended Notice, Case Management and Administrative Procedures*, the undersigned counsel hereby certify they have (a) carefully examined the matter and concluded there is a true need for an urgent extension; (b) not created the urgency through any lack of due diligence; and (c) made reasonable, good-faith communications in an effort to resolve or narrow the issues that are being brought to the Court. The Committee has communicated with counsel for the Government Parties, the Ad Hoc Group, and Assured, who have consented to a briefing schedule requiring **responses by August 16, 2019 and replies by August 20, 2019**.  The Committee believes that, given the impending discovery deadlines under the current litigation schedule, including the deadline for completion of depositions, a slightly more abbreviated schedule is appropriate, with responses due by August 14, 2019 and replies due by August 16, 2019.  In the event the current litigation schedule is extended in the manner proposed by the Government Parties,[28] however, the Committee would agree to the scheduled preferred by the Government Parties, the Ad Hoc Group, and Assured.

---

[27]     In addition, Assured's New York regulator has chosen not to assert a bank examiner privilege.  The fact that Assured's Maryland regulator asserted a bank examiner privilege is irrelevant—it cannot be that Maryland has the power to restrict the use of documents provided to regulators in New York.

[28]     *See* Dkt. No. 1573.

Dated: August 8, 2019

*/s/ Luc A. Despins* .
PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors
for all Title III Debtors[29]*

- and –

*/s/ John Arrastia*
John H. Genovese, Esq. (*Pro Hac Vice*)
John Arrastia, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
GENOVESE JOBLOVE & BATTISTA, P.A
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Special Litigation Counsel to the Official Committee of
Unsecured Creditors for all Title III Debtors with Respect to
Claims against Citigroup Global Markets, Inc.*

---

[29]     Paul Hastings LLP does not represent the Committee with respect to any statements in these Objections or the Motion to Strike regarding Citigroup Global Markets, Inc.

- and -

*/s/ Juan J. Casillas Ayala*
CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors*