**<u>EXHIBIT C</u>**

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF PUERTO RICO
2

3    In Re:                          )
                                     )  PROMESA Title III
4    The Financial Oversight and     )
     Management Board for Puerto Rico )  Case No. 3:17-BK-3283-LTS
5                                     )
     as representative of            )
6                                     )
     The Commonwealth of Puerto Rico, )
7    et al.,                          )
              Debtors.               )
8    _____ )
     In Re:                          )  PROMESA Title III
9                                     )
     The Financial Oversight and     )
10   Management Board for Puerto Rico )  Case No. 17 BK 4780-LTS
                                      )
11   As representative of             )
                                      )
12   Puerto Rico Power Authority,     )
                                      )
13            Debtor.                 )

14                        **MOTION HEARING**

15        BEFORE THE HONORABLE JUDITH GAIL DEIN
16              UNITED STATES MAGISTRATE JUDGE

17

18

19                         United States District Court
                           1 Courthouse Way, Courtroom 8
20                         Boston, Massachusetts  02210
                           July 30, 2019, 1:00 p.m.
21

22

23             Marianne Kusa-Ryll, CRR, RDR
                 Federal Official Court Reporter
24        Donohue Courthouse and Federal Building
                595 Main Street, Room 514A
25            Worcester, Massachusetts 01608
                     (508)929-3399

```
1    A P P E A R A N C E S:

2    Proskauer Rose LLC
     Margaret Dale, Esquire
3    Brandon C. Clark, Esquire
     Laura Stafford, Esquire
4    One International Place
     Boston, Massachusetts 02110-2600
5    Appearing for the Oversight Board

6    O'Melveny & Myers, LLP
     Peter Friedman, Esquire
7    Ashley Pavel, Esquire
     Elizabeth McKeen, Esquire
8    Times Square Tower, 7 Times Square
     New York, New York 10036
9    Appearing for AAFAF on its own behalf and as representative of
     the Commonwealth of Puerto Rico and ERS
10
     Paul Hastings, LLP
11   Nicholas A. Bassett, Esquire
     875 15th Street, N.W.
12   Washington, DC 20005
     Appearing for the Official Committee of Unsecured Creditors
13
     Paul Hastings, LLP
14   Luc A. Despins, Esquire
     Zachary S. Zwillinger, Esquire
15   200 Park Avenue
     New York, New York 10166
16   Appearing for the Official Committee of Unsecured Creditors

17   Cadwalader, Wickersham & Taft, LLC
     William J. Natbony, Esquire
18   Ellen M. Halstead, Esquire
     200 Liberty Street
19   New York, New York 10281
     Appearing for Assured Guaranty Corp. and Assured Guaranty
20   Municipal Corp.

21   Wachtell, Lipton, Rosen & Katz
     Emil A. Kleinhaus, Esquire
22   51 West 52nd Street
     New York, New York 10019-6150
23   Appearing for Cortland Capital Market Services, LLC, as
     Administrative Agent

24

25   (continued)
```

```
 1    APPEARANCES: (Continued)

 2    Simpson Thacher & Bartlett, LLP
      Bryce L. Friedman, Esquire
 3    425 Lexington Avenue
      New York, New York 10017
 4    Appearing for Solus Alternative Asset Management, LP

 5    Kramer Levin Natfalis & Frankel, LLP
      Natan M. Hamerman, Esquire
 6    Thomas Moers Mayer, Esquire
      Alice J. Byowitz, Esquire
 7    1177 Avenue of the Americas
      New York, New York 10036
 8    Appearing for the Ad Hoc Group of PREPA Bondholders

 9    Maslon LLP
      John T. Duffey, Esquire
10    Clark T. Whitmore, Esquire
      3300 Wells Fargo Center
11    90 South Seventh Street
      Minneapolis, Minnesota 55402-41401
12    Appearing for U.S. Bank National Association, solely in its
      capacity as successor trustee
13
      Colberg of Bufete Emmanuelli, C.S.P.
14    Rolando Emmanuelli Jimenez, Esquire
      Jessica Esther Mendez, Esquire
15    Urb. Constancia
      2803 Calle San Francisco Ponce
16    PR 00717
      Appearing for Unión de Trabajadores de la Industria Eléctrica y
17    Riego, Inc. (UTIER) and Sistema de Retiro de los Empleados de
      la Autoridad de Energia Eléctrica (SREAEE)
18
      Weil, Gotshal & Manges, LLP
19    Robert S. Berezin, Esquire
      767 Fifth Avenue
20    New York, New York 10153-0119
      Appearing for National Public Finance Guarantee Corporation
21

22

23

24

25
```

1              P R O C E E D I N G S

2              (The following proceedings were held in open court

3    before the Honorable Judith Gail Dein, United States Magistrate

4    Judge, District of Massachusetts, at the United States District

5    Court, One Courthouse Way, Boston, Massachusetts, on July 30,

6    2019.)

7              THE CLERK:  All rise.

8              The United States District Court for the District of

9    Puerto Rico is now in session, the Honorable Judge Dein

10   presiding.  Today is Tuesday, July 30, 2019, in the matter of

11   In Re:  The Financial Oversight and Management Board for Puerto

12   Rico as representative of Puerto Rico Electric Power Authority,

13   Case No. 17 BK 4780 will now be heard.

14             THE COURT:  You may be seated.

15             Welcome, everyone, to Boston, and welcome to those who

16   are listening in New York and Puerto Rico.

17             We are here on a number of motions relating to

18   discovery for the PREPA 9019 motion, which is scheduled to be

19   heard in Puerto Rico in October.  Judge Swain's rules

20   regarding -- she has repeated a number of times, no audio and

21   video recordings apply to this proceedings as well.

22             So since there are a lot of people here, I'm assuming

23   that means that since I saw you last you have not managed to

24   resolve all of the outstanding issues.  There's death silence.

25   So apparently we still have a lot of controversy.

1          Has anything been taken off the list, or are we...

2          MR. BASSETT:  Your Honor, Nick Bassett from Paul

3    Hastings, on behalf of the Official Committee of Unsecured

4    Creditors.

5          THE COURT:  You know what, I think we're going to need

6    everybody to speak from the podium.

7          MR. BASSETT:  Sure.

8          MR. BASSETT:  Your Honor, again, Nick Bassett from

9    Paul Hastings on behalf of the Official Committee of Unsecured

10   Creditors.  You know, I don't think that there are any

11   significant issues that have been resolved.  There are a couple

12   very discrete issues relating to certain document requests, I

13   believe maybe Request No. 5, that the -- and actually, I have

14   to check my notes.  And it may -- may make more sense for me to

15   do this as I go through my remarks today.

16         A couple of discrete document requests have been taken

17   off the table.  One of which I was just informed by counsel to

18   the Oversight Board prior to the hearing, the committee had

19   served a supplemental document request asking for models that

20   back up the 2019 fiscal plan.  I was informed before the

21   hearing that that will be provided.  So that's an issue that

22   has been taken off the table.

23         Beyond that, I think most of the issues again with

24   maybe a discrete exception or two that I will get to that are

25   listed on the chart that we submitted as Exhibit A to our reply

1    brief are still on the table.

2            THE COURT:  Okay.  So who's starting?  You?

3            MR. BASSETT:  Yes, this works out well.

4            THE COURT:  Okay.

5            MR. BASSETT:  So as I -- as I mentioned, your Honor,

6    there are a number of issues, and as you know from reading the

7    briefing and seeing the chart, I think what I will do shortly

8    is try to go through and take through each of the issues, and

9    in large part I will try to use this Exhibit A as a guide to do

10   that, although I may skip around a little bit.

11           Before I actually get into this --

12           THE COURT:  Let's see if it makes sense though to deal

13   with some of these item by item, as opposed to you talking for

14   50 minutes about all of the discovery.

15           MR. BASSETT:  That's -- that's fine, your Honor.  I'm

16   happy to break it up that way.  In fact --

17           THE COURT:  Let's see where we go.

18           MR. BASSETT:  Yeah, that may make some sense.

19           Before getting into the issues, we can talk about the

20   order of addressing them, and I did want to raise some kind of

21   big-picture points that I think are important for the court to

22   keep in mind as we talk about discovery.

23           You know, a lot of the arguments that you've seen in

24   the papers and that you will hear again today from the parties

25   opposing discovery go to the overall burden associated with

1    producing additional documents, providing documents of

2    additional custodians, and, you know, the overall

3    proportionality of those requests to this dispute.  And because

4    of that, I think that context is really absolutely critical

5    here.  And I know your Honor is familiar with the 9019 motion

6    and the relief that it seeks so I won't belabor the point and

7    go over it again in detail, but just as a reminder for

8    everyone, and this is a settlement being proposed by the

9    government parties that purports to resolve $8.5 billion in

10   bonds, and in a deal that will pay upwards of $20 billion in

11   consideration to the bondholders over the next nearly 50 years

12   through payments that are made by the Island's ratepayers for

13   electricity.

14          And the government parties in their own words in their

15   briefing called this an enormous and complicated transaction,

16   and that's a perfectly apt description.

17          And to be clear, the Committee believes that this is a

18   bad deal for the government, and we will raise all of our

19   arguments at the appropriate time as to why that's the case.

20   But the point today is that when talking about whether

21   discovery requests are proportional and what the burden is that

22   the parties should bear, we need to keep in mind the scope and

23   magnitude of this dispute.

24          The other preliminary point I wanted to make was to

25   respond to this notion that was raised in basically all of the

1    oppositions to our motion to compel that somehow between the

2    time that the Committee filed its initial motion to compel and

3    it served its discovery requests and today and the filing of

4    our renewed motion to compel that somehow based on intervening

5    events the appropriate scope of the hearing and the appropriate

6    scope of discovery has narrowed, and I think that's absolutely

7    not the case.  In fact, I think the opposite is true.

8         I think if you look at what has happened since we

9    initially served discovery requests until today, the scope of

10   appropriate discovery has actually expanded, and what is, I

11   think, instructive if you look at the very first paragraph of

12   the government parties' joint opposition to the Committee's

13   initial motion to compel, this is -- I believe they filed this

14   on June 7th.  The government parties argued at that time,

15   quote, "The hearing on approval of the RSA should focus only on

16   whether the disputed secured claims are discounted enough to

17   put the settlement in the range of reasonableness."  So in

18   other words, their initial argument is that all the court needs

19   to consider is whether their settlement of these $8.5 billion

20   in bond claims, which is approximately 80 cents on the dollar

21   by our calculations, if not more, that that alone is all the

22   court needed to consider.  Is that reasonable in light of the

23   risk of litigation.

24        But they had a status conference before Judge Swain in

25   June, and she sent a very clear message that what they had

1   submitted in terms of factual support and argument in support

2   of their motion was not enough.  So they went back and they

3   submitted a supplemental memorandum of law at her request along

4   with declarations.  And what we have now is 70 pages or so of

5   declarations that go through a whole host of facts and

6   different rationales and justifications for the settlement to

7   go far beyond simply looking at the amount.  In fact, now they

8   say that the amount matters less and that it's all these other

9   issues, including the effect that the RSA has on the proposed

10   transformation, the economic objectives of the government

11   parties in negotiating the RSA, including to make sure that the

12   electricity rates to be charged thereunder would be sustainable

13   in terms of being able to be paid by bondholders.  The effect

14   of the RSA on PREPA's future they talk about.  They talk about

15   the fact that PREPA will not end up in Title III again as a

16   result of this settlement.

17        They talk about the consequences of PREPA if no

18   settlement is reached, including are rates going to rise in the

19   future.  They say there's no element that rates will go up

20   without a cap in the future.  They put forward 70 pages of

21   declarations that introduce a whole host of factual issues that

22   weren't by their argument at least on the table initially.

23        THE COURT:  Well, it's your understanding of

24   Judge Swain's order that you are supposed to have the

25   opportunity to argue about whether or not their calculation of

1      the financial rate savings or the effect of the -- the rate

2      setting is at issue in this RSA in the 9019 motion.

3              MR. BASSETT:  Well, I think -- I think, your Honor --

4              THE COURT:  I mean, I thought she was pretty clear

5      about -- I think the phrase she used was macroeconomic issues

6      are not on the table related to the viability of the RSA and

7      that the status of the transformation process was not on the

8      table in connection with the 9019.

9              So when you open up and you say you think it's a bad

10     deal, I'm curious as to how -- whether you think that the 9019

11     motion is where you argue the underlying economics of this

12     deal.

13             MR. BASSETT:  What Judge Swain made clear at the

14     status conference on July 11th was that everything they've

15     said, everything they've proffered in support of their motion

16     in their declarations is fair game for discovery.  Her quote

17     was, "I have to consider that."  So there -- just as an

18     example, the effect of the RSA on the proposed transformation,

19     they're arguing that -- I'm presuming that the reason they're

20     arguing that is relevance, and why it goes to the

21     reasonableness factors is because they view that as value that

22     they're receiving in connection with this settlement.  And, of

23     course, the entire inquiry when you look at the reasonableness

24     factors and the test that the court has set out that she's

25     going to apply is you look at the value that the government is

1    getting in the settlement and compare that to the risks at

2    issue in the litigation.  You compare that to paramount

3    interests of creditors.  Those are all factors that the court

4    must consider.  And what they're arguing is not that, look,

5    we're getting a 20 percent discount on the face amount of the

6    bonds.  They're not saying that that's the only reason for the

7    settlement.  They're introducing all these other reasons.

8    They're introducing the fact that this is a great settlement

9    because as a result of this settlement ratepayers will be able

10   to, you know, bear the increases in electricity rates that will

11   occur in the future.  This is a great settlement because this

12   transformation is incredibly important for Puerto Rico, and

13   this settlement helps ensure that the transformation goes

14   forward.

15        So that's the package of value that they're saying

16   this settlement gives to Puerto Rico, and that's why it should

17   be approved.

18        Now, I would be happy to --

19        THE COURT:  What do you expect to put -- what -- what

20   type of evidence do you anticipate putting forward at the 9019

21   hearing?

22        MR. BASSETT:  We anticipate putting forward all the

23   evidence that we need to demonstrate that the purported

24   rationales for the settlement are not, in fact, true.

25        THE COURT:  And what witnesses?

1          MR. BASSETT:  Well, it's going to be primarily the

2     cross-examination of the four declarants.  Now it's three

3     declarants.  They've -- we've been informed that Christian

4     Sobrino, the former head of AAFAF is no longer going to be a

5     witness.  So the cross-examination of all their testimony

6     demonstrating that, in fact, the purported rationale that they

7     offer for the settlement is -- is, you know, is faulty in a

8     number of respects.

9          We have an expert witness that we intend to -- to have

10    testify, which is not up for discussion on any motion today,

11    concerning the effect that the settlement has on other

12    creditors, which goes to the paramount interests of creditors,

13    which is required as an element of the reasonableness test that

14    the court said it's going to apply.

15         THE COURT:  So that's based on the economics of the

16    RSA, right?

17         MR. BASSETT:  It's based on the economics of the RSA

18    itself, that's correct.

19         THE COURT:  Okay.

20         MR. BASSETT:  So this takes me to my next opening

21    point in terms of how I think the landscape has changed since

22    we filed our initial motion, and we make references to this in

23    our renewed motion to compel.  I'm sure your Honor is well

24    familiar with it, but, of course, there was the group chat

25    scandal that has shaken up the entire government, led to the

1    resignation of the governor himself, and Christian Sobrino,

2    among others.  I think that's hugely significant when we talk

3    about what discovery is appropriate on this 9019 motion.

4         Now, the government parties have said that we haven't

5    tied anything in the chat to this dispute specifically, but I

6    don't think that's correct.  In fact, if you look at the chat,

7    which we have all 900 pages of it, there are multiple

8    discussions in there.  I think six discussions at least

9    relating to PREPA that spans 15 pages.  You have various chat

10   participants, including Christian Sobrino, one of the

11   witnesses -- former witnesses; and a gentleman, Elias Sanchez,

12   who's the soon to be ex-governor's former campaign director.

13   They talk about news releases concerning the privatization

14   process for PREPA.  They talk about placing spin on those news

15   reports when they, you know, make public announcements, et

16   cetera.  So there is a relationship between these individuals

17   and the scandal that has occurred and what's happening in

18   PREPA.  And I think it's important to keep in mind that the

19   official committee of unsecured creditors is statutorily

20   appointed to be the watchdog of the debtors in these cases, and

21   that extends to this proposed settlement.

22        If there are, you know, issues of corruption or other

23   wrongdoing that extend to the proposed transformation process,

24   that's something they've put at issue.  That's their

25   justification for the settlement that this is important because

1   we need to make sure the transformation goes forward.  That

2   kind of thing absolutely has to be explored here.

3           THE COURT:  So you view it as the court's role to make

4   that assessment as to which is the appropriate path forward on

5   the -- in the energy field for Puerto Rico; is that what you

6   see as part of this motion?

7           MR. BASSETT:  Your Honor, I will preface all of my

8   remarks or most of my remarks today with the -- the idea that

9   if the government parties want to withdraw or revise the

10  evidence they have proffered in support of the motion in their

11  declarations, and we can have a much different discussion about

12  what's relevant.  And maybe the answer is after we seek

13  discovery, and if that discovery is denied on the grounds that

14  the court thinks it's not relevant, our next move is to file a

15  motion in limine to strike entire paragraphs of these

16  declarations.

17          Indeed, on the issue of the proposed transformation,

18  an entire declaration of theirs submitted by Frederic Chapados,

19  an individual with the Oversight Board's advisor Citigroup, the

20  entire declaration goes to the effect that the RSA has on the

21  proposed transformation.

22          THE COURT:  So I'm just trying to understand how you

23  see your role in -- assuming they put in that declaration, do

24  you see it as your role as part of the 9019 hearing -- I'm not

25  talking about the confirmation hearing, right.  We're not

1    talking about a final plan.  So we're talking about the 9019

2    hearing.

3         Do you see it as your role to prove to address the

4    underlying facts that he submits?

5         I don't know.  I mean, are you going to have a fight

6    at this 9019 hearing in your view as to projections as to how

7    many users there are of electricity or any of the other

8    assumptions that are made in his discussion about why he thinks

9    the transformation is appropriate?

10         MR. BASSETT:  As -- as long as the statements that

11    these declarants are offering are admitted into the record and

12    considered as part of the justification for the settlement, I

13    don't see how we cannot have a fight about all those issues.

14         THE COURT:  Okay.

15         MR. BASSETT:  So, your Honor, I think that sort of

16    takes me to the end of the -- the opening remarks that I had.

17    So my next planned step was to start walking through some of

18    the specific issues that I have on our Exhibit A there.  I was

19    actually going to start a little bit out of order and talk

20    about the -- the nonemail communications issue and then after

21    that talk about custodians and then go through the privilege

22    issues.  So I'm happy to address it in that order, in a

23    different order.  I'm happy to start with one and then let

24    other parties respond.  Whatever you think is best.

25         THE COURT:  What I would like to spend a few minutes

1       on though is what actually has been produced.  There seems to

2       be a very big difference in your papers as to what information

3       you have about, in particular, the process and the information

4       that was considered by the government entities in approving the

5       RSA, and I think that's sort of an overriding concern

6       throughout this process, and I need some -- I mean, there ought

7       to be some agreement somewhere along the line as to what was

8       produced and what wasn't produced.

9              MR. BASSETT:  So, your Honor, I think we actually have

10      gotten some documents in response to nearly all of our

11      requests.  So we do have, for example, documents that go to the

12      negotiation of the RSA, the back and forth that transpired

13      between the government parties and the supporting bondholders,

14      but like all of the other or many of the other categories of

15      information where we have received some documentation, there's

16      a big caveat in that there are voids in the production.  And

17      that's as a result of either custodians not having been

18      identified, who should have been identified, certain types of

19      documents like anything other than emails not being produced;

20      and in the case of negotiations, specifically we have broad

21      common interest privilege -- privileges that are being asserted

22      so we basically have a huge blackout window.

23              As for RSA negotiations, we have nothing from July 30,

24      2018, through the -- the date of the term sheet for the

25      definitive RSA, which was March 20 -- March 26, 2019.

1          Actually --

2          THE COURT:  So you have the -- the communications with

3    Assured during that period?

4          MR. BASSETT:  We do.  We do.  So we have -- we have

5    some communications, but there is -- anything that they

6    consider, which is thousands upon thousands of documents, so

7    they consider to be covered by the common interests in those

8    periods, we don't have that.

9          THE COURT:  Okay.  So that would be resolved by the

10   privilege discussion?

11         MR. BASSETT:  Exactly.  But they also --

12         THE COURT:  But they have produced information about

13   the negotiation and the information that -- like, if there

14   was -- somebody produced, I think, board minutes and reports.

15         Is that all -- has that all been produced?

16         MR. BASSETT:  So from my perspective, we've been

17   informed that we have received or will be receiving certain

18   reports that were delivered to the Oversight Board in

19   connection with the settlement.  I don't know standing here

20   right now, because I need to talk to my team whether we

21   actually have received those, but what we definitely don't have

22   are any communications or documents from the files of the board

23   members.  I mean, these presentations they've said that they

24   will give us as a one-off, I don't even know what those consist

25   of, but there has been no effort, as far as my understanding

1    and concern, to undertake a search or review of emails or any

2    other files of the actual members of the Oversight Board, who

3    are the decision-makers with respect to the RSA.

4         THE COURT:  Okay.  All right.  So why don't you go in

5    whatever order you think works best.

6         MR. BASSETT:  Okay.  So again, this goes to an issue

7    we were just talking about, but the respondents across the

8    board have taken the position in this case that the only

9    documents that they're going to search for to review and

10   produce in the files of their custodians are emails from their

11   official email accounts, whether that be at the government or

12   in the case of Assured and the bondholders, at their respective

13   firms.

14        And for a lot of reasons, I think that is just a -- an

15   astonishing position to take, particularly in light of what has

16   happened in 2019 in general.  And as your Honor knows from

17   dealing with these discovery disputes all the time, in matters

18   that are far less sweeping in scope and involve much lower

19   stakes in terms of the amount at issue, like a personal injury

20   case is probably taking place in a different room in this

21   courthouse.  Text messages are always produced.  I mean,

22   they're a form of documents that are required under Rule 26.

23   That's just part of the discovery obligations.

24        For some reason, the respondents are completely

25   unwilling to even have a discussion about giving us anything

1    other than emails.  And that would include text messages.  It

2    would include anything else on mobile devices, the chats of the

3    kind that have caused the recent scandal, all of those types of

4    messages, we've been told across the board we can't have them,

5    and I think it's -- you know, it's noteworthy that the

6    government parties aren't taking the position that they're not

7    relevant.  In fact, they say in their objection to the renewed

8    motion to compel that they don't know if they would be

9    relevant.  They say the actual material value, if any, of

10   nonemail electronic communications is, of course, impossible to

11   know without actually collecting and reviewing the devices.  So

12   they admit that they haven't looked, and they don't know that

13   they might.  They're just not willing to undertake the search.

14          They also haven't told us that they don't have the

15   mobile devices or these other communications available to them.

16   They've just said they don't want to get them.  And they also

17   haven't articulated that it would be particularly burdensome.

18          Collecting a mobile device and imaging it again is

19   something that happens all the time, and when $8.5 billion of

20   bond claims are being resolved, given the magnitude of this

21   dispute, whatever incremental expense there is associated with

22   collecting those text messages is one that we think should

23   absolutely be incurred.

24          And now I've already talked about --

25          THE COURT:  One of the problem that I'm having though

1    is drawing that line between what people may have thought

2    individually.  I understand that there's a lot of money, and I

3    understand this is a very significant event, but I also

4    understand that we have a very short time frame that we're

5    dealing with and that the discovery needs to be efficient; and

6    that while I recognize that you viewed Judge Swain's order as

7    opening discovery, it seems to me she made it clear that it was

8    very focused at least on the issues that are going to be

9    presented at the 9019.

10        MR. BASSETT:  Right.

11        THE COURT:  So I do think we need to focus on what the

12   most efficient discovery is, and I'm not sure where individual

13   thoughts, as opposed to the board's itself expression of

14   policy, is relevant.  You know, if one member thinks it's a

15   good deal and one member thinks it's a bad deal, does that

16   really matter when you all have to -- when they have to take a

17   collective opinion -- a decision?  And I don't know the answer.

18   I'm asking you.

19        MR. BASSETT:  I think it absolutely matters.  I don't

20   know what official board communications would even be.  I mean,

21   the board consists of and acts through its members.  So their

22   communications --

23        THE COURT:  But it makes a collective decision, right?

24   So -- it does, it makes a vote, and then there's -- there are,

25   as I assume you've obtained, you have or will obtain, you have

1      official presentations, you have official votes, you have

2      official statements that are made.  I gather you're not

3      fighting about those.  Those at least have been represented as

4      being produced so you're going beyond that?

5            MR. BASSETT:  We're -- yes, I mean, we've

6      received -- to be clear, we've also received emails from, and

7      I'm not just talking about board members here.  I'm talking

8      about the custodians we have received documents from.

9            At the Oversight Board, we've received documents from

10     Natalie Jaresko, the executive director.  We've received

11     documents from Alejandro Figueroa, the PREPA transformation

12     manager.  We've received some documents from counsel at -- at

13     PREPA and AAFAF.  We've received documents from Christian

14     Sobrino.  We've received some documents from advisors at

15     Ankura.  So it's not just the custodians we don't have, who we

16     think should present text messages; it's the ones we do have.

17           From the concerning we do have, we've been given their

18     emails.  We've been given the individual email communications

19     of these people to the extent they exist that talk about the

20     RSA, the proposed transformation, all the relevant topics that

21     we've -- that we've asked for, but our point when it comes to

22     text messages and to the scope of the searches that are done by

23     custodians, which I'll talk about later, is that they can't be

24     limited to what they want to give us.  And if history has shown

25     anything, it's that the officials in the Puerto Rico

1    government -- I mean, set aside whether or not the chat

2    contains information relevant to PREPA.  It could not be more

3    clear that the way government officials, including the one

4    Christian Sobrino, who is put forward as the key witness, the

5    only declarant for the -- for AAFAF and PREPA communicates

6    using chat messages and other nonofficial email forms of

7    communications to talk about how he really feels about official

8    business.  I mean, that's the kind of discovery that could not

9    be more relevant.  I mean, if you have board members here,

10   Natalie Jaresko, the executive director, she doesn't want me

11   talking about in private how this is a horrible deal, about how

12   in the underlying merits of the dispute makes the bondholders

13   have no chance about how this doesn't have any bearing on the

14   proposed transformation.

15        There could be any number of statements that are being

16   made that directly undercut everything they are putting forward

17   as the rationale for this settlement in their declarations, and

18   we can't -- we can't just be told that we're not entitled to

19   that.

20        It -- your Honor, last night I was looking at some of

21   the indictments that were recently issued.  On July 9th, the

22   DOJ issued indictments against the former secretary of the

23   department of education, the former health insurance

24   administration director, among many other defendants in the

25   government of Puerto Rico, for a combined 32 counts of

1    conspiracy and all other kinds of wrongful conduct.  And in the

2    indictment, the DOJ specifically alleges that these individuals

3    carried out their conspiracy using personal email accounts and

4    text messages and other forms of group chats.  I mean, what we

5    know from recent history is that the way these officials have

6    chosen to communicate is not through their emails.  So for us

7    to only get emails is depriving us of what we believe would be

8    the most relevant and revealing documents in this entire case.

9    So the next issue, I was going to move on and talk

10    about custodians.  I'm happy to let people --

11    THE COURT:  I think that will probably go together.

12    MR. BASSETT:  Okay.  So, obviously, the custodians,

13    and I'll try to not be repetitive because we have gotten into

14    some of these issues already.  And I'll just briefly recapture

15    what we have.

16    Again, the Oversight Board, we have documents from

17    three members of their outside counsel, I believe; and if I'm

18    wrong, I'm sure Ms. Dale will correct me, from Natalie Jaresko,

19    who's the executive director; and then Alejandro Figueroa,

20    who's the PREPA transformation manager.  Again, no documents

21    from a single board member, who are the actual decision-makers.

22    And what's noteworthy is that the Oversight Board has

23    agreed to give us a deposition of one of those board members,

24    David Skeel, but they told us we can't even have his documents

25    in advance of the deposition.

1          Regarding AAFAF and PREPA, I think as I mentioned, we

2     have documents from two of their outside counsel, certain

3     individuals at Ankura, I believe it's three, although

4     Ms. McKeen can correct me if I'm wrong on that.  And then

5     documents from one actual government official, and that's

6     Christian Sobrino, who as we've discussed, obviously, now has

7     resigned.

8          So as to the AAFAF custodians, what I think is

9     important is as it stands today, we don't have documents from a

10     single person associated with the AAFAF outside of their

11     advisors, who continued to be with AAFAF.  So there's no

12     documents from any actual decision-maker that have been made

13     available to us in discovery.

14          Now, we've listed four or five individuals, who we

15     would propose as potential custodians, and we're happy to have

16     a discussion with counsel about, you know, maybe it's not all

17     those custodians, maybe it's certain of them, but we think

18     absolutely that some or all of these people that we mentioned

19     should be added as custodians, and just to briefly tick through

20     those.  Jose Ortiz, he's the CEO of PREPA, and the documents

21     that we've seen in discovery state that he's in charge of

22     implementing, quote, the financial, operational, and

23     administrative restructuring efforts and initiatives of PREPA,

24     including the PREPA transformation plan.

25          Indeed, I noticed this just yesterday, Jose Ortiz led

1    a round table.  This is reported on through reorg research with

2    local reporters who talk about the transformation.  He

3    announced in that round table that one of the four

4    concessionaires had dropped out of the bidding.  He also

5    touched on an issue with the Puma fuel contract and some

6    controversy surrounding that, but the point is, he's somebody

7    who is knowledgeable of key issues, but yet not made a

8    custodian.

9         Another one is Gerardo Loran Butron, who is a member

10   of the PREPA transformation in AAFAF based on what documents

11   we've seen.  He's the one person --

12        THE COURT REPORTER:  Excuse me.  I'm sorry.  I don't

13   have any audio.

14        MR. BASSETT:  Oh, I'm sorry.

15        THE CLERK:  Can you test the podium mic.

16        (Discussion off the record.)

17        THE CLERK:  You're good to go.

18        MR. BASSETT:  Thank you.

19        Gerardo Loran Butron, who is a member of the PREPA

20   transformation team at AAFAF.  As I was saying, it's our

21   understanding from the documents and what we have been able to

22   gather from other sources that he's the -- the lead person at

23   AAFAF, who has knowledge of the transformation.

24        Another individual, I'm probably going to butcher

25   these names, Eli Atenza Diaz, the PREPA board chairman, who has

1     general responsibility for the oversight to PREPA.

2          Nelson Morales, the CFO of PREPA, he was actually

3     identified in response to the interrogatories as having

4     relevant information concerning the extent of the security

5     interests that the bondholders have in their collateral, which

6     is the key issue in the underlying litigation that's being

7     settled.  He's also the CFO, who has knowledge of the

8     transformation process, et cetera.  I mean, another custodian

9     who has a dispute particularly of this magnitude, we think

10    should be included and should give documents.

11          Lastly, we have Filsinger Energy Partners, who's the

12    entity that has been appointed the chief financial advisor for

13    PREPA.

14          The documents that we've seen indicate that the PREPA

15    board stated that it had asked Todd Filsinger of Filsinger

16    Energy Partners to take on the, quote, "single point of

17    responsibility for further development of the coordinated

18    transformation plan."  He's the -- the documents make clear

19    that he has been at meetings involving the transformation, et

20    cetera.  Again, clearly a relevant custodian.

21          THE COURT:  And who have you received information --

22    who are the custodians that have been provided; do you know?

23          MR. BASSETT:  Yes, so as I mentioned earlier, as far

24    as PREPA and AAFAF are concerned, one.  Well, we have -- we

25    have outside --

1          THE COURT:  You have the outside counsel?

2          MR. BASSETT:  Outside counsel, some advisors from

3    Ankura, and then one person associated with PREPA and AAFAF,

4    who's no longer there.

5          So, lastly, on the custodian front, we do have an open

6    dispute also with the ad hoc bondholder group.  We've received

7    documents from -- again, there seems to be a theme in being

8    limited to advisors, so we've received documents from outside

9    counsel and from their financial advisor.  We have not received

10   any documents from any principals at any of the member funds of

11   the group.  We've had a long running discussion with their

12   counsel about that, about how we could potentially narrow the

13   universe of custodians for something reasonable.

14         What we had offered was, look, just take your -- the

15   two what we understood to be the biggest for those concerned,

16   the largest amount of holding members of the group, and give us

17   two people from each of them, give us the person who is

18   responsible for the day to day of this particular deal or

19   transaction, and then the person who is, you know, sort of

20   primary ultimate overseer.  So just give us two custodians from

21   those two -- those two funds, and the answer has been no, we're

22   not willing to do that.

23         And I think those documents are relevant.  I mean,

24   what -- their views as to whether this settlement is, in fact,

25   you know -- if there's -- if there's somebody at one of the

1    bondholders who is saying, you know, look, this deal is the

2    steal of the century, you know, there's an old saying, you know

3    a settlement is a good one if both sides are a little unhappy.

4    If it turns out that's completely not the case on the

5    bondholders side, that's at a minimum probative as to whether

6    or not this is a reasonable settlement.  They also may discuss

7    the underlying merits of the dispute, which is do they really

8    have secured bonds and what are those bonds secured by.  That's

9    what is being settled here, and, you know, if there's

10   admissions from the bondholders that they either aren't secured

11   or have a secured interest only in very limited funds then

12   they're entitled to virtually nothing instead of the, you know,

13   eight and a half -- or 80 percent of $8.5 billion, I guess,

14   that they're getting in the face amount of new bonds.

15           So -- so for those reasons, we think those custodians

16   are relevant too.  So I'm happy to answer any questions as to

17   the custodians or anything else; otherwise, if now is a good

18   breaking point, I'm happy to cede the podium.

19           THE COURT:  So that -- that seems to me to make sense.

20           MR. BASSETT:  Sure.

21           THE COURT:  After that you're going to go into

22   specifics?

23           MR. BASSETT:  Well, after that I'm going to talk about

24   privilege issues.

25           THE COURT:  So why don't we address the custodians and

1      the scope of the review.

2              MS. DALE:  Good afternoon, your Honor.  Margaret Dale

3      from Proskauer Rose for the Oversight Board.

4              And I will take on the two issues that we just

5      discussed, the email custodial accounts and the issue of the

6      custodians.  Some of my colleagues will do some of the other

7      issues.  We'll get up and down as appropriate.

8              I did want to address the points that Mr. Bassett made

9      at the outset today.  With respect to the supplemental

10     submission that we made, we made that at the request of

11     Judge Swain, who asked us to provide additional factual

12     background for the settlement that we were proposing.  We also

13     when we submitted that supplemental -- those supplemental

14     submissions, we substantially narrowed the scope of the order

15     that we were asking the court to enter, and the judge -- I'm

16     not going to read this, but on the -- at the July 11th hearing

17     on page 7 of the transcript, she identifies the approval that

18     is being sought now, as opposed to before -- you know, as

19     opposed to before, and also goes through what we're -- what she

20     is not being asked to approve any longer with respect to the

21     RSA.

22             And I think that's important because she goes on to

23     say -- I'm obviously still reading, looking at the transcript

24     now, page 8.  We all know this is the standard is whether --

25     the court has to assess whether the proposed settlement falls

1    below the lowest point in the range of reasonableness, and she

2    goes on and she says, We have to look at the Jeffrey factors,

3    and we have all these -- I think most of us now have those

4    tattooed on our brains, the four Jeffrey factors. And then she

5    says at the bottom of page 8, while -- quote, While as the

6    Supreme Court stated in the *TMT trailer* case, the court must

7    consider evidence that is relevant to a full and fair

8    assessment of the wisdom of the proposed compromise. The court

9    recognizes that its task on this motion practice is not to

10   determine whether the compromise embodied in the portions of

11   the RSA presented for approval is the wisest. And I'm going to

12   stop the quote there. So with that background, you know, we

13   disagree vehemently with the UCC's suggestion that somehow this

14   has exploded the scope of discovery, as opposed to narrowed it.

15   So now, I'll pick up on the two topics.

16           THE COURT: So you have repeatedly stated, your

17   declarants have repeatedly stated, that there are a number of

18   factors that led them to believe that this is the appropriate

19   resolution, and among those have been the trans -- the

20   transformation project, the -- the cap on rates, and there was

21   certain goals that -- that the government entities had set and

22   that the -- the declarations say that this settlement is the

23   best resolution reaching those goals. So you have put on the

24   table the goals, right?

25           MS. DALE: And they're goals, you're right, your

1    Honor.  We talked about the goals.  We were giving the factual

2    background about how we came -- how the parties came to the

3    settlement, and you touched on this before, as did Mr. Bassett.

4    We produced a ton of documents relating to the communications

5    and their back and forth, but those -- those -- the motivations

6    of the parties is not one of the relevant factors under

7    Jeffrey -- Jeffrey, and I really -- and I'll speak to this as

8    we go on, but I -- we don't see how the UCC is matching up what

9    it's looking for in addition to what we've already provided to

10   one of the factors that this -- that the court is going to be

11   considering.  I think that, you know, that goes to irrelevance.

12   That goes to lack of efficiency.  Your Honor mentioned the time

13   frame that we're under to manage this process.

14          So we were asked to provide some of the factual

15   background for how we got where we got to.  We've provided it.

16   All the -- I think with the exception of Mr. Sobrino, all of

17   the declarants are going to be deposed, your Honor, and that's

18   in another --

19          THE COURT:  And what's happening with Mr. Sobrino?  He

20   has been withdrawn?

21          MS. DALE:  My understanding is we are withdrawing his

22   declaration in its entirety, and I can let Ms. McKeen speak to

23   this directly.

24          MS. McKEEN:  Good afternoon, your Honor.  Elizabeth

25   McKeen with O'Melveny & Meyers on behalf of AAFAF and PREPA.

1          Yes, your Honor, Mr. Sobrino is no longer an employee

2    at AAFAF.  We do not intend to present him as a witness at the

3    hearing, and he is no longer within AAFAF's control.

4          THE COURT:  But do you expect to have a different

5    witness or you don't know yet?

6          MS. McKEEN:  We don't know yet, your Honor.

7          THE COURT:  Okay.

8          MS. McKEEN:  Thank you.

9          MS. DALE:  So, your Honor, if I could take up the two

10   issues now.  The request for the nonemail communications.

11         Again, I would start with saying that there's no

12   indication by the UCC how these communications map to any of

13   the Jeffrey factors and, in fact, we think they do not map to

14   those factors.

15         The state of mind or the motivations of the

16   negotiators, that's not an issue.

17         The collection of material from people's personal

18   devices is incredibly invasive, expensive, and time-consuming,

19   your Honor, and I don't -- I'm a commercial litigator.  I don't

20   routinely get text messages in discovery unless somebody makes

21   a showing that text messages are relevant to the issue.

22         THE COURT:  Well, let me ask you this.  Are

23   there -- are there personal phones and work phones?

24         MS. DALE:  My understanding for the Oversight Board is

25   that there are personal devices, not -- not a -- it's not like

1    a phone that the FOMB gives to either staff or its -- the

2    members of the board, no.

3           THE COURT:  So they're all using their personal

4    communications.

5           And when you searched for email, what did you search?

6           MS. DALE:  We -- and Ms. Stafford, who is here, who

7    knows this much better than I, so in case I say anything wrong

8    she'll correct me, but in terms of our email communications,

9    your Honor, we have been searching both the promesa.gov email

10   addresses for staff and board, as well as members of the board

11   have other email addresses where they work, for example, and

12   potentially also Gmail.  We have gone to get personal email

13   communications as well.  That said, your Honor, that's when we

14   go and collect, which we have been doing routinely.

15          In this case, we have not produced email from all of

16   the board members.  We have produced email from Ms. Jaresko and

17   Mr. Figueroa, three Proskauer Rose partners, who were

18   negotiating the deal, and we facilitated the email production

19   by two Citibank witnesses, David Brownstein, who was the lead

20   negotiator for the government parties on the deal; and James

21   Castigliani, I think I might have said that wrong, but James

22   Castigliani, who has worked with David and supported him at

23   Citi.

24          THE COURT:  The problem that I'm having, I'm not

25   talking about the scope of the production right now, but to the

1    extent that people communicate these days, even I who do not

2    have a Facebook account communicate by text.  So -- and use

3    that interchangeably with email.

4         MS. DALE:  But there has been no -- there has been no

5    showing that that's the case that people interchangeably use

6    text to communicate --

7         THE COURT:  But what he's saying is that you haven't

8    proven it one way or the other; that you're putting in a

9    statement that says, I don't know.  I haven't asked.  I don't

10   know.

11        MS. DALE:  Your Honor, we -- we know that people use

12   texts to communicate.  What we don't know is -- and what we

13   don't think is relevant at all in this matter is whether people

14   used texts to communicate substantive communications relating

15   to the negotiation of the RSA.  And, in fact, whether

16   they -- if -- we've produced the email communications relating

17   to the negotiations of the RSA.  The only thing we think that

18   goes to is the fact that this was an arm's length negotiated

19   agreement.

20        What else are we trying to get at?  What is the --

21   what is the benefit of taking the enormous intrusion into

22   people's personal devices to collect that information, the time

23   and the expense.

24        Now, if Ms. Jaresko is talking to -- and I don't --

25   I'm just making this up, but if Ms. Jaresko is emailing her

1    lawyers, that's privileged.  So now we're going to have to go

2    through another layer of privilege.  We've done --

3              THE COURT:  Why is that different than your email

4    search?

5              MS. DALE:  Because of the -- because of the intrusion

6    and the expense and the lack of evidence that there's anything

7    to be found there that would be germane to the Jeffrey factors

8    that we're supposedly handling this.  Why did we do an email,

9    because, your Honor, because we -- we produced email, because

10   that has become what you have to do, and so we gave email

11   communications.  I mean, we said at the beginning we don't

12   think the email communications concerning the negotiations of

13   the RSA is relevant, but, you know, we'll go do it, because as

14   I said earlier, we have a promesa.gov server, so there are

15   servers that we can easily get to without having to take

16   anybody's device.

17             And the Oversight Board at least, I can't speak for

18   anybody else, we have been going every once in a while out to

19   our board members and saying, can -- you know, can we take your

20   work email or whatever -- whatever any other email that you're

21   utilizing, can we collect that, please, so that we have it.

22             So, you know, that's why email has become acceptable

23   in terms of the burden to do it, but we said -- and, your

24   Honor, to your other point, we have produced the -- the agenda

25   and the presentations that the board received, and we've

1    produced the -- the communications with Ms. Jaresko, who is the

2    executive director, who, you know, is the mainstay person at

3    the board who leads the efforts.  And, of course, the board

4    votes.  I believe we've produced the unanimous consent or we

5    will.  So we are producing the information that I'm not sure

6    what the UCC is looking for to go through and, you know,

7    to -- to separate or all of us, all of the custodians that

8    they're looking for.  The board isn't implicated in any kind of

9    scandal, you know, so we just -- everybody with a broad brush,

10   everybody communicates by text, I'm not sure.  I don't -- I

11   don't think that's true.  They haven't made that showing.

12        So I think that -- I think the -- the time, expense,

13   intrusion, and lack of relevance to nonemail communications

14   should result in the rejection of that request.

15        In terms of the custodians, I detailed who we produced

16   from, and we've -- we've said we would make David Skeel

17   available, he's one of the seven board members, for a

18   deposition.  They have, again, we believe, the email that's

19   relevant or not even relevant, but at least the back and forth

20   on the negotiations of the RSA to the extent that they believe

21   that that's relevant or material here.

22        THE COURT:  I understand that you have not produced --

23   you have not reviewed his files as a custodian?

24        MS. DALE:  Correct.  For this purpose.

25        THE COURT:  For this purpose?

1          MS. DALE:  Right.

2          THE COURT:  But you have -- you have produced the

3   others who are being produced as witnesses, but not him?

4          MS. DALE:  Correct, your Honor.

5          THE COURT:  So and --

6          MS. DALE:  Well, Mr. Figueroa is the transformation

7   manager for PREPA at the board.  He's not a witness.  They

8   haven't sought to take his deposition.  We just thought because

9   of the role that he plays at the board that he would be a

10  relevant custodian.

11         THE COURT:  But Ms. Jaresko --

12         MS. DALE:  Ms. Jaresko --

13         THE COURT:  -- you have produced?

14         MS. DALE:  I have -- we have.

15         THE COURT:  She has been a custodian?

16         MS. DALE:  Yes, ma'am.

17         THE COURT:  And will be deposed?

18         MS. DALE:  Correct.  And she put in the declaration,

19  your Honor.  Unless have you --

20         THE COURT:  And you selected Mr. Skeel, why?

21         MS. DALE:  Excuse me.

22         THE COURT:  Why did you pick Mr. Skeel?

23         MS. DALE:  We -- we did not pick Mr. Skeel.

24         THE COURT:  Oh, I'm sorry.

25         MS. DALE:  I believe the UCC identified him as a -- as

1    a witness that they would like to depose.  He's very well known

2    in bankruptcy -- the bankruptcy area and I think has written on

3    the topic and things.

4         THE COURT:  Okay.  So -- all right.  Well, let me hear

5    from who -- everybody on this, and then we'll continue our

6    discussion.

7         MS. PAVEL:  Good afternoon, your Honor.  Ashley Pavel

8    from O'Melveny & Myers on behalf of AAFAF and PREPA.

9         I think your Honor had it just right a little bit ago

10   when you were talking to Mr. Bassett that what's left at issue

11   in this motion to compel are not the core relevant documents

12   but people's communications about the goings on, and I think

13   it's important to remember that the Jeffrey factors require an

14   objective inquiry into the reasonableness of the settlement

15   based on the final agreement as it was executed as compared to

16   the realities of the litigation.

17        What everybody said amongst each other or to others

18   along the way just isn't all that relevant.  And as Ms. Dale

19   said, we've taken the position all along that nobody's

20   communications are actually relevant.  As an accommodation and

21   as a method to try to reach a compromise with the Committee,

22   we've agreed to produce nonprivileged communications because

23   under the time frame we're under we found it more efficient and

24   more reasonable than litigating a motion to compel about those

25   communications, but the Committee's demands go one step forward

1    and ask for everybody's communications about everything.  And

2    what you haven't heard is any real articulation as to how that

3    would map to the Jeffrey factors.

4            THE COURT:  I think he has actually framed the issue

5    slightly different, which says, assuming that your agreement as

6    to the scope of the search is supportable, you haven't

7    conceded, but let's assume that.  Why should you be limited to

8    these emails and not include commonly used other methods?  And

9    I have to say that I don't have anything here that says from

10   anybody, from any of the custodians, I don't use this for

11   personal.

12           I think the ad hoc is in a different situation.  The

13   Ad Hoc Group, I believe, has submitted information to that

14   effect, but I don't have any records from any of the government

15   entities, let me use that phrase --

16           THE WITNESS:  Uh-huh.

17           THE COURT:  -- that says, I don't use my text

18   messaging, and I don't see how the burden of specific text

19   messages by and between certain given individuals is more

20   difficult to find than an email.  I --

21           MS. PAVEL:  Well, I think it's important to remember

22   burden is not the only proportionality factor.  It's also about

23   importance to the litigation and the benefit outweighing the

24   burden.

25           THE COURT:  But I don't know.  I don't know.  I mean,

1    you've made a statement that says I've searched the email, and

2    I understand it theoretically.  I understand, you know, looking

3    at anybody's personal information is more complicated than

4    looking at the work server, but you have looked at personal

5    information, and I don't know why there's a distinction between

6    email and texting, for example, without any understanding or

7    any statement by any of the custodians that says, listen, if I

8    sent to -- if I sent a text, it was once in a lifetime.  That's

9    not how I communicated.  I don't have any of that kind of

10   record.

11           MS. PAVEL:  I understand that, your Honor.  I think

12   our response would be that the documents that are relevant and

13   important to the issues before the court are the key economic

14   analyses, the financial data that we've all produced, and

15   collecting personal devices not only from the custodians we've

16   designated, but the Committee wants them from a host of other

17   people.

18           THE COURT:  This is a step at a time.

19           MS. PAVEL:  Okay.

20           THE COURT:  It is a step at a time, but I feel that

21   we're talking a little bit abstractly when the information is

22   in your client's phone.  I mean, if you've got -- if your

23   client came over to you and said, listen, all of my

24   communications are my text messages, and I'm not giving them to

25   you, you would have a different fight with me.  Your fight with

1    me would be, look, I know that they're there, but they're so

2    irrelevant, and it's -- I'm just not giving it to you.  And

3    we'd have that fight.  But right now I'm talking about

4    something I don't even know what scope we're talking about.

5    You made a line, and I'm not understanding how you get to make

6    that line without any support.  To both -- I mean, it's to all

7    the government entities.  It's just a distinction I'm not --

8    I'm not understanding how you search somebody's personal email

9    account and you say, I'm not going to search their text

10   messages.  The same -- the same limitations can apply.  You can

11   say it's only by and between people who are on the board or

12   whatever.

13           MS. DALE:  Your Honor, it's Margaret Dale again.

14           I don't think it's exactly the same thing.  I don't.

15   I disagree.  I think the way people use their telephones as

16   your question before was, you know, does the board give their

17   members or their staff phones to use for pers -- for work

18   purposes.  My understanding is no, they don't, but people are

19   using their own personal device, and I -- I asked this question

20   before we got here today.  You know, collecting text messages

21   you have to go collect all of the text messages off of that

22   person's device.  You can't just search by -- the way -- you

23   know, with email we say, okay, we want between this, you know,

24   this domain name and this domain name, or, you know, or discard

25   everything that's newyorktimes.com, because we don't need that,

1    but there's ways that you can completely block off aspects of

2    emails that is not as easy to do in text messaging, and I don't

3    even -- I don't even know how to do it in a chat room or

4    anything like that. But I did ask about text messaging. And I

5    was told it's not as easy. So you are -- you know, you are

6    getting, Honey, I'll be home at five o'clock or whatever, and

7    people are more reticent to hand over their phone and say, you

8    know, take -- yeah, take it all. And so you do have to address

9    that with people, and I guess that you're saying, well, we

10   should have gone and gotten some statements from our clients

11   that said, you know, we don't -- we didn't use our text

12   messages to communicate substantively about the RSA

13   negotiations, but our position was the communications like that

14   aren't relevant to the inquiry that the court's saying it's

15   looking at, because as Ms. Pavel said, they have the documents.

16   They have the underlying financial analyses, and they're going

17   to -- they're going to ask these people questions at

18   deposition, but what their motivation was or, you know, whether

19   Mr. Skeel said he thought it was a good deal or a bad deal, I

20   mean, I don't -- I'm not sure that makes any difference here.

21   So, you know, the time, the expense, the intrusion all for us,

22   counsel, and, you know, the time that we had to do -- to get

23   this done counseled against, you know, giving that -- giving

24   that at that point in time.

25             THE COURT:  Thank you.

1          MS. PAVEL:  Unless your Honor has any more questions

2     about text messages, I would like to move on to custodians.

3          THE COURT:  I think we're ready to move on.

4          MS. PAVEL:  Okay.  So just by way of context, AAFAF

5     and PREPA, unlike the government parties, put in six document

6     custodians, the two primary outside counsel, who advised both

7     the AAFAF and PREPA, three financial advisors from Ankura, and

8     Christian Sobrino, who was the key government decision-maker.

9          Mr. Bassett has expressed a desire to have people from

10    PREPA, Nelson Morales, and Mr. Ortiz, Elia Diaz, to be added as

11    custodians, but what is important to remember is that PREPA and

12    PREPA's management didn't negotiate the RSA.  As a matter of

13    Puerto Rico law, AAFAF is the sole government entity with

14    authority to negotiate restructuring agreements, and those

15    restructuring efforts were led by outside counsel from

16    O'Melveny & Myers, with support from Ankura working with

17    Mr. Sobrino, and so we picked the six people who were likely to

18    have the materials.

19         Another reason that Mr. Bassett brought up that

20    various people from PREPA and Mr. Loran from AAFAF should be

21    included because they may have transformation-related

22    materials, but the issue before the court aren't completely

23    relitigating the transformation.  Yes, transformation was

24    listed as one of the potential benefits that the RSA would

25    remove some litigation uncertainty from that process, but it's

1    also important to remember that PREPA is not negotiating that

2    process either.  The public-private partnership authority is

3    running that business process and -- or the bidding process,

4    excuse me, and the Committee has independently subpoenaed P3,

5    who's represented by separate counsel, and the Committee is

6    receiving documents from them.  And so it doesn't really make

7    sense, and it's unduly burdensome for us to go out and collect

8    additional materials from PREPA trying to locate duplicative

9    materials from what P3 would have about the current status of

10    transformation.

11          THE COURT:  What about Mr. Morales, though, who I

12    gather you've identified as someone with information about the

13    security interests?

14          MS. PAVEL:  We identified Mr. Morales, the chief

15    financial officer, in response to an interrogatory asking for a

16    person with knowledge about financial issues, like the

17    preparation of budgets and flow of funds under the trust

18    agreement.

19          PREPA in its ordinary course of business is not

20    valuing the bondholders' security interests, and we've produced

21    the financial reporting, although we didn't name him as the

22    email custodian.  The revenue and expense reporting has been

23    produced.

24          And also Mr. -- Mr. Morales in opposition to one of

25    the Fuel Line Lenders' motions earlier on in this proceeding

1    submitted a sworn declaration explaining that he was not

2    involved in the RSA negotiation and that his finance director

3    was not asked to evaluate any.

4          THE COURT:  So was Mr. Diaz though as chairman of the

5    PREPA board being kept apprised of the negotiations of the RSA?

6          MS. PAVEL:  So PREPA board and AAFAF's board each

7    approved the final RSA that was mentioned in Mr. Sobrino's

8    declaration.  There may have been updates to Mr. Diaz.  We have

9    produced some board minutes.  I don't know, as I sit here, if

10   they cover that time period, but he wasn't involved in the

11   day-to-day negotiations.  Those were done by AAFAF.

12         THE COURT:  But somehow the board -- the PREPA board

13   had to be -- there had to be a contact person from the board

14   somewhere along the line.

15         MS. PAVEL:  Well, the board did receive a

16   presentation, I think, in late April suggesting that PREPA and

17   AAFAF board both approve the RSA, and Mr. Sobrino was a member

18   of PREPA's board at the time, a member of both the AAFAF board

19   and PREPA's board, and was the ex-officio representative to the

20   Oversight Board.  And we had -- we produced emails from

21   Mr. Sobrino.

22         THE COURT:  Okay.  Is there anything else you wanted

23   to add?

24         MS. PAVEL:  No, I think that's everything on

25   custodians and text messages.

1    THE COURT:  So this is where I am.  I think that since

2    Mr. Skeel has been identified as a custodian -- as a deponent

3    that he should be added as a custodian.

4    I also think that Mr. Diaz as chairman of PREPA's

5    board should be added.  I think if Mr. Sobrino is replaced by

6    anyone, I don't know if it's somebody who would have

7    information or if it's going to be somebody totally new, okay.

8    I don't profess to guess what that answer is, but if it's

9    somebody who may have historic records they should be added as

10   a custodian.

11   I'm wavering on expanding the scope.  I'm going to

12   give you all a few days to, if you want, to file a supplemental

13   statement as to whether or not these alternative communication

14   methods may have some relevant information or not, but you

15   don't have to file anything.

16   What's today, Tuesday.  How about by Monday?  All

17   right.

18   All right.  I haven't heard from the ad hoc committee.

19   MR. HAMERMAN:  Hi.  Good afternoon, Judge.

20   Natan Hamerman from Kramer, Levin, Naftalis & Frankel for the

21   ad hoc group of PREPA bondholders.

22   I'll address the topics that I guess are so far up for

23   grabs which relates to custodians and text messages.

24   The Committee contends that receiving documents from

25   the ad hoc group's five lead negotiators was not sufficient and

1   it wants documents from four more custodians, the most senior

2   responsible person and a person involved on a day-to-day basis

3   to Ad Hoc Group members.  This prong of the committee's motion

4   should be denied for multiple reasons.

5        First, you don't even need to address the question of

6   custodians because the Committee until a few minutes ago had

7   effectively conceded that the discovery it seeks from the Ad

8   Hoc Group does not relate to any relevant issue at the 9019

9   hearing.  According to the committee, the central -- this is a

10   quote, "The central issue relating to the 9019 motion is the

11   reasonableness of the government party's decision to enter into

12   the RSA."  That's from paragraph 16 of their renewal.  That has

13   nothing to do with the Ad Hoc Group.

14        In paragraph 4 of their renewal, they list a series of

15   topics relating to the 9019 motion about which they contend

16   they need discovery.  They said basically the same list here

17   today.

18        None of those topics relate to the Ad Hoc Group.

19   They've provided in each of their submissions to the court

20   lists and lists and lists of specific requests, RFP No. 7, RFP

21   No. 8 to PREPA, to AAFAF, to the Oversight Board.  Not one of

22   them is to the Ad Hoc Group.

23        And we made all of these arguments in our opposition

24   papers, and in their reply papers they didn't come back with

25   something different.  They didn't come back and say, oh, yes,

1      your discovery is relevant to this topic that's at issue or we

2      need an answer to this RFP as to the Ad Hoc Group.  Instead,

3      they just continued to focus on the communications with the

4      government parties -- I'm sorry.  On the government parties'

5      judgment and the RFPs that went to the government parties.

6           So the only subject that our documents could

7      conceivably relate to is whether the RSA was negotiated in

8      arm's length and in good faith.  And that can theoretically be

9      an issue in some 9019 motions, but it's not in this one.

10          The Committee has never argued that the RSA is not the

11     result of arm's length negotiation.  To the contrary, it is

12     repeatedly contended and admitted that the RSA negotiations

13     were at arm's length, including again in its reply papers here.

14          So even if the Committee had argued that the

15     negotiations were relevant, which they didn't do, that brings

16     us to the custodians.  That still would not necessitate

17     documents from the Ad Hoc Group members because the

18     negotiations were led by the Ad Hoc Group's professionals, not

19     its members.

20          In its reply, basically the only thing the Committee

21     says about this is we haven't supported our position on this

22     custodian question.  We only point to the absence of certain

23     documents by our clients.  But, first of all, they have the

24     burden of proof on this issue, not us, and we certainly did

25     support our position.

1          First, we've made repeated representations to your

2     Honor subject to Rule 11 that the professionals led the

3     negotiations on the ad hoc group's basis.

4          Second, there is a sworn declaration by David

5     Brownstein, the Oversight Board lead negotiator, in which he

6     says in paragraph 17 that the negotiations on the Ad Hoc

7     Group's behalf were predominantly led by its professionals.

8          Third, the absence of documents of any emails with our

9     clients' names on them other than a handful is significant.

10    This isn't just in our production.  This is any production from

11    anybody else.  Surely, if our clients had been actively leading

12    negotiations, communications with their names on it would have

13    appeared in the productions by various parties.

14          And fourth, in contrast to the absence of emails with

15    our clients' names on them, there's the presence of thousands

16    of pages of negotiation communications that have been produced

17    by us and other parties confirming that the Ad Hoc Group's

18    professionals were the ones to lead the negotiations on its

19    behalf.

20          Fifth, the single document that the Committee attaches

21    to its paper -- to its papers actually supports our position.

22    That's Exhibit 10 to their renewal, Judge.  In that document,

23    that's one of the handful communications that even has our

24    clients' names on them.  One ad hoc group member asked a

25    representative of the Oversight Board to catch up to make sure,

1    quote, "nothing is getting lost between all the

2    intermediaries."

3         Now, if that member had been leading negotiations

4    himself, sending such an email would not be necessary because

5    there would be nothing to catch up about, and he wouldn't be

6    referencing intermediaries.  So the email, in fact, proves our

7    point.

8         A few moments ago, when Mr. Bassett was up here, he

9    mentioned one other subject, which we had frankly thought was

10   off the table based on prior communications, which was, gee,

11   what if there are communications between -- you know, with one

12   of the Ad Hoc Group members saying this is the steal of the

13   century or we don't really have security.

14        And this goes back to a comment that Ms. Pavel was

15   making, which is the factors that are at issue here are

16   objective ones.  That's what Jeffrey says.  That's what the

17   *TMT Trailer versus Anderson* case says.  It's not the subjective

18   views of any particular person that determines whether the

19   settlement value is good or bad or somewhere in between.  These

20   are objective criteria.  So even if such a communication

21   existed, it would not be relevant.

22        And I would note, your Honor, that we -- this is not

23   the first time a request for documents like this has been made.

24   In our original opposition to the original motion to compel,

25   when we thought this issue was still ripe and had not been

1    taken off the table, we cited various decisions, mostly in

2    transcripts from the *Dolan* case, the *Genco* case, the *Energy 21*

3    case, where parties opposing a particular settlement or plan of

4    reorganization asked a group of creditors or bondholders for

5    documents relating to what they thought about the settlement,

6    and the courts in all three of those instances said that those

7    documents are not to be -- are not required to be produced

8    because they're not relevant.  The individual creditors' view

9    as to these subjects don't matter.

10           By contrast, the Committee has not cited any decisions

11   that would indicate that such documents are relevant.  So I

12   think that on this particular issue, there's no basis to -- to

13   find any relevant subject matter in any of the communications

14   that our clients might potentially have.  The bottom line on

15   this subject, Judge, is that the burden to the Ad Hoc Group

16   associated with producing four more custodian documents on top

17   of the five lead negotiators substantially outweighs any

18   benefit from that production particular -- particularly on an

19   issue that the Committee has not been focused on, hasn't

20   identified how it relates to the 9019 hearing, appears totally

21   irrelevant, and at a minimum is very far from the heart of the

22   9019 hearing.  And particularly under Rule 45, which the

23   committee does not dispute governs the Ad Hoc Group subpoena.

24           Let me take one last moment on burden because we heard

25   some comments from Mr. Bassett about the size of the

1    settlement.  Just because there are big dollars at issue

2    doesn't mean that we act wastefully or that we allow discovery

3    that has no relevance.  It just delays or harasses people.  If

4    it did, Judge Swain wouldn't have now excluded witnesses and

5    depositions and things of that nature repeatedly.  So I just

6    don't think that that is really getting to the core of the

7    issue.

8            That's all I have on custodians, but I'll speak for a

9    very brief moment on text messages.  We are a little bit

10   differently situated than the other parties.  We were asked by

11   the Committee to go to our various custodians whose documents

12   we produced and confirmed that they did not have any

13   substantive negotiations about the preliminary RSA, the

14   settlement.  They asked us to do -- by text message or similar

15   messaging system, they asked us to do that.  We did.  Each one

16   of them confirmed, in fact, that they did not have such

17   messages of that kind of substantive nature.

18           You know, in the face of that producing such

19   communications is burdensome, it's significantly disruptive, it

20   relates -- it raises all of the privacy concerns that your

21   Honor has heard about already here today.  It doesn't work the

22   way email does.  Text messages don't get filtered the way

23   emails do with one party and one message and specifics.  You

24   get a giant screen of messages, and it's much more difficult to

25   go through.

1          So in the face of the representation from our

2     respective custodians that they did not have substantive

3     communications by text, we think there's really no reason to do

4     that here.

5          Mr. Bassett also mentioned other documents other than

6     emails.  I just want to note that we did look for other

7     documents and have produced nonemail documents as part of our

8     production.  So that's not an exclusion that we applied, Judge.

9          Unless have you questions on this, I'm done.  Thank

10    you.

11         THE COURT:  Thank you.

12         Mr. Bassett, do you want to get the last word in?

13         MR. NATBONY:  Your Honor, it's short.

14         THE COURT:  Okay.

15         MR. NATBONY:  Thank you, your Honor.  William Natbony

16    from Cadwalader on behalf of Assured.

17         On the three issues that your Honor mentioned, first,

18    the UCC's reply and its Exhibit A does not indicate that it

19    have any issues with respect to Assured's custodians.  So

20    that's not an issue to address for Assured.

21         As to hard copy documents, Assured did, in fact, agree

22    to undertake a reasonable search for responsive and

23    nonprivileged documents, including hard copy and did, in fact,

24    produce those.

25         And with respect to electronic messages, as did with

1    the ad hocs, Assured did, in fact, communicate with its client,

2    and in accordance with the Assured's internal policies

3    confirmed, and it's in our papers, that the relevant Assured

4    custodians, including Assured's negotiator of the RSA and

5    Assured's outside counsel, negotiated the RSA and conducted all

6    negotiations by email, phone, or in-person meetings, not texts,

7    not any other of the electronic-type communications that are

8    described in the UCC's papers.

9           That's all I have, your Honor.

10          MR. BASSETT:  So just a few points in reply to the

11   arguments that we've heard, your Honor.  I'll try to be brief.

12          On the issue of the -- the text messages and other

13   personal devices, I think the court -- one thing I want to make

14   clear is the court made a comment at one point, I think,

15   that -- that personal emails had been searched and provided.

16   That's --

17          THE COURT:  I think that was the representation.

18          MR. BASSETT:  If that's -- we have not seen those,

19   your Honor.  I'm happy to be corrected by Ms. Dale or someone

20   else, but the only emails we received are from official email

21   accounts.

22          MS. DALE:  It's Margaret Dale.

23          Just to clarify, we have collected from the members of

24   the board personal email accounts.  The folks who are the

25   custodians here, they didn't have personal email accounts.  We

1 have only produced documents from their promesa.gov email

2 accounts.  So it was collection versus production for

3 Ms. Jaresko and Mr. Alejandro Figueroa.

4    THE COURT:  Okay.  But that's because there were

5 none -- there was no personal account?

6    MS. DALE:  That's my understanding, yes.

7    MR. BASSETT:  Just to clarify that point.  I'm not

8 sure if it's that they don't have them or there's a

9 representation that the government parties are willing to make

10 that some assurance that they can make through a declaration of

11 these individuals or what it might be that they did not use

12 personal email accounts to communicate.  I just want to refer

13 back again, federal indictment alleging that officials in

14 Puerto Rico specifically used personal nongovernment email

15 accounts in furtherance of a conspiracy.  I think it's a

16 relevant question.

17    MS. DALE:  We can make a representation that neither

18 Ms. Jaresko nor Mr. Figueroa used personal email accounts for

19 their business at the board.

20    THE COURT:  I have no reason to disbelieve that.  I

21 will accept that.

22    MR. BASSETT:  I'm sorry.

23    THE COURT:  Without evidence to the contrary, I have

24 no reason not to accept counsel's representation.

25    MR. BASSETT:  Your Honor, we don't know what we don't

1  know.  I --

2          THE COURT:  I don't know what to say to that.

3          MR. BASSETT:  Okay.  So other issues.

4          THE COURT:  Do you agree that the collection though of

5   the text messaging is a different -- a different burden than

6   the collection of emails?

7          MR. BASSETT:  I would -- I would agree that it might

8   not be as easy as searching emails that are in one central

9   location, but I disagree wholeheartedly that any incremental

10  burden that is associated with producing text messages somehow

11  shields them from disclosure in this case given the likely

12  relevance of those materials.  In fact, as your Honor has

13  pointed out, there has been no showing that they're not

14  relevant.  There has been no representation that they don't

15  exist.  There has been no representation that -- that the text

16  messages that do exist aren't related to this dispute.  I think

17  given everything at stake here, given what is -- what we sought

18  in discovery and what's undeniably relevant to this dispute,

19  the court should compel the government parties to collect

20  devices.

21          I mean, the idea that it's invasive or that some

22  custodians would not like to give over their devices is not

23  remotely a reason for them to not be provided.  I mean, just

24  out of personal experience, I was involved in a bankruptcy case

25  six months ago on the other end of this, which is a fraction to

1    say the least of the magnitude of this case, and everybody

2    produced text messages because they were called for by the

3    requests.  And the individuals in question had relevant text

4    messages, and it wasn't burdensome.  We had a vendor go to the

5    person, image the devices, and search their text messages for

6    key words to figure out of all the texts on their phone, which

7    ones have the hallmarks of being relevant because they touched

8    on certain key words.  It's -- there has been no -- there has

9    been no showing that it's particularly costly or difficult to

10   do this because it's not.

11        And I also want to be clear that, you know, we have

12   been talking about text messages, but that's not the full

13   extent of what we're seeking.  I mean, in fact, it's anything

14   else that may be recoverable from their mobile devices or other

15   devices on which they use social media or other chat platforms

16   like whatsapp, like the Telegram chat that has led to the

17   recent scandal.  All of those forms of communication are

18   equally relevant.

19        We're happy to have a conversation with the government

20   parties about exactly how to go about collecting those

21   materials from their phones and what can be done to gather

22   them, but they have not been willing to have that discussion.

23   So, again, it's not -- it's not just text messages.

24        THE COURT:  And you're seeking those from the

25   custodians who have already produced documents as well?

1        MR. BASSETT:  Absolutely.

2        THE COURT:  Like the lawyers and the financial

3   advisors that have served as the custodians for the documents

4   do you -- are you seeking text messages from them as well?

5        MR. BASSETT:  Absent a showing to the contrary that

6   they don't have them, yes.  We're happy to have that

7   discussion.  I think as it relates to certainly the nonlawyers,

8   the financial advisors, the individuals at PREPA and AAFAF and

9   the Oversight Board, including the board members, absolutely we

10  are seeking text messages from all those individuals, and we're

11  seeking it from everybody else as well, but again, we have not

12  been able to have any dialogue on this issue at all beyond

13  you're not getting anything other than emails.  So that's part

14  of the reason it's a little bit difficult to talk about

15  specifics in terms of burden, in terms of what's available on

16  these phones.  We've not had that dialogue at all.

17        THE COURT:  Okay.

18        MR. BASSETT:  In terms of the custodians, your Honor,

19  I mean, as to David Skeel, we appreciate your Honor indicating

20  that we should have his documents, but there's seven board

21  members, and we don't see a principled reason to just have his

22  documents.  I mean the board acts through its members, each of

23  which has a vote to approve this transaction.  We've sought one

24  deposition initially of Mr. Skeel and not because we believe

25  that he is the only one who has relevant documents or that he's

1    more likely to have information or he's more relevant to have

2    information than other board members, but because we are

3    mindful of the limited time we have and the number of

4    depositions that can be taken.  We have not noticed seven

5    depositions.  We've noticed one to at least talk to a board

6    member initially and go from there.  But to only get his

7    documents, it doesn't make sense to us.

8             I mean, again, to just look at other contexts, if this

9    was any corporate litigation regarding a merger or some other

10   decision that has been made by that corporation that is at

11   issue, the first custodians would be the board members because

12   they're the people who make the decision.

13            THE COURT:  Right, but I think this is a difference.

14   I mean, the report before me seems pretty clear that you have

15   the information.  The -- the people who participated in the

16   negotiation have been identified as custodians, and you do have

17   their records.

18            You also have records, official records, from the

19   board itself.  In my view, unless -- I'm not seeing a gap.  We

20   have a gap for other reasons, and that we will get to on all of

21   the privilege issues, but it seems to me that the information

22   that you have both from the Oversight Board --

23            MR. BASSETT:  Just --

24            THE COURT:  Let me say from the Oversight Board adding

25   Mr. Skeel is sufficient to cover the decision-makers in

1    connection with the issues being brought up at the 9019.

2         MR. BASSETT:  Okay.  Just a couple of points of

3    clarification, your Honor.

4         So I talked to my colleague, who is closer to the

5    documents than I am during our break, and as to the materials

6    that we have received regarding presentations to the board, et

7    cetera, I'm told we, in fact, don't have any minutes relating

8    to board meetings from FOMB and AAFAF or PREPA or any documents

9    regarding the voting that took place.  We don't have any

10   presentations from AAFAF or PREPA regarding the RSA, even

11   though the Oversight Board has produced some of those that were

12   given to their board.  So I think what we do have concerning

13   board member communications and documents that go to their

14   deliberations and decision-making, which is at the center of

15   what's at issue here is again very, very limited.  And again, I

16   just -- I just don't see how picking one out of seven is

17   enough.

18        THE COURT:  So as I understand it, there's a different

19   issue with AAFAF that will come up, I assume, in the

20   deliberative process discussion, but the Oversight Board has

21   agreed to produce the minutes and the presentations and the

22   votes; is that correct?

23        MS. DALE:  Your Honor, it's Margaret Dale.

24        There are no minutes.  The agenda is what we produced.

25   That functions as the record of what is, you know, discussed --

1    being discussed at the meeting, and presentations, Board decs,

2    nonprivileged parts have been produced, and I understand that

3    there are a few more cleanups, and there will be a further

4    production this week.

5        THE COURT:  Okay.

6        MR. BASSETT:  And, frankly, your Honor, that's more

7    reason why what we have is extremely limited.  I mean, just

8    seeing the agenda premium of what has been discussed without

9    any communications or any insight into the discussions that

10   occurred.  That's what we're not being given.

11       THE COURT:  But you also have the documents from the

12   people who would have made the -- the presentations and who

13   provided the information because they negotiate any

14   communications that are nonprivileged?

15       MR. BASSETT:  We don't --

16       THE COURT:  You have the people who are making the

17   assessment entering the negotiations?

18       MR. BASSETT:  I --

19       THE COURT:  They have served as the custodians.

20       MR. BASSETT:  I don't think that's correct.  We have

21   documents from some of the people, the advisors --

22       THE COURT:  I believe --

23       MR. BASSETT:  -- and people who have -- we have

24   documents from people who negotiated the settlement from the

25   Oversight Board, yes.  But what we're talking about is

1      evaluating the reasonableness of the decision to enter into the

2      settlement.

3              THE COURT:  And you have --

4              MR. BASSETT:  That's what we don't have.

5              THE COURT:  -- the documents of the people who have

6      submitted declarations?

7              MR. BASSETT:  We do have the documents of the people

8      who have submitted declarations, yes.

9              THE COURT:  Okay.

10             MR. BASSETT:  And by the way, there -- you know, we

11     have been talking about advisors to the Oversight Board and

12     AAFAF, and what I had forgot to mention is with respect to the

13     Oversight Board there are two Citigroup custodians who

14     submitted declarations, Frederic Chapados and David Brownstein,

15     his name has come up.  We have also gotten documents from a

16     couple of other Citigroup custodians, but we have an unresolved

17     issue with regard to getting text messages from the custodians

18     as well.  I just wanted to draw to your Honor, they are part of

19     the group of custodians we are talking about when we talk about

20     the FOMB.

21             THE COURT:  Okay.

22             MR. BASSETT:  And then just a quick last point on the

23     custodians, you know, as to the PREPA and AAFAF, and again I

24     guess we can talk about that later if it comes up in

25     deliberative process, but, you know, the CEO of the debtor, who

1    is the -- the key party in this entire dispute, the key

2    decision-maker, who like I said is, you know, talking with the

3    media and panels about the privatization as recently as

4    yesterday sees no principal basis to not have the documents.

5            THE COURT:  And this is Mr. Ortiz?

6            MR. BASSETT:  This is Mr. Ortiz.  The same with the

7    CFO, again, we're talking about a decision made by PREPA.  The

8    CEO and CFO both of whom have relevant information that I think

9    the record is pretty clear on that.  And that we're not

10   entitled to their documents in this situation and a dispute of

11   this magnitude, I don't see how that is possible.

12           THE COURT:  Except that you're not responding to the

13   information that was provided about their roles.

14           MR. BASSETT:  But the information that was provided

15   about their roles by counsel is different from what we know

16   about their roles based on the documents that have been

17   produced and what has happened and what's in the public record.

18   I mean, they -- there's documents indicating that the CEO is

19   going to meetings on the privatization.  He's commenting on the

20   confidential information memorandum that's provided to

21   concessionaries created by Citibank.  There's other documents.

22   Again, he's -- he's the -- he's the CEO, the head of the

23   organization, who is involved in these issues.  He's talking to

24   the press about them.  I mean, the fact that they say he is not

25   involved is belied by the record.

1          THE COURT:  Okay.  Anybody want to respond to that?

2          MS. PAVEL:  Thank you, your Honor, Ashley Pavel for

3     AAFAF.

4          Mr. Ortiz did not negotiate the RSA.  As a matter of

5     Puerto Rico law, it's AAFAF not PREPA who negotiated the

6     agreement.  Mr. Ortiz signed the RSA after AAFAF, together with

7     outside counsel, presented the RSA to PREPA's board so that

8     PREPA could sign it.  As a matter of Puerto Rico law, it was

9     not Mr. Ortiz or PREPA's management to negotiate that

10    agreement.

11         THE COURT:  Would he have been the person that was

12    kept apprised?

13         MS. PAVEL:  That would have been Mr. Sobrino, your

14    Honor.

15         THE COURT:  Hmm.

16         MS. PAVEL:  Mr. Sobrino, as a member of PREPA's board,

17    would have been apprised.

18         THE COURT:  And his documents have been subpoenaed?

19         THE WITNESS:  His documents have been produced.

20         THE COURT:  All right.  What is the problem with

21    producing Mr. Ortiz's and Mr. Diaz's documents?

22         MS. PAVEL:  It's not that there's any problem per se

23    in doing it.  It's that we think we have produced materials

24    from the custodians, who are likely to have information, and

25    the incremental burden of adding another set of custodians and

1    more documents to review would outweigh the benefits of adding

2    more custodians.

3              MR. BASSETT:  Your Honor, just real -- just quickly.

4    And I think they've conceded that there's no problem with

5    getting the documents.  So I think any argument on burden to me

6    at least is not very persuasive.

7              I wanted to make one quick point regarding this

8    distinction between AAFAF and PREPA and how AAFAF negotiates on

9    behalf of PREPA.  They each approved the transaction

10   independently.  And, in fact, they had different rights under

11   the transaction.  PREPA has a termination right that AAFAF

12   doesn't have.  I mean, there are distinctions between those two

13   groups, and they each have their own decision-makers who

14   approved the transaction.  We need to see their documents.

15   The -- it's the same as the Oversight Board members.  We need

16   to see the notes that they took during meetings, what they

17   considered in deciding that this settlement was in the best

18   interests of their respective organizations.  That's all front

19   and center and what they have in paragraph after paragraph in

20   their declarations, talking what they believed when they did

21   the negotiations of the agreement, what motivated them, why

22   this is a good dial for PREPA and AAFAF and Puerto Rico in

23   general.  All of those things.  That's -- that's the discovery

24   that we need here.

25             THE COURT:  So I think the scope of the discovery

1    relating to the deliberative process notes of meetings or -- we

2    haven't heard that yet.  We'll deal with that in a moment.

3         I will add Mr. Ortiz and Mr. Diaz as the -- as

4    custodians along with Mr. Skeel.  I don't believe any

5    additional information or custodian is needed from the Ad Hoc

6    Group.  I didn't see that anything was asked for from Assured,

7    so I assume you don't want me to order them to do anything.

8         All right.  With respect to the -- I'm reserving on

9    the scope of the text messaging.  I want to think about that,

10   but I will let the government entities -- I believe that

11   Assured and the Ad Hoc Group have established that there is no

12   need to search further for their text messages or other

13   platforms.

14        The government entities either need to supplement the

15   record or I will make a ruling based on the record, as I have

16   now, which is I understand your argument being -- excuse me

17   -- that it's just burdensome and not likely to lead to the

18   discovery of relevant information for the 9019.

19        But I will let you supplement the record on whether or

20   not there's -- these other platforms were used.

21        MS. DALE:  Thank you.

22        THE COURT:  Okay.

23        MR. BASSETT:  And, your Honor, just to clarify,

24   what -- in terms of supplementing the record, this may have

25   been what --

1          THE COURT: They could produce an affidavit, like --

2          MR. BASSETT: Okay.

3          THE COURT: -- what has been produced of where that

4  says -- it will have to be more than -- if it's counsel's

5  representations, which I will take, but it will have to be

6  based in detail on discussions and confirmation by -- with the

7  individual members as to whether or not these platforms were

8  used. All right. I'm not requiring you to do that. If you

9  elect not to do it, it's fine, and I will just make a ruling

10  based on the record that I have.

11         MS. DALE: I will, your Honor.

12         MR. BASSETT: And, your Honor, the one point I would

13  now -- it's just a flag. In terms of timing, I think your

14  Honor is aware of the schedule. We have depositions starting

15  next week, and then it's really three weeks of that, so to the

16  extent that we, you know, get additional documents obviously it

17  creates a problem that that doesn't happen before we start

18  having documents --

19         THE COURT: Well, with the custodians that I've

20  identified, I would expect those to be produced as soon as

21  possible, obviously.

22         Can you produce -- can you produce the affidavits by

23  Friday, and then we can make a ruling at the beginning of the

24  week?

25         MS. DALE: It's Margaret Dale again for the Oversight

1    Board.

2            With respect to supplementing the record, we'll do our

3    best to get you -- if we -- if we do submit something by

4    Friday, as opposed to Monday, your Honor.

5            THE COURT:  Yes.

6            MS. DALE:  With respect to Mr. Skeel, we -- we have

7    the promesa.gov email collection.  So we can look through that,

8    and I guess I'm not sure exactly the scope and timing, but

9    we'll -- we'll get on that right away.

10           I don't know the last date that we collected from

11   his -- his -- his -- he's a professor at UPenn so we have to

12   get his UPenn account.  I just don't know what was the last

13   date we collected from him, and I just don't know how long that

14   is going to take.  So that could be an issue in terms of

15   timing.

16           THE COURT:  It needs to be rolling, right --

17           MS. DALE:  Yes, of course.

18           THE COURT:  -- you're not going to wait -- you're not

19   going to wait until you have everything?

20           MS. DALE:  No.  Thanks.

21           THE COURT:  Mr. Bassett.

22           MR. BASSETT:  And as to -- as to Mr. Skeel and the

23   other custodians, when we talk about, you know, the affidavit

24   and text messages, are we talking about all documents other

25   than official emails that's going to be addressed in that

1    affidavit or are we just talking --

2            THE COURT:  It will be the other platforms.

3            MR. BASSETT:  Okay.

4            THE COURT:  The use of other platforms.

5            MR. BASSETT:  But that would -- but that also is not

6    electronic to be clear.  So the notes that a board member took,

7    Mr. Skeel in particular, since he has been identified as a

8    custodian now at the meeting, subject to the deliberative

9    process discussion.

10           THE COURT:  There's always that one more question that

11   I have to rephrase in my head.  As I understand it, the

12   production to date has been documents, nonelectronic documents,

13   as well as electronic emails.

14           MR. BASSETT:  I don't believe we've gotten

15   nonelectronic documents from the government parties.  I'm happy

16   to be corrected on that, but I -- I don't know that we have.

17           MS. DALE:  I think what -- I think what Mr. Bassett is

18   talking about is hard copy notes.

19           Is that basically what you're talking about?

20           MR. BASSETT:  That's fair, yeah.

21           MS. DALE:  Okay.  So we did not produce any hard copy

22   notes.  I don't even know if any exist, but right now we have

23   not produced hard copy notes.  So that the request, I think, is

24   that we -- if we were to put in something that we indicate

25   whether or not the custodians have notes?

1              MR. BASSETT:  I was more asking the question to the

2    court.

3              THE COURT:  Why hasn't hard copy documents been

4    included in the production?

5              Is it because everything's electronic?

6              MS. DALE:  Pretty much, yes, your Honor, because

7    everything is electronic or -- but we will put -- you know,

8    we'll take that and go back and talk to our custodians and see

9    if there is anything that is written down that is germane, and

10   we'll let you know.

11             THE COURT:  I am not excluding -- I don't find it

12   overly burdensome based on this record to produce hard copies

13   information.  So if there is responsive material from these

14   custodians that is in hard copy, it should be produced.

15             MS. DALE:  Understood.

16             THE COURT:  Okay?

17             MS. DALE:  Thank you.

18             THE COURT:  Before we get to the process can we take a

19   five-minute break.

20             MR. BASSETT:  Sure.  Thank you.

21             THE COURT:  Thank you.

22             THE CLERK:  All rise.

23             (Recess from 2:43 p.m. until 2:55 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  Okay.  Mr. Bassett, we're ready.

1          MR. BASSETT:  Yes.  So, your Honor, I believe the

2     issues we are going to discuss next are the two privilege

3     issues.  I'm happy to go in either order.  I was going to take

4     deliberative process first, if that's fine.

5          THE COURT:  That's fine.  And I need to understand --

6     I don't know actually if you go first or -- or the government

7     goes first on this, because there has been a production of

8     materials relating to the negotiation, as I understand it, but

9     I don't have a full sense of what that is, and so I don't

10    really understand the scope of the privilege that's being

11    claimed.

12          I know you say they're claiming it on everything, but

13    they're responding by saying, "No, we're not."

14          MR. BASSETT:  So -- so I'm happy to -- I'm happy to

15    hear from the government on that.  The one thing I will note is

16    that we have received categorical privilege logs -- well, we

17    received a categorical privilege log from the Oversight Board.

18    We have not received one from AAFAF and PREPA, but the -- among

19    other things, and we're going -- we're in a dialogue about the

20    contents of the log as we speak, but it doesn't contain yet, at

21    least, although they said they will provide it, the number of

22    documents that are being withheld under each of these different

23    privileges, so we, at this point, don't have a lot of insight

24    into that, but what we do know is that they are asserting the

25    deliberative process privilege over what appear to be large

1   categories of documents.  But I'm happy to hear from the

2   government as to exactly how they've drawn that line.

3            THE COURT:  Thank you.

4            MS. STAFFORD:  Good afternoon, your Honor.

5   Laura Stafford on behalf of the Oversight Board, and I'm happy

6   to address the -- what's actually the very narrow scope of what

7   the government parties have asserted -- the deliberative

8   process privilege over up to this point.

9            The UCC appears to be under the misimpression that

10  we've applied the deliberative process privilege very broadly

11  to resist discovery into negotiations regarding or the decision

12  to enter into the RSA, and that really hasn't been the truth.

13           We've -- as we've been discussing this afternoon, your

14  Honor, the Oversight Board and the other government parties

15  have produced thousands of documents showing the RSA

16  negotiation process and the back and forth between the

17  government parties' advisors and attorneys on the one hand and

18  the supporting holders on the other hand.

19           THE COURT:  You have to slow down a little bit.

20           THE WITNESS:  Sorry.  We've also produced materials

21  that were submitted to the Oversight Board by their advisors in

22  connection with the decision-making process, and those are the

23  agendas and meeting materials that we were discussing so far

24  this morning.  All of those are the agendas and meeting

25  materials that were considered and relied upon by the Oversight

1    Board in making the decision to enter into the RSA.

2            To date, the Oversight Board has identified and

3    withheld only two categories of responsive documents pursuant

4    to the deliberative process privilege.

5            The larger category of those relates to the decision

6    to enter into the demand protection term sheet.  These

7    communications are ones that took place between the government

8    parties and their advisors and involved analyses regarding the

9    terms that were contained within the demand protection term

10   sheet.

11           THE COURT:  Can you say that again.

12           THE WITNESS:  The demand protection term sheet.

13           That term sheet addresses the pricing and

14   implementation of demand protection for bondholders in the RSA,

15   including specific charges that will be assessed and how they

16   will be assessed, all of which implicate Puerto Rico's overall

17   energy policy.

18           We have not been asserting the deliberative process

19   privilege over the decision to enter into the RSA at all.  As

20   we've discussed, we've produced a lot of information that was

21   put before the board in order to allow it to make that

22   decision.

23           We've also identified a very small number of

24   communications that are related to the decision to certify

25   PREPA's fiscal plan on June 27, 2019.  That's really only a

1    very small handful of documents.

2            I don't have the exact number of communications

3    related to the demand protection term sheet, but it's

4    not -- it's not a huge number, but I don't know exactly what it

5    is as I stand here today.

6            So I -- I hope that provides your Honor with some

7    guidance about what has actually been the very narrow scope of

8    the -- the deliberative process that has been asserted to date,

9    and --

10           THE COURT:  Why have you asserted it for those two

11   categories?

12           MS. STAFFORD:  So with respect to the demand

13   protection term sheet, again, this relates to the specific

14   energy policy determinations that needed to be made by the

15   government as to the scope and extent of charges and how they

16   could be collected from ratepayers.  Those sorts of

17   determinations affect overall energy policy for Puerto Rico,

18   and as a result those -- the decision to enter into a term

19   sheet with the specific charges and how they -- those charges

20   would be collected, the various decisions that needed to be

21   made in order to reach that demand protection term sheet

22   result -- were the result of a lot of back and forth between

23   PREPA, AAFAF, and the Oversight Board and their advisors.

24           THE COURT:  And how does this fit into the RSA?

25           MS. STAFFORD:  That demand protection term sheet is

1    one piece of the RSA.  It's a schedule that's actually attached

2    to the RSA, and it was one of the main features that needed to

3    be negotiated between the preliminary RSA and the definitive

4    RSA, and the decisions that needed to be made by the government

5    parties included how those transition charges should be

6    structured and collected from ratepayers.

7          THE COURT:  So you have produced the final --

8          MS. STAFFORD:  That's correct.

9          THE COURT:  -- piece that is part of the RSA?

10          And have you provided factual information that was

11   provided to the board in voting on it?

12          MS. STAFFORD:  That's correct, your Honor.  We've

13   provided factual information that was provided to the board in

14   voting on it.  We've also on various drafts of the demand

15   protection term sheet that were exchanged before the common

16   interest period with Assured took -- really solidified in

17   March -- on March 25th of 2019.  Any demand protection term

18   sheets that were exchanged between the parties at that time

19   were produced, and there's a number of nonprivileged redacted

20   versions of documents that were exchanged between the Oversight

21   Board and its advisors, which provide summaries and analyses of

22   the different demand protection terms that were being

23   considered at that time.

24          What was redacted and removed, your Honor, were things

25   that involved analyses and discussions and recommendations to

1    the board and its advisors of how those transition charges

2    should be structured.

3         THE COURT:  And what about the other -- the certified

4    fiscal plan; is that what you said?

5         MS. STAFFORD:  Yes.  There's -- this is really a very

6    small number of communications probably on the order of 10 or

7    15 that involve discussions about the RSA and how it will fit

8    into the overall fiscal plan.  It relates to the development of

9    the fiscal plan, which I believe your Honor and Judge Swain

10   have both acknowledged that as between the Oversight Board and

11   its advisors and the Oversight Board and AAFAF, those types of

12   communications should -- are protected by the deliberative

13   process privilege.

14        THE COURT:  Let me just ask before Mr. Bassett asks.

15   To the extent that there are notes of the members of the

16   Oversight Board at any of these meetings that you've produced

17   the agendas for, have you produced those?

18        MS. STAFFORD:  I don't believe any notes have been

19   produced to date, your Honor, taken by Oversight Board members.

20        THE COURT:  And is that -- are you claiming a

21   privilege on those or are -- you just didn't produce notes?

22        MS. STAFFORD:  We didn't -- we didn't collect hard

23   copy documents from our board members.  So to the extent that

24   they included nonprivileged information, they -- I don't know

25   without looking at them if they include a lot of documents or

1    discussion of things like these demand protection issues that

2    we've just been discussing or if they include anything that

3    might include anything that might relate to attorney advice.

4    So I can can't say for sure whether or not they would be viewed

5    as privileged.  We haven't collected them to date.

6            THE COURT:  But it would fit into your analysis, I

7    think, since you produced the agendas, and you sort of produced

8    the information about that you have about what went on at these

9    meetings where it was discussed, I think it would be consistent

10   with your production to produce notes.

11           MS. STAFFORD:  I -- we are not claiming the

12   deliberative process privilege over the decision to enter into

13   the RSA, so to the extent there are notes that don't discuss

14   any of these deliberative issues that we've discussed or

15   reflect any attorney-client communications, yes, your Honor, it

16   would fit within the analysis I just described.

17           THE COURT:  And that for those it seems that that

18   shouldn't be restricted to just the custodians, right?

19           These are personal notes of anybody who was at the

20   meeting?

21           MS. STAFFORD:  Sure.  I don't know that any such notes

22   were even taken, but...

23           THE COURT:  It's always the fun part about making

24   discovery rulings, you don't know whether they exist or not.

25           MS. STAFFORD:  Yeah.

1          THE COURT:  Okay.  Thank you.

2          MS. STAFFORD:  Yeah.

3          THE COURT:  Does that change your argument at all,

4     Mr. Bassett?

5          MR. BASSETT:  Well, I -- I do have a couple of points

6     to make in response, but I would suggest that to the extent it

7     makes sense maybe we should hear from AAFAF and PREPA about

8     their position on these same issues, and I could respond to --

9     to all of them.

10          THE COURT:  Okay.  Thank you.

11          MS. PAVEL:  Ashley Pavel for AAFAF and PREPA.

12          So AAFAF and PREPA are slightly differently situated

13     from the Oversight Board just by virtue of who the key players

14     were and what our role in the process was.

15          AAFAF didn't hire a separate investment banker or

16     business advisor.  We relied on Citibank, the same advice they

17     gave from the Oversight Board.  And so as a result, AAFAF and

18     PREPA's efforts for their separate work stream were really led

19     by outside counsel, and their internal communications within

20     the elected government parties are discussing the

21     recommendations of counsel and worked on at the recommendation

22     of counsel.  Ankura, AAFAF, and PREPA's financial advisor was

23     working to assist counsel in that direction of counsel, and the

24     particular work streams that Ankura worked on are the demand

25     protection term sheet that Ms. Stafford just discussed, and

1    they worked on some underlying projections that went into the

2    fiscal plan, and we did produce from Ankura's files, the doc --

3    the final documents underlying the demand protection and the

4    PREPA fiscal plan documents that we have.

5            My understanding is the Oversight Board is going to

6    produce the documents underlying the most recent PREPA fiscal

7    plan.

8            THE COURT:  So have you claimed attorney-client

9    privilege; is that what you're saying?

10           MS. PAVEL:  Yes.  We're also claiming deliberative

11   process privilege, but it's not the primary privilege.  The

12   primary privilege here is the attorney-client privilege and

13   attorney work product.  And to the extent anything doesn't fall

14   within that, because of the nature of what Ankura was doing,

15   it's going to fall within the deliberative process privilege.

16           THE COURT:  In your affidavits, who did you submit

17   declarations from?

18           MS. PAVEL:  Only Mr. Sobrino.

19           THE COURT:  And you've -- you've withdrawn that?

20           MS. PAVEL:  Yes.

21           THE COURT:  Do you anticipate filing anything else

22   that would explain your position vis-à-vis the RSA?

23           MS. PAVEL:  We don't know yet, your Honor.  We're

24   still deliberating on that.

25           THE COURT:  Okay.

1           MS. PAVEL:  Okay.

2           THE COURT:  The problem, obviously, is to the extent

3     that you take a position that says I've relied on advice from

4     counsel in making the decision to vote for this plan --

5           MS. PAVEL:  Uh-huh.

6           THE COURT:  -- it's -- it's hard to protect that as an

7     attorney-client privilege communication if you're affirmatively

8     taking the position that you're relying on the advice of

9     counsel, but I don't really know what you're doing at the

10    moment --

11          MS. PAVEL:  I know.

12          THE COURT:  -- if you've withdrawn that affidavit.

13    That's where I am.

14          All right.

15          MS. PAVEL:  All right.

16          THE COURT:  Mr. Bassett.

17          MR. BASSETT:  So a couple of points, your Honor, and

18    I'll start with the issue of the deliberative process privilege

19    being asserted over the demand protection term sheet.  So I

20    think, as we've heard and which is consistent with my

21    understanding and how it has been explained in the various

22    declarations that have been submitted, this is -- this demand

23    protection term sheet is a component of the RSA.  And if you

24    look at David Brownstein's declaration, I don't have the

25    paragraph cite handy, but he touts this particular aspect of

1    the RSA as an important provision of the RSA.  And to the

2    extent that's true and simply because it is part of the

3    agreement that the court is being asked to approve, we think

4    the arguments we have made concerning whether or not the

5    deliberative process privilege appropriately applies in this

6    situation are equally applicable to that issue.  We don't see a

7    principal basis for drawing a line there, and again this is all

8    in our paper and -- in our papers that I won't belabor all the

9    points, but, you know, as your Honor has held in past decisions

10   and in the case law we've cited, the deliberative process

11   privilege does not extend to the situation where the

12   government's decision-making, its intentions, its motivations

13   were those that are at issue in the litigation.

14          And if you look at what the court is being asked to

15   approve here, which is being -- being asked to do here, which

16   is decide whether the entry into the RSA, including the demand

17   protection term sheet, is a reasonable decision by the

18   Oversight Board or the other government parties can't shield

19   communications that go to their decision-making from any aspect

20   of the deal from disclosure.

21          And if you look again, I go back to the declarations,

22   and you have declarant after declarant talking about

23   specifically what objectives they had in mind when they

24   approved the settlement, the fact that those objectives shape

25   the terms and the ultimate agreement consummated in the RSA, I

1    mean, they're relying on what formed the basis for their

2    decision and their effort to have the court approve this

3    transaction.

4         So I don't see how you can then turn around and say

5    but you can't have discovery into that because it's shielded by

6    the deliberative process privilege.  Now, I appreciate that at

7    least as far as the Oversight Board is concerned, they have

8    said that they are limiting that only to the demand protection

9    term sheet issue, but it's still not only a part of the

10   agreement, but an integral part of it as they said in their own

11   declaration.  So our position is that the deliberative process

12   privilege is not appropriately applied to those documents.

13        I -- I want to take you through my other points.  As

14   to AAFAF and PREPA, I guess I'm not -- I'm not entirely sure

15   what the position is.  It sounds like they're saying that all

16   of the documents that could potentially be covered by a

17   deliberative process privilege in their view are also covered

18   by the attorney-client privilege or the work-product doctrine.

19   Even if that's the case, we're still entitled to know whether

20   the deliberative process privilege has been appropriately

21   asserted over those documents, because there may be reasons why

22   the other privileges don't apply.  But I think what -- this

23   leads into another argument in the agenda that I will just

24   quickly address now.

25        I think part of the reason we're having this

1    difficulty and part of my confusion at least is that the

2    approach AAFAF and PREPA have taken in collecting, searching,

3    and reviewing documents in response to our discovery is to take

4    entire huge categories of communications and simply not review

5    them.  So it's not that AAFAF and PREPA have gone and

6    collected, for example, all internal government communications

7    or intragovernment communications, so all their internal

8    communications, not just with counsel, internal among the

9    government officials.  It's not that they've taken those

10   documents, searched them for the relevant custodians, reviewed

11   them, and decided on the basis of what the documents say that a

12   particular privilege applies because the elements of that

13   privilege have been satisfied.  They have taken the position

14   that they -- they may not even collect them at all.  So

15   they -- I could be corrected if I'm wrong, but the position

16   they've told us they're taking is they're simply not reviewing

17   the documents.

18           I don't see how one could possibly say that a document

19   is covered by the attorney-client privilege, the work product

20   privilege, the deliberative process privilege, or any other

21   privilege, if the document is not even reviewed.

22           The same goes for their common interest communications

23   during the relevant date ranges where they're asserting a

24   common interest with the Ad Hoc Group and Assured.  They are

25   not even reviewing the documents.  They're just saying they're

1   privileged, and because they're still likely to be privileged

2   we're not going to review and collect them.

3        So our position is that we need a whole lot more

4   information from AAFAF and PREPA before we can even realize

5   what they're withholding and before we can adequately assess

6   the propriety of the privileges they're asserting.

7        And one last point as to notes which came up in the

8   discussion with the Oversight Board's counsel, I think the same

9   has to hold true for AAFAF and PREPA to the extent that they're

10  decision-makers, they're board, they're CEO, they're CFO,

11  people who are producing documents took notes regarding

12  decision-making, those have to be subject to production in the

13  same way the Oversight Board's are.

14       THE COURT:  So I'm trying to figure out the most

15  efficient way to -- oh, go ahead.

16       MS. STAFFORD:  Sorry.  I just wanted to point out one

17  thing that Mr. Bassett said that is not correct, which is that

18  demand protection provisions would be part of the amended

19  proposed order.  I believe it's -- the demand protections are

20  not included in the amended proposed order, and Judge Swain

21  said in the July 11th hearing that demand protections are one

22  of the items that she's no longer being asked to approve in

23  connection with the RSA.

24       I'd also just want to note that nowhere in what

25  Mr. Bassett just said was there any articulation of how these

1   demand protections bear -- have any bearing on the Jeffrey

2   factors which will form the framework for the court's analysis.

3          THE COURT:  So I think this is one where I do believe

4   it is beyond the scope of what's being asked at the 9019.  So

5   I'm -- I'm going to sustain the deliberative process privilege

6   for those -- for the demand protection term sheet.

7          If you feel that that needs to result in striking any

8   part of the declarations, you can, but I believe that it -- you

9   have the information that was ultimately included, which

10  is -- which are the facts that you're challenging.  I mean

11  you're challenging that this -- the rates are not appropriate

12  or can't be or harms Puerto Rico, or whatever the basis is, I'm

13  not sure, but I think you have the facts that are necessary for

14  that.  I'm not sure -- I think that the 9019 is not going to

15  get into the macroeconomics of this, and for present purposes

16  I'm going to sustain the claim of privilege on that.

17         I'm not hearing an objection to the certified fiscal

18  plan claim of privilege.

19         MR. BASSETT:  We don't take issue with the assertion

20  of the privilege over those documents, your Honor.

21         THE COURT:  Okay.  So unless the privilege log looks

22  very different once you've agreed to the scope of the

23  appropriate privilege log, I think that deals with the

24  Oversight Board's claim of privilege.

25         AAFAF is a bigger issue.  It's a bigger issue with

1   respect to the search for documents.  So maybe we need to hear

2   about that.

3           MS. PAVEL:  Thank you, your Honor.

4           AAFAF and PREPA agreed to search and produce the

5   selection of documents that was most likely to be

6   nonprivileged, our communications with the objectors and with

7   the settling bondholders during time periods in which common

8   interests didn't apply.  We have collected the common interest

9   period communications, but we have not produced them, and we

10  have objected to doing a document-by-document review of those

11  documents for purposes of creating a log.

12          Obviously, whatever ruling the court has today on the

13  common interest issue will have a bearing on what we do next,

14  but at this point we asserted it would be unduly burdensome for

15  us to endeavor to create yet a fourth privilege log.  The other

16  parties have all done categorical logs over that category of

17  communications.

18          With respect to our internal communications, again,

19  those conversations were led by outside counsel, and so we've

20  asserted that those materials are so likely to be

21  attorney-client or work product, and they are so far afield

22  from the objective Jeffrey factors that are before the court

23  right now.  What Nancy Mitchell and Maria DiConza may have said

24  to Christian Sobrino or may have said or asked consultants from

25  Ankura to do to support their work is not only overwhelmingly

1    likely to be privileged, but even if it were found not to be,

2    it's just not particularly relevant to the four objective

3    Jeffrey factors of whether the final agreement is actually

4    reasonable in accordance with those factors.

5         THE COURT:  You've produced your attorneys as

6    witnesses?

7         MS. PAVEL:  Not as witnesses, as two of them are

8    custodians, and we have produced both of their communications

9    with the objectors and with the.

10        Ad Hoc Group and Assured outside the common interest

11   period.

12        THE COURT:  So you have not produced their

13   communications with their client?

14        MS. PAVEL:  No.

15        THE COURT:  And when PREPA voted --

16        MS. PAVEL:  Uh-huh.

17        THE COURT:  -- have you produced -- it sounds to me

18   like you're not producing the same types of information that

19   the Oversight Board is producing.

20        MS. PAVEL:  There was a presentation given to a joint

21   session of the AAFAF and PREPA board, and we logged that on our

22   document-by-document privilege log because we did --

23        THE COURT:  So what you're saying is the Board isn't

24   claiming the privilege for it and you are?

25        MS. PAVEL:  Yes, because ours contains legal

1    recommendations from outside counsel.

2              THE COURT:  At this meeting with both of you?

3              MS. PAVEL:  No, no, no.  The Oversight Board was not

4    there.  It was the board of directors from PREPA and the board

5    from AAFAF that was the joint session.

6              THE COURT:  And you've taken the position that the

7    information that was presented to you on which you based your

8    decision to approve the RSA is privileged?

9              MS. PAVEL:  Yes, your Honor.

10             THE COURT:  Then do you -- so you don't intend to

11   argue that you relied on information from your attorneys or

12   your financial advisors in deciding to approve this?  You're

13   just standing silent on whether you think it's a good decision

14   or not?

15             MS. PAVEL:  I wouldn't say we're standing silent.  I

16   think whether we think it's a good decision is determined by

17   the Jeffrey factors, which look to the realities of the

18   litigation being settled and aren't about internal discussions

19   with attorneys, and so the kind -- the kinds of things we were

20   looking at are the costs of continuing to litigate the receiver

21   motion or continuing to pursue the lien challenge and the

22   appeals that would come from that, and that -- that's the kind

23   of common sense information that doesn't require discovery into

24   attorney-client communications.

25             THE COURT:  And is it your position then that the

1    court makes its own assessment without your input on whether or

2    not this was a reasonable resolution?

3            You may be right.  I don't know.

4            MS. PAVEL:  I think -- the four Jeffrey factors, I

5    said are objective, and the court will look at those objective

6    factors.  There is an element of deference to the government

7    decision-making, but that doesn't mean that there's a

8    full-blown inquiry into every step along the way that the

9    government made and whether that was the best call to make.

10   What it means is that if when you apply those four objective

11   factors and were on the bubble and it's a close call on whether

12   it's within the range of reasonableness that the scales get

13   tipped in our favor.

14           THE COURT:  Well, everybody's agreeing on the

15   definition of the Jeffrey factor.  It just sounds to me like

16   the Oversight Board has taken a different position as to what

17   information is relevant about the merits of the RSA.

18           Am I hearing a difference here or am I making it up?

19           MS. PAVEL:  No, I hear you in that they have produced

20   board materials, and we have not.  I think some of what is

21   going on is that we shared a business advisor, and so as was

22   brought up in the papers, some communications with investment

23   bankers from Citibank between the government parties have been

24   produced because they were business advice, and I think to the

25   extent there's daylight between us, a lot of the difference is

1    that our communications that were separate from the board were

2    legal discussions with counsel and legal advice or Ankura's

3    work on the demand protection and fiscal plan issues that your

4    Honor has just sustained deliberative process on.

5         THE COURT:  All right.  So I guess we have to get into

6    the common privilege now.

7         As it now stands, it seems to me that the declaration

8    of Sobrino has been withdrawn.  There is no alternative

9    declaration.  I have to say that the dec -- the terms of the

10   declaration are important to me, that to the extent that a

11   declaration says that the decision was made based on reliance

12   of presentations or meetings or whatever that that information

13   does need to be produced.  But if you're -- if you're standing

14   pat on that.

15        MS. PAVEL:  Well, we are withdrawing the Sobrino

16   declaration.  I would point out, however, the bulk of

17   Mr. Sobrino's declaration which is in the court record is not

18   about talking about, like, Nancy and Maria had advised him, and

19   that's why he agreed.  The declaration spends a lot of time

20   talking about the publicly available information about the

21   realities of the receivership litigation and how long it had

22   drawn out, and the litigation risks of the lien challenge,

23   there was a paragraph or two at the end, I'm just saying.

24        THE COURT:  He already gave him that information, and

25   he was going to be deposed about it --

1          MS. PAVEL:  Yes.

2          THE COURT:  -- but he --

3          MS. PAVEL:  Right.

4          THE COURT:  So he -- I assume that the original plan

5     was for him to stand up and say, you know, my information was

6     that it was going to take another four years, and this was what

7     PREPA's plans were, and this was inconsistent with it, but

8     right now you don't have anybody --

9          MS. PAVEL:  That's correct, your Honor.

10         THE COURT:  -- to say that your vote was based on that

11    the litigation would take four years?

12         MS. PAVEL:  Yes.

13         THE COURT:  Are there any depositions of PREPA that

14    are scheduled?

15         MS. PAVEL:  There is a 30(b)(6) deposition of PREPA,

16    and we currently have a deposition of Fernando Battle, who is

17    an advisor for Ankura, who will be speaking to some of the

18    topics.  We're still working out some other topics that have

19    been noticed for PREPA and AAFAF now that Mr. Sobrino is no

20    longer an AAFAF employee.

21         THE COURT:  Okay.  Thank you.

22         MS. PAVEL:  Thank you.

23         MR. BASSETT:  Your Honor, just a couple of quick

24    points.  As to the Sobrino declaration having been withdrawn,

25    while that's true, we just learned about that today.  It

1    doesn't mean that the statements that they made in that

2    declaration are all of a sudden no longer relevant topics for

3    discovery.  I mean what they said in their declaration

4    concerning the events that transpired leading up to this

5    element, the decision-making processes that AAFAF and PREPA

6    followed in entering into the settlement, I mean, that was a

7    sworn declaration under oath.  So all the topics and statements

8    made in that declaration are still topics and statements that

9    we can explore.

10          And, you know, this idea that internal communications

11   are completely irrelevant to the Jeffrey factors analysis

12   because it's only an objective analysis, again that's

13   completely belied by all of the declarations not just

14   Mr. Sobrino's that we've received.  That's not the basis upon

15   which they're asking the court to approve the transaction.

16          As I mentioned in my opening remarks in June, on

17   June 7th, at that time they had a different argument.  They

18   said the only thing the court should consider is the amount of

19   the settlement and whether it's discounted enough to be

20   reasonable.  They have since expanded their argument into a

21   whole new host of territories.

22          And we think internal communications from people

23   at -- government officials at AAFAF and their advisors could

24   absolutely be relevant to that, if not the most relevant

25   documents in this entire dispute.  I mean, whether there was a

1      quid pro quo involved in some aspect of the transaction,

2      whether or not people who were actually tasked with approving

3      the transaction believed that it was a deal that makes sense in

4      light of the litigation risks and other considerations whether

5      or not the deal, in fact, has a positive effect on the proposed

6      transformation, all of these things that they're offering is

7      their rationale for the settlement, it's what the

8      decision-makers themselves thought.  Do they actually support

9      those statements or do they not?  Do they completely undermine

10     them?  That's, in our view, all subject to discovery.

11             And another point, I think your Honor was right to

12     point out that AAFAF and PREPA should be held to the same

13     standard as the Oversight Board in terms of producing documents

14     and notes and things like that.  And I just -- I want to make

15     sure that what I was discussing in my remarks a few minutes ago

16     is not lost on the court, but they haven't reviewed any

17     internal communications.  So they may think that they're of

18     marginal relevance.  They may say that their counsel largely

19     led discussions, but they haven't undertaken -- nobody else in

20     this case has taken that position.

21             The Oversight Board, the Ad Hoc Group, Assured,

22     they've all satisfied their discovery obligations by

23     identifying documents that might be responsive, reviewing those

24     documents, and making privilege calls.  AAFAF has just

25     categorically decided we're not going to review any of it.  If

1    it's internal, if there's a document that's between two

2    board -- two board members, if there's a document between two

3    officials at AAFAF talking about their decision to approve this

4    transaction, or even a communication between somebody at AAFAF

5    and somebody at PREPA, they have no idea whether it's relevant.

6    They also have no idea whether it's privileged because they

7    didn't review it.

8            And what we're asking for in our motion is an order

9    compelling them to comply with their discovery obligations and

10   at a minimum search for, review, and log -- we're happy to talk

11   about a categorical log -- to the extent necessary these

12   documents and produce what's not privileged.  That, I don't

13   think we've, you know, have -- I don't think that issue has

14   been resolved, but to be clear that's what we're asking for in

15   our motion.

16           THE COURT:  I do want to understand more fully whether

17   or not that review has taken please.

18           MS. PAVEL:  So for the common interest communications,

19   we have them, and we have done a first-cut review; and if we

20   are ordered to produce those communications, we could roll them

21   out the door very quickly.

22           What we have not done is a document-by-document

23   categorical log.  We have collected the email files for all of

24   our custodians so that we are in possession of any

25   communications between the custodians.  We have not endeavored

1    to do a document-by-document review of those communications

2    because we believe they are marginally at best relevant and

3    overwhelmingly likely to be privileged, and it's not in the

4    interest of efficient litigation for us to undertake a

5    document-by-document review of those documents for purposes of

6    logging them or producing what potential handful of marginally

7    relevant information would be there.

8             THE COURT:  And that's the scope of documents that

9    you're talking about?

10            MS. PAVEL:  For the common interest communications, I

11   believe across both the Ad Hoc Group and Assured it's around

12   3,000.  I don't have a document number as I sit here for the

13   internal communications.

14            THE COURT:  It's not appropriate to make the

15   assumption that the documents are not going to be producible.

16   All right.  So you do need to undertake that review.

17            MS. PAVEL:  Okay.

18            THE COURT:  I also in looking at Mr. Sobrino's

19   declaration, he does talk about this August 17th -- I'm sorry.

20   April 17, 2019, presentation, which was made to the joint

21   session of AAFAF's Board of Directors and PREPA's governing

22   board explaining the key provisions and other analysis.  I mean

23   that's in his declaration.  It seems to me that that position

24   says that the deliberative process can't cover that meeting.

25   You -- you've either waived it or it's not applicable, but you

1    put in the record about this joint presentation, which was the

2    basis for the vote.

3              MS. PAVEL:  Uh-huh.

4              THE COURT:  You can't hide behind the privilege for

5    that.  So you do need to produce the documents -- I

6    don't -- I -- I don't have a full sense of what's out there,

7    but I do think that the board's characterization of what was

8    produceable should apply to PREPA as well.

9              MS. PAVEL:  Yes, your Honor.

10             THE COURT:  So it should be the Board -- now, if you

11   want to claim a privilege on specific information, I'm not

12   telling you you can't do that, but as a general statement, you

13   need to produce the documents reflecting what went on at these

14   meetings, the information that was provided, and that the

15   information that was relied on by PREPA in approving this RSA.

16             MS. PAVEL:  Yes, your Honor.

17             THE COURT:  Okay?

18             MS. PAVEL:  Okay.

19             THE COURT:  And then you can work on the scope of the

20   log, and if there's a problem we'll deal with that at another

21   time.

22             MS. PAVEL:  Yes, your Honor.

23             MR. BASSETT:  Thank you, your Honor.

24             I think that's -- I think that's it for

25   deliberative -- the deliberative process privilege for now.  So

1    I will move on to the common interest privilege.

2         So like many of the other positions the government

3    parties have taken in discovery, they take an incredibly

4    aggressive stance as to their application of the common

5    interest privilege to communications that they had with the

6    supporting bondholders to the deal.

7         As to the Ad Hoc Group, with which the government

8    parties initially entered into a preliminary RSA in July of

9    2018, July 30, 2018, which was later superseded by the

10   definitive RSA, which is the one that's actually being asked to

11   be approved by the court in May of 2019, the government parties

12   take the position and the Ad Hoc Group likewise take the

13   position that the common interest privilege attaches on

14   July 30th when the preliminary RSA was signed and covers all

15   communications that they had with one another concerning the

16   RSA in any way, shape, or form, until May 3rd -- well, through

17   May 3, 2019.  After that it continues to apply.

18        So they're going back to July 30, 2018, and basically

19   their argument is that they had a deal on all material terms of

20   the RSA when they signed a preliminary RSA.  And then because

21   of that all the negotiations that took place for the next nine

22   months are all shielded by the common interest doctrine.

23        And just based on the sheer length of time alone, I've

24   never seen a common interest privilege extended that long in

25   negotiations.  It's hard to believe.  It's also hard to believe

1    because they say that they began negotiating the preliminary

2    RSA in, I believe, May of 2019 and reached -- what they say --

3    May 2018, I'm sorry.  And say that they reached an agreement on

4    all material terms by July.  But yet it took them another nine

5    months or more until May 3, 2019, to actually enter into the

6    final agreement.

7         And if you look at the documents that we've found in

8    discovery thus far, which we cited to in our papers, they

9    demonstrate clearly that there was no commonality and interest

10   to the extent required for the privilege to attach between the

11   Ad Hoc Group and the government parties during that time

12   period.  I mean, we cite documents from the October to

13   November 2018 time period.  This is attached as Exhibit 5 to

14   our initial motion to compel where the Oversight Board and the

15   Ad Hoc Group were talking about changing the structure of the

16   bonds and other -- other terms that would amount to material

17   changes to the original deal.

18        In December 2018, they -- there is discussion about

19   major additional terms being added to the agreement that were

20   unacceptable to clients and a discussion about how the parties

21   at that point were, quote, very far apart.

22        In January --

23        THE COURT:  How did you get that information?  So

24   where is -- where are those -- where's that document production

25   from?

1           MR. BASSETT:  So --

2           (Counsel conferred.)

3           MR. BASSETT:  These -- these were documents, your

4    Honor, that are discussed in the materials.  These are

5    documents that were given to the committee before this

6    litigation occurred.

7           THE COURT:  So this has to do with the receivership

8    motion?

9           MR. BASSETT:  No, your Honor.  These were documents

10   that were voluntarily provided to the committee by counsel for

11   the Oversight Board during the negotiations, before

12   this -- before this settlement was ever --

13          THE COURT:  This is the one whether that's a waiver

14   of -- okay.

15          MR. BASSETT:  That's right.

16          And I also just want to be clear that the -- you know,

17   these comparison charts that the government parties have

18   attached that show the terms of the preliminary RSA versus the

19   definitive RSA, they're designed to show that a lot of

20   provision -- that a lot of the terms have stayed the same and

21   that somehow that's evidence of a continued common interest

22   during the entire time period.  There's a couple of responses

23   to that.

24          One, the cherry-picking provisions for the purposes of

25   making a chart look like there are a lot that are consistent,

1     but the chart itself, if you look at the last four or five

2     rows, has a host of key provisions that many of the declarants

3     rely on and tout as critical components of the deal that were

4     totally unsettled and hadn't even come into being at the time

5     of the preliminary RSA.

6              You had the demand protection issue that we've talked

7     about, remedies that a defaulting party would have under the

8     agreement, securitization protections which are the terms under

9     which the new bonds will be issued.  And then a whole category

10    of how the settlement would be implemented, including the

11    millions of dollars in settlement payments, the hundreds of

12    millions of dollars in adequate protection payments, settlement

13    payments, et cetera, that are being made to the bondholders.

14    These are all provisions that they admit had not been fully

15    agreed upon at the time of the preliminary RSA, yet, they're

16    saying that they have a common interest at every point

17    thereafter.

18             And I think just to address the case law very quickly.

19    I think there may be a -- a bit of confusion on that.  We think

20    the standard in the First Circuit is that there must be an

21    identical or nearly identical interest.  They've cited to your

22    Honor's decision in the ERS case as being to the contrary, and

23    that decision cites the mortgage and realty trust case from

24    California, and the -- the language that they quote is that the

25    privilege applies where the interests of the parties are not

1    identical and even where the parties and interests -- where the

2    parties' interests are adverse in substantial respects.  That

3    doesn't mean remotely what they say it means.  If you look at

4    the very next paragraph in the mortgage realty and trust case,

5    what the court was talking about, that was a case involving a

6    common interest between a creditors committee and a debtor in a

7    Chapter 11 case as to litigation against a third party.  And

8    the point the court was making is that, of course, a committee

9    and a debtor have widely divergent interests in a number of

10   areas in a case.  We have divergent interests with the

11   Oversight Board in this case.  We are on the same side as them

12   and others, and we have asserted common interest in this case

13   as to this other issues.  That's not surprising.

14        What the court was not saying is that parties can

15   diverge as to the issue in question and then have the common

16   interest apply to communications related to that issue.  As to

17   the issue over which the common interest privilege is being

18   claimed, the parties have to have substantially identical

19   interests, and they cite the *Tribune* case, but the *Tribune* case

20   also doesn't support their point.

21        In that case, the court cited to the mortgage realty

22   and trust for the same quote that they've relied on, and in the

23   very next sentence in that case, the *Tribune* case, the *Tribune*

24   court said, When the interests of the parties diverge to some

25   extent, the common interest doctrine applies, quote, "only

1      insofar as their interests are, in fact, identical," end quote.

2            And the communications as to matters which they hold

3      opposing interest lose any privilege.  Now, in that case the

4      *Tribune* court did say, and in the context of negotiations, two

5      parties who are negotiating a transaction can have a common

6      interest even if some terms are being ironed out, but the court

7      only applied that once all material terms had been ironed out.

8      And here that's not our facts.

9            THE COURT:  So what is your -- which of the areas of

10     this that you contend remained adverse that are material?

11     Anything that is on this list that's not yet decided?

12           MR. BASSETT:  Well, I -- it's not just limited to

13     that, your Honor.  What the court needs to keep in mind is that

14     the preliminary RSA was not binding.  And I think that's key

15     because what it was essentially an agreement to agree or an

16     agreement to negotiate.

17           THE COURT:  You still have to flush it out into an

18     agreement, and presumably you can decide that you don't get to

19     that agreement, but your goal at that point is working towards

20     the same -- you have the same interests more than just wanting

21     to settle.  You've defined the principal terms of that, and

22     you're working together to figure out the best way to express

23     that agreement.

24           MR. BASSETT:  That may be so as to certain provisions

25     that the parties have said that they are preliminary --

1    preliminarily agreeing upon, but I -- I don't think that allows

2    them to then shield everything from disclosure, because we have

3    documents showing, for example, you know, they do the

4    comparison that says that the amount of the bonds are the same

5    as to the exchange rates, right?  So the -- the old -- the

6    outstanding bonds are being exchanged for new bonds at certain

7    exchange rates, and they put in their chart that those were the

8    same, and the preliminary are the same, the final are the same.

9    But we now have communications, and I think these are ones that

10   actually somehow were produced in discovery, although I can be

11   corrected wrong by a colleague, that show that the exchange

12   rates were actually in flux through January 2019.  There was a

13   back and forth about whether or not that should be changed.  In

14   fact, at one point it was changed.

15          So I don't -- it would create a very perverse

16   incentive, and this is something that the debtor would do every

17   time it wants to negotiate with a party in this case to say,

18   you know what, just in case we end up successfully agreeing to

19   a deal and we want to put to -- put forth a motion to the court

20   that might be challenged, before we start negotiations let's

21   throw out a nonbinding aspirational term sheet, and if it just

22   so happens that when we actually get to a deal after we've

23   actually negotiated and the terms are similar to those in the

24   original term we put together, then all that shielded it from

25   disclosure, because you can just do a comparison, and things

1    didn't change.  But that's -- it shouldn't be that way.  And

2    that's not what happened because the fact is they had

3    aspirational provisions, and then they negotiated from there

4    and at times were completely at odds with one another.  And as

5    they said in their email correspondence, very far apart.

6           So based on the record that we have, it seems to us

7    that there's not nearly enough for the government parties to

8    satisfy their burden of demonstrating that the common interest

9    privilege should apply here during that entire time period.

10          THE COURT:  Is there a way to say that there was

11   agreement on components of this and not on others?  I mean...

12          MR. BASSETT:  I'm willing to have that discussion with

13   the government parties, your Honor, but I think the response

14   you'll get from them is that, particularly from AAFAF, I'm

15   assuming is that they aren't able to undertake that level of

16   review, but I'm happy to have that discussion to the extent

17   that they think that there are categories of communications or

18   particular emails that they can identify as relating to items

19   that were still being negotiated as to ones that they contended

20   that they weren't.  I'm happy to have that discussion.  I don't

21   think that's the right way to go because again this is a

22   nonbinding agreement.  I don't think they had agreed on any

23   terms in July of 2018.  So nothing should be privileged.

24          THE COURT:  Okay.

25          MS. DALE:  It's Margaret Dale for the Oversight Board.

1          Your Honor, the Exhibit A to our opposition to the

2     renewed motion to compel, or Appendix A, my apologies, reflects

3     the issues upon which in the preliminary RSA and in the

4     definitive RSA the parties had agreement or where there was

5     differences.  And we think that chart is really important for

6     the court to consider because essentially the material terms of

7     the agreement were decided upon entering into the preliminary

8     RSA as of January -- July 30, 2018.  That was with the ad hocs.

9          THE COURT:  As of the time -- at the time of the

10    preliminary RSA, were the terms that were not changed open to

11    be being changed?

12         Could -- could a party have said, okay, we're okay on

13    the exchange of PREPA revenue bonds into traunch A and

14    traunch B, but now we don't want to do that any more.  I think

15    that's what their position is.  Is it the fact that it didn't

16    change doesn't mean that you weren't still negotiating all of

17    the critical changes?

18         MS. DALE:  But, your Honor, that's not --

19    respectfully, I mean, that's just not relevant.  I mean, they

20    didn't change, and the economic terms of the two bonds were set

21    in the preliminary, and they didn't change; and what the cases

22    talk about is minimally identical or nearly identical legal

23    interest in the issue presently before the court, and here I

24    would say the issue presently before the court is whether the

25    terms of the RSA that we're asking for approval, whether we --

1    whether we and the ad hocs as of July 30, 2018, had a common

2    interest, a common legal interest, in getting those terms

3    approved and getting the restructuring of these bonds done.

4            THE COURT:  Well, that's what I'm asking you.  Was

5    there an agreement at that point to have a common interest to

6    have these terms approved --

7            MS. DALE:  That's -- I believe there --

8            THE COURT:  -- per the ones that say we still need to

9    talk?

10           MS. DALE:  Right.  There were the TBDs of the -- I'm

11   sorry, to be discussed in the demand protection section, for

12   example.  But, yes, the -- the economics of the deal were set

13   on -- as of the time the preliminary RSA was negotiated --

14   signed, July 30, 2018.

15           You know, whether there were back and forth and

16   whether people were saying, well, we should do -- you know,

17   maybe there can be more on A and less on B, I believe that did

18   occur, but they did -- overall those -- those -- those terms

19   did not change.  They were the major economic terms, and they

20   didn't change.

21           So with respect to the issue that the court is looking

22   at and deciding right now, there was a common legal interest

23   nearly identical.  The court says there can be some adversity,

24   but I think with respect to getting approval of the relevant

25   terms of the deal and restructuring the bond debt everyone was

1    on the same boat and rowing in the same direction, had the same

2    potential adversaries at that time, right. The UCC wasn't in

3    the deal. The Fuel Line Lenders weren't in the deal.

4         I mean, we're only claiming the common interest

5    privilege with the Ad Hoc Group starting at the time that the

6    preliminary RSA was signed. We have produced our

7    communications with Assured up until the time that we've signed

8    the term sheet on the definitive RSA with Assured and -- I'm

9    sorry.

10        THE COURT: Was that because Assured was not signing

11   on to all of the terms?

12        MS. DALE: Correct. Yes. That was the difference.

13   And so we had to deal with the Ad Hoc Group earlier, and then

14   we were negotiating the things that were still TBD, and I

15   believe that Assured was continuing to negotiate as well, but

16   we weren't claiming a common interest with Assured at that

17   point. And we've produced those communications.

18        And with respect to the waiver point, your Honor,

19   because I didn't want to take a lot of time on this, but the --

20        THE COURT: As I understand it, you provided

21   those -- those documents to them to keep them apprised of what

22   was going on at their request, because there was a potential of

23   them joining or -- or wanting to know what was happening?

24        MS. DALE: They wanted to be kept apprised of the

25   negotiations. They asked us, you know, at various points in

1    time.  They have a special statutory role here.  We gave those

2    documents, I think there were 14 in total, as a -- to them as a

3    professional-eyes-only designation.  We have not claimed

4    privilege here with respect to those documents.  We've produced

5    them.  And according to the -- you know, the case, XYZ case,

6    for example, we have not sought to gain an adversarial

7    advantage in judicial proceedings with respect to any of them.

8    So we don't think we have worked an implied waiver or an

9    implied waiver has occurred here.

10             THE COURT:  I'm also hearing them argue that you

11   waived.  Did I miss an argument?  I could have, but I don't

12   find a waiver.

13             MS. DALE:  Thank you.

14             MR. BASSETT:  We have asserted that argument in our

15   papers, your Honor.

16             THE COURT:  Well, you lost.

17             MR. BASSETT:  Fair enough.

18             THE COURT:  There you go.

19             MR. BASSETT:  Was that it for Ms. Dale?

20             THE COURT:  I don't believe that there was a waiver --

21             MR. BASSETT:  Okay.

22             THE COURT:  -- in connection with the way it

23   was -- the way the information was requested and turned over on

24   a limited basis and not part of the litigation.  I think there

25   was no waiver under the law.  Okay.

1          Does anybody else need to be heard on waiver?

2          MR. HAMERMAN:  Not on waiver.

3          THE COURT:  Okay.

4          MR. BASSETT:  So the issue I wanted to address on

5   common interest was with respect to the government parties and

6   Assured.  We've been talking about the government parties and

7   the Ad Hoc Group to this point.

8          So the -- the issue's a bit different there, so,

9   Assured and the -- well, Assured is claiming two different

10   common interest privileges at two different time periods.

11          One of those is a common interest privilege between

12   Assured and the government parties and the Ad Hoc Group

13   beginning on March 26, 2019, which was the date of a term sheet

14   that preceded the definitive RSA.  And this kind of goes to

15   your Honor's point when you liken the preliminary RSA to a term

16   sheet -- it's the actual term sheet related to the definitive

17   RSA.  It was in March of 2019.

18          THE COURT:  So March was the first one that included

19   Assured?

20          MR. BASSETT:  That was the first that included

21   Assured.  Then the definitive RSA was executed --

22          THE COURT:  In May.

23          MR. BASSETT:  -- in May.  And on that issue it's our

24   position that based on the record that has been presented to

25   us, Assured and the government parties haven't carried their

1    burden of even demonstrating that the transaction didn't change

2    materially from March 26th through May 3rd.  In fact, I mean

3    just from our review of the term sheet, at a minimum there's a

4    fiduciary out provision related to the agreement that was not

5    part of the term sheet that remained to be negotiated that

6    would allow, you know, backing out of the agreement in the

7    appropriate circumstance, and that is something that we think

8    is a material provision of the agreement.

9            So, again, it's not our burden to demonstrate that the

10   privilege is applicable during this time period.  We don't

11   think the government parties or Assured has satisfied it.

12           The other privilege that Assured is asserting is a

13   common interest privilege with the Ad Hoc Group.  So the Ad Hoc

14   Group is also asserting this privilege as well on its behalf.

15   Beginning in October 2018, even though in October 2018, Assured

16   didn't have its common interest with the government parties.

17   So Assured is saying it had a common interest with the

18   government parties as to the RSA beginning in March, but

19   somehow it had a common interest with the Ad Hoc Group relating

20   to the same RSA beginning in October.

21           When I first read that I was confused as to how that

22   could possibly be, and the way the Ad Hoc Group describes it in

23   their papers is that they understood, the Ad Hoc Group

24   understood, that Assured had accepted the economic terms of the

25   settlement in October 2018.  That is simply not possible to

1    believe.

2         In October 2018 and well beyond that for several

3    months, Assured was vigorously litigating the receivership

4    motion, which is being settled as part of this deal against the

5    government parties and clearly had not agreed to the terms of

6    the settlement.

7         So the idea that Assured and the Ad Hoc Group somehow

8    had their own common interests because Assured had accepted the

9    terms of the settlement in October of 2018 is not supportable

10   on the -- on the undisputed record.

11        That's all I have on those arguments, your Honor.

12        THE COURT:  From Assured?

13        I don't think they should have given me a courtroom

14   without a clock.

15        MR. HAMERMAN:  Judge, Natan Hamerman from the Ad Hoc

16   Group, not from Assured, one more time, this time to talk about

17   the various common interest issues.

18        We join in the arguments that the government parties

19   made.  We have a few points, and I'll try to answer some of the

20   questions that Mr. Bassett has posed.

21        First of all, for the reasons I mentioned earlier,

22   because the committee has never contended that the issue of

23   negotiations is truly relevant to any of the topics at the

24   9019, in many respects this is all a side show.  It's all

25   relating to irrelevant communications that don't go to any of

1    the core issues at the 9019 hearing.  These particular

2    communications don't really matter, and so the court can easily

3    deny the motion on that reason alone, but that kind of folds in

4    later in the argument as well, which I'll get to in a second.

5         With respect to demand protections -- well, you know,

6    even before we get there, the committee contends that the

7    common interest claim is incredibly aggressive.  It's not

8    incredibly aggressive at all.  If you look at -- if you look at

9    that chart, the entire structure of the deal was agreed to back

10   in July 2018.  The entire concept that we'll have -- we have

11   these old bonds, what are we going to do with them?  We're

12   going to exchange them for new bonds.  That -- that didn't have

13   to be that way.  It could have been you keep your old bonds.

14   They're coming through, you know, in the reorganized debtor.

15   It could be you don't get any bonds, you get a payment, you

16   become partial owners.  There's a thousand different structures

17   that could have been agreed upon between a creditor like the Ad

18   Hoc Group, like bondholders like the Ad Hoc Group, and the

19   debtors.

20        This overall structure was agreed upon, not just the

21   overall structure, but the exchange rate was agreed upon, and a

22   whole host of other provisions that are enumerated there.  They

23   make it sound like we cherry-picked.  These are the biggest

24   provisions of the deal.  They go to the absolute heart of the

25   economics between the parties, and they are virtually

1    unchanged.

2        Now, your Honor was clearly asking a question about

3    well does that -- is that just lucky?  Is it just lucky that

4    they kind of stayed the same?  That's what Mr. Bassett is

5    implying, that this was just lucky that they stayed this way.

6    No, that's not the case.  Those terms were the agreed upon

7    terms.  If something happened that required a change to those

8    terms, then the parties cooperating together had a discussion

9    about changing those terms.

10       So, for example, one of the documents that they

11   mention in their renewed motion to compel are a series of

12   communications about, well, what happens if these -- if these

13   new securitization bonds become taxable; whereas, before we

14   contemplated and we agreed that we would try to make them

15   nontaxable.  So now the parties are stuck with a situation

16   where they're concerned, it didn't ultimately pan out this way,

17   but they're concerned.  What happens if these are taxable, and

18   they said, well, if they're taxable, in order for the economics

19   to remain the way they were back in July 2018, because we're

20   living by that deal, in order for the economics to remain that

21   way, we need to push on this lever or pull on this lever or

22   modify things slightly in order to make that happen.

23       So rather than showing that the terms were just fluid,

24   and it's lucky that we ended up this place, what the documents

25   that the committee has put in actually show is that the parties

1    were extremely committed to the July 2018 deal and that they

2    recognized -- I'm sorry.  I need to slow down?

3            THE COURT:  Apparently New York lost us, so we need a

4    minute.

5            MR. HAMERMAN:  I'll pause.

6            (Pause.)

7            THE COURT:  I hate to do this midstream, but why don't

8    we take five minutes.

9            MR. HAMERMAN:  Okay.  No problem, Judge.

10           THE CLERK:  All rise.

11           (Recess from 4:01 p.m. to 4:07 p.m.)

12           THE CLERK:  All rise.

13           Please be seated.

14           THE COURT:  We were going to keep going.  So New York

15   is still awake.  All right.

16           MR. HAMERMAN:  Just for -- for clarity of the record,

17   Judge, I was talking about Exhibit 15, which talks to the

18   renewed -- to the committee's renewed motion, which talks about

19   some of these tax concepts.

20           What you'll also see in the chart, which is attached

21   to the government's papers and our papers on the original

22   opposition to the -- to the original motion to compel, another

23   reason that terms changed is because Assured joined the deal,

24   and they negotiated for certain different terms.  So the -- the

25   government parties and the Ad Hoc Group had fidelity to their

1    original deal, except for if something came in and changed and

2    caused the change and caused a reevaluation.

3            You know, Mr. Bassett talks about, well, the original

4    deal was not binding.  I'm not sure why that matters.  He has

5    not cited a single decision that says that that matters.  I

6    don't know why it should matter.  What should matter is

7    not what's -- and what, frankly, weighs in the other direction

8    is not withstanding that an agreement is not binding, nobody

9    left the agreement.  They had a common interest that they

10   worked towards, and nobody left.  There's no decision that I'm

11   aware of that says you have to have a binding agreement in

12   order for a common interest to apply.

13           He talks about the sheer length of time, nine months.

14   Imagine for a moment, Judge, one of the -- one of the most

15   common places that common interest agreements come up is in the

16   joint defense context with criminal defendants.  Those

17   litigations can go on for years.  There's no rule that says

18   nine months is too long for a common interest agreement to

19   apply.  He hasn't cited a decision that says that.

20           So, you know, I really don't think there is anything

21   incredibly aggressive to -- quite to the contrary, I think

22   what's going on with the common interest claims here makes

23   complete sense.

24           THE COURT:  All right.  So the question that I have is

25   the common interest alleged between Assured and the Ad Hoc

1    Group.  But what?  I mean, the common interest is getting this

2    plan approved by the court.  So it seems to me that Assured,

3    who is still not signed onto that until March, the fact that

4    it's getting along with the Ad Hoc Group, I don't see

5    constitutes a common interest.

6              MR. HAMERMAN:  Okay.  So --

7              THE COURT:  If there is a common interest there and

8    not with the -- not with the government parties then I'm not

9    sure then how Assured can have a common interest with the

10   government parties.

11             MR. HAMERMAN:  Sure.

12             THE COURT:  I mean the Ad Hoc Group.  It either breaks

13   it or it doesn't.

14             MR. HAMERMAN:  Let -- let me try to break it down a

15   little bit.  The common interest that we claim arose in

16   October -- in late October or mid-October of 2018 was based on

17   Assured agreeing with the Ad Hoc Group on the economic terms by

18   which it would be folded in to the RSA.

19             THE COURT:  But it didn't agree with the government

20   parties?

21             MR. HAMERMAN:  That's correct.  That agreement didn't

22   happen until March in part because, as Mr. Bassett correctly

23   points out, the receivership motion that was brought by the

24   mono line insurers was going on at that time, but we had agreed

25   with Assured that we had wanted them to be folded into the RSA

1    under these particular terms that we had agreed -- that we had

2    agreed to with them.

3           So there was an agreement with -- between the Ad Hoc

4    Group and Assured that said, let's get you in on this.  It

5    would be -- it would be very good if more parties were part of

6    this RSA.  We have agreed upon how you should be part of RSA.

7    Let's take this back to the government.  Ultimately, it does go

8    back to the government and those tripart -- those tripartite

9    negotiation communications we've produced.  We haven't claimed

10   common interest over those.

11          So between October 18, 2018, and March of 2019, when

12   Assured, the government, and the Ad Hoc Group are commonly

13   discussing folding Assured into the deal, those

14   negotiation-related communications have been produced because

15   we recognize that while -- while we had a deal with the

16   government, Assured did not, and while we wanted Assured to

17   be -- to be part of the deal, the government had not yet agreed

18   to that.  So those communications were, in fact, produced.

19          Come March of 2019, Assured, the government, and the

20   Ad Hoc Group had all agreed on common terms, and so now at that

21   point in time, all parties have claimed what I'll call a

22   tripartite common interest.  So there is a logical basis that

23   dovetails exactly with the fact of how the negotiations and

24   deals went.  We didn't just pick it, and it's not just lucky.

25   It's we -- we worked at this.  We came up with the principled

1    reason, and that aligns with the parties' expectations.

2            THE COURT:  If -- if you had reached a common interest

3    with that -- with Assured in October 18th, did you then have a

4    united front with the government parties?  It's that interim

5    that I'm having a really -- a problem with.

6            MR. HAMERMAN:  Sure.

7            THE COURT:  Not that, yes, we would like as many

8    people as possible to sign on, you know, we're happy that

9    you're signing on, but I don't see where there's a common

10   interest to a goal until you have reached -- because the plan

11   has to involve the government parties.

12           MR. HAMERMAN:  So the plan between the Ad Hoc Group

13   and the government parties did not end or terminate or,

14   frankly, even change in very many material ways once the Ad Hoc

15   Group and Assured agreed that Assured should be folded in.  So

16   that -- the deal didn't go away.  We were still aligned with

17   the government, the Ad Hoc Group was still aligned with the

18   government, and still had a deal with the government.  That was

19   not changed.

20           So insofar as there are communications between the

21   government and the Ad Hoc Group alone about the government-Ad

22   Hoc Group deal, we are continuing to claim common interest over

23   that.  Insofar as there were negotiations to fold Assured into

24   this deal and make it a tripartite deal, we did not claim

25   common interest over those.

1          So that's the, I think --

2          THE COURT:  You are claiming a common interest though

3     with the -- with Assured?

4          MR. HAMERMAN:  Yes, over communications relating to

5     folding them in.  Only between -- only between the Ad Hoc Group

6     and Assured in that period of time, yes, Judge.

7          THE COURT:  Right.  But what were the major terms

8     there because Assured still -- Assured's major terms are still

9     being negotiated with the government parties.  So I'm not

10    sure -- I mean, you didn't commit yourself to pushing Assured's

11    position with the government parties or did you?

12         MR. HAMERMAN:  I -- I don't know the answer to that as

13    I'm standing here.  My understanding is that Assured --

14         THE COURT:  Is there a term sheet?  Is there anything

15    other than that email that says we have a handshake or...

16         Was that you?

17         MR. HAMERMAN:  No, that was -- that was a later

18    communication.  I don't know the answer to your Honor's

19    question.  I'm happy to try to find an answer to it.

20         THE COURT:  That's all right.  It's getting a little

21    late.  Why don't -- let me just hear from Assured.

22         MR. HAMERMAN:  Can -- can I touch on just two other

23    points, Judge, just quickly?  Sorry.

24         The -- the committee talked about -- you know, Judge,

25    I'm going to let it go.

1          Thank you.

2          MR. NATHBONY:   Thank you, your Honor.

3          William Nathbony from Cadwalader on behalf of Assured.

4          First, with respect to the March 26th date, I know

5     your Honor mentioned it, but it wasn't mentioned before, that

6     is we have come forward with evidence of the agreement and the

7     handshake deal in the Ellenberg email that is attached to our

8     papers to support the common interest, the tripart common

9     interest that starts March 26, 2019, as opposed to the date of

10    the signing of the RSA.

11         At that point, all three were moving together towards

12    implementation and finalization of the -- the final RSA, and

13    those communications would be covered by common interests.

14         As far as your Honor's questions relating to

15    October 18th, well, it was at that point that Assured basically

16    joined the negotiation, and we spent a fair amount of time

17    talking to the custodians looking at documents, and that's how

18    we came up with the October 18th date, because that was the

19    first time that basically Assured joined the negotiation.

20         And what is the common interest now between the

21    ad hocs and Assured, which is your Honor's question.  And I

22    think the answer is that they're both creditors.  They're both

23    creditors looking to finalize a deal moving forward.  Now, it

24    may be that the ad hocs have their own communications with the

25    government as well, but from our perspective, you know, just as

1    the ad hocs did, we did not withhold documents from October 18,

2    2018, to March 26 -- March 25 -- excuse me -- 2019, with the

3    government because we didn't believe that the common interest

4    of the government started until March 26 of 2019.

5         But as of October 18, we with the ad hocs were part of

6    a deal to move forward to implement as creditors a deal

7    relating to this.  And the basic economic terms -- I mean, the

8    ad hocs and the government could have said, sorry, Assured, you

9    know, you're not coming aboard, but the bottom line is we had

10   agreement under which terms that we could come aboard, and that

11   is that the negotiation of those -- the language to get that

12   done in the final terms was creditors working together with the

13   government to get something done.

14        And, admittedly, the government is the adverse side of

15   that, but the ad hocs and Assured were not the adverse side,

16   nor were we adverse parties at that point because they had

17   their separate deal, and we were moving forward to join the

18   club.  That's what I have for you, your Honor.

19        THE COURT:  This is where I am right now.  I don't

20   think that we need to have a binding agreement or a finalized

21   deal to have a common interest; and I do believe whether under

22   First Circuit law and the other cases that are cited, there

23   just has to be a substantial identity of interest, but there

24   can't -- and it's on the points that are at issue.  The parties

25   can be an adverse in other situations.

1          I do though believe the record is sufficient to

2     establish the two outside the July 30, 2018, between the

3     government parties and the Ad Hoc Group, and the March 26,

4     2019, for the government parties, Ad Hoc Group, and Assured.

5          I am not accepting that October 18th date.

6     It -- if -- if Assured still has critical issues that it's

7     negotiating to be part of the process to go forward then the

8     fact that they wanted to sign on is not sufficient, that there

9     was still key elements that have not been decided, and those

10    get decided in March 26th of 20 -- the date I think I have is

11    March 26, 2019.

12         All right.  Now, if that then turns into a different

13    issue with specific documents, attorney-client issues, you can

14    raise those, but as a general principle I think that

15    communications between those parties at that point are not

16    privileged.  They are just beginnings of negotiations.

17         Okay.  We are running over.  We can -- we can keep

18    running.  Let me just say a couple of things.

19         I want to go on your list for a minute.  The documents

20    produced by the government's parties in the receivership

21    litigation, I've read all of the papers on that.  The -- I

22    believe the Oversight Board can use them -- I'm sorry -- that

23    the UCC can use the documents.

24         All objections as to relevance and the like can be

25    raised as appropriate.

1          I do want to throw out that it may be appropriate for

2     the efficiency in depositions and the like if the documents

3     that are going to be shown to witnesses before the deposition

4     are exchanged or at least identified shortly before the

5     deposition, especially if you've got a world of documents that

6     have not been sort of focused.

7          I'm not going to order that, but if you guys want to

8     talk about it at all, it tends to work a lot on this, I won't

9     say in bankruptcy cases, but in civil litigation it works if

10    you have a witness that's coming up if you can identify the

11    documents that you want that witness to be familiar with before

12    the deposition.  It tends to make things move smoothly -- more

13    smoothly.  I leave that to you.

14          Assured's loss reserves, I am not going to order them

15    produced.  My reasoning is the same.  It's either right or

16    wrong, but I'm not changing it.

17          So, now, we're getting into the specific categories.

18    Do you want to do that now, or should I take the fuel lines?

19          MR. BASSETT:  I'm happy to proceed either way, your

20    Honor, whichever you would like me to do.  I'm happy to do it

21    right now, if that's most efficient.

22          THE COURT:  How are we holding up?  How are the fuel

23    line people holding up?  Are you holding up?  How about we see

24    if we can do this in, like, 15 minutes.

25          MR. BASSETT:  Fifteen minutes, okay.

1          THE COURT:  All right.

2          MR. BASSETT:  All right.  So I think -- and you

3     probably are following along my Exhibit A here, your Honor.  I

4     think what I'll do is try to consolidate --

5          THE COURT:  Okay.

6          MR. BASSETT:  -- some of the requests into ones that

7     are similar to one another, which will hopefully speed things

8     up.

9          First, the category of requests, and sorry they're not

10    grouped together, so it's skipping around a little bit.  But it

11    would be requests 4, 9, 25, and 26.  These are all requests

12    that one way or another go to the impact of the RSA and the

13    transition charge on other creditors, including information

14    relating to rate projections and ultimately the ability of the

15    Puerto Rico electrical system to absorb the transition charges

16    that are being imposed under the deal.

17         So we have asked that all documents in response to

18    these requests be produced.  The government parties have agreed

19    to produce more limited documents; for example, the Oversight

20    Board has said they will provide analyses, but they won't

21    search for communications, et cetera; and AAFAF basically took

22    the position that they'll give us what was produced in the

23    receivership motion and otherwise produce some documents from

24    Ankura, but not from AAFAF personnel.

25         So very briefly, argument under this as to this issue,

1      your Honor, I think the impact that the RSA has on other

2      creditors is tied specifically to one of the reasonableness

3      factors, which the court must consider which is whether or not

4      and to what extent this settlement affects the paramount

5      interests of other creditors, nonsettling creditors, including

6      the committee.  And it has been our position that this

7      settlement will leave no value for any other creditors and will

8      severely therefore prejudice the rights of unsecured creditors,

9      and we actually raised this during the July 11th hearing with

10     Judge Swain.  And in response to that she said that the court

11     will consider core relevant issues, including contentions that

12     what I'm asked to approve now affects or forecloses legal

13     rights that a nonsettling party contends it would otherwise be

14     able to pursue.  So I think the court has recognized this type

15     of discovery is relevant and permissible.  I would also again

16     go back to the declarations.

17            David Brownstein, paragraph 25 of his declaration,

18     places this squarely at issue.  He says -- and this is in a

19     section that he calls the key economic objectives of the

20     settlement.  And he says that their first key economic

21     objective was that any recovery by PREPA's creditors had to be

22     secondary to the Commonwealth's overall recovery for which the

23     recovery of PREPA plays an important role.  Then he says that

24     meant any agreed repayment of legacy debt could not outpace

25     revitalization of the Island's overall economy, and in

1    particular, the ability of PREPA's customers to pay any

2    increased rates or additional charges required to restructure

3    PREPA debt.  So he places the documents out by all of these

4    requests directly at issue.

5          THE COURT:  But I think you're being generous in your

6    description of what these categories call for.  I think these

7    categories are much more granular and call for a lot of

8    financial information about the rates in particular, and I

9    think Judge Swain was pretty clear that she's not going to be

10   assessing the macroeconomics of this or doing the rate.  She's

11   not being asked to approve any specific rate.  So I think that

12   the categories that give you the analysis and give you the

13   conclusion of -- which you can then argue is no good or you can

14   argue that under these documents there really is no limit to

15   the rates or whatever you want to argue, I think you have the

16   legal argument, and I think you have enough of the facts as to

17   what's actually being charged to deal with it, but I don't

18   think that further -- further documentation is necessary or

19   appropriate from the 9019.

20         MR. BASSETT:  But it's the factual issue as to whether

21   or not it is indeed true, as Mr. Braunstein says in his

22   declaration, that these -- that the surcharge is being imposed

23   under the settlement --

24         THE COURT:  All right.  I'm sorry.

25         MR. BASSETT:  -- are sustainable --

1        THE COURT:  From the beginning.

2        MR. BASSETT:  Are sustainable and can be borne by

3   ratepayers.  And whether there is any additional room to charge

4   additional surcharges to PREPA's customers.  That's -- that's

5   what he places in issue.

6        THE COURT:  I think Judge Swain is going to be arguing

7   or allow -- well, if you have a concern about some testimony

8   that you think is going in, feel free to move to strike it.

9   But as a general principle, Judge Swain, it's my understanding

10   in the 9019, will not be assessing whether or not the rate

11   charges as set or the formula for the appropriate rate charges

12   are appropriate.

13        MR. BASSETT:  It's --

14        THE COURT:  So...

15        MR. BASSETT:  It's not the rates and the levels that

16   are being set.  It's whether or not this settlement leaves any

17   value for other creditors, which goes squarely to the paramount

18   interests of creditors' prong of the reasonableness test.

19        THE COURT:  The reasonableness requests go beyond

20   that, and I'm not allowing them.

21        MR. BASSETT:  Okay.  Thank you, your Honor.

22        Okay.  Do you -- okay.

23        THE COURT:  That has always been when it's a negative

24   ruling, everybody always says thank you.

25        (Laughter.)

1          MR. BASSETT:  So the next one, this one actually is

2     not grouped with other requests.  This is request 8 because, I

3     think, it kind of stands alone, but this is a request for

4     documents relating to alternative restructuring or litigation

5     strategies that the government parties considered.

6          Our position is that these documents should be

7     produced and that we're also entitled to a witness to testify

8     at a 30(b)(6) deposition about these documents or about this

9     the topic.  And the government parties have taken a position

10    that they won't produce documents and won't produce a witness.

11         I mean --

12         THE COURT:  The problem that I have with this request,

13    and anybody can jump up, okay, but if there's not a deal then

14    the fact that people have alternative proposals is interesting,

15    but there's no evidence that it would be agreed to.  So I think

16    if there were other proposals that were submitted to be voted

17    on is a different issue than whether or not each party sort of

18    thought that they had different alternatives.

19         MR. BASSETT:  I mean, our point on this, your Honor,

20    is that if -- I mean, if there was another transaction that was

21    on the table that had been proposed by, say, the bondholders

22    that would have been significantly more favorable to the

23    government parties, for example, and its other constituents,

24    for example, by leaving additional consideration that could be

25    paid out to other creditor groups in a plan, and then that

1    transaction was eschewed in favor of the one that was entered

2    into, that's a relevant consideration that goes to was the

3    transaction that they eventually agreed to actually reasonable.

4            And again, I point to the declarations, and maybe this

5    goes to a motion to strike, but they talk about alternative

6    again.  This is paragraph 71 of the Brownstein declaration.

7    There are a myriad of settlement permutations that perhaps

8    could have been reached, but the settlement negotiation -- the

9    settlement negotiated by the RSA parties that is embodied by

10   the RSA was a reasonable middle ground is what he says.  And I

11   just don't see how he can make these statements, and then we

12   can't test them so maybe again --

13           THE COURT:  How do you -- is there any evidence of

14   agreement to alternatives?  So the fact that you or I can come

15   up with a different way to resolve this doesn't really mean

16   anything unless there's another side to this equation that's

17   going to agree -- that's going to sign onto it.

18           So the -- I mean, I think we just heard from counsel

19   there are a million different ways that you can have structured

20   this.  Do you reissue the same bonds?  Do you just change the

21   rate?  Do you carry over legacy debt?  Whatever it is, I mean,

22   there are these different alternatives.

23           MR. BASSETT:  But what we're asking for is documents

24   relating to the ones that were actually considered.

25           THE COURT:  By who?

1         MR. BASSETT:  By the government parties.

2         THE COURT:  Before they presented them?  I mean, do

3    you have --

4         MR. BASSETT:  It goes --

5         THE COURT:  Do you understand what I'm saying?  They

6    could have presented anything.  They could have sat in a back

7    room and come up with a million different ideas.  But if --

8    unless there's some evidence that there's going to be an

9    agreement to that...

10        MR. BASSETT:  I understand your point.

11        (Counsel conferred.)

12        MR. BASSETT:  I hear the point that your Honor is

13   making, and if the government parties are talking about some

14   other deal that they would like in a perfect world where the

15   bondholders would --

16        THE COURT:  Said don't pay us.

17        MR. BASSETT:  Yeah, would accept nothing, then, no,

18   we're not -- that's not -- that's not the type of documents

19   that we're -- that we're asking for.  But if there were other

20   proposals that were made or considered in the context of

21   negotiations we're entitled to those.  Maybe they'll tell us we

22   already have that, I don't know, but that's the type of

23   information that we're asking for in these requests.

24        THE COURT:  All right.  So to the government parties,

25   to the extent that there were -- if there were agenda items

1    discussing any specific proposals or any votes to extend

2    proposals, those should -- can those be produce?

3            MS. STAFFORD:  Those would have been part of any of

4    the agendas and meeting materials that would have been

5    presented to the board.  And to the extent that such proposals

6    ended up in those types of agendas or meeting materials, they

7    either would have been produced or they will be in our

8    collection of additional board meetings.

9            THE COURT:  So those productions shouldn't be limited

10   just to the RSA that was --

11           MS. STAFFORD:  Correct.

12           THE COURT:  -- eventually agreed upon?

13           Okay.  So broaden that to any proposal.

14           MS. STAFFORD:  It hasn't been to date limited to only

15   the RSA that was ultimately voted upon.  It was other

16   alternatives that were presented as well.

17           THE COURT:  So I think that's sufficient.

18           MR. BASSETT:  The -- the next category, your Honor, is

19   going to be requests 10, 11, and 12 on our chart.  Again, I'm

20   just trying to summarize for the sake of efficiency here, but

21   these are requests that ask for documents related to --

22   generally, that ask for documents related to the effect of the

23   RSA on a proposed transformation, including documents related

24   to the current status of the proposed transformation, its

25   estimated completion date, et cetera.

1      We've asked for a full response to these requests.

2  The government parties, the Oversight Board has said that they

3  will produce documents that refer to the effect of the RSA on a

4  proposed transformation, but we'll leave it to that.  And then

5  AAFAF and PREPA have basically said they'll give us documents

6  produced as part of the receivership litigation, but nothing

7  else.

8      THE COURT:  And that you have the documents from P3,

9  right?

10     MR. BASSETT:  And that we can get documents from P3,

11  yes, they also take that position.

12     I mean, unless again this goes back -- unless the

13  government parties are going to submit revised declarations and

14  submit a revised supplemental memorandum of law in support of

15  their settlement that removes any justification related to the

16  effect that the RSA has on the proposed transformation as part

17  of the reason the court should approve it, then we absolutely

18  have to be able to explore that.

19     THE COURT:  So the way I read it, and I certainly

20  didn't read it in the detail that you have analyzed the

21  economics of this, but the transformation was described as they

22  need to get this litigation behind them, and they need to know

23  what the debt is, and that's the only way that they can move

24  forward -- I mean, that was the extent of really the

25  representation in the declarations.  I think you're free to

1    explore that, but I -- I don't think that the declarations went

2    beyond that.  There was nothing in the declaration that I

3    recall that went --

4            MR. BASSETT:  Well, but -- but --

5            THE COURT:  -- more specifically and that's a -- you

6    know, that's a cross-examination.  That says, you know, are you

7    making this up?  Do you have anybody in mind?  Do you really

8    have any idea whether one year or four years makes a

9    difference?

10           MR. BASSETT:  But those are -- those are exactly the

11   types of issues and questions.

12           THE COURT:  You don't need any documents, you just

13   need me.

14           MR. BASSETT:  But we need documents that show -- that

15   shed light on those issues.  How -- what is -- how likely is

16   the transformation to close?  Are there other issues that are

17   going to either push out the time line indefinitely or cause it

18   to fall apart entirely?  In that case, we shouldn't be entering

19   into a settlement in part based on the notion that that

20   settlement is going to help facilitate a transformation that's

21   just never going to occur anyway.

22           THE COURT:  I'm not going to limit this or pretend to

23   micromanage what happens at the hearing; that's really

24   Judge Swain's decision, and I'm assuming it will flush out more

25   when you have the expert disclosures and the depositions, but

1    those types of arguments don't require document production.

2    They don't.  You have -- you have the declarations.  You have

3    the -- the communications among the parties that were

4    negotiating it.  You -- you have the custodial records of the

5    key players in the negotiation, and you have the presentations

6    that were made, and to the fact that you want to undermine any

7    of these --

8              MR. BASSETT:  Well, I just don't understand how --

9              THE COURT:  -- is a matter of law.

10             MR. BASSETT:  Like Mr. Chapados, he submits an entire

11   declaration on this point to the extent he's taking the

12   position that the proposed transformation is right on track,

13   and this RSA is really going to remove a significant road block

14   and help facilitate it, et cetera, I don't see how being able

15   to only ask him questions in a deposition without getting

16   documents in advance of that deposition that may controvert the

17   things he would say in his deposition, I don't see

18   how -- there's no way just being able to examine a witness

19   gives us what we need to fully explore this significant

20   rationale being put forward for the settlement.

21             THE COURT:  You have the documents from P3, which is

22   the entity that's in charge, right?

23             MR. BASSETT:  We are getting documents from P3, but P3

24   is not a party to this settlement.  P3 is not a party, who is

25   standing before the court saying that the RSA is necessary to

1    facilitate the proposed transformation.  They weren't involved

2    in any way in the negotiations.

3          I mean, to only get their view and not to get the view

4    of the parties who are actually making these statements in

5    their declarations to the court, we think is totally

6    insufficient.

7          THE COURT:  But don't you have the documents from the

8    deponent, from the declarants?

9          MR. BASSETT:  But not --

10          THE COURT:  They're documents about what they have

11    supported.

12          MR. BASSETT:  Not on this issue, that's the point,

13    your Honor.  As to this -- the parties' positions are as laid

14    out in the chart as to these requests.

15          THE COURT:  So the government's position is the

16    Oversight Board will produce documents that refer to the effect

17    of the RSA on the proposed transformation.

18          MR. BASSETT:  Right.

19          THE COURT:  And they've also given you information

20    somewhere along here on -- in the renewed receivership

21    litigation that had all the documents about what the plans were

22    for the transformation, as I understand it --

23          MR. BASSETT:  It has some --

24          THE COURT:  -- I told you you can you use those.

25          MR. BASSETT:  It has some documents related to the

1   proposed transformation, yes.  But the other significant gap

2   that that leaves in the universe of the documents that have

3   been produced in discovery and are available to us is that, I

4   mean, discovery, I don't have the -- I don't have before me the

5   exact date cutoff for discovery in the renewed receivership

6   litigation, but we're talking about meeting the current status,

7   you know, recent information regarding the state of the

8   trans --

9            THE COURT:  That status you can get from P3.  I mean,

10  they're the ones that are negotiating this.

11           MR. BASSETT:  That's --

12           THE COURT:  That's what you need.  That's the facts

13  that you're going to get.

14           MR. BASSETT:  Okay.  As to -- there's two more

15  categories.  Requests relating to legislation and regulatory

16  issues, these are requests 17, 18, and 19, and including

17  communications with the Puerto Rico energy board or the

18  legislature regarding the different approvals that the RSA

19  requires in terms of implementing the surcharge and otherwise.

20           The government parties generally have -- well, yeah,

21  the government parties have generally taken the position that

22  they're not going to produce any of these documents.  We

23  believe that they should be produced.  We believe that they're

24  relevant.  This all basically goes to how likely it is that the

25  settlement is actually going to be implemented because if the

1       settlement calls for certain surcharges to be applied in order

2       to pay these payments to bondholders that they're getting under

3       the new bonds, that all requires regulatory approval and

4       potentially other legislation; and to the extent that that

5       doesn't happen, the settlement can't be implemented.  And the

6       reason why all that matters is because if this settlement falls

7       through and is never approved, it -- there's other

8       consideration that's being offered as part of the settlement

9       that's starting today, right?  The bondholders are receiving

10      what's going to amount to hundreds of millions of dollars in

11      preconfirmation preimplementation payments, and in order to

12      evaluate whether that's an appropriate aspect of the deal, we

13      need to know how likely is it that these -- these rate

14      increases and everything else that the government needs to

15      approve will actually happen.

16              And another -- another quick reason why this is

17      particularly relevant is on July 3rd, a couple of weeks ago,

18      the government parties filed a rate motion with the Puerto Rico

19      Energy Bureau where they are seeking to start implementing the

20      surcharges called for by the settlement, and that rate motion

21      that they filed is inconsistent with what we understood based

22      on the RSA and the government file -- the government parties'

23      filings to date about how the surcharge is going to be

24      implemented.  It's also inconsistent with what they said in the

25      fiscal plan.  What we understood and what they said is that the

1    surcharge will be tacked onto -- to the base rate that

2    electricity customers pay. So there would be a net increase

3    overall in what customers pay. But in this rate motion,

4    they're actually asking it to be offset so the base rate goes

5    down, and then the incremental surcharges is offset against

6    that. And we've asked them. We've actually served

7    supplemental requests that we're still negotiating as to that

8    issue, but these documents that we're asking for regarding

9    communication with regulators, et cetera, are relevant for us

10   to be able to understand what exactly is going on here and what

11   exactly is happening.

12           THE COURT: So let me hear from the government parties

13   on this. And I'm wondering if it's appropriate to do something

14   along the lines that if this -- if any legislation has been

15   proposed that is related to the RSA.

16           MS. STAFFORD: So I'm not aware of any such

17   legislation at this point, but -- but I would note that we

18   viewed these three topics also as being foreclosed by the

19   positions in the statements that Judge Swain made at the

20   July 11th hearing, which were very clear that evidence and

21   arguments going only to whether matters requiring further

22   action by Puerto Rico's elected government officials ought to

23   be approved should not be offered at this juncture. That seems

24   to clearly contemplate the various points that Mr. Bassett

25   would like to make about the feasibility of implementing rate

1    increases or the legislature passing any legislation with

2    respect to these issues.

3              THE COURT:  Okay.  But you're unaware of any

4    legislation that has been proposed?

5              MS. STAFFORD:  I'm not -- I'm not standing here right

6    now, but I -- I haven't done any investigation of that either,

7    so...

8              THE COURT:  Well, it seems to me if legislation has

9    been proposed that's related, you ought to let them know in

10   some form or another.  But I do -- I mean, I have to agree that

11   the argument -- the legal argument that says they haven't

12   proposed any legislation, there's no guarantee that the

13   legislation will be passed.  Those are all issues that can be

14   propounded by you.

15             MR. BASSETT:  Well, but not -- not adequately without

16   discovery.  I mean, if they have documents where they have

17   communications saying that they don't believe that the

18   regulatory approvals they need for the settlement are actually

19   going to be given to them, then that -- then that goes to

20   whether or not it is in any way reasonable to let the

21   government parties pay, you know, hundreds of millions, upwards

22   of a billion dollars potentially to these creditors --

23             THE COURT:  So --

24             MR. BASSETT:  -- for a settlement that is never going

25   to materialize.

1          THE COURT:  I am not prejudging that argument at all,

2     and it is an argument you are free to make, but you are getting

3     in the discovery the documents, the -- the information that was

4     presented to the parties that voted on it.  That may or may not

5     include references to the likelihood of legislation.  I don't

6     know, but you will have their assumptions in connection with

7     the information that weigh the costs and benefits of this

8     proposal, and that's --

9          MR. BASSETT:  But if that -- but if that information

10    is just in a different document, we're not going to get that

11    document.  I mean, it's --

12         THE COURT:  But you are.  Well, it's either there or

13    it's not there, and then your cross-examination is so you

14    didn't consider that it didn't pass.  I -- I don't even know

15    what you're looking for.

16         MR. BASSETT:  I'm looking for an effort to undertake a

17    reasonable search for documents and communications related to

18    the likelihood that regulatory approvals they're seeking and

19    that they need for the settlement will actually be obtained.

20         THE COURT:  I think that the discovery that has been

21    allowed to date on the negotiations that have been produced and

22    the information that has been provided to the entities is

23    sufficient and that you are free to make the unknown argument.

24         MR. BASSETT:  All right.  I understand your Honor's

25    ruling on that issue.

1          The last request is request 20.  This -- this request

2     seeks documents concerning the nature, extent, and value of any

3     security interest that the bondholders hold in assets of PREPA.

4     To be clear, this is the heart of the issue that's being

5     settled.  It goes to the first reasonableness factor and the

6     test which is you know what are the risks inherent in

7     litigating the dispute if no settlement is reached.  And the

8     entire issue there is, in our view at least, is, you know, do

9     these bondholders have a security interest in the assets of

10    PREPA.  If so, to what extent do they have the security

11    interest?  And all we're asking for with this request is

12    documents that go to that particular issue.  So it's hard to

13    see how it could be more relevant.

14         The government parties have said that they're not

15    going to give us documents in response to this request unless

16    they're publicly available.

17         THE COURT:  I'll hear from the government parties.

18         MS. PAVEL:  Your Honor, that's not quite what our

19    response to this request has been.  The nature and scope of any

20    alleged security interest is a legal question.  It has been the

21    government parties' legal position there isn't a lien, and we

22    have filed a lien challenge, and that legal position has been

23    set out in a public manner.

24         In terms of evaluation of anything, it's my

25    understanding from the investigations that we have done to date

1    that PREPA in its ordinary course of business isn't valuing

2    anybody's security interests or doing any kind of, like, net

3    present value calculation.

4          They, of course, have revenue and expense information,

5    which would feed into that, and we've given that information so

6    I don't know that there's even anything other than potentially

7    attorney-client privilege or common interest attorney

8    communications with O'Melveny and Proskauer discussing those

9    issues that could even be provided.

10         THE COURT:  How do you envision this issue being

11   presented at the 9019 hearing?

12         MS. PAVEL:  My reference to the very same legal

13   arguments that we made in the lien challenge, presenting what

14   the controversy was in the litigation and referring to it that

15   way.  It's a legal question.  And they have the trust

16   agreement.

17         THE COURT:  Okay.

18         MS. STAFFORD:  Just one other note we'd want to make.

19   So first of all, the majority of the issues that are being

20   raised by this RFP are really legal in nature and can be

21   determined on the basis of those public documents that we

22   referred to, so the trust agreement and the other associated

23   documents.  And in light of the fact that the receiver motion

24   productions are available to the UCC, and I believe some of

25   them have been produced here, there's ample information about

1     the value of what's in certain accounts as to which, you know,

2     we have disputes about what exactly the lien is that the proper

3     bondholders have, that that would provide them with all the

4     information they need in order to be able to understand and

5     make arguments on that point.

6             THE COURT:  So have you been provide -- producing the

7     account information?

8             MS. STAFFORD:  I would defer to AAFAF and PREPA

9     counsel on that point.

10            MS. PAVEL:  Yes, we have produced account information

11    on the trust agreement accounts, and we have also produced

12    financial statements, cash flow reporting, the analysis feeding

13    up into the fiscal plan.  They have several different

14    iterations of our revenue and expense information.

15            THE COURT:  So, Mr. Bassett, what I wrote down in my

16    notes are legal arguments, have fax re: account information.

17            What don't have?

18            MR. BASSETT:  Well, as to the account information, I

19    mean, one -- one idea that could partially resolve this request

20    is a stipulation with the government parties as to exactly what

21    is the value in the relevant account presently.  So that's

22    something that I'm just --

23            THE COURT:  I think maybe you can talk about that.

24            MR. BASSETT:  So that's -- so that's -- that's a

25    possibility, but beyond that while, yes, we're going to make an

1    argument based on the documentation before the court, it's not

2    entirely -- that's not the entirety of the argument.  I mean,

3    whether the bondholders have a lien and the scope of that lien,

4    yes, is a legal issue, but again there's a factual component to

5    it, which is, you know, what is it -- what is the value of the

6    security interest and, you know...

7         THE COURT:  But isn't that dependent on what's in the

8    accounts?  I mean, isn't -- isn't that the fight here?  I mean,

9    which accounts are relevant and --

10        MR. BASSETT:  That is -- that is in large part what we

11   are fighting about, but I don't know -- I mean, I'm taking

12   their representation that they've produced all the information

13   that we need on that front, and I -- sitting here today, I

14   can't say that we do.

15        THE COURT:  Okay.  Well, as I'm sitting it here it

16   looks to me like it's a legal argument, and it's a critical

17   legal argument but -- because it has to do with is the

18   settlement feasible?  Is it a real issue?  But I don't see that

19   it's a document production.

20        Could we be done?

21        MR. BASSETT:  I think we're done.

22        THE COURT:  Are we done?

23        MR. BASSETT:  The only thing I would say as to all

24   these issues that we have been talking about is, I mean, there

25   has been a lot of rulings made today.

1              Is the court planning to issue a written order?

2              THE COURT:  I will issue an order.

3              MR. BASSETT:  Okay.  Thank you, your Honor.

4              THE COURT:  All right.  Judge Swain, be prepared.

5              (Laughter.)

6              THE COURT:  Okay.  How are we doing?  Everybody with

7       me?

8              Do you need a break?  Are you okay?

9              What are we doing next?

10             MR. HAMERMAN:  We're switching over, and they're

11      coming.

12             THE COURT:  All right.

13             MS. DALE:  Your Honor, may I step out for a moment?

14             THE COURT:  Do you need to be --

15             MS. DALE:  Be part of this?

16             THE COURT:  Be part of this?

17             MS. DALE:  No.

18             THE COURT:  Okay.  Go ahead.

19             MR. KLEINHAUS:  Should I begin, your Honor?

20             THE COURT:  Yes.

21             MR. KLEINHAUS:  Good afternoon, your Honor.  For the

22      record, Emil Kleinhaus from Wachtell, Lipton, Rosen & Katz.  I

23      represent Cortland Capital Markets, LLC, a successor initiative

24      agent on a fuel line facility.  I'm here with my colleague

25      Angela Herring.

1          The Fuel Line Lenders, including lenders under the

2     Cortland facility and lenders under a separate Citibank

3     facility extended a total of approximately $700 million to

4     PREPA so that PREPA could purchase fuel, and I'm here to speak

5     to a motion to compel that Cortland and Solus have brought

6     against the government parties in connection with discovery in

7     this matter.

8          Three quick preliminary comments after listening to

9     everything that we've heard here today.  So far one is we did

10    join in the committee's motions to compel without duplicating

11    any of the things they said.  So we would expect to get the

12    same documents that they'll receive.  I don't expect that will

13    be controversial.  We have so far.

14         The second preliminary point.  This goes to something

15    Mr. Bassett said is we also served supplemental document

16    requests on the government parties relating to a rate

17    application that was made to regulators in Puerto Rico recently

18    in which, as I understand it, PREPA has sought to reduce rates

19    by an amount to offset the amount of the increase or the

20    transition charge; and the reason we served that document

21    request is because the government parties in seeking to support

22    this settlement stated in numerous filings that in applying one

23    of the Jeffrey factors, paramount interest of creditors,

24    creditors here would not be affected or harmed, because this

25    was a supplemental charge.  And then we learned recently that

1     that charge is being offset apparently dollar for dollar by a

2     reduction.  I did not understand your Honor to be presented

3     with that issue or rule on that issue today.  We still haven't

4     gotten a final response from --

5            THE COURT:  I understand that the parties are talking

6     about that.

7            MR. KLEINHAUS:  Correct.  So I just wanted to make

8     clear for the record that we made that request.  We're still

9     waiting for a final response.  If necessary, we'll come to

10    court, but we just didn't understand that issue to be resolved

11    or presented to the court today.

12           THE COURT:  That's right.

13           MR. KLEINHAUS:  Okay.  And then the third point, then

14    we're back to what your Honor said at the very beginning of

15    this hearing.  Between our first motion to compel, really

16    between our requests and then our first motion to compel and

17    our renewed motion to compel, we did actually resolve some

18    issues, a number of issues with the government parties.

19           So it seems like there's a lot of disputes here, and

20    there are, and we still have one dispute, which I think is an

21    important dispute, but we have narrowed things with the

22    government parties over time, and our renewed motion to compel

23    really focuses on one issue that has a few parts.  So I'll turn

24    to that issue now.

25           I'll start with the obvious.  This is a discovery

1    hearing.  It's not a hearing on the merits of the settlement,

2    on the merits of the settlement at this point.  The government

3    parties have put in three separate submissions, include two

4    supplemental submissions, including a second supplemental

5    submission addressing issues particular to the fuel lines and

6    UTIER.  They've put in hundreds of pages of briefing and

7    evidentiary submissions, declarations.  We have not yet filed

8    our objection.  We have a lot to say in response to what was

9    submitted, but that's obviously not what's in front of the

10   court today, and that will be in front of Judge Swain on

11   October 3rd.

12           THE COURT:  Are you going to discuss both your

13   document requests and interrogatories and the deposition of

14   U.S. Bank or is --

15           MR. KLEINHAUS:  I'm not covering U.S. Bank.

16   Mr. Friedman at Simpson Thacher on behalf of Solus will cover

17   U.S. Bank after I finish with the motion to compel vis-à-vis

18   the government parties.

19           THE COURT:  Okay.

20           MR. KLEINHAUS:  So the question before the court with

21   respect to the government parties is whether the government

22   parties should be allowed on the one hand to challenge the

23   status of the fuel lines as current expenses under the trust

24   agreement for PREPA's bonds while on the other hand refusing to

25   produce documents and to provide testimony on that topic, and

1    here's why that's a relevant issue.

2         As your Honor knows, the Fuel Line Lenders have stated

3    in pretrial reports at pretrial conferences and otherwise that

4    contrary to what the government parties have asserted this

5    settlement, not a future plan, this settlement will prejudice

6    the Fuel Line Lenders rights and interests immediately, not in

7    the future and that's because of the relationships between the

8    Fuel Line Lenders' debt and the bond debt under the trust

9    agreement and otherwise.

10         The trust agreement, we will argue in our objection,

11   provides the bondholders with a net revenue lien.  What that

12   means is that the lien is net of current expenses, including

13   the fuel lines.  It also provides the bond holders with

14   recourse to an account that is only funded with net revenues,

15   namely revenues after current expenses are paid, and there's

16   leftover revenue, and that revenue is deposited in the special

17   account.

18         So our position, as we've articulated, is that it's

19   the net revenue that go into that special account to which the

20   bondholders have a claim, but before there are net revenues

21   current expenses have to get paid.  So we don't have a problem

22   with the bondholders getting paid, but our problem is the

23   bondholders getting paid without current expenses and, in

24   particular, the fuel lines getting paid.

25         So that's the basic issue we've raised, and in

1    response to this problem there were a couple of submissions as

2    to how the settlement does not -- well, first -- the first two

3    submissions didn't really address how the settlement does not

4    affect the Fuel Line Lenders rights.  The third supp -- the

5    second supplemental submission and third submission address

6    that.

7            Our basic point with respect to the settlement -- we

8    have a number of points is:  No. 1, it essentially inverts that

9    net revenue relationship.  It turns a net revenue lien into a

10   gross revenue lien, because without paying the current

11   expenses, including the fuel lines, it allows for payments and

12   initiative claims to be made to the bondholders.

13           It also importantly purports to cut off the ability,

14   the legal right of the Fuel Line Lenders, to assert under

15   Section 502 of the Bankruptcy Code, Section 506 of the

16   Bankruptcy Code, and otherwise causes of action and objections

17   to vindicate the argument that I just made about this net

18   revenue lien and the limitations on the claim.

19           So these are aspects of the settlement, and there are

20   others too, including a most favored nation clause, I won't go

21   through it all now, that we believe negatively impact the Fuel

22   Line Lenders now.

23           And in the second supplemental submission after two

24   prior submissions, the government parties offered several

25   explanations as to why, in their view, the settlement does not

1       impact or impair the Fuel Line Lenders rights and interests.

2              Now, that's not in front of the court today, but what

3       is in front of the court today is that one of the arguments in

4       the July 19th submission that was made is an assertion for the

5       first time that the Fuel Line Lenders are not prejudiced by the

6       settlement because the fuel lines are not current expenses at

7       all.  And in particular, they made a number of assertions and

8       statements to support the claim that the Fuel Line Lenders are

9       not current expenses at all.

10             First of all, they said, and here I'm quoting, that

11      there's no acknowledgment from PREPA that the lenders under the

12      Scotiabank credit agreement are current expenses.  That's on

13      page 29 of the supplement.  That's a factual statement about

14      history.  No acknowledgment.

15             Our view and based on the evidence that we already

16      have gathered so far and we're prepared to martial in our

17      objection is that that statement is factually wrong.  There is

18      lots, many acknowledgments by PREPA and others that the lenders

19      under the Scotiabank credit agreement are current expenses.

20      One of those acknowledgments or more than one in many different

21      versions of official statements provided to bondholders, PREPA

22      represented and stated to its bondholders that repayment of the

23      fuel line facilities and future lines of credit to cover

24      operational expenses is treated as a current expense under the

25      trust agreement, which is entitled to be paid before debt

1    service on the power revenue bonds.  That's from the official

2    statement to the bondholders.  That official statement was

3    approved by a resolution, which under Puerto Rico law is

4    incorporated into the trust agreement.  There are many more

5    examples like that that we intend to put forward.

6              THE COURT:  Let me -- let me stop you for a minute

7    though and ask the government entities that -- I want to

8    understand -- I can't rule on the scope of what's going to be

9    presented at this 9019, on this fuel line issue in connection

10   with a motion to compel.  So that doesn't seem the right way,

11   but I do -- clearly, the filing said we don't think that the

12   9019 is going to affect the fuel line rights.  You claim that

13   it is.  I have a question of whether or not Judge Swain can

14   assume that the Fuel Line Lenders are right and still rule on

15   the 9019.

16             I could -- I need to understand where the -- if this

17   is actually coming up at the 9019.

18             MR. CLARK:  Good afternoon, your Honor.  Brandon Clark

19   on behalf of the Oversight Board.

20             I think that the -- Judge Swain actually just

21   yesterday really clarified this exact point for the court in

22   relation to the Andrew Wolfe subpoena, a motion for

23   protection -- for protective order that we had filed, the

24   Oversight Board, and that the judge granted.

25             The reason that I say this is that if you -- if your

1      Honor looks at the briefs for that, the UCC, the committee

2      raises a very similar argument in -- in why they wanted to

3      present Mr. or Dr. Wolfe's testimony at the hearing.  In

4      their -- their opposition to our motion at paragraph 13, they

5      say that they are seeking it -- seeking to introduce it because

6      it's relevant to the extent to which that nonsettling creditors

7      are affected by the RSA.

8              In our reply, we pointed out, this being after the

9      supplemental briefing that counsel was just speaking about, we

10     pointed out why that's not the case.  We went through in some

11     detail and a couple of paragraphs about why the RSA will not

12     impact the -- the nonsettling parties, and the judge in her

13     order yesterday said that for substantially the reasons that

14     were articulated.

15             THE COURT:  I read the decision, and the decision had

16     a lot of grounds for why that -- the declaration shouldn't be

17     admissive -- admissible, including the relevancy of the facts

18     that were being presented.

19             Can you answer my question: Can she go through this

20     9019 hearing and assume that the Fuel Line Lenders are correct?

21             MR. CLARK:  That they're correct about their priority?

22             THE COURT:  That their position is correct, that they

23     should be paid as a current expense first?

24             MR. CLARK:  I think that it is irrelevant to the

25     Judge's ruling on the 9019 motion, and that was the position

1   that we put forth in our papers related to Andrew Wolfe.

2           THE COURT:  Can you assume when she makes her

3   decision, she can assume that the Fuel Line Lenders' position

4   is accurate as to the status of their payments?

5           MR. CLARK:  I think it is immaterial to the judge's

6   decision.

7           THE COURT:  I'm not asking you that.  I'm really

8   asking you the question I want the answer to.

9           MR. CLARK:  I understand you, Judge.  Your -- I

10  understand, Juge.  I guess my answer would have to be that, yes

11  she can assume that because it's not material to the decision.

12  I don't think it factors into the Jeffrey factors.  I think

13  we've laid out in -- in our briefing as to why it is that the

14  approval of the RSA will not prejudice nonsettling creditors,

15  and so she can assume that they're right; she can assume that

16  they're wrong.  I think she doesn't need to reach that

17  decision.

18          THE COURT:  All right.  The other question I have -- I

19  have two more.  One is:  Is there anything in the RSA that

20  precludes the Fuel Line Lenders from completing their adversary

21  proceeding?

22          MR. CLARK:  Nothing that I'm aware of, your Honor.

23          THE COURT:  And what does the provision of the RSA

24  that precludes lien challenges, what does that mean?

25          MR. CLARK:  I'm sorry, your Honor.

1          THE COURT:  There's a provision that says, "No person

2     or entity other than a person or entity acting on behalf of a

3     government party, other than a government party, shall bring a

4     lien challenge so long as there is not a stipulated treatment

5     termination."  I don't know what that means.  Like, does that

6     affect any argument that the Fuel Line Lenders might make?

7          MR. CLARK:  I'm not sure, your Honor, that that is one

8     of the -- one of the issues that's before Judge Swain, as she

9     articulated at the July 11th hearing for what she's being asked

10    to decide at this juncture.  So once again, I don't -- I don't

11    know that that is something that needs to be decided in order

12    to rule on the reasonableness of the -- the portions of the RSA

13    that Judge Swain is going to be asked to approve.

14         THE COURT:  All right.  So he -- can -- I can end this

15    hearing by telling her that she can assume that the Fuel Line

16    Lenders are going to prevail in their position in connection

17    with her ruling on the 9019, and there's nothing that you are

18    presenting to the court or otherwise that would prohibit the

19    adversary proceeding from being completed before she has to

20    rule on the actual plan?

21         I mean, is there anything that's going to happen

22    that's going to derail the adversary proceeding.

23         MR. CLARK:  As pertains to the -- the RSA, I don't

24    believe so, your Honor.  I believe the parties have been

25    discussing whether or not it may be more efficient to not

1    proceed with that at the moment, although I'm not personally

2    privy to all this conversation so --

3              THE COURT:  Settlement is a different issue.

4              MR. CLARK:  Okay.  I want to be sure that I'm just

5    being --

6              THE COURT:  If the Fuel Line Lenders want to have this

7    issue resolved, is there anything that's happening that will

8    prevent that from being resolved before or as part of the final

9    plan?

10             MR. CLARK:  Nothing that I'm aware of.  And -- and

11   just to fall back to what I was saying about what our position

12   is of what Judge Swain needs to decide.  I believe that she can

13   assume that the Fuel Line Lenders will prevail or not prevail

14   and still reach the merits of what she's actually being asked

15   to approve in the 9019 hearing, so...

16             THE COURT:  A lot of people are jumping up here.

17             MS. PAVEL:  Ashley Pavel briefly for AAFAF and PREPA.

18             To grant us a little bit more in what documents are

19   actually needed because there has been lot of back and forth

20   what the legal questions will be.  It's not clear to me what

21   more they would even need.  Like, through the meet-and-confer

22   process, we produced the official statements that were quoted

23   back to you.  We -- the trust agreement's available.  They have

24   their credit agreements.  We've produced the financial

25   reporting showing how balances were treated or not as per

1     expenses.  And we've agreed to produce a 30(b)(6) witness to

2     discuss how PREPA has accounted for the fuel line loans and

3     fuel costs or not as current expenses.

4              So in terms of additional documents that would be

5     needed, it's not clear to me at all.

6              And as another point, the documents that are subject

7     to the motion to compel seem to be going to whether PREPA

8     breached the fuel line credit agreements by not continuing to

9     treat past due balances as current expenses.  But that's a

10    separate question that was going on in the 9019 litigation.

11             What arguably is before Judge Swain in the 9019

12    litigation is to the extent they prevail in their breach of

13    contract claim and they have an unsecured claim for damages how

14    is that supposed to be treated vis-à-vis the bondholders'

15    claim, and is there anything in the RSA that would prevent them

16    from saying their claim should come first in a plan of

17    adjustment.  And I don't believe there is anything in the RSA

18    that would prevent them from litigating that issue at planned

19    confirmation.

20             THE COURT:  Thank you.

21             MR. KLEINHAUS:  All right.  Your Honor, I heard a few

22    things said, and I think if they're taken at face value they

23    could actually resolve our issues to some extent here or to a

24    large extent.

25             Number one, I heard said that the RSA will not release

1    or affect the lien challenge adversary proceeding that was

2    brought.  That's a point that we were going to seek to address

3    and clarify through our objection.  In light of the comments

4    that we heard so be it.  The other thing I heard is that Judge

5    Swain can assume and the Oversight Board and the government

6    parties are content with it seems Judge Swain assuming for

7    purposes of the hearing that the current expense priority

8    argument is meritorious both in terms of the scope of the lien

9    and the claim and in any intercreditor rights.  There -- I

10   understand that point.  There's a body of case law out there as

11   to when settlements can be approved or can't be approved.

12   Despite departures from applicable priority, there's the

13   *Iridium* case in the First Circuit -- in the Second Circuit,

14   excuse me, that addresses that issue.  And if the government

15   parties are planning to argue that despite this assumed

16   departure from priority the settlement should be approved that

17   I understand their position.  We will contest it, but if that's

18   their position, then I think I agree that we don't need the

19   discovery we're seeking and the same is true on the lien

20   challenge.

21        I think the reason we had to bring this renewed motion

22   to compel is in their second supplemental submission, they did

23   argue in part, the first part of their brief, essentially what

24   your Honor asked and what I just said, which is it doesn't

25   matter if we're right as to the scope of the lien and on

1    priority issues because the settlement can be approved anyway.

2    And then -- but then at the end they said things like you're

3    not really a current expense, even though PREPA determined in

4    2012 that you're a current expense and made all kinds of

5    statements to that effect.  We no longer think that.

6         So we felt required to bring the motion to compel to

7    address those statements; and if the government parties are

8    going to stand on what they said, I don't know if there's much

9    more to say.  I certainly don't agree with any of the comments

10   about us not needing more documents in a world in which the

11   government parties plan to litigate those issues now.  So if

12   the Court wants to get into that, I'm prepared to do so and to

13   explain in detail what additional documents we would need, but

14   that doesn't seem necessary given what the government parties

15   have now said.

16        THE COURT:  This is what I wrote down from somebody's

17   brief.  I don't remember if this was yours, but you wrote that

18   the government has refused to confirm that they will not argue

19   the merits of the priority issue, but only that the settlement

20   motion should not be approved regardless of how that issue is

21   decided in the future.  I'm not -- I'm missing a nuance here.

22        MS. DALE:  Yeah.

23        THE COURT:  I guess, let me -- let me -- if this could

24   be done by stipulation, obviously, I would prefer that.  I'm

25   not sure why it can't be.

1          MS. DALE:  May I jump in for a second?  Sorry to

2     interrupt.  Hi.  It's Margaret Dale again for the Oversight

3     Board.

4          I think we were of the position that the Fuel Line

5     Lenders' priority is not something that is subject to the RSA

6     at this point.  But they came in and said, well, we believe

7     that we have a priority that's -- supersedes the bondholders,

8     and so we need all this discovery.  And we said, No, you don't.

9     It's not an issue for the RSA.  And they said, Well, we're

10    making it an issue.  So I'm a little confused because we're

11    saying we don't think it's an issue for the RSA, and that if it

12    down the line they're right, then the judge is going to deal

13    with that as a confirmation issue.  But they then come back --

14    we can't be precluded to -- to say -- we can't be precluded

15    from challenging their priority if that is something that is

16    going to be allowed to happen at the RSA hearing.  That's our

17    position.  We don't think it should come up, but if it does

18    come up, we don't think we can be precluded.

19         THE COURT:  Well, so that's the issue.  The issue is

20    can Judge Swain -- can -- can we report that Judge Swain can

21    decide this assuming that the Fuel Line Lenders are correct?

22    That's the issue.  You can argue that it's irrelevant, but to

23    the extent that it comes up, the question is can she assume

24    it's correct -- that they're correct and rule accordingly,

25         MR. NATHBONY:  May I --

1        THE COURT:  I don't know.  What are you talking about

2    here?

3        MS. DALE:  No, I'm sorry.  I apologize for the delay.

4    I believe your Honor is right so long as we can reserve our

5    rights with respect to this issue that if it does come up that

6    we have -- we've been arguing that they don't have this

7    priority.  So if the judge wants to -- if Judge Swain wants to

8    take the position that the Fuel Line Lenders, you know -- I

9    will just assume that the Fuel Line Lenders' priority is as

10   they claim and proceed with the RSA, and not decide that issue,

11   assume it, not decide it, let everyone reserve their rights, so

12   that, you know, later or at planned confirmation that issue has

13   to be adjudicated, that seems like it's workable to me.

14       MR. NATBONY:  Only with your permission, your Honor?

15       THE COURT:  You have my permission.

16       MS. DALE:  Sure, Bill.

17       MR. NATBONY:  Thank you, your Honor.

18       THE COURT:  So don't --

19       MR. NATBONY:  No, I'm not looking -- I'm not looking

20   to break up any agreement.  I just -- I think your Honor, to

21   the extent that your Honor wants to say that the -- Judge Swain

22   can go forward indicating that that issue is -- is preserved

23   and people's rights are preserved, I think that perhaps is a

24   more appropriate way to proceed as opposed to making an

25   assumption about the merits.  That's the question that I have.

1          THE COURT:  It's a two-prong thing, and I want

2     everybody to be clear on it.  Everybody's rights are preserved,

3     and the understanding would be that the issue can and will be

4     decided at some point if the parties want it decided, because

5     there's nothing in the RSA that precludes it from being decided

6     is number one; and number two, if it's relevant to her analysis

7     of the RSA, I'm not making that decision.  But if it is, she

8     can assume that the Fuel Line Lenders are correct.  It's a

9     two-pronged issue.  I'm hearing okay on that from the

10    government entities.

11          MR. NATBONY:  Well, I mean, I've expressed at least

12    Assured's position that I don't know why the court would have

13    to force an assumption --

14          THE COURT:  I don't see it as an issue or not, but if

15    it's -- if it's potentially going to be an issue, and I'm not

16    prepared to carve out issues --

17          MR. NATBONY:  Right.

18          THE COURT:  -- on the RSA.

19          MR. NATBONY:  Well, your Honor, I was -- I was before

20    Judge Swain when we had our last pretrial conference, as you

21    were, and I thought that -- that the answer to all this was

22    that, you know, the Fuel Line Lender issue would be preserved

23    and dealt with potentially at confirmation.  At least that's

24    what I heard.  That's what I remember, but -- so I'm not even

25    sure why we need to get here because the issue of whether that

1    priority would be determined in the context of the 9019, you

2    know, it never came up.  It wasn't going to be determined

3    during the 9019.  It was a separate and completely unrelated

4    issue.  That was my recollection.

5              Thank you, your Honor.

6              MS. DALE:  Thank you, Bill.

7              Your Honor, I -- I'm very un -- I feel very

8    uncomfortable agreeing that Judge Swain can assume that the

9    Fuel Line Lenders have priority above the bondholders for

10   purposes of whatever she wants to do.  I feel that -- I don't

11   think I can agree to that right now.  I could agree to a

12   reservation of rights, and I'm happy to continue to try to talk

13   to the Fuel Line Lenders, but our -- the reason this became an

14   issue was because we didn't think that issue had anything to do

15   with the RSA, and the Fuel Line Lenders said, No, it has to be

16   decided now, and so here's all the documents we want from you.

17   And we said, We don't think it's an issue, but you can't -- you

18   can't preclude us from raising it if the Court wants to hear

19   that issue.

20             So I apologize if this is unclear, but I think that

21   position is where we end up here, that we don't -- we're not

22   comfortable letting Judge Swain and having somebody come back

23   and say, oh, the Oversight Board said you can assume that the

24   Fuel Line Lenders have priority above the bondholders here.

25   We're not going to be comfortable with that.  Sorry.

1          MR. KLEINHAUS:  Okay.  Well, I think I heard two

2     opposite statements from the Oversight Board in the last

3     10 minutes in this exact answer to this question, and I

4     understand that the last answer is the answer.  I think we have

5     made some progress today in that I heard very clearly from the

6     government parties that the RSA does not impair or affect the

7     adversary proceeding.  That was one of our concerns.

8          To the extent our adversary proceeding is not being

9     released, good, but I just heard now from Ms. Dale that they're

10    not prepared to present the issue to Judge Swain on the

11    assumption that the priority position that we've articulated is

12    correct.

13         THE COURT:  So what I am hearing is that they are

14    prepared to tell Judge Swain that the issue of priority is not

15    relevant to the 9019?

16         MS. DALE:  Correct.

17         THE COURT:  So I don't know if that's enough for you.

18         MR. KLEINHAUS:  It's not.  I mean, the lien challenge

19    point is helpful, but it's not enough, and the reason it's not

20    enough is it's fine for them to say it's not relevant, but the

21    substance of the agreement is what makes it relevant.  We don't

22    want to argue priority now.  We want to -- our clients want to

23    bring their lien challenge and argue about this in a plan.  The

24    problem is the settlement makes that impossible because put

25    aside the nonrelease of the lien challenge.  We have the fact

1    that all of these payments are being coming out ahead of the

2    fuel lines, and these very large administrative claims are

3    coming out ahead of the fuel lines, and there's a most favored

4    nation provision in the agreement.  So there are things

5    happening now in the settlement that if the judge is not going

6    to assume that the fuel lines have priority, the issues being

7    made relevant by certain terms of the settlement, and that's

8    why given that the government is putting those priority issues

9    forward by -- rather than putting it -- I mean, the lien

10   challenge is helpful, but rather than putting off everything or

11   negotiating us in good faith now to try to reach a resolution,

12   they're going ahead with this settlement, making the payments

13   ahead of the Fuel Line Lenders, and giving the admin claims

14   ahead of the Fuel Line Lenders.

15          So there's still an issue here, and given that there's

16   still an issue, and the Oversight Board just said they won't

17   agree at least without further discussion or -- to this

18   assumption, I think at least in part, not totally, in part

19   we're back to where we started 20 minutes ago or so, and the

20   problem is that if they're not willing to make an assumption,

21   and yet they still want to go ahead with the RSA as is, there's

22   lots of factual things that they've said about current expense

23   status.  And I gave one example of that.

24          One example I gave was that they had said they didn't

25   represent or confirm -- there was no acknowledgement that the

1        lenders under the Scotiabank credit agreement are current

2        expenses.  That's a factual statement that we think is just

3        wrong, and we're entitled to discovery to show that that is

4        just wrong.

5                THE COURT:  In light of what AAFAF has said about its

6        willingness to produce information combined with that you will

7        have your adversary proceeding, where are we on your -- your

8        document request?

9                MR. KLEINHAUS:  Well, so they have produced some very

10       limited information, but what they never agreed to produce are

11       any documents relating to the current expense status and the

12       determination that -- that PREPA -- that the fuel lines are a

13       current expense.

14               THE COURT:  They are producing documents showing how

15       they were treated, how the expenses are treated.

16               MR. KLEINHAUS:  Just to give an example, your Honor,

17       there were official statements provided to bondholders saying

18       in so many words that the fuel lines are entitled to be paid

19       before debt service on the power revenue bonds.  That was their

20       official statement.  Communications about that statement,

21       whether external or internal, and there are lots of other

22       examples, including in a fuel line credit agreements where it

23       was represented that the fuel lines are current expenses.

24       Communications about those statements, whether drafts, emails,

25       if they're coming into court now and saying, we didn't give

1    that acknowledgment, that's one thing they're saying.  Another

2    thing they're saying now is whatever determinations we made in

3    2012, ah-ha, we've changed.  So you loaned us $700 million

4    based on determinations made in 2012.  It seems like their

5    theory now is too bad, we changed our mind now.  How can we not

6    be entitled to documents about the initial determinations and

7    the supposed new determination when they're claiming that they

8    changed their mind after seven years?

9            THE COURT:  I'm sorry.  I missed it though.  I thought

10   they were producing that information.  So I'm missing what's

11   not --

12           MR. KLEINHAUS:  They have not agreed to produce any

13   emails or communications about the original determinations that

14   the fuel line loans are current expenses, nor have they agreed

15   to produce emails or communications about the supposed new

16   determination that the fuel lines are not current expenses

17   after seven years.

18           And there's also a deposition issue, which is we want

19   to ask a witness about this stuff, and they've said we can't

20   get a 30(b)(6) on this question of current expenses, which we

21   just don't understand.

22           THE COURT:  Okay.  So on your document -- on your

23   document request does it make sense to sort of just go through

24   them?

25           MR. KLEINHAUS:  Sure.

1          THE COURT:  I guess -- is it -- is AAFAF the one

2     that's producing the information?  Do you want to stand up

3     there, and we'll do them together?

4          We have request No. 5, all the communications since

5     the petition date -- are you following it?  Do you have the

6     same list?

7          MS. PAVEL:  No, but I'm listening.

8          THE COURT:  Do you have your list with you?

9          MR. KLEINHAUS:  I do.

10         THE COURT:  Why don't you stand up there together, and

11    we can go over them.

12         As I understand it you're moving to compel Request 5,

13    6, 8, 9, 10, 22, 23, correct?

14         MR. KLEINHAUS:  Correct.

15         THE COURT:  All right.  So 5 is all communications

16    regarding the status of the fuel line loans as current

17    expenses.  And it's communications with specific entities.

18         Was that being produced?

19         MS. PAVEL:  To the extent it's already encompassed in

20    the negotiation, communications we discussed in connection with

21    the UCC motion, they'd be getting it, but, no, we haven't

22    collected all the way back to the petition date to look for

23    these communications.

24         THE COURT:  All right.  Do you have -- do you object

25    to doing that?

1          MS. PAVEL:  I do think it would be unduly burdensome

2     and very, very marginally relevant.  We are producing all of

3     the underlining financial reporting about how they were, in

4     fact, treated and whether they're entitled to priority or to be

5     treated as current expense now that they're past due balances,

6     that's an legal issue based on the trust agreement, which they

7     already have.  What people said about it isn't -- isn't

8     particularly relevant.

9          THE COURT:  Well, but I think public statements

10     certainly are, and I think you're saying part of the problem is

11     that they haven't made statements to bondholders or...

12          MS. PAVEL:  To the extent this refers to offering

13     statements, we have collected and produced the public offering

14     statements.

15          THE COURT:  Okay.

16          MR. KLEINHAUS:  Two points, your Honor, one I think

17     both on this and on 6, there's not a lot of burden.  There are

18     simple search terms that could be used to look for these; but

19     second, I think the government parties have put at issue this

20     question of determination and acknowledgment of current expense

21     status with a whole bunch of statements in their supplemental

22     filings.  So I don't think it's fair to say they put it at

23     issue by saying they haven't acknowledged it, and then we can't

24     look for documents.

25          THE COURT:  I think five and six are producible, but

1    you need to meet and confer on search terms and appropriate

2    custodians.

3           Eight to me seems overly broad.  I don't know why you

4    need it.

5           The same with nine and ten.

6           MR. KLEINHAUS:  Very briefly, your Honor, I think I

7    would characterize eight through ten as record completing

8    requests in the sense that the -- we think we have a lot of

9    this stuff already.  We just want to make sure we have a

10   complete record of all the borrowing expenses.  And maybe what

11   we could do is meet and confer, and if we are missing stuff we

12   could talk to them, because one of the points they've made is

13   these aren't current expenses, and one of the points we're

14   going to make in response is these were all used to pay for

15   fuel, which is a current expense, and they were all within a

16   defined short-term period.  So we want to have a -- make sure

17   we have a full record to confirm all those things.

18          THE COURT:  I think you can work this one out.

19          MS. PAVEL:  Okay.

20          MR. KLEINHAUS:  Okay.

21          THE COURT:  Twenty-two, relating to current expense

22   treatment of priority of loans made under the Citibank credit

23   agreement.

24          Is that -- isn't that sort of assumed and...

25          MS. PAVEL:  We've pointed them to the public location

1    of the financial records going this far back.  All documents

2    relating to the current expense treatment is very overbroad and

3    would be burdensome to go that far back and try to find

4    everything related to it, but they have the financial

5    reporting, and they know how the expenses were treated.

6            MR. KLEINHAUS:  Your Honor, on this one, I would come

7    back to my earlier comment.  They've now asserted in a

8    supplemental filing that they did not acknowledge the current

9    expense status, and they're redetermining the current expense

10   status.  I think we're entitled to the full record of all their

11   acknowledgments of the current expense status including in

12   communications with bondholders and others.

13           THE COURT:  So what's your difference between five,

14   six and --

15           MR. KLEINHAUS:  Five and six, your Honor, are

16   communications with a number of specific parties; 22 and 23,

17   among other things, would include internal communications.

18           THE COURT:  Do you have the applications for the

19   credit agreements?  Has that been produced?

20           MS. PAVEL:  No, that has not been produced, your

21   Honor.

22           THE COURT:  I think documents relating to whether or

23   not these are treated as current expenses need to be produced,

24   and they need to be produced from January 1, 2020, forward.

25           MR. KLEINHAUS:  2012, your Honor?

1          THE COURT:  I think you need to meet and confer and

2     make that a reasonable request.  All documents relating to

3     anything is too broad.

4          MR. KLEINHAUS:  Fair enough, your Honor.  I think you

5     might have stated 2020.  Just to be clear --

6          THE COURT:  2012.

7          MR. KLEINHAUS:  Okay.  All right.  Thank you, your

8     Honor.

9          I think the only open issue then is the -- the

10    30(b)(6), and we can meet and confer on that as well --

11         MS. PAVEL:  Yes.

12         MR. KLEINHAUS:  -- if the government is amenable?

13         THE COURT:  Okay.

14         MS. PAVEL:  Yes, we can meet and confer.

15         THE COURT:  I don't mean to keep you all here really

16    late, and then you agree.  Okay.  The next hearing starts at

17    4:00.

18         MS. DALE:  Your Honor, it's Margaret Dale for the

19    Oversight Board, and I apologize but I have to clarify for the

20    record a few things relating to -- to the Fuel Line Lenders,

21    because I don't think -- I don't think we spoke correctly

22    before.

23         First of all, I'm looking at the supplemental

24    submission that went in the other day.  One thing I just want

25    to note for the record is that we've said that if the Fuel Line

1    Lenders are really senior, as they contend, then they

2    have -- they retain rights to turnover of funds as well as the

3    court -- the court could deem the plan not confirmable.  So

4    there are alternative methods for the Fuel Line Lenders to be

5    compensated either as a turnover or the plan not, you know,

6    being confirmable.

7            The more relevant issue that I wanted to raise is

8    the -- the Fuel Line Lenders filed a complaint, you know,

9    asserting their sort of *Alleyne* challenge against the

10   bondholders' liens.  We had the same lien challenge, but we're

11   settling that.  The Oversight Board -- the government parties

12   are settling the lien challenge as part of the settlement of

13   the RSA.  So, you know, that -- that is off the table.  They

14   have -- they have their own rights to continue to claim that

15   they have a priority, but we cannot concede that the -- that

16   the Fuel Line Lenders can bring a lien challenge because that's

17   not -- that's not something they can bring.  We could --

18           THE COURT:  They brought an adversary complaint.  The

19   question that I asked was whether or not that can be -- that

20   can play out through conclusion despite the lien provision.

21           MS. DALE:  Despite our settlement of our lien

22   challenge.  And my understanding is that we -- we've never

23   asserted that they had a -- have a right to bring that

24   challenge in the first place, and we haven't -- we can't agree

25   that they can continue to bring an adversary complaint to

1    fruition of their -- for their own lien challenge here.

2            And, you know, I -- I appreciate that -- that I think

3    my colleague misspoke, but it sounded not appropriate to me,

4    and I -- we've gone back to look, and I don't want to leave the

5    record obviously wrong on an issue this important that -- that

6    your Honor raised with us.

7            THE COURT:  And it is very important actually.

8            MS. DALE:  I know.

9            THE COURT:  So I think we are back to --

10           MS. DALE:  I think we are.

11           THE COURT:  -- the agreement.  We'll see what happens

12   at the 9019 then how that's presented in that, but I think it's

13   appropriate.  All right.

14           And the deposition, do we -- I'll deal with it now, if

15   you want to, but do you think you can agree?  And does

16   this involve -- is this the U.S. Bank as well or?

17           MS. DALE:  You should address it.

18           THE COURT:  People I made sit here for hours quietly.

19           MR. FRIEDMAN:  Good afternoon, your Honor.  Bryce

20   Friedman, Simpson Thacher & Bartlett for the Solus parties to

21   address the U.S. Bank issue.  I'll be brief given the hour and

22   everything that has just been discussed.

23           U.S. Bank is the trustee for the bondholders, and we

24   have asked the trustee for the bondholders about the same

25   documents you just ordered.  I think you just ordered the

1    government parties to produce documents whether -- and to the

2    extent that the fuel lines were treated as current expenses you

3    said should be produced.  We asked the U.S. Bank to produce

4    their similar documents, and I think the answer to this point

5    has been no.  This is not a very burdensome request.  We asked

6    the other financial institutions involved to do the same.

7         Citibank, like every other major bank involved in

8    loans of this extent produced a -- a few-page document which

9    said, "Advances under the trade finance facility will be

10   considered by PREPA as current expenses proving priority claim

11   over bondholders and other creditors."  U.S. Bank must have a

12   similar document in its files.  I don't know where they are.

13   We haven't taken a document custodian deposition.  We've asked

14   them to go find it.  I think they were taking a similar

15   position as the other parties were today that it's not

16   relevant.  It clearly is for the reasons my colleague,

17   Mr. Kleinhaus, explained.  So we would like to have the

18   opportunity to receive that small handful of documents.

19         We've also asked U.S. Bank for a deposition.  The

20   deposition was for two purposes.  One is to deal with the lien

21   issue.  They've produced a multipage spreadsheet with a whole

22   bunch of numbers on it, which I think indicate which accounts

23   they think they have control over or money in or have a lien

24   on.  We want to depose a witness, it will be a short witness,

25   to figure out what they actually think they have a lien over so

1       we can respond to it appropriately in an objection.

2              And to the extent that are there are documents that

3       confirm our agreement with U.S. Bank and the fact that they

4       agree with our position on current expenses, like everybody

5       else who was involved prior to this bankruptcy petition, has

6       agreed.  We would ask them a few questions about that as well

7       as in a deposition to confirm their historical agreement and

8       deal with the issues that the government parties have raised

9       in -- in their brief.

10             THE COURT:  So you did -- you did request a deposition

11      topic on the negotiation or entry into the terms of the RSA,

12      and they responded that they didn't -- they didn't negotiate

13      it?  So I don't -- I'm not sure that's what you're really

14      asking for.

15             Are you really asking for how are they treating

16      everything now?

17             MR. FRIEDMAN:  Correct.  What we're interested in is

18      how is this going to change the -- affect our clients.  And

19      they were clearly involved, and I didn't want to get -- we

20      didn't want into -- we tried to avoid a debate over whether --

21      what participation negotiation means.  They were clearly

22      involved.  They said they have many, many privileged documents.

23      If they were truly involved given that they're producing a

24      30(b)(6) witness, it's going to be a very short set of

25      questions.  And they'll say, we had no involvement whatsoever,

1    and we don't know -- we don't know.  But that's really probably

2    not the factual circumstance here based on what we've learned

3    to date.

4              THE COURT:  Who's representing the bank?

5              MR. DUFFEY:  Good afternoon, your Honor.  John Duffey

6    from the Maslon law firm on behalf of U.S. Bank National

7    Association in its capacity as the present bond trustee.

8              I'll take the issues in the same order as counsel

9    raised.  So first with respect to the document request, I think

10   the specific document request that's at issue here is worded

11   differently than the request that you resolved prior that was

12   issued to the government parties.

13             The request here is specifically asking for

14   communications with external parties.  I think that's the only

15   reasonable way to read the request at issue here.  Moreover, as

16   part of the meet-and-confer process, U.S. Bank and the Fuel

17   Line Lenders came to a specific agreement about what was going

18   to be searched for and produced with respect to that request.

19   We complied with that agreement.  They were looking for

20   external communications between U.S. Bank and either PREPA or

21   the PREPA bondholders.  And they agreed to limit the search

22   that U.S. Bank had to conduct to email files using the search

23   terms that they proposed.  We ran those terms against the

24   relevant custodians, and we produced the external

25   communications that result to it.

1          Now, they're seeking kind of, you know, to expand the

2     scope of that request, beyond not only the agreement that they

3     reached, but also even the actual language of the request

4     itself.  And we don't think that that's appropriate at this

5     point.

6          With respect to the depo topics -- sorry.

7          THE COURT:  Do you have a file though that has the

8     original loan documents, the original communications about it?

9     Leave aside the emails.  It seems there's probably an

10    application, there's probably maybe some explanatory material.

11    There are opening forms.

12         MR. DUFFEY:  In terms of -- so I don't think that

13    they've requested anything of that nature.  I mean, their

14    request is specific just for communications regarding the

15    purported fuel line -- the priority status of the fuel line

16    loans, as well as the current expense treatment of that.  So,

17    you know, I don't think that they've requested that, but beyond

18    that, you know, your Honor, I don't think it's appropriate at

19    this stage for them to be seeking that.

20         If you're done with that request, I'll return to the

21    deposition topics.  With respect to the topic number one, which

22    asked about the negotiation entry into in terms of the RSA,

23    the -- the story keeps changing a little bit on the Fuel Line

24    Lenders and as exactly what they're actually seeking testimony

25    on on this topic.

1          We've informed them that the U.S. Bank is not a party

2     to the RSA and that it wasn't one of the parties that

3     negotiated the RSA.  Those are undisputed facts at this point.

4          If they're only really seeking a deposition to

5     understand what our, you know, participation of that is, that's

6     a different story.

7          What they've indicated in their papers is that they

8     actually want to quiz a U.S. Bank witness on the terms of the

9     RSA and how those terms will be implemented.  We think that

10    that's just not appropriate, and we cite case law that

11    indicates that a deposition, a 30(b)(6) deposition, shouldn't

12    focus on issues of contract interpretation.

13         And with regard to counsel's comment about the fact

14    that we've asserted privilege.  The concerns that we have from

15    a privileged nature aren't because, you know, they're necessary

16    privileged communication with U.S. Bank -- between U.S. Bank

17    and their counsel about what's going on, you know, with respect

18    to the RSA.  The concerns we have is that, you know, U.S. Bank

19    wasn't involved in these negotiations, so to the extent that,

20    you know, they're asking for testimony from U.S. Bank about

21    what the RSA actually says and how it's supposed to be

22    implemented, that -- that's the subject of communications that

23    are taking place between U.S. Bank and its counsel in

24    understanding that agreement.  That's just not appropriate

25    for -- an appropriate topic for a 30(b)(6) deposition.

1        With respect to the other topics, topic No. 2,

2   concerning the control of the bank accounts, you know, we've

3   offered to present the two facts that they are looking for by

4   declaration, as opposed to deposition on this front.

5   Specifically, we've offered a declaration that says -- that

6   will say, you know, these are the accounts that are held at

7   U.S. Bank, and also, you know, U.S. Bank's knowledge of any

8   deposit account control agreements regarding the accounts at

9   the other banks.  That's what they've indicated they're looking

10   for.

11        But in their papers they say they actually want to

12   look for something more than that.  They want to be able to

13   fully examine the nature of the security interest at play in

14   the trust agreement, and that's why that line of cases that we

15   cite about how 30(b)(6) topics can't focus on legal conclusions

16   comes into play.

17        Specifically, the way that they've drafted this topic

18   would permit them to question the U.S. Bank witness on a whole

19   host of other questions relating to control that aren't

20   narrowly focused on what accounts are held at U.S. Bank and

21   whether there are deposit control account agreements at other

22   banks.

23        So -- the topic as drafted presents kind of all sorts

24   of issues that under the case law make it an appropriate -- an

25   inappropriate topic -- an inappropriate topic under 30(b)(6).

1           With respect to topic No. 3, so this one seeks

2    testimony on U.S. Bank's position regarding the Fuel Line

3    Lenders' priority status.  Counsel seem to make representation

4    that they're really only looking for testimony about specific

5    communications that we might have produced or, you know, or

6    might be out there that they're aware of about the specific

7    issue, but again the language as actually drafted is much

8    broader than that and would allow the Fuel Line Lenders to

9    question the U.S. Bank witness about actually -- about U.S.

10   Bank's actual position on this legal issue.

11           Again, you know, we cite cases, the *Neponset* case,

12   *W. Holding, Cooper*, all of these routinely reject this type of

13   contention topic and find that it's inappropriate for the

14   purposes of a 30(b)(6) deposition, and the reason why it's

15   inappropriate is these are legal issues, and it's going to be

16   very difficult for a lay witness to divorce the facts that

17   might support that issue from the actual legal conclusion that

18   those facts relate to.

19           Lastly, with respect to the last topic, topic No. 4,

20   again this is just a catchall topic.  They've, you know, to the

21   extent they're just trying to seek testimony to authenticate

22   documents, we've offered a declaration to do that, and we're

23   willing to work with them on a stipulation to do that.  What

24   seems to be clear based on their papers is they actually want

25   to just use this as an opportunity to inquire about anything

1    that's in our production and to ask substantive questions about

2    that.  We did feel that that lacks the specificity required by

3    Rule 30(b)(6).

4            So the only other points I guess I wanted to make were

5    just to reserve U.S. Bank's rights with respect to a couple of

6    things that were said prior to that -- prior to this.  You

7    know, with respect to the position that the Fuel Line Lenders

8    are asserting that -- regarding the scope of U.S. Bank's and

9    the PREPA bond trustee and the PREPA bondholders' liens, we

10   reserve the rights to contest those arguments in the

11   appropriate forum, and we feel that that appropriate forum is

12   the adversary proceeding that -- that your Honor is aware of.

13           And we don't think that this sort of discovery is

14   appropriate within the context of the settlement motion in

15   light of all the arguments that we've raised in our papers.

16           MR. FRIEDMAN:  Your Honor, I would -- this is Bryce

17   Friedman again for the Solus parties.

18           I just would like to make two quick points at this

19   late hour.  I think on the objections to the deposition, what

20   we're hearing is asking requests for prerulings on deposition

21   questions.  We've taken a lot of deposition questions

22   in -- depositions in circumstances just like this where we can

23   ask about the relevant historical facts going back to 2000 that

24   presumably will get a better understanding of once we get the

25   documents that reflect what has happened at U.S. Bank and its

1    agreements with the various bondholders over that time back to

2    2000.  We're not going to ask legal questions.  If you ask me

3    which bank accounts do I control, I would tell you it's my

4    checking account, my savings account, and my retirement

5    account.  Those are factual questions, not questions that

6    require any sort of legal conclusion.  And if there's an

7    objectionable question, there will be an objection and

8    presumably an instruction.

9          As to the specific document requests we made, we

10   disagree over the wording of the requests and what it meant.

11   We tried to clarify for U.S. Bank that it was intended to get

12   at the documents you were asking about, which is the file and

13   the communications that they were made -- making with respect

14   to the current expense treatment of the Fuel Line Lenders since

15   2012.  Unfortunately, we didn't find out until the very last

16   minute that we weren't going to get those stuff.  So here we

17   are.

18         Now that we've clarified it over and over again, I

19   think it would be appropriate for U.S. Bank to give us that

20   file and any communications they had about that one very small

21   issue that is on -- in dispute with our clients.

22         THE COURT:  So I think the -- let me do the disputed

23   document requests first.  All right.  It says all

24   communications since May 4, 2012, with any other person or

25   entity relating to the fuel line loans, including such

1   communications relating to current expense, treatment, or

2   priority status.  It's too broad.  You need to figure out what

3   you're asking for.  All right.  And if -- if the document

4   request is all bank documents or all documents relating to the

5   loans that reflect whether or not these were treated as current

6   expenses, period, that's a more finite request.  I think all

7   documents to any person over a six-year period that may somehow

8   reflect what the treatment of the document -- of the

9   loans -- loans were is too broad.  So can you work on limiting

10  that?

11         MR. FRIEDMAN:  Absolutely.  And we have, your Honor.

12  And we don't know what they call it, but every bank that we

13  have encountered in -- across this has a file.  I think your

14  Honor referred to it as the loan file.  This is a trustee file

15  that explains the payment priorities associated with the

16  $8.4 billion facility and --

17         THE COURT:  So it's not communication.  Okay.  So it's

18  bank documents controlling -- establishing the terms.

19         MR. FRIEDMAN:  There is -- in most, and we have said

20  this.  Again, we haven't got any information back.  There is a

21  loan file that is associated that's the official file, and then

22  after that there is probably some communications with the

23  bondholders over their current expense treatment.  Very narrow

24  areas.  Those are the things that we've asked them to search

25  for and have not gotten any meaningful response that would be

1    hard or burdensome or anything like that.  And it goes back to

2    2012, as your Honor -- as your Honor indicated.

3            THE COURT:  So you can get documents going back to May

4    2012 specifying communications between the bank and -- and

5    identify who you want.  All right.  Relating to whether the

6    fuel line loans are treated as current expense treatment or

7    their -- or their priority status.  But put it in English

8    because it would probably then have a better response.

9            MR. FRIEDMAN:  Fantastic.  And could we also get the

10   loan file.

11           THE COURT:  And then the loan file.

12           MR. FRIEDMAN:  Fantastic.

13           THE COURT:  And that's -- that's the limit.  You two

14   can work it out.  If you can't work it out, file what your

15   proposal is.  I'll rule on it on the papers, and do it by the

16   end of the week, all right?

17           MR. FRIEDMAN:  Yes, your Honor.

18           THE COURT:  On the 30(b)(6) witness, they are entitled

19   to some of this.  They are entitled to a witness that will

20   explain the documents that he has specific questions about.

21   That's not all documents that have been produced.  If you've

22   got a spreadsheet that's a problem that you don't understand,

23   so see if you can identify the documents that you want

24   explained in that.

25           MR. FRIEDMAN:  We'd be happy to send them the whole

1       set of documents that we are going to ask questions about in

2       advance of the deposition, we just need that full set of

3       documents.

4               THE WITNESS:  Okay.

5               MR. DUFFEY:  I just want to address one point

6       regarding the document request.  So I'm not aware of any sort

7       of loan file that they're suggesting, so I'm willing to meet

8       and confer with them about the types of files that an

9       indentured trustee would have related to this.

10              THE COURT:  I don't know what it's called, but there

11      is a file that has the operative documents --

12              MR. DUFFEY:  Okay.

13              THE COURT:  -- that identifies the terms of the loan

14      and the payment processes under the loan.  It's -- it's --

15              MR. DUFFEY:  So just to be clear, that there was no

16      loan from U.S. Bank, but in terms of you're asking for the --

17      essentially, the -- what would be part of the closing

18      transcript related to the bond per se, like, the closing

19      transcript related to -- so, like, the trust agreement and any

20      supplements to that and the like?

21              Again, I'm not asking for specific guidance.  I'm just

22      more so inquiring because there's nothing that --

23              THE COURT:  Identify the official -- how would you

24      have in your possession --

25              MR. DUFFEY:  Sure.

1          THE COURT:  -- information about how these loans were

2     being treated.

3          MR. DUFFEY:  Okay.  I think that we can work together

4     to try to figure out what -- what that means.

5          THE COURT:  All right.  Now, from the Fuel Line

6     Lenders though can you take a declaration as to the

7     specific -- as to U.S. Bank's role in connection with those

8     specific funds?

9          MR. FRIEDMAN:  Yeah, based on what you said today and

10    hopefully the cooperativeness over the next week, we'll take a

11    declaration on any of these documents, frankly, that are going

12    to be admissible and not challenged by -- by -- by -- by any of

13    the parties in order to get some of the more technical stuff

14    in.  We've just -- we're waiting for the declaration.  We can't

15    write it because we don't know what we're looking at.  So we're

16    happy to try and work with counsel to get a declaration or

17    appropriate stipulation to get some of these more technical

18    facts into the record.

19         THE COURT:  I think, for the record, I think the

20    objections are right given the scope.  I recognize that you've

21    tried to meet and confer.  It hasn't worked.  Do one more time.

22    After that just file it, give me both positions, and I'll rule.

23    Okay?

24         MR. FRIEDMAN:  Thank you, your Honor.

25         MR. DUFFEY:  Thank you, your Honor.

1              THE COURT:  Anybody else feel the need to talk?

2              There are some people have been quiet.  No?  We're

3      done?

4              All right.  Thank you, all.

5              THE CLERK:  All rise.

6              (At 5:56 p.m., Court was adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4     certify that the foregoing transcript is a true and accurate

5     transcription of my stenographic notes before the Honorable

6     Judith Gail Dean, to the best of my skill, knowledge, and

7     ability.

8

9

10    /s/ Marianne Kusa-Ryll                        8/1/19

11    Marianne Kusa-Ryll, RDR, CRR                  Date

12    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25