**<u>EXHIBIT E</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

------------------------------x
In re:                                    PROMESA
                                          Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of              Case No. 17-BK-3283-LTS
                                          (Jointly Administered)
THE COMMONWEALTH OF PUERTO
RICO, *et al.*,

                Debtors.

------------------------------x
In re:                                    PROMESA
                                          Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

        as representative of              Case No. 17 BK 4780-LTS

PUERTO RICO ELECTRIC POWER
AUTHORITY,

        Debtor.
------------------------------x

                                          New York, N.Y.
                                          July 11, 2018
                                          10:00 a.m.

Before:

                HON. LAURA TAYLOR SWAIN,

                                          District Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                          APPEARANCES

 2   PROSKAUER ROSE LLP
           Attorneys for Financial Oversight and Management
 3         Board for Puerto Rico
     BY:   MARTIN J. BIENENSTOCK
 4         GREGG M. MASHBERG
           PAUL V. POSSINGER
 5         EHUD BARAK

 6   MASLON LLP
           Attorneys for U.S. Bank National Association
 7   BY:   CLARK T. WHITMORE

 8   CALWALADER WICKERSHAM & TAFT LLP
           Attorneys for Assured Guaranty Corp. and
 9         Assured Guaranty Municipal Corp.
     BY:   WILLIAM J. NATBONY
10         ELLEN M. HALSTEAD
           THOMAS J. CURTIN
11
     WEIL GOTSHAL & MANGES LLP
12         Attorneys for National Public Finance
           Guarantee Corporation
13   BY:   ROBERT BEREZIN

14   WACHTELL LIPTON ROSEN & KATZ
           Attorneys for Cortland Capital Market Services LLC
15   BY:   EMIL A. KLEINHAUS

16   FERNANDO E. AGRAIT
           Attorney for Instituto De Competitividad Y Sostenibilidad
17         Economica De Puerto Rico (ICSE)/Windmar Renewable Energy

18   PAUL HASTINGS LLP
           Attorneys for The Official Committee of
19         Unsecured Creditors
     BY:   LUC A. DESPINS
20         NICHOLAS A. BASSETT
           -and-
21   CASILLAS SANTIAGO & TORRES LLC
     BY:   JUAN J. CASILLAS AYALA
22
     WILLIAM SANTIAGO SASTRE
23         Attorney for Environmental Intervenors

24   CARLOS A. CINTRON GARCIA
           Attorney for SOMOS, Inc.
25
```

```
 1
     DEBEVOISE & PLIMPTON LLP
 2        Attorneys for Syncora Guarantee Inc.
     BY:  ELIE J. WORENKLEIN
 3
     BUFETE EMMANUELLI, C.S.P.
 4        Attorneys for Unión de Trabajadores de la
          Industria Eléctrica y Riego de Puerto Rico, Inc. and
 5        Sistema de Retiro de los Empleados de la Autoridad de
          Energía Eléctrica
 6   BY:  ROLANDO EMMANUELLI-JIMÉNEZ
          JESSICA MÉNDEZ-COLBERG
 7
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
 8        Attorneys for The Ad Hoc Group of PREPA Bondholders
     BY:  THOMAS MOERS MAYER
 9        MICHAEL J. DELL
          NATAN M. HAMERMAN
10        ALICE J. BYOWITZ

11   O'MELVENY & MYERS LLP
          Attorneys for The Puerto Rico Fiscal Agency and
12        Financial Advisory Authority
     BY:  ELIZABETH L. McKEEN
13        -and-
     MARINI PIETRANTONI MUÑIZ LLC
14   BY:  CAROLINA VELAZ-RIVERO
          IGNACIO LABARCA-MORALES
15
     SIMPSON THACHER & BARTLETT LLP
16        Attorneys for SOLA LTD, Solus Opportunities Fund 5 LP,
     Ultra Master LTD, and Ultra NB LLC
17   BY:  BRYCE L. FRIEDMAN

18
     Also Present:  Brady Williamson (by telephone)
19

20

21

22

23

24

25
```

1          (Case called)

2          THE COURT:  Again, good morning and welcome to

3    counsel, parties in interest, and members of the public and

4    press here in New York and in San Juan, as well as the

5    telephonic participants.  Today's renewed pretrial conference

6    relates to the *Joint Motion of Puerto Rico Electric Power*

7    *Authority and AAFAF Pursuant to Bankruptcy Code sections 362,*

8    *502, 922, and 928, and Bankruptcy Rules 3012(A)(1) and 9019 for*

9    *Order Approving Settlements Embodied in the Restructuring*

10   *Support Agreement and Tolling Certain Limitations Periods*.

11   That is docket entry No. 1235 in case 17-4780, which I'll refer

12   to shorthand as the 9019 motion.  That was filed by the

13   Financial Oversight and Management Board, which I'll refer to

14   the Oversight Board as usual, and the Puerto Rico Fiscal Agency

15   and Financial Advisory Authority, or AAFAF, on behalf of PREPA,

16   the Puerto Rico Electric Power Authority.

17          As usual, I remind you that consistent with Court and

18   judicial conference policies and the orders that have been

19   issued, there is to be no use of any electronic devices in the

20   courtroom to communicate with any person, source, or outside

21   repository of information, nor to record any part of the

22   proceedings.  So all electronic devices must be turned off

23   unless you are using a particular device to take notes or to

24   refer to notes or documents already loaded on the device.  All

25   audible signals, including vibrations features, must be turned

1   off, and no recording or retransmission of the hearing is

2   permitted by any person, including, but not limited to, the

3   parties or the press.

4          I remind counsel that due to technological limitations

5   in this courtroom the only live microphone will be the

6   microphone located at the podium, so counsel should speak only

7   into that live microphone so that people in the courtroom in

8   San Juan, as well as those listening in via Court Solutions,

9   will be able to hear clearly.

10          I have reviewed thoroughly the submissions that were

11   made in advance of the June Omni and those that have been filed

12   since in connection with this motion practice.  For the sake of

13   efficiency and focused conduct of this conference, I will now

14   make some extended opening remarks, which include background

15   information and certain rulings.

16          This pretrial conference was originally scheduled for

17   the June 12, 2019, Omni hearing.  Shortly before that hearing

18   the Oversight Board and AAFAF, which I'll typically refer to

19   collectively as the Government Parties, filed two motions *in*

20   *limine*, the first seeking to exclude testimony offered by 16

21   nonprofit advocacy groups and the second seeking to exclude

22   testimony offered by two labor union entities and a renewable

23   energy developer.

24          For the reasons stated on the record at the June

25   omnibus hearing, the Court directed the government parties to

1    clarify the nature and scope of the relief sought in the 9019

2    motion and to supplement the existing record in support of the

3    9019 motion.  Specifically, the Court ordered the government

4    parties to file supplemental submissions and declarations in

5    support of the 9019 motion, including a discussion of precisely

6    what relief the Court is being asked to approve in that motion,

7    the legal authority for such relief, and facts, as opposed to

8    conclusory assertions, that would justify granting that relief.

9          On June 18, 2019, the government parties and certain

10   anticipated objectors filed the supplemental joint status

11   report that is docket entry 1361 in case 17-4780.  The parties

12   to the supplemental joint status report jointly requested that

13   the Court vacate the then operative schedule for prehearing

14   discovery submissions and the hearing, and the government

15   parties submitted an amended proposed order limiting and

16   clarifying the relief sought in the 9019 motion.  The parties

17   advised the Court that they had not reached an agreement

18   regarding the disposition of the two motions *in limine* that had

19   been filed and briefed shortly before the June Omnibus hearing.

20         While the initial proposed order that accompanied the

21   9019 motion sought approval of the restructuring support

22   agreement, or the RSA, in its entirety, the amended proposed

23   order submitted by the government parties as Exhibit A to the

24   June 18, 2019 supplemental joint status report seeks relief

25   that is significantly more limited in nature.

1          Specifically, the government parties now seek Court

2  approval only of certain RSA provisions that would (i) allow

3  the asserted secured claims of the PREPA bondholders who are

4  parties to the RSA, I'll refer to them as the supporting

5  holders, in discounted amounts; (ii) allow the accrual of

6  certain administrative claims; (iii) allow certain settlement

7  and adequate protection payments prior to plan confirmation;

8  (iv) exculpate the supporting holders and the bond trustee for

9  acts and omissions in furtherance of the RSA; (v) require the

10  supporting holders to vote in favor of a plan consistent with

11  the RSA; and (vi) dismiss the receiver motion as to the

12  settling movants.

13          The Court is no longer being asked to approve RSA

14  provisions that would, for example, implement rate increases,

15  impose the settlement charge or transition charge, or implement

16  demand protections or securitization protections.  Furthermore,

17  the government parties are not asking that the Court determine

18  whether the treatment of disputed secured claims proposed in

19  the RSA would be confirmable or not confirmable in the context

20  of PREPA's eventual plan of adjustment.

21          The government parties have filed their supplemental

22  factual submissions and legal arguments concerning this

23  narrowed set of issues, and the parties filed a further joint

24  status report on July 9, 2019.

25          Thus, at the hearing currently scheduled for September

1   11, 2019, the Court will consider whether to approve certain

2   provisions of an agreement embodying a settlement between the

3   Oversight Board and AAFAF as representatives of PREPA, and

4   certain supporting bondholders of PREPA.

5           A motion to approve a compromise or settlement

6   pursuant to Bankruptcy Rule 9019 requires a Court to assess

7   whether the proposed settlement falls below the lowest point in

8   the range of reasonableness.  I cite *ARS Brook, LLC v. Jalbert*

9   *(In Re Servisense.com, Inc.)*, 382 F.3d 68, 71-72 (1st Cir.

10  2004).

11          In evaluating the reasonableness of the settlement,

12  the Court will consider (i) the probability of success in the

13  litigation being compromised; (ii) the difficulties, if any, to

14  be encountered in the matter of collection of the disputed

15  funds; (iii) the complexity of the litigation involved and the

16  expense, inconvenience, and delay attending it; and (iv) the

17  paramount interest of the creditors and proper deference to

18  their reasonable views.  *Jeffrey v. Desmond*, 70 F.3d 183-185

19  (1st Cir. 1995).

20          While, as the Supreme Court stated in the *TMT Trailer*

21  case, the Court must consider evidence that is relevant to a

22  full and fair assessment of the wisdom of the proposed

23  compromise, the Court recognizes that its task on this motion

24  practice is not to determine whether the compromise embodied in

25  the portions of the RSA presented for approval is the wisest

1   possible outcome, but, rather, whether it is within a range of

2   reasonable outcomes and, thus, the 9019 motion seeks limited

3   relief under a review standard that is deferential to the

4   choices made by those empowered to guide the debtors' affairs.

5   *See Protective Committee for Independent Stockholders of TMT*

6   *Trailer Ferry, Inc., v. Anderson*, 390 U.S. 414-424, a 1968

7   decision.

8          Turning now to the pending motions *in limine*, the

9   Court has considered carefully the parties' submissions and

10  will now rule on several aspects of these motions without

11  further oral argument or submissions.

12         The Court first addresses the government parties'

13  motion to preclude the testimonial proffers of the nonprofit

14  energy and environmental advocacy groups that have filed

15  notices of intention to present evidence.  Because the issues

16  presented in this motion practice, that is, the 9019 motion

17  practice, are narrow and do not turn on the major public policy

18  questions that the nonprofits wish to address, the Court grants

19  the government parties' motion to exclude the testimony offered

20  by these 16 nonprofit advocacy groups which are not creditors

21  or official committees and whose concerns are directed to

22  future broad economic and environmental effects of full

23  implementation of the measures contemplated by the RSA.

24         The Court concludes that the nonprofit advocacy groups

25  lack sufficient direct interest in the subset of measures

1   presented for court approval in the present 9019 motion

2   practice to warrant their participation as parties entitled to

3   present evidence and oral argument in connection with the 9019

4   motion.

5          As noted, the evidence that these groups seek to

6   proffer relates primarily to macroeconomic and energy policy

7   issues that are of limited potential probative value in the

8   9019 motion practice and are peripheral to the specific

9   questions that are currently before the Court.  These

10  macroeconomic issues challenge the wisdom of certain government

11  policy choices and actions of elected officials that may be

12  relevant to measures that will require further government

13  action before they are presented to the Court in the context of

14  plan confirmation, and may be relevant to whether a plan

15  proposal embodying the RSA meets relevant PROMESA standards,

16  but they are of, at best, limited probative value to the

17  question of the reasonableness of specific measures that is at

18  the core of this Rule 9019 motion practice.

19         The introduction of testimony from multiple witnesses

20  on these issues will only delay and prolong preparation for the

21  hearing and the hearing itself to an unnecessary degree.

22  Because the nonprofit groups have no direct connection to the

23  specific transactions encompassed in the 9019 motions, and

24  because they seek to introduce evidence of limited probative

25  value, the Court grants the government parties' motion *in*

1  *limine* with respect to these groups.  That motion is docket

2  entry No. 7331 in the Commonwealth's Title III case, which is

3  No. 17-3283, and docket entry No. 1300 in the PREPA Title III

4  case, which is No. 17-4780.

5       The Court now turns to the government parties' motion

6  *in limine* seeking preclusion of the evidentiary proffers of

7  Windmar Renewable Energy, UTIER, and SREAEE.  In light of the

8  considerations just discussed in connection with the proffers

9  of the nonprofit entities, the proffers of evidence from the

10  union entities concerning the anticipated demographic and

11  macroeconomic effects of full implementation of the RSA are

12  precluded.

13       Under Federal Rule of Evidence 403, the Court is

14  empowered to exclude evidence whose probative value is

15  substantially outweighed by added complexity and time

16  requirements associated with discovery and lengthier court

17  proceedings that would be associated with consideration of the

18  evidence on this 9019 motion practice.  The union entities'

19  proffers concerning PREPA's operations and the impact of full

20  RSA implementation on those operations and PREPA's ability to

21  address the costs thereof are also ones whose logistical impact

22  on these narrowly focused 9019 proceedings would outweigh

23  substantially any probative value in connection with the

24  decisions the Court must make on this 9019 motion practice.

25       Accordingly, the government parties' motion is granted

1   to the extent that these elements of the union entities'

2   proffers are precluded pursuant to Rule 403.

3       The motion is also granted with respect to Windmar

4   Renewable Energy's proffers which relate to Windmar's concerns

5   about the potential impact of full implementation of the RSA on

6   solar energy development and on its own future business

7   prospects.  The probative value of these proffers at this

8   juncture is substantially outweighed by the delay and

9   prolongation of proceedings that would be occasioned by their

10  admission and related participation in the expedited discovery

11  leading up to the hearing.

12      The government parties' motion, which is filed at

13  docket entry 7332 in the Commonwealth's Title III case,

14  17-3283, and docket entry No. 1301 in PREPA's Title III case,

15  which is 17-4780, is, therefore, granted at this time except

16  insofar as it is directed to proffers made by the union

17  entities concerning alleged violation of or inconsistency with

18  a 1974 trust agreement.  The Court will ask the government

19  parties and counsel for the union entities to address the

20  nature and purpose of the evidence targeted by that aspect of

21  the motion *in limine* later in this pretrial conference.

22      The Court now turns to the parties' requests presented

23  in the July 9, 2019 joint status report, which is docket entry

24  No. 1452 in the PREPA Title III case, which is 17-4780, for

25  modification of the current briefing schedule pertaining to

1  discovery motions.  That request is granted with some minor

2  changes.

3          First, the deadline for replies to discovery motions

4  and motions to quash is extended only to 11:59 p.m. on July 25,

5  2019; that is, July 25.  Furthermore, the Court will require

6  that any additional discovery motions filed after July 16, 2019

7  be accompanied by a showing of good cause, and the Court will

8  take any such later filed motions on submission.  The Court

9  will enter an appropriate order after the conclusion of today's

10  conference.

11          In light of the limited scope of the questions

12  presented by the Rule 9019 motion, the deferential decisional

13  standard, and the judicial efficiency and economy concerns that

14  have been discussed in these remarks, the Court is of the view

15  that evidence and argument at the 9019 hearing ought to be

16  focused tightly on identification of the range of reasonable

17  settlement outcomes and whether the aspects of the agreement

18  currently submitted for approval fall within that range and

19  facts directly relevant to any legal injury that a party

20  contends it would suffer as a direct result of the granting of

21  the specific relief sought.  Evidence and arguments that go

22  only to the confirmability of a potential plan based on the

23  full scope of the RSA and to whether the matters requiring

24  further action by Puerto Rico's elected government officials

25  and agencies of the Puerto Rico government ought to be approved

1    should not be offered at this juncture.

2         With these parameters the Court anticipates that the

3    Rule 9019 hearing can and should be concluded within nine

4    hours, encompassing the presentation of any live testimony and

5    all oral argument by participating parties in interest.

6         In the next portion of this conference the Court

7    invites the parties to speak to the following questions:

8    First, what legal and factual issues the party considers core

9    to the Court's determination of whether the proposed settlement

10   features fall below the lowest point in the range of

11   reasonableness and what is the general nature of the evidence

12   that the party intends to present and how that evidence is

13   connected to the core issue of reasonableness;

14        Second, as to the contentions of the fuel line lenders

15   and the union entities, whether the RSA's lien challenge

16   provision, or any other provision that the Court is being asked

17   to approve at this juncture, would preclude nonsettling parties

18   from enforcing rights and seeking remedies they would otherwise

19   have legal rights to assert. Relatedly, how does this issue

20   fit into the Court's inquiry with respect to the reasonableness

21   of certain provisions of the RSA and whether this question is

22   one properly addressed within the scope of the 9019 motion?

23   Any argument regarding the remaining aspects of the motion *in*

24   *limine* concerning the union entity's proffers should be

25   presented in the context of this set of questions, and

1   particularly as to the union entities I have in mind their

2   references to inconsistency with the 1974 trust agreement.

3         Third, whether the party anticipates any difficulty in

4   presenting its evidence and arguments within the overall

5   nine-hour time frame that the Court is contemplating which

6   provides about a day and a half for the hearing in its

7   entirety;

8         And, fourth, any other issues related to the 9019

9   motion practice that the party believes it must bring to the

10  Court's attention at this time.

11        I expect to conclude this pretrial conference by noon.

12  We will now take a 15-minute break.  During that break the

13  parties who wish to address the Court must confer as to

14  allocation of the remaining time, which will be just under an

15  hour and a half.  We will call it an hour and a half.  That

16  will be easier.  And they must inform the law clerks of their

17  agreed allocations of that time before we recommence.

18        I'll see you in 15 minutes.  Thank you.

19        (Recess)

20        (Continued on next page)

21

22

23

24

25

1          THE COURT:  Thank you for arranging your time

2     allocations.  Before I call on the government parties, I have

3     gotten word that Mr. Williamson, the fee examiner, is on the

4     phone line, and we have made his line live.  I understand that

5     he would like to make a comment.

6          Mr. Williamson, are you there?  Perhaps not at the

7     moment.  So, before we close up, I will check in again for

8     Mr. Williamson.  And we will go straight to the remarks of the

9     parties, and so I understand that the Oversight Board has

10    requested to start off with 20 minutes.

11         MR. BIENENSTOCK:  Thank you, your Honor.

12         THE COURT:  Good morning, Mr. Bienenstock.

13         MR. BIENENSTOCK:  Good morning, Judge Swain.  Martin

14    Bienenstock of Proskauer Rose LLP for the Financial Oversight

15    and Management Board as PREPA's Title 3 representative.  Your

16    Honor, hopefully this will turn out accurate, but we hope not

17    to use all of our time.

18         Of the four questions that the Court asked us to

19    address, on the last two we do not anticipate an issue with the

20    nine hour hearing, and we don't have any additional issues to

21    raise that I am aware of.

22         So, on the first two issues the way we see it is as

23    follows:  The first issue was legal and factual issues relevant

24    to the reasonableness inquiry and what evidence.  As your Honor

25    already knows, PREPA has essentially put on the record its

1    direct case through the four declarations and the supplementary

2    brief, and unless we learn something in the discovery process

3    going forward that shows us a hole that we need to fill in, our

4    direct case is pretty known.  The only thing I want to point

5    out about it is this:

6         We have identified three key benefits of the

7    settlement.  One is there is a cap on rate hikes.  Two is there

8    is basically no rate covenant, or receivership remedy or

9    default to worry about because the bonds are being issued by a

10   new entity, and they can only look to that entity for their

11   revenue.  And the third benefit was the savings that, depending

12   on how things work out, were mathematically calculated by

13   Citibank as being between 2 billion and 3 billion.

14        Each of those we believe are fairly objective,

15   discernible, and we don't know how it can be disputed, so the

16   only real issue is are those enough benefit to warrant the

17   allowance of the secured claims in the discounted amounts we're

18   proposing and to make the payments that we're proposing.

19        Now, the objectors, or at least the UCC, says that

20   there should be a lien challenge.  We have actually helped

21   their case, because out of an abundance of prudence we filed a

22   lien challenge so as not to have to rely on tolling, etcetera,

23   so your Honor will have in front of you what the case would be

24   if we were attacking the liens, and we can argue as a matter of

25   law why we think the settlement makes sense, notwithstanding

1   that we could file a complaint in good faith attacking the

2   liens.

3          In terms of the fuel line lenders' argument, my

4   understanding is -- there had been a previously proposed RSA

5   with PREPA bondholders, and it got so far as some validation

6   proceedings in the Commonwealth courts, and it was pointed out

7   there that the trust agreement that the fuel line lenders are

8   relying on to assert their seniority they are not a party to,

9   and the document says there are no third-party beneficiaries,

10  and that's what the Commonwealth court observed the last time

11  around.

12         So, we think that the fuel line lenders' issue of

13  seniority and priority is going to really be a matter of law.

14  We're going to look at whatever documents they say grant them

15  these priority and seniority rights and, as a matter of law,

16  the Court can determine whether they have them and they're

17  being prejudiced by the settlement.

18         Another issue they have -- just not to overlook the

19  obvious -- is they don't claim they're secured.  They can't.

20  They don't have any security documents.  The bondholders are

21  secured, and the bondholders would be entitled to adequate

22  protection presumably.  If they're not already adequately

23  protected, we could make payments to make them adequately

24  protected.  Our settlement has some of those payments.

25         It's very awkward, it seems to us, for the fuel line

1    lenders to be arguing that they have to be paid first.  I mean

2    they can't really credibly say that they could stop us from

3    making adequate protection payments that might be required by

4    law to avoid stay relief because of some seniority right.  I

5    mean we don't think they have the seniority right in the first

6    place, that's not today's issue.  So, we think that's a matter

7    of law.

8             So, the overall point of my comments, your Honor, is

9    we think the actual facts we're putting into evidence in our

10   direct case, that the world now knows about, are very hard to

11   dispute; they jump right off the documents and the arithmetic.

12   So, people can argue that they think we're giving too much, but

13   we don't know why lots of discovery is necessary for this

14   because it's so much of a legal argument.

15            That being said, your Honor, based on the Court's

16   rulings on the in limine motions, the number of depositions I

17   understand is way down.  I mean it's still a significant number

18   but not nearly the 12 or 19 previously we were worried about

19   having.

20            So, we hope the parties at the depositions will apply

21   your Honor's rulings as to the comments your Honor made about

22   what the Court believes the appropriate scope of the 9019

23   hearing will be, but we're not in a position now to ask your

24   Honor for specific relief in regard to those matters.

25            Unless the Court has questions, those are our

1    responses to the Court's four questions.

2                THE COURT:  Thank you.

3                I have no further questions at this point.  I

4    understand that Mr. Williamson is on the live line now, and so,

5    Mr. Williamson, did you wish to make some remarks?

6                MR. WILLIAMSON:  Yes, your Honor.  Thank you.  This

7    will be very brief.  We may have, subject to further

8    discussion, a legal issue with respect to the professional

9    compensation provision that's in the RSA.  It is a legal issue;

10   it's not a factual issue; and we are in touch with the

11   government parties and others on the issue.  If it becomes ripe

12   for the September hearing, I suspect it won't take but a

13   fraction of the nine hours.

14               THE COURT:  Thank you for giving me that heads-up.  Is

15   there anything further?

16               MR. WILLIAMSON:  No, thank you.

17               THE COURT:  Thanks so much.

18               Now AAFAF is next on the list for ten minutes.

19               MS. MCKEEN:  Elizabeth McKeen with O'Melveny & Myers

20   on behalf of AAFAF.

21               THE COURT:  Good morning, Ms. McKeen.

22               MS. MCKEEN:  Good morning.

23               I would like to just briefly address your questions

24   regarding the 1974 trust agreement as well as time at the

25   hearing.

1      The union entities identified two witnesses to address

2  the issue of the 1974 trust agreement and their disclosures,

3  Guitterez's president and the retirement systems' president of

4  the board.  They haven't offered any specifics about what these

5  witnesses would actually address and, to Mr. Bienenstock's

6  point, why facts, testimony from a witness would be necessary

7  rather than simple legal argument on these issues.  So, we

8  would urge the Court to grant the motion in limine in its

9  entirety, and rather than permitting witnesses to testify as to

10  these issues, we would urge the parties to put their argument

11  in in the form of legal argument and briefing rather than two

12  witnesses whose testimony would likely be cumulative and

13  unnecessary.

14      THE COURT:  And do you know what the 1974 trust

15  agreement document is?

16      MS. MCKEEN:  My familiarity with it is limited, but my

17  understanding is that there have been a number of previous

18  legal rulings that will bear on the parties' rights and

19  obligations as to the trust agreement, and for that reason we

20  think that this issue can be addressed adequately with briefing

21  rather than with witness testimony.

22      I am not sure what these two witnesses would testify

23  about, nor have they indicated what they would testify about

24  that would bear on these issues.

25      THE COURT:  So, assuming that you have in mind the

1  same base document that the union entities have in mind, would

2  AAFAF as a government party be prepared to stipulate to the

3  admissibility and authenticity of that document so that there

4  is no need for a witness to proffer or to explain the

5  circumstances and substantiation of the document?

6      MS. MCKEEN:  Absolutely, your Honor.

7      THE COURT:  Thank you.

8      MS. MCKEEN:  And as to the Court's question regarding

9  the timing of the hearing, I would like to echo what

10 Mr. Bienenstock said, which is that we think nine hours should

11 be sufficient as long as each of the parties take to heart the

12 Court's very helpful guidance of this morning on the motions in

13 limine and with respect to the scope of what the hearing ought

14 to be about.  To the extent that guidance extends to witnesses

15 who may not have been the direct focus of those motions in

16 limine, we hope the parties can continue to meet and confer to

17 ensure that the nine hours is sufficient to address all the

18 issues that are properly before the Court.

19     THE COURT:  Thank you, Ms. McKeen.

20     MS. MCKEEN:  Thank you, your Honor.

21     THE COURT:  Next I have the Ad Hoc Committee.

22     Mr. Hamerman?

23     MR. HAMERMAN:  Good morning, Judge.  Natan Hamerman

24 from Kramer Levin Naftalis & Frankel for the Ad Hoc Group.

25     I will be speaking briefly as to the issues -- the

1    factual issues you asked about -- I'm sorry -- the issues of

2    evidence that you asked about in question number one, and my

3    colleague Alice Byowitz will also be speaking to some of the

4    legal issues that you asked about.

5            Just very briefly, the factual material as

6    Mr. Bienenstock mentioned really came in through the four

7    government declarants, and that's their direct case, and we

8    don't really think that anybody else is necessary to provide

9    pure factual testimony on any subjects.  So, the other

10   witnesses that have been identified thus far by the objecting

11   parties, we personally view them as unnecessary.  The case

12   should come in through those witnesses alone.  That's what the

13   government is presenting, and that should be sufficient.

14           We are reserving the right to present two expert

15   witnesses, and those will touch on some of the issues you

16   mentioned, Judge.

17           We have a municipal finance expert, Robert Lamb.

18   Mr. Lamb will potentially be testifying -- we are continuing to

19   review what factual material comes in and whether his testimony

20   is necessary.  He will be testifying as an expert on financing

21   structures that are typical in municipal finance, and the

22   unique attributes of the securitization bonds that are being

23   agreed to in this RSA and what benefit that gives to Puerto

24   Rico.  And that would go to the issues that your Honor asked

25   about in terms of the reasonableness of the range of

 1   settlements.

 2          Derrick Hasbrook is a utility-related expert.  He has

 3   experience in managing utilities and consulting with utility

 4   companies.  He may be testifying about the elimination of

 5   liability uncertainty and reducing legacy debt and how those

 6   subjects also benefit Puerto Rico and therefore also weigh on

 7   the issue of the range of reasonableness of the settlement.  He

 8   had reserved the right to testify on various other subjects

 9   that were intended to be responsive to the not-for-profits.

10   Now that we have your Honor's ruling on those motions in

11   limine, those subjects will be withdrawn.

12          With that, Judge, unless you have questions about the

13   factual submissions, I will turn it over to Ms. Byowitz.

14          THE COURT:  No, thank you.

15          Good morning, Ms. Byowitz.

16          MS. BYOWITZ:  Good morning, your Honor.  Alice Byowitz

17   of Kramer Levin Naftalis & Frankel on behalf the Ad Hoc Group.

18   I just wanted to supplement what my colleague Mr. Hamerman

19   said.  We do also intend to present legal argument to you

20   regarding what the Ad Hoc Group is giving up as part of this

21   settlement.  In exchange for settlement of the lien challenge,

22   we are giving up certain rights we have to have a receiver

23   appointed and to compel a rate increase.  As Mr. Bienenstock

24   mentioned, it would be an unlimited rate increase, and so

25   capping that is a serious form of consideration that the Ad Hoc

1    Group is giving.  And we will be addressing our rights both

2    under Puerto Rico law and the rights that we believe we are

3    also giving up under Section 316(b)(6) of PROMESA.

4             Thank you very much, your Honor.

5             THE COURT:  Thank you.

6             Next, Assured.  Good morning, Mr. Natbony.

7             MR. NATBONY:  Good morning, your Honor.  Thank you.  I

8    will try not to use my time, as everyone else has.

9             THE COURT:  You are all very efficient.  I like this.

10            MR. NATBONY:  I really only want to mention one point,

11   which is that I think there is a difference between priority

12   and fiscal plan and lien challenge issues.  I think that to the

13   extent that you are talking about some of the issues that some

14   of the third parties have raised concerning priority, those are

15   plan issues, they're not 9019 issues.

16            When it comes to the lien challenge issues -- which we

17   believe are legal issues and controlled by the relevant

18   documents that are in place -- those, yes, are 9019 issues.

19            So, I think we need to separate out some of the issues

20   that are being raised by the fuel line lenders and the union

21   concerning priority, which from our perspective are really plan

22   issues and can be addressed at the plan stage, which goes to

23   your Honor's issue of injury.

24            Thank you very much.

25            THE COURT:  Thank you.

1        And now the Trustee.  Good morning, Mr. Whitmore.

2        MR. WHITMORE:  Good morning, your Honor.  Clark

3   Whitmore from the law firm of Maslon LLP on behalf of U.S. Bank

4   National Association as a PREPA bond trustee.

5        Your Honor, we are not a party to the RSA.  The

6   trustee doesn't vote on the plan, and so that makes sense.  But

7   we have been directed so far by about 72 percent of the

8   principal amount of the outstanding bonds to support the

9   motion.  We haven't taken a formal position, but we do

10  anticipate participating in these proceedings at the

11  appropriate time.  We are still trying to understand how this

12  ever-changing situation is going to shake out.

13       We would like to note for the record that we disagree

14  with the positions taken by the fuel line lenders and the

15  unions with respect to their interpretation of the trust

16  agreement, and we believe that those really present legal

17  issues that the Court can either decide not to address at the

18  9019 hearing because they are confirmation issues or, to the

19  extent necessary, can address them as legal issues at that

20  time.

21       That's all I have, your Honor.

22       THE COURT:  Thank you, Mr. Whitmore.

23       We will now turn to the objectors.  I have first Mr.

24  Despins.  And I have you allocated 20 minutes.

25       MR. DESPINS:  Good morning, your Honor.

1          THE COURT:  Good morning.

2          MR. DESPINS:  I asked my colleague Mr. Bassett to join

3    me in case there are technical litigation issues that come up,

4    but let me try to address your questions up front, the global

5    issues.

6          Basically, the first point is actually a very

7    difficult question.  Normally it wouldn't be.  The reason it's

8    difficult is because we're dealing with two things:  We're

9    dealing with payments made today -- or not today but the day

10   after your Honor would approve the settlement -- and then

11   confirmation later on.

12         So, if we were on the eve of confirmation, the issues

13   would be very simple.  We would basically fight over who is

14   right from a pure legal point of view.  But what is happening

15   here is that they're saying we have a great deal with these

16   folks and the key attributes of that deal is that we're locking

17   them into a plan and that plan will have the following

18   features.

19         If that's the case, and that's one of the bases to

20   approve this settlement, how is it that the Committee cannot be

21   allowed to say, no, no, no, no, this plan cannot be confirmed

22   for the following five reasons?

23         I know typically you're absolutely right that that

24   shouldn't be a basis to object, but here the crux of the

25   argument for why it's OK to make these payments today is that

1  it locks them into a plan, that's a beautiful thing.  So,

2  that's the first part and that's why it's so complex.

3        THE COURT:  I hear what you're saying, and I

4  understand, I believe.  It is a bit different, it is a bit more

5  complex, but one way the question today can be put is:  Is it

6  reasonable for them to pay what they propose to pay, or make

7  the concessions they propose to make, in exchange for the

8  opportunity to pursue confirmation of a plan in the future,

9  given their judgment that they believe this is a realistic and

10 important opportunity without having a confirmation hearing on

11 that plan?  Things may change.  They are proposing to buy, if

12 you will, a space of time in which to develop around this

13 model.  I think that's different from asking whether that plan

14 is confirmable.

15       MR. DESPINS:  No, but if the benefit is illusory -- we

16 need to be able to show that the benefit that they think

17 they're getting is illusory because this plan is not

18 confirmable.

19       Let me give you another example.  If you read the

20 Brownstein declaration -- I know you read all the papers, so

21 I'm not going to review all the details -- but you will notice

22 that there is a slight shift -- it's actually not so slight --

23 where they're saying forget about the dollar amounts, that's

24 not that important; it's the good of the Commonwealth, the rate

25 payors, etcetera.  That's now what they're anchoring their

1  settlement on mostly.

2       Well, obviously we think that what they said that

3  there is challengeable, we want to be able to challenge it.

4  These are factual issues.

5       For example, they say this will lead us to

6  privatization.  Well, will it?  When?  At what cost?  I mean it

7  couldn't be clearer in the Brownstein declaration that they're

8  anchoring their settlement on these other issues.  They're

9  anchoring the settlement on the issue of the privatization, of

10  these great securities that would be offered under a plan.

11  And, you know, it ignores -- your Honor, I want to make sure

12  you know this -- and I keep repeating this -- but these are

13  nonrecourse bonds.  OK?

14       THE COURT:  The current bonds are nonrecourse.

15       MR. DESPINS:  Correct.  And they're net revenue bonds.

16  What that means is that if your borrower, PREPA, is always in

17  the red, as they have been, you're out of luck.  I'm not saying

18  this.  The Board has said that many times.  They're moving away

19  from that structure to a direct charge to the customers.  So,

20  PREPA can be losing billions of dollars every day; they still

21  get the charge to the customer.

22       So, I'm not going to argue the merits, but I want to

23  make sure you understand.  Also I want to make sure you

24  understand, they say don't worry about confirmation, your

25  rights, unsecured creditors, are not being affected, because if

1   the judge denies confirmation, all bets are off.

2          All bets are not off.  And we are going to submit

3   evidence that in certain scenarios there is more than a billion

4   dollars of benefits that are being awarded to these folks if

5   the Board later on -- and, by the way, it's not only the Board,

6   it's the Board, AAFAF or PREPA, they all have a termination

7   right.  If they ever determine that they don't want to do this

8   deal anymore, the benefits that will have been awarded to those

9   nonrecourse creditors that were undersecured on the petition

10  date would be in the range of a billion dollars.

11         So, they say that could be a break-up fee.  Your

12  Honor, I am not going to even engage in that now, but the point

13  is that in light of that, the Court needs to look at all the

14  factors.

15         So, let me give you another example.  It is true they

16  are not seeking the complete approval of the RSA.  But there

17  are provisions of the RSA that the Oversight Board is binding

18  itself to, which you are not approving but nevertheless they're

19  binding, and those provisions will never be triggered unless

20  your Honor enters an order.  So, it's like the key that starts

21  the car.  Without that key, which is your order, these other

22  provisions will never kick in.  So, let me give you an example

23  of such a provision.

24         There is a provision -- and this is in the documents

25  that were filed with the court, documents number 14 -- sorry --

1  1235-1, and this is on page 114 through 116 of 150.  You will

2  see that the lenders have a veto -- a veto -- over unsecured

3  creditors getting a charge or a distribution or a payment.

4       So, you might say, well, Mr. Despins, that's too bad,

5  I'm not approving that provision, I didn't sign that and

6  therefore...  And therefore what?  I mean clearly that is

7  incredibly relevant to what is going on here, the fact that

8  they have a veto over whether we can get a charge or get paid

9  it's clearly relevant, even if your Honor is not being asked to

10  approve that provision, because they're binding themselves to

11  that provision.

12       And that's the difference between Chapter 11.  In

13  Chapter 11 I would be laughing and saying it's not binding,

14  it's not binding on the debtor, the court did not approve it.

15  But here it is binding on the Oversight Board, and basically it

16  gives the veto to the lenders over any distribution to other

17  creditors other than for funding for pension liabilities -- God

18  bless the pensions -- but the point is that doesn't deal with

19  other creditors.

20       THE COURT:  Well, that is one reason that I spoke in

21  terms of the core relevant issues including contentions that

22  what I'm asked to approve now affects or forecloses legal

23  rights that a nonsettling party contends it would otherwise be

24  able to pursue.

25       And in relation to the extent to which potential

1   confirmability is argued to go to whether the proposed features

2   being approved now are within the range of reasonableness, I'm

3   not precluding that argument, but at the same time I hope I

4   made myself very clear that I do not expect to entertain or

5   have an attempt to set up before me a full Monty confirmation

6   hearing.  You need to find an efficient way to identify your

7   core points, tie them to the range of reasonableness and find

8   an efficient way to present them.

9        MR. DESPINS:  Understood, your Honor.  And we will hit

10  head-on the arguments they make; we will respond to them.  So,

11  when Mr. Brownstein is saying this is an amazing deal for rate

12  payers, you might say normally, Mr. Despins, I don't want you

13  to address that issue.  But he's saying that's the key selling

14  point.  Mr. Bienenstock actually said that's number one on

15  their list.  I need to be able to engage on those issues that

16  they're relying on, your Honor.  That's really the main point

17  we want to make.

18       THE COURT:  It's their burden, and if you have grounds

19  for attacking their proffer in support of their burden, of

20  course you can explore that.  I have to consider that.

21       MR. DESPINS:  So the point I wanted to make about the

22  excess of a billion dollars in benefits, it goes to this issue

23  of why this is so complicated, because today if you are

24  awarding benefits of a billion dollars, there is only certain

25  legal theories that support that.  Right?  Mr. Bienenstock

1   mentioned one, adequate protection.

2           Well, we know from your ERS decision from last week or

3   ten days ago -- probably ten days ago -- we know from that

4   decision that if the debtor has no rights in the collateral,

5   the secured party cannot have rights either, cannot be a

6   secured party.

7           So you might say what does ERS have to do with this?

8   Well, very easy.  On the petition date there was not a billion

9   dollar of receivables owed by PREPA customers.  There was only

10  $33 million in the bank account that the indenture trustee has,

11  but other than that there was probably -- there was no

12  collateral because future receivables are not collateral on the

13  petition date.  OK?  That's fundamental and that's essentially

14  what your Honor ruled in ERS, which is that you have to look at

15  the rights of the debtor on the petition date.  And on the

16  petition date the debtor has no rights in receivables that have

17  not been generated yet.  So why am I saying this?

18          Well, how are these people getting 800 million of

19  post-petition interest; that's part of the deal that you would

20  be approving, 800 million of post-petition interest --

21  post-petition interest -- when there was only $33 million in

22  the bank on day one?  And they will say, oh, we have a -- they

23  don't agree when I say it's a net revenue.  OK, let's assume

24  it's not a net revenue; let's assume it's a gross revenue.  It

25  is a net revenue, but let's assume it's a gross revenue.  It

1    doesn't change the basic UCC fact, which is that until

2    receivables are created, they have no security interest in

3    that.  That means no right to adequate protection to that, and

4    that means no post-petition interest to the tune of about $800

5    million, your Honor.

6          So, I want to make sure -- the problem is that you're

7    doing this, and you saw one side of the pleadings -- and they

8    did a very nice job, and I will commend them for that -- but

9    you haven't seen our side yet.  So, I think it's dangerous to

10   set the stage based on only a one-sided presentation here, and

11   that's why I'm spending more time on that.

12         I just want to check my notes for one second, your

13   Honor.  I apologize for the disjointed presentation.

14         The consequence of not settling is also a key issue,

15   because they're saying that's the benefit we're getting, there

16   won't be a receiver.  Well, first of all we believe the

17   receiver -- the appointment -- the motion to lift the stay to

18   appoint a receiver would be subject to the Sonnax factor -- I

19   don't think they would get it -- but putting that aside, let's

20   assume a receiver is granted.  Well, what does that mean?  That

21   may mean that they don't like it because they lose control, but

22   does that mean that their collateral goes down in value by a

23   hundred fold -- which it needs to, right, because they only

24   have 33 million on the petition date -- where somebody just

25   said before we have an unlimited right to increase rates.

1   False.  Under the documents they do.  But will the Utility

2   Commission in Puerto Rico allow them to increase their rates in

3   an unlimited fashion?  That is a very key factual issue, your

4   Honor.

5          I know that counsel for UTIER served a notice of

6   deposition on the Utility Commission just to see exactly what's

7   their position on this, if their position is, you're kidding

8   me, we will never increase the rates to pay these guys.

9          You might agree or disagree with that, but putting

10  that aside, the point is that what does that tell you about

11  their rights that they're waiving under this document

12  allegedly?  The fact that they have the structure they have,

13  they have to live with that structure under the bankruptcy

14  code, and they have problems.  One of them is that if these two

15  rights -- the right to increase rates and the right to cause

16  the borrower to increase rates -- which the borrower cannot do

17  without Utility Commission approval -- and the right it appoint

18  a receiver -- if that's collateral -- which we disagree with --

19  and the board also disagreed with -- if that were the case,

20  what does that translate into?  That's a factual issue that's

21  very key to the settlement.  If it gives them nothing, we need

22  to be able to establish that, because then the whole premise --

23  not the whole premise, but a part of the premise goes away from

24  the settlement.

25          Just going down the list, your Honor.  So

1 essentially -- I'm just checking with my colleague, but I think

2 that covers the issues.

3 On the issue of the nine hours, you know, we would

4 like to be able to come back to your Honor on that after we're

5 smarter about the entire case. At this point there has been no

6 deposition taken, none of that. I think that we would be able

7 to give you a smarter answer in two weeks, three weeks from

8 now, on whether that works or not. But we get the message --

9 we have done this before -- usually when the judge says nine

10 hours, that's kind of a good thing to try to follow that

11 guidance, so we understand that.

12 THE COURT: Thank you for hearing me.

13 MR. DESPINS: And on the other issues regarding the

14 9019, none in particular. The only point I want to raise,

15 because you limited that issue to UTIER and to the fuel line

16 lenders, the Committee is determining whether it will file an

17 objection to the claim of the indenture trustee on the basis

18 that this is a nonrecourse claim and therefore you cannot seek

19 to have a claim allowed for a billion dollars.

20 They filed a claim that seeks the full amount of the

21 debt, and so I want to make sure that nobody would say, well,

22 you should have said that at the hearing. We have not made a

23 determination, but we may very well do that.

24 I think that's permitted under the order your Honor

25 entered with regard to the 926 AAFAF board challenge, because

1   there was a change made.  Remember that the fuel line lenders

2   asked for a change to be made?  It was made.  So, I think

3   that's permitted, but I wanted to mention that's a possibility.

4           The last point I would make, your Honor, is you may

5   not have looked at the complaint -- because there is no reason

6   for you to have looked at the complaint -- but if you have not,

7   I would really urge you to look at it, because I would say

8   again they did a very nice job of explaining why these

9   creditors have no collateral.  The only thing they didn't do is

10  to tie that to the facts of the case and also to say that

11  they're nonrecourse.  And if nonrecourse, that means the

12  downside to them -- if the Court were to rule that they're

13  limited to 33 million in collateral -- is huge, and that has to

14  be factored in when you look at the reasonableness of a

15  settlement.  Thank you, your Honor.

16          THE COURT:  Thank you, Mr. Despins.

17          Next for the fuel line lenders, Mr. Kleinhaus.

18          MR. KLEINHAUS:  Good morning -- or afternoon.  I think

19  it's still morning, your Honor.

20          THE COURT:  Still morning.

21          MR. KLEINHAUS:  Emil Kleinhaus from Wachtell Lipton

22  Rosen & Katz on behalf of Cortland Capital Markets Service LLC

23  as administrative agent.

24          The fuel line lenders collectively have about $700

25  million of prepetition debt including a Citibank facility.

1   That debt, as I mentioned before, was incurred.  Loans were

2   made to allow PREPA to purchase fuel, and that was done on the

3   express agreement of all parties that the fuel lines would be

4   treated as current expenses under the 1974 trust agreement,

5   which I'm going to come back to shortly.

6           I will try now to answer one after the other two of

7   the questions your Honor has posed in terms of core issues at

8   the hearing, legal and factual, and the effect of the lien

9   challenge provisions of the RSA.  So, let me start with core

10  issues at the hearing and try to respond to Mr. Bienenstock as

11  well.

12          From the time the RSA was filed, the fuel line lenders

13  have had a very clear and consistent position that we've made

14  known to the Oversight Board and made known to the Court

15  including in status reports.  The position is that this RSA, if

16  approved, would not just constitute a settlement between the

17  debtor and certain creditors -- namely the bondholders -- of

18  their dispute regarding the size of that claim, but would

19  severely prejudice other creditors, in particular the fuel line

20  lenders, with respect to their own rights.

21          This settlement goes beyond a debtor/creditor

22  settlement and severely implicates intercreditor issues, and

23  here is why:  Under the trust agreement, the 1974 trust

24  agreement, there is a very specific priority scheme and

25  financing structure.  The way the agreement works is that the

1    bondholders have a net revenue lien.  What that means is that

2    unless and until all current expenses are paid, they have no

3    lien at all.  The only lien is on funds deposited into a

4    particular account, a sinking fund after all current expenses

5    are paid.  Likewise, the recourse of the bondholders is to that

6    account.  Unless and until all current expenses are paid, not

7    only do they not only have a lien, but our position is they

8    have no claim at all.

9         So, to the extent the fuel line lenders are current

10   expenses -- and I will come to that in a minute -- the current

11   expenses have to get paid before these bond claims, secured or

12   otherwise, can be allowed or paid, including the massive

13   amounts that are proposed to be paid under the RSA.

14        The RSA as proposed -- and we heard Mr. Despins use a

15   billion dollar number -- would allow for payment of massive

16   amounts -- hundreds of millions if not billions of dollars --

17   of cash payments and then administrative expense claims to the

18   bondholders in exact reversal of what the prepetition priority

19   scheme contemplates.  The bondholders would get paid very

20   significant amounts outside of a plan -- which is also a key

21   point -- in a preplan settlement before the current expenses

22   are paid anything.

23        Now, I heard Mr. Bienenstock say on behalf of the

24   Oversight Board that the Oversight Board doesn't agree that the

25   fuel line lenders have priority as current expenses.  That's an

1    incredible position for the Oversight Board as trustee for

2    PREPA to take.  It's incredible because PREPA represented and

3    covenanted in many different binding agreements that the fuel

4    oil lenders are current expenses, entitled to the benefits of

5    the trust agreement.

6           It's incredible because PREPA enacted a resolution

7    before the bankruptcy that the fuel lines are current expenses

8    entitled to all the benefits of the trust agreement.  And that

9    resolution and PREPA's determination -- as we will show in our

10   objection -- are determinative of that issue.  And the trust

11   agreement itself says that.  If PREPA determines that the fuel

12   lines are current expenses, that's determinative.  So PREPA --

13   in whose shoes the Oversight Board now stands -- determined

14   that the fuel lines are current expenses.  And not only that,

15   but they told the world and they told the bondholders -- in

16   binding official documents they told the bondholders the fuel

17   line lenders get paid before you; you only have a net revenue

18   lien; until they are paid in full you get nothing.  That's what

19   they told the bondholders; that's the basis on which the

20   bondholders extended their credit.

21          So, for the Oversight Board as the trustee for PREPA

22   to stand up for the very first time at this hearing and say

23   everything PREPA has said over many years in many official

24   documents is worth nothing and we repudiate it, that's

25   essentially what is happening here.

1          And on the substance, we will address it more in our

2    objection, it seems like the Oversight Board now agrees that

3    this issue of priority is within the scope and has to be

4    addressed at this hearing.  They had previously said things

5    like it's irrelevant.  Of course it's relevant.  There is

6    substantial case law saying it's relevant, including from the

7    First Circuit Bankruptcy Appellate Panel.  There are multiple

8    decisions from the District of Puerto Rico which hold that

9    issues of priority should not be predetermined in a settlement

10   the way that they're getting determined here.

11         So, we will make all of those arguments our objection,

12   but as to the relevance and whether that's a core issue, I

13   don't know how that could be disputed under the relevant case

14   law.  So, that's the substance.

15         There is also a major procedural problem, and it's

16   raised by what has happened today in court.  At the last

17   hearing June 12 at the status conference your Honor said, after

18   reviewing the initial submissions from the Oversight Board and

19   the other government parties, that "The Court would need to be

20   persuaded" -- that's a quote -- "that the priorities

21   established by the RSA are supported by legal authority and

22   relevant facts and analysis."

23         The Court also told the Oversight Board they would

24   have to "lay out legally and factually their position as to how

25   the RSA will preserve the rights of nonsettling interested

1  parties and have no constraining effect on the ability of

2  nonparticipants to litigate issues that are normally material

3  to confirmation that the government parties contend are

4  irrelevant to this 9019 motion practice."  That's what the

5  Court directed the Oversight Board to do.

6          The Oversight Board submitted hundreds of pages.  As

7  Mr. Despins said, they did a very nice job laying out a lot of

8  issues.  You can search those pages in vain for what

9  Mr. Bienenstock said in court today for any explication or

10  argument as to how the fuel line lenders' $700 million of

11  claims are not prejudiced.

12          So, what it seems like now is happening here -- even

13  though the Court gave the government parties another chance to

14  supplement their filings to address this issue that the fuel

15  line lenders had raised as explicitly as we possibly could not

16  just in the joint status report but for many years -- we filed

17  a complaint in 2017, a motion to intervene in an action the

18  bondholders brought that laid out these arguments in complete

19  detail.  We filed a proof of claim to which the Oversight Board

20  never objected, stating very explicitly we are current

21  expenses, we have priority.

22          This point has been out there completely, explicitly

23  and clearly for years.  The Oversight Board chose not to

24  address it, not at all, in their hundreds of pages of

25  submissions.  What it seems like they want to do now is have us

 1  make our argument on priority and then a few days before the

 2  hearing make their entire case on this issue on reply.  But we

 3  don't think that's appropriate at all, and respectfully it's

 4  not what we thought the Court had in mind when it directed the

 5  Oversight Board to supplement its papers on these issues

 6  relating to prejudice to other creditors.  But that seems to be

 7  where we are.

 8          So, not only do we disagree on the substance, but on

 9  the issue of procedure our sense is that the Oversight Board

10  has not provided the disclosure that it should have provided to

11  address this position in advance of our filing our objection

12  August 7.

13          This issue will also be addressed in some ways in

14  front of Judge Dein on a motion to compel, because the

15  Oversight Board -- despite now arguing we don't have priority

16  for the first time -- has taken the position that any discovery

17  upon priority issues is out of bounds and not permitted.  So,

18  we're going to have to address that with Judge Dein as well.

19          Let me say a few words about the lien challenge, and

20  it's really related to the points that I have already made.

21          The Oversight Board and AAFAF have brought their own

22  lien challenge proceeding asserting claims on behalf of the

23  debtor.  I want to focus on a point that came up at the last

24  hearing, the hearing on who would be the trustee under 926,

25  where a distinction was drawn between debtor/creditor issues

1  and, in particular, the causes of action that the debtor

2  controls and owns under Section 926, the Chapter 5, Section 544

3  actions, 546, 547, etcetera, a distinction between those causes

4  of action versus causes of action and objections that belong to

5  creditors as well as the Oversight Board.

6      And that distinction I think is central to this issue

7  of the lien challenge, because the Court at that hearing, after

8  agreement and discussion between us and the Oversight Board,

9  narrowed the definition of lien challenge for purposes of the

10  trustee appointment, so that as to Chapter 5 actions, the

11  Oversight Board and AAFAF would be the ones bringing those

12  actions, but did not appoint them as trustee for Section 502

13  and Section 506 objections. And Section 502 of the Bankruptcy

14  Code on its face allows any party in interest to bring a claim

15  objection. Here the claim objection is that these are

16  nonrecourse bonds that can only get paid after the fuel lines

17  are paid in full.

18      Rule 3012 likewise permits any party in interest to

19  challenge the extent of a lien under Section 506, so here that

20  challenge is they have no lien until the fuel lines are paid in

21  full.

22      And Mr. Bienenstock made a comment to the effect of

23  we're not a party to the trust agreement. We don't have to be

24  a party to the trust agreement to exercise basic creditor

25  rights under the Bankruptcy Code under Section 502 and 506,

1    including the right to object to the claim on the basis that it

2    should not be allowed until we're paid.

3              I would also note that the trust agreement itself says

4    "accept as expressly provided herein there are no third-party

5    beneficiaries."  There are many express provisions of the trust

6    agreement that recognize the priority of current expenses.  And

7    not only that, as I said before, PREPA itself made very clear

8    through course of conduct and numerous statements that PREPA

9    itself recognized the priority of the fuel lines.

10             But we're entitled as creditors to make all of those

11   arguments, and consistent with that entitlement our clients

12   just two days ago -- and your Honor would have no reason to

13   focus on this yet -- filed a complaint.

14             THE COURT:  Oh, I noticed.

15             MR. KLEINHAUS:  And that complaint is being prosecuted

16   by our cocounsel at Simpson Thacher.  But what that complaint

17   does is it shows the Court -- and over time will show the Court

18   more -- that there are unique particular interests and rights

19   of creditors here separate and apart from the general debtor

20   estate causes of action that are asserted by the Oversight

21   Board.  And the particular interest here is the interest in

22   enforcing the terms of the trust agreement by limiting the

23   liens, limiting the claims unless and until the current

24   expenses -- and in particular the fuel lines -- are paid first.

25             That is an interest that is particular to us, and yet

1    under the broad definition of lien challenge in the RSA, those

2    claims as we read it would be affected.  This will have to be

3    addressed further at that hearing, but that broad definition is

4    the same broad definition that was in the AAFAF Oversight Board

5    stipulation before it was modified.

6            THE COURT:  And that's why I raised the question and

7    put it on the list; I did notice that.

8            MR. KLEINHAUS:  So, that is another core issue and

9    it's related to the first issue.

10           Finally, on the matter of evidence, look, the

11   substantive and the procedural issues I've raised are in some

12   part at least legal issues.  I don't disagree with

13   Mr. Bienenstock and others on that.  We do propose to have just

14   one witness at the hearing, Mark Belanger of Alvarez & Marsal,

15   who will be expected to testify on the economic effect of this

16   deal on the fuel line lenders.  And in particular we believe

17   that he will show that if the RSA is approved -- including a

18   most favored nations provision that says the fuel lines can't

19   get paid better than or can't get better terms than the

20   bonds -- and there is another provision that says the bonds get

21   to veto any agreement with the fuel line lenders -- if those

22   provisions are put into effect, as an economic matter it will

23   not be feasible to treat the fuel line lenders in accordance

24   with their priorities.  So, it's fairly narrow testimony; it

25   dovetails with the priority argument.  He will also provide

1    factual testimony as to the dealings between the parties and in

2    particular the complete lack of engagement by the government

3    parties with the fuel line lenders.

4           I mean some of the case law on the priority issue says

5    the movant has to show some extremely compelling need to depart

6    from prepetition priorities, and one of our points is going to

7    be how can there be an extremely compelling need when the

8    Oversight Board has essentially refused to engage with the

9    parties that have priority.

10          So, with that, your Honor, I will sit down and leave

11   the rest of my comments and argument for briefing and further

12   hearings.  Thank you.

13          THE COURT:  Thank you, Mr. Kleinhaus.

14          Next I have Mr. --

15          Do you want to wait to reply to everything or do

16   you --

17          MR. BIENENSTOCK:  No, I'm happy to wait.  Thanks.

18          THE COURT:  Thank you.

19          So, Mr. Emmanueli-Jimenez for UTIER -- or his

20   colleague. So that's Ms. Mendez-Colberg?

21          MS. MENDEZ-COLBERG:  Ms. Mendez, yes.

22          Good morning, your Honor.  This is Jessica

23   Mendez-Colberg on behalf of UTIER and the retirement system for

24   the PREPA employees.

25          We join the arguments of all of the other objectors,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    but in the sense of UTIER and the retirement system employees

2    we submit that we are also included in the definition of the

3    current expenses in the trust agreement of 1974, slightly

4    different from the fuel line lenders in the sense that UTIER

5    members are part of the employees that -- I'm sorry -- the

6    UTIER employees are part of operating -- of operating PREPA --

7    and the definition also includes the payment to pensions or

8    retirement funds.  So, we are clearly included in the

9    definition of current expenses, which gives us the priority

10   with respect to the trust agreement.  And it is infringed with

11   the settlement that the government parties are requesting the

12   Court to grant.

13         And we submit that even though Mr. Bienenstock didn't

14   address UTIER and the retirement system claims but AAFAF did,

15   we submit that even though how can -- if these bondholders are

16   secured, how can the Court -- the Court needs to consider if

17   this affects the limitations of the trust agreement with

18   respect to the payment of the current expenses, for which I

19   mentioned that the employees of UTIER and the retirement system

20   are included.

21         To the extent this settlement requires payments even

22   before the plan of adjustment is confirmed, it is relevant to

23   discuss at this stage of the proceedings and not at the stage

24   of the plan of adjustment's information hearing the damage that

25   this settlement could cause to UTIER and the retirement system.

1     We submit that the recovery of the bondholders is

2   contingent on PREPA being able to cover the current expenses,

3   which has in the been discussed in the documents presented to

4   the Court of how is PREPA going to be able to manage the

5   current expenses -- to manage its current expenses.

6     And let's remember that Section 505 with respect to

7   the applications of monies in the general funds explicitly says

8   that the monies in the general fund will be used first for the

9   payment of the current expenses.

10     With respect to the offered testimony of UTIER and the

11   retirement system, we do agree that the factual witnesses, we

12   could stipulate that their testimony -- we could stipulate

13   their testimony in the sense that if the trust agreement is

14   stipulated in terms of its authenticity, then we wouldn't need

15   those testimonies.  But we do submit that Jose Fernandes, which

16   is the expert witness for the retirement system, will provide

17   actuarial and financial information relevant to establish the

18   retirement system financial condition, which is critical to

19   evaluate the current expenses that PREPA needs to consider as

20   they should be paid first and as they should be paid first

21   according to the trust agreement.  So, we still submit that

22   that expert testimony is needed in order for the Court to have

23   all the relevant information to grant or accept this

24   settlement.

25     And if the Court doesn't have any more questions, that

1    would be all for us.

2              THE COURT:  Thank you very much, Ms. Mendez.

3              And finally, National?

4              Good morning, Mr. Berezin.

5              MR. BEREZIN:  Good morning, your Honor.  Robert

6    Berezin for National Public Finance Guarantee Corporation.

7              Your Honor, as I previously reported, National is

8    working with the government parties to resolve its objection,

9    and it continues to do so.  We're hopeful that that will happen

10   before the hearing.  But given where we are now, we just wanted

11   to briefly reserve our rights to present our objections which

12   are described in the original pretrial status report, docket

13   number 1361, but otherwise other than that reservation, I think

14   that's all I need to say at this time.

15             THE COURT:  Thank you.

16             MR. BEREZIN:  Thank you, your Honor.

17             THE COURT:  Mr. Bienenstock.

18             MR. BIENENSTOCK:  Thank you, your Honor.  Martin

19   Bienenstock of Proskauer Rose for the Oversight Board as

20   PREPA's Title 3 representative.  I will still try to keep to my

21   word to keep this well under our time limit.

22             Just very briefly, because from sitting there, from

23   our perspective some fairly inflammatory arguments were made by

24   the UCC and the fuel line lenders, I think there are very short

25   answers that I just want to put on the record and so that your

1   Honor after this hearing and before the 9019 hearing can have

2   both sides in mind.

3          First, as far as the UCC's arguments go, their notion

4   that there is anything about what your Honor is being asked to

5   approve that would prevent confirmation is just unfounded, and

6   they will have to prove it.  And their notion that the

7   treatment that we're proposing to give to the supporting

8   bondholders is unconfirmable as a matter of law is just

9   unfounded.  They've referred to post-petition interest for

10  people they say who are undersecured, and we agree they are

11  undersecured and they are agreeing to a claim that's

12  undersecured.

13         As one of the reasons why our declaration for

14  Citibank -- Citibank's declaration -- was so specific was so

15  that anyone reading it can see that the total payments they're

16  getting are less than their principal claim.  It is totally

17  accurate that in the negotiations people came up with formulas

18  that involve the petition date claim plus the post-petition

19  interest, and what percent are they getting of that sum.

20  That's right, because for whatever reason that's how the

21  negotiations went.  But the bottom line is they are agreeing to

22  a claim of less than their full amount, they're going to get

23  interest on the less-than-full amount, there is going to be the

24  2 to $3 billion savings, and it's a great deal for PREPA.

25         So, unless they show us something in their

1   objection -- and they haven't told us anything yet -- there is

2   nothing about the plan that's contemplated that's unconfirmable

3   on its face.

4          Similarly -- and I will jump for a moment to the fuel

5   line lenders -- Mr. Kleinhaus says, you know, this is the

6   horrible of horribles, he goes first, and that his issue should

7   come up -- his priority issue should come up at the 9019

8   hearing.  Wrong.

9          Bottom line, they have a claim.  Let's ballpark it for

10  argument's sake now at $700 million and they say it has

11  priority.  If they're right and they prove that at

12  confirmation, we're going to have to pay it, aren't we?  Yes,

13  we're going to have to pay it.  And if we can't pay it, the

14  plan won't be confirmed.  That has nothing to do with the 9019

15  hearing, what claim he might have.

16         And I also want to make clear while I'm on that that

17  all of this talk about their seniority and priority, it reminds

18  me if you say something loud enough and often enough, people

19  start believing it.  Not only do they admit they're not

20  parties, but an agreement that gives PREPA the right to pay

21  current expenses before taking the other revenues and putting

22  them into a lock box or the like doesn't mean that the current

23  expense claimants are being given any rights or entitlements.

24  It's PREPA was given permission to pay current expenses.

25  That's much different than current expenses having a priority

1   as a matter of law, which is what they have to prove to your

2   Honor.

3           The ERS decision that the committee is alluding to was

4   an application of Bankruptcy Code Section 552.  One of the many

5   arguments to why our lien challenge -- or one of the many

6   arguments that would contest our lien challenge is that 552

7   doesn't apply to the PREPA bondholders because they claim

8   they're special revenue bonds; they get the revenues from the

9   electric utility.  Whether that's right or wrong, I'm not going

10  to argue now, and we're not going to argue I don't think even

11  at the 9019 hearing, but there is an issue there, there is a

12  clear issue there, and that's why we're settling.

13          Finally, Judge, in terms of the procedural problem

14  that the fuel line lenders raised that we PREPA should not be

15  allowed to give our argument to them in reply, two things, your

16  Honor.  First, we have been begging them -- begging them -- to

17  lay out the grounds for their priority.

18          (Continued on the next page)

19

20

21

22

23

24

25

1        MR. BIENENSTOCK:  Today on the record I already

2  explained why they are wrong.  We would love to see the

3  documents establishing their priority and how an unsecured fuel

4  line claim can have priority over secured bonds.  Enough said.

5        THE COURT:  Well, on that point it does seem to me

6  that Mr. Kleinhaus' procedural point was well taken to the

7  extent that the government parties assert that this proposed

8  RSA and, in particular, the 9019 approvals that are being

9  sought now would not affect the rights of any other creditors,

10  and we know that the fuel line lenders are taking and have

11  taken this position, even if you don't know, in granular detail

12  every single statement of PREPA or whatever they would be

13  pointing to.

14        We know that the fuel line lenders and also UTIER are

15  taking the position that they have a right that would

16  essentially be either precluded entirely in terms of pursuit or

17  materially affected even by this smaller set of approvals which

18  include the lien challenge preclusion and they say that they

19  would be hurt by the advanced payments.  Clearly, you don't

20  agree with that, but they do take that position.  When you are

21  coming out of the box saying, it doesn't hurt anyone, you do

22  have a responsibility to show me your basis for that position,

23  and I think it is appropriate for you to do that before they

24  respond, even if they end up responding with another box of

25  documents.

1    So I am going to require that you further supplement

2  your supplemental proffer to address the fuel line and

3  compensation priority arguments and tell me what the legal

4  basis and factual basis is of the government parties' position

5  that this requested set of approvals of the 9019 does not

6  adversely affect legal rights that these people have.

7    MR. BIENENSTOCK:  Your Honor, we are happy to do that,

8  but I have one request.  They have alleged, from our viewpoint,

9  out of the thin blue air, that they have this priority right.

10  And a priority has two elements for our purposes.  It's an

11  amount of payment and timing of payment.

12    When bonds are senior and junior, there is language

13  that says at such and such a time if the senior is not paid, no

14  more money can go to the juniors, it should go to the seniors.

15  If the juniors get the money, they are to hold it in trust,

16  they should turn it over to the seniors.  It's none of that

17  here.  There is none of that here.

18    My request is this.  Could they each be instructed to

19  send me a letter -- it can be one, two, three pages,

20  whatever -- just setting down the basis for their priority

21  claims and whether they are asserting priority not only to get

22  their total amount paid, but the timing of that payment so I

23  know what I'm dealing with.

24    From our perspective, they have made up something out

25  of the thin blue air, and I'm supposed to respond to it.  I'd

1    like to have the basis for their priority claims.  Our response

2    will be much better if we know where they are coming from.

3              THE COURT:  Mr. Kleinhaus, will you provide a précis?

4              MR. KLEINHAUS:  Your Honor, I am not sure how to

5    respond.  We filed a complaint in 2017 and a motion to

6    intervene that laid out our case quite extensively.  We filed

7    another complaint two days ago that lays out our case quite

8    extensively.  In terms of the basis for our priority, those

9    documents lay it out fully.  The trust agreement says --

10             THE COURT:  Let me ask you this.  Is your bottom line

11   as to your legal position that you currently have a right to

12   have your $700 million paid before a further penny is paid to

13   bondholders?

14             MR. KLEINHAUS:  Yes.  And that's in part because the

15   bondholder document itself limits and conditions the

16   bondholder's lien and their claims on payment in full of

17   current expenses.

18             THE COURT:  I think that's your précis,

19   Mr. Bienenstock.

20             Ms. Mendez.

21             MS. MENDEZ-COLBERG:  Yes, your Honor.

22             I just mentioned that the trust agreement in its

23   definition of the current expenses it says that it's the

24   reasonable and necessary current expenses of maintaining,

25   repairing, and operating the system, including all

1    administrative expenses, which includes UTIER, and also, among

2    others, payments to pension or retirement funds.  It's in the

3    text of the trust agreement of 1974, which we are explicitly

4    including.

5              THE COURT:  Is it your position that the entire

6    actuarial value of the accrued unfunded benefits would have to

7    be paid before a penny goes to the bondholders or that -- and

8    this is an or -- any provision for payment of the bondholders

9    would have put before it an actuarial amortization of the

10   outstanding unfunded liability and coverage of other current

11   compensation-related expenses?

12             MS. MENDEZ-COLBERG:  Yes, your Honor.  They will have

13   to be paid before the bondholders.

14             THE COURT:  The whole thing or the amount that would

15   be normally paid on the schedule?

16             MS. MENDEZ-COLBERG:  We would submit the whole thing.

17             THE COURT:  Thank you.

18             MR. KLEINHAUS:  Your Honor, one supplemental comment.

19   If Mr. Bienenstock wants further explication of our position,

20   another alternative here is, we can file our objection,

21   explicate our position.  We heard what Mr. Bienenstock said

22   today.  They will file their reply.  But in that case we would

23   want a surreply so that we can see their position written out

24   for the first time and respond to that.

25             THE COURT:  I tried to be really careful in approving

1   the schedule shifts to get full briefing to me in time for me

2   not to have to do what I did last night, since I was out of

3   pocket all day yesterday, and I granted this request.  But it's

4   not in the best interests of efficient judicial thinking to

5   leave me at the last minute.  So I want Mr. Bienenstock to

6   supplement before you file your opposition.

7           MR. BIENENSTOCK:  Your Honor, I just wanted to state

8   briefly, there is a world of difference between a document that

9   allows PREPA to pay its current expenses with revenues that are

10  otherwise encumbered by the bondholders in their net pledge.

11  There is a world of difference between having permission to do

12  it and granting either UTIER or the fuel line lenders a

13  priority right, especially when the document says there are no

14  third-party beneficiaries.

15          But we will do exactly as your Honor requested, with

16  pleasure, and we are maintaining our position.  This is not an

17  issue for the 9019.  But when your Honor has everything in

18  front of you, the Court will decide whether we are right or

19  not.

20          THE COURT:  Precisely.  Can you file that supplement

21  by next Wednesday, the 17th or next Friday, the 19th?

22          MR. BIENENSTOCK:  If I could have until next Friday,

23  that's fine.

24          THE COURT:  By next Friday, the 19th, because I think

25  the oppositions are due the 7th of August, and we have the omni

1    between and all sorts of other things.  By Friday, the 19th, a

2    further supplementation as to the government parties' position

3    on the fuel line lenders and UTIER priority assertions, whether

4    those would be -- I guess your answer to the question of

5    whether they would be affected negatively is going to be that

6    you believe, as a matter of law, they don't exist in a link

7    that is material to this.

8            MR. BIENENSTOCK:  There is that one answer, they don't

9    have the priority right in the first place.  The second answer

10   is, if they do have it, then the confirmation will have to get

11   it provided for in a way that's confirmable.

12           THE COURT:  In essence, a damages claim for a breach

13   by virtue of these preplanned payments of the priority that

14   they are claiming.

15           MR. BIENENSTOCK:  Your Honor, PREPA has been paying

16   current expenses -- PREPA was paying some expenses, not others.

17   This was not governed by the Oversight Board.  It was just what

18   PREPA was doing for a long time.  This is the first time we

19   have ever heard out of their mouths, oh, we get paid before you

20   pay anything to anyone else.

21           THE COURT:  At the hearing today what we heard is we

22   get paid before you pay bondholders.  Under the current bond

23   arrangements that's the argument I think I'm hearing.

24           MR. BIENENSTOCK:  Fine.  All I'm saying is, we don't

25   think they have that right.  Everything in bankruptcy is a

1   damage claim.  Their claim is in default already.  It's not

2   paid when due.

3          All we have to do is, under a plan, show that we will

4   give it whatever Title III requires us to give it.  That's why

5   we are saying it's not really a 9019 hearing, but I understand

6   your Honor's concern.  You want to make sure the Court doesn't

7   approve something that makes it impossible for their rights to

8   ever be satisfied, and we will file what your Honor requested

9   to show that that's not happening.

10          THE COURT:  Thank you very much.

11          I thank you all today for responding to these

12   questions and for your participation in this conference.  And I

13   do urge you to bear in mind and act in accordance with the

14   general principles and guidelines I have laid out here.

15          As to the remaining piece of the motion *in limine*

16   directed to UTIER and the Sistema, please meet and confer and

17   see if you can work that out with stipulations and send me a

18   status on that by next Friday, the 19th as well.  And I'll

19   enter orders embodying the other decisions that I made today on

20   the record and will enter one with the new schedule for the

21   discovery motion related submissions.  I think that takes care

22   of today's agenda.  Keep well, everyone.

23          Our next hearing is the omni on July 24 in San Juan.

24   As always, I thank all of the court staff here in New York, in

25   Puerto Rico, and in Boston for all of their constant work in

1    supporting the progress of these cases and the logistics for

2    these hearings.

3              Keep well, everyone.  We are adjourned.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT)
                                ) ss.
2   OF PUERTO RICO              )

3

4                      REPORTER'S CERTIFICATE

5

6          I, Steven Greenblum, do hereby certify that the above

7   and foregoing pages, consisting of the preceding 61 pages

8   constitutes a true and accurate transcript of our stenographic

9   notes and is a full, true, and complete transcript of the

10  proceedings to the best of our ability.

11         Dated this 11th day of July, 2019.

12         S/Steven Greenblum _____

13         Steven Greenblum

14         Official Court Reporters
           500 Pearl Street
15         New York, NY 10007
           212-805-0320
16

17

18

19

20

21

22

23

24

25

```
1   UNITED STATES DISTRICT COURT)
                                  ) ss.
2   OF PUERTO RICO                )

3

4                    REPORTER'S CERTIFICATE

5

6        I, Steven J. Griffing, do hereby certify that the

7   above and foregoing pages, consisting of the preceding 61 pages

8   constitutes a true and accurate transcript of our stenographic

9   notes and is a full, true, and complete transcript of the

10  proceedings to the best of our ability.

11       Dated this 11th day of July, 2019.

12       S/Steven J. Griffing _____

13       Steven J. Griffing

14       Official Court Reporters
         500 Pearl Street
15       New York, NY 10007
         212-805-0320
16

17

18

19

20

21

22

23

24

25
```