U NITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | PROMESA<br>TITLE III |
| THE FINANCIAL OVERSIGHT   MANAGEMENT<br>BOARD FOR PUERTO RICO | |
| as  representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO | |
| DEBTOR | |

MOTION IN COMPLIANCE WITH ORDER

TO THE HONORABLE COURT:

COMES NOW creditor, Sucesión Pastor Mandry Mercado (hereinafter "Movant"), through its
undersigned counsel and very respectfully states and prays:

1.   On July 7, 2017, this Court issued a Memorandum Order on a motion filed by
Movant, a putative creditor of the Commonwealth of Puerto Rico, for relief from the
automatic stay imposed by the filing of Title III case  no. 17 BK-3283-LTS  in a proceeding
captioned *Sucesión Pastor Mandry Mercado v. Commonwealth of Puerto Rico,* civil case
no. JAC2008-0853, in the Puerto Rico Court of First Instance in Ponce (hereinafter the
"Litigation"). Said order lifted the stay of the Litigation for all necessary damages-
determination proceedings prior to the entry of judgment but stated that "the stay continues
to apply in all other respects, including as to entry and execution of judgment and
provisional remedies."

2.   Pursuant to said order, the Puerto Rico Court of First Instance (hereinafter
"PRCFI") continued proceedings in civil case JAC2008-0853, and on August 6, 2019,

rendered judgment quantifying of the Commonwealth's liability on the plaintiffs taking claim in the amount of $30,496,000.00 plus interest from the date of the taking, August 9, 2008, and costs. In compliance with the order issued by this Court, PRCFI did not order entry ("registro") of said judgment and advised the parties that any further proceedings in the case would require authorization by this Court. Copy of said judgment is enclosed herewith.

3.  Puerto Rico's Civil Procedure Rule 42.2 requires that judgment be entered (registered) in order for the judgment to become final.  *S.L.G. Szendrey-Ramos v. Consejo de Titulares*, *184 D.P.R.  133, 156 (2011)*.   As the judgment rendered by PRCFI has not been entered (registered), said judgment is not final.

4.  On April 19, 2018, the undersigned filed a proof of claim as creditor's attorney on behalf of Movant in the amount of $30,000,000.00 arising out of the inverse condemnation proceeding filed in case no. JAC2008-0853, then still unresolved.  As at present the taking claim has been quantified in the amount of $30,496,000.00 plus interest from the date of the taking, August 9, 2008, and costs, it is necessary to amend the proof of claim filed on April 19, 2018, and for that reason it is also necessary that the automatic stay imposed by the filing of Title III case  no. 17 BK-3283-LTS, be lifted to allow entry ("registro") of the   judgment rendered by PRCFI on August 6, 2019, in order for said judgment to become final.

5.  Movant fully understands that the stay will continue to apply in respect to execution of judgment and provisional remedies.

WHEREFORE,  Movant very respectfully prays this Honorable Court to enter an order for the PRFIC to enter (register) the judgment in order for it to become final and appealable and for Movant to amend its proof of claim.

**CERTIFICATE OF SERVICE**: I hereby certify that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Office of the United States Trustee and to the attorneys of record.

RESPECTFULLY SUBMITTED.

In Ponce, Puerto Rico, this 15th of August, 2019.

/s/María E. Vicéns Rivera
MARÍA E. VICÉNS RIVERA
USDC- PR 226711
9140 MARINA ST., SUITE 801
PONCE, PUERTO RICO 00717
TEL. / FAX: (787) 259-1999
E-mail: mevicens@yahoo.com

3

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL DE PRIMERA INSTANCIA**
**CENTRO JUDICIAL DE PONCE**
**SALA SUPERIOR**

| | |
|---|---|
| SALVADOR EDUARDO MANDRY NONES, ET ALS<br>**Demandante**<br><br>**Vs.**<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO, ET ALS<br>**Demandados** | **CIVIL NUM:** J AC2008-0853<br><br>**SALA** 605<br><br>**SOBRE:**<br><br>EXPROPIACIÓN A LA INVERSA |

### SENTENCIA

El 24 de octubre de 2008 los demandantes, presentaron demanda en la que alegaron la expropiación dos fincas de su propiedad descritas en la demanda, en la modalidad de expropiación a la inversa, y reclamaron la justa compensación por su valor. Se alegó en la demanda que las fincas están incluidas dentro del área que la Legislatura de Puerto Rico designó como el "Área de Reserva Natural Punta Cucharas" mediante la aprobación de la Ley Núm. 227 del 9 de agosto de 2008 —en adelante, "la Ley 227". Sostuvieron los demandantes que la actuación del Estado Libre Asociado de Puerto Rico —en adelante, "el ELA"— al incluir dichas fincas en el área de Reserva Natural Punta Cucharas – en adelante, "RNPC"- les privó de toda posible utilización productiva de su propiedad y constituyó una incautación de su derecho real de propiedad imponiendo restricciones a la propiedad mediante ley, sin que el Estado haya presentado previamente una acción de expropiación ni consignado una justa compensación.

En la demanda se alegó que en el 2007 y como paso previo a la inclusión de las fincas antes descritas dentro del área de RNPC, el Departamento de Recursos Naturales y Ambientales —en adelante "el DRNA"— de manera arbitraria e ilegal realizó un deslinde de la Zona Marítimo-Terrestre —en adelante "ZMT"— en las fincas. Como resultado de dicho deslinde en la porción "A" de la finca 1,908 se incluyó dentro de la ZMT un área con cabida de 133.6698 cuerdas dejando fuera de la ZMT sólo un área con cabida de 49.8228 cuerdas. En la finca 4,751 se incluyó dentro de la ZMT un área con cabida de 7.8730 cuerdas dejando fuera de la ZMT sólo un área con cabida de 4.0760 cuerdas. Alegaron

los demandantes que mediante este subterfugio, el DRNA, que ya contemplaba la futura adquisición de las fincas, pretendió convertir a dominio público el 73% de la porción "A" de la finca 1,908 y el 66% de la finca 4,751 con el evidente propósito de reducir la compensación que en su día tendrían derecho a recibir los demandantes.

En la demanda se incluyó como parte demandada a Javier Enrique Mandry Mercado —en adelante denominado "Javier Mandry"— quien a esa fecha tenía una participación del 3.100% en las fincas a los únicos fines de unirlo al pleito por ser este una parte indispensable en la reclamación y no se ha unido a la misma como demandante. Javier Mandry compareció inicialmente por conducto del Lcdo. Manuel Purcell Requena y contestó la demanda. Posteriormente, Javier Mandry pretendió retirar la contestación a la demanda que había suscrito el Lcdo. Purcell Requena y sustituirla por una contestación enmendada suscrita por él por derecho propio. El Tribunal no autorizó la presentación de la contestación enmendada por derecho propio y dictó una orden el 23 de diciembre de 2009 concediéndole un término de 30 días para contratar representación legal.[1]

El ELA presentó una Moción de Desestimación el 25 de marzo de 2009. La parte demandante se opuso a dicha moción y, a su vez solicitó que se dictara una sentencia sumaria parcial a su favor. El 20 de noviembre de 2009, se denegó tanto la moción de desestimación del ELA como la moción de sentencia sumaria presentada por los demandantes. El ELA procedió a contestar la demanda, negó la mayoría de sus aseveraciones y levantó una serie de defensas afirmativas, dirigidas principalmente alegar que la demanda era prematura y que la demandante no había agotado los procedimientos administrativos pertinentes.

---

[1] El 28 de mayo de 2010 el Tribunal emitió una nueva orden indicándole a Javier Mandry que no podía comparecer por derecho propio y concediéndole un nuevo término para contratar representación profesional. Ante el reiterado incumplimiento de Javier Mandry con las órdenes del Tribunal, el 17 de noviembre de 2010, se dictó una orden eliminando su alegación y le anotó la rebeldía. Pese a ello, Javier Mandry continuó presentando escritos por derecho propio, lo que requirió que este Tribunal emitiera una orden el 5 de diciembre de 2016 en la que se le ordenó que se abstuviera de presentar escritos por derecho propio. Javier Mandry también hizo caso omiso de esa orden lo que llevó a este Tribunal a emitir una orden el 5 de diciembre de 2017 apercibiéndole de que una nueva violación se podría entender como un desacato al Tribunal y podría acarrear severas sanciones.

Las partes realizaron el descubrimiento de prueba luego de lo cual presentaron el informe de la conferencia con antelación al juicio en el que estipularon que no había controversia en cuanto que el ELA "no tiene intención de reivindicar parte alguna de las fincas de la demandante descritas en el expositivo 2 de la demanda por estar dentro de los límites de un deslinde de ZMT."

El demandante Salvador Mandry Nones, falleció el 17 de febrero de 2011 y fue sustituido por sus cinco hijos Salvador Rafael, Eduardo José, Margarita Rosa y Adrián Roberto, y Javier de apellidos Mandry Mercado, quienes ya eran partes en el pleito, así como por su viuda Rosa Estela Mercado Guzmán, quien se sometió voluntariamente a la jurisdicción del Tribunal.

Posteriormente, el tribunal bifurcó el caso respecto a las controversias a adjudicarse, disponiendo que resolvería primeramente si la Ley 227 constituyó una incautación de la propiedad de los demandantes, y luego resolvería, si procediera, la justa compensación a pagarse por la propiedad incautada.  Así las cosas, ambas partes radicaron sus respectivas solicitudes de sentencia sumaria en apoyo de sus alegaciones. El 27 de febrero de 2014, este Tribunal dictó una Sentencia Parcial en la que determinó que la Ley 227 constituyó una incautación de la propiedad del demandante y ordenó la celebración de una vista para la determinación de la justa compensación.  Denegada su reconsideración, el ELA recurrió ante el Tribunal de Apelaciones solicitando su revocación.

En una resolución fechada el 30 de junio de 2014, en el recurso KLCE2014-00713, el TA denegó expedir el auto de *Certiorari* solicitado, por entender que el TPI "emitió un dictamen cónsono en Derecho cuando determinó que la acción del Estado apoyada en la Ley 227, *supra,* constituyó una incautación de la propiedad perteneciente a la parte recurrida".  Luego de haber presentado una moción de reconsideración que fue denegada 13 de agosto de 2014, el ELA presentó una solicitud de Certiorari ante el Tribunal Supremo en el caso CC-2014-0801, que fue denegada el 5 de diciembre de 2014.  Una moción de reconsideración presentada por el ELA ante el Tribunal Supremo fue declarada no ha lugar mediante Resolución fechada el 17 de abril de 2015.

Remitidos los mandatos del Tribunal Supremo y el Tribunal de Apelaciones, el caso volvió a la competencia de este Tribunal de Primera Instancia para la determinación de la justa compensación que debe pagar el ELA. El 20 de junio de 2016, las partes presentaron un informe de conferencia preliminar entre abogados suplementario para ajustarlo a lo resuelto en la sentencia parcial. En el mismo, las partes acordaron que las controversias a adjudicar en la vista del caso serían: la justa compensación a la que tiene derecho la parte demandante como consecuencia de la incautación de dicho predio y como parte de esa controversia, el mejor y más productivo uso de las fincas y el efecto sobre el mismo del deslinde de la ZMT que el DRNA efectuó en el 2007.

Próximo a celebrarse la vista en su fondo del caso, el ELA notificó a este Tribunal de la paralización automática que se generó por la presentación del caso No. 17 BK-3283-LTS bajo el Capítulo III de la Ley Promesa, presentado por la Junta de Supervisión y Administración Financiera para Puerto Rico en representación del ELA. Los demandantes acudieron al foro federal para solicitar el relevo de la paralización automática, y la Juez Laura Taylor Swain, quien está a cargo del procedimiento bajo el Capítulo III de la Ley Promesa, emitió una orden el 7 de julio de 2017 donde relevó de la paralización automática al caso de epígrafe para continuar con la determinación de la justa compensación, pero la mantuvo en vigor para efectos del registro de la sentencia, procedimientos de ejecución y la obtención de remedios provisionales.

El 16 de octubre de 2018 se presentó una moción informando el fallecimiento de la demandante Estrella María Aparicio Vázquez, el 28 de agosto de 2018 y solicitando su sustitución por sus herederos, su hijo Oscar Adolfo Mandry Aparicio, a sus nietos María del Carmen y Selma Verónica, de apellidos Mandry Llombart, y Oscar Adolfo y Gustavo Alejandro, de apellidos Mandry Bonilla.

La vista en su fondo del caso se celebró los días 6, 7, 8, 9, 16, y 17 de agosto; 4 y 6 de septiembre y 4 y 30 de octubre de 2018. Ambas partes

presentaron prueba pericial y documental. Como peritos de la demandante declararon el Arquitecto Javier Bonnin Orozco, el Dr. Máximo Cerame Vivas y el tasador, Ing. Ismael Isern Suárez —en adelante, "el Ing. Isern". El ELA presentó como testigos al Sr. Vicente Quevedo Bonilla, Técnico del DRNA, al Agrimensor Gerardo Ramos y como perito tasador al Sr. Esteban Núñez Camacho —en adelante, "el Sr. Núñez".

Luego de finalizado el testimonio del Ing. Isern, la representante legal del ELA le indicó al Tribunal que el informe presentado en evidencia no correspondía con la copia que ella tenía. El asunto fue discutido en sala y la parte demandante admitió que por error inadvertido presentó en evidencia una copia preliminar del informe del Ing. Isern. Ante esta situación, se ordenó que el Ing. Isern regresara a sala para clarificar cual de los documentos era el final que debía quedar en evidencia. Quedo establecido que la copia que tenía la representación legal del ELA era la versión final. Aclarado el asunto, el Tribunal ordenó al Ing. Isern tomar nuevamente la silla testifical para que la parte demandada le hiciera las preguntas que tuviera a su bien hacer. Así ocurrió.

Luego de considerar y ponderar las estipulaciones de las partes, y la totalidad de la prueba pericial y documental admitida en evidencia y darle el peso probatorio y credibilidad que estimó merecían, el procedemos a formular las siguientes

### DETERMINACIONES DE HECHOS:

Las partes estipularon la veracidad de los siguientes hechos:

1. Las cabidas de las fincas objeto del presente caso al 9 de agosto de 2008 eran: Finca 1,908, 184.0899 cuerdas; finca 4,751 era de 12.9333 cuerdas. La cabida combinada de ambas era de 197.0232 cuerdas.

2. En junio de 2004 el DRNA emitió un informe titulado *Informe Sobre Valor Natural Área Natural Punta Cucharas* en el que se recomendó la designación del área como reserva natural.

3. Como parte de las gestiones realizadas por el DRNA encaminadas a lograr la designación del Área Natural Punta Cucharas el DRNA realizó un deslinde de la Zona Marítimo Terrestre (ZMT).

4. El 2 de febrero de 2007, el Agrimensor José A. Vilanova Portalatín, Director de la División de Agrimensura del DRNA recomendó y el Secretario del DRNA aprobó un plano titulado *Land Acquisition Plans for "La Matilde" Property*.

5.      En el plano del 2 de febrero de 2007 titulado *Land Acquisition Plans for "La Matilde" Property* aparece deslindada la ZMT en las dos fincas objeto del presente caso. El área que se incluyó como parte de la ZMT en la finca 1,908 se designó en el plano como Parcela 003-01 con una cabida de 134.0042 cuerdas. El área que se incluyó como parte de la ZMT en la finca 4,751 se designó en el plano como Parcela 004-01 con una cabida de 7.1214 cuerdas.

6.      El 21 de febrero de 2007 el Secretario del DRNA envió una carta al Sr. Salvador Mandry Nones notificándole "que los días 19 de julio y 31 de agosto de 2005, personal técnico de la División de Agrimensura y de la Secretaría Auxiliar de Planificación visitaron el área de la Finca Matilde con el propósito de iniciar los trabajos de deslinde del Límite de la Zona Marítimo Terrestre en terrenos.

7.      El Estado Libre Asociado de Puerto Rico no tiene intención de reivindicar parte alguna de los terrenos de los demandantes por estar dentro de los límites de un deslinde de Zona Marítimo Terrestre.

8.      Las fincas 1,908 y 4,751 están ubicadas en un área que fue incluida en un Plan Especial de Área en el Plan de Ordenación Territorial denominado "PL.E.2 LA MATILDE". El artículo 44.3 del R.O.T. establece que "El Plan Especial para el área de La Matilde pretende facilitar un desarrollo residencial, turístico, y comercial condicionado a la protección de recursos naturales como La Laguna Salinas y una zona de humedales al sur del área identificada y a la conversión de la PR.2 en expreso con la construcción de calles marginales.

9.      También dispone dicho artículo 44.3 que los objetivos de desarrollo del plan son:
." Maximizar el potencial del área para proyectos de carácter residencial y turístico, de preferencia orientados al Mar Caribe y comercial, de preferencia a lo largo del futuro expreso de la PR-2.
· Ordenar el desarrollo a lo largo de marginales a la PR-2 para evitar las conexiones directas a la misma.
· Establecer una zona de protección de humedales y de la laguna Salinas."

10.     La finca 1,908 y la finca 4,751 estaban dentro de dos Distritos de Ordenación: el EV.4, cuyos propósitos y usos permitidos aparecen en el Capítulo 16 del R.O.T. y el SREP.N, cuyos propósitos y usos permitidos aparecen en el Capítulo 35 del R.O.T.

11.     Las partes estipulan que los peritos tasadores de ambas partes, Ing. Ismael Isern, por los demandantes y el Sr. Esteban Núñez Camacho, por la parte demandada, están debidamente cualificados para declarar sobre la valoración de las fincas objeto de este litigio.

En virtud de la prueba admitida y creída por el Tribunal durante la vista en su fondo quedaron probados adicionalmente los hechos que a continuación se relacionan:

12.     Las descripciones registrales de las fincas de las que los demandantes, junto con el demandado Javier Mandry, eran dueños en pleno dominio y que fueron incluidas en la Reserva Natural Punta Cuchara, son:

PARCELA MT-3- RÚSTICA:  Radicada en el Barrio Canas del término municipal de Ponce con cabida de ochocientas una cuerdas cuarenta y seis céntimos, equivalentes a trescientas quince hectáreas, cero áreas, cincuenta y ocho centiáreas y trescientas ochenta y cuatro miliáreas, cabida ésta que resulta una vez descontadas cinco punto cuatro (5.04) cuerdas para el polígono de tiro de la Policía de Puerto Rico, y que está formada de las siguientes porciones:

PORCIÓN A RÚSTICA:  Radicada en el Barrio Canas del término municipal de Ponce, compuesta de CIENTO NOVENTA Y DOS cuerdas cincuenta y un céntimos, equivalentes a setenta y cinco hectáreas, sesenta y seis áreas, cuarenta y una centiáreas y trescientas cuatro miliáreas, de terrenos llanos, identificados en el plano de segregación como Porción MT3-Llana, colindando por el Norte, con terrenos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, Oficina Regional, en una alineación de doscientos ocho punto seis (208.06) metros, con terrenos del Gobierno Municipal de Ponce en dos alineaciones que totalizan cuatrocientos cincuenta y tres punto tres (453.03) metros y con la carretera estatal número Dos en seis alineaciones que totalizan seiscientos veintiséis punto noventa y ocho (626.98) metros; por el Este, con la Porción MT-2 Llana en una alineación de ochocientos treinta y seis punto cero nueve (836.09) metros; por el Sur, con el Mar Caribe en seis alineaciones que totalizan ochocientos sesenta punto cuarenta y siete (860.47) metros y por el Oeste, con la porción MT-4 Llana en una alineación de setecientos veinte punto cuarenta y un (720.41) metros.

Consta inscrita al folio 293, del tomo 635 de Ponce II, finca 1,908, inscripción 1era.

RUSTICA:  Parcela MT-2 radicada en el Barrio Canas del término Municipal de Ponce, Puerto Rico, compuesta de TRECE PUNTO OCHENTA Y NUEVE CUERDAS equivalentes a CINCUENTA Y CUATRO MIL QUINIENTOS NOVENTA Y TRES PUNTO MIL DOSCIENTOS SETENTA Y SIETE METROS CUADRADOS; en lindes por el Norte, en 65.292 metros con Carretera Estatal Núm. 2; por el Sur, en 64.554 metros y .430 metros con el Mar Caribe; por el Este, en 836.087 metros con terrenos propiedad de Sucesión Mandry Mercado y por el Oeste, en 845.481 metros con terrenos de la finca de la cual se segrega.

Consta inscrita al folio 8, del tomo 696 de Ponce II, finca 4,751, inscripción 1era.

13.  Las fincas antes descritas colindan entre sí y forman un cuerpo continuo con las mismas características físicas y topográficas.  Ambos tasadores coincidieron en que las fincas pueden considerarse como una unidad a los efectos de valoración aunque el tasador del ELA valoró las dos fincas por separado.  En adelante se denominarán ambas fincas como "las fincas sujeto".

14.  Las fincas sujeto ubican al Sur de la carretera PR-2 (en adelante, "la PR-2") a la altura del Km. 222.8. La PR-2 es una vía de gran flujo vehicular ya que es la ruta de conexión entre Ponce y el Oeste de la Isla.  La porción de la



PR-2 donde se encuentran las fincas ya había sido convertida en expreso para
la fecha de aprobación de la Ley 227. Las fincas tienen acceso a la PR-2 desde
una de las marginales de esta carretera.

15.     La topografía es prácticamente llana en su totalidad, aunque con
alguna inclinación de Norte a Sur.

16. La mayor parte de las fincas se encuentra dentro de la zona
susceptible de inundación con una clasificación "AE" y la parte más próxima al
Mar Caribe, un área de humedales y manglares, tiene clasificación "VE". La
Zona "AE" indica áreas en las que se ha determinado elevación de la inundación
base.

17. Conforme atestó el Arq. Javier Bonnin Orozco, el Reglamento 13 de
la Junta Planificación, sobre áreas especiales de riesgo a inundación, establece
que clasificación "AE" no es un impedimento al desarrollo de los terrenos, si no
que dispone que las construcciones en las áreas con clasificación "AE" deben
tener una elevación sobre el nivel de inundación. Esto puede lograrse mediante
el uso de relleno, lo que es usual en los terrenos en Ponce. Solo en el área
próxima al Mar Caribe, que tiene una clasificación "VE", quedaría limitado el
desarrollo.

18.     El Plan de Ordenación Territorial del Municipio Autónomo de Ponce
de 2003 establece dos clasificaciones para los terrenos de las fincas sujeto. La
mayor parte de las fincas sujeto tiene una clasificación como suelo urbano que
ubica en un distrito subyacente EV.4 con un distrito sobrepuesto, el (PL.E). El
área de humedales próxima al Mar Caribe tiene una calificación de SREP.N.

19.     El Distrito PL.E (Planes Especiales) se establece para facilitar,
mediante guías de ordenamiento, el desarrollo o redesarrollo armónico de áreas
que ameritan atención especial. Las condiciones para usos, actividades,
intensidades y otros parámetros se establecen en los Distritos subyacentes
identificados en los Planos de Ordenación y no en los planes especiales de los
distritos sobrepuestos. Los usos y actividades preferenciales y el diseño de la
infraestructura que se indican en los planes especiales son solamente a título
ilustrativo y deben considerarse como guías para armonizar los desarrollos.

20. El plan especial aplicable a las fincas sujeto es el PL.E.2 (La Matilde)[2]. El propósito de este plan especial es facilitar un desarrollo residencial, turístico y comercial, condicionado la protección de recursos naturales como la Laguna Salinas y una zona de humedales al sur del área identificada y la conversión de la PR-2 en expreso con la construcción de calles marginales. Los objetivos de desarrollo del plan incluyen el maximizar el potencial del área para proyectos de carácter residencial y turístico, de preferencia orientados al Mar Caribe y comercial, de preferencia a lo largo del futuro expreso de la PR-2. El plano que ilustra las guías de desarrollo del plan especial ubica el sujeto en un área para nuevos desarrollos de conformidad con el Distrito de Ordenación EV.4.

21. El Distrito EV.4 se establece para fomentar el desarrollo residencial, comercial, de servicios y de industria liviana en sectores que permiten una amplia variedad de usos con alta intensidad[3].

22. La porción de las fincas sujeto más cercana al Mar Caribe está en un Distrito de Ordenación SREP.N. El Distrito SREP.N se establece para proteger o restaurar recursos naturales sensitivos, establecer nuevos bosques y áreas de amortiguamiento y permitir el desarrollo ecoturístico en sectores que lo ameriten. Este distrito aplicará también para proteger los ecosistemas que bordean los cuerpos de agua. No se permite segregar los terrenos identificados por el Distrito SREP.N, a menos que sean para separarlos de la finca original con propósito de reservarlos o dedicarlos para fines de conservación[4]. El Distrito SREP.N permite la construcción de viviendas unifamiliares, museos, sitios históricos, campos recreativos y de vacaciones, parques públicos y jardines, bajo ciertas condiciones y restricciones del propio Reglamento de Ordenación del Plan Territorial de Ponce. Cualquier desarrollo debe cumplir con una intensidad de uso de 1 unidad de vivienda por cada solar legalmente segregado, una altura máxima de 2 plantas, las construcciones solo pueden ocurrir en terrenos con una pendiente menor de 25%, con patios laterales y posteriores mínimo de 20

---

[2] Reglamento de Ordenación, Sec. 44.3

[3] Los tasadores de ambas partes coincidieron en que el Distrito de Ordenación EV.4 permite una gran variedad de usos de alta intensidad y que tanto los usos comerciales como residenciales son usos permitidos ministerialmente.

[4] Reglamento de Ordenación, Sec. 35.1

metros, entre otras restricciones[5].

23.    Las fincas tenían disponibles todos los servicios de infraestructura necesarios para su desarrollo.

24.    El vecindario donde ubica el Sujeto, es uno de amplio desarrollo urbano. En el área existían para el 2008, urbanizaciones residenciales, desarrollos industriales, hoteles, restaurantes, oficinas de los gobiernos estatal y municipal, el área recreativa del Balneario "El Tuque", restaurantes de comida rápida y, a minutos de las fincas sujeto, los centros comerciales de Ponce Towne Center, Ponce Mall, Sam's Club, Walgreens, y K-Mart. Según se aprecia de las fotografías aéreas presentadas en evidencia, al sur de la PR-2, no existen desarrollos residenciales.

25.    Tomando en consideración los factores que surgen de la totalidad de la evidencia presentada por las partes respecto de la localización, accesos, exposición a la PR-2, topografía, usos predominantes en el vecindario, infraestructura disponible y las guías de desarrollo del plan especial que ubican las fincas  sujeto en un área para nuevos desarrollos de conformidad con el Distrito de Ordenación EV.4, y la que la cabida total de ambas fincas es de 197.023 cuerdas, el Tribunal determina que el mejor y más productivo uso del sujeto debe establecerse por sectores.

26.    Este Tribunal acoge la opinión del perito tasador de los demandantes, el Ing. Isern, atendiendo el valor de ambas fincas sujeto como un todo y subdividirse en tres áreas o sectores.

27.    La más próxima a la PR-2, con una cabida de 50 cuerdas, su mejor y más productivo uso o destino es para fines comerciales.  Tal cabida tiene como base varios elementos: las disposiciones del Reglamento de Ordenación Territorial, entre las que se encuentra destinar el frente de carretera para un uso comercial, la topografía y cabida total de las fincas sujeto; su ubicación en el área oeste de Ponce, donde ha habido un extenso desarrollo comercial; su exposición visual a la Carretera PR-2; que el tamaño de los usos comerciales en el área sugiere una proporción de 3 de ancho a 2 de fondo para acomodar espacio de

---

[5] Reglamento de Ordenación, sec. 35.2 a la 35.9

estacionamiento; que las condiciones económicas que demostraba el informe del Banco Popular de Puerto Rico para el período de 2006 al 2008, revelaban la viabilidad económica del uso comercial en un área de esa cabida.

28.    El área más cercana al Mar Caribe, donde ubican los manglares, con una cabida de 35.075 cuerdas, su mejor uso es para fines de conservación. El Ing. Isern determinó la cabida del área a la que asignó un mejor uso de conservación a base de un plano que presentó el Arq. Federico Montilla a la Oficina de Permisos del Municipio Autónomo de Ponce —en adelante, "la Oficina de Permisos"— en 2005 para un proyecto multiusos denominado Mandry Seaside Estates.   Este plano, a su vez, descansa en una determinación jurisdiccional —en adelante la "JD" por las siglas en inglés de "Jurisditional Determination"— sobre humedales que se emitió para las fincas sujeto por el Cuerpo de Ingenieros del Ejército de Estados Unidos —en adelante, "el Cuerpo de Ingenieros"— el 1 de noviembre de 1995.   Esa JD fue gestionada por el Dr. Máximo Cerame Vivas y estableció que los humedales a protegerse (Wetlands) cubrían un área de 35.075 cuerdas y los terrenos susceptibles de desarrollo (Upland), 171.280 cuerdas. La vigencia de la JD era de 5 años.

29.    Al someterse el proyecto Mandry Seaside Estates en 2005, la Oficina de Permisos requirió la preparación de una JD actualizada. El 5 de septiembre de 2005, funcionarios de la Oficina de Permisos del Municipio Autónomo de Ponce que evaluaban el proyecto de Mandry Seaside Estates enviaron una carta al Sr. Salvador Mandry en la que se le requirió una revisión de la delimitación de la zona marítimo terrestre que aparecía en los planos sometidos.   El 24 de octubre de 2005, el Cuerpo de Ingenieros le indicó al Arq. Montilla que la nueva JD se haría conforme al "1987 Wetland Delineation Manual", el mismo que se usó para la de 1995.   La gestión para tramitar la actualización de la JD se le encomendó nuevamente al Dr. Cerame Vivas.

30.    El Dr. Cerame Vivas declaró que en el descargo de esa encomienda realizó varias visitas a las fincas, caminándolas, sobrevolándolas y fotografiándolas. Aunque el proceso de gestión de la JD actualizada no se llegó a concluir, sus observaciones le llevaron a concluir que no hubo una variación



significativa en el área de humedales durante los años transcurridos desde la JD de 1995. El Dr. Cerame Vivas explicó que para emitir la JD el Cuerpo de Ingenieros negocia su jurisdicción y escoge el área que interesa proteger, lo que significa que es posible que en el área de "Upland" puedan existir humedales que no se tengan que proteger.

31.    El testimonio del Dr. Cerame Vivas mereció completo crédito al Tribunal, y permite la inferencia que para agosto de 2008 el área de humedales no desarrollable de las fincas sujeto tenía una cabida de 35.075 cuerdas[6].

32.    A la porción de las fincas sujeto que ubica entre el área a la que atribuyó un mejor uso comercial y el área a la que asignó un mejor uso para fines de conservación, con cabida de 111.948 cuerdas, su mejor y más productivo uso es para fines residenciales turísticos.

33.    El Ing. Isern valoró el área de 50 cuerdas, (196,519.8300 m.c.) próxima a la carretera PR-2, a la que atribuyó un mejor uso comercial, en $20,600,000.00, con un precio unitario de $105.00 por metro cuadrado.  Hizo la valoración utilizando el método de ventas comparables, para lo que usó cuatro ventas de propiedades ubicadas en Ponce, con la misma clasificación EV.4 y un mejor uso comercial.  Los unitarios ajustados de las ventas comparables fueron de $115.00/m.c. para la número 1, $131.00/m.c. para la número 2, $161.00/m.c. para la número 3 y $105.00/m.c. para la número 4.

34.    El tasador del Estado, Sr. Núñez, asignó un mejor uso mixto, comercial-residencial a los terrenos próximos a la PR-2.  Valoró la Parcela 003-02, a la que atribuyó una cabida de 49.8228 cuerdas, (195,823,1866 m.c) en $13,708,000, con un precio unitario de $70.00 por metro cuadrado[7]. Utilizó el método de ventas comparables, usando cuatro ventas, tres de las cuales estaban en distritos de ordenación EV-4 y una en un distrito EV-3. Los unitarios ajustados de las ventas comparables para valorar la Parcela 003-02 fueron de $73.00/m.c. para la número 1, $69.00/m.c. para la número 2, $72.00/m.c. para la número 3 y $67.00/m.c. para la número 4.

_____

[6] Regla 110 (C) de las de Evidencia establece que para establecer un hecho no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.
[7] En el informe de valoración efectivo el 15 de noviembre de 2007 concluyó que el valor de esta parcela era $14,882,600.00 con un precio unitario de $76.00/m.c.

35.    A los terrenos colindantes, la Parcela 004-02, con cabida 4.0760 cuerdas (16,020.3265 m.c) los valoró en $2,243,000.00, con un precio unitario de $140.00 por metro cuadrado. Utilizó el método de ventas comparables con cuatro ventas, tres de las cuales estaban en distritos de ordenación EV-4 y una en un distrito EV-3.

36.    La cabida de la Parcela 003-02 que indica el plano de adquisición estipulado no es de 49.8228 cuerdas, sino de 64.05061 cuerdas, equivalentes a 253,534.6697 m.c[8]. La cabida de esta parcela utilizada por el Sr. Núñez surge de un plano que se le suministró, que difiere del plano estipulado. Si se valora la Parcela 003-02 con la cabida de 253,534.6697 m.c. que aparece en el plano estipulado, utilizando el precio unitario de $70/m.c. establecido por el Sr. Núñez, el valor de la misma ascendería a $17,747,426.88.

37.    El área de 50 cuerdas a las que el Ing. Isern le atribuye un mejor uso comercial está dentro de la cabida combinada de 53.8998 cuerdas de las Parcelas 003-02 y 004-02 a las que el Sr, Núñez atribuye un mejor uso mixto comercial- residencial.

38.    La opinión del Ing. Isern de que las 50 cuerdas más próximas a la PR-2 tienen un mejor y más productivo uso comercial, está sustentada en criterios de razonabilidad que surgen de su informe y de su testimonio y no fueron refutados por el ELA.  Al comparar las opiniones de valor de ambos peritos sobre los terrenos próximos a la PR-2, concluimos que el valor estimado por el Ing. Isern para las 50 cuerdas a las que asigna un mejor uso comercial se justifica y es razonable.

39.    El Sr. Núñez no hizo valoración de terrenos cuyo mejor uso fuera para fines residenciales. Ni de su informe ni de su testimonio sobre la Parcelas 003-02 y 004-02, próximas a la PR-2 a las que atribuyó un mejor uso mixto comercial-residencial, se puede colegir una valoración para el mejor uso residencial.   En sus informes sobre ambas parcelas, tres de las cuatro comparables que consideró para la valoración tienen mejor uso comercial y una, un uso mixto, residencial-comercial.

---

[8] Exhibit I por estipulación, hoja 4.

40. El Ing. Isern valoró el predio de 111.948 cuerdas, (440,000.0386 m.c.), al que atribuyó un mejor uso residencial en $9,700,000, a base de un precio unitario de $22.00/m.c. Para llegar a ese valor utilizó tres ventas comparables con valores ajustados de $42.00, la número 6; $38.00 la número 7 y $17.00, la número 5.

41. El uso de las comparables 6 y 7 fue cuestionado por el Sr. Núñez quien testificó que tenían un mejor uso comercial. En contrainterrogatorio reconoció, sin embargo, que la clasificación EV. 2 de la venta número 6, solo permitía usos residenciales. La clasificación de la venta comparable número 7 es de EV.4 que también permite usos residenciales, pero aún si se descarta esta comparable, el precio unitario de $22.00/ m.c. para el uso residencial, sigue siendo razonable.

42. El Ing. Isern valoró las 35.070 cuerdas a las que atribuyó un mejor uso de conservación en $196,000.00 basado en un precio unitario de $5,600.00/cuerda. Utilizó el método de ventas comparables con tres ventas comparables. A la número 8 le dio un unitario ajustado de $1,900.00/cuerda; a la número 9 le dio un unitario ajustado de $5,600.00/cuerda y a la número 10 le dio un unitario ajustado de $3,200.00/cuerda.

43. El tasador del Estado, Sr. Núñez, asignó un mejor uso de conservación a las parcelas 003-01 y 004-01, con cabidas de 134.2271 cuerdas y 8.8573 cuerdas, respectivamente. Valoró la Parcela 003-01, en $537,000.00, con un precio unitario de $4,000.00 por cuerda. Utilizó el método de ventas comparables con cinco ventas comparables. Los unitarios ajustados de las ventas comparables para valorar la Parcela 003-01 fueron de $3,132.95/cuerda para la número 1, $3,250.00/cuerda para la número 2, $5,111.10/cuerda para la número 3; $5,268.92/cuerda para la número 4 y $3,632.85/cuerda para la número 5. El análisis de ajustes en la página 83 del informe de la Parcela 003-01[9], hace evidente que calificó como "superiores" las fincas de unitarios más altos por su errónea interpretación respecto del efecto de la inclusión en la zona

---

[9] El Sr. Núñez no hizo informe detallado para la parcela 004-01, limitándose a indicar que utilizaría el valor asignado a la Parcela 003-01.

marítimo terrestre en los usos permitidos en las fincas sujeto. Este error de análisis nos lleva a concluir que el unitario asignado por el Sr. Núñez para los terrenos de mejor uso para conservación es muy bajo y debe descartarse.

## CONCLUSIONES DE DERECHO

"El deslinde administrativo de la zona marítimo terrestre es sin duda una función de vital importancia para el Estado pues establece los límites del dominio público marítimo respecto las propiedades colindantes. Aun cuando el deslinde implique una declaración sobre la naturaleza física del terreno como zona marítimo terrestre, lo cierto es que "en ningún caso tiene carácter declarativo de derechos". *Buono Correa v. Srio. Rec. Naturales,* 177 DPR 415, 426(2009).

En el presente caso, el deslinde de la zona marítimo terrestre no tuvo el efecto de alterar los usos permitidos en los terrenos de las fincas sujeto pues es un hecho estipulado que luego del mismo los terrenos siguieron siendo de propiedad privada. En *San Gerónimo Caribe Project v. E.L.A., 174 D.P.R. 518 (2008)* citando a *Rubert Amstrong v. E.L.A., 97 D.P.R. 588 (1969),* se reconoció que los manglares y marismas podrían constituir enclaves privados comprendidos en la zona marítimo terrestre en virtud de la Ley de Puertos de 1886.

En *Buono Correa v. Srio. Rec. Naturales,* supra, pág. 445, se destacó que el Reglamento 4860 "...aclara, en la sección 1.5, que se excluyen de su aplicación los terrenos de dominio particular que estén enclavados en la zona marítimo terrestre, aunque aplican a éstos las disposiciones del Reglamento 4860 relativas a su deslinde."

La Regla 110 de las de Evidencia establece los principios por los cuales el juzgador de hechos debe evaluar la evidencia presentada con el propósito de determinar qué hechos han quedado establecidos. Entre ellos, que "[p]ara establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza"; que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley" y que "[e]n los casos

civiles, la decisión de la juzgadora o del juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad, a menos que exista disposición al contrario".

La Regla 704 de Evidencia establece que "Las opiniones o inferencias de una persona como testigo pericial pueden estar basadas en hechos o datos percibidos por ella o dentro de su conocimiento personal o informados a ella antes de o durante el juicio o vista.  Si se trata de materia de naturaleza tal que las personas expertas en ese campo razonablemente descansan en ella para formar opiniones o hacer inferencias sobre el asunto en cuestión, los hechos o datos no tienen que ser admisibles en evidencia."

Se ha resuelto que "el valor probatorio del testimonio pericial depende de varios factores, entre los que se destacan los siguientes: (1) las cualificaciones del perito; (2) la solidez de los fundamentos de su testimonio; (3) la confiabilidad de la ciencia o técnica subyacente, y (4) la parcialidad del perito." *Dye-Tex Puerto Rico, Inc. v. Royal Insurance Company of Puerto Rico, Inc.*, 150 DPR 658, 664 (2000).  Estos criterios están también recogidos en la actual Regla 702 de Evidencia.

La reclamación que nos ocupa es una de expropiación inversa.  En el caso de *Velázquez Velázquez v. ELA,* 135 DPR 84, 88-89, nuestro Más Alto Tribunal expresó:

> La obligación del Estado de pagar justa compensación puede manifestarse de tres formas: (1) mediante el ejercicio directo del poder de dominio eminente, instando un recurso de expropiación; (2) por medio de su reglamentación, y (3) cuando ocurre una incautación de hecho al afectar sustancialmente el uso de la propiedad físicamente. *Culebra Enterprises Corp. et. al. v. E.L.A.,* supra; *Sucn. García v. Autoridad*, 114 D.P.R 676 (1983); *Olivero v. Autoridad*, 107 D.P.R. 301 (1978). Precisamente para los casos excepcionales de ocupación física, incautación de un derecho real, o restricciones a la propiedad por vía de reglamentación sin haberse presentado una acción de expropiación, se ha instituido la acción de expropiación a la inversa. En *E.L.A. v. Northwestern Const., Inc.*, 103 D.P.R. 377, 383 (1975), explicamos que se denomina inversa "porque se insta por el dueño de la propiedad contra el Estado, para obtener la compensación a que tiene derecho pero los tribunales generalmente le aplican las mismas normas y principios que rigen la acción de expropiación iniciada por el Estado". Véase también *Olivero v. Autoridad*, supra, pág. 307.

Cuando —como ha ocurrido en este caso— el Tribunal resuelve que la ocupación de la propiedad ("taking") *de jure* y *de facto*, ocurrió desde que se

congeló la propiedad, la compensación se fija a base del valor en ese momento. *ELA v. Northwestern Const. Inc.*, supra, 382; *Planta de Cal Hicaco v. Tribunal Superior*, 103 DPR 385 (1975).   Como se expresó previamente y ratificó el Tribunal de Apelaciones, en el caso de autos la incautación ocurrió al aprobarse la Ley 227, o sea, el 9 de agosto de 2008.

El derecho de expropiación del Estado es un atributo inherente y necesario de la soberanía y es superior a todos los derechos de propiedad. *López y otros v. AEE*, 151 DPR 701, 706 (2000); *Adm. de Terrenos v. Nerashford Dev. Corp.*, 136 DPR 801, 808 (1994); *ELA v. Registrador*, 111 DPR 117 (1981). Sin embargo, este poder del Estado está limitado por la exigencia del pago de una justa compensación, que el objeto expropiado sea para un fin público y que se siga el procedimiento establecido por ley. *Culebra Enterprises Corp. v. ELA*, 143 DPR 946 (1997); *Hampton Development Corp. v, ELA*, 139 DPR 877 (1996); *ELA v. Registrador*, supra, pág. 119; *ELA v. Rosso*, 95 DPR 501, 536 (1967). La justa compensación a que tiene derecho el dueño de un predio expropiado es aquella cantidad que representa todo el valor de la propiedad al tiempo de la incautación. *Olivero v. Autoridad de Carreteras*, 107 DPR 301, 314 (1978); *ELA v. Fonalledas Córdova*, 84 DPR 573, 579 (1962).

La justa compensación pretende colocar al antiguo dueño de la propiedad en la misma situación económica en que se encontraban antes de la expropiación. *ELA v. Rexco Industries*, 137 DPR 683 (1994).  De esa manera, como medida para el pago de la justa compensación, se adoptó el concepto de valor en el mercado de la propiedad, según establecido en la jurisdicción federal. *Adm. de Terrenos v. Nerashford Dev. Corp.*, supra, página 807. supra. "La justa compensación a que tiene derecho el dueño de un predio expropiado es aquella cantidad que representa todo el valor de la propiedad al tiempo de la incautación, y en ausencia de una definición estatutaria sobre este concepto de valor hemos favorecido la norma de fijarlo mediante la determinación del valor en el mercado del bien expropiado- "valor en plaza" se le llama en Hispanoamérica, véase, Canasi, *El Justiprecio en la Expropiación Pública*, (1952), pág. 124- O sea, el precio que un comprador estaría dispuesto a pagar en una venta voluntaria y que



un vendedor estaría dispuesto a aceptar, considerando para ello las condiciones en que se halle el bien a la fecha de la expropiación y el uso más productivo o beneficioso a que podría dedicarse dentro de un futuro razonablemente cercano. *Pueblo v. Colón,* 73 DPR 579 (1952); *Pueblo v. Sucn. Rabell*, 72 DPR 574 (1951); *Pueblo v. Huyke*, 70 DPR 754 ,756 (1950). La fijación de este valor requiere una hábil sincronización de varios factores, y en último análisis, un sano equilibrio entre el derecho de los propietarios y las exigencias de la comunidad. " *ELA v. Fonalledas Córdova*, supra.

Para determinar el valor en el mercado de una propiedad expropiada, cualquier evidencia competente puede ser considerada si legítimamente establece un valor en el mercado.   En los casos de expropiación —y por consiguiente en este caso de expropiación inversa, al que, como hemos visto, le aplican las normas y principios que rigen las expropiaciones ordinarias— el peso de la prueba respecto del justo valor del bien expropiado recae sobre la parte que reclama. *Martínez Rivera v. Tribunal Superior*, 85 DPR 1, 11 (1962); *Pueblo v. García*, 66 DPR 504, 508 (1946). Véase, además, *ELA v. Fonalledas Córdova*, supra, pág. 574; *ELA v. Bravo*, 79 DPR 779, 785 (1956).   Le corresponde pues a la parte demandante probar su derecho a recobrar la justa compensación y establecer el valor de la propiedad presentando la evidencia correspondiente sobre el valor en el mercado del inmueble expropiado. *ACTPR v. 780.61416m2, BPPR*, 165 DPR 121, 133 (2005); *Martínez Rivera v. Tribunal Superior*, supra, pág. 11; *Pueblo v. García*, supra, pág. 508.

El valor en el mercado de la propiedad ha sido definido como el precio que un comprador determinado en una venta no forzada estaría dispuesto a pagar y aquél en que un vendedor, en las mismas circunstancias, estaría dispuesto a vender, consideradas las condiciones en que se encuentre el terreno en la fecha de la expropiación y el uso más productivo al que el dueño pudiere dedicarlo dentro de un futuro razonablemente cercano. *Adm. de Terrenos v, Nerashford Dev. Corp.*, supra, pág. 809; *Pueblo v. Huyke*, 70 DPR 754, 756-757 (1950).

Para determinarlo, el tribunal debe tomar en consideración todo elemento o indicador que un comprador prudente consideraría. *Adm. de Terrenos v, Nerashford Dev. Corp.*, supra, pág. 809. Sobre este tema se ha expresado: "In determining fair market value of property in condemnation proceedings, the triers of fact are generally allowed to consider those elements that 'fairly might be brought forward and reasonably be given substantial weight (in) fair negotiations by an owner willing to sell and a purchaser desiring to buy'. Therefore, the relevant factors in condemnation case, where the major issue is the fair market value of the condemned property, are those that a hypothetical buyer and seller would consider in setting a purchase price for the property." Véase, 5 *Nichols on Eminent Domain*, Mathew Bender, §18.05[1], p. 18-25, tercera edición.

Como señala la jurisprudencia, uno de los elementos críticos para determinar la justa compensación de un predio es el uso más productivo al que el dueño pudiere dedicarlo dentro de un futuro razonablemente cercano. Nichols explica el efecto del concepto de mejor y más productivo uso en la valoración de una propiedad como sigue:

> Just compensation within the meaning of the Fifth Amendment is not limited to the market value of the property as presently used. Instead, a property owner's compensation should be determined by considering any higher market value obtainable by developing the property to the highest and best use for which it is suitable. The phrase "highest and best use" is a term of art in the lexicon of real estate appraisal.

> Even in other contexts such as a sale, a property's highest and best use is one of the primary considerations in determining its fair market value. This concept has been defined as the legally and physically possible use of the land that is likely to produce the highest value. Therefore, in determining the highest and best use, the owner must prove that the property is physically adaptable for such use and that there is a need or demand for this use in the reasonably near future.

> A determination of a property's highest and best use requires a study of the community, the neighborhood, zoning, market factors, the site, and its improvements. Important factors to consider include market demand, economic development in the area, specific plans of businesses and individuals (including action already taken to develop the property for that purpose), and the use to which the property is devoted at the time of the taking. Frequently, a property's highest and best use will be limited to its current use due to zoning.

> When determining a property's highest and best use, the court may not engage in mere speculation and conjecture. The highest and best use must be shown with a degree of certainty that the

property's use will change in the not-too-distant future. 4 *Nichols
on Eminent Domain*, § 13.01(8). (Énfasis suplido.)

Como ya hemos señalado, la controversia en los informes de valoración
y el testimonio de los peritos de las partes es principalmente en cuanto al mejor
y más productivo uso de las fincas sujeto. El tasador de la parte demandante,
Ing. Isern, concluyó que el mejor uso debe analizarse dividiendo las fincas sujeto
en zonas. A una porción de cincuenta (50) cuerdas colindantes con la PR-2 le
adjudicó un mejor uso comercial.   A las ciento once cuerdas con novecientas
cuarenta y ocho milésimas de otra (111.948 cuerdas) adyacentes, le determinó
un mejor uso residencial turístico y a las restantes treinta y cinco cuerdas con
setenta y cinco milésimas de otra (35.075 cuerdas) más próximas al Mar Caribe,
un mejor uso para conservación.

Por su parte, el tasador del ELA, concluyó que el mejor uso para las
parcelas  003-02 y 004-02, las más próximas a la PR-2, con cabidas de 49.8228
cuerdas y 4.0760 cuerdas, respectivamente es uno mixto, comercial-residencial.
A los remanentes de las fincas sujeto, la parcela 003-01, a la que atribuye una
cabida de 134.2771 cuerdas y la parcela 004-01, a la que atribuye una cabida
de 8.8573 cuerdas, les establece un mejor uso de conservación. En las
determinaciones de hechos que anteceden hemos concluido que ese no es el
mejor y más productivo uso para la totalidad de esas dos parcelas.

Varios aspectos del testimonio del tasador Núñez menoscaban la
confiabilidad de su opinión de valor, pues indican poca objetividad y un afán de
reducir la valoración de los predios.   Cabe señalar las discrepancias en las
cabidas para las Parcelas 003-01 y 003-02, con el Plano estipulado, que el
Sr. Núñez atribuye a haber utilizado un plano distinto que se le suministró y a un
error tipográfico.  Al hacer su informe de valoración en 2015 el Sr. Núñez tenía
conocimiento de que los terrenos que estaban dentro del área marcada como
ZMT en los planos seguían siendo de propiedad privada.  Los funcionarios del
DRNA, declararon no haberle indicado al Sr. Núñez que los usos en esos
terrenos tenían que limitarse a conservación.  El Sr. Núñez admitió durante su
testimonio que el único factor que utilizó para dar un mejor uso de conservación
a los terrenos al preparar su informe de valoración en 2015 fue que aparecían

dentro de la ZMT marcada en el plano que se le suministró.  Pese a ello, en el
análisis de las ventas comparables que aparece a las páginas 79 a la 81 de su
informe de valoración para la parcela 003-01 el Sr. Núñez reconoce que la
"zonificación" del sujeto es EV.4, que como se ha indicado en las
determinaciones de hechos probados permite una extensa variedad de usos
tanto comerciales como residenciales.  Esto, unido al error de análisis que
incurre a subestimar las fincas sujetos frente a las comparables por su ubicación
dentro de la ZMT, lo llevó a una conclusión de valor excesivamente baja para la
mayor parte de los terrenos expropiados.

En noviembre de 2007, el Sr. Núñez hizo informes de valoración para las
parcelas 003-02 y 004-02 a solicitud del DRNA con fecha de efectividad del 15 y
el 10 de noviembre de 2007, respectivamente, con el propósito de su adquisición
para una reserva natural.  Valoró la parcela 003-02 con una cabida de 49.8228
cuerdas en $14,882,600.00 con un unitario de $76.00 por metro cuadrado.  La
parcela 004-02 con una cabida de 4.0760 cuerdas la valoró en $2,243,000.00,
con un unitario de $140.00 por metro cuadrado.  En esa ocasión no se le pidió al
Sr. Núñez que valorara las parcelas 003-01 y 004-01 porque el DRNA entendía
que eran de dominio público en virtud del deslinde de la ZMT practicado ese año.

En el informe de valoración que el Sr. Núñez rindió en el 15 de junio de
2015, con fecha de efectividad del 9 de agosto de 2008 —8 meses después de
las de 2007— valoró los mismos predios, con las mismas cabidas, utilizando las
mismas ventas comparables y concluyó que la Parcela 004-02 tenía el mismo
valor pero que el valor de la Parcela 003-02 era de $13,708,000.00, o sea,
$1,174,600.00 menos que lo que había concluido en su informe de 2007.  La
explicación que dio para reducir el unitario de $76.00 por metro cuadrado a
$70.00 por metro cuadrado para la Parcela 003-02 fue que en el informe que
preparó en 2015 no hizo un ajuste por tiempo a las comparables pues desde
2006 el valor de las propiedades se había estancado.  Si esa fue la razón, resulta
ilógico que hubiese hecho el ajuste por tiempo en el informe de 2007 y que en el
informe de 2015, cuya fecha de efectividad era de solo 8 meses más tarde, lo
eliminara, incluso para los años anteriores a 2006. Para mayor inconsistencia,

expresó en la página 20 de su informe de 2015 sobre las parcelas 003 que "por

el tipo de condición de la vecindad se considera que la tendencia de los valores

incrementa a un ritmo promedio" y que no hay evidencia que demuestre lo

contrario.

Llamó la atención del Tribunal que al ajustar las cabidas de las fincas que

aparecen en su informe de valoración para conformarlas a las cabidas

estipuladas, el Sr. Núñez les adicionó la cabida adicional a las parcelas 003-01

y 004-01 a las que atribuyó un mejor uso de conservación y valoró a razón de

$4,000.00 por cuerda. Al preguntársele qué criterio utilizó para ubicar la cabida

adicional en estas dos parcelas, el Sr. Núñez no pudo dar una explicación lógica

o racional que lo justificara.

Llama también la atención la diferencia entre la valoración de las parcelas

003-02 y 004-02 que son terrenos contiguos con exactamente las mismas

condiciones y características. Aun tomando en consideración la diferencia en la

cabida de ambos predios, resulta difícil de entender que el precio unitario que

le asigna a la parcela 004-02 es de $140.00/m.c. y a los de la Parcela 003-02,

de $70.00/m.c.

La Lcda. Cynthia Torres Torres, en su libro, *La Expropiación Forzosa en

Puerto Rico*, p. 144, San Juan (2002), explica que el mejor y más productivo uso

de un inmueble se determina tomando en consideración cuatro factores: 1) que

sea un uso legalmente permitido, 2) que sea un uso físicamente posible, 3) que

sea un uso económicamente viable y 4) que rinda el beneficio mayor al

propietario.

Estos criterios son también aplicados por el Gobierno de los Estados

Unidos en los "Uniform Appraisal Standards for Federal Land Acquisitions."   43

CFR § 2201.3.  En *National Parks and Conservation Ass'n. v. Bureau of Land

Management*, 606 F. 3d 1058 1066-1067 (2009) se dice:

> "Under the Uniform Appraisal Standards definition, highest and
> best use is [t]he highest and most profitable use for which the
> property is adaptable and needed or likely to be needed in the
> reasonably near future.' The Appraisal Institute, Uniform Appraisal
> Standards for Federal Land Acquisitions 34 (quoting Olson v.
> United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236
> (1934). While Department of Interior regulations define highest and
> best use as the "most probable" use of land, the Uniform Standards

only require "reasonable probability" of a given use. Uniform
Standards at 34; Desert Citizens, 231 F.3d at 1181 n. 10.  Under
the Uniform Standards, the highest and best use must also be:  (1)
physically possible; (2) legally permissible; (3) financially feasible;
and (4) must result in the highest value.

Los usos legalmente permitidos en las fincas sujeto a la fecha de la
aprobación de la Ley 227, el 9 de agosto de 2008, eran los establecidos en el
Distrito de Ordenación EV.4 del Reglamento de Ordenación de Ponce, que
permite una gran variedad de usos de alta intensidad por lo que tanto los usos
comerciales como residenciales turísticos eran legalmente posibles.  Los
terrenos de humedales tenían una clasificación de SREP.N que aunque no limita
los usos a conservación, tampoco permite usos de desarrollo.

Los informes de los tasadores coinciden en que tanto los usos
comerciales como los residenciales son físicamente posibles en los terrenos
dentro del distrito EV.4.  Ambos peritos coincidieron que el uso comercial es el
que mayor productividad daría a los terrenos más próximos a la PR-2.[10]

Respecto de los usos económicamente viables, ambos tasadores
concluyen que los usos comerciales y residenciales son viables. El Sr. Núñez
testificó que la extensión del uso comercial que concluyó el Ing. Isern no podía
sostenerse sin un estudio de viabilidad.  Sin embargo, admitió que él no hizo un
estudio de viabilidad para concluir que las 53.8998 cuerdas combinadas de las
parcelas 0030-02 y 004-02 tenían un mejor uso mixto comercial-residencial.

El criterio del uso económicamente viable es uno que descansa en las
características del mercado y que es importante considerar las características
de la comunidad, el vecindario y la zonificación en el área donde ubica la
propiedad.  Las fotografías aéreas del área en que ubica el Sujeto, que se
presentaron en evidencia demuestran el alto desarrollo, comercial, industrial,
institucional y residencial del vecindario. Atestó el perito de la parte demandante
en el juicio, que para el 2008 era más fácil conseguir financiamiento para el uso
comercial que para usos residenciales.

La existencia de usos comerciales e institucionales de esta naturaleza en
el vecindario en que ubican las fincas sujeto indica la viabilidad económica de un

---

[10] Informe del Ing. Isern, pág. 25; informe del Sr. Núñez, Parcela 003, pág. 27.

uso comercial en la parte más próxima a la PR-2 como indicó el perito de la demandante en su testimonio y como lo establecen los objetivos de desarrollo del Plan Especial "la Matilde" que incluyen el "maximizar el potencial del área para proyectos de carácter residencial y turístico, de preferencia orientados al Mar Caribe y comercial, de preferencia a lo largo del futuro expreso de la PR-2."

Como hemos visto, la jurisprudencia establece que el valor en el mercado de la propiedad ha sido definido como el precio que un comprador determinado en una venta no forzada estaría dispuesto a pagar y aquél en que un vendedor, en las mismas circunstancias, estaría dispuesto a vender, consideradas las condiciones en que se encuentre el terreno en la fecha de la expropiación y el uso más productivo al que el dueño pudiere dedicarlo dentro de un futuro razonablemente cercano. *Adm. de Terrenos v, Nerashford Dev. Corp.*, supra; *Pueblo v. Huyke*, supra.

La Regla 702 de las de Evidencia de 2009 establece los criterios que para determinar el valor probatorio del testimonio pericial presentado por las partes: (a) Si el testimonio está basado en hechos o información suficiente; (b) si el testimonio es el producto de principios y métodos confiables; (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso; (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (e) las calificaciones o credenciales de la persona testigo, y (f) la parcialidad de la persona testigo. Al aplicar los mismos, es forzoso concluir que la opinión del tasador del ELA, Sr. Núñez, sobre el mejor y más productivo uso no reúne los criterios enumerados bajo los incisos (a) al (d) de la Regla 702 para recibir mucho peso probatorio pues, como hemos visto, no está apoyada por en los hechos probados y adolece de serias omisiones y contradicciones metodológicas que la hacen poco confiable para fines de establecer el justo valor en el mercado del Sujeto.

Las ventas de propiedades similares constituyen la prueba principal del valor en el mercado que ayuda en la determinación de un valor justo. *ELA v. Fonalledas Córdova*, supra, página 580, citando a *Pueblo v. Amadeo*, 82 DPR 102, 1222 (1961). El valor razonable en el mercado de una parcela de terreno

expropiada no puede fijarse descansándose para ello en bases inciertas y puramente especulativas. *ELA v. Fonalledas Córdova*, supra, página 579, citando a *ELA v. Sucn. Gautier*, 81 DPR 580, 594 (1959). No existe una regla fija en cuanto cuando una propiedad es similar a otra y en cada caso el tribunal debe ejercitar su sana discreción. *Autoridad sobre Hogares de PR v. Valldejuli*, 71 DPR 640 (1950). De ahí que es pertinente considerar la similitud en topografía, facilidades, servicios, acceso, ubicación, cabida y el mejor uso de lo expropiado y los bienes comparables. *Pueblo v. Amadeo*, supra, pág. 122; *Estado Libre v. Bravo*, supra, pág. 785. Si las compraventas no reúnen estos requisitos, las mismas no serán admisibles. Una vez se establece la justa compensación por el testimonio pericial admisible, se podrá pasar al informe de valoración que se rinde. Es en éste que se puede apreciar la investigación que realizó y el análisis de los datos obtenidos. Toda esta información y evaluación es lo que sustenta su estimado de valor. Se ha resuelto también que las ventas de terreno que, en topografía y localización, no son similares al inmueble expropiado, son inadmisibles en el correspondiente procedimiento de expropiación. *ELA v. 317.813 Cuerdas de Terreno,* 84 DPR 1, 10 (1961) citando a *Pueblo v. Colón*, 73 DPR 579, 583 (1952).

La decisión del Sr. Núñez de limitar el mejor uso de la mayor parte de las fincas sujeto a uno de conservación, lo llevó a no utilizar ventas comparables de usos residenciales, por lo que la única prueba que recibió el Tribunal respecto del valor de la porción de las fincas sujeto cuyo mejor y más productivo uso es el residencial turístico, es la que surge del informe y testimonio del perito de la demandante. El ELA no presentó prueba alguna que contradijera la opinión del tasador de la parte demandante sobre el valor del predio de mejor uso residencial.

El informe de valoración del perito de la demandante es confiable y debe adjudicársele mayor credibilidad conforme a los criterios que establece la Regla 702 de las de Evidencia pues está basado en los hechos correctos y se ajusta a la metodología que establecen las autoridades para establecer el mejor y más productivo uso del Sujeto. La opinión del ingeniero Isern es la que más se ajusta

a las características del vecindario y a los usos que prevalecen en el área, a la infraestructura disponible en el área, a los objetivos establecidos en el Plan Especial La Matilde para el desarrollo de los terrenos, y a los usos que el mercado ha dedicado los terrenos del área. El enfoque de valoración que utilizó es adecuado para las fincas sujeto. Las ventas comparables que utilizó para establecer la cabida de la porción a la que asignó un uso comercial dan apoyo a su testimonio de que es razonable determinar que las cincuenta (50) cuerdas más próximas a la PR-2 tienen ese mejor uso. Las cuatro ventas comparables que usó para establecer el valor del predio de uso comercial son de propiedades ubicadas en Ponce, con usos, infraestructura, accesos comparables con el Sujeto.

El Tribunal, al determinar el valor en el mercado de una finca, debe tomar en consideración todo elemento o indicador que un comprador prudente consideraría. *Administración de Terrenos v. Nerashford Dev. Corp.*, supra, pág. 809. La fijación de ese valor requiere una hábil sincronización de varios factores, y en último análisis, un sano equilibrio entre el derecho de los propietarios y las exigencias de la comunidad. *ELA v. Fonalledas*, supra, 579.

Como ya se ha dicho, en los casos de expropiación inversa los tribunales generalmente le aplican las mismas normas y principios que rigen la acción de expropiación iniciada por el Estado. *Velázquez Velázquez v. ELA,* supra, 88-89. El Tribunal Supremo ha resuelto que la justa compensación a que tiene derecho el dueño de un predio expropiado es aquella cantidad que representa todo el valor de la propiedad al tiempo de la incautación. *ELA v. Northwestern Const. Inc.*, supra. La compensación por una propiedad expropiada es aquella "que ponga al dueño en una posición pecuniaria tan buena a la que estaría si la propiedad no se hubiese expropiado". El pago de intereses forma parte integrante de la justa compensación al amparo del mandato constitucional de justa compensación. La Ley de Expropiación, supra, establece que la tasa de interés que fije la Junta Financiera de la OCIF es la que se utilizará para calcular intereses en casos de expropiación forzosa. *ELA v. Rexco Industries, Inc.*, 137 DPR 683, 689 (1994).

El Tribunal Supremo explicó cómo se deben computar los intereses bajo la Ley de Expropiaciones en el caso de *Autoridad de Carreteras y Transportación de Puerto Rico v. 8554.741 Metros Cuadrados,* 172 DPR 1050, 1064-1065 (2008). Sin embargo, la Ley 167-2015, enmendó la Sección 5B de la Ley de Expropiaciones para establecer que "[e]n los casos donde el periodo entre la incautación y el pago total del Estado exceda un semestre, el Tribunal deberá considerar las variaciones en las tasas de interés aplicables a los semestres comprendidos entre la fecha de la expropiación hasta la fecha del pago total de la justa compensación, según determinados por la Oficina del Comisionado de Instituciones Financieras (OCIF); disponiéndose que los intereses se computarán de forma simple y no compuesta."

## SENTENCIA

Por los fundamentos que anteceden, se declara con lugar la demanda. En consecuencia, se dicta Sentencia decretando que la justa compensación a pagarse por el Estado Libre Asociado de Puerto Rico a los demandantes y al Sr. Javier Mandry Mercado por las propiedades de las que se incautó lo constituye la suma de $30,496,000.00.

El Estado Libre Asociado de Puerto Rico deberá satisfacer intereses sobre dicha suma desde la fecha de la incautación (9 de agosto de 2008) hasta su pago total.  El cómputo de los intereses se hará de acuerdo con las tasas de interés prevalecientes en el mercado, según surgen del Reglamento 78-1 de la Oficina del Comisionado de Instituciones Financieras y conforme hayan variado semestralmente desde la fecha de la incautación hasta la fecha del pago total de la justa compensación computado como interés simple.

Se dicta esta sentencia con condena de costas conforme lo establece la Regla 44.1(a) de las de Procedimiento Civil.

Se apercibe a las partes que conforme a lo autorizado por la Juez Laura Taylor Swain en la orden dictada el 7 de julio de 2017, este Tribunal solo puede determinar el monto de la justa compensación y la presente sentencia no podrá ejecutarse ni obtenerse remedios provisionales para su ejecución, sin la

correspondiente autorización del Tribunal de Distrito de los Estados Unidos para

el Distrito de Puerto Rico en el caso No. 17 BK-3283-LTS.

**NOTIFÍQUESE**.

Dada en Ponce, Puerto Rico a 6 de agosto de 2019.

FRANCISCO J. ROSADO COLOMER
Juez Superior