**Reply Deadline:  August 20, 2019**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS<br><br>**This filing relates only to PREPA, and shall be filed in the lead Case No. 17-BK-3283-LTS, and PREPA's Title III case (Case No. 17-BK-4780-LTS)** |

## OPPOSITION OF ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP. TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' URGENT (I) OBJECTIONS TO MAGISTRATE JUDGE'S AUGUST 2, 2019 ORDER ON MOTION TO COMPEL AND (II) ALTERNATIVE MOTION TO STRIKE AND TO EXCLUDE <u>OUT-OF-SCOPE DECLARATION TESTIMONY AND RELATED EVIDENCE</u>

---

[1]     The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID:  3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:  8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID:  3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID:  9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

USActive 54008749.9

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ........................................................................................ 3

ARGUMENT .............................................................................................. 6

I.   The Magistrate Judge Correctly Found That Assured's Loss
     Reserves Are Irrelevant To The 9019 Motion ............................ 6

II.  Assured's Loss Reserves Are Outside The Scope Of The UCC's
     Document Requests And Are Privileged ................................... 13

     A.   The UCC's Document Requests To Assured Did Not Seek
          Loss Reserves .................................................................. 13

     B.   Assured's Loss Reserves Are Protected By The Work
          Product Doctrine ............................................................ 14

     C.   Assured Did Not Waive Privilege By Providing Loss
          Reserves To Its Regulators ............................................ 16

     D.   The Loss Reserves Provided To Assured's Regulators Are
          Protected By The Bank Examiner Privilege ................... 19

CONCLUSION .......................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES:</u>

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
No. 14-CV-7126, 2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016) ...........................................18

*American Steamship Owners Mut. Prot. and Indemnity Ass'n, Inc. v. Alcoa Steamship Co., Inc.*,
2006 WL 278131 (S.D.N.Y. Feb. 2, 2006) ....................................................................16, 17

*Blattman v. Scaramellino*,
891 F. 3d 1 (1st Cir. 2018) .................................................................................................17

*Bryan Corp. v. ChemWerth*,
296 F.R.D. 31 (D. Mass. 2013) (Dein, M.J.) .........................................................................17

*CH Properties, Inc. v. First Am. Title Ins. Co.*,
48 F. Supp. 3d 143 (D.P.R. 2014) ......................................................................................14

*Fed. Deposit Ins. Corp. v. Arrillaga-Torrens*,
212 F. Supp. 3d 312 (D.P.R. 2016) ....................................................................................14

*Fed. Realty Inv. Trust v. Pac. Ins. Co.*,
760 F. Supp. 533 (D. Md. 1991) ........................................................................................12

*Gill v. Gulfstream Park Racing Ass'n., Inc.*,
399 F.3d 391 (1st Cir. 2005) ..............................................................................................7

*In re Citigroup Bond Litig.*,
No. 08 Civ. 9522, 2011 WL 8210671 (S.D.N.Y. Dec. 5, 2011) ...........................................19

*In re Fin. Oversight and Mgmt. Bd. for P.R.*, No. 17-BK-3566-LTS,
2019 WL 2929001 (Bankr. D.P.R. July 8, 2019) (Swain, J.) ..................................................6

*In re Genco Shipping & Trading Ltd.*,
No. 14-111-8-SHL, ECF No. 267 (Bankr. S.D.N.Y. June 3, 2014) ..................................9, 11

*In re McDowell*,
483 B.R. 471 (Bankr. S.D. Tex. 2012) .................................................................................14

*In re Nat'l City Corp. S'Holders Litig.*,
No. CIV.A. 4123-CC, 2009 WL 1653536 (Del. Ch. June 5, 2009) ........................................20

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*,
No. 13-cv-2419, 2015 WL 13715296 (D. Mass. Nov. 6, 2015) ...........................................12

*In re Quigley Co.*,
Case No. 04-15739, 2009 Bankr. LEXIS 1352 (Bankr. S.D.N.Y. Apr. 24, 2009) ................14

*In re Steinhardt Partners, L.P.*,
9 F.3d 230 (2d Cir. 1993) ...........................................................................................18

*In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed.*
*Reserve Sys.*,
967 F.2d 630 (D.C. Cir. 1992) ...........................................................................................19

*In re The Dolan Co.*,
No. 14-10614-BLS, ECF No. 284 (Bankr. D. Del. May 2, 2014) ...............................9, 11, 13

*Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan*,
937 F. Supp. 2d 202 (D.P.R. 2012), aff'd, 802 F.3d 99 (1st Cir. 2015) ...................................7

*Jeffrey v. Desmond*,
70 F.3d 183 (1st Cir. 1995) ...........................................................................................7

*Matrix Essentials, Inc. v. Quality King Distributors, Inc.*,
No. CV90-1070, 2006 WL 8435312 (E.D.N.Y. Jan. 12, 2006) ...........................................17

*Mullins v. Dep't of Labor of P.R.*,
269 F.R.D. 172 (D.P.R. 2010) ...................................................................................15, 16

*Nicholas v. Bituminous Cas. Corp.*,
235 F.R.D. 325 (N.D. W.Va. 2006) ...........................................................................................15

*Phinney v. Wentworth Douglas Hosp.*,
199 F.3d 1 (1st Cir. 1999) ...........................................................................................6

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
No. 06 Civ. 5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010) ...........................................18

*Progressive Cas. Ins. Co. v. F.D.I.C.*,
298 F.R.D. 417 (N.D. Iowa 2014) ...........................................................................................15

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ...........................................................................................11

*Schreib v. Am. Family Mut. Ins. Co.*,
   304 F.R.D. 282 (W.D. Wash. 2014) .................................................................15

*State of Maine v. U.S. Dep't of Interior*,
   298 F.3d 60 (1st Cir. 2002) ...........................................................................14

*U.S. v. Mass. Institute of Technology*,
   129 F.3d 681 (1st Cir. 1997) .........................................................................17

*U.S. v. Textron Inc. & Subsidiaries*,
   577 F.3d 21 (1st Cir. 2009) ...........................................................................15

*U.S. States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) ........................................................................14

*U.S. v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ...................................................................17, 19

*U.S. v. Olano*,
   507 U.S. 725 (1993) ......................................................................................16

*W. Holding Co. v. Chartis Ins. Co. of P.R.*,
   300 F.R.D. 48 (D.P.R. 2014) .....................................................................15, 16

## STATUTES AND OTHER AUTHORITIES:

28 U.S.C.A § 636(b)(1)(A) ...................................................................................6

Fed. R. Civ. P. 72(a) ...........................................................................................6

Fed. R. Civ. P. 26(b)(1) ............................................................................7, 8, 12

N.Y. Ins. Law 1504(c) .......................................................................................18

N.Y. Pub. Off. L. § 87(2)(d) ...............................................................................18

To the Honorable United States District Judge Laura Taylor Swain:

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") respectfully submit this opposition ("Opposition") to the *Official Committee of Unsecured Creditors' Urgent (i) Objections to Magistrate Judge's August 2, 2019 Order on Motion to Compel and (ii) Alternative Motion to Strike and to Exclude Out-Of-Scope Declaration Testimony and Related Evidence* (Case No. 17-3283, ECF No. 8412; Case No. 17-4780, ECF No. 1576)[2] ("Objection"), filed by the Official Committee of Unsecured Creditors of All Title III Debtors (other than COFINA) ("UCC"), that objects to various rulings in the *Order Granting in Part Renewed Motion to Compel* ("Order") (ECF No. 1556) entered by Magistrate Judge Judith Gail Dein ("Magistrate Judge").  The Order addressed a number of discovery issues relating to the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(i) and 9019 for Order Approving Settlements Embodied in Restructuring Support Agreement and Tolling Certain Limitations Periods* (ECF No. 1235) ("9019 Motion").  In this Opposition, Assured responds to and opposes the portion of the UCC's Objection that objects to paragraph 15 of the Order denying the UCC's motions to compel the production of Assured's loss reserves (collectively, "Loss Reserves").  As set forth below, the Magistrate Judge's Order regarding the Loss Reserves should be upheld:

### PRELIMINARY STATEMENT

1.  The Court should deny the UCC's fourth attempt to move to compel the production of Assured's Loss Reserves.  The Magistrate Judge correctly found that Assured's Loss Reserves are "not relevant to the ultimate issue before the Court" in the 9019 Motion, and thus are "outside the scope of reasonable discovery for the 9019 Motion hearing."  *See* ECF No. 1556 ¶ 15.

---

[2]   "ECF No." refers to documents filed in Case No. 17-BK-4780-LTS, unless otherwise noted.

2.      As the Magistrate Judge found, Assured's Loss Reserves are irrelevant to whether the proposed settlement set forth in the RSA falls below the Debtor's zone of reasonableness.  In determining the range of outcomes, this Court is to make an objective, independent evaluation of the facts and the law relating to the issues being settled.  Assured's Loss Reserves only reflect Assured's multiple subjective assessments of the probability of varied litigation and settlement outcomes, developed in consultation with counsel.  They do not reflect any objective calculations or the objective value of any settlement, including the RSA.  Assured's subjective litigation and settlement assessments have no possible relevance to the issues that the Court will decide in the 9019 Motion.

3.      Furthermore, the Loss Reserves are highly sensitive and confidential, and are subject to the attorney work product privilege and bank examiner privilege.  These privileges were not waived when Assured shared the Loss Reserves with its regulator.  The law is clear that delivery of otherwise privileged materials to a regulator in response to a statutory mandate or the regulator's request is not a waiver.

4.      In addition to the Order that the UCC is objecting to, the Magistrate Judge previously rejected two previous attempts to move to compel the production of Assured's Loss Reserves, both of which the UCC supported.  This Court should uphold the Order and also adhere to these prior rulings regarding the non-discoverability of Assured's Loss Reserves.  Assured's Loss Reserves are irrelevant to these proceedings, including the Court's determination of the 9019 Motion.  The production would offer no benefit to the Court, but would create an unfair burden and significant prejudice to Assured by revealing its subjective combined assessment of a variety of litigation and settlement probabilities and hampering Assured's potential future negotiating positions if the Rule 9019 Motion were to be denied or the RSA could not be implemented.

## BACKGROUND

5.      On October 3, 2018, Assured, National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora" and, collectively with Assured and National, the "Insurers") filed the *Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed* (ECF No. 975) ("Lift Stay Motion").

6.      Following the filing of the Lift Stay Motion, the parties engaged in extensive discovery.  The Financial Oversight and Management Board for Puerto Rico ("Oversight Board"), in its capacity as representative of the Puerto Rico Electric Power Authority ("PREPA" or "Debtor") pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[3] and the Puerto Rico Fiscal Agency and Financial Authority ("AAFAF" and, together with the Oversight Board and PREPA, "Government Parties") issued substantial document requests on Assured to which Assured produced documents in response.  In response to document requests served in the 9019 Motion by the UCC and other parties, Assured produced the same documents it produced in Lift Stay Motion discovery, as well as additional documents, for a total production in 9019 Motion discovery of over 2,600 documents comprising over 33,800 pages of documents.

7.      On February 7, 2019, the Oversight Board filed the *Urgent Motion of Financial Oversight and Management Board, as Representative of Debtor, to Compel Production of Documents from Movants Relating to Their Motion for Relief from Automatic Stay* (ECF No. 1066) ("Oversight Board Motion to Compel"), seeking an order compelling Assured and the other

---

[3]      PROMESA is codified at 48 U.S.C. §§ 2101-2241.

Insurers to produce certain loss reserve information.  Assured and the other Insurers objected to the Oversight Board Motion to Compel.  *See* ECF No. 1084.

8.      On February 26, 2019, the Magistrate Judge heard oral argument on the Oversight Board Motion to Compel.  *See* ECF No. 1115 (Feb. 26, 2019 Hr'g Tr.).  At the argument, counsel for the UCC argued in favor of the Court granting the Oversight Board Motion to Compel. *Id.* at 19-21.

9.      On March 5, 2019, the Magistrate Judge entered an Order denying the Oversight Board Motion to Compel, including the portion of the motion that sought the production of Assured's Loss Reserves.  *See* ECF No. 1119.

10.      On March 8, 2019, the Oversight Board filed the *Motion of the Financial Oversight and Management Board for Reconsideration Pursuant to Fed. R. Civ. P. 59 and 60* (ECF No. 1122) ("Reconsideration Motion") seeking reconsideration of the Oversight Board Motion to Compel by the Magistrate Judge.  Assured and the other Insurers objected to the Reconsideration Motion.  *See* ECF No. 1134.  The UCC filed a statement in support of the Motion for Reconsideration.  *See* ECF No. 1142.

11.      On April 4, 2019, the Magistrate Judge issued a *Memorandum of Decision and Order Denying Motion for Reconsideration* (ECF No. 1165) denying the Oversight Board's Reconsideration Motion, including the portion of the motion that sought the production of Assured's Loss Reserves.

12.      Neither the Oversight Board nor the UCC further appealed the Magistrate Judge's Orders denying the Oversight Board Motion to Compel and the Reconsideration Motion.

13.      On March 26, 2019, Assured, the Government Parties, and members of the Ad Hoc Group of PREPA Bondholders ("Ad Hoc Group") reached an agreement in principle ("Agreement in Principle") on the material terms for a settlement embodied in the Definitive

Restructuring Support Agreement, dated as of May 3, 2019 ("RSA").  On May 10, 2019, the

Government Parties filed the 9019 Motion, seeking an order approving certain aspects of the RSA.

*See* ECF No. 1235.

14.     On June 3, 2019, the UCC filed the *Official Committee of Unsecured*

*Creditors' Omnibus Motion to Compel Production of Documents in Connection with PREPA RSA*

*Rule 9019 Settlement Motion* (ECF No. 1269) ("Initial Motion to Compel").  The Initial Motion to

Compel, among other things, sought the production of Assured's Loss Reserves provided to its

regulator, the New York State Department of Financial Services ("NYDFS").  Assured opposed

the Initial Motion to Compel.  *See* ECF No. 1299.

15.     On June 20, 2019, the Court entered an amended scheduling order that,

among other things, set deadlines for the Government Parties to submit supplemental papers in

support of the 9019 Motion and for the parties to renew the previously-filed discovery motions,

including the UCC's Initial Motion to Compel.  *See* ECF No. 1366 at 2-3.

16.     On July 16, 2019, the UCC filed the *Renewal of June 3, 2019 Omnibus*

*Motion of Official Committee of Unsecured Creditors to Compel in Connection with PREPA RSA*

*Rule 9019 Settlement Motion* (ECF No. 1467) ("Renewed Motion to Compel" and, together with

the Initial Motion to Compel, the "Motions to Compel").  The Renewed Motion to Compel

repeated the UCC's arguments made in the Initial Motion to Compel in seeking the production of

Assured's Loss Reserves provided to the NYDFS.  Assured opposed the Renewed Motion to

Compel.  *See* ECF No. 1495.

17.     On July 30, 2019, the Magistrate Judge heard argument on the UCC's

Motions to Compel.  During the hearing, the Magistrate Judge found that Assured's Loss Reserves

did not have to be produced.  *See* Obj., Ex. C (July 30, 2019 Hr'g Tr.) at 123:14:16.  Thereafter,

the Magistrate Judge entered the Order finding, among other things, that Assured's Loss Reserves did not have to be produced.  *See* ECF No. 1556 ¶ 15.

## **ARGUMENT**

18.     In reviewing timely objections to a non-dispositive order issued by a magistrate judge, the district judge may modify or set aside any part of the order that is "clearly erroneous or contrary to law."  28 U.S.C.A. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).  The UCC incorrectly asserts that the standard of review is *de novo* (Obj. ¶ 18), but, especially in reviewing the portion of the Order denying discovery of Assured's Loss Reserves, this Court should review under the "clearly erroneous" standard of review.  As this Court has previously recognized: "[u]nder the 'clearly erroneous' standard, the reviewing court 'must accept both the trier's findings of fact and the conclusions drawn therefrom unless, after scrutinizing the entire record, [it forms] a strong, unyielding belief that a mistake has been made.'" *In re Fin. Oversight and Mgmt. Bd. for P.R.*, No. 17-BK-3566-LTS, 2019 WL 2929001, at *3 (Bankr. D.P.R. July 8, 2019) (Swain, J.) (quoting *Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999) (internal quotation and citation omitted)).  The UCC has failed to show that the Magistrate Judge's Order is clearly erroneous.

## I.    The Magistrate Judge Correctly Found That Assured's Loss Reserves Are Irrelevant To The 9019 Motion

19.     The Magistrate Judge's Order finding that Assured's Loss Reserves do not have to be produced should be upheld by this Court.  Following well-accepted law and previous rulings by this Court, the Magistrate Judge correctly found that Assured's Loss Reserves were irrelevant to the issues that the Court will decide in the 9019 Motion.

20.     Specifically, the Magistrate Judge found:

> The Court has found in similar litigation that the loss reserves are not probative of the question of the value of the PREPA bondholders' collateral. (Dkt. No. 1165 at 9). Similarly here, the Court finds that loss reserve information is not relevant to the ultimate issue before the Court. Assured's loss reserves may show the entity's expectations given a set of different possible litigation outcomes, but that information is not probative of the question whether the settlement reached by the parties in this case is a reasonable one. Thus, the loss reserve information is outside the scope of reasonable discovery for the 9019 Motion hearing.

ECF No. 1556 ¶ 15. The Magistrate Judge's Order is correct and not clearly erroneous.

21.     Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Federal Rules")[4] provides that the scope of discovery includes relevant and non-privileged matter "proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *Gill v. Gulfstream Park Racing Ass'n., Inc.*, 399 F.3d 391, n.5 (1st Cir. 2005); *Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan*, 937 F. Supp. 2d 202, 204-205 (D.P.R. 2012), *aff'd*, 802 F.3d 99 (1st Cir. 2015).

22.     This Court has made clear that it will apply the First Circuit's four-factor test to the 9019 Motion and consider "(i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection of the disputed funds; (iii) the complexity of the litigation involved and the expense, inconvenience, and delay attending it; and (iv) the paramount interest of the creditors and proper deference to their reasonable views." Obj., Ex. E (July 11, 2019 Hr'g Tr.) at 8:12-19 (quoting *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995)).

23.     At the June 12, 2019 omnibus hearing, the Court provided guidance regarding the scope of the hearing on the 9019 Motion and stated that an essential element of the

---

[4]     The Federal Rules are applicable to these proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Section 310 of PROMESA.

Government Parties' case would include the **Government Parties'** "worst case/best case risk analyses," and the **Government Parties'** demonstration that they have "given reasoned consideration of relevant factors," as part of the exercise of the **Government Parties'** "business judgment." *See* Obj., Ex. D (June 12, 2019 Hr'g Tr.) at 155:7-13.

24.     At the July 11, 2019 pre-trial conference, the Court also stated that the scope of the 9019 Motion hearing would be limited to evaluating the RSA based on the **Government Parties'** discretion and business judgment. Specifically, the Court stated that:

> [T]he Court recognizes that its task on this motion practice is not to determine whether the compromise embodied in the portions of the RSA presented for approval is the wisest possible outcome, but, rather, whether it is within a range of reasonable outcomes and, thus, the 9019 seeks limited relief under a review standard ***that is deferential to the choices made by those empowered*** [*i.e.*, the Government Parties] ***to guide the debtors' affairs***.

Obj., Ex. E (July 11, 2019 Hr'g Tr.) at 8:23-9:4 (emphasis added).

25.     The case law regarding the settlement of bankruptcy claims and the guidance by the Court regarding the scope of the hearing on the 9019 Motion are the "needs of the case" that inform discovery for purpose of the 9019 Motion. Fed. R. Civ. P. 26(b)(1). They demonstrate that Assured's Loss Reserves are irrelevant to the 9019 Motion.

26.     In its Objection, the UCC asserts that the Loss Reserves should be produced because the Magistrate Judge previously found that loss reserves "'are based on ***potential litigation outcomes***'" and "the probability of litigation success is directly tied to the potential outcomes of that litigation[.]" Obj. ¶ 62 (quoting ECF No. 1165 at 9) (emphasis in original). The UCC further asserts that Assured's "views as to the outcome of the litigation are arguably more relevant than anyone's" because Assured is "the party actually litigating against the Government Parties." *Id.*

27.     The UCC's assertions run directly counter to the case law cited above and the Court's guidance regarding the scope of the 9019 Hearing.  In determining the 9019 Motion, this Court will arrive at an objective, independent determination of the likely litigation outcomes. Assured's views regarding litigation outcomes, as a non-party to the 9019 Motion and as a non-decision maker for PREPA as the Debtor, are not probative.  The point of Bankruptcy Rule 9019 is that the court, which would ultimately decide the issues if not settled, reach its own view of the merits based on a summary showing of law and facts and compare that to the ultimate views of the Debtor.

28.     In similar contexts, bankruptcy courts have denied discovery requests for a creditor's own internal valuations and analysis of settlements in restructuring support agreements. In *In re The Dolan Co.*, the bankruptcy court rejected discovery of internal valuations and analysis by a lender who was party to a restructuring support agreement, holding that the lender's valuation was not "an appropriate area of inquiry" and is "of limited relevance, as the [plan confirmation] burden rests with the debtor to demonstrate the value of the company."  No. 14-10614-BLS, ECF No. 284 at 9-10, 19-20 (Bankr. D. Del. May 2, 2014), relevant pages attached hereto as Exhibit 1. Likewise, in *In re Genco Shipping & Trading Ltd.*, which also involved requests for internal valuations of the debtor's business from parties to a restructuring support agreement, the bankruptcy court found that internal valuations "would be of limited relevance to the inquiry" because "the burden rest[s] with the debtor on the value of the company."  No. 14-111-8-SHL, ECF No. 267 at 62 (Bankr. S.D.N.Y. June 3, 2014), relevant pages attached hereto as Exhibit 2.

29.     Moreover, but equally significant, Assured's Loss Reserves are **_not_** an assessment of the proposed settlement embodied in the RSA.[5]  Loss reserves are the amounts that

---

[5]    Assured respectfully refers the Court to, and fully incorporates by reference, its detailed explanation of loss reserves in paragraphs 5-10 and 28-38 of the *Opposition of Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee Inc. to the*

Assured sets aside to satisfy its estimated insurance obligations.  They allow Assured to cover future claims made against their respective policies, including future claims on PREPA bonds and other bonds issued by Puerto Rico entities.  *See* ECF No. 1084-7 (Declaration of Benjamin Rosenblum, dated February 14, 2019 ("Rosenblum Decl.")) ¶ 7.[6]  Assured's Loss Reserves do not reflect the objective probability of success of any litigated claim, and they do not inform whether the proposed settlement set forth in the RSA falls outside the Debtor's zone of reasonableness. Assured's Loss Reserves are calculated by considering multiple subjective assessments by Assured of the probability of varied litigation and settlement outcomes, developed in consultation with counsel.  *See* Rosenblum Decl. ¶¶ 10-17.

            30.    The Loss Reserves reflect probabilistic assessments of potential litigation and settlement outcomes regarding PREPA as well as other Title III litigations and disputes. *See* Rosenblum Decl. ¶¶ 11-17.  These assessments are necessarily based on the advice of counsel regarding the strength of Assured's legal positions and likelihood of certain litigation outcomes. *Id.*  The Loss Reserves are not a calculation of the value of any one proposed settlement, including the RSA.  Rather, the Loss Reserves evaluate a number of different settlement possibilities and account for the ***likelihood*** of particular settlements coming to fruition based on a variety of litigation outcomes, and not the merits or fairness of the RSA or any settlement by itself.

            31.    The UCC appears to concede that Assured's Loss Reserves are subjective determinations, but claims that "does not somehow render them not relevant."  Obj. ¶ 62.  In making this assertion, the UCC ignores that, in determining a motion based on Bankruptcy Rule

---

*Urgent Motion of Financial Oversight and Management Board, as Representative of Debtor, to Compel Production Of Documents From Movants Relating To Their Motion For Relief From Automatic Stay* (ECF No. 1084) ("Insurers' Opposition").

[6]    An unredacted copy of the Rosenblum Declaration was provided to the Court via email and other parties on February 14, 2019 when Assured served the Insurers' Opposition (ECF No. 1084).  The UCC was also provided an unredacted copy of the Rosenblum Declaration.

9019, the law is clear that the courts will consider *objective* evidence related to the likelihood of success in the litigation. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

32.     The UCC also fails to explain why or how the opinions of Assured and its counsel comparing the likelihood of potential litigation and settlement outcomes affect the "reasonableness" of the RSA.  Assured's necessarily *subjective* assessments about risks, litigation positions and probabilities of various litigation and settlement outcomes are far removed from objective evidence.  Nor are Assured's range of subjective assessments of whether various settlements will ultimately materialize or be approved, or will be able to be implemented, indicative of the underlying reasonableness of the RSA itself and whether it falls outside the Debtor's zone of reasonableness.  The court decisions described above, thus, clearly demonstrate that the subjective valuation of a settlement by a creditor is inadmissible and thus not a proper subject for discovery.  *See* Ex. 1 (*Dolan*, No. 14-10614-BLS, ECF No. 284) at 9-10, 19-20; Ex. 2 (*Genco*, No. 14-111-8-SHL, ECF No. 267) at 60-62.

33.     Moreover, Assured has already produced documents that allow the UCC to determine the objective value of the RSA to Assured.  These documents include Assured's PREPA insurance policies, Assured's PREPA claim notices and Assured's public reporting of its total PREPA exposure.  The UCC also has the RSA itself.  As a result, the UCC already knows the amounts of Assured's claim payments on the bonds it insures, how those payments compare to Assured's total exposure, and the treatment Assured receives under the RSA.  The only thing the UCC thinks they are missing is what they have no right to see:  Assured's work product informing regulators of a subjective calculated analysis, which is the result of accounting for several settlement and litigation outcome scenarios.  The Loss Reserves reflecting the *likelihood* of various outcomes cannot inform the *reasonableness* of the single outcome embodied in the RSA.

-11-

The Loss Reserves only reflect Assured's subjective assessment of the likelihood of whether various settlements or litigation outcomes will ultimately materialize based on a variety of factors.

34.     Given that Assured's Loss Reserves are not probative of the issues to be resolved in the 9019 Motion, any purported benefit of production is far outweighed by the prejudice to Assured.  "While Rule 26 contemplates liberal discovery and a broad concept of relevance, the Rule also recognizes that discovery must be proportionate to the case and issues at hand and must protect responding parties from undue burden or expense."  *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-cv-2419, 2015 WL 13715296, at *1 (D. Mass. Nov. 6, 2015) (citation omitted); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (emphasizing proportionality in discovery); *Fed. Realty Inv. Trust v. Pac. Ins. Co*., 760 F. Supp. 533, 540 (D. Md. 1991) (finding that "[r]eserve decisions are mere guesses at the outcome of litigation based on conservative accounting principles" and holding that loss reserve evidence was not admissible at trial because "the probative value of [the loss reserve] predictions, if any, is substantially outweighed by its prejudicial aspects").

35.     Disclosure of the Loss Reserves would be highly prejudicial to Assured. *See* Rosenblum Decl. ¶¶ 10-12, 17, 25.  The Loss Reserves contain proprietary and highly sensitive commercial and financial information.  *Id.* ¶¶ 10, 17, 25.  In particular, if the Court denies the 9019 Motion or the RSA cannot be implemented, the production of Assured's Loss Reserves would expose Assured's reserve analyses to all counterparties by revealing its assessment of strengths, weaknesses, and worst-case scenarios.  Although there is a protective order covering productions made in response to 9019 Motion discovery requests (*see* ECF No. 1322), the protective order does not diminish the prejudice that would be suffered by Assured through the disclosure of its Loss Reserves because such disclosure would reveal Assured's internal strategies and thinking relating to its claims against the Commonwealth and PREPA.

36.     In sum, Assured's Loss Reserves fall beyond the scope of the 9019 Motion, and would be "of limited relevance as the burden rests with the debtor to demonstrate the value of the [deal]" per its own business judgment. Ex. 1 (*Dolan*) at 9-10, 19-20.  Assured's Loss Reserves do not constitute objective valuations of the RSA settlement terms and, in any event, do not concern the exercise of the Debtor's business judgment; indeed, the best evidence of the economics of the RSA terms is the RSA itself, to which the UCC (and the Debtor, of course) have full access. For these reasons, the Magistrate Judge's Order denying the UCC's motions to compel the production of Assured's Loss Reserves should be upheld by this Court.

## II.  **Assured's Loss Reserves Are Outside The Scope Of The UCC's Document Requests And Are Privileged**

37.     Given the Magistrate Judge's finding that Assured's Loss Reserves are irrelevant to the 9019 Motion, the Magistrate Judge did not reach the issues of whether the Loss Reserve documents are within the scope of the UCC's document requests and, if so, are protected from discovery by privilege.  This Court also does not have to reach these issues if it upholds the Magistrate Judge's Order.  To the extent this Court finds it has to address these issues, Assured's Loss Reserves are not within the scope of the UCC's document requests and, in any event, are subject to the attorney work product privilege and bank examiner privilege.  Assured did not waive these privileges by providing its Loss Reserves to its regulator, the NYDFS.

### A.  **The UCC's Document Requests To Assured Did Not Seek Loss Reserves**

38.     The production of Loss Reserves is beyond the scope of the UCC's document requests on Assured.  On May 22, 2019, the Court entered a scheduling order that set a deadline of May 22, 2019 to serve initial document requests.  *See* ECF No. 1253 at 3.[7]  The UCC's

---

[7]   The revised scheduling Orders for the 9019 Motion that the Court later entered did not modify this deadline.  *See* ECF Nos. 1366, 1534, 1579.

document requests that were served on Assured on May 22, 2019 do not call for the production of Loss Reserves. *See* ECF No. 1269-21 at 18-20. It was not until May 31, 2019, during a meet and confer, that counsel for the UCC told counsel for Assured that it was seeking Assured's Loss Reserves as part of discovery, a request to which Assured objected. Indeed, in their Motions to Compel and Objection, the UCC fails to identify a single request that expressly or implicitly calls for production of Loss Reserves. *See* ECF Nos. 1269 ¶¶ 54-57, 1467 ¶¶ 26-27, Obj. ¶¶ 62-64. Given that the UCC has never made a formal document request for the Loss Reserves, the UCC's Objection can be denied on that ground, alone.

**B.     Assured's Loss Reserves Are Protected By The Work Product Doctrine**

39.     Assured's Loss Reserves are protected by the work product privilege. The work product privilege protects "work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party." *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 66 (1st Cir. 2002); *CH Properties, Inc. v. First Am. Title Ins. Co.*, 48 F. Supp. 3d 143, 149-150 (D.P.R. 2014). The doctrine "protects (1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; (3) by or for another party or by or for that other party's representative, protecting the mental impressions, conclusions, or legal theories of a party's attorney concerning the litigation." *Fed. Deposit Ins. Corp. v. Arrillaga-Torrens*, 212 F. Supp. 3d 312, 368 (D.P.R. 2016). For the purpose of the work product doctrine, bankruptcy filings can be considered litigation. *See In re Quigley Co.*, Case No. 04-15739, 2009 Bankr. LEXIS 1352, at *21 (Bankr. S.D.N.Y. Apr. 24, 2009); *see also In re McDowell*, 483 B.R. 471, 494 (Bankr. S.D. Tex. 2012).

40.     Assured's Loss Reserves were prepared in anticipation of and during litigation. Thus, the work product doctrine applies to the Loss Reserves. *U.S. v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998) (the work product doctrine applies if a company's attorneys "estimate[e] the likelihood of success in litigation and an accompanying analysis of the company's legal

-14-

strategies and options to assist it in estimating what should be reserved for litigation losses."); *Schreib v. Am. Family Mut. Ins. Co.*, 304 F.R.D. 282, 285 (W.D. Wash. 2014) ("[R]eserve information that was created in anticipation of litigation is protected by the work product doctrine."); *Progressive Cas. Ins. Co. v. F.D.I.C.*, 298 F.R.D. 417, 426 (N.D. Iowa 2014) (finding work product doctrine applicable to loss reserves when litigation was reasonably foreseeable); *Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325, 331–34 (N.D. W.Va. 2006) (finding that "all documents concerning loss reserves . . . are protected by the work-product doctrine and are not discoverable").

41.     Assured's Loss Reserves with regard to PREPA were specifically prepared in anticipation of and during litigation.  Assured's Loss Reserves are prepared in consultation with Assured's outside and in-house attorneys.  *See* Rosenblum Decl. ¶¶ 11-17.  The calculations within the Loss Reserves reflect legal assessments and risks, the nature and likelihood of prospective settlement and/or litigation success, and other confidential work product of counsel.  *Id.* ¶¶ 11-17, 25.

42.     The UCC asserts that the Loss Reserves are not protected by the work product doctrine because they "were prepared in the ordinary course of business to satisfy regulatory requirements." Obj. ¶ 63.[8]  However, even if the Loss Reserves did not have such a specific litigation-oriented purpose, work product in the First Circuit is not limited to documents

---

[8]     In citing *U.S. v. Textron Inc. & Subsidiaries*, 577 F.3d 21 (1st Cir. 2009) (en banc), the UCC cherry-picks two parts of the opinion to misstate the relevant legal standard in the First Circuit.  *See* Obj. ¶ 63.  Contrary to the UCC's description of the holding, the *Textron* court found that "a document ***not in any way prepared 'for' litigation*** but relat[ing] to a subject that ***might or might not occasion litigation***" in the future was not protected by the work product doctrine.  577 F.3d at 26 (emphasis added).  In contrast, Assured has provided uncontested sworn testimony that its Loss Reserves embody confidential work product.  *See* Rosenblum Decl. ¶¶ 11-17.  The other cases cited by the UCC are inapposite because the documents at issue were investigation reports documenting "facts and events" prepared in the course of internal investigations when no litigation was pending.  *W. Holding Co. v. Chartis Ins. Co. of P.R.*, 300 F.R.D. 48, 49 (D.P.R. 2014); *Mullins v. Dep't of Labor of P.R.*, 269 F.R.D. 172, 174 (D.P.R. 2010).

created exclusively for litigation.  Documents created with the dual purpose of business operations

and litigation are entitled to work product protection so long as they were created in anticipation

of litigation.  *W. Holding Co. v. Chartis Ins. Co. of P.R.*, 300 F.R.D. 48, 50 (D.P.R. 2014)

("Litigation does not need to be the primary purpose for which the document was created; the

document simply has to be prepared *because of* litigation or the prospect of litigation.") (emphasis

in original); *Mullins v. Dep't of Labor of P.R.*, 269 F.R.D. 172, 175 (D.P.R. 2010) (rejecting the

notion that litigation must be the "primary" purpose of a document because that "implies that

documents prepared with a dual purpose of litigation and business do not fall within the protective

scope of the Rule.").  Indeed, in a case cited by the UCC, the court found that letters "estimating

the likelihood of success in litigation and . . . estimating what should be reserved for litigation

losses" were work product.  *American Steamship Owners Mut. Prot. and Indemnity Ass'n, Inc. v.

Alcoa Steamship Co., Inc.*, 2006 WL 278131, at *1 (S.D.N.Y. Feb. 2, 2006).

43.    For these reasons, Assured's Loss Reserves constitute attorney work

product, and this Court should enforce that privilege.

## C.    Assured Did Not Waive Privilege By Providing Loss Reserves To Its Regulators

44.    Assured provided its Loss Reserves to its regulator, the NYDFS.  In doing

so, the UCC claims that Assured waived privilege.  *See* Obj. ¶ 64.  Contrary to this assertion,

disclosure to a regulator with statutory assurances of confidentiality does not waive work product

privilege.

45.    "[W]aiver is the intentional relinquishment or abandonment of a known

right."  *U.S. v. Olano*, 507 U.S. 725, 733 (1993) (citation omitted).  The First Circuit has

specifically recognized that "disclosure of work-product to a third-party does not necessarily waive

the protection; only disclosing material in a way inconsistent with keeping it from an adversary

waives work product protection." *Blattman v. Scaramellino*, 891 F. 3d 1, 5 (1st Cir. 2018) (citation omitted); *U.S. v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) (finding that work product privilege was not waived over material shared with an independent auditor because that third-party disclosure was not inconsistent with maintaining secrecy from their litigation adversary); *Matrix Essentials, Inc. v. Quality King Distributors, Inc.*, No. CV90-1070, 2006 WL 8435312, at *3 (E.D.N.Y. Jan. 12, 2006).

46.     The one case relied upon by the UCC that deals with privileged information disclosed by an insurer to its regulator does not support the UCC's assertion that such disclosure waives privilege. *See* UCC Opp. ¶ 64.  In *American Steamship*, the court declined to reach the question of waiver because the documents at issue were never shared with the regulator.  *See* 2006 WL 278131, at *2.  The UCC nevertheless points to *dicta* in the unpublished opinion that speculates "[t]here still **might** be a waiver here **if** the opinions were disclosed to the New York Insurance Department and that agency stood in an **adversarial relationship with the [regulated entity]**." *Id.* (emphasis added).[9]  In relying on this case, the UCC ignores the distinction between (i) a disclosure that is made in a manner consistent with keeping privileged material from an adversary compared to (ii) a disclosure that is made in a manner inconsistent with that purpose. Courts in the First Circuit have found that there is no waiver of privilege under the first type of disclosure.  *Bryan Corp. v. ChemWerth*, 296 F.R.D. 31, 38-40 (D. Mass. 2013) (Dein, M.J.) (no waiver of the work product privilege when a party disclosed materials to its agent because:  (1) the agent was not an adversary of the plaintiff, (2) the disclosure did not substantially increase an adversary's likelihood of obtaining the materials, and (3) all of the relevant communication

---

[9]     The other case cited by the UCC, *U.S. v. Mass. Institute of Technology*, is similarly distinguishable because the documents at issue (minutes of board meetings) were shared with a contractual counterparty, the Department of Defense's Defense Contract Audit Agency, not an insurance regulator.  129 F.3d 681, 683 (1st Cir. 1997).

occurred in furtherance of a common strategy against the defendant).   Given this standard, submissions to regulators do not waive work product privilege when there is an expectation of confidentiality.   *See Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, No. 06 Civ. 5797, 2010 WL 935317, at *1 (S.D.N.Y. Mar. 12, 2010); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993); *see generally Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126, 2016 WL 6779901, at *4-5 (S.D.N.Y. Nov. 16, 2016).

47.   Here, disclosure of the Loss Reserves to Assured's regulator, the NYDFS, was not a disclosure to a litigation adversary and the disclosure did not increase the probability that any litigation adversary of Assured would obtain the privileged information.   Instead, Assured shared the Loss Reserves pursuant to regulatory requests and an understanding with the NYDFS that such information would be protected against further disclosure.   *See* Rosenblum Decl. ¶¶ 20-25.

48.   The UCC incorrectly asserts that the NYDFS is "permitted to disclose such regulatory submissions publicly if it determines that the public interest will thereby be satisfied." Obj. ¶ 64.  On the contrary, New York State statutes directly protect these submissions from further disclosure by the NYDFS and disclosure through public records requests.   *See* N.Y. Pub. Off. L. § 87(2)(d); N.Y. Ins. Law 1504(c); *see also* Rosenblum Decl. ¶ 20.   In particular, the New York Insurance Law requires that the NYDFS:

> *[S]hall keep the contents of each report* made pursuant to this article *and any information obtained in connection therewith confidential and shall not make the same public* without the prior written consent of the controlled insurer to which it pertains unless the superintendent after notice and an opportunity to be heard, shall determine that the interests of policyholders, shareholders or the public will be served by the publication thereof.

N.Y. Ins. Law § 1504(c) (emphasis added).

49.     The plain text of the New York Insurance Law demonstrates that Assured has a statutorily-protected expectation of confidentiality for its disclosures to the NYDFS, and that Assured enjoys significant due process protections before ***any*** submitted materials—not just those subject to a work product privilege, like the Loss Reserves—may be disclosed by their regulator.

50.     Accordingly, the Loss Reserves were shared with the NYDFS with the legally-supported expectation that their confidentiality would be preserved.  Whether or not the NYDFS asserts the bank examination privilege, New York law and past practice with the NYDFS gave comfort to Assured that its disclosures to the NYDFS would remain protected. *See* Rosenblum Decl. ¶¶ 20-22, 24-25.  Indeed, the Loss Reserves have not been made public by the NYDFS and Assured fully expects that they will continue to remain confidential.

51.     For these reasons, disclosure to the NYDFS did not increase the probability that any litigation adversary of Assured would obtain the privileged information or that such information would be disclosed to the general public.  As a result, the disclosure was fully consistent with maintaining secrecy from litigation adversaries.  *See Deloitte*, 610 F.3d at 140.

### D.     The Loss Reserves Provided To Assured's Regulators Are Protected By The Bank Examiner Privilege

52.     The Loss Reserves provided to Assured's insurance regulators also should not be produced because they are protected by the bank examiner privilege.  The bank examiner privilege protects bank examiner reports and communications against disclosure.  *See In re Citigroup Bond Litig.*, No. 08 Civ. 9522, 2011 WL 8210671, at *1 (S.D.N.Y. Dec. 5, 2011); *In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed. Reserve Sys.*, 967 F.2d 630, 633 (D.C. Cir. 1992).  The privilege protects a critical "flow of communication between the bank and the regulatory agency."  *In re Subpoena*, 967 F.2d at 634.  That necessary flow of information would not be possible "if communications between the bank and its regulators

were not privileged." *Id.* Therefore, bank examination reports, related communications, and agency reports are not subject to discovery unless a court determines that the documents are necessary to promote the interests of justice. *See id*. at 635-36.

53.     The UCC is seeking Loss Reserves that Assured provided to the NYDFS. Loss Reserves are also provided to the Maryland Insurance Administration ("MIA"). As set forth in previous filings, in a letter to Assured, the Maryland Insurance Administration ("MIA") acknowledged that Assured falls within the MIA's direct regulatory purview, and that Assured regularly shares sensitive information and analysis. *See* Rosenblum Decl., Ex. A. Assured's Loss Reserves constitute part of the open flow of information that enables effective regulation, and serves the policy interest of the bank examination privilege. The MIA, by its letter, specifically objected to the disclosure of the type of loss reserve information sought here and asserted all privileges to do so, including Maryland's statutory protection mechanisms which is "in the nature of a 'bank examination' privilege statute." *Id.* at 2.

54.     The UCC does not dispute that the MIA has asserted the bank examiner privilege, but argues that assertion is irrelevant because MIA does not have the power to restrict the use of documents provided to NYDFS. However, as the UCC itself acknowledged, the bank examiner privilege "belongs to the regulatory authority" rather than the regulated entity. *See* ECF No. 1269 ¶ 56 (citation omitted). As a result, the privilege "can only be waived by the government, not [the regulated entity]." *In re Nat'l City Corp. S'Holders Litig.*, No. CIV.A. 4123-CC, 2009 WL 1653536, at *1 (Del. Ch. June 5, 2009). As Assured's Loss Reserves are provided to both the MIA and the NYDFS, the assertion of the bank examiner privilege over Assured's Loss Reserves by the MIA equally impacts the same submission to the NYDFS. *See* Rosenblum Decl. ¶¶ 19-20. The production of the Loss Reserves to the UCC would, therefore, ignore and violate the bank examiner privilege asserted by the MIA. Thus, Assured's Loss Reserves provided to Assured's

insurance regulators are protected by the bank examiner privilege and Assured should not be required to produce such privileged information to the UCC.

## **CONCLUSION**

55.    For the reasons set forth herein, the Court should uphold the Magistrate Judge's Order regarding Assured's Loss Reserves.

Dated:  August 16, 2019
        New York, New York

CASELLAS ALCOVER & BURGOS P.S.C.

By: /s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
USDC-PR 204809
Ricardo F. Casellas-Sánchez
USDC-PR 203114
Diana Pérez-Seda
USDC-PR 232014
P.O. Box 364924
San Juan, PR  00936-4924
Telephone:  (787) 756-1400
Facsimile:  (787) 756-1401
Email:  hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

CADWALADER, WICKERSHAM & TAFT LLP

By:/s/  *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William J. Natbony*
Ellen Halstead*
Thomas J. Curtin*
Casey J. Servais*
200 Liberty Street
New York, NY  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 406-6666
Email:  howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

*admitted pro hac vice

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, the 16th day of August 2019.

By: _/s/ Howard R. Hawkins, Jr._
    Howard R. Hawkins, Jr.*
    * Admitted _pro hac vice_