## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>     as representative of<br><br>The Commonwealth of Puerto Rico, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS |
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>     as representative of<br><br>The Puerto Rico Electric Power Authority,<br><br>     Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>**Court Filing Relates Only to PREPA and Shall Only be Filed in Case No. 17 BK 4780-LTS and Main Docket 17 BK 3283-LTS** |

## THE AD HOC GROUP OF PREPA BONDHOLDERS' OPPOSITION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' URGENT OBJECTIONS TO MAGISTRATE JUDGE'S AUGUST 2, 2019 ORDER AND ALTERNATIVE MOTION TO STRIKE AND TO EXCLUDE TESTIMONY AND EVIDENCE

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

RELEVANT PROCEDURAL HISTORY ................................................................................. 4

ARGUMENT ............................................................................................................................. 6

I.     JUDGE DEIN'S DECISION TO DENY THE COMMITTEE'S REQUEST FOR
DISCOVERY FROM TWO AD HOC GROUP MEMBERS WAS CORRECT
AND DID NOT ABUSE HER DISCRETION .................................................................. 7

     A.     The Court's Explanation of the Scope of the 9019 Hearing and the
Committee's Own Arguments Show Additional Discovery from the Ad Hoc
Group Is Not Warranted ..................................................................................... 7

     B.     The Committee Has Never Claimed that the Negotiations Are Relevant to
the Hearing on the 9019 Motion, and Even if it Did So Now, the Two Ad
Hoc Group Members Should Not be Compelled to Produce Negotiation-
Related Communications Because Virtually All Negotiations Were Led by
the Ad Hoc Group's Professionals Who Have Already Produced
Documents ......................................................................................................... 9

II.     JUDGE DEIN'S RULING THAT THE COMMON INTEREST DOCTRINE
APPLIES TO COMMUNICATIONS BETWEEN THE GOVERNMENT
PARTIES AND THE AD HOC GROUP STARTING ON JULY 30, 2018 IS
CORRECT AND DID NOT ABUSE HER DISCRETION ............................................. 12

     A.     Judge Dein's Ruling that the Common Interest Doctrine Applies Is Amply
Supported by the Facts and the Law ................................................................. 12

     B.     None of the Documents Cited by the Committee Is Inconsistent with Judge
Dein's Decision that a Common Interest Has Existed Since July 30, 2018 ......... 16

CONCLUSION ........................................................................................................................ 20

APPENDIX A ...................................................................................................................... A-1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asymetrix Medical, Inc. v. McKeon*,
No. 11-11079-NMG, 2013 WL 2181084 (D. Mass. May 16, 2013) ......................................14

*CSC Tr. Co. of Del. v. Energy Future Intermediate Holdings Co. (In re Energy
Future Holdings Corp.)*,
513 B.R. 651 (Bankr. D. Del. 2014) .....................................................................................9

*In re Dolan Co.*,
No. 14-10614 (BLS), Tr., Dkt. No. 284 (Bankr. D. Del. May 2, 2014) ..................................9

*In re Energy XXI Ltd.*,
No. 16-31928, Tr., Dkt. No. 1141 (Bankr. S.D. Tex. Aug. 23, 2016) .....................................9

*Ferring Pharm. Inc. v. Braintree Labs., Inc.*,
168 F. Supp. 3d 355 (D. Mass. 2016) ....................................................................................6

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
No. 17 BK 3283-LTS, 2019 WL 2636273 (D.P.R. June 27, 2019) (Swain, J.) .......................6

*In re Genco Shipping & Trading Ltd.*,
No. 14-111-8-SHL, Tr., Dkt. No. 267 (Bankr. S.D.N.Y. June 3, 2014)..................................9

*In re JP Morgan Chase & Co. Securities Litigation*,
No. 06 C 4674, 2007 WL 2363311 (N.D. Ill. Aug. 13, 2007)...............................................14

*In re Leslie Controls, Inc.*,
437 B.R. 493 (Bankr. D. Del. 2010) ............................................................................14, 17

*In re Lyondell Chemical Co.*,
No. 09-10023, Tr. 15, Dkt. No. 3592 (Bankr. S.D.N.Y. Jan 7, 2010) ...................................14

*PowerShare, Inc. v. Syntel, Inc.*,
597 F.3d 10 (1st Cir. 2010).....................................................................................................6

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968)................................................................................................................9

*In re Tribune Co.*,
No. 08-13141 (KJC), 2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ............... 13-15, 17, 19

KL3 3263493.1

**Rules**

Fed. R. Civ. P. 26(b)(1) ........................................................................................3, 11

Fed. R. Civ. P. 45(d)(1) ........................................................................................3, 11

**Other Authorities**

*Wright, Miller & Marcus*, 12 Fed. Prac. & Proc. Civ. § 3069 (3d ed.) ...........................................6

Elliot Moskowitz, *The Common Interest Privilege in Bankruptcy: Recent Trends and Practical Guidance*, 3 Nat'l J. Bankr. L. & Prac. 271 (2017) ...................................13, 14

KL3 3263493.1

To the Honorable United States District Judge Laura Taylor Swain:

The Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group") respectfully submits this opposition to the Committee's objections (the "Objections") (Dkt. No. 1576) to Magistrate Judge Dein's August 2, 2019 Order (the "August 2 Order") (Dkt. No. 1556), concerning the discovery issues the Committee raised in its June 3, 2019 motion to compel (the "Motion to Compel") (Dkt. No. 1269) and July 16, 2019 renewal of its Motion to Compel (the "Renewal") (Dkt. No. 1467).[1]

## **PRELIMINARY STATEMENT**

1.     Judge Dein correctly denied the portion of the Committee's Motion to Compel and Renewal of its Motion to Compel that sought to compel the Ad Hoc Group to produce: (i) documents of two Ad Hoc Group members; and (ii) communications between the Government Parties and the Ad Hoc Group starting on July 30, 2018 as to which the Government Parties and the Ad Hoc Group have asserted a common interest privilege.  Because Judge Dein's ruling is correct, the Court should uphold it under any standard of review.  But contrary to the Committee's position, the standard of review is deferential, not de novo.

2.     The Committee effectively conceded before Judge Dein that the very issues for which it said it needed more discovery (Renewal ¶ 4) do not require any additional discovery from the Ad Hoc Group or its members.  Thus,

- The Committee argued that "the central issue on the 9019 Motion is the reasonableness of the *Government Parties'* decision to enter into the RSA, which necessarily involves an assessment of *their* intentions and motivations" (*id.* ¶ 16) (emphasis added), not those of the Ad Hoc Group or its members.

- The Committee contended (contrary to the Court's directions at the July 11, 2019 status conference and in its July 29, 2019 and August 13, 2019 orders (Dkt. Nos. 1543 and 1586)) that the Committee is entitled to "broad discovery" of seven topics that relate to the Government Parties' purportedly "sweeping" justifications for the proposed

---

[1] Capitalized terms not defined here have the meanings stated in the Committee's Objections.

settlement.  Renewal ¶ 4.  None of those topics or Government justifications has anything to do with the Ad Hoc Group or its members.

- The Committee enumerated the specific discovery requests to which it seeks to compel responses.  *Id.* ¶ 7.  Tellingly, the Committee did not cite, and still does not cite, even a single request addressed to the Ad Hoc Group.

3.     The Committee's Objections before this Court now effectively concede once again that the issues as to which the Committee says it needs discovery that was denied by Judge Dein do not require any additional discovery from the Ad Hoc Group or its members.  Thus,

- The Committee argues that the discovery it now seeks "deals directly with whether or not **the debtor, PREPA**, can sustain the rate increases that the RSA contemplates." Objections ¶ 3 (emphasis by the Committee).  Even if such discovery was consistent with the Court's directions and rulings concerning the 9019 Motion (and it is not), the Committee does not argue that it needs documents on this issue from the Ad Hoc Group or its members.

- The Committee argues the discovery it now seeks "also relates to whether the RSA leaves room for more recoveries for other creditors."  *Id.* ¶ 3.  Once again, even if further discovery were warranted on that topic at this juncture (and it is not), the Committee does not assert that the Ad Hoc Group or its members have that information or should have to produce it.

Indeed, the Committee's Objections as to the Ad Hoc Group appear to be an afterthought.  *Id.* ¶ 7. When the Committee finally addresses the discovery it seeks from two Ad Hoc Committee members (*id.* ¶¶ 47-48), and the Government Parties' communications with the Ad Hoc Group that Judge Dein ruled are protected by the common interest privilege (*id.* ¶¶ 52-60), the Committee does not even attempt to explain how they are relevant to the issues the Court has ruled should be addressed on the Rule 9019 Motion.

4.     The only subject as to which the Ad Hoc Group's documents could conceivably be relevant is whether the Government Parties negotiated their settlement with the Ad Hoc Group at arms' length and in good faith.  But the Committee has never disputed that the Government Parties did so.  In fact, the Committee itself has argued that the negotiations between the Government

Parties and the Ad Hoc Group were at "arms' length," continued for "many months" and "at times became contentious."  Motion to Compel ¶¶ 25-26; *see also* Objections ¶¶ 56, 58.

5.     And even if the Committee were to try to raise a belated question now as to the arms' length or good faith nature of the Government Parties' negotiations with the Ad Hoc Group (and the Objections do not do so), that would not warrant the additional discovery from a custodian at two Ad Hoc Group members that the Committee requests, for at least two independently dispositive reasons.  *First*, such discovery has nothing to do with the issue the Court has explained should be determined on the 9019 Motion: whether the settlement "is within a range of reasonable outcomes."  Objections Ex. E at 8-9; *see also* July 29, 2019 and August 13, 2019 orders (Dkt. Nos. 1543 & 1586).  *Second*, the Ad Hoc Group's *professionals* (Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") and Houlihan Lokey, Inc. ("Houlihan")) handled virtually all negotiations on behalf of the Group.  Those professionals (four Kramer Levin custodians and one from Houlihan) have already produced non-privileged documents in response to the Committee's subpoena.  The undue burden and expense of any additional discovery from two Ad Hoc Group members, who are not parties to the 9019 Motion, would far outweigh its likely benefit and would not be proportional to the needs of the 9019 Motion.  *See* Fed. R. Civ. P. 45(d)(1); *see also* Fed. R. Civ. P. 26(b)(1).  Judge Dein correctly denied this prong of the Committee's Renewal.  The Committee has not provided any basis for overturning that decision (and the Committee cannot do so).

6.     There is also no merit to the Committee's effort to invade the common interest privilege of the Government Parties and the Ad Hoc Group.  The Committee seeks the Government Parties' communications with the Ad Hoc Group between July 30, 2018, when the Government Parties and the Ad Hoc Group entered into the Preliminary Restructuring Support Agreement (the "Preliminary RSA"), and March 26, 2019, when Assured reached agreement with the Government

Parties and the Ad Hoc Group.  Objections ¶ 61 n. 24.[2]  Judge Dein correctly concluded that the Committee is not entitled to those documents.  The Ad Hoc Group has had a common interest with the Government Parties since July 30, 2018, when the Ad Hoc Group and the Government Parties agreed on the structure and material terms of their settlement and to work together to consummate and obtain Court approval for their deal.  The deal has not changed materially since then.

7.      The Committee points to eight documents that it contends show that the Government Parties did not have a common interest with the Ad Hoc Group until March 26, 2019.  Judge Dein had those documents, and addressed many of them during the July 30, 2019 hearing.  None of them supports the Committee's position.  They concern the implementation of the agreement, dealing with changed circumstances, and presenting the settlement to the Court for approval.  The Committee's Objections do not provide any reason to overturn Judge Dein's ruling.

8.      The Committee is not entitled to the documents protected by the common interest doctrine for a second independent reason.  As explained above, the Government Parties' communications with the Ad Hoc Group are not relevant to the 9019 Motion because the Committee has never disputed that the Government Parties negotiated their settlement with the Ad Hoc Group at arms-length and in good faith.  The Committee's Objections do not even attempt to explain how these communications are relevant.

**RELEVANT PROCEDURAL HISTORY**

9.      On May 10, 2019, the Government parties moved for approval of the settlement in the RSA (the "9019 Motion") (Dkt. No. 1235).  Shortly thereafter, the Committee served burdensome document requests or subpoenas on many constituencies, including the Ad Hoc Group.  The Committee insisted that the subpoena to the Ad Hoc Group also be deemed to be

---

[2] The Government Parties, the Ad Hoc Group, and Assured entered into the Definitive RSA on May 3, 2019 (the "RSA") (Dkt. No. 1235-1).

KL3 3263493.1

applicable to each of the Group's members, its lawyers at Kramer Levin, and its financial advisors at Houlihan.

10.     The Ad Hoc Group served detailed objections, which it supplemented as discovery continued and as the scope of the 9019 Motion hearing was clarified by the Government Parties and the Court.  *See* Exhibit 1 hereto.  The Ad Hoc Group objected to the subpoena on many grounds, including principally because the subpoena seeks documents that are not relevant to the 9019 Motion.

11.     The Ad Hoc Group explained in its objections that the only subject as to which its documents could conceivably be relevant is whether the Government Parties negotiated their settlement with the Ad Hoc Group at arms' length and in good faith.  But the Committee has never disputed that.  Moreover, even if the negotiations were relevant, the Ad Hoc Group's professionals handled virtually all of the negotiations on behalf of the Group.  The five lead negotiators (four Kramer Levin custodians and one from Houlihan) produced non-privileged documents in response to the Committee's subpoena.  The Ad Hoc Group explained in its objections that in light of the production by its lead negotiator professionals, the burden and expense of an additional production by non-party Ad Hoc Group members would outweigh its likely benefit, and would not be proportional to the needs of the 9019 Motion.

12.     The Committee fully briefed its original Motion to Compel in June 2019, and rebriefed its Renewal in July 2019, but it has never explained why discovery from the Ad Hoc Group is relevant to the issues presented by the 9019 Motion or why the production from the Ad Hoc Group lead negotiator professionals is not sufficient.

13.     On July 30, 2019, following a lengthy hearing, Judge Dein denied the Committee's motion to compel production of documents from two custodians at two Ad Hoc Group members

(Objections Ex. C at 66:4–6) and communications between the Government Parties and the Ad

Hoc Group on and after July 30, 2019, when they had a common interest agreement. *See id.* 122:1–

4. The Court's rulings at the July 30 hearing were memorialized in the August 2 Order, to which

the Committee now objects.

## **ARGUMENT**

14.     Judge Dein correctly denied the Committee's motion to compel the Ad Hoc Group

to produce: (i) documents of two custodians of two Ad Hoc Group members; and (ii) the

Government Parties' communications with the Ad Hoc Group which the Government Parties and

the Ad Hoc Group have asserted are protected by the common interest doctrine. For the reasons

discussed below, the Court should uphold that decision under any standard of review. But contrary

to the Committee's position (Objections ¶ 18), the standard of review is deferential, not de novo.

*See, e.g., Ferring Pharm. Inc. v. Braintree Labs., Inc.*, 168 F. Supp. 3d 355, 363 (D. Mass. 2016)

(upholding a Magistrate Judge's discovery rulings, which are reviewed under a "deferential

standard"); *Wright, Miller & Marcus*, 12 Fed. Prac. & Proc. Civ. § 3069 (3d ed.) ("Regarding legal

issues, the language 'contrary to law' appears to invite plenary review. But many matters such as

discovery scheduling or disputes might better be characterized as suitable for an abuse-of-

discretion analysis.").[3]

---

[3] De novo review is used only when the issue under consideration "turns on a pure question of
law." *PowerShare, Inc. v. Syntel, Inc*., 597 F.3d 10, 15 (1st Cir. 2010). Mixed questions of law
and fact require a sliding scale of review. "The more fact intensive the question, the more
deferential the level of review" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK
3283-LTS, 2019 WL 2636273, at *3–4 (D.P.R. June 27, 2019) (Swain, J.). Judge Dein's discovery
order was based on her assessment of the facts and circumstances in hundreds of pages of
pleadings, dozens of exhibits, and hours of oral argument. *See, e.g.*, Objections Ex. C at 44-66,
102-122.

I.   **JUDGE DEIN'S DECISION TO DENY THE COMMITTEE'S REQUEST FOR DISCOVERY FROM TWO AD HOC GROUP MEMBERS WAS CORRECT AND DID NOT ABUSE HER DISCRETION**

A.   **The Court's Explanation of the Scope of the 9019 Hearing and the Committee's Own Arguments Show Additional Discovery from the Ad Hoc Group Is Not Warranted**

15.   Discovery from the Ad Hoc Group is not relevant to any issue to be heard at the 9019 Hearing.  At the July 11 Pre-Trial Conference, the Court explained that a "motion to approve a compromise or settlement pursuant to Bankruptcy Rule 9019 requires a Court to assess whether the proposed settlement falls below the lowest point in the range of reasonableness."  Objections Ex. E at 8 (citing *ARS Brook, LLC v. Jalbert (In re Servisense.com, Inc.)*, 382 F.3d 68, 71-72 (1st Cir. 2004), which considers the range of reasonableness based on the costs and benefits to the debtor).  The Court's task is "not to determine whether the compromise embodied in portions of the RSA . . . is the wisest possible outcome, but, rather, whether it is within a range of reasonable outcomes and, thus, the 9019 motion seeks limited relief under a review standard that is deferential to the choices made *by those empowered to guide the debtor's affairs*." *Id.* at 8-9 (emphasis added).

16.   The Court described the issue for the 9019 hearing as follows:  "Is it reasonable for [the Government Parties] to pay what they propose to pay, or make the concessions they propose to make, in exchange for the opportunity to pursue confirmation of a plan in the future, given their judgment that they believe this is a realistic and important opportunity . . . ."  *Id.* at 28.  That question concerns the Government Parties' judgment, not the Ad Hoc Group's.

17.   The Court stated that, "[i]n light of the limited scope of the questions presented by the Rule 9019 [M]otion, the deferential decisional standard, and . . . judicial efficiency and economy concerns," the 9019 hearing should be "focused tightly on [1] identification of the range of reasonable settlement outcomes and whether the aspects of the agreement currently submitted for approval fall within that range and [2] facts directly relevant to any legal injury that a party

contends it would suffer as a direct result" of the settlement.  *Id.* at 13.  This "limited scope" does not warrant any additional discovery from the Ad Hoc Group or its members.[4]

18.     The Committee acknowledges that the Court's "inquiry on the 9019 Motion will be a narrow one."  Objections § 37.  The Committee argued in its Renewal that "[t]he central issue on the 9019 Motion is the reasonableness of the *Government Parties'* decision to entered into the RSA, which necessarily involves an assessment of *their* intentions and motivations."  Renewal ¶ 16 (emphasis added).  The Committee identified seven topics it contended should be subject to "broad discovery:"  But all of those topics concern the Government Parties or macroeconomic issues which the Court has already ruled are beyond the scope of the 9019 Motion hearing, such as "Puerto Rico's overall restructuring" and whether, in the absence of a settlement, electrical rates may rise without limit.  *Id.* ¶ 4.  None of the Committee's topics has any connection to or warrants additional discovery from the Ad Hoc Group or its members.

19.     The Committee's Renewal also identified specific discovery requests that it contends relate to its topics.  Renewal ¶ 7; *see also* Dkt. No. 1520 (reply in further support of Renewal) at ¶ 17.  But the Committee's subpoena to the Ad Hoc Group, a non-party, does not contain any of those requests.  All are directed to other parties.

20.     The Committee's Objections now also identify topics as to which the Committee says it needs discovery (Objections ¶¶ 19-33) and discovery requests it says are at issue.  *Id.* ¶¶ 22 n.4, 26 n.7, 29 n.10, 32 n.11.  They too have nothing to do with the Ad Hoc Group.  The Committee never even attempts to explain how the documents it now seeks from two Ad Hoc Group members relate to any of the topics.  And none of the discovery requests is included in the subpoena to the

---

[4] The Court reiterated the "narrowly focused" scope of the 9019 Motion proceedings in its August 13, 2019 Order.  Dkt. No. 1586 at 4.  *See also* July 29, 2019 Order (Dkt. No. 1543) at 3, 5.

KL3 3263493.1

Ad Hoc Group.  Far from providing a basis to overturn Judge Dein's decision denying discovery

from the two Ad Hoc Group members, the absence of any such showing in the Committee's

Objections trumpets loudly that Judge Dein's order was correct.[5]

> **B.      The Committee Has Never Claimed that the Negotiations Are Relevant to the
> Hearing on the 9019 Motion, and Even if it Did So Now, the Two Ad Hoc
> Group Members Should Not be Compelled to Produce Negotiation-Related
> Communications Because Virtually All Negotiations Were Led by the Ad Hoc
> Group's Professionals Who Have Already Produced Documents**

21.      The documents the Committee now seeks from the Ad Hoc Group could be relevant

to only one subject: whether the Government Parties' negotiation of the RSA with the Ad Hoc

Group was conducted at arms' length and in good faith.  However, the Committee has *never*

asserted that the negotiations were not conducted in good faith or at arms' length.  To the contrary,

the Committee argues that the negotiations *were* "at arms-length," continued for "many months,"

---

[5] During the July 30, 2019 hearing, the Committee speculated that Ad Hoc Group member
documents could be relevant to the reasonableness of the settlement if they discuss the value of
the bondholders' security or the consideration to be paid under the settlement.  *See* Objections Ex.
C at 27:23-28:14.  That argument is incorrect, and the Committee has not reiterated it in its
Objections.  It is the Government Parties' judgment that matters when determining whether the
settlement is reasonable, and the criteria for that determination are objective.  *See, e.g., Protective
Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)
(the review of the decision to settle is "objective").  The subjective views of any creditor group are
not relevant.  *See, e.g., In re Dolan Co.*, No. 14-10614 (BLS), Tr., Dkt. No. 284 at 62 (Bankr. D.
Del. May 2, 2014) (Dkt. No 1303-1) (rejecting argument that lenders who were parties to an RSA,
"may well have in their files valuation materials that can contradict [the plan value that] has been
presented to the Court, or otherwise provide information that will be useful in analyzing and
critiquing that valuation," because that is not "an appropriate area of inquiry" and is "of limited
relevance, as the [plan confirmation] burden rests with the debtor to demonstrate the value of the
company."); *accord In re Genco Shipping & Trading Ltd.*, No. 14-111-8-SHL, Tr., Dkt. No. 267
at 62 (Bankr. S.D.N.Y. June 3, 2014) (Dkt. No. 1303-2); *In re Energy XXI Ltd.*, No. 16-31928, Tr.,
Dkt. No. 1141 at 77 (Bankr. S.D. Tex. Aug. 23, 2016) (Dkt. No. 1303-3); *see also CSC Tr. Co. of
Del. v. Energy Future Intermediate Holdings Co. (In re Energy Future Holdings Corp.)*, 513 B.R.
651, 663 (Bankr. D. Del. 2014).  The Committee has never cited a single contrary decision.

and "at times became contentious."  Motion to Compel ¶¶ 25-26; *see also* Objections ¶¶ 56, 58

(the negotiations "continued to intensify" and were "frequently acrimonious").[6]

22.     Even if the Committee had not conceded that the negotiations were at arms' length

(and it has conceded that), or the RSA-negotiation communications were otherwise relevant to the

9019 hearing (and they are not), that would not mean there should be discovery from two Ad Hoc

Group members.  The vast majority of the negotiations on behalf of the Ad Hoc Group were led

by its professionals, not any of its individual members.  The Government Parties' supplemental

submission in further support of the 9019 Motion confirms this.  The declaration of their lead

negotiator, David Brownstein, states his "hard-fought negotiations" concerning the RSA were with

"*representatives of the Ad Hoc Group — principally their counsel, Kramer Levin, and financial

advisor, Houlihan Lokey.*"  Dkt. No. 1426 at ¶ 17 (emphasis added).  That is consistent with the

thousands of pages of documents the Government Parties have produced concerning their

negotiations with the Ad Hoc Group.  All but a handful were with Kramer Levin and Houlihan,

*not* any of the Ad Hoc Group members.  It is also consistent with the thousands of pages of

documents the Ad Hoc Group has produced from the files of its professionals — Kramer Levin

and Houlihan — including the communications of the five individuals who led the negotiations

for the Ad Hoc Group.[7]

---

[6] If the Committee wanted to make any contrary argument, it has had ample opportunity to do so.
The Committee has filed four pleadings in support of its Motion to Compel (Dkt. Nos. 1269, 1318,
1467 and 1520), a fifth pleading in support of its Objections (Dkt. No 1576), and two status reports
(Dkt Nos. 1334 and 1361), and has made lengthy arguments at pre-trial conferences (Dkt. Nos.
1351 and 1459).

[7] The Committee previously argued that documents produced in discovery contradict the assertion
that the Ad Hoc Group's professionals led the negotiations on its behalf.  The Committee has not
repeated that argument here, for good reason.  It is manifestly incorrect.

23.     Since (a) the communications the Committee now seeks from two Ad Hoc Group members are far afield from the issues that the Court has directed should be addressed at the 9019 hearing, (b) the Committee has not included them in the topics as to which it says it needs discovery, and (c) communications with the Ad Hoc Group's members are a mere drop in a very large bucket when compared to the thousands of pages of direct communications between the Ad Hoc Group professionals and the Government Parties that have already been produced, Judge Dein's order denying the motion to compel discovery from two Ad Hoc Group members was correct and well within her discretion.   The undue burden of searching for and producing documents would far outweigh any limited (actually non-existent) potential benefit to the Committee.  *See* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena"); *see also* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit").

24.     Judge Dein's decision should be upheld.  The Committee does not provide any basis to find that she erred or abused her discretion when she denied the Committee's request for discovery from the two Ad Hoc Group members, and there is none.[8]

---

[8] The Committee now says it wants documents from a single individual at two Ad Hoc Group members, not two each as it previously requested.  Objections ¶ 48.  That request is meritless, for the reasons discussed above.

II.   **JUDGE DEIN'S RULING THAT THE COMMON INTEREST DOCTRINE APPLIES TO COMMUNICATIONS BETWEEN THE GOVERNMENT PARTIES AND THE AD HOC GROUP STARTING ON JULY 30, 2018 IS CORRECT AND DID NOT ABUSE HER DISCRETION**

A.   **Judge Dein's Ruling that the Common Interest Doctrine Applies Is Amply Supported by the Facts and the Law**

25.     Judge Dein found "a common interest existed, for purposes of the common interest doctrine, starting on July 30, 2018 between the Government Parties and the Ad Hoc Group" because that is when those parties "executed the Preliminary RSA, which contained the materials terms of the Definitive RSA, parts of which are before the Court at the 9019 Motion hearing." Thus, "[a]t that point, these two otherwise adverse groups shared an 'identical (or nearly identical) legal interest in finalizing their agreement on material terms" and "advancing settlement on those terms."  August 2 Order ¶ 11 (quoting *FDIC v. Ogeden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000). Judge Dein's holding is correct, and she did not abuse her discretion, for two independently dispositive reasons.

26.     *First,* as a threshold matter, the communications between the Government Parties and the Ad Hoc Group concerning the negotiation of the RSA starting on July 30, 2018, which the Government Parties and the Ad Hoc Group have asserted are protected by the common interest doctrine, are not relevant to the 9019 Motion.  As explained above, the only subject as to which those documents could be relevant is whether the Government Parties negotiated their settlement with the Ad Hoc Group at arms' length and in good faith.  But the Committee has never disputed that.  The Committee itself asserts that the negotiations were conducted at arms-length.

27.     *Second*, Judge Dein correctly determined that those communications are protected by the common interest doctrine.  As at least one commentator has recently explained, the common interest doctrine has "been applied with increasing frequency" and is of special importance and value in bankruptcy proceedings because "parties to complex disputes align with one another in

12

the negotiation of plans of reorganization or resolution of contested matters." Elliot Moskowitz,

*The Common Interest Privilege in Bankruptcy: Recent Trends and Practical Guidance*, 3 Nat'l J.

Bankr. L. & Prac. 271, 271 (2017) ("bankruptcy proceedings can make for strange bedfellows, and

debtors, official and ad hoc committees, secured and unsecured creditors, and other parties in

interest may be aligned with or adverse to one another at various points in the life of a [bankruptcy]

case").

28.    The Court recently held that parties can share common interests as to some issues

even if their interests diverge as to others. *See* Memorandum Order Regarding Magistrate Judge's

May 6, May 15 and May 30, 2019 Orders, No. 17-03283, Dkt. No. 7695, at 22-23 (affirming Judge

Dein's ruling that although "ERS and Commonwealth may be adverse in some respects, with

respect to the issues presently before the Court, they share a common interest" that meets the

standard in the First Circuit); *see also In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827,

at *4 (Bankr. D. Del. Feb. 3, 2011) ("the community of interest privilege can apply to parties

whose interests are not totally in accord").

29.    Courts have also found that parties who settle bankruptcy-related disputes may

share a common interest *before* executing definitive agreements. For example, in *In re Tribune

Company*, which Judge Dein cited, the court held that while the interests of certain settling parties

were "not completely in accord," they "share[d] the common legal interest of obtaining approval

of their settlement and confirmation of the [] Plan, thereby resolving the legal disputes between

and among them." 2011 WL 386827, at *4. The Court rejected an objector's argument that a

common interest could not attach until plan documents were finalized, because the common

interest existed when the settling parties agreed to *term sheets* containing material terms of their

agreement even though "the parties *continued to negotiate and certain terms changed*." *Id.* at *5

(emphasis added).  The terms in *In re Tribune Company* changed materially — for example, distributable enterprise value increased from \$6.1 billion to \$6.75 billion — but the common interest still applied.  *Id.  See also In re Leslie Controls, Inc.*, 437 B.R. 493, 501-02 (Bankr. D. Del. 2010) (rejecting argument "that parties engaged in negotiations can never share a common interest" and ruling that documents concerning insurance that were shared between negotiating parties before they executed an agreement were protected by the common interest doctrine); Moskowitz, *supra* ¶ 23, at 273 ("courts have concluded that the common interest privilege may attach to documents and communications exchanged prior to the commencement of a bankruptcy case, and even prior to the time adversaries reach an agreement").[9]

30.    Here, as in *In re Tribune Company*, Judge Dein correctly concluded that the common interest doctrine has applied to communications between the Government Parties and the Ad Hoc Group since they signed and publicly filed the Preliminary RSA, which sets forth the structure and material economic terms of a consensual resolution of their disputes and a

---

[9] *Asymetrix Medical, Inc. v. McKeon*, No. 11-11079-NMG, 2013 WL 2181084, at \*2 (D. Mass. May 16, 2013), and *In re JP Morgan Chase & Co. Securities Litigation*, No. 06 C 4674, 2007 WL 2363311, at \*5 (N.D. Ill. Aug. 13, 2007), cited by the Committee (Objections ¶ 59), are not to the contrary.  Those cases are inapposite here because they address negotiations between *adverse* parties.  The Government Parties and the Ad Hoc Group have not asserted a common interest concerning their negotiations before they reached their July 2018 agreement.  They have asserted a common interest only for the period when they were not adverse and were working towards a common goal.  The Committee also misplaces reliance on *In re Lyondell Chemical Co.*, No. 09-10023, Tr. 15, Dkt. No. 3592 (Bankr. S.D.N.Y. Jan 7, 2010) (Objections Ex. T), for the proposition that a debtor and a settling party do not share a common interest until a court approves the settlement.  In that case, Lyondell's official committee of unsecured creditors alleged that the debtor and settling creditors colluded on the settlement.  *Id* at Tr. 20-22, 41-45.  The Committee has not made any such allegation here.  To the contrary, as explained above, the Committee has repeatedly argued that the negotiations were at "arm's length."

restructuring of PREPA's debt.  The Government Parties and the Ad Hoc Group committed to work together to finalize other documents and to seek approval of a final RSA.[10]

31.    During the months between the execution of the Preliminary RSA on July 30, 2018 and the agreement with Assured on March 26, 2019, the parties worked together to implement the material terms of their deal.  Their discussions were contemplated by the Preliminary RSA, which was to be superseded by a RSA (Preliminary RSA § 2).  The Preliminary RSA states the parties will "cooperate and coordinate activities . . . with the other Parties" to reach that common objective. *Id*. § 4.01(a).  Their discussions were complicated by the fact that PREPA was and is in the midst of reviewing and considering massive changes to its generation system, and bringing in outside parties to further professionalize and privatize management of its transmission and distribution system in what could be the largest privatization of a public utility in recent years.  Because PREPA does not expect to propose a Title III plan until after it has chosen a private operator or concessionaire, confirmation of a plan is likely to occur in 2020, at least 18 months *after* the Preliminary RSA was signed.

32.    The Government Parties and the Ad Hoc Group had a common goal in these months of discussions: to create an RSA that is flexible enough to accommodate a long-dated Title III plan process and different potential PREPA operating structures, while ensuring that the Ad Hoc Group will receive the benefit of the bargain it struck in the Preliminary RSA.  Negotiations during this period were almost entirely about legal and implementation mechanics, not financial terms.  And even when the parties did discuss modifications of certain financial terms, it was because a

---

[10] The Committee tries to distinguish *In re Tribune Company* because it was decided under the Third Circuit's purportedly "less stringent . . . substantially similar legal interest" standard. Objections ¶ 25.  But Judge Dein found the Government Parties' and the Ad Hoc Group's interests were "identical (or nearly identical)," in accordance with the First Circuit's standard.  August 2 Order ¶ 11.

circumstance had changed (for example, the addition of Assured as a party to the RSA, new timing expectations, or different expectations about whether the Securitization Bonds would be tax exempt).

33.     While efforts were underway to finalize the RSA, the parties also sought the support and participation of other constituencies.  For example, as of March 26, 2019, Assured agreed to join in the settlement and, thus, the Government Parties, the Ad Hoc Group and Assured had a tripartite common interest as of that date.  The Committee does not contest that the common interest doctrine applies on and after March 26, 2019.  Objections ¶ 61 n. 24.

34.     The process was lengthy and sometimes arduous.  As one would expect, while memorializing a $8.259 billion deal, there were sometimes disagreements.  But the parties' common interest and goal did not change.  After discussing how to implement the RSA, and working through any issues, the parties arrived at their common goal on May 3, 2019, when they signed the RSA, a much more detailed document that addresses these challenges while leaving the structure and material economic terms set forth in the Preliminary RSA substantially unchanged.

**B.     None of the Documents Cited by the Committee Is Inconsistent with Judge Dein's Decision that a Common Interest Has Existed Since July 30, 2018**

35.     The Committee grounds its argument that Judge Dein erred on eight documents, all of which were in the record before Judge Dein, and many of which were addressed at the July 30, 2019 hearing.  The Committee asserts these documents demonstrate that the Ad Hoc Group and the Government Parties did not share a common interest until after Assured joined the RSA on March 26, 2019.  That is incorrect.  The documents are consistent with the parties' agreement to make robust efforts to create an implementation structure for the RSA, finalize terms to implement the deal set forth in the Preliminary RSA, create a structure to incentivize other holders to join the RSA, and seek Court approval for the deal.  None of the documents suggests that the parties did

not agree to the material economic terms of the deal in the Preliminary RSA or did not share a common interest on and after July 30, 2018.

36.     For example, the Committee argues that three documents produced in discovery (Exhibits L, M and N) purportedly demonstrate that the Government Parties and the Ad Hoc Group did not share a common interest when they signed the Preliminary RSA on July 30, 2019, because it "was merely a non-binding step towards a definitive RSA" (Objections ¶ 53), and purportedly "did not include key features of the final deal, such as demand protection provisions, remedies, securitization protections, and implementation provisions." *Id.* ¶ 52.  However, as demonstrated in Appendix A to this Opposition, the structure and material economic terms of the RSA are virtually identical to those agreed in the Preliminary RSA.

37.     Moreover, the Committee fails to cite any authority that supports its argument that parties cannot have a common interest before a definitive RSA is signed.  The law is to the contrary.  *See In re Tribune Co.*, 2011 WL 386827, at *4-5 (common interest attached when the parties agreed on material economic terms even if they "continued to negotiate and certain terms changed"); *In re Leslie Controls, Inc.*, 437 B.R. at 501-02 (rejecting argument "that parties engaged in negotiations can never share a common interest," and holding that documents the negotiating parties exchanged regarding insurance were protected by the common interest doctrine even though plan negotiations were ongoing and an agreement was not signed).  The Committee's theory ignores reality, particularly in a complex and multifaceted bankruptcy such as this one.  As demonstrated above, the parties spent the months between the execution of the Preliminary RSA and the execution of the RSA in discussions and working together on how to implement the material terms of their deal, *as expressly contemplated by the Preliminary RSA.  See id.* § 4.01(a)

(the parties will "cooperate and coordinate activities . . . with the other Parties" to reach their common objective).

38.     The other documents the Committee cites also fail to suggest, let alone show, that the common interest never arose or was terminated, as the Committee argues.  For example, Exhibit O reflects efforts to address the Government Parties' concern that (a) a final agreement could not be consummated during the period originally contemplated under the Preliminary RSA, and (b) the tax-exempt treatment of the Tranche B Securitization Bonds contemplated in the Preliminary RSA might not be available.  This document proposed adjustments to resolve these concerns without impacting the economic arrangement between the parties.  Exhibit P reflects the parties' efforts to "keep implementation positively focused and moving forward,"  by identifying transaction and litigation deadlines and milestones, and the consequences of a failure to comply with the deadlines and milestones.

39.     Exhibits Q and R to the Objections concern the parties' efforts to address the evolving circumstances while the parties were working to finalize the definitive RSA.  For example, they reflect discussions concerning approaches to address issues that might arise if the new Securitization Bonds were not found to be tax-exempt, as originally contemplated.  However, far from abandoning their common interest agreement, the parties cooperated in discussing proposed changes to the exchange rates to reflect a potentially changed economic reality.[11]  In the end, the parties did not change the exchange rate.  As the Committee admitted in its Renewal, "the same ratios [are] provided for" in both the Preliminary RSA and the RSA.  Renewal ¶ 20.

---

[11] The passage concerning the parties' cooperative efforts appears in the version of Exhibit R that the Committee submitted with its Motion to Compel.  Dkt. No. 1269-9.  Inexplicably, the Committee has now submitted a different version of the document that omits this language.  The Bates numbers of Exhibit R jump from PROSK_9019_00005322 to PROSK_9019_00005331.

40. Exhibit S to the Objections does not relate to the material economic terms of the deal. It concerns discussions between the Oversight Board and the Ad Hoc Group about a possible "Plan B" to implement the RSA without AAFAF and PREPA, if necessary. The Oversight Board professionals' skepticism about whether the parties could "get to a deal" in those hypothetical circumstances merely reflects that the Board was not willing to move forward without AAFAF and PREPA at that time. It does not suggest that the parties' interests in the RSA had diverged. Moreover, AAFAF and PREPA stayed in the deal, "Plan B" never progressed, and the parties stuck to their original structure.

41. In short, none of the communications on which the Committee relies changes the structure or the material economic terms of the deal agreed to in late July 2018, which match almost completely the terms in the RSA. As *In re Tribune Company* held, because the Government Parties and the Ad Hoc Group had already agreed to the material terms, the fact that they "continued to negotiate and certain terms changed" does not negate their common interest. 2011 WL 386827, at *5.

42. Finally, the Committee argues that the Government Parties and the Ad Hoc Group did not share a common interest because Section 10.02(a)(iv) of the Preliminary RSA purportedly gave the Government Parties an "absolute right" to terminate the Preliminary RSA. Objections ¶ 58. In fact, Section 10.2(a)(iv) of the Preliminary RSA gives a termination right only to the Ad Hoc Group, and only in response to certain actions by the Government Parties – not the unilateral termination right the Committee portrays it to be. Moreover, the existence of that right does not undermine the common interest agreement. Virtually every common interest agreement permits its parties to withdraw from it without affecting the continued privileged nature of the documents to which it applied during the period it was in effect. Furthermore, no one *exercised* any right to

terminate the Preliminary RSA.  The Committee has not cited any authority that ascribes any significance to the fact that a party *can* terminate a common interest agreement when it did not do so.

43.     Judge Dein cited and applied the correct legal standard, appropriately considered all of the factual material before her, and appropriately exercised her discretion in denying the Committee's motion to compel the production of communications between the Government Parties and the Ad Hoc Group on and after July 30, 2018, because they are protected by the common interest doctrine.  There is no reason or basis to overturn her decision.

## **CONCLUSION**

For the foregoing reasons, the Court should overrule the Committee's Objections in their entirety.[12]

---

[12] The Ad Hoc Group joins the Government Parties' and Assured's arguments in opposition to the Objections to the extent they address the issues raised here.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, August 16, 2019.

| | |
|---|---|
| **TORO COLÓN MULLET P.S.C.**<br>P.O. Box 195383<br>San Juan, PR 00919-5383<br>Tel.: (787) 751-8999<br>Fax: (787) 763-7760 | **KRAMER LEVIN NAFTALIS & FRANKEL LLP**<br>1177 Avenue of the Americas<br>New York, New York 10036<br>Tel.: (212) 715-9100<br>Fax: (212) 715-8000 |
| *s/ Manuel Fernández-Bared*<br>MANUEL FERNÁNDEZ-BARED<br>USDC-PR No. 204,204<br>E-mail: mfb@tcm.law | */s/ Natan Hamerman*<br>AMY CATON*<br>THOMAS MOERS MAYER*<br>MICHAEL J. DELL*<br>NATAN HAMERMAN*<br>ALICE J. BYOWITZ* |
| *s/ Linette Figueroa-Torres*<br>LINETTE FIGUEROA-TORRES<br>USDC-PR No. 227,104<br>E-mail: lft@tcm.law | Email: acaton@kramerlevin.com<br>tmayer@kramerlevin.com<br>mdell@kramerlevin.com<br>nhamerman@kramerlevin.com<br>abyowitz@kramerlevin.com<br>*Admitted Pro Hac Vice* |
| *s/ Nayda Perez-Roman*<br>NAYDA PEREZ-ROMAN<br>USDC–PR No. 300,208<br>E-mail: nperez@tcm.law | *Counsel for the Ad Hoc Group of PREPA Bondholders* |
| *Counsel for the Ad Hoc Group of PREPA Bondholders* | |

21

KL3 3263493.1

## Appendix A

| Term | Preliminary RSA | Definitive RSA |
|---|---|---|
| **Overall Structure**<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA Ex. C. at § II* | Exchange of PREPA revenue bonds into Tranche A and Tranche B Securitization Bonds issued by an SPV | No change |
| **Exchange Ratio**<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA Ex. C. at § IV(a)-(b)* | Tranche A: 67.5% | No change |
| | Tranche B: 10% | No change |
| **Claim Amount**<br>*Prelim. RSA Ex. B at n.1*<br>*Def. RSA at § 2(d)(i)-(iii) and Ex. C. at n.3* | Principal plus interest through Effective Date for all Supporting Holders | No change; other than after 5/1/19, Administrative Expense Claims and cash payments replace interest |
| **Tranche A Bond Terms**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA Ex. C at § V(a)(i)-(ii), § VIII(a)* | 5.25% tax-exempt coupon | No change |
| | 40 year stated maturity | No change |
| | 35 year expected maturity under Oversight Board's May 2018 load projections | 33 year expected maturity projections as a result of negotiations between Assured and Government Parties |
| | Callable after 5 to 10 years, to be agreed upon | Callable starting in year 10 |
| **Tranche B Bond Terms**<br>*Prelim. RSA Ex. B at 1-2*<br>*Def. RSA Ex. C at § VI(a)(i)-(iv), § VIII(b)* | 7.0% tax-exempt coupon OR 8.75% taxable coupon | No change |
| | 45 year stated maturity – unpaid debt service expires unpaid | 47 year stated maturity – unpaid debt service expires unpaid (as a result of negotiations between Assured and Government Parties) |
| | No Tranche B payments while Tranche A outstanding | No change |
| | Call protection TBD | Callable starting in year 10 at levels set forth in Definitive RSA |

KL3 3263493.1

| | | |
|---|---|---|
| **Tranche B Tax Covenant**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA Ex. C at n.5* | Covenant to work in good faith to try to obtain tax-exempt status for Tranche B Bonds or as great a portion thereof as possible | Covenant remains |
| **DSRF Size**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA Ex. C at § IX(a)* | Set at 5% of Tranche A Bonds | No change |
| **Securitization Bond Collateral**<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA, Ex. C, Annex A,*<br>*Schedule I-B at § III.* | Securitization Bonds secured by Transition Charge | No change; further details included |
| **Transition Charge Life**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA, Ex. C at § X(c)* | Transition Charge does not extend past Tranche B stated maturity unless Tranche A Bonds are still outstanding. | No change |
| **Transition Charge Levels***<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA, Ex. C at § III*<br>*and Annex A at 8* | Fixed schedule of Transition Charge levels; ratepayers are not taking the risk of declining power demand due to reduced economic activity | No change to structure; additional terms set forth |
| **Demand Protections***<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA, Ex. C, Annex A*<br>*at Schedule I-A* | To be mutually agreed upon | Agreed upon in Demand Protection Term Sheet |
| **Remedies***<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA, Exhibit C at §*<br>*XI and Annex A at 8 and*<br>*Schedule I-B at § VI* | Framework for remedies agreed upon; additional remedies to be mutually agreed upon in definitive documentation | No change, but certain additional details spelled out |
| **Securitization Protections***<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA, Ex. C at Annex*<br>*A* | To be mutually agreed upon | Agreed upon in Securitization Term Sheet |
| **Implementation**<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA at §§ 2-3, 5(c),*<br>*and 9* | Timeline and implementation mechanics to be mutually agreed upon | Agreed upon in Definitive RSA, including target milestones, Administrative Claims, Settlement Payments, Delayed Implementation Date, Increased Settlement Payments, Adequate Protection Payments, termination rights, Stipulated Treatment, and litigation stay, forbearance and tolling provisions |
| *An asterisk denotes an issue that the Court has said need not be determined as part of the 9019 Motion.  Objections Ex. E at 7:13-20. | | |

A-2