# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
---------------------------------------------------------------- X
                                                                 :
In re:                                                           :
                                                                 :
THE FINANCIAL OVERSIGHT AND                                      :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                :   Title III
                                                                 :
           as representative of                                  :   Case No. 17-BK-3283 (LTS)
                                                                 :
THE COMMONWEALTH OF PUERTO RICO et al.,                          :   (Jointly Administered)
                                                                 :
           Debtors.¹                                             :
---------------------------------------------------------------- X
                                                                 :
In re:                                                           :
                                                                 :
THE FINANCIAL OVERSIGHT AND                                      :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                :   Title III
                                                                 :
           as representative of                                  :   Case No. 17-BK-4780 (LTS)
                                                                 :
PUERTO RICO ELECTRIC POWER AUTHORITY                             :   This filing relates only to
                                                                 :   Case No. 17-BK-4780 (LTS)
                                                                 :
           Debtor.                                               :
---------------------------------------------------------------- X
```

**OMNIBUS REPLY OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF URGENT (I) OBJECTIONS TO MAGISTRATE JUDGE'S AUGUST 2, 2019 ORDER ON MOTION TO COMPEL AND (II) ALTERNATIVE MOTION TO STRIKE AND TO EXCLUDE OUT-OF-SCOPE DECLARATION TESTIMONY AND RELATED EVIDENCE**

---

[1]  The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 4

I.  Committee is Entitled to an Order Authorizing Discovery on Certain Relevant
    Topics or, Alternatively, Excluding Evidence on Such Topics ........................................ 4

    A.  Committee is Entitled to (i) Discovery Concerning Reasonableness of
    Government Parties' Proposal to Distribute More Than $1 Billion in Value
    Before Settlement is Implemented Through a Plan of Adjustment, or (ii)
    an Order Precluding Introduction of Evidence Relating to Plan
    Confirmation Issues ..................................................................................................... 6

    B.  Committee is Entitled to (i) Discovery Concerning Status of Proposed
    Transformation, or (ii) an Order Precluding Introduction of Evidence
    Relating to Proposed Transformation ......................................................................... 8

    C.  Committee is Entitled to (i) Discovery Concerning Status of Legislative
    and Regulatory Approvals Necessary for Implementation of RSA, or (ii)
    an Order Precluding Introduction of Evidence on Issues Related to Such
    Approvals .................................................................................................................... 9

    D.  Committee is Entitled to (i) Discovery Concerning Alternative Strategies
    or Transactions Government Parties Considered, or (ii) an Order
    Precluding Introduction of Evidence of Such Alternatives ...................................... 10

II.  Government Parties and Ad Hoc Group Should Be Required to Produce
    Documents From Additional Custodians ....................................................................... 11

III.  Government Parties and Supporting Holders Should Not Be Allowed to Assert a
    Common Interest Privilege Until, At the Earliest, the Date of RSA Term Sheet on
    March 26, 2019 ............................................................................................................... 15

IV.  Discovery Into Assured's Loss Reserves Should Be Permitted ..................................... 19

    A.  Assured's Loss Reserves are Relevant and Responsive ........................................... 19

    B.  Assured's Loss Reserves are Not Protected by any Privilege ................................... 21

CONCLUSION ...................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   14-CV-7126 (JMF), 2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016)........................22

*In re Bankers Tr. Co.*,
   61 F.3d 465 (6th Cir. 1995) ........................................................................23

*Bryan Corp. v. Chemworth*,
   296 F.R.D. 31 (D. Mass. 2013)....................................................................22

*FDIC v. Ogden Corp.*,
   202 F.3d 454 (1st Cir 2000).........................................................................15

*Fed. Realty Inv. Trust v. Pac. Ins. Co.*,
   760 F.Supp. 533 (D. Md. 1991) ...................................................................20

*In re Financial Oversight & Management Board for Puerto Rico*,
   No. 17-BK-3283-LTS, 2019 WL 2633273 (D.P.R. June 27, 2019)....................16

*In re Genco Shipping & Trading Ltd.*,
   No. 14-11108 (Bankr. S.D.N.Y. June 3, 2014).................................................20

*McCoy v. Meyers*,
   No. 12-3160-CM-GLR, 2016 WL 183517 (D. Kan. Jan. 14, 2016).........................5

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
   478 F.3d 452 (2d Cir. 2007)..........................................................................5

*In re Nat'l City Corp. S'Holders Litig.*,
   No. 4123-CC, 2009 WL 1653536 (Del. Ch. June 5, 2009) ...........................23, 24

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*,
   No. MDL 13-2419, 2015 WL 13715296 (D. Mass. Nov. 6, 2015) .......................20

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   No. 06 Civ. 5797(PAC), 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010)..................22

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)................................................................................12, 19

*In re Subpoena Served Upon Comptroller of the Currency & Sec'y of Bd. of Governors of Fed. Res. Sys.*,
   967 F.2d 630 (D.C. Cir. 1992) .....................................................................23

*In re the Dolan Co.*,
  No. 14-10614 (Bankr. D. Del. May 2, 2014) ............................................................................ 20

*In re Tribune Co.*,
  No. 08-13141 (KJC), 2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ................................. 18

*United States v. Textron Inc.*,
  577 F.3d 21 (1st Cir. 2009) ........................................................................................ 21, 22

**Statutes**

N.Y. Ins. Law 1504(c) .................................................................................................. 23

**Other Authorities**

Fed. R. Civ. P. 26(b)(1) ................................................................................................ 20

ii

To the Honorable United States District Judge Laura Taylor Swain:

      Pursuant to the order entered August 9, 2019 [Dkt. No. 1577], the Official Committee of Unsecured Creditors of all Title III Debtors (the "Committee") hereby submits this omnibus reply (the "Reply") in response to the responses of the Government Parties[2] [Dkt. No. 1595] (the "GP Resp."), the Ad Hoc Group [Dkt. No. 1596] (the "AHG Resp."), and Assured [Dkt. No. 1594] (the "Assured Resp." and collectively with the GP Resp. and the AHG Resp., the "Responses") to the Committee's urgent objections (the "Objections") to the Order of Magistrate Judge Judith Gail Dein (the "Magistrate Judge"), entered on August 2, 2019 (Ex. A[3]) [Dkt. No. 1556], and in the alternative, the Committee's motion to strike and exclude testimony and evidence (the "Motion to Strike").  In support of these Objections and the Motion to Strike, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Objections and Motion to Strike are not, as the Respondents contend, an attempt by the Committee to broaden the 9019 Motion beyond its established parameters, but rather a good-faith effort by the Committee to obtain full and fair discovery regarding matters that the Government Parties have decided are relevant to the 9019 Motion by placing them at issue in the declarations they submitted to the Court.  In their Response, the Government Parties stress repeatedly the "narrowness" of the Court's inquiry (a highly ironic characterization indeed considering the massive scale of the relief sought in the 9019 Motion from a dollars and cents point of view) and contend that the Court has already foreclosed discovery in response to the

---

[2]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Objections and Motion to Strike.

[3]      Exhibits A-U refer to the exhibits attached to the Committee's Objections and Motion to Strike.

Committee's requests, either through statements it made during the July 11 Conference or through its orders on motions *in limine*.  The Government Parties are wrong.

2.      As explained in the Objections and Motion to Strike, the Court expressly stated at the July 11 Conference that the Committee is "of course" entitled to discovery regarding the justifications that the Government Parties offer for the Settlement, including their claims that it will pave the way for plan confirmation and will facilitate PREPA's proposed transformation. Moreover, the Court did not foreclose discovery on plan confirmation or feasibility issues, as the Government Parties contend, but rather held that the Committee may explore such issues to the extent they bear on whether the Settlement falls within the range of reasonableness.  And in this case, the Government Parties' justification for the massive pre-confirmation benefits of more than one billion dollars that the RSA grants to the bondholders is based largely on the argument that such benefits will allow the Government Parties to get to the "promised land" of a PREPA Title III plan of adjustment.  To simply ignore the issue of the ability of the Government Parties to actually reach this "promised land" is impermissible.

3.      The discovery the Committee seeks is undeniably relevant to the reasonableness of the Settlement.  Specifically, all of the discovery requests relate to (i) justifications the Government Parties have offered in support of the Settlement (*i.e.*, the economic and non-economic value that PREPA is purportedly receiving under the RSA), (ii) whether it is reasonable for the Settlement to confer massive pre-confirmation benefits to bondholders on account of a transaction that may never be implemented through a plan of adjustment, and/or (iii) whether the Settlement is consistent with the paramount interests of PREPA's creditors.  No ruling of this Court has foreclosed discovery on these issues.

4.      Nevertheless, the Government Parties now take the remarkable position that the
Court should not only deny this discovery but also permit the Government Parties to introduce
detailed factual information on the very same topics through their declarations.  The litigation of
the 9019 Motion—which embodies a Settlement calling for the eventual disbursement of more
than $20 billion in consideration over nearly 50 years and constitutes the single most important
event in PREPA's Title III case—should not proceed on such an unlevel playing field.  If the
Court upholds the Magistrate Judge's decisions as to the relevance of the Committee's discovery
requests, it must grant the Motion to Strike evidence on related issues.

5.      For the same reason, the Court should overrule the Magistrate Judge's decision
denying the Committee discovery from limited additional custodians.  The Government Parties
cannot argue that subjective judgments of the Oversight Board's members are not relevant to the
9019 Motion (and therefore not subject to discovery) and simultaneously rely on their subjective
judgments as purported support for the Settlement, as they do in the declaration of Natalie
Jaresko, a board official who had no vote on the decision to approve the RSA.  The documents
and communications of the Oversight Board members—the very decision-makers who approved
the Settlement—should be subject to discovery.  The same is true of the limited additional
custodians that the Committee seeks from PREPA and the Ad Hoc Group, who also have
uniquely relevant information.

6.      The Court should also reject the efforts of the Government Parties and the Ad Hoc
Group to shield their RSA negotiations from disclosure based on an unprecedented common
interest privilege covering more than nine months of negotiations.  The Government Parties and
the Ad Hoc Group attach a chart to their Responses that purports to compare the terms of the
Preliminary RSA to the Definitive RSA, but rather than supporting the existence of a common

3

interest, it shows how far apart the parties were.  On balance, the record simply does not support

the application of a common interest privilege beginning on the date of the Preliminary RSA, and

the Magistrate Judge erred in holding otherwise.

7.     Finally, Assured is incorrect in arguing that its loss reserve information is not

relevant to the 9019 Motion and that it is covered by one or more privileges.  To the contrary, the

loss reserves are probative in showing Assured's assessment of the risks at issue in litigation

being resolved by the 9019 Motion.  Moreover, the loss reserves are not subject to any privilege

because they were prepared to satisfy Assured's regulatory obligations and were disclosed to a

regulator which has since chosen not to assert a bank examiner privilege over them.

8.     For all of these reasons and those discussed below, the Court should grant the

Objections in full.  In the alternative, to the extent the Court upholds the Magistrate Judge's

decision as to discovery relating to certain topics, it should grant the Motion to Strike the

Government Parties' submission of evidence on those topics.

## ARGUMENT

### I.     Committee is Entitled to an Order Authorizing Discovery on Certain Relevant Topics or, Alternatively, Excluding Evidence on Such Topics

9.     The Government Parties contend, on the one hand, that the Committee's

discovery is not relevant because it is not tied to the range of reasonableness inquiry and, on the

other hand, that not a single sentence of their lengthy declarations addressing the very same

issues should be stricken from the record.  They cannot have it both ways.  Either the evidence is

relevant (and discoverable), or it is not.

10.     As discussed in the Objection, the Committee's discovery is indeed relevant to the

9019 Motion.  Many of the requests at issue seek discovery relating to the value that the

Government Parties contend they are receiving under the RSA—whether it be value in the form

4

of paving the way for confirmation, reducing risks relating to ongoing litigation, or facilitating

the proposed transformation.  Other requests seek information relating to whether the Settlement

leaves value for other creditors and therefore serves the paramount interests of PREPA's

creditors.  These areas of inquiry are central to the Court's analysis of whether the Settlement

falls within the range of reasonableness.  *See Motorola, Inc. v. Official Comm. of Unsecured

Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (holding that a court

must consider the "paramount interests of the creditors" by examining "each affected class's

relative benefits 'and the degree to which creditors either do not object to or affirmatively

support the proposed settlement'").

11.     The Government Parties argue that, even if the Committee is not entitled to the

discovery it seeks, the Court nevertheless should not strike any statements from their declarations

because such statements reveal the Government Parties' "considered judgment" in deciding to

enter into the Settlement.  *See, e.g.*, GP Resp. ¶¶ 33, 35, 41.  In other words, the Government

Parties ask the Court to simply accept on blind faith that the Settlement is reasonable because

they say so, without allowing any factual inquiry into whether their claimed exercise of judgment

was reasonable.  This is not the standard for approval of a Settlement under Rule 9019.  The

"range of reasonableness" inquiry requires just the opposite.

12.     For each of the categories of requests discussed below, the Court should either

permit the discovery to go forward or grant the Committee's Motion to Strike.  *See McCoy v.

Meyers*, No. 12-3160-CM-GLR, 2016 WL 183517, at *4 (D. Kan. Jan. 14, 2016) (inviting

defendant to file motion to strike allegations in event plaintiff fails to provide requested

discovery on such allegations).  The Court should not—consistent with the Federal Rules of

Civil Procedure and the case law applicable to the 9019 Motion—deny both requests.

A.     Committee is Entitled to (i) Discovery Concerning Reasonableness of
       Government Parties' Proposal to Distribute More Than $1 Billion in Value Before
       Settlement is Implemented Through a Plan of Adjustment, or (ii) an Order
       Precluding Introduction of Evidence Relating to Plan Confirmation Issues

13.     As discussed in the Objections, the discovery that the Committee seeks through

its Requests[4] Nos. 4, 9, 25, and 26 relates not to macroeconomic issues but rather to whether it is

reasonable for the Government Parties to enter into a Settlement that (i) proposes to distribute

more than one billion dollars in benefits to the supporting bondholders before the Settlement is

implemented through a plan of adjustment and (ii) leaves no value for other creditors.[5]

14.     The Government parties argue that this discovery is precluded by the Court's

comments at the July 11 Conference that the inquiry on the 9019 Motion relates to whether it is

"reasonable for [the Government Parties] to pay what they propose to pay . . .  in exchange for

the opportunity to pursue confirmation of a plan in the future, given their judgment that they

believe this is a realistic and important opportunity without having a confirmation hearing[.]"

GP Resp. ¶ 18 (quoting Ex. E (July 11, 2019 Hr'g Tr.) at 27:20-22, 28:3-14).  This argument

selectively quotes the transcript.  Later, during the same exchange with the Committee's counsel,

the Court clarified that, "in relation to the extent to which potential confirmability is argued to go

to whether the proposed features being approved now are within the range of reasonableness,

***I'm not precluding that argument***[.]"  Ex. E (July 11, 2019 Hr'g Tr.) at 31:25-32:3 (emphasis

---

[4]     The Responses and Objections of PREPA, AAFAF and the FOMB to the Committee's First Set of
Document Requests (the "Requests") were attached as Exhibits F (PREPA), G (AAFAF), and H (FOMB) to the
Committee's Objections and Motion to Strike.

[5]     Contrary to the Government Parties' assertions, the Committee never admitted that these requests relate
solely to macroeconomic issues.  The Government Parties cite disingenuously to an email exchange in an ongoing
meet-and-confer process in which the Committee's counsel referred to certain of the requests as those relating to
"so-called 'macroeconomic' issues."  As the email makes clear, however, the Committee's counsel was referring to
the label applied to these requests during the parties' prior discussions—hence the use of the word "so-called" and
the inclusion of quotation marks around the word "macroeconomic."  The email is in no way a concession by the
Committee regarding the scope and relevance of its requests.

added).  This is the exact argument the Committee intends to support through the discovery it now seeks:  that it is not reasonable for the Government Parties to relinquish more than a billion dollars in benefits under the RSA in exchange for the "opportunity" to pursue a plan that is patently not confirmable.

15.     The Committee acknowledges the Court's instruction that evidence on this argument should be limited and that the Court will not conduct a full-blown confirmation hearing.  The inquiry the Committee seeks to conduct, however, is narrow.  The Committee does not wish to delve into a wide range of confirmation issues but rather only to explore the narrow issues of whether the RSA's rate increases are sustainable and whether any value would potentially remain for other creditors.  This does not require voluminous or burdensome discovery, and the Committee's requests are appropriately tailored to these questions.

16.     If the Court agrees with the Government Parties that Requests Nos. 4, 9, 25, and 26 are outside the scope of the 9019 Hearing, the Court should exclude evidence concerning the extent to which the Settlement supports plan confirmation.  The Government Parties argue that excluding such evidence would improperly "deprive the Court from considering evidence of the Government Parties' reasoned judgment[.]"  GP Resp. ¶ 33.  In other words, the Government Parties appear to believe that the Court should consider the bald assertion by a government witness that it believed the Settlement would facilitate confirmation *without regard to whether that belief is reasonable*.  Blind deference to a debtor's judgment, however, is not the standard under Rule 9019—rather, the standard is whether the Settlement in fact falls within the range of reasonableness.  This is an issue of fact that must be tested in discovery.

17.     Accordingly, the Court should strike all statements in the Government Parties'
declarations concerning the Settlement's anticipated effect on plan confirmation and related
issues unless the Committee is allowed to take discovery on the same topics.

B.     Committee is Entitled to (i) Discovery Concerning Status of Proposed
Transformation, or (ii) an Order Precluding Introduction of Evidence Relating to
Proposed Transformation

18.     The Government Parties take a similar and equally flawed position as to the
Committee's Request Nos. 10, 11, and 12, which relate to PREPA's proposed transformation.
Specifically, they contend that, in ruling upon the 9019 Motion, "the Court is not going to test
whether the RSA will actually pave the way for transformation[,]" but rather "whether the
Oversight Board's considered judgment that the RSA provides an enhanced opportunity to
pursue transformation is entitled to deference . . . ."  GP Resp. ¶ 34.  In other words, the
Government Parties again ask the Court to blindly defer to their judgment in pursuing a course of
action without allowing the Committee to test whether that judgment is reasonable.

19.     The notion that the Committee is not entitled to discovery regarding the proposed
transformation is particularly troubling given the extent to which the Government Parties rely on
it as a justification for the Settlement.  Frederic Chapados of Citi spends the entirety of his
declaration on this topic, describing the history and current status of the transformation process
in intricate detail, providing estimates as to when a privatization transaction is projected to close,
and offering his views as to why the RSA will help facilitate transformation.  Natalie Jaresko
also discusses the transformation at length in her declaration, as does David Brownstein in his.
Taking all the declarations together, it seems clear that the Government Parties believe that
facilitation of PREPA's transformation is the single most significant benefit of the RSA.

20.     In apparent recognition that the Committee is entitled to at least *some* information
concerning the proposed transformation, the Government Parties resort to arguing that the

Committee has already received the discovery it needs.  Specifically, they assert that the

Committee has received documents from the P3 Authority, which is tasked with overseeing the

transformation process.  But discovery from the P3 Authority alone is insufficient, for the P3

Authority was not responsible for negotiating the Settlement.  The Committee is also entitled to

discovery from the Government Parties (who were responsible for the Settlement) to determine,

among other things, whether they truly believe the RSA will facilitate the proposed

transformation and whether that belief is objectively reasonable.[6]

      C.     <u>Committee is Entitled to (i) Discovery Concerning Status of Legislative and
Regulatory Approvals Necessary for Implementation of RSA, or (ii) an Order
Precluding Introduction of Evidence on Issues Related to Such Approvals</u>

21.     The Committee's Request Nos. 17, 18, and 19, which seek documents relating to

the legislative and regulatory implementation of the Settlement Charge and Transition Charge

are relevant for the same reasons as Request Nos. 4, 9, 25, and 26 above:  they bear on whether

or not the Settlement will ever be implemented.

22.     The Government Parties argue that this discovery is not relevant because "the

Court has not been asked to approve" aspects of the Settlement that relate to rate increases.  GP

Resp. ¶ 38.  This argument misses the point, because the Court *is* being asked to approve the

provisions of the RSA that would provide the settling bondholders with more than a billion

dollars in benefits before the Settlement is implemented through a plan of adjustment.  In

assessing whether the conferral of these benefits is "reasonable," the Court must necessarily

perform some analysis of the likelihood that the Government Parties will ever obtain the

legislative and regulatory approvals required for implementation.

---

[6]     The Government Parties also say they are already producing documents that specifically refer to the effect
of the RSA on the proposed transformation.  This, however, is an extremely limited (and ill-defined) subset of
information.

23.     The Committee's discovery is also relevant to determining the value to PREPA of settling its ongoing litigation with bondholders, including the receivership litigation.  The Government Parties argue that settling the receivership litigation is valuable because, if the bondholders prevail in that litigation, electricity rates will likely rise in the future.  Whether that statement is true, however, depends entirely on whether regulators would in fact allow increased rates and to what extent.  The Committee intends to show that they would not increase rates (or at least not to the degree the Government Parties suggest) and seeks discovery for that purpose.

24.     As with the Committee's other requests, if the Court does not authorize this discovery to proceed, it should prevent the Government Parties from introducing and relying on related evidence in support of the 9019 Motion.  This would require the Court to, among other things, strike the statements in the Government Parties' declarations that the RSA is necessary to prevent electricity rates from rising uncontrollably in the future.

D.      <u>Committee is Entitled to (i) Discovery Concerning Alternative Strategies or Transactions Government Parties Considered, or (ii) an Order Precluding Introduction of Evidence of Such Alternatives</u>

25.     In contending that the Committee is not entitled to the discovery sought by Request No. 8 concerning alternative transactions, the Government Parties again struggle to reconcile their expansive declarations with their proposed narrow scope of discovery.  They contend that "the settlement alternatives not pursued [by the Oversight Board] are not themselves relevant [to the 9019 Motion] . . . [w]hat is relevant is that the Oversight Board did in fact consider alternatives . . . ."  GP Resp. ¶ 41.

26.     The mere fact that the Government Parties considered alternative transactions, however, has no probative value absent some information as to what those alternatives entailed.  Indeed, depending on the terms of an alternative transaction that the Government Parties considered but rejected, it may or may not support the reasonableness of the Settlement.  For

example, if discovery were to reveal that the Government Parties passed on a proposed

Settlement that contained objectively better terms for PREPA than the RSA, this fact would

undermine the reasonableness of the Settlement.

27.     For this reason, the Committee is entitled to discovery in response to Request No.

8.  If the Court does not permit such discovery, it should grant the Committee's motion to

exclude evidence on alternative transactions submitted by the Government Parties in support of

the 9019 Motion.

## II.   Government Parties and Ad Hoc Group Should Be Required to Produce Documents From Additional Custodians

28.     Neither the Government Parties nor the Ad Hoc Group offer any compelling

reason in their Responses as to why the Committee is not entitled to obtain the discovery it seeks

from a limited set of additional document custodians.

29.     **Documents from Additional Members of the Oversight Board.**  The Oversight

Board argues that the Committee is not entitled to documents from additional of its members

because (i) the documents of one member, David Skeel, are sufficient, and (ii) the "subjective"

views and understandings of the members of the Oversight Board are not relevant to the 9019

Motion in any event.  GP Resp. ¶¶ 47-48.  These arguments are belied by the Government

Parties' own statements.  In her declaration, Natalie Jaresko proclaims that, "[i]n my judgment as

the Executive Director of the Oversight Board *and in the judgment of all members of the*

*Oversight Board*, the RSA is a reasonable compromise . . . ."  Jaresko Decl. ¶ 39 (emphasis

added).  Thus, the Government Parties place the subjective views of each member of the

Oversight Board directly at issue.  The Committee is entitled to explore each board member's

files to determine whether they expressed contrary views privately—*i.e.*, that they did not believe

the Settlement was reasonable but nevertheless agreed to vote in favor of the Settlement for other

reasons or concluded that the Settlement was reasonable based on insufficient or incorrect information.  If the Court does not permit this discovery, all statements concerning the board members' views should be excluded from evidence.

30.     Moreover, the Government Parties' assertion that only "objective" evidence is relevant on a Rule 9019 motion appears to be based on a misreading of the Supreme Court's decision in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  The Government Parties cite the decision as standing for the proposition that "the review of the decision to settle is 'objective.'"  GP Resp. ¶ 48.  The Supreme Court, however, stated that "the bankruptcy judge [must] apprise[] himself of ***all facts*** necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated."  *TMT*, 390 U.S. at 424 (emphasis added).  In other words, although the Supreme Court made clear that the bankruptcy court must develop its own, objective determination of the reasonableness of the settlement, it did not limit the type of evidence that may be relevant to that determination.  In fact, a court could find a debtor's subjective views highly relevant to an assessment of the objective reasonableness of a settlement, particularly where, as here, the settlement is complex, and the debtor has the unique, specialized knowledge necessary to fully understand and appreciate all of its various aspects.

31.     Finally, the need to add board members as custodians is especially strong in light of the recent revelation that the Oversight Board failed to conduct a reasonable search and review of documents for its initial production.  As the Committee learned on the same day that it filed its Objection, the Oversight Board failed to "search communications from . . . Oversight Board custodians (Jaresko and Figueroa, and now Skeel) to other Oversight Board or

Government personnel." *See* Ex. V (Aug. 14, 2019 M&C Email Chain).[7] What this means is

that, at the time the Oversight Board objected to the Committee's discovery requests and

opposed its Motion to Compel, the Oversight Board's advisors had virtually no idea whether and

to what extent the members of the Oversight Board engaged in communications regarding the

RSA. The Magistrate Judge should therefore not have credited the Oversight Board's assertions

that the board members' documents are of no probative value.

32. **Documents from Filsinger.** PREPA/AAFAF's primary argument that they need

not produce documents from a custodian of Filsinger is that AAFAF, not PREPA's management

or Filsinger, negotiated the RSA, and that Filsinger's documents related to other issues, such as

the proposed transformation, are not relevant or can be obtained from other sources. The idea

that Filsinger does not have documents analyzing the RSA and its impact on PREPA, however,

is simply not true. Indeed, just last week, after the Committee filed its Objection, the Committee

received a document production from PREPA that included an email exchange between

employees of Filsinger and PREPA's CEO, Jose Ortiz, in which the Filsinger employees

attached a detailed presentation concerning the RSA and asked Ortiz to let them know if he has

"any questions or redirects regarding RSA issues." Ex.W (PREPA_RSA0026153, 154). Thus,

Filsinger plainly has relevant documents. Moreover, the fact that other parties may also have

documents on similar topics does not mean the Committee is not also entitled to documents from

Filsinger. Given the nature of its role as chief financial advisor to PREPA, Filsinger's

---

[7]      Specifically, for Ms. Jaresko, the Oversight Board only reviewed emails that included David Brownstein
(and therefore did not review any purely internal Oversight Board communications, or any other communications to
anyone unless they also included Mr. Brownstein on their circulations), and for Mr. Figueroa, the Oversight Board
only reviewed emails that included individuals at McKinsey, one of the Oversight Board's advisors. The Oversight
Board has now agreed to conduct a supplemental review of documents to address this issue, but the scope of that
review is still being negotiated, and documents have not yet been produced.

documents concerning matters such as the financial impacts of the RSA are likely more detailed and probative than those of other custodians.

33.      **Documents from the Ad Hoc Group.**  As noted in its Objection, the Committee now seeks just a single individual from two members of the Ad Hoc Group.  The modest burden this would impose on the members of the Ad Hoc Group is proportionate in light of the fact that they stand to gain billions of dollars as part of the RSA.  The Ad Hoc Group's arguments to the contrary are unpersuasive.  All of the other parties to the RSA have agreed to produce at least one decision-maker as a custodian; there is no reason why the Ad Hoc Group should be treated differently.  The fact that the Ad Hoc Group has produced documents from its advisors is insufficient.  The Ad Hoc Group repeatedly states that it was the Ad Hoc Group's legal and financial advisors that *negotiated* the RSA.  But the actual *decision* to enter into the RSA was made by the member firms themselves, not their advisors; they signed the RSA, and it is the member firms that ultimately stand to receive billions of dollars if the RSA is approved.

34.      The Ad Hoc Group is incorrect that the member firms' views of the RSA are irrelevant to the 9019 Motion.  The Ad Hoc Group argues that the determination of whether the Settlement is reasonable is "objective."  AHG Resp. ¶ 20 n. 5.  But, as noted above, there is no restriction on the types of evidence that may aid the Court in arriving at this objective determination.  With so much at stake, the employees of the firms that agreed to the Settlement likely conducted detailed analysis and engaged in internal discussions concerning the costs and benefits associated with the RSA.  This information could be helpful to the Court in evaluating the credibility of the Government Parties' own assertions regarding such costs and benefits.  Accordingly, the limited additional discovery should be permitted.

14

III.    **Government Parties and Supporting Holders Should Not Be Allowed to Assert a Common Interest Privilege Until, At the Earliest, the Date of RSA Term Sheet on March 26, 2019**

35.    In her order, the Magistrate Judge correctly held that, for a common interest to exist, there must be an agreement upon the material terms between the otherwise adverse parties. *See* Ex. A (Aug. 2 Order) ¶ 11; *see also FDIC v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir 2000) (adverse groups must share an "identical (or nearly identical) legal interest" for there to be a common interest among those groups).  The Magistrate Judge incorrectly determined, however, that there was agreement on all of the material terms between the Government Parties and the Ad Hoc Group as of the date of the Preliminary RSA in July 2018.  As detailed in the Objections, there was no agreement on a number of material terms, including demand protections, remedies, securities protections, and implementation, all of which were "to be mutually agreed upon" until well into 2019.  This is clear on the face of Appendix A to the Government Parties' Response, which lists what they themselves consider the material terms of the RSA.  Because there was no agreement on all of the material terms of the RSA, there was no common interest.

36.    In response, the Government Parties claim that there was in fact an agreement between the Government Parties and the Ad Hoc Group on these material terms because "the parties had reached a meeting of the minds that these provisions would be features of the deal." *See* GP Resp. ¶ 55.  But agreeing that terms should be a part of a deal is not an agreement on the terms of the deal.  Under this logic, the Government Parties and the Ad Hoc Group could have simply signed a Preliminary RSA with a series of headings, under which it stated that their contents were "to be mutually agreed upon," and then a common interest would attach.  The common interest privilege applies when there is agreement as to all material terms relating to the subject as to which a common interest is asserted (here, the RSA), not to some of the terms.

15

37.     Tellingly, in an attempt to downplay the number of terms that were still to be determined after the execution of the Preliminary RSA, the Government Parties cram into the "Implementation" entry of Appendix A (the last row in the chart) ***eleven*** different important provisions, some of which happen to be the most objectionable provisions of the RSA and will be further explored in the Committee's forthcoming objection to the 9019 Motion[8]:

| Term | Preliminary RSA | Definitive RSA |
|---|---|---|
| **Implementation**<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA at §§ 2-3, 5(c), and 9* | Timeline and implementation mechanics to be mutually agreed upon | Agreed upon in Definitive RSA, including ***target milestones, Administrative Claims, Settlement Payments, Delayed Implementation Date, Increased Settlement Payments, Adequate Protection Payments, termination rights, Stipulated Treatment, and litigation stay, forbearance and tolling provisions*** (emphasis added) |

GP Resp., App. A at A-2.

38.     This gerrymandering is especially brazen in light of the fact that, in the 9019 Motion itself, the Government Parties detailed these same terms over pages and pages. *See* 9019 Motion at 20-21 (describing over two pages the "Administrative Claims, Settlement Payments, Delayed Implementation Date, Increased Settlement Payments, Adequate Protection Payments"); *id.* at 26-27 (describing over two pages "termination rights [and] Stipulated Treatment"); *id.* ¶ 54-56 (describing over two pages the tolling of the applicable statutes of limitations).

---

[8]     Thus there is no common interest "with respect to the issues presently before the Court." *Cf. In re Financial Oversight & Management Board for Puerto Rico*, No. 17-BK-3283-LTS, 2019 WL 2633273, at *10 (D.P.R. June 27, 2019).

39.     Even for the terms in the RSA that ultimately were left unchanged from the
Preliminary RSA, the documents produced show that they continued to be negotiated.  These
included the top-line economics of the RSA.  *See* Ex. O (October 2018 presentation showing a
potential splitting of the Tranche B bonds); Ex. R (January 2019 presentation showing a different
amount of new bonds the existing bondholders would receive in return for their legacy claims).[9]
If the basic economics of the deal were subject to negotiation as late as January 2019, there could
not have been a common interest covering that deal six months earlier in July 2018.

40.     Indeed, in a document produced by Citi, Jarekso told various Oversight Board and
Citi personnel on July 26, 2018 (four days before the supposed common interest between the
Government Parties and the Ad Hoc Group started) that the Preliminary RSA "is a step in the
direction of an agreement, ***not an agreement***."  Ex. X (CGMIRSA_002637) at 2 (emphasis
added).  Moreover, John Gavin of Citi agreed with Jaresko's statement:  "Agree with that.
Positive but still work to do."  *Id*.  It simply cannot be that the Oversight Board had agreement
on all material terms of the RSA, when its executive director and its financial advisor expressly
stated in a wholly internal, contemporaneous communication that there was no agreement at all.

41.     Further, the Preliminary RSA was not binding on any party.  The Government
Parties and the Ad Hoc Group do not dispute that, as explained in the Objections, section 11.13
provides that the sole remedy of a breach of the Preliminary RSA was to give the non-breaching
parties the right to walk away.  *See* Objections ¶ 58.  Moreover, under section 10.02(a)(iv), if any
of the Government Parties unilaterally decide to proceed with a transaction that is inconsistent
with the Preliminary RSA, all the Ad Hoc Group can do is terminate the Preliminary RSA.[10]  It

---

[9]      In fact, the Ad Hoc Group's Response concedes that "the parties did discuss modifications of certain
financial terms."  *See* AHG Resp. ¶ 32.

[10]     The Ad Hoc Group argues that section 10.02(a)(iv) only gives the Ad Hoc Group the right to terminate the
agreement "in response to certain actions by the Government Parties," and therefore is "not the unilateral

does not matter that no party actually exercised a right to terminate.  What matters is that the

parties had no contractual obligation or incentive to negotiate a final agreement consistent with

the Preliminary RSA because there was no consequence for not doing so.

42.     Finally, the Magistrate Judge's decision is inconsistent with the cases it cites.

Although the Government Parties and the Ad Hoc Group are correct that parties may have a

common interest on some issues while they are adverse on others, any such common interest

only extends to those matters on which the parties' interests are indeed identical.  As the *Tribune*

court explained:

> when the interests of the parties diverge to some extent the
> common interest doctrine applies 'only insofar as their interests
> [are] in fact identical; communications relating to matters as to
> which they [hold] opposing interests . . . lose any privilege.

*In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *4 (Bankr. D. Del. Feb. 3, 2011)

(*quoting In re Leslie Controls, Inc.*, 437 B.R. 493, 496-98 (Bankr. D.Del. 2010) (internal

quotations omitted).  Therefore, in *Tribune*, the court held that a common interest existed among

otherwise adverse parties when they had agreed to the material terms of a settlement, but not

before then.  *Tribune*, 2011 WL 386827, at *5 (Bankr. D. Del. Feb. 3, 2011).  Here, because the

Government Parties and the Ad Hoc Group did not share identical interests as to the RSA until

March 26, 2019, at the earliest, they are not entitled to assert a common interest until that date.

---

termination right the Committee portrays it to be."  AHG Resp. ¶ 42.  But the "certain actions" that give the Ad Hoc
Group the right to terminate is "the ***determination*** by the FOMB, PREPA or AAFAF (i) not to proceed with the
transactions materially consistent with those contemplated by the Agreement or (ii) to proceed with a transaction
that would be materially inconsistent with the terms of, or the transactions contemplated by, this Agreement."  Ex. U
(Restructuring Support Agreement, dated as of July 30, 2018) at 7 (emphasis added).  Thus, if the Government
Parties merely decide that they will not go forward with the transaction contemplated by the Preliminary RSA, all
the Ad Hoc Group would receive is the right to terminate.

## IV.     Discovery Into Assured's Loss Reserves Should Be Permitted

### A.     Assured's Loss Reserves are Relevant and Responsive

43.     Assured argues at great length that its loss reserve calculations are not relevant to
an "objective" assessment of the reasonableness of the Settlement embodied in the RSA because
Assured is not one of the Government Parties seeking approval of the Settlement.  Assured is
wrong.  Although its loss reserve calculations may not be ***dispositive*** of the reasonableness of the
Settlement, they are certainly ***relevant*** to the Court's analysis of whether the Settlement falls
within the range of reasonableness, as the loss reserves reflect the assessment of a highly
interested party of the likely outcome of litigation that is to be settled through the RSA.[11]  If, for
example, Assured's loss reserves indicate a litigation valuation of its PREPA claims of 40 cents
on the dollar (or 5 cents on the dollar), based on its "probabilistic assessments of potential
litigation and settlement outcomes" (Assured Resp. ¶30), and Assured is found to be settling now
for 80 cents on the dollar, this contrast would undeniably be relevant to the Court's assessment
of whether the Settlement is reasonable.

44.     Assured concedes that "[t]here can be no informed and independent judgment as
to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised
[herself] of all facts necessary for an intelligent and objective opinion of the probabilities of
ultimate success should the claim be litigated."  *Protective Comm. for Indep. Stockholders of*

---

[11]     Further, Assured is incorrect that its loss reserve calculations are beyond the scope of the Committee's
document requests.  In fact, the calculations are directly responsive to a number of the requests, including Assured
Request No. 4 (Ex. Y), which asks for all "documents and communications concerning [Assured's] analysis or
calculation of the various payments that [Assured] will receive under the terms of the Settlement."  This request
would necessarily call for production of documents that compare amounts Assured stands to receive under the
settlement to amounts Assured believes it may receive absent a settlement, as reflected by its loss reserves.  Loss
reserves are also captured by Assured Request No. 11, which calls for all "documents and communications
consisting of any spreadsheets or models concerning projected revenues from the sale of electricity or other revenue
sources in Puerto Rico."  Because Assured has argued that it is secured by PREPA's revenues, its loss reserves
would necessarily involve projection of such revenues.  In short, the loss reserve calculations are responsive to
multiple requests.

*TMT Trailer Ferry, Inc.*, 390 U.S. at 424 (1968).  As discussed above, however, and contrary to Assured's contentions, the Court's "objective opinion" should be informed by all relevant evidence, not a universe of evidence artificially limited to exclude the views of the parties whose claims would be settled through the 9019 Motion.

45.     The cases cited by Assured in which bankruptcy courts have refused to compel production of a creditor's internal analyses are inapposite.  Each of those cases dealt with valuation issues, not the reasonableness of the provisions of a settlement between creditor and the debtor.  Moreover, the crux of the creditor's objection in these cases was that the requested information was proprietary and ***internal*** to the creditor.  Hr'g Tr. at 6:6-8, *In re the Dolan Co*., No. 14-10614 (Bankr. D. Del. May 2, 2014) [Dkt. No. 284] (Creditor counsel explained objection: "our internal analysis of value we believe to be, not only irrelevant, but proprietary information that we shouldn't be forced to share with our competitors."); Hr'g Tr. at 60:22-24, *In re Genco Shipping & Trading Ltd*., No. 14-11108 (Bankr. S.D.N.Y. June 3, 2014) [Dkt. No. 267] (Court characterizing question as "[t]he question is whether their internal communications and views on values shared with nobody outside their group would be relevant")  Here, by contrast, Assured prepared its loss reserves to satisfy external regulatory obligations, and it has in fact already shared its loss reserve calculations with regulators.  The remaining cases cited by Assured contesting the relevance of its loss reserves (Assured Resp. ¶ 34) are equally inapposite.[12]

---

[12]     *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.,* No. MDL 13-2419, 2015 WL 13715296, at *2 (D. Mass. Nov. 6, 2015) simply sets forth the general standards for discovery under Fed. R. Civ. P. 26(b)(1), and has nothing to do with discovery of loss reserves.  *Fed. Realty Inv. Trust v. Pac. Ins. Co.*, 760 F.Supp. 533, 540 (D. Md. 1991) addresses admissibility, not discoverability, and focuses on the risk of prejudice to an insurer from use at trial of its loss reserves in a claim against it by its insured.  The loss reserves at issue in that case, of course, had been produced in discovery, as they should be here.

B.     Assured's Loss Reserves are Not Protected by any Privilege

46.     Assured next argues that, even if its loss reserve calculations are responsive and

relevant, they are protected from disclosure by the work product doctrine.  These arguments fare

no better.  The loss reserve documents are not protected by any privilege that belongs to Assured

to assert, and the cases it cites in opposition are not to the contrary, given that the loss reserves

were prepared by Assured with the intention of disclosing them to its regulators in satisfaction of

its regulatory obligations.  The one entity—the New York Department of Financial Services (the

"NYDFS")—that properly could have asserted a privilege over Assured's loss reserve

communications to it has chosen not to do so.

47.     The First Circuit opinion of *United States v. Textron Inc.*, 577 F.3d 21 (1st Cir.

2009) controls the application of the work product doctrine to materials like the loss reserves at

issue here.  In *Textron*, the First Circuit analyzed tax reserve spreadsheets, which—like

Assured's loss reserves—reflected a litigant's internal "item-by-item analysis of the

corporation's potential exposure to additional liability" (*id*. at 23) and in the preparation of which

in-house tax lawyers were "centrally involved" and outside counsel provided advice.  *Id*. at 24.

Critically—and again, like Assured's loss reserves—although the tax reserves reflected the

opinions of its counsel regarding likely outcomes in the event of litigation, Textron was required

to create these reserve calculations in order to satisfy its legal audit requirements.  *Id*. at 31.

Thus, although the tax reserves reflected the confidential opinions of its counsel, those opinions

"were not prepared *for use* in possible litigation" (*id*. at 27, emphasis in original)—rather, like

Assured's loss reserves, they had a "different purpose," satisfying securities laws and accounting

regulations.  *Id*. at 31.  Far from a "cherry picked" holding, the conclusion of the First Circuit

that the work product doctrine does not apply to materials—like Assured's loss reserves—that

are "independently required by statutory and audit requirements" (*id*. at 26) and were not created

for use in litigation is the heart of the *Textron* opinion.  Assured's loss reserves may reflect its opinions about likely litigation outcomes, but it has not made any representation that the loss reserves were prepared for use (primary, dual, or otherwise) in litigation; accordingly, they are not subject to work production protection, for "the work product privilege is aimed at protecting work done for litigation, not in preparing financial statements." *Id*. at 31.  Assured has cited no First Circuit authorities to the contrary.

48.     In any event, even if Assured's loss reserve calculations were protected at inception as work product, any such protection has been waived because the information was submitted by Assured to its regulator in New York, which has chosen not to assert any bank examiner privilege over them.  As Assured acknowledges, the New York Insurance Law permits the New York insurance superintendent to publish submissions made to it if the superintendent "shall determine that the interests of policyholders, shareholders or the public will be served by the publication thereof."  Assured Resp. ¶ 48.  This is a far cry from the particularized and specific non-waiver agreements at issue in cases cited by Assured (Assured Resp. ¶ 46) finding that privilege can in some circumstances survive a regulatory disclosure, such as *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, No. 06 Civ. 5797(PAC), 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010) (disclosure pursuant to confidentiality and non-waiver agreement) or *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 14-CV-7126 (JMF), 2016 WL 6779901, at *5 (S.D.N.Y. Nov. 16, 2016) (disclosure to CFTC pursuant to confidentiality and non-waiver agreement).[13]

---

[13]     *Bryan Corp. v. Chemworth*, 296 F.R.D. 31 (D. Mass. 2013) is simply inapposite, as it involved disclosure of work product by a party to its agent, and Assured does not—and cannot—contend that NYDFS was its agent.

49.     When Assured flatly states that its loss reserves disclosure to the NYDFS "did not increase the probability that any litigation adversary of Assured would obtain" them (Assured Resp. ¶ 47), Assured simply assumes the answer to the question at issue.  If the NYDFS had subsequently asserted a bank examiner privilege over the loss reserves, Assured's statement might be correct, but the NYDFS has chosen not to do so.  This more than merely "increases the probability" of disclosure—it should result in production of the loss reserves.

50.     Assured continues to claim that the assertion of a bank examiner privilege by a different regulator in a different state—the Maryland Insurance Administration—somehow gives rise to a privilege barring disclosure of materials provided to the ***NYDFS***.  Assured offers no legal support for this sweeping proposition, and for good reason.  It cannot be the case that one regulator's assertion of privilege restricts the use of documents provided to an entirely different regulator.[14]  It is worth noting that the Committee is not seeking discovery of communications and documents authored by any regulators—all that the Committee is seeking are Assured's loss reserve documents and communications provided to NYDFS.[15]  The one case cited by Assured (Assured Resp. ¶ 54), *In re Nat'l City Corp. S'Holders Litig.*, No. 4123-CC, 2009 WL 1653536, at *1 (Del. Ch. June 5, 2009), does not support its position.  This case addressed a media request to unseal documents subject to a bank examiner privilege controlled by the Office of the Comptroller of the Currency (the "OCC").  Although recognizing the OCC's interest in its

---

[14]     For example, if NYDFS were to decide, pursuant to N.Y. Ins. Law 1504(c), to make public materials provided to it by Assured, it is inconceivable that Maryland would have the ability to interfere with such disclosure through the assertion of a bank examiner privilege.

[15]     Further, the "bank examiner" privilege, contrary to Assured's contentions, is both narrow and qualified:  it does not protect "[p]urely factual material," and it must bend to good cause.  *In re Bankers Tr. Co.*, 61 F.3d 465, 471 (6th Cir. 1995); *see also In re Subpoena Served Upon Comptroller of the Currency & Sec'y of Bd. of Governors of Fed. Res. Sys.*, 967 F.2d 630, 634-35 (D.C. Cir. 1992).  Even if the Court were inclined to consider Maryland's assertion of privilege as being at all relevant to the present analysis, the Court would have to consider additional factors (including relevance, the unavailability of other evidence, and the seriousness of the litigation, *see In re Bankers Tr. Co.*, 61 F.3d at 472), each of which militate against the privilege.

privilege, the court nonetheless wrote that "I am requesting the OCC to submit an affidavit setting forth why the OCC requires this information to be sealed indefinitely." *Id.* The case in no way supports Assured's claim that one regulator's assertion of a privilege can restrict the use of documents provided to an entirely different regulator.

51.     Finally, it is worth noting that the Committee's argument is narrowly bounded: when an interested party generates litigation valuations relevant to a court's assessment of the reasonableness of a settlement, and that party shares such litigation valuations with a regulator in a non-privileged manner, the valuations are subject to discovery. This conclusion does not threaten anything like the broadly disruptive effects that Assured complains about, nor does it interfere with a regulator's power to control its privileges. The Court should order Assured to produce its loss reserve communications with the NYDFS.

## **CONCLUSION**

For all of the foregoing reasons, the Court should grant the relief sought in the Objections in full, or, in the alternative, to the extent it denies some or all of the relief sought in the Objections, grant the Motion to Strike.

*[Remainder of page intentionally left blank]*

Dated: August 20, 2019

/s/ Luc A. Despins                    .
PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors
for all Title III Debtors[16]*

- and –

/s/ John Arrastia
John H. Genovese, Esq. (*Pro Hac Vice*)
John Arrastia, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
GENOVESE JOBLOVE & BATTISTA, P.A
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Special Litigation Counsel to the Official Committee of
Unsecured Creditors for all Title III Debtors with Respect to
Claims against Citigroup Global Markets, Inc.*

- and -

---

[16]    Paul Hastings LLP does not represent the Committee with respect to any statements in this Reply regarding Citigroup Global Markets, Inc.

*/s/ Juan J. Casillas Ayala*
CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors*