# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III1<br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA"),<br><br>Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3567-LTS |

## MOTION OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR ADEQUATE PROTECTION OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID:  3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:  8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID:  9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID:  3747).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

JURISDICTION AND VENUE .............................................................................................2

LEGAL AND FACTUAL BACKGROUND .........................................................................2

I.     MOVANTS INSURE SECURED BONDS ISSUED BY HTA..........................................2

II.    THE COMMONWEALTH'S DIVERSION AND DISSIPATION OF THE
       PLEDGED REVENUES .............................................................................................6

III.   PROMESA......................................................................................................................7

IV.    PRE-TITLE III LIFT-STAY MOTIONS (ASSURED, NATIONAL, AND
       PEAJE)........................................................................................................................8

V.     THE FISCAL PLANS AND COMPLIANCE LAW..........................................................9

VI.    THE TITLE III FILINGS ...........................................................................................10

ARGUMENT .......................................................................................................................11

I.     TITLE III OF PROMESA REQUIRES COURTS TO CONDITION OR LIFT
       THE AUTOMATIC STAY FOR CAUSE ...............................................................11

II.    MOVANTS HAVE CONSTITUTIONALLY-PROTECTED INTERESTS IN
       THE PLEDGED REVENUES....................................................................................12

       A.     Movants' Liens On The Pledged Revenues Are Entitled To Protection ..............13

              1.     Movants Have Security Interests In All Pledged Revenues ....................13

              2.     Movants Have Statutory Liens On The Excise Taxes ..............................16

       B.     Movants Have A Statutory Entitlement To Receive The Excise Taxes ...............17

III.   MOVANTS' LIENS ARE NOT SUBJECT TO SECTION 552(A) OR SECTION
       928(B) ...........................................................................................................................22

IV.    CAUSE EXISTS FOR AN ADEQUATE PROTECTION ORDER OR RELIEF
       FROM STAY................................................................................................................26

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES:**

Alternative Sys. Concepts. Inc. v. Synopsys, Inc.,
  374 F.3d 23 (1st Cir. 2004) ........................................................................15

Ambac Assurance Corp. v. Commonwealth,
  Case No. 18-1214 (1st Cir.) .......................................................................27

Ass'n de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza,
  484 F.3d 1 (1st Cir. 2007)....................................................................17, 18, 19, 20

Assured Guaranty Corp. v. Commonwealth of Puerto Rico,
  582 B.R. 579 (D.P.R. 2018), aff'd, 919 F.3d 121 (1st Cir. 2019) .........................................11

Assured Guaranty Corp. v. García-Padilla,
  214 F. Supp. 3d 117 (D.P.R. 2016) ...............................................................4

Bedell v. Lassiter,
  143 Fla. 43 (1940) .................................................................................21

Bexar County Hosp. Dist. v. Crosby,
  160 Tex. 116 (1959) ...............................................................................21

Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla,
  217 F. Supp. 3d 508 (D.P.R. 2016) ........................................................8, 9, 28

City of Austin v. Cahill,
  99 Tex. 172 (1905) ................................................................................22

City of Winter Haven v. Summerlin,
  114 Fla. 727 (1934) ...............................................................................22

Colón-Rivera v. Asociación de Suscripción,
  665 F. Supp. 2d 88 (D.P.R. 2009) ................................................................19

Cty. & Cnty. of Dallas Levee Imp. Dist. v. Indus. Props. Corp.,
  89 F.2d 731 (5th Cir. 1937) ......................................................................21

Ecker v. Sw. Tampa Storm Sewer Drainage Dist.,
  75 F.2d 870 (5th Cir. 1938) ......................................................................21

Fed. Deposit Ins. Corp. v. Casady,
  106 F.2d 784 (10th Cir. 1939) ...................................................................21

## TABLE OF AUTHORITIES (cont'd)

Fin. Oversight Mgmt. Bd. v. Ad Hoc Group of PREPA Bondholders,
  899 F.3d 13 (1st Cir. 2018) ...........................................................................32

García-Rubiera v. Calderón,
  570 F.3d 443 (1st Cir. 2009) .....................................................................18, 19

Garcia-Rubiera v. Fortuño,
  665 F.3d 261 (1st Cir. 2011) .....................................................................18, 19

Grella v. Salem Five Cent Sav. Bank,
  42 F.3d 26 (1st Cir. 1994) ..........................................................................12

Hays v. Isaacs,
  275 Ky. 26 (1938) ......................................................................................22

In re Balco Equities Ltd.,
  312 B.R. 734 (Bankr. S.D.N.Y. 2004) ........................................................32

In re Bldrs. Grp. & Dev. Corp.,
  502 B.R. 95 (Bankr. D.P.R. 2013) ..............................................................32

In re Briggs Transp. Co.,
  780 F.2d 1339 (8th Cir. 1985) ....................................................................12

In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25,
  143 B.R. 750 (Bankr. D. Mont. 1992) ........................................................21

In re Fonseca,
  534 B.R. 261 (Bankr. D.P.R.), aff'd, 542 B.R. 628 (B.A.P. 1st Cir. 2015) ...........16

In re Fonseca,
  542 B.R. 628 (B.A.P. 1st Cir. 2015) ...........................................................17

In re J.F.K. Acquisitions Group,
  166 B.R. 207 (Bankr. E.D.N.Y. 1994) ........................................................15

In re Jefferson County,
  482 B.R. 404 (Bankr. N.D. Ala. 2012) ........................................................25

In re Johnson,
  215 B.R. 381 (Bankr. N.D. Ill. 1997) .........................................................13

## TABLE OF AUTHORITIES (cont'd)

**Page**

In re Murel Holding Corp.,
    75 F.2d 941 (2d Cir. 1935) ......................................................................32

In re Sandoval,
    78 F. Supp. 135 (D.P.R. 1948) ...............................................................13

In re Schick,
    418 F.3d 321 (3d Cir. 2005) ...................................................................16

JK Mullen Inv. Co. v. Town of Arvada,
    261 P.2d 714 (Colo. 1953) .....................................................................16

Keyes v. City of Tacoma,
    12 Wash. 2d 54 (1941) ...........................................................................22

N.H. v. Me.,
    532 U.S. 742 (2001) ...............................................................................15

Peaje Invs. LLC v. Garcia Padilla,
    Case No. 16-2377 (1st Cir.), Dkt. No. 64 ..............................................15

Peaje Invs. LLC v. Garcia Padilla,
    Case No. 16-2365-FAB, Dkt. No. 67 .....................................................15

Peaje Invs. LLC v. García-Padilla,
    845 F.3d 505 (1st Cir. 2017) ...................................................8, 12, 15, 29

Peaje Invs. LLC v. García Padilla, No. 16-2365,
    2016 WL 6562426 (D.P.R. Nov. 2, 2016), aff'd in part, vacated in part, 845 F.3d 505
    (1st Cir. 2017) .........................................................................8, 15, 28

Peaje Invs. LLC v. Fin. Oversight Mgmt. Bd.,
    899 F.3d 1 (1st Cir. 2018) .................................................................25, 33

Peaje Invs. v. P.R. Highways & Transp. Auth.,
    301 F. Supp.3d 290 (D.P.R. 2017) ....................................................16, 17

Rocco v. J.P. Morgan Chase Bank,
    255 F. App'x 638 (3d Cir. 2007) ...........................................................33

State v. City of Lakeland,
    154 Fla. 137 (Fla. 1943) .........................................................................13

## TABLE OF AUTHORITIES (cont'd)

**Page**

Town of Shattuck v. Barcafer,
   137 P.2d 238 (Ok. 1943) ...............................................................................22

Vickrey v. City of Sioux City,
   104 F. 164 (Cir. Western Div. 1900) ........................................................21

Wulff-Hansen & Co. v. Silvers,
   21 Cal. 2d 253 (1942) ..................................................................................22

### STATUTES & OTHER AUTHORITIES:

PROMESA:

   § 206(a) ............................................................................................................8
   § 301(a) ........................................................................................1, 11, 23, 32
   § 303(1) ...........................................................................................................7
   § 303(3) ...........................................................................................................7
   § 405 ................................................................................................................8
   § 405(k) .........................................................................................................28
   § 407 ..............................................................................................................33

9 L.P.R.A.:

   § 2021 ...............................................................................................3, 4, 10, 16
   § 5681 ...............................................................................................3, 4, 10, 16
   § 2004(*l*) ........................................................................................................13
   § 2013(a)(2) ................................................................................................3, 4

11 U.S.C.:

   § 101(37) ..................................................................................................13, 16
   § 101(50) .......................................................................................................13
   § 101(51) .......................................................................................................13
   § 101(53) .......................................................................................................16
   § 361(1) .........................................................................................................32
   § 361(2) .........................................................................................................32
   § 361(3) .........................................................................................................32
   § 362(a) .........................................................................................................11
   § 362(d)(1) ...............................................................................................11, 32
   § 362(g) .........................................................................................................12
   § 552(a) .........................................................................................................22
   § 902(2)(A) ...................................................................................................23

## TABLE OF AUTHORITIES (cont'd)

**Page**

§ 902(2)(B) ...................................................................................................23
§ 902(2)(D) ...................................................................................................23
§ 902(2)(E) ...................................................................................................23
§ 922(a) .........................................................................................................11
§ 922(b) .........................................................................................................11
§ 928(a) .........................................................................................................23
§ 928(b).....................................................................................................23, 24

13 L.P.R.A.:
§ 31751 ...............................................................................................10, 16, 21
§ 31751(a) .......................................................................................................3
§ 31751(a)(1) ..................................................................................................3
§ 31751(a)(1)(D) .............................................................................................4

26 L.P.R.A. § 8053(a) ................................................................................18, 20

Act No. 1-2015 ................................................................................................23

H.R. No. 95-595, 95th Cong. 1st Sess., 338-40 (1977) ..................................11

H.R. No. 100-1011 (1988) .............................................................................25

S. Rep. No. 95-989, 95th Cong., 2d Sess., 49, 53-54 (1978) ........................12

S. Rep. No. 100-506 (1988) .....................................................................23, 26

U.S. Const. amend. XIV, § 1 ..........................................................................24

Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. (together with AGC, "Assured"), and National Public Finance Guarantee Corporation ("National", and, together with Assured, the "Movants"), by and through their undersigned counsel, respectfully request adequate protection for their property interests in the Pledged Revenues, as defined below, or, in the alternative, move, pursuant to 11 U.S.C. § 362(d)(1), for relief from the automatic stay imposed pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  See PROMESA § 301(a) (incorporating 11 U.S.C. §§ 362 and 922).  In support, Movants respectfully state as follows:[2]

## PRELIMINARY STATEMENT

1.      Movants insure bonds issued by Debtor HTA.  The bonds are secured by two categories of collateral—toll revenues collected directly by HTA and excise taxes collected on behalf of HTA and its bondholders by the Commonwealth.  Although PROMESA both expressly preserves the liens securing the bonds and provides that the collateral must remain subject to the liens throughout the Title III cases, millions of dollars of collateral are diverted away from HTA every day.  Many of these funds are then applied to expenses of the Commonwealth that are totally unrelated to HTA, and not to fund the reserves from which the bonds are to be repaid as required by Commonwealth law.  This diversion continues, even though the revenues are the exclusive property of HTA and its bondholders and the statutes creating the excise taxes restrict their use to payment of HTA's bonds.  Once these dollars are spent they cannot be recovered, thus

---

[2] On July 24, 2019, this Court entered its *Order Regarding Stay Period and Mandatory Mediation* (ECF No. 8244, the "Stay and Mediation Order").  Because Movants support the goals of the Stay and Mediation Order, Movants will be filing an Urgent Motion concurrently with this Motion to request that the Stay and Mediation Order be extended to this Motion, and that this Motion be incorporated into the same schedule and mediation process as the other adversary proceedings and contested matters identified in Appendix I to the Stay and Mediation Order.

creating a permanent loss of collateral that endangers Movants' interest in repayment and entitles Movants to relief under Section 362(d).

2.      Accordingly, Movants are entitled to entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (i) ordering adequate protection of Movants' interests in the Pledged Revenues and in the repayment of the Bonds, or, in the alternative, (ii) lifting the automatic stay to permit Movants to enforce the application of the Pledged Revenues to the payment of the Bonds, including by permitting Movants to enforce their liens on the Pledged Revenues.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a).   Venue is proper pursuant to 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a).

## LEGAL AND FACTUAL BACKGROUND

### I.      Movants Insure Secured Bonds Issued by HTA

4.      Movants are providers of financial guaranty insurance.  Movants insure scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings, including bonds issued by HTA.

5.      HTA is a public corporation created by Act No. 74-1965 (the "<u>Enabling Act</u>", Exhibit B) to assume responsibility for the construction of highways and other transportation systems in Puerto Rico.  Pursuant to the Enabling Act, HTA has issued certain bonds (the "<u>Bonds</u>") under general bond resolutions (the "<u>Resolutions</u>") adopted in 1968 (the "<u>1968 Resolution</u>," Exhibit C) and 1998 (the "<u>1998 Resolution</u>," Exhibit D).

6.      Under the Resolutions, the Bonds are secured by a gross lien on pledged revenues, including (i) revenues derived from HTA's toll facilities (the "Toll Revenues"); (ii) special excise taxes consisting, among other things, of taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes collected by the Commonwealth (the "Tax Revenues"); and (iii) special excise taxes consisting of motor vehicle license fees collected by the Commonwealth (the "Vehicle Fees"; together with the Tax Revenues, the "Excise Taxes"; and together with the Toll Revenues and the Tax Revenues, the "Pledged Revenues").

7.      In addition, on February 7, 2002, HTA entered into a security agreement (the "2002 Security Agreement," Exhibit E) with Movants and other holders of Bonds issued under the 1998 Resolution, under which HTA granted these Bondholders "a security interest in the Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund (and all accounts therein), maintained under the [1998] Resolution, ***and all amounts required to be on deposit therein by the terms of the Resolution***, including all proceeds and after-acquired property, subject to application as permitted by the Resolution." Ex. E (emphasis added).

8.      The Commonwealth's Secretary of Treasury acts as a collection agent on behalf of the Bondholders with respect to the Excise Taxes. Upon collection, the Secretary of Treasury is not permitted to deposit the Excise Taxes in the Commonwealth's general fund. See, e.g., 13 L.P.R.A. § 31751(a). Instead, the Secretary of Treasury is required by statute to hold the Excise Taxes in a segregated account for the benefit of HTA and its bondholders and to transfer the Excise Taxes each month to the fiscal agent for the Bonds (the "Fiscal Agent") for the benefit of Bondholders. From the time of their collection, the Excise Taxes constitute trust funds that are property of HTA held in trust for its Bondholders, and are not property of the Commonwealth. See, e.g., 13 L.P.R.A. § 31751(a)(1); 9 L.P.R.A. §§ 2013(a)(2), 2021, 5681 (collectively, and including any related statutes, the "Excise Tax Statutes"). The Commonwealth covenanted with

-3-

the Bondholders in the Enabling Act that it would "not limit or restrict the rights or powers . . .

vested in [HTA] by the [Enabling Act] until all such bonds at any time issued, together with the

interest thereon, are fully met and discharged." 9 L.P.R.A. §§ 2021.  The Commonwealth in the

Excise Tax Statutes also committed to the Bondholders not to reduce the Tax Revenues (see 13

L.P.R.A. § 31751(a)(1)(D)) or the Vehicle Fees (see 9 L.P.R.A. §§ 2021, 5681) below certain

specified rates.

9.      The Toll Revenues likewise constitute trust funds collected and held by

HTA on behalf of the Bondholders and constitute property of HTA and its Bondholders and not

property of the Commonwealth.  See 9 L.P.R.A. § 2013(a)(2).

10.      At any time that the Commonwealth or HTA is in possession of Pledged

Revenues, the Commonwealth or HTA holds possession of such Pledged Revenues for the

Bondholders' benefit, subject only to a valid "clawback," as described below.

11.      The Excise Tax Statutes grant Bondholders the most senior possible lien on

the Excise Taxes consistent with Section 8, Article VI of the Commonwealth Constitution (the

"Constitutional Debt Priority Provision").[3]  To this end, these statutes grant Bondholders first-

priority liens on the Excise Taxes, subject only to the conditions that, in a fiscal year in which the

Constitutional Debt Priority Provision is in effect, the Excise Taxes may (i) be used *solely* to pay

the public debt, but (ii) *only if the public debt remains unpaid after a first application of all other*

*available resources to the payment of public debt.*  See Assured Guaranty Corp. v. García-Padilla,

214 F. Supp. 3d 117, 121 (D.P.R. 2016) ("The funds from these taxes and tax liens may be used

---

[3] The Constitutional Debt Priority Provision provides: "In case the available resources including surplus for
any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and
amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with
the order of priorities established by law."  P.R. Const. art. VI, § 8.  In addition, certain statutory priorities
are established by the Commonwealth's Management and Budget Office Organic Act (Act No. 147-1980
(June 1980) (Exhibit F, the "OMB Act")).

to pay the public debt if no other Commonwealth resources are available."). The preconditions to a "clawback" of the Excise Taxes have never been satisfied, because the Commonwealth has at all relevant times had sufficient available resources to pay the public debt on a first-priority basis in accordance with the Constitutional Debt Priority Provision.[4]  In any event, the Commonwealth ceased paying the public debt as of July 1, 2016, and no valid "clawback" can exist during any period in which the public debt is not being paid.

12.     The Bondholders' liens on the Pledged Revenues are perfected, including by the filing of the financing statements attached hereto as <u>Exhibit M</u>.

13.     The Bonds are limited recourse obligations, payable solely from the Pledged Revenues.  Moreover, because the Bonds are secured by a "gross lien" on all of the Pledged Revenues, the Resolutions are clear that operating expenses of HTA may only be paid *after* HTA satisfies its debt service and reserve fund requirements with respect to the Bonds. Specifically, these operating expenses are paid either from the Construction Fund pursuant to the terms of the Resolutions or otherwise after amounts then due and owing on the Bonds have been paid.  <u>See</u>, <u>e.g.</u>, Ex. C §§ 405, 409; Ex. D §§ 409, 414.

14.     Movants insure approximately $1.98 billion gross par of HTA Bonds currently outstanding.  Under their insurance agreements and/or insurance policies, Movants are deemed to be the sole holders of the Bonds that they insure for purposes of, or otherwise have control rights over, consents and other bondholder actions, including exercising rights and

---

[4] For example, the Commonwealth's general fund budgets for fiscal years 2017, 2018, 2019, and 2020 contemplated that the Commonwealth would make total expenditures of $8.78 billion (<u>see</u>, <u>e.g.</u>, Reorg Research, "Puerto Rico Legislature Passes $8.78B Fiscal 2017 General Fund Budget" (July 1, 2016)) (Exhibit G), $9.562 billion (<u>see</u> FOMB, "FY18 Budget" (June 30, 2017)) (Exhibit H), $8.757 billion (<u>See</u> FOMB, "Press Release: Oversight Board Submits FY19 Commonwealth Compliant Budget Certified by Unanimous Written Consent" (June 30, 2018) (Exhibit I), and $9.1 billion (<u>see</u> FOMB, "FY20 Certified Budget for the Commonwealth of Puerto Rico" (June 30, 2019) (Exhibit J), respectively, in these fiscal years.  Meanwhile, total debt service on the public debt in each of these fiscal years was anticipated as only $1.128 billion, $1.065 billion, $1.090 billion, and $1.118 billion, respectively.  <u>See</u> Exs. K and L.

remedies of Bondholders.[5]   Under the HTA Resolutions and/or their insurance agreements or

policies, Movants are also recognized as third-party beneficiaries.[6]   To date, Movants have paid

approximately $440 million in aggregate claims by Bondholders.   Movants are now fully

subrogated to the rights of Bondholders for the claims they paid.

II.      **The Commonwealth's Diversion and Dissipation Of The Pledged Revenues**

15.      Beginning in 2015, the Commonwealth has engaged in a series of actions

that have served to divert the Excise Taxes from the payment of the Bonds and to destroy the value

of these revenues to Bondholders.

16.      First, on November 30, 2015, former Governor García Padilla issued

Administrative Bulletin No. EO-2015-46 (the "Clawback Order", Exhibit R), which directed the

Secretary of Treasury to withhold the Excise Taxes, purportedly for application to the public debt,

instead of applying the Excise Taxes to the payment of the Bonds as required by the Excise Tax

Statutes.

17.      Next, on April 6, 2016, the Commonwealth enacted a moratorium law (Act

No. 21-2016, the "First Moratorium Law," Exhibit S) that purported to authorize the Governor to

declare states of emergency with respect to a number of Puerto Rico public entities, including

HTA, and to prohibit the payment of principal or interest by such entities, including by suspending

the obligations of such entities to transfer funds to the relevant bond trustees or fiscal agents.  See

Ex. S § 201(d)(ii).

---

[5] See, e.g., MBIA Insurance Agreement for Series AA Bonds (Exhibit N) § 1(vii) ("[National] shall be
recognized as the registered owner of each Insured Bond for the purposes of exercising all rights and
privileges available to bondholders under the Resolution. [National] shall have the right to institute any
suit, action, or proceeding at law or in equity under the same terms as a holder of an Insured Bond in
accordance with applicable provisions of the Resolution.").

[6] See, e.g., Insurance Agreement for Series AA Bonds (Exhibit O) § 1(k); Insurance Agreement for Series L
Bonds (Exhibit P) § 6; Insurance Agreement for Series N Bonds (Exhibit Q) § 9.

18.     Beginning on April 30, 2016, pursuant to the First Moratorium Law, the Governor issued a series of orders (the "Moratorium Orders")[7] that prohibited payments of principal and interest on the Bonds, including by diverting the Pledged Revenues from the payment of the Bonds to other, unauthorized purposes.  Since the enactment of the First Moratorium Law and the issuance of these initial Moratorium Orders, the Commonwealth has enacted additional moratorium laws (collectively, including the First Moratorium Law, the "Moratorium Laws")[8] and the Governor has issued additional Moratorium Orders, which have continued in effect the prohibition of payment of principal and interest on the Bonds, including by diverting the Pledged Revenues from the payment of the Bonds and dissipating them for unauthorized purposes.

## III.   PROMESA

19.     On June 30, 2016, the President signed PROMESA into law.  PROMESA, among other things, sought to remedy what Congress viewed as the abuses of creditor rights committed by the Commonwealth prior to PROMESA's enactment, including through the passage of the First Moratorium Law and the issuance of the Clawback and Moratorium Orders.  For that reason, PROMESA expressly preempts (i) any moratorium law (including the Moratorium Laws) and (ii) any "unlawful executive orders" (including the Clawback Order and the Moratorium Orders) that alter the rights of holders of any debt of a territorial instrumentality or divert funds from one instrumentality to another or to the Commonwealth.  PROMESA § 303(1), (3).

20.     In addition, PROMESA (i) created the Financial Oversight and Management Board for Puerto Rico ("FOMB"); (ii) requires FOMB to develop or approve fiscal plans governing the finances and budgets of the Commonwealth and its instrumentalities, including HTA (Title II); and (iii) in the event that a series of statutory predicates are satisfied

---

[7] The relevant Moratorium Orders include those attached hereto as Exhibit T.

[8] The Moratorium Laws include those attached hereto as Exhibit U.

(PROMESA § 206(a)), authorizes, but does not require, FOMB to file a petition on behalf of the Commonwealth or its instrumentalities, including HTA, to commence a court-supervised debt adjustment proceeding (Title III).

21.     Finally, immediately upon the enactment of PROMESA on June 30, 2016, Section 405 of PROMESA gave rise to a temporary automatic stay (the "Section 405 Stay") of litigation against the Commonwealth and its instrumentalities, as well as certain other actions to collect pre-PROMESA debts. See PROMESA § 405.  As the First Circuit later observed, however, Section 405 did not "leave creditors entirely without recourse" during the temporary stay period. Peaje Invs. v. García-Padilla, 845 F.3d 505, 509 (1st Cir. 2017).  Rather, subsection 405(e) of Section 405 allowed creditors to move for relief from the Section 405 Stay and directed district courts to grant such relief "after notice and a hearing . . . for cause shown."  Id.

## IV.     Pre-Title III Lift-Stay Motions (Assured, National, and Peaje)

22.     Following the enactment of PROMESA, and in light of the Commonwealth government's ongoing diversion and dissipation of the Pledged Revenues, Assured, National, and bondholder Peaje Investments LLC ("Peaje") brought various motions for relief from the Section 405 Stay for lack of adequate protection.  Judge Besosa of this Court denied those motions for relief from the Section 405 Stay.  See Peaje Invs. LLC v. García-Padilla, No. 16-2365, 2016 WL 6562426 (D.P.R. Nov. 2, 2016), aff'd in part, rev'd in part, 845 F.3d 505 (1st Cir. 2017); Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla, 217 F. Supp. 3d 508 (D.P.R. 2016).

23.     In Assured's case, Judge Besosa ruled that Assured had failed to establish an "injury in fact," and therefore lacked standing, because it was undisputed that during the Section 405 Stay period insured bondholders would continue to receive payments from reserve funds held by the Fiscal Agent.  Peaje, 2016 WL 6562426, at *5.  As a result, Assured would not need to make any payments under its policies during the period the Section 405 Stay was in effect.  Id.

24.     In Peaje's case, Judge Besosa ruled that Peaje was adequately protected because, notwithstanding what Judge Besosa justifiably but mistakenly took to be a *temporary* moratorium under the First Moratorium Law, Peaje "continue[d] to hold a security interest in a stable, recurring source of income that will eventually provide funds for the repayment of the PRHTA Bonds." Id.

25.     Separately, in National's case, Judge Besosa ruled that National did not carry its "burden of showing adequate 'cause' for relief from the automatic stay pursuant to section 405(e)(2) of PROMESA." Brigade, 217 F. Supp. 3d at 525.  The Court reasoned that because Section 407(a) of PROMESA empowers creditors to enforce their rights "by bringing an action in the U.S. District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 405," there existed a "mechanism for the negation and recovery of any improper transfer that harms a creditor's interests while the Oversight Board is in existence." Brigade, 217 F. Supp. 3d at 527.

26.     On or around May 1, 2017, the Section 405 Stay expired by its terms.

## V.      The Fiscal Plans And Compliance Law

27.     Following its appointment in August 2016, FOMB has promulgated a series of fiscal plans for the Commonwealth and HTA, each of which has provided that the Excise Taxes will continue to be diverted from HTA to the Commonwealth and consumed for purposes other than payment of the Bonds.  In addition, each HTA fiscal plan promulgated by FOMB to date has assumed that Toll Revenues will continue to be consumed for purposes other than payment of the Bonds.  See, e.g., Ex. Z at 51 (referring to "Toll revenues" as "Operating Revenue").

28.     Purportedly in an effort to comply with these fiscal plans, the Commonwealth, on or about April 29, 2017, enacted a "Fiscal Plan Compliance Law" (Act No. 26-2017, including as amended or superseded, the "Compliance Law," Exhibit V).

-9-

29.     Article 4.01 of Chapter 4 of the Compliance Law provides for the Commonwealth to expropriate property, in the form of "surplus" revenues, from its public corporations and their bondholders.  Chapter 4 purports to authorize the Commonwealth to expropriate the Pledged Revenues from HTA, and makes no provision for payment by HTA of its secured debt.

30.     Chapter 6 of the Compliance Law provides that "any special State fund and any other income of the agencies and public corporations [including HTA] shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate."  Ex. V.  Funds held in special funds in the Commonwealth treasury include Excise Taxes constituting trust funds held by the Department of Treasury on behalf of HTA for the benefit of its Bondholders. See, e.g., 13 L.P.R.A. § 31751; 9 L.P.R.A. §§ 2021, 5681.

31.     Chapter 6 also conditions the use of the Excise Taxes on such use being "in accordance with the Budget recommended by the Office of Management and Budget and with the Fiscal Plan."  Chapter 6 therefore authorizes the continued diversion and dissipation of Pledged Revenues to the extent such diversion is provided for in a "Recommended Budget" or in a fiscal plan.

VI.     **The Title III Filings**

32.     On May 3, 2017, FOMB filed a petition commencing a proceeding under Title III of PROMESA on the Commonwealth's behalf.  On May 21, 2017, FOMB filed a petition commencing a proceeding under Title III of PROMESA on HTA's behalf.

-10-

# **ARGUMENT**

I.   **Title III Of PROMESA Requires Courts To Condition Or Lift The Automatic Stay For Cause**

33.   Title III of PROMESA, which incorporates Sections 362 and 922(a) of the Bankruptcy Code, provides that the filing of a Title III petition operates as a stay on certain creditor remedies against the debtor.  See 11 U.S.C. §§ 362(a) and 922(a); PROMESA § 301(a). However, these stay provisions are not absolute.

34.   As the Court is aware, Movants contend that Section 922(d) of the Bankruptcy Code creates an exception from the automatic stay that permits Movants to enforce the application of the Pledged Revenues to the payment of the Bonds, including through enforcement of Movants' liens on the Pledged Revenues.  This Court has taken a different view. Assured Guaranty Corp. v. Commonwealth of Puerto Rico, 582 B.R. 579 (D.P.R. 2018), aff'd, 919 F.3d 121 (1st Cir. 2019).  In light of this Court's holding, and given the ongoing diminution in the value of Movants' property interests, Movants have no alternative but to bring this Motion. Movants do not, however, waive their argument that Section 922(d) already provides advanced relief from the automatic stay with respect to actions to enforce the application of pledged special revenues, and Movants continue to press this argument in the higher courts.

35.   In any event, PROMESA recognizes that courts must condition or lift the stay under certain circumstances to protect creditors.  Section 362(d)(1) of the Bankruptcy Code states that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1); see also 11 U.S.C. § 922(b) (incorporating same).

36.   The adequate protection requirement was added to the Bankruptcy Code for both constitutional and policy reasons.  House Report No. 95-595, 95th Cong. 1st Sess., 338-40

-11-

(1977), Senate Report No. 95-989, 95th Cong., 2d Sess., 49, 53-54 (1978) ("adequate protection is based as much on policy grounds as on constitutional grounds"); <u>see also</u> <u>Peaje Invs.</u>, 845 F.3d at 511 ("In the bankruptcy context, Congress's explicit designation of lack of adequate protection as cause to lift a stay was based, at least in part, on constitutional concerns."). Adequate protection is a constitutional imperative, because it ensures that no uncompensated "taking" of a creditor's property occurs in contravention of the Takings Clause of the Fifth Amendment. <u>See</u> <u>Peaje Invs.</u>, 845 F.3d at 511 ("[P]rior to the enactment of the current bankruptcy stay provision, the Supreme Court had recognized that creditors are constitutionally entitled to protection to the extent of the value of the[ir] property.); <u>see also</u> <u>In re Briggs Transp. Co.</u>, 780 F.2d 1339, 1342 (8th Cir. 1985).

37.     In a hearing on relief from the automatic stay, the Commonwealth and HTA, as debtors, bear the burden of proof on the question of adequate protection. <u>Peaje</u>, 845 F.3d at 513 (" . . . movant 'has the burden of proof on the issue of the debtor's equity in property,' but the debtor 'has the burden of proof on all other issues.'") (quoting 11 U.S.C. § 362(g)).

## II.     <u>Movants Have Constitutionally-Protected Interests In The Pledged Revenues</u>

38.     Adjudication of a lift stay motion does "not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate." <u>Grella v. Salem Five Cent Sav. Bank</u>, 42 F.3d 26, 32 (1st Cir. 1994). Movants have a colorable interest in the property at issue here. At a minimum, Movants' (i) liens on the Pledged Revenues and (ii) statutory entitlements to receive the Excise Taxes constitute property interests that are protected under the Takings Clause and with respect to which Movants are entitled to adequate protection.

A.  **Movants' Liens On The Pledged Revenues Are Entitled To Protection**

1.  **Movants Have Security Interests In All Pledged Revenues**

39.     As an initial matter, the Resolutions grant Movants a security interest in all
of the Pledged Revenues (including both the Toll Revenues and the Excise Taxes) as against HTA.[9]
The Bankruptcy Code defines "lien" to mean a "charge against or interest in property to secure
payment of a debt or performance of an obligation." 11 U.S.C. § 101(37).  A "security agreement"
is defined as "[an] agreement that creates or provides for a security interest."  Id. § 101(50).  A
"security interest" means a "lien created by an agreement."  Id. § 101(51).

40.     The pledges effectuated pursuant to the Resolutions are "liens," because the
Enabling Act treats a "pledge" as a "lien."  See 9 L.P.R.A. § 2004(*l*) (authorizing HTA to secure
bonds "***by pledge of, or other lien on***, all or any of its properties, revenues or other income . . . .")
(emphasis added).  Moreover, the pledges solely grant an interest in and charge against the Pledged
Revenues in favor of the Bondholders.  See In re Sandoval, 78 F. Supp. 135, 136 (D.P.R. 1948)
(finding that a pledge fell squarely within the definition of a lien because it was "'a hold or claim
which one person has upon the property of another as a security for some debt or charge'") (citation
omitted); In re Johnson, 215 B.R. 381, 384 (Bankr. N.D. Ill. 1997) (finding that an interest in a
security deposit was "akin to a pledge and hence a 'lien' for purposes of § 101(37)"); State v. City
of Lakeland, 154 Fla. 137, 139-40 (Fla. 1943) ("[A]n express pledge of revenues to be derived
from a particular source . . . creates a lien or charge upon the specific revenues designated, *whether
then or thereafter collected*.") (emphasis added).

41.     The Resolutions themselves also qualify as "security agreements," because
they create the interest (i.e., the pledge) in the Pledged Revenues.  Both Resolutions expressly state

---

[9] In addition, the 2002 Security Agreement grants Movants an additional security interest with respect to
the Pledged Revenues pledged to the payment of Bonds issued under the 1998 Resolution.

that the Pledged Revenues "are hereby pledged" to the payment of the Bonds.  Ex. C § 601; Ex. D § 601.  Further evidencing the creation of liens in favor of the Bondholders, the Resolutions prohibit HTA from incurring debt "having a priority to or being on a parity **with the lien on Revenues on the Bonds**"  (Ex. C § 602) (emphasis added) or "ranking equally with or prior to the senior bonds, except **the lien and charge of the senior bonds secured hereby upon the Revenues**" Ex. D § 602 (emphasis added).  Moreover, the Resolutions prohibit amendments that would result in "the creation of a lien upon or pledge of Revenues **other than the liens and pledges created under this Resolution**."  Id., Ex. C § 802; id., Ex. D § 802 (emphasis added).

42.     In addition, the offering documents for the Bonds confirm that the Bondholders' lien extends to the ongoing stream of current and future Pledged Revenues.  See, e.g., Official Statement for Series AA Bonds issued pursuant to 1968 Resolution (Exhibit W), at 14 (providing that the Bonds "are payable solely from, and **secured by a pledge of**, the 1968 Resolution Revenues and all other moneys held for the credit of the 1968 Bond Sinking Fund") (emphasis added), at 11 (defining the "1968 Resolution Revenues" to include the Toll Revenues and Excise Taxes); Official Statement for Series M and N Transportation Revenue Bonds issued pursuant to 1998 Resolution (Exhibit X), at 27 (providing that Senior Transportation Revenue Bonds issued under the 1998 Resolution "are payable solely from, and **secured by a pledge of**, the 1998 Resolution Revenues and all other moneys held for the credit of the 1998 Senior Bond Sinking Fund") (emphasis added), at 28 (defining the "1998 Resolution Revenues" to include the Toll Revenues and Excise Taxes).

43.     This accords with prior admissions of FOMB and HTA, as well as with prior findings from this Court and the First Circuit.  For example, in the 2016 Peaje proceedings before this Court and the First Circuit, FOMB and HTA repeatedly admitted that the Bonds were "secured by a pledge of revenues generated by highway tolls, excise taxes on gasoline, vehicle

-14-

license fees, and investment earnings."   See, e.g., Peaje Invs LLC v. Garcia Padilla, Case

No. 16-2377 (1st Cir.), Dkt. No. 64 at 10.[10]   Relying on these admissions, Judge Besosa found:

"*Peaje Investments continues to hold a security interest in a stable, recurring source of income*

*that will eventually provide funds for the repayment of the HTA bonds*.   Though it will not receive

the pledged revenues during the stay period, *this enduring security interest* means that it faces

only a delay in recouping such funds, not a permanent loss of them."   Peaje Invs. LLC v.

García-Padilla, No. 16-2365, 2016 WL 6562426, at *5-6 (D.P.R. Nov. 2, 2016), aff'd in part,

vacated in part, 845 F.3d 505 (1st Cir. 2017). (emphasis added).   On appeal, the First Circuit

likewise found that "[t]he [Bonds] are secured by a lien on toll revenues, among other things."

Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 510 (1st Cir. 2017).  As a result, HTA and FOMB

are now judicially estopped from taking a position inconsistent with their prior admissions—which

were the basis for decisions rendered by two different courts.   See N.H. v. Me., 532 U.S. 742, 749

(2001) (holding that judicial estoppel "'generally prevents a party from prevailing in one phase of

a case on an argument and then relying on a contradictory argument to prevail in another phase'")

(citation omitted); Alternative Sys. Concepts. Inc. v. Synopsys, Inc., 374 F.3d 23, 33-36 (1st Cir.

2004) (holding that litigant was judicially estopped from advancing new arguments where the

party's new argument was inconsistent with its original arguments and a court accepted the original

position); In re J.F.K. Acquisitions Group, 166 B.R. 207, 209-11 (Bankr. E.D.N.Y. 1994) (holding

that debtor was judicially estopped from contending that the collateral was worth only $11 million,

when debtor previously defeated a lift stay motion on the basis that the creditor was oversecured).

---

[10]   See also Peaje Invs. LLC v. Garcia Padilla, Case No. 16-2365-FAB (D.P.R. Oct. 28, 2016), Dkt. No.
67 at 12 (filing by FOMB that contended that "the perpetual revenue streams that secure their claims would
still be available for future payments . . . in future proceedings under PROMESA"); Peaje Invs LLC v.
Garcia Padilla, Case No. 16-2377 (1st Cir. Dec. 23, 2016) at 18 (amicus brief by FOMB contending that
"perpetual revenue streams that secure [HTA bondholders'] claims . . . are continually replenished.").

2.     **Movants Have Statutory Liens On The Excise Taxes**

44.     In addition to Movants' security interests in all of the Pledged Revenues

under the Resolutions, the Excise Tax Statutes also grant Movants statutory liens on the Excise

Taxes against both HTA and the Commonwealth by providing that the Commonwealth must

collect the Excise Taxes on behalf of HTA *solely* for payment of the Bonds.  See, e.g., 13 L.P.R.A.

§ 31751; 9 L.P.R.A. §§ 2021, 5681.  These statutes create "liens" as defined in the Bankruptcy

Code because they give rise to a "charge against or interest in property to secure payment of a debt

or performance of an obligation."  11 U.S.C. § 101(37) (defining "lien").  The liens are *statutory*

liens because they "aris[e] solely by force" of the Excise Tax Statutes (see id. § 101(53)), which

contain mandatory, self-executing "shall" language.  Moreover, the Excise Tax Statutes identify

the specific taxes that serve as collateral and contain nondiscretionary language requiring that such

taxes be used to pay for debt service on the Bonds.  See, e.g., JK Mullen Inv. Co. v. Town of

Arvada, 261 P.2d 714, 718 (Colo. 1953) (where a statute provides that special taxes "shall be

applied to the payment of all bonds," the "statute unequivocally gives the bondholders a prior lien

on any and all proceeds received from the assessments").

45.     As this Court recognized in its opinion denying a preliminary injunction

motion previously brought by Peaje, a statute does not need to expressly use the word "lien" in

order to create a statutory lien.  See Peaje Invs. v. P.R. Highways & Transp. Auth., 301 F. Supp.3d

290 (D.P.R. 2017) (citing In re Fonseca, 534 B.R. 261, 268-69 (Bankr. D.P.R.), aff'd, 542 B.R.

628 (B.A.P. 1st Cir. 2015)); see also In re Schick, 418 F.3d 321, 328-29 (3d Cir. 2005) (finding

statutory lien where the relevant statute "lack[ed] explicit lien-creating language."). In its Peaje

decision, this Court relied on the decision by the First Circuit Bankruptcy Appellate Panel ("BAP")

in Fonseca, which is on all fours with this case.  Specifically, in Fonseca, the debtor was a

government employee who obtained a loan from a non-profit savings and loan association (the

-16-

"Savings and Loan") established by Puerto Rico Law No. 133.  Fonseca, 542 B.R. at 630.  The

Savings and Loan claimed a statutory lien on the liquidated value of the vacation and sick leave

the employee-debtor had accumulated as an employee of the Commonwealth, and the Court held

that the Savings and Loan in fact held such a statutory lien arising by force of the following statute:

> Any credit, deposit or surplus, for any reason, in the Commonwealth
> Government, or in any dependency or instrumentality thereof, [o]n
> behalf of a member who, having ceased in office, is in debt with the
> [Savings and Loan], **shall be retained by the Secretary of the
> Treasury of Puerto Rico** or the competent officer, if not alienated
> in the corresponding retirement system, **and covered into the funds
> of the [Savings and Loan], partially or fully to pay the debt
> pending therewith.**

See id. at 636 (citing 3 L.P.R.A. § 863d) (emphasis added).  This operative statute in Fonseca is

indistinguishable from the Excise Tax Statutes, because it uses mandatory "shall" language to

require the Secretary of Treasury to deposit or "cover" funds into particular accounts to be used

for the satisfaction of a debt.  Even though this statute did not use the word "lien," the BAP held

"[i]t is evident . . . that this section establishes a statutory lien on 'any credit, deposit, or surplus'

held by the government."  Id.  Therefore, under the test this Court adopted from Fonseca in the

Peaje case, the Excise Tax Statutes give rise to a statutory lien, because they "define[] with

specificity the nature of the collateral and require[] no further discretionary action for a lien to

come into force."  See Peaje, 301 F. Supp.3d at 298 (citing Fonseca).

**B.     Movants Have A Statutory Entitlement To Receive The Excise Taxes**

46.     Under controlling First Circuit precedent, Movants' statutory entitlement to

receive the Excise Taxes also constitutes a property interest constitutionally protected under the

Takings Clause and therefore entitled to adequate protection. See Ass'n de Subscripción Conjunta

del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 27 (1st Cir. 2007),

García-Rubiera v. Calderón, 570 F.3d 443, 452 (1st Cir. 2009), and Garcia-Rubiera v. Fortuño,
665 F.3d 261, 263 (1st Cir. 2011).

47.     The leading First Circuit case, Flores Galarza, concerned insurance
premiums that the Commonwealth's Secretary of Treasury was required to collect in the context
of a compulsory motor vehicle insurance program established by Puerto Rico Law 253 of
December 27, 1997 ("Law 253").  Law 253 required motor vehicle owners to pay to the Secretary
of Treasury a compulsory insurance premium when they acquired or renewed a vehicle license.
Id. at 7; see 26 L.P.R.A. § 8053(a).  Law 253 then required the Secretary of Treasury to transfer
these premiums to a government-created association of private insurers (the "Association")[11] that
was required by law to provide insurance to motor vehicle owners who were unable to obtain
private insurance.  Id.  To the extent the Association provided insurance to motor vehicle owners,
Law 253 provided that the Association was entitled to keep the premiums (the "Earned
Premiums").  Id.  By contrast, if motor vehicle owners who had paid the compulsory premiums
were able to show that they had obtained private insurance, then Law 253 required the Association
to reimburse the compulsory premiums (the "Duplicate Premiums") to such motor vehicle owners.
Id.  As an alternative to seeking reimbursement of the Duplicate Premiums directly from the
Association, privately-insured motor vehicle owners could also seek reimbursement from their
private insurers, in which case Law 253 required the Secretary of Treasury to reimburse the
insurers.  Id.

48.     Beginning in 2000, the Secretary of Treasury discontinued the
statutorily-mandated transfer of insurance premiums to the Association in an attempt to ease cash-
flow problems.  Id. at 9.  The Association brought a claim against the Secretary of Treasury under

---

[11]   Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, or Compulsory
Liability Joint Underwriting Association of Puerto Rico.

the Takings Clause of the United States Constitution.  Id. at 6.  The First Circuit ruled that the
Association had "successfully alleged *an entitlement* to the Earned Premiums under Law 253, *and
therefore a property interest in those funds*."  Id. at 29 (emphasis added).  The First Circuit also
held that the Duplicate Premiums owed to privately-insured motor vehicle owners or to their
insurers, but withheld by the Secretary of Treasury, "*belong[ed] to* [the] privately insured motorists
or their insurers who are entitled to reimbursement."  Id. at 30 (emphasis added); see also Fortuño,
665 F.3d at 263 (holding there was "*no doubt*" that motor vehicle owners entitled to Duplicate
Premiums under Law 253 "have a *property interest* in the duplicate payments") (emphasis added);
Colón-Rivera v. Asociación de Suscripción, 665 F. Supp. 2d 88, 93 (D.P.R. 2009) (holding it was
"*crystal clear*" that privately-insured motor vehicle owners "do have a *property interest* in the
duplicate premiums.") (emphasis added).

49.     In defining the nature of the Secretary of Treasury's interest in the funds
that he was required by statute to transfer to other parties, the First Circuit in Flores Galarza held
that the Secretary of Treasury (i.e., the Commonwealth) was a mere "custodian" with "no
entitlement" to the funds.  Id. at 29.  Similarly, in a subsequent decision again dealing with the
Secretary of Treasury's withholding of the Duplicate Premiums, the First Circuit held that, whether
in the hands of the Secretary of Treasury (i.e., Commonwealth) or of the Association, these funds
were held *in trust* for the benefit of their true beneficial owners, i.e. the privately-insured motorists
entitled by statute to receive them: "[L]ike funds held *in trus*t in an IOLTA account or an
interpleader account, the funds held by [the Association] or the Secretary [of Treasury] are clearly
*the 'private property'* of [the privately-insured motor vehicle owners] for purposes of the Takings
Clause."  Calderón, 570 F.3d at 452 (emphasis added).

50.     Like the Association, the privately-insured motor vehicle owners, and the
insurers in Flores Galarza, all of whom the First Circuit found to have a "property interest" in

funds withheld by the Secretary of Treasury, Movants and other HTA Bondholders are the

beneficiaries of "state law-rules or understandings that secure certain benefits and that support

claims of entitlement to those benefits." See id. at 27.  In particular, the Excise Tax Statutes, which

require the Secretary of Treasury to collect the Excise Taxes on behalf of HTA for the benefit of

the Bondholders, are almost identical to Law 253.  Indeed, in holding that the Association, motor

vehicle owners, and insurers had property interests in the funds withheld by the Secretary of

Treasury, the First Circuit relied on the following language from Law 253:

> Any person who obtains a motor vehicle license for the first time, or
> who renews it, as required by §§ 5001 et seq. of Title 9, shall be
> bound to pay the corresponding premium for the compulsory
> insurance together with the payment of the amount of the fees for
> the issuing or renewing said license, to the Secretary of Treasury.
> The Secretary of Treasury *shall transfer* the total amount of the
> premiums collected to the [Association].

Flores Galarza, 484 F.3d at 7, 29 (quoting 26 L.P.R.A. § 8053(a)) (emphasis added). The language

of the Excise Tax Statutes is either identical or extremely similar to the "shall transfer" language

that the First Circuit held gave rise to a property interest in Flores Galarza.  For example:

### § 31751.  Disposition of funds

**(a)**  The proceeds from taxes and license fees collected by virtue of
this part shall be covered into the General Fund of the Treasury of
Puerto Rico except as provided below:

**(1)** The sum of the tax collected on gasoline and four cents (4¢) of
the gas oil or diesel oil tax established by § 31626 of this title, and
the total amount per fiscal year of the excise tax collected for crude
oil, partially finished and finished oil by-products, and any other
hydrocarbon mixtures established in § 31627 of this title, *shall be
covered* into a special deposit in favor of the Highways and
Transportation Authority for its corporate purposes.

**(A)** The Secretary *shall transfer* every month, or as agreed on with
the Highways and Transportation Authority, the amounts covered
into said special deposit, deducting from these the amounts
reimbursed according to the provisions of §§ 31669 and 31670 of
this title.

-20-

13 L.P.R.A. § 31751 (emphasis added).

51.     These holdings by the First Circuit are entirely consistent with a well-settled body of case law holding that where, as here, a state statute restricts the use of taxes or other revenues for the payment of bonds, the taxing entity holds the taxes in trust for the bondholders. See, e.g., Fed. Deposit Ins. Corp. v. Casady, 106 F.2d 784, 788 (10th Cir. 1939) (where state law required town treasurer to deposit assessments in a separate special fund, "[t]he relation . . . thus created is that of an express trust created by law in which the city is the trustee and the bondholder the *cestui que trustent*."); Ecker v. Sw. Tampa Storm Sewer Drainage Dist., 75 F.2d 870, 872-73 (5th Cir. 1938) (pledged assessments were trust funds that could not otherwise be applied by the municipality); Cty. & Cnty. of Dallas Levee Imp. Dist. v. Indus. Props. Corp., 89 F.2d 731, 733 (5th Cir. 1937) (taxes collected for servicing bonds "are simply held in trust for the purposes expressed in the statute, of paying the interest and the principal of the bonded indebtedness."); Vickrey v. City of Sioux City, 104 F. 164, 166 (Cir. Western Div. 1900) ("[U]nder the provisions of the act . . . authorizing the issuance of the bonds, the city assumed the duty of creating and properly applying the sinking fund provided for in the act, and to that end was charged with the duty of levying the special assessments called for by the act, collecting the same, and making proper payment thereof to the bondholders. In these particulars the city is charged with a duty amounting to a trust."); In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25, 143 B.R. 750, 762 (Bankr. D. Mont. 1992) (funds pledged to the payment of bonds "are trust funds under state law" and that taxing authority merely acts as a custodian with respect to such funds); Bexar County Hosp. Dist. v. Crosby, 160 Tex. 116, 122 (1959) (taxes levied specifically to retire certain bonded indebtedness were held by the city and county in trust for the bondholders, and cannot be applied to any purpose except the bond indebtedness); Bedell v. Lassiter, 143 Fla. 43 (1940) (taxes levied and collected to secure payment of bonds constitute a trust fund for the benefit of

bondholders); <u>Hays v. Isaacs</u>, 275 Ky. 26 (1938) (fund held by County for repayment of bonds "is a trust for the benefit of the holders of the bonds" and cannot be diverted to another purpose); <u>City of Austin v. Cahill</u>, 99 Tex. 172, 187-88 (1905) ("[I]n appropriating or disposing of tax funds, money raised for a specific purpose cannot be used for any other purpose." (internal citations and quotations omitted)).[12]

### III.   Movants' Liens Are Not Subject To Section 552(a) Or Section 928(b)

52.     Neither Section 552(a) nor Section 928(b) of the Bankruptcy Code, incorporated into Title III of PROMESA, prevents the relief requested herein.

53.     Section 552(a) provides that, with certain exceptions, "property acquired by the . . . debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 552(a).  Therefore, except where an exception applies, Section 552(a) generally cuts off liens on property acquired by the debtor after the petition date of a bankruptcy case.

54.     However, Section 552(a) is plainly inapplicable to Movants' liens here. Section 928(a) of the Bankruptcy Code creates an exception to Section 552(a) in the case of liens on what the Bankruptcy Code defines as "special revenues."  Specifically, Section 928(a) provides that "[n]*otwithstanding section 552(a)* of this title and subject to subsection (b) of this section,

---

[12] Courts have also held that a municipality becomes a trustee of funds resulting from the collection of special taxes and assessments, and thus is charged with all related fiduciary duties.  <u>See, e.g.,</u> <u>Town of Shattuck v. Barcafer</u>, 137 P.2d 238 (Ok. 1943) (holding that in the collection of money paid in by property owners for the retirement of the bonds, the municipality stands in relation of agent to the bondholders); <u>Wulff-Hansen & Co. v. Silvers</u>, 21 Cal. 2d 253, 263 (1942) ("Any money that the city receives as a result of the foreclosure actions, over and above authorized costs, is not city money but belongs to bondholders, and the city is trustee for them as to such money."); <u>Keyes v. City of Tacoma</u>, 12 Wash. 2d 54 (1941) (funds collected to pay off local improvement bonds constituted trust fund, even after being commingled with general funds); <u>City of Winter Haven v. Summerlin</u>, 114 Fla. 727, 732 (1934) ("It is well settled that, where a municipal corporation is charged by law with the duty of collecting special assessments and making proper payment thereof to bondholders to whom the assessments have been pledged as party of their security, the duty amounts to a trust that is cognizable in equity for the purpose of calling into account the municipality and its officers for the manner in which that trust has been performed.").

special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a) (emphasis added); PROMESA § 301(a). Section 928(a) therefore "negate[s] Section 552(a) in the municipal context." See S. Rep. No. 100-506, at 12-13 (1988).

55.     Because the Pledged Revenues constitute "special revenues" as defined in Section 902(2) of the Bankruptcy Code, Movants' security interests in the Pledged Revenues fall within the Section 928(a) exception and therefore are not subject to Section 552(a). Specifically, the Toll Revenues qualify as "special revenues" because they constitute "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used to provide transportation[.]" 11 U.S.C. § 902(2)(A). The Toll Revenues also constitute "other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions." Id. § 902(2)(D). The Excise Taxes are "special excise taxes imposed on particular activities or transactions," id. § 902(2)(B), and are also "taxes specifically levied to finance one or more projects or systems." Id. § 902(2)(E); see also Act No. 1-2015.

56.     Section 928(b) in turn provides a limitation on Section 928(a) in some circumstances by providing that "[a]ny . . . lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be." See 11 U.S.C. § 928(b). Section 928(b) **does not apply to Movants' liens on the Pledged Revenues**.

57.     First, the Excise Taxes are not revenues generated from a project or a system; rather, they are special excise taxes pledged solely for the payment of the Bonds. See 11 U.S.C. §§ 902(2)(B), (E). Moreover, the application of Section 928(b) is limited to liens "resulting

from any security agreement entered into by the debtor before the commencement of the case,"
see 11 U.S.C. § 928(b). Because Movants have statutory liens on the Excise Taxes, Section 928(b)
does not apply.

58.     Further, the application of Section 928(b) to the Bonds would be
unconstitutional, because the liens securing the Bonds predate the provisions of PROMESA that
make Section 928(b) applicable to Puerto Rico instrumentalities such as HTA. As set forth above,
the Bondholders are the beneficiaries of a "gross" lien on the Toll Revenues and other Pledged
Revenues. In accordance with the terms of that lien, HTA must *first* deposit sufficient funds with
the Fiscal Agent to meet the debt service and reserve requirements under the Resolutions *before*
HTA can apply the funds to other purposes. Movants have held these gross liens since the Bonds
were issued, years before PROMESA was enacted. Subordinating the Bondholders' lien to the
"necessary operating expenses" of HTA would effectively convert Bondholders' lien from a
"gross" lien into a "net" lien and thereby drastically change the nature of their security. Such an
application of Section 928(b) would violate the Takings and Due Process Clauses of the U.S.
Constitution[13] by depriving Bondholders of their gross lien without just compensation or due
process of law.

59.     However, even if Section 928(b) did apply, it does not give the Debtors
license to spend the Pledged Revenues on all of HTA's expenses during the pendency of these
Title III cases. Rather, as the plain language suggests, Section 928(b) provides that liens on special
revenues derived from a project or system are subject only to the necessary operating expenses of
such project or system. 11 U.S.C. § 928(b). Here, the First Circuit has already suggested that the

---

[13] The Takings Clause of the Fifth Amendment to the U.S. Constitution provides that "private property
[shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Due Process
Clause of the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty,
or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

relevant project or system consists only of the "toll highways" that will "generate future revenues"
pledged to the Bonds.  Peaje Invs. LLC v. Fin. Oversight Mgmt. Bd., 899 F.3d 1, 13 (1st Cir.
2018).  Therefore, even if Section 928(b) were to apply, only the necessary operating expenses of
the toll highways that generate the Toll Revenues would fall within its scope, and not the expenses
of any other HTA or Commonwealth assets, projects, or systems.

60.    Consistent with the plain language of Section 928, and as Judge Bennett
recognized in Jefferson County, the special revenue amendments "were designed to keep the
framework of special revenue financing unaltered" and to "keep such special revenue financing
transactions unaffected by" a bankruptcy filing.  In re Jefferson County, 482 B.R. 404, 434-436
(Bankr. N.D. Ala. 2012).  Thus, Judge Bennett held that Section 928(b) was never intended to
provide a debtor with the ability "to significantly restructure agreements for the lien against special
revenues or the distribution of monies to secured creditors.  *Quite the contrary is the case*."  Id.
(emphasis added).

61.    To that end, Section 928(b) is a provision of limited scope, which permits
the limited use of special revenues to cover only certain operating expenses that are  "necessary to
keep the project or system going . . . so that the project or system can be maintained in good
condition to generate the revenue to repay bondholders. . . ." H.R. Rep. No. 100-1011, at 8 (1988).
Section 928(b) covers no other expenses.  As its plain language suggests, Section 928(b) covers
only certain operating expenses.  Section 928(b) therefore does not subject any lien to capital
improvements or enhancements.  See Jefferson Cnty., 482 B.R. at 439 ("[E]xpenditures for items
that are capitalized are not included within the scope of 'necessary operating expenses.'").

62.    Moreover, the relevant "project or system" for purposes of Section 928(b)
is only that which "generate[s] the special revenues."  See S. Rep. No. 100-506 (1988) at 23; see
also In re Jefferson Cty., 482 B.R. 404, 437 (Bankr. N.D. Ala. 2012) (necessary operating expenses

are those that are "directly related to the project or system *generating the special revenues* and are not the expenses of the municipality generally or for other systems or projects") (emphasis added).

## IV.     Cause Exists For An Adequate Protection Order Or Relief From Stay

63.     The Debtors' ongoing consumption of the Pledged Revenues is clearly destroying the value of Movants' property interests in those revenues, and this diminution in the value of Movants' property interests is putting Movants' right to repayment at serious risk. Specifically, the Commonwealth and HTA are not using the Pledged Revenues to make payments on the Bonds, nor are they segregating and preserving the Pledged Revenues for the benefit of Bondholders.  Instead, since 2015, they have been continuously diverting and dissipating the Pledged Revenues for unauthorized and unlawful purposes, thereby permanently making a portion of the Pledged Revenues unavailable to pay debt service.  In particular, following the filing of the Commonwealth and HTA's Title III petitions near the end of Fiscal Year 2017 (in May 2017), all of the Pledged Revenues for Fiscal Years 2018 and 2019 have been diverted.  According to FOMB's own fiscal plans, the diverted Pledged Revenues for these two fiscal years total approximately $251 million in Toll Revenues ($117 for FY2018 and $134 for FY2019) and $1.114 billion in Excise Taxes ($535 million in FY2018 and $579 million in FY2019), meaning that Movants' collateral has diminished in value by at least $1.397 billion since the Commonwealth and HTA filed for Title III.  Additional Pledged Revenues were diverted at the end of Fiscal Year 2017 following the Title III filings in May 2017, and additional Pledged Revenues continue to be diverted, now, in Fiscal Year 2020.  Movants will require discovery in order to ascertain with certainty the amounts of these additional diversions and of the resulting diminution in the value of their property interests.

64.     As noted above, in 2016, prior to FOMB's development of its first fiscal plans and the commencement of the Title III cases, Movants brought motions for relief from the Section 405 Stay for lack of adequate protection, and Judge Besosa denied these motions. Circumstances have changed dramatically, however, since Judge Besosa made his pre-Title III rulings.

65.     First, Judge Besosa denied Assured's motion for relief from the Section 405 Stay on the grounds that Assured had not yet suffered an "injury in fact" as HTA Bondholders whose Bonds were insured by Assured were continuing to receive payments from the reserve funds held by the Fiscal Agent.  These reserve funds have since been substantially depleted, however, and to the extent they were not depleted, they have been withheld as a result of the Commonwealth's instructions to the Fiscal Agent not to pay HTA Bondholders.[14]  As a result of the depletion and/or withholding of the reserve funds, Movants have now indisputably suffered an "injury in fact" in the form of the hundreds of millions of dollars in claims Movants have been required to pay to insured Bondholders, and there can no longer be any question as to Movants' standing.  Furthermore, Judge Besosa's finding that Assured had not suffered an injury in fact was premised on the assumption that the moratorium under the Moratorium Laws would be temporary, as Judge Besosa expressly noted that the first principal and interest payment date on which Assured might face a risk of nonpayment by HTA would occur "well after the termination of both the [First

---

[14] Specifically, on June 20, 2017, counsel to the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") sent a letter (the "AAFAF Letter", Exhibit Y) to the Fiscal Agent, instructing the Fiscal Agent not to apply any funds held in the reserve accounts to HTA Bond payments due July 1, 2017, and asserting that such application would violate the automatic stay because the funds in the reserve accounts supposedly constituted HTA's property. Subsequently, at the oral argument before the First Circuit in Ambac Assurance Corp. v. Commonwealth, Case No. 18-1214 (1st Cir.) on January 15, 2019, counsel to AAFAF conceded that the purported basis for the AAFAF Letter may have been "incorrect" and "inaccurate" because, as special revenues, the funds in the reserve accounts could be applied to the payment of the HTA Bonds notwithstanding the automatic stay of Section 362 of the Bankruptcy Code pursuant to Section 922(d).  Notwithstanding this admission, the AAFAF Letter has not been retracted, and the funds in the reserve accounts have not been applied to the payment of the Bonds.

Moratorium Law]'s 'emergency period' and the [Section 405 Stay]." See Peaje Invs. LLC v.

García-Padilla, No. 16-2365, 2016 WL 6562426, at *5 (D.P.R. Nov. 2, 2016). Judge Besosa's

reasonable assumption that the moratorium would be short-lived and not cause any lasting harm

to Assured has since been disproven (i) by the serial extensions of the Moratorium Laws and

Moratorium Orders by the Commonwealth government and (ii) by the incorporation of the

diversion of the Pledged Revenues into FOMB's fiscal plans and into the Compliance Law.

66.     Second, as noted above, Judge Besosa in 2016 found Peaje to be adequately

protected because it "continue[d] to hold a security interest in a stable, recurring source of income

that," it appeared at that time, would "eventually provide funds for the repayment of the PRHTA

Bonds." Id. Judge Besosa's ruling with respect to Peaje, like his ruling with respect to Assured,

relied centrally on what Judge Besosa reasonably understood at that time to be the *temporary*

nature of the First Moratorium Law and the Moratorium Orders thereunder. For example, Judge

Besosa emphasized the existence of "provisions of both the [First Moratorium Law] and

PROMESA that effectively preserve [Peaje's] contractual security interest in PRHTA's pledged

revenues." Id.

67.     Third, Judge Besosa denied National's motion in part because he reasoned

that National would be able to enforce its rights by bringing an action under Section 407(a) of

PROMESA after the expiration of the automatic stay. See Brigade, 217 F. Supp. 3d at 527.

68.     Since that time, however, the provision of the First Moratorium Law that

Judge Besosa identified as preserving Peaje's security interest (§ 204(a)) has been repealed by

subsequent Moratorium Laws, and the provisions of PROMESA that Judge Besosa pointed to as

preserving Peaje's security interest for the period after the Section 405 Stay expired (PROMESA

§ 405(k)) is no longer in effect. More importantly, since the time of Judge Besosa's Peaje decision,

(i) the moratorium has been repeatedly extended through the enactment of additional Moratorium

Laws and the issuance of additional Moratorium Orders, with no end in sight, and (ii) FOMB and

the Debtors have made clear their intention to continue the diversion and dissipation of the Pledged

Revenues indefinitely, and have conceded that this indefinite—and likely permanent—diversion

and dissipation of collateral endangers Movants' "interest in repayment." See Peaje Invs., 845

F.3d 505 at 513. The resulting "uncertainty" about the availability of future Pledged Revenues to

pay debt service could "affect the 'repayment of [HTA's] bond payable,'" meaning that Movants

are entitled to adequate protection. See id. at 514.

69.     For example, the most recent HTA Fiscal Plan (Exhibit Z) acknowledges

that HTA has not made debt service payments "since July 2017." Ex. Z at 112. Moreover, the

HTA Fiscal Plan projects that HTA will have a *total* of only $493 million of cash flow available

for debt service during the *entirety* of the period covered by the HTA Fiscal Plan (Fiscal Years

2019-24), which will be insufficient to pay the approximately $1.812 billion in debt service coming

due on the Bonds during this period. Id.

70.     The HTA Fiscal Plan also requires Toll Revenues to be used first to fund

HTA operations, which turns HTA's gross pledge to Bondholders on its head and puts Movants'

interest in having their debt repaid at risk. See, e.g., Ex. Z at 51 (referring to "Toll revenues" as

"Operating Revenue"). This misappropriation of Toll Revenues to fund operations could not be

justified under Section 928(b), even if it applied (which it does not), because the HTA Fiscal Plan

subordinates debt service even to expenses of HTA that have nothing to do with the assets that

generate the Toll Revenues. For example, the HTA Fiscal Plan projects "Toll fares" ranging from

approximately $133.7 to approximately $184.9 million a year for fiscal years 2019-24, but projects

expenses for toll highway maintenance and administration of only approximately $40.8 million to

$50.2 million annually. Ex. Z at 62-63. Therefore, even under Section 928(b), at most a modest

percentage of the Toll Revenues collected each year would be eligible for use to pay the necessary

operating expenses of the toll roads, and the remainder would be available for debt service. However, the HTA Fiscal Plan subordinates debt service not only to the necessary operating expenses of the toll roads (which would be permitted if Section 928(b) applied), but rather to HTA's "total expenses," which range from a staggering $532.6 million to $871.5 million annually. Id. at 63.  Moreover, the HTA Fiscal Plan provides for a **$2.7 billion dollar** "capital improvement plan" (CIP) for Fiscal Years 2019-24, notwithstanding the fact that capital improvements cannot be netted against debt service under Section 928(b).  See id. at 32, 52.

71.     The HTA Fiscal Plan also requires the Commonwealth to "clawback", i.e., confiscate, all Excise Taxes for the foreseeable future, expressly acknowledging that "[Tax and Fee Revenue] is subject to clawback by the Commonwealth."  Ex. Z at 50.

72.     The most recent Commonwealth Fiscal Plan likewise indicates that FOMB intends for the Commonwealth's misappropriation and dissipation of the Excise Taxes to be permanent.  For example, the Commonwealth Fiscal Plan mandates the creation of an "Office of the Chief Financial Officer for Puerto Rico" ("OCFO"), one of the functions of which will be to "[e]nforce and manage a consolidated treasury single account for the Government; this involves consolidating visibility and control of all Government bank accounts . . . and creating a true Treasury Single Account."  Ex. L at 78.  Therefore, the Commonwealth Fiscal Plan mandates that the Commonwealth, through the OCFO, illegally transfer the Pledged Revenues to a consolidated "Treasury Single Account," where the Pledged Revenues will be commingled with general Commonwealth revenues and expended and dissipated for purposes other than payment of the Bonds.  Id.

73.     Furthermore, HTA's 2016 audited financial statements (Exhibit AA), expressly acknowledge the obvious but determinative facts—that the diversion of the Pledged Revenues, beginning with the Clawback Order, "diminished" HTA's ability to pay its debts,

stating: "[The Clawback Order] had a significant negative effect on [HTA's] liquidity . . . [W]ithout the taxes and other revenues allocated by the Commonwealth . . . , [HTA] is unable to deposit additional monies in the bond payment reserve accounts and without additional deposits *the ability to continue making the scheduled payments on the bonds issued is diminished.*" Ex. AA at 28-29 (emphasis added).  FOMB similarly acknowledged in HTA's April 28, 2017 fiscal plan (Exhibit BB) that HTA's fiscal situation "was recently aggravated" by the diversion of the Excise Taxes, calling into question HTA's ability to repay the Bonds.  See Ex. BB at 16.

       74.    HTA's most recent audited financial statements, from fiscal year 2018 (the "2018 Financial Statements", Exhibit CC) similarly admit that HTA "does not have sufficient funds available to fully repay its various obligations as they come due" and expressed "substantial doubt about [HTA's] ability to continue as a going concern."  Ex. CC at 3. The 2018 Financial Statements also concede that "the [First Moratorium Law], the related executive orders, and subsequent to the enactment of PROMESA certain developments in connection with actions of the Oversight Board . . . have had a significant negative effect on [HTA's] liquidity . . . There is no indication that the conditional allocation of gasoline, oil, diesel, and petroleum taxes to [HTA] will resume . . .  Without the taxes and other revenues conditionally allocated by the Commonwealth . . . , [HTA] has been unable to make the scheduled payments on its outstanding bonds and fund its reserve accounts accordingly."  Id. at 34.[15]

---

[15] No doubt as part of AAFAF and FOMB's legal strategy, HTA's most recent financial statements refer to the Excise Taxes as being "conditionally allocated" to HTA.  The right of HTA and its bondholders to the Excise Taxes is not conditional, however; rather the Commonwealth's right to "claw back" the Excise Taxes for the benefit of its public debtholders is conditional on the two conditions to a valid clawback being satisfied, which they are not and have never been.  Notably, HTA's financial statements from the period before the Commonwealth started misappropriating the Excise Taxes do not use this "conditional allocation" language and instead state explicitly that the Excise Taxes were "assigned" to HTA, demonstrating that the "conditional allocation" language is a cynical attempt to retroactively legitimize the Commonwealth's confiscation of property to which it lacks any entitlement.  See, e.g., Ex. U at 10, 28; HTA 2015 Financial Statement (Exhibit DD) at 21, 80, 89, 90.

75.      In view of these admissions about HTA's diminishing ability to repay its debts, Movants are entitled to adequate protection.  Under Section 361 of the Bankruptcy Code, a debtor may provide adequate protection in one of three ways:  (1) by making cash payments or periodic cash payments in an amount equal to the decrease in the value of the secured creditor's interest in property, (2) by providing an additional or replacement lien to replace the property, or (3) by providing such other relief "as will result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property."   11 U.S.C. § 361(1)–(3); PROMESA § 301(a).  Where, as here, the decrease in the value of a secured creditor's property is "attributable to the debtor's usage" of revenues pledged as collateral, the amount of such decrease "must be protected by cash payments from another source, an additional or replacement lien, or other such indubitable equivalent."  In re Bldrs. Grp. & Dev. Corp., 502 B.R. 95, 122 (Bankr. D.P.R. 2013).  The mere promise of a future payment is not a "suitable substitute" because it "is not generally the equivalent of payment now."  In re Murel Holding Corp., 75 F.2d 941, 942-43 (2d Cir. 1935).

76.      Alternatively, in the event the Court concludes that the Debtors cannot, or cannot be ordered, to provide adequate protection in the form of cash payments, substitute collateral, or some other "indubitable equivalent" for the value of the Pledged Revenues, the Court must, as both a statutory and a constitutional matter, lift the stay to "allow[] the processes of state or territorial law to operate in the normal course as if there were no bankruptcy."  Fin. Oversight Mgmt. Bd. v. Ad Hoc Group of PREPA Bondholders, 899 F.3d 13, 21 (1st Cir. 2018) ("PREPA"); see also 11 U.S.C. § 362(d)(1) ("the court shall grant relief from the stay . . . for cause, including the lack of adequate protection"); In re Balco Equities Ltd., 312 B.R. 734, 753 (Bankr. S.D.N.Y. 2004) ("Where . . . the Debtor cannot provide adequate protection, the stay must be lifted.").  Specifically, the Court should lift the stay to permit Movants to bring actions against HTA, the

Commonwealth, and other appropriate defendants in a forum other than the Title III Court seeking, among other things, (i) enforcement of the Commonwealth's and HTA's obligations to apply the Pledged Revenues to the payment of the Bonds, including through (ii) enforcement of Movants' liens on the Pledged Revenues and any related contractual, statutory, and constitutional rights. Because the automatic stay, as interpreted by this Court, currently prevents Movants from taking these actions to halt the ongoing diminution in the value of their property, the automatic stay is the cause of that ongoing diminution. See, e.g., Peaje, 899 F.3d at 20 (the automatic stay "deprive[s] a creditor of its property interest" where it "preclud[es] the creditor from exercising any rights it possesses to protect that interest from destruction").

77. In addition, although an unsecured litigation claim alone does not constitute adequate protection of a secured claim, the Court should also lift the stay to permit Movants to bring an action under PROMESA § 407 in this Court to hold the Commonwealth and HTA liable for their transfers of the Pledged Revenues in violation of the applicable laws under which Movants have a valid pledge of, security interest in, and liens on the Pledged Revenues and in violation of the Excise Tax Statutes, which assure the transfer of the Pledged Revenues to HTA for the benefit of the Bondholders. See PROMESA § 407; see also Rocco v. J.P. Morgan Chase Bank, 255 F. App'x 638, 641 (3d Cir. 2007) ("[A] lawsuit is too speculative in nature to offer adequate protection.").

WHEREFORE, Movants request that the Court enter an order, substantially in the form attached hereto as Exhibit A, (i) ordering adequate protection of Movants' interests in the Pledged Revenues and in the repayment of the Bonds, or, in the alternative, (ii) lifting the automatic stay to permit Movants to enforce the application of the Pledged Revenues to the payment of the Bonds, including by permitting Movants to enforce their liens on the Pledged Revenues.

-33-

Dated:     New York, New York
           August 23, 2019


CASELLAS ALCOVER & BURGOS P.S.C.    CADWALADER, WICKERSHAM & TAFT LLP


By: _/s/ Heriberto Burgos Pérez_           By: _/s/ Mark C. Ellenberg_

Heriberto Burgos Pérez                    Howard R. Hawkins, Jr.*
USDC-PR 204809                        Mark C. Ellenberg*
Ricardo F. Casellas-Sánchez         William J. Natbony*
USDC-PR 203114                        Ellen M. Halstead*
Diana Pérez-Seda                     Thomas J. Curtin*
USDC-PR 232014                        Casey J. Servais*
P.O. Box 364924                       200 Liberty Street
San Juan, PR 00936-4924            New York, NY 10281
Telephone:  (787) 756-1400         Telephone:  (212) 504-6000
Facsimile:  (787) 756-1401          Facsimile:  (212) 504-6666
Email:      hburgos@cabprlaw.com    Email:      howard.hawkins@cwt.com
            rcasellas@cabprlaw.com           mark.ellenberg@cwt.com
            dperez@cabprlaw.com              bill.natbony@cwt.com
                                    ellen.halstead@cwt.com
_Attorneys for Assured Guaranty Corp. and_     thomas.curtin@cwt.com
_Assured Guaranty Municipal Corp._         casey.servais@cwt.com


                               * Admitted _pro hac vice_

                               _Attorneys for Assured Guaranty Corp. and_
                               _Assured Guaranty Municipal Corp._

ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC

By:/s/ *Eric Perez-Ochoa*
    ERIC PÉREZ-OCHOA
    USDC-PR No. 206,314
    E-mail:   epo@amgprlaw.com


By:*/s/Luis A. Oliver-Fraticelli*
    LUIS A.  OLIVER-FRATICELLI
    USDC-PR NO. 209,204
    E-mail:   loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Tel.:     (787) 756-9000
    Fax:     (787) 756-9010

*Counsel for National Public Finance
Guarantee Corp.*

WEIL, GOTSHAL & MANGES LLP

By:/s/ *Robert Berezin*
    MARCIA GOLDSTEIN*
    JONATHAN POLKES*
    GREGORY SILBERT*
    ROBERT BEREZIN*
    767 Fifth Avenue
    New York, New York 10153
    Tel.:    (212) 310-8000
    Fax:    (212) 310-8007
    Email:  marcia.goldstein@weil.com
            jonathan.polkes@weil.com
            gregory.silbert@weil.com
            robert.berezin@weil.com

*admitted pro hac vice

*Counsel for National Public Finance Guarantee
Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court

using the CM/ECF System, which will send notification of such filing to all parties of record in

the captioned case.

At New York, New York, the 23rd day of August, 2019.

By: _/s/ *Howard R. Hawkins, Jr.*_____
Howard R. Hawkins, Jr.*
* Admitted pro hac vice