Prospectus Supplement
to Prospectus dated July 29, 2003

# 40,625,000 Shares
# Puerto Rico Fixed Income Fund, Inc.
# Common Stock

This Prospectus Supplement relates to the issuance by Puerto Rico Fixed Income Fund, Inc. (the "Fund") of additional shares of its common stock, par value $0.01 per share (the "Shares").  **This Prospectus Supplement may not be used unless the Prospectus dated July 29, 2003 (the "Prospectus") is delivered simultaneously herewith.**  Capitalized terms used but not defined herein are defined in the Prospectus.

**An investment in the Fund involves risks, including the risk of loss of some or all amounts invested.** See "RISK FACTORS AND SPECIAL CONSIDERATIONS" commencing on page 7 of the Prospectus.

The Fund is offering the Shares through UBS Financial Services Incorporated of Puerto Rico.  As of November 25, 2003, the Fund had issued 33,050,000 Shares (excluding shares issued pursuant to the Fund's dividend reinvestment plan).  The Fund is now offering an additional 7,575,000 Shares.  After the issuance of the Shares offered hereby, the Fund will have 40,625,000 Shares outstanding (excluding shares issued pursuant to the Fund's dividend reinvestment plan).

The Fund may offer additional Shares.  The Shares are being offered solely to individuals who have their principal residence in Puerto Rico and to corporations and other business organizations whose principal office and place of business are in Puerto Rico.

|  | Public Offering Price (1) | Sales Load | Proceeds to Fund (before expenses) (2) |
|---|---|---|---|
| Per Share (1) | $10.007 | $0.475 | $9.532 |
| Sub-total: Shares to be issued on December 30, 2003 | $75,803,025 | $3,598,125 | $72,204,900 |
| Total (3) | $406,303,025 | $19,296,875 | $387,006,150 |

(1)     The price to the public is the greater of (i) $10.00 or (ii) the then current net asset value per Share plus applicable sales load.  The public offering price of the Shares issued prior to December 30, 2003 was $10.00.  The public offering price of the additional Shares to be issued on December 30, 2003 will be $10.007.

(2)     Before deduction of offering expenses payable by the Fund, estimated not to exceed $300,000.  UBS Puerto Rico may also purchase up to an additional 6,093,750 Shares within 30 days from the date of the final closing to cover over-allotments.  If such over-allotment is exercised, total proceeds to the Fund (including proceeds from the Shares already issued, and assuming the over-allotment Shares are sold at $10.007 per Share) will amount to $445,091,775 (before offering expenses) and the total amount of sales load will be $22,191,406.25. See "ESTIMATED FUND EXPENSES" in the Prospectus for a description of the various costs and expenses you can expect to bear, directly or indirectly.

(3)     Including the 33,050,000 Shares that had been issued as of November 25, 2003.

## UBS Financial Services Incorporated of Puerto Rico
The date of this Prospectus Supplement is December 30, 2003

# 5,000,000 Shares
# Puerto Rico Fixed Income Fund, Inc.
# Common Stock

**Investment Objective:**  Puerto Rico Fixed Income Fund, Inc. (the "Fund") is a newly organized, non-diversified, closed-end management investment company. The Fund's investment objective is to provide you with current income, consistent with the preservation of capital. No assurance can be given that the Fund will achieve its investment objective.

**Investment Policies:**  The Fund will normally invest its assets in the following securities:

• At least 67% of the Fund's total assets will be invested in taxable and tax-exempt securities issued by Puerto Rico issuers, including securities issued by the Commonwealth of Puerto Rico and its political subdivisions and instrumentalities, mortgage-backed and asset-backed securities, and corporate obligations and preferred stock. The Fund may invest up to 33% of its total assets in taxable and tax-exempt securities issued by non-Puerto Rico issuers, including securities issued or guaranteed by the U.S. Government, its agencies and instrumentalities, mortgage-backed and asset-backed securities, corporate obligations and preferred stock, and municipal securities.

• At least 80% of the Fund's total assets will be invested in securities that, at the time of purchase, are rated investment grade by a nationally recognized statistical rating organization or, if not so rated, the Fund's Investment Adviser determines to be of comparable credit quality.

• Up to 20% of the Fund's total assets may be invested in preferred stock of Puerto Rico issuers (which preferred stock may be unrated or rated below investment grade), provided (i) the issuer of such preferred stock has senior unsecured debt rated investment grade by a nationally recognized statistical rating organization or (ii) if such issuer does not have a senior unsecured debt rating, the Fund's Investment Adviser determines that such issuer's senior unsecured debt is of comparable credit quality. The Fund will not invest in debt securities rated below investment grade, and will not invest in unrated debt securities unless the Investment Adviser determines that such unrated debt securities are of investment grade quality.

**Investment Adviser:**  The Fund's Investment Adviser is UBS Asset Managers of Puerto Rico, a division of UBS Trust Company of Puerto Rico, an affiliate of UBS Financial Services Incorporated of Puerto Rico ("UBS Puerto Rico").

**Risk Factors:**  An investment in the Fund involves risks, including the risk of loss of some or all amounts invested. Since the Fund may have large investments in a small number of issuers, the Fund's net asset value and its yield may increase or decrease more than those of a diversified investment company. The Fund may invest up to 20% of its total assets in preferred stock of Puerto Rico issuers that may be rated below investment grade or that the Investment Adviser may determine to be below investment grade quality. These securities are of lower credit quality and pose greater credit risk to the Fund than investment grade securities, and are regarded as having predominantly speculative characteristics with respect to capacity to pay. Certain conflicts of interest exist among the Fund, the Investment Adviser, and its affiliates. The Fund may raise additional cash to invest by issuing preferred stock, debt securities, and other forms of leverage. Leverage is a speculative investment technique and can result in large changes in the net asset value and the market value of the Shares, as well as increased risk for your investment in the Fund. An investment in the Fund is not equivalent to an investment in the underlying securities of the Fund. You should not view the Fund as a vehicle for trading purposes. An investment in the Shares is designed primarily for long-term investors. See "RISK FACTORS AND SPECIAL CONSIDERATIONS" commencing on page 7 and "SPECIAL LEVERAGE CONSIDERATIONS" commencing on page 19. This Prospectus contains important information about the Fund. You should read this Prospectus in its entirety before deciding whether to invest and retain it for future reference.

**Possibility of Limited Market for the Shares:**  The Shares are a new issue of securities. Therefore, prior to this offering there has been no market for the Shares. UBS Puerto Rico currently intends to maintain a market in the Shares, although it is not obligated to do so, and may discontinue such activities at any time. No assurance can be given as to the liquidity of the market for the Shares as a result of such activities by UBS Puerto Rico. If UBS Puerto Rico's activities are discontinued at any time, there may be no other market for the Shares. The Fund does not intend to list the Shares on any securities exchange. The Fund is not obligated to redeem or repurchase any Shares.

**Offering Limited to Residents of Puerto Rico; Shares May Only be Transferred to Residents of Puerto Rico:**  The Shares are being offered exclusively to individuals who have their principal residence in Puerto Rico and to corporations and other business organizations whose principal office and principal place of business are in Puerto Rico, and may only be transferred to such individuals and business organizations.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS OF THE COMMONWEALTH OF PUERTO RICO. THE OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS HAS NOT MADE ANY DETERMINATION REGARDING THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

|  | *Public Offering Price(1)* | *Sales Load* | *Proceeds to Fund (before expenses) (2)* |
|---|---|---|---|
| Per Share ...................... | $10.00 | $0.475 | $9.525 |
| Total ......................... | $50,000,000 | $2,375,000 | $47,625,000 |

(1) The price to the public after the initial closing, expected to occur on or about July 31, 2003, will be the greater of (i) $10 or (ii) the then-current net asset value per Share plus applicable sales load.

(2) Before deduction of offering expenses payable by the Fund, estimated not to exceed $300,000. UBS Puerto Rico may also purchase up to an additional 750,000 Shares at the initial public offering price within 30 days from the date of the final closing to cover over-allotments. If such over-allotment is exercised, total proceeds to the Fund will amount to $54,768,750 (before offering expenses). See "ESTIMATED FUND EXPENSES" for a description of the various costs and expenses you can expect to bear, directly or indirectly.

# UBS Financial Services Incorporated of Puerto Rico

The date of this Prospectus is July 29, 2003.

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE U. S. SECURITIES ACT OF 1933, OR WITH ANY OF THE VARIOUS STATES OR JURISDICTIONS, AND THE FUND HAS NOT BEEN REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940.

AN INVESTMENT IN THE FUND IS NEITHER INSURED NOR GUARANTEED BY THE U.S. GOVERNMENT OR BY THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO. PROSPECTIVE INVESTORS SHOULD BE AWARE THAT THESE SECURITIES ARE NOT AN OBLIGATION OF OR GUARANTEED BY UBS PUERTO RICO, UBS TRUST COMPANY OF PUERTO RICO, OR ANY OF THEIR AFFILIATES. THESE SECURITIES ARE NOT DEPOSITS OR OBLIGATIONS OF, OR GUARANTEED OR ENDORSED BY ANY BANK OR OTHER INSURED DEPOSITORY INSTITUTION AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION, THE FEDERAL RESERVE BOARD OR ANY OTHER GOVERNMENT AGENCY.

You will bear certain costs, directly or indirectly, related to sales load, organizational and offering expenses, investment advisory fees, administration fees, as well as other Fund operating expenses described herein.

You should rely only on the information contained in this Prospectus. The Fund has not authorized anyone to provide you with different information. The information contained in this Prospectus may change.  You should not assume that the information provided in this Prospectus is accurate as of any date other than the date on the cover of this Prospectus. This Prospectus does not constitute an offer to sell or a solicitation of an offer to buy such securities in any circumstances in which such offer or solicitation is unlawful.

## SUMMARY

The following is a summary of more detailed information included elsewhere in this Prospectus.  You should read the entire Prospectus, and you should carefully consider the information set forth under the headings "RISK FACTORS AND SPECIAL CONSIDERATIONS" and "SPECIAL LEVERAGE CONSIDERATIONS."

**The Fund**

Puerto Rico Fixed Income Fund, Inc. (the "Fund") is a newly organized, non-diversified, closed-end management investment company registered under the Puerto Rico Investment Companies Act.  The Fund is a corporation organized under the laws of the Commonwealth of Puerto Rico.

**Investment Objective and Policies**

The Fund's investment objective is to provide you with current income, consistent with the preservation of capital.  **There is no assurance that the Fund will achieve its investment objective.**

- The Fund will normally invest at least 67% of its total assets in taxable and tax-exempt securities issued by Puerto Rico issuers.  These include securities issued by the Commonwealth of Puerto Rico and its political subdivisions and instrumentalities, Puerto Rico mortgage-backed and asset-backed securities, corporate obligations and preferred stock of Puerto Rico entities, and other securities that the Investment Adviser may select, consistent with the Fund's investment objective and policies.  The Fund may invest up to 33% of its total assets in taxable and tax-exempt securities issued by non-Puerto Rico issuers.  These include securities issued or guaranteed by the U.S. Government, its agencies and instrumentalities, non-Puerto Rico mortgage-backed and asset-backed securities, corporate obligations or preferred stock of non-Puerto Rico issuers, municipal securities of issuers within the U.S., and other non-Puerto Rico securities that the Investment Adviser may select, consistent with the Fund's investment objective and policies.

- At least 80% of the Fund's total assets will be invested in securities that, at the time of purchase, are rated investment grade by a nationally recognized statistical rating organization or, if not so rated, the Investment Adviser determines to be of comparable credit quality.

- Up to 20% of the Fund's total assets may be invested in preferred stock of Puerto Rico issuers  (which preferred stock may be unrated or rated below investment grade), provided (i) the issuer of such preferred stock has senior unsecured debt rated investment grade by a nationally recognized statistical rating organization or (ii) if such issuer does not have a senior unsecured debt rating, the Fund's Investment Adviser determines that such issuer's senior unsecured debt is of comparable credit quality.  The Fund will not invest in debt securities rated below investment grade, and will not invest in unrated debt securities unless the Investment Adviser determines that such unrated debt securities are of investment grade quality.

**The Offering**

The Fund is offering shares of its Common Stock (the "Shares") through UBS Puerto Rico (referred to as the "Underwriter" in its capacity as underwriter of the Shares).  The Underwriter will commit to purchase the Shares at several closings to be held in San Juan, Puerto Rico.  It is anticipated that the initial closing will take place on or about July 31, 2003, and that several closings will take place at monthly intervals thereafter.  The Fund is initially offering the number of Shares set forth on the cover page of this prospectus, but it may increase the number of Shares offered to the public at any time.  The Underwriter may also purchase additional  Shares to cover "over-allotments."

The initial public offering price is $10 per Share and the price to the public after the initial closing will be the greater of $10 or the then current net asset value per Share plus the applicable sales load. The minimum number of Shares an investor may purchase is 100.

**Offering Limited to Puerto Rico Residents; Restrictions on Transfer**

The Shares are being offered exclusively to individuals who have their principal residence in Puerto Rico and to corporations and other business organizations whose principal office and principal place of business are in Puerto Rico.  You will be required to deliver to the Underwriter or to a dealer a letter of representation in the form of Appendix C attached to this Prospectus. The Shares may only be sold, pledged, hypothecated, or otherwise transferred to residents of Puerto Rico.  If you cease to be resident of Puerto Rico, you will no longer have available the tax benefits that make the Fund an attractive investment.  In such case, you have an obligation to notify the Fund or the Underwriter of such change in residency within 30 days from ceasing to be a resident of Puerto Rico and to liquidate your investment in the Shares as soon as it becomes economically feasible to do so.  Furthermore, you must agree not to purchase more Shares.

**Special Leverage Considerations**

The Fund may raise additional cash to invest by issuing preferred stock, debt securities, or other forms of leverage, representing not more than 50% of the Fund's total assets immediately after such issuance.  The Fund intends to start its leverage program after the completion of the offering of the Shares.

Use of leverage is a speculative investment technique and involves risk to a greater extent than if you invested in a non-leveraged fund, including the possibility of greater changes, up or down, of both the net asset value and the market value of your investment in the Shares. The effects of leverage may cause you to lose some or all amounts invested.  See "RISK FACTORS AND SPECIAL CONSIDERATIONS" and "SPECIAL LEVERAGE CONSIDERATIONS."

**Management of the Fund**

UBS Asset Managers of Puerto Rico ("UBS Asset Managers"), a division of UBS Trust Company of Puerto Rico ("UBS Trust Company"), will serve as the Fund's investment adviser (in such capacity, the "Investment Adviser") and will receive an annual investment advisory fee not to exceed 0.75% of the Fund's average weekly gross assets.

UBS Trust Company will also serve as the Fund's administrator (in such capacity, the "Administrator") as well as its transfer agent, registrar, dividend disbursing, and shareholder servicing agent and custodian of the Fund's assets.  As Administrator, UBS Trust Company will receive a fee of 0.15% of the Fund's average weekly gross assets.

UBS Trust Company is an affiliate of UBS Puerto Rico and UBS AG.  You should be aware that certain conflicts of interest exist among the Fund, the Investment Adviser, and its affiliates.

**Risk Factors**

• *General*.  The Fund's investments may be adversely affected by the performance of U.S., Puerto Rico, and foreign investment securities markets, which may be influenced by a number of factors, including the level of interest rates, the rate of inflation, politics, fiscal policy, and current events.  Because the Fund invests in investment securities, the Fund's net asset value may fluctuate due to market conditions, and as a result you may experience a decline in the value of your investment in the Fund and lose money.

• *Lack of Operating History*.  The Fund is a newly organized, non-diversified, closed-end management investment company with no previous operating history.  The Fund may not succeed in meeting its investment objective.

• *Interest Rate Risk*.  The value of fixed income securities such as those in which the Fund may invest generally can be expected to fall when interest rates rise and to rise when interest rates fall.  Interest rate risk is the risk that interest rates will rise, and that as a result the value of the Fund's investments will fall.  The Fund is subject to interest rate risk.  Because market interest rates are currently near their lowest levels in many years, there is a greater risk that the Fund's portfolio will decline in value.  Prices of longer term fixed income securities generally change more in response to interest rate changes than prices of shorter term fixed income securities.  Because the Fund will invest primarily in long term fixed income securities, the net asset value and market price per share of its common stock will fluctuate more in response to changes in market interest rates than if the Fund invested primarily in shorter term fixed income securities.

• *Risks of Preferred Stock*.  The Fund may invest up to 20% of its total assets in preferred stock of Puerto Rico issuers that may be rated below investment grade or that the Investment Adviser may determine to be below investment grade quality.  These securities are of lower credit quality and pose greater credit risk (risk of loss of income and principal) to the Fund than investment grade securities, and are regarded as having predominantly speculative characteristics with respect to capacity to pay dividends and redemption or liquidation payments.  Shares of preferred stock have greater payment risks than debt securities in part because issuers of preferred stock are not legally required to pay dividends on their preferred stock.  These securities may be substantially less liquid (they may have a more limited secondary market and therefore may be more difficult to sell) than other securities in which the Fund could invest, such as U.S. government securities.  These securities also have very limited voting rights and are usually redeemable at the option of the issuer.  In addition, the issuers of these securities are mostly financial institutions.  Therefore, the Fund will be more adversely affected by factors adversely affecting the financial industry than more diversified funds.

• *Geographic Concentration Risk*.  At least 67% of the Fund's total assets will be invested in securities of Puerto Rico issuers.  Consequently, the Fund is more susceptible to economic, political, regulatory or other factors adversely affecting issuers in Puerto Rico than an investment company that is not concentrated in Puerto Rico issuers.

• *Non-Diversification Risk*.  A relatively high percentage of the Fund's total assets will be invested in obligations of a limited number of Puerto Rico issuers.  Consequently, the Fund's net asset value and its yield may increase or decrease more than that of a more diversified investment company as a result of changes in the market's assessment of the financial condition and prospects of such Puerto Rico issuers.

3

• *Credit Risk*.  Credit risk is the risk that debt securities or preferred stock in the Fund's portfolio will decline in price or fail to make dividend or interest payments when due because the issuer of the security experiences a decline in its financial condition.  The Fund is subject to credit risk.  The risk is greater in the case of securities rated below investment grade, or rated in the lowest investment grade category.

• *Conflicts of Interest*.  While the Fund is subject to certain restrictions regarding transactions with affiliates, including restrictions imposed by the Commissioner of Financial Institutions, it is not registered under the U.S. Investment Company Act of 1940 and is therefore not subject to the restrictions thereof regarding transactions between the Fund and UBS Puerto Rico or its affiliates (including UBS Trust Company and UBS AG), or regarding investments in or deposits with such affiliates.  It is anticipated that the Fund will engage in transactions, such as securities purchase and sale transactions and repurchase agreement transactions, directly with UBS Puerto Rico and possibly other of its affiliates.

• *Liquidity and Restrictions on the Transfer of the Shares*.  The Shares may only be offered, sold, or otherwise transferred to Puerto Rico residents.  Shareholders who cease to be residents of Puerto Rico may no longer have available the tax benefits that make the Fund an attractive investment, and will have an obligation to liquidate their Shares as soon as it becomes economically feasible to do so.  The Shares are a new issue of securities and therefore prior to this offering there has been no market for the Shares.  No assurance can be given as to the liquidity of, or the trading market for, the Shares as a result of any activities undertaken by the Underwriter.

See "RISK FACTORS AND SPECIAL CONSIDERATIONS" and "SPECIAL LEVERAGE CONSIDERATIONS" for a more detailed description of the risks of investing in the Fund.

|  |  |
|---|---|
| **Dividends and Other Distributions; Dividend Reinvestment Plan** | The Fund intends to distribute monthly dividends of substantially all of its net investment income (which reflects amounts declared and paid as dividends on preferred stock as well as interest paid on outstanding debt securities or other forms of leverage).  The net capital gains realized by the Fund, if any, may be retained by the Fund, as permitted by Puerto Rico law, unless the Fund's Board of Directors determines that the net capital gains will also be distributed.<br><br>The Fund will establish a Dividend Reinvestment Plan under which all Shareholders will have all dividends and other distributions on their Shares paid in cash, unless such Shareholders elect to have the dividends and distributions reinvested in additional Shares. There will be no charge to participants for reinvesting dividends or other distributions. The Transfer Agent's fees for the handling of reinvestment of distributions will be paid by the Fund. |
| **Share Repurchases** | Although the Shareholders will not have the right to require the Fund to redeem their Shares, the Fund may repurchase Shares in the open market or make tender offers for its Shares at their net asset value. |
| **Taxation** | See "TAXATION" for a summary of the material Puerto Rico and U.S. tax considerations that may be relevant to prospective investors in the Fund. |

## ESTIMATED FUND EXPENSES

The following tables are intended to assist you in understanding the various costs and expenses you can expect to bear, directly or indirectly, by investing in the Shares.

**Shareholder Transaction Expenses**

Sales Load (as a percentage of the initial public offering price) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4.75%

**Annual Fund Operating Expenses (as a percentage of average weekly gross assets) [1]**

Investment Advisory Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  0.75%
Administration Fees  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  0.15%
Other Expenses [2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  0.10%

Total Annual Fund Operating Expenses [3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1.00%

---

[1]     Investment advisory and administration fees, which are indirectly paid entirely by you, will be charged as a percentage of average weekly gross assets (which include the assets purchased with the proceeds of leverage).

[2]     "Other Expenses" have been estimated for the first fiscal year of operations and include, among others, custodian and transfer agency fees, organizational expenses, fees for certain shareholder services, legal, regulatory, and accounting fees, printing costs, and registration fees.

The Fund may raise additional cash to invest by issuing preferred stock, debt securities, and other forms of leverage.  As a result of any such borrowings, the Fund will incur interest costs not reflected in the above table.   See "SPECIAL LEVERAGE CONSIDERATIONS."   Assuming borrowings in the amount of approximately 50% of the Fund's total assets, including amount borrowed at an annual interest rate (including dividends on preferred stock) of 2% payable on such leverage, and based on market rates as of the date of this Prospectus, the annual return on the assets that the Fund's portfolio must experience (net of expenses) in order to cover such interest payments would be 2%.  The actual cost of leverage (including dividends on preferred stock) will be based on market rates at the time the Fund undertakes a leveraging strategy, and such actual cost of leverage may be higher or lower than that assumed, as more fully described herein.

[3]     Investment advisory and administration fees may be voluntarily waived or reimbursed by UBS Trust Company from time to time.  There is no assurance, however, that any such waiver or reimbursement, if commenced, will be continued. However, items included under the caption "Other Expenses" will not be waived.

**Example**

  The following is intended to assist you in understanding the various costs that you will bear directly or indirectly.  The example assumes payment by the Fund of operating expenses at the levels set forth in the table above.

  You would pay the following expenses on a $10,000 investment, assuming (i) the deduction of 4.75% initial sales load at the time of purchase, (ii) a 5% annual return, (iii) all dividends and distributions reinvested at net asset value, and (iv) the deduction of the total annual Fund operating expenses, as described above, remaining the same for the years shown.

|  | One Year | Three Years | Five Years | Ten Years |
|---|---|---|---|---|
| Assuming No Leverage | $572 | $778 | $1,001 | $1,641 |
| Assuming Leverage of 50% of the Fund's total assets | $668 | $1,073 | $1,501 | $2,692 |

  This example also provides you with a means for comparison with the expense levels of other investment companies with different fee structures over varying investment periods.  To facilitate such comparison, the Fund has used a 5% annual return assumption.  **The Fund's annual return may be greater or less than 5%.  This example should not be considered a representation of future expenses, and actual expenses may be greater or less than those shown for purposes of this example.**

## RISK FACTORS AND SPECIAL CONSIDERATIONS

The main risks of investing in the Fund are described below.  **Any of these risks may cause you to lose money.**

*General.*  The Fund's investments may be adversely affected by the performance of U.S., Puerto Rico, and foreign investment securities markets, which may be influenced by a number of factors, including the level of interest rates, the rate of inflation, politics, fiscal policy, and current events.  Because the Fund invests in investment securities, the Fund's net asset value may fluctuate due to market conditions and you may experience a decline in the value of your investment in the Fund and lose money.

*Lack of Operating History.*  The Fund is a newly organized, non-diversified, closed-end management investment company with no previous operating history.  The Fund may not succeed in meeting its investment objective.

*Conflicts of Interest Risk.*  While the Fund is subject to certain restrictions regarding transactions with affiliates), including restrictions imposed by the Commissioner of Financial Institutions, it is not registered under the U.S. Investment Company Act of 1940, as amended, (the "U.S. Investment Company Act") and is therefore, not subject to the restrictions thereof regarding transactions between the Fund and UBS Puerto Rico or its affiliates (including UBS Trust Company and UBS AG), regarding investments in or deposits with such affiliates.  It is anticipated that the Fund will engage in transactions, such as securities purchase and sale transactions and repurchase agreement transactions, directly with UBS Puerto Rico and possibly other of its affiliates.  For most securities purchased by the Fund, one of those entities may be the only dealer, or one of only a few dealers, in the securities being purchased or sold by the Fund. In that event, independent sources for valuation or liquidity of a security may be limited or nonexistent.  The Fund is expected to invest a substantial portion of its total assets in those securities.  The Fund may also invest in securities issued by its affiliates, or make deposits with those affiliates.  As a result of the above transactions and other dealings, the interests of UBS Puerto Rico, an affiliate of the Investment Adviser, may conflict with those of the Fund as to the price and other terms of transactions in which they engage.  Portfolio transactions between the Fund and UBS Puerto Rico and/or its affiliates will be executed pursuant to terms and conditions comparable to those with unrelated third parties in the ordinary course of its investment activities.  In addition, the investment advisory fee payable to the Investment Adviser during periods in which the Fund is utilizing leverage will be higher than when it is not doing so because the fee is calculated as a percentage of average weekly gross assets, including assets purchased with leverage. Because the asset base used for calculating the investment advisory fee is not reduced by aggregate indebtedness incurred in leveraging the Fund, the Investment Adviser may have a conflict of interest in formulating a recommendation to the Fund as to whether and to what extent to use leverage.

UBS Asset Managers, a division of UBS Trust Company, as well as UBS Puerto Rico and their affiliates may engage, at the present or in the future, in business transactions with or related to any one of the issuers of the Fund's investment assets, or with competitors of such issuers, as well as provide them with investment banking, asset management, trust, or advisory services, including merger and acquisition advisory services.  These activities may present a conflict between any such affiliated parties and the interests of the Fund.  Any such affiliated parties may also publish or may have published research reports on one or more of such issuers and may have expressed opinions or provided recommendations inconsistent with the purchasing or holding of the securities of such issuers.  Any of these activities may affect the market value of the securities issued by them and therefore, will affect the value of the shares of the Common Stock of the Fund.  Moreover, the Investment Adviser is not registered under the U.S. Investment Advisers Act of 1940, and therefore is not subject to the restrictions imposed on investment advisers thereunder.

*Liquidity and Restrictions on the Transfer of the Shares.*  The Shares have not been registered with the U.S. Securities and Exchange Commission under the U.S. Securities Act of 1933, as amended (the "U.S. Securities Act"), and the Fund has not been registered under the U.S. Investment Company Act.  Consequently, the Shares may be offered, sold, or otherwise transferred exclusively to individuals whose principal residence is in Puerto Rico, or to corporations and other business organizations whose principal office and principal place of business are in Puerto Rico. Prior to the initial sale or subsequent transfer of the Shares, each purchaser will be required to represent in writing to the Fund, the Underwriter, or the Administrator that the above conditions to purchase are satisfied.  Appendix C to this Prospectus contains, in letter form, the substance of the representations that must be made prior to the purchase and

delivery of such shares.  Such restrictions shall remain in effect until such time as the Fund shall determine, based on an opinion of legal counsel, that they are no longer necessary in order to preserve an exemption for the Shares from the registration requirements of the U.S. Securities Act, and for the Fund under the U.S. Investment Company Act. Shareholders who cease to be residents of Puerto Rico (as described above) will no longer have available the tax benefits that make the Fund an attractive investment and will have an obligation to liquidate their Shares as soon as it becomes economically feasible to do so.

The Shares are a new issue of securities.  Therefore, prior to this offering there has been no market for the Shares. UBS Puerto Rico currently intends to maintain a market in the Shares commencing after the final closing of the initial public offering of the Shares, although it is not obligated to do so.  No assurance can be given as to the liquidity of, or the trading market for, the Shares as a result of any activities undertaken by UBS Puerto Rico.  Such purchases and sales, if commenced, may be discontinued at any time. If at any time UBS Puerto Rico (and other dealers, if any) ceases to maintain a market, the Shares will become illiquid until a market is reestablished.

*Market Price of Shares*.  The market price of the Shares will be determined by such factors as relative demand for and supply of such Shares in the market, general economic and market conditions, and other factors beyond the control of the Fund.  The Fund cannot predict whether the Shares will trade at, below, or above net asset value or their respective offering price.  There may be few or no market-makers in the Shares.  UBS Puerto Rico may be the only firm maintaining a market in the Shares, and from time to time, due to regulatory constraints or otherwise, UBS Puerto Rico may cease to maintain a market in the Shares, which could result in illiquidity of the Shares.  Shares of closed-end investment companies such as the Fund frequently trade at prices lower than their net asset value.  This characteristic of shares of closed-end funds is a risk separate and distinct from the risk that the Fund's net asset value may decrease. Net asset value will be reduced following the offering of the Shares by the amount of the underwriting discount and the offering expenses paid by the Fund.

Puerto Rico investment companies that are similar to the Fund have sometimes traded at a price equal to or greater than their net asset value.  This happens in part because the market price of the Shares reflects the dividend yield on the Shares.  When the yield on the net asset value per share is higher than yields generally available in the market for comparable securities, the market price will tend to reflect this by trading higher than the net asset value per share to adjust the yield to a comparable market rate.  There is no assurance, however, that this will continue in the future or that the experience of the Fund will replicate that of other similar Puerto Rico investment companies.  Accordingly, the Shares may not be suitable to all investors as they are designed primarily for long-term investors, and investors in the Shares should not view the Fund as a vehicle for trading purposes.

*Interest Rate Risk*.  The value of fixed income securities such as those in which the Fund may invest generally can be expected to fall when interest rates rise and to rise when interest rates fall. Interest rate risk is the risk that interest rates will rise, and that as a result the value of the Fund's investments will fall. The Fund is subject to interest rate risk.  Because interest rates are currently near their lowest levels in many years, there is a greater risk that interest rates will rise and that as a result the Fund's portfolio will decline in value.  Prices of longer term fixed income securities generally change more in response to interest rate changes than prices of shorter term fixed income securities. Because the Fund will invest primarily in long term fixed income securities, the net asset value and market price per share of its common stock will fluctuate more in response to changes in market interest rates than if the Fund invested primarily in shorter term fixed income securities.  In addition, during periods of rising interest rates, the average life of certain types of securities may be extended because of the right of the issuer to defer payments or make slower than expected principal payments.  This may lock in a below market interest rate, increase the security's duration (the estimated period until the security is paid in full) and reduce the value of the security.  This is known as extension risk. The Fund is subject to extension risk.  Conversely, during periods of declining interest rates, the issuer of a security may exercise its option to prepay principal earlier than scheduled in order to refinance at lower interest rates, forcing the Fund to reinvest in lower yielding securities.  This is known as prepayment risk.  The Fund is subject to prepayment risk.  This tendency of issuers to refinance debt with high interest rates during periods of declining interest rates may reduce the positive effect of declining interest rates on the market value of the Fund's securities.  Finally, the Fund's use of leverage by the issuance of preferred stock, debt securities and other instruments, as discussed below, may increase the risks described above.  See "SPECIAL LEVERAGE CONSIDERATIONS."

8

*Credit Risk*.  Credit risk is the risk that debt securities or preferred stock in the Fund's portfolio will decline in price or fail to make dividend or interest payments when due because the issuer of the security experiences a decline in its financial condition.  The risk is greater in the case of securities that are rated below investment grade ("BB" or lower in the case of Standard & Poor's and Fitch, and "Ba" or lower  in the case of Moody's).  The Fund is authorized to invest up to 20% of its total assets in preferred stock of Puerto Rico issuers that may be rated below investment grade at the time of acquisition or that the Investment Adviser may determine to be below investment grade quality.  These securities are of lower credit quality and  pose greater credit risk (risk of loss of income and principal) to the Fund than investment grade securities.  They involve substantial risk of loss, are considered highly speculative with respect to the issuer's ability to pay dividends and any required redemption or liquidation payments and are more susceptible to default or decline in market value due to adverse economic and business developments than more highly rated securities.   In addition, investment grade securities rated in the lowest investment grade category (BBB in the case of Standard & Poor's and Fitch and Baa in the case of Moody's) are considered to have some speculative characteristics, and changes in economic conditions are more likely to lead to a weakened capacity to pay interest and repay principal than is the case with higher grade securities.  The market value of speculative securities is also more sensitive to changes in interest rates than the market value of more highly rated securities, and may be adversely affected by negative perceptions of the market for speculative securities.  These securities may also be substantially less liquid (they may have a more limited secondary market and may therefore be more difficult to sell) than more highly rated securities.  A decline in the financial condition of certain issuers of fixed income securities may also result in such issuers seeking protection from creditors under bankruptcy, insolvency, and other laws affecting the rights and remedies of creditors, or in creditors seeking such protection on behalf of the issuer.  This may result in delays and costs to the Fund.

The Investment Adviser has the responsibility of determining whether an unrated security is of a credit quality comparable to that of a security rated investment grade by a nationally recognized statistical rating organization, and can therefore be purchased by the Fund without regard to the 20% limitation on securities rated below investment grade.  To the extent the Investment  Adviser incorrectly assesses the credit quality of an unrated security, the Fund will be exposed to a greater degree of credit risk.

*Risks of Preferred Stock*.  Investments in preferred stock present certain special risks.  One of them is that the issuers of preferred stock are not legally required to pay dividends when scheduled, even if they have sufficient funds to do so, and therefore these securities have greater payment risk than other securities in which the Fund may invest.  In the case of cumulative preferred stock, missed dividends only have to be paid upon the liquidation of the company, and only after payment of the company's creditors.  In the case of non-cumulative preferred stock, missed dividends never have to be paid.  (However, the issuer is normally prohibited from paying dividends on its common stock unless all or some of its preferred dividends have been paid.)  Preferred stock is subordinated in right of payment to all other creditors of the issuer, and therefore is subject to greater credit risk than debt instruments.  Also, holders of preferred stock usually have no voting rights, except in very limited circumstances.  Shares of preferred stock may be substantially less liquid (they may have a more limited secondary market and may therefore be more difficult to sell) than other securities in which the Fund could invest, such as U.S. government securities.  Shares of preferred stock are usually redeemable at the option of the issuer.  As with any fixed income security, a redemption may negatively impact the return of the security to the holder.  The Fund may invest up to 20% of its total assets in preferred stock of Puerto Rico issuers (which may be unrated or rated below investment grade).

*Fixed Income Securities Generally*.  The yield on fixed income securities such as those in which the Fund may invest depends on a variety of factors, including general market conditions for such securities, the financial condition of the issuer, the size of the particular offering, and the maturity, credit quality and rating of the security.  Generally, the longer the maturity of those securities, the higher its yield and the greater the changes in its yields both up and down.  The market value of fixed income securities normally will vary inversely with changes in interest rates.  Such changes in the Fund's net asset value, in particular, also might affect the price of the Shares.  The unique characteristics of certain types of securities may also make them more sensitive to changes in interest rates.

*Political Risk*.  Political or regulatory developments in Puerto Rico and in the United States could adversely affect the tax status of dividends and interest paid on the Fund's securities.  These developments could also cause the value of the Fund's investments to fall.

*Geographic Concentration Risk*.  The Fund is exposed to certain risks resulting from the reduced geographic diversification of its portfolio.  The Fund's assets are invested primarily in securities of Puerto Rico issuers.  Consequently, the Fund in general is more susceptible to economic, political, regulatory or other factors adversely affecting issuers in Puerto Rico than an investment company that is not concentrated in Puerto Rico issuers.  Also, the Fund's ability to achieve its investment objective and to comply with applicable law depends on the availability of Puerto Rico obligations.  If those obligations are unavailable or are only available at a price unreasonably above their market value or at interest rates inconsistent with the Fund's investment objective, it may harm the Fund's performance.

*Non-Diversification Risk*.  A relatively high percentage of the Fund's total assets will be invested in obligations of a limited number of Puerto Rico issuers.  Consequently, the Fund's net asset value and its yield may increase or decrease more than that of a more diversified investment company as a result of changes in the market's assessment of the financial condition and prospects of such Puerto Rico issuers.  The Fund will also be more susceptible to any single economic, political, or regulatory occurrence in Puerto Rico than a more widely diversified fund.

*Repurchase Agreement Risk*.  If a repurchase agreement counterparty defaults, the Fund may suffer time delays and incur costs or possible losses in connection with the disposition of the securities underlying the repurchase agreement.  In the event of a default, instead of the contractual fixed rate of return, the rate of return to the Fund will depend on intervening fluctuations of the market values of the underlying securities and the accrued interest thereon.  In such an event, the Fund would have rights against the counterparty for breach of contract with respect to any losses resulting from those market fluctuations.

*Municipal Obligations Risk*.  Certain of the municipal obligations in which the Fund may invest present their own distinct risks.  These risks may depend, among other things, on the financial situation of the government issuer, or in the case of industrial development bonds and similar securities, on that of the entity supplying the revenues that are intended to repay the obligations.  It is also possible that, as a result of litigation or other conditions, the power or ability of issuers or those other entities to meet their obligations for the repayment of principal and payment of interest may be materially and adversely affected.

*Mortgage-Backed Securities Risk*.  Mortgage-backed securities, in general, differ from investments in traditional debt securities in that, among other things, principal may be prepaid at any time due to prepayments by the obligors on the underlying obligations.  As a result, the Fund may receive principal repayments on these securities earlier or later than anticipated by the Fund.  In the event of repayments that are received earlier than anticipated, the Fund may be required to reinvest such repayments at rates that are lower than the anticipated yield of the prepaid obligation.  The rate of prepayments is influenced by a variety of economic, geographic, demographic and other factors, including prevailing mortgage interest rates, local and regional economic conditions and home mortgage mobility.  Generally, however, prepayments will increase during periods of declining interest rates and decrease during periods of rising interest rates.  The decrease in the rate of prepayments during periods of rising interest rates results in the extension of the duration of mortgage-backed securities, which makes them more sensitive to changes in interest rates and more likely to decline in value (this is known as extension risk).  Since a substantial portion of the assets of the Fund may be invested in mortgage-backed securities, the Fund may be subject to these risks to a significant degree.

*CMO Risk*.  Collateralized mortgage obligations or "CMOs" exhibit similar risks to those of mortgage-backed securities but also present certain special risks.  CMO classes may be specially structured in a manner that provides a variety of investment characteristics, such as yield, effective maturity and interest rate sensitivity.  As market conditions change, however, particularly during periods of rapid or unanticipated changes in interest rates, the ability of a CMO class to provide the anticipated investment characteristics and performance may be significantly reduced.  These changes may result in volatility in the market value, and in some instances reduced liquidity, of the CMO class.

*Asset-Backed Securities Risk*.  Asset-backed securities present risks similar to those of mortgage-backed securities.  However, in the case of many asset-backed securities, the prepayment rates on the underlying assets have historically been less influenced by market interest rate fluctuations and therefore, have been more stable.  The frequent absence of a government guarantee creates greater exposure to the credit risk on the underlying obligations and depending on the structure, the credit risk of the sponsor of such obligations.

*Risk of Concentration in Financial Sector*.  As mentioned above, the Fund may invest up to 20% of its total assets in preferred stock of Puerto Rico issuers.  Most of the issuers of preferred stock in Puerto Rico are bank holding companies.  Therefore, the Fund will be more adversely affected by factors adversely affecting the financial services sector than more diversified funds. These factors include extensive regulation, restrictions on their ability to enter into new lines of business or expand in other jurisdictions, sensitivity to interest rate changes, and sensitivity to changes in the stock market.

*Illiquid Securities*.  Illiquid securities are securities that cannot be sold within a reasonable period of time, not to exceed seven days, in the ordinary course of business at approximately the amount that the Fund has valued the securities.  There presently are a limited number of participants in the market for certain Puerto Rico securities or other securities or assets that the Fund may own.  That and other factors may cause certain securities to have periods of illiquidity. Illiquid securities include, among other things, securities subject to legal or contractual restrictions on resale that hinder the marketability of the securities.  There are no limitations on the Fund's investment in illiquid securities. The Fund may also continue to hold, without limitation, securities or other assets that become illiquid after the Fund invests in them.  To the extent the Fund owns illiquid securities or other illiquid assets, the Fund may not be able to sell them easily, particularly at a time when it is advisable to do so to avoid losses.  Certain of the securities in which the Fund intends to invest, such as preferred stock of Puerto Rico issuers, may be substantially less liquid than other types of securities in which the Fund may invest.  Illiquid securities may trade at a discount from comparable, more liquid investments.

*Valuation Risk*.  There may be few or no dealers making a market in certain securities owned by the Fund, particularly with respect to securities of Puerto Rico issuers including, but not limited to, investment companies. Dealers making a market in those securities may not be willing to provide quotations on a regular basis to the Fund's Investment Adviser.  It may therefore be particularly difficult to value those securities.  When market quotations for securities held by the Fund are not readily available from any such independent dealers, the Fund's administrator will be responsible for obtaining quotations for such securities from various sources, including UBS Puerto Rico.  As a result, the interests of UBS Puerto Rico may conflict with those of the Fund as to the price and other terms of transactions among them.

*Special Risks of Hedging Strategies*.  The Fund may use a variety of derivative instruments including securities options, financial future contracts, options on future contracts and other interest rate protection transactions such as swap agreements, to attempt to hedge its portfolio of assets and enhance its return.  Successful use of most derivative instruments depends upon the Investment Adviser's ability to predict movements of the overall securities and interest rate markets.  There can be no assurance that any particular hedging strategy will succeed, or that the Fund will employ such strategy with respect to all or any portion of its portfolio.  Some of the derivative strategies that the Fund may use to enhance its return are riskier than its hedging transactions and have speculative characteristics.  Such strategies do not attempt to limit the Fund's risk of loss.  See "Appendix F – Hedging and Related Income Strategies."

*Derivative Instruments*.  In order to attempt to hedge various portfolio positions or to enhance its return, the Fund may invest up to 5% of its total assets in certain instruments which are or may be considered derivatives.  Subject to the approval of the Fund's Board of Directors (the "Board of Directors"), such 5% limit may be exceeded only for the purpose of hedging. Derivative instruments, because of their increased volatility and potential leveraging effect (without being subject to the Fund's leverage limitations ), may adversely affect the Fund.  For example, investments in indexed securities, including, among other things, securities linked to an equities or commodities index and inverse floating rate securities, may subject the Fund to the risks associated with changes in the particular indices, which may include reduced or eliminated interest payments and losses of invested principal.  Such investments, in effect, may also be leveraged, thereby magnifying the risk of loss.  Even where such derivative investments are used for hedging purposes, there can be no assurance that the hedging transactions will be successful or will not result in losses.  If the Fund invests in derivative instruments, it could lose more than the principal amount invested.  For example, utilization of options and futures transactions involves the risk of imperfect correlation in movements in the price of such options and futures and the movements in the price of the securities or interest rates which are the subject of the hedge.  Municipal derivatives may also be subject to the same risks as floating rate municipal obligations generally, as well as risks of adverse tax determinations, or in the case of municipal derivatives used for hedging purposes, risks similar to those for other hedging strategies.

*Transactions with Counterparties*.  The Fund will engage in swap and other financial transactions directly with other counterparties. This subjects the Fund to the credit risk that a counterparty will default on an obligation to the Fund. Such a risk contrasts with transactions done through exchange markets, wherein credit risk is reduced through the collection of variation margin and through the interposition of a clearing organization as the guarantor of all transactions. Clearing organizations transform the credit risk of individual counterparties into the more remote risk of the failure of the clearing organization.

*Securities Lending*.  Securities lending involves the risk that there may be delay in recovery of securities or even loss of rights in the collateral, among other things, should the borrower of the securities fail financially or become insolvent.

*Changes in Applicable Law.*  Legislation affecting Puerto Rico Securities, assets other than Puerto Rico Securities, Puerto Rico and U.S. investment companies, taxes, and other matters related to the business of the Fund are continually being considered by the Puerto Rico Legislature and the U.S. Congress.  Moreover, the determinations made and the waivers and rulings granted by the Office of the Commissioner of Financial Institutions (the "Commissioner of Financial Institutions") to the Fund do not constitute a precedent binding on the Commissioner of Financial Institutions. There can be no assurance that legislation enacted or regulations promulgated after the date hereof will not have an adverse effect on the operations of the Fund, the economic value of the Shares, or the tax consequences of the acquisition or redemption of Shares.

## THE FUND

The Fund is a newly-organized, non-diversified, closed-end management investment company. It is a corporation organized under the laws of the Commonwealth of Puerto Rico and will operate as a registered investment company under the Puerto Rico Investment Companies Act. The Fund's principal office is located at American International Plaza, Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918, and its telephone number is (787) 773-3888.

## THE OFFERING

The Fund is offering shares of its common stock through UBS Puerto Rico. The Underwriter will commit to purchase the Shares at several closings to be held in San Juan, Puerto Rico. It is anticipated that the initial closing will take place on or about July 31, 2003 (the "Initial Closing"), and that several closings will take place at monthly intervals thereafter. The Fund is initially offering the number of Shares set forth in the cover page of this prospectus, but it may increase the number of Shares offered to the public at any time. The Underwriter will be granted an option to purchase additional Shares solely to cover over-allotments.

The public offering price will be the greater of (i) $10.00 or (ii) the then current net asset value per Share plus the applicable sales load.

The minimum number of Shares an investor may purchase is 100.

## OFFERING LIMITED TO PUERTO RICO RESIDENTS;
## RESTRICTIONS ON TRANSFER OF THE SHARES

The Shares have not been registered under the U.S. Securities Act of 1933, or under the securities laws of any other state or jurisdiction. The Fund is not registered under the U.S. Investment Company Act of 1940. The Shares are being offered exclusively to individuals who have their principal residence in Puerto Rico and to corporations and other business organizations that have their principal office and principal place of business in Puerto Rico (collectively, "Puerto Rico Residents"). The Shares may only be subsequently sold, pledged, hypothecated, or otherwise transferred to Puerto Rico Residents.

All purchasers and transferees of the Shares will be required to deliver to the Underwriter or a dealer a letter of representation in the form of Appendix C attached to this Prospectus in which such purchaser or transferee represents that it is a Puerto Rico Resident. The Underwriter and any dealers will be contractually obligated to the Fund to obtain such letter of representation in proper form. Any transfer of the Shares to a transferee who has not so provided such a letter will be null and void.

Shareholders who cease to be Puerto Rico Residents will no longer have available the tax benefits that make the Fund an attractive investment. In such case, within 30 days from ceasing to be Puerto Rico Residents, such Shareholders have an obligation to notify an Underwriter or dealer and liquidate their investment in the Shares as soon as it becomes economically feasible to do so. Furthermore, such Shareholders agree not to purchase more Shares. These restrictions shall remain in effect until such time as the Fund shall determine, based on an opinion of counsel, that the restrictions are no longer necessary in order to preserve an exemption from the registration requirements of the U.S. Securities Act and the U.S. Investment Company Act.

## USE OF PROCEEDS

The proceeds to the Fund of this public offering, assuming that the Fund issues only the number of Shares specified on the cover page of this prospectus, is set forth on the cover page of this prospectus, before payment of offering expenses (which are not expected to exceed $300,000), including legal counsel fees.  Organizational expenses, which will also be paid by the Fund in the first year of operations, are estimated at $50,000.  Such proceeds will be invested in accordance with the Fund's investment objective and policies on or before the first anniversary of the Fund's registration as an investment company with the Commissioner of Financial Institutions.  Pending such investment, such proceeds may be invested temporarily in cash and short-term U.S. Government Securities (as used herein, "U.S. Government Securities" includes direct obligations of the U.S., as well as securities issued by agencies and instrumentalities of the U.S.), and other securities selected by the Fund's investment adviser .

## INVESTMENT OBJECTIVE AND POLICIES

The Fund's investment objective is to provide you with current income, consistent with the preservation of capital.  **There is no assurance that the Fund will achieve its investment objective**.

The Fund will normally invest at least 67% of its total assets in taxable and tax-exempt securities issued by Puerto Rico issuers (the "Puerto Rico Assets").  These include securities issued by the Commonwealth of Puerto Rico and its political subdivisions, agencies, and instrumentalities, Puerto Rico mortgage-backed and asset-backed securities, corporate obligations and preferred stock of Puerto Rico entities, and other securities that the Investment Adviser may select, consistent with the Fund's investment objective and policies. The Fund may invest up to 33% of its total assets in non-Puerto Rico securities, including taxable and tax-exempt securities issued or guaranteed by the U.S. Government, its agencies and instrumentalities, non-Puerto Rico mortgage-backed and asset-backed securities, corporate obligations or preferred stock of non-Puerto Rico issuers, municipal securities of issuers within the U.S., and other non-Puerto Rico securities which the Investment Adviser may select, consistent with the Fund's investment objective and policies.

At least 80% of the Fund's total assets will be invested in securities that, at the time of purchase (i) are rated in one of the four highest investment categories (generally considered to be "investment grade") by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P" - BBB or better), Fitch Ratings ("Fitch" - BBB or better), or Moody's Investors Service, Inc. ("Moody's" - Baa or better), or have received an equivalent rating from another nationally recognized statistical rating organization (a "Rating Organization"), or (ii) if not so rated, are in the opinion of the Investment Adviser of a credit quality comparable to such rated obligations (i.e., those that are backed by a letter of credit or other forms of corporate or governmental guarantees, the issuer of which has received an equivalent short-term or long-term credit rating, as applicable).  See Appendix D for further information regarding S&P's, Fitch's, and Moody's ratings.  The Fund may invest up to 20% of its total assets in preferred stock of Puerto Rico issuers that, at the time of purchase (i) may be rated below investment grade by S&P (BB or lower), Fitch (BB or lower), or Moody's (Ba or lower), or have received an equivalent rating from another Rating Organization, or (ii) if not so rated, are not in the opinion of the Investment Adviser of investment grade credit quality,  provided (A) the issuer of such preferred stock has senior unsecured debt rated investment grade by a Rating Organization or (B) if such issuer does not have a senior unsecured debt rating, the Fund's Investment Adviser determines that such issuer's senior unsecured debt is of comparable credit quality.  The Fund will not invest in debt securities rated below investment grade, and will not invest in unrated debt securities unless the Investment Adviser determines that such unrated debt securities are of investment grade quality.  The Fund will not make additional investments in lower-rated securities if, at the time of a proposed purchase, more than 20% of its total assets would be invested in such lower-rated securities.  Changes in economic conditions or other circumstances are more likely to lead to a weakened capacity for issuers of lower-rated securities to make principal and interest payments than is the case for issuers of higher grade securities.  Subsequent to its purchase by the Fund, an issue of securities may cease to be rated or its rating may be reduced below the minimum rating required for purchase by the Fund.  The Investment Adviser will consider such an event in determining whether the Fund should continue to hold the obligation.  In making such a determination, the Investment Adviser will consider

14

factors such as its assessment of the credit quality of the issuer of the security and the price at which the security could be sold.

As of the date of this prospectus, most preferred shares of Puerto Rico issuers available in the market paid fixed dividend rates on a monthly basis and were non-cumulative, non-convertible, non-voting, and perpetual, redeemable only at the option of the issuer after a certain period of time.   A significant percentage of these preferred securities are unrated.

The average maturity and duration of the Fund's portfolio securities will vary based upon the Investment Adviser's assessment of economic and market conditions.   The net asset value of the common shares of a closed-end investment company, such as the Fund, which invests primarily in fixed-income securities, changes as the general level of interest rates fluctuates.   When interest rates decline, the value of fixed-income securities can be expected to rise. Conversely, when interest rates rise, the value of fixed-income securities can be expected to decline.   The prices of longer-term securities generally fluctuate more in response to interest rate changes than the prices of short-term or medium-term securities.   These changes in net asset value might be greater in the case of an investment company having a leveraged capital structure, as the one proposed for the Fund.   See "SPECIAL LEVERAGE CONSIDERATIONS."

The Fund's investment objective and fundamental policies may not be changed unless authorized by the holders of a supermajority (or in some cases, a simple majority) of the Fund's outstanding Shares and by the Commissioner of Financial Institutions.   All other investment policies and limitations, however, subject to applicable Puerto Rico law, may be changed by the Board of Directors without the approval of either the Shareholders or the Commissioner of Financial Institutions.  See "INVESTMENT RESTRICTIONS."

Set forth below is a description of the various types of securities in which the Fund may invest.

*Mortgage-Backed Securities*.  Mortgage-Backed Securities represent direct or indirect participations in, or are secured by and are payable from, mortgage loans secured by real property ("Mortgage-Backed Securities").  Investors in Mortgage-Backed Securities typically receive interest and principal on the underlying mortgage loans (and/or any related credit support).  The Fund's investments in Mortgage-Backed Securities will be considered as Puerto Rico Assets when the underlying assets are substantially comprised of mortgages over real property located within Puerto Rico ("Puerto Rico Mortgage-Backed Securities").

Investments in Mortgage-Backed Securities will include those issued or guaranteed by the Government National Mortgage Association ("GNMA"), Federal National Mortgage Association ("FNMA") or Federal Home Loan Mortgage Corporation ("FHLMC"), as well as Mortgage-Backed Securities which are not guaranteed or issued by GNMA, FNMA, FHLMC, or any other government agency ("Private Label Mortgage-Backed Securities"), and in either case may include collateralized mortgage obligations ("CMOs").  Private Label Mortgage-Backed Securities represent a beneficial interest in a privately sponsored trust or other entity, the assets of which are mortgage loans or GNMA, FNMA, FHLMC, or other Mortgage-Backed Securities, including CMOs.

GNMA Mortgage-Backed Securities include securities which are backed by mortgage loans insured by the Federal Housing Administration or guaranteed by the Veterans Administration, and which consist of mortgage-backed certificates with respect to pools of such mortgages guaranteed as to the timely payment of principal and interest by the GNMA.  That guarantee is backed by the full faith and credit of the U.S.

FNMA Mortgage-Backed Securities represent a beneficial ownership interest in one or more pools of mortgage loans, which may be insured by the Federal Housing Administration or the Veterans Administration, or which may not be insured or guaranteed by any governmental agency.  FHLMC Mortgage-Backed Securities represent direct or indirect participations in, and are payable from, conventional residential mortgage loans.  FNMA's and FHLMC's obligations with respect to their Mortgage-Backed Securities are not backed by the full faith and credit of the U.S., but

are considered to present minimal credit risks.  CMOs are multiple-class Mortgage-Backed Securities.  Some CMOs are directly supported by other CMOs, which in turn are supported by pools of mortgage loans.  Investors in such securities typically receive payments out of the interest and principal on the underlying mortgage loans.  The portions of these payments that investors receive, as well as the priority of their rights to receive payments, are determined by the specific terms of the CMO class.  CMOs involve special risks.  See "RISK FACTORS AND SPECIAL CONSIDERATIONS — Mortgage-Backed Securities."  The type of GNMA, FNMA, FHLMC and certain other Mortgage-Backed Securities in which the Fund may invest are described in more detail in "APPENDIX A — Mortgage-Backed Securities."  Not all types of Mortgage-Backed Securities are currently available in Puerto Rico.

*U.S. Government Securities*.  The Fund may invest in U.S. Government securities.  These include securities that are issued or guaranteed by the U.S. Government, such as Treasury bills, Treasury notes, and Treasury bonds, or that are issued or guaranteed by its agencies or instrumentalities, such as obligations of the Federal Home Loan Bank, which are supported by the right of the issuer to borrow from the U.S. Treasury, and obligations of the Federal Intermediate Credit Banks, which are supported only by the credit of the issuer.  The Fund may also invest in repurchase agreements secured by such securities.

*Municipal Obligations*.  Municipal Obligations are debt obligations or similar securities issued by or on behalf of Puerto Rico, a State of the U.S., or any of their respective political subdivisions, organizations, agencies or instrumentalities, or by multi-state agencies or authorities.  Municipal Obligations are issued for various public purposes, including construction of public or privately-operated facilities, such as airports, bridges, hospitals, housing, mass transportation, schools, streets and water and sewer works.  Other public purposes for which Municipal Obligations may be issued include refinancing outstanding obligations and obtaining funds for general operating expenses and for loans to other public institutions and facilities.  The types of Municipal Obligations in which the Fund may invest, and certain of the risks attached thereto, are described in Appendix B to this Prospectus.  Not all of such types of Municipal Obligations are currently available in Puerto Rico.

*Asset-Backed Securities*.  The Fund may invest in various types of asset-backed securities ("Asset-Backed Securities").  The securitization techniques used in the context of Asset-Backed Securities are similar to those used for Mortgage-Backed Securities.  The receivables supporting Asset-Backed Securities presently are primarily home equity mortgage loans and automobile and credit card receivables, but may also consist of other types of obligations.  Asset-Backed Securities and the underlying receivables are not generally insured or guaranteed by any government agency.  However, in certain cases, such securities are collateralized by loans guaranteed by the U.S. Small Business Administration ("SBA").  The SBA is an independent agency of the United States.

The SBA guarantees the payment of principal and interest on portions of loans made by private lenders to certain small businesses.  The loans are generally commercial loans such as working capital loans and equipment loans.  The SBA is authorized to issue from time to time, through its fiscal and transfer agent, SBA-guaranteed participation certificates evidencing fractional undivided interests in pools of these SBA-guaranteed portions of loans made by private lenders.  The SBA's guarantee of such certificates, and its guarantee of a portion of the underlying loan, are backed by the full faith and credit of the United States.

Asset-Backed Securities will be considered Puerto Rico Asset-Backed Securities when the securitization vehicle is organized under the laws of Puerto Rico, or regardless of where organized, when a majority of the underlying assets are obligations of Puerto Rico Residents.

*Preferred Stock*.  Preferred stock generally has priority over common stock with respect to payment of dividends and upon liquidation, but does not have the seniority of a debt instrument in an issuer's capital structure in terms of claims to corporate income and liquidation payments.  Preferred stock may have a fixed dividend rate and may not participate in any profits of the issuer above such dividend rate, in which case it is referred to as "non-participating," or it may participate in some or all of the profits of the issuer, in which case it is referred to as "participating."  Preferred stock may be perpetual, with no mandatory redemption date, or issued with a mandatory redemption date.  It may also

be callable or redeemable at the option of the issuer after a certain period of time.  Issuers of preferred stock are not required to pay dividends on the preferred stock, even if they have sufficient funds to pay dividends, although they are usually prohibited from paying dividends on their common stock unless all or some preferred dividends have been paid. Preferred dividends may be "cumulative" or "non-cumulative."  If dividends are cumulative and they are not declared and paid at their regularly scheduled time, such dividends must generally be paid when the issuer is liquidated, before any assets may be distributed to holders of the issuer's common stock.  If dividends are non-cumulative, they never have to be paid if they are not declared.  (However, as mentioned above, the issuer may be prohibited from paying dividends on their common stock unless all or some preferred dividends have been paid.)  Holders of preferred stock do not have the right to precipitate bankruptcy filings or collection activities in the event of missed dividend payments. Preferred stock may be convertible into common stock of the issuer or into some other security, or it may non-convertible.  Holders of preferred stock usually have no voting rights, except in cases where preferred dividends have been unpaid for a certain period, in which case holders of preferred stock usually have the right to elect certain representatives to the board of directors of the issuer.  Most of the preferred stock of Puerto Rico issuers currently available in the market is non-cumulative, non-voting, non-convertible, and non-participating, and pays dividends at a fixed dividend rate on a monthly basis.  Most of the preferred stock of Puerto Rico issuers currently available in the market is issued by bank holding companies.

*Corporate Obligations*.  Corporate obligations are debt obligations or similar securities issued by or on behalf of corporations.  See "Appendix D – Ratings of Securities" and "Appendix E – Certain Other Types of Investments."

## OTHER INVESTMENT PRACTICES

Certain of the other investment practices in which the Fund may engage are described below.  If, as the Fund currently intends, the Fund issues preferred stock, debt securities, and other forms of leverage and seeks to obtain a rating for such preferred stock, debt securities, and other forms of leverage, any Rating Organization issuing such rating may, as a condition thereof, impose additional asset coverage or other requirements, which may restrict the Fund's ability to engage in these investment practices.

**When-Issued Securities and Delayed Delivery Transactions**

The purchase of securities on a when-issued or delayed delivery basis involves the risk that, as a result of an increase in yields available in the marketplace, the value of the securities purchased will decline prior to the settlement date.  The sale of securities for delayed delivery involves the risk that the prices available in the market on the delivery date may be greater than those obtained in the sale transaction.  At the time the Fund enters into a transaction on a when-issued or delayed delivery basis, it will segregate with the Custodian (as defined herein) cash or liquid instruments with a value not less than the value of the when-issued or delayed delivery securities.  The value of these assets will be monitored daily to ensure that their marked-to-market value will at all times exceed the corresponding obligations of the Fund.  There is always a risk that the securities may not be delivered, and the Fund may incur a loss.

**Short-Term Temporary Investments**

Subject to the requirements of the Commissioner's Ruling, if, in the opinion of the Investment Adviser, no suitable Puerto Rico Securities, other Municipal Obligations, or long-term U.S. Government Securities are available, or if the Investment Adviser believes unusual circumstances warrant a defensive posture, the Fund may temporarily commit all or any portion of its assets to short-term instruments.  Such instruments may include securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities, commercial paper rated at least A-1 by S&P, Prime-1 by Moody's or F1 by Fitch, bank certificates of deposit, bankers' acceptances and Repurchase Agreements (as defined herein) secured by any of the foregoing.

**Dollar Rolls and Reverse Repurchase Agreements**

The Fund may enter into dollar rolls, in which the Fund sells mortgage-backed or other securities for delivery in the current month and simultaneously contracts to purchase substantially similar securities on a specified future date. In the case of dollar rolls involving mortgage-backed securities, the mortgage-backed securities that are purchased will be of the same type and will have the same interest rate as those sold, but will be supported by different pools of mortgages. The Fund forgoes principal and interest paid during the roll period on the securities sold in a dollar roll, but the Fund is compensated by the difference between the current sales price and the lower price for the future purchase as well as by any interest earned on the proceeds of the securities sold. The Fund could also be compensated through the receipt of fee income equivalent to a lower forward price. The Fund may also enter into reverse repurchase agreements in which a member bank of the Federal Reserve System or a securities dealer who is a member of a national securities exchange or is a market-maker in U.S. Government Securities purchases portfolio securities from the Fund, coupled with an agreement to resell them to the Fund at a specific date and price (a "Reverse Repurchase Agreement").

Dollar rolls and Reverse Repurchase Agreements will generally be considered to be leverage and accordingly, will be subject to the Fund's limitations on leverage, which will restrict the aggregate of such transactions, together with the issuance of preferred stock, debt securities, and other forms of leverage, to 50% of the Fund's total assets. However, dollar rolls and Reverse Repurchase Agreements will not be subject to such limitation if a separate account is established and maintained with respect to the value of the Fund's commitments thereunder. In addition, certain of the dollar rolls and Reverse Repurchase Agreements entered into by the Fund will be arbitrage transactions in which the Fund will maintain an offsetting position in securities or Repurchase Agreements (as defined herein) that mature on or before the settlement date on the related dollar roll or Reverse Repurchase Agreement. The Investment Adviser believes that such arbitrage transactions do not present the risks to the Fund that are associated with other types of leverage.

The market value of securities sold under Reverse Repurchase Agreements typically is greater than the proceeds of the sale, and accordingly, the market value of the securities sold is likely to be greater than the value of the securities in which the Fund invests those proceeds. Reverse Repurchase Agreements involve the risk that the buyer of the securities sold by the Fund might be unable to deliver them when the Fund seeks to repurchase such securities. In the event the buyer of securities under a Reverse Repurchase Agreement files for bankruptcy or becomes insolvent, such buyer or its trustee or receiver may receive an extension of time to determine whether to enforce the Fund's obligation to repurchase the securities, and the Fund's use of the proceeds of the Reverse Repurchase Agreement may effectively be restricted pending such decision.

**Repurchase Agreements**

The Fund may use Repurchase Agreements. Repurchase Agreements consist of transactions in which the Fund purchases securities from a member bank of the Federal Reserve System or a securities dealer who is a member of a national securities exchange or is a market-maker in U.S. Government Securities and simultaneously commits to resell the securities to such original seller at an agreed-upon date and price reflecting a market rate of interest unrelated to the coupon rate or maturity of the purchased securities. Although Repurchase Agreements carry certain risks not associated with direct investments in securities, including possible declines in the market value of the underlying securities and delays and costs to the Fund if the other party to the Repurchase Agreement becomes bankrupt, the Fund intends to enter into Repurchase Agreements only with banks and dealers in transactions believed by the Investment Adviser to present minimum credit risks. In addition, each Repurchase Agreement must be collateralized at least at 102% with U.S. Government or other appropriate liquid high grade securities, held at a third party custodian, and marked-to-market daily.

**Other Practices**

*Call Rights*.  The Fund may purchase a Puerto Rico Security or other Municipal Obligation issuer's right to call all or a portion of such obligation for mandatory tender for purchase (a "Call Right").  A holder of a Call Right may exercise such right to require a mandatory tender for the purchase of related obligations, subject to certain conditions. A Call Right that is not exercised prior to the maturity of the related obligation will expire without value.  The economic effect of holding both a Call Right and the related obligation is identical to holding an obligation as a non-callable security.

*Options and Futures*.  The Fund may use securities options (both exchange-traded and over-the-counter) to attempt to enhance income and may also attempt to reduce the overall risk of its investments (i.e., hedge) by using securities options, financial futures contracts and other interest rate protection transactions such as swap agreements. However, the Fund will not enter into financial futures contracts or options thereon unless UBS Puerto Rico qualifies for an exclusion or exemption or comparable relief from applicable registration requirements contained in the regulations administered by the U.S. Commodity Futures Trading Commission.  See Appendix E to this Prospectus, for a more complete discussion of the Fund's types of derivative and related income strategies and the risks thereof.

*Short Sales*.  The Fund may engage in short sales of securities "against the box" to defer realization of gains or losses for tax or other purposes.  A short sale "against the box" occurs when the Fund owns an equal amount of the securities sold short or owns securities convertible into or exchangeable, without payment of any further consideration, for securities of the same issue as, and equal amount to, the securities sold short.

*Securities Lending*.  The Fund may also lend securities from its portfolio to broker-dealers, banks, financial institutions, and institutional borrowers of securities and receive collateral in the form of cash or U.S. Government obligations, subject to procedures adopted by the Board of Directors.

## SPECIAL LEVERAGE CONSIDERATIONS

**Issuance of Preferred Stock and Debt Securities**

The Fund may raise additional cash to invest through the issuance of preferred stock, debt securities (i.e., debt instruments of varying maturities, including commercial paper, short-term and medium-term notes, and long-term securities; such securities are collectively referred to herein as the "debt securities"), or other forms of leverage to Puerto Rico Residents, in an aggregate amount representing not more than 50% of the value of the Fund's total assets immediately after such issuance.  Subject to these percentage limitations, the Fund may also engage in certain additional borrowings from banks or other financial institutions through Reverse Repurchase Agreements.  In addition, the Fund may also borrow for temporary or emergency purposes in an amount of up to an additional 5% of its total assets.

The Fund presently anticipates that it will engage in borrowings from, and other forms of leverage with, UBS Puerto Rico or its affiliates through Reverse Repurchase Agreements, dollar rolls, and other transactions.

The Fund intends to begin structuring its leverage program after the completion of the offering of the Shares. UBS Puerto Rico may act as dealer or placement agent in connection with any offering of debt securities by the Fund.

Although the terms of any shares of preferred stock or debt securities issued by the Fund, and of other forms of leverage used by the Fund, will be determined by the Board of Directors, it is anticipated that such shares of preferred stock, debt securities, and other forms of leverage will pay dividends or interest at rates that are adjusted over relatively short periods of time and will reflect prevailing short-term interest rates.  The proceeds of any offering of preferred stock, debt securities, and other form of leverage may be invested in longer-term fixed income Puerto Rico Securities (or other debt securities), which typically bear interest at rates that are higher than short-term interest rates (although such higher rates cannot be assured).

Use of leverage through the issuance of preferred stock, debt securities, and other forms of leverage is a speculative investment technique and involves increased risk for Shareholders to a greater extent than in a non-leveraged fund. These include the possibility of higher volatility of the Fund's yield and net asset value and in the market value of the Shares. In addition, changes in short-term, medium-term and long-term interest rates and in their relationship to each other could negatively impact the Fund's yield, net asset value and the market price of the Shares. The effects of leverage may cause a Shareholder to lose any or all of the amount invested. So long as the Fund is able to realize a higher net return on the assets purchased with the proceeds of the leverage than the then current dividend or interest rate, as the case may be, on any preferred stock, debt securities, or other forms of leverage together with other related expenses, the effect of the leverage will be to cause the Shareholders to realize higher current net investment income than if the Fund were not so leveraged. There can be no assurance, however, that the Fund will be able to realize such a net return. Short-term, medium-term, and long-term interest rates change from time to time, as does their relationship to each other (*i.e.*, the slope of the yield curve), depending upon such factors as supply and demand forces, monetary and tax policies, and investor expectations. Changes in any or all of such factors could cause the relationship between short-term, medium-term, and long-term rates to change (*i.e.*, to flatten or to invert the slope of the yield curve) so that short-term and medium-term rates may substantially increase relative to the long-term obligations in which the Fund may be invested. To the extent that the then current dividend or interest rate, as the case may be, paid on any preferred stock, debt securities, and other forms of leverage approaches the net return on that portion of the Fund's assets purchased with the proceeds of the leverage, the benefit of leverage to the Shareholders will be reduced. Should the then current dividend or interest rate, as the case may be, paid on any preferred stock, debt securities, and other forms of leverage exceed the yield or return on the Fund's assets purchased with the proceeds of the leverage, the Fund's leveraged capital structure would result in a lower yield or return to the Shareholders than if the Fund were not so leveraged and therefore, the amount available for distribution to Shareholders will be reduced. Because market interest rates are currently near their lowest levels in many years, there is a greater risk that interest rates will rise, and that the interest rate paid by the Fund on any short-term or medium-term debt securities or other forms of leverage will exceed the yield or return on any long-term assets previously purchased by the Fund with the proceeds of leverage. Nevertheless, the Investment Adviser may determine to maintain the Fund's leveraged position if it deems such action to be appropriate under the circumstances. The investment advisory fee payable to the Investment Adviser during periods in which the Fund is utilizing leverage will be higher than when it is not doing so because the fee is calculated as a percentage of average weekly gross assets, including assets purchased with leverage. Because the asset base used for calculating the investment advisory fee is not reduced by aggregate indebtedness incurred in leveraging the Fund, the Investment Adviser may have a conflict of interest in formulating a recommendation to the Fund as to whether and to what extent to use leverage.

In addition, payments on preferred stock, debt securities, and other forms of leverage issued by the Fund for investment may be indexed to equity or other indices unrelated to the assets held by the Fund. While the Fund will enter into hedging transactions to minimize the risks inherent in those transactions, there is no assurance that those transactions will be successful. Moreover, any decline in the value of the Fund's assets will be borne entirely by the Shareholders. Accordingly, the effect of leverage in a declining market would be a greater decrease in the net asset value of the Fund's Shares than if the Fund were not leveraged and could adversely affect the Fund's ability to make dividend payments and other distributions on both the Shares and preferred stock. Any such decrease may be reflected in a greater decline in the market price of the Shares and preferred stock. If the current investment income of the Fund were not sufficient to meet dividend or interest requirements on the preferred stock, debt securities, and other forms of leverage, it could become necessary for the Fund to liquidate certain of its investments, thereby reducing net assets and therefore, the net asset value of the Shares. Such liquidations would also cause the Fund to incur transaction costs. Moreover, while dividends on preferred stock or interest on debt securities, or other forms of leverage are unpaid, no dividends or other distributions would be permitted to be paid on the Shares until the Fund resumes its payments of dividends on preferred stock or of interest on the debt securities, or other forms of leverage, as the case may be.

The Fund may use a variety of derivative instruments to attempt to hedge its portfolio of assets against interest rate risk. Successful use of most derivative instruments depends upon the Investment Adviser's ability to predict

movements of the overall securities and interest rate markets. There can be no assurance that any particular hedging strategy will succeed, or that the Fund will employ such strategies with respect to all or any portion of its portfolio. See "Appendix F – Hedging and Related Income Strategies."

The Fund may issue preferred stock, debt securities, and other forms of leverage to the extent that immediately after their issuance, (i) the value of the Fund's total assets (ii) less all the Fund's liabilities and indebtedness which are not represented by preferred stock, debt securities, or other forms of leverage being issued or already outstanding, (iii) is equal to or greater than 200% of the aggregate par value of all outstanding preferred stock (not including any accumulated dividends or other distributions attributable to such preferred stock) and the total amount outstanding of debt securities and other forms of leverage. This asset coverage requirement must also be met any time the Fund pays a dividend or makes any other distribution on the issued and outstanding Shares or any shares of the Fund's preferred stock (other than a dividend or other distribution payable in Shares) as well as any time the Fund repurchases any Shares, in each case after giving effect to such repurchase of Shares or issuance of preferred stock, debt securities, or other forms of leverage in order to maintain asset coverage at the required 200% level. To the extent necessary, the Fund may purchase or redeem preferred stock, debt securities, or other forms of leverage in order to maintain asset coverage at the required 200% level. In such circumstances, the Fund may have to liquidate portfolio securities in order to meet redemption requirements and might also have to pay a premium. Any necessary liquidations could have the effect of reducing future net income of the Fund. Such liquidations could cause the Fund to incur related transactional costs.

Assuming the utilization of leverage by borrowings in the amount of approximately 50% of the Fund's total assets, and an annual interest rate (including dividends on preferred stock) of 2% payable on such leverage based on market rates as of the date of this Prospectus, the annual return on the assets that the Fund's portfolio must experience (net of expenses) in order to cover such interest payments would be 2%. The following table is designed to illustrate the effect on investment return with leverage obtained by the issuance of preferred stock, debt securities, and other forms of leverage representing approximately 50% of the Fund's total assets, assuming hypothetical annual returns of minus 10% to plus 10%. As the table shows, leverage generally increases the return when portfolio return is positive and decreases the return when the portfolio return is negative. The figures appearing in the table are hypothetical and actual returns may be greater or less than those appearing in the table.

| Assumed Return (net of expenses) | (10%) | (5%) | 0% | 5% | 10% |
|---|---|---|---|---|---|
| Corresponding Share Return | (22%) | (12%) | (2%) | 8% | 18% |

Leveraging of the Fund cannot be fully achieved until preferred stock, debt securities, and other forms of leverage are issued and the proceeds have been invested by the Fund.

The Fund will seek to obtain an investment grade credit rating from S&P, Moody's, Fitch, or another Rating Organization on any preferred stock or debt securities which it may issue. The Fund believes that obtaining such ratings may enhance the marketability of the preferred stock, debt securities, and other forms of leverage and thereby reduce the dividend or interest rate on the preferred stock or debt securities from that which the Fund would be required to pay if the preferred stock, debt securities, and other forms of leverage were not so rated. There can be no assurance that the Fund will be able to obtain such ratings, and such ratings would not eliminate or mitigate any risks of investing in the Fund's securities. The Rating Organization rating the preferred stock, debt securities, and other forms of leverage may require asset coverage maintenance ratios that are in addition to, and more stringent than, those discussed above. In addition, restrictions may be imposed on certain investment practices in which the Fund may otherwise engage. The Rating Organization requirements are also expected to impose certain minimum issue size, diversification and other requirements for determining portfolio assets that are eligible for computing compliance with their asset coverage requirements. The ability of the Fund to comply with such asset coverage maintenance ratios may be subject to

circumstances, which are beyond the control of the Fund, such as market conditions for its portfolio securities.  The terms of any preferred stock, debt securities, or other forms of leverage might prohibit the payment of dividends or other distributions on the Shares and any other preferred stock of the Fund in the event the Fund fails to meet such asset coverage maintenance ratios and in such circumstances, might also provide for mandatory redemption of the preferred stock (if redeemable), with the potential adverse effects discussed above.

The issuance of any preferred stock, debt securities, and other forms of leverage entails certain costs and expenses, such as underwriting discounts, rating agency fees, legal and accounting fees, printing costs, and certain other ongoing expenses, such as administrative and accounting fees.  These costs and expenses are borne by the Fund. Ongoing expenses associated with the issuance of any preferred stock, debt securities, and other forms of leverage are reflected as a reduction in the investment income that otherwise would be available for distribution to Shareholders.

**Borrowings**

In addition, the Fund may also borrow from banks or other financial institutions for temporary or emergency purposes (including, among others, financing repurchases of the Shares and tender offers), in an amount of up to an additional 5% of its total assets.  Such borrowings by the Fund would also create leverage and would entail speculative factors similar to those applicable to the issuance of preferred stock, debt securities, and other forms of leverage.  If borrowings are made on a secured basis, the Custodian will segregate the pledged assets for the benefit of the lender or arrangements will be made with a suitable sub-custodian, which may include the lender.

**INVESTMENT RESTRICTIONS**

The Fund may not change its investment objective or fundamental policy without the approval of the holders of  (i) a majority of the outstanding Shares, if the proposed change has previously been recommended by the Board of Directors, or (ii) 75% of the outstanding Shares, upon the failure of the Board of Directors to approve a proposal submitted by a Shareholder or a group of Shareholders that hold in the aggregate at least 20% of the Shares.  Under current law, the Commissioner of Financial Institutions must also approve any change in such investment objective or fundamental policy.

As its fundamental policy, the Fund may not issue debt securities or borrow money from banks or other entities (including borrowings through dollar rolls and Reverse Repurchase Agreements), in excess of 50% of the Fund's total assets (including the amount of borrowings and debt securities issued).  Notwithstanding this restriction, the Fund may borrow from banks or other financial institutions for temporary or emergency purposes (including, among others, financing repurchases of the Shares and tender offers), in an amount of up to an additional 5% of its total assets.

In addition, the Commissioner's Ruling contains certain conditions with respect to the Fund's investment of 67% of its total assets in Puerto Rico Assets (the "67% Investment Requirement") that restrict the Fund's investments. See "RULING OF THE COMMISSIONER."

The Fund may not change the following investment limitations without the approval of a majority of the members of the Board of Directors, and provided that prior written notice is given to its Shareholders:

(a)       purchase the securities of any one issuer, if after such purchase it would own more than 75% of the voting securities of such issuer, provided that securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities are not subject to this limitation;

(b)       make an investment in any one industry if, at the time of purchase, the investment would cause the aggregate value of all the Fund's investments in such industry to equal 25% or more of the Fund's total assets; provided that this limitation shall not apply to: (i) investments in securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities; (ii) Municipal Obligations, including Puerto Rico Municipal Obligations, other than those

22

backed only by the assets or revenues of a non-governmental entity; and (iii) investments in mortgage-backed securities and asset-backed securities (whether or not issued or guaranteed by an agency or instrumentality of the U.S. Government).  For purposes of this restriction, the intended or designated use of real estate shall determine its industry;

(c)        purchase securities on margin, except for short term credits necessary for clearance of portfolio transactions, and except that the Fund may make margin deposits in connection with its use of options or future contracts.  See "Appendix E – Certain Other Types of Investments;"

(d)        engage in the business of underwriting securities of other issuers, except to the extent that, in connection with the disposition of portfolio securities, the Fund may be deemed an underwriter under U.S. securities laws and except that the Fund may write options;

(e)        make short sales of securities or maintain a short position, except that the Fund may sell short "against the box." A short sale "against the box" occurs when the Fund owns an equal amount of the securities sold or owns securities convertible into or exchangeable for, without payment of any further consideration, securities of the same issue as, and equal in amount to, the securities sold short;

(f)        purchase or sell real estate (including real estate limited partnership interests), provided that the Fund may invest in securities secured by real estate or interests therein or issued by entities that invest in real estate or interests therein (including mortgage-backed securities), and provided further that the Fund may exercise rights under agreements relating to such securities, including the right to enforce security interests and to liquidate real estate acquired as a result of such enforcement; provided, however, that such securities and any such real estate securing a security acquired by the Fund shall not be a "U.S. real property interest" within the meaning of Section 897 of the U.S. Internal Revenue Code of 1986, as amended (the "Code");

(g)        purchase or sell commodities or commodity contracts, except that the Fund may enter into swap agreements, options, futures contracts, see "Appendix E – Ceratin Other Types of Investments," and options on futures contracts subject to certain restrictions.  See "OTHER INVESTMENT PRACTICES — Other Practices — Options and Futures;"

(h)        make loans, except through Repurchase Agreements, provided that for purposes of this restriction the acquisition of bonds, debentures or other debt instruments or interests therein and investment in government obligations, shall not be deemed to be the making of a loan;

(i)        purchase securities of other investment companies, unless immediately thereafter not more than (i) 3% of the total outstanding voting stock of such investment company is owned by the Fund, (ii) 5% of the Fund's total assets, valued at market value, would be invested in any one such investment company, (iii) 10% of the Fund's total assets, valued at market value, would be invested in such securities, and (iv) the Fund, together with other investment companies having the same investment adviser and companies controlled by such companies, owns not more than 10% of the total outstanding stock of any one closed-end investment company;

(j)        make investments fore the purpose of effecting control of management; or

(k)        lend portfolio securities, except to the extent that such loans, if and when made, do not exceed 33-1/3% of the total assets of the Fund valued at market value.

## MANAGEMENT OF THE FUND

The overall management of the business and affairs of the Fund is vested with the Board of Directors.  The Board of Directors approves all significant agreements between the Fund and persons or companies furnishing services to it, including the Fund's agreements with its Investment Adviser, Administrator, Custodian, and Transfer Agent (all

terms as defined herein).   The day-to-day operations of the Fund will be delegated to its officers and to the Administrator, subject to the Fund's investment objective and policies and to general supervision by the Board of Directors.

**The Board of Directors.**   The Board of Directors of the Fund will be initially composed of eight persons. Five of these are "Independent Fund Directors," as defined in the Fund's Code of Ethics, and three are affiliates of UBS Trust Company.

The five Independent Fund Directors are:

> Víctor J. Salgado
>
> Gabriel Dolagaray Balado
>
> Mario S. Belaval
>
> Luis M. Pellot - González
>
> Agustín Cabrer - Roig

The three directors who are affiliates of UBS Trust Company are:

> Miguel A. Ferrer
>
> Thomas F. Streiff
>
> Carlos V. Ubiñas

***Independent Fund Directors.***   Certain biographical and other information relating to the directors of the Fund who are "Independent Fund Directors" is set forth below, including their ages and their principal occupations for at least the last five years.   Each of these persons was elected a director of the Fund on July 17, 2003.   None of these persons is currently a director of any publicly traded company.   Messrs. Victor Salgado, Gabriel Dolagaray and Mario Belaval are also members of the boards of directors of all the other funds that have engaged UBS Trust Company as their investment adviser (the "UBS Advised Funds") or as their co-investment adviser (the "UBS Co-Advised Funds" and, together with the UBS Advised Funds, the "Affiliated Funds").   Messrs. Luis Pellot - González and Agustín Cabrer-Roig are also members of the boards of directors of the UBS Advised Funds and of the Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., which is a UBS Co-Advised Fund.   Each of these directors, other than Mr. Luis Pellot - González and Mr. Agustín Cabrer - Roig, oversees 18 Affiliated Funds, consisting of 25 portfolios.   Mr. Pellot - González and Mr. Cabrer - Roig oversee nine Affiliated Funds, consisting of 15 portfolios.   The business address of each of these persons is c/o UBS Trust Company of Puerto Rico, American International Plaza, Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

| Name, Address, and Age | Positions Held | Director Since | Principal Occupations During Past Five Years | Number of Affiliated Funds Overseen | Public Director-ships |
|---|---|---|---|---|---|
| Víctor J. Salgado Arroyo (77) c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Director | July 17, 2003 | Chairman of the Board of Directors, President, and Chief Executive Officer of INTEGRAND Assurance Company | 18 funds consisting of 25 portfolios | None |
| Gabriel Dolagaray Balado (68) c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Director | July 17, 2003 | Former President of the Cooperativa de Seguros de Vida; former President of the Association of Insurance Companies of Puerto Rico, Inc.; former member of the Executive Committee of the North American Association of the International Cooperative Insurance Federation; Member, Advisory Board to the Commissioner of Insurance of Puerto Rico; and former President of the Puerto Rico Chamber of Commerce. | 18 funds consisting of 25 portfolios | None |
| Mario S. Belaval (65) c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Director | July 17, 2003 | Special Advisor of Miradero Capital Partners, Inc.; Member of the Board of Directors of Triple S Management, Corp. and Triple S, Inc. | 18 funds consisting of 25 portfolios | None |

| Name, Address, and Age | Positions Held | Director Since | Principal Occupations During Past Five Years | Number of Affiliated Funds Overseen | Public Director-ships |
|---|---|---|---|---|---|
| Luis M. Pellot - González (55) c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Director | July 17, 2003 | Tax attorney at Pellot - González, PSC since 1989; Member of the Board of Directors of Empresas Santana; Secretary of AA-10,000 Corp.; Member of the Board of Directors and Secretary of Financiadora de Primas; 98% Partner and Manager of Lepanto, S.E.; Tax Professor, University of Puerto Rico Business School, 1981-1993; President of Tax Committee, Puerto Rico Chamber of Commerce, 1996-1997; Member, P.R. Bar Association; P.R. Manufacturers Association; P.R. Chamber of Commerce; P.R. General Contractors Association; P.R. Hotel and Tourism Association. | 9 funds consisting of 15 portfolios | None |
| Agustín Cabrer - Roig (54), c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Director | July 17, 2003 | President of Starlight Development Group, Inc. since 1994; President of Antonio Roig Sucesores since 1995; Chairman of Marvel Specialties since 1998; Chairman of Pennock Growers since 1998; Chairman of Candelero Point Partners since 1999; Director of V. Suárez & Co., V. Suárez Investment Corporation, V. Suárez International Banking Entity, Inc., BacPlas, Inc., and Candelero Holding; Partner of Desarrollos Roig S.E., Desarrollos Agrícolas del Este S.E., El Ejemplo, S.E., RODUNECA, S.E., NECANE, S.E., Los Pinos S.E., Costa Norte, S.E.; Starlight One, Inc. and Forest Cove Homes, Inc. | 9 funds consisting of 15 portfolios | None |

*Directors who are not Independent Fund Directors.* Certain biographical and other information relating to the other directors of the Fund who are not Independent Fund Directors is set forth below, including their ages and their principal occupations for at least the last five years and the total number of Affiliated Funds overseen by them. Each of these persons was elected a director of the Fund on July 17, 2003, except for Mr. Ubiñas, who was elected on July 11, 2003. These persons also serve as directors and officers of the UBS Advised Funds and, in some cases, of certain of the UBS Co-Advised Funds. None of these persons is currently a director of any publicly traded company. Each of these directors oversees 18 Affiliated Funds, consisting of 25 portfolios. The business address of each of these persons is c/o UBS Trust Company of Puerto Rico, American International Plaza, Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

| Name, Address, and Age | Positions Held | Director since | Principal Occupations during Past Five Years | Affiliated Funds Overseen | Public Director-ships |
|---|---|---|---|---|---|
| Miguel A. Ferrer (65), c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Director | July 17, 2003 | President and CEO of of UBS Trust Company; Director of "Fundación para la Universidad de Puerto Rico" since 1996; Director of "Fundación Biblioteca Rafael Hernández Colón" since 1993; President of UBS Puerto Rico since 1980 (employee since 1965) and a Senior Vice President of UBS Inc.; former President and founder of the Puerto Rico Association of Financial Analysts; Member of the Board of the Securities Industry Association of Puerto Rico; and Associate Member of the New York Stock Exchange. | 18 funds consisting of 25 portfolios | None |

| Name, Address, and Age | Positions Held | Director since | Principal Occupations during Past Five Years | Affiliated Funds Overseen | Public Director-ships |
|---|---|---|---|---|---|
| Thomas F. Streiff (45) c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Director | July 17, 2003 | Senior Vice President and Director of Investment Solutions at UBS since October 2002; Partner at NxStar Ventures, LLC, from January 2002 to October 2002; President, Financial Services of Ilona Financial Group; President and CEO of Talbot Financial Services, Inc. and Co-founder and Chairman of NFC Consulting Group from February 1986 to May 2000. | 18 funds consisting of 25 portfolios | None |
| Carlos V. Ubiñas (48) c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue,San Juan, Puerto Rico 00918 | Director | July 11, 2003 | Executive Vice President and Chief Operating Officer of UBS Puerto Rico since 1998; Executive Vice President of UBS Puerto Rico and Managing Director of Investment Banking since 1989 | 18 funds consisting of 25 portfolios | None |

*Officers*.  Certain biographical and other information relating to the officers of the Fund is set forth below, including their ages and their principal occupations for at least the last five years.  Each of these persons was appointed as an officer of the Fund on July 16, 2003.  These persons also serve as directors and officers of the UBS Advised Funds and, in some cases, as directors or officers of some of the UBS Co-Advised Funds. None of these persons is currently a director of any publicly traded company.  The business address of each of the following persons is c/o UBS Trust Company of Puerto Rico, American International Plaza, Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

| Name, Address, and Age | Positions Held | Officer since | Principal Occupations during Past Five Years | Affiliated Funds Overseen | Public Director-ships |
|---|---|---|---|---|---|
| Miguel A. Ferrer (65), c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | President | July 16, 2003 | President and CEO of of UBS Trust Company; Director of "Fundación para la Universidad de Puerto Rico" since 1996; Director of "Fundación Biblioteca Rafael Hernández Colón" since 1993; President of UBS Puerto Rico since 1980 (employee since 1965) and a Senior Vice President of UBS Inc.; former President and founder of the Puerto Rico Association of Financial Analysts; Member of the Board of the Securities Industry Association of Puerto Rico; and Associate Member of the New York Stock Exchange. | 18 funds consisting of 25 portfolios | None |

| Name, Address, and Age | Positions Held | Officer since | Principal Occupations during Past Five Years | Affiliated Funds Overseen | Public Director-ships |
|---|---|---|---|---|---|
| Leslie Highley, Jr. (54) c/o UBS Trust Company of Puerto Rico, American International Plaza- Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Senior Vice President | July 16, 2003 | Senior Vice President of UBS Trust Company (since May 2000), of UBS Puerto Rico (since 1994), and of the Affiliated Funds; President of Dean Witter Puerto Rico, Inc. and a senior officer responsible for corporate and public finance from 1985 to 1993; Executive Vice President of Government Development Bank for Puerto Rico from 1977 to 1985 | Not applicable | None |
| Carlos V. Ubiñas (48) c/o UBS Trust Company of Puerto Rico, American International Plaza- Seventh Floor, 250 Muñoz Rivera Avenue,San Juan, Puerto Rico 00918 | Treasurer and Secretary | July 16, 2003 | Executive Vice President and Chief Operating Officer of UBS Puerto Rico since 1998; Executive Vice President of UBS Puerto Rico and Managing Director of Investment Banking since 1989 | 18 funds consisting of 25 portfolios | None |
| William Rivera (45) c/o UBS Trust Company of Puerto Rico, American International Plaza- Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | First Vice President | July 16, 2003 | Assistant portfolio manager for UBS Asset Managers; First Vice President of Trading of UBS Trust Company since January 2002 and of UBS Puerto Rico since 1987. | Not applicable | None |

| Name, Address, and Age | Positions Held | Officer since | Principal Occupations during Past Five Years | Affiliated Funds Overseen | Public Director-ships |
|---|---|---|---|---|---|
| Ricardo Ramos (46) c/o UBS Trust Company of Puerto Rico, American International Plaza-Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918 | Vice President | July 16, 2003 | Portfolio manager and Vice President of UBS Asset Managers since September 2002; Executive Vice President of Firstbank Puerto Rico from August 1999 to September 2002; Executive Vice President of Reliable Financial Services, Inc. from November 1998 to July 1999; Senior Vice President-Finance of Oriental Financial Group from August 1992 to September 1998. | Not applicable | None |

**Compensation of Directors.**   Each Independent Fund Director receives a stipend from the Fund of up to $1,000 plus expenses, for attendance at each meeting of the Board of Directors, and $500 plus expenses, for attendance at each meeting of a committee thereof.  The Independent Fund Directors do not receive retirement or other benefits as part of their compensation.

| Name of Independent Fund Director | Aggregate Compensation from Fund [(1)] | Retirement Benefits Accrued as Part of Fund Expenses | Total Compensation from Affiliated Funds [(2)] |
|---|---|---|---|
| Victor Salgado Arroyo | $6,000 | None | $26,500 |
| Gabriel Dolagaray Balado | $4,000 | None | $35,000 |
| Mario S. Belaval | $6,000 | None | $35,250 |
| Luis M. Pellot - González | $6,000 | None | $5,000 |
| Agustín Cabrer - Roig | $4,000 | None | $5,000 |

(1)  Estimated for the first fiscal year of the Fund, assuming that the Board of Directors holds four  meetings during the fiscal year which are attended by all of the Independent Fund Directors, and four meetings of the Audit Committee attended by all the members of such committee.

(2)  Amount as of December 31, 2002, excluding  amounts, if any,  related to reimbursement for expenses related to attendance at such Board meetings or meetings of committees thereof.  In addition to serving as directors of the Fund, the Independent Fund Directors also serve on the Boards of Directors of some or all of the Affiliated Funds.

**Investment Advisory Services and other Service Providers to the Fund**

Subject to the supervision of the Board of Directors, investment advisory services will be provided to the Fund by UBS Asset Managers of Puerto Rico, a division of UBS Trust Company, pursuant to an Investment Advisory Agreement (the "Advisory Agreement") to be entered into prior to the issuance of the Shares.  UBS Asset Managers will also serve as investment adviser to the Affiliated Funds.  As of May 31, 2003, the Affiliated Funds have combined portfolio assets of approximately $5.2 billion.  UBS Trust Company is a trust company organized under the laws of Puerto Rico and has its principal office and place of business at American International Plaza, Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.  UBS Trust Company is licensed with the Commissioner of Financial Institutions as a trust company organized under the Puerto Rico Trust Company Act, as amended, and is not registered as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended.  UBS Asset Managers is located at American International Plaza, Seventh Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

Pursuant to the Advisory Agreement, the Investment Adviser will provide a complete and continuous investment program for the Fund and make investment decisions and place orders to buy, sell or hold particular securities and other investments.  As compensation for their investment advisory services related to the Fund, the Investment Adviser will receive an annual investment advisory fee (which is indirectly paid entirely by Shareholders) not to exceed 0.75% of the average weekly gross assets of the Fund, payable monthly.

Unless earlier terminated as described below, the Advisory Agreement will continue in effect for a period of two years from the date of execution and will remain in effect from year to year thereafter if approved annually by a vote of a majority of those directors of the Fund who, as indicated below, are independent members of the Board of Directors (the "Independent Board"). The Advisory Agreement is not assignable, except to affiliates of the Investment Adviser subject to certain conditions.  An Advisory Contract may be terminated, without penalty, (i) at any time by the vote of a majority of the Independent Board, (ii) on 60 days' written notice by the Investment Adviser to the Fund or (iii) on 60 days' written notice to the Investment Adviser by the vote of a majority of the outstanding voting securities of the Fund.

The Investment Adviser shall not be liable for any loss, expense, cost, or liability arising out of any error in judgment or any action or omission, including any instruction given to the Custodian unless (i) such action or omission involved an officer, director, employee, or agent of the Investment Adviser, and (ii) such loss, expense, cost, or liability arises out of the Investment Adviser's gross negligence, malfeasance or bad faith.  The Investment Adviser may rely on any notice or communication (written or oral) reasonably believed by it to be genuine.  These limitations shall not relieve the Investment Adviser from any responsibility, obligation or duty that an Investment Adviser may have under state statutes, the laws of Puerto Rico or any federal securities law which is not waivable.

UBS Trust Company will also serve as the Fund's administrator.  Pursuant to the Administration Agreement to be entered into between the Fund and UBS Trust Company prior to the issuance of the Shares, and subject to the overall supervision of the Board of Directors, the Administrator will be responsible for providing facilities and personnel to the Fund in the performance of certain services including the weekly determination of the Fund's net asset value and net income.  As compensation for their administration services to the Fund, the Administrator will receive an administration fee (which is indirectly paid entirely by Shareholders) not to exceed 0.15% of the Fund's average weekly gross assets, payable monthly.  The Administrator may retain the services of a sub-administrator, which may be its affiliate.

The Fund's securities and cash will be held under a custody agreement to be entered into between the Fund and UBS Trust Company prior to the issuance of the Shares, pursuant to which UBS Trust Company will serve as custodian for the Fund's assets (in such capacity, the "Custodian").  As compensation for its custody services, the Custodian will receive a fee as agreed from time to time with the Fund; such fee will be at a rate customarily paid to other custodians for the provision of similar services.  The Custodian may retain the services of a sub-custodian, which may be its affiliate.  In such regard, the Fund intends to retain Citibank, N.A. to perform certain custody functions for the Fund.

Pursuant to the terms of the Transfer Agency, Registrar, and Shareholder Servicing Agreement to be entered into between the Fund and UBS Trust Company prior to the issuance of the Shares, the latter will be responsible for maintaining a register of the Shares for holders of record and opening and maintaining Shareholder accounts (in such capacity, the "Transfer Agent"). As compensation for its transfer agency, registrar, dividend disbursing and shareholder services, the Transfer Agent will receive a fee as agreed from time to time with the Fund. Such fee will be at a rate customarily paid to other transfer agents for the provision of similar services. The Transfer Agent may retain the services of a sub-transfer agent, which may be its affiliate.

Certain fees may be voluntarily waived or reimbursed by UBS Trust Company from time to time. There is no assurance, however, that any such waiver or reimbursement, if commenced, will be continued.

## VALUATION OF COMMON STOCK

The net asset value of the Shares will be calculated at least weekly by the Administrator. The Fund intends to publish its net asset value weekly in a local newspaper of general circulation within Puerto Rico. The net asset value per Share will be computed by dividing the value of the securities held by the Fund plus any cash or other assets (including interest and dividends accrued but not yet received and earned discount) minus all liabilities (including accrued expenses) by the total number of Shares outstanding at such time.

The Fund's assets will be valued by the Administrator, with the assistance of the Investment Adviser, in good faith and under the supervision of the Board of Directors based upon market quotations when such quotations are available. Primarily because it may be an administrative inconvenience for dealers other than UBS Puerto Rico to provide the Administrator with market quotations, independent sources of valuation may be unavailable for a substantial majority of the Fund's assets. When market quotations for securities held by the Fund are not readily available from any such independent dealers, the Administrator will be responsible for obtaining quotations from UBS Puerto Rico. When market quotations for the Fund's assets are not available from any sources, including UBS Puerto Rico, they will be valued at fair value by or under the direction of the Board of Directors utilizing quotations and other information concerning similar securities derived from recognized dealers in those securities or information regarding the trading spreads quoted by recognized dealers between such securities and U.S. Treasury securities whose maturities are determined to be most closely matched to the average life of the Fund's securities for which fair value is to be determined. UBS Puerto Rico might also be the sole or best source of this type of pricing information. Notwithstanding the above, assets with maturities of 60 days or less will generally be valued at amortized cost if their original term to maturity was 60 days or less, or by amortizing the difference between their fair value as of the 61st day prior to maturity and their maturity value if their original term to maturity exceeded 60 days, unless in either case the Board of Directors or an authorized committee thereof determines that this does not represent fair value.

## PORTFOLIO TRANSACTIONS

Subject to policies established from time to time by the Board of Directors, the Investment Adviser will be responsible for the execution of the Fund's portfolio transactions. In executing portfolio transactions, the Investment Adviser will seek to obtain the best net price and most favorable execution for the Fund, taking into account factors such as the price (including the applicable dealer spread or brokerage commission), size of order, difficulty of execution, and operational facilities of the firm involved. Certain securities in which the Fund will invest are traded on a "net" basis without a stated commission through dealers acting for their own account and not as brokers. Prices paid to dealers in principal transactions of such securities generally include a "spread," which is the difference between the prices at which the dealer is willing to purchase and sell a specific security at that time.

In placing orders with dealers, the Investment Adviser will generally attempt to obtain the best net price and most favorable execution of their orders. The Investment Adviser may purchase and sell portfolio securities from and

to dealers that provide the Fund with research analysis, statistical or pricing advice or similar services.  Portfolio transactions will not be directed by the Fund to dealers solely on the basis of research and advice provided.  In selecting brokers and dealers, the Investment Adviser will consider the full range and quality of a broker's or dealer's services. Factors considered by the Investment Adviser in selecting brokers and dealers may include the following: price; the broker's or dealer's facilities; the broker's or dealer's reliability and financial responsibility; when relevant, the ability of the broker or dealer to effect securities transactions, particularly with regard to such aspects as timing, order size, and execution of orders; and the research and other services provided by that broker or dealer to the Investment Adviser (and the Investment Adviser's arrangements relating thereto) that are expected to enhance the Investment Adviser's general portfolio management capabilities, notwithstanding that the Fund may not be the direct or exclusive beneficiary of those services.  While the Investment Adviser will generally seek the best net price in placing orders, the Fund may not necessarily be paying the lowest price available.  Commission rates are one factor considered together with other factors.  The Investment Adviser will not be obligated to seek in advance competitive bidding for the most favorable commission rate applicable to any particular transaction for the Fund or to select any broker-dealer on the basis of its purported "posted" commission rate.  The Investment Adviser in its discretion may cause the Fund to pay a commission in excess of the amount another broker or dealer would have been charged for effecting that transaction, provided the Investment Adviser has determined in good faith that such commission is reasonable in relation to the value of the brokerage or research provided by the broker to the Investment Adviser.  Research services furnished by the brokers or dealers through which or with which the Fund effects securities transactions may be used by the Investment Adviser in advising its other accounts (including the Affiliated Funds), and conversely, research services furnished to the Investment Adviser in connection with their other accounts or such other funds may be used in advising the Fund.

The Investment Adviser will seek to allocate on a fair and equitable basis among advisory clients, including the Affiliated Funds and the Fund, the opportunity to purchase or sell a security or investment that may be both desirable and suitable for one or more of their clients, but for which there is a limited supply or demand, although there can be no assurance of equality of treatment according to any particular or predetermined standards or criteria.  Where, because of prevailing market conditions, it is not possible to obtain the same price or time of execution for all of the securities or other investments purchased or sold for the Fund, transactions for the Fund may be reported with the average price of these transactions.

The Investment Adviser may, on an aggregated basis, purchase or sell the same security for more than one client to obtain a favorable price to the extent permitted by applicable law. These orders may be averaged as to price and allocated as to amount according to each client's daily purchase or sale orders or upon some other basis believed to be equitable in accordance with procedures adopted by the Board of Directors.

**Transactions Involving Affiliates**

While the Fund is subject to the terms and conditions of the Commissioner's Ruling (including provisions regarding transactions with affiliates), it is not registered under the U.S. Investment Company Act and, therefore, is not subject to the restrictions regarding, among other things, transactions between the Fund and UBS Puerto Rico and its affiliates (an "Affiliated Party," and each such transaction an "Affiliated Transaction") contained therein.

It is anticipated that the Fund will engage in Affiliated Transactions, such as securities purchase and sale transactions and repurchase agreement transactions, directly with UBS Puerto Rico and possibly other of its affiliates. For most securities purchased by the Fund, one of those entities may be the only dealer, or one of only a few dealers, in the securities being purchased or sold by the Fund.  In that event, independent sources for valuation or liquidity of a security may be limited or nonexistent.  The Fund is expected to invest a substantial portion of its assets in those securities.  The Fund may also invest in securities issued by or make deposits with an Affiliated Party.  As a result of such Affiliated Transactions and other dealings, the interests of an Affiliated Party may conflict with those of the Fund as to the price and other terms of transactions that they engage in.  Portfolio transactions between the Fund and an Affiliated Party will be executed pursuant to terms and conditions comparable to those with unrelated third parties in the ordinary course of its investment activities.

An Affiliated Party may also act as agent in connection with the placement of the Fund's preferred stock, debt securities, and other forms of leverage. Such activities will be carried out in accordance with procedures established by the Board of Directors in an effort to address potential conflicts of interest including, among other things, the potential conflicts of interest in setting interest or dividend rates. There is no assurance that these procedures will be effective. In addition, the investment advisory fee payable to the Investment Adviser (an Affiliated Party) during periods in which the Fund is utilizing leverage will be higher than when it is not doing so because the fee is calculated as a percentage of average weekly gross assets, including assets purchased with leverage. Because the asset base used for calculating the investment advisory fee is not reduced by aggregate indebtedness incurred in leveraging the Fund, the Investment Adviser may have a conflict of interest in formulating a recommendation to the Fund as to whether and to what extent to use leverage. Affiliated Parties may also directly provide some or all of such leverage.

Affiliated Parties may also engage, at the present or in the future, in business transactions with or related to any one of the issuers of the Fund's investment assets, or with competitors of such issuers, as well as provide them with investment banking, asset management, trust, or advisory services, including merger and acquisition advisory services. These activities may present a conflict between an Affiliated Party and the interests of the Fund. Affiliated Parties may also publish or may have published research reports on one or more of such issuers and may have expressed opinions or provided recommendations inconsistent with the purchasing or holding of the securities of such issuers. Any of these activities may affect the market value of the securities issued by them and therefore, will affect the value of the Shares.

Other conflicts of interest may arise in the future, which will be addressed by the Board of Directors at such time.

## DIVIDENDS AND OTHER DISTRIBUTIONS; DIVIDEND REINVESTMENT PLAN

### Dividends and other Distributions

The Fund intends to distribute monthly dividends of substantially all of its net investment income (which reflects amounts declared and paid as dividends on preferred stock, as well as interest paid on outstanding debt securities or other forms of leverage).

The net capital gains realized by the Fund, if any, may be retained by the Fund, unless the Board of Directors determines that the net capital gains will be distributed to the Shareholders. The Fund will not retain any net capital gains, unless such gains are offset by operating expenses of the Fund that are deductible for Puerto Rico income tax purposes. Substantially all of the Fund's net investment income for any fiscal year will be distributed to Shareholders during or after that year.

"Net capital gains" as used herein, means the excess of the net long-term capital gains over the net short-term capital losses. "Net investment income" as used herein, includes all interest (including accrued interest on zero coupon Municipal Obligations) and other ordinary income earned by the Fund on its portfolio holdings and the net short-term capital gains, net of Fund expenses.

While any debt securities or other forms of leverage are outstanding, the Fund may not declare any cash dividend or other distribution on the Shares unless at the time of such declaration: (1) all accrued, due and payable interest payments have been paid; and (2) after giving effect to such dividend or distribution, the value of the Fund's total assets less all liabilities and indebtedness not represented by any outstanding debt securities, is at least equal to 200% of the aggregate principal amount of the outstanding debt securities and the aggregate par value of all outstanding preferred stock. For further information regarding the impact of the issuance of preferred stock, debt securities, and other forms of leverage on the payment of dividends and other distributions on the Shares, see "SPECIAL LEVERAGE CONSIDERATIONS."

**Dividend Reinvestment Plan**

The Fund will establish a Dividend Reinvestment Plan (the "Plan") under which all Shareholders will have all dividends and other distributions on their Shares paid in cash, unless such Shareholders elect to have the dividends and distributions reinvested in additional Shares.  Shareholders who do not so affirmatively elect will receive all dividends and other distributions in cash paid by check mailed directly to the Shareholders by the Transfer Agent.  Shareholders who elect to hold their shares in the name of a broker or nominee other than UBS Puerto Rico or its nominee should contact such broker or nominee to confirm that they may participate in the Plan.  There will be no charge to participants for reinvesting dividends or other distributions. The Transfer Agent's fees for the handling of reinvestment of distributions will be paid by the Fund. The reinvestment of dividends and other distributions in Shares will not relieve participants of any income tax that may be payable on such distributions.  See "TAXATION".

The Transfer Agent will serve as the Fund's agent in administering the Plan for the participating Shareholders. After the Fund declares a dividend or determines to make a capital gain distribution, the Shares will be acquired by the Transfer Agent for the participant's account through (i) receipt of additional unissued but authorized Shares from the Fund or (ii) the acquisition of Shares in the open market or privately negotiated transactions, whichever option is economically more favorable to the participant. In the case of newly-issued shares, the number of Shares to be credited to the participant's account will be determined by dividing the dollar amount of the dividend by the net asset value per Share on the date the Shares are issued. In the case of Shares acquired in the open market or privately negotiated transactions, the amount of the dividend or other distribution on the Shares of the Shareholder would be applied (less the *pro rata* share of brokerage commissions incurred with respect to such open-market or privately negotiated purchases, such commissions to be paid to parties which are unaffiliated to the Fund) to the purchase of the Shares for the Shareholder's account.  If the full dividend amount in open-market or privately negotiated purchases during the purchase period was unable to be so invested, the uninvested portion of the amount of the dividend or other distribution would be invested in newly-issued Shares at the close of business on the last purchase date.  It is possible that, due to changes in market conditions or the Fund's net asset value, the prices at which Shares are acquired in the open market exceed net asset value per Share at any given point in time.  In acquiring Shares in the open market or through privately negotiated transactions, the Transfer Agent may acquire Shares from an Affiliated Party.  The acquisition of such Shares will be subject to the procedures adopted by the Board of Directors to address potential conflicts of interest.  See "PORTFOLIO TRANSACTIONS - Transactions Involving Affiliates."

The Transfer Agent will maintain all Shareholder accounts in the Plan, including information needed by the Shareholders for personal and tax records.  Shares in the account of each Plan participant will be held by the Transfer Agent in non-certificated form in the name of the participant, and each Shareholder's proxy will include those Shares purchased pursuant to the Plan.

All registered Shareholders (other than brokers and nominees), upon request made to the Fund, to UBS Puerto Rico or to the Shareholder's financial advisor, will be mailed information regarding the Plan, including a form with which they may elect to participate in the Plan.  A Shareholder who has elected to participate in the Plan may terminate participation in the Plan at any time without penalty, and Shareholders who have previously terminated participation in the Plan may rejoin it at any time.  Changes in elections must be made in writing to the Transfer Agent and should include the Shareholder's name and address as they appear on the share certificate.  An election to terminate participation in the Plan, until such election is changed, will be deemed to be an election by a Shareholder to take all subsequent distributions in cash.  An election will be effective only for distributions declared and having a record date at least ten days after the date on which the election is received.

The Fund reserves the right to amend or terminate the Plan with respect to any dividend or other distribution if notice of the change is sent to Plan participants at least 30 days prior to the record date for the payment of such dividend or distribution. The Plan may also be amended or terminated by the Transfer Agent by written notice to all Plan participants at least 30 days prior to the record date for the payment of the dividend or distribution.  All

correspondence concerning the Plan should be directed to the Transfer Agent at UBS Trust Company, American International Plaza Building, 7th Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

## REPURCHASE OF THE SHARES BY THE FUND

Although Fund shareholders will not have the right to require the Fund to redeem their Shares, the Board of Directors of the Fund may, in its sole discretion, from time to time authorize the Fund to repurchase Shares in the open market or make tender offers for its Shares at their net asset value. The Fund would normally do so only if the Shares are trading at a discount from the net asset value per share. These transactions may have the effect of reducing any market discount from net asset value. There is no assurance that any such repurchase or tender offer will result in trading of the Shares at a price which approximates their net asset value. Although such repurchases and tenders could have a favorable effect on the market price of the Shares, the acquisition of such Shares by the Fund will decrease the Fund's total assets and therefore have the effect of increasing the Fund's expense ratio. Moreover, the Fund may repurchase Shares from Affiliated Parties. The Board of Directors will establish procedures to address any conflicts of interest which may arise when effecting such repurchases with an Affiliated Party. See "PORTFOLIO TRANSACTIONS – Transactions Involving Affiliates."

## TAXATION

**THIS SECTION IS NOT TO BE CONSTRUED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR OWN TAX ADVISERS WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATIONS, INCLUDING THE APPLICATION AND EFFECT OF OTHER TAX LAWS AND ANY POSSIBLE CHANGES IN THE TAX LAWS AFTER THE DATE OF THIS PROSPECTUS.**

The following discussion is a summary of the material Puerto Rico and U.S. federal tax considerations that may be relevant to prospective investors in the Fund. The discussion in connection with the Puerto Rico tax considerations is based on the current provisions of the Puerto Rico Internal Revenue Code of 1994, as amended (the "Puerto Rico Code") and the regulations promulgated or applicable thereunder (the "Puerto Rico Code Regulations") issued by the Treasury Department of Puerto Rico (the "Treasury Department"), the Puerto Rico Municipal Property Tax Act of 1991, as amended (the "MPTA") and the regulations promulgated thereunder, the Municipal License Tax Act, as amended (the "MLTA") and the regulations promulgated thereunder, and the Puerto Rico Investment Companies Act. The U.S. federal tax discussion is based on the current provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations promulgated thereunder (the "Code Regulations").

This discussion assumes that (i) the investors will be (a) individuals who for the entire taxable year are bona fide residents of Puerto Rico for purposes of Section 933 of the Code and residents of Puerto Rico for purposes of the Puerto Rico Code (the "Puerto Rico Individuals"), or (b) corporations and partnerships organized under the laws of Puerto Rico, excluding corporations and partnerships having in effect an election and qualifying as "corporations of individuals" or "special partnerships" under the Puerto Rico Code or subject to any other special tax regime under the Puerto Rico Code (the "Puerto Rico Entities," and jointly with the Puerto Rico Individuals, the "Puerto Rico Investors"), (ii) the Puerto Rico Entities will not be subject at any time to any special tax regime under the Code including, without limitation, the provisions of the Code that apply to "controlled foreign corporations," "passive foreign investment companies," "personal holding companies," or "foreign personal holding companies," and (iii) that for each taxable year that dividends are distributed by the Fund, the Fund will meet the 90% Distribution Requirement, as defined herein.

This discussion does not purport to deal with all aspects of Puerto Rico and U.S. federal taxation that may be relevant to other types of investors, particular investors in light of their investment circumstances, or to certain types of investors subject to special treatment under the Puerto Rico Code or the Code (e.g., banks, insurance companies or tax-

exempt organizations).  Unless otherwise noted, the references in this discussion to the Puerto Rico regular income tax will include the alternative minimum tax imposed on Puerto Rico Entities by the Puerto Rico Code.

The existing provisions of the statutes, regulations, judicial decisions, and administrative pronouncements, on which this discussion is based, are subject to change (even with retroactive effect).

The statements herein have been opined on by O'Neill & Borges, counsel to the Fund.  A prospective investor should be aware that an opinion of counsel represents only such counsel's best legal judgment and that it is not binding on the Treasury Department, the Municipal Revenue Collection Center, any other agency or municipality of Puerto Rico, the U.S. Internal Revenue Service (the "IRS"), or the courts.  Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained.

### *Puerto Rico Taxation*

**Taxation of the Fund**

*Income Taxes*.  As a registered investment company under the Puerto Rico Investment Companies Act, the Fund will be exempt from the income tax imposed by the Puerto Rico Code for each taxable year that it distributes as Taxable Dividends (as defined below) to its investors an amount equal to at least 90% of its net income for such year within the time period provided by the Puerto Rico Code (the "90% Distribution Requirement").  In determining its net income for purposes of the 90% Distribution Requirement, the Fund is not required to take into account capital gains and losses and net interest income that is exempt under the Puerto Rico Code.  For each taxable year, the Fund intends to meet the 90% Distribution Requirement to be exempt from the income tax imposed by the Puerto Rico Code.

*Property Taxes*.  The securities owned by the Fund will be exempt from the personal property tax imposed by the MPTA.

*Municipal License Taxes*.  Under the MLTA, the Fund will be subject to a municipal license tax of up to 1.5% imposed on its "volume of business."  Interest derived by the Fund on obligations issued by the Government of Puerto Rico, its instrumentalities or political subdivisions, or by the Government of the U.S., will be exempt from municipal license tax.  In addition, that part of the Fund's income that is distributed annually to Puerto Rico Investors is excluded in determining its "volume of business."

**Taxation of Puerto Rico Investors**

*Income Taxes*.  The Fund may make distributions out of its current or accumulated earnings and profits attributable to (i) income that is included in the Fund's gross income for purposes of the Puerto Rico Code, other than gains from the sale or exchange of property (the "Taxable Dividends"), (ii) net gains derived from the sale or exchange of property (the "Capital Gain Dividends"), or (iii) income exempt from Puerto Rico income tax (the "Exempt Dividends," and jointly with the Taxable Dividends and the Capital Gains Dividends, the "Dividends").

*Taxable Dividends Distributed to Puerto Rico Individuals*.  Taxable Dividends distributed to Puerto Rico Individuals are subject to a 10% withholding tax (the "10% Puerto Rico Withholding Tax"), if certain requirements are met.  Otherwise, Taxable Dividends will be subject to the regular income tax.

The Puerto Rico Code Regulations state that to qualify for the 10% Puerto Rico Withholding Tax, the Taxable Dividends must be derived from current or accumulated earnings and profits of the Fund derived from investments (i) in Puerto Rico corporations or partnerships, or non-Puerto Rico corporations or partnerships whose gross income effectively connected with the conduct of a trade or business in Puerto Rico is at least 80% of its gross income for the three taxable years ending with the close of its taxable year preceding the declaration of the dividend, (ii) an activity which produces Puerto Rico source income under the Puerto Rico Code, provided the proceeds of the investment are

used to finance or refinance real property located in Puerto Rico or used in the active conduct of a trade or business in Puerto Rico, or (iii) subject to U.S. federal income tax under the Code.  Additionally, if the Fund derives income from sources within the U.S. that qualifies as "portfolio interest" under Section 881(c) of the Code, dividends distributed by the Fund from such earnings and profits will qualify for the 10% Puerto Rico Withholding Tax only if the "portfolio interest" derived by the Fund for any given taxable year represents less than 10% of the Fund's total gross income for such year.  For purposes of determining whether less than 10% of the Fund's total gross income is "portfolio interest," gross income that is exempt from tax under Section 1022(b) of the Puerto Rico Code shall be excluded from the Fund's gross income.

If the 10% Puerto Rico Withholding Tax is applicable, it must be withheld by the Fund and paid to the Treasury Department.  However, a Puerto Rico Individual may elect not to be subject to the 10% Puerto Rico Withholding Tax (the "Election").  If the Election is made, the Taxable Dividend distributed to such individual will be subject to the regular income tax.  For an Election to be effective during a taxable year, the Fund must be notified in writing prior to the first distribution made by the Fund during such taxable year.  The Election must be made on a yearly basis, and it must include (i) the name and address of the electing Puerto Rico Individual, (ii) his or her taxpayer identification number, (iii) a statement authorizing the Fund to abstain from withholding the 10% Puerto Rico Withholding Tax, (iv) the year of the distribution(s) with respect to which the Election is made, (v) the date on which the election is made, and (vi) the signature of the Puerto Rico Individual.  Once an Election is made, such Election is final with respect to all subsequent distributions during such taxable year.

Absent an Election, the Fund will withhold the 10% Puerto Rico Withholding Tax from Taxable Dividends distributed to Puerto Rico Individuals.  Upon filing his or her Puerto Rico income tax return, the Puerto Rico Individual that fails to make an Election will still have the option to include the Taxable Dividend as ordinary income subject to the regular income tax.  If such option to include the Taxable Dividends as ordinary income is made, the 10% Puerto Rico Withholding Tax will be allowed as a credit against the Puerto Rico Individual's income tax liability for the particular taxable year.

Unless otherwise designated by the Fund, its distributions of dividends to Puerto Rico Individuals will consist of Taxable Dividends subject to the 10% Puerto Rico Withholding Tax.

*Taxable Dividends Distributed to Puerto Rico Entities.*  Puerto Rico Entities receiving Taxable Dividends during a taxable year are entitled to claim an 85% dividend received deduction with respect to such distributions (the "Dividend Received Deduction").  The Dividend Received Deduction may not exceed 85% of the Puerto Rico Entity's net taxable income for such taxable year.  The remaining 15% of such dividends is subject to income tax at the regular corporate income tax rates.

Unless otherwise designated by the Fund, its distributions of dividends to Puerto Rico Entities will consist of Taxable Dividends subject to the Dividend Received Deduction.

*Taxable Dividends Distributed to Special Partnerships and Corporations of Individuals.*  Puerto Rico Entities that are treated under the Puerto Rico Code as "special partnerships" or "corporations of individuals", are generally exempt from Puerto Rico income tax and their income is treated as derived by their respective owners (the "Owners").  Accordingly, Taxable Dividends distributed to a Puerto Rico Entity during a taxable year in which such Puerto Rico Entity has in effect an election to be treated as a "special partnership" or a "corporation of individuals" will not subject to Puerto Rico income tax in the hands of such investor.  In lieu thereof, the Taxable Dividends received by such Puerto Rico Entity will be treated as being derived by its Owners in an amount equal to their distributive share in such income and subject to Puerto Rico income tax under the rules described herein.  For purposes of the following discussion it is assumed that the Owner is (i) a resident individual, estate, or a trust that is taxable as a trust under the Puerto Rico Code (collectively, the "Individual Owners"), or a corporation or partnership created or organized under the laws of Puerto Rico that is not a "special partnership", a "corporation of individuals", or an insurance company (the "Institutional Owner").

39

Individual Owners will be subject to the 10% Puerto Rico Withholding Tax with respect to their distributive share of Taxable Dividends received by a Puerto Rico Entity that is a "special partnership" or a "corporation of individuals", provided such Taxable Dividends otherwise qualify for the 10% Withholding Tax in the hands of a Puerto Rico Individual. See *Taxable Dividends Distributed to Puerto Rico Individuals*. If an Individual Owner's distributive share in a Taxable Dividend qualifies for the 10% Withholding Tax, the Puerto Rico Entity will be required to comply with the withholding of tax at source, deposit and reporting requirements imposed by section 1012 of the Puerto Rico Code for such Taxable Dividends. An Individual Owner may make an Election in accordance with the rules provided by such section of the Puerto Rico Code and the regulations issued thereunder. An Individual Owner's distributive share in Taxable Dividends that does not qualify for the 10% Puerto Rico Withholding Tax will be subject to the regular income tax rates provided by the Puerto Rico Code. In such case, the Puerto Rico entity that is a special partnership or corporation of individuals is generally required to withhold 33% of the Individual Owner's distributive share of the net income of the entity, which would include the Taxable Dividends not eligible for the 10% Withholding Tax.

An Institutional Owner's distributive share in Taxable Dividends received by a Puerto Rico Entity that is a "special partnership" will be subject to Puerto Rico income tax at the regular income tax rates. The Institutional Owner should be entitled to claim the Dividend Received Deduction in connection with its distributive share of Taxable Dividends received by the Puerto Rico Entity. The Puerto Rico entity that is a special partnership generally must withhold 39% of the Institutional Owner's distributive share of the net income of the special partnership, which would include such Taxable Dividend.

*Capital Gain Dividends.* Capital Gain Dividends distributed to Puerto Rico Investors are treated as long-term capital gains in the hands of such investors.

A Capital Gain Dividend received by a Puerto Rico Entity that is a "special partnership" or a "corporation of individuals" is not subject to Puerto Rico income tax in the hands of such investor. In lieu thereof, the Owners are treated as deriving such Capital Gain Dividends in an amount equal to their distributive share in such income.

The Puerto Rico Code provides for a 10% long term capital gains rate for Puerto Rico Individuals and a 12.5% long term capital gains tax rate for Puerto Rico Entities in connection with long term capital gains realized from the sale or exchange of "property located in Puerto Rico," as defined in the Puerto Rico Code. Long term capital gains realized by Puerto Rico Individuals and Puerto Rico Entities with respect to the sale or exchange of property that does not constitute "property located in Puerto Rico" will respectively qualify for a 20% and 25% capital gains tax rate. It is important to note that the Puerto Rico Code does not specify whether Capital Gain Dividends should be treated as a gain from the sale or exchange of "property located within Puerto Rico" or other property and therefore, the applicable capital gains tax rate for such distributions is not currently determinable.

*Exempt Dividends.* Exempt Dividends will not be subject to the regular income tax imposed by the Puerto Rico Code on the Puerto Rico Investors. Likewise, for purposes of the alternative minimum tax, the "adjusted net book income" of the Puerto Rico Entities will not include Exempt Dividends.

A Distribution by the Fund will qualify as an Exempt Dividend if (i) such dividend is designated as an Exempt Dividend by the Fund in a written notice submitted to the Puerto Rico Investors no later than 59days after the close of the Fund's taxable year, and (ii) such dividend does not exceed the earnings and profits of the Fund attributable to income that is exempt under the Puerto Rico Code.

The Puerto Rico Code provides various rules that disallow a deduction for expenses that are directly or indirectly attributable to income that is exempt from Puerto Rico income tax.

*Exempt Dividends Distributed to Special Partnerships and Corporations of Individuals.* An Exempt Dividend distributed to a Puerto Rico Entity during a taxable year in which it has in effect an election to be treated as a "special partnership" or a "corporation of individuals" will be excluded from the gross income of such investor for purposes of

40

determining the net income to be treated as derived by its Owners.  As a result thereof, an Exempt Dividend is not treated as an item of income derived by the Owners.

In order to take into account the tax free nature of Exempt Dividends received by a Puerto Rico Entity that is a "special partnership", the Puerto Rico Code provides that the adjusted basis of an Owner's Interest in the Puerto Rico Entity will increase by an amount equal to such Owner's distributive share of the Exempt Dividends received by the Puerto Rico Entity.  Such an increase in the adjusted basis of an Owner has the effect of reducing any gain or increasing any loss the such Owner may realize on account of a sale or exchange of the ownership interest in the Puerto Rico Entity or on account of distributions received therefrom.

For Puerto Rico Entities that are "corporations of individuals" the Puerto Rico Code does not provide for an adjustment in the adjusted basis of an Owner for Exempt Dividends received by such Puerto Rico Entity.

*Distributions of Principal.*  For purposes of the Puerto Rico Code, all distributions (including Distributions of Principal) made by the Fund during a taxable year, will be treated as dividends to the extent for such year the Fund has current or accumulated earnings and profits, as determined under the Puerto Rico Code.  Distributions in excess of current and accumulated earnings and profits will be treated as a tax-free return of capital to the Puerto Rico Investor to the extent of such investor's basis in the Shares.  To the extent that such distributions exceed the Fund's current and accumulated earnings and profits and the Puerto Rico Investor's basis in the Shares, such excess will be treated as a gain derived from the sale, exchange or other disposition of such Shares.  If the Shares have been held by the Puerto Rico Investor for more than six months and they constitute a capital asset in the hands of such investor, the gain will qualify as a long term capital gain.  The Puerto Rico Code provides for a 10% long term capital gains rate for Puerto Rico Individuals and a 12.5% long term capital gains rate for Puerto Rico entities in connection with long term capital gains realized from the sale or exchange of "property located in Puerto Rico," as defined in the Puerto Rico Code.  Long term capital gains realized by Puerto Rico Individuals and Puerto Rico entities with respect to the sale or exchange of property that does not constitute "property located in Puerto Rico" will qualify, respectively, for a 20% and 25% capital gains rate.  It is important to note that the Puerto Rico Code does not specify whether distributions in excess of current and accumulated earnings or profits should be treated as a gain from the sale or exchange of "property located in Puerto Rico" or other property and, therefore, the applicable capital gains rate for such distributions is not currently determinable.

*Sale, Exchange or Other Disposition of the Shares.*  Gains from the sale, exchange or other disposition of Shares which have been held by Puerto Rico Individuals for more than six months and which constitute capital assets in the hands of such investors are subject to a 10% capital gains tax.  Puerto Rico Individuals may elect to treat such gains as ordinary income and subject to the regular income tax provided by the Puerto Rico Code in lieu of the 10% tax rate indicated herein.

Gains from the sale, exchange or other disposition of Shares which have been held by Puerto Rico Entities for more than six months and which constitute capital assets in the hands of such investors qualify for a 12.5% alternative capital gains tax.

Losses from the sale, exchange or other disposition of Shares that constitute capital assets in the hands of Puerto Rico Investors are deductible only to the extent of gains from the sale, exchange or other disposition of capital assets; except that Puerto Rico Individuals may also deduct up to $1,000 of such losses from ordinary income.

*Redemption of Shares.*  The partial or total redemption of Shares is generally treated as a sale or exchange of such Shares, unless it is "essentially equivalent to a dividend." If a redemption of Shares is treated as "essentially equivalent to a dividend," then the redemption is treated as a Taxable Dividend to the extent of the Fund's current and accumulated earnings and profits.  In distinguishing whether a stock redemption should be treated as such or "essentially equivalent to a dividend," the Puerto Rico Code Regulations provide that (i) pro-rata redemptions of stock are generally treated as essentially equivalent to a dividend, and (ii) redemptions that terminate a shareholder's interest

41

are not to be treated as essentially equivalent to a dividend.  However, neither the Puerto Rico Code nor the Puerto Rico Code Regulations set forth guidelines to determine which other redemptions are not essentially equivalent to a dividend distribution.   In the absence of Puerto Rico guidelines, the Treasury Department generally follows the principles established under the Code, the Code Regulations, and rulings and other administrative pronouncements of the IRS.

*Dividends Distributed to Life Insurance Companies.*  Taxable Dividends and Exempt Dividends distributed to insurance companies organized under the laws of the Commonwealth of Puerto Rico which are subject to the Puerto Rico income tax as "life insurance companies" under the provisions of Section 1201 of the Puerto Rico Code (the "Life Insurance Companies") will not be subject to the regular income tax.

Capital Gain Dividends will be subject to income tax under the Puerto Rico Code and treated as long term capital gains.  See "Taxation of Puerto Rico Investors – Capital Gain Dividends."

For purposes of the alternative minimum tax, the "adjusted net book income" of Life Insurance Companies does not include Exempt Dividends.

*Dividends Distributed to Mutual Insurance Companies.*  Taxable Dividends received by insurance companies organized under the laws of the Commonwealth of Puerto Rico, other than Life Insurance Companies, which are subject to Puerto Rico income tax under the provisions of Section 1211 of the Puerto Rico Code (the "Mutual Insurance Companies") are subject to income tax under the Puerto Rico Code.  Mutual Insurance Companies are entitled to claim the 85% Dividend Received Deduction with respect to Taxable Dividends, subject to the limitations imposed by the Puerto Rico Code.

Capital Gain Dividends will be treated as long-term capital gains.  See "Taxation of Puerto Rico Investors – Capital Gain Dividends."

Exempt Dividends distributed to Mutual Insurance Companies will not be subject to the regular income tax.  The Puerto Rico Code provides various rules that disallow a deduction for expenses that are directly or indirectly attributable to income that is exempt from Puerto Rico income tax.

For purposes of the alternative minimum tax, the "adjusted net book income" of Mutual Insurance Companies does not include the Exempt Dividends.

*Dividends Distributed to Non-Mutual Insurance Companies.*   Taxable Dividends received by Insurance Companies subject to Puerto Rico income tax under the provisions of Section 1207 of the Puerto Rico Code (the "Non-Mutual Insurance Companies"), will be included in gross income.  Non-Mutual Insurance Companies are entitled to claim the 85% Dividend Received Deduction with respect to Taxable Dividends, subject to the limitations imposed by the Puerto Rico Code.

In computing their net income for purposes of the regular income tax, Non-Mutual Insurance Companies are entitled to deduct interest exempt from Puerto Rico income taxes under the provisions of Section 1022(b)(4) of the Puerto Rico Code.  The Non-Mutual Insurance Companies are not, however, entitled to deduct expenses that are attributable to exempt interest as provided in Section 1207(e) of the Puerto Rico Code.  Moreover, such Section 1207 does not address the treatment of Exempt Dividends distributed from earnings and profits attributable to interest described in Section 1022(b)(4) of the Puerto Rico Code.  Under the general principles that apply to the tax treatment of distributions made by investment companies registered under the Puerto Rico Investment Companies Act, Exempt Dividends should be treated as interest described in Section 1022(b)(4) of the Puerto Rico Code to the extent distributed out of such earnings and profits.

Capital Gain Dividends will be treated as long term capital gains.  See "Taxation of Puerto Rico Investors – Capital Gain Dividends."

For purposes of the alternative minimum tax, the "adjusted net book income" of Non-Mutual Insurance Companies will not include Exempt Dividends.

*Estate and Gift Taxes.*  The Shares will not be subject to Puerto Rico estate and gift taxes if held by a Puerto Rico Individual who is a citizen of the United States that acquired his or her citizenship solely by reason of birth or residence in Puerto Rico and was a resident of Puerto Rico, in the case of estate taxes, at the time of death, and in the case of gift taxes, at the time the gift was made.

*Municipal License Taxes.*  Distributions made to Puerto Rico Entities may be subject to a municipal license tax of up to 1.5% in the case of investors engaged in a financial business, and up to 0.5% in the case of Puerto Rico Entities engaged in a non-financial business, as defined in the MLTA.  Distributions to Puerto Rico Individuals will not be subject to municipal license tax.

*Property Taxes.*  The Shares are exempt from Puerto Rico personal property taxes in the hands of the Puerto Rico Investors.

### United States Taxation

**Taxation of the Fund**

In the opinion of O'Neill & Borges, counsel to the Fund, based on certain representations made by the Fund and the Investment Adviser, the Fund will be treated under the Code as a foreign corporation not engaged in a U.S. trade or business.  As a foreign corporation not engaged in a U.S. trade or business, the Fund is not subject to U.S. federal income tax on gains derived from the sale or exchange of personal property (except for gains from the disposition of a "United States Real Property Interest," as defined in Section 897 of the Code).  The Fund is, however, subject to a U.S. federal income tax of 30% on certain other types of income from sources within the United States. An opinion of counsel is not binding on the IRS, however, and it is possible that the IRS or a court could disagree with counsel's conclusion.  If the Fund were ultimately found to be engaged in a U.S. trade or business, it would be subject to U.S. federal corporate income tax on that part of its net income that was effectively connected with such trade or business and to a branch profits tax (which is generally imposed on a foreign corporation on the repatriation from the U.S. of earnings and profits attributable to a U.S. trade or business) at a 30% rate on its earnings and profits attributable to such effectively connected income, subject to a number of statutory adjustments.

The Code also imposes a "Personal Holding Company" tax on certain income derived from sources within the U.S. by foreign corporations that qualify as "Personal Holding Companies."  In general, a "Personal Holding Company" is any corporation that derives at least 60% of its gross income from certain sources in which more than 50% of the value of its stock is owned directly or indirectly by five or fewer individuals.  The Fund's Certificate of Incorporation contains certain ownership limitations to ensure that five or fewer Puerto Rico residents never own directly or indirectly more than 50% of the stock of the Fund, measured by value or voting power.  Furthermore, if the Fund qualifies as a "Foreign Personal Holding Company" or as a "PFIC" (as defined below), it will not be treated as a "Personal Holding Company."

**Taxation of Puerto Rico Individuals and Puerto Rico Entities**

*Dividends.*  Dividends distributed by the Fund will constitute income from sources within Puerto Rico for purposes of the Code.

Under Code Section 933, Puerto Rico Individuals will generally not be subject to U.S. federal income tax on dividends distributed by the Fund (see "PFIC" discussion below).

Foreign corporations not engaged in a U.S. trade or business are generally not subject to U.S. federal income tax on amounts received from sources outside the U.S.  Corporations incorporated in Puerto Rico are treated as foreign corporations under the Code.  Because dividends distributed by the Fund will constitute income from sources within Puerto Rico, Puerto Rico corporations not engaged in a U.S. trade or business will not be subject to U.S. taxation on dividends received from the Fund.  Dividends paid to a Puerto Rico corporate investor that is engaged in a U.S. trade or business will be subject to U.S. federal income tax only if such dividends are effectively connected to the U.S. trade or business.  The Code provides special rules for Puerto Rico Entities that are treated as partnerships for U.S. federal income tax purposes.

*Sales, Exchange or Disposition of Shares.*  Gain, if any, from the sale, exchange or other disposition of the Shares by a Puerto Rico Individual that is not a resident of the United States, within the meaning of Section 865(g)(1) of the Code, is generally treated as Puerto Rico source income and therefore exempt from federal income  taxation  if such shares do not constitute inventory in the hands of such investor and the Puerto Rico Individual pays a Puerto Rico income tax at an effective rate of at least 10% on the gain.  However, a Puerto Rico Individual who is not subject to a 10% Puerto Rico income tax on a gain realized from the sale of the Shares (that do not constitute inventory in the hands of such investor) may nevertheless treat the gain as Puerto Rico source income not subject to U.S. federal income tax if the requirements of Notice 89-40 are met.  In Notice 89-40, the IRS announced that regulations will be issued to provide that gain from the sale of stock that does not constitute inventory, by an individual that is not a resident of the U.S. under Section 865(g)(1) of the Code and who has been a bona fide resident of Puerto Rico for the entire taxable year of the sale will be income from sources within Puerto Rico and therefore exempt from U.S. federal income taxation, whether or not the individual paid a Puerto Rico income tax of at least 10% on the gain.  Unless contrary authority is issued, a Puerto Rico Individual who meets the conditions described in the Notice may treat gain from the sale, exchange or other disposition of the Shares as Puerto Rico source income.

A Puerto Rico corporation that invests in the Fund will be subject to U.S. federal income tax on a gain from a disposition of Shares only if the gain is effectively connected to a U.S. trade or business carried on by the Puerto Rico corporation.  The Code provides special rules for Puerto Rico Entities that are subject to federal income tax as partnerships.

*PFIC Rules.*  Under the Code, the Fund will likely be treated as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes.  Under the PFIC rules, a Shareholder that is a U.S. person — i.e., a citizen or resident of the U.S., a U.S. domestic corporation or partnership, or an estate or trust that is taxed as a resident of the U.S. — (such a Shareholder referred to as a "U.S. Shareholder"), that disposes of its PFIC stock at a gain is treated as receiving an "excess distribution" equal to such gain.  In addition, if a U.S. Shareholder receives a distribution from a PFIC in excess of 125% of the average amount of distributions such Shareholder has received from the PFIC during the three preceding taxable years (or shorter period if the U.S. Shareholder has not held the stock for three years), the U.S. Shareholder is also treated as receiving an "excess distribution" equal to such excess.  In general, an "excess distribution" is taxed as ordinary income, and to the extent it is attributed to earlier years in which the PFIC stock was held, is subject to an interest charge which the Code refers to as the "deferred tax amount."  Puerto Rico corporations are not U.S. Shareholders for purposes of the PFIC provisions.  However, the PFIC rules may also give rise to tax consequences for a U.S. person that owns an interest in such entity.  Citizens of the U.S. who are bona fide residents of Puerto Rico are U.S. Shareholders for purposes of the PFIC provisions.

Prop. Reg. Sec. 1.1291-1(f) states that a "deferred tax amount" will be determined under Section 1291 of the Code on amounts derived from sources within Puerto Rico by Puerto Rico Individuals only to the extent such amounts are allocated to a taxable year in the Shareholder's holding period during which the Shareholder was not entitled to the benefits of Section 933 thereof.  Thus, under the proposed regulations, Puerto Rico Individuals will not be subject to the PFIC provisions if they are entitled to the benefits of Section 933 of the Code for each entire taxable year that they hold the Shares.

*Foreign Personal Holding Company Rules.*  U.S. Shareholders of a "foreign personal holding company" are subject to U.S. federal income tax on their allocable portions of certain undistributed income of such entity, thereby preventing deferral of U.S. federal income taxes on such income.  A "foreign personal holding company" generally includes a foreign corporation if such corporation meets certain income tests and more than 50% of its stock is owned directly or indirectly by five or fewer individuals who are U.S. citizens or residents.  Puerto Rico Individuals, that are U.S. citizens, are not excepted from such status for these purposes.  However, because the Code excludes Puerto Rico source income from the gross income of Puerto Rico Individuals, such an individual would not be subject to U.S. federal income tax on undistributed income of the Fund, even if the Fund were a foreign personal holding company.  Furthermore, the Fund's Certificate of Incorporation contains certain ownership limitations to ensure that five or fewer Puerto Rico residents never own directly or indirectly more than 50% of the stock of the Fund, measured by value or voting power.

**Estate and Gift Taxes**

Under the provisions of the Code, the Shares will not be subject to U.S. estate and gift taxes if held by a Puerto Rico Individual who is a citizen of the U.S. who acquired his or her citizenship solely by reason of birth or residence in Puerto Rico and was a resident of Puerto Rico, in the case of estate taxes, at the time of death, and in the case of gift taxes, at the time the gift was made.

Potential investors are advised to consult their own tax advisers as to the consequences of an investment in the Fund under the tax laws of Puerto Rico and the U.S., including the consequences of the sale or redemption of Shares in the Fund.

## DESCRIPTION OF CAPITAL STOCK

The Fund is authorized to issue 88,000,000 shares of Common Stock, $0.01 par value per share, and 12,000,000 shares of Preferred Stock, $25 par value per share.  The Board of Directors is authorized to classify and reclassify any unissued shares of capital stock from time to time by setting or changing the rights, preferences, and other terms and conditions of such shares.

**Common Stock**

The Shares have no preemptive, conversion, exchange or redemption rights.  Each Share has equal voting, dividend, distribution, and liquidation rights.  Shareholders are entitled to one vote per Share.  All voting rights for the election of directors are noncumulative, which means that the holders of more than 50% of the Shares can elect 100% of the directors then nominated for election if they choose to do so, and in such event, the holders of the remaining Shares will not be able to elect any directors.  The Puerto Rico Investment Companies Act provides that not more than 50% of the Shares may be controlled by less than six Shareholders.

The Fund may sell additional Shares in the future, if approved by its Board of Directors.  During a certain period of time prior to the closing of any such sales, UBS Puerto Rico may have to stop buying and selling outstanding Shares in the market.

**Preferred Stock**

The Fund is authorized to issue 12,000,000 shares of preferred stock.  Each share of preferred stock has a par value of $25.  At the time of issuance of each series of preferred stock, the Board of Directors of the Fund will determine the particular rights and other characteristics of such series, including:

(a)     The number of shares constituting that series;

(b)     The dividend rate of the shares of that series; whether dividends shall be cumulative, and if so, from which date or dates; and the relative rights of priority, if any, of payment of dividends on the shares of that series;

(c)     Whether the shares of that series shall have conversion privileges, and if so, the terms and conditions of such conversion;

(d)     Whether or not the shares of that series shall be redeemable, and if so, the terms and conditions of such redemption, including the date or dates after which they shall be redeemable, and the redemption price;

(e)     Whether the shares of that series shall have a sinking fund for the redemption or purchase of such shares, and if so, the terms and amount of such sinking fund;

(f)     The rights of the shares of that series in the event of the voluntary or involuntary liquidation, dissolution or winding-up of the Fund, and the relative rights of priority, if any, of payment of shares of that series; and

(g)     Any other relative rights, voting rights, preferences, and limitations of that series.

Upon any voluntary or involuntary liquidation, dissolution, or winding-up of the Fund, the holders of the shares of preferred stock will be entitled to receive, out of the assets of the Fund available for distribution to shareholders, before any distribution is made to holders of the Shares, distributions upon liquidation in an amount per share of preferred stock equal to the liquidation preference plus, if provided by the resolution of the Board of Directors of the Fund creating a particular series of preferred stock, accrued and unpaid dividends.

The specific terms and conditions of any preferred stock issuance by the Fund will be set forth in a prospectus supplement to this Prospectus.  Moreover, in accordance with the Puerto Rico Investment Companies Act, the Commissioner of Financial Institutions must also approve the issuance of such preferred stock.

### RULING OF THE COMMISSIONER

Pursuant to the Commissioner's Ruling, the Commissioner of Financial Institutions imposed certain restrictions on the Fund and granted the Fund certain waivers from the provisions of the Puerto Rico Investment Companies Act.  The Commissioner's Ruling is available for inspection at the Fund's principal office.  Among the restrictions imposed on the Fund and the waivers granted to the Fund in the Commissioner's Ruling are the following:

1.  The Fund is authorized to (i) offer, issue, and sell securities through private placements and (ii) after the initial offering period, offer, issue, and sell common stock through private placements, but only in connection with the Fund's dividend reinvestment plan.

2.  The Fund is allowed to hold investments in Puerto Rico Securities and U.S. Government securities in each case in excess of the 25% limitation on investments in a single issuer imposed by Section 2 of the Puerto Rico Investment Companies Act.  For all other securities, the Fund must comply with the 25% limitation on investment of a single issuer imposed by Section 2 of the Puerto Rico Investment Companies Act.

3.  The Fund may also purchase or otherwise acquire securities issued by UBS Puerto Rico or its affiliates, subject to a limitation of 5% of the market value of the Fund's total assets and the approval of a majority of the Independent Fund Directors.

4.  The Fund shall comply with the 67% Investment Requirement on or before the first anniversary of its registration as an investment company with the Commissioner of Financial Institutions, by investing at least 67% of the net proceeds received by the Fund from the sale of its securities invested in Puerto Rico Assets.  Thereafter, the Fund shall comply with the 67% Investment Requirement by investing at all times 67% of its total assets in Puerto Rico Assets upon the sale, exchange, prepayment, maturity or any other voluntary or involuntary disposition of a Fund asset, provided that the amount required by the Fund to be invested in order to achieve compliance with the 67% Investment Requirement shall not exceed the amount of cash available for investment by the Fund as a result of the sale, exchange, prepayment, maturity, or any other voluntary or involuntary disposition of a Fund asset.  In the event that the 67% Investment Requirement is not met, as verified on any valuation date, the Fund shall achieve compliance with such requirement by the end of the calendar month after the date of non-compliance, taking such actions as may be determined by the Investment Adviser to be in the best interests of the Fund's investors.

5.  The 67% Investment Requirement shall not be applicable (i) during a maximum of 60 days per year, for defensive or strategic purposes, (ii) during a maximum of 30 days per year, upon the proven scarcity of Puerto Rico Assets or of market disruption, or (iii) otherwise, for such longer periods as approved by the Commissioner of Financial Institutions.

6.  The Fund will render quarterly reports as specified by the Commissioner of Financial Institutions affirmatively certifying full compliance with the 67% Investment Requirement during the preceding quarter (if applicable), or if the Fund failed to comply with such requirement, specifying the extent of the breach, the reasons therefor, and a description of the actions taken or to be taken by the Fund to achieve compliance. In addition, the Fund shall submit annual reports and audited financial statements, as well as any report requested by the Commissioner of Financial Institutions from time to time, and the Commissioner of Financial Institutions may designate an auditor, at the Fund's expense, to verify compliance by the Fund with the requirements contained in the Commissioner's Ruling.

7.  A claim by a Fund investor against the Fund, its directors or officers will be subject to the jurisdiction of the Puerto Rico courts, and therefore arbitration proceedings will not be the sole forum to resolve any claims.

In addition, the Commissioner of Financial Institutions has restricted the Fund's ability to engage in certain leveraging activities.  Presently, the Fund may conduct additional offerings of preferred stock, debt securities, and other forms of leverage, including reverse repurchase agreements, subject to the 50% of total assets restriction after giving effect to previous borrowings and previously issued preferred stock, debt securities, and other forms of leverage.  Such offerings would be made to Puerto Rico Residents.  See "Appendix F — Hedging and Related Income Strategies" herein.

## UNDERWRITING

UBS Puerto Rico, in its capacity as the Underwriter of the Shares, will purchase from the Fund, subject to the terms and conditions of a certain underwriting agreement (the "Underwriting Agreement"), and the Fund will sell to the Underwriter, all the Shares being offered hereby.

The Underwriter will commit to purchase the number of Shares specified in the cover page of this prospectus at several closings to be held in San Juan, Puerto Rico.  It is anticipated that the Initial Closing will take place on or about July 31, 2003, and that several additional closings will take place at monthly intervals thereafter.  The Fund may increase the number of Shares offered to the public.  The Underwriter will offer and sell the Shares at a public offering price equal to the greater of (i) $10.00 or (ii) the then current net asset value per Share plus the applicable sales load.  The sales load on purchases of the Shares in this offering is $0.475 per Share (4.75%).  Subject to the terms and conditions of the Underwriting Agreement, UBS Puerto Rico will compensate certain brokers and dealers in connection with sales of the Shares in this offering at a rate of up to $0.30 per Share.  After the later of (i) the final closing of the initial public offering of the Shares or (ii) the date of closing for the purchase of any Shares to cover over-allotments, the public offering price and other selling terms may be changed by UBS Puerto Rico.  Investors should consult their

brokers concerning the manner and method of payment for the Shares.  The minimum investment in the initial public offering is 100 Shares.

UBS Puerto Rico may reduce or waive in its entirety the sales load on sales of the Shares where investors (i) represent that the purchase of the Shares will be made with the proceeds from the redemption or sale of stock or units of any fixed income investment companies or portfolio thereof advised by UBS Asset Managers; (ii) provide notice to UBS Puerto Rico prior to such redemption or sale; and (iii) execute their purchase of the Shares within 60 days of such redemption or sale.  Pending such purchase, the redemption or sale proceeds must be held in cash or cash equivalents. For investors that satisfy such requirements, UBS Puerto Rico currently intends to reduce the sales load in an amount not to exceed $0.275 per Share, which results in a sales load of $0.20 per Share.

The Fund will grant to UBS Puerto Rico an option, exercisable for 30 days from the date of the Final Closing, to purchase up an additional number of Shares equal to 15% of the aggregate number of Shares sold through the date of the Final Closing.  UBS Puerto Rico may exercise this option only to cover over-allotments.  The maximum sales load paid to UBS Puerto Rico for this offering, based on a maximum sales load per Share of $0.475, and assuming that the Fund issues only the number of Shares set forth on the cover page of this prospectus, is set forth on the cover page of this prospectus.

UBS Puerto Rico may take certain actions to discourage short-term trading of the Shares during a period of time following the initial offering date.  Included in these actions is the withholding of any compensation to dealers in connection with Shares which were sold by such dealers and which were repurchased for the account of UBS Puerto Rico during such period.

The Underwriting Agreement will provide that the obligation of UBS Puerto Rico to purchase the Shares offered hereby will be subject to certain conditions.  UBS Puerto Rico will commit to purchase, and the Fund will be obligated to sell, by means of a firm commitment underwriting, all of the Shares offered by this Prospectus, if any are purchased.  The Underwriting Agreement will provide that it may be terminated at or prior to the Initial Closing if, in the judgment of UBS Puerto Rico, payment for and delivery of the Shares is rendered impracticable or inadvisable.

UBS Puerto Rico may appoint other entities to distribute Shares of the Fund as selected dealers.

## LEGAL OPINIONS

The statements in the section "TAXATION" have been passed upon by O'Neill & Borges, San Juan, Puerto Rico.  O'Neill & Borges will render an opinion on the validity of the Shares on each closing date.

## INDEPENDENT ACCOUNTANTS

The independent accountants of the Fund are PricewaterhouseCoopers LLP  The address of such independent accountants is Banco Bilbao Vizcaya Building, Ninth Floor, 254 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

## PRIVACY POLICY

Attached as Appendix G is a copy of the Privacy Policy as to the information the Fund compiles and maintains on its investors.

## GENERAL INFORMATION

**Reports to Shareholders**

The fiscal year of the Fund ends on June 30 of each year.  An annual report, containing financial statements audited by the Fund's independent auditors, will be sent to Shareholders each year.  After the end of each year, Shareholders will receive Puerto Rico income tax information regarding dividends and capital gains distributions.

**Additional Information**

Additional information regarding the Fund is on file with the Commissioner of Financial Institutions.

[Intentionally left blank]

APPENDIX A

## MORTGAGE-BACKED SECURITIES

### General

Mortgage-backed securities were introduced in the 1970s when the first pool of mortgage loans was converted into a mortgage pass-through security.  Since the 1970s, the mortgage-backed securities market in general has vastly expanded and a variety of structures have been developed to meet investor needs.

New types of mortgage-backed securities are developed and marketed from time to time, and consistent with its investment limitations, the Fund expects to invest in those new types of mortgage-backed securities that the Investment Adviser believes may assist the Fund in achieving its investment objective.  The Fund may invest in various types of Puerto Rico Mortgage-Backed Securities, as described herein.  Not all the types of securities described below are available in Puerto Rico.

### Government National Mortgage Association Securities

GNMA is a wholly-owned corporate instrumentality of the U.S. within the Department of Housing and Urban Development.  The National Housing Act of 1934, as amended (the "Housing Act"), authorizes GNMA to guarantee the timely payment of the principal of and interest on securities that are based on and backed by a pool of specified mortgage loans.  To qualify such securities for a GNMA guarantee, the underlying mortgages must be insured by the Federal Housing Administration under the Housing Act, or Title V of the Housing Act of 1949 ("FHA Loans"), or be guaranteed by the Veterans' Administration under the Servicemen's Readjustment Act of 1944, as amended ("VA Loans"), or be pools of other eligible mortgage loans.  The Housing Act provides that the full faith and credit of the U.S. Government is pledged to the payment of all amounts that may be required to be paid under any GNMA guarantee.  In order to meet its obligations under such guarantee, GNMA is authorized to borrow from the U.S. Treasury with no limitation as to amount.

GNMA pass-through mortgage-backed securities may represent a *pro rata* interest in one or more pools of the following types of mortgage loans: (i) fixed rate level payment mortgage loans; (ii) fixed rate graduated payment mortgage loans; (iii) fixed rate growing equity mortgage loans; (iv) fixed rate mortgage loans secured by manufactured (mobile) homes; (v) mortgage loans on multifamily residential properties under construction; (vi) mortgage loans on completed multifamily projects; (vii) fixed rate mortgage loans as to which escrowed funds are used to reduce the borrower's monthly payments during the early years of the mortgage loans ("buydown" mortgage loans); (viii) mortgage loans that provide for adjustments in payments based on periodic changes in interest rates or in other payment terms of the mortgage loans; and (ix) mortgage-backed serial notes.

### Federal National Mortgage Association Securities

FNMA is a federally chartered and privately owned corporation established under the Federal National Association Charter Act.  FNMA was originally organized in 1938 as a U.S. Government agency to add greater liquidity to the mortgage market.  FNMA was transformed into a private sector corporation by legislation enacted in 1968.  FNMA provides funds to the mortgage market primarily by purchasing home mortgage loans from local lenders, thereby providing them with funds for additional lending.  FNMA acquires funds to purchase such loans from investors that may not ordinarily invest in mortgage loans directly, thereby expanding the total amount of funds available for housing.

Each FNMA pass-through mortgage-backed security represents a *pro rata* interest in one or more pool of FHA Loans, VA Loans or conventional mortgage loans (i.e., mortgage loans that are not insured or guaranteed by any governmental agency).  The loans contained in those pools consist of:

(i) fixed rate level payment mortgage loans; (ii) fixed rate growing equity mortgage loans; (iii) fixed rate graduated payment mortgage loans; (iv) variable rate mortgage loans; (v) other adjustable rate mortgage loans; and (vi) fixed rate mortgage loans secured by multifamily projects.  FNMA guarantees timely payment of principal and interest on FNMA mortgage-backed securities.  However, the obligations of FNMA are not backed by the full faith and credit of the U.S.  Instead, these obligations are supported only by the discretionary authority of the U.S. government to purchase the agency's obligations. Nevertheless, because of the relationship between FNMA and the U.S., it is widely believed that FNMA mortgage-backed securities present minimal credit risks.

**Federal Home Loan Mortgage Corporation Securities**

FHLMC is a corporate instrumentality of the U.S. established by the Emergency Home Finance Act of 1970, as amended (the "FHLMC Act").  FHLMC was organized primarily for the purpose of increasing the availability of mortgage credit to finance needed housing.  The operations of FHLMC currently consist primarily of the purchase of first lien, conventional, residential mortgage loans and participation interests in such mortgage loans and the resale of the mortgage loans so purchased in the form of mortgage-backed securities.

The mortgage loans underlying the FHLMC mortgage-backed securities typically consist of fixed rate or adjustable rate mortgage loans with original terms to maturity of between ten and 30 years, substantially all of which are secured by first liens on one-to-four-family residential properties or multifamily projects.  Each mortgage loan must meet the applicable standards set forth in the FHLMC Act.  Mortgage loans underlying FHLMC mortgage-backed securities may include whole loans, participation interests in whole loans and undivided interests in whole loans and participations in another FHLMC mortgage-backed securities.

FHLMC guarantees: (i) the timely payment of interest on all FHLMC mortgage-backed securities; (ii) the ultimate collection of principal with respect to some FHLMC mortgage-backed securities; and (iii) the timely payment of principal with respect to other FHLMC mortgage-backed securities.  However, the obligations of FHLMC are not backed by the full faith and credit of the U.S.

**ARM and Floating Rate Mortgage-Backed Securities**

Because the interest rates on adjustable rate mortgage-backed securities ("ARM mortgaged backed securities") and Floating Rate mortgage-backed securities are reset in response to changes in a specified market index, the values of such securities tend to be less sensitive to interest rate fluctuations than the values of fixed-rate securities.  ARM mortgage-backed securities represent a right to receive interest payments at a rate that is adjusted to reflect the interest earned on a pool of ARMs.  ARMs generally provide that the borrower's mortgage interest rate may not be adjusted above a specified lifetime maximum rate or, in some cases, below a minimum lifetime rate.  In addition, certain ARMs provide for limitations on the maximum amount by which the mortgage interest rate may adjust for any single adjustment period.  ARMs may also provide for limitations on changes in the maximum amount by which the borrower's monthly payment may adjust for any single adjustment period.  In the event that a monthly payment is not sufficient to pay the interest accruing on the ARM, any such excess interest is added to the mortgage loan ("negative amortization"), which is repaid through future monthly payments. If the monthly payment exceeds the sum of the interest accrued at the applicable mortgage interest rate and the principal payment that would have been necessary to amortize the outstanding principal balance over the remaining term of the loan, the excess reduces the principal balance of the ARM.  Borrowers under ARMs experiencing negative amortization may take longer to build up their equity in the underlying property and may be more likely to default.

The rates of interest payable on certain ARMs, and therefore on certain ARM mortgage-backed securities, are based on indices, such as the one-year constant maturity Treasury Rate, that reflect changes in market interest rates.  Others are based on indices, such as the 11th District Federal Home Loan Bank

Cost of Funds index, that tend to lag behind changes in market interest rates.  The values of ARM mortgage-backed securities supported by ARMs that adjust based on lagging indices tend to be somewhat more sensitive to interest rate fluctuations than those reflecting current interest rate levels, although the values of such ARM mortgage-backed securities still tend to be less sensitive to interest rate fluctuations than fixed-rate securities.

Floating Rate mortgage-backed securities are classes of mortgage-backed securities that have been structured to represent the right to receive interest payments at rates that fluctuate in accordance with an index but that generally are supported by pools comprised of fixed-rate mortgage loans.  As with ARM mortgage-backed securities, interest rate adjustments on Floating Rate mortgage-backed securities may be based on indices that lag behind market interest rates.  Interest rates on Floating Rate mortgage-backed securities generally are adjusted monthly.  Floating Rate mortgage-backed securities are subject to lifetime interest rate caps, but they generally are not subject to limitations on monthly or other periodic changes in interest rates or monthly payments.

**Specified Mortgage-Backed Securities**

The Fund may invest in Mortgage-Backed Securities constituting derivative instruments such as interest-only obligations ("IOs"), principal-only obligations ("POs") (other than IOs and POs that are "planned amortization class" or "PAC" bonds), or inverse floating rate obligations or other types of Puerto Rico mortgage-backed securities that may be developed in the future and that are determined by the Investment Adviser to present types and levels of risk that are comparable to such IOs, POs and inverse floating rate obligations (collectively, "Specified Mortgage-Backed Securities").  The Fund will invest in Specified Mortgage-Backed Securities only when the Investment Adviser believes that such securities, when combined with the Fund's other investments, would enable the Fund to achieve its investment objectives and policies.

Stripped mortgage-backed securities ("SMBSs") are classes of mortgage-backed securities that receive different proportions of the interest and principal distributions from the underlying pool of mortgage assets.  SMBSs may be issued by agencies or instrumentalities of the U.S. Government or by private mortgage lenders.  A common type of SMBS will have one class that receives some of the interest and most of the principal from the mortgage assets, while the other class will receive most of the interest and the remainder of the principal.

An IO is an SMBS that is entitled to receive all or a portion of the interest, but none of the principal payments, on the underlying mortgage assets; a PO is an SMBS that is entitled to receive all or a portion of the principal payments, but none of the interest payments, on the underlying mortgage assets.  The Investment Adviser believes that investments in POs may facilitate its ability to manage the price sensitivity of the Fund to interest rate changes.  Generally, the yields to maturity on both IO and PO classes are extremely sensitive to the rate of principal payments (including prepayments) on the underlying mortgage assets.  If the underlying mortgage assets of an IO class of mortgage-backed security held by the Fund experience greater than anticipated prepayments of principal, the Fund may fail to recoup fully its initial investment in such securities even though the securities are rated in the highest rating category.  The Investment Adviser believes that, since principal amortization on PAC Bonds is designed to occur at a predictable rate, IOs and POs that are PAC Bonds generally are not as sensitive to principal prepayments as other IOs and POs.

Mortgage-backed securities that constitute inverse floating rate obligations are mortgage-backed securities on which the interest rates adjust or vary inversely to changes in market interest rates.  Typically, an inverse floating rate mortgage-backed security is one of two components created from a pool of fixed rate mortgage loans.  The other component is a variable rate mortgage-backed security, on which the amount of interest payable is adjusted directly in accordance with market interest rates.  The inverse floating rate obligation receives the portion of the interest on the underlying fixed-rate mortgages that is allocable to the two components and that remains after subtracting the amount of interest payable

A-3

on the variable rate component.  The market value of an inverse floating rate obligation will be more volatile than that of a fixed-rate obligation and like most debt obligations, will vary inversely with changes in interest rates.  Certain of such inverse floating rate obligations have coupon rates that adjust to changes in market interest rates to a greater degree than the change in the market rate and accordingly have investment characteristics similar to investment leverage.  As a result, the market value of such inverse floating rate obligations are subject to greater risk of fluctuation than other mortgage-backed securities, and such fluctuations could adversely affect the ability of the Fund to achieve its investment objectives and policies.

The yields on Specified Mortgage-Backed Securities may be more sensitive to changes in interest rates than Puerto Rico GNMA Mortgage-Backed Securities.  While the Investment Adviser will seek to limit the impact of these factors on the Fund, no assurance can be given that it will achieve this result.

A-4

APPENDIX B

## TYPES OF MUNICIPAL OBLIGATIONS

The Fund may invest in the following types of Municipal Obligations, subject to their availability in Puerto Rico, and in other types of Municipal Obligations that become available on the Puerto Rico market from time to time. Not all of the described Municipal Obligations are presently available in Puerto Rico.

**Municipal Bonds, Industrial Development Bonds and Private Activity Bonds**

Municipal bonds are debt obligations issued to obtain funds for various public purposes. The two principal classifications of municipal bonds are "general obligation" and "revenue" bonds. General obligation bonds are secured by the issuer's pledge of its full faith, credit and taxing power for the payment of principal and interest. Revenue bonds are payable only from the revenues derived from a particular facility or class of facilities or, in some cases, from the proceeds of a special excise tax or from another specific source, such as the user of the facility being financed. Certain municipal bonds are "moral obligation" issues, which normally are issued by special purpose public authorities. In the case of such issues, an express or implied "moral obligation" of a related government unit is pledged to the payment of the debt service but is usually subject to annual budget appropriations.

The Fund may invest in industrial development bonds ("IDBs") and private activity bonds ("PABs"), which are municipal bonds issued by or on behalf of public authorities to finance various privately operated facilities, such as airports or pollution control facilities. IDBs and PABs are generally revenue bonds and thus are not payable from the unrestricted revenue of the issuer. The credit quality of IDBs and PABs is usually directly related to the credit standing of the user of the facilities being financed.

As generally described in this Prospectus, the Fund may not presently concentrate its investments, e.g., invest a relatively high percentage of its assets in Municipal Obligations (e.g., revenue bonds) issued by entities which may pay their debt service obligations from the revenues derived from similar projects such as hospitals, multifamily housing, nursing homes, continuing care facilities, commercial facilities (including hotels), electric utility systems or industrial companies. This limitation may be changed by the Board of Directors. Any determination to allow concentration of the Fund's investments in Municipal Obligations issued by entities that pay their debt service obligations from revenues derived from similar projects may make the Fund more susceptible to economic, political, or regulatory occurrences affecting that type of project. As the similarity in issuers increases, the potential for fluctuation of the net asset value of Shares of the Fund also increases. Also, it is anticipated that a significant percentage of the Municipal Obligations in the Fund's portfolio may be revenue bonds issued by entities or secured by facilities with a relatively short operating history. Therefore, investors should also be aware of the risks which these investments might entail, as discussed below.

*Health Care Revenue Bonds.* These securities include Municipal Obligations that are revenue bonds issued to finance hospitals, nursing homes and continuing care facilities and which are generally secured by the revenues of particular facilities. The ability of the issuers of such securities to meet their obligations is dependent upon, among other things, the revenues, costs and occupancy levels of the subject facilities and the competitive nature of these industries. In addition, a major portion of hospital and nursing home revenues typically is derived from Federal or state programs such as Medicare and Medicaid and from various insurers. Changes in such programs or in the rates paid by insurers may reduce revenues available for the payment of principal of or interest on such bonds. New governmental legislation or regulations and other factors, such as the inability to obtain sufficient malpractice insurance, may also adversely affect the revenues or costs of these issuers. Moreover, in the case of life care facilities, since a portion of the services provided may be financed by an initial lump-sum deposit

B-1

paid by occupants of the facility, there may be risk if the facility does not maintain adequate financial resources to secure estimated actuarial liabilities.

A number of legislative proposals concerning health care have been introduced in U.S. Congress in recent years or have been reported to be under consideration. These proposals include or may lead to a wide range of topics, including cost controls, national health insurance, incentives for competition in the provision of health care services, tax incentives and penalties related to health care insurance premiums and promotion of prepaid health care plans. The Fund is unable to predict the effect of any of these proposals, if enacted.

*Single Family Housing Bonds and Multifamily Housing Bonds.* Single family housing bonds and multifamily housing bonds are obligations of state and local housing authorities that have been issued in connection with a variety of single and multifamily housing projects. Economic developments, including fluctuations in interest rates, increasing construction and operating costs, increasing real estate taxes and declining occupancy rates, and real estate investment risks may have an adverse effect upon the revenues of such projects and such housing authorities. Multifamily housing bonds may be subject to mandatory redemption prior to maturity, including redemption upon a non-completion of the project or upon receipt of Federal Housing Administration or certain other insurance proceeds. Housing bonds may also be subject to changes in creditworthiness due to potential weaknesses of mortgage insurance companies providing various policies; fluctuations in the valuation of invested funds and the strengths of banks and other entities which may provide investment agreements; and smaller than expected mortgage portfolios due to the inability to originate mortgages.

*Public Power Revenue Bonds.* Risks that may arise with respect to the electric utility industry include difficulty in financing large construction programs during an inflationary period; restrictions on operations and increased costs attributable to environmental considerations; the difficulty of the capital markets in absorbing utility securities; the availability of fuel for electric generation at reasonable prices, including among other considerations the potential rise in fuel costs and the costs associated with conversion to alternate fuel sources; technical cost factors and other problems associated with construction, licensing, regulation and operation of nuclear facilities for electric generation, including among other considerations the problems associated with the use of radioactive materials and the disposal of radioactive waste; and the effects of energy conservation. Certain of the issuers of these bonds may own or operate nuclear generating facilities. Federal, state, and municipal governmental authorities may from time to time review and revise existing requirements and impose additional requirements on such facilities. Problems of the type referred to above could adversely affect the ability of the issuer of public power revenue bonds to make payments of principal and interest on such bonds. Certain municipal utilities or agencies may have entered into contractual arrangements with investor-owned utilities and large industrial users and consequently may be dependent in varying degrees on the performance of such contracts for payment of bond debt service. Also, the enforceability against municipalities of "take-and-pay" and "take-or-pay" contracts which secure bonds issued by other municipal issuers has been successfully challenged in recent years.

*Transportation Revenue Bonds.* Bonds in this category include bonds issued for airport facilities, bridges, turnpikes, port facilities, railroad systems, or mass transit systems. Generally, airport facility revenue bonds are payable from and secured by the revenues derived from the ownership and operation of a particular airport. Payment on other transportation bonds is often dependent primarily or solely on revenues from financed facilities, including user fees, charges, tolls and rents. Such revenues may be adversely affected by increased construction and maintenance costs or taxes, decreased use, competition from alternative facilities, scarcity of fuel, reduction or loss of rents, or the impact of environmental considerations. Other transportation bonds may be dependent primarily or solely on Federal, state or local assistance including motor fuel and motor vehicle taxes, fees and licenses and therefore, may be subject to fluctuations in such assistance.

*Water and Sewage Revenue Bonds.*  Bonds in this category include securities issued to finance public water supply treatment and distribution facilities, and sewage collection, treatment and disposal facilities.  Repayment of these bonds is dependent primarily on revenues derived from the billing of customers for water and sewer services, as well as, in some instances, connection fees and hook-up charges.  Such revenue bonds may be adversely affected by the lack of availability of Federal and state grants and by decisions of Federal and state regulatory bodies and courts.

*Solid Waste and Resource Recovery Revenue Bonds.*  Bonds in this category include securities issued to finance facilities for removal and disposal of solid waste.  Repayment of these bonds is dependent on factors that may include revenues from appropriations from a governmental entity, the financial condition of the private project corporation and revenues derived from the collection of charges for disposal of solid waste.  In addition, construction and operation of such facilities may be subject to cost overruns.  Repayment of resource recovery bonds may also be dependent to various degrees on revenues from the sale of electric energy or steam.  Bonds in this category may be subject to mandatory redemption in the event of project non-completion, if the project is rendered uneconomical, if the project fails to meet certain performance criteria, or if it is considered an environmental hazard.

*Pollution Control Facility Revenue Bonds.*  Bonds in the pollution control facilities category include securities issued on behalf of private corporations, including utilities, to provide facilities for the treatment of air, water and solid waste pollution.  Repayment of these bonds is dependent upon income from and the financial condition of the project corporation.  In addition, governmental entities may from time to time impose additional restrictions or regulations that could adversely affect the cost or operation of the facility.

*Educational Facility Revenue Bonds.*  Educational facility revenue bonds include debt of state and private colleges and universities, and parental and student loan obligations.  The ability of universities and colleges to meet their obligations is dependent on various factors, including the revenues, costs and enrollment levels of the institutions.  In addition, their ability may be affected by declines in Federal, state, and alumni financial support, fluctuations in interest rates and construction costs, increased maintenance and energy costs, failure or inability to raise tuition or room charges and adverse results of endowment fund investments.

*Tax Increment Bonds.*  Tax increment bonds are issued to finance various public improvements and redevelopment projects in blighted areas.  Interest on such bonds is payable from increases in real property taxes attributable to increases in assessed value resulting from the redevelopment of the blighted project area.  Repayment risks include, among other things, a reduction in taxable value in the project areas, reduction in tax rates, delinquencies in tax payments or a general shortfall in forecasted tax revenues.

*Commercial Facility Revenue Bonds.*  The Fund may also invest in bonds for other commercial facilities (including hotels) and industrial enterprises.  The viability of such facilities depends on, among other things, general economic factors affecting those industries and affecting those geographic areas in which such facilities are situated, as well as the ability of the individual management of those facilities to maximize earnings and to remain competitive within its service area.

**Municipal Lease Obligations**

Municipal lease obligations are Municipal Obligations that may take the form of leases, installment purchase contracts or conditional sales contracts, or certificates of participation with respect to such contracts or leases.  Municipal lease obligations are issued by state and local governments and authorities to purchase land or various types of equipment and facilities.  Although municipal lease obligations do not constitute general obligations of the municipality for which the municipality's taxing power is pledged, they ordinarily are backed by the municipality's covenant to budget for, appropriate

B-3

and make the payments due under the lease obligation. The leases underlying certain Municipal Obligations, however, provide that lease payments are subject to partial or full abatement if, because of material damage or destruction of the leased property, there is substantial interference with the lessee's use or occupancy of such property. This "abatement risk" may be reduced by the existence of insurance covering the leased property, the maintenance by the lessee of reserve funds or the provision of credit enhancements such as letters of credit.

The liquidity of municipal lease obligations varies. Certain municipal lease obligations contain "non-appropriation" clauses which provide that the municipality has no obligation to make lease or installment purchase payments in future years unless money is appropriated for such purpose on a yearly basis. Some municipal lease obligations of this type are insured as to timely payment of principal and interest, even in the event of a failure by the municipality to appropriate sufficient funds to make payments under the lease. However, in the case of an uninsured municipal lease obligation, the Fund's ability to recover under the lease in the event of non-appropriation or default will be limited solely to the repossession of the leased property, without recourse to the general credit of the lessee, and disposition of the property in the event of foreclosure might prove difficult. The Fund does not intend to invest a significant portion of its assets in such uninsured "non-appropriation" municipal lease obligations. There is no limitation on the Fund's ability to invest in other municipal lease obligations.

**Zero Coupon Obligations**

The Fund may invest in zero coupon Municipal Obligations. Such obligations include "pure zero" obligations, which pay no interest for their entire life (either because they bear no stated rate of interest or because their stated rate of interest is not payable until maturity), and "zero/fixed" obligations, which pay no interest for an initial period and thereafter pay interest currently. Zero coupon obligations also include derivative instruments representing the principal-only components of Municipal Obligations from which the interest components have been stripped and sold separately by the holders of the underlying Municipal Obligations. Zero coupon securities usually trade at a deep discount from their face or par value and will be subject to greater fluctuations in market value in response to changing interest rates than obligations of comparable maturities that make current distributions of interest.

**Floating and Variable Rate Obligations**

The Fund may also purchase floating and variable rate municipal notes and bonds, which frequently permit the holder to demand payment of principal at any time, or at specified intervals, and permit the issuer to prepay principal, plus accrued interest, at its discretion after a specified notice period. The issuer's obligations under the demand feature of such notes and bonds generally are secured by bank letters of credit or other credit support arrangements. There frequently will be no secondary market for variable and floating rate obligations held by the Fund, although the Fund may be able to obtain payment of principal at face value by exercising the demand feature of the obligation.

**Participation Interests**

The Fund may invest in participation interests in municipal bonds, including IDBs, PABs, and floating and variable rate securities. A participation interest gives the Fund an undivided interest in a municipal bond owned by a bank. The Fund has the right to sell the instrument back to the bank. Such right is generally backed by the bank's irrevocable letter of credit or guarantee and permits the Fund to draw on the letter of credit on demand, after specified notice, for all or any part of the principal amount of the Fund's participation interest plus accrued interest. Generally, the Fund intends to exercise the demand under the letters of credit or other guarantees only upon a default under the terms of the underlying bond, or to maintain compliance with the investment objectives and policies of the Fund. The ability of a bank to fulfill its obligations under a letter of credit or guarantee might be affected by possible financial difficulties of its borrowers, adverse interest rate or economic conditions, regulatory limitations or other

B-4

factors.  The Administrator will be responsible for the Fund being provided the services of monitoring the pricing, quality and liquidity of the participation interests held by the Fund, and the credit standing of banks issuing letters of credit or guarantees supporting such participation interests on the basis of published financial information reports of rating services and bank analytical services.

**Put Bonds**

Put bonds are municipal bonds which give the holder an unconditional right to sell the bond back to the issuer or a remarketing agent at a specified price and exercise date, which is typically well in advance of the bond's maturity date.  If the put is a "one time only" put, the Fund ordinarily will sell the bond or put the bond, depending on the more favorable price.  If the bond has a series of puts after the first put, the bond will be held as long as, in the opinion of the Investment Adviser, it is in the best interests of the Fund to do so.  The obligation to purchase the bond on the exercise date of the put may be supported by a letter of credit or other credit support agreement from a bank, insurance company or other financial institution, the credit standing of which affects the credit standing of the obligation.  There is no assurance that an issuer or remarketing agent for a put bond will be able to repurchase the bond on the put exercise date if the Fund chooses to exercise its right to put the bond back to the issuer or remarketing agent.

**Tender Option Bonds**

Tender option bonds are long-term municipal securities sold by a bank subject to a "tender option" that gives the purchaser the right to tender them to the bank at par plus accrued interest at designated times (the "tender option").  The tender option may be exercisable at intervals ranging from bi-weekly to semi-annually, and the interest rate on the bonds is typically reset at the end of the applicable interval in order to cause the bonds to have a market value that approximates their par value.  The tender option generally would not be exercisable in the event of a default on, or significant downgrading of, the underlying municipal securities.  Therefore, the Fund's ability to exercise the tender option will be affected by the credit standing of both the bank involved and the issuer of the underlying securities.

[Intentionally left blank]

**APPENDIX C**

**FORM OF REPRESENTATION LETTER**

[Date]

TO:   [Underwriter or Dealer]
      Puerto Rico Fixed Income Fund, Inc.
      San Juan, Puerto Rico

RE:   **PUERTO RICO FIXED INCOME FUND, INC.**

Dear Sirs:

The undersigned (the "Purchaser"), intends to purchase shares of Common Stock, par value $0.01 per share (the "Shares") of the Puerto Rico Fixed Income Fund, Inc. (the "Fund") from you, as authorized seller of the Shares (the "Seller"), and hereby represents to you that:

1.    The Purchaser is acquiring the Shares for its own account and is the sole beneficial owner thereof.

2.    At the time the Shares were offered to the Purchaser, and as of the date of this letter, the Purchaser was and is a resident of Puerto Rico, which means that the Purchaser is either (i) an individual whose principal residence is in Puerto Rico or (ii) a corporation, partnership, trust or other form of business organization which has its principal office and principal place of business within Puerto Rico, and has not been organized for the purpose of acquiring the Shares.

3.    The Purchaser understands that (i) the Shares have not been registered under the Securities Act of 1933, as amended; (ii) the Fund has not been registered under the U.S. Investment Company Act of 1940, as amended; (iii) none of the Fund, the Seller, or any of their affiliates, is required to register the Shares under the Securities Act of 1933 or to register the Fund under the Investment Company Act of 1940; (iv) the Shares may not be resold, transferred or disposed of except as provided in the Prospectus, and then only to an individual or an entity that executes a letter that contains the same representations as to residency that are set forth in this letter; (v) the Transfer Agency Agreement provides that the Transfer Agent for the Fund may not register the transfer of ownership of any Shares unless the Underwriter of the Shares or an authorized dealer of the Shares or the Transfer Agent receives from the transferee of the Shares a letter of representation substantially similar to this letter; (vi) the Underwriter of the Shares and the authorized dealers of the Shares are under a contractual obligation to the Fund to obtain such a letter of representation and to indemnify the Fund against the consequences of a failure to do so; and (vii) the Certificate of Incorporation of the Fund provides that any purported transfer of Shares to anyone other than a resident of Puerto Rico will be null and void.

4.    If the Purchaser is a business organization, the Purchaser is not an employee benefit plan subject to Section 406 of the Employee Retirement Income Security Act of 1974, as amended, or to Section 4975 of the Internal Revenue Code of 1986, as amended (or comparable provisions of any subsequent enactments), or a trustee of any such plan.

5.    If the Purchaser ceases to be a resident of Puerto Rico, the Purchaser will (i) notify the Seller or the Fund within 30 days of ceasing to be a resident of Puerto Rico, (ii) liquidate its investment in the Fund when such liquidation becomes economically feasible, and (iii) agree not to invest in additional Shares.

6.   The Purchaser acknowledges having received and read a copy of the Prospectus and Prospectus Supplements, if any, relating to the offering of the Shares by the Fund.  The Purchaser further acknowledges that (i) an investment in the Shares may not be suitable to all investors as they are designed primarily for long-term investors, (ii) investors in the Shares should not view the Fund as a vehicle for trading purposes, and (iii) an investment in the Fund is not equivalent to an investment in the underlying securities of the Fund.

7.   The Purchaser hereby acknowledges that the Fund may issue debt securities and preferred stock or otherwise engage in activities that may constitute leverage.  In that regard, the Purchaser fully understands the risks to the Fund and the Purchaser's investment in the Fund resulting from leverage including, but not limited to, the risks described in the Prospectus of the Fund under the heading "Special Leverage Considerations" and "Appendix F — Hedging and Related Income Strategies."

Very truly yours,


By:
Name:
Title (if applicable):
Company (if applicable):

C-2

**APPENDIX D**

## RATINGS OF SECURITIES

**Description of Moody's Investors Service, Inc.'s ("Moody's") Long-Term Ratings**

The purpose of Moody's ratings is to provide investors with a simple system of gradation by which the relative investment qualities of bonds may be noted. There are nine basic rating categories for long-term obligations, ranging from Aaa (highest quality) to C (lowest quality). Moody's applies numerical modifiers 1, 2 and 3 in each generic rating classification from Aa to Caa. The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the lower end of the generic rating category.

Moody's bond ratings, where specified, are applicable to preferred stock, financial contracts, senior bank obligations and insurance company senior policyholder and claims obligations with an original maturity in excess of one year. Obligations relying upon support mechanisms such as letters of credit and indemnity bonds are excluded unless explicitly rated. Obligations of a branch of a bank are considered to be domiciled in the country in which the branch is located.

Moody's ratings are opinions, not recommendations to buy or sell, and their accuracy is not guaranteed. A rating should be weighed solely as one factor in an investment decision, and one should make one's own study and evaluation of any issuer whose securities or debt obligations one is considering buying or selling.

Aaa — Bonds and preferred stock which are rated "Aaa" are judged to be of the best quality. They carry the smallest degree of investment risk and are generally referred to as "gilt edge." Interest payments are protected by a large or by an exceptionally stable margin and principal is secure. While the various protective elements are likely to change, such changes as can be visualized are most unlikely to impair the Fundamentally strong position of such issues.

Aa — Bonds and preferred stock which are rated "Aa" are judged to be of high quality by all standards. Together with the "Aaa" group they comprise what are generally known as high grade bonds. They are rated lower than the best bonds because margins of protection may not be as large as in "Aaa" securities or fluctuation of protective elements may be of greater amplitude or there may be other elements present which make the long-term risks appear somewhat larger than in "Aaa" rated securities.

A — Bonds and preferred stock which are rated "A" possess many favorable investment attributes and are to be considered as upper medium grade obligations. Factors giving security to principal and interest are considered adequate, but elements may be present which suggest a susceptibility to impairment sometime in the future.

Baa — Bonds and preferred stock which are rated "Baa" are considered medium grade obligations (*i.e.*, they are neither highly protective nor poorly secured). Interest payments and principal security appear adequate for the present, but certain protective elements may be lacking or may be characteristically unreliable over any great length of time. Such bonds lack outstanding investment characteristics and in fact have speculative characteristics as well.

Ba — Bonds and preferred stock which are rated "Ba" are judged to have speculative elements; their future cannot be considered as well assured. Often the protection of interest and principal payments may be very moderate, and thereby not well safeguarded during both good and bad times over the future. Uncertainty of position characterizes bonds in this class.

B — Bonds and preferred stock which are rated "B" generally lack characteristics of the desirable investment.  Assurance of interest and principal payments or of maintenance of other terms of the contract over any long period of time may be small.

Caa — Bonds and preferred stock which are rated "Caa" are of poor standing.  Such issues may be in default or there may be present elements of danger with respect to principal or interest.

Ca — Bonds and preferred stock which are rated "Ca" represent obligations which are speculative in a high degree.  Such issues are often in default or have other marked shortcomings.

C — Bonds and preferred stock which are rated "C" are the lowest rated class of bonds and issues so rated can be regarded as having extremely poor prospects of ever attaining any real investment standing.

Issues that are secured by escrowed funds held in trust, reinvested in direct, non-callable U.S. Government obligations unconditionally guaranteed by the U.S. Government or Resolution Funding Corporation are identified with a #(hatchmark) symbol, e.g. #Aaa.

Con.(...) — Bonds for which the security depends upon the completion of some act or the fulfillment of some condition are rated conditionally.  These are bonds secured by (a) earnings of projects under construction, (b) earnings of projects unseasoned in operation experience, (c) rentals which begin when facilities are completed, or (d) payments to which some other limiting condition attaches. Parenthetical rating denotes probable credit stature upon completion of construction or elimination of basis of condition.

**Description of Moody's Short-Term Debt Ratings**

Moody's short-term issuer ratings are opinions of the ability of issuers to honor senior financial obligations and contracts.  Such obligations generally have an original maturity not exceeding one (1) year.  Moody's employs the following three designations, all judged to be investment grade, to indicate the relative repayment ability of rated issuers:

Prime-1.  Issuers rated Prime-1 (or supporting institutions) have a superior ability for repayment of senior short-term debt obligations.  Prime-1 repayment ability will often be evidenced by many of the following characteristics: leading market positions in well-established industries; high rates of return on funds employed; conservative capitalization structure with moderate reliance on debt and ample asset protection; broad margins in earnings coverage of fixed financial charges and high internal cash generation; well-established access to a range of financial markets and assured sources of alternate liquidity.

Prime-2.  Issuers rated Prime-2 (or supporting institutions) have a strong ability for repayment of senior short-term debt obligations.  This will normally be evidenced by many of the characteristics cited above, but to a lesser degree.  Earnings trends and coverage ratios, while sound, may be more subject to variation.  Capitalization characteristics, while still appropriate, may be more affected by external conditions.  Ample alternate liquidity is maintained.

Prime-3.  Issuers rated Prime-3 (or supporting institutions) have an acceptable ability for repayment of senior short-term obligations.  The effects of industry characteristics and market composition may be more pronounced.  Variability in earnings and profitability may result in changes in the level of debt protection measurements and may require relatively high financial leverage.  Adequate alternate liquidity is maintained.

D-2

Issuers rated "Not Prime" do not fall within any of the Prime rating categories.

If an issuer represents to Moody's that its short-term debt obligations are supported by the credit of another entity or entities, then the name or names of such supporting entity or entities are listed within the parenthesis beneath the name of the issuer, or there is a footnote referring the reader to another page for the name or names of the supporting entity or entities. In assigning ratings to such issuers, Moody's evaluates the financial strength of the affiliated corporations, commercial banks, insurance companies, foreign governments, or other entities, but only as one factor in the total rating assessment. Moody's makes no representation and gives no opinion on the legal validity or enforceability of any support arrangements.

**Description of Moody's Short-Term Notes and Variable Rate Demand Obligations (VRDOs) Ratings**

In municipal debt issuance, there are three rating categories for short-term obligations that are considered investment grade. These ratings are designated as Moody's Investment Grade (MIG) and are divided into three levels — MIG 1 through MIG 3. In addition, those short-term obligations that are of speculative quality are designated SG, or speculative grade.

In the case of variable rate demand obligations (VRDOs), a two-component rating is assigned. The first element represents Moody's evaluation of the degree of risk associated with scheduled principal and interest payments. The second element represents Moody's evaluation of the degree of risk associated with the demand feature, using the MIG rating scale. The short-term rating assigned to the demand feature of VRDOs is designated as VMIG. When either the long- or short-term aspect of a VRDO is not rated, that piece is designated NR, e.g., Aaa/NR or NR/VMIG 1. MIG ratings expire at note maturity. By contrast, VMIG rating expirations will be a function of each issue's specific structural or credit features.

MIG1/VMIG1. This designation denotes superior credit quality. Excellent protection is afforded by established cash flows, highly reliable liquidity support, or demonstrated broad-based access to the market for refinancing.

MIG2/VMIG2. This designation denotes strong credit quality. Margins of protection are ample, although not so large as in the preceding group.

MIG3/VMIG3. This designation denotes acceptable credit quality. Liquidity and cash flow protection may be narrow and market access for refinancing is likely to be less well established.

SG. This designation denotes speculative-grade credit quality. Debt instruments in this category may lack sufficient margins of protection.

**Description of Issue Credit Rating Definitions of Standard & Poor's, a Division of the McGraw-Hill Companies, Inc. ("S&P")**

An S&P issue credit rating is a current opinion of the creditworthiness of an obligor with respect to a specific financial obligation, a specific class of financial obligations, or a specific financial program (including ratings on medium term note programs and commercial paper programs). It takes into consideration the creditworthiness of guarantors, insurers, or other forms of credit enhancement on the obligation and takes into account the currency in which the obligation is denominated.

The issue credit rating is not a recommendation to purchase, sell, or hold a financial obligation, inasmuch as it does not comment as to market price or suitability for a particular investor.

D-3

Issue credit ratings are based on current information furnished by the obligors or obtained by S&P from other sources it considers reliable.  S&P does not perform an audit in connection with any credit rating and may, on occasion, rely on unaudited financial information.  Credit ratings may be changed, suspended, or withdrawn as a result of changes in, or unavailability of, such information, or based on other circumstances.

Issue credit ratings can be either long-term or short-term.  Short-term ratings are generally assigned to those obligations considered short-term in the relevant market.  In the U.S., for example, that means obligations with an original maturity of no more than 365 days - including commercial paper.  Short-term ratings are also used to indicate the creditworthiness of an obligor with respect to put features on long-term obligations.  The result is a dual rating, in which the short-term rating addresses the put feature, in addition to the usual long-term rating.  Medium-term notes are assigned long-term ratings.

***Long-Term Issue Credit Ratings***

Issue credit ratings are based, in varying degrees, on the following considerations:

I.     Likelihood of payment capacity and willingness of the obligor to meet its financial commitment on an obligation in accordance with the terms of the obligation;

II.    Nature of and provisions of the obligations; and

III.   Protection afforded by, and relative position of, the obligation in the event of bankruptcy, reorganization, or other arrangement under the laws of bankruptcy and other laws affecting creditors' rights.

The issue rating definitions are expressed in terms of default risk.  As such, they pertain to senior obligations of an entity.  Junior obligations are typically rated lower than senior obligations, to reflect the lower priority in bankruptcy, as noted above.  (Such differentiation applies when an entity has both senior and subordinated obligations, secured and unsecured obligations, or operating company and holding company obligations.)  Accordingly, in the case of junior debt, the rating may not conform exactly with the category definition.

AAA — An obligation rated "AAA" has the highest rating assigned by S&P.  The obligor's capacity to meet its financial commitments on the obligation is extremely strong.

AA — An obligation rated "AA" differs from the highest rated obligors only in small degree.  The obligor's capacity to meet its financial commitments on the obligation is very strong.

A — An obligation rated "A" is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligors in higher-rated categories.  However, the obligor's capacity to meet its financial commitments on the obligation is still strong.

BBB — An obligation rated "BBB" exhibits adequate protection parameters.  However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitments on the obligation.

BB, B, CCC, CC, C — Obligations rated "BB," "B," "CCC," and "CC" are regarded as having significant speculative characteristics.   "BB" indicates the least degree of speculation and "CC" the highest.  While such obligors will likely have some quality and protective characteristics, these may be outweighed by large uncertainties or major exposures to adverse conditions.

D-4

BB — An obligation rated "BB" is less vulnerable to nonpayment than other speculative issues. However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitments on the obligation.

B — An obligation rated "B" is more vulnerable to nonpayment than obligations rated "BB," but the obligor currently has the capacity to meet its financial commitment on the obligation. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitment on the obligation.

CCC — An obligation rated "CCC" is currently vulnerable to nonpayment and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitments on the obligation. In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitments on the obligation.

CC — An obligation rated "CC" is currently highly vulnerable to nonpayment.

C — A "C" rating may be used to cover a situation where a bankruptcy petition has been filed or similar action taken, but payments on this obligation are being continued. A "C" also will be assigned to a preferred stock issue in arrears on dividends or sinking fund payments, but that is currently paying.

R — An obligor rated "R" is under regulatory supervision owing to its financial condition. During the pendency of the regulatory supervision the regulators may have the power to favor one class of obligations over others or pay some obligations and not others. Please see S&P's issue credit ratings, for a more detailed description of the effects of regulatory supervision on specific issues or classes of obligations.

SD and D — An obligor rated "SD" (Selective Default) or "D" has failed to pay one or more of its financial obligations (rated or unrated) when it came due. A "D" rating is assigned when S&P believes that the default will be a general default and that the obligor will fail to pay all or substantially all of its obligations as they come due. An "SD" rating is assigned when S&P believes that the obligor has selectively defaulted on a specific issue or class of obligations but it will continue to meet its payment obligations on other issues or classes of obligations in a timely manner. Please see S&P's issue credit ratings, for a more detailed description of the effects of a default on specific issues or classes of obligations.

N.R. — An issuer designated N.R. is not rated.

Plus (+) or minus (-). The ratings from "AA" to "CCC" may be modified by the addition of a plus or minus sign to show relative standing within the major rating categories.

Public Information Ratings — Ratings with a "pi" subscript are based on an analysis of an issuer's published financial information, as well as additional information in the public domain. They do not, however, reflect in-depth meetings with an issuer's management and are therefore based on less comprehensive information than ratings without a "pi" subscript. Ratings with a "pi" subscript are reviewed annually based on a new year's financial statements, but may be reviewed on an interim basis if a major event occurs that may affect the issuer's credit quality.

Outlooks are not provided for ratings with a "pi" subscript, nor are they subject to potential CreditWatch listings. Ratings with a "pi" subscript generally are not modified with "+" or "-" designations. However, such designations may be assigned when the issuer's credit rating is constrained by sovereign risk or the credit quality of a parent company or affiliated group.

D-5

### *Short-Term Issue Credit Ratings*

A-1 — This designation indicates that the degree of safety regarding timely payment is STRONG. Those issues determined to possess extremely strong safety characteristics are denoted with a plus sign (+) designation.

A-2 — Capacity for timely payment on issues with this designation is SATISFACTORY. However, the relative degree of safety is not as high as for issues designated "A-1."

A-3 — Issues carrying this designation have an ADEQUATE capacity for timely payment. They are, however, more vulnerable to the adverse effects of changes in circumstances than obligations carrying the higher designations.

B — Issuers rated "B" are regarded as having only speculative capacity for timely payment.

C — This rating is assigned to short term debt obligations with a doubtful capacity for payment.

R — An obligor rated "R" is under regulatory supervision owing to its financial condition. During the pendency of the regulatory supervision the regulators may have the power to favor one class of obligations over others or pay some obligations and not others. Please see S&P's issue credit ratings, for a more detailed description of the effects of regulatory supervision on specific issues or classes of obligations.

SD and D — An obligor rated "SD" (Selective Default) or "D" has failed to pay one or more of its financial obligations (rated or unrated) when it came due. A "D" rating is assigned when S&P believes that the default will be a general default and that the obligor will fail to pay all or substantially all of its obligations as they come due. An "SD" rating is assigned when S&P believes that the obligor has selectively defaulted on a specific issue or class of obligations but it will continue to meet its payment obligations on other issues or classes of obligations in a timely manner. Please see S&P's issue credit ratings, for a more detailed description of the effects of a default on specific issues or classes of obligations.

N.R. — An issuer designated N.R. is not rated.

### Description of Fitch Ratings' ("Fitch") Credit Ratings

Fitch credit ratings are an opinion on the ability of an entity or of a securities issue to meet financial commitments, such as interest, preferred dividends, or repayment of principal, on a timely basis.

Credit ratings are used by investors as indications of the likelihood of getting their money back in accordance with the terms on which they invested. Thus, the use of credit ratings defines their function: "investment-grade" ratings (international long-term "AAA" — "BBB" categories; short-term "F-1" — "F-3") indicate a relatively low probability of default, while those in the "speculative" or "non-investment grade" categories (international long-term "BB" — "D"; short-term "B" — "D") either signal a higher probability of default or that a default has already occurred. Ratings imply no specific prediction of default probability.

Entities or issues carrying the same rating are of similar but not necessarily identical credit quality since the rating categories do not fully reflect small differences in the degrees of credit risk.

Fitch credit and other ratings are not recommendations to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or taxability of any payments of any security. The ratings are based on

information obtained from issuers, other obligors, Underwriters, their experts, and other sources Fitch believes to be reliable.  Fitch does not audit or verify the truth or accuracy of such information.  Ratings may be changed or withdrawn as a result of changes in, or the unavailability of, information or for other reasons.

### Analytical Considerations

When assigning ratings, Fitch considers the historical and prospective financial condition, quality of management, and operating performance of the issuer and of any guarantor, any special features of a specific issue or guarantee, the issue's relationship to other obligations of the issuer, as well as developments in the economic and political environment that might affect the issuer's financial strength and credit quality.

Investment-grade ratings reflect expectations of timeliness of payment.  However, ratings of different classes of obligations of the same issuer may vary based on expectations of recoveries in the event of a default or liquidation.  Recovery expectations, which are the amounts expected to be received by investors after a security defaults, are a relatively minor consideration in investment-grade ratings, but Fitch does "notching" of particular issues to reflect their degree of preference in a winding up, liquidation, or reorganization as well as other factors.  Recoveries do, however, gain in importance at lower rating levels, because of the greater likelihood of default, and become the major consideration at the "DDD" category.  Factors that affect recovery expectations include collateral and seniority relative to other obligations in the capital structure.

Variable rate demand obligations and other securities which contain a demand feature will have a dual rating, such as "AAA/F1+."  The first rating denotes long-term ability to make principal and interest payments.  The second rating denotes ability to meet a demand feature in full and on time.

The following ratings scale applies to foreign currency and local currency ratings.

### International Long-Term Credit Ratings

<u>Investment Grade</u>

AAA — Highest credit quality.  "AAA" ratings denote the lowest expectation of credit risk.  They are assigned only in case of exceptionally strong capacity for timely payment of financial commitments.  This capacity is highly unlikely to be adversely affected by foreseeable events.

AA — Very high credit quality.  "AA" ratings denote a very low expectation of credit risk.  They indicate very strong capacity for timely payment of financial commitments.  This capacity is not significantly vulnerable to foreseeable events.

A — High credit quality.  "A" ratings denote a low expectation of credit risk.  The capacity for timely payment of financial commitments is considered strong.  This capacity may, nevertheless, be more vulnerable to changes in circumstances or in economic conditions than is the case for higher ratings.

BBB — Good credit quality.  "BBB" ratings indicate that there is currently a low expectation of credit risk.  The capacity for timely payment of financial commitments is considered adequate, but adverse changes in circumstances and in economic conditions are more likely to impair this capacity.  This is the lowest investment-grade category.

<u>Speculative Grade</u>

BB — Speculative.  "BB" ratings indicate that there is a possibility of credit risk developing, particularly as the result of adverse economic change over time; however, business or financial alternatives may be available to allow financial commitments to be met.  Securities rated in this category are not investment grade.

B — Highly speculative.  "B" ratings indicate that significant credit risk is present, but a limited margin of safety remains.  Financial commitments are currently being met; however, capacity for continued payment is contingent upon a sustained, favorable business and economic environment.

CCC, CC, C — High default risk.  Default is a real possibility.  Capacity for meeting financial commitments is solely reliant upon sustained, favorable business or economic developments.  A "CC" rating indicates that default of some kind appears probable.  "C" ratings signal imminent default.

DDD, DD, D — Default.  The ratings of obligations in this category are based on their prospects for achieving partial or full recovery in a reorganization or liquidation of the obligor.  While expected recovery values are highly speculative and cannot be estimated with any precision, the following serve as general guidelines.  "DDD" obligations have the highest potential for recovery, around 90% - 100% of outstanding amounts and accrued interest.  "DD" indicates potential recoveries in the range of 50% - 90% and "D" the lowest recovery potential, i.e., below 50%.

Entities rated in this category have defaulted on some or all of their obligations.  Entities rated "DDD" have the highest prospect for resumption of performance or continued operation with or without a formal reorganization process.  Entities rated "DD" and "D" are generally undergoing a formal reorganization or liquidation process; those rated "DD" are likely to satisfy a higher portion of their outstanding obligations, while entities rated "D" have a poor prospect of repaying all obligations.

***International Short-Term Credit Ratings***

F1 — Highest credit quality.  Indicates the strongest capacity for timely payment of financial commitments; may have an added "+" to denote any exceptionally strong credit feature.

F2 — Good credit quality.  A satisfactory capacity for timely payment of financial commitments, but the margin of safety is not as great as in the case of the higher ratings.

F3 — Fair credit quality.  The capacity for timely payment of financial commitments is adequate; however, near-term adverse changes could result in a reduction to non-investment grade.

B — Speculative.  Minimal capacity for timely payment of financial commitments, plus vulnerability to near-term adverse changes in financial and economic conditions.

C — High default risk.  Default is a real possibility.  Capacity for meeting financial commitments is solely reliant upon a sustained, favorable business and economic environment.

D — Default.  Denotes actual or imminent payment default.

Notes to Long-term and Short-term ratings:

"+" or "-" may be appended to a rating to denote relative status within major rating categories.  Such suffixes are not added to the "AAA" long-term rating category, to categories below "CCC," or to Short-term ratings other than "F1."

NR — Indicates that Fitch does not rate the issuer or issue in question.

Withdrawn —  A rating is withdrawn when Fitch deems the amount of information available to be inadequate for rating purposes, or when an obligation matures, is called, or refinanced.

Rating Watch — Ratings are placed on Rating Watch to notify investors that there is a reasonable probability of a rating change and the likely direction of such change.  These are designated as "Positive," indicating a potential upgrade, "Negative," for a potential downgrade, or "Evolving," if ratings may be raised, lowered or maintained.  Rating Watch is typically resolved over a relatively short period.

A Rating Outlook indicates the direction a rating is likely to move over a one to two-year period.  Outlooks may be positive, stable or negative.  A positive or negative Rating Outlook does not imply a rating change is inevitable. Similarly, companies whose outlooks are `stable` could be upgraded or downgraded before an outlook moves to positive or negative if circumstances warrant such an action.  Occasionally, Fitch may be unable to identify the fundamental trend.  In these cases, the Rating Outlook may be described as evolving.

[Intentionally left blank]

APPENDIX E

## CERTAIN OTHER TYPES OF INVESTMENTS

*American Depositary Receipts.*  The Fund may invest in sponsored and  un-sponsored American Depositary Receipts representing interests in securities issued by foreign issuers (collectively, "ADRs"). ADRs are receipts typically issued by a U.S. bank or trust company evidencing ownership of the underlying securities of foreign issuers.  Generally, ADRs, in registered form, are denominated in U.S. dollars and are designed for use in the U.S. securities markets.   Thus, these securities are not denominated in the same currency as the securities into which they may be converted.  ADRs are subject to many of the risks inherent in investing in foreign securities, including confiscatory taxation or nationalization, and less comprehensive disclosure requirements for the underlying security.  See "Securities of Foreign Issuers" below.  In addition, the issuers of the securities underlying  un-sponsored ADRs are not obligated to disclose material information in the United States and, therefore, there may be less information available regarding such issuers and there may not be a correlation between such information and the market value of the ADRs.

*Bankers' Acceptances.*  The Fund may invest in bankers' acceptances, which are short-term credit instruments used to finance commercial transactions.  Generally, an acceptance is a time draft drawn on a bank by an exporter or an importer to obtain a stated amount of funds to pay for specific merchandise. The draft is then "accepted" by a bank that, in effect, unconditionally guarantees to pay the face value of the instrument on its maturity date.  The acceptance may then be held by the accepting bank as an asset, or it may be sold in the secondary market at the going rate of interest for a specified maturity.  Although maturities for acceptances can be as long as 270 days, most acceptances have maturities of six months or less.

*Certificates of Deposit.*  The Fund may invest in bank certificates of deposit ("CDs").  The Federal Deposit Insurance Corporation is an agency of the U.S. Government that insures the deposits of certain banks and savings and loan associations up to $100,000 per deposit.  To remain fully insured, these investments currently must be limited to $100,000 per insured bank or savings and loan association.  The interest on such deposits may not be insured if this limit is exceeded.  Current federal regulations also permit such institutions to issue insured negotiable CDs in amounts of $100,000 or more.  Investments in CDs are made only with domestic institutions with assets in excess of $1 billion.

*Commercial Paper.*  The Fund may invest in commercial paper that is limited to obligations rated Prime-1 or Prime-2 by Moody's, or A-1 or A-2 by S&P and F-1 or F-2 by Fitch.  Commercial paper includes notes, drafts or similar instruments payable on demand or having a maturity at the time of issuance not exceeding nine months, exclusive of days of grace or any renewal thereof.  See Appendix D for a description of commercial paper ratings.

*Convertible Securities.*  The Fund may invest in convertible securities that are rated as investment grade or, if not so rated, are deemed to be of comparable quality by the Investment Adviser.  While no securities investment is without some risk, investments in convertible securities generally entail less risk than the issuer's common stock, although the extent to which such risk is reduced depends in large measure upon the degree to which the convertible security sells above its value as a fixed income security.   The Investment Adviser will decide to invest in convertible securities based upon a fundamental analysis of the long-term attractiveness of the issuer and the underlying common stock, the evaluation of the relative attractiveness of the current price of the underlying common stock, and the judgment of the value of the convertible security relative to the common stock at current prices. Convertible securities in which the Fund may invest include corporate bonds, notes and preferred stock that can be converted into common stock.   Convertible securities combine the fixed-income characteristics of bonds and preferred stock with the potential for capital appreciation.  As with all debt securities, the market value of convertible securities tends to decline as interest rates increase and, conversely, to increase as interest rates decline.  While convertible securities generally offer lower

interest or dividend yields than nonconvertible debt securities of similar quality, they do enable the investor to benefit from increases in the market price of the underlying common stock.

*Debt Securities.*  The Fund may invest in debt securities.  The market value of debt securities is influenced primarily by changes in the level of interest rates.  Generally, as interest rates rise, the market value of debt securities decreases.  Conversely, as interest rates fall, the market value of debt securities increases.  Factors that could result in a rise in interest rates, and a decrease in the market value of debt securities, include an increase in inflation or inflation expectations, an increase in the rate of Puerto Rico or U.S. economic growth, an increase in the Federal budget deficit or an increase in the price of commodities such as oil.

*Floating and Variable Rate Obligations.*  The Fund may also purchase certain types of floating and variable rate securities.  The interest payable on a variable rate obligation is adjusted at predesignated periodic intervals.  The interest rate payable on floating rate obligations is adjusted whenever there is a change in the market rate of interest on which the interest rate payable is based.  There is a risk that the current interest rate on such obligations may not accurately reflect existing market interest rates.  These obligations frequently permit the holder to demand payment of principal at any time, or at specified intervals, and permit the issuer to prepay, at its discretion, principal plus accrued interest, in each case after a specified notice period.  The issuer's obligations under the demand feature of such notes and bonds generally are secured by bank letters of credit or other credit support arrangements.

*Money Market Funds.*  The Fund may invest in money market funds.  These funds attempt to provide the highest current income possible through investment in a portfolio of short-term money market securities, consistent with the preservation of capital.  While these funds typically invest in high quality investments, the value of an investment in these funds, among other things, remains subject to credit risk on the underlying instruments and volatility due to interest rate changes.

*Securities of Foreign Issuers.*  There are certain risks connected with investing in foreign securities.  These include risks of adverse political and economic developments (including possible governmental seizure or nationalization of assets), the possible imposition of exchange controls or other governmental restrictions, less uniformity in accounting and reporting requirements, the possibility that there will be less information on such securities and their issuers available to the public, the difficulty of obtaining or enforcing court judgments abroad, restrictions on foreign investments in other jurisdictions, difficulties in affecting repatriation of capital invested abroad, and difficulties in transaction settlements and the effect of delay on shareholder equity.  Foreign securities may be subject to foreign taxes, and may be less marketable than comparable U.S. securities.

*Preferred Stock.*  The Fund may invest in preferred stock.  A preferred stock has a blend of the characteristics of a bond and common stock.  It can offer the higher yield of a bond and have priority over common stock in equity ownership, but does not have the seniority of a bond and its participation in the issuer's growth may be limited.  Preferred stock generally has preference over common stock in the receipt of dividends and in any residual assets after payment to creditors should the issuer be dissolved.  Although the dividend is usually set at a fixed annual rate, in some circumstances it can be changed or omitted by the issuer.

*Real Estate Investment Trusts ("REITs").*  REITs are entities that invest primarily in commercial real estate or real estate-related loans.  A REIT is not subject to federal income tax on income distributed to its shareholders if it complies with regulatory requirements relating to its organization, ownership, assets and income, and with the regulatory requirement that it distribute to its shareholders at least 95% of its taxable income for each taxable year.  Generally, REITs can be classified as equity REITs, mortgage REITs and hybrid REITs.  Equity REITs invest the majority of their assets in real property and derive their income primarily from rents and capital gains from appreciation realized through property

E-2

sales.  Mortgage REITs invest the majority of their assets in real estate mortgages and derive their income primarily from interest payments.

*Repurchase Agreements.*  The Fund may invest in repurchase agreements.  A repurchase agreement is a transaction in which the Fund purchases securities and simultaneously commits to resell the securities to the original seller (a member bank of the Federal Reserve System or a securities dealer who is a member of a national securities exchange or is a market maker in U.S. Government securities) at an agreed upon date and price reflecting a market rate of interest unrelated to the coupon rate or maturity of the purchased securities.  Repurchase agreements carry certain risks not associated with direct investments in securities including possible decline in the market value of the underlying securities and costs to the Fund if the other party to the repurchase agreement becomes bankrupt, so that the Fund is delayed or prevented from exercising its rights to dispose of the collateral securities.  The value of the underlying securities (or collateral) will be at least equal at all times to the total amount of the repurchase obligation, including the interest factor.

*U.S. Government Securities.*  The Fund may invest in U.S. Government securities, including a variety of securities that are issued or guaranteed by the U.S. Government, its agencies or instrumentalities and repurchase agreements secured thereby.  These securities include securities issued and guaranteed by the U.S. Government, such as Treasury bills, Treasury notes, and Treasury bonds; obligations supported by the right of the issuer to borrow from the U.S. Treasury, such as those of the Federal Home Loan Banks; and obligations supported only by the credit of the issuer, such as those of the Federal Intermediate Credit Banks.

*When-Issued and Delayed Delivery Transactions.*  The Fund may enter into agreements with banks or broker-dealers for the purchase or sale of securities at an agreed-upon price on a specified future date.  Such agreements might be entered into, for example, when the Investment Adviser anticipates a decline in interest rates and is able to obtain a more advantageous yield by committing currently to purchase securities to be issued later.  When the Fund purchases securities on a when-issued or delayed delivery basis, it is required either (1) to create a segregated account with the Custodian and to maintain in that account cash, U.S. Government securities, or other high grade debt obligations in an amount equal on a weekly basis to the amount of the Fund's when-issued or delayed delivery commitments, or (2) to enter into an offsetting forward sale of securities it owns which are equal in value to those purchased.  The Fund will only make commitments to purchase securities on a when-issued or delayed delivery basis with the intention of actually acquiring the securities.  However, the Fund may sell these securities before the settlement date if it is deemed advisable as a matter of investment strategy.  When the time comes to pay for when-issued or delayed delivery securities, the Fund will meet its obligations from then available cash flow or the sale of securities, or although it would not normally expect to do so, from the sale of the when-issued or delayed delivery securities themselves (which may have a value greater or less than the Fund's payment obligation).

E-3

[Intentionally left blank]

APPENDIX F

**HEDGING AND RELATED INCOME STRATEGIES**

*General Description of Hedging and Related Income Strategies.* As discussed in the Prospectus, the Fund may use a variety of financial instruments ("Derivative Instruments"), including securities options, financial futures contracts ("futures contracts"), options on futures contracts, and other interest rate protection transactions such as swap agreements, to attempt to hedge its portfolio of assets. The use of these instruments for income enhancement purposes subjects the Fund to substantial risks of losses which would not be offset by gains on other portfolio assets or acquisitions. The Fund may invest up to 5% of its assets in Derivative Instruments. Such limit may be exceeded only for the purpose of hedging and subject to the approval of the Board of Directors. However, the Fund will not enter into futures contracts or options thereon unless an exclusion or exemption or comparable relief from applicable registration requirements contained in the regulations administered by the CFTC is obtained by the Investment Adviser. There can be no assurance that such relief will be granted or that the strategies discussed in this Appendix F can be implemented.

Hedging strategies can be broadly categorized as "short hedges" and "long hedges." A short hedge is a purchase or sale of a Derivative Instrument intended partially or fully to offset potential declines in the value of one or more investments held by the Fund. Thus, in a short hedge the Fund takes a position in a Derivative Instrument whose price is expected to move in the opposite direction of the price of the investment being hedged. For example, the Fund might purchase a put option on a security to hedge against a potential decline in the value of that security. If the price of the security declines below the exercise price of the put, the Fund could exercise the put and thus limit its loss below the exercise price to the premium paid plus transaction costs. In the alternative, because the value of the put option can be expected to increase as the value of the underlying security declines, the Fund might be able to close out the put option and realize a gain to offset the decline in the value of the security.

Conversely, a long hedge is a purchase or sale of a Derivative Instrument intended partially or fully to offset potential increases in the cost of one or more investments that the Fund intends to acquire. Thus, in a long hedge the Fund takes a position in the Derivative Instrument whose price is expected to move in the same direction as the price of the prospective investment being hedged. For example, the Fund might purchase a call option on a security it intends to purchase in order to hedge against an increase in the cost of the security. If the price of the security increases above the exercise price of the call, the Fund could exercise the call and thus limit its acquisition cost to the exercise price plus the premium paid and transaction costs. Alternatively, the Fund might be able to offset the price increase by closing out an appreciated call option and realizing a gain.

Derivative Instruments on securities generally are used to hedge against both price movements in one or more particular securities positions that the Fund owns or intends to acquire or fluctuations in interest rates. Derivative Instruments on bond indices, in contrast, generally are used to hedge against price movements in broad fixed income market sectors in which the Fund has invested or expects to invest.

In addition to the products, strategies and risks described below and in this Prospectus, the Investment Adviser expects to seek additional opportunities in connection with securities options, futures contracts and other hedging techniques. These new opportunities may become available as regulatory authorities broaden the range of permitted transactions and as new options, futures contracts or other techniques are developed. The Investment Adviser may utilize these opportunities to the extent that they are consistent with the Fund's investment objective and permitted by the Fund's investment limitations and applicable regulatory authorities.

*Special Risks of Hedging Strategies.*   The use of Derivative Instruments involves special considerations and risks, as described below.   Risks pertaining to particular Derivative Instruments are described in the sections that follow:

(1)      Successful use of most Derivative Instruments depends upon the Investment Adviser's ability to predict movements of the overall securities and interest rate markets, which requires different skills than predicting changes in the prices of individual securities.   While the Investment Adviser is experienced in the use of Derivative Instruments, there can be no assurance that any particular hedging strategy adopted will succeed.

(2)      There might be imperfect correlation, or even no correlation, between price movements of a Derivative Instrument and price movements of the investments being hedged.   For example, if the value of a Derivative Instrument used in a short hedge increased by less than the decline in value of the hedged investment, the hedge would not be fully successful.   Such a lack of correlation might occur due to factors unrelated to the value of the investments being hedged, such as speculative or other pressures on the markets in which Derivative Instruments are traded.   The effectiveness of hedges using Derivative Instruments on indices will depend on the degree of correlation between price movements in the index and price movements in the securities being hedged.

(3)      Hedging strategies, if successful, can reduce risk of loss by wholly or partially offsetting the negative effect of unfavorable price movements in the investments being hedged.   However, hedging strategies can also reduce opportunity for gain by offsetting the positive effect of favorable price movements in the hedged investments.   For example, if the Fund entered into a short hedge because the Investment Adviser projected a decline in the price of a security in the Fund, and the price of that security increased instead, the gain from that increase might be wholly or partially offset by a decline in the price of the Derivative Instrument.   Moreover, if the price of the Derivative Instrument declined by more than the increase in the price of the security, the Fund could suffer a loss.   Depending on the degree of correlation between a Derivative Instrument and the security or interest rate being hedged, it is possible that the Fund could sustain losses on both positions.   Similarly, transaction costs incurred in connection with a Derivative Instrument can exceed the amount of the benefits received.   In any such case, the Fund would have been in a better position had it not hedged at all.

(4)      As described below, the Fund might be required to maintain assets as "cover," maintain segregated accounts or make margin payments when it takes positions in Derivative Instruments involving obligations to third parties (i.e., Derivative Instruments other than purchase options).   If the Fund is unable to close out its positions in such Derivative Instruments, it might be required to continue to maintain such assets or accounts or make such payments until the position expires or matures.   These requirements might impair the Fund's ability to sell a portfolio security or make an investment at a time when it would otherwise be favorable to do so, or require that the Fund sell a portfolio security at a disadvantageous time.   The Fund's ability to close out a position in a Derivative Instrument prior to expiration or maturity depends on the existence of a liquid secondary market or, in the absence of such a market, the ability and willingness of a counterparty to enter into a transaction closing out the position.   Therefore, there is no assurance that any hedging position can be closed out at a time and price that is favorable to the Fund.

(5)      Although the Fund intends to purchase or sell futures contracts only if there is an active market for such contracts, no assurance can be given that a liquid market will exist for the contracts at any particular time.   Most futures exchanges limit the amount of fluctuation permitted in futures contract prices during a single trading day.   Once the daily limit has been reached in a particular contract, no trades may be made that day at a price beyond that limit.   Futures contract prices could move the daily limit for several consecutive trading days with little or no trading, thereby preventing prompt liquidation of futures positions and subjecting some futures traders to substantial losses.   In such event and in the event of adverse price movements, the Fund will be required to make daily cash payments of variation

F-2

margin.  In such circumstances, an increase in the value of the portion of the portfolio assets being hedged, if any, may offset, partially or completely, losses on the futures contract.

(6)     If the Fund has hedged against the possibility of an increase in interest rates adversely affecting the value of securities held in its portfolio and rates decrease instead, the Fund will lose part or all of the benefit of the increased value of the securities which it has hedged because it will have offsetting losses in its futures positions.  In addition, in such situations, if the Fund has insufficient cash, it may have to sell securities to meet daily variation margin requirements at a time when it may be disadvantageous to do so.  These sales of securities may, but will not necessarily be at increased prices which reflect the decline in interest rates.

(7)     Because of the low margin deposits normally required in futures contract trading (typically between 2% and 5% of the value of the contract purchased or sold), an extremely high degree of leverage is typical of a futures contract trading account.  As a result, a relatively small price movement in a futures interest contract may result in immediate and substantial losses to the investor.  For example, if at the time of purchase 5% of the price of a contract is deposited as margin, a 5% decrease in the value of the contract would, if the contract is then closed out, result in a total loss of the margin deposit before any deduction for brokerage commissions.  A decrease of more than 5% would result in a loss of more than the total margin deposit.  Thus, like other leveraged investments, any purchase or sale of a futures interest contract may result in losses in excess of the amount invested.

(8)     Most U.S. commodity exchanges limit fluctuations in certain futures interest contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Pursuant to such regulations, during a single trading day no trades may be executed at prices beyond the daily limits.  Once the price of a contract for a particular commodity has increased or decreased by an amount equal to the daily limit, positions in the commodity can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit.  Prices in various contracts have occasionally moved the daily limit for several consecutive days with little or no trading.  Similar occurrences could prevent the Fund from promptly liquidating unfavorable positions and subject the Fund to substantial losses.  While daily limits may reduce or effectively eliminate the liquidity of a particular market, they do not limit ultimate losses, and may in fact substantially increase losses because they may prevent the liquidation of unfavorable positions.

In addition, the Fund may not be able to execute trades at favorable prices if little trading in the contracts involved is taking place.  Under some circumstances, the Fund may be required to accept or make delivery of the underlying financial instrument if the position cannot be liquidated prior to its expiration date.  It also is possible that an exchange or the CFTC may suspend trading in a particular contract, order immediate liquidation and settlement of a particular contract, or order that trading in a particular contract be conducted for liquidation only.

(9)     The CFTC and the U.S. commodity exchanges have established limits referred to as "speculative position limits" or "position limits" on the maximum net long or net short position which any person or group of persons may own, hold, or control in particular futures contracts.  Under currently applicable regulations, the Fund as a whole will be required to comply with position limits as if it were a single trader.  Position limits may prevent the Fund from acquiring positions which might otherwise have been highly profitable.  Any violation of speculative position limits would lead to mandatory liquidation of positions, possibly on unfavorable terms.

*Cover*.  Transactions using Derivative Instruments which are not transacted on or subject to the rules of a regulated futures contract exchange or securities exchange, other than purchased options, will expose the Fund to an obligation to another party.  The Fund will not enter into any such transactions unless it owns either (1) an offsetting ("covered") position in securities or other options or futures

F-3

contracts, or (2) cash, receivables, and/or short-term debt securities, with a value sufficient at all times to cover its potential obligations to the extent not covered as provided in (1) above.

Assets used as cover cannot be sold while the position in the corresponding Derivative Instrument is open, unless they are replaced with similar assets. As a result, the commitment of a large portion of the Fund's assets to cover could impede portfolio management or the Fund's ability to meet other current obligations.

*Covered Straddles*. The Fund may purchase and write (sell) covered straddles on securities or bond indices. A long straddle is a combination of a call and a put option purchased on the same security or on the same futures contract, where the exercise price of the put is less than or equal to the exercise price of the call. The Fund would enter into a long straddle when the Investment Adviser believes that it is likely that interest rates will be more volatile during the term of the option than the option pricing implies. A short straddle is a combination of a call and a put written on the same security where the exercise price of the put is less than or equal to the exercise price of the call. The Fund would enter into a short straddle when the Investment Adviser believes that it is unlikely that interest rates will be as volatile during the term of the options as the option pricing implies.

*Options*. The Fund may purchase put and call options, and write covered put and call options, on debt securities and bond indices. The purchase of call options serves as a long hedge, and the purchase of put options serves as a short hedge. Writing covered put options can enable the Fund to enhance income by reason of the premiums paid by the purchasers of such options. However, if the market price of the underlying security declines to less than the exercise price on the option, minus the premium received, the Fund would expect to suffer a loss. Writing covered call options serves as a limited short hedge, because declines in the value of the hedged investment would be offset to the extent of the premium received for writing the option. However, if the security appreciates to a price higher than the exercise price of the call option, it can be expected that the option will be exercised, and the Fund will be obligated to sell the security at less than its market value.

The value of an option position will reflect, among other things, the current market value of the underlying investment, the time remaining until expiration, the relationship of the exercise price to the market price of the underlying investment, the historical price volatility of the underlying investment and general market conditions. Options normally have expiration dates of up to nine months. Options that expire unexercised have no value.

The Fund may effectively terminate its right or obligation under an option by entering into a closing transaction. For example, the Fund may terminate its obligations under a call option that it has written by purchasing an identical call option. This is known as a closing purchase transaction. Conversely, the Fund may terminate a position in a put or call option it has purchased by writing an identical put or call option. This is known as a closing sale transaction. Closing transactions permit the Fund to realize profits or limit losses on an option position prior to its exercise or expiration.

The Fund may purchase or write both exchange-traded and OTC options. Exchange markets for options on debt securities exist but are relatively new, and these instruments are primarily traded on the OTC market. Exchange-traded options in the U.S. are issued by a clearing organization affiliated with the exchange on which the option is listed which, in effect, guarantees completion of every exchange-traded option transaction. In contrast, OTC options are contracts between the Fund and a counterparty (usually a securities dealer or a bank) with no clearing organization guarantee. Thus, when the Fund purchases or writes an OTC option, it relies on the party from whom it purchased the option or to whom it has written the option (the "counterparty") to make or take delivery of the underlying investment upon exercise of the option. Failure by the counterparty to do so would result in the loss of any premium paid by the Fund as well as the loss of any expected benefit of the transaction.

Generally, the OTC debt options used by the Fund will be European-style options. This means that the option is only exercisable immediately prior to its expiration. This is in contrast to American-style options, which are exercisable at any time prior to the expiration date of the option.

The Fund's ability to establish and close out positions in exchange-listed options depends on the existence of a liquid market. The Fund intends to purchase or write only those exchange-traded options for which there appears to be a liquid secondary market. However, there can be no assurance that such a market will exist at any particular time. Closing transactions can be made for OTC options only by negotiating directly with the counterparty, or by a transaction in the secondary market if any such market exists. Although the Fund will enter into OTC options only with contra parties that are expected to be capable of entering into closing transactions with the Fund, there is no assurance that the Fund will in fact be able to close out an OTC option position at a favorable price prior to expiration. In the event of insolvency of the counterparty, the Fund might be unable to close out an OTC option position at any time prior to its expiration.

If the Fund were unable to effect a closing transaction for an option it had purchased it would have to exercise the option to realize any profit. The inability to enter into a closing purchase transaction for a covered call option written by the Fund could cause material losses because the Fund would be unable to sell the investment used as cover for the written option until the option expires or is exercised.

*Guideline for Options on Securities.* In view of the risks involved in using the options strategies described above, the Board of Directors has determined that the Fund may purchase a put or call option, including any straddles or spreads, only if the premium paid when aggregated with the premiums on all other options held by the Fund does not exceed 5% of the Fund's total assets. This guideline may be modified by the Board without Shareholder vote. Adoption of this guideline does not limit the percentage of the Fund's assets at risk to 5%.

*Futures.* The Fund may purchase and sell interest rate futures contracts and bond index futures contracts. The Fund may also purchase put and call options, and write covered put and call options, on futures in which it invests. The purchase of futures or call options thereon can serve as a long hedge, and the sale of futures or the purchase of put options thereon can serve as a short hedge. Writing covered call options on futures contracts can serve as a limited short hedge, using a strategy similar to that used for writing covered call options on securities or indices. Similarly, writing covered put options on futures contracts can serve as a limited long hedge.

The Fund may also write put options on interest rate futures contracts while at the same time purchasing call options on the same futures contracts in order synthetically to create a long futures contract position. Such options would have the same strike prices and expiration dates. The Fund will engage in this strategy only when it is more advantageous to the Fund than is purchasing the futures contract.

No price is paid upon entering into a futures contract. Instead, at the inception of a futures contract the Fund is required to deposit in a segregated account with its Custodian, in the name of the futures broker through whom the transaction was effected, "initial margin" consisting of cash, U.S. Government securities or other liquid, high-grade debt securities, in an amount generally equal to 2% to 5% or less of the contract, in accordance with applicable exchange rules. Unlike margin in securities transactions, initial margin on futures contracts does not represent a borrowing, but rather is in the nature of a performance bond or good-faith deposit that is returned to the Fund at the termination of the transaction if all contractual obligations have been satisfied. Under certain circumstances, such as periods of high volatility, the Fund may be required by an exchange to increase the level of its initial margin payment, and initial margin requirements might be increased generally in the future by regulatory actions.

Subsequent "variation margin" payments are made to and from the futures broker daily as the value of the futures position varies, a process known as "marking to market." Variation margin does not involve borrowing, but rather represents a daily settlement of the Fund's obligations to or from a futures broker. When the Fund purchases an option on a futures contract, the premium paid plus transaction costs is all that is at risk. In contrast, when the Fund purchases or sells a futures contract or writes a put or call option thereon, it is subject to daily variation margin calls that could be substantial in the event of adverse price movements. If the Fund has insufficient cash to meet daily variation margin requirements, it might need to sell securities at a time when such sales are disadvantageous.

Holders and writers of futures positions and options on futures can enter into offsetting closing transactions, similar to closing transactions on options, by selling or purchasing, respectively, an instrument identical to the instrument held or written. Positions in futures and options on futures may be closed only on an exchange or board of trade that provides a secondary market. The Fund intends to enter into futures transactions only on exchanges or boards of trade where there appears to be a liquid secondary market. However, there can be no assurance that such a market will exist for a particular contract at a particular time. Secondary markets for options on futures are currently in the development stage, and the Fund will not trade options on futures on any exchange or board of trade unless, in the Investment Adviser's opinion, the markets for such options have developed sufficiently that the liquidity risks for such options are not greater than the corresponding risks for futures.

Under certain circumstances, futures exchanges may establish daily limits on the amount that the price of a future or related option can vary from the previous day's settlement price; once that limit is reached, no trades may be made that day at a price beyond the limit. Daily price limits do not limit potential losses because prices could move to the daily limit for several consecutive days with little or no trading, thereby preventing liquidation of unfavorable positions.

If the Fund was unable to liquidate a futures or related options positions due to the absence of a liquid secondary market or the imposition of price limits, it could incur substantial losses. The Fund would continue to be subject to market risk with respect to the position. In addition, except in the case of purchased options, the Fund would continue to be required to make daily variation margin payments and might be required to maintain the position being hedged by the future or option.

Certain characteristics of the futures market might increase the risk that movements in the prices of futures contracts or related options might not correlate perfectly with movements in the prices of the investments being hedged. For example, all participants in the futures and related options markets are subject to daily variation margin calls and might be compelled to liquidate futures or related options positions whose prices are moving unfavorably to avoid being subject to further calls. These liquidations could increase price volatility of the instruments and distort the normal price relationship between the futures or options and the investments being hedged. Also, because initial margin deposit requirements in the futures market are less onerous than margin requirements in the securities markets, there might be increased participation by speculators in the futures markets. This participation also might cause temporary price distortions. In addition, activities of large traders in both the futures and securities markets involving arbitrage, "program trading" and other investment strategies might result in temporary price distortions.

*Guideline for Futures and Related Options.* In view of the risks involved in using the futures and options strategies that are described above, the Board of Directors has determined that the Fund will not purchase or sell futures contracts or related options if, immediately thereafter, the sum of the amount of initial margin deposits on existing futures positions and initial margin deposits and premiums paid for related options would exceed 5% of the Fund's total assets. This guideline may be modified by the Board without Shareholder vote. For purposes of this guideline, options on futures contracts traded on a commodities exchange are considered "related options." Adoption of this guideline will not limit the percentage of the Fund's assets at risk to 5%.

The Fund may use the following Derivative Instruments:

*Options on Debt Securities.*  A call option is a short-term contract pursuant to which the purchaser of the option, in return for a premium, has the right to buy the security underlying the option at a specified price at any time during the term of the option.  The writer of the call option, who receives the premium, has the obligation, upon exercise of the option during the option term, to deliver the underlying security against payment of the exercise price.  A put option is a similar contract that gives its purchaser, in return for a premium, the right to sell the underlying security at a specified price during the option term.  The writer of the put option, who receives the premium, has the obligation, upon exercise of the option during the option term, to buy the underlying security at the exercise price.

*Options on Bond Indices.*  A bond index assigns relative values to the debt securities included in the index and fluctuates with changes in the market values of those debt securities.  A bond index option operates in the same way as a more traditional option on a debt security, except that exercise of a bond index option is effective with cash payment and does not involve delivery of securities.  Thus, upon exercise of a bond index option, the purchaser will realize, and the writer will pay, an amount based on the difference between the exercise price and the closing price of the bond index.

*Interest Rate Futures Contracts.*  Interest rate futures contracts are bilateral agreements pursuant to which one party agrees to make, and the other party agrees to accept, delivery of a specified type of debt security or other interest rate instruments at a specified future time and at a specified price or its equivalent cash-settled value.  Although such futures contracts by their terms call for actual delivery or acceptance of debt securities or other interest rate instruments, in most cases the contracts are closed out before the settlement date without the making or taking of delivery of the debt security or other interest rate instrument.

*Options on Futures Contracts.*  Options on futures contracts are similar to options on securities, except that an option on a futures contract gives the purchaser the right, in return for the premium, to assume a position in a futures contract (a long position if the option is a call and a short position if the option is a put), rather than to purchase or sell a security, at a specified price at any time during the option term.  Upon exercise of the option, the delivery of the futures position to the holder of the option will be accompanied by delivery of the accumulated balance that represents the amount by which the market price of the futures contract exceeds, in the case of a call, or is less than, in the case of a put, the exercise price of the option on the future.  The writer of an option, upon exercise, will assume a short position in the case of a call and a long position in the case of a put.

*Bond Index Futures.*  A bond index futures contract is a bilateral agreement pursuant to which one party agrees to accept, and the other party agrees to make, delivery of an amount of cash equal to a specified dollar amount times the difference between the bond index value at the close of trading of the contract and the price at which the futures contract is originally struck.  No physical delivery of the debt securities comprising the index is made.  Generally, contracts are closed out prior to the expiration date of the contract.

*Swaps and Interest Rate Protection Transactions.*  The Fund may enter into interest rate and other swaps, including interest rate protection transactions, interest rate caps, collars and floors.  Swap transactions involve an agreement between two parties to exchange payments that are based, respectively, on indices or specific securities or other assets, such as variable and fixed rates of interest that are calculated on the basis of a specified amount of principal (the "notional principal amount") for a specified period of time.  Interest rate cap and floor transactions involve an agreement between two parties in which the first party agrees to make payments to the counterparty when a designated market interest rate goes above (in the case of a cap) or below (in the case of a floor) a designated level on predetermined dates or during a specified time period.  Interest rate collar transactions involve an agreement between two parties in which the first party makes payments to the counterparty when a designated market interest

rate goes above a designated level of predetermined dates or during a specified time period, and the counterparty makes payments to the first party when a designated market interest rate goes below a designated level on predetermined dates or during a specified time period.

The Fund will engage in swap transactions directly with other counterparties.  This subjects the Fund to the credit risk that a counterparty will default on an obligation to the Fund.  Such a risk contrasts with transactions done through exchange markets, wherein credit risk is reduced through the collection of variation margin and through the interposition of a clearing organization as the guarantor of all transactions.  Clearing organizations transform the credit risk of individual counterparties into the more remote risk of the failure of the clearing organization.  Additionally, the financial integrity of swap transactions is generally unsupported by other regulatory or self-regulatory protections such as margin requirements, capital requirements, or financial compliance programs.  Therefore, there are much greater risks of defaults with respect to swap transactions than with respect to exchange-traded futures or securities transactions.

The Fund expects to enter into interest rate protection transactions to preserve a return or spread on a particular investment or portion of its portfolios to protect against any increase in the price of securities the Fund anticipates purchasing at a later date or to effectively fix the rate of interest that it pays on one or more borrowings or series of borrowings.  The Fund intends to use these transactions as a hedge and not as a speculative investment.

The Fund may enter into swaps, caps, collars and floors on either an asset-based or liability-based basis, depending on whether it is hedging its assets or its liabilities, and will usually enter into interest rate swaps on a net basis, i.e., the two payment streams are netted out, with the Fund receiving or paying, as the case may be, only the net amount of the two payments.  Inasmuch as these transactions are entered into for good faith hedging purposes, the Investment Adviser and the Fund believe such obligations do not constitute debt securities and accordingly, will not treat them as being subject to its borrowing restrictions.

The Fund will enter into such transactions only with banks and recognized securities dealers believed by the Investment Adviser to present minimal credit risks in accordance with guidelines established by the Fund's Board of Directors.  If there is a default by the other party to such a transaction, the Fund will have to rely on its contractual remedies (which may be limited by bankruptcy, insolvency or similar laws) pursuant to the agreements related to the transaction.

The swap market has grown substantially in recent years, with a large number of banks and investment banking firms acting both as principals and as agents utilizing standardized swap documentation.  Caps, collars and floors are more recent innovations for which documentation is less standardized, and accordingly, they are less liquid than swaps.

**APPENDIX G**

**PRIVACY POLICY**

The Fund is committed to protecting the personal information that it collects about individuals who are prospective, former or current investors.  The Fund collects personal information for business purposes to process requests and transactions and to provide customer service.  Personal information is obtained from the following sources:

*Investor applications and other forms*, which may include your name, address, social security number, or tax identification number;

*Written and electronic correspondence*, including telephone contacts; and

*Account history*, including information about Fund transactions and balances in your accounts with UBS PaineWebber, Inc. or our affiliates, other fund holdings in the UBS PaineWebber family of funds, and any affiliation with UBS and its subsidiaries.

The Fund limits access to personal information to those employees who need to know that information in order to process transactions and service accounts.  Employees are required to maintain and protect the confidentiality of personal information.  The Fund maintains physical, electronic, and procedural safeguards to protect personal information.

The Fund may share personal information described above with their affiliates for business purposes, such as to facilitate the servicing of accounts.  The Fund may share the personal information described above for business purposes with a non-affiliated third party only if the entity is under contract to perform transaction processing, servicing or maintaining investor accounts on behalf of the Fund.  The Fund may share personal information with its affiliates or other companies who are not affiliates of the Fund that perform marketing services on the Fund's behalf or to other financial institutions with whom it has marketing agreements for joint products or services.  These companies are not permitted to use personal information for any purposes beyond the intended use (or as permitted by law).  The Fund does not sell personal information to third parties for their independent use.  The Fund may also disclose personal information to regulatory authorities or otherwise as permitted by law.

G-1

[Intentionally left blank]

[Intentionally left blank]

[Intentionally left blank]

No person has been authorized to give any infor-
mation or to make any representations in connec-
tion with this offering other than those contained in
this Prospectus, and if given or made, such other
information and representations must not be relied
upon as having been authorized by the Fund or the
Underwriter. Neither the delivery of this Prospec-
tus nor any sale made hereunder shall, under any
circumstances, create any implication that there
has been no change in the affairs of the Fund since
the date hereof or that the information contained
herein is correct as of any time subsequent to its
date. This Prospectus does not constitute an offer
to sell or a solicitation of an offer to buy any
securities other than the securities to which it
relates. This Prospectus does not constitute an
offer to sell or a solicitation of an offer to buy such
securities in any circumstances in which such offer
or solicitation is unlawful.



**Common Stock**
Par Value $0.01

## TABLE OF CONTENTS

|  | Page |
| --- | --- |
| Summary | 1 |
| Estimated Fund Expenses | 5 |
| Risk Factors and Special Considerations | 7 |
| The Fund | 13 |
| The Offering | 13 |
| Offering Limited to Puerto Rico Residents; Restrictions on Transfer of the Shares | 13 |
| Use of Proceeds | 14 |
| Investment Objective and Policies | 14 |
| Other Investment Practices | 17 |
| Special Leverage Considerations | 19 |
| Investment Restrictions | 22 |
| Management of the Fund | 23 |
| Valuation of Common Stock | 33 |
| Portfolio Transactions | 33 |
| Dividends and Other Distributions; Dividend Reinvestment Plan | 35 |
| Repurchase of the Shares By the Fund | 37 |
| Taxation | 37 |
| Description of Capital Stock | 45 |
| Ruling of the Commissioner | 46 |
| Underwriting | 47 |
| Legal Opinions | 48 |
| Independent Accountants | 48 |
| Privacy Policy | 48 |
| General Information | 49 |
| Appendix A — Mortgage-Backed Securities | A-1 |
| Appendix B — Types of Municipal Obligation | B-1 |
| Appendix C — Form of Representation Letter | C-1 |
| Appendix D — Ratings of Securities | D-1 |
| Appendix E — Certain Other Types of Investments | E-1 |
| Appendix F — Hedging and Related Income Strategies | F-1 |
| Appendix G — Privacy Policy | G-1 |

**PROSPECTUS**



**UBS Financial Services
Incorporated of Puerto Rico**

**July 29, 2003**