**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION and MBIA INSURANCE CORPORATION, <br><br>    *Plaintiffs*, <br><br>      v. <br><br> UBS FINANCIAL SERVICES INC.; UBS SECURITIES LLC; CITIGROUP GLOBAL MARKETS INC.; GOLDMAN SACHS & CO. LLC; J.P. MORGAN SECURITIES LLC; MORGAN STANLEY & CO. LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; RBC CAPITAL MARKETS LLC; and SANTANDER SECURITIES LLC, <br><br>    *Defendants*. | Case No. _____ |

**NOTICE OF REMOVAL**

**TO THE CLERK OF THE COURT:**

    **PLEASE TAKE NOTICE** that Defendants Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; Morgan Stanley & Co. LLC; RBC Capital Markets, LLC; Santander Securities LLC; UBS Financial Services Inc.; and UBS Securities LLC (collectively, the "Defendants" or the "Underwriters"), by their undersigned counsel, file this Notice of Removal pursuant to 48 U.S.C. § 2166(d)(1) and 28 U.S.C. § 1441(a), removing the action commenced against them by Plaintiffs National Public Finance Guarantee Corporation ("NPFG") and MBIA Insurance Corporation ("MBIA Insurance," and together with NPFG, the "Plaintiffs" or the "Bond Insurers"), from the Commonwealth Court of Puerto Rico, Court of First Instance, Superior Part of San Juan (the "Court of First Instance"), to the United States District Court for the District of

1

Puerto Rico.  This Court has original jurisdiction over this action pursuant to 48 U.S.C.

§ 2166(a)(2) (PROMESA jurisdiction) and 28 U.S.C. § 1331 (federal question jurisdiction).

Pursuant to 48 U.S.C. § 2166(d)(3) and Local Rule 3A of the United States District Court for the

District of Puerto Rico, this case should be transferred to the Honorable Laura Taylor Swain as a

proceeding related to *In re Commonwealth of Puerto Rico*, No. 17-bk-3283 (D.P.R.).

## INTRODUCTION AND SUMMARY OF GROUNDS FOR REMOVAL

1.      MBIA Insurance and NPFG, its subsidiary, are sophisticated, private, for-profit

commercial entities that together insure billions of dollars in bonds and asset-backed securities.

2.      Among the securities the Plaintiffs insured are sixteen bonds issued by the

Commonwealth of Puerto Rico ("Puerto Rico") and three of its agencies: Puerto Rico Electric

Power Authority ("PREPA"), the Highways & Transportation Authority ("HTA") and the Sales

Tax Financing Corporation ("COFINA," and collectively with Puerto Rico, PREPA, and HTA,

the "Issuers" or the "Debtors").[1]  The Defendants underwrote those bonds.

3.      By agreeing to insure the bonds, the Plaintiffs promised, in exchange for a

premium, to pay the bondholders if the Issuers ever defaulted on the bonds.  The Issuers'

subsequent default on the bonds, beginning in 2015, triggered the Plaintiffs' obligation to pay

bondholders.

4.      The Issuers' unprecedented default on billions in government-issued debt

contributed to a severe financial crisis in Puerto Rico, and drove Congress to enact the 2016

Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. § 2101 *et seq.*

("PROMESA"), which established the Financial Oversight and Management Board ("FOMB")

---

[1]      The Puerto Rico Employees Retirement System ("ERS") also issued municipal bonds and
commenced a proceeding under Title III of PROMESA, on May 21, 2017, but its bond issuances
are not at issue in the Bond Insurer Action.

for Puerto Rico, created a bankruptcy-like process for the adjustment of municipal debts ("Title III"), and provided other relief.  The Issuers have sought relief under Title III of PROMESA.

5.       In this litigation, the Bond Insurers seek to offload their liability stemming from the Issuers' default on the bonds they insured onto parties that did *not* insure the bonds—and to do so outside of the PROMESA process established by Congress.

6.       The Defendants intend to move to dismiss at the appropriate time.  To start, though, this dispute—centered on the Bond Insurers' claimed reliance on the Underwriters' supposed false assurances of compliance with due diligence obligations set forth in the federal securities laws—should proceed in federal court, and particularly before this Court, where the Issuers are proceeding with the adjustment of their debts in four consolidated proceedings under Title III of PROMESA (the "Title III Cases").

7.       Federal jurisdiction is proper here for two independently sufficient reasons, both of which support removal of this action.

8.       *First*, federal jurisdiction exists because this action is related to the Title III Cases. *See* 48 U.S.C. § 2166(a)(2).  The outcome of this action could—indeed, almost surely will— affect the assets and liabilities of the estates being administered by this Court under PROMESA. The Bond Insurers (along with other insurers not parties to this action) have filed proofs of claim in the Title III Cases predicated on precisely the same bonds at issue in this action.  Further, one of the Defendants has already filed proofs of claim for indemnification, and indeed many if not all Defendants may yet have claims against the Debtors' estates in the Title III Cases sounding in indemnification, contribution, or similar theories.  And more broadly, this Court in the Title III Cases is already supervising a wide swath of interlocking issues relating to the Issuers, the Bond Insurers, and the Underwriters, including issues that necessarily must be resolved in this case.

9.      *Second*, where, as here, a complaint turns on a question of federal law, and where

there is a substantial federal interest in the resolution of that question, original federal

jurisdiction lies under 28 U.S.C. § 1331.  *See, e.g.*, *Grable & Sons Metal Prods., Inc. v. Darue

Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  According to the Bond Insurers' own Complaint, the

Bond Insurers, to prevail on either of their purported Puerto Rico civil law causes of actions,

must establish (among other things) that the Issuers' offering documents were false, and that the

Defendants failed to meet their due diligence obligations under the federal securities laws in

underwriting the bonds.  *E.g.*, Complaint ("Compl.") ¶¶ 16, 90-92 (quoting and expounding upon

17 C.F.R. § 240.15c2-12).[2]  And there are especially strong federal interests at play here.  This

case implicates Congress's recent decision, in PROMESA, to create a federal forum for

resolving issues relating to Puerto Rico's financial crisis, including the bond defaults at the

center of this case, as well as the federal government's comprehensive and longstanding

regulation of the nation's securities markets.[3]

## BACKGROUND AND PARTIES

10.      The sixteen bonds at issue in this case (the "Bonds") were issued by Puerto Rico,

PREPA, HTA, and COFINA between 2001 and 2007, underwritten by the Defendants and

---

[2]      The English version of the Complaint that was posted on Plaintiffs' website in connection
with their media efforts in this case is referred to throughout this Notice of Removal, and is
attached as Exhibit A to the Declaration of Roberto Quiñones-Rivera (the "Quiñones-Rivera
Decl.").  The Spanish version of the Complaint that was filed in the Court of First Instance, as
well as copies of all process properly served, are attached to this Notice of Removal and filed
herewith on the docket consistent with the applicable rules.  *See infra* ¶¶ 55, 59.  The Defendants
are in the process of obtaining a certified translation of the Complaint and have requested leave
to file the same in Spanish, pending completion of the certified translation.

[3]      Moreover, if for some reason there were original federal jurisdiction over only a portion
of the claims asserted in the Complaint, this Court would have supplemental jurisdiction over the
remaining portions of the Complaint under 28 U.S.C. § 1367(a), as all of the claims arise from
the same nucleus of operative facts and transactions and form part of the same case or
controversy.

insured by the Plaintiffs, along with several other insurers.  As the Plaintiffs readily acknowledge, their agreements are with the Issuers who paid premiums for the insurance, not with the Defendants.  *See* Compl. ¶ 38.

11.     Here, the Issuers agreed to indemnify the Underwriters for most liabilities arising out of many, if not all, of the Bonds, as well as for any related litigation defense costs.  *See, e.g.*, Quiñones-Rivera Decl. Ex. B (Offering Statement for PREPA, Power Revenue Bonds, Series LL) at 54; Quiñones-Rivera Decl. Ex. C (Offering Statement for PREPA, Power Revenue Bonds, Series NN) at 50; Quiñones-Rivera Decl. Ex. D (Offering Statement for PREPA, Power Revenue Refunding Bonds, Series MM) at 10; Quiñones-Rivera Decl. Ex. E (Offering Statement for PREPA, Power Revenue Refunding Bonds, Series OO) at 59; Quiñones-Rivera Decl. Ex. F (Offering Statement for PREPA, Power Revenue Refunding Bonds, Series RR and SS) at 60; Quiñones-Rivera Decl. Ex. G (Offering Statement for PREPA, Power Revenue Refunding Bonds, Series UU) at 61; Quiñones-Rivera Decl. Ex. H (Offering Statement for PREPA, Power Revenue Refunding Bonds, Series VV) at 16; Quiñones-Rivera Decl. Ex. I (Offering Statement for HTA, Highway Revenue Refunding Bonds, Series N) at 55.[4]  As noted below, this indemnification obligation supports the proofs of claim filed by one of the Defendants in the Title III Cases.

12.     Although the Bonds in this action were all issued between 2001 and 2007, Puerto Rico and its municipal entities continued issuing bonds until 2015 when the Governor of Puerto Rico declared that the Commonwealth was unable to pay its debts.  Shortly after that, the Issuers began defaulting on their bonds.

---

[4]     The other Offering Statements associated with the Bonds at issue in this case are attached to the Quiñones-Rivera Declaration as Exhibits J-P.

13.     In response to this crisis, Congress passed PROMESA to stabilize Puerto Rico and provide a sorely needed process for the adjustment of debts.  On June 30, 2016, President Obama signed PROMESA into law.  PROMESA sets forth Congress's explicit finding that "[a] comprehensive approach to [Puerto Rico's] fiscal, management, and structural problems ... is necessary, involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process."  48 U.S.C. § 2194(m)(4).

14.     The enactment of PROMESA operated as an automatic stay of any enforcement and debt-collection activities against Puerto Rico and its agencies.  *See* 48 U.S.C. § 2194(b).  Shortly after that stay expired, the Issuers filed for relief under Title III of PROMESA.  Puerto Rico and COFINA commenced their Title III proceedings on May 9, 2017.  HTA commenced its Title III proceeding on May 21, 2017.  PREPA commenced its Title III proceeding on July 3, 2017.[5]  Pursuant to 48 U.S.C. § 2168, Chief Justice Roberts designated U.S. District Judge Swain, of the Southern District of New York, to preside over the Title III Cases.  *See* Order of Designation, *In re Commonwealth of Puerto Rico*, No. 17-bk-3283 (D.P.R. May 11, 2017), Dkt. No. 4.[6]

15.     The Title III Cases together comprise a massive docket approaching 9,000 entries in just over two years.  And the Bond Insurers are no strangers to PROMESA.  Plaintiff NPFG has made dozens of filings in the Title III Cases, including seeking Rule 2004 discovery of the FOMB, Dkt. No. 1177; objecting to debtor-in-possession financing, Dkt. No. 2340; moving for the appointment of a receiver, Dkt. No. 4009; and seeking relief from the automatic stay to allow

---

[5]     Of the Debtors, only COFINA is currently operating under a confirmed plan of adjustment.

[6]     Unless otherwise stated, all references herein to "Dkt." are to the docket in the consolidated Title III Cases.

it to enforce its alleged liens relating to HTA Bonds, Dkt. No. 8536.  NPFG has commenced four

adversary proceedings against Puerto Rico, HTA, and PREPA, *see* Nos. 17-ap-00125, 17-ap-

00155, 17-ap-00156, 17-ap-00232, and is the defendant in at least one adversary proceeding, No.

19-ap-00363.  Based on its payments to investors holding the defaulted government bonds,

NPFG has affirmatively alleged that it "has the right to assert bondholders' rights in these Title

III Cases under applicable bond and insurance documents."  Dkt. No. 127, at ¶ 1; *see also* Dkt.

No. 254, at ¶ 26 (NPFG alleging that, under applicable insurance agreements, it is "deemed to be

the sole owner of the PRHTA Bonds that it insures for purposes of consents and other

bondholder actions, including exercising rights and remedies").  Indeed, NPFG has alleged that,

for at least some of the Bonds, it holds security interests in the Debtors' revenues.  *See* Dkt. No.

254 at ¶ 5 (alleging PRHTA Bonds insured by NPFG are secured by "special revenues" and

entitled to special revenue protections under the Bankruptcy Code); *see also* Dkt. No. 127, at ¶ 1

(alleging NPFG holds "statutory liens in revenues that were pledged as security for the bonds

issued by COFINA").

16.     The parties to this action have also filed proofs of claim in the Title III Cases that

implicate the issues raised in this action.  As described below, the Bond Insurers filed proofs of

claim against the Issuers' estates for their alleged losses on the Bonds, listing the very same

insurance policy numbers as cited in the Complaint.  And one of the Underwriters filed proofs of

claim against the Issuers for indemnification, and others may have grounds to do the same.

17.     On July 24, 2019, Judge Swain entered an *Order Regarding Stay Period and*

*Mandatory Mediation* (July 24, 2019), Dkt. No. 8244 (the "Stay Order"), sending a broad range

of contested matters and adversary proceedings to mandatory mediation facilitated by Magistrate

(U.S. Bankruptcy) Judge Houser.

18.     A few weeks later, on August 8, 2019, the Bond Insurers commenced this action
(the "Bond Insurer Action") by filing their *demanda* (or, the "Complaint") in the Court of First
Instance.  The Complaint accuses the Issuers of making misrepresentations in the Official
Statements, accuses the Underwriters of failing to perform the due diligence obligations that
were supposedly required of them by SEC Rule 15c2-12 that allegedly would have detected
those misrepresentations, and alleges that the Bond Insurers were induced to insure the Bonds
based on the Underwriters' representation that they complied with those federal law obligations.
Unable to cite any statute enacted in Puerto Rico that might support their claims, the Bond
Insurers nevertheless assert that these allegations support "equitable" causes of action against the
Underwriters under Puerto Rico law.

### GROUNDS FOR REMOVAL

### I.  THE BOND INSURER ACTION IS "RELATED TO" THE PROMESA CASES

19.     Removal of the Bond Insurer Action to federal court, and this Court in particular,
is proper because it is "related to" the Title III Cases under PROMESA.  *See* 48 U.S.C.
§ 2166(a)(2) (granting the district courts original jurisdiction over civil proceedings "related to
cases under this subchapter"); *id.* (d)(1) (providing for removal).

20.     In the bankruptcy context, related-to jurisdiction exits whenever "the outcome of
[the] proceeding could conceivably have any effect on the estate being administered in
bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see also, e.g.*, *In re
G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991) (applying the *Pacor* standard); *Voya
Institutional Tr. Co. v. Univ. of P.R.*, 266 F. Supp. 3d 590, 597 (D.P.R. 2017) (applying *Pacor* in
assessing related-to jurisdiction under PROMESA).

21.     The *Pacor* standard is broad, encompassing "the entire universe of matters
connected with bankruptcy estates," *Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l*

*Med. Ctr., Inc.)*, 410 F.3d 100, 105 (1st Cir. 2005), and accordingly the proceeding "need not

necessarily be against the debtor or ... the debtor's property" so long as the "outcome could alter

the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and

… in any way impact[] upon the handling and administration of the bankrupt estate." *Pacor*,

743 F.2d at 994; *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995) (citing *Pacor*

favorably and noting that Congress's "choice of words suggests a grant of some breadth").

22.      Further, the removed case need only have a "conceivable" impact on the

bankruptcy proceeding; "[c]ertainty, or even likelihood, is not a requirement." *Lindsey v.

O'Brien, Tansky, Tanzer & Young Health Care Providers (In re Dow Corning Corp.)*, 86 F.3d

482, 491 (6th Cir. 1996) (quoting *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir.

1991)); *see also Voya*, 266 F. Supp. 2d at 599.

23.      The Bond Insurer Action is "related to" the Title III Cases for at least three

reasons, any one of which would suffice to support removal.

24.      *First*, this action is related to the Title III Cases because MBIA Insurance and

NPFG (*i.e.*, the Plaintiffs here) have asserted claims against the Debtors' estates in the Title III

Cases based on the same Bonds and insurance policies cited in the Complaint, and on their

Bond-related payments to investors under said policies.  Any recovery by the Plaintiffs in this

action will reduce the amount the Plaintiffs can collect on their claims in the Title III Cases.

25.      This is more than sufficient for related-to jurisdiction.  As numerous courts have

held, "a claim between two non-debtors that will potentially reduce the bankruptcy estate's

liabilities" supports related-to jurisdiction.  *Randall & Blake, Inc. v. Evans (In re Canion)*,

196 F.3d 579, 586-87 (5th Cir. 1999); *see also SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 341

(2d Cir. 2018) ("[I]f SPV were successful in its claims against UBS, it would reduce the amount

it is owed as a creditor of the BLMIS/Madoff estate."); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03-MDL-1529 (LMM), 2005 WL 1404798, at *2 (S.D.N.Y. June 14, 2005) ("To the extent that plaintiffs are successful against the defendants, plaintiffs' recoveries will in all probability (and certainly conceivably) reduce the total of Adelphia's liabilities.").

26.     In *TD Bank, N.A. v. Sewall*, 419 B.R. 103 (D. Me. 2009), for example, the court found that related-to jurisdiction existed when the plaintiff in the proceeding held a claim against the debtor's estate, because the lawsuit would, if successful, "change [the plaintiff's] status vis-à-vis other creditors, the [debtor's] relationship to the underlying debt, and the amount of the [debtor's] liabilities." *Id.* at 108.  Other courts have similarly exercised related-to jurisdiction when a plaintiff sought to recover for some of the same harms as those underlying a proof of claim in the bankruptcy proceeding, reasoning that success in the related litigation would reduce the bankruptcy distribution to the successful plaintiff, freeing up more of the estate to pay the claims of other creditors.  *See Johnson v. Fifth Third Bank, Inc.*, 476 B.R. 493, 501 (W.D. Ky. 2012); *Omega Tool Corp. v. Alix Partners, LLP*, 416 B.R. 315, 320 (E.D. Mich. 2009).

27.     These rules of law apply fully here.  MBIA Insurance and NPFG filed proofs of claim against the Debtors' estates predicated upon 15 of the 16 Bond issuances that form the basis of their Complaint in this action (Claim Nos. 22078, 22657, 23450, 23454, 23459, 23905, 24041, 27883, and 30114, attached as Exs. 1-9 to the accompanying Request for Judicial Notice or "RJN").  Those proofs of claim reference the very same insurance policy numbers as those cited in the Complaint.  In the Title III Cases, the Bond Insurers are seeking to recover from the Debtors the same amounts that they have paid, and will pay in the future, to bondholders that they are seeking to recover from the Underwriter Defendants in this action.  Because the Bond Insurers are not entitled to a double recovery, any favorable judgment in this action would

directly affect the liabilities of, and potential distributions from, the Debtors' estates in the Title III Cases (*i.e.*, every dollar the Bond Insurers collect in this action would automatically reduce by one dollar the Bond Insurers' claim against the Debtors in the Title III Cases).

28.      In addition, most of the Bonds were insured by *multiple insurers*, and some of those other insurers, not parties to this action, have also filed proofs of claim in the Title III Cases. *See, e.g.*, RJN Ex. 10 (Proof of Claim No. 52307 (Ambac Assurance Corporation)). Adjudication of the issues in this case may therefore affect the rights not only of the parties to this case, but of the wider set of parties involved in the Title III Cases.

29.      *Second*, this action is related to the Title III Cases because at least one Defendant here has asserted claims against the Debtors' estates for indemnification under the relevant underwriter agreements, other Defendants may also be able to pursue indemnification claims, and—especially now that they have been sued—the Defendants (*i.e.*, the Underwriters) may in any case have claims against the Issuers for contribution or under related theories.

30.      Where the defendant in an action has filed a proof of claim against a bankruptcy debtor for indemnification or contribution, that connection supports related-to jurisdiction over the action, since a finding of liability against the defendant could require the debtor's estate to indemnify or make contribution to the defendant, increasing the estate's own liabilities. *See, e.g.*, *Voya*, 266 F. Supp. 2d at 599; *In re New Eng. Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 496 B.R. 256, 269 (D. Mass. 2013); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-11376, 2010 WL 6580503, at *5 (D. Mass. Dec. 28, 2010); *see also SPV OSUS*, 882 F.3d at 342 ("[A] contingent contribution claim may serve as the basis for 'related to' jurisdiction as it may have a 'conceivable effect' on the bankruptcy estate."). Indeed, some courts do not even require a proof of claim to be filed at all, finding related-to jurisdiction when

there is merely "the prospect of an effect on distributions" and the "potential for an indemnity claim." *Five Mile Capital II SPE ESH LLC v. Cerberus Capital Mgmt. (In re Extended Stay Inc.)*, 435 B.R. 139, 150 (S.D.N.Y. 2010) (Swain, J.); *see also, e.g.*, *SPV OSUS*, 882 F.3d at 340-341 (finding a conceivable effect on the estate notwithstanding the failure to file a proof of claim and explaining that "failure to file claims prior to the bar date is not fatal" to removal).

31.     Here, most of the underwriting agreements for the Bonds provide the Defendants with broad contractual rights to indemnification by the Debtors, including for their defense costs incurred in connection with this action.  *See supra* ¶ 11.  At least one Underwriter has filed proofs of claim in the Title III Cases asserting (among other things) contingent claims for indemnification (*e.g.*, Claim Nos., 117119, 121152, 125781, 126411).  *See* RJN Exs. 11-14.  And the other Underwriters may seek leave to file proofs of claim against the Debtors' estates for indemnification as well, and any claims for indemnification (among other theories) could also be asserted by way of counterclaims in one or more adversary proceedings that have been filed against the Underwriters on behalf of the Debtors' estates in the Title III Cases.

32.     Furthermore, the Defendants may also have claims against the Issuers for contribution, or under related theories, now that they have been sued.  *See, e.g.*, *Zurich Am. Ins. v. Lord Elec. Co. of P.R.*, 828 F. Supp. 2d 462, 469-470 (D.P.R. 2011).  While the bar date for filing proofs of claim has passed, courts have accepted late proofs of claim for contribution since "[a] party may not know of a potential contribution claim until sued."  *SPV OSUS*, 882 F.3d at 340.  Indeed, in *SPV OSUS*, the Second Circuit determined that the mere *potential* for a contribution proof of claim supported related-to jurisdiction, because even the need to evaluate a late-filed proof of claim by the trustee impacts the estate's fisc.  *Id.* at 341.

33.     *Third*, this litigation is closely related to the Title III Cases.  "The existence of strong interconnections between the third-party action and the bankruptcy has been cited frequently by courts in concluding that the third-party litigation is related to the bankruptcy proceeding."  *SPV OSUS*, 882 F.3d at 342 (quoting *N.Y.C. Emps.' Ret. Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, 293 B.R. 308, 313 (S.D.N.Y. 2003)).

34.     As one application of this general principle, courts have repeatedly held that related-to jurisdiction exists when the debtor would have been named as a defendant were it not for the automatic stay.  The plaintiffs in the *WorldCom* securities litigation, for example, could not sue WorldCom itself for its accounting fraud due to the automatic stay, but sued underwriters of WorldCom's bond offerings (among others) in state court.  293 B.R. at 313.  The defendants removed the action, and the federal court declined to remand.  In determining that related-to jurisdiction existed, the court observed that, "despite [WorldCom's] absence as a party, its conduct will remain at the heart of the ... litigation."  *Id.* at 321.

35.     More recently, the Second Circuit followed *WorldCom* in a case arising from the Madoff bankruptcies.  *SPV OSUS*, 882 F.3d at 342.  The Court held that related-to jurisdiction existed over state law claims that UBS aided and abetted Madoff because "there is a high degree of interconnectedness between this action and the Madoff bankruptcies."  *Id.*  The Court emphasized that "but for the automatic stay, it is difficult to imagine a scenario wherein SPV would not also sue Madoff and BLMIS, given that SPV alleges that UBS aided and abetted in their fraud."  *Id.*

36.     The allegations in the Complaint make clear that, as in *SPV OSUS* and *WorldCom*, the Issuers *themselves* would have been named in this lawsuit were it not for the automatic stay.  After all, the Bond Insurers' theory of the case is that *the Issuers* made

13

misrepresentations in their Official Statements, which the Underwriters failed to detect due to
their supposedly inadequate diligence.  *See, e.g.*, Compl. ¶ 3 (claiming reliance on the
Underwriters "to carry out that duty to investigate and to identify *false or incomplete
representations by the issuers*—especially representations relating to the ability of the issuers to
repay the debt in accordance with its terms.") (emphasis added).  Indeed, as discussed already,
these same Plaintiffs have filed proofs of claim in these PROMESA proceedings against the
Issuers.

37.     Consistent with that, this action raises many of the same factual issues that will be
litigated in the claims allowance process and adversary proceedings that this Court is already
administering in the Title III Cases.  For example, the FOMB's Special Claims Committee and
others representing the Issuers' creditors have commenced an adversary proceeding against
many of the Underwriters in the Title III Cases over the 2007 Series A-4 GO Bonds, which are a
subset of one of the Bonds at issue in this case.  Similarly to this case, the plaintiffs in that action
argue that those Underwriters should have known that Puerto Rico was insolvent.  *See* Adv.
Compl. (Dkt. No. 1), *Special Claims Committee of the Fin. Oversight and Mgmt. Bd. et al. v.
Barclays Capital et al.*, ¶¶ 340-353, Adv. Proc. No. 19-00280 (May 2, 2019).

38.     The approach adopted in *SPV OSUS* and *WorldCom* is consistent with Congress's
aims in crafting the concept of related-to jurisdiction.  As the Supreme Court affirmed in
*Celotex*, "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that
they might deal efficiently and expeditiously with all matters connected with the bankruptcy
estate."  514 U.S. at 308 (quoting *Pacor*, 743 F.2d at 994).  Thus, a significant overlap of key
disputed legal issues will support related-to jurisdiction.  *See, e.g.*, *Rivera v. Puerto Rico (In re.
Fin. Oversight & Mgmt. Bd.)*, No. 18-AP-47, 2018 U.S. Dist. LEXIS 225532, at *15 (D.P.R.

Oct. 12, 2018) (removal to PROMESA court proper when the assets and liabilities of PREPA were at issue in the removed case).  Here, the Complaint itself alleges that it arises out of the same "financial tragedy" that is at the heart of the Title III Cases.  Compl. ¶ 1.

39.     Moreover, allowing this case to proceed in the Court of First Instance could conceivably disrupt the PROMESA Court's supervision of the Title III Cases.  Shortly before the Plaintiffs commenced the Bond Insurer Action, Judge Swain entered the Stay Order to promote efficient management of matters related to the Title III cases.  The Stay Order governs a wide range of matters in the PROMESA proceedings, including half a dozen omnibus claims objections, another ten or so contested matters, and almost thirty adversary proceedings, including one in which the Bond Insurers are defendants.  *See* Stay Order, Appendix I at 2 (staying, *inter alia*, Adv. Proc. No. 19-00363).  It directs a wide swath of issues related to the Title III Cases to mediation before Judge Houser, including "*[c]laims against underwriters and other service providers in connection with debt issuances.*"  Stay Order at 4 (emphasis added).  Under these circumstances, the Court's exercise of federal related-to jurisdiction would be entirely consistent with the "comprehensive jurisdiction" provided to bankruptcy courts generally.  *Celotex*, 514 U.S. at 308.  Federal jurisdiction would promote the efficient and expeditious adjudication of matters that are deeply interconnected with the issues, parties, and disputes already before the Court in the Title III proceeding.

## II.    THE BOND INSURER ACTION RAISES A SUBSTANTIAL FEDERAL QUESTION

40.     There is another, independently sufficient basis for federal jurisdiction here.

41.     The Bond Insurers say that "there is no apparent statutory claim available in this case" because they "did not purchase bonds and thus ha[ve] no claim under federal securities laws."  Compl. ¶ 38.  But even when a plaintiff does not and cannot assert a cause of action

provided by federal law, their claim may nonetheless arise "under the … laws ... of the United States" for purposes of federal jurisdiction pursuant to 28 U.S.C. § 1331. *See, e.g.*, *Grable & Sons Metal Prods., Inc.*, 545 U.S. at 312. Specifically, "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues," *i.e.*, cases where "claims recognized under state law … nonetheless turn on substantial questions of federal law." *Id.* "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).[7]

42.     This principle is frequently applied in the context of the securities industry, which is subject to comprehensive and longstanding federal regulation. *See, e.g.*, *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180 (1921) (federal jurisdiction was proper where state law claims turned on constitutionality of federal regulation of bond issuances); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1020-1021 (2d Cir. 2014) (federal jurisdiction was proper where "the duty underlying" plaintiff's state law claims, "NASDAQ's duty to operate a fair and orderly market," "derive[d] directly from federal law," particularly federal securities law); *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 101-102 & n.6 (2d Cir. 2001) ("[R]esolution of D'Alessio's claims requires a court to construe federal securities laws and evaluate the scope of the NYSE's duties, as defined under the Exchange Act and the regulations and rules thereto").

---

[7]     Puerto Rico is treated as a state for purposes of the "laws of the United States relating to ... removal of causes."  48 U.S.C. § 864.

43.     The *Gunn-Grable* test is met in this case, which turns on a substantial and disputed question regarding the duty of municipal bond underwriters under the federal securities laws.

44.     *First*, a question of federal law is both necessarily raised and disputed in this case. The Bond Insurers explicitly premise their claims on the adequacy of the Issuers' disclosures under the federal securities laws, and the Underwriters' alleged due diligence obligations under SEC Rule 15c2-12, which governs municipal bond underwriting and the contents of offering materials.  As the Bond Insurers put it in the first pages of the Complaint:  "Under laws designed to protect investors [*i.e.*, SEC Rule 15c2-12], the banks were required to investigate the truth of key representations made in connection with the issuance of municipal bonds and to identify and disclose any materially false or incomplete disclosures by the issuers. … [The Bond Insurers] relied on the banks to carry out that duty to investigate …."  Compl. ¶ 3.

45.     The Complaint then goes on to discuss the SEC Rule 15c2-12 extensively.  That Rule, the Complaint recounts, "makes it 'unlawful' for a bank to 'act as an underwriter in a primary offering of municipal securities' of over $1 million unless, among other things, it 'obtain[s] and review[s] an Official Statement" that contains key information about the issuance.'"  Compl. ¶ 91 (quoting 17 C.F.R. § 240.15c2-12); *see also* Compl. ¶¶ 90-92 (discussing SEC Rule 15c2-12).  The Complaint further asserts that the SEC's interpretive guidance for Rule 15c2-12 provides that an underwriter's participation "implies that the underwriter has a reasonable basis for belief in truthfulness and completeness of the key representations contained in the [O]fficial [S]tatement," Municipal Securities Disclosure, Exchange Act Release No. 26985, 1989 WL 1113459, at *7 (June 28, 1989), 54 Fed. Reg. 28799, 28803 (July 10, 1989) and that Rule 15c2-12 requires a "reasonable investigation" to

develop "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents [*i.e.*, the Official Statements] used in the offerings," Municipal Securities Disclosure, Exchange Act Release No. 26100, 54 Fed. Reg. 28799, 28803 (July 10, 1989) at \*20 (Sept. 22, 1988).  *See* Compl. ¶ 92 (quoting these sources).

46.      In describing the nature of the claims in this case, the Complaint then repeatedly adverts to the language of the operative guidance on SEC Rule 15c2-12, verbatim or nearly verbatim, in characterizing the Underwriters' purported conduct.  *See* Compl. ¶¶ 16, 19, 23, 40, 116, 156, 180, 184, 234, 245 (referring to the Underwriters' supposed failure to conduct a "reasonable investigation" of the Official Statements or their supposed lack of a "reasonable belief" or "reasonable basis" to believe their "truth and completeness"), including in the portions of the Complaint setting forth the elements of both of the Bond Insurers' purported causes of action, *id.* at ¶¶ 248-250, 256, 260, 262, 265 (same).

47.      The Bond Insurers also assert that their injury flows directly from the Underwriters' representation that they had complied with this federal law duty, which representation allegedly induced them to insure the bonds.  *E.g.*, Compl. ¶ 25 ("Defendants' unfulfilled representations have caused National immense damage.").

48.      The Bond Insurers' "equitable" causes of action thus turn entirely on a duty created, not by state law, but by federal law.  And, for their part, the Underwriters dispute that they breached any applicable duty under the federal securities laws, including any duty arising under SEC Rule 15c2-12.  This claims in this case thus necessarily raise a disputed question of federal law.

49.      The Second Circuit's decision in *NASDAQ OMX Group* is right on point.  There, the court explained that various state law claims asserted against NASDAQ were all premised on

"a singular duty," namely "NASDAQ's duty to operate a fair and orderly market."  770 F.3d at

1020-1021.  That duty, and, "indeed, the very language [that the complaint] employ[ed]" in

describing it, "derive[d] directly from federal law."  *Id.*  In those circumstances, the complaint

"necessarily raise[d] a disputed question of federal law."  *Id.*  So too here.

50.     *Second*, the federal securities law question at issue here is substantial, implicating

ongoing and longstanding federal interests.  The diligence requirements of SEC Rule 15c2-12,

which governs the conduct of municipal bond underwriters, apply to hundreds of billions of

dollars in underwriting activity every year, for bonds issued by numerous state and local

governments, for all manner of purposes, across the Nation.  *See* SIFMA, U.S. Municipal

Issuance, https://www.sifma.org/resources/research/us-municipal-issuance (breaking down U.S.

municipal bond issuance volumes).  A Puerto Rico court's overbroad construction of those

requirements, and imposition of significant monetary liability (indeed, at least $720 million in

liability, according to the Bond Insurers, Compl. ¶ 265) based on a purported violation of SEC

Rule 15c2-12, would affect the national economy and the securities markets by chilling

underwriting or monoline insurance transactions across the country.

51.     Allowing such litigation to proceed in state or territorial courts would, moreover,

disrupt the uniform development by the federal courts of the law surrounding the Securities

Exchange Act and regulations promulgated thereunder (such as SEC Rule 15c2-12), over which

the federal courts have been granted exclusive jurisdiction by Congress, *see* 15 U.S.C. § 78aa(a).

52.     There are no countervailing considerations.  In particular, there is no reason for

concern that the exercise of federal court jurisdiction here would upset the federal-state balance

in a manner unintended by Congress.  Because of the national nature of the securities markets,

the federal government has comprehensively regulated securities issuances and transactions since

the 1930s.  *See, e.g.*, *Reserve Mgmt. Co. v. Willkie Farr & Gallagher LLP*, No. 11 Civ. 7045,

2012 WL 4378058, at *6-*7 (S.D.N.Y. Sept. 25, 2012) (denying remand from removal on

federal question grounds under *Grable* and explaining that, "given the comprehensive federal

securities regime, and the fact that Congress has granted federal courts exclusive jurisdiction

over federal securities law actions, there is a strong federal interest in the federal securities law

issues raised in [the] complaint") (collecting cases).  For a federal court to resolve in the first

instance the scope and application of SEC Rule 15c2-12, a key federal regulation governing the

municipal bond underwriting process, would be consistent with these longstanding federal

interests.

      53.    Indeed, the federal interests are doubly strong in this particular case.  This action

arises in the context of the Issuers' default on various Puerto Rico municipal bonds, which

contributed to Puerto Rico's financial crisis, which the Plaintiffs describe as a "financial abyss of

historic proportions."  Compl. ¶ 2.  Plaintiffs go so far as to assert that the case "provides [the

Court of First Instance] with the opportunity to help facilitate Puerto Rico's return to the capital

markets and financial stability." *Id*. ¶ 5.  But Congress specifically delegated that job to the

federal judiciary—and expressly articulated the significant federal interests in an orderly

resolution to the saga of Puerto Rico's financial crisis—when it enacted PROMESA, which

provides for substantial federal judicial involvement in overseeing and resolving the Issuers'

bankruptcy proceedings, as well as any related actions.  Congress even went to the extraordinary

step of removing the mandatory abstention provision applicable in bankruptcy proceedings under

Title 11, from the PROMESA jurisdictional statute, *see* 48 U.S.C. § 2166, a sign that it intended

for the federal judiciary to have an especially firm grip on proceedings under Title III and related

cases.[8]  It would hardly upset the federal-state balance to require the Bond Insurers to litigate

their claim in federal court, when those claims are related to the PROMESA proceeding in which

they are already active participants and claimants *and* when those claims are premised on

contested questions of federal securities law.

## TIMELINESS

54.     Defendants in this action were served with process no earlier than August 9, 2019.

Accordingly, this petition is timely.  *See* 28 U.S.C. § 1446(b); *Murphy Bros, Inc. v. Michetti Pipe*

*Stringing, Inc.*, 526 U.S. 344, 354 (1999).

## NO WAIVER

55.     Nothing in this Notice of Removal should be interpreted as a waiver or

relinquishment of Defendants' rights to assert any defenses or objections including, without

limitation, the defenses of (i) lack of personal jurisdiction; (ii) improper venue and/or forum non

conveniens; (iii) insufficiency or lack of process or service of process; (iv) improper joinder of

claims and/or parties; (v) failure to state a claim; (vi) failure to join an indispensable party(ies);

or (vii) any other procedural or substantive defense available under state or federal law.

56.     If any question arises as to the propriety of the removal of this action, Defendants

request the opportunity to brief any disputed issues and to present further evidence and oral

argument in support of their position that this case has been properly removed to this Court.

---

[8]     When a case is removed to federal court because it is "related to" a Title 11 bankruptcy
proceeding, 28 U.S.C. § 1334(c)(2) provides that the district court "shall abstain" from hearing
the case and shall remand to state court if the case can be "timely adjudicated" there.  However,
PROMESA contains no analogous provision.

## RELATED CASES

57.     As discussed above, this Action is related to the Title III Cases for Puerto Rico

(17-03283), PREPA (17-04780), HTA (17-03567), and COFINA (17-03284) (jointly

administered under lead Case No. 17-03283).

## OTHER COMPLIANCE

58.     Although removal based on 48 U.S.C. § 2166 does not require unanimity, all of

the Defendants to the Bond Insurer Action join in this Notice of Removal (including some who

have not yet been properly served).

59.     The Defendants have attached to this Notice of Removal as Exhibits A through G

copies of all process, pleadings, and orders served upon them in the Bond Insurer Action that

they have been able to locate after a reasonable search.  The attachment of such documents does

not waive or relinquish any arguments that service of process was insufficient or lacking.  *See*

*supra* ¶ 55.

60.     Today, the Defendants will serve written notice of this Notice of Removal on the

Plaintiffs and will file a copy of the notice with the clerk of the Court of First Instance pursuant

to 28 U.S.C. § 1446(d).

## VENUE

61.     Venue is properly laid in this Court as the U.S. district court for the district in

which the Bond Insurer Action is pending.  48 U.S.C. § 2166(d)(1); 28 U.S.C. § 1441(a).

## TRANSFER

62.     Pursuant to 48 U.S.C. § 2166(d)(3) and Local Rule 3A of the United States

District Court for the District of Puerto Rico, this case should be transferred to the Honorable

Laura Taylor Swain as a proceeding related to *In re Commonwealth of Puerto Rico*, No. 17-bk-

3283 (D.P.R.).  *See, e.g.*, *Voya*, 266 F. Supp. 3d at 599-600 (transferring to Judge Swain cases that were removed as related to the Title III Cases).

WHEREFORE, the Defendants respectfully request that this Court accept this Notice of Removal, refer the action to Judge Swain, and grant them such other and further relief as the Court deems just and proper.

Dated: September 9, 2019
San Juan, Puerto Rico                                          Respectfully submitted,


*/s/ Roberto C. Quiñones-Rivera*
Roberto C. Quiñones-Rivera
USDC-PR No. 211512

Leslie Y. Flores-Rodríguez
USDC-PR No. 223601

Myrgia M. Palacios-Cabrera
USDC-PR No. 230807

McCONNELL VALDÉS LLC
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Tel.: (787) 250-2631 / 5628
Fac.: (787) 759-8282
E-mail:   rcq@mcvpr.com
              lfr@mcvpr.com
              mpc@mcvpr.com

– and –

WILMER CUTLER PICKERING
   HALE AND DORR LLP
Peter G. Neiman (*pro hac vice* to be filed)
Philip D. Anker (*pro hac vice* to be filed)
Ross E. Firsenbaum (*pro hac vice* to be filed)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.:  (212) 230-8800

E-mail:  peter.neiman@wilmerhale.com
philip.anker@wilmerhale.com
ross.firsenbaum@wilmerhale.com

*Counsel to Citigroup Global Markets Inc.;
Goldman Sachs & Co. LLC; J.P. Morgan
Securities LLC; Merrill Lynch, Pierce,
Fenner & Smith Inc.; Morgan Stanley & Co.
LLC; RBC Capital Markets, LLC;
Santander Securities LLC; UBS Financial
Services Inc.; and UBS Securities LLC*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(b), I certify that on this 9th day of

September, 2019, I caused a true and correct copy of Defendants' **NOTICE OF REMOVAL** to

be served on counsel for the Plaintiffs via e-mail and certified mail, return receipt requested.

> */s/ Roberto C. Quiñones-Rivera*
> Roberto C. Quiñones-Rivera
> McCONNELL VALDÉS LLC
> 270 Muños Rivera Avenue
> Hato Rey, Puerto Rico 00918
> Tel.:  (787) 250-2631 / 5628
> Fac.: (787) 759-8282