# Exhibit D

**CT Corporation**

**Service of Process Transmittal**
08/09/2019
CT Log Number 536051833

**TO:**   Michael Bury (BAS & BAIC), AVP Litigation Specialist
Bank of America
South Tower, 225 Liberty St- 2 World Financial Ctr
Mailcode #NY3-002-37-12
New York, NY 10281

**RE:**   **Process Served in Puerto Rico**

**FOR:**   Merrill Lynch, Pierce, Fenner & Smith Incorporated  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | National Public Finance Guarantee Corporation, Pltf. vs. UBS Financial Services Inc, et al., Dfts. // To: Merrill Lynch, Pierce, Fenner & Smith, Inc. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Estado Libre Asociado de Puerto Rico - Tribunal General de Justicia, Tribunal de Primera Instancia, Sala Superior de San Juan, PR Case # SJ2019CV07932804 |
| **NATURE OF ACTION:** | Damages - Demand to Hold Investment Banks to the Original the Issuance of Municipal Bonds and Market and Sell the Bonds |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, San Juan, PR |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/09/2019 at 16:12 |
| **JURISDICTION SERVED :** | Puerto Rico |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days |
| **ATTORNEY(S) / SENDER(S):** | Harold D Vicente Gonzalez PO Box 11609 San Juan, PR 00910-1609 787-751-8000 |
| **REMARKS:** | We cannot complete the transmittal because the attached documents are in a foreign language. We are forwarding as process so that you can determine next steps. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/14/2019, Expected Purge Date: 08/19/2019 |
| | Image SOP |
| | Email Notification, Anitria Walker-Doe  anitria_walker-doe@ml.com |
| | Email Notification, Mark Borowski  mark.f.borowski@bankofamerica.com |
| | Email Notification, Michael Bury (BAS & BAIC)  mike.bury@bankofamerica.com |
| | Email Notification, Jeff Rayball  jeffrey.rayball@bankofamerica.com |
| **SIGNED:** | C T Corporation System |

Page 1 of  2 / MD

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**CT Corporation**

**Service of Process Transmittal**
08/09/2019
CT Log Number 536051833

| | |
|---|---|
| **TO:** | Michael Bury (BAS & BAIC), AVP Litigation Specialist<br>Bank of America<br>South Tower, 225 Liberty St- 2 World Financial Ctr<br>Mailcode #NY3-002-37-12<br>New York, NY 10281 |
| **RE:** | **Process Served in Puerto Rico** |
| **FOR:** | Merrill Lynch, Pierce, Fenner & Smith Incorporated  (Domestic State: DE) |

| | |
|---|---|
| **ADDRESS:** | 1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201 |
| **For Questions:** | 214-932-3601 |

Page 2 of  2 / MD

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**CT System**
**Form**

**Service of Process Transmittal**

San Juan, Puerto Rico
**August 13, 2019**

**Log #**

**Via Federal Express Tracking #**

**To:**

**RE: PROCESS SERVED IN PUERTO RICO**

**For: MERRILL LYNCH, PIERCE, FENNER & SMITH, INC**

Enclosed are Copies of Legal Process received by the Statutory Agent of the Above Company as Follows:

**1. Title of Action:** National Public Finance Guarantee Corporation, et al., Pltf. Vs UBS Financial Services Inc, et al. Deft.

**2. Document(s) Served:** Summons and Complaint

**3. Court:** Estado Libre Asociado de Puerto Rico, Tribunal General de Justicia, Tribunal de Primera Instancia, Sala Superior de San Juan. Civil No SJ2019CV07932 (804)

**4. Nature of Action:** DAMAGES - demand to hold investment banks to the original the issuance of municipal bonds and market and sell the bonds.

**5. On Whom Process Was Served:** CT CORPORATION SYSTEM, SAN JUAN, PR

**6. Date and Hour of Service:** By Process Server on August 9, 2019 @ 2:00 pm

**7. Appearance or Answer Due: 30 days**

**8. Sender:** Harold D Vicente Gonzalez
RUA 3966
PO Box 11609
San Juan, Puerto Rico, 00910-1609
Phone: 787-751-8000
Fax: 787-756-5250
hvicente@vclawpr.com

**9. Remarks:**

**Signed:** CT CORPORATION SYSTEM
**Per:** Federico Calaf, Representative
**Address:** PO Box 9022946,
San Juan, PR 00902-2946

Information contained on this transmittal form is recorded for CT Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.



**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL GENERAL DE JUSTICIA**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION Y
OTROS
**Parte Demandante**

v.

UBS FINANCIAL SERVICES, INC. Y
OTROS
**Parte Demandada**

**CASO NÚM. SJ2019CV07932**

SOBRE: DAÑOS

804

**EMPLAZAMIENTO**

ESTADOS UNIDOS DE AMERICA, SS
EL PRESIDENTE DE LOS ESTADOS UNIDOS
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO

**A: MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.**
ONE BRYANT PARK NEW YORK, ESTADOS UNIDOS 10036

POR LA PRESENTE se le emplaza para que presente al tribunal su alegación responsiva dentro de los 30 días de haber sido diligenciado este emplazamiento, excluyéndose el día del diligenciamiento. Usted deberá presentar su alegación responsiva a través del Sistema Unificado de Manejo y Administración de Casos (SUMAC), al cual puede acceder utilizando la siguiente dirección electrónica: https://unired.ramajudicial.pr, salvo que se represente por derecho propio, en cuyo caso deberá presentar su alegación responsiva en la secretaría del tribunal. Si usted deja de presentar su alegación responsiva dentro del referido término, el tribunal podrá dictar sentencia en rebeldía en su contra y conceder el remedio solicitado en la demanda, o cualquier otro, si el tribunal, en el ejercicio de su sana discreción, lo entiende procedente.

Nombre del Abogado: HAROLD D. VICENTE GONZÁLEZ
RUA: 3966
Dirección: PO BOX 11609, SAN JUAN, PUERTO RICO, 00910-1609
Tel: 7877518000 / Fax: 7877565250
Correo Electrónico: hvicente@vclawpr.com

0 9 AUG 2019

Expedido bajo mi firma y sello del Tribunal, el _____ de _____ de _____ .

Por: _____

Grisselda Rodríguez Collado
Secretaria Regional
Secretaría Regional
María Ocasio Rodríguez
Secretaria Auxiliar
Nombre y Firma del (de la)
Secretario(a) Auxiliar del Tribunal

K027

Caso Núm. __SJ2019CV07932__

## CERTIFICADO DE DILIGENCIAMIENTO POR EL (LA) ALGUACIL

Yo _____ Alguacil del Tribunal de Primera Instancia de Puerto Rico, Sala de _____

CERTIFICO que el diligenciamiento del emplazamiento y de la demanda del caso de referencia fue realizada por mí, el _____ de _____ de _____, a las _____ ☐ am ☐ pm, de la siguiente forma:

☐ Mediante entrega personal a la parte demandada en la siguiente dirección física:
_____

☐ Accesible en la inmediata presencia de la parte demandada en la siguiente dirección física: _____

☐ Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demandada o designada por ley para recibir emplazamientos en la siguiente dirección física:
_____

☐ No se pudo diligenciar el emplazamiento personalmente debido a que:
_____
_____

En _____, Puerto Rico, el _____ de _____ de _____.

_____            _____
Nombre del (de la) Alguacil Regional      Nombre del (de la) Alguacil de Primera Instancia
                                          y Número de Placa

                                          _____
                                          Firma del (de la) Alguacil de Primera Instancia

## DILIGENCIAMIENTO DEL EMPLAZAMIENTO POR PERSONA PARTICULAR

Yo, _Alberto Ríos Ortiz_, declaro tener capacidad legal conforme la Regla 4.3 de Procedimiento Civil de Puerto Rico, y certifico que el diligenciamiento del emplazamiento y de la demanda del caso de referencia fue realizado por mí, el _7_ de _Agosto_ de _2019_, de la siguiente forma:

☐ Mediante entrega personal a la parte demandada en la siguiente dirección física:

☑ Accesible en la inmediata presencia de la parte demandada en la siguiente dirección física: _CT Corp. System 361 Sanfrancisco 4 Piso Sanjuan_

☑ Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demandada o designada por ley para recibir emplazamientos en la siguiente dirección física:
_p/c Lcdo. Federico Calaf (Rep. CT Corp)_

☐ No se pudo diligenciar el emplazamiento personalmente debido a que:
_____
_____

### COSTOS DEL DILIGENCIAMIENTO

$ _____

### DECLARACIÓN DEL (DE LA) EMPLAZADOR(A)

Declaro bajo pena de perjurio, conforme a las leyes del Estado Libre Asociado de Puerto Rico, que la información provista en el diligenciamiento del emplazamiento es verdadera y correcta.
Y PARA QUE ASÍ CONSTE, suscribo la presente en _____, Puerto Rico, el _____ (fecha) _____ de _____.

_____            _____
Firma del (de la) emplazador(a)          Dirección del (de la) emplazador(a)

AFFIDÁVIT NÚM. _____ (en caso de ser juramentado ante un(a) notario(a))

Jurado(a) y suscrito(a) ante mí por _____
de las circunstancias personales anteriormente mencionadas, a quien doy fe de conocer

(conocimiento personal o, en su defecto, la acreditación del medio supletorio provisto por la Ley Notarial)

En _____, Puerto Rico, el _____ de _____ de _____.

                                          _____
                                          Nombre del (de la) Notario(a) o
                                          Secretario(a) Regional

Por: _____                     _____
                                          Nombre y Firma del (de la)
                                          Secretario(a) Auxiliar del Tribunal

OAT 1721 Emplazamiento (SUMAC)
(Rev. Mayo 2016)
Reglas de Procedimiento Civil de 2009, según enmendadas

Página 2 de 2

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 7 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 1 de 93

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION; y MBIA
INSURANCE CORPORATION,

Demandantes,

Civil Núm.

V.

UBS FINANCIAL SERVICES, INC.; UBS
SECURITIES LLC; CITIGROUP GLOBAL
MARKETS INC.; GOLDMAN SACHS & CO.
LLC; J.P. MORGAN SECURITIES LLC;
MORGAN STANLEY & CO. LLC; MERRILL
LYNCH, PIERCE, FENNER & SMITH INC.;
RBC CAPITAL MARKETS LLC; y
SANTANDER SECURITIES LLC,

Demandados.

SOBRE: Daños y Perjuicios por
Actos Propios, y Declaración
Unilateral de Voluntad

## DEMANDA

**AL HONORABLE TRIBUNAL:**

COMPARECE la parte demandante, National Public Finance Guarantee
Corporation y MBIA Insurance Corporation, por conducto de la representación legal
que suscribe y, muy respetuosamente, expone, alega, y solicita:

## INTRODUCCIÓN

1. Ocho de los principales bancos de inversión provocaron la tragedia fiscal
por la que atraviesa Puerto Rico, sus ciudadanos y otros quienes igualmente confiaron
en la buena fe y conducta de dichas entidades en el mercado de bonos municipales de
Puerto Rico. Por más de una década, estos bancos promovieron que Puerto Rico y sus
agencias e instrumentalidades emitieran deuda que era insostenible según sus
términos. Esa deuda llevó al Gobierno de Puerto Rico a la quiebra, mientras que los
bancos se enriquecieron a través de comisiones sustanciales.

2. Puerto Rico sufrió las graves consecuencias de estos actos que han
llevado a la Isla a un abismo fiscal de proporciones históricas. Cuando los bonos
colapsaron, el gobierno hizo recortes drásticos a servicios públicos, incluyendo las
pensiones, servicios de salud, las utilidades, e infraestructura básica (para redes
eléctricas y transporte. Como resultado, muchos ciudadanos sintieron que no tenían
oportunidades de trabajo o se afectó su calidad de vida y se vieron forzados a

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 8 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 2 de 93

abandonar a la Isla. Ciudadanos de Puerto Rico vieron el valor de sus ahorros y pensiones que con sacrificio acumularon durante toda su vida desplomarse.

3. Esta Demanda pretende responsabilizar a los bancos de inversión. Al originar la emisión de los bonos municipales y comercializar y vender los bonos, estos bancos de inversión se representaron como guardianes ("gatekeepers") del mercado de bonos municipales de Puerto Rico. Conforme a las leyes diseñadas para proteger a los inversionistas, los bancos de inversión tenían la obligación de investigar la veracidad de las representaciones claves hechas en relación con la emisión de bonos municipales y de identificar y divulgar cualquier declaración sustancialmente falsa o incompleta de parte de los emisores. El Gobierno de Puerto Rico, la ciudadanía, y muchas otras personas, incluyendo a las aseguradoras aquí demandantes, confiaron en los bancos de inversión para llevar a cabo esa debida diligencia ("due diligence") y la obligación de investigar e identificar representaciones falsas o incompletas de parte de los emisores—especialmente las representaciones relacionadas con la capacidad de los emisores de repagar la deuda de acuerdo con sus términos.

4. A diferencia de los otros participantes en el mercado, los bancos de inversión tuvieron un especial acceso a información sobre las operaciones y solvencia financiera de las agencias e instrumentalidades que emitieron los bonos. Basado en la debida diligencia supuestamente llevada a cabo por los bancos de inversión en torno a las declaraciones, se le garantizaba al mercado que dichos emisores tenían la capacidad para pagar sus deudas según sus términos. De acuerdo con las prácticas establecidas hace años en ese sector, los demás participantes en el mercado tenían derecho a confiar y en efecto confiaron en la buena fe y debida diligencia de los bancos de inversión. Sin embargo, éstos violaron esa confianza.

5. Por más de cuarenta años, los aquí Demandantes, MBIA Insurance Corporation y National Public Finance Guarantee Corporation ("NPFG") junto con Financial Guaranty Insurance Company ("FGIC"), el predecesor en derechos, que no es una parte de esta demanda, de varias pólizas en asunto de NPFG (en conjunto "National") ha garantizado seguros para mercados financieros públicos y municipales, incluyendo muchos bonos emitidos por el Gobierno de Puerto Rico y sus agencias para distintos proyectos de desarrollo e infraestructura en la Isla. National siempre ha estado comprometida con proteger a quienes han asegurado sus intereses y su motor principal es reestablecer el funcionamiento normal de los mercados municipales con transparencia e integridad. Adjudicar responsabilidad a los bancos de inversión y asegurar que éstos cumplan cabalmente con sus responsabilidades ayudará a reestablecer el mercado y promover y apoyar el crecimiento de la economía

2

Case 17-03283-LTS Doc 8866-7 Filed 09/09/19 Entered 09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 9 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 3 de 93

de Puerto Rico. Este caso le brinda la oportunidad a este Tribunal de facilitar que Puerto Rico pueda regresar a los mercados de capital y estabilidad financiera, y salir de la crisis que tanto ha afectado el bienestar del pueblo de Puerto Rico.

6. Cada uno de los bancos de inversión aquí demandados fue un suscriptor líder de uno o más de los bonos emitidos por el Gobierno y sus instrumentalidades y/o formó parte del grupo de suscriptores responsables de comercializar y/o vender múltiples series de bonos a través de los años. Esos bancos de inversión compitieron para convertir al Gobierno y sus instrumentalidades en clientes y lograr que emitieran bonos para levantar fondos para cubrir sus necesidades. Los bancos de inversión fueron seleccionados por el Gobierno y sus instrumentalidades para desempeñar la gestión de comercializar y vender los bonos a los inversionistas. Los bancos de inversión aquí demandados tuvieron un acceso único a los emisores, tales como el Gobierno de Puerto Rico, la Autoridad de Energía Eléctrica de Puerto Rico ("AEE"), la Autoridad de Carreteras y Transporte de Puerto Rico ("ACT") y la Corporación del Fondo de Interés Apremiante ("COFINA") y se valieron de esas relaciones con las agencias e instrumentalidades para estimular y permitir que éstas emitieran miles de millones de dólares en bonos, sin tomar en consideración los riesgos resultantes de asumir obligaciones de deudas tan extraordinarias. Estos bancos de inversión quienes tenían serios conflictos de interés, se aprovecharon de la coyuntura fiscal del Gobierno de Puerto Rico para promover la rentabilidad en volúmenes gigantescos de bonos. Al así actuar, obtuvieron ganancias multi-millonarias a costa del pueblo de Puerto Rico.

7. Para suscribir los bonos, los bancos venían obligados a diseminar Declaraciones Oficiales (las "Declaraciones Oficiales") para cada una de las emisiones. Al hacer eso, los bancos representaron que la emisión cumplía con las leyes federales y las costumbres y reglas del mercado de bonos municipales que exigían que investigaran razonablemente los documentos e información de la oferta de los bonos y que notificarían al mercado si encontraban que cualquier parte de esa información era falsa o sustancialmente incompleta. La conducta de los bancos de inversión le aseguraron al mercado que todos los participantes —incluyendo a los aquí Demandantes— podrían confiar en la información de los emisores que surgían de las Declaraciones Oficiales. Sin embargo, los bancos de inversión no examinaron esos materiales con la debida diligencia como le habían asegurado al mercado que habían hecho. En su lugar, se apresuraron a mercadear un sinnúmero de bonos con información sustancialmente falsa o incompleta, ocultando así riesgos masivos que predestinaron a los bonos a caer en morosidad.

Case 17:03283 LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 10 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 4 de 93

8. Con el objetivo de hacer que los bonos fueran lo más atractivos posibles a los inversionistas —y de esa manera facilitar la emisión de la mayor cantidad de bonos posible— los bancos de inversión solicitaron en repetidas ocasiones un seguro de garantía de los aseguradores de bonos (también conocidos como aseguradores "monoline") incluyendo a National. Al estar estos bonos respaldados por el seguro ("wrapping") emitido por National, se hizo mucho más fácil su mercadeo, ya que el seguro equivalía a una garantía de solvencia del emisor.

9. Las Declaraciones Oficiales diseminadas por los bancos de inversión fueron un elemento integral del esfuerzo de los bancos de inversión para obtener un seguro para los bonos. Para que los aseguradores aquí Demandantes pudieran evaluar los riesgos inherentes en asegurar una emisión en particular, los bancos de inversión, como parte de sus solicitudes de seguro, entregaban a los aseguradores un borrador y luego una versión final de las Declaraciones Oficiales que describían los bonos, incluyendo expresiones sobre la solvencia de las entidades emisoras (y, por lo tanto, fundamentalmente, sobre su capacidad para repagar la deuda, según sus términos) y los propuestos usos del capital que sería recaudado. Al hacer eso, los bancos de inversión le hicieron a los aquí Demandantes las mismas afirmaciones falsas que habían hecho al Gobierno y a los inversionistas de que habían investigado las declaraciones y representaciones en los documentos e información de la oferta y que habían concluido que la información allí vertida era cierta y completa.

10. Confiando de buena fe en las representaciones de los bancos de inversión, los aquí Demandantes emitieron miles de millones de dólares en pólizas de seguro irrevocables, garantizando los bonos —facilitando que se efectuaran y mercadearan las emisiones de bonos, y que los bancos de inversión cobraran sustanciales honorarios. Sin embargo, contrario a las representaciones de los bancos de inversión —y según se ha revelado recientemente— los bancos decidieron no investigar información crítica que habían proporcionado a los aquí Demandantes en las Declaraciones Oficiales, y esa información ha resultado ser falsa. A modo de ejemplo, los ratios de cobertura de la amortización de las deudas de los emisores fueron sobreestimados, las proyecciones de las rentas fueron sobreestimadas, y los emisores ocultaron que no habían gastado y con toda probabilidad no iban a invertir los fondos, según habían representado. Estas declaraciones falsas e incompletas ocultaron el riesgo muy real de que a su vencimiento los bonos no serían pagados de acuerdo con sus términos. Si los bancos de inversión hubieran investigado, como tenían la obligación de hacer, hubieran descubierto la verdad y habrían tenido la obligación de advertir a National junto con los demás participantes en el mercado.

4

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 11 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 5 de 93

11.    Los graves riesgos enmascarados por estas declaraciones falsas finalmente salieron a relucir, con trágicas consecuencias. Cuando los bonos comenzaron a caer en morosidad, Puerto Rico y sus agencias quedaron sin los fondos necesarios para proveer servicios esenciales. Hubo recortes drásticos a pensiones, atención médica, servicios públicos, y educación. Fondos para construir y mantener carreteras y puentes se agotó. Muchas escuelas públicas cerraron. Trabajos desaparecieron.

12.    National ha sufrido daños sustanciales también, teniendo que pagar más de $720 millones en reclamaciones al 1 de julio 2019—obligaciones que tiene la intención de continuar a honrar en su totalidad—atenuando así el perjuicio que los bancos de inversión ocasionaron a los tenedores de bonos. Por más de cuarenta años, National ha asegurado emisiones de Puerto Rico, ayudando a financiar mejoras a instalaciones y servicios para la gente del Gobierno de Puerto Rico. En este rol, National ha protegido a muchos inversionistas en bonos de Puerto Rico. A través de esta demanda, National ahora busca responsabilizar los bancos por su conducta inescrupulosa, e imponerle consecuencias al no actuar con transparencia, integridad, y según las reglas de juego limpio, y asegurar que esta conducta nunca vuelva a ocurrir.

13.    National interpone esta demanda procurando que se haga justicia bajo reconocidos principios de equidad conforme a la doctrina de actos propios y la doctrina de la declaración unilateral de la voluntad. El legado de la conducta injusta de los bancos afectará a Puerto Rico por generaciones. Éstos no sólo desatendieron su obligación de actuar como celosos guardianes, sino que se aprovecharon de las circunstancias imperantes en Puerto Rico, llevando a Puerto Rico directamente a su crisis actual. Mientras los bancos se enriquecían, le infligían graves daños al Gobierno de Puerto Rico y a sus ciudadanos, al igual que a National. Deben por tanto responder por esta conducta ilícita.

*      *      *

14.    Entre el 2001 y el 2014, la banca de inversión—incluyendo a UBS Financial Services, Inc.; UBS Securities LLC; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Morgan Stanley & Co. LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; RBC Capital Markets LLC; y Santander Securities LLC (colectivamente "las Demandadas")—suscribieron ("underwrote") más de $66 mil millones en bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades.

Case 17-03283-LTS Doc#8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 12 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 6 de 93

15. Los bonos aquí descritos no se hubieran podido emitir con términos mercadeables sin el seguro y las garantías que le brindaron los aquí Demandantes, conocido como el "seguro de garantía financiera" o "seguro monoline." Según sus términos, los bonos se pagarían a los inversionistas en cantidades fijas de principal e intereses. El dinero en efectivo para realizar estos pagos debía provenir de los ingresos y fondos de los emisores. Los aquí Demandantes aseguraron el eventual riesgo de que, a su vencimiento, un emisor no tuviese fondos suficientes para pagar a los tenedores de los bonos todo el dinero que se les debía; en caso de una escasez, éstos tendrían que intervenir para cubrir la diferencia. Al garantizar que los tenedores de los bonos serían pagados en su totalidad, el seguro emitido por las aquí Demandantes causó que los bonos fueran más atractivos para los inversionistas y, por lo tanto, más fáciles de emitir y mercadear para las Demandadas.

16. Según la costumbre en la industria, las Demandadas solicitaron un seguro para cada emisión de bonos, para lo cual proporcionaron a los Demandantes información, datos y materiales requeridos en la solicitud, la cual se fue suplementando hasta el momento de la emisión. Cada solicitud de seguro incluía documentos relevantes a la transacción, incluyendo un borrador y luego versiones finales de los materiales de oferta que se registrarían públicamente con la Comisión de Bolsa y Valores de los Estados Unidos ("United States Securities and Exchange Comission" o "SEC"). Estos materiales, denominados "Declaraciones Oficiales" o "Official Statements" incluían una representación de que "The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws[.]" Esas leyes, promulgadas para proteger a los inversionistas, requerían que los bancos de inversión suscriptores investigaran la suficiencia y veracidad de la información en las Declaraciones Oficiales y que tuvieran una base razonable para creer que esa información era cierta y completa.

17. Aunque en sus solicitudes de seguro las Demandadas no venían obligadas a entregar a National las Declaraciones Oficiales que incluían certificaciones de que habían cumplido con las leyes de valores federales (National es un asegurador que no compra valores y por tanto no tiene reclamación basada en las leyes de valores), la realidad es que así lo hicieron destacando su cumplimiento con las leyes de valores. Al así actuar, asumieron la obligación de investigar razonablemente la información contenida en las Declaraciones Oficiales. Los aquí Demandantes le dieron mucha importancia a estas representaciones y las investigaciones que los bancos de inversión manifestaron que habían hecho, y de

Case 1:17-03283-LTS  Doc# 8665-7  Filed 09/09/19  Entered 09/09/19 17:18:09  Desc.
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc  Page 13 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 7 de 93

buena fe confiaron plenamente en ellas. Hasta cierto punto, era necesario hacerlo, porque conforme a las leyes de valores, los emisores de los bonos están exentos de los requisitos de registración y presentación de informes de acuerdo con las leyes de valores federales, y eso significaba que públicamente se podía obtener muy poca información confiable sobre los bonos a ser emitidos. Por tanto, como generalmente ocurre con los bonos municipales, la única fuente de información confiable era las supuestas investigaciones "realizadas" por los suscriptores, incluyendo las Demandadas.

18. Las aquí Demandadas sabían que era uso y costumbre y una práctica generalizada en la industria de seguros de bonos que los suscriptores entregaran a los aseguradores Declaraciones Oficiales indicando que éstos habían investigado y que sus representaciones eran ciertas y completas. Como los suscriptores ("underwriters") —incluyendo a las aquí Demandadas— tenían acceso directo a los emisores, mientras que los aseguradores y otros participantes en el mercado no lo tenían, el mercado de los seguros de bonos dependía y contaba en la buena fe de los suscriptores de proveer a los aseguradores con información debidamente revisada y exacta sobre los emisores y su solvencia. Como bien sabían o debían saber todos los participantes en el mercado de bonos —incluyendo a las aquí Demandadas— este sistema era clave para el mejor y más eficiente funcionamiento del mercado de bonos y, por lo tanto, para la capacidad que tenían las entidades gubernamentales de obtener financiamiento para sus proyectos públicos.

19. Mediante sus acciones y representaciones, las Demandadas aseguraron a los aquí Demandantes que iban a investigar las Declaraciones Oficiales para formar una creencia razonable de que las declaraciones eran verdaderas y completas, y que informaría a los aquí Demandantes de cualquier declaración sustancialmente falsa u omisión. Por ende, los aquí Demandantes confiaron de buena fe en las afirmaciones de que las Demandadas habían realizado las investigaciones correspondientes, previo a la emisión de los bonos. Las acciones y representaciones de las Demandadas proporcionando las Declaraciones Oficiales claramente tenían como objetivo ganarse la confianza de los aquí Demandantes.

20. Confiando de buena fe en las representaciones en las garantías de las Demandadas, y tomando en consideración la información que las Demandadas brindaron en los Declaraciones Oficiales con relación a la solvencia de los emisores, los aquí Demandantes aseguraron en exceso de $11 mil millones en deuda para entidades gubernamentales de Puerto Rico entre el 2001 y el 2007. Según sus propios términos, estas pólizas de seguro eran, y siguen siendo, irrevocables. Después de

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 14 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 8 de 33

emitir su seguro, los Demandantes se vieron obligados a cumplir con sus obligaciones, aun cuando más adelante descubrieron que se le había dado información falsa antes de la emisión de las pólizas. De hecho, los Demandantes no han dejado de cumplir con su compromiso con los bonistas—y han honrado cada una de las reclamaciones sobre esas pólizas y tienen la intención de continuar haciéndolo.

21. Los bancos de inversión suscriptores, incluyendo a las aquí Demandadas, se lucraron de una manera significativa de la emisión de estos bonos, ganando cientos de millones de dólares. Cada una de las Demandadas recibieron enormes honorarios como resultado de cada emisión de bono. Algunos vendieron los bonos también por medio de fondos mutuos cerrados, que estaban limitado a residentes bona fide de Puerto Rico, lo cual permitió que generaran ingresos adicionales. Otros vendieron también "swaps" de tasas de interés—contratos que responsabilizaron a los emisores a pagar altas tasas de interés fijas en lugar de las tasas variables de los bonos—cobrándoles a los emisores una tarifa sustancial para participar en los "swaps," y honorarios aún más grandes para salirse de esos "swaps" cuando se desplomaron las tasas de interés. Algunos de los suscriptores hasta estimularon a algunos de los emisores a emitir bonos adicionales—también con la intención de que cayeran en mora—para que esos emisores pudieran obtener los fondos necesarios para pagar esa masiva compensación. Como los suscriptores podían cobrar las comisiones independientemente de si se repagaban los bonos, a los suscriptores incluyendo las Demandadas, poco o nada les importaba si los bonos finalmente eran pagados según sus términos o si eran buenas inversiones, con tal de que los suscriptores tuvieran éxito a corto plazo. Así, sus intereses estaban en conflicto directo con los intereses del Gobierno, los puertorriqueños, y de otras entidades como los aquí Demandantes, que tenían interés en el éxito a largo plazo de emisiones.

22. Mientras que por un lado las Demandadas se beneficiaron de estas transacciones, casi todos los demás participantes sufrieron grandes pérdidas y daños. Los emisores se afectaron severamente cuando los bonos cayeron en morosidad, ya que lamentablemente les faltaba la liquidez necesaria para ofrecer servicios esenciales inicialmente. Los ciudadanos de Puerto Rico también fueron impactados a medida que el Gobierno se vio imposibilitado de proveer esos servicios esenciales. Las bonistas, por su parte, muchos de los cuales eran residentes de Puerto Rico, también sufrieron tras los impagos, cuando el valor de sus inversiones cayó de forma estrepitosa. Pero las Demandadas—quienes, como guardianes, debían haber evitado la emisión de una deuda altamente riesgosa y haber advertido al público de esos

8

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill, Lynch, Pierce, Fenner & Smith Inc Page 15 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 9 de 93

riesgos—hasta ahora, no han enfrentado consecuencias reales por su conducta anti-jurídica.

23. Investigaciones recientes han revelado que las Demandadas no verificaron y validaron representaciones claves entre los materiales que proporcionaron a los aquí Demandantes, con respecto a parámetros críticos como lo son los convenios para el pago de deudas, los ingresos estimados, y el uso del capital generado por las emisiones. Las Demandadas nunca generaron una creencia razonable de que esas declaraciones eran verdaderas y estaban completas, y de hecho, esas declaraciones eran falsas. Las representaciones de las Demandadas crearon la falsa impresión de que los bonos eran menos riesgosos de lo que en realidad eran. Esas declaraciones falsas, junto con las representaciones igualmente engañosas de las Demandadas a los efectos de que habían realizado investigaciones razonables, permitieron y estimularon que el Gobierno y sus agencias e instrumentalidades acumularan deudas que en definitiva no han podido pagar de acuerdo con sus términos.

24. Al igual que el Gobierno, los puertorriqueños, los emisores y los aquí Demandantes fueron decepcionados, al haber confiado en la palabra y las representaciones en los suscriptores, incluyendo a las Demandadas, y como consecuencia han sido gravemente perjudicados.

25. Las representaciones incompletas de las Demandadas han causado a los Demandantes un daño enorme y sin precedentes. Inducidos por las Demandadas a emitir pólizas de seguro irrevocables, los Demandantes, al 1 de julio de 2019, se han visto obligados a pagar de más de $720 millones en reclamaciones, honrando sus garantías a los bonistas, y prevé que van a tener que pagar cientos de millones más. Si los Demandantes hubieran sabido que las Demandadas no iban a investigar la información que surgía de sus representaciones, nunca habrían emitido las pólizas de seguro.

26. Estas circunstancias extraordinarias ameritan que se aplique la doctrina de actos propios y/o de declaración unilateral de la voluntad, ya que el Tribunal Supremo de Puerto Rico ha reconocido ambas expresamente como reclamaciones equitativas conforme a la ley de Puerto Rico.

27. La doctrina de actos propios—la cual tiene su origen en el principio de derecho romano de *venire contra factum proprium* y luego fue reconocido en la jurisprudencia Española, y también en la jurisprudencia de muchas otras jurisdicciones civiles—tiene como objetivo proteger las "legitimate expectations" y la "good faith" y prohibit[] behavior that would result in an unreasonable

9

Case: 17-03283-LTS   Doc#:8666-7   Filed:09/09/19   Entered:09/09/19 17:18:09   Desc:
Exhibit Exhibit D - Service of Process Merill Lynch 24.39 am Page 16 of 96
3:20-19CV07932 08/08/2019 10.24.39 am Pagina10 de 93   Fenner & Smith Inc   Page 16 of 96

interference with a legitimately created trust relationship, that allowed the other party to reasonably rely on the original conduct." Thiago Luis Sombra, *The Duty of Good Faith Taken to a New Level: An Analysis of Disloyal Behavior*, 9 J. CIV. L. STUD. 28, 31 (2016). La doctrina de actos propios "aim[s] to raise good faith to the condition of a general principle that is autonomous, abstract, and subject to being invoked for a variety of legal relations, but with consideration of the peculiar aspects of each case." *Id.* pág. 34.

28.    El derecho vigente en Puerto Rico reconoce una interpretación amplia de la doctrina de actos propios conforme resolvió el Tribunal Supremo de Puerto Rico hace cuarenta años en *International General Electric v. Concrete Builders, Inc.*, 104 D.P.R. 871 (1976). De modo que la doctrina permite que el reclamante recupere daños cuando se establece un "ataque a la buena fe," aún en ausencia de una relación contractual entre las partes. *Id.* a la pág. 877.

29.    La doctrina es flexible y provee a los tribunales un "amplio margen de libertad," permitiéndoles dar forma a la aplicación de la doctrina para ajustarse a las circunstancias según lo requiera la equidad. LUIS DÍEZ-PICAZO PONCE DE LEÓN, LA DOCTRINA DE LOS ACTOS PROPIOS: UN ESTUDIO CRÍTICO SOBRE LA JURISPRUDENCIA DEL TRIBUNAL SUPREMO, 74 (Civitas Thomson Reuters (Legal) ed. 2da ed. 2014) (en lo sucesivo, DÍEZ-PICAZO, DOCTRINA DE ACTOS PROPIOS).

30.    "Mediante [su] aplicación [de doctrina de actos propios], se salvaguardan intereses esenciales para lograr una interacción efectiva a todos los niveles de la vida diaria. Se espera que el devenir entre los miembros que componen la sociedad esté caracterizado por las cualidades de honestidad y sinceridad, de manera que en todo momento se pueda descansar en la veracidad de las representaciones o las actuaciones de otro según se ha actuado." *O.C.S. v. Universal*, 187 D.P.R. 164, 172 (2012). La doctrina se fundamenta en parte en el entendido que "la buena fe exige de la persona un comportamiento coherente con la confianza que anteriormente sus actos puedan haber suscitado en otros." DÍEZ-PICAZO, DOCTRINA ACTOS PROPIOS, pág. 80. La intención del sujeto es irrelevante puesto que "[e]l centro de gravedad de la regla no reside en la voluntad de su autor, sino en la confianza generada en terceros." *O.C.S.*, 187 D.P.R. pág. 173 *citando a* A. GULLÓN BALLESTEROS EN I. SIERRA GIL DE LA CUESTA, COMENTARIO DEL CÓDIGO CIVIL, Barcelona, Ed. Bosch, 2000, T. 1, pág. 397. Los tribunales de Puerto Rico aplican esta doctrina sin reparos en controversias comerciales, incluyendo cuando—como en este caso—se presentan reclamaciones contra bancos de inversión por parte de un demandante cuyas expectativas legitimas de buena fe han sido socavadas. *E.g., MMB Dev. Grp., Ltd. v.*

10

Case 17-03283-LTS  Doc#8666-7  Filed 09/09/19  Entered 09/09/19 17:18:09  Desc
Exhibit Exhibit D - Service of Process Merrill Lynch  Pierce  Fenner & Smith Inc  Page 17 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 11 de 93

*Westernbank Puerto Rico*, 762 F. Supp. 2d 356, 370 (D.P.R. 2010) (el demandante presentó una reclamación bajo la doctrina de actos propios contra el banco al "alegar que [el banco] manifestó que iba a extender el período de cierre para los préstamos y eventualmente emitir los préstamos prometidos a [un tercero]; que estos actos y declaraciones del [banco] presentaron al demandante un cuadro impreciso de que [el banco] estaba dispuesto y podría emitir los préstamos; y que el demandante actuó con buena fe y confió a su detrimento en los "actos y declaraciones" del banco)."

31. De manera similar, mediante una declaración unilateral de voluntad, una persona puede obligarse a favor de otra, siempre que su intención en obligarse sea clara, surja de un acto jurídico idóneo y no sea contraria a la ley, la moral ni al orden público. *Nationstar Mortg., LLC v. de Jesús Roldan*, KLCE201301345, 2014 WL 1692581 (2014), pág. *5. Así exige que, "[u]na vez constituida la obligación, mientras que la obligación no sea efectivamente retirada, el declarante quedará sujeto a indemnizar los daños y perjuicios de su incumplimiento." *Id.* pág. *6. En efecto, la doctrina de la declaración unilateral de voluntad llena el vacío que surge cuando una parte hace una promesa concreta con la intención de que otros descansen y confíen en la promesa hecha.

32. Nuestro Tribunal Supremo reiteró la vigencia de esta doctrina hace poco más de una década, reconociendo que "el auge y tráfico comercial ameritaban que se reconociera la posibilidad de dar plena eficacia a una serie de situaciones en las que una sola persona pretendía obligarse, tal como es el caso de la declaración unilateral de voluntad." *Ortiz v. P. R. Tel.*, 162 D.P.R. 715, 724 (2004). "[L]a adopción de la declaración unilateral de voluntad como fuente de obligación a base de la necesidad [del Gobierno de Puerto Rico] ordenamiento de proteger la confianza depositada de buena fe por quien confía en una promesa de esa naturaleza." *Nationstar*, pág. *6.

33. Los elementos para aplicación tanto de la doctrina de actos propios y de la declaración unilateral de la voluntad se cumplen cabalmente en este caso. La existencia y operación del mercado de bonos municipales siempre se ha basado en que los aseguradores tales como los Demandantes, dependen y confían en la conducta de buena fe de las partes.

34. Debido a que este caso claramente da origen a un tema de vital importancia pública para Puerto Rico, la política pública justifica plenamente que este tribunal actuando en equidad aplique la doctrina de actos propios y también la de la declaración unilateral de la voluntad. 31 L.P.R.A. § 7 ("Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se

11

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch - Pierce - Fenner & Smith Inc Page 18 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 12 de 93

tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos.")

35. *Primero*, la aplicación a los hechos aquí relacionados de la doctrina de actos propios y de la declaración unilateral de la voluntad, rectificará una situación injusta e inequitativa creada por las Demandadas. La crisis de bonos de Puerto Rico es uno de los grandes desastres económicos del siglo XXI. Los emisores han incumplido sus obligaciones de pago, perjudicando sus reputaciones y solvencia, y los servicios esenciales para los ciudadanos de Puerto Rico fueron afectados. A su vez, los bonistas que no gozan de la protección de un seguro, sufrieron pagos incumplidos y atrasados, mientras que el valor de sus inversiones se ha desplomado. Los Demandantes han sufrido enormes pérdidas, habiendo tenido que mitigar el daño ocasionado a los bonistas, habiendo tenido que desembolsar, al 1 de julio de 2019, más de $720 millones en pagos de reclamaciones y están expuestos a tener que pagar cientos de millones de dólares adicionales. Por otro lado, las Demandadas se lucraron significativamente, generando cientos de millones de dólares en comisiones y honorarios, pagadas por los emisores de estos bonos. De no concederse los remedios aquí solicitados, es probable que las Demandadas se queden con sus ganancias, mientras que los que verdaderamente resultaron afectados continúan sufriendo los daños como resultado. Este Tribunal de Primera Instancia es el foro apropiado para remediar la conducta anti-jurídica de las Demandadas.

36. *Segundo*, la aplicación de la doctrina de actos propios y de declaración unilateral de la voluntad en esta acción convalidará la suposición de las normas, costumbres y trasfondo en la industria de seguros. La capacidad de confiar en la buena fe de los suscriptores es esencial para el adecuado funcionamiento del mercado de seguros en garantía de bonos municipales. Como regla general, los suscriptores y aseguradores de los bonos municipales no celebran contratos entre sí; más bien, los aseguradores tienen que, de buena fe, confiar en los suscriptores para que estos les puedan presentar solicitudes de seguro verídicas y completas, ya que los suscriptores son los únicos que tienen acceso a la información de los emisores. Responsabilizar a las Demandadas por no haber investigado si la información que entregaron a los Demandantes era cierta y completa, es la única y recta forma de defender esos sanos principios.

37. *Tercero*, esta demanda ofrece una oportunidad importante para ayudar a restaurar el acceso que tiene el Gobierno a los mercados de capital, que es tan necesaria para la recuperación de la Isla. Cuando el mercado de bonos municipales funciona apropiadamente, proporciona a las entidades gubernamentales y sus

12

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:13:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 19 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 13 de 93

agencies e instrumentalidades, con capital a bajo costo y ofrece a los inversionistas una sólida y segura inversión. La infracción de las costumbres y normas del sector por las Demandadas ha lacerado este crítico mercado al desalentar la participación de entidades claves que dependen de la buena fe de los suscriptores. Este Tribunal tiene la extraordinaria oportunidad de restaurar la confianza en el mercado al dejar claro que los bancos de inversión tienen que revisar minuciosamente la información de los bonos que suscriben, o atenerse a las consecuencias, de no hacerlo.

38. *Cuarto*, aun cuando las Demandadas han actuado contrario a los más elementales principios de equidad y buena fe, los Demandantes no tienen remedios contractuales o estatutarios para vindicar sus remedios como tienen los bonistas. National no puede instar reclamaciones contractuales porque no existe ningún contrato entre National y las Demandadas. Tampoco existe ningún esquema estatutario o legislación especial que proteja a National. A diferencia de los inversionistas, National no compró bonos y, por lo tanto, no tiene ninguna reclamación conforme a las leyes de valores federales.

39. Los Demandantes no habrían podido presentar esta reclamación, en equidad antes. Sus daños tomaron años en manifestarse —los primeros pagos de reclamaciones no se efectuaron sino hasta el 2016, y la magnitud de la conducta de las Demandadas, contraria a la buena fe y la equidad, no se manifestó hasta la publicación de un informe sobre una investigación especial y abarcadora en agosto de 2018, según se describe a continuación.

40. En resumen, las Demandadas, por medio de sus actos, le garantizaron a los Demandantes que habían realizado investigaciones completas y razonables de los términos de los bonos que los Demandantes aseguraron, y éstos de buena fe confiaron en dichas representaciones, al emitir sus seguros. Pero las Demandadas frustraron las expectativas legítimas y de buena fe de los Demandantes, al no llevar a cabo esas investigaciones y en torno a la veracidad y de las representaciones que hicieron en las solicitudes de seguro. Ellos incumplieron con su obligación de actuar, como los celosos guardianes del mercado. Por lo tanto, las Demandadas están impedidos de negar la responsabilidad de las consecuencias de su omisión de no llevar a cabo las investigaciones requeridas y lo recto, lo justo, y lo equitativo, es que se les condene a pagar la correspondiente indemnización a National.

13

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 20 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 14 de 93

## LAS PARTES

I.  La Parte Demandante

41. La demandante National Public Finance Guarantee Corporation ("NPFG") (anteriormente conocida como MBIA Insurance Corp. of Illinois), es una compañía de seguros de garantías financieras con oficina principal en 1 Manhattanville Road, Purchase, NY 10577. NPFG es una corporación organizada y existente bajo las leyes del estado de Nueva York y tiene sus oficinas principales en Nueva York. NPFG es una subsidiaria de MBIA, Inc., que no es parte en esta demanda, a través de otra compañía tenedora de sus acciones, National Public Finance Guarantee Holdings, Inc. Como aseguradora monoline, NPFG asegura bonos municipales, incluyendo deuda exenta y no exenta de contribuciones de instrumentalidades políticas de los Estados Unidos, como también de utilidades, aeropuertos, facilidades de salud, instituciones educativas, emisores de préstamos estudiantiles, autoridades de vivienda y otras agencias similares, y obligaciones emitidas por entidades privadas que financian proyectos que sirven un fin público importante.

42. La demandante MBIA Insurance Corporation ("MBIA"), es una compañía de seguros de garantías financieras con oficina principal en 1 Manhattanville Road, Purchase, NY 10577. MBIA es una corporación organizada y existente bajo las leyes de Nueva York y tiene sus oficinas principales en Nueva York. MBIA es una subsidiaria de MBIA Inc., que no es parte en esta demanda. MBIA asegura y reasegura obligaciones de finanzas estructuradas y obligaciones de finanzas públicas internacionales que se venden en los mercados de nuevas emisiones y mercados secundarios.

43. Financial Guaranty Insurance Company ("FGIC"), que no es parte en esta demanda, es una compañía de seguros organizada y existente bajo las leyes del estado de Delaware y con oficinas principales en 463 Seventh Avenue, New York, NY 10018. Es una aseguradora monoline que emite pólizas de seguros de garantías que aseguran las finanzas públicas, las finanzas estructuradas, y otras obligaciones.

44. Entre el 2001 y 2007, MBIA aseguró las siguientes emisiones de bonos de Puerto Rico: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds [los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; PREPA Power Revenue Bonds [los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico] Series LL y NN; PREPA Power Revenue Refunding Bonds [los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico], Series MM, SS, UU, y VV; PRHTA Highway

14

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 21 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 15 de 93

Revenue Refunding Bonds [los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico], Serie AA; PRHTA Transportation Revenue Bonds [los Bonos de Ingresos de Transporte de la ACT de Puerto Rico],Serie J; PRHTA Transportation Revenue Refunding Bonds [los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico], Series L y N; y COFINA Sales Tax Revenue Bonds [los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA], Serie 2007A bajo las pólizas número: 36358, 40952, 503220, 38324, 42162, 39115, 46002, 494781, 496040, 409190, 437160, 46994, 492151, y 499240. NPFG asumió la responsabilidad sobre estas pólizas en el 2009, conforme a un plan de reestructuración por medio del cual se convirtió en una subsidiaria de National Public Finance Guarantee Holdings, Inc., que a su vez es una subsidiaria de MBIA Inc. NPFG está obligada a pagar cualquier reclamación que surja bajo estas pólizas. En la medida que NPFG no pague alguna reclamación, MBIA retuvo la obligación de pagar las reclamaciones.

45. También, entre el 2001 y 2007, FGIC aseguró los siguientes bonos de Puerto Rico: los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series OO y VV; y los Bonos de Ingresos de Impuestos sobre la Venta de COFINA, Serie 2007A bajo las pólizas número: FG05010237, FG04010536, FG07010235, y FG07010326. NPFG es la sucesora de FGIC en cuanto a estas pólizas: En septiembre de 2008, MBIA asumió la responsabilidad de los intereses de FGIC en relación a estas pólizas; en febrero de 2009 le cedió esos intereses a NPFG; y FGIC posteriormente en septiembre de 2012 novó las pólizas directamente a NPFG.

46. En lo sucesivo para propósitos de esta Demanda, nos referimos a NPFG, MBIA, y FGIC colectivamente como "National."

II. **La Parte Demandada**

47. La Demandada UBS Financial Services, Inc. ("UBS Financial Services"), anteriormente conocido como UBS PaineWebber Inc., es un corredor de valores registrado con la SEC. UBS Financial Services está organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en 1200 Harbor Blvd, Weehawken, NJ 07086. UBS Financial Services es una subsidiaria de UBS Americas Inc., que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS Americas Holding LLC, que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS AG, que no es parte de esta demanda, la cual a su vez es una subsidiaria de la compañía matriz UBS Group AG, que no es parte de esta demanda.

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 22 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 16 de 93

UBS Financial Services está registrada como corredor de valores en Puerto Rico desde el 1 de septiembre de 1984.

48. La Demandada UBS Securities LLC ("UBS Securities") es un corredor de valores registrado con la SEC. UBS Securities está organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en 1285 Avenue of the Americas, New York, NY 10019. Dicha empresa anteriormente era conocida como UBS Investment Bank, y es una subsidiaria de UBS Americas Inc. que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS Americas Holding LLC, que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS AG, que no es parte de esta demanda, la cual a su vez es una subsidiaria matriz UBS Group AG, que no es parte de esta demanda. UBS Securities está registrada como corredor de valores en Puerto Rico desde el 4 de junio de 1992.

49. UBS Financial Services y UBS Securities (colectivamente, las Demandadas "UBS") suscribieron las siguientes emisiones de bonos: Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A, los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingreso de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36363, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG0401 0536, FG05010237, FG07010235, y FG07010326. UBS Financial Services actuó como suscriptor líder para los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, 2002A y de los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie VV. UBS Securities actuó como suscriptor líder de los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2007A y los Bonos de Refinanciamiento de Ingresos de la ACT de Puerto Rico, Serie L.

50. La Demandada Citigroup Global Markets Inc. ("Citigroup" Global Markets") es un corredor de valores registrado con la SEC. Citigroup Global Markets está organizada bajo las leyes del estado de Nueva York y tiene sus oficinas principales en 388 Greenwich Street, New York, NY 10013. Es una subsidiaria indirecta de Citigroup Global Markets Holdings Inc., la cual a su vez es una

16

Case 17-03283-LTS  Doc#:8666-7  Filed:09/09/19  Entered:09/09/19 17:18:09  Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch   Pierce   Fenner & Smith Inc  Page 23 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 17 de 93

subsidiaria de Citigroup, Inc., las cuales no son parte en esta demanda. Citigroup Global Markets está registrado como corredor de valores en Puerto Rico desde el 1 de septiembre de 1984.

51. Citigroup Global Markets suscribió las siguientes emisiones de bonos: Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2003C y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie NN y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235; y FG07010326. Citigroup Global Markets actuó de suscriptor líder de los siguientes bonos: los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; y los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N.

52. En 1998, Citigroup, Inc., llegó a ser el sucesor mediante una fusión con Salomon Smith Barney; en 2003, el nombre de Salomon Smith Barney fue cambiado a Citigroup Global Markets. Antes del cambio de nombre, Salomon Smith Barney suscribió los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2002A; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie LL; y los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie MM. National aseguró estos bonos bajos las pólizas número: 36358, 38324, y 39115.

53. La Demandada Goldman Sachs & Co. LLC ("Goldman Sachs LLC") es un corredor de valores registrado con la SEC. Goldman Sachs LLC está organizada bajo las leyes del estado de Nueva York y tiene sus oficinas principales en 200 West Street, New York, NY 10282. Goldman Sachs LLC es una subsidiaria de Goldman Sachs Group, Inc. ("Goldman Sachs"), que no es parte en esta demanda, quien, sujeto a ciertas excepciones, ha garantizado las obligaciones de pago de Goldman Sachs LLC. Anteriormente dicha empresa se conocía como Goldman Sachs & Co., pero en abril de 2017, se convirtió en una compañía de responsabilidad limitada. Sus actividades incluyen banca de inversión, servicios a clientes institucionales,

17

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 24 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 18 de 93

inversiones y préstamos, y administración de inversiones. Goldman Sachs LLC es el corredor de valores en los Estados Unidos de Goldman Sachs, y está registrado como corredor de valores en Puerto Rico desde el 1 de septiembre de 1984.

54. Goldman Sachs LLC suscribió las siguientes emisiones: Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326. Goldman Sachs LLC actuó como suscriptor líder de los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N; los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, 2003C; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, MM, y NN; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A.

55. La Demandada J.P. Morgan Securities LLC ("J.P. Morgan Securities"), conocido anteriormente como J.P. Morgan Securities, Inc., es un corredor de valores registrado con la SEC. J.P. Morgan Securities está organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en 277 Park Avenue, New York, NY 10172. En 2010, se convirtió de una corporación a una compañía de responsabilidad limitada. J.P. Morgan Securities es el corredor de valores principal y es una subsidiaria de JPMorgan Chase & Co. que no es parte en esta demanda. J.P. Morgan Securities, ha sido un corredor de valores registrado en Puerto Rico desde el 1 de septiembre de 1984. En el año 2008, Bear Stearns & Co. se fusionó con JPMorgan Chase & Co., convirtiéndose en una subsidiaria de JP Morgan Chase & Co.

56. J.P. Morgan Securities y/o Bear Stearns & Co., Inc. suscribieron los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit 7 - Service of Process Merrill Lynch , Pierce , Fenner & Smith Inc Page 25 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 19 de 93

Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de
Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los
Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National
aseguró estos bonos bajos las pólizas número: 36358, 38324, 39115, 409190, 40952,
42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536,
FG05010237, FG07010235, y FG07010326. J.P. Morgan Securities actuó como
suscriptor líder de los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto
Rico, Series OO, RR, SS, y UU.

57. La Demandada Morgan Stanley & Co. LLC ("Morgan Stanley LLC") es
un corredor de valores registrado con la SEC. Morgan Stanley LLC está organizada
bajo las leyes del estado de Delaware, y tiene sus oficinas principales en 1585
Broadway, New York, NY 10036. Es una subsidiaria de Morgan Stanley Domestic
Holdings, Inc., que no es parte de esta demanda, la cual a su vez es una subsidiaria
de Morgan Stanley Capital Management, LLC, que no es parte de esta demanda, la
cual a su vez es una subsidiaria de la matriz Morgan Stanley, que no es parte de esta
demanda. Morgan Stanley LLC se dedica a la suscripción y distribución de valores y
a proveer servicios de asesoramiento financiero. Es el principal corredor de valores
de Morgan Stanley en los Estados Unidos, y está registrado como corredor de valores
en Puerto Rico desde el 8 de noviembre de 1985.

58. Morgan Stanley LLC suscribió las siguientes emisiones: los Bonos de
Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A,
2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT
de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto
Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de
Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de
Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de
Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los
Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National
aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952,
42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536,
FG05010237, FG07010235, y FG07010326. Morgan Stanley LLC actuó como
suscriptor líder de los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto
Rico, Series RR y SS, y los Bonos de Refinanciamiento de Mejoras Públicas del
Gobierno de Puerto Rico, Serie 2003C.

59. La Demandada Merrill Lynch, Pierce, Fenner & Smith Incorporated
("Merrill Lynch") es un corredor de valores registrado con la SEC. Merrill Lynch está

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 26 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 20 de 93

organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en One Bryant Park, New York, NY 10036. Dicha empresa opera como subsidiaria de BAC North America Holding Company, que no es parte de esta demanda, la cual a su vez opera como subsidiaria de NB Holdings Corporation, que no es parte de esta demanda, la cual a su vez opera como subsidiaria de la corporación matriz Bank of America Corporation, que no es parte de esta demanda. Merrill Lynch es el corredor de valores principal en los Estados Unidos de Bank of America. Está registrada como corredor de valores en Puerto Rico desde el 1. de septiembre de 1984 y mantiene oficinas en Puerto Rico en 15 Second Street, Suite 210, Guaynabo, PR 00968.

60. Merrill Lynch suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326.

61. En el 2010, Merrill Lynch se convirtió en la sucesora por fusión de Banc of America Securities LLC ("Banc of America Securities"). Banc of America Securities suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326.

62. En el 2009, Merrill Lynch se convirtió en la sucesora por fusión de Banc of America Investment Services, Inc., la cual había adquirido previamente a LaSalle

Financial Services, Inc., conocida anteriormente como ABN AMRO Financial Services, Inc. ("ABN AMRO"). ABN AMRO suscribió los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2002A; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie LL; y los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie MM. National aseguró estos bonos bajo las pólizas número: 36358, 38324, y 39115.

63.     La Demandada RBC Capital Markets LLC ("RBC Capital Markets") es un corredor de valores registrado con la SEC. RBC Capital Markets está organizada bajo las leyes de Minnesota y tiene sus oficinas principales en 200 Vesey Street, New York, NY 10281. Es subsidiaria de RBC USA Holdco Corporation, que no es parte de esta demanda, la cual a su vez es una subsidiaria de RBC US Group Holdings LLC, que no es parte de esta demanda, la cual a su vez es una subsidiaria de la matriz Royal Bank of Canada, que no es parte de esta demanda. En febrero de 2008, RBC Capital Markets cambió de nombre de RBC Dain Rauscher Inc. a RBC Capital Markets Corporation. En noviembre de 2010, la compañía se convirtió de una corporación a una compañía de responsabilidad limitada. RBC Capital Markets está registrada como corredor de valores en Puerto Rico desde el 16 de mayo de 1997.

64.     RBC Capital Markets suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series UU y VV; los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A; y los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 492151, 494781, 496040, 499240, 503220, FG07010235, y FG07010326. RBC Capital Markets actuó como suscriptor líder de los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N.

65.     La Demandada Santander Securities LLC ("Santander Securities") es un corredor de valores registrado con la SEC con dirección en 2 Morrissey Boulevard, Dorchester, MA 02125. Santander Securities está organizada bajo las leyes de Puerto Rico y durante el período pertinente, tenía sus oficinas principales en Puerto Rico. Opera como subsidiaria de Santander Holdings USA, Inc., que no es parte de esta demanda, la cual a su vez es una subsidiaria de la matriz Banco Santander, S.A., que no es parte de esta demanda. En el 2011, Santander Securities se convirtió de una corporación a una compañía de responsabilidad limitada. Santander Securities está registrada como corredor de valores en Puerto Rico desde el 3 de diciembre de 1996.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 28 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 22 de 93

66. Santander Securities suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series UU y VV; los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A; y los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 492151, 494781, 496040, 499240, 503220, FG07010235, y FG07010326.

## JURISDICCIÓN

67. Este Tribunal tiene jurisdicción sobre la persona de cada una de las Demandadas.

### I. Jurisdicción General.

68. Este Tribunal tiene jurisdicción general sobre cada una de las Demandadas porque cada una de ellas tiene contactos recurrentes y continuos con Puerto Rico.

69. La Demandada UBS Financial Services es un corredor de valores registrado en Puerto Rico. UBS Financial Services se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades.

70. La Demandada UBS Securities es un corredor de valores registrado en Puerto Rico. UBS Securities se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades.

71. La Demandada Citigroup Global Markets es un corredor de valores registrado en Puerto Rico. Citigroup Global Markets se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Además, Citigroup Global Markets sirve como consultor a la Junta de Supervisión Fiscal para Puerto Rico (la "Junta de Supervisión"), la cual fue creada conforme a la "Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico de 2016" ("Puerto Rico Oversight, Management, and Economic Stability Act of 2016" o "PROMESA," por sus siglas en inglés), para asistir a Puerto Rico a restructurar sus deudas. En específico, en 2017, la Junta de Supervisión, a nombre de Puerto Rico y algunas de sus agencias e instrumentalidades—incluyendo la AEE de Puerto Rico, la ACT de Puerto Rico, y COFINA—presentó peticiones

22

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 29 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 23 de 93

conforme al Título III de PROMESA con el propósito de restructurar sus deudas (los "Procedimientos del Título III"). Citigroup Global Markets sirve como consultor a la Junta de Supervisión en esos Procedimientos del Título III y es el asesor líder de inversiones para la restructuración y privatización de la AEE.

72. La Demandada Goldman Sachs LLC es un corredor de valores registrado en Puerto Rico. Goldman Sachs LLC se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Goldman Sachs LLC participa en empresas comunes con entidades de Puerto Rico, tales como Autopistas Metropolitanas de Puerto Rico, LLC, que administra las carreteras de peaje en Puerto Rico.

73. La Demandada J.P. Morgan Securities es un corredor de valores registrado en Puerto Rico. J.P. Morgan Securities se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. J.P. Morgan Securities mantiene oficinas en Puerto Rico en las cuales realizaba su negocio como corredor de valores.

74. La Demandada Morgan Stanley LLC es un corredor de valores registrado en Puerto Rico. Morgan Stanley LLC se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades, y tiene clientes en Puerto Rico. Morgan Stanley LLC mantuvo oficinas en Puerto Rico en las cuales realizaba su negocio como corredor de valores.

75. La Demandada Merrill Lynch es un corredor de valores registrado en Puerto Rico. Merrill Lynch se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Merrill Lynch mantiene oficinas en Puerto Rico en las que realizó su negocio como corredor de valores.

76. La Demandada RBC Capital Markets es un corredor de valores registrado en Puerto Rico. RBC Capital Markets se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Por medio de su Grupo de Capital Social de Créditos Tributarios ("Tax Credit Equity Group"), RBC Capital Markets administra fondos de inversión enfocados parcialmente, en propiedades en Puerto Rico.

23

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 30 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 24 de 93

77. La Demandada Santander Securities está incorporado en Puerto Rico y tiene sus oficinas principales en Puerto Rico. Santander Securities es un corredor de valores registrado en Puerto Rico. Santander Securities se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Santander Securities mantiene oficinas en Puerto Rico desde las cuales realizaba su negocio como corredor de valores.

II. Jurisdicción Específica

78. El Tribunal tiene jurisdicción específica sobre cada una de las Demandadas bajo nuestro ordenamiento procesal ya que cada uno de las Demandadas, ya sea directamente o por medio de sus agentes, realizaba negocios en Puerto Rico y las reclamaciones de National surgen de y están relacionadas con esas transacciones.

79. Las reclamaciones y daños y perjuicios de National surgen de su seguro en garantía de bonos emitidos en Puerto Rico por el Gobierno de Puerto Rico y sus instrumentalidades, incluyendo sin limitación a la AEE, COFINA, y la ACT. Cada uno de los bonos fue suscrito por las Demandadas, quienes se dedicaban a realizar negocios en Puerto Rico, ya sea directamente o por medio de sus agentes con el Gobierno de Puerto Rico, la AEE, COFINA, y/o la ACT. Las Demandadas gestionaron y obtuvieron seguros de National para cada una de las emisiones de bonos en nombre del Gobierno de Puerto Rico, la AEE, COFINA, y/o la ACT.

80. Cada una de las Demandadas, ya sea directamente o por medio de sus agentes, dirigía comunicaciones—incluyendo por teléfono, carta, fax y correo electrónico—a direcciones en Puerto Rico que están relacionadas directamente con las reclamaciones de National, incluyendo comunicaciones relacionadas con los seguros en garantía de bonos de National.

81. Las pólizas de seguro que las Demandadas indujeron a National a emitir se firmaron en Puerto Rico.

82. Como suscriptores, las Demandadas compraron los bonos emitidos por el Gobierno de Puerto Rico, la AEE, COFINA, y/o la ACT. Luego, las Demandadas vendieron esos bonos a, entre otras, personas naturales o jurídicas ubicadas en Puerto Rico. A cambio de ello, el Gobierno de Puerto Rico, la AEE, COFINA, y la ACT pagaron a las Demandadas cuantiosos honorarios.

83. Según información, cada una de las Demandadas sostuvo reuniones en Puerto Rico relacionadas con las emisiones aquí descritas, incluyendo contactos en

24

Case: 17-03283-LTS Doc#: 8666-7 Filed: 09/09/19 Entered: 09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 31 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 25 de 93

Puerto Rico para el mercadeo, promoción y venta de los bonos. Según un anterior gerente de la sucursal de una afiliada de UBS Securities: "All the major banks in New York [came] to Puerto Rico on a regular basis to pitch deals. . . . They make commissions. They make fees. This is kind of like a moneymaking machine. As long as there are transactions coming and going, they're making a ton of money." Laura Sullivan, *How Puerto Rico's Debt Created a Perfect Storm before the Storm*, NPR (2 de mayo de 2018), https://www.npr.org/2018/05/02/607032585/how-puerto-ricos-debt-created-a-perfect-storm-before-the-storm. Además, la Demandada Citigroup Global Markets tuvo por lo menos una reunión en Puerto Rico con National con respecto a la emisión de un seguro para AEE.

84. "Asumir jurisdicción *in personam* es razonable: Este foro tiene un interés apremiante en adjudicar esta controversia, que trata de causas de acción únicas bajo el derecho sustantivo de Puerto Rico —incluyendo reclamaciones conforme al Código Civil de Puerto Rico, Art. 7— y las alegaciones tratan con hechos relacionados con la emisión de miles de millones de dólares de bonos en Puerto Rico. Las Demandadas cuentan con mucho capital y siguen realizando negocios aquí, para ellos no sería oneroso comparecer ante este tribunal. Ningún otro foro tiene tantos contactos ni un interés tan apremiante en adjudicar esta controversia, y todas las reclamaciones podrán ser resueltas aquí.

## COMPETENCIA

85. La competencia territorial del Tribunal de Primera Instancia, Sala Superior de San Juan, es apropiada conforme a la Regla 3.5 de Procedimiento Civil. Las Demandadas Santander Securities, J.P. Morgan Securities, Morgan Stanley LLC, y Merrill Lynch tienen una presencia física y oficinas en San Juan. Además, la gran mayoría de los actos, eventos, y las transacciones que se alegan en esta demanda ocurrieron en San Juan. Los bonos fueron emitidos en San Juan y se vendieron a personas en San Juan. Las pólizas de seguros emitidas por National fueron firmadas en San Juan. Las comunicaciones pertinentes —incluyendo por medio de reuniones y por teléfono, fax, correo electrónico y carta— sucedieron también en San Juan.

## ALEGACIÓN DE LOS HECHOS

I.    El Mercado de Bonos Municipales.

86.    Un bono municipal es un valor ("debt security"), representativo de una deuda, según el cual el emisor reconoce una deuda con los tenedores de los bonos y tiene que pagarles intereses, normalmente en intervalos fijos, y tiene que reintegrar

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 32 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 26 de 93

el principal en una fecha de vencimiento en el futuro. Los bonos municipales pueden ser emitidos por un gobierno estatal, local, territorial, o por una de sus agencias, instrumentalidades o dependencias. Estos bonos se utilizan normalmente para financiar proyectos de interés público, o de infraestructura como por ejemplo carreteras, escuelas, vivienda y otros servicios públicos.

87. El mercado de los bonos municipales está limitadamente reglamentado. "[M]unicipal issuers are exempt from regulation by the SEC with limited exceptions." MSRB Regulatory Notice 2017-18, pág. 2 (13 de septiembre de 2017), http://www.msrb.org/~/media/Files/Regulatory-Notices/Announcements/2017-18.ashx. Las emisiones de bonos municipales están "exempt from federal securities registration and reporting requirements that apply to other securities being offered to the public." SEC Investor Bulletin: The Municipal Securities Market 1, (12 de febrero de 2018), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_munibondsmarket. Por lo tanto, cualquier divulgación pública sobre los bonos que el emisor elija hacer es voluntaria. Véase Municipal Securities Disclosure, Exchange Act Release No. 26100 (22 de septiembre de 1988).

A. Suscriptores de Bonos Municipales

88. El emisor de un bono municipal (en este caso, todas instrumentalidades del gobierno) contrata a un suscriptor ("underwriter") — generalmente un banco de inversión—para mercadear y vender los bonos. Entre otras cosas, por lo regular el suscriptor participa en redactar las Declaraciones Oficiales que describen los bonos y se radican con el SEC. El suscriptor compra los bonos del emisor, fija el precio de los bonos, luego los revende a inversionistas en una oferta inicial.

89. Mientras que cada emisión de bonos suele tener varios suscriptores, la mayoría de las emisiones tienen por lo menos un "suscriptor líder" que asume el control y mando entre otras cosas, para fijar el precio de los bonos, incluir a otros suscriptores en la emisión, distribuir la cantidad de bonos que serán vendidos entre suscriptores secundarios, coordinar entre los suscriptores y obtener el seguro de garantía de los bonos. Cada emisión a la que se refiere este caso tenía por lo menos un suscriptor líder, responsable de vender más bonos que el resto del equipo de suscriptores y que por ello además tenía derecho a recibir honorarios más altos.

90. Si el emisor hace una divulgación pública sobre sus bonos, la SEC requiere que los suscriptores (aquí las Demandadas) revisen esas divulgaciones y que se aseguren que, por medio de una investigación razonable, su contenido e información es verdadera y completa. Según ha explicado el SEC, "investors in the

26

Case 1:17-03283-LTS Doc#8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 33 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 27 de 93

municipal markets rely on the reputation of the underwriters participating in an offering in deciding whether to invest." Disclosure, Release No. 26100 a la pág. *6. Por lo tanto, la SEC adoptó la Regla 15c2-12 de la Ley de la Bolsa de Valores de la SEC para "stimulate greater scrutiny by underwriters of the representations made by issuers and the circumstances surrounding the offering." *Id.* Este cargo recae sobre los suscriptores porque ellos son "securities professionals" sofisticados con experiencia en la emisión de bonos que suele ser mucho mayor que la de los emisores municipales. *Id.*

91. Según la Regla 15c2-12 es "unlawful" que el banco de inversión "act as an underwriter in a primary offering of municipal securities" de más de $1 millón a menos que, entre otras cosas, "obtain[s] and review[s] an Official Statement" que contenga información clave sobre la emisión. *Véase* 17 C.F.R. § 240.15c2-12. Los suscriptores colocan sus nombres en las portadas de estas Declaraciones Oficiales, respaldándolas así con sus reputaciones. Es posible que los borradores de Declaraciones Oficiales excluyan cierta información relacionada con los precios, las tasas de interés y los rendimientos de los bonos, pero en todo lo demás contienen usualmente la misma información que las versiones finales.

92. Según ha explicado la SEC interpretando la Regla 15c2-12: "by participating in an offering, an underwriter makes an implied recommendation about the securities. This recommendation implies that the underwriter has a reasonable basis for belief in truthfulness and completeness of the key representations contained in the [O]fficial [S]tatement." Municipal Securities Disclosure, Exchange Act Release No. 26985 a la pág. *2 (28 de junio de 1989). Por ende, según la Regla 15c2-12, el suscriptor viene obligado a realizar una "reasonable investigation" para desarrollar "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents [i.e., the Official Statements] used in the offerings." Disclosure, Release No. 26100 a la pág. *20. Es decir, para llevar a cabo una investigación razonable, el suscriptor también tiene que examinar la veracidad y lo completo ("truthfulness and completeness") de las declaraciones hechas por el mismo emisor en emisiones en el pasado: "An underwriter's obligation to have a reasonable basis to believe that the key representations in a final [O]fficial [S]tatement are true and accurate extends to an issuer's representations concerning past compliance with disclosure obligations." U.S. SEC. AND EXCH. COMM'N, *Municipalities Continuing Disclosure Cooperation Initiative*, https://www.sec.gov/divisions/enforce/municipalities-continuing-disclosure-cooperation-initiative.shtml (modificada por última vez el 13 de noviembre de 2014).

27

Case: 17-03283-LTS Doc#: 8666-7 Filed: 09/09/19 Entered: 09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 34 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 28 de 93

93. En definitiva, los suscriptores son, en efecto, los celadores o guardianes del mercado. Ellos "help address the informational asymmetries between investors and companies by verifying the credibility of contractual representations", incluyendo "the accuracy of financial statements" and "the risk profile of bonds". Stavros Gadinis & Colby Mangels, *Collaborative Gatekeepers*, 73 WASH. & LEE L. REV. 797, 802 (2016).

94. Cuando los suscriptores hacen su trabajo como se espera y pueden proteger a los emisores contra la emisión de deudas que tengan la probabilidad de ser incumplidas. Disclosure, Release No. 26100. Por consiguiente, si el suscriptor determina que las divulgaciones de los bonos son substancialmente falsas o incompletas, debe colaborar con el emisor para corregir la representación o sencillamente negarse a participar en la oferta—dando así una señal al mercado que algo está mal. *Véase* Gadinis, 73 WASH. & LEE L. REV. pág. 810. En otras palabras, los inversionistas y otros que confían de buena fe en esta información, podrán estar en condiciones de evaluar si es probable que el emisor pueda pagar los bonos que emita según los términos expuesto—es decir, se trata de una evaluación que pueden realizar solamente si la información revelada es cierta y completa.

## B. El Seguro en Garantía de Bonos Municipales

95. Para facilitar el mercadeo y venta de los bonos y hacerlos más atractivos a inversionistas, los emisores de bonos municipales pueden, como en este caso, contratar a un asegurador de bonos—también conocido como asegurador monoline—para proporcionar un seguro de garantía financiera. A cambio de una prima, el asegurador del bono garantiza que pagará los intereses o el principal a los tenedores de algunos o de todos los bonos, si el emisor incumple con el pago. Al introducir su propia solvencia crediticia y capacidad para pagar reclamaciones relacionadas con los bonos, el asegurador del bono le provee un aumento a la solvencia y credibilidad; y por lo tanto, la capacidad de mercadear de los bonos. Sin un seguro en garantía de bonos, es posible que el suscriptor no pueda traficar un bono al precio deseado—o, incluso, a ningún precio, dependiendo de la solvencia del emisor.

96. Por lo general, el suscriptor solicita un seguro de garantía de bonos municipales de un asegurador en nombre de un emisor. El suscriptor y el asegurador no celebran un contrato, y el suscriptor no actúa como el agente del emisor; el contrato de seguro es entre el asegurador y el emisor (o una entidad actuando en nombre del emisor, como un agente de seguros).

97. Sin embargo, según normas bien reconocidas en la industria, es el suscriptor, el que presenta una "solicitud de seguro" al asegurador para pedir un

28

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 35 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 29 de 93

seguro en garantía de bonos para un emisor. A diferencia de las solicitudes de seguros de naturaleza personal (como contra incendios, de auto o de casa), no hay ningún formulario de seguro estándar; en su lugar, la solicitud de un seguro en garantía de bonos municipales es un conjunto de documentos que describen el emisor y los bonos, incluyendo un borrador de las Declaraciones Oficiales, tres años de estados financieros debidamente auditados, y borradores de los documentos legales que describen la emisión. El suscriptor suplementa la solicitud constantemente con borradores actualizados de las Declaraciones Oficiales, y por último la versión final.

98. Al presentar Declaraciones Oficiales a un asegurador para que emita su póliza, el suscriptor garantiza al asegurador que realizará una investigación razonable de la veracidad y corrección de esas declaraciones, y que el suscriptor puede tener una base razonable para creer que esas declaraciones y divulgaciones son substancialmente verdaderas y completas. El suscriptor no está obligado a enviar esos materiales e información al asegurador, o a certificar al asegurador que cumplirá con las leyes de valores federales. Después de que lo hace voluntariamente, el suscriptor ("underwriter") proporcionar esos materiales e información, sin embargo, el asegurador tiene derecho a confiar de buena fe en que el suscriptor realizará las investigaciones requeridas por la ley.

99. Las afirmaciones del asegurador son esenciales porque los suscriptores tienen acceso especial a los emisores—incluyendo a su información financiera—que los aseguradores y otros participantes en el mercado no tienen. Para decidir si va a emitir un seguro, el asegurador de bonos necesariamente depende de en la información proporcionada por el suscriptor y de su afirmación de que ha revisado esa información. *Véase* Gadinis, 73 WASH. & LEE L. REV. pág. 809. Según observó la SEC, los aseguradores de bonos tienen que "rely upon disclosure concerning the primary obligor" (es decir, el emisor) y la "reasonable investigation [by] the underwriter] of the accuracy and completeness of key representations concerning the primary obligor." Disclosure Release No. 26985 a la pág. *22.

100. Típicamente, después de que un asegurador monoline emite un seguro en garantía de bonos, ese seguro no puede ser cancelado—el asegurador viene obligado a pagar las reclamaciones, aun si emitió la póliza con base en información que resulta ser esencialmente falsa o incompleta. El asegurador no puede presentar reclamaciones contra los suscriptores conforme a las leyes de valores, porque no compró los bonos, sino que los aseguró. El asegurador tampoco puede presentar reclamaciones contractuales contra un suscriptor, porque entre los dos nunca se formaliza un contrato.

29

Case 17-03283-LTS Doc#8563-7 Filed 09/09/19 Entered 09/09/19 17:18:09 Desc:
Exhibit Exhibit D-Review of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 36 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 30 de 93

101.   Por tanto, es esencial que la información y las afirmaciones de los suscriptores dadas a los aseguradores de los bonos sean verdaderas y completas. Si el suscriptor no realiza la revisión prometida y permite que los bonos se vendieran a base de información falsa o incompleta, esa omisión puede —tal como sucedió en este caso— ocasionar un daño catastrófico al emisor, al asegurador, y al mercado.

II.   Las Demandadas Suscribieron Los Bonos y Se Beneficiaron Inmensamente de Todas y Cada Una de Esas Transacciones

102.   Entre el 2001 y el 2014, el Gobierno de Puerto Rico y sus agencias e instrumentalidades, incluyendo a la AEE, la ACT, y COFINA —emitieron bonos con un valor principal al momento de la emisión de aproximadamente $66,469,538,131. Dieciséis de esas emisiones de bonos son objeto de esta reclamación:

(a)   Bonos de Ingresos de Energía, Serie LL ("Power Revenue Bonds, Series LL")

(b)   Bonos de Refinanciamiento de Ingresos de Energía, Serie MM ("Power Revenue Refunding Bonds, Series MM")

(c)   Bonos de Ingresos de Energía, Serie NN ("Power Revenue Bonds, Series NN")

(d)   Bonos de Refinanciamiento de Ingresos de Energía, Serie OO ("Power Revenue Refunding Bonds, Series OO")

(e)   Bonos de Ingresos de Energía, Serie RR ("Power Revenue Bonds, Series RR")

(f)   Bonos de Refinanciamiento de Ingresos de Energía, Serie SS ("Power Revenue Refunding Bonds, Series SS")

(g)   Bonos de Refinanciamiento de Ingresos de Energía, Serie UU ("Power Revenue Refunding Bonds, Series UU")

(h)   Bonos de Refinanciamiento de Ingresos de Energía, Serie VV ("Power Revenue Refunding Bonds, Series VV")

(i)   Bonos de Refinanciamiento de Mejoras Públicas, Serie 2002A ("Public Improvement Refunding Bonds, Series 2002A")

(j)   Bonos de Mejoras Públicas, Serie 2003C ("Public Improvement Bonds, Series 2003C")

(k)   Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A ("Public Improvement Refunding Bonds, Series 2007A")

(l)   Bonos de Refinanciamiento de Ingresos de Carreteras, Serie AA ("Highway Revenue Refunding Bonds, Series AA")

Case 17-03283-LTS Doc#:8666-2 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 37 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 31 de 93

(m) Bonos de Ingresos de Transporte, Serie J ("Transportation Revenue Bonds, Series J")

(n) Bonos de Refinanciamiento de Ingresos de Transporte, Serie L ("Transportation Revenue Refunding Bonds, Series L")

(o) Bonos de Refinanciamiento de Ingresos de Transporte, Serie N ("Transportation Revenue Refunding Bonds, Series N")

(p) Bonos de Ingresos de Impuestos Sobre la Venta, Serie 2007A ("Sales Tax Revenue Bonds, Series 2007A").

103. Como resultado de esas emisiones, las Demandadas se lucraron significamente de diferentes maneras.

104. *Primero*, afiliadas de algunos de los suscriptores, incluyendo a una afiliada de las Demandadas UBS con sede en Puerto Rico, actuaron como asesores financieros de los emisores, y cobraron honorarios sustanciales al actuar en esa capacidad. Informe sobre la Investigación Especial a las págs. 557-58 [el Informe sobre la Investigación Especial se describe *infra* ¶¶ 130-133]. Este asesoramiento fue motivado por sus propios intereses y les permitió a esas afiliadas lucrarse de la emisión de los bonos, obteniendo millones de dólares como resultado de su asesoramiento motivado por sus intereses particulares.

105. *Segundo*, los emisores pagaron a las Demandadas para llevar las emisiones al mercado por medio de un diferencial del suscriptor—es decir, la diferencia entre el precio que las Demandadas pagaron al emisor de los bonos y el precio al cual las Demandadas vendieron los bonos a los inversionistas. Por lo general, el diferencial del suscriptor era un porcentaje del valor total de la emisión y tenía tres componentes, todos pagados a las Demandadas del producto de la venta de los bonos: (a) el cargo inicial, pagado a los suscriptores por la venta de los valores (usualmente el componente más grande del diferencial), (b) los honorarios por administración, pagados al suscriptor líder por llevar el papel directivo en la emisión; y (c) gastos pagados a los suscriptores por efectuar la emisión, incluyendo los costos de los honorarios de los abogados del suscriptor, los gastos incidentales a la promoción y la venta a los inversionistas, y los aspectos técnicos de las emisiones.

106. Como resultado del diferencial del suscriptor ("underwriter spread") las Demandadas ganaron muchos millones de dólares. A modo de ejemplo, se calcula que entre el 2000 y el 2013 a los suscriptores—incluyendo a las Demandadas—le fueron pagados $880 millones tan solo en honorarios de administración. Bill Faries, Martin Z. Braun & Michelle Kaske, *How Wall Street Fed Puerto Rico's $70 Billion Debt Binge*, Bloomberg News (22 de octubre de 2013),

31

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 38 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página:32 de 93

https://www.bloomberg.com/news/articles/2013-10-22/how-wall-street-fed-puerto-rico-s-70-billion-borrowing-binge.

107. Las Demandadas incrementaron la cuantía de su diferencial de suscriptor al obtener de National los seguros en garantía de bonos de National. Sin ese seguro, es probable que los emisores no hubieran podido emitir la misma cantidad de bonos o que hubieran tenido que venderlos a precios mucho más bajos. Al solicitar y obtener los seguros de National exitosamente, las Demandadas aumentaron el tamaño y precio de cada emisión de bonos, lo cual, a su vez, aumentó sus ingresos.

108. *Tercero*, los suscriptores como lo son las Demandadas UBS y la Demandada Santander Securities vendieron bonos por medio de Fondos Mutuos Cerrados de Puerto Rico (los "CEF" por sus siglas en inglés, Locales) administrados por sus afiliadas, generando así beneficios adicionales. Los CEF Locales, los cuales se vendían exclusivamente a residentes de Puerto Rico, son fondos mutuos que están exentos de determinados reglamentos federales sobre divulgación de información relacionada al apalancamiento y transacciones con afiliadas. Informe sobre la Investigación Especial a las págs. 340-43. Los CEF Locales fueron sumamente populares porque gozaban de una "triple exención" de impuestos. Es decir, estaban exentos de impuestos federales, estatales y locales. *Id.* a la pág. 340. Al venderle bonos de esta manera, estas Demandadas ganaron honorarios por administrar los CEF Locales, honorarios adicionales por asesorar a los CEF Locales, y comisiones sobre ventas por vender acciones en los CEF Locales. *Id.* a la pág. 357. Estos ingresos fueron multimillonarios. Por ejemplo, entre el 2004 y el 2008, los honorarios de asesoramiento y administración, al igual que las comisiones por ventas en los mercados primario y secundario relacionados con los CEF Locales, constituían la mitad de los ingresos anuales de algunas afiliadas de UBS. Tan solo en 2008, una afiliada de un CEF local generó $94.5 millones en ingresos. *Id.* a la pág. 359. Los corredores afiliados de UBS ganaban una comisión del tres por ciento (3%) sobre las ventas de las acciones de los CEF Locales y recibían una compensación adicional basada en cantidades tomadas a préstamo mediante líneas de crédito de sus clientes. *Id.* a la pág. 368.

109. *Cuarto*, muchos de los suscriptores también generaron honorarios resultantes de la administración y terminación de "swaps" de tasas de interés sobre los bonos que suscribieron. Un "swap" de tasa de interés es un contrato mediante el cual dos partes intercambian un flujo de pagos de intereses por otro. Como regla general, el emisor de un bono de tasa fija intercambia los pagos de intereses que habría de recibir de ese bono a cambio de pagos de intereses variables del proveedor

32

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 39 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 33 de 93

del intercambio. El emisor paga al proveedor del "swap" unos honorarios por emitir el "swap" y, si se termina el "swap", es posible que tenga que pagar al proveedor unos honorarios por terminación. *Id.* a las págs. 22, 418-19, 431.

110. Los suscriptores, incluyendo a las Demandadas Morgan Stanley LLC, Merrill Lynch, las Demandadas UBS, J.P. Morgan Securities y Goldman Sachs LLC, vendieron "swaps" de tasas de interés al Gobierno de Puerto Rico, COFINA, y/o la AEE. *Véase* Demanda a las págs. 5-8, *The Official Committee of Unsecured Creditors of Puerto Rico v. Barclays Capital*, Caso No. 19-00281, ECF 1 (Bankr. D.P.R. 2 de mayo de 2019); Informe sobre Investigación Especial a las págs. 421, 432-33. Estas Demandadas promovieron los "swaps" como instrumento para proteger a estos emisores contra tasas de interés ascendentes—los cuáles las Demandadas dijeron que iban a continuar subiendo—al intercambiar las tasas de interés variables de los bonos por tasas de interés fijas. Cuando la crisis financiera de los Estados Unidos comenzó en 2007, sin embargo, las tasas de interés variables cayeron en picada, pero los emisores todavía tenían que hacer a las Demandadas los pagos de altas tasas de interés fijas.

111. Así las cosas, para el 2009, los emisores tuvieron que poner fin a los "swaps" porque no los pudieron costear—colectivamente, los emisores de bonos de Puerto Rico adeudaban $1.32 mil millones en honorarios de terminación de "swaps," más del 14% del presupuesto anual el Estado Libre Asociado y el 17% de sus ingresos reales. Informe sobre la Investigación Especial a las págs. 413-14. Finalmente, los emisores terminaron pagando más de mil millones de dólares en honorarios, incluyendo cientos de millones de dólares a varios de los aquí las Demandadas. Cierto estimado establece el total de honorarios pagados por los emisores a los suscriptores, incluyendo a las Demandadas, en la suma de $1.6 mil millones. Saqib Bhatti & Carrie Sloan, ReFund America Project, *Recogiendo y Botando el Futuro de Puerto Rico*, 1 (31 de agosto de 2016), https://www.scribd.com/document/322588236/Scooping-and-Tossing-Puerto-Rico-s-Future#page=1&fullscreen=1.

112. Por último, los suscriptores, incluyendo a las Demandadas, indujeron a los emisores que enfrentaban esos altos costos de cancelación de "swaps" a emitir bonos adicionales para bajar la deuda pendiente de esos honorarios. Colectivamente, el Gobierno de Puerto Rico, la AEE, y COFINA incurrieron en una nueva deuda de más de $800 millones para pagar los gastos resultantes de la cancelación de "swaps," provenientes de una deuda vieja—incluyendo honorarios que se le debían a varios de las Demandadas, como las Demandadas Morgan Stanley LLC, las Demandadas UBS, Citigroup Global Markets, J.P. Morgan Securities, Goldman Sachs, LLC, y Merrill

33

Lynch. Informe sobre la Investigación Especial a las págs. 432-33. Las Demandadas se beneficiaron de estos despilfarros, generando millonarios ingresos relacionados con esos costos de cancelación y de la emisión de los nuevos bonos. Algunos de las Demandadas—incluyendo a Santander Securities, J.P. Morgan Securities, Morgan Stanley LLC, y Goldman Sachs LLC—también generaron honorarios adicionales al suscribir los nuevos bonos. *Véase, e.g.*, Gobierno de Puerto Rico, *Declaración Oficial para los Bonos de Obligación General de 2014, Serie A*, 24-25 (2014).

113. Como consecuencia de lo anterior, las Demandadas tuvieron múltiples incentivos para lucrarse y estimular a los emisores a emitir más y más deuda—y prácticamente ningún incentivo para garantizar que los bonos pudieran tener éxito a largo plazo. Las emisiones resultaron tan lucrativas para las Demandadas que tenían todo el incentivo para omitir información que señalara los riesgos de un potencial impago para que así pudieran empujar la venta de los bonos en el mercado. La posibilidad de un seguro—el cual obligaba a los aseguradores a cubrir cualquier incumplimiento—constituyó un incentivo aun mayor para que las Demandadas omitieran la divulgación de esos riesgos, porque sabían que el riesgo recaía sobre los aseguradores, y no sobre ellos. Así, los intereses de las Demandadas estuvieron en craso conflicto con los de los emisores, con los de los aseguradores como National, con los de los tenedores de los bonos, y con los de los ciudadanos de Puerto Rico, quienes dependían de los servicios esenciales, resultantes de los fondos que generaban esas emisiones.

III. Para Inducir a National a Asegurar los Bonos, las Demandadas le Aseguraron a National Que Ellos Tenían Una Base Razonable Para Creer Que las Declaraciones Oficiales Eran Ciertas y Estaban Completas

114. Entre 2001 y 2007, las Demandadas solicitaron e indujeron a National a asegurar el pago puntual de principal e intereses, a su vencimiento, de los bonos emitidos por el Gobierno de Puerto Rico, la AEE, la ACT, y COFINA, un total de aproximadamente $11,465,305,000 en deuda. Por cada emisión, e independientemente del emisor, las Demandadas actuaron de la misma forma. Sometieron a National solicitudes de seguros, las cuales suplementaron constantemente, incluyendo un borrador y una versión final de las Declaraciones Oficiales que tenían los nombres de ellos en la portada.

115. Aunque supuestamente las Demandadas no garantizaron expresamente que las representaciones en las Declaraciones Oficiales eran verdaderas y estaban completas, las Demandadas pudieron afirmar y afirmaron a National que habían investigado esas declaraciones razonablemente y que tenían una base razonable para

34

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 41 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 35 de 93

creer que eran verdaderas y estaban completas. Así pues, cada Declaración Oficial indicaba como sigue: "The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws as applied to the facts and circumstances of the transaction, but the Underwriters do not guarantee the accuracy or completeness of such information." *E.g.*, AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie NN* (2003).

116. Como paso esencial para solicitar que National asegurara los bonos, las Demandadas sometieron estas Declaraciones Oficiales a National tanto en borrador como en formato final. Al someter los borradores de las declaraciones, las Demandadas destacaron su supuesto cumplimiento con las leyes de valores, actuaron como si estuvieran observando las normas y costumbres del sector de bonos municipales, y así aseguraron a National que realizarían una "reasonable investigation" para desarollar "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offerings." Disclosure, Release No. 26100. Al someter las Declaraciones Oficiales finales, las Demandadas le aseguraron a National que habían completado su investigación y que razonablemente entendían que las declaraciones eras ciertas y estaban completas. Las Demandadas tenían la intención de que National confiara en sus afirmaciones—y así lo hizo National.

**IV. Confiando de Buena Fe en las Afirmaciones de las Demandadas, National Emitió Su Seguro En Garantía de los Bonos Sin Que Pueda Ser Éste Revocado**

117. Según el mejor conocimiento de la parte demandante, las Demandadas son suscriptores con vasta experiencia en la emisión y suscripción de bonos municipales y han suscrito por lo menos cientos, si no miles, de emisiones de bonos municipales fuera de Puerto Rico. Para procurar un seguro para esas ofertas de bonos municipales en el pasado, las Demandadas han sometido Declaraciones Oficiales a las aseguradoras, las cuales han descansado en las investigaciones razonables de esos suscriptores para tomar decisiones sobre seguros de acuerdo, todo ello a tenor con lo que son las normas y costumbres en el mercado de bonos municipales.

118. Al decidir si aseguraban o no los bonos, y siguiendo las costumbres y las normas de la industria, National tenía que necesariamente confiar en la información sometida por las Demandadas, quienes tenían acceso a la información financiera de los emisores. Fue objetivamente razonable que National así lo hiciera. Fue particularmente razonable que National confiara en la información específica que las

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 42 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 36 de 93

Demandadas le presentaron y que supuestamente habían examinado, puesto que National no podía razonablemente verificar esa información por cuenta propia de forma independiente. La información disponible al público sobre el Gobierno de Puerto Rico resultó que "no era confiable." John Dizard, *Puerto Rico's Number-Crunching Frustrates Even the Best Minds*, FIN. TIMES (15 de marzo de 2019), https://www.ft.com/content/132a4e75-9016-3757-9f4d-08baf3c7a798.

119. Basado en la información proporcionada por las Demandadas, y de las afirmaciones de las Demandadas de que habían investigado esas declaraciones razonablemente, National aceptó con emisores para asegurar los bonos. Estos acuerdos permitían que National se retirara de la transacción antes de la emisión de los bonos, si surgían cambios adversos substanciales en el borrador o en la versión final de las Declaraciones Oficiales, o si National se enterara de que las declaraciones eran substancialmente falsas o que había omisiones en la solicitud. Si National no se retiraba antes de la emisión de los bonos, la póliza de seguros emitida sería irrevocable.

120. National revisó los borradores y versiones finales de las Declaraciones Oficiales. Se enfocó en evaluar la probabilidad de un incumplimiento, examinando cómo el emisor estaba gastando y gastaría sus fondos; los ratios de deuda del emisor; los ingresos, deudas, y apropiaciones del emisor; y si la emisión estaba garantizada por los ingresos del emisor, las condiciones de las facilidades que generarían esos ingresos y si el emisor gastaría los fondos necesarios para mantenerlas o mejorarlas.

121. A base de la información contenida en las solicitudes—y debido a que las Demandadas nunca informaron a National que alguna parte de las declaraciones era incorrecta o incompleta—National emitió pólizas de seguro irrevocables sobre los bonos en cuestión. Como el seguro de National era irrevocable, los intereses a largo plazo de National siempre estuvieron alineados con los del Gobierno, la AEE, la ACT, COFINA, y los ciudadanos de Puerto Rico—ninguno de los cuales quería ni deseaba el incumplimiento con el pago de los bonos.

V.    Los Emisores Incumplen y National Honra Sus Pólizas de Seguros Haciendo Pagos por Reclamaciones Comenzando en el 2016

122. Eventualmente, los bonos que los suscriptores, incluyendo a las Demandadas, introdujeron al mercado ocasionaron la quiebra del Gobierno de Puerto Rico.

123. Para el 2015, Puerto Rico tenía una deuda de aproximadamente $72 mil millones—supuestamente casi "15 times the median bond debt of the 50 states" y mucho más que cualquiera de esos estados. Mary Williams Walsh, *The Bonds That*

Case 17-03283-LTS Doc#8666-7 Filed 09/09/19 Entered 09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 43 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 37 de 93

*Broke Puerto Rico*, N.Y. TIMES (30 de junio de 2015),
https://www.nytimes.com/2015/07/01/business/dealbook/the-bonds-that-broke-
puerto-rico.html. Esta deuda causó una crisis económica. El Gobierno supuestamente
había "lock[ed] up more and more of its resources to secure more and more bonds,"
which, "over the long term", left less and less money to provide essential government
services," such as "policing, staffing the public schools and providing clean water." *Id.*

124. El Gobernador de Puerto Rico declaró que la deuda de la isla "era
impágable." Michael Corkery & Mary Williams Walsh, *Puerto Rico's Governor Says
Island's Debts Are Not Payable*, N.Y. TIMES (28 de junio de 2015),
https://www.nytimes.com/2015/06/29/business/dealbook/puerto-ricos-governor-says-
islands-debts-are-not-payable.html. Poco tiempo después, los emisores de Puerto Rico
comenzaron a incumplir con el pago de sus obligaciones. Estos incumplimientos
devastaron a los ciudadanos de Puerto Rico, especialmente a los inversionistas
individuales, muchos de los cuales eran "conservadores" en sus estrategias de
inversión y habían invertido fuertemente en el momento de cada emisión porque
estaban bajo la impresión de que los bonos eran inversiones seguras. Por ejemplo,
una afiliada de las Demandadas UBS admitió la existencia de "nearly $3 billion in
losses to Local CEF investors." Informe sobre la Investigación Especial a la pág. 340.
Muchos inversionistas de inmediato experimentaron una reducción severa o la
pérdida completa de sus ahorros para el retiro. El impago también perjudicó a todos
los ciudadanos de Puerto Rico de un sinnúmero de maneras. Debido a la abrumadora
crisis fiscal y perdida de acceso al mercado de seguro municipal el Gobierno cerró
instituciones esenciales, incluyendo escuelas y hospitales; limitó la asignación de
fondos para servicios sociales importantes tales como el cuidado de la salud y la
infraestructura; y redujo el mantenimiento de redes de energía eléctrica y de
transporte. *Véase id.* pág. 48; Thomas Health & Tory Newmyer, *Puerto Rico, con una
deuda de $73 mil millones, forzado hacia la quiebra*, WASH. POST (3 de mayo de 2017),
https://www.washingtonpost.com/business/economy/puerto-rico-with-73-billion-in-
debt-forced-toward-bankruptcy/2017/05/03/92e39d76-3020-11e7-9534-
00e4656c22aa_story.html?noredirect=on&utm_term=.59dff9c2442e;  Sullivan,
*supra* ¶ 83.

125. Los incumplimientos por parte del Gobierno, la AEE y la ACT
detonaron las obligaciones de National de efectuar pagos bajo sus pólizas. National
ha tomado medidas responsables para mitigar la crisis, realizando todos los pagos
según han ido venciendo—más de $720 millones al 1 de julio de 2019.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 44 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 38 de 93

126. National tiene la intención de realizar todos los pagos por reclamaciones futuras también, los cuales estima en cientos de millones de dólares adicionales.

127. Los pagos que ha realizado National hasta el presente han ayudado y continuarán ayudando a compensar a los bonistas, incluyendo a los ciudadanos de Puerto Rico, que se han visto afectados por el descalabro financiero ocasionado por los incumplimientos.

128. Aunque COFINA no incumplió con [sus] pagos, se acogió a un procedimiento parecido a una quiebra en perjuicio de National. Bajo el Título III de la Ley PROMESA, la Junta de Supervisión presentó peticiones a nombre y en representación del gobierno y luego varias de sus instrumentalidades—incluyendo a la AEE, la ACT y COFINA. En el contexto de dicho procedimiento, en febrero de 2019 se aprobó un plan de reestructuración para COFINA mediante el cual National prevé razonablemente que pagará en exceso de $100 millones en reclamaciones. Otras instrumentalidades del gobierno todavía se encuentran inmersas en sus procedimientos bajo el Título III de PROMESA.

129. Mientras National, los emisores y el pueblo de Puerto Rico en general sufrían el embate del masivo impago, los suscriptores retuvieron sus cuantiosas ganancias. Según expresó un anterior corredor de bonos de la Demandada Morgan Stanley: "Los bancos se salieron, y todos los demás tuvieron que pagar la cuenta." Sullivan, *supra* ¶ 83.

**VI.  En 2018, una Investigación Especial Reveló Que—Contrario a Sus Afirmaciones Dolosas—las Demandadas No Habían Investigado Razonablemente las Declaraciones Oficiales y Esas Declaraciones Eran Sustancialmente Falsas e Incompletas**

130. La Junta de Supervisión formó un Comité de Investigación Especial (la "Investigación Especial") que investigó los orígenes de la crisis fiscal de Puerto Rico. Los resultados de la Investigación Especial se dieron a conocer en un informe en agosto de 2018 (el "Informe sobre la Investigación Especial"). Por medio de requerimientos de producción de documentos y citaciones, el Comité de Investigación Especial obtuvo sobre 260,000 documentos de 32 partes diferentes, incluyendo a entidades de Puerto Rico, instituciones financieras y asesores financieros; también entrevistó a 120 testigos, incluyendo a pasados y presentes oficiales de gobierno—y suscriptores. Informe sobre la Investigación Especial págs. 26, 27.

131. Los hallazgos del Comité fueron impactantes. Descubrió que las representaciones clave en las Declaraciones Oficiales de las emisiones que examinó eran incorrectas o incompletas. El Informe sobre la Investigación Especial determinó que los suscriptores, incluyendo a las Demandadas, no examinaron adecuadamente

38

Case:17-03283-LTS Doc#:8666-2 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 45 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 39 de 93

la veracidad de esas representaciones—si es que realmente investigaron. El Informe sobre la Investigación Especial indicó además que los suscriptores utilizaron la misma estrategia con otras emisiones que no fueron examinadas como parte de la Investigación Especial. *Véase id.* a las secciones XI; XIV.

132. El alcance de la Investigación Especial, según determinado por el Comité, fue limitado: solamente examinó el período del 2006 al 2015 y se enfocó solo en ciertos emisores—el Gobierno, la AEE, COFINA, y la Autoridad de Acueductos y Alcantarillados ("AAA"). El Informe sobre la Investigación Especial señaló que "[m]ás análisis y recopilación de evidencia adicional por otras partes interesadas, con mandatos diferentes o más amplios que el nuestro, determinará si cualquiera de las posibles causas de acción o remedios legales que se identifican en este Informe podrían o deberían ser encausadas y, en ese caso, de qué manera y contra quién." *Id.* a la pág. 30. El Informe indicó que su discusión de posibles causas de acción "no tiene la intención de proporcionar una lista exhaustiva o definitiva y análisis de todas las causas de acción que podrían estar disponibles[.]" *Id.*

133. El Informe sobre la Investigación Especial revela que las Demandadas no investigaron razonablemente la veracidad y suficiencia de las Declaraciones Oficiales de los bonos objeto de esta reclamación. El Informe no solo revela la estrategia totalmente inadecuada de los suscriptores con relación a las emisiones de AEE, sino que indica que éstos utilizaron la misma estrategia para otras emisiones que el Informe no analizó en su totalidad—incluyendo aquellas del Gobierno, la ACT y COFINA. Según elaboramos a continuación, varios de las Demandadas suscribieron múltiples bonos para cada emisor y para varios emisores. Seis de las Demandadas— J.P. Morgan Securities, las Demandadas UBS (entre UBS Financial Services y UBS Securities), Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, y Merrill Lynch—participaron en cada emisión asegurada por National—mientras que las Demandadas Santander Securities y RBC Capital Markets participaron en cada emisión asegurada por National en 2007. Los emisores tenían a las mismas Demandadas mercadeando y vendiendo sus bonos; tenían problemas similares o idénticos en cuanto a sus divulgaciones, y los bonos que emitieron dejaron de pagar más o menos al mismo tiempo. Las Demandadas tuvieron incentivos similares para cada emisión—llevar los bonos al mercado sin realizar investigaciones, los resultados de las cuales podrían poner en riesgo sus ganancias.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 46 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 40 de 93

A.   Las Representaciones Clave en las Declaraciones Oficiales de la AEE Eran Esencialmente Falsas e Incompletas

134.   La AEE tiene la responsabilidad de conservar, desarrollar y utilizar los recursos de energía de Puerto Rico para fomentar el bienestar general de Puerto Rico.

135.   Los bonos de la AEE están garantizados por los ingresos de la autoridad derivados de la generación, transmisión y distribución de electricidad. *E.g.*, *AEE, Declaración Oficial para los Bonos de Ingresos de Energía, Serie NN*, 5 (2003).

136.   Entre el año 2001 y el 2007, las Demandadas procuraron y obtuvieron seguro de garantía de bonos de National, y National ha realizado pagos por reclamaciones relacionadas a los siguientes bonos de la AEE:

a.   Bonos de Ingresos de Energía de AEE, Serie LL del 13 de junio de 2002, con fecha de vencimiento del 1 de julio de 2019. Los suscriptores líderes fueron Goldman Sachs LLC y UBS PaineWebber Inc. (ahora conocido como UBS Financial Services). Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), ABN AMRO Financial Services, Inc. (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Bear Stearns & Co., Inc. (predecesor de la Demandada J.P. Morgan Securities), y Salomon Smith Barney (predecesor de la Demandada Citigroup Global Markets). Estos bonos tenían como objetivo financiar una porción del costo de varios proyectos bajo el programa de mejoras capitales de la AEE. National aseguró estos bonos a su valor nominal original de $98,125,000. El primer impago de estos bonos fue el 3 de julio de 2017.

b.   Los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie MM del 20 de septiembre de 2002, con fecha de vencimiento del 1 de julio de 2023. Los suscriptores líderes fueron Goldman Sachs LLC y UBS PaineWebber Inc. (ahora conocido como UBS Financial Services). Otros de los suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), ABN AMRO Financial Services, Inc. (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Salomon Smith Barney (predecesor de la Demandada Citigroup Global Markets), y Bear Stearns & Co., Inc. (predecesor de la Demandada J.P. Morgan Securities). Estos bonos tenían el objetivo de refinanciar bonos de ingresos de la AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $68,700,000. El primer impago de estos bonos fue el 3 de julio de 2017.

Case: 17-03283-LTS Doc#: 8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 47 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 41 de 93

c. Los Bonos de Ingresos de Energía de AEE, Serie NN del 8 de agosto de 2003, con fecha de vencimiento del 1 de julio de 2033. Los suscriptores líderes fueron Goldman Sachs LLC, Merrill Lynch, y J.P. Morgan Securities. Otros suscriptores incluyeron Morgan Stanley LLC, UBS Financial Services, Banc of America Securities (predecesor de la Demandada Merrill Lynch), y Citigroup Global Markets. Estos bonos tenían como objetivo financiar una porción del costo de varios proyectos del programa de mejoras capitales de la AEE y pagar una línea de crédito con el Banco Gubernamental de Fomento ("GDB" por sus siglas en inglés). National aseguró estos bonos a su valor nominal original de $272,290,000. El primer impago de estos bonos fue el 3 de julio de 2017.

d. Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie OO del 12 de agosto de 2004, con fecha de vencimiento del 1 de julio de 2025. Los suscriptores líderes fueron Morgan Stanley LLC, Merrill Lynch, y J.P. Morgan Securities. Otros suscriptores incluyeron a Goldman Sachs LLC, Banc of America Securities (predecesor de la Demandada Merrill Lynch), UBS Financial Services, y Citigroup Global Markets. Estos bonos tenían como objetivo refinanciar bonos de ingresos de la AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $124,550,000. El primer impago de estos bonos fue el 3 de julio de 2017.

e. Los Bonos de Ingresos de Energía de AEE Serie RR y los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie SS del 24 de marzo de 2005, con fecha de vencimiento del 1 de julio de 2024 y el 1 de julio de 2025, respectivamente. Los suscriptores líderes fueron Morgan Stanley LLC, Merrill Lynch, y J.P. Morgan Securities. Otros suscriptores incluyeron a Goldman Sachs LLC, Banc of America Securities (predecesor de la Demandada Merrill Lynch), UBS Financial Services, y Citigroup Global Markets. Los bonos Serie RR tenían el objetivo de financiar una porción del costo de varios proyectos del programa de mejoras capitales de la AEE y pagar ciertos pagarés al GDB. Los bonos de la Serie SS tenían el objetivo de refinanciar bonos de ingresos de AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $469,025,000. El primer impago de estos bonos fue el 3 de julio de 2017.

f. Los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie UU del 19 de abril de 2007, con fecha de vencimiento del 1 de julio de 2019. Los suscriptores líderes fueron J.P. Morgan Securities y UBS Investment

41.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch , Pierce , Fenner & Smith Inc Page 48 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 42 de 93

Bank (ahora conocido como UBS Securities). Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Goldman Sachs LLC, RBC Capital Markets, y Santander Securities. Estos bonos tenían como objetivo refinanciar bonos de ingresos de AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $77,290,000. El primer impago de estos bonos fue el 3 de julio de 2017.

g. Los Bonos de Refinanciamiento de Ingreso de Energía de AEE, Serie VV del 16 de mayo de 2007, con fecha de vencimiento del 1 de julio de 2035. Los suscriptores líderes fueron J.P. Morgan Securities y UBS Investment Bank (ahora conocido como UBS Securities). Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Citigroup Global Markets, Goldman Sachs LLC, RBC Capital Markets, y Santander Securities. Estos bonos tenían como objetivo refinanciar bonos de ingresos de AEE emitidos anteriormente. National aseguró estos bonos por $302,600,000 y emitió una póliza adicional de seguro por su valor nominal original de $127,610,000. El primer impago de estos bonos fue el 3 de julio de 2017.

137. Era esencial que las declaraciones sobre la capacidad de la AEE a largo plazo de generar ingresos, minimizar costos, y pagar sus deudas utilizando los ingresos de su negocio fueran precisas. Por razón de que los bonos estaban garantizados por los ingresos de la generación, transmisión y distribución de electricidad, era sumamente importante que los fondos recaudados en realidad se gastaran según se acreditó, en la generación, transmisión y distribución de electricidad—lo cual generaría ingresos—para minimizar el riesgo de un incumplimiento.

138. En realidad, las representaciones clave en las Declaraciones Oficiales fueron esencialmente falsas e incompletas, incluyendo aquellas que tenían que ver con: (a) información financiera básica, incluyendo los ratios de cobertura del servicio de la deuda y sus componentes, tales como los ingresos; (b) cómo la AEE estaba gastando el dinero—incluyendo declaraciones de que estaba gastando dinero en la generación, transmisión y distribución de electricidad; y (c) el estado de los sistemas de la AEE. Las Demandadas no investigaron y no tenían una base razonable para creer la veracidad y suficiencia de estas divulgaciones.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 49 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 43 de 93

139. *Primero*, las Declaraciones Oficiales reflejaban la información financiera
básica de la AEE, incluyendo sus ingresos históricos y proyectados, sus gastos, sus
ingresos netos, y la información sobre deudas existentes, incluyendo principal e
intereses. Mientras más altos los ingresos y más bajos los gastos y deudas, menos
probable era que la AEE incurriría en un incumplimiento con el pago de los bonos
propuestos.

140. Las Declaraciones Oficiales proporcionadas por las Demandadas
también divulgaron los requisitos de cobertura de la deuda de AEE. Para poder emitir
nuevos bonos, y mientas existan bonos sin saldar, la AEE tiene que "fijar, facturar y
cobrar, tarifas y cargos [razonables] para que los ingresos del sistema [sean]
suficientes para pagar los gastos corrientes [en ese momento y en el futuro] y
proporcionar el 120% de los requisitos agregados de principal e intereses para el
próximo año fiscal." *E.g., Declaración Oficial para los Bonos de Ingresos de Energía
de AEE, Series TT y UU, 10 (2007); Declaración Oficial para los Bonos de Ingresos de
Energía de AEE, Serie NN, 7 (2003); Declaración Oficial para los Bonos de Ingresos
de Energía de AEE, Serie LL, 10 (2002).* Cada Declaración Oficial divulgaba los
cálculos históricos y proyectados de la cobertura del servicio de la deuda de la AEE
como en el "ratio de [] Ingresos Netos frente a los pagos requeridos de Principal e
Intereses." *E.g. Declaración Oficial para los Bonos de Ingresos de Energía de AEE,
Serie NN, 34 (2003).* Estos cálculos fueron diseñados para demostrar que los ingresos
de la AEE serían suficientes para cubrir sus gastos de operación más los pagos para
el servicio de su deuda, minimizando de esa manera el riesgo de un incumplimiento
de pago. Un cálculo de la cobertura del servicio de la deuda que arrojara un ratio por
encima del 120% requerido, o 1.2, indicaba que la AEE estaba bien posicionada para
pagar gastos corrientes y futuros. Mientras más por encima del ratio de 1.2 estuviera
el cálculo, menos arriesgada parecía ser una emisión.

141. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P.
Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global
Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de
AEE, Serie LL del 13 de junio de 2002 reflejaban los siguientes "Ingresos Netos
Históricos y Cobertura." Estas representaciones incluyeron, entre otras cosas,
información sobre los ingresos netos que arrojaba ratios de cobertura de deuda
históricos mucho más altos que el ratio de 1.2 requerido—entre 1.46 y 1.77 por los
cinco años anteriores.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Proses Merrill Lynch Pierce Fenner & Smith Inc Page 50 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 44 de 93

Historical Net Revenues and Coverage

AEE, Declaración Oficial para los Bonos de Ingresos de Energía, Serie LL, 40 (2002).

142. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch en referencia a los Bonos de Ingresos de Energía de AEE, Serie LL del 13 de junio de 2002 reflejaban los siguientes "Ingresos Netos Proyectados y Cobertura." Estas representaciones incluyeron entre otras cosas, ingresos netos que arrojaba ratios proyectados de cobertura de deuda mucho más altos del ratio de 1.2 requerido—entre 1.54 y 1.77 para los siguientes cinco años:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 51 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 45 de 93

Projected Net Revenues and Coverage:

| | Years Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 |
| Average number of clients | 1,384,206 | 1,403,844 | 1,424,481 | 1,444,121 | 1,464,762 |
| Electric energy sales (in millions of kWh) | 19,051.3 | 19,756.2 | 20,352.2 | 20,823.7 | 21,453.4 |
| Authority generation (gross)(in millions of kWh) | 19,576.6 | 17,157.5 | 17,622.1 | 18,393.2 | 19,512.4 |
| Purchased generation (gross)(in millions of kWh) | 2,986.0 | 6,195.0 | 6,435.0 | 6,221.0 | 6,085.0 |

| Sources of Net Revenues | (dollars in thousands) | | | | |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| Sales of electrical energy: | | | | | |
| Residential | $ 717,119 | $ 766,354 | $ 782,243 | $ 809,770 | $ 851,101 |
| Commercial | 958,533 | 1,037,601 | 1,101,832 | 1,154,489 | 1,235,627 |
| Industrial | 377,723 | 411,788 | 430,525 | 454,049 | 481,285 |
| Other | 85,055 | 90,734 | 91,909 | 92,548 | 93,665 |
| | 2,138,430 | 2,306,477 | 2,406,509 | 2,510,856 | 2,661,678 |
| Revenues from Commonwealth for | | | | | |
| Rural Electrification | 739 | 704 | 591 | 161 | 116 |
| Other (principally, interests earned) | 33,573 | 37,115 | 39,115 | 41,115 | 43,115 |
| | 2,172,742 | 2,344,296 | 2,446,215 | 2,552,132 | 2,704,909 |
| Current Expenses: | | | | | |
| Operations: | | | | | |
| Fuel | 696,408 | 594,334 | 638,146 | 699,579 | 786,835 |
| Purchased Power | 339,265 | 438,830 | 450,989 | 458,351 | 461,651 |
| Other Production | 44,707 | 35,533 | 36,268 | 37,019 | 37,785 |
| Transmission and Distribution | 85,672 | 83,400 | 85,126 | 86,888 | 88,686 |
| Customer Accounting and Collections | 82,614 | 79,707 | 81,356 | 83,040 | 84,759 |
| Administration and general | 171,986 | 181,624 | 185,382 | 189,219 | 193,138 |
| Maintenance | 233,057 | 249,901 | 255,071 | 260,352 | 265,741 |
| Other - Interest Charges | 3,263 | 2,027 | 2,078 | 2,130 | 2,183 |
| | 1,546,972 | 1,665,356 | 1,734,416 | 1,816,578 | 1,920,778 |
| Net Revenues | $ 625,770 | $ 678,940 | $ 711,799 | $ 735,554 | $ 784,131 |
| Coverage | | | | | |
| Principal and Interest Requirements [3] | $ 392,043 | $ 382,519 | $ 430,888 | $ 477,554 | $ 500,056 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.60 | 1.77 | 1.65 | 1.54 | 1.57 |

*Id.* pág. 45.

143. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P.
Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global
Markets, UBS Securities, y Merrill Lynch sobre los Bonos de Refinanciamiento de
Ingresos de Energía de AEE, Serie MM del 20 de septiembre de 2002 reflejaban los
siguientes "Ingresos Netos Históricos y Cobertura." Estas representaciones
incluyeron, entre otras cosas, información sobre los ingresos netos que arrojaba ratios
históricos de cobertura de deuda mucho más altos que el ratio de 1.2 requerido—entre
1.62 en 2001 y 1.77 en 2002:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 52 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 46 de 93

### Historical Net Revenues and Coverage

|  | Years Ended June 30, | |
|---|---|---|
|  | 2001 | 2002* |
| Average number of clients | 1,365,668 | 1,383,888 |
| Electric energy sales (in millions of kWh) | 18,723 | 19,130 |
| **Source of Net Revenues** | (dollars in thousands) | |
| Revenues: | | |
| Sales of electrical energy: | | |
| Residential | $ 779,682 | $ 725,797 |
| Commercial | 1,026,219 | 969,182 |
| Industrial | 436,313 | 382,140 |
| Other | 86,889 | 85,052 |
|  | 2,329,103 | 2,162,171 |
| Revenues from Commonwealth for rural electrification | 705 | 739 |
| Other operating revenues | 8,210 | 8,514 |
| Other (principally interest earned) | 35,059 | 29,129 |
|  | 2,373,077 | 2,200,553 |
| Current Expenses: | | |
| Operations: | | |
| Fuel | 944,760 | 720,292 |
| Purchased power | 177,330 | 227,923 |
| Other production | 56,301 | 56,029 |
| Transmission and Distribution | 105,034 | 114,971 |
| Customer accounting and collection | 83,453 | 84,689 |
| Administrative and general | 139,117 | 146,497 |
| Maintenance [2] | 213,666 | 212,959 |
| Other | 3,028 | 3,235 |
|  | 1,722,689 | 1,566,595 |
| **Net Revenues** | $ 650,388 | $ 633,958 |
| **Coverage** | | |
| Principal and Interest Requirements | $ 367,796 | $ 392,043 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.77 | 1.62 |

AEE, Declaración Oficial para los Bonos de Refinanciamiento de Ingresos de
Energía, Serie MM, 7 (2002).

144. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P.
Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global
Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de
AEE, Serie NN, del 8 de agosto de 2003, reflejaban los siguientes "Ingresos Netos
Históricos y Cobertura." Estas representaciones incluyeron, entre otras cosas,
información sobre ingresos netos que arrojaba ratios históricos de cobertura de deuda
mucho más altos del ratio de 1.2 requerido entre 1.46 y 1.77 para los cinco años
anteriores:

Case: 17-03283-LTS Doc#: 8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 53 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 47 de 93



Historical Net Revenues and Coverage

AEE, Declaración Oficial para los Bonos de Ingresos de Energía, Serie NN, 35 (2003).

145. Las Declaraciones Oficiales proporcionadas por las Demandadas Goldman Sachs LLC, Merrill Lynch, J.P. Morgan Securities, Morgan Stanley LLC, UBS Financial Services, Merrill Lynch, y Citigroup Global Markets para los Bonos de Ingresos de Energía de AEE, Serie NN del 8 de agosto de 2003 reflejaban los siguientes Ingresos Netos Proyectados y Cobertura. Estas representaciones incluyeron, entre otras cosas, información de ingresos netos que arrojaba ratios proyectados de cobertura de deuda mucho más altos del ratio de 1.2 requerido—entre 1.54 y 1.76 para los siguientes cinco años:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 54 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 48 de 93

Projected Net Revenues and Coverage

| | Years Ending June 30; | | | | |
|---|---|---|---|---|---|
| | 2003[a] | 2004 | 2005 | 2006 | 2007 |
| Average number of clients | 1,401,379 | 1,420,024 | 1,439,656 | 1,458,277 | 1,477,899 |
| Electric energy sales (in millions of KWh) | 19,888.5 | 20,536.2 | 21,146.2 | 21,796.3 | 22,458.6 |
| Authority generation (gross)(in millions of KWh) | 23,676.2 | 24,326.3 | 25,048.8 | 25,818.9 | 26,603.4 |
| Purchased generation (gross)(in millions of KWh) | 5,303.0 | 6,195.0 | 6,622.0 | 6,519.0 | 6,351.6 |
| **Sources of Net Revenues** | (dollars in thousands) | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $ 848,704 | $ 919,870 | $ 907,407 | $ 929,614 | $ 949,605 |
| Commercial | 1,099,070 | 1,187,370 | 1,206,163 | 1,260,723 | 1,314,370 |
| Industrial | 430,351 | 463,224 | 456,183 | 464,602 | 472,026 |
| Other | 92,333 | 93,632 | 91,435 | 91,458 | 91,406 |
| | 2,470,458 | 2,664,096 | 2,661,188 | 2,746,397 | 2,827,407 |
| Revenues from Commonwealth for Rural Electrification | 704 | 591 | 161 | 116 | 76 |
| Other (principally, Interests earned) | 28,333 | 38,247 | 40,247 | 42,247 | 44,247 |
| | 2,499,495 | 2,702,934 | 2,701,596 | 2,788,760 | 2,871,730 |
| Current Expenses[b]: | | | | | |
| Operations: | | | | | |
| Fuel | 840,722 | 873,970 | 812,568 | 847,038 | 880,163 |
| Purchased Power | 345,705 | 447,050 | 473,260 | 480,123 | 483,696 |
| Other Production | 40,861 | 51,174 | 52,924 | 54,737 | 56,616 |
| Transmission and Distribution | 112,306 | 112,329 | 116,170 | 120,150 | 124,274 |
| Customer Accounting and Collections | 88,827 | 97,207 | 100,531 | 103,975 | 107,544 |
| Administration and general | 159,094 | 164,563 | 170,189 | 176,021 | 182,063 |
| Maintenance | 236,314 | 243,862 | 252,200 | 260,841 | 269,795 |
| Other - Interest Charges | 3,187 | 2,078 | 2,129 | 2,182 | 2,238 |
| | 1,827,016 | 1,992,233 | 1,979,971 | 2,045,067 | 2,106,389 |
| Net Revenues | $ 672,479 | $ 710,701 | $ 721,625 | $ 743,693 | $ 765,341 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[c] | $ 382,519 | $ 427,088 | $ 447,143 | $ 476,260 | $ 498,184 |
| Ratio of Net Revenues to Principal and Interest Requirements[b] | 1.76 | 1.66 | 1.61 | 1.56 | 1.54 |

*Id.* pág. 40.

146. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de AEE, Serie OO del 12 de agosto de 2004 reflejaban los siguientes "Ingresos Netos Históricos y Cobertura." Estas representaciones incluyeron información de ingresos netos que arrojaba ratios históricos de cobertura de deuda mucho más altos que el ratio de 1.2 requerido—entre 1.46 y 1.77 por los cinco años anteriores:

Case: 17-03283-LTS Doc#: 8666-4 Filed: 09/09/19 Entered: 09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 55 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 49 de 93

Historical Net Revenues and Coverage



AEE, *Declaración Oficial para los Bonos de Ingresos de Energía, Serie OO*, 44 (2004).

147. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie OO del 12 de agosto de 2004 reflejaban los siguientes "Ingresos Netos Proyectados y Cobertura." Estas representaciones incluyen información de los ingresos netos que arrojaba ratios proyectados de cobertura de deuda mucho más altos del ratio de 1.2 requerido—entre 1.50 y 1.66 durante los siguientes cinco años:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process, Merrill Lynch, Pierce, Fenner & Smith Inc Page 56 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 50 de 93

**Projected Net Revenues and Coverage**

Years Ending June 30;

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Average number of clients | 1,417,718 | 1,435,452 | 1,451,494 | 1,467,557 | 1,483,712 |
| Electric energy sales (in millions of kWh) | 20,540.9 | 20,879.9 | 21,335.3 | 21,803.5 | 22,273.1 |
| Authority generation (gross)(in millions of KWh) | 19,610.0 | 17,220.0 | 16,729.0 | 16,995.0 | 17,819.0 |
| Purchased generation (gross)(in millions of KWh) | 5,947.0 | 7,511.0 | 7,381.0 | 7,736.0 | 7,511.0 |
| **I. Sources of Net Revenues** | | | (dollars in thousands) | | |
| **Revenues:** | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $ 690,747 | $ 946,457 | $ 932,257 | $ 948,313 | $ 972,547 |
| Commercial | 1,172,188 | 1,234,604 | 1,265,331 | 1,314,945 | 1,371,655 |
| Industrial | 441,271 | 469,497 | 473,687 | 479,943 | 492,712 |
| Other | 88,797 | 90,877 | 89,351 | 89,428 | 90,542 |
| | 1,693,103 | 2,741,635 | 2,760,628 | 2,832,629 | 2,927,454 |
| Revenues from Commonwealth for Rural Electrification | 591 | 161 | 116 | 76 | 26 |
| Other (principally, interest earned) | 24,766 | 27,403 | 29,403 | 31,403 | 33,403 |
| | 2,618,460 | 2,769,199 | 2,790,147 | 2,864,108 | 2,960,883 |
| **Current Expenses:** | | | | | |
| Operation: | | | | | |
| Fuel | 850,451 | 896,537 | 869,091 | 686,653 | 648,386 |
| Purchased Power | 438,289 | 491,662 | 504,746 | 523,922 | 525,469 |
| Other Production | 49,231 | 50,141 | 51,179 | 52,338 | 53,519 |
| Transmission and Distribution | 127,245 | 133,446 | 136,000 | 128,608 | 131,270 |
| Customer Accounting and Collections | 91,457 | 100,671 | 102,754 | 104,881 | 107,052 |
| Administration and general | 161,650 | 166,519 | 169,964 | 173,481 | 177,072 |
| Maintenance | 335,776 | 251,058 | 256,253 | 261,557 | 266,971 |
| Other - Interest Charges | 3,278 | 2,130 | 2,183 | 2,237 | 2,293 |
| | 1,947,587 | 2,054,154 | 2,082,177 | 2,133,577 | 2,211,833 |
| **Net Revenues** | $ 671,073 | $ 685,045 | $ 707,970 | $ 730,531 | $ 749,050 |
| **Coverage** | | | | | |
| Principal and Interest Requirements | $ 433,827 | $ 413,077 | $ 473,299 | $ 477,503 | $ 488,681 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.55 | 1.66 | 1.50 | 1.53 | 1.53 |

*Id.* pág. 48.

148. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P.
Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global
Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de
AEE, Serie RR y los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie
SS del 24 de marzo de 2005, reflejaban los siguientes Ingresos Netos Históricos y
Cobertura. Estas representaciones incluyen información de ingresos netos que
arrojaba ratios históricos de cobertura de deuda mucho más altos que el ratio de 1.2
requerido—entre 1.48 y 1.77 por los cinco años anteriores:

## Historical Net Revenues and Coverage

| | Years Ended June 30, | | | | | Six Months Ended December 31, | |
|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2003 | 2004 |
| Average number of clients | 1,341,907 | 1,365,668 | 1,383,833 | 1,401,303 | 1,419,603 | 1,414,849 | 1,433,982 |
| Electric energy sales (in millions of kWh) | 18,145 | 18,723 | 19,130 | 19,857 | 20,260 | 10,524 | 10,441 |
| Source of Net Revenues | | | | | | | |
| (dollars in thousands) | | | | | | | |
| Revenues: | | | | | | | |
| Sales of electric energy: | | | | | | | |
| Residential | $ 613,131 | $ 779,682 | $ 725,797 | $ 867,684 | $ 897,965 | $ 459,461 | $ 503,949 |
| Commercial | 878,637 | 1,026,219 | 969,182 | 1,117,317 | 1,171,110 | 588,581 | 632,700 |
| Industrial | 391,906 | 436,313 | 382,140 | 432,296 | 444,070 | 219,251 | 244,177 |
| Other | 50,433 | 86,889 | 85,052 | 91,461 | 87,123 | 43,826 | 43,981 |
| | 1,934,227 | 2,329,103 | 2,162,171 | 2,508,758 | 2,600,268 | 1,311,119 | 1,424,807 |
| Revenues from Commonwealth | | | | | | | |
| for reclassification | 831 | 905 | 730 | 704 | 591 | 294 | 78 |
| Other operating revenues | 10,240 | 8,210 | 8,514 | 9,625 | 8,565 | 5,333 | 4,919 |
| Other (principally interest earned) | 29,986 | 135,059 | 22,253 | 17,163 | 3,587 | 643 | 8,813 |
| | 2,025,284 | 2,473,077 | 2,193,681 | 2,536,250 | 2,613,006 | 1,317,388 | 1,438,617 |
| Current Expenses: | | | | | | | |
| Operation: | | | | | | | |
| Fuel | 801,413 | 944,760 | 720,297 | 816,431 | 864,700 | 435,053 | 507,440 |
| Purchased power | 64,517 | 177,330 | 273,972 | 339,087 | 436,763 | 208,059 | 338,680 |
| Other production | 55,690 | 56,301 | 56,029 | 44,590 | 48,787 | 24,450 | 27,160 |
| Transmission and Distribution | 94,793 | 105,034 | 114,971 | 119,408 | 136,509 | 68,270 | 74,747 |
| Customer accounting and Collection | 76,598 | 82,433 | 84,689 | 89,710 | 91,363 | 44,318 | 51,065 |
| Administrative and General | 131,069 | 139,117 | 146,497 | 162,317 | 163,069 | 82,863 | 90,437 |
| Maintenance | 219,812 | 213,666 | 212,959 | 224,941 | 234,543 | 114,495 | 118,932 |
| Other | 2,311 | 3,028 | 3,235 | 1,492 | 1,632 | 1,697 | 1,759 |
| | 1,466,823 | 1,722,669 | 1,546,595 | 1,871,676 | 1,979,256 | 979,577 | 1,110,311 |
| Net Revenues | 558,461 | 650,389 | 647,086 | 664,774 | 633,750 | 337,811 | 328,306 |
| Coverage | | | | | | | |
| Principal and Interest Requirements | 346,417 | 367,296 | 392,043 | 381,178 | 427,088 | | |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.61 | 1.77 | 1.60 | 1.74 | 1.48 | | |

AEE, *Declaración Oficial para los Bonos de Ingresos de Energía, Serie RR y los Bonos de Refinanciamiento de Ingresos de Energía, Serie SS*, 45 (2005).

149. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities y Merrill Lynch para los Bonos de Ingresos de Energía de AEE, Serie RR y los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Series SS del 24 de marzo de 2005 reflejaban los siguientes "Ingresos Netos Proyectados y Cobertura." Estas representaciones incluyeron información de ingresos netos que arrojaba ratios proyectados de cobertura de deuda mucho más altos del ratio de 1.2 requerido—entre 1.55 y 1.62 durante los siguientes cinco años:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch - Pierce – Fenner & Smith Inc Page 58 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 52 de 93

### Projected Net Revenues and Coverage

| | 2005[1] | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| | | | Years Ending June 30, | | |
| Average number of clients | 1,417,718 | 1,435,492 | 1,451,494 | 1,467,257 | 1,483,312 |
| Electric energy sales (in millions of kWh) | 20,474.3 | 21,035.5 | 21,843.5 | 22,227.8 | 22,657.1 |
| Authority generation (gross)(in millions of KWh) | 19,610 | 17,220 | 16,729 | 18,995 | 17,819 |
| Purchased generation (gross)(in millions of KWh) | 6,804 | 7,381 | 7,736 | 7,511 | 8,637 |
| Sources of Net Revenues | | | (dollars in thousands) | | |
| **Revenues:** | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $ 945,347 | $ 932,257 | $ 948,313 | $ 972,547 | $ 990,276 |
| Commercial | 1,224,497 | 1,265,333 | 1,316,943 | 1,371,653 | 1,425,599 |
| Industrial | 470,258 | 473,687 | 479,943 | 492,712 | 507,139 |
| Other | 88,358 | 89,351 | 89,428 | 90,542 | 90,843 |
| | 2,728,660 | 2,760,628 | 2,832,629 | 2,927,454 | 3,013,857 |
| Revenues from Commonwealth for Rural Electrification | 161 | 116 | 76 | 26 | 19 |
| Other (principally interests earned) | 27,507 | 29,403 | 31,403 | 33,403 | 35,403 |
| | 2,756,328 | 2,790,147 | 2,864,108 | 2,960,883 | 3,049,279 |
| **Current Expenses[2]** | | | | | |
| Operations: | | | | | |
| Fuel | 918,616 | 869,098 | 886,653 | 948,386 | 925,939 |
| Purchased Power | 481,344 | 504,746 | 523,922 | 525,469 | 602,272 |
| Other Production | 52,253 | 51,179 | 52,238 | 53,319 | 54,423 |
| Transmission and Distribution | 136,477 | 128,000 | 128,608 | 131,270 | 133,988 |
| Maintenance | 244,432 | 256,233 | 261,557 | 266,071 | 272,497 |
| Client screening and collection | 101,402 | 102,754 | 104,881 | 107,052 | 109,268 |
| Administration and general | 173,754 | 169,964 | 173,481 | 177,073 | 180,739 |
| Other – Interest Charges | 2,842 | 2,183 | 2,237 | 2,293 | 2,351 |
| | 2,111,120 | 2,082,177 | 2,133,577 | 2,211,433 | 2,281,077 |
| **Net Revenues** | $ 645,208 | $ 707,970 | $ 730,531 | $ 749,050 | $ 768,202 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[3] | $ 398,450 | $ 455,302 | $ 470,622 | $ 474,802 | $ 496,942 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.62 | 1.55 | 1.55 | 1.58 | 1.55 |

*Id.* a la pág. 49.

150. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P.
Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global
Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital
Markets para los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie
UU, del 19 de abril de 2007 reflejaban los siguientes "Ingresos Netos Históricos y
Cobertura." Estas representaciones incluyeron información de ingresos netos que
arrojaba ratios históricos de cobertura de deuda mucho más altos del ratio de 1.2
requerido—entre 1.48 y 1.74 por los cinco años anteriores.

52

Case 1:03283-LTS Doc#:3666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 59 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 53 de 93

Historical Net Revenues and Coverage

[table illegible due to image degradation]

AEE, Declaración Oficial para los Bonos de Refinanciamiento de Ingresos de
Energía, Serie UU, 45 (2007).

151. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P.
Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global
Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital
Markets para los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie
UU del 19 de abril de 2007 reflejaban los siguientes Ingresos Netos Proyectados y
Cobertura. Estas representaciones incluyeron información de ingresos netos que
arrojaba ratios proyectados de cobertura de deuda mucho más altos del ratio de 1:2
requerido—entre 1.53 y 1.75 para los siguientes cinco años:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 60 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 54 de 93

**Projected Net Revenues and Coverage**

Years Ending June 30,

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Average number of clients | 1,455,164 | 1,472,492 | 1,482,311 | 1,491,083 | 1,501,706 |
| Electric energy sales (in millions of KWh) | 20,749.3 | 21,113.1 | 21,645.5 | 22,202.21 | 22,796.8 |
| Authority generation (gross) (in millions of KWh) | 18,801.0 | 19,166.5 | 19,006.5 | 20,559.7 | 21,313.6 |
| Purchased generation (gross) (in millions of KWh) | 6,138.0 | 5,994.0 | 6,116.0 | 6,132.0 | 6,091.0 |
| **Sources of Net Revenues** | | | (dollars in thousands) | | |
| **Revenues:** | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $1,306,965 | $1,332,003 | $1,205,130 | $1,251,747 | $1,344,923 |
| Commercial | 1,713,602 | 1,765,023 | 1,754,359 | 1,733,165 | 1,756,159 |
| Industrial | 659,657 | 671,090 | 656,464 | 637,916 | 613,240 |
| Other | 103,701 | 107,902 | 104,137 | 100,771 | 99,264 |
| | 3,784,125 | 3,876,337 | 3,610,100 | 3,723,599 | 3,735,583 |
| Revenues from Commission with the for Rural Electrification | 76 | 26 | 19 | | |
| Other Operating Revenues | 6,323 | | | | |
| Other (principally interest earned) | 26,350 | 29,832 | 31,832 | 33,832 | 35,832 |
| | 3,818,874 | 3,906,995 | 3,841,961 | 3,757,431 | 3,774,417 |
| **Current Expenses:** | | | | | |
| Operations: | | | | | |
| Fuel | 1,650,538 | 1,668,759 | 1,577,861 | 1,475,500 | 1,464,372 |
| Purchased Power | 664,220 | 712,572 | 711,176 | 713,635 | 707,383 |
| Other Production | 56,310 | 54,970 | 55,596 | 57,127 | 58,349 |
| Transmission and Distribution | 149,685 | 141,706 | 144,092 | 147,565 | 150,615 |
| Client accounting and collection | 107,496 | 112,059 | 113,966 | 116,673 | 119,967 |
| Administration and general | 210,917 | 211,143 | 214,703 | 219,430 | 224,124 |
| Maintenance | 253,894 | 265,109 | 269,573 | 273,503 | 261,402 |
| Other - Interest Charges | 3,044 | 2,292 | 2,351 | 2,410 | 2,410 |
| | 3,096,104 | 3,168,620 | 3,095,640 | 3,007,371 | 3,007,422 |
| **Net Revenues** | $722,770 | $737,465 | $746,321 | $750,060 | $766,995 |
| **Coverage** | | | | | |
| Principal and Interest Requirements | $455,022 | $420,563 | $452,311 | $464,976 | $501,873 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.59 | 1.75 | 1.65 | 1.61 | 1.53 |

*Id.* a la pág. 49.

152. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets para los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie VV del 16 de mayo de 2007 reflejaban los siguientes "Ingresos Netos Proyectados y Cobertura." Estas representaciones incluyen información de ingresos netos que arrojaba ratios proyectados de cobertura de deuda mucho más altos del ratio de 1.2 requerido—entre 1.56 y 1.76 para los siguientes cuatro años.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 61 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 55 de 93

**Projected Net Revenues and Coverage**

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| | | | (Years Ending June 30) | | |
| Average number of clients | 1,455,104 | 1,472,492 | 1,482,211 | 1,491,683 | 1,501,705 |
| Electric energy sales (in millions of KWh) | 20,749.3 | 21,113.1 | 21,645.5 | 22,202.2 | 22,796.8 |
| Authority generation (gross in millions of KWh) | 18,303.5 | 19,388.5 | 19,906.5 | 20,359.7 | 21,315.6 |
| Purchased generation (gross in millions of KWh) | 6,138.0 | 5,994.0 | 6,116.0 | 6,132.0 | 6,091.0 |
| **Sources of Net Revenues** | | | (In thousands) | | |
| **Revenues:** | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $1,306,905 | $1,332,013 | $1,295,130 | $1,251,747 | $1,244,522 |
| Commercial | 1,711,602 | 1,765,622 | 1,754,359 | 1,733,165 | 1,756,159 |
| Industrial | 659,857 | 671,090 | 656,484 | 637,916 | 638,240 |
| Others | 105,701 | 107,502 | 104,137 | 100,771 | 99,264 |
| | 3,783,123 | 3,876,232 | 3,810,110 | 3,723,590 | 3,718,585 |
| Revenues from Commonwealth for Rural Electrification | 76 | 26 | 141 | | |
| Other Operating Revenues | 9,271 | | | | |
| Other (principally interest earned) | 26,350 | 29,832 | 31,812 | 33,832 | 35,832 |
| | 3,818,824 | 3,906,095 | 3,841,961 | 3,757,431 | 3,754,417 |
| **Current Expenses:** | | | | | |
| **Operations:** | | | | | |
| Fuel | 1,650,538 | 1,668,755 | 1,577,881 | 1,475,500 | 1,464,572 |
| Purchased Power | 664,220 | 712,572 | 717,176 | 707,853 | 707,183 |
| Other Production | 50,310 | 54,970 | 55,896 | 57,127 | 58,349 |
| Transmission and Distribution | 149,885 | 141,706 | 143,092 | 147,265 | 150,415 |
| Client accounting and collection | 107,496 | 112,079 | 113,906 | 116,175 | 118,967 |
| Administration and general | 210,917 | 211,147 | 214,703 | 219,450 | 224,124 |
| Maintenance | 253,894 | 263,109 | 269,573 | 275,508 | 281,403 |
| Other - Interest Charges | 3,844 | 2,292 | 2,351 | 2,410 | 2,410 |
| | 3,090,104 | 3,168,630 | 3,063,640 | 3,007,271 | 3,007,423 |
| **Net Revenues** | $722,770 | $737,465 | $746,221 | $730,060 | $746,995 |
| **Coverage** | | | | | |
| Principal and Interest Requirements | $455,072 | $419,668 | $451,343 | $464,604 | $491,850 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.59 | 1.76 | 1.65 | 1.62 | 1.56 |

AEE, *Declaración Oficial para los Bonos de Ingresos de Energía, Serie VV,* 13
(2007).

153. Las expresiones descritas anteriormente, hechas entre el 2002 al 2007,
fueron falsas, engañosas e incompletas. Las diversas representaciones sobre los ratios
de cobertura de deuda de la AEE, y sobre sus ingresos, fueron afirmaciones falsas. En
cada instancia, la información declarada fue declarada falsamente para hacer creer
que la AEE estaba más estable financieramente de lo que en realidad estaba, y para
aparentar que las propuestas emisiones de bonos de la AEE eran menos riesgosas de
lo que en realidad eran.

154. El Informe sobre la Investigación Especial descubrió que "la AEE
sistemáticamente incluía ingresos no cobrados al calcular su habilidad de cubrir sus
gastos operacionales y el servicio de su deuda." Informe sobre las Investigaciones
Especiales a la pág. 114, y que la AEE "infló su ratio de cobertura de deuda" lo cual
"hizo parecer que tenía la liquidez financiera para respaldar nuevas emisiones de

Case:17-03283-LTS Doc#:8656-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 62 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 56 de 93

bonos cuando con toda seguridad, como lo demuestra su insolvencia, no era así," *id.* a la pág. 139.

155. La AEE excedió su convenio de deuda (es decir, su ratio cayó por debajo del 1.2) desde el 2011 hasta el 2016, porque sus ingresos cobrados fueron insuficientes para cubrir sus gastos generales y de operación. *Id.* a la pág. 562 (Existe un "consenso ... de que las tarifas [de electricidad] de la AEE fueron insuficientes para cubrir sus gastos de operación.") De hecho, la AEE admitió que desde al menos el 2011 hasta el 2016, las tarifas de la [AEE] fueron insuficientes para cubrir sus gastos generales y de operación," *véase id.*, admitiendo así que los bonos que emitió en el 2012 NO cumplían con su convenio de deuda. *Id.* pág. 136. Es razonable inferir que la AEE incumplió también con la ratio de convenio de deuda en años anteriores al 2011.

156. El Informe sobre la Investigación Especial demuestra que, contrario a sus representaciones, las Demandadas no investigaron en momento alguno los ratios de cobertura para el servicio de la deuda de la AEE: "Los Suscriptores aceptaron los cálculos de la AEE sobre el servicio de la deuda sin llevar a cabo ninguna investigación o debida diligencia sobre la veracidad de esas cifras" y "negaron haber llevado a cabo su propia diligencia" en cuanto a si las tarifas de la AEE no eran, en efecto, suficientes para cubrir sus gastos de operación." *Id.* a las págs. 562-63. Dicho de otro modo, las Demandadas no investigaron los ratios de cobertura del servicio de la deuda de la AEE—ni la información sobre ingresos, gastos y deuda utilizada para calcular el ratio de cobertura del servicio de la deuda—y por tanto no podían haber formado ninguna opinión en cuanto a la veracidad o suficiencia de dicha información—mucho menos una creencia razonable. Además, debido a que las Demandadas suscribían los bonos de la AEE casi todos los años entre el 2001 y el 2013, es razonable inferir que trataron las emisiones de la AEE de la misma manera a través de todos esos años—es decir, que en ningún momento investigaron los cálculos del ratio de la deuda.

157. Si las Demandadas hubieran razonablemente investigado los cálculos del ratio de la deuda, habrían descubierto, como mínimo, que las tarifas de la AEE eran insuficientes para cubrir sus gastos, y que estaba sistemáticamente incluyendo ingresos no cobrados en sus cálculos—tal y como lo reveló la Investigación Especial. Si National hubiese sabido que estas declaraciones eran falsas o que las Demandadas no las habían investigado, nunca habría emitido su seguro.

158. *Segundo*, las Declaraciones Oficiales reflejaban cómo la AEE había gastado y cómo gastaría su dinero—incluyendo tanto ingresos devengados por sus operaciones comerciales como por emisiones de bonos. Las declaraciones reflejaban

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desu:
Exhibit Exhibit D - Service of Eng. Ve. Media... Part... Pierce, Ferrara & Smith Inc Page 63 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 57 de 93

que la AEE gastaba su dinero prudentemente lo cual sugería que los ingresos relacionados de AEE incrementarían y sus gastos relacionados disminuirían a largo plazo, lo cual a su vez parecía indicar que era menos probable que la AEE incumpliera con el pago de los bonos a largo plazo. Esta representación era particularmente importante porque los bonos de AEE estaban garantizados por los ingresos por la AEE.

159. Las Declaraciones Oficiales reflejaban que la AEE había utilizado y/o utilizaría sus fondos para mejorar sus sistemas de generación, transmisión y distribución. Las Declaraciones Oficiales incluyeron divulgaciones referentes al "programa de mejoras capitales y fuentes de financiamiento históricos" y "programa de mejoras capitales y fuentes de financiamiento proyectadas."

160. Las Declaraciones Oficiales proporcionadas por las Demandadas para los Bonos de Ingresos de Energía de AEE Serie LL del 13 de junio de 2002, que se emitieron en parte para "financiar una parte del costo de varios proyectos bajo su programa de mejoras capitales" para los años fiscales de 2002 a 2006, reflejaban lo que la AEE proyectaba que gastaría en mejoras capitales a las plantas de producción, facilidades de transmisión y distribución, y si el gasto sería financiado con fondos generados internamente o con fondos de préstamos, AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie LL,* 7 (2002).

**Projected Capital Improvement Program**
(in thousands)

| Capital Improvements | Years Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | Total(1) |
| Production plant | $ 144,743 | $ 118,638 | $ 131,389 | $ 132,182 | $ 110,436 | $ 637,388 |
| Transmission facilities | 85,037 | 93,489 | 107,042 | 98,827 | 114,306 | 500,697 |
| Distribution facilities | 94,323 | 106,619 | 103,189 | 101,567 | 103,397 | 511,097 |
| Other | 92,375 | 109,411 | 85,325 | 77,595 | 55,192 | 419,896 |
| | $ 416,478 | $ 430,153 | $ 428,945 | $ 410,171 | $ 383,331 | $ 2,069,078 |
| *Financing Sources* | | | | | | |
| Internally generated funds | $ 82,158 | $ 125,687 | $ 105,344 | $ 77,540 | $ 92,012 | $ 482,741 |
| Borrowed funds(2) | 334,320 | 304,466 | 323,601 | 332,631 | 291,319 | 1,586,337 |
| | $ 416,478 | $ 430,153 | $ 428,945 | $ 410,171 | $ 383,331 | $ 2,069,078 |
| Allowance for funds used during construction | $ 15,993 | $ 11,780 | $ 8,564 | $ 14,951 | $ 14,170 | $ 65,650 |

*Id.* a la pág. 32.

161. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de AEE, Serie NN del 8 de agosto de 2003, los cuales se emitieron en parte para "financiar una parte del costo de varios proyectos bajo su programa de mejoras capitales" para los años fiscales del 2003 al 2007, reflejaban cuánto proyectaba la

Case:17-03283-LTS Doc#:8666-3 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 64 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 58 de 93

AEE que gastaría en mejoras capitales a las plantas de producción, facilidades de transmisión y distribución, y si el gasto sería financiado con fondos generados internamente o con fondos de préstamos, AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie NN,* 4 (2003).

Projected Capital Improvement Program
(in thousands)

| Capital Improvements | Years Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
| Production plant | $ 99,458 | $ 142,831 | $ 137,845 | $ 142,918 | $ 193,317 | $ 1,716,369 |
| Transmission facilities | 96,488 | 104,027 | 103,181 | 97,104 | 74,369 | 420,169 |
| Distribution facilities | 123,001 | 112,319 | 98,048 | 105,277 | 86,690 | 525,335 |
| Other | 59,303 | 87,520 | 78,667 | 77,058 | 63,723 | 366,271 |
| Total | $ 378,250 | $ 446,697 | $ 472,741 | $ 422,357 | $ 418,099 | $ 2,058,144 |
| Financing Sources | | | | | | |
| Internally generated funds | $ 133,188 | $ 101,762 | $ 95,517 | $ 83,263 | $ 77,905 | $ 491,635 |
| Borrowed funds | 245,062 | 344,935 | 377,224 | 339,094 | 340,194 | 1,596,509 |
| Total | $ 378,250 | $ 446,697 | $ 472,741 | $ 422,357 | $ 418,099 | $ 2,058,144 |
| Allowance for funds used during construction | $ 11,780 | $ 21,076 | $ 9,719 | $ 19,726 | $ 25,782 | $ 88,083 |

*Id.* a la pág. 27.

162. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie OO del 12 de agosto de 2004 reflejaban cuánto proyectaba la AEE que gastaría en mejoras capitales para las plantas de producción, facilidades de transmisión y distribución, y si el gasto sería financiado con fondos generados internamente o con fondos de préstamos:

Projected Capital Improvement Program
(in thousands)

| Capital Improvements | Years Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
| Production plant | $ 119,274 | $ 152,568 | $ 172,314 | $ 192,089 | $ 171,906 | $ 808,151 |
| Transmission facilities | 99,685 | 117,334 | 98,934 | 99,757 | 104,786 | 520,496 |
| Distribution facilities | 124,111 | 95,345 | 98,893 | 98,297 | 87,368 | 504,015 |
| Other | 76,950 | 69,222 | 74,376 | 77,652 | 71,043 | 369,243 |
| Total | $ 420,020 | $ 434,470 | $ 444,517 | $ 467,795 | $ 435,103 | $ 2,201,905 |
| Financing Sources | | | | | | |
| Internally generated funds | 82,139 | 102,499 | 60,202 | 74,135 | 77,131 | 396,106 |
| Borrowed funds | 337,881 | 331,971 | 384,315 | 393,660 | 357,972 | 1,805,799 |
| Total | $ 420,020 | $ 434,470 | $ 444,517 | $ 467,795 | $ 435,103 | $ 2,201,905 |
| Allowance for funds used during construction | $ 21,076 | $ 12,328 | $ 9,258 | $ 21,771 | $ 26,014 | $ 90,947 |

AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía, Serie OO,* 35 (2004).

163. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch - Pierce, Fenner & Smith Inc Page 65 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 59 de 93

AEE Serie RR del 24 de marzo de 2005, los cuales se emitieron en parte para financiar una parte del costo de varios proyectos bajo su programa de mejoras capitales para los años fiscales de 2005 y 2006, reflejaban cuánto proyectaba la AEE que gastaría en mejoras capitales para las plantas de producción, facilidades de transmisión y distribución, y cómo se había financiado el gasto -fondos generados internamente o fondos de préstamos. AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie RR y Bonos de Refinanciamiento de Ingresos de Energía, Serie SS*, 5 (2005):

**Projected Capital Improvement Program**
**(In thousands)**

| Capital Improvements | A ñ o s F i s c a l e s / Years Ending June 30. | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | Total |
| Production plant | $ 128,807 | $ 172,314 | $ 192,089 | $ 171,906 | $ 138,519 | $ 803,630 |
| Transmission facilities | 122,883 | 98,934 | 99,357 | 104,786 | 78,794 | 505,159 |
| Distribution facilities | 119,222 | 98,893 | 98,297 | 87,368 | 64,281 | 468,061 |
| Other | 81,300 | 74,376 | 77,652 | 71,043 | 46,113 | 350,486 |
| Total | $ 452,312 | $ 444,517 | $ 467,795 | $ 435,103 | $ 327,709 | $ 2,127,336 |
| **Financing Sources:** | | | | | | |
| Internally generated funds | $ 82,995 | $ 77,379 | $ 80,191 | $ 90,190 | $ 83,807 | $ 414,562 |
| Borrowed funds | 369,317 | 367,138 | 387,604 | 344,913 | 243,902 | 1,712,774 |
| Total | $ 452,312 | $ 444,517 | $ 467,795 | $ 435,103 | $ 327,709 | $ 2,127,336 |
| Allowance for funds used during construction | $ 19,328 | $ 9,758 | $ 21,771 | $ 26,014 | $ 23,092 | $ 91,963 |

*Id.* a la pág. 37.

164. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets para los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie UU del 19 de abril de 2007 reflejaban cuánto proyectaba la AEE que gastaría en mejoras capitales para las plantas de producción, facilidades de transmisión y distribución, y si el gasto sería financiado con fondos generados internamente o con fondos de préstamos:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 66 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 60 de 93

**Projected Capital Improvement Program**
(in thousands)

| | Years Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| Capital Improvements | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
| Production plant | $291,200 | $242,811 | $208,620 | $130,787 | $107,970 | $981,388 |
| Transmission | 97,749 | 109,316 | 95,033 | 110,958 | 77,804 | 490,860 |
| Distribution | 84,076 | 81,445 | 78,030 | 79,733 | 78,215 | 401,499 |
| Other | 58,468 | 52,694 | 51,860 | 80,884 | 70,302 | 314,208 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |
| **Financing Sources** | | | | | | |
| Internal Funds | 57,229 | 133,312 | 120,261 | 110,268 | 86,502 | 507,572 |
| Borrowed Funds [2] | 474,264 | 352,954 | 313,282 | 292,094 | 247,789 | 1,680,383 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |

AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía, Serie UU*, 37 (2007).

165. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets en referencia a los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie VV del 16 de mayo de 2007 reflejaban cuánto proyectaba la AEE que gastaría en mejoras capitales para las plantas de producción, facilidades de transmisión y distribución, y si el gasto sería financiado con fondos generados internamente o con fondos de préstamos:

**Projected Capital Improvement Program**
(in thousands)

| | Years Ending June 30 | | | | | |
|---|---|---|---|---|---|---|
| Capital Improvements | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
| Production plant | $291,200 | $242,811 | $208,620 | $130,787 | $107,970 | $981,388 |
| Transmission | 97,749 | 109,316 | 95,033 | 110,958 | 77,804 | 490,860 |
| Distribution | 84,076 | 81,445 | 78,030 | 79,733 | 78,215 | 401,499 |
| Other | 58,468 | 52,694 | 51,860 | 80,884 | 70,302 | 314,208 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |
| **Financing Sources** | | | | | | |
| Internal Funds | 57,229 | 134,287 | 121,235 | 111,240 | 96,525 | 507,516 |
| Borrowed Funds [2] | 474,264 | 351,979 | 312,308 | 291,122 | 237,766 | 1,667,439 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |

AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía, Serie VV*, 37 (2007).

166. Las Declaraciones Oficiales proporcionadas por las Demandadas también incluyeron divulgaciones en cuanto a las fuentes y usos de los fondos, incluyendo si la AEE depositaría fondos en su "fondo de construcción"—que contiene "los ingresos de los bonos emitidos con el propósito de pagar el costo de adquirir o construir Mejoras" para los sistemas de la AEE (*esto es*, cualquier costo relacionado a

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 67 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Pagina 61 de 93

la construcción, como por ejemplo mano de obra, ingenieros, arquitectos, materiales, y terrenos). *Véase, e.g.,* AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie RR y de los Bonos de Refinanciamiento de Ingresos de Energía, Serie SS,* I-15 (2005). Los depósitos efectuados al fondo de construcción indicaban que los ingresos netos de la AEE incrementarían a largo plazo. Igualmente, las Declaraciones Oficiales representaban que la AEE depositaría dinero en fondos de reserva ("escrow funds") para refinanciar bonos, con el propósito de pagar otras deudas o gastos. Al utilizar este dinero para cubrir sus obligaciones financieras existentes, la AEE estaba supuestamente liberando fondos para otros propósitos, tales como para la construcción, de esa manera haciendo que los bonos fuesen menos riesgosos.

167. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de AEE Serie LL del 13 de junio de 2002 reflejaban lo siguiente en cuanto a las fuentes y el uso de los fondos, incluyendo que la AEE depositaría $106,000,000 en el fondo de construcción y $425,881,025.00 en su fondo de reserva ("escrow fund"):

**Estimated Sources and Uses of Funds**

| Sources: | |
|---|---|
| Principal amount of the Series KK Bonds | $ 401,785,000.00 |
| Principal amount of the Series LL Bonds | 98,125,000.00 |
| Net original issue premium | 43,119,586.45 |
| Total Sources | $ 543,029,586.45 |

| Uses: | |
|---|---|
| Deposit to Escrow Fund for Refunded Power Revenue Bonds | $ 425,881,025.00 |
| Deposit to 1974 Construction Fund | 106,000,000.00 |
| Underwriting discount, municipal bond insurance premiums and estimated legal, printing and other financing expenses | 11,148,561.45 |
| Total Uses | $ 543,029,586.45 |

AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie LL,* 7 (2002).

168. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley, LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie MM de 20 de septiembre de 2002 reflejaban lo siguiente en cuanto a las fuentes y el uso de los fondos, incluyendo que la AEE depositaría $114,211,191.80 en el fondo de reserva ("escrow fund") para los Bonos de Refinanciamiento de ingresos de energía:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 68 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 52 de 93

**Estimated Sources and Uses of Funds**

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $105,055,000.00 |
| Net original issue premium | 9,880,295.85 |
| Other available moneys | 1,483,484.38 |
| **Total Sources** | **$116,418,780.23** |

Uses:

| | |
|---|---|
| Deposit to Escrow Fund for Refunded Power Revenue Bonds | $114,211,191.80 |
| Underwriting discount, municipal bond insurance premium and estimated legal, printing and other financing expenses | 2,207,588.43 |
| **Total Uses** | **$116,418,780.23** |

AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía, Serie MM, 3 (2002).*

169. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de AEE Serie NN del 8 de agosto de 2003 reflejaban lo siguiente en cuanto a las fuentes y el uso de los fondos, incluyendo que la AEE depositaría $410,913,000 en el fondo de construcción:

**Estimated Sources and Uses of Funds for the Bonds**

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $517,305,000.00 |
| Net original issue premium | 1,069,071.40 |
| **Total Sources** | **$518,374,071.40** |

Uses:

| | |
|---|---|
| Deposit to 1974 Construction Fund | $410,913,000.00 |
| Repayment of Government Development Bank line of credit | 90,000,000.00 |
| Underwriting discount, municipal bond insurance premium and estimated legal, printing and other financing expenses | 17,461,071.40 |
| **Total Uses** | **$518,374,071.40** |

AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie NN, 4 (2003).*

170. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Refinanciamiento de Ingresos de Energía de AEE Series OO y PP del 12 de agosto de 2004, reflejaban lo siguiente en cuanto a las fuentes y el uso de los fondos, incluyendo que la AEE depositaría $244,224,171.48 en los fondos de reserva ("escrow funds") para los Bonos de Refinanciamiento de las Series OO y PP:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 69 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 63 de:93

Estimated Sources and Uses of Funds

*Series OO Bonds and Series PP Bonds*

| Sources: | |
|---|---|
| Principal amount of the Series OO Bonds and Series PP Bonds | $ 224,700,000.00 |
| Net original issue premium or discount | 17,754,262.45 |
| Other available moneys [1] | 7,094,192.08 |
| Total Sources | $ 249,548,454.53 |
| Uses: | |
| Deposit to Escrow Funds for the Series OO and Series PP Refunded Bonds | $ 244,224,171.48 |
| Underwriting discount, bond insurance premiums and estimated legal, printing and other financing expenses: | 5,324,283.05 |
| Total Uses | $ 249,548,454.53 |

AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía*, Series OO y PP, 9, (2004).

171. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Ingresos de Energía de AEE Serie RR del 24 de marzo de 2005 reflejaban lo siguiente en cuanto a las fuentes y el uso de los fondos, incluyendo que la AEE depositaría $332,067,172.17 en el fondo de construcción:

Estimated Sources and Uses of Funds

*Series RR Bonds*

| Sources: | |
|---|---|
| Principal amount of the Series RR Bonds | $ 509,520,000.00 |
| Original issue premium | 23,496,510.60 |
| Total Sources | $ 533,016,510.60 |
| Uses: | |
| Deposit to 1974 Construction Fund | $ 332,067,172.17 |
| Repayment of Government Development Bank Line of Credit [1] | 167,932,827.83 |
| Capitalized interest on Series RR Bonds through January 1, 2006 | 18,481,477.27 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses: | 14,535,033.33 |
| Total Uses | $ 533,016,510.60 |

AEE, *Declaración Oficial de los Bonos de Ingresos de Energía*, Series RR y SS, 7 (2005).

172. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan, Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie SS del 24 de marzo de 2005, reflejaban lo siguiente en cuanto a las fuentes y el uso de los fondos, incluyendo que la AEE depositaría $533,090,846 en el fondo de reserva ("escrow fund") para los Bonos de Refinanciamiento:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 70 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 64 de 93

Estimated Sources and Uses of Funds

**Series SS Bonds**

| Sources: | |
|---|---|
| Principal amount of the Series SS Bonds | $ 483,930,000.00 |
| Net original issue premium | 28,084,075.15 |
| Other available moneys [1] | 30,315,281.82 |
| Total Sources | $ 542,329,356.97 |
| Uses: | |
| Deposit to Escrow Fund for the Refunded Bonds | $ 533,090,846.40 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses | 9,238,510.57 |
| Total Uses | $ 542,329,356.97 |

AEE, *Declaración Oficial de los Bonos de Ingresos de Energía*, Series RR y SS, 7 (2005).

173. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley, LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets para los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie UU del 19 de abril de 2007 reflejaban lo siguiente en cuanto a las fuentes y el uso de los fondos, incluyendo que la AEE depositaría $1,328,964,760.50 en el fondo de reserva ("escrow fund") para los Bonos de Refinanciamiento:

Estimated Sources and Uses of Funds

**Series UU Bonds**

| Sources: | |
|---|---|
| Principal amount of the Series UU Bonds | $1,300,035,000.00 |
| Net original issue premium | 25,352,703.80 |
| Other available moneys [1] | 21,777,849.17 |
| Total Sources | $1,347,165,552.97 |
| Uses: | |
| Deposit to Escrow Fund for the Refunded Bonds | $1,328,964,760.50 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses | 18,200,792.47 |
| Total Uses | $1,347,165,552.97 |

AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía, Series TT y UU, 7* (2007).

174. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley, LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets para los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie VV del 16 de mayo de 2007 reflejaban lo siguiente en cuanto a las fuentes y el uso de

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 71 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 65 de 93

los fondos, incluyendo que la AEE depositaría $637,315,730.38 en la cuenta de reserva ("escrow account").

**Estimated Sources and Uses of Funds**

| | |
|---|---|
| **Sources:** | |
| Principal amount of the Bonds | $557,410,000.00 |
| Net original issue premium | 82,016,511.80 |
| Other available moneys [1] | 12,619,072.92 |
| Total Sources | $652,045,584.72 |
| **Uses:** | |
| Deposit to Escrow Fund for the Refunded Bonds | $637,315,730.38 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses | 14,729,854.34 |
| Total Uses | $652,045,584.72 |

AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía, Serie VV, 3 (2007).*

175. En resumen, las Declaraciones Oficiales reflejaban que AEE utilizaría $1,181,047,344 de los ingresos de los bonos para fines de construcción y $1,753,699,290 para pagar otras deudas o gastos, con la expectativa de que gastaría el dinero liberado por esos pagos en mejoras capitales para producción, transmisión, y distribución de energía. Ciertamente, las Declaraciones Oficiales para cada emisión reflejaban que cientos de millones de dólares—generados a través de emisiones de bonos y de ingresos internos—se gastarían en estas mejoras capitales. *Véase supra* ¶¶ 159-165.

176. Sin embargo, estas declaraciones en cuanto a cómo se gastaba y cómo se gastaría el dinero, eran falsas e incompletas, según lo indica el Informe sobre la Investigación Especial. El Informe sobre la Investigación Especial incluyó un análisis ilustrativo de cómo la AEE en realidad gastó los fondos generados por los bonos emitidos entre marzo de 2010 y agosto de 2013, que se habían destinado para construcción. Un examen forense no pudo dar cuenta de la asombrosa cantidad de *$400 millones* de estos fondos. Como expresó el Informe sobre la Investigación Especial: "Para poner en contexto esta cifra, observamos que la diferencia representa aproximadamente el 86% de los $500 millones de los bonos de Ingresos de Energía 2013A de la AEE que ésta representó se destinarían al Fondo de Construcción." Informe sobre la Investigación Especial a la pág. 144. El Informe sobre la Investigación Especial también reveló que las Demandadas no "monitor[earon]" en ningún momento el "uso real de los ingresos" por parte de la AEE "en relación con los usos que se representó se les daría según los documentos de oferta pertinentes." *Id.* a la pág. 5.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 72 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 66 de 93

177. El Comité de Investigación Especial no examinó cómo la AEE en realidad gastó los fondos generados por bonos emitidos antes de 2010 o los fondos generados internamente, observando expresamente que le estaba dejando este tema a otras partes: "Elegimos publicar este hallazgo, observando que un análisis adicional por parte de otras partes interesadas, con mandatos diferentes o más amplios que el nuestro, pudieran llevar a determinaciones adicionales y más definitivas al respecto," *id.* a la pág. 144, y "esperamos que esto genere más indagaciones por otras partes interesadas." *Id.* a la pág. 564.

178. Por otra parte, un Informe de mayo de 2018 de la Oficina de Contabilidad del Gobierno de los Estados Unidos ("GAO," por sus siglas en inglés) a ciertos Comités del Congreso sobre "Factores que Contribuyeron a la Crisis de la Deuda y Posibles Acciones Federales para Abordarlos" (el "Informe GAO") confirmó que la AEE no gastó el dinero según lo había representado. *Véase* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-18-387, PUERTO RICO: FACTORS CONTRIBUTING TO THE DEBT CRISIS AND POTENTIAL FEDERAL ACTIONS TO ADDRESS THEM (2018), https://www.gao.gov/assets/700/691944.pdf. Entre otras cosas, la GAO "revisó documentos del gobierno de Puerto Rico sobre su situación financiera y sobre sus procesos para el desarrollo y la ejecución del presupuesto, la emisión de deuda, y la administración financiera[]" y entrevistó a oficiales del gobierno pasados y presentes. *Id.* a las págs. 2-3. La GAO concluyó que, a pesar de las grandes sumas de dinero que la AEE supuestamente destinó para construcción y mejoras capitales, "AEE no actualizó ni mejoró sus sistemas de generación y transmisión de electricidad, lo cual obstaculizó su desempeño y llevó a un incremento en sus costos de producción." *Id.* a la pág. 25.

179. En resumen, la AEE no gastó su dinero según reflejaban que lo haría las Declaraciones Oficiales distribuidas y circuladas por las Demandadas. Es razonable inferir que la AEE tampoco se gastó el producto de los bonos, aquí en controversia, según lo representó. Las Demandadas no investigaron cómo se había gastado o se gastaría el producto de estos bonos—ni tampoco la información sobre los ingresos, gastos y deuda de la AEE—así es que las Demandadas no pudieron haber formado una opinión o creencia en cuanto a la veracidad o suficiencia de las representaciones en las Declaraciones Oficiales sobre esos temas. Las mismas Demandadas estaban suscribiendo bonos en el período de tiempo comprendido entre 2010-2013 que en los años 2001-2007. No hay razón para creer que las Demandadas trataron las emisiones posteriores de manera diferente. Estas conclusiones son reforzadas por el hecho de

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch - Pierce, Fenner & Smith Inc Page 73 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 67 de 93

que la AEE emitió bonos casi todos los años entre el 2001 y el 2013; y los mismos suscriptores suscribieron múltiples emisiones de la AEE.

180. Las Demandadas no investigaron de manera razonable estos gastos y no tenían una base razonable para creer que eran verdaderos y estaban completos. Si las Demandadas hubiesen investigado de manera razonable cómo se gastó en la AEE el producto de los bonos, habrían descubierto cuando menos que la AEE no estaba utilizando los fondos como se reflejaba en las declaraciones. Específicamente, los suscriptores y emisiones posteriores, habrían descubierto, como parte de su investigación razonable en cuanto a la emisión, que las declaraciones anteriores sobre cómo se había gastado el dinero eran erróneas—como la Investigación Especial reveló. Si National hubiese sabido que las divulgaciones eran falsas o que las Demandadas no las habían investigado, nunca habría emitido su seguro.

181. *Tercero*, las Demandadas manifestaron en cada Declaración Oficial que "el sistema de generación, transmisión y distribución de la AEE están en buenas condiciones de reparación y de operación." *E.g.* AEE, *Declaración Oficial de los Bonos de Refinanciamiento de Ingresos de Energía, Series OO y PP*, 30 (2004). Entre más estable estuviese el sistema, más probabilidades había de que la AEE pudiese generar mayores ingresos netos del sistema a lo largo del tiempo, y menos probabilidades había de que la AEE incumpliera sus obligaciones de pago bajo los bonos propuestos.

182. El Informe sobre la Investigación Especial demuestra que estas declaraciones eran falsas e incompletas. Estas declaraciones fueron hechas "considerando la edad del sistema"—una cualificación que nunca se divulgó. Informe sobre la Investigación Especial a la pág. 135. Más aún, la AEE no tenía siquiera los suficientes fondos para "retirar del sistema instalaciones viejas y construir nuevas"—otro hecho que nunca se divulgó. *Id.*

183. El presidente del hoy día Negociado de Energía de Puerto Rico (antes Comisión de Energía de Puerto Rico), el organismo independiente que regula el abasto de energía en Puerto Rico, recientemente comentó que las "power plants are decrepit, with some more than 40 years old." Umair Irfan, *Puerto Rico's Blackout, the Largest in American History, Explained*, Vox (May 8, 2018), https://www.vox.com/2018/2/8/16986408/puerto-rico-blackout-power-hurricane. Asimismo, informes recientes sometidos al Negociado de Energía de Puerto Rico observan que "[i]t is difficult to overstate the level of disrepair or operational neglect at PREPA's generation facilities." Expert Report de Fisher and Horowitz, Comisión de Energía de P.R. *In Re Review of Rates of the Puerto Rico Electric Power Authority*, No. CEPR-AP-2015-0001, pág. 27 (23 de noviembre de 2016),

67

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service on Phillips Merrill Lynch - Pierce - Fenner & Smith Inc Page 74 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Pagina 68 de 93

http://energia.pr.gov/wp-content/uploads/2016/11/Expert-Report-Revenue-Requirements-Fisher-and-Horowitz-Revised-20161123.pdf. Informes de noticias recientes confirman que los sistemas de AEE "decrepit, corroded and poorly maintained". James Glanz & Frances Robles, *How Storms, Missteps and an Ailing Grid Left Puerto Rico in the Dark*, N.Y. TIMES, May 6, 2018, https://www.nytimes.com/interactive/2018/05/06/us/puerto-rico-power-grid-hurricanes.html.

184. Las Demandadas no efectuaron una investigación razonable del estado en que se encontraban ni de las condiciones de operación de los sistemas de la AEE, ni formaron una base razonable en cuanto a la veracidad y suficiencia de las representaciones al respecto. Esta conclusión se reafirma con el hecho de que la AEE emitió bonos casi todos los años entre el 2001 y el 2013, y los mismos suscriptores suscribieron múltiples emisiones de AEE. Si las Demandadas hubiesen visitado las facilidades, como hubiese requerido una investigación razonable, habrían descubierto su estado de deterioro—tal y como lo reveló la Investigación Especial. Si National hubiese sabido que las divulgaciones eran falsas o que las Demandadas no las habían investigado, nunca habría emitido su seguro.

B. Las Representaciones Clave en las Declaraciones Oficiales Para Los Bonos de Obligaciones Generales Eran Esencialmente Falsas e Incompletas

185. El Fondo de Mejoras Públicas de Puerto Rico está destinado a pagar varias obligaciones que el Gobierno de Puerto Rico ha asumido a nombre de sus ciudadanos, incluyendo protección policial y contra incendios, la educación, la salud pública y los programas de bienestar social, el desarrollo económico, y temas fiscales municipales. Los bonos emitidos para allegar dinero a este fondo —denominados bonos de Obligaciones Generales, o "GO" (por sus siglas en inglés)—son obligaciones generales del Gobierno, respaldadas por su buena fe, crédito y poder tributario, y son pagaderos del fondo general del Gobierno. Bajo la Constitución de Puerto Rico, los tenedores de bonos GO gozan de primera prioridad sobre los recursos disponibles del Gobierno.

186. Del año 2001 al 2007, las Demandadas procuraron y obtuvieron seguro en garantía de bonos por parte de National, y National ha efectuado pagos por reclamaciones relacionadas a los siguientes bonos GO:

a. Los bonos de Serie 2002A del 11 de octubre de 2001 con fecha de vencimiento del 1 de julio de 2021. El suscriptor líder fue UBS PaineWebber Inc. (ahora conocido como UBS Financial Services). Otros suscriptores

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 75 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 69 de 93

incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), ABN AMRO Financial Services, Inc. (predecesor de la Demandada Merrill Lynch), Goldman Sachs LLC, Morgan Stanley LLC, Salomon Smith Barney (predecesor de la Demandada Citigroup Global Markets), y Bear Stearns & Co. Inc. (predecesor de la Demandada J.P. Morgan Securities). El propósito de los bonos era para financiar el Fondo de Mejoras Públicas de 2002 para llevar a cabo programas de mejoras capitales incluyendo a instalaciones de agricultura y turismo, acueductos y alcantarillados, escuelas y proyectos similares, y para financiar el Fondo de Mantenimiento Extraordinario, el cual se utiliza para proyectos de infraestructura relacionados con el recurso agua. National aseguró estos bonos por su valor nominal original de $261,675,000. El primer incumplimiento de pago sobre estos bonos fue el 1 de julio de 2016.

b.    Los bonos de Serie 2003C del 16 de abril de 2003 con fecha de vencimiento del 1 de julio de 2028. Los suscriptores líderes fueron Goldman Sachs LLC y Morgan Stanley LLC. Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), UBS PaineWebber Inc. (ahora conocido como UBS Financial Services), J.P. Morgan Securities, y Citigroup. El propósito de los bonos de Serie 2003C era pagar la línea de crédito con el GDB por una cantidad de $11.3 millones y refinanciar bonos de Mejoras Públicas emitidos previamente. National aseguró estos bonos por su valor nominal original de $466,995,000. El primer incumplimiento de pago sobre estos bonos fue el 1 de julio de 2016.

c.    Los bonos de Serie 2007A del 3 de octubre de 2007 con fecha de vencimiento el 1 de julio de 2020. Los suscriptores líderes fueron UBS Investment Bank (ahora conocido como UBS Securities) y Morgan Stanley. Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), Goldman Sachs LLC, Citigroup, RBC Capital Markets, J.P. Morgan Securities, Bear, Stearns & Co., Inc. (predecesor de la Demandada J.P. Morgan Securities), y Santander Securities. El propósito de los bonos era el de pagar bonos de Mejoras Públicas emitidos previamente. National aseguró estos bonos por su valor nominal original de $92,505,000. El primer incumplimiento de pago sobre estos bonos fue el 1 de julio de 2016.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 76 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 70 de 93

187. Era esencial para National y para otros participantes en el mercado que las representaciones sobre la habilidad a largo plazo del Gobierno de Puerto Rico de generar ingresos y emitir más deuda fueran correctas.

188. En realidad, las proyecciones de ingresos se sobreestimaban sistemáticamente (incluyendo ingresos que nunca serían cobrados), las proyecciones sobre apropiaciones se subestimaban de forma igualmente sistemática, y, como resultado, los ingresos netos (según se reflejaban como la diferencia entre los ingresos proyectados más las apropiaciones y los ingresos reales más las apropiaciones) se sobreestimó constantemente.

189. Un informe especial preparado a nombre del Gobierno de Puerto Rico y del GDB en 2015 por economistas concluyó que los presupuestos del Gobierno eran demasiado optimistas, observando que del Año Fiscal 2004 a 2014, "los pronósticos de ingresos ... sistemáticamente excedían lo realmente cobrado por aproximadamente $1.5 miles de millones cada año (15% del presupuesto original)." Anne O. Krueger, Ranjit Teja & Andrew Wolfe, GDB, *Puerto Rico—A Way Forward*, 9 (June 29, 2015), http://www.gdb.pr.gov/documents/puertoricoawayforward.pdf.

190. De manera similar, el Informe GAO concluyó, basándose en entrevistas con "[a]ntiguos funcionarios de Puerto Rico y expertos en la economía de Puerto Rico," que el Gobierno "frecuentemente sobreestimaba la cantidad de ingresos que cobraría en el siguiente año." Informe GAO, pág. 16. "Los estimados de ingresos extremadamente optimistas permitieron que la legislatura de Puerto Rico—con la aprobación del gobernador—incrementara las apropiaciones a las agencias casi todos los años a la vez que también se aprobaban presupuestos supuestamente balanceados. Cuando los ingresos reales se quedaban cortos en comparación con los ingresos estimados—y los gastos no se ajustaban de manera correspondiente—el Fondo General de Puerto Rico operaba con un déficit." *Id.*, a la pág. 17. El informe también explica que "Puerto Rico tuvo dificultades para cobrar ingresos por contribuciones," y que los políticos "en el proceso de estimación de ingresos" "ejercieron presión ... para que se adoptaran estimados de ingreso optimistas". *Id.* a las págs. 18-19.

191. El Informe GAO concluyó que el Gobierno "regularmente gastaba más de las cantidades que la legislatura de Puerto Rico apropiaba para cada año fiscal." *Id.* a la pág. 19. De hecho, Puerto Rico gastó por encima de las cantidades apropiadas del fondo general en nueve de los trece años más recientes para los cuales había datos disponibles .... Durante los nueve años en los cuales Puerto Rico gastó en exceso de

Case 17-03283-LTS Doc#:8656-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc. Page 77 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 71 de 93

las cantidades apropiadas, el gasto real excedió los montos apropiados por un promedio de 5.6 por ciento, o $459 millones, anualmente. *Id.*

192. Debido a que estas proyecciones incluían ingresos no cobrados, y por tanto sobreestimaban los ingresos estimados, y debido a que el Gobierno consistentemente subestimaba las apropiaciones, el estimado combinado de ingresos y apropiaciones del Gobierno consistentemente presentaba un panorama mucho más favorable que los ingresos y las apropiaciones reales combinadas. El alcance de estas falsas representaciones se ilustra al comparar los estimados combinados de ingresos y apropiaciones con sus ingresos y apropiaciones combinados reales, según identifica el Informe GAO.



Estimados Ingresos Manifestados + Asignaciones vs. Ingresos Reales + Gastos

| Año Fiscal | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| Manifestados | 0.64 | 0.65 | 0.57 | 0.14 | 0.20 | 0.57 | 0.40 | 0.44 |
| Reales | 0.39 | 0.24 | 0.03 | 0.1 | 0.88 | 0.08 | 0.59 | 2.32 |

Fuente: OFICINA DE CONTABILIDAD DEL GOBIERNO DE EEUU, GAO 18-387,
PUERTO RICO: FACTORES QUE CONTRIBUYEN A LA CRISIS DE LA DEUDA
Y POSIBLES ACCIONES FEDERALES PARA AFRONTARLOS (2018).

71

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit-D Service of Process Merrill Lynch, Pierce, Feener & Smith Inc Page 78 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 72 de 93

193. Bloomberg—que solamente tiene data desde 2004—tiene estimados de ingresos *reales* similares:



**Ingresos Manifestados vs. Ingresos Reales**

| Año Fiscal | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Manifestados * | 7.93 | 8.30 | 8.65 | 8.89 | 8.25 | 7.60 |
| Reales ** | 7.01 | 7.67 | 8.21 | 8.45 | 7.72 | 7.21 |

* Fuente: Declaraciones Oficiales, Bonos para Mejoras Públicas y Bonos para el Refinanciamiento de Mejoras Públicas para el Gobierno de Puerto Rico

** Fuente: Bloomberg, Gobierno de Puerto Rico, Estado de Resultados del Fondo General, Total de Ingresos por Impuestos del Fondo General

194. Las diferencias entre los estimados del Informe de GAO y los estimados de Bloomberg demuestran las dificultades existentes para verificar independientemente los datos del Gobierno de Puerto Rico—la información públicamente disponible era poco confiable. Si bien es imposible determinar con precisión la magnitud total de las declaraciones falsas y erróneas, es evidente que los datos fueron enormemente tergiversados.

195. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos para el Refinanciamiento de las Mejoras Públicas, Serie 2002A para el Gobierno de Puerto Rico, reflejaban ingresos estimados al fondo general de $7,485,000,000 y apropiaciones de $7,371,398,000 para el Año Fiscal 2002. *Declaración Oficial, Bonos para el*

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 79 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 73 de 93

*Refinanciamiento de las Mejoras Públicas, Serie 2002A*, I-37 (2001) para el Gobierno de Puerto Rico. Sin embargo, el análisis de 2018 efectuado por la GAO encontró que el monto real de los ingresos del fondo general en combinación con los gastos reales fue sobreestimado por aproximadamente $250,000,000.

196. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch, para los Bonos, para el Refinanciamiento de las Mejoras Públicas Series 2003B y 2003C, para el Gobierno de Puerto Rico, reflejaban ingresos estimados al fondo general de $7,836,000,000 y apropiaciones de $7,530,938,000 para el Año Fiscal 2003, e ingresos estimados al fondo general de $7,925,000,000 y apropiaciones de $7,785,552,000 para el año fiscal 2004. *Declaración Oficial, Bonos para el Refinanciamiento de las Mejoras Públicas, Series 2003B y 2003C*, I-48 (2003) para el Gobierno de Puerto Rico. Sin embargo, el análisis de 2018 efectuado por la GAO descubrió que los ingresos reales del fondo general combinados con los gastos reales fueron sobreestimados por aproximadamente $410,000,000 para el Año Fiscal 2003 y por aproximadamente $540,000,000 para el año fiscal 2004.

197. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets para los Bonos para el Refinanciamiento de las Mejoras Públicas Serie 2007A para el Gobierno de Puerto Rico, reflejaban ingresos estimados al fondo general de $8,890,047,000 y apropiaciones de $8,794,003,000 para el Año Fiscal 2007 e, ingresos estimados al fondo general de $9,077,000,000 y apropiaciones de $8,776,298,000 para el Año Fiscal 2008. *Declaración Oficial, Bonos para el Refinanciamiento de las Mejoras Públicas, Serie 2007A*, I-55 (2007) para el Gobierno de Puerto Rico. Sin embargo, el análisis de 2018 efectuado por la GAO descubrió que los ingresos reales del fondo general combinados con los gastos reales fueron sobreestimados por aproximadamente $650,000,000 para el año fiscal 2007 y por aproximadamente $990,000,000 para el año fiscal 2008. Además, los datos recopilados por Bloomberg demuestran que el total de ingresos al fondo general por concepto de contribuciones para el año fiscal 2007 fue aproximadamente $440,000,000 menos de lo estimado y para el año fiscal 2008 fue aproximadamente $1,350,000,000 menos de lo proyectado en las Declaraciones Oficiales para los bonos de la Serie 2007A.

198. Las Demandadas no investigaron de manera razonable estas proyecciones y no tenían una base razonable para creer que eran ciertas ni que

73

Case 17-03283-LTS Doc#8666-7 Filed 09/09/19 Entered 09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 80 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 74 de 93

estaban completas. Si las Demandadas hubiesen investigado de manera razonable cómo era que el Gobierno estimaba sus ingresos y apropiaciones, habrían descubierto cuando menos que estos estimados y proyecciones eran incorrectas o inexactas—así como lo hizo la GAO cuando investigó. Si National hubiese sabido que las divulgaciones eran falsas o que las Demandadas no las habían investigado, nunca habría emitido su seguro.

C. Las Representaciones Clave de las Declaraciones Oficiales de la ACT Eran Materialmente Falsas e Incompletas

199. La ACT es una corporación pública y una instrumentalidad gubernamental de Puerto Rico que planifica y administra la construcción de todos los principales proyectos relacionados al sistema de transportación en Puerto Rico; controla y supervisa las autopistas y otras facilidades de transporte de su propiedad, o que opera o construye; fija peajes y otros cargos por el uso de carreteras y otras facilidades de transporte; y lleva a cabo reparaciones y el mantenimiento de las autopistas con peaje de Puerto Rico.

200. La ACT podía emitir "Bonos de Ingresos de Carreteras" bajo la Resolución Núm. 68-18, adoptada por la Autoridad el 13 de junio de 1968, según enmendada (la "Resolución 1968 de la ACT"). Esos bonos eran pagaderos de, y estaban garantizados por ciertos ingresos de la Autoridad, incluyendo: (i) impuestos sobre la gasolina, parte de los impuestos sobre el combustible diésel, y una porción de los derechos por licencia de vehículos de motor que el gobierno central le asigna a la ACT; (ii) ingresos por peajes en las autopistas financiadas con Bonos de Ingresos de Carretera y cualquier extensión o mejoras a éstas; y (iii) ciertas ganancias por inversiones. Resolución 1968 de la ACT a las págs. 7, 11.

201. La ACT también podía emitir "Bonos de Ingresos de Transporte" bajo la Resolución No. 98-06, adoptada por la Autoridad el 26 de febrero de 1998, según enmendada (la "Resolución 1998 de la ACT"). Estos bonos eran pagaderos de, y estaban garantizados por (i) arbitrios, hasta $120 millones por año fiscal, impuestos por el Gobierno sobre ciertos productos derivados del petróleo; (ii) ingresos por peajes en autopistas no financiadas con Bonos de Ingresos de Carreteras; (iii) ciertas ganancias por inversiones; e (iv) ingresos derivados de bonos emitidos en virtud de la Resolución 1968 de la ACT después del pago de la amortización de la deuda por concepto de Bonos de Ingresos de Carreteras pendientes de saldo. Resolución 1998 de la ACT a las págs. 3, 19.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit-D - Service of Process Merrill Lynch - Pierce - Fenner & Smith Inc Page 81 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 75 de 93

202. La ACT emitió bonos para financiar directamente ciertas mejoras capitales; para construir nuevos proyectos de transporte; y para refinanciar deuda pendiente, liberando fondos para financiar otros proyectos.

203. Del 2003 al 2007, las Demandadas procuraron y obtuvieron seguro en garantía de bonos por parte de National, y National ha efectuado pagos por reclamaciones sobre los siguientes bonos de la ACT:

a. Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT, Serie AA del 10 de abril de 2003, con fecha de vencimiento del 1 de julio de 2023. Los suscriptores líderes fueron Citigroup, Morgan Stanley LLC, y Merrill Lynch. Otros suscriptores incluían a UBS PaineWebber Inc. (ahora conocido como UBS Financial Services), J.P. Morgan Securities, Goldman Sachs LLC, Merrill Lynch, y Banc of America Securities (predecesor de la Demandada Merrill Lynch). El propósito de estos bonos era refinanciar una porción de bonos emitidos previamente y pagar costos de la emisión de bonos Serie AA. National aseguró estos bonos por su valor nominal original de $196,440,000. El primer incumplimiento de pago sobre estos bonos fue el 1 de julio de 2017.

b. Bonos de Ingresos de Transporte de la ACT, Serie J del 7 de abril de 2004, con fecha de vencimiento del 1 de julio de 2018. Los suscriptores líderes fueron Citigroup, Morgan Stanley LLC, y Merrill Lynch. Otros suscriptores incluían a UBS Financial Services, J.P. Morgan Securities, Goldman Sachs LLC y Banc of America Securities (predecesor de la Demandada Merrill Lynch). El propósito de estos bonos era financiar varios proyectos de carreteras en el Programa de Mejoras de la ACT, para efectuar un depósito a la Cuenta de Reserva de Bonos Senior de 1998, para efectuar un depósito a la Cuenta de Servicio de Bonos Senior 1998 para el pago de intereses sobre los bonos de la Serie J, y para pagar los costos de la emisión de los bonos de la Serie J. National aseguró estos bonos por su valor nominal original de $106,745,000. El primer incumplimiento de pago sobre estos bonos fue el 1 de julio de 2017.

c. Bonos de Refinanciamiento de Ingresos de Transporte de la ACT, Serie L del 22 de septiembre de 2005, con fecha de vencimiento del 1 de julio de 2035. Los suscriptores líderes fueron Citigroup y UBS Financial Services. Otros suscriptores incluían a Morgan Stanley LLC, J.P. Morgan Securities, Goldman Sachs LLC, Merrill Lynch, y Banc of America Securities (predecesor de la Demandada Merrill Lynch). El propósito de los bonos de la Serie L era refinanciar una parte de los bonos senior de ingresos por transporte de la ACT

75

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 82 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 76 de 93

y pagar los costos de la emisión de los bonos Serie L. National aseguró estos bonos por su valor nominal original de $170,730,000. El primer incumplimiento de pago sobre estos bonos fue el 1 de julio de 2017.

d. Los Bonos de Refinanciamiento de Ingresos de la ACT, Serie N, del 15 de febrero de 2007, con fecha de vencimiento del 1 de julio de 2041. El propósito de los bonos de la Serie N era refinanciar una porción de los bonos senior de ingresos por transporte de la ACT y pagar los costos de la emisión de los bonos de la Serie N. Los suscriptores líderes fueron Citigroup, RBC Capital Markets, y Goldman Sachs LLC. Otros suscriptores incluían a Morgan Stanley LLC, UBS Investment Bank (ahora conocido como UBS Securities), Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch) J.P. Morgan Securities, y Santander Securities. National aseguró estos bonos por su valor nominal original de $337,075,000. El primer incumplimiento de pago sobre estos bonos fue el 1 de julio de 2017.

204. Las Declaraciones Oficiales representaron que en ciertas circunstancias el Gobierno de Puerto Rico tenía la primera prioridad sobre los impuestos y cargos por licencias de la ACT, en la medida que los propios ingresos del Gobierno fuesen insuficientes para cubrir sus obligaciones bajo los bonos GO. Las Declaraciones Oficiales para los bonos de la ACT expresamente incorporaron la información financiera del Gobierno, debido a "[l]a posibilidad de que una porción significativa de los ingresos de la [ACT] tuvieran que utilizarse para pagar" los Bonos GO. *E.g.*, ACT, *Declaración Oficial de los Bonos de Refinanciamiento de los Ingresos de Transporte Serie L*, 2 (2005).

205. Era esencial para National y para otros participantes del mercado que las representaciones en cuanto a la habilidad del Gobierno de Puerto Rico de recuperar los impuestos y cargos de la ACT fueran exactas y completas.

206. En realidad, según alegado anteriormente, los estimados de los recaudos del Gobierno se sobreestimaban sistemáticamente y sus apropiaciones fueron de igual forma subestimadas sistemáticamente. Las Demandadas también hicieron las siguientes representaciones en referencia a la ACT, las cuales también eran materialmente falsas e incompletas: (a) como la ACT se estaba gastando el producto de los bonos, incluyendo declaraciones de que estaba gastando dichos fondos en carreteras y otros proyectos que generaban ingresos, como peajes—lo cual en realidad no estaba haciendo; y (b) información básica financiera, incluyendo los ratios de cobertura del servicio de la deuda y la información utilizada para calcularlos, como por ejemplo sus ingresos.

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch - Pierce - Fennel & Smith Inc Page 83 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 77 de 93

207. *Primero*, las Demandadas no tenían una base razonable para creer los estimados de los ingresos y las apropiaciones del Gobierno.

208. La Declaración Oficial de la ACT para los bonos de la serie AA incorporó por referencia el Reporte de Información Financiera y de los Datos de Operación del Gobierno incluido como Apéndice I de la Declaración Oficial para los Bonos de Mejoras Públicas de la Serie 2003 del Gobierno de Puerto Rico (el "Informe de la Serie 2003 del Gobierno"). El Informe de la Serie de 2003 del Gobierno estimaba los ingresos del fondo general en $7,465,000,000 y las apropiaciones en $7,294,396,000 para el año fiscal 2002 y proyectó ingresos al fondo general de $7,836,000,000 y apropiaciones de $7,460,111,000 para el Año Fiscal 2003. *Declaración Oficial de los Bonos de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2003*, I-45 (2002). Sin embargo, el análisis de 2018 efectuado por la GAO encontró que los ingresos reales del fondo general combinados con los gastos reales fueron sobreestimados por aproximadamente $250,000,000 para el año fiscal 2002 y $410,000,000 para el año fiscal 2003.

209. La Declaración Oficial de la ACT para los bonos de la serie J incorporó por referencia Reporte de Información Financiera y de los Datos de Operación del Gobierno del 1 de septiembre de 2003 incluido como Apéndice I de la Declaración Oficial del 3 de octubre de 2003 para los Bonos de Mejoras Públicas, Serie 2004A del Gobierno de Puerto Rico (el "Informe de septiembre de 2003 del Gobierno"). El Informe de septiembre de 2003 del Gobierno estimaba los ingresos del fondo general en $7,591,742,000 y las apropiaciones en $7,590,059,000 para el año fiscal 2003 y proyectó ingresos al fondo general de $7,925,000,000 y apropiaciones de $7,944,984,000 para el Año Fiscal 2004. *Declaración Oficial de los Bonos de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2004A*, I-50 (2003). Sin embargo, el análisis 2018 de la GAO encontró que los ingresos reales del fondo general combinados con los gastos reales fueron sobreestimados por aproximadamente $410,000,000 para el año fiscal 2003 y por aproximadamente $540,000,000 para el año fiscal 2004. Además, los datos recopulados por Bloomberg reflejan que el total de ingresos por contribuciones al fondo general para el año fiscal 2004 fue aproximadamente $980,000,000 menos que lo proyectado en el Informe de septiembre de 2003 del Gobierno.

210. La Declaración Oficial de la ACT para los bonos de la serie L incorporó por referencia el Reporte de Información Financiera y de los Datos de Operación del Gobierno del 1 de mayo de 2005 incluido como Apéndice I de la Declaración Oficial del 2 de junio de 2005, de la Autoridad de Financiamiento de Infraestructura de

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 84 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 78 de 93

Puerto Rico para los Bonos de Ingresos por Impuestos Especiales, Series 2005A y 2005B (el "Informe de mayo de 2005 del Gobierno"). El Informe de mayo de 2005 del Gobierno estimaba los ingresos del fondo general en $8,304,000,000 y las apropiaciones en $8,962,015,000 para el Año Fiscal 2005 y proyectó ingresos al fondo general de $9,684,000,000 y apropiaciones de $9,249,000,000 para el año fiscal 2006: *Declaración Oficial de los Bonos de Contribuciones Especiales de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, Serie 2005A y 2005B*, III-44 (2005). Sin embargo, el informe 2018 de la GAO encontró que los ingresos reales del fondo general combinados con los gastos reales fueron sobreestimados por aproximadamente $540,000,000 para el año fiscal 2004 y por aproximadamente $240,000,000 para el año fiscal 2005. Además, los datos recopilados por Bloomberg reflejan que el total de ingresos por contribuciones al fondo general para el año fiscal 2004 fue aproximadamente $920,000,000 menos que lo estimado y para el año fiscal 2005 fue aproximadamente $630,000,000 menos de las proyecciones en el Informe de mayo de 2005 del Gobierno.

211. La Declaración Oficial de la ACT para los bonos de la serie N incorporó por referencia el Reporte de Información Financiera y de los Datos de Operación del Gobierno del 1 de julio de 2006 incluido como Apéndice I de la Declaración Oficial del 2 de agosto de 2006 para los Bonos de Refinanciamiento de la Mejora Pública, Serie 2006A y Serie 2006B del Gobierno de Puerto Rico, (el "Informe de julio de 2006 del Gobierno"). El Informe de julio de 2006 del Gobierno estimaba los ingresos del fondo general en $8,645,024,000 y las apropiaciones en $9,389,289,000 para el Año Fiscal 2006 y proyectó ingresos al fondo general de $8,899,000,000 y apropiaciones de $8,524,803,000 para el año fiscal 2007. *Declaración Oficial de los Bonos de Mejoras Públicas del Gobierno de Puerto Rico, Series 2006A y 2006B*, I-55 (2005). Sin embargo, el informe 2018 de la GAO encontró que los ingresos reales del fondo general combinados con los gastos reales fueron sobreestimados por aproximadamente $680,000,000 para el año fiscal 2006 y por aproximadamente $650,000,000 para el año fiscal 2007. Además, los datos recopilados por Bloomberg reflejan que el total de ingresos por contribuciones al fondo general para el año fiscal 2006 fue aproximadamente $430,000,000 menos que lo estimado y para el año fiscal 2007 fue aproximadamente $450,000,000 menos de las proyecciones en el Informe de julio de 2006 del Gobierno.

212. Las Demandadas no investigaron razonablemente las Declaraciones Oficiales de las emisiones de bonos de la ACT en cuanto a las finanzas del Gobierno de Puerto Rico, incluyendo los estimados y proyecciones de los ingresos y

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 85 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 79 de 93

apropiaciones del Gobierno y su habilidad para pagar el servicio de su deuda—aunque las Demandadas suscribieron bonos emitidos por el Gobierno de Puerto Rico, AEE, y la ACT durante el mismo periodo de tiempo. Si las Demandadas hubiesen investigado de manera razonable, habrían descubierto que estas declaraciones eran materialmente falsas e incompletas—así como lo hizo la GAO cuando investigó los factores que contribuyeron a la crisis de la deuda de Puerto Rico (*véase supra* ¶¶ 178-179, 190-198). Si National hubiese sabido que las divulgaciones eran falsas o que las Demandadas no las habían investigado, nunca habría emitido su seguro.

213. *Segundo*, las Demandadas no tenían una base razonable para creer las divulgaciones sobre cómo gastó su dinero la ACT, las cuales eran materialmente falsas e incompletas.

214. Las Demandadas representaron en las Declaraciones Oficiales cómo la ACT había gastado y gastaría su dinero—incluyendo el dinero generado a través de sus operaciones y aquél generado a través de las emisiones de bonos. Las Demandadas indicaron en esas declaraciones que era poco probable que la ACT incumpliera con los pagos de los bonos propuestos porque estaba gastando su dinero prudentemente y de una forma que tendía a aumentar los ingresos y reducir los gastos a largo plazo.

215. Las declaraciones a los efectos de que la ACT había utilizado o utilizaría sus fondos para mantener, operar, reparar o mejorar las autopistas, calles, puentes y otras facilidades de transporte indicaban que los ingresos netos de la ACT incrementarían a largo plazo. En particular, las declaraciones a los efectos de que la ACT depositaría fondos en su "fondo de construcción"—que mantiene el dinero producto de los bonos emitidos con el propósito de pagar costos de construcción—aseguraban que los ingresos netos de la ACT aumentarían.

216. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Refinanciamiento de Ingresos de Carreteras Serie AA de la ACT del 10 de abril de 2003, reflejaban lo siguiente en cuanto a las fuentes y el uso de fondos, incluyendo que se depositarían $522,475,000 en el fondo de construcción.

Case:17-03283-LTS Doc#:8656-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 86 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 80 de 93

Sources and Uses of Funds:

Sources:

| | |
|---|---|
| Principal Amount of 2003 Highway Revenue Bonds | $717,365,000.00 |
| Principal Amount of 2003 Transportation Revenue Bonds | 956,230,000.00 |
| Net Original Issue Premium | 80,116,608.35 |
| Other available moneys | 67,780,398.31 |
| Total Sources | $1,821,492,006.66 |

Uses:

| | |
|---|---|
| Deposit into 1998 Construction Fund | $522,475,000.00 |
| Payment of TIFIA Loan | 305,614,191.78 |
| Deposit to 1968 Escrow Fund | 796,880,008.08 |
| Deposit to 1998 Escrow Fund | 80,912,991.80 |
| Deposit to 1968 Reserve Account | 10,884,473.34 |
| Deposit to 1998 Senior Bond Reserve Account | 36,770,506.26 |
| Deposit to 2003 Subordinated Bonds Reserve Account | 26,512,201.26 |
| Underwriting discount and legal, printing, bond insurance and other financing expenses | 41,442,634.14 |
| Total Uses | $1,821,492,006.66 |

ACT, *Declaración Oficial para ACT, Bonos de Refinanciamiento de Ingresos de Carreteras, Serie AA, 7 (2003).*

217. Las Declaraciones Oficiales proporcionadas por las Demandadas UBS Securities, Citigroup Global Markets, J.P. Morgan Securities, Goldman Sachs LLC, y Merrill Lynch para los Bonos de Ingresos de Transporte Serie J de la ACT del 7 de abril de 2004 reflejaron lo siguiente en cuanto a las fuentes y el uso de fondos, incluyendo que se depositarían $360,000,000 en el fondo de construcción:

Sources and Uses of Proceeds of the Series J Bonds

Sources:

| | |
|---|---|
| Principal Amount of Series J Bonds | $405,895,000.00 |
| Net Original Issue Premium | 7,550,647.10 |
| Total Sources | $413,445,647.10 |

Uses:

| | |
|---|---|
| Deposit into 1998 Construction Fund | $360,000,000.00 |
| Deposit into 1998 Senior Bond Reserve Account | 24,275,575.00 |
| Deposit into 1998 Senior Bond Service Account | 22,104,922.85 |
| Underwriting discount and legal, bond insurance, printing and other financing expenses | 7,065,149.25 |
| Total Uses | $413,445,647.10 |

ACT, *Declaración Oficial para los Bonos de Ingresos de Transporte, Serie J, 6 (2004).*

218. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, y Merrill Lynch para los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT Serie L del 22 de septiembre de 2005, reflejaban lo siguiente en cuanto a las fuentes y el uso de fondos, incluyendo que se depositarían $294,220,068.41 en el fondo de construcción:

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 87 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 81 de 93

Sources and Uses of Funds

Sources:

| | |
|---|---|
| Principal Amount of the Bonds............................. | $1,499,910,000.00 |
| Net Original Issue Premium ............................. | 130,321,412.80 |
| Other Available Moneys ................................. | 9,960,464.69 |
| Total Sources............................ | $1,640,191,877.49 |

Uses:

| | |
|---|---|
| Deposit into 1998 Construction Fund.................... | $ 294,220,068.41 |
| Deposit into 1968 Escrow Fund......................... | 112,939,249.11 |
| Deposit into 1998 Escrow Funds:...................... | 667,426,462.75 |
| Deposit into 1998 Senior Bond Reserve Account.......... | 46,883,777.50 |
| Capitalized interest on Series K Bonds through July 1, 2006........................... | 27,007,323.43 |
| Underwriting discount and legal, printing, municipal bond insurance policy and other financing expenses...... | 38,714,996.29 |
| Payment of GDB Line of Credit.......................... | 453,000,000.00 |
| Total Uses............................ | $1,640,191,877.49 |

ACT, *Declaración Oficial para los Bonos de Refinanciamiento de Ingresos de Transporte, Serie L*, 7 (2005).

219. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets para los bonos de Refinanciamiento de Ingresos de Transporte de la ACT Serie N del 15 de febrero de 2007 reflejaban lo siguiente en cuanto a las fuentes y el uso de fondos, incluyendo que se depositarían $53,232,325.88 en el fondo de construcción:

Sources and Uses of Funds

Sources:

| | |
|---|---|
| Principal Amount of the Bonds......................... | $2,184,860,553.00 |
| Net Original Issue Premium or Discount................ | 240,821,059.45 |
| Other available moneys ............................... | 42,951,730.36 |
| Total Sources ................................. | $2,468,633,342.81 |

Uses:

| | |
|---|---|
| Deposit into 1998 Construction Fund.................. | $ 53,232,325.88 |
| Deposit into 1968 Escrow Fund........................ | 497,283,713.96 |
| Deposit into 1998 Escrow Fund........................ | 1,650,106,990.44 |
| Deposit into 1998 Bond Reserve Account............... | 3,932,464.00 |
| Underwriting discount and bond insurance premium, legal, printing, and other financing expenses............ | 62,638,375.43 |
| Repayment of Subordinated Transportation Revenue Bonds Series 2007A............................... | 201,439,473.10 |
| Total Uses............................ | $2,468,633,342.81 |

ACT, *Declaración Oficial para los Bonos de Refinanciamiento de Ingresos de Transporte, Serie N*, 10 (2007).

220. La ACT no gastó el dinero de la manera que dijo que lo haría. El FBI investigó al Director Ejecutivo de la ACT de 2005 a 2007 por corrupción—un hecho

Case: 17-03283 LTS Doc#: 8666-7 Filed: 09/09/19 Entered: 09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 88 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 84 de 93.

Subordinada bajo la Resolución 1998." Este ratio era un indicador clave de la habilidad de la ACT de accesar financiamiento y de la salud financiera de la ACT— entre más altos los ingresos, más baja la deuda, menos probable el riesgo de incumplimiento.

230. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital para los Bonos de Refinanciamiento de Ingresos de la ACT, Serie N, 15 de febrero de 2007 reflejaban "Ingresos Históricos y Cobertura del Servicio a la Deuda," incluyendo información de ingresos netos que llevaron a que los Ratios de Cobertura de Deuda Senior y Subordinada bajo la Resolución 1998 estuvieran muy por encima de 1.5— entre el 2.66 y el 1.61.

## HISTORICAL REVENUES AND DEBT SERVICE COVERAGE
### (dollars in thousands)

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 |
| **1998 Resolution Revenues** | | | | | |
| Gasoline taxes | $173,388 | $173,507 | $188,529 | $185,883 | $179,932 |
| Gas oil and diesel oil taxes | 19,923 | 15,298 | 14,536 | 16,679 | 14,676 |
| Subtotal | $193,307 | $188,805 | $203,065 | $202,562 | $194,608 |
| Motor vehicle license fees | 30,691 | 31,920 | 32,491 | 32,385 | 31,655 |
| Subtotal | $224,500 | $220,725 | $235,576 | $234,947 | $226,263 |
| Toll receipts | 130,398 | 135,559 | 141,578 | 146,286 | 189,615 |
| Investment income | 10,168 | 12,047 | 9,064 | 9,858 | 9,927 |
| Total 1998 Resolution Revenues | $365,066 | $369,024 | $386,218 | $391,091 | $425,804 |
| Debt Service on Highway Revenue Bonds | $177,400 | $95,056 | $120,773 | $153,925 | $145,060 |
| 1998 Resolution Coverage Ratio | 2.06 | 3.88 | 3.20 | 2.54 | 2.93 |
| Excess 1998 Resolution Revenues | $187,766 | $273,863 | $265,495 | $237,166 | $280,754 |
| **1998 Resolution Revenues** | | | | | |
| Petroleum Products Tax | $120,000 | $120,000 | $115,295 | $110,262 | $102,206 |
| Excess 1998 Resolution Revenues | 187,766 | 273,963 | 265,495 | 237,166 | 280,724 |
| Toll Receipts | | | | | 2,455 |
| Investment income | 11,198 | 11,586 | 11,440 | 16,892 | 16,801 |
| **Total 1998 Resolution Revenues** | $318,964 | $405,554 | $392,230 | $364,320 | $402,181 |
| Debt Service on Senior Transportation Revenue Bonds | $110,150 | $135,168 | $162,848 | $196,726 | $225,891 |
| 1998 Resolution Senior Coverage Ratio | 2.75 | 3.00 | 2.41 | 1.85 | 1.78 |
| Debt Service on Subordinated Transportation Revenue Bonds | $53,795 | $56,654 | $20,398 | $20,398 | $24,018 |
| Total Debt Service on Transportation Revenue Bonds | $119,945 | $141,822 | $183,266 | $217,124 | $249,909 |
| 1998 Resolution Senior and Subordinated Coverage Ratio | 2.66 | 2.86 | 2.14 | 1.68 | 1.61 |
| **Aggregate Revenues** | $406,164 | $500,610 | $513,053 | $418,045 | $542,263 |
| Aggregate Debt Service | $297,345 | $236,878 | $301,989 | $371,049 | $394,939 |
| Aggregate Coverage Ratio | 1.63 | 2.11 | 1.69 | 1.40 | 1.39 |

ACT, Declaración Oficial para los Bonos de Refinanciamiento de Ingresos de Transporte, Serie N, 43 (2007).

Case 17-03283-LTS Doc#:8665-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 89 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 85 de:93

231. Las Declaraciones Oficiales proporcionadas por las Demandadas J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, y RBC Capital Markets para los Bonos de Refinanciamiento de Ingresos de la ACT Serie N del 15 de febrero de 2007 reflejaban lo siguiente "Ingresos Proyectados y Cobertura del Servicio a la Deuda", incluyendo información de ingresos netos que llevaron a que los Ratios de Cobertura de Deuda Senior y Subordinada bajo la Resolución 1998 estuvieran durante los siguientes cinco años muy por encima de 1.5, entre el 1.81y el 1.62 hasta 2011, cuando caía a 1.43; a pesar de la caída a 1.43, las proyecciones no obstante cumplieron con los requisitos para los ratios de cobertura de la deuda senior y subordinada (teniendo, respectivamente, ratios del 1.74 y 1.35).

**PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**
**PROJECTED REVENUES AND DEBT SERVICE COVERAGE**
(Dollars in thousands)

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| **1968 Resolution Revenues** | | | | | |
| Gasoline Taxes | $177,470 | $180,320 | $185,580 | $190,150 | $195,140 |
| Gas oil and diesel oil taxes | 15,500 | 12,500 | 12,750 | 9,000 | 9,000 |
| Subtotal | 192,970 | 192,820 | 198,330 | 199,150 | 204,140 |
| Motor vehicle license fees | 31,980 | 32,310 | 32,640 | 32,980 | 33,320 |
| Subtotal | 224,950 | 225,130 | 230,970 | 232,130 | 237,460 |
| Toll receipts | 205,760 | 214,950 | 223,780 | 232,210 | 243,290 |
| Investment Income | 8,950 | 9,018 | 9,033 | 9,109 | 9,075 |
| Total 1968 Resolution Revenues | 439,660 | 449,098 | 463,783 | 473,589 | 488,825 |
| Debt Service on Highway Revenue Bonds | 124,942 | 129,018 | 129,928 | 136,871 | 132,430 |
| 1968 Resolution Coverage Ratio | 3.52 | 3.48 | 3.57 | 3.46 | 3.69 |
| Excess 1968 Resolution Revenues | 314,718 | 320,080 | 333,855 | 337,118 | 356,395 |
| **1998 Resolution Revenues** | | | | | |
| Petroleum Products Tax | 101,160 | 102,780 | 105,780 | 108,380 | 111,230 |
| Investment Income | 17,543 | 18,548 | 19,374 | 19,302 | 19,776 |
| Eastern Corridor Toll Receipts | 16,130 | 21,000 | 21,630 | 22,379 | 22,947 |
| Subtotal 1998 Resolution Revenues | 134,833 | 142,328 | 146,784 | 150,160 | 153,953 |
| Excess 1968 Resolution Revenues | 314,718 | 320,080 | 333,855 | 337,118 | 356,395 |
| Total 1998 Revenues | 449,551 | 462,408 | 480,639 | 487,479 | 510,348 |
| Debt Service on 1998 Senior Transportation Revenue Bonds (1) | 208,476 | 245,705 | 268,582 | 269,992 | 275,187 |
| 1998 Senior Coverage Ratio (2) | 2.18 | 1.87 | 1.80 | 1.81 | 1.86 |
| Additional Bond Test, Senior Transportation Revenue Bonds (3) | 1.57 | 1.57 | 1.63 | 1.66 | 1.74 |
| Additional Bond Test, Subordinated Transportation Revenue Bonds (4) | 1.36 | 1.43 | 1.48 | 1.29 | 1.33 |
| Available to Pay 1998 Subordinated Transportation Revenue (5) | 243,074 | 215,703 | 214,057 | 217,577 | 236,162 |
| Debt service on 1998 Subordinated Transportation Revenue Bonds | 41,816 | 33,251 | 30,321 | 30,244 | 83,557 |
| Senior and Subordinate Debt Service | 248,292 | 280,457 | 298,903 | 300,244 | 357,744 |
| Senior and Subordinate Debt Service Coverage Ratio | 1.81 | 1.65 | 1.62 | 1.62 | 1.43 |
| Aggregate Revenues (6) | 574,493 | 591,426 | 610,567 | 624,349 | 642,778 |
| Aggregate Debt Service (7) | 373,234 | 409,475 | 426,831 | 433,116 | 490,174 |
| Aggregate Debt Service Coverage Ratio (8) | 1.54 | 1.44 | 1.43 | 1.43 | 1.31 |

*Id.* a la pág. 45.

232. Los cálculos de la cobertura de la deuda y la información utilizada para éstos, como los ingresos, no se divulgaron de manera precisa en la Declaración Oficial de la ACT. Por ejemplo, los cálculos no reflejaron que el Gobierno "frecuentemente sobreestimaba el monto de ingresos que cobraría durante el siguiente año", como

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce Fenner & Smith Inc Page 90 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 86 de 93

concluyó el Informe de la GAO, aun cuando los ingresos de la ACT pueden haber sido posiblemente recuperado por el Gobierno de Puerto Rico para reintegrar los pagos de los bonos GO. Informe GAO a la pág. 16.

233. Las Demandadas no investigaron de manera diligente y razonable estas declaraciones, las cuales eran materialmente falsas e incompletas. El Informe sobre la Investigación Especial reveló que la "AEE sistemáticamente incluía ingresos no cobrados cuando calculaba su habilidad para cubrir sus gastos de operaciones y servicio a la deuda," Informe sobre la Investigación Especial a la pág. 114, e "inflaba su ratio de cobertura de la deuda," lo cual "creaba la apariencia de que tenía la liquidez financiera para respaldar emisiones de bonos adicionales cuando casi ciertamente, como lo demuestra su insolvencia, no la tenía[.]" *Id.* a la pág. 139. Además, "los suscriptores aceptaron los cálculos de la cobertura de la deuda provistos por la AEE sin llevar a cabo su propia investigación en cuanto a la veracidad de esas cifras." *Id.* a la pág. 563. Es razonable inferir que la ACT también incluyó ingresos no cobrados en sus cálculos del servicio a la deuda y que las Demandadas también aceptaron esos cálculos sin investigarlos.

234. Por otra parte, in circunstancias limitadas, el Gobierno de Puerto Rico puede recuperar los ingresos de la ACT para hacer pagos de los bonos GO. Los mismos suscriptores, incluyendo a las Demandadas, suscribieron las emisiones de bonos tanto para el Gobierno de Puerto Rico como para la ACT durante el mismo período de tiempo—todas las nueve Demandadas suscribieron bonos COFINA y bonos de la ACT de la Serie 2007. las Demandadas debieron haber investigado los ingresos de la ACT en conexión con sus revisiones de los ingresos netos del Gobierno de Puerto Rico, pero no lo hicieron. Es razonable inferir que las Demandadas manejaron los bonos de la ACT de la misma manera que manejaron los bonos del Gobierno de Puerto Rico—no efectuaron una investigación diligente y razonable de los ingresos netos.

235. Las Demandadas no investigaron y no tuvieron una base razonable para creer la veracidad y la suficiencia de estas divulgaciones. Si las Demandadas hubiesen investigado razonablemente, habrían descubierto que estas declaraciones eran materialmente falsas e incompletas. Si National hubiese sabido que las declaraciones eran falsas o que las Demandadas no las habían investigado, nunca habría emitido el seguro.

**D. Las Representaciones Clave en las Declaraciones Oficiales de COFINA Eran Materialmente Falsas e Incompletas**

236. COFINA, creada en julio de 2007, es una "entidad corporativa y política independiente y separada del Gobierno de Puerto Rico," creada para emitir bonos

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch - Pierce . Fenner & Smith Inc Page 91 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 87 de 93

asegurados por un impuesto sobre ventas y uso ("SUT" por sus siglas en inglés).
COFINA, *Declaración Oficial para los Bonos de Ingresos por Impuestos sobre Ventas,*
*Serie 2007A,* 1 (2007).

237.  En el 2007, las Demandadas procuraron y obtuvieron el seguro de
National, y National ha efectuado pagos por reclamaciones relacionadas a los Bonos
de Ingresos por Impuestos de COFINA, Serie 2007A, del 13 de julio de 2007, con fecha
de vencimiento del 1 de agosto de 2046. El suscriptor líder fue Goldman Sachs LLC.
El equipo de suscriptores incluía a las siguientes Demandadas: UBS Investment
Bank (ahora conocido como UBS Securities), Morgan Stanley LLC, Merrill Lynch,
Banc of America Securities (predecesor de la Demandada Merrill Lynch), Citigroup,
RBC Capital Markets, J.P. Morgan Securities, Bear, Stearns & Co., Inc. (predecesor
de la Demandada J.P. Morgan Securities), y Santander Securities. El propósito de los
bonos era el de pagar y saldar una porción de la deuda que se le debía al GDB y a la
Corporación de Finanzas de Puerto Rico ("PFC," por sus siglas en inglés). National
aseguró estos bonos bajo dos pólizas por su valor nominal original de $440,396,676 y
de $243,774,198.40, respectivamente, o $684,170,874.40 en total.

238.  COFINA emergió de un proceso similar a una quiebra con un plan de
ajuste de deuda confirmado por el Tribunal Federal bajo el Título III de PROMESA
en febrero de 2019 (actualmente sujeto a apelación). El plan de ajuste de COFINA
refleja un acuerdo entre partes interesadas de ambos COFINA y el Gobierno de
Puerto Rico sobre la asignación y disponibilidad del SUT. Conforme a ese plan,
National razonablemente espera pagar más de $100 millones en reclamaciones.

239.  Un asunto clave para la viabilidad de los bonos de COFINA era si el
ingreso producto del "[SUT] podría efectivamente ser 'desviado' del Fondo General de
manera que no estuviera sujeto a reclamaciones prioritarias por parte de los
Tenedores de Bonos GO" bajo el Artículo VI de la Constitución de Puerto Rico. El
Artículo VI dispone que los tenedores de bonos GO "tienen derechos de prioridad para
ser pagados de los 'recursos disponibles' por encima de todas las otras deudas, en caso
de un déficit en ingresos." Informe sobre la Investigación Especial a la pág. 164. Si el
ingreso del SUT no constituye un "recurso disponible," entonces los bonos COFINA
estarían garantizados por un flujo de ingresos independiente de y no compartido con
los bonos GO.

240.  Las Demandadas le proporcionaron a National Declaraciones Oficiales
para los bonos COFINA que indicaban de manera concluyente que los ingresos
derivados del SUT *no* eran "recursos disponibles" del Gobierno de Puerto Rico para
ningún propósito, incluyendo para propósitos de la Sección 8 del Artículo VI de la

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 92 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 88 de 93

Constitución." COFINA, *Declaración Oficial para los Bonos de Ingresos de Impuestos sobre la Venta, Serie 2007A*, 22 (2007).

241. Era esencial para National y para otros participantes del mercado que las representaciones en cuanto a la prioridad del Gobierno de Puerto Rico sobre las tarifas y los impuestos de COFINA fuesen precisas.

242. Como cuestión de hecho, estas divulgaciones eran materialmente incompletas. El Informe sobre la Investigación Especial descubrió que cuando menos un abogado le informó al agente fiscal de COFINA alrededor de marzo de 2006 que la representación era materialmente incompleta porque: "de acuerdo con la [Constitución de Puerto Rico], [el ingreso del SUT] *no* puede desviarse del Fondo General." Informe sobre la Investigación Especial a la pág. 165. Esta opinión legal fue enviada a cuando menos un suscriptor. *Id.*

243. El Informe sobre la Investigación Especial también encontró que en mayo de 2007—dos meses *antes* de que se emitieran los bonos—el bufete de abogados de Sidley Austin LLP ("Sidley"), el cual fungió como asesor de bonos ("bond counsel") de Puerto Rico, le dijo al agente fiscal de COFINA: "Yo pienso que a un tribunal se le haría difícil concluir solo en base a que la Legislatura así lo dice, que los ingresos del impuesto sobre las ventas no están disponibles al Gobierno si éste necesitara el dinero para pagar deuda [de bonos GO]." *Id.* Sidley aconsejó que se debía proporcionar un lenguaje cautelar en la Declaración Oficial—pero no se hizo. Sidley, se negó a proporcionar una opinión legal a los efectos de que "si el asunto fuese a presentarse ante el Tribunal Supremo de Puerto Rico, la estructura de titulización del impuesto sobre ventas se consideraría constitucional y que no violenta los derechos de prioridad de los Tenedores de Bonos GO bajo la Constitución de Puerto Rico." *Id.* a la pág. 530. De acuerdo al Informe sobre la Investigación Especial, cuando menos un suscriptor conocía la opinión legal de Sidley. *Id.* a la pág. 165.

244. Las Demandadas nunca divulgaron en las Declaraciones Oficiales de estos bonos que existían opiniones conflictivas en cuanto a la disponibilidad de los ingresos derivados del SUT para el pago a los tenedores de bonos GO. No fue sino hasta el 2009—mucho después de que National emitiera el seguro para esos bonos— que las Declaraciones Oficiales para nuevos bonos COFINA admitieron que existían serios riesgos de que el SUT pudiera ser reclamado por el Gobierno de Puerto Rico. Específicamente, estas nuevas divulgaciones manifestaron que "las opiniones" a los efectos de que el SUT era una fuente de ingreso independiente "no eran una predicción de lo que un tribunal en particular ... enfrentado con el asunto resolvería en los méritos y ... no son una garantía o representación." *Id.* a la pág. 531. Además,

88

Case:17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 93 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 89 de 93

la nueva Declaración Oficial informó que los tribunales, incluyendo al Tribunal Supremo de Puerto Rico, podrían decidir que el SUT sí constituye un recurso disponible del Gobierno de Puerto Rico. *Id.* Estas nuevas divulgaciones alteraron de forma radical e incrementaron sustancialmente el perfil de riesgo de los bonos COFINA.

245. Las Demandadas no investigaron y no tenían una base razonable para creer la veracidad y suficiencia de estas divulgaciones. Si las Demandadas hubiesen investigado de manera razonable, habrían sabido que los abogados habían recomendado que las Declaraciones Oficiales tuvieran un lenguaje cautelar en el sentido contrario—como lo reveló después la Investigación Especial. Si National hubiese sabido que las divulgaciones eran materialmente incompletas o que las Demandadas no las habían investigado, nunca habría emitido su seguro.

### Primera Causa de Acción: Doctrina de Actos Propios

246. National incorpora y adopta aquí por referencia y repite las alegaciones contenidas en los párrafos que anteceden.

247. Bajo el Artículo 7 del Código Civil de Puerto Rico, "Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos."

248. Las Demandadas solicitaron seguro en garantía de bonos asegurándole a National que formarían, estaban formando, y ya habían formado una base razonable para creer que las Declaraciones Oficiales que le proporcionaron a National eran correctas y completas—incluyendo mediante investigaciones razonables de esas declaraciones antes de que se emitieran los bonos y los seguros. Las Demandadas lo hicieron, entre otras cosas, al entregar solicitudes de seguro a National; destacar su cumplimiento con las leyes de valores (lo cual requería que ellos tuvieran una base razonable de veracidad y suficiencia de las declaraciones, y que efectuaran una investigación razonable); al aparentar adherirse a las normas y costumbres de la industria (lo cual requería una investigación razonable); y al añadir sus nombres a las Declaraciones Oficiales.

249. Las afirmaciones de las Demandadas crearon una situación contraria a la realidad. Las Demandadas no actuaron acorde a su rol como celosos guardianes en el mercado de bonos municipales. Específicamente, no llevaron a cabo la investigación razonable requerida ni formaron una base razonable para creer que los borradores y documentos finales de las Declaraciones Oficiales eran correctos o estaban

Case:17-03283-LTS Doc#:8666-4 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit D - Service of Process Merrill Lynch, Pierce, Fenner & Smith Inc Page 94 of 96
SJ2019CV07932 08/08/2019 10:24:39 am Página 90 de 93

completos—incluyendo las declaraciones sobre los ratios de cobertura de servicio de la deuda; la información financiera básica de los emisores, como por ejemplo sus ingresos netos; información sobre cómo habían gastado y gastarían los fondos los emisores; y el estado actual de sus facilidades. Basado en los hallazgos de la Investigación Especial, las Demandadas han aparentemente tomado la posición de que no necesitaban investigar estas divulgaciones, las cuales eran sustancialmente erróneas.

250. Las afirmaciones de las Demandadas objetivamente indujeron a National a emitir pólizas de seguro irrevocables para los bonos; National confió de buena fe en los actos de las Demandadas, todo ello en detrimento y perjuicio de sus derechos y mejores intereses. Si National hubiese sabido la verdad—que las Demandadas *no* habían efectuado investigaciones razonables y que *no* tenían las bases razonables para creer la verdad y la suficiencia de las Declaraciones Oficiales— National no habría emitido su seguro. Debido a que National confió en lo que aseguraban las Demandadas, emitió pólizas de seguro irrevocables. Al presente ha pagado más de $720 millones en reclamaciones a partir de 1° de julio 2019 y espera razonablemente tener que pagar cientos de millones de dólares más en reclamaciones adicionales futuras, que de otra forma no hubiera tenido que desembolsar.

251. No hay ningún remedio estatutario disponible para National. National no puede presentar ni una reclamación bajo las leyes de valores ni una reclamación ex contractu y/o ex delicto. La doctrina de actos propios sirve para llenar ese vacío en estas circunstancias extraordinarias.

252. Las acciones de las Demandadas causaron graves daños a través de todo Puerto Rico, incluyendo daños a National que totalizan no menos de $720 millones.

253. Debido a que las Demandadas actuaron sin efectuar su debida diligencia e investigación prometida, están impedidas ahora de negar responsabilidad por las consecuencias de no haber realizado dichas investigaciones, y por consiguiente deben indemnizar a National por su desleal desempeño.

<u>Segunda Causa de Acción: Declaración Unilateral de la Voluntad</u>

254. National incorpora y adopta aquí por referencia y repite las alegaciones contenidas en los párrafos que anteceden.

255. Bajo el Artículo 7 del Código Civil de Puerto Rico, "Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos."

Case 17-03283-LTS Doc#:8666-7 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc
Exhibit Exhibit D - Service of Process Merrill Lynch Pierce, Fenner & Smith Inc Page 95 of 96
SJ2019CV07932;08/08/2019 10:24:39 am Página 92 de 93

ex contractu y/o ex delicto. La declaración unilateral de la voluntad sirve para llenar ese vacío en estas circunstancias extraordinarias.

265. National confió en la buena fe de los actos y representaciones de las Demandadas, todo ello en detrimento de sus mejores intereses. National no habría emitido un seguro si hubiese sabido que las Demandadas no efectuaron una investigación razonable y que no formaron una base razonable en cuanto a la veracidad y suficiencia de las Declaraciones Oficiales. Las acciones y omisiones de las Demandadas causaron graves daños a través de todo Puerto Rico, incluyendo daños a National que totalizan no menos de $720 millones.

POR TODO LO CUAL, National respetuosamente solicita del Honorable Tribunal que se sirva declarar CON LUGAR la Demanda de epígrafe y, en su consecuencia, dicte sentencia a favor de National condenando a las Demandadas a pagar solidariamente a National:

a) Daños estimados al presente en una cantidad no menor de SETECIENTOS VEINTE MILLONES DE DOLARES ($720,000,000), así como todos los daños razonablemente previsibles y que surjan tras la radicación de la Demanda;
b) Intereses presentencia por temeridad más cualquiera otros intereses a los que tenga derecho National;
c) Costas y honorarios razonables de abogado; y
d) Concediéndole a National cualquier otra indemnización o remedio que considere justa y adecuada, de conformidad con la Regla 42.4 de las de Procedimiento Civil, 32 L.P.R.A. Ap. V, R. 42.4.

RESPETUOSAMENTE SOMETIDA.

En San Juan, Puerto Rico, hoy 8 de agosto de 2019.

VICENTE & CUEBAS
*Abogados de la Parte Demandante*
P.O. Box 11609
San Juan, PR 00910-1609
Teléfono (787) 751-8000
Facsímil (787) 756-5250

Por: /f/ Federico Hernández Denton
FEDERICO HERNÁNDEZ DENTON
RÚA NÚM.: 3846
E-mail: fhd@vclawpr.com
fhernándezdenton@gmail.com

Por: /f/ Harold D. Vicente Colón
HAROLD D. VICENTE COLÓN
T.S.P.R. Número 11303
E-Mail: hdvc@vclawpr.com

Por: /f/ Harold D. Vicente
HAROLD D. VICENTE
RÚA NÚM.: 3966
E-mail: hvicente@vclawpr.com

Por: /f/ Steven Liong Rodríguez
STEVEN LIONG RODRÍGUEZ
T.S.P.R. Número 19356
E-Mail: sliong@vclawpr.com

SELENDY & GAY PLLC
1290 Avenue of the Americas, New York, NY 10104
Tel: (212) 390 9000
Fax: (212) 390 9399

Por: /f/ Philippe Z. Selendy
PHILIPPE Z. SELENDY
RÚA NÚM.: 9002
E-mail: pselendy@selendygay.com

Por: /f/ Andrew R. Dunlap
ANDREW R. DUNLAP
RÚA NÚM.: 9005
E-mail: adunlap@selendygay.com

Por: /f/ Yelena Konanova
YELENA KONANOVA
RÚA NÚM.: 9010
E-mail: lkonanova@selendygay.com

*Admisión Pro Hac Vice en curso*