# Exhibit G

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

| | |
|---|---|
| NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; y MBIA INSURANCE CORPORATION, <br><br> Demandantes, <br><br> v. <br><br> UBS FINANCIAL SERVICES, INC.; UBS SECURITIES LLC; CITIGROUP GLOBAL MARKETS INC.; GOLDMAN SACHS & CO. LLC; J.P. MORGAN SECURITIES LLC; MORGAN STANLEY & CO. LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; RBC CAPITAL MARKETS LLC; y SANTANDER SECURITIES LLC, <br><br> Demandados. | Civil Núm. <br><br> SOBRE: Daños y Perjuicios por Actos Propios, y Declaración Unilateral de Voluntad |

SANTANDER SECURITIES LLC
RECIBIDO
AUG 0 9 2019
ASESORIA JURIDICA

## DEMANDA

**AL HONORABLE TRIBUNAL:**

COMPARECE la parte demandante, National Public Finance Guarantee Corporation y MBIA Insurance Corporation, por conducto de la representación legal que suscribe y, muy respetuosamente, expone, alega, y solicita:

## INTRODUCCIÓN

1. Ocho de los principales bancos de inversión provocaron la tragedia fiscal por la que atraviesa Puerto Rico, sus ciudadanos y otros quienes igualmente confiaron en la buena fe y conducta de dichas entidades en el mercado de bonos municipales de Puerto Rico. Por más de una década, estos bancos promovieron que Puerto Rico y sus agencias e instrumentalidades emitieran deuda que era insostenible según sus términos. Esa deuda llevó al Gobierno de Puerto Rico a la quiebra, mientras que los bancos se enriquecieron a través de comisiones sustanciales.

2. Puerto Rico sufrió las graves consecuencias de estos actos que han llevado a la Isla a un abismo fiscal de proporciones históricas. Cuando los bonos colapsaron, el gobierno hizo recortes drásticos a servicios públicos, incluyendo las pensiones, servicios de salud, las utilidades, e infraestructura básica para redes eléctricas y transporte. Como resultado, muchos ciudadanos sintieron que no tenían oportunidades de trabajo o se afectó su calidad de vida y se vieron forzados a

abandonar a la Isla. Ciudadanos de Puerto Rico vieron el valor de sus ahorros y pensiones que con sacrificio acumularon durante toda su vida desplomarse.

3.  Esta Demanda pretende responsabilizar a los bancos de inversión. Al originar la emisión de los bonos municipales y comercializar y vender los bonos, estos bancos de inversión se representaron como guardianes ("gatekeepers") del mercado de bonos municipales de Puerto Rico. Conforme a las leyes diseñadas para proteger a los inversionistas, los bancos de inversión tenían la obligación de investigar la veracidad de las representaciones claves hechas en relación con la emisión de bonos municipales y de identificar y divulgar cualquier declaración sustancialmente falsa o incompleta de parte de los emisores. El Gobierno de Puerto Rico, la ciudadanía, y muchas otras personas, incluyendo a las aseguradoras aquí demandantes, confiaron en los bancos de inversión para llevar a cabo esa debida diligencia ("due diligence") y la obligación de investigar e identificar representaciones falsas o incompletas de parte de los emisores—especialmente las representaciones relacionadas con la capacidad de los emisores de repagar la deuda de acuerdo con sus términos.

4.  A diferencia de los otros participantes en el mercado, los bancos de inversión tuvieron un especial acceso a información sobre las operaciones y solvencia financiera de las agencias e instrumentalidades que emitieron los bonos. Basado en la debida diligencia supuestamente llevada a cabo por los bancos de inversión en torno a las declaraciones, se le garantizaba al mercado que dichos emisores tenían la capacidad para pagar sus deudas según sus términos. De acuerdo con las prácticas establecidas hace años en ese sector, los demás participantes en el mercado tenían derecho a confiar y en efecto confiaron en la buena fe y debida diligencia de los bancos de inversión. Sin embargo, éstos violaron esa confianza.

5.  Por más de cuarenta años, los aquí Demandantes MBIA Insurance Corporation y National Public Finance Guarantee Corporation ("NPFG") junto con Financial Guaranty Insurance Company ("FGIC"), el predecesor en derechos, que no es una parte de esta demanda, de varias pólizas en asunto de NPFG (en conjunto "National") ha garantizado seguros para mercados financieros públicos y municipales, incluyendo muchos bonos emitidos por el Gobierno de Puerto Rico y sus agencias para distintos proyectos de desarrollo e infraestructura en la Isla. National siempre ha estado comprometida con proteger a quienes han asegurado sus intereses y su motor principal es reestablecer el funcionamiento normal de los mercados municipales con transparencia e integridad. Adjudicar responsabilidad a los bancos de inversión y asegurar que éstos cumplan cabalmente con sus responsabilidades ayudará a reestablecer el mercado y promover y apoyar el crecimiento de la economía

de Puerto Rico. Este caso le brinda la oportunidad a este Tribunal de facilitar que Puerto Rico pueda regresar a los mercados de capital y estabilidad financiera, y salir de la crisis que tanto ha afectado el bienestar del pueblo de Puerto Rico.

6.    Cada uno de los bancos de inversión aquí demandados fue un suscriptor líder de uno o más de los bonos emitidos por el Gobierno y sus instrumentalidades y/o formó parte del grupo de suscriptores responsables de comercializar y/o vender múltiples series de bonos a través de los años. Esos bancos de inversión compitieron para convertir al Gobierno y sus instrumentalidades en clientes y lograr que emitieran bonos para levantar fondos para cubrir sus necesidades. Los bancos de inversión fueron seleccionados por el Gobierno y sus instrumentalidades para desempeñar la gestión de comercializar y vender los bonos a los inversionistas. Los bancos de inversión aquí demandados tuvieron un acceso único a los emisores, tales como—el Gobierno de Puerto Rico, la Autoridad de Energía Eléctrica de Puerto Rico ("AEE"), la Autoridad de Carreteras y Transporte de Puerto Rico ("ACT"), y la Corporación del Fondo de Interés Apremiante ("COFINA")—y se valieron de esas relaciones con las agencias e instrumentalidades para estimular y permitir que éstas emitieran miles de millones de dólares en bonos, sin tomar en consideración los riesgos resultantes de asumir obligaciones de deudas tan extraordinarias. Estos bancos de inversión quienes tenían serios conflictos de interés, se aprovecharon de la coyuntura fiscal del Gobierno de Puerto Rico para promover la rentabilidad en volúmenes gigantescos de bonos. Al así actuar, obtuvieron ganancias multi-millonarias a costa del pueblo de Puerto Rico.

7.    Para suscribir los bonos, los bancos venían obligados a diseminar Declaraciones Oficiales (las "Declaraciones Oficiales") para cada una de las emisiones. Al hacer eso, los bancos representaron que la emisión cumplía con las leyes federales y las costumbres y reglas del mercado de bonos municipales que exigían que investigaran razonablemente los documentos e información de la oferta de los bonos y que notificarían al mercado si encontraban que cualquier parte de esa información era falsa o sustancialmente incompleta. La conducta de los bancos de inversión le aseguró al mercado que todos los participantes—incluyendo a los aquí Demandantes—podrían confiar en la información de los emisores que surgían de las Declaraciones Oficiales. Sin embargo, los bancos de inversión no examinaron esos materiales con la debida diligencia como le habían asegurado al mercado que habían hecho. En su lugar, se apresuraron a mercadear un sinnúmero de bonos con información sustancialmente falsa o incompleta, ocultando así riesgos masivos que predestinaron a los bonos a caer en morosidad.

3

8.    Con el objetivo de hacer que los bonos fueran lo más atractivos posibles a los inversionistas—y de esa manera facilitar la emisión de la mayor cantidad de bonos posible—los bancos de inversión solicitaron en repetidas ocasiones un seguro de garantía de los aseguradores de bonos (también conocidos como aseguradores "monoline") incluyendo a National. Al estar estos bonos respaldados por el seguro ("wrapping") emitido por National, se hizo mucho más fácil su mercadeo, ya que el seguro equivalía a una garantía de solvencia del emisor.

9.    Las Declaraciones Oficiales diseminadas por los bancos de inversión fueron un elemento integral del esfuerzo de los bancos de inversión para obtener un seguro para los bonos. Para que los aseguradores aquí Demandantes pudieran evaluar los riesgos inherentes en asegurar una emisión en particular, los bancos de inversión, como parte de sus solicitudes de seguro, entregaban a los aseguradores un borrador y luego una versión final de las Declaraciones Oficiales que describían los bonos, incluyendo expresiones sobre la solvencia de las entidades emisoras (y, por lo tanto, fundamentalmente, sobre su capacidad para repagar la deuda según sus términos) y los propuestos usos del capital que sería recaudado. Al hacer eso, los bancos de inversión le hicieron a los aquí Demandantes las mismas afirmaciones falsas que habían hecho al Gobierno y a los inversionistas de que habían investigado las declaraciones y representaciones en los documentos e información de la oferta y que habían concluido que la información allí vertida era cierta y completa.

10.    Confiando de buena fe en las representaciones de los bancos de inversión, los aquí Demandantes emitieron miles de millones de dólares en pólizas de seguro irrevocables, garantizando los bonos—facilitando que se efectuaran y mercadearan las emisiones de bonos y que los bancos de inversión cobraran sustanciales honorarios. Sin embargo, contrario a las representaciones de los bancos de inversión—y según se ha revelado recientemente—los bancos decidieron no investigar información crítica que habían proporcionado a los aquí Demandantes en las Declaraciones Oficiales, y esa información ha resultado ser falsa. A modo de ejemplo, los ratios de cobertura de la amortización de las deudas de los emisores fueron sobreestimados, las proyecciones de las rentas fueron sobreestimadas, y los emisores ocultaron que no habían gastado y con toda probabilidad no iban a invertir los fondos, según habían representado. Estas declaraciones falsas e incompletas ocultaron el riesgo muy real de que a su vencimiento los bonos no serían pagados de acuerdo con sus términos. Si los bancos de inversión hubieran investigado, como tenían la obligación de hacer, hubieran descubierto la verdad y habrían tenido la obligación de advertir a National junto con los demás participantes en el mercado.

4

11.    Los graves riesgos enmascarados por estas declaraciones falsas finalmente salieron a relucir, con trágicas consecuencias. Cuando los bonos comenzaron a caer en morosidad, Puerto Rico y sus agencias quedaron sin los fondos necesarios para proveer servicios esenciales. Hubo recortes drásticos a pensiones, atención médica, servicios públicos, y educación. Fondos para construir y mantener carreteras y puentes se agotó. Muchas escuelas públicas cerraron. Trabajos desaparecieron.

12.    National ha sufrido daños sustanciales también, teniendo que pagar más de $720 millones en reclamaciones al 1 de julio 2019—obligaciones que tiene la intención de continuar a honrar en su totalidad—atenuando así el perjuicio que los bancos de inversión ocasionaron a los tenedores de bonos. Por más de cuarenta años, National ha asegurado emisiones de Puerto Rico, ayudando a financiar mejoras a instalaciones y servicios para la gente del Gobierno de Puerto Rico. En este rol, National ha protegido a muchos inversionistas en bonos de Puerto Rico. A través de esta demanda, National ahora busca responsabilizar los bancos por su conducta inescrupulosa, e imponerle consecuencias al no actuar con transparencia, integridad, y según las reglas de juego limpio, y asegurar que esta conducta nunca vuelva a ocurrir.

13.    National interpone esta demanda procurando que se haga justicia bajo reconocidos principios de equidad conforme a la doctrina de actos propios y la doctrina de la declaración unilateral de la voluntad. El legado de la conducta injusta de los bancos afectará a Puerto Rico por generaciones. Éstos no solo desatendieron su obligación de actuar como celosos guardianes, sino que se aprovecharon de las circunstancias imperantes en Puerto Rico, llevando a Puerto Rico directamente a su crisis actual. Mientras los bancos se enriquecían, le infligían graves daños al Gobierno de Puerto Rico y a sus ciudadanos, al igual que a National. Deben por tanto responder por esta conducta ilícita.

*    *    *

14.    Entre el 2001 y el 2014, la banca de inversión—incluyendo a UBS Financial Services, Inc.; UBS Securities LLC; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Morgan Stanley & Co. LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; RBC Capital Markets LLC; y Santander Securities LLC (colectivamente "las Demandadas")—suscribieron ("underwrote") más de $66 mil millones en bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades.

15. Los bonos aquí descritos no se hubieran podido emitir con términos mercadeables sin el seguro y las garantías que le brindaron los aquí Demandantes, conocido como el "seguro de garantía financiera" o "seguro monoline." Según sus términos, los bonos se pagarían a los inversionistas en cantidades fijas de principal e intereses. El dinero en efectivo para realizar estos pagos debía provenir de los ingresos y fondos de los emisores. Los aquí Demandantes aseguraron el eventual riesgo de que, a su vencimiento, un emisor no tuviese fondos suficientes para pagar a los tenedores de los bonos todo el dinero que se les debía; en caso de una escasez, éstos tendrían que intervenir para cubrir la diferencia. Al garantizar que los tenedores de los bonos serían pagados en su totalidad, el seguro emitido por las aquí Demandantes causó que los bonos fueran más atractivos para los inversionistas y, por lo tanto, más fáciles de emitir y mercadear para las Demandadas.

16. Según la costumbre en la industria, las Demandadas solicitaron un seguro para cada emisión de bonos, para lo cual proporcionaron a los Demandantes información, datos y materiales requeridos en la solicitud, la cual se fue suplementando hasta el momento de la emisión. Cada solicitud de seguro incluía documentos relevantes a la transacción, incluyendo un borrador y luego versiones finales de los materiales de oferta que se registrarían públicamente con la Comisión de Bolsa y Valores de los Estados Unidos ("United States Securities and Exchange Comission" ó "SEC"). Estos materiales, denominados "Declaraciones Oficiales" ó "Official Statements" incluían una representación de que: "The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws[.]" Esas leyes, promulgadas para proteger a los inversionistas, requerían que los bancos de inversión suscriptores investigaran la suficiencia y veracidad de la información en las Declaraciones Oficiales y que tuvieran una base razonable para creer que esa información era cierta y completa.

17. Aunque en sus solicitudes de seguro las Demandadas no venían obligados a entregar a National las Declaraciones Oficiales que incluían certificaciones de que habían cumplido con las leyes de valores federales (National es un asegurador que no compra valores y por tanto no tiene reclamación basada en las leyes de valores), la realidad es que así lo hicieron destacando su cumplimiento con las leyes de valores. Al así actuar, asumieron la obligación de investigar razonablemente la información contenida en las Declaraciones Oficiales. Los aquí Demandantes le dieron mucha importancia a estas representaciones y las investigaciones que los bancos de inversión manifestaron que habían hecho, y de

6

buena fe confiaron plenamente en ellas. Hasta cierto punto, era necesario hacerlo, porque conforme a las leyes de valores, los emisores de los bonos están exentos de los requisitos de registración y presentación de informes de acuerdo con las leyes de valores federales, y eso significaba que públicamente se podía obtener muy poca información confiable sobre los bonos a ser emitidos. Por tanto, como generalmente ocurre con los bonos municipales, la única fuente de información confiable era las supuestas investigaciones "realizadas" por los suscriptores, incluyendo las Demandadas.

18.   Las aquí Demandadas sabían que era uso y costumbre y una práctica generalizada en la industria de seguros de bonos que los suscriptores entregaran a los aseguradores Declaraciones Oficiales indicando que éstos habían investigado y que sus representaciones eran ciertas y completas. Como los suscriptores ("underwriters")—incluyendo a las aquí Demandadas—tenían acceso directo a los emisores, mientras que los aseguradores y otros participantes en el mercado no lo tenían, el mercado de los seguros de bonos dependía y contaba en la buena fe de los suscriptores de proveer a los aseguradores con información debidamente revisada y exacta sobre los emisores y su solvencia. Como bien sabían o debían saber todos los participantes en el mercado de bonos—incluyendo a las aquí Demandadas—este sistema era clave para el mejor y más eficiente funcionamiento del mercado de bonos y, por lo tanto, para la capacidad que tenían las entidades gubernamentales de obtener financiamiento para sus proyectos públicos.

19.   Mediante sus acciones y representaciones, las Demandadas aseguraron a los aquí Demandantes que iban a investigar las Declaraciones Oficiales para formar una creencia razonable de que las declaraciones eran verdaderas y completas, y que informaría a los aquí Demandantes de cualquier declaración sustancialmente falsa u omisión. Por ende, los aquí Demandantes confiaron de buena fe en las afirmaciones de que las Demandadas habían realizado las investigaciones correspondientes, previo a la emisión de los bonos. Las acciones y representaciones de las Demandadas— proporcionando las Declaraciones Oficiales—claramente tenían como objetivo ganarse la confianza de los aquí Demandantes.

20.   Confiando de buena fe en las representaciones en las garantías de las Demandadas, y tomando en consideración la información que las Demandadas brindaron en los Declaraciones Oficiales con relación a la solvencia de los emisores, los aquí Demandantes aseguraron en exceso de $11 mil millones en deuda para entidades gubernamentales de Puerto Rico entre el 2001 y el 2007. Según sus propios términos, estas pólizas de seguro eran, y siguen siendo, irrevocables. Después de

7

emitir su seguro, los Demandantes se vieron obligados a cumplir con sus obligaciones, aun cuando más adelante descubrieron que se le había dado información falsa antes de la emisión de las pólizas. De hecho, los Demandantes no han dejado de cumplir con su compromiso con los bonistas—y han honrado cada una de las reclamaciones sobre esas pólizas y tienen la intención de continuar haciéndolo.

21. Los bancos de inversión suscriptores, incluyendo a las aquí Demandadas, se lucraron de una manera significativa de la emisión de estos bonos, ganando cientos de millones de dólares. Cada una de las Demandadas recibieron enormes honorarios como resultado de cada emisión de bono. Algunos vendieron los bonos también por medio de fondos mutuos cerrados, que estaban limitado a residentes bona fide de Puerto Rico, lo cual permitió que generaran ingresos adicionales. Otros vendieron también "swaps" de tasas de interés—contratos que responsabilizaron a los emisores a pagar altas tasas de interés fijas en lugar de las tasas variables de los bonos—cobrándoles a los emisores una tarifa sustancial para participar en los "swaps," y honorarios aún más grandes para salirse de esos "swaps" cuando se desplomaron las tasas de interés. Algunos de los suscriptores hasta estimularon a algunos de los emisores a emitir bonos adicionales—también con la intención de que cayeran en mora—para que esos emisores pudieran obtener los fondos necesarios para pagar esa masiva compensación. Como los suscriptores podían cobrar las comisiones independientemente de si se repagaban los bonos, a los suscriptores incluyendo las Demandadas, poco o nada les importaba si los bonos finalmente eran pagados según sus términos o si eran buenas inversiones, con tal de que los suscriptores tuvieran éxito a corto plazo. Así, sus intereses estaban en conflicto directo con los intereses del Gobierno, los puertorriqueños, y de otras entidades, como los aquí Demandantes, que tenían interés en el éxito a largo plazo de las emisiones.

22. Mientras que por un lado las Demandadas se beneficiaron de estas transacciones, casi todos los demás participantes sufrieron grandes pérdidas y daños. Los emisores se afectaron severamente cuando los bonos cayeron en morosidad, ya que lamentablemente les faltaba la liquidez necesaria para ofrecer servicios esenciales inicialmente. Los ciudadanos de Puerto Rico también fueron impactados a medida que el Gobierno se vio imposibilitado de proveer esos servicios esenciales. Las bonistas, por su parte, muchos de los cuales eran residentes de Puerto Rico, también sufrieron tras los impagos, cuando el valor de sus inversiones cayó de forma estrepitosa. Pero las Demandadas—quienes, como guardianes, debían haber evitado la emisión de una deuda altamente riesgosa y haber advertido al público de esos

8

riesgos—hasta ahora, no han enfrentado consecuencias reales por su conducta anti-jurídica.

23. Investigaciones recientes han revelado que las Demandadas no verificaron y validaron representaciones claves entre los materiales que proporcionaron a los aquí Demandantes, con respecto a parámetros críticos como lo son los convenios para el pago de deudas, los ingresos estimados, y el uso del capital generado por las emisiones. Las Demandadas nunca generaron una creencia razonable de que esas declaraciones eran verdaderas y estaban completas, y de hecho, esas declaraciones eran falsas. Las representaciones de las Demandadas crearon la falsa impresión de que los bonos eran menos riesgosos de lo que en realidad eran. Esas declaraciones falsas, junto con las representaciones igualmente engañosas de las Demandadas a los efectos de que habían realizado investigaciones razonables, permitieron y estimularon que el Gobierno y sus agencias e instrumentalidades acumularan deudas que en definitiva no han podido pagar de acuerdo con sus términos.

24. Al igual que el Gobierno, los puertorriqueños, los emisores y los aquí Demandantes fueron decepcionados, al haber confiado en la palabra y las representaciones en los suscriptores, incluyendo a las Demandadas, y como consecuencia han sido gravemente perjudicados.

25. Las representaciones incompletas de las Demandadas han causado a los Demandantes un daño enorme y sin precedentes. Inducidos por las Demandadas a emitir pólizas de seguro irrevocables, los Demandantes, al 1 de julio de 2019, se han visto obligados a pagar de más de $720 millones en reclamaciones, honrando sus garantías a los bonistas, y prevé que van a tener que pagar cientos de millones más. Si los Demandantes hubieran sabido que las Demandadas no iban a investigar la información que surgía de sus representaciones, nunca habrían emitido las pólizas de seguro.

26. Estas circunstancias extraordinarias ameritan que se aplique la doctrina de actos propios y/o de declaración unilateral de la voluntad, ya que el Tribunal Supremo de Puerto Rico ha reconocido ambas expresamente como reclamaciones equitativas conforme a la ley de Puerto Rico.

27. La doctrina de actos propios—la cual tiene su origen en el principio de derecho romano de *venire contra factum proprium* y luego fue reconocido en la jurisprudencia Española, y también en la jurisprudencia de muchas otras jurisdicciones civiles —tiene como objetivo proteger las "legitimate expectations" y la "good faith" y "prohibit[] . . . behavior that would result in an unreasonable

9

interference with a legitimately created trust relationship, that allowed the other party to reasonably rely on the original conduct." Thiago Luis Sombra, *The Duty of Good Faith Taken to a New Level: An Analysis of Disloyal Behavior*, 9 J. CIV. L. STUD. 28, 31 (2016). La doctrina de actos propios "aim[s] to raise good faith to the condition of a general principle that is autonomous, abstract, and subject to being invoked for a variety of legal relations, but with consideration of the peculiar aspects of each case." *Id.* pág. 34.

28. El derecho vigente en Puerto Rico reconoce una interpretación amplia de la doctrina de actos propios conforme resolvió el Tribunal Supremo de Puerto Rico hace cuarenta años en *International General Electric v. Concrete Builders, Inc.*, 104 D.P.R. 871 (1976). De modo que la doctrina permite que el reclamante recupere daños cuando se establece un "ataque a la buena fe," aún en ausencia de una relación contractual entre las partes. *Id.* a la pág. 877.

29. La doctrina es flexible y provee a los tribunales un "amplio margen de libertad," permitiéndoles dar forma a la aplicación de la doctrina para ajustarse a las circunstancias según lo requiera la equidad. LUIS DÍEZ-PICAZO PONCE DE LEÓN, LA DOCTRINA DE LOS ACTOS PROPIOS: UN ESTUDIO CRÍTICO SOBRE LA JURISPRUDENCIA DEL TRIBUNAL SUPREMO, 74 (Civitas Thomson Reuters (Legal) ed., 2da ed. 2014) (en lo sucesivo DÍEZ-PICAZO, DOCTRINA DE ACTOS PROPIOS).

30. "Mediante [su] aplicación [de doctrina de actos propios], se salvaguardan intereses esenciales para lograr una interacción efectiva a todos los niveles de la vida diaria. Se espera que el devenir entre los miembros que componen la sociedad esté caracterizado por las cualidades de honestidad y sinceridad, de manera que en todo momento se pueda descansar en la veracidad de las representaciones o las actuaciones de otro según se ha actuado." *O.C.S. v. Universal*, 187 D.P.R. 164, 172 (2012). La doctrina se fundamenta en parte en el entendido que "la buena fe exige de la persona un comportamiento coherente con la confianza que anteriormente sus actos puedan haber suscitado en otros." DÍEZ-PICAZO, DOCTRINA ACTOS PROPIOS, pág. 80. La intención del sujeto es irrelevante puesto que "[e]l centro de gravedad de la regla no reside en la voluntad de su autor, sino en la confianza generada en terceros…." *O.C.S.*, 187 D.P.R. pág. 173 *citando* a A. GULLÓN BALLESTEROS EN I. SIERRA GIL DE LA CUESTA, COMENTARIO DEL CÓDIGO CIVIL, Barcelona, Ed. Bosch, 2000, T. 1, pág. 397. Los tribunales de Puerto Rico aplican esta doctrina sin reparos en controversias comerciales, incluyendo cuando—como en este caso—se presentan reclamaciones contra bancos de inversión por parte de un demandante cuyas expectativas legítimas de buena fe han sido socavadas. *E.g., MMB Dev. Grp., Ltd. v.*

10

*Westernbank Puerto Rico*, 762 F. Supp. 2d 356, 370 (D.P.R. 2010) (el demandante presentó una reclamación bajo la doctrina de actos propios contra el banco al "alegar que [el banco] manifestó que iba a extender el período de cierre para los préstamos y eventualmente emitir los préstamos prometidos a [un tercero]; que estos actos y declaraciones del [banco] presentaron al demandante un cuadro impreciso de que [el banco] estaba dispuesto y podría emitir los préstamos; y que el demandante actuó con buena fe y confió a su detrimento en los "actos y declaraciones" del banco).

31.   De manera similar, mediante una declaración unilateral de voluntad, "una persona puede obligarse a favor de otra, siempre que su intención en obligarse sea clara, surja de un acto jurídico idóneo y no sea contraria a la ley, la moral ni al orden público." *Nationstar Mortg., LLC v. de Jesús Roldan*, KLCE201301345, 2014 WL 1692581 (2014), pág. *5. Así exige que, "[u]na vez constituida la obligación," mientras que la obligación no sea efectivamente retirada, "el declarante quedará sujeto a indemnizar los daños y perjuicios de su incumplimiento." *Id.* pág. *6. En efecto, la doctrina de la declaración unilateral de voluntad llena el vacío que surge cuando una parte hace una promesa concreta con la intención de que otros descansen y confíen en la promesa hecha.

32.   Nuestro Tribunal Supremo reiteró la vigencia de esta doctrina hace poco más de una década, reconociendo que "el auge y tráfico comercial ameritaban que se reconociera la posibilidad de dar plena eficacia a una serie de situaciones en las que una sola persona pretendía obligarse, tal como es el caso de la declaración unilateral de voluntad." *Ortiz v. P. R. Tel.*, 162 D.P.R. 715, 724 (2004). "[L]a adopción de la declaración unilateral de voluntad como fuente de obligación a base de la necesidad [del Gobierno de Puerto Rico] ordenamiento de proteger la confianza depositada de buena fe por quien confía en una promesa de esa naturaleza." *Nationstar*, pág. *6.

33.   Los elementos para aplicación tanto de la doctrina de actos propios y de la declaración unilateral de la voluntad se cumplen cabalmente en este caso. La existencia y operación del mercado de bonos municipales siempre se ha basado en que los aseguradores tales como los Demandantes, dependen y confían en la conducta de buena fe de las partes.

34.   Debido a que este caso claramente da origen a un tema de vital importancia pública para Puerto Rico, la política pública justifica plenamente que este tribunal actuando en equidad aplique la doctrina de actos propios y también la de la declaración unilateral de la voluntad. 31 L.P.R.A. § 7 ("Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se

tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos.")

35. *Primero*, la aplicación a los hechos aquí relacionados de la doctrina de actos propios y de la declaración unilateral de la voluntad, rectificará una situación injusta e inequitativa creada por las Demandadas. La crisis de bonos de Puerto Rico es uno de los grandes desastres económicos del siglo XXI. Los emisores han incumplido sus obligaciones de pago, perjudicando sus reputaciones y solvencia, y los servicios esenciales para los ciudadanos de Puerto Rico fueron afectados. A su vez, los bonistas que no gozan de la protección de un seguro, sufrieron pagos incumplidos y atrasados, mientras que el valor de sus inversiones se ha desplomado. Los Demandantes han sufrido enormes pérdidas, habiendo tenido que mitigar el daño ocasionado a los bonistas, habiendo tenido que desembolsar, al 1 de julio de 2019, más de $720 millones en pagos de reclamaciones y están expuestos a tener que pagar cientos de millones de dólares adicionales. Por otro lado, las Demandadas se lucraron significativamente, generando cientos de millones de dólares en comisiones y honorarios, pagadas por los emisores de estos bonos. De no concederse los remedios aquí solicitados, es probable que las Demandadas se queden con sus ganancias, mientras que los que verdaderamente resultaron afectados continúan sufriendo los daños como resultado. Este Tribunal de Primera Instancia es el foro apropiado para remediar la conducta anti-jurídica de las Demandadas.

36. *Segundo*, la aplicación de la doctrina de actos propios y de declaración unilateral de la voluntad en esta acción convalidará la suposición de las normas, costumbres y trasfondo en la industria de seguros. La capacidad de confiar en la buena fe de los suscriptores es esencial para el adecuado funcionamiento del mercado de seguros en garantía de bonos municipales. Como regla general, los suscriptores y aseguradores de los bonos municipales no celebran contratos entre sí; más bien, los aseguradores tienen que, de buena fe, confiar en los suscriptores para que estos les puedan presentar solicitudes de seguro verídicas y completas, ya que los suscriptores son los únicos que tienen acceso a la información de los emisores. Responsabilizar a las Demandadas por no haber investigado si la información que entregaron a los Demandantes era cierta y completa, es la única y recta forma de defender esos sanos principios.

37. *Tercero*, esta demanda ofrece una oportunidad importante para ayudar a restaurar el acceso que tiene el Gobierno a los mercados de capital, que es tan necesaria para la recuperación de la Isla. Cuando el mercado de bonos municipales funciona apropiadamente, proporciona a las entidades gubernamentales y sus

agencies e instrumentalidades, con capital a bajo costo y ofrece a los inversionistas una sólida y segura inversión. La infracción de las costumbres y normas del sector por las Demandadas ha lacerado este crítico mercado al desalentar la participación de entidades claves que dependen de la buena fe de los suscriptores. Este Tribunal tiene la extraordinaria oportunidad de restaurar la confianza en el mercado al dejar claro que los bancos de inversión tienen que revisar minuciosamente la información de los bonos que suscriben, o atenerse a las consecuencias, de no hacerlo.

38.     *Cuarto*, aun cuando las Demandadas han actuado contrario a los más elementales principios de equidad y buena fe, los Demandantes no tienen remedios contractuales o estatutarios para vindicar sus remedios como tienen los bonistas. National no puede instar reclamaciones contractuales porque no existe ningún contrato entre National y las Demandadas. Tampoco existe ningún esquema estatutario o legislación especial que proteja a National. A diferencia de los inversionistas, National no compró bonos y, por lo tanto, no tiene ninguna reclamación conforme a las leyes de valores federales.

39.     Los Demandantes no habrían podido presentar esta reclamación en equidad antes. Sus daños tomaron años en manifestarse—los primeros pagos de reclamaciones no se efectuaron sino hasta el 2016, y la magnitud de la conducta de las Demandadas, contraria a la buena fe y la equidad, no se manifestó hasta la publicación de un informe sobre una investigación especial y abarcadora en agosto de 2018, según se describe a continuación.

40.     En resumen, las Demandadas, por medio de sus actos, le garantizaron a los Demandantes que habían realizado investigaciones completas y razonables de los términos de los bonos que los Demandantes aseguraron, y éstos de buena fe confiaron en dichas representaciones, al emitir sus seguros. Pero las Demandadas frustraron las expectativas legítimas y de buena fe de los Demandantes, al no llevar a cabo esas investigaciones y en torno a la veracidad y de las representaciones que hicieron en las solicitudes de seguro. Ellos incumplieron con su obligación de actuar como los celosos guardianes del mercado. Por lo tanto, las Demandadas están impedidos de negar la responsabilidad de las consecuencias de su omisión de no llevar a cabo las investigaciones requeridas y lo recto, lo justo, y lo equitativo, es que se les condene a pagar la correspondiente indemnización a National.

<u>LAS PARTES</u>

**I.    La Parte Demandante**

41.    La demandante National Public Finance Guarantee Corporation ("NPFG") (anteriormente conocida como MBIA Insurance Corp. of Illinois) es una compañía de seguros de garantías financieras, con oficina principal en 1 Manhattanville Road, Purchase, NY 10577. NPFG es una corporación organizada y existente bajo las leyes del estado de Nueva York y tiene sus oficinas principales en Nueva York. NPFG es una subsidiaria de MBIA Inc., que no es parte en esta demanda, a través de otra compañía tenedora de sus acciones, National Public Finance Guarantee Holdings, Inc. Como aseguradora monoline, NPFG asegura bonos municipales, incluyendo deuda exenta y no exenta de contribuciones de instrumentalidades políticas de los Estados Unidos, como también de utilidades, aeropuertos, facilidades de salud, instituciones educativas, emisores de préstamos estudiantiles, autoridades de vivienda y otras agencias similares, y obligaciones emitidas por entidades privadas que financian proyectos que sirven un fin público importante.

42.    La demandante MBIA Insurance Corporation ("MBIA") es una compañía de seguros de garantías financieras con oficina principal en 1 Manhattanville Road, Purchase, NY 10577. MBIA es una corporación organizada y existente bajo las leyes de Nueva York y tiene sus oficinas principales en Nueva York. MBIA es una subsidiaria de MBIA Inc., que no es parte en esta demanda. MBIA asegura y reasegura obligaciones de finanzas estructuradas y obligaciones de finanzas públicas internacionales que se venden en los mercados de nuevas emisiones y mercados secundarios.

43.    Financial Guaranty Insurance Company ("FGIC"), que no es parte en esta demanda, es una compañía de seguros organizada y existente bajo las leyes del estado de Delaware y con oficinas principales en 463 Seventh Avenue, New York, NY 10018. Es una aseguradora monoline que emite pólizas de seguros de garantías que aseguran las finanzas públicas, las finanzas estructuradas, y otras obligaciones.

44.    Entre el 2001 y 2007, MBIA aseguró las siguientes emisiones de bonos de Puerto Rico: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds [los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; PREPA Power Revenue Bonds [los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico] Series LL y NN; PREPA Power Revenue Refunding Bonds [los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico], Series MM, SS, UU, y VV; PRHTA Highway

14

Revenue Refunding Bonds [los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico], Serie AA; PRHTA Transportation Revenue Bonds [los Bonos de Ingresos de Transporte de la ACT de Puerto Rico],Serie J; PRHTA Transportation Revenue Refunding Bonds [los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico], Series L y N; y COFINA Sales Tax Revenue Bonds [los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA], Serie 2007A bajo las pólizas número: 36358, 40952, 503220, 38324, 42162, 39115, 46002, 494781, 496040, 409190, 437160, 46994, 492151, y 499240. NPFG asumió la responsabilidad sobre estas pólizas en el 2009, conforme a un plan de reestructuración por medio del cual se convirtió en una subsidiaria de National Public Finance Guarantee Holdings, Inc., que a su vez es una subsidiaria de MBIA Inc. NPFG está obligada a pagar cualquier reclamación que surja bajo estas pólizas. En la medida que NPFG no pague alguna reclamación, MBIA retuvo la obligación de pagar las reclamaciones.

45.    También, entre el 2001 y 2007, FGIC aseguró los siguientes bonos de Puerto Rico: los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series OO y VV; y los Bonos de Ingresos de Impuestos sobre la Venta de COFINA, Serie 2007A bajo las pólizas número: FG05010237, FG04010536, FG07010235, y FG07010326. NPFG es la sucesora de FGIC en cuanto a estas pólizas: En septiembre de 2008, MBIA asumió la responsabilidad de los intereses de FGIC en relación a estas pólizas; en febrero de 2009 le cedió esos intereses a NPFG; y FGIC posteriormente en septiembre de 2012 novólas pólizas directamente a NPFG.

46.    En lo sucesivo para propósitos de esta Demanda, nos referimos a NPFG, MBIA, y FGIC colectivamente como "National."

## II.    La Parte Demandada

47.    La Demandada UBS Financial Services, Inc. ("UBS Financial Services"), anteriormente conocido como UBS PaineWebber Inc., es un corredor de valores registrado con la SEC. UBS Financial Services está organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en 1200 Harbor Blvd, Weehawken, NJ 07086. UBS Financial Services es una subsidiaria de UBS Americas Inc., que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS Americas Holding LLC, que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS AG, que no es parte de esta demanda, la cual a su vez es una subsidiaria de la compañía matriz UBS Group AG, que no es parte de esta demanda.

UBS Financial Services está registrada como corredor de valores en Puerto Rico desde el 1 de septiembre de 1984.

48.     La Demandada UBS Securities LLC ("UBS Securities") es un corredor de valores registrado con la SEC. UBS Securities está organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en 1285 Avenue of the Americas, New York, NY 10019. Dicha empresa anteriormente era conocida como UBS Investment Bank, y es una subsidiaria de UBS Americas Inc., que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS Americas Holding LLC, que no es parte de esta demanda, la cual a su vez es una subsidiaria de UBS AG, que no es parte de esta demanda, la cual a su vez es una subsidiaria matriz UBS Group AG, que no es parte de esta demanda. UBS Securities está registrada como corredor de valores en Puerto Rico desde el 4 de junio de 1992.

49.     UBS Financial Services y UBS Securities (colectivamente, las "Demandadas UBS") suscribieron las siguientes emisiones de bonos: Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingreso de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326. UBS Financial Services actuó como suscriptor líder para los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, 2002A y de los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie VV. UBS Securities actuó como suscriptor líder de los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2007A y los Bonos de Refinanciamiento de Ingresos de la ACT de Puerto Rico, Serie L.

50.     La Demandada Citigroup Global Markets Inc. ("Citigroup Global Markets") es un corredor de valores registrado con la SEC. Citigroup Global Markets está organizada bajo las leyes del estado de Nueva York y tiene sus oficinas principales en 388 Greenwich Street, New York, NY 10013. Es una subsidiaria indirecta de Citigroup Global Markets Holdings Inc., la cual a su vez es una

16

subsidiaria de Citigroup Inc., las cuales no son parte en esta demanda. Citigroup Global Markets está registrado como corredor de valores en Puerto Rico desde el 1 de septiembre de 1984.

51.     Citigroup Global Markets suscribió las siguientes emisiones de bonos: Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2003C y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie NN y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326. Citigroup Global Markets actuó de suscriptor líder de los siguientes bonos: los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; y los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N.

52.     En 1998, Citigroup, Inc., llegó a ser el sucesor mediante una fusión con Salomon Smith Barney; en 2003, el nombre de Salomon Smith Barney, fue cambiado a Citigroup Global Markets. Antes del cambio de nombre, Salomon Smith Barney suscribió los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2002A; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie LL; y los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie MM. National aseguró estos bonos bajos las pólizas número: 36358, 38324, y 39115.

53.     La Demandada Goldman Sachs & Co. LLC ("Goldman Sachs LLC") es un corredor de valores registrado con la SEC. Goldman Sachs LLC está organizada bajo las leyes del estado de Nueva York y tiene sus oficinas principales en 200 West Street, New York, NY 10282. Goldman Sachs LLC es una subsidiaria de Goldman Sachs Group, Inc. ("Goldman Sachs"), que no es parte en esta demanda, quien, sujeto a ciertas excepciones, ha garantizado las obligaciones de pago de Goldman Sachs LLC. Anteriormente dicha empresa se conocía como Goldman Sachs & Co., pero en abril de 2017, se convirtió en una compañía de responsabilidad limitada. Sus actividades incluyen banca de inversión, servicios a clientes institucionales,

inversiones y préstamos, y administración de inversiones. Goldman Sachs LLC es el corredor de valores en los Estados Unidos de Goldman Sachs, y está registrado como corredor de valores en Puerto Rico desde el 1 de septiembre de 1984.

54.    Goldman Sachs LLC suscribió las siguientes emisiones: Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326. Goldman Sachs LLC actuó como suscriptor líder de los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N; los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, 2003C; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, MM, y NN; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A.

55.    La Demandada J.P. Morgan Securities LLC ("J.P. Morgan Securities"), conocido anteriormente como J.P. Morgan Securities, Inc., es un corredor de valores registrado con la SEC. J.P. Morgan Securities está organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en 277 Park Avenue, New York, NY 10172. En 2010, se convirtió de una corporación a una compañía de responsabilidad limitada. J.P. Morgan Securities es el corredor de valores principal y es una subsidiaria de JPMorgan Chase & Co. que no es parte en esta demanda. J.P. Morgan Securities, ha sido un corredor de valores registrado en Puerto Rico desde el 1 de septiembre de 1984. En el año 2008, Bear Stearns & Co. se fusionó con JPMorgan Chase & Co., convirtiéndose en una subsidiaria de JP Morgan Chase & Co.

56.    J.P. Morgan Securities y/o Bear Stearns & Co., Inc. suscribieron los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de

Case:17-03283-LTS Doc#:8666-10 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit G - Service of Process Exhibit G - Santander 1 Page 20 of 43
SJ2019CV07932 08/08/2019 10:24:59 am Página 19 de 93

Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajos las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326. J.P. Morgan Securities actuó como suscriptor líder de los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series OO, RR, SS, y UU.

57.     La Demandada Morgan Stanley & Co. LLC ("Morgan Stanley LLC") es un corredor de valores registrado con la SEC. Morgan Stanley LLC está organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en 1585 Broadway, New York, NY 10036. Es una subsidiaria de Morgan Stanley Domestic Holdings, Inc., que no es parte de esta demanda, la cual a su vez es una subsidiaria de Morgan Stanley Capital Management, LLC, que no es parte de esta demanda, la cual a su vez es una subsidiaria de la matriz Morgan Stanley, que no es parte de esta demanda. Morgan Stanley LLC se dedica a la suscripción y distribución de valores y a proveer servicios de asesoramiento financiero. Es el principal corredor de valores de Morgan Stanley en los Estados Unidos, y está registrado como corredor de valores en Puerto Rico desde el 8 de noviembre de 1985.

58.     Morgan Stanley LLC suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326. Morgan Stanley LLC actuó como suscriptor líder de los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series RR y SS, y los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2003C.

59.     La Demandada Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") es un corredor de valores registrado con la SEC. Merrill Lynch está

19

organizada bajo las leyes del estado de Delaware y tiene sus oficinas principales en One Bryant Park, New York, NY 10036. Dicha empresa opera como subsidiaria de BAC North America Holding Company, que no es parte de esta demanda, la cual a su vez opera como subsidiaria de NB Holdings Corporation, que no es parte de esta demanda, la cual a su vez opera como subsidiaria de la corporación matriz, Bank of America Corporation, que no es parte de esta demanda. Merrill Lynch es el corredor de valores principal en los Estados Unidos de Bank of America. Está registrada como corredor de valores en Puerto Rico desde el 1 de septiembre de 1984 y mantiene oficinas en Puerto Rico en 15 Second Street, Suite 210, Guaynabo, PR 00968.

60.     Merrill Lynch suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326.

61.     En el 2010, Merrill Lynch se convirtió en la sucesora por fusión de Banc of America Securities LLC ("Banc of America Securities"). Banc of America Securities suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Series 2002A, 2003C, y 2007A; los Bonos de Refinanciamiento de Ingresos de Carreteras de la ACT de Puerto Rico, Serie AA; los Bonos de Ingresos de Transporte de la ACT de Puerto Rico, Serie J; los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Series L y N; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series LL, NN, y RR; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series MM, OO, SS, UU, y VV; y los Bonos de Ingresos de Impuestos Sobre la Venta, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, y FG07010326.

62.     En el 2009, Merrill Lynch se convirtió en la sucesora por fusión de Banc of America Investment Services, Inc., la cual había adquirido previamente a LaSalle

20

Financial Services, Inc., conocida anteriormente como ABN AMRO Financial Services, Inc. ("ABN AMRO"). ABN AMRO suscribió los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2002A; los Bonos de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie LL; y los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Serie MM. National aseguró estos bonos bajo las pólizas número: 36358, 38324, y 39115.

63.    La Demandada RBC Capital Markets LLC ("RBC Capital Markets") es un corredor de valores registrado con la SEC. RBC Capital Markets está organizada bajo las leyes de Minnesota y tiene sus oficinas principales en 200 Vesey Street, New York, NY 10281. Es subsidiaria de RBC USA Holdco Corporation, que no es parte de esta demanda, la cual a su vez es una subsidiaria de RBC US Group Holdings LLC, que no es parte de esta demanda, la cual a su vez es una subsidiaria de la matriz Royal Bank of Canada, que no es parte de esta demanda. En febrero de 2008, RBC Capital Markets cambió de nombre de RBC Dain Rauscher Inc. a RBC Capital Markets Corporation. En noviembre de 2010, la compañía se convirtió de una corporación a una compañía de responsabilidad limitada. RBC Capital Markets está registrada como corredor de valores en Puerto Rico desde el 16 de mayo de 1997.

64.    RBC Capital Markets suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series UU y VV; los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A; y los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 492151, 494781, 496040, 499240, 503220, FG07010235, y FG07010326. RBC Capital Markets actuó como suscriptor líder de los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N.

65.    La Demandada Santander Securities LLC ("Santander Securities") es un corredor de valores registrado con la SEC con dirección en 2 Morrissey Boulevard, Dorchester, MA 02125. Santander Securities está organizada bajo las leyes de Puerto Rico y durante el período pertinente, tenía sus oficinas principales en Puerto Rico. Opera como subsidiaria de Santander Holdings USA, Inc., que no es parte de esta demanda, la cual a su vez es una subsidiaria de la matriz Banco Santander, S.A., que no es parte de esta demanda. En el 2011, Santander Securities se convirtió de una corporación a una compañía de responsabilidad limitada. Santander Securities está registrada como corredor de valores en Puerto Rico desde el 3 de diciembre de 1996.

Case:17-03283-LTS   Doc#:8666-10   Filed:09/09/19   Entered:09/09/19 17:18:09   Desc:
Exhibit Exhibit G - Service of Process Exhibit G - Santander 1   Page 23 of 43
SJ2019CV07982 08/06/2019 10:24:39 am Página 22 de 93

66.     Santander Securities suscribió las siguientes emisiones: los Bonos de Refinanciamiento de Ingresos de Transporte de la ACT de Puerto Rico, Serie N; los Bonos de Refinanciamiento de Ingresos de Energía Eléctrica de la AEE de Puerto Rico, Series UU y VV; los Bonos de Ingresos de Impuestos Sobre la Venta de COFINA, Serie 2007A; y los Bonos de Refinanciamiento de Mejoras Públicas del Gobierno de Puerto Rico, Serie 2007A. National aseguró estos bonos bajo las pólizas número: 492151, 494781, 496040, 499240, 503220, FG07010235, y FG07010326.

## JURISDICCIÓN

67.     Este Tribunal tiene jurisdicción sobre la persona de cada una de las Demandadas.

### I.    Jurisdicción General

68.     Este Tribunal tiene jurisdicción general sobre cada una de las Demandadas porque cada una de ellas tiene contactos recurrentes y continuos con Puerto Rico.

69.     La Demandada UBS Financial Services es un corredor de valores registrado en Puerto Rico. UBS Financial Services se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades.

70.     La Demandada UBS Securities es un corredor de valores registrado en Puerto Rico. UBS Securities se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades.

71.     La Demandada Citigroup Global Markets es un corredor de valores registrado en Puerto Rico. Citigroup Global Markets se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Además, Citigroup Global Markets sirve como consultor a la Junta de Supervisión Fiscal para Puerto Rico (la "Junta de Supervisión"), la cual fue creada conforme a la "Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico de 2016" ("Puerto Rico Oversight, Management, and Economic Stability Act of 2016" o "PROMESA," por sus siglas en inglés), para asistir a Puerto Rico a restructurar sus deudas. En específico, en 2017, la Junta de Supervisión, a nombre de Puerto Rico y algunas de sus agencias e instrumentalidades—incluyendo la AEE de Puerto Rico, la ACT de Puerto Rico, y COFINA—presentó peticiones

conforme al Título III de PROMESA con el propósito de restructurar sus deudas (los "Procedimientos del Título III"). Citigroup Global Markets sirve como consultor a la Junta de Supervisión en esos Procedimientos del Título III y es el asesor líder de inversiones para la reestructuración y privatización de la AEE.

72.    La Demandada Goldman Sachs LLC es un corredor de valores registrado en Puerto Rico. Goldman Sachs LLC se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Goldman Sachs LLC participa en empresas comunes con entidades de Puerto Rico, tales como Autopistas Metropolitanas de Puerto Rico, LLC, que administra las carreteras de peaje en Puerto Rico.

73.    La Demandada J.P. Morgan Securities es un corredor de valores registrado en Puerto Rico. J.P. Morgan Securities se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. J.P. Morgan Securities mantiene oficinas en Puerto Rico en las cuales realizaba su negocio como corredor de valores.

74.    La Demandada Morgan Stanley LLC es un corredor de valores registrado en Puerto Rico. Morgan Stanley LLC se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades, y tiene clientes en Puerto Rico. Morgan Stanley LLC mantuvo oficinas en Puerto Rico en las cuales realizaba su negocio como corredor de valores.

75.    La Demandada Merrill Lynch es un corredor de valores registrado en Puerto Rico. Merrill Lynch se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Merrill Lynch mantiene oficinas en Puerto Rico en las que realizó su negocio como corredor de valores.

76.    La Demandada RBC Capital Markets es un corredor de valores registrado en Puerto Rico. RBC Capital Markets se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Por medio de su Grupo de Capital Social de Créditos Tributarios ("Tax Credit Equity Group"), RBC Capital Markets administra fondos de inversión enfocados, parcialmente, en propiedades en Puerto Rico.

77.    La Demandada Santander Securities está incorporado en Puerto Rico y tiene sus oficinas principales en Puerto Rico. Santander Securities es un corredor de valores registrado en Puerto Rico. Santander Securities se dedica con regularidad y sistemáticamente al negocio de corretaje de valores en Puerto Rico, incluyendo la suscripción de múltiples bonos emitidos por el Gobierno de Puerto Rico y sus agencias e instrumentalidades. Santander Securities mantiene oficinas en Puerto Rico desde las cuales realizaba su negocio como corredor de valores.

## II.    Jurisdicción Especifica

78.    El Tribunal tiene jurisdicción específica sobre cada una de las Demandadas bajo nuestro ordenamiento procesal ya que cada uno de las Demandadas, ya sea directamente o por medio de sus agentes, realizaba negocios en Puerto Rico y las reclamaciones de National surgen de y están relacionadas con esas transacciones.

79.    Las reclamaciones y daños y perjuicios de National surgen de su seguro en garantía de bonos emitidos en Puerto Rico por el Gobierno de Puerto Rico y sus instrumentalidades, incluyendo sin limitación a la AEE, COFINA, y la ACT. Cada uno de los bonos fue suscrito por las Demandadas, quienes se dedicaban a realizar negocios en Puerto Rico, ya sea directamente o por medio de sus agentes con el Gobierno de Puerto Rico, la AEE, COFINA, y/o la ACT. Las Demandadas gestionaron y obtuvieron seguros de National para cada una de las emisiones de bonos en nombre del Gobierno de Puerto Rico, la AEE, COFINA, y/o la ACT.

80.    Cada una de las Demandadas, ya sea directamente o por medio de sus agentes, dirigía comunicaciones—incluyendo por teléfono, carta, fax y correo electrónico—a direcciones en Puerto Rico que están relacionadas directamente con las reclamaciones de National, incluyendo comunicaciones relacionadas con los seguros en garantía de bonos de National.

81.    Las pólizas de seguro que las Demandadas indujeron a National a emitir se firmaron en Puerto Rico.

82.    Como suscriptores, las Demandadas compraron los bonos emitidos por el Gobierno de Puerto Rico, la AEE, COFINA, y/o la ACT. Luego, las Demandadas vendieron esos bonos a, entre otras, personas naturales o jurídicas ubicadas en Puerto Rico. A cambio de ello, el Gobierno de Puerto Rico, la AEE, COFINA, y la ACT pagaron a las Demandadas cuantiosos honorarios.

83.    Según información, cada una de las Demandadas sostuvo reuniones en Puerto Rico relacionadas con las emisiones aquí descritas, incluyendo contactos en

Case:17-03283-LTS   Doc#:8666-10   Filed:09/09/19   Entered:09/09/19 17:18:09   Desc:
Exhibit Exhibit G - Service of Process Exhibit G - Santander 1   Page 26 of 43
SJ2019CV07932 08/08/2019 10:24:39 am Página 25 de 95

Puerto Rico para el mercadeo, promoción y venta de los bonos. Según un anterior gerente de la sucursal de una afiliada de UBS Securities: "All the major banks in New York [came] to Puerto Rico on a regular basis to pitch deals. . . . They make commissions. They make fees. This is kind of like a moneymaking machine. As long as there are transactions coming and going, they're making a ton of money." Laura Sullivan, *How Puerto Rico's Debt Created a Perfect Storm before the Storm*, NPR (2 de mayo de 2018), https://www.npr.org/2018/05/02/607032585/how-puerto-ricos-debt-created-a-perfect-storm-before-the-storm. Además, la Demandada Citigroup Global Markets tuvo por lo menos una reunión en Puerto Rico con National con respecto a la emisión de un seguro para AEE.

84.    Asumir jurisdicción *in personam* es razonable. Este foro tiene un interés apremiante en adjudicar esta controversia, que trata de causas de acción únicas bajo el derecho sustantivo de Puerto Rico—incluyendo reclamaciones conforme al Código Civil de Puerto Rico, Art. 7—y las alegaciones tratan con hechos relacionados con la emisión de miles de millones de dólares de bonos en Puerto Rico. Las Demandadas cuentan con mucho capital y siguen realizando negocios aquí; para ellos no sería oneroso comparecer ante este tribunal. Ningún otro foro tiene tantos contactos ni un interés tan apremiante en adjudicar esta controversia y todas las reclamaciones podrán ser resueltas aquí.

<u>COMPETENCIA</u>

85.    La competencia territorial del Tribunal de Primera Instancia, Sala Superior de San Juan, es apropiada conforme a la Regla 3.5 de Procedimiento Civil. Las Demandadas Santander Securities, J.P. Morgan Securities, Morgan Stanley LLC, y Merrill Lynch tienen una presencia física y oficinas en San Juan. Además, la gran mayoría de los actos, eventos, y las transacciones que se alegan en esta demanda, ocurrieron en San Juan. Los bonos fueron emitidos en San Juan y se vendieron a personas en San Juan. Las pólizas de seguros emitidas por National fueron firmadas en San Juan. Las comunicaciones pertinentes—incluyendo por medio de reuniones y por teléfono, fax, correo electrónico y carta—sucedieron también en San Juan.

<u>ALEGACIÓN DE LOS HECHOS</u>

I.    **El Mercado de Bonos Municipales**

86.    Un bono municipal es un valor ("debt security"), representativo de una deuda, según el cual el emisor reconoce una deuda con los tenedores de los bonos y tiene que pagarles intereses, normalmente en intervalos fijos, y tiene que reintegrar

el principal en una fecha de vencimiento en el futuro. Los bonos municipales pueden ser emitidos por un gobierno estatal, local, territorial, o por una de sus agencias, instrumentalidades o dependencias. Estos bonos se utilizan normalmente para financiar proyectos de interés público o de infraestructura como por ejemplo carreteras, escuelas, vivienda y otros servicios públicos.

87.    El mercado de los bonos municipales está limitadamente reglamentado. "[M]unicipal issuers are exempt from regulation by the SEC with limited exceptions." MSRB Regulatory Notice 2017-18, pág. 2 (13 de septiembre de 2017), http://www.msrb.org/~/media/Files/Regulatory-Notices/Announcements/2017-18.ashx. Las emisiones de bonos municipales están "exempt from federal securities registration and reporting requirements that apply to other securities being offered to the public. "SEC, *Investor Bulletin: The Municipal Securities Market* 1, (12 de febrero de 2018), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_munibondsmarket. Por lo tanto, cualquier divulgación pública sobre los bonos que el emisor elija hacer es voluntaria. *Véase* Municipal Securities Disclosure, Exchange Act Release No. 26100 (22 de septiembre de 1988).

A.    **Suscriptores de Bonos Municipales**

88.    El emisor de un bono municipal (en este caso, todas instrumentalidades del gobierno) contrata a un suscriptor ("underwriter")— generalmente un banco de inversión—para mercadear y vender los bonos. Entre otras cosas, por lo regular el suscriptor participa en redactar las Declaraciones Oficiales que describen los bonos y se radican con el SEC. El suscriptor compra los bonos del emisor, fija el precio de los bonos, luego los revende a inversionistas en una oferta inicial.

89.    Mientras que cada emisión de bonos suele tener varios suscriptores, la mayoría de las emisiones tienen por lo menos un "suscriptor líder" que asume el control y mando entre otras cosas, para fijar el precio de los bonos, incluir a otros suscriptores en la emisión, distribuir la cantidad de bonos que serán vendidos entre suscriptores secundarios, coordinar entre los suscriptores y obtener el seguro de garantía de los bonos. Cada emisión a la que se refiere este caso tenía por lo menos un suscriptor líder responsable de vender más bonos que el resto del equipo de suscriptores y que por ello además tenía derecho a recibir honorarios más altos.

90.    Si el emisor hace una divulgación pública sobre sus bonos, la SEC requiere que los suscriptores (aquí las Demandadas) revisen esas divulgaciones y que se aseguren que, por medio de una investigación razonable, su contenido e información es verdadera y completa. Según ha explicado el SEC, "investors in the

26

municipal markets rely on the reputation of the underwriters participating in an offering in deciding whether to invest." Disclosure, Release No. 26100 a la pág. *6. Por lo tanto, la SEC adoptó la Regla 15c2-12 de la Ley de la Bolsa de Valores de la SEC para "stimulate greater scrutiny by underwriters of the representations made by issuers and the circumstances surrounding the offering." *Id.* Este cargo recae sobre los suscriptores porque ellos son ""securities professionals" sofisticados con experiencia en la emisión de bonos que suele ser mucho mayor que la de los emisores municipales. *Id.*

91.     Según la Regla 15c2-12 es "unlawful" que el banco de inversión "act as an underwriter in a primary offering of municipal securities" de más de $1 millón a menos que, entre otras cosas, "obtain[s] and review[s] an Official Statement" que contenga información clave sobre la emisión. *Véase* 17 C.F.R. § 240.15c2-12. Los suscriptores colocan sus nombres en las portadas de estas Declaraciones Oficiales, respaldándolas así con sus reputaciones. Es posible que los borradores de Declaraciones Oficiales excluyan cierta información relacionada con los precios, las tasas de interés y los rendimientos de los bonos, pero en todo lo demás contienen usualmente la misma información que las versiones finales.

92.     Según ha explicado la SEC, interpretando la Regla 15c2-12: "by participating in an offering, an underwriter makes an implied recommendation about the securities. This recommendation implies that the underwriter has a reasonable basis for belief in truthfulness and completeness of the key representations contained in the [O]fficial [S]tatement." Municipal Securities Disclosure, Exchange Act Release No. 26985 a la pág. *2 (28 de junio de 1989). Por ende, según la Regla 15c2-12, el suscriptor viene obligado a realizar una "reasonable investigation" para desarrollar "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents [i.e., the Official Statements] used in the offerings." Disclosure, Release No. 26100 a la pág. *20. Es decir, para llevar a cabo una investigación razonable, el suscriptor también tiene que examinar la veracidad y lo completo ("truthfulness and completeness") de las declaraciones hechas por el mismo emisor en emisiones en el pasado: "An underwriter's obligation to have a reasonable basis to believe that the key representations in a final [O]fficial [S]tatement are true and accurate extends to an issuer's representations concerning past compliance with disclosure obligations." U.S. SEC. AND EXCH. COMM'N., *Municipalities     Continuing     Disclosure     Cooperation     Initiative*, https://www.sec.gov/divisions/enforce/municipalities-continuing-disclosure-cooperation-initiative.shtml (modificada por última vez el 13 de noviembre de 2014).

93. En definitiva, los suscriptores son, en efecto, los celadores o guardianes del mercado. Ellos "help address the informational asymmetries between investors and companies by verifying the credibility of contractual representations," incluyendo "the accuracy of financial statements" and "the risk profile of bonds." Stavros Gadinis & Colby Mangels, *Collaborative Gatekeepers*, 73 WASH. & LEE L. REV. 797, 802 (2016).

94. Cuando los suscriptores hacen su trabajo como se espera y pueden proteger a los emisores contra la emisión de deudas que tengan la probabilidad de ser incumplidas. Disclosure, Release No. 26100. Por consiguiente, si el suscriptor determina que las divulgaciones de los bonos son substancialmente falsas o incompletas, debe colaborar con el emisor para corregir la representación o sencillamente negarse a participar en la oferta—dando así una señal al mercado que algo está mal. *Véase* Gadinis, 73 WASH. & LEE L. REV. pág. 810. En otras palabras, los inversionistas y otros que confían de buena fe en esta información, podrán estar en condiciones de evaluar si es probable que el emisor pueda pagar los bonos que emita según los términos expuesto—es decir, se trata de una evaluación que pueden realizar solamente si la información revelada es cierta y completa.

## B. El Seguro en Garantía de Bonos Municipales

95. Para facilitar el mercadeo y venta de los bonos y hacerlos más atractivos a inversionistas, los emisores de bonos municipales pueden, como en este caso, contratar a un asegurador de bonos—también conocido como asegurador monoline—para proporcionar un seguro de garantía financiera. A cambio de una prima, el asegurador del bono garantiza que pagará los intereses o el principal a los tenedores de algunos o de todos los bonos, si el emisor incumple con el pago. Al introducir su propia solvencia crediticia y capacidad para pagar reclamaciones relacionadas con los bonos, el asegurador del bono le provee un aumento a la solvencia y credibilidad, y, por lo tanto, la capacidad de mercadear, de los bonos. Sin un seguro en garantía de bonos, es posible que el suscriptor no pueda traficar un bono al precio deseado—o, incluso, a ningún precio, dependiendo de la solvencia del emisor.

96. Por lo general, el suscriptor solicita un seguro de garantía de bonos municipales de un asegurador en nombre de un emisor. El suscriptor y el asegurador no celebran un contrato, y el suscriptor no actúa como el agente del emisor; el contrato de seguro es entre el asegurador y el emisor (o una entidad actuando en nombre del emisor, como un agente de seguros).

97. Sin embargo, según normas bien reconocidas en la industria, es el suscriptor el que presenta una "solicitud de seguro" al asegurador para pedir un

seguro en garantía de bonos para un emisor. A diferencia de las solicitudes de seguros de naturaleza personal (como contra incendios, de auto o de casa), no hay ningún formulario de seguro estándar; en su lugar, la solicitud de un seguro en garantía de bonos municipales es un conjunto de documentos que describen el emisor y los bonos, incluyendo un borrador de las Declaraciones Oficiales, tres años de estados financieros debidamente auditados, y borradores de los documentos legales que describen la emisión. El suscriptor suplementa la solicitud constantemente con borradores actualizados de las Declaraciones Oficiales, y por último la versión final.

98. Al presentar Declaraciones Oficiales a un asegurador para que emita su póliza, el suscriptor garantiza al asegurador que realizará una investigación razonable de la veracidad y corrección de esas declaraciones, y que el suscriptor puede tener una base razonable para creer que esas declaraciones y divulgaciones son substancialmente verdaderas y completas. El suscriptor no está obligado a enviar esos materiales e información al asegurador, o a certificar al asegurador que cumplirá con las leyes de valores federales. Después de que lo hace voluntariamente, el suscriptor ("underwriter") proporcionar esos materiales e información, sin embargo, el asegurador tiene derecho a confiar de buena fe en que el suscriptor realizará las investigaciones requeridas por la ley.

99. Las afirmaciones del asegurador son esenciales porque los suscriptores tienen acceso especial a los emisores—incluyendo a su información financiera—que los aseguradores y otros participantes en el mercado no tienen. Para decidir si va a emitir un seguro, el asegurador de bonos necesariamente depende de en la información proporcionada por el suscriptor y de su afirmación de que ha revisado esa información. *Véase* Gadinis, 73 WASH. & LEE L. REV. pág. 809. Según observó la SEC, los aseguradores de bonos tienen que "rely upon disclosure concerning the primary obligor" (es decir, el emisor) y la "reasonable investigation [by the underwriter] of the accuracy and completeness of key representations concerning the primary obliger." Disclosure, Release No. 26985 a la pág. *22.

100. Típicamente, después de que un asegurador monoline emite un seguro en garantía de bonos, ese seguro no puede ser cancelado—el asegurador viene obligado a pagar las reclamaciones, aun si emitió la póliza con base en información que resulta ser esencialmente falsa o incompleta. El asegurador no puede presentar reclamaciones contra los suscriptores conforme a las leyes de valores, porque no compró los bonos, sino que los aseguró. El asegurador tampoco puede presentar reclamaciones contractuales contra un suscriptor, porque entre los dos nunca se formaliza un contrato.

29

101. Por tanto, es esencial que la información y las afirmaciones de los suscriptores dadas a los aseguradores de los bonos sean verdaderas y completas. Si el suscriptor no realiza la revisión prometida y permite que los bonos se vendieran a base de información falsa o incompleta, esa omisión puede—tal como sucedió en este caso—ocasionar un daño catastrófico al emisor, al asegurador, y al mercado.

## II. Las Demandadas Suscribieron Los Bonos y Se Beneficiaron Inmensamente de Todas y Cada Una de Esas Transacciones

102. Entre el 2001 y el 2014, el Gobierno de Puerto Rico y sus agencias e instrumentalidades, incluyendo a la AEE, la ACT, y COFINA—emitieron bonos con un valor principal al momento de la emisión de aproximadamente $66,469,538,131. Dieciséis de esas emisiones de bonos son objeto de esta reclamación:

a)   Bonos de Ingresos de Energía, Serie LL ("Power Revenue Bonds, Series LL")

b)   Bonos de Refinanciamiento de Ingresos de Energía, Serie MM ("Power Revenue Refunding Bonds, Series MM")

c)   Bonos de Ingresos de Energía, Serie NN ("Power Revenue Bonds, Series NN")

d)   Bonos de Refinanciamiento de Ingresos de Energía, Serie OO ("Power Revenue Refunding Bonds, Series OO")

e)   Bonos de Ingresos de Energía, Serie RR ("Power Revenue Bonds, Series RR")

f)   Bonos de Refinanciamiento de Ingresos de Energía, Serie SS ("Power Revenue Refunding Bonds, Series SS")

g)   Bonos de Refinanciamiento de Ingresos de Energía, Serie UU ("Power Revenue Refunding Bonds, Series UU")

h)   Bonos de Refinanciamiento de Ingresos de Energía, Serie VV ("Power Revenue Refunding Bonds, Series VV")

i)   Bonos de Refinanciamiento de Mejoras Públicas, Serie 2002A ("Public Improvement Refunding Bonds, Series 2002A")

j)   Bonos de Mejoras Públicas, Serie 2003C ("Public Improvement Bonds, Series 2003C")

k)   Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A ("Public Improvement Refunding Bonds, Series 2007A")

l)   Bonos de Refinanciamiento de Ingresos de Carreteras, Serie AA ("Highway Revenue Refunding Bonds, Series AA")

m)  Bonos de Ingresos de Transporte, Serie J ("Transportation Revenue Bonds, Series J")

n)  Bonos de Refinanciamiento de Ingresos de Transporte, Serie L ("Transportation Revenue Refunding Bonds, Series L")

o)  Bonos de Refinanciamiento de Ingresos de Transporte, Serie N ("Transportation Revenue Refunding Bonds, Series N")

p)  Bonos de Ingresos de Impuestos Sobre la Venta, Serie 2007A ("Sales Tax Revenue Bonds, Series 2007A")

103.  Como resultado de esas emisiones, las Demandadas se lucraron significativamente de diferentes maneras.

104.  *Primero,* afiliadas de algunos de los suscriptores, incluyendo a una afiliada de las Demandadas UBS con sede en Puerto Rico, actuaron como asesores financieros de los emisores, y cobraron honorarios sustanciales al actuar en esa capacidad. Informe sobre la Investigación Especial a las págs. 557-58 [el Informe sobre la Investigación Especial se describe *infra* ¶¶ 130-133]. Este asesoramiento fue motivado por sus propios intereses y les permitió a esas afiliadas lucrarse de la emisión de los bonos, obteniendo millones de dólares como resultado de su asesoramiento motivado por sus intereses particulares.

105.  *Segundo,* los emisores pagaron a las Demandadas para llevar las emisiones al mercado por medio de un diferencial del suscriptor—es decir, la diferencia entre el precio que las Demandadas pagaron al emisor de los bonos y el precio al cual las Demandadas vendieron los bonos a los inversionistas. Por lo general, el diferencial del suscriptor era un porcentaje del valor total de la emisión y tenía tres componentes, todos pagados a las Demandadas del producto de la venta de los bonos: (a) el cargo inicial, pagado a los suscriptores por la venta de los valores (usualmente el componente más grande del diferencial); (b) los honorarios por administración, pagados al suscriptor líder por llevar el papel directivo en la emisión; y (c) gastos, pagados a los suscriptores por efectuar la emisión, incluyendo los costos de los honorarios de los abogados del suscriptor, los gastos incidentales a la promoción y la venta a los inversionistas y los aspectos técnicos de las emisiones.

106.  Como resultado del diferencial del suscriptor ("underwriter spread"), las Demandadas ganaron muchos millones de dólares. A modo de ejemplo, se calcula que entre el 2000 y el 2013, a los suscriptores—incluyendo a las Demandadas—le fueron pagados "$880 millones" tan solo en honorarios de administración. Bill Faries, Martin Z. Braun & Michelle Kaske, *How Wall Street Fed Puerto Rico's $70 Billion Debt Binge,* Bloomberg    News    (22    de    octubre    de    2013),

Case:17-03283-LTS   Doc#:8666-10   Filed:09/09/19   Entered:09/09/19 17:18:09   Desc:
Exhibit Exhibit G - Service of Process Exhibit G - Santander 1   Page 33 of 43
SJ2019CV07932 08/08/2019 10:24:39 am Página 32 de 39

https://www.bloomberg.com/news/articles/2013-10-22/how-wall-street-fed-puerto-rico-s-70-billion-borrowing-binge.

107.  Las Demandadas incrementaron la cuantía de su diferencial de suscriptor al obtener de National los seguros en garantía de bonos de National. Sin ese seguro, es probable que los emisores no hubieran podido emitir la misma cantidad de bonos o que hubieran tenido que venderlos a precios mucho más bajos. Al solicitar y obtener los seguros de National exitosamente, las Demandadas aumentaron el tamaño y precio de cada emisión de bonos, lo cual, a su vez, aumentó sus ingresos.

108.  *Tercero*, los suscriptores como lo son las Demandadas UBS y la Demandada Santander Securities vendieron bonos por medio de Fondos Mutuos Cerrados de Puerto Rico (los "CEF, por sus siglas en inglés, Locales") administrados por sus afiliadas, generando así beneficios adicionales. Los CEF Locales, los cuales se vendían exclusivamente a residentes de Puerto Rico, son fondos mutuos que están exentos de determinados reglamentos federales sobre divulgación de información relacionada al apalancamiento y transacciones con afiliadas. Informe sobre la Investigación Especial a las págs. 340-43. Los CEF Locales fueron sumamente populares porque gozaban de una "triple exención" de impuestos. Es decir, estaban exentos de impuestos federales, estatales y locales. *Id.* a la pág. 340. Al venderle bonos de esta manera, estas Demandadas ganaron honorarios por administrar los CEF Locales, honorarios adicionales por asesorar a los CEF Locales, y comisiones sobre ventas por vender acciones en los CEF Locales. *Id.* a la pág. 357. Estos ingresos fueron multimillonarios. Por ejemplo, entre el 2004 y el 2008, los honorarios de asesoramiento y administración, al igual que las comisiones por ventas en los mercados primario y secundario relacionados con los CEF Locales, constituían la mitad de los ingresos anuales de algunas afiliadas de UBS. Tan solo en 2008, una afiliada de un CEF local generó $94.5 millones en ingresos. *Id.* a la pág. 359. Los corredores afiliados de UBS ganaban una comisión del tres por ciento (3%) sobre las ventas de las acciones de los CEF Locales y recibían una compensación adicional basada en cantidades tomadas a préstamo mediante líneas de crédito de sus clientes. *Id.* a la pág. 368.

109.  *Cuarto*, muchos de los suscriptores también generaron honorarios resultantes de la administración y terminación de "swaps" de tasas de interés sobre los bonos que suscribieron. Un "swap" de tasa de interés es un contrato mediante el cual dos partes intercambian un flujo de pagos de intereses por otro. Como regla general, el emisor de un bono de tasa fija intercambia los pagos de intereses que habría de recibir de ese bono a cambio de pagos de intereses variables del proveedor

del intercambio. El emisor paga al proveedor del "swap" unos honorarios por emitir el "swap" y, si se termina el "swap," es posible que tenga que pagar al proveedor unos honorarios por terminación. *Id.* a las págs. 22, 418-19, 431.

110.   Los suscriptores, incluyendo a las Demandadas Morgan Stanley LLC, Merrill Lynch, las Demandadas UBS, J.P. Morgan Securities y Goldman Sachs LLC, vendieron "swaps" de tasas de interés al Gobierno de Puerto Rico, COFINA, y/o la AEE. *Véase* Demanda a las págs. 5-8, *The Official Committee of Unsecured Creditors of Puerto Rico v. Barclays Capital*, Caso No. 19-00281, ECF 1 (Bankr. D.P.R. 2 de mayo de 2019); Informe sobre Investigación Especial a las págs. 421, 432-33. Estas Demandadas promovieron los "swaps" como instrumento para proteger a estos emisores contra tasas de interés ascendentes—los cuales las Demandadas dijeron que iban a continuar subiendo—al intercambiar las tasas de interés variables de los bonos por tasas de interés fijas. Cuando la crisis financiera de los Estados Unidos comenzó en 2007, sin embargo, las tasas de interés variables cayeron en picada, pero los emisores todavía tenían que hacer a las Demandadas los pagos de altas tasas de interés fijas.

111.   Así las cosas, para el 2009, los emisores tuvieron que poner fin a los "swaps" porque no los pudieron costear—colectivamente, los emisores de bonos de Puerto Rico adeudaban $1.32 mil millones en honorarios de terminación de "swaps," más del 14% del presupuesto anual el Estado Libre Asociado y el 17% de sus ingresos reales. Informe sobre la Investigación Especial a las págs. 413-14. Finalmente, los emisores terminaron pagando más de mil millones de dólares en honorarios, incluyendo cientos de millones de dólares a varios de los aquí las Demandadas. Cierto estimado establece el total de honorarios pagados por los emisores a los suscriptores, incluyendo a las Demandadas, en la suma de $1.6 mil millones. Saqib Bhatti & Carrie Sloan, ReFund America Project, *Recogiendo y Botando el Futuro de Puerto Rico*, 1 (31 de agosto de 2016), https://www.scribd.com/document/322588236/Scooping-and-Tossing-Puerto-Rico-s-Future#page=1&fullscreen=1.

112.   *Por último,* los suscriptores, incluyendo a las Demandadas, indujeron a los emisores que enfrentaban esos altos costos de cancelación de "swaps" a emitir bonos adicionales para bajar la deuda pendiente de esos honorarios. Colectivamente, el Gobierno de Puerto Rico, la AEE, y COFINA incurrieron en una nueva deuda de más de $800 millones para pagar los gastos resultantes de la cancelación de "swaps," provenientes de una deuda vieja—incluyendo honorarios que se le debían a varios de las Demandadas, como las Demandadas Morgan Stanley LLC, las Demandadas UBS, Citigroup Global Markets, J.P. Morgan Securities, Goldman Sachs LLC, y Merrill

Lynch. Informe sobre la Investigación Especial a las págs. 432-33. Las Demandadas se beneficiaron de estos despilfarros, generando millonarios ingresos relacionados con esos costos de cancelación y de la emisión de los nuevos bonos. Algunos de las Demandadas—incluyendo a Santander Securities, J.P. Morgan Securities, Morgan Stanley LLC, y Goldman Sachs LLC—también generaron honorarios adicionales al suscribir los nuevos bonos. *Véase, e.g.*, Gobierno de Puerto Rico, *Declaración Oficial para los Bonos de Obligación General de 2014, Serie A*, 24-25 (2014).

113. Como consecuencia de lo anterior, las Demandadas tuvieron múltiples incentivos para lucrarse y estimular a los emisores a emitir más y más deuda—y prácticamente ningún incentivo para garantizar que los bonos pudieran tener éxito a largo plazo. Las emisiones resultaron tan lucrativas para las Demandadas que tenían todo el incentivo para omitir información que señalara los riesgos de un potencial impago para que así pudieran empujar la venta de los bonos en el mercado. La posibilidad de un seguro—el cual obligaba a los aseguradores a cubrir cualquier incumplimiento—constituyó un incentivo aun mayor para que las Demandadas omitieran la divulgación de esos riesgos, porque sabían que el riesgo recaía sobre los aseguradores, y no sobre ellos. Así, los intereses de las Demandadas estuvieron en craso conflicto con los de los emisores, con los de los aseguradores como National, con los de los tenedores de los bonos, y con los de los ciudadanos de Puerto Rico, quienes dependían de los servicios esenciales, resultantes de los fondos que generaban esas emisiones.

III.   **Para Inducir a National a Asegurar los Bonos, las Demandadas le Aseguraron a National Que Ellos Tenían Una Base Razonable Para Creer Que las Declaraciones Oficiales Eran Ciertas y Estaban Completas**

114. Entre 2001 y 2007, las Demandadas solicitaron e indujeron a National a asegurar el pago puntual de principal e intereses, a su vencimiento, de los bonos emitidos por el Gobierno de Puerto Rico, la AEE, la ACT, y COFINA, un total de aproximadamente $11,465,305,000 en deuda. Por cada emisión, e independientemente del emisor, las Demandadas actuaron de la misma forma. Sometieron a National solicitudes de seguros, las cuales suplementaron constantemente, incluyendo un borrador y una versión final de las Declaraciones Oficiales que tenían los nombres de ellos en la portada.

115. Aunque supuestamente las Demandadas no garantizaron expresamente que las representaciones en las Declaraciones Oficiales eran verdaderas y estaban completas, las Demandadas pudieron afirmar y afirmaron a National que habían investigado esas declaraciones razonablemente y que tenían una base razonable para

Case:17-03283-LTS   Doc#:8666-10   Filed:09/09/19   Entered:09/09/19 17:18:09   Desc:
Exhibit Exhibit G - Service of Process Exhibit G - Santander 1   Page 36 of 43
SJ2019CV07932 08/08/2019 10:24:39 am Página 35 de 93

creer que eran verdaderas y estaban completas. Así pues, cada Declaración Oficial indicaba como sigue: "The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws as applied to the facts and circumstances of the transaction, but the Underwriters do not guarantee the accuracy or completeness of such information." *E.g.*, AEE, *Declaración Oficial de los Bonos de Ingresos de Energía, Serie NN* (2003).

116.    Como paso esencial para solicitar que National asegurara los bonos, las Demandadas sometieron estas Declaraciones Oficiales a National tanto en borrador como en formato final. Al someter los borradores de las declaraciones, las Demandadas destacaron su supuesto cumplimiento con las leyes de valores, actuaron como si estuvieran observando las normas y costumbres del sector de bonos municipales, y así aseguraron a National que realizarían una "reasonable investigation" para desarrollar "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offerings." Disclosure, Release No. 26100. Al someter las Declaraciones Oficiales finales, las Demandadas le aseguraron a National que habían completado su investigación y que razonablemente entendían que las declaraciones eras ciertas y estaban completas. Las Demandadas tenían la intención de que National confiara en sus afirmaciones—y así lo hizo National.

IV.    **Confiando de Buena Fe en las Afirmaciones de las Demandadas, National Emitió Su Seguro En Garantía de los Bonos Sin Que Pueda Ser Éste Revocado**

117.    Según el mejor conocimiento de la parte demandante, las Demandadas son suscriptores con vasta experiencia en la emisión y suscripción de bonos municipales y han suscrito por lo menos cientos, si no miles, de emisiones de bonos municipales fuera de Puerto Rico. Para procurar un seguro para esas ofertas de bonos municipales en el pasado, las Demandadas han sometido Declaraciones Oficiales a las aseguradoras, las cuales han descansado en las investigaciones razonables de esos suscriptores para tomar decisiones sobre seguros de acuerdo, todo ello a tenor con lo que son las normas y costumbres en el mercado de bonos municipales.

118.    Al decidir si aseguraban o no los bonos, y siguiendo las costumbres y las normas de la industria, National tenía que necesariamente confiar en la información sometida por las Demandadas, quienes tenían acceso a la información financiera de los emisores. Fue objetivamente razonable que National así lo hiciera. Fue particularmente razonable que National confiara en la información específica que las

Demandadas le presentaron y que supuestamente habían examinado, puesto que National no podía razonablemente verificar esa información por cuenta propia de forma independiente. La información disponible al público sobre el Gobierno de Puerto Rico resultó que "no era confiable." John Dizard, *Puerto Rico's Number-Crunching Frustrates Even the Best Minds*, Fin. Times (15 de marzo de 2019), https://www.ft.com/content/132a4e75-9016-3757-9f4d-08baf3c7a798.

119.    Basado en la información proporcionada por las Demandadas, y de las afirmaciones de las Demandadas de que habían investigado esas declaraciones razonablemente, National aceptó con emisores para asegurar los bonos. Estos acuerdos permitían que National se retirara de la transacción antes de la emisión de los bonos, si surgían cambios adversos substanciales en el borrador o en la versión final de las Declaraciones Oficiales, o si National se enterara de que las declaraciones eran substancialmente falsas o que había omisiones en la solicitud. Si National no se retiraba antes de la emisión de los bonos, la póliza de seguros emitida sería irrevocable.

120.    National revisó los borradores y versiones finales de las Declaraciones Oficiales. Se enfocó en evaluar la probabilidad de un incumplimiento, examinando cómo el emisor estaba gastando y gastaría sus fondos; los ratios de deuda del emisor; los ingresos, deudas, y apropiaciones del emisor; y si la emisión estaba garantizada por los ingresos del emisor, las condiciones de las facilidades que generarían esos ingresos y si el emisor gastaría los fondos necesarios para mantenerlas o mejorarlas.

121.    A base de la información contenida en las solicitudes—y debido a que las Demandadas nunca informaron a National que alguna parte de las declaraciones era incorrecta o incompleta—National emitió pólizas de seguro irrevocables sobre los bonos en cuestión. Como el seguro de National era irrevocable, los intereses a largo plazo de National siempre estuvieron alineados con los del Gobierno, la AEE, la ACT, COFINA, y los ciudadanos de Puerto Rico—ninguno de los cuales quería ni deseaba el incumplimiento con el pago de los bonos.

## V.    Los Emisores Incumplen y National Honra Sus Pólizas de Seguros Haciendo Pagos por Reclamaciones Comenzando en el 2016

122.    Eventualmente, los bonos que los suscriptores, incluyendo a las Demandadas, introdujeron al mercado ocasionaron la quiebra del Gobierno de Puerto Rico.

123.    Para el 2015, Puerto Rico tenía una deuda de aproximadamente $72 mil millones—supuestamente casi "15 times the median bond debt of the 50 states" y mucho más que cualquiera de esos estados. Mary Williams Walsh, *The Bonds That*

36

*Broke    Puerto    Rico*,    N.Y.    TIMES    (30    de    junio    de    2015),
https://www.nytimes.com/2015/07/01/business/dealbook/the-bonds-that-broke-
puerto-rico.html. Esta deuda causo una crisis económica. El Gobierno supuestamente
había "lock[ed] up more and more of its resources to secure more and more bonds,"
which, "over the long term … left less and less money to provide essential government
services," such as "policing, staffing the public schools and providing clean water." *Id.*

124.   El Gobernador de Puerto Rico declaró que la deuda de la isla "era
impagable." Michael Corkery & Mary Williams Walsh, *Puerto Rico's Governor Says
Island's Debts Are 'Not Payable,'* N.Y. TIMES (28 de junio de 2015),
https://www.nytimes.com/2015/06/29/business/dealbook/puerto-ricos-governor-says-
islands-debts-are-not-payable.html. Poco tiempo después, los emisores de Puerto Rico
comenzaron a incumplir con el pago de sus obligaciones. Estos incumplimientos
devastaron a los ciudadanos de Puerto Rico, especialmente a los inversionistas
individuales, muchos de los cuales eran "conservadores" en sus estrategias de
inversión y habían invertido fuertemente en el momento de cada emisión porque
estaban bajo la impresión de que los bonos eran inversiones seguras. Por ejemplo,
una afiliada de las Demandadas UBS admitió la existencia de "nearly $3 billion in
losses to Local CEF investors." Informe sobre la Investigación Especial a la pág. 340.
Muchos inversionistas de inmediato experimentaron una reducción severa o la
pérdida completa de sus ahorros para el retiro. El impago también perjudicó a todos
los ciudadanos de Puerto Rico de un sinnúmero de maneras. Debido a la abrumadora
crisis fiscal y perdida de acceso al mercado de seguro municipal el Gobierno cerró
instituciones esenciales, incluyendo escuelas y hospitales; limitó la asignación de
fondos para servicios sociales importantes tales como el cuidado de la salud y la
infraestructura; y redujo el mantenimiento de redes de energía eléctrica y de
transporte. *Véase id.* pág. 48; Thomas Health & Tory Newmyer, *Puerto Rico, con una
deuda de $73 mil millones, forzado hacia la quiebra*, WASH. POST (3 de mayo de 2017),
https://www.washingtonpost.com/business/economy/puerto-rico-with-73-billion-in-
debt-forced-toward-bankruptcy/2017/05/03/92e39d76-3020-11e7-9534-
00e4656c22aa_story.html?noredirect=on&utm_term=.59dff9c2442e;        Sullivan,
*supra* ¶ 83.

125.   Los incumplimientos por parte del Gobierno, la AEE, y la ACT
detonaron las obligaciones de National de efectuar pagos bajo sus pólizas. National
ha tomado medidas responsables para mitigar la crisis, realizando todos los pagos
según han ido venciendo—más de $720 millones al 1 de julio de 2019.

126. National tiene la intención de realizar todos los pagos por reclamaciones futuras también, los cuales estima en cientos de millones de dólares adicionales.

127. Los pagos que ha realizado National hasta el presente han ayudado y continuarán ayudando a compensar a los bonistas, incluyendo a los ciudadanos de Puerto Rico, que se han visto afectados por el descalabro financiero ocasionado por los incumplimientos.

128. Aunque COFINA no incumplió con sus pagos, se acogió a un procedimiento parecido a una quiebra en perjuicio de National. Bajo el Título III de la Ley PROMESA, la Junta de Supervisión presentó peticiones a nombre y en representación del Gobierno y luego varias de sus instrumentalidades—incluyendo a la AEE, la ACT, y COFINA. En el contexto de dicho procedimiento, en febrero de 2019 se aprobó un plan de reestructuración para COFINA mediante el cual National prevé razonablemente que pagará en exceso de $100 millones en reclamaciones. Otras instrumentalidades del gobierno todavía se encuentran inmersas en sus procedimientos bajo el Título III de PROMESA.

129. Mientras National, los emisores y el pueblo de Puerto Rico en general sufrían el embate del masivo impago, los suscriptores retuvieron sus cuantiosas ganancias. Según expresó un anterior corredor de bonos de la Demandada Morgan Stanley: "Los bancos se salieron, y todos los demás tuvieron que pagar la cuenta." Sullivan, *supra* ¶ 83.

## VI. En 2018, una Investigación Especial Reveló Que—Contrario a Sus Afirmaciones Dolosas—las Demandadas No Habían Investigado Razonablemente las Declaraciones Oficiales y Esas Declaraciones Eran Sustancialmente Falsas e Incompletas

130. La Junta de Supervisión formó un Comité de Investigación Especial (la "Investigación Especial") que investigó los orígenes de la crisis fiscal de Puerto Rico. Los resultados de la Investigación Especial se dieron a conocer en un informe en agosto de 2018 (el "Informe sobre la Investigación Especial"). Por medio de requerimientos de producción de documentos y citaciones, el Comité de Investigación Especial obtuvo sobre 260,000 documentos de 32 partes diferentes, incluyendo a entidades de Puerto Rico, instituciones financieras y asesores financieros; también entrevistó a 120 testigos, incluyendo a pasados y presentes oficiales de gobierno—y suscriptores. Informe sobre la Investigación Especial págs. 25, 27.

131. Los hallazgos del Comité fueron impactantes. Descubrió que las representaciones clave en las Declaraciones Oficiales de las emisiones que examinó eran incorrectas o incompletas. El Informe sobre la Investigación Especial determinó que los suscriptores, incluyendo a las Demandadas, no examinaron adecuadamente

Case:17-03283-LTS Doc#:8666-10 Filed:09/09/19 Entered:09/09/19 17:18:09 Desc:
Exhibit Exhibit G - Service of Process Exhibit G - Santander 1 Page 40 of 43
3D2019CV0793208708/2019 10:24:59 am Página 39 de 98

la veracidad de esas representaciones—si es que realmente investigaron. El Informe sobre la Investigación Especial indicó además que los suscriptores utilizaron la misma estrategia con otras emisiones que no fueron examinadas como parte de la Investigación Especial. *Véase id.* a las secciones XI, XIV.

132. El alcance de la Investigación Especial, según determinado por el Comité, fue limitado: solamente examinó el período del 2006 al 2015 y se enfocó solo en ciertos emisores—el Gobierno, la AEE, COFINA, y la Autoridad de Acueductos y Alcantarillados ("AAA"). El Informe sobre la Investigación Especial señaló que "[m]ás análisis y recopilación de evidencia adicional por otras partes interesadas, con mandatos diferentes o más amplios que el nuestro, determinará si cualquiera de las posibles causas de acción o remedios legales que se identifican en este Informe podrían o deberían ser encausadas y, en ese caso, de qué manera y contra quién." *Id.* a la pág. 30. El Informe indicó que su discusión de posibles causas de acción "no tiene la intención de proporcionar una lista exhaustiva o definitiva y análisis de todas las causas de acción que podrían estar disponibles[.]" *Id.*

133. El Informe sobre la Investigación Especial revela que las Demandadas no investigaron razonablemente la veracidad y suficiencia de las Declaraciones Oficiales de los bonos objeto de esta reclamación. El Informe no solo revela la estrategia totalmente inadecuada de los suscriptores con relación a las emisiones de AEE, sino que indica que éstos utilizaron la misma estrategia para otras emisiones que el Informe no analizó en su totalidad—incluyendo aquellas del Gobierno, la ACT y COFINA. Según elaboramos a continuación, varios de las Demandadas suscribieron múltiples bonos para cada emisor y para varios emisores. Seis de las Demandadas—J.P. Morgan Securities, las Demandadas UBS (entre UBS Financial Services y UBS Securities), Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, y Merrill Lynch—participaron en cada emisión asegurada por National—mientras que las Demandadas Santander Securities y RBC Capital Markets participaron en cada emisión asegurada por National en 2007. Los emisores tenían a las mismas Demandadas mercadeando y vendiendo sus bonos, tenían problemas similares o idénticos en cuanto a sus divulgaciones, y los bonos que emitieron dejaron de pagar más o menos al mismo tiempo. Las Demandadas tuvieron incentivos similares para cada emisión—llevar los bonos al mercado sin realizar investigaciones, los resultados de las cuales podrían poner en riesgo sus ganancias.

A. **Las Representaciones Clave en las Declaraciones Oficiales de la AEE Eran Esencialmente Falsas e Incompletas**

134.  La AEE tiene la responsabilidad de conservar, desarrollar y utilizar los recursos de energía de Puerto Rico para fomentar el bienestar general de Puerto Rico.

135.  Los bonos de la AEE están garantizados por los ingresos de la autoridad derivados de la generación, transmisión y distribución de electricidad. *E.g.*, AEE, *Declaración Oficial para los Bonos de Ingresos de Energía, Serie NN*, 5 (2003).

136.  Entre el año 2001 y el 2007, las Demandadas procuraron y obtuvieron seguro de garantía de bonos de National, y National ha realizado pagos por reclamaciones relacionadas a los siguientes bonos de la AEE:

a.  Bonos de Ingresos de Energía de AEE, Serie LL del 13 de junio de 2002, con fecha de vencimiento del 1 de julio de 2019. Los suscriptores líderes fueron Goldman Sachs LLC y UBS PaineWebber Inc. (ahora conocido como UBS Financial Services). Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), ABN AMRO Financial Services, Inc. (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Bear Stearns & Co., Inc. (predecesor de la Demandada J.P. Morgan Securities), y Salomon Smith Barney (predecesor de la Demandada Citigroup Global Markets). Estos bonos tenían como objetivo financiar una porción del costo de varios proyectos bajo el programa de mejoras capitales de la AEE. National aseguró estos bonos a su valor nominal original de $98,125,000. El primer impago de estos bonos fue el 3 de julio de 2017.

b.  Los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie MM del 20 de septiembre de 2002, con fecha de vencimiento del 1 de julio de 2023. Los suscriptores líderes fueron Goldman Sachs LLC y UBS PaineWebber Inc. (ahora conocido como UBS Financial Services). Otros de los suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), ABN AMRO Financial Services, Inc. (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Salomon Smith Barney (predecesor de la Demandada Citigroup Global Markets), y Bear Stearns & Co., Inc. (predecesor de la Demandada J.P. Morgan Securities). Estos bonos tenían el objetivo de refinanciar bonos de ingresos de la AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $68,700,000. El primer impago de estos bonos fue el 3 de julio de 2017.

c.      Los Bonos de Ingresos de Energía de AEE, Serie NN del 8 de agosto de 2003, con fecha de vencimiento del 1 de julio de 2033. Los suscriptores líderes fueron Goldman Sachs LLC, Merrill Lynch, y J.P. Morgan Securities. Otros suscriptores incluyeron Morgan Stanley LLC, UBS Financial Services, Banc of America Securities (predecesor de la Demandada Merrill Lynch), y Citigroup Global Markets. Estos bonos tenían como objetivo financiar una porción del costo de varios proyectos del programa de mejoras capitales de la AEE y pagar una línea de crédito con el Banco Gubernamental de Fomento ("GDB" por sus siglas en inglés). National aseguró estos bonos a su valor nominal original de $272,290,000. El primer impago de estos bonos fue el 3 de julio de 2017.

d.      Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie OO del 12 de agosto de 2004, con fecha de vencimiento del 1 de julio de 2025. Los suscriptores líderes fueron Morgan Stanley LLC, Merrill Lynch, y J.P. Morgan Securities. Otros suscriptores incluyeron a Goldman Sachs LLC, Banc of America Securities (predecesor de la Demandada Merrill Lynch), UBS Financial Services, y Citigroup Global Markets. Estos bonos tenían como objetivo refinanciar bonos de ingresos de la AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $124,550,000. El primer impago de estos bonos fue el 3 de julio de 2017.

e.      Los Bonos de Ingresos de Energía de AEE Serie RR y los Bonos de Refinanciamiento de Ingresos de Energía de AEE Serie SS del 24 de marzo de 2005, con fecha de vencimiento del 1 de julio de 2024 y el 1 de julio de 2025, respectivamente. Los suscriptores líderes fueron Morgan Stanley LLC, Merrill Lynch, y J.P. Morgan Securities. Otros suscriptores incluyeron a Goldman Sachs LLC, Banc of America Securities (predecesor de la Demandada Merrill Lynch), UBS Financial Services, y Citigroup Global Markets. Los bonos Serie RR tenían el objetivo de financiar una porción del costo de varios proyectos del programa de mejoras capitales de la AEE y pagar ciertos pagarés al GDB. Los bonos de la Serie SS tenían el objetivo de refinanciar bonos de ingresos de AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $469,025,000. El primer impago de estos bonos fue el 3 de julio de 2017.

f.      Los Bonos de Refinanciamiento de Ingresos de Energía de AEE, Serie UU del 19 de abril de 2007, con fecha de vencimiento del 1 de julio de 2019. Los suscriptores líderes fueron J.P. Morgan Securities y UBS Investment

Bank (ahora conocido como UBS Securities). Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Goldman Sachs LLC, RBC Capital Markets, y Santander Securities. Estos bonos tenían como objetivo refinanciar bonos de ingresos de AEE emitidos anteriormente. National aseguró estos bonos a su valor nominal original de $77,290,000. El primer impago de estos bonos fue el 3 de julio de 2017.

       g.    Los Bonos de Refinanciamiento de Ingreso de Energía de AEE, Serie VV del 16 de mayo de 2007, con fecha de vencimiento del 1 de julio de 2035. Los suscriptores líderes fueron J.P. Morgan Securities y UBS Investment Bank (ahora conocido como UBS Securities). Otros suscriptores incluyeron a Merrill Lynch, Banc of America Securities (predecesor de la Demandada Merrill Lynch), Morgan Stanley LLC, Citigroup Global Markets, Goldman Sachs LLC, RBC Capital Markets, y Santander Securities. Estos bonos tenían como objetivo refinanciar bonos de ingresos de AEE emitidos anteriormente. National aseguró estos bonos por $302,600,000 y emitió una póliza adicional de seguro por su valor nominal original de $127,610,000. El primer impago de estos bonos fue el 3 de julio de 2017.

137.    Era esencial que las declaraciones sobre la capacidad de la AEE a largo plazo de generar ingresos, minimizar costos, y pagar sus deudas utilizando los ingresos de su negocio fueran precisas. Por razón de que los bonos estaban garantizados por los ingresos de la generación, transmisión y distribución de electricidad, era sumamente importante que los fondos recaudados en realidad se gastaran según se acreditó, en la generación, transmisión y distribución de electricidad—lo cual generaría ingresos—para minimizar el riesgo de un incumplimiento.

138.    En realidad, las representaciones clave en las Declaraciones Oficiales fueron esencialmente falsas e incompletas, incluyendo aquellas que tenían que ver con: (a) información financiera básica, incluyendo los ratios de cobertura del servicio de la deuda y sus componentes, tales como los ingresos; (b) cómo la AEE estaba gastando el dinero—incluyendo declaraciones de que estaba gastando dinero en la generación, transmisión y distribución de electricidad; y (c) el estado de los sistemas de la AEE. Las Demandadas no investigaron y no tenían una base razonable para creer la veracidad y suficiencia de estas divulgaciones.