# **EXHIBIT K**

LATEST AUDITED FINANCIAL STATEMENTS FOR THE DEBTORS

# COMMONWEALTH OF PUERTO RICO

Basic Financial Statements
and Required Supplementary Information

June 30, 2016

(With Independent Auditors' Report Thereon)

# BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION

### Fiscal Year Ended June 30, 2016



### Commonwealth of Puerto Rico

### Honorable Ricardo Rosselló Nevares
### Governor

*Prepared by:*

### Puerto Rico Department of the Treasury

### Raúl Maldonado Gautier, CPA, Esq.
*Secretary of the Treasury*

### Francisco Peña Montañez
*Under Secretary of the Treasury*

### Omar E. Rodríguez Pérez
*Assistant Secretary of Central Accounting*

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

| | Page(s) |
|---|---|
| Independent Auditors' Report | 1–10 |
| Management's Discussion and Analysis (Unaudited) | 11–33 |
| Basic Financial Statements: | |
|    Government-wide- Financial Statements: | |
|       Statement of Net Position | 34–35 |
|       Statement of Activities | 36–37 |
|    Fund Financial Statements: | |
|       Governmental Funds: | |
|          Balance Sheet | 38 |
|          Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Position | 39 |
|          Statement of Revenue, Expenditures, and Changes in Fund Balances | 40 |
|          Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances of Governmental Funds to the Statement of Activities | 41 |
|       Proprietary Funds: | |
|          Statement of Net Position | 42 |
|          Statement of Revenues, Expenses, and Changes in Fund Net Position | 43 |
|          Statement of Cash Flows | 44 |
|       Fiduciary Funds: | |
|          Statement of Fiduciary Net Position | 45 |
|          Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds | 46 |
|    Discretely Presented Component Units: | |
|       Combining Statement of Net Position | 47–48 |

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

| | Page(s) |
|---|---|
| Combining Statement of Activities | 49 |
| Notes to Basic Financial Statements | 50–330 |
| Required Supplementary Information (Unaudited): | |
| Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans - TRS | 331 |
| Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans - JRS | 332 |
| Schedule of Proportionate Share of the Net Pension Liability of a Cost-Sharing Multiple-Employer Pension Plan - ERS | 333 |
| Schedule of Employers' Contributions - All Pension Plans | 334 |
| Schedule of Funding Progress for the Postemployment Healthcare Plans | 335 |
| Schedule of Employers' Contributions for the Postemployment Healthcare Plans | 336 |
| Schedule of Revenue and Expenditures – Budget and Actual – Budgetary Basis – General Fund | 337 |
| Notes to Required Supplementary Information | 338–342 |
| Combining and Individual Fund financial Statements and Schedules | |
| General Fund: | |
| General Fund | 343 |
| Schedule of Expenditures by Agency – Budget and Actual – Budgetary Basis – General Fund | 344–346 |
| Nonmajor Governmental Funds: | |
| Nonmajor Governmental Funds | 347–349 |
| Combining Balance Sheet | 350 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Balances | 351 |
| Nonmajor Proprietary Funds: | |
| Nonmajor Proprietary Funds | 352 |

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

|  | **Page(s)** |
|---|---|
| Combining Statement of Net Position | 353 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Net Position | 354 |
| Combining Statement of Cash Flows | 355 |
| Fiduciary Funds: | |
| Fiduciary Funds | 356–357 |
| Combining Statement of Fiduciary Net Position – Pension Trust Funds | 358 |
| Combining Statement of Changes in Fiduciary Net Position – (and Other Employee Benefit) Trust Funds | 359 |
| Combining Statement of Changes in Assets and Liabilities – Agency Funds | 360 |
| Nonmajor Discretely Presented Component Units: | |
| Nonmajor Discretely Presented Component Units | 361 |
| Combining Statement of Net Position | 362–368 |
| Combining Statement of Activities | 369 |



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

**Independent Auditors' Report**

The Honorable Governor and Legislature
   Commonwealth of Puerto Rico
   San Juan, Puerto Rico

We have audited the accompanying financial statements of the Governmental Activities, the Business-Type
Activities, the Aggregate Discretely Presented Component Units, each major fund, and the Aggregate
Remaining Fund Information of the Commonwealth of Puerto Rico (the Commonwealth) as of and for the year
ended June 30, 2016, and the related notes to the basic financial statements, which collectively comprise the
Commonwealth's basic financial statements as listed in the table of contents.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in
accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and
maintenance of internal control relevant to the preparation and fair presentation of financial statements that are
free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the
financial statements of the following entities and funds:

- *Governmental Activities*

    – Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto
      Rico, Office of Legislative Services, Office for the Improvement of Public Schools, Superintendence of
      the Capitol Building, Puerto Rico House of Representatives, Puerto Rico Senate, Puerto Rico Public
      Housing Administration, Puerto Rico Housing Finance Department – Sales and Acquisition Fund,
      Puerto Rico Department of Economic Development and Commerce, which collectively represent
      18.95% and 2.49% of the total assets and revenues, respectively, of the General Fund.

    – Puerto Rico Maritime Shipping Authority, Special Communities Perpetual Trust special revenue and
      debt service funds, Public Buildings Authority, University of Puerto Rico Comprehensive Cancer
      Center, Puerto Rico Infrastructure Financing Authority, The Children's Trust, Port of the Americas
      Authority which are non-major governmental funds that represent 12.84% and 3.04% of the total assets
      and revenues, respectively, of the Aggregate Remaining Fund Information.

    These entities and funds collectively represent 56.02% and 4.11% of the total assets and revenues,
    respectively, of the Governmental Activities.

- *Business-Type Activities*

    – Unemployment Insurance Fund, which is a major enterprise fund.

    – The Additional Lottery System, which represents 68.02% and 55.17% of the total assets and revenues,
      respectively, of the Lotteries Fund, which is a major enterprise fund.

    – Puerto Rico Health Insurance Administration, which is a major enterprise fund.

KPMG LLP is a Delaware limited liability partnership and the U.S. member
firm of the KPMG network of independent member firms affiliated with
KPMG International Cooperative ("KPMG International"), a Swiss entity.



- Puerto Rico Medical Services Administration, which is a major enterprise fund.

- Puerto Rico Water Pollution Control Revolving Fund, which is a major enterprise fund

- The Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, the Governing Board of 9-1-1 Services, Disability Insurance Fund, Drivers' Insurance Fund, and Ponce Ports Authority which are non-major enterprise funds that collectively represent 3.54% and 3.20% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

- *Other Entities and Funds*

  The Puerto Rico System of Annuities and Pensions for Teachers, which represents 19.35% and 21.53% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

- *Aggregate Discretely Presented Component Units*

  The discretely presented component units listed in note 1(c) to the basic financial statements, except for those considered unaudited as discussed under "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information".

  These entities collectively represent 89.95% and 93.48% of the total assets and revenues, respectively, of the Aggregate Discretely Presented Component Units.

Those financial statements were audited by other auditors, whose reports thereon have been furnished to us, and our opinions, insofar as they relate to the amounts included for the entities and funds indicated above, are based solely on the reports of the other auditors.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the basic financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the basic financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

**Summary of Opinions**

| Opinion Unit | Type of Opinion |
| --- | --- |
| Governmental Activities | Qualified |
| Business-Type Activities | Qualified |

**KPMG**

| Opinion Unit | Type of Opinion |
|---|:---:|
| Aggregate Discretely Presented Component Units | Qualified |
| General Fund | Unmodified |
| Debt Service Fund | Unmodified |
| COFINA Special Revenue Fund | Unmodified |
| COFINA Debt Service Fund | Unmodified |
| Unemployment Insurance Fund | Unmodified |
| Lotteries Fund | Unmodified |
| Puerto Rico Medical Services Administration Fund | Unmodified |
| Puerto Rico Water Pollution Control Revolving Fund | Unmodified |
| Puerto Rico Health Insurance Administration Fund | Qualified |
| Aggregate Remaining Fund Information | Qualified |

**Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information**

*Basis for Qualified Opinions – Unaudited Entities and Funds*

As discussed in note 6 to the basic financial statements, the Commonwealth determined that a custodial credit loss of deposits at the Government Development Bank for Puerto Rico (GDB) should have been recognized as of June 30, 2015. The following entities and funds, which were audited by other auditors, did not evaluate the potential for custodial credit loss of deposits at the GDB in their respective separately issued 2015 financial statements and either did not recognize a custodial credit loss in 2015, or recognized a custodial credit loss in 2016 without consideration to the impact on the beginning net position/fund balance. Because such loss could have been material to those financial statements, we were not able to rely on the other auditors' reports. Accordingly, we considered the financial statement amounts for the following entities and funds included in the financial statements of the Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information of the Commonwealth to be unaudited.

- *Governmental Activities*

  – Office for the Improvement of Public Schools

  – Puerto Rico Housing Finance Department – Sales and Acquisition Fund

  – The Children's Trust

  These entities and funds collectively represent 1.62% and 0.03%% of the total assets and revenues, respectively, of the Governmental Activities.

3



- *Business-Type Activities*

    – The Disability Insurance Fund

    – The Drivers' Insurance Fund

    These funds collectively represent 8.86% and 0.56% of the total assets and revenues, respectively, of the Business-Type Activities.

- *Aggregate Discretely Presented Component Units*

    – Farm Insurance Corporation of Puerto Rico

    – Land Authority of Puerto Rico

    – Puerto Rico Council of Education

    – Puerto Rico Energy Commission

    – Puerto Rico Housing Finance Authority

    – Puerto Rico Industrial Development Company

    – Puerto Rico Integrated Transit Authority

    – Puerto Rico Land Administration

    – Puerto Rico Municipal Finance Agency

    – Puerto Rico School of Plastic Arts

    – Puerto Rico Science, Technology and Research Trust

    – Puerto Rico Telephone Authority

    – Puerto Rico Trade and Export Company

    – Solid Waste Authority

    These entities collectively represent 16.41% and 9.46% of the total assets and revenues, respectively, of the Aggregate Discretely Presented Component Units.

- *Aggregate Remaining Fund Information*

    – The Children's Trust

    – The Disability Insurance Fund

    – The Drivers' Insurance Fund

    These entities and funds collectively represent 5.73% and 1.20% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

*Basis for Qualified Opinions – Unaudited Pension Amounts*

The funds listed below, which were audited by other auditors, did not apply the provisions of GASB Statement No. 68 in their respective separately issued financial statements. In accordance with GASB Statement No. 68, these funds should have recorded their proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. However, the Commonwealth recorded within Governmental Activities such proportionate share of the collective pension



amounts, which were not subject to our audit procedures, or the audit procedures of the other auditors. Accordingly, we were not able to obtain sufficient appropriate audit evidence about the pension amounts of the following funds which are included in the financial statements of the Governmental Activities of the Commonwealth.

- Office of Legislative Services

- Superintendence of the Capitol Building

- Puerto Rico House of Representatives

- Puerto Rico Senate

- Puerto Rico Public Housing Administration

Additionally, the Commonwealth recorded the pension amounts within Governmental Activities related to the Puerto Rico System of Annuities and Pensions for Teachers, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Such pension amounts have not been audited, nor were we engaged to audit the pension amounts as a part of our audit of the Commonwealth's basic financial statements.

The aggregate net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense related to these funds and to the Puerto Rico System of Annuities and Pensions for Teachers' that are included in the financial statements of the Governmental Activities of the Commonwealth were $15,109 million, $1,543 million, $82.5 million, and $936 million, respectively.

The entities listed below, which were audited by other auditors, applied the provisions of GASB Statement No. 68 in their respective separately issued financial statements. However, based on the lack of availability of audited pension amounts from the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico at the time of the respective issuance of their financial statements, the other auditors qualified their opinions due to the lack of sufficient appropriate audit evidence on the pension amounts, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, we were not able to obtain sufficient appropriate audit evidence about the pension amounts included in the financial statements for the following entities which are included in the financial statements of the Aggregate Discretely Presented Component Units of the Commonwealth.

- *Aggregate Discretely Presented Component Units*

    – State Insurance Fund Corporation

    – Agricultural Enterprises Development Administration

    – Automobile Accidents Compensation Administration

    – Culebra Conservation and Development Authority

    – Land Authority of Puerto Rico

    – Puerto Rico School of Plastic Arts

The net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense included for these entities in the financial statements of the Aggregate Discretely Presented Component Units of the Commonwealth were $1,854.5 million, $117.9 million, $14.3 million, and $104.6 million, respectively.



**Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units and Puerto Rico Health Insurance Administration Fund**

*Basis for Qualified Opinions – Unrecorded Pension Amounts*

As discussed in note 18 to the basic financial statements, the entities and funds listed below, which were audited by other auditors, did not apply the provisions of GASB Statement No. 68 in their respective separately issued financial statements. In accordance with GASB Statement No. 68, the following entities and funds should have recorded their proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, the amounts included in the financial statements of the Governmental Activities, Aggregate Discretely Presented Component Units and Puerto Rico Health Insurance Administration Fund of the Commonwealth do not include the pension amounts for the following entities and funds as required by GASB Statement No. 68. Management's unaudited estimate of the unrecorded net pension liability for each opinion unit is disclosed in notes 18(g) and 18(h) to the basic financial statements.

- *Governmental Activities*

  – Public Buildings Authority

  – Puerto Rico Infrastructure Financing Authority

  – Puerto Rico Maritime Shipping Authority

- *Aggregate Discretely Presented Component Units*

  – Government Development Bank for Puerto Rico

  – Puerto Rico Aqueduct and Sewer Authority

  – Puerto Rico Highways and Transportation Authority

  – Company for the Integral Development of the "Península de Cantera"

  – Corporation for the "Caño Martin Peña" Enlace Project

  – Economic Development Bank for Puerto Rico

  – Farm Insurance Corporation of Puerto Rico

  – Fine Arts Center Corporation

  – Institutional Trust of the National Guard of Puerto Rico

  – Institute of Puerto Rican Culture

  – Musical Arts Corporation

  – Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives

  – Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority

  – Puerto Rico and Municipal Islands Maritime Transportation Authority

  – Puerto Rico Conservatory of Music Corporation

  – Puerto Rico Council of Education

  – Puerto Rico Industrial Development Company



- – Puerto Rico Land Administration
- – Puerto Rico Metropolitan Bus Authority
- – Puerto Rico Ports Authority
- – Puerto Rico Public Broadcasting Corporation
- – Puerto Rico Public Private Partnerships Authority
- – Puerto Rico Tourism Company
- – Puerto Rico Trade and Export Company
- – Solid Waste Authority

- *Puerto Rico Health Insurance Administration Fund*

**Qualified Opinions**

In our opinion, based on our audit and the reports of other auditors, except for the possible effects of the matters described in the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information" paragraphs and except for the effects of the matters described in the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units and Puerto Rico Health Insurance Administration Fund" paragraphs, the financial statements referred to above present fairly, in all material respects, the financial position of the Governmental Activities, the Business-Type Activities, the Aggregate Discretely Presented Component Units, the Puerto Rico Health Insurance Administration Fund, and the Aggregate Remaining Fund Information as of June 30, 2016, and the respective changes in financial position and, where applicable, cash flows thereof for the year then ended in accordance with U.S. generally accepted accounting principles.

**Unmodified Opinions**

In our opinion, based on our audit and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the General Fund, Debt Service Fund, COFINA Special Revenue Fund, COFINA Debt Service Fund, Unemployment Insurance Fund, Lotteries Fund, Puerto Rico Medical Services Administration Fund, and Puerto Rico Water Pollution Control Revolving Fund as of June 30, 2016, and the respective changes in financial position and, where applicable, cash flows thereof for the year then ended in accordance with U.S. generally accepted accounting principles.

**Emphasis of Matters**

*Uncertainty about Ability to Continue as a Going Concern – Primary Government*

The accompanying basic financial statements have been prepared assuming that the Commonwealth will continue as a going concern. As discussed in note 2(a) to the basic financial statements, the Commonwealth has incurred recurring deficits, has a negative financial position, has experienced further deterioration of its economic condition, has not been able to access the credit markets, and has stated that substantial doubt exists about the Commonwealth's ability to continue as a going concern. Additionally, on May 3, 2017, the Financial Oversight and Management Board (the Oversight Board) at the request of the Governor, filed a petition for relief under Title III of the U.S. Congress Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) in the United States District Court for the District of Puerto Rico. Management's evaluation of the events and conditions and management's plans regarding these matters are also described in note 2(a) to the basic financial statements. The basic financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinions on the basic financial statements are not modified with respect to this matter.



*Uncertainty about Ability to Continue as a Going Concern – Retirement Systems*

The accompanying basic financial statements have been prepared assuming that the retirement systems of the Commonwealth will continue as a going concern. As discussed in note 2(b) to the basic financial statements, the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, and the Puerto Rico System of Annuities and Pensions for Teachers are severely underfunded. In fiscal year 2018, each of the retirement systems sold most of their investments and started operating on a pay-as-you-go basis. Also, on May 3, 2017 and May 21, 2017, the Oversight Board commenced cases for the Commonwealth and the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, respectively, by filing petitions for relief under Title III of PROMESA. Accordingly, the Commonwealth has stated in note 2(b) to the basic financial statements that substantial doubt exists about each of the retirement systems' ability to continue as a going concern. The basic financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our opinions on the basic financial statements are not modified with respect to these matters.

*Uncertainty about Ability to Continue as a Going Concern – Major Discretely Presented Component Units*

The accompanying basic financial statements have been prepared assuming that the major discretely presented component units of the Commonwealth will continue as a going concern. As discussed in note 2(c) to the basic financial statements, the Commonwealth has stated that substantial doubt exists for the following major discretely presented component units to continue as a going concern. Management's evaluation of the events and conditions and management's plans in regard to these matters are described in note 2(c) to the basic financial statements. The basic financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our opinions on the basic financial statements are not modified with respect to these matters.

- *Government Development Bank for Puerto Rico (GDB)*

  The Commonwealth and its component units have not been able to repay their loans from the GDB, which has significantly affected the GDB's liquidity and ability to repay its obligations. Also, on March 23, 2018, the GDB ceased its operations and is currently winding down in an orderly fashion under Title VI of PROMESA. These matters raise substantial doubt about the GDB's (including its blended component units) ability to continue as a going concern.

- *Puerto Rico Highways and Transportation Authority (PRHTA)*

  The financial statements of PRHTA as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated April 6, 2018, included an emphasis of matter paragraph related to PRHTA's ability to continue as a going concern. As stated in PRHTA's independent auditors' report, PRHTA has had significant recurring losses from operations and does not have sufficient funds available to fully repay its various obligations as they come due. Also, on May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PRHTA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico.

- *Puerto Rico Electric Power Authority (PREPA)*

  The financial statements of PREPA as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated December 12, 2018, included an emphasis of matter paragraph related to PREPA's ability to continue as a going concern. As stated in PREPA's independent auditors' report, PREPA has an accumulated deficit of $5 billion at June 30, 2016 and due to liquidity constraints, during the year ended June 30, 2016, PREPA did not make the required deposits to the Sinking Fund. Also, on July 2, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for



PREPA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico.

- *Puerto Rico Aqueduct and Sewer Authority (PRASA)*

    The financial statements of PRASA as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated March 7, 2017, included an emphasis of matter paragraph related to PRASA's ability to continue as a going concern. As stated in PRASA's independent auditors' report, PRASA has had significant recurring operating losses, working capital deficiencies, credit downgrades, large non-discretionary capital expenditure requirements, uncertainty as to fully satisfying its obligations, fiscal oversight and has not been able to access the capital markets.

- *University of Puerto Rico (UPR)*

    The financial statements of UPR as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated March 29, 2018, included an emphasis of matter paragraph related to UPR's ability to continue as a going concern. As stated in UPR's independent auditors' report, UPR is highly dependent on the Commonwealth's appropriations to finance its operations.

*Restatement of Net Position and Fund Balance*

As discussed in note 4 to the basic financial statements, the net position/fund balance of the Business-Type Activities, Aggregate Discretely Presented Component Units, COFINA Debt Service Fund, Puerto Rico Medical Services Administration Fund, and the Puerto Rico Water Pollution Control Revolving Fund have been restated as of July 1, 2015 to correct misstatements. Our opinions on the basic financial statements are not modified with respect to these matters.

**Other Matters**

*Required Supplementary Information*

U.S. generally accepted accounting principles require that the management's discussion and analysis on pages 11 through 33; the schedules of changes in the Commonwealth's net pension liability for single-employer pension plans on pages 331 and 332; the schedule of the Commonwealth's proportionate share of the net pension liability of the cost-sharing multiple-employer pension plan on page 333; the schedule of employers' contributions for all pension plans on page 334; the schedule of funding progress for the postemployment healthcare plans on page 335; the schedule of employers' contributions for the postemployment healthcare plans on page 336; and the schedule of revenue and expenditures – budget and actual–budgetary basis – General Fund on page 337, be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context.

We were unable to apply certain limited procedures to the management's discussion and analysis in accordance with auditing standards generally accepted in the United States of America, due to the matters described in the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information" and the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units, and Puerto Rico Health Insurance Administration Fund" paragraphs. Additionally, although our opinions on the basic financial statements are not affected, the financial statements amounts included in the management's discussion and analysis contain material departures from U.S. generally accepted accounting principles because they do not include pension amounts for certain entities and funds that did not apply the provisions of GASB Statement No. 68. We do not express an opinion or provide any assurance on the information.



We and the other auditors have applied certain limited procedures to the schedules of changes in the Commonwealth's net pension liability for single-employer pension plans, the schedule of the Commonwealth's proportionate share of the net pension liability of the cost-sharing multiple-employer pension plan, the schedule of employers' contributions for all pension plans, the schedule of funding progress for the postemployment healthcare plans, the schedule of employers' contributions for the postemployment healthcare plans, and the schedule of revenue and expenditures – budget and actual–budgetary basis – General Fund, in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. Although our opinions on the basic financial statements are not affected, the amounts included in the schedule of the Commonwealth's proportionate share of the net pension liability of the cost-sharing multiple-employer pension plan and the schedule of employer's contributions for all pension plans contain material departures from U.S. generally accepted accounting principles because they do not include the pension amounts for certain entities and funds that did not apply the provisions of GASB Statement No. 68. We do not express an opinion or provide any assurance on the information.

*Supplementary Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Commonwealth's basic financial statements. The combining and individual fund financial statements and schedules listed in the accompanying table of contents are presented for the purpose of additional analysis and are not a required part of the basic financial statements. The combining and individual fund financial statements and schedules are the responsibility of management and were derived from and relate directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, except for the effect on the supplementary information of the matters described above in the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information" paragraphs, and the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units and Puerto Rico Health Insurance Administration Fund" paragraphs, the information is fairly stated in all material respects in relation to the financial statements as a whole.

KPMG LLP

May 3, 2019

Stamp No. E363832 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

This management's discussion and analysis section (MD&A) provides a narrative overview and analysis of the financial activities of the Commonwealth of Puerto Rico (the Commonwealth) for the fiscal year ended June 30, 2016. The MD&A is intended to serve as an introduction to the Commonwealth's basic financial statements, which have the following components: (1) government-wide financial statements, (2) fund financial statements, and (3) notes to the basic financial statements. The MD&A is designed to (a) assist the reader in focusing on significant matters, (b) provide an overview of the Commonwealth's financial activities, (c) present an overview of results for the General Fund on a budgetary basis, and (d) highlight individual fund matters. The following presentation is by necessity highly summarized, and therefore, in order to gain a thorough understanding of the Commonwealth's financial condition, the financial statements, notes, and required supplementary information should be reviewed in their entirety.

**Financial Highlights**

- The Commonwealth's Primary Government, which encompasses the Commonwealth's Governmental and Business-Type Activities, reported, in the government-wide financial statements, a net position (deficit) of approximately $70.3 billion at June 30, 2016, which was comprised of approximately $14.1 billion in total assets and approximately $4.9 billion in deferred outflows of resources, less approximately $88.1 billion in total liabilities and approximately $1.2 billion in deferred inflows of resources.

- The net position (deficit) of the Commonwealth's Primary Government increased by approximately $2.5 billion during fiscal year 2016. The net position (deficit) for Governmental Activities increased by approximately $1.9 billion and the net position (deficit) for Business-Type Activities increased by approximately $591 million during the fiscal year 2016.

- The Commonwealth's Governmental Activities had total revenue of approximately $18.3 billion for fiscal year 2016, which represent an increase of approximately $1.3 billion when compared to fiscal year 2015. The Commonwealth's Business-Type Activities had total revenue of approximately $3.4 billion for fiscal year 2016, which represented an increase of approximately $72 million when compared to fiscal year 2015.

- The Commonwealth's Primary Government had total expenses of approximately $24.2 billion in fiscal year 2016, which represented an increase of approximately $2.5 billion when compared to total expenses incurred during fiscal year 2015 (as restated).

- For fiscal year 2016, the total excess of revenue over expenditures and general obligation debt service payments in the General Fund (budgetary basis) was approximately $439 million. It consisted of the difference between total actual revenue of approximately $9 billion (excluding other financing sources), less the sum of total actual expenditures of approximately $8.3 billion and general obligation debt service payments of approximately $287 million (excluding other financing uses). The variance between the U.S. generally accepted accounting principles (U.S. GAAP) and budgetary basis deficits results from differences of accounting, entity, and perspective differences between budgetary reporting versus those established by U.S. GAAP and followed in these financial statements.

The Commonwealth's management believes that there is substantial doubt as to the ability of the Primary Government to continue as a going concern in accordance with Governmental Accounting Standards Board (GASB) Statement No. 56, *Codification of Accounting and Financial Reporting Guidance Contained in the AICPA Statements on Auditing Standards*. In addition, the Commonwealth's pension trust funds, included as part of the fiduciary funds, were severely underfunded as of June 30, 2016. As a result of the fiscal difficulties faced by the Commonwealth, on May 3, 2017 the Financial Oversight and Management Board for Puerto Rico (Oversight

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

Board), at the request of the Governor, commences a Title III case for the Commonwealth, by filing a petition for relief under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) in the United States District Court for the District of Puerto Rico. For additional information regarding going concern, uncertainties and liquidity risk, refer to Note 2 and Note 3.

**Reporting the Commonwealth as a Whole**

The Commonwealth financial reporting entity consists of all departments, agencies, funds, functions, and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's basic financial statements. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth is such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. As noted above, the Commonwealth's basic financial statements consist of three components: (i) government-wide financial statements, (ii) fund financial statements, and (iii) notes to the basic financial statements. The fund financial statements include governmental, proprietary, and fiduciary types of funds that will be described later in this MD&A. The notes to the basic financial statements provide explanations and/or additional detail for all of the above types of financial statements and are considered an integral part of the financial statements.

The following table summarizes the major features of the basic financial statements.

| | Government-Wide Financial Statements | Fund Financial Statements | | |
| --- | --- | --- | --- | --- |
| | | Governmental Funds | Proprietary Funds | Fiduciary Funds |
| Scope | Governmental activities, business type activities and discretely presented component units. | The activities of the Commonwealth that are not proprietary or fiduciary, including education, health, public safety services, among others. | Activities of the Commonwealth that operate similar to private businesses, including Lotteries. | Instances in which the Commonwealth is the trustee or agent for someone else's resources, such as the retirement plans for public employees. |
| Required financial statements | Statement of net position and statement of activities. | Balance sheet and statement of revenue, expenditures, and changes in fund balances. | Statement of net position; statement of revenue, expenses and changes in fund net position; and statement of cash flows. | Statement of fiduciary net position and statement of changes in fiduciary net position. |
| Accounting basis and measurement focus | Accrual basis and economic resources measurement focus. | Modified accrual basis and current financial resources measurement focus. | Accrual basis and economic resources measurement focus. | Accrual basis and economic resources measurement focus. |

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

| | Government-Wide Financial Statements | Fund Financial Statements | | |
| | | Governmental Funds | Proprietary Funds | Fiduciary Funds |
|---|---|---|---|---|
| Type of asset/liability information | All assets and liabilities, both financial and capital, and both short-term and long-term. | Only assets expected to be used up and liabilities that come due during the year or soon thereafter; no capital assets or long-term obligations are included. | All assets and liabilities, both financial and capital, and both short-term and long-term. | All assets and liabilities, both financial and capital, and both short-term and long-term. |
| Type of inflow/outflow information | All revenue and expenses during the year, regardless of when cash is received or paid. | Revenue for which cash is received during the year or soon after the end of the year; expenditures when goods or services have been received and payment is due during the year or soon thereafter. | All revenue and expenses during the year, regardless of when cash is received or paid. | All revenue and expenses during the year, regardless of when cash is received or paid. |

**Government-Wide Financial Statements**

The government-wide financial statements provide readers a broad view of the Commonwealth's operations in a manner similar to a private-sector business. The statements provide both short and long-term information about the Commonwealth's financial position, which assists in assessing the Commonwealth's economic condition at the end of fiscal year 2016. These statements are prepared using the economic resources measurement focus and the full accrual basis of accounting. This means that they follow methods that are similar to those used by most private businesses. They take into account all revenue and expenses connected with the fiscal year even if cash involved has not been received or paid.

The government-wide financial statements include two statements:

- *Statement of Net Position* – This statement presents all of the government's assets, liabilities, and deferred outflows and inflows of resources. Net position is the difference between (a) assets and deferred outflows of resources and (b) liabilities and deferred inflows of resources. Over time, increases or decreases in the Commonwealth's net position may serve as a useful indicator of whether the financial position of the Commonwealth is improving or deteriorating.

- *Statement of Activities* – This statement presents information showing how the Primary Government's and its component units' net position changed during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenue and expenses are reported in this statement for some items that will not result in cash flows until future fiscal periods (such as uncollected taxes and earned but unused vacation leave). This statement also presents a comparison between direct expenses and program revenue for each function of the Commonwealth.

13

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

Although one can think of the Commonwealth's net position as one way to measure whether the Commonwealth's financial health is improving or deteriorating, one may also need to consider other nonfinancial factors, such as changes in the Commonwealth's tax structure, population, employment, debt levels, fiscal conditions, economic factors, availability to external markets and the condition of the Commonwealth's roads, bridges and buildings, in order to assess the overall health of the Commonwealth.

In the statement of net position and the statement of activities, the operations of the Commonwealth are divided into the following activities:

- *Governmental Activities* – Most of the Commonwealth's basic services are reported here, including education, health, public housing and welfare, public safety, economic development, general government and interest on long-term debt. Federal grants (intergovernmental), income taxes, sales and use taxes, and other taxes, transfers from lottery revenues, and bond or loan proceeds finance most of these activities. Also included in Governmental Activities are nine blended component units, which are entities that, while legally separate from the Commonwealth, meet the blending criteria under GASB guidance to be reported as part of the Primary Government.

- *Business-Type Activities* – These activities are normally intended to recover all or a significant portion of their costs through user fees and charges to external users of goods and services. These Business-Type Activities of the Commonwealth include the operations of the following major funds: the Unemployment Insurance Trust Fund, the Lotteries Fund, the Puerto Rico Health Insurance Administration (PRHIA), the Puerto Rico Medical Services Administration (PRMeSA) and the Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF).

- *Discretely Presented Component Units* – Although legally separate from the Commonwealth, discretely presented component units are important to the Commonwealth because the Commonwealth is financially accountable for them or the nature and significance of their relationship with the Commonwealth are such that their exclusion would cause the Commonwealth's financial statements to be misleading or incomplete. Discretely presented component units, presented in a separate column in these basic financial statements, are discretely presented principally because of the nature of the services they provide, the Commonwealth's ability to impose its will (principally through the appointment of their governing authorities), and because such component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth. The Commonwealth classifies 44 separate legal entities as discretely presented component units, as disclosed in Note 1 to the basic financial statements.

The government-wide financial statements can be found immediately following this MD&A.

**Governmental and Proprietary Fund Financial Statements**

Financial statements prepared at the fund level provide additional details about the Commonwealth's financial position and activities. A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. The Commonwealth uses fund accounting to help ensure and demonstrate compliance with finance-related legal requirements. The fund financial statements focus on individual parts of the Commonwealth government, reporting the Commonwealth's operations in more detail than the government-wide financial statements. The Commonwealth's governmental and proprietary funds types use different perspectives and accounting basis. The funds presented in the fund financial statements are

14

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

categorized as either major or nonmajor funds as required by U.S. GAAP. All of the funds of the Commonwealth can be divided into the following categories:

- **Governmental Funds** – Most of the basic services provided by the Commonwealth are financed through governmental funds. Governmental funds are used to account for essentially the same functions reported as Governmental Activities in the government-wide financial statements. However, unlike the government-wide financial statements that use the full accrual basis of accounting, the governmental funds financial statements use a modified accrual basis of accounting, which focuses on near-term inflows and outflows of expendable resources. This information may be useful in evaluating the government's near-term financing requirements. These statements provide a detailed short-term view of the Commonwealth's finances and assist in determining whether there will be adequate financial resources available to meet the current needs of the Commonwealth. Since the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for the Governmental Activities in the government-wide financial statements. By comparing the governmental funds financial statements to the Governmental Activities in the government-wide financial statements, readers may better understand the long-term impact of the government's near-term financing decisions. Both the governmental funds balance sheet and the governmental funds statement of revenue, expenditures, and changes in fund balances provide a reconciliation to facilitate comparison between governmental funds and the Governmental Activities. These reconciliations are presented on the next page immediately following each governmental fund financial statement.

The Commonwealth has four major governmental funds. That is, each major fund is presented in a separate column in the governmental funds balance sheet and in the governmental funds statement of revenue, expenditures, and changes in fund balances. The Commonwealth's four major governmental funds are:

- General Fund [1]
- Debt Service Fund
- COFINA Special Revenue Fund
- COFINA Debt Service Fund

The remaining nonmajor governmental funds, which consist of funds from the blending of the Port of the Americas Authority (PAA), Public Buildings Authority (PBA), Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA), Puerto Rico Infrastructure Financing Authority (PRIFA), Puerto Rico Maritime Shipping Authority (PRMSA), Special Communities Perpetual Trust (SCPT), The Children's Trust, University of Puerto Rico Comprehensive Cancer Center (UPRCCC), and the Commonwealth's capital project funds, are grouped and presented in a single column in the governmental funds financial statements. The basic

---

[1] The General Fund is the primary operating fund of the Commonwealth. The financial resources received and used in the General Fund mostly include: the General Fund budgeted resources, as approved by the Legislative Assembly of Puerto Rico (the Legislature) and as adjusted for timing and basis of accounting differences, and other financial resources outside the General Fund budget such as: federal funds, pledged funds, resources that otherwise would be accounted for in special revenue funds, and agencies with independent treasuries.

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

governmental funds financial statements can be found immediately following the government-wide financial statements.

- *Proprietary Funds* – These funds are used to show activities that operate more like those of commercial enterprises. Because these funds charge fees for services provided to outside customers, including local governments, they are also known as enterprise funds. Proprietary funds provide the same type of information as the Business-Type Activities in the government-wide financial statements, but in more detail. As with government-wide financial statements, proprietary funds financial statements use the full accrual basis of accounting. There is no reconciliation needed between the government-wide financial statements for Business-Type Activities and the proprietary funds financial statements.

The Commonwealth has five major proprietary funds:

- Unemployment Insurance Fund

- Lotteries Fund, which includes the Lottery of Puerto Rico and the Additional Lottery System

- Puerto Rico Health Insurance Administration (PRHIA)

- Puerto Rico Medical Service Administration (PRMeSA)

- Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF)

Other nonmajor proprietary funds consist of the Disability Insurance Fund, Drivers' Insurance Fund, Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (PRSDWRLF), Ponce Ports Authority (PPA), and the Governing Board of 9-1-1 Services which are grouped and presented in a separate column in the proprietary funds' financial statements. The basic proprietary funds financial statements can be found immediately following the governmental funds financial statements.

**Fiduciary Funds**

The Commonwealth is a trustee, or fiduciary, for its employees' pension plans. It is also responsible for other assets on an agent capacity for individuals, private organizations, and other governmental entities. All the Commonwealth fiduciary activities are reported in a separate statement of fiduciary net position and of changes in fiduciary net position. The Commonwealth excluded these activities from its government-wide financial statements because the Commonwealth cannot use these assets to finance its operations. The Commonwealth is responsible for ensuring that the assets reported in these funds are used for their intended purposes.

*New Plan for Defined Contributions for Public Servants*

On August 23, 2017, Act No. 106 of 2017 (Act No.106 of 2017) was signed into law to guarantee the payment to pensioners and establish a new plan for defined contributions for public servants, reformed the Commonwealth's pensions by replacing the governing boards of the Retirement Systems with a single Retirement Board of the Commonwealth of Puerto Rico (Retirement Board) and established a separate "account for the payment of accrued pensions" to implement a "pay-as-you-go" (PayGo) method for the Retirement Systems. Act No. 106 of 2017 created the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system. For additional information regarding the PayGo system, refer to Notes 2, 3 and 23.

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

## Notes to Basic Financial Statements

The notes provide additional information that is essential to a full understanding of the data provided in the government-wide and the fund financial statements. The notes to the basic financial statements can be found immediately following the major component units' combining financial statements.

## Required Supplementary Information/Supplementary and Other Information (Unaudited)

The basic financial statements include a section of required supplementary information and other information immediately following its notes. This section includes information of funding progress and employer contributions for the Commonwealth's three separate retirement systems, including postemployment healthcare benefits, schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund, supplemental schedule of expenditures by agency – budget and actual – budgetary basis – General Fund, and combining schedules for nonmajor governmental funds, nonmajor proprietary funds, fiduciary funds, and nonmajor discretely presented component units.

## Overall Financial Position and Results of Operations (Government-Wide)

The following is an analysis of the financial position and changes in the financial position of the Commonwealth's Governmental Activities and Business-Type Activities for fiscal year 2016.

## Financial Position

Condensed financial information from the statement of net position as of June 30, 2016 and 2015 is as follows (in thousands):

| | Governmental Activities | | Business-Type Activities | | Primary Government | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 (As restated) | 2016 | 2015 (As restated) | 2016 | 2015 (As restated) |
| **Assets:** | | | | | | |
| Non-capital assets: | | | | | | |
| Cash and investments | $ 1,651,681 | 2,686,669 | 793,954 | 786,553 | 2,445,635 | 3,473,222 |
| Receivables, net | 2,371,864 | 2,433,357 | 332,490 | 980,264 | 2,704,354 | 3,413,621 |
| Other | 103,161 | 106,797 | 46,877 | 53,493 | 150,038 | 160,290 |
| Total non-capital assets | 4,126,706 | 5,226,823 | 1,173,321 | 1,820,310 | 5,300,027 | 7,047,133 |
| Capital Assets | 8,701,112 | 8,823,439 | 93,170 | 97,070 | 8,794,282 | 8,920,509 |
| Total assets | 12,827,818 | 14,050,262 | 1,266,491 | 1,917,380 | 14,094,309 | 15,967,642 |
| **Deferred outflows of resources** | 4,736,911 | 2,252,947 | 136,118 | 90,928 | 4,873,029 | 2,343,875 |
| **Liabilities:** | | | | | | |
| Long-term liabilities | 82,674,133 | 78,282,969 | 1,587,252 | 1,621,772 | 84,261,385 | 79,904,741 |
| Other liabilities | 3,519,587 | 4,985,591 | 277,170 | 264,892 | 3,796,757 | 5,250,483 |
| Total liabilities | 86,193,720 | 83,268,560 | 1,864,422 | 1,886,664 | 88,058,142 | 85,155,224 |
| **Deferred inflows of resources** | 1,192,697 | 943,173 | 11,304 | 3,378 | 1,204,001 | 946,551 |
| **Net Position:** | | | | | | |
| Net investment in capital assets | 3,203,987 | 3,444,760 | 75,020 | 80,760 | 3,279,007 | 3,525,520 |
| Restricted | 346,399 | 509,458 | 536,152 | 1,209,359 | 882,551 | 1,718,817 |
| Unrestricted (deficit) | (73,372,074) | (71,862,742) | (1,084,289) | (1,171,853) | (74,456,363) | (73,034,595) |
| Total net position (deficit) | $ (69,821,688) | (67,908,524) | (473,117) | 118,266 | (70,294,805) | (67,790,258) |

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

Governmental entities are required by U.S. GAAP to report on their net position. The statement of net position presents the value of all of the Commonwealth's assets and deferred outflows of resources, and liabilities and deferred inflows of resources, with the difference between them reported as net position.

Net position may serve over time as a useful indicator of a government's financial position. The total aggregate amount of assets plus deferred outflows of resources and total liabilities plus deferred inflows of resources of the Primary Government as of June 30, 2016 amounted to approximately $19 billion and $89.3 billion, respectively, for a net deficit of approximately $70.3 billion as of June 30, 2016, compared to a net deficit of approximately $67.8 billion as of June 30, 2015 (as restated).

Net position (deficit) for Governmental Activities increased by approximately $1.9 billion during fiscal year 2016, to approximately $69.8 billion at June 30, 2016 from approximately $67.9 billion at June 30, 2015 (as restated). The unrestricted deficit for Governmental Activities – that part of net position that can be used to finance day-to-day governmental operations without constraints established by debt covenants, enabling legislation, or other legal requirements – had a deficit of approximately $73.4 billion as of June 30, 2016. The unrestricted deficit in Governmental Activities, which increased by approximately $1.5 billion, exists primarily because of excessive operating expenses in disparity with actual revenues. This deficit can be expected to continue for as long as the Commonwealth continues to have obligations outstanding for purposes other than the acquisition of governmental capital assets. The statement of net position in Governmental Activities reflects outstanding bonds and notes amounting to approximately $40.2 billion and net pension liability amounting to approximately $36.9 billion as of June 30, 2016, as compared to outstanding bonds and notes amounting to approximately $40.3 billion and net pension liability amounting to approximately $33 billion as of June 30, 2015.

A portion of the Commonwealth's net position (deficit) reflects its investment in capital assets such as land, buildings, and equipment, less any related debt used to acquire those assets. The Commonwealth uses these capital assets to provide services to its residents; consequently, these assets are not available for future spending, and except for certain assets within Business-Type Activities, do not generate direct revenue for the Commonwealth. They do represent, however, an obligation on the part of the Commonwealth to maintain these assets into the future. Although the Commonwealth investment in its capital assets is reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since most of the capital assets themselves cannot be used to liquidate these liabilities.

The net position (deficit) in Business-Type Activities decreased by approximately $591 million in fiscal year 2016 when compared to fiscal year 2015, from approximately a $118 million net position at June 30, 2015 (as restated) to approximately a $473 million net position (deficit) at June 30, 2016. The principal reason for the decrease in net position (deficit) is related to an aggregate impairment loss on loans receivable of approximately $573 million recognized in 2016 over the PRWPCRF and the PRSDWRLF, collectively referred to as the State Revolving Funds.

COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2016

## Results of Operations

Condensed financial information of the statements of activities for the years ended June 30, 2016 and 2015 is as follows (in thousands):

| | Governmental Activities | | Business-Type Activities | | Primary Government | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 (As restated) | 2016 | 2015 (As restated) | 2016 | 2015 (As restated) |
| Revenue: | | | | | | |
| Program revenue: | | | | | | |
| Charges for services | $ 821,092 | 852,708 | 1,621,440 | 1,597,467 | 2,442,532 | 2,450,175 |
| Operating grants and contributions | 6,446,731 | 6,355,255 | 1,739,479 | 1,682,071 | 8,186,210 | 8,037,326 |
| Capital grants and contributions | 73,189 | 80,753 | — | — | 73,189 | 80,753 |
| | 7,341,012 | 7,288,716 | 3,360,919 | 3,279,538 | 10,701,931 | 10,568,254 |
| General revenue: | | | | | | |
| Taxes | 10,314,767 | 9,085,898 | — | — | 10,314,767 | 9,085,898 |
| Revenue from global tobacco settlement agreement | 70,665 | 66,192 | — | — | 70,665 | 66,192 |
| Revenue from component units | 265,357 | 152,635 | — | — | 265,357 | 152,635 |
| Other, including loss on investments | 302,569 | 355,184 | 16,956 | 26,457 | 319,525 | 381,641 |
| | 10,953,358 | 9,659,909 | 16,956 | 26,457 | 10,970,314 | 9,686,366 |
| **Total revenue** | **18,294,370** | **16,948,625** | **3,377,875** | **3,305,995** | **21,672,245** | **20,254,620** |
| Expenses: | | | | | | |
| General government | 3,675,139 | 2,251,979 | — | — | 3,675,139 | 2,251,979 |
| Public safety | 2,071,961 | 1,828,596 | — | — | 2,071,961 | 1,828,596 |
| Health | 3,080,551 | 2,327,012 | — | — | 3,080,551 | 2,327,012 |
| Public housing and welfare | 3,314,500 | 3,279,564 | — | — | 3,314,500 | 3,279,564 |
| Education | 3,724,041 | 3,599,979 | — | — | 3,724,041 | 3,599,979 |
| Economic development | 1,026,935 | 1,525,337 | — | — | 1,026,935 | 1,525,337 |
| Intergovernmental | 554,429 | 344,594 | — | — | 554,429 | 344,594 |
| Interest and other | 2,086,720 | 2,499,411 | — | — | 2,086,720 | 2,499,411 |
| Unemployment insurance | — | — | 139,993 | 161,312 | 139,993 | 161,312 |
| Lotteries | — | — | 654,355 | 634,336 | 654,355 | 634,336 |
| Health Insurance Administration | — | — | 2,867,938 | 2,805,897 | 2,867,938 | 2,805,897 |
| Medical Services Administration | — | — | 279,976 | 225,230 | 279,976 | 225,230 |
| Water Pollution Control Revolving Fund | — | — | 424,778 | 114,720 | 424,778 | 114,720 |
| Nonmajor proprietary funds | — | — | 275,476 | 52,916 | 275,476 | 52,916 |
| **Total expenses** | **19,534,276** | **17,656,472** | **4,642,516** | **3,994,411** | **24,176,792** | **21,650,883** |
| Increase (decrease) in net position before transfers | (1,239,906) | (707,847) | (1,264,641) | (688,416) | (2,504,547) | (1,396,263) |
| **Transfers** | **(673,258)** | **(664,363)** | **673,258** | **664,363** | **0** | **0** |
| **Change in net position** | **(1,913,164)** | **(1,372,210)** | **(591,383)** | **(24,053)** | **(2,504,547)** | **(1,396,263)** |
| Net position (deficit), beginning of year, as adjusted (note 4) | (67,908,524) | (66,536,314) | 118,266 | 142,319 | (67,790,258) | (66,393,995) |
| Net position (deficit), end of year | $ (69,821,688) | (67,908,524) | (473,117) | 118,266 | (70,294,805) | (67,790,258) |

19

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

As described above, the Governmental Activities net position (deficit) increased from approximately $67.9 billion at June 30, 2015 (as restated) to approximately $69.8 billion at June 30, 2016, an increase of approximately $1.9 billion. The increase in total net deficit position is mainly due to an increase in  the loss contingency recognized for the State Revolving Funds loss on deposits and loans guaranteed by the Commonwealth of approximately $627.4 million and a pension expense related to changes in net pension liability, deferred inflow and outflow of resources of approximately $1.6 billion. Approximately 56.4% of the Governmental Activities' revenue came from taxes, while approximately 35.6% resulted from grants and contributions (primarily federal financial assistance). Charges for services represented approximately 4.5% of total revenue. The Governmental Activities' expenses cover a range of governmental services. The largest expenses were for education 18.4% of total expenses, general government 18.2% of total expenses, public housing and welfare 16.5% of total expenses, health 15.2% of total expenses, and public safety 10.3% of total expenses. In fiscal year 2016, Governmental Activities' expenses, which amounted to approximately $19.5 billion, were funded by approximately $11 billion in general revenue, and approximately $7.3 billion in program revenue (comprised primarily of federal financial assistance). Also, the implementation of Act No. 66 of 2014 "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act" contributed to a reduction in expenses in areas such as:

- Payroll and related expenses.

- Freeze Commonwealth Appropriations, based on formulas, to the University of Puerto Rico, the Commonwealth's Judicial Branch and the Municipalities.

- Reduction in the Commonwealth's Department of Education expenses, such as, a reduction in school transportation services, payroll savings on account of teacher's retirement system and no contracting to fill vacancies.

- Reduction of special appropriations.

- Elimination of certain subsidies to programs or operations of component units.

Total revenue from Governmental Activities for fiscal year 2016 increased by approximately $1.3 billion compared to fiscal year 2015. This increase was mainly related to an increase in the sales and use tax base of 4.5%, which resulted in an increase of approximately $1 billion.

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

**Revenues – Governmental Activities**



**Expenses – Governmental Activities**



**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

Business-Type Activities' total net position decreased by approximately $591 million from the total net position at June 30, 2015. Approximately 48% of the Business-Type Activities total revenue came from charges for services, while approximately 52% resulted from grants and contributions (primarily federal financial assistance). Business-Type Activities expenses cover a range of services. The largest expenses were for lotteries and Health Insurance Administration. In fiscal year 2016, Business-Type Activities' total expenses exceeded revenue by approximately $1.3 billion. The excess of expenses over revenue in fiscal year 2016 was decreased by net transfers from Governmental Activities, amounting to approximately $673 million. Total expenses increased by approximately $648 million in comparison with prior year expenses mainly for the recognition of a custodial credit loss and a loan receivable impairment of approximately $627.4 million.

**Governmental Funds**

The governmental funds financial statements provide information on near-term inflows, outflows, and balances of expendable resources. Such information is useful in assessing the Commonwealth's financing requirements. In particular, unassigned fund balance may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year. As of June 30, 2016, the Commonwealth's governmental funds, reported a combined ending deficit of approximately $299.5 million. In fiscal year 2016, revenue in these governmental funds exceeded expenditures by approximately $1.4 billion. However, this excess of revenue over expenditures was offset by other financing uses totaling approximately $576 million in the governmental funds. For fiscal year 2016, the excess of expenditures over revenues decreased by approximately $2.5 billion when compared with the prior year, primarily as a result of a decrease of debt service payments on long-term debt in the total aggregate amount of $1 billion due on July 1, 2016 and an increase in sales and use tax revenue of $1 billion in comparison with prior year figures.

The General Fund (as described in footnote 1 above) is the chief operating fund of the Commonwealth. At the end of fiscal year 2016, the General Fund, which encompasses other financial resources outside the General Fund budget such as federal funds, pledged funds, special revenue funds, and agencies with independent treasuries, had a total fund deficit of approximately $1.2 billion. The fund deficit of the Commonwealth's General Fund decreased by approximately $1.2 million as a result of the fiscal year's change in financial position. The deficit also shows the accumulation of significantly higher operating expenses than projected and actual revenue necessary to provide essential services to the citizens. During fiscal year 2016 a sales and use surtax of 4.5% and a 4% tax for services rendered between merchants redounded in an increase of $1 billion. Also, the amortization of approximately $300 million in 2016 of taxes prepaid during fiscal year 2015 contributed to the increase in revenue.

The debt service fund is the fund in which the Commonwealth accumulates the resources for the payment of the long-term general obligations debt. The net change in fund balance of the debt service fund decreased by approximately $18 million in fiscal year 2016, and the fund balance at the end of year decreased to approximately $202 million at June 30, 2016. Bonds and interest payable during fiscal year 2016 decreased by approximately $767 million when compared with fiscal year 2015 as a result of the non-payment of general obligation bonds due on July 1, 2016.

The COFINA Special Revenue Fund is used to account for and report all financial resources of the Puerto Rico Sales Tax Financing Corporation (COFINA). The fund balance of the COFINA special revenue fund decreased by approximately $5 million in fiscal year 2016, to a deficit of approximately $29 thousand at June 30, 2016. The COFINA Debt Service Fund is used to account for the Commonwealth sales tax revenue being deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations of COFINA. The

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

fund balance of the COFINA debt service fund increased by approximately $16 million during fiscal year 2016, to approximately $448 million at June 30, 2016.

**General Fund Budgetary Highlights**

The Commonwealth Constitution requires the Governor to submit annually for the approval of the Commonwealth Legislature a balanced budget that contains a plan of expenditures for the ensuing fiscal year and identifies the anticipated revenues and other resources enough to meet the proposed expenditures. The Commonwealth adopts an annual appropriations budget for its General Fund. A budgetary comparison schedule has been provided as required supplementary information for the General Fund to demonstrate compliance with this budget. The schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund presents only the information for the General Fund for which there is a legally adopted budget, as required by U.S. GAAP.

Total General Fund actual revenue on a budgetary basis for fiscal year 2016 was approximately $9 billion (excluding other financing sources), representing a decrease of approximately $642 million, or 7%, from original budgeted revenue, and an increase of approximately $240 million or 3% from actual revenue of approximately $8.8 billion for fiscal year 2015.

Total General Fund actual expenditures on a budgetary basis for fiscal year 2016 were approximately $8.3 billion, representing a decrease of $495 million or 6% from original budgeted expenses and a decrease of approximately $359 million or 4% from actual expenditures of approximately $8.7 billion for fiscal year 2015.

For fiscal year 2016, the budgeted excess of revenue over expenditures (budgetary basis) was approximately $726 million, consisting of the difference between total actual revenue of approximately $9 billion and total actual expenditures of approximately $8.3 billion. For fiscal year 2015, the excess of revenue over expenditures (budgetary basis) was approximately $126 million, consisting of the difference between total actual revenue of approximately $8.8 billion and total actual expenditures of approximately $8.7 billion. The budgeted excess of revenue over expenditures (budgetary basis) for fiscal year 2016 increased by approximately $600 million when compared to the surplus of fiscal year 2015 and increased by approximately $1.2 billion when compared to the deficiency of revenue under expenditures (budgetary basis) of approximately $440 million in fiscal year 2014.

For fiscal year 2016, the total excess of revenue over expenditures and general obligation debt service payments in the General Fund (budgetary basis) was approximately $439 million. It consisted of the difference between actual revenue of approximately $9 billion (excluding other financing sources), less the sum of total expenditures of approximately $8.3 billion and general obligation debt service payments of approximately $287 million (excluding other financing uses). This surplus of approximately $439 million in the General Fund (budgetary basis) differs from the excess of revenue over expenditures in the General Fund on a modified accrual basis (U.S. GAAP) of approximately $2.8 billion, which was offset by approximately $1.6 billion in other financing uses, principally consisting of transfers to other funds, for a resulting net increase in fund balances of approximately $1.2 billion for the fiscal year 2016. The variance between the U.S. GAAP and budgetary basis deficiency results from differences in the basis of accounting, and perspective differences between budgetary reporting versus those established by U.S. GAAP and followed in these financial statements. Examples of such differences include: (i) recognition of proceeds of long-term debt issued as other financing sources, (ii) recognition of receivables (revenue) for reimbursements of expenses allocated to federal funds, (iii) the recognition of revenue and expenditures of entities with independent treasuries, (iv) expenditures incurred in nonbudgetary funds (special revenue funds, internal revenue funds, and other funds), which were not included in the General Fund

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

Budget, and (v) timing differences in basis of accounting such as (a) the recognition of receivables on income and corporate taxes and (b) recognition of expenditure accruals. A reconciliation is presented on page 359 in the notes to required supplementary information section. The Commonwealth's ability to continue reducing the deficit will depend in part on its ability to continue increasing revenue and reducing expenditures in the face of rising debt service and pension obligations, which in turn depends on a number of factors, including improvements in general economic conditions.

The following information is presented to assist the reader in comparing the final amended budget and the actual results.

**Actual Revenue – General Fund**
Budgetary Basis
Year ended June 30, 2016
(in thousands)



**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

**Actual Expenditures – General Fund**
Budgetary Basis
Year ended June 30, 2016
(in thousands)



For more than a decade, the Commonwealth had significant deficiencies of revenues under expenditures (including debt services) that were mainly funded through issuances of bonds and lines of credits.

25

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

**Capital Assets and Debt Administration**

*Capital Assets*

The following is a summary schedule of the Primary Government's capital assets (in thousands):

**Commonwealth's Capital Assets – Primary Government**
June 30, 2016 and 2015
(Net of depreciationexpressed in thousands)

| | Governmental activities | | Business-type activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | **2016** | **2015** | **2016** | **2015 (as restated)** | **2016** | **2015 (as restated)** |
| Land | $ 936,891 | 937,124 | 36,005 | 36,005 | 972,896 | 973,129 |
| Construction in progress | 1,345,319 | 1,350,084 | 3,339 | 3,282 | 1,348,658 | 1,353,366 |
| Buildings and building improvements, net | 5,806,027 | 5,922,261 | 39,081 | 40,523 | 5,845,108 | 5,962,784 |
| Equipment, furniture, fixtures, vehicles and software, net | 205,239 | 194,103 | 14,745 | 17,260 | 219,984 | 211,363 |
| Infrastructure, net | 407,636 | 419,867 | — | — | 407,636 | 419,867 |
| Total capital assets | $ 8,701,112 | 8,823,439 | 93,170 | 97,070 | 8,794,282 | 8,920,509 |

The total aggregate amount of the Commonwealth's investment in capital assets for its Governmental Activities and Business-Type Activities as of June 30, 2016 amounted to approximately $14 billion, less accumulated depreciation and amortization of approximately $5.2 billion, resulting in a book value of approximately $8.8 billion. Capital assets include land, constructions in progress, buildings, building improvements, equipment, and infrastructure. Capital assets included in the Governmental Activities column are principally owned by blended component units (e.g., Public Buildings Authority and Puerto Rico Infrastructure Financing Authority) and are primarily of value only to the Commonwealth, such as public schools, roads, and buildings used for governmental services. The total aggregate amount of the Commonwealth's depreciation and amortization expense for its Governmental Activities and Business-Type Activities amounted to approximately $318 million for the year ended June 30, 2016.

Other infrastructure assets, such as highways, bridges, toll road facilities, water and sewer systems, electricity production, transmission and distribution systems, and similar assets, are owned by discretely presented component units.

Additional information on the Commonwealth's capital assets can be found in Note 11 to the basic financial statements that accompany this report.

*Debt Administration – Primary Government*

The Commonwealth has incurred long-term debt financing and other obligations, including lease/purchases and contractual obligations where the Commonwealth's legal obligation to make payments is typically subject to and paid from annual appropriations made by the Legislative Assembly of Puerto Rico (the Legislature) of the Commonwealth. For example, the debts reported by most blended component units, by Business-Type Activities and certain discretely presented component units are supported, directly or indirectly, by payments from resources from the Commonwealth's Governmental Activities.

## COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2016

At June 30, 2016, the total aggregate amount of (i) the Primary Government's bonds and notes outstanding amounted to approximately $40.3 billion, (ii) the discretely presented component units' bonds and notes outstanding amounted to approximately $24.3 billion, and (iii) the fiduciary funds' bonds outstanding amounted to approximately $3.1 billion.

General obligation bonds are backed by the full faith, credit, and taxing power of the Commonwealth. The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth should not be issued if the amounts of the principal of and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter internal revenue) in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee as long as the Commonwealth is in compliance with the 15% limitation at the time of issuance of such guaranteed debt. Internal revenue consists principally of income taxes, sales and use tax, property taxes, and excise taxes. For additional information on the current status of the Title III cases, refer to Note 3. For additional information related to ongoing litigation, refer to Note 17.

On September 13, 2017 the Oversight Board announced that its special investigation committee (the Special Investigation Committee) retained an independent investigator to carry out a review of the Commonwealth's debt and its connection to the current financial crisis. The Special Investigation Committee considers this investigation an integral part of the Oversight Board's mission to restore fiscal balance and economic opportunity and to promote the Commonwealth's reentry to the capital markets. On August 20, 2018, the independent investigator published the final report, which presented a series of findings and recommendations on the following areas:

- Government Development Bank (GDB)
- Puerto Rico Public Utilities (Puerto Rico Energy and Power Authority (PREPA) and Puerto Rico Aqueduct and Sewer Authority (PRASA))
- COFINA
- Employees' Retirement System
- Puerto Rico's Budgeting, External Reporting, and Accounting Functions
- Calculation of the Constitutional Debt Limit
- Credit Rating Agencies (CRAs)
- Selling Practices for Puerto Rico-Related Bonds
- Puerto Rico's Government Ethics Framework
- Issuers' Use of Interest Rate Swaps
- Puerto Rico's Lack of a Clear Mechanism for Validating Puerto Rico-Related Bonds Before They Issue
- Possession Tax Credit

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

Finally, the Independent Investigator presented an overview of potential causes of action. The report in its entirety can be found on the Oversight Board's website.

Debt of certain discretely presented component units (other than bond anticipation notes) such as the PREPA and PRASA is supported by the revenue of such component units from rates charged for services or products. However, the debt of certain blended component units and discretely presented component units is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Additional information on the Commonwealth's long-term debt can be found in Note 13 to the basic financial statements that accompany this report.

As a direct result of the profound economical crisis that the Commonwealth is facing, the Commonwealth enacted Act No. 21 of 2016, known as the Puerto Rico Emergency Moratorium and Rehabilitation Act (as amended, the Moratorium Act) on April 6, 2016. Pursuant to the Moratorium Act, the Governor issued a series of executive orders declaring an emergency period, a moratorium and various other measures with respect to certain obligations of the Commonwealth and several of its instrumentalities. Pursuant to these executive orders, certain Commonwealth entities have either: (i) not made debt service payments, (ii) made debt service payments with funds on deposit with the trustees of their bonds, and/or (iii) not received or transferred certain revenues. Subsequent to the filing of the Commonwealth's Title III case on May 3, 2017, such payments have not been made due to the automatic stay under Title III of PROMESA.

The following paragraphs detail the amount of debt service not paid:

*PFC Bonds*

On July 15, 2015, PFC filed a notice with Electronic Municipal Market Access (EMMA) indicating that the Legislature had not included in the approved budget for fiscal year 2016 the funds necessary to pay principal and interest on all outstanding PFC bonds. Such appropriation is the sole source of payment of a principal and interest on PFC bonds. The first payment of debt service on PFC bonds for fiscal year 2016 came due on August 3, 2015, on which date PFC made a partial payment of interest in the amount of $628,000 (of the approximately $58 million payment due on that date) from funds held by PFC representing funds remaining from prior legislative appropriations. From August 3, 2015 through March 31, 2019, PFC had missed additional debt payments on its bonds in the aggregate amount of approximately $346.1 million.

*General Obligation (GO) Bonds*

On July 1, 2016, approximately $1.1 billion of principal and interest payments were due on the Commonwealth's GO bonds. Of this amount, the Commonwealth paid approximately $351.9 million (leaving approximately $778.8 million unpaid). The $351.9 million payment consisted of funds held in escrow accounts ($314.4 million in principal amounts plus $37.5 million from existing capitalized interest thereon). From July 1, 2016 through March 31, 2019, the Commonwealth missed additional debt payments on its GO bonds in the aggregate amount of approximately $3 billion.

*COFINA Bonds*

On May 30, 2017, Judge Swain ordered not to make payments to COFINA bondholders. Of the outstanding bonds debt service requirements due from June 1, 2017 through March 31, 2019, COFINA missed outstanding debt payments of approximately $1,392 million

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

*PBA Bonds*

On July 1, 2016, of the approximately $186.9 million of debt service due on the PBA outstanding bonds (consisting of approximately $86.1 million in principal and $100.9 million in interest), all was paid except principal of $25.3 million. Of the outstanding bonds debt service requirements due from August 1, 2016 through March 31, 2019, PBA missed additional outstanding debt payments of approximately $706.1 million, except for principal of $3.5 million and interest of $64.3 million which were paid.

*PRIFA Bonds*

On January 1, 2016, of the approximately $35.9 million debt service (all interest) due on the PRIFA bonds, almost all remained unpaid except $14.4 thousands. Since January 1, 2016, PRIFA has missed additional outstanding debt payments due of approximately $455.8 million, except principal of $100 thousand and interest of $1.1 million.

*Port of the Americas (PAA) Bond Purchase Agreement with GDB*

On August 1, 2016, of the approximately $28.7 million debt service due on the PAA Bond Purchase Agreement with GDB (consisting of approximately $7.8 million in principal and $20.9 million in interest), all remained unpaid. On August 1, 2018, of the approximately $58.5 million debt payments due on the PAA Bond Purchase Agreement with GDB (consisting of approximately $15.6 million in principal and $42.9 million in interest), all remained unpaid.

**Going Concern, Liquidity Risk and Fiscal Plan**

*Going Concern and Liquidity Risk*

The Commonwealth is in the midst of a profound fiscal, economic and liquidity crisis, the culmination of many years of significant governmental deficits, a prolonged economic recession (which commenced in 2006), high unemployment, population decline, and high levels of debt and pension obligations. As the Commonwealth's tax base has shrunk and its revenues affected by prevailing economic conditions, health care, pension and debt service costs have become an increasing portion of the General Fund budget, which has resulted in reduced funding available for other essential services. The Commonwealth's very high level of debt and unfunded pension liabilities and the resulting required allocation of revenues to service debt and pension obligations contributed to significant budget deficits for several years, which deficits the Commonwealth has financed, further increasing the amount of its debt. These matters and the Commonwealth's liquidity constraints, among other factors, have adversely affected its credit ratings and its ability to obtain financing at reasonable interest rates. As a result, the Commonwealth had relied more heavily on short-term financings and interim loans from the GDB, and other instrumentalities of the Commonwealth, which reliance has constrained the liquidity of the Commonwealth in general and GDB and increased near-term refinancing risk. These factors also resulted in delays in the repayment by the Commonwealth and its component units of outstanding GDB lines of credit, which delays limited GDB's ability to continue providing liquidity to the Commonwealth and caused GDB to fail to make a principal payment on its debt obligations. Similarly, and pursuant to a series of legislations and executive orders during fiscal year 2016, the Commonwealth and certain other public corporations also delayed the debt service payments on some of their debts, including the general obligation bonds of the Commonwealth.

During fiscal year 2016, liquidity measures included: (i) requiring the two of the largest Commonwealth's retirement systems to pre-fund the payment of current retirement benefits to participants (in prior fiscal years such amounts were first paid in full by the Treasury Department's single cash Concentration Account, referred to

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

as the "Treasury Single Account" or "TSA", and only later reimbursed to the TSA by the retirement systems), (ii) suspending Commonwealth set-asides required by Act No. 39 of May 13, 1976, as amended, (iii) delaying the payment of third-party payables or amounts due to public corporations, (iv) deferring the disbursement of certain budgetary assignments and (v) delaying the payment of income tax refunds. For decades, the TSA receipts had been deposited primarily at GDB. In April 2016, as a result of GDB's deteriorated liquidity situation, the Commonwealth started to deposit TSA receipts in a commercial bank. Remaining cash balances in the TSA held at GDB were subject to the limitations on withdrawals of funds imposed by the Moratorium Act.

Other liquidity measures had also been bolstered by placing an emergency "intra-governmental" Tax Revenue Anticipation Note (TRANs) with State Insurance Fund (SIFC), Automobile Accident Compensation Administration (AACA) and the Disability Insurance Fund. During fiscal year 2016, the Commonwealth obtained additional funding through the issuance of TRANs with the SIFC, the AACA and the Disability Insurance Fund for the amount of $335 million, $50 million and $15 million, respectively.

Additionally, for the fiscal year ended June 30, 2016, the Legislature did not appropriate approximately $94 million for the payment of the Public Finance Corporation (PFC) bonds which are obligations of certain component units of the Commonwealth that are payable solely from such appropriations. PFC did not make payments of debt service on its bonds in the aggregate amount of approximately $90.2 million and $87.3 million for fiscal years 2016 and 2017, respectively.

On December 1, 2015, Executive Order No. 46 was signed, which ordered the Secretary of Treasury to retain certain revenues in light of revised revenue estimates for fiscal year 2016 and the Commonwealth's deteriorating liquidity situation. Pursuant to Executive Order No. 46, certain available resources of the Commonwealth were conditionally allocated to Puerto Rico Highway and Transportation Authority (PRHTA), Puerto Rico Infrastructure Financing Authority (PRIFA), Puerto Rico Convention Center District Authority (PRCCDA) and Puerto Rico Metropolitan Bus Authority (PRMBA) to pay debt service on their obligations were, and continue to be, retained by the Commonwealth (commonly referred to as the "clawback"), pursuant to Article VI, Section 8 of the Constitution of the Commonwealth and the statutory provisions pursuant to which such revenues were assigned to the applicable public corporations.

Even with the additional resources provided by the implementation of the aforementioned clawback, on April 6, 2016, the Commonwealth enacted the Moratorium Act. Based on the provisions of the Moratorium Act, the Commonwealth and certain of its instrumentalities suspended the payment of debt service on their respective debts. In particular, the Commonwealth suspended the payment of $779 million in debt service on general obligation bonds due July 1, 2016 (net of $352 million of capitalized interest fund and escrow accounts) because it did not have enough funds in its TSA to make such payment.

The Commonwealth was also faced with the challenge to replace the revenue produced by the special temporary excise tax imposed by Act No. 154 of October 25, 2010 (described in Note 1(j) below) if its effective period is not extended (it was set to expire on December 31, 2017) or if the U.S. Internal Revenue Service eliminates its credit against an entity's federal income tax liability. Act No. 154 currently accounts for approximately 20% of General Fund budgeted revenues and approximately 10 companies account for approximately 90% of such Act No. 154 revenues. Although Act No. 154 imposes a modified source of income rule upon the expiration of the temporary excise tax, the Commonwealth currently estimates that revenues from the modified source of income rule would be materially lower than revenues collected from the temporary excise tax. To the extent the Commonwealth is unable to replace the revenue generated by the temporary excise tax, the Commonwealth's funding gap will materially increase and the Commonwealth's ability to continue funding its current operations and provide

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

essential services will be compromised. On January 23, 2017, the Commonwealth enacted Act No. 3 of 2017, which among several provisions, established a 10 year extension of the Act No. 154 excise tax on acquisitions by foreign corporations, thus temporarily eliminating the fiscal cliff related to the Act 154 excise tax.

On January 29, 2017 Act No. 5 of 2017 was signed into law, known as the Puerto Rico Fiscal Emergency and Fiscal Responsibility Act (as amended, Act No. 5), which repealed certain provisions of the Moratorium Act and authorized additional emergency measures. Pursuant to Act No. 5, however, the executive orders issued under the Moratorium Act would continue in effect until amended, rescinded or superseded. The emergency period under Act No. 5, as amended, will expire June 30, 2019, unless extended by the Governor. Some additional powers provided to the Governor through Act No. 5 include: authority to (i) exercise receivership powers to rectify the financial emergency, (ii) exercise general supervisory control over the functions and activities of all government entities within the Executive Branch, and (iii) issue executive orders to implement and enforce compliance with Act No. 5. On April 30, 2017, the Governor of the Commonwealth issued executive order OE-2017-031, which extended the Act No. 5 emergency period through August 1, 2017. On July 19, 2017, the Legislature enacted Act No. 46 (Act No. 46), which further extended the Act No. 5 emergency period through December 31, 2017. Act No. 46 allowed the Governor to sign executive orders to extend the emergency period for successive periods of six months as long as the Oversight Board remains established for Puerto Rico under PROMESA. On December 27, 2018, the Governor issued executive order OE-2018-053, which extended the Act No. 5 emergency period through June 30, 2019.

The Commonwealth has not included appropriations for the payment of debt service in its general fund budget since fiscal year 2017, as the payment of such obligations has been suspended pursuant to the Moratorium Act, Act No. 5, and the commencement of the Commonwealth's Title III case on May 3, 2017.

On June 30, 2016, President Barack Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act (codified under 48 U.S.C. §§ 2101-2241) (PROMESA). In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through, among other things: (i) the establishment of the Oversight Board, whose responsibilities include the certification of fiscal plans and budgets for the Commonwealth and its related entities; (ii) a temporary stay of all creditor lawsuits; and (iii) two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a bankruptcy-type proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of the U.S. Bankruptcy Code (11 U.S.C. §§ 101, et seq.). For additional information on the key elements of PROMESA and the Title III cases, refer to Note 23. For additional information on the civil actions related to the Title III cases and other litigation contingencies, refer to Note 17.

*Fiscal Plan*

Pursuant to PROMESA and the requirements imposed by the Oversight Board, on October 23, 2018, the Oversight Board certified its own fiscal plan for the Commonwealth (the Board Fiscal Plan). The Board Fiscal Plan commits to fiscal responsibility and implements specific revenue enhancements and targeted expenditure reductions to return Puerto Rico to fiscal stability and economic growth. On January 18, 2019, the Oversight Board requested the Governor to submit a new Commonwealth fiscal plan to replace the Board Fiscal Plan. On March 10, 2019, the Governor submitted a new proposed Commonwealth fiscal plan. According to the Oversight Board's prescribed schedule, the Oversight Board anticipates certifying a new Commonwealth fiscal plan on April 26, 2019. For additional information regarding the Board Fiscal Plan, refer to Note 2.

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

**Currently Known Facts**

The following is a summary description of currently known facts, decisions, and conditions that have had, or are expected to have, a significant effect on the Commonwealth's financial position and results of operations. For additional information and further detail, refer to Note 23.

*Tax Revenue Anticipation Notes and Other Notes and Bonds Issued after Year-End*

(a)  2017 Tax and Revenue Anticipation Notes

On September 6, 2016, the Commonwealth renewed the emergency "intra-governmental" TRANs for fiscal year 2017, in the aggregate principal amount of $400 million with the SIFC, ACAA, and the Disability Insurance Bonds, also at the interest rate of 6%. On April 28, 2017, the Commonwealth acknowledged that it would be unable to pay the principal and interest payments on the TRANs notes as they become due and entered into a forbearance agreement with SIFC, ACAA, and SINOT. The forbearance period expired on June 30, 2018. The repayment has not been made and the forbearance period has not been extended, but the automatic stay under Title III of PROMESA remains in effect.

(b)  PRIFA Bond Anticipation Notes

On June 24, 2016, the Governor signed an executive order, EO-2016-027, which suspended all obligations to transfer money to PRIFA in respect to PRIFA BANs, as described in Note 13(c).

*Significant Legislation and Other Events after Year-End*

(a)  Sales and Use Tax

On November 8, 2017, the Governor issued executive order OE-2017-068, which established a 10% reimbursement for the certain small and mid-sized businesses on their SUT filings from August 2017 through November 2017. Due to the sweeping power outages in the wake of Hurricane Maria that left many people without access to refrigeration or ovens, the Governor temporarily waived SUT collections on prepared foods through December 2017 to enable relief organizations and families to maximize their resources.

On November 7 and 8, 2018, respectively, new legislation to amend and restate Act No. 91 of 2006 to establish the legal framework for the restructuring of COFINA's issued and outstanding bonds was passed in the Puerto Rico House of Representatives and the Puerto Rico Senate. On November 15, 2018, the Governor signed into law the new legislation as Act No. 241 of 2018.  Act No. 241 of 2018 established the legal framework for the restructuring of COFINA's issued and outstanding bonds by, among other things, authorizing the issuance of new COFINA bonds necessary to complete the transactions contemplated under COFINA's Third Amended Plan of Adjustment. For a further discussion of Act No. 241 of 2018, refer to the discussion of the Third Amended Plan of Adjustment under Note 3 and Note 17(c) below.

(b)  Laws to Address Fiscal Crisis and Economic Recovery

Act No. 3 of January 23, 2017, the Fiscal Crisis Management Act, was enacted to extend most of the fiscal measures that had been adopted under Act No. 66 of 2014 through July 1, 2021, including a 10-year extension of the excise tax on acquisitions by foreign corporations under Act No. 154.

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

Act No. 9 of February 8, 2017 (Act No. 9 of 2017) and Act No. 14 of February 21, 2017 (Act No. 14 of 2017) introduced a series of tax amendments to provide incentives to professionals to stay in Puerto Rico by promoting and facilitating the creation and management of retirement plans and other trusts to promote financial stability and job creation.

*Bonds Credit Rating Downgrades*

Soon after the missed payments of July 1, 2016, imposed by the Moratorium Act and related executive orders, S&P downgraded to the lowest level of "D" the general obligation bonds of the Commonwealth, PRIFA's Special Tax Revenue Bonds, and the PBA bonds, while Fitch did the same with the general obligation bonds of the Commonwealth and the PBA bonds. On April 6, 2017, Moody's downgraded PRIFA's Special Tax Revenue Bonds and ERS bonds to a level C rating from its previous ratings of Ca and Ca, respectively. On that same date, Moody's reaffirmed the Caa3 rating on the Commonwealth's GO bonds. On June 7, 2017, S&P downgraded COFINA's senior- and junior-lien bonds to the default rating of D, in response to the Title III Court's order to not make COFINA's scheduled debt service for June 1, July 1, and August 1, 2017, but to maintain such funds in a trust account until further court order. As of the date hereof, pursuant to the terms of the COFINA plan of adjustment, the funds have been distributed to COFINA bondholders, the old COFINA bonds have been cancelled, and the new COFINA bonds have been issued.

**Requests for Information**

This financial report is designed to provide a general overview of the Commonwealth's finances for all of the Commonwealth's residents, taxpayers, customers, investors, and creditors. This financial report seeks to demonstrate the Commonwealth's accountability for the money it receives. Questions concerning any of the information provided in this report or requests for additional information should be addressed to: Department of the Treasury of the Commonwealth of Puerto Rico, Área de Contabilidad Central, P.O. Box 9024140, San Juan, PR 00902.

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position

June 30, 2016

(In thousands)

| | Primary government | | | |
|---|---|---|---|---|
| | Governmental activities | Business-type activities | Totals primary government | Component units |
| Assets: | | | | |
| Cash and cash equivalents in commercial banks | $ 426,733 | 244,543 | 671,276 | 1,411,430 |
| Cash and cash equivalents in governmental banks | 4,369 | 719 | 5,088 | 48,714 |
| Investments | 14,591 | — | 14,591 | 1,185,350 |
| Collateral from securities lending transactions | — | — | — | 38,436 |
| Receivables – net: | | | | |
| Income and excise taxes | 1,236,829 | — | 1,236,829 | — |
| Insurance premium | — | 4,088 | 4,088 | 39,396 |
| Intergovernmental | 374,919 | 119,297 | 494,216 | 117,077 |
| Accounts | 31,396 | 95,788 | 127,184 | 618,855 |
| Loans | 39 | — | 39 | 3,183,891 |
| Accrued interest | 3,088 | 465 | 3,553 | 137,891 |
| Other | 148,608 | 16,889 | 165,497 | 42,191 |
| Due from – net : | | | | |
| Primary government | — | — | — | 189,776 |
| Component units | 80,019 | — | 80,019 | 519,727 |
| Other governmental entities | 314,940 | 1,533 | 316,473 | 460,860 |
| Internal balances | (24,111) | 24,111 | — | — |
| Inventories | 12,443 | — | 12,443 | 228,109 |
| Prepaid expenses | 31,866 | — | 31,866 | 57,567 |
| Other assets | 13,514 | 25,672 | 39,186 | 24,988 |
| Restricted assets: | | | | |
| Cash and cash equivalents in commercial banks | 540,567 | 24,258 | 564,825 | 529,270 |
| Cash and cash equivalents in governmental banks | 6,935 | 2,983 | 9,918 | 10,373 |
| Cash equivalents in PRGITF | 56,178 | — | 56,178 | — |
| Cash and cash equivalents under the custody of U.S. Treasury | — | 496,906 | 496,906 | — |
| Sales and use tax receivable | 188,666 | — | 188,666 | — |
| Insurance premium – net | — | 62,384 | 62,384 | — |
| Intergovernmental receivable | 17,471 | — | 17,471 | — |
| Accrued interest | — | 14 | 14 | — |
| Loans receivable from component units | — | 7,935 | 7,935 | — |
| Investments | 602,308 | 24,545 | 626,853 | 1,953,613 |
| Other | 1,127 | 21,191 | 22,318 | 62,356 |
| Real estate held for sale or future development | 44,211 | — | 44,211 | 243,005 |
| Capital assets: | | | | |
| Land and other nondepreciable | 2,282,210 | 39,344 | 2,321,554 | 4,777,754 |
| Depreciable, net | 6,418,902 | 53,826 | 6,472,728 | 23,893,174 |
| Total assets | 12,827,818 | 1,266,491 | 14,094,309 | 39,773,803 |
| Deferred outflows of resources: | | | | |
| Accumulated decrease in fair value of hedging derivatives | 87,728 | — | 87,728 | 68,910 |
| Loss on bonds refunding | 421,099 | — | 421,099 | 201,689 |
| Pension related | 4,228,084 | 136,118 | 4,364,202 | 1,435,132 |
| Total deferred outflows of resources | 4,736,911 | 136,118 | 4,873,029 | 1,705,731 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position

June 30, 2016

(In thousands)

| | Primary government | | | |
| | Governmental activities | Business-type activities | Totals primary government | Component units |
| --- | ---: | ---: | ---: | ---: |
| Liabilities: | | | | |
| Accounts payable and accrued liabilities | 1,560,987 | 156,401 | 1,717,388 | 2,151,343 |
| Deposits and escrow liabilities | | | | 3,955,142 |
| Tax refunds payable | 690,652 | — | 690,652 | — |
| Due to: | | | | |
| Primary government | — | — | — | 726,139 |
| Component units | 234,769 | 41,468 | 276,237 | 3,490,472 |
| Other governmental entities | 192,453 | 2,227 | 194,680 | 151,755 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | 38,436 |
| Interest payable | 704,952 | 52,174 | 757,126 | 725,473 |
| Grant advances | 6,538 | — | 6,538 | — |
| Unearned revenue | 127,536 | 24,900 | 152,436 | 119,417 |
| Notes payable to GDB | 1,700 | — | 1,700 | — |
| Liabilities payable within one year: | | | | |
| Commonwealth appropriation bonds | 46,520 | — | 46,520 | 19,096 |
| General obligations and revenue bonds | 717,236 | — | 717,236 | 586,851 |
| Bond purchase agreement with GDB | 7,839 | — | 7,839 | — |
| Notes payable to component units | 173,820 | 62,000 | 235,820 | — |
| Note payable to financial institution | 4,753 | — | 4,753 | 1,421,324 |
| Capital leases | 8,864 | — | 8,864 | 1,277 |
| Compensated absences | 635,654 | 11,866 | 647,520 | 158,590 |
| Net pension liability | 152,044 | — | 152,044 | — |
| Obligation for unpaid lottery prizes | — | 70,847 | 70,847 | — |
| Voluntary termination benefits | 74,220 | 1,382 | 75,602 | 24,006 |
| Liability for automobile accident insurance and workmen compensation | — | — | — | 795,360 |
| Liability for unemployment, disability and health insurance | — | 170,051 | 170,051 | — |
| Other long-term liabilities | 267,576 | 71,160 | 338,736 | 95,692 |
| Liabilities payable after one year: | | | | |
| Commonwealth appropriation bonds | 523,644 | — | 523,644 | 509,372 |
| General obligations and revenue bonds | 36,279,613 | — | 36,279,613 | 18,223,396 |
| Bond purchase agreement with GDB | 217,695 | — | 217,695 | — |
| Notes payable to component units | 2,339,490 | 424,559 | 2,764,049 | — |
| Notes payable to financial institutions | 19,011 | — | 19,011 | 3,578,107 |
| Liability under guaranteed obligation | 360,739 | — | 360,739 | — |
| Capital leases | 335,231 | — | 335,231 | 27,670 |
| Compensated absences | 703,567 | 10,722 | 714,289 | 324,037 |
| Net pension obligation | — | — | — | 18,240 |
| Net pension liability | 36,698,109 | 651,651 | 37,349,760 | 7,406,662 |
| Hedging derivatives instruments – interest rate swaps | 87,728 | — | 87,728 | 68,910 |
| Other postemployment benefit obligation | 265,012 | 1,834 | 266,846 | — |
| Obligation for unpaid lottery prizes | — | 101,314 | 101,314 | — |
| Voluntary termination benefits | 608,530 | 7,566 | 616,096 | 135,633 |
| Other long-term liabilities | 2,147,238 | 2,300 | 2,149,538 | 701,475 |
| Total liabilities | 86,193,720 | 1,864,422 | 88,058,142 | 45,453,875 |
| Deferred inflows of resources: | | | | |
| Service concession arrangements | — | — | — | 1,896,720 |
| Gain on bonds refunding | 118,614 | — | 118,614 | — |
| Pension related | 1,074,083 | 11,304 | 1,085,387 | 376,751 |
| Total deferred inflows of resources | 1,192,697 | 11,304 | 1,204,001 | 2,273,471 |
| Net position: | | | | |
| Net investment in capital assets | 3,203,987 | 75,020 | 3,279,007 | 6,237,873 |
| Restricted for: | | | | |
| Capital projects | 101,683 | — | 101,683 | 252,635 |
| Debt service | 139,382 | — | 139,382 | 514,050 |
| Emergency activities | — | 6,268 | 6,268 | — |
| Lending activities | — | 9,260 | 9,260 | — |
| Payment of insurance benefits | — | 520,624 | 520,624 | — |
| Public housing and welfare | — | — | — | 112,599 |
| Student loans and other educational purposes | — | — | — | 107,251 |
| Other | 105,334 | — | 105,334 | 173,700 |
| Unrestricted (deficit) | (73,372,074) | (1,084,289) | (74,456,363) | (13,645,920) |
| Total net position (deficit) | $ (69,821,688) | (473,117) | (70,294,805) | (6,247,812) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Activities

Year ended June 30, 2016

(In thousands)

| Functions | Expenses | Charges for services | Operating grants and contributions | Capital grants and contributions | Net (expense) revenue and changes in net position — Primary government — Governmental activities | Business-type activities | Total | Component units |
|---|---|---|---|---|---|---|---|---|
| Primary government: | | | | | | | | |
| Governmental activities: | | | | | | | | |
| General government | $ 3,675,139 | 230,749 | 65,937 | — | (3,378,453) | — | (3,378,453) | — |
| Public safety | 2,071,961 | 135,218 | 71,711 | — | (1,865,032) | — | (1,865,032) | — |
| Health | 3,080,551 | 256,457 | 2,393,345 | — | (430,749) | — | (430,749) | — |
| Public housing and welfare | 3,314,500 | 13,689 | 2,845,782 | 73,189 | (381,840) | — | (381,840) | — |
| Education | 3,724,041 | 1,546 | 1,065,112 | — | (2,657,383) | — | (2,657,383) | — |
| Economic development | 1,026,935 | 183,433 | 4,844 | — | (838,658) | — | (838,658) | — |
| Intergovernmental | 554,429 | — | — | — | (554,429) | — | (554,429) | — |
| Interest and other | 2,086,720 | — | — | — | (2,086,720) | — | (2,086,720) | — |
| Total governmental activities | 19,534,276 | 821,092 | 6,446,731 | 73,189 | (12,193,264) | — | (12,193,264) | — |
| Business-type activities: | | | | | | | | |
| Unemployment insurance | 139,993 | 221,600 | 1,725 | — | — | 83,332 | 83,332 | — |
| Lotteries | 654,355 | 873,714 | — | — | — | 219,359 | 219,359 | — |
| Puerto Rico Health Insurance Administration | 2,867,938 | 348,768 | 1,706,686 | — | — | (812,484) | (812,484) | — |
| Puerto Rico Medical Services Administration | 279,976 | 131,486 | — | — | — | (148,490) | (148,490) | — |
| Puerto Rico Water Pollution Control Revolving Fund | 424,778 | 4,188 | 12,624 | — | — | (407,966) | (407,966) | — |
| Nonmajor proprietary funds | 275,476 | 41,684 | 18,444 | — | — | (215,348) | (215,348) | — |
| Total business-type activities | 4,642,516 | 1,621,440 | 1,739,479 | — | — | (1,281,597) | (1,281,597) | — |
| Total primary government | $ 24,176,792 | 2,442,532 | 8,186,210 | 73,189 | (12,193,264) | (1,281,597) | (13,474,861) | — |

36

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Statement of Activities

Year ended June 30, 2016

(In thousands)

| Functions | Expenses | Charges for services | Operating grants and contributions | Capital grants and contributions | Governmental activities | Business-type activities | Total | Component units |
|---|---|---|---|---|---|---|---|---|
| | | Program revenue | | | Net (expense) revenue and changes in net position | | | |
| | | | | | Primary government | | | |
| **Component units:** | | | | | | | | |
| Government Development Bank for Puerto Rico | $ 386,086 | 356,614 | 184,521 | — | — | — | — | 155,049 |
| Puerto Rico Highways and Transportation Authority | 994,632 | 258,555 | 24,416 | 126,001 | — | — | — | (585,660) |
| Puerto Rico Electric Power Authority | 4,301,816 | 2,994,893 | — | 8,243 | — | — | — | (1,298,680) |
| Puerto Rico Aqueduct and Sewer Authority | 1,245,245 | 978,718 | — | 18,257 | — | — | — | (248,270) |
| University of Puerto Rico | 1,280,432 | 185,113 | 288,169 | — | — | — | — | (807,150) |
| State Insurance Fund Corporation | 568,010 | 538,431 | — | — | — | — | — | (29,579) |
| Nonmajor component units | 1,974,380 | 733,897 | 273,307 | 21,490 | — | — | — | (945,686) |
| Total component units | $ 10,750,601 | 6,046,221 | 770,413 | 173,991 | — | — | — | (3,759,976) |
| **General revenue:** | | | | | | | | |
| Income taxes | | | | | $ 4,557,727 | — | 4,557,727 | — |
| Sales and use tax | | | | | 2,301,143 | — | 2,301,143 | — |
| Excise taxes | | | | | 3,304,800 | — | 3,304,800 | 132,940 |
| Other taxes | | | | | 151,097 | — | 151,097 | — |
| Revenue from global tobacco settlement agreement | | | | | 70,665 | — | 70,665 | — |
| Revenue from State Insurance Fund Corporation | | | | | 157,407 | — | 157,407 | — |
| Revenue from Puerto Rico Tourism Company | | | | | 20,790 | — | 20,790 | — |
| Revenue from Automobile Accidents Compensation Administration | | | | | 7,360 | — | 7,360 | — |
| Revenue from Puerto Rico Highways and Transportation Authority | | | | | 79,800 | — | 79,800 | — |
| Grants and contributions not restricted to specific programs | | | | | 116,635 | — | 116,635 | 4,611 |
| Revenue from primary government | | | | | — | — | — | 1,036,414 |
| Unrestricted investment (losses) earnings – net | | | | | 15,140 | 16,458 | 31,598 | 135,602 |
| Other | | | | | 170,794 | 498 | 171,292 | — |
| Transfers | | | | | (673,258) | 673,258 | — | — |
| Total general revenue and transfers | | | | | 10,280,100 | 690,214 | 10,970,314 | 1,309,567 |
| Change in net position | | | | | (1,913,164) | (591,383) | (2,504,547) | (2,450,409) |
| **Net position:** | | | | | | | | |
| At beginning of year, as previously reported | | | | | (67,692,485) | 654,563 | (67,037,922) | (4,151,633) |
| Correction of errors and adoption of new accounting pronouncements (note 4) | | | | | (216,039) | (536,297) | (752,336) | 354,230 |
| Net position (deficit) – beginning of year, as adjusted and restated | | | | | (67,908,524) | 118,266 | (67,790,258) | (3,797,403) |
| Net position (deficit) – end of year | | | | | $ (69,821,688) | (473,117) | (70,294,805) | (6,247,812) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Balance Sheet – Governmental Funds

June 30, 2016

(In thousands)

| | General | Debt service | COFINA special revenue | COFINA debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 394,393 | — | — | — | 32,340 | 426,733 |
| Cash and cash equivalents in governmental banks | 2,361 | — | 82 | — | 1,926 | 4,369 |
| Investments | — | — | 166 | — | 14,425 | 14,591 |
| Receivables – net: | | | | | | |
| Income and excise taxes | 1,236,829 | — | — | — | — | 1,236,829 |
| Intergovernmental | 372,405 | — | — | — | 2,514 | 374,919 |
| Accounts | 28,310 | — | — | — | 3,086 | 31,396 |
| Loans | — | — | — | — | 39 | 39 |
| Accrued interest | 3,087 | — | — | — | 1 | 3,088 |
| Other | 108,771 | — | — | — | 39,837 | 148,608 |
| Due from – net: | | | | | | |
| Other funds | 19,855 | — | — | — | 5,739 | 25,594 |
| Component units | 69,772 | — | — | — | 10,247 | 80,019 |
| Other governmental entities | 310,877 | — | — | — | 4,063 | 314,940 |
| Other assets | 12,477 | — | — | — | 1,037 | 13,514 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 22,863 | 224,116 | — | 33,331 | 260,257 | 540,567 |
| Cash and cash equivalents in governmental banks | 1,703 | — | — | — | 5,232 | 6,935 |
| Cash equivalents in PRGITF | 4,279 | — | — | — | 51,899 | 56,178 |
| Sales and use tax receivable | 80,383 | — | — | 108,283 | — | 188,666 |
| Intergovernmental receivable | — | 17,471 | — | — | — | 17,471 |
| Investments | 51,395 | — | — | 437,766 | 113,147 | 602,308 |
| Due from other funds | — | — | — | — | 140,178 | 140,178 |
| Other assets | — | — | — | 670 | 457 | 1,127 |
| Real estate held for sale or future development | — | — | — | — | 1,854 | 1,854 |
| Total assets | $ 2,719,760 | 241,587 | 248 | 580,050 | 688,278 | 4,229,923 |
| **Liabilities, deferred inflow of resources, and fund balances (deficit):** | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable and accrued liabilities | $ 1,425,371 | — | 277 | 90 | 135,249 | 1,560,987 |
| Tax refunds payable | 690,652 | — | — | — | — | 690,652 |
| Due to: | | | | | | |
| Other funds | 51,309 | — | — | 132,051 | 6,523 | 189,883 |
| Component units | 224,519 | — | — | — | 10,250 | 234,769 |
| Other governmental entities | 186,476 | — | — | — | 5,977 | 192,453 |
| Interest payable | 35,703 | 37,499 | — | — | 143,623 | 216,825 |
| Grant advances | 6,538 | — | — | — | — | 6,538 |
| Unearned revenue | 123,144 | 1,727 | — | — | 2,665 | 127,536 |
| Notes payable to GDB | 134,234 | — | — | — | 1,700 | 135,934 |
| Commonwealth appropriation bonds | 25,578 | — | — | — | — | 25,578 |
| General obligation and revenue bonds | — | — | — | — | 60,852 | 60,852 |
| Voluntary termination benefits payable | 716 | — | — | — | — | 716 |
| Net pension liability | 152,044 | — | — | — | — | 152,044 |
| Other liabilities | 49,000 | — | — | — | — | 49,000 |
| Total liabilities | 3,105,284 | 39,226 | 277 | 132,141 | 366,839 | 3,643,767 |
| Deferred inflows of resources: | | | | | | |
| Unavailable income taxes | 723,598 | — | — | — | — | 723,598 |
| Intergovernmental grants and contributions | 41,266 | — | — | — | — | 41,266 |
| Developer fees | 83,997 | — | — | — | — | 83,997 |
| Global tobacco settlement agreement | — | — | — | — | 36,765 | 36,765 |
| Total deferred inflows of resources | 848,861 | — | — | — | 36,765 | 885,626 |
| Fund Balances: | | | | | | |
| Nonspendable | 63 | — | — | — | — | 63 |
| Spendable: | | | | | | |
| Restricted | 78,001 | 202,361 | — | 447,909 | 330,511 | 1,058,782 |
| Committed | 256 | — | — | — | 26,078 | 26,334 |
| Assigned | 17,913 | — | — | — | 4,012 | 21,925 |
| Unassigned (deficit) | (1,330,618) | — | (29) | — | (75,927) | (1,406,574) |
| Total fund balances (deficit) | (1,234,385) | 202,361 | (29) | 447,909 | 284,674 | (299,470) |
| Total liabilities, deferred inflow of resources, and fund balances (deficit) | $ 2,719,760 | 241,587 | 248 | 580,050 | 688,278 | 4,229,923 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Reconciliation of the Balance Sheet of Governmental Funds
to the Statement of Net Position

June 30, 2016

(In thousands)

| | | |
|---|---|---:|
| Total fund balances (deficit) of governmental funds | $ | (299,470) |
| Amounts reported for governmental activities in the statement of net position are different than the amounts reported in the governmental funds because: | | |
| Inventories and prepaid expenses that are not reported in governmental funds and are reported in the statement of net position | | 44,309 |
| Deferred outflows of resources reported in governmental activities but not in governmental funds | | |
| Accumulated decrease in fair value of hedging derivatives | | 87,728 |
| Loss on bond refunding | | 421,099 |
| Pension related | | 4,228,084 |
| Capital assets used in governmental activities are not financial resources and, therefore, are not reported in funds | | 8,701,112 |
| Real estate held for sale or future development are not current financial resources and, therefore, are not reported in the governmental funds | | 42,357 |
| Deferred inflows of resources reported in the governmental funds are recognized as revenue in the governmental activities | | 885,626 |
| Deferred inflows of resources reported in governmental activities but not in governmental funds | | |
| Gain on bonds refunding | | (118,614) |
| Pension related | | (1,074,083) |
| Long-term liabilities are not due and payable in the current period and, therefore, are not reported in the funds: | | |
| Interest payable | | (488,127) |
| Commonwealth appropriation bonds | | (544,586) |
| General obligation and revenue bonds | | (36,935,997) |
| Bond purchase agreement with GDB | | (225,534) |
| Notes payable to component units | | (2,379,076) |
| Notes payable to financial institution | | (23,764) |
| Liability under guaranteed obligation | | (360,739) |
| Capital leases | | (344,095) |
| Compensated absences | | (1,339,221) |
| Net pension liability | | (36,698,109) |
| Hedging derivative instrument – interest rate swaps | | (87,728) |
| Other postemployment benefit obligation | | (265,012) |
| Voluntary termination benefits | | (682,034) |
| Other long-term liabilities | | (2,365,814) |
| Total net position (deficit) of governmental activities | $ | (69,821,688) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenditures, and Changes in Fund Balances – Governmental Funds

Year ended June 30, 2016

(In thousands)

| | General | Debt service | COFINA special revenue | COFINA debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Taxes: | | | | | | |
| Income taxes | $ 4,762,831 | — | — | — | — | 4,762,831 |
| Sales and use tax | 1,626,943 | — | — | 674,200 | — | 2,301,143 |
| Excise taxes | 3,304,800 | — | — | — | — | 3,304,800 |
| Property taxes | 11,197 | — | — | — | — | 11,197 |
| Other taxes | 139,900 | — | — | — | — | 139,900 |
| Charges for services | 821,092 | — | — | — | — | 821,092 |
| Revenue from global tobacco settlement agreement | 70,771 | — | — | — | — | 70,771 |
| Revenue from component units | 265,357 | — | — | — | — | 265,357 |
| Intergovernmental | 6,468,836 | 116,635 | — | — | 37,957 | 6,623,428 |
| Interest and investment earnings | 6,357 | 33 | — | 2,275 | 6,475 | 15,140 |
| Other | 155,444 | — | — | — | 11,971 | 167,415 |
| Total revenue | 17,633,528 | 116,668 | — | 676,475 | 56,403 | 18,483,074 |
| **Expenditures:** | | | | | | |
| Current: | | | | | | |
| General government | 1,393,824 | — | 60 | 56 | 176,017 | 1,569,957 |
| Public safety | 2,040,770 | — | — | — | 46 | 2,040,816 |
| Health | 2,901,391 | — | — | — | 10,275 | 2,911,666 |
| Public housing and welfare | 3,341,010 | — | — | — | 5,835 | 3,346,845 |
| Education | 3,567,855 | — | — | — | 794 | 3,568,649 |
| Economic development | 873,472 | — | — | — | 30,683 | 904,155 |
| Intergovernmental | 538,711 | — | — | — | 15,619 | 554,330 |
| Capital outlays | 96,633 | — | — | — | 135,866 | 232,499 |
| Debt service: | | | | | | |
| Principal | 78,012 | — | — | 11,300 | 291,291 | 380,603 |
| Interest and other | 77,875 | 421,355 | — | 643,890 | 383,788 | 1,526,908 |
| Total expenditures | 14,909,553 | 421,355 | 60 | 655,246 | 1,050,214 | 17,036,428 |
| Excess (deficiency) of revenue over (under) expenditures | 2,723,975 | (304,687) | (60) | 21,229 | (993,811) | 1,446,646 |
| **Other financing sources (uses):** | | | | | | |
| Transfers in | 254,121 | 286,507 | — | 5,123 | 688,998 | 1,234,749 |
| Transfers out | (1,892,781) | — | (5,123) | (10,103) | — | (1,908,007) |
| Proceeds from long term debt issued | 43,163 | — | — | — | 53,485 | 96,648 |
| Proceeds from sale of capital assets | 778 | — | — | — | — | 778 |
| Total other financing sources (uses) | (1,594,719) | 286,507 | (5,123) | (4,980) | 742,483 | (575,832) |
| Net change in fund balances | 1,129,256 | (18,180) | (5,183) | 16,249 | (251,328) | 870,814 |
| Fund balances (deficit) – beginning of year, as restated (note 4) | (2,363,641) | 220,541 | 5,154 | 431,660 | 536,002 | (1,170,284) |
| Fund balances (deficit) – end of year | $ (1,234,385) | 202,361 | (29) | 447,909 | 284,674 | (299,470) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Reconciliation of the Statement of Revenue, Expenditures, and Changes in
Fund Balances of Governmental Funds to the Statement of Activities

Year ended June 30, 2016

(In thousands)

| | | | |
|---|---|---|---|
| Net change in fund balances – total governmental funds | | $ | 870,814 |
| Amounts reported for governmental activities in the statement of activities are different because: | | | |
| Governmental funds report capital outlays as expenditures. However, in the statement of activities, the cost of those assets is allocated over their estimated useful lives and reported as depreciation and amortization expense. In the current period, these amounts are: | | | |
|    Capital outlays | $ 232,499 | | |
|    Less depreciation and amortization expense | (311,683) | | |
|    Loss on disposal of assets | (43,143) | | |
|      Subtotal | | | (122,327) |
| The issuance of long-term debt (e.g., bonds and notes) provides current financial resources to governmental funds, while the repayment of the principal of long-term debt consumes the current financial resources of governmental funds. Neither transaction, however, has any effect on net position. Also, governmental funds report the effect of premiums, discounts, and similar items when debt is first issued, whereas these amounts are deferred and amortized in thestatement of activities. This amount is the net effect of these differences in the treatment of long-term debt and related items: | | | |
|    Principal payments of long-term debt | 380,603 | | |
|    Proceed from long-term debt issued | (96,648) | | |
|      Subtotal | | | 283,955 |
| Some revenues in the statement of activities do not provide current financial resources, and, therefore, are deferred in governmental funds. Also, revenue related to prior periods that became available during the current period is reported in governmental funds but are eliminated in the statement of activities. This amount is the net adjustment. | | | (188,704) |
| Some expenses reported in the statement of activities do not require the use of current financial resources and, therefore, are not reported as expenditures in governmental funds. | | | (2,754,800) |
| Generally, inventory and prepayments are recorded as expenditures in the governmental funds when purchased rather than capitalized as an asset. However, these assets are capitalized in the statement of net position. This amount is the net decrease in total inventories and prepaid expenses. | | | (2,102) |
|      Change in net position of governmental activities | | $ | (1,913,164) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position – Proprietary Funds

June 30, 2016

(In thousands)

| | | | Business-Type Activities – Enterprise Funds | | | | |
|---|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| **Assets:** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents in commercial banks | $ — | 119,785 | 67,575 | 560 | — | 56,623 | 244,543 |
| Cash and cash equivalents in governmental banks | — | — | 719 | — | — | — | 719 |
| Receivables – net: | | | | | | | |
| Insurance premiums | — | — | — | — | — | 4,088 | 4,088 |
| Intergovernmental | — | — | 116,597 | 2,700 | — | — | 119,297 |
| Accounts | — | 6,205 | 61,034 | 18,924 | — | 9,625 | 95,788 |
| Accrued interest receivable | — | — | 307 | — | — | 158 | 465 |
| Other | — | — | — | 58 | — | 59 | 117 |
| Due from other funds | — | — | — | 26,250 | — | 7,428 | 33,678 |
| Due from other governmental entities | — | — | — | 1,533 | — | — | 1,533 |
| Other assets | — | — | 21,563 | 4,078 | — | 31 | 25,672 |
| Restricted assets: | | | | | | | |
| Cash and cash equivalents in commercial banks | 1,090 | — | 1,321 | — | — | 18,510 | 20,921 |
| Cash and cash equivalents in governmental banks | — | — | — | — | 460 | 2,523 | 2,983 |
| Cash and cash equivalents under the custody the | | | | | | | |
| U.S. Treasury | 496,906 | — | — | — | — | — | 496,906 |
| Insurance premiums | 62,384 | — | — | — | — | — | 62,384 |
| Other | 60 | — | — | — | 131 | — | 191 |
| Accrued interest | — | — | — | — | — | 14 | 14 |
| Loans from component units | — | — | — | — | 163 | 81 | 244 |
| Total current assets | 560,440 | 125,990 | 269,116 | 54,103 | 768 | 99,126 | 1,109,543 |
| Noncurrent assets: | | | | | | | |
| Cash and cash equivalents in commercial banks – restricted | — | — | — | 3,337 | — | — | 3,337 |
| Receivables – net: | | | | | | | |
| Loans from component units – restricted | — | — | — | — | 5,506 | 2,185 | 7,691 |
| Due from other funds | — | — | — | — | — | 7,761 | 7,761 |
| Other | — | — | 16,772 | — | — | — | 16,772 |
| Restricted investments | — | — | — | — | — | 24,545 | 24,545 |
| Other restricted assets | — | 20,377 | — | — | 623 | — | 21,000 |
| Land and other nondepreciable | — | — | — | 6,872 | — | 32,472 | 39,344 |
| Depreciable, net | — | 1,136 | 575 | 49,410 | — | 2,705 | 53,826 |
| Total assets | 560,440 | 147,503 | 286,463 | 113,722 | 6,897 | 168,794 | 1,283,819 |
| Deferred outflows of resources: | | | | | | | |
| Pension related | — | 14,386 | — | 121,732 | — | — | 136,118 |
| **Liabilities:** | | | | | | | |
| Current liabilities: | | | | | | | |
| Accounts payable and accrued liabilities | — | 11,624 | 93,945 | 42,513 | 1,054 | 7,265 | 156,401 |
| Due to other funds | 10,089 | 7,239 | — | — | — | — | 17,328 |
| Due to component units | — | — | — | 41,468 | — | — | 41,468 |
| Due to other governmental entities | — | — | — | 2,120 | — | 107 | 2,227 |
| Interest payable | — | — | 19,713 | 30,091 | — | 2,370 | 52,174 |
| Unearned revenue | 16,443 | 5,752 | — | — | — | 2,705 | 24,900 |
| Notes payable to component units | — | — | 62,000 | — | — | — | 62,000 |
| Compensated absences | — | 653 | 500 | 9,256 | — | 1,457 | 11,866 |
| Obligation for unpaid lottery prizes | — | 70,847 | — | — | — | — | 70,847 |
| Voluntary termination benefits payable | — | 552 | 720 | — | — | 110 | 1,382 |
| Liability for unemployment, disability and health insurance | 53,288 | — | 115,961 | — | — | 802 | 170,051 |
| Other long-term liabilities | — | — | — | 71,160 | — | — | 71,160 |
| Total current liabilities | 79,820 | 96,667 | 292,839 | 196,608 | 1,054 | 14,816 | 681,804 |
| Noncurrent liabilities: | | | | | | | |
| Notes payable to component units | — | — | 121,251 | 282,445 | — | 20,863 | 424,559 |
| Compensated absences | — | 2,607 | 320 | 5,867 | — | 1,928 | 10,722 |
| Net pension liability | — | 42,574 | — | 609,077 | — | — | 651,651 |
| Other postemployment benefit obligation | — | — | — | 1,834 | — | — | 1,834 |
| Obligation for unpaid lottery prizes | — | 101,314 | — | — | — | — | 101,314 |
| Voluntary termination benefits payable | — | 3,807 | 3,460 | — | — | 299 | 7,566 |
| Other long-term liabilities | — | — | — | 2,300 | — | — | 2,300 |
| Total liabilities | 79,820 | 246,969 | 417,870 | 1,098,131 | 1,054 | 37,906 | 1,881,750 |
| Deferred inflows of resources: | | | | | | | |
| Pension related | — | 739 | — | 10,565 | — | — | 11,304 |
| **Net position:** | | | | | | | |
| Net investment in capital assets | — | 1,136 | 575 | 56,282 | — | 17,027 | 75,020 |
| Restricted for emergency services | — | — | — | — | — | 6,268 | 6,268 |
| Restricted for lending activities | — | — | — | — | 5,843 | 3,417 | 9,260 |
| Restricted for payment of insurance benefits | 480,620 | — | — | — | — | 40,004 | 520,624 |
| Unrestricted (deficit) | — | (86,955) | (131,982) | (929,524) | — | 64,172 | (1,084,289) |
| Total net position (deficit) | $ 480,620 | (85,819) | (131,407) | (873,242) | 5,843 | 130,888 | (473,117) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenses, and Changes in Fund Net Position – Proprietary Funds

Year ended June 30, 2016

(In thousands)

| | Business-Type Activities – Enterprise Funds | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Unemployment Insurance | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| Operating revenue: | | | | | | | |
| Health insurance administration | $  — | — | 348,768 | — | — | — | 348,768 |
| Insurance premiums | 221,600 | — | — | — | — | 17,099 | 238,699 |
| Lottery ticket sales | — | 873,664 | — | — | — | — | 873,664 |
| Patient service, net of provision for bad debts | — | — | — | 131,486 | — | — | 131,486 |
| Emergency telephone service charges | — | — | — | — | — | 22,739 | 22,739 |
| Interest | — | 50 | — | — | 4,188 | 1,845 | 6,033 |
| Other | — | — | — | — | — | 1 | 51 |
| Total operating revenue | 221,600 | 873,714 | 348,768 | 131,486 | 4,188 | 41,684 | 1,621,440 |
| Operating expenses: | | | | | | | |
| Insurance benefits | 139,993 | — | — | — | — | 2,480 | 142,473 |
| Medical premiums and claims | — | — | 2,829,171 | — | — | — | 2,829,171 |
| Lottery prizes | — | 559,618 | — | — | — | — | 559,618 |
| Patient services | — | — | — | 161,436 | — | — | 161,436 |
| General, administrative, and other operating expenses | — | 94,737 | 27,745 | 96,162 | 34,649 | 85,096 | 338,389 |
| Impairment loss on loans receivable | — | — | — | — | 388,272 | 184,938 | 573,210 |
| Total operating expenses | 139,993 | 654,355 | 2,856,916 | 257,598 | 422,921 | 272,514 | 4,604,297 |
| Operating income (loss) | 81,607 | 219,359 | (2,508,148) | (126,112) | (418,733) | (230,830) | (2,982,857) |
| Nonoperating revenue (expenses): | | | | | | | |
| U.S. government grants | 1,725 | — | 1,706,686 | — | 12,624 | 18,444 | 1,739,479 |
| Contributions to component units | — | — | — | — | (1,857) | (1,522) | (3,379) |
| Interest and investment earnings | 9,154 | 432 | 5,120 | — | — | 1,752 | 16,458 |
| Interest expense | — | — | (11,022) | (22,378) | — | (1,440) | (34,840) |
| Other | — | — | — | — | — | 498 | 498 |
| Total nonoperating revenue (expenses) | 10,879 | 432 | 1,700,784 | (22,378) | 10,767 | 17,732 | 1,718,216 |
| Income (loss) before transfers | 92,486 | 219,791 | (807,364) | (148,490) | (407,966) | (213,098) | (1,264,641) |
| Transfers from other funds | — | — | 892,070 | 27,770 | 2,225 | 4,084 | 926,149 |
| Transfers to other funds | (45,133) | (196,147) | — | — | — | (11,611) | (252,891) |
| Net change in net position | 47,353 | 23,644 | 84,706 | (120,720) | (405,741) | (220,625) | (591,383) |
| Net position (deficit)– beginning of year, as adjusted (note 4) | 433,267 | (109,463) | (216,113) | (752,522) | 411,584 | 351,513 | 118,266 |
| Net position (deficit)– end of year | $ 480,620 | (85,819) | (131,407) | (873,242) | 5,843 | 130,888 | (473,117) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Cash Flows – Proprietary Funds

Year ended June 30, 2016

(In thousands)

| | | | Business-Type Activities – Enterprise Funds | | | | |
|---|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| **Cash flows from operating activities:** | | | | | | | |
| Receipts from customers and users | $ 217,309 | 871,365 | 278,750 | 117,674 | — | 37,953 | 1,523,051 |
| Other receipts | — | 50 | 171,289 | — | — | — | 171,339 |
| Payments to healthcare organizations and third party administrators | — | — | (2,976,506) | — | — | — | (2,976,506) |
| Payments to suppliers | — | (84,474) | (27,584) | (17,546) | (34,415) | (64,276) | (228,295) |
| Payments to employees | — | (4,412) | (4,813) | (105,964) | — | (18,041) | (133,230) |
| Payments of lottery prizes | — | (608,951) | — | — | — | — | (608,951) |
| Payments of insurance benefits | (144,388) | — | — | — | — | (2,330) | (146,718) |
| Net cash provided by (used in) operating activities | 72,921 | 173,578 | (2,558,864) | (5,836) | (34,415) | (46,694) | (2,399,310) |
| **Cash flows from noncapital financing activities:** | | | | | | | |
| U.S. government grants | 1,725 | — | 1,706,686 | — | 12,625 | 18,444 | 1,739,480 |
| Contributions to component units | — | — | — | — | (1,857) | (1,522) | (3,379) |
| Advances from line of credit | — | — | — | — | — | 1,763 | 1,763 |
| Interest paid | — | — | (27) | (5,432) | — | — | (5,459) |
| Transfers from other funds | — | — | 885,000 | 14,076 | 2,225 | 7,196 | 908,497 |
| Transfers to other funds | (43,537) | (185,032) | — | — | — | (11,604) | (240,173) |
| Net cash provided by (used in) noncapital and related financing activities | (41,812) | (185,032) | 2,591,659 | 8,644 | 12,993 | 14,277 | 2,400,729 |
| **Cash flows from capital and related financing activities:** | | | | | | | |
| Transfers from other funds | — | — | 7,070 | — | — | — | 7,070 |
| Advances to other funds | — | — | — | — | — | (1,366) | (1,366) |
| Capital expenditures | — | (169) | (88) | (1,831) | — | (181) | (2,269) |
| Net cash provided (used) by capital and related financing activities | — | (169) | 6,982 | (1,831) | — | (1,547) | 3,435 |
| **Cash flows from investing activities:** | | | | | | | |
| Interest collected on deposits, investments, and loans | 9,153 | 432 | 4,873 | — | 7,786 | 13,134 | 35,378 |
| Loans originated | — | — | — | — | (26,634) | (24,853) | (51,487) |
| Principal collected on loans | — | — | — | — | 17,700 | 8,158 | 25,858 |
| Proceeds from sales and maturities of investments | — | — | 6,512 | — | — | 13,822 | 20,334 |
| Purchases of investments | — | — | — | — | — | (7,452) | (7,452) |
| Net cash provided by (used in) investing activities | 9,153 | 432 | 11,385 | — | (1,148) | 2,809 | 22,631 |
| Net change in cash and cash equivalents | 40,262 | (11,191) | 51,162 | 977 | (22,570) | (31,155) | 27,485 |
| Cash and cash equivalents at beginning of year, as restated (note 4) | 457,734 | 130,976 | 18,453 | 2,920 | 23,030 | 108,811 | 741,924 |
| Cash and cash equivalents at end of year | $ 497,996 | 119,785 | 69,615 | 3,897 | 460 | 77,656 | 769,409 |
| **Reconciliation of operating income (loss) to net cash provided by (used in) operating activities:** | | | | | | | |
| Operating income (loss) | $ 81,607 | 219,359 | (2,508,148) | (126,112) | (418,733) | (230,830) | (2,982,857) |
| Adjustments to reconcile operating income (loss) to net cash provided by (used in) operating activities: | | | | | | | |
| Interests earned on deposits, loans, and investments | — | — | — | — | (4,188) | (1,846) | (6,034) |
| Depreciation | — | 128 | 214 | 5,054 | — | 854 | 6,250 |
| Provision for bad debts | — | — | — | 16,223 | — | 10 | 16,233 |
| Loss on disposition of capital assets | — | — | — | (92) | — | — | (92) |
| Impairment loss on loans receivable | — | — | — | — | 388,272 | 184,938 | 573,210 |
| Changes in operating assets and liabilities: | | | | | | | |
| Decrease (increase) in accounts and loans receivable | (8,280) | (2,225) | 101,270 | (14,492) | — | (1,829) | 74,444 |
| Increase in due from component units | — | — | — | 1,446 | — | — | 1,446 |
| Decrease in due from other governmental entities | — | — | — | (734) | — | — | (734) |
| Decrease (increase) in other assets | — | 2,761 | 1,057 | (32) | — | 17 | 3,803 |
| Increase in deferred outflow of resources | — | (9,320) | — | (35,870) | — | — | (45,190) |
| Increase (decrease) in accounts payable and accrued liabilities | — | 2,568 | (29,067) | 25,122 | 234 | 1,824 | 681 |
| Increase in due to component units | — | — | — | 9,182 | — | — | 9,182 |
| Increase (decrease) in due to other governmental entities | — | — | — | (432) | — | (1) | (433) |
| Increase in unearned revenue | 3,989 | (2,835) | — | — | — | (56) | 1,098 |
| Increase (decrease) in compensated absences | — | 129 | (3) | 2,617 | — | 233 | 2,976 |
| Increase in deferred inflow of resources | — | 547 | — | 7,380 | — | — | 7,927 |
| Increase in net pension liability | — | — | — | 104,904 | — | — | 117,125 |
| Increase in obligation for unpaid lottery prizes | — | 12,221 | — | — | — | — | (49,333) |
| Decrease in voluntary termination benefits payable | — | (49,333) | — | — | — | — | (49,333) |
| Decrease in liability for unemployment, disability and health insurance | — | (422) | 5 | — | — | (159) | (576) |
| | (4,395) | — | (124,192) | — | — | 151 | (128,436) |
| Total adjustments | (8,686) | (45,781) | (50,716) | 120,276 | 384,318 | 184,136 | 583,547 |
| Net cash provided by (used in) operating activities | $ 72,921 | 173,578 | (2,558,864) | (5,836) | (34,415) | (46,694) | (2,399,310) |
| **Noncash capital and financing activities:** | | | | | | | |
| Retirement of capital assets | $ — | — | 932 | 187 | — | — | 1,119 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Fiduciary Net Position – Fiduciary Funds

June 30, 2016

(In thousands)

| | Pension (and other employee benefit) trust | Agency |
|---|---|---|
| Assets: | | |
| Cash and cash equivalents in commercial banks: | | |
| Unrestricted | $ 314,736 | 664,397 |
| Restricted | 139,136 | — |
| Cash and cash equivalents with governmental banks: | | |
| Unrestricted | 165,435 | 897 |
| Restricted | 48,611 | — |
| Receivables – net: | | |
| Employers – net | 258,801 | — |
| Accrued interest and dividends | 8,536 | — |
| Investments sold | 988 | — |
| Other | 29,322 | — |
| Collateral from securities lending transactions | 21,592 | — |
| Investments at fair value: | | |
| Bonds and notes | 466,893 | — |
| Nonexchange commingled trust funds | 729,821 | — |
| Stocks | 23,333 | — |
| Investments in limited partnerships | 53,035 | — |
| Member loans and interest receivable – net | 964,071 | — |
| Capital assets – net | 25,675 | — |
| Other assets | 1,147 | — |
| Total assets | 3,251,132 | 665,294 |
| Liabilities: | | |
| Accounts payable and accrued liabilities | 119,810 | 665,294 |
| Interest payable | 14,094 | — |
| Payable for investment securities purchased | 1,821 | — |
| Securities lending obligations | 21,592 | — |
| Due to Commonwealth of Puerto Rico | 102,789 | — |
| Other liabilities | 191,724 | — |
| Bonds payable | 3,134,902 | — |
| Total liabilities | 3,586,732 | 665,294 |
| Net position: | | |
| Restricted for pensions to be provided by TRS | 895,455 | — |
| Restricted for pensions to be provided by JRS | 34,830 | — |
| Unrestricted (deficit) ERS | (1,265,885) | — |
| Total net position (deficit) | $ (335,600) | — |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds

Year ended June 30, 2016

(In thousands)

| | | |
|---|---|---:|
| Additions: | | |
| Contributions: | | |
| Employer contributions: | | |
| Basic benefits, net of provision for allowance of $233,615 | $ | 741,654 |
| Special benefits | | 398,296 |
| Member contributions | | 438,184 |
| Total contributions | | 1,578,134 |
| Investment income and investment expense: | | |
| Net appreciation in fair value of investments | | 3,743 |
| Interest | | 103,874 |
| Dividends | | 1,147 |
| Investment expense, other than from security lending | | (3,851) |
| Net income from investing, other than from security lending | | 104,913 |
| Securities lending income | | 178 |
| Securities lending expenses | | (16) |
| Net income from security lending | | 162 |
| Net investment income | | 105,075 |
| Other income | | 54,157 |
| Total additions | | 1,737,366 |
| Deductions: | | |
| Benefits paid to participants | | 2,425,781 |
| Refunds of contributions | | 49,127 |
| Interest on bonds payable | | 196,211 |
| General and administrative | | 75,267 |
| Other expenses | | 9,561 |
| Total deductions | | 2,755,947 |
| Net decrease in net position | | (1,018,581) |
| Net position: | | |
| Beginning of year | | 682,981 |
| End of year | $ | (335,600) |

See accompanying notes to basic financial statements.

46

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Discretely Presented Component Units

June 30, 2016

(In thousands)

| | Major component units | | | | | | Major component units totals | Nonmajor component units totals | All component units totals |
|---|---|---|---|---|---|---|---|---|---|
| | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | State Insurance Fund Corporation | | | |
| Assets: | | | | | | | | | |
| Cash and cash equivalents in commercial banks | $ 140,540 | 11,581 | 307,346 | 106,079 | 197,475 | 368,736 | 1,131,757 | 279,673 | 1,411,430 |
| Cash and cash equivalents with governmental banks | — | 1,525 | — | — | — | — | 1,525 | 47,189 | 48,714 |
| Investments | 76,250 | — | — | — | 2,632 | 631,434 | 710,316 | 475,034 | 1,185,350 |
| Collateral from securities lending transactions | — | — | — | — | — | 38,436 | 38,436 | — | 38,436 |
| Receivables – net: | | | | | | | | | |
| Insurance premiums | — | — | — | — | — | 37,663 | 37,663 | 1,733 | 39,396 |
| Intergovernmental | — | 23,187 | 6,144 | 18,519 | 33,924 | — | 81,774 | 35,303 | 117,077 |
| Accounts | — | 9,551 | 339,456 | 157,285 | 25,655 | — | 531,947 | 86,908 | 618,855 |
| Loans and advances | 2,816,065 | — | — | — | 6,232 | 100,000 | 2,922,297 | 261,594 | 3,183,891 |
| Accrued interest | 125,580 | 1,296 | 2,048 | — | — | 1,543 | 130,467 | 7,424 | 137,891 |
| Other | 12,961 | — | 15,588 | 176 | 1,098 | 6,629 | 36,452 | 5,739 | 42,191 |
| Due from – net: | | | | | | | | | |
| Primary government | — | 13,196 | 87,827 | 17,407 | 4,955 | 5,976 | 129,361 | 60,415 | 189,776 |
| Component units | 388,042 | — | 4,983 | 5,192 | — | — | 398,217 | | |
| Other governmental entities | — | — | 417,711 | 1,803 | 11,854 | — | 431,368 | 29,492 | 460,860 |
| Inventories | — | — | 175,599 | 27,800 | 3,272 | 4,255 | 210,926 | 17,183 | 228,109 |
| Prepaid expenses | — | 6,172 | 19,783 | 4,346 | 4,425 | 31 | 34,757 | 22,810 | 57,567 |
| Other assets | 1,147 | 889 | — | — | — | — | 2,036 | 22,952 | 24,988 |
| Restricted assets: | | | | | | | | | |
| Cash and cash equivalents in commercial banks | 113,871 | 1,548 | 127,328 | 241,094 | 8,861 | — | 492,702 | 36,568 | 529,270 |
| Cash and cash equivalents with governmental banks | — | — | — | 4,625 | 500 | — | 5,125 | 5,248 | 10,373 |
| Investments | 225,051 | 400,427 | — | — | 256,686 | — | 882,164 | 1,071,449 | 1,953,613 |
| Other restricted assets | 8,478 | — | — | — | — | — | 8,478 | 53,878 | 62,356 |
| Real estate held for sale or future development | 61,957 | — | — | — | — | — | 61,957 | 181,048 | 243,005 |
| Capital assets: | | | | | | | | | |
| Land and other nondepreciable | 25,825 | 2,261,570 | 627,560 | 484,185 | 58,000 | 46,131 | 3,503,271 | 1,274,483 | 4,777,754 |
| Depreciable – net | 2,198 | 8,045,297 | 6,074,650 | 6,776,601 | 848,591 | 74,850 | 21,822,187 | 2,070,987 | 23,893,174 |
| Total assets | 3,997,965 | 10,776,239 | 8,291,646 | 7,844,903 | 1,469,352 | 1,315,684 | 33,695,789 | 6,078,014 | 39,773,803 |
| Deferred outflows of resources: | | | | | | | | | |
| Accumulated decrease in fair value of hedging derivatives | — | — | 68,910 | — | — | — | 68,910 | — | 68,910 |
| Loss on bonds refunding | 2,376 | 104,284 | 48,423 | 27,452 | 2,225 | — | 184,760 | 16,929 | 201,689 |
| Pension related | — | — | 1,181,691 | — | 102,379 | 79,027 | 1,363,097 | 72,035 | 1,435,132 |
| Total deferred outflows of resources | 2,376 | 104,284 | 1,299,024 | 27,452 | 104,604 | 79,027 | 1,616,767 | 88,964 | 1,705,731 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Discretely Presented Component Units

June 30, 2016

(In thousands)

| | Major component units | | | | | | Major component units totals | Nonmajor component units totals | All component units totals |
|---|---|---|---|---|---|---|---|---|---|
| | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | State Insurance Fund Corporation | | | |
| **Liabilities:** | | | | | | | | | |
| Accounts payable and accrued liabilities | $ 89,850 | 113,923 | 1,077,838 | 356,061 | 71,372 | 86,276 | 1,795,320 | 356,023 | 2,151,343 |
| Deposits and escrow liabilities | 3,419,482 | — | 191,436 | 86,393 | — | — | 3,697,311 | 257,831 | 3,955,142 |
| Due to: | | | | | | | | | |
| Primary government | 1,418 | 9,945 | — | 580,012 | 1,537 | 19,834 | 612,746 | 113,393 | 726,139 |
| Component units | — | 1,992,013 | 39,299 | 105,405 | 102,983 | — | 2,239,700 | 1,250,772 | 3,490,472 |
| Other governmental entities | — | — | — | — | 15,424 | 7,290 | 22,714 | 129,041 | 151,755 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — | 38,436 | 38,436 | — | 38,436 |
| Interest payable | 33,355 | 430,605 | 10,493 | 135,252 | — | — | 609,705 | 115,768 | 725,473 |
| Unearned revenue | 3,459 | — | 12,351 | 20,199 | — | 18,525 | 54,534 | 64,883 | 119,417 |
| Liabilities payable within one year: | | | | | | | | | |
| Commonwealth appropriation bonds | 84 | — | — | 13,251 | — | — | 13,335 | 5,761 | 19,096 |
| Revenue bonds | 38,595 | 117,940 | 240,320 | 58,291 | 23,280 | — | 478,426 | 108,425 | 586,851 |
| Notes payable to financial institutions | 669,195 | — | 698,683 | 4,153 | 452 | 5,966 | 1,378,449 | 42,875 | 1,421,324 |
| Capital leases | — | — | — | — | — | 938 | 938 | 339 | 1,277 |
| Compensated absences | — | 9,583 | 68,632 | 11,548 | 27,816 | 4,480 | 122,059 | 36,531 | 158,590 |
| Voluntary termination benefits | — | 8,487 | — | — | — | — | 8,487 | 15,519 | 24,006 |
| Liability for automobile accident insurance and workmen compensation | — | — | — | — | — | 727,998 | 727,998 | 67,362 | 795,360 |
| Other long-term liabilities | 7,669 | 19,356 | — | 6,883 | 2,494 | 48,112 | 84,514 | 11,178 | 95,692 |
| Liabilities payable after one year: | | | | | | | | | |
| Commonwealth appropriation bonds | 3,250 | — | — | 403,069 | — | — | 406,319 | 103,053 | 509,372 |
| Revenue bonds | 113,202 | 4,222,119 | 8,126,433 | 3,971,812 | 492,892 | — | 16,926,458 | 1,296,938 | 18,223,396 |
| Notes payable to financial institutions | 3,170,708 | — | 16,886 | — | 261 | 9,379 | 3,197,234 | 380,873 | 3,578,107 |
| Capital leases | — | — | — | — | — | 26,729 | 26,729 | 941 | 27,670 |
| Compensated absences | — | 15,662 | 98,291 | 31,886 | 127,755 | 30,398 | 303,992 | 20,045 | 324,037 |
| Net pension obligation | — | — | — | — | — | — | — | 18,240 | 18,240 |
| Net pension liability | — | — | 3,603,802 | — | 1,796,727 | 1,417,963 | 6,818,492 | 588,170 | 7,406,662 |
| Hedging derivative instruments – interest rate swaps | — | — | 68,910 | — | — | — | 68,910 | — | 68,910 |
| Voluntary termination benefits | — | 61,373 | — | — | — | — | 61,373 | 74,260 | 135,633 |
| Other long-term liabilities | 183,785 | 107,648 | 117,053 | 33,652 | 117,465 | 58,407 | 618,010 | 83,465 | 701,475 |
| Total liabilities | 7,734,052 | 7,108,654 | 14,370,427 | 5,817,867 | 2,780,458 | 2,500,731 | 40,312,189 | 5,141,686 | 45,453,875 |
| **Deferred inflows of resources:** | | | | | | | | | |
| Service concession arrangements | — | 1,201,986 | — | — | — | — | 1,201,986 | 694,734 | 1,896,720 |
| Pension related | — | — | 58,309 | — | 301,418 | 11,347 | 371,074 | 5,677 | 376,751 |
| Total deferred inflows of resources | — | 1,201,986 | 58,309 | — | 301,418 | 11,347 | 1,573,060 | 700,411 | 2,273,471 |
| **Net position:** | | | | | | | | | |
| Net investment in capital assets | 19,383 | 2,810,878 | (1,328,918) | 2,442,040 | 393,762 | 77,968 | 4,415,113 | 1,822,760 | 6,237,873 |
| Restricted for: | | | | | | | | | |
| Capital projects | — | 12,076 | — | — | 10,960 | — | 23,036 | 229,599 | 252,635 |
| Debt service | 22,511 | 300,813 | — | — | 56,210 | — | 379,534 | 134,516 | 514,050 |
| Affordable housing and related loan insurance programs | 112,599 | — | — | — | — | — | 112,599 | — | 112,599 |
| Student loans and other educational purposes | — | — | — | — | 101,453 | — | 101,453 | 5,798 | 107,251 |
| Other | — | — | — | 5,364 | 13,793 | — | 19,157 | 154,543 | 173,700 |
| Unrestricted (deficit) | (3,888,204) | (553,884) | (3,509,148) | (392,916) | (2,084,098) | (1,195,335) | (11,623,585) | (2,022,335) | (13,645,920) |
| Total net position (deficit) | $ (3,733,711) | 2,569,883 | (4,838,066) | 2,054,488 | (1,507,920) | (1,117,367) | (6,572,693) | 324,881 | (6,247,812) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Activities – Discretely Presented Component Units

Year ended June 30, 2016

(In thousands)

| | Expenses | Program revenue — Charges for services | Program revenue — Operating grants and contributions | Program revenue — Capital grants and contributions | Net revenue (expenses) and changes in net position | Payments from (to) primary government | Payments from (to) other component units | General revenue — Grants and contributions not restricted to specific programs | General revenue — Interest and investment earnings | General revenue — Excise taxes and others | Change in net position | Net position (deficit) – beginning of year, as previously reported | Correction of errors and adoption of new pronouncements (note 4) | Net position (deficit) – beginning of year, as adjusted and restated | Net position (deficit) end of year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | | | | | | | | | |
| Government Development Bank for Puerto Rico | $ 386,086 | 356,614 | 184,521 | — | 155,049 | — | — | — | — | — | 155,049 | (3,888,760) | — | (3,888,760) | (3,733,711) |
| Puerto Rico Highways and Transportation Authority | 994,632 | 258,555 | 24,416 | 126,001 | (585,660) | 108,215 | — | — | 20,699 | 189 | (456,557) | 3,026,440 | — | 3,026,440 | 2,569,883 |
| Puerto Rico Electric Power Authority | 4,301,816 | 2,994,893 | — | 8,243 | (1,298,680) | — | (5,800) | — | 44,315 | — | (1,260,165) | (4,054,940) | 477,039 | (3,577,901) | (4,838,066) |
| Puerto Rico Aqueduct and Sewer Authority | 1,245,245 | 978,718 | — | 18,257 | (248,270) | — | — | — | 3,372 | 6,482 | (238,416) | 2,292,904 | — | 2,292,904 | 2,054,488 |
| University of Puerto Rico | 1,280,432 | 185,113 | 288,169 | — | (807,150) | 870,132 | 62,371 | — | 5,873 | 9,966 | 141,192 | (1,649,112) | — | (1,649,112) | (1,507,920) |
| State Insurance Fund Corporation | 568,010 | 538,431 | — | — | (29,579) | (157,407) | — | — | — | 38 | (186,948) | (930,419) | — | (930,419) | (1,117,367) |
| Nonmajor component units | 1,974,380 | 733,897 | 273,307 | 21,490 | (945,686) | 215,474 | (56,571) | 4,611 | 61,343 | 116,265 | (604,564) | 1,052,254 | (122,809) | 929,445 | 324,881 |
| | $ 10,750,601 | 6,046,221 | 770,413 | 173,991 | (3,759,976) | 1,036,414 | — | 4,611 | 135,602 | 132,940 | (2,450,409) | (4,151,633) | 354,230 | (3,797,403) | (6,247,812) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**(1) Summary of Significant Accounting Policies**

The Commonwealth of Puerto Rico (the Commonwealth) was constituted on July 25, 1952, under the provisions of the Commonwealth's Constitution as approved by the people of Puerto Rico and the U.S. Congress. The Commonwealth's Constitution provides for the separation of powers of the executive, legislative, and judicial branches of the government. The Commonwealth assumes responsibility for general government, public safety, health, public housing and welfare, education, and economic development. Recently, however, as a result of the current fiscal crisis that affects the Commonwealth (as further described below in Note 2 and Note 3), the U.S. Congress enacted a law establishing an Oversight Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs, and review and approval over certain governmental responsibilities. This law is known as the "Puerto Rico Oversight, Management and Economic Stability Act" (PROMESA).

The accompanying basic financial statements of the Commonwealth are presented in conformity with U.S. Generally Accepted Accounting Principles (U.S. GAAP) for governments as prescribed by the Governmental Accounting Standards Board (GASB).

The accompanying basic financial statements present the financial position of the Commonwealth and its various funds and component units, the results of operations of the Commonwealth and its various funds and component units, and the cash flows of the proprietary funds.

**(a) Financial Reporting Entity**

As required by U.S. GAAP, the financial reporting entity of the Commonwealth includes all departments, agencies, funds, functions, and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's financial reporting entity. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. The GASB has set forth criteria to be considered in determining financial accountability. These criteria include when the Commonwealth appoints a voting majority of an organization's governing body and it has (i) the ability to impose its will on that organization or (ii) the potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth. In situations where the Commonwealth has not appointed the voting majority of an organization's governing body, the GASB has then provided as criteria for financial accountability the fiscal dependency of such organizations on the Commonwealth and when there is a potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth.

**(b) Component Units**

The financial statements of the component units discussed below have been included in the financial reporting entity either as blended component units or as discretely presented component units in accordance with GASB Statements No. 14, *The Financial Reporting Entity*, as amended by GASB Statements No. 39, *Determining Whether Certain Organizations Are Component Units—an*

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*amendment of GASB Statement No. 14* and *No. 61, The Financial Reporting Entity: Omnibus—an amendment of GASB Statements No. 14 and No. 34.*

(i) *Blended Component Units*

The following entities, while legally separate from the Commonwealth, meet the blending criteria to be reported as part of the Primary Government as follows:

*Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA)* – On April 6, 2016, Act No. 21 (Act No. 21) was approved creating the FAFAA as an independent public corporation and government instrumentality with separate legal existence, fiscal and administrative autonomy, and independence from the Commonwealth. FAFAA was created for the purpose of acting as fiscal agent, financial advisor and reporting agent of the Government of Puerto Rico, its agencies, instrumentalities, subdivisions, public corporations and/or municipalities, and to assist such entities in confronting the fiscal and economic emergency that Puerto Rico is experiencing. The FAFAA assumed the fiscal agency and financial advisory responsibilities that were previously held by the Government Development Bank (GDB). On January 18, 2017, the Governor signed into law the Enabling Act of the Fiscal Agency and Financial Advisory Authority, Act No. 2 of 2017. This new law amended and replaced sections of the prior law that established FAFAA. Act No. 2 of 2017 expanded FAFAA's powers to include, among other things, sole responsibility to renegotiate, to restructure and/or to reach an agreement with creditors on all or part of the public debt or any other debt issued by any government entity. In addition, FAFAA is the entity in charge of the collaboration, communication and cooperation efforts between the Government of Puerto Rico and the Oversight Board, created under the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-187 (PROMESA).

The Board of Directors of FAFAA was initially composed of only one member appointed by the Governor but upon the enactment of Act No. 2 of 2017 the Board is now composed of five members: (1) FAFAA's Executive Director appointed by the Governor, (2) a representative of the Senate of Puerto Rico, and (3) a representative of the House of Representatives of Puerto Rico which will be appointed by the President of each Legislative Body, and (4) two members appointed by the Governor. The members can only be replaced and/or removed by the entity who appointed them. The members of the Board of Directors will select a President, Vice-President and Secretary among them. FAFAA does not have legal authority to issue bonds, notes or any other debt instrument; however, will be the principal financial advisor in future debt issuances of any instrumentality of the Commonwealth. FAFAA's budget will be assigned by the Legislative Assembly and will originate from the General Fund, special assignments or any other revenue identified.

*Ponce Ports Authority (PPA)* – On December 12, 2011, Act No. 240 (Act No. 240) was approved creating the PPA, a component unit of the Commonwealth, with a seven-member board required to be comprised of the Secretary of Economic Development and Commerce, the director of the Ponce port, three members to be appointed by the Governor with the consent of the Senate and two members to be appointed by the Mayor of Ponce with the consent of the Ponce legislative assembly. PPA was created to continue the development of the container terminal formerly undertaken by Port of the Americas Authority (PAA) and handle such facilities' future operations; therefore, all of the assets, rights and duties of PAA (with the exception of its existing debt) would be transferred to PPA. Effective fiscal year 2015, the board of PPA was formed and operations started; although the assets

51

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

of PAA have not been transferred at June 30, 2016. On December 19, 2013, Act No. 156 was approved amending Act No. 240 by, among other things, authorizing PPA to request a line of credit of up to $60 million from the GDB to start funding the operations for which it was created and to establish that effective fiscal year 2015 the debt service of such debt be satisfied with annual Commonwealth's legislative appropriations. As the total debt outstanding of PPA at June 30, 2015 is payable from Commonwealth's legislative appropriations, PPA's financial statements became blended in the Commonwealth's fund financial statements as an enterprise fund effective July 1, 2015.

*Port of the Americas Authority (PAA)* – PAA is governed by an eleven-member board comprising the Secretary of the Department of Transportation and Public Works (DTPW), the Secretary of Economic Development and Commerce, the Executive Director of PRIDCO, the Mayors of the Municipalities of Ponce, Peñuelas, and Guayanilla and five private citizens appointed by the Governor with the consent of the Senate. The main purpose of the PAA was the planning, development and construction of a large-scale container terminal in the city of Ponce, Puerto Rico. The Commonwealth generally provided financial support to the PAA through legislative appropriations and its current existing debt is guaranteed by the Commonwealth pursuant to the provisions of Act No. 409 of September 22, 2004 (Act No. 409 of 2004). With the commencement of the operations of PPA in fiscal year 2015, as described in the previous paragraph above, the operations of PAA have been limited to processing the remaining legal requirements resulting after the transfer of all rights and duties to PPA. Such legal requirements consist principally of servicing the long-term debt that remained in PAA. Act No. 49 of 2004 also provides for the Commonwealth to appropriate funds in its general operating budget annually for the payment of principal and interest on such debt, which is the total debt outstanding. Therefore, PAA's financial statements became blended in the Commonwealth's fund financial statements as a special revenue fund and a debt service fund effective July 1, 2015.

*Public Buildings Authority (PBA)* – PBA is governed by a seven-member board comprised of the Secretary of the DTPW, the Secretary of the Department of Education of the Commonwealth, the President of the GDB, and four members appointed by the Governor of Puerto Rico with the advice and consent of the Senate. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. PBA is a legally separate entity, whose activities are blended within the Primary Government because it exists to construct, purchase, or lease office, school, health, correctional, social welfare, and other facilities for lease to the Commonwealth's departments, component units, and instrumentalities. Bonds issued by the PBA to finance such facilities are payable from the payments of rentals of certain government facilities leased by PBA and are further supported by a guarantee of the Commonwealth. Therefore, the financial statements of the PBA are blended in the Commonwealth's fund financial statements as a special revenue, debt service, and capital project fund.

*Puerto Rico Health Insurance Administration (PRHIA)* – PRHIA is governed by a board of directors, which, by law, is composed of eleven members (six compulsory members and five discretionary members). The compulsory members are the Secretary of Health of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the Director of the Office of Management and Budget of the Commonwealth (OMB), the President of the GDB, the Insurance Commissioner of

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Puerto Rico, and the Administrator of the Administration of Services of Mental Health and Addiction. The five discretionary members are appointed by the Governor, with the advice and consent of the Senate. The board of directors' president is designated by the Governor and all discretionary board members are executives in a trustworthy position. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. PRHIA was created for implementing, administering, and negotiating a health insurance system through contracts with insurance underwriters to provide quality medical and hospital care to low income individuals (via the Medicaid program administered and funded by the Centers for Medicare and Medicaid Services through a memorandum of understanding with the Department of Health); and also to employees of the Commonwealth, Municipalities and policemen who voluntarily subscribe to the Puerto Rico health insurance medical plan in exchange for a fee paid by them through payroll deductions. PRHIA also recovers its operating costs through charges made to Municipalities and a rebate program with pharmacies where PRHIA retains 100% of the income derived from this program. Since 2015, the Commonwealth should annually appropriate funds from its general operating budget to provide for the payment of principal and interest on the PRHIA line of credit obligation, which is the total debt outstanding of PRHIA. Therefore, PRHIA's financial statements are blended in the Commonwealth's fund financial statements as an enterprise fund effective July 1, 2015.

*Puerto Rico Infrastructure Financing Authority (PRIFA)* – PRIFA is governed by a seven-member board comprised of five members appointed by the board of the directors of the GDB, the Secretary of the Treasury of the Commonwealth and one member appointed by the Governor. . As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The members of PRIFA's board of directors are executives in trustworthy positions, named and supervised by the Governor. The President is appointed by the Governor from among its members. PRIFA is a financing authority whose responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternate means for financing them. PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt is payable from federal excise taxes levied on the rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the US Treasury and returned to the Commonwealth. PRIFA's remaining debt, other than the Special Tax Revenue Bonds, is payable from Commonwealth legislative appropriations. Therefore, PRIFA's financial statements are blended in the Commonwealth's fund financial statements as a special revenue, debt service and capital project fund.

*Puerto Rico Maritime Shipping Authority (PRMSA)* – PRMSA is governed by the President of the GDB.As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The operations of PRMSA have been limited to processing the remaining legal requirements resulting from the sale of certain maritime operations formerly owned and operated by PRMSA. Such legal requirements consist solely of servicing the long-term debt that remained in PRMSA after the sale. The Commonwealth should appropriate annually funds in its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding.

53

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Therefore, PRMSA's financial statements are blended in the Commonwealth's fund financial statements as a debt service fund.

*Puerto Rico Medical Services Administration (PRMeSA)* – PRMeSA is governed by a ten member board comprising the Secretary of the Department of Health of the Commonwealth, who is the Chairman, the Dean of the Medical Sciences Faculty of the University of Puerto Rico (UPR), the President of the board of directors of the Puerto Rican League Against Cancer, the Mayor of the Municipality of San Juan, the Administrator of the State Insurance Fund Corporation, the Administrator of the Administration of Mental Health and Addiction Services, the President of the Medical Policy and Administration Committee, the Secretary of the Department of Family, and two members appointed by the Secretary of the Department of Health of the Commonwealth. Its purpose is to plan, organize, operate, and administer the centralized health services, provided in support of the hospital and other functions, offered by the member institutions and users of the medical complex known as the Puerto Rico Medical Center. The Commonwealth should annually appropriate funds from its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding of PRMeSA. Therefore, PRMeSA's financial statements are blended in the Commonwealth's fund financial statements as an enterprise fund.

*Puerto Rico Sales Tax Financing Corporation (Known as COFINA, its Spanish Acronym)* – COFINA was created under Act No. 91 approved on May 13, 2006, as amended by the Legislature. COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain debt obligations of the Commonwealth outstanding at June 30, 2006 (the 2006 Appropriation Debt). During 2009, the Legislature expanded the purposes of COFINA to assist in funding operational expenses of the Commonwealth for 2009 through 2011 and for 2012, to the extent included in the annual budget of the Commonwealth. As of June 30, 2016, the board of directors of COFINA was comprised of the same members as the GDB board. As a consequence of Act No. 241 of 2018 and the effectiveness of COFINA's Third Amended Plan of Adjustment as described in Note 17(c), COFINA's board of directors is currently comprised of three members appointed by the Governor. Because COFINA's Sales Tax Revenue Bond obligations have historically been repaid with the Commonwealth's sales and use taxes as described in Note 13, its financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund. As discussed in Note 3 and Note 17 below, COFINA has successfully completed its restructuring pursuant to a court-confirmed plan of adjustment under Title III of PROMESA, which became effective on February 12, 2019.

*Special Communities Perpetual Trust (SCPT)* – SCPT is governed by a board of directors composed of eleven members: the Secretary of the Department of Housing of the Commonwealth, the Secretary of the DTPW of the Commonwealth, the Coordinator for the Social and Economic Financing of the Special Communities, one Mayor of a municipality of Puerto Rico, one community leader resident in one special community, four private citizens representing the public interest, and two public employees. All members of the board of directors are appointed by the Governor. SCPT's principal purpose is to fund development projects that address the infrastructure and housing needs of the underprivileged communities. Over the years since its inception, SCPT has seen its revenue sources diminished as its principal assets, mortgage loans, are being fully reserved. SCPT has accumulated debt with the GDB, which is payable from Commonwealth Legislative appropriations. Therefore,

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

SCPT's financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

*The Children's Trust* – The Children's Trust is governed by a seven-member board comprised of the Governor, who designates the president of the board, the President of the GDB, the Director of the OMB, the Secretary of Justice of the Commonwealth, and three private citizens appointed by the Governor with the advice and consent of the Senate. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The Children's Trust's sole operation consists of providing financial assistance principally to the Commonwealth's departments to carry out projects aimed at promoting the well being of families, children, and youth of Puerto Rico, especially in the areas of education, recreation, and health. The operation of the Children's Trust is financed with the moneys being received by the Commonwealth from a global settlement agreement (GSA) dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The GSA calls for annual payments through the year 2025, which will vary due to inflationary and volume adjustments. After 2025, the tobacco companies should continue making contributions in perpetuity. As the Children's Trust provides financial assistance entirely or almost entirely to the Commonwealth's departments and its total debt outstanding is being repaid with the GSA resources received by the Commonwealth, its financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

*University of Puerto Rico Comprehensive Cancer Center (UPRCCC)* – UPRCCC is governed by a nine-member board comprising of four ex officio members: the President of the UPR, the Chancellor of Medical Sciences Campus of the UPR, the Secretary of the Department of Health of the Commonwealth, and the Dean of the UPR School of Medicine. The remaining five (5) members must be citizens of Puerto Rico who have shown commitment to the fight against cancer, and are appointed by the Governor with the approval of the Commonwealth Senate with the following criteria: two members from the investigative studies or cancer treatment community; one member with experience in management, finance, or business administration, or with previous experience managing hospitals or medical investigation clinics; one member who is a cancer patient; and one member of which will be a member of the "Liga Puertorriqueña Contra el Cancer." The Commonwealth provides financial support to UPRCCC through legislative appropriations. The UPRCCC was created by Act No. 230 of August 26, 2004 (Act No. 230), to be the governmental entity principally responsible to execute public policy related to the prevention, orientation, investigation and treatment of cancer in Puerto Rico. On October 31, 2013, Act No. 128 (Act No. 128) was approved amending Act No. 230 in order to specifically establish that beginning with fiscal year 2015, annual Commonwealth's legislative appropriations of $15 million could be made available to cover the debt service of the obligations incurred by the UPRCCC in its capital related projects, particularly the construction of its medical and hospital facilities. Prior to Act No.128, Act No. 230 was not conclusive as to the revenue source from which to repay the aforementioned debt service. As the total debt outstanding of UPRCCC at June 30, 2015 was payable from Commonwealth's legislative appropriations, UPRCCC's financial statements became blended in the Commonwealth's fund financial statements as a special revenue fund effective July 1, 2015; inasmuch as the medical and hospital operations has not commenced.

55

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The COFINA Debt Service Fund and the COFINA Special Revenue Fund are presented as major governmental funds, while PRMeSA and PRHIA are presented as major enterprise funds. All the other blended component units are reported in the nonmajor governmental funds column, except for PPA, which is reported in the nonmajor enterprise funds column. Complete financial statements of the blended component units can be obtained directly by contacting their respective administrative offices at:

Ponce Ports Authority
P.O. Box 7051
Ponce, PR 00752

Port of the Americas Authority
P.O. Box 195534
San Juan, PR 00919-5534

Public Buildings Authority
P.O. Box 41029 – Minillas Station
San Juan, PR 00940-1029

Puerto Rico Fiscal Agency and Financial
  Advisory Authority
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Health Insurance Administration
P.O. Box 195661
San Juan, PR 00919-5661

Puerto Rico Infrastructure Financing Authority
P.O. Box 41207 Minillas Station
San Juan, PR 00940

Puerto Rico Maritime Shipping Authority
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Medical Services Administration
P.O. Box 2129
San Juan, PR 00922-2129

Puerto Rico Sales Tax Financing Corporation
P.O. Box 42001
San Juan, PR 00940-2001

Special Communities Perpetual Trust
P.O. Box 42001
San Juan, PR 00940-2001

University of Puerto Rico Comprehensive
  Cancer Center
PMB 711, 89 De Diego Ave., Suite 105
San Juan, PR 00927-6346

The Children's Trust
P.O. Box 42001
San Juan, PR 00940-2001

*(ii)   Discretely Presented Component Units*

The component units described below, all legally separate entities, consistent with GASB Statement No. 14, as amended by GASB Statements No. 39 and 61, are discretely presented in the basic financial statements principally because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because the component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth (with the exception of Culebra Conservation and Development Authority and the Puerto Rico Science, Technology and Research Trust, which do not meet all these criteria, but the Commonwealth has determined it would be misleading to exclude them from the Commonwealth's financial reporting entity). These component units are not blended with the Primary Government because they do not provide services entirely, or almost entirely to the Primary Government, their governing board is not substantively the same as that of the Primary Government, the Primary Government does not have any operational responsibilities over them, and they do not have total debt outstanding being repaid entirely or almost entirely with resources of the Primary Government. These have been classified by management between major and nonmajor

56

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

component units. A major discretely presented component unit is determined by the Commonwealth based on the nature and significance of its relationship to the Primary Government. This determination is based on the evaluation of the following factors: a) the services provided by the component unit to the citizenry are such that separate reporting as a major component unit is considered to be essential to financial statement users, b) there are significant transactions with the Primary Government, or c) there is a significant financial benefit or burden relationship with the Primary Government. If a component unit is expected to meet some of these considerations for inclusion as major component unit in a future year, the Commonwealth may elect to report it as a major component unit.

(iii)   *Major Component Units*

*Government Development Bank for Puerto Rico (GDB)* – Prior to its decision on March 23, 2018 to cease operations and wind down under Title VI of PROMESA, GDB is governed by a seven-member board appointed by the Governor. GDB's board of directors' members were executives in a trustworthy position, named and supervised by the Governor. When operating prior to March 23, 2018, GDB acted as fiscal agent, depository of funds, disbursing agent, investor and financial advisor for the Commonwealth, its public corporations, and municipalities in connection with the issuance of bonds and notes; and it also issued warranties to third parties, made loans, and advanced funds predominantly to the Commonwealth's departments, component units, and municipalities.

Act No. 21 2016, known as the "Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" (the Moratorium Act), created FAFAA to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities, and municipalities. This new fiscal agency and advisory authority commenced its functions as described above immediately upon the Moratorium Act's enactment. The Moratorium Act did not have an impact on the designation of GDB as a major discretely presented component unit for fiscal year 2016. The scope of FAFAA's powers were substantially expanded under Act No. 2 of 2017, as discussed in Note 3 and Note 23. For additional information regarding the Moratorium Act, refer to Note 3 and Note 23.

*Puerto Rico Highways and Transportation Authority (PRHTA)* – PRHTA is governed by a seven-member board comprising the Secretary of Department of Transportation and Public Works (DTPW) (serving as the President of the board), the President of the Planning Board, the Secretary of the Treasury, the President of GDB, and three other members from the private sector appointed by the Governor with the advice and consent of the Senate. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The PRHTA has broad powers to carry out its responsibilities in accordance with DTPW's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities constructed, owned, or operated by the PRHTA, the ability to set tolls for the use of the highway facilities, and the power to issue bonds, notes, or other obligations. The PRHTA plans and manages the construction of all major projects relating to the Commonwealth's toll highway system, undertakes major repairs, and maintains the toll ways. The Commonwealth has the ability to significantly influence the toll rates charged by the PRHTA.

*Puerto Rico Electric Power Authority (PREPA)* – PREPA is governed by a seven-member board, three of whom are independent members appointed by the Governor with the advice and consent of

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

the Senate. The members are selected from a list of ten candidates presented to the Governor after a search for executive talent by a recognized firm. PREPA is responsible for conserving, developing, and utilizing the power resources in order to promote the general welfare of Puerto Rico and owns and operates the Commonwealth's electrical power generation, transmission, and distribution system. The Commonwealth is entitled to receive contributions in lieu of taxes from PREPA.

*Puerto Rico Aqueduct and Sewer Authority (PRASA)* – PRASA is governed by a nine-member board comprising six members appointed by the Governor with the advice and consent of the Senate (including the President of the Puerto Rico Planning Board), the Executive President of PREPA, the Executive Director of Mayors' Federation, and the Executive Director of Mayors' Association. PRASA owns and operates the Commonwealth's system of public water supply and sanitary sewer facilities. PRASA is authorized, among other things, to borrow money and issue revenue bonds for any of its corporate purposes. The Commonwealth guarantees the principal and interest payments of certain outstanding bonds and of all future bonds issued to refinance those outstanding bonds at the date of refinancing. Act No. 45 of July 28, 1994 was later amended to include other loans under the State Revolving Fund Program (SRFP) and under the USDA Rural Development Program. The Commonwealth historically provided certain financial support to PRASA through legislative appropriations for debt service of its Public Finance Corporation (PFC) notes.

*University of Puerto Rico (UPR)* – The UPR is governed by a thirteen-member Governing Board, nine of which are appointed by the Governor of Puerto Rico and confirmed by the Senate of Puerto Rico. The remaining members of the Governing Board consist of two tenured professors and two full time students. The Secretary of the Department of Education of the Commonwealth becomes an ex officio member of the governing board. The Commonwealth provides financial support to the UPR through legislative appropriations.

*State Insurance Fund Corporation (SIFC)* – SIFC is governed by a seven-member board appointed by the Governor with the advice and consent of the Senate. The board comprises the Commissioner of Insurance of Puerto Rico, an officer from the Department of Labor and Human Resources of the Commonwealth, an officer from the Department of Health of the Commonwealth, a representative of the employers' interest, a representative of the employees' interest, and two members without any of these interests. One of these members is appointed by the Governor as president of the board for a period of six years. The three public officials are appointed for a period of five years, and the rest of the members for four, three, two, and one year, respectively. SIFC provides workers' compensation and disability insurance to public and private employees. The Commonwealth has access to SIFC's resources.

*(iv)  Nonmajor Component Units*

*Agricultural Enterprises Development Administration (AEDA)* – AEDA is governed by the Secretary of Agriculture of the Commonwealth. The purpose of AEDA is to provide a wide variety of services and incentives to the agricultural sector. The Commonwealth has the ability to impose its will on AEDA. The Commonwealth provides financial support to AEDA through legislative appropriations.

*Automobile Accidents Compensation Administration (AACA)* – AACA is governed by a Cabinet Member, and a four-member board appointed by the Governor with the advice and consent of the Senate. The AACA operates a system of compulsory insurance coverage for all registered motor

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

vehicles and compensates citizens for injuries arising from motor vehicle accidents. The Commonwealth has the ability to significantly influence rates charged by the AACA. The Commonwealth has access to AACA's resources.

*Cardiovascular Center Corporation of Puerto Rico and the Caribbean (CCCPRC)* – CCCPRC is governed by a seven member board comprising the Secretary of Health of the Commonwealth, the Director of the Medical Sciences Campus of the UPR, the Executive Director of the PRMeSA, and four additional members appointed by the Governor with the advice and consent of the Senate, one of which should be from the Cardiology Society of Puerto Rico and another a member of a cardiology foundation properly registered in the Department of State of the Commonwealth. The purpose of the CCCPRC is to provide special treatment to patients suffering from cardiovascular diseases. The Commonwealth provides financial support to the CCCPRC through legislative appropriations.

*Company for the Integral Development of the "Península de Cantera" (CIDPC)* – CIDPC is governed by an eleven-member board, of which six members are appointed by the Governor and five members appointed by the Mayor of the Municipality of San Juan. The CIDPC was created to establish and implement a comprehensive development plan for the Península de Cantera area. Its main function is to supervise and coordinate governmental efforts and also promote and manage private sector initiatives for the improvements and rehabilitation of the aforementioned area. The Commonwealth generally provides financial support to the CIDPC.

*Corporation for the "Caño Martín Peña" ENLACE Project (CPECMP)* – CPECMP was created for the purpose of coordinating the public policy related to the rehabilitation of the Caño Martín Peña area. The CPECMP is governed by a board of directors of thirteen members of which seven members are appointed by the Governor and six members appointed by the Mayor of the Municipality of San Juan. The Commonwealth generally provides financial support to the CPECMP through legislative appropriations.

*Culebra Conservation and Development Authority (CCDA)* – CCDA was created to formulate and administer the program and plan for the conservation, use, and development of natural resources of the Municipality of Culebra. The CCDA is administered through a board of directors composed of five members, including the Mayor of the Municipality of Culebra and four additional members appointed by the Mayor of the Municipality of Culebra and confirmed by the municipal legislature. The administration and operations of the CCDA are conducted by an executive director elected by the board of directors. The Commonwealth provides financial support to the CCDA through legislative appropriations. Although CCDA's board of directors is not appointed by the Commonwealth and it is not fiscally dependent on the Commonwealth, the Commonwealth believes it would be misleading to exclude it from its reporting entity, given the financial support provided by the Commonwealth.

*Economic Development Bank for Puerto Rico (EDB)* – EDB is governed by a nine-member board comprising the President of the GDB, who is the Chairman, the Secretary of Agriculture of the Commonwealth, the Secretary of the Department of Economic Development and Commerce of the Commonwealth, the Executive Director of the Puerto Rico Industrial Development Company (PRIDCO), the Executive Director of the PRTC (Puerto Rico Tourism Company), and four members representing the private sector and appointed by the Governor with the advice and consent of the Senate. Private sector members are appointed for a maximum period of three years. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The EDB is responsible for the promotion and development of the private sector economy of the Commonwealth. This purpose is to be met by granting direct loans, loan guarantees, loan participation, and/or direct investments to any person or business organization devoted to manufacturing, agriculture, trade, tourism, or other service enterprises with preference, but not limited, to economic activities that may have the effect of substituting imports. The Commonwealth has the ability to impose its will on the EDB.

*Farm Insurance Corporation of Puerto Rico (FICPR)* – FICPR is governed by a five-member board consisting of the Secretary of Agriculture of the Commonwealth, the Dean of the Agricultural Sciences Faculty of the UPR Mayaguez Campus, a representative of the GDB, and two bona fide farmers appointed by the Governor with the advice and consent of the Senate. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The purpose of the FICPR is to provide insurance to farmers against losses in their farms caused by natural disasters. The Commonwealth has the ability to impose its will on the FICPR.

*Fine Arts Center Corporation (FACC)* – FACC is governed by a nine-member board comprising the President of the Musical Arts Corporation (MAC) and eight members named by the Governor. FACC was created with the purpose of administering the Fine Arts Center. The Commonwealth provides financial support to FACC through legislative appropriations.

*Independent Consumer Protection Office (ICPO)* – ICPO is overseen by the Director appointed by the Governor with the advice and consent of the Senate. ICPO is also supported by an executive director who works together with the Puerto Rico Energy Affairs Administration and provides technical advice to the commissioners. ICPO shall be the key component for the faithful and transparent execution of the Puerto Rico Energy Reform. The Puerto Rico Energy Commission provides financial support to the ICPO, equivalent to the 10% of the contributions received from PREPA.

*Institute of Puerto Rican Culture (IPRC)* – IPRC is governed by a nine-member board comprising the President of MAC and eight members appointed by the Governor with the advice and consent of the Senate. The IPRC is responsible for implementing the public policy related to the development of Puerto Rican arts, humanities, and culture. The Commonwealth provides financial support to the IPRC through legislative appropriations.

*Institutional Trust of the National Guard of Puerto Rico (ITNGPR)* – ITNGPR is governed by a seven-member board comprising the Adjutant General of the Puerto Rico National Guard, the President of the GDB, the Secretary of Justice of the Commonwealth, three militaries from the Puerto Rico National Guard, and one representative from the community appointed by the Governor. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. ITNGPR's purpose is to provide life insurance, retirement benefits, and economic assistance to the active members of the Puerto Rico National Guard and their families. The Commonwealth generally provides financial support to the ITNGPR through legislative appropriations and has the ability to impose its will on the ITNGPR.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Land Authority of Puerto Rico (LAPR)* – LAPR is governed by a five-member board consisting of the Secretary of Agriculture of the Commonwealth and four members appointed by the Governor. LAPR was created to carry out the provisions of the Land Law of Puerto Rico, principally geared to the agricultural development of Puerto Rico. LAPR maintains debt that is payable from Commonwealth's appropriations and funds generated by LAPR operations.

*Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads (LRA)* – LRA is governed by a nine member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, two members appointed by the Mayor of the Municipality of Ceiba, one member appointed by the Mayor of the Municipality of Naguabo, one member appointed by the President of the Senate, one member appointed by the Speaker of the House of Representatives and three additional members appointed by the Governor, all to possess known interest and expertise in the areas of planning; commercial, tourism, residential, and institutional development; real estate; tourism and recreational facilities administration; and infrastructure projects' management. The LRA is responsible for the implementation of the reuse and redevelopment plan for the former Navy Station of Roosevelt Roads located in Ceiba, Puerto Rico. Some of the activities involved in these redevelopment plans include the direction, supervision, regulation, and maintenance of the economic development on the land and facilities formerly occupied by the U.S. Navy. The Commonwealth generally provides financial support to the LRA through legislative appropriations.

*Musical Arts Corporation (MAC)* – MAC is governed by a seven-member board appointed by the Governor with the advice and consent of the Senate. MAC was created to promote the development of the arts and cultural programs of the Commonwealth. The Commonwealth provides financial support to MAC through legislative appropriations.

*Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives (PCSDIPRC)* – PCSDIPRC is governed by a nine member board comprising the Administrator of the Cooperative Development Administration, the Commissioner of Financial Institutions of Puerto Rico, the Secretary of the Treasury of the Commonwealth, the Inspector of Cooperatives, three citizens representing the cooperative movement, one representative of the Puerto Rico Cooperatives League, and one private citizen representing the public interest. PCSDIPRC has the responsibility of providing to all the cooperatives and the Federation of Cooperatives of Puerto Rico insurance coverage over the stocks and deposits, and for monitoring the financial condition of the insured cooperatives, and the uninsured cooperatives when requested by the Inspector of Cooperatives. The Commonwealth has the ability to impose its will on PCSDIPRC.

*Puerto Rico Conservatory of Music Corporation (PRCMC)* – PRCMC is governed by a seven-member board appointed by the Governor, with the advice and consent of the Senate. The PRCMC is responsible for providing the Puerto Rican community and especially its youths with the required facilities to educate and perfect their musical skills, including secondary education programs for developing musical arts. It prepares the artistic element that nourishes the Puerto Rico Symphony Orchestra and other musical organizations, and coordinates the governmental efforts to interested industries, private enterprises, and particular citizens. The Commonwealth occasionally provides financial support to the PRCMC through legislative appropriations.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Puerto Rico Convention Center District Authority (PRCCDA)* – PRCCDA is governed by a nine- member board of directors comprising of three members from the public-sector and six members from the private sector. The public-sector members comprise the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Executive Director of the PRTC, and the president of the GDB. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The private sector members are individuals having experience in the areas of hotel operations, tourism, real estate, convention centers, and at least one with financial expertise who are appointed by the Governor with the advice and consent of the Senate. PRCCDA was created to be responsible, for improving, developing, managing, and operating the property and improvements within the Puerto Rico Convention Center District (the District) geographical area. PRCDDA has the power to finance all of the improvements to be developed through the issuance of bonds and the imposition of assessments against the owners or lessees of land within the District who benefit from the Convention Center and other improvements. Also, PRCCDA promotes the development, construction, expansion and improvement of the Puerto Rico Convention Center (Convention Center), Bahía Urbana, and the Jose Miguel Agrelot Coliseum (the Coliseum). The administration, operation and management of the Convention Center and the Coliseum are carried out by a third-party private entity, under PRCDDA's responsibility. Bahía Urbana is administered by PRCCDA's management. The Commonwealth provides financial support to the PRCCDA through legislative appropriations.

*Puerto Rico Council on Education (PRCE)* – PRCE is governed by a board comprising nine members appointed by the Governor with the consent of the Senate. Its purpose is to develop higher education, to administer the licensing and certification of institutions of higher education, and to administer scholarship funds. The Commonwealth provides financial support to the PRCE through legislative appropriations.

*Puerto Rico Energy Commission (PREC)* – PREC is governed by a board of directors composed by a commissioner President and two associate commissioners, all appointed by the Governor with the advice and consent of the Senate. The first commissioner President and two associate commissioners appointed will occupy their positions for six years, four years and two years, respectively, with succeeding commissioners to be appointed for a term of six years. PREC was created on May 27, 2014 pursuant Act No. 57, also known as the Puerto Rico Energy Transformation and Relief Act. Under the provisions of Act No. 57, PREC functions as an independent government entity in charge of regulating, overseeing and ensuring compliance with the public policy on energy of the Commonwealth and with the authority to approve electric rates proposed by PREPA, among other responsibilities. Act No. 57 requires PREPA to appropriate annually $5.8 million for PREC's operations, to be remitted to the PREC through special accounts established at the Commonwealth's Treasury Department. The Commonwealth also has the ability to impose its will on PREC. Pursuant to a restructuring of PREC in 2018, PREC is now known as the Puerto Rico Energy Bureau (PREB).

*Puerto Rico Government Investment Trust Fund (PRGITF)* – PRGITF is governed by the Secretary of the Treasury of the Commonwealth. Prior to the GDB's decision on March 23, 2018 to cease operations and wind down under Title VI of PROMESA, the GDB was PRGITF's trustee, custodian, and administrator, a role that FAFAA currently assumes. PRGITF's main objective is to provide investment opportunities in a professionally managed money market portfolio by investing in high

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

quality securities with minimal credit risk. Qualified investors include the Commonwealth's central government, its public corporations, instrumentalities and agencies, and the municipalities of Puerto Rico. In conformity with GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investments Pools*, the financial statements of the PRGITF are not included in the accompanying basic financial statements because the Primary Government and each component unit investor is already presenting as cash or investment their corresponding share of the assets of the PRGITF.

*Puerto Rico Industrial Development Company (PRIDCO)* – PRIDCO is governed by a seven-member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Secretary of the Treasury of the Commonwealth, the President of the GDB, the President of the Planning Board of Puerto Rico, and three members from the private sector appointed by the Governor with the advice and consent of the Senate. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The private sector members are appointed for a period of four years. PRIDCO administers the Commonwealth sponsored economic development program by providing facilities, general assistance, and special incentive grants to manufacturing companies operating in Puerto Rico. PRIDCO has issued interim notes and revenue bonds to finance manufacturing plants and other facilities. Rentals derived from the leasing of specified facilities of PRIDCO are used for the payment of PRIDCO's revenue bonds. PRIDCO maintains debt that is payable from Commonwealth's appropriations. The Commonwealth generally provides financial support to PRIDCO through legislative appropriations and has the ability to impose its will on PRIDCO.

*Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (known as AFICA, its Spanish acronym)* – AFICA is governed by a seven-member board comprising the Executive Director of PRIDCO, the President of the GDB, the Executive Director of PRIFA, the Executive Director of the PRTC, the President of the Environmental Quality Board, and two private citizens appointed by the Governor. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. AFICA is authorized to issue revenue bonds to finance industrial, tourist, environmental control, medical, and educational facilities in Puerto Rico and the United States of America for use by private companies, nonprofit entities, or governmental agencies. The bonds are payable solely from collections from such private companies, nonprofit entities, or governmental agencies, and do not constitute debt of the Commonwealth or any of its other component units. The Commonwealth has the ability to impose its will on AFICA.

*Puerto Rico Integrated Transit Authority (PRITA)* – PRITA is governed by a nine member board comprising the Secretary of DTPW, who serves as Chairman, the Executive Director of the PRHTA, the President of the Puerto Rico Planning Board, the Director of OMB, the President of GDB, two additional members from the private sector appointed by the Governor with the advice and consent of the Senate and two other members representing entities within the Metropolitan Planning Organization, who are selected through the vote from its own Board of Directors. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. PRITA was created by Act No. 123 of August 3, 2014 for the purpose of implementing a uniform public policy on collective,

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

road and maritime transportation, and with it the integration of the operations, assets, rights, obligations and funds of PRHTA's urban train, the Puerto Rico Metropolitan Bus Authority (PRMBA) and the Puerto Rico and Municipal Islands Maritime Transport Authority (PRMIMTA). As of June 30, 2016, PRITA was still in the process of obtaining the required approvals from local and federal authorities to integrate and officialize the merger of the urban train, PRMBA and PRMIMTA into PRITA. The Commonwealth generally provides financial support to PRITA through legislative appropriations and PRITA will transfer the necessary funds to the PRHTA, PRMBA and PRMIMTA, when they are engaged in construction, operations and maintenances of Mass, Rail and Maritime Transportation Facilities.

*Puerto Rico Land Administration (PRLA)* – PRLA is governed by an eleven member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who serves as President, the President of the Planning Board of Puerto Rico, who serves as Vice President, the Secretary of the Treasury of the Commonwealth, the Secretary of Agriculture of the Commonwealth, the Secretary of DTPW of the Commonwealth, the Secretary of Housing of the Commonwealth, the Executive Director of PRIDCO, and four members appointed by the Governor with the advice and consent of the Senate. The PRLA acquires parcels of land on behalf of government instrumentalities through negotiation or expropriation for future development or for reserve. The Commonwealth provides financial support to the PRLA through legislative appropriations.

*Puerto Rico and Municipal Islands Maritime Transport Authority (PRMIMTA)* – PRMIMTA is governed by a five-member board comprising the Secretary of DTPW, who serves as President, the Executive Director of the Puerto Rico Ports Authority, the Mayors of Vieques and Culebra, and one additional member appointed by the Governor. The operations of PRMIMTA consist of administering and operating the maritime transportation services between San Juan, Fajardo, Vieques, and Culebra. The Commonwealth generally provides financial support to PRMIMTA through legislative appropriations. Act No. 123 of August 3, 2014, which created PRITA, provided for the integration into PRITA of PRMIMTA's operations; however, as of June 30, 2016, PRMIMTA's operations, assets, rights, obligations and funds had not been transferred.

*Puerto Rico Metropolitan Bus Authority (PRMBA)* – PRMBA is governed by the Secretary of DTPW of the Commonwealth. The PRMBA provides bus transportation to passengers within the San Juan Metropolitan Area. The Commonwealth provides financial support to the PRMBA through the transfer of certain gasoline and diesel excise taxes collected by the Commonwealth. Act No. 123 of August 3, 2014, which created PRITA, provided for the integration into PRITA of PRMBA's operations; however, as of June 30, 2016, PRMBA's operations, assets, rights, obligations and funds had not been transferred.

*Puerto Rico Municipal Finance Agency (PRMFA)* – PRMFA is governed by a five-member board comprising the President of the GDB, who is the Chairman, the Commissioner of Municipal Affairs, and three additional members appointed by the Governor, one of whom must be either the Mayor or chief financial officer of a municipality. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The PRMFA was organized to create a capital market to assist the municipalities of Puerto Rico in financing their public improvement programs. The

64

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Commonwealth is required to cover any potential deficiency that may exist on the MFA reserve accounts established for debt service.

*Puerto Rico Municipal Finance Corporation (Known as COFIM, for its Spanish Acronym)* – COFIM is governed by a seven-member board comprising three members of the Board of Directors of GDB, three Mayors from municipalities in Puerto Rico (two of them from the political party controlling the majority of municipalities and the remaining major elected by the rest of the municipalities) and one member representing the public interest recommended by all the Mayors of the municipalities and ratified by the Governor. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. COFIM was created by Act No. 19 of January 24, 2014 to issue bonds and use other financing mechanisms to pay or refinance, directly or indirectly, all or a portion of the municipalities' debt obligations payable from the municipal sales and use tax. The Commonwealth is required to cover any potential deficiency that may exist on the COFIM reserve accounts established for debt service. COFIM commenced operations during fiscal year 2015.

*Puerto Rico Ports Authority (PRPA)* – PRPA is governed by a five-member board consisting of the Secretary of DTPW of the Commonwealth, who is the Chairman, the Secretary of Economic Development and Commerce of the Commonwealth, the Executive Director of the PRTC, the Executive Director of Puerto Rico Industrial Development Company and one private citizen appointed by the Governor with the consent of the Senate. The purpose of the PRPA is to administer all owned ports and aviation transportation facilities of the Commonwealth and to render other related services, including the supervision and monitoring over the service concession arrangement of the Luis Muñoz Marín International Airport, as further described in Note 17. The Commonwealth generally provides financial support to the PRPA through legislative appropriations.

*Puerto Rico Public Broadcasting Corporation (PRPBC)* – PRPBC is governed by an eleven-member board of directors comprising the Secretary of the Department of Education of the Commonwealth, the President of the UPR, the Executive Director of the IPRC, and eight private citizens appointed by the Governor with the advice and consent of the Senate. At least three of these private citizens must have proven interest, knowledge, and experience in education, culture, art, science, or radio and television. The PRPBC was created for the purpose of integrating, developing, and operating the radio, television, and electronic communication facilities that belong to the Commonwealth. The Commonwealth provides financial support to the PRPBC through legislative appropriations.

*Puerto Rico Public Private Partnerships Authority (PPPA)* – PPPA is governed by a five-member board of directors comprising the President of the GDB, the Secretary of the Treasury of the Commonwealth, the President of the Planning Board, and two members appointed by the Governor, one member selected by the President of the Senate of Puerto Rico and another member, by the Speaker of the Puerto Rico House of Representatives. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The PPPA is the only government entity authorized and responsible for implementing public policy on public private partnerships established by Act No. 29 of June 8, 2009, as amended, and to determine the functions, services, or facilities for which such Partnerships will be established.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Puerto Rico School of Plastic Arts (PRSPA)* – PRSPA is governed by a seven-member board. Four members are appointed by the board of directors of the IPRC, representing the public educational and cultural interests. Board members may not be employees of the PRSPA. The remaining three members are elected from among the members of the board of directors of the IPRC, one of whom serves as president. The PRSPA was created to develop, promote, plan, and coordinate programs of study in higher education oriented to the plastic arts, teaching, artistic techniques, and to help students to develop humanistic values. The Commonwealth generally provides financial support to the PRSPA through legislative appropriations.

*Puerto Rico Science, Technology and Research Trust (PRSTRT)* – PRSTRT is governed by an eleven-member board of trustees comprising five members ex officio representing certain Primary Government agencies and public corporations: the Secretary of the Department of Economic Development and Commerce, the President of the UPR, the Director of OMB, the President of the GDB and the Executive Director of PRIDCO; and six additional trustees appointed by the board of trustees. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The PRSTRT was created by Act No, 214 of August 18, 2004, as amended, to foster and fund research, development and infrastructure projects related to science and technology to promote the economic, social or educational development of the Commonwealth and to operate exclusively for charitable, educational and scientific purposes. The PRSTRT was initially financially supported through various sources including moneys from certain UPR's funds, private donations and legislative appropriations which have not recurred during the past several years. But recently, most of the funds come indirectly from the Commonwealth's contributions into several funds that are managed and administered by PRIDCO, which in turn makes such funds available to PRSTRT. The PRSTRT's board of trustees is not appointed by the Commonwealth. The Commonwealth believes it would be misleading to exclude it from its reporting entity, given the substantial indirect financial support provided by the Commonwealth and the fact that PRSTRT was created by law to implement and execute the Commonwealth's scientific research mission and can be eliminated by actions of the Commonwealth.

*Puerto Rico Telephone Authority (PRTA)* – PRTA is governed by a five-member board comprising the President of the GDB and four members that are appointed by the board of directors of the GDB from among the GDB board members, all of which are appointed by the Governor. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. PRTA is the legal entity responsible to account for the equity interest in Telecommunications de Puerto Rico, Inc. PRTA is currently inactive and awaiting for a legislative process to arrange its liquidation.

*Puerto Rico Tourism Company (PRTC)* – PRTC is governed by a seven-member board comprising of representatives of different tourist related sectors appointed by the Governor with the consent of the Senate. At least one member must represent internal tourism and two must not be residents of the metropolitan area. Its purpose is to promote the tourism industry of Puerto Rico. The Commonwealth generally provides financial support to the PRTC through legislative appropriations.

*Puerto Rico Trade and Export Company (PRTEC)* – PRTEC is governed by a nine-member board comprising the Secretary of the Department of Economic Development and Commerce, who is the Chairman, the Executive Director of the PRPA, the Secretary of the Department of Agriculture, the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

President of the EDB, the Executive Director of PRIDCO, the Legal Division Director of the PRTEC, and three private citizens. The PRTEC has the responsibility to promote the highest efficiency in the services provided to the commercial sector, with emphasis on small and medium sized enterprises while promoting the export of products and services from Puerto Rico to other countries. The Commonwealth has the ability to impose its will on the PRTEC.

*Solid Waste Authority (SWA)* – SWA is governed by a board appointed by the Secretary of the Department of Natural Resources, whereby, the Secretary and the Executive Director of SWA periodically meet. SWA provides alternatives for processing of solid waste and encourages recycling, reuse, and recovery of resources from waste. The Commonwealth provides financial support to SWA through legislative appropriations.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Complete financial statements of the discretely presented component units can be obtained directly by contacting their administrative offices:

Agricultural Enterprises Development
Administration
P.O. Box 9200
Santurce, PR 00908-0200

Automobile Accidents Compensation
Administration
P.O. Box 364847
San Juan, PR 00936-4847

Cardiovascular Center Corporation of
Puerto Rico and the Caribbean
P.O. Box 366528
San Juan, PR 00936-6528

Company for the Integral Development of the
"Península de Cantera"
P.O. Box 7187
Santurce, PR 00916-7187

Corporation for the "Caño Martín Peña"
ENLACE Project
P.O. Box 41308
San Juan, PR 00940-1308

Culebra Conservation and Development
Authority
P.O. Box 217
Culebra, PR 00775-0217

Economic Development Bank for Puerto Rico
P.O. Box 2134
San Juan, PR 00922-2134

Farm Insurance Corporation of Puerto Rico
P.O. Box 9200
Santurce, PR 00908

Fine Arts Center Corporation
P.O. Box 41287 – Minillas Station
San Juan, PR 00940-1287

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Independent Consumer Protection Office
268 Muñoz Rivera Ave Suite 204
San Juan, PR 00918

Institutional Trust of the National Guard of
Puerto Rico
P.O. Box 9023786
San Juan, PR, 00902-3786

Institute of Puerto Rican Culture
P.O. Box 9024184
San Juan, PR 00902-4184

Local Redevelopment Authority of the Lands
and Facilities of Naval Station Roosevelt Roads
400 Calaf Street, PMB 456
San Juan, PR 00918-1314

Land Authority of Puerto Rico
P.O. Box 9745
Santurce, PR 00908-9745

Public Corporation for the Supervision and
Deposit Insurance of Puerto Rico Cooperatives
P.O. Box 195449
San Juan, PR 00919-5449

Musical Arts Corporation
P.O. Box 41227
San Juan, PR 00940-1227

68

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | |
|---|---|
| Puerto Rico Aqueduct and Sewer Authority<br>P.O. Box 7066<br>San Juan, PR 00916-7066 | Puerto Rico Conservatory of Music Corporation<br>951 Ponce de León Ave.<br>San Juan, PR 00907-3373 |
| Puerto Rico Convention Center District Authority<br>P.O. Box 19269,<br>San Juan, Puerto Rico, 00910-1269 | Puerto Rico Council on Education<br>P.O. Box 19900<br>San Juan, PR 00910-1900 |
| Puerto Rico Energy Commission<br>268 Munoz Rivera Avenue<br>San Juan, PR 00918 | Puerto Rico Electric Power Authority<br>P.O. Box 364267<br>San Juan, PR 00936-4267 |
| Puerto Rico Government Investment Trust Fund<br>P.O. Box 42001, Millas Station<br>San Juan, Puerto Rico 00940-2001 | Puerto Rico Highways and Transportation Authority<br>P.O. Box 42007<br>San Juan, PR 00940-2007 |
| Puerto Rico Industrial Development Company<br>P.O. Box 362350<br>San Juan, PR 00936-2350 | Puerto Rico Industrial, Tourist, Educational,<br>Medical, and Environmental Control<br>Facilities Financing Authority<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Puerto Rico Integrated Transit Authority<br>P.O. Box 41267<br>San Juan, PR 00940 | Puerto Rico Land Administration<br>P.O. Box 363767<br>San Juan, PR 00936-3767 |
| Puerto Rico and Municipal Islands Maritime<br>Transport Authority<br>P.O. Box 4305<br>Puerto Real, PR 00740 | Puerto Rico Metropolitan Bus Authority<br>P.O. Box 195349<br>San Juan, PR 00919-5349 |
| Puerto Rico Municipal Finance Agency<br>P.O. Box 42001<br>San Juan, PR 00940-2001 | Puerto Rico Municipal Finance Corporation<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Puerto Rico Ports Authority<br>P.O. Box 362829<br>San Juan, PR 00936-2829 | Puerto Rico Public Broadcasting Corporation<br>P.O. Box 190909<br>San Juan, PR 00919-0909 |
| Puerto Rico Public Private Partnerships Authority<br>P.O. Box 42001<br>San Juan, PR 00940-2001 | Puerto Rico School of Plastic Arts<br>P.O. Box 9021112<br>San Juan, PR 00902-1112 |
| Puerto Rico Science, Technology and Research Trust<br>P.O.Box 363475<br>San Juan, PR 00936-3475 | Puerto Rico Telephone Authority<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Puerto Rico Tourism Company
Tanca Street #500, Ochoa Building, 3rd Floor
Old San Juan, PR 00902-3960

Puerto Rico Trade and Export Company
P.O. Box 195009
San Juan, PR 00919-5009

Solid Waste Authority
P.O. Box 40285
San Juan, PR 00940-0285

State Insurance Fund Corporation
P.O. Box 365028
San Juan, PR 00936-5028

University of Puerto Rico
Jardín Botánico Sur
1187 Street Flamboyán
San Juan, PR 00916-1117

The financial statements of the discretely presented component units have a fiscal year end of June 30, 2016.

*(v)   Pension Trust Funds*

The three employee retirement systems described in the following paragraphs (the Retirement Systems) administered the pension funds and other postemployment healthcare benefits for the Commonwealth and its political subdivisions until the enactment of the Act for Guaranteeing the Payment to Retirees and Establishing a New Defined Contributions Plan for the Public Servicers (Act No. 106) on August 23, 2017. These Retirement Systems are subject to legislative and executive controls, and their administrative expenses are subject to legislative budget controls. They meet the component units' criteria and blend into fiduciary funds of the Commonwealth. They have been omitted from the government-wide- financial statements, as their resources prior to August 23, 2017 were not available to fund operations of the Commonwealth. The Retirement Systems, as governmental retirement plans, are excluded from the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

*Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)* – ERS is a cost sharing, multiple employer defined benefit pension plan, which covers all regular employees of the Commonwealth and its instrumentalities and of certain municipalities and component units not covered by their own retirement systems. Prior to August 23, 2017, ERS was governed by an eleven-member board of trustees, composed of the Secretary of the Treasury of the Commonwealth (who serves as ERS' President), the President of the GDB, the Commissioner of Municipal Affairs, the Director of the Office of Human Resources of the Commonwealth, three employees, and two retirees, who were appointed by the Governor. The other two members were the President of the Federation of Mayors and the President of the Association of Mayors. Prior to August 23, 2017, ERS was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (ERS and JRS Administration) which also administered the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). ERS MIPC is an unfunded, cost sharing, multi employer defined benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)* – JRS is a single employer defined benefit plan that covers all active judges or retired judges of the judiciary branch of the Commonwealth. Prior to August 23, 2017, JRS was governed by the same board of trustees as ERS and was administered by the ERS and JRS Administration.

*Puerto Rico System of Annuities and Pensions for Teachers (TRS)* – TRS provides retirement benefits to all teachers of the Department of Education of the Commonwealth, all pensioned teachers, all teachers transferred to an administrative position in the Department of Education of the Commonwealth, and those who practice in private institutions accredited by the Department of Education of the Commonwealth who elect to become members. TRS provides retirement, death, and disability benefits. Prior to August 23, 2017, TRS was governed by a nine member board comprising three *ex officio* members, comprised of the Secretary of the Department of Education of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the President of the GDB, and one member who was a representative of a teachers' organization designated by the Governor; three teachers appointed by the Governor, one of which represented certified teachers in active service, and two who represented retired teachers; one member who was a representative of the entity that represented the proper unit under Act No. 45 of February 25, 1998, as amended; and one additional member, as representative of the public interest, with knowledge of and experience in the administration and operation of financial systems, appointed by the Governor. The Commonwealth reports TRS as a single employer pension plan. TRS was administered by the Teachers Retirement System (TRS Administration) which also administered the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC). TRS MIPC is an unfunded, cost-sharing, multi-employer defined benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of TRS Administration.

On August 23, 2017, the Governor signed Act No.106 into law. Act No. 106 reformed ERS, JRS and TRS by substituting the governing boards of the Retirement Systems with the Retirement Board of the Government of Puerto Rico (the Retirement Board) and establishing a separate "Account for the Payment of Accrued Pensions" to implement a "pay-as-you-go" method for the Retirement Systems. For additional information on the transition to the  PayGo method, refer to Note 23.

Complete financial statements of these component units can be obtained directly by contacting their respective administrative offices at:

| | |
|---|---|
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico<br>P.O. Box 42003 – Minillas Station<br>San Juan, PR 00940-2203 | Retirement System for the Judiciary of the Commonwealth of Puerto Rico<br>P.O. Box 42003 – Minillas Station<br>San Juan, PR 00940-2203 |

Puerto Rico System of Annuities and Pensions for
    Teachers
P.O. Box 191879
San Juan, PR 00919-1879

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

### (c) Component Units Audited Separately

The basic financial statements of the Commonwealth include the financial statements of the following component units that were audited by other auditors:

(i) *Blended Component Units*

Ponce Ports Authority
Port of the Americas Authority
Public Buildings Authority
Puerto Rico Health Insurance Administration
Puerto Rico Infrastructure Financing Authority
Puerto Rico Maritime Shipping Authority
Puerto Rico Medical Services Administration
Special Communities Perpetual Trust
The Children's Trust
University of Puerto Rico Comprehensive Cancer Center

(ii) *Discretely Presented Component Units*

Agricultural Enterprises Development Administration
Automobile Accidents Compensation Administration
Cardiovascular Center Corporation of Puerto Rico and the Caribbean
Company for the Integral Development of the "Península de Cantera"
Corporation for the "Caño Martín Peña" ENLACE Project
Culebra Conservation and Development Authority
Economic Development Bank for Puerto Rico
Farm Insurance Corporation of Puerto Rico
Fine Arts Center Corporation
Independent Consumer Protection Office
Institute of Puerto Rican Culture
Institutional Trust of the National Guard of Puerto Rico
Land Authority of Puerto Rico
Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads
Musical Arts Corporation
Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives
Puerto Rico Aqueduct and Sewer Authority
Puerto Rico Conservatory of Music Corporation
Puerto Rico Convention Center District Authority
Puerto Rico Council on Education
Puerto Rico Electric Power Authority
Puerto Rico Energy Commission
Puerto Rico Government Investment Trust Fund
Puerto Rico Highways and Transportation Authority
Puerto Rico Industrial Development Company
Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities Financing Authority
Puerto Rico Integrated Transit Authority

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Puerto Rico Land Administration
Puerto Rico and Municipal Islands Maritime Transport Authority
Puerto Rico Metropolitan Bus Authority
Puerto Rico Municipal Finance Agency
Puerto Rico Municipal Finance Corporation
Puerto Rico Ports Authority
Puerto Rico Public Broadcasting Corporation
Puerto Rico Public Private Partnerships Authority
Puerto Rico School of Plastic Arts
Puerto Rico Science, Technology and Research Trust
Puerto Rico Telephone Authority
Puerto Rico Tourism Company
Puerto Rico Trade and Export Company
Solid Waste Authority
State Insurance Fund Corporation
University of Puerto Rico

(iii)   *Pension Trust Funds*

Puerto Rico System of Annuities and Pensions for Teachers

*(d)  Basis of Presentation*

(i)   *Government-Wide Financial Statements*

The government-wide financial statements (the statement of net position and the statement of activities) report information of all the nonfiduciary activities of the Commonwealth and its component units. For the most part, the effect of interfund activity has been removed from these government- wide financial statements. Governmental Activities, which normally are supported by taxes and intergovernmental revenue, are reported separately from Business-Type Activities, which rely to a significant extent on fees and charges for services or which are financed and operated in a manner similar to private business enterprises. Likewise, the Primary Government is reported separately from the legally separate discretely presented component units for which the Primary Government is financially accountable. The statement of net position presents the reporting entities' nonfiduciary assets, deferred outflows of resources, liabilities, and deferred inflows of resources, with the residual measure reported as net position. Net position is reported in three categories:

- *Net Investment in Capital Assets* – This component of net position consists of capital assets net of accumulated depreciation and reduced by the outstanding balance of any bonds, mortgages, notes, or other borrowings that are directly attributable to the acquisition, construction, or improvement of those assets. Deferred outflows of resources and deferred inflows of resources that are attributable to the acquisition, construction, or improvement of those assets or related debt also should be included in this component of net position. If there are significant unspent related debt proceeds or deferred inflows of resources at year end, the portion of the debt or deferred inflows of resources attributable to the unspent amount is not included in the calculation of this component of net position. Rather, that portion of the debt or deferred inflows of resources is included in the same net position component (restricted or unrestricted) as the unspent amount.

73

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- *Restricted Net Position* – This component of net position consists of restricted assets and deferred outflows of resources reduced by related liabilities and deferred inflows of resources. Generally, a liability relates to restricted assets if the asset results from a resource flow that also results in the recognition of a liability or if the liability will be liquidated with the restricted assets reported. Restricted assets result when constraints placed on those assets use are either, externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

- *Unrestricted Net Position* – This component of net position is the net amount of the assets, deferred outflows of resources, liabilities, and deferred inflows of resources that are not included in the determination of net investment in capital assets or the restricted component of net position.

  When both restricted and unrestricted resources are available for use, generally, it is the Commonwealth's policy to use restricted resources first, then the unrestricted resources as they are needed.

The statement of activities demonstrates the degree to which the direct expenses of a given function, segment, or component unit are offset by program revenue. Direct expenses are those that are clearly identifiable with a specific function, segment, or component unit. The Commonwealth does not allocate general government (indirect) expenses to other functions. Program revenue includes charges to customers who purchase, use, or directly benefit from goods or services provided by a given function, segment, or component unit. Program revenue also includes grants and contributions that are restricted to meeting the operational or capital requirements of a particular function, segment, or component unit. Revenue that is not classified as program revenue, including all taxes, is presented as general revenue. Resources that are dedicated internally are reported as general revenue rather than as program revenue.

*(ii) Fund Financial Statements*

The Commonwealth reports its financial position and results of operations in funds, which are considered separate accounting entities, including those component units, which are required to be blended. The operations of each fund are accounted for within a set of self-balancing accounts. Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with legal, financial, and contractual provisions. Major funds are determined using a predefined percentage of the assets, deferred outflows of resources, liabilities, deferred inflows of resources, revenue, or expenditures/expenses of either the fund category or the governmental and proprietary funds combined. The nonmajor funds are combined in a single column in the fund financial statements.

*(iii) Governmental Funds*

Governmental funds focus on the sources and uses of funds and provide information on near term inflows, outflows, and balances of available resources. The Commonwealth reports the following governmental funds:

- *General Fund* – The General Fund is the primary operating fund of the Commonwealth. It is used to account for and report all financial resources received and used for those services traditionally provided by a government, except those required to be accounted for and reported in another

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

fund. The General Fund includes transactions for services such as general government, public safety, health, public housing and welfare, education, and economic development. The financial resources received and used in the General Fund mostly include: budgeted resources (such as taxes and charges for services), as approved by the Legislature and as adjusted for timing and basis of accounting differences, and other financial resources outside the General Fund budget such as: federal funds, pledged funds, other special revenue and general type funds, and agencies with independent treasuries.

- *Debt Service Fund* – The debt service fund accounts for and reports financial resources that are restricted, committed or assigned to expenditure for general long-term bonds' principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and component units, either blended or discretely presented. Long-term debt and interest due on July 1 of the following fiscal year are accounted for as a fund liability if resources are available as of June 30 for its payment.

- *COFINA Special Revenue Fund* – The special revenue fund of the Puerto Rico Sales Tax Financing Corporation (COFINA) was used to account for and report all financial resources of COFINA, except those required to be accounted for and reported in the COFINA Debt Service fund.

- *COFINA Debt Service Fund* – The debt service fund of COFINA was used to account for the Commonwealth sales tax revenue being deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations.

- *Nonmajor Governmental Funds* – The Commonwealth reports the following blended component units within the nonmajor governmental funds: PBA, The Children's Trust, PRIFA, PRMSA, PAA, SCPT and the UPRCCC. The nonmajor governmental funds also includes the Commonwealth's capital project fund.

If a component unit is blended, it should be blended with those funds of the Primary Government by including them in the appropriate fund category of the Primary Government. Although the Primary Government's General Fund is usually the main operating fund of the reporting entity, the General Fund of a blended component unit should be reported as a special revenue fund. Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

The capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditures for capital outlays, including the acquisition or construction of capital facilities and other capital assets. These capital expenditures may be for the Primary Government directly or for discretely presented component units and outside organizations and governments such as the municipalities of the Commonwealth and other applicable entities. Capital project funds exclude those types of capital related outflows financed by proprietary funds or for assets that will be held in trust for individuals, private organizations, or other governments.

In accordance with GASB Statement No. 54, *Fund Balance Reporting and Governmental Fund Type Definitions*, the classification of fund balance is based on the extent to which the Commonwealth is

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

bound to observe constraints imposed upon the use of resources in the governmental funds. The classifications are as follows:

- *Nonspendable* – Amounts that are not in a spendable form or are legally or contractually required to be maintained intact.

- *Restricted* – Amounts that are legally restricted by outside parties, constitutional provisions, or enabling legislation for a specific purpose.

- *Committed* – Amounts that are constrained for specific purposes that are internally imposed by the government's formal action at the highest level of decision making authority and do not lapse at year end. The highest level of decision authority for the Commonwealth is the Legislature and the Governor, and the formal action is the passage of a law specifying the purposes for which amounts can be used.

- *Assigned* – includes fund balance amounts that are constrained by the Commonwealth and are intended to be used for specific purposes that are neither considered restricted or committed. The Director of the Commonwealth OMB is authorized to assign an amount for a specific purpose through the approval of budget certificates as required by statute.

- *Unassigned* – is the residual classification for the General Fund. In a governmental fund other than the General Fund, a negative amount indicates that the expenditures incurred for a specific purpose exceeded the amounts in the fund that are restricted, committed, and assigned to that purpose.

The Commonwealth uses restricted amounts first when both restricted and unrestricted fund balances are available, unless there are legal documents/contracts that prohibit doing this, such as a grant agreement requiring dollar for dollar spending. Additionally, unless required by law or agreement, the Commonwealth would first use committed, then assigned, and lastly unassigned amounts of unrestricted fund balance when expenditures are made.

The Commonwealth does not have a formal minimum fund balance policy.

*(iv)   Proprietary Funds*

These funds account for those activities, which are financed and operated in a manner similar to private business enterprises. Management intends to recover, primarily through user charges, the cost of providing goods or services to the general public.

The Commonwealth reports the following major proprietary funds:

- *Unemployment Insurance Fund* – This fund accounts for amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

- *Lotteries Fund* – This fund accounts for the assets and operations of two lottery systems administered by the Commonwealth.

- *Puerto Rico Health Insurance Administration* –This fund, a blended component unit, accounts for a health insurance system operated through contracts with insurance underwriters to provide

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

quality medical and hospital care to low income individuals, employees of the Commonwealth and policemen who voluntarily subscribe to the Puerto Rico health insurance medical plan.

- *Puerto Rico Medical Services Administration* – This fund, a blended component unit, accounts for the operations of the centralized health services, provided in support of hospitals and other functions offered by the member institutions and consumers of the complex known as Puerto Rico Medical Center.

- *Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF)* – This fund, administered by the Puerto Rico Environmental Quality Board (EQB), is authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), mostly for water infrastructure projects, under a joint cooperation agreement between the EQB, PRIFA, PRASA, and the GDB, where each entity has agreed to assume their corresponding responsibilities.

The Commonwealth reports the following nonmajor proprietary funds: Disability Insurance Fund, Drivers' Insurance Fund, the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (PRSDWTRLF), Ponce Ports Authority and the 9-1-1 Service Governing Board.

*(v)  Fiduciary Funds*

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity, or as an agent for individuals, private organizations, and other governmental units. The following are the Commonwealth's fiduciary funds:

- *Pension (and Other Employee Benefit) Trust Funds* – These are used to account for the assets, liabilities, and net position held in trust for pension benefits and postemployment healthcare benefits held in trust for the public employees' retirement systems.

- *Agency Funds* – These are custodial in nature (assets equal liabilities) and do not involve measurement of the results of operations.

**(e)  Measurement Focus and Basis of Accounting**

*Government-Wide Financial Statements* – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows.

*Governmental Fund Financial Statements* – The governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available, and net of estimated overpayments (as applicable) and amounts considered not collectible. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period (see Note 1(j) for further description about the period of availability for the principal sources of revenue in the Governmental Activities).

Principal revenue sources considered susceptible to accrual include personal and corporate income taxes (recognized as taxpayers earn the underlying income), sales and uses taxes (recognized as the underlying sales are made), excise taxes (as the underlying import or related activity takes place),

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

property taxes (imposed on real estate property values, as defined), intergovernmental revenue (typically, when related expenditures are incurred), and other taxes and charges for services (typically, as cash is received).

Expenditures are generally recorded when a liability is incurred, as under accrual basis of accounting. Modifications to the accrual basis of accounting include the following:

- Employees' vested annual vacation and sick leave are recorded as expenditures when matured. The unmatured amount of accumulated annual vacation and sick leave unpaid at June 30, 2016 is reported only in the government-wide financial statements.

- Interest and principal on general long-term obligations and interest on interest rate swap agreements are recorded when due, except for interest and principal due on July 1 of the following fiscal year, if resources are available for its payment as of June 30.

- Debt service expenditures, federal funds' cost disallowances, other long-term obligations, and amounts subject to judgments under litigation are recorded in the governmental funds only when payment is due; and in the case of judgments under litigation, when a settlement has been made and awaiting payment. Until these criteria are met, these liabilities have been recorded only in the government-wide financial statements.

A summary reconciliation of the difference between total fund balances (deficit) as reflected in the governmental funds balance sheet and net position of Governmental Activities as shown on the government-wide statement of net position is presented in an accompanying reconciliation of the balance sheet of governmental funds to the statement of net position.

A summary reconciliation of the difference between net change in fund balances (deficit) as reflected in the governmental funds statement of revenue, expenditures, and changes in fund balances (deficit) and change in net position in the statement of activities of the government-wide financial statements is presented in the accompanying reconciliation of revenue, expenditures, and changes in fund balances (deficit) of governmental funds to the statement of activities.

*Proprietary Funds, Fiduciary Funds, and Discretely Presented Component Units Financial Statements –* The financial statements of the proprietary funds, fiduciary funds, and discretely presented component units are reported using the economic resources measurement focus and the accrual basis of accounting, similar to the government-wide financial statements described above.

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations. Revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses. The major sources of revenue of the Commonwealth's major proprietary funds is as follows:

- *Unemployment Insurance Fund* – Insurance premiums charged to individual employers.

- *Lotteries Fund* – Amounts collected from the sale of traditional lottery tickets and electronic lotto games.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- *Puerto Rico Health Insurance Administration* – Amounts received through the Commonwealth Department of Health representing payments by the Medicaid Program under Title XIX of the Social Security Act and State Plan, contributions from the Commonwealth to cover the local share to meet the Medicaid Program matching requirements and amounts charged and collected from employers and municipalities for direct health services provided to its members.

- *Puerto Rico Medical Services Administration* – Amounts charged and collected from private citizens, member institutions and municipalities for patient services provided.

- *Puerto Rico Water Pollution Control Revolving Fund* – Interest income from the granting of infrastructure and construction loans.

*(f)* ***Cash, Cash Equivalents and Short-Term Investments***

The Commonwealth follows the practice of pooling cash. Cash balances of funds held in the Commonwealth Treasury are commingled in a general checking account and several zero balance bank accounts for special purposes. The available cash balance in the general checking account beyond immediate need was pooled in interest bearing accounts with GDB and PRGITF as of June 30, 2015. Subsequent to March 2016, new interest-bearing accounts were created with commercial banks insured with the Federal Deposit Insurance Corporation (FDIC). These new accounts are used by the Commonwealth to follow the practice of pooling its cash.

Cash and cash equivalents include investments with original maturities of 90 days or less from the date of acquisition. Short-term investments are recorded at cost.

The Puerto Rico Commissioner of Financial Institutions requires that Puerto Rico private financial institutions deposit collateral securities to secure the deposits of the Commonwealth and all other governmental entities in each of these institutions. The amount of collateral securities to be pledged for the security of public deposits must be established by the rules and regulations promulgated by the Commissioner of Financial Institutions.

The Puerto Rico Unemployment Insurance Trust Fund is maintained to account for the collection of unemployment insurance contributions from employers and the payment of unemployment benefits to eligible claimants. As required by federal law, all resources not necessary for current benefit payments are placed on deposit with the U.S. Treasury. Interest earned over such deposit is retained in the fund.

Cash and short-term investments and cash equivalents of the component units and certain funds of the Primary Government are maintained in bank accounts, separate from those of the rest of the Primary Government, in their own names. A significant portion of these financial instruments are invested in GDB deposits. For additional information regarding the cash deposited at GDB as of June 30, 2016, refer to Note 6.

The custodial credit risk, the availability and recoverability of cash and short-term investments is evaluated continuously by the Commonwealth. Refer to Note 6 for custodial credit loss recorded on certain cash and short-term investments. The custodial credit loss of cash and short-term investments held as of June 30, 2016 was determined on the actual subsequent utilization of such assets.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**(g)** *Securities Purchased/Sold under Agreements to Resell/Repurchase*

Certain component units of the Commonwealth enter into purchases of securities with simultaneous agreements to resell the same securities (resale agreements) and into sales of securities under agreements to repurchase (repurchase agreements). The amounts advanced or received under these agreements generally represent short-term loans and are reflected as an asset in the case of resale agreements and as a liability in the case of repurchase agreements. The securities underlying these agreements mainly consist of U.S. government obligations, mortgage backed securities, and interest bearing deposits with other banks. Resale and repurchase agreements are authorized transactions under their respective enabling legislation and/or authorized by the Commonwealth fiscal agent.

**(h)** *Securities Lending Transactions*

Certain component units and pension trust funds of the Commonwealth enter into securities lending transactions in which governmental entities (lenders) transfer their securities to broker dealers and other entities (borrowers) for collateral with a simultaneous agreement to return the collateral for the same securities in the future. Cash received as collateral on securities lending transactions and investments made with that cash are reflected as investments. Securities received as collateral are reported as investments if the component unit has the ability to pledge or sell them without a borrower default. Liabilities resulting from these securities lending transactions also are reported in the statement of net position. Securities lending transactions collateralized by letters of credit or by securities that the component unit does not have the ability to pledge or sell unless the borrower defaults are not reported as assets and liabilities in the statement of net position.

**(i)** *Investments*

Investments mainly include U.S. government and agencies' obligations, mortgage backed securities, repurchase agreements, commercial paper, local government obligations, investment contracts, and corporate debt and equity obligations. Investments and investment contracts are carried at fair value, except for money market investments and participating investment contracts with a remaining maturity at the time of purchase of one year or less and nonparticipating investment contracts (guaranteed investment contracts), which are carried at cost; and investment positions in 2a7 like external investment pools, which are carried at the pool's share price. Fair value is determined based on quoted market prices and quotations received from independent broker/dealers or pricing service organizations. Investment income, including changes in the fair value of investments, is presented as investment earnings in the statement of activities, the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds, and the statement of revenue, expenses, and changes in net position – proprietary funds. Realized gains and losses from the sale of investments and unrealized changes in the fair value of outstanding investments are included within interest and investments earnings.

The PRGITF is considered to be like an external investment pool and, as such, reports its investments or short-term- investments at amortized cost. For additional information, refer to Note 5.

GASB Statement No. 72, *Fair Value Measurement and Application*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. This Statement required a government to use valuation techniques that are appropriate under the circumstances and for which sufficient data are available to measure fair value. The techniques should be consistent with one or more of the following approaches: (i) the market

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

approach, (ii) the cost approach, or (iii) the income approach. This Statement also establishes a hierarchy of inputs to valuation techniques used to measure fair value. The disclosure of fair value estimates in the hierarchy is based on whether the significant inputs into the valuations are observable. In determining the level of hierarchy in which the estimate is disclosed, the highest level, Level 1, is given to unadjusted quoted prices in active markets and the lowest level, Level 3, to unobservable inputs.

Level 1 - inputs whose values are based are quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2 – inputs whose values are based on quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which all significant inputs are observable.

Level 3 – inputs are unobservable inputs for asset or liability and may require a degree of professional judgment.

In instances where inputs used to measure fair value fall into different levels in the fair value hierarchy, fair value measurements in their entirety are categorized based on the lowest level input that is significant to the valuation. The Commonwealth's assessment of the significance of particular inputs to these fair value measurements requires judgment and considers factors specific to each investment. Investments measured at Net Asset Value (NAV) for fair value are not subject to level classification.

### *(j)* *Accounts Receivable, Loans, General Revenue and Unearned Revenue*

Income taxes receivables, in both the General Fund and statement of net position, include predominantly an estimate of amounts owed by taxpayers for individual and corporate income taxes, net of estimated uncollectible amounts. Income taxes receivables in the General Fund are recognized as revenue when they become measurable and available based on actual collections during the 120 days following the current fiscal year end that are related to taxable years of prior periods. Income taxes receivable also include amounts owed by taxpayers on income earned prior to June 30, 2016, estimated to be collectible but not currently available, and thus are reported as deferred inflows of resources in the General Fund; such deferred inflows are considered revenue in the statement of activities as the availability criteria is not applicable on the government-wide financial statements for revenue recognition.

Act No. 44 of March 30, 2016 allowed citizens to prepay taxes on their individual retirements, educational savings accounts, annuities contracts and on the incremental value of property subject to capital gain. The income taxes collected in advance are recognized as unearned revenue in the balance sheet governmental funds and will be recognized as revenue when the underlying transaction occurs.

The sales and use tax receivable is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during the 30 days following the current fiscal year end related to sales and use transactions due on or before year end. The same treatment is given in the government-wide financial statements given its short period of availability.

Excise tax receivable is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during the 30 days following the current fiscal year end related to transactions that occurred before year end. The same treatment is given in the government-wide financial statements given its short period of availability. Act No. 154 of October 25, 2010 imposed a

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

temporary excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico by nonresident alien individuals, foreign corporations, and foreign partnerships. Act No. 154 applies to income realized and acquisitions occurring after December 31, 2010. Initially, the excise tax would apply until the year 2017. The excise tax is based on the value of the personal property or the services acquired, and was 4% for calendar year 2011, 3.75% in 2012 and 2.75% for portions of 2013 until February 28, 2013. On February 28, 2013, Act No. 2 was enacted raising the then prevailing excise tax rate of 2.75% to 4%, effective immediately, and maintaining such rate fixed at 4% until the year 2017. On January 23, 2017, Act No. 3 of 2017 was enacted extending the fixed rate of 4% for ten additional years. For additional information regarding Act No. 3 of 2017, refer to Note 2 and Note 23.

For purposes of the governmental fund financial statements, property tax revenue represents payments received during the year and payments received (against the current fiscal year and prior years' levies) within the first 90 days of the following fiscal year reduced by tax refunds, if any. Additionally, the government-wide financial statements recognize real property tax revenue (net of refunds), which is not available to the governmental funds in the fiscal year for which the taxes are levied. Act No. 7 of March 9, 2009, as amended, imposed a real property tax, in addition to the one already established for the municipalities of the Commonwealth through the Municipal Revenue Collection Center (CRIM), on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax was applicable during fiscal years 2010 through 2012 and amounted to 0.591% of such properties' appraised value as determined by the CRIM. Act No. 1 of January 31, 2011 eliminated this additional real property tax commencing with the quarter ended June 30, 2011. Collections on this tax, which were due September 1, 2012 and March 1, 2013, were still being received during fiscal year 2016, as a result of delinquent taxpayers bringing their accounts current or taking advantages of amnesty programs offered by the Treasury Department. The Commonwealth applies a 90-day availability period, rather than the traditional 60-day period after year end, in order to cover a period in which most tax extension payments are made. This has been applied consistently over the years.

Intergovernmental receivables are stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions. Intergovernmental receivables primarily represent amounts owed to the Commonwealth for reimbursement of expenditures incurred pursuant to federally funded programs. This intergovernmental receivable is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during one year following the fiscal year end related to transactions that occurred before year end. Those intergovernmental receivables not expected to be collected within the aforementioned one-year period are recorded as deferred inflows of resources. In applying the susceptible to accrual concept to federal grants, revenue is recognized when all applicable eligibility requirements are met (typically, when related expenditures are incurred) and the resources are available. Resources received before eligibility requirements, other than timing, are met are considered unearned revenue. Resources received before timing requirements are met are considered deferred inflows of resources.

Intergovernmental receivables also include taxes that the CRIM, is required to remit to the Commonwealth to be used by the Commonwealth's debt service fund for payment of debt service on general obligations of the Commonwealth. The amount to be remitted is based on the special tax of 1.03% of the assessed value of all real and personal property not exonerated from taxation, which is

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

levied by the CRIM, pursuant to Act No. 83 of 1991. This receivable from CRIM is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during 180 days following the current fiscal year end that are related to transactions that occurred before year end. The amounts from CRIM not expected to be collected within the aforementioned 180 days period are recorded as deferred inflows of resources.

Unemployment, disability, driver's insurance, and other services receivables recognized in the proprietary funds are stated net of estimated allowances for uncollectible accounts.

The accounts receivable from nongovernmental customers of the component units are net of estimated uncollectible amounts. These receivables arise primarily from service charges to users. Accounts receivable from the Primary Government and other component units that arise from service charges, are evaluated for collectability.

Loans of the General Fund are net of estimated uncollectible amounts. These receivables arise from amounts owed by public corporations and municipalities for public insurance and rent paid by the General Fund on their behalf.

The loans of the pension trust funds are presented net of estimated allowances for adjustments and losses in realization. However, most of the loans are secured by mortgage deeds, plan members' contributions, and any unrestricted amounts remaining in escrow. Loans of the component units consist predominantly of loans to the Primary Government, other component units, and municipalities, and are presented net of allowances for uncollectible accounts. The remaining loans of the component units are to small and medium businesses, agricultural, and low-income housing loans from nongovernmental customers, and are presented net of estimated losses on such portfolios.

*(k)   Inventories*

Generally, inventories are valued at cost and predominantly on the first in, first out basis. Governmental fund inventories are recorded as expenditures when purchased rather than capitalized as an asset. Only significant amounts of inventory at the end of the year are capitalized in the governmental funds. However, inventories are always capitalized in the statement of net position of Governmental Activities.

*(l)   Restricted Assets*

Funds set aside for the payment and guarantee of notes and interest payable and for other specified purposes are classified as restricted assets since their use is limited for this purpose by applicable agreements or required by law. Restricted assets in the proprietary funds mainly include amounts set aside for the payment of insurance benefits and lending activities.

*(m) Real Estate Held for Sale or Future Development*

Real estate held for sale or future development is carried at the lower of fair value or cost, which is established by a third-party professional assessment or based upon an appraisal, minus estimated costs to sell. Subsequent declines in the value of real estate available for sale are charged to expenditure/expense.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(n)* *Capital Assets*

Capital assets include land, buildings, building improvements, equipment (including software), vehicles, construction in process, and infrastructure assets, and are reported in the applicable Governmental Activities, Business-Type Activities, and component unit columns in the government-wide financial statements and in the proprietary fund financial statements. The Commonwealth's Primary Government defines capital assets as assets that (i) have an initial, individual cost of $25,000 or more at the date of acquisition and (ii) have a useful life of more than one year. Capital assets are recorded at historical cost or at estimated historical cost, if actual historical cost is not available.

Capital assets donated by third parties are recorded at fair value at the time of donation. Those capital assets donated by related parties are recorded at the carrying value existing at the transferor's records. Major outlays for capital assets and improvements are capitalized as projects are constructed. Interest costs are capitalized during the construction period only for Business-Type Activities and most component units. The costs of normal maintenance and repairs that do not add value to the assets or materially extend asset lives are not capitalized.

Capital assets utilized in the governmental funds are recorded as expenditures in the governmental fund financial statements. Depreciation expense is recorded in the government-wide financial statements, as well as the proprietary funds and component units' financial statements.

Capital assets of the Primary Government are depreciated on the straight-line method over the assets estimated useful life. There is no depreciation recorded for land and construction in progress. The estimated useful life of capital assets is as follows:

|  | Years |
| --- | --- |
| Buildings and building improvements | 20–50 |
| Equipment, furniture, fixtures, vehicles, and software | 5–15 |
| Infrastructure | 50 |

The capital assets of the component units are recorded in accordance with the applicable standards of the component units and under their own individual capitalization thresholds, which includes capitalization of interest. Depreciation has been recorded when required by these standards based on the types of assets, use, and estimated useful lives of the respective assets, and on the nature of each of the component unit's operations.

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

The estimated useful lives of capital assets reported by the component units are as follows:

|  | Years |
|---|---|
| Buildings and building improvements | 3–50 |
| Equipment, furniture, fixtures, vehicles, and software | 3–20 |
| Intangibles, other than software | 3–5 |
| Infrastructure | 10–50 |

In the case of capital assets under service concession arrangements pursuant to GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements* (mostly attributed to PRPA and PRHTA), these are maintained on their books and also stated at cost or at estimated historical cost. Construction in progress made by the third-party operators under these service concession arrangements is not recorded by the aforementioned component units while such construction is still in progress and not ready for use and operation; at which time such constructed assets and improvements will be recognized at their corresponding fair value. These capital assets are not being depreciated after the closing date of their respective service concession arrangements because such agreements require the third-party operators to return the related facilities to these component units in its original or enhanced condition. Such capital assets continue to apply existing capital asset guidance, including depreciation through the closing date of the respective service concession arrangements. Under these service concession arrangements, the aforementioned component units have received from the third-party operator either an upfront compensation fee or capital assets (or the commitment to construct them under the agreement) or both. These resources, net of any contractual obligation from the component units, are considered a deferred inflow of resources, which is recognized into revenue under the straight-line method over the term of the respective agreements.

The Commonwealth follows the provisions of GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*, an amendment to GASB Statement No. 34. This statement establishes guidance for accounting and reporting for the impairment of capital assets and for insurance recoveries. In accordance with these provisions, governments are required to evaluate prominent events or changes in circumstances affecting capital assets to determine whether impairment of a capital asset has occurred. Such events or changes in circumstances that may be indicative of impairment include evidence of physical damage, enactment or approval of laws or regulations or other changes in environmental factors, technological changes or evidence of obsolescence, changes in the manner or duration of use of a capital asset, and construction stoppage among others. The Commonwealth and its components units evaluated its capital assets as required by GASB Statement No. 42 and an impairment of approximately $3.2 million and $14 million was identified at the Primary Government and Discretely Presented Component Units level, respectively, during the year ended June 30, 2016. The $3.2 million impairments at the Primary Government level related to public schools identified for closure. At the Discretely Presented Component Unit level, the impairment of approximately $14 million was identified in the construction in progress account for PRHTA presented in the repairs and maintenance of roads and bridges line item.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(o) Income Tax Refunds Payable*

During the calendar year, the Commonwealth collects individual and corporate income taxes through withholdings and payments from taxpayers. At June 30, the Commonwealth estimates the amount owed to taxpayers for overpayments of income taxes during the first half of the calendar year. These estimated amounts and the actual individual and corporate income tax refunds claimed for prior years but not paid at year end are recorded as income tax refunds payable and as a reduction of tax revenue in both the Governmental Funds and the Governmental Activities.

*(p) Deferred Outflows/Inflows of Resources*

In addition to assets, the statement of net position will sometimes report a separate section for deferred outflows of resources. This separate financial statement element, deferred outflows of resources, represents a consumption of net position that applies to a future period(s) and so will not be recognized as an outflow of resources (expense/expenditure) until then. The Primary Government and the component units have three major captions that qualify for reporting in this category: (i) the unamortized balance of losses on bond refunding, (ii) the accumulated decrease in the fair value of hedging derivatives and (iii) several items related to pensions, the three of them reported in the government-wide statement of net position. A loss on bond refunding results from the difference in the carrying value of refunded debt and its reacquisition price. This amount is capitalized and amortized over the shorter of the life of the refunded or refunding debt. Further information about the balances of unamortized deferred refunding losses can be found in Note 13. With respect to hedging derivatives, the accumulated losses on their fair values are also deferred and amortized as the underlying hedged instrument (in this case, debt) is being repaid or refunded and/or as the hedging derivative is terminated. Further information on the derivative instruments of the Primary Government can be found in Note 21. Of the pension related items (further disclosed in Note 2 (s) and Note 18), changes in proportionate share of contributions and differences between expected and actual experience, are capitalized and recognized over a period equal to the expected remaining working lifetime of active and inactive participants. Net differences between projected and actual earnings on pension plan investments is deferred and recognized over a five-year period. Pension contributions made subsequent to the measurement date will be recognized as a reduction of the net pension liability after the next measurement date. There were no deferred outflows of resources at the governmental funds level.

In addition to liabilities, the statement of net position and the governmental funds' balance sheet will sometimes report a separate section for deferred inflows of resources. This separate financial statement element, deferred inflows of resources, represents an acquisition of net position and resources that applies to a future period(s) and so will not be recognized as an inflow of resources (revenue) until that time. The Primary Government has only one type of caption arising under the modified accrual basis of accounting that qualify for reporting in this category, and that is unavailable revenue. Deferred inflows of resources at the governmental fund level arise when potential revenue does not meet the "available" criteria for revenue recognition in the current period under the modified accrual basis of accounting. In subsequent periods, when the applicable resources become available, the deferred inflow of resources is removed from the balance sheet, and the revenue is recognized. The Primary Government and the component units also have two captions that qualify for reporting in this category in the government-wide- statement of net position and those are the unamortized balance of gains on bond refunding and several items related to pensions. A gain on a bond refunding results when the carrying value of refunded debt is greater than its reacquisition price. This amount is capitalized and amortized

86

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

over the shorter of the life of the refunded or refunding debt. Further information about the balances of unamortized deferred refunding gains can be found in Note 13. Of the pension related items (further disclosed in Note 2 (s) and Note 18), changes in proportionate share of contributions, differences between expected and actual experience and changes in actuarial assumptions, are deferred and recognized over a period equal to the expected remaining working lifetime of active and inactive participants. Net differences between projected and actual earnings on pension plan investments is deferred and recognized over a five-year period. The component units also have one additional item that qualifies for reporting in this category in the government-wide- statement of net position, which is the unamortized balances of the upfront amounts received and related adjustments pertaining to the Service Concession Arrangements of PRPA and PRHTA, further described in Note 17.

*(q) Long-Term Debt*

The liabilities reported in the government-wide- financial statements include the Commonwealth's general obligation and revenue bonds and long-term notes, liabilities under guaranteed obligations, obligations under lease/purchase agreements, obligations for voluntary termination benefits, and long-term liabilities including vacation, sick leave, long-term liabilities to other governmental entities, net pension liability, legal claims, and noncurrent federal fund cost disallowances related to expenditures of federal grants. Long-term obligations financed by proprietary fund types and component units are recorded as liabilities in those funds and in the discretely presented component units' column.

In the government-wide- financial statements, premiums and discounts on long-term debt and other long- term obligations are presented in the columns for Governmental and Business-Type Activities. The same is presented in the proprietary fund financial statements. Bond and note premiums and discounts are deferred and amortized over the life of the debt under a method that approximates the effective interest method. Bonds and notes payable are reported net of the applicable bond premium or discount. Bond issuance costs, other than prepaid insurance, are reported as expenses. In the governmental fund financial statements, governmental funds recognize bond premiums and discounts, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums received on debt issuance are reported as other financing sources while discounts are reported as other financing uses. Issuance costs, whether or not withheld from the actual debt proceeds received, are reported as expenditures.

*(r) Derivative Instruments*

The Commonwealth accounts for derivative instruments in accordance with GASB Statement No. 53, *Accounting and Financial Reporting for Derivative Instruments*. Derivative instruments such as interest rate and commodity swaps, interest rate locks, options (caps, floors, and collars), swaptions, forward contracts, and futures contracts are entered into by governments as investments; as hedges of identified financial risks associated with assets or liabilities, or expected transactions (i.e., hedge able items); to lower the costs of borrowings; to effectively fix cash flows or synthetically fix prices; or to offset the changes in fair value of hedgeable items. Certain derivative instruments, with the exception of synthetic guaranteed investment contracts that are fully benefit responsive, are reported at fair value in the government-wide financial statements. The changes in fair value of effective hedging derivative instruments are reported as deferred inflows or deferred outflows of resources. The changes in fair value of investment derivative instruments (which include ineffective hedging derivative instruments) are reported as part of investment revenue in the current reporting period. Effectiveness is determined by considering whether the changes in cash flows or fair values of the potential hedging derivative

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

instrument substantially offset the changes in cash flows or fair values of the hedge able item. For additional information regarding hedging and investment derivative instruments, refer to Note 21.

*(s) Accounting for Pension Costs*

The Commonwealth accounts for pension costs under the provisions of GASB Statement No. 68, *Accounting and Financial Reporting for Pensions an amendment of GASB Statement No. 27*, and GASB Statement No. 71, *Pension Transitions for Contributions Made Subsequent to the Measurement Date an amendment of GASB Statement No. 68*, which were adopted by a portion of the Primary Government and partially by the Component Units effective July 1, 2014. GASB Statement No. 68 replaced GASB Statement No. 27, *Accounting for Pensions by State and Local Government Employers*, and requires that employers report a net pension liability and related pension accounts, such as pension expense and deferred outflows/inflows of resources as determined by the Retirement Systems, as applicable, under the requirements contained in GASB Statement No. 67, *Financial Reporting for Pension Plans – an amendment of GASB Statement No. 25*. The major fundamental change brought by GASB Statement No. 67, was switching from the then existing "funding based" accounting model, where the Annual Required Contribution (ARC) was compared to the actual payments made and that difference determined the net pension obligation; to an "accrual basis" model, where the total pension obligation (actuarially determined) is compared to the plan net position and the difference represents the net pension liability. In essence, GASB Statement No. 68 brings the effect of GASB Statement No. 67 into the accounting records of the Primary Government and each of the component units and municipalities, whose employees participate in the Retirement Systems.

The Primary Government of the Commonwealth, as well as its component units and the municipalities, are considered "cost sharing" employers of ERS; therefore, they report their allocated share of ERS's net pension liability and the related pension amounts taking in consideration the following, as of June 30, 2016:

- The individual proportion to the collective net pension liability of all the governments participating

- Each participating government employer's proportionate share was consistent with the manner in which contributions were determined and should reflect that participating government employer's projected long-term contribution effort relative to that of all the participating government employers. Contributions that separately financed specific liabilities of an individual participating government employer to ERS (such a local participating government employer early retirement incentives) were not included in determining the proportionate share of the overall projected long-term contribution effort.

- The contributions that reflected each participating government employer's projected long-term contribution effort are the Act No. 116 of 2011 statutory payroll-based contribution, the Act No. 3 of 2013 supplemental contribution, other special contributions, and the Act No. 32 of 2013 Additional Uniform Contribution (AUC). Other contributions that did not reflect a participating government employer's projected long-term contribution effort were excluded from the proportionate share calculation.

- The AUC, required a contribution that it is determined in the aggregate and ERS then allocated the total amount to each participating government employer based on such participating government employer's payroll. However, due to a history of non-payment of the AUC by many participating government employers and the expected continuing nonpayment of such contributions, it was

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

determined that the collected AUC amounts would be excluded from the proportionate share determination, in order to prevent an overallocation of net pension liability amounts to those participating government employers who paid their AUC (or are expected to do so) and an under allocation of net pension liability amounts to the participating government employers who did not pay their AUC (or are not expected to do so).

TRS is a single employer pension plan for purposes of GASB Statement No. 68 reporting, as it covers those eligible participants who are teachers within the Commonwealth public education system and are employed by the Commonwealth's Department of Education, which is a single government employer. Similarly, JRS is a single employer pension plan for purposes of GASB Statement No. 68 reporting, as it covers those eligible participants who are judges within the Commonwealth judiciary system and are employed by the Commonwealth's Court Administration Office.

Neither GASB Statements No. 68 nor No. 71 affect the way the Commonwealth may choose to fund its pension obligations.

For purposes of the stand-alone financial statements of each of the blended and discretely presented component units, which audit reports for fiscal year 2016 had already been issued prior to the issuance of the accompanying financial statements of the Commonwealth, ERS did not timely provide the information needed to apply GASB Statements No. 68 and No. 71. Therefore, the majority of the component units were unable to apply these accounting pronouncements, and certain component units applied them based on unaudited information. As a result, the majority of the component units have maintained the accounting for pension costs in accordance with GASB Statement No. 27, also based from the standpoint of a participant in a multiple employer cost-sharing plan. Accordingly, pension costs recognized for most of the component units were principally equal to the statutorily or contractually required contributions, with a liability recorded for any unpaid required contributions. The component units did not record pension related assets or liabilities because they constitute the statutorily required contributions; except for those that applied GASB Statement No. 68 based on the unaudited information received from ERS. For additional information, refer to Notes 18 (g) and 18 (h).

*(t)*  *Other Postemployment Benefits*

In addition to the pension benefits described in Note 18, the Commonwealth provided, prior to August 23, 2017, other retirement benefits, such as summer and Christmas bonus, and postemployment healthcare benefits (collectively referred to as other post-employment benefits or OPEB) for its retired employees in accordance with local law. Substantially, all of the employees may become eligible for these benefits if they reach normal retirement age while working for the Commonwealth. The Commonwealth accounts for OPEB under the provisions of GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. This statement requires a systematic, accrual basis measurement and recognition of OPEB cost (expense) over a period that approximates employees' years of service and provides information about actuarial accrued liabilities associated with OPEB and whether and to what extent progress is being made in funding the plan. Annual postemployment benefits cost should equal the annual required contribution to the plans, calculated in accordance with certain parameters. For additional information regarding OPEB, refer to Note 19.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The Christmas bonus and the summer bonus benefits are provided by Commonwealth statutes. The Christmas bonus and the summer bonus paid by the Commonwealth to the retired employees during the year ended June 30, 2016 was $600 per retiree, except for those retirees of the ERS, which had their summer bonus eliminated and the Christmas bonus reduced from $600 per retiree to $200 per retiree pursuant to Act No. 3 of April 4, 2013, which reformed ERS. The total amount of Christmas and summer bonus paid during fiscal year 2016 was approximately $30.1 million. These benefits are recorded as expenditures when paid in the General Fund.

Bonus for medicines is also provided to retirees by Commonwealth statutes. The total amount of this bonus paid during fiscal year 2016 was approximately $15.4 million. These benefits are recorded as expenditures when paid in the General Fund.

*(u)* *Compensated Absences*

The vacation policy of the Commonwealth generally provides for the accumulation of 2.5 days per month, except for the teachers who accrue 4 days per month, up to an annual maximum of 40 days. Vacation time accumulated is fully vested by the employees from the first day of work up to a maximum of 60 days. Employees generally accumulate sick leave at a rate of 1.5 days per month up to an annual maximum of 18 days and an accumulated maximum of 90 days. Upon retirement, an employee receives compensation for all accumulated unpaid vacation leave at the current rate regardless of years of service; and for all accumulated unpaid sick leave if the employee has at least 10 years of service with the Commonwealth. The liability for compensated absences reported in the government-wide and proprietary fund financial statements has been calculated using the vesting method (except for Police department employees), in which leave amounts for both employees who currently are eligible to receive termination payments and other employees who are expected to become eligible in the future to receive such payments upon termination, are included. The liability has been calculated based on the employees' current salary level and includes salary related costs (e.g., social security and Medicare tax). The liability for compensated absences of Police department employees is estimated based on actual termination payments made and projected statistically, which is a hybrid between the vesting and termination methods. The governmental fund financial statements record expenditures when employees are paid for leave, or when the balance due is accrued upon the employee's separation from employment. Compensated absence accumulation policies for the blended component units and discretely presented component units vary from entity to entity based on negotiated agreements and other factors agreed upon between the management of these entities and their employees.

*(v)* *Termination Benefits*

The Commonwealth accounts for termination benefits in accordance with GASB Statement No. 47, *Accounting for Termination Benefits*. Pursuant to the provisions of GASB Statement No. 47, in financial statements prepared on the accrual basis of accounting, employers should recognize a liability and expense for voluntary termination benefits (for example, early retirement incentives) when the offer is accepted and the amount can be estimated. A liability and expense for involuntary termination benefits (for example, severance benefits) should be recognized in the government-wide financial statements when: (i) a plan of termination has been approved by those with the authority to commit the government to the plan, (ii) the plan has been communicated to the employees, and (iii) the amount can be estimated. In financial statements prepared on the modified accrual basis of accounting, liabilities and expenditures for termination benefits should be recognized to the extent the liabilities are normally expected to be liquidated with expendable available financial resources.

90

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

### (w) Encumbrances

Encumbrance accounting, under which purchase orders, contracts, and other commitments for expenditures are recorded to reflect the use of the applicable spending appropriations, is used by the General Fund during the fiscal year to control expenditures. The unencumbered balance of any appropriation of the General Fund at the end of the fiscal year lapses immediately. Appropriations, other than in the General Fund, are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending.

### (x) Interfund Activities and Intraentity Transactions

The Commonwealth had the following interfund activities and intraentity transactions:

*Interfund Transfer* – Legally required transfers are reported when incurred as transfer in by the recipient fund and as transfer out by the disbursing fund, with receivables and payables presented as amounts due to and due from other funds. Advances between funds are also presented as amounts due to and due from other funds. However, these advances, transfers, and related amounts receivable and payable are considered internal balances and activities that have been eliminated in the government-wide financial statements. Interfund receivables are stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions.

*Intraentity Transactions* – There are two types of intraentity transactions: First, the flow of resources between the Primary Government and its component units, and among the component units. This flow of resources and the related outstanding balances are reported as if they were external transactions. However, flow of resources between the Primary Government and blended component units are classified as interfund activity, as described above. Second, the intraentity balances between the Primary Government and discretely presented component units are equivalent to long-term debt financing. The Primary Government's liability is reported in the statement of net position, the proceeds in the Primary Government's statement of revenue, expenditures and changes in fund balance governmental funds, and the asset in the discretely presented component units' statement of net position. Amounts due from component units are stated net of estimated allowances for uncollectible accounts, which are determined, by past collection experience and current economic conditions.

### (y) Lottery Revenue and Prizes

The revenue, expenses, and prizes awarded by the Lottery of Puerto Rico and the Additional Lottery System, reported within the lotteries enterprise fund, are recognized as drawings are held. Moneys collected prior to June 30 for tickets related to drawings to be conducted subsequent to June 30 are reported as unearned revenue. Unpaid prizes awarded as of June 30, are reported as obligation for unpaid lottery prices. Unclaimed prizes expire after six months and are transferred to the General Fund.

### (z) Risk Management

The Commonwealth purchases commercial insurance covering casualty, theft, tort claims, and other losses for the Primary Government, most component units, and the municipalities. The Commonwealth is reimbursed for premium payments made on behalf of the component units and the municipalities. The current insurance policies have not been canceled or terminated. For workers' compensation, the Commonwealth has a discretely presented component unit, the SIFC, which provides workers'

91

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

compensation to both public and private employees. The Commonwealth's blended component units are responsible for assuring that its property is properly insured. Annually, these blended component units compile the information of all property owned and its respective replacement value and purchases its property and casualty insurance policies. Insurance coverage for fiscal year 2016 remained similar to those of prior years. In the last three years, the Commonwealth's or the component units' insurance settlements have not exceeded the amount of coverage.

Certain discretely presented and blended component units combine commercial insurance with internal self-insurance funds covering specific risks related to their specialized operations. The most significant self-insurance funds reside at the discretely presented component unit's level and are described in detail in Note 16.

*(aa) Tobacco Settlement*

The Commonwealth follows GASB Technical Bulletin No. 2004 1, *Tobacco Settlement Recognition and Financial Reporting Entity Issue*, as amended by GASB Statement No. 48, *Sales and Pledges of Receivables and Future Revenues and Intra Entity Transfers of Assets and Future Revenues*, (the TB), which provides accounting guidance for entities created to obtain the rights to all or a portion of future tobacco settlement resources and for the governments that create such entities.

The TB indicates that the entity created to obtain the rights, generally referred to as Tobacco Settlement Authority (in the Commonwealth's case, the Children's Trust), should be considered a blended component unit of the government that created it. The TB also states that the government receiving the payments from the tobacco companies under the agreement, referred to as settling governments, should recognize a receivable and revenue for tobacco settlement resources when an event occurs. The event that results in the recognition of an asset and revenue by the settling government is the domestic shipment of cigarettes. The TB indicates that accruals should be made by the settling government and tobacco settlement authorities for estimated shipments from January 1 to their respective fiscal year ends, since the annual payments are based on a calendar year. However, under the modified accrual basis of accounting at the fund level, revenue should be recognized only to the extent that resources are available.

*(bb) Use of Estimates*

The preparation of the basic financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the basic financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*(cc) New Accounting Standards Adopted*

The following new accounting standards were adopted by the Commonwealth effective July 1, 2015:

- GASB Statement No. 72, *Fair Value Measurement and Application.* This statement requires a government to use valuation techniques that are appropriate under the circumstances and for which sufficient data are available to measure fair value. The techniques should be consistent with one or more of the following approaches; the market approach, the cost approach, or the income approach. This statement also establishes a three-level hierarchy of inputs to valuation techniques used to measure fair value. Level 1 inputs are quoted prices (unadjusted) in active markets for identical

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

assets or liabilities. Level 2 inputs are inputs, other than quoted prices, included within Level 1 that are observable for the assets or liability, either directly or indirectly. Finally, Level 3 inputs are unobservable inputs, such as management's assumptions of the default rate among underlying mortgages of a mortgage backed security. There was no material impact on the Commonwealth's financial statements as a result of the implementation of GASB Statement No. 72.

- GASB Statement No. 73, *Accounting and Financial Reporting for Pensions and Related Assets That Are Not within the Scope of GASB Statement No. 68, and Amendments to Certain Provisions of GASB Statements No. 67 and No. 68.* This statement establishes requirements for defined benefit pensions that are not within the scope of GASB Statement No. 68, *Accounting and Financial Reporting for Pensions,* as well as for the assets accumulated for purposes of providing those pensions. In addition, it establishes requirements for defined contribution pensions that are not within the scope of GASB Statement No. 68. It also amends certain provisions of GASB Statement No. 67, *Financial Reporting for Pension Plans*, and GASB Statement No. 68 for pension plans and pensions that are within their respective scopes. The provisions of this statement that address accounting and financial reporting by employers and governmental nonemployer contributing entities for pensions that are not within the scope of GASB Statement No. 68 are effective for financial statements for fiscal years beginning after June 15, 2016, and the provisions of this statement that address financial reporting for assets accumulated for purposes of providing those pensions are effective for fiscal years beginning after June 15, 2015. The provisions of this statement for pension plans that are within the scope of GASB Statement No. 67 or for pensions that are within the scope of GASB Statement No. 68 are effective for fiscal years beginning after June 15, 2015. There was not material impact on the Commonwealth's financial statements as a result of the implementation of the applicable parts of GASB Statement No. 73.

- GASB Statement No. 76, *The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments.* This statement identifies in the context of the current governmental financial reporting environment the hierarchy of generally accepted accounting principles (GAAP). The "GAAP hierarchy" consists of the sources of accounting principles used to prepare financial statements of state and local governmental entities in conformity with GAAP and the framework for selecting those principles. This statement reduces the GAAP hierarchy to two categories of authoritative GAAP and addresses the use of authoritative and nonauthoritative literature in the event that the accounting treatment for a transaction or other event is not specified within a source of authoritative GAAP. This statement supersedes GASB Statement No. 55, *The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments.* The adoption of this statement had no impact on the Commonwealth's financial statements.

- GASB Statement No. 79, *Certain External Investment Pools and Pool Participants.* This statement addresses accounting and financial reporting for certain external investment pools and pool participants. Specifically, it establishes criteria for an external investment pool to qualify for making the election to measure all of its investments at amortized cost for financial reporting purposes. An external investment pool qualifies for that reporting if it meets all of the applicable criteria established in this statement. The specific criteria address (1) how the external investment pool transacts with participants; (2) requirements for portfolio maturity, quality, diversification, and liquidity; and (3) calculation and requirements of a shadow price. Significant noncompliance prevents the external investment pool from measuring all of its investments at amortized cost for financial reporting

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

purposes. Professional judgment is required to determine if instances of noncompliance with the criteria established by this statement during the reporting period, individually or in the aggregate, were significant. If an external investment pool does not meet the criteria established by this statement, that pool should apply the provisions in paragraph 16 of GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investment Pools*, as amended. If an external investment pool meets the criteria in this statement and measures all of its investments at amortized cost, the pool's participants also should measure their investments in that external investment pool at amortized cost for financial reporting purposes. If an external investment pool does not meet the criteria in this statement, the pool's participants should measure their investments in that pool at fair value, as provided in paragraph 11 of GASB Statement No. 31, as amended. This statement establishes additional footnote disclosure requirements for qualifying external investment pools that measure all of their investments at amortized cost for financial reporting purposes and for governments that participate in those pools. Those disclosures for both the qualifying external investment pools and their participants include information about any limitations or restrictions on participant withdrawals. This statement is effective for fiscal year 2016, except for certain provisions on portfolio quality, custodial credit risk, and shadow pricing. Those provisions are not effective until fiscal year 2017. There was no material impact on the Commonwealth's financial statements as a result of the implementation of the applicable parts of GASB Statement No. 79.

**(dd)   Accounting Pronouncements Issued But Not Yet Effective**

The following new accounting standards have been issued but are not yet effective:

- GASB Statement No. 74, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*. This statement replaces GASB Statements No. 43, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*, as amended, and GASB Statement No. 57, *OPEB Measurements by Agent Employers and Agent Multiple Employer Plans*. It also includes requirements for defined contribution OPEB plans that replace the requirements for those OPEB plans in GASB Statement No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*, as amended, GASB Statement No. 43, and GASB Statement No. 50, *Pension Disclosures*. The scope of this statement includes OPEB plans defined benefit and defined contribution administered through trusts that meet the following criteria:

  – Contributions from employers and nonemployer contributing entities to the OPEB plan and earnings on those contributions are irrevocable.

  – OPEB plan assets are dedicated to providing OPEB to plan members in accordance with the benefit terms.

  – OPEB plan assets are legally protected from the creditors of employers, nonemployer contributing entities, and the OPEB plan administrator. If the plan is a defined benefit OPEB plan, plan assets also are legally protected from creditors of the plan members.

This statement also includes requirements to address financial reporting for assets accumulated for purposes of providing defined benefit OPEB through OPEB plans that are not administered through trusts that meet the specified criteria. The provisions of this statement are effective for fiscal years beginning after June 15, 2016.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- GASB Statement No. 75, *Accounting and Financial Reporting for Postemployment Benefits Other Than Pensions*. This Statement replaces the requirements of GASB Statements No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*, as amended, and GASB Statement No. 57, *OPEB Measurements by Agent Employers and Agent Multiple Employer Plan*, for OPEB. GASB Statement No. 74, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*, establishes new accounting and financial reporting requirements for OPEB plans. The scope of this statement addresses accounting and financial reporting for OPEB that is provided to the employees of state and local governmental employers. This statement establishes standards for recognizing and measuring liabilities, deferred outflows of resources, deferred inflows of resources, and expense/expenditures. For defined benefit OPEB, this statement identifies the methods and assumptions that are required to be used to project benefit payments, discount projected benefit payments to their actuarial present value, and attribute that present value to periods of employee service. Footnote disclosure and required supplementary information requirements about defined benefit OPEB also are addressed. In addition, this statement details the recognition and disclosure requirements for employers with payables to defined benefit OPEB plans that are administered through trusts that meet the specified criteria and for employers whose employees are provided with defined contribution OPEB. This statement also addresses certain circumstances in which a nonemployer entity provides financial support for OPEB of employees of another entity. The provisions of this statement are effective for fiscal years beginning after June 15, 2017.

- GASB Statement No. 77, *Tax Abatement Disclosures*. This statement establishes financial reporting standards for tax abatement agreements entered into by state and local governments. The disclosures required by this statement encompass tax abatements resulting from both (a) agreements that are entered into by the reporting government and (b) agreements that are entered into by other governments and that reduce the reporting government's tax revenue. The provisions of this statement should be applied to all state and local governments subject to tax abatement agreements. For financial reporting purposes, a tax abatement is defined as a reduction in tax revenue that results from an agreement between one or more governments and an individual or entity in which (a) one or more governments promise to forgo tax revenue to which they are otherwise entitled and (b) the individual or entity promises to take a specific action after the agreement has been entered into that contributes to economic development or otherwise benefits the governments or the citizens of those governments. A transaction's substance, not its form or title, is a key factor in determining whether the transaction meets the definition of a tax abatement for the purpose of this Statement. The provisions of this statement are effective for financial statements for periods beginning after December 15, 2015.

- GASB Statement No. 78, *Pensions Provided Through Certain Multiple Employer Defined Benefit Plans*. This Statement addresses a practice issue regarding the scope and applicability of GASB Statement No. 68. This issue is associated with pensions provided through certain multiple employer defined benefit pension plans and to state or local governmental employers whose employees are provided with such pensions. Prior to the issuance of this statement, the requirements of GASB Statement No. 68 applied to the financial statements of all state and local governmental employers whose employees are provided with pensions through pension plans that are administered through trusts that meet the criteria in paragraph 4 of that statement. This statement amends the scope and applicability of GASB Statement No. 68 to exclude pensions provided to employees of state or local governmental employers through a cost sharing multiple employer

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

defined benefit pension plan that (1) is not a state or local governmental pension plan, (2) is used to provide defined benefit pensions both to employees of state or local governmental employers and to employees of employers that are not state or local governmental employers, and (3) has no predominant state or local governmental employer (either individually or collectively with other state or local governmental employers that provide pensions through the pension plan). This statement establishes requirements for recognition and measurement of pension expense, expenditures, and liabilities; note disclosures; and required supplementary information for pensions that have the characteristics described above. This statement is not effective until fiscal year 2017.

- GASB Statement No. 80, *Blending Requirements for Certain Component Units*. This statement improves financial reporting by clarifying the financial statement presentation requirements for certain component units. This statement amends the blending requirements established in paragraph 53 of GASB Statement No. 14, *The Financial Reporting Entity*, as amended. The additional criterion requires blending of a component unit incorporated as a not for profit corporation in which the Primary Government is the sole corporate member. The additional criterion does not apply to component units included in the financial reporting entity pursuant to the provisions of GASB Statement No. 39, *Determining Whether Certain Organizations Are Component Units*. This statement is not effective until fiscal year 2017.

- GASB Statement No. 81, *Irrevocable Split Interest Agreements*. This statement improves accounting and financial reporting for irrevocable split interest agreements by providing recognition and measurement guidance for situations in which a government is a beneficiary of the agreement. Split interest agreements are a type of giving agreement used by donors to provide resources to two or more beneficiaries, including governments. Split interest agreements can be created through trusts, or other legally enforceable agreements with characteristics that are equivalent to split interest agreements, in which a donor transfers resources to an intermediary to hold and administer for the benefit of a government and at least one other beneficiary. Examples of these types of agreements include charitable lead trusts, charitable remainder trusts, and life interests in real estate. This statement requires that a government that receives resources pursuant to an irrevocable split interest agreement recognize assets, liabilities, and deferred inflows of resources at the inception of the agreement. Furthermore, this statement requires that a government recognize assets representing its beneficial interests in irrevocable split interest agreements that are administered by a third party, if the government controls the present service capacity of the beneficial interests. This statement requires that a government recognize revenue when the resources become applicable to the reporting period. This statement is not effective until fiscal year 2018.

- GASB Statement No. 82, *Pension Issues an Amendment of GASB Statements No. 67, No. 68 and No. 73*. This statement addresses certain issues that have been raised with respect to GASB Statements No. 67, No. 68, and No. 73. The statement is designed to improve consistency in the application of the pension standards by clarifying or amending related areas of existing guidance. Specifically, this statement addresses issues regarding (1) the presentation of payroll related measures in required supplementary information, (2) the selection of assumptions and the treatment of deviations from the guidance in an Actuarial Standard of Practice for financial reporting purposes, and (3) the classification of payments made by employers to satisfy employee (plan member) contribution requirements. Prior to the issuance of this statement, GASB Statements No. 67 and No. 68 required presentation of covered employee payroll, which is the payroll of employees that are provided with pensions through the pension plan, and ratios that use that measure, in schedules of required supplementary information. This statement amends GASB Statements No. 67 and No. 68

96

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

to instead require the presentation of covered payroll, defined as the payroll on which contributions to a pension plan are based, as well as ratios that use that measure. This statement clarifies that a deviation, as the term is used in Actuarial Standards of Practice issued by the Actuarial Standards Board, from the guidance in an Actuarial Standard of Practice is not considered to be in conformity with the requirements of GASB Statement No. 67, GASB Statement No. 68, or GASB Statement No. 73 for the selection of assumptions used in determining the total pension liability and related measures. This statement clarifies that payments made by an employer to satisfy contribution requirements that are identified by the pension plan terms as plan member contribution requirements should be classified as plan member contributions for purposes of GASB Statement No. 67 and as employee contributions for purposes of GASB Statement No. 68. It also requires that an employer's expense and expenditures for those amounts be recognized in the period for which the contribution is assessed and classified in the same manner as the employer classifies similar compensation other than pensions (for example, as salaries and wages or as fringe benefits). This statement is not effective until fiscal year 2017, except for the requirements of this statement for the selection of assumptions in a circumstance in which an employer's pension liability is measured as of a date other than the employer's most recent fiscal year end. In that circumstance, the requirements for the selection of assumptions are effective for that employer in the first reporting period in which the measurement date of the pension liability is on or after June 15, 2017.

- GASB Statement No. 83, *Certain Asset Retirement Obligations*. This statement addresses accounting and financial reporting for certain asset retirement obligations (AROs). An ARO is a legally enforceable liability associated with the retirement of a tangible capital asset. A government that has legal obligations to perform future asset retirement activities related to its tangible capital assets should recognize a liability based on the guidance in this statement. This statement establishes criteria for determining the timing and pattern of recognition of a liability and a corresponding deferred outflow of resources for AROs. This statement requires that recognition occur when the liability is both incurred and reasonably estimable. The determination of when the liability is incurred should be based on the occurrence of external laws, regulations, contracts, or court judgments, together with the occurrence of an internal event that obligates a government to perform asset retirement activities. Laws and regulations may require governments to take specific actions to retire certain tangible capital assets at the end of the useful lives of those capital assets, such as decommissioning nuclear reactors and dismantling and removing sewage treatment plants. Other obligations to retire tangible capital assets may arise from contracts or court judgments. Internal obligating events include the occurrence of contamination, placing into operation a tangible capital asset that is required to be retired, abandoning a tangible capital asset before it is placed into operation, or acquiring a tangible capital asset that has an existing ARO.

This statement requires the measurement of an ARO to be based on the best estimate of the current value of outlays expected to be incurred. The best estimate should include probability weighting of all potential outcomes, when such information is available or can be obtained at reasonable cost. If probability weighting is not feasible at reasonable cost, the most likely amount should be used. This statement requires that a deferred outflow of resources associated with an ARO be measured at the amount of the corresponding liability upon initial measurement.

This statement requires the current value of a government's AROs to be adjusted for the effects of general inflation or deflation at least annually. In addition, it requires a government to evaluate all relevant factors at least annually to determine whether the effects of one or more of the factors are

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

expected to significantly change the estimated asset retirement outlays. A government should remeasure an ARO only when the result of the evaluation indicates there is a significant change in the estimated outlays. The deferred outflows of resources should be reduced and recognized as outflows of resources (for example, as an expense) in a systematic and rational manner over the estimated useful life of the tangible capital asset.

The requirements of this statement are effective for reporting periods beginning after June 15, 2018.

- GASB Statement No. 84, *Fiduciary Activities.* The objective of this statement is to improve guidance regarding the identification of fiduciary activities for accounting and financial reporting purposes and how those activities should be reported. This statement establishes criteria for identifying fiduciary activities of all state and local governments. The focus of the criteria generally is on (1) whether a government is controlling the assets of the fiduciary activity and (2) the beneficiaries with whom a fiduciary relationship exists. Separate criteria are included to identify fiduciary component units and postemployment benefit arrangements that are fiduciary activities. An activity meeting the criteria should be reported in a fiduciary fund in the basic financial statements. Governments with activities meeting the criteria should present a statement of fiduciary net position and a statement of changes in fiduciary net position. An exception to that requirement is provided for a Business-Type activity that normally expects to hold custodial assets for three months or less. This statement describes four fiduciary funds that should be reported, if applicable: (1) pension (and other employee benefit) trust funds, (2) investment trust funds, (3) private purpose trust funds, and (4) custodial funds. Custodial funds generally should report fiduciary activities that are not held in a trust or equivalent arrangement that meets specific criteria. This statement also provides for recognition of a liability to the beneficiaries in a fiduciary fund when an event has occurred that compels the government to disburse fiduciary resources.

Events that compel a government to disburse fiduciary resources occur when a demand for the resources has been made or when no further action, approval, or condition is required to be taken or met by the beneficiary to release the assets. The requirements of this statement are effective for reporting periods beginning after December 15, 2018.

- GASB Statement No. 85, *Omnibus 2017.* The objective of this statement is to address practice issues that have been identified during implementation and application of certain GASB Statements. This statement addresses a variety of topics including issues related to blending component units, goodwill, fair value measurement and application, and postemployment benefits (pensions and other postemployment benefits [OPEB]). Specifically, this statement addresses the following topics:

  – Blending a component unit in circumstances in which the Primary Government is a Business-Type activity that reports in a single column for financial statement presentation.

  – Reporting amounts previously reported as goodwill and "negative" goodwill.

  – Classifying real estate held by insurance entities.

  – Measuring certain money market investments and participating interest earning investment contracts at amortized cost.

  – Timing of the measurement of pension or OPEB liabilities and expenditures recognized in financial statements prepared using the current financial resources measurement focus.

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

- – Recognizing on behalf payments for pensions or OPEB in employer financial statements.

- – Presenting payroll related measures in required supplementary information for purposes of reporting by OPEB plans and employers that provide OPEB.

- – Classifying employer paid member contributions for OPEB.

- – Simplifying certain aspects of the alternative measurement method for OPEB.

- – Accounting and financial reporting for OPEB provided through certain multiple employer defined benefit OPEB plans.

The requirements of this Statement are effective for reporting periods beginning after June 15, 2017. Earlier application is encouraged.

- GASB Statement No. 86, *Certain Debt Extinguishment Issues*. This statement improves the consistency in accounting and financial reporting for in substance defeasance of debt by providing guidance for transactions in which cash and other monetary assets acquired with only existing resources – resources other than the proceeds of refunding debt – are placed in an irrevocable trust for the sole purpose of extinguishing debt. This statement also improves accounting and financial reporting for prepaid insurance on debt that is extinguished and notes to financial statements for debt that is defeased in substance. The requirements of this statement are effective for fiscal years beginning after June 15, 2017.

- GASB Statement No. 87, *Leases.* The objective of this statement is to better meet the information needs of financial statement users by improving accounting and financial reporting for leases by governments. This statement increases the usefulness of governments' financial statements by requiring recognition of certain lease assets and liabilities for leases that previously were classified as operating leases and recognized as inflows of resources or outflows of resources based on the payment provisions of the contract. It establishes a single model for lease accounting based on the foundational principle that leases are financings of the right to use an underlying asset. Under this statement, a lessee is required to recognize a lease liability and an intangible right to use lease asset, and a lessor is required to recognize a lease receivable and a deferred inflow of resources, thereby enhancing the relevance and consistency of information about governments' leasing activities. The requirements of this statement are effective for reporting periods beginning after December 15, 2019.

- GASB Statement No. 88, *Certain Disclosures Related to Debt, Including Direct Borrowings and Direct Placements.* The primary objective of this statement is to improve the information that is disclosed in notes to government financial statements related to debt, including direct borrowings and direct placements. It also clarifies which liabilities governments should include when disclosing information related to debt. This statement defines debt for purposes of disclosure in notes to financial statements as a liability that arises from a contractual obligation to pay cash (or other assets that may be used in lieu of cash) in one or more payments to settle an amount that is fixed at the date the contractual obligation is established. This statement requires that additional essential information related to debt be disclosed in notes to financial statements, including unused lines of credit; assets pledged as collateral for the debt; and terms specified in debt agreements related to significant events of default with finance-related consequences, significant termination events with finance-related consequences, and significant subjective acceleration clauses. For notes to financial statements related to debt, this statement also requires that existing and additional information be

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

provided for direct borrowings and direct placements of debt separately from other debt. The requirements of this statement are effective for reporting periods beginning after June 15, 2018.

- GASB Statement No. 89, *Accounting for Interest Cost Incurred Before the End of a Construction Period*. This statement establishes accounting requirements for interest cost incurred before the end of a construction period. Such interest cost includes all interest that previously was accounted for in accordance with the requirements of paragraphs 5–22 of GASB Statement No. 62, *Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements*, which are superseded by this statement. This statement requires that interest cost incurred before the end of a construction period be recognized as an expense in the period in which the cost is incurred for financial statements prepared using the economic resources measurement focus. As a result, interest cost incurred before the end of a construction period will not be included in the historical cost of a capital asset reported in a business-type activity or enterprise fund. This statement also reiterates that in financial statements prepared using the current financial resources measurement focus, interest cost incurred before the end of a construction period should be recognized as an expenditure on a basis consistent with governmental fund accounting principles. The requirements of this statement are effective for reporting periods beginning after December 15, 2019.

- GASB Statement No. 90, *Majority Equity Interest*. The primary objectives of this Statement are to improve the consistency and comparability of reporting a government's majority equity interest in a legally separate organization and to improve the relevance of financial statement information for certain component units. It defines a majority equity interest and specifies that a majority equity interest in a legally separate organization should be reported as an investment if a government's holding of the equity interest meets the definition of an investment. A majority equity interest that meets the definition of an investment should be measured using the equity method, unless it is held by a special-purpose government engaged only in fiduciary activities, a fiduciary fund, or an endowment (including permanent and term endowments) or permanent fund. Those governments and funds should measure the majority equity interest at fair value. For all other holdings of a majority equity interest in a legally separate organization, a government should report the legally separate organization as a component unit, and the government or fund that holds the equity interest should report an asset related to the majority equity interest using the equity method. This Statement establishes that ownership of a majority equity interest in a legally separate organization results in the government being financially accountable for the legally separate organization and, therefore, the government should report that organization as a component unit. This Statement also requires that a component unit in which a government has a 100 percent equity interest account for its assets, deferred outflows of resources, liabilities, and deferred inflows of resources at acquisition value at the date the government acquired a 100 percent equity interest in the component unit. Transactions presented in flows statements of the component unit in that circumstance should include only transactions that occurred subsequent to the acquisition. The requirements of this statement are effective for reporting periods beginning after December 15, 2018.

Management is evaluating the impact that these statements may have on the Commonwealth basic financial statements upon adoption.

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

## (2) Going Concern, Uncertainties and Liquidity Risk

The following discussion covers in detail the Commonwealth's liquidity risks and uncertainties, and the detailed plans set forth in order to address the complex challenges ahead.

### (a) Going Concern – Primary Government

Management believes that there is substantial doubt about the Commonwealth's ability to continue as a going concern because of the following:

- The Commonwealth is in the midst of a profound fiscal, economic and liquidity crisis, the culmination of many years of significant governmental deficits, a prolonged economic recession, high unemployment, population decline, and high levels of debt and pension obligations. Further stressing the Commonwealth's liquidity is the vulnerability of revenue streams during times of major economic downturns and large health care, pension and debt service costs. As the Commonwealth's tax base has shrunk and its revenues affected by prevailing economic conditions, health care, pension and debt service costs have become an increasing portion of the General Fund budget, which has resulted in reduced funding available for other essential services. The Commonwealth's high level of debt and unfunded pension liabilities and the resulting required allocation of revenues to service debt and pension obligations contributed to significant budget deficits for several years, which deficits the Commonwealth financed, further increasing the amount of its debt.  These matters and the Commonwealth's liquidity constraints, among other factors, adversely affected its credit ratings and its ability to obtain financing at reasonable interest rates, if at all.

- Since June 30, 2014, the principal rating agencies have continued to lower their rating on the general obligation bonds of the Commonwealth, which had already been placed in a default rating of "D." They also lowered similarly to a default grade their ratings on the bonds of the PBA and GDB, while the ratings on the bonds of COFINA have been lowered multiple notches to a current noninvestment grade level of Ca, CC and D (depending on the particular rating agency), but certain COFINA bonds have been placed on positive outlook as the result of developments in the Title III cases.

- The Primary Government reflects a net deficit of approximately $70.3 billion as of June 30, 2016. The Commonwealth's General Fund shows a fund deficit of approximately $1.2 billion as of June 30, 2016.

- For the fiscal year ended June 30, 2016, the Legislature of Puerto Rico did not appropriate approximately $94 million for the debt service payment of the PFC bonds which are obligations of certain component units of the Commonwealth that are payable solely from such appropriations.

- On April 6, 2016, the Moratorium Act under which, the Commonwealth and certain of its component units suspended their respective debt service payments. In particular, the Commonwealth suspended the payment of approximately $779 million in debt service on general obligation bonds due July 1, 2016 (net of approximately $352 million of capitalized interest and escrow accounts). For additional information regarding the Moratorium Act and other relevant legislation, refer to Notes 3 and 23.

- On May 1, 2017, the stay under Title IV of PROMESA expired, permitting the substantial litigation brought by bondholders and other creditors against the Commonwealth and its component units to resume. As a result, on May 3, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for the Commonwealth by filing a petition for relief under Title III of

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

PROMESA. Title III of PROMESA incorporates the automatic stay provisions of Bankruptcy Code section 362 and 922, which are made applicable to the Title III cases pursuant to PROMESA section 301(a).

*Remediation Plan – Primary Government*

On March 13, 2017, the Oversight Board certified the initial fiscal plan for the Commonwealth. The fiscal plan has been subject to various revisions. On October 23, 2018, the Oversight Board certified its own new fiscal plan for the Commonwealth (the Board Fiscal Plan), which included the following categories of structural reforms and fiscal measures:

(i)     *Human Capital and Welfare Reform*

(ii)    *Ease of Doing Business Reform*

(iii)   *Energy and Power Regulatory Reform*

(iv)    *Infrastructure and Capital Investment Reform*

(v)     *Establishment of the Office of the CFO*

(vi)    *Agency Efficiency Measures*

(vii)   *Healthcare Reform*

(viii)  *Tax Compliance and Fees Enhancement*

(ix)    *Reduction in UPR and Municipality Appropriations*

(x)     *Pension Reform*

(xi)    *Fiscal Controls and Transparency*

On January 18, 2019, the Oversight Board requested the Governor to submit a new Commonwealth fiscal plan to replace the Board Fiscal Plan.  According to the Oversight Board's prescribed schedule, the Oversight Board anticipates certifying a new Commonwealth fiscal plan on April 26, 2019.

There is no certainty that the Board Fiscal Plan (as currently certified or as subsequently amended and recertified) will be fully implemented, or if implemented will ultimately provide the intended results. All these plans and measures, and the Commonwealth's ability to reduce its deficit and to achieve a balanced budget in future fiscal years depends on a number of factors and risks, some of which are not wholly within its control.

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

### (b) Going Concern – Retirement Systems

The Commonwealth has historically maintained three retirement systems: (i) ERS; (ii) JRS; and (iii) TRS, (collectively, the Retirement Systems).

The Retirement Systems are severely underfunded. In the case of the ERS, which is the largest of the three Retirement Systems, its funded ratio (fiduciary net position as a percentage of total pension liability) as of June 30, 2016, was negative 3.47%, because its fiduciary net position was negative as of such date, and its net pension liability was approximately $37.7 billion.

In the case of TRS and JRS, their funded ratio was 4.93% and 5.36%, respectively, and their net pension liability was approximately $17.3 billion and $615 million, respectively, as of June 30, 2016. TRS and JRS subsequently depleted all liquid assets by the end of fiscal year 2018.

On May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for ERS by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico. On June 15, 2017, the United States Trustee appointed the Official Committee of Retired Employees of Puerto Rico (the Retiree Committee) in the Commonwealth's Title III cases.

*Remediation Plan – Retirement Systems*

On August 23, 2017, the Governor signed into law the "Act to Guarantee the Payment to our Pensioners and Establish a New Plan of Defined Contributions for Public Servants (Act No. 106-2017). As of the effective date of Act No. 106-2017, plan participants shall not accumulate additional benefits in the Retirement Systems. Act No. 106-2017 established the PayGo mechanism effective July 1, 2017 and reformed the Retirement Systems so that their active participants would deposit their individual contributions in a new Defined Contribution Plan, similar to a 401(k) plan, that would be managed by a private entity.

Detailed information about the Retirement Systems' liquidity and solvency issues and the corresponding remediation plans are disclosed in the notes of the 2016 fiscal year stand-alone audited financial statements for each of the Retirement Systems.

### (c) Going Concern – Discretely Presented Component Units

The following major discretely presented component units have been identified as having substantial doubt about their ability to continue as a going concern. Each major discretely presented component units' circumstances and remediation plan are described below.

#### (i) GDB

The stand-alone audited financial statements of GDB disclose that there is substantial doubt about GDB's ability to continue as a going concern because of the following:

- GDB, traditionally served as interim lender to the Commonwealth, its component units, and municipalities in anticipation of the issuance of long-term bonds and notes by such entities in the municipal bond market. GDB also provided financing to the Commonwealth and its component units to finance their respective budget deficits, collateral requirements under swap agreements, and to meet mandatory payments of obligations. As a result, GDB's liquidity and financial

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

condition depended to a large extent on the repayment of loans made to the Commonwealth and its component units. Conditions that adversely affect the ability of the Commonwealth and its component units to raise cash (including limited access to capital markets) and repay their interim and other loans to GDB had an adverse effect on GDB's liquidity and financial condition.

- On March 23, 2018, GDB ceased its operations and determined to wind down in an orderly fashion under Title VI of PROMESA (as discussed below).

- Under the Moratorium Act (as amended by Act No. 2 of 2017), FAFAA was created, as an independent public corporation to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its component units, and municipalities. FAFAA has also been assigned the tasks of overseeing matters related to the restructuring or adjustment of the Commonwealth's financial liabilities, coordinating liability management or other transactions with respect to such obligations, and ensuring compliance with fiscal plans and budgets approved by the Oversight Board pursuant to PROMESA.

*Remediation Plan – GDB*

Upon the establishment of FAFAA, GDB's role was reduced to act as an agent in (i) collecting on its loan portfolio and (ii) disbursing funds pursuant to strict priority guidelines. Therefore, taking into consideration the scenario described above, given the reduced services that GDB was then providing and given that no appropriations were assigned to GDB for fiscal year 2018, GDB's management initiated an orderly wind down process consisting of a restructuring support agreement entered into by FAFAA and GDB with a significant portion of GDB major stockholders subject to different milestones.

(ii)  *PRHTA*

The stand-alone audited financial statements of PRHTA disclose that there is substantial doubt about PRHTA's ability to continue as a going concern because of the following:

- PRHTA has experienced significant recurring losses from operations and faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the fact that PRHTA has not increased revenues to cover the effects of its rising costs.

- PRHTA does not have sufficient funds available to fully repay its various obligations as they come due or those that are currently in default.

- Additionally, significant support and funding for obligations of PRHTA has previously been provided by the Commonwealth and its component units, including GDB. The Commonwealth and such entities are experiencing significant financial difficulties and are unable to continue to extend, refinance or otherwise provide the necessary liquidity to PRHTA as and when needed. As such, current defaults may not be cured and future defaults on PRHTA's obligations may not be avoided.

- On May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PRHTA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico. PRHTA is currently operating under the protection of the Title III Court.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Remediation Plan – PRHTA*

On April 28, 2017, the Oversight Board approved a fiscal plan for PRHTA recommending certain amendments. The fiscal plan has been subject to various revisions. According to its current schedule, the Oversight Board anticipates certifying a new PRHTA fiscal plan by May 28, 2018.

Detailed information about PRHTA's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans are disclosed in the notes of PHRTA's 2016 fiscal year stand-alone audited financial statements.

(iii)   *PREPA*

The stand-alone audited financial statements of PREPA disclose that there is substantial doubt about PREPA's ability to continue as a going concern because of the following:

- PREPA has defaulted on various debt obligations and does not currently have sufficient funds available to fully repay its various obligations as they come due.

- The Commonwealth and its component units are also experiencing significant financial difficulties and have been unable to repay amounts due to PREPA or to extend, refinance or otherwise provide the necessary liquidity to PREPA as and when needed.

- On July 2, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PREPA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico. PREPA is currently operating under the protection of the Title III Court.

*Remediation Plan – PREPA*

On April 28, 2017, the Oversight Board approved the fiscal plan for PREPA, but suggested certain amendments. The fiscal plan has been subject to various revisions. On March 11, 2019, the Oversight Board requested PREPA to submit a new fiscal plan.  According its current schedule, the Oversight Board anticipates certifying a new PREPA fiscal plan by May 28, 2019.

Detailed information about PREPA's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans are disclosed in the notes of PREPA's 2016 fiscal year stand-alone audited financial statements.

(iv)   *PRASA*

The stand-alone audited financial statements of PRASA disclose that there is substantial doubt about PRASA's ability to continue as a going concern because of the following:

- PRASA is experiencing cash flow and financing difficulties. PRASA's net position decreased by approximately $238.4 million during the year ended June 30, 2016, and PRASA had a working capital deficiency of approximately $347 million as of June 30, 2016.

- At June 30, 2016, PRASA has had significant recurring losses, working capital deficiencies, credit downgrades, and large nondiscretionary capital expenditures

- As a result of PRASA's inability to obtain long-term financing, PRASA was not able to pay during fiscal year 2016 certain contractor obligations related to its Capital Improvement Program (CIP).

105

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

- On June 30, 2016 PRASA with the acknowledgment and support of the United States Environmental Protection Agency (EPA), executed a Forbearance Agreement with the Commonwealth Department of Health, administrator of the Drinking Water Fund, the Environmental Quality Board (EQB), administrator of the Clean Water Fund, and PRIFA, as operating agent for the State Revolving Funds, authorized to assist the DOH and EQB in the administration, financial and accounting activities of State Revolving Funds. Under the Forbearance Agreement, certain payments due under the State Revolving Funds' loans were deferred through a series of amendments.

- PRASA also requested that USDA Rural Development Program provided a short-term forbearance period, which included deferral of certain payments, during which they would refrain from exercising its rights and remedies under the Rural Development Bond documents or grants or loan agreements. To this effect, PRASA and USDA Development Program executed a forbearance document as of June 30, 2016 and granted a three (3) month forbearance period. Subsequent additional forbearance periods have been granted.

- PRASA is not a debtor under a Title III case.

*Remediation Plan – PRASA*

On April 28, 2017, the Oversight Board approved the fiscal plan for PRASA but suggested certain amendments. The fiscal plan has been subject to various revisions. On March 11, 2019, the Oversight Board requested PRASA to submit a new fiscal plan.  According to its current schedule, the Oversight Board anticipates certifying a new PRASA fiscal plan by May 28, 2019.

Detailed information about PRASA's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans are disclosed in the notes of PRASA's 2016 fiscal year stand-alone audited financial statements.

*(v)   UPR*

The stand-alone audited financial statements of UPR disclose that there is substantial doubt about UPR's ability to continue as a going concern because of the following:

- UPR had an unrestricted deficit position of $1.5 billion at June 30, 2016.

- The UPR has had significant recurring operating losses, has been highly dependent on the Commonwealth appropriations to finance its operations, and has historically relied on GDB for liquidity. Approximately, 68% of the UPR's total revenues were derived from the Commonwealth's appropriations for the year ended June 30, 2016. The UPR's ability to continue receiving similar operational support from the Commonwealth and obtaining external financing is uncertain.

- Act No. 66-2016 froze the benefits under formula-based appropriations of the UPR at approximately $833.9 million up to fiscal years ended June 30, 2017.

- The UPR has limited ability to raise operating revenues due to the economic and political related challenges of maintaining enrollment and increasing tuition.

- UPR is not a debtor under a Title III case.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Remediation Plan – UPR*

On October 23, 2018, the Oversight Board certified the latest version of its own UPR fiscal plan. However, on March 11, 2019, the Oversight Board requested UPR to submit a new fiscal plan. According to its current schedule, the Oversight Board anticipates certifying a new UPR fiscal plan by May 28, 2019.

Detailed information about UPR's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans is disclosed in the notes of UPR's 2016 fiscal year stand-alone audited financial statements.

*(vi)  Other Nonmajor Component Units*

There are other nonmajor component units that have accumulated deficits and others that even without deficits, carry significant debt payable to GDB or debt subject to the Moratorium Act and related executive orders (such as PRPA, PRMBA, PRIDCO and PRCCDA). Similarly to the reasons presented above for the Primary Government and discretely presented major component units, the uncertainty as to the ability of the other nonmajor component units to satisfy their obligations when they become due raises substantial doubt about their ability to continue as a going concern.

Additionally, there are other nonmajor discretely presented component units that although do not have a deficit position, or loans outstanding with GDB as of June 30, 2016, and have not been impacted by the Moratorium Act and related executive orders are mainly funded by nonoperating revenues primarily from Commonwealth appropriations and are highly reliant on the Commonwealth and on GDB for liquidity and financial management support. These appropriations are contingent on the availability of funds from the Commonwealth and their legislative approval. A reduction in the amount of these appropriations could result in financial difficulties for these entities, including the uncertainty as to their ability to fully satisfy their obligations when due, which raises substantial doubts about their ability to continue as a going concern. For additional information regarding the Moratorium Act, refer to Note 3, and Note 23.

**(3)  PROMESA and Other Legislation Related to Debt Restructuring**

As discussed in Note 2, the Commonwealth and many of its component units are in the midst of a profound fiscal economic and liquidity crisis, which have caused, among other things, the initiation of financial measures directed to reinstate fiscal and financial stability, including a number of state and federal laws that have been passed in recent years. As further discussed below, on June 30, 2016 the U.S Congress enacted the "Puerto Rico Oversight, Management, and Economic Stability Act" (PROMESA), which allowed for fiscal and economic discipline including alternatives of debt restructuring. During the fiscal years subsequent to June 30, 2016, the Commonwealth and other governmental entities like COFINA, PREPA, ERS, PRHTA and GDB have initiated restructuring procedures of their existing debt. Following are the most relevant state and federal legislation enacted to address the fiscal crisis and to initiate the economic recovery:

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(a)  Fiscal Measures Before PROMESA*

    *(i)  Retention by the Government of Tax Revenues Conditionally Allocated to Certain Public Corporations and Priority of Payment Provisions*

    On December 1, 2015, the Governor signed Executive Order No. 46 (Executive Order No. 46). Executive Order No. 46 ordered the Secretary of Treasury to retain certain available resources of the Commonwealth in light of revised revenue estimates for fiscal year 2016 and the Commonwealth's deteriorating liquidity situation. Pursuant to such executive order, the Secretary of Treasury retained revenues conditionally allocated to PRHTA, PRIFA, PRCCDA, and PRMBA for the payment of debt service on their bonds during fiscal year 2016 and segregated such funds for the payment of debt service on the Commonwealth's public debt. Since fiscal year 2017, such revenues are being retained by the Commonwealth for the payment of essential government services pursuant to (a) the Moratorium Act and Act No. 5 (discussed below), and (b) due to the automatic stay under Title III of PROMESA.

    *(ii)  Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Financial Emergency and Fiscal Responsibility of Puerto Rico Act and Related Executive Orders*

    On April 6, 2016, the Commonwealth enacted the Moratorium Act. Pursuant to the Moratorium Act, the Governor issued a series of executive orders declaring an emergency period, a moratorium and various other measures with respect to certain obligations of the Commonwealth of Puerto Rico and several of its instrumentalities. Pursuant to these executive orders, certain Commonwealth entities have either: (i) not made debt service payments, (ii) made debt service payments with funds on deposit with the trustees of their bonds, and/or (iii) not received or transferred certain revenues. Such executive orders also placed significant restrictions on the disbursement of funds deposited at GDB and suspended the disbursement of loans by GDB.

*(b)  PROMESA and Other Puerto Rico Legislation*

    *(i)  PROMESA*

    In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through, among other things: (i) the establishment of the Oversight Board, whose responsibilities include the certification of fiscal plans and budgets for the Commonwealth and its related entities; (ii) a temporary stay of all creditor lawsuits under Title IV of PROMESA; and (iii) two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a quasi-bankruptcy proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of Title 11 of the United States Code (U.S. Bankruptcy Code). Each of these elements are divided among PROMESA's seven titles, as briefly discussed below.

    (a)  *Title I – Establishment of Oversight Board and Administrative Matters*

    Upon PROMESA's enactment, the Oversight Board was established for Puerto Rico. As stated in PROMESA, "the purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." On August 31, 2016, the President of the United States announced the appointment of the Oversight Board members. Each Oversight

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Board member is required to have "knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government." The Oversight Board was "created as an entity within the territorial government for which it was established" and is expressly not an entity of the federal government), but it was also established to act independently from the Commonwealth government, such that neither the Governor nor the Legislature may "(i) exercise any control, supervision, oversight, or review over the Oversight Board or its activities; or (ii) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board.

*(b) Title II – Fiscal Plan and Budget Certification Process and Compliance*

Title II sets forth the requirements for proposing and certifying fiscal plans and budgets for the Commonwealth and its instrumentalities. "Each fiscal plan serves as the cornerstone for structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards fiscal responsibility and access to capital markets. "According to the legislative history, a fiscal plan should "provide for a sustainable level of debt, improve governance, provide for capital expenditures that promise economic growth, and respect the relative priorities that different classes of bondholders have vis-à-vis one another under Puerto Rico law."

Only after the Oversight Board has certified a fiscal plan may the Governor submit a fiscal year Commonwealth budget and fiscal year budgets for certain Commonwealth instrumentalities (as approved by the Oversight Board) to the Legislature.

In furtherance of the foregoing duties, PROMESA contains a provision that grants the Oversight Board powers to monitor compliance with certified fiscal plans and budgets and undertake certain actions, including spending reductions and the submission of recommended actions to the Governor that promote budgetary compliance. Please refer to the language of PROMESA for a complete description of the Oversight Board's powers related to fiscal plan and budgetary compliance.

*(c) Title III – In-Court Restructuring Process*

Title III of PROMESA establishes an in-court process for restructuring the debts of Puerto Rico and other United States territories that is modeled after the process under Chapter 9 of the U.S. Bankruptcy Code.

The Oversight Board has sole authority to file a voluntary petition seeking protection under Title III of PROMESA.

In a Title III case, the Oversight Board acts as the debtor's representative and is authorized to take any actions necessary to prosecute the Title III case. Immediately upon filing the Title III petition, Bankruptcy Code section 362 (which is incorporated into Title III cases under PROMESA) applies to automatically stay substantially all litigation against the debtor (the Title III Stay). A Title III case culminates in the confirmation of a plan of adjustment of the debts of the debtor. The Oversight Board has the exclusive authority to file and modify a plan of adjustment prior to confirmation.

*(d) Title IV – Temporary Stay of Litigation, Government Reporting, and Other Miscellaneous Provisions*

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Title IV of PROMESA contains several miscellaneous provisions, including a temporary stay of litigation related to "Liability Claims," relief from certain wage and hour laws, the establishment of a Congressional Task Force on Economic Growth in Puerto Rico (the Task Force), the requirement that the Comptroller General of the United States submit two reports to Congress regarding the public debt levels of the U.S. territories, and expansion of the federal government's small business HUBZone program in Puerto Rico.

Pursuant to PROMESA section 405, the enactment of PROMESA immediately and automatically imposed a temporary stay (the Title IV Stay) from June 30, 2016 (the date of PROMESA's enactment) through February 15, 2017 of all "Liability Claim" litigation commenced against the Commonwealth of Puerto Rico and its instrumentalities after December 18, 2015. A "Liability Claim" is defined as any right to payment or equitable remedy for breach of performance related to "a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights entitlements, or obligations arise from contract, statute, or any other source of law related [thereto]" for which the Commonwealth or one of its instrumentalities was the issuer, obligor, or guarantor and such liabilities were incurred prior to June 30, 2016. The Title IV Stay was subject to a one-time 75-day extension by the Oversight Board or a one-time 60-day extension by the United States District Court. On January 28, 2017, the Oversight Board extended the Title IV Stay by 75 days to May 1, 2017, at which time the Title IV Stay expired.

Title IV of PROMESA also required several federal government reports. First, PROMESA established the Task Force within the legislative branch of the U.S. federal government. The Task Force submitted its report to Congress on December 20, 2016.

Second, PROMESA required the U.S. Comptroller General, through the Government Accountability Office (GAO), to submit a report to the House and Senate by December 30, 2017 regarding: (i) the conditions that led to Puerto Rico's current level of debt; (ii) how government actions improved or impaired its financial condition; and (iii) recommendations on new fiscal actions or policies that the Commonwealth could adopt. The GAO published this report on May 9, 2018.

Third, PROMESA required the U.S. Comptroller General, through the GAO, to submit to Congress by June 30, 2017 a report on public debt of the U.S. territories. In addition to its initial report, the GAO must submit to Congress updated reports on the public debt at least once every two years. The GAO published this report on October 2, 2017.

*(e) Title V – Infrastructure Revitalization*

Title V of PROMESA establishes the position of Revitalization Coordinator under the Oversight Board and provides a framework for infrastructure revitalization through an expedited permitting process for "critical projects" as identified by the Revitalization Coordinator.

*(f) Title VI – Consensual, Out-of-Court Debt Modification Process*

Title VI of PROMESA establishes an out-of-court process for modifying Puerto Rico's debts. Under PROMESA section 601(d), the Oversight Board is authorized to establish "pools" of bonds issued by each Puerto Rico government-related issuer based upon relative priorities. After establishing the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

pools, the government issuer or any bondholder or bondholder group may propose a modification to one or more series of the government issuer's bonds. If a voluntary agreement exists, the Oversight Board must issue a certification and execute a number of additional processes in order to qualify the modification.

Finally, the United States District Court for the District of Puerto Rico must enter an order approving the Qualifying Modification and vesting in the issuer all property free and clear of claims in respect of any bonds.

The Title VI process was successfully implemented to restructure the debts of the GDB. The GDB Title VI process is discussed below under Component Units – GDB, Qualifying Modification and Title VI Approval Process.

*(g) Title VII – Sense of Congress*

Title VII of PROMESA sets forth the sense of Congress that "any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States."

*(ii)  Puerto Rico Legislation and Other Fiscal Measures*

Act No. 2 of January 18, 2017 (Act No. 2 of 2017), the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, was enacted to expand FAFAA's powers and authority (as initially established under the Moratorium Act) so that FAFAA has the sole responsibility to negotiate, restructure, and reach agreements with creditors on all or part of the public debt or any other debt issued by any Commonwealth entity. FAFAA is also responsible for the collaboration, communication, and cooperation efforts between the Commonwealth and the Oversight Board under PROMESA. In addition, Act No. 2 of 2017 established FAFAA as the Commonwealth entity responsible for carrying out the roles inherited from the GDB along with additional duties and powers, which include, among other things: (i) oversight of the Commonwealth budget; (ii) an administrative presence on every board or committee where the GDB president is currently a member; (iii) authority to conduct audits and investigations; and (iv) authority to freeze budgetary items, appoint trustees, redistribute human resources, and change procedures.

Act No. 3 of January 23, 2017 (Act No. 3 of 2017), the Fiscal Crisis Management Act, was enacted to extend most of the fiscal measures that had been adopted under Act No. 66 of 2014 through July 1, 2021, including a 10-year extension of the excise tax on acquisitions by foreign corporations under Act No. 154.

Act No. 5 of January 29, 2017 (Act No. 5 of 2017), the Puerto Rico Fiscal Responsibility and Financial Emergency Act, was enacted to maintain the moratorium on debt payment existing under the Moratorium Act; however, it allowed the Commonwealth to segregate funds that would eventually be used to fund the payment of public debt. Act No. 5 of 2017 states that the Governor may pay debt service as long as the Commonwealth is able to continue to fund essential services, such as the health, safety, and wellbeing of the people of Puerto Rico, including providing for their education and assistance to residents. Act No. 5 of 2017 continued to declare the Commonwealth to be in a state of emergency and increased the Governor's powers to manage the Commonwealth's finances. The emergency period

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

under Act No. 5 of 2017 was set to expire on May 1, 2017 to coincide with the expiration of the Title IV Stay (as discussed above), unless extended by an additional three months by executive order. On April 30, 2017, the Governor issued executive order OE2017031, which extended the Act No. 5 of 2017 emergency period to August 1, 2017. On July 19, 2017, the Legislature enacted Act No. 46 of 2017 (Act No. 46 of 2017), which further extended the Act No. 5 of 2017 emergency period through December 31, 2017. Act No. 46 of 2017 allowed the Governor to sign executive orders to extend the emergency period for successive periods of six months as long as the Oversight Board remains established for Puerto Rico under PROMESA. On December 27, 2018, the Governor issued executive order EO-2018-053 extending the emergency period until June 30, 2019.

Act No. 106 of August 23, 2017 (Act No. 106 of 2017), the Act to Guarantee the Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants, reformed the Commonwealth's pensions by replacing the governing boards of the Retirement Systems with a single Retirement Board of the Commonwealth of Puerto Rico (Retirement Board) and established a separate "Account for the Payment of Accrued Pensions" to implement a PayGo method for the Retirement Systems. Act No. 106 of 2017 created the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system.

Act No. 109 of August 24, 2017 (Act No. 109 of 2017), the Government Development Bank for Puerto Rico Debt Restructuring Act (the GDB Restructuring Act), effectuated the GDB Fiscal Plan and provided a path for the implementation of the GDB RSA by addressing the claims of the Commonwealth and its instrumentalities against GDB. Act No. 109 of 2017 created two special purpose entities—the GDB Debt Recovery Authority and the Public Entity Trust—into which the GDB would divide and irrevocably transfer its assets. As discussed below, these entities were utilized to complete the transactions in the GDB's Qualifying Modification, as approved by the District Court under Title VI of PROMESA.

Act No. 241 of November 15, 2018 (Act No. 241 of 2018), the Puerto Rico Sales Tax Financing Corporation Act, amended and restated Act No. 91 of 2006 to establish the legal framework for the restructuring of COFINA's issued and outstanding bonds by, among other things, authorizing the issuance of new COFINA bonds necessary to complete the transactions contemplated under COFINA's Third Amended Plan of Adjustment, as discussed below and in Note 17(c).

*(c)* ***PROMESA Title III Cases***

  *(i)*  *Oversight Board Commencement of Title III Cases*

On May 1, 2017, the Title IV Stay expired, permitting the substantial litigation brought by bondholders and other creditors against the Commonwealth and its instrumentalities to resume. On May 3, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for the Commonwealth by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico (the Title III Court). On May 5, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for COFINA by filing a similar petition for relief under Title III of PROMESA in the Title III Court.

On May 21, 2017, the Oversight Board, at the request of the Governor, commenced Title III cases for PRHTA and ERS by filing similar petitions for relief under Title III of PROMESA in the Title III Court. On July 2, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PREPA by filing a similar petition for relief under Title III of PROMESA in the Title III Court. All of the foregoing

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Title III cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 17-3283-LTS in the United States District Court for the District of Puerto Rico.

The Title III cases were commenced in part due to the May 1, 2017 expiration of the Title IV Stay. Title III of PROMESA incorporates the automatic stay provisions of Bankruptcy Code section 362 and 922, which are made applicable to the Title III cases pursuant to PROMESA section 301(a). Accordingly, upon the filing of the Title III cases, the Title III Stay immediately went into effect to stay creditor litigation. All claims against any Title III debtor that arose prior to the filing of the Title III case (whether or not discussed herein) may be subject to the laws governing Title III.

On August 7, 2017, a group of GO bondholders led by Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, Aurelius) filed a motion to dismiss the Title III petitions. In the motion, Aurelius argued that the appointment of the Oversight Board members violated the "Appointments Clause" of the United States Constitution, which requires that "principal officers" of the United States be appointed by the President and confirmed by the Senate. The Title III Court denied Aurelius' motion to dismiss, and Aurelius appealed to the United States Court of Appeals for the First Circuit. On February 15, 2019, the First Circuit reversed the Title III Court, holding that the Oversight Board members' appointment process violated the Appointments Clause. The First Circuit stayed its ruling for 90 days to allow the President and Senate to appoint the Oversight Board in accordance with the United States Constitution. It also expressly validated all of the Oversight Board's past actions, including any actions taken by the Oversight Board during the 90-day stay period. The Oversight Board has announced its intention to appeal the First Circuit's decision to the Supreme Court. Although the First Circuit stayed its ruling for 90 days, the continued prosecution of the Title III cases may be uncertain if the Oversight Board is not properly re-appointed during the 90-day stay period, unless such stay is extended.

*(ii)  Mediation in the Title III Cases*

On June 23, 2017, the Title III Court appointed a team of five federal judges to facilitate settlement negotiations of any and all issues and proceedings arising in the Title III cases. Mediation of various disputes relating to Title III cases remains ongoing.

*(iii)  Commonwealth Title III Case*

On May 5, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for COFINA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico. The deadline by which all creditors were required to file their proofs of claim against COFINA was June 29, 2018.

After the commencement of the Commonwealth's Title III case, numerous motions and adversary proceedings have been filed both by and against the Commonwealth regarding creditor rights to Commonwealth assets.  The outcome of these proceedings and their impact on any plan of adjustment for the Commonwealth cannot be determined at this time.  For a detailed description of these legal contingencies, refer to Note 17.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(iv) COFINA Title III Case*

On May 5, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for COFINA by filing a petition for relief under Title III of PROMEA in the United States District Court for the District of Puerto Rico.

Questions regarding the Commonwealth and COFINA's respective ownership interests in the sales-and-use tax revenue pledged as collateral for the existing COFINA bonds have been at the center of Puerto Rico's Title III cases since their commencement in May 2017. Resolution of this issue (the Commonwealth-COFINA Dispute) was essential in order for Puerto Rico's debt restructuring to move forward.

To expedite resolution of the Commonwealth-COFINA Dispute, the Oversight Board proposed the appointment of representatives for the Commonwealth and COFINA. On August 10, 2017, the Title III Court issued an order (the Procedures Order) to approve a protocol for resolving the disputes between the Commonwealth and COFINA. The Procedures Order defines the Commonwealth-COFINA Dispute as "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law. . ." The Procedures Order provided for the appointment of (1) an agent for the Oversight Board as representative of the Commonwealth in its Title III Case (the Commonwealth Agent); and (2) an agent for the Oversight Board as representative of COFINA in its Title III Case (the COFINA Agent).

On September 8, 2017, the Commonwealth Agent filed a complaint asserting that the SUT revenue pledged by COFINA bond debt is "the exclusive property of the Commonwealth." The complaint alleges that the COFINA enabling legislation "did not transfer to COFINA present ownership of future SUT revenues" and did not assign to COFINA the Commonwealth right to receive such revenues. The complaint argued that the transfer to COFINA of SUT revenues was at most an unsecured promise to transfer revenues in the future. The complaint further alleged that even if the transfer of future SUT revenues to COFINA had any legal effect, such transfers were merely a grant of a security interest in acquired property governed by Article 9 of the Uniform Commercial Code. The complaint alleged that any security interest of COFINA in SUT revenues was unenforceable against the Commonwealth or, in the alternative, was unperfected and therefore avoidable and otherwise subordinate to the rights of the Oversight Board as trustee. The Complaint further asserted that the Commonwealth's Title III case cuts off any security interest.

The Complaint also alleged that COFINA's structure was unconstitutional because it circumvents the Commonwealth's Constitution's debt limitations.

After extensive legal proceedings, on August 29, 2018, COFINA, FAFAA, the Oversight Board and various holders and insurers of COFINA's bonds (the Settlement Parties) entered into that certain Plan Support Agreement dated as of August 29, 2018 (the Original PSA), that contemplates, among other things, (i) the compromise and settlement of the Commonwealth-COFINA Dispute, consistent with the Agreement in Principle, providing COFINA with an ownership interest in an amount up to 53.65% of the Pledged Sales Tax Base Amount; and (ii) the Title III Court's approval of the compromise and settlement concurrently through a plan of adjustment in COFINA's Title III case and a settlement motion in the Commonwealth's Title III case.

114

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On October 19, 2018, the Oversight Board filed the Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (the Plan of Adjustment), along with other bankruptcy related documents, as further discussed in Note 17(c).

On November 7 and 8, 2018, respectively, new legislation to amend and restate Act No. 91 of 2006 to establish the legal framework for the restructuring of COFINA's issued and outstanding bonds was passed in the Puerto Rico House of Representatives and the Puerto Rico Senate. On November 15, 2018, the Governor of Puerto Rico signed into law the new legislation as Act No. 241 of 2018.

After various amendments, on January 9, 2019, the Oversight Board filed its Third Amended Title III Plan of Adjustment, as further discussed in Note 17(c). The Third Amended Plan of Adjustment proposed, among other things, to release the Commonwealth from all liability from claims and causes of action held by any creditor of COFINA (solely in its capacity as a creditor of COFINA) arising from or relating to the relationship of the Commonwealth and COFINA.

The Title III Court held a hearing on the Settlement Motion and confirmation of the Third Amended Plan of Adjustment on January 16, 2019, and January 17, 2019. On February 4, 2019, the Title III Court granted the Settlement Motion and confirmed the Third Amended Plan of Adjustment.

On February 5, 2019, the Title III Court amended the Findings and Conclusions and Confirmation Order. Pursuant to the Amended Findings and Conclusions and the Amended Confirmation Order, which supersede the Findings and Conclusions and the Confirmation Order, the Title III Court confirmed COFINA's Third Amended Plan of Adjustment, which became effective on February 12, 2019. For additional information, refer to Note 17(c).

Certain parties whose objections were overruled in confirming the Third Amended Plan of Adjustment filed Notices of Appeal in the Title III Court. The appeals have been docketed with the United States Court of Appeals for the First Circuit under case numbers 19-1181 (also discussed in relation to the adversary proceeding captioned Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board for Puerto Rico, et al.) and 19-1182. The deadline to the file Notices of Appeal was March 7, 2019. For additional information, refer to Note 17(c).

*(v) PRHTA Title III Case*

On May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PRHTA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico. The deadline by which all creditors were required to file their proofs of claim against PRHTA was June 29, 2018.

After the commencement of PRHTA's Title III case, numerous motions and adversary proceedings have been filed both by and against PRHTA regarding creditor rights to PRHTA assets.  The outcome of these proceedings and their impact on any plan of adjustment for PRHTA cannot be determined at this time. For a detailed description of these legal contingencies, refer to Note 17.

*(vi) ERS Title III Case*

The Title IV Stay expired on May 1, 2017. On May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for ERS by filing a petition for relief under Title III of PROMESA in

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

the United States District Court for the District of Puerto Rico.  The deadline by which all creditors were required to file their proofs of claim against ERS was June 29, 2018.

On May 31, 2017, certain holders of senior and subordinate pension funding bonds issued by ERS pursuant to Pension Funding Bond Resolution, adopted on January 24, 2008 (the ERS Bondholders) filed a motion seeking relief from the automatic stay imposed upon the commencement of the Title III case. The Commonwealth, ERS, and the ERS Bondholders entered a stipulation resolving the stay motion, which was approved by order of the Title III Court on July 17, 2017.

On July 13, 2018, the ERS Bondholders renewed their motion for relief from the automatic stay. On August 17, 2018, the District Court issued an opinion and order finding that the ERS Bondholders' asserted security interests were not properly perfected and therefore were invalid and unenforceable against ERS. On August 21, 2018, the Title III Court denied the ERS Bondholders' renewed stay motion on the grounds that the ERS Bondholders were not entitled to relief in light of the Title III Court's decision regarding the validity and enforceability of the ERS Bondholders' liens. The ERS Bondholders appealed from the Title III Court's opinion and order and on January 31, 2019, the First Circuit reversed the Title III Court, finding that the ERS Bondholders hold a valid perfected security interest that is enforceable against ERS.

On March 12, 2019, the Creditors' Committee filed an omnibus objection to all claims asserted against ERS based on the approximately $3.1 billion of outstanding bonds issued by ERS in 2008 (the ERS Bond Claims Objection). The ERS Bond Claims Objection argues that ERS was only authorized to issue a "direct placement of debts," which the Creditors' Committee claims is commonly understood to mean a "private placement, not a public offering." Because the ERS bonds were issued in a public offering, the Creditors' Committee asserts that the ERS bonds were illegally issued as ultra vires and are thus "null and void." As a result, the Creditors' Committee seeks an order disallowing all ERS bond claims in their entirety. Also, on March 12, 2019, the Creditors' Committee filed a procedures motion related to the adjudication of the ERS Bond Claims Objection. Any objections to the procedures motion are due on April 9, 2019 and a hearing is scheduled for April 24, 2019. No objection deadlines or hearing date on the ERS Bond Claims Objection have been established.

After the commencement of ERS's Title III case, numerous motions and adversary proceedings have been filed both by and against ERS regarding creditor rights to ERS assets.  The outcome of these proceedings and their impact on any plan of adjustment for ERS cannot be determined at this time.  For a detailed description of these legal contingencies, refer to Note 17.

*(vii)*   *PREPA Title III Case*

On July 2, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PREPA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico.

On July 18, 2017, an ad hoc group of PREPA creditors and certain monoline insurers of PREPA bonds filed a motion seeking to lift the automatic stay in PREPA's Title III case, to permit the monoline insurers to seek the appointment of a receiver for PREPA to oversee the operations of the utility company and to seek an increase in rates. On September 15, 2017, the Title III Court denied the motion seeking to lift the PROMESA's law's stay.  On August 8, 2018, the United States Court of Appeals for the First Circuit

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

reversed the Title III Court's determination that PROMESA prohibited the appointment of a receiver and instead held that the Title III Court may appoint a receiver if warranted. On October 18, 2018, the monoline insurers filed a motion seeking to appoint a receiver to install sound and prudent management at PREPA but did not seek authority for a receiver to increase rates or exert control over energy planning or budgets. The hearing on the motion to appoint a receiver is currently scheduled to start on May 8, 2019.

*(viii)  GDB Qualifying Modification and Title VI Approval Process*

On November 29, 2018, GDB completed a restructuring of certain of its indebtedness pursuant to a Qualifying Modification under Title VI of PROMESA (the Qualifying Modification). Under the Qualifying Modification, holders of certain bond and deposit claims against GDB exchanged their claims for bonds issued by a newly created public instrumentality—the GDB Debt Recovery Authority—and GDB transferred to such entity its municipal loan portfolio, a portion of its public entity loan portfolio, its real estate owned assets and its unencumbered cash. In addition, pursuant to the GDB Restructuring Act, claims on account of deposits held by the Commonwealth and other public entities were exchanged for interest in a newly formed trust created pursuant to the GDB Restructuring Act, titled the Public Entity Trust (the PET).

Under the GDB Restructuring Act, the balance of liabilities owed between the Commonwealth and its agents, instrumentalities and affiliates, including the Authority (each a Non-Municipal Government Entity) and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date. Those Non-Municipal Government Entities having net claims against GDB, after giving effect to the foregoing adjustment received their pro rata share of interests in the PET, which was deemed to be full satisfaction of any and all claims such Non-Municipal Government Entity may have against GDB.

The assets of the PET (the PET Assets) consist of among other items, a claim against the Commonwealth totaling no more than $905 million, which is the subject of a proof of claim filed in the Commonwealth case pending under Title III of PROMESA. The Authority's recovery on account of its interest in the PET will depend upon the recovery ultimately received by the PET on account of the PET Assets. Claims that the Commonwealth and other governmental entities may have had against GDB have been released pursuant to the Qualifying Modification (except for as set forth therein), and GDB has reduced the amount of any allowed claim against the Commonwealth it may receive as set forth in such Qualifying Modification.

On November 6, 2018, the District Court approved GDB's Qualifying Modification under Title VI of PROMESA and the Qualifying Modification became effective as of November 29, 2018.

*(ix)   PRIFA-Ports Restructuring Support Agreement*

On April 10, 2019, FAFAA, on behalf of PRIFA and PRPA, entered into a restructuring support agreement ("RSA") with the Ad Hoc Group of holders of certain Series 2011 bonds issued by PRIFA (the "PRIFA-Ports Bonds"). The restructuring contemplated by the RSA has two principal components. First, the members of the Ad Hoc Group—who hold more than 90% of the outstanding PRIFA-Ports Bonds—will

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

tender all of their holdings of PRIFA-Ports Bonds for their pro rata share of (i) the distribution made to PRIFA under the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation on account of $91.5 million of Junior COFINA Bond Claims (as defined in the COFINA plan) held by PRIFA; and (ii) a $40 million promissory note issued by PRPA. Second, the Puerto Nuevo cargo and logistics operation in the San Juan Bay (the "Property") will be revitalized through the Ad Hoc Group's contribution to a newly formed subsidiary of PRPA of (i) at least $11 million, (ii) the promissory note, and (iii) up to 10% of gross rental income generated from the Property. In exchange, AFICA will issue new bonds to the Ad Hoc Group in a face amount equal to the projected cash flows of the Property.

The proposed transaction remains subject to approval from the Financial Oversight and Management Board for Puerto Rico and agreement on other definitive documentation.

*(d)  Default of Bond Principal and Interest Payments*

As a direct result of the Moratorium Act and the retention of certain revenues conditionally allocated to public corporations and priority of payment provisions, the Commonwealth and such public corporations have not been able to make the debt service payments as they become due.

The table below summarizes the past due balance of principal and interest on bonds as of March 31, 2019:

|  | Principal | Interest | Past due Balance |
|---|---|---|---|
| Governmental activities: |  |  |  |
| Commonwealth | $        832,970 | 2,172,210 | 3,005,180 |
| COFINA | 66,696 | 1,325,429 | 1,392,125 |
| PBA | 178,948 | 484,613 | 663,561 |
| PRIFA | 206,495 | 249,304 | 455,799 |
| PAA | 23,363 | 63,840 | 87,203 |
| Total governmental activities | 1,308,472 | 4,295,396 | 5,603,868 |
| PFC appropriation bonds | 127,760 | 218,344 | 346,104 |
| Fiduciary funds: |  |  |  |
| ERS | — | 222,025 | 222,025 |
| Major component units |  |  |  |
| PRHTA | 222,318 | 369,861 | 592,179 |
| PREPA | 534,400 | 782,624 | 1,317,024 |
| PRASA | 18,759 | 35,938 | 54,697 |
| Total major component units | 775,477 | 1,188,423 | 1,963,900 |
| Nonmajor component units | 36,867 | 41,674 | 78,541 |
| Total | $     2,248,576 | 5,965,862 | 8,214,438 |

118

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**(4) Correction of Errors**

During 2016, the Commonwealth identified various errors related to prior year financial statements, including that certain of its component units applied the guidance in GASB Statements No. 68 and No. 71, which resulted in restatements of the beginning net position of the Commonwealth's government-wide financial statements. The impact of the related adjustments to beginning net position/fund balance are as follows:

**Governmental and Business-Type Activities**

The following table summarizes the changes to net position at the beginning of the year as previously reported for the Governmental and Business-Type Activities in the government-wide financial statements (in thousands):

| | Governmental Activities | Business-type Activities |
|---|---|---|
| Net position (deficit) – July 1, 2015, as previously reported | $ (67,692,485) | 654,563 |
| Application of GASB Statement No. 68 and No. 71: (a) | | |
| Recognition of net pension liability | — | (504,172) |
| Recognition of deferred outflow of resources for pension contributions made after the measurement date (July 1, 2014) | — | 85,862 |
| Recognition of deferred inflow of resources | — | (3,186) |
| Overstatement of cash and cash equivalents in governmental banks (b) | — | (120,048) |
| Overstatement of accounts receivable (c) | — | (3,176) |
| Understatement of capital assets (d) | — | 12,411 |
| Understatement of liabilities (e) | — | (3,988) |
| Correction of immaterial errors (f) and (g) | (216,039) | — |
| Net position (deficit) – July 1, 2015, as restated | $ (67,908,524) | 118,266 |

Correction of Material Errors – Business-Type Activities

The correction of material errors to beginning net position of the Business-Type Activities includes a combination of the following:

(a) The impact of applying the guidance in GASB Statement No. 68 and No. 71. The error correction consisted of recognizing the net effects of the PRMeSA's proportionate share of ERS' beginning net pension liability, deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date and deferred inflows of resources due to differences between the projected and the actual pension plan investment earnings in different measurement periods.

(b) An overstatement of cash and cash equivalents in governmental banks for approximately $120 million. The PRWPCRF (a major proprietary fund) and the PRSDWTRLF (a nonmajor proprietary fund)

119

### COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

recognized the 2015 custodial credit loss of approximately $106.5 million and $13.6 million, respectively, on deposits held at GDB.

(c)  A net overstatement in accounts receivable of approximately $3.2 million due to the effect of an overstatement of accounts receivable for approximately $8.6 corrected by PRHIA, and an understatement for approximately $5.4 million corrected by the 9-1-1 Service Governing Board to recognize accounts receivable from two telecommunication companies.

(d)  An understatement of capital assets corrected by PPA for approximately $12.4 million related to a capital contribution received from PAA.

(e)  An understatement of approximately $4 million corrected by The Additional Lottery System in the prizes reserve for the Multi-state Lottery Association due to mathematical errors.

*Correction of Immaterial Errors – Governmental Activities*

The correction of immaterial errors in the beginning net position of Governmental Activities includes a combination of the following:

(f)  An overstatement of accounts payable for approximately $32.3 million.

(g)  Balances previously recognized as revenues from income taxes were reclassified as unearned revenue for approximately $248.3 million since the balances were related to income tax prepayments.

**Governmental Funds**

The following table summarizes the changes to fund balances (deficit) at the beginning of the year as previously reported for the governmental funds (in thousands):

| | General Fund | COFINA Debt Service | Nonmajor Governmental Funds |
|---|---|---|---|
| Fund balances (deficit) – July 1, 2015, as previously reported: | $ (2,115,324) | 336,433 | 598,951 |
| Overstatement of balance due to PRIFA (a) | — | 95,227 | — |
| Correction of immaterial errors (b) - (d) | (248,317) | — | (62,949) |
| Fund balances (deficit) – July 1, 2015, as restated | $ (2,363,641) | 431,660 | 536,002 |

*Correction of Material Error – COFINA Debt Service Fund*

(a)  PRIFA, on its standalone financial statements reports an investment in COFINA bonds. As a result of the blended presentation of PRIFA ad COFINA, the PRIFA investment is presented in the accompanying balance sheet as an interfund loan due from COFINA Debt Service Fund. After an evaluation of COFINA's repayment ability since prior years, the estimated uncollectible portion of the interfund balance for approximately $95.2 million was written-off against beginning fund balance. The correction of the error was material to the COFINA Debt Service Fund.

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

*Correction of Immaterial Error – General Fund and Non-Major Governmental Funds*

(b) After an evaluation of COFINA's repayment ability since prior years, the estimated uncollectible portion of the interfund balance for approximately $95.2 million was written-off against beginning fund balance. The correction of the error was considered immaterial to the nonmajor governmental funds.

(c) Accounts payable in the Capital Projects Fund were overstated by approximately $32.3 million.

(d) Balances previously recognized as revenues from income taxes were reclassified as unearned revenue for approximately $248.3 million since the balances were related to income tax prepayments.

**Proprietary Funds**

The following table summarizes the changes to net position at the beginning of the year as previously reported for the proprietary funds (in thousands):

| | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Service Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor Proprietary Funds |
|---|---|---|---|---|---|
| Net (deficit) position – July 1, 2015, as previously reported | $ (105,475) | (207,505) | (331,026) | 518,079 | 347,223 |
| Application of GASB Statement No. 68 and No. 71: (a) | | | | | |
| Recognition of net pension liability | — | — | (504,172) | — | — |
| Recognition of deferred outflow of resources for pension contributions made after the measurement date (July 1, 2014) | — | — | 85,862 | — | — |
| Recognition of deferred inflow of resources | — | — | (3,186) | — | — |
| Overstatement of cash and cash equivalents in governmental banks (b) | — | — | — | (106,495) | — |
| Correction of immaterial errors (c) - (g) | (3,988) | (8,608) | — | — | 4,290 |
| Net (deficit) position – July 1, 2015, as restated | $ (109,463) | (216,113) | (752,522) | 411,584 | 351,513 |

*Correction of Material Errors – PRMeSA and PRWPCR Funds*

The correction of material errors in the beginning net position of proprietary funds includes a combination of the following:

(a) The impact of applying the guidance in GASB Statement No. 68 and No. 71 by recognizing the net effects of the PRMeSA's proportionate share of beginning net pension liability, deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date and deferred inflows of resources due to differences between the projected and the actual pension plan investment earnings in different measurement periods.

121

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

(b)   An overstatement of cash and cash equivalents in governmental banks for approximately $106.5 million corrected in the PRWPCRF for a custodial credit loss on deposits held at GDB.

*Correction of Immaterial Errors – Lotteries, PRHIA, and Nonmajor Proprietary Funds*

The correction of immaterial errors in the beginning net position of proprietary funds includes a combination of the following:

(c)   An understatement of approximately $4 million corrected by The Additional Lottery System in the prizes reserve for the Multi State Lottery Association due to mathematical errors.

(d)   An overstatement in accounts receivable of approximately $8.6 million in PRHIA

(e)   An overstatement of cash and cash equivalents in governmental banks for approximately $13.6 million corrected in the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (a nonmajor proprietary fund) for a custodial credit loss on deposits held at GDB.

(f)   An understatement in accounts receivable for approximately $5.4 million corrected by the 9-1-1 Service Governing Board (a nonmajor proprietary fund) to recognize accounts receivable from two telecommunication companies that did not remit the monthly emergency telephone service charges.

(g)   An understatement of capital assets corrected by PPA (a nonmajor proprietary fund) for approximately $12.4 million related to a capital contribution received from PAA.

The following table summarizes the changes to cash and cash equivalents at the beginning of the year as previously reported in the statement of cash flows by the proprietary funds (expressed in thousands):

|  | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor Proprietary Funds |
|---|---|---|
| Cash and cash equivalents – July 1, 2015, as previously reported | $          129,525 | 122,363 |
| Correction of error: | | |
|     Overstatement of cash and cash equivalents in governmental banks | (106,495) | (13,552) |
| Cash and cash equivalents – July 1, 2015, as restated | $          23,030 | 108,811 |

122

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**Discretely Presented Component Units**

The following table summarizes the changes to the beginning net position for certain discretely presented component units (in thousands):

| | Discretely Presented Component Units |
|---|---:|
| Net position – July 1, 2015, as previously reported | $ (4,151,633) |
| Application of GASB Statements No. 68 and No. 71: (a) | |
| Recognition of beginning net pension liability | (102,996) |
| Recognition of deferred outflow of resources for pension contributions made after the measurement date (July 1, 2014) | 3,818 |
| Net understatement of capital assets (b) | 348,460 |
| Net overstatement of assets other than capital assets (c) | (936,514) |
| Net overstatement of liabilities (d) | 1,041,462 |
| Net position – July 1, 2015, as restated | $ (3,797,403) |

*Correction of Material Errors*

The correction of material errors in the beginning net position of discretely presented component units includes a combination of the following:

(a)  The impact of adopting of applying the guidance in GASB Statements No. 68 and No. 71 by recognizing the net effects of AEDA's, CCCPRC's, LAPR and PRSPA's proportionate share of the beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date, against beginning net position. These component units applied the provisions of GASB Statements No. 68 and No. 71 based on unaudited information, while the remaining of the nonmajor component units did not adopt GASB Statements No. 68 and No. 71, as disclosed in Notes 1(s), 18(g) and 18(h).

(b)  An understatement of capital assets for approximately $367.1 million in PREPA's financial statements, and an overstatement identified by PRTEC for approximately $20 million related to write-off of capital assets for which there is no evidence of existence and of assets that were transferred or sold in previous years but were not removed from accounting records, and an understatement of capital assets of approximately $1.3 million corrected by LAPR.

(c)  An overstatement in accounts receivable for approximately $909.8 million related to contributions in lieu of taxes from municipalities, an overstatement of other assets of approximately $29 million corrected by PREPA, and an understatement of cash in bank for approximately $2.3 million corrected by IPRC.

(d)  An overstatement of accounts payable for approximately $1,019.1 million related to contributions in lieu of taxes payable to municipalities and an overstatement of unearned revenue of approximately $29.7 corrected by PREPA, an understatement of contingent liabilities corrected by LAPR for approximately

123

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

$6.8 million, an understatement of accrued expenses for approximately $350 thousand corrected by PRPBC, and an understatement of liabilities for approximately $140 thousand corrected by MAC.

**(5) Puerto Rico Government Investment Trust Fund (PRGITF)**

PRGITF was created by Act No. 176, of August 11, 1995, and began operations on December 4, 1995. The PRGITF is a no load diversified collective investment trust administered by GDB, and created to provide eligible governmental investors of Puerto Rico with a convenient and economical way to invest in a professionally managed money market portfolio. The PRGITF is not an investment company or a mutual fund and is not subject to regulation or registration under the Investment Company Act of 1940. Units issued by the PRGITF are not subject to regulation or registration under the Securities and Exchange Act of 1933, as amended, because the units are issued by a government entity. The deposits on hand and the investments purchased are not collateralized, secured, or guaranteed by the Commonwealth or any of its agencies, instrumentalities, or political subdivisions.

PRGITF is considered a 2a7 like external investment pool, and as such, reports its investment at amortized cost, which approximates fair value. In addition, the Puerto Rico Government Investment Trust Fund follows GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investments Pools*; however, as stated in Note (1)(b), such financial statements are not included in the accompanying basic financial statements because the Primary Government and each component unit already present their corresponding share of the assets of the PRGITF as cash equivalents or investments.

The investment securities on hand at June 30, 2016, consisted of certificates of deposit and time deposits, money market funds, securities purchased under agreements to resell, corporate obligations, commercial paper, and U.S. government and sponsored agencies obligations, all of which may be considered highly liquid. However, the participants' investments are subject to the ability of the PRGITF to receive payment from the securities' issuer when due. The liquidity of certain investments and changes in interest rates may affect PRGITF's yield and the fair value of its investments.

The Commonwealth classified approximately $56.2 million of investments presented in the PRGITF (see Note 6) as cash and cash equivalents. Investments in the PRGITF with an original maturity of 90 days or less from the date of acquisition are considered to be cash equivalents.

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

The dollar amount of the investments at June 30, 2016 at $1.00 per unit of participation was reported in the individual financial statements of each of the participants, and combined in the basic financial statements as follows (in thousands):

|  |  | Outstanding balance | Percentage of total |
|---|---|---|---|
| Primary Government: |  |  |  |
| General Fund and Capital Project Fund | $ | 56,178 | 33.11 % |
| The Children's Trust (1) |  | 14,425 | 8.51 |
| COFINA (1) |  | 166 | 0.10 |
| Total for Primary Government |  | 70,769 | 41.72 |
| Discretely presented major component units: |  |  |  |
| GDB (1) |  | 55,089 | 32.47 |
| SIFC (1) |  | 1,043 | 0.61 |
| PRHTA |  | 171 | 0.10 |
| Total for discretely presented major component units |  | 56,303 | 33.18 |
| Nonmajor component units (1) |  | 42,025 | 24.78 |
| Other participants |  | 549 | 0.32 |
| Total for all participants | $ | 169,646 | 100.00 % |

(1) Reported as investments in the accompanying statement of net position.

The deposits at June 30, 2016 were invested in securities with a cost that approximates fair value, plus accrued interest, for approximately $169.6 million. The external portion of the PRGITF was not considered significant for separate reporting in the accompanying basic financial statements.

As June 30, 2016, the PRGITF's investments were rated "A1" or "AAA" by Standard & Poor's. U.S. government securities carry the explicit guarantee of the U.S. government.

Following is a table of the investments held by the PRGITF at June 30, 2016, presented at amortized cost (in thousands):

| | | |
|---|---|---|
| Commercial paper | $ | 85,868 |
| U.S. government and sponsored agencies obligations | | 44,486 |
| Certificates of deposit and time deposits | | 6,892 |
| Money market | | 32,400 |
| | $ | 169,646 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**(6) Deposits and Investments**

**Primary Government**

The Primary Government may invest in different types of securities, including domestic, international, and fixed income securities, among others.

The Primary Government maintains a cash and investment pool that is available for use by all funds, including some of the fiduciary funds. Each fund's portion of this pool is reported on the statement of net position as cash and cash equivalents. The fiduciary funds' investments are held and managed separately from those of other Primary Government funds.

*Cash and Cash Equivalents*

Custodial credit risk for deposits is the risk that in the event of bank failure, the Commonwealth's deposit might not be recovered. The Commonwealth requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by banks in the Commonwealth's name. There is no formal policy for custodial credit risk for cash accounts opened with commercial banks outside of Puerto Rico.

Deposits in governmental banks represent the balance of interest and noninterest bearing accounts in GDB and EDB. The deposit liability at the GDB and the EDB is substantially related to deposits from the Treasury Department of the Commonwealth, its component units and its municipalities.

Deposits maintained in GDB, EDB, and commercial banks established outside Puerto Rico are exempt from the collateral requirement established by the Commonwealth and thus represent a custodial credit risk, because in the event that these financial institutions fail, the Commonwealth may not be able to recover these deposits. As noted herein, the Commonwealth does not currently maintain deposits at GDB.

The carrying amount of deposits of the Primary Government at June 30, 2016 consists of the following (in thousands):

| | | Carrying amount | | | Bank |
|---|---|---|---|---|---|
| | | Unrestricted | Restricted | Total | balance |
| Governmental activities: | | | | | |
| Commercial banks | $ | 426,733 | 540,567 | 967,300 | 1,331,822 |
| Governmental banks | | 4,369 | 6,935 | 11,304 | 669,958 |
| Total | $ | 431,102 | 547,502 | 978,604 | 2,001,780 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | | Carrying amount | | | Bank |
|---|---|---|---|---|---|
| | | Unrestricted | Restricted | Total | balance |
| Business-type activities: | | | | | |
| Commercial banks | $ | 244,543 | 24,258 | 268,801 | 214,487 |
| Governmental bank | | 719 | 2,983 | 3,702 | 231,182 |
| Under the custody of the U.S. Treasury | | — | 496,906 | 496,906 | 497,060 |
| | | 719 | 499,889 | 500,608 | 728,242 |
| Total | $ | 245,262 | 524,147 | 769,409 | 942,729 |

As of June 30, 2016, the total aggregate amount of the Primary Government's bank balance of deposits in commercial banks was approximately $1.5 billion, covered by the FDIC or by collateral held by the Commonwealth's agent in the Commonwealth's name. Deposits of approximately $497 million with the U.S. Treasury represent unemployment insurance premiums collected from employers that are transferred to the federal Unemployment Insurance Trust Fund in the U.S. Treasury. These deposits are uninsured and uncollateralized. The Primary Government's bank balance of deposits in governmental banks, which as of June 30, 2016, aggregated approximately $901.1 million, is also uninsured and uncollateralized.

The Primary Government classified approximately $56.2 million of investments in the PRGITF as cash equivalents, not presented in the table above; but included in a separate line item in the accompanying statement of net position (Note 5).

*Custodial Credit Loss on Deposits held at GDB and EDB*

GDB faced a critical and economic situation as of June 30, 2016 as described in Note 2. Therefore, deposits held at GDB were subject to strict restrictions and limitations during fiscal year 2016, and subsequent periods. GDB served as the primary depository agent of the Commonwealth, its instrumentalities and municipalities' funds; depositors' cash and cash equivalents with GDB were thus subject to custodial credit risk. In the case of EDB, due to the spiral of economic deterioration affecting the Commonwealth, including downgrades in credit ratings of the Commonwealth's bonds led the private sector to retire deposits from EDB. Also, the GDB financial and liquidity crisis made public governmental agencies and corporations move their deposits from EDB to GDB, reducing EDB's capacity to issue commercial loans or make investments in financial instruments. In addition to these situations, the investments held by EDB had declined in value and EDB was running only on the interest income generated by its loan's portfolio. This posed a difficult liquidity situation to EDB, because due to the high default rate on its loans portfolio, the ability to raise cash through loan repayments is limited. Management determined that a custodial credit loss existed as of June 30, 2016 for the deposits held at GDB and EDB. Based on an evaluation of the availability and recoverability of such

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

deposits, a custodial credit loss on these deposits has been recorded on the Primary Government's financial statements as follows (in thousands):

|  | Amount |
|---|---|
| Governmental activities: | |
| Carrying value before loss | $ 669,958 |
| Custodial credit loss | (658,654) |
| Net carrying value | $ 11,304 |

|  | Amount |
|---|---|
| Business-Type activities: | |
| Carrying value before loss | $ 231,182 |
| Custodial credit loss | (227,480) |
| Net carrying value | $ 3,702 |

A custodial credit loss of approximately $363.6 million was recognized in 2016 as general government expenditures of the Governmental Activities and belong substantially to those Treasury Department accounts and those blended component units or agencies that issued their stand-alone financial statements considering the impact of the custodial credit loss. However, certain blended component units or agencies that are audited by other auditors issued their 2016 stand-alone financial statements without a custodial credit loss evaluation or recognition. Consequently, the cash and cash equivalents balances reported in the financial statements of such blended component units or agencies and of the Primary Government were overstated at June 30, 2016.

A custodial credit loss of approximately $107.4 million was recognized in 2016 as general and administrative expenses of the Business-Type Activities.

As discussed in Note 2(c), on November 29, 2018, GDB completed a restructuring of certain of its indebtedness pursuant to a Qualifying Modification under Title VI of PROMESA. Under the Qualifying Modification and the GDB Restructuring Act, the balance of liabilities owed between the Commonwealth and each Non-Municipal Government Entity and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date. As a result of this foregoing adjustment, all of the Commonwealth's deposits at GDB were extinguished as a result of the Qualifying Modification.

EDB is in the process of developing a strategy to restructure its obligations and operations. Upon the eventual restructuring of EDB obligations and operations, the recorded and unrecorded custodial credit loss on the cash and cash equivalents disclosed above may change.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Investments*

*Custodial Credit Risk* – Custodial credit risk for investments is the risk that, in the event of the failure of the counterparty to the transaction, the Commonwealth may not be able to recover the value of the investment or collateral securities that are in the possession of an outside party.

*Credit Risk* – This is the risk of loss of principal or loss of a financial reward stemming from a borrower's failure to repay a loan or otherwise meet a contractual obligation. Investors are compensated for assuming credit risk by way of interest payments from the borrower or issuer of a debt obligation.

Credit risk is closely tied to the potential return of an investment, the most notable being that the yields on bonds correlate strongly to their perceived credit risk.

The Commonwealth's general investment policy is to apply the "prudent investor" rule, which states investments must be made with judgment and care under circumstances then prevailing, that persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not for speculation but for investment, and considering the probable safety of their capital as well as the probable income to be derived. The prudent investor rule should be applied in the context of managing an overall portfolio.

Short-term funds of the agencies, including operating funds, may be invested in U.S. Treasury bills; U.S. Treasury notes or bonds with short-term maturities; short-term obligations of U.S. government agencies and instrumentalities classified within the highest rating category of Standard & Poor's Rating Services (S&P) and Moody's Investors Service (Moody's); fully insured or collateralized certificates of deposit of eligible financial institutions designated by the Commissioner of Financial Institutions and the Secretary of the Treasury of the Commonwealth; prime commercial paper rated A1/P1 by S&P and Moody's or secured by an irrevocable line of credit of an institution rated within the highest rating category of S&P and Moody's or collateralized by government securities; bankers' acceptances (as alternatives to CDs) of eligible financial institutions doing business in Puerto Rico provided adequate collateral has been pledged; the PRGITF; obligations of the Commonwealth and its instrumentalities with an expected rate of return similar to other securities with the same risk profile.

Longer term funds may also be invested in U.S. government and agency securities in the highest rating category of S&P and Moody's. This include Taxable Municipal Bonds of state and local governments in the United States classified within the three (3) highest categories of at least two of the principal rating services; taxable municipal obligations of the Primary Government and its component units; structured investments (notes and other types of on balance sheet securities issued by a U.S. Government Agency or another financial institutions in the highest rating category of at least two of the principal rating services); and any mortgage backed instrument issued by a U.S. Government Agency in the highest rating category of S&P and Moody's.

*Concentration of Credit Risk* – This is the risk of loss attributed to the magnitude of a government's investment in a single issuer. The Commonwealth policy on larger portfolios with positions in securities having potential default risk is to limit the investments in size so that in case of default, the portfolio's annual investment income will exceed a loss on a single issuer's securities.

*Interest Rate Risk* – It is the Commonwealth policy that a minimum 10% of the total portfolio be held in highly marketable U.S. Treasury bills or overnight investment instruments. Larger portfolios should not hold more

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

than 30% of the portfolio in marketable instruments with maturities beyond one month. This policy should be followed as long as it does not reduce investment yields.

**Governmental Activities**

The Governmental Activities investments consisted of approximately $87.5 million in nonparticipating investment contracts (guaranteed investment contracts) that were exposed to custodial risk as uninsured, unregistered, and held by the counterparties or by their trust departments or agents, but not in the Primary Government's name.

At June 30, 2016, the fair value of the Governmental Activities' investments based on the hierarchy of inputs was as follows:

| Investment type | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| U.S government securities | $          — | 35,737 | — | 35,737 |
| U.S sponsored agencies securities | — | 420 | — | 420 |
| U.S. corporate bonds and notes | — | 367,984 | — | 367,984 |
| Internal investment pools – fixed-income: securities: | | | | |
| PRGITF | — | 14,907 | — | 14,907 |
| External investment pools – fixed-income securities: | | | | |
| Dreyfus Government Cash Management | — | 33,309 | — | 33,309 |
| US Bank Money Market | 25,696 | — | — | 25,696 |
| Nonparticipating investment contracts: | | | | |
| UniCredit Bank AG – Guaranteed Investment Contract | — | — | 83,684 | 83,684 |
| Total investments measured at fair value | $    25,696 | 452,357 | 83,684 | 561,737 |
| Investments measured at amortized cost: | | | | |
| Money market funds | | | | 28,266 |
| Negotiable certificate of deposits | | | | 21,537 |
| Nonparticipating investment contracts | | | | 3,767 |
| Other | | | | 1,592 |
| Total investments | | | $ | 616,899 |

The following table summarizes the type and maturities of investments held by the Governmental Activities at June 30, 2016 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| Investment type | Within one year | After one to five years | After ten years | Total |
|---|---|---|---|---|
| | | **Maturity (in years)** | | |
| U.S. government securities | $ 35,737 | — | — | 35,737 |
| U.S. sponsored agencies securities | 420 | — | — | 420 |
| U.S. corporate bonds and notes | 367,984 | — | — | 367,984 |
| Money market funds | 28,266 | — | — | 28,266 |
| Negotiable certificates of deposits | 2,302 | 19,235 | — | 21,537 |
| Other | — | 1,592 | — | 1,592 |
| Internal investment pools – fixed-income securities: | | | | |
| PRGITF | 14,907 | — | — | 14,907 |
| External investment pools – fixed-income securities: | | | | |
| Dreyfus Government Cash Management | 33,309 | — | — | 33,309 |
| US Bank Money Market | — | — | 25,696 | 25,696 |
| Nonparticipating investment contracts: | | | | |
| Unicredit Bank AG-Guaranteed Investment Contract | — | — | 83,684 | 83,684 |
| Calyon | — | — | 3,767 | 3,767 |
| Total debt securities and fixed-income investment contracts | $ 482,925 | 20,827 | 113,147 | 616,899 |
| Reconciliation to the government-wide statement of net position: | | | | |
| Unrestricted investments | | | | $ 14,591 |
| Restricted investments | | | | 602,308 |
| Total | | | | $ 616,899 |

131

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The credit quality ratings (S&P) and fair value by investment type for the investments reported by the Governmental Activities at June 30, 2016 consisted of the following (in thousands):

| Investment type | | AAA | A+ to A- | BBB+ to B- | Not rated | Total |
|---|---|---|---|---|---|---|
| U.S sponsored agencies securities | $ | 420 | — | — | — | 420 |
| U.S. corporate bonds and notes | | 367,984 | — | — | — | 367,984 |
| Money market funds | | 28,266 | — | — | — | 28,266 |
| Negotiable certificate of deposits | | 21,537 | — | — | — | 21,537 |
| Other | | 1,592 | — | — | — | 1,592 |
| Internal investment pools – fixed-income securities: | | | | | | |
| PRGITF | | 14,425 | — | — | 482 | 14,907 |
| External investment pools – fixed-income securities: | | | | | | |
| Dreyfus Government Cash Management | | 33,309 | — | — | — | 33,309 |
| US Bank Money Market | | — | 25,696 | — | — | 25,696 |
| Nonparticipating investment contracts: | | | | | | |
| UniCredit Bank AG-Guaranteed Investment Contract | | — | — | 83,684 | — | 83,684 |
| Calyon | | — | 3,767 | — | — | 3,767 |
| Total debt securities and fixed-income investment contracts | $ | 467,533 | 29,463 | 83,684 | 482 | 581,162 |

Approximately $35.7 million of the total Governmental Activities' investments consist of U.S. Treasury instruments, which carry no credit risk and therefore, are not included within the table above.

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

**Business-Type Activities**

At June 30, 2016, the fair value of the Business-Type Activities' investments based on the hierarchy of inputs is as follows:

| Investment type | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| U.S. government and agency securities | $        — | 5,005 | — | 5,005 |
| Mortgage and asset-backed securities: | | | | |
| Government National Mortgage Association (GNMA) | — | 3,666 | — | 3,666 |
| Commercial mortgages | — | 279 | — | 279 |
| Asset-backed securities | — | 974 | — | 974 |
| U.S. corporate bonds and notes | — | 5,433 | — | 5,433 |
| Foreign corporate and government bonds and notes | — | 889 | — | 889 |
| U.S. municipal notes | — | 595 | — | 595 |
| External investment pools – equity securities | — | 7,704 | — | 7,704 |
| Total investments measured at fair value | $        — | 24,545 | — | 24,545 |

The following table summarizes the type and maturities of investments held by the Business-Type Activities at June 30, 2016 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| | Maturity (In years) | | | | |
|---|---|---|---|---|---|
| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
| U.S. government and agency securities | $        — | 757 | 2,992 | 1,256 | 5,005 |
| Mortgage and asset-backed securities: | | | | | |
| Government National Mortgage Association (GNMA) | — | 31 | 556 | 3,079 | 3,666 |
| Commercial mortgages | — | — | — | 279 | 279 |
| Asset-backed securities | — | 805 | 169 | — | 974 |
| U.S. corporate bonds and notes | 275 | 2,143 | 1,918 | 1,097 | 5,433 |

### COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

| Investment type | | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|---|
| | | | Maturity (In years) | | | |
| Foreign corporate and government bonds and notes | $ | 290 | 528 | 71 | — | 889 |
| U.S. municipal notes | | — | — | 61 | 534 | 595 |
| Total debt securities | $ | 565 | 4,264 | 5,767 | 6,245 | 16,841 |
| External investment pools – equity securities: | | | | | | |
| SPDR S&P 500 ETF Trust | | | | | | 6,136 |
| MFC ISHARES TR Russell 2000 Index Fund | | | | | | 762 |
| MFC Vanguard FTSE Emergency MKTS ETF | | | | | | 806 |
| Total | | | | | $ | 24,545 |
| Reconciliation to the government-wide statement of net position: | | | | | | |
| Unrestricted investments | | | | | $ | — |
| Restricted investments | | | | | | 24,545 |
| Total | | | | | $ | 24,545 |

The credit quality ratings (S&P) and fair value by investment type for the investments reported by the Business-Type Activities at June 30, 2016 consist of the following (in thousands):

| Investment type | | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ to BB- | CCC+ to CCC- | Not rated | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Rating | | | | |
| Mortgage and asset-backed securities: | | | | | | | | | |
| Commercial mortgages | $ | 101 | — | — | — | — | — | 178 | 279 |
| Asset-backed securities | | 890 | — | — | — | — | — | 84 | 974 |
| U.S. corporate bonds and notes | | — | 960 | 2,031 | 2,367 | — | 75 | — | 5,433 |
| Foreign corporate and government bonds and notes | | — | — | 685 | 151 | 53 | — | — | 889 |
| U.S. municipal notes | | 300 | 263 | — | 32 | — | — | — | 595 |
| Total debt securities | $ | 1,291 | 1,223 | 2,716 | 2,550 | 53 | 75 | 262 | 8,170 |

Approximately $8.7 million of the total Business-Type Activities' investments consist of $3.7 million in U.S. Government National Mortgage Association (GNMA) securities and $5.0 million in U.S. Treasury Instruments, which carry no credit risk and therefore, are not included within the table above.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**Fiduciary Funds**

*Cash and Cash Equivalents*

Cash and cash equivalents of the Fiduciary Funds at June 30, 2016 consisted of the following (in thousands):

| | | Carrying amount | | | Bank balance |
|---|---|---|---|---|---|
| | | **Unrestricted** | **Restricted** | **Total** | |
| Commercial banks | $ | 979,133 | 139,136 | 1,118,269 | 1,113,332 |
| Governmental banks (all with GDB), net | | 166,332 | 48,611 | 214,943 | 251,395 |
| Total | $ | 1,145,465 | 187,747 | 1,333,212 | 1,364,727 |

Cash and cash equivalents consist of deposits with commercial banks, deposits with the GDB and short-term investments. Short-term investments include money market funds and other cash equivalents. The cash in commercial banks and governmental banks also include funds deposited in private banks (approximately $664.8 millions) and GDB (approximately $0.9 million) held by the Commonwealth's agency fund on behalf of third parties outside the Commonwealth's reporting entity.

The total aggregate amount of restricted cash and cash equivalents amounted to approximately $187.7 million as of June 30, 2016 and consisted of the following:

- Approximately $85.4 million in funds restricted for the debt service of ERS bonds payable, of which 100% of such funds were deposited at a trustee in money market funds.

- Approximately $102.3 million in funds restricted for repayments of mortgage and personal loans, for expired checks not claimed by the plan members, and other purposes, of which approximately $83.3 million was deposited at a trustee in money market accounts, approximately $6.3 million was deposited at GDB and approximately $12.6 million were deposited at commercial banks.

Collateral received for securities lending transactions of the pension trust funds at June 30, 2016 that amounted to approximately $21.6 million was invested in short-term investment funds sponsored by the pension trust funds' custodian bank (see Note 7).

Custodial Credit Risk – As of June 30, 2016, the fiduciary funds had approximately $237.7 million in cash and cash equivalents and collateral from securities lending transactions, which were exposed to custodial credit risk as uninsured and uncollateralized. Cash collateral received from securities lending transactions invested in short-term investment funds sponsored by the pension trust funds' custodian bank are also exempt from compliance with the collateralization requirement.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Custodial Credit Loss on Deposits held at GDB and EDB*

Based on an evaluation of the availability and recoverability of deposits, a custodial credit loss has been recorded on the fiduciary funds' financial statements within other expenses as follows (in thousands):

|  | Deposits Held with GDB at June 30, 2016 | | |
|---|---|---|---|
|  | Carrying value before custodial credit loss | Custodial credit loss | Carrying value |
| Cash and cash equivalents | $ 251,395 | (36,452) | 214,943 |

The above custodial credit loss belongs to the Retirement Systems that issued their stand-alone financial statements considering the impact of the custodial credit loss. The realizable balance of the deposits held with the GDB as of June 30, 2016 was determined based on the corresponding actual collections received from the GDB on such deposits after the June 30, 2016 year end. There were no funds deposited in EDB as of June 30, 2016.

*Investments*

At June 30, 2016, the fair value of the pension trust funds' investments based on the hierarchy of inputs is as follows:

| Investment type | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| U.S. government securities | $ 46,924 | — | — | 46,924 |
| U.S. government sponsored agencies notes | 13,222 | — | — | 13,222 |
| Mortgage and asset–backed securities: |  |  |  |  |
|   GNMA | 3,987 | — | — | 3,987 |
|   FNMA | 8,875 | — | — | 8,875 |
|   FHLMC | 4,129 | — | — | 4,129 |
|   Commercial mortgages | — | 1,533 | — | 1,533 |
| U.S. corporate bonds and notes | — | 237,980 | — | 237,980 |
| Non-U.S. corporate bonds and notes | — | 53,070 | — | 53,070 |
| U.S. corporate stock | 1,277 | — | — | 1,277 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| Investment type | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Non U.S. corporate stock | $ 22,056 | — | — | 22,056 |
| U.S. municipal bonds and notes | — | 3,689 | — | 3,689 |
| COFINA bonds | — | 93,484 | — | 93,484 |
| Investments at fair value level | $ 100,470 | 389,756 | — | 490,226 |
| Investments measured at NAV: | | | | |
| Nonexchange commingled trust funds: | | | | |
| Fixed income funds | | | | 417,430 |
| Other funds | | | | 312,391 |
| Investments in limited partnerships | | | | 53,035 |
| Total Investments | | | $ | 1,273,082 |

The following table summarizes the type and maturities of investments held by the pension trust funds at June 30, 2016 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|
| | | | **Maturity (In years)** | | |
| U.S. government securities: | | | | | |
| U.S. Treasury notes | $ 10,537 | 31,329 | — | — | 41,866 |
| U.S. Treasury bonds | — | 2,832 | — | — | 2,832 |
| U.S. Treasury Inflation-Protected Securities (TIPS) | 1,667 | 559 | — | — | 2,226 |
| U.S. government sponsored agencies notes: | | | | | |
| Federal Home Loan Bank (FHLB) | — | 2,908 | — | — | 2,908 |
| FNMA | — | 4,117 | — | — | 4,117 |
| FHLMC | — | 2,519 | — | — | 2,519 |
| Federal Farm Credit Bank (FFCB) | 1,945 | 1,733 | — | — | 3,678 |
| Mortgage and asset–backed securities: | | | | | |
| GNMA | 1,213 | 2,774 | — | — | 3,987 |
| FNMA | 3,373 | 5,502 | — | — | 8,875 |
| FHLMC | 1,979 | 2,150 | — | — | 4,129 |
| Commercial mortgages | — | 1,533 | — | — | 1,533 |

137

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

| Investment type | Maturity (In years) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Within one year | After one to five years | After five to ten years | After ten years | Total |
| U.S. corporate bonds and notes | $   23,754 | 200,287 | 11,851 | 2,088 | 237,980 |
| Non-U.S. corporate bonds and notes | 4,644 | 38,986 | 7,306 | 2,134 | 53,070 |
| U.S. municipal bonds and notes | 611 | 3,078 | — | — | 3,689 |
| COFINA bonds | — | — | — | 93,484 | 93,484 |
| Total bonds and notes | 49,723 | 300,307 | 19,157 | 97,706 | 466,893 |
| Nonexchange commingled trust funds: Fixed income fund – SSgA Intermediate Fund: | | | | | |
| U.S. | 12,758 | 355,626 | — | — | 368,384 |
| Non-U.S. | — | 49,046 | — | — | 49,046 |
| Total bonds and notes and nonexchange commingled fixed-income trust funds | $   62,481 | 704,979 | 19,157 | 97,706 | 884,323 |
| Stocks and equity and other nonexchange commingled trust funds: | | | | | |
| U.S. corporate stock | | | | $ | 1,277 |
| Non U.S. corporate stock | | | | | 22,056 |
| Nonexchange commingled trust funds: Equity and other funds: | | | | | |
| U.S. – SSgA Russell 3000 Fund | | | | | 234,251 |
| U.S. – SSgA S&P 500 Fund | | | | | 8,296 |
| Non-U.S. – SSgA MSCI ACWI Ex USA Fund | | | | | 69,844 |
| Total stocks and equity and other nonexchange commingled trust funds | | | | | 335,724 |
| Investments in limited partnerships | | | | | 53,035 |
| Total | | | | $ | 1,273,082 |

The pension trust fund's investments are exposed to custodial credit risk, credit risk, concentration of credit risk, foreign currency risk, and interest rate risk. Following is a description of these risks as of June 30, 2016:

*Custodial Credit Risk* – At June 30, 2016, securities investments were registered in the name of the pension trust fund and were held in the possession of the pension trust fund's custodian banks, State Street Bank and Trust and Bank of New York Mellon, except for securities lent. Securities lent are not exposed to custodial credit risk (see Note 7).

*Credit Risk* – All fixed income securities at the time of purchase must be of investment grade quality. All issuances must be rated investment grade by at least two of the nationally recognized rating agencies. The portfolio is expected to maintain a minimum weighted average credit quality of either "A" or better using either S&P or Moody's credit ratings. TRS's investment guidelines prohibit the investments in securities with

138

# COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

expected maturity dates beyond 30 years. Positions that drift below investment grade should be reported to a management representative of TRS and monitored carefully. TRS's portfolio is not expected to have more than 5% invested in securities that have drifted after purchase below investment grade quality. JRS investment policy limits the investment in corporate debt securities to the top ratings issued by nationally recognized statistical rating organizations.

The credit quality ratings for investments held by the pension trust funds at June 30, 2016 are as follows (in thousands):

| Investment type | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ to BB- | CCC- | Not Rated | Total |
|---|---|---|---|---|---|---|---|---|
| Bonds and notes: | | | | | | | | |
| U.S. government agencies obligations: | | | | | | | | |
| FHLB | $ — | 2,908 | — | — | — | — | — | 2,908 |
| FNMA | — | 4,117 | — | — | — | — | — | 4,117 |
| FHLMC | — | 2,519 | — | — | — | — | — | 2,519 |
| FFCB | — | 3,678 | — | — | — | — | — | 3,678 |
| Mortgage and asset – backed securities: | | | | | | | | |
| FNMA | 4,963 | 3,662 | — | — | — | — | 250 | 8,875 |
| FHLMC | 2,482 | 1,647 | — | — | — | — | — | 4,129 |
| Commercial mortgages | — | — | — | — | — | — | 1,533 | 1,533 |
| U.S. corporate bonds and notes | 8,829 | 37,691 | 88,129 | 89,899 | 5,984 | 224 | 7,224 | 237,980 |
| Non U.S. corporate bonds and notes | 650 | 2,181 | 23,651 | 17,918 | 6,779 | — | 1,891 | 53,070 |
| U.S. municipal bonds and notes | 1,108 | 1,424 | — | 1,157 | — | — | — | 3,689 |
| COFINA bonds | — | — | — | — | — | 93,484 | — | 93,484 |
| Total bonds and notes | 18,032 | 59,827 | 111,780 | 108,974 | 12,763 | 93,708 | 10,898 | 415,982 |
| Nonexchange commingled trust funds: | | | | | | | | |
| Fixed Income fund – SSgA | | | | | | | | |
| Intermediate Fund | 270,858 | 23,026 | 56,411 | 67,095 | 40 | — | — | 417,430 |
| Total debt securities and fixed-income nonexchange commingled trust fund | $ 288,890 | 82,853 | 168,191 | 176,069 | 12,803 | 93,708 | 10,898 | 833,412 |

(1) Rating obtained from Standard and Poor's or equivalent rating by Moody's Investor Service or Fitch Ratings.

Approximately $50.9 million of the total fiduciary funds' investments at June 30, 2016 consist of GNMA and U.S. Treasury securities, which carry no risk and therefore, are not included within the table above.

*Concentration of Credit Risk* – As of June 30, 2016, none of ERS and JRS investments in marketable securities in any organization represented 5% or more of ERS and JRS net assets held in trust for pension benefits. There were no TRS investments in any one issuer that represented 5% or more of total investments as of June 30, 2016. TRS investment guidelines specify that no more than 5% of a manager's assets at market may be invested in the securities of any single issuer.

*Interest Rate Risk* – In accordance with their investment policy, ERS and JRS manage their exposure to declines in fair values by structuring the investment portfolio so that securities mature to meet cash requirements for benefit payments, thereby avoiding the need to sell securities on the open market prior to maturity. The Pension Trust Fund is expected to achieve capital preservation and income generation by investing in a diversified portfolio of marketable investment grade core fixed income securities. TRS investment guidelines specify that the duration of the portfolio is expected to vary no more than between 75% and 125% of the duration of the respective benchmark.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

As of June 30, 2016, investment maturities as a percentage of total debt securities and fixed income nonexchange traded mutual funds were as follows:

| Maturity | Maximum maturity |
|---|---|
| Within one year | 7% |
| After one year to five years | 80 |
| After five years to ten years | 2 |
| After ten years | 11 |
| Total | 100% |

*Foreign Currency Risk* – This is the risk that changes in exchange rates will adversely affect the fair value of an investment or a deposit. ERS and JRS have no investments with exposure to foreign currency risk. TRS's international portfolio is expected to achieve long-term and aggressive capital appreciation by investing in Core EAFE (Europe Australasia and the Far East) securities. The portfolio is expected to be broadly diversified with respect to exposures to countries, economic sectors, industries, and individual stock. No single issue is expected to exceed 5% (at market) of the portfolio.

TRS's investments and deposits exposed to foreign currency risk as of June 30, 2016, were as follows:

| Investment type | Local currency | Fair value |
|---|---|---|
| | | (In thousands) |
| Cash and cash equivalents | Hong Kong Dollar | $ 37 |
| Cash and cash equivalents | Japanese Yen | 4 |
| Total cash and cash equivalents | | 41 |
| Non-U.S. corporate stock | Australian Dollar | 1,539 |
| Non-U.S. corporate stock | British Sterling Pound | 4,518 |
| Non-U.S. corporate stock | Danish Krone | 1,381 |
| Non-U.S. corporate stock | Euro | 2,378 |
| Non-U.S. corporate stock | Hong Kong Dollar | 470 |
| Non-U.S. corporate stock | Japanese Yen | 5,204 |
| Non-U.S. corporate stock | South African Rand | 505 |
| Non-U.S. corporate stock | Singapore Dollar | 383 |
| Non-U.S. corporate stock | South Korean Won | 135 |
| Non-U.S. corporate stock | Swedish Krona | 1,607 |
| Non-U.S. corporate stock | Swiss Franc | 1,658 |
| Total common stock | | 19,778 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| Investment type | Local currency | Fair value |
|---|---|---|
| | | (In thousands) |
| Nonexchange commingled trust funds – Ssga MCSI ACWI Ex USA | | $ 69,845 |
| Total cash and cash equivalents and securities exposed to foreign currency risk | | $ 89,664 |

In July 2017, the Retirement Systems sold all of the held investments amounting to approximately $297 million and started operating on a "pay-as-you-go" basis. For additional information on the transition to a the PayGo structure for the Retirement Systems, refer to Note 23.

*Nonexchange Commingled Trust Funds*

The pension trust funds invest in shares of the following State Street Global Advisor equity funds: SsgA S&P 500 Flagship Securities Lending Fund (the SsgA S&P 500 Fund), the SsgA Russell 3000 1qIndex Non- Lending Fund (the SsgA Russell 3000 Fund), and the SsgA MSCI ACWI Ex USA Non- Lending Fund (the SsgA MSCI ACWI Ex USA Fund). The investment objectives of the SsgA S&P 500 Fund, the SsgA Russell 3000 Fund, and the SsgA MSCI ACWI Ex USA Fund are to match the return of the Standard & Poor's 500 Index, the Russell 3000 Index, and the MSCI ACWI Ex USA Index, respectively, over the long-term. Shares of the SsgA S&P 500 Fund and of the SsgA Russell 3000 Fund can be redeemed on a daily basis at net asset value (NAV) and have no redemption restrictions. Shares of the SsgA MSCI ACWI Ex USA Fund can be redeemed semimonthly at NAV and have no redemption restrictions. The pension trust funds' investment in these funds is included as part of nonexchange commingled trust funds.

As of June 30, 2016, the investments underlying the SsgA S&P 500 Fund, the SsgA Russell 3000 Fund and the SsgA MSCI ACWI Ex USA Fund had the following sector allocations:

| Sector | SSgA S&P 500 Fund | SSgA Russell 3000 Fund | SSgA MSCI ACWI Ex USA Fund |
|---|---|---|---|
| Information technology | 20% | 18% | 8% |
| Financials | 16 | 18 | 28 |
| Healthcare | 15 | 14 | 9 |
| Consumer discretionary | 12 | 13 | 12 |
| Industrials | 10 | 10 | 11 |
| Consumer staples | 10 | 9 | 10 |
| Energy | 7 | 7 | 7 |
| Materials | 3 | 4 | 7 |
| Utilities | 4 | 5 | 3 |
| Telecommunication services | 3 | 2 | 5 |
| Total | 100% | 100% | 100% |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

In addition, the pension trust funds invest in shares of the State Street Global Advisor Intermediate Credit Index Non- Lending Fund (the SsgA Intermediate Fund). The investment objective of the SsgA Intermediate Fund is to replicate the Barclays U.S. Intermediate Credit Bond Index over a long-term by investing exclusively in fixed income securities. Shares of the SsgA Intermediate Fund can be redeemed on a daily basis at their NAV and have no redemption restrictions. The pension trust funds' investment in the SsgA Intermediate Fund is included as part of nonexchange commingled trust funds.

As of June 30, 2016, the investments underlying the SsgA Intermediate Fund had the following sector allocations:

| Sector | Percentage |
|---|---|
| Treasury | 53% |
| Corporate – Industrial | 20 |
| Corporate – Finance | 13 |
| Noncorporates | 7 |
| Agency | 4 |
| Corporate – Utility | 3 |
| Total | 100% |

As of June 30, 2016, the composition of the underlying investments in the SsgA MSCI ACWI Ex USA Fund and in the SsgA Intermediate Fund by country was as follows:

| Country | SSgA MSCI ACWI Ex USA Fund |
|---|---|
| Japan | 17% |
| United Kingdom | 14 |
| Canada | 7 |
| France | 7 |
| Switzerland | 7 |
| Germany | 6 |
| Australia | 5 |
| China | 6 |
| Korea | 3 |
| Spain | 2 |
| Taiwan | 3 |
| Hong Kong | 2 |
| India | 2 |
| Sweden | 2 |
| Other | 17 |
| Total | 100% |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**Investments in Limited Partnerships**

Pursuant to the Commonwealth's General Investment Policy, the pension trust funds invested approximately $3.2 million in limited partnerships during the year ended June 30, 2016.

The fair value of investments in limited partnerships at June 30, 2016 amounted to approximately $53 million. The allocations of net gains and losses to limited partners are based on certain percentages, as established in the limited partnership agreements. Investments in limited partnerships are not rated by a nationally recognized statistical rating organization. The related credit risk is measured through credit analysis, periodic reviews of results of operations, and meetings of subject companies' management.

As of June 30, 2016, the pension trust funds had capital commitments with limited partnerships and related contributions as follows (in thousands):

| | Public sector commitments | Fiscal year contributions | Cumulative contributions | Fair value |
|---|---|---|---|---|
| Guayacán Fund of Funds II, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | $ 25,000 | — | 23,681 | 1,744 |
| Puerto Rico System of Annuities and Pensions for Teachers | 25,000 | — | 23,681 | 1,743 |
| Subtotal | 50,000 | — | 47,362 | 3,487 |
| Guayacán Private Equity Fund, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 5,000 | — | 4,645 | 2,161 |
| Puerto Rico System of Annuities and Pensions for Teachers | 5,000 | — | 4,645 | 2,156 |
| Subtotal | 10,000 | — | 9,290 | 4,317 |
| Guayacán Private Equity Fund II, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 25,000 | 3,196 | 24,547 | 25,701 |
| Subtotal | 25,000 | 3,196 | 24,547 | 25,701 |

143

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | Public sector commitments | Fiscal year contributions | Cumulative contributions | Fair value |
|---|---|---|---|---|
| Other Funds: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | $ 27,596 | — | 28,389 | 17,856 |
| Puerto Rico System of Annuities and Pensions for Teachers | 28,714 | — | 26,498 | 1,674 |
| Subtotal | 56,310 | — | 54,887 | 19,530 |
| Total | $ 141,310 | 3,196 | 136,086 | 53,035 |

## Discretely Presented Component Units

### Deposits

Cash and cash equivalents consist of demand deposits, interest bearing accounts, certificates of deposit, and bank investment contracts. Cash and cash equivalents of the component units at June 30, 2016 consisted of (in thousands):

### Major Component Units

| | Carrying amount | | | Bank balance |
|---|---|---|---|---|
| | Unrestricted | Restricted | Total | |
| Commercial banks | $ 1,131,757 | 492,702 | 1,624,459 | 2,764,329 |
| Governmental banks | 1,525 | 5,125 | 6,650 | 300,514 |
| Total | $ 1,133,282 | 497,827 | 1,631,109 | 3,064,843 |

As of June 30, 2016, the major component units had approximately $301 million of cash and cash equivalents that were exposed to custodial credit risk as uninsured and uncollateralized.

The major component units classified approximately $171 thousand of investments in the PRGITF as cash and cash equivalents presented in the table above.

### Nonmajor Component Units

| | Carrying amount | | | Bank balance |
|---|---|---|---|---|
| | Unrestricted | Restricted | Total | |
| Commercial banks | $ 279,673 | 36,568 | 316,241 | 304,564 |
| Governmental banks: | 47,189 | 5,248 | 52,437 | 419,376 |
| Total | $ 326,862 | 41,816 | 368,678 | 723,940 |

144

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

As of June 30, 2016, the nonmajor component units had approximately $419 million of cash and cash equivalents that were exposed to custodial credit risk as uninsured and uncollateralized.

*Custodial Credit Loss on Deposits held at GDB and EDB*

Management determined that a custodial credit loss existed at June 30, 2016 for the deposits held at GDB and EDB. Based on an evaluation of the availability and recoverability of such deposits, a custodial credit loss on these deposits has been recorded on the component units' financial statements within general expenses as follows (in thousands):

|  | Amount |
|---|---|
| Major component units: | |
| Carrying value before custodial credit loss | $ 300,514 |
| Custodial credit loss | (293,864) |
| Net carrying value | $ 6,650 |

|  | Amount |
|---|---|
| Nonmajor component units: | |
| Carrying value before custodial credit loss | $ 419,376 |
| Custodial credit loss | (366,939) |
| Net carrying value | $ 52,437 |

The aforementioned custodial credit losses were substantially related to those discretely presented component units which issued their stand-alone financial statements considering the impact of the custodial credit loss. However, certain of the discretely presented component units issued their 2016 stand-alone financial statements without performing a custodial credit loss evaluation. Consequently, the cash and cash equivalents amounts reported by such discretely presented component units were overstated as of June 30, 2016.

A custodial credit loss of approximately $518.9 million was recognized as general and administrative expenses of the discretely presented component units during fiscal year 2016.

The Commonwealth evaluated the availability and recoverability of the deposits held at GDB and EDB for the entities that did not evaluate custodial credit loss on their respective 2016 stand-alone financial statements, and determined that an additional custodial credit loss of approximately $97 million should have been recorded as of June 30, 2016 on the cash and cash equivalents of the discretely presented nonmajor component units. These additional amounts of custodial credit loss which should have been recognized as of June 30, 2016 were considered unaudited because they relate to entities and funds, which were audited by other auditors, that did not evaluate the potential custodial credit loss of deposits at GDB and EDB in their respective separately issued financial statements.

As discussed in Note 2(c), on November 29, 2018, GDB completed a restructuring of certain of its indebtedness pursuant to a Qualifying Modification under Title VI of PROMESA.  Under the Qualifying

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Modification and the GDB Restructuring Act, the balance of liabilities owed between the Commonwealth and each Non-Municipal Government Entity and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date. As a result of this foregoing adjustment, all of the Commonwealth's deposits at GDB were extinguished as a result of the Qualifying Modification.

EDB is in the process of developing a strategy directed to restructure its obligations and operations. Upon the eventual restructuring of EDB obligations and operations, the recorded and unrecorded custodial credit loss on the cash and cash equivalents disclosed above may change.

*Credit Risk* – In addition to the investments permitted for the Primary Government, the component units' investment policies allow management to invest in the following: certificates of deposit or Euro notes issued by financial institutions in the U.S. in which the issuer is classified in the highest rating category for short-term obligations and in the two highest rating category for long-term obligations as classified by S&P and Moody's; corporate notes and bonds classified in the highest categories of at least two of the principal rating services; taxable corporate debt issued through AFICA within the two (2) highest rating categories of at least two of the principal rating services; trust certificates (subject to prior written consultation with GDB); and Mortgage and Asset Backed Securities rated AAA by S&P or Aaa by Moody's that must not exceed 5% of the underlying Trust at any time.

The component units' investment policies establish limitations and other guidelines on amounts to be invested in the aforementioned investment categories and by issuer/counterparty and on exposure by country. In addition, such policies provide guidelines on the institutions with which investment transactions can be entered into.

The component units' investment policies provide that investments transactions must be entered into with counterparties that are rated BBB+/A 1 or better by S&P's or equivalent rating by Fitch Ratings or Moody's, depending on the type and maturity of the investment and the counterparty to the transaction.

*Concentration of credit risk* – In addition, the investment policy specifies that no more than 5% of a manager's assets at fair value must be invested in the securities of any single issuer. The following table summarizes the type and maturities of investments held by the component units at June 30, 2016 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**Component Units**

At June 30, 2016, the fair value of the major component units' investments based on the hierarchy of inputs is as follows:

| Investment type | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| U.S. government securities | $ | 8,651 | 81,051 | - | 89,702 |
| U.S. government agencies notes: | | | | | |
|     FHLB | | 24,630 | 8,847 | - | 33,477 |
|     FNMA | | - | 12,777 | - | 12,777 |
|     FHLMC | | - | 1,196 | - | 1,196 |
|     FFCB | | - | 12,884 | - | 12,884 |
|     Other | | - | 1,980 | - | 1,980 |
| Mortgage and asset-backed securities: | | | | | |
|     GNMA | | 99,924 | 6,760 | - | 106,684 |
|     FNMA | | 19,872 | 33,496 | - | 53,368 |
|     FHLMC | | - | 14,421 | - | 14,421 |
|     Commercial mortgages | | - | 537 | - | 537 |
|     Asset-backed securities | | - | 6,189 | - | 6,189 |
|     Other | | 179 | 272 | - | 451 |
| U.S. corporate bonds and notes | | 24,989 | 95,053 | - | 120,042 |
| Foreign government bonds and notes | | 49,831 | 2,626 | - | 52,457 |
| U.S. municipal notes | | - | 7,869 | - | 7,869 |
| Commonwealth agency bonds and notes | | - | 67,386 | - | 67,386 |
| External investment pools - fixed - income securities | | 17,438 | - | - | 17,438 |
| External investment pools - equity securities | | 30,715 | - | 59,974 | 90,689 |
| U.S. corporate stocks | | 238,091 | - | - | 238,091 |
| Non U.S. corporate stocks | | 24,172 | - | - | 24,172 |
| Other | | - | - | 3,524 | 3,524 |
|     Investments at fair value level | $ | 538,492 | 353,344 | 63,498 | 955,334 |
| Investments valued at NAV or amortized cost: | | | | | |
|     Cash equivalent - money market fund | | | | | 178,390 |
|     Negotiable certificates of deposit | | | | | 161 |
|     Mutual funds | | | | | 98,612 |
|     PRGITF | | | | | 55,816 |
|     Guaranteed investments contract | | | | | 204,876 |
|     External investment pools - equity securities | | | | | 55,278 |
|     Limited partnership/private equity | | | | | 44,013 |
| Total major component units | | | | | 1,592,480 |
| Total non-major component units | | | | | 1,546,483 |
| Total investments | | | | $ | 3,138,963 |

147

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

The following table summarizes the type and maturities of investments held by major component units at June 30, 2016 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|
| U.S. government securities | $ 61,556 | 7,742 | 17,577 | 2,827 | 89,702 |
| U.S. government sponsored agencies notes: | | | | | |
| FHLB | 7,739 | 19,732 | 6,006 | — | 33,477 |
| FNMA | 6,159 | 6,618 | — | — | 12,777 |
| FHLMC | — | 772 | 424 | — | 1,196 |
| FFCB | — | 5,289 | 7,595 | — | 12,884 |
| Other | — | 576 | 1,404 | — | 1,980 |
| Mortgage and asset-backed securities: | | | | | |
| GNMA | — | — | 30,424 | 76,260 | 106,684 |
| FNMA | 25,589 | 87 | 8,369 | 19,323 | 53,368 |
| FHLMC | — | 6 | 1,406 | 13,009 | 14,421 |
| Commercial mortgages | — | — | — | 537 | 537 |
| Asset-backed securities | 112 | 6,077 | — | — | 6,189 |
| Other | — | — | — | 451 | 451 |
| U.S. corporate bonds and notes | 16,760 | 54,000 | 43,163 | 6,119 | 120,042 |
| Foreign government bonds and notes | 8,063 | 39,900 | 4,305 | 189 | 52,457 |
| U.S. municipal notes | — | 5,368 | 1,434 | 1,067 | 7,869 |
| Commonwealth agency bonds and notes | — | 67,386 | — | — | 67,386 |
| Money market funds | 150,636 | 27,754 | — | — | 178,390 |
| Negotiable certificates of deposit | 161 | — | — | — | 161 |
| PRGITF | 55,816 | — | — | — | 55,816 |
| External investment pools – fixed-income securities | 11,968 | 316 | 76 | 5,078 | 17,438 |
| Nonparticipating investment contracts | 83,654 | 47,618 | — | 73,604 | 204,876 |
| Other | 98,612 | — | — | — | 98,612 |
| Total debt securities and fixed-income investment contracts | $ 526,825 | 289,241 | 122,183 | 198,464 | 1,136,713 |
| Equity securities: | | | | | |
| U.S. corporate stocks | | | | | $ 238,091 |
| Non-U.S. corporate stocks | | | | | 24,172 |
| External investment pools – equity securities | | | | | 149,491 |
| Limited partnership/private equity | | | | | 44,013 |
| Total major component units | | | | | 1,592,480 |
| Total nonmajor component units | | | | | 1,546,483 |
| Total | | | | | $ 3,138,963 |

148

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | Maturity (in years) | | | | |
|---|---|---|---|---|---|
| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
| Reconciliation to the government-wide statement of net position: | | | | | |
| Unrestricted investments | | | | | $ 1,185,350 |
| Restricted investments | | | | | 1,953,613 |
| Total | | | | | $ 3,138,963 |

PRHTA, a major component unit, classified approximately $171 thousand of investments presented in the PRGITF as cash equivalents.

*Custodial Credit Risk* – The component units had approximately $129.8 million (approximately $0.1 million and $129.7 million at major and nonmajor component units, respectively) in various types of U.S. government and agency securities, mortgage backed securities, and other investments that were exposed to custodial credit risk as uninsured, unregistered, and held by the counterparties or by their trust departments or agents, but not in the component units' name.

*Foreign Currency Risk* – SIFC (a major component unit) limits its exposure to foreign currency risk by limiting the total amount invested to 10% of the portfolio. As of June 30, 2016, the SIFC had the following investments denominated in foreign currency (in thousands):

| Description | Currency | Fair value |
|---|---|---|
| Common stock | Australian dollar | $ 427 |
| | Canadian Dollar | 1,092 |
| | Swiss Franc | 2,184 |
| | Danish Krone | 227 |
| | Euro | 6,406 |
| | British Pound | 3,804 |
| | Hong Kong Dollar | 648 |
| | Indonesian Rupiah | 290 |
| | Japanese Yen | 6,556 |
| | Mexican Peso | 253 |
| | Norwegian Krone | 502 |
| | Swedish Krona | 495 |
| | Singapore Dollar | 435 |
| | South African Rand | 309 |
| Preferred stock and other equities | Euro | 544 |
| Total | | $ 24,172 |

149

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Custodial Credit Loss on Deposits held at GDB and EDB*

Certain negotiable certificates of deposits presented in the investment tables above were deposits at GDB. As GDB served as the depository agent of these deposits, such certificates of deposits at GDB, were subject to custodial credit risk. Management determined that a custodial credit loss existed at June 30, 2016 for the deposits held at GDB. Based on an evaluation of the availability and recoverability of such deposits, a custodial credit loss on these deposits has been recorded on the corresponding component units' financial statements as follows (in thousands):

| | | Certificates of Deposits Held in Governmental Banks at June 30, 2016 | | |
| --- | --- | --- | --- | --- |
| | | Carrying value before custodial credit loss | Custodial credit loss | Net carrying value |
| Major component units: | | | | |
| UPR | $ | 91,475 | (91,475) | — |
| Nonmajor component units | | 185,385 | (100,781) | 84,604 |
| Total component units | $ | 276,860 | (192,256) | 84,604 |

The aforementioned custodial credit loss was mainly related to those discretely presented component units which issued their 2016 stand-alone financial statements considering the impact of the custodial credit loss. However, certain of the discretely presented component units issued their stand-alone financial statements without performing a custodial credit loss evaluation. Consequently, the certificates of deposit amounts reported by such discretely presented component units were overstated as of June 30, 2016.

The Commonwealth evaluated the availability and recoverability of the funds held at GDB that have not been subject to custodial credit loss considerations on their respective 2016 stand-alone financial statements and concluded that an additional custodial credit loss of approximately $83.5 million should have been recorded as of June 30, 2016 on the certificates of deposit held at GDB of the discretely presented component units. These additional amounts of custodial credit loss which should have been recognized as of June 30, 2016 are considered unaudited because they relate to entities and funds, which are audited by other auditors, that did not evaluate the potential custodial credit loss of deposits at GDB in their respective separately issued financial statements. There were no Certificates of Deposits in EDB as of June 30, 2016.

As discussed in Note 2(c), on November 29, 2018, GDB completed a restructuring of certain of its indebtedness pursuant to a Qualifying Modification under Title VI of PROMESA.  Under the Qualifying Modification and the GDB Restructuring Act, the balance of liabilities owed between the Commonwealth and each Non-Municipal Government Entity and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date. As a result of this foregoing adjustment, all of the Commonwealth's deposits at GDB were extinguished as a result of the Qualifying Modification.

150

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

EDB is in the process of developing a strategy directed to restructure its obligations and operations. Upon the eventual restructuring of EDB obligations and operations, the recorded and unrecorded custodial credit loss on the cash and cash equivalents disclosed above may change.

*Subsequent Downgrades in Credit Ratings of Commonwealth's Bonds*

As explained in Note 23, beginning in fiscal year 2015, several bonds of the Commonwealth and its instrumentalities were downgraded on multiple occasions and by notches by the principal credit rating agencies in the United States. However, most of the existing investments in the tables above were not affected. Generally, the investment policies of the Commonwealth require its agencies and instrumentalities to hold only investment grade ratings debt securities in their investment portfolio. With over 85% and 75% of the investments at the Primary Government and component unit level, respectively, with credit ratings no lower than "A" or without risks at June 30, 2016, overall average credit ratings on the entire investment portfolio have remained within the Commonwealth's required investment policies, even after the downgrades. The remaining percentage of investments is either rated throughout the B spectrum or not rated, except for a SIFC (major component unit) investment in GDB bonds of approximately $67.4 million and four nonmajor component units' investments in GDB, Primary Government Bonds, and Commonwealth's Municipalities Bonds of approximately $595 million, both of which were downgraded to D after June 30, 2016.

**(7)   Securities Lending and Repurchase Agreement Transactions**

During the fiscal year ending June 30, 2016, the pension trust funds (included within the fiduciary funds), GDB, EDB, and SIFC (all discretely presented component units) entered into transactions involving securities lending and the selling of securities with agreements to repurchase. These transactions are explained below:

*Pension Trust Funds*

The Retirement Systems participate in a securities lending programs, whereby investment securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, government securities, and/or irrevocable bank letters of credit equal to approximately 102% of the fair value of the domestic securities on loan and 105% of the fair value of the international securities on loan, with a simultaneous agreement to return the collateral for the same securities in the future. Collateral is marked to market daily, and the agent places a request for additional collateral from brokers, if needed. The custodian bank is the agent for the securities lending program.

At year end, the Retirement Systems had no credit risk exposure to borrowers because the amounts the Retirement Systems owed the borrowers (the collateral) exceeded the amounts the borrowers owed the Retirement Systems. At June 30, 2016, the collateral received represented 105.5% of the fair value of the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

domestic securities lent. The securities on loan for which collateral was received as of June 30, 2016, consisted of the following (in thousands):

| Description | | Fair value of underlying securities |
|---|---|---|
| U.S. government securities: | | |
| U.S. Treasury bills | $ | 110 |
| U.S. Treasury notes | | 2,351 |
| U.S. Treasury bonds | | 1,043 |
| U.S. corporate bonds and notes | | 14,634 |
| Non-U.S. corporate bonds and notes | | 1,940 |
| U.S. corporate stock | | 246 |
| Non-U.S. corporate stock | | 185 |
| Total | $ | 20,509 |

The underlying collateral for these securities had a fair value of approximately $21.6 million as of June 30, 2016. The collateral received was invested in a short-term investment fund sponsored by the custodian bank and is presented as collateral from securities lending transactions in the accompanying statement of fiduciary net position.

As of June 30, 2016, the distribution of the short-term investment fund by investment type is as follows (in thousands):

| Investment type | | Fair value of underlying securities |
|---|---|---|
| Securities bought under agreements to resell | $ | 20,514 |
| Certificates of deposit | | 1,078 |
| Total | $ | 21,592 |

Under the terms of the securities lending agreement, the Retirement System is fully indemnified against failure of the borrowers to return the loaned securities (to the extent the collateral is inadequate to replace the loaned securities) or failure to pay the Retirement System for income distributions by the securities' issuers while the securities are on loan. In addition, the Retirement System is indemnified against loss should the lending agent fail to demand adequate and appropriate collateral on a timely basis.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Discretely Presented Component Units*

GDB – The following is selected information concerning securities sold under agreements to repurchase (in thousands):

| | | |
|---|---|---|
| Carrying amount at June 30, 2016 | $ | — |
| Maximum amount outstanding at any month-end | | 188,076 |
| Average amount outstanding during the year | | 148,079 |
| Weighted average interest rate for the year | | 0.21% |
| Weighted average interest rate at year-end | | — |

The following summarizes the activity of securities sold under agreements to repurchase for the year ended June 30, 2016 (in thousands):

| | | Beginning balance | Issuances | Maturities | Ending balance |
|---|---|---|---|---|---|
| GDB Operating Fund | $ | 267,207 | 876,720 | 1,143,927 | — |

All sales of investments under agreements to repurchase are for fixed terms. In investing the proceeds of securities sold under agreements to repurchase, GDB's policy was for the term to maturity of investments to be on or before the maturity of the related repurchase agreements.

SIFC – The Commonwealth statutes and the SIFC's board of directors' policies permit the SIFC to use its investments to enter into securities lending transactions, whereby securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, securities, and/or irrevocable bank letter of credit. The SIFC's securities custodian, JP Morgan Chase Bank, N.A., as agent of the SIFC, manages the securities lending program and receives cash collateral, securities, or irrevocable bank letters of credit as collateral. The collateral securities cannot be pledged or sold by the SIFC unless the borrower defaults. The collateral requirement is equal to 102% for securities issued in the United States of America and 105% for securities issued outside of the United States of America, of the fair value of the securities lent. Collateral must be supplemented by the next business day if its fair value falls to less than 100% of the fair value of the securities lent. All security loans can be terminated on demand by either the SIFC or the borrower. In lending securities, the term to maturity of the securities loans is matched with the term to maturity of the investment of the cash collateral. Such matching existed at year end. At year end, the SIFC has no credit risk exposure to borrowers because the amounts the SIFC owes the borrowers exceed the amounts the borrowers owe SIFC. Contracts with the lending agents require them to indemnify the SIFC if the borrowers fail to return the securities (and if the collateral is inadequate to replace the securities lent) or fail to pay the SIFC for income distributions by the securities' issuers while the securities are on loan.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Securities lent as of June 30, 2016 had a fair value of approximately $43.8 million and were secured with collateral received with a fair value of approximately $44.8 million. Securities lent for which cash was received as collateral as of June 30, 2016 consist of the following (in thousands):

| Investment type | | Fair value of underlying securities |
|---|---|---|
| Equity securities | $ | 33,002 |
| Corporate bonds and notes | | 4,579 |
| Foreign government and corporate bonds | | 10 |
| Total | $ | 37,591 |

Cash collateral received as of June 30, 2016 amounted to approximately $38.4 million and was invested as follows (in thousands):

| Investment type | | Fair value of underlying securities |
|---|---|---|
| Certificates of deposit with other banks | $ | 14,006 |
| Resell agreements | | 14,398 |
| Money market funds | | 10,032 |
| Total | $ | 38,436 |

In addition, the SIFC had the following lending obligations as of June 30, 2016 for which securities were received as collateral (in thousands):

| Description | | Fair value Securities lent | Investment collateral received |
|---|---|---|---|
| U.S. Treasury bonds and notes | $ | 4,269 | 4,362 |
| U.S. sponsored agencies bonds and notes FHLMC | | 428 | 437 |
| Equity securities | | 1,473 | 1,518 |
| | $ | 6,170 | 6,317 |

154

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

EDB – EDB's investment policies, as authorized by Act No. 22 of July 24, 1985, Article 3, allow management to sell securities under agreements to repurchase. The following table summarizes certain information on securities sold under agreements to repurchase (in thousands):

| | |
|---|---:|
| Carrying amount at June 30, 2016 | $ — |
| Average amount outstanding during the year | |
| Maximum amount outstanding at any | 9,324 |
| month-end | 24,406 |
| Weighted average interest rate for the year | 0.56% |
| Weighted average interest rate at year-end | — |

The activity for securities sold under agreements to repurchase during 2016 was as follows (in thousands):

| | Beginning balance | Issuances | Maturities | Ending balance |
|---|---:|---:|---:|---:|
| Securities sold under agreements to repurchase | $  28,756 | 85,186 | (113,942) | — |

## (8) Receivables and Payables

*Governmental and Proprietary Funds*

Receivables in the governmental funds include approximately $1.4 billion of accrued income, excise, and sales and use taxes. Intergovernmental receivables include approximately $374.9 million from the federal government and $17.5 million from CRIM. In addition, the proprietary funds include $66.5 million of unemployment, disability, and drivers' insurance premium receivables; approximately $23.2 million receivable from private citizens, member institutions, and municipalities for patient services provided by the PRMeSA; and approximately $177.6 million receivable from the U.S. Department of Health, municipalities and private citizens and pharmacies for the related health insurance coverage services provided by PRHIA's operations. Payables in the governmental funds include approximately $1.6 billion of trade accounts due to suppliers for purchase of merchandise and services rendered, approximately $373.7 million of salary related benefits owed to eligible police agents for annual salary increases, awards, and other monetary benefits granted to them through several laws dating back to 1954, and approximately $690.7 million of tax refunds payable.

In accordance with GASB Technical Bulletin No. 2004 1, *Tobacco Settlement Recognition and Financial Reporting Entity Issue*, as amended (the TB), a receivable of $36.8 million was recorded as other receivable in the government-wide financial statements and in the nonmajor governmental funds for estimated shipments from January 1 to June 30, 2016, which will be applied to debt service upon collection. Additionally, the TB indicated that the trust designated as the Tobacco Settlement Authority (the Children's Trust in the case of the Commonwealth) should recognize a liability for the bonds payable and an expense (and liability if unpaid) in the same period in its stand-alone financial statements. The expense (and liability if unpaid) recognizes the contractual obligation to remit the proceeds of the bond sold to the settling

155

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

government (the Commonwealth). Since the Children's Trust is reported as a blended component unit, the TB indicates these remittances should be reported as transfers into the fund receiving the proceeds and transfers out of the fund that accounts for the activities of the Tobacco Settlement Authority. Since the Children's Trust has no contractual obligation, under its enabling legislation or elsewhere, to remit all bond proceeds or assets related to the Tobacco Settlement Authority to the settling government (the Commonwealth), the Children's Trust has not recognized an expense and liability for unpaid proceeds from the bonds since it records the expense as amounts are disbursed as grants to its settling government (including its instrumentalities) or third parties.

*Pension Trust Funds*

Prior to the enactment of Act No. 106 of 2017 on August 23, 2017, loans receivable from plan members were guaranteed by the contributions of plan members and by other sources, including mortgage deeds and any unrestricted amount remaining in the escrow funds. In addition, collections on loans receivable were received through payroll withholdings. For the year ended June 30, 2016, the maximum amount of loans to plan members for mortgage loans was $100,000 for ERS and JRS and $125,000 for TRS, and $5,000 for personal and cultural trip loans for the three systems. During the year ended June 30, 2014 and 2013, ERS personal loans with principal balances amounting to approximately $100 million and $88 million, respectively, were sold to two financial institutions. As per the servicing agreement, ERS will be in charge of the servicing, administration and collection of loans and outstanding principal balances at the end of the closing date for a servicing fee of 2%. After August 23, 2017, pension benefits will be paid from the Primary Government's General Fund (as discussed in Note 23), and as of the date hereof, the pension trust funds are no longer applicable.

The allowance for adjustments and losses in realization is considered a general allowance for all categories of loans and interest receivable, except mortgage loans, that is a specific allowance for the special collection project loans balances.

As of June 30, 2016, the composition of loans and interest receivable from plan members is summarized as follows (in thousands):

| | | |
|---|---|---|
| Loans receivable from plan members: | | |
| Personal | $ | 372,465 |
| Mortgage | | 515,045 |
| Cultural trips | | 47,491 |
| Total loans to plan members | | 935,001 |
| Accrued interest receivable | | 34,187 |
| Total loans and interest receivable from plan members | | 969,188 |
| Less allowance for adjustments and losses in realization | | (5,117) |
| Total loans and interest receivable from plan members – net | $ | 964,071 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

As of June 30, 2016, accounts receivable from employers, included within accounts receivable in the accompanying statement of fiduciary net position, consisted of the following (in thousands):

| | | |
|---|---|---:|
| Early retirement programs | $ | 2,733 |
| Employer contributions under special laws | | 64,012 |
| Employer and employee contributions | | 395,989 |
| Interest on late payments | | 59,001 |
| Total accounts receivable from employers | | 521,735 |
| Less allowance for doubtful accounts receivable | | (262,934) |
| Accounts receivable from employers – net | $ | 258,801 |

According to Act No. 447 1991, each employer must pay, on a monthly basis, the amounts corresponding to contributions and loan repayments, on or before the fifteenth day of the following month. After that date, interest is charged as established by the Pension Trust Fund.

The Commonwealth and many of its instrumentalities and municipalities, which are employers for the purpose of ERS and JRS, have been facing significant fiscal and economic challenges. Further, in recent months, the rating downgrade and widening of credit spreads for Puerto Rico's public-sector debt, including public corporations, has put further strain on liquidity and sources of funding for the employers. Consequently, most of the receivables from employers are delinquent past established payment dates and/or installment plan due dates. In other instances, amounts past due continue to be renegotiated to later dates.

As of June 30, 2016, ERS and JRS recorded an allowance of approximately $250.8 million and $12.1 million respectively, for adjustments and losses in realization related to the uncertain collectability of the additional uniform contributions due from the Commonwealth.

Although certain measures were taken to improve the collection of such receivables, the timing of collections from employers affects the liquidity needs of ERS and JRS. Management is of the opinion that, except for the additional uniform contributions of the Commonwealth of approximately $250.8 million due to ERS for the fiscal years 2015 and 2016 and approximately $12.1 million due to JRS for the fiscal year 2016, other amounts due from employers are collectible; however, this situation could ultimately affect the payment of benefits to members or repayment of ERS's bonds payable, should any such amounts become uncollectible in the future.

As of June 30, 2016, accounts receivable from employers include amounts due from PRMeSA of approximately $71.2 million (recorded within ERS), as follow (in thousands):

| | | |
|---|---|---:|
| Employer and employee contributions | $ | 38,786 |
| Withholdings of employees' loans | | 1,934 |
| Interest | | 30,440 |
| Total accounts receivable from PRMeSA | $ | 71,160 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Amounts due from PRMeSA as of June 30, 2016 mainly consists of accrued pension costs corresponding to fiscal years 2013 through 2016 amounting to approximately $68.2 million, which have no repayment plan and those related to fiscal year 2011 under the repayment plan referred to below amounting to approximately $3 million.

On November 1, 2011, PRMeSA and ERS entered into a payment plan agreement (the Agreement) for the repayment of a debt amounting to approximately $15.3 million, at such date, corresponding to fiscal year 2011. Beginning on November 15, 2011, the agreement calls for sixty (60) monthly installments of $255,677 bearing no interest. Default payments of less than one year in default will bear interest at 9% and 12% for those in excess of one year.

*Discretely Presented Component Units – GDB*

At June 30, 2016, loans from GDB to public corporations and agencies of the Commonwealth (excluding municipalities) amounting to $6.5 billion were repayable from the following sources (in thousands):

|  | Amount |
|---|---|
| Repayment source: | |
| Proceeds from future bond issuances | $    1,504,300 |
| General fund and/or legislative appropriations | 3,497,642 |
| Operating revenues | 1,141,690 |
| Other | 347,924 |
| Total | $    6,491,556 |

For the year ended June 30, 2016, disbursements and collections of principal of public-sector loans payable by future bond issuances amounted to approximately $20.8 million and $4.5 million, respectively. Public-sector loans payable by the Commonwealth's General Fund and/or appropriations had disbursements and collections of principal amounting to approximately $647.1 million and $970.8 million, respectively during the year ended June 30, 2016. Public-sector loans payable by operating revenue and other sources of repayment had disbursements and collections of principal amounting to approximately $240 million and $172.4 million, respectively during the year ended June 30, 2016.

At June 30, 2016, approximately $3.5 billion of the public-sector loans were payable from legislative appropriations or future tax revenue of the Commonwealth. Accordingly, the payment of these loans may be affected by budgetary constraints and the overall fiscal situation impacting Puerto Rico.

As of June 30, 2016, the PRHTA had an authorized maximum of approximately $2 billion in financing with GDB, with an outstanding balance of approximately $1.7 billion in principal. Historically, these facilities were repaid from proceeds of bond issuances. All of these facilities have been extended repeatedly and have not been paid as scheduled. On December 1, 2015, the Commonwealth announced its intention to retain certain taxes and revenues that were conditionally allocated to certain public corporations and agencies, including the PRHTA.

158

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

PRHTA is currently in a debt restructuring proceeding under Title III of PROMESA and does not currently have sufficient funds available to fully repay its various obligations, including those owed to GDB, as they come due or that are currently in default.

As of June 30, 2016, the majority of loans to public corporations and agencies totaling approximately $6.5 billion were classified as nonaccrual. Interest income that would have been recorded if under the original term of these loans amounted approximately $379.5 million in fiscal year 2016. Actual interest collected during fiscal year 2016 on these loans amounted approximately $112.6 million.

GDB considers the public-sector loan portfolio to be impaired based on current information and events, including the significant delays in the receipt of the scheduled debt service payment mentioned above. In Management's opinion, it is highly probable that GDB will be unable to collect all amounts due according to the loan's original contractual terms, particularly in light of the Title III cases of certain borrowers. GDB's evaluation of impaired loans consisted of identifying which public-sector loans have reliable or unreliable sources of repayment, respectively. Loans with reliable sources of repayment that were performing were evaluated collectively. Loans with unreliable sources of repayment were evaluated for impairment individually. Impaired loans are measured individually based on the present value of expected future cash flows discounted at the loan's effective interest rate, or if the loan is collateral dependent, the fair value of the collateral.

During fiscal year 2016, GDB recognized a release in the provision for loan losses of approximately $76.5 million in its public corporations and agencies loan portfolio. As of June 30, 2016, the public-sector loan portfolio had an allowance for loan losses in the amount of $5.8 billion. Prior to fiscal year 2014, no charge-off has been recorded by GDB in its public-sector loan portfolio.

Loans to municipalities amounted to approximately $2.3 billion at June 30, 2016. For the year ended June 30, 2016, municipal sector loan disbursements and collections amounted to approximately $92.4 million and $131.8 million, respectively. These loans include approximately $1.4 billion at June 30, 2016, which are collateralized by a pledge of a portion of property tax assessments of each municipality. Loans pledged with property tax assessments include bonds and notes issued by Puerto Rico municipalities which are originated by GDB as bridge financing. Approximately $512 million in loans to municipalities at June 30, 2016, are collateralized by a pledge of a portion of municipal sales tax deposited in specially designated accounts with GDB. The funds available in such accounts increase the borrowing capacity of the corresponding municipality. Approximately $421 million in loans to municipalities at June 30, 2016, were provided mainly as interim loans to finance capital expenditures that are payable from revenues to be generated from a specific revenue generating project associated with the loan or to cover operating losses. Once operating loans are approved and if the municipality is not servicing the debt with its own funds, GDB informs the CRIM in order to withhold property taxes revenues and remit them directly to GDB before they are distributed to the municipalities. Approximately $7.2 million in municipality loans were identified as delinquent as of June 30, 2016. No interest was collected on these loans during the year ended June 30, 2016.

During the fiscal year 2016, GDB recognized a release in the provision for loan losses of approximately $131.3 million in its municipal loans portfolio to end up with an allowance for loan losses of approximately $77.4 million at June 30, 2016.

Loans to the private sector include the outstanding principal balance of credit facilities granted by GDB and its different subsidiaries to private enterprises in Puerto Rico, the activities of which are deemed to further

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

the economic and tourism development of Puerto Rico. Loans to the private sector also include the outstanding principal balance of mortgage loans granted to low and moderate-income families for the acquisition of single-family housing units and to developers of low- and moderate-income multifamily housing units in Puerto Rico. These credit facilities, net of allowance for loan losses, amounted to approximately $241 million at June 30, 2016, of which approximately $206 million are mortgage loans for low and moderate-income housing units, approximately $34 million are for tourism projects and approximately $1 million are manufacturing loans. Private sector loans classified as noncurrual amounted to approximately $164 million at June 30, 2016 and had a corresponding allowance for loan losses of $135 million as of June 30, 2016. Interest income that would have been recorded if these loans had been performing in accordance with their original terms was approximately $12.6 million in 2016.

**(9) Conditionally Allocated Receivables and Future Revenue**

    *(a) COFINA Revenue*

        Prior to the enactment of Act No. 241 of 2018 and confirmation of COFINA's Third Amended Plan of Adjustment in February 2019, Act No. 91 of 2006 established the Dedicated Sales Tax Fund, a special revenue fund held by COFINA. Act No. 91 required that the greater of the following amounts be deposited in the Dedicated Sales Tax Fund each fiscal year for the payment of COFINA bonds: (i) a minimum fixed amount, referred to as the Pledged Sales Tax Base Amount and (ii) the revenue generated by up to 2.75% of the Commonwealth's sales and use tax.

        On October 9, 2013, an amendment to Act No. 91 of 2006 was signed into law which increased from 2.75% to 3.50% the portion of the Pledged Sales Tax deposited in the Dedicated Sales Tax Fund.

        The Pledged Sales Tax Base Amount in fiscal year ended June 30, 2016 amounted to approximately $696.3 million. For fiscal year 2016, debt service paid by COFINA amounted to approximately to $655.2 million.

    *(b) PRIFA Assigned Revenue*

        The following revenue (collectively, the PRIFA Allocated Revenue) has been conditionally allocated by the Commonwealth to PRIFA, subject to the provisions of Article VI, Section 8, of the Commonwealth's Constitution. As further discussed in Note 2 and Note 23, the PRIFA Allocated Revenues are currently being retained by the Commonwealth.

        *(i) Federal Excise Taxes*

            Rum manufactured in Puerto Rico is subject to federal excise taxes once exported to the United States; however, the revenue generated by such excise taxes is returned by the IRS to the Commonwealth. Act No. 44 of June 21, 1988, as amended (the PRIFA Act), requires that the first $117 million of certain federal excise taxes received by the Commonwealth be transferred to PRIFA, a blended component unit of the Commonwealth, each fiscal year. Such taxes consist of the federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States. PRIFA applies these taxes to the repayment of PRIFA's Special Tax Revenue Bonds. Receipt of the federal excise taxes securing the bonds is subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. The amount of federal excise taxes to be received by the Commonwealth is currently expected to decrease, although the exact amount cannot be determined. If the federal

# COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

excise taxes received by the Commonwealth in any fiscal year are less than $117 million, the PRIFA Act requires that PRIFA request, and the Director of the Commonwealth OMB include in the budget of the Commonwealth for the corresponding fiscal year, an appropriation sufficient to cover such deficiency. The Legislature, however, is not required to make such appropriation. For the year ended June 30, 2016, the Legislature originally appropriated the $117 million required by Act No. 44-1988 but it was subsequently amended to decrease such appropriation to a total amount of $4 million.

(ii)   *Petroleum Products Tax*

The PRIFA Act and the Puerto Rico Internal Revenue Code of 2011, as amended (the Puerto Rico Code) were amended by Act No. 1 of 2015, as amended, in order to impose a new petroleum products tax on nondiesel products ($6.25 initially) and to assign the revenue therefrom to PRIFA to secure the payment of certain of its bonds and notes, in particular, the Dedicated Tax Fund Revenue Bond Anticipation Notes issued on March 16, 2015 to redeem certain PRHTA Special Revenue Bonds 2013A Bond Anticipation Notes. For fiscal year 2016, debt service paid on the Dedicated Tax Fund Revenue Bond Anticipation Notes issued by PRIFA amounted to $169 million, composed of $155 million in principal and $14 million in interest.

## (c) *PRHTA Allocated Revenue*

The following revenues (collectively, the PRHTA Allocated Revenues) have been conditionally allocated by the Commonwealth to PRHTA, subject to the provisions of Article VI, Section 8 of the Commonwealth's Constitution. As further discussed in Note 2 and Note 23, prior to May 3, 2017, the PRHTA Allocated Revenues were retained by the Commonwealth pursuant to Article VI, Section 8 of the Commonwealth's Constitution. Subsequent to the filing of the Commonwealth's Title III case on May 3, 2017, the PRHTA Allocated Revenues have been retained by the Commonwealth due to the automatic stay under Title III of PROMESA.

(i)   *Gasoline and Gas Oil Taxes*

The Puerto Rico Code currently imposes a $0.16 per gallon tax on gasoline and a $0.04 per gallon tax on gas oil and diesel oil. By law, the Commonwealth has conditionally allocated the entire $0.16 tax on gasoline and $0.04 tax on gas oil and diesel oil to PRHTA as a source of revenue.

(ii)   *License Fees*

Under Act No. 22 of 2000, as amended, known as the "Vehicle and Traffic Law," the Commonwealth imposes annual license fees on various classes of motor vehicles. Fifteen dollars ($15) of each such annual license fee were conditionally allocated to PRHTA to be used as a source of revenue. Act No. 30 of 2013 conditionally assigned the remaining twenty-five dollars ($25) of each such annual license fee to PRHTA.

(iii)   *Petroleum Products Tax*

The Puerto Rico Code also allocates to PRHTA $9.50 per barrel or fraction thereof of petroleum products excise tax (which include crude oil, unfinished oil, and derivative products). The tax is imposed on any petroleum product introduced, consumed, sold, or transferred in the Commonwealth.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

   *(iv)  Cigarette Tax*

       A portion of the proceeds of the cigarette tax imposed by Section 3020.05 of the Puerto Rico Code (approximately $20 million) has been conditionally allocated to PRHTA.

### (d) PRCCDA Allocated Revenue

Article 24 of Act No. 272 of 2003, as amended, imposes a hotel occupancy tax on all hotels and motel accommodations on the island (the Hotel Occupancy Tax). A portion of the proceeds of the Hotel Occupancy Tax (the PRCCDA Allocated Revenue) has been conditionally allocated to PRCCDA for the payment of PRCCDA's bonds, subject to the provisions of Article VI, Section 8 of the Commonwealth's Constitution. As further discussed in Note 2 and Note 23, the PRCCDA Allocated Revenues are currently being retained by the Commonwealth.

### (e) PRMBA Allocated Revenue

A portion of the proceeds of the cigarette tax imposed by Section 3020.05 of the Puerto Rico Code (the PRMBA Allocated Revenue) has been conditionally allocated to PRMBA for the payment of certain PRMBA debt obligations, subject to the provisions of Article VI, Section 8, of the Commonwealth's Constitution. As further discussed in Note 2 and Note 23, the PRMBA Allocated Revenues are currently being retained by the Commonwealth.

### (f) The Children's Trust Revenue

The Children's Trust is a public trust ascribed to GDB, created pursuant to Act No. 173 1999 (Act No. 173). Through Act No. 173, the Commonwealth conditionally allocated and transferred to the Children's Trust all of its rights, title, and interest in a settlement agreement entered into by and among the Commonwealth, 46 states and several cigarette manufacturers (the Tobacco Settlement Agreement), including the Commonwealth's right to receive certain annual payments from such cigarette manufacturers (the TSRs). The TSRs, otherwise deliverable to the General Fund, were conditionally allocated to the Children's Trust in consideration of the issuance of bonds by the Children's Trust and the application of the proceeds thereof to fund certain social programs.

### (g) Executive Order OE–2015-046 (Clawback)

On December 1, 2015, Executive Order No. 46 was signed, which ordered the Secretary of Treasury to retain certain revenues in light of revised revenue estimates for fiscal year 2016 and the Commonwealth's deteriorating liquidity situation. Pursuant to Executive Order No. 46, certain available resources of the Commonwealth conditionally allocated to PRIFA, PRHTA, PRMBA and PRCCDA to pay debt service on their obligations and to provide operational support continue to be retained by the Commonwealth (commonly referred to as the "clawback"), pursuant to Article VI, Section 8 of the Commonwealth's Constitution of the Commonwealth and the statutory provisions pursuant to which such revenues were assigned to the applicable public corporations. Further information regarding clawbacks is set forth herein.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**(10)  Interfund and Intraentity Activity**

Interfund receivables and payables at June 30, 2016 are summarized as follows (in thousands):

| Receivable Fund | Payable Fund | |
|---|---|---:|
| Nonmajor governmental | COFINA debt service | $ 132,051 |
| Puerto Rico Medical Service Administration | General | 26,250 |
| Nonmajor governmental | General | 13,866 |
| Nonmajor proprietary | General | 11,193 |
| General | Unemployment insurance | 10,089 |
| General | Lotteries | 7,239 |
| Nonmajor proprietary | Nonmajor governmental | 3,996 |
| General | Nonmajor governmental | 2,527 |
| | | $ 207,211 |

Transfers from (to) other funds for the year ended June 30, 2016 are summarized as follows (in thousands):

| Transferee Fund | Transferor Fund | |
|---|---|---:|
| Puerto Rico Health Insurance Administraiton (a) | General | $ 892,070 |
| Debt service (b) | General | 286,507 |
| Nonmajor governmental (c) | General | 680,125 |
| General (d) | Lotteries | 196,147 |
| Puerto Rico Medical Services Administration (e) | General | 27,770 |
| General (f) | Unemployment Insurance | 45,133 |
| General (g) | Nonmajor proprietary | 11,611 |
| COFINA Debt Service (h) | COFINA Special Revenue | 5,123 |
| Nonmajor governmental (i) | COFINA Debt Service | 8,873 |
| Nonmajor proprietary (j) | General | 4,084 |
| General (k) | COFINA Debt Service | 1,230 |
| Puerto Rico Water Pollution Control Revolving Loan Fund (l) | General | 2,225 |
| | | $ 2,160,898 |

The principal purposes of the interfund transfers are to (in thousands):

(a)  Transfer of $892,070 from the General Fund to Puerto Rico Health Insurance Administration to provide funds to cover operational expenditures.

(b)  Transfer of $286,507 from the General Fund to the debt service fund to make funds available for debt service payments.

(c)  Recognize as transfers the rental payments made by the Commonwealth's agencies on properties leased by the PBA, a blended component unit of the Commonwealth ($346,592); ($70,771) related to

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

the revenues received from the Tobacco Settlement Agreement managed by The Children's Trust, a blended component unit of the Commonwealth; ($180,363) to PRIFA for the payment of debt and capital projects; ($38,033) to UPRCCC to provide funds to cover operational expenditures; ($18,377) to PAA for the payment of debt and ($25,989) to the capital projects fund to cover capital related expenditures.

(d) Transfer of $196,147 from the Lotteries to the General Fund to distribute the increase in net assets of the Lotteries for the use of the General Fund, as required by the Lotteries enabling legislation.

(e) Transfer of $27,770 from the General Fund to Puerto Rico Medical Service Administration, a major proprietary fund, to make funds available for debt service payments, capital projects and operational expenditures.

(f) Transfer of $45,133 from the Unemployment Insurance Fund related to the distribution of surplus cash corresponding to the General Fund for the payment of administrative expenses.

(g) Transfer from Disability and Drivers' Insurance Funds related to the distribution of surplus cash to the general fund ($4,993) and from 9-1-1 Service Governing Board ($6,618) to reimburse the general fund for expenses assistance provided on emergency calls services.

(h) Transfer of $5,123 from the COFINA Special Revenue Fund to the COFINA Debt Service Fund to be transferred to the General Fund to make funds available for debt service payments.

(i) Recognize as transfers of $8,873, the interest income earned by PRIFA, a blended component unit, on its investment on bonds issued by COFINA, another blended component unit, where an interest expense is incurred by the same amount.

(j) Transfer of $4,084 to provide local matching funds from the General Fund to the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, a nonmajor enterprise fund of the Commonwealth.

(k) Transfer of $1,230 from the COFINA Debt Service Fund to the General Fund to finance the General Fund's operational expenditures.

(l) Transfer of $2,225 to provide local matching funds from the General Fund to the Puerto Rico Water Pollution Control Revolving Fund, a major enterprise fund of the Commonwealth.

Interfund receivables and payables represent the pending settlements of the aforementioned transfers or transactions from current and prior years.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Amounts due to the Primary Government from component units were as follows (in thousands):

| Payable entity | General fund | Nonmajor governmental | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total due from component units |
|---|---|---|---|---|---|
| Major component units: | | | | | |
| Puerto Rico Aqueduct and Sewer Authority | $ — | — | 392,807 | 187,205 | 580,012 |
| Puerto Rico Highway and Transportation Authority | — | 9,945 | — | — | 9,945 |
| University of Puerto Rico | — | 1,537 | — | — | 1,537 |
| State Insurance Fund Corporation | 17,000 | 2,834 | — | — | 19,834 |
| Governmental Development Bank | — | 1,418 | — | — | 1,418 |
| Nonmajor component units | 88,239 | 25,154 | — | — | 113,393 |
| Subtotal due from component units | 105,239 | 40,888 | 392,807 | 187,205 | 726,139 |
| Allowance for uncollectible balances | (35,467) | (30,641) | (392,807) | (187,205) | (646,120) |
| | $ 69,772 | 10,247 | — | — | 80,019 |

The amount owed by PRASA of approximately $580 million represents construction loans granted by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, nonmajor proprietary funds, to finance the construction of capital assets for PRASA. PRASA has not made the required payments under the debt agreement related to this debt (see Note 2).

Amounts due to component units from the Primary Government were as follows (in thousands):

| Receivable entity | General fund | Nonmajor governmental funds | Puerto Rico Medical Services Administration | Total due to component units | Allowance for uncollectible balance | Total due to component units |
|---|---|---|---|---|---|---|
| Major component units: | | | | | | |
| Puerto Rico Electric Power Authority | $ 82,776 | 6,496 | 25,247 | 114,519 | (26,692) | 87,827 |
| Puerto Rico Aqueduct and Sewer Authority | 27,261 | 1,321 | 4,216 | 32,798 | (15,391) | 17,407 |
| University of Puerto Rico | 20,145 | 2,433 | 12,005 | 34,583 | (29,628) | 4,955 |
| Puerto Rico Highway and Transportation Authority | 13,196 | — | — | 13,196 | — | 13,196 |
| State Insurance Fund Corporation | 5,976 | — | — | 5,976 | — | 5,976 |
| Nonmajor component units | 75,165 | — | — | 75,165 | (14,750) | 60,415 |
| Total due to | $ 224,519 | 10,250 | 41,468 | 276,237 | (86,461) | 189,776 |

165

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

Amounts due from (to) component units were as follows (in thousands):

| | Receivable entity | | | | | | |
| | Major component units | | | | | | |
| Payable entity | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | Nonmajor component units | Total due to component units |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Puerto Rico Highways and Transportation Authority | $ 1,933,698 | — | 47,653 | — | — | 10,662 | 1,992,013 |
| University of Puerto Rico | 88,629 | — | 14,354 | — | — | — | 102,983 |
| Puerto Rico Aqueduct and Sewer Authority | 65,550 | — | 39,855 | — | — | — | 105,405 |
| Puerto Rico Electric Power Authority | 35,846 | — | — | 3,453 | — | — | 39,299 |
| Nonmajor component units | 1,083,505 | 34,379 | 47,908 | 19,243 | 5,192 | 60,545 | 1,250,772 |
| Subtotal due from component units | 3,207,228 | 34,379 | 149,770 | 22,696 | 5,192 | 71,207 | 3,490,472 |
| Allowance for uncollectible balances | (2,819,186) | (34,379) | (59,164) | (17,713) | — | (40,303) | (2,970,745) |
| Total due from component units | $ 388,042 | — | 90,606 | 4,983 | 5,192 | 30,904 | 519,727 |

The amount due from component units presented by GDB of approximately $3.2 billion (before allowance for uncollectible accounts) represents loan balances owed to GDB by other Commonwealth's component units. The rest of the loans receivable reported by the GDB consists of the following (in thousands):

| | |
|---|---|
| Primary government – governmental activities | $ 2,515,011 |
| Primary government – business-type activities | 486,562 |
| Other governmental entities and municipalities | 2,595,971 |
| Private sector, net of allowance for loan losses | 241,463 |
| Total loans receivable reported by GDB | 5,839,007 |
| Less allowance for public sector loans | (3,022,942) |
| | $ 2,816,065 |

The loans to the Primary Government are presented by the Commonwealth within notes payable in the statement of net position.

166

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Expenses of the Primary Government include capital and operational contributions made by the Primary Government to the component units as follows (in thousands):

| | | |
|---|---:|---:|
| University of Puerto Rico | $ | 870,132 |
| Puerto Rico Highways and Transportation Authority | | 108,215 |
| Nonmajor components units | | 246,980 |
| Total contributions made by primary government to component units | $ | 1,225,327 |

**(11)  Capital Assets**

Capital assets activity for the year ended June 30, 2016 was as follows (in thousands):

*Primary Government*

| | Beginning balance | Increases | Decreases | Ending balance |
|---|---:|---:|---:|---:|
| Governmental activities: | | | | |
| Land and other nondepreciable assets: | | | | |
| Land | $        937,124 | 859 | 1,092 | 936,891 |
| Construction in progress | 1,350,084 | 159,495 | 164,260 | 1,345,319 |
| Total land and other nondepreciable assets | 2,287,208 | 160,354 | 165,352 | 2,282,210 |
| Buildings and building improvements | 9,970,125 | 175,251 | 40,698 | 10,104,678 |
| Equipment, furniture, fixtures, vehicles, and software | 724,819 | 45,583 | 5,214 | 765,188 |
| Infrastructure | 599,682 | — | — | 599,682 |
| Total other capital assets, being depreciated and amortized | 11,294,626 | 220,834 | 45,912 | 11,469,548 |
| Less accumulated depreciation and amortization for: | | | | |
| Buildings and building improvements | 4,047,864 | 265,292 | 14,505 | 4,298,651 |

167

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|---|
| Equipment, furniture, fixtures, vehicles, and software | $ | 530,716 | 34,160 | 4,927 | 559,949 |
| Infrastructure | | 179,815 | 12,231 | — | 192,046 |
| Total accumulated depreciation and amortization | | 4,758,395 | 311,683 | 19,432 | 5,050,646 |
| Total other capital assets, net of depreciation and amortization | | 6,536,231 | (90,849) | 26,480 | 6,418,902 |
| Governmental activities capital assets, net | $ | 8,823,439 | 69,505 | 191,832 | 8,701,112 |

| | | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|---|
| **Business-type activities:** | | | | | |
| Land and other nondepreciable assets: | | | | | |
| Land | $ | 36,005 | — | — | 36,005 |
| Construction in progress | | 3,282 | 57 | — | 3,339 |
| Total capital assets, not being depreciated | | 39,287 | 57 | — | 39,344 |
| Building and building improvements | | 107,733 | 827 | — | 108,560 |
| Equipment | | 93,633 | 1,387 | 252 | 94,768 |
| Total other capital assets being depreciated and amortized | | 201,366 | 2,214 | 252 | 203,328 |
| Less accumulated depreciation and amortization for: | | | | | |
| Building and building improvements | | 67,210 | 2,365 | 96 | 69,479 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Equipment | $  76,373 | 3,886 | 236 | 80,023 |
| Total accumulated depreciation and amortization | 143,583 | 6,251 | 332 | 149,502 |
| Total business-type activities other capital assets, net of depreciation and amortization | 57,783 | (4,037) | (80) | 53,826 |
| Total business-type activities capital assets, net | $  97,070 | (3,980) | (80) | 93,170 |

Depreciation and amortization expense were charged to functions/programs of the Primary Government for the year ended June 30, 2016 as follows (in thousands):

| Governmental activities: | |
|---|---|
| General government | $        104,637 |
| Public safety | 31,745 |
| Health | 9,641 |
| Public housing and welfare | 117,983 |
| Education | 30,983 |
| Economic development | 16,694 |
| Total depreciation and amortization expense – governmental activities | $        311,683 |

The Commonwealth annually performs an impairment analysis of its capital assets in accordance with the provisions of GASB Statement No. 42. The current year's analysis identified approximately $3.2 million of impairments, recognized by the Governmental Activities in the statement of Governmental Activities for the year ended June 30, 2016.

General infrastructure assets include $427 million representing costs of assets transferred to the Department of Natural and Environmental Resources (DNER) of the Commonwealth (at cost) in 1997 upon completion of the Cerrillos Dam and Reservoir and the Portugues River and Bucana River Projects (the Cerrillos Dam and Reservoir Project) by the United States (U.S.) Army Corps of Engineers. These infrastructure assets are reported within Governmental Activities and include dams, intake facilities, and similar items built for flood control, water supply, and recreational purposes. The depreciation is computed using the straight-line method over an estimated useful life of 50 years from the transfer date of the property. Late in April 2011, the Commonwealth received a final debt agreement from the U.S. Army Corps of Engineers establishing a repayment schedule for its allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project, excluding those costs for items built for recreational purposes, amounting to $214 million.

169

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On March 21, 2014, the debt agreement with the U.S. Army Corps of Engineers was modified to reduce the interest rate and the annual payment for the remaining term of the debt. (see Note 13(p)).

On February 24, 2012, PRIFA, a blended component unit, entered into an Assistance Agreement with the Puerto Rico Department of Justice (PRDOJ) and GDB to acquire, refurbish, and operate a property to be used for the relocation of the PRDOJ's main offices. In connection with the Assistance Agreement, GDB provided a $35 million credit facility to PRIFA to undertake the acquisition and administration of this property and manage the initial phase of the rehabilitation and refurbishment of the property. On March 8, 2012, PRIFA acquired the property for approximately $27 million. The relocation of the PRDOJ's main offices never materialized but PRIFA has been working with gradually securing lease agreements with other governmental entities and third parties. The credit facility is secured by a mortgage lien on the property, and is payable from future appropriations from the Commonwealth and from the assignment of current and any future lease agreement.

PRIFA has also issued certain bonds and notes to finance the construction of certain capital projects for the benefit of PRASA, municipalities and other agencies and instrumentalities of the Commonwealth. The capital projects include the construction of infrastructure and buildings to be used in the operations of, and managed by, PRASA, the municipalities and other agencies in their respective operations. The capital projects, including the land acquired, are included as part of PRIFA's capital assets until construction is completed and the conditions for transfers to the ultimate beneficiaries are met. During the year ended June 30, 2016, PRIFA incurred approximately $4.7 million in construction costs for the benefit of other instrumentalities of the Commonwealth.

In October 2010, PRIFA entered into a memorandum of understanding with PPPA, PBA, Puerto Rico Department of Education, DTPW and GDB for the administration of the Schools for the 21st Century Program (the 21st Century Program). Construction in process at June 30, 2016 includes $39.2 million related to this program. The program consists of remodeling over 100 schools throughout Puerto Rico. To finance the program, the PBA issued government facilities revenue bonds in the amount of $878 million during the fiscal year ended June 30, 2012 of which $15.7 million are deposited in construction funds, within PBA's capital project fund, at June 30, 2016.

*Discretely Presented Component Units*

Capital assets activity for discretely presented component units for the year ended June 30, 2016 is as follows (in thousands):

| | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Major component units: | | | | |
| Land and other nondepreciable assets: | | | | |
| Land | $    2,163,643 | 49,207 | 35 | 2,212,815 |
| Construction in progress | 1,718,190 | 464,813 | 892,547 | 1,290,456 |
| Total capital assets not being depreciated/ amortized | 3,881,833 | 514,020 | 892,582 | 3,503,271 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Other capital assets being depreciated/ amortized: | | | | |
| Buildings and building improvements | $ 1,570,164 | 54,622 | 26,805 | 1,597,981 |
| Equipment, furniture, fixtures, vehicles, and software | 2,205,583 | 134,090 | 56,611 | 2,283,062 |
| Infrastructure | 40,431,311 | 721,233 | 160,348 | 40,992,196 |
| Intangibles, other than software | — | — | — | — |
| Total other capital assets, being depreciated/ amortized | 44,207,058 | 909,945 | 243,764 | 44,873,239 |
| Less accumulated depreciation/ amortization for: | | | | |
| Buildings and building improvements | 3,631,355 | 316,440 | 13,775 | 3,934,020 |
| Equipment, furniture, fixtures, vehicles, and software | 902,177 | 81,280 | 13,504 | 969,953 |
| Infrastructure | 17,321,638 | 905,808 | 80,367 | 18,147,079 |
| Total accumulated depreciation/ amortization | 21,855,170 | 1,303,528 | 107,646 | 23,051,052 |
| Total other capital assets, net of depreciation and amortization | 22,351,888 | (393,583) | 136,118 | 21,822,187 |
| Nonmajor component units | 3,361,739 | 71,487 | 87,756 | 3,345,470 |
| Capital assets (net) | $ 29,595,460 | 191,924 | 1,116,456 | 28,670,928 |

**(12) Short-Term Obligations**

Short-term obligations at June 30, 2016 and changes for the year then ended were as follows (in thousands):

| | Balance at June 30, 2015 | Debt issued | Debt paid | Balance at June 30, 2016 | Due within one year |
|---|---|---|---|---|---|
| Governmental activities: | | | | | |
| Notes payable to GDB | $ 1,700 | — | — | 1,700 | 1,700 |
| Tax revenue anticipation notes | 300,000 | 975,000 | (1,275,000) | — | — |
| | $ 301,700 | 975,000 | (1,275,000) | 1,700 | 1,700 |

171

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

### (a) Notes payable to GDB

The Commonwealth has entered into a short-term line of credit agreements with GDB (all within Governmental Activities) consisting of the following at June 30, 2016 (in thousands):

| Agency | Purpose | Interest rate | Line of credit | Outstanding balance |
|--------|---------|---------------|----------------|---------------------|
| Ports of the Americas Authority | To finance terms of consent decree agreement | 150 bp over PRIME with floor of 6% and ceiling of 12% | 1,700 | 1,700 |
| | | | $ 1,700 | 1,700 |

### (b) Tax Revenue Anticipation Notes

Act No. 1 of the Legislature of the Commonwealth, approved on June 26, 1987 (Act No. 1), authorizes the Secretary of the Treasury Department to issue, notes to either private or governmental institutions, in anticipation of taxes and revenue (Tax Revenue Anticipation Notes or TRANs) as an alternate means of providing liquidity to cover any temporary cash shortages projected for a fiscal year. Act No. 139, approved on November 9, 2005, amended Section 2(g) of Act No. 1 to provide that the total principal amount of notes issued under the provisions of Act No. 1 and outstanding at any time for any fiscal year may not exceed the lesser of eighteen percent (18%) of the net revenue of the General Fund for the fiscal year preceding the fiscal year in which the notes are issued or one billion five hundred million dollars ($1.5 billion).

On October 10, 2014, GDB entered into a Note Purchase, Revolving Credit, and Term Loan Agreement providing for the issuance of up to $900 million aggregate principal amount of 2015 Series B Senior Notes guaranteed by the Commonwealth (the GDB Notes). The proceeds of the GDB Notes were used to make a loan to the Commonwealth evidenced by $900 million aggregate principal amount of Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series B (2015) (the 2015 Series B TRANs). GDB also purchased an additional $300 million aggregate principal amount of Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series C (2015) (the 2015 Series C TRANs and, collectively with the 2015 Series B TRANs, the 2015 TRANs). Therefore, the 2015 TRANs issued during fiscal year 2015 amounted to $1.2 billion at interest rates ranging from prime rate plus 625 basis points (7.75% at June 30, 2015) to 8.30%. TRANs proceeds were used to cover temporary cash deficiencies resulting from the timing differences between tax collections and the payments of current expenditures. TRANs were refinanced during the year in order to take advantage of interest rates. The maximum amount of TRANs outstanding at any time during the year was $1.5 billion. As of June 30, 2016, there was no outstanding balance of TRANs. The 2015 Series C TRANs were fully repaid during July 2015.

During fiscal year 2016, the Commonwealth issued the 2016 GDB TRANs in the aggregate amount of $575 million to obtain interim funding and meet certain cash requirements. In addition, and in accordance with Act 102-2015, the Commonwealth obtained additional funding through the issuance of an "intra-governmental" TRANS with the SIFC, the AACA and the Disability Insurance Fund for the amount of $335 million, $50 million and $15 million, respectively. The 2016 GDB TRANs and "intra-governmental" TRANS (collectively the 2016 TRANs) bore an annual interest rate of 6%. The 2016 TRANs were fully repaid during fiscal year 2016.

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

On September 6, 2016, the Commonwealth renewed the "intra governmental" TRANs for fiscal year 2017, in the aggregate principal amount of $400 million with the SIFC, AACA and the Disability Insurance Fund, also at the interest rate of 6%. On April 28, 2017, the Commonwealth acknowledged that it would be unable to pay the principal and interest payments on the TRANs notes as they become due and entered into a forbearance agreement with SIFC, AACA, and Disability Insurance Fund. The forbearance period expired on June 30, 2018. The repayment has not been made and the forbearance period has not been extended.

### (13) Long-Term Obligations

#### *Primary Government*

Long-term obligations at June 30, 2016 and changes for the year then ended were as follows (in thousands):

| | Balance at June 30, 2015 as restated | Debt issued | Debt paid | Other increases | Other (decreases) | Balance at June 30, 2016 | Due within one year |
|---|---|---|---|---|---|---|---|
| **Governmental activities:** | | | | | | | |
| Commonwealth appropriation bonds | $ 570,654 | — | — | — | (490) | 570,164 | 46,520 |
| General obligation and revenue bonds | 37,373,667 | — | (753,095) | 394,526 | (18,249) | 36,996,849 | 717,236 |
| Bond purchase agreement with GDB | 233,270 | — | (7,736) | — | — | 225,534 | 7,839 |
| Notes payable to component units: | | | | | | | |
| GDB | 2,322,589 | 94,669 | (5,948) | — | — | 2,411,310 | 173,820 |
| Other | 102,000 | — | — | — | — | 102,000 | — |
| Note payable to financial institution | 28,517 | — | (4,753) | — | — | 23,764 | 4,753 |
| Capital leases | 350,354 | 1,979 | (8,238) | — | — | 344,095 | 8,864 |
| Total bonds, notes, and capital leases payable | 40,981,051 | 96,648 | (779,770) | 394,526 | (18,739) | 40,673,716 | 959,032 |
| Liability under guaranteed obligation | 337,257 | — | — | 23,482 | — | 360,739 | — |
| Compensated absences | 1,341,809 | — | — | 582,571 | (585,159) | 1,339,221 | 635,654 |
| Net pension liability | 33,044,676 | — | — | 4,448,340 | (642,863) | 36,850,153 | 152,044 |
| Other postemployment benefit obligation | 263,335 | — | — | 135,037 | (133,360) | 265,012 | — |
| Voluntary termination benefits payable | 735,774 | — | — | 28,611 | (81,635) | 682,750 | 74,220 |
| Other long-term liabilities | 1,639,295 | 78,361 | (198,811) | 901,744 | (5,775) | 2,414,814 | 267,576 |
| Total governmental activities | 78,343,197 | 175,009 | (978,581) | 6,514,311 | (1,467,531) | 82,586,405 | 2,088,526 |
| **Business-type activities:** | | | | | | | |
| Notes payable to GDB | 484,796 | 1,763 | — | — | — | 486,559 | 62,000 |
| Compensated absences | 19,614 | — | — | 11,884 | (8,910) | 22,588 | 11,866 |
| Net pension liability | 534,526 | — | — | 117,125 | — | 651,651 | — |
| Other postemployment benefit obligation | 1,834 | — | — | — | — | 1,834 | — |
| Obligation for unpaid lottery prizes | 221,494 | — | — | 559,628 | (608,961) | 172,161 | 70,847 |
| Voluntary termination benefits | 9,525 | — | — | 132 | (709) | 8,948 | 1,382 |
| Liability for unemployment, disability and health insurance | 298,487 | — | — | 228,914 | (357,350) | 170,051 | 170,051 |
| Other long-term liabilities | 51,497 | — | — | 22,126 | (163) | 73,460 | 71,160 |
| Total business-type activities | 1,621,773 | 1,763 | — | 939,809 | (976,093) | 1,587,252 | 387,306 |
| Total primary government | $ 79,964,970 | 176,772 | (978,581) | 7,454,120 | (2,443,624) | 84,173,657 | 2,475,832 |

173

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The principal balance of general obligation and revenue bonds paid reported as expenditures in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds do not agree with amounts reported as debt paid in the table above. The balance paid includes principal paid on July 1, 2015 on general obligation and revenue bonds amounting to approximately $510.9 million, which was accrued at June 30, 2015 as a fund liability. U.S. GAAP allows accrual of debt service liabilities and expenditures if a government has provided financial resources to a debt service fund for payment of liabilities that will mature within a month in the following fiscal year. As a result of the economic and liquidity challenges that the Commonwealth faced during fiscal year 2016, the Commonwealth had limited  available funds at June 30, 2016 for debt service payment due on July 1, 2016. The Commonwealth only provided resources for interest payments; consequently, approximately $37.5 million related to interest was accrued as a fund liability at June 30, 2016 and subsequently paid on July 1, 2016 and no principal was accrued as a fund liability at June 30, 2016.

Please refer to Note 13 (e) and Note 14 (a) for detailed information regarding the liability under guaranteed obligation. The other decrease of $7.7 million in the Bond Purchase Agreement with GDB represents payments by the Primary Government reducing the principal balance of such bonds. The remaining balance of the other increases (decreases) in bonds and notes consists of capitalization of interest on capital appreciation bonds (increases) and amortization of premiums (decreases) and accretion of discounts (increases) on bonds. These adjustments did not require any source or use of cash.

Accrual adjustments for fiscal year 2016 were made to reconcile various obligations with the new estimated balances at June 30, 2016, and other decreases resulting from payments on these obligations made during the fiscal year. These obligations include compensated absences, net pension liabilities, other postemployment benefit obligation, voluntary termination benefits, other long-term liabilities, obligation for unpaid lottery prizes, and claims liability for insurance benefits. These payments, as pertaining to Governmental Activities, are included not as principal payments in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds, but as expenses within their corresponding functions.

*(a) Debt Limitation and Arbitrage*

The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth should not be issued if the amounts of the principal of and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter internal revenue) in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee so long as the Commonwealth is in compliance with this 15% limitation at the time of issuance of such guaranteed debt. During the period ended June 30, 2016, no direct obligations were issued by the Commonwealth.

Litigation regarding whether certain bond issuances of the Commonwealth and PBA violated the Commonwealth's constitutional debt limitation is ongoing in the Commonwealth's Title III case. For

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

additional information regarding the Commonwealth's Title III case, refer to Note 3. For additional information regarding the ongoing litigation related to the Commonwealth's Title III case, refer to Note 17.

The Commonwealth's bonds payable are subject to arbitrage regulations issued by the Internal Revenue Service of the United States of America, requiring a rebate to the federal government of excess investments earnings on tax exempt debt proceeds if the yield on those earnings exceeds the effective yield on the related tax-exempt debt issued. Excess earnings must be rebated every five years or upon maturity of the debt, whichever is earlier. Arbitrage calculations resulted in no liability as of June 30, 2016.

*(b)* *Bonds Payable*

The Constitution of the Commonwealth provides that public debt will constitute a first claim on the available revenue of the Commonwealth. Public debt includes general obligation bonds and debt guaranteed by the Commonwealth. The full faith, credit, and taxing power of the Commonwealth is irrevocably pledged for the prompt payment of the principal and interest of the general obligation bonds. On April 6, 2016, the Governor signed into law the Moratorium Act. For additional information on the Moratorium Act, refer to Note 3 and Note 23. For additional information on litigation contingencies related to the Moratorium Act, refer to Note 17. Developments in the Title III cases, as discussed in Note 3, have affected the application of the Moratorium Act and may affect the priorities any party claims with respect to its right to debt repayment.

Act No. 83 of August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The levy is made by CRIM, a municipal corporation, not a component unit of the Commonwealth. CRIM is required to remit the 1.03% of property tax collected by the Commonwealth to pay debt service on general obligation bonds. During the year ended June 30, 2016, the total revenue and receivable reported by the Commonwealth amounted to approximately $116.6 million and $17.5 million, respectively, which are included in the debt service fund.

For financial reporting purposes, the outstanding amount of bonds represents the total principal amount outstanding, plus unamortized premiums and interest accreted on capital appreciation bonds, less

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

unaccreted discount. Bonds payable outstanding at June 30, 2016, including accreted interest on capital appreciation bonds, were as follows (in thousands):

| | General obligation bonds | Revenue bonds | Total |
|---|---|---|---|
| Term bonds payable through 2042; interest payable monthly or semiannually at rates varying from 3.00% to 8.00% | $ 8,258,803 | 8,189,470 | 16,448,273 |
| Serial bonds payable through 2042; interest payable monthly or semiannually at rates varying from 3.00% to 6.75% | 4,163,140 | 1,651,092 | 5,814,232 |
| Fixed rate bonds payable through 2057; interest payable at rates varying from 3.38% to 6.50% | — | 5,530,046 | 5,530,046 |
| Capital appreciation bonds payable through 2056; no interest rate, yield ranging from 4.93% to 7.48%. (1) | 119,660 | 5,864,443 | 5,984,103 |
| Special Tax Revenue Bonds payable through 2045; interest payable or accreted monthly and semiannually at rates varying from 4.00% to 8.25% | — | 1,872,026 | 1,872,026 |
| Mental Health Infrastructure Revenue Bonds payable through 2038; interest payable semiannually at rates varying from 5.60% to 6.50% | — | 35,700 | 35,700 |
| The Children's Trust Fund Tobacco Settlement asset-backed bonds payable through 2057; interest payable or accreted semiannually at rates varying from 5.38% to 8.38% | — | 1,438,655 | 1,438,655 |
| Capital Fund Program Bonds, maturing in various dates payable through 2025; interest payable semiannually at rates varying from 2.00% to 5.00% | — | 129,347 | 129,347 |
| LIBOR-Based Adjustable Rate Bonds due on August 1, 2057; interest payable quarterly (1.36% at June 30, 2016) | — | 136,000 | 136,000 |
| Total | 12,541,603 | 24,846,779 | 37,388,382 |
| Unamortized premium | 78,705 | 182,773 | 261,478 |
| Unamortized discount | (268,023) | (150,850) | (418,873) |
| Subtotal bonds payable | 12,352,285 | 24,878,702 | 37,230,987 |
| Elimination entry COFINA bonds issued to PRIFA | — | (234,138) | (234,138) |
| Total bonds payable | $ 12,352,285 | 24,644,564 | 36,996,849 |

1   Revenue bonds include $969 million capital appreciation bonds convertible to fixed rate interest bonds on August 1, 2031; August 1, 2032; and August 1, 2033.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

As of June 30, 2016, debt service requirements for general obligation and revenue bonds outstanding, including accreted interest of capital appreciation bonds are as follows (in thousands):

| Year ending June 30 | Principal | Interest | Interest subsidy (1) | Total |
|---|---|---|---|---|
| 2017 | $      717,236 | 1,746,535 | 3,835 | 2,467,606 |
| 2018 | 560,770 | 1,716,926 | 3,835 | 2,281,531 |
| 2019 | 524,885 | 1,721,643 | 3,835 | 2,250,363 |
| 2020 | 603,500 | 1,703,204 | 3,835 | 2,310,539 |
| 2021 | 677,940 | 1,612,020 | 3,835 | 2,293,795 |
| 2022-2026 | 3,805,445 | 7,960,984 | 19,173 | 11,785,602 |
| 2027-2031 | 6,831,394 | 7,047,286 | 19,173 | 13,897,853 |
| 2032-2036 | 8,938,835 | 4,674,982 | 19,173 | 13,632,990 |
| 2037-2041 | 9,715,940 | 2,609,980 | 19,173 | 12,345,093 |
| 2042-2046 | 8,945,806 | 633,075 | 4,793 | 9,583,674 |
| 2047-2051 | 6,603,296 | 316,882 | — | 6,920,178 |
| 2052-2056 | 5,090,170 | 313,365 | — | 5,403,535 |
| 2057-2061 | 10,913,849 | 86,516 | — | 11,000,365 |
| Total | 63,929,066 | $  32,143,398 | 100,660 | 96,173,124 |
| Less unaccreted interest | (26,540,684) | | | |
| Plus unamortized premium | 261,478 | | | |
| Less unamortized discount | (418,873) | | | |
| Subtotal | 37,230,987 | | | |
| Elimination of COFINA bonds issued to PRIFA | (234,138) | | | |
| Total | $      36,996,849 | | | |

The above schedule has been presented in accordance with original terms of the bonds payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding. Accordingly, the effects of the PROMESA Title III or any other debt restructuring proceeding may affect the carrying amounts, interest rates and the repayment terms. See Note 3 and Note 23 for additional information.

(1) Sales Tax Revenue Bonds, First Subordinate Series 2010D and 2010E were issued as Build America Bonds. COFINA will receive a subsidy payment from the federal government equal to 35% and 45%, respectively, of the amount of each interest payment. On June 24, 2013, the IRS sent notice that 8.7% of the subsidy payment on the Build America Bonds will be sequestered due to adjustments of the federal government budget.

On March 16, 2015, PRIFA issued $245.9 million of bond anticipation notes (disclosed as Special Tax Revenue Bonds) payable from the increase in the petroleum products tax imposed by Act No. 1 of 2015 (the PRIFA BANs), the proceeds of which were used to refinance certain outstanding PRHTA bond

177

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

anticipation notes and pay-related expenses. The PRIFA BANs were originally expected to be refinanced through a long-term bond issuance by PRIFA. However, this proposed transaction has been abandoned. The PRIFA BANs had a maturity date of May 1, 2017 (which was not met), with an interest rate of 8.25% payable monthly on the first business day of each month, commencing on April 1, 2015. The aforementioned revenues that support the payment of the PRIFA BANs could instead be applied to pay the Commonwealth's general obligation debt if its available resources proved insufficient to cover all approved appropriations. The PRIFA BANs are guaranteed by the good faith, credit and taxing power of the Commonwealth (Refer to Note 14(a)). On June 24, 2016, the Governor signed an executive order, EO 2016 027, which suspended all obligations to transfer money to PRIFA for the purpose of making payments on PRIFA BANs.

The table below presents Governmental Activities-debt service payments on certain revenue variable rate bonds and the net payments on associated hedging derivative instruments (see Note 21) as of June 30, 2016 (all pertaining to COFINA). Although interest rates on variable rate debt and the current reference rates of hedging derivative instruments change over time, the calculations included in the table below are based on the assumption that the variable rate and the current reference rates of hedging derivative instruments as of June 30, 2016, will remain constant.

| | Variable-rate bonds | | Hedging derivative instruments, net | Total |
|---|---|---|---|---|
| | Principal | Interest | | |
| | | (In thousands) | | |
| Year ending June 30: | | | | |
| 2017 | $           — | 1,845 | 4,846 | 6,691 |
| 2018 | — | 1,845 | 4,846 | 6,691 |
| 2019 | — | 1,845 | 4,846 | 6,691 |
| 2020 | — | 1,845 | 4,846 | 6,691 |
| 2021 | — | 1,845 | 4,846 | 6,691 |
| 2022–2026 | — | 9,224 | 24,232 | 33,456 |
| 2027–2031 | — | 9,224 | 24,232 | 33,456 |
| 2032–2036 | — | 9,224 | 24,232 | 33,456 |
| 2037–2041 | — | 9,224 | 24,232 | 33,456 |
| 2042–2046 | — | 9,224 | 24,232 | 33,456 |
| 2047–2051 | — | 9,224 | 24,232 | 33,456 |
| 2052–2056 | — | 9,225 | 24,232 | 33,457 |
| 2057–2058 | 136,000 | 2,002 | 5,247 | 143,249 |
| Total | $   136,000 | 75,796 | 199,101 | 410,897 |

The above schedule has been presented in accordance with original terms of the bonds payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding. Accordingly, the effects of the PROMESA Title III or any other debt restructuring

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

proceeding may affect the carrying amounts, interest rates and the repayment terms. See Note 3 and Note 23 for additional information.

COFINA's outstanding bonds prior to consummation of its Title III plan of adjustments were payable from amounts deposited in the Dedicated Sales Tax Fund in each fiscal year. The minimum amount to be deposited was the Pledged Sales Tax Base Amount, which for the fiscal year ended June 30, 2016, was approximately $696.3 million. The Pledged Sales Tax Base Amount increases each fiscal year thereafter at a statutory rate of 4% up to $1,850 million.

At June 30, 2016, the Pledged Sales Tax Base Amount, by year, was as follows (in thousands):

|  | Amount |
|---|---|
| Year ending June 30: | |
| 2017 | $        724,110 |
| 2018 | 753,074 |
| 2019 | 783,197 |
| 2020 | 814,525 |
| 2021 | 847,106 |
| 2022–2026 | 4,771,728 |
| 2027–2031 | 5,805,537 |
| 2032–2036 | 7,063,323 |
| 2037–2041 | 8,587,499 |
| 2042–2046 | 9,250,000 |
| 2047–2051 | 9,250,000 |
| 2052–2056 | 9,250,000 |
| 2057–2058 | 3,700,000 |
| Total | $     61,600,099 |

The above schedule has been presented in accordance with original terms of the bonds payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding. Accordingly, the effects of the PROMESA Title III or any other debt restructuring proceeding may affect the calculation of the Pledged Sales Tax Base. See Note 3 and Note 23 for additional information.

*(c)* ***Commonwealth's Department of Housing Partnership Agreement***

Vivienda Modernization 1, LLC (the LLC) is a limited liability company created under the laws of the Commonwealth whose sole member is Vivienda Modernization Holdings 1, S.E. (the Partnership), a civil partnership created under the laws of the Commonwealth and pursuant to a related Partnership Agreement. The Partnership was created on August 1, 2008 with the Department of Housing of the Commonwealth (the Commonwealth DOH), acting as general partner (the General Partner) and Hudson SLP XL LLC, a Delaware limited liability company (the Special Limited Partner) and Hudson Housing Tax Credit Fund XL LP, a Delaware limited partnership (the Investment Partnership); acting as limited partners (collectively the Limited Partners). The Partnership has been organized to acquire, develop,

179

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

rehabilitate, own, maintain, and operate thirty-three residential rental housing developments intended for low- and moderate-income tenants. Profits, losses, and tax credits are allocated in accordance with the Partnership Agreement. Profits and losses from operations and low-income housing tax credits in any year should be allocated 99.98% to the Investment Partnership, 0.01% to the Special Limited Partner, and 0.01% to the General Partner. As defined in the Partnership Agreement, certain transactions and occurrences warrant special allocations of profits and losses. All other losses should be allocated to the extent allowable under Section 704(b) of the U.S. Internal Revenue Code.

Pursuant to the Partnership Agreement, the Limited Partners are required to provide capital contributions totaling approximately $235 million to the Partnership (the Initial Projected Equity), subject to adjustment based on the amount of low-income housing credits ultimately allocated to the developments in addition to other potential occurrences as more fully explained in the Partnership Agreement. As of June 30, 2016, the Limited Partners have provided capital contributions totaling approximately $126.6 million.

Pursuant to the Partnership Agreement, the General Partner is required to provide capital contributions totaling approximately $10 million to the Partnership. Should the Partnership not have sufficient funds available to pay the outstanding balance of the developer fee thereof, as defined, the General Partner must provide additional capital contributions to the Partnership in an amount sufficient for the Partnership to pay such balance in full. The General Partner must have no right or obligation to make any other capital contributions. As of June 30, 2016, the General Partner had provided no capital contributions. In addition, the Commonwealth DOH as General Partner must establish the Assurance Reserve Fund at the initial closing in the amount of the initial capital contribution less approximately $4 million (plus any initial capital contribution with respect to the apartment complexes). Amounts in the Assurance Reserve Fund must be used, (i) upon the request of the General Partner, subject to the consent of the Special Limited Partner or (ii) upon the direction to the Special Limited Partner, to meet financial obligations of the General Partner, other than for excess development costs, as provided in the Partnership Agreement. As of June 30, 2016, such reserve was maintained in the Partnership.

On August 7, 2008, the LLC entered into a Master Developer Agreement with the Commonwealth DOH to perform services in connection with the development, rehabilitation, and modernization of certain housing projects (the Master Developer Agreement). Pursuant to the Master Developer Agreement, the Commonwealth DOH will earn a developer's fee in the amount of approximately $75.1 million for such services. Payment of the developer's fee must be subject to the terms and conditions of Section 6(a) (iv) of the Master Developer Agreement. As of June 30, 2016, approximately $73.7 million was recorded within other accounts receivable in the General Fund related to the Master Development Agreement (including approximately $16.6 million related to the Assurance Reserve Fund).

Additionally, on August 7, 2008, the LLC and the Commonwealth DOH entered into a Purchase and Sale Agreement through which the LLC acquired the surface rights of a property (the Property) and the improvement erected on such property consisting of buildings and construction in progress with a net book value and cost of approximately $45.9 million and $110 million, respectively, from the Commonwealth DOH. This purchase is subject to certain deeds of Constitution of Surface Rights and Transfer of Improvements dated August 7, 2008, which require the LLC to rehabilitate or construct on the Property four thousand one hundred thirty two (4,132) residential rental units (the Units or collectively the Development), all of which will receive the benefit of an operating subsidy and Low-Income Housing Tax Credits under Section 42 of the U.S. Internal Revenue Code of 1986, as amended. Eighty-four (84)

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

of the units, all of which will be located at the Brisas de Cayey II site, are to be newly constructed. The remaining units will be modernized.

Also, on August 7, 2008, the Commonwealth DOH entered into a loan agreement with the LLC in the amount of approximately $102.9 million for the acquisition of the 33 residential rental properties (the deferred purchase price note). The LLC must make payments equal to the amount of net available capital contributions, as defined, for the preceding calendar quarter.

The following are the terms of the deferred purchase price note: commitment $102,889,957; interest rate 3.55%; and maturity date later of (i) funding of the last installment of the capital contribution or (ii) August 7, 2013. The note must be a full recourse liability of the LLC; however, none of the LLC's members has personal liability. As of June 30, 2016, the principal balance outstanding on the deferred purchase price note was approximately $8.8 million and accrued interest was approximately $1.6 million, and both amounts were recorded within deferred inflow of resources – developer fees in the General Fund.

PHA has entered into an Interagency Agreement dated August 7, 2008, with the Commonwealth DOH, in Commonwealth DOH's capacity as general partner of the Partnership, to delegate management and operational duties related to the Development to PHA as set forth in the Interagency Agreement. The LLC and PHA also intend that the units be developed, operated, and managed so as to assure receipt by the LLC of the aforementioned economic and tax benefits to the full extent available to the LLC.

*(d) Commonwealth Appropriation Bonds*

Over the years, GDB, as fiscal agent and a bank for the Commonwealth, had extended lines of credit, advances, and loans to several agencies and component units of the Commonwealth in order to finance their capital improvement projects and to cover their operational deficits at the time. At different points in time, these loans were refunded through the issuance of Commonwealth appropriation bonds issued by the Puerto Rico Public Finance Corporation (PFC), a blended component unit of GDB, which serves only as a conduit for the issuance of the bonds. The Commonwealth has recognized a mirror effect of these refundings by PFC over the years in its own debt in proportion to the portion of the Commonwealth's notes included in such PFC refundings. Also, during more recent years, COFINA, through the issuance of bonds, has been used to repay certain other loans and existing appropriation bonds. COFINA is a blended component unit of the Commonwealth created in 2007 with the capacity to issue bonds to repay or refund advances from GDB, the appropriation bonds referred to above, and other debt obligations, collectively referred as the extra constitutional debt. There were no new activities of Commonwealth appropriation bonds during fiscal year 2016, other than the annual amortization of corresponding premiums and their related deferred inflows and outflows of resources in the form of deferred refunding gains and losses.

181

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

At June 30, 2016, the outstanding balance of the Commonwealth appropriation bonds pertaining to the Primary Government (i.e., excluding the balance pertaining to discretely presented component units), consisted of the following obligations (in thousands):

| | | |
|---|---|---:|
| Act. No. 164 restructuring | $ | 438,470 |
| Puerto Rico Maritime Shipping Authority (PRMSA) | | 131,694 |
| Total Commonwealth appropriation bonds | $ | 570,164 |

**Act No. 164 Restructuring** – On December 17, 2001, Act No. 164 was approved, which authorized certain government agencies and discretely presented component units to refund approximately $2.4 billion of their outstanding obligations with GDB, for which no repayment source existed, over a period not exceeding 30 years, and to be repaid with annual Commonwealth appropriations not to exceed $225 million. This refunding was originally executed with Commonwealth appropriation bonds through several bond series issued by PFC during the period between December 2001 and June 2002.

Subsequently, additional refundings (current and advance) and/or redemptions of Act No. 164 restructuring have been executed through PFC and COFINA bond issuances.

Approximately $438 million of the Commonwealth appropriation bonds outstanding at June 30, 2016, belong to the Primary Government under Act No. 164, consisting of the Department of Health of the Commonwealth (health reform financing and other costs), the Treasury Department of the Commonwealth (originally the fiscal year 2001 deficit financing and the obligation assumed for defective tax liens), and the one attributed to PRIFA, a blended component unit of the Commonwealth. The outstanding balance of Commonwealth appropriation bonds related to Act No. 164 bears interest at rates ranging from 3.10% to 6.50%. Debt service requirements, subject to legislative appropriations, in future years were as follows (in thousands):

| | | Principal | Interest | Total |
|---|---|---:|---:|---:|
| Year ending June 30: | | | | |
| 2017 | $ | 46,520 | 42,827 | 89,347 |
| 2018 | | 21,554 | 20,254 | 41,808 |
| 2019 | | 22,361 | 19,374 | 41,735 |
| 2020 | | 23,257 | 18,421 | 41,678 |
| 2021 | | 24,219 | 17,382 | 41,601 |
| 2022–2026 | | 82,634 | 73,142 | 155,776 |
| 2027–2031 | | 215,689 | 31,620 | 247,309 |
| Total | | 436,234 | 223,020 | 659,254 |
| Plus unamortized premium | | 2,236 | | |
| Total | $ | 438,470 | | |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The above schedule has been presented in accordance with original terms of the bonds payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding. Accordingly, the effects of the PROMESA Title III or any other debt restructuring proceeding may affect the carrying amounts, interest rates and the repayment terms. See Note 3 and Note 23 for additional information.

**Puerto Rico Maritime Shipping Authority (PRMSA)** – A promissory note payable owed by PRMSA to GDB was assumed by the Commonwealth in connection with the sale of the maritime operations of PRMSA. Commonwealth appropriation bonds, 2003 Series B and 2004 Series B were issued to refund this liability, which were refunded most recently in June 2012 with the issuance of PFC 2012 Series A bonds. The bond balance bears interest at a variable rate ranging from 3.10% to 5.35%. Debt service requirements in future years were as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2017 | $              — | 6,837 | 6,837 |
| 2018 | — | 6,837 | 6,837 |
| 2019 | — | 6,837 | 6,837 |
| 2020 | — | 6,837 | 6,837 |
| 2021 | — | 6,837 | 6,837 |
| 2022–2026 | 62,514 | 27,852 | 90,366 |
| 2027–2031 | 20,870 | 13,100 | 33,970 |
| 2032–2036 | 48,310 | 431 | 48,741 |
| Total | $    131,694 | 75,568 | 207,262 |

The above schedule has been presented in accordance with original terms of the bonds payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding. Accordingly, the effects of the PROMESA Title III or any other debt restructuring proceeding may affect the carrying amounts, interest rates and the repayment terms. See Note 3 and Note 23 for additional information.

*(e) Bond Purchase Agreement with GDB*

At various times during fiscal years ending in 2005 and 2006, the PAA, a blended component unit of the Commonwealth, entered into bond purchase agreements with the GDB, whereby the GDB agreed to disburse to the PAA from time to time certain bond principal advances up to a maximum aggregate principal amount of $70 million (Port of the Americas Authority 2005 Series A Bond), $40 million (Port of the Americas Authority 2005 Series B Bond), and $140 million (Port of the Americas Authority 2005 Series C Bond). These bonds are guaranteed by the Commonwealth by Act No. 409 of September 22, 2004 (Act No. 409), which authorized the issuance of these financing arrangements and accounted by the Commonwealth as a liability under guarantee obligation. The Commonwealth had been paying for debt service on these bonds under its guarantee pursuant to Act No 409. For additional detail, refer to Note 14(a).

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

The proceeds of the bonds were used to finance the cost of development and construction of the PAA facilities. These bonds, having an original maturity of January 2015, were refinanced on December 31, 2014 into one single bond for a period of 30 years, with the first payment of principal and interest to commence on August 1, 2015, with interest rates based on the rates borne by the general obligation of the Commonwealth. These rates should be revised on a quarterly basis provided, however, that the interest should never be less than 7% nor greater than 12%. The principal and interest on the refinanced bond continue to be covered by the guarantee of the Commonwealth. Upon the refinancing referred to above at the then outstanding balance of $224.8 million, accrued interest through the date of the refinancing amounting to approximately $8.8 million was capitalized into the principal balance then outstanding for a refinanced amount of approximately $233.3 million. The outstanding balance as of June 30, 2016 is $225.5 million. The table that follows represents the future debt service payments on the refinanced amount. Although interest rates on the refinancing change over time, the calculations included in the table below are based on the assumption that the variable rate then and at the refinancing date (7.18%) will remain the same for the rest of the term.

| | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: | | | |
| 2017 | $      7,839 | 16,216 | 24,055 |
| 2018 | 7,788 | 15,656 | 23,444 |
| 2019 | 7,788 | 15,097 | 22,885 |
| 2020 | 7,788 | 14,538 | 22,326 |
| 2021–2025 | 38,938 | 64,303 | 103,241 |
| 2026–2030 | 38,938 | 50,324 | 89,262 |
| 2031–2035 | 38,938 | 36,435 | 75,373 |
| 2036–2040 | 38,938 | 22,366 | 61,304 |
| 2041–2045 | 38,579 | 8,387 | 46,966 |
| Total | $    225,534 | 243,322 | 468,856 |

The PAA debt may be paid with any of the following: (i) a long-term bond issuance, once the projects are completed or (ii) legislative appropriations, as established by Act No. 409, honoring the agreement referred to above. During the prior year, a liability under guaranteed obligation was recorded upon adoption of GASB Statement No. 70, *Accounting and Financial Reporting for Nonexchange Financial Guarantees*, with respect to this guarantee of the PAA's bond obligation given that the Commonwealth has been paying the debt service on these bonds based on the provisions of Act No. 409. Such liability was measured based on the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee. During 2015, PAA became a blended component unit of the Primary Government and as a consequence of the change in reporting entity, the Commonwealth de-recognized the liability under guaranteed obligation previously recorded. If PAA ceases to be a blended component unit of the Commonwealth, a liability under guarantee obligation may be recorded by the Commonwealth related to PAA's guaranteed obligations.

Act No. 409, as amended, is silent as to whether there are arrangements established for recovering payments from PAA for guarantee payments made; however, there is no intention from the Commonwealth to request a recovery of any such payments.

184

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

#### (f)  *Advance Refunding, Defeasance and Refunding of Commonwealth Bonds*

In prior years, the Commonwealth defeased certain general obligation and other bonds by placing the proceeds of the bonds in an irrevocable trust to provide for all future debt service payments on the refunded bonds. Accordingly, the trust's account assets and liabilities for the defeased bonds are not included in the basic financial statements. At June 30, 2016, approximately $306.5 million of bonds outstanding from prior years' advance refunding are considered defeased.

PBA, a blended component unit, has defeased certain revenue bonds in prior years by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payments on the old debts. Accordingly, the trust's account assets and liabilities for the defeased bonds are not included in the statement of net position. As of June 30, 2016, approximately $660.0 million of PBA's bonds are considered defeased.

During prior years, COFINA, a blended component unit, issued certain refunding bonds, the proceeds of which were placed in an irrevocable trust to provide for all future debt service payments on the refunded COFINA Series 2009A and 2009B bonds. The outstanding balance of the advance refunded bonds was approximately $48.3 million at June 30, 2016.

#### (g)  **Notes Payable to GDB, Other Component Units and Financial Institution**

The Commonwealth financed certain long-term liabilities through GDB and other component units, within both Governmental and Business-Type Activities. The outstanding balance at June 30, 2016 on the financing provided by GDB and other component units presented within notes payable in the statement of net position-Governmental Activities, comprises the following (in thousands):

| | | |
|---|---|---:|
| Notes payable to GDB: | | |
| Department of the Treasury | $ | 884,872 |
| Special Communities Perpetual Trust | | 345,841 |
| Office of Management and Budget | | 265,471 |
| Public Buildings Authority | | 182,160 |
| Department of Education | | 106,308 |
| Department of Transportation and Public Works | | 82,870 |
| Department of Correction and Mental Health | | 82,489 |
| UPRCCC | | 120,482 |
| Department of Agriculture | | 65,225 |
| Environmental Quality Board | | 2,225 |
| Department of Justice | | 49,846 |
| Department of Health | | 44,158 |
| Puerto Rico Infrastructure Financing Authority | | 49,337 |
| Police Department | | 31,679 |
| Department of Housing | | 18,657 |
| Office of the Superintendent of the Capitol | | 27,489 |
| Puerto Rico Court Administration Office | | 34,033 |
| Department of Recreation and Sports | | 18,168 |
| | $ | 2,411,310 |
| | | |
| Notes payable to component units: | | |
| State Insurance Fund Corporation | | 100,000 |
| Automobile Accidents Compensation Administration | | 2,000 |
| | $ | 102,000 |
| | | |
| Note payable to financial institution | $ | 23,764 |

185

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Notes Payable to GDB*

*(i) Governmental Activities*

The Commonwealth has entered into the following line of credit agreements with GDB (all within Governmental Activities) which were due and recorded as a fund liability in the General Fund as of June 30, 2016 (in thousands):

| Agency | Purpose | Interest rate | Original Maturity | Line of credit | Outstanding balance |
|---|---|---|---|---|---|
| Department of the Treasury | To pay several central government agencies' debt | 125 bp over three months LIBOR | 9/30/2012 | $ 100,000 | 75,342 |
| Department of the Treasury | To cover operational needs of catastrophic disaster funds | 125 bp over three months LIBOR | 9/30/2013 - 9/30/2015 | 79,930 | 42,543 |
| Department of the Treasury | To fund information technology project | 125 bp over GDB's commercial | 6/30/2008 | 14,782 | 13,601 |
| Department of the Treasury | Purchase of mobile X-ray machines | 125 bp over three months LIBOR | 6/30/2008 | 12,000 | 2,456 |
| Office of Veteran's Ombudsman | To fund improvements to veteran's facilities | 6% | 3/31/2015 | 7,500 | 292 |
| | | | | $ 214,212 | 134,234 |

As of June 30, 2016, the Treasury Department of the Commonwealth had entered into various lines of credit agreements with GDB amounting to approximately $2.8 billion for different purposes, bearing fixed and variable interest rates, and various maturity dates as summarized below (in thousands):

| Purpose | Interest rate | Maturity | Lines of credit | Outstanding balance |
|---|---|---|---|---|
| To finance payroll and operational expenditures of the Commonwealth for fiscal year 2006 | 7.00% | June 30, 2040 | $ 741,000 | 164,515 |
| To pay lawsuits against the Commonwealth and to assign $15.3 million to Labor Development Administration for operational expenses | 6.00% | June 30, 2018 | 160,000 | 145,270 |
| Resources to meet appropriations in annual budget of the Commonwealth (fiscal year 2004) and federal programs expenditures | 125 bp over 3 month LIBOR | June 30, 2040 | 640,000 | 111,205 |
| To finance capital improvements projects of agencies and municipalities | 150 bp over GDB's commercial paper rate | June 30, 2019 | 130,000 | 83,548 |
| To finance capital improvements of several governmental agencies | 7.00% | June 30, 2040 | 105,000 | 68,834 |
| To partially fund monthly principal and interest deposits required for 2013 debt service of General Obligation and Revenue Bonds | 150 bp over PRIME, but not less than 6% | June 30, 2042 | 384,496 | 63,135 |
| To fund monthly principal and interest deposits required for the 2014 debt service of the General Obligation and Revenue Bonds | 6.00% | June 30, 2043 | 319,645 | 50,419 |
| To finance certain capital improvement projects | 150 bp over PRIME, but not less than 6% | June 30, 2043 | 100,000 | 34,789 |
| To finance certain capital improvement projects | 150 bp over PRIME, but not less than 6% | June 30, 2041 | 215,000 | 21,095 |
| Acquisition of Salinas Correctional Facilities | 125 bp over 3 month LIBOR | June 30, 2040 | 15,000 | 7,141 |

186

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| Purpose | Interest rate | Maturity | Lines of credit | Outstanding balance |
|---------|---------------|----------|-----------------|---------------------|
| To pay invoices presented to the Treasury Department related to Act No. 171 "Ley de Manejo de Neumátuicos" | 6.00% | June 30, 2019 | $ 22,100 | 687 |
| Total | | | $ 2,832,241 | 750,638 |

On November 21, 2002, Resolution No. 1028 from the Legislature authorized GDB to provide a line of credit financing for $500 million to the Special Communities Perpetual Trust for the construction and rehabilitation of housing, construction and improvements of electric, water and sewage systems; repair and improvements of streets and sidewalks; construction and improvement of recreational facilities, and to develop initiatives for economic self-sufficiency for the residents of a selected group of displaced and economically disadvantaged communities, all encompassed within the Special Communities Program initiated with the creation of the SCPT by Act No. 271 of November 21, 2002. This nonrevolving line of credit, originally for a ten-year term, was extended on June 30, 2012 to a maturity date of June 30, 2040. Effective October 2009, the interest rate on this line was set at 7%. Annual payments on the line are determined using a 30-year amortization table based on the principal and interest balance as of December 31 of each year, and a 4% interest penalty is carried on late payments. Legislative Resolution No. 1762 of September 18, 2004, established that the principal plus accrued interest of this line would be repaid from Commonwealth's legislative appropriations as established by the Commonwealth OMB. The outstanding balance of this line as of June 30, 2016, amounted to approximately $345.8 million.

On May 23, 2012, the Commonwealth OMB entered into a $100 million line of credit agreement (amended during fiscal year 2016 to a maximum of $178 million) with GDB to cover costs of the implementation of the third phase of Act No. 70 of 2010. Borrowings under this line of credit bear interest at prime rate plus 1.50% with a floor of 6%. The amended line of credit matures on July 31, 2037. As of June 30, 2016, approximately $115.5 million was outstanding. On June 5, 2006, the Commonwealth OMB entered into a $150 million line of credit agreement with GDB to provide economic assistance for disasters and emergencies. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and were payable upon the original maturity of the line of credit on September 30, 2011. On July 22, 2011, OMB and GDB amended the $150 million line of credit agreement to extend its maturity date to July 30, 2022. In addition, the agreement was converted to a revolving line of credit bearing interest at 150 basis points over prime rate, but in no event may such rate be less than 6% per annum. As of June 30, 2016, approximately $150 million was outstanding. Both of the outstanding lines of credit are payable from Commonwealth's legislative appropriations.

On August 18, 2010, GDB provided PBA a nonrevolving credit facility in the maximum principal amount of approximately $93.6 million bearing interest at a fluctuating annual rate equal to Prime plus 1.50%, provided that such interest cannot be less than 6%, or at such other rate determined by GDB. The proceeds of the facility were used for construction projects development. The line is due on June 30, 2044 and is payable from the proceeds of future revenue refunding bond issuance of PBA. As of June 30, 2016, approximately $51.0 million was outstanding. PBA also maintains a $75 million line of credit

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

agreement with GDB for payment of operational expenses. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon maturity on June 30, 2018. As of June 30, 2016, approximately $64.7 million was outstanding. In addition, on May 2, 2008, PBA executed two Loan Agreements with GDB for the interim financing of its Capital Improvement Program in an amount not to exceed approximately $226 million, bearing interest at 6%. The loans and the accrued interest are due on June 30, 2044 and are payable from the proceeds of the future revenue refunding bond issuance of PBA. The loans are divided into approximately $209 million on a tax-exempt basis and approximately $16.9 million on a taxable basis. As of June 30, 2016, approximately $66.4 million remains outstanding.

On February 6, 2003, the Department of Education of the Commonwealth entered into a $25 million line of credit agreement with GDB for the purchase of equipment and for school improvements. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and are payable upon the maturity of the line of credit on June 30, 2018. As of June 30, 2016, approximately $4.6 million was outstanding. On August 4, 2002, the Department of Education of the Commonwealth entered into an additional $140 million line of credit agreement with GDB in order to reimburse the Treasury Department of the Commonwealth for payments made on their behalf for state funds used to fund federal program expenditures. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2016, approximately $101.7 million was outstanding, which is payable from Commonwealth's legislative appropriations.

The Department of Transportation and Public Works of the Commonwealth entered into five line of credit agreements with GDB amounting to $104 million for improvement and maintenance of roads around the island. Borrowings under these lines of credit bear interest at a 7% rate and are payable upon maturity of the line of credit on June 30, 2018. As of June 30, 2016, approximately $82.9 million was outstanding, which is payable from Commonwealth's legislative appropriations. On May 12, 2004, the Correction Administration of the Commonwealth entered into a $60 million line of credit agreement with GDB for improvements to certain correctional facilities. Borrowings under this line of credit agreement bear interest at a fixed 7% rate and are payable upon the maturity of the line of credit on June 30, 2018. As of June 30, 2016, approximately $18.1 million was outstanding, which is payable from Commonwealth's legislative appropriations. In addition, on November 24, 2010, the Correction Administration of the Commonwealth entered into an $80 million line of credit agreement with GDB for the construction of a new correctional medical center. Borrowings under this line of credit agreement bear interest at a rate per annum equal to Prime Rate, plus 150 basis points, but in no event may such rate be less than 6% per annum nor greater than 12% per annum and were payable originally upon the maturity of the line of credit on June 30, 2040. As of June 30, 2016, approximately $64.4 million was outstanding which is payable from Commonwealth's legislative appropriations.

On August 22, 2007, UPRCCC entered into an $18 million nonrevolving line of credit agreement with GDB to build the UPRCCC's administrative offices and research facilities. On May 29, 2008, the agreement was amended, mainly to increase the maximum borrowing amount to $75 million, to extend the maturity date up to October 31, 2021, and to finance the construction of the hospital and radiotherapy facilities. The balance will be repaid from future annual Commonwealth legislative appropriations commencing in fiscal year 2015. The nonrevolving line bears interest at a fixed rate of 6%. As of June 30, 2016, approximately $31.9 million was outstanding. On November 18, 2013, the UPRCCC entered into another nonrevolving line of credit facility with GDB up to an aggregate principal amount not to exceed

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

$196 million, for the construction and development of a ninety-six beds hospital, a multi disciplinary outpatient clinic, a diagnostic imaging center and a medical oncology infusion unit in a land lot property of the UPRCCC located in San Juan. The line of credit, including interest at a fixed rate of 6.5%, is payable in 28 consecutive annual installments from future Commonwealth legislative appropriations, commencing on the last business day of December 2016. As of June 30, 2016, approximately $88.5 million was outstanding.

On August 9, 1999, the Department of Agriculture of the Commonwealth entered into a $125 million nonrevolving line of credit agreement with GDB to provide economic assistance to the agricultural sector, which sustained severe damages caused by Hurricane Georges in 1998. As of February 24, 2004, the line of credit increased by $50 million resulting in a total amount of $175 million. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2016, approximately $65.2 million was outstanding, which is payable from Commonwealth's legislative appropriations.

On October 2, 2002, the Department of Justice of the Commonwealth entered into a $90 million line of credit agreement with GDB for the financing of 12 public improvement projects for the Municipality of Ponce pursuant to a court order. Borrowings under this line of credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on June 30, 2018. On August 8, 2005, the Department of Justice of the Commonwealth entered into an amended agreement to increase the aforementioned line of credit from $90 million to $110 million to cover various additional projects in Ponce, pursuant to the same court order. Borrowings under the new amended line of credit agreement bear interest at a 7% rate and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2016, the aggregated balance outstanding under this amended line of credit agreement amounted to $49.8 million which, is payable from Commonwealth's legislative appropriations.

On February 18, 2005, PRIFA entered into a $40 million line of credit agreement with GDB for the construction of an auditorium for the Luis A. Ferré Fine Arts Center. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon maturity of the loan agreement on June 30, 2040. Principal and interest payments are being paid from Commonwealth's legislative appropriations. As of June 30, 2016, approximately $4.8 million related to this credit agreement was outstanding. On June 1, 2009, PRIFA entered into an additional revolving line of credit agreement with GDB to provide financing for costs incurred by PRIFA under certain American Recovery and Reinvestment Act Programs (the ARRA programs). Borrowings under this line of credit agreement bear interest at variable rates based on 150 basis points over the prime rate and are payable upon the maturity of the line of credit on January 31, 2016. This line is being repaid from Commonwealth's legislative appropriations. As of June 30, 2016, the outstanding balance of this line of credit agreement amounted to approximately $7.1 million. On March 8, 2012, PRIFA also entered into a $35 million line of credit agreement with GDB for the acquisition, refurbishments, and maintenance of certain real estate properties that are mostly occupied by various governmental agencies. This credit facility is secured by a mortgage lien on the property and is payable from future Commonwealth appropriations. This line of credit matures on June 30, 2017, and bears interest at 150 basis points over the prime rate, with a minimum interest rate of 6%. As of June 30, 2016, the outstanding balance of this line of credit agreement amounted to approximately $37.4 million.

In August 2003, the Department of Health of the Commonwealth entered into a $30 million line of credit agreement with GDB in order to repay certain outstanding debts that the PRMeSA had with other

# COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

agencies and suppliers. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon maturity of the line of credit on June 30, 2040. As of June 30, 2016, approximately $21.3 million related to this line of credit agreement was outstanding. On November 8, 2004, the Department of Health entered into an additional $58.5 million line of credit agreement with GDB for the financing of a project of the Department of Health and PRMeSA. Borrowings under this line of credit agreement bear interest at variable rates based on 150 basis points over GDB's commercial paper rate and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2016, the outstanding balance of this line of credit agreement amounted to approximately $19.6 million, which is payable from Commonwealth's legislative appropriations. On February 14, 2008, the Department of Health also entered into an additional $8 million line of credit agreement with GDB to cover costs of treatment, diagnosis, and supplementary expenses during fiscal year 2008 in conformity with Act No. 150 of 1996. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and are payable upon maturity of the line of credit on June 30, 2040. As of June 30, 2016, the outstanding balance of this line of credit agreement amounted to approximately $3.3 million, which is payable from Commonwealth's legislative appropriations.

On July 29, 2004, the Police Department of the Commonwealth entered into a $45 million line of credit agreement with GDB for the acquisition of vehicles and high technology equipment. Borrowings under this line of credit agreement bear interest based on the All Inclusive Total Interest Cost of the Medium Term Notes, Series B, plus a markup of 1.25%, and are payable upon the maturity of the line of credit on June 30, 2040. The outstanding balance of this line of credit agreement amounted to approximately $31.7 million as of June 30, 2016, which is payable from the Commonwealth's legislative appropriations.

On February 15, 2002, the Office of the Superintendent of the Capitol entered into a $35 million line of credit agreement with GDB for the Office of the Superintendent of the Capitol parking's construction. Borrowings under this line of credit agreement bear interest at a fixed rate 7% and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2016, approximately $15.5 million remained outstanding from the line of credit agreement, which is payable from the Commonwealth's legislative appropriations. On February 9, 2012, the Office of the Superintendent of the Capitol entered into an additional $15 million line of credit agreement with GDB for permanent improvements of existing buildings. Borrowings under this line of credit agreement bear interest at 150 basis points over Prime Rate and may not be less than 6% nor greater than 12% per annum and are payable upon maturity of the line of credit on June 30, 2018. As of June 30, 2016, approximately $6.5 million was outstanding, which is payable from Commonwealth's legislative appropriations. On December 17, 2014, the Office of the Superintendent of the Capitol entered into another $15 million line of credit agreement with GDB for permanent improvements to the Capitol District. Borrowings under this line of credit agreement bear interest at the fixed rate of 5.8% and are payable upon maturity of the line of credit on June 30, 2024. As of June 30, 2016, approximately $5.5 million was outstanding.

On March 8, 2007, the Commonwealth DOH entered into a $19 million line of credit agreement with GDB, to reimburse the Puerto Rico Housing Financing Authority, a blended component unit of GDB, for certain advances made for a revitalization project. Borrowings under this line of credit agreement bear interest at a variable rate of three-month LIBOR plus 1.25%, not to exceed 5%, and are payable upon maturity of the line of credit on June 30, 2040. As of June 30, 2016, the line of credit has an outstanding balance of approximately $5.2 million, which is payable from the proceeds of the sale of properties. On December 3, 2007, the Commonwealth DOH entered into an additional $30 million line of credit

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

agreement with GDB for the purchase of Juan C. Cordero Dávila building. Borrowings under this line of credit agreement bear interest based on 75 basis points over three-month LIBOR and are payable upon maturity of the line of credit on February 28, 2038. As of June 30, 2016, approximately $13.4 million related to this line of credit agreement was outstanding, which is payable from future rental revenues.

On January 18, 2005, the Department of Recreation and Sports of the Commonwealth (DRS) entered into a $17.2 million line of credit agreement with GDB for the development of a series of recreational projects at different municipalities. Borrowings under this line of credit agreement bear interest based on 150 basis points over GDB's commercial paper rate and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2016, approximately $0.5 million was outstanding. Also, on February 9, 2004, DRS entered into a $16 million line of credit agreement with GDB for the development and improvement of recreational facilities. Borrowings under this line of credit agreement bear interest on the unpaid principal amount of each advance at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2018. As of June 30, 2016, approximately $0.6 million was outstanding, which is payable from Commonwealth's legislative appropriations. An additional line of credit agreement was entered into between GDB and DRS in the maximum principal amount of $13.028 million bearing interest on the unpaid principal amount of each advance at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2040. The proceeds of the line of credit were used for development and improvement of recreational facilities. As of June 30, 2016, approximately $8.2 million was outstanding, which is payable from Commonwealth's legislative appropriations. On July 23, 2014, Act No. 107 was approved, creating the National Parks Program of the Commonwealth (NPP), which among other provisions, merged NPCPR, then a discretely presented component unit, into a program within the DRS, NPCPR then ceased to exist as a separate legal entity. With this transaction, the program brought three separate line of credit agreements with GDB into DRS. On August 17, 2007, NPP entered in a $10 million line of credit in order to finance an early retirement program in response to Act No. 70 of June 30, 2007. Borrowings under this line of credit agreement bear interest based on a fixed rate of 7%, and principal and interest are payable on October 31 of each year until December 31, 2018. The source for the repayment comes from revenues collected by NPP during the first four months of the year and thereafter until 2018. As of June 30, 2016, approximately $3.2 million was outstanding. On February 6, 2003, NPP entered in a $9.3 million line of credit in order to finance the improvements of certain parks, seaside facilities and buildings of NPP. Borrowings under this line of credit agreement bear interest based on a variable rate (7% as of June 30, 2016). Principal and interest are payable annually through June 30, 2040 and the source for the repayment comes from legislative appropriations. As of June 30, 2016, approximately $1.1 million was outstanding. During 2003, NPP entered into a $12 million line of credit in order to finance the acquisition of a certain land lot. Borrowings under this line of credit agreement bear interest based on a variable rate (7% as of June 30, 2016). Principal and interest are payable annually through June 30, 2040, and the source for the repayment comes from future Commonwealth's legislative appropriations. As of June 30, 2016, approximately $4.5 million was outstanding.

On February 27, 2014, the Office entered into an additional $50 million line of credit agreement with GDB for the development of several priority projects pursuant to its strategic plan and to fund additional operational commitments. Borrowings under this line of credit agreement bear interest at 150 basis points over Prime Rate and may not be less than 6% nor greater than 12% per annum and are payable upon maturity of the line of credit on July 31, 2027. As of June 30, 2016, approximately $34 million was outstanding, which is payable from future custom duty taxes.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On September 18, 2003, the EQB entered into a $11 million line of credit agreement with GDB for the federal funds matching requirements related to the Clean Water State Revolving Fund. Borrowings under this line of credit agreement bear interest at a variable rate of 150 basis points over Prime Rate calculated on a quarterly basis with a floor of 6% and are payable annually through March 31, 2017. If there is any unpaid principal amount after the maturity date, the interest rate will increase 200% of the applicable interest rate at such date. The interest payable will be accrued daily. As of June 30, 2016, approximately $2.2 million remained outstanding from the line of credit agreement, which is payable from the Commonwealth's legislative appropriations.

*Notes Payable to Component Units*

Act No. 80 of 2015 was approved with the objective of addressing the Commonwealth's projected cash flow deficiencies for fiscal year 2015. This Act, among other provisions, specifically authorized the SIFC, PRTC, AACA, EDB, PRIDCO and the Department of Economic Development and Commerce to grant loans and/or special contributions to the Treasury Department, in the aggregate amount of $125 million. On June 5 and 9, 2015, SIFC and AACA granted loans to the Treasury Department under the provisions of this Act in the amounts of $100 million and $2 million, respectively, which is payable from the Commonwealth's legislative appropriations. These loans bear interest at a rate of 1%, and principal and interest will be payable on an annual basis, effective July 31, 2017. The loan granted by ACAA matures on July 31, 2022, and that granted by SIFC matures on July 31, 2032.

*Notes Payable to Financial Institutions*

On December 26, 2013, the General Service Administration (GSA) entered into a $33.3 million nonrevolving line of credit agreement with a financial institution for the purchase of four helicopters to be used by the Puerto Rico Police Department, through a lease agreement between both government agencies. Such lease agreement has been assigned as the line of credit repayment source, which in turn will be sustained with annual future Commonwealth legislative appropriations in the amounts necessary to cover the required debt service of the line of credit. This obligation is payable in seven equal, annual and consecutive installments commencing on July 15, 2014, plus interest payable on July 15 and January 15 of every year beginning on July 15, 2014, at an interest rate based on the financial institution cost of funds, as defined, plus 0.25 basis points. The interest rate as of June 30, 2016, was 3.0204%. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of principal and interest on this obligation. As of June 30, 2016, approximately $23.8 million was outstanding. Debt service requirements in future years were as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2017 | 4,753 | 656 | 5,409 |
| 2018 | 4,753 | 509 | 5,262 |
| 2019 | 4,753 | 363 | 5,116 |
| 2020 | 4,753 | 218 | 4,971 |
| 2021 | 4,752 | 73 | 4,825 |
| Total | $ 23,764 | 1,819 | 25,583 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

(ii)  Business-Type Activities (in thousands):

| | | |
|---|---|---:|
| Puerto Rico Medical Services Administration | $ | 282,445 |
| Puerto Rico Health Insurance Administration | | 183,251 |
| Ponce Ports Authority | | 20,863 |
| Notes payable to GDB | $ | 486,559 |

On October 14, 2010, the Legislature approved a new article 9A to Act No. 66 of June 22, 1978, by which it authorized PRMeSA, a component unit blended as a Commonwealth enterprise fund, to incur on an obligation of up to $285 million to be deposited in a special GDB account and to be used for payment of debts to suppliers, agencies and a reserve fund for self insurance of PRMeSA, and to provide operational liquidity to ease PRMeSA's fiscal situation. GDB was named fiscal agent to administer and monitor the use of these funds. The Commonwealth is required to honor the payment of this obligation with future legislative appropriations to be made every year until fiscal year 2023–2024. Borrowings under this line of credit agreement bear interest at variable rates based on 150 basis points over the prime rate. No legislative appropriations were made in 2015 and 2016 to cover the first scheduled principal payment of approximately $31.5 million. As of June 30, 2016, approximately $282.4 million was outstanding.

On March 14, 2011, PRHIA, a blended component unit, entered into a credit agreement with GDB in order to pay its obligations to healthcare insurers incurred prior to fiscal year 2010. The aggregate principal amount of the nonrevolving line of credit was $186 million. This line is payable in nine payments of $20.7 million each due on March 14 of the years 2015 through 2023, through future Commonwealth annual legislative appropriations. Interest is accrued at a fluctuating annual rate of interest equal to the greater of 150 basis points over the prime rate and 6%. No legislative appropriations were made in 2015 and 2016 to cover the principal payments scheduled for March 14, 2015 and 2016. As of June 30, 2016, the outstanding principal balance amounted to approximately $183.3 million.

On August 29, 2014, the PPA entered into an $60 million line of credit agreement with GDB to cover the operational, maintenance, equipment acquisition and permanent improvement costs of the Ports of the Americas Rafael Cordero Santiago, pursuant to the provisions of Act No. 240 of 2011, which created the PPA (assets are owned by PAA as of June 30, 2016). Borrowings under this line of credit agreement bear interest based on the rates borne by the general obligation of the Commonwealth. These rates should be revised on a quarterly basis provided, however, that the interest may never be less than 7% nor greater than 12%. Interest during fiscal year 2016 was 7.78%. The line of credit has a maturity of June 30, 2044, and its principal and interests are payable through annual legislative appropriations. As of June 30, 2016, the outstanding principal balance was approximately $20.9 million, which is payable from future Commonwealth's legislative appropriations.

193

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**(h) Obligations under Capital Lease Arrangements**

The Commonwealth is obligated under capital leases with third parties that expire through 2044 for land, buildings, and equipment.

The present value of future minimum capital lease payments at June 30, 2016 reported in the accompanying government-wide statement of net position was as follows (in thousands):

| Year ending June 30: | | |
|---|---|---:|
| 2017 | $ | 35,994 |
| 2018 | | 34,972 |
| 2019 | | 33,894 |
| 2020 | | 33,782 |
| 2021 | | 33,410 |
| 2022–2026 | | 166,669 |
| 2027–2031 | | 162,816 |
| 2032–2036 | | 118,375 |
| 2037–2041 | | 88,048 |
| 2042–2046 | | 42,558 |
| Total future minimum lease payments | | 750,518 |
| Less amount representing interest costs | | (406,423) |
| Present value of minimum lease payments | $ | 344,095 |

Leased land, buildings, and equipment under capital leases included in capital assets at June 30, 2016, include the following (in thousands):

| | | |
|---|---|---:|
| Land | $ | 7,960 |
| Buildings | | 438,784 |
| Equipment | | 3,674 |
| Subtotal | | 450,418 |
| Less accumulated amortization | | (90,994) |
| Total | $ | 359,424 |

Amortization applicable to capital leases and included within depreciation expense of capital assets amounted to approximately $12.8 million in 2016.

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

### (i)  Net Pension Liability

The amount reported as net pension liability in the government-wide financial statements of approximately $37.5 billion of which approximately $152 million is due within one year at June 30, 2016, represents the Primary Government's proportionate share of the ERS calculation of the net pension liability measured as the total pension liability less the amount of the ERS' fiduciary net position, plus the sum of the full TRS and JRS measure of its total pension liability less the amount of its corresponding fiduciary net positions (see Note 18).

### (j)  Other Post-Employment Benefit Obligation

The amount reported as other post-employment benefit obligation in the Governmental Activities and Business-Type Activities of approximately $265 million and $1.8 million, respectively, at June 30, 2016 represents the cumulative amount owed by the Commonwealth for the unfunded prior years' actuarially required other post-employment benefit contributions to the ERS MIPC, JRS MIPC, and TRS MIPC (see Note 19) in the case of Governmental Activities, and to other post-employment plans in the case of Business-Type Activities.

### (k)  Compensated Absences

Long-term liabilities include approximately $1.3 billion and $22.6 million of accrued compensated absences recorded as Governmental and Business-Type Activities, respectively, at June 30, 2016.

### (l)  Obligation for Unpaid Lottery Prizes

The amount reported as unpaid lottery prizes represents the lottery prizes payable of the Lottery of Puerto Rico (commonly known as Traditional Lottery) and the Additional Lottery System (commonly known as Lotto) jointly known as the Lotteries at June 30, 2016. The minimum annual payments related to unpaid awards of both lotteries were as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2017 | $ 70,847 | 10,135 | 80,982 |
| 2018 | 15,239 | 9,734 | 24,973 |
| 2019 | 13,063 | 8,982 | 22,045 |
| 2020 | 11,363 | 8,364 | 19,727 |
| 2021 | 9,725 | 7,512 | 17,237 |
| 2022–2026 | 33,299 | 27,699 | 60,998 |
| 2027–2031 | 15,243 | 11,032 | 26,275 |
| 2032–2036 | 3,382 | 2,518 | 5,900 |
| Total | $ 172,161 | 85,976 | 258,137 |

The minimum annual payments related to unpaid awards of Lotto include an unclaimed prizes liability (not lapsed) of approximately $6.1 million at June 30, 2016, which is reported as prizes payable – current portion.

195

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The liability for unpaid lottery prizes is reported in Business-Type Activities of the accompanying statement of net position and statement of net position of the proprietary funds.

### (m) Voluntary Termination Benefits Payable

On July 2, 2010, the Commonwealth enacted Act No. 70 to establish a program that provides early retirement benefits or economic incentives for voluntary employment termination to eligible employees, as defined. Act No. 70 applies to agencies and component units whose budgets are funded in whole or in part by the General Fund.

Act No. 70 established that early retirement benefits (early retirement program) will be provided to eligible employees that have completed between 15 to 29 years of credited services in the Retirement System and will consist of bi-weekly benefits ranging from 37.5% to 50% of each employee's salary, as defined. Pursuant to Act No. 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Retirement System, as well as covering the annuity payments to the employees opting for early retirement, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments.

Economic incentives are available to eligible employees who have less than 15 years of credited service in the Retirement System (incentivized resignation program) or who have at least 30 years of credited service in the Retirement System and who have the age for retirement (incentivized retirement program). Economic incentives will consist of a lump sum payment ranging from one month to six months' salary based on employment years.

Additionally, eligible employees that choose to participate in the early retirement program or in the incentivized resignation program are eligible to receive health plan coverage for up to 12 months in a health plan selected by management of the Commonwealth.

Act No. 70 allows certain component units of the Commonwealth that operate with their own resources to implement a similar program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. The benefits and the requirements are the same as provided by Act No. 70, except as follows: in the early retirement benefit program, the component unit will make the employee and employer contributions to the Retirement System and pay the corresponding pension until the employee complies with the requirements of age and 30 years of credited service in the Retirement System; and in the incentivized retirement program, the component unit will make the employee and the employer contributions to the Retirement System for a five year period.

At June 30, 2016, unpaid long-term benefits granted in Act No. 70 were discounted at interest rates that ranged from 1.84% to 3.00% at the Primary Government level and from 1.38% to 3.34% at the component units level.

### (n) Claims Liability for Health Insurance Benefits

The Commonwealth, through PRHIA (a blended component unit), is responsible for implementing, administering, and negotiating a health insurance system, through contracts with insurance underwriters, to provide quality medical and hospital care to the Commonwealth residents regardless of their financial

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

condition and capacity to pay. PRHIA pays a monthly premium to such insurance underwriters based on a contracted premium and the number of members subscribed in the health plan. Funds to pay for such premiums are requested from the Commonwealth, net of funds available for such purposes from all other sources.

Under the provisions of Act No. 105 of July 19, 2002, which amends Act No. 72 of 1993, PRHIA was authorized to negotiate directly with health providers under a pilot program. PRHIA has, since then, entered into different direct contracts to cover the insured population of different regions and municipalities. Since November 1, 2006 through September 1, 2010, PRHIA directly contracted providers that served approximately 190,000 lives from the metro north region. At June 30, 2011, PRHIA has direct contracting projects with the municipalities of Vieques and Guaynabo, and effective October 1, 2011, the projects were expanded to cover the west, the metro north, the north, San Juan, the northeast, and the virtual regions under a new arrangement with a new insurance underwriter as third party administrator. In addition, PRHIA implemented certain cost containment strategies to control costs, such as establishing a co-payment that applies for the unjustified use of emergency rooms, detection and control of prescription drug overuse, implementation of a disease management program for respiratory conditions, modification of provider fees, and better coordination of benefits for members of the population that have other medical insurance.

PRHIA establishes a liability to cover the estimated amount to be paid to providers based on experience and accumulated statistical data under one of the direct contracting pilot projects. The estimates of medical claims incurred but not reported and other medical expense payments is developed using actuarial methods and assumptions based upon payment patterns, inflation of medical costs, historical developments, and other relevant factors. The following table provides a reconciliation of the beginning and ending liability for incurred but unpaid medical and benefit adjustment expenses for the period ended June 30, 2016 (in thousands):

| | |
|---|---|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ 240,153 |
| Total incurred benefits | 86,440 |
| Total benefit payments | (210,632) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ 115,961 |

The liability for health benefits claims is reported as liability for health insurance in the Business-Type Activities of the accompanying statement of net position and in the statement of net position of the proprietary funds. The liability as of June 30, 2016, amounts to approximately $116 million.

*(o) Claims Liability for Unemployment and Disability Insurance Benefits*

The Commonwealth provides unemployment compensation, occupational disability, and drivers' insurance coverage to public and private employees through various insurance programs administered by the Department of Labor and Human Resources of the Commonwealth. These insurance programs cover workers against unemployment, temporary disability, or death because of work or employment related accidents or because of illness suffered as consequence of their employment. The following table

197

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

provides a reconciliation of the beginning and ending liability for incurred but unpaid benefits and benefit adjustment expenses for the year ended June 30, 2016:

|  | Unemployment insurance | Other nonmajor proprietary funds | Totals |
|---|---|---|---|
|  | (In thousands) | | |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ 57,683 | 651 | 58,334 |
| Total incurred benefits | 139,993 | 2,481 | 142,474 |
| Total benefit payments | (144,388) | (2,330) | (146,718) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ 53,288 | 802 | 54,090 |

The Commonwealth establishes liabilities for incurred but unpaid benefits and benefit adjustment expenses based on the ultimate cost of settling the benefits. Insurance benefit claim liabilities are reevaluated periodically to take into consideration recently settled claims, the frequency of claims, and other economic and social factors. The liability for insurance benefits claims is reported as liability for unemployment and disability insurance in the Business-Type Activities of the accompanying statement of net position and statement of net position of the proprietary funds. The liability as of June 30, 2016, amounts to approximately $54.1 million.

*(p)* *Other Long-Term Liabilities*

The remaining long-term liabilities of Governmental Activities at June 30, 2016 include (in thousands):

| | |
|---|---|
| Liability for legal claims and judgments (note 17) | $ 1,268,256 |
| Liability to U.S. Army Corps of Engineers (note 11) | 218,442 |
| Liability for custodial credit risk loss and uncollectible loans receivable of State Revolving Funds | 760,673 |
| Accrued Employees' Christmas bonus | 78,361 |
| Liability for federal cost disallowances (note 17) | 65,182 |
| Other | 23,900 |
| Total | $ 2,414,814 |

198

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

As described in Note 11, the Commonwealth has a debt obligation with the U.S. Army Corps of Engineers in relation to its estimated allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project. Late in April 2011, the Commonwealth received a final debt agreement from the U.S. Army Corps of Engineers establishing a repayment schedule for its allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project, amounting to $214 million, excluding those costs for items built for recreational purposes. On October 10, 2012, the U.S. Army Corps of Engineers placed such debt into the U.S. Treasury Department Offset Program (the Offset Program) until May 2013 (the month in which the Offset Program was stopped). On March 21, 2014, the U.S. Army Corps of Engineers granted certain concessions on this obligation of the Commonwealth by forgiving the balance already due and payable in the amount of $35.4 million and approving a new payment plan proposed by the Secretary of the Treasury for the remaining debt obligation. This new payment plan reduced the interest rate from 6.063% to 1.50% and waived all cumulative penalty interest and fees, which reduced the annual payment from approximately $12.9 million to approximately $7.1 million for the remaining term of the debt. The new payment plan consists of 33 annual payments of $7.1 million, including interest, from June 7, 2014 until June 7, 2046. These concessions qualified as a troubled debt restructuring, where the total future cash payments specified by the new terms exceeded the carrying value of the old debt, including the accrued balance matured and payable of $35.4 million. Under such circumstances, the effects of the new terms are accounted for prospectively without modifying the carrying amount of the debt in the statement of net position.

The unpaid allocated share of the construction costs associated with the Cerrillos Project amounted to approximately $170 million at June 30, 2016. Debt service requirements on this debt obligation at June 30, 2016 were as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year(s) ending June 30: |  |  |  |
| 2017 | $    4,527 | 2,550 | 7,077 |
| 2018 | 4,595 | 2,482 | 7,077 |
| 2019 | 4,664 | 2,413 | 7,077 |
| 2020 | 4,734 | 2,342 | 7,076 |
| 2021 | 4,805 | 2,271 | 7,076 |
| 2022–2026 | 25,129 | 10,254 | 35,383 |
| 2027–2031 | 27,071 | 8,312 | 35,383 |
| 2032–2036 | 29,164 | 6,220 | 35,384 |
| 2037–2041 | 31,418 | 3,966 | 35,384 |
| 2042–2046 | 33,846 | 1,538 | 35,384 |
| Total | $  169,953 | 42,348 | 212,301 |

In addition, the Commonwealth has a debt obligation of approximately $48.5 million with the U.S. Army Corps of Engineers in relation to its estimated allocated share of the construction costs associated with the recreational part of the Cerrillos Dam and Reservoir Project, including accrued interest of approximately $6.1 million, at June 30, 2016. The final debt agreement with the U.S. Army Corps of Engineers for the recreational part of the Cerrillos Dam and Reservoir Project has not been finalized, and therefore, terms and conditions could differ from those estimated. The related debt is expected to be

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

payable in annual installment payments over a 35-year period. However, the debt has been presented as a long-term payable after one year in the accompanying statement of net position since the commencement date of repayment has not yet been determined.

The Commonwealth recorded a contingent liability for the custodial credit risk loss on deposits held at GDB by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund amounting to approximately $187.5 million and the uncollectible portion of the loans receivable from PRASA that the Commonwealth guarantees of approximately $573.2 million.

The remaining other long-term liabilities within Business-Type Activities at June 30, 2016 are composed of an accrued pension costs and a self insurance reserve for approximately $71.1 million and $2.4 million, respectively, corresponding to PRMeSA.

*Fiduciary Funds*

On January 31, 2008, ERS issued its first of three series of bonds (collectively, ERS Bonds), which consisted of approximately $1,589 million aggregate principal amount of Senior Pension Funding Bonds, Series A (the Series A Bonds). On June 2, 2008, ERS issued its second series of ERS Bonds, which consisted of approximately $1,059 million aggregate principal amount of Senior Pension Funding Bonds, Series B (the Series B Bonds). Finally, on June 30, 2008, ERS issued its third and final series of ERS Bonds, which consisted of approximately $300 million aggregate principal amount of Senior Pension Funding Bonds, Series C (the Series C Bonds).

The ERS Bonds are limited, nonrecourse obligations of ERS, payable solely from employer contributions made after the date of issuance of the first series of the ERS Bonds, and from funds held on deposit with the Bank of New York Mellon (the Fiscal Agent). ERS Bonds are not payable from contributions made to ERS by participating employees, or from the assets acquired with the proceeds of the ERS Bonds, or from employer contributions released by the Fiscal Agent to ERS after funding of required reserves, or from any other asset of ERS. ERS invested the proceeds of ERS Bonds and used these investments and the earnings thereon to provide pension benefits to its beneficiaries.

On March 12, 2019, the Creditors' Committee filed the ERS Bond Claim Objection seeking to disallow all claims asserted against ERS based on the approximately $3.1 billion of outstanding bonds issued by ERS in 2008.  For additional information regarding the ERS Bond Claim Objection, refer to Note 3.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

As of June 30, 2016, the outstanding principal balance of ERS Bonds is as follows (in thousands):

| Description | | |
|---|---|---|
| Series A Bonds: | | |
| Capital Appreciation Bonds, maturing in 2028, bearing interest at 6.20% | $ | 75,302 |
| Term Bonds, maturing in 2023, bearing interest at 5.85% | | 200,000 |
| Term Bonds, maturing from 2031 through 2038, bearing interest at 6.15% | | 679,000 |
| Term Bonds, maturing from 2039 through 2042, bearing interest at 6.20% | | 332,770 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.45% | | 332,000 |
| Total Series A Bonds outstanding | | 1,619,072 |
| Series B Bonds: | | |
| Capital Appreciation Bonds, maturing from 2028 through 2030, bearing interest at 6.40% | | 234,706 |
| Capital Appreciation Bonds, maturing from 2031 through 2034, bearing interest at 6.45% | | 169,479 |
| Term Bonds, maturing in 2031, bearing interest at 6.25% | | 117,100 |
| Term Bonds, maturing from 2036 through 2039, bearing interest at 6.30% | | 270,000 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.55% | | 429,000 |
| Total Series B Bonds outstanding | | 1,220,285 |
| Series C Bonds: | | |
| Capital Appreciation Bonds, maturing in 2030, bearing interest at 6.50% | | 3,678 |
| Term Bonds, maturing in 2028, bearing interest at 6.15% | | 110,000 |
| Term Bonds, maturing in 2038, bearing interest at 6.25% | | 45,000 |
| Term Bonds, maturing in 2043, bearing interest at 6.30% | | 143,000 |
| Total Series C Bonds outstanding | | 301,678 |
| Total bonds outstanding | | 3,141,035 |
| Less bonds discount | | (6,133) |
| Bonds payable – net | $ | 3,134,902 |

**Series A Bonds** – The aggregate principal amount of the Series A Bonds issued amounted to approximately $1,589 million of which approximately $1,544 million was issued as term bonds (the Series A Term Bonds) and $45 million was issued as capital appreciation bonds (the Series A Capital Appreciation Bonds). Interest on the Series A Term Bonds is payable monthly on the first day of each month. Interest on the Series A Capital Appreciation Bonds is not payable on a current basis, but is added to the principal of the Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest must be computed based on a 360-day year consisting of twelve 30-day months. The Series A Bonds are subject to redemption at the option of ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series A Capital Appreciation Bonds, the accreted amount) of the Series A Bonds, plus accrued interest to the redemption date, and without premium.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

In addition, the following Series A Term Bonds are subject to mandatory redemption in part commencing on July 1, 2021 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (in thousands):

| Redemption period | Subject bonds | | Amount |
|---|---|---|---|
| July 1, 2021 | Term bonds maturing July 1, 2023 | $ | 50,000 |
| July 1, 2022 | Term bonds maturing July 1, 2023 | | 70,000 |
| July 1, 2023 | Term bonds maturing July 1, 2023 | | 80,000 |
| | Subtotal | | 200,000 |
| July 1, 2031 | Term bonds maturing July 1, 2038 | | 3,000 |
| July 1, 2032 | Term bonds maturing July 1, 2038 | | 4,500 |
| July 1, 2033 | Term bonds maturing July 1, 2038 | | 4,000 |
| July 1, 2034 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2035 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2036 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2037 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2038 | Term bonds maturing July 1, 2038 | | 133,500 |
| | Subtotal | | 679,000 |
| | Total | $ | 879,000 |

**Series B Bonds** – The aggregate principal amount of the Series B Bonds amounted to approximately $1,059 million of which approximately $816 million was issued as term bonds (the Series B Term Bonds) and $243 million was issued as capital appreciation bonds (the Series B Capital Appreciation Bonds). Interest on the Series B Term Bonds is payable monthly on the first day of each month. Interest on the Series B Capital Appreciation Bonds is not payable on a current basis, but is added to the principal of the Series B Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest must be computed based on a 360-day year consisting of twelve 30-day months. The Series B Bonds are subject to redemption at the option of ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series B Capital Appreciation Bonds, the accreted amount) of the Series B Bonds, plus accrued interest to the redemption date, and without premium.

**Series C Bonds** – The aggregate principal amount of the Series C Bonds amounted to approximately $300 million of which approximately $298 million was issued as term bonds (the Series C Term Bonds) and $2 million was issued as capital appreciation bonds (the Series C Capital Appreciation Bonds). Interest on the Series C Term Bonds is payable monthly on the first day of each month. Interest on the Series C Capital Appreciation Bonds is not payable on a current basis but are added to the principal of the Series C Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest must be computed based on a 360-day year consisting of twelve 30-day months. The Series C Bonds are subject to redemption at the option of ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series C Capital Appreciation Bonds, the accreted amount) of the Series C Bonds, plus accrued interest to the redemption date, and without premium.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

In addition, the following Series C Term Bonds are subject to mandatory redemption in part commencing on July 1, 2024 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (in thousands):

| Redemption period | Subject bonds | | Amount |
|---|---|---|---|
| July 1, 2024 | Term bonds maturing July 1, 2028 | $ | 18,700 |
| July 1, 2025 | Term bonds maturing July 1, 2028 | | 22,000 |
| July 1, 2026 | Term bonds maturing July 1, 2028 | | 29,150 |
| July 1, 2027 | Term bonds maturing July 1, 2028 | | 36,300 |
| July 1, 2028 | Term bonds maturing July 1, 2028 | | 3,850 |
| | Subtotal | | 110,000 |
| July 1, 2029 | Term bonds maturing July 1, 2038 | | 100 |
| July 1, 2030 | Term bonds maturing July 1, 2038 | | 540 |
| July 1, 2031 | Term bonds maturing July 1, 2038 | | 100 |
| July 1, 2032 | Term bonds maturing July 1, 2038 | | 3,420 |
| July 1, 2033 | Term bonds maturing July 1, 2038 | | 4,320 |
| July 1, 2034 | Term bonds maturing July 1, 2038 | | 100 |
| July 1, 2035 | Term bonds maturing July 1, 2038 | | 11,940 |
| July 1, 2036 | Term bonds maturing July 1, 2038 | | 2,160 |
| July 1, 2037 | Term bonds maturing July 1, 2038 | | 7,920 |
| July 1, 2038 | Term bonds maturing July 1, 2038 | | 14,400 |
| | Subtotal | | 45,000 |
| July 1, 2039 | Term bonds maturing July 1, 2043 | | 28,600 |
| July 1, 2040 | Term bonds maturing July 1, 2043 | | 28,600 |
| July 1, 2041 | Term bonds maturing July 1, 2043 | | 28,600 |
| July 1, 2042 | Term bonds maturing July 1, 2043 | | 28,600 |
| July 1, 2043 | Term bonds maturing July 1, 2043 | | 28,600 |
| | Subtotal | | 143,000 |
| | Total | $ | 298,000 |

203

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

ERS complied with the sinking fund requirements at June 30, 2016. Debt service requirements in future years on ERS bonds as of June 30, 2016 were as follows (in thousands):

| Year(s) ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2017 | $ — | 166,519 | 166,519 |
| 2018 | — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2021 | — | 166,519 | 166,519 |
| 2022–2026 | 200,000 | 797,495 | 997,495 |
| 2027–2031 | 808,280 | 753,800 | 1,562,080 |
| 2032–2036 | 613,560 | 739,532 | 1,353,092 |
| 2037–2041 | 1,240,170 | 520,143 | 1,760,313 |
| 2042–2046 | 218,100 | 305,430 | 523,530 |
| 2047–2051 | — | 285,084 | 285,084 |
| 2052–2056 | 183,200 | 273,171 | 456,371 |
| 2057–2061 | 577,800 | 77,838 | 655,638 |
| | 3,841,110 | $ 4,585,088 | 8,426,198 |
| Less unaccreted interest | (700,075) | | |
| Less unamortized discount | (6,133) | | |
| Total | $ 3,134,902 | | |

**Use of Employer Contributions** – ERS entered into a Security Agreement with the Fiscal Agent for the benefit of the bondholders, pursuant to which ERS pledged to the Fiscal Agent, and granted the Fiscal Agent a security interest in employer contributions made after January 31, 2008, which was the date of issuance of the first series of bonds, and the funds on deposit with the Fiscal Agent under the various accounts established under the Pension Funding Bond Resolution (the Resolution).

Annual employer contributions that were made after January 31, 2008, which was the date of issuance of the first Series of bonds, in accordance with the Act and amounts on deposit in the different accounts created pursuant to the Resolution for the benefits of the owners of the bonds, were used for annual debt service requirements as established.

On August 23, 2017, the Commonwealth enacted Act No. 106 of 2017 which instituted a PayGo system for the Retirement Systems, including ERS, and eliminated employers' obligations to contribute to ERS. For additional information regarding the PayGo system, refer to Notes 2, 3 and 23.

*Discretely Presented Component Units*

Notes, bonds, and appropriation bonds payable are those liabilities that are paid out of the component units' own resources. These obligations do not constitute a liability or debt of the Primary Government.

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

### (a)   Notes Payable to Financial Institutions

The outstanding balance of notes payable to financial institutions at June 30, 2016 is as follows (in thousands):

| Component unit | Interest rates | Maturity through | Balance at June 30, 2015 | Additions | Reductions | Balance at June 30, 2016 | Due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| GDB | 3.375%–8.00% | 2042 | $   4,049,987 | 39,990 | 250,074 | 3,839,903 | 669,195 |
| PREPA | 3.25%–7.25% | 2023 | 718,476 | 4,087 | 6,994 | 715,569 | 698,683 |
| PRASA | 8.75% | 2017 | 96,553 | — | 92,400 | 4,153 | 4,153 |
| UPR | 4.00% - 5.95% | 2017 | 1,319 | — | 606 | 713 | 452 |
| SIFC | Variable | 2028 | 232,261 | — | 216,916 | 15,345 | 5,966 |
| Sub-total | | | 5,098,596 | 44,077 | 566,990 | 4,575,683 | 1,378,449 |
| Nonmajor component units | 1.83%-8.45%, Variable | 2033 | 812,264 | 108,792 | 497,308 | 423,748 | 42,875 |
| Total | | | $   5,910,860 | 152,869 | 1,064,298 | 4,999,431 | 1,421,324 |

Debt service requirements on component units' notes payable with fixed maturities at June 30, 2016 were as follows (in thousands):

| | | Principal | Interest | Total |
|---|---|---|---|---|
| Year(s) ending June 30: | | | | |
| 2017 | $ | 1,421,324 | 182,839 | 1,604,163 |
| 2018 | | 307,933 | 159,357 | 467,290 |
| 2019 | | 861,721 | 141,754 | 1,003,475 |
| 2020 | | 444,383 | 98,281 | 542,664 |
| 2021 | | 456,469 | 74,148 | 530,617 |
| 2022–2026 | | 1,126,178 | 219,511 | 1,345,689 |
| 2027–2031 | | 324,613 | 52,013 | 376,626 |
| 2032–2036 | | 27,353 | 14,535 | 41,888 |
| 2037–2041 | | 26,434 | 5,744 | 32,178 |
| 2042 | | 3,023 | 105 | 3,128 |
| Total | $ | 4,999,431 | 948,287 | 5,947,718 |

The above schedule has been presented in accordance with original terms of the notes payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding, including the effect of the GDB Qualifying Modification. Accordingly, the effects

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

of the PROMESA Title III or any other debt restructuring proceeding may affect the carrying amounts, interest rates and the repayment terms. See Note 3 and Note 23 for additional information.

*(b)  Commonwealth Appropriation Bonds*

Commonwealth appropriation bonds payable outstanding at June 30, 2016 were as follows (in thousands):

| Component unit | Interest rates | Maturity through | Balance at June 30, 2015 | Additions | Reductions | Balance at June 30, 2016 | Amounts due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| PRASA | 3.10% – 6.50% | 2032 | $   416,566 | — | 246 | 416,320 | 13,251 |
| GDB | 3.10% – 6.50% | 2032 | 3,434 | — | 100 | 3,334 | 84 |
| Sub-total | | | 420,000 | — | 346 | 419,654 | 13,335 |
| Nonmajor component units | 3.10% – 6.50% | 2032 | 108,872 | — | 58 | 108,814 | 5,761 |
| Total | | | $   528,872 | — | 404 | 528,468 | 19,096 |

Debt service requirements on the Commonwealth's appropriation bonds payable with fixed maturities at June 30, 2016 were as follows (in thousands):

| | | Principal | Interest | Total |
|---|---|---|---|---|
| Year(s) ending June 30: | | | | |
| 2017 | $ | 19,096 | 48,479 | 67,575 |
| 2018 | | 8,895 | 28,296 | 37,191 |
| 2019 | | 9,229 | 27,940 | 37,169 |
| 2020 | | 9,598 | 27,554 | 37,152 |
| 2021 | | 9,995 | 27,134 | 37,129 |
| 2022–2026 | | 51,509 | 128,709 | 180,218 |
| 2027–2031 | | 380,435 | 70,116 | 450,551 |
| 2032 | | 33,950 | 1,867 | 35,817 |
| | | 522,707 | $   360,095 | 882,802 |
| Premium | | 5,825 | | |
| Discount | | (64) | | |
| Total | $ | 528,468 | | |

The above schedule has been presented in accordance with original terms of the bonds payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding. Accordingly, the effects of the PROMESA Title III or any other debt restructuring

206

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

proceeding may affect the carrying amounts, interest rates and the repayment terms. See Note 3 and Note 23 for additional information.

*(c)   Revenue Bonds*

Revenue bonds payable outstanding at June 30, 2016 were as follows (in thousands):

| Component Unit | Interest rates | Maturity through | Balance at June 30, 2015 | Additions | Reductions | Balance at June 30, 2016 | Amount due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| GDB | 2.96%–6.56% | 2040 | $ 424,180 | — | 272,383 | 151,797 | 38,595 |
| PRHTA | 2.25%–6.50% | 2046 | 4,458,152 | 5,736 | 123,829 | 4,340,059 | 117,940 |
| PREPA | 4.00%–10.00% | 2043 | 8,448,926 | 504,849 | 587,022 | 8,366,753 | 240,320 |
| PRASA | 2.0%–6.15% | 2056 | 4,070,634 | 85,600 | 126,131 | 4,030,103 | 58,291 |
| UPR | 5.00%–5.63% | 2036 | 540,112 | — | 23,940 | 516,172 | 23,280 |
| Sub-total | | | 17,942,004 | 596,185 | 1,133,305 | 17,404,884 | 478,426 |
| Nonmajor component units | 2.75%–6.75% | 2036 | 1,521,730 | 533 | 116,900 | 1,405,363 | 108,425 |
| Total | | | $ 19,463,734 | 596,718 | 1,250,205 | 18,810,247 | 586,851 |

PREPA, a major component unit, and PRIDCO, a nonmajor component unit, have bonds that may have acceleration provisions contained in the Trust Agreements. Due to the fact that PREPA is currently a debtor in a Title III proceeding under PROMESA any action that would be taken to accelerate the bonds is subject to the automatic stay in that proceeding. Therefore, the acceleration provision is not relevant despite the fact that an event of default arguably exists under the Trust Agreement. As for PRIDCO, the Trustee has not sent a default notice or declared the defaulted principal on all bonds oustanding due and payable immediately subject to the applicable acceleration provisions.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Debt service requirements on component units' bonds payable with fixed maturities at June 30, 2016 were as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Years ending June 30: | | | |
| 2017 | $ 586,851 | 953,339 | 1,540,190 |
| 2018 | 664,978 | 926,030 | 1,591,008 |
| 2019 | 720,492 | 891,340 | 1,611,832 |
| 2020 | 697,841 | 854,671 | 1,552,512 |
| 2021 | 685,082 | 820,193 | 1,505,275 |
| 2022–2026 | 3,525,139 | 3,574,847 | 7,099,986 |
| 2027–2031 | 3,740,395 | 2,658,760 | 6,399,155 |
| 2032–2036 | 3,209,130 | 1,746,187 | 4,955,317 |
| 2037–2041 | 3,070,028 | 850,184 | 3,920,212 |
| 2042–2046 | 1,240,582 | 216,246 | 1,456,828 |
| 2047–2051 | 299,424 | 18,174 | 317,598 |
| 2052–2056 | 5,524 | 204 | 5,728 |
| Total | 18,445,466 | $ 13,510,175 | 31,955,641 |
| Premium | 423,741 | | |
| Discount | (58,960) | | |
| | $ 18,810,247 | | |

The above schedule has been presented in accordance with original terms of the bonds payable and do not reflect the effects, if any, that may result from the PROMESA Title III proceedings or any other debt restructuring proceeding. Accordingly, the effects of the PROMESA Title III or any other debt restructuring proceeding may affect the carrying amounts, interest rates and the repayment terms. See Note 3 and Note 23 for additional information.

Changes in deferred outflows of resources related to losses on the refunding of some of the bonds referred to in the table above follow (in thousands):

| Component unit | Balance at June 30, 2015 | Reductions | Balance at June 30, 2016 |
|---|---|---|---|
| Major component units: | | | |
| PRHTA | $ 116,947 | 12,663 | 104,284 |
| PREPA | 66,354 | 17,931 | 48,423 |
| PRASA | 31,638 | 4,186 | 27,452 |
| UPR | 2,517 | 292 | 2,225 |
| GDB | 2,568 | 192 | 2,376 |
| Nonmajor component units | 18,670 | 1,741 | 16,929 |
| Total | $ 238,694 | 37,005 | 201,689 |

208

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The table that follows presents debt service payments on PREPA's variable rate bonds and the net payments on associated hedging derivative instruments as of June 30, 2016 (in thousands). Such variable rate bonds are included within bonds payable in the discretely presented component units column. Although interest rates on variable rate debt and the current reference rate of hedging derivative instruments change over time, the calculations included in the table below are based on the assumption that the variable rate and the current reference rate of the hedging derivative instrument at June 30, 2016 will remain the same for their term (in thousands).

|  | | Variable-Rate Bonds | | Hedging derivative instruments, net | Total |
|---|---|---|---|---|---|
|  | | Principal | Interest | | |
| Years ending June 30: | | | | | |
| 2017 | $ | — | 2,374 | 7,943 | 10,317 |
| 2018 | | — | 2,374 | 7,943 | 10,317 |
| 2019 | | — | 2,374 | 7,943 | 10,317 |
| 2020 | | — | 2,374 | 7,943 | 10,317 |
| 2021 | | — | 2,374 | 7,943 | 10,317 |
| 2022–2026 | | — | 11,870 | 39,716 | 51,586 |
| 2027–2031 | | 252,875 | 7,122 | 23,829 | 283,826 |
| Total | $ | 252,875 | 30,862 | 103,260 | 386,997 |

Several component units have defeased certain revenue bonds by placing the proceeds of new bonds in irrevocable trusts to provide for all future debt service payments on the old debts. Accordingly, the trust accounts' assets and liabilities for the defeased bonds are not included in the statement of net position. As of June 30, 2016, the following bonds are considered defeased (in thousands):

| Component unit | | Amount outstanding |
|---|---|---|
| PREPA | $ | 147,700 |
| PRHTA | | 664,995 |
| PRMFA | | 196,900 |
| Total | $ | 1,009,595 |

Since 2014, PREPA has entered into certain forbearance agreements with certain insurers and certain beneficiary owners of Power Revenue Bonds, banks that provide fuel lines of credit and the GDB (collectively, the Forbearing Creditors). As provided in the Forbearance Agreements, the Forbearing Creditors agreed not to exercise certain rights and remedies under their financing agreements. Under the Forbearance Agreements PREPA's obligations to pay any and all principal and interest payments on the Power Revenue Bonds continued. The Forbearance Agreement expired on November 5, 2015, but the agreement of the Forbearing Creditors to refrain from exercising certain rights and remedies was extended under the PREPA RSA. The Forbearing Creditors consented permitting PREPA not to make

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

transfers to the Revenue Fund or the Sinking Fund, delay making certain payments that became due to the Fuel Line Lenders, use approximately $280 million held in its construction fund for payment of current expenses in addition to capital improvements, increase the thresholds required for the exercise of remedies under the Trust Agreement, allow for the issuance of $130.7 million in Bonds to the Monoline Bond Insurers (the 2015A Bonds) that matured on January 1, 2016 and were paid in accordance with their terms.

From January 2016 until January 2017, PREPA was able to make the principal and interest payments on its Bonds as they became due. Subsequently, PREPA has missed the principal and interest payments due on the Bonds on July 3, 2017, January 1, 2018 and July 3, 2018.

**(14) Guaranteed and Appropriation Debt**

*(a) Guaranteed Debt*

The Commonwealth may provide guarantees for the repayment of certain borrowings of component units to carry out designated projects. The guarantees are backed by the full faith and credit of the Commonwealth. The guarantees are accounted following the guidance provided by the GASB Statement No. 70 – *Accounting and Financial Reporting for Nonexchange Financial Guarantees*. GASB Statement No. 70 requires that nonexchange financial guarantees be recorded when qualitative factors and historical data, if any, indicate that it is more likely than not that the Commonwealth will be required to make a payment on the guarantee. The amount of the liability to be recognized should be the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee.

|  | Maximum guarantee | Outstanding balance | Recorded Commonwealth Guaranteed Obligation |
|---|---|---|---|
| Blended component units: |  |  |  |
| Public Buildings Authority | $ 4,721,000 | 4,073,314 | N/A |
| Port of the Americas Authority | 250,000 | 225,534 | N/A |
| Puerto Rico Infrastructure Financing Authority | 245,955 | 90,845 | N/A |
| Discretely presented component units: |  |  |  |
| Government Development Bank for Puerto Rico | 2,000,000 | 110,000 | 109,271 |
| Puerto Rico Aqueduct and Sewer Authority | 1,258,978 | 1,258,978 | 251,468 |
| Total | $ 8,475,933 | 5,758,671 | 360,739 |

**Public Buildings Authority (PBA)** – PBA, a blended component unit, uses the payments of rentals of certain government facilities like departments, agencies, instrumentalities and municipalities of the Commonwealth under various lease agreements executed pursuant to the enabling Act that created it (Act No. 56 of June 19, 1958, as amended) for the payment of principal and interest on it's own debt. Act

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

No. 56 also provides that the Treasury Department of the Commonwealth will make advances to PBA for any unpaid portion of rent payable to PBA by any departments, agencies, instrumentalities, or municipalities of the Commonwealth under a lease agreement with PBA. Such advances are recorded as reductions of rent receivables since the responsibility of reimbursement belongs to the corresponding agency or instrumentality according to the enabling Act.

On December 21, 2018, the Oversight Board and the Creditors' Committee commenced an adversary proceeding styled The Fin. Oversight and Mgmt. Bd. for Puerto Rico v. Puerto Rico Public Building Auth., Case No. 18-00149-LTS (D.P.R. Dec. 21, 2018), seeking declaratory relief and disallowance of administrative rent claims. The adversary proceeding alleges that the PBA leases are not true leases, but rather "disguised financing transactions." Multiple parties have filed motions to intervene. On January 28, 2019, PBA responded to the complaint.

The debt of PBA is supported by a guarantee of the Commonwealth that if revenues or income of PBA are not sufficient for the payment of principal and interest when they come due, the Treasury Department of the Commonwealth will withdraw from any available funds amounts as may be necessary to cover the deficiency. The debt of PBA is further supported by a Commonwealth guarantee. Act No. 56 is silent as to whether there are arrangements established for recovering payments from PBA if the guarantee is exercised; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments.

Rental income of PBA funds amounted to approximately $206 million during the year ended June 30, 2016, which was used to cover debt service obligations.

Beginning on July 1, 2016, a portion of PBA debt service due on that date and scheduled for service in subsequent periods through the date of these financial statements was not paid, including interest payments. Some of the interest that was in fact paid after July 1, 2016 reflected amounts received from applicable subsidy programs.

**Port of the Americas Authority (PAA)** – At various times during fiscal years ending in 2005 and 2006, the PAA, a blended component unit of the Commonwealth, entered into bond purchase agreements with the GDB, whereby the GDB agreed to disburse the PAA from time to time certain bond principal advances up to a maximum aggregate principal amount of $70 million (Port of the Americas Authority 2005 Series A Bond), $40 million (Port of the Americas Authority 2005 Series B Bond), and $140 million (Port of the Americas Authority 2005 Series C Bond). These bonds are guaranteed by the Commonwealth by Act No. 409 of September 22, 2004 (Act No. 409), which authorized the issuance of these financing arrangements and accounted for by the Commonwealth as a liability under guarantee obligation. The proceeds of the bonds were used to finance the cost of development and construction of the PAA facilities. The Commonwealth had been paying for debt service on these bonds under its guarantee pursuant to Act No 409.

**Puerto Rico Infrastructure Financing Authority (PRIFA)** – On March 17, 2015, PRIFA, a blended component unit of the Commonwealth, issued $245.9 million of Dedicated Tax Fund Revenue Bond Anticipation Notes (the PRIFA BANs or Series 2015A BANs), the proceeds of which were used to refinance certain outstanding PRHTA bond anticipation notes and pay related expenses. The PRIFA BANs are payable from, and are supported by, a Trust Estate comprising certain assets and revenues of PRIFA, which include: (i) a $6.25/barrel Petroleum Products Tax on non- diesel products; (ii) any funds

211

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

received by PRIFA pursuant to the terms of a financial assistance agreement between PRIFA and PRHTA; and (iii) any additional revenues pledged to PRIFA in accordance with the Trust Agreement. The PRIFA BANs are guaranteed by the Commonwealth. The PRIFA BANs agreement and the underlying Trust Agreement are silent as to whether there are arrangements established for recovering payments from PRIFA if the guarantee were to be claimed; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments. As of the date of these basic financial statements, no payments have been made yet honoring the aforementioned guarantee.

Of the monthly debt service due on the PRIFA BANs from August 1, 2016 through February 1, 2019, all remain unpaid.

**Government Development Bank (GDB)** – On February 13, 2014, the Commonwealth enacted Act No. 24 that, among other provisions, increased from $500 million to $2 billion the amount of GDB obligations that can be guaranteed by the full faith and credit of the Commonwealth.

The Commonwealth guaranteed the Remarketed Refunding Bonds, Series 1985, issued by GDB. The outstanding balance of these bonds amounted to $267 million at June 30, 2015. These bonds were fully repaid upon their maturity on December 1, 2015.

On December 13, 2013, GDB issued Senior Guaranteed Notes 2013 Series B (guaranteed by the Commonwealth). The 2013 Series B Notes consist of term notes maturing on various dates from December 1, 2017 to December 1, 2019, and carry an interest rate of 8.00% payable monthly on the first day of each month. At June 30, 2016, the outstanding balance of these notes amounted to $110 million. SIFC, a major component unit of the Commonwealth, is the sole holder of these bonds. Based on the liquidity and uncertainty risks discussed in Note 2, GDB has shown all indicators to conclude that there is substantial doubt as to GDB's ability to continue as a going concern. These risks and events impacting GDB caused the Commonwealth's management to recognize a liability on this guaranteed obligation in the amount of approximately $109 million based on the discounted present value of the best estimate of the future outflows expected to be incurred, at that moment, as a result of the guarantee. Act No. 24, referred to above, is silent as to whether there are arrangements established for recovering any potential payments from GDB for guarantee payments made; however, there is no intention from the Commonwealth to request a recovery of any potential payments. As of the date of these basic financial statements, no payments have been made honoring the aforementioned guarantee. GDB made its monthly payments of interest until July 2016, but beginning on August 1, 2016, GDB started to miss such payments.

As discussed in Note 2, GDB has executed an orderly wind down of its operations and has entered into a Qualifying Modification of its debts pursuant to Title VI of PROMESA.

The Commonwealth recognized a liability on this guaranteed obligation in the amount of approximately $109.3 million at June 30, 2016. This measurement was based on the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee.

**Puerto Rico Aqueduct and Sewer Authority (PRASA)** – Act No. 45 of July 28, 1994, as amended, states that the Commonwealth guarantees the payment of principal and interest of all outstanding bonds at the date the law was enacted and of all future bond issues to refinance those outstanding bonds of PRASA, a discretely presented component unit. Act No. 140 of August 3, 2000 amended Act No. 45 to

212

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

extend the Commonwealth guarantee to include the principal and interest payments of the Rural Development Serial Bonds and the loans under the State Revolving Fund Program (SRFP) outstanding at the effective date of Act No. 140, and of all future bonds and SRFP loans that may be issued through June 30, 2005. Act No. 386 of September 21, 2004 extended the Commonwealth guarantee to June 30, 2010. Act. No. 75 of July 12, 2010 amended Section 1 of Act No. 45 of July 28, 1994 to extend the Commonwealth guarantee over the bonds issued under the United States Department of Agriculture (USDA) Rural Development Program and SRFP's borrowings to June 30, 2015. Pursuant to Act No. 96 of June 30, 2015, the Commonwealth guarantee on the payment of principal and interest on most of the outstanding Revolving Fund loans granted to PRASA was extended to cover such loans issued through June 30, 2020. Each of these Acts, as amended, is silent as to whether there are arrangements established for recovering potential payments from PRASA if the guarantee is executed; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments.

The USDA Rural Development Program assists PRASA in the financing and construction of aqueduct and sewer facilities in rural areas by purchasing revenue bonds from PRASA, the proceeds of which are used by PRASA to finance such projects. As of June 30, 2016, the USDA Rural Development Program Bonds consisted of twenty-six (26) separate series, issued from 1983 through 2016 and bearing interest from 2% to 5% due in semiannual installments through 2055. The outstanding balance of the USDA Rural Development Program Serial Bonds as of June 30, 2016 was approximately $394.2 million. The USDA Rural Development Program Serial Bonds are guaranteed by the Commonwealth pursuant to Act No. 140 of 2000 as amended, and PRASA's net revenue is pledged toward the payment of debt service on the USDA Rural Development Program Bonds. The USDA Rural Development Program Bonds are subordinate to all senior and senior subordinated debt.

The PRWPCRF and the PRSDWTRLF (collectively, the Revolving Funds) were created by Act No. 44 of June 21, 1988 and Act No. 32 of July 7, 1997, respectively, of the Commonwealth. The PRWPCRF is administered, pursuant to Act No. 44 and Act No. 9 of June 21, 1988 and June 18, 1970, respectively, as amended, by EQB. The PRSDWTRLF is administered, pursuant to Act No. 5 of July 21, 1977, as amended, by the Commonwealth Department of Health. Pursuant to these laws, the EQB and the Commonwealth Department of Health, on behalf of the Commonwealth, are authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA). PRIFA, PRASA, and GDB entered into a memorandum of understanding under which each party has agreed to assume specific responsibilities in connection with the operations of the Revolving Funds. PRASA has entered into revolving loan agreements to finance certain capital improvements. As of June 30, 2016, PRASA had outstanding approximately $580 million under these loan agreements, which bear interest at a 2% annual rate payable semiannually and are required to be paid in full within 20 years of the project completion date. PRASA has pledged its net revenue on a basis subordinate in all respects to PRASA's bonds outstanding. If PRASA's pledged revenue is not sufficient for the payment of principal and interest, the payments are guaranteed by the Commonwealth under Act No. 45 of July 28, 1994, as amended, which obligates the Commonwealth to pay principal and interest on the notes.

On March 18, 2008, PRASA issued approximately $284.8 million of Revenue Refunding Bonds, Series A and B (the 2008 Revenue Refunding Bonds) that were guaranteed by the Commonwealth and primarily used to refund PRASA's outstanding Revenue Refunding Bonds, Series 1995 (which were also guaranteed by the Commonwealth) in the amount of approximately $262.8 million. The 2008 Revenue

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Refunding Bonds bear interest at rates from 5.80% to 6.10% per annum with maturity dates ranging from July 1, 2021 to July 1, 2034. The outstanding balance of the 2008 Revenue Refunding Bonds at June 30, 2016 amounted to $284.8 million.

As a result of the voluntary disclosure statement issued by PRASA on March 4, 2016 regarding the expectation that it might not have sufficient funds to fully fund the debt service on certain of its Commonwealth guaranteed debt, management concluded that it would be more likely than not that the Commonwealth will be required to make a payment only on the USDA Rural Development Program Serial Bonds guarantee. As a result, a liability on the Rural Development Bonds guaranteed obligation in the amount of approximately $251.5 million was recognized at June 30, 2016. This measurement was based on the discounted present value of the best estimate of the future outflows expected to be incurred, at that moment, as a result of the guarantee. As of the date of these basic financial statements, no payments have been made honoring the aforementioned guarantee. The 2008 Revenue Refunding Bonds and the SRFP loans were excluded from this conclusion because: (a) the 2008 Revenue Refunding Bonds are considered senior subordinated debt and will not be affected by the aforementioned set asides; and (b) the Revolving Funds are proprietary funds within the Commonwealth and not a separate legal entity, and therefore there is no separate guarantee liability.

*Forbearance Agreements*

On June 30, 2016, PRASA executed a forbearance agreement with the Commonwealth Department of Health, administrator of the Drinking Water State Revolving Fund (DW SRF), the Puerto Rico Environmental Quality Board (EQB), administrator of the Clean Water State Revolving Fund (CW SRF), and PRIFA, as operating agent for the SRFs, authorized to assist Commonwealth Department of Health and EQB in the administration, financial and accounting activities of the SRFs. Under the Forbearance Agreement the payments due since July 1, 2016 under the SRF Loans are deferred and the parties thereto agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to each under the SRF Loans.

PRIFA, DOH and EQB, with the acknowledgment and support of the United States Environmental Protection Agency (EPA), granted such forbearance, subject to the terms and conditions set forth in the Forbearance Agreement, for a period of six months, which may be extended for an additional six months if certain conditions are met. During such forbearance period, the Commonwealth Guarantee will not be enforced either. PRIFA, EQB and Commonwealth Department of Health, with the support of EPA, contemplate that during the forbearance period the parties will negotiate new terms and conditions to the SRF loans under a restructuring of such loans and a revision of underlying agreements between PRASA, PRIFA, EQB, Commonwealth Department of Health and, where applicable, EPA. After the expiration of the initial six-month forbearance period under the Forbearance Agreement, such period was extended for an additional six months until June 30, 2017, and subsequently further extended to May 31, 2019.

Regarding the Rural Development Bonds (RD Bonds), PRASA has requested that USDA Rural Development Program provide a short-term forbearance period, during which it would refrain from exercising its rights and remedies, including the enforcement of the Commonwealth Guarantee, under the RD Bond documents. To this effect, PRASA and USDA Rural Development Program executed a forbearance document, effective as of June 30, 2016 (the USDA Forbearance Agreement). The USDA Rural Development Program granted PRASA a three-month forbearance period, through September 30, 2016, subject to the terms and conditions set forth in the USDA Forbearance Agreement in order to

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

provide for additional time to examine all options available to correct PRASA's deficiencies and restore loan repayment. Pursuant to the USDA Forbearance Agreement, the payments due since July 1, 2016 under the RD Bond documents were also deferred for the duration of the forbearance period and USDA Rural Development Program agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to it under the RD Bond documents or any grant or loan document in relation thereto. After the expiration of the initial three-month forbearance period, the USDA Forbearance Agreement has been extended multiple times, with the latest forbearance expiring on July 17, 2019.

*(b) Debt Supported by Commonwealth Appropriations*

At June 30, 2016, the outstanding principal balances of debt payable by Commonwealth appropriations and sales and use taxes (PFC bonds and notes payable, as described in Note 13(d), and notes payable to GDB and others, as described in Note 13(e)), which are included in the individual financial statements of the following discretely presented component units, were as follows (in thousands):

| Component units | PFC bonds and notes | Notes payable to GDB and others | Total |
|---|---|---|---|
| Major Component Units: | | | |
| PRASA | $ 411,229 | — | 411,229 |
| GDB | 3,334 | 13,340 | 16,674 |
| UPR | — | 48,286 | 48,286 |
| PREPA | — | 713 | 713 |
| Sub-total | 414,563 | 62,339 | 476,902 |
| Nonmajor Component Units | 108,814 | 388,252 | 497,066 |
| Total | $ 523,377 | 450,591 | 973,968 |

*(c) Other Guarantees*

Mortgage Loan Insurance – The Puerto Rico Housing Finance Authority (the Housing Finance Authority), a blended component unit of GDB, provides mortgage credit insurance to low and moderate-income families through its mortgage loan insurance program. The Commonwealth guarantees up to $75 million of the principal insured by the mortgage loan insurance program. As of June 30, 2016, the mortgage loan insurance program covered loans aggregating to approximately $576 million. Currently, the Commonwealth has not been called to make any direct payments pursuant to these guarantees and there are no triggering events indicating that it is more likely than not that it will be required to make payments on these guarantees.

**(15) Conduit Debt Obligations and No Commitment Debt**

From time to time, certain of the Commonwealth's component units issue revenue bonds to provide financial assistance to private sector entities for the acquisition and construction of transportation, environmental, industrial, tourism, educational, and commercial facilities, deemed to be in the public interest and that are

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

expected to provide benefits to Puerto Rico. These bonds are supported by the property financed and are payable solely from payments received on the underlying mortgage loans. Upon repayment of the bonds, ownership of the acquired facilities is retained by the private sector entity served by the bond issuance. Neither the Commonwealth nor any political subdivision or component unit thereof is obligated in any manner for the repayment of the bonds. Accordingly, the bonds are not reported as liabilities in the basic financial statements of the issuing entities. As of June 30, 2016, conduit debt obligations consisted of the following bonds issued by component units (in thousands):

| Issuing entity | | Issued since inception to date | Amount outstanding |
|---|---|---|---|
| Major component units: | | | |
| GDB | $ | 1,047,500 | 414,300 |
| PRHTA | | 270,000 | 146,300 |
| Sub-total | | 1,317,500 | 560,600 |
| Nonmajor component units | | 6,508,410 | 974,210 |
| Total | $ | 7,825,910 | 1,534,810 |

*(a) GDB*

In December 2003, GDB, through its Housing Finance Authority, issued approximately $663 million in Capital Fund Program Bonds Series 2003 to lend the proceeds thereof to the Public Housing Administration, an agency of the Commonwealth, in its financing of improvements to various public low and moderate-income housing projects. The Capital Fund Program Bonds Series 2003 are limited obligations of the Housing Finance Authority, which will be paid solely from an annual allocation of public housing capital funds when received from the U.S. Department of Housing and Urban Development (U.S. HUD) and other funds available under the bond indenture. Accordingly, these bonds are considered conduit debt and are excluded, along with the related assets held in trust, from the accompanying basic financial statements. The outstanding balance of these bonds amounted to approximately $129.3 million at June 30, 2016.

On August 1, 2008, the Housing Finance Authority issued the Capital Fund Modernization Program Subordinate Bonds amounting to approximately $384.5 million. The proceeds from the issuance were mainly used to finance a loan to a limited liability company and pay the costs of issuance. The $384.5 million bonds are limited obligations of the Housing Finance Authority, payable primarily by a pledge and assignment of federal housing assistance payments made available by the U.S. HUD, with an outstanding balance of approximately $285 million at June 30, 2016. Payment of principal of the Housing Revenue Bonds was also secured by an irrevocable standby letter of credit issued by GDB.

*(b) PRHTA*

In March 1992, the PRHTA issued Special Facility Revenue Bonds, 1992 Series A, B, and C for approximately $117 million for the construction of a toll bridge. The proceeds from the sale of these bonds were transferred by the PRHTA to a private entity, Autopistas de Puerto Rico & Compañía, S.E.

216

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

(Autopistas), pursuant to a signed concession agreement for the design, construction, operation, and maintenance of the bridge. On October 30, 2003, the PRHTA issued Special Facility Revenue Refunding Bonds, 2004 Series A, amounting to approximately $153 million for the purpose of refunding PRHTA's Special Facility Revenue Bonds, 1992 Series A, B, and C, which were issued to fund the construction of the bridge, and to pay the cost of issuance of the bonds. The proceeds from the sale of the bonds were transferred by the PRHTA to Autopistas pursuant to a new loan agreement by and between Autopistas and the PRHTA. The bonds should be paid from the proceeds received by Autopistas from the operation of the bridge.

Under certain circumstances, the concession agreement may be terminated and the PRHTA is then obligated to assume Autopista's entire obligation to pay principal of, and interest on, the bonds outstanding, which pursuant to the signed agreement, will be paid from the net revenue of the use and operation of the bridge. The PRHTA does not currently expect the concession agreement to terminate. The outstanding bonds (including accrued interest) at June 30, 2016 amounted to approximately $146.3 million.

**(16) Risk Management**

*Primary Government*

The risk management policies of the Primary Government of the Commonwealth are addressed on Note 1(z).

*Discretely Presented Component Units*

The following describes the risk management programs separately administered by certain discretely presented component units, including all the major component units and certain nonmajor component units carrying self funded risk reserves:

**(a) GDB**

As previously noted, GDB ceased operations as of March 23, 2018 and completed a debt restructuring pursuant to a Qualifying Modification under Title VI of PROMESA, which became effective on November 29, 2018. For additional information regarding GDB's Qualifying Modification under Title VI of PROMESA, refer to Note 3(g).

Prior to these developments and during fiscal year 2016, to minimize the risk of loss, GDB purchased insurance coverage for public liability, hazard, automobile, crime, and bonding, as well as workmen's compensation insurance for employees. The selection of the insurer needed to be approved by the Public Insurance Office of the Treasury Department. Insurance coverage was updated annually to account for changes in operating risk. For the three years prior to June 30, 2016, insurance settlements did not exceeded the amount of coverage. Other risk management policies of GDB involved its mortgage and loans servicing and insurance activities. Certain loan portfolios of the Housing Finance Authority were administered by private servicers who are required to maintain an errors and omissions insurance policy. The Housing Finance Authority had a program to manage the risk of loss on its mortgage loan lending and insurance activities.

**(b) PRHTA**

PRHTA carries commercial insurance to cover casualty, theft, claims, and other losses. The PRHTA has not settled any claims in excess of its insurance coverage for any of the past three years.

217

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

**(c) *PREPA***

PREPA purchases commercial insurance covering casualty, theft, tort claims, natural disaster and other claims covering all risk property (excluding transmission and distribution lines), boiler and machinery, and public liability. In addition, PREPA has a self-insured fund to pay the cost of repairing, replacing, or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of a cause.

PREPA has a cost-plus health insurance program covering substantially all employees. PREPA contracted an administrator for the processing, approval, and payment of claims plus an administrative fee. The accrual for employees' health plan includes the liability for claims processed and an estimate for claims incurred but not reported.

Changes in the balances of the health insurance program and other self insurance risks during fiscal year 2016 were as follows (in thousands):

| | | |
|---|---|---:|
| Claims payable – July 1 | $ | 5,147 |
| Incurred claims | | 54,173 |
| Claim payments | | (55,204) |
| Claims payable – June 30 | $ | 4,116 |

These claims payable are presented as a component of accounts payable and accrued liabilities in the accompanying combining statement of net position major component units.

**(d) *PRASA***

PRASA has acquired commercial insurance to mitigate its exposure to certain losses involving real and personal property (including windstorm, flood, and earthquake damages) and comprehensive general and automobile claims. PRASA also has an Owner Controlled Insurance Program (OCIP) under which commercial general liability, excess general liability, builder's risk, and contractors' pollution liability coverage are procured or provided on a project "wrap up" basis for contractors and subcontractors of any tier, who have been properly enrolled, while performing operations at the applicable project site. Each commercial insurance policy maintained by PRASA contains specific policy limits and deductibles. Settled claims resulting from these risks have not exceeded commercial insurance coverage in any of the past three fiscal years.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(e) UPR*

UPR is exposed to various risks of loss related to torts; theft of, damage to, and destruction of assets; errors and omissions; injuries to employees; and natural disasters. Through January 1993, the UPR was insured under claims made insurance policies with respect to medical malpractice risks for $250,000 per occurrence up to an annual aggregate of $500,000. Subsequent to such date, the UPR was unable to obtain insurance at a cost it considered to be economically justifiable; consequently, the UPR is now self insured for such risks. Under Act No. 98 of August 24, 1994, the responsibility of the UPR is limited to a maximum amount of $75,000 per person, or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Self insured risk liabilities are reported when it is probable that a loss has occurred and the amount of the loss can be reasonably estimated. Liabilities include an amount for claims that have been incurred but not reported. The process used in computing claims liabilities does not necessarily result in an exact amount because actual claims liabilities depend upon such complex factors as inflation, changes in legal doctrines, and damage awards. Claims liabilities are reevaluated periodically to take into consideration recently settled claims, the frequency of claims, and other economic and social factors.

Changes in the claims liability amount for medical malpractice in fiscal year 2016 were as follows (in thousands):

| | | |
|---|---:|---:|
| Claims payable – July 1 | $ | 8,565 |
| Incurred claims and changes in estimates | | 792 |
| Payments for claims and adjustments expenses | | (418) |
| Claims payable – June 30 | $ | 8,939 |

In addition, the UPR is a defendant in several lawsuits other than medical malpractice arising out of the normal course of business. Management has recorded an accrual of $7.6 million as of June 30, 2016 to cover claims and lawsuits that may be assessed against the UPR. The UPR continues to carry commercial insurance for these risks of loss.

These claims payable are presented as a component of accounts payable and accrued liabilities in the accompanying combining statement of net position major component units. The UPR continues to carry commercial insurance for all other risks of loss.

*(f) SIFC*

SIFC provides workers' compensation insurance to public and private employees. This insurance covers workers against injuries, disability, or death caused by work or employment related accidents, or by illness suffered as a consequence of their employment. SIFC establishes liabilities for incurred but unpaid benefits and benefit adjustment expenses based on the ultimate cost of settling the benefits. The liability includes estimates for cases reported that have not been adjudged and cases incurred but not reported.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The following table provides a reconciliation of the beginning and ending liability for incurred but unpaid benefits and benefit adjustment expenses for the most recent fiscal year (in thousands):

|  |  |  |
|---|---|---|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ | 760,149 |
| Total incurred benefits | | 368,727 |
| Total benefit payments | | (400,879) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ | 727,997 |

The liability for incurred but unpaid benefits and benefit adjustment expenses is based on historical claims experience data, assumptions and projections as to future events, including claims frequency, severity, persistency, and inflationary trends determined by an independent actuarial study. This liability has been discounted at 3.54% in 2016. SIFC's management believes that discounting such liability results in a better matching of costs and revenue since compensation benefits have a long payment cycle. The assumptions used in estimating and establishing the liability are reviewed annually based on current circumstances and trends.

SIFC's management believes that the liability for incurred but unpaid benefits and benefit adjustment expenses, actuarially determined at June 30, 2016, is a reasonable estimate of the ultimate net cost of settling benefits and benefit expenses incurred. Because actual benefit costs depend upon such factors as duration of worker disability, medical cost trends, occupational disease, inflation, and other social and economic factors, the process used in computing the ultimate cost of settling benefits and expenses for administering benefits is necessarily based on estimates. The amount ultimately paid may be above or below such estimates. Adjustments resulting from changes in estimates of these liabilities are charged or credited to operations in the period in which they occur.

The liability for incurred but unpaid benefits and benefit adjustment expenses is reported as liability for automobile accident insurance and workmen's compensation in the accompanying combining statement of net position major component units.

**(17) Commitments and Contingencies**

*Primary Government*

*Legal Contingencies*

**(a) Litigation Prior to Commencement of Title III Cases Related to Governmental Operations**

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 29, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions set forth in said Act to a maximum amount of $75,000 or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

and employees with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the payment of such judgments. To the extent claims arose prior to the commencement of the Commonwealth's Title III case, their status and priority may be affected by the Title III case.

With respect to pending and threatened litigation involving the Commonwealth's Governmental Activities, excluding the litigation mentioned in the ensuing paragraphs, the Commonwealth reported approximately $326.3 million as an amount to cover for awarded and anticipated unfavorable judgments at June 30, 2016. This amount was included as other long-term liabilities in the accompanying statement of net position, and represents the amount estimated as a probable liability or a liability with a fixed or expected due date that will require future available financial resources for this payment. Management believes that the ultimate liability in excess of amounts provided, if any, would not be significant.

The Commonwealth is a defendant in parallel lawsuits regarding an alleged inappropriate withholding of Medicaid funds, one filed in the state court and two in federal court. The plaintiffs are various primary healthcare centers seeking to recover from the Commonwealth approximately $800 million of Medicaid funds retained by the Department of Health of the Commonwealth since 1997. In February 2005, the United States Court of Appeals for the First Circuit determined that the Commonwealth must return the funds withheld because of noncompliance with a federal law. The Commonwealth is still contesting several provisions of this determination, and amounts to be returned and payment plan methods are still in the process of estimation. As of June 30, 2016, the Commonwealth accrued approximately $173 million for this legal contingency.

The Commonwealth is a defendant in a class action presented by parents of special education students in the areas of education and healthcare. In October 2006, the State Court of Appeals decided in favor of the parents' request to include damage claims pursuant to the same class action case although not as a remedy in the class action per se. The court now may award damages to the members of the class action and to do so it may look at the claims by dividing them into groups or consider each case individually. This will require that the parents prove the damages suffered on an individual basis. On June 26, 2016, the court ordered the publication of a public edict that would describe in detail the process to be followed to submit claims for damages suffered. Such edict was published and opened a claims period effective August 14, 2016 through October 31, 2016. The Commonwealth plans to vigorously defend each individual case. The Commonwealth has accrued approximately $650 million for this legal contingency as of June 30, 2016.

Under the lawsuit Vaquería Tres Monjitas, Inc. et al v. Ramírez et al., certain plaintiffs alleged that the price rates set by the Administrator of the Office for the Regulation of the Dairy Industry (ORIL, as its Spanish acronym) did not afford local dairy processors Suiza Dairy and Vaquería Tres Monjitas the opportunity to make the reasonable profit to which they were constitutionally entitled. The parties reached a settlement agreement on October 29, 2013. Among other things, the Commonwealth, through certain of its instrumentalities, agreed to contribute the following amounts to certain regulatory accrual payments to be made pursuant to the settlement agreement: $50 million by December 31, 2014, $15 million by December 31, 2015, $15 million by December 31, 2016, and $15 million by December 31, 2017, for a total original amount accrued by the Commonwealth during fiscal year 2014 of $95 million. The case is now closed, but the court will retain jurisdiction in order to tend to any matter of compliance or breach of compliance regarding the settlement agreement. During fiscal year 2015, the Commonwealth paid $16 million, out of the required $50 million due on December 31, 2014. As of June 30, 2016, the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Commonwealth has accrued $79 million for this legal contingency, $49 million of which, pertain to the portions not paid on December 31, 2015 and 2014, are recorded as due and payable within the general fund.

On December 2, 2014 and on January 16, 2015, the United States Securities and Exchange Commission (SEC) requested information about certain bond issuances of the Commonwealth and its component units. The Commonwealth is cooperating in the inquiry, including providing the SEC with documents and information. The SEC has advised that the information requests should not be construed as an indication that any violation of the federal securities laws has occurred. During April 2018, the SEC communicated that they do not intend to recommend an enforcement action against the Commonwealth.

PBA, a blended component unit as a Governmental Activity, is a defendant or codefendant in various lawsuits for alleged damages and breaches of contracts in cases related to construction projects. In addition, PBA is a defendant or codefendant in other cases related to public liability and labor related matters. PBA, based on legal advice, has recorded an accrual approximating $17.9 million at June 30, 2016 to cover probable losses on these claims. In the opinion of legal counsel, any liability in excess of the insurance coverage and/or the recorded accrual that may arise from such claims would not be significant to affect PBA's financial position or results of operations.

The SCPT, a blended component unit as a Governmental Activity, is a defendant and a party in numerous legal proceedings and extrajudicial claims pertaining to matters incidental to the performance of its normal operations. SCPT has recognized approximately $12.7 million to cover for awarded and anticipated unfavorable judgments at June 30, 2016.

PHA is a defendant and a party in numerous legal proceedings and extrajudicial claims pertaining to matters incidental to the performance of its normal operations, including cases arising out of alleged torts, alleged breaches of contracts, alleged violation of law, discrimination against employees, unlawful discharge, and condemnation proceedings, among others. PHA has recognized approximately $6.0 million to cover for awarded and anticipated unfavorable judgments at June 30, 2016.

Of the total liability for legal claims and judgments recognized in the Governmental Activities, approximately $189.2 million are considered payable within one year, based on the payments made subsequent to June 30, 2016 through June 30, 2017.

PRMeSA, a blended component unit as a Business-Type Activity, is a party in certain legal actions and claims related to medical malpractice arising in the ordinary conduct of its business. Although PRMeSA appears as a defendant in the claims, many of them involve medical personnel of the member institutions, and in effect, these claims are against said institutions. As a result of the deficiency of funds available in the Self-Insurance Fund as of June 30, 2016, any unfavorable outcome may have a significant effect on the financial condition of PRMeSA. Based on a review of current facts and circumstances, PRMeSA's management has provided for what is believed to be a reasonable estimate of the exposure to loss associated to litigation. PRMeSA has established an accrual for claim losses in the amount of approximately $2.3 million at June 30, 2016 under Business-Type Activities in the statement of net position and in the statement of net position proprietary funds.

PRHIA, a blended component unit as a Business-Type Activity, has been requested to repay the Commonwealth's Treasury Department approximately $103 million representing excess transfers of

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

money from the central government during the fiscal years 2001–2003. After consultation with external legal counsel, PRHIA is of the opinion that the money does not have to be repaid and believes that the likelihood of an unfavorable outcome is remote. Therefore, no reserve for such request has been recognized in PRHIA's financial statements. PRHIA is also a defendant and codefendant in legal proceedings pertaining to matters incidental to the performance of its operations. With respect to the pending and threatened litigation, PRHIA, in consultation with legal counsel, has advised that at this stage of the proceedings they cannot offer an opinion as to the probable outcome. Accordingly, management does not consider it necessary to make any provision in its books for these cases and intends to contest them vigorously.

On December 21, 2012, the federal government, through the U.S. Department of Justice (USDOJ), filed a lawsuit in order to demand from the Commonwealth and its Police Department, compliance with the action and remediation plan submitted on September 8, 2011 by the Civil Rights Division of the USDOJ pursuant to an investigation which revealed a pattern of civil rights violations by the Police Department. According to this investigation and resulting report, the pattern or practice of illegal activity is the product of an ongoing failure by the Commonwealth and its Police Department to provide officers with the necessary guidance, training, and tools to engage in constitutional and effective law enforcement. The federal government was seeking declaratory and equitable relief to eliminate this unlawful pattern by asking the Commonwealth and its Police Department to adopt and implement policies and procedures in the areas of recruitment, hiring, promotions, policies, training, supervision, investigation, discipline, and to prevent the police officers from depriving persons of rights, privileges, or immunities secured and protected by the Constitution or laws of the United States. Although the claim does not include damages, the action and remediation plan proposed would require an investment of approximately $600 million, which is expected to be incurred over a period of 10 years, starting with fiscal year 2015. The Secretary of Justice of the Commonwealth is still negotiating the final determinations of the measures to be implemented by the Police Department in terms of final costs and timeframe. On July 17, 2013, a final definitive agreement was reached between the USDOJ and the Commonwealth, which was filed with the Court. Under the settlement agreement, the court dismissed the claim, but retained jurisdiction to ensure compliance with the agreement, through the appointment of a Technical Compliance Advisor. No provision for any liability is required at this time under this remediation plan. Expenditures and related liabilities will be recognized as costs during the execution of the remediation plan are incurred which began in fiscal year 2015.

The Commonwealth receives financial assistance from the federal government in the form of grants and entitlements. Receipt of grants is generally conditioned upon compliance with terms and conditions of the grant agreements and applicable federal laws and regulations, including the expenditure of resources for eligible purposes. Substantially, all grants are subject to audit under Circular A 133 of the Office of Management and Budget of the United States of America (OMB Circular A 133), all of which are performed at the individual department or agency level. Disallowance as a result of these audits may become liabilities of the Commonwealth. As of June 30, 2016, based on an evaluation of pending federal disallowances, the Commonwealth has recorded approximately $65.2 million as other long-term liabilities in the accompanying statement of net position. Expenditures that are still subject to audit could be disallowed, but management believes any such future disallowances would not be material to the basic financial statements.

223

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

**(b)** *Civil Actions Filed by Several Bondholder Groups and Other Creditors Against the Commonwealth Prior to the Commencement of the Title III Cases.*

Several groups of bondholders, monoline insurers, and indenture trustees have filed claims contesting the constitutionality of the Moratorium Act. However, these lawsuits were stayed from June 30, 2016 through May 1, 2017 under the Title IV stay and re-stayed upon commencement of the Title III cases. For additional information regarding the Moratorium Act, refer to Note 3 and Note 23.

- *Assured Guar. Corp. v. Garcia Padilla*, Case No. 16-1037-FAB (D.P.R. Jan. 7, 2016)

  On January 7, 2016, a group of monoline insurers of bonds issued by PRHTA, PRCCDA, and PRIFA filed a complaint in the United States District Court for the District of Puerto Rico (the District Court, and having jurisdiction over the Title III Cases and related proceedings discussed below, the Title III Court) seeking (i) a declaration that EO-2015-46 and EO-2015-49—which prioritized the payment of general expenditures over the payment of public debt subject to pledged revenues—violate the Contract Clause, Takings Clause, and Due Process Clause of the U.S. Constitution and Commonwealth's Constitution and are invalid, null, and void, and (ii) an injunction prohibiting defendants from taking or causing to be taken any action pursuant to the executive orders. On May 17, 2017, the District Court entered an order confirming the stay. On August 8, 2017, the United States Court of Appeals for the First Circuit dismissed the plaintiffs' interlocutory appeal. On August 9, 2018, the clerk closed the case administratively until the District Court orders it to be reopened. There has been no further relevant docket activity.

- *Fin. Guar. Ins. Co. v. Garcia Padilla*, Case No. 16-1095-FAB (D.P.R. Jan. 19, 2016)

  On January 19, 2016, a monoline insurer for bonds issued by PRHTA, PRCCDA, and PRIFA filed a complaint (similar to that of Case No. 16-1037 discussed in the prior paragraph), seeking declaratory and injunctive relief stating that the U.S. Constitution preempts Section 8 of Article VI of the Commonwealth Constitution, the OMB Act, and EO-2015-46 and EO-2015-49. On May 16, 2017, the Puerto Rico Department of Justice filed a notice of stay under Title III of PROMESA. On May 17, 2017, the District Court entered an order confirming the stay. Also on May 17, 2017, the District Court granted a motion for joinder filed by Ingrid Rivera-Rocafort, Executive Director of the Puerto Rico Tourism Company. On August 9, 2018, the clerk closed the case administratively until the District Court orders it to be reopened. There has been no further relevant docket activity.

- *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia Padilla*, Case No. 16-1610-FAB (D.P.R. Apr. 4, 2016)

  The holder of a substantial amount of bonds issued by GDB filed a complaint seeking a declaration that the Moratorium Act, and executive orders issued pursuant to the Act, violate the United States and Commonwealth's Constitutions, and alleging that the Moratorium Act (i) rewrites the contractual and legal rights and entitlements of GDB's creditors; (ii) takes, without due process or just compensation, property to which GDB's creditors are entitled for the benefit of the Commonwealth, other Puerto Rico government entities, and their respective creditors; (iii) facially discriminates against interstate commerce by providing for preferential treatment of Puerto Rico resident institutional holders of GDB bonds over nonresident holders of GDB bonds of equal rank; (iv) establishes a law on bankruptcy within the power of the United States Congress and preempted

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

by Congress's exercise of those powers; and (v) unconstitutionally seeks to preclude creditors of GDB from suing in federal court.

On July 8, 2016, defendants filed a motion to stay the action, which the District Court granted on August 22, 2016. On November 15, 2016, the District Court denied plaintiffs' motion to vacate the stay, as well as the Oversight Board's motion to intervene. On January 11, 2017, the United States Court of Appeals for the First Circuit affirmed the District Court's decision and remanded for further proceedings. On May 16, 2017, the Puerto Rico Department of Justice filed a notice of stay under Title III of PROMESA. On May 17, 2017, the District Court entered an order confirming the stay. On August 1, 2017, the District Court sua sponte dismissed the case with prejudice. On August 29, 2017, plaintiffs filed an informative motion objecting to the dismissal order. There has been no further docket activity.

- *Ambac Assurance Corp. v. Puerto Rico Highways and Trans. Auth.*, Case No. 16-1893-FAB (D.P.R. May 10, 2016)

    Ambac, a monoline insurer of PRHTA bonds filed a complaint alleging breach of contract and breach of fiduciary duty based on PRHTA's mismanagement and lack of transparency. The complaint seeks, among other things, (i) a preliminary injunction enjoining the Economic Development Bank for Puerto Rico from transferring the proceeds of toll revenues to any entity other than PRHTA, (ii) expedited discovery of PRHTA's financial condition, and (iii) an appointment of a provisional receiver over PRHTA.

    On July 1, 2016, PRHTA filed a motion to stay the action. On August 23, 2016, the District Court granted the motion to stay. On May 23, 2017, the Puerto Rico Department of Justice filed a notice of stay under Title III of PROMESA. On May 24, 2017, the District Court entered an order confirming the stay. There has been no further docket activity.

- *Nat'l Pub. Fin. Guar. Corp. v. Garcia Padilla*, Case No. 16-2101-FAB (D.P.R. Jun. 15, 2016)

    On June 15, 2016, a group of monoline insurers filed a lawsuit in the United States District Court for the District of Puerto Rico, claiming that the Moratorium Act and its related executive orders violated the United States Constitution and the Commonwealth's Constitution and seeking various forms of declaratory relief.

    On July 7, 2016, defendants filed a motion to stay the action. On August 22, 2016, the District Court granted defendants' motion to stay. On November 15, 2016, the District Court denied plaintiff's requests to vacate the stay and the Oversight Board's motion to intervene. On May 15, 2017, the Puerto Rico Department of Justice filed a notice of stay under Title III of PROMESA. On May 17, 2017, the District Court entered an order confirming the stay. On August 1, 2017, the District Court sua sponte dismissed the case with prejudice. On August 28, 2017, plaintiff filed a motion for reconsideration objecting to the dismissal order. There has been no further docket activity.

- *Jacana Holdings I LLC v. Puerto Rico*, Case No. 16-4702-GHW (S.D.N.Y. Jun. 21, 2016)

    On June 21, 2016, a group of four hedge funds, each holding the Commonwealth's general obligation bonds, filed a lawsuit in the United States District Court for the Southern District of New York

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

challenging the Moratorium Act and questioning COFINA's debt structure for rendering COFINA's sales and use tax resources unavailable to pay general obligation bonds, which plaintiffs contend should enjoy constitutional priority. Plaintiffs seek declaratory and injunctive relief.

On July 22, 2016, defendants filed a motion to stay the action. On February 6, 2017, the District Court entered an order staying the case. On May 8, 2017, the parties filed a joint letter notifying the District Court that the action is stayed under Title III of PROMESA. There has been no further relevant docket activity.

- *Trigo Gonzalez v. Garcia Padilla*, Case No. 16-2257-FAB (D.P.R. Jun. 30, 2016)

On June 30, 2016, a group of Puerto Rico residents who own bonds issued by either GDB or PFC filed a complaint challenging the Moratorium Act on constitutional grounds, alleging that it (i) usurps the powers vested by Congress to the Bankruptcy Court and contained in the Bankruptcy Code" (ii) is preempted by the Bankruptcy Code; and (iii) impairs creditors' rights without consent and gives preference to one creditor over another in violation of plaintiffs' rights under the Contract Clause; and (iv) deprives plaintiffs of their proprietary right to existing and future funding for the repayment of their bonds in violation of the Takings Clause. The complaint sought a declaratory judgment that certain sections of the Moratorium Act, and any executive or governmental action predicated on those sections, are null and void.

On July 7, 2016, defendants filed a motion to stay the action. On August 22, 2016, the District Court granted defendants' motion to stay. On November 11, 2016, the District Court denied plaintiffs' motion to lift the stay and the FOMB's motion to intervene. On May 17, 2017, the Puerto Rico Department of Justice filed a notice of stay under Title III of PROMESA. The District Court entered an order confirming the stay the same day. On May 18, 2017, the District Court dismissed the case without prejudice pursuant to a notice of voluntary dismissal. This matter is now concluded.

- *Lex Claims, LLC v. Garcia Padilla*, Case No. 16-2374-FAB (D.P.R. Jul. 20, 2016)

On July 20, 2016, certain holders of general obligation bonds issued by the Commonwealth (the GO Bonds) commenced an action in the District Court against the Commonwealth and several of its officials, including the Governor, seeking (a) declaratory relief that the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act No. 21-2016, which authorized the Governor to, among other things, declare a temporary moratorium on debt service and stay creditor remedies, and an executive order issued pursuant to Act No. 21 announcing a moratorium on payment of the Commonwealth's GO Bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction to prevent certain measures taken by the Commonwealth permitting transfers outside of the ordinary course. On November 4, 2016, plaintiffs filed a Second Amended Complaint, adding COFINA as a defendant in their action against Commonwealth officials. The Second Amended Complaint requested two declaratory judgments that challenge the legal validity of COFINA: (1) a declaration that the Pledged Sales Tax constitutes "available resources" under Article VI, Section 8 of the Commonwealth's Constitution and that such funds cannot be deposited with COFINA or its Bondholders; and (2) a declaration that the Commonwealth is obligated to afford the General Obligation debt absolute priority, including priority over required deposits with COFINA and its Bondholders. On May 17, 2017, after COFINA's Title III case had been commenced, the Title III Court stayed the Lex Claims Litigation until further court order.

226

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On June 7, 2017, the UBS Family of Funds and the Puerto Rico Family of Funds (together, the Puerto Rico Funds), and mutual funds managed by Oppenheimer Funds, Inc., Franklin Advisers, Inc., and the First Puerto Rico Family of Funds (collectively, the Movants) filed the Puerto Rico Funds and Mutual Funds Group's Motion for Relief from the Automatic Stay in COFINA's Title III case [ECF No. 270] (the Lex Claims Motion) seeking an order lifting that automatic stay to allow the Lex Claims Litigation, before the District Court, to proceed in order for the District Court to decide the Puerto Rico Funds' motion to certify the question of the constitutionality of COFINA to the Puerto Rico Supreme Court (the Certification Motion), and if the Certification Motion were granted, to allow the Puerto Rico Supreme Court to consider and decide the certified questions. In the alternative, Movants requested that the Lex Claims Litigation be transferred pursuant to PROMESA section 306(d)(3) to the Commonwealth's and COFINA's Title III cases as an adversary proceeding.

The Title III Court denied the Lex Claims Motion without prejudice, holding that (1) the Movants did not show that lifting the stay would result in a partial or complete resolution of the issues where it was uncertain that the District Court would grant the certification if the stay were lifted or, if the Certification Motion were granted, that the Puerto Rico Supreme Court would accept certification; (2) judicial economy would not be achieved by lifting the automatic stay because the Title III Court had before it various adversary proceedings pending to address the very issues raised in the certified questions; (3) the certification had not been fully briefed in the Lex Claims Litigation, and the parties in the Lex Claims Litigation were not better positioned to litigate the issues in the certified questions than the parties to the Title III proceedings; and (4) the Movants have not demonstrated a particular harm that they are likely to suffer in the absence of relief from the automatic stay.

On February 5, 2019, the Title III Court issued an Amended Confirmation Order (discussed below), confirming the Third Amended Plan of Adjustment (also discussed below).  On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to art. 1.4 of the Third Amended Plan of Adjustment, the Lex Claims Litigation is defined one of several "Actions"; and pursuant to art. 2.1(c), "[o]n the Effective Date, pursuant to the Settlement Order and the Confirmation Order . . . the Actions shall be dismissed, with prejudice, and Claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice."

- *U.S. Bank Trust Nat'l Ass'n v. Garcia Padilla*, Case No. 16-2510-FAB (D.P.R. Aug. 19, 2016)

On August 19, 2016, a successor trustee to a trust agreement that authorized the UPR revenue bonds filed a complaint arguing that OE 2016 31 – which suspended the obligation of UPR to transfer the pledged revenues to U.S. Bank – was improper and seeking declaratory and injunctive relief under PROMESA to prevent the Commonwealth from diverting revenues away from UPR.

On September 1, 2016, the District Court stayed the matter. On July 21, 2017, the District Court entered the parties' stipulation staying the litigation pursuant to Title III of PROMESA as to the Commonwealth and the Governor, but not as to the University of Puerto Rico and its president. On August 1, 2017, the District Court denied a motion to reopen the record as moot in light of the stipulation. There has been no further docket activity.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- *Voya Inst'l Tr. Co. v. Univ. of Puerto Rico*, Case No. 16-2519-FAB (D.P.R. Aug. 22, 2016)

On August 22, 2016, the trustee for the UPR deferred compensation plan filed a complaint alleging that since April 2016, UPR has directed Voya to make approximately $33 million in emergency distributions to plan participants. Because of the UPR's known insolvency, Voya denied these requests and further suspended emergency withdrawals. Because of this, the UPR notified Voya that the UPR intended to remove Voya as plan trustee. In its complaint, Voya recognized that the UPR has the right to remove Voya as the trustee but asserted that compliance with the UPR's request may subject Voya to liability for violating PROMESA's stay and restrictions on transfer if the UPR is later found to currently be insolvent. Through the complaint, Voya sought declaratory judgments that it may transfer plan assets to a successor trustee pursuant to the UPR's instructions without incurring liability under PROMESA.

After the filing of the Commonwealth's Title III case, this case was converted to an adversary proceeding under Adv. Proc. No. 17-00216-LTS in the Title III. This case was resolved in connection with a related adversary proceeding styled Univ. of Puerto Rico v. Voya Inst'l Tr. Co., Case No. 17-00217-LTS (D.P.R. July 26, 2017), as discussed below.

- *Scotiabank de Puerto Rico v. Garcia Padilla*, Case No. 16-2736-FAB (D.P.R. Sept. 28, 2016)

On September 28, 2016, Scotiabank de Puerto Rico (a Puerto Rico based bank) filed a complaint against the Commonwealth. In its amended complaint, Scotiabank alleged that a $37.5 million loan extended to PRMBA was secured by liens on certain cigarette sales tax revenues conditionally allocated to PRMBA and that the loan was in default since December 2015. In this action, Scotiabank sought declaratory and injunctive relief to prevent the Commonwealth from diverting and expropriating any cigarette sales tax revenues.

On November 11, 2016, defendants filed a motion to stay the action. On December 16, 2016, defendants filed a motion to dismiss. On January 31, 2017, plaintiffs filed an opposition to defendants' motion. That motion is pending. On May 16, 2017, the Puerto Rico Department of Justice filed a notice of stay under Title III of PROMESA. On May 17, 2017, the District Court entered an order confirming the stay. There has been no further docket activity.

- *Servidores Públicos Unidos v. Fin. Oversight and Mgmt. Bd. for Puerto Rico*, Case No. 17-1483-FAB (D P.R. Apr. 12, 2017)

On April 12, 2017, a Puerto Rico labor union filed a complaint against the Oversight Board and the Commonwealth, asserting that the Commonwealth fiscal plan, as certified by the Oversight Board on March 13, 2017, violated PROMESA both procedurally and substantively by requiring the Commonwealth to unconstitutionally impair the contractual rights of pensioners and improperly using the funds of employees' individual retirement savings accounts. The complaint also asserts that the Oversight Board improperly approved the Governor's proposed fiscal plan by adding amendments to it rather than approving it without amendments, which the labor union claims is the proper procedure under PROMESA. As a result, the complaint seeks related declaratory and injunctive relief to prevent implementation of the Commonwealth fiscal plan.

228

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On May 3, 2017, the Oversight Board filed a notice of stay under Title III of PROMESA. On May 4, 2017, the District Court entered an order confirming the stay. There has been no further relevant docket activity.

- *Rodríguez Perelló v. Rosselló Nevares*, Case No. 17-1566 (D.P.R. May 1, 2017)

On May 2, 2017, certain COFINA bondholders commenced an action in the District Court for declaratory and injunctive relief against COFINA, FAFAA, GDB, Governor Rosselló and certain other governmental officials. Plaintiffs asserted that their interest in COFINA's securities provided them with contract and property rights protected by the Constitutions of the United States and the Commonwealth, as well as federal and Puerto Rico statutes. Plaintiffs further asserted that the defendants had unlawfully and unconstitutionally impaired these contractual rights and taken plaintiffs' property. In the action, plaintiffs sought protection and vindication of their alleged rights through a declaratory judgment that defendants had breached plaintiffs' constitutional, statutory, and contractual obligations to COFINA bondholders, and injunctive relief against defendants' continuation of those breaches.

Following the commencement of COFINA's Title III case, the Title III Court entered an order on May 17, 2017, staying the litigation. There has been no further activity in this action since the commencement of the COFINA's Title III case.

On February 5, 2019, the Title III Court issued an Amended Confirmation Order, confirming the Third Amended Plan of Adjustment (as discussed in Note 3 and Note 17(c) below). On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to Article 1.4 of the Third Amended Plan of Adjustment, Rodriguez-Perello, et al. v. Rosselló-Nevares is defined one of several "Actions"; and pursuant to Article 2.1(c), "[o]n the Effective Date, pursuant to the Settlement Order and the Confirmation Order . . . the Actions shall be dismissed, with prejudice, and Claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice."

- *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Case No. 17-1567 (D.P.R. May 1, 2017)

Ambac, a COFINA bond insurer, filed an action requesting the District Court for the District of Puerto Rico to invalidate the Commonwealth fiscal plan, as certified by the Oversight Board on March 13, 2017, and Act No. 26. Ambac claims that both are unconstitutional and in violation of PROMESA. Through this lawsuit, Ambac is attempting to prevent the Commonwealth from using SUT funds used for the payment of COFINA's debt.

On May 15, 2017, the Oversight Board filed a notice of stay under Title III of PROMESA. On May 17, 2017, the District Court entered an order confirming the stay. There has been no further docket activity.

- *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Case No. 17-1568 (D.P.R. May 2, 2017)

Ambac filed an action requesting the District Court to invalidate all moratorium legislation and related orders in effect since the end of 2015. Through the moratorium legislation and orders, Ambac alleges that the Commonwealth withholds certain revenue sources–highway tolls, license fees and taxes on

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

tobacco products, gasoline, and hotel rooms, among others–that are used for the payment of the debt incurred by PRIFA, PRHTA and PRCCDA. Ambac claims that the related orders are also unconstitutional and contrary to PROMESA.

On May 15, 2017, the Oversight Board filed a notice of stay under Title III of PROMESA. On May 17, 2017, the District Court entered an order confirming the stay. There has been no further docket activity.

- *Ambac Assurance Corp. v. U.S. Dept. of the Treasury*, Case No. 17-0809 (D.D.C. May 2, 2017)

Ambac sued the United States Department of the Treasury in relation to the money transferred to the Commonwealth from the federal excise tax on the sale of rum. The Commonwealth has retained this source of revenue, which is used for the payment of certain PRIFA bonds. The insurer requests that the U.S. Treasury stop transferring these funds to the Commonwealth until the dispute is resolved, or, in the alternative, that a receiver retains these funds in a separate account.

- *Aurelius Investment, LLC v. Commonwealth of Puerto Rico*, Index No. 652357/2017 (N.Y. Sup. Ct. May 2, 2017)

A group of hedge funds–which included Aurelius, Autonomy, and Monarch–sued in New York state court, demanding that the Commonwealth pay nearly $243 million in GO debt service, plus interest. The plaintiffs own approximately $1.4 billion in GO bonds issued by the Commonwealth in 2014. The lawsuit asserts that the GO bondholders have a right to all funds held by the Treasury Department to pay remaining principal and interest on the GO bonds and seeks injunctive relief and monetary damages to account for all overdue interest.

*(c) Key Civil Actions Filed Against the Commonwealth After the Commencement of the Title III Cases*

- *Assured Guar. Corp. et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. No. 17-00125-LTS (D.P.R. May 11, 2017)

On May 11, 2017, certain GO bond monoline insurers filed an adversary proceeding claiming that the Commonwealth fiscal plan, as certified by the Oversight Board on March 13, 2017, was "illegal" under PROMESA because of its alleged (i) "failure to comply with lawful priorities and liens established by Puerto Rico's constitution"; (ii) "failure to differentiate between Nonessential and essential spending"; (iii) "elevation of all Nondebt spending above debt service"; and (iv) "unexplained economic assumptions." Plaintiffs challenge the legality of Act No. 26 of 2017 on the ground that it "effectuates the contract impairments and illegal expropriations of property purportedly authorized by the Illegal Fiscal Plan."

In the aftermath of Hurricane María, the plaintiffs filed a voluntary dismissal without prejudice on October 6, 2017, and the Title III court dismissed the case on October 10, 2017.

- *Peaje Investment LLC v. Puerto Rico Highways and Trans. Auth., et al.,* Case Nos. 17-00151-LTS, 17-00152-LTS (D.P.R. May 31, 2017)

On May 31, 2017, plaintiff filed a lawsuit against the PRHTA, PRHTA's Executive Director in his official capacity, the Commonwealth, the Governor, the Secretary of the Treasury of the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Commonwealth, the Director of the Office of Management and Budget, FAFAA, and FAFAA's Executive Director in his official capacity. O'Melveny & Myers represents FAFAA and its Executive Director. Plaintiff alleges that (i) it owns bonds secured by liens on pledged special revenues; (ii) the Commonwealth and PRHTA unlawfully evaded payment on those bonds by diverting pledged special revenues to unauthorized uses; and (iii) defendants unlawfully paid PRHTA bonds almost exclusively out of reserve account funds and that those funds are the bondholders' property. Plaintiff claims that it is entitled to certain of PRHTA's toll revenues in payment of its bonds, alleging both statutory and consensual liens. Through this lawsuit, plaintiff seeks to stop the Commonwealth, FAFAA, and their respective officials from interfering with (1) the obligation of PRHTA and its Executive Director to deposit the toll revenues with the fiscal agent; (2) the execution of any judgment directing PRHTA and its Executive Director to resume depositing toll revenues; and (3) the execution of any judgment directing PRHTA and its Executive Director to deposit sufficient funds with the fiscal agent in advance of the semi-annual debt service payment dates. Plaintiff seeks only declaratory and injunctive relief.

On September 8, 2017, the Title III Court denied plaintiff's motion for preliminary injunction, which decision was appealed to the United States Court of Appeals for the First Circuit. On August 8, 2018, the First Circuit issued an opinion affirming the order denying Peaje's motion for preliminary injunction and adequate protection, finding Peaje does not hold a statutory lien. On October 26, 2018, plaintiff filed a writ of certiorari, which the Supreme Court denied on February 19, 2019.

On October 10, 2017, plaintiff filed an amended complaint, which defendants answered on November 17, 2017. On November 14, 2018, the parties filed a joint status report. In the status report, the parties requested entry of an order directing them to report back to the Title III Court regarding the status of the pendency of plaintiff's writ of certiorari and the related appeals of Assured Guaranty Corporation, et al. (Case Nos. 18-1165, 18-1166), and Ambac Assurance Corporation (Case No. 18-1214). The parties are to submit a joint status report by April 29, 2019.

- *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.,* Case Nos. 17-00155-LTS, 17-00156-LTS (D.P.R. June 4, 2017)

On June 4, 2017, plaintiffs, who insure PRHTA bonds, filed a lawsuit alleging that the Commonwealth and PRHTA have engaged in a pattern of unlawfully evading the payment of their debts by diverting certain pledged special revenues from payment of PRHTA bonds to other, unauthorized uses. The plaintiffs assert that they are entitled to PRHTA's toll revenues, fuel excise taxes, and motor vehicle license fees in payment of their bonds, and they allege both statutory and consensual liens. Plaintiffs sought various forms of declaratory relief, including (i) the revenues backing the PRHTA bonds are pledged special revenues under the Bankruptcy Code, and (ii) all funds held in the reserve accounts are the HTA Bondholders' property. On January 30, 2018, the Title III Court granted the motions to dismiss and closed the case. On February 9, 2018, plaintiff filed an appeal to the United States Court of Appeals for the First Circuit. On March 26, 2019, the First Circuit affirmed the District Court's decision, finding that it did not err when it dismissed the amended complaint on the grounds that neither Bankruptcy Code section 922(d) nor section 928(a) entitle the plaintiffs to the relief they sought. The First Circuit held that these sections "permit, but do not require, continued payment during the pendency of the bankruptcy proceedings" and "stand for the premise that any consensual prepetition lien secured by special revenues will survive the period of municipal bankruptcy, and, accordingly, municipalities can elect to voluntary continue payment on these debts during the course

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

of the bankruptcy proceedings so as to not fall behind and thus be at risk of being unable to secure financing in the future."

- *Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.,* Case No. 17-00159-LTS (D.P.R. June 8, 2017)

  On June 8, 2017, plaintiff filed a lawsuit against the Commonwealth, the Oversight Board, FAFAA, PRHTA, Governor Rosselló Nevares, Raúl Maldonado Gautier, José Iván Marrero Rosado, Gerardo José Portela Franco, José B. Carrión III, Andrew G. Biggs, Carlos M. García, Arthur J. Gonzalez, José R. González, Ana J. Matosantos, David A. Skeel, Jr., Elías Sánchez Sifonte, and John Does 1-12, alleging that certain moratorium legislation and orders are unconstitutional and unlawful.  On November 21, 2017, the court held a hearing on the motion to dismiss.  On November 28, 2017, as directed at the hearing, the parties filed supplemental briefs addressing the applicability of section 544(a) of the Bankruptcy Code to PROMESA as well as the provisions of the Uniform Commercial Code related to unperfected liens.  On February 27, 2018, the court granted the motion to dismiss. On March 9, 2018, plaintiff appealed the dismissal to the United States Court of Appeals for the First Circuit.  On January 15, 2019, the First Circuit heard oral argument and reserved decision.

- *ACP Master, Ltd., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. No. 17-00189-LTS (D.P.R. Jun. 29, 2017)

  On June 29, 2017, a group of GO bondholders filed a lawsuit alleging that the Oversight Board and the Commonwealth have improperly allocated retained revenues and special property tax revenues to expenditures other than payment of GO Bonds. The plaintiffs sought declaratory judgments and injunctive relief directing defendants to segregate and preserve the revenue for payment of the GO Bonds.

  On January 30, 2018, the District Court granted the defendants' motion to dismiss, and dismissed the case with prejudice on the grounds that (i) it lacked subject matter jurisdiction to issue advisory opinions regarding the parties' respective rights to the subject revenues without a current, concrete dispute, (ii) the Takings Clause claim was unripe because the Commonwealth had not made a final decision regarding the treatment of the subject revenues, and (iii) the relief requested would restrict the Commonwealth's use of revenues and exercise of its political and governmental powers in violation of PROMESA section 305. On February 1, 2018, the plaintiffs filed a notice of appeal to the United States Court of Appeals for the First Circuit (Case No. 18-1108). On November 5, 2018, the First Circuit heard oral argument and reserved decision. On March 26, 2019, the First Circuit affirmed the District Court's decision, finding that the District Court correctly dismissed the complaint on appropriate grounds.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- *Asociación de Profesoras y Profesores del Recinto Universitario de Mayagüez, Inc. (APRUM) v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. No. 17-00197-LTS (D.P.R. July 9, 2017)

  On July 9, 2017, an association of UPR professors filed an adversary proceeding claiming that UPR "is the main catalyst for sustainable economic development" and is therefore an essential service under PROMESA section 201. The complaint argues that the Commonwealth fiscal plan, as certified by the Oversight Board on March 13, 2017, failed to differentiate "between higher priority 'essential' services and lower priority 'Nonessential services'" and "artificially inflate[s] the Commonwealth's 'expenses' by including a so called 'Reconciliation Adjustment' of $585 million."

  On November 6, 2017, APRUM filed an amended complaint in lieu of responding to defendants' motion to dismiss. On December 8, 2017, Judge Dein granted the parties' motion to hold this case in abeyance until revised fiscal plans were certified for the Commonwealth and UPR. APRUM filed a second amended complaint on May 11, 2018, challenging the new Commonwealth fiscal plan as certified by the Oversight Board on April 19, 2018.  On August 21, 2018, the plaintiffs filed a motion for voluntary dismissal and the Title III Court dismissed the case.

- *Employees Ret. Sys. of the Gov't of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC, et al.,* Case No. 17-00213 (D.P.R. July 21, 2017)

  On July 21, 2017, the Oversight Board filed this lawsuit on behalf of ERS pursuant to a stipulation between certain ERS Bondholders, on the one hand, and the Oversight Board, ERS, and FAFAA on the other. See In re Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Case No. 17- 03566, [ECF No. 170] (D.P.R. July 14, 2017) (the Stipulation). Pursuant to the Stipulation, the FOMB, on behalf of ERS, sought declaratory relief challenging the validity, priority, extent, and enforceability of the prepetition and postpetition liens and security interests asserted by defendants with respect to bonds issued by ERS. The complaint contended that defendants' alleged liens and security interests are not perfected because the required UCC financing statements and subsequent amendments were defective. ERS also challenged, among other things, the ERS Bondholders' alleged security interest in postpetition employer contributions. Defendants asserted counter-claims related to the same issues.

  In the Stipulation, the parties also agreed that ERS would make interest payments due on October 1, 2017 from ERS's Prepetition Segregated Account (which was created pursuant to a stipulation and order dated January 17, 2017) and that these payments would constitute adequate protection for the creditors until October 31, 2017 with respect to the automatic stay. On November 28, 2017, certain ERS Bondholders (the Puerto Rico Funds) filed a motion to require ERS to continue making payments from the Prepetition Segregated Account until the Title III Court ruled on the parties' motion for summary judgment. In re The Financial Oversight and Management Board for Puerto Rico, as representative of Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Case No. 17-03566, [ECF No. 222] (D.P.R. Nov. 28, 2017). On December 28, 2017, the Title III Court granted the motion in part. Id. [ECF  No. 248] (D.P.R. Dec. 28, 2017). The Title III Court ordered ERS to transfer the December 2017 and January 2018 interest payments pursuant to the Stipulation, and thereafter transfer the interest payment by the 20th of each month until the earlier of (i) the Title III Court's order on the motion for summary judgment, or (ii) the exhaustion of the funds in the Prepetition Segregated Account. Id.

233

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

A hearing on the parties' summary judgment motions took place on December 13, 2017. On August 17, 2018, the Title III Court granted partial summary judgment in ERS's favor, finding the bondholders' liens were not perfected and are avoidable under Bankruptcy Code section 544, as incorporated into PROMESA by section 301(a), 11 U.S.C. § 2161(a). On September 5, 2018, the court entered an order dismissing the remaining count and counterclaims. This decision was appealed to the United States Court of Appeals for the First Circuit.

On January 30, 2019, the First Circuit (i) affirmed the Title III Court's holding that the 2018 financing statements related to ERS's bonds did not perfect the ERS Bondholders' security interest in pledged property, (ii) affirmed the dismissal of the ERS Bondholders' claim regarding a January 2017 stipulation, and (iii) reversed the Title III Court by finding that the ERS Bondholders met the requirement for perfection beginning on December 17, 2015.

- *Altair Global Credit, et al. v. Commonwealth of Puerto Rico, et al.*, Case Nos. 17-00219-LTS (D.P.R. July 27, 2017)

On July 27, 2018, plaintiffs, ERS bondholders, initiated a complaint against the Commonwealth, the Oversight Board, FAFAA, ERS, the Governor, and Treasury Secretary Raúl Maldonado Gautier. The lawsuit seeks a declaration that Joint Resolution 188 and Act No. 106 of 2017 (together, the PayGo Legislation), is void ab initio on the ground that it violates the automatic stay under the Bankruptcy Code and violates the Takings and Contract clauses of the U.S. Constitution. On November 17, 2017, the Oversight Board, FAFAA, and other defendants moved to dismiss the complaint in full. On February 2, 2018, the Title III Court took the dismissal motions under submission. On September 9, 2018, the court stayed the case until the United States Court of Appeals for the First Circuit rendered a decision regarding the summary judgment appeal in ERS v. Altair Global Credit Opportunities Fund (A), LLC, et al., Adv. Proc. No. 17-00213-LTS (D.P.R. July 21, 2017), which was rendered on January 30, 2019. No parties have moved to lift the stay.

On March 1, 2019, the District Court dismissed this case without prejudice as to Altair Global Credit Opportunities Fund (A), LLC and Nokota Capital Master Fund, L.P. As a result, the case has been re-captioned *Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. Nos. 17-00219, 17-00220 (D.P.R.).

- *Univ. of Puerto Rico v. Voya Inst'l Tr. Co.*, Case No. 17-00217-LTS (D.P.R. July 26, 2017)

On December 28, 2016, the UPR filed in the Estado Libre Asociado de Puerto Rico, Tribunal de Primera Instancia, Sala Superior de San Juan, a verified complaint against Voya, and a motion for preliminary injunction, seeking an order compelling Voya to comply with the UPR's demand to transfer the assets of the Trusts. On January 4, 2017, Voya removed the UPR's action to Judge Besosa of the United States District Court for the District of Puerto Rico. On July 21, 2017, Judge Besosa transferred the case styled *Voya Inst'l Tr. Co. v. Univ. of Puerto Rico*, Case No. 16-2519 FAB (D.P.R. Aug. 22, 2016) and the UPR's action to Judge Swain in the Title III Court. On August 18, 2017, the actions were referred to Magistrate Judge Judith G. Dein for pre-trial management.

On June 19, 2018, Voya and the UPR mediated with the Honorable Roberta A. Colton of the United States Bankruptcy Court for the Middle District of Florida. At the mediation, Voya and the UPR agreed to an agreement in principle to resolve their respective actions. On July 30, 2018, Judge Swain

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

transferred Voya's and the UPR's actions back to Judge Besosa; on the same date Judge Besosa ordered that the actions remain referred to Magistrate Judge Dein. On January 3, 2019, Voya and the UPR entered into a settlement agreement under which the parties agreed that the UPR would file an unopposed motion requesting entry of an order (i) establishing that the UPR is not insolvent within the meaning of the trust agreements and (ii) authorizing Voya to prospectively abide by UPR instructions regarding disbursement of funds from the Trusts. On January 9, 2019, the UPR filed its unopposed motion for partial summary judgment; implementation of the settlement agreement is contingent on the Distric Court granting the UPR's motion. On January 15, 2019, the District Court ordered that Voya respond to the UPR's motion by January 31, 2019. On January 29, 2019, Voya filed a response in support of the UPR's motion, stating that it "does not object to the relief requested by the UPR in its Motion." On January 30, 2019, the District Court issued an order granting the UPR's motion, and on January 31, 2019, it issued a partial judgment consistent with its order.

- *Asociación de Salud Primaria de Puerto Rico et al. v. Commonwealth of Puerto Rico et al.*, Adv. Pro. No. 17-00227-LTS (D.P.R. Aug. 2, 2017)

  On August 2, 2017, the plaintiffs, a group of non-profit health centers in Puerto Rico, removed to the Title III Court certain claims pending since 2002 in the Puerto Rico Court of First Instance (the 2002 Puerto Rico Court Action) alleging that the Commonwealth and its officials have not complied with their ministerial duties to the plaintiffs to supplement payments for services under Medicaid to indigent patients. Plaintiffs seek mandamus relief and a declaratory judgment that the Commonwealth must reimburse expenses incurred for rendering services to Medicaid beneficiaries.

  On November 14, 2017, the Puerto Rico Department of Justice, on behalf of the Commonwealth, filed a motion for abstention seeking to have the case remanded to the Puerto Rico Court of First Instance. On December 11, 2017, the Title III Court entered an amended order referring the case to Magistrate Judge Dein for general pre-trial management and for a report and recommendation regarding the Commonwealth's motion for abstention. On April 2, 2018, Judge Dein recommended that the Title III Court remand the adversary proceeding to the Puerto Rico Court of First Instance. Plaintiffs filed objections to Judge Dein's report and recommendation. On July 10, 2018, the Title III Court overruled these objections and adopted Judge Dein's report and recommendation to abstain from the proceeding.  On February 16, 2019, the plaintiffs filed an appeal to the United States Court of Appeals for the First Circuit, which is currently pending.

- *Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Elec. Power Auth., et al.*, Case No. 17-00228-LTS (D.P.R. Aug. 7, 2017)

  Aurelius filed a motion to dismiss all of the Title III cases, arguing that the appointment of the Oversight Board members violated the Appointments Clause of the United States Constitution and, consequently, that the Oversight Board's acts, including the issuance of the restructuring certification and initiation of the Title III cases, are void.  UTIER filed this adversary proceeding to the same effect.

  On July 13, 2018, the Title III Court denied Aurelius's motion to dismiss.  On July 17, 2018, Aurelius filed a notice of appeal to the United Court of Appeals for the First Circuit.  On December 3, 2018, the First Circuit heard oral argument.  On February 15, 2019, the First Circuit held that PROMESA's appointments method for the Oversight Board is unconstitutional.  The court did not dismiss the Title

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

III petitions as plaintiffs had requested, but instead expressly validated the Oversight Board's past acts and stayed the First Circuit's mandate for 90 days.  On March 1, 2019, UTIER filed a motion seeking a panel rehearing or rehearing en banc, arguing that the Oversight Board's past acts cannot be validated and that the Oversight Board is acting without legal authority. On February 28, 2019, the Oversight Board announced that it will appeal the First Circuit's decision to the U.S. Supreme Court and that it will request a stay of the First Circuit's mandate pending the Supreme Court's consideration of the Oversight Board's petition for a writ of certiorari.  The last day to file a petition for a writ of certiorari is May 16, 2019.

- *Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Elec. Power Auth., et al.*, Case No. 17-00229-LTS (D.P.R. Aug. 7, 2017)

    Plaintiff UTIER challenges the constitutionality of four Commonwealth statutes and the 2017 Commonwealth and PREPA Fiscal Plans and Budgets that allegedly "adopt" and "implement" those statutes, arguing that they violate the terms of a collective bargaining agreement between UTIER and PREPA.  The motion to dismiss was fully briefed as of March 28, 2018.  On September 26, 2018, the Title III Court entered an order granting in part and denying in part the motions to dismiss the amended complaint.  On December 17, 2018, the remaining defendants answered the amended complaint.

- *American Federation of State, County & Municipal Employees, AFL-CIO v. Fin. Oversight & Mgmt. Bd. for Puerto Rico, et al.,* Case Nos. 17-00242, 17-00243 (D.P.R. Aug. 22, 2017)

    On August 22, 2017, American Federation of State, County & Municipal Employees (AFSCME) filed a lawsuit challenging the Oversight Board's 2017 fiscal plan for the Commonwealth as improper under PROMESA.  AFSCME seeks (1) a declaration that the Oversight Board's amendments to the that fiscal plan were unlawful or else not part of such fiscal plan, and that the employees' own contributions to their retirement accounts must be paid in full and cannot be impaired by a plan of adjustment and (2) an order imposing a trust over and enjoining sale of pension fund assets attributable to employee contributions.  On October 23, 2017, the court granted AFSCME's motion to stay the proceeding pending further other of the court.  On December 13, 2018, AFSCME filed a notice of voluntary dismissal without prejudice.  On December 14, 2018, the District Court closed the case.

- *The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as Agent of The Commonwealth of Puerto Rico v. Bettina Whyte as Agent of COFINA (In re: The Financial Oversight and Management Board for Puerto Rico)*, Adv. Pro. No. 17-00257-LTS (D. P.R. Sept. 8, 2017)

    On August 10, 2017, the Title III Court issued an order (the Procedures Order) to approve a protocol for resolving the disputes between the Commonwealth and COFINA. The Procedures Order defines the Commonwealth-COFINA Dispute as "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law. . ." The Procedures Order provided for the appointment of (1) an agent for the Oversight Board as representative of the Commonwealth in its Title III Case (the Commonwealth Agent); and (2) an agent for the Oversight Board as representative of COFINA in its Title III Case (the COFINA Agent).

236

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On September 8, 2017, the Commonwealth Agent filed a complaint asserting that the SUT revenue pledged by COFINA to secure its bond debt is "the exclusive property of the Commonwealth." The complaint alleges that the COFINA enabling legislation "did not transfer to COFINA present ownership of future SUT revenues" and did not assign to COFINA the Commonwealth's right to receive such revenues. The complaint argued that the transfer to COFINA of SUT revenues was at most an unsecured promise to transfer revenues in the future. The complaint further alleged that even if the transfer of future SUT revenues to COFINA had any legal effect, such transfers are a security interest in acquired property governed by Article 9 of the Uniform Commercial Code. The complaint alleged that any security interest of COFINA in SUT revenues is unenforceable against the Commonwealth or, in the alternative, is unperfected and therefore avoidable and otherwise subordinate to the rights of the Oversight Board as trustee. The Complaint further asserted that the Commonwealth's Title III case cuts off any security interest.

The Complaint also alleged that COFINA's structure was unconstitutional because it circumvents the Commonwealth's Constitution's debt limitations.

On September 15, 2017, the COFINA Agent filed her answer to the Complaint (the Answer and Counterclaims) disputing the Commonwealth Agent's claims, asserting various counterclaims, and seeking declaratory judgments that: (a) the COFINA enabling legislation is constitutional and thereby made the Pledged Sales Tax transferred to COFINA property of COFINA and not an "available resource" of the Commonwealth; (b) COFINA has a perfected and unavoidable lien in the Pledged Sales Tax, and/or there is an enforceable subordination agreement whereby the Commonwealth has agreed to subordinate any interest it may have in the Pledged Sales Tax to the interest of COFINA, and/or the Pledged Sales Tax is held in constructive trust for the benefit of COFINA; (c) the Commonwealth's misappropriation of the Pledged Sales Tax violates the United States and Commonwealth's Constitutions; (d) the fiscal plan compliance law violates PROMESA; (e) Act No. 84-2016, which amended the COFINA enabling legislation to decrease the amount of SUT proceeds COFINA receives from 6.0% to 5.5%, violates PROMESA, and COFINA is entitled to 6.0% of the SUT proceeds until the Pledged Sales Tax Base Amount is reached each year; and (f) any non-COFINA debt, including general obligation bonds of the Commonwealth issued in violation of the debt limit provisions in the Puerto Rico Constitution, are not entitled to priority under the Commonwealth's Constitution's debt priority provisions. The COFINA Agent's Answer and Counterclaims also sought injunctive relief, including that: (y) the Title III Court impose a constructive trust in COFINA's favor over the Pledged Sales Tax in order to prevent the Commonwealth's alleged tortious interference and fraud with respect such revenues; and (z) the Title III Court enter an order permanently enjoining the Commonwealth from diverting or transferring the Pledged Sales Tax proceeds away from COFINA, designating such revenues as "available resources," and taking any action to breach, revoke or reject the transfer of such revenues to COFINA or to otherwise interfere with COFINA's rights to such revenues.

In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and Commonwealth bondholders, as well as other parties that had been permitted to intervene in the adversary proceeding, filed counterclaims and cross-claims regarding ownership of the applicable portion of the SUT.

On December 21, 2017, the Title III Court entered an order dismissing, without prejudice, several of the Commonwealth Agent's and the COFINA Agent's claims as outside the scope of the

237

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Commonwealth-COFINA Dispute, as well as several claims asserted by the intervening parties (the Dismissed Claims). The Title III Court found that the scope of the Commonwealth-COFINA Dispute, as defined in the Procedures Order, is confined to whether the Commonwealth or COFINA owns the Pledged Sales Tax. The Dismissed Claims, the Title III Court found, were outside the scope of the Commonwealth-COFINA Dispute because they presumed either the Commonwealth's or COFINA's ownership of the Pledged Sales Tax or addressed other issues that were not related to the ownership question. Following the Title III Court's order and subsequent order permitting the Commonwealth Agent to amend its complaint, which it did on January 16, 2018, the Commonwealth Agent's only remaining claims asserted that (a) Act 91 did not transfer present ownership of future SUT Revenues to COFINA; (b) Act 91 did not assign to COFINA any "right to receive" future SUT Revenues; and (c) Act 91 was designed to, and did, violate the debt and balanced budget provisions of the Puerto Rico Constitution. The COFINA Agent's only remaining claims asserted that Act 91 is constitutional and the Pledged Sales Tax and Dedicated Sales Tax Fund are COFINA's property.

On February 21, 2018, the Commonwealth Agent, the COFINA Agent, and several of the intervening parties, filed cross-motions for summary judgment. In its motion, the Commonwealth Agent asserted that (a) Act 91 did not transfer to COFINA a present property interest in potential future tax revenues because no such property exists to be transferred; (b) there was no "true sale" of future tax revenues to COFINA because the Commonwealth retained the power to substitute, reduce, or even eliminate those revenues, and the Commonwealth and COFINA both accounted for the transaction in question as a "collateralized borrowing" by the Commonwealth rather than a "sale" of revenues to COFINA; (c) Act 91 did not transfer to COFINA the Commonwealth's "right to receive" future tax revenues because the Act says nothing to that effect, and the Commonwealth has no "right to receive" tax revenues until a taxable transaction occurs; and (d) Act 91 and the purported SUT revenue transfer are unconstitutional because the Legislative Assembly cannot create financing structures that operate as an evasion of the debt and balanced budget provisions of the Commonwealth's Constitution. The intervening parties who filed cross-motions in favor of the Commonwealth asserted, among other things, that (a) the scope of the Adversary Proceeding is limited to ownership of post-petition and future SUT revenues which cannot have been transferred to COFINA due to the automatic stay; (b) under the Puerto Rico Civil Code, the Commonwealth did not transfer ownership of future SUT revenues to COFINA; (c) under the Bankruptcy Code, a "right to receive" future SUT revenues is not an asset that can be transferred; (d) the Pledged Sales Tax remains property of the Commonwealth because it is an "available resource" under the Commonwealth's Constitution; and (e) Act 56 did not transfer ownership of the Pledged Sales Tax to COFINA. Conversely, the COFINA Agent asserted that the Legislative Assembly has the power to, and did, transfer the Pledged Sales Tax to COFINA through Act 91. The intervening parties who filed cross-motions in favor of COFINA asserted, among other things, that (a) the Commonwealth's transfer of the Pledged Sales Tax to COFINA was valid under the Commonwealth's Constitution; (b) the Pledged Sales Tax is not an "available resource" under the Commonwealth's Constitution; (c) it is not "legally impossible" to transfer future SUT revenues; and (d) the plain terms of COFINA's enabling legislation clearly transferred ownership of the Pledged Sales Tax to COFINA. A hearing on the cross-motions was held on April 10, 2018.

Concurrently with the litigation in the adversary proceeding, the Agents participated in court-sanctioned mediation to settle the Commonwealth-COFINA Dispute. Through the auspices of a court-appointed mediation team, the Agents reached an understanding set forth in that certain

238

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Agreement in Principle (the Agreement in Principle) on a settlement of the Commonwealth-COFINA Dispute. On June 5, 2018, the Agents filed a joint motion (the Abeyance Motion) to hold the Title III Court's decision on the pending motions for summary judgment in abeyance for sixty (60) days due to their agreement in principle to settle the Commonwealth-COFINA Dispute. On June 7, 2018, the Agents publicly announced the terms of their Agreement in Principle.

Under the Agreement in Principle, a portion of the 5.5% SUT revenue currently conditionally allocated to COFINA–which portion is referred to as Pledge Sales Tax Base Amount (PSTBA)–would be shared between COFINA and the Commonwealth. The PSTBA is the base amount of 5.5% Sales Tax revenue allocated to COFINA that COFINA must receive under the Act No. 91 generally before the balance of the 5.5% Sales Tax can be made available to the Commonwealth. As of the date of the Agreement in Principle, the PSTBA was approximately $783.2 million for fiscal year 2019 and grew 4% annually until reaching approximately $1.85 billion in fiscal year 2041. The Agreement in Principle proposed to, among other things, divide the PSTBA so that COFINA would receive 53.65% of the PSTBA starting in fiscal year 2019 while the Commonwealth would receive the other 46.35%, subject to certain restrictions and exceptions. The balance of the 5.5% Sales Tax revenue allocated to COFINA would continue to flow to the Commonwealth. This description of the Agreement in Principle is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the Agreement in Principle itself. To the extent there is any discrepancy between the description contained herein and the terms set forth in the Agreement in Principle, the terms set forth in the Agreement in Principle control. Readers are directed to the Agreement in Principle, which is a public document.

On August 29, 2018, COFINA, FAFAA, the Oversight Board and various holders and insurers of COFINA's bonds (the Settlement Parties) entered into that certain Plan Support Agreement dated as of August 29, 2018 (the Original PSA), that contemplates, among other things, (i) the compromise and settlement of the Commonwealth-COFINA Dispute, consistent with the Agreement in Principle, providing COFINA with an ownership interest in an amount up to 53.65% of the Pledged Sales Tax Base Amount (the COFINA Revenues); and (ii) the Title III Court's approval of the compromise and settlement concurrently through a plan of adjustment in COFINA's Title III case and a settlement motion in the Commonwealth's Title III case.

On September 20, 2018, the Original PSA was amended and restated pursuant to that certain Amended and Restated Plan Support Agreement dated as of September 20, 2018 (the Amended PSA), to include certain additional holders of COFINA's bonds, who also held a significant amount of the Commonwealth's general obligation bonds and were among the plaintiffs in the Lex Claims Litigation. Among other things, the Amended PSA provides that (i) Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each of their applicable entities, will request dismissal, with prejudice, of their claims and causes of action in the Lex Claims Litigation, effective upon the entry of an order approving the settlement motion and confirmation of the a plan of adjustment consistent with the Amended PSA, and (ii) parties to the Amended PSA generally will not oppose approval of the settlement motion in the Commonwealth's Title III Case.

This description of the Original PSA and Amended PSA is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the Original PSA and Amended PSA, respectively. To the extent there is any discrepancy between the description contained herein and the terms set forth in the Original PSA and Amended PSA, the terms set forth in the Original PSA

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

and Amended PSA control, respectively. Readers are directed to the Original PSA and Amended PSA, which are public documents.

On October 19, 2018, the Oversight Board filed (i) the Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4072] (the Plan of Adjustment), the Disclosure Statement for the Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4073] (the Disclosure Statement), and the Puerto Rico Sales Tax Financing Corporation's Motion for Order (i) Approving Disclosure Statement, (ii) Fixing Voting Record Date, (iii) Approving Confirmation Hearing Notice, (iv) Approving Solicitation Packages and Distribution Procedures, (v) Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (vi) Approving Notice of Non-Voting Status, (vii) Fixing Voting and Election Deadlines, and (viii) Approving Vote Tabulation Procedures [Case No. 17-3283, Docket No. 4075] (the Disclosure Statement Motion) in COFINA's Title III case and (ii) the Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4067] (the Settlement Motion) in the Commonwealth's Title III case. The Plan of Adjustment provides for the issuance of newly issued bonds in the approximate principal amount of $12 billion by COFINA (the New COFINA Bonds, defined in the Plan of Adjustment as "[t]he securities to be issued by Reorganized COFINA on the Effective Date pursuant to the Plan") and the distribution of cash to holders of COFINA's existing bonds.

This description of the Plan of Adjustment and Disclosure Statement is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the Plan of Adjustment and Disclosure Statement, respectively. To the extent there is any discrepancy between the description contained herein and the terms set forth in the Plan of Adjustment and Disclosure Statement, the terms set forth in the Plan of Adjustment and Disclosure Statement control, respectively. Readers are directed to the Plan of Adjustment and Disclosure Statement, which are public documents.

On November 16, 2018, the Oversight Board filed the Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4296] (the Amended Plan of Adjustment), and the Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4299] (the Amended Disclosure Statement).

On November 20, 2018, the Title III Court held a hearing on the Disclosure Statement Motion and ruled that it would enter an order approving a modified version of the Amended Disclosure Statement.

On November 26, 2018, the Oversight Board filed a Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4363] (the Second Amended Plan of Adjustment), and the Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4364] (the Second Amended Disclosure Statement), and a revised form of proposed order approving the Second Amended Disclosure Statement and related solicitation procedures.

On November 29, 2018, the Title III Court entered an order approving the Second Amended Disclosure Statement and related solicitation procedures.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On January 9, 2019, the Oversight Board filed a Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 4652] (the Third Amended Plan of Adjustment). The Third Amended Plan of Adjustment proposes, among other things, to release the Commonwealth from all liability from claims and causes of action held by any creditor of COFINA (solely in its capacity as a creditor of COFINA) arising from or relating to the relationship of the Commonwealth and COFINA.

This description of the Third Amended Plan of Adjustment and Second Amended Disclosure Statement is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the Third Amended Plan of Adjustment and Second Amended Disclosure Statement, respectively. To the extent there is any discrepancy between the description contained herein and the terms set forth in the Third Amended Plan of Adjustment and Second Amended Disclosure Statement, the terms set forth in the Third Amended Plan of Adjustment and Second Amended Disclosure Statement control, respectively. Readers are directed to the Third Amended Plan of Adjustment and Second Amended Disclosure Statement, which are public documents.

The Title III Court held a hearing on the Settlement Motion and confirmation of the Third Amended Plan of Adjustment on January 16, 2019, and January 17, 2019.  On February 4, 2019, the Title III Court granted the Settlement Motion and confirmed the Third Amended Plan of Adjustment by entry of (i) the Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 5045] (the Settlement Order), (ii) the Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 5047] (the Findings and Conclusions), and (iii) the Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 5048] (the Confirmation Order).

On February 5, 2019, the Title III Court amended the Findings and Conclusions and Confirmation Order by entry of (i) the Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 13-3283, Docket No. 5053] (the Amended Findings and Conclusions) and (ii) the Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [Case No. 17-3283, Docket No. 5055] (the Amended Confirmation Order). Pursuant to the Amended Findings and Conclusions and the Amended Confirmation Order, which supersede the Findings and Conclusions and the Confirmation Order, the Title III Court confirmed COFINA's Third Amended Plan of Adjustment, and the Effective Date occurred on February 12, 2019.

Pursuant to the Settlement Motion approved in the Commonwealth's Title III case by the Settlement Order and through the Plan of Adjustment confirmed in the Title III Case, the Title III Court found the split of the Pledged Sales Tax into a 53.65% portion (i.e., the COFINA Revenues), which COFINA receives, and a 46.35% portion, which the Commonwealth receives, to be consistent with the Agreement in Principle.  Moreover, as further described in this Note, pursuant to articles 1.4 and 2.1(c) of the Third Amended Plan of Adjustment, several litigation actions and claims and causes of action asserted therein have been dismissed with prejudice on the Effective Date of the Plan of Adjustment (February 12, 2019) pursuant to the Settlement Order and the Confirmation Order.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On November 15, 2018, Governor Rosselló Nevares signed into law Act No. 241, which amended and restated Act No. 91, and which became effective on the Effective Date of the Plan of Adjustment, to establish the legal framework for the restructuring of COFINA's then-outstanding bonds.  To this end, Act No. 241 provided for: (i) the modification of COFINA's corporate governance structure, including the requirement that each member of the Board of Directors must satisfy the independence and qualification standards set forth in the Indenture and COFINA's by-laws (including that no member of the Board of Directors may be an officer, employee or director of any entity of the Government other than COFINA); (ii) the authorization for COFINA to issue the New COFINA Bonds and provide for the terms of such bonds; (iii) confirmation of COFINA's ownership of the COFINA Revenues; (iv) the creation of a statutory lien to secure the New COFINA Bonds; and (v) covenants to secure further the repayment of COFINA's bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Tax upon satisfaction of certain requirements.

The Amended Confirmation Order and Amended Findings and Conclusions confirmed the Third Amended Plan of Adjustment, which authorized the issuance of approximately $12 billion in principal amount of the New COFINA Bonds, cancelled COFINA's then-outstanding bonds, and discharged the related liability. The Amended Confirmation Order and Amended Findings and Conclusions also provided the following enumerated protections for the New COFINA Bonds.  Specifically, the Amended Confirmation Order provisions include: (i) the New COFINA Bonds "constitute valid, binding, legal and enforceable obligations of" COFINA; (ii) the COFINA Revenues are property of the new issuer "free and clear of all liens, claims, encumbrances, and any other interests of creditors of the old issuer, the new issuer, the Commonwealth, or any instrumentality of the Commonwealth, other than the liens granted" hereunder; (iii) the COFINA Revenues shall not be "available resources" or "available revenues" of the Commonwealth; and (iv) retention of Title III Court jurisdiction to ensure protection and enforcement of legal framework and security pledges.

The Third Amended Plan of Adjustment and Act No. 241 of 2018 provide for the reduction of the principal amount of COFINA's bonds and clarify COFINA's ownership of the COFINA Revenues. They further provide for COFINA's financial and operating independence from the Commonwealth by establishing independent standing for COFINA's operations.

The foregoing description is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the Third Amended Plan of Adjustment, Act No. 241 of 2018, the Amended Findings and Conclusions, and Amended Confirmation Order, respectively. To the extent there is any discrepancy between the description contained herein and the terms set forth in each of these documents, the terms set forth therein control, respectively. Readers are directed to the Third Amended Plan of Adjustment, Act No. 241 of 2018, the Amended Findings and Conclusions, and Amended Confirmation Order, which are public documents.

Certain parties whose objections were overruled in confirming the Third Amended Plan of Adjustment filed Notices of Appeal in the Title III Court. The appeals have been docketed with the United States Court of Appeals for the First Circuit under case numbers 19-1181 (also discussed below in relation to the adversary proceeding captioned Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board for Puerto Rico, et al.) and 19-1182. The deadline to file Notices of Appeal was March 7, 2019.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

As discussed in Note 21, COFINA rejected the Swap Agreement pursuant to the Third Amended Plan of Adjustment, and the claim for termination payment was discharged.

- *Atlantic Medical Center, Inc. et al., v. Commonwealth of Puerto Rico*, Adv. Pro. No. 17-00278-LTS (D.P.R. Nov. 17, 2017)

  On November 17, 2017, a group of domestic nonprofit corporations filed an adversary complaint alleging that the Commonwealth is obligated to pay them for services provided in furtherance of the Commonwealth's Medicaid program. Plaintiffs allege that federal law requires the Commonwealth to make certain payments to plaintiffs, and Congress gave plaintiffs an enforceable right under 42 U.S.C. § 1983 to compel the Commonwealth to make those payments.

  Plaintiffs seek a declaratory judgment that their claims for all supplemental payments for Medicaid services owed by the Commonwealth for the years since 1997–and that are the object of Adversary Proceeding 17-0227 (LTS)–are nondischargeable under PROMESA and otherwise unimpaired by the Commonwealth's filing of a Title III case. Plaintiffs rely on PROMESA section 7 (48 U.S.C. § 2016), which states that PROMESA "shall not be construed as impairing or in any manner relieving a territorial government from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory," and PROMESA section 304(h) (48 U.S.C. § 2164(h)), which precludes discharge of obligations arising under federal policy or regulatory laws, including those relating to public safety.

  On February 2, 2018, the Title III Court granted the Commonwealth's unopposed motion to consolidate this adversary proceeding with *Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerío, Corozal, Naranjito y Orocovis v. Commonwealth* (Adv. Pro. No. 17-00298-LTS), consolidating the cases under Adv. Proc. No. 17-00278. On February 22, 2018, the Commonwealth filed a motion to dismiss the consolidated complaint, which has been fully briefed. On August 7, 2018, Judge Dein entered an order recommending the Title III Court to grant the Commonwealth's motion to dismiss the consolidated complaints.  Parties filed objections to Judge Dein's report and recommendation.  On November 27, 2018, the Title III Court overruled these objections, adopted Judge Dein's report and recommendation, and dismissed the consolidated adversary proceedings.  On December 13, 2018, the plaintiffs filed an appeal to the United States Court of Appeals for the First Circuit, which is currently pending.

- *Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerío, Corozal, Naranjito y Orocovis (Corporación de Servicios) v. Commonwealth of Puerto Rico*, Case No. 17-00292-LTS (D.P.R. 2017)

  On December 17, 2017, Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerío, Corozal, Naranjito y Orocovis (CSI) filed an adversary proceeding seeking a declaratory judgment determining that its claims in *Salud Primaria* are non-dischargeable under PROMESA and otherwise unimpaired by the Commonwealth's filing of its Title III case. On February 2, 2018, the District Court consolidated this adversary proceeding with *Atlantic Medical* under the Adv. Proc. No. 17-00278 docket. On August 7, 2018, Judge Dein entered an order recommending the Title III Court to grant the Commonwealth's motion to dismiss the consolidated complaints. Parties filed objections to Judge Dein's report and recommendation. On November 27, 2018, the Title III Court overruled

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

these objections, adopted Judge Dein's report and recommendation, and dismissed the consolidated adversary proceedings. On December 13, 2018, the plaintiffs filed an appeal to the United States Court of Appeals for the First Circuit, which is currently pending.

- *Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerío, Corozal, Naranjito y Orocovis v. Commonwealth of Puerto Rico*, Case No. 17-00298 (D.P.R. Dec. 28, 2017)

On December 28, 2017, CSI filed an adversary proceeding seeking a declaratory judgment (1) declaring that sections 28 and 29 of Act No. 66 of 2014 violate CSI's substantive and procedural due process rights, as well as violate the contracts clause and the takings clause, and are preempted by Bankrupcy Code section 903, PROMESA section 202, and Medicaid law; and (2) declaring that nothing in PROMESA allows the non-payment of federal obligations by the Commonwealth and that PROMESA actually requires payment of the Commonwealth's contractual obligations with plaintiff and the associated state court judgments. On March 28, 2018, the Commonwealth filed a motion to dismiss, which has been fully briefed. The matter is stayed pending the outcome of the United States Court of Appeals for the First Circuit's review of *Asociación de Salud Primaria de Puerto Rico, et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 17-00227-LTS (D.P.R. 2017), as discussed above.

- *Coopertiva de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. No. 18-00028-LTS (D. P.R. Mar. 22, 2018)

On March 22, 2018, several credit unions chartered under Puerto Rico law filed an adversary complaint against the Commonwealth, the Oversight Board, and other Commonwealth's instrumentalities (including COFINA, PRHTA, ERS, and PREPA), seeking a declaratory judgment that their Puerto Rico debt holdings are not dischargeable and seeking monetary damages for alleged fraud in issuing and encouraging local credit unions to purchase Puerto Rico debt service instruments. On August 6, 2018, the Oversight Board, for itself and as representative of COFINA, the Commonwealth and certain other instrumentalities, moved to dismiss the complaint. Also on August 6, 2018, GDB filed a separate motion to dismiss. In addition, several parties filed joinders to the motions to dismiss or were granted leave from the Title III Court to file joinders.

On February 5, 2019, the Title III Court issued an Amended Confirmation Order (discussed below), confirming the Third Amended Plan of Adjustment (also discussed below). On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to paragraph 30 of the Amended Confirmation Order, "the plaintiffs in that certain adversary proceeding before the Title III Court, captioned Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 18-00028, shall be entitled to continue pursuit of such litigation against all parties other than COFINA and Reorganized COFINA, subject to all available rights and defenses with respect to claims and causes of action asserted therein."

On March 19, 2019, the Title III Court entered an amended scheduling order requiring that any objections to the motions to dismiss and any joinders thereto must be filed by April 1, 2019, and any reply must be filed by May 31, 2019. The Title III Court will thereafter take the motions to dismiss on submission unless determined otherwise. This case is in its early stages and no decisions on the substantive issues have been determined as of the date hereof.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- *Pinto-Lugo, et al. v. United States, et al.*, Adv. Pro. No. 18-00041-LTS (D. P.R. Apr. 24, 2018)

  On April 24, 2018, plaintiffs–a group of labor unions, non-profit organizations, and one individual–filed suit against the U.S. Government, the Oversight Board, and Governor Rosselló seeking injunctive and declaratory relief, including a determination that certain provisions of PROMESA, including the establishment of the Oversight Board, violate plaintiffs' fundamental rights as protected by the First, Fifth, and Fourteenth Amendments of the U.S. Constitution. Plaintiffs also seek a forensic audit of public debt, which they allege is fundamental to transparency and constitutes an essential fiduciary and statutory duty of the Oversight Board and Commonwealth. On April 25, 2018, the Title III Court referred the case to Magistrate Judge Dein for general pre-trial management. Defendants filed motions to dismiss on August 23, 2018, and after a successful motion to strike plaintiff's initial oversized opposition and after plaintiff failed to timely file its revised opposition, plaintiff filed its opposition on January 4, 2019.  Defendants filed their reply briefs on March 18, 2019. The Title III Court intends to take the motions to dismiss on submissions and a hearing is not currently scheduled.

- *The Financial Oversight and Management Board for Puerto Rico v. Puerto Rico Electric Power Authority, et al.*, Adv. Pro. No. 18-00047 (D. P.R. Apr. 27, 2018)

  On April 27, 2018, the Oversight Board filed a notice of removal of *José Ramón Rivera, et al., v. Commonwealth of Puerto Rico, et al.*, Civil No. SJ2018cv01670 filed in the Commonwealth of Puerto Rico Court of First Instance, San Juan Superior Court on March 27, 2018. The removed action seeks, among other things, declaratory and injunctive relief providing that (i) PREPA's Employees Retirement System is a trust separate and independent of PREPA and the Commonwealth, and (ii) Executive Order OE-2018-012 interferes with the independence and powers of the Retirement System and is null and void.  On May 28, 2018, the parties informed the Title III Court that plaintiffs intended to file a motion for an order remanding the action to the Commonwealth courts and if that motion were denied, the plaintiffs intended to file an amended complaint. The plaintiffs' remand motion was denied and on February 6, 2019, the plaintiffs filed an amended complaint. Under the current schedule, the defendants' deadline to answer, move or otherwise respond to the amended complaint is April 4, 2019.

- *PFZ Properties Inc. v. Commonwealth of Puerto Rico*, Adv. Pro. No. 18-00056-LTS (D. P.R. May 14, 2018)

  On May 14, 2018, PFZ Properties, Inc. filed a complaint against the Commonwealth alleging that the Commonwealth took its beachfront property without just compensation. Plaintiff seeks, among other things, (i) declarations that the Debtor has effected a regulatory taking of the property and violated PFZ's constitutional rights and (ii) a judgment against the Commonwealth in the amount of $75,550,000 providing for just compensation for the property to the plaintiff. On May 14, 2018, PFZ Properties Inc. filed a corporate disclosure statement. Summonses were issued to the Commonwealth on May 16, 2018. On July 27, 2018, PFZ filed a motion for voluntary dismissal and the Title III Court granted the motion and dismissed the case on July 30, 2018.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 18-00059-LTS (D.P.R. May 23, 2018)

  On May 23, 2018, plaintiffs filed a complaint against the Commonwealth, FOMB, FAFAA, Governor Rosselló Nevares, Gerardo Portela Franco, and Raúl Maldonado Gautier.  The complaint seeks fourteen different forms of declaratory relief, which seek declaratory judgments that (1) the Revised Fiscal Plan and Compliance Law violate several sections of PROMESA; (2) the Revised Fiscal Plan violates section 928 of the Bankruptcy Code; (3) no plan of adjustment based on the Revised Fiscal Plan can be confirmed, and the court will not hold a confirmation hearing; (4) the Moratorium Act, Moratorium Orders, Revised Fiscal Plan, and Compliance Law are void because they (a) violate the Contract Clause, (b) violate the Takings and Due Process clauses, and (c) are preempted by Sections 303(1) and 303(3) of PROMESA; and (5) to the extent the court determines that PROMESA bars review of the Commonwealth fiscal plan, PROMESA violates the Due Process Clause and constitutes an unconstitutional delegation of legislative power.  Defendants have yet to respond to the complaint.  On August 13, 2018, the court stayed the litigation and ordered that the deadline to file a motion to dismiss will be 30 days after the United States Court of Appeals for the First Circuit renders an opinion in the appeal of *Ambac Assurance Corporation v. Commonwealth of Puerto Rico, et al.*, No. 17-00159-LTS (D.P.R. Jun. 8, 2017).  The response to the complaint will be due within 30 days of the First Circuit's decision.

- *Unión de Empleados de la Corporación del Fondo del Seguro del Estado v. United States, et al.*, Case No. 18-00066-LTS (D.P.R. May 30, 2018)

  On May 30, 2018, Unión de Empleados de la Corporación del Fondo del Seguro del Estado (UECFSE), Asociación de Empleados Gerenciales del Fondo del Seguro del Estado Corp. (AEGFSE), and Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. (UMCFSE) filed a complaint against the U.S. Government, the Oversight Board, and Governor Rosselló Nevares seeking declaratory and injunctive relief.  Plaintiffs allege that PROMESA deprives the Commonwealth of its self-government charters and constitutes a disenfranchisement of plaintiffs' members and the Puerto Rican people.  Plaintiffs filed an amended complaint on August 17, 2018 and filed a second amended complaint on October 5, 2018. Defendants filed motions to dismiss the second amended complaint on December, 19, 2018, which plaintiffs opposed on March 1, 2019.  Defendants must reply by April 8, 2019.

- *Rosselló-Nevares v. The Fin. Oversight and Mgmt. Bd. for Puerto Rico, et al.*, Case No. 18-00080-LTS (D.P.R. July 5, 2018)

  On July 5, 2018, Governor Ricardo Rosselló Nevares and FAFAA filed a complaint against the Oversight Board, each individual Oversight Board member, and the Oversight Board's executive director, seeking declarations that (i) the Oversight Board lacks the authority to impose policy initiatives on the government through a fiscal plan and/or budget, including the Oversight Board's Commonwealth fiscal plan certified on June 29, 2018 and the Oversight Board's Commonwealth budget for fiscal year 2019 as certified on June 29, 2018; (ii) the substantive policy mandates contained in the June 29, 2018 Commonwealth fiscal plan, and rejected by the Governor pursuant to PROMESA section 205, are null and void; and (iii) the substantive policy mandates contained in the Oversight Board's fiscal year 2019 budget exceeds the Oversight Board's powers and are null and void.  Plaintiffs also seek an injunction stopping defendants from implementing and enforcing

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

the Oversight Board's rejected policy recommendations (whether or not styled as recommendations) contained in the June 29, 2018 Commonwealth fiscal plan and fiscal year 2019 Commonwealth budget.

On August 7, 2018, the court entered an order dismissing (1) claims regarding agency consolidation and compensation reductions/hiring freezes because there is not a ripe case or controversy given the concessions already made by the Oversight Board and (2) the claim regarding budgetary reprogramming as inconsistent with PROMESA's declaration that the Board-certified budget is in full force and effect, holding it is therefore preempted by section 4 of PROMESA.  The court did not dismiss claims regarding automatic budget reductions and corrective measures.  The Oversight Board answered the complaint on November 2, 2018.  On September 10, 2018, plaintiffs filed an urgent motion requesting certification of the court's August 7, 2018 opinion and order for immediate appeal under PROMESA section 306(e)(3)–(4).  On October 9, 2018, the court entered a memorandum order certifying certain aspects of the court's August 27, 2018 opinion and order for interlocutory appeal.  Plaintiffs filed a petition for interlocutory appeal on October 19, 2018; the Oversight Board filed a response on October 29, 2018.

On November 20, 2018, the United States Court of Appeals for the First Circuit entered a judgment, concluding that review of the Title III Court decision is warranted.  On March 4, 2019, appellants filed their brief.  Appellee's brief is due May 3, 2019, and appellant's reply brief is due May 24, 2019.

- *Hernandez-Montanez, et al. v. The Fin. Oversight and Mgmt. Bd. for Puerto Rico, et al.*, Case No. 18-00090-LTS (D.P.R. July 25, 2018)

On July 25, 2018, members of the Popular Democratic Party filed a complaint requesting a declaratory judgment holding that the Oversight Board appointment provisions contained in PROMESA are in violation of the Appointments Clause, decreeing the delegation of executive and legislative authority to the Oversight Board is in violation of the Separation of Powers doctrine or, decreeing that the Oversight Board's exercise of authority over budgeting to compel the adoption of its public policy constitutes an impermissible interference with federally-protected legislative autonomy.  This matter is stayed pending any party's motion to lift the stay after the First Circuit's decision in the Appointments Clause appeals.

- *Hermandad de Empleados del Fondo del Seguro del Estado, Inc. et al. v. Commonwealth of Puerto Rico*, Case No. 18-00091-LTS (D.P.R. July 25, 2018)

On July 25, 2018, Hermandad de Empleados del Fondo del Seguro del Estado, Inc. (UECFSE) and Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. (UMCFSE) filed a complaint against the Commonwealth, the Oversight Board, the State Insurance Fund Corporation, Jesus M. Rodriguez Rosa, Governor Rosselló Nevares, Gerardo Portela Franco, Hon. Raul Maldonado Gautier, Jose Ivan Marrero Rosado, and Natalie A. Jaresko seeking an order that CFSE is a protected essential public service, that four acts of the Commonwealth Legislature violate the Contract Clause of the United States Constitution, that four acts of the Commonwealth Legislature violate the Rights to Collective Bargaining of the Commonwealth's Constitution, and an order declaring the Commonwealth fiscal plan (as certified on June 29, 2018) unconstitutional and in violation of the Contract Clause of the United States and Commonwealth Constitutions.  Plaintiffs filed an Amended Complaint on October 29, 2018, seeking relief only as it relates to the four

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Commonwealth Legislature Acts (Acts 66-2014, 3-2017, 8-2017, and 26-2017) as allegedly violating the U.S. and Commonwealth Constitutions.  On January 25, 2019, defendants filed responses to the first amended complaint. On March 7, 2019, plaintiffs filed an omnibus objection to defendants' motions to dismiss.

- *Am. Fed. of Teachers, AFL-CIO, et al. v. Commonwealth of Puerto Rico*, Case No. 18-00134-LTS (D.P.R. Nov. 15, 2018)

On November 15, 2018, the American Federation of Teachers, AFL-CIO and American Federation of State, County & Municipal Employees, and AFL-CIO filed a complaint against the Commonwealth, Governor Rosselló Nevares, Raul Maldonado Gautier, Teresa Fuentes, The Retirement Board of Puerto Rico and its voting members, FAFAA, Banco Popular, the Oversight Board, and John Does 1-10 alleging unconstitutional takings by Banco Popular and the Commonwealth, seeking declaratory and injunctive relief along with damages and disgorgement.  The Oversight Board filed a motion to dismiss on January 8, 2019; plaintiff must respond by April 16, 2019, with the Oversight Board's reply due May 7, 2019.  All other defendants must respond to the complaint by April 16, 2019.

- *The Fin. Oversight and Mgmt. Bd. for Puerto Rico v. Puerto Rico Public Building Auth.*, Case No. 18-00149-LTS (D.P.R. Dec. 21, 2018)

On December 21, 2018, the Oversight Board and the Creditors' Committee filed this action seeking declaratory relief and disallowance of administrative rent claims, alleging that the PBA leases are not true leases, but rather "disguised financing transactions."  Multiple parties have filed motions to intervene.  On January 28, 2019, PBA responded to the complaint.  There has been no further docket activity.

- *Manuel Natal-Albelo, et al. v. The Fin. Oversight and Mgmt. Bd. for Puerto Rico*, Case No. 19-00003-LTS (D.P.R. Jan. 14, 2019)

On December 6, 2018, Manuel Natal Abelo, at-large independent representative in the House of Representatives of Puerto Rico, Rene Pinto-Lugo, and others, including Movimiento de Concertación Ciudadana Inc., (VAMOS) and various unions, filed a complaint (the Complaint) in the Commonwealth of Puerto Rico Court of First Instance, San Juan Superior Court (the Superior Court) (Civil No. SJ2018cv01569), against the Commonwealth of Puerto Rico and Carlos Mendez Nunez, in his official capacity as President of the House of Representatives of Puerto Rico (the Civil Action).

On December 17, 2018, the Complaint was served on the Puerto Rico Department of Justice. The Complaint contains two causes of action. The first cause of action alleges that the legislative process leading to the passing of Puerto Rico House Bill 1837 and the enactment of Act 241-2018, which created the legal structure necessary to execute the COFINA restructuring, was flawed and violated Puerto Rico House regulations as well as Natal's constitutional and civil rights under the Puerto Rico and United States Constitutions because he was not allowed to participate in debate prior to the bill's approval.  The first cause of action seeks a declaration that Act 241 is unconstitutional. The second cause of action alleges that Act 91-2006 (the COFINA legislation, as amended) and Act 241 (which is an amendment to the COFINA legislation, and which was signed into law by the Governor of Puerto Rico on November 15, 2018), violate the Commonwealth's Constitution's debt-limit and balanced-budget provisions.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On January 14, 2019, the Oversight Board, on behalf of the Commonwealth and COFINA, filed a notice of removal of the Civil Action to the Title III Court, where it became Adversary Proceeding No. 19-00003-LTS (D.P.R.), captioned Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board for Puerto Rico, et al. (the Adversary Proceeding). On January 15, 2019, the Title III Court referred the Adversary Proceeding to Magistrate Judge Judith Dein for general pre-trial management.

On February 5, 2019, the Title III Court issued the Amended Confirmation Order, confirming COFINA's Third Amended Plan of Adjustment, and the Amended Findings and Conclusions. In Paragraph 3 of the Amended Findings and Conclusions, the Title III Court took judicial notice of Act 241 (defined as the New Bond Legislation; see Exhibit A of the Amended Findings and Conclusions) and finds that the Act "has been duly enacted." See also Paragraph 120 of the Amended Findings and Conclusions (concluding that "[t]he Commonwealth's Legislative Assembly passed, and its Governor signed, the New Bond Legislation" and that "[p]ursuant to Puerto Rico case law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor."); n.14 of the Amended Findings and Conclusions (overruling the objections by Manuel Natal-Albelo and his co-objectors to the constitutionality of the New Bond Legislation under the United States and Commonwealth's Constitutions). On February 12, 2019, the Third Amended Plan of Adjustment was substantially consummated and became effective.

On February 18, 2019, Manuel Natal-Albelo, Rene Pinto-Lugo, and others, including VAMOS and various unions, filed a Notice of Appeal in the Title III Court [Case No. 17-03283, ECF No. 5155]. On February 22, 2019, the appeal was docketed with the United States Court of Appeals for the First Circuit under case number 19-1181; the appeal remains pending.

On March 21, 2019, the plaintiffs filed a motion to remand this case to the Superior Court, asserting that the Title III Court lacks subject matter jurisdiction over the Complaint because it pertains solely to violations of the Commonwealth's Constitution and Puerto Rico statutory law—not federal law—which do not involve rights created by Title III of PROMESA. As a result, the plaintiffs claim that the Complaint can only be adjudicated by a local Puerto Rico court.

*Commitments*

On November 23, 1998, a global settlement agreement (the Global Agreement) was entered into by and between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The Global Agreement calls for annual payments through the year 2025, which will vary due to inflationary and volume adjustments. Estimated payments to be received under the Global Agreement through the year ending June 30, 2025, amount to approximately $884 million. After 2025, the tobacco companies will continue making contributions in perpetuity. Pursuant to Act No. 173 of July 30, 1999, which created the Children's Trust (a blended component unit), the Commonwealth conditionally allocated and transferred to the Children's Trust the contributions that the Commonwealth is entitled to receive under the Global Agreement. Payments received under the Global Agreement and recognized as revenue during the year ended June 30, 2016, amounted to approximately $70.7 million. All of the revenue to be received under the Global Agreement and investment earnings on certain accounts under bond indentures is pledged as collateral for the Tobacco Settlement Asset Backed Bonds, Series 2002, 2005, and 2008. As of June 30, 2016, the approximate amount of the pledge is $1.4 billion, representing the approximate remaining principal and

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

interest of the aforementioned bond issuances, which are committed through May 15, 2057. Accordingly, until May 15, 2057, such revenue is not available for other purposes.

On November 23, 2010, the Legislature approved a new article 9A to Act No. 66 of June 22, 1978 (the Article), authorizing PRMeSA, a blended component unit, to incur obligations up to $285 million, under such terms and conditions approved by the Board of Member Institutions of PRMeSA and GDB, as fiscal agent of the Commonwealth and its instrumentalities. These additional funds must be deposited in a special account at GDB and may only be used for the following purposes:

(a) payment of debts to suppliers, agencies, institutions, and reserve fund for the self insurance (professional responsibility and interfund debt) of PRMeSA; and

(b) to provide operational liquidity to ease PRMeSA's fiscal situation, as determined by the agreement with GDB.

From savings generated as a result of the debt renegotiations with the agencies and institutions, PRMeSA will create a fund to cover operating expenses related to maintenance, overhaul, and the reconditioning of the physical plant. GDB, in its role as the Fiscal Agent, may possess the administrative mechanisms as it deems necessary to ensure that these funds will be used solely and exclusively for the purposes set forth in the Article. The special bank account and the funds deposited therein cannot be seized, syndicated, frozen, encumbered, or otherwise affected by decisions, judgments, orders, or rulings issued by courts of Justice of the Commonwealth or its agencies or public corporations during any adjudicative proceeding of an administrative or judicial nature, regardless of whether they were initiated by private individuals or public institutions. PRMeSA was required to develop and implement within one hundred eighty (180) days from the approval of the Article, an aggressive collection plan for the recovery of its accounts receivable. The Directors must report periodically to GDB on the implementation of that plan, and report annually to the Board of Member Institutions and GDB the collection proceeds arising from the execution of the plan. GDB was authorized as fiscal agent to undertake any necessary measures in order to, within a reasonable period of time, help PRMeSA to become and operate as an independent fiscal instrumentality. However, once the collection plan is working as expected and providing PRMeSA the resources required, and once PRMeSA becomes a financially independent institution as determined by GDB, PRMeSA will be required to assume the remaining established obligations.

The healthcare industry, under which PRMeSA operates, is subject to numerous laws and regulations, which include, among other things, matters such as government healthcare participation requirements, various licenses and accreditations, reimbursements for patient services, and Medicare and Medicaid fraud and abuse. Government action has increased with respect to investigations and/or allegations concerning possible violations of fraud and abuse and false claims statutes and/or regulations by healthcare providers. Providers that are found to have violated these laws and regulations may be subjected to fines or penalties. While management of PRMeSA believes its policies, procedures, and practices comply with governmental regulations, no assurance can be given that the Administration will not be subject to governmental inquires or actions.

The Health Insurance Portability and Accountability Act (HIPAA) was enacted in August 1996 to assure health insurance portability, reduce healthcare fraud and abuse, guarantee security and privacy of health information, and enforce standards for health information. Organizations are required to be in compliance with HIPAA provisions. Organizations are subject to significant fines and penalties if found not to be

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

compliant with the provisions outlined in the regulations. PRMeSA's management believes that they are in compliance.

The Health Information Technology for Economic and Clinical Health Act set meaningful use of interoperable Electronic Health Record (EHR) adoption in the health system as a critical national goal and incentivized the EHR adoption. Its goal is not adoption alone but meaningful use of EHRs, that is, their use by providers to achieve significant improvements in care. Meaningful use compliance is required before the Federal Fiscal Year 2016, otherwise, the hospital will incur penalties for noncompliance that may reduce future Medicare payments and potentially Medicare Advantage program payments. The Centers for Medicare and Medicaid Services (CMS) manages and has implemented an incentive program for those hospitals that implement EHR and comply with certain specific requirements. CMS' EHR Incentive Programs provide incentive payments to eligible hospitals as they adopt, implement, upgrade, or demonstrate meaningful use, as defined by CMS, of certified EHR technology. As of June 30, 2016, PRMeSA is under the implementation of its EHR system.

The SCPT has financial assistance agreements with several municipalities of the Commonwealth to provide funding for the construction, improvement, and rehabilitation of certain projects of the Special Communities. At June 30, 2016, the SCPT's accumulated budgeted balances on these agreements amounted to approximately $1,092 million, from which a total of approximately $1,027 million had been disbursed.

As of June 30, 2016, the following blended component units maintained various unspent construction and assistance commitments as follows (in thousands):

| Entity | | Amount |
|---|---|---|
| Puerto Rico Public Housing Administration | $ | 138,200 |
| UPRCCC | | 8,583 |
| PBA | | 4,800 |
| PRIFA | | 32,200 |
| Total | $ | 183,783 |

The Commonwealth is also committed under numerous noncancelable long-term operating lease agreements, which expire through 2033, covering land, office facilities, and equipment. Rental expenditure within the governmental funds for the year ended June 30, 2016 under such operating leases was approximately $129 million.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The future minimum lease payments for these leases were as follows (in thousands):

| Years ending June 30: | | |
|---|---|---:|
| 2017 | $ | 87,030 |
| 2018 | | 69,721 |
| 2019 | | 56,489 |
| 2020 | | 39,566 |
| 2021 | | 26,745 |
| 2022–2026 | | 68,137 |
| 2027–2031 | | 23,751 |
| 2032–2033 | | 2,394 |
| Total future minimum lease payments | $ | 373,833 |

*Environmental Commitments and Contingencies*

The Commonwealth accounts for pollution remediation obligations in accordance with GASB Statement No. 49, *Accounting and Financial Reporting for Pollution Remediation Obligations*. This Statement addresses accounting and financial reporting standards for pollution (including contamination) remediation obligations, which are obligations to address the current or potential detrimental effects of existing pollution by participating in pollution remediation activities such as site assessments and cleanups. The scope excludes pollution prevention or control obligations with respect to current operations, and future pollution remediation activities that are required upon retirement of an asset, such as landfill closure and postclosure care.

Once any of five specified obligating events occurs, a government is required to estimate the components of expected pollution remediation outlays and determine whether outlays for those components should be accrued as a liability or, if appropriate, capitalized when goods and services are acquired. Obligating events include the following:

- The government is compelled to take pollution remediation action because of an imminent endangerment.

- The government violates a pollution prevention related permit or license.

- The government is named, or evidence indicates that it will be named, by a regulator as a responsible party or potentially responsible party (PRP) for remediation, or as a government responsible for sharing costs.

- The government is named, or evidence indicates that it will be named, in a lawsuit to compel participation in pollution remediation.

- The government commences or legally obligates itself to commence pollution remediation.

On June 16, 2014, the USDOJ, acting on behalf of the United States Environmental Protection Agency (EPA), filed a complaint alleging unauthorized discharges of pollutants from the storm sewer systems owned and/or operated by the Municipality of San Juan (MSJ), the Department of Transportation and Public Works (DTPW), and the PRHTA through certain flood control pump stations owned and operated

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

by the Department of Natural and Environmental Resources (DNER), into the waters of the United States, in violation of the Federal Clean Water Act. The complaint seeks the assessment of civil penalties against MSJ, DTPW/PRHTA, DNER and the Commonwealth (collectively, the Puerto Rico Defendants) for past and present violations of up to $32,500 per day per violation, for those violations that occurred between February 5, 2007 and January 12, 2009; and $37,500 per day per violation, for those violations that occurred from January 13, 2009 to the present. The complaint further seeks injunctive relief to bring the defendants into compliance with the Municipal Separate Storm Sewer Systems Permit. MSJ, DNER, and DTPW/PRHTA individually resolved the complaint by entering into three separate consent decrees with USDOJ/EPA. Pursuant to the settlement negotiations, and taking into considerations the economic impact of a civil penalty and the Puerto Rico Defendants' documented inability to pay a penalty, USDOJ/EPA agreed to waive the monetary civil penalty associated with the provisions alleged in the complaint. Thus, the three consent decrees focus on injunctive relief to enable the Puerto Rico Defendants to attain compliance with applicable statutory and regulatory provisions. The MSJ consent decree was lodged with the U.S. District Court for the District of Puerto Rico (District Court) on October 26, 2015. The DNER and the DTPW/PRHTA consent decrees were both lodged with the District Court on December 23, 2015. At this time, USDOJ has not yet filed a motion with the District Court for entry of the consent decrees, as USDOJ/EPA is evaluating public comments received during the mandatory public period pursuant to 28 C.F.R.£50.7.

**Fiduciary Funds**

ERS is a defendant in a lawsuit challenging the constitutionality of Act No. 3 of 2013 and in another lawsuit challenging the constitutionality of Act No. 3 and Act No. 32 of 2013. In the first lawsuit, the plaintiffs requested the ERS to honor the participants of an employer of the ERS, the benefits available to them under Act No. 447 which were affected by Act No. 3 of 2013, with the economic consequences that this would entail. On February 13, 2015, the Puerto Rico Supreme Court denied the plaintiff's recourse. On March 6, 2014, the plaintiffs filed an amended complaint, including the Board of Trustees of the ERS as a defendant and including a tort claim against the ERS's Administration and its Board of Trustees. In the second lawsuit, the plaintiffs requested the annulment of the provisions of law imposing economic obligations to municipalities in favor of the ERS. Act No. 3 of 2013 imposed a $2,000 contribution to all municipalities and public corporations for every retiree as of June 30, 2013 and Act No. 32 of 2013 imposed an additional uniform contribution according to the corresponding proportion of the employer's contributions. On May 5, 2015, the Puerto Rico First Court of Instance issued a judgment dismissing the case. On July 27, 2015, the plaintiffs filed an appeal at the Puerto Rico Court of Appeals. On January 5, 2016, the Puerto Rico Court of Appeals upheld the decision regarding the dismissal of the case. On April 5, 2016, the plaintiffs filed a Certiorari before the Puerto Rico Supreme Court. The Puerto Rico Supreme Court has yet to issue a ruling regarding this. Although economic compensation was not requested in this second case, if a ruling declaring invalidity of the questioned articles is made by the Puerto Rico Supreme Court, the ERS will not receive the payments imposed by Act No. 3 and Act No. 32 of 2013 to the municipality and the ERS will probably have to refund payments already made under those law provisions. With respect to these lawsuits, the ERS, in consultation with legal counsel, has advised that at this stage of the proceedings they cannot offer an opinion as to the probable outcome. Accordingly, management does not consider it necessary to make any provision in its books for these cases and intends to contest them vigorously.

ERS is also a defendant in a lawsuit brought by pensioners of ERS. They filed the claim on behalf of ERS against the underwriters of certain ERS pension bonds and some of the former members of the

253

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Board of Trustees of ERS. The complaint requested $800 million in damages resulting from the $3 billion bond issuance in 2008 that according to the plaintiffs compromised the solvency of ERS. As of June 30, 2016, this case was in its initial stages; therefore, no provision for any liability that may result upon adjudication of this lawsuit has been recorded by ERS in its fiduciary funds for fiscal year 2016. As of May 21, 2017, ERS is a debtor in a Title III case under PROMESA and, as a result, this case is stayed during the pendency of ERS' Title III case.

TRS is a defendant in one lawsuit filed by several groups representing the teachers alleging that, since the Puerto Rico Supreme Court declared unconstitutional the subsection in Act No. 160 of 2013 that established the interest rate to be paid by a member for the accreditation of services rendered but not credited, TRS is unable to charge 9.5% interest on account of service credit. Prior to the adoption of Act No. 160 of 2013, the interest rate applicable in respect of such accreditation stood at 2% as per Board Resolution. TRS believes that the claimant's allegations are not legally sustainable, and the 9.5% interest rate is valid given that the percentage interest is not a contractual right of the active members; as it was not established in Act 91 of 2004, previous law of TRS. It is TRS's opinion, in consultation with legal counsel, that what the Puerto Rico Supreme Court ruled as unconstitutional is that active participants could only pay for unaccredited services up to July 31, 2014. With the Puerto Rico Supreme Court's ruling, active participants can continue to pay for unaccredited services and the interest to be charged is defined in Article 1, which was not declared unconstitutional. The Board of Trustees of TRS addressed the issue administratively by unanimously approving a resolution, retroactive to December 24, 2013, by which it determined that the interest rate to be paid by a member for the accreditation of services rendered but not credited will be 9.5%.

On October 21, 2016, the Puerto Rico Supreme Court ruled against the petition for reconsideration requested by TRS regarding the retroactive application of 9.5% interest rate on not credited services as explained above. The Supreme Court resolved that the applicable interest rate for not credited services for all participants is 2% until September 2, 2015 and 9.5% thereafter, instead of applying 9.5% interest rate since December 24, 2013. Based on this determination, it is probable that TRS will be required to reimburse the amounts already collected in excess of 2% and honor the 2% for all cases pending and new applications submitted. The actual and actuarial impact of granting such accreditation has not been determined as of the date of this report. TRS is contemplating a re consideration request from the Supreme Court. The Board of Trustees of TRS, in consultation with legal counsel, is unable to assess the likelihood of an adverse resolution of the case. At this time, it is not possible to determine the financial impact of said outcome.

In addition, each of the Retirement Systems is a defendant or co defendant in various lawsuits resulting from the ordinary conduct of its operations. Based on the advice of legal counsel and considering insurance coverages, management is of the opinion that the ultimate liability, if any, will not have a significant effect on the financial status of each of the Retirement Systems.

**Discretely Presented Component Units**

On June 28, 2014, the Commonwealth enacted Act 71 2014, known as the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (Recovery Act). The Recovery Act was intended to fill the void that currently exists with respect to an orderly legal process governing the enforcement and restructuring of the debts and other obligations of a public corporation, due to the general inapplicability of Chapters 9 and 11 of the United States Bankruptcy Code to public corporations that are governmental

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

instrumentalities of the Commonwealth. The purpose of the Recovery Act was to create a legal framework that: (1) allows public corporations to adjust their debts in a manner that protects the interests of all affected creditors; (2) provides procedures for the orderly enforcement and restructuring of a public corporation's debt in a manner that is consistent with the United States and Commonwealth Constitution; and (3) maximizes the return to the public corporation's stakeholders.

The Recovery Act did not apply to the Commonwealth. It applied solely to public corporations, other than the following: the Children's Trust; ERS; GDB and its subsidiaries, affiliates, and any entities ascribed to GDB; JRS; MFA; the Municipal Finance Corporation; PFC; PRIDCO, AFICA; PRIFA; COFINA; TRS; and UPR.

On February 6, 2015, the United States District Court for the District of Puerto Rico issued an opinion and order declaring the Recovery Act unconstitutional and stating that it was preempted by the United States Bankruptcy Code. The District Court's decision was upheld by the United States Court of Appeals for the First Circuit (the First Circuit) and subsequently upheld by the Supreme Court of the United States (the Supreme Court).

In the normal course of their operations, various Component Units are also subject to guarantees and other actions brought by third parties seeking damages or entering into commitments. Such actions are disclosed in the separately issued reports of the major component units, included below. With respect to commitments related to guarantees, certain nonmajor component units engaged in the financial services industry were also included for informative purposes. These commitments and guarantees are summarized below:

**(a) GDB**

At June 30, 2016, GDB had financial guarantees for the private sector of approximately $330 million. In addition, at June 30, 2016, standby letters of credit to the public-sector were approximately $1.3 billion. Commitments to extend credit to the public-sector were approximately $1.4 billion, while there were no commitments to extend credit to the private sector.

On July 24, 2013, Aerostar Airport Holdings, LLC (Aerostar) and PRPA entered into a lease agreement of Luis Muñoz Marín International Airport (LMMIA), for a term of 40 years. In connection with the lease of LMMIA, GDB executed a payment guarantee in favor of Aerostar for any Termination Damages due and payable in cash by PRPA under the lease agreement. In accordance with GDB's guarantee, Aerostar has the right to terminate the lease agreement mainly under three different noncompliance scenarios on the part of PRPA. The amount of Termination Damages mainly consists, among other components, of the LMMIA Facility Leasehold Value and Leasehold Compensation as defined in the agreement.

On September 22, 2011, Autopistas Metropolitanas de Puerto Rico, LLC (Metropistas) and PRHTA entered into a concession agreement (the Concession Agreement) for the administration of the toll roads PR-22 and PR-5, for which PRHTA received in exchange a lump sum payment of $1.1 billion and a commitment to make immediate improvements to the toll roads amounting to $56 million and to comply with world class operating standards, which may require investing more than $600 million over the life of the concession. In connection with the closing of the Concession Agreement, GDB executed a payment guarantee in favor of Metropistas pursuant to which GDB acts as guarantor of any Termination Damages, as defined in the Concession Agreement, due and payable in cash by PRHTA under the Concession Agreement. The amount of Termination Damages consists, among other components, of the fair market

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

value of Metropistas' interest in the toll roads. At the same time, in connection with the payment guarantee, GDB and PRHTA also entered into a Reimbursement Agreement whereby PRHTA agreed to reimburse GDB for any amounts paid under the guarantee.

On August 18, 2002, the Legislature approved Act No. 198, which created the Cooperative Development Investment Fund (Development Fund). The purpose of this fund is to promote the development of cooperative entities. This fund will be capitalized through contributions to be provided by GDB up to $25 million to be matched by cooperative entities. As of June 30, 2016, GDB has contributed $23.4 million to the Cooperative Development Investment Fund, $1.5 million of which was contributed during the year ended June 30, 2016.

On January 19, 2012, the Boards of Directors of GDB and the Development Fund approved a loan guaranty program (the Guaranty Program) to stimulate lending by private banks to businesses in Puerto Rico in order to promote job creation and economic development in Puerto Rico. On April 3, 2012, GDB, the Development Fund and certain participating banks entered into guarantee and commitment and funding agreements in which the Development Fund will guarantee eligible loans made by those banks to eligible businesses up to a maximum of 30% of the principal amount of the loans, in accordance with criteria established in the Guaranty Program. GDB had committed to provide up to $200 million to the Development Fund to enable it to honor payments related to guarantees issued under the Guaranty Program. The Guaranty Program had a term of one year, and it ended on April 2, 2013. As of June 30, 2016, the total loan balance under the Guaranty Program amounted to approximately $43.4 million. The guarantee issued for each loan is in effect for a maximum term of seven years. The best estimate of the discounted present value of the future outflows expected to be incurred under the Development Fund's loan guaranty program has been determined to be approximately $1.5 million at June 30, 2016, reflecting a decrease during fiscal year 2016 of approximately $1.7 million, mostly as a result of loans removed from the guaranty program by the corresponding private bank.

The Development Fund has entered into an agreement (the Agreement) with EDB whereby the Development Fund would guarantee a portion of loans granted by the EDB under a government program named The Key for Your Business (the Program). Under the Agreement, the Development Fund would assign $15 million of its capital for the program. The Development Fund guarantees one third of the outstanding principal balance of each loan plus accrued interest and certain other charges. The Development Fund charges one percent of the loan amount as a guarantee fee and no loan can exceed $50,000. As of June 30, 2016, the outstanding balance of these loans guaranteed by the Development Fund amounted to approximately $1.7 million. The best estimate of the discounted present value of the future outflows expected to be incurred under the Development Fund's Key for Your Business Program has been determined to be approximately $444 thousand at June 30, 2016, reflecting a decrease of approximately $20 thousand, mostly due to guaranty payments made during the year.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The Housing Finance Authority acts as servicer for a number of mortgage loans owned by other investors. The servicing is generally subcontracted to a third party. As of June 30, 2016, the principal balance of the mortgage loans serviced for others is approximately as follows (in thousands):

| Entiy | Amount |
|-------|--------|
| Puerto Rico Community Development Fund I | $ 29,301 |
| Office for the Administration of the Assets of the Urban Renovation and Housing Corporation or its successor without guaranteed mortgage loan payments | 20 |
| Total | $ 29,321 |

The U.S. Office of Inspector General (OIG) has performed various examinations of the HOME Program covering fiscal years ended prior to July 1, 2010. These examinations covered periods in which the HOME Program was under the administration of the Commonwealth Department of Housing. These examinations identified instances of non-compliance with terms and conditions of the grant agreements, applicable federal law, and the HOME Program's regulations, including but not limited to the expenditure of resources for ineligible purposes. OIG identified in its examinations disallowed costs amounting to approximately $18.3 million. The Housing Finance Authority recorded a contingency for such disallowed costs, and additional amounts identified internally as potential disallowances, amounting to approximately $20.4 million. On October 1, 2013, the Housing Finance Authority entered into a three-year repayment plan, starting on February 1, 2016, to reimburse HOME Program beginning on October 15, 2013 approximately $1.8 million that were determined to be disallowed costs within the $18.3 million discussed above.

On July 31, 2014, the Governor signed the HOME Voluntary Repayment Settlement Agreement (the HUD Agreement) with HUD. The HUD Agreement establishes the reimbursement to the HOME Program of $14.2 million, from nonfederal funds, for disallowed expenditures in connection with HUD-funded projects, as defined and described in the Agreement, in two installments of $10 million and $4.2 million due on October 1, 2014 and October 1, 2015, respectively.  The Housing Finance Authority has already complied with these installments.

Other federal programs are also subject to audits. Such audits could result in claims against the resources of the Housing Finance Authority. No provision has been made for any liabilities that may arise from such amounts since the amount, if any, cannot be determined at this date.

GDB and certain of its component units are defendants in several lawsuits arising out of the normal course of business. Management, based on advice of legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings will not have a material adverse effect on the financial position and results of operations of GDB or its component units.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

#### (b) *PRHTA*

PRHTA is a defendant or codefendant in various lawsuits for alleged damages in cases principally related to construction projects. These are generally either fully or partially covered by insurance. The contactors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless PRHTA from lawsuits brought on account of damages relating to the construction of the projects. As of June 30, 2016, PRHTA, based on legal advice, has recorded a liability of approximately $127 million for probable losses on those claims not fully covered by insurance. In the opinion of legal counsel, any liability in excess of the recorded liability that may arise for such claims will not be significant to PRHTA's financial position or results of operations. As of May 21, 2017, PRHTA is a debtor in a Title III case under PROMESA and, as a result, these cases are stayed during the pendency of PRHTA's Title III case.

PRHTA entered into a System and Test Track Turnkey Contract (STTT Contract) with Siemens Transportation Partnership Puerto Rico, S.E. (Siemens) and other contractors for the purpose of operating and maintaining the Urban Train. During 2005, the STTT Contract became effective upon execution of the contract for an initial term of five years with an option by PRHTA to extend the term for an additional five years. The compensation is based on a schedule included in the master agreement, which approximates $4.0 million on a monthly basis. The total annual operation and maintenance cost, including cost of issuance and electricity, for fiscal year 2016 was approximately $56.6 million.

#### (c) *PREPA*

PREPA is a defendant or codefendant in several lawsuits incidental to its business, some involving substantial amounts. In those instances, that management and legal counsel believe that the outcome of the litigation will be unfavorable to PREPA, a provision has been made to cover the estimated liability. PREPA's management, based on discussions with legal counsel, believes that the additional liability, if any, resulting from the ultimate resolution of these matters will not have a material effect on PREPA's financial position or results of operations. As of July 2, 2017, PREPA is a debtor in a Title III case under PROMESA and, as a result, these cases are stayed during the pendency of PREPA's Title III case.

On May 18, 2000, Abengoa, Puerto Rico, S.E. (Abengoa), PREPA's contractor for the repowering of San Juan steam plant units 5 and 6, unilaterally declared a termination of the contract with PREPA and filed a complaint for breach of contract. This litigation was bifurcated into a liability and damages phase. Trial on the first phase to determine breach of contract commenced on January 22, 2015 and was concluded during the course of that same year. Trial on the second phase to determine damages and economic terms was scheduled to commence in 2016; but later postponed until January 16, 2018. Economic claims have been reserved for this second phase of the trial on damages. PREPA is prepared to prove direct damages arising from the wrongful termination by Abengoa (i.e. direct costs to complete Abengoa's scope of work, equipment refurbishment, etc.). in an amount of at least $250 million. If recovery of indirect or consequential damages is permitted by the Court, PREPA has claimed in excess of $400 million (including claims for fuel differential costs, loss of EPA credits, etc.).

The limit of the liability under the EPC Contract is 150% of the Contract Price. This represents a range of between $276 million and $310.5 million depending on which value is considered the Contract Price at the time of termination. The penal sum of all Performance Bonds issued by the surety in the aggregate is approximately $190 million.

258

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

PREPA understands that it has significant probabilities of prevailing on the merits or its counterclaim for wrongful termination against Abengoa and its surety insurance company. The evidence will show that Abengoa chose to terminate the Contract with knowledge of or total disregard of the financial damage that such termination would cause.

In 2009, a large fire at a tank farm owned by Caribbean Petroleum Corporation (CAPECO) caused major damage to surrounding areas. PREPA stored some of its fuel at this facility. In the aftermath of the fire, numerous claims were filed against CAPECO. Some of the plaintiffs included PREPA as a defendant in these suits, alleging that PREPA failed in its duty (as the owner of fuel stored at the site) to properly monitor CAPECO's operations in the tank farm. All cases are in the initial stages and PREPA intends to vigorously defend against these claims. On August 12, 2010, CAPECO filed for bankruptcy. As a result, thereof all proceedings against CAPECO have been stayed. Subsequently, CAPECO's bankruptcy proceeding ended. The proceedings against PREPA continue.

In 2011, separate lawsuits were filed against PREPA by various consumers claiming damages allegedly caused by incorrect and unlawful billing and invoicing practices. The lawsuits have been consolidated and certified as complex litigation, as requested by PREPA. The consumers are claiming damages in excess of $100 million and requested that the case be certified as a class action. PREPA filed its reply in opposition to the class certification request. Discovery proceedings are still being conducted in those cases that have not been dismissed yet. On December 7, 2016, a Status Conference was held, and a new judge was assigned. On March 23, 2017, a conference was held and as a result thereof a hearing for class certification was scheduled on August 16, 2017. However, on July 2, 2017, PREPA filed for bankruptcy under Title III of PROMESA. PREPA filed the notice of stay before the state court on July 12, 2017 and the corresponding judgment staying the case was entered on August 11, 2017. PREPA will vigorously defend these cases and maintains that there is no cause of action against PREPA.

In 2011, a civil lawsuit was filed against PREPA and its directors in federal court in Puerto Rico, by eight private individuals and one local private corporation, claiming violations of the Racketeer Influenced and Corrupt Organizations Act (the RICO Act), including unlawful use of an enterprise to launder money generated by a pattern of racketeering activity, unlawful manipulation of an enterprise for purposes of engaging in, concealing, or benefiting from a pattern of racketeering activity, unlawful conspiracy to violate the RICO Act, and conspiracy to advance a money laundering scheme. Neither the United States federal government nor the Commonwealth government is a party in this civil lawsuit. The amount claimed is unspecified. Plaintiffs have also asked the federal court to allow them to be the representatives of a class consisting of all consumers of the electricity sold by PREPA from 2007 to the present. PREPA opposed the certification of class action and was denied by the court. On September 25, 2012, the federal court dismissed all of the above claims except those claims regarding conspiracy to advance a money laundering scheme and conspiracy for acquiring an interest in an enterprise. PREPA believes that the undismissed RICO Act claims are without merit because the plaintiffs will be unable to prove the necessary elements of those claims, in particular those that require showing that PREPA conspired through its employees to violate the RICO Act, or that its directors or Board members obtained any interest in PREPA (other than their Board position). PREPA will continue to vigorously defend this case.

In 2009, PREPA filed a lawsuit in Commonwealth court against Vitol, Inc. and certain of its affiliates and subsidiaries seeking a declaratory judgment as to the nullity of a $2 billion fuel supply agreement due to Vitol's failure to disclose certain corruption cases for which it accepted responsibility. Vitol removed this lawsuit to federal court and presented a counterclaim alleging that PREPA owed it approximately

259

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

$45 million for delivered fuel and related excise taxes. On November 28, 2012, PREPA filed a second complaint against Vitol in the Commonwealth of Puerto Rico Court of First Instance seeking essentially the same remedies sought in the first action but as to four other contracts, after discovery revealed the date in which Vitol learned of the investigations in the corruption cases. Vitol also removed this action to the U.S. District Court for the District of Puerto Rico. PREPA claims approximately $3.5 billion in the aggregate. Vitol has resolved the claim for the $17 million in excise taxes and has stated that it will amend its counterclaim to dismiss that claim. Discovery in the case is closed. The parties have submitted motions for summary judgment against each other and are in the process of filing their respective oppositions thereto. The motions are pending adjudication by the court.

Fifty-four plaintiffs, former and current PREPA employees, claim that they have health problems due to PREPA's intentional failure to comply with federal and local laws regarding asbestos materials. In particular, plaintiffs claim that, during a certain time frame, in which PREPA had the obligation to take measures regarding asbestos materials in its facilities, PREPA failed to comply with its duty to protect the plaintiffs from asbestos exposure. Plaintiffs claim approximately $321 million in damages. PREPA alleged employer's immunity under the Workers' Compensation Law. An evidentiary hearing on the issue took place. After trial, the Court entered judgment dismissing the claims in their entirety. The plaintiffs filed an appeal before the Puerto Rico Appeals Court. PREPA filed a motion to dismiss the appeal. The Appeals Court denied PREPA's motion to dismiss and PREPA filed its appellate brief. The case is pending adjudication by the Appeals Court.

On November 21, 2013, Tropical Solar Farms, LLC; New Horizon Solar, LLC; Jonas Solar Energy, LLC; and Roberto Torres (collectively, the Plaintiffs) filed a suit in the Commonwealth of Puerto Rico Court of First Instance, Ponce Section, against 29 defendants and several John Does. The complaint contains a plethora of claims against multiple defendants arising from an alleged multiplicity of sources of obligations: contractual, in tort, and in breach of fiduciary duties and the law. It encompasses private entities, a public corporation, PREPA and former public officers, among others. The complaint claims monetary compensation in excess of $705 million. The complaint alleges that the defendants negotiated several Renewable Power Purchase Agreements to provide up to 40 megawatts to PREPA, all of which were assigned by the plaintiffs to various other defendants. The Plaintiffs allege that the defendants never intended to comply with their obligations under the agreements, and were only buying time to advance their other renewable energy projects with PREPA.

PREPA filed a motion to dismiss and on October 2, 2015, a partial judgment was entered dismissing all claims in the case against PREPA with prejudice. Tropical Solar appealed the dismissal to the Puerto Rico Court of Appeals. On appeal, the Puerto Rico Courts of Appeals modified the dismissal on the claims against PREPA from a dismissal with prejudice to a dismissal without prejudice. Any subsequent claims asserted by Tropical Solar against PREPA will be addressed in PREPA's Title III proceeding.

In addition to these cases, PREPA is involved in other typical litigations for an electric power utility, but management estimates the amounts of such claims are not material and will not affect adversely PREPA's operations. These other cases remain in discovery stages and PREPA will defend them vigorously.

Securities and Exchange Commission Investigation

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The United States Securities and Exchange Commission (SEC) requested information about certain bond issuance of PREPA dating back to 2012 and 2013. PREPA is cooperating in the inquiry, including providing the SEC with documents and information. The SEC has also sent what is known as Wells letter notifications to PREPA as well as to investment bankers, financial advisors and legal advisors who helped structure all the related bond issuances under the scope of its investigation. Wells letters notify the recipient that is being investigated by the SEC and presents an opportunity for all recipients of such notifications to respond to any allegations from the SEC. The SEC has advised that the information requests should not be construed as an indication that any violation of the federal securities laws has occurred. PREPA continues to cooperate with the SEC regarding their investigation with respect to these bond issuances. This matter is ongoing and, it cannot be predicted when it will be concluded or its outcome.

*(d)* *PRASA*

PRASA is the defendant in a lawsuit presented by customers alleging that PRASA has over billed them due to the methodology used to estimate consumption. There is one case in which plaintiffs requested a certification of the suit as a class action and seek recovery damages and an injunction enjoining PRASA from continuing to bill using the current methodology. The class certification hearing took place in June 2011, a certification to a class action was issued. PRASA appealed the class action certification and is expecting the Court decision on the request. PRASA's potential exposure from these lawsuits is unlikely and, as such, no liability is being reported on the accompanying basic financial statements.

PRASA is the defendant or codefendant in various other lawsuits. The ultimate outcome of the lawsuits cannot presently be determined. However, PRASA's management, based on the advice of legal counsels, is of the opinion that these lawsuits will not have a material impact on their standalone financial statements.

*Environmental Commitments and Consent Decree*

On September 15, 2015, the USDOJ, acting at the request of the Administrator of EPA, filed a complaint against PRASA and the Commonwealth, as a required party under the Clean Water Act (defined below), in the United States District Court for the District of Puerto Rico. The Complaint seeks injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the Federal Water Pollution Control Act enacted in 1956, as amended by the federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, and the Water Quality Act of 1987, as amended (the Clean Water Act). Concurrently with the filing of the complaint, USDOJ also filed a consent decree (the 2015 EPA Consent Decree) executed among EPA, PRASA, and the Commonwealth settling the matters addressed in the complaint, under the terms agreed upon by PRASA and EPA. The 2015 EPA Consent Decree is the result of an extensive negotiation process aimed, among other things, at resolving the claims addressed in the complaint and the requirements of various existing consent decrees entered in 2003, 2006 and 2010 (collectively the EPA Consent Decrees) related to the allegations included in the complaint. EPA and PRASA acknowledged in the 2015 EPA Consent Decree the work to be undertaken thereunder will enable PRASA to better understand its sewer systems, but will not resolve all of PRASA's Clean Water Act obligations with respect to such systems. The Commonwealth will incur a liability under the 2015 EPA Consent Decree only to the extent that the laws of the Commonwealth prevent PRASA from raising revenue needed to comply with the 2015 EPA Consent Decree. The Commonwealth has represented under the 2015 EPA Consent Decree that its present laws do not prevent PRASA from raising the revenue needed to comply with the obligations it has incurred thereunder.

261

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by PRASA in order to mitigate the high construction-in-progress costs mandated by the Existing Consent Decrees, representing 60% of construction-in-progress cost and an approximate cost of $1.4 billion during fiscal years 2006–2014. Another $1.7 billion of mandatory compliance projects would be required under the Existing Consent Decrees, in their current form, through fiscal year 2025. Despite being in material compliance with the capital improvement project requirements of the Existing Consent Decrees, PRASA began discussions with the USDOJ, on behalf of EPA, the EPA and the Commonwealth Department of Health seeking to amend the Existing Consent Decrees, in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in PRASA's construction-in-progress not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance, and capital improvement program requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows. The resulting 2015 EPA Consent Decree is expected to realign the cost of these projects and activities with PRASA's current financial condition and economic prospects.

On May 23, 2016, the District Court entered judgment approving the 2015 EPA Consent Decree as presented on May 10, 2016. The complaint was dismissed with prejudice and civil case number 15-2283 was closed. PRASA expects that with the final approval of the 2015 EPA Consent Decree, it will be able to finalize the proposed amendment to the 2006 Drinking Water Settlement Agreement under terms substantially similar to those currently being negotiated with DOH. The agreement established a prioritization system to manage and comply with the required capital improvements projects based on PRASA's financing capability, without affecting the regulatory and compliance requirements.

On December 2016, PRASA requested a time extension to EPA pursuant to Section XIII-Modification/Prioritization of Remedial Measures for certain projects of the Consent Decree which include the remedial measures to address Wastewater Discharges at Water and Wastewater Treatment Plants.

*(e) UPR*

UPR participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of the OMB Circular A 133, *Audits of States, Local Governments, and Non-Profit Organizations*, or to compliance audits by grantor agencies. The amount, if any, of expenditures that may be disallowed by the granting agencies cannot be determined at this time. Management believes the impact will not be material to UPR's financial statements.

Medical malpractice claims have been asserted against UPR hospital and are currently at various stages of litigation. It is the opinion of the UPR hospital's legal counsel and management that the recorded accruals are adequate to provide for potential losses resulting from pending or threatened litigation, as well as claims from unknown incidents that may be asserted arising from services provided to patients. Under Act No. 98 of August 24, 1994, maximum claims loss against UPR hospital is limited to $75,000 per person, or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. It is the opinion of UPR hospital's management and its legal counsel that the outcome of these claims would not have a material effect on UPR or the hospital's operations.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Environmental Commitments and Contingencies*

The following discretely presented component units' operations are the ones carrying and involved in specific activities that are subject to state and federal environmental regulations:

### (a) PREPA

Facilities and operations of PREPA are subject to regulation under numerous federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, Oil Pollution Act (OPA), Resource Conservation Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and Underground Storage Tanks, among others.

In February 1992, the Environmental Protection Agency (EPA) conducted a multimedia inspection of PREPA's facilities and identified several alleged instances of noncompliance related to PREPA's air, water, and oil spill prevention control and countermeasures compliance programs. PREPA and the EPA negotiated to resolve the issues regarding the deficiencies observed during the inspection and to ensure future compliance with all applicable laws and regulations. As a result of the negotiations, PREPA and the EPA reached an agreement that resulted in a consent decree (the Consent Decree) approved by the United States federal court in March 1999. Under the terms and conditions of the Consent Decree, PREPA paid a civil penalty of $1.5 million, and implemented additional compliance measures amounting to $4.5 million. In addition, the Consent Decree requires that PREPA improve and implement compliance programs and operations in order to assure compliance with environmental laws and regulations.

In 2004, the United States federal court approved a modification to the Consent Decree agreed to by PREPA and the EPA under which PREPA reduced, in two steps, the sulfur content in the No. 6 fuel oil used in certain generating units of its Costa Sur and Aguirre power plants (to 0.75% or less by March 1, 2005 and to 0.5% or less by March 1, 2007), and used No. 6 fuel oil with sulfur content of not more than 0.5% through July 18, 2009 at its Palo Seco and San Juan power plants. Additionally, PREPA has completed a nitrogen oxide emissions reduction program and modified the optimal operating ranges for all its units under the Consent Decree. PREPA also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs under the Consent Decree.

PREPA has been audited several times for compliance with the Consent Decree programs, and understands that a considerable number of them can be closed since their requirements have been completed. On July 22, 2014, representatives from PREPA, EPA, and USDOJ met to begin the discussion towards the termination of some of the programs. As a result, the EPA and the USDOJ requested PREPA to submit information regarding PREPA's compliance with the Programs for their review and evaluation. On September 25, 2014, PREPA met again with EPA and USDOJ representatives and submitted the information requested, along with a letter where PREPA formally requested the EPA to review and approve the termination of those programs provisions of the Consent Decree and its Modification of 2004 presented, as well as begin the process toward jointly filing in the Court a stipulation for Partial Termination of such programs. To accomplish this goal, PREPA suggested to appoint a task force composed of EPA and PREPA representatives to schedule and meet to address the details which EPA agreed to. On May 27 and 28, 2015, PREPA, EPA, and USDOJ legal representatives met to begin discussions about PREPA's termination claims, as well as define any additional documentation requested to support and demonstrate PREPA's determination of compliance with the different programs obligations. EPA, PREPA, and USDOJ representatives continue with a thorough evaluation and discussion process about this matter. As of May 2018, task force meetings between PREPA and EPA

263

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

have been held, and a draft of the document is being reviewed by EPA and DOJ. Once the document is final it has to go through a public process for its final approval.

Since September 2004, there has been no legal action in the United States federal courts or any administrative proceeding against PREPA regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of noncompliance. Noncompliance events must be disclosed to EPA in the corresponding report. Ordinarily, when a covered noncompliance event occurs, PREPA pays the stipulated penalty in advance in order to benefit from a 50% discount of the applicable stipulated penalty.

In 2002, PREPA received a "Special Notice Concerning Remedial Investigation/Feasibility Study for Soil" at the Vega Baja Solid Waste Disposal Superfund Site. The EPA has identified PREPA and six other entities as "potentially responsible parties," as defined in the CERCLA. In 2003, PREPA agreed to join the other potentially responsible parties in an Administrative Order on Consent (AOC) for a Remedial Investigation/Feasibility Study (RI/FS), with the understanding that such agreement did not constitute an acceptance or responsibility. Under the AOC, PREPA committed up to $250,000 as its contribution to partially fund the RI/FS. At this time, the RI/FS has been completed. The work proceeded in accordance with the schedule established by PREPA and the other designated (PRPs). In July 2010, a proposed plan was issued identifying the Preferred Alternative to address soil contamination at the Vega Baja Solid Waste Disposal Site. EPA held a public hearing on August 3, 2010 to discuss the alternatives to address soil contamination.

The Record of Decision (ROD) was published as scheduled by EPA on September 30, 2011. Alternative No. 2, Removal with On Site Consolidation and Cover in the Non-Residential Area, was selected. From this point on, EPA resumed negotiations with the PRP's, both private and public, toward signing a Consent Decree through which the PRP's would contribute enough funds to cover the costs of the remedial action and the maintenance of the site. PREPA has already approved a contribution of $1.0 million through Resolution 3804, April 1, 2011. Notwithstanding, through further negotiations an additional contribution of $300,000 was required by EPA. This additional contribution was approved by PREPA's Governing Board.

On December 4, 2012, the Federal Department of Justice lodged with the Court the Consent Decree Civil Action No. 3:12 cv 01988, which requires that PREPA pay EPA for the past response costs of the agency the amounts of $300,000 within 30 days of the effective date; $300,000 no later than August 15, 2013 and $300,000 no later than August 15, 2014. On April 10, 2013, an Environmental Escrow Account was entered into by GDB, as the escrow agent, PRLA, the Puerto Rico Housing Department and PREPA; and the United States of America on behalf of the Environmental Protection Agency. On June 24, 2013, PREPA deposited $400,000 into the escrow as provided in the Consent Decree.

PREPA continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

*(b) PRASA*

On July 1, 2003, PRASA entered into an agreement (Civil Action No. 01 1709) with EPA to attain compliance with the Clean Water Act in relation to PRASA's wastewater pump stations (WWPSs) in response to a significant number of sanitary sewer bypasses from these locations. The Clean Water Act

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

prohibits discharges of sewage from any point in the collection and treatment system other than the authorized point at the treatment facility. PRASA completed all improvement projects required by EPA for these WWPSs on or before the established completion dates in the agreement. This agreement also required PRASA to invest $1 million in the development and implementation of a Supplemental Environmental Project (SEP). This project consisted of the connection of three non PRASA communities to the PRASA's drinking water system. The connection has been completed and is awaiting completion of adjacent systems to fully integrate these systems to PRASA's service. The agreement also required the implementation of the Preventive Maintenance Program (PMP) for all of PRASA's WWPSs. This was fully completed in December 2010, and is still in place. As part of the agreement, PRASA pays stipulated penalties for pump station bypass events on a quarterly basis.

The penalty calculations are based on the pumping capacity of the pump station and the time taken to correct the deficiency causing the bypass event. The amount paid during fiscal year 2016 was approximately $100,000.

On June 22, 2006, PRASA entered into a consent decree (Civil Action No. 06 1624) with EPA that requires PRASA to implement system wide remedial measures at all of the wastewater treatment plants operated by PRASA. The decree establishes deadlines for the compliance with the conditions set forth in the agreement and stipulates penalties for violation of any of those deadlines. PRASA was assessed a stipulated civil penalty of $1 million, which was paid during fiscal year 2008. This penalty was assessed by the Court as payment for the discharge permit violations of several treatment facilities to the Clear Water Act. The agreement also required PRASA to deposit in an escrow account with GDB an additional civil penalty of $3 million. These funds are to be used for providing sewer service to a community that has not been connected to PRASA's sanitary sewer system. PRASA and the EPA decided to select the Lago La Plata community for this project. As part of the agreement, PRASA pays stipulated penalties on a yearly basis for exceedances to each of PRASA's facilities to their individual discharge permits. The penalty calculations are based on frequency of the exceedances as well as the percentage of the exceedances with its respective limit. The amount paid during fiscal year 2016 was approximately $600,000. These penalty payments are deposited into an escrow account from which a fraction of the deposited amount can be reimbursed to PRASA based on completion of specific projects and initiatives.

On May 25, 2006, PRASA entered into a plea agreement with the U.S. Department of Justice related to violations of the Clean Water Act, as amended, Title 33, USC, Sections 1131(a) and 1319(c)(2)(A). As part of the agreement (Criminal Case No. 06 CR 00202 001), PRASA paid a $9 million fine. This penalty was assessed by the Court as payment for the discharge permit violations of several treatment facilities to the Clean Water Act. PRASA was placed on probation for a period of five years. As part of the probation, PRASA had to comply with several special conditions, such as: (i) upgrade the collection and wastewater treatment system in the Ponce de León Avenue area of San Juan for a cost of not less than $10 million to prevent direct discharges to the Martín Peña Channel; (ii) upgrade nine wastewater treatment plants for a cost of not less than $109 million; and (iii) comply with the consent decree signed by PREPA with the U.S. government on June 22, 2006. The plea agreement also established stipulated penalties for violation of any of the deadlines of performance standards set forth in the agreement. Currently, PRASA is in compliance with the deadlines and requirements of this consent order and no penalties have been paid.

On December 15, 2006, an agreement (Civil Case No. KPE 2006 0858) was signed between PRASA and the Department of Health of the Commonwealth related to violations of the Safe Drinking Water Act

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016


(SDWA), as amended. The agreement was preliminarily approved by the supervising court on March 15, 2007 and it was amended and finally approved by that court on June 20, 2008. PRASA agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the SDWA. This Act requires the compliance with parameters of water quality and treatment techniques in PRASA's water systems. As part of the agreement, PRASA paid a civil penalty of $1 million during fiscal year ended June 30, 2007. The civil penalty was stipulated by the court for alleged noncompliance issues to the SDWA attended in this decree. In this Consent Decree, PRASA must pay stipulated penalties for failing to comply with remedial measures deadlines, failure to submit deliverables, or exceedances to maximum contaminant levels. During fiscal year ended June 30, 2008 and based on the amendment and final approval of the agreement, PRASA accrued approximately $2.7 million for penalties for noncompliance as stipulated by the final agreement, which were paid during fiscal year 2009. Also, as part of the penalties for noncompliance with the remedial measures of the agreement with the Department of Health during fiscal year 2009, $1.3 million was deposited in a GDB escrow account to be used for a SEP. This SEP included three projects: (1) a chemical monitoring of 67 non PRASA systems, (2) the installation of a disinfection system in six non PRASA systems, and (3) the connection of schools that have their own deficient water systems to PRASA's water system. During fiscal year ended June 30, 2016, the penalties amounted to approximately $500,000. PRASA deposited $100,000 in an escrow account for parameters exceedances that will be used for compliance projects with the approval of the Department of Health.

In November 2007, PRASA entered into negotiation of a consent decree (Civil Action No. 10 1365) with EPA that requires PRASA to implement system wide remedial measures at all of the sludge treatment systems at the water treatment plants owned and operated by PRASA. The consent decree was lodged on May 3, 2010 and its entry date was August 24, 2010. This consent order supersedes previous consent orders known as PRASA II (Civil Action No. 92 1511) and PRASA III (Civil Action No. 00 2554). This consent order establishes deadlines for compliance with the conditions set forth in the proposed agreement and stipulates penalties for violation of any of those deadlines.

PRASA was assessed a civil penalty of approximately $3.2 million of which $1 million was paid to the Treasurer of the United States of America as a civil penalty, and $2.2 million was deposited in an escrow account with GDB for the design and construction of a SEP. This SEP consisted of the installation of an aeration system in the Toa Vaca Lake. The aeration system was finished and placed into operation in November 2012. The total amount of penalties paid under this agreement during the fiscal year 2016 was approximately $200,000. Stipulated penalties must be paid by PRASA for failing to comply with remedial measures deadlines, permitting limit exceedances or failure to submit deliverables or Discharge Monitoring Reports.

PRASA is in the process of renegotiation of all the consent decrees and commitments mentioned above. The objective of this renegotiation is to establish a prioritization system that will smooth out the economic impact of the capital improvement projects on a yearly basis.

On September 15, 2015, the USDOJ, acting at the request of the Administrator of EPA, filed a complaint (the Complaint) against PRASA and the Commonwealth, as a required party (pursuant to Section 309(e)) in the United States District Court for the District of Puerto Rico (the District Court). The Complaint seeks injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the Clean Water Act. Specifically, the Complaint alleges PRASA violated Section 301(a) of the Clean Water Act,

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

by discharging pollutants, for failing to comply with the terms of the National Pollutant Discharge Elimination System (NPDES) permits issued to PRASA's facilities under Section 402 of the Clean Water Act, for failing to report unauthorized discharges required under such permits, and failing to meet operation and maintenance requirements for certain of PRASA's water treatment plants and wastewater treatment plants.

Concurrently with the filing of the Complaint, USDOJ also filed the 2015 EPA Consent Decree executed among EPA, PRASA and the Commonwealth settling the matters addressed in the Complaint, under the terms agreed upon by PRASA, USDOJ and EPA. The 2015 EPA Consent Decree is the result of an extensive negotiation process aimed, among other things, at resolving the claims addressed in the Complaint and the requirements of previous consent decrees related to the allegations included in the Complaint, specifically with the goal of implementing a system wide NPDES permit compliance plan, continue the implementation of operational and maintenance plans in all of PRASA's facilities, implementing remedial measures to address discharges and the alleged violations to the Clean Water Act occurring within the Puerto Nuevo Sewer System in the municipality of San Juan.

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by PRASA in order to mitigate the high capital improvement program (CIP') costs mandated by the existing consent decrees. Despite being in material compliance with the capital improvement project requirements of the Existing Consent Decrees, PRASA began discussions with the USDOJ, on behalf of EPA and the US Department of Health seeking to amend the existing consent decrees in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in the PRASA's CIP not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance and capital improvement program requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows.

On May 23, 2016, the District Court entered judgment approving the 2015 EPA Consent Decree as presented on May 10, 2016. The Complaint was dismissed with prejudice and civil case number 15 2283 was closed. PRASA expects that with the final approval of the 2015 EPA Consent Decree, it will be able to finalize the proposed amendment to the 2006 Drinking Water Settlement Agreement under terms substantially similar to those currently being negotiated with the U.S. Department of Health.

*Construction Commitments*

As of June 30, 2016, the following discretely presented component units maintained various unspent construction agreements as follows (in thousands):

PREPA has entered into certain forbearance agreements with certain insurers and certain beneficiary owners of Power Revenue Bonds, banks that provide fuel lines of credit and the GDB (collectively, the Forbearing Creditors). As provided in the Forbearance Agreements, the Forbearing Creditors agreed not to exercise certain rights and remedies under their financing agreements. Under the Forbearance Agreements PREPA's obligations to pay any and all principal and interest payments on the Power Revenue Bonds continued. The Forbearing Creditors consented permitting PREPA not to make transfers to the Revenue Fund or the Sinking Fund, delay making certain payments that became due to the Fuel Line Lenders, use approximately $280 million held in its construction fund for payment of current expenses in addition to capital improvements, increase the thresholds required for the exercise of

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

remedies under the Trust Agreement, allow for the issuance of $130.7 million in Bonds that matured on January 1, 2016 and pay the outstanding principal and interest amounts due on the 2015A Bonds.

From January 2016 until January 2017, PREPA was able to make the principal and interest payments on its Bonds as they became due. Subsequently, PREPA has missed the principal and interest payments due on the Bonds on July 3, 2017, January 1, 2018 and July 3, 2018.

| Component units | | Amount |
|---|---|---|
| Major component units | | |
| PRHTA | $ | 158,200 |
| PRASA | | 5,600 |
| PREPA | | 198,000 |
| UPR | | 58,000 |
| SIFC | | 13,601 |
| Sub-total | | 433,401 |
| Nonmajor component units | | 54,571 |
| Total | $ | 487,972 |

*Service Concession Arrangements (SCA)*

### (c) PRHTA

On September 22, 2011, the PRHTA entered into a toll road concession agreement (the Toll Road Service Concession Agreement) with Autopistas Metropolitanas Puerto Rico, LLC (the Concessionaire), in which the PRHTA granted to the Concessionaire the right to finance, operate and maintain PR-5 and PR-22 highways (the Toll Roads) for a period of 40 years. During the 40-year term, the Concessionaire will have the right to charge and collect tolls imposed on the Toll Roads. The PRHTA received an upfront concession fee payment of approximately $1.1 billion, from which approximately $873 million was used to redeem or defease certain bonds issued and outstanding associated with the Toll Roads. Pursuant to the provisions of GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements*, the PRHTA recognized a deferred inflow of resources of approximately $1.1 billion, which will be amortized and recognized as revenue over the 40-year term of the agreement. The PRHTA will recognize approximately $28.4 million annually through fiscal year 2052 as a result of the amortization of the recognized deferred inflow of resources. The Toll Roads will continue to be presented as an asset of the PRHTA, which at June 30, 2016 amounted to approximately $131.5 million, but are not being depreciated since September 22, 2011 until the end of the agreement in 2052, as the concession agreement required the Concessionaire to return the Toll Roads to the PRHTA in its original or enhanced condition. Toll Roads Concession improvements are recognized in PRHTA's records as soon as they are completed and placed in operations.

On April 19, 2016, the PRHTA entered into an amendment to the Toll Road Service Concession Agreement to extend the original term for 10 additional years and to create five bi-directional tolling points on the PR-5 and PR-22 highways. The PRHTA received an upfront concession fee payment of $100

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

million, which was used to pay $18.2 million of the PRHTA's current debts and $79.8 million of the Commonwealth's debts in fiscal year 2016.

On December 20, 1992, the PRHTA and Autopistas de Puerto Rico y Compañía S.E. (Autopistas) entered into a service concession agreement (as amended in 2004 and 2009, the Bridge Service Concession Agreement, and together with the Toll Road Service Concession Agreement, the Service Concession Agreement) for the design, construction, operation, and maintenance of the Teodoro Moscoso Bridge (the Bridge), a toll bridge that crosses the San Jose Lagoon between the municipalities of San Juan and Carolina. The initial term of this agreement was 35 years, expiring on April 3, 2027, but has been subsequently amended on September 9, 2009 to extend the term to 50 years until 2044. Also, pursuant to the provisions of GASB No. 60, as of June 30, 2013, the PRHTA recognized the Bridge at its estimated fair market value of $109.5 million, amortized over an estimated useful life of 59 years, and a deferred inflow of resources, also of $109.5 million that will be amortized and recognized as revenue over the remaining term of the agreement.

Toll Roads and Bridge Concessions under the Service Concession Agreements, net at June 30, 2016 consisted of (in thousands):

| | | |
|---|---|---|
| Toll roads concession | $ | 90,740 |
| Toll roads concession improvements | | 37,985 |
| Bridge concession | | 64,496 |
| Total | $ | 193,221 |

The deferred inflows of resources at June 30, 2016 consisted of (in thousands):

| | | |
|---|---|---|
| Toll roads concession | $ | 1,140,666 |
| Bridge concession | | 61,320 |
| Total | $ | 1,201,986 |

**(18)  Retirement Systems**

The Retirement Systems issue financial reports, which are publicly available and include the basic financial statements, the required trend information, and any other required supplementary information. Each system is independent; thus, their assets or liabilities may not be transferred from one system to another or be used for any purpose other than to benefit the participants of each system.

*(a)  ERS*

After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

*Plan Description* – Prior to August 23, 2017, ERS implemented a cost-sharing, multi-employer defined benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement

269

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Systems Administration (ERS and JRS Administration). It is a trust created by Act No. 447 on May 15, 1951 (Act No. 447), as amended, to provide pension and other benefits to retired employees of the Commonwealth, its public corporations, and municipalities of Puerto Rico. ERS began operations on January 1, 1952, at which date, contributions by employers and participating employees commenced. ERS is a pension trust fund of the Commonwealth.

Prior to August 23, 2017, ERS administered different benefit structures pursuant to Act No. 447 including a cost-sharing, multi-employer defined benefit program, a defined contribution program (System 2000 program) and a contributory hybrid program. Benefit provisions vary depending on member's date of hire. Substantially, all full-time employees of the Commonwealth and its instrumentalities (73 Commonwealth agencies, 78 municipalities, and 55 public corporations, including ERS) were covered by ERS. Membership was mandatory for all regular, appointed, and temporary employees of the Commonwealth at the date of employment. Membership is optional for the Governor of the Commonwealth, Commonwealth secretaries, head of public agencies, and instrumentalities, among others.

The benefits provided to members of ERS were established by Commonwealth law and may be amended only by the Legislature with the Governor's approval. Act No. 3 of April 4, 2013 (Act No. 3 of 2013), in conjunction with other recent funding and design changes, provided for a comprehensive reform of ERS. This summary details the provisions under Act No. 3 of 2013, which were in effect prior to August 23, 2017.

Certain provisions are different for the three groups of members who entered ERS prior to July 1, 2013 as described below:

- Members of Act No. 447 are generally those members hired before April 1, 1990 (contributory, defined benefit program).

- Members of Act No. 1 of February 16, 1990 (Act No. 1) are generally those members hired on or after April 1, 1990 and on or before December 31, 1999 (contributory, defined benefit program).

- Members of Act No. 305 of September 24, 1999 (Act No. 305 or System 2000) are generally those members hired on or after January 1, 2000 and on or before June 30, 2013 (defined contribution program).

All regular employees hired for the first time on or after July 1, 2013, and former employees who participated in the defined benefit program and the System 2000 program, and were rehired on or after July 1, 2013, became members of the Contributory Hybrid Program as a condition to their employment. In addition, employees who at June 30, 2013, were participants of previous programs became part of the Contributory Hybrid Program on July 1, 2013.

Each member had a nonforfeitable right to the value of his or her account. Members had three options to invest their contributions. Investment income was credited to the member's account semi-annually. The Commonwealth did not guarantee benefits at retirement age.

The assets of the defined benefit program, the defined contribution program and the Contributory Hybrid Program were pooled and invested by ERS. Future benefit payments were paid from the same pool of assets.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

This summary of ERS plan provisions is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts should be determined in strict accordance with the plan document itself.

*(a) Service Retirements*

(a) *Eligibility for Act No. 447 Members*: Act No. 447 members who were eligible to retire as of June 30, 2013 would continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 447 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 58 with 10 years of credited service, (3) any age with 30 years of credited service, (4) for Public Officers in High Risk Positions (the Commonwealth Police and Firefighter Corps, the Municipal Police and Firefighter Corps and the Custody Office Corps), attainment of age 50 with 25 years of credited service, and (5) for Mayors of municipalities, attainment of age 50 with 8 years of credited service as a Mayor. In addition, Act No. 447 members who would attain 30 years of credited service by December 31, 2013 would be eligible to retire at any time.

Act No. 447 members who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire upon attainment of the retirement eligibility age shown in the table below with 10 years of credited service.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 61 |
| July 1, 1956 to June 30, 1957 | 56 | 60 |
| Before July 1, 1956 | 57 and up | 59 |

In addition to the requirements in the table above, Act No. 447 Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(b) *Eligibility for Act No. 1 Members*: Act No. 1 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 1 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 65 with 10 years of credited service, (3) for Public Officers in High Risk Positions, any age with 30 years of credited service, and (4) for Mayors, attainment of age 50 with 8 years of credited service as a Mayor.

Act No. 1 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 65 with 10 years of credited service. In addition, Act No. 1 Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(c) *Eligibility for System 2000 Members*: System 2000 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, System 2000

271

### COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

members could retire upon attainment of age 55 for Public Officers in High Risk Positions and attainment of age 60 otherwise.

System 2000 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 55 for Public Officers in High Risk Positions and upon attainment of the retirement eligibility age shown in the table below otherwise.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 65 |
| July 1, 1956 to June 30, 1957 | 56 | 64 |
| July 1, 1955 to June 30, 1956 | 57 | 63 |
| July 1, 1954 to June 30, 1955 | 58 | 62 |
| Before July 1, 1954 | 59 and up | 61 |

(d) *Eligibility for Members Hired after June 30, 2013*: Attainment of age 58 if a Public Officer in a High-Risk Position and attainment of age 67 otherwise.

(2) *Service Retirement Annuity Benefits*

An annuity payable for the lifetime of the member equal to the annuitized value of the balance in the hybrid contribution account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013. If the balance in the hybrid contribution account was $10,000 or less, it would have been paid as a lump sum instead of as an annuity.

(a) *Accrued Benefit as of June 30, 2013 for Act No. 447 Members*: The accrued benefit as of June 30, 2013 was determined based on the average compensation, as defined, for Act No. 447 members, the years of *credited* service, and the attained age of the member all as of June 30, 2013. For Act No. 447 Mayors, the highest compensation, as defined, as a Mayor was determined as of June 30, 2013.

If the Act No. 447 member had at least 30 years of credited service as of June 30, 2013, the accrued benefit equals 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting the Coordination Plan, the benefit was recalculated at the Social Security Retirement Age (SSRA), as defined, as 1.5% of average compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 65% (75% if member was at least age 55 as of June 30, 2013) of average compensation in excess of $6,600.

If the Act No. 447 member had less than 30 years of credited service as of June 30, 2013 and attained 30 years of credited service by December 31, 2013, the accrued benefit equaled 55% of average compensation if the member was under age 55 as of June 30, 2013 or 60% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting the Coordination Plan, the benefit was recalculated at SSRA as 1.5% of average

272

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 55% (60% if member was at least age 55 as of June 30, 2013) of average compensation in excess of $6,600. Member contributions received from Act No. 447 members eligible for this transitory benefit during the period beginning July 1, 2013 and ending upon the attainment of 30 years of credited service were considered pre- July 1, 2013 contributions; the contributions to the hybrid contribution account begin after the member attains 30 years of credited service.

If the Act No. 447 member had less than 30 years of credited service as of December 31, 2013, the accrued benefit equaled 1.5% of average compensation multiplied by years of credited service up to 20 years, plus 2% of average compensation multiplied by years of credited service in excess of 20 years. Maximum benefit is 75% of average compensation. Except for Commonwealth Police and Commonwealth Firefighters, the benefit was actuarially reduced for each year payment commences prior to age 58. For participants selecting the Coordination Plan, the basic benefit is recalculated at SSRA as 1% of average compensation up to $6,600 multiplied by years of credited service up to 20 years, plus 1.5% of average compensation up to $6,600 multiplied by years of credited service in excess of 20 years, plus 1.5% of average compensation in excess of $6,600 multiplied by years of credited service up to 20 years, plus 2.0% of average compensation in excess of $6,600 multiplied by years of credited service in excess of 20 years. Except for Police and Firefighters, the benefit was actuarially reduced for each year payment commences prior to age 58.

For Act No. 447, Mayors with at least 8 years of credited service as a Mayor, the accrued benefit was not to be less than 5% of highest compensation, as defined, as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for each year of non-Mayoral credited service in excess of 20 years. Non-Mayoral credited service included service earned as a Mayor in excess of 10 years. Maximum benefit was 90% of highest compensation as a Mayor.

(b) *Accrued Benefit as of June 30, 2013 for Act No. 1 Members*: The accrued benefit as of June 30, 2013 is determined based on the average compensation for Act No. 1 members, the years of credited service, and the attained age of the member all as of June 30, 2013. For Act No. 1 Mayors, the highest compensation as a Mayor was determined as of June 30, 2013.

If the Act No. 1 member is a police officer or firefighter member that had at least 30 years of credited service as of June 30, 2013, the accrued benefit equaled 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013.

For all other Act No. 1 members, the accrued benefit equaled 1.5% of average compensation multiplied by years of credited service. The benefit was actuarially reduced for each year payment commences prior to age 65.

For Act No. 1 Mayors with at least 8 years of credited service as a Mayor, the accrued benefit was not to be less than 5% of highest compensation as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for

273

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

each year of non-Mayoral credited service in excess of 20 years. Non-Mayoral credited service included service earned as a Mayor in excess of 10 years. Maximum benefit is 90% of highest compensation as a Mayor.

*(3) Compulsory Retirement*

All Act No. 447 and Act No. 1 Public Officers in High Risk Positions were required to retire upon attainment of age 58 and 30 years of credited service. A two-year extension may be requested by the member from the Superintendent of the Puerto Rico Police, the Chief of the Firefighter Corps, or supervising authority as applicable.

*(4) Termination Benefits*

*(a) Lump Sum Withdrawal*

*Eligibility*: A Member was eligible upon termination of service prior to 5 years of service or if the balance in the hybrid contribution account is $10,000 or less.

*Benefit:* The benefit equaled a lump sum payment of the balance in the hybrid contribution account as of the date of the permanent separation of service.

*(b) Deferred Retirement*

*Eligibility*: A Member was eligible upon termination of service with 5 or more years of service (10 years of credited service for Act No. 447 and Act No. 1 members) prior to the applicable retirement eligibility, provided the member had not taken a lump sum withdrawal of the accumulated contributions and the hybrid contribution account.

*Benefit*: An annuity payable for the lifetime of the member commencing at the applicable retirement eligibility age equal to the annuitized value of the balance in the hybrid contribution account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013.

*(5) Death Benefits*

*(a) Pre- retirement Death Benefit*

*Eligibility*: Any current nonretired member was eligible.

*Benefit*: A refund of the hybrid contribution account, plus the accumulated contributions for Act No. 447 and Act No. 1 members.

*(b) High Risk Death Benefit under Act No. 127*

*Eligibility*: Police, firefighters, and other employees in specified high-risk positions who die in the line of work due to reasons specified in Act No. 127 of 1958, as amended.

*Spouse's Benefit*: 50% of the participant's compensation at date of death, payable as an annuity until death or remarriage.

*Children's Benefit*: 50% of the participant's compensation at date of death, payable as an annuity, and allocated pro rata among eligible children. The annuity was payable for life for a disabled

274

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

child, until age 18 for a nondisabled child not pursuing studies, and until age 25 for a nondisabled child who is pursuing studies.

*Benefit if No Spouse or Children*: The parents of the member should each receive 50% of the participant's compensation at date of death, payable as an annuity for life.

*Postdeath Increases*: Effective July 1, 1996 and subsequently every three years, the above death benefits are increased by 3% provided that the beneficiary(ies) had been receiving payments for at least three years.

The cost of these benefits was paid by the Commonwealth's General Fund.

*(c)  Postretirement Death Benefit for Members Who Retired prior to July 1, 2013*

*Eligibility*: Any retiree or disabled member receiving a monthly benefit who had not elected a reversionary annuity and whose benefits commenced prior to July 1, 2013.

*Benefit*: The benefit is as follows (Law No. 105, as amended by Law No. 4):

(i)   For those married or with dependent children at the time of death, the annual income to a widow, or widower or dependent children is equal to 60% (50% if in the Coordination Plan – 30%, prior to January 1, 2004) of the retirement benefit payable for life for a surviving spouse and/or disabled children and payable until age 18 (age 25 if pursuing studies) for nondisabled children. If in the Coordination Plan, the benefit to the surviving spouse does not begin until the spouse's attainment of age 60 and the surviving spouse must have been married to the member for at least 10 years to be eligible for this benefit. The increase in the percentage from 30% to 50% if in the Coordination Plan is paid by the Commonwealth's General Fund for former government employees or by the public enterprise or municipality for their former employees.

(ii)  The benefit, when there is no relation as stated above, is equal to the remaining balance of accumulated contributions at the time of retirement after the deduction of lifetime annual income paid and is payable to a beneficiary or to the Member's estate. In no case may the benefit be less than $1,000. Either the Commonwealth's General Fund for former government employees or the public enterprise or municipality for their former employees pays the difference, up to $250, between (1) the accumulated contributions less the lifetime annual income paid and (2) $1,000. ERS pays for the rest.

*(d)  Postretirement Death Benefit for Members Who Retired after June 30, 2013*

*Eligibility*: Any retiree or disabled member who began receiving a monthly benefit after June 30, 2013.

*Benefit*: If the member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent optional form of payment, the applicable survivor benefit.

For all members, the excess, if any, of the hybrid contribution account, plus the accumulated contributions for Act No. 447 and Act No. 1 members, at the time of retirement over the total

275

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

annuity payments paid to the member and any beneficiary per the terms of the optional form of payment must be payable to a beneficiary or the member's estate.

(e) *Beneficiaries receiving occupational death benefits as of June 30, 2013 continue to be eligible to receive such benefits*

(6) *Disability Benefits*

(a) *Disability*

*Eligibility*: All members are eligible upon the occurrence of disability.

*Benefit*: The balance of the hybrid contribution account payable as lump sum distribution, an immediate annuity, or a deferred annuity at the election of the participant. Act No. 447 and Act No. 1 members remain eligible to receive the accrued benefit as of June 30, 2013 commencing at the applicable retirement eligibility age.

(b) *High Risk Disability under Act No. 127*

*Eligibility*: Police, firefighters, and other employees in specified high risk positions who are disabled in the line of work due to reasons specified in Act No. 127 of 1958 (as amended).

*Benefit*: 80% (100% for Act No. 447 members) of compensation as of date of disability, payable as an annuity. If the member died while still disabled, this annuity benefit continued to his beneficiaries. Beneficiaries include the surviving spouse and/or disabled children (for life), nondisabled children until age 18 (age 25 if pursuing studies), and the parents if no other beneficiaries. Effective July 1, 1996 and subsequently every three years, the disability benefit was increased by 3% provided that the member (or beneficiary) had been receiving payments for at least three years (Act No. 127 of 1958, as amended). The cost of these benefits was paid by the Commonwealth's General Fund.

(c) *Members who qualified for occupational or nonoccupational disability benefits as of June 30, 2013 continue to be eligible to receive such benefits*

(7) *Special Benefits*

(a) *Minimum Benefits*

(i) Past Ad hoc Increases: The Legislature, from time to time, increased pensions for certain retirees as described in Act No. 124 approved on June 8, 1973 and Act No. 23 approved on September 23, 1983. The benefits were paid 50% by the Commonwealth's General Fund and 50% by ERS.

(ii) Minimum Benefit for Members Who Retired before July 1, 2013 (Act No. 156 of 2003, Act No. 35 of 2007, and Act No. 3 of 2013): The minimum monthly lifetime income for members who retired or become disabled before July 1, 2013 is $500 per month effective July 1, 2013 ($400 per month effective July 1, 2007 and $300 per month up to June 30, 2007). The increase in the minimum monthly benefit from $200 per month to $300 per month was paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees. The increase in the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

minimum monthly benefit from $300 per month to $400 per month was to be paid by ERS for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(iii) Coordination Plan Minimum Benefit: A minimum monthly benefit was payable upon attainment of SSRA such that the benefit, when added to the Social Security Benefit, was not less than the benefit payable prior to SSRA.

*(b) Cost of Living Adjustments (COLA) to Pension Benefits*: The Legislature, from time to time, increases pensions by 3% for retired and disabled members. Beneficiaries were not entitled to COLAs granted after the retiree's death. The first increase was granted by Act No. 10 of 1992. Subsequent 3% increases have been granted every third year since 1992, with the latest 3% increase established on April 24, 2007 and effective July 1, 2007 (retroactive to January 1, 2007) for retired and disabled members that were receiving a monthly benefit on or before January 1, 2004 (Act No. 35). In addition, effective July 1, 2008, any retired or disabled member that was receiving a monthly annuity on or before January 1, 2004 less than $1,250 per month received an increase of up to 3% without exceeding the limit of $1,250 per month (Act No. 35). The COLAs granted in 1992 to all retirees and in 1998 to retirees who are former government or municipal employees are to be paid by ERS. All other COLAs granted in 1995 and later were required to be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

*(c) Special "Bonus" Benefits*

(i) *Christmas Bonus (Act No. 144, as Amended by Act No. 3 of 2013)*: An annual bonus of $200 for each retiree, beneficiary, and disabled member has historically been paid in December provided the member retired prior to July 1, 2013. This benefit is paid from the supplemental contributions received from the Commonwealth's General Fund for former government and certain public corporations without their own treasuries, or by certain public corporations with their own treasuries or municipalities for their former employees.

(ii) *Medication Bonus (Act No. 155, as Amended by Act No. 3 of 2013)*: An annual bonus of $100 for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the member retired prior to July 1, 2013. Evidence of coverage is not required. The amount is prorated if there are multiple beneficiaries. This benefit is paid from the Supplemental Contributions received from the Commonwealth's General Fund for former government and certain public corporations without their own treasuries, or by certain public corporations with their own treasuries or municipalities for their former employees.

The special benefits contributions of approximately $197 million in fiscal year 2016 mainly represent contributions from the Commonwealth's General Fund, public corporations and municipalities for the special benefits identified above granted by special laws. Prior to August 23, 2017, the funding of the special benefits was provided to ERS through legislative appropriations each July 1 by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries and by certain public

277

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

corporations with their own treasuries and municipalities for their former employees. The legislative appropriations were considered estimates of the payments to be made by ERS for the special benefits. Deficiencies in legislative appropriations were covered by ERS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid was combined with the assets held in trust for the payment of other pension benefits.

*(8) Contributions*

The contribution requirement to ERS is established by law and is not actuarially determined.

(a) *Member Contributions*: Effective July 1, 2013, contributions by members are 10% of compensation. However, for Act No. 447 members who selected the Coordination Plan, the member contributions are 7% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2013 2014 fiscal year and 8.5% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2014-2015 fiscal year. Members may voluntarily make additional contributions to their hybrid contribution account.

Prior to July 1, 2013, contributions by Act No. 447 members selecting the Coordination Plan were 5.775% of compensation up to $6,600 plus 8.275% of compensation in excess of $6,600. Contributions by all other members were 8.275% of compensation. System 2000 members could also have made voluntary contributions of up to 1.725% of compensation prior to July 1, 2013.

(b) *Employer Contributions (Article 2 116, as Amended by Law No. 116 of 2010 and Act No. 3 of 2013)*: Prior to July 1, 2011, employer contributions were 9.275% of compensation. Effective July 1, 2011, employer contributions are 10.275% of compensation. For the next four fiscal years effective July 1, 2012, employer contributions will increase annually by 1% of compensation. For the next five fiscal years, employer contributions will increase annually by 1.25% of compensation, reaching an employer contribution rate of 20.525% of compensation effective July 1, 2020. Under Act No. 106 of 2017, employers' obligations to contribute to ERS were eliminated.

(c) *Supplemental Contributions from the Commonwealth's General Fund, Certain Public Corporations, and Municipalities (Act No. 3 of 2013)*: Effective July 1, 2013, ERS will receive a supplemental contribution of $2,000 each year for each pensioner (including beneficiaries receiving survivor benefits) that was previously benefitting an Act No. 447 or Act No. 1 member while an active employee. This supplemental contribution will be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries or by certain public corporations with their own treasuries or municipalities for their former employees.

(d) *Additional Uniform Contribution (Act No. 32 of 2013, as Amended)*: The additional uniform contribution will be certified by the external actuary of ERS each fiscal year from fiscal year 2015 through 2033 as necessary to avoid the projected gross assets of ERS, falling below $1 billion during any subsequent fiscal year. The Additional Uniform Contribution is to be paid by the Commonwealth's General Fund, public corporations with their own treasuries, and municipalities. The additional uniform contribution determined for fiscal years 2014, 2015, and 2016 was $120 million. The additional uniform contribution determined for fiscal year 2017 is

278

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

$596 million, payable at the end of the fiscal year. For additional information on the status of these contributions, refer to Note 2.

*(9) Early Retirement Programs*

The EQB implemented an early retirement program for its employees under the Law 224 Act No. 7 dated August 9, 2008. EQB has already made the initial payment and would reimburse the remaining balance on annuities and other benefits paid by ERS in four installments on each July 31 starting in 2009 through 2012. EQB was in default on the retirement plan payment, so they requested a new payment plan. ERS Board of Trustees approved a payment plan for the debt balance due of the retirement program for 24 months starting in March 2014.

On July 2, 2010, the Commonwealth enacted Act No. 70 establishing a program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. Act No. 70 also established that early retirement benefits will be provided to eligible employees that have completed between 15 and 29 years of creditable services and will consist of monthly benefits ranging from 37.5% to 50.0% of each employees' monthly salary. Benefits under this program will be paid by the General Fund of the Commonwealth (the General Fund) and by the public corporations, covering their respective employees until the plan member reaches the later of age 55 for members under Act No. 447 or age 65 for members under Act No. 1, or the date the plan member would have completed 30 years of service had the member continued employment. In addition, the public corporations will also be required to continue making the required employee and employer contributions to ERS. The General Fund will be required to continue making its required employer contributions. ERS will be responsible for benefit payments afterward.

**(b) JRS**

*Plan Description* – Prior to August 23, 2017, JRS implemented a single employer defined benefit pension plan administered by ERS and JRS Administration. It is a trust created by Act No. 12 on October 19, 1954 (Act No. 12 of 1954), as amended, to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth, through the Office of the Administration of Court Facilities (the Employer). JRS is a pension trust fund of the Commonwealth and is not an employer.

ERS and JRS Administration allocated 97.93% and 2.08% of its general and administrative expenses during the fiscal year ended June 30, 2016 to the JRS and ERS systems, respectively. The methodology used to determine the allocation of ERS ad JRS Administration's expenses is based on total employers' and participants' contributions to ERS and JRS, combined.

Prior to August 23, 2017, JRS consisted of two benefit structures pursuant to Act No. 12 of 1954, as amended by Act No. 162 of 2013. Benefit provisions vary depending on member's date of hire as follows:

- Judges hired on or before June 30, 2014 with certain distinctions for judges hired December 24, 2013 to June 30, 2014 (contributory, defined benefit program).

- Judges hired July 1, 2014 or later (contributory, hybrid program).

All judges of the Judiciary Branch of the Commonwealth are members of JRS. Members include all persons holding a position as Judge of the Puerto Rico Supreme Court, Judge of the Court of Appeals,

279

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Superior Judges of the Court of First Instance, and Municipal Judges of the Court of First Instance in the Commonwealth.

The benefits provided to members of JRS are established by Commonwealth law and may be amended only by the Legislature with the Governor's approval.

This summary of JRS plan provisions is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts should be determined in strict accordance with the plan document itself.

**Pension Plan Provisions Applicable to Judges Hired on or before June 30, 2014 (Pre- Act No. 162 Members)**

*(1) Service Retirement Annuity Benefits*

An annuity payable for the lifetime of the member equal to the applicable benefit detailed below.

*(a) Normal Retirement*

*Basic Eligibility*: Age 60 with 10 years of credited service.

*Basic Benefit*: 25% of highest salary, as defined, plus 5% of highest salary, as defined, for each year of credited service in excess of 10 years, subject to a maximum of 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014.

*Eligibility for Judges who serve without a Fixed Tenure*: 10 years of credited service. This enhanced eligibility is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Benefit for Judges who serve without a Fixed Tenure*: 25% of the salary corresponding to the office during the retirement period, plus 5% of such salary for each year of credited service in excess of 10 years, subject to a maximum of 100% of such salary. If the judge has served in a position without a fixed tenure for a total of at least 8 years, the 25% increases to 50% in the preceding formula. This enhanced benefit is not available to judges who are appointed after June 28, 2007 to an unlimited term.

280

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Optional Eligibility*: Age and credited service as shown in the table below, provided at least 8 years of credited service were earned in office as a judge.

| Age | Years of credited services |
|:---:|:---:|
| Less than 60 | 30 |
| 62 | 20 |
| 61 | 21 |
| 60 | 22 |
| 59 | 23 |
| 58 | 24 |
| 57 | 25 |
| 56 | 26 |
| 55 | 27 |

*Optional Benefit*: 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014.

*Enhanced Eligibility*: Any judge who has served without a fixed tenure for at least 3 years and has at least 25 years of credited service. This enhanced benefit is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Enhanced Benefit*: 75% of the salary earned at the time of retirement.

*Compulsory Retirement*: All judges must retire by age 70. If the judge has less than 10 years of credited service, the judge can elect a refund of accumulated contributions or a proportional part of the basic benefit based on completed years and months of credited service.

(b) *Early Retirement*

*Basic Eligibility*: 20 years of credited service before age 60.

*Basic Benefit*: The basic benefit payable under Normal Retirement, reduced on an actuarial equivalent basis for each month that early retirement date precedes age 60. However, no actuarial reduction is applied for judges who serve without a fixed tenure.

*Optional Eligibility*: 20 years of credited service, provided at least 8 years of credited service were earned in office as a judge.

*Optional Benefit*: 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014, reduced on an actuarial equivalent basis for each month that early retirement date precedes the age specified in the table under Optional Eligibility under Normal Retirement for the applicable years of credited service.

281

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

(2)   *Termination Benefits*

(a)   *Lump Sum Withdrawal*

*Eligibility*: A member is eligible upon termination of service.

*Benefit*: The benefit equals a refund of accumulated contributions.

(b)   *Deferred Retirement*

*Eligibility*: A member is eligible upon termination of service prior to age 60 and after 10 years of credited service, provided the member has not taken a lump sum withdrawal.

*Benefit*: The benefit, commencing at age 60, is equal to the benefit payable upon Normal Retirement.

(3)   *Death Benefits*

(a)   *Occupational Death Benefit*

*Eligibility*: The beneficiaries of any active participant who dies from an employment related cause under the Workmen's Accident Compensation Act.

*Spouse's Benefit*: 50% of the participant's salary at date of death, payable as an annuity until death or remarriage.

*Children's Benefit*: $10 ($20 if full orphan) for each child payable monthly until child's age 18 or completion of studies, if later. The maximum family benefit is 75% of the participant's salary at date of death.

*Benefit if No Spouse or Children*: Refund of accumulated contributions, plus an amount equal to one year of compensation, as defined, in effect at the time of death.

(b)   *Pre-retirement Death Benefit*

*Eligibility*: Any current non-retired member is eligible, provided they are not eligible for the Occupational Death Benefit.

*Benefit*:

(i)   While in active service, the benefit equals a refund of accumulated contributions; plus, an amount equal to one year of compensation in effect at the time of death.

(ii)   While not in active service, the benefit equals a refund of accumulated contributions.

(c)   *Special Pre-retirement Death Benefit*

*Eligibility*: An active participant who was eligible to retire at the date of death with a surviving spouse or dependent children.

*Benefit*: The post-retirement death benefits described below assuming the active participant retired the day before the date of death.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

(d) *Post-retirement Death Benefit*

*Eligibility*: Any retiree or disabled member receiving a monthly benefit.

*Benefit:*

(i) For those married or with dependent children at the time of death, an annual income equal to 60% of the retirement benefit at time of death, payable for life for a surviving spouse and/or disabled children, and payable until age 18 or completion of studies, if later, for nondisabled children.

(ii) The benefit, when there is no relation as stated above, is equal to the remaining balance of accumulated contributions at the time of retirement after the deduction of lifetime annual income paid and is payable to a beneficiary or to the Member's estate. In no case may the benefit be less than $1,000. The Commonwealth's General Fund pays the difference, up to $500, between (1) the accumulated fees, as defined, with interest less the lifetime annual income paid and (2) $1,000. JRS pays for the rest.

(4) *Disability Benefits*

(a) *Non-occupational Disability*

*Eligibility*: All members are eligible for non-occupational disability upon 10 years of credited service and the occurrence of disability.

*Benefit*: 30% of average compensation, plus 1% of average compensation for each year of credited service in excess of 10 years, payable as an annuity; subject to a maximum of 50% of average compensation.

(b) *Occupational Disability*

*Eligibility*: All members disabled while in the course and as a consequence of their work, as certified by two physicians appointed by the Plan Administrator, and provided the member is receiving compensation from the Workmen's Accident Compensation Act.

*Benefit*: 50% of Salary at date of disability, payable as an annuity, reduced by any payments received from the State Insurance Fund Corporation under the Workmen's Accident Compensation Act.

(5) *Special Benefits*

(a) *Cost-of-Living Adjustments (COLA) to Pension Benefits*: Effective January 1, 2001, commencing January 1, 2002 and subsequently every three years thereafter, the annual benefit is increased by 3% for retirees and disabled members provided that the member had been receiving payments for at least three years.

These COLAs are paid by the Commonwealth's General Fund. In addition, an ad hoc 3% COLA was granted effective January 1, 1999 and is paid by JRS.

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

*(b) Special "Bonus" Benefits*

(i) Christmas Bonus (Act No. 144): An annual bonus of $600 for each retiree, beneficiary, and disabled member paid in December provided the judge was hired before December 24, 2013. JRS pays $150 per retiree, beneficiary, and disabled member and the balance is paid by the Commonwealth's General Fund.

(ii) Summer Bonus (Act No. 37): An annual bonus of $100 for each retiree, beneficiary, and disabled member paid in July provided the judge was hired before December 24, 2013. The amount is prorated if there are multiple beneficiaries. This benefit is paid by the Commonwealth's General Fund.

(iii) Medication Bonus (Act No. 155): An annual bonus of $100 for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the judge was hired before December 24, 2013. Evidence of coverage is not required. The amount is prorated if there are multiple beneficiaries. This benefit is paid by the Commonwealth's General Fund.

Judges hired on December 24, 2013 and thereafter are not eligible for these special "bonus" benefits.

The special benefits contributions of approximately $4.9 million in fiscal year 2016 represent contributions from the Commonwealth's General Fund for the special benefits identified above granted by special laws. Prior to August 23, 2017, the funding of the special benefits was provided to JRS through legislative appropriations each July 1. The legislative appropriations were considered estimates of the payments to be made by JRS for the special benefits. Deficiencies in legislative appropriations were covered by JRS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid was combined with the assets held in trust for the payment of other pension benefits.

**Pension Plan Provisions Applicable to Judges Hired on or after July 1, 2014 (Act No. 162 Members)**

Prior to August 23, 2017, members hired on or after July 1, 2014 were covered by a contributory, hybrid plan with defined benefit and defined contribution components as follows:

*(1) Service Retirement Annuity Benefits*

An annuity payable for the lifetime of the member equal to the applicable benefit detailed below.

*(a) Normal Retirement*

*Eligibility*: Age 65 with 12 years of credited service.

*Basic Benefit*: 1.5% of average compensation, as defined, for each year of credited service, plus the annualized value of the balance in the hybrid program contribution account at the time of retirement.

*Compulsory Retirement*: All judges must retire by age 70. If the judge has less than 12 years of credited service, the judge will receive a refund of the hybrid program contribution account.

*(b) Early Retirement*

*Basic Eligibility*: Age 55 with 12 years of credited service before age 65.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Basic Benefit*: 1.5% of average compensation, as defined, for each year of credited service, reduced by 1/180 for each for the first 60 months and by 1/360 for each next 60 months by which the early retirement date precedes age 65, plus the annualized value of the balance in the hybrid program contribution account at time of retirement.

(2) *Termination Benefits*

  (a) *Lump Sum Withdrawal*

    *Eligibility*: A member is eligible upon termination of service with less than 12 years of credited service.

    *Benefit*: The benefit equals a refund of the hybrid program contribution account.

  (b) *Deferred Retirement*

    *Eligibility*: A member is eligible upon termination of service prior to age 65 and after 12 years of credited service, provided the member has not taken a lump sum withdrawal.

    *Benefit*: The benefit, commencing at age 65, is equal to the benefit payable upon Normal Retirement. The benefit may commence as early as age 55, subject to the reductions described under early retirement.

(3) *Death Benefits*

  (a) *Pre-retirement Death Benefit*

    *Eligibility*: Any current Non-retired member is eligible.

    *Benefit*: The benefit equals a refund of the hybrid program contribution account.

  (b) *Post-retirement Death Benefit*

    *Eligibility*: Any retiree or disabled member.

    *Benefit*: If a member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent optional form of payment, the applicable survivor benefits.

    For all members, the excess, if any, of the hybrid program contribution account at the time of retirement over the total hybrid program annuity payments paid to the member and any beneficiary per the terms of the optional form of payment is payable to a beneficiary or the member's estate.

(4) *Disability Benefits*

  *Eligibility*: All members are eligible upon 5 years of credited service and the occurrence of disability prior to age 65.

  *Benefit*: 1.5% of average compensation, as defined, for each year of credited service plus the annuitized value of the balance in the hybrid program contribution account at the time of disability, payable as an annuity; subject to a maximum of 33% of average compensation, as defined.

285

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

(5) *Special Benefits*

   (a) *Cost-of-Living Adjustments (COLA) to Pension Benefits*

      Commencing January 1, 2017 and subsequently every three years thereafter, the annual benefit is increased by 3% for retirees and disabled members provided that the member had been receiving payments for at least three years.

      These COLAs are paid by the Commonwealth's General Fund.

**Contributions**

The contribution requirement to JRS is established by law and is not actuarially determined.

   (1) *Member Contributions*: Contributions by members are 8.0% of compensation if hired before December 24, 2013, 10.0% of compensation if hired between December 24, 2013 and June 30, 2014 and 12.0% of compensation if hired on or after July 1, 2014.

   (2) *Employer Contributions:*

      (a) Payroll based Employer Contributions: Contributions by the Commonwealth are 30.34% of compensation. Prior to July 1, 2008, the employer contribution rate was 20.0% of compensation.

      (b) Additional Uniform Contribution (Act No. 162 of 2013): Beginning with the fiscal year 2015, JRS will receive an additional uniform contribution as necessary to avoid having the projected gross assets of JRS, during any subsequent fiscal year, to fall below $20 million. The Annual Additional Contribution is to be funded by the Commonwealth's General Fund from fiscal year 2015 through fiscal year 2046. The additional uniform contributions determined for fiscal years 2015, 2016, and 2017 were $11.6 million, $12.1 million and $13.5 million, respectively. The additional uniform contribution is payable at the end of the corresponding fiscal year. For additional information on the status of the contributions, refer to Note 2.

*(c) TRS*

Plan Description – Prior to August 23, 2017, the Puerto Rico System of Annuities and Pensions for Teachers (TRS) was a single employer defined benefit pension plan administered by the Puerto Rico Teachers Retirement System. It was a trust created by Act No. 218 of May 6, 1951, as superseded by Act No. 91 of March 29, 2004, to provide pension and other benefits mainly to retired teachers of the Puerto Rico Department of Education (Department of Education), an agency of the Commonwealth, and the employees of TRS.

Prior to August 23, 2017, TRS administered two benefit structures pursuant to Act No. 160 of December 24, 2013 (Act No. 160 of 2013), as modified by the April 11, 2014 decision of the Puerto Rico Supreme Court. Benefit provisions vary depending on member's date of hire as follows:

- Members hired on or before July 31, 2014 with certain distinctions for members who retire August 1, 2014 or later (contributory, defined benefit program).

- Members hired August 1, 2014 or later (contributory, hybrid program).

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

All active teachers of the Department of Education and the employees of TRS became plan members of TRS at their date of employment. Licensed teachers working in private schools or other educational organizations had the option to become members of TRS so long as the required employer and employee contributions were satisfied.

The benefits provided to members of TRS are established by Commonwealth of Puerto Rico law and may be amended only by the Legislature with the Governor's approval.

This summary of TRS plan description is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts should be determined in strict accordance with the plan document itself.

As part of the plan description information, the most important aspects of Act No. 160 of 2013, as modified by the April 11, 2014 decision of the Puerto Rico Supreme Court, are as follows: (i) active participants as of July 31, 2014 will continue to participate in the defined benefit pension program; (ii) starting August 1, 2014, the defined benefit pension program will be closed for future participants and they will contribute to a contributory hybrid program; (iii) the retirement age for employees hired on or after August 1, 2014 will increase to age 62; (iv) the employee contribution for employees hired on or after August 1, 2014 will increase to 10% from August 1, 2014 to June 30, 2017, 13.12% from July 1, 2017 to June 30, 2020, and 14.02% from July 1, 2020 and thereafter; (v) special benefits payable to active participants that retire on or before July 31, 2014 will be reduced, and (vi) special benefits and post-employment healthcare benefits will be eliminated for future retirees.

**Defined Benefit Pension Program**

Prior to August 23, 2017, the members of TRS hired on or before July 31, 2014 were eligible for the benefits described below:

*(1) Retirement Annuity*

Members were eligible for monthly benefit payments determined by the application of stipulated benefit ratios to the member's average compensation. Average compensation was computed based on the highest 36 months of compensation recognized by TRS. The monthly annuity for which a member was eligible was limited to a minimum of $400 per month and a maximum of 75% of the average compensation.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Members were eligible for retirement annuity benefits upon complying with the following:

| Age | Years of creditable services | Retirement annuity compensation |
|---|---|---|
| 55 | 30 or more | 75% of average compensation |
| 50 | 30 or more | 75% of average compensation |
| Under 50 | 30 or more | 65% of average compensation |
| 50 | At least 25, but less than 30 | 1.8% of average compensation times years of service |
| 47, but less than 50 | At least 25, but less than 30 | 95% of 1.8% of average compensation times years of service |
| 60 or more | At least 10, but less than 25 | 1.8% of average compensation times years of service |

*(2) Deferred Retirement Annuity*

A participating employee who terminated service before age 60, after having accumulated a minimum of 10 years of creditable service, qualified for a deferred retirement annuity payable beginning at age 60. A participating employee who completed 25 or more years of creditable service and is under the age of 47 at termination qualified for a deferred retirement annuity payable beginning at age 47. The vested rights described above were provided if his or her contributions to TRS are left within TRS until the attainment of the respective retirement age.

*(3) Occupational Disability Annuity*

A participating employee, who as a direct result of the performance of his or her occupation became disabled, was eligible for an annuity of 1.8% of average compensation based on the highest 60 months or the number of months of creditable service, if less than 5 years, recognized by TRS, times years of creditable service, but not less than $400 per month.

*(4) Death Benefits*

Pre-retirement – The beneficiaries receive the member contributions made plus 2% interest accumulated as of the date of death (after discounting debts with TRS). Additionally, for beneficiaries of members who died on or before July 31, 2014, will receive an amount equal to the annual compensation of the member at the time of death.

Post-retirement – For members who retire on or before July 31, 2014: The surviving spouse receives 50% of the member's pension and the other 50% is shared among the members' children (if any) and only if such children are under 22 years of age or disabled (until disability ceases). If there is no surviving spouse or qualifying children, the beneficiaries receive the excess, if any, of the accumulated contributions at the time of retirement over the total annuity benefits received before death. The benefit includes the full pension for the month in which the pensioner died plus an additional fifteen-day pay

288

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

period payable to the member's eligible beneficiaries, but in no case, may the benefit be less than $1,000 per month (prior to discounting any debts with TRS).

Post-retirement – For members who retire on or after August 1, 2014: If the member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent option form of payment, the applicable survivor benefit will be granted. Otherwise, the excess, if any, of the accumulated contributions at the time of retirement over the total annuity benefits received before death is payable to the beneficiaries or to the member's estate.

*(5) Refunds*

A participating employee who ceases his or her employment with the Commonwealth on or before July 31, 2014 without the right to a retirement annuity has the right to a refund of the employee contributions paid to TRS, plus any interest earned thereon.

*(6) Early Retirement Program*

On January 27, 2000, Act No. 44 was approved, which provided that effective March 9, 2000, members were eligible for early retirement upon attaining the age of 50 and 28 years of service in the first year of implementation and age 50 and 25 years of service in subsequent years. Those who selected early retirement under these conditions receive monthly benefits equal to 75% of their average compensation, which was computed based on the highest 36 months of compensation recognized by TRS. Effective July 31, 2001, the option for early retirement was closed. On January 27, 2001, Act No. 45 was approved, that established 50 years as the minimum age requirement to obtain a pension benefit equal to 75% of average compensation with 30 years of service. In these cases, the retiree pays the participating employee contribution until attaining 55 years of age. Act No. 160 of 2013 imposed the same obligation on the employer.

**Contributory Hybrid Program**

A hybrid plan, such as a cash balance plan, (i) determines the benefit amount based on a formula using contributions and earning credits, (ii) has notional individual accounts for members, and (iii) provides lifetime annuity benefits. Prior to August 23, 2017, each member had a defined contribution account that was credited with member contributions and investment yield. Upon retirement, the balance in the account was paid as a lifetime annuity. The program was defined as hybrid because it contained some features that are commonly found in defined benefit (DB) plans and other features that are commonly found in defined contribution (DC) plans, such as:

- The members contributed a fixed percentage of payroll to their account. In DB plans, the percentage is usually fixed. In DC plans, the percentage is usually elected by the member.

- The defined contribution account was credited each semester with TRS's investment portfolio's net rate of return. The return was determined by the Board and will not be less than 80% of TRS's investment portfolio net rate of return. Account growth via the application of investment earnings is a common feature of DC plans.

- Assets were invested by TRS. This feature is more commonly found in DB plans. Conversely, DC plans commonly allow for the members to elect their investments on an individual basis and the member contributions are then actually invested in the options selected by the member.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- Upon retirement, the balance in the account was paid to the member in the form of a lifetime annuity with optional survivor benefits. TRS was responsible for investment and longevity risk during retirement. This annuity feature is common in DB plans.

Prior to August 23, 2017, members of TRS hired on or after August 1, 2014 were eligible for the benefits described below:

*(1) Retirement Annuity*

Members with five or more years of service and $10,000 or more in contributions at the age of 62 will qualify for an annuity of the percentage acquired by contributions based on the actuarial formula.

The pension of each member is computed upon retirement as follows: (i) the accumulated balance of member contributions to the defined contribution account on the date of retirement, divided by (ii) a factor, established by TRS Board in consultation with its actuaries and to be determined on the basis of the actuarial life expectancy of the participant and a specific interest rate.

*(2) Deferred Retirement Annuity*

Members with five or more years of service and $10,000 or more in contributions will qualify for an annuity calculated based on the balance of the defined contribution account. If separated from service with the requirements but with less than 62 years of age, the annuity will be deferred until reaching 62 years of age.

*(3) Disability Annuity*

Any member who enrolled in TRS after August 1, 2014, and after five years in the public service suffers a disability, whether work related or not, is granted a disability pension by TRS computed on the basis of such members individual contributions, as determined by TRS through regulations.

*(4) Death Benefits*

Prior to August 23, 2017, there were two death benefit options for beneficiaries of new members joining on or after August 1, 2014 upon such members retirement and death:

(a)  continue to receive the monthly annuity payments until the balance, if any, of the contributions to the defined contribution account is exhausted or

(b)  request reimbursement in one global payment of the balance, if any.

*(5) Refunds*

Prior to August 23, 2017, A member with less than five years of service or less than $10,000 in contributions qualified for a reimbursement. Specifically, a refund of contributions and earnings in such member's defined contribution account.

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

**Special Benefits**

Act No. 160 of 2013 provides for a reduction in the special laws for pensioners as of July 31, 2014 and the elimination of special laws for future pensioners who retire on or after August 1, 2014. Special benefits include the following:

*(1) Christmas Bonus*

An annual bonus of $600 for each retiree and disabled member paid each December. TRS pays $150 per retiree and disabled member and the remaining bonus is paid by the Commonwealth's General Fund. After August 1, 2014, for active participants that retired on or before July 31, 2014, the bonus will be $200 and paid from the Commonwealth's General Fund.

*(2) Medication Bonus*

An annual bonus of $100 for each retiree, beneficiary, and disabled member paid each July to cover health costs. Evidence of coverage is not required. This benefit is paid from the Commonwealth's General Fund. Act No. 160 of 2013 kept this benefit for active participants that retired on or before July 31, 2014.

*(3) Summer Bonus*

Prior to Act No. 160 of 2013 an annual bonus of $100 for each retiree, beneficiary, and disabled member was paid each July. This benefit was prorated if there were multiple beneficiaries and was paid from the Commonwealth's General Fund. Act No. 160 of 2013 eliminated this benefit for all retirees.

*(4) Cost of Living Adjustments*

Act No. 62 of September 4, 1992 provided, subject to the Legislature's approval, for increases of 3% every three years in pensions to those members with three or more years of retirement. In years 1995, 1998, 2001, 2004, and 2007, the Legislature replicated the benefit granted per Act No. 62 of September 4, 1992. This benefit is paid from the Commonwealth's General Fund. Act No. 160 of 2013 did not alter this benefit.

*(5) Other Pension Increase Acts*

Act No. 128 of June 10, 1967, and Act No. 124 of June 8, 1973, provided a pension increase (from 2% to 10%) based on the monthly pension. Act No. 47 of June 1, 1984, provided a pension increase based on credited service worked. These increases are paid from the Commonwealth's General Fund. Act No. 160 of 2013 did not alter this benefit.

*(6) Cultural Loans*

Act No. 22 of June 14, 1965, provides a 50% repayment of the interest that would be paid by active teachers and retirees. This benefit is paid from the Commonwealth's General Fund. Act No. 160 of 2013 did not alter this benefit.

*(7) Death Benefit*

Act No. 272 of March 29, 2004, increased the death benefit of $500 to $1,000. This $500 increase is paid from the Commonwealth's General Fund. Under Act No. 160 of 2013, this benefit will apply only at the death of members who joined TRS on or before July 31, 2014.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The special benefits contributions of approximately $65.1 million in 2016 represent contributions from the General Fund of the Commonwealth for the special benefits granted by special laws. The funding of the special benefits is provided to TRS through legislative appropriations each January 1 and July 1. The legislative appropriations are considered estimates of the payments to be made by TRS for the special benefits. Deficiencies in legislative appropriations are covered by TRS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits.

**Contributions**

The contribution requirement to TRS is established by law and is not actuarially determined.

*(1) Member Contributions*

    (a) Contributions by members hired on or before July 31, 2014 are 9% of compensation.

    (b) Contributions by members hired on or after August 1, 2014 are as follows: (i) 10% of compensation for fiscal years 2015 through 2017, (ii) 13.12% of compensation for fiscal years 2018 through 2020, and (iii) 14.02% of compensation for fiscal year 2021 and each year thereafter.

*(2) Employer Contributions*

    (a) Payroll-Based Employer Contributions: Commonwealth and TRS contributions, as applicable, are 9.5% of compensation for the fiscal year beginning July 1, 2011. For the next four fiscal years (July 1, 2012 through July 1, 2015) employer contributions will increase annually by 1%. For the next five fiscal years, (July 1, 2016 through July 1, 2020) employer contributions will increase annually by 1.25%, reaching an employer contribution rate of 19.75% effective July 1, 2020. Effective July 1, 2021 and later fiscal years, the employer contribution rate will be 20.525%.

    (b) Supplemental Contributions: From fiscal year 2015 and each subsequent fiscal year thereafter, the General Fund of the Commonwealth will provide TRS with a supplemental a contribution of $1,675 per pensioner, regardless of whether the pensioner retired before or after August 1, 2014, to pay for special benefits (i.e., Christmas and medication bonuses) and medical insurance plan contribution.

    (c) Teacher's Justice Uniform Contribution: The annual contribution to be made to TRS is equal to $30 million in fiscal year 2017, $30 million in fiscal year 2018, and $60 million in each fiscal year from fiscal year 2019 through fiscal year 2042. The Teacher's Justice Uniform Contribution is paid from the Commonwealth's General Fund.

    (d) Annual Additional Contribution: The annual contribution certified by the external actuary of TRS as necessary to prevent the value of the projected gross assets of TRS from falling below $300 million during any subsequent fiscal year. The Annual Additional Contribution is paid from the Commonwealth's General Fund for each fiscal year from fiscal year 2019 through fiscal year 2042. For additional information on the status of these contributions, refer to Note 2.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

#### (d) Membership as of July 1, 2014

| | JRS | TRS |
|---|---|---|
| Retirees, beneficiaries and disabled members currently receiving benefits | 431 | 41,661 |
| Current participating employees | 365 | 37,700 |
| Terminated vested participants not yet receiving benefits | 41 | 527 |
| Total | 837 | 79,888 |

#### (e) Net Pension Liability

The Commonwealth's net pension liability as of June 30, 2016 was measured as of June 30, 2015, and the total pension liability used to calculate the net pension liability was determined by an actuarial valuation with beginning of year census data as of July 1, 2014 that was updated to roll forward the total pension liability to June 30, 2015, assuming no gains or losses. After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

*(i) Actuarial Methods and Assumptions*

The total pension liabilities in the June 30, 2015 actuarial valuations were determined using the following actuarial methods and assumptions, applied to all periods included in the measurement:

| | ERS | JRS | TRS |
|---|---|---|---|
| Actuarial cost method | Entry age normal | Entry age normal | Entry age normal |
| Asset-valuation method | Market value of assets | Market value of assets | Market value of assets |
| Actuarial assumptions: | | | |
| Inflation | 2.5% | 2.5% | 2.5% |
| Investment rate of return, net of investment expenses, including inflation | 6.5 | 5.5 | 6.7 |
| Municipal bond index | 3.8 | 3.8 | 3.8 |
| Discount rate | 3.8 | 3.8 | 3.8 |

293

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| | ERS | JRS | TRS |
|---|---|---|---|
| Projected salary increases per annum | 3.0% per annum. No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 and the current general economy. | 3.0% per annum. No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 and the current general economy. | 2.5% per annum general wage inflation plus service-based merit increases. No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 and the current general economy. |
| Cost-of-living adjustments | None assumed. | None assumed. | None assumed. |

The mortality tables used in the June 30, 2015 actuarial valuations were as follows:

- Pre-Retirement Mortality: For ERS general employees not covered under Act No. 127 and for TRS members, RP-2014 Employee Mortality Rates for males and females adjusted to reflect Mortality improvement Scale MP-2015 from the 2006 base year and projected forward using MP-2015 on a generational basis. For ERS members covered under Act No. 127, RP 2014 Employee Mortality Rates are assumed with blue collar adjustments for males and females, adjusted to reflect Mortality Improvement Scale MP-2015 from the 2006 base year, and projected forward using MP-2015 on a generational basis. As generational tables, they reflect mortality improvements both before and after the measurement date.

- For ERS, 100% of deaths while in active service are assumed to be occupational only for members covered under Act No. 127. For JRS, among deaths while in active service, 50% are assumed to be occupational and 50% are assumed to be nonoccupational.

- Post-Retirement Healthy Mortality: For ERS and TRS, rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of the plan's experience from 2007 to 2012 equal to 92% of the rates from the UP 1994 Mortality Table for Males and 95% (ERS) or 87% (TRS) of the rates from the UP 1994 Mortality Table for Females. The rates are projected on a generational basis using Mortality Improvement Scale MP-2015 on a generational basis. As a generational table, it reflects mortality improvements both before and after the measurement date.

- For JRS, RP 2014 Healthy Annuitant Mortality Rates are assumed with white collar adjustments for males and females, adjusted to reflect Mortality Improvement Scale MP-2015 from the 2006 base year, and projected forward using MP-2015 on a generational basis. As generational tables, it reflects mortality improvements both before and after the measurement date.

- Post-Retirement Disabled Mortality: For ERS, rates which vary by gender are assumed for disabled retirees based on a study of the plan's experience from 2007 to 2012 equal to 105% of the rates from the UP 1994 Mortality Table for Males and 115% of the rates from the UP 1994 Mortality Table for Females. The base rates are projected using Mortality Improvement Scale MP-2015 on a generational basis. No provision was made for future mortality improvement for disabled retirees.

# COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

For TRS, rates which vary by gender are assumed for disabled retirees based on a study of the plan's experience from 2007 to 2012 equal to the rates in the UP 1994 Mortality Table for Males and Females. The base rates are projected using Mortality Improvement Scale MP-2015 on a generational basis. No provision was made for future mortality improvement for disabled retirees.

- For JRS, RP 2014 Disabled Annuitant Mortality Rates for males and females are assumed adjusted to reflect Mortality Improvement Scale MP-2015 from the 2006 base year and projected forward using MP-2015 on a generational basis. No provision was made for future mortality improvement for disabled retirees.

*(ii)* *Long-term Expected Rate of Return on Investments*

The long-term expected rate of return on pension benefit investments was determined in accordance with the portfolio asset allocation adopted by the corresponding boards of the Retirement Systems during December 2013 for ERS, December 2010 for TRS and October 2014 for JRS and the actuary's capital market assumptions as of June 30, 2015. The long-term expected rate of return on pension benefit investments as of June 30, 2015 and 2014 was 6.55% and 6.75% for ERS, respectively, 6.65% for both years for TRS, and 5.50% and 5.35% for JRS, respectively. In the case of ERS, the long-term expected rate of return on pension benefit investments was slightly higher than the debt service of the senior pension funding bonds payable which, ranged from 5.85% per year to 6.55% per year. After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

The Retirement Systems' policies in regard to allocation of invested assets is established and may be amended by the corresponding Retirement System's Board. Plan assets are managed on a total return basis with a long-term objective of achieving and maintaining a positive impact on each of the Retirement Systems' financial condition for the benefits provided through the pension programs. The following are of the Retirement System Board's adopted asset allocation policies as of June 30, 2015:

| | ERS | | TRS | | JRS | |
|---|---|---|---|---|---|---|
| | Target allocation | Long-term expected rate of return | Target allocation | Long-term expected rate of return | Target allocation | Long-term expected rate of return |
| Asset class: | | | | | | |
| Domestic equity | 25% | 6.4% | 25% | 6.8% | 18% | 6.4% |
| International equity | 10 | 6.7 | 10 | 7.6 | 7 | 6.7 |
| Fixed income | 64 | 6.3 | 64 | 3.9 | 74 | 4.9 |
| Cash | 1 | 3.0 | 1 | 2.9 | 1 | 3.0 |
| Total | 100% | | 100% | | 100% | |

The long-term expected rates of return on pension benefit investments were determined using a building block method in which best estimate ranges of expected future real rates of return (expected returns, net of pension plan investment expense and inflation) were developed for each major asset class. These ranges were combined to produce the long-term expected rate of return by weighting the expected future real rates of return by the target asset allocation percentage and by adding expected inflation.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(iii)   Date of Depletion and Discount Rate*

The asset basis for the date of depletion projection is each of the Retirement Systems' fiduciary net position (the gross assets plus deferred outflows of resources less the gross liabilities, including the senior pension funding bonds payable, plus deferred inflows of resources). On this basis, ERS's fiduciary net position was exhausted in fiscal year 2015. The fiduciary net position for each of TRS and JRS is expected to be exhausted in fiscal years 2019 and 2018, respectively. The projections assume that certain illiquid assets (consisting primarily of loans to members), of approximately $762 million, $444 million and $477 thousand as of June 30, 2015 for ERS, TRS and JRS, respectively, will be converted to cash when needed.

The discount rate used to measure the total pension liability decreased from 4.29% per annum in June 30, 2014 to 3.80% per annum in June 30, 2015, for ERS, from 4.33% and 4.30% per annum in June 30, 2014 for both TRS and JRS, respectively, to 3.82% per annum in June 30, 2015.

The fiduciary net position of ERS was not projected to be available to make all projected future benefit payments of current active and inactive employees. The date of depletion projection in the actuarial report does not include any amounts from the additional uniform contribution required by Act No. 32 because of actual fiscal and budgetary financial difficulties, continued budget deficits and liquidity risks of the Commonwealth and its municipalities, and the risk that the financial condition of the Commonwealth and its municipalities do not improve in the near term. Therefore, the tax-free municipal bond index (Bond Buyer General Obligation 20 Bond Municipal Bond Index) was applied to all periods of projected benefits payments to determine the total pension liability. The discount rate for ERS was 3.80% as of June 30, 2015. After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.   For further information regarding such pension legislation, see Note 3 and Note 23.

The fiduciary net positions of TRS and JRS are not expected to be available to make all projected future benefit payments of current active and inactive members. Therefore, the discount rate for calculating the total pension liability is equal to the single equivalent rate that results in the same actuarial present value as the long-term expected rate of return applied to benefit payments, to the extent that the pension plan's fiduciary net position is projected to be sufficient to make projected benefit payments, and the tax free municipal bond index rate (Bond Buyer General Obligation 20 Bond Municipal Bond Index) applied to benefit payments, to the extent that the pension plan's fiduciary net position is not projected to be sufficient. The TRS and the JRS discount rate was 3.82% as of June 30, 2015.

296

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

(iv)  *Changes in Net Pension Liability of TRS and JRS*

Changes in the Commonwealth's net pension liability of TRS and JRS as of period June 30, 2016 (using a June 30, 2015 measurement date) were as follows (in thousands):

| | TRS | | | JRS | | |
|---|---|---|---|---|---|---|
| | Total pension liability | Plan fiduciary net position | Net pension liability | Total pension liability | Plan fiduciary net position | Net pension liability |
| Balance at July 1, 2014 | $  14,807,703 | 1,703,779 | 13,103,924 | 502,075 | 46,067 | 456,008 |
| Changes for the year: | | | | | | |
| Service cost | 273,754 | — | 273,754 | 16,375 | — | 16,375 |
| Interest on total pension liability | 637,849 | — | 637,849 | 21,861 | — | 21,861 |
| Changes in benefit terms | — | — | — | — | — | — |
| Differences between expected and actual experience in measuring the total pension liability | 88,544 | — | 88,544 | (4,670) | — | (4,670) |
| Changes in assumptions | 1,235,988 | — | 1,235,988 | 72,805 | — | 72,805 |
| Contributions – employer | — | 194,541 | (194,541) | — | 12,337 | (12,337) |
| Contributions – employees | — | 105,120 | (105,120) | — | 3,676 | (3,676) |
| Contributions – transfers | — | 2,345 | (2,345) | — | — | — |
| Pension plan net investment income | — | 59,921 | (59,921) | — | 899 | (899) |
| Other income | — | 1,057 | (1,057) | — | 873 | (873) |
| Benefit payments, including refunds of contributions | (736,107) | (736,300) | 193 | (23,134) | (23,134) | — |
| Pension plan net administrative expenses | — | (19,382) | 19,382 | — | (546) | 546 |
| Net changes | 1,500,028 | (392,698) | 1,892,726 | 83,237 | (5,895) | 89,132 |
| Balance at June 30, 2015 | $  16,307,731 | 1,311,081 | 14,996,650 | 585,312 | 40,172 | 545,140 |

The net pension liabilities for TRS and JRS of approximately $15 billion and $545 million, respectively, as of June 30, 2016 are included as part of the Governmental Activities of the Primary Government in the statement of net position.

Actuarial assumptions are revised periodically to more closely reflect both actual and anticipated future experience. Due to the change in the census collection date to the beginning of the fiscal year rather than the end of the fiscal year, demographic gain/loss during the year is limited to the difference between actual and expected benefit payments, which arise from differences in termination and retirement activity and mortality versus expectations.

The June 30, 2015, actuarial valuation for TRS reflect increases in the total pension liability as follows: (i) approximately $1.2 billion loss as a result of the changes in assumptions, and (ii) approximately $89 million loss as a result of the update of the census data to reflect outsized retirement activity during the fiscal year 2015, plus the difference between actual and expected benefit payments, which arise from differences in retirement activity and actual mortality versus expectations.

The June 30, 2015, actuarial valuation for JRS reflects an increase of approximately $73 million in the total pension liability because of changes in assumptions related to the change in the discount

297

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

rate as required by GASB Statement No. 67 from 4.30% in fiscal year 2014 to 3.82% in fiscal year 2015 and a decrease of approximately $4.7 million in the total pension liability because of differences between expected and actual experience. No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 of 2014.

*(v)*   *Sensitivity of Net Position Liability to Changes in Discount Rate*

The following table presents the Commonwealth's net pension liability for TRS and JRS calculated as follows (in thousands): (i) using the discount rate of 3.82%, as well as what such rate would be if calculated using a discount rate of 1% point lower (2.82%) or 1% percentage point higher (4.82%) than the current rate:

| | | TRS | | | JRS | |
|---|---|---|---|---|---|---|
| | 1% decrease (2.82%) | Current discount rate (3.82%) | 1% increase (4.82%) | 1% decrease (2.82%) | Current discount rate (3.82%) | 1% increase (4.82%) |
| Net pension liability | $   17,426,298 | 14,996,650 | 13,013,440 | 630,010 | 545,140 | 476,106 |

The following table presents the Commonwealth's proportionate share of the net pension liability for ERS calculated using the discount rate of 3.80%, as well as what the Commonwealth's proportionate share of the net pension liability would be if it were calculated using a discount rate of 1% point lower (2.80%) or 1% percentage point higher (4.80%) than the current rate (in thousands):

| | | 1% decrease (2.80%) | Current discount rate (3.80%) | 1% increase (4.80) | Information basis |
|---|---|---|---|---|---|
| Commonwealth's proportionate share of the net pension liability | $ | 24,906,720 | 21,848,093 | 19,342,037 | Audited |
| Commonwealth's proportionate share of the net pension liability | $ | 127,589 | 111,921 | 99,083 | Unaudited |

298

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

*(vi)   Commonwealth Proportion of Net Pension Liability of ERS*

The following table presents the Commonwealth's proportionate share of the net pension liability of ERS as of June 30, 2016, and the proportion percentage of the aggregate net pension liability of ERS allocated to the Commonwealth (in thousands):

| | Governmental activities | Business-type activities | Totals primary government | Information basis |
|---|---|---|---|---|
| Commonwealth's proportion of the net pension liability | 63.58% | 1.95% | 65.53% | Audited |
| Commonwealth's proportionate share of the net pension liability | $   21,196,442 | 651,651 | 21,848,093 | Audited |
| Commonwealth's proportion of the net pension liability | 0.34% | — | 0.34% | Unaudited |
| Commonwealth's proportionate share of the net pension liability | $   111,921 | — | 111,921 | Unaudited |

The Commonwealth's proportion of ERS's net pension liability was based on the actual required contributions of each of the participating employers that reflect each employer's projected long-term contribution effort. The contributions that reflect each employer's projected long-term contribution effort included in the proportionate share calculation are: (1) Act No. 116 of 2010 statutory payroll-based contribution, (2) Act No. 3 of 2013 supplemental contribution, and (3) other special law contributions. Contributions to ERS of approximately $501 million were required during the period subsequent to the measurement date or during the period ended June 30, 2016. Other contributions to ERS that do not reflect an employer's projected long-term contribution effort, such as contributions that separately finance specific liabilities of an individual employer to ERS (i.e. local employer early retirement incentives), were excluded from the proportionate share calculation.

In addition, Act No. 32 of 2013 Additional Uniform Contribution (AUC), which is a contribution that reflects each employer's projected long-term contribution effort, was excluded from the proportionate share calculation because its collectability from various employers, including the Commonwealth, is uncertain at this moment. This prevents an overallocation of GASB Statement No. 68 amounts to the employers who have paid their AUC (or are expected to do so) and an underallocation of GASB Statement No. 68 amounts to the employers who have not paid their AUC (or are not expected to do so).

*(vii)   Changes in Assumptions*

Actuarial assumptions are revised periodically to more closely reflect both actual and anticipated future experience. Due to the change in the census collection date to the beginning of the fiscal year, rather than the end of the fiscal year, demographic gain/loss during the year is limited to the

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

difference between actual and expected benefit payments, which arise from differences in termination and retirement activity and mortality versus expectations.

The June 30, 2015 actuarial valuation for ERS reflects an increase of approximately $2.8 billion in the total pension liability because of the changes in assumptions related to the change in the discount rate as required by GASB Statement No. 67 and an increase of approximately $464 million in the total pension liability because of differences between expected and actual experience. With the enactment of Act No. 3 of 2013, termination, retirement and disability rates were added for new Act No. 3 members. Also, the compensation increase assumption was revised due to Act No. 66 of 2014.

After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

*(f)* *Pension Expense and Deferred Outflows of Resources and Deferred Inflows of Resources from Pension Activities*

Pension expense recognized by the Commonwealth for the year ended June 30, 2016 related to the Retirement Systems were as follows (in thousands):

| Retirement systems | | Governmental activities | Business-type activities | Totals primary government | Information basis |
|---|---|---|---|---|---|
| ERS | $ | 1,239,917 | 52,488 | 1,292,405 | Audited |
| ERS | | (5,010) | — | (5,010) | Unaudited |
| TRS | | 941,124 | — | 941,124 | Unaudited |
| JRS | | 49,447 | — | 49,447 | Audited |
| Total | $ | 2,225,478 | 52,488 | 2,277,966 | |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Deferred outflows and deferred inflows of resources from pension activities by source reported by the Commonwealth in the statement of net position as of June 30, 2016 for each of the Retirement Systems were as follows (in thousands):

| Retirement system | Source | Governmental activities | | Business-type activities | | Information basis |
| | | Deferred outflows of resources | Deferred inflows of resources | Deferred outflows of resources | Deferred inflows of resources | |
|---|---|---|---|---|---|---|
| ERS | Differences between expected and actual experience in measuring total pension liability | $    24,496 | 245,794 | 753 | 7,557 | Audited |
| | Changes in assumptions | 2,017,769 | — | 62,033 | — | Audited |
| | Net difference between projected and actual earnings on pension plan investments | — | 121,884 | — | 3,747 | Audited |
| | Changes in proportion and differences between actual contributions and proportionate share | 53,979 | 613,981 | 59,365 | — | Audited |
| | Employer contributions made subsequent to the measurement date | 503,264 | — | 13,967 | — | Audited |
| | Total ERS | 2,599,508 | 981,659 | 136,118 | 11,304 | |

301

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| Retirement system | Source | Governmental activities | | Business-type activities | | Information basis |
|---|---|---|---|---|---|---|
| | | Deferred outflows of resources | Deferred inflows of resources | Deferred outflows of resources | Deferred inflows of resources | |
| ERS | Differences between expected and actual experience in measuring total pension liability | $ 129 | 1,298 | — | — | Unaudited |
| | Changes in assumptions | 10,654 | — | — | — | Unaudited |
| | Net difference between projected and actual earnings on pension plan investments | — | 644 | — | — | Unaudited |
| | Changes in proportion and differences between actual contributions and proportionate share | — | 59,843 | — | — | Unaudited |
| | Employer contributions made subsequent to the measurement date | 1,904 | — | — | — | Unaudited |
| | Total ERS | 12,687 | 61,785 | — | — | |
| | Total ERS | 2,612,195 | 1,043,444 | 136,118 | 11,304 | |
| TRS | Differences between expected and actual experience in measuring total pension liability | 197,383 | — | — | — | Unaudited |
| | Changes in assumptions | 1,119,104 | — | — | — | Unaudited |
| | Net difference between projected and actual earnings on pension plan investments | — | 20,656 | — | — | Unaudited |
| | Changes in proportion and differences between actual contributions and proportionate share | — | — | — | — | Unaudited |
| | Employer contributions made subsequent to the measurement date | 213,675 | — | — | — | Unaudited |
| | Total TRS | 1,530,162 | 20,656 | — | — | |

302

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| Retirement system | Source | Governmental activities | | Business-type activities | | Information basis |
|---|---|---|---|---|---|---|
| | | Deferred outflows of resources | Deferred inflows of resources | Deferred outflows of resources | Deferred inflows of resources | |
| JRS | Differences between expected and actual experience in measuring total pension liability | $  — | 6,057 | — | — | Audited |
| | Changes in assumptions | 58,404 | — | — | — | Audited |
| | Net difference between projected and actual earnings on pension plan investments | — | 3,926 | — | — | Audited |
| | Changes in proportion and differences between actual contributions and proportionate share | — | — | — | — | Audited |
| | Employer contributions made subsequent to the measurement date | 27,323 | — | — | — | Audited |
| | Total JRS | 85,727 | 9,983 | — | — | |
| Total | Differences between expected and actual experience | 222,008 | 253,149 | 753 | 7,557 | |
| | Changes in assumptions | 3,205,931 | — | 62,033 | — | |
| | Net difference between projected and actual earnings on pension plan investments | — | 147,110 | — | 3,747 | |
| | Changes in proportion and differences between actual contributions and proportionate share | 53,979 | 673,824 | 59,365 | — | |
| | Employer contributions made subsequent to the measurement date | 746,166 | — | 13,967 | — | |
| | Total | $  4,228,084 | 1,074,083 | 136,118 | 11,304 | |

Amounts reported as deferred outflows/inflows of resources from pension activities as of June 30, 2016 will be recognized in the pension expense as follows (in thousands):

| | ERS | TRS | JRS | Total |
|---|---|---|---|---|
| Year ending June 30: | | | | |
| 2017 | $  332,829 | 216,064 | 16,603 | 565,496 |
| 2018 | 332,829 | 216,064 | 16,603 | 565,496 |
| 2019 | 332,829 | 216,064 | 15,117 | 564,010 |
| 2020 | 364,188 | 232,944 | 98 | 597,230 |
| 2021 | 372,236 | 225,448 | — | 597,684 |
| Thereafter | — | 189,247 | — | 189,247 |
| Total | $  1,734,911 | 1,295,831 | 48,421 | 3,079,163 |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Deferred outflows of resources related to pensions resulting from the Commonwealth required contributions subsequent to the measurement date were approximately $505.2 million, $213.7 million and $27.3 million as of June 30, 2016 for the corresponding proportionate share of ERS, for TRS and for JRS, respectively, and will be recognized as a reduction of the net pension liability in the year ended June 30, 2017. This amount is not included in the table above.

After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

*(g)  Unrecorded Pension Amounts – Primary Government*

These additional amounts (in thousands) of GASB Statement No. 68 and No. 71 should have been recognized as of June 30, 2016 and are considered unaudited because they relate to blended component units of the Commonwealth, reported as part of the Primary Government, which are audited by other auditors that did not implement the requirements of GASB Statements No. 68 and No. 71 in their respective separately issued financial statements.

After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

| | | Unaudited | |
| FS Caption | Governmental activities | Business-type activities | Total primary government |
| --- | --- | --- | --- |
| Net pension liability | $ 495,453 | 77,052 | 572,505 |
| Pension Expense | 38,615 | 6,662 | 45,277 |
| Deferred outflows of resources | 95,642 | 18,058 | 113,700 |
| Deferred inflows of resources | 8,742 | 1,337 | 10,079 |

*(h)  Net Pension Liability Information for Discretely Presented Component Units*

As mentioned in Note 1(s), for purposes of the stand-alone financial statements of each of the discretely presented component units, which audit reports for fiscal year 2016 had already been issued prior to the issuance of the accompanying financial statements of the Commonwealth, ERS did not timely provide the information needed to apply GASB Statements No. 68 and No. 71. Therefore, the majority of the component units were unable to apply these accounting pronouncements. Of the component units that applied GASB Statements No. 68 and No. 71 in their stand-alone audited financial statements, most were based on unaudited information (except for PREPA and UPR which were able to use audited information because they each have their own separate retirement systems). As a result, the majority of the component units have maintained the accounting for pension costs in accordance with GASB Statement No. 27, also based from the standpoint of a participant in a multiple employer cost sharing plan. Accordingly, pension costs recognized for most of the component units were principally

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

equal to the statutorily or contractually required contributions, with a liability recorded for any unpaid required contributions.

After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

*(i)   Plan Description and Membership*

**University of Puerto Rico Retirement System**

The University of Puerto Rico Retirement System (UPR Retirement System) is a single-employer, defined benefit pension plan that covers all employees of UPR with the exception of hourly, temporary, part-time, contract and substitute employees, and visiting professors. It is qualified and exempt from Puerto Rico and United States income taxes. The UPR Retirement System is not subject to the requirements of the Employees Retirement Income Security Act of 1974 (ERISA). The UPR Retirement System issues a publicly available financial report that includes additional financial information, other required disclosures and required supplementary information for the plan. That report may be obtained by writing to the University of Puerto Rico Retirement System at P.O. Box 21769, San Juan, Puerto Rico 00931-1769.

**Puerto Rico Electric Power Authority Retirement System**

The Puerto Rico Electric Power Authority Retirement System (PREPA Retirement System) is a single-employer, defined benefit pension plan that covers all permanent full-time employees of PREPA administered by Employees' Retirement System of the Puerto Rico Electric Power Authority. It is qualified and exempt from Puerto Rico and United States income taxes. The PREPA Retirement System is not subject to the requirements of the Employees Retirement Income Security Act of 1974 (ERISA). The PREPA Retirement System issues a publicly available financial report that includes additional financial information, other required disclosures and required supplementary information for the plan. That report may be obtained by writing to the Retirement System of the Puerto Rico Electric Power Authority, PO Box 13978, San Juan, Puerto Rico 00908-3978.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(ii)  Recognition of Pension Amounts*

For those component units that did apply the GASB Statements No. 68 and No. 71, the following consists of the Net Pension Liability and Pension Expense recognized on the accompanying basic financial statements under the Component Units opinion unit (in thousands):

|  | Net pension liability | Pension expense | Information basis |
|---|---|---|---|
| Major component units: | | | |
| PREPA | $  3,603,802 | 528,000 | Audited |
| UPR | 1,796,727 | (49,350) | Audited |
| SIFC | 1,417,963 | 81,300 | Unaudited |
| Total major component units | 6,818,492 | 559,950 | |
| Nonmajor component units: | | | |
| CCCPRC | 151,604 | 12,386 | Audited |
| Various | 436,566 | 23,306 | Unaudited |
| Total nonmajor component units | 588,170 | 35,692 | |
| Total component units | $  7,406,662 | 595,642 | |

306

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The following consists of the deferred outflows and deferred inflows of resources from pension activities by source reported at June 30, 2016 by those component units referred to (in thousands):

| Major component unit | Source | Deferred outflows of resources | Deferred inflows of resources |
|---|---|---|---|
| PREPA (Audited) | Employer contributions made subsequent to the measurement date | $ 113,315 | — |
| | Differences between expected and actual experience in measuring the total pension liability | 36,113 | — |
| | Changes in assumptions | 1,032,263 | 46,362 |
| | Net difference between projected and actual earnings on pension plan investments | — | 11,947 |
| | Total PREPA | 1,181,691 | 58,309 |
| UPR (Audited) | Employer contributions made subsequent to the measurement date | 77,811 | — |
| | Differences between expected and actual experience in measuring the total pension liability | — | 246,653 |
| | Changes in assumptions | 24,568 | 5,546 |
| | Net difference between projected and actual earnings on pension plan investments | — | 49,219 |
| | Total UPR | 102,379 | 301,418 |
| SIFC (Unaudited) | Employer contributions made subsequent to the measurement date | 30,629 | — |
| | Differences between expected and actual experience in measuring the total pension liability | — | 11,347 |
| | Changes in assumptions | 48,398 | — |
| | Total SIFC | 79,027 | 11,347 |
| Total | Employer contributions made subsequent to the measurement date | 221,755 | — |
| | Differences between expected and actual experience in measuring the total pension liability | 36,113 | 258,000 |
| | Changes in assumptions | 1,105,229 | 51,908 |
| | Net difference between projected and actual earnings on pension plan investments | — | 61,166 |
| | Total major component units | $ 1,363,097 | 371,074 |

307

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

| Nonmajor component units | Source | Deferred outflows of resources | Deferred inflows of resources |
|---|---|---|---|
| Audited | Employer contributions made subsequent to the measurement date | $        3,684 | — |
| Audited | Differences between expected and actual experience in measuring the total pension liability | 175 | 1,758 |
| Audited | Changes in assumptions | 14,432 | — |
| Audited | Net difference between projected and actual earnings on pension plan investments | — | 872 |
| Audited | Changes in proportion and differences between actual contributions and proportionate share | 14,798 | — |
|  | Total nonmajor component units | 33,089 | 2,630 |
| Unaudited | Employer contributions made subsequent to the measurement date | 17,496 | 1,341 |
| Unaudited | Differences between expected and actual experience in measuring the total pension liability | 204 | 840 |
| Unaudited | Changes in assumptions | 28,888 | — |
| Unaudited | Net difference between projected and actual earnings on pension plan investments | (7,696) | 866 |
| Unaudited | Changes in proportion and differences between actual contributions and proportionate share | 54 | — |
|  | Total nonmajor component units | 38,946 | 3,047 |
| Total | Employer contributions made subsequent to the measurement date | 21,180 | 1,341 |
|  | Differences between expected and actual experience in measuring the total pension liability | 379 | 2,598 |
|  | Changes in assumptions | 43,320 | — |
|  | Net difference between projected and actual earnings on pension plan investments | (7,696) | 1,738 |
|  | Changes in proportion and differences between actual contributions and proportionate share | 14,852 | — |
|  | Total nonmajor component units | $       72,035 | 5,677 |

*(iii)   Unrecorded Pension Amounts*

The following pension amounts (in thousands) of GASB Statement No. 68 and No. 71 should have been recognized as of June 30, 2016 and are considered unaudited because they relate to discretely presented component units of the Commonwealth which are audited by other auditors that did not

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

implement the requirements of GASB Statements No. 68 and No. 71 in their respective separately issued financial statements.

| | Net pension liability | Pension expense | Deferred outflows of resources | Deferred inflows of resources |
|---|---|---|---|---|
| Aggregate discretely presented component units | $ 3,392,479 | 272,887 | 797,792 | 129,543 |

*(i)  Payable to the Retirement Systems*

Payable to the Retirement Systems reported by the Commonwealth at June 30, 2016 related to unpaid contributions for each of the Retirement Systems were as follows (in thousands):

| Retirement systems | Amount |
|---|---|
| ERS | $ 277,143 |
| TRS | — |
| JRS | 23,200 |
| Total | $ 300,343 |

As of June 30, 2016, ERS had an obligation with the Commonwealth of approximately $304 million. The accounts receivable from and accounts payable to ERS are presented in the Statement of Net Position as part of the due from and due to other governmental entities. After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by ERS.  For further information regarding such pension legislation, see Note 3 and Note 23.

**(19)  Other Post-Employment Benefits**

As further described in Note 1(t), the Commonwealth provides post-employment healthcare benefits through the following defined benefit plans that are administered by ERS and JRS Administration or by the TRS Administration:

- Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC)

- Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC)

- Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC)

309

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

After June 30, 2016, the Commonwealth enacted legislation that changed the structure of pension benefits administered by the ERS and JRS Administration.  For further information regarding such pension legislation, see Note 3 and Note 23.

*(a) Plans Descriptions*

ERS MIPC is an unfunded cost sharing, multiple employer defined benefit other post-employment (OPEB) plan sponsored by the Commonwealth. JRS MIPC and TRS MIPC are unfunded, single employer defined benefit OPEB plans sponsored by the Commonwealth. These OPEB plans were created under Act No. 95 approved on June 29, 1963. Healthcare benefits are provided through insurance companies whose premiums are paid by the retiree with the Commonwealth providing a matching share. ERS MIPC covers substantially all full-time employees of (1) the Primary Government and (2) certain municipalities of Puerto Rico and certain component units of the Commonwealth not having their own post-employment benefit plans. JRS MIPC covers all judges of the Judiciary Branch of the Commonwealth. TRS MIPC covers all active teachers of the Department of Education of the Commonwealth and employees of the TRS Administration.

For ERS MIPC and TRS MIPC, Commonwealth employees became plan members upon their date of employment. Plan members were eligible for benefits upon reaching the applicable pension benefits retirement age. Act No. 3 of 2013 eliminated this healthcare benefit to ERS MIPC members retired after June 30, 2013. Act No. 160 of 2013 eliminated this healthcare benefit to TRS MIPC members retired after July 31, 2014.

For JRS MIPC, judges of the Judiciary Branch of the Commonwealth become plan members upon their date of employment. Plan members are eligible for benefits upon reaching the age of 60 with 10 years of service.

Funding Policy – The contribution requirement of ERS MIPC, JRS MIPC, and TRS MIPC are established by Act No. 95 approved on June 29, 1963. Its benefit consists of a maximum of $100 per month per retiree or disabled member. Each of these OPEB plans is financed by the Commonwealth and its public corporations and municipalities on a pay as you go basis. The funding of the OPEB benefits are provided to the ERS MIPC, the JRS MIPC and TRS MIPC through legislative appropriations each July 1 by (i) the Commonwealth's General Fund for former government and (ii) certain public corporations without their own treasuries, (iii) certain public corporations with their own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by the ERS MIPC, the JRS MIPC and TRS MIPC for the healthcare benefits throughout the year. There is no contribution requirement for plan members during active employment.

Retirees contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution.

*(b) Membership as of July 1, 2015*

|  | ERS | JRS | TRS | Total |
|---|---|---|---|---|
| Retirees, disabled members and currently receiving benefits | $          110,423 | 386 | 38,488 | 149,297 |

310

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(c)* *Annual OPEB costs and Net OPEB obligation*

The annual OPEB cost and the annual required contribution (ARC) were computed as part of an actuarial valuation in accordance with parameters of GASB Statement No. 45 based on beginning of year census (demographic) data as of July 1, 2015, as adjusted. Prior year actuarial valuations were made using end of year census data.

The Commonwealth's annual OPEB cost and the net OPEB obligation for the post-employment healthcare benefits plans as of and for the year ended June 30, 2016 were as follows (in thousands):

|  | ERS MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|
| Annual OPEB cost: |  |  |  |  |
| ARC | $ 107,739 | 923 | 38,049 | 146,711 |
| Interest on net OPEB obligation | 6,242 | 68 | 1,855 | 8,165 |
| Adjustment to annual required contribution | (15,416) | (208) | (4,215) | (19,839) |
| Annual OPEB cost | 98,565 | 783 | 35,689 | 135,037 |
| Statutory sponsor's contributions made | (93,728) | (317) | (37,481) | (131,526) |
| Increase (decrease) in net OPEB obligation | 4,837 | 466 | (1,792) | 3,511 |
| Net OPEB obligation at beginning of year | 201,347 | 2,140 | 59,848 | 263,335 |
| Net OPEB obligation at year-end | $ 206,184 | 2,606 | 58,056 | 266,846 |

The net OPEB obligation at June 30, 2016 for ERS MIPC, JRS MIPC, and TRS MIPC was approximately $265 million and $1.8 million recorded in the Governmental Activities and Business-Type Activities, respectively, in the accompanying statement of net position.

*(d)* *Actuarial Methods and Assumptions*

The OPEB funded status as of June 30, 2016 was determined by the actuarial valuation with beginning of year census data as of July 1, 2015, which was updated to roll forward the funded status to June 30, 2016 and assumed no liability gains or losses.

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

The following are the most significant actuarial methods and assumptions used to estimate the net OPEB obligation at June 30, 2016 and the OPEB required annual contribution for the year ended June 30, 2016:

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Actuarial-cost method | Entry age normal | Entry age normal | Entry age normal |
| Amortization method | 18 years closed (beginning July 1, 2014), level dollar | 30 years closed, level percentage of payroll | 20 years closed (beginning July 1, 2014), level dollar |
| Remaining amortization period | 18 years | 11 years | 18 years |
| Discount rate | 3.10% | 3.20% | 3.00% |
| Projected payroll growth | N/A | 0% until June 30, 2021; 3% thereafter | N/A |
| Projected salary increases | N/A | N/A | N/A |
| Inflation | N/A | N/A | N/A |

N/A = Not applicable.

The ERS MIPC, JRS MIPC, and TRS MIPC statutory contributions as a percentage of the annual required contribution for the current year and each of the two preceding years were as follows:

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Year ended June 30, 2016 | 89.5% | 34.4% | 98.5% |
| Year ended June 30, 2015 | 93.7 | 36.3 | 104.1 |
| Year ended June 30, 2014 | 115.3 | 44.1 | 77.3 |

Actuarial valuations of an ongoing plan involve estimates of the net value of reported amounts and assumptions about the probability of occurrence of events far into the future. Including for example, assumptions about future employment and mortality. Amounts determined regarding the funded status of the plan and the ARC of the employer are subject to continuous revision because actual results are compared with past expectations and new estimates are made about the future.

Calculations are based on the types of benefits provided under the terms of the substantive plan at the time of each valuation and the pattern of sharing of costs between the employer and plan members at the time of each valuation. The projections of benefits for financial reporting purposes does not explicitly incorporate the potential effects of legal or contractual funding limitations on the pattern of cost sharing between the employer and plan members in the future.

The actuarial calculations reflect a long-term perspective. Consistent with that perspective, the actuarial methods and assumptions used include techniques designed to reduce short-term volatility in actuarial accrued liabilities and actuarial value of assets.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*(e)  Three Year Trend Information*

The three-year trend information is as follows (in thousands):

| | | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|---|
| Annual OPEB cost: | | | | |
| Year ended June 30, 2016 | $ | 98,565 | 783 | 35,689 |
| Year ended June 30, 2015 | | 95,267 | 745 | 33,946 |
| Year ended June 30, 2014 | | 82,222 | 617 | 45,902 |
| Percentage of annual OPEB cost contributed: | | | | |
| Year ended June 30, 2016 | | 95.1% | 40.5% | 105.0% |
| Year ended June 30, 2015 | | 102.2 | 41.2 | 111.3 |
| Year ended June 30, 2014 | | 124.2 | 48.9 | 78.2 |
| Net OPEB obligation: | | | | |
| At June 30, 2016 | $ | 206,184 | 2,606 | 58,056 |
| At June 30, 2015 | | 201,347 | 2,140 | 59,848 |
| At June 30, 2014 | | 203,454 | 1,702 | 63,678 |

*(f)  Funded Status*

Funded status of the post-employment healthcare benefit plans as of June 30, 2016, the most recent actuarial valuation date, is as follows (in thousands):

| | | ERS MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|---|
| Actuarial accrued liability (AAL) | $ | 1,349,503 | 6,985 | 523,230 | 1,879,718 |
| Actuarial value of assets | | — | — | — | — |
| Unfunded actuarial accrued liability | $ | 1,349,503 | 6,985 | 523,230 | 1,879,718 |

| | | ERS MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|---|
| Funded ratio | | —% | —% | —% | —% |
| Covered payroll | $ | 3,344,382 | 32,204 | 1,101,896 | 4,478,482 |
| Unfunded actuarial accrued liability as a percentage of covered payroll | | 40.4% | 21.7% | 47.5% | 42.0% |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

The schedule of funding progress presented as required supplementary information following the notes to the basic financial statements, present multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

**(20) Debt Service Deposit Agreements**

On May 26, 2005, the Commonwealth, PFC, and GDB (together the Commonwealth Entities) and Lehman Brothers Special Financing Inc. (Lehman) entered into Debt Service Deposit Agreements (DSD Agreements) effective on July 1, 2005. The objective of the DSD Agreement was for the Commonwealth Entities to secure an upfront payment in exchange for granting Lehman the rights to earnings generated from eight of its debt service funds. On September 25, 2008, as a result of Lehman commencing a case in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the United States Code, Lehman selected Hexagon Securities LLC to act as the Qualified Dealer under the DSD Agreements and delivered Qualified Securities as permitted under the DSD Agreement. Seven of the funds are associated with the Commonwealth PFC bonds, presented in the accompanying basic financial statements as Commonwealth appropriation bonds, and one fund is associated with the Commonwealth's general obligation bonds. On May 26, 2005 the Commonwealth Entities received the upfront payment of approximately $82.7 million, representing the present value of the projected earnings income adjusted for credit timing risks as well as an appropriate amount of compensation for Lehman.

With the upfront payment made as explained above, the Commonwealth Entities delivered to Lehman the required and scheduled debt service deposits and Lehman delivered qualified government debentures, which will mature before the next debt service payment date at an amount approximating such next debt service payment. Lehman will attempt to earn sufficient funds on the debt service deposit amounts, less its cost for the qualified government debentures, to make back the $82.7 million over time. At the same time, the Commonwealth Entities will be managing their borrowings and investments by increasing the predictability of its cash flows from earnings on its investments and not for purposes of speculation. The Commonwealth Entities acknowledge that, in exchange for the upfront payment received, they are foregoing their rights to receive investment earnings on the deposit amounts referred to above in the future and that, by accepting the upfront payment, the Commonwealth Entities have minimized the risks resulting from fluctuations in interest rates during the term of the DSD Agreements but also have foregone the possibility of receiving greater returns on such amounts from such fluctuations.

Under the DSD Agreements, the Commonwealth Entities will be exposed to the payment to Lehman of a Termination Amount, as defined in the agreement, principally upon the occurrence of redemption or a defeasance of the related bonds on or prior to the last scheduled deposit date. The amount of the Termination Amount will vary depending on various market conditions, as defined in the DSD Agreements. Under certain market conditions, the Termination Amount owed to Lehman by the Commonwealth may exceed the amount of the original upfront payment received.

The $82.7 million upfront payment received by the Commonwealth Entities was recognized as other revenue for budgetary purposes in 2005; however, under U.S. GAAP, such upfront payment was deferred and is being recognized proportionally over the future periods the Commonwealth Entities would have otherwise earned such interest earnings. The unamortized balance amounted to approximately $15.9 million and is a component of unearned revenue at June 30, 2016. During fiscal year 2016, approximately $3.1 million was amortized into other revenue in the Governmental Activities of the accompanying statement of activities. For

314

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

additional information regarding potential claims with respect to the debt service deposit agreements, refer to Note 23.

**(21)  Derivative Instruments**

*Hedging Derivative Instruments*

The sole hedging derivative instrument at the Primary Government as of June 30, 2016 resided at COFINA, which has entered into an interest rate exchange agreement (swap) with a counterparty in connection with the issuance of $136 million LIBOR based adjustable rate bonds within the Sales Tax Revenue Bonds Series 2007A (the Adjustable Rate Bonds) maturing August 1, 2057. The Adjustable Rate Bonds expose COFINA to variability in interest payments due to changes in interest rates. Management believes that it is prudent to limit the variability of interest payments on the Adjustable Rate Bonds. To meet this objective, management entered into a $136 million interest rate swap agreement to manage fluctuations in cash flows resulting from interest rate risk. This swap effectively changes the variable rate cash flow exposure on the Adjustable Rate Bonds to fixed cash flows. Under the terms of the interest rate swap, COFINA receives variable interest rate payments equal to the interest payment on the Adjustable Rate Bonds, and makes fixed interest rate payments at 4.92% through August 1, 2057, thereby creating the equivalent of a fixed rate debt. At June 30, 2016, the credit rating of the counterparty to this swap agreement was BBB+ by Standard & Poor's.

COFINA rejected the Swap Agreement in its Title III case, and the claim for termination payment was discharged under the Third Amended Plan of Adjustment.

The fair value and notional amount of the derivative instrument (pay fixed interest rate swap) outstanding as of June 30, 2016, designated as cash flow hedge, was as follows (in thousands):

| Notional amount | Fair value | Change in fair value from June 30, 2015 | Effective date | Floating rate indicator | Maturity date | Receives | | Pays | | Counterparty credit rating Moody's |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Type | Rate | Type | Rate | |
| | | | | 67% of 3m | | | | | | |
| $ 136,000 | (86,745) | (33,545) | 7/31/2007 | LIBOR +0.93% | 8/1/2057 | Variable | 1.357% | Fixed | 4.92% | Ba3 |

The fair value of the interest rate swap classified in Level 2 of the fair value hierarchy was estimated using the zero-coupon method. This method calculates the future net settlement payments required by the swap, assuming that the current forward rate implied by the yield curve correctly anticipates future spot interest rates. These payments are then discounted using the spot rates implied by the current yield curve for hypothetical zero-coupon bonds due on the date of each future net settlement of the swaps.

The COFINA swap does not have embedded options.

*Risks on Hedging Derivative Instruments*

By using derivative financial instrument to hedge the exposure to changes in interest rates, COFINA exposes itself to interest rate risk, credit risk, and termination risk.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Credit or Counterparty Risk – Credit risk is the failure of the counterparty (or its guarantor) to perform under the terms of the derivative contract. When the fair value of a derivative contract is positive, the counterparty owes COFINA, which creates credit risk for COFINA. When the fair value of a derivative contract is negative, COFINA owes the counterparty and, therefore, does not possess credit risk. COFINA minimizes the credit risk in derivative instruments by entering into transactions with counterparties whose credit rating is acceptable under the investment policies of COFINA. As of June 30, 2016, there was no credit risk because the fair value of the derivative instrument was negative.

Interest Rate Risk – Interest rate risk is the adverse effect on the value of a financial instrument that results from a change in interest rates. COFINA is exposed to interest rate risk on its pay fixed, receive variable swap; as LIBOR decreases, COFINA's net payment on the swap increases. At the same time, interest payments on the hedged adjustable rate bonds decrease. The interest rate risk associated with interest rate swap contracts is managed by establishing and monitoring parameters that limit the types and degree of interest rate risk that may be undertaken.

Termination Risk – Termination risk is the possibility that a hedging derivative instrument's unscheduled end will affect COFINA's liability strategy or will present COFINA with potentially significant unscheduled termination payments to the counterparty. COFINA or its counterparty may terminate a derivative instrument if the other party fails to perform under the terms of the contract. COFINA is at risk that the counterparty will terminate a swap at a time when COFINA owes it a termination payment. COFINA has mitigated this risk by specifying that the counterparty has the right to terminate only as a result of certain events, including a payment default by COFINA; insolvency of COFINA (or similar events); or a downgrade of COFINA's credit rating below BBB+ or Baa1. If at the time of termination, an investment derivative instrument is in a liability position, COFINA would be liable to the counterparty for a payment equal to the liability, subject to netting arrangements.

*Investment Derivative Instruments*

In connection with the COFINA swap agreement, on July 1, 2014, Moody's issued a downgrade on the LIBOR 2007A Bonds to a rating of Ba3. On September 24, 2014, rather than terminate the Swap Agreement, COFINA and the counterparty entered into a new credit annex (the 2014 Credit Support Annex) as well as an Amendment to the ISDA Master Agreement (the 2014 ISDA Amendment) to permit COFINA to collateralize its obligations under the Swap Agreement and to amend the termination events thereunder. The impact of the new agreement was for COFINA to post $12 million in collateral to the counterparty, as well as set up a restricted account in which a portion of the collateral be deposited for the benefit of counterparty. In addition, COFINA has committed to post up to $15 million annually in additional collateral by March 15 of each year until fiscal year 2018. Over time, the maximum amount COFINA would have to post is $60 million. In January 2015 and 2016, COFINA posted $15 million and $6.3 million in additional collateral due on March 31, 2015 and 2016, respectively. As of June 30, 2016, the collateral amount held by the counterparty is $33.3 million.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

## (22) Fund Balance (Deficit)

Below is the detail included in the fund balance (deficit) classifications for the governmental funds as of June 30, 2016 (in thousands):

| | General | Debt service | COFINA Special revenue | COFINA Debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| **Nonspendable:** | | | | | | |
| Inventory | $ 63 | — | — | — | — | 63 |
| | 63 | — | — | — | — | 63 |
| **Spendable:** | | | | | | |
| Restricted for: | | | | | | |
| General government | 7,917 | — | — | — | — | 7,917 |
| Public housing and welfare | 66,057 | — | — | — | — | 66,057 |
| Education | 1,549 | — | — | — | — | 1,549 |
| Capital projects | 2,478 | — | — | — | 215,160 | 217,638 |
| Debt service | — | 202,361 | — | 447,909 | 115,351 | 765,621 |
| Subtotal | 78,001 | 202,361 | — | 447,909 | 330,511 | 1,058,782 |
| Committed to: | | | | | | |
| General government | 256 | — | — | — | — | 256 |
| Public housing and welfare | — | — | — | — | 25,487 | 25,487 |
| Capital projects | — | — | — | — | 591 | 591 |
| Subtotal | 256 | — | — | — | 26,078 | 26,334 |
| Assigned to: | | | | | | |
| General government | 11,309 | — | — | — | — | 11,309 |
| Public housing and welfare | 6,604 | — | — | — | 2,851 | 9,455 |
| Capital projects | — | — | — | — | 1,161 | 1,161 |
| Subtotal | 17,913 | — | — | — | 4,012 | 21,925 |
| Unassigned | (1,330,618) | — | (29) | — | (75,927) | (1,406,574) |
| Total fund balance (deficit) | $ (1,234,385) | 202,361 | (29) | 447,909 | 284,674 | (299,470) |

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

### (23) Subsequent Events

Subsequent events were evaluated through May 3, 2019 to determine if any such events should either be recognized or disclosed in the 2016 basic financial statements. The subsequent events disclosed below are principally those related to debt activities, including credit rating downgrade events, other revenue and/or budget related matters and fiscal events and related legislation, both local or federal, that management believes are of public interest for disclosure.

**Primary Government**

*(a) Bonds Credit Rating Downgrades*

Soon after June 30, 2016 S&P downgraded the Commonwealth general obligation bonds, PRIFA's Special Tax Revenue Bonds and the PBA bonds; to the lowest level D rating, while Fitch did the same with the Commonwealth general obligation bonds and the PBA bonds. On April 6, 2017, Moody's downgraded PRIFA's Special Tax Revenue Bonds and the ERS bonds to a level C rating from its previous ratings of Ca and Ca, respectively. On that same date, Moody's reaffirmed the Caa3 rating on the Commonwealth's GO bonds. On June 7, 2017, S&P downgraded COFINA's senior and junior lien bonds to the default rating of D.

*(b) Debt Investigation Report*

On August 2, 2017, the Oversight Board announced its intention, pursuant to its authority under PROMESA, to conduct an investigation to review the fiscal crisis and its contributors, and examine Puerto Rico's debt and its issuance, including disclosure and selling practices. To that end, the Oversight Board named a special investigation committee (the Special Investigation Committee), and conducted a competitive process to identify and select an independent firm to conduct the investigation. On September 13, 2017 the Oversight Board announced that the Special Investigation Committee retained an independent investigator to carry out a review of the Commonwealth's debt and its connection to the current financial crisis. The Special Investigation Committee considers this investigation an integral part of the Oversight Board's mission to restore the fiscal balance and economic opportunity and to promote the Commonwealth's reentry to the capital markets. The independent investigator's work concluded, and the Oversight Board published the independent investigator's final report on August 20, 2018 (the Debt Investigation Report). The Debt Investigation Report provides an analysis of the historical and more recent macroeconomic and political factors contributing directly and indirectly to the Commonwealth's fiscal and economic crisis, the Commonwealth's municipal bond issuance process, and legislative efforts to restructure the debt, as well as the Oversight's Board investigative findings, policy recommendations, and identification of potential claims and matters for regulatory attention.

The Debt Investigation Report presented findings and recommendations on the following areas:

- GDB
- Puerto Rico Public Utilities (PREPA and PRASA)
- COFINA
- ERS
- Puerto Rico's Budgeting, External Reporting, and Accounting Functions
- Calculation of the Constitutional Debt Limit
- Credit Rating Agencies (CRAs)

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

- Selling Practices for Puerto Rico-Related Bonds
- Puerto Rico's Government Ethics Framework
- Issuers' Use of Interest Rate Swaps
- Puerto Rico's Lack of a Clear Mechanism for Validating Puerto Rico-Related Bonds Before They Issue
- Possession Tax Credit

Finally, the independent investigator presented an overview of potential causes of action. The Debt Investigation Report in its entirety can be found on the Oversight Board's website.

On August 28, 2018, the Oversight Board appointed its Special Claims Committee and delegated to the Special Claims Committee any and all authority of the Oversight Board to review the findings in the Debt Investigation Report and to take any appropriate steps, including, but not limited to, recommending and/or initiating the negotiation and/or prosecution of claims based on the findings in the Debt Investigation Report on behalf of the Title III debtors for the benefit of all creditors and parties in interest in the Title III cases. The Special Claims Committee is entitled, in its full discretion, to determine the scope of any further action, including, but not limited to, additional investigation, as well as claims to be pursued, and to retain such advisors, consultants, attorneys or other advisors as it in its sole discretion sees fit. On October 25, 2018, the Oversight Board requested proposals for counsel to assist the Special Claims Committee regarding consideration of potential claims described in the Debt Investigation Report. On November 28, 2018, the Special Claims Committee signed the contract with the firm that will provide those services. The Commonwealth is cooperating with this investigation.

On January 14, 2019, the Special Claims Committee and the Creditors' Committee filed a joint omnibus objection (the GO Claims Objection) seeking the disallowance of more than $6 billion of claims related to the Commonwealth's GO bonds issued on or after March 2012, including (a) $2.3 billion in Public Improvement Refunding Bonds, Series 2012 A issued in April 2012; (b) $415.27 million in Public Improvement Refunding Bonds, Series 2012 B issued in March 2012; and (c) $3.5 billion in General Obligation Bonds of 2014, Series A issued in March 2014 (collectively, the Challenged GO Bonds). According to the GO Claims Objection, the Challenged GO Bonds are "invalid" because, among other things, they were issued in violation of: (i) the Commonwealth Constitution's debt service limit, which should have included debt service on bonds issued by the PBA that the GO Claims Objection characterizes as a "sham" structure; (ii) the Commonwealth's constitutional balanced budget clause, which should have included $425 million of interest that was excluded; and (iii) the Commonwealth's constitutional balanced budget clause because proceeds of the Challenged GO Bonds were used to finance deficit spending. On February 15, 2019, the Title III Court entered a procedures order related to the GO Claims Objection, which gives parties until April 16, 2019 to provide notice of their participation in the proceedings related to the GO Claims Objection.

This matter is ongoing and the Commonwealth cannot predict when it will be concluded or its outcome.

**Commonwealth Retirement Systems**

The Commonwealth has historically maintained three retirement systems: (i) ERS; (ii) JRS; and (iii) TRS (collectively, the Retirement Systems).

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Faced with the eventual insolvency of ERS and the inability to reach a consensual restructuring agreement with the ERS creditors, on May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for ERS by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico. On June 15, 2017, the United States Trustee appointed the Retiree Committee in the consolidated Title III cases.

On June 23, 2017, the Legislature approved certain other assignments for the Fiscal Year 2018 Joint Resolution, which among other things, ordered ERS, JRS and TRS to liquidate their assets and pass the net proceeds to the Treasury Department. On July 20, 2017, ERS, JRS and TRS sold investments amounting to approximately $297 million.

On June 27, 2017, the Treasury Department issued Circular Letter No. 1300 46 17 in order to convey to the Primary Government's agencies, public corporations and municipalities the new implementation procedures to adopt, effective, July 1, 2017, the new PayGo mechanism for all of the Commonwealth's Retirement Systems. With the start of the fiscal year 2018, employers' contributions, contributions ordered by special laws and the Additional Uniform Contribution were all eliminated and replaced by a monthly PayGo charge that will be collected from the aforementioned government entities to pay retirees. The Retirement Systems will determine and administer the payment amount per retiree that will be charged to each agency, public corporation and municipality. The PayGo charge must be submitted to the Treasury Department before the 15th day of each month along with the individual contributions withheld from active employees. As liquid retirement funds become depleted, the PayGo charge is expected to increase.

In addition to the establishment of the PayGo mechanism, on August 23, 2017, the Governor signed into law Act No. 106 of 2017, which reformed the Retirement Systems, so that their active participants would deposit their individual contributions in a new Defined Contribution Plan that will be managed by a private entity. Act No.106 of 2017 creates the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system. Under the PayGo system, the Commonwealth makes pension payments from the General Fund, to the extent money is available, and municipalities and public corporations will reimburse the Commonwealth for any payments made on behalf of their employees. Approximately $2 billion was allocated for these purposes in the fiscal year 2018 budget. Act No. 106 of 2017 also created a Defined Contribution Plan, similar to a 401(k) plan, which guarantees the contributions of public servants, because future benefits will not be paid by the Retirement Systems. However, under the PayGo system, Puerto Rico's municipalities will remain obligated on their pension obligations.

On March 12, 2019, the Creditors' Committee filed the ERS Bond Claim Objection seeking to disallow all claims asserted against ERS based on the approximately $3.1 billion of outstanding bonds issued by ERS in 2008.  For additional information regarding the ERS Bond Claim Objection, refer to Note 3.

**Component Units**

On September 30, 2016, the Oversight Board designated the initial Commonwealth's component units subject to the PROMESA. These entities include, among others, PRASA, UPR, PREPA, and PRHTA.

## COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

Further specific subsequent events for major discretely presented component units follow:

*(a) PRHTA*

On July 1, 2016, the trustee of PRHTA's 1998 Resolution Subordinated Series Bonds notified to PRHTA that it failed to make a portion of the principal and interest payment to the trustee on July 1, 2016 and that a default under the trust agreement constitutes an event of default under the 1998 Resolution Subordinated Bonds Trust Agreement. As such, PRHTA is in default on this obligation.

On May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PRHTA by filing a petition for relief under Title III of PROMESA in the United Stated District Court for the District of Puerto Rico.

On June 30, 2017, the Oversight Board approved and certified PRHTA's Budget for the fiscal year 2018.

On July 3, 2017, the trustee of PRHTA notified PRHTA that it failed to make payment on principal and interest amounting to approximately $107.2 million and $116.9 million, respectively, under the 1968 and 1998 Bond Resolutions. Of the total amount defaulted by PRHTA approximately $76.5 million and $66.7 million of principal and interest, respectively, was paid by the insurance company under the financial guarantee insurance policy.

During September 2017, Hurricanes Irma and Maria struck the island of Puerto Rico causing widespread damages throughout the island. At the date of the financial statements, PRHTA's management is in the process of determining the amount of damages suffered by PRHTA's roads, bridges, mass transportation system and other capital assets. PRHTA's management has been unable to determine the amount of damages at the date of the financial statements but a preliminary assessment of the physical damages to its roads and bridges amounts to approximately $437 million. PRHTA is in the process of assessing the physical damages suffered by its urban train system. In addition, Hurricane Maria caused an interruption in PRHTA's electronic toll system and train operation resulting in a loss of revenue. PRHTA has insurance policies in force at the time of both hurricanes and expects to recover part of such damages with assistance to be provided by Federal Emergency Management Agency (FEMA).

On June 29, 2018 the Oversight Board approved a revised fiscal plan to provide a roadmap for transforming not only the PRHTA, but also infrastructure across Puerto Rico to catalyze economic growth. PRHTA has four objectives aligned with this goal: (a) transit security and safety projects, (b) improvement of existing transportation infrastructure, (c) completing highway systems, and (d) traffic reduction.

*(b) PREPA*

*Restructuring Support Agreement*

On August 1, 2018 the Oversight Board approved a revised fiscal plan to provide a framework for the negotiation and approval of the transformation of PREPA. The PREPA fiscal plan includes a set of aspirational rate and reliability targets that set the parameters for funding and transformation processes that can no longer be delayed, including: (i) near-term investments in restoration, generation and resiliency; (ii) the scope and focus of federal funding; and (iii) the funding and/or size of transition charge available for restructuring debt and pension liabilities.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Provisional Rate*

On May 27, 2016, PREPA filed a petition before the Energy Commission seeking approval of an adjustment to the base rates charged to PREPA's customers. The petition also sought approval of the proposed base rate adjustment on a temporary basis pending the Energy Commission's consideration of the requested rate adjustment. On June 24, 2016, the Energy Commission issued an order authorizing PREPA to increase its base rates, on a temporary basis, by approximately 1.3 cents per kWh, effective as of thirty days after issuance of the order, subject to certain conditions. The base rate adjustment was estimated to generate additional revenues in the amount of approximately $220 million annually.

On January 10, 2017, the Energy Commission issued a Final Resolution and Order lowering the requested increase in PREPA's base rate revenue requirement to $177 million, which resulted in an approved average base rate increase of approximately 1.025 cents per kWh. However, on January 20, 2017, PREPA filed a motion for clarification regarding, among other things, the base rate revenue requirement calculation. On March 8, 2017, the Commission issued a Resolution that approved a revised base rate revenue requirement increase of approximately $171.8 million. On April 25, 2017 PREPA filed its Compliance Filing basing base rates on the updated revenue requirement calculation, which was approved through orders entered on May 10, 2017 and May 31, 2017 (subject to certain modifications), although the new rates did not go into effect. PREPA is required to credit customer bills based on a reconciliation of the provisional rate and the final approved rate in accordance with those orders and the requirements of Act No. 83 of 1941, as amended by Act No. 4 of 2016.

Due to Hurricane Maria, the Energy Commission temporarily suspended, effective September 19, 2017, all administrative proceedings including the provisional and final rate implementation issues. On November 1, 2017, in the rate case docket, the Energy Commission granted in part and denied in part PREPA's motion to postpone the permanent rate implementation. Specifically, the Energy Commission granted PREPA's request for temporary extension of the provisional rate and of all other deadlines under the rate order and subsequent orders regarding permanent rate implementation and the provision of information regarding reconciliations and budgetary oversight and approvals, under Section 6A of Act No. 83 of 1941 and Article 6.25 of Act No. 57 of 2014. The Energy Commission also ordered that it would issue a new timeline for compliance and filing deadlines when PREPA's operations are normalized.

On September 28, 2018, in the rate docket, the renamed PREB denied PREPA's petition to make a one-time modification to the Adjustment Clause, the tariff that makes fuel and purchased power cost adjustments. The petition involved the backlog of fuel and purchased power adjustments due to the 2017 hurricanes. The PREB instead added this subject to the provision rate reconciliation calculation to be performed later. The order also directed PREPA to implement the permanent rates by December 1, 2018, among other provisions.

There were additional orders about the timeline, including a PREB order dated November 27, 2018 and served November 28, 2018 that ordered PREPA to file a compliance plan by December 14, 2018; ordered PREPA to issue customer notices about the new rates in January 2019; set compliance hearings for December 14, 2018 and January 18, February 15, and March 15, 2019; and ordered the permanent rates to be implemented on April 1, 2019.

PREPA filed the compliance plan and issued the notices. The compliance hearings scheduled to date have been held, plus an additional working meeting held on February 27, 2019 at PREPA's request.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

On February 25, 2019, the PREB issued an order deferring the reconciliations until at least July 1, 2019.

PREPA and intervenor ICSE-PR each filed for judicial review of the PREB's 2017 final and rehearing orders. Those judicial reviews were removed to the Title III Court.

*Oversight Board Actions and Litigation*

As noted above, the PREPA RSA was subject to approval of the Oversight Board under PROMESA. After consideration of the terms of the PREPA RSA, the Oversight Board ultimately declined to approve the PREPA RSA on June 27, 2017, and the PREPA RSA expired and terminated by its terms on June 29, 2017. On July 2, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PREPA in the United States District Court for the District of Puerto Rico.

On October 26, 2017, in the aftermath of Hurricane Maria, the Oversight Board filed a motion seeking entry of an order confirming the appointment and authority of a Chief Transformation Officer for PREPA, which the Title III Court ultimately denied.

On March 4, 2018, the Puerto Rico Energy Commission (PREC) filed an adversary complaint and preliminary injunction motion against the Oversight Board and PREPA, seeking an order prohibiting the Oversight Board from mandating or authorizing "substantive electricity actions" by PREPA – including the certification of a fiscal plan – without PREC's prior permission and approval, prohibiting PREPA from taking certain actions in alleged contravention of PREC's authority. On March 28, 2018, the Title III Court denied the request for a preliminary injunction, on the grounds that PREC was seeking an advisory opinion. On April 10, 2018, PREC voluntarily dismissed the adversary complaint, without prejudice.

*Superpriority Post-Petition Revolving Credit Loan Agreement*

On February 16, 2018, the Oversight Board and PREPA jointly filed an urgent application seeking approval of a proposed $300 million unsecured, superpriority loan from the Commonwealth to PREPA (the Revolving Credit Loan), which was granted by order dated February 19, 2018. As authorized by the Title III Court on February 22, 2018, PREPA (as borrower) and the Commonwealth (as lender) entered into a Revolving Credit Loan Agreement, in which the Commonwealth agreed to make the Revolving Credit Loan consisting of a superpriority post-petition credit facility in an aggregate principal amount not to exceed $300 million available to PREPA until June 30, 2018, unless extended by necessary governmental action by the Commonwealth. The Revolving Credit Loan will bear 5% interest, provided that, in the event the Commonwealth funds or refinances the Revolving Credit Loan with the proceeds of a Commonwealth financing, the interest rate on the such funded or refinanced Revolving Credit Loan will automatically accrue interest at the rate equal to the interest rate on the Revolving Credit Loan not funded or refinanced with any Commonwealth financing.  As of the date hereof, PREPA has made a number of payments to the Commonwealth to repay the Revolving Credit Loan and the outstanding principal balance is currently approximately $60 million.

*PREPA Governing Board*

On June 26, 2017, the Governor signed into law Act No. 37 of 2017 (Act No. 37 of 2017) in order to overhaul PREPA's existing governing board structure. After the enactment of Act No. 37 of 2017, PREPA's governing board consists of seven members. Of its seven-member board, six members are designated by the Governor (three of which require Senate approval) and one member is an elected consumer representative.

323

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*Impact of Hurricanes Irma and Maria*

The PREPA electric system sustained significant damage as a result of Hurricanes Irma and Maria. The damages were exacerbated by the fact that PREPA's infrastructure was in disrepair prior to the hurricanes due to years of limited investment and lack of maintenance. Hurricane Maria made her landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period. Hurricane Maria crossed Puerto Rico diagonally, entering through the Southeast and exiting through the Northwestern region. The hurricane caused catastrophic destruction in Puerto Rico, including severe damage to the electric power system, and left the island completely without power. Only two weeks prior to Hurricane Maria, Hurricane Irma – one of the strongest hurricanes ever recorded in the Atlantic – passed by Puerto Rico's north coast, substantially impairing an already weak infrastructure.

After Hurricane Maria passed through the island, and when it was safe for personnel to return to the field, PREPA deployed assessment teams to conduct a preliminary damage assessment and attempted to reestablish communications with PREPA's various key components. This initial assessment confirmed that PREPA's entire grid suffered severe damage. The infrastructure was designed to withstand winds up to 140 miles per hour, but Hurricane Maria brought sustained winds of over approximately 155 miles per hour. This resulted in massive direct damage and mechanical fatigue and stress that will require significant replacement and repair. These include, for example:

- Transmission: Hundreds of major transmission structures were damaged, and hundreds of hardware, conductor, and insulator failures were also identified at that time.

- Distribution: Many thousands of individual distribution lines, poles and transformers fell or were damaged, which will require debris removal and line reconstruction and repair.

Communications and IT: Communications and IT systems throughout much of the PREPA system were not functional in the immediate aftermath of Hurricane Maria. PREPA's data center, which houses PREPA's critical IT assets, was offline for weeks. Internet communication was nonexistent for the first two weeks and intermittent thereafter. Most of the communication antennas suffered severe damage. During the weeks after Hurricane Maria, PREPA had to rely on several short-wave radios and satellite phones for its limited communication abilities.

Based upon the damage assessment, PREPA began implementation of its emergency communication and restoration procedures. PREPA established five key stabilization initiatives essential to the emergency response: (1) reestablishing communications and IT systems, (2) reconstructing distribution and transmission systems, (3) energizing substations, (4) procurement and liquidity, and (5) operations planning.

PREPA's initial recovery actions focused on reestablishing power to the most critical customers including: (i) hospitals and elder care facilities; (ii) airports; (iii) ports; (iv) water and sewage treatment plants; (v) agencies providing essential services; (vii) lodging facilities; (viii) industrial buildings; (ix) financial institutions; and (x) ice making plants.

On August 15, 2018, PREPA published its final Emergency Management KPI Dashboard, which indicated that electricity had been restored to effectively all of its customers. PREPA continues to work to implement measures to improve operations, improve grid resiliency, harden PREPA's grid against

324

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

future emergencies and outages and facilitate the development of and utilization of renewable resources to reduce the environmental impact of generation in Puerto Rico.

*Bond Ratings Downgrade*

On July 6, 2017, Moody's downgraded its rating for PREPA's bonds to Ca from Caa3, with the outlook remaining negative. This latest downgrade reflects PREPA having commenced a proceeding under Title III of PROMESA. On the same date, Fitch also downgraded its rating for PREPA's bonds to D.

*Privatization*

On January 22, 2018, the Governor announced that the Commonwealth will begin the transformation of PREPA. The purpose of the transformation is to assure that the system is modern and reliable and that energy rates are affordable for the residents of Puerto Rico. The contemplated transformation will involve (a) private ownership and operation of generation assets and (b) an operator of the transmission and distribution system through a concession model. The transformation process will likely take between 18 months to two years to complete. On October 31, 2018, the P3 Authority, in collaboration with PREPA issued its request for qualifications (RFQ) for the transmission and distribution systems. PREPA received five responses to the RFQ and selected four proponents with the necessary experience to manage and operate all aspects of PREPA's transmission and distribution systems. The Request for Proposals was issued on February 1, 2019 with a targeted closing in late 2019.

*(c)* **PRASA**

On July 12, 2016, the Governor of Puerto Rico signed into law Act No. 68 of 2016 (Act No. 68 of 2016), providing for the creation of a new public corporation to be known as the Puerto Rico Aqueduct and Sewer Authority Revitalization Corporation (the PRASARC) as a single-purpose, bankruptcy remote entity. PRASARC is authorized to fix and collect securitization charges for the purpose of issuing bonds the proceeds of which may be used by PRASA for its Capital Improvement Program (CIP), refinancing of bond anticipation notes and the cancelation, defeasance and refinancing of its Bonds, among other approved financing costs. Act No. 68 of 2016 limits the securitization charge which may be imposed by the PRASARC to an amount equivalent to 20% of PRASA's revenues and provides that PRASARC may issue up to a maximum of $900 million in bonds for the purpose of financing the development of the PRASA's CIP. The difference between the $900 million that may be used for the financing of the CIP and the maximum amount that can be financed with the 20% of PRASA's revenues may be used to retire, cancel (defease) or refinance Bonds of the PRASA subject to certain conditions.

On August 1, 2018 the Oversight Board approved a revised fiscal plan to allow PRASA to continue providing safe and reliable supplies of drinking water and treatment of wastewater. Also, PRASA will be able to invest in necessary infrastructure to restore the system and ensure compliance with required standards while promoting much need economic growth through the island.

On December 18, 2018, a Deed of Trust was entered into, by and among PRIFA, the Puerto Rico Department of Natural and Environmental Resources as successor to EQB, and Banco Popular de Puerto Rico, as trustee of the Clean Water Fund (the Clean Water Fund Deed of Trust) to create a trust to hold all funds related to the Clean Water Fund in trust separate from the assets of the Commonwealth, its agencies and instrumentalities (the Clean Water Fund Trust) and a Deed of Trust was entered into, by and among PRIFA, Commonwealth Department of Health, and Banco Popular de Puerto Rico, as trustee of the Drinking Water Fund (the Drinking Water Fund Deed of Trust), to hold all funds related to

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

the Drinking Water Fund in trust separate from the assets of the Commonwealth, its agencies and instrumentalities (the Drinking Water Fund Trust, and together with the Clean Water Fund Trust, the SRF Trusts).

During the month of February 2019, the Commonwealth transferred the amount of $194.5 million to the SRF Trusts. Specifically, approximately $141.2 million was transferred to the Clean Water Fund Trust and approximately $53.3 million was transferred to the Drinking Water Fund Trust. These funds were transferred to the SRF Trusts to safeguard the future viability of the State Revolving Funds to ensure continued assistance to communities with critical water and wastewater infrastructure problems.

*Bond Ratings Downgrade*

On May 2, 2017, Fitch's rating on PRASA bonds was downgraded to C from CC.

*(d)* **UPR**

On July 1, 2015, Moody's lowered its ratings on UPR's revenue bonds from Caa3 to Ca, and which it further lowered to a C rating on October 17, 2017. These rating downgrades have generally followed each downgrade made on the Commonwealth general obligation bonds and certain other public corporation bonds given UPR's significant dependence on Commonwealth appropriations and its constrained ability to raise tuition and other auxiliary revenue sufficient to mitigate cuts. At the time of these downgrades, UPR was highly reliant on the Commonwealth for operating revenue and on GDB for liquidity and financial management support.

On May 11, 2016, a majority of plan participants (96.9%) of UPR's Healthcare Deferred Compensation Plan of the Medical Sciences Campus recommended the termination of UPR's Healthcare Deferred Compensation Plan, which UPR's board of directors ratified. On June 30, 2016, Governing Board of the UPR ratified the termination of Voya Institutional Trust Company as Trustee of the Trust of the UPR's Healthcare Deferred Compensation Plan. The members of the Governing Board of UPR were designated as the Successor Trustees of the Governing Board of UPR's Healthcare Deferred Compensation Plan. In addition, the Governing Board of the UPR approved the dissolution of the UPR's Healthcare Deferred Compensation Plan and the distribution of the deferred funds to its participants. On August 22, 2016, Voya filed a complaint in the United States District Court for the District of Puerto Rico against the Governor of the Commonwealth, UPR and UPR's President. The complaint seeks relief from the Court relating to its administration of the Trust in light of the financial crisis in Puerto Rico and its effect on UPR. Specifically, the complaint seeks declaratory relief for federal judicial review of the issues arising under PROMESA, the Trust Agreements, and other relevant law, in light of UPR's financial condition and its efforts to distribute all plan assets. Voya has not yet transferred the plan assets to UPR pending the resolution of the complaint. The District Court entered an order staying the case until December 14, 2017 to give the parties an opportunity to consensually resolve the dispute. By that date, the parties were ordered to file a supplemental joint status report apprising the court on the status of negotiations and proposed resolutions on all motions filed in the case (both substantive and procedural).

On June 30, 2016, the Governing Board of UPR reestablished the annual increase per incoming class (approximately 2% increase) in the tuition cost per credit for academic year 2016-2017.

On June 30, 2016, the Governor of Puerto Rico signed Executive Order No. 31 (EO 31) declaring UPR in a state of emergency pursuant to Act No. 21. In compliance with EO 31, the UPR suspended the

326

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

monthly payments to the trustee of the Trust Agreement that governs UPR System Revenue Bonds and the monthly payments of the Lease Agreement with "Desarrollos Universitarios Inc" (DUI) starting in July 2016.

In July 2016, UPR filed the Deed of Confirmation and Acknowledgment of Trust of UPR Retirement System in which UPR (as the Original Settlor) and the Governing Board of UPR (as the Original Trustee) confirmed, restated and acknowledged the inception of the Pension Plan and its Trust Fund in accordance to the provisions of the laws of the Commonwealth, specifically, the provisions of Act No. 219 of 2012.

On August 5, 2016, the trustee of the DUI's AFICA Bonds notified UPR that it failed to make the basic lease payment to the trustee on July 25, 2016 and that a default under the lease agreement with DUI constitutes an event of default under the DUI's AFICA Bonds Trust Agreement. At this time, the trustee did not seek to collect or recover any indebtedness from, enforce any judgment against, or obtain possession of, or exercise control over, any property of or from, the Commonwealth or any of its instrumentalities, including DUI and UPR, or exercise any act that was stayed by PROMESA, the Moratorium Act, or any Executive Orders related thereto. For additional information regarding the Moratorium Act, refer to Note 3 and Note 23. On or around the time that the PROMESA Title IV stay expired, the trustee again notified UPR that it was in default for failure to make the outstanding lease payments. Thereafter, in May 2017, UPR made the outstanding lease payments and has continued to do so on a monthly basis since that time. As a result, the lease agreement and the DUI AFICA Bonds Trust Agreement are not in default.

On August 19, 2016, the U.S. Bank Trust National Association, in its capacity as Trustee for UPR System Revenue Bonds, filed a civil lawsuit under the United States Court, District of Puerto Rico against the Commonwealth, the Governor, UPR and UPR's President. The motion sought relief from Title IV Stay under PROMESA for claims related to the Moratorium Act and the executive orders related thereto, and a preliminary injunction against the Commonwealth's diversion and expropriation of pledged revenues, which the trustee alleges constitute collateral supporting the UPR system revenue bonds. On May 1, 2017, Title IV Stay under PROMESA expired. However, pursuant to the Standstill Agreement (defined below), the lawsuit is not currently active.

On June 29, 2017, the Trustee for the UPR System Revenue Bonds entered into a standstill agreement (the Standstill Agreement) with UPR, pursuant to which UPR agreed to transfer to a segregated account, for the benefit of the holders of the revenue bonds, certain amounts in respect of revenue pledged on the condition that during the covered period of the Standstill Agreement the trustee would not institute, commence, or continue any legal proceeding against UPR, the Commonwealth of Puerto Rico or any other agency, instrumentality, or municipality thereof to enforce rights related to the revenue bonds. Under the initial Standstill Agreement, which expired on August 31, 2017, UPR made two payments of $20 million to the segregated account. UPR and the Trustee have agreed to extend the Standstill Agreement on several occasions, and the standstill period is currently set to expire on March 31, 2018. During the time that the Standstill Agreement remains in effect, UPR has agreed to transfer $4 million a month (the approximate amount required to cover debt service payments during such period) to a segregated account in exchange for the trustee's agreement to not commence or continue any legal proceeding related to the revenue bonds. Pledged revenues mostly include student's tuition fees.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

UPR and FAFAA shall provide the Trustee with detailed plans and specifications for repairing, replacing or reconstructing its property that was damaged or destroyed by Hurricane Maria as these plans are approved. UPR shall deposit all proceeds of casualty insurance policies in a separate account and of direct federal aid (the Repair Funds) in one or more separate accounts at a commercial bank to facilitate the audit of the expenditure of such accounts. All Repair Funds in excess of $1,000,000 shall be used pursuant to a written requisition. UPR will submit the preceding month's requisitions to the Trustee on or before the fifteenth calendar day of each month. Pursuant to the extended letter agreement, the majority bondholders expanded their direction to instruct the Trustee not to call a default during the pendency of the new Compliance Period if UPR sends to the Trustee copies of the preceding month's requisitions, as set forth above. UPR and FAFAA will provide, or cause relevant agencies to provide, the Trustee with all project requests, progress or other reports provided by FEMA or to any casualty insurance company with respect to the expenditure of the Repair Funds during the preceding month.

On October 23, 2018 the Oversight Board approved a revised UPR fiscal plan. UPR plays an essential role as the Island's engine for economic and workforce development. In many ways, the future of Puerto Rico depends on a vibrant and sustainable UPR. The UPR fiscal plan returns the system to a three campus "hub" model, whereby the footprint of secondary campuses is reduced, and shared services are increasingly relied upon to drive down operating expenditures. Also, the UPR fiscal plan makes every effort to minimize the increase of tuition and fees that could jeopardize affordability and access to quality higher education on the Island. It does so by first maximizing opportunities to increase revenue from nontuition sources, such as: (i) federal grants and awards, (ii) intellectual property and patent monetization, and (iii) ancillary service fees for providing training to external institutions.

### (e) Certain U. S. Internal Revenue Service Examinations

The United States Internal Revenue Service (the "IRS") issued several letters dated from February 7, 2019 to March 28, 2019 to PBA, PREPA, COFINA, MFA to inform that the IRS is conducting certain investigations. The investigations are related to certain Forms 8038-CP (Return for Credit Payments to Issuers of Qualified Bonds, as defined by IRS) and some Bond issuances.

PBA, PREPA, COFINA and MFA intend to respond to all correspondences from the IRS and intend to continue to cooperate with the IRS in connection with the above referenced examinations and are working with their representatives to respond to these IRS examinations in a timely manner.

### Aftermath of Hurricane Maria

On September 20, 2017, Puerto Rico was directly impacted by Hurricane Maria, leaving in its path the destruction of thousands of homes, knocking out power across the entire island and flooding many streets and roads. As a result of the massive impact of the hurricane, a series of actions and events have been taken. Some of these actions, events and considerations are discussed in the ensuing paragraphs.

On September 20, 2017, the same day that Hurricane Maria made landfall in Puerto Rico, the Governor requested funds from categories A and B of FEMA's public assistance program to address the state of emergency, which were immediately approved. Shortly thereafter, the Governor requested funds from categories C through G of FEMA's public assistance program, which are the categories dealing with permanent infrastructure projects such as roads, bridges, electricity and water infrastructure, public buildings, and parks and recreation spaces.

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

After FEMA's processing of the categories C through G funding requests, on November 1, 2017, the U. S. President approved the use of such funds for permanent projects on November 1, 2017. By doing so, the federal share on these funds was also increased from 75% to 90%, given the major disaster caused by the Hurricane Maria in Puerto Rico.

On September 21, 2017, pursuant to its authority under PROMESA and section 3 of the fiscal year 2018 budget resolutions, the Oversight Board announced its approval for the Commonwealth to reallocate up to $1 billion of its fiscal year 2018 budget to be used for emergency funding in the aftermath of Hurricane Maria.

On October 23, 2017, the Governor issued executive order EO 2017 065, creating the Central Recovery and Reconstruction Office of Puerto Rico (CRRO) pursuant to Act No. 211 of 1999, Act No. 5 of 2017, and Act No. 20 of 2017. The CRRO is created as a division within the Public Private Partnerships Authority (P3 Authority) for the purpose of (i) identifying, procuring, and administering resources to invest in the recovery of Puerto Rico, (ii) coordinating and channeling efforts of the Commonwealth related to the recovery of Puerto Rico, (iii) financing, executing, or effecting works and infrastructure projects related to the recovery of Puerto Rico, and (iv) advising the Governor and providing technical assistance and advice to other governmental entities regarding any matter related to the recovery of Puerto Rico. On November 10, 2017, the Governor issued executive order EO 2017 069, which amended EO 2017 065.

On October 26, 2017, the U.S. President signed into law the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, which provides for $36.5 billion of disaster relief funds for Texas, Florida, Puerto Rico and the United States Virgin Islands (USVI) related to damage from Hurricanes Harvey, Irma, and Maria. The law included $4.9 billion of Disaster Assistance Direct Loans to maintain liquidity for Puerto Rico and the USVI. Puerto Rico is expected to receive a substantial majority of these loans, with the USVI expected to receive only between $200 million and $400 million.

On November 8, 2017, the Governor issued executive order EO 2017 066 pursuant to his authority under Act No. 5 of 2017. EO 2017 066 delegates the Governor's receivership powers under Section 206(a) of Act No. 5 of 2017 to FAFAA so that it may act as receiver of PREPA's procurement division and any other division or office whose duties affect PREPA's procurement processes for goods and services in order to supervise and reform the procurement processes. EO 2017 066 also created within PREPA the Office of Contract and Procurement Compliance, which reports to FAFAA.

On November 8, 2017, the Governor also issued executive order EO 2017 068, which established a 10% reimbursement for the certain small and mid-sized businesses on their sales and use tax filings from August 2017 through November 2017.

On November 27, 2017, the Governor announced a series of controls that will be imposed in the administration of federal funds for the long-term infrastructure projects required in the aftermath of Hurricanes Irma and Maria, and which the Commonwealth expects to reach the $94.4 billion the Governor requested on November 14, 2017 to the U.S. Congress. In addition to the creation of the CRRO previously discussed, another control measure would be the role that will be played by FEMA. In addition to the oversight over the use of federal money, FEMA will preauthorize each permanent work project so that prior to its start, the Commonwealth can be sure that it will receive federal funds to help pay for it. For long-term infrastructure reconstruction projects, the Commonwealth will use section 428 of the Stafford Act, which provides some flexibility in the requirements for obtaining the maximum amount of federal funds for these efforts. For example, under that section, introduced after Superstorm Sandy, the state government is not required to

329

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

reconstruct exactly to the pre- disaster state, as required by FEMA's process under section 406. In essence, section 428 would allow the Commonwealth to make improvements to existing infrastructure without losing access to the maximum amount of federal funds it could obtain via reimbursement. Currently, the United States federal government will cover up to 90% of the cost of permanent work projects, while the rest must come from the local government's checkbook. Under section 428, both the Commonwealth and FEMA will analyze the damage separately and, if there is any disagreement, a third party would validate a single damage estimate. Without these evaluations, FEMA will not be able to disburse funds to pay for the respective project.

On February 9, 2018, the U.S. Congress approved, and the U.S. President signed an amendment of the Continuing Appropriations Act of 2018 to provide continuing fiscal year 2018 appropriations to most federal agencies through March 23, 2018. The Continuing Appropriations Act allocates additional budget appropriations of approximately $15 billion to the U.S. Corps of Engineers for necessary expenses to address emergency situation projects, and to construct, and rehabilitate and repair damages caused by natural disasters. Of the total amount of $15 billion, not less than $10.4 billion will be available for such projects within states and insular areas that were impacted by Hurricanes Harvey, Irma, and Maria and all repair, rehabilitation, study, design, and construction of the U.S. Corps of Engineers projects in Puerto Rico and the USVI will be conducted at full federal expense. Also, allocates approximately $28 billion to the Community Development Fund to cover for necessary expenses related to disaster relief, long-term recovery, restoration of infrastructure and housing, economic revitalization, and mitigation in the most impacted and distressed areas resulting from a major declared disaster that occurred in 2017; of the amounts made available under this provision, no less than $11 billion will be allocated to the States and units of local government affected by Hurricane Maria, and of such amounts allocated to such grantees affected by Hurricane Maria, $2 billion will be used to provide enhanced or improved electrical power systems. In addition, the budget appropriation include $4.8 billion in Medicaid funds for Puerto Rico, $39 million to carry out U.S. Customs and Border Protection activities in fiscal year 2018 in Puerto Rico and the USVI, $30.9 million for construction, rehabilitation and acquisition for Job Corps Centers in Puerto Rico, $64 million to repair the U.S. Immigration & Customs Enforcement Service (ICE) facilities in Puerto Rico, USVI, Texas and Florida, $1.37 billion for the Emergency Recovery Program of the Federal Highway Administration of which Puerto Rico will receive 100 percent federal contribution to repair damages from Hurricanes Irma and María, $14 million for the Special Supplemental Nutrition Program for Women, Infants, and Children (known as PAN in Spanish) for infrastructure grants to Puerto Rico and the U.S. Virgin Islands to assist in the repair and restoration of buildings, equipment, technology, and other infrastructure damaged as a consequence of Hurricanes Irma and Maria and $24 million for the Commodity Assistance Program for the emergency food assistance program to cover necessary expenses related to the consequences of Hurricanes Harvey, Irma, and Maria or due to wildfires in 2017.

**REQUIRED SUPPLEMENTARY INFORMATION**

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans – TRS

(Amounts in thousands)

The Schedule of Changes in the Net Pension Liability for Single-Employer Pension Plans presents the changes in net pension liability for the System of Annuities and Pensions for Teachers (TRS) at June 30, 2016:

| | | TRS | | |
| --- | --- | --- | --- | --- |
| | | 2016 | 2015 | 2014 |
| Total pension liability: | | | | |
| Service cost | $ | 294,692 | 273,754 | 354,159 |
| Interest | | 648,407 | 637,849 | 690,742 |
| Changes in benefit terms | | — | — | (599,560) |
| Differences between expected and annual experience | | 43,202 | 88,544 | 169,851 |
| Changes in assumptions | | 1,621,712 | 1,235,988 | 83,560 |
| Benefit payments, including refunds of contributions | | (750,172) | (736,107) | (683,698) |
| Net change in total pension liability | | 1,857,841 | 1,500,028 | 15,054 |
| Total pension liability – beginning | | 16,307,731 | 14,807,703 | 14,792,649 |
| Total pension liability – ending (a) | | 18,165,572 | 16,307,731 | 14,807,703 |
| Plan fiduciary net position: | | | | |
| Contributions – employers, net of provision | | 213,724 | 194,541 | 189,367 |
| Contributions – participating employees | | 99,557 | 105,120 | 115,461 |
| Contributions – transfers | | 1,804 | 2,345 | 4,131 |
| Net investment income | | 45,060 | 59,921 | 190,023 |
| Other income | | 1,350 | 1,057 | 1,416 |
| Benefit payments, including refunds of member contributions | | (751,245) | (736,300) | (683,698) |
| Administrative expenses | | (22,568) | (19,382) | (19,803) |
| Custodial credit loss on deposits held at GDB | | (3,308) | — | — |
| Net change in plan fiduciary net position | | (415,626) | (392,698) | (203,103) |
| Plan fiduciary net position – beginning | | 1,311,081 | 1,703,779 | 1,906,882 |
| Plan fiduciary net position – ending (b) | | 895,455 | 1,311,081 | 1,703,779 |
| Employer's net pension liability – ending (a)-(b) | $ | 17,270,117 | 14,996,650 | 13,103,924 |
| Plan fiduciary net position as a percentage of the total pension liability | | 4.93 % | 8.04 % | 11.51 % |
| Covered-employee payroll | $ | 1,101,896 | 1,127,500 | 1,171,154 |
| Employer's net pension liability as a percentage of covered-employee payroll | | 1,567.31 % | 1,330.08 % | 1,118.89 % |

Notes:
 The Commonwealth's net pension liability as of June 30, 2016 was measured as of June 30, 2015, and the total pension liability used to calculate the net pension liability was determined by an actuarial valuation with beginning-of-year census data as of July 1, 2014 that was updated to roll forward the total pension liability to June 30, 2015 and assuming no gains or losses. Due to outsized retirement activity in the TRS during the 2013-2014 fiscal year, 2,234 reported retirements were reflected.

 Schedules are intended to show information for ten years. Additional years will be displayed as they become available.

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans – JRS

(Amounts in thousands)

The Schedule of Changes in the Net Pension Liability for Single-Employer Pension Plans presents the changes in net pension liability for the Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS) at June 30, 2016:

|  |  | JRS | | |
|  |  | 2016 | 2015 | 2014 |
| --- | --- | --- | --- | --- |
| Total pension liability: |  |  |  |  |
| Service cost | $ | 19,155 | 16,375 | 16,764 |
| Interest |  | 22,630 | 21,861 | 22,620 |
| Changes in benefit terms |  | — | — | — |
| Differences between expected and annual experience |  | (3,064) | (4,670) | (1,658) |
| Changes in assumptions |  | 51,960 | 72,805 | 7,601 |
| Benefit payments, including refunds of contributions |  | (24,327) | (23,134) | (22,667) |
| Net change in total pension liability |  | 66,354 | 83,237 | 22,660 |
| Total pension liability – beginning |  | 583,012 | 502,075 | 481,715 |
| Total pension liability – ending (a) |  | 649,366 | 585,312 | 504,375 |
| Plan fiduciary net position: |  |  |  |  |
| Contributions – employers, net of provision |  | 15,223 | 12,337 | 11,992 |
| Contributions – participating employees |  | 3,190 | 3,676 | 3,804 |
| Contributions – transfers |  | — | — | — |
| Net investment income |  | 1,751 | 899 | 9,713 |
| Other income |  | — | 873 | 59 |
| Benefit payments, including refunds of member contributions |  | (24,560) | (23,134) | (22,667) |
| Administrative expenses |  | (946) | (546) | (2,150) |
| Net change in plan fiduciary net position |  | (5,342) | (5,895) | 751 |
| Plan fiduciary net position – beginning |  | 40,172 | 46,067 | 45,316 |
| Plan fiduciary net position – ending (b) |  | 34,830 | 40,172 | 46,067 |
| Employer's net pension liability – ending (a)-(b) | $ | 614,536 | 545,140 | 458,308 |
| Plan fiduciary net position as a percentage of the total pension liability |  | 5.36 % | 6.86 % | 9.17 % |
| Covered-employee payroll | $ | 32,204 | 31,917 | 31,707 |
| Employer's net pension liability as a percentage of covered-employee payroll |  | 1,908.26 % | 1,707.99 % | 1,438.19 % |

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of the Proportionate Share of the Net Pension Liability of a

Cost-Sharing Multiple-Employer Pension Plan – ERS

(Amounts in thousands)

The following Schedule of the Proportionate Share of the Net Pension Liability presents the proportionate share of the pension amounts of the Commonwealth over the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS), a Cost-Sharing Multiple-Employer Pension Plan, at June 30, 2016:

| | ERS | |
| --- | --- | --- |
| | 2016 | 2015 |
| Commonwealth's proportion of the net pension liability | 65.87 % | 64.74 % |
| Commonwealth's proportionate share of the net pension liability | $ 21,960,015 | 19,512,798 |
| Commonwealth's covered-employee payroll | 2,186,540 | 2,258,946 |
| Commonwealth's proportionate share of the net pension liability as a percentage of its covered-employee payroll | 1,000.32 % | 864.00 % |
| Plans fiduciary net position as a percentage of the total pension liability | (2.05) | 0.27 |

Notes:

The Commonwealth's net pension liability as of June 30, 2016 was measured as of June 30, 2015, and the total pension liability used to calculate the net pension liability was determined by an actuarial valuation with beginning-of-year census data as of July 1, 2014 that was updated to roll forward the total pension liability to June 30, 2015 and assuming no gains or losses.

Schedules are intended to show information for ten years. Additional years will be displayed as they become available.

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of Employers' Contributions for All Pension Plans

(Amounts in thousands)

| | | 2016 (measurement date June 30, 2015) | 2015 (measurement date June 30, 2014) |
|---|---|---|---|
| **ERS:** | | | |
| Statutorily required contributions | $ | 535,664 | 492,972 |
| Contributions (a) | | 460,659 | 415,933 |
| Contribution deficiency | $ | 75,005 | 77,039 |
| Covered-employee payroll (b) | $ | 2,244,829 | 2,307,688 |
| Contributions as a percentage of covered-employee payroll (a)/(b) | | 20.52 % | 18.02 % |
| **TRS:** | | | |
| Statutorily required contributions | $ | 194,541 | 189,367 |
| Contributions (a) | | 194,541 | 189,367 |
| Contribution deficiency | $ | — | — |
| Covered-employee payroll (b) | $ | 1,127,500 | 1,171,154 |
| Contributions as a percentage of covered-employee payroll (a)/(b) | | 17.25 % | 16.17 % |
| **JRS:** | | | |
| Statutorily required contributions | $ | 24,437 | 23,592 |
| Contributions (a) | | 12,337 | 11,992 |
| Contribution deficiency | $ | 12,100 | 11,600 |
| Covered-employee payroll (b) | $ | 31,917 | 31,707 |
| Contributions as a percentage of covered-employee payroll (a)/(b) | | 38.65 % | 37.82 % |

Notes:

The contribution requirement to each retirement system is established by law and is not actuarially determined.

Schedule is intended to show information for ten years. Additional years will be displayed as they become available.

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of Funding Progress for the Postemployment Healthcare Plans

(Amounts in thousands)

The Schedule of Funding Progress for the Commonwealth Postemployment Healthcare Plans presents the results of the other than pension postemployment benefits (OPEB) valuations for the past eight years. The schedule provides an eight year information trend about whether the actuarial values of plan assets are increasing or decreasing over time relative to the actuarial accrued liabilities for benefits. All actuarially determined information has been calculated in accordance with actuarial assumptions and methods reflected in the actuarial valuations as of the indicated actuarial valuation date.

**ERS:**

| Actuarial Valuation Date (1) | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2016 | $    — | 1,349,503 | 1,349,503 | —% $ | 3,344,382 | 40% |
| June 30, 2015 | — | 1,428,788 | 1,428,788 | — | 3,319,280 | 43% |
| June 30, 2014 | — | 1,438,475 | 1,438,475 | — | 3,489,096 | 41 |
| June 30, 2013 | — | 1,482,879 | 1,482,879 | — | 3,489,096 | 43 |
| June 30, 2012 | — | 2,120,970 | 2,120,970 | — | 3,570,339 | 59 |
| June 30, 2011 | — | 1,758,389 | 1,758,389 | — | 3,666,402 | 48 |
| June 30, 2010 | — | 1,699,373 | 1,699,373 | — | 3,818,332 | 45 |
| June 30, 2009 | — | 1,633,159 | 1,633,159 | — | 4,292,552 | 38 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

**TRS:**

| Actuarial Valuation Date (1) | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2016 | $    — | 523,300 | 523,300 | —% | 1,101,896 | 48% |
| June 30, 2015 | — | 548,518 | 548,518 | — | 1,127,500 | 49% |
| June 30, 2014 | — | 543,205 | 543,205 | — | 1,171,154 | 46 |
| June 30, 2013 | — | 792,875 | 792,875 | — | 1,248,674 | 64 |
| June 30, 2012 | — | 797,332 | 797,332 | — | 1,292,975 | 62 |
| June 30, 2011 | — | 706,069 | 706,069 | — | 1,320,400 | 54 |
| June 30, 2010 | — | 694,230 | 694,230 | — | 1,370,344 | 51 |
| June 30, 2009 | — | 750,382 | 750,382 | — | 1,418,304 | 53 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

**JRS:**

| Actuarial Valuation Date (1) | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2016 | $    — | 6,985 | 6,985 | —% | 32,204 | 22% |
| June 30, 2015 | — | 6,917 | 6,917 | — | 31,917 | 22% |
| June 30, 2014 | — | 6,540 | 6,540 | — | 31,707 | 21 |
| June 30, 2013 | — | 6,705 | 6,705 | — | 32,138 | 21 |
| June 30, 2012 | — | 6,592 | 6,592 | — | 33,066 | 20 |
| June 30, 2011 | — | 5,810 | 5,810 | — | 31,811 | 18 |
| June 30, 2010 | — | 5,808 | 5,808 | — | 32,061 | 18 |
| June 30, 2009 | — | 5,643 | 5,643 | — | 30,587 | 19 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

N/D=Not determined.

(1) The System's OPEB funded status as of June 30, 2016 and 2015 were determined by the actuarial valuation at beginning of year that was updated to roll forward the funded status to June 30, 2016 and 2015 and assuming no liability gains or losses. Prior year actuarial valuations were made using end-of-year census data.

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of Employers' Contributions for the  Postemployment Healthcare Plans

(Amounts in thousands)

The Schedule of Employers' Contributions for the Commonwealth Postemployment Healthcare Plans provides information about the annual required contributions (ARC) for OPEB and the extent to which contributions were made to cover the ARC for OPEB for the past eight years. The ARC is the annual required contribution for the year calculated in accordance with certain parameters, which include actuarial methods and assumptions.

| Fiscal Year Ended (1) | ERS | | TRS | | JRS | |
|---|---|---|---|---|---|---|
| | Annual Required Contribution | Percentage Contributed | Annual Required Contribution | Percentage Contributed | Annual Required Contribution | Percentage Contributed |
| June 30, 2016 | 107,739 | 87% | 38,049 | 100% | 923 | 34% |
| June 30, 2015 | 103,878 | 94 | 36,292 | 104 | 847 | 36 |
| June 30, 2014 | 88,508 | 115 | 46,403 | 77 | 684 | 44 |
| June 30, 2013 | 154,999 | 59 | 45,669 | 75 | 643 | 45 |
| June 30, 2012 | 133,654 | 71 | 41,069 | 84 | 554 | 53 |
| June 30, 2011 | 129,395 | 73 | 39,925 | 84 | 529 | 48 |
| June 30, 2010 | 128,294 | 69 | 42,487 | 71 | 488 | 52 |
| June 30, 2009 | 111,683 | 77 | 38,015 | 77 | 425 | 55 |
| June 30, 2008 | 110,650 | 72 | 36,836 | 77 | 408 | 55 |

(1) The System's annual required contributions for the years ended June 30, 2016 and 2015 were determined by the actuarial valuation at beginning of year that was updated to roll forward the funded status to June 30, 2016 and 2015 and assuming no liability gains or losses. Prior year actuarial valuations were made using end-of-year census data.

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information – Unaudited

Schedule of Revenue and Expenditures – Budget and Actual –

Budgetary Basis – General Fund

Year ended June 30, 2016

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---|---|---|
| Revenue: | | | |
| Income taxes | $ 4,791,000 | 4,617,000 | 4,486,543 |
| Sales and use taxes | 1,738,000 | 1,566,000 | 1,545,210 |
| Excise taxes | 2,695,000 | 2,553,000 | 2,613,568 |
| Property taxes | 5,000 | 10,000 | 11,305 |
| Other taxes | 24,000 | 23,000 | 20,870 |
| Charges for services | 104,000 | 93,000 | 90,399 |
| Revenue from component units | 22,000 | 17,000 | 20,922 |
| Intergovernmental | 186,000 | 198,000 | 201,152 |
| Other | 97,000 | 71,000 | 29,806 |
| Total revenue | 9,662,000 | 9,148,000 | 9,019,775 |
| Expenditures – current: | | | |
| General government | 1,334,724 | 1,092,766 | 1,158,835 |
| Public safety | 1,980,324 | 1,951,119 | 1,904,186 |
| Health | 1,341,970 | 1,330,939 | 1,315,911 |
| Public housing and welfare | 452,172 | 436,743 | 443,888 |
| Education | 2,976,379 | 2,955,585 | 2,760,968 |
| Economic development | 336,621 | 207,938 | 199,329 |
| Intergovernmental | 366,600 | 365,700 | 510,661 |
| Total expenditures | 8,788,790 | 8,340,790 | 8,293,778 |
| Surplus of revenue over expenditures | 873,210 | 807,210 | 725,997 |
| Other financing sources (uses): | | | |
| Transfer in from Lotteries Fund | 138,000 | 144,000 | 124,121 |
| Transfer out for payments for debt service | (1,011,210) | (951,210) | (286,507) |
| Total other financing sources | (873,210) | (807,210) | (162,386) |
| Excess of revenue and other financing sources over expenditures and other financing uses | $ — | — | 563,611 |

See accompanying notes to required supplementary information and independent auditors' report.

## COMMONWEALTH OF PUERTO RICO

Notes to Required Supplementary Information (Unaudited)

June 30, 2016

**(1) Schedule of Funding Progress**

The schedule of funding progress provides information about the funded status of the Post-Employment Healthcare Plans and the progress being made in accumulating sufficient assets to pay benefits when due. The information was obtained from the last actuarial report as of June 30, 2016.

**(2) Schedule of Employers' Contributions**

The schedule of employers' contributions provides information about the annual required contributions (ARC) and the extent to which contributions were made cover the ARC. The ARC is the annual required contribution for the year calculated in accordance with certain parameters, which include actuarial methods and assumptions.

The Retirement Systems' and the Post-Employment Healthcare Plans' schedule of employers' contributions includes both Commonwealth and participating employees contributions because ultimately the Commonwealth's contributions should cover any deficiency between the participating employees' contributions, pension benefits, and the Retirement Systems' administration costs.

The information was obtained from the last actuarial report as of June 30, 2016.

**(3) Changes of Benefit Terms and Assumptions**

   *(a) ERS:*

For purposes of the 2016 actuarial valuation of the ERS, the projected mortality improvement scale was updated from Scale AA to Scale MP-2015, which was published by the Society of Actuaries in October 2015. Also, as Scale MP-2015 is a two-dimensional mortality improvement scale, the base mortality rates for the post-retirement mortality assumption was set to the 2010 rates – the central year of the 2007 to 2012 ERS experience study upon which the rates were based.

The investment return assumption reflects a decrease from 6.75% per year to 6.55% per year. The 6.55% assumption reflects the asset allocation for the non-loan portion of the portfolio that was adopted by the ERS during December 31, 2013 and the capital market assumptions as of June 30, 2015. Please note that this new interest rate assumption of 6.55% per year is equal to the highest debt service of the Pension Obligation Bonds of the ERS. The debt on the Pension Obligations Bonds ranges from 5.85% to 6.55%. In addition, the assumption reflects that loans to members comprise approximately 20% of the portfolio and have an approximate return of 9.1% with no volatility.

   *(b) JRS:*

The pre retirement mortality rates were updated from RP 2000 Employee Mortality Rates to RP 2014 Employee Mortality Rates (both with white collars adjustments), which were published by the Society of Actuaries in October 2014. The post retirement healthy mortality rates were updated from RP 2000 Healthy Annuitant Mortality Rates to the RP 2014 Healthy Annuitant Mortality Rates (both with white collars adjustments), which were published by the Society of Actuaries in October 2014. The disability mortality rates were updated from RP 2000 Disabled Annuitant Mortality Rates, which were published by the Society of Actuaries in October 2014.

338

COMMONWEALTH OF PUERTO RICO

Notes to Required Supplementary Information (Unaudited)

June 30, 2016

For active members and healthy retirees, the projected mortality improvement scale was updated from Scale MP-2015 to Scale MP 2016, which were published by the Society of Actuaries in October 2016. Projected mortality improvement was implemented for disabled retirees using Scale MP 2016.

The investment return assumption was increased from 5.50% per year in fiscal year 2015 to 5.70% per year in fiscal year 2016. Accordingly, the assumed investment return on the defined contribution hybrid program contribution account (80% of the net investment return assumption) was increased from 4.40% per year in fiscal year 2015 to 4.56% per year in fiscal year 2016.

*(c) TRS:*

For actuarial valuation purposes, the census collection date was changed to the beginning of the fiscal year, rather than the end of the fiscal year. Therefore, demographic gain/loss during the year is limited to the update of the census data to reflect outsized retirement activity during the year, plus the difference between actual and expected benefit payments, which rise from the differences in retirement activity and also actual mortality versus expectations. During fiscal year 2016, these differences resulted in a loss of $43 million.

The valuation reflects an investment return assumption of 5.85% as of June 30, 2016. Under GASB Statements No. 25 and No. 27, the investment return assumption was used to discount all projected Basic System Pension Benefits and System Administered Pension Benefits to determine the Actuarial Accrued Liability.

The index selected for the System is the Bond Buyer General Obligation 20-Bond Municipal Bond Index. The index rate decreased from 3.80% as of June 30, 2015 to 2.85% as of June 30, 2016. Therefore, the discount rates used to determine the annual required contributions and the total pension liability decreased from 3.82% at June 30, 2015 to 2.86% at June 30, 2016, in accordance with GASB Statement No. 67.

**(4) Budgetary Control**

The Governor is constitutionally required to submit to the Legislature an annual balanced budget of the Commonwealth for the ensuing fiscal year. The annual budget is prepared by the Commonwealth's Office of Management and Budget (Commonwealth OMB) and takes into consideration the advice provided by the Puerto Rico Planning Board (annual economic growth forecasts and four-year capital improvements plan), the Treasury Department of the Commonwealth (revenue estimates, accounting records, and the comprehensive annual financial report), GDB (the fiscal agent), and other governmental offices and agencies. Section 7 of Article VI of the Constitution of Puerto Rico provides that "the appropriations made for any fiscal year shall not exceed the total revenue, including available surplus, estimated for the said fiscal year, unless the imposition of taxes sufficient to cover the said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenue and other resources for the ensuing fiscal year under: (i) laws existing at the time the budget is submitted and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four year capital improvements plan adopted by the Puerto Rico Planning Board.

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2016

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying other sources of revenue to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor who may decrease or eliminate any line item but may not increase or insert any new line item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the fiscal year, the annual budget for the preceding fiscal year, as approved by the Legislature and the Governor, is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments for its operating and other expenses until the new budget is approved. The appropriated annual budget for fiscal year 2016 (including other financing uses) amounted to approximately $9.8 billion, including several special budget appropriations to the General Fund made by the Legislature throughout the year which amounted to approximately $5.6 billion.

The Commonwealth OMB has authority to amend the budget within a department, agency, or government unit without legislative approval.

For budgetary purposes, encumbrance accounting is used. The encumbrances (that is, purchase orders and contracts) are considered expenditures when a commitment is made. For U.S. GAAP reporting purposes, encumbrances outstanding at year-end are reported within the restricted, committed, assigned, and unassigned fund balance classifications and do not constitute expenditures or liabilities on a U.S. GAAP basis because the commitments will be honored during the subsequent year. The unencumbered balance of any appropriation of the General Fund at the end of the fiscal year lapses immediately. Appropriations, other than in the General Fund, are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending. In addition, for budgetary purposes, revenue is recorded when cash is received.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments must give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: (i) the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); (ii) the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit, and full faith of the Commonwealth; (iii) current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and (iv) all other purposes.

In addition, the Legislature may direct that certain revenue be retained and made available for spending within a specific appropriation account. Generally, expenditures may not exceed the level of spending authorized for an individual department. However, the Commonwealth is statutorily required to pay debt service, regardless of whether such amounts are appropriated. Appropriations are enacted for certain departments, agencies, and government units included in the General Fund.

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2016

For these funds, a schedule of revenue and expenditures – budget and actual budgetary basis – General Fund is included. Appropriations for capital projects are made for each bond issue and the authorization continues for the expected construction period.

The Commonwealth OMB has the responsibility to ensure that budgetary spending control is maintained on an individual department basis. The OMB may transfer part or all of any unencumbered balance within a department to another department subject to legislative approval. Budgetary control is exercised through the Puerto Rico Integrated Financial Accounting System (PRIFAS). PRIFAS ensures that encumbrances or expenditures are not processed if they exceed the department's total available spending authorization, which is considered its budget. The legal level of budgetary control is at the individual department level for General Fund expenditures, principal and interest due for the year for the debt service fund, and by bond authorization for capital expenditures.

Notwithstanding the foregoing, the enactment of PROMESA (as discussed in Note 3) created an Oversight Board with the power to review and approve budgets for the Commonwealth and its instrumentalities. Under PROMESA, a fiscal plan for each covered entity must be certified by the Oversight Board before the Commonwealth can propose any fiscal year budgets. All budgets proposed after the enactment of PROMESA must be certified by the Oversight Board as being consistent with the applicable certified fiscal plan. For additional information on the budget certification process under PROMESA, refer to Note 3.

**(5) Statutory (Budgetary) Accounting**

The Commonwealth's budget is adopted in accordance with a statutory basis of accounting, which is not in accordance with U.S. GAAP. Revenue is generally recognized when cash is received. Income tax revenues are reduced for the amount of income tax refunds paid during the year and claimed but unpaid at year end. Short-term and long-term borrowings may be used to finance budgetary excess of expenditures over revenue. Expenditures are generally recorded when the related expenditure is incurred or encumbered. Encumbrances generally lapse the year following the end of the fiscal year when the encumbrance was established, as established by Act No. 123 of August 17, 2001. Unencumbered appropriations lapse at year-end. Amounts required for settling claims and judgments against the Commonwealth and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment.

Under the statutory basis of accounting, the Commonwealth uses encumbrance accounting to record the full amount of purchase orders, contracts, and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure. In the governmental funds, encumbrance accounting is a significant aspect of budgetary control.

The schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund only presents the information for the General Fund for which there is a legally adopted budget, as required by U.S. GAAP. For a reconciliation of the statement of revenue and expenditures – budget and actual – budgetary basis – General Fund with the statement of revenue, expenditures, and changes in fund balances (deficit) for the General Fund, refer to Note 6 to Required Supplemental Information. The special revenue funds do not have a legally mandated budget.

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2016

**(6) Budget/U.S. GAAP Reconciliation**

The following schedule presents comparisons of the legally adopted budget with actual data on a budgetary basis. Because accounting principles applied for purposes of developing data on a budgetary basis differ significantly from those used to present financial statements in conformity with U.S. GAAP, a reconciliation of entity, timing, and basis differences in the excess (deficiency) of revenue and other financing sources over expenditures and other financing uses for the year ended June 30, 2016 is presented below for the General Fund (in thousands):

| | | |
|---|---|---:|
| Excess of revenue and other financing sources under expenditures and other financing uses – budgetary basis | $ | 563,611 |
| Entity differences–excess of revenues and other financing sources over expenditures and other financing uses for: | | |
| Nonbudgeted funds | | 839,475 |
| Inclusion of agencies with independent treasuries | | (23,094) |
| Timing differences: | | |
| Adjustment for encumbrances | | 176,132 |
| Current year expenditures against prior year encumbrances | | (229,196) |
| Basis of accounting differences: | | |
| Revenue accrual adjustment | | 432,295 |
| Expenditures accrual adjustments | | (629,967) |
| Deficiency of revenue and other financing sources under expenditures and other financing uses – U.S. GAAP basis | $ | 1,129,256 |

See accompanying independent auditors' report.

# COMBINING AND INDIVIDUAL FUND
# FINANCIAL STATEMENTS AND SCHEDULES

**COMMONWEALTH OF PUERTO RICO**

General Fund

Year ended June 30, 2016

(In thousands)

The General Fund is the primary operating fund of the Commonwealth. The General Fund is used to account for and report all financial resources received and used for those services traditionally provided by a government, which are not required legally or by sound financial management to be accounted for in another fund. Included are transactions for services such as general government, public safety, health, public housing and welfare, education, and economic development. Following is the supplemental schedule of expenditures – budget and actual – General Fund (budgetary basis).

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2016

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---:|---:|---:|
| Expenditures – Current: | | | |
| General government: | | | |
| Senate of Puerto Rico | $ 40,204 | 40,204 | 40,204 |
| House of Representatives of Puerto Rico | 47,646 | 47,665 | 47,665 |
| Comptroller's Office | 39,690 | 39,690 | 39,690 |
| Governor's Office | 18,147 | 18,518 | 17,799 |
| Office of Management and Budget (1) | 119,917 | 119,510 | 44,259 |
| Planning Board | 15,458 | 15,055 | 11,803 |
| Department of State | 5,276 | 5,328 | 5,937 |
| Department of the Treasury (1) | 492,553 | 261,060 | 425,422 |
| Central Office of Personnel Administration | 3,778 | 3,632 | 3,727 |
| Commonwealth Elections Commission | 53,741 | 50,841 | 49,993 |
| Federal Affairs Administration | 4,064 | 4,048 | 4,083 |
| General Services Administration | 5,360 | 2,426 | 144 |
| Municipal Complaints Hearing Commission | 10,179 | 9,945 | 10,451 |
| Civil Rights Commission | 1,089 | 1,089 | 1,191 |
| Office of the Citizen's Ombudsman | 4,000 | 4,000 | 4,544 |
| Government Ethics Board | 9,278 | 9,278 | 9,278 |
| Legislative Affairs Office | 19,508 | 17,545 | 17,545 |
| Office of the Superintendent of the Capitol | 18,854 | 15,513 | 17,513 |
| Comptroller's Special Reports Joint Commission | 662 | 662 | 636 |
| Corporation "Enlace" Caño Martín Peña | 1,333 | 1,281 | 1,314 |
| Legislative Donation Commission | 1,307 | 1,161 | 1,272 |
| Puerto Rico Statistics Institute | 2,739 | 2,521 | 2,555 |
| Permits Management Office | 5,582 | 5,311 | 6,634 |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 304,633 | 304,633 | 282,669 |
| Puerto Rico System of Annuities and Pensions for Teachers | 102,586 | 102,586 | 102,586 |
| Contributions to Political Parties | — | 2,400 | 2,400 |
| Public Buildings Authority | 300 | 165 | 44 |
| Office of Elections Comptroller | 3,574 | 3,574 | 4,344 |
| Appellative Board of the Personnel System Administration | 3,266 | 3,125 | 3,133 |
| Total general government | 1,334,724 | 1,092,766 | 1,158,835 |
| Public safety: | | | |
| Puerto Rico General Court of Justice | 322,967 | 322,967 | 315,109 |
| Civil Defense | 10,517 | 9,462 | 7,013 |
| Commission of Investigation, Processing and Appeals Board | 450 | 436 | 421 |
| Department of Justice | 142,377 | 136,945 | 119,251 |
| Puerto Rico Police Department | 825,838 | 810,604 | 789,704 |
| Puerto Rico Firefighters Corps | 65,794 | 64,378 | 63,997 |
| Puerto Rico National Guard | 11,901 | 11,518 | 11,753 |
| Public Service Commission | 5,464 | 5,283 | 5,118 |
| Consumer Affairs Department | 9,588 | 9,363 | 7,395 |
| Natural Resources Administration | 33,215 | 31,913 | 29,556 |
| Office of the Model Forest | 55 | 55 | 500 |
| Department of Correction and Rehabilitation | 433,870 | 425,794 | 432,907 |
| Parole Board | 2,355 | 2,278 | 2,367 |
| Forensic Sciences Institute | 17,861 | 17,391 | 18,904 |
| Special Prosecutor Panel | 2,614 | 2,614 | 2,604 |
| Correctional Health | 72,616 | 75,988 | 72,739 |
| Medical Emergencies Service | 22,842 | 24,130 | 24,848 |
| Total public safety | 1,980,324 | 1,951,119 | 1,904,186 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2016

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---:|---:|---:|
| Health: | | | |
| Environmental Quality Board | $ 8,454 | 8,203 | 7,850 |
| Department of Health | 280,514 | 268,076 | 256,130 |
| Puerto Rico Medical Services Administration | 27,536 | 27,536 | 27,288 |
| Mental Health and Drug Addiction Services Administration | 90,981 | 99,381 | 95,127 |
| Puerto Rico Solid Waste Authority | 4,453 | 4,380 | 6,370 |
| Puerto Rico Health Insurance Administration | 892,690 | 892,487 | 892,270 |
| University of Puerto Rico Comprehensive Cancer Center | 37,342 | 30,876 | 30,876 |
| | 1,341,970 | 1,330,939 | 1,315,911 |
| Public housing and welfare: | | | |
| Office of Youth Affairs | — | — | 1,512 |
| Department of Labor and Human Resources | 13,714 | 12,369 | 18,147 |
| Labor Relations Board | 832 | 807 | 801 |
| Department of Housing | 20,458 | 19,113 | 19,766 |
| Department of Recreation and Sports | 54,870 | 51,910 | 55,253 |
| Administration for the Horse Racing Sport and Industry | 1,841 | 2,206 | 2,227 |
| Women's Affairs Commission | 4,846 | 3,616 | 3,691 |
| Public Housing Administration | 500 | 450 | 450 |
| Office of the Veteran's Ombudsman | 2,545 | 2,367 | 2,718 |
| Department of Family | 38,277 | 37,578 | 32,463 |
| Family and Children Administration | 181,607 | 183,057 | 188,306 |
| Minors Support Administration | 13,277 | 12,807 | 12,597 |
| Vocational Rehabilitation Administration | 17,782 | 16,708 | 16,234 |
| Social Economic Development Administration | 75,138 | 68,091 | 64,541 |
| Office of the Disabled Persons Ombudsman | 1,708 | 1,597 | 1,590 |
| Office for Elderly Affairs | 2,976 | 2,771 | 2,401 |
| Company for the Integral Development of the Península de Cantera | 813 | 784 | 484 |
| Patient Ombudsman | 2,882 | 2,766 | 2,160 |
| Administration for the Care and Development of the Childhood | 14,084 | 13,945 | 15,466 |
| Special Communities Trust | 4,022 | 3,801 | 3,081 |
| | 452,172 | 436,743 | 443,888 |
| Education: | | | |
| Department of Education | 2,030,425 | 2,023,875 | 1,823,731 |
| Institute of Puerto Rican Culture | 21,109 | 18,420 | 19,767 |
| Puerto Rico School of Plastics Arts | 2,375 | 2,309 | 2,225 |
| State Office for Historic Preservation | 1,690 | 1,648 | 2,008 |
| University of Puerto Rico | 873,477 | 869,696 | 869,696 |
| Musical Arts Corporation | 7,572 | 7,160 | 7,334 |
| Fine Arts Center Corporation | 4,032 | 3,785 | 4,878 |
| Puerto Rico Public Broadcasting Corporation | 11,352 | 10,869 | 12,530 |
| Athenaeum of Puerto Rico | 350 | 271 | 271 |
| Puerto Rico Conservatory of Music Corporation | 6,464 | 6,212 | 7,188 |
| Puerto Rico Council on Education | 17,533 | 11,340 | 11,340 |
| | 2,976,379 | 2,955,585 | 2,760,968 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2016

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---:|---:|---:|
| Economic development: | | | |
| Department of Transportation and Public Works | $ 65,727 | 63,925 | 63,459 |
| Department of Natural and Environmental Resources | 5,019 | 4,321 | 5,623 |
| Department of Agriculture | 14,877 | 15,621 | 14,605 |
| Cooperative Enterprises Development Administration | 2,773 | 2,548 | 2,075 |
| Department of Economic Development and Commerce | 5,876 | 4,623 | 4,666 |
| Agricultural Enterprises Development Administration | 82,651 | 71,494 | 67,145 |
| Energy Affairs Administration | 1,000 | 961 | 922 |
| Puerto Rico Infrastructure Financing Authority | 117,000 | 4,000 | 4,000 |
| Puerto Rico Integrated Transportation Authority | 34,000 | 34,000 | 29,000 |
| Puerto Rico Land Administration | 500 | 225 | 325 |
| Puerto Rico Diabetes Center | 500 | 450 | 225 |
| Puerto Rico Fiscal Agency and Financial Advisory Authority | 250 | 250 | — |
| Puerto Rico Metropolitan Bus Authority | — | — | 260 |
| Puerto Rico Public Partnership Authority | 4,300 | 3,490 | 990 |
| Puerto Rico Tourism Company | 275 | 275 | 275 |
| Culebra Conservation and Development Authority | 281 | 270 | 274 |
| Ports of Americas Authority | 300 | 270 | 270 |
| Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | 1,292 | 1,215 | 1,215 |
| Puerto Rico Maritime Transportation Authority | — | — | 4,000 |
| Total economic development | 336,621 | 207,938 | 199,329 |
| Intergovernmental – Municipal Services Administration | 366,600 | 365,700 | 510,661 |
| Total expenditures | $ 8,788,790 | 8,340,790 | 8,293,778 |
| Operating Transfer-out to Other Funds: | | | |
| Department of the Treasury – transfer to Debt Service Fund and other funds | $ 1,011,210 | 951,210 | 286,507 |

(1)   As a department and a fiscal agent.

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2016

**Special Revenue Funds**

Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects. Other resources (investment earnings and transfers from other funds, for example) also may be reported in the fund if those resources are restricted, committed, or assigned to the specified purpose of the fund.

*(1) Public Buildings Authority Special Revenue Fund*

The operating fund of the Public Buildings Authority, a blended component unit, used to account for the operation, maintenance, equipment replacement, and other extraordinary operation and maintenance costs of the buildings and facilities that, when constructed, are leased to the Commonwealth's Primary Government agencies.

*(2) Puerto Rico Infrastructure Financing Authority's Special Revenue Fund*

The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth. Under Act No. 44 of June 21, 1988, as amended, the Commonwealth conditionally allocates to this fund the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds. This special revenue fund also receives ARRA funds for the weatherization program aimed at converting certain government buildings into eco-friendly locations.

*(3) Port of the Americas Authority's Special Revenue Fund*

The special revenue fund of Port of the Americas Authority, a blended component unit, is used to account for its remaining legal and certain other administrative requirements resulting after the transfer of all rights and duties to PPA. The main purpose of the PAA was the planning, development and construction of a large-scale container terminal in the city of Ponce, Puerto Rico.

*(4) Special Communities Perpetual Trust's Special Revenue Fund*

The special revenue fund of the Special Communities Perpetual Trust, a blended component unit, is used to account for the moneys received from the Governmental Development Bank, through a line of credit financing and cash contributions, upon inception of the Special Communities Perpetual Trust. The financial resources received by this fund are used to carry out development projects that address the infrastructure and housing needs of certain under privileged communities.

*(5) The Children's Trust Special Revenue Fund*

The special revenue fund of the Children's Trust, a blended component unit, is used to account for the money received by the Commonwealth from a global settlement agreement dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United State of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2016

**(6)  *University of Puerto Rico Comprehensive Cancer Canter's Special Revenue Fund***

The special revenue fund of the UPRCCC, a blended component unit, is used to account for the moneys received from the Commonwealth and certain other grants from both the private sector and the Federal government, to execute public policy related to the prevention, orientation, investigation and treatment of cancer in Puerto Rico.

**Debt Service Funds**

The debt service funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for principal and interest, and related costs other than bonds payable from operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following year are accounted for as a fund liability if resources are available as of June 30 for its payment.

**(1)  *Public Buildings Authority Debt Service Fund***

A blended component unit engaged in the construction and/or acquisition of building facilities for lease mainly to the Commonwealth's Primary Government agencies. Its debt service fund is used to account for the financial resources that are restricted, committed, or assigned to expenditure for the payment of revenue bonds and other liabilities incurred to finance the construction of the buildings and facilities.

**(2)  *Puerto Rico Infrastructure Financing Authority's Debt Service Fund***

The debt service fund of the Puerto Rico Infrastructure Financing Authority accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its special tax revenue bonds. These resources are received from operating transfers from the Puerto Rico Infrastructure Financing Authority Special Revenue Fund.

**(3)  *Port of the Americas Authority's Debt Service Fund***

The debt service fund of Port of the Americas Authority is used to account for the financial resources that are restricted for the payment of the long-term debt that remained at PAA after the transfer of its operations to PPA. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

**(4)  *Puerto Rico Maritime Shipping Authority Debt Service Fund***

This is the remainder of a former shipping company owned by the Commonwealth. Its debt service fund is used to account for the financial resources that are restricted for the payment of the long-term liability that resulted from the sale of its marine operations. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

**(5)  *Special Communities Perpetual Trust's Debt Service Fund***

The debt service fund of the Special Communities Perpetual Trust accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its line of credit with the GDB, financed with moneys to be received by the Commonwealth from general legislative appropriations.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2016

*(6)  The Children's Trust Debt Service Fund*

The debt service fund of The Children's Trust accounts for the financial resources that are restricted, committed, or assigned to expenditure for the payment of interest and principal on long-term obligations financed with moneys to be received by the Commonwealth from the global settlement agreement signed by certain tobacco companies.

**Capital Projects Funds**

Capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not being financed by the Public Buildings Authority's Capital Projects Fund, the Puerto Rico Infrastructure Financing Authority's Capital Project Fund, proprietary fund types, pension trust funds, and discretely presented component units.

*(1)  Commonwealth of Puerto Rico Capital Project Fund*

These funds present the activities of the capital improvements program of the Commonwealth, financed with the proceeds of the general obligation bonds.

*(2)  Public Buildings Authority's Capital Projects Fund*

The Public Buildings Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not financed by proprietary fund types, pension trust funds, and discretely presented component units.

*(3)  Puerto Rico Infrastructure Financing Authority's Capital Projects Fund*

The Puerto Rico Infrastructure Financing Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned for the acquisition or construction of capital assets and capital improvements, not financed by proprietary fund types, pension trust funds, and discretely presented component units.

**COMMONWEALTH OF PUERTO RICO**

Combining Balance Sheet – Nonmajor Governmental Funds

June 30, 2016

(In thousands)

| | Special Revenue | | | | | | Debt Service | | | | | | Capital Projects | | | Total |
| | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | The Children's Trust | University of Puerto Rico Comprehensive Cancer Center | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Puerto Rico Maritime Shipping Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | The Children's Trust | Commonwealth of Puerto Rico | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Nonmajor Governmental Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | $ 11,699 | 1,609 | — | — | — | 18,592 | — | — | — | — | — | — | 440 | — | — | 32,340 |
| Cash and cash equivalents in governmental banks | — | 1,547 | — | — | 277 | — | — | — | 102 | — | — | — | — | — | — | 1,926 |
| Investments | — | — | — | — | 14,425 | — | — | — | — | — | — | — | — | — | — | 14,425 |
| Receivables – net: | | | | | | | | | | | | | | | | |
| Intergovernmental | — | — | — | — | — | 682 | — | — | — | — | — | — | — | — | 1,832 | 2,514 |
| Accounts | — | 1,462 | — | — | — | 953 | — | — | — | — | — | — | 671 | — | — | 3,086 |
| Loans | — | — | — | — | 1 | — | — | — | — | — | — | — | — | — | — | 1 |
| Accrued interest | — | — | — | — | — | — | — | — | — | — | — | — | 39 | — | — | 39 |
| Other | 2,451 | 387 | — | — | — | 234 | — | — | — | — | — | 36,765 | — | — | — | 39,837 |
| Due from: | | | | | | | | | | | | | | | | |
| Other funds | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 5,739 | 5,739 |
| Component units | 5,876 | — | — | — | — | — | — | — | — | — | — | — | — | — | 4,371 | 10,247 |
| Other governmental entities | — | 2,039 | — | 1,076 | — | — | — | — | — | — | — | — | — | — | 948 | 4,063 |
| Other assets | 1,010 | — | — | 5 | — | 22 | — | — | — | — | — | — | — | — | — | 1,037 |
| Restricted assets: | | | | | | | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | — | — | — | 5 | — | 384 | 167,232 | 12,990 | — | — | — | — | 20,538 | 23,904 | 35,204 | 260,257 |
| Cash and cash equivalents in governmental banks | — | 603 | — | 2,484 | — | 207 | — | — | 37 | — | — | — | — | — | 1,901 | 5,232 |
| Cash equivalents in PRGITF | — | — | — | — | — | — | — | — | — | — | — | — | 51,899 | — | — | 51,899 |
| Investments | — | — | — | — | — | — | — | 3,139 | — | — | — | 109,380 | — | — | 628 | 113,147 |
| Due from other funds | — | 140,178 | — | — | — | — | — | — | — | — | — | — | — | — | — | 140,178 |
| Other | — | — | — | — | — | — | — | — | — | — | — | 457 | — | — | — | 457 |
| Real estate held for sale or future development | — | — | — | — | — | — | — | — | — | — | — | — | 1,854 | — | — | 1,854 |
| **Total assets** | $ 21,036 | 147,825 | — | 3,570 | 14,703 | 21,074 | 167,232 | 16,129 | 139 | — | — | 146,602 | 75,441 | 23,904 | 50,623 | 688,278 |
| **Liabilities, deferred outflow of resources, and fund balances (deficit):** | | | | | | | | | | | | | | | | |
| Accounts payable and accrued liabilities | $ 7,845 | 12,845 | 429 | 21,666 | 305 | 25,535 | — | — | 49 | — | — | — | 7,832 | 14,807 | 43,936 | 135,249 |
| Due to: | | | | | | | | | | | | | | | | |
| Other funds | 2,527 | — | 3,996 | — | — | — | — | — | — | — | — | — | — | — | — | 6,523 |
| Component units | 7,817 | — | — | — | — | 2,433 | — | — | — | — | — | — | — | — | — | 10,250 |
| Other governmental entities | 2,664 | — | 12 | 88 | — | — | — | — | — | — | — | — | — | 3,213 | — | 5,977 |
| Notes payable to GDB | — | — | 1,700 | — | — | — | — | — | — | — | — | — | — | — | — | 1,700 |
| General obligation and revenue bonds | — | — | — | — | — | — | 60,852 | — | — | — | — | — | — | — | — | 60,852 |
| Interest payable | — | — | — | — | — | — | 100,866 | 35,920 | 6,837 | — | — | — | — | — | — | 143,623 |
| Unearned revenue | 2,665 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 2,665 |
| **Total liabilities** | 23,518 | 12,845 | 6,137 | 21,754 | 305 | 27,968 | 161,718 | 35,920 | 6,886 | — | — | — | 7,832 | 18,020 | 43,936 | 366,839 |
| Deferred inflow of resources: | | | | | | | | | | | | | | | | |
| Global tobacco settlement agreement | — | — | — | — | — | — | — | — | — | — | — | 36,765 | — | — | — | 36,765 |
| **Total deferred inflow of resources** | — | — | — | — | — | — | — | — | — | — | — | 36,765 | — | — | — | 36,765 |
| Fund balances: | | | | | | | | | | | | | | | | |
| Restricted for: | | | | | | | | | | | | | | | | |
| Debt service | — | — | — | — | — | — | 5,514 | — | — | — | — | 109,837 | — | — | — | 115,351 |
| Capital projects | — | 134,980 | — | — | — | — | — | — | — | — | — | — | 67,609 | 5,884 | 6,687 | 215,160 |
| Committed to: | | | | | | | | | | | | | | | | |
| Public housing and welfare | — | — | — | — | 25,487 | — | — | — | — | — | — | — | — | — | — | 25,487 |
| Capital projects | — | — | — | — | — | 591 | — | — | — | — | — | — | — | — | — | 591 |
| Assigned to: | | | | | | | | | | | | | | | | |
| Public housing and welfare | — | — | — | — | 2,851 | — | — | — | — | — | — | — | — | — | — | 2,851 |
| Capital projects | — | — | — | — | — | 1,161 | — | — | — | — | — | — | — | — | — | 1,161 |
| Unassigned (deficit) | (2,482) | — | (6,137) | (18,184) | (13,940) | (8,646) | — | (19,791) | (6,747) | — | — | — | — | — | — | (75,927) |
| **Total fund balances (deficit)** | (2,482) | 134,980 | (6,137) | (18,184) | 14,398 | (6,894) | 5,514 | (19,791) | (6,747) | — | — | 109,837 | 67,609 | 5,884 | 6,687 | 284,674 |
| **Total liabilities, deferred inflow of resources, and fund balances (deficit)** | $ 21,036 | 147,825 | — | 3,570 | 14,703 | 21,074 | 167,232 | 16,129 | 139 | — | — | 146,602 | 75,441 | 23,904 | 50,623 | 688,278 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Revenue, Expenditures, and Changes in Fund Balances – Nonmajor Governmental Funds

Year ended June 30, 2016

(In thousands)

| | Special Revenue | | | | | | Debt Service | | | | | | Capital Projects | | | Eliminations | Total Nonmajor Governmental Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | The Children's Trust | University of Puerto Rico Comprehensive Cancer Center | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Puerto Rico Maritime Shipping Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | The Children's Trust | Commonwealth of Puerto Rico | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | | |
| **Revenue:** | | | | | | | | | | | | | | | | | |
| Intergovernmental | $ — | — | — | — | — | 1,822 | 36,135 | — | — | — | — | — | — | — | — | — | 37,957 |
| Interest and investment earnings | 342 | 8 | 1 | 2,362 | 55 | 14 | — | 156 | 1 | — | — | 3,416 | — | — | 120 | — | 6,475 |
| Other | 347 | 6,460 | — | 304 | — | 1,833 | — | 2,577 | 86 | — | — | — | 26 | — | 338 | — | 11,971 |
| Total revenue | 689 | 6,468 | 1 | 2,666 | 55 | 3,669 | 36,135 | 2,733 | 87 | — | — | 3,416 | 26 | — | 458 | — | 56,403 |
| **Expenditures:** | | | | | | | | | | | | | | | | | |
| Current: | | | | | | | | | | | | | | | | | |
| General government | 108,047 | 16,750 | — | 2,235 | 16,968 | — | 797 | — | — | — | — | — | 2,070 | 1,382 | 27,768 | — | 176,017 |
| Public safety | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 46 | — | 46 |
| Health | — | — | — | — | 397 | 9,430 | — | — | — | — | — | — | 448 | — | — | — | 10,275 |
| Public housing and welfare | — | — | — | 3,614 | — | — | — | — | — | — | — | — | 1,466 | — | 755 | — | 5,835 |
| Education | — | — | — | — | 58 | — | — | — | — | — | — | — | — | — | 736 | — | 794 |
| Economic development | — | — | 1,617 | — | 80 | — | — | — | 87 | — | — | — | 25,687 | — | 3,212 | — | 30,683 |
| Intergovernmental | — | — | — | — | 193 | — | — | — | — | — | — | — | 15,426 | — | — | — | 15,619 |
| Capital outlays | — | 2,481 | 198 | — | — | 58,934 | — | — | — | — | — | — | 16,031 | 36,629 | 21,593 | — | 135,866 |
| Debt service: | | | | | | | | | | | | | | | | | |
| Principal | — | — | — | — | — | 2,913 | 60,852 | 194,840 | — | 7,736 | — | 24,950 | — | — | — | — | 291,291 |
| Interest and other | — | 231 | — | — | — | 4,245 | 224,191 | 90,072 | 6,837 | 10,155 | — | 48,057 | — | — | — | — | 383,788 |
| Other – debt issuance costs | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Total expenditures | 108,047 | 19,462 | 1,815 | 5,849 | 17,696 | 75,522 | 285,840 | 284,912 | 6,924 | 17,891 | — | 73,007 | 61,128 | 38,011 | 54,110 | — | 1,050,214 |
| Deficiency of revenue under expenditures | (107,358) | (12,994) | (1,814) | (3,183) | (17,641) | (71,853) | (249,705) | (282,179) | (6,837) | (17,891) | — | (69,591) | (61,102) | (38,011) | (53,652) | — | (993,811) |
| **Other financing sources (uses):** | | | | | | | | | | | | | | | | | |
| Transfers in | 346,592 | 16,954 | 486 | — | 13 | 38,033 | 249,667 | 142,549 | — | 17,891 | — | 70,771 | 25,989 | 11,562 | 29,733 | (261,242) | 688,998 |
| Transfers out | (261,229) | — | — | — | — | — | — | — | — | — | — | (13) | — | — | — | 261,242 | — |
| Proceeds from long term debt issued | — | — | — | — | — | 46,932 | — | — | — | — | — | — | 2,451 | 3,976 | 126 | — | 53,485 |
| Total other financing sources | 85,363 | 16,954 | 486 | — | 13 | 84,965 | 249,667 | 142,549 | — | 17,891 | — | 70,758 | 28,440 | 15,538 | 29,859 | (261,242) | 742,483 |
| Net change in fund balances | (21,995) | 3,960 | (1,328) | (3,183) | (17,628) | 13,112 | (38) | (139,630) | (6,837) | — | — | 1,167 | (32,662) | (22,473) | (23,793) | — | (251,328) |
| Fund balances (deficit) — beginning of year (as restated)(note 4 to financial statements) | 19,513 | 131,020 | (4,809) | (15,001) | 32,026 | (20,006) | 5,552 | 119,839 | 90 | — | — | 108,670 | 100,271 | 28,357 | 30,480 | — | 536,002 |
| Fund balances — end of year | $ (2,482) | 134,980 | (6,137) | (18,184) | 14,398 | (6,894) | 5,514 | (19,791) | (6,747) | — | — | 109,837 | 67,609 | 5,884 | 6,687 | — | 284,674 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Proprietary Funds

Year ended June 30, 2016

Proprietary funds are used to account for operations that are financed and operated in a manner similar to private business enterprises where the intent of the government is that the costs of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges.

**9-1-1 Service Governing Board (9-1-1 Service)**

This fund was created by Act No. 144 on December 22, 1994. The 9-1-1 Service is responsible for providing an efficient service of fast response to emergency calls through the 9-1-1 number and transferring these to the appropriate response agencies.

*Disability Insurance*

This fund was created by Act No. 139 on June 26, 1968. It is used to account for disability benefits to remedy temporarily the loss of income as a result of disability caused by sickness or accident unrelated to the employment.

*Drivers' Insurance*

This fund was created by Act No. 428 on May 15, 1950. It is used to account for contributions made by the drivers and their employers to provide a social security plan for the benefit of the drivers in Puerto Rico. The plan also includes payment of benefits for health and life insurance.

*Ponce Ports Authority*

This fund was created by Act No. 240 on December 12, 2011. It is used to account for the development of the container terminal formerly undertaken by PAA and handle such facilities future operations.

*Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund*

This fund was created by Act No. 32 on July 7, 1997. It is administered, pursuant to Act No. 9 of June 18, 1970, as amended, by the Commonwealth Department of Health. Pursuant to such act, the Commonwealth Department of Health, on behalf of the Commonwealth, is authorized to enter into operating and capitalization grant agreements with the EPA for lending activities.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Nonmajor Proprietary Funds

June 30, 2016

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | | |
|---|---|---|---|---|---|---|
| | 9-1-1 Service Governing Board | Disability Insurance | Drivers' Insurance | Ponce Ports Authority | Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents in commercial banks | $ — | 49,196 | 7,427 | — | — | 56,623 |
| Receivables - net: | | | | | | |
| Insurance premiums | — | 3,027 | 1,061 | — | — | 4,088 |
| Accounts | 9,625 | — | — | — | — | 9,625 |
| Accrued interest | — | 158 | — | — | — | 158 |
| Other | 11 | 48 | — | — | — | 59 |
| Due from other funds | — | — | 3,432 | 3,996 | — | 7,428 |
| Other assets | 31 | — | — | — | — | 31 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 3,051 | 15,459 | — | — | — | 18,510 |
| Cash and cash equivalents in governmental banks | 1,005 | — | — | — | 1,518 | 2,523 |
| Receivables - net: | | | | | | |
| Accrued interest | — | — | — | — | — | — |
| Loans from component units | — | — | — | — | 81 | 81 |
| Total current assets | 13,723 | 67,888 | 11,920 | 3,996 | 1,599 | 99,126 |
| Noncurrent assets: | | | | | | |
| Receivables - net: | | | | | | |
| Loans from component units – restricted | — | — | — | — | 2,185 | 2,185 |
| Due from other funds | — | — | 7,761 | — | — | 7,761 |
| Restricted investments | — | 24,545 | — | — | — | 24,545 |
| Land and other nondepreciable assets | 3,829 | — | — | 28,643 | — | 32,472 |
| Depreciable assets | 2,666 | 39 | — | — | — | 2,705 |
| Total assets | 20,218 | 92,472 | 19,681 | 32,639 | 3,784 | 168,794 |
| **Liabilities and net position:** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable and accrued liabilities | 4,680 | 1,367 | 363 | 488 | 367 | 7,265 |
| Due to other governmental entities | 101 | 1 | 5 | — | — | 107 |
| Interest payable | — | — | — | 2,370 | — | 2,370 |
| Unearned revenue | — | 2,692 | 13 | — | — | 2,705 |
| Compensated absences | 754 | 449 | 254 | — | — | 1,457 |
| Voluntary termination benefits payable | 110 | — | — | — | — | 110 |
| Liability for unemployment and disability benefits | — | 553 | 249 | — | — | 802 |
| Total current liabilities | 5,645 | 5,062 | 884 | 2,858 | 367 | 14,816 |
| Noncurrent liabilities: | | | | | | |
| Notes payable to component units | — | — | — | 20,863 | — | 20,863 |
| Compensated absences | 875 | 673 | 380 | — | — | 1,928 |
| Voluntary termination benefits payable | 299 | — | — | — | — | 299 |
| Total liabilities | 6,819 | 5,735 | 1,264 | 23,721 | 367 | 37,906 |
| Net position: | | | | | | |
| Net investment in capital assets | 6,445 | 39 | — | 10,543 | — | 17,027 |
| Restricted for emergency services | 6,268 | — | — | — | — | 6,268 |
| Restricted for lending activities | — | — | — | — | 3,417 | 3,417 |
| Restricted for payment of insurance benefits | — | 40,004 | — | — | — | 40,004 |
| Unrestricted | 686 | 46,694 | 18,417 | (1,625) | — | 64,172 |
| Total net position | $ 13,399 | 86,737 | 18,417 | 8,918 | 3,417 | 130,888 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Revenue, Expenses, and Changes in Fund Net Position – Nonmajor Proprietary Funds

Year ended June 30, 2016

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | | |
|---|---|---|---|---|---|---|
| | 9-1-1 Service Governing Board | Disability Insurance | Drivers' Insurance | Ponce Ports Authority | Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total |
| Operating revenue: | | | | | | |
| Insurance premiums | $            — | 12,694 | 4,405 | — | — | 17,099 |
| Emergency telephone service charges | 22,739 | — | — | — | — | 22,739 |
| Interest | — | — | — | — | 1,845 | 1,845 |
| Other | — | — | — | 1 | — | 1 |
| Total operating revenue | 22,739 | 12,694 | 4,405 | 1 | 1,845 | 41,684 |
| Operating expenses: | | | | | | |
| Insurance benefits | — | 1,756 | 724 | — | — | 2,480 |
| General, administrative, and other operating expenses | 24,706 | 9,350 | 15,868 | 819 | 34,353 | 85,096 |
| Impairment loss on loans receivable | — | — | — | — | 184,938 | 184,938 |
| Total operating expenses | 24,706 | 11,106 | 16,592 | 819 | 219,291 | 272,514 |
| Operating income (loss) | (1,967) | 1,588 | (12,187) | (818) | (217,446) | (230,830) |
| Nonoperating revenue (expenses): | | | | | | |
| U.S. government grants | — | — | — | — | 18,444 | 18,444 |
| Contributions to component units | — | — | — | — | (1,522) | (1,522) |
| Interest and investment earnings | 14 | 1,409 | 329 | — | — | 1,752 |
| Interest expense | — | — | — | (1,440) | — | (1,440) |
| Other | 498 | — | — | — | — | 498 |
| Total nonoperating revenue | 512 | 1,409 | 329 | (1,440) | 16,922 | 17,732 |
| Income (loss) before transfers | (1,455) | 2,997 | (11,858) | (2,258) | (200,524) | (213,098) |
| Transfers from other funds | — | — | — | — | 4,084 | 4,084 |
| Transfers to other funds | (6,618) | (4,986) | (7) | — | — | (11,611) |
| Net change in net position | (8,073) | (1,989) | (11,865) | (2,258) | (196,440) | (220,625) |
| Net position – beginning of year, as adjusted (see note 4 to the financial statement) | 21,472 | 88,726 | 30,282 | 11,176 | 199,857 | 351,513 |
| Net position – end of year | $         13,399 | 86,737 | 18,417 | 8,918 | 3,417 | 130,888 |

See accompanying independent auditors' report.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Cash Flows – Nonmajor Proprietary Funds

Year ended June 30, 2016

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | | |
|---|---|---|---|---|---|---|
| | 9-1-1 Service Governing Board | Disability Insurance | Drivers' Insurance | Ponce Ports Authority | Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total |
| Cash flows from operating activities: | | | | | | |
| Receipts from customers and users | $ 20,730 | 12,694 | 4,529 | — | — | 37,953 |
| Payments to suppliers | (13,283) | (3,326) | (13,116) | (410) | (34,141) | (64,276) |
| Payments to employees | (10,049) | (5,291) | (2,701) | — | — | (18,041) |
| Payments of insurance benefits | — | (1,702) | (628) | | | (2,330) |
| Net cash provided by (used in) operating activities | (2,602) | 2,375 | (11,916) | (410) | (34,141) | (46,694) |
| Cash flows from noncapital financing activities: | | | | | | |
| U.S. government grants | — | — | — | — | 18,444 | 18,444 |
| Advances from line of credit | — | — | — | 1,763 | — | 1,763 |
| Contributions to component units | — | — | — | — | (1,522) | (1,522) |
| Transfers from other funds | — | — | 3,112 | — | 4,084 | 7,196 |
| Transfers to other funds | (6,618) | (4,986) | — | — | — | (11,604) |
| Net cash provided by (used in) noncapital financing activities | (6,618) | (4,986) | 3,112 | 1,763 | 21,006 | 14,277 |
| Cash flows from capital and related financing activities: | | | | | | |
| Advances to other funds | — | — | — | (1,366) | — | (1,366) |
| Capital expenditures | (181) | — | — | — | — | (181) |
| Net cash provided (used) by capital and related financing activities | (181) | — | — | (1,366) | — | (1,547) |
| Cash flows from investing activities: | | | | | | |
| Interest collected on deposits, investments, and loans | 512 | 8,714 | 449 | — | 3,459 | 13,134 |
| Loans originated | — | — | — | — | (24,853) | (24,853) |
| Principal collected on loans | — | — | — | — | 8,158 | 8,158 |
| Proceeds from sales and maturities of investments | — | 13,822 | — | — | — | 13,822 |
| Purchases of investments | — | (7,452) | — | — | — | (7,452) |
| Net cash provided by (used in) investing activities | 512 | 15,084 | 449 | — | (13,236) | 2,809 |
| Net increase (decrease) in cash and cash equivalents | (8,889) | 12,473 | (8,355) | (13) | (26,371) | (31,155) |
| Cash and cash equivalents – beginning of year, as restated (note 4) | 12,945 | 52,182 | 15,782 | 13 | 27,889 | 108,811 |
| Cash and cash equivalents – end of year | $ 4,056 | 64,655 | 7,427 | — | 1,518 | 77,656 |
| Reconciliation of operating income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Operating income (loss) | $ (1,967) | 1,588 | (12,187) | (818) | (217,446) | (230,830) |
| Adjustments to reconcile operating income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Interests earned on deposits, loans, and investments | — | — | — | — | (1,846) | (1,846) |
| Depreciation | 782 | 72 | — | — | — | 854 |
| Loss on disposition of capital assets | 10 | — | — | — | — | 10 |
| Impairment loss on loans receivable | — | — | — | — | 184,938 | 184,938 |
| Changes in operating assets and liabilities: | | | | | | |
| Decrease (increase) in accounts receivable | (2,008) | 53 | 126 | — | — | (1,829) |
| Decrease (increase) in other assets | 15 | — | — | 2 | — | 17 |
| Increase (decrease) in accounts payable and accrued liabilities | 497 | 630 | 78 | 406 | 213 | 1,824 |
| Increase (decrease) in due to other governmental entities | — | 1 | (2) | — | — | (1) |
| Increase (decrease) in unearned revenue | — | (53) | (3) | — | — | (56) |
| Increase (decrease) in compensated absences | 228 | 30 | (25) | — | — | 233 |
| Decrease in voluntary termination benefits payable | (159) | — | — | — | — | (159) |
| Increase (decrease) in liability for disability benefits payable | — | 54 | 97 | — | — | 151 |
| Total adjustments | (635) | 787 | 271 | 408 | 183,305 | 184,136 |
| Net cash provided by (used in) operating activities | $ (2,602) | 2,375 | (11,916) | (410) | (34,141) | (46,694) |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Fiduciary Funds

Year ended June 30, 2016

Fiduciary funds are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units. Following are the Commonwealth's fiduciary funds:

**Pension Trust Funds**

Prior to the enactment of Act No.106 of 2017 on August 23, 2017, the pension trust funds were used to account for the assets, liabilities, and net assets available for pension benefits held in trust for the public employees of the Commonwealth. After August 23, 2017, all pension benefits will be paid from the Primary Government's General Fund (as discussed in Note 23).

**(1) Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)**

ERS is a cost-sharing multiple-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 447 on May 15, 1951. ERS is sponsored by the Commonwealth, public corporations, and municipalities of Puerto Rico. Substantially all full-time employees of the Commonwealth and its instrumentalities are covered by the ERS. All regular appointed and temporary employees of the Commonwealth become plan members at the date of employment. Prior to August 23, 2017, ERS was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration) that also administered the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). The ERS MIPC is an unfunded, cost-sharing, multi-employer, defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

**(2) Puerto Rico System of Annuities and Pensions for Teachers (TRS)**

TRS is a cost-sharing multiple-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Teachers Retirement System and was created by Act No. 91 of March 29, 2004, that superseded Act No. 218 of May 6, 1951. TRS is sponsored by the Commonwealth. All active teachers of the Commonwealth's Department of Education are covered by the TRS. Licensed teachers working in private schools or other educational organizations have the option to become members of TRS as long as the required employer and employee contributions are satisfied. The employees of the TRS are also plan members. Prior to August 23, 2017, TRS was administered by the Puerto Rico Teachers Retirement System (the TRS Administration) that also administered the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC), an unfunded, cost-sharing, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of the TRS Administration.

**COMMONWEALTH OF PUERTO RICO**

Fiduciary Funds

Year ended June 30, 2016

**(3)  Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)**

JRS is a single-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 12 on October 19, 1954. The JRS is sponsored by the Commonwealth. All judges of the judiciary branch of the Commonwealth are plan members. The JRS provides retirement benefits to the employees of the judiciary branch of the Commonwealth through the office of the Administration of Court Facilities. Prior to August 23, 2017, JRS was administered by the ERS and JRS Administration that also administered the Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC), an unfunded, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired judges of the Judiciary Branch of the Commonwealth.

**Agency Fund**

Agency fund is used to account for assets held by the Commonwealth as an agent for individuals, private organizations, and other governments. This fund is custodial in nature (assets equal liabilities) and does not involve measurement of the results of operations.

**Special Deposits**

This fund acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections, and agency accounts for which the Commonwealth act in an agent's capacity.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Fiduciary Net Position – Pension Trust Funds

June 30, 2016

(In thousands)

| | Pension Trust Funds | | | | | | |
|---|---|---|---|---|---|---|---|
| | (ERS) | | (TRS) | | (JRS) | | |
| | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Total |
| **Assets:** | | | | | | | |
| Cash and cash equivalents in commercial banks: | | | | | | | |
| Unrestricted | $ 302,140 | — | 11,354 | — | 1,242 | — | 314,736 |
| Restricted | 139,136 | — | — | — | — | — | 139,136 |
| Cash and cash equivalents in governmental banks: | | | | | | | |
| Unrestricted | 162,324 | — | — | — | 3,111 | — | 165,435 |
| Restricted | 48,611 | — | — | — | — | — | 48,611 |
| Receivables – net: | | | | | | | |
| Employers | 258,801 | — | — | — | — | — | 258,801 |
| Accrued interest and dividends | 8,348 | — | 37 | — | 151 | — | 8,536 |
| Investments sold | 738 | — | 250 | — | — | — | 988 |
| Other | 15,000 | — | 14,261 | — | 61 | — | 29,322 |
| Due from JRS (Due to ERS) | 7,854 | — | — | — | (7,854) | — | — |
| Collateral from securities lending transactions | 19,754 | — | 760 | — | 1,078 | — | 21,592 |
| Investments at fair value: | | | | | | | |
| Bonds and notes | 445,891 | — | — | — | 21,002 | — | 466,893 |
| Nonexchange commingled trust funds | 219,585 | — | 486,571 | — | 23,665 | — | 729,821 |
| Stocks | 1,277 | — | 22,056 | — | — | — | 23,333 |
| Investments in limited partnerships | 47,461 | — | 5,574 | — | — | — | 53,035 |
| Member loans and interest receivable– net | 596,997 | — | 366,590 | — | 484 | — | 964,071 |
| Capital assets – net | 9,733 | — | 15,942 | — | — | — | 25,675 |
| Other assets | 754 | — | 393 | — | — | — | 1,147 |
| Total assets | 2,284,404 | — | 923,788 | — | 42,940 | — | 3,251,132 |
| **Liabilities:** | | | | | | | |
| Accounts payable and accrued liabilities | 104,315 | — | 15,495 | — | — | — | 119,810 |
| Interest payable | 14,094 | — | — | — | — | — | 14,094 |
| Payable for investment securities purchased | 1,609 | — | 212 | — | — | — | 1,821 |
| Securities lending obligations | 19,754 | — | 760 | — | 1,078 | — | 21,592 |
| Due to Commonwealth of Puerto Rico | 91,474 | — | 4,824 | — | 6,491 | — | 102,789 |
| Other liabilities | 184,141 | — | 7,042 | — | 541 | — | 191,724 |
| Bonds payable | 3,134,902 | — | — | — | — | — | 3,134,902 |
| Total liabilities | 3,550,289 | — | 28,333 | — | 8,110 | — | 3,586,732 |
| Net position (deficit) restricted for pensions | $ (1,265,885) | — | 895,455 | — | 34,830 | — | (335,600) |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds

Year ended June 30, 2016

(In thousands)

| | Pension Trust Funds | | | | | | |
| | (ERS) | | (TRS) | | (JRS) | | |
| | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Total |
|---|---|---|---|---|---|---|---|
| Additions: | | | | | | | |
| Contributions: | | | | | | | |
| Employer contributions: | | | | | | | |
| Basic benefits, net of provision to allowance of $222,015 for the ERS and | | | | | | | |
| $11,600 for the JRS | $ 582,803 | — | 148,619 | — | 10,232 | — | 741,654 |
| Special benefits | 196,674 | 93,728 | 65,105 | 37,481 | 4,991 | 317 | 398,296 |
| Member contributions | 333,633 | — | 101,361 | — | 3,190 | — | 438,184 |
| Total contributions | 1,113,110 | 93,728 | 315,085 | 37,481 | 18,413 | 317 | 1,578,134 |
| Investment income and investment expense: | | | | | | | |
| Net appreciation (depreciation) in fair value of investments | 870 | — | 1,887 | — | 986 | — | 3,743 |
| Interest | 59,651 | — | 43,476 | — | 747 | — | 103,874 |
| Dividends | 277 | — | 870 | — | — | — | 1,147 |
| Investment expense, other than from security lending | (2,631) | — | (1,220) | — | — | — | (3,851) |
| Net income from investing, other than from security lending | 58,167 | — | 45,013 | — | 1,733 | — | 104,913 |
| Securities lending income | 113 | — | 62 | — | 3 | — | 178 |
| Securities lending expenses | — | — | (15) | — | (1) | — | (16) |
| Net income from security lending | 113 | — | 47 | — | 2 | — | 162 |
| Net investment income | 58,280 | — | 45,060 | — | 1,735 | — | 105,075 |
| Other income | 52,791 | — | 1,350 | — | 16 | — | 54,157 |
| Total additions | 1,224,181 | 93,728 | 361,495 | 37,481 | 20,164 | 317 | 1,737,366 |
| Deductions: | | | | | | | |
| Benefits paid to participants | 1,532,640 | 93,728 | 737,335 | 37,481 | 24,280 | 317 | 2,425,781 |
| Refunds of contributions | 34,937 | — | 13,910 | — | 280 | — | 49,127 |
| Interest on bonds payable | 196,211 | — | — | — | — | — | 196,211 |
| General and administrative | 48,605 | — | 25,876 | — | 786 | — | 75,267 |
| Other expenses | 9,401 | — | — | — | 160 | — | 9,561 |
| Total deductions | 1,821,794 | 93,728 | 777,121 | 37,481 | 25,506 | 317 | 2,755,947 |
| Net change in net position | (597,613) | — | (415,626) | — | (5,342) | — | (1,018,581) |
| Net position (deficit) restricted for pensions: | | | | | | | |
| Beginning of year | (668,272) | — | 1,311,081 | — | 40,172 | — | 682,981 |
| End of year | $ (1,265,885) | — | 895,455 | — | 34,830 | — | (335,600) |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Changes in Assets and Liabilities – Agency Funds

Year ended June 30, 2016

(In thousands)

| Assets | | Balance at June 30, 2015 | Additions | Deletions | Balance at June 30, 2016 |
|---|---|---|---|---|---|
| Cash and cash equivalents in commercial banks | $ | 598,848 | 1,071,641 | 1,006,092 | 664,397 |
| Cash and cash equivalents with governmental banks | | 192,477 | 17,049,074 | 17,240,654 | 897 |
| Total assets | $ | 791,325 | 18,120,715 | 18,246,746 | 665,294 |
| **Liabilities** | | | | | |
| Accounts payable and accrued liabilities | $ | 791,325 | 18,120,715 | 18,246,746 | 665,294 |
| Total liabilities | $ | 791,325 | 18,120,715 | 18,246,746 | 665,294 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Year ended June 30, 2016

These entities, all legally separate entities, consistent with GASB Statement No. 14, as amended by GASB Statement Nos. 39 and 61, are discretely presented in a separate column of the basic financial statements of the Primary Government principally because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because these component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth (with the exception of Culebra Conservation and Development Authority and the Puerto Rico Science, Technology and Research Trust, which does not meet all these criteria, but the Commonwealth has determined it would be misleading to exclude them from the Commonwealth's financial reporting entity). These entities have been classified as nonmajor component units because management believes they do not meet the following factors for inclusion as major: a) the services provided by the component to the citizenry are such that separate reporting as a major component unit is considered to be essential to financial statement users, b) there are significant transactions with the Primary Government, or c) there is a significant financial benefit or burden relationship with the Primary Government. The accounting principles followed by each of the component units included herein may vary depending on the type of industries they are involved in (that is, banking, construction, public utilities, and so forth). The detailed information for each of these entities may be obtained directly from the administrative offices of the corresponding entities, as described in Note 1 to the basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2016

(In thousands)

| | Agricultural Enterprises Development Administration | Automobile Accidents Compensation Administration | Cardiovascular Center Corporation of Puerto Rico and the Caribbean | Company for the Integral Development of the "Peninsula de Cantera" | Corporation for the "Caño Martín Peña" ENLACE Project |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Cash and cash equivalents in commercial banks | $ 8,322 | 60,845 | 5,704 | 1,976 | 738 |
| Cash and cash equivalents in governmental banks | 1,356 | — | — | — | — |
| Investments | — | — | — | — | — |
| Receivables – net: | | | | | |
| Insurance premiums | — | 1,733 | — | — | — |
| Intergovernmental | — | — | — | 95 | — |
| Accounts | 587 | — | 5,155 | — | — |
| Loans and advances | 1,068 | 2,000 | — | 5,710 | — |
| Accrued interest | — | 355 | — | — | — |
| Other | 144 | 778 | 145 | 20 | — |
| Due from – net: | | | | | |
| Primary government | 41,840 | — | — | — | — |
| Component units | — | — | — | — | — |
| Other governmental entities | 196 | 410 | 1,755 | — | 470 |
| Inventories | 8,901 | — | 1,264 | — | — |
| Prepaid expenses | 585 | — | 689 | 5 | — |
| Other assets | — | 215 | — | — | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | 164 | — | — | 45 |
| Cash and cash equivalents in governmental banks | — | — | — | — | — |
| Investments | — | — | — | — | — |
| Other restricted assets | — | — | — | 497 | — |
| Real estate held for sale or future development | — | — | — | 1,061 | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | 3,739 | 901 | 103 | 80 | 1,976 |
| Depreciable, net | 20,414 | 4,990 | 14,854 | 3,604 | 1,149 |
| Total assets | 87,152 | 163,420 | 29,669 | 13,048 | 4,378 |
| Deferred outflows of resources: | | | | | |
| Loss on bonds refunding | — | — | — | — | — |
| Pension related | 21,290 | 7,938 | 33,089 | — | — |
| Total deferred outflows of resources | 21,290 | 7,938 | 33,089 | — | — |
| Liabilities: | | | | | |
| Accounts payable and accrued liabilities | 57,185 | 5,336 | 28,096 | 493 | 698 |
| Deposits and escrow liabilities | — | — | — | — | — |
| Due to: | | | | | |
| Primary government | — | — | 25,154 | — | — |
| Component units | 101,214 | — | 12,594 | 39,717 | — |
| Other governmental entities | 224 | — | 2,557 | — | — |
| Interest payable | — | — | — | 4,717 | — |
| Unearned revenue | 993 | 39,497 | — | — | 45 |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Revenue bonds | — | — | — | — | — |
| Notes payable to financial institutions | 2,802 | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | 2,515 | 3,309 | 4,019 | — | 79 |
| Voluntary termination benefits payable | 2,711 | — | — | — | — |
| Liability for automobile accident insurance, and workmen's compensation | — | 67,362 | — | — | — |
| Other long-term liabilities | 7,142 | — | 64 | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Revenue bonds | — | — | — | — | — |
| Notes payable to financial institutions | — | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | 2,725 | — | — | — | 119 |
| Net pension obligation | — | — | — | — | — |
| Net pension liability | 185,174 | 133,003 | 151,604 | — | — |
| Voluntary termination benefits payable | 18,765 | — | — | — | — |
| Other long-term liabilities | — | 4,617 | 5,489 | — | — |
| Total liabilities | 381,450 | 253,124 | 229,577 | 44,927 | 941 |
| Deferred inflows of resources: | | | | | |
| Service concession arrangements | — | — | — | — | — |
| Pension related | 1,341 | 840 | 2,630 | — | — |
| Total deferred inflows of resources | 1,341 | 840 | 2,630 | — | — |
| Net position: | | | | | |
| Net investment in capital assets | 24,153 | 5,891 | 14,957 | 3,684 | 3,125 |
| Restricted for: | | | | | |
| Capital projects | 194,330 | — | — | — | 152 |
| Debt service | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — |
| Other specified purposes | — | — | — | 498 | — |
| Unrestricted (deficit) | (492,832) | (88,497) | (184,406) | (36,061) | 160 |
| Total net position (deficit) | $ (274,349) | (82,606) | (169,449) | (31,879) | 3,437 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2016

(In thousands)

| | Culebra Conservation and Development Authority | Economic Development Bank for Puerto Rico | Farm Insurance Corporation of Puerto Rico | Fine Arts Center Corporation | Independent Consumer Protection Office | Institute of Puerto Rican Culture |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 106 | 21,246 | 1,135 | 2,700 | 39 | 1,946 |
| Cash and cash equivalents in governmental banks | — | 290 | 1,259 | — | 304 | — |
| Investments | — | 41,713 | — | — | — | — |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | — |
| Intergovernmental | — | — | — | — | — | 120 |
| Accounts | — | — | — | 111 | — | 550 |
| Loans and advances | — | 240,526 | — | — | — | — |
| Accrued interest | — | 1,258 | — | — | — | — |
| Other | — | — | 91 | — | — | — |
| Due from – net: | | | | | | |
| Primary government | — | — | — | — | — | — |
| Component units | — | — | 3,927 | — | — | — |
| Other governmental entities | — | 84 | 508 | — | — | 951 |
| Inventories | — | — | — | — | — | 2,006 |
| Prepaid expenses | — | — | 14 | 104 | — | — |
| Other assets | — | 11,287 | — | — | — | — |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 59 | 1,487 | — | — | — | 2,202 |
| Cash and cash equivalents in governmental banks | — | — | — | — | — | 203 |
| Investments | — | — | — | — | — | — |
| Other restricted assets | — | 11,931 | — | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — | — |
| Capital assets: | | | | | | |
| Land and other nondepreciable | 640 | 2,735 | — | 3,169 | — | 55 |
| Depreciable, net | 194 | 5,713 | 67 | 12,789 | 24 | 48,792 |
| Total assets | 999 | 338,270 | 7,001 | 18,873 | 367 | 56,625 |
| **Deferred outflows of resources:** | | | | | | |
| Loss on bonds refunding | — | — | — | — | — | — |
| Pension related | 88 | — | — | — | — | — |
| Total deferred outflows of resources | 88 | — | — | — | — | — |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | 91 | 1,133 | 1,294 | 265 | 37 | 2,274 |
| Deposits and escrow liabilities | — | 168,860 | — | 226 | — | — |
| Due to: | | | | | | |
| Primary government | — | — | — | — | — | — |
| Component units | — | 7,833 | 4,692 | — | — | 3,326 |
| Other governmental entities | — | — | — | — | 36 | — |
| Interest payable | — | 696 | — | — | — | 427 |
| Unearned revenue | — | — | 1,342 | — | — | 85 |
| Liabilities payable within one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Revenue bonds | — | — | — | — | — | — |
| Notes payable to financial institutions | — | — | — | — | — | — |
| Capital leases | — | — | — | — | — | — |
| Compensated absences | 67 | — | 683 | 96 | — | 31 |
| Voluntary termination benefits payable | 14 | — | — | 264 | — | 613 |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — | — |
| Other long-term liabilities | — | — | 43 | — | — | — |
| Liabilities payable after one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Revenue bonds | — | — | — | — | — | — |
| Notes payable to financial institutions | — | — | — | — | — | — |
| Capital leases | — | — | — | — | — | — |
| Compensated absences | — | 1,752 | — | 457 | 22 | 1,396 |
| Net pension obligation | — | — | — | — | — | — |
| Net pension liability | 1,746 | — | — | — | — | — |
| Voluntary termination benefits payable | 103 | — | — | 2,069 | — | 3,734 |
| Other long-term liabilities | — | 4,008 | — | — | — | — |
| Total liabilities | 2,021 | 184,282 | 8,054 | 3,377 | 95 | 11,886 |
| **Deferred inflows of resources:** | | | | | | |
| Service concession arrangements | — | — | — | — | — | — |
| Pension related | 13 | — | — | — | — | — |
| Total deferred inflows of resources | 13 | — | — | — | — | — |
| **Net position:** | | | | | | |
| Net investment in capital assets | 834 | 614 | 67 | 15,388 | 24 | 45,521 |
| Restricted for: | | | | | | |
| Capital projects | — | — | — | — | — | — |
| Debt service | — | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — | — |
| Other specified purposes | 58 | 24,727 | — | — | — | 1,102 |
| Unrestricted (deficit) | (1,839) | 128,647 | (1,120) | 108 | 248 | (1,684) |
| Total net position (deficit) | $ (947) | 153,988 | (1,053) | 15,496 | 272 | 44,939 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2016

(In thousands)

| | Institutional Trust of the National Guard of Puerto Rico | Land Authority of Puerto Rico | Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | Musical Arts Corporation | Public Corporation for the Supervision and Deposit Insurance of P.R. Cooperatives |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Cash and cash equivalents in commercial banks | $ 3,854 | 13,713 | 549 | 4,137 | 4,102 |
| Cash and cash equivalents in governmental banks | — | 15,377 | — | 57 | 66 |
| Investments | — | — | — | — | 251,594 |
| Receivables – net: | | | | | |
| Insurance premiums | — | — | — | — | — |
| Intergovernmental | — | 988 | 95 | — | — |
| Accounts | 282 | 13,801 | 29 | 24 | — |
| Loans and advances | — | — | — | — | 3,731 |
| Accrued interest | 596 | — | — | — | 1,810 |
| Other | 332 | — | — | — | 93 |
| Due from – net: | | | | | |
| Primary government | — | 8,567 | — | — | — |
| Component units | — | 9,075 | — | — | — |
| Other governmental entities | 632 | 1,181 | 171 | 149 | — |
| Inventories | — | — | — | — | — |
| Prepaid expenses | 52 | — | 123 | — | — |
| Other assets | 91 | 6,276 | — | 83 | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | 984 | — | 250 | — |
| Cash and cash equivalents in governmental banks | — | 1,965 | — | — | — |
| Investments | 26,358 | — | — | — | — |
| Other restricted assets | — | — | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | 7,887 | 87,929 | 12,098 | 568 | 35 |
| Depreciable, net | 10,433 | 6,223 | 4,270 | 457 | 2,836 |
| Total assets | 50,517 | 166,079 | 17,335 | 5,725 | 264,267 |
| Deferred outflows of resources: | | | | | |
| Loss on bonds refunding | — | — | — | — | — |
| Pension related | — | 8,892 | — | — | — |
| Total deferred outflows of resources | — | 8,892 | — | — | — |
| Liabilities: | | | | | |
| Accounts payable and accrued liabilities | 2,235 | 4,811 | 747 | 257 | 109,032 |
| Deposits and escrow liabilities | — | 2,567 | 164 | — | — |
| Due to: | | | | | |
| Primary government | — | — | — | — | — |
| Component units | — | 33,765 | — | — | — |
| Other governmental entities | — | 23,659 | 16,944 | 350 | 42 |
| Interest payable | — | 1,235 | — | — | — |
| Unearned revenue | — | 9,045 | 1 | 210 | — |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | 2,975 | — | — | — |
| Revenue bonds | — | — | — | — | — |
| Notes payable to financial institutions | — | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | 94 | 881 | 233 | 535 | 1,722 |
| Voluntary termination benefits payable | — | — | — | 64 | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — |
| Other long-term liabilities | — | 1,773 | — | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | 52,843 | — | — | — |
| Revenue bonds | — | — | — | — | — |
| Notes payable to financial institutions | — | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | 1,014 | — | 207 | — |
| Net pension obligation | — | — | — | 18,240 | — |
| Net pension liability | — | 105,622 | — | — | — |
| Voluntary termination benefits payable | — | — | — | 774 | 508 |
| Other long-term liabilities | — | 26,887 | — | — | 30 |
| Total liabilities | 2,329 | 267,077 | 18,089 | 20,637 | 111,334 |
| Deferred inflows of resources: | | | | | |
| Service concession arrangements | — | — | — | — | — |
| Pension related | — | 765 | — | — | — |
| Total deferred inflows of resources | — | 765 | — | — | — |
| Net position: | | | | | |
| Net investment in capital assets | 18,320 | 94,152 | 28 | 1,025 | 2,871 |
| Restricted for: | | | | | |
| Capital projects | — | — | — | — | — |
| Debt service | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — |
| Other specified purposes | 27,730 | — | — | 250 | 92,763 |
| Unrestricted (deficit) | 2,138 | (187,023) | (782) | (16,187) | 57,299 |
| Total net position (deficit) | $ 48,188 | (92,871) | (754) | (14,912) | 152,933 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2016

(In thousands)

| | Puerto Rico Conservatory of Music Corporation | Puerto Rico Convention Center District Authority | Puerto Rico Council on Education | Puerto Rico Energy Commission | Puerto Rico Industrial Development Company | Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities Financing Authority |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 2,145 | 8,836 | 216 | 564 | 24,474 | — |
| Cash and cash equivalents in governmental banks | — | — | 3,115 | 696 | 7,076 | — |
| Investments | — | — | — | — | 4,093 | — |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | — |
| Intergovernmental | — | — | — | — | 780 | — |
| Accounts | — | 7,608 | — | 1,217 | 12,963 | — |
| Loans and advances | — | 2,490 | — | — | — | — |
| Accrued interest | — | — | — | — | — | — |
| Other | 588 | — | 1,625 | — | — | — |
| Due from – net: | | | | | | |
| Primary government | — | — | — | — | 3,808 | — |
| Component units | — | 7,240 | — | — | — | — |
| Other governmental entities | — | — | — | 261 | 992 | — |
| Inventories | — | — | — | — | — | — |
| Prepaid expenses | 13 | 10,345 | — | — | 2,045 | — |
| Other assets | — | 313 | — | — | — | — |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 1,564 | 5,316 | 120 | — | — | — |
| Cash and cash equivalents in governmental banks | — | — | 1,994 | — | — | 29 |
| Investments | — | 39,939 | — | — | 32,044 | — |
| Other restricted assets | — | — | — | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — | — |
| Capital assets: | | | | | | |
| Land and other nondepreciable | 5,157 | 290,143 | — | 404 | 283,301 | — |
| Depreciable, net | 73,409 | 384,692 | 50 | 544 | 372,603 | — |
| Total assets | 82,876 | 756,922 | 7,120 | 3,686 | 744,179 | 29 |
| **Deferred outflows of resources:** | | | | | | |
| Loss on bonds refunding | — | — | — | — | 559 | — |
| Pension related | — | — | — | — | — | — |
| Total deferred outflows of resources | — | — | — | — | 559 | — |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | 1,548 | 6,937 | 1,441 | 1,300 | 31,684 | 29 |
| Deposits and escrow liabilities | — | 4,878 | — | — | 7,603 | — |
| Due to: | | | | | | |
| Primary government | — | — | — | — | — | — |
| Component units | — | 146,379 | — | — | 77,772 | — |
| Other governmental entities | 339 | — | — | — | — | — |
| Interest payable | — | 28,350 | — | — | 5,972 | — |
| Unearned revenue | 646 | 6,920 | — | — | — | — |
| Liabilities payable within one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Revenue bonds | — | 11,325 | — | — | 10,065 | — |
| Notes payable to financial institutions | — | — | — | — | 9,702 | — |
| Capital leases | — | — | — | — | 105 | — |
| Compensated absences | 391 | 292 | 287 | — | 5,078 | — |
| Voluntary termination benefits payable | 21 | — | 124 | — | 965 | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — | — |
| Other long-term liabilities | — | — | — | — | 161 | — |
| Liabilities payable after one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Revenue bonds | — | 391,353 | — | — | 157,477 | — |
| Notes payable to financial institutions | — | — | — | — | 94,471 | — |
| Capital leases | — | — | — | — | 206 | — |
| Compensated absences | 477 | — | 419 | 172 | — | — |
| Net pension obligation | — | — | — | — | — | — |
| Net pension liability | — | — | — | — | — | — |
| Voluntary termination benefits payable | 55 | — | 1,296 | — | 6,547 | — |
| Other long-term liabilities | — | — | — | — | 22,730 | — |
| Total liabilities | 3,477 | 596,434 | 3,567 | 1,472 | 430,538 | 29 |
| **Deferred inflows of resources:** | | | | | | |
| Service concession arrangements | — | — | — | — | — | — |
| Pension related | — | — | — | — | — | — |
| Total deferred inflows of resources | — | — | — | — | — | — |
| **Net position:** | | | | | | |
| Net investment in capital assets | 78,565 | 117,368 | 50 | 948 | 400,196 | — |
| Restricted for: | | | | | | |
| Capital projects | — | 911 | — | — | — | — |
| Debt service | — | 39,028 | — | — | 20,558 | — |
| Student loans and other educational purpose | 1,564 | — | 2,081 | — | — | — |
| Other specified purposes | — | — | — | — | — | — |
| Unrestricted (deficit) | (730) | 3,181 | 1,422 | 1,266 | (106,554) | — |
| Total net position (deficit) | $ 79,399 | 160,488 | 3,553 | 2,214 | 314,200 | — |

See accompanying independent auditors' report.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2016

(In thousands)

| | Puerto Rico Integrated Transit Authority | Puerto Rico Land Administration | Puerto Rico and Municipal Islands Maritime Transport Authority | Puerto Rico Metropolitan Bus Authority | Puerto Rico Municipal Finance Agency |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Cash and cash equivalents in commercial banks | $ 1,478 | 4,105 | 4,313 | 2,657 | — |
| Cash and cash equivalents in governmental banks | — | — | 5 | — | 5,036 |
| Investments | — | 1,619 | — | — | — |
| Receivables – net: | | | | | |
| Insurance premiums | — | — | — | — | — |
| Intergovernmental | — | — | 688 | — | — |
| Accounts | — | 229 | 60 | 1 | — |
| Loans and advances | — | — | — | — | — |
| Accrued interest | — | 97 | — | — | — |
| Other | — | 23 | — | 1,017 | — |
| Due from – net: | | | | | |
| Primary government | 2,000 | — | — | — | — |
| Component units | — | — | — | 4,468 | — |
| Other governmental entities | — | 1,379 | 1,024 | 1,079 | — |
| Inventories | — | — | 55 | 4,957 | — |
| Prepaid expenses | — | 167 | 861 | — | 3,275 |
| Other assets | — | — | — | 542 | 22 |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | 82 | — | — | 6,856 |
| Cash and cash equivalents in governmental banks | — | — | — | — | — |
| Investments | — | — | — | — | 699,212 |
| Other restricted assets | — | — | — | — | 16,099 |
| Real estate held for sale or future development | — | 177,387 | — | — | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | — | 30,143 | 122 | 2,500 | — |
| Depreciable, net | 287 | 7,774 | 58,212 | 21,722 | — |
| Total assets | 3,765 | 223,005 | 65,340 | 38,943 | 730,500 |
| Deferred outflows of resources: | | | | | |
| Loss on bonds refunding | — | — | — | — | 2,420 |
| Pension related | — | — | — | — | — |
| Total deferred outflows of resources | — | — | — | — | 2,420 |
| Liabilities: | | | | | |
| Accounts payable and accrued liabilities | 433 | 1,047 | 1,933 | 8,000 | 609 |
| Deposits and escrow liabilities | — | 34,027 | — | — | 35,475 |
| Due to: | | | | | |
| Primary government | — | 1,054 | 4,279 | 35,467 | — |
| Component units | — | — | 72,101 | 6,096 | — |
| Other governmental entities | 2,000 | 949 | 10,426 | 34,939 | 1,648 |
| Interest payable | — | — | — | — | 13,545 |
| Unearned revenue | — | 2,916 | — | — | — |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Revenue bonds | — | — | — | — | 84,980 |
| Notes payable to financial institutions | — | — | — | 28,255 | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | 729 | 1,234 | 3,701 | — |
| Voluntary termination benefits payable | — | 401 | 335 | 931 | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — |
| Other long-term liabilities | — | — | 487 | 165 | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Revenue bonds | — | — | — | — | 552,759 |
| Notes payable to financial institutions | — | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | 157 | — | 1,566 | 1,755 | — |
| Net pension obligation | — | — | — | — | — |
| Net pension liability | — | — | — | — | — |
| Voluntary termination benefits payable | — | 2,414 | 3,240 | 5,919 | — |
| Other long-term liabilities | — | — | 3,610 | 9,969 | — |
| Total liabilities | 2,590 | 43,537 | 99,211 | 135,197 | 689,016 |
| Deferred inflows of resources: | | | | | |
| Service concession arrangements | — | — | — | — | — |
| Pension related | — | — | — | — | — |
| Total deferred inflows of resources | — | — | — | — | — |
| Net position: | | | | | |
| Net investment in capital assets | 287 | 6,629 | 58,334 | 24,222 | — |
| Restricted for: | | | | | |
| Capital projects | — | — | — | — | — |
| Debt service | — | — | — | — | 74,930 |
| Student loans and other educational purpose | — | — | — | — | — |
| Other specified purposes | — | 82 | — | — | — |
| Unrestricted (deficit) | 888 | 172,757 | (92,205) | (120,476) | (31,026) |
| Total net position (deficit) | $ 1,175 | 179,468 | (33,871) | (96,254) | 43,904 |

See accompanying independent auditors' report.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2016

(In thousands)

| | Puerto Rico Municipal Finance Corporation | Puerto Rico Ports Authority | Puerto Rico Public Broadcasting Corporation | Puerto Rico Public Private Partnerships Authority | Puerto Rico School of Plastic Arts |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash and cash equivalents in commercial banks | $ 46,177 | 3,177 | 944 | — | 239 |
| Cash and cash equivalents in governmental banks | — | 4,074 | — | 374 | 186 |
| Investments | — | — | — | — | — |
| Receivables – net: | | | | | |
| Insurance premiums | — | — | — | — | — |
| Intergovernmental | 29,491 | 2,975 | 71 | — | — |
| Accounts | 14,025 | 20,869 | 261 | — | 64 |
| Loans and advances | — | — | — | — | — |
| Accrued interest | — | — | — | — | — |
| Other | — | — | 41 | — | — |
| Due from – net: | | | | | |
| Primary government | — | — | 1,446 | — | — |
| Component units | — | 6,194 | — | — | — |
| Other governmental entities | — | — | 65 | 7,702 | — |
| Inventories | — | — | — | — | — |
| Prepaid expenses | — | 4,227 | — | — | — |
| Other assets | — | 3,748 | 171 | 18 | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | 8,855 | 2,445 | 1,361 | 20 |
| Cash and cash equivalents in governmental banks | — | — | — | 1 | 8 |
| Investments | — | — | — | — | 2,154 |
| Other restricted assets | — | 25,351 | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | — | 438,496 | 83 | — | — |
| Depreciable, net | — | 845,584 | 5,245 | 11 | 7,505 |
| Total assets | 89,693 | 1,363,550 | 10,772 | 9,467 | 10,176 |
| Deferred outflows of resources: | | | | | |
| Loss on bonds refunding | — | 12,506 | — | — | — |
| Pension related | — | — | — | — | 738 |
| Total deferred inflows of resources | — | 12,506 | — | — | 738 |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | — | 31,686 | 3,208 | 796 | 591 |
| Deposits and escrow liabilities | — | 1,393 | — | — | — |
| Due to: | | | | | |
| Primary government | — | 43,640 | — | — | — |
| Component units | 326,188 | 320,473 | — | 6,462 | — |
| Other governmental entities | 5,569 | 23,735 | — | 618 | 39 |
| Interest payable | — | 40,359 | — | — | — |
| Unearned revenue | — | 1,655 | — | 1,528 | — |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Revenue bonds | — | 2,055 | — | — | — |
| Notes payable to financial institutions | — | 1,545 | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | 6,225 | 1,004 | — | 138 |
| Voluntary termination benefits payable | — | 2,383 | 451 | — | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — |
| Other long-term liabilities | — | — | — | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Revenue bonds | — | 195,349 | — | — | — |
| Notes payable to financial institutions | — | 7,442 | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | — | 1,545 | — | 263 |
| Net pension obligation | — | — | — | — | — |
| Net pension liability | — | 19,258 | 3,621 | — | 11,021 |
| Voluntary termination benefits payable | — | — | — | — | — |
| Other long-term liabilities | — | 3,319 | 1,680 | — | — |
| Total liabilities | 331,757 | 700,517 | 11,509 | 9,404 | 12,052 |
| Deferred inflows of resources: | | | | | |
| Service concession arrangements | — | 694,734 | — | — | — |
| Pension related | — | — | — | — | 88 |
| Total liabilities and deferred inflows of resources | 331,757 | 1,395,251 | 11,509 | 9,404 | 12,140 |
| **Net position:** | | | | | |
| Net investment in capital assets | — | 636,346 | 5,328 | 11 | 7,505 |
| Restricted for: | | | | | |
| Capital projects | — | 34,206 | — | — | — |
| Debt service | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | 2,153 |
| Other specified purposes | — | — | 2,238 | — | — |
| Unrestricted (deficit) | (242,064) | (689,747) | (8,303) | 52 | (10,884) |
| Total net position (deficit) | $ (242,064) | (19,195) | (737) | 63 | (1,226) |

See accompanying independent auditors' report.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2016

(In thousands)

| | Puerto Rico Science, Technology and Research Trust | Puerto Rico Telephone Authority | Puerto Rico Tourism Company | Puerto Rico Trade and Export Company | Solid Waste Authority | Nonmajor Component Units Total |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 11,020 | — | 33,706 | 3,648 | 862 | 279,673 |
| Cash and cash equivalents in governmental banks | 7,129 | — | — | 570 | 219 | 47,189 |
| Investments | 78,585 | — | 6,401 | — | — | 475,034 |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | 1,733 |
| Intergovernmental | — | — | — | — | — | 35,303 |
| Accounts | — | — | 7,959 | 1,113 | — | 86,908 |
| Loans and advances | — | — | 6,069 | — | — | 261,594 |
| Accrued interest | — | 1 | — | 3,307 | — | 7,424 |
| Other | 89 | — | 753 | — | — | 5,739 |
| Due from – net: | | | | | | |
| Primary government | — | — | — | — | 2,754 | 60,415 |
| Component units | — | — | — | — | — | 30,904 |
| Other governmental entities | 9,349 | — | — | — | 1,134 | 29,492 |
| Inventories | — | — | — | — | — | 17,183 |
| Prepaid expenses | — | — | 94 | 211 | — | 22,810 |
| Other assets | 54 | — | — | — | 132 | 22,952 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | — | — | — | 4,758 | — | 36,568 |
| Cash and cash equivalents in governmental banks | — | 7 | — | 711 | 330 | 5,248 |
| Investments | 5,768 | — | — | 265,974 | — | 1,071,449 |
| Other restricted assets | — | — | — | — | — | 53,878 |
| Real estate held for sale or future development | — | — | 2,600 | — | — | 181,048 |
| Capital assets: | | | | | | |
| Land and other nondepreciable | 35,327 | — | 5,046 | 40,048 | 21,798 | 1,274,483 |
| Depreciable, net | 2,854 | — | 18,147 | 47,094 | 88,445 | 2,070,987 |
| **Total assets** | 150,175 | 8 | 80,775 | 367,434 | 115,674 | 6,078,014 |
| **Deferred outflows of resources:** | | | | | | |
| Loss on bonds refunding | — | — | 1,444 | — | — | 16,929 |
| Pension related | — | — | — | — | — | 72,035 |
| **Total deferred outflows of resources** | — | — | 1,444 | — | — | 88,964 |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | 4,418 | 7 | 38,699 | 4,428 | 3,245 | 356,023 |
| Deposits and escrow liabilities | — | — | — | 2,638 | — | 257,831 |
| Due to: | | | | | | |
| Primary government | — | — | 2,558 | 1,241 | — | 113,393 |
| Component units | — | — | 13,947 | 1,047 | 77,166 | 1,250,772 |
| Other governmental entities | — | — | — | — | 4,967 | 129,041 |
| Interest payable | — | — | 4,284 | 3,074 | 13,109 | 115,768 |
| Unearned revenue | — | — | — | — | — | 64,883 |
| Liabilities payable within one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | 2,371 | — | 415 | 5,761 |
| Revenue bonds | — | — | — | — | — | 108,425 |
| Notes payable to financial institutions | — | — | — | 571 | — | 42,875 |
| Capital leases | 7 | — | 180 | 47 | — | 339 |
| Compensated absences | — | — | 2,352 | 577 | 259 | 36,531 |
| Voluntary termination benefits payable | — | — | 5,508 | 271 | 463 | 15,519 |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — | 67,362 |
| Other long-term liabilities | 5 | — | 1,338 | — | — | 11,178 |
| Liabilities payable after one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | 42,811 | — | 7,399 | 103,053 |
| Revenue bonds | — | — | — | — | — | 1,296,938 |
| Notes payable to financial institutions | — | — | — | 278,960 | — | 380,873 |
| Capital leases | 2 | — | 680 | 53 | — | 941 |
| Compensated absences | — | — | 4,410 | 1,236 | 353 | 18,240 |
| Net pension obligation | — | — | — | — | — | 20,045 |
| Net pension liability | — | — | — | — | — | 588,170 |
| Voluntary termination benefits payable | — | — | — | 1,490 | 4,467 | 74,260 |
| Other long-term liabilities | — | — | — | 1,126 | — | 83,465 |
| **Total liabilities** | 4,432 | 7 | 119,138 | 296,759 | 111,843 | 5,141,686 |
| **Deferred inflows of resources:** | | | | | | |
| Service concession arrangements | — | — | — | — | — | 694,734 |
| Pension related | — | — | — | — | — | 5,677 |
| **Total deferred inflows of resources** | — | — | — | — | — | 700,411 |
| **Net position:** | | | | | | |
| Net investment in capital assets | 122,019 | — | 22,333 | 73,584 | 38,381 | 1,822,760 |
| Restricted for: | | | | | | |
| Capital projects | — | — | — | — | — | 229,599 |
| Debt service | — | — | — | — | — | 134,516 |
| Student loans and other educational purpose | — | — | — | — | — | 5,798 |
| Other specified purposes | — | — | — | 4,764 | 330 | 154,543 |
| Unrestricted (deficit) | 23,724 | 1 | (59,252) | (7,673) | (34,880) | (2,022,335) |
| **Total net position (deficit)** | $ 145,743 | 1 | (36,919) | 70,675 | 3,831 | 324,881 |

See accompanying independent auditors' report.

COMMONWEALTH OF PUERTO RICO

Nonmajor Discretely Presented Component Units

Combining Statement of Activities

Year ended June 30, 2016

(In thousands)

| | Expenses | Program revenue — Charges for services | Program revenue — Operating grants and contributions | Program revenue — Capital grants and contributions | Net revenues (expenses) and changes in net position | General revenue — Payments from (to) primary government | General revenue — Payments from (to) other component units | General revenue — Grants and contributions not restricted to specific programs | General revenue — Interest and investment earnings | General revenue — Excise taxes and others | Change in net position | Net position (deficit) beginning of year as previously reported | Correction of errors and adoption of new accounting pronouncements (note 4) | Net position (deficit)–beginning of year, as adjusted and restated | Net position (deficit) end of year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agricultural Enterprises Development Administration | $ 233,935 | 92,831 | — | — | (141,104) | 92,453 | — | 1,671 | 76 | 887 | (46,017) | (252,648) | 24,316 | (228,332) | (274,349) |
| Automobile Accidents Compensation Administration | 69,871 | 85,885 | — | — | 16,014 | (10,716) | — | — | 1,976 | — | 7,274 | (89,880) | — | (89,880) | (82,606) |
| Cardiovascular Center Corporation of Puerto Rico and the Caribbean | 90,862 | 76,163 | — | — | (14,699) | 187 | — | — | 68 | — | (14,444) | (42,562) | (112,443) | (155,005) | (169,449) |
| Company for the Integral Development of the "Península de Cantera" | 8,754 | — | 1,587 | — | (7,167) | 2,636 | — | 11 | 57 | — | (4,463) | (27,416) | — | (27,416) | (31,879) |
| Corporation for the "Caño Martín Peña" Enlace Project | 3,062 | — | 48 | 567 | (2,447) | 2,006 | — | — | 1 | 226 | (214) | 3,651 | — | 3,651 | 3,437 |
| Culebra Conservation and Development Authority | 736 | 262 | — | — | (474) | 255 | — | — | — | — | (219) | (728) | — | (728) | (947) |
| Economic Development Bank for Puerto Rico | 45,564 | 30,177 | — | 26 | (15,361) | — | — | — | — | 514 | (14,847) | 168,835 | — | 168,835 | 153,988 |
| Farm Insurance Corporation of Puerto Rico | 5,862 | 486 | 928 | — | (4,448) | — | — | — | 51 | — | (4,397) | 3,344 | — | 3,344 | (1,053) |
| Fine Arts Center Corporation | 6,767 | 2,361 | — | — | (4,406) | 3,785 | — | — | 3 | — | (618) | 16,114 | — | 16,114 | 15,496 |
| Independent Consumer Protection Office | 888 | — | 580 | — | (308) | — | 580 | — | — | — | 272 | — | — | — | 272 |
| Institute of Puerto Rican Culture | 29,169 | — | 1,928 | 85 | (27,156) | 11,770 | — | — | — | — | (15,386) | 58,060 | 2,265 | 60,325 | 44,939 |
| Institutional Trust of the National Guard of Puerto Rico | 7,807 | 4,444 | — | — | (3,363) | — | — | — | 1,605 | — | (1,758) | 49,946 | — | 49,946 | 48,188 |
| Land Authority of Puerto Rico | 39,347 | 10,113 | 170 | — | (29,064) | 14,566 | — | — | — | 5,638 | (8,860) | (78,358) | (5,653) | (84,011) | (92,871) |
| Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | 3,663 | 454 | 1,284 | — | (1,925) | 1,215 | — | — | — | 32 | (678) | (76) | — | (76) | (754) |
| Musical Arts Corporation | 8,556 | 487 | — | — | (8,069) | 7,525 | — | — | 422 | 219 | 97 | (14,880) | (129) | (15,009) | (14,912) |
| Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives | 92,782 | 21,868 | 1,038 | — | (69,876) | — | — | 9,816 | — | — | (60,060) | 212,993 | — | 212,993 | 152,933 |
| Puerto Rico Conservatory of Music Corporation | 11,689 | 3,286 | — | — | (8,370) | 6,788 | — | 680 | 8 | 22 | (872) | 80,271 | — | 80,271 | 79,399 |
| Puerto Rico Convention Center District Authority | 74,461 | 30,718 | — | — | (43,743) | — | 19,892 | — | 308 | 301 | (23,242) | 183,730 | — | 183,730 | 160,488 |
| Puerto Rico Council on Education | 14,229 | 620 | 2,407 | — | (11,202) | 11,301 | — | — | 29 | 159 | 287 | 3,266 | — | 3,266 | 3,553 |
| Puerto Rico Energy Commission | 8,578 | 1,932 | — | — | (6,646) | — | 5,220 | — | 7 | — | (1,419) | 3,633 | — | 3,633 | 2,214 |
| Puerto Rico Industrial Development Company | 97,495 | 65,602 | — | 6,657 | (25,236) | — | (2,351) | — | 397 | 8,014 | (19,176) | 333,376 | — | 333,376 | 314,200 |
| Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority | 11 | — | — | — | (11) | — | — | — | 10 | — | (1) | 1 | — | 1 | — |
| Puerto Rico Integrated Transit Authority | 11,634 | — | — | — | (11,634) | 6,972 | — | — | — | — | (4,662) | 5,837 | — | 5,837 | 1,175 |
| Puerto Rico Land Administration | 46,735 | 12,648 | 5,572 | — | (28,515) | — | — | — | 414 | — | (28,101) | 207,569 | — | 207,569 | 179,468 |
| Puerto Rico and Municipal Islands Maritime Transport Authority | 44,408 | 4,755 | 121 | 6,862 | (32,670) | 30,289 | — | — | — | — | (2,381) | (31,490) | — | (31,490) | (33,871) |
| Puerto Rico Metropolitan Bus Authority | 64,261 | 3,173 | 6,262 | 3,207 | (51,619) | 36,053 | — | — | — | — | (15,566) | (80,688) | — | (80,688) | (96,254) |
| Puerto Rico Municipal Finance Agency | 31,544 | — | — | — | (31,544) | — | — | — | 32,924 | 2 | 1,382 | 42,522 | — | 42,522 | 43,904 |
| Puerto Rico Municipal Finance Corporation | 467,739 | — | 224,842 | — | (242,897) | — | — | — | — | 833 | (242,064) | — | — | — | (242,064) |
| Puerto Rico Ports Authority | 134,651 | 103,226 | 11,287 | — | (20,138) | 25 | 2,351 | — | 237 | 7,472 | (10,053) | (9,142) | — | (9,142) | (19,195) |
| Puerto Rico Public Broadcasting Corporation | 22,545 | 3,805 | — | — | (18,740) | 11,819 | — | 2,249 | 77 | — | (4,595) | 4,206 | (348) | 3,858 | (737) |
| Puerto Rico Public Private Partnerships Authority | 3,556 | 3,621 | — | — | 65 | — | — | — | 1 | — | 66 | (3) | — | (3) | 63 |
| Puerto Rico School of Plastic Arts | 4,871 | 610 | 1,881 | — | (2,380) | 2,755 | — | — | 47 | — | 422 | 9,240 | (10,888) | (1,648) | (1,226) |
| Puerto Rico Science, Technology and Research Trust | 17,723 | 7 | 6,567 | 4,053 | (7,096) | — | — | — | — | 174 | (6,922) | 152,665 | — | 152,665 | 145,743 |
| Puerto Rico Telephone Authority | 17,320 | — | — | — | (17,320) | — | — | — | 14 | 5,415 | (11,891) | 11,892 | — | 11,892 | 1 |
| Puerto Rico Tourism Company | 168,358 | 158,597 | 3,560 | — | (6,201) | (20,790) | — | (82,263) | — | 85,689 | (23,565) | (13,354) | — | (13,354) | (36,919) |
| Puerto Rico Trade and Export Company | 38,187 | 15,466 | 1,313 | — | (21,408) | — | — | — | 12,412 | 668 | (8,328) | 98,932 | (19,929) | 79,003 | 70,675 |
| Solid Waste Authority | 46,760 | 2,232 | — | — | (44,528) | 4,580 | — | — | 383 | — | (39,565) | 43,396 | — | 43,396 | 3,831 |
| Total nonmajor component units | $ 1,974,380 | 733,897 | 273,307 | 21,490 | (945,686) | 215,474 | (56,571) | 4,611 | 61,343 | 116,265 | (604,564) | 1,052,254 | (122,809) | 929,445 | 324,881 |

See accompanying independent auditors' report.