# United States Court of Appeals
## For the First Circuit

---

No. 18-1463

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina, Depository Trust Company; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Puerto Rico Electric Power Authority (PREPA),

Debtors.

---

SAMUEL GRACIA-GRACIA, individually and as representative of the certified class; JORGE PLARD, individually and as representative of the certified class,

Movants, Appellants,

v.

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, as representative of the Commonwealth of Puerto Rico,

Debtor, Appellee,

PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA),

Debtors.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain, <u>U.S. District Judge</u>*]

---

Before

Torruella, Lynch, and Kayatta,
<u>Circuit Judges</u>.

---

<u>Antonio J. Amadeo Murga</u> for appellants.
<u>Ehud Barak</u>, with whom <u>Timothy W. Mungovan</u>, <u>John E. Roberts</u>,
<u>Martin J. Bienenstock</u>, <u>Stephen L. Ratner</u>, <u>Mark D. Harris</u>, <u>Jeffrey
W. Levitan</u>, and <u>Proskauer Rose LLP</u> were on brief, for debtor-
appellees.

---

September 25, 2019

---

*Of the Southern District of New York, sitting by designation.

**KAYATTA**, <u>**Circuit Judge**</u>.  The plaintiffs in this case are motor-vehicle owners and operators who paid duplicate premiums to the Commonwealth of Puerto Rico in accordance with the Commonwealth's compulsory automobile-insurance law, P.R. Laws Ann. tit. 26, § 8053.  The plaintiffs have waged a decades-long campaign to retrieve the funds that they overpaid to the Commonwealth. After we issued several opinions favorable to the plaintiffs' claims, the parties eventually entered into a settlement agreement in which the Commonwealth agreed to establish a notice and claim-resolution process for motorists who paid duplicate premiums from 1998 to 2010.  Shortly thereafter, the Financial Oversight and Management Board for Puerto Rico initiated Title III debt-adjustment proceedings on behalf of the Commonwealth pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), 48 U.S.C. §§ 2101–2241, which triggered an automatic stay of collection actions against the Commonwealth.  The Commonwealth, citing the automatic stay, then halted its implementation of the settlement agreement's notice and claim-resolution process.  Never relenting, the plaintiffs petitioned the Title III court for relief from the automatic stay to allow them to bring an enforcement action against the Commonwealth in a separate proceeding.  The Title III court largely denied that petition.  We now affirm in part and vacate in part that decision.

## I.

Approved in December 1995, Puerto Rico's Compulsory Motor Vehicle Liability Act ("Law 253") requires all motorists in Puerto Rico to obtain liability insurance either through the Commonwealth or through a private insurer. P.R. Laws Ann. tit. 26, § 8053. Though the Commonwealth adopted procedures to enable motorists who opted for private insurance to avoid paying the Commonwealth premiums, many of those motorists nevertheless paid annual premiums to the Commonwealth. García-Rubiera v. Fortuño (García-Rubiera II), 665 F.3d 261, 264-65 (1st Cir. 2011). Pursuant to Law 253, the Puerto Rico Secretary of Treasury transfers those premiums (referred to here as "duplicate premiums") to the Compulsory Liability Joint Underwriting Association of Puerto Rico (JUA). See P.R. Laws Ann. tit. 26, § 8055(c). In accordance with the general scheme that Law 253 initially established, the JUA kept those duplicate premiums that it received from the Secretary in a separate "Reserve" account, where they were subject to reimbursement upon request by the motorists who had paid the duplicate premiums. P.R. Laws Ann. tit. 26, § 8055(j); García-Rubiera II, 665 F.3d at 266. And, pursuant to Puerto Rico's default general-insurance law, unclaimed duplicate premiums escheated to the Commonwealth after seven years. García-Rubiera v. Calderón (García-Rubiera I), 570 F.3d 443, 449 (1st Cir. 2009).

In 2002, the Puerto Rico legislature passed Law 230, which modified this general scheme in a few notable ways. First, Law 230 directed the JUA to transfer accumulated duplicate premiums from the Reserve account to the Secretary of Treasury every two years. P.R. Laws Ann. tit. 26, § 8055(j). Second, Law 230 provided that the Secretary of Treasury will "retain the funds transferred by the [JUA] in its fiduciary capacity for a five (5)-year term." Id. Once that five-year term "elapse[s] without the consumer claiming the retained funds, said funds [will] become property of the Government of Puerto Rico and [will] be transferred to the General Fund of the State's Treasury." Id.

Following Law 230's passage, the JUA transferred $73 million from the Reserve account to the Secretary of Treasury. After the Commonwealth used a large portion of those funds to balance its budget, a class of motorists who had paid duplicate premiums filed suit in district court, asserting that the Commonwealth's transfer of funds from the Reserve account to the Secretary of Treasury amounted to a violation of the Takings Clause and was executed without the notice and process required by the Due Process Clause. García-Rubiera I, 570 F.3d at 450. In a series of opinions, this court held that those plaintiffs had a property interest in these duplicate premiums for purposes of their procedural Due Process Clause claim, id. at 457, and instructed the Commonwealth "to give individual notice to insureds owed

reimbursement to the maximum extent feasible," García-Rubiera II,
665 F.3d at 276.

Not satisfied with the Commonwealth's initial efforts to
notify potential claimants on remand, a subsequent panel of this
court ordered in 2013 that the Commonwealth afford plaintiffs at
least one year to file reimbursement claims. See García-Rubiera
v. Fortuño (García-Rubiera III), 727 F.3d 102, 105, 110 (1st Cir.
2013). "In the meantime," we added, "no duplicate premiums shall
escheat to the Commonwealth until it has established and complied
with a reimbursement procedure which meets the basic requirements
of constitutional due process." Id. at 105. Important to the
immediate appeal, this latter injunction on further escheatment to
the Commonwealth effectively created two separate pools of
duplicate premiums. Those funds that had not yet escheated to the
Commonwealth, i.e., funds the JUA received during or after 2006
and transferred to the Secretary of Treasury after July 2008,
remain in a segregated account.[1] These funds -- referred to here
as the "segregated funds" -- amounted to roughly $76.1 million as
of March 2018. All other funds, the "non-segregated funds," had
previously escheated to the Commonwealth and had already been
intermixed with the general Commonwealth coffers.

---

[1] The record does not indicate the exact dates of receipt and
transfer in 2006 and 2008 that correspond with the funds that
remain in the segregated account.

In 2016, the parties entered into a settlement agreement whereby the Commonwealth agreed to (1) establish a notice and claim-resolution process for motorists who paid duplicate premiums from 1998 to 2010, (2) refund claimants who demonstrate entitlement to reimbursement, and (3) pay, out of the funds due to the motorists, attorneys' fees amounting to twenty percent of the total reimbursement claims paid under the settlement.  Later that year, Congress passed PROMESA and the Commonwealth made an initial installment payment to the class attorneys.  And on May 3, 2017, the Financial Oversight and Management Board for Puerto Rico initiated Title III debt-adjustment proceedings on behalf of the Commonwealth, triggering an automatic stay of collection actions against the Commonwealth.  See 11 U.S.C. § 362(a); 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 362 into PROMESA).  The Commonwealth subsequently halted its implementation of the reimbursement procedures set forth in the settlement agreement and stopped payments to the plaintiffs' attorneys.

In February 2018, the plaintiffs filed a motion in the Title III debt-adjustment proceeding, seeking relief from the automatic stay to allow them to enforce the terms of the settlement agreement in a separate action.  The Title III court denied most of the plaintiffs' requested relief but lifted the stay "solely to the extent of permitting implementation of the notice and insurance premium claim submission and review process."  Memorandum Order

Granting in Part and Denying in Part Motion Requesting Relief from
Stay at 8, No. 17 BK 3283-LTS (D.P.R. Apr. 6, 2018) [hereinafter
Order Denying Stay Relief].  In other words, the relief ordered by
the Title III court permits the plaintiffs' claims to be processed
(and also presumably allows the plaintiffs to pursue a separate
action to enforce the implementation and execution of that claims-
resolution process), but it does not allow the plaintiffs to
actually obtain reimbursement from the Commonwealth.  This appeal
followed.

**II.**

**A.**

        As the law stands in seven circuits, there would be no
question that we have appellate jurisdiction over an appeal like
this one because denials of motions for relief from an automatic
stay are categorically deemed final and appealable in those
circuits.  See Pinpoint IT Servs., LLC v. Rivera (In re Atlas IT
Export Corp.), 761 F.3d 177, 182 n.8 (1st Cir. 2014) (collecting
cases).  In this circuit though, we need do some more work because
our decision in In re Atlas rejected that categorical approach,
requiring us "to scout for finality indicators, like whether the
disputed order conclusively decided a discrete, fully-developed
issue -- an order that, at the time of appeal, will not be changed
or be mooted and is not reviewable elsewhere."  Id. at 184.  We
find plenty of such indicators.  Unlike in In re Atlas, there is

no suggestion here that "the bankruptcy court will get to decide the stay-relief question again . . . on a better-developed record." Id. at 186. To the contrary, confronted with an extraordinary docket and an equally extraordinary workload, the Title III court appears to have no intention to reconsider the plaintiffs' denied motion for relief from stay, instead relegating the resolution of their claims to the "debt adjustment phases of the Title III proceeding." Order Denying Stay Relief, supra, at 8. Nor is any other court in a position to resolve the parties' dispute. We are therefore most comfortable concluding that we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. See Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 511 (1st Cir. 2017) (finding appellate jurisdiction from a denial of a motion for stay relief when the denial "rejected the Movants' substantive arguments, holding that their interests in the collateral were adequately protected," and "there was nothing left for the district court to do").

### B.

11 U.S.C. § 362(d)(1) provides that the Title III court "shall grant relief from the [automatic] stay . . . for cause, including the lack of adequate protection of an interest in property of [a] party in interest." We review the Title III court's decision to deny a motion for relief from the automatic stay for abuse of discretion. See Fields Station LLC v. Capitol

Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields
Corner), 490 F.3d 21, 23 (1st Cir. 2007).  That court abuses its
discretion "if it ignores 'a material factor deserving of
significant weight,' relies upon 'an improper factor' or makes 'a
serious mistake in weighing proper factors.'"  In re Whispering
Pines Estates, Inc., 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007)
(quoting Bright v. Wash. Mut. Bank (In re Bright), 338 B.R. 530,
534 (1st Cir. B.A.P. 2006)).

        "Lack of adequate protection is the most common basis
for finding cause to grant relief."  3 Collier on Bankruptcy
¶ 362.07 (Richard Levin & Henry J. Sommer eds., 16th ed. 2018)
[hereinafter Collier].  But it is not the only reason a court might
grant such relief.  See id. ("Use of the word 'cause' suggests an
intention that the bases for relief from the stay should be broader
than merely lack of adequate protection.").  We have previously
observed that the factors the Second Circuit laid out in Sonnax
Industries v. Tri Components Products Corp. (In re Sonnax
Industries), 907 F.2d 1280, 1286 (2d Cir. 1990), "provide a helpful
framework" for determining whether stay relief should otherwise be
granted "for cause."  See Fin. Oversight & Mgmt. Bd. for P.R. v.
Ad Hoc Grp. of PREPA Bondholders (In re PREPA), 899 F.3d 13, 23
(1st Cir. 2018).  These factors are:

        (1) whether relief would result in a partial or complete
        resolution of the issues; (2) lack of any connection
        with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

In re Sonnax Indus., 907 F.2d at 1286.

Initially, the moving party has the burden of establishing prima facie eligibility for stay relief. See Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999). "A prima facie case requires a showing by the movant of 'a factual and legal right to the relief that it seeks.'" 3 Collier, supra, ¶ 362.10 (italics omitted) (quoting In re Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)). But the debtor has the ultimate burden of persuasion on "all issues other than 'the debtor's equity in property.'" In re Sonnax Indus., 907 F.2d at 1285 (quoting 11 U.S.C. § 362(g)(1)); see generally 11 U.S.C. § 362(g). With those respective burdens in mind, we turn to the particulars of the request for stay relief in this case.

## C.

Plaintiffs' claim to relief rests on their contention that the funds they seek are their own and are being held by the Commonwealth only as a trustee that lacks any equitable interest in the property.  In short, plaintiffs argue not that they are creditors who are owed damages to be paid from the Commonwealth's coffers; rather, they argue that they are seeking the rightful return of their own assets.

In ruling on the plaintiffs' request to be allowed to retrieve their funds in a separate action, the Title III court chose not to determine, in the first instance, whether the Commonwealth in fact holds assets of the plaintiffs in which the Commonwealth has no equitable interest.  Instead, the district court went directly to weighing the In re Sonnax factors.  It found that (1) implementation of the reimbursement aspect of the parties' stipulated agreement was not yet ripe for resolution, (2) resolving the class members' reimbursement claims "raise[d] the prospect of preferential treatment over other similarly situated creditors," and (3) considerations of judicial economy weighed in favor of resolving the payment questions during the plan-confirmation phase of the Title III case.  Accordingly, the Title III court declined to grant the plaintiffs' requested stay relief.

On appeal, the plaintiffs argue that the Title III court abused its discretion by not first addressing their claim that the contested funds are their property and are merely being held in trust by the Commonwealth.  Had this issue been resolved in the first instance, they maintain, the Title III court would have concluded that the Commonwealth holds only legal title to the duplicate premiums and that the In re Sonnax factors, when viewed in light of this fact, would have weighed in favor of lifting the automatic stay.

We agree with the plaintiffs that, in order to properly weigh the In re Sonnax factors, the Title III court first needed to make at least a preliminary determination of the parties' respective property interests in the disputed funds.  The parties' legal and equitable interests in the duplicate premiums were certainly material to the decision to grant or deny the request for stay relief.  "[W]hether the other proceeding involves the debtor as a fiduciary" is one of the relevant In re Sonnax factors that courts look to in determining whether stay relief is warranted.  See 907 F.2d at 1286.  And in this case, an assessment of a number of the other In re Sonnax factors would likely turn on the parties' respective property interests in the disputed funds.  These include whether stay relief would pose an obstacle to the Title III debt-adjustment process, whether prejudice to other Commonwealth creditors would ensue from granting relief, and the

balance of harms amongst the parties (factors two, seven, and twelve, respectively). If the plaintiffs are correct that the Commonwealth is merely retaining their funds in a fiduciary capacity as a trustee, those factors would all seem to weigh in their favor.

Many courts have decided to grant stay relief "for cause" after first finding that the debtor has only a legal, rather than equitable, interest in the property at issue. See, e.g., In re Williams, 144 F.3d 544, 550 (7th Cir. 1998) (upholding the bankruptcy court's modification of the automatic stay to permit an eviction action to proceed upon determining that the debtor no longer had any interest in the lease prior to her bankruptcy petition); In re Zubenko, 528 B.R. 784, 790 (Bankr. E.D. Cal. 2015) (finding "cause exist[ed] under § 362(d)(1) to . . . terminate the automatic stay" when the estate lacked an equitable interest in the property); In re Madison, 438 B.R. 866, 870 (Bankr. D.S.C. 2010) ("Where debtor has been divested of all but bare legal title through a foreclosure sale, cause exists to grant relief from the automatic stay to permit Creditor to conclude any act remaining in the sale process and take possession of the property."); In re Brown, 75 B.R. 1009, 1012 (Bankr. E.D. Pa. 1987) (finding "cause" to lift the stay to allow a creditor to "obtain a deed and, ultimately, possession" of property when the debtor retained only legal title to said property). And though the bankruptcy code

does not comprehensively define what grounds constitute "cause" to lift the automatic stay, the legislative history accompanying the 1978 amendments to the bankruptcy code indicates that Congress thought stay relief would be warranted when the debtor retains no equitable stake in the property. See S. Rep. No. 95-989, at 52 (1978) ("Generally, proceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the purpose of the automatic stay, which is protection of the debtor and his estate from his creditors."); H.R. Rep. No. 95-595, at 343-44 (1977) (same).

The Commonwealth tries to resist this conclusion by pointing out that Congress did not incorporate section 541(d) of the bankruptcy code into PROMESA. See 48 U.S.C. § 2161(a) (incorporating various provisions of the bankruptcy code into Title III of PROMESA). Therefore, argues the Commonwealth, we should pay no attention to case law or legislative history pertaining to relief from the automatic stay under the Code, especially if the case law or history happens to mention section 541(d). This argument presents nothing but a red herring. We explain why.

Section 541(d) does not address -- at all -- the subject of relief from the automatic stay. What it does do is define "property of the estate," stating as follows:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). That provision is important in non-PROMESA and non-municipal bankruptcy cases because it defines what property constitutes "the estate." That initial compartmentalization, in turn, delineates the reach of the automatic stay because the subsections of the automatic-stay provision, id. § 362(a), variously apply to "property of the estate" or, more broadly, to "property of the debtor." See id. § 362(a). Were this a typical bankruptcy case rather than a Title III proceeding, the plaintiffs might have invoked section 541(d) to argue that the duplicate premiums to which they assert ownership are not a part of the estate and, as a result, the automatic stay does not even apply to their attempts to recoup those funds. But this argument is unavailable to the plaintiffs because there is no "estate" in the PROMESA context. See 48 U.S.C. § 2161(a) (not incorporating 11 U.S.C. § 541). Instead, PROMESA and the municipal bankruptcy code instruct that we replace all instances of "property of the estate" that appear in the incorporated provisions of the bankruptcy code with "property of the debtor." See id. § 902(1).

The practical ramification of the foregoing is that the reach of the automatic stay is broader in the PROMESA and municipal bankruptcy contexts than it is in the run-of-the-mill bankruptcy case. See Collier, supra, ¶ 901.04 ("The applicability of section 362 to municipal debt adjustment cases is a continuation of prior law. However, the protection afforded by section 362 is substantially broader for the debtor . . . ."). The textual ramification is that section 541(d) has no role to play under PROMESA because the concept of "the estate" has no role under PROMESA.

So, the fact that PROMESA does not incorporate section 541 of the bankruptcy code has no relevance of any kind to the immediate dispute about whether plaintiffs should receive relief from the otherwise admittedly applicable automatic stay. For the same reason, any passing reference to section 541 of the bankruptcy code in the foregoing case law does not sap those cases of their precedential relevance to determining whether an admittedly applicable stay should be lifted.

Nor does Congress's choice to not incorporate section 541 into PROMESA diminish the relevance of the parties' respective property interests to the plaintiffs' requested stay relief. That Congress thought that stay relief should be granted under PROMESA upon a showing that the debtor lacks equity in disputed property is confirmed by Congress's express decision to

incorporate subsection 362(d)(2) of the bankruptcy code into PROMESA. See 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 362). That provision provides that stay relief shall be granted "with respect to a stay of an act against property" if "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). Inexplicably, the plaintiffs opted to seek stay relief by showing "cause," id. § 362(d)(1), rather than by pursuing the more obvious path for relief laid out in subsection 362(d)(2). The former was likely the more arduous course for the plaintiffs to choose in this case: Not only must the plaintiffs show the Commonwealth's absence of equity in the duplicate premiums and a "lack of . . . interference with the bankruptcy case" -- the functional equivalent of the prerequisites for stay relief under subsection 362(d)(2) -- they must also show that the other relevant In re Sonnax factors, such as "whether relief would result in a partial or complete resolution of the issues," prejudice to other creditors, the interests of judicial economy, "whether the parties are ready for trial in the other proceeding," and the balance of harms amongst the parties, weigh in their favor. In re Sonnax Indus., 907 F.2d at 1286. While we might question the wisdom of this dubious strategic choice, it is not an attempt to make an end run around the requirements set forth in subsection 362(d)(1), and it therefore provides no basis to deny the plaintiffs' request for

stay relief so long as the <u>In re Sonnax</u> factors weigh in their favor.[2]

In short, the parties' respective property interests in the contested funds were "material factor[s] deserving of significant weight" in deciding to grant or deny the requested stay relief. <u>In re Whispering Pines Estates, Inc.</u>, 369 B.R. at 757. It follows that the Title III court should not have declined to consider this factor. We therefore turn our attention to ascertaining whether the Title III court's failure to make this

---

[2] Neither the Commonwealth nor the Title III court addressed the possibility that subsections 362(d)(1) and 362(d)(2) are mutually exclusive provisions that require a movant asserting an equitable right to property in the possession of a debtor to pursue stay relief via subsection 362(d)(2), not subsection 362(d)(1). <u>But see, e.g.</u>, <u>In re Behanna</u>, 381 B.R. 631, 642 (Bankr. W.D. Pa. 2008) ("A party in interest . . . may seek relief from the automatic stay on two alternative, but not mutually exclusive, grounds."); <u>In re Miller</u>, 13 B.R. 110, 117 (Bankr. S.D. Ind. 1981) ("Section 362(d)(1) and Section 362(d)(2) each provide an alternative basis for obtaining relief from the automatic stay . . . ."). The legislative history accords with this caselaw. <u>See</u> H.R. Rep. No. 95-595 ("Under section 362(d)(1) . . . the court may terminate, annul, modify or condition the automatic stay for cause, including lack of adequate protection of an interest in property of a secured party. . . . Under section 362(d)(2) the court may alternatively terminate, annul, modify, or condition the automatic stay for cause . . . . The court shall grant relief from the stay if there is no equity and it is not necessary to an effective reorganization of the debtor."). We find it unnecessary to address this possibility because it seems very unlikely both that the two provisions are mutually exclusive and that the plaintiffs could not shift their citation and reduce the scope of their argument on remand. Be that as it may, our opinion does not tie the district court's hands on this point should it turn out to be more significant than we expect.

initial determination could have made any difference to the court's
ultimate decision to grant or deny the plaintiffs' request for
stay relief.   We consider, separately, the non-segregated funds
and then the segregated funds.

**1.**

Despite not determining the parties' property interests
in the contested funds, the Title III court did not err in
declining to grant the entirety of the plaintiffs' requested stay
relief as to the non-segregated funds because the plaintiffs did
not make out a prima facie case for such relief.   As we have
previously explained:

> In order to establish . . . a right as trust beneficiary,
> a claimant must make two showings:  first, the claimant
> must prove the existence and legal source of a trust
> relationship; second, the claimant must identify the
> trust fund or property and, where the trust fund has
> been commingled with general property of the bankrupt,
> sufficiently trace the property or funds . . . .

Conn. Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 618
(1st Cir. 1988) (emphasis added).  To trace those intermixed funds,
we apply the "lowest intermediate balance rule," which requires us
to "follow the trust fund and decree restitution from an account
where the amount on deposit has at all times since the commingling
of the funds equaled or exceeded the amount of the trust fund."
Id. at 619 (citations omitted).  When "all the money is withdrawn,
the trust fund is treated as lost, even though later deposits are
made into the account." Id.  If, however, only some but not all

of the money is withdrawn such that "the amount on deposit [is] reduced below the amount of the trust fund . . ., the claimant is entitled to the lowest intermediate balance in the account." Id.[3]

Because the plaintiffs had the initial burden to demonstrate a prima facie legal right to the duplicate premiums, In re Mazzeo, 167 F.3d at 142, and because they premise that right on their alleged status as the trust beneficiaries (and, therefore, the true equitable owners) of those premiums, they needed to show not only that a trust relationship exists as to the non-segregated funds but also that those duplicate premiums are traceable. The plaintiffs, however, made no effort to demonstrate that the non-segregated duplicate premiums could be traced despite the fact that all parties acknowledge that those funds escheated to the Commonwealth (whether that escheatment is void or not, we need not decide) and were transferred to the Commonwealth to be used, along with other funds, to pay general budget expenses. See García-Rubiera II, 665 F.3d at 268. The plaintiffs, therefore, have waived any ability to make a prima facie right of ownership in any of the non-segregated funds, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), and for that reason, the Title III

---

[3] Note, too, that other courts have applied a pro rata approach to tracing funds "when one party is claiming assets that are commingled with the assets of someone similarly situated." Gulfstream Aerospace Corp. v. Calascibetta, 142 Fed. App'x 562, 566 (3d Cir. 2005).

court acted well within its discretion in declining to grant stay
relief as to this subset of funds.

## 2.

That leaves the segregated funds. As all parties
acknowledged below, "approximately $76.1 million corresponding to
unclaimed funds from 2006 to present" are "segregated into a
separate account in the General Fund for accounting purposes."
Moreover, as proof of their beneficial entitlement to these
segregated premiums (limited to those payments of duplicate
premiums that were made through 2010), the plaintiffs point to the
trust relationship established in Law 230, which requires the
Secretary of Treasury to hold duplicate premiums "in its fiduciary
capacity" prior to their escheatment to the Commonwealth. P.R.
Laws Ann. tit. 26, § 8055(j); see also García-Rubiera II, 665 F.3d
at 266 (explaining that the Secretary of Treasury holds duplicate
premiums "as trustee"). Therefore, members of the plaintiff class
who qualify for reimbursement from this subset of funds have made
a prima facie showing of traceability and the existence of a trust
relationship. See Conn. Gen. Life Ins. Co., 838 F.2d at 618.

On appeal, the Commonwealth attempts to parry that prima
facie showing with a three-sentence assertion that,
notwithstanding the prior opinions of this court and the terms of
Law 230, no trust relationship exists as to these funds in the
absence of a notarized "public deed." It is true that Puerto

Rico's Trust Law requires that trusts be recorded with the Special
Trust Registry "under penalty of nullity." P.R. Laws Ann. tit. 32,
§ 3351d.   Why this requirement would apply equally to a trust
relationship created by statute, the Commonwealth does not say.
See Cordova & Simonpietri v. Crown Am. Ins. Co., 12 P.R. Offic.
Trans. 1003, 1007 (P.R. 1982) (In Puerto Rico, "according to the
general rules of construction statutes, a special law governing a
specific matter prevails over a general law.")  At any rate, the
Commonwealth concedes that this is "an open question disputed by
the parties."  If so, then it remains for the Title III court to
consider on remand in preliminarily deciding whether the
Commonwealth possesses any equity in the segregated funds.

        In its briefing and at oral argument, the Commonwealth
also raised the possibility that other "similarly situated
prepetition creditors" might have overlapping claims to the same
pool of disputed funds to which the plaintiffs are now asserting
ownership in their motion for stay relief.  The Commonwealth
maintains that this possibility warrants the denial of stay relief
so that such putative competing interests can be untangled at the
plan-confirmation phase with all interested parties present.
Whether this argument concerns both the segregated and non-
segregated funds, the Commonwealth does not make clear.  In any
event, the Commonwealth points to no evidence that these putative
creditors exist, at least as to the segregated funds.  The Federal

Rules of Bankruptcy Procedure, which apply in Title III
proceedings, see 48 U.S.C. § 2170, required the plaintiffs to serve
their motion for stay relief upon certain interested creditors and
"other entities as the court may direct," Fed. R. Bankr.
P. 4001(a)(1). No other interested creditor came forward to object
to the plaintiffs' motion. And the Commonwealth made no argument
on appeal or below that the plaintiffs did not sufficiently alert
all appropriate parties, even though the Commonwealth had the
burden to do so. See 11 U.S.C. § 362(g)(2). On the record as it
now stands, then, we have no reason to believe that any creditor
with interests equal or senior to those of the plaintiffs was
deprived of the opportunity to assert a claim to the segregated
funds.

Accordingly, remand is warranted for the Title III
court, in ordinary course, to make at least a preliminary
determination of the parties' respective property interests in the
segregated funds, taking into consideration both the prima facie
showing made by the plaintiffs and the plaintiffs' ultimate burden
"on the issue of the debtor's equity" in the disputed funds, see
11 U.S.C. § 362(g)(1), and to reapply the In re Sonnax factors to
these funds in light of that preliminary determination, see Grella
v. Salem Five Cent Sav. Bank, 42 F.3d 26 (1st Cir. 1994) (holding
that "a hearing on a motion for relief from stay is merely a
summary proceeding of limited effect," requiring the bankruptcy

court to decide only "whether the party seeking relief has a colorable claim to [the] property").[4]

### III.

For the above-stated reasons, we <u>affirm</u> in part and <u>vacate</u> in part the Title III court's partial denial of the plaintiffs' requested stay relief. As to the segregated funds, we <u>remand</u> to the Title III court for proceedings consistent with this opinion.

No costs are awarded.

---

[4] Section 362(e) of the bankruptcy code requires the bankruptcy court to hold a preliminary hearing within thirty days and to conclude and issue a final hearing and determination within sixty days of a movant's request for stay relief absent "consent of the parties in interest" or "compelling circumstances." 11 U.S.C. § 362(e)(1). Those time limits will commence anew upon issuance of the court's mandate corresponding with our opinion today. We express no view on whether "compelling circumstances" might warrant a continuance of a final determination on the plaintiffs' motion for stay relief.