Estimated Hearing Date: October 30, 2019 at 9:30 (AST)
Objection Deadline: October 15, 2019 at 4:00 p.m. (AST)

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*<br><br>Debtors. | ) PROMESA<br>) Title III<br>)<br>) No. 17 BK 3283-LTS<br>)<br>) (Jointly Administered)<br>)<br>)<br>)<br>)<br>)<br>) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>PUERTO RICO ELECTRIC POWER<br>AUTHORITY ("PREPA")<br><br>Debtor.[1] | ) PROMESA<br>) Title III<br>)<br>) No. 17 BK 4780-LTS<br>)<br>)<br>)<br>)<br>)<br>) |

## COBRA ACQUISITIONS LLC'S
## MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE
## CLAIMS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Estimated Hearing Date: October 30, 2019 at 9:30 (AST)
Objection Deadline: October 15, 2019 at 4:00 p.m. (AST)

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................................................5

FACTUAL BACKGROUND ...................................................................................8
    A.    The First Agreement ......................................................................9
    B.    The Second Agreement ...............................................................11
    C.    PREPA's Failure to Pay and Cobra's Efforts to Obtain Payment..........................14
        a.    Undisputed Invoices...............................................................15
        b.    Payments Withheld Based Upon Unsubstantiated "Headcount" Questions......................................16
        c.    Payments Withheld for Completed Work Erroneously Claimed to be Outside the Contract Scope ...................17
        d.    PREPA's Failure to Pay for Costs and Work Completed at PREPA's Direction Relating to Hurricane Beryl........................19
        e.    PREPA's Failure to Pay for Extra Mapping Work Completed at PREPA's Direction ...................19
        f.    PREPA's Failure to Reimburse Cobra's Excess Tax Payments .................20
        g.    PREPA Owes Interest on the Late Payments ............................20

DISCUSSION ...................................................................................................20

NOTICE.............................................................................................................25

Estimated Hearing Date: October 30, 2019 at 9:30 (AST)
Objection Deadline: October 15, 2019 at 4:00 p.m. (AST)

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Babbs*,
265 B.R. 35 (Bankr. S.D.N.Y. 2001) .........................................................................22

*In re Enron Corp.*,
279 B.R. 695 (Bankr. S.D.N.Y. 2002) .......................................................................22

*In re Garden Ridge Corp.*,
323 B.R. 136 (Bankr. D. Del. 2005) ......................................................................21, 23

*In re Hemingway Transp., Inc.*,
954 F.2d 1 (1st Cir. 1991) .........................................................................................21

*In re HQ Global Holdings, Inc.*,
282 B.R. 169 (Bankr. D. Del. 2002) ..........................................................................21

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg.
Corp.)*,
25 F.3d 1132 (2d Cir. 1994).......................................................................................22

*In re Rare Coin Galleries, Inc.*,
72 B.R. 415 (Bankr. D. Mass. 1987) ..........................................................................21

**Statutes**

11 U.S.C. §105(a) ..............................................................................................................22

Bankruptcy Code sections 503 and 507..............................................................................22

Bankruptcy Code section 503(a).........................................................................................20

Bankruptcy Code section 503(b)(1)(A) ..............................................................................20

Bankruptcy Code section 507(a)(2) ....................................................................................22

Puerto Rico Oversight, Management, and Economic Stability Act Title III, section
304(a) ...........................................................................................................5, 9, 24

Stafford Act.............................................................................................................................6

**Other Authorities**

2 C.F.R. § 200.40(a).............................................................................................................23

FAR 52.232-7(a)(5) ................................................................................................................17

Estimated Hearing Date: October 30, 2019 at 9:30 (AST)
Objection Deadline: October 15, 2019 at 4:00 p.m. (AST)

TO THE HONORABLE LAURA TAYLOR SWAIN,
UNITED STATES DISTRICT JUDGE:

COMES NOW Cobra Acquisitions LLC ("Cobra" or "Contractor"), represented by the

undersigned attorneys, and very respectfully avers and prays as follows:

## **PRELIMINARY STATEMENT**

1.      Hurricanes Irma and Maria struck Puerto Rico on September 6 and September 20,

2017, respectively.  Hurricane Maria in particular, which struck as Category 4 storm, devastated

Puerto Rico in what is regarded as the worst natural disaster in recorded history to affect the

island. The storm caused the worst electrical blackout in the history of the United States.

Virtually all of Puerto Rico was left without power, effecting the entire population.

2.      The entity responsible for Puerto Rico's power grid, and thus its post-storm

restoration, was The Puerto Rico Electric Power Authority ("PREPA" or the "Debtor").  Since

July 2017, PREPA has been the subject of a voluntary petition for relief pursuant to Title III,

section 304(a) of the Puerto Rico Oversight, Management, and Economic Stability Act

("PROMESA") (the "Title III Case").

3.      PREPA awarded Cobra two post-petition contracts for the restoration of Puerto

Rico's devastated power grid (the "Contracts").  PREPA and Cobra entered into an initial $200

million post-petition Emergency Master Service Agreement for PREPA's Electrical Grid Repairs

– Hurricane Maria in October 2017 ("First Agreement") to aid in the restoration of the power

grid and the rebuilding of the power infrastructure.  Through five amendments, the contract

amount was eventually increased to $945 million.

4.      PREPA awarded Cobra a second post-petition contract, in the amount of up to

$900 million, in response to a Request For Proposals ("RFP") process.  This Master Services

Contract for PREPA's Electrical Grid Repairs - Hurricane Maria, dated May 26, 2018 ("Second

Agreement"), called for Cobra to perform all of the work necessary to restore and reconstruct Puerto Rico's power grid.  In return, PREPA would pay Cobra for its time and materials at negotiated rates.

5.      Although PREPA intended and expected to be wholly or partially reimbursed by the Federal Emergency Management Agency ("FEMA") pursuant to the Stafford Act for the payments it would make to Cobra pursuant to the Contract, the Contracts are solely between PREPA and Cobra and obligate PREPA to pay Cobra regardless of whether it receives FEMA funding.

6.      Through enormous effort and expense, and under extremely difficult circumstances, Cobra successfully complied with its obligations under both Contracts by repairing and replacing the electrical grid in Puerto Rico.  Doing so required extraordinary skill and effort.

7.      When Cobra began its work, the island of Puerto Rico was without power. The obstacles to repairing the electrical transmission and distribution system were many. The entirety of Puerto Rico was declared a Federal Disaster Zone. Critical infrastructure, such as roads and bridges, had been destroyed or severely damaged. Flooding, storm surge, landslides and lack of cell phone service made travel and operations difficult. Housing was not available for the numerous workers needed to undertake the repair work.  The hundreds of workers and tons of equipment to perform the work needed to be brought from the mainland.

8.      Despite these and numerous other extreme difficulties, Cobra mobilized and delivered a large work force, arranged for the delivery of heavy equipment to the island and otherwise undertook a herculean effort to perform the work it had contracted to provide.  As part of its efforts, Cobra obtained and transported to Puerto Rico offshore housing for its personnel so

that it did not add an additional burden to the already challenging circumstances on the Island. Within seven days following the initial contract award, Cobra had an advance crew on site in Puerto Rico. Approximately 30 days later more than 600 Cobra employees were engaged in providing critical work.

9.      Cobra's crews were required to combat Puerto Rico's formidable mountainous jungle. Frequently, the work required linemen to be lowered from helicopters to repair segments of electrical lines in precipitous conditions. On the ground, Linemen fought through vegetation that overran electrical lines.

10.     Cobra also provided its own security forces. In the aftermath of Hurricane Maria, crime on the island increased significantly, and the resources of the local police diminished significantly. More than once, Cobra crews encountered gunfire.

11.     Cobra also performed community services for the people of Puerto Rico beyond what was required by its PREPA contracts. For example, Cobra donated the use of its helicopters for delivery of food, water and medical supplies to hard-hit areas in Puerto Rico and to government officials to survey damage on the island. In addition, Cobra's full-time nurse traveled to remote areas to provide much-needed medical treatment to local populations. Cobra sponsored local baseball teams organized as life on the island began to resume a semblance of normalcy.

12.     As a result of Cobra's remarkable efforts, by April 2019, Puerto Rico's electrical grid was restored. In total, Cobra successfully performed repairs and replacements pursuant to more than 100 "work packages" issued by PREPA. Cobra's work generated more than 2,000 invoices for payment to PREPA.

13.     In contrast to Cobra's dauntless efforts to do its contracted job, PREPA has not

met its contractual obligation.  Cobra completed the work in April 2019, yet Cobra's invoices in

excess of $255 million remain unpaid. This amount includes interest owed to Cobra by PREPA

on unpaid invoices, which continues to accumulate at over $2 million per month.

14.     Cobra has patiently and diligently sought the payments from PREPA to which it is

entitled, but payment has not been forthcoming.  PREPA's failure to pay as required by the

Contracts is a breach of those Contracts, entitling Cobra to damages in the amount of unpaid

invoices and interest thereon.

15.     Cobra hereby requests that this Honorable Court enter an order (a) allowing an

unpaid and outstanding balance of $216,116,471.93 (the "Outstanding $216 Million Obligation")

to Cobra as a post-petition administrative expense, plus interest not yet invoiced, and (b)

directing PREPA to pay the Outstanding $216 Million Obligation in full plus the additional

accrued interest that is owed to the date of payment on, or as soon as reasonably practicable after,

the first business day after it is allowed. A schedule of the amounts requested in this Motion is

attached as Exhibit A hereto.

16.     In addition to the amounts requested in this Motion, Cobra is continuing to pursue

payment from PREPA of approximately $40 million for unpaid demobilization expenses and

work associated with Roosevelt Roads restoration and associated interest, which Cobra will

claim separately if payment is not forthcoming from PREPA.

## **FACTUAL BACKGROUND**

17.     On July 2, 2017, the Financial Oversight and Management Board for Puerto Rico

(the "Oversight Board") on behalf of the Commonwealth of Puerto Rico ("Puerto Rico,"

collectively the "Debtors") filed a voluntary petition for relief for PREPA, pursuant to section 304(a) of PROMESA.

18.     After the Petition Date, on September 6 and September 20, 2017, Puerto Rico's power grid was destroyed by Hurricanes Irma and Maria.  PREPA contracted with Cobra and others to aid in the restoration of the power grid and the rebuilding of the power infrastructure.

### A. The First Agreement

19.     On October 19, 2017, PREPA and Cobra entered the First Agreement, a $200 million emergency contract for restoration services.  The First Agreement was amended five times.  The Fourth Amendment raised the contract amount of the First Agreement by approximately $245 million.  The Fifth Amendment raised the contract amount of the First Agreement by approximately $500 million, bringing the total contract amount to $945,429,800.

20.     Under Article 1 of the First Agreement, Cobra was to "provide labor, supervision, tools, equipment and materials necessary to perform the storm restoration services."  Article 3 of the First Agreement provided that "PREPA agrees to pay and the Contractor accepts that PREPA will make payment for the work performed on a Time and Materials basis at the rates, and subject to the terms, set forth in Exhibit B and C, as supplemented from time to time by additional subcontractors."

21.     Exhibit B to the First Agreement was the Contractor's Rate Schedule, setting forth daily and extended daily billable rates for various labor categories and expenses. For example, Exhibit B indicated that Cobra would provide "skilled linemen and equipment, Transmission/Distribution/Substation" at blended rates, consisting of a "Billable Daily Rate" of $4,000 and an "Extended Daily billable rate" of $1,000,000 and "120 day minimum" of $120,000,000.  Multiple reviews have established that the agree-upon contractual rates were

9

reasonable. FEMA determined Cobra's costs to be reasonable. Letter from Michael Byrne,

FEMA's Federal Coordinating Officer, to Jose Marrero, Puerto Rico Governor's Authorized

Representative, dated December 23, 2017. In addition, the Rand Corporation reportedly

undertook a review of Cobra's rates for laborers, equipment and security and informed FEMA

that the contract rates were reasonable considering the "situational uncertainty that prevailed"

after Hurricane Maria.

22.     Exhibit B also provided that PREPA would reimburse Cobra for all Puerto Rico

taxes paid over 8.5%:

> In the event that any amounts to be paid to Contractor under this Contract are subject to
> any taxes (including withholding) imposed by any governmental authority of Puerto Rico
> in excess of 8.5% and Contractor has not obtained an exemption from such taxes, the
> amount to be paid to Contractor shall be increased by an amount that, after the payment
> of such taxes, leaves the Contractor with the amount that Contractor would have received
> if Contractor had been exempted from all such taxes.

Exhibit B.

23.     Exhibit C to the First Agreement was Contractor's Standard Equipment and

Tooling Schedule, which stated, *inter alia*, that "Contractor's composite day rate for labor and

standard equipment has been developed based on supplying the following types of equipment

listed below." The listed equipment included, for example, 129 tracked trucks, two 50-ton truck

cranes, 60 pickup trucks and five rotary aircraft.  The list of 273 pieces of equipment also

included pressure diggers, pullers, tensioners, and various specialty trucks.

24.     Article 3 of the First Agreement provided for Cobra to submit invoices twice a

week. The invoices were to include "a description of the services rendered as per established in

Contractor's Proposal, Contractor's Rate Structure and Contractor's Standard Equipment and

Tooling Schedule." It required that "[e]ach invoice shall be itemized and must be duly certified

by an authorized representative of the Contractor."  Each invoice was to include a "No Interest

Certification", the text of which was set forth in the Contract and included a statement that "[t]he total amount of this invoice is fair and correct."

25.      Article 3 further provided for PREPA to approve invoices within seven days of receipt and to pay invoices within three days of approval.  It stated that "[p]ayment is due upon approval of a valid invoice. In any event, payment terms to contractor shall not exceed Net 10 Days from date of submission of invoice by contractor to PREPA."

26.      Article 3 further stated that "[a] finance charge of 1% per month shall be due on payments received after the date due."

27.      Cobra began work under the First Agreement on or about October 20, 2017.  On an expedited basis, Cobra deployed hundreds of skilled workers and many tons of specialized equipment to work on Puerto Rico's devastated transmission and distribution lines. Cobra submitted invoices for work completed under the First Agreement. Over $74 million including interest,  remains unpaid.

**B.  The Second Agreement**

28.      On May 26, 2018, Cobra and PREPA entered into the Second Agreement, a $900 million contract for electrical grid repairs. This followed a competitive process under which PREPA issued a request for proposals and received proposals from multiple offerors. After reviewing the proposals, PREPA selected Cobra and, upon information and belief, others for award of new restoration and repair contracts

29.      Under Article 1 of the Second Agreement, Cobra was to "provide labor, supervision, tools, equipment and materials necessary to perform hurricane restoration and reconstruction services."  Article 3 of the First Agreement provided that "PREPA agrees to pay and the Contractor accepts that PREPA will make payment for the work performed on a Time

11

and Materials (Equipment) basis at the rates, and subject to the terms, set forth in Exhibit B and C."

30.     Although not designated Exhibit B and C, two documents were attached to the Second Agreement that corresponded to Exhibits B and C of the First Agreement.  The first document contained the "Quantities and Billable Daily Rates … that reflect the final negotiated price proposal."  For example, this document indicated that Cobra would provide "skilled linemen and equipment, Transmission" at blended rates, consisting of a "(16 hours) Billable Daily Rate" of $5,200 and an "Extended Daily billable rate" of $520,000.  The document further indicated that PREPA would receive a 10 percent discount for payments made within 15 days. This document also provides that "Mobilization/Demobilization and other reimbursable items shall be paid on a cost reimbursement basis."  Ex. B.

31.     The second document attached to the Second Agreement was Contractor's Standard Equipment and Tooling Schedule, which stated, *inter alia*, that "Contractor's composite day rate for labor and standard equipment has been developed based on supplying the following types of equipment listed below."  It included two tables.  The first showed "Work Unit Prices" — *e.g.*, General Foreman at a "Work Unit Per Hour" of $55, a "Construction Cost Factor" of 2.59, resulting in a "Total Unit Price Per Hour" of $142.45."  The second table was similar, but was for equipment — it provided "Work Unit Per Hour," "Construction Cost Factor," and "Total Unit Price Per Hour" for listed equipment.

32.     Article 3 of the Second Agreement provided for Cobra to submit invoices once a week.  The invoices were to include "a description of the services rendered as per established in Contractor's Proposal, Contractor's Rate Structure and Contractor's Standard Equipment and Tooling Schedule."  It required that "[e]ach invoice shall be itemized and must be duly certified

by an authorized representative of the Contractor." Invoices were required to be "approved by the Engineer and … accompanied by the proper supporting documents (such as inspection certifications, work reports and third party invoices)." Each invoice was to include a "No Interest Certification," the text of which was set forth in the Contract and included a statement that "[t]he total amount of this invoice is fair and correct."

33.     Article 3 further provided that "PREPA will make commercially reasonable efforts" to review and accept invoices within seven days of receipt and required PREPA to accept or reject invoices within fifteen days of receipt. It further provided that "[i]n any event, PREPA will either accept or reject such invoice within 15 calendar days from when it is received." It required PREPA to return rejected invoices to Cobra within three days of such rejection and provide a written explanation for such rejection. Cobra could resubmit any rejected invoices, which would be processed in the same manner. It provided that "[e]ach invoice accepted by PREPA shall be paid within 30 days from when such invoice is received."

34.     Article 3 further provides for PREPA to pay a finance charge of 1% per month for payments received after the due date.

35.     Article 7 of the Second Agreement, entitled "Changes and/or Extra Work" provided that PREPA could make changes to the services or work to be provided, within the general scope of the contract. It provided that "[t]he Contractor shall work with PREPA to supply Emergency Crews for this purpose." It further provided for equitable adjustments to the contract in the event such changes caused an increase or decrease in the Contractor's cost of or time required for performance.

36.     Cobra completed work under the Second Agreement on or about March 31, 2019.
Cobra submitted invoices for work completed under the Second Agreement. Over $181 million
remains unpaid.

37.     The total amount of invoices under the First and Second Agreements that remain
unpaid and for which Cobra seeks payment in this Motion is $216,116,471.93, which includes
accrued interest of $26,581,740.64 as of September 1, 2019.

**C.  PREPA's Failure to Pay and Cobra's Efforts to Obtain Payment**

38.     Cobra undertook a herculean effort to restore power to Puerto Rico.  Cobra
performed from October 20, 2017 through March 31, 2019, pursuant to the First Agreement, as
amended, and the Second Agreement.  Cobra submitted invoices in accordance with the terms of
the Contracts.  Nonetheless, PREPA has not paid the full amounts due and owing to Cobra under
these Contracts.

39.     Cobra has made every reasonable effort to obtain payment without resorting to
legal action.  Cobra has fully cooperated in efforts to resolve any issues raised by PREPA
regarding outstanding payments.  In addition to the documentation required by the Contracts,
Cobra has provided reams of additional information to PREPA to address questions raised by
PREPA, to facilitate discussions and to expedite the payment process.  Cobra has undertaken
additional efforts to coordinate discussions between PREPA, FEMA, and the Central Office for
Recovery, Reconstruction and Resiliency ("COR3") in order to address any issues or concerns
delaying payment to Cobra or approvals of such payments.  Nonetheless, PREPA has failed to
pay the amounts due and owing to Cobra.

40.     Cobra has not received any payment from PREPA since May 24, 2019.  Since
May 24, 2019, Cobra has flown its executives and counsel to Puerto Rico to meet with PREPA

on at least five occasions in an attempt to resolve the payment issues without court involvement.

Despite promises made by PREPA officials, payments have not been forthcoming, even for

invoices that PREPA does not dispute in any way.

41.     Where PREPA has provided reasons for failing to pay Cobra's invoices, Cobra has

thoroughly responded to those concerns, including submission of corrected invoices where

necessary.

### a. Undisputed Invoices

42.     Cobra has submitted invoices totaling $20,137,138.94 to which PREPA has not

raised any objections.  PREPA has acknowledged in discussions that payment is due for these

invoices and, for several months, PREPA has represented to Cobra that payment of these

invoices is forthcoming.  Nonetheless, PREPA has neither paid these invoices nor offered any

explanation for its failure to do so.  As a result of the failure to pay these undisputed invoices,

PREPA is in breach of the Contracts.

43.     As discussed above, the First Agreement specifically provided for payment no

later than ten days from the submission of the invoice.  The Second Agreement required payment

within 30 days of receipt of an accepted invoice.  PREPA did not reject or otherwise dispute

invoices totaling $20,137,138.94.  PREPA was required to pay each such invoice within 30 days

of receipt.  Thirty days having long since passed, Cobra is entitled to immediate payment of

these invoices.  PREPA, however, has unjustifiably failed to pay.

44.     Cobra has also submitted invoices totaling $7,551,956.01 that PREPA did not

reject, but nonetheless failed to pay in their entirety.  Instead, following approval of the invoices,

PREPA withheld 10 percent of the payment due, apparently based upon the term in the Second

Agreement providing for a 10 percent discount if PREPA made payment within 15 days of

receipt of an invoice.  PREPA withheld 10 percent even though payment was not made within 15

days of receipt and PREPA was therefore not entitled to the discount.  In some instances, PREPA

granted itself the early-payment discount even when it failed to pay such invoices for over 90

days.  Cobra is entitled to the immediate and full payment of the total amount withheld on this

basis, which is $7,551,956.01 .

### b.  Payments Withheld Based Upon Unsubstantiated "Headcount" Questions

45.    Cobra has submitted invoices totaling $86,965,033.06  that PREPA has claimed

payment are not payable because PREPA questions the number of workers (the "headcount") set

forth on those invoices.

46.    These invoices, submitted under the Second Agreement, were in full compliance

with the terms of that agreement, including Cobra's certification of their accuracy, and nothing in

the Second Agreement permits PREPA to withhold payment.  Each of the invoices is for services

previously rendered as required by Article 3 of the Second Agreement.  Each invoice is

accompanied by a package of supporting documentation that includes descriptions of the services

rendered and an itemization, by line item, showing the quantity, billable daily rate, extended

daily billable rate, and blended rate per lineman for the relevant date as required by Article 3 of

the Second Agreement.  Each invoice is duly certified by an authorized representative of Cobra

that "under penalty of absolute nullity…the total amount of this invoice is true and correct [and]

all products and/or services which are shown on this invoice have been delivered and/or rendered

and have not been paid" as required by Article 3 of the Second Agreement.

47.    PREPA has provided no substantiation for its purported concern about

headcounts.  Cobra provided PREPA with additional documentation to verify headcount

information in addition to the documentation required by the Second Agreement.  Cobra

submitted Daily Work Logs, which include the total number of workers in the crew for each day

and a detailed description of the work performed.  Cobra also submitted Daily Construction

16

Crew Reports, which identify each lineman of the crew by name and position, a sign-in sheet used by members of the crew, and a date-stamped photograph of the crew.  Finally, Cobra submitted to PREPA payroll registers in order to further establish headcount for invoicing and payment purposes.  This documentation not only exceeds the requirements of the Second Agreement, but the requirements of the clause used in federal government time and material contracts governed by the Federal Acquisition Regulation.  *See* FAR 52.232-7(a)(5) (vouchers may be substantiated with "[i]ndividual daily job timekeeping records.")

48.     Cobra is entitled to immediate payment of these invoices to which PREPA claims there is a headcount dispute.  Cobra has met its obligation under the Second Agreement to substantiate its headcount information.  Nonetheless, PREPA continues to withhold payment, in breach of the Second Agreement.

### c.  Payments Withheld for Completed Work Erroneously Claimed to be Outside the Contract Scope

49.     PREPA has claimed payment is not due on Cobra invoices under the Second Agreement totaling $19,967,796.20  on the ground that they include activities that, according to PREPA, are beyond the scope of work under the Contracts.   These invoices include amounts due for safety and training exercises, waste disposal, and maintenance work.

50.     PREPA's refusal to pay on these grounds is unjustified and constitutes a further breach of the Contracts.  Article 1 of the Second Agreement provides, "The Contractor shall provide labor, supervision, tools, equipment and materials *necessary* to perform the hurricane restoration and reconstruction services at various locations in PREPA's service areas" (emphasis added).  In addition, Article 39 imposes numerous safety provisions on the Contractor, which require Cobra to maintain safe and clean work sites and properly dispose of waste.  As part of the Contracts, Cobra was required to perform these functions and activities.  Safety, waste disposal,

and maintenance work was necessary under the Contracts to perform the required hurricane restoration and reconstruction services, and Cobra is entitled to payment for such work.

51.    All of the work covered by these invoices was necessary for Cobra to complete the restoration and reconstruction of PREPA's electrical lines, feeders, and segments and specifically required by the Contracts.  Because PREPA has failed to pay $19,967,796.20  of invoices that properly fall within the scope of work under the Contracts, Cobra is entitled to immediate payment of these invoices.

52.    Even if the Contract could be interpreted to require payment only for time working directly on line restoration and not for time spent on activities necessary to the line restoration (which it cannot), payment of the subject invoices would still be required.  The work covered by the subject invoices was performed during periods when Cobra was unable to perform restoration work directly on the lines because of PREPA's failure to timely release work packages to Cobra.  PREPA repeatedly failed to timely issue work packages so that Cobra's crews could move from one project to the next without significant downtime, even though Cobra kept PREPA well-informed as to its progress on each project so that PREPA would know when the work would be completed and the next work package would be needed.

53.    Because of the indefinite nature of the PREPA-caused delays and suspension of work, and the fact that most of the labor came from the mainland, it was not possible or practicable for Cobra to release the impacted workers and send them home only to rehire them or recruit new personnel at a later date.

54.    The Second Agreement provides that, while PREPA may suspend the work, Cobra is entitled to payment for such periods.  *See* Second Agreement, Article 5.1 ("The right of PREPA to suspend the work shall not be construed as denying the Contractor all actual,

reasonable and necessary costs and expenses due to the delays caused by such suspension") and

5.3 ("In case of suspension of the work by PREPA for any reason, … Contractor will also have

the right to claim lost revenue standing time of manpower and equipment, and overhead costs").

55.    Although Cobra would have been entitled to recover the daily rate for its crews

even if they had remained idle during the PREPA-caused suspensions of work, Cobra directed

the impacted crews to perform necessary tasks related to safety, training, clean up, and

maintenance during these periods. PREPA's failure to pay these invoices is a breach of contract.

### d.    PREPA's Failure to Pay for Costs and Work Completed at PREPA's Direction Relating to Hurricane Beryl

56.    PREPA has rejected invoices totaling $4,307,491.88 relating to extra work

performed and costs incurred by Cobra at PREPA's direction as Hurricane Beryl approached

Puerto Rico in early July 2018.

57.    As Hurricane Beryl approached Puerto Rico, PREPA instructed Cobra to stand

down from its restoration work in order to prevent risks and danger to human life and property,

plant and equipment; to stage equipment and personnel before the storm arrived in order to be

prepared to restore damage after the storm; and to perform any restoration work needed as a

result of the storm.  The plan directed by PREPA included all Cobra employees on the island and

required Cobra to mobilize equipment to Vieques. On the day of the storm, July 9, 2018, all of

Cobra's crews were instructed to remain on standby until further instructions.

58.    It is undisputed that Cobra performed this work for PREPA and PREPA's failure

to pay is a breach of the Second Agreement.  Cobra is entitled to immediate payment.

### e.    PREPA's Failure to Pay for Extra Mapping Work Completed at PREPA's Direction

59.    PREPA is withholding payment on invoices totaling $3,080,426.54 for work

Cobra performed, at PREPA's request, to provide line coordinates, access mapping and shape

files. PREPA failed to ensure that certain of its other contractors provided these materials for the work they completed and requested that Cobra create these records.

60.      Because PREPA instructed Cobra to perform this work, and it is undisputed that Cobra did so, Cobra is entitled to immediate payment of these invoices.  PREPA's failure to pay is a breach of the Second Agreement.

### f.   PREPA's Failure to Reimburse Cobra's Excess Tax Payments

61.      PREPA has also failed to pay Cobra $61,668,083.34 due under the Contracts for reimbursement of Puerto Rico taxes in excess of 8.5% in 2018.  PREPA has failed to provide any explanation for its failure to pay these taxes.  Instead, PREPA has repeatedly demanded that Cobra provide PREPA with additional information related to the payment of these taxes. Although Cobra's entitlement to the reimbursement of these amounts is not dependent on any of the information PREPA has demanded, Cobra has accommodated PREPA by providing as much of this documentation as possible. Nonetheless, PREPA has failed to reimburse Cobra, in breach of its contractual obligations.

### g.   PREPA Owes Interest on the Late Payments

62.      Both Contracts imposed a finance charge of 1% per month for payments received after the due date pursuant to the Contracts.  As of September 1, 2019, interest on the unpaid Cobra invoices at issue in this Motion totals $26,581,740.64  and is continuing to accrue. PREPA has failed to pay Cobra the interest owed, in breach of its contractual obligations.

### DISCUSSION

63.      Bankruptcy Code section 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate."  Generally, a request for payment of an administrative expense pursuant to Bankruptcy Code section 503(a) may qualify if (i) the right to payment arose

from a post-petition transaction with the debtor estate (rather than from a prepetition transaction

with the debtor) and (ii) the consideration supporting the right to payment was beneficial to the

estate of the debtor. *See In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir. 1991).

64.     Nothing prohibits immediate payment of an allowed administrative expense,

either, as the timing of payment is within a court's discretion. *See In re HQ Global Holdings,

Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002); *In re Rare Coin Galleries, Inc.*, 72 B.R. 415, 417

(Bankr. D. Mass. 1987) ("In general, the timing of the payment of ordinary administrative claims

is in the discretion of the Court."). Courts look to a variety of factors in determining whether to

order immediate payment, including, but not limited to, prejudice to the debtor, hardship to the

claimant, potential detriment to other creditors, and the length and expense of the case's

administration. *See id.*; *see also In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del.

2005).

65.     It is abundantly clear that Cobra and the Outstanding $216 Million Claim

qualifies for administrate expense priority. Both Contracts are post-petition. PREPA entered into

bankruptcy in July of 2017. The First Agreement, on which Cobra is owed over $74 million, was

entered into in October of 2017.  The Second Agreement, on which Cobra is owed more than

$181 million, was entered into in May of 2018. Likewise, Cobra rendered all appropriate

services under the Contracts and completed their work in April of 2019. Such services

undoubtedly benefited PREPA's estate. PREPA now has a functioning power grid and can

provide electricity to people of Puerto Rico. Cobra provided a necessary service to PREPA on a

post-petition basis and to deny the Outstanding $216 Million Claim administrative expense

priority would be unfounded.

66.     Additionally, the facts of this case warrant immediate payment.  It was critical for PREPA to enter into these types of contracts and prioritize disaster relief efforts.  Consequently, per the Bankruptcy Code, PREPA also prioritized payment of services rendered under these Contracts.  As a court in equity, this Court has the ability to issue orders necessary or appropriate to carry out provisions of the Bankruptcy Code.  *See* 11 U.S.C. §105(a).  Immediate payment is not contrary to the demands of the Bankruptcy Code but consistent with it.  Administrative expense claims are afforded high priority pursuant to Bankruptcy Code section 507(a)(2) for many, if not all, of the reasons stated above.  This favorable treatment induces parties to continue doing business with a debtor-in-possession, and thus, in turn, facilitate a debtor's reorganization efforts.  *See In re Babbs*, 265 B.R. 35, 37 (Bankr. S.D.N.Y. 2001); *see also In re Enron Corp.*, 279 B.R. 695, 704 (Bankr. S.D.N.Y. 2002).

67.     Principles of fairness and justice only solidify Cobra's entitlement to immediate payment.  *See Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process").  If a debtor utilizes services of a third-party post-petition and leaves this party uncompensated, immediate payment is the only just solution. Parties rely on debtors to fulfill their post-petition obligations pursuant to the terms of the contract.  Otherwise, no party would contract with a debtor going through reorganization if payment were delayed to an indefinite date in the future. Cobra rendered post-petition services for the benefit of PREPA's estate and anything short of immediate payment would be unjust and contravene clear mandates of Bankruptcy Code sections 503 and 507.

68.     These proceedings have been ongoing since July 2017.  Two years later, PREPA
has yet to set forth any plan for reorganization.  Cobra has repeatedly reached out to PREPA
regarding the Outstanding $216 Million Claim, only to be rebuffed.  Payment of the Outstanding
$216 Million Obligation is not in the foreseeable future and continued delay in payment creates a
crucial detrimental hardship to both parties that, frankly, only worsens each day.  *See Garden
Ridge*, 323 B.R. at 143 (noting that hardship to the administrative claimants is a factor that
warrants immediate payment of an administrative expense claim).  Not only does non-payment
significantly burden Cobra, but, as noted, every day that the Outstanding $216 Million Claim
goes unpaid places a burden on PREPA's estate because of certain accruing interest (*i.e.* each
contract calls for a 1% finance charge per month for untimely payments).  Immediate payment
not only alleviates Cobra's continuous and mushrooming burden that it incurred at the behest of
PREPA and to its sole benefit, but alleviates the growing burden on PREPA and its estate.

69.     Moreover, and maybe most importantly, payment of the Outstanding $216 Million
Claim will not prejudice PREPA or other creditors.  On October 26, 2017, the Court entered the
*Order Granting Urgent Joint Motion of the Commonwealth of Puerto Rico, Puerto Rico
Highways and Transportation Authority, and Puerto Rico Electric Power Authority, and the
Puerto Rico Fiscal Agency and Financial Advisory Authority for Order Concerning Receipt and
Use of Anticipated Federal Disaster Relief Funds and Preserving Rights of Parties* [Docket No.
1547] (the "Disaster Relief Funds Order").  The Disaster Relief Funds Order makes certain funds
available solely for emergency assistance and disaster relief efforts.  The Disaster Relief Funds
Order most notably ordered that all Federal Disaster Relief Funds,[2] Commonwealth Disaster

---

[2] As defined in the Disaster Relief Funds Order, "Federal Disaster Relief Funds" means "federal assistance
as defined in 2 C.F.R. § 200.40(a) made available, disbursed by, and/or otherwise earmarked or provided by the
Federal Emergency Management Agency ("FEMA"), or any other federal agency, to the Commonwealth and Non-
Federal Entities, whether directly or indirectly, and related program income, that may be used for the purpose of

Relief Advances,[3] and Disaster Relief Accounts[4] were not subject to any liens, encumbrances, priorities, or other claims by preexisting creditors, and such funds and accounts are not considered available funds, revenues, or resources for distribution in any restructuring under Title III of PROMESA. *See Disaster Relief Funds Order* at ¶2.

70.     The Disaster Relief Funds Order anticipates this exact situation. FEMA funds have been specifically segregated to protect parties that have entered into contracts with PREPA, post-petition, to assist in disaster relief efforts. Cobra's work directly benefited PREPA in its attempt to reorganize and the Court undeniably realized the need for funding these efforts when it entered the Disaster Relief Funds Order. PREPA entered into the Contracts with Cobra in anticipation of FEMA reimbursement. Although Cobra's entitlement to payment from PREPA is in no way contingent upon payment by FEMA, the Disaster Reliefs Funds Order ensures that PREPA has FEMA funds for the sole purpose of compensating parties who provide, or provided, emergency assistance and disaster relief. And, as an added benefit, the funds subject to the Disaster Relief Funds Order are not subject to any claim by any preexisting creditor or privy to any distribution under a plan of reorganization – their sole use is to compensate these claimants,

---

providing emergency assistance, disaster relief, and/or recovery and restorative assistance, in the form of grants; *provided, however*, that Federal Disaster Relief Funds shall not include funds received by the Commonwealth as reimbursement for Commonwealth Disaster Relief Advances; and *provided further*, for avoidance of doubt, that Federal Disaster Relief Funds shall not include any Reimbursement Claim or any funds received by the Commonwealth on account of any Reimbursement Claim."

[3] As defined in the Disaster Relief Funds Order, "Commonwealth Disaster Relief Advances" means "advances by the Commonwealth to Non-Federal Entities of, or expenditures by the Commonwealth from, funds other than Federal Disaster Relief Funds, to pay the costs of a project approved by FEMA or another federal agency entitled to approve the use of Federal Disaster Relief Funds, and to be reimbursed by funds made available by, disbursed by, and/or otherwise provided by FEMA or any other federal agency to the Commonwealth and Non-Federal Entities for the purpose of providing emergency assistance, disaster relief, and/or recovery and restorative assistance in the form of grants; *provided* for the avoidance of doubt, that Commonwealth Disaster Relief Advances shall not include any Reimbursement Claim or any funds received by the Commonwealth on account of any Reimbursement Claim."

[4] As defined in the Disaster Relief Funds Order, "Disaster Relief Accounts" means "new, segregated, non-commingled, unencumbered accounts held in the name of the Commonwealth or of the instrumentality to whom the funds have been allocated according to a governing Project Worksheet or otherwise under applicable law."

which rightfully include Cobra.  Cobra urges the Court that PREPA's access to these unencumbered funds is the tipping point that warrants immediate payment of the Outstanding $216 Million Obligation.

71.     Lastly, the PREPA has already acknowledged that immediate payment of administrative claims made by similarly situated contracts is appropriate.  *See Motion for Allowance of Administrative Expense Claims* [Docket No. 881]; *see also Notice of Withdrawal of Motion for Allowance of Administrative Expense Claims* [Docket No. 950].

## **REQUEST FOR EVIDENTIARY HEARING**

72.     Cobra respectfully requests that an evidentiary hearing be scheduled, if deemed appropriate by this Honorable Court.

## **NOTICE**

73.     Notice has hereby been served by CM/EF and on the Master Service List posted on the website of the Debtors' claims and noticing agent, by e-mail or by first-class mail.

74.     No prior request for the relief sought herein has been made to this Court or to any other court.

WHEREFORE, Cobra respectfully requests that this Court allow Cobra's claim as an administrative expense claim, with any other appropriate relief.

RESPECTFULLY SUBMITTED.

Dated:  September 30, 2019

Respectfully submitted,

REICHARD & ESCALERA, LLC

/s/ Rafael Escalera Rodríguez
Rafael Escalera Rodríguez
USDC-PR No. 122609
escalera@reichardescalera.com

/s/Sylvia M. Arizmendi
Sylvia M. Arizmendi
USDC-PR No. 210714
arizmendis@reichardescalera.com

/s/ Alana Vizcarrondo-Santana
Alana Vizcarrondo-Santana
USDC-PR No. 301614
vizcarrondo@reichardescalera.com

/s/Gustavo A. Pabón-Rico
Gustavo A. Pabón-Rico
USDC-PR No. 231207
pabong@reichardescalera.com


255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Telephone: (787) 777-8888

AKIN GUMP STRAUSS HAUER & FELD LLP

/s/ Thomas P. McLish
Thomas P. McLish (*pro hac vice* pending)
tmclish@akingump.com

/s/ Scott M. Heimberg
Scott M. Heimberg (*pro hac vice* pending)
sheimberg@akingump.com

/s/ Allison Thornton
Allison S. Thornton (*pro hac vice* pending)
athornton@akingump.com

Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC 20006
Tel: (202) 887-4000
Fax: (202) 887-4288

and

/s/ David F. Staber
David F. Staber (*pro hac vice* pending)
dstaber@akingump.com

Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, TX 75201
Tel: (214) 969-2800
Fax: (214) 969-4343

*Attorneys for Cobra Acquisitions LLC*