## **EXHIBIT A**

Sᴋᴀᴅᴅᴇɴ, Aʀᴘs, Sʟᴀᴛᴇ, Mᴇᴀɢʜᴇʀ & Fʟᴏᴍ ʟʟᴘ

ONE RODNEY SQUARE
P.O. BOX 636
WILMINGTON, DELAWARE 19899-0636
———
TEL: (302) 651-3000
FAX: (302) 651-3001
www.skadden.com

DIRECT DIAL
(302) 651-3210
DIRECT FAX
(302) 574-3100
EMAIL ADDRESS
PAUL.LOCKWOOD@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

April 29, 2019

**VIA EMAIL**

Ehud Barak, Esq.
(ebarak@proskauer.com)
Counsel to the Oversight Board
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036-8299

Diana M. Perez, Esq.
(dperez@omm.com)
Counsel to AAFAF
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York  10036

Maja Zerjal, Esq.
(mzerjal@proskauer.com)
Counsel to the Oversight Board
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036-8299

Luis C. Marini-Biaggi, Esq.
(lmarini@mpmlawpr.com)
Counsel to AAFAF
Marini Pietrantoni Muñiz LLP
MCS Plaza
255 Ponce de León Ave., Suite 500
San Juan, Puerto Rico  00917

Steve Ma, Esq.
(sma@proskauer.com)
Counsel to the Oversight Board
Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, California  90067-3010

RE:   Lift Stay Notice

Dear Counsel:

Pursuant to Paragraph III. Q. of the Eighth Amended Notice, Case Management and Administrative Procedures (Dkt. #4866-1), entered in *In re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al.*, No. 17 BK 323-LTS (the main case) and

Ehud Barak, Esq.
Maja Zerjal, Esq.
Steve Ma, Esq.
Diana M. Perez, Esq.
Luis C. Marini-Biaggi, Esq.
April 29, 2019
Page 2
No. 17 BK 3566-LTS (the ERS case), we write on behalf of our client, UBS
Financial Services Incorporated of Puerto Rico ("UBS Financial"), to provide notice
of UBS Financial's intention to seek relief from the automatic stay to file, fully
prosecute and liquidate counterclaims (the "Lift Stay Notice") in *Administración de
los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto
Rico, et. al v. UBS Financial Services Incorporated of Puerto Rico, et al.*, Civ. No.
KAC-2011-1067 (803), currently pending in the Commonwealth of Puerto Rico
Court of First Instance ("ERS Action").

UBS Financial is a defendant in the ERS Action.  Plaintiff Administración de
los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto
Rico's (the "ERS") Fourth Amended Complaint was accepted by the Court of First
Instance on April 15, 2019 and is attached hereto as Exhibit A.  If UBS Financial is
granted relief from the automatic stay, it intends to file counterclaims against the
ERS for breach of contract and indemnification (the "Counterclaims") and will fully
prosecute and liquidate the Counterclaims.  The factual grounds for the
Counterclaims are set forth in Exhibit B to this letter which is a draft of the
Counterclaims.  The Counterclaims seek unliquidated damages.

There is good cause to lift the automatic stay to allow UBS Financial to assert
the Counterclaims against the ERS in the ERS Action.  Among the reasons that the
District Court should lift the stay:

- ***The Puerto Rico Rules of Civil Procedure require that UBS
  Financial file any counterclaims it has at this time.***  UBS Financial
  must answer the Fourth Amended Complaint no later than ten (10)
  business days after the notice of acceptance of the Fourth Amended
  Complaint (*i.e.* today, April 29, 2019).  Puerto Rico Rule 11.1
  requires that defendants file any counterclaims they have when they
  file their answer.  Because affirmative claims against the ERS are
  prohibited by the automatic stay until the stay is lifted, UBS Financial
  intends to file an informative motion in the ERS Action attaching a
  draft of the Counterclaims today to preserve its rights pending
  resolution of its request in the Title III Cases to lift the automatic stay.

- ***The ERS Action has been pending for more than seven years.***  The
  ERS Action was originally filed on September 29, 2011 by certain
  beneficiaries of the ERS as a derivative action for breach of fiduciary
  duties and breach of contract.  Plaintiffs brought seventeen derivative
  causes of action against UBS Financial, Samuel Ramirez & Co., Inc.,

Ehud Barak, Esq.
Maja Zerjal, Esq.
Steve Ma, Esq.
Diana M. Perez, Esq.
Luis C. Marini-Biaggi, Esq.
April 29, 2019
Page 3

Santander Securities, Global Insight (USA), Inc., the then-current and former administrators and trustees of the ERS, the directors of the Government Development Bank of Puerto Rico, and various unnamed insurance carriers who purportedly insure the other defendants. Plaintiffs alleged wrongs to the ERS in connection with the ERS's decision to issue three series of pension obligation bonds in 2008 (the "ERS Bonds").  UBS Financial served as lead underwriter for the issuances.  Plaintiffs amended their complaint on December 27, 2011 to add, among others, UBS Trust, who, through its division, UBS Consulting Services of Puerto Rico, acted as financial consultant to the ERS.  On September 26, 2016, Plaintiffs informed the Court that the ERS planned to join the case as a direct plaintiff.  On December 7, 2016, the Court allowed the ERS to intervene and ordered Plaintiffs, including the ERS, to file an amended complaint.  The parties engaged in multiple rounds of dispositive motion practice until February 5, 2018 when the Court of Appeals issued a mandate returning the case to the Court of First Instance.  Discovery commenced in mid-2017 and is expected to continue through 2019.

- ***UBS Financial will be prejudiced if the automatic stay is not lifted to allow it to assert the Counterclaims.***  The ERS intervened in the ERS Action in 2017 and has continued to litigate the action outside of the Title III Cases.  Without relief from the automatic stay, the ERS can prosecute the claims asserted in the ERS Action, but UBS Financial cannot prosecute its counterclaims, which arise from the same facts and transactions.  For reasons of judicial economy and fairness, and to prevent prejudice from issue preclusion, UBS Financial should be granted relief from the automatic stay to pursue its Counterclaims.

Please contact me via email at paul.lockwood@skadden.com or via telephone at (302) 651-3210 so that we may schedule a time to meet and confer regarding the Lift Stay Notice.

Sincerely,

*/s/ Paul J. Lockwood*

Paul J. Lockwood, Esq.

cc:  Harold D. Vicente, Esq. (via email)

# EXHIBIT A

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
CENTRO JUDICIAL DE SAN JUAN
SALA SUPERIOR

| | |
|---|---|
| ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO; PEDRO JOSÉ NAZARIO SERRANO, SU CÓNYUGE, JUANITA SOSA PÉREZ Y LA SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR AMBOS; JOEL RIVERA MORALES; MARÍA DE LOURDES GÓMEZ PÉREZ; HÉCTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; Y, LUIS M. JORDÁN RIVERA | CIVIL NÚMERO: KAC-2011-1067 (803)    SOBRE:  INCUMPLIMIENTO DE CONTRATO DAÑOS Y PERJUICIOS |
| **Demandantes** | |
| **v.** | |
| UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO Y UBS CONSULTING SERVICES OF PUERTO RICO; ABC INSURANCE COMPANY, INC.; XYZ INSURANCE COMPANY, INC. | |
| **Demandados** | |

_RECIBIDO-SECRETARIA CJ DE SAN JUAN 2019 MAR -6 P 3:07_

## MOCIÓN DE AUTORIZACIÓN PARA PRESENTAR _CUARTA DEMANDA ENMENDADA_

**AL HONORABLE TRIBUNAL:**

**COMPARECEN** los **DEMANDANTES**, por conducto de sus abogados que suscriben, y muy respetuosamente EXPONEN, ALEGAN Y SOLICITAN:

1.      Recientemente se presentaron mociones de desistimiento en virtud de las cuales los codemandados, Santander Securities, LLC, Samuel Ramírez, Inc. y Héctor Mayol dejaron de ser partes en el caso.  Por esa razón, y a los fines de depurar y simplificar las alegaciones, los comparecientes consideran que resulta conveniente la presentación de una nueva demanda enmendada.

2.      De conformidad con lo dispuesto por las Reglas 13.1 y 13.4 de las de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. V, R.13.1 y 13.4, así como su jurisprudencia interpretativa, se solicita que el Honorable Tribunal acepte la presentación de la _Cuarta Demanda Enmendada_ más particularizada, que aquí se acompaña.

3.      La Regla 13.1, _supra_, que versa sobre las alegaciones enmendadas y suplementarias reza como sigue:

> "_Cualquier parte podrá enmendar sus alegaciones una vez en cualquier momento antes de habérsele notificado una alegación respondiente, o si su_

*alegación es de las que no admiten alegación respondiente y **el pleito no ha sido señalado para juicio**, podrá de igual modo enmendarla en cualquier fecha dentro de los veinte (20) días de haber notificado su alegación. En cualquier otro caso las partes podrán enmendar su alegación únicamente con permiso del tribunal o mediante el consentimiento por escrito de la parte contraria; **y el permiso se concederá liberalmente cuando la justicia así lo requiera**. Una parte notificará su contestación a una alegación enmendada dentro del tiempo que le restare para contestar la alegación original o dentro de veinte (20) días de notificársele la alegación enmendada, cualquiera de estos plazos que fuere más largo, a menos que el tribunal de otro modo lo ordenare".* (Énfasis nuestro)

4.    La política firmemente establecida en nuestro ordenamiento jurídico es que las reglas que conceden discreción a los Tribunales para autorizar las enmiendas a las alegaciones son preceptos reparadores que deben interpretarse liberalmente. Neca Mortgage Corporation v. A & W Developers S.E., 137 D.P.R. 860, 867 (1995). Interpretando las referidas Reglas, nuestro Tribunal Supremo ha reiterado el que la facultad para conceder el permiso para enmendar las alegaciones debe ejercerse liberalmente. Véase, Cruz Cora v. UCB/Trans Union P.R. Div., 137 D.P.R. 917 (1995).

5.    Ciertamente, el poder de los tribunales para permitir enmiendas a las alegaciones es amplio, y tiene que demostrarse un claro abuso de discreción o un perjuicio manifiesto a la parte contraria para que se revoque la actuación del juez. Id.; Torres v. Ramos, 28 D.P.R. 586 (1920).

6.    Basado en lo antes expuesto, respetuosamente sometemos que (i) en vista de que aún no se ha celebrado la conferencia inicial al amparo de la Regla 37.1 de las de Procedimiento Civil y (ii) que resulta conveniente tanto para las partes como para el Tribunal que luego del desistimiento con respecto a tres partes demandadas se depuren las alegaciones y se trabaje con unas alegaciones más claras y sencillas, se le permita a la compareciente enmendar la *Demanda*, conforme lo permite nuestro ordenamiento y la interpretación liberal de las Reglas 13.1 y 13.4 de Procedimiento Civil, con el propósito de resumir las alegaciones y dejar las mismas claramente establecidas y más particularizadas. A tales fines se acompaña una *Cuarta Demanda Enmendada* con el ruego de que el Tribunal autorice su presentación.

**POR TODO LO CUAL**, la parte compareciente, muy respetuosamente solicita de este Honorable que permita la presentación de la *Cuarta Demanda Enmendada* que se acompaña con la presente solicitud, con cualquier otro pronunciamiento que en derecho proceda.

**RESPETUOSAMENTE SOMETIDA.**

**CERTIFICAMOS:**  Haber enviado copia fiel y exacta del presente escrito a: **LCDO. UBALDO M. FERNÁNDEZ BARRERA, LCDO. SALVADOR ANTONETTI STUTTS** y **LCDO. MAURICIO O. MUÑIZ LUCIANO, O'NEILL & BORGES LLC,** Avenida Muñoz Rivera 250, Suite 800, San Juan, PR  00918-1813; **LCDO. PAUL J. LOCKWOOD, LCDA. NICOLE A DISALVO** y **LCDA. ELISA M.C. KLEIN, SKADDEN, ARPS, SLATE MEAGHER & FLOM,** One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899.

En San Juan, Puerto Rico, hoy  6  de marzo de 2019.

| | |
|---|---|
| **VICENTE & CUEBAS**<br>P.O. Box 11609<br>San Juan, PR 00910-1609<br>Teléfono (787) 751-8000<br>Facsímil (787) 756-5250 | **PUJOL LAW OFFICE, PSC**<br>P.O. Box 363042<br>San Juan, PR 00936-3042<br>Teléfono: (787) 724-0900<br>Facsímil: (787) 724-1196 |

**HAROLD D. VICENTE**
**T.S.P.R. Número 3966**
E-Mail: _hvicente@vclawpr.com_

**FRANCISCO PUJOL MENESES**
**T.S.P.R. Número 11883**
Email: _fpujol@pujollawpr.com_

**HAROLD D. VICENTE COLÓN**
**T.S.P.R. Número 11303**
E-Mail: _hdvc@vclawpr.com_

**IVELISSE M. ORTIZ MOREAU**
**TSPR Número 18640**
E-mail: _iortiz@vclawpr.com_

_ABOGADOS DE LOS DEMANDANTES INDIVIDUALES,_
_BENEFICIARIOS DEL SISTEMA DE RETIRO Y DE LA ADMINISTRACIÓN DE LOS SISTEMAS_
_DE RETIRO DE LOS EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO_

**FEDERICO HERNÁNDEZ DENTON**
P.O. Box 9021279
San Juan, PR 00902-1279
Teléfono (787) 758-3542

**PUERTO RICO ATTORNEYS & COUNSELORS AT LAW**
P.O. Box 362122
San Juan, PR 00936-2122
Teléfono  (787) 767-1919
Facsímil  (787) 764-9120

**FEDERICO HERNÁNDEZ DENTON**
**T.S.P.R. Número 3846**
E-Mail: _f.hernandezdenton@gmail.com_

**JOSÉ CHÁVES CARABALLO**
**T.S.P.R. Número  7953**
E-Mail: _chaves@fc-law.com_

**WOLF POPPER LAW OFFICES, PSC**
654 Plaza
654 Avenida Muñoz Rivera, Suite 1001
San Juan, PR  00918
Teléfono (787) 522-0200
Facsímil  (787) 522-0201


*Carlos López López* / A
**CARLOS LÓPEZ LÓPEZ**
**T.S.P.R. Número 10526**
E-Mail: *clopez@wolfpopperpr.com*


*Rodolfo Carrión Vargas* / A
**RODOLFO CARRIÓN VARGAS**
**T.S.P.R. Número  13390**
E-Mail: *rcarrion@wolfpopperpr.com*


*ABOGADOS DE LA ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO*
*DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO*

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
CENTRO JUDICIAL DE SAN JUAN
SALA SUPERIOR

| | |
|---|---|
| ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO; PEDRO JOSÉ NAZARIO SERRANO, SU CÓNYUGE, JUANITA SOSA PÉREZ Y LA SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR AMBOS; JOEL RIVERA MORALES; MARÍA DE LOURDES GÓMEZ PÉREZ; HÉCTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; Y, LUIS M. JORDÁN RIVERA | CIVIL NÚMERO: K AC2011-1067 (803) |
| | SOBRE: |
| | INCUMPLIMIENTO DE CONTRATO DAÑOS Y PERJUICIOS |
| **Demandantes** | |
| v. | |
| UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO Y UBS CONSULTING SERVICES OF PUERTO RICO; ABC INSURANCE COMPANY, INC.; XYZ INSURANCE COMPANY, INC. | |
| **Demandados** | |

<u>**CUARTA DEMANDA *ENMENDADA***</u>

AL HONORABLE TRIBUNAL:

COMPARECEN los **DEMANDANTES**, por conducto de sus abogados que suscriben, y muy respetuosamente EXPONEN, ALEGAN Y SOLICITAN:

## I. NATURALEZA Y RESUMEN DEL CASO

1.1    Durante la primera mitad del año 2008, la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico (en adelante el "Sistema") hizo tres (3) emisiones de bonos a largo plazo (los "Bonos") por un importe total de aproximadamente tres  mil millones de dólares ($3 mil millones) y los colocó en el mercado de Puerto Rico a través de un grupo de "underwriters" dirigido por UBS Financial Services Incorporated of Puerto Rico ("UBS").

1.2    El supuesto propósito de dicha transacción era que el Sistema obtuviera fondos a tasas de interés bajas, para re-invertir los mismos a rendimientos más altos, y producir así una ganancia recurrente para el Sistema ("positive arbitrage") durante el término de los Bonos. Lo anterior no se logró.  Los Bonos fueron colocados en el mercado local a tasas de interés tan altas que el Sistema ha perdido, pierde y continuará perdiendo

multimillonarias sumas de dinero, porque no ha podido colocar los fondos producto de los Bonos a rendimientos suficientemente altos como para producir una ganancia y amortizar el costo de emisión y venta de los Bonos.

1.3     Antes de llevarse a cabo la emisión y venta de los Bonos, en el año 2008, UBS como suscriptor líder ("lead underwriter"), le representó al Sistema que UBS era experto en asesoría financiera y tenía la capacidad para colocar los Bonos, a los fines de convencer al Sistema para que contratara a UBS para llevar a cabo la referida emisión;

1.4     Entre las representaciones que hizo UBS para convencer al Sistema de que la emisión y la venta de los Bonos serían beneficiosas y ayudarían a solventar las arcas del mismo, estaba que el producto de las mismas iba a generar un diferencial positivo en rendimiento ("positive arbitrage"), el cual redundaría en ganancias para el Sistema.  Esas representaciones no sólo eran falsas, sino que se hicieron para que UBS se pudiese lucrar y cobrar honorarios y comisiones, como los que en efecto cobró, los cuales sobrepasaron los $35 millones.

1.5     El 4 de abril de 2013, se aprobó la Ley Núm. 3 de 2013, para reformar de manera integral el Sistema de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "Sistema").  La aprobación de esta Ley fue un intento de mitigar la grave crisis financiera en la que se encuentran dicho Sistema y el Estado Libre Asociado de Puerto Rico ("ELA").  La propia Asamblea Legislativa de Puerto Rico concluyó que la emisión de los Bonos fue una de las causas de esta grave crisis y así fue señalado en la exposición de motivos de dicha Ley.  Como dato significativo, expresaron allí los legisladores que los Bonos le costarán al Sistema alrededor de $6,000 millones en intereses, más el repago del principal.

1.6     Además, según se explica más adelante, la emisión y la venta de los Bonos fueron ilícitas, pues (i) violaron la política pública establecida por la Asamblea Legislativa de Puerto Rico, la cual denegó su aprobación a las mismas cuando éstas se contemplaban a través del Gobierno; y (ii) los Bonos se garantizaron mediante la pignoración o enajenación de las aportaciones patronales al Sistema, lo cual no está permitido por la Ley de Retiro.

1.7     Esta Cuarta Demanda Enmendada se presenta para beneficio del Sistema y de los Demandantes individuales identificados más adelante, para recobrar los graves daños sufridos tanto por el Sistema como por dichos Demandantes individuales, causados por la conducta crasamente negligente de UBS y UBS Consulting Services of Puerto Rico, ("UBS Consulting").

## II. LAS PARTES

### Demandantes:

2.1      El Sistemas de Retiro es un fideicomiso creado mediante la Ley Número 447, del 15 de mayo de 1951, según enmendada (la "Ley de Retiro"). Los fiduciarios del Sistema son los miembros de su Junta de Síndicos y los fideicomisarios/beneficiarios del mismo son los empleados activos y los empleados retirados del Gobierno de Puerto Rico y sus subdivisiones políticas e instrumentalidades (en adelante, en conjunto, el "Gobierno"). Como consecuencia de los actos y omisiones de la parte demandada que se describen con particularidades más adelante, el Sistema ha sufrido pérdidas en exceso de 800 millones de dólares.

2.2      Los Demandantes Pedro José Nazario Serrano y Juanita Sosa Pérez, son mayores de edad, casados entre sí, jubilado él del Departamento de Hacienda de Puerto Rico y ella del Municipio de Carolina, Puerto Rico, y comparecen en sus respectivas capacidades personales y como representantes de la sociedad legal de bienes gananciales compuesta por ambos. Son residentes de Carolina, Puerto Rico y su dirección postal y su teléfono son los siguientes: P.O. Box 3603, Bayamón Gardens Station, Bayamón, Puerto Rico 00958, (787) 289-0233. El daño directo que la conducta negligente de los demandados le ha causado a estos Demandantes consiste en que éstos han perdido sus bonos de verano y el derecho a recibir reembolsos por el costo de medicamentos. Esta situación también les ha generado y les continuará ocasionando intensas angustias y sufrimientos.

2.3      El Co-Demandante Joel Rivera Morales es mayor de edad, casado, empleado en la Autoridad de los Puertos de Puerto Rico y vecino de Carolina, Puerto Rico. Su dirección es Villa Fontana Park 5DD24. Calle Muñoz Rivera, Carolina, Puerto Rico 00982 y su teléfono es el (787) 390-5242.   El daño directo que la conducta negligente de los demandados le ha ocasionado al Sr. Rivera Morales consiste en que, en vez de poderse retirar a los 65 años con un 65% de su salario, ahora tendrá que esperar hasta los 67 años y recibirá solo un 34% de su salario, lo cual no será suficiente para sufragar sus gastos. Esta situación también le ha generado y continuará ocasionando intensas angustias y sufrimientos.

2.4      La Co-Demandante María de Lourdes Gómez Pérez es mayor de edad, casada, empleada en el Departamento de la Familia y vecina de Carolina, Puerto Rico. Su dirección es Calle 9 M-14, Urb. Mountain View, Carolina, Puerto Rico  y su teléfono es el (787) 390-

5242. El daño directo que la conducta negligente de los demandados le ha ocasionado a la Sra. Gómez Pérez consiste en que, tras haber laborado durante 28 años en el Departamento de la Familia, en lugar de poder retirarse dentro de un año y medio, ahora tendrá que trabajar 6 años adicionales y recibirá solo el 38% de su salario, lo cual no será suficiente para sufragar sus gastos. Esta situación también le ha generado y le continuará ocasionando intensas angustias y sufrimientos.

2.5    El Co-Demandante Héctor Cruz Villanueva es mayor de edad, casado, empleado civil en la Guardia Nacional de Puerto Rico y vecino de Vega Baja, Puerto Rico. Su dirección es Chalets de la Playa, Apartamento 487, Vega Baja, Puerto Rico 00693 y su teléfono es (787) 647-4584. El daño directo que la conducta negligente de los demandados le ha ocasionado al Sr. Cruz Villanueva consiste en que, después de haber laborado durante 24 años como empleado civil de la Guardia Nacional de Puerto Rico, al momento de su retiro va a recibir una cantidad muy inferior al 75% de su salario, lo cual no será suficiente para sufragar sus gastos. Esta situación también le ha generado y le continuará ocasionando intensas angustias y sufrimientos.

2.6    La Co-Demandante Lourdes Rodríguez es mayor de edad, casada, empleada en el Centro de Recaudación de Ingresos Municipales (CRIM) y vecina de Guaynabo, Puerto Rico. Su dirección es Guácima O-1, Urb. Santa Clara, Guaynabo, Puerto Rico 00969 y su teléfono es el (787) 632-2697. El daño que la conducta negligente de los demandados le ha ocasionado a la Sra. Rodríguez consiste en que, en lugar de poder retirarse en dos años al cumplir 57 años y recibir el 40% de su salario, ahora no podrá retirarse hasta dentro de unos 10 años, cuando cumpla la edad de 65. Aun así solo recibirá un porciento mucho menor de su salario, lo cual no será suficiente para sufragar sus gastos. Esta situación también le ha generado y le continuará ocasionando intensas angustias y sufrimientos.

2.7    El Co-Demandante Luis M. Jordán Rivera, mayor de edad, casado, empleado en el Centro de Recaudación de Ingresos Municipales (CRIM) y vecino de San Juan, Puerto Rico. Su dirección es Condominio Miramar Tower, Apartamento 5-I, #721 Calle Hernández, San Juan, Puerto Rico 00907 y su teléfono es (787) 632-7543. El daño que la conducta negligente de los demandados le ha ocasionado al Sr. Jordán Rivera consiste en que, tras haber laborado durante 28 años en el CRIM, en el Municipio de San Juan, en el Departamento de Hacienda y el Instituto de Cultura, en lugar de poder retirarse dentro de un año recibiendo un 75% de

su salario, ahora solo va a recibir el 46% de su salario, lo cual no será suficiente para sufragar sus gastos. Esta situación también le ha generado y le continuará ocasionando intensas angustias y sufrimientos.

**Demandados:**

2.8     La Demandada UBS Financial Services Incorporated of Puerto Rico ("UBS") es una corporación organizada y existente al amparo de las leyes de Puerto Rico, la cual se dedica al negocio de banca de inversiones, asesoramiento financiero y corretaje de valores. Su dirección y su teléfono son: Penthouse – American International Plaza, 250 Avenida Muñoz Rivera, Hato Rey, San Juan, Puerto Rico 00918, Teléfono: (787) 284-3445.

2.9     La Demandada UBS Consulting Services of Puerto Rico ("UBS Consulting") es una corporación o persona jurídica cuyo lugar de formación o incorporación se desconocen en este momento. Es una afiliada o subsidiaria de UBS Financial Services Incorporated of Puerto Rico o una entidad relacionada a ésta y, durante el período de tiempo relevante a esta Cuarta Demanda Enmendada, prestaba servicios de asesoramiento financiero al Sistema. Su dirección y teléfono conocidos son: Penthouse – American International Plaza, 250 Avenida Muñoz Rivera, Hato Rey, San Juan, PR 00918, Teléfono (787) 284-3435.

2.10    La Demandada desconocida ABC Insurance Company, Inc. es la compañía de seguro, si alguna, que emitió la póliza, si alguna, que, durante el tiempo relevante a esta Cuarta Demanda Enmendada aseguró la responsabilidad por daños ocasionados por actos, omisiones, o conducta negligente y/o ilícita por parte de funcionarios de UBS cuando se negoció y/o culminó la emisión y venta de los Bonos o parte(s) de los mismos. Se desconocen en este momento su nombre correcto, su lugar de incorporación, su teléfono y su número de fax.

2.11    La Demandada desconocida XYZ Insurance Company, Inc. es la compañía de seguro, si alguna, que emitió la póliza, si alguna, que, durante el tiempo relevante a esta Cuarta Demanda Enmendada aseguró la responsabilidad por daños ocasionados por actos, omisiones, o conducta negligente y/o ilícita por parte de UBS Consulting. Se desconocen en este momento su nombre correcto, su lugar de incorporación, su teléfono y su número de fax.

## III. LEGITIMACIÓN ACTIVA DE LOS DEMANDANTES

3.1     El Sistema es un fideicomiso creado por la Ley de Retiro.  El Administrador administra el Sistema y es nombrado por la Junta de Síndicos.  Los miembros de la Junta de Síndicos son los fiduciarios del fideicomiso constituido por el Sistema.  Los empleados activos y empleados retirados del Gobierno son los fideicomisarios o beneficiarios del fideicomiso constituido por el Sistema.  Los aquí Demandantes son empleados activos o retirados del Gobierno y, por tanto, beneficiarios/fideicomisarios del fideicomiso constituido por el Sistema.

3.2     Por su parte, la Ley Núm. 3 del 4 de abril de 2013, en su Sección 40, también confiere legitimación activa a los aquí Demandantes, al disponer taxativamente:

> *"Se le reconoce una causa de acción por virtud de esta Ley, a los participantes y pensionados del Sistema de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico para demandar, <u>por sí mismos,</u> a los asesores de inversión no gubernamentales y suscriptores en cualquier transacción en la que el Sistema de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico haya emitido bonos (pensión obligation bonds), por cualquier daño causado <u>al Sistema o a sus beneficiarios.</u>"*

(Subrayado añadido).

## IV. HECHOS

### La Emisión de Bonos del 2008

4.1     Durante el año 2007, la firma de banqueros de inversiones y corredores de valores Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") propuso al entonces Administrador y a la Junta de Síndicos del Sistema una emisión de bonos a largo plazo por la suma principal de por lo menos  siete mil millones de dólares ($7 mil millones), para colocarlos fuera de Puerto Rico, a tasas de interés que permitieran al Sistema (i) utilizar aproximadamente setecientos millones de dólares ($700,000,000) para gastos y obligaciones corrientes del Sistema, inyectándole liquidez al mismo; y (ii) invertir los restantes seis mil trescientos millones de dólares ($6,300 millones) en valores o instrumentos que generaren ingresos por intereses o dividendos en exceso de los intereses pagaderos por el Sistema en los bonos.  Dicho exceso o diferencial positivo ("positive arbitrage") produciría una ganancia para el Sistema, la cual que le permitiría mitigar su crónica falta de liquidez.

4.2     El alto importe de principal agregado total de los propuestos bonos del Sistema era crucial, porque las ganancias proyectadas serían menores o hasta insignificantes

en volúmenes menores de principal y podrían ser insuficientes para cubrir los costos inherentes a la emisión, distribución y venta de los propuestos bonos.

4.3    Después de algunos meses, Merrill Lynch no logró culminar la referida transacción, pues no identificó en el mercado fuera de Puerto Rico una demanda razonable para colocar allí los propuestos bonos del Sistema, a tasas de interés suficientemente bajas como para producir el diferencial positivo en rendimiento ("positive arbitrage") que el Sistema necesitaba.

4.4    Durante el período en que el Sistema negociaba con Merrill Lynch la referida posible emisión de bonos de por los menos siete mil millones de dólares ($7 mil millones), la demandada UBS Consulting, directamente o a través de su(s) afiliada(s), en virtud de un contrato, actuaba como asesora de inversiones de la Administración y/o la Junta de Síndicos del Sistema y le representó falsamente a dicha Administración y a dicha Junta que podría invertir el producto de la venta de los Bonos a tasas de rendimiento mucho más altas que los intereses que pagaría el Sistema por los Bonos.

4.5    Al percatarse UBS de que Merrill Lynch no podría colocar fuera de Puerto Rico los siete mil millones de dólares ($7 mil millones) de los propuestos bonos, UBS le propuso al Sistema que éste contratase a la propia UBS como "underwriter", para emitir y vender los propuestos bonos. El 14 de febrero de 2007, UBS y UBS Consulting, en su intento de convencer al Sistema para que los contratara para asesorarlo y llevar a cabo la referida emisión, le hicieron una presentación en "Power Point" a la Junta de Síndicos del Sistema (véase **ANEJO 1**). En esa presentación UBS y UBS Consulting le representaron a los miembros de la Junta de Síndicos del Sistema que UBS su firma estaba entre los primeros diez (10) bancos de inversión a nivel global (**ANEJO 1**, página 3). UBS le ofreció al Sistema de Retiro proveerle una impresionante combinación de experiencia ("*expertise*") y fuerza global, al igual que una sociedad ("*partnership*"), que le garantizaba ejecución superlativa, soluciones noveles y el máximo conocimiento en términos de asesoría de inversiones. (**ANEJO 1**, páginas 5, 7 y 10). UBS se obligó, además, a reconocer y aceptar responsabilidad fiduciaria y que eso es lo que podía esperar de su "*Consultor*". (**ANEJO 1**, página 26). En cuanto a los problemas y retos particulares del Sistema de Pensiones de Puerto Rico, UBS recalcó que tenía amplia experiencia en reconciliar las condiciones del mercado y las expectativas de resultados. (**ANEJO 1**, páginas 29, 40, 47 y 48).

4.6     UBS representó, además, que podría lograr exitosamente la colocación de los propuestos bonos por su importante presencia en Puerto Rico y por el alto monto de la cartera de inversiones locales a su cargo, así como invertir el producto de dicha venta con un rendimiento que produciría ganancias para el Sistema.

4.7     Eventualmente, la Junta de Directores de Retiro contrató a UBS como la firma que estuvo a cargo de la emisión ("*underwriting*") de Bonos del Sistema de Retiro por la cantidad de aproximadamente tres mil millones de dólares. Éstos fueron emitidos el 29 de enero de 2008 (Series A); el 28 de mayo de 2008 (Series B); y el 26 de junio de 2008 (Series C) (en adelante, en conjunto, los "Bonos de Retiro").

4.8     Entre las representaciones que hicieron UBS y UBS Consulting a los miembros de la Junta de Síndicos del Sistema para convencer al Sistema de que esta emisión sería beneficiosa y ayudaría a solventar las arcas del Sistema, estaba que el producto de la emisión iba a generar un arbitraje positivo ("positive arbitrage"), el cual redundaría en ingresos netos para el Sistema y que, si parte de la emisión se hacía en el mercado local, resultaría más económica y producía un mayor rendimiento. Esas representaciones no sólo eran falsas, sino que se hicieron para que UBS y las demás firmas que participaron en la emisión se pudiesen lucrar y lograsen ganarse comisiones y honorarios, como los que en efecto se ganaron, los cuales sobrepasaron los $35 millones.

4.9     UBS, por conducto de su entonces principal oficial ejecutivo, Miguel A. Ferrer, le representó no sólo al Sistema, sino al país en general, a través de comunicaciones a la prensa, que la emisión y venta de los Bonos, según recomendada por UBS Consulting y UBS, iba a resultar en una ganancia ("positive arbitrage") para el Sistema desde el mismo momento en que dichas transacciones fueren efectivas.

4.10     La propuesta de UBS fue aceptada por el Sistema descansando en las representaciones de UBS y UBS Consulting. Tanto UBS y UBS Consulting sabían o debían saber que los siguientes puntos eran cruciales para que la referida operación financiera fuera exitosa y cumpliera con los objetivos del Sistema:

4.10.1 Que el monto de la emisión de los Bonos fuera suficientemente alto (al menos $7 mil millones) para (i) sufragar los costos de su originación, emisión, distribución y venta; y (ii) producir una ganancia para el Sistema mediante la inversión por el Sistema de la

mayor parte del producto neto de la venta de los Bonos a rendimientos más altos que el costo de los Bonos al Sistema.

4.10.2 Que los intereses de los Bonos fueran a tasas suficientemente bajas como para permitir al Sistema lograr una razonable ganancia recurrente al invertir el producto de su venta.

4.10.3 Que los valores en los que el Sistema invirtiera el producto de la venta de los Bonos fueran sumamente estables y con un mínimo riesgo de crédito y/o mercado, pues el Sistema no podía permitirse la posibilidad de perder todo o parte de su principal o de incurrir en una pérdida en intereses y/o dividendos ("negative arbitrage").

4.10.4 Que la proporción del producto de la venta de los Bonos que el Sistema usara para solventar sus necesidades inmediatas fuera la menor posible (no más de aproximadamente el diez por ciento (10%) del producto de la venta), pues la gran mayoría de dicho producto tendría que ser colocado por el Sistema en inversiones para lograr la ganancia ("positive arbitrage") recurrente que necesitaba el Sistema y que era la principal razón de ser de la propuesta emisión y venta de los Bonos.

4.11   Con conocimiento de todo lo anterior, el Sistema y UBS otorgaron contratos para la emisión y venta de los Bonos, pero no por la cantidad completa originalmente contemplada de lo menos de siete mil millones de dólares ($7 mil millones), sino por cantidades mucho menores e insuficientes para lograr los antes mencionados objetivos del Sistema y sin disposición alguna que requiriera (i) la venta de la totalidad necesaria para que funcionara el referido plan original concebido por Merrill Lynch y bien conocido por UBS y UBS Consulting,; o (ii), en su defecto, la cancelación de las emisiones y ventas parciales de Bonos si no se conseguía llegar al monto total necesario para que el plan funcionara.  Es decir, no hubo el "all or nothing provision" que era prudente y necesario para proteger al Sistema y sus pensionados de las posibles consecuencias negativas de que no se lograra la emisión por el monto total contemplado.

4.12   Tampoco investigó UBS si el mercado local tenía la profundidad suficiente para absorber siete mil millones de dólares ($7 mil millones) en bonos del Sistema, en fechas en que (i) ya la economía local llevaba meses contrayéndose, (ii) los inversionistas locales estaban sufriendo cuantiosas pérdidas en sus inversiones inmobiliarias y en valores, incluyendo, sin limitación, acciones de bancos y/o instrumentos de deuda garantizados por bancos u otras instituciones financieras; (iii) la población de Puerto Rico estaba envejeciendo y disminuyendo; y (iv) el desempleo en Puerto Rico estaba aumentando.

4.13   A tenor con dicha contratación de UBS con  el Sistema, durante el primer semestre del año 2008, UBS actuó como suscriptor u "underwriter" principal en las siguientes tres emisiones, distribuciones y ventas en el mercado local de bonos del Sistema (en adelante los "Bonos"), por la suma principal agregada total de aproximadamente tres mil millones de dólares ($3 mil millones), o sea, menos de la mitad de los siete mil millones de dólares ($7 mil millones) originalmente contemplados:

4.13.1   "Senior Pension Funding Bonds, Serie A", por mil quinientos cincuenta y ocho millones ochocientos diez mil setecientos noventa y nueve dólares con sesenta centavos ($1,558,810,795.60), del 29 de enero de 2008.

4.13.2   "Senior Pension Funding Bonds, Serie B", por mil cincuenta y ocho millones seiscientos treinta y cuatro mil seiscientos trece dólares con cinco centavos ($1,058,634,613.05), del 28 de mayo de 2008.

4.13.3   "Senior Pension Funding  Bonds, Serie C", por trescientos millones doscientos dos mil novecientos treinta dólares ($300,202,930), del 26 de junio de 2008.

4.14   El vencimiento de los Bonos fluctúa entre el 1 de julio de 2023 y el 1 de julio de 2058, y sus tasas de interés fluctúan entre el 5.85% y el 6.55% anual.  Dichos intereses son exentos de contribución sobre ingresos para residentes en Puerto Rico.

4.15   En cada uno de los "Official Statements" de los Bonos se expresa que, si las futuras condiciones del mercado fueren favorables, el Sistema contemplaría emitir bonos adicionales durante el año 2008.  Obviamente, como era lógico y prudente suponer, tales condiciones favorables del mercado no se produjeron y el Sistema no ha podido emitir bonos después de la emisión de los referidos Bonos Series C, el 26 de junio de 2008.  En el "Official Statement" de los Bonos Serie A se representó que los Bonos Serie B no se venderían en Puerto Rico bajo ninguna circunstancia. Sin embargo, tanto los Bonos Serie B como los Bonos Serie C se vendieron exclusivamente en Puerto Rico[1].

4.16   El uso de los fondos producto de la venta de los Bonos, según unas tablas que aparecen en los "Official Statement" de cada emisión, en la sección titulada "Use of Proceeds"), se representó como sigue:

| Uso | Importe |
|---|---|
| Descuento inicial | $   7,889,350 |
| Transferencia al Sistema para solventar beneficios de retiro | 2,728,354,898 |

---

[1] Véase Sección 6.5, *infra*, en torno a las falsas representaciones en los "Official Statements" acerca de este tema.

| | |
|---|---:|
| Descuento de "underwriters" y costos de emisión | 35,744,191 |
| Depósitos en cuentas de intereses capitalizados | 93,737,392 |
| Depósitos en cuentas de servicio de deuda de bonos "senior" | 81,922,512 |
| Total | $2,947,648,343 |

4.17    Según se puede apreciar, el propuesto uso del producto de la venta de los Bonos, según representado en dichas tablas, las cuales aparecen en la página 17 de cada uno de los "Official Statements" y se resumen en 4.16, *supra,* era distinto al que se había contemplado cuando se proponía hacer la emisión de bonos por siete mil millones de dólares ($7 mil millones) a través de Merrill Lynch, y no era cónsono con el modelo originalmente propuesto por Merrill Lynch y posteriormente por UBS, para crear un ingreso recurrente para el Sistema mediante diferenciales positivos entre ingresos por dividendos e intereses, por una parte y costo de intereses, por otra parte *("positive arbitrage").*  Cabe señalar que en dichos "Offering Statements" se presenta información contradictoria acerca del uso de los fondos producto de la venta de los Bonos, pues en sus páginas introductorias y en la página 17 de cada uno de ellos se dice que el Sistema invertiría el producto de la venta de los Bonos y usaría dichas inversiones y las ganancias que éstas produjeren para pagar beneficios de pensiones a sus beneficiarios, lo cual no es cónsono con lo que se resume en 4.16, *supra.*

4.18    De hecho, según se explica más adelante, el producto de la venta de los Bonos no se usó como se representó en los "Offering Statements" ni como se le había propuesto a la Junta de Síndicos del Sistema, y los Bonos han causado, causan y continuarán causando pérdidas significativas y graves daños financieros al Sistema. En realidad, dicho producto se usó aproximadamente como sigue y las cifras exactas de su uso surgirán del descubrimiento de prueba en el caso de autos:

4.18.1 De la suma de aproximadamente $1,600 millones procedente de la emisión y venta de los Bonos Series A, se invirtieron aproximadamente $937 millones de bonos y acciones a través de Citibank, N.A. y/o su(s) afiliada(s) (en adelante, en conjunto "Citi"). Dichos $937 millones invertidos a través de Citi están produciendo un rendimiento anual de aproximadamente un 4.11%, significativamente menor que el interés que pagan los Bonos, el cual fluctúa entre el 5.85% y el 6.55% anual.  El balance restante del producto de

la emisión de los Bonos Series A, ascendente a $642 millones aproximadamente, se utilizó para el pago de gastos y descuentos relacionados con la emisión y venta de los Bonos, reserva para servicio de deuda y pago de gastos del Sistema y pensiones y no genera, por tanto, ingreso alguno para el Sistema.

4.18.2   De la suma agregada total de aproximadamente $1.4 mil millones, producto de la emisión y venta de los Bonos Serie B y Serie C, se usaron aproximadamente $564 millones para cubrir necesidades de caja del Sistema y obligaciones por pensiones, lo cual no genera ingreso alguno para el Sistema.  Los $836 millones restantes se depositaron en el Banco Gubernamental de Fomento para Puerto Rico ("GDB"), ganando intereses sólo al 2% anual (a pesar de que la tasa de interés pagadera por los Bonos fluctúa entre el 5.85% y el 6.55% anual), pero al 30 de junio de 2010 sólo quedaban allí depositados $737 millones, pues se habían usado aproximadamente $99 millones para cubrir necesidades de fondos del Sistema.

4.19   Lo anterior quiere decir que, de los aproximadamente $3 mil millones de principal de los Bonos, por los que el Sistema paga y pagará intereses, hasta el vencimiento de los mismos, a  entre el 5.85% y el 6.55% anual, al 30 de junio de 2010 lo único invertido y no gastado ascendía a $1,674 millones, de los cuales los aproximadamente $937 millones invertidos a través de Citi rendían al Sistema aproximadamente un 4.11% anual, mientras que los $737 millones invertidos en depósitos en el GDB rendían al Sistema sólo el 2% anual.

4.20   Los aproximadamente $1,326 millones recibidos por el Sistema y gastados y no invertidos rinden absolutamente nada y le cuestan al Sistema entre el 5.85% y el 6.55% anual.  Sin contar el costo de esos aproximadamente $1,326 millones recibidos y gastados (no invertidos) por el Sistema, se calcula que los aproximadamente $1,674 millones recibidos e invertidos por el Sistema le han costado, le cuestan y le costarán al Sistema aproximadamente $55 millones anuales por diferenciales negativos en intereses ("negative arbitrage").  Esto no incluye los casi $36 millones de costos de descuento, emisión y venta de los Bonos incurridos y pagados por el Sistema cuando éstos se emitieron y vendieron, ni los honorarios de asesoramiento financiero pagados por el Sistema a UBS, ni los honorarios que le ha pagado y le continúa pagando el Sistema a UBS Consulting.

4.21   Dichas pérdidas comenzaron cuando se emitieron y vendieron los Bonos Serie A, el 29 de enero de 2008, y terminarán cuando venzan los Bonos, entre los años 2023 y 2058.  El

monto exacto de las pérdidas al Sistema causadas por la emisión y venta de los Bonos se computará con más exactitud según se consignen los documentos que se requerirán en el descubrimiento de prueba en este caso, pero se estima preliminarmente que el valor presente de estas pérdidas es de aproximadamente ochocientos millones de dólares ($800 millones). Increíblemente, cuando se emitieron los Bonos Serie B y Serie C, ya los Bonos Serie A habían generado millonarias pérdidas al Sistema, lo cual no se tomó en consideración al emitirse los Bonos Serie B y Serie C.

4.22    Como puede apreciarse, los Bonos en realidad han creado un diferencial negativo en rendimiento ("negative arbitrage") para el Sistema, que es exactamente lo opuesto a la ganancia neta ("positive arbitrage") que era el principal objetivo que el Sistema perseguía al emitir los Bonos. **Esto ha afectado muy negativamente la liquidez del Sistema, ha debilitado significativamente su condición financiera, ha causado la degradación crediticia de los bonos del Gobierno en general y ha causado graves daños a los aquí Demandantes (Ley Núm. 3 del 4 de abril de 2013, *supra*).**

4.23    Las aportaciones al Sistema por parte del Gobierno, como patrono, son la única fuente de pago y colateral de los Bonos y, siguiendo las recomendaciones de UBS , el Sistema las gravó o pignoró a favor de los bonistas, como garantía y fuente de pago de los Bonos. Mediante la emisión de los Bonos y dicho gravamen o pignoración, la deuda evidenciada por los Bonos acrecentó, de facto, la deuda total del Sistema y ha afectado negativamente la clasificación crediticia ("rating") de las obligaciones del Gobierno, causando un grave daño no sólo al Sistema sino también a Puerto Rico en general.   Dicho gravamen o pignoración de las aportaciones patronales del Sistema viola las disposiciones de los Artículos 2-116 y 3-105 de la Ley de Retiro, donde taxativamente se dispone el uso permitido de dichas aportaciones, ninguno de los cuales es el pago de bonos o deudas del Sistema[2]. El derecho al cobro de dichas aportaciones es claramente un activo del Sistema y, si el Sistema ahora no las recibe porque se usan para el servicio de deuda de los Bonos, se menoscaban así los activos del Sistema y su capacidad para pagar beneficios a sus pensionados y futuros pensionados, como lamentablemente ha ocurrido.

---

[2] El Artículo 2-166 Aportación patronal dispone, en su parte pertinente: "(a) Las aportaciones del patrono deberán cubrir la diferencia entre el costo total de proveer todos los beneficios que provee el Sistema más los gastos de administración, reducido por aquella parte de dicho costo total que aporten los participantes.
(b)..................................................................................................................................................................
(c).........................................................................................................................."El   Artículo   3-105   Programa   de Ahorro para el Retiro – Aportaciones del patrono dispone:
"Todo patrono aportará compulsoriamente al Sistema una suma equivalente al nueve punto doscientos setenta y cinco por ciento (.275%) de la retribución de cada participante del Programa mientras el participante sea un empleado.  Estas aportaciones se depositarán en el Sistema para aumentar el nivel de activos del Sistema, reducir su déficit actuarial y viabilizar la capacidad del Sistema para cumplir sin obligaciones futuras".  (Este Artículo fue recientemente enmendado por la Ley Núm. 116 del 6 de julio de 2011, pero dicha enmienda no dispone un uso distinto para las aportaciones patronales).

4.24   Además, la degradación del crédito del Gobierno aumentará significativamente los costos de intereses al Sistema, ya que las aportaciones del Gobierno son la principal fuente con la que el Sistema cuenta para el pago de sus obligaciones y el costo de intereses al Sistema depende del costo de intereses al Gobierno, pues, repetimos, el pago de las deudas del Sistema depende en gran parte de los pagos que recibe el Sistema del Gobierno.

4.25   A fines del año 2006 y durante el año 2007, cuando se conducían las negociaciones para la posible emisión de los Bonos, se había propuesto que éstos se emitieran como obligaciones directas del Gobierno, para que éste facilitara al Sistema los fondos producto de su venta y se mejorara así el patrimonio neto ("net worth") y la condición financiera, así como el llamado "funding ratio", del Sistema.   Se proponía aumentar los activos del Sistema por el importe neto del producto de la venta de los Bonos y también se proponía aumentar el patrimonio neto ("net worth") del Sistema, pues los Bonos no serían deudas o pasivos del Sistema, sino del Gobierno. Esto mejoraría considerablemente el "funded o funding ratio" del Sistema.  Sin embargo, lamentablemente eso no ocurrió.

4.26   Para que la emisión de los Bonos fuera hecha por el Gobierno se necesitaba, la aprobación de la Asamblea Legislativa.   Dicha aprobación fue solicitada a la Asamblea Legislativa y denegada por ésta.  A pesar de dicha denegatoria de la Asamblea Legislativa y de la política pública que tal denegatoria estableció, el Sistema (cuya existencia y poderes emanan de la Ley de Retiro, o sea, de legislación aprobada por la Asamblea Legislativa) violó dicha política pública y, descansando en las representaciones y el asesoramiento y recomendaciones de UBS y UBS Consulting, soslayó la denegatoria de la Asamblea Legislativa y temerariamente procedió con la emisión y venta de los Bonos como obligaciones directas y pasivos del Sistema (aunque comprometiendo de todas formas el crédito del Gobierno, mediante el mencionado gravamen o pignoración a los bonistas de las aportaciones patronales del Gobierno al Sistema, en violación de lo dispuesto en la Ley de Retiro).  Con estas violaciones se afectó negativamente el "funded o funding ratio" del Sistema, pues sus pasivos aumentaron más que sus activos, con la consiguiente reducción en su patrimonio neto ("net worth").

4.27   El Sistema está impedido de mitigar las futuras pérdidas recurrentes que le causarán los Bonos, porque las tasas de interés que paga por los mismos no le permiten ni le

permitirán en el futuro previsible realizar un arbitraje positivo o ganancia neta en la inversión de los fondos que aún conserva, si alguno, del producto de la venta de los Bonos. Al monto de los mencionados daños hay que añadir el costo adicional al Sistema de futuros financiamientos, causado por la degradación crediticia de las obligaciones del Gobierno, causada, a su vez, por la emisión y venta de los Bonos.

### Las Minutas de las Juntas de Directores

4.28 Según la página 6 de la Minuta de la Junta de Síndicos del Sistema correspondiente a la Reunión Extraordinaria del 27 de febrero de 2007, oficiales del Banco Gubernamental de Fomento para Puerto Rico ("BGF") le representaron a los miembros de la Junta de Síndicos del Sistema lo siguiente, refiriéndose a la susodicha emisión de Bonos de Retiro:

> "...esta solución **alargaría la vida de los recursos del Sistema hasta el 2027 y mejoraría notablemente el "funding ratio" del 19% que está actualmente hasta un 72%.** Si además se aprobara el aumento en aportaciones propuesto en el proyecto de ley al 12.5%, utilizando este esquema, se podría cubrir la obligación del Sistema hasta el 2042" (Énfasis suplido).

4.29 En esa misma reunión, el entonces Administrador del Sistema de Retiro le representó a la Junta de Síndicos del Sistema lo siguiente, según surge de la página 7 de la minuta de dicha reunión:

> "...ya los **consultores financieros** están trabajando en los distintos escenarios para la distribución de inversiones que se presentará ante la consideración de la Junta próximamente. Añadió el señor Cancel Alegría que las conversaciones sobre esta transacción van dirigidas a que se pueda ejecutar para junio de 2007, esto es, <u>antes del cierre del presente año fiscal</u>".

(Énfasis y subrayado nuestro).

4.30 En reunión conjunta de la Junta de Síndicos del Sistema y la Junta de Directores de BGF, del 24 de enero de 2008, en la cual se aprobó la emisión de los Bonos de Retiro por ambas Juntas, también se le representó a ambas Juntas que "*Las expectativas de la emisión es que los mercados sean favorables y haya un rendimiento positivo de la cartera, lo que aliviaría la deuda*".

4.31 En la misma reunión conjunta, el entonces Presidente de la Junta de Directores del Banco Gubernamental de Fomento, Sr. Rafael Martínez Margarida, preguntó sí la Administración del Sistema de Retiro contaba con los mecanismos para asegurar que, cuando entrara el dinero de la emisión, se podría poner a producir el rendimiento promedio que se espera. El Sr. Jorge Irizarry Herrans, (entonces Presidente de BGF), manifestó que,

junto a los consultores, se ha diseñado una estrategia para la distribucion de dichos fondos, que incluye la contratación de dieciocho (18) manejadores además de los ocho (8) que ya existen y que están listos para recibir el dinero.

4.32   También en dicha reunión conjunta se expresó lo siguiente, según surge de la página 9 de la minuta de la misma:

> "Señala el Sr. Luis Alfaro Martínez, Vicepresidente de Financiamiento del Banco Gubernamental de Fomento para Puerto Rico que no se está aumentando la deuda del fondo general **porque la obligación está en el Sistema de Retiro**, lo que se está haciendo es cambiar la fuente de repago de las obligaciones".

(Énfasis suplido).

4.33   Finalmente, en la página 13 de la Minuta de esa reunión, se expone lo siguiente:

> "...El Sr. Luis Alfaro Martínez expresó que la política pública del Banco Gubernamental de Fomento es maximizar los recursos y las condiciones del mercado local, es por esa razón que la emisión se hace primero en el mercado local para luego ir al mercado global. Añadió que el mercado local tiene unas ventajas frente al mercado global, como por ejemplo, que los bonos locales son redimibles antes de su vencimiento ("callable") en el término de diez (10) años, lo que permite que si al cabo de los diez (10) años las tasas han bajado, se pueden llamar esos bonos y refinanciarlos, esto no se puede hacer con los bonos globales porque estos son "non-callable". Manifiesta el señor Alfaro que originalmente se fue al mercado con un ofrecimiento de $750 millones, a medida que fueron pasando los días el interés aumentó y finalizaron con una demanda de $1.4 millardo ($1,456,247,368.95) y continúan entrando órdenes, por lo que se hizo un **compromiso con UBS** para brindar espacio y enmendar la transacción, para lo cual la Junta de Síndicos y la Junta de Directores del Banco tendrían que reunirse nuevamente para aprobar la nueva cantidad. Los miembros de la Junta de Directores recomendaron establecer la cláusula que permita el aumento de la cantidad hasta un 15% sin tener que acudir a las juntas para nueva aprobación. El Presidente de la Junta de Síndicos vio favorable la recomendación para el futuro...". (Énfasis suplido)

4.34   De acuerdo con lo expresado en la Minuta de la Junta de Síndicos del Sistema del 27 de febrero de 2007, a la página 6, se dijo lo siguiente:

> "...> El costo de la deuda se estima en 6%, lo cual permite un _arbitraje positivo_ en vista de que las inversiones del Sistema deben rendir un 8.5%...". (Subrayado nuestro).

4.35   En la Minuta de la Reunión Extraordinaria de la Junta de Síndicos del Sistema del 10 de enero de 2008, a la página 2, surge lo siguiente:

> "...Con mucho entusiasmo y satisfacción el Presidente informó a la Junta de Síndicos, que hoy se lanza al mercado la primera fase de la emisión de bonos de los Sistemas de Retiro, en la parte local que corresponde a Puerto Rico. Indicó que en la próxima hora, el equipo de financiamiento de la transacción se estaría reuniendo con los 'brokers', para hacerles la presentación de la estructura..".

4.36   En la Minuta correspondiente al 13 mayo 2008, a la página 20, se dice lo siguiente:

*"...C.  Comité de Inversiones de la Junta de Síndicos*

*El Sr. Jorge Irizarry Herrans, Presidente del Comité de Inversiones de la Junta de Síndicos informó a los Miembros de la Junta, que el Comité se ha estado reuniendo para trabajar con la estrategia de inversiones conocida como 'liability driven investment' a fin de asegurar el flujo de efectivo de las inversiones por los próximos seis (6) o siete (7) años. Explica el señor Irizarry Herrans que el Comité ha examinado un gran número de propuestas sobre esta estrategia y sigue elaborando estrategias, para luego presentar una recomendación ante la Junta de Síndicos...".*

4.37   Según la Minuta del 13 junio 2008, los señores Juan G. Herrans Barrera y John Thomas Engfer, ambos funcionarios de UBS, comparecieron como invitados a la Junta de Directores del Sistema de Retiro.

4.38   En esa reunión del 13 de junio de 2008, el Presidente de la Junta de Síndicos del Sistema de Retiro, dice lo siguiente a la página 3:

*"...El Presidente de la Junta de Síndicos, Sr. Jorge Irizarry Herrans presentó ante los Miembros de la Junta para su discusión y aprobación las recomendaciones del Comité de Inversiones de la Junta de Síndicos y el **Consultor Financiero de la Agencia: UBS, sobre la estrategia de inversión** denominada 'Liability Driven Investment'. Para la presentación de este asunto, los Miembros de la Junta contaron con los representantes de **UBS**: Juan G. Herrans Barrera y John Thomas Engfer, así como el Tesorero Interino del Banco Gubernamental de Fomento para Puerto Rico, el Sr. René Van Noort...".* (Énfasis y subrayado nuestro).

4.39   Más adelante, en esa misma Minuta del 13 junio de 2008, a la página 3, se dice lo siguiente:

*"...Indica el señor Irizarry Herrans que el Comité de Inversiones·de la Junta y el grupo de trabajo del Banco Gubernamental han trabajado arduamente durante los pasados meses con el <u>análisis y evaluación de estrategias de inversión que permitan al Sistema de Retiro cumplir sus obligaciones con los pensionados</u>. Señala el Presidente de la Junta que ambos grupos en unión al <u>Consultor Financiero han venido estudiando cuidadosamente la estrategia</u> conocida como 'LDI' o 'liability driven investment...".* (Subrayado nuestro).

4.40   Más adelante, en esa misma Minuta del 13 de junio de 2008, a las páginas 3 y 4, se dice lo siguiente:

*"...Explica el señor <u>Irizarry Herrans</u> que la estrategia de inversión 'LDI' es una relativamente nueva y por ende muchas de las alternativas presentadas por los manejadores <u>son nuevas en el mundo</u> de las inversiones, por lo que <u>requirió mucho estudio y análisis de las personas que estuvieron trabajando en este ejercicio</u>. Añade que el enfoque del grupo iba dirigido a seleccionar una combinación de inversión que <u>ofreciera mucho rendimiento con el menor riesgo posible...".*

(Subrayado nuestro).

4.41   En esa misma Minuta del 13 de junio de 2008, a la página 4, se dice lo siguiente:

*"...El Sr. Juan G. Herrans Barrera [de UBS] inició su presentación explicando a los Miembros de la Junta los aspectos·a ser presentados ante su consideración que son: las recomendaciones de distribución de activos sobre las cuales la Junta deberá*

deliberar; _la explicación de la estrategia del 'LDI'; y la recomendación de selección de manejadores para implementar la estrategia de inversión y las cantidades que se les han de asignar..._". (Subrayado nuestro).

4.42    Además, en la página 5, se dice lo siguiente:

"_...Los invitados [de UBS] comenzaron por presentar a la Junta la distribución actual de los activos del Sistema asumiendo que se levantan $400 millones adicionales a los $1,000 millones que se levantaron el 2 de junio de 2008 como resultado de la emisión de bonos del Sistema de Retiro, para un gran total de activos de $5,015,200,557; de los cuales 27.28% sería efectivo. La asignación del Consultor es recomendar la forma en que se ha de distribuir ese efectivo..._".

4.43    También en la Minuta del 13 de junio de 2008, a la página 5, se dice lo siguiente, sin hacer mención al aumento en pasivos del Sistema de Retiro, resultante de la emisión de los Bonos:

"_...El Sr. Jorge Irizarry Herrans intervino en este punto para indicar que los $1,000 millones aprobados en la Junta de Síndicos para emitir el 2 de junio de 2008 eran bonos institucionales y que queda una demanda de cuentas individuales que son las que se van a ofrecer para la venta próximamente. Informó que los $1,000 millones ya se recibieron y se estiman $400 millones adicionales. Resaltó como un logro importante para el Sistema que se haya alcanzado un total de $5 millardos en activos, cuando hace sólo un año el Sistema contaba con $2.5 millardos, lo que significa que se han duplicado los activos gracias a la estrategia que se ha estado ejecutando. Añadió que el 'funding ratio' del Sistema que para el 2005 se encontraba en un 19%, a junio de 2008 se encuentra en un 40% con un plan trazado para alcanzar un 70 u 80% si se logra culminar la estrategia..._".

4.44    Más adelante, en esa misma Minuta del 13 de junio de 2008, a las páginas 5 y 6, se dice lo siguiente:

"_...El Sr. Juan G. Herrans Barrera continuó la presentación mostrando la distribución de activos propuesta a tenor con la estrategia recomendada, sobre la cual la Junta de Síndicos deberá tomar una determinación. La misma propone asignar $1.7 millardos a la estrategia del 'LDI', lo que equivale a un 34.10% del total de activos considerando los $5 millardos antes mencionados, esto es igual a una tercera parte de la cartera del Sistema en 'LDI'. La propuesta contempla asignar los $1.4 millardos del efectivo (27.28%) a la estrategia de 'LDI' y añadir a la misma, mediante redistribución, $3 millones asignados actualmente en acciones..._". (Subrayado nuestro).

4.45    Según esa Minuta del 13 de junio de 2008, aparece una presentación en "_power point_" con el logo de UBS.

### PRERS Proposed Asset Allocation

| Asset Type | | | % Allocation |
|---|---|---|---|
| LDI Strategies | $ | 1,710,000,000 | 34.10% |
| | | | 35.80% |
| Hedge Fund of Funds | $ | 904,747,000 | 18.03% |
| Fixed Income | | 552,519,494 | 11.02% |
| Private Equity | $ | 53,365,000 | 1.06% |
| Total Portfolio | $ | 5,015,200,557 | 100.00% |

🐟UBS

4.46   En esa misma reunión y, según la Minuta del 13 de junio de 2008, a las páginas 6 y 7, se dice lo siguiente:

> ...Para que la Junta de Síndicos pueda considerar esta _recomendación, el Consultor presentó las dos (2) caras de las inversiones: riesgo versus rendimiento. El diagrama presentado por el Consultor identifica la estrategia actual del Sistema ("current"), sin considerar el efectivo._ Esta estrategia mantiene una distribución del 40% de su cartera en bonos o préstamos que se comportan como bonos y 60% de la misma en acciones. Explica el señor Herrans Barrera que esta distribución está a la par con el promedio de todos los planes de pensión de los Estados Unidos. A preguntas del CPA Roberto E. Aquino García, _el señor Herrans Barrera [de UBS] señaló que esta estrategia se ajusta a las políticas de inversión aprobadas_ por la Junta de Síndicos. Como resultado de la misma, _el Sistema obtiene un rendimiento aproximado de 9.52% versus una desviación de riesgo equivalente a 5.5%_...". (Subrayado nuestro).

4.47   En esa Minuta del 13 de junio de 2008, a las páginas 7 y 8, se dice lo siguiente y se adjunta la tabla que aparece a continuación:

> "...Por esta razón, el _Consultor propone una estrategia_ intermedia que ofrezca un rendimiento de 10.44% y una desviación de riesgo de 3.74%. Señala el señor Herrans Barrera [de UBS] que tiene conocimiento que hay muchos planes y fundaciones de pensiones que utilizan esta estrategia con mucho éxito. Sin embargo, tomando en consideración el criterio de la prudencia su _recomendación_ va dirigida a una estrategia intermedia que permita durante el proceso en que se utiliza la misma, evaluar sus resultados con cautela, considerando un movimiento hacia dicha estrategia basado en los resultados que se van obteniendo...". (Subrayado nuestro).

## PRERS Portfolio Risk Reward Analysis



4.48   En esa Minuta del 13 de junio de 2008, a las páginas 8 y 9, se dice lo siguiente:

> "...El señor Herrans Barrera [de UBS] continuó su exposición presentando promedios de _probabilidad de ganancias y rendimientos de la cartera del Sistema de Retiro_ tomando en consideración las alternativas de distribución de la cartera según las _estrategias presentadas_ para los $1.7 millardos de activos a uno, tres, cinco y diez años. Del análisis de las mismas se desprende que la

*diversificación de la cartera reduce el riesgo y mejora el rendimiento, <u>razón por la cual se recomienda la estrategia del 'LDI' y la combinación de estrategias que la sostienen por un ciclo económico completo de siete (7) años</u>...".* (Subrayado nuestro).

4.49   En esa misma Minuta del 13 de junio de 2008, a la página 12, se dice lo siguiente:

> *"...Por lo tanto, <u>el Consultor</u> señala que esta <u>estrategia</u> no se puede trabajar como una <u>estrategia</u> convencional, ni se puede usar data histórica sobre ello porque es 'sui generis'. <u>Es necesario entonces estructurar la estrategia</u>...".*(Subrayado nuestro).

4.50   En esa misma Minuta del 13 de junio de 2008, a la página 12, se dice lo siguiente y se incluye la siguiente tabla:

> *"...A tales fines, el <u>Consultor Financiero presentó una propuesta</u> para el rebalanceo y redistribución de los nuevos activos del Sistema, que no incluye la Firma Wellington porque sus alternativas no eran muy diferentes de las estrategias con las cuentas del Sistema, no agrega diversidad, no presentó cohesión, etc. La propuesta de distribución de activos presentada por UBS es la siguiente:* (Subrayado nuestro).

## Proposed Rebalancing and Distribution of New Assets

| Money Manager | Style | Balance as of March 31, 2008 | Rebalancing | New Money | Balance after Distribution |
|---|---|---|---|---|---|
| Taplin | Core Fixed Income | $ 185,803,114 | $ (35,000,000) | $ - | $ 150,803,114 |
| State Street | Indexed US Equity | $ 679,873,114 | $ (275,000,000) | $ - | $ 404,873,114 |
| Morgan Stanley Int'l | International Equity | $ 619,663,458 | $ (200,000,000) | $ - | $ 319,663,458 |
| Wellington | US LCC | $ 210,063,797 | $ (100,000,000) | $ - | $ 110,063,797 |
| Neuberger Int'l | International Equity | $ - | $ 75,000,000 | $ - | $ 75,000,000 |
| Evergreen Int'l | International Equity | $ - | $ 75,000,000 | $ - | $ 75,000,000 |
| Goldman Sachs Int'l | International Equity | $ - | $ 50,000,000 | $ - | $ 50,000,000 |
| Emerging Managers | | $ - | $ 100,000,000 | $ - | $ 100,000,000 |
| Evergreen | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Eaton Vance | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| PIMCO | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Invesco | GTAA | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Putnam | GTAA | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Morgan Stanley | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Credit Suisse | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Calyon | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| | Totals | $ 1,595,303,483 | $ - Rebalancing Total $ 810,000,000 | $ 1,400,000,000 | $ 2,995,303,483 |

**UBS**

4.51   En esa misma Minuta del 13 de junio de 2008, a la página 13, se dice lo siguiente:

> *"...Los Miembros de la Junta discutieron las propuestas presentadas, en la misma se discutieron las expectativas que podría tener el Sistema de Retiro al aprobar las <u>estrategias propuestas</u>. El Presidente de la Junta se mostró muy esperanzado, entendiendo que tales estrategias pueden alargar la vida útil del Sistema de Retiro, haciendo referencia a las siguientes proyecciones incluidas en la presentación de los consultores...".* (Subrayado nuestro).





**PRERS Portfolio Asset Value**

🔹 **UBS**

4.52   En esa misma Minuta del 13 de junio de 2008, a la página 15, se dice lo siguiente:

> "...*Discutidos estos aspectos, el CPA Roberto E. Aquino García presentó moción para que se aprueben las <u>propuestas y recomendaciones del **Consultor Financiero: UBS**, en cuanto a la estrategia de inversión</u> considerando el 'LDI', el rebalanceo y la distribución de los activos del Sistema de Retiro, así como la selección de los manejadores propuestos en la presentación.  El Lcdo. Juan José Zamora Santos secundó la moción.  No habiendo objeciones, se aprueba la misma.  A tales fines, el Presidente de la Junta de Síndicos, Sr. Jorge Irizarry Herrans impartió instrucciones a la Administradora de los Sistemas de Retiro, Lcda. Minia González Álvarez para que realice trámites correspondientes para ejecutar esta determinación de la Junta de Síndicos...*".  (Énfasis y subrayado nuestro)

### El Informe Conway MacKenzie

4.53   El 30 de junio de 2010, la firma independiente Conway Mackenzie (en adelante "*CM*") fue contratada por el BGF para estudiar las causas y origen de la crisis por la cual atravesaba el Sistema de Retiro. Específicamente, CM se enfocó en varias áreas, incluyendo el análisis llevado a cabo para apoyar la decisión de emitir tres mil millones de dólares en Bonos de obligación de pensión durante el año 2008.  CM es una firma prestigiosa de Consultores Financieros, especializados en evaluaciones y análisis forense, con una extensa carrera de investigaciones. Son examinadores de fraude certificado "*Certified Fraud Examiners*" y especialistas en finanzas forenses certificados "*Certified Financial Forensic Specialists*". El estudio concluyó que la emisión de Bonos de Retiro de 2008, fue detrimental y contribuyó a la crisis actual del Sistema de Retiro, así como que se trató de una estrategia riesgosa, mal concebida y especulativa.

4.54   Del Informe rendido por CM, se desprende que encontraron que la Junta de Síndicos del Sistema fue inducida a ejecutar esta riesgosa transacción, que fue mal calculada. Originalmente, el Sistema de Retiro, con el aval del Banco Gubernamental de Fomento,

consideró emitir $7.0 mil millones en Bonos de obligación, que serían pagados por las contribuciones recibidas de los miembros y patronos.   Debido a la magnitud de la transacción, ésta no se pudo concretar de acuerdo a los parámetros originales, y sólo se pudieron emitir aproximadamente $2.9 mil millones; todos en el mercado local, a través de UBS.   Esa menor cantidad no fue suficiente para llevar a cabo la estrategia trazada originalmente y el producto de los Bonos no fue reinvertido con un rendimiento suficiente para sufragar los intereses de los Bonos y, además, producir un margen positivo para el Sistema de Retiro, por lo que nunca se generaron los resultados esperados para ayudar a mejorar la condición financiera del Sistema de Retiro.   Era evidente que las condiciones del mercado revelaban que esta transacción era muy riesgosa y no existía apetito de inversionistas para participar en la misma.   De hecho, en la reunión extraordinaria de la Junta de Síndicos del Sistema de 27 de mayo de 2008, se levantó el siguiente punto:   *"Señaló el señor Alfaro Martínez que desde enero [2008] cuando se emitió la primera serie de bonos hasta el presente, el mercado se ha deteriorado alrededor de 35 puntos base, lo que representa una diferencia sustancial en las tasas de interés de los bonos, por lo que resulta más oneroso obtener financiamiento hoy que en enero de 2008...Señaló el señor Alfonso Martínez que estos bonos solamente se vendieron a los fondos de UBS, Santander y una pequeña orden de $5 millones a los fondos de Triple S".*   La estrategia de crear una oportunidad de arbitraje (*"arbitrage"*) para el Sistema de Retiro, a través de la emisión de Bonos, fue mal concebida desde un principio. En realidad la emisión de Bonos de obligaciones de pensión es y será una carga adicional para el Sistema de Retiro, que no brindó una solución para el problema y empeoró (en vez de mejorar) el *"funded ratio"* del mismo.

    4.55   Conway MacKenzie sometió al Sistema y al GDB su Informe en octubre de 2010, con el título, en inglés, "Review of the Events and Decisions That Have Lead to the Current Financial Crisis of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico".   Véase *ANEJO III* de la *Demanda* original.   En la página 12 del Informe Conway MacKenzie se indica, en inglés:

> As discussed in greater detail below, the POB[3] transaction **was subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee prior to undertaking the bond issuance strategy.**   In addition, several early warning signs which existed prior to the

---

[3] "POB" se refiere a "Pension Obligation Bonds", es decir, los Bonos objeto de este caso.

*issuance of the POBs appear to have been ignored by the ERS's Board of Trustees*[4]
***Therefore it is our opinion that given the risks inherent in the transactions,
several of which appear to have increased significantly in probability prior
to the issuance of these bonds, the decisions to pursue and enter into Series
A, Series B and Series C transactions were not prudent and may not comply
with the general standards of fiduciary responsibilities of a Board of
Trustees.*** *Furthermore, our analyses indicate that a significant portion of the
POB proceeds were not invested as originally anticipated and as a result, the
System has not achieved its targeted arbitrage strategy. (Footnotes and
emphasis added).*

4.56    Las conclusiones del Informe Conway MacKenzie acerca de la emisión y venta
de los Bonos en el mercado local a través de UBS, entre otros, son devastadoras, evidencian
la crasa negligencia de las aquí demandadas y se transcriben a continuación en inglés, tal y
como aparecen en el mismo:

*In analyzing management's decision to enter into the POB transaction, we found
no basis for the initial assumption made that such a strategy would improve the
funded status of the ERS. The treatment of bond obligations in the calculation of
the UAAL by the System's actuarial consultants appears to support the practical
reality that the incurrence of additional debt to increase plan assets should have
little effect on the funded status of a pension plan in the short term. If the bond
obligations could be excluded from the calculation of net assets or otherwise in
the UAAL, we would have expected the ERS to oppose the calculation by Milliman
in the System's June 30, 2009 actuarial valuation report. We did not come across
any information to suggest there was a disagreement. This could imply a lack of
understanding of the true impacts of the bond transaction on the ERS by ERS
management, the Board of Trustees and GDB Board of Directors when they made
the decision to enter into the POB transaction.*

***Perhaps even more concerning in our analysis of the decision to enter into
the POB transaction is the decision to move forward with the transaction
in light of the many warning signs that existed, which suggested full
implementation of the strategy would be difficult, if not impossible.***

*The successful execution of the POB transaction was dependent on certain risks
not materializing, primarily the risk that the market would be unable to absorb
the full $7.0 billion issuance.* ***Consummating a transaction of significantly
less than $7.0 billion would merely serve as an expensive, temporary
measure to address the System's liquidity issues, postponing for some
period of time the date of the ERS's eventual insolvency. For this reason,
the POB transaction resulted in the flawed execution of a failed strategy.***

***The POB transaction has negatively impacted the ERS and the Government,
in general.*** *Rather than addressing the System's long-term funding problems,
the $3.0 billion POB transaction merely provided a short-term temporary
measure to address the System's liquidity needs, as it was not large enough to
create arbitrage opportunities. It did nothing to improve the funded position of
the System and due to the negative arbitrage realized and fees paid as part of
the POB transaction, actually worsened the funded position of the System. The
short-term liquidity fix is costly and these costs may be realized for decades to
come. In our opinion, the POB transaction accomplished little more than passing
on, and increasing the complexity of, the burden of fixing the System's
fundamental structural problems to future administrations of the ERS. (Énfasis
añadido).*

---

[4] "ERS" Board of Trustees significa Junta de Síndicos del Sistema.

4.57    La emisión, venta y uso del producto de la venta de los Bonos, en violación a la Ley de Retiro y a la política pública promulgada por la Asamblea Legislativa, constituyó conducta crasamente negligente e ilícita por parte de UBS Consulting y UBS.

4.58    Según la documentación y los informes revisados por CM, se concluyó que la Administración del Sistema de Retiro nunca fue puesta en conocimiento total y cabal de las posibles repercusiones que tendría esta emisión de Bonos, a todas luces riesgosa y totalmente especulativa. A la página 4 de su informe, CM señala lo siguiente:

> "...Lastly, we believe that the POB transactions may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would immediately improve the funded status of the ERS. In fact, the strategy has not improved the funded position of the System and, due to the negative arbitrage realized and fees paid as part of the POB transaction, actually, worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. In addition, several warning signs, which suggested that the full implementation of the POB strategy would be difficult, if not impossible, were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the ERS Board of Trustees, and the GDB Board of Directors in 2008). For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction...".

(Subrayado nuestro).

4.59    A la página 10 del Informe CM, se señala lo siguiente:

> "...The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial liability and generate additional revenue to the System through speculative arbitrage...".

4.60    A la página 11 del Informe CM, se señala lo siguiente:

> "...As discussed in greater detail below, the POB transaction was speculative and subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee's prior to undertaking the bond issuance strategy in 2008. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. Therefore it is our opinion that given the risks inherent in the transactions, several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated..." (Subrayado nuestro).

4.61    A la página 11 del Informe CM, se añade lo siguiente:

> "...Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0

*billion POB transaction would be sufficient to resolve the System's short term liquidity crisis and meet the System's long-term cash flow requirements but the ERS and GDB should have known the $3.0 billion of proceeds issued would not solve the long-term cash flow requirements...".*

4.62    A la página 12 del Informe CM, se señala lo siguiente:

*"...Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this <u>fundamental flaw</u> in the forecasted funding ratio's computation methodology...".* (Subrayado nuestro).

4.63    A la página 12 del Informe CM, se añade lo siguiente:

*"...It appears that <u>numerous warning signs existed, foretelling difficulties with placing the bonds and realizing the returns required, yet action</u> plans were not altered..."* (Subrayado nuestro).

4.64    A la página 12 del Informe CM, esta firma llega a la siguiente conclusión:

*"...<u>Conclusion</u>*

*Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System's funding status when calculated consistently with prior methodologies. In addition, <u>the transaction was subject to significant risks</u> among others, the risk of a failed or undersubscribed offering <u>and the System's potential inability to generate arbitrage on the POB proceeds.</u> Based upon our review of supporting documents, it appears that <u>these risks were not fully understood or vetted by the decision-makers</u> prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care...".* (Subrayado nuestro).

4.65    Basado en los hechos anteriores, UBS estaba obligada a identificar, para beneficio de los miembros de la Junta de Síndicos del Sistema, los riesgos significativos que conllevaba la emisión de Bonos. Es decir, UBS, como Asesor Financiero, tenía la obligación de asegurarse que los miembros de la Junta de Síndicos del Sistema entendían y validaron plenamente la estrategia antes de aprobar la emisión. Sobre si fue prudente llevar a cabo esta emisión, el Informe CM, a la página 12, concluye lo siguiente:

*"...2. Was it prudent to issue the Pension Obligation Bonds?*

*The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB issuance during 2007 but Merrill Lynch was unable to consummate the transaction due to a lackluster demand in the global market. UBS then replaced Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds in the local Puerto Rico market. Given the System's significant current and projected annual net cash flow shortfalls, the transaction was not large enough to create arbitrage opportunities since a significant portion of the proceeds have been (and will continue to be) utilized to address annual cash flow shortfalls, as opposed to being invested for the long term. This means that the transaction has also resulted in costly annual interest expense for the ERS...".*

4.66    El Informe CM concluye lo siguiente acerca de las condiciones del mercado:

"...c.    In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing."[12]...

---

[12] Based on the ERS Board of Trustees meeting minutes dated May 27, 2008."

"...d.    By June 2008 there were also signs that the <u>stock market was deteriorating, which should have signaled to the ERS that its arbitrage goals were jeopardized</u>...". (Subrayado nuestro).

4.67    UBS, como Asesor Financiero, debió haberse percatado de ese deterioro del mercado y alertar a los miembros de la Junta de Síndicos del Sistema y recomendarles de conformidad.

### Violación a Deber de Fiducia de UBS Y UBS Consulting

4.68    El Reglamento de la Ley Uniforme de Valores de Puerto Rico, Ley Núm. 60-1963, 10 L.P.R.A. §851, *et seq.*, en su sección pertinente, lee como sigue:

"...*Sección 25.1.   Estándar de negocios y **deberes fiduciarios** hacia los clientes.*

*Todo corredor-traficante, emisor, **asesor de inversiones**, representante de asesor de inversiones, asesor bajo cubierta federal, representante del asesor bajo cubierta federal, agente o cualquier otra persona sujeta a las disposiciones de la Ley, observará los <u>más altos estándares de deberes fiduciarios hacia sus clientes e inversionistas</u>...*". (Énfasis y subrayado nuestro).

4.69    UBS, en su capacidad de Consultor Financiero y asesor de inversiones, tenía la obligación y el deber fiduciario de alertar a los miembros de la Junta de Síndicos del Sistema sobre los riesgos inherentes a la emisión.  No hay duda que la emisión de Bonos recomendada por UBS fue imprudente.  UBS debió haber alertado a los miembros de la Junta de Síndicos del Sistema.  Las siguientes conclusiones del Informe CM, a las páginas 14 y 16, así lo reflejan.

"...<u>Conclusion</u>

<u>The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed</u> based on the current liquidity needs of the System. In fact, <u>the POB transaction has and will continue to cost the System money</u>, as short-term cash flow problems continue to require the use of the POB proceeds to fund current expenses of the System.   Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds.  Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System.  This lack of understanding is not reasonable any may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees...". (Subrayado nuestro).

*"...Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the <u>many warning signs that existed suggesting</u> full implementation of the strategy would be difficult if not impossible. The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency..."*. (Subrayado nuestro).

## V. JURISDICCIÓN Y COMPETENCIA:

5.1    Este Honorable Tribunal tiene la jurisdicción y competencia necesarias para juzgar el presente caso, porque los hechos aquí descritos ocurrieron en San Juan, Puerto Rico, además de por ser San Juan, Puerto Rico el municipio donde tiene su lugar de hacer negocios las Demandadas UBS y UBS Consulting.

## VI. PRIMERA CAUSA DE ACCIÓN/VIOLACIÓN DE DEBERES CONTRACTUALES POR UBS Y UBS CONSULTING

6.1    Los Demandantes repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Cuarta Demanda Enmendada.

6.2    Antes de llevarse a cabo la emisión de los Bonos, UBS y UBS Consulting le hicieron varias presentaciones y representaciones al Sistema de que ellos eran expertos en asesoría financiera y tenían la capacidad para colocar los Bonos, a los fines de convencer al Sistema para que los contratara para llevar a cabo la referida emisión.

6.3    Entre las representaciones que hicieron UBS y UBS Consulting, para convencer al Sistema de que la emisión de los Bonos sería beneficiosa y ayudaría a solventar las arcas del Sistema, estaba que la inversión del producto de la emisión iba a generar un arbitraje positivo, el cual redundaría en ingresos netos para el Sistema. Esas representaciones no sólo eran falsas, sino que se hicieron para que UBS y UBS Consulting se pudiesen lucrar y cobrar sus comisiones y honorarios, como los que en efecto cobraron, los cuales sobrepasaron los $35 millones.

6.4    UBS, por conducto de su entonces Presidente, Miguel Ferrer, le representó falsamente no sólo al Sistema, sino al país en general, a través de comunicaciones a la prensa, que la emisión de los Bonos, recomendada por UBS Consulting y UBS, iba a resultar en ganancias mediante un arbitraje positivo para el Sistema desde el mismo momento de su efectividad.

6.5     En el *"Official Statement"* fechado 29 de enero de 2008, para los Bonos Serie A, UBS y los demás "underwriters" hicieron las siguientes falsas representaciones, entre otras, acerca del uso del producto de la venta de los Bonos Serie A:

a.      El producto de la venta de los Bonos sería invertido y dichas inversiones y las ganancias que éstas produjeren serían utilizadas para pagar beneficios de pensiones a los beneficiarios del Sistema (*"invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries"*) (Primera página o cubierta del *"Official Statement"* del 29 de enero de 2008).

b.      El producto de la venta de los Bonos, después de deducir gastos de emisión, comisiones y reservas, se añadirá a los activos invertidos del Sistema (*"will be added to the System's pool of invested assets"*) (Página 17 del *"Official Statement"* del 29 de enero de 2008).

6.6     En el *"Official Statement"* fechado 29 de enero de 2008, para los Bonos Serie A, UBS y los demás "underwriters" hicieron las siguientes falsas representaciones, entre otras, acerca de la proyectada futura emisión de Bonos Serie B, los cuales importaron $1,058,634,613.05 y, al igual que los Bonos Series A y los Bonos Serie C, _se vendieron exclusivamente en Puerto Rico_:

> *"The System currently contemplates offering additional parity Bonds (the "Series B Bonds") in other jurisdictions. The Series B Bonds would be Offered by means of one or more separate Official Statements and may not under any circumstances, be purchased by residents of Puerto Rico."* (Énfasis añadido).

6.7     Sin embargo, en el *"Official Statement"* del 28 de mayo de 2008, para los Bonos Serie B, UBS hizo las siguientes falsas representaciones, entre otras, acerca del uso del producto de la venta de los Bonos Serie B, los cuales, al igual que los Bonos Serie C, se ofrecieron y vendieron únicamente a inversionistas en Puerto Rico, en contravención a lo citado en la Sección 6.6, _supra_:

a.      El producto de la venta de los Bonos sería invertido y dichas inversiones y las ganancias que éstas produjeren serían utilizadas para pagar beneficios de pensiones a los beneficiarios del Sistema (*"invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries"*) (Primera página o cubierta del *"Official Statement"* del 28 de mayo de 2008).

b.  El producto de la venta de los Bonos, después de deducir gastos de emisión, comisiones y reservas, se añadirá a los activos invertidos del Sistema ("*will be added to the System's pool of invested assets*") (Página 17 del "*Official Statement*" del 28 de mayo de 2008).

6.8    En el "*Official Statement*" del 26 de junio de 2008, para los Bonos Serie C, UBS hizo las siguientes falsas representaciones, entre otras, acerca del uso del producto de la venta de los Bonos Serie C, <u>los cuales se ofrecieron y vendieron únicamente a inversionistas en Puerto Rico, en contravención a lo citado en la Sección 6.6, *supra*:</u>

a.  El producto de la venta de los Bonos sería invertido y dichas inversiones y las ganancias que éstas produjeren serían utilizadas para pagar beneficios de pensiones a los beneficiarios del Sistema ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*") (Primera página o cubierta del "*Official Statement*" del 26 de junio de 2008).

b.  El producto de la venta de los Bonos, después de deducir gastos de emisión, comisiones y reservas, se añadirá a los activos invertidos del Sistema ("*will be added to the System's pool of invested assets*") (Página 17 del "*Official Statement*" del 26 de junio de 2008).

6.9    Cuando se hicieron las emisiones de los Bonos, la Co-Demandada UBS Consulting actuaba como asesora financiera del Sistema y, tanto ésta como su afiliada UBS, sabían o debían saber que al Sistema se le haría imposible invertir prudentemente el producto de la venta de los Bonos a un rendimiento suficiente para cubrir el costo de sus intereses al Sistema y generar ganancias ("*positive arbitrage*"). A pesar de ello, y a sabiendas de las pérdidas que ocasionarían al Sistema la emisión y venta de los Bonos, UBS procedió con la transacción, con el propósito de lucrarse y con absoluto menosprecio a los mejores intereses del Sistema.

6.10    Mientras el Sistema negociaba con Merrill Lynch la posible emisión y venta fuera de Puerto Rico de bonos del Sistema por la suma principal de por lo menos siete mil millones de dólares ($7 mil millones) y posteriormente, cuando se hizo la emisión y venta de los Bonos en el mercado local a través de UBS, por un importe de aproximadamente tres mil millones de dólares ($3 mil millones), UBS, directamente y/o a través de su(s) afiliada(s),

incluyendo, sin limitación, a UBS Consulting, tenía un contrato de asesoramiento financiero con el Sistema. Además, UBS y UBS Consulting estaban entonces al tanto de la precaria condición financiera del Sistema y conocían la necesidad que tenía el Sistema de mejorar su liquidez y de crear fuentes de ingresos y generar ganancias para mitigar su crónica insuficiencia de fondos.

6.11    Es obligación ineludible de asesores financieros como UBS Consulting y UBS defender los mejores intereses de sus clientes (en este caso el Sistema) y proveer al mismo asesoramiento correctó en beneficio del cliente y por encima del propio. Al no sólo respaldar, sino participar como principal "underwriter" en la ilícita y crasamente negligente emisión de los Bonos, UBS violó sus obligaciones contractuales, extracontractuales y fiduciarias para con el Sistema, pues les aconsejaron y participaron, para lucrarse, en una transacción ilícita, imprudente y a todas luces perdidosa y ajena a los objetivos y mejores intereses del Sistema.

6.12    UBS y UBS Consulting sabían o debían saber que la emisión y la venta de los Bonos violaba la política pública establecida por la Asamblea Legislativa de Puerto Rico al denegar su aprobación a las mismas cuando éstas se propusieron a través del Gobierno y que violaban la Ley de Retiro. También sabían o debían saber entonces dichos codemandados que la pignoración o gravamen de las aportaciones patronales del Gobierno al Sistema, como garantía y fuente de pago de los Bonos, comprometía el crédito del Gobierno, lo cual era precisamente lo que había denegado la Asamblea Legislativa y lo cual violaba la política pública establecida mediante tal denegación y violaba también las disposiciones de la Ley de Retiro acerca del uso permitido por dicha Ley para las aportaciones patronales al Sistema.

6.13    También sabían o debían saber entonces UBS y UBS Consulting, que el producto de la ilícita y crasamente negligente venta de los Bonos no se podría invertir prudentemente en vehículos seguros de inversión que produjeran rendimientos suficientes para amortizar los costos de la emisión e intereses de los Bonos y producir la ganancia ("positive arbitrage") que necesitaba el Sistema y que, por el contrario, la inversión del producto de la venta de los Bonos provocaría una pérdida recurrente al Sistema, ya que los intereses pagaderos por los Bonos excedían el rendimiento que el Sistema podía razonablemente obtener de la inversión de los fondos netos recibidos de la venta de los mismos.

6.14    Igualmente sabían o debían saber UBS y UBS Consulting, que los Bonos no mejorarían, sino que empeorarían, el "funding o funded ratio" del Sistema, puesto que, al completarse su emisión, disminuiría el patrimonio neto o "net worth" del Sistema por los gastos de la emisión y la venta de los Bonos y aumentarían los pasivos del Sistema en una cantidad mayor al aumento en sus activos, debido a dichos costos de emisión y venta de los Bonos.   A pesar de saber o deber haber sabido todo lo anterior, dichos codemandados no solo recomendaron la emisión y venta de los Bonos, sino que, para lucrarse aún más de la misma, UBS actuó como su principal "underwriter" y colocó gran parte de los Bonos en fondos mutuos cerrados ("closed end mutual funds") creados y administrados por la propia UBS y/o afiliadas a UBS y/o UBS Consulting. Esto produjo grandes ganancias a UBS y/o UBS Consulting  en la venta de los Bonos y le continúa produciendo a UBS y/o sus afiliadas pingües ganancias anuales por concepto de la administración de los fondos mutuos cerrados que invirtieron en los Bonos, cuyos activos aún incluyen gran parte de los Bonos y los cuales son administrados por UBS y/o UBS Consulting  y/o sus afiliadas.

6.15    UBS y UBS Consulting, sabían o debían saber que las proyecciones y estimados usados para respaldar la emisión y venta de los Bonos eran claramente erróneos y conducentes a error, pero no se lo advirtieron al Sistema y prosiguieron con la emisión y venta de los Bonos, para lucrarse y sin darle consideración ni importancia a las predecibles nefastas consecuencias para el Sistema de dicha emisión y venta de los Bonos.

6.16    También sabían o debían saber UBS y UBS Consulting, que el mercado local no tenía capacidad suficiente para absorber los por lo menos siete mil millones de dólares ($7 mil millones) en bonos que se contemplaban según el modelo propuesto por Merrill Lynch y que eran necesarios para que el Sistema obtuviera los beneficios que necesitaba, así como que no había demanda en el mercado internacional para dichos bonos.

6.17    No condujeron UBS, ni UBS Consulting, un estudio adecuado acerca de la viabilidad de la emisión y venta de los Bonos, de sus posibles consecuencias nefastas para el Sistema y de los riesgos que tal transacción acarrearía para el Sistema y para el crédito del mismo y del Gobierno.

6.18    Dicha conducta de UBS y UBS Consulting, fue crasamente negligente e ilícita y constituyó (i) una violación a sus obligaciones contractuales  en virtud de sus contratos con el Sistema; (ii)  una violación a los contratos de "underwriting" de UBS con el Sistema para

la emisión y venta de los Bonos, mediante los cuales UBS venía obligada a actuar de buena fe y a proteger los intereses del Sistema; (iii) una violación de los deberes fiduciarios contractuales y extracontractuales de dichos codemandados para con el Sistema; (iv) y conducta ilícita por parte de dichos codemandados en la medida en que fueron responsables de violar la política pública establecida por la Asamblea Legislativa de Puerto Rico cuando ésta denegó la propuesta de emitir los Bonos a través del Gobierno y de la violación a la Ley de Retiro cuando se pignoraron o gravaron las aportaciones patronales del Sistema para garantizar el pago de los Bonos.

6.19   De hecho, la ilícita y crasamente negligente emisión y venta de los Bonos no sólo comprometió el crédito del Gobierno, sino que ha causado la degradación del "rating" de todos los bonos del Gobierno.   UBS y UBS Consulting, deben responder a los aquí Demandantes por los daños que les han causado, así como al Sistema por todos los daños que su susodicha conducta ha causado al mismo y que incluyen, entre otros, (i) los costos de emisión y venta de los Bonos; (ii) la pérdidas recurrentes ("negative arbitrage") que ha sufrido, sufre y sufrirá el Sistema desde la emisión y venta de los Bonos hasta el vencimiento de los mismos, debido a que los intereses que paga el Sistema por los Bonos exceden el rendimiento que el Sistema recibe por la inversión del producto de su venta; y (iii) el aumento en costos de futuras obligaciones del Sistema, debido a la degradación del crédito del Gobierno causada por la emisión y venta de los Bonos.

6.20   UBS y UBS Consulting, le hicieron al Sistema recomendaciones a todas luces negligentes e imprudentes, ya que, como antes expresamos,  no llevaron a cabo un análisis adecuado del riego en que se colocó el Sistema como consecuencia de la emisión y venta de los Bonos y de las posibles consecuencias de dichas transacciones.

6.21   UBS y/o UBS Consulting, directamente y/o a través de una de sus afiliadas, mantenían un contrato de asesoramiento financiero con el Sistema y UBS, además, actuó como banquero de inversiones y principal "underwriter" en la emisión de los Bonos en virtud de contratos con el Sistema.

6.22   UBS y UBS Consulting, cobraron ilegalmente cuantiosas comisiones y honorarios y descuentos relacionados con la imprudente, ilícita y crasamente negligente emisión y venta de los Bonos y deben devolverlos al Sistema.

6.23    La conducta de UBS y UBS Consulting, según referida anteriormente en la presente Cuarta Demanda Enmendada, fue ilícita, imprudente, crasamente negligente, violó sus referidas obligaciones para con el Sistema y por ello ha causado, causa y causará daños al Sistema por importes multimillonarios, así como daños a los aquí Demandantes.

**POR TODO LO CUAL**, se solicita en esta *Primera Causa de Acción* que se ordene solidariamente a los Demandados UBS y UBS Consulting, al pago al Sistema de las sumas que más adelante se detallan, para resarcir los daños causados por dichos demandados al Sistema, y el pago a los demandantes de los daños causados a éstos y las costas y gastos legales del presente litigio.

## VII.  SEGUNDA CAUSA DE ACCION/ARTÍCULO 1802 DEL CÓDIGO CIVIL DE PUERTO RICO/UBS Y UBS CONSULTING

7.1    Los Demandantes repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Cuarta Demanda Enmendada.

7.2    La referida conducta crasamente negligente e ilícita de UBS y UBS Consulting, en la prestación de los servicios que se obligaron a rendir al Sistema y violación por dichos demandados de sus deberes contractuales, extracontractuales y fiduciarios para con el Sistema causaron al Sistema daños multimillonarios, según se ha explicado anteriormente en la presente Cuarta Demanda Enmendada, y también causaron daños a los Demandantes, por todos los cuales dichos demandados deben responder, según, entre otros, el Artículo 1802 del Código Civil de Puerto Rico.

**POR TODO LO CUAL**, se solicita en esta *Segunda Causa de Acción* que se ordene solidariamente a los Demandados UBS y UBS Consulting, al pago al Sistema de las sumas que más adelante se detallan, para resarcir los daños causados por ellos al Sistema, y el pago a los Demandantes de los daños causados a éstos, más las costas y gastos del presente litigio.

## VIII.  TERCERA CAUSA DE ACCIÓN – RESPONSABILIDAD DE LA ASEGURADORA ABC INSURANCE COMPANY, INC.:

8.1    Los Demandantes repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Cuarta Demanda Enmendada.

8.2    La Demandada ABC Insurance Company, Inc., cuyo nombre correcto se desconoce en este momento, emitió póliza(s) cubriendo daños causados por actos u omisiones imprudentes, irrazonables, crasamente negligentes o ilícitos de UBS y UBS Consulting, durante el período de tiempo pertinente a la presente Cuarta Demanda Enmendada.

8.3    Los actos u omisiones imprudentes, irrazonables, crasamente negligentes o ilícitos atribuidos a las Demandadas UBS y UBS Consulting en la presente Cuarta Demanda Enmendada, fueron cometidos o incurridos a través de oficiales de UBS y los daños causados al Sistema y a los aquí Demandantes por dichos actos u omisiones están asegurados y cubiertos por dicha(s) póliza(s) emitidas por ABC Insurance Company, Inc., a la que los Demandantes reclaman resarcir dichos daños a ellos y al Sistema en la presente causa de acción, en virtud de dichas pólizas.

**POR TODO LO CUAL**, se solicita en esta *Tercera Causa de Acción* que se ordene solidariamente a la Demandada ABC Insurance Company, Inc., al pago al Sistema y a los aquí Demandantes de las sumas que más adelante se detallan, más las costas y gastos legales del presente litigio.

## IX. CUARTA CAUSA DE ACCION
### RESPONSABILIDAD DE XYZ INSURANCE COMPANY, INC.

9.1    Los Demandantes repiten o incorporan por referencia al presente apartado todo lo previamente alegado en la presente Cuarta Demanda Enmendada.

9.2    La Demandada XYZ Insurance Company, Inc., cuyo nombre correcto se desconoce en este momento, emitió póliza(s), si alguna, cubriendo los daños causados por los actos u omisiones imprudentes, irrazonables, crasamente negligentes o ilícitos que aquí se imputan a UBS Consulting y/o sus funcionarios.

**POR TODO LO CUAL,** se solicita en esta *Cuarta Causa de Acción* que se ordene solidariamente a la Demandada XYZ Insurance Company, Inc., al pago al Sistema de las sumas que más adelante se detallan y el pago a los Demandantes de los referidos daños sufridos por éstos, más las costas y gastos legales del presente litigio.

## X. QUINTA CAUSA DE ACCIÓN
### COSTAS Y GASTOS Y HONORARIOS DEL ABOGADO

10.1    Los Demandantes repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Cuarta Demanda Enmendada.

10.2    Las leyes de Puerto Rico autorizan a este Honorable Tribunal ordenar a la parte demandada el pago de las costas y gastos del presente litigio, incluyendo honorarios contingentes de abogados de los Demandantes por hasta un treinta y tres por ciento (33%) de cualquier suma que se ordene a los Demandados pagar al Sistema y/o a los Demandantes en cualquier sentencia favorable a los Demandantes y/o al Sistema en el presente caso.

**POR TODO LO CUAL**, se solicita en esta *Quinta Causa de Acción* que se ordene solidariamente a los Demandados pagar las sumas detalladas más adelante en el presente, más las costas y gastos en que incurran e incurrirán los Demandantes en el presente litigio, más una cantidad equivalente al treinta y tres por ciento (33%) de dichas sumas para honorarios de abogados de los Demandantes, más intereses y cualquier otro remedio que fuere procedente conforme a derecho.

## XI. SÚPLICA

A tenor con lo antes expresado, los Demandantes muy respetuosamente solicitan que este Honorable Tribunal declare CON LUGAR la presente Cuarta Demanda Enmendada y en su virtud (a) condene solidariamente a los Demandados UBS y UBS Consulting y a sus respectivas aseguradoras, (i) al pago al Sistema de $800 millones; (ii) el pago a los aquí Demandantes individuales de una suma no menor de $50 mil para cada uno de ellos; y (iii) el pago de las costas, gastos y honorarios de abogados de los Demandantes en el presente litigio; y (b) conceda a los Demandantes y/o al Sistema cualquier otro remedio en ley o equidad que este Honorable Tribunal considere adecuado.

**RESPETUOSAMENTE SOMETIDA.**

**CERTIFICO:** Haber enviado copia fiel y exacta del presente escrito a: **LCDO. UBALDO M. FERNÁNDEZ BARRERA, LCDO. SALVADOR ANTONETTI STUTTS** y **LCDO. MAURICIO O. MUÑIZ LUCIANO, O'NEILL & BORGES LLC**, Avenida Muñoz Rivera 250, Suite 800, San Juan, PR 00918-1813; **LCDO. PAUL J. LOCKWOOD, LCDA. NICOLE A DISALVO** y **LCDA. ELISA M.C. KLEIN, SKADDEN, ARPS, SLATE MEAGHER & FLOM**, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899.

En San Juan, Puerto Rico, hoy 6 de marzo de 2019.

| | |
|---|---|
| **VICENTE & CUEBAS** | **PUJOL LAW OFFICE, PSC** |
| P.O. Box 11609 | P.O. Box 363042 |
| San Juan, PR 00910-1609 | San Juan, PR 00936-3042 |
| Teléfono (787) 751-8000 | Teléfono: (787) 724-0900 |
| Facsímil (787) 756-5250 | Facsímil: (787) 724-1196 |

**HAROLD D. VICENTE-GONZÁLEZ**
T.S.P.R. Número 3966
E-Mail: *hvicente@vclawpr.com*

**FRANCISCO PUJOL MENESES**
T.S.P.R. Número 11883
Email: *fpujol@pujollawpr.com*

**HAROLD D. VICENTE COLÓN**
T.S.P.R. Número 11303
E-Mail: *hdvc@vclawpr.com*

**IVELISSE M. ORTIZ MOREAU**
TSPR Número 18640
E-mail: *iortiz@vclawpr.com*

*ABOGADOS DE LOS DEMANDANTES INDIVIDUALES,*
*BENEFICIARIOS DEL SISTEMA DE RETIRO Y DE LA ADMINISTRACIÓN DE LOS SISTEMAS*
*DE RETIRO DE LOS EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO*

**FEDERICO HERNÁNDEZ DENTON**
P.O. Box 9021279
San Juan, PR 00902-1279
Teléfono (787) 758-3542

**PUERTO RICO ATTORNEYS & COUNSELORS AT LAW**
P.O. Box 362122
San Juan, PR 00936-2122
Teléfono  (787) 767-1919
Facsímil  (787) 764-9120

**FEDERICO HERNÁNDEZ DENTON**
T.S.P.R. Número 3846
E-Mail: *f.hernandezdenton@gmail.com*

**JOSÉ CHÁVES CARABALLO**
T.S.P.R. Número  7953
E-Mail: *chaves@fc-law.com*

**WOLF POPPER LAW OFFICES, PSC**
654 Plaza
654 Avenida Muñoz Rivera, Suite 1001
San Juan, PR 00918
Teléfono (787) 522-0200
Facsímil (787) 522-0201

**CARLOS LÓPEZ LÓPEZ**
T.S.P.R. Número 10526
E-Mail: *clopez@wolfpopperpr.com*

**RODOLFO CARRIÓN VARGAS**
T.S.P.R. Número 13390
E-Mail: *rcarrion@wolfpopperpr.com*

*ABOGADOS DE LA ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO*
*DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO*

ANEJO 1





# UBS Financial Services

Presentation to the Puerto Rico Employee's Retirement System

2/14/07

Not For Public Use

Section 1

# About UBS: What Sets Us Apart

✵ UBS

**A leading global financial services firm with over 75,000 employees, some US$2.3 trillion in invested assets and a market value of over US$100 billion**

| Global Wealth Management & Business Banking | Investment Bank | Global Asset Management |
|---|---|---|
| • US$2.3tr invested assets | • Top 5 global bulge bracket position[2] | • Leading institutional and wholesale asset manager |
| • Over 6 million individual and corporate clients | • No.1 global Equity house (over 11% market share secondary cash equities[3]) | • US$658bn invested assets |
| • Some 12,500 advisors including 7,300 in US | • A leading Fixed Income and Foreign Exchange House (12% market share FX market[1]) | • Broad based capabilities |
| • Globally, largest and best private bank[1] – Euromoney 2006-4 | • Emerging Market Equity House[1] | • Second largest European mutual fund manager |
| • A leading US full service brokerage | • Some 6,000 corporations/ institutions/clients | |
| • In Switzerland, 25-35% of banking market | | |

Notes:
1   Euromoney 2006/2005/Euromoney Poll 2006
2   Quarterly reports, UBS-IB analysis, PSR
3   Leading Private Industry survey Q2/2006-2002

Note:   All figures as at 30 September 2006. The UBS group manages its business and reports its results in Swiss Francs (CHF), USD figures provided for convenience only. All figures for all periods
       have been translated at US$1 = CHF1.25, the spot rate on 30 September 2006. Wealth management services in the U.S. are provided by UBS Financial Services Inc., a registered broker-
       dealer offering securities, trading, brokerage, and related products and services

 UBS

# Private Client Invested Assets – Top 10 Banks

## UBS AG is a global leader in wealth management



(In USD billions as of year-end 2004)

Source: Wealth Partnership Review April 2005 and company reporting. The survey is based on invested assets at private banks and fee-based assets at U.S. brokerage houses. UBS Wealth Management includes UBS Wealth Management USA (UBS Financial Services Inc.) fee-based invested assets.

 **UBS**

3

# Solid Long-Term Credit Rating

We have an excellent credit rating among financial service institutions.

| AAA | AA+ | AA | AA- | A+ | A |
|---|---|---|---|---|---|
| Rabobank Nederland | **UBS** | Banco Popular Español | ABN Amro | **Bank of America** | Allied Irish Bank |
| | | Bank of Scotland | Bank of New York | Bank of Ireland | Banco de Sabadell |
| | | Barclays Bank | National Australia Bank | Banco Santander | **Bear Stearns** |
| | | Dexia Bank Belgique | **Citigroup** | Central Hispano | Dresdner Bank |
| | | Halifax | **Deutsche Bank** | **Credit Suisse** | **Lehman Brothers** |
| | | Lloyds TSB Bank | HSBC Bank | **Goldman Sachs** | Swedbank |
| | | BNP Paribas | Royal Bank of Scotland | **J.P. Morgan Chase** | |
| | | State Street Bank | Wells Fargo Bank | **Merrill Lynch** | |
| | | | | **Morgan Stanley** | |
| | | | | U.S. Bancorp | |
| | | | | **Wachovia Bank** | |

Source: Standard & Poor's long-term rating, January 3, 2005

 UBS

4

# A winning partnership

**UBS Investment Bank is a client-driven global investment banking and securities firm, providing clients with an impressive combination of expertise and global strength**

An unwavering commitment to establishing strong partnerships with clients—we build long-term relationships, and offer original ideas and global reach

UBS Investment Bank— one of the world's leading investment banking and securities businesses, serving a wide range of clients including corporates, governments, hedge funds, financial sponsors, private equity firms, banks, brokers and asset managers worldwide. We offer them expert advice, superb execution, product innovation and comprehensive access to the world's capital markets.

- Top-tier capabilities across investment banking, equities, fixed income and foreign exchange. UBS offers clients expert advice and innovative solutions across every major product and region

- Over 20,000 professionals in 34 countries provide clients with access to a global franchise that's genuinely multi-local

- A leading global investment banking franchise. By using innovative structures and creating best-fit solutions, we have led some of the most challenging and complex M&A, debt equity and equity-linked offerings in the market

- UBS offers world-class distribution and execution. We trade more securities through the equity markets than any other firm[1], are one of the leading fixed income traders and recognized as a leader in the global foreign exchange markets[2]

- With more *Institutional Investor* ranked analysts than any other firm and ranked top 5 for equity and fixed income research across the globe[3], UBS offers unrivalled content, investment insight and advice

Notes:
1   Leading private industry survey 2006-2004; Autex 2005
2   FX Week 2005-03 / The Banker 2004-02
3   Institutional Investor 2006/05

 UBS

# Key awards and deals

**1st**

**Best Investment Bank Asia**
*Euromoney 2006*

**Best Global Private Bank**
*Euromoney 2006-2004*

**Corporate Broker of the Year**
*Acquisitions Monthly 2006*

**Best Global Emerging Markets Equity House**
*Euromoney 2006*

**Best Bank Overall for FX**
*FX Week 2005-2003*

**Best Global Risk Management House**
*Euromoney 2005*

**No.1 Currency Derivatives**
*Risk institutional client survey 2006*

**Equities House of the Decade**
*Financial News 2006*

**No.1 Distributor of Secondary Cash**
*Leading Private Industry Survey 2006-2002*

**No.1 Debt House for Financial Institutions**
*Bloomberg June 2006*

**Best Overall on-line services for FX, Fixed Income and Derivatives**
*Euromoney 2005*

## M&A/Advisory



**Anadarko** Petroleum Corporation

**2006**

**US$23 billion**

UBS acted as financial advisor to Anadarko Petroleum Corporation on its acquisitions of Kerr-McGee Corporation and Western Gas Resources

**The Blackstone Group**

**2006**

**US$4.3billion**

UBS was financial advisor and financing provider to the Blackstone Group on its acquisition of Travelport

**SUEZ**

**2006**

**US$44.8 billion**

UBS acted as joint financial advisor to Suez S.A on its merger with Gaz de France S.A (GDF)

### Equity/equity-linked

**VINCI**

**2006**

**US$3.1 billion**

Joint bookrunner on Vinci Company's US$3.1bn rights issue



中国银行 **BANK OF CHINA**

**2006**

**HK$75.43 billion**

UBS was a joint global co-ordinator and bookrunner for the Bank of China Ltd.

**STANDARD LIFE**

**2006**

**£2.3billion**

UBS was joint sponsor, joint global coordinator and joint bookrunner on the Standard Life IPO

## Debt



**Anadarko** Petroleum Corporation

**2006**

**US$5.5 billion**

Joint bookrunner on a US$5.5bn unsecured senior notes offering for Anadarko Petroleum Corporation

**RESONA**

**2006**

**£400 million**

Joint bookrunner on subordinated bond offering for Japan's Resona Bank

**SIEMENS**

**2006**

**900 million/£750 million**

Joint bookrunner and joint structuring advisor on a hybrid bond offering for Siemens AG

 **UBS**

6

# Your full service provider

An established and widely recognized leader across the full range of investment banking and securities products, we offer expertise and influence in all markets

| Investment Banking | Equities | Fixed Income | FXCCT |
|---|---|---|---|
| No.4 for worldwide M&A *Dealogic* YTD Q3 2006 | No.1 market share for global secondary cash equities[1] | Interest Rate Derivatives House of the Year—*Risk* 2005 | Best bank overall in FX—*FX Week* Poll 2006–2003 |
| No.1 in APAC M&A—*Dealogic* YTD Q3 2006 | Largest trader of equity securities globally; No.1 trader of NASDAQ (Autex 2006) and No.2 trader of NYSE (NYSE 2006) | No.2 All-Europe FI Research Team Poll—*Institutional Investor* 2006 | Best Bank with Banks—*FX Week* Poll 2006 |
| No.4 for global ECM—*Dealogic* YTD Q3 2006 | Asia-Pacific 'Equity House of the Year'—*IFR* 2005 | No.2 Overall for Credit Trading—*Euromoney* Poll 2006 | No.1 with Bank Customers *Euromoney* FX poll 2006 |
| No.1 Equity Risk Management for Corporates—*Risk* 2005 | Best Pan-European Brokerage Firm—*Thomson Extel* (2006–01) | No.1 Best Bank for Asset Backed—*Euromoney* Poll 2006 | No.1 Overall in Currency Derivatives—*Risk* institutional client end user survey 2006 |
| Best M&A House in Hong Kong—*Euromoney* 2006 | Best Global Emerging Markets Equity House—*Euromoney* 2006 | Best Provider of Support in the Secondary Markets—*EuroWeek* 2005, 2004 | No.1 Overall in Currency Derivatives—*Risk* institutional inter-dealer rankings 2006 |
| Best Lead Manager of FIG Bonds—*EuroWeek* 2006 | Leading Global Portfolio Trading Service—*Financial News* 2005 | Best Portfolio Analytics—*Euromoney* 2005–2001 | No.1 with Accounts Trading US$25 billion and under—*Euromoney* FX poll 2006–2005 |
| No.4 underwriter by total fees—Bloomberg 2005 | Top ranked sales house— for Pan-European, Asian, Japan and Latin America sales[1] | Electricity House of the Year—*Energy Risk* 2005 | Best FX Internet Bank—*Euromoney* poll of polls 2006 |
| No.4 Best Debt House Poll—*Euromoney* 2006 | Top ranked research house—No.1 with more *Institutional Investor* ranked analysts than any other firm | No.1 European Investment Grade Research—*Institutional Investor* 2006, 2005 | Best Bank Platform 2006; Best Overall Platform—Profit & Loss digital FX awards 2005–2002 |
| No.1 all UK Equity Issuance—*Dealogic* 2005 | Best On-line Services for Equity Research—*Euromoney* 2005 | No.1 FI Strategy & Technical Analysis—*Thomson Extel* 2005 | Best Single Bank Trading Site—*FX Week* FX poll 2006; 2003–2001 |
| | | Best Overall for Fixed Income & Derivatives On-line—*Euromoney* 2005 | Currency Derivatives House of the Year—*Risk* 2005 |
| | | Swiss Franc Bond House of the Year—*IFR* 2005 | Best Bank for Post-Trade Services to Clients—*FX Week* 2006 |

Notes:
1   Leading private industry survey of global investors Q1 2006 – 2002
2   Institutional Investor 2004 (not Global research & sales rankings for 2005)
3   Institutional Investor 2005


**UBS**

Offering you the best quality advice whatever your financing need

# A global franchise that is genuinely multi-local

**We have the global strength and the local knowledge to undertake the most complex transactions anywhere in the world**



**The Americas**

| | |
|---|---|
| 1 Atlanta | 14 Mexico City |
| 2 Boston | 15 Minneapolis |
| 3 Buenos Aires | 16 Montreal |
| 4 Calgary | 17 New York |
| 5 Chicago | 18 Philadelphia |
| 6 Dallas | 19 Rio de Janeiro |
| 7 Denver | 20 San Francisco |
| 8 Edina | 21 Santiago |
| 9 El Segundo | 22 São Paulo |
| 10 Hamilton | 23 Stamford |
| 11 Houston | 24 Toronto |
| 12 Kansas City | 25 Vancouver |
| 13 Los Angeles | |

**Europe, Middle East, Africa**

| | |
|---|---|
| 26 Amsterdam | 42 London |
| 27 Basel | 43 Lucerne |
| 28 Berlin | 44 Lugano |
| 29 Bern | 45 Madrid |
| 30 Brussels | 46 Milan |
| 31 Copenhagen | 47 Moscow |
| 32 Dubai | 48 Munich |
| 33 Dusseldorf | 49 Oporto |
| 34 Edinburgh | 50 Oslo |
| 35 Frankfurt | 51 Paris |
| 36 Geneva | 52 Johannesburg |
| 37 Helsinki | 53 St Gallen |
| 38 Istanbul | 54 Stockholm |
| 39 Lausanne | 55 Stuttgart |
| 40 Leipzig | 56 Tel Aviv |
| 41 Lisbon | 57 Vienna |
| | 58 Zurich |

**Asia/Pacific**

| | |
|---|---|
| 59 Auckland | 69 Mumbai |
| 60 Bangkok | 70 Osaka |
| 61 Beijing | 71 Pasig City |
| 62 Busan | 72 Seoul |
| 63 Hong Kong | 73 Shanghai |
| 64 Jakarta | 74 Singapore |
| 65 Kuala Lumpur | 75 Sydney |
| 66 Labuan | 76 Taipei |
| 67 Manila | 77 Tokyo |
| 68 Melbourne | 78 Wellington |

**And we work seamlessly together across geographical boundaries to fulfill your needs**

 UBS

8



Section 2

# The Consultative Process



# The Consultative Process



- Portfolio Reviews
- Portfolio Rebalancing
- Refine Plan as Needed
- Develop Further Action Steps

- Assess Current Situation
- Develop Vision
- Risk Reward Assessment
- Investment Policy Development

**Investment Policy Planning**

**Ongoing Consulting and Performance Measurement**

**Clients with UBS**

**Asset Allocation Modeling**

**Manager/Fund Search and Selection**

- Investment Manager Search and Selection
- Strategy Integration
- Cost Analysis

- Asset Allocation Analysis
- Overall Portfolio Design

 UBS

10

# Investment Policy Statement

♦ Review of current investment policy statements

♦ The investment policy can help you:
   — Evaluate and determine investment goals and objectives
   — Effectively communicate those goals and objectives both internally and externally
   — Reduce emotional response to market downturns, keeping your focus on the long term
   — Make disciplined and systematic decisions

**A well-written investment policy statement can provide important guidance for the management of assets**

 UBS

11

# Importance of Asset Allocation

The Importance of Asset Allocation



Asset Allocation 91%

Market Timing 2%

Other 2%

Security Selection 5%

Source: Financial Analyst Journal, May–June 1991:
Contribution Asset Allocation Policy, Market Times and Security Selection to Portfolio Performance

 UBS

12

# Asset Allocation



An "efficient frontier" model identifies mixes with specific risk/return characteristics

The model will identify "efficient" asset mixes that generate the highest returns for the least risk, given the client's risk tolerance.

Hypothetical Current
Portfolio
Stocks, Bonds & T-Bills

Risk (Standard Deviation)

 UBS

Note: These are hypothetical results used for illustration purposes only.  Past performance does not guarantee future results.

13

# Diversification (done correctly) Can Bring A Bonus



STOCKS AND BONDS: RISK VS. RETURN 1973-2002

Return high return >
low return

100% Stocks
90% Stocks, 10% Bonds
75% Stocks, 25% Bonds
50% Stocks, 50% Bonds
20% Stocks, 80% Bonds
10% Stocks, 90% Bonds
100% Bonds

< low fluctuation | Standard Deviation | high fluctuation >

Risk is measured by standard deviation, a statistical measure of dispersion about an average. Return is measured by arithmetic mean. Portfolios presented are based on Modern Portfolio Theory. This chart is for illustrative purposes only and is not indicative of any single investment. Investors should note that diversification does not assure against market loss and that there is no guarantee that a diversified portfolio will outperform a non-diversified portfolio. Past performance is no guarantee of future results. See notes on slide 21.

 UBS

14

# Domestic Versus Global  Portfolios



Source : " The Asset Allocation Decision Presentation 1990-1997. Ibbotson  Associates,  Chicago Used with permission. All rights reserved. Average return and risk (standard  deviation) are measured over 1970-1997.  Past Performance is no guarantee of future results.

 UBS

# Equity Style Matrix



 **UBS**

16

# The Importance of Diversification within A Single Asset Class

◆ Timing when Stock Styles Go In and Out of Favor Is Often Unachievable

◆ Position Yourself for the Next Change in Leadership by Staying Invested in the Major Styles Over the Longer Term



The indexes used are the Russell 1000® Growth Index for growth stocks and the Russell 1000® Value Index for value stocks. Both indexes are unmanaged and are not available for direct investment. Results do not reflect any deduction for any transaction costs, management fees or other expenses that would reduce an investor's actual returns. Past performance is no guarantee of future results.
Source: Calculated by Investment Consulting Services using information and data presented in Ibbotson Investment Analysis Software.
©Ibbotson Associates, Inc.  All rights reserved.  Used with permission.

 UBS

17

# The Benefit of Style Diversification

## Manager structure is analyzed for impact on the total portfolio
### GROWTH AND VALUE EXCESS RETURN OVER THE S&P 500



**Diversification of style may reduce total portfolio volatility**

Past performance is no guarantee of future results. The indices are unmanaged and not available for direct investment. Source: Calculated by UBS Financial Services using data presented in Effron PSN software. Effron PSN. All rights reserved. Used with permission.

 UBS

18

## Concentrated Positions



 UBS

19

# Capital Market Assumptions

- ♦ Developed in collaboration with UBS Global Asset Management's Asset Allocation/Currency and Risk Management Team consisting of 49 investment professionals and is headed by Brian Singer, Regional Chief Investment Officer for the Americas

- ♦ Define individual asset classes

  — Model return, risk and correlation for each asset class using multi-factor process

- ♦ Have a stategic time horizon of 7-10 Years

**Process is fully integrated across all asset classes allowing for consistent use with traditional and alternative asset classes**

 UBS

20

# Evaluating Investment Managers

**Researched and Reviewed strategies\*are evaluated on the following criteria:**

♦ **Organization**
- — Financially & structurally sound
- — Incentive Arrangements and Retention
- — Proper resources
- — Disaster Recovery Plan

♦ **Quality of Personnel**
- — Experienced & skilled investment professionals that work well as a team

♦ **Philosophy**
- — Clearly defined investment philosophy

♦ **Process**
- — Methods & procedures must be sound & consistent
- — Effectiveness of decision-making
- — Buy and sell disciplines
- — Performed well in the past & structured to perform well in the future

♦ **Quality of Research**
- — Proper resources to track full universe
- — Knowledgeable and skilled research team
- — Objectivity and creativity

♦ **Risk Management**
- — Appropriate system of risk controls in place
- — Managed in accordance to their philosophy & process

♦ **Style Consistency and Implementation**
- — Adherence to style consistency
- — Appropriate trading capabilities
- — System of checks and balances

♦ **Performance**
- — Competitive past absolute and risk-adjusted performance results
- — Consistent with investment philosophy
- — Track record by current team

 **UBS**

\*For managers included in searches, we currently provide three different categories of investment manager analysis. Managers chosen may be researched or reviewed by the ICS Research Group or reviewed by UBS Consulting Services Asset Consulting. We cannot assure you that we will continue to provide ongoing analysis for any of these managers. Please see the UBS Consulting Services ADV Disclosure Document for a general description of the parameters and criteria reviewed for each manager category.

# Current Asset Allocation and Local Capabilities

|  | Current Managers | % of Assets | Local Providers |
|---|---|---|---|
| **Domestic Equity** | | | |
| Wellington Large Cap | $  200,541,121.00 | | *Popular Asset Management* |
| State Street Global Advisers | 639,905,458.00 | | *Invesco* |
| Fisher Small Cap Value | 75,213,263.00 | | *Lehman Brothers* |
| Seligman Small Cap | $   56,332,135.00 | | *Merrill Lynch* |
| **Total Domestic Equity** | **$  971,991,977.00** | **36.4%** | *Smith Barney (Legg Mason)* |
| | | | *Wachovia Securities* |
| **International Equity** | | | |
| Morgan Stanley | $  429,102,047.00 | | *San Juan Asset Management* |
| **Total International Equity** | **$  429,102,047.00** | **16.1%** | *Invesco* |
| | | | *Lehman Brothers* |
| | | | *Merrill Lynch* |
| | | | *Smith Barney (Legg Mason)* |
| | | | *Wachovia Securities* |

 UBS

22

# Current Asset Allocation and Local Capabilities

**Fixed Income**

| | | | |
|---|---|---|---|
| Taplin, Canida & Habacht | $ | 24,819,063.00 | |
| Master Repo | $ | 143,125,352.00 | |
| Loans and Mortgages | $ | 527,900,875.00 | |
| **Total Fixed Income** | $ | 695,845,290.00 | 26.0% |

Popular Asset Management
San Juan Capital Partners LLC.
Invesco
Lehman Brothers
Merrill Lynch
Smith Barney (Legg Mason)
Wachovia Securities

**Short Tem**

| | | | |
|---|---|---|---|
| Cash Account | $ | 122,291.00 | |
| I.B.A. | $ | 46,340,753.00 | |
| P.R. Gov't Inv. Trust Fund | $ | 1,885.00 | |
| **Total Short Term** | $ | 46,464,929.00 | 1.7% |

**Altenative Investments**

| | | | |
|---|---|---|---|
| Chase Capital Private Equity | $ | 10,207,235.00 | |
| Guayacan Private Equity | $ | 5,169,721.00 | |
| Guayacan Fund of Funds | $ | 9,273,810.00 | |
| Guayacan Fund of Funds II | $ | 16,464,601.00 | |
| Venture Capital Fund | $ | 704,904.00 | |
| **Total Alternative Investments** | $ | 41,820,271.00 | 1.6% |

Invesco
Merrill Lynch
Lehman Brothers
Smith Barney (Legg Mason)
Wachovia Securities

**TELPRI**

| | | | |
|---|---|---|---|
| TELPRI Stock | $ | 486,080,000 | |
| **Total TELPRI** | $ | 486,080,000 | 18.2% |

| | | | |
|---|---|---|---|
| **Total** | $ | 2,671,304,514.00 | 100.0% |

Market Values as of March 31, 2006, Source: Callan Associates


UBS

# Portfolio Reviews

## Basic Performance Report Components

♦ Summary of assets at the beginning and end of the period (including additions and withdrawals)

♦ Industry standard time-weighted rates of return

♦ Graphic and tabular representations of performance

♦ Comparisons to a universe of similarly managed funds by style

♦ Market cycle comparisons



♦ Performance attribution

♦ Risk and return analysis

 UBS

24

# The Results of the UBS Consulting Services Process

- ◆ Clearly articulated goals and objectives and a methodology to pursue them

- ◆ A comprehensive investment policy statement

- ◆ A customized asset allocation

- ◆ Appropriate investment managers to fulfill your asset allocation

- ◆ A method to objectively evaluate investment performance

- ◆ Customized fee structures

- ◆ Comfort of detailed review and evaluation to help you know whether you are fulfilling your obligations

 UBS

# What to Expect from Your Consultant

- ◆ Accept Fiduciary Liability
- ◆ Guidance in Setting Strategy, Policy, and Asset Allocation
- ◆ Assistance in Writing and Reviewing Investment Policy Statements and Guidelines
- ◆ Capacity to Deal with a Wide Range of Assets
- ◆ Close Supervision of Managers / Beyond Performance Reports
- ◆ Capacity to Produce Information and Advice Tailored to Your Particular Needs
- ◆ Shield Trustees from Importunate Investment Managers
- ◆ Keep Trustees Informed about Available Investment Opportunities, Techniques, and Risks
- ◆ Help Put Decisions on a Rational Basis
- ◆ Provide Trustee Education

 UBS

26

# What to Expect from Your Consultant

- ♦ Conduct All Searches and Negotiate Contracts and Fees
- ♦ Monitor Compliance with "Best Practice" Standards and Regulatory Requirements
- ♦ Work Collaboratively with Other Service Providers
- ♦ Give Unbiased Advise, Even if Unpopular

Source: Employee Benefits Journal, December 1988

 UBS

# Multiple Parallel Projects scheduled for 1Q and 2Q 07'

| Priority | Consultative Process | Education | Local Providers | Emerging Managers | LDI Strategies | Transition Mgmt |
|---|---|---|---|---|---|---|
| 1 | Performance Reporting Documentation | Basics of Investing Consultative Process | Create Local Providers List | | | |
| 2 | Assess Possible Asset Allocation Scenarios | Alternative Investments and Liability Driven Investments | Get Questionnaires for various investment management mandates | | | |
| 3 | Evaluate Current Asset Allocation & Investment Managers | | Send To Providers | | | |
| 4 | Due Diligence | | Compile Data/Conclude Local Providers Database | Gather data on Emerging Manager Firms | Gather data on possible Custom Liability Index Providers | Gather data on Transition Managers |
| 5 | Investment Policy Statement Changes | | | Arrange for presentation of Finalists to Client | Arrange for presentation of LDI to Client | Arrange Finals Presentations of Transition Managers |

 UBS



Section 3

# Addressing the Pension Fund Challenge

 UBS

# How to face the Pension Challenge?

## Integration of all the Parties in the Process

- **Actuary**
  - Estimates the Liability Cash Flows
  - Determines Current Funding Status
    - Estimates the amount of Pension Contribution if underfunded.

- **Investment Consultant**
  - Determine Asset Allocation based on
    - The Cash Flow of the Liabilities
    - Required Rate of Return on Plan Assets
    - Reconciles Pension Funding with Current Market conditions and expected rates of return and correlations (are they possible?)

  - Search for Appropriate Investment Managers
  - Review and Monitor Performance

 **UBS**

# How to face the Pension Challenge?

## Integration of all the Parties in the Process

♦ **Investment Managers**

– Manage the appropriate amount of funds for their particular discipline.

♦ **Benchmarking Providers**

– Can establish a Custom Liability Index to track the <u>real</u> performance of the Plan's Liabilities.

♦ **Plan Sponsors**

– Supervise that all parties are working well together

 **UBS**

# An Integrated Approach to Pension Management



 UBS

# Tackling the Asset / Liability Mismatch

## Financial Overview of 64 State Retirement Systems ($ billions)

| | 2000 | 2001 | 2002 | 2003 | 2004 | Growth % 2002-2004 | Growth % 2003-2004 |
|---|---|---|---|---|---|---|---|
| **Total Pension Assets:** | | | | | | | |
| - Market Value | $795.0 | $730.1 | $669.1 | $681.7 | $778.9 | 16% | 14% |
| - Actuarial Value | $725.8 | $769.4 | $771.7 | $773.0 | $804.6 | 4% | 4% |
| **Total Pension Liabilities:** | $727.4 | $792.7 | $850.1 | $889.4 | $942.3 | 11% | 6% |
| **Difference:** | | | | | | | |
| - Market Value | $67.6 | -$62.6 | -$181.0 | -$207.7 | -$163.4 | | |
| - Actuarial Value | -$1.6 | -$23.3 | -$78.5 | -$116.3 | -$137.7 | | |
| **Assets as a % of Liabilities:** | | | | | | | |
| - Market Value | 109% | 92% | 79% | 77% | 83% | | |
| - Actuarial Value | 100% | 97% | 91% | 87% | 85% | | |
| **Underfunded Plans as % of All Plans:** | | | | | | | |
| - Market Value | 39% | 69% | 92% | 97% | 84% | | |
| - Actuarial Value | 53% | 53% | 67% | 77% | 77% | | |
| **Total No. of Systems:** | 64 | 64 | 64 | 64 | 64 | | |

Source: 2005 Wilshire Report on State Retirement Systems: Funding Levels and Asset Allocation

♦ On a market value basis, 84% of these 64 state pension systems have unfunded liabilities (assets < liabilities).

 UBS

32

# Tackling the Asset / Liability Mismatch

## Assets vs. Liability Funding Ratio

**Assets Allocation (30% Bonds/60% Equity/5% Int'l./5% Cash)**
**12/31/1988 – 12/31/2004**



Source: Ryan ALM

♦ The financial health of state pension plans has swung back from a funding surplus in the late 90's to a recent significant deficit.

�֎ UBS

33

# US Equity Market:
## 1929 – 1950—Consolidation Phase



1929 – 1950

Rate of
Return: -1.1%

Source: Bloomberg, 2004. Ticker is "INDU", Dow Jones Industrial Index. The Dow Jones Industrial Average is comprised of 30 common stocks chosen by the editors of The Wall Street Journal as representative of the broad market and of the U.S. industry. The past performance of an index is not a guarantee of how the client's portfolio will perform. Indices are not available for direct investment and reflect an unmanaged universe of securities which does not take into account advisory or transaction fees, all of which will reduce the overall return.

 UBS

34

# US Equity Market:
# 1951 – 1966—Appreciation Phase



Source: Bloomberg, 2004. Ticker is "INDU", Dow Jones Industrial Index. The Dow Jones Industrial Average is comprised of 30 common stocks chosen by the editors of The Wall Street Journal as representative of the broad market and of the U.S. industry. The past performance of an index is not a guarantee of how the client's portfolio will perform. Indices are not available for direct investment and reflect an unmanaged universe of securities which does not take into account advisory or transaction fees, all of which will reduce the overall return.

 UBS

35

# US Equity Market:
# 1967 – 1982 — Consolidation Phase



Source: Bloomberg, 2004. Ticker is "INDU", Dow Jones Industrial Index. The Dow Jones Industrial Average is comprised of 30 common stocks chosen by the editors of The Wall Street Journal as representative of the broad market and of the U.S. industry. The past performance of an index is not a guarantee of how the client's portfolio will perform. Indices are not available for direct investment and reflect an unmanaged universe of securities which does not take into account advisory or transaction fees, all of which will reduce the overall return.

 UBS

36

# US Equity Market:
# 1983 – 1999—Appreciation Phase



**1983 – 1999**

**Rate of Return:
15.1%**

Source: Bloomberg, 2004. Ticker is "INDU", Dow Jones Industrial Index. The Dow Jones Industrial Average is comprised of 30 common stocks chosen by the editors of The Wall Street Journal as representative of the broad market and of the U.S. industry. The past performance of an index is not a guarantee of how the client's portfolio will perform. Indices are not available for direct investment and reflect an unmanaged universe of securities which does not take into account advisory or transaction fees, all of which will reduce the overall return.

 UBS

# US Equity Market:
# 2000 – 20??—Consolidation Phase



Source: Bloomberg, 2004. Ticker is "INDU", Dow Jones Industrial Index. The Dow Jones Industrial Average is comprised of 30 common stocks chosen by the editors of The Wall Street Journal as representative of the broad market and of the U.S. industry. The past performance of an index is not a guarantee of how the client's portfolio will perform. Indices are not available for direct investment and reflect an unmanaged universe of securities which does not take into account advisory or transaction fees, all of which will reduce the overall return.

 UBS

38

# Consolidation/Appreciation Summary (DJIA)

| Phases | Dates[1] | Annualized Performance[2] | Duration (in Years) |
|---|---|---|---|
| *Consolidation* | *1929 – 1950* | *-1.1%* | *22* |
| Appreciation | 1951 – 1966 | 7.8% | 16 |
| *Consolidation* | *1967 – 1982* | *1.8%* | *16* |
| Appreciation | 1983 – 1999 | 15.1% | 17 |
| *Consolidation* | *2000 – 20??* | *????* | *????* |

- Historically, the US equity market[3] has tended to move upwards in a "stairstep" manner. Of course, past performance is not indicative of future results.
- The average time for both the Appreciation (step up) and the Consolidation (sideways) phases has been approximately 18 years.[4]
- From January 1, 2000 through March 31, 2005, the average annual return for the DJIA was -0.6%.[2]

[1]Dates for beginning and end of the phases include the entire calendar year and are approximate.
[2]Returns are price-only and do not include the reinvestment of dividends. The DJIA is an unmanaged index not available for direct investing and therefore does not incur investment fees and expenses which when included with an investment program will reduce the results shown. Past performance is no guarantee of future results.
[3]As measured by the Dow Jones Industrial Average. Indexes are unmanaged and not available for direct investing.
[4]Source: UBS Financial Services Inc. Manager Research Group.

 UBS

39

# Pension Funds Solutions



*A solutions driven partnership to meet all your needs*

 UBS

40



Section 4

# Education / Training



# Education and Training



◆ Detailed and customized education programs for your team

◆ Financial markets education

— We will keep you updated on what is happening in the U.S., International and local financial markets and how it can impact ERS.

— We will educate you on all financial products, including local instruments, to help you determine which could be appropriate for ERS.

◆ Investor forum and conferences

— We provide access to UBS' conferences and forums, particularly those of specific concern to institutional investors, for example:
- "Managing Fund Assets in a Low Return Environment"
- "UBS Global Investor Forum"

 UBS

42



Section 5

# Tackling the Asset / Liability Mismatch



# Tackling the Asset / Liability Mismatch

- With changing regulations and low investment returns impacting the future security of plan participants, pension plans must rethink how they manage their portfolios and embrace a shift in perspective from an "asset-only" to an **"asset-liability" framework**.

    — Match assets to liabilities to buy time (Beta Portfolio and Custom Liability Index)

    — Relocate deficit versus longest liabilities

    — Create an Alpha Portfolio whose returns aim to outperform the liability growth to generate Portable Alpha

    — Portable Alpha is then transferred to the Beta Portfolio to start funding the deficit.

- UBS can help clients structure innovative solutions for managing funding-ratio risk using cutting edge technology and quantitative models. This can be done with UBS or through a third party such as Ryan ALM, Inc.

 UBS

# Tackling the Asset / Liability Mismatch



*Relocate current pension deficit*

**Beta Portfolio**

Used to fund cash flows

(Match assets to
Custom Liability Index)

*Transfer back Portable Alpha to start funding deficit*

|  0 – 5 years  |  6 – 35 years  |

 **UBS**

45



Section 6

# Asset Allocation Research and Expertise

 UBS

# Asset Allocation Research and Expertise



- ◆ A comprehensive and **dynamic asset allocation approach**, based on robust long-term capital market assumptions is the foundation of every plan's success.

- ◆ Through its **seminal research on asset allocation**, UBS has pioneered many concepts in asset allocation that go beyond conventional methods (i.e. efficient frontier analysis, modern portfolio theory, mean-variance analysis).

- ◆ UBS combines **proprietary, state-of-the-art** simulation models and risk management frameworks with unparalleled advice to deliver proven, value-added results.

 **UBS**

47

# Asset Allocation Research and Expertise





Strategic Asset Allocation Update

UBS Financial Services Inc's Strategic Asset Allocation Process and
Approach to Capital Market Assumption Development

March 2004

◆ Capital Market Assumptions

— Define individual asset classes (Model return, risk and correlation for each asset class using multi-factor process)

— Have a strategic time horizon of 7-10 yrs

◆ UBS Global Asset Management's Asset Allocation/Currency and Risk Management Team

— Brian Singer, Regional Chief Investment Officer for the Americas and Head of Global Investment Solutions.

— 49 investment professionals

◆ UBS Investment Research Team

— Dr. Lawrence Hatheway, UBS Chief Economist and Global Head of Asset Allocation

**Process is fully integrated across all asset classes allowing for consistent use with traditional and alternative asset classes**

�kh-UBS

48



Section 7

# Improving Returns via Alternative Investments



# Improving Returns via Alternative Investments



◇ While pension plans have continued to slowly incorporate alternative investments into their portfolios, they have struggled in determining the appropriate "normal" or policy allocation.

◇ UBS's Asset Allocation team, estimates that a mid-risk pension plan **should increase alternative investments to a 20% allocation** within a broadly diversified policy. Yet, as the following table shows, many state pension plans still have a much lower allocation in this asset class.

### Average Asset Allocation for State Pension Plans

|  | 2003 | 2004 | Change |
|---|---|---|---|
| US Equity | 42.7 % | 44.5 % | 1.8 % |
| Non-US Equity | 13.3 | 14.4 | 1.1 |
| US Bonds | 33.6 | 29.1 | -4.5 |
| Non-US Bonds | 1.2 | 1.3 | 0.1 |
| Real Estate | 4.2 | 3.8 | -0.4 |
| Private Equity | 4.7 | 4.3 | -0.4 |
| Other | 0.3 | 2.5 | 2.2 |

*Source: 2005 Wilshire Report on State Retirement Systems: Funding Levels and Asset Allocation*

 UBS

50

# Improving Returns via Alternative Investments



### Asset Allocation for a Sample of Pension Systems

| Retirement System | Date | Market Value | U.S. Equity | Non-U.S. Equity | Fixed Income | Real Estate | Alternative Investments | Cash & Eq. |
|---|---|---|---|---|---|---|---|---|
| CalPERS | 1/31/06 | $ 207.2 | 40.4% | 23.2% | 25.0% | 4.5% | 5.1% | 1.7% |
| CalSTRS | 12/31/05 | $ 137.6 | 42.5% | 22.6% | 22.8% | 6.1% | 5.4% | 0.6% |
| Colorado PERA | 12/31/05 | $  34.2 | 43.4% | 17.1% | 23.4% | 5.5% | 9.3% | 1.3% |
| Washington State Dept. of Ret. System | 6/30/05 | $  47.5 | 32.8% | 16.3% | 26.0% | 9.3% | 14.6% | 1.0% |
| NY State and Local Ret. System | 3/31/05 | $ 126.1 | 49.8% | 13.9% | 26.3% | 3.7% | 6.3% | 0.0% |
| Average | | $ 110.5 | 41.8% | 18.6% | 24.7% | 5.8% | 8.1% | 0.9% |

13.9%

Source:

- www.caplers.ca.gov

- www.calstrs.com

- www.copera.org

- www.drs.wa.gov

- www.osc.state.ny.us

 UBS

# Pension Funds Solutions



*A solutions driven partnership to meet all your needs*

 UBS

52

# Why UBS Consulting Services of Puerto Rico

- ◆ Global Resources

- ◆ Strong Local Presence

- ◆ Leading Edge, Proprietary Research

- ◆ Our People

- ◆ Open Architecture

- ◆ Consulting Only Focus

- ◆ Proactive Consulting Process

 UBS



Section 9

# The Basics of Investing

 **UBS**

# Financial Asset Classes

- ♦ Bonds are debt

- ♦ Stocks are equity

- ♦ Asset  Classes

    — Debt instruments

    — Equity instruments

    — Options, future and other contract instruments

 UBS

55

## Stocks

- ◆ Represent ownership rights in a corporation
- ◆ Entail more risk than other asset types in the short run
- ◆ Historically provide highest returns in the long run
- ◆ Greatest potential for short-term downturns

 UBS

56

# Types of Stocks

**What you want to achieve can help you decide what types of stocks to select.**

- Blue Chip
- Growth
- Value
- Income

- Large/Mid/Small-Cap
- Cyclical
- Defensive

 UBS

57

# Reading a Stock Table

## Track a listed stock's performance in your daily newspaper.

| | | |
|---|---|---|
| 52-Week High/Low | Yld. | High/Low |
| Stock | P/E Ratio | Close |
| Div. | Sales 100s | Net Chg. |



 UBS

SB

# Tracking the Stock Market

♦ **The Dow**

♦ **The S&P 500**

♦ **The Nasdaq**

**How do these benchmarks relate to investments?**

 **UBS**

59

## Objectives

**The following information introduces you to:**

♦ Basics of Equity Securities
♦ Exchanges and Marketplaces

**When you have completed this presentation you will:**

♦ Know what a stock is
♦ Know how stocks are traded

 UBS

# Equity Securities

◆ Stocks offer shareholders ownership in a company

◆ A company raises money according to how many shares it can sell, and at what price

 **UBS**

61

# Large Cap Stocks

- ◆ Established companies such as IBM, General Electric and Dupont.

- ◆ Included in the Standard & Poor's Stock Index (S&P 500)

 UBS

# Mid Cap Stocks

♦ Somewhat smaller than large caps

♦ No set rules

♦ Usually worth a few billion dollars

 UBS

## Small Cap Stocks

- ◆ Investment in America's entrepreneurial spirit

- ◆ Usually newer, smaller organizations

- ◆ Total value of $1 billion or less

 UBS

64

# International Stocks

- ♦ Stocks outside the U.S.

- ♦ Additional areas of uncertainty

 UBS

# How Stocks are Traded

**Stock prices are determined through trading, which means the buying or selling of an asset.**

Majority of securities traded at three sites:

- The New York Stock Exchange (NYSE)
- The American Stock Exchange (AMEX)
- The National Association of Securities Dealers' Automated Quotation service (NASDAQ)

 UBS

66

# The New York Stock Exchange and
# The American Stock Exchange

♦ Both operate differently from NASDAQ

♦ Auction markets

♦ Specialists

**❊ UBS**

# Primary Role of the Specialist

♦ Executing orders for floor brokers

♦ Establishing a fair market price, based on
supply and demand, for the security at the
beginning of each trading day

♦ Maintaining an "orderly market" for the security,
by making sure trading goes smoothly and with
a minimum of price fluctuation

♦ Keeping a balance between supply and
demand

 UBS

68

# NASDAQ

♦ Trades made electronically

♦ Directly between buyer and seller

♦ Bid price

♦ Ask price

 UBS

59

# Stock Characteristics

♦ Dividend - distributions of corporate profits made to shareholders, usually 4 times a year

♦ Yield - return per share, calculated by dividing the annual dividend by the current stock price

♦ P/E Ratio - price/earnings ratio enables one to determine the company's latest 12-month earnings per share

�له UBS

70

## Choosing a Stock

### Choosing an appropriate stock depends on:

- ◆ Amount willing to invest
- ◆ Time one devotes to actively track and make decisions
- ◆ Long-term plans
- ◆ Risk one is willing to take

 UBS

# Self-Check/Test

♦ (Fill in the blank) A _____ is an ownership share in a corporation.
- ♦ Bond
- ♦ Stock
- ♦ Option
- ♦ None of the above

♦ Stocks are traded on what exchange(s)?

♦ Specialists can be found:
1. In the home office
2. In the branch office
3. On the trading floor

 **UBS**

72

# Bonds

- ◆ IOUs issued by corporations, governments and municipalities
- ◆ Offer higher yields than cash
- ◆ Value fluctuates in response to changes in interest rates
- ◆ Generally offer higher current income with less volatility than stocks
- ◆ Limited potential for increased returns

 UBS

73

## Bonds: Three Terms to Know

- ◆ Coupon Rate
- ◆ Maturity Date
- ◆ Par Value

 UBS

# Bonds: Three Types to Know

Bonds are classified by the source of the issuer:

- Corporate Bonds
- Government Bonds
    - U.S. Treasury securities — T-bills, T-notes, T-bonds
    - Federal agency securities — Fannie Mae, Freddie Mac, Ginnie Mae, Sallie Mae
- Municipal Bonds*

\* Income from municipal bonds may be subject to state and local taxes, as well as the Alternative Minimum Tax.

 UBS

75

# Bonds

## Here's a switch:

You're the lender and the corporation, government or municipality is the borrower.

 UBS

# Bonds

**Some Terms to Know:**

➢ Coupon Rate

➢ Maturity Date

➢ Yield to Maturity

➢ Par Value

➢ Call Provision

 **UBS**

# Price vs. Yield



 UBS

78

# Fixed Income Instruments

**Some Broad Types to Know:**

➢ Government Bonds

➢ Corporate Bonds

➢ Municipal Bonds

➢ Certificates of Deposit

➢ Preferred Securities

➢ Mortgage Bonds

➢ Short-Term Debt

 UBS

79

# Government Bonds

**Treasury Securities**

◆ T-Bills; Notes; Bonds.

**Government-Sponsored Enterprises**

◆ Federal National Mortgage Association (Fannie Mae)

◆ Federal Home Loan Mortgage Corp. (Freddie Mac)

◆ Federal Home Loan Bank

◆ Federal Farm Credit Bank

 UBS

80

# Corporate Bond Rating System

| Investment Grade | Moody's | S&P |
| --- | --- | --- |
| Best Quality | Aaa | AAA |
| High Quality | Aa | AA |
| Upper-Med Quality | A | A |
| Medium Quality | Baa | BBB |

| Below Investment Grade | Moody's | S&P |
| --- | --- | --- |
| Speculative | Ba | BB |


UBS

# Municipal Bonds

➢ Exempt from federal income tax

➢ May be exempt from state and local taxes

➢ Ability to sell prior to maturity

 UBS

83

# Certificates of Deposit

➢ FDIC-insured*

➢ Variety of local banks and savings associations

➢ Wide range of maturities from which to choose

➢ Brokered CDs may trade in the secondary market

➢ Some CDs offer Survivor Put Option

*FDIC Insured: CDs available through UBS Financial Services Inc. are insured by the Federal Deposit Insurance Corporation (FDIC), an independent agency of the U.S. government. It is important to bear in mind that, when purchasing a CD, the interest and principal are insured up to a maximum of $100,000 for all deposits held in the same legal capacity at the same depository institution.

 UBS

# Preferred Securities

➢ Typically $25.00 par value

➢ NYSE listed

➢ Quarterly dividend payments

➢ Senior to common stock
  *Junior to other indebtedness*

 UBS

85

# GNMA Mortgage Pass-Throughs

➢ Monthly Income

➢ Payments of principal and interest are guaranteed by the full faith and credit of the U.S. government

➢ Prepayments can affect returns

 UBS

86

# Why Do Some Bonds Have Higher Yields Than Others?

**Yield levels are a function of the perceived differences in:**

➢ Expected return

➢ Risk
  - Credit
  - Call
  - Interest rate

➢ Liquidity



88

# Short-Term Debt Instruments

- ➢ Commercial Paper

- ➢ Municipal Auction Preferred Stock

- ➢ Agency Discount Notes

- ➢ Certificates of Deposit

 UBS

89

# Allocating A Portion Of Your Portfolio To Bonds Can Help To:

➢ Diversify your overall portfolio

➢ Fund liabilities

➢ Generate current income

 UBS

## Cash Reserves

- ◆ Include cash and money market securities such as Treasury bills and short-term CDs
- ◆ Can provide value stability and current interest income
- ◆ However, purchasing power can erode quickly due to inflation

 **UBS**

91



## How the Asset Classes Have Performed Historically

Year-end 1985–2005

Hypothetical value of $1 invested at year-end 1985. Assumes reinvestment of income and no transaction costs or taxes.
Source: Small Company Stocks—represented by the performance of the Dimensional Fund Advisors, Inc. (DFA) U.S. Micro Cap
Portfolio; Large Company Stocks—Standard & Poor's 500®, which is an unmanaged group of securities and considered to be
representative of the stock market in general; Government Bonds—20-year U.S. Government Bond; Treasury Bills—30-day U.S.
Treasury Bill; Inflation—Consumer Price Index.

 UBS

# Understanding Risk



 UBS

93

# Asset Allocation

It can help you to reduce risk and potentially improve long-term returns.
Remember, it's like a pie, and you determine how large to cut your slices.



�֍ UBS

94

# Managing Investment Risk
## Through Asset Allocation

How much emphasis you should place on...

◈ Stocks for growth
◈ Bonds for income
◈ Cash reserves for safety and liquidity

Will depend in part on your...
◆ Tolerance for risk
◈ Time horizon for reaching financial goals

 UBS

95

# The Investor's Pie



 UBS

96

# Diversification within Asset Classes:
## A Way to Further Manage Risk

Diversify within a single asset class to further manage risk and maximize return

- ◆ Stock allocation could include:
  - — Large-, small- or mid-cap companies
  - — Growth or value stocks
  - — U.S. or non-U.S. companies

- ◆ Bond allocation could include:
  - — Short-, intermediate- and long-term instruments
  - — U.S. government, corporate or municipal bonds
  - — Domestic or international

 UBS

97

## Mutual Funds

### Professionally Managed
### Investment Portfolios

### Mutual funds are sold by prospectus only.

 UBS

98

# Mutual Funds

The benefits:

- ◆ Diversification*
- ◆ Professional management
- ◆ Regulation & disclosure
- ◆ Choice
- ◆ Liquidity

*Diversification does not assure a profit or guarantee against loss in declining markets.

 UBS

99

# Mutual Funds

What you need to know:

- ◆ Risks
- ◆ Fees and Expenses
  - – Shareholder Fees
  - – Annual Operating Expenses
- ◆ Prospectus

 UBS

100

# Professionally Managed Accounts

### You select the manager, they manage your money.



101

# Unit Investment Trust

- Registered investment company that buys and holds a relatively fixed portfolio of stocks, bonds or other securities for a stated amount of time.
- Units in the trust are sold to investors who receive a share of principal and interest or dividends.

UITs are sold by prospectus only.

 UBS

102

# Stay on Course

An effective asset allocation strategy can help you:

◆ Balance the risk you assume with the return you earn.

◆ Understand what to expect from your investment plan.

◆ Resist the urge to respond emotionally to a market downswing.

 UBS

103

# Keep a Long-Term Perspective

◆ The longer you have before your goal (for example, retirement), the more risk you should be willing to withstand, giving you:

  — the ability to ride out the ups and downs of more volatile investments.

◆ Whether you are 30 years from retirement or only a few years away, stock investments may have a place in your portfolio:

  — Provide growth potential to offset inflation

  — Stocks have historically outperformed cash and bonds

  — Proportions of stocks to bonds and cash should change as you get older.

 UBS

104

## Final Thoughts

When investing, keep in mind:

- Stocks should be viewed as long-term investments
- Diversification within asset classes and among various industries can potentially reduce overall portfolio risk
- You should always consider your risk tolerance, goals and investment time horizon

 UBS

105

# EXHIBIT B

**ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
CENTRO JUDICIAL DE SAN JUAN
TRIBUNAL SUPERIOR**

| | |
|---|---|
| ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO, *et al.*,<br><br>Demandantes<br><br>v.<br><br>UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO, *et al.*<br><br>Demandados | CIVIL NUMERO KAC-2011-1067 (803)<br><br>S O B R E :<br><br>ACCIÓN DERIVATIVA / INCUMPLIMIENTO DE DEBERES FIDUCIARIOS / INCUMPLIMIENTO DE CONTRATO / DAÑOS Y PERJUICIOS |

**RECONVENCIONES DE LA DEMANDADA
UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO**

La demandada UBS Financial Services Incorporated of Puerto Rico ("UBS Financial"), por y a través de los abogados que suscriben, alega lo siguiente en contra de la demandante Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico (el "ASR").

**TRASFONDO DE HECHOS**

1.      Estas son reconvenciones por incumplimiento de contrato e indemnización que surgen de tres contratos de compra que la ASR otorgó con UBS Financial y otros suscriptores en el 2008 con relación a la emisión por la ASR de tres series de bonos de fondos de pensión.  En dichos contratos de compra, la ASR le representó a UBS Financial que tenía "pleno derecho, poder y autoridad legal" para emitir y entregar los bonos, que había obtenido cualquier aprobación que necesitara de las agencias gubernamentales y públicas para emitir los bonos, y que no estaba en incumplimiento con ninguna de las disposiciones constitucionales o leyes. UBS Financial compró los bonos de la ASR confiando en las representaciones de la ASR de que los bonos fueron emitidos legalmente.

2.      Además, la ASR representó en las declaraciones de ofrecimiento para los bonos que estaba emitiendo los bonos a tenor con la autoridad general contenida en la Ley 447 de la Asamblea Legislativa de Puerto Rico (la "Ley de Retiro"), que la Ley de Retiros autorizó al sistema a que tomara dinero prestado mediante la colocación de deuda y asegurar dicha deuda con sus propios activos, y que los bonos serían "legally binding special obligations of the

System, enforceable in accordance with their terms and the terms of" en la resolución de los bonos.  La ASR representó además que " all conditions, acts and things required by law" habrían existido y/u ocurrido al momento de la entrega de los bonos y que los bonos estarían dentro de cada límite prescrito por las leyes del Estado Libre Asociado.  La ASR también incorporó a las declaraciones de ofrecimiento una opinión de sus abogados que indica que los bonos "constitute legal, valid and binding limted obligations of the [ASR]."

3.       Sin embargo, cuando la ASR se unió a este pleito y presentó la Tercera Demanda Enmendada en enero de 2017, alegó que las emisiones de bonos violaban la ley de Puerto Rico.  La ASR ha mantenido dicha postura en su Cuarta Demanda Enmendada, contradiciendo sus propias representaciones contractuales y declaraciones de ofrecimiento que indicaban que los bonos eran legales y que la ASR tenía autoridad para emitir dichos bonos.  UBS Financial respetuosamente alega que las manifestaciones originales de la ASR al momento de los ofrecimientos de los bonos son correctas y sus cambio de postura motivado por el litigio debe ser ignorado.  No obstante, en caso de que se determine que los bonos no fueron autorizados o emitidos legalmente, entonces la ASR habrá incumplido materialmente con los contratos de compra con UBS Financial al hacer declaraciones falsas y ocasionar que UBS Financial incurriera en gastos sustanciales al litigar las reclamaciones de los Demandantes y otras reclamaciones que surjan de la compra de los bonos.  Además, UBS Financial tendría derecho a ser indemnizado por cualquier pérdida incurrida como resultado de las declaraciones que la ASR realizó en las declaraciones de ofrecimiento de los bonos con respecto a la legalidad de los mismos.

**A.    Las Partes.**

4.       La ASR es una entidad pública organizada bajo las leyes de Puerto Rico como un fideicomiso.  Se estableció bajo la Ley de Retiro para proveer pensiones y otros beneficios a empleados jubilados del gobierno central, los municipios y los sistemas públicos del Estado Libre Asociado de Puerto Rico.

5.       UBS Financial es una corporación de Puerto Rico que, entre otras cosas, provee servicios de banca de inversión a entidades públicas y privadas en Puerto Rico.  UBS Financial fue uno de los varios suscriptores de la ASR con relación a la emisión por la ASR de bonos de fondos de pensiones en el 2008.

**B.     La ASR decide emitir bonos de fondos de pensiones y otorga los contratos de compra con UBS Financial.**

6.      Por mucho tiempo la ASR ha sufrido de falta de fondos. Comenzando en o alrededor del 2006, y en consulta con su asesor financiero, el Banco Gubernamental de Fomento de Puerto Rico, la ASR comenzó a considerar la opción de recaudar fondos mediante la emisión de bonos de fondos de pensiones. En el 2007, la ASR estaba contemplando la emisión de bonos en el mercado global a través de Merril Lynch & Co., Inc.  Sin embargo, la ASR pospuso dicho plan y, en cambio, decidió emitir varias series de bonos en el mercado local de Puerto Rico.  Para llevar a cabo su plan, otorgó tres contratos de compra con UBS Financial y otros bancos de inversión que habían acordado fungir como suscriptores de los bonos.

7.      Específicamente, el 30 de enero de 2008, la ASR aceptó y otorgó un *Amended and Restated Purchase Contract for Senior Pension Funding Bonds, Series A* (el "Series A Purchase Contract") mediante el cual UBS Financial y los otros suscriptores acordaron:

> [u]pon the terms and conditions and in reliance on the representations, warranties and agreements set forth herein … to purchase from the [ERS] … all (but not less than all) of the $1,588,810,799.60 initial principal amount of Employees Retirement System  of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series A….

(*Véase,* Exhibit 1 ¶ 1.)  De acuerdo con el Certificado del Secretario del Sistema, la Junta de Fideicomisarios de la ASR aprobó el *Series A Purchase Contract* mediante resolución de 29 de enero de 2008 (Exhibit 1).

8.      El 28 de mayo de 2008, la ASR aceptó y otorgó un *Purchase Contract for Senior Pension Funding Bonds, Series B* (el "Series B Purchase Contract"), mediante el cual UBS Financial y los otros suscriptores acordaron:

> [u]pon the terms and conditions and in reliance on the representations, warranties and agreements set forth herein … to purchase from the [ERS] … all (but not less than all) of the $1,058,634,613.05 initial principal amount of Employees Retirement System  of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series B….

(*Véase,* el Exhibit 2 ¶ 1)  De acuerdo con el Certificado del Secretario del Sistema, la Junta de Fideicomisarios de la ASR aprobó el *Series B Purchase Contract* mediante resolución de 29 de enero de 2008 (Exhibit 2).

9.      El 26 de junio de 2008, la ASR aceptó y otorgó un *Purchase Contract for Senior Pension Funding Bonds, Series C* (el "Series C Purchase Contract" y junto con el Series A Purchase Contract y el Series B Purchase Contract, los "Contratos de Compra") mediante el cual UBS Financial y los otros suscriptores acordaron:

> [m]ediante los términos y condiciones y confiando en las representaciones, garantías y acuerdos establecidos en este documento ... para comprar a [SRE] ... toda (pero no menos que toda) la cantidad de $300,202,930.00 en capital inicial de los Bonos de Fondos de Pensiones, Serie A del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, ….

(*Véase,* el Exhibit 3 ¶ 1.)  De acuerdo con el Certificado del Secretario del Sistema, la Junta de Fideicomisarios de la ASR aprobó el *Series C Purchase Contract* mediante resolución de 26 de junio de 2008 (Exhibit 3).

10.    Los Bonos de la Serie A, Serie B y Serie C se denominan en lo sucesivo los "Bonos".

## C.    La ASR representa y garantiza a UBS Financial que tiene la autoridad legal para emitir los Bonos.

11.    Con el fin de inducir a UBS Financial a que aceptara y otorgara los Contratos de Compra, la ASR hizo varias representaciones y garantías a UBS Financial y a los otros suscriptores.  Específicamente, en el *Series A Purchase Contract*, la ASR representó que:

- The [ASR] has full legal right, power and authority to adopt the Bond Resolution, to enter into this Purchase Contract . . ., and to issue and deliver the Bonds to the Underwriters as provided herein . . . (Ex. 1 ¶ 6(a));

- Except for the approval of the Government Development Bank, which has already been or will before the Closing be obtained and is or will at the Closing be in full force and effect, no approval, permit, consent, or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the [ASR] in connection with the issuance and sale of the Bonds in the Commonwealth of Puerto Rico, or the execution or adoption and delivery by the System of, or the due performance of its obligations under this Purchase Contract . . . (Ex. 1 ¶ 6(b));

- [T]he [ASR] is not in breach of or default under any applicable constitutional provision, law (including, without limitation, any administrative rule-making law) or administrative regulation of the Commonwealth or the United States, or any agency or department of either, or any applicable judgment or decree . . . and no event has occurred and is continuing relating to bonds, notes or other evidences of indebtedness of the [ASR] or any [ASR] guaranty of bonds, notes or other evidences of indebtedness or indebtedness of others which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default under any such instrument … (Ex. 1 ¶ 6(c)).

La ASR hizo representaciones y garantías idénticas en el *Series B Purchase Contract* (*véase,* el Exhibit 2 ¶¶ 6(a), (b), (c)) y el *Series C Purchase Contract* (*véase,* el Exhibit 3 ¶¶ 6(a), (b), (c)).

## D.    La ASR representa en los *Official Statements* de los Bonos que tiene autoridad legal para emitir los bonos.

12.    La ASR también acordó en los Contratos de Compra entregar a UBS Financial copias de las declaraciones de ofrecimiento para los Bonos (los "Official Statements") y "a

certified copy of the Bond Resolution" (Exhibit 1 ¶ 2; Exhibit 2 ¶ 2; Exhibit 3 ¶ 2), y a

indemnizar a UBS Financial:

> against any and all loss, liability claim, damage and expense whatsoever, joint and
> several, arising out of any untrue statement or alleged untrue statement of material
> fact contained in the Official Statement (or any amendment or supplement thereto) or
> the omission or alleged omission of therefrom of a material fact necessary in order to
> make the statements therein, in light of the circumstances under which they were
> made, not misleading….

(Exhibit 1 ¶ 11(a); Exhibit 2 ¶ 11(a); Exhibit 3 ¶ 11(a)).

13.     La ASR representó expresamente tanto en los *Official Statements* como en el

*Bond Resolution* que tenía la autoridad legal para emitir los Bonos. Por ejemplo, en el *Series A*

*Official Statement*, la ASR declaró que "[t]he Bonds are being issued pursuant to general

authority contained in the [Retirement] Act" (Ex. 4 at []) y que "[t]he [Retirement] Act

authorizes the [ASR] to borrow money, including through the direct placement of debt, and

secure any such borrowing with its assets" (*id*., a la pág. 7).  La ASR incluyó representaciones

similares en la *Series B Official Statement* (*véase*, Ex. 5 en []) y *Series C Official Statement*

(*véase*, Ex. 6 en []).

14.     Además, el *Bond Resolution*, que se incorporó en cada uno de los *Official*

*Statements*, estableció que:

> The [ASR] is duly authorized under the Act to create and issue the Bonds and to
> adopt this Resolution and to create a security interest on the Pledged Property in
> the manner and to the extent provided in this Resolution.  … The Bonds are and
> will be the valid and legally binding special obligations of the [ASR], enforceable
> in accordance with their terms and the terms of this Resolution.

(Ex. 7 § 705)  La ASR representó además que:

> Upon the date of authentication and delivery of any of the Bonds, all conditions,
> acts and things required by law and this Resolution to exist, to have happened and
> to have been performed precedent to and in the issuance of such Bonds shall exist,
> shall have happened and shall have been performed and the issue of such Bonds,
> together with all other indebtedness of the [ASR], shall be within every debt and
> other limit prescribed by the laws of the Commonwealth.

(*Id*. § 709.3)

15.     La ASR también contrató al bufete de abogados Fiddler Gonzalez & Rodríguez,

P.S.C. para que proveyera opiniones legales, anejados a las declaraciones de ofrecimiento de los

Bonos, afirmando que, "[after having] examined the Constitution and the laws of the

Commonwealth of Puerto Rico," "[t]he Bonds have been duly authorized by the System and

constitute legal, valid and binding limited obligations of the System…." (*Véase,* el Exhibit 8 a las

págs. 1-2; Exhibit 9 a las págs. 1-2; Exhibit 10 a las págs. 1-2.)

16.     La postura actual de la ASR de que los bonos no estaban legalmente autorizados contradice totalmente sus manifestaciones dirigidas a los compradores en los *Official Statements*, los cuales aseguraban a dichos compradores que la ASR tenía la autoridad para emitir los Bonos. Al revelar todos los hechos materiales en los *Official Statements*, la ASR nunca indicó que estaba obligada a obtener la aprobación de la Asamblea Legislativa de Puerto Rico antes de emitir los Bonos.

**E.     UBS Financial compra los bonos confiando en las representaciones de la ASR.**

17.     Según se indica en los Contratos de Compra, UBS Financial y los otros suscriptores confiaron en las declaraciones y garantías de la ASR con respecto a la legalidad de los Bonos al aceptar comprar los mismos.   Habiendo recibido la garantía de la ASR de que ésta estaba legalmente autorizada para emitir los bonos y que no era necesaria una aprobación adicional de ningún otro organismo o agencia gubernamental, UBS Financial y los otros suscriptores compraron casi $3 mil millones en bonos de la ASR:

- El 30 de enero de 2008, compraron toda la cantidad de $1,588,810,799.60 en principal inicial de los Bonos de la Serie A;

- El 28 de mayo de 2008, compraron toda la cantidad de $1,058,634,613.05 en principal inicial de los Bonos de la Serie B;

- Y el 26 de junio de 2008, compran toda la cantidad de $300,202,930.00 en principal inicial de los Bonos de la Serie C

**F.     Los beneficiarios individuales de la ASR presentan reclamaciones contra UBS Financial alegando que ésta incumplió los contratos de compra.**

18.     El 29 de septiembre de 2011, dos personas, Pedro José Nazario Serrano y Juanita Sosa Pérez, quienes alegaron ser beneficiarios de la ASR (los "Demandantes Originales"), presentaron una demanda alegando reclamaciones en nombre de la ASR que surjan de la emisión de los Bonos.  Los Demandantes Originales nombraron como los demandados a UBS Financial, una de sus afiliadas, dos de los otros suscriptores de los Bonos, un asesor de la ASR, y exempleados y miembros de la Junta de Fideicomisarios de la ASR.

19.     En su demanda original, los Demandantes Originales alegaron que "la emisión de los Bonos era ilegal, ya que violaban la política pública establecida por la Asamblea Legislativa de Puerto Rico, la cual negó la aprobación de los mismos cuando éstos fueron contemplados a través del gobierno". (Demanda Original ¶ 1.4) Los Demandantes originales también alegaron que esta "violación de la política pública promulgada por la Asamblea Legislativa, constituía ... una violación de las obligaciones contractuales" de UBS Financial y que UBS Financial "cobró

ilegalmente numerosas comisiones y aranceles y deducciones relacionados con la emisión y venta imprudente, ilegal y crasamente negligente de los Bonos ... ". (*Id.*, ¶¶ 2.31, 7.3)

20.     El 16 de abril de 2013, los Demandantes Originales presentaron una Segunda Demanda Enmendada, uniéndose a cinco demandantes adicionales quienes también supuestamente se beneficiaron de la ASR (junto con los Demandantes Originales, los "Demandantes Beneficiarios").  La Segunda Demanda Enmendada incluyó alegaciones similares de que los bonos se emitieron ilegalmente.

**G.     La ASR se une a la demanda y presenta una tercera y cuarta demanda enmendada, donde reconoce que no tenía autoridad para emitir los bonos.**

21.     El 27 de septiembre de 2016, la ASR solicitó unirse a las reclamaciones de los Demandantes Beneficiarios contra UBS Financial, y se le concedió dicha solicitud con la condición de que los demandantes presentaran una demanda enmendada, añadiendo a la ASR como demandante.  El 20 de enero de 2017, la ASR y los Demandantes Beneficiarios cumplieron con la orden del Tribunal y presentaron una Tercera Demanda Enmendada.  En dicha demanda, la ASR *se unió a la alegación de los Demandantes Beneficiarios de que los Bonos eran ilegales* cuando los emitió:

> la emisión y la venta de los Bonos fueron ilícitas, pues (i) violaron la política pública establecida por la Asamblea Legislativa de Puerto Rico, la cual denegó su aprobación a las mismas cuando éstas se contemplaban a través del Gobierno; y (ii) los Bonos se garantizaron mediante la pignoración o enajenación de las aportaciones patronoales al Sistema, lo cual no está permitido por la Ley de Retiro.

(Tercera Demanda Enmendada, ¶ 1.7)  La ASR incluyó la misma alegación cuando presentó la Cuarta Demanda Enmendada el 6 de marzo de 2019. (Cuarta Demandada Enmendada, ¶ 1.6 y 6.12)  Al afirmar dicha alegaciones, la ASR contradijo sus representaciones anteriores en los Contratos de Compra y los *Official Statements* de que tenía la autoridad para emitir los bonos.

22.     Por lo tanto, en violación de sus propias representaciones contractuales y escritas, la ASR ahora alega que UBS Financial incumplió los Contratos de Compra al aceptar participar en la emisión de bonos que eran ilegales. Alegan que la emisión y venta de los Bonos violaron la Ley de Retiro y constituyeron una "conducta crasamente negligente e ilícita por parte de UBS [Financial] ...". (*Íd.* ¶4.57). Además, alegan que la conducta de UBS Financial fue una "violación por dichos demandados de sus deberes contractuales, extracontractuales y fiduciarios para con el Sistema ..." (*Íd.* ¶7.2) debido a que UBS Financial "sabía[] o debía[] saber que la emisión y venta

de los Bonos violaba la política pública establecida por la Asamblea Legislativa de Puerto Rico ... y que violaba[] la Ley de Retiro" (*Íd.* ¶6.12).

23.     La conducta deshonesta de la ASR con respecto a la legalidad de los Bonos no debe ser acreditada por este Tribunal. UBS Financial respetuosamente sostiene que la ASR lo acertó la primera vez – que los Bonos se emitieron legalmente en el 2008. Pero en la medida en que los Bonos no fueron debidamente autorizados, las representaciones expresas en los Contratos de Compra asignan a la ASR el riesgo de que los Bonos fueran ilegales. En la medida en que se determine que los Bonos no fueron legalmente autorizados, entonces la ASR ha incumplido los Contratos de Compra y es responsable ante UBS Financial por los daños que resulten de dichos incumplimientos.

24.     UBS Financial ha incurrido en gastos sustanciales para litigar las reclamaciones de incumplimiento de contrato de los Demandantes Beneficiarios y de la ASR y otras reclamaciones que surgen de su compra de los Bonos. Además, UBS Financial enfrenta reclamaciones potenciales derivadas de las representaciones del ASR en los *Official Statements* sobre la legalidad de los Bonos.

## <u>Causa I</u>

## <u>Incumplimiento de Contrato</u>

25.     UBS Financial reitera y reincorpora las alegaciones establecidas en los párrafos 1 al 24 como si constaran aquí.

26.     Los Contratos de Compra son contratos válidos y obligatorios.

27.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá incumplido materialmente sus obligaciones contractuales en virtud de los Contratos de Compra al representar falsamente a UBS Financial que tenía " full legal right, power and authority … to issue and deliver the Bonds."

28.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá incumplido materialmente sus obligaciones contractuales en virtud de los Contratos de Compra al representar falsamente a UBS Financial que "no approval, permit, consent, or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the [ASR] in connection with the issuance and sale of the Bonds in the Commonwealth of Puerto Rico, or the execution or adoption and

delivery by the System of, or the due performance of its obligations under th[e] Purchase Contract[s]."

29.      En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá incumplido materialmente sus obligaciones contractuales en virtud de los Contratos de Compra al declarar falsamente a UBS Financial que "[it was] not in breach of or default under any applicable constitutional provision, law (including, without limitation, any administrative rule-making law) or administrative regulation of the Commonwealth or the United States, or any agency or department of either, or any applicable judgment or decree."

30.      UBS Financial confió expresamente en la veracidad de las representaciones anteriores al firmar los Contratos de Compra.

31.      En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, los incumplimientos materiales de los Contratos de Compra por la ASR habrán provocado que UBS Financial sufriera daños sustanciales al litigar las reclamaciones de la ASR y los Demandantes Beneficiarios y otras reclamaciones con relación a los Contratos de Compra.

32.      Los Demandantes Beneficiarios han presentado reclamaciones contra UBS Financial, alegando que UBS Financial es responsable de pagarles los daños porque los Bonos fueron emitidos ilegalmente.

33.      En el caso de que se determine que UBS Financial es responsable ante los Demandantes Beneficiarios, dicha responsabilidad habrá surgido, total o parcialmente, por virtud del incumplimiento material por la ASR de sus obligaciones en virtud de los Contratos de Compra.

34.      Como resultado, UBS Financial tendrá derecho a daños y perjuicios en una cantidad a ser determinada en el juicio, junto con intereses pre y post-sentencia.

## Causa II

## Indemnización

35.      UBS Financial reitera y reincorpora las alegaciones establecidas en los párrafos 1 al 34 como si constaran aquí.

36.      Los Contratos de Compra son contratos válidos y obligatorios.

37.      La ASR acordó en los Contratos de Compra indemnizar a UBS Financial "against any and all loss, liability, claim, damage and expense whatsoever, joint and several, arising out of any untrue statement or alleged untrue statement of material fact contained in the Official

Statement … or the omissions or alleged omission therefrom of a material fact necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading…."

38.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá representado falsamente en los *Official Statements* de los Bonos que los Bonos fueron "issued pursuant to general authority contained in the [Retirement] Act".

39.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá representado falsamente en los *Official Statements* de los Bonos que "[t]he [Retirement] Act authorizes the [ASR] to borrow money, including through the direct placement of debt, and secure any such borrowing with its assets".

40.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá representado falsamente en el *Bond Resolution* – que se incorporó a los *Official Statements* – que "[t]he [ASR] is duly authorized under the Act to create and issue the Bonds and to adopt this Resolution and to create a security interest on the Pledged Property in the manner and to the extent provided in this Resolution".

41.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá representado falsamente en el *Bond Resolution* que "[t]he Bonds are and will be the valid and legally binding special obligations of the [ERS], enforceable in accordance with their terms and the terms of this Resolution".

42.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá representado falsamente en el *Bond Resolution* que "[u]pon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and this Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the [ASR], shall be within every debt and other limit prescribed by the laws of the Commonwealth."

43.     En el caso de que se determine que los Bonos son ilegales o emitidos de manera no válida, la ASR habrá omitido los hechos materiales de los *Official Statements* necesarios para hacer que las declaraciones que aparecen en ellos no induzcan a error.

44.     Como resultado de lo anterior, la ASR deberá indemnizar UBS Financial por las pérdidas en que ésta incurra.

## SOLICITUD DE REMEDIO

POR TODO LO CUAL, UBS Financial respetuosamente solicita que se dicte sentencia a su favor y se otorgue los siguientes remedios:

        A.      Indemnización por daños y perjuicios en una cantidad a ser determinada en el juicio;

        B.      Una sentencia que ordene que el SRE deberá indemnizar a UBS Financial por cualquier responsabilidad a la que es o estará sujeta;

        C.      Cualquier otro remedio que el Tribunal estime justo y apropiado.