**EXHIBIT B**

**COMMONWEALTH OF PUERTO RICO**
**COURT OF FIRST INSTANCE**
**SAN JUAN SUPERIOR PART**

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; PEDRO JOSÉ NAZARIO SERRANO, HIS SPOUSE, JUANITA SOSA PÉREZ AND THE CONJUGAL PARTNERSHIP COMPRISED BY BOTH; JOEL RIVERA MORALES; MARÍA DE LOURDES GOMEZ PEREZ; HECTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; AND, LUIS M. JORDAN RIVERA,

Plaintiffs,

v.

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO AND UBS CONSULTING SERVICES OF PUERTO RICO; ABC INSURANCE COMPANY, INC.; XYZ INSURANCE COMPANY, INC.,

Defendants.

CIVIL NO.: KAC-2011-1067 (803)

RE: BREACH OF CONTRACT DAMAGES

[Court Clerk Receipt Stamp - March 6 2019]

**MOTION FOR AUTHORIZATION TO FILE *FOURTH AMENDED COMPLAINT***

**TO THE HONORABLE COURT**:

**COME NOW PLAINTIFFS**, through their undersigned attorneys, and very respectfully STATE, ALLEGE AND PRAY:

1. Motions of voluntary dismissal were recently filed whereby co-defendants Santander Securities, LLC, Samuel Ramirez, Inc., and Hector Mayol ceased to be parties to the case. For this reason, and for the purpose of refining and simplifying the allegations, movants consider that it is appropriate to file a new amended complaint.

2. Pursuant to Rules 13.1 and 13.4 of Civil Procedure Rules of 1979, 32 L.P.R.A. App. V, R.13.1 and 13.4, as well as their interpretive case law, it is requested that the Honorable Court authorizes the more specific *Fourth Amended Complaint*, which is attached hereto.

3. Rule 13.1, *supra*, which addresses amended and supplementary pleadings, reads as follows:

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

> *"A party may amend his pleading once at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been set for trial, he may amend it at any time within twenty (20) days after it is served. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party;* ***and leave shall be freely given when justice so requires****. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within twenty (20) days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders."* (Emphasis Added)

4. The policy firmly established in our legal system is that the rules that grant discretion to the Courts to authorize amendments to pleadings are reparative precepts that must be interpreted liberally. Neca Mortgage Corporation v. A & W Developers S.E. 137 D.P.R. 860,867 (1995). Interpreting the above Rules, our Supreme Court has reiterated that the power to give leave to amend pleadings must be exercised liberally. See Cruz Cora v. UCB/Trans Union P.R. Div. 137 D.P.R. 917 (1995).

5. Indeed, the power of the courts to allow amendments to pleadings is broad, and a clear abuse of discretion or manifest detriment to the opposing party must be demonstrated for the judge's action to be revoked. Id; Torres v. Ramos. 28 D.P.R. 586 (1920).

6. Based on the foregoing, we respectfully submit that (i) in view of the fact that the initial conference has not yet been held under Rule 37.1 of the Rules of Civil Procedure and (ii) it is in the interests of both parties and the Court, after the voluntary dismissal of three defendants, to refine the pleadings so as to work with clearer and simpler allegations, movants be authorized to amend the *Complaint*, pursuant to our law and the liberal interpretation of Rules 13.1 and 13.4 of Civil Procedure, for the purpose of summarizing the allegations and to clearly establish and specify them. To this end, a *Fourth Amended Complaint* is attached hereto with the request that this Court authorize its filing.

**WHEREFORE**, movant respectfully requests this Honorable to allow the filing of the *Fourth Amended Complaint* attached hereto, with any other pronouncement that may be appropriate in law.

**RESPECTFULLY SUBMITTED.**

WE HEREBY CERTIFY: That a true and exact copy of this document has been sent to: **UBALDO M. FERNÁNDEZ BARRERA, ESQ., SALVADOR ANTONETTI**

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

**STUTTS, ESQ**. and **MAURICIO O. MUÑIZ LUCIANO, ESQ.**, O'NEILL & BORGES LLC, Avenida Muñoz Rivera 250, Suite 800, San Juan, PR 00918-1813; **PAUL J. LOCKWOOD, ESQ.**, **NICOLEA DISALVO, ESQ**. and **ELISA M.C. KLEIN, SKADDEN, ARPS, SLATE MEAGHER & FLOM**, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899.

In San Juan, Puerto Rico, on this 6th day of March 2019.

**VICENTE & CUEBAS**
**P.O. Box 11609**
**San Juan, PR 00910-1609**
**Tel.: (787) 751-8000**
**Fax.: (787) 756-5250**

**[Signed]**

**HAROLD D. VICENTE-GONZÁLEZ**
**RUA NO. 3966**
**E-Mail: *hvicente@vclawpr.com***

**[Signed]**

**HAROLD D. VICENTE COLÓN**
**RUA NO. 11303**
**E-Mail: *hdvc@vclawpr.com***

**[Signed]**
**IVELISSE M. ORTIZ MOREAU**
**RUA NO. 18640**
**E-mail: *iortiz@vclawpr,corn***

**PUJOL LAW OFFICE, PSC**
**P.O. Box 363042**
**San Juan, PR 00936-3042**
**Tel.: (787) 724-0900**
**Fax.: (787) 724-1196**

**[Signed]**

**FRANCISCO PUJOL MENESES**
**RUA NO. 11883**
**Email: fpuiol@puioIIawpr.com**

*ATTORNEYS FOR INDIVIDUAL PLAINTIFFS*
*BENEFICIARIES OF THE RETIREMENT SYSTEM AND THE COMMONWEALTH OF PUERTO RICO GOVERNMENT EMPLOYEES RETIREMENT SYSTEM ADMINISTRATION*

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

**FEDERICO HERNÁNDEZ DENTON**
**P,O, Box 9021279**
**San Juan, PR 00902-1279**
**Tel.: (787) 758-3542**

**[Signed]**

**FEDERICO HERNANDEZ DENTON**
**RUA NO. 3846**
**E-Mail:**
***f.hernandezdenton@grnail,com***

**WOLF POPPER LAW OFFICES, PSC**
**654 Plaza**
**654 Avenida Muñoz Rivera, Suite 1001**
**San Juan, PR 00918**
**Tel.: (787) 522-0200**
**Fax.: (787) 522-0201**

**[Signed]**

**CARLOS LÓPEZ LÓPEZ**
**RUA NO. 10526**
**E-Mail:** ***clopez@wolfpopperpr,com***

**[Signed]**

**RODOLFO CARRION VARGAS**
**RUA NO. 13390**
**E-Mail:** ***rcarrion@wolfpopperpr.com***

**PUERTO RICO ATTORNEYS & COUNSELORS AT LAW**
**P,O, Box 362122**
**San Juan, PR 00936-2122**
**Tel.: (787) 767-1919**
**Fax (787) 764-9120**

**[Signed]**

**JOSE CHAVES CARABALLO**
**RUA NO. 7953**
**E-Mail: chaves@fc-law,com**

*ATTORNEYS FOR THE COMMONWEALTH OF PUERTO RICO GOVERNMENT EMPLOYEES AND JUDICIARY RETIREMENT SYSTEM ADMINISTRATION*

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

**COMMONWEALTH OF PUERTO RICO**
**COURT OF FIRST INSTANCE**
**SAN JUAN SUPERIOR PART**

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; PEDRO JOSÉ NAZARIO SERRANO, HIS SPOUSE, JUANITA SOSA PÉREZ AND THE CONJUGAL PARTNERSHIP COMPRISED BY BOTH; JOEL RIVERA MORALES; MARÍA DE LOURDES GOMEZ PEREZ; HECTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; AND, LUIS M. JORDAN RIVERA<br><br>Plaintiffs<br><br>v.<br><br>UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO AND UBS CONSULTING SERVICES OF PUERTO RICO; ABC INSURANCE COMPANY, INC.; XYZ INSURANCE COMPANY, INC.,<br><br>Defendants. | CIVIL NO.: KAC-2011-1067 (803)<br><br>RE: BREACH OF CONTRACT DAMAGES<br><br>[ Stamped by the Court Clerk March 6 2019] |

**<u>FOURTH AMENDED COMPLAINT</u>**

**TO THE HONORABLE COURT:**

COME NOW plaintiffs, through their undersigned attorneys, and very respectfully STATE, ALLEGE AND PRAY:

## I. NATURE OF THE CASE AND SUMMARY

1.1. During the first half of 2008, the Puerto Rico Government Employees and Judiciary Retirement System Administration (hereinafter the "System") issued three (3) long- term pension obligation bonds (the "Bonds") for a total amount of approximately three billion dollars ($3 billion) and placed them in the Puerto Rican market through a group of underwriters managed by UBS Financial Services lncorporated of Puerto Rico ("UBS").

1.2 The purpose of said transaction was for the System to obtain funds at low-interest rates, in order to reinvest them at higher return rates, and thus produce a recurring profit for the System ("positive arbitrage") during the term of the Bonds. This was not achieved. The Bonds were placed in the local market at such high interest rates that the System has lost, loses and will

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

continue to lose multimillion-dollar sums, because it has not been able to place the funds product of the Bonds at sufficiently high return rates to produce revenues and amortize the cost of the issuance and sale of the Bonds.

1.3. Before the issuance and sale of the Bonds took place, in 2008, UBS, as lead underwriter, represented to the System that UBS was an expert in financial advice and had the capacity to place the Bonds, in order to convince the System to engage UBS to undertake the issuance.

1.4 Among the representations made by UBS to convince the System that the issuance and sale of the Bonds would be beneficial and would help with the solvency of the System's coffers, was that the proceeds thereof would generate a positive arbitrage, which would result in profits for the System. Not only were those representations false, but they were made so that UBS could make a profit and collect fees and commissions, such as those it actually charged, which exceeded $35 million.

1.5 On April 4, 2013, Act No. 3 of 2013 was passed to comprehensively reform the Commonwealth of Puerto Rico Government Employee System (the "System"). The approval of this Act was an attempt to mitigate the serious financial crisis in which this System and the Commonwealth of Puerto Rico ("ELA") find themselves. The Legislative Assembly of Puerto Rico itself concluded that the issuance of the Bonds was one of the causes of this serious crisis and this was pointed out in the Statement of Motives of said Act. As a significant fact, the legislators expressed that the Bonds will cost the System around $6 billion in interest, plus the repayment of the principal.

1.6 In addition, as explained below, the issuance and sale of the Bonds were illicit as

(i) they violated the public policy established by the Legislative Assembly of Puerto Rico, which denied their approval when they were contemplated throughout the Government; and

(ii) the Bonds were guaranteed by pledging or alienating employer contributions to the System, which is not permitted by the Retirement Act.

1.7 This Fourth Amended Complaint is filed for the benefit of the System and the individual Claimants identified below, to recover the serious damages suffered both by the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Certified Translation

System and by said individual Plaintiffs, caused by the grossly negligent conduct of UBS and UBS Consulting Services of Puerto Rico ("UBS Consulting").

## II. THE PARTIES

**Plaintiffs**:

2.1. The Retirement Systems is a trust created by Act Number 447 of May 15, 1951, as amended (the "Retirement Act"). The trustees of the System are the members of its Board of Trustees and the fideicommissaries/beneficiaries thereof are the active and retired employees of the Government of Puerto Rico and its political subdivisions and instrumentalities (hereinafter, collectively, the "Government"). As a result of defendants' acts and omissions described in detail below, the system has suffered losses above $800 million.

2.2. Plaintiffs Pedro José Nazario Serrano and Juanita Sosa Pérez are of legal age, married to each other, he is retired from the Puerto Rico Treasury Department and she from the Municipality of Carolina, Puerto Rico, and appear in their respective personal capacities and as representatives of the conjugal partnership comprised by both. They are residents of Carolina, Puerto Rico and their mailing address and telephone number are as follows: P.O. Box 3603, Bayamón Gardens Station, Bayamón, Puerto Rico 00958, (787) 289-0233. The direct damage that the defendants' negligent conduct has caused these Plaintiffs is that they have lost their summer bonus and the right to be reimbursed for the cost of medications. This situation has also generated and will continue to cause intense anguish and suffering.

2.3. Co-Plaintiff Joel Rivera Morales is of legal age, married, employed by the Puerto Rico Ports Authority and a resident of Carolina, Puerto Rico. His address is Villa Fontana Park 5DD24, Muñoz Rivera Street, Carolina, Puerto Rico 00982 and his phone number is (787) 390-5242. The direct damage that the negligent conduct of the defendants has caused Mr. Rivera Morales is that, instead of being able to retire at age 65 with 65% of his salary, he will now have to wait until age 67 and will receive only 34% of his salary, which will not be enough to cover his expenses. This situation has also generated and will continue to cause intense anguish and suffering.

2.4. Co-Plaintiff María de Lourdes Gómez Pérez is of legal age, married, employed at the Department of Family Affairs, and a resident of Carolina, Puerto Rico. Her address is Calle 9 M-14, Urb. Mountain View, Carolina, Puerto Rico and her telephone number is (787) 390-5242. The direct damage that the defendants' negligent conduct has caused Ms. Gómez Pérez is that,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **7** of **36**

Certified Translation

after 28 years [working at] the Department of Family Affairs, instead of being able to retire within a year and a half, she will now have to work an additional 6 years and will receive only 38% of her salary, which will not be enough to defray her expenses. This situation has also generated and will continue to cause intense anguish and suffering.

2.5. Co-Plaintiff Héctor Cruz Villanueva is of legal age, married, a civilian employee in the Puerto Rico National Guard, and a resident of Vega Baja, Puerto Rico. His address is Chalets de la Playa, Apartment 487, Vega Baja, Puerto Rico 00693 and his phone number is (787) 647-4584. The direct damage that the defendants' negligent conduct has caused Mr. Cruz Villanueva is that, after 24 years as a civilian employee of the Puerto Rico National Guard, at the time of his retirement he will receive well under 75% of his salary, which will not be sufficient to defray his expenses. This situation has also generated and will continue to cause intense anguish and suffering.

2.6. Co-Plaintiff Lourdes Rodríguez is of legal age, married, employed at the Municipal Revenue Collection Center (CRIM) and a resident of Guaynabo, Puerto Rico. Her address is Guácima 0-1, Urb. Santa Clara, Guaynabo, Puerto Rico 00969 and her telephone number is (787) 632-2697. The damage that the defendants' negligent conduct has caused Ms. Rodríguez is that, instead of being able to retire in two years when she turns 57 and receives 40% of her salary, she will not be able to retire until about 10 years from now, when she turns 65. Even so, she will only receive a much lower percentage of her salary, which will not be enough to cover her expenses. This situation has also generated and will continue to cause intense anguish and suffering.

2.7. Co-Plaintiff Luis M. Jordán Rivera, is of legal age, married, employed at the Municipal Revenue Collection Center (CRIM) and a resident of San Juan, Puerto Rico. His address is Condominio Miramar Tower, Apartment 5-I, #721 Calle Hernández, San Juan, Puerto Rico 00907 and his phone number is (787) 632-7543. The damage that the negligent conduct of the defendants has caused Mr. Jordán Rivera is that, after working for 28 years at CRIM, at the Municipality of San Juan, at the Department of the Treasury and at the Institute of Culture, instead of being able to retire within a year receiving 75% of his salary, he is now only going to receive 46% of his salary, which will not be enough to cover his expenses. This situation has also generated and will continue to cause intense anguish and suffering.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **8** of **36**

**Defendants:**

2.8. Defendant UBS Financial Services Incorporated of Puerto Rico ("UBS") is a corporation organized and existing under the laws of Puerto Rico, engaged in the business of investment banking, financial advice and securities brokerage. Its address and phone number are: Penthouse - American International Plaza, 250 Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto Rico 00918, Phone: (787) 284-3445.

2.9. Defendant UBS Consulting Services of Puerto Rico ("UBS Consulting") is a corporation or legal person whose place of formation or incorporation is unknown at this time. It is an affiliate or subsidiary of UBS Financial Services Incorporated of Puerto Rico or an entity related to it and, during the time period relevant to this Fourth Amended Complaint, provided financial advice services to the System. Its known address and phone number are: Penthouse-American International Plaza, 250 Muñoz Rivera Avenue, Hato Rey, San Juan, PR 00918, Telephone (787) 284-3435.

2.10. Unknown Defendant ABC Insurance Company, Inc. is the insurance company, if any, that issued the policy, if any, which, during the time relevant to this Fourth Amended Complaint insured liability for damages caused by acts, omissions, or negligent and/or illicit conduct on the part of UBS officials when the issuance and sale of the Bonds or part(s) thereof was negotiated and/or completed. Its correct name, place of incorporation, telephone number and fax number are not known at this time.

2.11. Unknown Defendant XYZ Insurance Company, Inc. is the insurance company, if any, that issued the policy, if any, which during the time relevant to this Fourth Amended Complaint insured liability for damages caused by acts, omissions, or negligent and illicit conduct on the part of UBS Consulting. Its correct name, place of incorporation, telephone number and fax number are not known at this time.

## III. PLAINTIFFS' STANDING

3.1. The System is a trust created by the Retirement Act. The Administrator administers the System and is appointed by the Board of Trustees. The members of the Board of Trustees are the trustees of the trust constituted by the System. The active and retired employees of the Government are the fideicommissaries or beneficiaries of the trust constituted by the System. The Plaintiffs herein are active or retired employees of the Government and, therefore, beneficiaries/ fideicommissaries of the trust constituted by the System.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

3.2. Moreover, Act No. 3 of April 4, 2013, in Section 40, also confers standing to the Plaintiffs herein, by specifically providing:

> "A Cause for action is hereby recognized to the participants and pensioners of the Employees Retirement System of the Government of Puerto Rico and the Judiciary to sue, on their own behalf, non-government investment advisors and underwriters in any transaction in which pension obligation bonds have been issued by the Employees Retirement System of the Government of Puerto Rico and the Judiciary, for damages caused to the System or its beneficiaries."(Emphasis added).

## IV. FACTS

### The 2008 Issuance of Bonds

4.1 During 2007, the investment banking and securities brokerage firm Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") proposed to the then Administrator and the Board of Trustees of the System a long-term issuance of bonds on the principal amount of at least seven billion dollars ($7 billion), to be placed outside Puerto Rico, at interest rates that would allow the System (i) to use approximately seven hundred million dollars ($700,000,000) for current expenses and obligations of the System, injecting liquidity into it; and (ii) invest the remaining six billion three hundred million dollars ($6.3 billion) in securities or instruments that would generate earnings over interest or dividends in excess of the interest payable by the System on the bonds. This excess or positive differential ("positive arbitrage") would produce profits for the System, which would allow it to mitigate its chronic lack of liquidity.

4.2. The high total aggregate principal amount of the proposed System bonds was crucial, because the projected profits would be minimal or even insignificant in reduced volumes of principal and could be insufficient to cover the costs inherent to the issuance, distribution and sale of the proposed bonds.

4.3. After a few months, Merrill Lynch was unable to complete the transaction, since they did not identify a reasonable demand in the market outside Puerto Rico to place the proposed System bonds, at sufficiently low-interest rates to produce the positive arbitrage that the System needed.

4.4. During the period in which the System was negotiating with Merrill Lynch the aforementioned possible issuance of bonds of at least seven billion dollars ($7 billion), the defendant UBS Consulting, directly or through its affiliate(s), under a contract, acted as investment

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

advisor to the Administration and/or the Board of Trustees of the System and falsely represented to said Administration and said Board that it could invest the proceeds from the sale of the Bonds at return rates much higher than the interest that the System would pay for the Bonds.

4.5. Upon realizing that Merrill Lynch could not place the seven billion dollars ($7 billion) of the proposed bonds outside of Puerto Rico, UBS proposed to the System that it contract UBS itself as an underwriter to issue and sell the proposed bonds. On February 14, 2007, UBS and UBS Consulting, in their attempt to convince the System to hire them as advisors and carry out the aforementioned issuance, made a Power Point presentation to the System's Board of Trustees (see **ANNEX 1**). In that presentation UBS and UBS Consulting represented to the members of the System's Board of Trustees that UBS[,] their firm[,] was among the top ten (10) investment banks globally (**ANNEX 1**, page 3). UBS offered the Retirement System an impressive combination of expertise and global strength, as well as a partnership that guaranteed superlative execution, novel solutions and maximum knowledge in terms of investment advice. (**ANNEX 1**, pages 5, 7 and 10). UBS also committed to acknowledge and accept fiduciary liability and that this is what could be expected from its “Consultant". (**ANNEX 1**, page 26). Regarding the particular problems and challenges of the Puerto Rico Pension System, UBS stressed that it had extensive experience in reconciling market conditions and expectations of results. (**ANNEX 1**, pages 29, 40, 47 and 48).

4.6. UBS also represented that it could successfully achieve the placement of the proposed bonds due to its important presence in Puerto Rico and the high volume of the local investment portfolio under its responsibility, as well as invest the proceeds of such sale at a return rate that would produce profits for the System.

4.7. Eventually, the Retirement [System’s] Board of Directors hired UBS as the firm in charge of the underwriting of the Retirement System Bonds in the amount of approximately three billion dollars. These were issued on January 29, 2008 (Series A); May 28, 2008 (Series B); and June 26, 2008 (Series C) (collectively, the "Retirement Bonds").

4.8. Among the representations made by UBS and UBS Consulting to the members of the System's Board of Trustees to convince the System that the issuance would be beneficial and would help with the solvency of the System's coffers, was that the proceeds of the issuance would generate a positive arbitrage, which would result in net revenues for the System and that, if part of

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Certified Translation

the issuance was made in the local market, it would be more economical and produce a higher return rate. Not only were those representations false, but they were made so that UBS and the other firms that participated in the issuance could make a profit and earn commissions and fees, such as those which they actually earned, which exceeded $35 million.

4.9. UBS, through its then chief executive officer Miguel A. Ferrer, represented to not only the System, but the country in general, through press releases, that the issuance and sale of the Bonds, as recommended by UBS Consulting and UBS, would result in a positive arbitrage for the System from the moment such transactions became effective.

4.10. UBS's proposal was accepted by the System on the basis of representations made by UBS and UBS Consulting. Both UBS and UBS Consulting knew or should have known that the following points were crucial for the financial operation to be successful and to meet the objectives of the System:

4.10.1. That the Bond issuance amount would be sufficiently high (at least $7 billion) to (i) cover the costs of its origination, issuance, distribution and sale; and (ii) produce revenues for the System through the investment by the System of most of the net proceeds from the sale of the Bonds at return rates that would exceed the cost of the Bonds to the System.

4.10.2. That the Bonds' interest rate would be low enough to allow the System to achieve a positive arbitrage by investing the proceeds of their sale.

4.10.3. That the securities in which the System invested the proceeds of the sale of the Bonds were extremely stable and with a minimum credit and/or market risk, since the System could not afford the possibility of losing all or part of its principal or of incurring a loss in interest and/or dividends ("negative arbitrage").

4.10.4. That the proportion of the proceeds of the Bonds' sale that would be used by the System to solve its immediate needs be the least possible (no more than approximately ten percent (10%) of the proceeds of the sale), since the great majority of said proceeds would have to be placed by the System in investments to achieve the positive arbitrage needed by the System and which was the main rationale of the proposed issuance and sale of the Bonds.

4.11. Having knowledge of the foregoing, the System and UBS awarded contracts for the issuance and sale of the Bonds, but not for the full amount originally contemplated of at least seven

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **12** of **36**

billion dollars ($7 billion), rather for amounts that were inferior and not sufficient to achieve the aforementioned objectives of the System and without any provision that would require (i) the sale of the total amount necessary for the original plan conceived by Merrill Lynch and well known by UBS and UBS Consulting, to work; or (ii), in absence thereof, the cancellation of the partial issue and sale of Bonds if the total amount necessary for the plan to function was not accomplished. In other words, there was no "all or nothing provision", which was prudent and necessary to protect the System and its pensioners from the possible negative consequences of not achieving the issuance on the total amount contemplated.

4.12. Neither did UBS investigate whether the local market had sufficient depth to absorb seven billion dollars ($7 billion) in System bonds, on dates when (i) the local economy had already been contracting for months (ii) local investors were suffering substantial losses in their real estate investments and securities, including, without limitation, bank shares and/or debt instruments guaranteed by banks or other financial institutions; (iii) Puerto Rico's population was aging and declining; and (iv) unemployment in Puerto Rico was increasing.

4.13. Pursuant to said UBS contract with the System, during the first half of 2008, UBS acted as lead underwriter in the following three issuances, distributions and sales in the local market of System bonds (hereinafter "Bonds"), for the aggregate principal amount of approximately three billion dollars ($3 billion), that is, less than half of the seven billion dollars ($7 billion) originally contemplated:

4.13.1. "Senior Pension Funding Bonds, Series A", for one thousand five hundred and fifty-eight million eight hundred and ten thousand seven hundred and ninety-five dollars and sixty cents ($1,558,810,795.60), as of January 29, 2008.

4.13.2. "Senior Pension Funding Bonds, Series B", for one thousand fifty-eight million six hundred thirty-four thousand six hundred thirteen dollars and five cents ($1,058,634,613.05), dated May 28, 2008.

4.13.3. "Senior Pension Funding Bonds, Series C", for three hundred million two hundred two thousand nine hundred and thirty dollars ($300,202,930), as of June 26, 2008.

4.14. The maturity of the Bonds fluctuates between July 1, 2023 and July 1, 2058, and their interest rates fluctuate between 5.85% and 6.55% per annum. Such interest is exempt from

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Certified Translation

income tax for residents of Puerto Rico.

4.15. Each of the “Official Statements’ of the Bonds states that if future market conditions were favorable, the System would consider issuing additional bonds during 2008. Obviously, as it was logical and prudent to presume, such favorable market conditions did not occur and the System has not been able to issue bonds after the issuance of the referred Series C Bonds, on June 26, 2008. The Official Statement of the Series A Bonds represented that the Series B Bonds would not be sold in Puerto Rico under any circumstances. However, both Series B Bonds and Series C Bonds were sold exclusively in Puerto Rico.[1]

4.16. The use of the proceeds from the sale of the Bonds, according to tables appearing in the "Official Statement" of each issue, in the section entitled "Use of Proceeds"), was represented as follows:

| **Use** | **Amount** |
|---|---|
| Initial discount | $ 7,889,350 |
| Transfer to the System to settle retirement benefits | 2,728,354,898 |
| Underwriters discount and issuance costs | 35,744,191 |
| Capital interest account deposits | 93,737,392 |
| Senior bond debt service account deposits | 81,922,512 |
| **Total** | **$2,947,648,343** |

4.17. As can be seen, the proposed use of the Bonds’ sale proceeds, as represented in said tables, which appear on page 17 of each of the "Official Statements" and are summarized in 4.16, *supra*, was different to the one it had been contemplated when it intended to make the bond issuance for seven-billion-dollar ($7 billion) through Merrill Lynch, and it was not in line with the original model proposed by Merrill Lynch and subsequently by UBS, to create a recurring profit for the System through positive differentials between dividend and interest earnings, on the one hand and interest cost, on the other hand ("positive arbitrage"). It should be noted that said “Offering Statements" present contradictory information about the use of the funds resulting from the sale of the Bonds, since in their introductory pages and page 17 of each of them it is stated that

[1] *See* Section 6.5, *infra*, on misrepresentations in the Official Statements regarding this subject.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **14** of **36**

the System would invest the proceeds from the sale of the Bonds and would use those investments and the revenues thereby produced to pay for pension benefits to its beneficiaries which is not in line with what is summarized in 4.16, *supra*.

4.18. In fact, as explained below, the proceeds from the sale of the Bonds were not used as depicted in the Offering Statements or as proposed to the System's Board of Trustees, and the Bonds have caused, cause and will continue to cause significant losses and serious financial damage to the System. In reality, the proceeds are used approximately as follows and the exact figures of their use will emerge from the discovery of evidence in this case:

4.18.1. Of the sum of approximately $1.6 billion coming from the issuance and sale of the Series A Bonds, approximately $937 million in bonds and shares were invested through Citibank, N.A. and/or its affiliate(s) (hereinafter and collectively, "Citi"). The $937 million invested through Citi are producing an annual return rate of approximately 4.11%, significantly lower than the interest that the Bonds pay, which fluctuates between 5.85% and 6.55% per annum. The remaining balance of the proceeds from the issued Series A Bonds, amounting to approximately $642 million, was used for the payment of costs and deductions related to the issuance and sale of the Bonds, reserve for debt service and payment of System expenses and pensions and therefore does not generate any revenue for the System.

4.18.2. Of the aggregate amount of approximately $1.4 billion resulting from the issuance and sale of the Series B and Series C Bonds, approximately 564 million were used to cover the system's cash needs and pension obligations, which generates no income for the system. The remaining $836 million were deposited in the Government Development Bank for Puerto Rico ("the GDB"), earning interest only at 2% per annum (despite the fact that the interest rate payable on the Bonds fluctuates between 5.85% and 6.55% per annum), but as of June 30, 2010 only $737 million remained, as approximately $99 million had been used to cover the System's funding needs.

4.19. This means that, of the approximately $3 billion in the Bonds' principal, for which the System pays and will pay interest, until maturity, at between 5.85% and 6.55% per annum, as of June 30, 2010 the only unspent investment was $1.674 billion, of which the approximate $937 million invested through Citi returned approximately 4.11% per annum to the System, while the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Certified Translation

$737 million invested in deposits in the GDB returned only 2% annually to the System.

4.20. The approximately $1.326 billion received by the System and spent and not invested returns absolutely nothing and costs the System between 5.85% and 6.55% per annum. Excluding the cost of those approximately $1.326 billion received and spent (not invested) by the System, it is estimated that the approximately $1.674 billion received and invested by the System have cost, costs and will cost the System approximately $55 million annually in negative arbitrage. This does not include the nearly $36 million on discount, issuance and sale costs of the Bonds incurred and paid by the System when they were issued and sold, nor the financial advisory fees paid by the System to UBS, nor the fees that the System has paid and continues to pay to UBS Consulting.

4.21. Said losses began when the Series A Bonds were issued and sold on January 29, 2008, and will end when the Bonds mature between the years 2023 and 2058. The exact amount of losses to the System caused by the issuance and sale of the Bonds will be calculated more accurately as the documents to be requested in the discovery of evidence in this case are obtained, but it is preliminarily estimated that the present value of these losses is approximately eight hundred million dollars ($800 million). Incredibly, when the Series B and Series C Bonds were issued, the Series A Bonds had already generated millionaire losses to the System, which was not taken into consideration when the Series B and Series C Bonds were issued.

4.22. As can be seen, the Bonds have actually created a negative arbitrage for the System, which is exactly the opposite of the positive arbitrage which was the main objective pursued by the System upon issuing the Bonds. This has negatively affected the liquidity of the System, significantly weakened its financial condition, caused the credit downgrade of the Government obligations in general and caused serious damage to the Plaintiffs herein (Act No. 3 of April 4, 2013, *supra*).

4.23. The contributions to the System by the Government, as an employer, are the only source of payment and collateral of the Bonds and, following UBS recommendations, the System alienated or pledged them in favor of the bondholders, as a guarantee and source of payment of the Bonds. Through the Bonds issuance and said alienation or pledge, the debt evidenced by the Bonds increased, de facto, the System's total debt and has negatively affected the rating of the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **16** of **36**

Certified Translation

Government's obligations, causing serious damage not only to the System but also to Puerto Rico in general. Said alienation or pledge of the System's employer contributions violates the provisions of Sections 2-116 and 3-105 of the Retirement Act, which restrictively provide for the permitted use of such contributions, none of which is the payment of System bonds or debts.[2] The right to collect said contributions is clearly an asset of the System and, if the System does not now receive them because they are used for the Bonds' debt service, the assets of the System and its capacity to pay benefits to its pensioners and future pensioners are thus diminished, as has unfortunately occurred.

4.24. Furthermore, the downgrade of the Government's credit will significantly increase the interest costs to the System, since the Government's contributions are the main source for the payment of the System's obligations and the interest cost to the System depends on the interest cost to the Government, since, we repeat, the payment of the System's debts depends largely on the payments received by the System from the Government.

4.25. At the end of 2006 and during 2007, when negotiations were taking place for the possible Bonds issuance, the proposal was that the bonds be issued as direct Government bonds, so that the Government could provide the System with the funds resulting from the bonds' sale and thus improve the System's net worth and financial condition, as well as the so-called "funding ratio." The intention was to increase the assets of the System by the net proceeds of the sale of the Bonds and to increase the net worth of the System, as the Bonds would not be debts or liabilities of the System, but of the Government. This would considerably improve the System's "funded or funding ratio." Unfortunately, however, that did not happen.

4.26. In order for the Bonds to be issued by the Government, the approval of the Legislative Assembly was required. This approval was requested from the Legislative Assembly

[2] 2. Section 2-116.-Employer Contributions, provides, in the relevant part-(a)Employer's contributions shall cover the difference between the total cost of the benefits provided by the System and the costs of administration, reduced by the portion contributed by participants
(b)..........................................................................................................................................................
(c)................................................................................................... "Section 3-105.-Retirement Savings Account Program –Employer Contributions, provides:
"Every employer to contribute to the System a sum equal to ten point two hundred seventy-five (10.275%) of the compensation of each participant of the Program while such participant is an employee. These contributions shall be deposited in the System to increase the level of the assets of the System, reduce the actuarial deficit, and enable the System to meet its future obligations." (This Section was recently amended by Act No. 116 of July 6, 2011, but the amendment does not provide a different use for employer contributions).

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **17** of **36**

and denied by it. Despite this denial by the Legislative Assembly and the public policy that such denial established, the System (whose existence and powers emanate from the Retirement Act, that is, from legislation approved by the Legislative Assembly) violated said public policy and, relying on the representations and advice and recommendations of UBS and UBS Consulting, ignored the Legislative Assembly's refusal and recklessly proceeded with the issuance and sale of the Bonds as direct obligations and liabilities of the System (still compromising the Government's credit, by means of the aforementioned alienation or pledge to bondholders of the Government's employer contributions to the System, in violation of the provisions of the Retirement Act). With these violations, the "funded or funding ratio" of the System was negatively affected, as its liabilities increased more than its assets, with a consequent reduction in their net worth.

4.27. The System is precluded from mitigating those future recurring losses caused by the Bonds, because the interest rates paid for them do not allow or will not allow in the foreseeable future the attainment of a positive arbitrage or net gain on the investment of the funds it still preserves, if any, from the proceeds of the sale of the Bonds. The additional cost to the System of future financings, caused by the credit downgrade of the Government obligations, caused, in turn, by the issue and sale of the Bonds, must be added to the amount of the mentioned damages.

**<u>The Minutes of the Boards of Directors</u>**

4.28. According to page 6 of the Minutes of the System's Board of Trustees corresponding to the Extraordinary Meeting of February 27, 2007, officials of the Government Development Bank for Puerto Rico ("GDB") represented the following to the System's Board of Trustees' members, regarding the Retirement Bonds:

> "...this solution would extend the life of the System's resources until 2027 and would notably improve the 19% funding ratio which is currently up to 72%. If the increase to 12.5% in contributions proposed in the bill were also approved, using this scheme, the System's obligation could be covered up to 2042" (Emphasis added)."

4.29. At that same meeting, the then Retirement System Administrator represented to the System's Board of Trustees the following, on page 7 of the minutes of said meeting:

> "the **financial consultants** are already working on the different 'investment distribution scenarios that will be presented for consideration by the Board in the near future. Mr. Cancel Alegria added that the purpose of the conversations on this transaction is that the execution thereof can take place by June 2007, that is, <u>before the closing of the current fiscal year</u>."(Emphasis added).

4.30. At a joint meeting between the System's Board of Trustees and the GDB's Board

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Certified Translation

of Directors on January 24, 2008, at which the Retirement Bonds' issue was approved by both Boards, both Boards were also represented that "*The expectation of the issue is that the markets will be favorable and there will be a positive return on the portfolio, which would alleviate the debt*."

4.31. At the same joint meeting, the then Chairman of the Board of Directors of the Government Development Bank, Mr. Rafael Martínez Margarida, asked whether the Retirement System Administration had the mechanisms in place to ensure that, when the money from the issuance came in, it could start producing the expected average return. Mr. Jorge lrizarry Herrans, (then President of the GDB), stated that, together with the consultants, a strategy has been designed for the distribution of these funds, which includes hiring eighteen (18) managers in addition to the eight (8) that already exist and are ready to receive the money.

4.32. The following was also expressed at that joint meeting, on page 9 of the minutes of that meeting:

> "Mr. Luis Alfaro Martinez, Vice President of Financing of the Government Development Bank for Puerto Rico, points out that the general fund debt is not being increased **because the obligation is in the Retirement System**, what is being done is changing the source of repayment of the obligations." (Emphasis added).

4.33. Finally, on page 13 of the Minutes of that meeting, the following is stated:

> "...Mr. Luis Alfaro Martínez. expressed that the public policy of the Government Development Bank is to maximize the resources and conditions of the local market, which is why the issuance is made first in the local market to then go to the global market. He added that the local market has advantages over the global market, such as, for example, that local bonds are callable before maturity within ten (10) years, which permits that if after ten (10) years the rates are lower, those bonds can be called and refinanced, this cannot be done with global bonds because they are "non-callable". Mr. Alfaro states that originally the market offer was $750 million, as the days went by the interest increased and ended with a demand of $1.4 billion ($1,456,247,368.95) and orders continue to come in, so a **commitment was made with UBS** to provide space and amend the transaction, for which the Board of Trustees and the Board of Directors of the Bank would have to meet again to approve the new amount. The members of the Board of Directors recommended establishing the clause that would allow the amount to be increased by up to 15% without having to submit it before the boards for further approval. The Chairman of the Board of Trustees endorsed the recommendation for the future...". (Emphasis added)

4.34. Based on the February 27, 2007 Minutes of the System's Board of Trustees, on page 6, the following was stated:

> "... The cost of the debt is estimated at 6%, which allows for <u>positive arbitrage</u> in view of the fact that the System's investments must return 8.5%...". (Emphasis added).

4.35. The Minutes of the System's Board of Trustees Extraordinary Meeting of January

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **19** of **36**

Certified Translation

10, 2008, on page 2, states the following:

"...With great enthusiasm and satisfaction, the President informed the Board of Trustees that today the first phase of the issuance of bonds of the Retirement Systems is being launched in the local portion, which corresponds to Puerto Rico. He indicated that in the next hour, the transaction's financing team would be meeting with the brokers to give them a presentation of the structure."

4.36. The Minutes of May 13, 2008, on page 20, read as follows:

"...C. Investment Committee of the Board of Trustees

Mr. Jorge Irizarry Herrans, Chairman of the Investment Committee of the Board of Trustees informed the Board Members that the Committee has been meeting to work with the liability-driven investment strategy to ensure cash flow from investments for the next six (6) or seven (7) years. Mr. Irizarry Herrans explains that the Committee has examined a large number of proposals on this strategy and continues to develop strategies, and then submit a recommendation to the Board of Trustees...".

4.37. According to the Minutes of June 13, 2008, Messrs. Juan G. Herrans Barrera and John Thomas Engfer, both UBS officers, appeared as guests at the Board of Directors of the Retirement System.

4.38. At that meeting on June 13, 2008, the Chairman of the Retirement System Board of Trustees says the following on page 3:

"...The Chairman of the Board of Trustees, Mr. Jorge Irizarry Herrans presented to the Members of the Board for discussion and approval the recommendations of the Investment Committee of the Board of Trustees and the Financial Consultant of the Agency: UBS, on the investment strategy called 'Liability-Driven Investment'. Representatives of UBS: Juan G. Herrans Barrera and John Thomas Engfer, as well as the Interim Treasurer of the Government Development Bank for Puerto Rico, Mr. René Van Noort were there to carry out the presentation of this matter to the Members of the Board...," (Emphasis added).

4.39. Then, the same Minute of June 13, 2008, on page 3, reads as follows:

"...Mr. Irizarry Herrans indicates that the Investment Committee of the Board and the working group of the Government Bank have worked arduously during the past months with the analysis and evaluation of investment strategies that allow the Retirement System to fulfill its obligations to pensioners. The Chairman of the Board points out that both groups, together with the Financial Consultant, have been carefully studying the strategy known as 'LDI' or 'liability-driven investment...". (Emphasis added).

4.40 Then, the same Minute of June 13, 2008, on pages 3 and 4, reads as follows:

" ...Mr. Irizarry Herrans explains that the 'LDI' strategy is relatively new and therefore many of the alternatives presented by the managers are new in the investment world, so it required a lot of study and analysis by the people working on this exercise. He adds that the group's approach was aimed at selecting an investment combination that offered a high return with the lowest possible risk...." (Emphasis added).

4.41. The same Minute of June 13, 2008, on page 4, states the following:

"Mr. Juan G. Herrans Barrera [from UBS] began his presentation by explaining to the Members of the Board the aspects to be presented for their consideration which are: the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **20** of **36**

Certified Translation

asset distribution recommendations on which the Board should deliberate; the explanation of the 'LDI' strategy; and the recommendation for the selection of managers to implement the investment strategy and the amounts to be allocated..." (Emphasis added).

4.42. In addition, page 5 reads as follows:

"...The guests [from UBS] began by presenting to the Board the current distribution of the System's assets assuming that $400 million are raised in addition to the $1 billion raised on June 2, 2008 as a result of the Retirement System bonds issuance, for a grand total of assets of $5,015,200,557; of which 27.28% would be cash. The Consultant's assignment is to recommend how that cash should be distributed...".

4.43. Also, the Minutes of June 13, 2008, on page 5, read as follows, without mentioning the Retirement System's increase in liabilities, resulting from the issue of Bonds:

"Mr. Jorge Irizarry Herrans intervened at this point to indicate that the $1 billion approved by the Board of Trustees to [be] issue[d] on June 2, 2008 were institutional bonds and that a demand for individual accounts remains, which are the ones to be offered for sale soon. He reported that the $1 billion have already been received and an additional $400 million are estimated. He highlighted as an important achievement for the System that a total of $5 billion in assets has been reached, when only one year ago the System had $2.5 billion, which means that the assets have doubled thanks to the strategy that is being executed. He added that the system's funding ratio, which for 2005 was at 19%, as of June 2008 is at 40% with a plan drawn up to reach 70 or 80% if the strategy is completed...".

4.44. Furthermore, the same Minute of June 13, 2008, on pages 5 and 6, reads as follows:

" ...Mr. Juan G. Herrans Barrera continued the presentation by showing the proposed asset distribution in accordance with the recommended strategy on which the Board of Trustees should make a determination. It proposes to allocate $1.7 billion to the 'LDI' strategy. This is equivalent to 34.10% of the total assets considering the $5 billion mentioned above, this equals to one third of the System's portfolio in 'LDI'. The proposal contemplates allocating the $1.4 billion in cash (27.28%) to the 'LDI' strategy and adding to it, through redistribution, $3 million which are currently allocated in shares...". (Emphasis added)."

4.45. According to that Minute of June 13 2008, a "power point" presentation with the UBS logo appears. (Figure omitted)

4.46. At the same meeting, and according to the Minutes of June 13, 2008, on pages 6 and 7, the following is said:

"...In order for the Board of Trustees to consider this recommendation, the Consultant presented the two (2) faces of the investments: risk versus return. The diagram presented by the Consultant identifies the current strategy of the System, without considering the cash. This strategy maintains a distribution of 40% of its portfolio in bonds or loans that behave like bonds and 60% in shares. Mr. Herrans Barrera [from UBS]explains that this distribution conforms to the investment policies approved by the Board of Trustees. As a result, the System obtains an approximate yield of 9.52% versus a risk deviation equivalent to 5.5%...." (Emphasis added).

4.47. In that Minute of June 13, 2008, on pages 7 and 8, the following is stated and the table below is attached:

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **21** of **36**

Certified Translation

"...For this reason, the Consultant proposes an intermediate strategy that offers a return of 10.44% and a risk deviation of 3.74%. Mr. Herrans Barrera [of UBS] points out that he is aware that there are many pension plans and pension foundations that use this strategy very successfully. However, taking into consideration the criterion of prudence, his recommendation is aimed at an intermediate strategy that allows, during the process in which it is used, a cautious evaluation of its results, considering a move towards said strategy based on the results that are obtained...". (Emphasis added). (Figure omitted)

4.48. In the Minutes of June 13 2008, pages 8 and 9 read as follows:

"...Mr. Herrans Barrera [of UBS] continued his presentation by showing averages of probability of profits and returns in the Retirement System portfolio taking into consideration the portfolio distribution alternatives according to the strategies presented for the $1.7 billion of assets at one, three, five and ten years. An analysis thereof shows that portfolio diversification reduces risk and improves returns, which is why the 'LDI' strategy and the combination of strategies that support it for a full economic cycle of seven (7) years is recommended...". (Emphasis added).

4.49. The same Minute of June 13, 2008, on page 12, reads as follows:

"...Therefore, the Consultant points out that this strategy cannot be handled as a conventional strategy, nor can historical data be used on it because it is 'sui generis'. It is then necessary to structure the strategy..." (Emphasis added).

4.50. In that same Minute of June 13, 2008, on page 12, the following is said and the following table is included:

"...To this end, the Financial Consultant submitted a proposal for the rebalancing and redistribution of the new assets of the System, which does not include the Wellington Firm because their alternatives were not very different from the strategies with the System's accounts, they do not add diversity, did not present cohesion, etc. The asset distribution proposal presented by UBS is as follows: (Emphasis added). (Table omitted)

4.51. The same Minute of June 13, 2008, on page 13, reads as follows:

"...The Members of the Board discussed the proposals presented, where they discussed the expectations that the Retirement System could have when approving the proposed strategies. The Chairman of the Board was very hopeful, understanding that such strategies can extend the useful life of the Retirement System, making reference to the following projections included in the presentation by the consultants...". (Emphasis added). (Graph omitted).

4.52. The same Minute of June 13 2008, on page 15, reads as follows:

"...Having discussed these aspects, CPA Roberto E. Aquino García presented a motion to approve the proposals and recommendations of the Financial Consultant: UBS, regarding the investment strategy considering the 'LDI', the rebalancing and distribution of the Retirement System's assets, as well as the selection of the managers proposed in the presentation. Juan José Zamora Santos, Esq. seconded the motion. As there are no objections, it is approved. To this end, the Chairman of the Board of Trustees, Mr. Jorge Irizarry Herrans, gave instructions to the Retirement Systems Administrator, Minia González Álvarez, Esq. to carry out the corresponding procedures to execute this determination by the Board of Trustees..." (Emphasis added)

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **22** of **36**

Certified Translation

**The Conway MacKenzie Report**

4.53. On June 30, 2010, the independent firm Conway Mackenzie (hereinafter "CM") was hired by the GDB to study the causes and origin of the crisis that the Retirement System was going through. Specifically, CM focused on several areas, including the analysis carried out to support the decision to issue three billion dollars in Pension Obligation Bonds during 2008. CM is a prestigious firm of Financial Consultants, specializing in forensic analysis and evaluation, with an extensive investigative career. They are Certified Fraud Examiners and Certified Financial Forensic Specialists. The study concluded that the issuance of the 2008 Retirement Bonds was detrimental and contributed to the current crisis of the Retirement System, as well as that it was a risky, ill-conceived and speculative strategy.

4.54. The report submitted by CM, reveals that they found that the Board of Trustees of the System was induced to execute this risky transaction, which was miscalculated. Originally, the Retirement System, with the backing of the Government Development Bank, considered issuing $7.0 billion in Obligation Bonds, which would be paid by the contributions received from members and employers. Due to the magnitude of the transaction, it could not be finalized according to the original parameters, and only approximately $2.9 billion were able to be issued; all in the local market, through UBS. This lesser amount was not enough to carry out the strategy originally outlined and the bond proceeds were not reinvested at a sufficient yield to cover the interest of the bonds and, in addition, to produce a positive arbitrage for the Retirement System, thus, the expected results were never generated to help improve the financial condition of the Retirement System. It was evident that market conditions revealed that this transaction was too risky and there was no appetite for investors to participate in it. In fact, at the extraordinary meeting of the System's Board of Trustees on May 27, 2008, the following point was raised: "Mr. Alfaro Martinez noted that from January [2008] when the first series of bonds were issued, up to the present time, the market has deteriorated by about 35 base points, which represents a substantial difference in bond interest rates, making it more expensive to obtain financing today than in January 2008…Mr. Alfonso Martinez pointed out that these bonds were only sold to the UBS funds, Santander funds and a small order of $5 million to Triple S funds. The strategy of creating an arbitrage for the Retirement System, upon the issuance of Bonds, was poorly conceived from the outset. In reality,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **23** of **36**

the issuance of Pension Obligation Bonds is and will be an additional burden for the Retirement System, which did not provide a solution to the problem and worsened (instead of improving) its funded ratio.

4.55. Conway MacKenzie submitted to the System and the GDB its Report on October 2010, titled, "Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico". See ANNEX III of the original Complaint. Page 12 of the Conway MacKenzie Report, states the following, in English:

> As discussed in greater detail below, the POB[3] transaction was subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee prior to undertaking the bond issuance strategy. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. [4] Therefore, it is our opinion that given the risks inherent in the transactions, several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated and as a result, the System has not achieved its targeted arbitrage strategy. (Footnotes and emphasis added).

4.56. The findings of the Conway MacKenzie Report regarding the issuance and sale of bonds in the local market through UBS, among others, are devastating, evidence defendants' gross negligence, and are transcribed below in English as they appear in the Report:

> In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would improve the funded status of the ERS. The treatment of bond obligations in the calculation of the UAAL by the System's actuarial consultants appears to support the practical reality that the incurrence of additional debt to increase plan assets should have little effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the ERS by ERS management, the Board of Trustees and GDB Board of Directors when they made the decision to enter into the POB transaction.
>
> Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed, which suggested full implementation of the strategy would be difficult, if not impossible.
>
> The successful execution of the POB transaction was dependent on certain risks not materializing, primarily the risk that the market would be unable to absorb the full $7.0 billion issuance. Consummating a transaction of significantly less than $7.0 billion would

[3] POB" refers to "Pension Obligation Bonds", i.e. the Bonds subject of this case

[4] "ERS" Board of Trustees means the System's Board of Trustees.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

merely serve as an expensive, temporary measure to address the System's liquidity issues, postponing for some period of time the date of the ERS's eventual insolvency. For this reason, the POB transaction resulted in the flawed execution of a failed strategy.

The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the $3.0 billion POB transaction merely provided a short-term temporary measure to address the System's liquidity needs, as it was not large enough to create arbitrage opportunities. It did nothing to improve the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized far decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. (Emphasis added).

4.57. The issuance, sale and use of the proceeds from the sale of the Bonds, in violation of the Retirement Act and the public policy promulgated by the Legislative Assembly, constituted grossly negligent and illicit conduct by UBS Consulting and UBS.

4.58. According to the documentation and reports reviewed by CM, it was concluded that the Retirement System Administration was never fully aware of the possible repercussions that this issuance of Bonds would have, which was clearly risky and totally speculative. On page 4 of his report, CM notes the following:

“...Lastly, we believe that the POB transactions may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would immediately improve the funded status of the ERS. In fact, the strategy has not improved the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction actually, worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. In addition. several warning signs which suggested that the full implementation of the POB strategy would be difficult, if not impossible, were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the ERS Board of Trustees, and the GDB Board of Directors in 2008). For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction ....” (Emphasis added).

4.59. On page 10 of the CM Report, the following is noted:

" ...The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial Liability and generate additional revenue to the System through speculative arbitrage ...".

4.60. On page 11 of the CM Report, the following is noted:

“...As discussed in greater detail below, the POB transaction was speculative and subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee's prior to undertaking the bond issuance strategy in 2008. In addition,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. Therefore, it is our opinion that given the risks inherent in the transactions several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated ...” (Emphasis added).

4.61. On page 11 of the CM Report, the following is added:

"...Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0 billion POB transaction would be sufficient to resolve the System's short-term liquidity crisis and meet the System's long-term cashflow requirements but the ERS and the GDB should have known the $3.0 billion of proceeds issued would not solve the long- term cash flow requirements ...".

4.62. On page 12 of the CM Report, the following is noted:

“...Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this fundamental flaw in the forecasted funding ratio's computation methodology....” (Emphasis added).

4.63. On page 12 of the CM Report, the following is pointed out:

“...It appears that numerous warning signs existed, foretelling difficulties with placing the bonds and realizing the returns required, yet action plans were not altered ..." (Emphasis added).

4.64. On page 12 of the CM Report, the firm arrives to the following conclusion:

...Conclusion
Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System 's funding status when calculated consistently with prior methodologies. In addition, <u>the transaction was subject to significant risks</u> among others, the risk of a failed or undersubscribed offering <u>and the System’s potential inability to generate arbitrage on the POB proceeds</u>. Based upon our review of supporting documents, it appears that <u>these risks were not fully understood or vetted by the decision-makers</u> prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care...". (Emphasis added).

4.65. Based on the foregoing facts, UBS had the obligation to identify, for the benefit of the members of the System's Board of Trustees, the significant risks involved in the issuance of Bonds. In other words, UBS, as Financial Advisor, had an obligation to ensure that the members of the System's Board of Trustees understood and fully validated the strategy before approving the issuance. On whether it was prudent to undertake the issuance, the CM Report, on page 12,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

concludes as follows:

> " …2. Was it prudent to issue the Pension Obligation Bonds?
>
> The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB issuance during 2007 but Merrill Lynch was unable to consummate the transaction due to a lackluster demand in the global market. UBS then replaced Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds in the local Puerto Rico market. Given the System's significant current and projected annual net cash flow shortfalls, the transaction was not large enough to create arbitrage opportunities since a significant portion of the proceeds have been (and will continue to be) utilized to address annual cashflow shortfalls, as opposed to being invested for the long term. This means that the transaction has also resulted in costly annual interest expense for the ERS..."

4.66. The CM Report concludes the following in regard to market conditions:

> "…c. In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing".[12]...
>
> [12] Based on the ERS Board of Trustees meeting minutes dated May 27, 2008."
>
> "...d. By June 2008 there were also signs that the stock market was deteriorating. which should have signaled to the ERS that its arbitrage goals were jeopardized ...". (Emphasis ours).

4.67. UBS, as Financial Advisor, should have been aware of this market deterioration and should have alerted the members of the System's Board of Trustees and make the corresponding recommendation.

**<u>Breach of Fiduciary Duty by UBS and UBS Consulting</u>**

4.68. The Regulations of the Uniform Securities Act of Puerto Rico, Act No. 60- 1963, 10 L.P.R.A. §851, *et seq*., in its relevant section, reads as follows:

> *"...Section 25.1. Standard of business and* ***fiduciary duties*** *toward customers. Every broker-dealer, issuer,* ***investment adviser****, investment adviser representative, federal covered adviser, investment adviser representative of a federal covered adviser, agent or any other person subject to the provisions of the Act, must observe the highest standard of fiduciary duty toward their customers and investors…."* (Emphasis ours)

4.69. UBS, in its capacity as Financial Consultant and investment advisor, had the fiduciary obligation and duty to alert the members of the System's Board of Trustees of the risks inherent in the issuance. There is no doubt that the issuance of bonds recommended by UBS was reckless. UBS should have alerted the members of the System's Board of Trustees. The following conclusions of the CM Report, on pages 14 and 16, reflect this.

> <u>"Conclusion</u>
> <u>The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed</u> based on the current liquidity needs of the System. In fact, t<u>he POB transaction has and will continue to cost the System money</u> as

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Certified Translation

> short-term cashflow problems continue to require the use of the POB proceeds to fund current expenses of the System. Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds. Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System. This lack of understanding is not reasonable and may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees..." (Emphasis added).
>
> "…Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed suggesting full implementation of the strategy would be difficult if not impossible. The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency…". (Emphasis added).

## V. JURISDICTION AND VENUE:

5.1. This Honorable Court has the venue and jurisdiction necessary to hear the present case, because the facts described herein occurred in San Juan, Puerto Rico, and because San Juan, Puerto Rico is the municipality in which Defendants UBS have their place of business.

## FIRST CAUSE OF ACTION/BREACH OF CONTRACTUAL DUTIES BY UBS AND UBS CONSULTING

6.1. Plaintiffs repeat and incorporate herein by reference all that has been previously alleged in this Fourth Amended Complaint.

6.2. Before the issuance of the Bonds, UBS and UBS Consulting made several presentations and representations to the System that they were experts in financial advice and had the capacity to place the Bonds, in order to convince the System to hire them to carry out the issuance.

6.3. Among the representations made by UBS and UBS Consulting, to convince the System that the issuance of the Bonds would be beneficial and would help with the solvency of the System's coffers, was that the investment of the proceeds from of the issuance would generate a positive arbitrage, which would result in net income for the System. These representations were not only false, but were made so that UBS and UBS Consulting could profit and collect their commissions and fees, such as those they actually charged, which surpassed $35 million.

6.4. UBS, through its then President Miguel Ferrer, falsely represented not only to the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **28** of **36**

Certified Translation

System, but to the country in general, through press releases, that the issue of bonds, recommended by UBS Consulting and UBS, was going to result in revenues for the System through a positive arbitrage from the very moment of its effectiveness.

6.5. In the Official Statement dated January 29, 2008 for the Series A Bonds, UBS and the other underwriters made the following misrepresentations, among others, regarding the use of the proceeds from the sale of Series A Bonds:

a. The proceeds from the sale of the Bonds would be invested and such investments and the earnings therefrom would be used to pay pension benefits to the beneficiaries of the System ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*" (First page or cover of the *Official Statement* of January 29, 2008).

b. The proceeds from the sale of the Bonds, after deducting issuance costs, commissions and reserves, will be added to the System's pool of invested assets (*will be added to the System's pool of invested assets*) (Page 17 of the *Official Statement* of January 29, 2008).

6.6. In the *Official Statement* dated January 29, 2008 for the Series A Bonds, UBS and the other underwriters made the following misrepresentations, among others, regarding the projected future issue of Series B Bonds, which imported $1,058,634,613.05 and, <u>like the Series A Bonds and Series C Bonds, were sold exclusively in Puerto Rico</u>:

"*The System currently contemplates offering additional parity Bonds (the "Series B Bonds") <u>in other jurisdictions</u>. The Series B Bonds would be Offered by means of one or more separate Official Statements and <u>may not under any circumstances be</u> <u>purchased by residents of Puerto Rico</u>."* (Emphasis added).

6.7. In the *Official Statement* of May 28, 2008 for the Series B Bonds, UBS made the following misrepresentations, among others, regarding the use of the proceeds from the sale of the Series B Bonds, which, like the Series C Bonds, were offered and sold only to investors in Puerto Rico, in contravention of the quote in Section 6.6, *supra*:

a. The proceeds from the sale of the Bonds would be invested and such investments and the earnings therefrom would be used to pay pension benefits to the beneficiaries of the System ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*") (First page or cover of the Official Statement of May 28, 2008).

b. The proceeds from the sale of the Bonds, after deduction of issuance costs, commissions and reserves, will be added to the System's pool of invested assets (*will be added to the System's pool of invested assets*) (Page 17 of the *Official Statement* of May 28, 2008).

6.8. In the Official Statement of June 26, 2008, for Series C Bonds, UBS made the following misrepresentations, among others, concerning the use of the proceeds from the sale of the Series C Bonds, which were offered and sold only to investors in Puerto Rico in contravention

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **29** of **36**

Certified Translation

of the quote in Section 6.6, *supra*:

> a. The proceeds from the sale of the Bonds would be invested and such investments and the earnings therefrom would be used to pay pension benefits to the beneficiaries of the System ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*" (First page or cover of the Official Statement of June 26, 2008).
> b. The proceeds from the sale of the Bonds, after deducting issuance costs, commissions and reserves, will be added to the System's pool of invested assets (will be added to the System's pool of invested assets) (Page 17 of the Official Statement of June 26, 2008).

6.9. When the Bonds were issued, Co-Defendant UBS Consulting acted as financial advisor to the System and both it and its affiliate UBS knew or should have known that it would be impossible for the System to prudently invest the proceeds from the sale of the Bonds at a sufficient yield to cover the cost of its interests and generate profits ("positive arbitrage"). In spite of this, and knowing the losses that the issuance and sale of the Bonds would cause to the System, UBS proceeded with the transaction, with the purpose of making a profit and with absolute disregard for the best interests of the System.

6.10. While the System negotiated with Merrill Lynch the possible issuance and sale outside of Puerto Rico of System bonds for the principal amount of at least seven billion dollars ($7 billion) and subsequently, when the issuance and sale of the Bonds was made in the local market through UBS, for an amount of approximately three billion dollars ($3 billion), UBS, directly and/or through its affiliate(s), including, without limitation, UBS Consulting, had a financial advisory contract with the System. In addition, UBS and UBS Consulting were then aware of the System's precarious financial condition and were aware of the System's need to improve its liquidity and create sources of revenue and generate profits to mitigate its chronic underfunding.

6.11. It is the inescapable duty of financial advisors such as UBS Consulting and UBS to defend the best interests of their clients (in this case the System) and to provide them the correct advice for the benefit of the client and over their own. By not only endorsing, but also participating as the lead underwriter in the illicit and grossly negligent issuance of the Bonds, UBS violated its contractual, non-contractual and fiduciary obligations towards the System, as it advised and participated, for profit, in an illicit, reckless and clearly losing transaction that was alien to the objectives and best interests of the System.

6.12. UBS and UBS Consulting knew or should have known that the issuance and sale

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **30** of **36**

Certified Translation

of the Bonds violated the public policy established by the Legislative Assembly of Puerto Rico upon rejecting their approval when they were proposed by the Government and that the Retirement Act was being violated. These co-defendants also knew or should have known then that the pledge or alienation of the Government's contributions to the System, as a guarantee and source of payment of the Bonds, compromised the Government's credit, which was precisely what the Legislative Assembly had denied and which violated the public policy established through said denial and also violated the provisions of the Retirement Act regarding the use permitted by said Act of employer contributions to the System.

6.13. UBS and UBS Consulting also knew or should have known then that the proceeds of the illicit and grossly negligent sale of the Bonds could not be prudently invested in safe investment vehicles that would produce a sufficient yield to amortize the issuance costs and interest on the Bonds and produce the positive arbitrage that the System needed and that, on the contrary, the investment of the proceeds from the sale of the Bonds would result in a recurring loss to the System, as the interest payable on the Bonds exceeded the yield that the System could reasonably obtain from the net funds investment attained from the sale thereof.

6.14. UBS and UBS Consulting also knew or should have known that the Bonds would not improve, but would worsen, the "funding or funded ratio" of the System, since, upon their issuance, the net worth of the System would decrease due to the Bond issuance and sale costs and the System's liabilities would increase by an amount greater than the increase in its assets, due to said Bond issuance and sale costs. Despite knowing or [despite the fact] that they should have known all of the above, these co-defendants not only recommended the issuance and sale of the Bonds, but, for further profit, UBS acted as its lead underwriter and placed much of the Bonds in closed-end mutual funds created and administered by UBS and/or UBS affiliates and/or UBS Consulting. This produced large profits for UBS and/or UBS Consulting in the sale of the Bonds and continues to produce annual profits for UBS and/or its affiliates from the management of the closed-end mutual funds invested in the Bonds, whose assets still include much of the Bonds and which are managed by UBS and/or UBS Consulting and/or its affiliates.

6.15. UBS and UBS Consulting knew or should have known that the projections and estimates used to support the issuance and sale of the Bonds were clearly erroneous and misleading, but they did not warn the System and proceeded with the issuance and sale of the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **31** of **36**

Certified Translation

Bonds, for profit and without giving consideration or importance to the predictable negative consequences for the System of such issue and sale of the Bonds.

6.16. UBS and UBS Consulting also knew or should have known that the local market did not have sufficient capacity to absorb at least seven billion dollars ($7 billion) in bonds that were contemplated according to the model proposed by Merrill Lynch and which were necessary for the System to obtain the benefits that it needed, as well as that there was no demand in the international market for such bonds.

6.17. Neither UBS nor UBS Consulting conducted an adequate study on the viability of the issuance and sale of the Bonds, their possible harmful consequences for the System and the risks that such a transaction would entail for the System and for the System's and the Government's credit.

6.18. Such conduct by UBS and UBS Consulting was grossly negligent and illicit and constituted (i) a breach of UBS' contractual obligations under its contracts with the System; (ii) a breach of UBS's underwriting contracts with the System for the issue and sale of the Bonds, through which UBS had the obligation to act in good faith and protect the interests of the System; (iii) said co-defendants' breach of the contractual and non-contractual fiduciary duties to the System; (iv) and illicit conduct by said co-defendants insofar as they were liable for violating the public policy established by the Legislative Assembly of Puerto Rico upon rejecting the proposal to issue the Bonds through the Government and for violating the Retirement Act by the pledge or alienation of employer contributions to the System as guarantee of the Bonds' payment.

6.19. In fact, the illicit and grossly negligent issuance and sale of the Bonds not only compromised the Government's credit, but has caused the downgrading of the rating of all Government bonds. UBS and UBS Consulting should be liable to the Plaintiffs hereunder for the damages caused to them, as well as to the System for all damages their conduct has caused it, including, but not limited to, (i) the Bond issuance and sale costs; (ii) the recurring losses ("negative arbitrage") that the System has suffered, suffers and will suffer from the issuance and sale of the Bonds until their maturity, due to the fact that the interest paid by the System on the Bonds exceeds the returns that the System receives over the investment of the proceeds of their sale; and (iii) the increase in costs of future System obligations, due to the downgrading of the Government's credit caused by the issuance and sale of the Bonds.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **32** of **36**

6.20. UBS and UBS Consulting made recommendations to the System that were obviously negligent and reckless because, as stated above, they failed to perform an adequate analysis of the risk in which the System was placed as a result of the issuance and sale of the Bonds and the possible consequences of such transactions.

6.21. UBS and/or UBS Consulting, directly and/or through one of its affiliates, held a financial advisory contract with the System and UBS, in addition, acted as investment banker and lead underwriter in the issuance of Bonds, under contracts with the System.

6.22. UBS and UBS Consulting, illegally charged substantial commissions and fees and discounts related to the reckless, illicit and grossly negligent issuance and sale of the Bonds and must return them to the System.

6.23. The conduct of UBS and UBS Consulting, as referred to above in this Fourth Amended Complaint, was illicit, reckless, grossly negligent, violated its obligations to the System and therefore has caused, causes and will cause damage to the System in multi-million-dollar amounts, as well as damages to the Plaintiffs herein.

## VII. SECOND CAUSE OF ACTION/SECTION 1802 OF THE PUERTO RICO CIVIL CODE /UBS AND UBS CONSULTING

7.1 Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

7.2. The grossly negligent and illicit conduct of UBS and UBS Consulting in the while providing the services they were required to render to the System and the breach by such defendants of their contractual, non-contractual and fiduciary duties to the System caused the System multi-million dollar damages, as explained above in this Fourth Amended Complaint, and also caused damages to the Plaintiffs, all of which render defendants liable under, among others, Section 1802 of the Puerto Rico Civil Code.

## VIII. THIRD CAUSE OF ACTION - LIABILITY OF INSURER ABC INSURANCE COMPANY INC.:

8.1. Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

8.2. Defendant ABC Insurance Company, Inc., whose correct name is unknown at this time, issued policy(s) covering damages caused by reckless, unreasonable, grossly negligent or

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Certified Translation

illicit acts or omissions of UBS and UBS Consulting, during the time period relevant to this Fourth Amended Complaint.

8.3. The reckless, unreasonable, grossly negligent or illicit acts or omissions attributed to Defendants UBS and UBS Consulting in this Fourth Amended Complaint were committed or incurred through UBS officers and the damages caused to the System and Plaintiffs hereunder by such acts or omissions are insured and covered by said policy(s) issued by ABC Insurance Company, Inc., from which the Plaintiffs are claiming indemnification under said policies for damages to them and to the System in the present cause of action.

## IX. FOURTH CAUSE OF ACTION. LIABILITY OF XYZ INSURANCE COMPANY INC.

9.1. Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

9.2. Defendant XYZ Insurance Company, Inc. whose correct name is unknown at this time, issued policy(s), if any, covering damages caused by the reckless, unreasonable, grossly negligent or illicit acts or omissions herein attributed to UBS Consulting and/or its officers.

## X. FIFTH CAUSE OF ACTION COSTS AND EXPENSES AND ATTORNEY'S FEES

10.1. Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

10. 2. The laws of Puerto Rico authorize this Honorable Court to order defendants to pay the costs and expenses of this litigation, including Plaintiffs' contingent attorneys' fees of up to thirty-three percent (33%) of any amount that Defendants are ordered to pay to the System and/or to Plaintiffs in any judgment favorable to Plaintiffs and/or the System in this case.

WHEREFORE, this *Fifth Cause of Action* requests that Defendants be ordered to jointly and severally pay the sums set forth below, plus the costs and expenses incurred and to be incurred by Plaintiffs in this litigation, plus an amount equal to thirty-three percent (33%) of such sums for Plaintiffs' attorneys' fees, plus interest and any other remedy as may be permitted by law.

## XI. PRAYER

In light of the foregoing, Plaintiffs respectfully request that this Honorable Court to

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **34** of **36**

GRANT this Fourth Amended Complaint and by virtue thereof (a) jointly and severally condemn the UBS and UBS Consulting Defendants and their respective insurers, (i) to pay the System $800 million; (ii) pay to the individual Plaintiffs hereunder an amount of not less than $50,000 each; and (iii) pay Plaintiffs' costs, expenses, and attorneys' fees in this litigation; and (b) grant to the Plaintiffs and/or the System any other remedy in law or equity that this Honorable Court deems appropriate.

**RESPECTFULLY SUBMITTED.**

I HEREBY CERTIFY: To have sent a true and exact copy of this document to: **UBALDO M. FERNÁNDEZ BARRERA, ESQ., SALVADOR ANTONETTI STUTTS, ESQ**. and **MAURICIO O. MUÑIZ LUCIANO, ESQ.**, O'NEILL & BORGES LLC, Avenida Muñoz Rivera 250, Suite 800, San Juan, PR 00918-1813; **PAUL J. LOCKWOOD, ESQ.**, **NICOLEA DISALVO, ESQ**., and **ELISA M.C. KLEIN, SKADDEN, ARPS, SLATE MEAGHER & FLOM**, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899.

In San Juan, Puerto Rico, on this day 6th day of March, 2019.

**VICENTE & CUEBAS**
**P.O. Box 11609**
**San Juan, PR 00910-1609**
**Tel.: (787) 751-8000**
**Fax.: (787) 756-5250**

**[Signed]**
**HAROLD D. VICENTE-GONZÁLEZ**
**RUA NO. 3966**
**E-Mail: *hvicente@vclawpr.com***

**PUJOL LAW OFFICE, PSC**
**P.O. Box 363042**
**San Juan, PR 00936-3042**
**Tel.: (787) 724-0900**
**Fax.: (787) 724-1196**

**[Signed]**
**FRANCISCO PUJOL MENESES**
**RUA NO. 11883**
**Email: fpuiol@puioIIawpr.com**

**[Signed]**
**HAROLD D. VICENTE COLÓN**
**RUA NO. 11303**
**E-Mail: *hdvc@vclawpr.com***

**[Signed]**
**IVELISSE M. ORTIZ MOREAU**
**RUA NO. 18640**
**E-mail: *iortiz@vclawpr,corn***

*ATTORNEYS FOR INDIVIDUAL PLAINTIFFS*
*BENEFICIARIES OF THE RETIREMENT SYSTEM AND THE COMMONWEALTH OF PUERTO RICO GOVERNMENT EMPLOYEES RETIREMENT SYSTEM ADMINISTRATION*

**FEDERICO HERNÁNDEZ DENTON**
**P,O, Box 9021279**
**San Juan, PR 00902-1279**

**PUERTO RICO ATTORNEYS & COUNSELORS AT LAW**
**P,O, Box 362122**

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

**Tel.: (787) 758-3542**

**[Signed]**
**FEDERICO HERNANDEZ DENTON**
**RUA NO. 3846**
**E-Mail:**
***f.hernandezdenton@grnail,com***

**San Juan, PR 00936-2122**
**Tel.: (787) 767-1919**
**Fax (787) 764-9120**

**[Signed]**
**JOSE CHAVES CARABALLO**
**RUA NO. 7953**
**E-Mail: chaves@fc-law,com**

**WOLF POPPER LAW OFFICES, PSC**
**654 Plaza**
**654 Avenida Muñoz Rivera, Suite 1001**
**San Juan, PR 00918**
**Tel.: (787) 522-0200**
**Fax.: (787) 522-0201**

**[Signed]**
**CARLOS LÓPEZ LÓPEZ**
**RUA NO. 10526**
**E-Mail: *clopez@wolfpopperpr,com***

**[Signed]**
**RODOLFO CARRION VARGAS**
**RUA NO. 13390**
**E-Mail: *rcarrion@wolfpopperpr.com***

*ATTORNEYS FOR THE COMMONWEALTH OF PUERTO RICO GOVERNMENT EMPLOYEES AND JUDICIARY RETIREMENT SYSTEM ADMINISTRATION*

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS