# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | Case No. 17-BK-4780-LTS<br><br>**This Court Filing Relates Only to PREPA and Shall Only Be Filed in PREPA′s Title III Case (Case No. 17-BK-4780-LTS)** |
| COBRA ACQUISITIONS LLC,<br><br>    Movant,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | **Re: ECF Nos. 17-BK-3283-LTS, ECF No. 8789, 8838, 8850.** |

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY,

Respondent.

**REPLY IN SUPPORT OF JOINT URGENT MOTION OF
THE OVERSIGHT BOARD, PREPA, AND AAFAF TO EXTEND ALL
APPLICABLE DEADLINES TO COBRA ACQUISITION LLC'S MOTION
<u>FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..........................................................................................1

ARGUMENT .................................................................................................................5

I.     The Legal Standard .........................................................................................5

II.    Staying the Administrative Expense Motion to Allow for the Criminal
       Investigation and Trial to Proceed is in the Interest of Justice ................................6

III.   Staying the Administrative Expense Motion Until the FEMA Analysis is
       Completed Is in the Interest of Justice and Efficiency ...........................................9

IV.    The Interests of Judicial Efficiency are Harmed by Trying to Conduct
       Discovery While the Criminal Proceeding Remains Ongoing ..............................10

V.     Additional Time After the Stay is Necessary to Resolve Disputes between
       PREPA and Cobra....................................................................................................12

VI.    Cobra Will Not be Harmed by a Stay Because the Court Cannot Order
       Immediate Payment of Cobra's Claim, Even if it is Valid ....................................13

CONCLUSION.....................................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aurelius Capital Master, Ltd. v. Puerto Rico*,
    919 F.3d 638 (1st Cir. 2019) ...................................................................................14

*Dopp v. HTP Corp.*,
    947 F.2d 506 (1st Cir. 1991) .....................................................................................8

*Ellison v. U.S.A.*,
    Case No. 19-CV-3341-SI (N.D. Cal. Jun. 21, 2019), ...............................................7

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    335 F. Supp. 3d 256 (D.P.R. 2018)...........................................................................5

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    927 F.3d 597 (1st Cir. 2019)....................................................................................14

*In re HQ Global Holdings, Inc.*,
    282 B.R. 169 (Bankr. D. Del. 2002) ........................................................................13

*In re Moore*,
    109 B.R. 777 (Bankr. E.D. Tenn. 1989) ...................................................................9

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*,
    No. MDL 13-2419-RWZ, 2015 WL 13715289 (D. Mass. July 31, 2015) ............11

*In re Public Serv. Co.*,
    160 B.R. 404 (Bankr. D.N.H. 1993) ........................................................................9

*In re Rare Coin Galleries, Inc.*,
    72 B.R. 415 (Bankr. D. Mass. 1987) .......................................................................13

*In the Matter of Hayes*,
    20 B.R. 469 (Bankr. W.D. Wis. 1982)......................................................................9

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936)...................................................................................................5

*Lebron v. Mechem Fin.*,
    27 F.3d 937 (3d Cir. 1994)........................................................................................9

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*,
   385 F.3d 72 (1st Cir. 2004) ................................................................................5

*Rosario Rosario v. Pagan Santiago*,
   196 D.P.R. 180, 188 (P.R. 2016) ......................................................................8

*Total Petroleum P.R. Corp. v. T.C. Oil, Corp.*,
   2010 WL 11545626 (D.P.R. May 7, 2010) ......................................................5

*Wolf Creek Collieries Co. v. GEX Kentucky, Inc.*,
   127 B.R. 374 (D. Ohio 1991) ...........................................................................9

## STATUTES

22 L.P.R.A. § 196 ..................................................................................................4, 14

31 L.P.R.A. § 3408 ......................................................................................................8

31 L.P.R.A. § 3432 ......................................................................................................8

31 L.P.R.A. § 3511 ......................................................................................................8

31 L.P.R.A. § 3513 ......................................................................................................8

31 L.P.R.A. § 3514 ......................................................................................................8

31 L.P.R.A. § 3516 ......................................................................................................8

48 U.S.C. §§ 2101-2241 .............................................................................................1

11 U.S.C. § 503 .........................................................................................................10

11 U.S.C. § 503(b)(1)(A) ............................................................................................8

PROMESA § 305 ...............................................................................................4,13,14

PROMESA § 314(b)(4) .......................................................................................4,14

PROMESA § 315(b) ....................................................................................................1

To the Honorable United States District Judge Laura Taylor Swain:

The Puerto Rico Electric Power Authority ("PREPA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as PREPA's representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together with PREPA and the Oversight Board, "Movants"), hereby file this reply ("Reply") to Cobra Acquisitions LLC's ("Cobra") opposition [Case No. 17-BK-3283-LTS, ECF No. 8850] ("Opposition") to Movants' joint urgent motion (the "Urgent Motion")[2] to stay litigation relating to *Cobra Acquisitions LLC's Motion for Allowance and Payment of Administrative Expense Claims* [Case No. 17-BK-3283-LTS, ECF No. 8789] (the "Administrative Expense Motion") until the January 29, 2020 omnibus hearing, without prejudice to Movants seeking further extensions.  In support of this Reply, Movants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      In response to the Urgent Motion, Cobra concedes that some delay of the Administrative Expense Motion is necessary.  Cobra—which has been paid well over $1 billion to date—proposes to bifurcate the Administrative Expense Motion so that a hearing on approximately $89 million of purportedly "not contested" claims takes place first during the omnibus hearing on December 11, 2019.  Following that, Cobra recognizes that a discovery schedule should be determined and contends that a hearing on the remainder of the payments sought in the Administrative Expense Motion should not be held until the January 29, 2020 omnibus hearing.

---

[1]  PROMESA has been codified in 48 U.S.C. §§ 2101-2241.

[2]  Capitalized terms used but not defined herein shall have the meaning given them in the Urgent Motion.

Opp. ¶¶ 45-47.  For the reasons set forth in the Urgent Motion and below, Movants respectfully suggest the Court should reject Cobra's unsupported and erroneous arguments and stay the Administrative Expense Motion in its entirety at least until the January 29, 2020 hearing as requested in the Urgent Motion.

2.     Cobra's request that its Administrative Expense Motion not be stayed in full until the January 29, 2020 hearing boils down to two arguments: (1) the Indictment itself does not name Cobra as defendant and does not explicitly contain allegations that the Cobra Contracts are subject to rescission due to fraud or illegality, Opp. at ¶¶ 3, 8, 14-16, 24-26, 44, and (2) Cobra would be prejudiced if it had to wait to be paid the approximately $216 million it claims it is owed.  Opp. at ¶ 40.  Both arguments lack merit, and Cobra's transparent attempt to ram through a decision on its claims before discovery and the criminal investigation can play out, and FEMA's review the reasonableness of Cobra's fees is completed, should be rejected.

3.     <u>First</u>, the validity of the Cobra Contracts is deeply intertwined with the issues raised by the Indictment.  Cobra time and again asserts that the Indictment does not itself either charge Cobra or demonstrate that the Cobra Contracts are legally invalid.  *See* Opp. at ¶¶ 3, 8, 14-16, 24-26, 44.  But that Cobra itself has not been criminally indicted does not prove Cobra was unaware of or complicit in its former president's alleged criminal acts, that its former president's acts directly benefiting Cobra to the tune of hundreds of millions of dollars should not be attributable to Cobra, or that PREPA's liability under the Cobra Contracts is not impacted by the alleged conduct of its president.  Contrary to Cobra's assertions, the fact that there is much movants do not know about Cobra's complicity in or responsibility for Ellison's alleged criminal actions is not a reason to grant it immediate payment on all or even a portion of a quarter of a billion dollar claim—it is a reason to stay the Administrative Expense Motion to allow the criminal matter to

2

conclude and allow movants to conduct discovery to determine whether the Cobra Contracts are tainted by the alleged illegal acts of Cobra's former President.

4.  <u>Second</u>, and similarly, the FEMA Analysis is critical to inform movants whether and to what extent Cobra is entitled to any further payments.  Cobra argues that "[u]nder the [Cobra] Contracts, PREPA is required to pay Cobra for its work regardless of whether FEMA is obligated to reimburse PREPA."  Opp. ¶ 12.  But Cobra's position is contradicted by the very provisions it then cites, Article 29 of the First Contract and Article 53(F) of the Second Contract, both of which provide that PREPA is obligated to pay Cobra **unless** "any failure to secure approvals or funding from FEMA . . . [is] due to [Cobra's] sole fault . . . ."  *See* Opp. ¶ 12; *see also* First Contract § 68 (requiring Cobra to reimburse PREPA if FEMA demands repayment of funds due to Cobra's fault); Second Contract § 53(J) (same).  Cobra entered into the Cobra Contracts with full awareness that PREPA was relying on FEMA funding for the full payment of costs incurred under the Contract.[3]  The Cobra Contracts specifically provided PREPA protection for this very circumstance where Cobra's own actions result in the failure to secure funding from FEMA.  Under Article 29 and Article 53(F), if FEMA refuses to reimburse future PREPA payments to Cobra due to Cobra's fault, PREPA will not have to pay Cobra.  Whether such clauses are triggered is predicated on factual issues that will only come to light once FEMA finishes its analysis of the Cobra Contracts.  The Administrative Expense Motion should be stayed until that time.

5.  <u>Third</u>, discovery would be materially impeded and unnecessarily duplicated if it has to proceed in tandem with the criminal trial.  PREPA would need discovery from Ellison and other Cobra employees, including on matters related to the alleged, fraudulent scheme that may

---

[3]  *See* First Contract, Article 53(N)(1)("PREPA is using Federal grant funding awarded or administered by FEMA to the Government of Puerto Rico and/or PREPA to pay, in full, for the costs incurred under this Contract.")

impact some or all of PREPA's obligations to pay Cobra.  This discovery will likely be impeded if Ellison or others at Cobra invoke the Fifth Amendment due to the pending criminal case, and certainly will prove duplicative of the criminal investigation.  A stay would address these issues.

6.     <u>Fourth</u>, PREPA requires time to conduct discovery and analyze Cobra's claims for reasons other than the Indictment or the FEMA Analysis, to determine independent of the fraud whether Cobra is entitled to payment of the amounts claimed under the Cobra Contracts.  More than 200 of Cobra's invoices are actively in dispute over issues of fact such as accuracy of headcounts, unauthorized work, non-restoration issues, inappropriate charging for access mapping, incorrect blended rate billing practices, pending inspection reports, and billing issues, including numerous invoices for interest on disputed and unauthorized work.  Indeed, PREPA disputes the so-called "undisputed claims."  First, PREPA timely took a $7.6 million discount when it promptly paid outstanding invoices following receipt of Cobra's long-delayed no-criminal activity certification as required under the Cobra Contracts.  Second, Cobra has failed to provide supporting documentation for the tax gross-up amount, which is subject to adjustment pending the cost analysis performed by FEMA.  As for the invoices to which PREPA allegedly has not raised objections, these are not identified in the Administrative Expense Motion and hence PREPA cannot verify them without further discovery.  However, it appears that the referenced invoices were for unauthorized work and have been disputed by PREPA for months.

7.     <u>Fifth</u>, and finally, Cobra will not be prejudiced by a stay until at least the January 29, 2020 omnibus.  This is because, under PROMESA Title III, Cobra has no right to immediate payment on its purported claim—it is only entitled to payment on the effective date of a confirmed plan under PROMESA section 314(b)(4).  Contrary to Cobra's arguments, the Court does not have discretion to order the payment of Cobra's claim before the Effective Date, because PROMESA

4

section 305 bars the Court from entering any order "interfer[ing] with (1) any of the political or

governmental powers of the debtor" or "(2) any of the property or revenues of the debtor."

PROMESA § 305.  As PREPA has the governmental power to decide when and how it pays

expenses, 22 L.P.R.A. § 196, and has the power to do what it wishes with its property during the

pendency of the Title III case, this Court cannot order earlier payment of Cobra's claim than

mandated by the Bankruptcy Code.  As a result, Cobra cannot be prejudiced by the limited stay

requested in the Urgent Motion.

<u>**ARGUMENT**</u>

**I.      The Legal Standard**

8.      As detailed in the Urgent Motion and this Court has recognized, "the power to stay

proceedings is incidental to the power inherent in every court to control the disposition of the

causes on its docket with economy of time and effort for itself, counsel, and for litigants."  *In re*

*Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 335 F. Supp. 3d 256, 262 (D.P.R. 2018) (quoting

*Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "Generally, courts have the discretionary power

to stay an action in the interest of justice and efficiency." *Id.* (quoting *Total Petroleum P.R. Corp.*

*v. T.C. Oil, Corp.*, 2010 WL 11545626, at *1 (D.P.R. May 7, 2010)). The Court must balance the

equities and potential prejudice to each party. *Id.* (internal quotations and citations omitted).

Indeed "[t]he pendency of a parallel *or related* criminal proceeding can constitute such a reason

[to stay a civil proceeding]." *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77

(1st Cir. 2004) (emphasis added).  All relevant factors make clear that the stay requested by

Movants is justified.

## II.   Staying the Administrative Expense Motion to Allow for the Criminal Investigation and Trial to Proceed is in the Interest of Justice

9.     Cobra contends that the Administrative Expense Motion should not be stayed because (i) the Indictment does not itself charge Cobra with criminal actions or allege that the Cobra Contracts "with PREPA were awarded improperly or corruptly," and (ii) "even if all the allegations in the Indictment are proved true" it would not affect Cobra's right to payment under the Cobra Contracts.  *See* Opp. ¶¶ 15-18; *see also* Opp. ¶¶ 24-29.  Cobra goes so far as to say that Cobra's civil claims "are far from" the conduct alleged in the Indictment.  Opp. ¶ 21.

10.     These arguments are, quite simply, preposterous.  While Cobra itself is not charged in the Indictment, Cobra and the Cobra Contracts take center stage—they are the alleged purpose for and mechanism through which the alleged fraud and bribery was conducted.  The Indictment is entirely premised upon the allegation that over the course of several months Ellison, then-president of Cobra, provided Tribble—the key FEMA official in Puerto Rico—with various bribes in order to get her to funnel opportunities **to Cobra**.  Specifically, the Indictment alleges that Tribble "performed official acts . . . **to advance COBRA's interests** and **secure favorable treatment for COBRA** as needed and as specific opportunities arose," "including but not limited to influencing, providing advice to, and exerting pressure on PREPA executives . . . **so that PREPA would accelerate payments to COBRA, assign tasks to COBRA instead of using PREPA employees, and use COBRA in restoration tasks to the exclusion of other contractors**."  *Id.* at ¶¶ 43-44 (emphasis added).  The Indictment further alleges that in return for Cobra's president's bribes, Tribble exerted pressure to have FEMA officials approve reimbursement **for Cobra**, *id.* ¶ 45, and "provid[ed] COBRA with information not readily accessible to it through other means."  *Id.* at 46.  Moreover, in connection with his alleged conspiracy with Tribble, Ellison apparently ordered other people to assist in providing services

6

and "things of value" to Tribble.  *See, e.g., id.* at ¶ 56.  Whether these other people were other employees of Cobra is not clear from the Indictment and would be a subject of discovery.[4]

11.     As is clear from these allegations, the Cobra Contracts are at the heart of Ellison's alleged bribery scheme, and Cobra was intended to and did benefit from that scheme.  It is incredible that Cobra would file a brief asserting that actions taken by Cobra's then-president fraudulently to obtain work for Cobra somehow have nothing to do with Cobra and do not implicate it at all in these criminal actions.

12.     Contrary to Cobra's claims, while it is true that Cobra itself has not yet been criminally indicted, this fact alone does nothing to show that Cobra's contractual entitlement to some or all of the payments is not eliminated by the alleged fraud or illegality.  What is clear from the Indictment is that there is probable cause to believe Cobra's president engaged in illegal and fraudulent acts to obtain work for Cobra.  These actions started at the latest before the Second Contract was entered into, as Cobra itself admits.  Opp. ¶¶ 26-27.[5]  Whether the Cobra Contracts were procured or affected by bribery and fraud and when that illegal conduct commenced will obviously impact whether some or all of the payment obligations to Cobra under the First Contract, the Second Contract, or both, are impacted and are factual questions that may be determined in the

---

[4]   Moreover, that the Cobra Contracts are hardly free from suspicion is made clear by federal court filings relating to the federal investigation of Ellison, in which Juan Carlos Lopez, Special Agent with the FBI, declared under penalty of perjury that (as of June 21, 2019) there was "an ongoing criminal investigation involving FEMA's PA grant program, PREPA, *and contracts awarded to COBRA*."  *See Ellison v. U.S.A.*, Case No. 19-CV-3341-SI (N.D. Cal. Jun. 21, 2019), ECF No. 26-1 at ¶ 10 (emphasis added).

[5]   Cobra's apparent defense that "most" of the bribes mentioned in the Indictment were provided to Tribble by Cobra's president after entry into the Second Contract (Opp. ¶ 28) does not foreclose the possibility that the First Contract was obtained through bribery, and simply demonstrates how many knots Cobra has to tie itself into to try to save the Cobra Contracts from the charges contained in the Indictment.  That Cobra's president allegedly gave Tribble even more things of value after the execution of the Second Contract does not change the fact that the Indictment alleges Cobra's president had started bribing Tribble *before* the Second Contract had been entered into, and—potentially— in order to obtain the Second Contract.

criminal proceeding, and on which PREPA otherwise needs to take discovery before it is forced

to litigate an action by Cobra seeking immediate payments on its claims.

13.    Significantly, Puerto Rico law separately may provide for rescission of one or both

of the Cobra Contracts or amendments and either damages or disgorgement claims against Cobra

based on theories of deceit or illicit cause if the allegations in the Indictment are true.[6]   Cobra

notably does not address this case law, but instead makes the baffling and demonstrably false

assertion that the Indictment itself "makes no allegations at all that undermine the legitimacy of

the [Cobra] Contracts."  Opp. ¶ 19.  As demonstrated above, the allegations in the Indictment

strongly undermine the legitimacy of the Cobra Contracts.  Whether the crimes alleged in the

Indictment warrant rescission of the Cobra Contracts can only be determined after the conclusion

of the criminal matter and, as needed, discovery of related matters by Movants.

14.    Moreover, facts relating to the Indictment will bear greatly on the allowance of

Cobra's alleged administrative expense claim.  Notably, courts have held that under Bankruptcy

Code section 503(b)(1)(A)—the section Cobra cites in support of its administrative expense claim

(Administrative Expense Motion at ¶ 63)—creditors must show that the services they rendered

were not done to pursue that creditors' economic self-interest but to benefit the estate.  *See, e.g.,*

*In re Public Serv. Co.*, 160 B.R. 404, 452 (Bankr. D.N.H. 1993) ("The law in this area has

---

[6]   As noted in the Urgent Motion, the Cobra Contracts may be voidable for having been obtained by "deceit," defined
to be "when by words or insidious machinations on the part of one of the contracting parties the other is induced to
execute a contract which without them it would not have made."  31 L.P.R.A. § 3408.  This could give PREPA a
complete defense to further payments, a damages claim against Cobra, and/or the right to receive back payments
made to Cobra under the vitiated contracts.  *See* 31 L.P.R.A. §§ 3511, 3513, 3514; *Dopp v. HTP Corp.*, 947 F.2d
506, 510 (1st Cir. 1991).  Moreover, under Puerto Rico law, when one contracting party is implicated in an "illicit"
consideration for a contract—that is, a consideration that is contrary to law or good morals (*see* 31 L.P.R.A. §
3432)—the innocent party (here, PREPA), "may recover what he may have given, and shall not be bound to fulfill
what he may have promised."  *See* 31 L.P.R.A. § 3516; *see also Rosario Rosario v. Pagan Santiago*, 196 D.P.R.
180, 188 (P.R. 2016) (if one of the contracting parties was not at fault, he can claim what he gave and will not be
obliged to fulfill what he promised).  This could apply to give PREPA a defense to further payments and a claim for
disgorgement against Cobra.  Movants reserve the right to make any other challenge to Cobra's claims, including,
without limitation, other challenges based on Puerto Rico contract law or based on any and all terms of the Cobra
Contracts.

coalesced to the point that it may fairly be stated that when a creditor is pursuing its own economic

self-interest . . . then that creditor cannot establish the requisite 'direct benefit' which the case law

requires in order to grant a creditor a section 503(b) award.").[7]  Given that Cobra directly benefited

from, and may be implicated in, the alleged illegal activities spearheaded by Cobra's former

president, significant factual discovery will be necessary to counter the presumption that Cobra

was acting entirely in its own self-interest and is not entitled to an administrative expense claim

against PREPA.[8]

      15.    Accordingly, Cobra's desire to ram through the allowance of its claims *now*—

before the criminal trial is concluded and PREPA has the opportunity to conduct its own discovery

into Cobra and Ellison's actions—is contrary to the interests of justice.

### III.   Staying the Administrative Expense Motion Until the FEMA Analysis is Completed Is in the Interest of Justice and Efficiency

      16.    Cobra argues that it is unnecessary for FEMA to finish its analysis of the

reasonableness of the Cobra charges, supposedly because of the "incontestable fact that Cobra's

contracts are with PREPA, not FEMA" and that "[u]nder the Contracts, PREPA is required to pay

Cobra for its work regardless of whether FEMA is obligated to reimburse PREPA."  Opp. ¶ 12.

Cobra is wrong, and its position is contradicted by express provisions in the Contracts that link

---

[7]  *See also, e.g., Lebron v. Mechem Fin.*, 27 F.3d 937, 946 (3d Cir. 1994) (reasoning that "unless the court is able to find that [the creditor's] actions were designed to benefit others who would foreseeably be interested in the estate," "there can be no award of expenses even though there may have been an incidental benefit" to the estate); *Wolf Creek Collieries Co. v. GEX Kentucky, Inc.*, 127 B.R. 374, 376 (D. Ohio 1991) ("to be allowed as administrative expenses . . . the entity incurring the expenses must have undertaken them in order to benefit the estate as a whole, not to further its own self-interest . . . [This] requirement[], it has been said, is to 'insure that unsecured creditors are not forced to bear the burden of the expenses incurred by the creditor acting in his own interest.'") (internal cites omitted); *In re Moore*, 109 B.R. 777, 783 (Bankr. E.D. Tenn. 1989) ("If the creditor provided the services out of self-interest, the expense is not an allowable administrative expense."); *In the Matter of Hayes*, 20 B.R. 469 (Bankr. W.D. Wis. 1982) (claimant denied administrative expense because the claimant "was acting substantially in his own interest.").

[8]  For the avoidance of doubt, Movants reserve all rights to challenge the Administrative Expense Motion and Cobra's alleged right to an administrative expense claim on any grounds whatsoever, including, without limitation, grounds based on contract law or bankruptcy law and grounds relating to the size of any potential claim.

FEMA funding to PREPA's payment obligations.  PREPA's ability to obtain FEMA funding is so

critical to the Cobra Contracts that the parties specifically provided in Article 29 of the First

Contract and Article 53(F) of the Second Contract that PREPA is obligated to pay Cobra **unless**

"any failure to secure approvals or funding from FEMA . . . [is] due to [Cobra's] sole fault . . . ."

*See* Opp. ¶ 12; *see also* Opp. ¶¶ 31-35.  The Cobra Contracts go further by providing that if FEMA

seeks repayment from PREPA, or otherwise penalizes PREPA for any act or omission of Cobra,

Cobra is obligated to reimburse PREPA within ten business days.  *See* First Contract § 68

(requiring Cobra to reimburse PREPA if FEMA demands repayment of funds due to Cobra's

fault); Second Contract § 53(J) (same).

17.     Together, these provisions mean that if FEMA determines that Cobra's actions

(including, potentially, actions related to the Indictment) disqualify PREPA from receiving further

funding to pay Cobra, then PREPA is not obligated to pay Cobra.  Moreover, if, following the OIG

Report which called into question Cobra's rates on the First Contract and the FEMA Analysis,

FEMA decides to seek repayment from PREPA because of Cobra's actions, then PREPA will be

entitled to repayment from Cobra, offsetting any potentially valid claim Cobra may otherwise

have. Further, if the new FEMA cost analysis referenced in the OIG Report shows that any Cobra

charges were unreasonable or unnecessary, it will not meet the definition of administrative expense

under Bankruptcy Code § 503. These factual issues will only come to light once FEMA finishes

its cost analysis of the Cobra invoices.  The stay is thus necessary to avoid PREPA overpaying

Cobra for work that FEMA will not reimburse.

## IV.     The Interests of Judicial Efficiency are Harmed by Trying to Conduct Discovery
## While the Criminal Proceeding Remains Ongoing

18.     As set forth in the Urgent Motion (¶ 29), a stay is also warranted because (i) the

ongoing criminal proceedings could implicate the Fifth Amendment rights of essential witnesses,

impeding discovery regarding the Administrative Expense Motion, and (ii) otherwise contemporaneous litigation here and in the criminal court would lead to duplicative discovery. Cobra fails to provide any credible reason to refute these arguments, merely doubling-down on its assertion that the Indictment contains nothing that affects the legitimacy of the Cobra Contracts (Opp. ¶ 21), and alleging that discovery would not be impeded as "[t]he only witnesses who could be expected [to invoke the Fifth Amendment] here are the three indicted individuals . . . none of whom Movants show have any testimony relevant to [Cobra's contract] claims."

19.    That assertion is obviously baseless. As has been demonstrated above, Cobra and the Cobra Contracts are central to the Indictment against Ellison, Tribble, and Patterson in ways that could eliminate all or some of PREPA's purported obligation to pay Cobra. It is absurd to argue Ellison or other Cobra employees have nothing relevant to say that could bear on the Administrative Expense Motion and the allowability of Cobra's claim. PREPA will certainly seek discovery relating to Ellison's alleged conduct and its impact on the Cobra Contracts. Yet seeking to obtain such discovery now, while Ellison is being criminally prosecuted and will have every incentive to invoke the Fifth Amendment, will be both unnecessarily difficult and duplicative of the criminal proceeding. Indeed, courts in this Circuit have regularly granted protective orders barring depositions in civil proceedings where a pending criminal case will require a witness to choose between incriminating himself and asserting his Fifth Amendment right which carries with it the potential for an adverse inference. *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.,* No. MDL 13-2419-RWZ, 2015 WL 13715289 (D. Mass. July 31, 2015) (noting that "courts have also stayed discovery in a civil case during the pendency of a criminal proceeding" in light of "Fifth Amendment concerns" and "even such apparently innocuous topics could be fraught with peril for those [litigants] given the criminal allegations against them."). As a result,

and as argued in the Urgent Motion, a stay is necessary while the criminal proceeding remains pending.

## V.      Additional Time After the Stay is Necessary to Resolve Disputes between PREPA and Cobra

20.      PREPA also will need time after the stay to take discovery to resolve disputes in addition to the Indictment or the FEMA Analysis, to determine whether Cobra is contractually entitled to payment under the Cobra Contracts.  Notably, for reasons unrelated to the Indictment and the FEMA Analysis, PREPA disputes the majority of Cobra's asserted rights to payment, including sums Cobra asserts are "undisputed," in large measure due to complex factual issues that will require discovery before PREPA can fully respond to the Administrative Expense Motion.

21.      Hundreds of Cobra invoices are in dispute.  For example, PREPA disputes the accuracy of the headcounts in some 70 invoices, amounting to nearly $71 million.  Non-restoration issues are under review or in dispute in another 48 invoices, resulting in over $32 million in dispute.  Questions over inappropriate billing for access mapping in 13 invoices results in an additional $3 million in dispute, and pending inspection reports as to another project as billed in 10 invoices amounts to an additional $7 million in dispute.  A further $5 million is in dispute due to miscellaneous billing issues reflected in 19 other invoices.  Over 200 invoices for interest are disputed because the work being billed in the invoices was unauthorized or otherwise disputed.

22.      Moreover, many of the claims Cobra asserts are "undisputed" are also actively disputed by PREPA. Cobra argues that PREPA was not entitled to an approximately $7.6 million prompt payment discount withheld by PREPA.  PREPA has asserted to Cobra that it promptly paid outstanding invoices following receipt of Cobra's long-delayed no-criminal activity certification as required under the Cobra Contracts.

23.     As for the invoices to which PREPA allegedly has not raised objections (which are not identified in the Administrative Expense Motion and hence cannot be verified by PREPA absent further discovery) and for the tax gross-up amount, both, at a minimum, may be subject to adjustment following the results of the pending cost analysis being performed by FEMA pursuant to the OIG Report that invalidated the original Cobra cost analysis.  In addition, Cobra has failed to provide back-up documentation to support its tax gross-up claim.  Cobra's so-called "undisputed" claims appear to include millions of dollars of unauthorized work on Vieques and Roosevelt Road.  At bottom, Movants need sufficient time and opportunity to investigate the propriety of Cobra's charges in light of issues PREPA has identified, issues that may come to light in the criminal proceedings and FEMA Analysis, and issues PREPA has not yet uncovered.

## VI.     Cobra Will Not be Harmed by a Stay Because the Court Cannot Order Immediate Payment of Cobra's Claim, Even if it is Valid

24.     Cobra alleges that a stay should not be granted because a stay of any length would "greatly prejudice" Cobra.  *See* Opp. ¶¶ 40-44.  Cobra is wrong.

25.     First, Cobra is not prejudiced by the stay because it is not entitled to immediate payment of its claims.  Citing chapter 11 case law, Cobra incorrectly asserts that "[n]othing prohibits immediate payment of an allowed administrative expense, either, as the timing of payment is within a court's discretion."  *See* Opp. ¶ 42 (citing *In re HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002); *In re Rare Coin Galleries, Inc.*, 72 B.R. 415, 417 (Bankr. D. Mass. 1987)).  In advancing this argument, Cobra ignores the considerable differences between chapter 11 and PROMESA Title III.  Specifically, PROMESA section 305 divests the Court of jurisdiction to issue any order that would interfere with any political or governmental powers of the debtor or any of the property or revenues of the debtor, absent the Oversight Board's consent. *See* PROMESA § 305; *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 927 F.3d 597, 602 (1st

Cir. 2019) (denying creditor's request to compel Commonwealth's remittance of toll revenues, vehicle fees, and excise taxes to HTA and then to the bank for payment to bondholders under section 305 because the "requested relief would require the Title III court itself to direct the Commonwealth's use of its revenues and property in a manner that contravenes the expressed will of the Commonwealth legislature, the Governor of Puerto Rico, and the Oversight Board"); *see also Aurelius Capital Master, Ltd. v. Puerto Rico,* 919 F.3d 638, 648–49 (1st Cir. 2019) (concluding that section 305 bars the Title III court from preventing the Commonwealth from using certain Commonwealth revenues for the payment of general obligation debt).

26.     An order compelling PREPA to make immediate payment, even of an allowed administrative expense, is barred by PROMESA section 305.  First, such order directly interferes with PREPA's property or revenues (*i.e.*, its cash).  Second, under 22 L.P.R.A. § 196, PREPA has the power "to determine the nature of and the need to incur all expenditures and the manner in which such expenditures shall be incurred, authorized, and defrayed."  An order compelling PREPA to prioritize payments to a single creditor whose claims may have been procured by fraud (and thus are potentially subject to offsetting) ahead of its other operating expenses would thus directly infringe on PREPA's governmental power to "determine the . . . manner in which such expenditures shall be . . . defrayed." *Id.*

27.     Accordingly, while proceeding with the Administrative Expense Motion would greatly prejudice PREPA's ability to conduct discovery and assess Cobra's claims, Cobra would suffer no prejudice from the stay even if it is found to have an administrative expense claim against PREPA because it would not receive payments until the effective date of a future PREPA plan of adjustment. *See* PROMESA § 314(b)(4).

28.     <u>Second</u>, even if the Court had the authority to order immediate payment on Cobra's purported administrative expense claim (it does not), it is clear the Court's discretion should not be exercised here.  Cobra has given no reason justifying it being paid ahead of other postpetition contractors, let alone a reason that would counterbalance the fact that: (i) its former President has been indicted for fraud in connection with execution and performance of the Cobra Contracts (from which Cobra has allegedly benefitted), (ii) FEMA is in the process of conducting an analysis questioning whether Cobra's rate were reasonable, (iii) PREPA has contested most of the payments allegedly due Cobra, and (iv) Cobra has already received $1.1 billion in payments on 82% of its submitted invoices.  As these facts weigh heavily against immediate payment of Cobra's claim until, at least, the Indictment is tried and FEMA has conducted its analysis, Cobra is not harmed by a stay of briefing on the Administrative Expense Motion.

*[Remainder of page intentionally left blank]*

## CONCLUSION

29.     For the foregoing reasons, the Court should overrule the Opposition, grant the

Urgent Motion, and enter the Proposed Order.

New York, New York
October 16, 2019

Respectfully submitted,

**O'NEILL & BORGES LLC**

By: /s/ *Hermann D. Bauer*
    Hermann D. Bauer
    USDC No. 215205
    250 Muñoz Rivera Ave., Suite 800
    San Juan, PR 00918-1813
    Telephone: (787) 764-8181
    Facsimile: (787) 753-8944
    Email: hermann.bauer@oneillborges.com


**PROSKAUER ROSE LLP**

By: /s/ *Martin J. Bienenstock*
    Martin J. Bienenstock*
    Paul V. Possinger*
    Ehud Barak*
    Eleven Times Square New York, NY 10036
    Telephone: (212) 969-3000
    Facsimile: (212) 969-2900
    Email:   mbienenstock@proskauer.com
              ppossinger@proskauer.com
              ebarak@proskauer.com
              gmashberg@proskauer.com


* admitted *pro hac vice*

*Attorneys for the Financial Oversight and
Management Board and as representative of the
Puerto Rico Electric Power Authority*

**DÍAZ & VÁZQUEZ LAW FIRM, P.S.C**.

By: /s/ *Katiuska Bolaños*
    Katiuska Bolaños
    kbolanos@diazvaz.com
    USDC-PR 231812
    290 Jesús T. Piñero Ave.
    Scotiabank Tower, Suite 11-E
    San Juan, PR 00918
    PO Box 11689
    San Juan, PR  00922-1689
    Cel.: (787) 458-8276

*Co-Attorneys for Puerto Rico Electric Power
Authority*

**O'MELVENY & MYERS LLP**

By: /s/ *Nancy A. Mitchell*
    John J. Rapisardi*
    Nancy A. Mitchell*
    7 Times Square
    New York, NY 10036
    Telephone: (212) 326-2000
    Facsimile: (212) 326-2061
    Email:   jrapisardi@omm.com
              nmitchell@omm.com


* admitted pro hac vice

*Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory
Authority and Puerto Rico Electric Power
Authority*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record and CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
