# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
----------------------------------------------------------- x
                                                            :
In re                                                       :
                                                            :    PROMESA
THE FINANCIAL OVERSIGHT AND                                 :    Title III
MANAGEMENT BOARD FOR PUERTO RICO,                           :
                                                            :
     as representative of                                   :    Case No. 17-BK-3283 (LTS)
                                                            :
THE COMMONWEALTH OF PUERTO RICO,                            :    (Jointly Administered)
et al.,¹                                                    :
                                                            :
     Debtors.                                               :
                                                            :
----------------------------------------------------------- x
                                                            :
In re                                                       :
                                                            :    PROMESA
THE FINANCIAL OVERSIGHT AND                                 :    Title III
MANAGEMENT BOARD FOR PUERTO RICO,                           :
                                                            :
     as representative of                                   :    Case No. 17-BK-04780 (LTS)
                                                            :
PUERTO RICO ELECTRIC POWER                                  :    **Court Filing Relates Only to PREPA**
AUTHORITY (PREPA)                                           :
                                                            :
     Debtor.                                                :
----------------------------------------------------------- x
```

## *AMICI CURIAE* AND LEGAL BRIEF OF
## THE PUERTO RICO SOLAR ENERGY INDUSTRIES ASSOCIATION CORP. ("SESA-PR") AND THE SOLAR ENERGY INDUSTRIES ASSOCIATION ("SEIA")

**TO THE HONORABLE COURT:**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

COME NOW, the Puerto Rico Solar Energy Industries Association Corp. ("SESA-PR") and the Solar Energy Industries Association ("SEIA"), through the undersigned legal counsel, and respectfully submit this legal brief as *amici curiae* in relation to the "Joint Motion of the Puerto Rico Electronic Power Authority and AAFAF pursuant to Bankruptcy Code Sections 362, 502, 922 and 928, and Bankruptcy Rules 3012(A)(1) and 9019 for Order Approving Settlement Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Periods" ("Rule 9019 Motion").

**I, INTRODUCTION**

> *A new and better Puerto Rico is built with the will of those who are not discouraged in the face of adversity. We rise up with the capacity to innovate and make the necessary changes to benefit our People.*

Statement of Motives, Law No. 17-2019

On April 11, 2019, the Government of Puerto Rico enacted ground breaking legislation which sets forth its unequivocal and binding public policy concerning the present and the future of the island's energy system. Act 17-2019, known as "Puerto Rico Energy Public Policy Act" ("Energy Policy Act"), was enacted with the purpose of guaranteeing universal access to an affordable, just, reasonable and nondiscriminatory electric power service by establishing accessible rates and consumer-oriented proceedings, **while promoting and encouraging the generation of renewable energy**, to reduce and, eventually, eliminate electric power generation from fossil fuels. Emphasis ours, *see* Sections 1.5 and 1.6.

Merely one (1) month after the enactment of the Energy Policy Act, the Financial Oversight Board ("FOMB") as representative of the Puerto Rico Power Electric Power Authority ("PREPA") and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") submitted to this Court's consideration the Rule 9019 Motion, a proposal which attempts to thwart the

- 2 -

Government of Puerto Rico's public policy on energy matters by creating additional obstacles to the utilization of renewable energy by consumers. As will be further explained below, SESA-PR and SEIA (jointly the "Amici") respectfully request to be allowed as *amici curiae* of the Court, to represent the special interests of the solar energy and storage industry and aid this Court in understanding the pertinent issues that impact the same.

SESA-PR is a not for profit corporation organized under the laws of Puerto Rico. It is a nonprofit trade association representing companies in the solar and energy storage industry which do business in Puerto Rico. SESA-PR's member companies come from the entire spectrum of businesses involved in the industry, including manufacturing, sales, installation, operation, maintenance and financing of solar and energy storage systems.

SESA-PR is the only entity in Puerto Rico comprised of the spectrum of solar and storage systems on the island, including residential, commercial, industrial, microgrid and utility-scale systems. In this regard, SESA-PR's wide-ranging interests are not already represented in the present case. Although other parties may be qualified to address solar and storage as a tangential component of their missions, or just a portion of the solar and/or storage industry, SESA-PR is the only entity focused on the wellbeing of the entire solar and storage industry in Puerto Rico.

In addition, SEIA is the national trade association for the United States solar industry. With more than 1,000 member companies nationwide, SEIA represents all segments of the solar market including residential rooftop solar companies, firms that provide solar solutions to commercial and industrial customers, community shared solar companies, solar companies that supply power directly into the wholesale energy markets across the country, and firms that manufacture and distribute a range of solar products.

SESA-PR is also the only nonprofit related to solar energy on the island with a national affiliation with SEIA. Thus, the Amici's participation adds the possibility of unique perspective on solar and storage issues across the entire nation, which we respectfully submit adds value and helps this Court receive a broader, balanced and unbiased view of pertinent issues.

## II, REQUIREMENTS FOR AN *AMICUS CURIAE*

Rule 29 of the Federal Rules of Appellate Procedure allows for a party to file a brief only by leave of the court, Fed. R. App. P. 29. Although there are rules governing the participation of *amicus curiae* on appeal, there is no provision in the Federal Rules of Civil Procedure "as to the conditions under which a trial court should permit *amicus* appearances and the restrictions, if any, that should attend its appearance." *Alliance of Auto. Mfrs. v. Gwadowsky,* 297 F.Supp.2d 305, 306 (D.Me.2003). Nevertheless, "the district court retains 'the inherent authority' to appoint *amicus curiae* 'to assist it in a proceeding.'" *Id.* (quoting *Resort Timeshare Resales, Inc. v. Stuart,* 764 F.Supp. 1495, 1500–01 (D.Me.1991)). An *amicus* is not a party and "does not represent the parties but participates only for the benefit of the court." *Resort Timeshare,* 764 F.Supp. at 1501.

The acceptance of *amicus* briefs is within the sound discretion of the courts. *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970); *All. of Auto. Mfrs. v. Gwadowsky*, 297 F. Supp. 2d 305, 307 (D. Me. 2003). The First Circuit has stated that, when allowing *amicus* briefs, the party in interest must demonstrate a special interest:

> [W]e believe that a district court lacking joint consent of the parties should go slow in accepting ... an *amicus* brief **unless**, as a party, although short of a right to intervene, **the *amicus* has a special interest that justifies his having a say**, or unless the court feels that existing counsel may need supplementing assistance.

(Emphasis ours). *Strasser*, 432 F.2d at 569.

In summary, the following criteria have been established regarding the decision to allow the filing of *amicus* briefs: "whether the brief will assist the judges by presenting ideas, arguments,

theories, insights, facts, or data that are not to be found in the parties' briefs." Ed R. Haden & Kelly Fitzgerald Pate, *The Role of Amicus Briefs*, 70 Ala. Law. 114, 116 (2009) (citing *Voices for Choices v. Illinois Bell Tel. Co.,* 339 F.3d 542, 545 (7th Cir. 2003)). These would more likely be met, according to the court, when "a party is inadequately represented; or ... the would-be *amicus* has a direct interest in another case that may be materially affected by a decision in this case; or ... the *amicus* has a unique perspective or specific information that can assist the court beyond what the parties can provide." *Id.* (citing *Voices for Choices v. Illinois Bell Tel. Co.,* 339 F.3d 542, 545 (7th Cir. 2003)).

In the case of *Neonatology Assocs. P.A. v. Comm'r*, 293 F.3d 128, 131 (3d Cir. 2002), Judge Alito took a more liberal stand regarding *amicus* briefs. When examining Rule 29 of the Federal Rules of Appellate Procedure, he noted that within Rule 29 are the requirements of "(a) an adequate interest, (b) desirability, and (c) relevance." Justice Alito explained that under modern practice an *amicus* is required to have an interest in the case, instead of being impartial. *Id*. He rejected the argument that a restrictive approach to allowing *amicus* briefs is more protective of the court's time and lessens its workload. The open approach to *amicus* briefs provides that "motions for leave to file *amicus* briefs [should be granted] unless it is obvious that the proposed briefs do not meet Rule 29's criteria as broadly interpreted." *Neonatology Assocs.,* 293 F.3d at 133.

We urge this Court to follow the more liberal approach championed by now Justice Alito and grant the present request since the Amici's participation will allow the Court to consider the pertinent issues that impact the entire renewable energy and storage industry and the unavoidable legal duty to comply with the Government's clearly delimited statutory public policy on energy. SESA-PR, as the only entity comprised of the entire spectrum of solar and storage systems, and

SEIA, as the national trade association, both can provide unique perspectives and information to assist this Court in examining the Rule 9019 Motion.

As it will further discussed, if enacted, the RSA would raise costs for people considering investing in solar generating systems. Higher costs would have a direct correlation with substantially less people investing in solar generating systems, an action contrary to the Government's public policy. In addition, the implementation of the RSA would harm the interests of the Amici and their respective member companies by jeopardizing or eliminating the economic benefits that accompany the sales and installation of solar and storage systems on the island.

### A. SUMMARY OF RSA'S PERTINENT PROVISIONS

The RSA would impose undue charges and restrictions upon customers which use renewable energy in open violation of the Government's public policy recently set forth in Act 17-2019. In particular, the RSA:

1. Imposes an unwarranted behind the meter charge that would have the effect of a "solar tax";

2. Shortens the term that a customer would be able to fully benefit from his or her renewable energy generation; and

3. Imposes additional and illegal costs upon renewable energy customers.

More specifically, the RSA proposes that a plan of adjustment to be filed by the FOMB on behalf of PREPA will provide for the exchange of bonds for securitization in favor of certain bondholders. The terms of the securitization of bonds are proposed to be modified and, in order to pay for the transaction, a non-by-passable charge ("Transition Charge") will be added to all electric customers' bills. The proposed Transition Charge consists of a charge of 2.768 cents per kilowatt-hour that to escalate over the next 24 years until it reaches a maximum of 4.552 cents per kilowatt

hour. In addition, the RSA called PREPA to implement a Settlement Charge of 1 cent per kilowatt-hour by July 1, 2019, to fund certain aspects of the transaction.

As further explained in the Schedule I-A of the RSA, the Transition Charge's alleged intention is to "*promote efficient investment in, and efficient use of, Puerto Rico's electric infrastructure while providing for the recovery of legacy costs associated with the financing of the development of that infrastructure*". Nowhere in the Rule 9019 Motion nor in its supporting documents, does PREPA or AAFAF discuss the potential infrastructure or relevant development of the same, particularly, within the scope of the Government of Puerto Rico's public policy on energy. From a cursory review of the RSA, it is apparent that its only objective is on the repayment of the legacy costs and, thus, exclusively favors its bondholders' creditors.

Furthermore, the RSA specifically provides that the Transition Charge will be collected from all current and future customers which have benefitted, are benefitting, or will benefit from the use of the PREPA's system. *Customer* is defined as a service location or premise that (a) is connected to the System, (b) uses or leases any part of the System, (c) is connected to a microgrid, municipal utility or electric cooperative that is connected to or uses the System, or (d) benefits from any agreement that requires the [PREPA] System to provide the Customer electricity under any condition, including without limitation, an obligation to provide power on a standby, maintenance, emergency, or similar basis. In turn, *consumption* is defined as the amount of electricity consumed by a Customer, regardless of the source of such electricity, including thermal, solar, wind, geothermal or other renewable or recyclable sources, whether owned by PREPA or any successor, lessor or concessionaire, an independent power producer, municipality, cooperative or a Customer. In other words, the Transition Charge would be imposed on any present or future Customer of the electric system as long as the Customer maintains at least a backup or emergency

connection, and its consumption will be measured without regard to the actual source of the energy used by that customer. That is, *consumption* would include the energy that the consumer self-generates using equipment the consumer itself paid for.

The proposed RSA classifies Customers with behind the meter generation ("BTMG Customers"). This classification could have the effect of discouraging the use of renewable sources of energy. First, the RSA establishes a cutoff date for eligibility for treatment as a Grandfathered BTMG Customer of September 30, 2020, known as the Implementation Date. Second, the BTMG Customers will be subject to a monthly Transition Charge consisting of a fixed charge calculated for each month by multiplying the Transition Charge Rate applicable to such month by a monthly average of the Grandfathered BTMG Customer's Net Consumption over the prior twenty-four (24) month period, after taking into account a three (3) month lag time (such period, the "Twenty-Four Month Period").

Furthermore, any Grandfathered BTMG Customers whose behind the meter generation capacity increases by more than 20% above the capacity in place on the Implementation Date shall cease in the next billing period, and in all subsequent billing periods, to be considered a Grandfathered BTMG Customer to the extent of the behind the meter generation capacity increases. All Grandfathered BTMG Customers shall cease to be Grandfathered BTMG Customers on the twentieth (20th) anniversary of the Effective Date and each such Customer shall thereafter be a Non-Grandfathered BTMG Customer.

Finally, all BTMG Customers other than Grandfathered BTMG Customers shall be obligated to pay the Servicer for the cost of installing at a minimum a revenue grade meter to measure the amount of electricity that is generated behind the meter. Non-Grandfathered BMTG Customers shall be subject to a monthly Transition Charge that will be based on the greater of the

Customer's average gross consumption and during the then-applicable Twenty-Four Month Period and the Customer's net consumption for that month.

By contrast, Act 17-2019 provides that:

- "No direct or indirect charge shall be imposed upon the generation of renewable energy by prosumers." Act 17-2019, Sec. 3.4(c).

- No such charge – like the Transition Charge or the Settlement Charge – shall be imposed on customers who interconnect any distributed generation system without prior authorization of the Puerto Rico Energy Bureau. *Id*.

- During a five (5) year period and until the PREB establishes the appropriate value for distributed energy and storage systems, any charges upon net metering customers shall be based on their <u>net consumption</u>, that is, after netting the energy such customers export to the electric grid. *Id.*, Section 3.4(b). That is, the consideration of gross consumption provided for by the RSA is not permitted.

- The distributed energy customer's rate or compensation mechanism will be grandfathered for a term of not less than twenty (20) years, which is in stark contrast with the single September 30, 2020 cutoff date for grandfathering protection. *Id.,* Sec. 3.4(b).

In sum, the RSA clearly contradicts the Government's public policy on energy as established in Act 17-2019. Furthermore, no other solar customers in any other jurisdiction in the United States are paying charges on their own solar production. The RSA establishes additional hurdles and costs upon customers who choose to utilize renewable energy, thus thwarting the

forward looking and binding norms for renewable energy promulgated by the Government of Puerto Rico.

## III. DISCUSSION ON THE *JEFFREY* FACTORS TO EXAMINE A MOTION UNDER RULE 9019

Rule 9019 of the Federal Rules of Bankruptcy Procedure provides that a bankruptcy court may approve a compromise or settlement. As such, notice must be given to creditors, debtors and other entities as directed by the court. "One of the reasons that notice and court approval are required is to prevent a debtor from binding the estate to the terms of a compromise without court approval after input from creditors and parties in interest." *In re Trism, Inc.*, 282 BR 662, 6687 (8th Cir. 2002).

In the case of *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson ("TMT Trailer Ferry"),* 390 U.S. 414 (1968), the United States Supreme Court developed standards for determining whether a pre-plan settlement is fair and equitable. These factors include: 1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6)the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

The First Circuit has followed the *TMT Trailer Ferry*'s factors and has narrowed the same to four (4). These factors are: 1) the probability of success in the litigation being compromised; 2)

the difficulties, if any to be encountered in the matter of collection of the disputed funds; 3) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and 4) the paramount interests of the creditors and a proper deference to their reasonable views, See *Jeffrey v. Desmond*, 70 F3d. 183, 185 (1st Cir. 1995).

This Court has held that, when considering compromise or a settlement pursuant to Bankruptcy Rule 9019, the court will assess "whether the settlement falls below the lowest point in the range of reasonableness. However, the court is not required to go so far as to conduct a trial on the terms to approve a settlement." *In re Financial Oversight & Mgmt. Bd. For PR* at 75, See also *Cosoff v. Rodman*, 699 F.2d 599 (2d Cir. 1983);

We will now discuss each of the *Jeffrey* factors and why the RSA should not be approved by this Court.

### A. <u>Probability of Success</u>

It is the Amici's contention that this is a key factor for this Court to consider in its analysis of whether to approve or not the Rule 9019 Motion. The RSA's ultimate success will be predicated upon the enactment and/or significant amendments to multiple state laws. To this day, and to the best of the Amici's knowledge, there are no proposed amendments pending before the Puerto Rico Legislature to the multiple state laws concerning the public policy on energy that would need to be modified in order to accommodate for the RSA's contradictory provisions.

The Court should weigh the realistic consideration that could result in it being highly unlikely that the Puerto Rico Legislature might not make the changes to drastically modify the Government's public policy promulgated merely six (6) months ago. This should be of serious concern and possibly represents an unsurmountable obstacle to the FOMB, considering that the FOMB does not have legislative powers:

> [T]**he Oversight Board has not been given power to affirmatively legislate**. Thus, with respect to policy measures that would require the adoption of new legislation or the repeal or modification of existing Commonwealth Law, the Oversight Board has only budgetary tools and negotiations to use to elicit any necessary buy-in from the elected officials and legislators.

(Emphasis ours). *Rosselló-Nevares et.al. v. FOMB et.al.*, 330 F.Supp.3d 685, 701 (2018).

Very recently, the Legislature of Puerto Rico enacted two (2) laws expressly dedicated to the creation and shaping of the Government's public policy on energy and climate change. These are: 1) Act 17-2019 known as "Energy Policy Act" and 2) Act 33-2019 known as "Puerto Rico Climate Change Mitigation, Adaptation, and Resilience Act" ("Climate Change Act").

### 1. Energy Policy Act, Act 17-2019

The Constitution of Puerto Rico provides that it shall be the public policy of the Commonwealth to conserve, develop and use its natural resources in the most effective manner possible for the general welfare of the community, *see* Article VI, Section 19 of the Constitution. Against this backdrop, on April 11, 2019 the Energy Policy Act was promulgated. The Act establishes the Government's public policy on energy by granting the population universal access to electric power service by, among others factors, establishing and designing an electric power grid that takes into account the development and integration of community solar, wheeling, the creation of microgrids and other tools to improve the access to renewable energy, *see* Section 1.5 of Act 17-2019.

The Energy Policy Act aims to reduce the electric system's reliance on energy sources derived from fossil fuels by developing short, medium and long-term plans to establish an optimum portfolio standard based on renewable energy for the electric system, *see* Section 1.5(5). As such, Act 17-2019 also imposes certain duties and responsibilities upon electric power service companies, which term includes PREPA. As such, said companies shall, among others:

1. Provide and allow for the provision of a reliable, clean, efficient, resilient, and affordable electric power, contributing to the general wellbeing and sustainable development of the people of Puerto Rico;

2. To rise to energy and environmental challenges by using scientific and technological advances;

3. **Facilitate and not hinder the interconnection of distributed renewable energy** producers, distributed generators, and independent power producers to the electric power grid;

4. Fully comply with the rules, regulations, orders, mandates, requests and penalties issued by the Energy Bureau; and

5. Create, with the approval of the Energy Bureau, an electricity bill for each customer class.

(Emphasis ours). *See* Section 1.10.

Regarding the electric power generation standards, Act 17-2019 mandates that **PREPA shall maximize the use of renewable energy,** ensuring its integration into the electric power grid. PREPA should also **promote the direct use of renewable energy by its customers, particularly by expediting and simplifying transactions, processes, and requirements**. (Emphasis ours). *See* Section 1.11. As drafted, the RSA does not encourage the use of renewable energy; on the contrary, it imposes additional charges and obstacles, such as the Transition Charge, the Settlement Charge, and the installation of a meter. It also squarely contradicts specific provisions of Act 17-2019, as noted above.

### 2. Climate Change Act – Act 33-2019

Act 33-2019, known as the Climate Change Act, was enacted on May 22, 2019, two (2) weeks after the Rule 9019 Motion was submitted before this Court by PREPA and AAFAF. Although Act 33-2019 deals mainly with policy regarding climate change, it provides further guidance as to the Government's policy on energy. Section 3 declares that the public policy of the Government of Puerto Rico is based on a profound and urgent commitment to implement an energy system

- 13 -

with reduced use of crude and <u>promote more efficient renewable or alternative energy systems</u>. Likewise, the Government of Puerto Rico recognizes its non-delegable responsibility to improve the decision-making process and implement measures that result in the best adaptation practices.

Act 33-2019 also establishes a mandatory "Climate Change Mitigation, Adaptation, Resilience Plan" to be submitted by the Expert Advisory Committee on Climate Change, *see* Section 6 and 8. This Plan will provide a guideline for the energy industry and, among others, will be used to adopt measures geared to energy transition while promoting the renewable or alternative energy in the electric power system. In addition, the Plan must adopt measures that foster and promote energy self-consumption based on renewable or alternative energy. Contrary to this main tenant of the Act, the RSA discourages the use of renewable energy.

Act 17-2019 and Act 33-2019 are just two of the most recent legislative measures detailing the Government's unequivocal and binding statutory policy on renewable energy[2]. As such, it is highly improbable that the conditions are met in the Legislature for the significant amendments to the existing, and recently-enacted, energy related laws for the RSA to succeed. Therefore, and

---

[2] However, said laws are not the only ones. For example, <u>Law 120-2018</u>, as amended by Law 17-2019, known as the "Puerto Rico Electric Power System Transformation Act", was created to authorize the legal framework required for the sale, disposition and/or transfer of the assets of PREPA, including the applicability of the Public-Private Partnership Act. According to Section 3 of this Law, it is the intent of the Puerto Rico Legislative Assembly to "*expedite a fair and transparent process for the establishment of Public- Private Partnerships, (…) thus placing such assets in the private hands of those who show a fair balance between the commercial interests and the sense of social responsibility; and who have the operational, technological and financial capacity to transform the electric power system into one that is modern, offers reasonable rates (…) and has efficient and environmentally-friendly energy sources*". Furthermore, the Act was enacted to promote and encourage the use of modern technology and alternative energy methods that include distributed generation, the use of microgrids, and renewable energy.

In addition, <u>Law 82-2010</u> enacted on July 19, 2010, and as amended by Law 17-2019, is known as "Public Policy on Energy Diversification by Means of Sustainable and Alternative Renewable Energy in Puerto Rico Act". Section 1.2 of the Act declares that the public policy of the Government of Puerto Rico to achieve the diversification of energy sources and energy technology infrastructure by reducing our dependency on energy sources derived from fossil fuels such as crude oil; reducing and stabilizing our energy costs; controlling electricity price volatility in Puerto Rico; reducing the flight of capital caused by the import of fossil fuels; preserving and improving our environment, natural resources and quality of life; promoting the conservation of energy and social well-being through various mechanisms such as setting and achieving goals within a mandatory timetable schedule, and economic and tax incentives to stimulate the generation of electric power through sustainable renewable and alternative renewable energy sources.

considering the *Jeffrey* factors, PREPA's probabilities of success in achieving a fair and equitable result should be seriously questioned.

Furthermore, it should be noted that in Schedule I-B of the Rule 9019 Motion, the FOMB lists a series of Puerto Rico laws that will allegedly not apply to the RSA, *see* Docket Entry No. 1235-1, page 134. Among these, **Act 17-2019** (Energy Policy Act) and Act 57-2014 (RELIEF Act) will be allegedly inapplicable. But the FOMB is simply not authorized by PROMESA to conveniently pick and "choose" which laws are applicable or not; these matters are exclusively within the purview of the Puerto Rico Legislature. "As the Court has explained, **nothing in Titles I and II permits the FOMB to displace local government structures and authority by declaration**." (Emphasis ours). *In re Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Electric Power Authority*, 583 B.R. 626, 635 (2017).

### B. Court to consider the difficulties, if any, to be encountered in the matter of collection.

The mechanisms provided for in the RSA for the collection of the Transition Charge and the Settlement Charge are speculative. As is evident from the preceding explanation, any such charges would require a major and unlikely overhaul of recently enacted legislation.

The main purpose of the FOMB is to provide fiscal responsibility for Puerto Rico and access to the capital markets, *see* Section 101 of PROMESA. Among the powers delegated to this entity, the FOMB may obtain official data, may certify any covered entity's fiscal plan and budgets and may file a voluntary petition before the District Court pursuant to section 206 of PROMESA. In general, PROMESA granted broad powers to the FOMB regarding the finances and fiscal projections of Puerto Rico. However, its powers are not all encompassing and its determinations may not override the Government's public policy. As stated by this Court:

> Congress created a PROMESA Oversight Board with significant leverage in the form of guidance, gatekeeping, and enabling powers that would in essence provide guardrails for

the territorial government on its journey to fiscal credibility and responsibility. **Congress did not grant the FOMB the power to supplant, bypass, or replace the Commonwealth's elected leaders and their appointees in the exercise of their managerial duties whenever the Oversight Board might deem such a change expedient** (…) "[T]he oversight board …will provide guardrails for the Puerto Rico government, but will not supplant or replace the territory's elected leaders, who will retain primary control over budgeting and fiscal policymaking.

(Emphasis ours). *Id*. at 634.

This Court has already cautioned the FOMB as to the limitations of its powers regarding the management of PREPA. When the FOMB filed a request for the confirmation of a chief transformation officer (CTO) for PREPA, this Court denied the motion and concluded that '[n]othing in the fiscal plan, budgeting, and enforcement provisions of PROMESA sections 201, 202, 203 and 204 suggest that the FOMB is the principal body empowered to manage PREPA's day-to-day functions, or that it has direct authority to alter PREPA's reporting structure." *Id* at 632.

The RSA provides, in the pertinent part, for the increase in rates by way of a Transition Charge and other charges depending on whether the customer is a Non-Grandfathered BTMG or a Grandfathered BTMG. However, PROMESA does not authorize the FOMB to unilaterally increase the electricity rates. The only entity which may authorize such an increase is the Puerto Rico Energy Bureau ("PREB").

The PREB is an independent and specialized public entity created by the Act 57-2014, as amended, to serve as a key component for full and transparent implementation of the energy reform. The main purpose of the Bureau is to oversee and ensure execution and implementation of the public policy on the electric power service of the Government of Puerto Rico. PREB has the power to evaluate and approve rates for electric service proposed by PREPA to ensure they are fair and reasonable for consumers. As such, the Bureau shall be ultimately responsible for ensuring that the fees, rent and any other type of charge collected by the electric power company is just and

reasonable, as well as consistent with sound fiscal and operational practices, resulting in a reliable service at the lowest reasonable cost, *see* Section 1.2 of Act 57-14, as amended by Act 17-2019.

To perform its duties, the PREB shall have broad powers to ensure compliance with the energy public policy. The Government of Puerto Rico gave the Bureau a clear mandate by urging the Bureau to evaluate efforts made by the electric power company to maintain the fess, rents, rates and any other type of charge as close as possible to twenty cents ($0.20 ) per kilowatt-hour goal established by the Certified Fiscal Plan for the Puerto Rico Electric Power Authority, *see* Section 1.5 of Act 57-14, as amended by Act 17-19. However, and as per the RSA, the rates will increase up to 4.552 cents per kilowatt hour.

### C. Complexity of the litigation involved, and the expense, inconvenience and delay.

There is no question that all the proceedings before this Court, due to their nature, are complex and time-consuming. After two (2) years of litigation, the docket of the Commonwealth's case surpasses eight thousand entries and the current PREPA's case has more than fifteen hundred entries. Thus, the sheer volume of the case's docket will incline this Court to favor any settlement. However, the complexity of the litigation, *per se*, should not be a critical factor in approving a non-feasible agreement as is the RSA discussed in the Rule 9019 Motion.

Before this Court, there is mainly one contested matter of importance and that is the Request for Relief from Stay filed by National Public Finance Guarantee, Assured Guaranty Corp and other related entities ("MFR"), Case No. 17-04780, Docket Entry No. 74. In essence, and after the matter was remanded by the First Circuit, this Court must determine if Movants comply or not with the requirements for the stay to be lifted in order to pursue a receiver in the District Court for PREPA.

Contrary to the facts discussed by this Court in the Commonwealth-COFINA dispute, the previous controversy does not entail an "all-or-nothing" determination, and it is just a matter of law to be addressed by this Court. See *In re the Financial Oversight and Management Board for Puerto Rico v. Bettina Whyte*, 360 F. Supp. 3d. 65 (2019). As per the pending MFR, the main issue is whether Movants' interests are adequately protected or not. PREPA will, and needs, to continue operations as it is the only electricity provider in Puerto Rico, be it under a receiver or under the providences of PROMESA.

In sum, and in this particular case, the Court must consider a more holistic approach to the proposed RSA, considering its impact upon all the residents of Puerto Rico and upon the future of PREPA and its environmental impact, matters of utter importance to the Government of Puerto Rico's public policy on energy.

### D. <u>The paramount interest of the creditors.</u>

As the final factor, this Court should consider the interests of the PREPA's creditors. According to *TMT Trailer Ferry* case, the United States Supreme Court described this factor as to the assessment of "each affected class's relative benefits and the degree to which creditors either do not object or affirmatively support the proposed settlement". *See In re Iridium Operating LLC*, 478 F.3d.452, 462 (2nd Cir. 2007) citing *TMT Trailer Ferry* at 424. Therefore, this Court's evaluation of the Rule 9019 Motion should not consider only the majority of PREPA bondholders; instead, it is the Amici's contention that its analysis should be broader. PREPA is the only source of electric power in all of the island, and, as such, any determination will significantly impact its entire population. Therefore, this Court should further examine other creditors and other parties in interest's arguments, particularly, those that could be seriously impacted by the effects of the RSA's implementation.

Currently, no other creditor and/or party in interest has filed a formal opposition to the RSA concerning its environmental and economic aspects.[3] Notwithstanding, multiple entities such as, Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico (Docket Entry No. 1271); Centro Unido de Detallistas, Cámara de Mercadeo, Industria y Distribución de Alimentos, Asociación de Contratistas y Consultores de Energía Renovable de Puerto Rico y Puerto Rico Manufacturers Association (Docket Entry No. 1272); Comité Diálogo Ambiental Inc., El Puente de Williamburgs, Inc, Enlace de Acción Climática, Comité Yabucoeño Pro-Calidad de Vida Inc. et al. (Docket Entry No. 1279); and Unión de Trabajadores de la Industria Electrónica y Riego and el Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica (Docket Entry No. 1329) have expressed their discontent with the RSA.

Even though this Court declined the above-mentioned entities' participation as parties to the Rule 9019 Motion, it should not completely disregard their arguments, particularly, those concerning the dissociation of the RSA with the Government's public policy on the environment. They represent, as well as SESA-PR and SEIA, a group of voices in favor of protecting the environment. This special interest should also be protected by this Court by not approving the Rule 9019 Motion.

## VI. CONCLUSION

For the foregoing reasons, SESA-PR and SEIA urge this Court to deny the Rule 9019 Motion.

---

[3] On September 20, 2019, a Limited Objection to the Rule 9019 Motion was filed by Whitefish Energy Holdings LLC., regarding the RSA's treatment of administrative claims, *see* Docket Entry no. 1641.

**RESPECTFULLY SUBMITTED.**

This 25th day of October, 2019, in San Juan, Puerto Rico.

                         **MCCONNELL VALDÉS LLC**
                         *Attorneys for SESA-PR and SEIA*
                         270 Muñoz Rivera Avenue, Suite 7
                         San Juan, Puerto Rico 00918
                         PO Box 364225
                         San Juan, Puerto Rico 00936-4225
                         Telephone: 787-250-5612
                         Facsimile:  787-759-9225

By:   *s/ Carlos Fernández-Lugo*
       Carlos Fernández-Lugo
       USDC-PR Bar No.210305
       Email: cfl@mcvpr.com

       *s/ Rosamar Garcia-Fontán*
       Rosamar Garcia-Fontán
       USDC-PR Bar No. 221004
       Email: rgf@mcvpr.com