# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
-------------------------------------------------------------------- X
                                                   :
In re:                                             :
                                                   :
THE FINANCIAL OVERSIGHT AND                        :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                  :   Title III
                                                   :
        as representative of                       :   Case No. 17-BK-3283 (LTS)
                                                   :
THE COMMONWEALTH OF PUERTO RICO et al.,            :   (Jointly Administered)
                                                   :
        Debtors.¹                                  :
-------------------------------------------------------------------- X
                                                   :
In re:                                             :
                                                   :
THE FINANCIAL OVERSIGHT AND                        :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                  :   Title III
                                                   :
        as representative of                       :   Case No. 17-BK-3566 (LTS)
                                                   :
THE EMPLOYEES RETIREMENT SYSTEM OF THE             :
GOVERNMENT OF THE COMMONWEALTH OF                  :
PUERTO RICO,                                       :
                                                   :
        Debtor.                                    :
-------------------------------------------------------------------- X
```

**RESPONSE OF CERTAIN SECURED CREDITORS OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO TO THE OMNIBUS CLAIM OBJECTIONS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO**

---

[1]   The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and (iv) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 2

BACKGROUND ................................................................................................. 4

ARGUMENT ....................................................................................................... 7

I.      THE ERS BONDS ARE VALID AND BINDING OBLIGATIONS OF ERS ............... 7

      A.     The Plain Text of the ERS Enabling Act Authorized ERS to Issue the
ERS Bonds ................................................................................................ 7

            1.     The Enabling Act's Authorization to "Tomar Prestado"
from Financial Institutions Authorized the ERS Bonds .......................... 8

            2.     The Enabling Act's Authorization of Borrowing via
"Colocaciones Directas" Authorized the ERS Bonds............................. 13

      B.     Precedent, Agency Interpretations, Other Legislation, and Judicial
Admissions All Support ERS's Statutory Authority ........................................... 18

            1.     The One Case to Address the Relevant Statutory Text Holds
that It Does Not Limit Bond-Issuing Authority...................................... 18

            2.     ERS's Board, ERS's General Counsel, ERS's Outside Counsel,
and the Government Development Bank All Interpreted the ERS
Enabling Act to Authorize Bond Issuances ............................................ 19

            3.     Other Legislation Confirms that the Enabling Act Authorized
the ERS Bonds ....................................................................................... 20

            4.     ERS Repeatedly Admitted in These Restructuring Proceedings
that the ERS Bonds Were Valid and Enforceable ................................... 24

            5.     The ERS Bonds Must Be Presumed Valid ............................................. 24

      C.     Contrary to the Creditors' Committee's Argument, Authority to
Borrow Is Sufficient to Authorize Bond Sales ....................................... 25

      D.     Even if the Creditors' Committee Were Correct About ERS's Authority,
the Secured Debt Underlying the Bonds Would Still Be Enforceable ............... 31

II.     THE ERS BONDS ARE ENFORCEABLE UNDER UCC § 8-202.............................. 33

      A.     UCC § 8-202(b) Applies Even Though the Committees Make the
Objection on ERS's Behalf...................................................................... 34

      B.     The Bondholders Are Purchasers for Value Without Notice................................ 37

      C.     UCC § 8-202 Applies to Invalid Bonds—That Is Its Entire Purpose ................ 39

III.    THE BONDHOLDERS ARE ENTITLED TO RECOVER IN EQUITY...................... 40

CONCLUSION.................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atl. Cleaners & Dyers v. United States*,
  286 U.S. 427 (1932) ................................................................................14

*Banco de la Republica de Colombia v. Bank of N.Y. Mellon*,
  No. 10 Civ. 536(AKH), 2013 WL 3871419 (S.D.N.Y. July 26, 2013) .................................37

*Black v. Cohen*,
  52 Ga. 621 (1874) ................................................................................27

*Bowert v. Yuckert*,
  482 U.S. 137 (1987) ................................................................................20, 21

*City of Brenham v. German-Am. Bank*,
  144 U.S. 173 (1892) ................................................................................ *passim*

*City of Brenham v. German Am. Bank*,
  144 U.S. 549 (1892) ................................................................................32

*Clay County v. Soc'y for Sav.*,
  104 U.S. 579 (1882) ................................................................................25

*Commonwealth v. Inhabitants of Williamstown*,
  156 Mass. 70 (1892) ................................................................................28

*Dutton v. City of Aurora*,
  114 Ill. 138 (1885) ................................................................................26

*Erie R.R. v. Tompkins*,
  304 U.S. 64 (1938) ................................................................................27

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................14

*Fidelity Trust & Safety Vault Co. v. City of Morganfield*,
  29 S.W. 442 (1895) ................................................................................28

*Forrest City v. Bank of Forrest City*,
  172 S.W. 1148 (Ark. 1915) ................................................................................32

*Gonzalez Segarra v. CFSE*,
  188 D.P.R. 252 (2013) ................................................................................19

*Holmes v. City of Shreveport*,
  31 F. 113 (C.C.W.D. La. 1887) ................................................................................27

*In re Blondheim Real Estate, Inc.*,
  91 B.R. 639 (Bankr. D.N.H. 1988) ................................................................................42

*In re Fin. Oversight & Mgmt. Bd.*,
  872 F.3d 57 (1st Cir. 2017) ................................................................................36

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Fin. Oversight & Mgmt. Bd.,*
  914 F.3d 694 (1st Cir. 2019) ........................................................................7, 9

*In re Hawaii Corp.,*
  59 B.R. 410 (D. Haw. 1986) ........................................................................35, 36

*In re Thompson,*
  965 F.2d 1136 (1st Cir. 1992) ......................................................................35

*Johns-Manville Corp. v. Village of DeKalb, Mo.,*
  439 F.2d 656 (8th Cir. 1971) ......................................................................25

*Keel v. Pulte,*
  10 S.W.2d 694 (Tex. Comm'n App. 1928) ..................................................32

*Keeler Bros. v. Sch. Dist. No. 3, Sheridan Cty.,*
  205 P. 217 (Mont. 1922) .............................................................................40

*Loan Syndications & Trading Ass'n v. SEC,*
  882 F.3d 220 (D.C. Cir. 2018) ....................................................................12

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
  486 U.S. 825 (1988) ....................................................................................22

*Merrill v. Town of Monticello,*
  138 U.S. 673 (1891) ..............................................................................25, 27, 32

*Merrill v. Town of Monticello,*
  72 F. 463 (7th Cir. 1896) ............................................................................32

*Mitchell v. City of Burlington,*
  71 U.S. 270 (1866) ......................................................................................27

*Moscato v. Technologies, Inc.,*
  No. 04 Civ. 2487(GBD), 2005 WL 146806 (S.D.N.Y. Jan. 21, 2005) ...................36

*Pac. Improvement Co. v. City of Clarksdale,*
  74 F. 528 (5th Cir. 1896) ............................................................................31

*Plan Bienestar Salud v. Alcalde Cabo Rojo,*
  14 P.R. Offic. Trans. 896 (1983) ................................................................41

*Police Jury of Par. of Tensas v. Britton,*
  82 U.S. 566 (1872) ....................................................................................27, 32

*Port of Palm Beach Dist. v. Goethals,*
  104 F.2d 706 (5th Cir. 1939) ......................................................................31

*Rivera Torres v. Junta de Retiro Para Maestros,*
  502 F. Supp. 2d 242 (D.P.R. 2007) ........................................................18, 19, 38

*Rogers v. City of Burlington,*
  70 U.S. 654 (1865) ......................................................................................26

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Russell v. Middletown City Sch. Dist.*,
    125 A. 641 (Conn. 1924) ............................................................... *passim*

*Russello v. United States*,
    464 U.S. 16 (1983) ..................................................................................13

*U.S.I. Props. Corp. v. M.D. Constr. Co.*,
    860 F.2d 1 (1st Cir. 1988) ......................................................................19

**STATUTES**

11 U.S.C. § 510 ...........................................................................................42

48 U.S.C. § 2161 .........................................................................................36

3 L.P.R.A. § 779 ................................................................................. *passim*

7 L.P.R.A. § 552 .........................................................................................20

18 L.P.R.A. § 392h ................................................................................9, 18

19 L.P.R.A. § 1751 ...........................................................................35, 36, 37

19 L.P.R.A. § 1752 ............................................................................. *passim*

UCC § 8-202 ....................................................................................... *passim*

**OTHER AUTHORITIES**

64A C.J.S. Municipal Corporations ...........................................................30

*About: Bureau of the Public Debt*,
    U.S. Dep't of Treasury .....................................................................10, 41

Black's Law Dictionary (11th ed. 2019) ..............................................10, 11

John C. Burch, Jr. and Bruce S. Foerster,
    *Capital Markets Handbook* § 3.02 (6th ed. 2019 Supp.) .......................11

*En Español: Oficina de la Deuda Pública*,
    U.S. Dep't of Treasury .............................................................................10

Kobre & Kim,
    *Final Investigative Report* (Aug. 20, 2018) ...................................5, 6, 39

McQuillin, 15 The Law of Municipal Corps. (3d ed. 2019).............25, 30, 31

SEC, *Proposed Amendments to Municipal Securities Disclosure*,
    82 Fed. Reg. 13,928 (Mar. 15, 2017).....................................................17

*US Municipal Issuance*, SIFMA (Oct. 4, 2019).......................................17

To the Honorable United States District Judge Laura Taylor Swain:

Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund, L.P.,[2] Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., PWCM Master Fund Ltd., Redwood Master Fund, Ltd, Tax-Free Puerto Rico Fund, Inc., Tax- Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc., and SV Credit, L.P. (the "Bondholders"), certain secured creditors of the Employees

---

[2] Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., and Oaktree Opportunities Fund IX (Parallel 2), L.P. hold through Opps Culebra Holdings, L.P. Oaktree Huntington Investment Fund II, L.P. holds through Oaktree Opportunities Fund X Holdings (Delaware), L.P. Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., and Oaktree Opportunities Fund X (Parallel 2), L.P. hold through Oaktree Opps X Holdco Ltd.

Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), hereby submit this response to certain arguments concerning the validity of bonds issued by ERS (the "ERS Bonds") in the *Omnibus Objection Of Official Committee Of Unsecured Creditors To Claims Asserted By Holders Of Bonds Issued By Employees Retirement System Of Government Of Puerto Rico*, ECF No. 5580 in Case No. 17-bk-03283 (the "Creditors' Objection") filed by the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the *Omnibus Objection Of The Official Committee Of Retired Employees Of The Commonwealth Of Puerto Rico, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of ERS Bonds Against ERS And The Commonwealth*, ECF No. 6482 in Case No. 17-bk-03283 (the "Retiree Objection") filed by the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee," and, together with the Creditors' Committee, the "Committees").[3]  The ERS Bondholders state as follows:

## PRELIMINARY STATEMENT

1.      The Committees' claim objections make the brazen argument that ERS borrowed $3 billion in 2008 by issuing bonds that were void from the start because ERS lacked any power to issue them.  This is difficult to credit.  The ERS Bonds were offered with the express approval of the ERS Board of Trustees and the Government Development Bank, with supporting legal opinions from ERS's in-house and outside counsel, and with the knowledge and conspicuous support of the Puerto Rico legislature.  No one asserted that the ERS Bonds were *ultra vires* for the next 10 years, until these restructuring procedures were well underway.  In the meantime, ERS paid interest on the ERS Bonds without any suggestion of invalidity, and both ERS and the

---

[3] In compliance with the Court's October 24, 2019, order, ECF No. 8962 in Case No. 17-bk-03283, the Bondholders respond here only to the *ultra vires* arguments raised in the Retiree Objection and Creditors' Objection, and not to other arguments raised in opposition to the Bondholders' claims.  The Bondholders reserve their rights to respond to those other arguments at the appropriate time in these proceedings.

legislature had repeatedly recognized that the ERS Bonds were existing, valid obligations.  That recognition continued into the present proceedings, where both ERS and the Oversight Board conceded that the ERS Bonds were valid in opposing the Bondholders' motions for stay relief or adequate protection.

2.      This continuous recognition of the ERS Bonds' validity reflects the fact that the ERS Enabling Act as it existed in 2008 plainly authorized ERS to issue the ERS Bonds.  While the Committees' objections focus on whether the ERS Bonds were a "direct placement[] of debt," the ERS Enabling Act's borrowing authorization was far broader than that.  Properly translated from the controlling Spanish text, the Act authorized ERS to *borrow*—not just seek a loan—from any financial institution, from the Puerto Rico Government, from the U.S. Government, or through direct placements of debt.  3 L.P.R.A. § 779(d) (2008).  And the issuance of the ERS Bonds was authorized not only as a direct placement of debt but also as borrowing from a financial institution—namely, the underwriters of the bonds.  The Committees agree that the Act allowed ERS to borrow through direct placements, which they define as involving the sale of bonds directly to investors.  But the Retiree Committee contends (and the Creditors' Committee assumes) that ERS's authority to borrow from financial institutions (such as the underwriters for the ERS Bonds) was limited to seeking a loan, and did not include the sale of securities.  That contention, however, is based entirely on the inaccurate "official" translation of the pertinent language.  The controlling Spanish text contains no such limitation.  And anyway, outside of a relative handful of states it is well established that authority to borrow money—which ERS indisputably had—implies authority to issue bonds, particularly where those bonds have already been issued and treated as valid.

3.      Moreover, even if the ERS Enabling Act were as limited as the Committees contend, that still would not invalidate the Bondholders' claims.  The Committees' sole objection

to ERS's authority to issue the ERS Bonds concerns their issuance in a public offering as negotiable bonds—there is no dispute that ERS had the power to sell them directly to investors. At most, then, the ERS Bonds would be rendered non-negotiable, and so subject to any defenses that ERS may have against the original purchasers. The Committees raise no such defenses, so even if that were the case, the Bondholders' claims would remain valid.

4.      And further, even if the ERS Bonds would otherwise be invalid, they are enforceable by the Bondholders under UCC revised § 8-202(b), 19 L.P.R.A. § 1752(b), which provides for the enforcement of otherwise invalid government securities where, among other things, the government issuer had the authority to borrow money for the stated purpose and received substantial consideration in exchange for the security. That is precisely what happened here, and the Bondholders are purchasers for value of the securities without notice of the alleged particular defect who are entitled to benefit from § 8-202(b). For all of these reasons, the Committees' claim objections must be overruled.

**BACKGROUND**

5.      This Court and the First Circuit have previously addressed disputes between ERS and the Bondholders concerning the nature and extent of the collateral securing the debt underlying the nearly $3 billion in ERS Bonds, of which the Bondholders hold approximately $2 billion. The claim objections that are the subject of this response concern a different issue entirely—the Committees' contention that the ERS Bonds were invalid from the start.

6.      ERS issued the ERS Bonds in 2008, receiving nearly $3 billion in exchange for them. It did so pursuant to § 4-205 of the ERS Enabling Act, 3 L.P.R.A. § 779(d) (2008), and a Bond Resolution from the ERS Board of Trustees, which declared that ERS had the authority under the Enabling Act "to incur debt secured by the assets of" ERS, and that the Bond Resolution itself was "adopted pursuant to the provisions of the [Enabling] Act." Bond Resolution at VI-1 (Exhibit

4

A). When it issued the ERS Bonds, ERS also provided legal opinions to the underwriters from both its general counsel and its outside counsel affirming ERS's authority to issue the ERS Bonds and the validity of those bonds. Fiddler, Gonzalez & Rodriguez Legal Opinion to UBS Financial Services Inc. of P.R., et al., at 1–2 (Jan. 31, 2008) (Exhibit B); Office of General Counsel to the System Legal Opinion at 2–3 (Jan. 31, 2008) (Exhibit C). And ERS represented to the underwriters that ERS "ha[d] full legal right, power and authority to adopt the Bond Resolution, . . . and to issue and deliver the Bonds to the Underwriters as provided herein." Amended and Restated Purchase Contract ¶ 6.a. (Jan. 30, 2008) (Exhibit D). After the issuance, ERS then paid interest on the ERS Bonds for nearly a decade, before defaulting just before the commencement of these restructuring proceedings. And even then, ERS did not contend that the ERS Bonds were invalid until that argument was raised by others for the first time during the Title III proceedings.

7.      The Puerto Rico legislature has changed ERS's borrowing authority over time. When ERS was first created in 1951, it had no express borrowing authority at all. In 1988, however, the legislature changed that, granting ERS authority to "tomar prestado de cualquier institución financiera, del Gobierno del Estado Libre Asociado de Puerto Rico o del gobierno federal de los Estados Unidos de América, o mediante colocaciones directas de deuda . . . .," 3 L.P.R.A. § 779(d) (2008)—to borrow from any financial institution, from the Puerto Rico Government, or from the U.S. Government, or through direct placements of debt. That is the provision that was in force when ERS issued the ERS Bonds in 2008. Consistent with the authority that provision creates, public documents suggest that ERS began considering in 2006 whether issuing pension obligation bonds could help to alleviate its severe funding crisis. Kobre & Kim, *Final Investigative Report* 206 (Aug. 20, 2018), https://drive.google.com/open?id=19-

lauVo3w9MPS03xYVe0SWhQin-Q6FEf.  Kobre & Kim's Investigative Report concluded that no

"material concerns about" ERS's authority to issue the bonds "were raised prior to issuance."  *Id.*

8. To the contrary, in 2007, the year before the ERS Bonds were issued, the Puerto

Rico legislature—evidently aware of ERS's deliberations—weighed in support, instructing ERS

to "cover the cost increase" from higher pensions "from the resources obtained through the issue

of bonds of the Employees of the Government and the Judicature Retirement Systems

Administration," Act 35-2007, § 5.  Apparently believing or concluding that ERS had the power

to do what it urged, the legislature did not make any amendments to ERS's borrowing authority.

In 2011, the legislature restricted ERS's borrowing authority going forward.  Act 116-2011, § 7.

In doing so, however, the legislature found that the issuance of the ERS Bonds had "encumber[ed]"

employer contributions of [ERS] for up to fifty years"—and thus recognized the validity of the

already-issued ERS Bonds once again.  *Id.*; *see also* Act 3-2013, Statement of Motives (ERS "is

under the obligation to repay these bonds from the employer contributions it receives").

9. Consistent with all of this evidence, ERS conceded in the early stages of

restructuring proceedings that the ERS Bonds were "authorized" by ERS "[p]ursuant to the

authority granted to it under the Enabling Act," Joint Stip. of Movants, the Commonwealth

Respondents, and ERS ¶ 6, No. 3:16-cv-02696, ECF No. 65 (D.P.R. Nov. 2, 2016), that "[t]he

ERS Bond Resolution adopted on January 24, 2008, is a valid and binding contract between the

ERS and holders of ERS Bonds," *id.* ¶ 11, and that the ERS Bonds gave rise to "*valid and*

*enforceable liens*" over hundreds of millions of dollars of ERS revenue, which will continue to

grow," ERS Opp'n to Mot. to Lift Stay, No. 3:16-cv-02696, ECF No. 52 (D.P.R. Oct. 26, 2016).

It was only later and after restructuring proceedings were well underway for ERS and the

Commonwealth that anyone alleged that the ERS Bonds were *ultra vires*.  The contention was first

raised in November 2017 by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), then-Governor Roselló, and then-Treasury Secretary Maldonado in seeking the dismissal of two adversary proceedings filed by certain of the Bondholders.  *See* ECF Nos. 41, 44 in Case No. 17-ap-00219 and ECF Nos. 41, 44 in Case No. 17-ap-00220.  Notably, ERS, the Oversight Board, and the Retiree Committee—all of whom were parties or intervenors in those adversaries—did not join in the *ultra vires* argument there, which has not yet been adjudicated. Nor did ERS or the Oversight Board raise the *ultra vires* argument in their separate objection to claims made under the ERS Bonds by the Fiscal Agent.  *See* ECF No. 7075 in Case No. 17-bk-03283.  ERS first raised the argument in adversary proceedings filed in May 2019—two years after the commencement of its Title III case—seeking to claw back previous payments made on account of the ERS Bonds on that basis.

## ARGUMENT

## I.     THE ERS BONDS ARE VALID AND BINDING OBLIGATIONS OF ERS

### A.     The Plain Text of the ERS Enabling Act Authorized ERS to Issue the ERS Bonds

10.     ERS had statutory authority to issue the ERS Bonds under the ERS Enabling Act as it existed in 2008, which allowed ERS to borrow, including by selling securities, from financial institutions and directly from investors.  The Committees' contrary arguments are based on an "official" English translation of the ERS Enabling Act.  But if there is "a discrepancy between the English and Spanish, when the legislation originated in Spanish 'the Spanish text shall be preferred to the English.'"  *In re Fin. Oversight & Mgmt. Bd.*, 914 F.3d 694, 717 (1st Cir. 2019) (quoting 31 L.P.R.A. § 13).  And the ERS Enabling Act's Spanish text makes ERS's authority to issue the ERS Bonds very clear.

1.    **The Enabling Act's Authorization to "Tomar Prestado" from Financial Institutions Authorized the ERS Bonds**

11.    As the Committees would have it, the ERS Enabling Act gave ERS just two options for borrowing money:  "see[king] a loan" from a financial institution or the U.S. or Puerto Rico governments, or "the direct placement of debts."  Creditors' Objection ¶ 2 (alteration in original); *see also id.* ¶ 5; Retiree Objection ¶ 67.  The Retiree Committee argues (and the Creditors' Committee assumes) that the issuance of the ERS Bonds could not qualify as "see[king] a loan."  Retiree Objection ¶¶ 68, 69.  And the Committees further argue that an underwritten bond offering is not a "direct placement of debts."  Creditors' Objection ¶¶ 31–36; Retiree Objection ¶¶ 68, 69.  But the Committees' threshold construction of the statute is wrong.  As the controlling Spanish text makes clear, the ERS Enabling Act did not limit ERS to "seek[ing] a loan" or the "direct placement of debts."  Rather, it authorized borrowing, which includes many arrangements other than seeking a loan, including issuing debt securities.

12.    In Spanish, the ERS Enabling Act authorized ERS to "tomar prestado de cualquier institución financiera, del Gobierno del Estado Libre Asociado de Puerto Rico o del gobierno federal de los Estados Unidos de América, o mediante colocaciones directas de deuda . . . ."  3 L.P.R.A. § 779(d) (2008).  The first phrase, "tomar prestado," means "to borrow" in general, not "seek a loan" specifically.  *See, e.g.*, "Tomar Prestado," WordReference.com, https://www. wordreference.com/es/en/translation.asp?spen=tomar%20prestado (defining the phrase as "borrow" and giving, as an example of usage, "Juan borrowed his parents' car").  That phrase was then modified by three means of borrowing, separated by commas:  (1) "de cualquier institución financiera," meaning from any financial institution; (2) "del Gobierno del Estado Libre Asociado de Puerto Rico o del gobierno federal de los Estados Unidos de América," meaning from the Puerto

Rico or United States governments; or (3) "mediante colocaciones directas de deuda," meaning through direct placements of debt.

13.     Properly translated, the ERS Enabling Act therefore authorized ERS to "borrow from any financial institution, from the Government of Puerto Rico or from the government of the United States, or through direct placements of debt."  The official English translation mistranslates "tomar prestado" as "seek a loan" when it simply means "borrow"—an error that the official translation of the identical Spanish language of the Teachers Retirement System's enabling act notably avoided.  *See* 18 L.P.R.A. § 392h (2008) ("The Board of Trustees may authorize the Executive Director to borrow from any financial institution of the Government of the Commonwealth of Puerto Rico or the federal government of the United States, or through direct debt placements.").  The official translation also omits important commas and mistranslates "del" as "of the" in a context where parallel structure—the reference to borrowing "*de* cualquier institución financiera, *del* Gobierno del Estado Libre Asociado de Puerto Rico o *del* gobierno federal de los Estados Unidos de América" (emphasis added)—shows it clearly means "from the." *See* "Del," WordReference.com, https://www.wordreference.com/es/en/translation.asp?spen=del (last accessed Oct. 15, 2019) (showing both translations).[4]  There is thus a clear "discrepancy between the English and Spanish" text of the ERS Enabling Act provision granting ERS borrowing authority, so the "Spanish text shall be preferred to the English."  *In re Fin. Oversight & Mgmt. Bd.*, 914 F.3d at 717 (quoting 31 L.P.R.A. § 13).

---

[4] The Retiree Committee, but not the Creditors' Committee, concedes that the official translation mistranslates "del" and omits commas.  Retiree Objection ¶ 10 & n. 3.  But in "correcting" this error the Retiree Committee itself misplaces the key comma, moving it from after "financial institution" to after "Government," where no comma is present in the original Spanish. *See id.*; 3 L.P.R.A. § 779(d) (2008).  As a result of this error, the Retiree Committee also "corrects" the wrong "del."  *See* Retiree Objection ¶ 10.

9

14.     This matters, because unlike "seek a loan," "borrow"—"tomar prestado"—includes raising money by selling bonds.  The U.S. Treasury, for example, explains on its Spanish-language website that "*tomamos prestado* mediante la venta de letras, notas y bonos de tesorería," *En Español: Oficina de la Deuda Pública*, U.S. Dep't of Treasury, https://www.treasury.gov/en-espanol/Pages/Oficina-de-la-Deuda-P%C3%BAblica.aspx (last visited Oct. 21, 2019) (emphasis added)—literally, "we borrow through the sale of bills, notes, and bonds of the treasury."  *See also About: Bureau of the Public Debt*, U.S. Dep't of Treasury, https://www.treasury.gov/about/organizational-structure/offices/General-Counsel/Pages/bpd.aspx (as last visited Oct. 21, 2019) (corresponding English page stating that "borrowing is done by the issuance of marketable Treasury securities, such as Treasury bills and Treasury bonds").

15.     The grammatical structure of the ERS Enabling Act confirms that "tomar prestado," as used in the Act, includes the sale of securities such as bonds.  The Committees agree that the Enabling Act authorized "direct placements," which the Creditors' Committee defines as "a term of art meaning a private *sale of securities* directly to investors."  Creditors' Objection ¶ 31 (emphasis added).   The Creditors' Committee cites various dictionaries in support of that definition, each of which provides that a "direct placement" involves a sale "of securities" to one or more investors or lenders.  *Id.*  The Retiree Committee provides a chart of five definitions of "direct placement" which likewise all involve sales of securities—three mention securities directly, while the remaining two refer to a "new issue," which itself refers to securities.  Retiree Objection ¶ 71; *see also Issue*, Black's Law Dictionary (11th ed. 2019) ("new issue. A stock or bond sold by a corporation for the first time, often to raise working capital.").

16.     Crucially, however, the Enabling Act's text, which the Committees agree authorized direct placements of this sort, did so by authorizing "borrowing," not by specifically referring to the sale of securities:  it provided that ERS may "tomar prestado . . . mediante colocaciones directas de deuda"—borrow through direct placements of debt.  3 L.P.R.A. § 779(d) (2008).  For this language to have the effect that the Committees concede it has of authorizing direct placements as the Committees define them, the phrase "tomar prestado" must cover borrowing through sales of bonds and other securities.

17.     Thus, the ERS Enabling Act authorized ERS to *borrow*—including by the sale of bonds, not just by seeking a loan—from any financial institution, from the U.S. or Puerto Rico governments, and through the direct placement of debts.  The issuance of the ERS Bonds was nothing more than that.  In an underwritten bond issuance, the issuer sells the bonds to the underwriter, a financial institution.  *See Underwriter*, Black's Law Dictionary (11th ed. 2019) ("a person or entity, esp. an investment banker, who guarantees the sale of newly issued securities by purchasing all or part of the shares for resale to the public"); John C. Burch, Jr. and Bruce S. Foerster, *Capital Markets Handbook* § 3.02 (6th ed. 2019 Supp.) (in an underwritten securities offering, "the company does not sell its securities directly to the public but rather sells the securities to the [underwriter] at a negotiated discount . . . .").

18.     That is precisely what happened in the case of the ERS bonds:  the "Underwriters . . . jointly and severally agreed, subject to certain conditions, to purchase the Series A Bonds from the System."  ERS Series A Bonds Official Statement, at 52; *see also* ERS Series B Bonds Official Statement, at 59 (same as to Series B); ERS Series C Bonds Official Statement, at 54 (same as to Series C).[5]  ERS therefore sold bonds to the underwriting financial institutions, and thereby

---

[5] The Official Statements are available online at http://www.gdb.pr.gov/investors_resources/ers.html (as last accessed Oct. 25, 2019).

Case:17-03283-LTS   Doc#:9012   Filed:10/25/19   Entered:10/25/19 19:19:02   Desc: Main
Document   Page 17 of 49

borrowed from those institutions as the ERS Enabling Act authorized it to do. In exchange for the borrowed funds from the underwriters, ERS issued a single bond certificate for each series of ERS Bonds, covering the entire issue of each series, to the Depository Trust Company or DTC. *See* ERS Series A Bonds Official Statement, at IX-1; ERS Series B Bonds Official Statement, at VIII-1; ERS Series C Bonds Official Statement, at VIII-1. DTC continues to hold the entire issue of all three series of ERS Bonds to this day. All subsequent transactions involving the ERS Bonds have been sales of contractual "ownership interests" in the ERS Bonds, not transfers of the ERS Bonds themselves. *See* ERS Series A Bonds Official Statement, at IX-1 to -2; ERS Series B Bonds Official Statement, at VIII-1 to -2; ERS Series C Bonds Official Statement, at VIII-1 to -2.

19. In any event, the underwriters' resale of "ownership interests" in the ERS Bonds does nothing to change the fact that the issuance of the ERS Bonds involved borrowing from the underwriting financial institutions as the ERS Enabling Act allowed. The Committees agree, as they must, that ERS was permitted to obtain a loan from a financial institution. Creditors' Objection ¶ 2; Retiree Objection ¶ 67. But in modern capital markets, large bank loans, too, are usually syndicated and resold by the initial lending institution, and they then continue to change hands on the secondary market. As the D.C. Circuit has explained,

> [u]sually no single bank originates the entirety of a loan. Rather, multiple banks "syndicate" under a lead arranger, each holding only a portion of the loan. Syndicated loans are "actively traded amongst financial institutions in a secondary market place," and purchased on these markets by a range of investors.

*Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018). The fact that "ownership interests" in the ERS Bonds were resold by the underwriters therefore does nothing to distinguish the ERS Bonds from the loans that the Committees concede ERS could obtain. And while bonds, but not loans, are securities for purposes of federal securities regulation, the Committees agree that ERS could "tomar prestado" by selling securities in a direct placement (*see*

*supra* ¶¶ 15–16), so they cannot possibly be contending that the ERS Enabling Act's text prohibits the sale of securities. Ultimately, nothing in the Enabling Act justifies confining ERS to selling securities only directly to investors and not to an underwriting financial institution: the Enabling Act expressly allowed ERS to borrow from both sources of capital.

### 2. The Enabling Act's Authorization of Borrowing via "Colocaciones Directas" Authorized the ERS Bonds

20. There is a separate and independent reason why the ERS Bonds were authorized and are enforceable: the Committees also read ERS's authority to borrow through "the direct placement of debts" too narrowly. In Spanish, the Enabling Act authorized "colocaciones *directas* de deuda" (emphasis added), and the same section of the Enabling Act elsewhere used the modifier "directa" to refer to debt owed by government entities directly, rather than by debt incurred through a conduit entity.[6] "Directas" is not, in other words, a shorthand for private placements. Rather, it refers to borrowing by ERS itself. By contrast, § 779 of the Enabling Act used a different term, "colocaciones privadas," when it prohibited ERS from investing in private placements of debt. *Id.* § 779(b)(2)(A)(ii) ("Securities shall not be acquired through private placings.").

21. Courts presume that a legislature "act[ed] intentionally and purposely" when "includ[ing] particular language in one section of a statute but omit[ting] it in another." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Thus, the fact that the Puerto Rico legislature used the term "privadas" when indisputably addressing private debt placements shows that its use of the different term "directas" in the language at issue is addressed to a different subject. Moreover, because the "natural presumption [is] that identical words used in different

---

[6] *See* 3 L.P.R.A. § 779(b)(1)(C) (2008) (authorizing ERS to invest in "obligaciones directas o que estén garantizadas por la buena fe y el crédito de entidades gubernamentales," that is, "direct obligations or [bonds, notes or evidence of indebtedness] that are secured by the good faith and credit of the government entities"); *id.* § 779(b)(1)(F) (authorizing ERS to invest in "[i]nstrumentos financieros constituidos directa o indirectamente sobre obligaciones financieras," that is, "[f]inancial instruments constituted directly or indirectly on financial obligations").

parts of the same act are intended to have the same meaning," *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932), the legislature's use of the term "directa" in other parts of § 779 to refer to direct obligations of ERS confirms that the legislature was in fact authorizing ERS to issue debt for which it was directly liable, instead of using a conduit to issue the bonds.  Thus, "read in [its] context and with a view to [its] place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), it is clear that by using the term "colocaciones directas" rather than "colocaciones privadas," the legislature authorized ERS to issue direct obligation bonds like the ERS Bonds at issue here, and did not limit ERS's ability to issue bonds to the public.  For this separate reason, too, ERS had the authority to issue the ERS Bonds.

22.     That "colocaciones directas" refers to borrowing by ERS itself, rather than solely to private placements, is reinforced by the fact that it followed directly after the authorization to borrow from the Puerto Rico and United States governments.  The Puerto Rico and United States governments would surely finance any lending to ERS through their own borrowing.  Thus, the authorization to undertake "colocaciones directas" serves to confirm that ERS could issue bonds itself, directly, rather than relying on the Puerto Rico and United States governments to do so on its behalf.

23.     The Committees offer several unconvincing responses to this argument.  *First*, the Creditors' Committee contends that the Enabling Act's reference to the "direct placement of debts," rather than "the placement of direct debts," precludes the Bondholders' reading of the Act.  Creditors' Objection ¶ 35.  But the fact that "direct" modifies "placement" (or, in Spanish, that "directas" modifies "colocaciones") is entirely consistent with the phrase being a reference to direct rather than conduit financing, because direct financing involves ERS placing the debt

directly, rather than through a conduit.  Indeed, "directa" is used in a similar way in § 779(b)(1)(F), where it modifies "constituidos," to refer to "financial instruments constituted directly"—a phrase much like "direct placements of debt"—in distinguishing direct debt from conduit debt.

24.     *Second*, the Retiree Committee contends that the Bondholders' reading of "colocaciones directas" would render § 7(d)'s other debt incurring authorizations surplusage. Retiree Objection ¶ 77.  Not so.  Even though "directa" refers to a direct obligation of ERS, rather than to a private placement, the authorization to "tomar prestado . . . mediante colocaciones directas" might still be read to authorize borrowing only via the issuance of debt securities, rather than other forms of borrowing such as a traditional loan, because of the use of the word "colocaciones" or "placements."  By *also* authorizing borrowing (in any form) from financial institutions and the U.S. and Puerto Rico governments, the ERS Enabling Act made clear that all forms of borrowing were permissible.

25.     *Third*, the Retiree Committee also contends that the canon of *noscitur a sociis* requires reading "colocaciones directas" as a limitation on ERS's authorization to incur debt, because it appeared alongside the references to borrowing from financial institutions and the U.S. and Puerto Rico governments, which were supposedly themselves limitations.  Retiree Committee ¶ 78.  But this argument is based on the assumption that those earlier clauses limited ERS to "seek[ing] a loan" from those sources.  *See id.* ¶ 67.  As explained above, however, the earlier clauses in fact authorized "borrowing" from those sources.  *Supra* ¶¶ 13–14.  As a result, the provision as a whole lacked the limiting effect on which the Retiree Committee's *noscitur a sociis* argument depends.  Properly construed, the Enabling Act authorized borrowing from essentially all conceivable sources of capital—financial institutions, the relevant governments, and investors—without limiting the forms that such borrowing may take.

15

26. *Fourth*, the Retiree Committee contends that its limited reading of "direct placements" is supported by statutory purpose. Retiree Objection ¶¶ 79–82. But contrary to the Retiree Committee's position, the statement of motives for Act 46-1988, in which the legislature granted ERS borrowing authority, says nothing to support the Committees' cabined construction. Most of Act 46 was concerned not with ERS's authority to borrow but instead with ERS's authority to invest and lend. Before Act 46, ERS's investments were largely limited to government and municipal bonds, mortgages, and mortgage-backed securities, with only a combined 20% of assets allowed to be invested in corporate bonds and stocks. 3 L.P.R.A. § 779 (1988). Act 46 substantially broadened ERS's investment authority, including allowing ERS to invest up to 60% of its assets in corporate stock. Act 46-1988 § 1. Act 46 also expanded ERS's authority to make personal loans to participants. Previously, such loans were generally limited to $1,500, but Act 46 expanded ERS's powers to allow personal loans up to the full amount of the participant's "total accumulated contributions." *Id.* § 2. In that context, the Retiree Committee's out-of-context quotations from the statement of motives, such as references to "broaden[ing] the investment and loan capacity of [ERS] in such a way that it may achieve its main objective of increasing its income," *id.*, plainly refer to Act 46's expansion of ERS's investment and lending authority, not its borrowing authority. The Act's direction that activities must be "carried out carefully and with foresight for investment purposes and not for speculation . . . observing the principle of maintaining an adequate balance between the expectations of risks and yields," *id.*, too, makes perfect sense with respect to investing and lending; however, it does not make sense with respect to borrowing (which, unlike lending and investing, does not involve a "yield"). And while the Act also refers to "administrative and control parameters," those too come in the context of investments, not borrowing—the parameters are to govern ERS's "investment policy," which is to

16

allow ERS to "take optimum advantage of the investment opportunities available in the contemporary and future financial markets." *Id.* In sum, nothing in Act 46's statement of motives even mentions the grant of borrowing authority, much less justifies the Committees' arbitrary distinction between underwritten and private sales of bonds.

27.     Grasping at straws, the Retiree Committee also relies on a quote from an unrelated SEC rulemaking document about the potential advantages of direct placements over underwritten bond offerings.  Retiree Objection ¶ 82.  This document was written in 2017, and the portion the Retiree Committee quotes is discussing a change in the municipal debt market that occurred "[b]eginning in 2009," in which issuers had "increasingly used direct placements as alternatives to public offerings of municipal securities."  SEC, *Proposed Amendments to Municipal Securities Disclosure*, 82 Fed. Reg. 13,928, 13,933 (Mar. 15, 2017).  This, of course, is irrelevant.  New practices in municipal finance from 2009 cannot explain what the Puerto Rico legislature meant in 1988 when it enacted Act 46-1988.  If anything, the fact that municipal private debt placements were so uncommon before 2009 only confirms the Bondholders' position—that the Puerto Rico legislature was not, in Act 46-1988, restricting ERS to what was evidently at the time an esoteric form of municipal finance.  The simple fact is that bond issuances and private placements each have pros and cons—if private placements were as unqualifiedly superior to public offerings as the Retiree Committee suggests, then it would be difficult to explain why there were, for example, a total of $320 billion of municipal bonds issued in 2018, and only $25 billion raised in municipal private placements.  *See US Municipal Issuance*, SIFMA (Oct. 4, 2019), https://www.sifma.org/ resources/research/us-municipal-issuance/.

17

**B.**     **Precedent, Agency Interpretations, Other Legislation, and Judicial Admissions All Support ERS's Statutory Authority**

28.     A mountain of evidence from before and after ERS issued the ERS Bonds in 2008 confirms that the ERS Enabling Act has always been understood to authorize underwritten bond issuances.

**1.**     **The One Case to Address the Relevant Statutory Text Holds that It Does Not Limit Bond-Issuing Authority**

29.     In a 2007 case, *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242 (D.P.R. 2007), the federal district court for Puerto Rico explained that an identically worded provision in the Teachers Retirement System's enabling act, 18 L.P.R.A. § 392h(7) (2007), authorized TRS to "enter into contracts, make loans, *issue bonds*, and invest its funds."  502 F. Supp. 2d at 25–55 (emphasis added); *see also id.* at 258 (explaining that TRS "has the capacity to issue bonds").  Indeed, the Teachers Retirement System, even though it was seeking to minimize its independent authority in order to benefit from the Commonwealth's Eleventh Amendment immunity, had conceded as much.  *Id.*  And *Rivera Torres* further held, rejecting TRS's contrary argument, that the enabling act did not "limit[] . . . [TRS's] ability to enter into contracts, make loans, issue bonds and invest funds."  *Id.* at 255.

30.     The Creditors' Committee contends that *Rivera Torres*'s statement about bond-issuing authority was not made "in reference to the language of the ERS Enabling Act's debt authorization."  Creditors' Objection ¶ 34.  But the sole authorization that TRS had to issue bonds was 18 L.P.R.A. § 392h(7), which (in the original Spanish) was at the time identically worded to the pertinent portion of the ERS Enabling Act, 3 L.P.R.A. § 779(g).  Thus, the statements that TRS had bond-issuing authority had to have been made about the pertinent statutory text, since there was no other basis for TRS's bond-issuing authority.  The Creditors' Committee also points out that *Rivera Torres* "said nothing about TRS having the authority to issue bonds 'to the public.'"

18

Creditors' Objection ¶ 34.  In fact, *Rivera Torres* held that the enabling act did not "limit[] . . . [TRS's] ability to . . . issue bonds."  502 F. Supp. 2d at 255.  And regardless, once it is conceded that the Enabling Act's use of the phrase "tomar prestado" gave ERS authority to issue bonds, which *Rivera Torres* repeatedly says it did, there is no basis for distinguishing between the sale of those bonds to a financial institution (as in an underwritten offering) or directly to investors (in a direct placement).  Even if direct placements meant only what the Committees say it meant, the Enabling Act authorized ERS to "tomar prestado" not only in direct placements but also from financial institutions.

> **2.      ERS's Board, ERS's General Counsel, ERS's Outside Counsel, and the Government Development Bank All Interpreted the ERS Enabling Act to Authorize Bond Issuances**

31.      "[U]nder Puerto Rico law, great deference is due to an agency's construction of its powers pursuant to its organic act."  *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 8 (1st Cir. 1988).  "[I]f the agency's interpretation of the statute is reasonable, even if it is not the only reasonable one, *the courts must defer to it*."  *Gonzalez Segarra v. CFSE*, 188 D.P.R. 252 (2013) (quoting *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, 144 D.P.R. 425, 436 (1997)).  In *U.S.I. Properties*, the First Circuit, in upholding a Puerto Rico instrumentality's statutory authority to act as it had, emphasized that the instrumentality "had approval from its own counsel and from its finance committee" to take the challenged actions, and that the "Government Development Bank . . . approved [the intrumentality's] role. . . ."  *U.S.I. Props. Corp.*, 860 F.2d at 8.  Given those contemporaneous approvals, the First Circuit remarked that "it may seem amazing that an ultra vires argument should arise at all," and upheld the instrumentality's authority "based on the statutory language and on the . . . agencies' reading of the statute."  *Id.*

32.      The principles followed by *U.S.I. Properties* further support ERS's authority to issue the ERS Bonds.  When ERS issued the ERS Bonds, they came accompanied by a slew of

approvals and legal opinions affirming their validity. These included (1) a Bond Resolution authorizing the bond issuance, which the ERS Board affirmed was "adopted pursuant to the provisions of the [ERS Enabling] Act," Bond Resolution § 101, VI-1; (2) a legal opinion from ERS's General Counsel opining that the Bond Resolution was a "legal, valid, and binding agreement[] of" ERS, that "the Bonds have been duly and validly authorized and issued," and that "[a]ll legislation . . . necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by the" bond issuance is "in full force and effect . . . and no further legislation . . . is required for such purposes," Op. of General Counsel to the System at 2–3 (Jan. 31, 2008) (Exhibit B); and (3) a legal opinion from outside counsel to ERS affirming that ERS "has the right and power under [the ERS Enabling Act] to adopt the Resolution" and that "the Bonds are valid and binding" ERS obligations, Op. of Fiddler Gonzalez & Rodriguez to Bank of New York, at 1–2 (Jan. 31, 2008) (Exhibit E). Moreover, the Government Development Bank—the "fiscal agent and . . . a financial advisory and reporting agency of" the Commonwealth and each of its agencies and instrumentalities, 7 L.P.R.A. § 552—approved the ERS Bonds' issuance. *See* Resolution No. 8798, Government Development Bank (Jan. 24, 2008) (Exhibit F). Just as in *U.S.I. Properties*, these approvals by ERS, its counsel, and the Government Development Bank reaffirm that ERS had the power to issue the ERS Bonds, as a plain reading of the ERS Enabling Act's original Spanish text shows.

### 3. Other Legislation Confirms that the Enabling Act Authorized the ERS Bonds

33. Other enactments by the Puerto Rico legislature, both before and after the ERS Bonds were issued, further confirm that the legislature authorized ERS to issue the ERS Bonds in the ERS Enabling Act. These enactments remove "any lingering doubt" about the scope of ERS's statutory authority. *Bowert v. Yuckert*, 482 U.S. 137, 149–51 (1987).

20

34.     *First*, in April 2007, before the ERS Bonds were issued, the legislature specifically anticipated their issuance when it provided that the "funds needed to cover the cost increase in the minimum amount of the pensions of the pensioners of the Central Government shall proceed from the resources obtained ***through the issue of bonds*** of the Employees of the Government and the Judicature Retirement Systems Administration."   Act 35-2007, § 5 (emphasis added).   By that time, the ERS Board had already preliminarily authorized Merrill Lynch to proceed with an issuance of ERS Bonds.   *See* Kobre & Kim, Final Investigative Report at 205 (Aug. 20, 2018). Act 35-2007 contains no independent authorization for ERS to issue bonds, but it confirms that the legislature was aware of the bond issuance, and understood ERS to have the authority to authorize it.   Otherwise, there could have been no "issue of bonds" to cover the cost of the pension increase provided for by Act 35-2007.

35.     Contrary to the Creditors' Committee's contentions, this provision is in the operative text of Act 35-2007, not in a "statement of motives."   Creditors' Objection ¶ 40.   And whether or not it was an "obvious attempt to justify additional pension increases at a time when ERS was already woefully underfunded," *id.*, is wholly beside the point.   Whatever the legislature's motivations, Act 35-2007 shows that the legislature knew about the ERS Bond issuance in advance and understood ERS had the authority to proceed with it—otherwise the legislature would have been in no position to tell ERS how to spend the "resources obtained through the issue of bonds."   Act 35-2007 § 5.   Moreover, while the Creditors' Committee points out that Act 35-2007 did not specifically mention a public offering of bonds, public documents suggest that ERS was always contemplating a public offering, not a private placement.   *See* Kobre & Kim Report at 204–207.   And as already explained, there is no textual basis in the ERS Enabling Act for distinguishing between the two types of bond sales.

36.    *Second*, the legislature acknowledged the ERS Bonds' validity in 2011 when it again amended the ERS Enabling Act in Act 116-2011.  Act 116 changed the ERS Enabling Act to prohibit future "Bond Issues . . . as part of the direct placement of debts secured with the assets of the System," and to require legislation approved by two-thirds of the Legislative Assembly for any other future direct placements of debts secured by ERS assets.  Act No. 116-2011, § 7(d). Self-evidently, the reference to "Bond Issues . . . as part of the direct placement of debts" is an acknowledgement that the phrase "direct placement of debts" always included the power to issue bonds.  The language would be superfluous if ERS never had the authority to issue bonds.  *See, e.g., Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) (courts are "hesitant to adopt an interpretation of a [legislative] enactment which renders superfluous another portion of that same law").

37.    Moreover, Act 116-2011's operative text also included a statement that the issuance of the ERS Bonds had "encumber[ed] employer contributions . . . for up to fifty years" and that it had "significantly contributed to the financial crisis of" ERS, *id.*—effects that were possible only if the ERS Bonds were valid and enforceable.  And Act 116-2011 further provided that the "interest accrued on these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico"—a provision that makes sense only if the ERS Bonds were valid. *Id.* § 7(d).  The Creditors' Committee responds that the reference to tax exemption was holdover language from the prior law, but in fact, the language was re-enacted in Act 116 immediately following a discussion of the ERS Bonds.  In its new context after Act 116, "these obligations" plainly refers to the ERS Bonds, which are the subject of the previous three sentences.  Regardless, even if the Creditors' Committee were correct about the reference to the tax exemption, it remains

the case that Act 116's discussion of the ERS Bonds' effects on ERS's finances assumes and confirms the ERS Bonds' validity.

38.     The Creditors' Committee makes much of the legislature's unexplained statement in the statement of motives from Act 116 that the Bond Issue was "illegally made." *Id.* at 6. The statement of motives does not specify why the Bond Issue was "illegally made," but nothing in the statement of motives or elsewhere in Act 116 suggests that the ERS Enabling Act did not authorize issuance of the bonds. Rather, the statement of motives' discussion is entirely focused on the bond issuance's supposed negative effects on ERS. *See id.* After surveying those negative effects, the preamble concludes that "[f]or such reason, the Retirement System *should not be* allowed to issue debt, such as stock market bonds [sic], to be secured with its assets." *Id.* (emphasis added). But "should not be allowed" is not, of course, the same as "was not allowed." And while Act 116 amended the ERS Enabling Act to prohibit bonds in the future, nothing the legislature said in that statute supports the conclusion that before the amendment, ERS lacked the authority to issue the bonds. In fact, if ERS had always lacked that authority, there would have been no need for the legislature to prohibit future "Bond Issues."

39.     *Third*, in 2013, the legislature again amended the ERS Enabling Act. *See* Act No. 3-2013. Yet again, when describing the obstacles facing ERS, the legislature directly referenced the ERS Bonds: "Although the bond issue enabled an injection of funds which extended 5 to 6 years the life of the System's assets, the [ERS] *is under the obligation to repay these bonds* from the employer contributions it receives." *Id.* at 6 (emphasis added). The legislation further provided that the 2008 "debt has a repayment term of almost 50 years, during which [ERS] shall pay approximately $6 billion in interest, in addition to repaying its principal, which amount is equal to approximately 4 years of benefit payments to retired persons." *Id.* Thus, even after the legislature

23

had amended the ERS Enabling Act in 2011 to reduce ERS's authority to issue bonds, the legislature assumed and reaffirmed the validity and enforceability of the ERS Bonds that ERS had already issued.  The Creditors' Committee asserts that these statements were simply "a convenient justification for highly unpopular pension benefit decreases" contained in the 2013 legislation. Creditors' Objection ¶ 45 (emphasis omitted).  But this is nothing but speculation, and whatever the legislature's motivations, the decision to include these statements shows that the legislature understood that the ERS Bonds were valid, enforceable obligations.

### 4.    ERS Repeatedly Admitted in These Restructuring Proceedings that the ERS Bonds Were Valid and Enforceable

40.    Similarly, ERS itself has repeatedly admitted that the ERS Bonds were valid and enforceable.  Before Judge Besosa in 2016, ERS stipulated that the ERS Bonds were "authorized" by ERS "[p]ursuant to the authority granted to it under the Enabling Act," Joint Stip. of Movants, the Commonwealth Respondents, and ERS ¶ 6, No. 3:16-cv-02696, ECF No. 65 (D.P.R. Nov. 2, 2016), and that "[t]he ERS Bond Resolution adopted on January 24, 2008, is a valid and binding contract between the ERS and holders of ERS Bonds," *id.* ¶ 11.  ERS also argued in opposing adequate protection in that case that "under the clear terms of the Bond Resolution, the [Bondholders] have *valid and enforceable liens* over hundreds of millions of dollars of ERS revenue, which will continue to grow."  ERS Opp'n to Mot. to Lift Stay, No. 3:16-2696, ECF No. 52 (D.P.R. Oct. 26, 2016).  These admissions further confirm ERS's statutory authority to issue the ERS Bonds.

### 5.    The ERS Bonds Must Be Presumed Valid

41.    Finally, ERS's authority to issue the ERS Bonds is further bolstered by the long-established rule that, "where [a] municipality has repeatedly recognized the validity of its bonds and has paid interest on them for a series of years, . . . all questions of doubt in relation to their

validity should be answered in favor of their legality." *Johns-Manville Corp. v. Village of DeKalb,*

*Mo.*, 439 F.2d 656, 661 (8th Cir. 1971); *Clay County v. Soc'y for Sav.*, 104 U.S. 579, 591 (1882)

(requiring a more "substantial defence" when an issuer seeks to "escape its liability" on bonds for

which "taxes had been levied to pay interest, and that interest had been paid" for nearly a decade);

*see also* McQuillin, The Law of Municipal Corps. § 43:22 (3d ed. 2019) ("In considering the

legality of a proposed bond issue, courts construe the constitution and statutes more strictly than

they are construed in determining the validity of bonds already issued and disposed of.").  Here,

ERS issued the ERS Bonds more than 10 years ago, and paid interest on those bonds continually

until the beginning of restructuring proceedings.  Not once in that time period did ERS do anything

to suggest that the ERS Bonds were not valid and enforceable.  The ERS Enabling Act must

therefore be construed, if possible, to support the validity of the ERS Bonds.  And for the reasons

already given, such a construction is not only possible—it is the most straightforward way of

reading the ERS Enabling Act's controlling Spanish text.

### C.   Contrary to the Creditors' Committee's Argument, Authority to Borrow Is Sufficient to Authorize Bond Sales

42.    Rather than focusing on the text of the ERS Enabling Act, the Creditors' Committee

primarily focuses on two nineteenth-century decisions from the U.S. Supreme Court, *Merrill v.

Town of Monticello*, 138 U.S. 673 (1891), and *City of Brenham v. German-American Bank*, 144

U.S. 173 (1892), and on a few early-twentieth-century state cases from Oregon and Iowa.

Creditors' Objection ¶¶ 25–29.  The Creditors' Committee contends that these cases show that

authority to issue negotiable bonds must be expressly granted by the legislature, not implied by a

power to borrow money or incur debts.  Creditors' Objection ¶ 24.

43.    At the outset, the ERS Bonds would still be valid even if express authority to issue

bonds were required.  As explained above, *supra* Part I.A., the ERS Enabling Act *did* expressly

authorize bond issuance.  The Creditors' Committee agrees that by allowing ERS to "tomar prestado . . . mediante colocaciones directas de deuda"—"borrow . . . through direct issuances of debt"—the Enabling Act authorized ERS to sell debt securities (*i.e.*, bonds) directly to investors. Once that is granted, it follows that ERS could also sell bonds to financial institutions, because the Enabling Act also authorized ERS to "tomar prestado de cualquier institución financiera."  Thus, the Enabling Act's text expressly authorized the sale of bonds to financial institutions, by using "tomar prestado" in a context where it necessarily included the sale of bonds.  And the legislature and the executive branch both later recognized the validity of the resulting bonds.  *Supra* ¶¶ 33–40.

44.      In any event, contrary to the Creditors' Committee's argument, the cases holding that express bonding authority is required reflect neither "the traditional rule" nor "the weight of the case law."  Creditors' Objection ¶ 24.   Rather, they are outliers.  Most states never adopted their approach, which made little sense then and makes even less sense now.  Puerto Rico certainly never adopted the rule, and there is no reason to think that Puerto Rico would do so.

45.      Thus, the traditional rule is the precise opposite of what the Creditors' Committee says it is.  Until the late 19th century, "the courts, federal and state, almost uniformly held that the power to borrow money carried with it the power to issue negotiable bonds."  *Russell v. Middletown City Sch. Dist.*, 125 A. 641, 642 (Conn. 1924).  As the Illinois Supreme Court put it, "[h]aving power to borrow money, the power to issue bonds therefor results as a necessary incident."  *Dutton v. City of Aurora*, 114 Ill. 138, 145 (1885); *see also, e.g.*, *Rogers v. City of Burlington*, 70 U.S. 654, 666 (1865) ("[T]he issuing of bonds by a municipal corporation as material aid in the construction of a railroad is merely a customary and convenient mode of borrowing money to accomplish the object," and allowed pursuant to authority to borrow);

*Mitchell v. City of Burlington*, 71 U.S. 270, 273 (1866) ("the power to borrow money for any public purpose" included the power to issue bonds); *Holmes v. City of Shreveport*, 31 F. 113, 120 (C.C.W.D. La. 1887) ("[W]e are, after a very careful and general examination of authorities, unable to find a single case in which the power of the city's agents to execute negotiable or commercial instruments, or promissory notes, to evidence the credit price of a thing which they were authorized to secure, provide for, or purchase, was judicially denied."); *Black v. Cohen*, 52 Ga. 621, 624 (1874) (power to make contracts includes power to issue bonds, because "a bond is nothing more than a contract under seal").

46.    In the late 19th century, however, a split developed.  The U.S. Supreme Court, which then before *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), construed state law for itself, raised concerns beginning in 1872 that municipal power to issue negotiable paper could lead to municipalities being liable for "burdens of a most fraudulent and iniquitous character, and of which they would have been summarily relieved had not the obligations been such as to protect them from question in the hands of bona fide holders."  *Police Jury of Par. of Tensas v. Britton*, 82 U.S. 566, 571 (1872).  After a series of cases "in one way or another narrow[ing] the scope of the doctrine" recognizing implied power to issue bonds, *Russell*, 125 A. at 643, the Court held in *Merrill* that where a town had only implied authority to borrow, it did not have authority under Indiana law to issue negotiable bonds.  138 U.S. at 686.  In *City of Brenham*, a majority then held that even express authority to borrow did not covey authority to issue negotiable bonds under Texas law.  144 U.S. at 182.  This was a sea change, not a statement of the "traditional rule," as the dissent in *City of Brenham* makes clear.  *Id*. at 196–97 (1892) (Harlan, J., dissenting) ("The aggregate amount of negotiable notes and bonds, executed by municipal corporations, for

legitimate purposes, under express power to borrow money simply, and now outstanding in every part of the country, must be enormous.").

47.     *City of Brenham* was a closely divided decision on a question of state law, however, and most states did not follow it.  The Connecticut Supreme Court held in *Russell* that the power to issue bonds was "so firmly established by usage and authority that it can only be taken away by legislative denial or limitation, and ought not to be negatived by judicial interpretation."  125 A. at 645.  The Massachusetts Supreme Judicial Court held that "however it may be elsewhere," in Massachusetts, towns' power to "raise these large or unusual sums of money by loan, no conditions or restrictions being imposed, carried with it the power to issue bonds."  *Commonwealth v. Inhabitants of Williamstown*, 156 Mass. 70, 73–74 (1892).  Many other states did the same. *Russell*, 125 A. at 643 ("The [*Brenham* rule requiring express bonding authority] obtains in Alabama, Illinois, Louisiana, New Jersey, and Texas, while the older rule is in force in Massachusetts, Arkansas, Georgia, Kentucky, Nevada, Ohio, New York, Rhode Island, Virginia, and Wisconsin.").

48.     No court has addressed the implied-bonding-authority issue as a matter of Puerto Rico law.  But the Supreme Court's 19th century, pre-*Erie* pronouncements about other states' laws are not decisive, and there are good reasons to conclude that Puerto Rico would follow the traditional, still-majority rule and recognize that the power to borrow includes the power to issue bonds.  As the Kentucky Court of Appeals recognized in *Fidelity Trust & Safety Vault Co. v. City of Morganfield*, 29 S.W. 442, 444 (1895), the issuance of bonds is "but an incident of" indebtedness, "some form of evidence of such indebtedness being necessary."  Construing an authorization to borrow as authorizing bond issuance is also consistent with market realities in which, today as much as in 1892, "[t]hose who have money to lend will not lend it upon mere

28

vouchers or certificates of indebtedness," but often demand "negotiable notes or bonds."  *City of Brenham*, 144 U.S. at 196 (Harlan, J., dissenting).  Today, too,

> the power to borrow is practically ineffective where large loans are concerned, unless resort may be had to ordinary and well–recognized methods of issuing corporate securities, and any attempt to evidence indebtedness by instruments not fully negotiable would either fail, or, if carried out, could only be effected with inconvenience in debt administration, and the burden of higher interest charges which are uniformly imposed on any security which departs from the ordinary type prevailing in the investment market.

*Russell*, 125 A. at 645.  And the Supreme Court's 19th century concerns about fraudulently issued securities have little relevance in the modern marketplace, where market participants demand legal opinions confirming validity.  UCC § 8-202 cmt. 3 ("As a practical matter the problem of policing governmental issuers has been alleviated by the present practice of requiring legal opinions as to the validity of the issue. The bulk of the case law on this point is nearly 100 years old and it may be assumed that the question now seldom arises.").  Thus, there is no reason to believe that Puerto Rico would construe authorizations of borrowing power any differently from other statutory authorizations, or impose the heightened express authority requirement that the Creditors' Committee contends exists.

49.    The treatises that the Creditors' Committee cites confirm that in most jurisdictions, authority to borrow and enter contracts implies authority to issue bonds.  *See* Creditors' Objection ¶ 24.  The C.J.S. Municipal Corporations writes,

> It has been held that power conferred on a municipality to make contracts necessarily includes authority to issue bonds and that power to issue bonds may be implied from power given to a municipality to contract debts.  On the other hand, where the corporation has no power to incur a particular indebtedness, it has no power to issue a bond therefor.

64A C.J.S. Municipal Corporations § 2119 (footnotes omitted).  Reflecting the split of authority

discussed above, C.J.S. also writes that "[i]t has been both affirmed and denied that authority to

issue bonds may be implied from power to borrow money."  *Id.*[7]

50.    The McQuillin treatise, The Law of Municipal Corporations, is no more helpful to

the Creditors' Committee.    Far from adopting a special, magic words requirement that

authorizations of bond issuances must use the word "bonds," McQuillin explains that "[t]he rules

relating to statutes generally are usually applied in construing enactments authorizing the issuance

of bonds."  Express power—Construction of statutes, 15 McQuillin Municipal Corps. § 43:22 (3d

ed. 2019).  Moreover, while McQuillin states that "if the intention of a statute purporting to

authorize the issuance of bonds is doubtful, the doubt will be resolved against the authority to issue

the bonds," it then explains that a different rule applies after the bonds have been issued:  if "rights

have grown up under" a construction of the statute under which bonds are allowed, that

construction "is entitled to weight . . . where the power may be fairly inferred from the terms of

such provision; and, in such a case, doubts and ambiguities will be resolved in favor of the power"

to issue bonds.  *Id.* (footnotes omitted).  That, of course, is the case here.  McQuillin's statement

in a separate section, without any citation, that "the general rule is that there is no authority to issue

bonds unless it has been expressly conferred," must be understood in the context of this more

---

[7] The separate C.J.S. discussion of authority to issue negotiable paper, on which the Creditors' Committee relies, is hopelessly contradictory, and reflects the lack of any uniform rule:

> Unless such power is conferred on it by charter or statute, a municipal corporation has no power to issue negotiable bonds or other negotiable instruments.  According to some authorities, the power does not exist unless it has been expressly conferred on the municipality by the legislature, but other authorities take the view that the power may be implied, and it has been held that a mere grant of power to issue bonds implies that bonds having the commercial quality of negotiability may be issued in the absence of provisions showing a contrary intention.  The power to issue negotiable bonds may not be implied from the right to borrow money or to contract an indebtedness, but there is also authority to the contrary.

64A C.J.S. Municipal Corporations § 2182.  Of course the first sentence is undisputed—there must be statutory authority for a bond issuance.  The question is whether that authority may be inferred from authority to borrow, or must be granted expressly.  As explained above, and as the C.J.S. provision notes, there is a split of authority on that question.

specific discussion of already issued bonds. *See id.* § 43:20. Moreover, McQuillin's statement about the "general rule" fails to distinguish between "two types of cases" in which this question arises—cases where there is no "express authority in the municipality to borrow money" at all, and cases, like this one, where "the power to borrow exists by express legislative grant and the power to issue negotiable securities has been implied." *Russell*, 125 A at 642. Whatever may be the rule where there is no express authority to borrow, the majority rule is clear that express borrowing authority implies authority to issue bonds. *See supra* ¶¶ 45–47.

> **D.    Even if the Creditors' Committee Were Correct About ERS's Authority, the Secured Debt Underlying the Bonds Would Still Be Enforceable**

51.    Finally, even if the Creditors' Committee were correct that the ERS Enabling Act did not authorize the issuance of negotiable bonds, that conclusion would not render the ERS Bonds or the secured debt that they represent void or unenforceable, but merely non-negotiable. ERS indisputably had the power to borrow money, including by issuing securities, and to "secur[e] said debt with the assets of the System." 3 L.P.R.A. § 779(d) (2008). The Committees' sole objection to the ERS Bonds is that they were negotiable—the Committees do not deny that ERS had full authority to incur the underlying secured debt. Even states that require express authority for municipalities to issue negotiable paper generally provide that "where such authority is lacking, such a paper is not void, but merely not negotiable. It is still an evidence of debt." *Port of Palm Beach Dist. v. Goethals*, 104 F.2d 706, 709 (5th Cir. 1939); *see also, e.g.*, *Pac. Improvement Co. v. City of Clarksdale*, 74 F. 528, 534 (5th Cir. 1896) ("[W]hen negotiable securities, instead of nonnegotiable instruments, have been employed in settlement of lawful debts, the negotiable bonds so given have, when they were being sued upon, been treated, in a number of reported cases both in federal and state courts, as evidences of the debt, and on them, in the hands of third parties, recovery has been had against such defendant corporation," even though the issuer lacked the

power to issue negotiable securities); *Keel v. Pulte*, 10 S.W.2d 694, 697–98 (Tex. Comm'n App. 1928) (warrants issued by city would be enforceable but nonnegotiable, "though couched in terms importing negotiability," because the city lacked authority to issue negotiable instruments); *Forrest City v. Bank of Forrest City*, 172 S.W. 1148, 1150 (Ark. 1915) (fact that city could not issue negotiable note did not render note unenforceable, only subject to personal defenses).  It is a different matter, of course, where the municipality lacked the authority to borrow at all—but that is not the Committees' contention here.

52.     Reaffirming this conclusion, in *City of Brenham*, the Supreme Court, after ruling that the city lacked authority to issue negotiable bonds, amended its judgment in response to a rehearing petition to allow the holders to sue the city on the underlying debt.  *See City of Brenham v. German Am. Bank*, 144 U.S. 549, 549–50 (1892).  Similarly, in *Merrill*, the bondholders' effort—after the Court's ruling that their bonds were issued without authority—to recover at least the principal cost of their bonds failed only on statute of limitations grounds.  *See Merrill v. Town of Monticello*, 72 F. 463, 464 (7th Cir. 1896).  Thus, a lack of authority to issue negotiable bonds would not preclude recovery, but merely mean that the bonds themselves would not be treated as negotiable documents.

53.     This makes sense.  The Supreme Court's concern, in narrowly construing municipal authority to issue negotiable paper, was with "burdens of a most fraudulent and iniquitous character" that would have been unenforceable "had not the obligations been such as to protect them from question in the hands of bona fide holders."  *Police Jury*, 82 U.S. at 571.  Similarly, the Committees' sole objection to the ERS Bonds is that they were offered to the public via an underwriter rather than being sold directly to selected investors in a private placement.  Creditors' Objection ¶ 31; Retiree Objection ¶ 74.  Each of those concerns is fully remedied by recognizing

32

that the underlying secured debt, which ERS indisputably had the authority to incur, is valid, but treating that debt as subject to any personal defenses that ERS may have against the initial purchasers. The Committees' claim objections do not assert any such defenses, and thus the ERS Bonds are enforceable evidence of the underlying secured debt, which ERS had the undisputed authority to incur, even if ERS lacked authority to issue negotiable paper.

## II.   THE ERS BONDS ARE ENFORCEABLE UNDER UCC § 8-202

54.    Even if ERS had not had the authority to issue the ERS Bonds, the ERS Bonds would still be enforceable under revised § 8-202 of the UCC,[8] 19 L.P.R.A. § 1752. Under § 8-202, "[a] security . . . , even though issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect . . . ." 19 L.P.R.A. § 1752(b)(1). That provision applies here, and the Bondholders are "purchaser[s] for value and without notice" who are entitled to its protection.

55.    Section 8-202 applies to government securities "only if [1] there has been substantial compliance with the legal requirements governing the issue or [2] [a] the issuer has received a substantial consideration for the issue as a whole or for that particular security and [b] a stated purpose of the issue is one for which the issue has power to borrow money or issue the security." 19 L.P.R.A. § 1752(b)(2). The Creditors' Committee does not deny that this requirement is met, and surely it is. As for the first prong, ERS is in "substantial" compliance with the ERS Enabling Act because, as explained above, it was indisputably permitted to both borrow and issue debt—the Committees object, at most, to the form of the transaction. And regardless, the second prong plainly is satisfied as well: ERS received hundreds of millions of dollars for each series of ERS Bonds, and the ERS Enabling Act expressly authorized ERS to "borrow

---

[8] All references to UCC § 8-202 herein will be to revised § 8-202.

money," without any restriction on purpose.  Thus, § 8-202(b)(1) applies to the ERS Bonds even though they are government securities.

### A.   UCC § 8-202(b) Applies Even Though the Committees Make the Objection on ERS's Behalf

56.   The Creditors' Committee argues that § 8-202(b) does not apply to the Committees' objections because of the statement, at the beginning of § 8-202(b), that its "rules apply if an issuer asserts that a security is not valid."  The Creditors' Committee contends that the Committees are not "issuer[s]," and so the fact that they, rather than ERS, bring the claim objection renders § 8-202(b) inapplicable.  But that contention, which was unsupported to begin with, has been entirely overtaken by subsequent events.

57.   Since the Committees filed their objections, ERS (via the Oversight Board) has now commenced multiple clawback avoidance actions in which it contends that the ERS Bonds are invalid and therefore unenforceable.  *See, e.g.*, 19-ap-356; 19-ap-357; 19-ap-358; 19-ap-359; 19-ap-361.  The Creditors' Committee concedes that ERS is an issuer.  *See* Creditors' Objection ¶ 59.  And now that the clawback actions have been filed, ERS is indeed "assert[ing] that a security is not valid."  19 L.P.R.A. § 1752(b).  Thus, even on the Creditors' Committee's account, the prerequisites for applicability of § 8-202(b) are satisfied.

58.   Regardless, the Creditors' Committee's contention that it may deprive the Bondholders of their rights under § 8-202 by bringing a claim objection on the issuer's behalf lacks any textual, precedential, or policy support.  The official comments to § 8-202 explain that § 8-202(b) is intended to cover "the rights of the purchaser for value . . . against the issuer," as opposed to "against other claimants to the security."  UCC § 8-202, cmt. 1.  Thus, "subsection (b) embod[ies] the concept that it is the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue."  *Id.* cmt. 3.  "Subsection (b) gives to a

34

purchaser for value without notice of the defect the right to enforce the security against the issuer despite the presence of a defect that otherwise would render the security invalid." *Id.* "[E]nforc[ing] the security against the issuer," of course, is precisely what the Committees are seeking to prevent the Bondholders from doing.  Allowing such an end-run around § 8-202(b)(1) would directly undermine the provision's purpose.  And nothing in the official comments or the text of § 8-202 suggests that a good faith purchaser for value loses its "right to enforce the security" just because a third party raises a defense of invalidity on the original issuer's behalf, rather than the original issuer doing so itself.

59.    Rather, under the UCC's definition of "issuer," the Committees count as "issuer[s]" for purposes of the *ultra vires* defense, because they raise that defense on behalf of ERS, an undisputed "issuer."  The UCC's definition of "issuer" "[w]ith respect to an obligation on or a defense to a security" is not limited to the entity whose name is on the security or who creates the property interest represented by the security, but also includes anyone who "becomes responsible for, or in place of, another person described as an issuer" in the UCC.  19 L.P.R.A § 1751(a)(4).  The one court to address the question, *In re Hawaii Corp.*, 59 B.R. 410, 412 (D. Haw. 1986), held that a bankruptcy trustee, "by operation of the Bankruptcy Act, falls within" the "[b]ecomes responsible for or in place of" portion of the definition.

60.    The same conclusion follows for the Committees, at least "[w]ith respect to" the *ultra vires* defense.  For one thing, the First Circuit has stated that ordinarily, the "trustee alone may interpose objections to proofs of claim," and that creditors may make objections only if "the bankruptcy court permits the creditor to object in the trustee's stead."  *In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992).  While the First Circuit has held that, notwithstanding related *dicta* in *Thompson*, creditors' committees can intervene as of right in PROMESA adversary proceedings,

35

*see In re Fin. Oversight & Mgmt. Bd.*, 872 F.3d 57, 63 (1st Cir. 2017), nothing about that holding suggests that Committees' claim objections are not still made "in the trustee's stead," which in PROMESA would mean the Oversight Board's stead.  48 U.S.C. § 2161(c)(7).  Indeed, the First Circuit cited with approval a S.D.N.Y. Bankruptcy decision recognizing that intervenors are not "'the possessors of causes of action,'" but merely "interested parties."  872 F.3d at 64 (quoting *In re Adelphia Commc'ns Corp.*, 285 B.R. 848, 851 (Bankr. S.D.N.Y. 2002)).  And because the Committees are raising the objections "in the trustee's stead," they are "issuers" for the same reason that *In re Hawaii* held a bankruptcy trustee to be an issuer.  *See* 59 B.R. at 412.

61.   Regardless, as a matter of plain meaning the Committees bring their claim objections "in place of" ERS, and thus are issuers "[w]ith respect to" the asserted defenses.  19 L.P.R.A. § 1751.  The Bondholders do not bring any claim against the Committees, so the Committees have no direct interest in whether the ERS Bonds are enforced.  The Committees' interest comes entirely via ERS's interest—if the Committees can relieve ERS from paying the ERS Bonds, then the Committees will benefit.  The Committees are therefore raising objections "in place of" ERS, and thus are "issuer[s]" for purposes of those defenses, and subject to § 8-202(b)(1).  Thus, the Bondholders are entitled to assert all the same responses to those objections that would be available to them vis-á-vis ERS.

62.   The Creditors' Committee cites two cases, but neither supports its contrary argument, because neither involved a third party raising a defense on behalf of an issuer.  In the first, *Moscato v. Technologies, Inc.*, No. 04 Civ. 2487(GBD), 2005 WL 146806, at *4 (S.D.N.Y. Jan. 21, 2005), securityholders sought to *enforce* their securities against directors of the issuer, rather than the issuer itself.  The court held that the directors were not issuers for purposes of liability on the securities.  *Id.  Moscato* involved neither a bankruptcy, nor a creditors' committee,

nor the assertion of a defense on behalf of an issuer.  The fact that a director is not an issuer "with

respect to an *obligation* on . . . a security" says nothing about whether a creditors' committee is an

issuer "with respect to . . . a *defense* to a security" when the committee makes a claim objection.

19 L.P.R.A. § 1751(a).  The Committee's second case, *Banco de la Republica de Colombia v.*

*Bank of N.Y. Mellon*, No. 10 Civ. 536(AKH), 2013 WL 3871419, at *6 (S.D.N.Y. July 26, 2013),

is even further afield.  It involved a contract claim that the defendant had breached an agreement

by investing in an "issuer" in the Cayman Islands, and held that a guarantor counted as an issuer

for purposes of the contract.  *Id.*  In reaching that result, the court considered the UCC definition

of issuer, which expressly covers guarantors.  *Id.*  Neither case has anything to say about whether

a creditors committee raising claim objections on behalf of an issuer is covered by the UCC's

definition for purposes of § 8-202.

### B.    The Bondholders Are Purchasers for Value Without Notice

63.    The Creditors' Committee also argues that the Bondholders cannot invoke § 8-202

because they were on notice of the ERS Bonds' invalidity when they purchased them.  There is no

support for the Creditors' Committee's position.

64.    The Creditors' Committee's contention that the Bondholders were on notice is

based first on the text of the ERS Enabling Act, which according to the Creditors' Committee

plainly did not cover underwritten bond offerings.  Creditors' Objection ¶ 64.  But even if the

Court were ultimately to conclude that the ERS Enabling Act did not authorize underwritten bond

offerings, the statute by no means clearly precluded them.  *See supra* Part I.  If the Court holds that

the Enabling Act did not allow bond offerings, it will be the first body with any authority to say

so, and it will be contradicting (a) the Bond Resolution authorizing the bond issuance, which the

ERS Board affirmed was "adopted pursuant to the provisions of the [ERS Enabling] Act," Bond

Resolution § 101, VI-1; (b) the contemporaneous legal opinions from ERS's general counsel and

37

outside counsel; (c) the statements in *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242 (D.P.R. 2007), one year before the bonds were issued, that identical language authorized bond issuances; (d) the legislature's statements also in 2007 that instructed ERS to use funds from the bond issuance to pay benefits, Act No. 35-2007 § 5, as well as subsequent statements in 2011 and 2013 recognizing the ERS Bonds' continuing validity; and (e) ERS's judicial admissions that the ERS Bonds are valid. *Supra* Part I.B. Nothing the Creditors' Committee cites suggests that the Bondholders should have anticipated such a holding in advance.

65. The Creditors' Committee also relies on the legislature's statement in the preamble to Act 116-2011 that the bond issuance was "illegally made." *See* Creditors' Objection ¶ 64–65. But as explained above, *supra* ¶ 38, that legislation did not articulate any explanation for *why* the bond issuance was supposedly "illegally made"—it merely complained about its wisdom. And Act 116-2011's operative text confirmed the continued validity of the ERS Bonds, as did subsequent legislative enactments. *Supra* ¶¶ 36–37. For the Bondholders to lose the protection of § 8-202, they must have had "notice of the *particular defect.*" 19 L.P.R.A. § 1752(b)(1) (emphasis added). The legislature's general complaint that the issue was "illegally made" did not give the Bondholders notice of the supposed "particular defect" that the ERS Enabling Act precluded an underwritten bond offering, particularly considering the legislature's subsequent recognition in 2013 that ERS was "under the obligation to repay these bonds from the employer contributions it receives." Act 3-2013, Statement of Motives.

66. Finally, the Creditors' Committee relies on what it says was the unusual phrasing of disclosures made in connection with the ERS Bonds. Creditors' Objection ¶¶ 66–69. But again, the ERS Bonds were issued accompanied by legal opinions from ERS's general counsel and outside counsel expressly confirming the bonds' validity and ERS's authority to issue them. *Supra*

38

¶ 32.   Contrary to the Creditors' Committee's statement that "any sophisticated investor would have recognized" the disclosures "as raising serious 'red flags,'" Creditors' Objection ¶ 66, Kobre & Kim's investigation found no evidence that "any material concerns about [ERS's statutory authority to issue bonds] were raised prior to issuance.  Kobre & Kim Report, *supra*, at 206.  And the Creditors' Committee's contention that the ERS Bonds, unlike many other revenue bonds, were not supported by a legislative non-impairment covenant, Creditors' Objection ¶¶ 66–69, is of course irrelevant to whether ERS had the authority to issue the bonds—it relates, at most, only to the nature of the security interest they created.

### C.    UCC § 8-202 Applies to Invalid Bonds—That Is Its Entire Purpose

67.   The Retiree Committee makes a different argument, contending that § 8-202(b)(1) does not apply because the ERS Bonds are *ultra vires*, and § 8-202(b)(1) (the Committee says) applies only to irregular exercises of a valid power.  Retiree Objection ¶ 83.  This argument fails for two reasons—it is wrong about § 8-202(b)(1) and it is wrong about the supposed problem with the ERS Bonds.

68.   The Retiree Committee's argument that § 8-202(b)(1) is inapplicable to *ultra vires* bonds relies entirely on non-UCC precedent—the Retiree Committee does not cite a single case supporting its argument that was decided under the UCC.  Retiree Objection ¶¶ 83–89.  In fact, no court has ever limited the UCC in the way that the Retiree Committee urges, no doubt because to do so would directly contradict the plain text and official comments to § 8-202.

69.   The official comments to § 8-202 explain that the line of precedent on which the Retiree Committee relies, which allowed "estoppel in favor of purchasers for value without notices" but "qualified" that rule "by requiring that the municipality have power to issue the security," was "simplif[ied]" and incorporated into § 8-202(b)(1).  UCC § 8-202 cmt. 2.  Under the "simplif[ied]" approach adopted by the UCC, there are "two conditions for an estoppel against

39

a governmental issuer: (1) substantial consideration given, and (2) power in the issuer to borrow money *or* issue the security for the stated purpose." *Id.* (emphasis added). In the case of the ERS Bonds, as explained above, ERS met these conditions because it received substantial consideration and indisputably had the power to borrow money for the stated purpose. *Supra* ¶ 11, 15–16. Thus, the ERS Bonds satisfy the statutory test that was explicitly adopted to replace the approach of the Retiree Committee's pre-UCC precedent.

70.     In any event, even if § 8-202(b) were applicable only to an irregularity and not to an *ultra vires* act, it would still validate the ERS Bonds. As already explained, there is no dispute that ERS had the authority to incur debt, including secured debt. *Supra* ¶¶ 11, 15–16. Nor is there any dispute that ERS had the authority to incur that debt by selling bonds. *Supra* ¶¶ 15–16. The sole contention is that ERS was required to sell those bonds directly to investors, instead of to an underwriter for resale to investors. *See id.* Even under the pre-UCC rule, when a government takes an action "which, under existing law, it has authority to make, but fails to follow the procedure laid down by statute, [the action] is not 'ultra vires,' but irregular." *Keeler Bros. v. Sch. Dist. No. 3, Sheridan Cty.*, 205 P. 217, 219 (Mont. 1922). Because ERS indisputably had the authority to incur secured debt and to sell bonds, a failure to follow the proper procedure in how those bonds were sold is all that has been alleged against ERS. Under those circumstances, the bonds are "not 'ultra vires,' but irregular." *Id.* And so even if the Retiree Committee's unprecedentedly narrow construction of § 8-202 were correct, the ERS Bonds would still be enforceable under that provision.

## III.     THE BONDHOLDERS ARE ENTITLED TO RECOVER IN EQUITY

71.     Finally, even if ERS lacked authority to issue the ERS Bonds at the time of issuance, and even if UCC § 8-202(b) did not render the ERS Bonds enforceable in the Bondholders' hands, the Bondholders would still be entitled to recover in equity, under the

40

doctrine of unjust enrichment.  ERS received nearly $3 billion from purchasers of the ERS Bonds.

If the Committees are correct that the ERS Bonds are *ultra vires*, then ERS received that amount

as a windfall for its own violation of the ERS Enabling Act.  The purchasers of the ERS Bonds,

and those (like the Bondholders) who acquired their claims in the secondary market bear no

responsibility for ERS's statutory violation.  To permit ERS to retain billions of dollars it gained

for violating its own governing statute at the expense of innocent investors would surely offend

"the elementary principles of equity."  *See Plan Bienestar Salud v. Alcalde Cabo Rojo*, 14 P.R.

Offic. Trans. 896, 903–04 (1983) (finding that where a government contract is void "because the

statutory formalities were not observed, the elementary principles of equity, in the civil law sense

of the word, are offended by a municipality's benefitting from an agreement in the specific

circumstances of this case, while at the same time evading all the responsibilities it freely

assumed").  And that is all the more so here, where the ERS Bonds are assertedly void not because

ERS could not borrow the money, but merely because ERS supposedly did so in the wrong way.

72.     The Creditors' Committee argues that equitable remedies against the government

are prohibited if they would undermine an important public policy established by statute or the

Constitution.  Creditors' Objection ¶ 53.  According to the Creditors' Committee, enforcing the

bonds in equity would violate a public policy against "unauthorized debt."  *Id.*  But even on the

Committees' account, the *debt* ERS incurred was not unauthorized—ERS plainly had authority to

borrow.  *Supra* ¶¶ 11, 15–16.  And the Creditors' Committee identifies no important statutory or

constitutional public policy against borrowing funds in the wrong form.

73.     The Creditors' Committee further argues that it would be "incongruous" for the

ERS Bondholders to have a claim against ERS's unpledged assets, when the ERS Bonds were (the

Creditors' Committee says) "non-recourse."  Creditors' Objection ¶ 54.  But if the Committee is

41

correct that the ERS Bonds are *ultra vires*, then ERS accepted $3 billion on false pretenses, in exchange for securities that it claims have always been worthless due to ERS's own statutory violation.  Under such circumstances, there would be nothing "incongruous" about allowing the investors to recover their investment, even if the ERS Bonds were in some sense "non-recourse."[9]

74.     Finally, the Creditors' Committee responds that Bankruptcy Code § 510(b) would subordinate any unjust enrichment claim, as such a claim would involve the "rescission of a purchase or sale of a security of the debtor" or "damages arising from the purchase or sale of such a security."  11 U.S.C. § 510(b).  But the Bondholders seek in equity nothing more than the "simple recovery of an unpaid debt due upon an instrument," *i.e.*, the ERS Bonds.  *In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988).  Their unjust enrichment claim therefore does not involve "damages" within the meaning of § 510(b), and so is not subject to subordination.  *Id.*

## CONCLUSION

For the foregoing reasons, the Committees' objections to the ERS Bondholders' claims are unsupported and contrary to the law, and should be overruled.

---

[9] The Bondholders dispute that the ERS Bonds are non-recourse, but that issue is separate from the *ultra vires* arguments, and therefore remains stayed under the Court's October 24, 2019, order.  ECF No. 8962 in Case No. 17-bk-03283.

In San Juan, Puerto Rico, today October 25, 2019.

/s/ Alfredo Fernández-Martínez

Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511


Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3435
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

/s/ Bruce Bennett

Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com


Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York
10281 Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com


David R. Fox (*pro hac vice*)
JONES DAY
100 High St
Boston, MA 02110
Tel. (617) 449-6925
Fax: (617) 960-3939
drfox@jonesday.com


*Counsel for Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund L.P., Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund, L.P.,[10] Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd., and SV Credit, L.P.*

---

[10] Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., and Oaktree Opportunities Fund IX (Parallel 2), L.P. hold through Opps Culebra Holdings, L.P. Oaktree Huntington Investment Fund II, L.P. holds through Oaktree Opportunities Fund X Holdings (Delaware), L.P. Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., and Oaktree Opportunities Fund X (Parallel 2), L.P. hold through Oaktree Opps X Holdco Ltd.

*/s/ Alicia I. Lavergne-Ramirez*

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@lsplawpr.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@lsplawpr.com

LÓPEZ SÁNCHEZ & PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110 San
Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*/s/ Jason N. Zakia*

Glenn M. Kurtz (*pro hac vice*)
John K. Cunningham (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
Jesse L. Green (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund II, Inc., Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax- Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund*