# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
------------------------------------------------------------x
In re                                          :
                                               :
THE FINANCIAL OVERSIGHT AND                    :    PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,              :    Title III
                                               :
       as representative of                    :
                                               :    Case No. 17-BK-3283 (LTS)
THE COMMONWEALTH OF PUERTO RICO,               :
et al.,*                                       :    (Jointly Administered)
                                               :
       Debtors.                                :
------------------------------------------------------------x
In re                                          :
                                               :
THE FINANCIAL OVERSIGHT AND                    :    PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,              :    Title III
                                               :
       as representative of                    :
                                               :    Case No. 17-BK-04780 (LTS)
PUERTO RICO ELECTRIC POWER                     :
AUTHORITY (PREPA),                             :    Court Filing Relates Only to PREPA
                                               :
       Debtor.                                 :
------------------------------------------------------------x
```

## OBJECTION OF CORTLAND CAPITAL MARKET SERVICES LLC, AS ADMINISTRATIVE AGENT, AND SOLUS TO PREPA BONDHOLDER SETTLEMENT

---

\* The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID:  3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:  8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID:  3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID:  9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID:  3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID:  3801).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ...................................................................................................8

    A.  The Fuel Line facilities and their Current Expense status ................................. 8

    B.  The bondholders' limited lien and recourse ................................................. 12

    C.  The forbearance agreements and the original RSA ...................................... 15

    D.  The Settlement Motion and the new RSA .................................................. 17

    E.  The RSA's restrictions on the Fuel Lines' recovery..................................... 21

    F.  The "Lien Challenge" release .................................................................. 23

ARGUMENT .....................................................................................................24

I.    THE SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT EXPANDS
THE BONDHOLDERS' RIGHTS WHILE SUBVERTING THE RIGHTS AND
PRIORITY POSITION OF THE FUEL LINE LENDERS...................................24

    A.  A settlement cannot predetermine or deviate from pre-bankruptcy priorities.............. 25

    B.  The Fuel Line Advances — as Current Expenses — are payable before there are
"Net Revenues" potentially subject to the bonds' lien and recourse........................... 28

        1.  The Fuel Lines are Current Expenses. ................................................... 28

        2.  The bondholders' security interest is limited and contingent on payment of
Current Expenses. ........................................................................... 33

        3.  The bondholders' recourse is similarly limited. ...................................... 36

        4.  The "rate covenant" also prioritizes Current Expenses. ........................... 37

    C.  The Government Parties are precluded from contesting the Current Expense
status of the Fuel Lines or the legal priority of Current Expenses. .............................. 38

        1.  *Actos propios* prevents the Government Parties from challenging the
Current Expense status of the Fuel Lines. .............................................. 38

        2.  Judicial estoppel prevents the Government Parties from arguing that Current
Expenses do not have a right to be paid ahead of the bonds. ................................. 41

3.  The Forbearance Agreements preclude the Government Parties from contesting the Fuel Lines' status and priority. ........................................................ 47

D.  The priority of the Fuel Lines over the bonds is enforceable and does not depend on a direct intercreditor agreement ...................................................... 49

1.  The priority of the Fuel Lines over the bonds is a product of the bonds' limited lien and recourse.  The settlement alters that priority. ............................... 50

2.  Although the Court does not have to reach the issue, a subordination agreement does not require an agreement between creditors. ................................. 53

3.  Although the Court does not have to reach the issue, Current Expense claimants are beneficiaries of the Trust Agreement. ............................... 57

II.  THE SETTLEMENT IMPERMISSIBLY RELEASES OBJECTIONS AND CLAIMS OF THE FUEL LINE LENDERS. ........................................................ 62

A.  The Oversight Board is not a fiduciary for creditors and should not be permitted to settle creditor objections and claims. ...................................................... 62

B.  The Oversight Board should not be permitted to compromise or release the particularized objections and claims of the Fuel Line Lenders. .................................... 67

III.  THE GOVERNMENT PARTIES HAVE FAILED TO MEET THEIR BURDEN TO DEMONSTRATE THAT THE SETTLEMENT IS FAIR AND EQUITABLE. .......... 70

A.  The Government Parties have not shown that the bondholders have a probability of success that justifies the recovery provided in the RSA. .......................................... 73

1.  The bondholders' arguments regarding the extent of their collateral are weak and do not justify a high recovery. ...................................................... 73

2.  Dismissal of the Receiver Motion does not justify the settlement. ......................... 76

B.  The settlement is not in the paramount interest of creditors. ........................................ 78

1.  Non-settling creditors strongly oppose the settlement. ............................................. 78

2.  The settlement prevents non-settling creditors from recovering and effectively provides a veto to bondholders. ............................................. 81

IV.  THE SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT AWARDS MASSIVE ADMINISTRATIVE EXPENSE CLAIMS WITHOUT ANY BASIS. ............ 83

A.  The administrative expense claims are not reimbursement for "actual, necessary expenses" in connection with a "substantial contribution." ............................................. 84

B.   The administrative expense claim to be awarded upon failure to confirm a plan cannot be approved as a "break-up fee." ........................................................................ 87

C.   The administrative expense claims would improperly expand the bondholders' recourse. ...................................................................................................................... 89

CONCLUSION ................................................................................................................................89

## **TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Air Line Pilots Ass'n* v. *Cont'l Airlines*,
　125 F.3d 120 (3d Cir. 1997) .................................................................................. 48

*Alt. Sys. Concepts, Inc.* v. *Synopsys, Inc.*,
　374 F.3d 23 (1st Cir. 2004).............................................................................. 41, 44

*Autonomous Municipality of Ponce* v. *Fin. Oversight & Mgmt. Bd.*
　939 F.3d 356 (1st Cir. 2019)........................................................................... 48 n.36

*Autoridad de Carreteras y Transportacion* v. *TransCore Atl., Inc.*
　387 F. Supp. 3d 163 (D.P.R. 2017)........................................................................ 35

*Banco Central* v. *Yauco Homes*,
　135 D.P.R. 858 (1994) ............................................................................... *passim*

*Bayerische Landesbank* v. *Aladdin Capital Mgmt., LLC*,
　692 F.3d 42 (2d Cir. 2012) ............................................................................ 59 n.42

*Berrios* v. *Univ. of P.R.*,
　16 P.R. Offic. Trans. 112, 116 D.P.R. 88 (1985)........................................................ 39

*Braunstein* v. *McCabe*,
　571 F.3d 108 (1st Cir. 2009)................................................................................ 64

*CFIP Master Fund Ltd.* v. *Citibank N.A.*,
　738 F. Supp. 2d 450 (S.D.N.Y. 2010) ............................................................... 60 n.44

*CFTC* v. *Weintraub*,
　471 U.S. 343 (1985)......................................................................................... 63

*CPA Grp. Int'l Inc.* v. *Am. Int'l Ins. Co. of P.R.*,
　2002 WL 31944044 (D.P.R. May 23, 2002) ............................................................ 58

*Czyzewski* v. *Jevic Holding Corp.*,
　137 S.Ct. 973 (2017)........................................................................ 28 n.24, 63, 64

*Dimino* v. *Sec'y of Commonwealth*,
　695 N.E.2d 659 (Mass. 1998) ...................................................................... 76 n.58

*First Nat'l Bank of Bos.* v. *Me. Turnpike Auth.*,
　136 A.2d 699 (Me. 1957).............................................................................. 76 n.58

*Franco* v. *Selective Ins. Co.*,
　184 F.3d 4 (1st Cir. 1999)............................................................................ 41, 46

*Garcia* v. *World Wide Entm't Co.*,
1992 P.R.—Eng. 754,802, 132 D.P.R. 378 (1992) ................................................. 48

*Gracia-Gracia* v. *Fin. Oversight & Mgmt. Bd.*,
939 F.3d 340 (1st Cir. 2019) .................................................... 64 n.49, 88

*Guay* v. *Burack*,
677 F.3d 10 (1st Cir. 2012) .................................................... 41

*Hiram Quiñones* v. *Administración de Corrección*,
2008 PR App. LEXIS 4105 (T.C.A. Dec. 19, 2008) ................................ 61 n.46

*In re 110 Beaver St. P'Ship*,
244 B.R. 185 (Bankr. D. Mass. 2000) ........................................... 70

*In re Adelphia Commc'ns Corp.*,
336 B.R. 610 (Bankr. S.D.N.Y. 2006) ........................................... 86

*In re Adelphia Commc'ns Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y. 2005) ......................................... 27, 28

*In re Advanced RISC Corp.*,
324 B.R. 10 (D. Mass. 2005) .................................................. 40 n.31

*In re AM Int'l, Inc.*,
46 B.R. 566 (Bankr. M.D. Tenn. 1985) ......................................... 54

*In re Am. Cartage, Inc.*,
656 F.3d 82 (1st Cir. 2011) ................................................... 63, 72

*In re AmFin Financial Corp.*,
468 B.R. 827 (Bankr. N.D. Ohio 2012) ......................................... 84

*In re AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984) ................................................. 26, 78

*In re Baldwin-United Corp.*,
79 B.R. 321 (S.D. Ohio 1987) ................................................. 87 n.63

*In re Best Prods. Co.*,
168 B.R. 35 (Bankr. S.D.N.Y. 1994) ........................................... 56 n.40

*In re Big Rivers Elec. Corp.*,
355 F.3d 415 (6th Cir. 2004) ................................................. 66

*In re Biolitec, Inc.*,
528 B.R. 261 (Bankr. D.N.J. 2014) ........................................... 27, 79

*In re Blasingame,*
  920 F.3d 384 (6th Cir. 2019) ............................................................................ 63

*In re Bobby Boggs, Inc.,*
  819 F.2d 574 (5th Cir. 1987) ...................................................................... 54 n.38

*In re Bos. & Providence R.R. Corp.,*
  673 F.2d 11 (1st Cir. 1982) ...................................................................... 25, 70, 71

*In re Bos. Generating, LLC,*
  440 B.R. 302 (Bankr. S.D.N.Y. 2010) ........................................................ 56 n.40

*In re C.P. del Caribe, Inc.,*
  140 B.R. 320 (Bankr. D.P.R. 1992) ............................................................... *passim*

*In re C.P. Hall Co.,*
  513 B.R. 540 (Bankr. N.D. Ill. 2014) ................................................................. 68

*In re Celotex Corp.,*
  227 F.3d 1336 (11th Cir. 2000) ................................................................... 87 n.63

*In re Charter Co.,*
  68 B.R. 225 (Bankr. M.D. Fla. 1986) ........................................................... 65 n.50

*In re Chateaugay Corp.,*
  961 F.2d 378 (2d Cir. 1992) ............................................................................. 49

*In re Chi., S.S. & S.B. R.R.,*
  146 B.R. 421 (Bankr. N.D. Ill. 1992) ........................................................... 56 n.40

*In re Cloverleaf Enters., Inc.,*
  2010 WL 1445487 (Bankr. D. Md. Apr. 2, 2010) ........................................... 27, 81

*In re Columbia Gas Sys., Inc.,*
  224 B.R. 540 (Bankr. D. Del. 1998) ............................................................... 84, 85

*In re Credit Indus. Corp.,*
  366 F.2d 402 (2d Cir. 1966) ..................................................................... 53, 54, 57

*In re CS Mining, LLC,*
  574 B.R. 259 (Bankr. D. Utah 2017) ................................................................. 68

*In re Cty. of Orange,*
  219 B.R. 543 (Bankr. C.D. Cal. 1997) ............................................................... 65

*In re Dilberto,*
  164 B.R. 1 (Bankr. D.N.H. 1993) ..................................................................... 85

*In re Dow Corning Corp.*,
244 B.R. 721 (Bankr. E.D. Mich. 1999) ........................................................ 65 n.50

*In re DVR, LLC*,
582 B.R. 507 (Bankr. D. Colo. 2018) ................................................................ 68

*In re El Paso Refinery L P*,
171 F.3d 249 (5th Cir. 1999) ........................................................................ 56 n.40

*In re Elrod Holdings Corp.*,
392 B.R. 110 (Bankr. D. Del. 2008) ............................................................. 69 n.53

*In re Energy Future Holdings Corp.*,
575 B.R. 616 (Bankr. D. Del. 2017) ................................................................ 86, 88

*In re Envtl. Aspecs, Inc.*,
235 B.R. 378 (E.D.N.C. 1999) ............................................................................ 55

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
899 F.3d 13 (1st Cir. 2018) ........................................................................ 76, 77 n.59

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico* (*Whyte*),
360 F. Supp. 3d 65 (D.P.R. 2019) ............................................................ 27, 81, 83

*In re Geo. P. Schinzel & Son, Inc.*,
16 F.2d 289 (S.D.N.Y. 1926) ........................................................................... 53, 56

*In re Hallet*,
33 B.R. 564 (Bankr. D. Me. 1983) .................................................................... 78, 79

*In re Hemingway Transp., Inc.*,
954 F.2d 1 (1st Cir. 1992) ..................................................................................... 84

*In re Holly's, Inc.*,
140 B.R. 643 (Bankr. W.D. Mich. 1992) ..................................................... *passim*

*In re Hopkinton Indep. Sch., Inc.*,
499 B.R. 158 (Bankr. D.N.H. 2013) .................................................................... 84

*In re Howland*,
545 B.R. 653 (Bankr. D. Or. 2015) .......................................................... 54, 56 n.40

*In re Ibarra*,
235 B.R. 204 (Bankr. D.P.R. 1999) ..................................................................... 51

*In re Iridium Operating, LLC*,
478 F.3d 452 (2d Cir. 2007) ................................................................................ 26

*In re Jackson*,
    231 B.R. 142 (Bankr. D. Mass. 1999) ............................................................. 48

*In re Jefferson Cty.*,
    474 B.R. 228 (Bankr. N.D. Ala. 2012) ............................................................ 89

*In re Jefferson Cty.*,
    482 B.R. 404 (Bankr. N.D. Ala. 2012) ............................................................ 37

*In re Klein-Swanson*,
    488 B.R. 628 (B.A.P. 8th Cir. 2013) ...................................................... 52 n.37

*In re Las Vegas Monorail Co.*,
    429 B.R. 317 (Bankr. D. Nev. 2010) ............................................................... 36

*In re Liberia Alma Mater, Inc.*,
    123 B.R. 698 (Bankr. D.P.R. 1991) ......................................................... 26, 51

*In re Lloyd, Carr & Co.*,
    617 F.2d 882 (1st Cir. 1980) ........................................................................... 79

*In re Louise's Inc.*,
    211 B.R. 798 (D. Del. 1997) ........................................................................... 83

*In re Mechanicsburg Fitness, Inc.*,
    592 B.R. 798 (Bankr. E.D. Pa. 2018) ...................................................... 64 n.48

*In re Medomak Canning*,
    922 F.2d 895 (1st Cir. 1990) ............................................. 63, 65 n.50, 69 n.53

*In re Miami Metals I, Inc.*,
    603 B.R. 531 (Bankr. S.D.N.Y. 2019) ....................................................... 27, 79

*In re Moorhead Corp.*,
    208 B.R. 87 (B.A.P. 1st Cir. 1997) .................................................................. 72

*In re N.Y.C. Off-Track Betting Corp.*,
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) ............................................................. 88

*In re Nationwide Sports Distribs., Inc.*,
    227 B.R. 455 (Bankr. E.D. Pa. 1998) ...................................................... 72 n.56

*In re Nortel Networks, Inc.*,
    522 B.R. 491 (Bankr. D. Del. 2014) ................................................................ 79

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ................................................................ 78

*In re O'Brien Envtl. Energy, Inc.*,
    181 F.3d 527 (3d Cir. 1999) ................................................................. 88

*In re Oxford Homes, Inc.*,
    204 B.R. 264 (Bankr. D. Me. 1997) ...................................................... 84

*In re Pub. Serv. Co. of N.H.*,
    160 B.R. 404 (Bankr. D.N.H. 1993) ...................................................... 86

*In re Pub. Serv. Co.*,
    114 B.R. 820 (Bankr. D.N.H. 1990) .............................................. 29 n.25

*In re Robotic Vision Sys., Inc.*,
    2006 WL 929322 (B.A.P. 1st Cir. 2006) ............................................... 25

*In re Sentinel Mgmt. Grp., Inc.*,
    404 B.R. 488 (Bankr. N.D. Ill. 2009) .................................................... 87

*In re Spencer*,
    457 B.R. 601 (E.D. Mich. 2011) ..................................................... 52 n.37

*In re Summit Metals, Inc.*,
    379 B.R. 40 (Bankr. D. Del. 2007) ....................................................... 86

*In re Tara Retail Grp., LLC*,
    595 B.R. 215 (Bankr. N.D. W. Va. 2018) ....................................... 69 n.53

*In re Thomas*,
    459 B.R. 708 (Bankr. E.D. Mich. 2011) ......................................... 56 n.40

*In re Thompson*,
    965 F.2d 1136 (1st Cir. 1992) ...................................................... *passim*

*In re Triple A&R Capital Inv.*,
    519 B.R. 581 (Bankr. D.P.R. 2014) ...................................................... 49

*In re Vitreous Steel Prods. Co.*,
    911 F.2d 1223 (7th Cir. 1990) ....................................................... 69 n.53

*In re Warwick Lumber & Supply Co.*,
    153 B.R. 12 (Bankr. D.R.I. 1993) .................................................. 74 n.57

*In re Washington Lane Assoc.*,
    79 B.R. 241 (Bankr. E.D. Pa. 1987) .............................................. 87 n.63

*In re Weinstein Co. Holdings LLC*,
    595 B.R. 455 (Bankr. D. Del. 2018) ...................................................... 62

*In re Whispering Pines Estates, Inc.*,
   370 B.R. 452 (B.A.P. 1st Cir. 2007) ................................................................ 72 n.56

*Industrial Equip. Corp.* v. *Builders, Inc.*,
   8 P.R. Offic. Trans. 296, 108 D.P.R. 290 (1979) ............................................ 59

*Int'l Gen. Elec., P.R., Inc.* v. *Concrete Builders of P.R., Inc.*,
   4 P.R. Offic. Trans. 1221, 104 D.P.R. 871 (1976) .......................................... 39

*IV Sols.* v. *United HealthCare Servs., Inc.*,
   2017 WL 6372488 (C.D. Cal. 2017) ............................................................... 60 n.43

*Jeffrey* v. *Desmond*,
   70 F.3d 183 (1st Cir. 1995) ........................................................................ *passim*

*Junta de Residentes* v. *Lora Mercedes*,
   2019 PR App. LEXIS 2674, 2019 WL 4493740 (T.C.A. Aug. 30, 2019) ........................ 61 n.46

*Maxwell Newspapers, Inc.* v. *Travelers Indem. Co.*,
   170 B.R. 549 (S.D.N.Y. 1994) ....................................................................... 71

*Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*,
   139 S.Ct. 1652 (2019) ................................................................................ 40

*Official Comm. of Unsecured Creditors of PSA, Inc.* v. *Edwards*,
   437 F.3d 1145 (11th Cir. 2006) .................................................................... 40 n.31

*Official Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co., Inc.*,
   267 F.3d 340 (3d Cir. 2001) ........................................................................ 40 n.31

*Oppenheimerfunds Inc.* v. *TD Bank, N.A.*,
   2014 N.Y. Slip. Op. 30379(U) (Sup. Ct. N.Y. Cty. Feb. 10, 2014) ................................. 60 n.44

*Patriot Cinemas, Inc.* v. *Gen. Cinemas Corp.*,
   834 F.2d 208 (1st Cir. 1987) ........................................................................ 41 n.32

*Patterson* v. *Carey*,
   363 N.E.2d 1146 (N.Y. 1977) ....................................................................... 76 n.58

*Perry* v. *Blum*,
   629 F.3d 1 (1st Cir. 2010) ............................................................................ 41 n.32

*PREPA* v. *Vitol, Inc.*,
   2013 WL 12234406 (D.P.R. Jan. 23, 2013) ................................................... 39

*PREPA* v. *Vitol, Inc.*,
   2012 WL 12995756 (D.P.R. Sep. 10, 2012) ................................................... 39

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson,*
  390 U.S. 414 (1968) ........................................................................................... *passim*

*Real Legacy Assurance Co.* v. *Santori Trucking,*
  2008 WL 11357822 (D.P.R. 2008) ................................................................. 60 n.44

*Rederford* v. *U.S. Airways,*
  589 F.3d 30 (1st Cir. 2009) ........................................................................... 48

*Schreibman* v. *Walter E. Heller & Co.,*
  446 F. Supp. 141 (D.P.R. 1978) ................................................................... 65 n.50

*U.S. Bank Nat. Ass'n* v. *S. Side House, LLC,*
  2012 WL 273119 (E.D.N.Y. Jan. 30, 2012) ............................................... 52 n.37

*U.S. Fidelity & Guar. Co.* v. *RR Enters., Inc.,*
  2005 WL 2808029 (D.P.R. Oct. 27, 2005) ................................................. 60 n.43

*U.S. Trust Co. of N.Y.* v. *New Jersey,*
  431 U.S. 1 (1977) ........................................................................................... 76 n.58

*UTIER, et al.* v. *Autoridad de Energia Electrica,*
  Case No. K-AC2016-0291 (Dec. 19, 2016) ................................................. *passim*

**Rules and Statutes**

11 U.S.C. § 323(a) ..................................................................................................... 64

11 U.S.C. § 502(a) ..................................................................................................... *passim*

11 U.S.C. § 503(b)(1)(A) ......................................................................................... 88

11 U.S.C. § 503(b)(3)(D) ......................................................................................... *passim*

11 U.S.C. § 510 ........................................................................................................... *passim*

11 U.S.C. § 506(a) ..................................................................................................... *passim*

11 U.S.C. § 704(a)(5) ............................................................................................... 64

11 U.S.C. § 901(a) ..................................................................................................... 65

11 U.S.C. § 902(2)(A) ............................................................................................... 37 n.30

11 U.S.C. § 926(a) ..................................................................................................... 69

11 U.S.C. § 927 ........................................................................................................... 37

19 L.P.R.A. § 2218(a) ............................................................................................... 75

19 L.P.R.A. § 2233(b)(2) ................................................................... 75

19 L.P.R.A. § 2233(b)(3)(A) .............................................................. 75

19 L.P.R.A. § 2264(a) ....................................................................... 35

19 L.P.R.A. § 2289 ........................................................................... 54

22 L.P.R.A. § 194 ...................................................................... 31 n.26

22 L.P.R.A. § 196(d) ................................................................... 29, 31

22 L.P.R.A. § 196(o) ......................................................................... 75

22 L.P.R.A. § 206(e)(1) ......................................................... 11 n.13, 75

31 L.P.R.A. § 3472 ........................................................................... 35

31 L.P.R.A. § 3475 ........................................................................... 35

48 U.S.C. § 2121 .............................................................................. 64

48 U.S.C. § 2161(a) .......................................................................... 64

48 U.S.C. § 2175(b) .................................................................... 40, 64

Fed. R. Bankr. P. 3001(f) .................................................................. 51

Fed. R. Bankr. P. 3012(a) .................................................................. 62

Fed. R. Bankr. P. 9019 ................................................................ *passim*

H.R. Rep. No. 100-1011, 100th Cong., 2d Sess. (1988) .......................... 37

**Other Authorities**

6 *Collier on Bankruptcy* § 901.04[13][a] (16th ed.) ................................ 88

7 *Collier on Bankruptcy* § 1108.09[1] (16th ed.) ................................... 66

Cortland Capital Market Services LLC ("Cortland"), as successor administrative agent for lenders under a Credit Agreement, dated May 4, 2012, among PREPA, Scotiabank de Puerto Rico, and certain lenders (the "Scotiabank Credit Agreement"), and SOLA LTD, Solus Opportunities Fund 5 LP, Ultra Master LTD, and Ultra NB LLC (collectively, "Solus"), as lenders to PREPA under the Scotiabank Credit Agreement and under a Trade Finance Facility Agreement, dated July 20, 2012, between PREPA and Citibank, N.A. (the "Citibank Credit Agreement" and, together with the Scotiabank Credit Agreement, the "Fuel Lines"), respectfully submit this objection to the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Periods* [Dkt. 1235] (the "Settlement Motion"), including the supplemental memorandum dated July 2, 2019 [Dkt. 1425] ("Supp.") and the second supplemental memorandum dated July 19, 2019 [Dkt. 1486] ("2d Supp.").

## **PRELIMINARY STATEMENT**[1]

1.     The Fuel Line Lenders object to the Settlement Motion because, contrary to the assertions of the Government Parties, the settlement embodied in the RSA does *not* leave them "unprejudiced and unaffected" and does *not* "fully preserve" their objections to confirmation of a plan of adjustment.  Settlement Mot. ¶¶ 65, 5; Supp. ¶ 97.  Rather, the settlement, if approved, would severely prejudice the Fuel Line Lenders, including by compromising their priority position and prematurely releasing their objections to the bondholders' claims and liens.  At the

---

[1]    Capitalized terms not defined have the same meanings as in the Settlement Motion.  Except where noted, emphases are added.  The objectors are the "Fuel Line Lenders" and the loans are the "Fuel Line Advances." References to "Ex." are to the exhibits accompanying the Declaration of Angela K. Herring.

same time, the settlement would vastly expand the rights of the bondholders as compared to what they bargained for and what they had on the petition date.

2.      The Trust Agreement governing PREPA's bonds establishes a priority structure: PREPA's revenues are first deposited into a "General Fund," and the costs associated with PREPA's operations — known as "Current Expenses" — are payable out of that General Fund. After PREPA pays its Current Expenses, its "net" revenues, if any, are deposited into a "Sinking Fund."  Bondholders have *no* claim against and *no* lien on the General Fund.  Rather, their recourse and their lien are limited to the Sinking Fund (and certain subordinate funds).

3.      The premise of the Fuel Lines — which PREPA used to buy fuel needed to operate its system — was that they are "Current Expenses" payable *ahead* of the bonds.  PREPA repeatedly certified and acknowledged, in documents described below, that the Fuel Line Advances satisfied all the requirements to be a "Current Expense."  PREPA's bondholders were likewise repeatedly informed, in Official Statements for bond issuances, that the Fuel Lines are "Current Expenses ***payable prior*** to" and "***entitled to be paid before***" the bonds.  *E.g.*, Ex. 5 at 22, 53.  Absent this Current Expense priority treatment, the Fuel Lines would never have existed.

4.      The RSA turns the priority scheme on its head.  On the most simple level, it reverses the order of payment:  Outside of bankruptcy, the Fuel Lines would be (and in fact were) paid out of the General Fund before revenues could be made available to the bonds.  But under the RSA, the bondholders stand to receive massive payments and administrative expense claims before the Fuel Line Lenders receive anything.  The result is a windfall to the bonds, who agreed that Current Expenses would be paid ahead of them, but are now jumping the line.

5.      Beyond the immediate deviation from pre-petition priorities, the RSA would also deprive the Fuel Line Lenders of the ability to vindicate their rights going forward.  Under the

RSA's "Lien Challenge" provision, the Fuel Line Lenders' priority-based objections to the bondholders' claims and liens will be released. In addition, the RSA imposes restrictions and conditions on PREPA's repayment of the Fuel Lines. The RSA appears to prevent PREPA from incurring debt or imposing charges on rates to repay the Fuel Lines. It also includes a "Most Favored Nations" provision, which says that the Fuel Lines cannot receive more favorable treatment than the bonds. Thus, assuming the Fuel Lines can be paid at all, respecting their priority would require the bonds to receive significant additional recoveries.[2]

6.      The RSA, in sum, is much more than a settlement between the Government Parties and the bondholders of *their own* dispute. Rather, the agreement would fundamentally alter the relationship among PREPA, the bondholders and the Fuel Line Lenders.

7.      In the Settlement Motion and the Supplement, the Government Parties failed to address any of those issues. But at the July 11 conference, the Government Parties took a new approach, proclaiming that the Fuel Lines do not have any "priority right" and that the priority of Current Expenses was "made up" by the Fuel Line Lenders "out of the thin blue air." July 11 Tr. at 52-53, 55. The Government Parties also contended that the loan documents merely give "permission" to PREPA to pay Current Expenses ahead of the bonds. *Id*. at 58:7-11.

8.      In their Second Supplement, the Government Parties went further, characterizing as "bogus" the Fuel Lines' priority position and denying that there is any "subordination" or "priority system" between the bonds and Current Expenses. 2d Supp. ¶¶ 29, 36. The Government Parties also announced that, despite having certified and agreed that the Fuel Lines were "Current Expenses" in order to procure $700 million of funding, PREPA has now

---

[2]      It is not true that repaying the Fuel Line Advances "would only involve increasing the Transition Charge by 0.43 c/kWh" or a similar figure. 2d Supp. ¶ 20 n.10. To comply with the MFN, the incremental Fuel Line recovery would have to be multiplied by approximately *twelve times*.

"determined" that the Fuel Lines are not Current Expenses after all, due to the passage of time and because they are "financing/debt obligations." *Id*. ¶¶ 10, 52-60.

9.      In advancing those new arguments, the Government Parties have chosen not to acknowledge a simple fact:  In numerous filings both in this Court and in the First Circuit, and in numerous prior agreements, certifications and Official Statements, they said **exactly the opposite** of what they are saying now, and they **expressly agreed**, many times over, with the very points they now call "bogus" and "made up."

10.      In particular, while the Government Parties now insist that Current Expenses do *not* have "priority rights" (*e.g.*, 2d Supp. ¶¶ 9, 36), the Government Parties previously represented to this Court, in seeking and obtaining an order approving post-petition financing, that Current Expenses "have a **_prior right_ to be paid** from the Debtor's revenues **before _any_ positive net revenues exist that _could go_**" to pay bondholders, and that "**Current Expenses are already afforded _priority_ over payment on the Power Revenue Bonds**."  Dkt. 549 ¶ 25; Dkt. 617 ¶¶ 5, 23.

11.      Likewise, while the Government Parties now insist that there is *no* "subordination agreement" that benefits Current Expenses (*e.g.*, 2d Supp. ¶¶ 2, 36),  the Government Parties represented in their prior filings that "**the bondholders' lien is _subordinate_ to payment of Current Expenses**" and that any "**debt service**" on the bonds is also "**_subordinated_ to the payment of Current Expenses**."  Dkt. 549 ¶ 51; Dkt. 617 ¶¶  23, 27.  And while the Government Parties now assert that PREPA merely has "permission" to pay Current Expenses before the bonds, they said the opposite not only to this Court (see the prior paragraph) but also to the First Circuit, where they represented that "**[b]efore _any_ bond payments can be made, revenues placed into the General Fund _must_ be 'used first for the payment of the Current Expenses of the**

*System*.'"  *Brief for Debtor-Appellee FOMB*, Case No. 17-2079 (1st Cir. Apr. 2, 2018), at 9

(quoting Section 505 of the Trust Agreement).

12.     The Government Parties also procured an order from this Court directly refuting

their new position that "debt/financing" obligations cannot be Current Expenses.  Specifically, in

Paragraph 9 of the order approving PREPA's DIP financing, the Court found that "Eligible

Uses" for the DIP loan "are limited to 'Current Expenses' under the Trust Agreement" and "*[a]s*

*such, the Debtor's repayment obligations to the Lender for amounts borrowed under the*

*Facility are treated as 'Current Expenses' under the Trust Agreement*."  Dkt. 744 ¶ 9.  The

logic of the Court's order — which the Government Parties requested — applies with equal and

full force to the Fuel Lines.[3]

*     *     *

13.     While the Court has made clear that the settlement hearing will have a "limited"

scope (*e.g.*, July 11 Tr. at 13), it has also recognized that the Settlement Motion requires

consideration not only of the "reasonableness" of the proposed compromise but also whether the

settlement will "preserve the rights of non-settling interested parties" and the "ability of non-

participants to litigate issues that are normally material to confirmation" (June 12 Tr. at 157-58;

*see also* July 11 Tr. at 13).  In addition, the Court asked whether the "lien challenge" or other

RSA provisions "would preclude nonsettling parties from enforcing rights and seeking remedies

---

[3]     Without mentioning their contradictory statements to this Court and the First Circuit, the Government Parties
invoke a decision of the Puerto Rico Court of First Instance that preceded all of those statements.  *UTIER* v.
*Autoridad de Energia Electrica*, Case No. K-AC2016-0291 at 7-73 (Dec. 19, 2016).  That decision is discussed in
Section I.D.3 below.  When read as a whole, the decision supports the critical point of this objection:  namely, that
the bondholders' lien and recourse are limited by PREPA's prior obligation to pay Current Expenses.  As shown
below, following the language selectively quoted by the Government Parties, the court expressly recognized that,
under the Trust Agreement, "*PREPA was bound to comply with paying its current expenses before proceeding to
pay the bonds*" and that, "[t]o assure continuity of operations, *it was necessary to specify in the trust that current
expenses would be paid first*."  *UTIER* at 72.

they would otherwise have legal rights to assert" (July 11 Tr. at 14), and whether there is a legal

justification for "pre-plan distributions" and "administrative claims" (June 12 Tr. at 158).

14.     Consistent with the Court's guidance, the Fuel Line Lenders submit that the

Settlement Motion should be denied on at least four independent grounds.  First, the proposed

settlement adversely impacts the rights of the Fuel Line Lenders.  The Fuel Lines, as Current

Expenses, are entitled to be paid out of the General Fund.  The bondholders, in contrast, have

recourse to and a lien on accounts that can be funded only *after* Current Expenses are paid in

full.  The RSA subverts that priority scheme.  It would require PREPA to make large payments

to the bondholders, and to award large administrative expense claims, before the Fuel Lines (and

other Current Expense claimants) receive anything, and would cut off the rights of the Fuel Line

Lenders to vindicate their priority position by pursuing objections to the bondholders' claims and

liens.  Those objections — which are based on sections 502(a) and 506(a) of the Bankruptcy

Code — do not depend on the Trust Agreement being a "subordination agreement" under section

510(a) of the Code, but even if they did, the Trust Agreement *is* a valid subordination agreement.

The Government Parties' challenges to the Fuel Lines' priority are not only wrong on the law

and facts, but they are precluded, under estoppel and related principles, by the Government

Parties' own prior admissions and statements, including to this Court.  *See* Point I, *infra*.

15.     Second, and relatedly, the settlement cannot be approved because it purports to

settle not only *the debtor's* claims against the bondholders — in particular, avoidance actions

under chapter 5 of the Bankruptcy Code — but also any and all "Lien Challenges," defined in the

RSA to include challenges to the "priority" or "extent" of the bonds' liens or claims.  The Fuel

Line Lenders, whose priority position is predicated in part on the limited scope of the bonds'

security and recourse, are authorized by sections 502(a) and 506(a) of the Bankruptcy Code to

pursue *their own* objections to the bonds' claims and liens, and have done so in an adversary proceeding.  Setting aside the merits of the issues addressed in Point I, the Oversight Board — which, under PROMESA, is not a fiduciary for creditors — has no authority or basis to forfeit or settle the particular rights and objections of the Fuel Line Lenders.  *See* Point II, *infra*.

16.    Third, the Settlement Motion should be denied because the Government Parties have failed to demonstrate that the RSA is "fair and equitable."  Priority issues aside, the Government Parties have themselves asserted strong objections to the bondholders' claims and liens, including that the bonds' recourse and liens are limited to the minimal amounts already on deposit in the Sinking Fund.  But despite those strong objections, the Government Parties have agreed to pay the bonds over *85%* on their petition-date claim.  They have also agreed that the bonds will retain much of the value of the settlement even if PREPA were to terminate the RSA and receive none of its supposed benefits.

17.    Given the lopsided terms of the settlement, PREPA's creditors (other than the bondholders) are adamantly opposed to it.  And with good reason.  By the Oversight Board's own admission, the "*primary*" goal of the settlement was to benefit "the Commonwealth" and "ratepayers," as opposed to creditors, by capping the "transition charge" that would be used to pay the bonds.  *See* Brownstein Decl. ¶ 69.  But to achieve that goal, the Government Parties have not just overly compensated the bonds but (as noted above) have agreed to major restrictions on their ability to pay other creditors, including the Fuel Lines.  The settlement, accordingly, is manifestly not in the "paramount interest of creditors."  *See* Point III, *infra*.

18.    Fourth, the Settlement Motion should be denied because it would provide the bondholders with huge administrative expense claims against PREPA, without any statutory basis.  *See* Point IV, *infra*.

## BACKGROUND

### A.     The Fuel Line facilities and their Current Expense status

19.     On May 4, 2012, PREPA entered into the Scotiabank Credit Agreement with Scotiabank and other Puerto Rico-based banks, in which the banks agreed to advance up to $500,000,000 to PREPA; the amount of the available line was subsequently increased to $550,000,000, of which $549,950,000 of principal is outstanding.  *See* Claim No. 44378.

20.     On July 20, 2012, PREPA entered into the Citibank Credit Agreement, under which the lender agreed to advance up to $250,000,000, of which approximately $146,000,000 in principal is outstanding.  *See* Claim Nos. 44342, 44358, 44388, 45816.  Citibank, N.A. was the original lender under the Citibank Credit Agreement and later assigned its loans to Solus.

21.     The Fuel Lines were negotiated and entered into against the backdrop of PREPA's bond financing under the Trust Agreement.  *See* Ex. 3 (Trust Agreement).[4]  The Fuel Lines existed solely "to finance [PREPA's] working capital requirements, classified as Current Expenses (as defined in the Trust Agreement), including but not limited to fuel oil purchases." Ex. 1 (Scotiabank Credit Agreement) § 5.08; Ex. 2 (Citibank Credit Agreement) § 5.08.

22.     The Fuel Line Lenders agreed to finance PREPA's purchase of fuel supplies on the express understanding that the Fuel Line Advances were "Current Expenses" under the Trust Agreement.  As discussed below, in the Trust Agreement, the bondholders agreed that "Current Expenses" — defined to include all "*reasonable and necessary current expenses of maintaining, repairing and operating the System*," Ex. 3 § 101[5] — would be paid out of PREPA's General Fund before any revenues would become available to the bonds.

---

[4]     The version of the Trust Agreement included as Exhibit 3 is the same version produced by the Bond Trustee.

[5]     The definition includes (without limitation) any expense "permitted by standard practices for public utility systems, similar to the properties and business of the Authority and applicable in the circumstances."  On the other

23.     In making their credit decisions, the Fuel Line Lenders relied on this Current

Expense priority status.  Scotiabank's term sheet stated that the Fuel Lines would "*rank senior* to

payments of debt service of outstanding PREPA bonds, as it qualifies as a Current Expense as

defined under the 1974 Trust Agreement."  Ex. 6 at 3.  Scotiabank's internal analysis concluded

that the facility would have a "*senior ranking* vis-à-vis the Authority's Bonds" and be accorded

"the *priority ranking* of payments to fuel suppliers classified as current expenses."  Ex. 7

(Scotiabank Credit Memoranda) at 13.  Similarly, Citibank concluded that "[a]dvances under the

trade finance facility will be considered by PREPA as current expenses prov[id]ing [a] *priority*

*claim* over bondholders and other creditors."  *See* Ex. 8 (Citibank Credit Memo) at 5.

24.     Numerous provisions of the Fuel Line Credit Agreements confirmed their Current

Expense status.  Each agreement states that "all obligations hereunder . . . *constitute Current*

*Expenses under the Trust Agreement*, which Current Expenses are subject to the terms and

conditions of the Trust Agreement and the Resolution relating to the priority of payments."

Ex. 1 § 2.14; Ex. 2 § 2.12.[6]  In addition, PREPA acknowledged that:  (1) the Fuel Lines "are

valid and binding obligations of [PREPA], payable as Current Expenses from the [PREPA]

General Fund established under the Trust Agreement" (Ex. 1 § 3.11; Ex. 2 § 3.11); and (2) "[t]he

Advances will be treated as Current Expenses" (Ex. 1 § 3.02; Ex. 2 § 3.02).

25.     As part of the process for entering into the Fuel Lines, PREPA's Executive

Director and its CFO each certified that the Fuel Lines met the Trust Agreement's requirements

for Current Expense status.  They determined that the Fuel Line Advances were "necessary" in

---

hand, it expressly *excludes* payments to bondholders by stating that Current Expenses "shall not include any deposits
to the credit of the Sinking Fund," which is the fund to which the bonds have recourse for recoveries.  *Id.*

[6]     In the Scotiabank Credit Agreement, Section 2.14 is prefaced by the phrase "[t]he Lenders acknowledge and
agree that . . . ."  The Government Parties seize on that phrase, stating that there was "no acknowledgement" by
PREPA of the Fuel Lines' current expense status.  2d Supp. ¶ 50 n.26.  But they simply ignore the other clear
acknowledgments of the Fuel Lines' Current Expense status quoted above.

light of PREPA's "financial position (including, in particular, its liquidity position)"; that the

Fuel Line Advances would be used "solely" to pay "unpaid invoices" for fuel and other expenses

"necessary to operate the System"; and that "the obligations" to pay principal and interest on the

Fuel Lines are "an expense that is permitted by standard practices for public utility systems" *and*

"reasonable for operating the System in an efficient and economical manner."[7]  PREPA,

accordingly, through multiple senior executives, unambiguously *admitted* the facts underlying

the Fuel Lines' "Current Expense" status.[8]

26.     Separately, when PREPA entered into the Fuel Lines, its Executive Director

provided "Certificates of Determination" stating that each of the Fuel Line Advances was "for

the purpose of" paying expenses "that qualify as Current Expenses" and that PREPA's

obligations under the Fuel Lines "*shall constitute 'Current Expenses.'*"[9]

27.     ████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

28.     Based on the certifications provided by PREPA and its officers, including the

factual statements that the Fuel Lines were "necessary" to PREPA and "reasonable for operating

the System," two law firms for PREPA (Nixon Peabody and Sidley Austin) opined that the Fuel

Line Advances are Current Expenses — as they are "analogous to the financing of current

---

[7]     Ex. 9 (Officer's Certificate dated May 4, 2012); *see also* Ex. 10 (Officer's Certificate dated July 20, 2012).

[8]     A year later, when the Fuel Lines were amended, PREPA's Executive Director and Director of Finance made the same certifications again.  Ex. 11 (Officer's Certificate dated August 14, 2013); *see also* Ex. 12 (Officer's Certificate dated May 13, 2013).

[9]     Ex. 13 (Certificate dated May 4, 2012) § 3; *see also* Ex. 14 (Certificate dated July 20, 2012) § 3 (Fuel Line was "for the purpose of providing funds to pay for power, fuel oil and liquefied natural gas").

expenses directly by the suppliers" of fuel — and that any challenge to the Current Expense

status "should *not* be successful." Ex. 9 (Nixon Peabody opinion dated May 4, 2012) at 2;

Ex. 11 (Sidley opinion dated August 14, 2013) at 2.[10]  Contrary to the Government Parties'

assertion that the opinion letters only extended to mid-2013 (2d Supp. ¶ 55 n.31), the Sidley

opinion was provided in August 2013 and covered advances through August 14, 2014, by which

time (as discussed below) the parties had entered into forbearance agreements that precluded

PREPA from contesting the Fuel Lines' priority status based on the passage of time.

29.     PREPA repeatedly informed its bondholders and their Trustee that the Fuel Lines

were Current Expenses that, under the Trust Agreement, had to be paid before the bonds.  In

Official Statements distributed to bondholders and required by federal securities law, PREPA

conveyed that the Fuel Lines had priority over the bonds, stating that "[t]he debt service

payments on [the Fuel Lines] are Current Expenses *payable prior* to debt service on the"

bonds,[11] and that "[r]epayment of [the Fuel Lines] and future lines of credit to cover operational

expenses is *treated as a Current Expense* under the Trust Agreement, which is *entitled to be

paid before debt service on the Power Revenue Bonds*."[12]  Those Official Statements were

approved and adopted by resolutions authorizing the bond issuances.  *See* Ex. 17.[13]

30.     Consistent with their stated purpose, PREPA drew on the Fuel Lines only to pay

invoices for fuel supplies, and it repaid its advances (as required) within 180 days or 270 days.

Ex. 1 §§ 2.06(b) and (c); Ex. 2 § 2.05(a).  As a prerequisite to each advance, PREPA was

---

[10]   The opinions were provided as to both the Scotiabank and the Citibank facilities.  *E.g.*, Exs. 9-10.

[11]   Ex. 5 (PREPA Series 2013A Official Statement) at 53.

[12]   Ex. 5 at 22; Ex. 16 (PREPA Series 2012A Official Statement) at 18.

[13]   Under Puerto Rico law, "resolutions authorizing any bonds may contain provisions, *which shall be a part of the contract with the holders of the bonds* . . . as to the disposition of the entire gross or net revenues and present or future income of [PREPA] . . . ."  22 L.P.R.A. § 206(e)(1).

required to present, and it did present, invoices showing the exact invoices that would be paid with the advance.  Ex. 1 § 2.03(a); Ex. 2 § 2.03(a); *e.g.,* Ex. 18 (draw notices).  PREPA, moreover, made clear in its annual reports that the cost of the Fuel Lines was a component of its "cost of fuel" and that repayments on the Fuel Lines were made out of the General Fund along with other operating expenses.  *E.g.*, Ex. 19 (2013 Annual Report to Bondholders) at 63.

31.     The Current Expense status of the Fuel Lines has also been recognized by PREPA in agreements with third parties.  On July 31, 2015, PREPA entered into a fuel supply contract with Freepoint Commodities, in which PREPA acknowledged that the Scotiabank and Citibank facilities are Current Expenses.  The agreement states that "[a]s of the date hereof, and at the time of any delivery hereunder, PREPA represents and warrants (i) it is paying all 'Current Expenses' (as defined in the Trust Agreement) as they become due, *other than* any amounts due under" the Scotiabank and Citibank Fuel Line Facilities.  Ex. 20 (Freepoint Agreement) Art. XII.K.  PREPA also agreed that Freepoint's own short-term fuel financing, like the Fuel Lines, would be a "Current Expense."  *Id.* Art XII.I.  In a subsequent amendment, which was approved by this Court last month (Dkt. 1624), it was agreed that *all* provisions of the original contract, including the provision relating to the Fuel Lines' Current Expense status, "remain unaltered and fully enforceable."  Ex. 20, 4th Amend. at 16.

**B.     The bondholders' limited lien and recourse**

32.     The lien securing the bonds is granted in Section 507 of the Trust Agreement. That section provides that "[t]he *moneys in the Sinking Fund* . . . shall be subject to a lien and charge in favor of the holders of the bonds."  The Trust Agreement contains no other collateral grant.  The introductory language of the agreement states generally that PREPA is pledging "the revenues of the System [subject to a prior pledge] and other moneys *to the extent provided in this*

-12-

*Agreement . . . as follows*." Ex. 3 at 14-15.[14]  Section 701 provides that PREPA's "Revenues"

are "pledged to the payment" of the bonds "*to the extent hereinabove particularly specified*."  *Id.*

§ 701.  The only "particularly specified" pledge is in Section 507.

33.     The allocation of PREPA's revenues is governed by a payment waterfall in the

Trust Agreement.  Section 503 of the Trust Agreement provides that revenues are deposited into

a "General Fund" and then, in Section 505, "[t]he Authority covenants that moneys in the

General Fund **will be used first for the payment of the Current Expenses of the System**."  *Id.*

§§ 503, 505.  In accordance with that provision, PREPA paid its obligations on the Fuel Lines

from the General Fund.  *See* Ex. 21 (PREPA 2013-14 Financial Statements) at 30, 135-36.

34.     Section 506 of the Trust Agreement directs PREPA, on a monthly basis, to

transfer its revenues — *after* payment of all Current Expenses — to a "Revenue Fund."  Ex. 3

§ 506.  Section 507 then requires that remaining amounts be transferred to a "Sinking Fund" and

subaccounts, including a "Bond Service Account" for payments to bondholders.  *Id.* § 507(a).[15]

35.     As noted, Section 507 is the only provision of the Trust Agreement that grants a

lien, and the lien is limited to the Sinking Fund and Subordinate Funds.  The provision states:

> The moneys **in the Sinking Fund** shall be held by the Trustee in trust, and
> the moneys in the [Subordinate Funds] shall be held by the Authority in
> trust, separate and apart from all other funds of the Authority, and . . .

---

[14]   The prefatory language states that PREPA is pledging "the revenues of the System, subject to the pledge of such
revenues to the payment of the principal of and the interest on the 1947 Indenture Bonds (hereinafter mentioned),
and other moneys *to the extent provided in this Agreement* as security for the payment of the bonds and the interest
and the redemption premium, if any, thereon and as security for the satisfaction of any other obligation assumed by
it in connection with such bonds, and it is mutually agreed and covenanted by and between the parties hereto, for the
equal and proportionate benefit and security of all and singular the present and future holders of the bonds issued
and to be issued under this Agreement, without preference, priority or distinction as to lien or otherwise, except as
otherwise hereinafter provided, of any one bond over any other bond, by reason of priority in the issue, sale or
negotiation thereof or otherwise, *as follows*:" Ex. 3 at 14-15.

[15]   If those accounts are fully funded, Section 507 directs that remaining revenues be deposited in a "Reserve
Maintenance Fund," a "Self-insurance Fund," and a "Capital Improvement Fund" (collectively, the "Subordinate
Funds").  *Id.* §§ 507(c-d).  The latter two funds were added to the Trust Agreement by the Tenth Supplemental
Amendment (*id.* at 196).

**shall be subject to a lien and charge in favor of the holders of the
bonds** issued and outstanding under this Agreement and for the further
security of such holders until paid out or transferred, as herein provided.

36.    The priority scheme in the Trust Agreement was depicted in a chart that was

included in the Official Statements distributed to bondholders with each issuance of bonds:[16]



As shown in the diagram, Current Expenses are paid *first* out of the General Fund, and nothing

goes into the Sinking Fund (on which the bonds have a lien) until Current Expenses are paid.

37.    The Trust Agreement contains a "rate covenant" that also benefits Current

Expense claimants.  Section 502 obligates PREPA to charge rates sufficient to pay the bonds, but

specifically requires that increased revenues are first sufficient to "*pay the Current Expenses of

the System*" in full.  *See id.* § 502(B).  This is consistent with the separate "rate covenant" in the

---

[16]    Ex. 5 (PREPA Series 2013A Official Statement) at 12 (circle added).

Fuel Line Credit Agreements, in which PREPA promised that it would set rates sufficient to pay the Fuel Lines and other Current Expenses in full.  *See* Ex. 1 § 5.09; Ex. 2 § 5.09.

38.     Aside from limiting the bondholders' lien, the Trust Agreement provides that the bondholders do not have recourse to PREPA or its General Fund; rather, they can only seek payment from their collateral, *i.e.*, the "moneys in the Sinking Fund."  The form of Power Revenue Bond states that PREPA "promises to pay" the amounts owed "***solely from the special fund*** *provided therefor*."  Ex. 3 at 5; *see also* Ex. 3 § 804 (limiting the bonds to collecting from the Sinking Fund and Subordinate Funds after default).

39.     Other provisions of the Trust Agreement further confirm the limited and contingent nature of the bonds' lien and recourse.  The Trust Agreement defines the "Opinion of Counsel" required for bond issuances as an opinion stating that the Trust Agreement "creates a legally valid and effective pledge of the *Net Revenues*" — namely, revenues *after* payment of Current Expenses. Ex. 3 § 101.  The Official Statements for bond issuances likewise state that the bonds are "payable solely from the Revenues of the System *after payment of the Current Expenses [] and reserve therefor*."  *E.g.*, Ex. 5 (PREPA Series 2013A Official Statement) at 11.  The opinion from PREPA's counsel appended to the Official Statements states that the bonds are "*payable solely from the Sinking Fund*" and that the Sinking Fund, and nothing else, "is pledged to and charged with the payment of the principal of and interest on such bonds (including the Bonds)."  *E.g.*, *id.* App'x IV at ¶ 6.

C.     **The forbearance agreements and the original RSA**

40.     In July 2014, facing a crisis and default on the Fuel Lines, PREPA requested that the Fuel Line Lenders enter into forbearance agreements.  Rather than exercising remedies to obtain immediate payment, the Fuel Line Lenders agreed to forbear, and extended the agreements multiple times.  *See, e.g.*, Exs. 22, 23 (July 2014 Forbearance Agreements).  The

forbearances allowed PREPA to avoid a default and severe negative consequences, including potential disruptions to its fuel supply.

41.     In the Forbearance Agreements dated July 6, 2014, PREPA again acknowledged the Fuel Lines' Current Expense status and priority position, and promised "never" to challenge that status or priority:

> [PREPA] reaffirms, covenants and agrees that (1) the Obligations under the Credit Agreement *are "Current Expenses" and have **first priority** in the waterfall structure under the Trust Agreement* and (2) it will *never* institute, join, or support any action or proceeding to challenge, modify or alter the treatment of the Obligations as Current Expenses under the Trust Agreement or otherwise impair the right of the Lenders to be paid the Obligations under the Credit Agreement as ***first priority** in the waterfall under the Trust Agreement*.

Ex. 22 (Scotiabank July 2014 Forbearance Agreement) § 5(a)(ii); *see* Ex. 23 (Citibank July 2014 Forbearance Agreement) § 5(b).

42.     PREPA entered into a separate forbearance agreement with the bondholders on August 14, 2014.  *See* Ex. 24 (August 2014 Bondholder Forbearance).  There, both PREPA and the bondholders agreed not to use the forbearances or the passage of time as a basis to challenge the Fuel Lines' Current Expense priority position.  Specifically, they committed:

> *not to take any position*, whether formally or informally, regarding the priority of repayments of the Citibank/Scotiabank Lines of Credit relative to the Bonds on the basis of . . . [Citibank and Scotiabank] (i) forbearing, delaying or failing to exercise remedies, (ii) agreeing to a postponement or delay in payment of interest or principal, (iii) granting an extension of any maturity date, (iv) not requiring the repayment or readvance of any loans under the Citibank/Scotiabank Lines of Credit or not requiring any loans under the Citibank/Scotiabank Lines of Credit to be revolving loans . . . and *none of the Forbearing Creditors or PREPA shall (or direct the Trustee to) use any such actions* as a basis for contesting whether any expense, claim, liability or amount shall be construed as a Current Expense under the Trust Agreement . . . .

*Id.* § 2(b).[17]  Directly contravening those agreements, the Government Parties and bondholders are now arguing to this Court that the Fuel Lines are not Current Expenses because they "are now long past-due."  2d Supp. ¶ 55.

43.     In November 2015, PREPA, the Fuel Line Lenders and the Ad Hoc Group of Bondholders executed a Restructuring Support Agreement (the "2015 RSA").  Under the 2015 RSA, PREPA agreed to convert the Fuel Lines into new facilities in amounts equal to 100% of the outstanding principal on the Fuel Lines, whereas uninsured bondholders would receive new bonds at an exchange ratio of 85%.  Ex. 25 (2015 RSA) Annex D at 1-2; *id.* Annex D Sch. III at 1, 5.  In addition, PREPA and the bondholders again agreed not to invoke the Fuel Line Lenders' forbearance or delay to contest the Current Expense status of the Fuel Lines.  *See id.* § 1(b).

44.     On April 28, 2017, PREPA asked the Oversight Board to certify an amended version of the 2015 RSA as a "Qualifying Modification" under section 601(g)(2)(B) of PROMESA.  On June 27, 2017, however, the Oversight Board voted to reject the pre-petition RSA and, on July 2, 2017, the Oversight Board commenced a case under Title III of PROMESA.

**D.     The Settlement Motion and the new RSA**

45.     Since they filed this Title III case, the Government Parties have engaged in extensive negotiations with the bondholders, but have had virtually no substantive discussions with the Fuel Line Lenders.  On May 10, 2019, the Government Parties filed the Settlement Motion seeking approval of the RSA.  Since May 10, despite repeated attempts by the Fuel Line Lenders to engage with the Government Parties, the Government Parties have not sought to facilitate a broader consensual resolution, including with the Fuel Line Lenders.

---

[17]    The Trust Agreement was supplemented to implement these forbearances, barring each bondholder from using the forbearances and passage of time as a basis to challenge the Current Expense status of the Fuel Lines.  Ex. 3 at 16th, 17th and 18th Supplemental Amendments.

46.     *Securitization Bonds.*  In the RSA, the Government Parties have committed to propose a plan under which each bondholder will receive Tranche A Bonds in the amount of 67.5% of the bondholder's claim for principal plus accrued interest as of May 1, 2019, and Tranche B Bonds in the amount of 10% of the bondholder's claim for principal plus accrued interest as of May 1, 2019.  *See* Ex. 4 (RSA) Ex. C ¶ IV.  These securitization bonds — before accounting for the additional consideration described below — would provide bondholders with a recovery of approximately $6.8 billion, or 79.9% of their claims as of the petition date.

47.     *Settlement Payments and Administrative Expense Claims.*  Upon approval of the RSA, bondholders will begin receiving the equivalent of post-petition interest, at a rate of 5.25%, that would accrue on the Tranche A Bonds had they been distributed on May 1, 2019.  The total value that bondholders will receive on account of this post-petition interest, assuming an effective date of June 30, 2020, will be approximately $384 million — or approximately $27.4 million per month for fourteen months.  This represents an additional recovery of 4.5% on the bonds' pre-petition claims.

48.     The post-petition interest will be paid in part in monthly cash payments from an interim "Settlement Charge" of 1 cent per kilowatt hour to be added to customers' bills.  Ex. 4 § 2(d).  Based on the sales volume estimate in the May 2018 PREPA Fiscal Plan, the Settlement Charge would be approximately $11.2 million per month.  The remainder of the post-petition interest will be allowed as an administrative expense claim.  *Id.*

49.     PREPA's obligation to pay post-petition interest to the bondholders under the RSA will continue even if no plan of adjustment is confirmed.  Indeed, if a plan that complies with the RSA has not been confirmed by March 31, 2021, PREPA must increase the Settlement

Charge to the amount of the Transition Charge that would have been applicable under the plan, and increase the Settlement Payments accordingly.  *Id.* § 2(e)(i)-(ii).

50.    In seeking to justify the pre-plan Settlement Payments, the Government Parties declared in their first Supplement that "recoveries of other creditors of PREPA" would not be affected because PREPA would "only" pay the bondholders "out of a *special, new charge*" on top of existing charges.  Supp. ¶ 103; *accord* Settlement Mot. ¶ 68 (payments "are coming from *new — not existing —* charges").  But just one day later, PREPA filed with the Puerto Rico Energy Bureau a motion asking for permission not only to add the 1 cent per kilowatt hour Settlement Charge but also "to reduce by 1 cent / kWh the applicable base rate charges billed on a kWh basis," such that "the two changes (the base rate reduction and the Settlement Charge addition) *offset and have no net impact on customer bills*."  Ex. 26 ¶ 11.

51.    Accordingly, the Government Parties' "*central factual assertions*" (as Judge Dein called them[18]) regarding the effect of the pre-plan Settlement Payments on other creditors appear to be unfounded.  In truth, PREPA has sought relief that would allow the *entirety* of the cost of the Settlement Payments to be imposed on non-settling creditors.

52.    *Waiver and Support Fee*.  The bondholders will also be paid approximately $151 million in fees, divided as follows:  The members of the Ad Hoc Group will be paid approximately $65 million; this translates to a recovery of 1.9350% of the par amount of their bonds held as of July 1, 2018; Assured will receive approximately $17 million, representing 1.8834% of the par amount of its holdings as of May 1, 2019; National and Syncora will receive

---

[18]    Order on Motion to Compel, Dkt. 1678, at 6 (Oct. 24, 2019).

approximately $69 million, representing 3.8722% of the par amount of National's holdings and 9.3979% of the par amount of Syncora's holdings as of May 1, 2019.  Ex. 4 §§ 4(a)-(c).[19]

53.     *Fees and Expenses*.  The settling bondholders will receive reimbursement of tens of millions of dollars of professional fees and expenses.  *See id.* §§ 22(a)-(b).

54.     *Total recoveries*.  As the evidence will show, the total payouts contemplated by the RSA are expected to result in a recovery to settling bondholders of no less than $7.3 billion — 86.2% of their pre-petition claim or 78.8% of the par-plus accrued value of the bonds as of May 1, 2019.  (These calculations do not reflect the reimbursement of fees and expenses, an unknown number.)  The projected bondholder recoveries are summarized in the following chart:

| Total RSA Consideration to Bondholders ($ in millions) | | |
|---|---|---|
| **Component** | **Recovery** | |
| | **$**[1] | **%**[2] |
| **Exchange Bond Consideration** | | |
| Tranche A Bonds | $6,268 | 73.9% |
| Tranche B Bonds | $511 | 6.0% |
| **Total Exchange Bond Consideration** | **$6,779** | **79.9%** |
| **Administrative Claim and Settlement Payments** | **$384** | **4.5%** |
| **Waiver and Support Fees** | **$151** | **1.8%** |
| **Total** | **$7,314** | **86.2%** |
| (1)  Assumes 100% recovery on Tranche A Bonds and 55% recovery on Tranche B Bonds. (2)  Recovery as percentage of $8,482M Pre-petition Bond Claim. | | |

---

[19]     These "waiver and support fees" will provide the bondholders an additional recovery of 1.8% of the total par value of the $8.482 billion of bonds.  As the evidence will show, the $151 million in "Waiver and Support" fees was calculated based on the amount needed to pay (in the aggregate) an approximately *100%* recovery on principal and interest payments that were "re-loaned" by certain bondholders to PREPA starting in 2016 to help PREPA avoid a default.  As discussed above, in the Forbearance Agreements, the Fuel Line Lenders also helped PREPA avoid a default by agreeing to forgo collection on their $700 million in claims and not to exercise remedies.

55.     *Treatment upon termination*.  The Government Parties may terminate the RSA in what is called a "Securitization Termination" if they determine that the terms of the RSA "will impede or have an adverse impact on the Transformation Transaction" — referring to a contemplated privatization of PREPA — or if, by March 15, 2020, the necessary legislation has not been enacted.  *Id.* § 9(b).  If such a termination takes place, including based on regulatory and political decisions that the Government Parties cannot control, bondholders will still receive allowed fully secured claims "against the Net Revenues . . . of PREPA" in the amount of at least 73.25% of their par plus accrued claim, translating to 82.4% of their pre-petition claim.  *See id.* § 2(c).  In that circumstance, post-petition interest will still continue to accrue (and be paid in part in cash and in part in administrative expense claims) unless and until there is a "Stipulated Treatment Termination," which can occur if (among other things) a plan that complies with the RSA fails twice.  *See id.* §§ 2(c)(iv), 9(c)(i).  But even in that case, the bondholders will still receive a "Surviving Administrative Claim" equal to the *full* amount of the administrative expense claim for interest accrued through denial of confirmation.  *Id.* § 2(c)(iv).

**E.     The RSA's restrictions on the Fuel Lines' recovery**

56.     The RSA does not just address the bondholders' claims and recoveries.  Rather, it also includes provisions that restrict and impede repayment of the Fuel Lines.

57.     The Securitization Term Sheet included with the RSA restricts PREPA's ability to pay *any amount* to the Fuel Line Lenders by limiting the "Additional Permitted Indebtedness" that can be incurred by PREPA or the entity that will issue the Securitization Bonds.  *See* Ex. 4, Ex. C, Annex A (RSA Securitization Term Sheet) at 9-12.  Although the Securitization Term Sheet permits PREPA to borrow money to finance the amortization of the PREPA pension plan, *id.* at 11-12, and to fund PREPA's capital and operating expenses, *id.* ¶¶ A.3-4 & n.16, it *prohibits* PREPA from incurring debt for non-specified purposes, and repayment of the Fuel

Lines is not specified.  The Government Parties, accordingly, appear to have agreed not to refinance the Fuel Lines or even to issue a note to the Fuel Lines payable over time.  In a separate provision, they have also agreed not to "impose" any "charges, taxes, or other fees on electricity other than those directly associated with operation of the System," except for charges "supporting Permitted Indebtedness and otherwise as permitted by the Securitization Trust Agreement."  *Id.* Securitization Term Sheet, Sch. I.B, § V.A.4.[20]

58.     Even if the RSA were to grant PREPA the contractual flexibility to pay the Fuel Lines, the RSA also contains a Most Favored Nations provision ("MFN") that puts conditions on such payment.  Under Section 23 of the RSA, if a holder of "Financial Indebtedness," defined to mean any of the bonds or the Fuel Lines,

> receives a treatment under a Plan, qualifying modification, exchange, or restructuring, however funded, more economically favorable than the treatment proposed to be received by the Ad Hoc Group Members, Assured, Syncora or National then (i) such treatment shall only be allowed and considered consistent with this Agreement if it does not adversely affect the Ad Hoc Group's, Assured's, Syncora's or National's recoveries, and (ii) additional consideration shall be provided to the Ad Hoc Group, Syncora, National or Assured, as applicable, such that the treatment of the Ad Hoc Group, Syncora, National or Assured is at least as favorable as the treatment being provided to such holder(s) of Financial Indebtedness.

As a result of the MFN, payments to the Fuel Line Lenders above what the bonds are getting under the RSA would also have to be made on $8.48 billion worth of bonds.  This effectively multiplies the cost of incremental Fuel Line recoveries by approximately *twelve times*.

---

[20]   The Government Parties have suggested that the Securitization Term Sheet "permit[s] creation of other charges to pay other legacy debt," including the Fuel Lines (2d Supp. ¶ 18), based on the following provision:  "*Subject to any restrictions in the Securitization Trust Agreement*, the Government Parties may establish other transition charges, statutory charge, or other tax or revenue stream, to provide for the payment of legacy obligations." Securitization Term Sheet at 14.  At this stage, however, there is no Securitization Trust Agreement; there is only the "Securitization Term Sheet," and it has the restrictive provisions set forth above.  In addition, Section 5 of the RSA requires all Parties to work to finalize and implement a Plan and Definitive Documents "based on" and "consistent with" the RSA, including the Securitization Term Sheet.

F.     The "Lien Challenge" release

59.     On July 1, 2019, the Government Parties commenced an adversary proceeding against the Bond Trustee, which seeks to limit the bondholders' lien to the amount on deposit in the Sinking Fund, as well as other relief.  *See* Adv. Pro. No. 19-00391.  On July 9, 2019, the Fuel Line Lenders commenced their own adversary proceeding.  *See* Adv. Pro. No. 19-00396.  On September 30, the Fuel Line Lenders filed an Amended Complaint.[21]

60.     The RSA would release any "Lien Challenge," defined to include "any action that a Government Party . . . may bring to challenge the liens and claims (including the validity, *priority*, nature or extent of any liens or security interests) related to the Bonds."  Ex. 4 § 1(a)(lxvi).  The Amended Proposed Order provides that "*[n]o person or entity* . . . other than the Government Parties shall bring a Lien Challenge" absent termination of the RSA.  Amend. Proposed Or. ¶ 11; *accord id.* ¶ 7 ("all challenges" to the bondholders' "allowed claims [under the RSA] shall be released in accordance with the RSA").  The Government Parties have stated that, in their view, those provisions would release the objections and claims in the Fuel Line Adversary Proceeding.[22]  More recently, in motions to dismiss the Fuel Line Adversary

---

[21]    The Amended Complaint has seven counts seeking:  (1) a declaratory judgment that the amounts owed under the Fuel Lines are Current Expenses; (2) a judgment pursuant to section 506(a) of the Bankruptcy Code that the bonds' lien is limited to the Sinking Fund or at most to revenues *after* the Fuel Lines are repaid; (3) disallowance of the bonds' claims pursuant to section 502(b)(1) of the Code to the extent that the claims exceed the Sinking Fund or until the Fuel Lines are repaid; (4) subordination of the bonds to the Fuel Lines pursuant to sections 510(a) and 510(c) of the Code; (5) in the alternative, imposition of an equitable lien or other remedy for the unjust enrichment that would result if the Fuel Lines are not repaid ahead of the bonds; (6) a judgment requiring PREPA and the bondholders to comply with the Forbearance Agreements; and (7) a judgment that the RSA is invalid under Puerto Rico law insofar as its MFN and related provisions are designed to prevent PREPA from performing under its agreements with the Fuel Line Lenders.  Adv. Pro. No. 19-00396 Dkt. 36.

[22]    At a hearing on July 30, Judge Dein asked the Government Parties whether the Lien Challenge release provision would "affect any argument that the Fuel Line Lenders might make" or "prohibit the adversary proceeding" brought by the Fuel Line Lenders "from being completed before [Judge Swain] has to rule on the actual plan."  July 30 Tr. 155:5-6, 14-20.  In response, counsel for the Oversight Board said "I don't believe so" and "[n]othing that I'm aware of."  *Id.* at 155:23-24, 156:10.  But other counsel corrected those comments and stated the Oversight Board "*can't agree* that" the Fuel Line Lenders "can continue to bring an adversary proceeding" or any "lien challenge."  *Id.* at 173:18-174:6.  Judge Dein noted that this change in position was "very important actually."  *Id.* at 174:7.

Proceeding, the Government Parties and the bondholders asserted that, in their view, the RSA

would release Counts 2 and 3 of the Fuel Line Adversary Proceeding (seeking relief under

sections 506(a) and 502(a)), as well as Count 4 to the extent it seeks equitable subordination.

Adv. Pro. No. 19-00396 Dkts. 24, 25.

61.     The Amended Proposed Order would also "exculpate" supporting bondholders for

*any* action "in connection with" or "pursuant to" *any* provision of the RSA, including "with

respect to payments made by PREPA to Supporting Holders" under the RSA.  Amend. Proposed

Or. ¶ 10.  This provision would appear to exculpate the bondholders from other direct claims

asserted in the Fuel Line Lenders' amended complaint, including the claim seeking recovery for

unjust enrichment (Count 5), despite the Government Parties' representations that any claim for

"turnover" would be unaffected by the RSA.  2d Supp. ¶ 1.

## **ARGUMENT**

### I.   **THE SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT EXPANDS THE BONDHOLDERS' RIGHTS WHILE SUBVERTING THE RIGHTS AND PRIORITY POSITION OF THE FUEL LINE LENDERS.**

62.     The Government Parties have asserted that the rights of the Fuel Line Lenders are

"unprejudiced and unaffected" by the RSA.  Settlement Mot. ¶¶ 65, 5; Supp. ¶ 97.  That assertion

is wrong.  The relief sought will adversely affect the Fuel Line Lenders in several ways.  *First*,

hundreds of millions of dollars of value will be transferred or committed to the bondholders,

under a Court order,[23] before the Fuel Line Lenders are paid anything.  *Second*, the Settlement

Parties are purporting to release the Fuel Line Lenders' objections to the scope and "priority" of

the bondholders' liens and claims — so that, if the RSA is approved, the Government Parties will

---

[23]    The Fuel Line Lenders do not agree that PREPA could pay millions of dollars to junior creditors without Court
approval, as the Government Parties suggest.  Supp. ¶ 91.  Here, however, the Government Parties have sought
approval (*id.*), so that issue is not presented.  In any event, the Government Parties do not even try to argue that
administrative expense claims could be awarded without approval.  *Id.* ¶ 94.

-24-

contend that those issues have been resolved, including for purposes of a plan. *Third*, as discussed, the Government Parties have agreed not to provide the Fuel Line Lenders with a higher recovery than the bonds, and not to incur new debt or charges to pay the Fuel Lines.

63.     Accordingly, although the Fuel Line Lenders were prepared to address their treatment and priority in the context of a plan, the Government Parties have prematurely raised those issues by proposing a settlement that deviates from the pre-petition priority scheme, releases all objections to the bondholders' claims and liens, and restricts PREPA's ability to repay the Fuel Line Advances.

**A.     A settlement cannot predetermine or deviate from pre-bankruptcy priorities.**

64.     Under longstanding case law, a settlement proposed by the debtor or trustee must be "fair and equitable." *In re Bos. & Providence R.R. Corp.*, 673 F. 2d 11, 12 (1st Cir. 1982) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424 (1968)). That requirement is not met if the debtor, by entering into "the Settlement Agreement," would depart from the "priority scheme for distribution of estate property." *In re Robotic Vision Sys., Inc.*, 2006 WL 929322, at *3-4 (B.A.P. 1st Cir. 2006).

65.     Courts in the District of Puerto Rico have declined to approve pre-plan settlements that would result in even a *potential* deviation from a pre-bankruptcy priority scheme. In *In re C.P. del Caribe, Inc.*, the court found that a settlement between a debtor and a tax authority was not "fair and equitable" because it would pay the tax authority outside of a plan ahead of Chrysler Financial, a creditor of equal or higher priority. 140 B.R. 320, 326-27 (Bankr. D.P.R. 1992). The court held that "fair and equitable" means that "senior interests are entitled to full priority over junior interests" and that "in the settlement context, 'fair and equitable' means that the settlement reasonably accords with the competing interests' relative priorities." *Id*. The

court denied approval of the settlement based on the potential deviation from the priority scheme and because it "would endanger debtors' negotiations with Chrysler." *Id.* at 327.

66. In *In re Liberia Alma Mater, Inc.*, the court declined to approve a settlement with a purported secured creditor that "recognize[d] a lien which very existence is questionable" and proposed to "satisfy that purported lien in a manner which may alter the scheme [of] payments set forth in the Code." 123 B.R. 698, 699 (Bankr. D.P.R. 1991). Significantly, the court noted that it was rejecting the settlement because a plan proposing treatment of other creditors had not yet been filed, and the settlement — given its treatment of the contested lien — could "cause the debtor to pay its unsecured creditors, as of the effective date of the plan, an amount which is less than the amount they would receive if the Debtor were liquidated under chapter 7 of the Code." *Id.* at 700. The potential effect on priorities and preemptive effect on the plan process required that the settlement not be approved.

67. The principle that a pre-plan settlement cannot predetermine or impact priorities has been widely accepted. In the Fifth Circuit, it is a *per se* rule. *See In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) ("[A] bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors."). The Second Circuit has held that "whether a particular settlement's distribution scheme complies with the Code's priority scheme must be *the most important factor* for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019" and "*will often be the dispositive factor*." *In re Iridium Operating, LLC*, 478 F.3d 452, 464 (2d Cir. 2007).

68. Courts have also held that Rule 9019 settlements cannot be "outcome-determinative" for non-settling parties, including as regards priority, or have the "same effect as

-26-

a sub rosa plan." *In re Miami Metals I, Inc.*, 603 B.R. 531, 536 (Bankr. S.D.N.Y. 2019); *accord In re Biolitec, Inc.*, 528 B.R. 261, 271-72 (Bankr. D.N.J. 2014).  To the contrary, "[w]hen a proposed transaction specifies terms or coerces one result for adopting a reorganization plan, the parties and the . . . court must scale the hurdles erected in Chapter 11."  *In re Cloverleaf Enters., Inc.*, 2010 WL 1445487, at *3 (Bankr. D. Md. Apr. 2, 2010) (internal quotation omitted).

69.      In arguing that priority issues can be disregarded by the Court in considering the Settlement Motion, the Government Parties ignore the decisions above and rely instead on two decisions — *In re Financial Oversight & Management Board for Puerto Rico*, 360 F. Supp. 3d 65 (D.P.R. 2019) ("*Whyte*"), and *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr. S.D.N.Y. 2005) — that are not remotely on point.

70.      In *Whyte*, the Court approved a settlement of a dispute between two Title III debtors, the Commonwealth and COFINA, over a stream of tax revenue.  Finding that the settlement was a reasonable compromise of the dispute, the Court ruled that the objectors' "concerns about the Commonwealth's future ability to provide properly for the citizens of Puerto Rico who depend on it," *id.* at 68, were outside the scope of its inquiry, *id.* at 78.  The Court's ruling in *Whyte* that such "macroeconomic" factors would not be considered provides no support for the Government Parties' claim that "the effect of the RSA on the treatment of other claimholders" is "immaterial to the Rule 9019 analysis."  Supp. ¶ 101.

71.      *Adelphia*, which the Government Parties characterize as "comparable" to this case (Supp. ¶ 103), is not comparable.  There, the debtors faced indictment and civil penalties from the SEC and the Department of Justice.  The court approved the debtors' settlement with the government — despite the fact that the settlement funds might be paid by the government to defrauded equity owners rather than to creditors — because, among other things, the payments to

equity owners would be made *not* by the debtor but by the government after exercising its

"indictment power and forfeiture power." 327 B.R. at 170. Thus, any priority deviation was at

most indirect and occurred in the context of a criminal case and forfeiture action.[24]

72.     Here, the Fuel Line Lenders object to the Government Parties' attempt to use a

settlement to predetermine priority-related issues, and to the negative impact the RSA will have

on their own rights and entitlements. The case law in this district and elsewhere requires that

those matters be considered in ruling on the Settlement Motion.

   **B.     The Fuel Line Advances — as Current Expenses — are payable before there
   are "Net Revenues" potentially subject to the bonds' lien and recourse.**

73.     As explained, the bondholders' lien and recourse are limited to "moneys in the

Sinking Fund," and the only moneys available for the Sinking Fund are revenues that are left

*after* all Current Expenses are paid. The Fuel Line Advances are Current Expenses and thus,

outside of bankruptcy, were payable from the General Fund before revenues could be transferred

to the Sinking Fund. Nothing in PROMESA justifies departure from that priority structure.

   **1.     The Fuel Lines are Current Expenses.**

74.     As a starting point, before turning to the treatment of Current Expenses, there can

be no reasonable dispute that the Fuel Lines fall within that category. All arguments to the

contrary disregard the contemporaneous record and have instead been concocted years after-the-

fact to deprive the Fuel Line Lenders of what they bargained for.

75.     As set forth in the Background section, the Fuel Lines were required to be, and

were, used to purchase fuel needed to operate PREPA's system. The purchase of fuel was

---

[24]   The ability of courts to sanction deviations from priority even in unusual circumstances has been called into
doubt by *Czyzewski* v. *Jevic Holding Corp.*, which held that "priority-violating structured dismissals" are improper
even in "rare cases." 137 S.Ct. 973, 986 (2017).

plainly a Current Expense:  without the fuel, the system would have ground to a halt.[25]  The Fuel

Line Advances replaced PREPA's obligations to fuel suppliers, were repaid by PREPA out of its

General Fund (along with other operating expenses), and were treated by PREPA as a

component of the "cost of fuel."  *See* Ex. 19 at 63.  As two separate law firms (Nixon Peabody

and Sidley Austin) opined at the time, the short-term advances, which provided PREPA with

necessary liquidity to pay for fuel, were likewise a Current Expense, including because they are

"analogous to the financing of current expenses directly by the suppliers" of fuel.  Exs. 9, 11

(Nixon Peabody and Sidley opinions) at 2.  Any other result would provide a windfall to the

bondholders:  It would allow them to obtain payment from PREPA's revenues without having to

deduct and first pay the cost (here, $700 million) of the fuel that was needed to operate the

system and generate those revenues.

76.     In obtaining approval of the Fuel Line facilities, PREPA determined multiple

times that the Fuel Line Advances were — and met each of the requirements to be — Current

Expenses.  Under Puerto Rico law, PREPA has "the power to determine the character of and

necessity for all its expenditures and the manner in which they shall be incurred, allowed and

paid."  22 L.P.R.A. § 196(d); *see also* Ex. 3 (Trust Agreement) at 1 (recognizing PREPA's

authority).  Consistent with that power, in Officers' Certificates, PREPA's senior executives

certified and represented, multiple times, that the Fuel Line Advances were "necessary" to meet

a "liquidity" need, were "reasonable for operating the System in an efficient and economical

manner," and as a result were necessarily "'Current Expenses' as such term is defined in the

Trust Agreement."  Exs. 9, 11.  In other words, PREPA itself, which had first-hand knowledge of

---

[25]     *See, e.g.*, *In re Pub. Serv. Co.*, 114 B.R. 820, 833-34 (Bankr. D.N.H. 1990) ("An operating expense is generally
defined as a good or service which will be consumed by the utility within one year.  These include costs such as *fuel*,
labor, insurance and taxes.").

its own financial position and operations, *admitted* and *agreed* that the factual predicates for Current Expense status were satisfied.

77. ████████████████████████████████████████████████████

████████████████████████████████████████████████ PREPA also disclosed the priority of the Fuel Lines to bondholders:  The Official Statements stated plainly that "[t]he debt service payments on" the two Fuel Lines "***are Current Expenses payable prior to***" the bonds.  Ex. 5 (PREPA Series 2013A Official Statement) at 53.

78. The Fuel Line Credit Agreements further confirmed that the Fuel Line Advances "constitute Current Expenses under the Trust Agreement" and are "payable as Current Expenses from the General Fund established under the Trust Agreement."  Ex. 1 § 2.14; Ex. 2 § 2.12; Ex. 1 § 3.11; Ex. 2 § 3.11.  Likewise, in the 2014 Forbearance Agreements, PREPA reconfirmed that the Fuel Lines are "Current Expenses" and thus "have ***first priority*** . . . under the Trust Agreement."  Exs. 22-23 (July 2014 Forbearance Agreements).  PREPA, moreover, certified in connection with each draw that the Fuel Line Advances satisfy the definition of "Current Expense" and "constitute Current Expenses."  Ex. 18 (draw notices).

79. Despite this overwhelming record showing that the Fuel Lines are and were agreed to be Current Expenses, in the Second Supplement, the Government Parties have in essence sought to retract all their prior statements regarding the Fuel Lines' status and priority — exactly when it matters, namely when PREPA is in default.  In a bait-and-switch of historic proportions, after having induced the Fuel Line Lenders to advance $700 million to PREPA based on certifications of their Current Expense priority status, PREPA asserts that it has now "determined" that the Fuel Lines are not Current Expenses after all.  2d Supp. ¶¶ 10, 59.  And despite PREPA having induced the Fuel Line Lenders to forbear in 2014 with a promise that the

Fuel Lines' priority status would be fully respected, the Government Parties now assert that the Fuel Lines lost their Current Expense status due to the passage of time and because the Fuel Lines are a "financing/debt obligation."  2d Supp. ¶¶ 10, 52-60.

80.     Under controlling law, however, PREPA cannot simply renege on its prior agreements and admissions that the Fuel Lines are Current Expenses.  As shown in the next section, the doctrine of *actos propios* prevents that change of position.  That doctrine is dispositive.  But even if it were not, nothing in the Trust Agreement or Puerto Rico law — under which PREPA has the "power" to determine the "necessity" for and "character" of its expenses (22 L.P.R.A. § 196(d)) — suggests that PREPA can determine that expenses are "necessary" and "current" in order to induce its counterparty to transact, only to retract that determination in a default situation.[26]  That would be an absurd and grossly unfair result.

81.     Nor can the Government Parties be heard to argue that the Fuel Lines somehow lost their status as Current Expenses due to the passage of time.  In the Forbearance Agreements, both PREPA and the bondholders agreed not to advance that *exact* argument — in exchange for the Fuel Line Lenders' agreement to forbear and delay the exercise of remedies.  As discussed below, the Forbearance Agreements remain in full force.  *See* Point I.C.3, *infra*.

82.     In any event, whether an obligation is a "Current Expense" under the Trust Agreement does not turn on when it is *paid* or whether it is a "financing/debt obligation." Rather, it depends on whether, at the time it is *incurred*, it is a "reasonable and necessary current expense[] of maintaining, repairing and operating the System."  Ex. 3 § 101.  As PREPA's two

---

[26]     PREPA has blocked discovery, on privilege grounds, regarding its supposed recent "determination" that the Fuel Lines are not Current Expenses.  The consequences of that position will have to be addressed at trial. Regardless, a pronouncement by counsel cannot constitute a new "determination" by PREPA (*see* 22 L.P.R.A. § 194 (requiring the powers of PREPA to be exercised by its board of directors)), and there is no evidence that PREPA's board of directors has in fact taken the extraordinary step of retracting PREPA's prior determinations.

law firms opined, the Fuel Line Advances satisfied the "Current Expense" definition because, as

PREPA's officers concluded, they were "necessary" given PREPA's financial condition,

"reasonable for operating the System," and were "short-term" obligations used "solely" to pay

for necessary operating expenses. Exs. 9, 11.  As discussed in Point I.C.2 below, the Fuel Lines

are just like PREPA's "financing/debt obligations" on its post-petition financing, which — under

a final order of this Court — were found to be  Current Expenses precisely *because* they were

earmarked to pay particular operating costs.  Dkt. 744 ¶ 9 (DIP advances limited to payment of

Current Expenses and "*as such*" are Current Expenses themselves).[27]

83.     Nor can the Government Parties eviscerate the Fuel Lines' priority status simply

by omitting reference to the Fuel Lines in PREPA's budgets.  *See* 2d Supp. ¶ 56.  Indeed, in

making that argument, the Government Parties have contradicted themselves again.  The

Oversight Board previously represented to this Court, in obtaining approval for post-petition

financing — and in response to arguments from bondholders that the DIP Facility could be used

for non-budgeted items, *see* Dkt. 585 at 25-26 — that "***the definition of Current Expenses is <u>not</u>***

***restricted by a budget***," Dkt. 688 at ¶ 5.  That representation was correct.  The "Current

Expense" definition in Section 101 of the Trust Agreement is *not* restricted to those expenses

listed in a budget, and Section 505 requires payment of *all* Current Expenses without regard to a

budget.  Section 505 does say that, absent unforeseen circumstances, the total Current Expenses

in a given year "will not exceed the amount provided therefor in the Annual Budget . . . or any

amendment thereof or supplement thereto."  Ex. 3 § 505.  But if Current Expenses *do* exceed the

budget, their status and priority do not change; rather, PREPA is required to "report in writing

---

[27]     Notably, the DIP Facility had a maximum maturity of *30 years*, during which the facility would retain its
character as a Current Expense.  Dkt. 722 Ex. A, Art. 1 (definition of "Maturity Date").

the amount of such excess and the reason or reasons therefor." *Id.*[28]  The Government Parties are again advocating a result that defies logic and fairness:  namely, that they can induce market participants to extend credit based on the agreed treatment of Current Expenses, only to change that treatment once they have the money.  Nothing in the Trust Agreement or Puerto Rico law supports that offensive result.

>    **2.    The bondholders' security interest is limited and contingent on payment of Current Expenses.**

84.    As shown in the Background, Article V of the Trust Agreement establishes a "waterfall" for PREPA's revenues.  First, under Section 503, all revenues go to the General Fund.  Second, under Section 505, "moneys in the General Fund *will be used first for the payment of the Current Expenses of the System*."  Third, under Section 506, after PREPA has funded a reserve for future Current Expenses, remaining revenues go to the Revenue Fund.

85.    Only after those required steps — in particular payment of all Current Expenses — can PREPA's "net" revenues be transferred to "Sinking Fund" accounts that can be used to pay bondholders, and the bondholders' lien is limited to those accounts.  The lien-granting language in Section 507 is unambiguous:  "*The moneys in the Sinking Fund* shall be held by the Trustee in trust" and "*shall be subject to a lien and a charge in favor of the holders of the bonds issued and outstanding under this Agreement*."  *See* Ex. 3 § 507.  Section 701 of the Trust Agreement then provides that a lien is granted on Revenues "to the extent hereinabove

---

[28]    Although the Fuel Lines are Current Expenses regardless of any budget, prior to the forbearances in 2014, PREPA's projected cost of fuel — whether payable to fuel suppliers or as principal drawn on the Fuel Lines — was included in the "Current Expense" category rather than the "Debt Service" category of PREPA's budgets.  In the 2012 to 2014 budgets, the "Fuel" line item encompassed all amounts projected to be paid on account of fuel (Exs. 27-28 (2012-14 Budgets), and PREPA treated the Fuel Line Advances as a component of the "cost of fuel" (Ex. 19 (2013 Annual Report) at 63).  In contrast to the amounts drawn on the Fuel Lines, amounts owed to bondholders were budgeted as "Debt Service."  Exs. 27-28 (2012-14 Budgets).

*particularly specified.*" *Id.* § 701.[29] The only security interest "hereinabove particularly specified" is in Section 507.

86.     Thus, under the Trust Agreement, there is *no* collateral for the bonds until PREPA has satisfied the requirements of Article V, including payment of Current Expenses, and deposited remaining revenues, if any, into the Sinking Fund. *See* Exs. 5, 16 at App'x IV (PREPA Official Statements) (legal opinions stating that the Trust Agreement provides only "a legally valid and binding pledge of the 1974 Sinking Fund").

87.     The bondholders have resisted the plain-language conclusion that their collateral is limited to the "moneys in the Sinking Fund," arguing that it also includes a "rate covenant" and receivership remedy. But even if it were possible to have a lien on a covenant or a remedy (which it is not, *see* Point III, *infra*), the bondholders have no colorable argument that their lien extends to PREPA's *gross* revenues. Rather, both the Trust Agreement and related documents make absolutely clear that the lien granted to the bondholders extends, *at most*, to the "Net Revenues" of PREPA, defined as PREPA's revenues *after* payment of Current Expenses out of the General Fund. Ex. 3 § 101 (definition of "Net Revenues"). Not only does the waterfall in the agreement require payment of Current Expenses *before* any revenues are transferred to the Sinking Fund, but the Trust Agreement defines the "Opinion of Counsel" necessary for bond issuances as an opinion stating that the Trust Agreement "creates a legally valid and effective pledge of the *Net Revenues*. . . ." Ex. 3 § 101.

88.     Under Puerto Rico law, "[w]hen a contract contains several sections or clauses, they 'should be interpreted in relation to one another,'" and the parties' intentions should be

---

[29]    Introductory language of the Trust Agreement before Article 1 similarly states that PREPA is pledging "revenues of the System," subject to a prior pledge (not relevant here), "and other moneys *to the extent provided in this agreement*" and "*as follows*" in the agreement. Ex. 3 at 14-15.

determined based upon "'consideration of all of them together.'"  *Autoridad de Carreteras y Transportacion* v. *TransCore Atl., Inc.*, 387 F. Supp. 3d 163, 167 (D.P.R. 2017) (quoting 31 L.P.R.A. § 3475).  Consideration of the Trust Agreement as a whole, including the Opinion of Counsel definition, compels the conclusion that what was intended was, at most, a pledge of revenues *after* payment or *net* of Current Expenses.

89.     The plain language of the Trust Agreement shows that the bondholders' lien is limited to, at most, revenues *net* of Current Expenses.  But if resort to extrinsic evidence were necessary, that evidence only confirms the limited nature of the pledge.  Under Puerto Rico law, "[i]n order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."  31 L.P.R.A. § 3472; *see TransCore Atl.*, 387 F. Supp. 3d at 169.  Here, with respect to the Fuel Lines, the bondholders were expressly told that, because the Trust Agreement granted them a lien and recourse limited by the requirement to pay Current Expenses, the Fuel Lines, as Current Expenses, would be "*payable prior*" to the bonds, and that the Fuel Lines were legally "*entitled* to be paid before" the bonds.  Exs. 5, 16 (PREPA Official Statements).  That disclosure would have surprised no one, because the purchase of fuel is absolutely necessary to preserve the bondholders' collateral:  Without fuel, there can be no revenues, let alone *net* revenues, available for bondholders.

90.     Finally, the character of the bondholders' collateral, which can only be perfected by control, renders a perfected *gross* revenues lien impossible.  "Revenues" are defined by the Trust Agreement not as moneys to be received in the future but as "moneys received," *i.e.*, cash.  Ex. 3 § 101 at 23.  Under section 9-312 of the U.C.C., a lien on cash can only be perfected by control; if the cash is in a deposit account, the secured party must have control of the account.  *See* 19 L.P.R.A. § 2264(a).  In this case, the Bond Trustee may control the Sinking Fund

accounts — to which revenues may be transferred after payment of all Current Expenses — but it does *not* control PREPA's General Fund.

91.     In sum, the broadest lien the bonds can conceivably have is a lien on revenues *net* of Current Expenses.  That "Net Revenues" lien can only come into effect, by definition, after PREPA has paid all Current Expenses, including the Fuel Lines.  *See In re Las Vegas Monorail Co.*, 429 B.R. 317, 338 (Bankr. D. Nev. 2010) (in interpreting indenture that granted a lien on "Net Project Revenues," court stated that "the referent of the grant of the security interest — Net Project Revenues — cannot and does not come into existence until after the subtraction — that is, until after the payment — of Operation and Maintenance Costs from gross revenues").

### 3.     The bondholders' recourse is similarly limited.

92.     In the Trust Agreement, the bondholders not only agreed that their lien would be limited to the Sinking Fund accounts; they also agreed that their recourse would be so limited. The bondholders have no recourse to PREPA's General Fund, meaning that until all Current Expense claims are paid from the General Fund, PREPA has no conceivable basis or obligation to make deposits into the Sinking Fund for the benefit of bondholders.

93.     The limited nature of the bonds' recourse is beyond dispute.  Each bond states on its face that it is payable "***solely from*** the special fund provided therefor."  Ex. 3 at 5 (Form of Coupon Bonds).  The Trust Agreement further confirms that, even in the event of a default, the bonds remain payable solely from the Sinking Fund, or from subordinate funds that can be transferred to the Sinking Fund.  Ex. 3 § 804.  Legal opinions confirmed that the bonds are "payable ***solely from*** the Sinking Fund."  Ex. 5 (PREPA Series 2013A Official Statement) App'x IV ¶ 6.  In the First Receiver Motion, the bondholders themselves acknowledged "the limited recourse nature of the Bonds," Dkt. 74 at 1, and they agreed that they "have no recourse

to or mortgage or other lien on physical assets, and are secured solely by a pledge of revenues of the utility after payment of current operating expenses," *id.* at 4.

94.     Unlike in a chapter 11 case, PREPA's bankruptcy filing does not alter the non-recourse nature of the bonds.  Special revenue bonds[30] are subject to section 927 of the Bankruptcy Code, which provides that "[t]he holder of a claim payable solely from special revenues of the debtor under applicable nonbankruptcy law *shall not be treated as having recourse against the debtor on account of such claim pursuant to section 1111(b) of this title*."  The legislative history explains that this provision was enacted to "ensure that nonrecourse revenue bonds cannot be converted, under section 1111(b) of the Bankruptcy Code, into recourse, or general obligation debt," notwithstanding the statutory limits imposed on municipalities in incurring recourse debt.  H.R. Rep. No. 100-1011, 100th Cong., 2d Sess. at *5, 7 (1988); *see generally In re Jefferson Cty.*, 482 B.R. 404, 432-34 (Bankr. N.D. Ala. 2012).  As a result, PREPA's filing does not alter the bonds' non-recourse position and allow them to assert claims against the General Fund that could be *pari passu* with the Fuel Lines.  Regardless of any security interest, the Fuel Lines have senior claims that must be paid before the bonds.

### 4.     The "rate covenant" also prioritizes Current Expenses.

95.     The bondholders have argued that the Trust Agreement gives them the right to compel PREPA to raise its rates to ensure that there is enough revenue to make deposits into the Sinking Fund.  Dkt. 74 at 23-27.  But this argument glosses over a critical fact.  Consistent with the waterfall structure under which revenues can be deposited into the Sinking Fund only *after*

---

[30]   "Special revenues" include "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems."  11 U.S.C. § 902(2)(A).

Current Expenses are paid, the rate covenant, by its express terms, requires revenues to be

sufficient to pay all Current Expenses first:

> The Authority further covenants that it will at all times fix, charge and
> collect reasonable rates and charges for the use of the services and
> facilities furnished by the System and that from time to time, and as often
> as it shall appear necessary, it will adjust such rates and charges so the
> Revenues *will at all times be sufficient* . . .
>
> **(a)** *to pay the Current Expenses of the System*, and
>
> (b) to provide an amount at least equal to one hundred twenty per centum
> (120%) of the aggregate Principal and Interest Requirements for the next
> fiscal year on account of all of the bonds then outstanding.

Ex. 3 § 502.  Invoking the rate covenant to benefit the bonds but not Current Expenses disregards

half the provision.  Yet under the RSA, PREPA is imposing a special charge to pay bondholders

without paying the Fuel Lines at all, again turning the priority scheme on its head.

### C.    The Government Parties are precluded from contesting the Current Expense status of the Fuel Lines or the legal priority of Current Expenses.

96.     Faced with the record set forth above — which shows that the Fuel Line Lenders

advanced $700 million to PREPA based on the express (and correct) understanding that their

advances would have to be repaid before bondholders would have collateral or recourse to

remaining revenues — the Government Parties have put forward a series of new, yet flawed,

arguments.  But the Court does not have to (and should not) consider those arguments, because

the Government Parties are precluded from taking the positions they are now pressing.  In

particular, the Government Parties are barred from asserting that the Fuel Lines are not Current

Expenses or that Current Expenses do not have priority vis-à-vis the bonds.

### 1.    *Actos propios* prevents the Government Parties from challenging the Current Expense status of the Fuel Lines.

97.     Puerto Rico's doctrine of *actos propios*, or "doctrine of one's own acts," is a close

relative of the common law concept of estoppel.  "The necessary premises or constituting

elements for the application of" *actos propios* "may be summarized as follows:  (a) [a] certain

behavior of a subject, (b) that . . . may influence the behavior of others, and (c) that it be the basis

of the trust of another party which has acted in good faith and that, for that reason, has acted in a

manner which would cause him prejudice if his trust was defrauded."  *Int'l Gen. Elec., P.R., Inc.*

v. *Concrete Builders of P.R., Inc.*, 4 P.R. Offic. Trans. 1221, 1231, 104 D.P.R. 871 (1976).

*Actos propios* and related doctrines under Puerto Rico law can be invoked against government

parties.  *Berrios* v. *Univ. of P.R.*, 16 P.R. Offic. Trans. 112, 125, 116 D.P.R. 88 (1985).  As the

Puerto Rico Supreme Court explained:

> These principles are deeply rooted in our legal system.  They are more
> than a hundred years old.  Our Law of Evidence of March 9, 1905,
> provided in its art. 101(3):  **"Whenever a party has, by his own
> declaration, act, or omission, intentionally and deliberately led
> another to believe a particular thing true and to act upon such belief,
> he cannot in any litigation arising out of such declaration, act, or
> omission, be permitted to falsify it."**

*Id.* at 125 n.3.

98.     The doctrine of *actos propios* has been applied against PREPA.  In *PREPA* v.

*Vitol*, *Inc.*, a fuel supplier alleged that PREPA made contractual representations to it, including a

representation that the parties' fuel supply arrangement would "remain in effect" and that the

parties would "cooperate."  2012 WL 12995756, at *14 (D.P.R. Sep. 10, 2012).  As PREPA

knew, a related company of the fuel supplier had been criminally convicted for various offenses.

After placing orders, receiving fuel, and making the contractual representations despite

knowledge of the conviction, PREPA refused to pay and sued to annul the contract and for

damages from the supplier, all on the basis of the conviction.  The District Court held that

"PREPA may be estopped to annul and seek damages . . . as PREPA is acting against its own

acts or commonly known . . . as the 'doctrina de actos propios' or doctrine of one's own acts."

*Id.* at *15; *see also PREPA* v. *Vitol*, *Inc.*, 2013 WL 12234406, at *7 (D.P.R. Jan. 23, 2013) ("as

PREPA failed to take any action . . . after it became knowledgeable of [the related company's] conviction" and "continued placing fuel orders under" the challenged contracts, "PREPA is *in pari delicto* and barred from requesting any remedy").

99. The elements required for application of *actos propios* are readily satisfied here. PREPA repeatedly certified and acknowledged that the Fuel Line Advances constituted and met all the requirements of the definition of "Current Expenses," and the Fuel Line Lenders would not have made those advances but for those representations. *See supra* ¶¶ 19-39. PREPA later assured the Fuel Line Lenders that if they forbore from exercising remedies, it would reconfirm their Current Expense status, not claim that the passage of time affected that status, and "never" attempt to challenge their first-priority status. *See supra* ¶¶ 40-44. If the Government Parties can disavow their many representations and agreements, after defaulting on the Fuel Lines, PREPA's conduct will have betrayed the "trust" of the Fuel Line Lenders and taken advantage of their undisputed "good faith" in funding the purchase of fuel and in forbearing. That is precisely what *actos propios* is designed to prevent.

100. Since PREPA is precluded from asserting that the Fuel Lines are not Current Expenses, the Oversight Board is likewise precluded. Section 315(b) of PROMESA provides that "[t]he Oversight Board in a case under this subchapter is the representative of the debtor." 48 U.S.C. § 2175(b). As the Supreme Court has held, a representative or trustee "cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*, 139 S.Ct. 1652, 1663 (2019).[31]

---

[31] *Accord, e.g.*, *Official Comm. of Unsecured Creditors of PSA, Inc.* v. *Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006) ("[I]f a claim of [debtor] would have been subject to [an affirmative defense] at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense."); *Official Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 356 (3d Cir. 2001) ("[T]he trustee, is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by

### 2. Judicial estoppel prevents the Government Parties from arguing that Current Expenses do not have a right to be paid ahead of the bonds.

101. The Government Parties' newfound position that Current Expenses lack priority over the bonds is also barred by the doctrine of judicial estoppel. The doctrine of judicial estoppel is designed to prevent parties from "playing fast and loose with the courts." *Franco* v. *Selective Ins. Co.*, 184 F.3d 4, 9 (1st Cir. 1999) (internal quotation omitted). It "is ordinarily applied to prevent a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *Guay* v. *Burack*, 677 F.3d 10, 16 (1st Cir. 2012) (internal quotations omitted). "There are two generally agreed-upon conditions for the application of judicial estoppel." *Id.* "'First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. Second, the responsible party must have succeeded in persuading a court to accept its prior position.'" *Id.* (quoting *Alt. Sys. Concepts, Inc.* v. *Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004)) (internal citation omitted).[32]

102. In defending the RSA, the Government Parties deny that Current Expense claimants have enforceable priority rights, characterizing those rights as "made up" and "bogus." *See, e.g.*, July 11, 2019 Tr. at 52:23-53:2; 55:24-25; 2d Supp. ¶ 29. But when the Government Parties sought and obtained this Court's approval of a post-petition revolving loan from the Commonwealth (the "DIP Motion," Dkt. 549), they took exactly the opposite position. In

---

the debtor." (internal quotation omitted)); *In re Advanced RISC Corp.*, 324 B.R. 10, 15 (D. Mass. 2005) ("The Trustee cites no law for the proposition that a bankruptcy trustee inherits or assumes greater rights than the Debtor possessed before filing.").

[32] For judicial estoppel purposes, "[a]cceptance . . . is a term of art. In order to satisfy this prerequisite, a party need not show that the earlier representation led to a favorable ruling on the merits of the proceeding in which it was made, but must show that the court adopted and relied on the represented position either in a preliminary matter or as part of a final disposition." *Perry* v. *Blum*, 629 F.3d 1, 11 (1st Cir. 2010) (internal quotations omitted). Ultimately, what must be shown is that it is "reasonable to believe that [the court] was influenced by the . . . representation." *Patriot Cinemas, Inc.* v. *Gen. Cinemas Corp.*, 834 F.2d 208, 213 (1st Cir. 1987).

seeking to persuade this Court that the DIP facility would not prejudice bondholders — because
it would be used to pay Current Expenses — the Government Parties insisted that Current
Expenses are legally entitled to be paid ahead of the bonds.

103.    Specifically, in the DIP Motion, the Government Parties represented that Current
Expenses "have a ***prior right to be paid*** from the Debtor's revenues before ***any*** positive net
revenues exist that ***could go*** to" the bonds, and that the DIP facility could not prejudice the bonds
because "the Trust Agreement already provides ***the bondholders' lien is subordinate to payment***
***of Current Expenses***, and the [DIP] Facility can only be used for Current Expenses."  DIP Mot.
¶¶ 25, 51.  In response to objections from bondholders, the Oversight Board reiterated that the
bondholders would be unaffected by the DIP Facility — including a proposed priming lien —
because, in the words of the Government Parties, "***Current Expenses are already afforded***
***priority over payment on the Power Revenue Bonds***," (Dkt. 617 ¶ 5), and "debt service" on the
bonds "***is subordinated to the payment of Current Expenses***" (Dkt. 617 ¶ 23 (citing Ex. 3
§ 505)).  At the hearing on the DIP Motion on February 15, 2018, counsel for the Oversight
Board repeated those points, submitting that "***the most important argument***" before the Court
was that the bonds "***were behind current expenses before this ever started***."  Ex. 29 (Feb. 15,
2018 Tr.) at 130-31, 137.

104.    At the conclusion of the argument, the Court indicated that the Oversight Board
had not put forward sufficient evidence to support a priming lien under section 364(d) of the
Bankruptcy Code, including in particular evidence of "any attempt to negotiate a credit facility
. . . that would provide for unsecured credit."  *Id.* at 231-32.  Nonetheless, the Court stated that it
would consider approval of a smaller, unsecured facility if changes were made.  Specifically, the
bondholders had objected on the basis that the loan documents allowed PREPA to amend the

facility to use the proceeds for payments *other than* "Current Expenses," thereby eroding the

bondholders' collateral.  *See, e.g.*, *id.* at 160-64; Dkt. 570 (Ad Hoc Group Objection) ¶¶ 47-50

("The Loan Motion thus avers that funding expenses senior to the bonds does not impair the

bonds – when in fact, immediately after this Court rules, the Oversight Board and PREPA could

agree to fund expenses that are *not* senior to the bonds.").  In light of that concern, the Court

directed the Oversight Board to amend the proposed order "to make clear that any material

change in terms," including to allow use of proceeds beyond payment of Current Expenses,

would require Court approval.  Ex. 29 at 234.[33]  Following the hearing, on February 16, 2018,

the Oversight Board submitted a revised order implementing that change.  Dkt. 722 at Ex. C.

105.    Like the original proposed order, the revised order submitted by the Government

Parties stated that "Eligible Uses" of the proceeds would be limited to "Current Expenses" under

the Trust Agreement and "***as such***, the Debtor's repayment obligations to the Lender for

amounts borrowed under the Initial Facility shall be deemed to be 'Current Expenses' under the

Trust Agreement."  *Id.* ¶ 9.  Bondholders continued to object to that provision.  National argued

---

[33]    The colloquy between counsel to the Oversight Board and the Court shows the significance of the amendment to paragraph 6 of the DIP Order:

> [COUNSEL TO THE OVERSIGHT BOARD]:  [The bonds] had a first lien on net revenues which was revenues minus current expenses, and this loan is only – only can be used for current expenses . . . . So I am arguing this as if we have to satisfy 364(d)(1) out of an abundance of caution because I think it makes it safer for all concerned including the Court, but ***I don't want to lose sight of the fact that the secured claim holders at PREPA really are behind current expenses before we ever got here***.

> THE COURT:  Now, you've made that point about current expenses and about the subset of current expenses, but the opposition papers have pointed out the operational reserve provisions that would appear to let monies disburse from this facility and transfer it into the operational account to be used for broader purposes and also the provisions for changing the application of funds' restrictions on agreement of the lender and the Oversight Board.  **Are they incorrect that those observations can move the application of funds beyond current expenses as defined in the bond financing papers?**

Ex. 29 at 131-32.  The colloquy ended with counsel for the Oversight Board stipulating that if "the Commonwealth were asked to approve use of loan proceeds other than current expenses, we would consider that a material modification invoking paragraph 6(a)."  *Id.* at 142.

that it should be stricken because "Current Expense status is neither fair nor reasonable in the

context of this loan and the Court's ruling, *as it is tantamount to a priming lien if approved*."

Dkt. 735 (National Objection) ¶ 21.  In reply, the Oversight Board reiterated the lack of harm to

bondholders due to the preexisting priority of Current Expenses:  "The Superpriority Facility can

only be used to pay for Current Expenses.  Accordingly, providing that repayment of the

Superpriority Facility is a Current Expense does not harm the bondholders."  Dkt. 740 (Post-

Hearing Reply) ¶ 16(b).  The Court granted the relief.  Dkt. 742.  No one appealed.

106.    The Government Parties, accordingly, have taken "directly inconsistent" positions

on whether Current Expense claimants have a right to be paid ahead of the bonds.[34]  *Alt. Sys.*

*Concepts*, 374 F.3d at 33.  It is also apparent that the Oversight Board "succeeded in persuading

a court to accept its prior position."  *Id.*  As noted, to ensure that the bonds would not be

prejudiced, the Court required that "Eligible Uses" be limited to Current Expenses.  The final

DIP Order was entered (over National's objection) after the Court heard repeated arguments

regarding the lack of harm to the bonds due to the "*prior right*" of Current Expenses to be paid.

107.    In addition to arguing now that Current Expenses do not have "priority" over the

bonds, and that the bonds are not "subordinate" to Current Expenses — despite having said the

exact opposite to obtain approval of the DIP Motion — the Government Parties have also

reversed themselves on whether the repayment of a facility tailored to fund Current Expenses

should be treated as a Current Expense, arguing now that the Fuel Lines are not Current

Expenses because they only *financed* the payment of Current Expenses.  2d Supp. ¶ 53.  But the

---

[34]    In opposing the Receiver Motions in this Court and the First Circuit, the Government Parties similarly took a
position directly contrary to what they argue now.  *See* Dkt. 149 at 5 ("[T]he bondholders' right to payment is
subordinated to the payment of Current Expenses."); FOMB Brief, Case No. 17-2079 (1st Cir.), at 9 ("Before *any*
bond payments *can* be made, revenues placed into the General Fund *must* be 'used first for the payment of the
Current Expenses of the System.'" (quoting Ex. 3 § 505)).

DIP Facility was likewise a *financing* of Current Expense payments, and the Government Parties

sought and obtained a judicial finding that, because the DIP financing could be used only for

Current Expenses, repayment of the DIP Facility was itself a Current Expense:

> 9.  Current Expense Classification.  "**Eligible Uses**" of the proceeds of the
> Loans . . . are limited to certain categories of expenses, all of which
> **constitute "Current Expenses" under the Trust Agreement.  As such,
> the Debtor's repayment obligations to the Lender for amounts
> borrowed under the Facility shall be deemed to be "Current
> Expenses" under the Trust Agreement.**

DIP Mot., Ex. A ¶ 9.

108.    Prior to entry of the final order, the Oversight Board tweaked the language of this

provision — so that the final version says that the amounts borrowed "***are treated as* Current**

**Expenses**" (instead of "deemed to be") — and added a limited reservation of rights to the end of

the paragraph stating that "[n]othing in this Order (a) prejudices the right of any party to argue

(on the basis of this paragraph 9 or otherwise) that a pre-petition claim is or is not a Current

Expense or (b) constitutes a determination of such issue."  DIP Order (Dkt. 744) ¶ 9.

109.    As a result of this reservation, the DIP Order does not itself "determine" that the

Fuel Lines are Current Expenses.  But the DIP Order has *no* reservation of rights regarding the

*priority status* of Current Expenses — which, as discussed, was a predicate to the relief sought.

For the Government Parties, moreover, the reservation has no bearing on whether they are barred

by the doctrine of *actos propios* from disavowing their many prior acknowledgments of the Fuel

Lines' Current Expense status.  And paragraph 9 explicitly preserves the Fuel Line Lenders'

right to argue, "on the basis of this paragraph 9," that the Fuel Lines *are* Current Expenses.  That

argument is very simple:  If the DIP facility was a Current Expense because it existed to fund

Current Expenses, as the Order provides, the exact same logic applies to the Fuel Lines.  Indeed, it would be completely arbitrary for the DIP loan and the Fuel Lines to be treated differently.[35]

110.    The Government Parties' conduct *to this day* is at odds with their position on this motion that the Fuel Lines are not Current Expenses.  On August 20, 2019, while this Settlement Motion was pending, the Oversight Board and PREPA obtained approval of an amendment to a contract with Freepoint Commodities, LLC, in which Freepoint agreed to provide PREPA with a credit limit of up to $250 million to finance fuel purchases.  Dkt. 1600.  The underlying agreement states that:  "As of the date hereof and on the date of each delivery, PREPA represents and warrants (i) all amounts payable by PREPA pursuant to the term of this Contract constitute and qualify as a 'Current Expense'" under the Trust Agreement and that "(ii) the Trust Agreement has not been modified or amended in any way that affects the definition or priority of 'Current Expense.'"  Ex. 20 (Freepoint Agreement) Art. XII.I.  PREPA also acknowledged that *the Fuel Lines* are (unpaid) Current Expenses:  the agreement states that PREPA is paying "all Current Expenses . . . other than" the two Fuel Lines and pension obligations.  *Id.* Art. XII.K.  The amendment, which was recently approved, Dkt. 1624, provides that each provision of the original agreement, including the provisions affirming the Current Expense status of the Fuel Lines and the priority of Current Expenses, remains "unaltered and fully enforceable."  Ex. 20. 4th Amend. at 16.

111.    The contradictory positions taken by PREPA and the Oversight Board epitomize "playing fast and loose with the courts."  *Franco*, 184 F.3d at 9.  As a matter of fairness and the integrity of the judicial process, the Government Parties should be held to their repeated

---

[35]    To this day, in PREPA's monthly financial reporting, the DIP loan and the Fuel Lines are all placed in the same category:  "Operational Financing."  *See, e.g.*, Ex. 30 at 10 (August 2019 Monthly Report).

representations that Current Expenses are entitled to be paid before the bonds. All parties, moreover, are bound by the final DIP Order, which, as explained above, was predicated on the Government Parties' position that Current Expenses have priority over the bonds.

### 3.   The Forbearance Agreements preclude the Government Parties from contesting the Fuel Lines' status and priority.

112.   The Government Parties are also barred from denying the Current Expense and priority status of the Fuel Lines by the express terms of forbearance agreements among PREPA, the bondholders, and the Fuel Line Lenders. As described above, when PREPA was in crisis in 2014, the Fuel Line Lenders agreed to forbear from exercising remedies. In return, PREPA reaffirmed that the Fuel Lines "are '*Current Expenses*,'" that they have "*first priority in the waterfall structure under the Trust Agreement*," and that PREPA would "*never*" take action to contest that status. Ex. 22 (Scotiabank July 2014 Forbearance Agreement) § 5(a)(ii) (first emphasis in original). Both PREPA and the bondholders also agreed not to use the Fuel Line Lenders' forbearances or the passage of time more broadly as a basis to contest their Current Expense status. Ex. 24 (August 2014 Bondholder Forbearance Agreement) § 2(b).

113.   The Forbearance Agreements must be enforced. Both PREPA and the bondholders agreed that the Fuel Line Lenders could specifically enforce the commitment not to argue that the passage of time would affect the lenders' Current Expense status. *Id.* § 11. But even without that provision, Puerto Rico law requires specific performance when a party seeks enforcement of a promise *not* to do something. As stated by the Supreme Court of Puerto Rico:

> [the] Civil Code and the Spanish Civil Code suggest "forced performance" by providing that *when the debtor does what he has been forbidden to do he can be compelled to undo what he unlawfully did*. (31 L.P.R.A. § 3016). Civil law commentators accept here substituting the compensation for damages for the injunction only when it is impossible to undo what has been unduly done, as for example, when a trade secret is unlawfully divulged.

*Garcia* v. *World Wide Entm't Co.*, 1992 P.R.—Eng. 754,802, 132 D.P.R. 378, 386 (1992).  Here,

by challenging the Fuel Lines' Current Expense status, including based on the passage of time,

PREPA is doing exactly what it has "been forbidden to do" under the Forbearance Agreements.

114.     PREPA's bankruptcy does not change that result.  The remedies available to the

Fuel Line Lenders for breach of the Forbearance Agreements cannot be reduced to a "claim" or

"right to payment" as defined in section 101(5)(B) of the Bankruptcy Code.  An equitable

remedy constitutes a "claim" only if, under applicable law, "'a monetary payment is an

alternative for the equitable remedy.'"  *Rederford* v. *U.S. Airways*, 589 F.3d 30, 36 (1st Cir.

2009) (quoting *Air Line Pilots Ass'n* v. *Cont'l Airlines*, 125 F.3d 120, 133 (3d Cir. 1997)).[36]

115.     Here, as noted, Puerto Rico law does not recognize damages as a viable

alternative in this situation.  *Garcia*, 132 D.P.R. at 386.  Moreover, in analogous circumstances,

a bankruptcy court in the First Circuit recognized that there is no monetary remedy sufficient to

compensate for a debtor's breach of a contractual provision relating to security for repayment —

and thus priority in bankruptcy — as opposed to the right to payment itself.  Specifically, in *In re

Jackson*, the court found that a cause of action seeking to reform a mortgage to ensure its validity

was not a "claim" in bankruptcy because it did not "give[] rise to a right to payment."  231 B.R.

142, 144 (Bankr. D. Mass. 1999).  While "[t]he right to payment arises from breach of

obligations under the note," "[b]reach of the[] mortgage covenants affects only the mortgage as

valid security."  *Id*.  Similarly here, the Fuel Line Lenders' right to payment arises from

PREPA's failure to repay the amounts it borrowed under the Credit Agreements.  A claim for

---

[36]     In *Autonomous Municipality of Ponce* v. *Financial Oversight & Management Board*, the court concluded that
monetary damages could adequately compensate for the breach of a contract to complete an underground wiring
project.  939 F.3d 356, 362 (1st Cir. 2019).  In that case, there was no meaningful dispute that there was a monetary
sum that would provide an adequate remedy for the failure to complete the project.  *Id*.  Here, Puerto Rico law and
the nature of the breach provide no viable monetary remedy.

breach of the Forbearance Agreements does not give rise to any additional monetary obligations

of PREPA, but rather arises from a separate commitment (given for separate consideration) to

preserve the priority status of the Fuel Lines despite the passage of time.

116.    Enforcing PREPA's commitments to the Fuel Line Lenders under the

Forbearance Agreements is also clearly justified as a matter of policy and fairness.  The Fuel

Line Lenders refrained from exercising remedies to save PREPA from the consequences of

default.  PREPA (and the bondholders) received all the benefits of that forbearance.  Yet they

now seek to deprive the Fuel Line Lenders of what they bargained for, including the agreement

of *all* parties not to use the passage of time to prejudice the Fuel Line Lenders.  As courts have

recognized, there is a "strong bankruptcy policy in favor" of "out-of-court" restructuring

solutions.  *In re Chateaugay Corp.*, 961 F.2d 378, 382 (2d Cir. 1992); *see In re Triple A&R

Capital Inv.*, 519 B.R. 581, 584 (Bankr. D.P.R. 2014) (recognizing "public polic[y] favoring out

of court workouts"), *aff'd*, 2015 WL 1133190 (D.P.R. Mar. 12, 2015).  The Bankruptcy Code

cannot be interpreted to "create[] a disincentive for creditors to cooperate with a troubled

debtor."  *Chateaugay*, 961 F.2d at 382.  But that is precisely what would happen if the

Government Parties (and the bondholders) are allowed to repudiate the commitments they made

to induce the Fuel Line Lenders to forbear, including in particular the commitment not to use the

resulting passage of time against the Fuel Line Lenders.

**D.    The priority of the Fuel Lines over the bonds is enforceable and does not
depend on a direct intercreditor agreement.**

117.    In trying to defend the settlement, the Government Parties argue that there is no

enforceable priority scheme here because there is no agreement "between" Current Expense

claimants and the bondholders.  2d Supp. ¶ 36.  But this misstates the issue presented by this

motion.  As shown above, the priority of Current Expenses results in part from the limitations

imposed by the Trust Agreement on the bondholders' lien and recourse.  Regardless of whether

there is an intercreditor agreement between the Fuel Line Lenders and the bondholders, the

Government Parties cannot use a "settlement" to expand the bonds' rights under the Trust

Agreement and, by doing so, deprive Current Expense claimants of their priority.  As discussed

next, any such settlement is inherently unreasonable and prejudicial to non-settling parties.

> **1.    The priority of the Fuel Lines over the bonds is a product of the bonds' limited lien and recourse.  The settlement alters that priority.**

118.    In the Second Supplement, the Government Parties do not address the limits on

the bondholders' lien and recourse.  Instead, they focus on the lack of a traditional intercreditor

agreement between Current Expense claimants and the bondholders.  *E.g.*, 2d Supp. ¶ 36.  But in

providing the DIP Lender (the Commonwealth) and Freepoint with Current Expense status —

with approval from this Court — the Government Parties ***never once*** suggested that an

agreement "between creditors" is necessary for those lenders to have priority.  *Id.*  Rather, the

Government Parties insisted, based on the terms of the Trust Agreement alone, that Current

Expense claimants have a "***prior right***" to be paid before "***any***" payment can be made on the

bonds and that the bondholders' claims and liens are "***subordinate***" to Current Expenses.  *See*

Point I.C.2, *supra*.  They were correct.

119.    As with the DIP Lender and Freepoint, the Fuel Lines' priority position is a

function of the limits imposed by the Trust Agreement on the bondholders' recourse and lien.

As a result of those limits, the bondholders have no claim against or lien on the General Fund,

ensuring that Current Expense claimants (who do have such a claim) will get paid first.  Those

limits on the bondholders' rights exist *regardless* of whether there is a direct agreement between

the Fuel Line Lenders and the bonds, and regardless of whether there is a "subordination

agreement" for purposes of section 510(a) of the Bankruptcy Code.  And those limits are

enforceable irrespective of the rights of the Fuel Line Lenders under section 510(a):  Under

section 502(a), the bondholders' claims are objectionable to the extent they seek to recover from

property beyond the Sinking Fund (or, at most, Net Revenues); and, under section 506(a), the

scope of their security must likewise be limited to the Sinking Fund (or, at most, Net Revenues).

120.    In their submissions, the Government Parties do not articulate any argument —

and there is no colorable argument — that the bondholders have a legal right to be paid out of (or

a lien on) the "gross" revenues in the General Fund.  Nonetheless, in the RSA, the Government

Parties have agreed to divert hundreds of millions of dollars to bondholders before meeting their

obligations to Current Expense creditors that are actually entitled to be paid from the General

Fund.  This departure from pre-petition priorities requires denial of the Settlement Motion.

*See, e.g.*, *In re C.P. del Caribe*, 140 B.R. at 326-27; *In re Liberia Alma Mater*, 123 B.R. at 699.

121.    In addition, through the release of the "Lien Challenge," the Government Parties

have agreed to deprive their creditors of the ability to use sections 502(a) and 506(a) to enforce

the limitations on the bondholders' lien and recourse.  Thus, rather than "preserv[ing]" all

arguments for confirmation, as the Government Parties have assured the Court they are doing,

Supp. ¶ 97, the Government Parties have taken a fundamental issue off the table.  Under the

Bankruptcy Code, "[a] claim or interest, proof of which is filed under section 501 of this title, is

deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a); *see* Fed. R. Bankr.

P. 3001(f); *In re Ibarra*, 235 B.R. 204, 212 (Bankr. D.P.R. 1999).  In their proof of claim, the

bondholders have (wrongly) asserted that they have a claim against and lien on "*all* Revenues of

the System."  *See* Proof of Claim No. 18449, Ex. A, at ¶¶ 6, 7(c).  If no party can object to the

bondholders' claim, including on priority grounds, then under section 502(a), that is the claim

the bondholders will have, including at plan confirmation.  As a result, the bondholders'

treatment will be locked in.

122.    In the Second Supplement, the Government Parties argue (for the first time) that

they can pay the bonds before the Fuel Lines because payment of Current Expenses out of the

General Fund is somehow "optional."  2d Supp. ¶ 37.  As shown above, this argument is belied

both by Section 505's mandatory language (the General Fund "*will* be used. . . .") and by the

Government Parties' representations that Current Expense claimants have a "***prior right***" to be

paid from the General Fund before "***any***" revenue "***could***" go to bondholders.  *See supra* Point

I.C.2.  But even if the promise to pay Current Expenses could be rewritten as an option, it would

not help the bondholders, since the Trust Agreement still limits the scope of their lien and

recourse.  The Trust Agreement indisputably empowers PREPA to pay Current Expenses before

the bonds (even after a default).  Ex. 3 §§ 804, 507.  As a result, the bonds can have no

enforceable claim to or lien on the amounts in the General Fund needed to pay Current Expenses.

Under settled law, a claim in bankruptcy or a corresponding lien requires an *enforceable* right to

payment, not a mere *possibility* of payment at the supposed "option" of the debtor.[37]  Allowing

the bondholders to recover before Current Expenses — because PREPA has unilaterally decided

to pay the bonds ahead of Current Expenses — is not a "settlement" of anything; it is an outright

*gift* to the bonds, out of General Fund assets from which the Fuel Line Lenders, but not the

bondholders, are entitled to recover.

---

[37]    *See, e.g.*, *In re Spencer*, 457 B.R. 601, 613 (E.D. Mich. 2011) ("A supposed right to payment that can be
avoided solely by discretionary action of the debtor is no right at all; it is merely illusory."); *U.S. Bank Nat. Ass'n* v.
*S. Side House, LLC*, 2012 WL 273119, at *5 (E.D.N.Y. Jan. 30, 2012) (claimed right to payment dependent on
borrower's exercise of option to prepay loan is "best thought of not as a 'right to payment' vesting with the lender,
but a right of the borrower . . . . [such] prepayment consideration would not be included as a pre-petition 'claim'
under the Bankruptcy Code"); *see also In re Klein-Swanson*, 488 B.R. 628, 633 (B.A.P. 8th Cir. 2013) (discretionary
bonus was not property of the estate because the debtor's employer "had the absolute discretion to decide that it
would not make an award" of the bonus).

**2.    Although the Court does not have to reach the issue, a subordination agreement does not require an agreement between creditors.**

123.    As discussed, to deny the Settlement Motion, the Court does not have to decide whether there is a "subordination agreement" for purposes of section 510(a) of the Bankruptcy Code.  But the Government Parties are wrong on that issue as well.  Contrary to the Government Parties' new position, and consistent with their many representations that the bonds are "subordinate" to Current Expenses, a subordination agreement does *not* require a direct agreement "*between creditors*," 2d Supp. ¶ 41 (emphasis in original).  The bondholders agreed in the Trust Agreement that Current Expenses would be paid before PREPA's revenues would become available to the bondholders.  That is a subordination agreement.  There is no basis to excuse them from that agreement.

124.    Numerous courts have enforced promises to subordinate without an intercreditor agreement.  Almost a century ago, in *In re Geo. P. Schinzel & Son, Inc.*, Judge Learned Hand enforced an agreement between "the bankrupt and a number of creditors" that the debtor's business would be placed in the hands of a trustee, and "all the signing creditors agreed not to press their claims while the agreement was in operation."  16 F.2d 289, 289 (S.D.N.Y. 1926).  After the trustee was appointed, suppliers continued to extend credit in reliance on the debtor's agreement to "take care of them first" and, although they were not parties to that agreement or named beneficiaries, Judge Hand allowed the suppliers to enforce the agreement based on "the plain expression of an intention to give priority" to them.  *Id.* at 290, 289-90.

125.    Subsequent cases likewise refute the Government Parties' argument that an "agreement between creditors" is necessary for subordination.  For example, in *In re Credit Industrial Corp.*, the Second Circuit defined a subordination agreement as one in which "*a creditor and the bankrupt agree* to create priorities among debts," noting that "such agreements

have been uniformly enforced according to their terms by bankruptcy courts."  366 F.2d 402, 409
(2d Cir. 1966).  In that case, the court held that where the terms of one creditor's note provide
that another creditor will be paid first, the "senior" creditor can enforce that agreement without
being a party *or* a "third-party beneficiary" and even without demonstrated reliance on (or even
knowledge of) the agreement.  *See id*. at 407, 410.  Otherwise, the court stated, the junior
creditor would be granted "a windfall which has no justification in reason, equity or logic. . . .  A
bankruptcy court . . . [must] prevent junior creditors from receiving funds where they have
explicitly agreed not to accept them."  *Id*. at 410 (internal quotations omitted).[38]

126.    Similarly, in *In re AM International, Inc.*, a bank that held a perfected lien on all
of a borrower's assets orally agreed to an arrangement whereby the borrower's receipts would be
paid to a lockbox at another bank, and that other bank would pay 75% of the receipts to the
borrower's supplier.  46 B.R. 566 (Bankr. M.D. Tenn. 1985).  Holding that "a subordination
agreement does not necessarily depend on a direct communication between the prior secured
party and the new seller or lender," the court enforced the supplier's entitlement to 75% of the
receipts.  *Id*. at 573; *see also In re Howland*, 545 B.R. 653, 659 (Bankr. D. Or. 2015) (oral
understanding between debtor and his father that the father's loans would not be paid until other
creditors were paid held enforceable notwithstanding the absence of an agreement between the
father and the other creditors).

127.    Authority for the enforcement of subordination promises is also found in cases
construing section 9-316 of the Uniform Commercial Code, 19 L.P.R.A. § 2289, which provides:

---

[38]    The Fifth Circuit has reached a similar conclusion.  In *In re Bobby Boggs, Inc.*, 819 F.2d 574 (5th Cir. 1987), an
insurance agency that had been retained to seek a surety for the debtor received a letter from the debtor's bank that
the bank would agree to come second on the debtor's receivables.  The Fifth Circuit held that the letter created an
enforceable subordination agreement and, further, that, "[e]ven if no bilateral contract existed," "a unilateral promise
which is foreseeably and detrimentally relied upon" would be enforced under principles of promissory estoppel or
equitable subordination.  *Id*. at 578-79.

"This chapter does not preclude subordination by agreement by a person entitled to priority." Those cases again confirm that "a subordination agreement *between a debtor and a creditor* can be enforced," and that there is *no* requirement that "the agreement by the party entitled to priority must be with the other creditor." *In re Envtl. Aspecs, Inc.*, 235 B.R. 378, 397 (E.D.N.C. 1999).

128.    Ignoring this long line of authority recognizing the enforceability in bankruptcy of a creditor's agreement with its debtor to subordinate to other creditors, the Government Parties rely on one decision, *In re Holly's, Inc.*, 140 B.R. 643 (Bankr. W.D. Mich. 1992). But *Holly's* does not support the effort to set aside the bondholders' agreement to come behind Current Expenses. First, the *Holly's* court made clear that its analysis of the subordination issue was driven by a circumstance that does not exist here, namely that it involved dual bankruptcies of the junior creditor and the common debtor, a hotel and its manager. *Id.* at 670. In that "unlikely dual bankruptcy situation," the court concluded that the hotel's promise in the management agreement between the two debtors that it would pay the bank, the senior creditor, ahead of the manager was a "negative promise," unenforceable in bankruptcy. *Id.* at 672-74. The court rested its conclusion at least in part on the fact that the bank was seeking "to collect a debtor's [the manager's] *postpetition earnings* to be applied to a prepetition debt." *Id.* at 678-79.

129.    Regardless, contrary to the assertion of the Government Parties, the Fuel Line Lenders are *not* relying solely on a "negative" promise by PREPA, *the debtor*, "that it will pay them" ahead of the bondholders. 2d Supp. ¶ 43. Rather, in the Trust Agreement, the *bondholders* made an affirmative agreement not to be paid (or even to have recourse) until Current Expenses are paid. That agreement by the bondholders is equivalent to the "affirmative promise" in *Holly's*, by the junior creditor (the manager), which the court *enforced*. In particular, the court in *Holly's* held that, unlike the debtor's "negative promise" to the bank, the

-55-

manager's agreement to subordinate its fee "create[d] a common debtor-senior creditor-junior creditor relationship and constitutes a subordination agreement." *Id.* at 675.[39] Significantly, the court acknowledged that a subordination agreement "*may be between the debtor and the subordinated creditor*," *id.* at 668, enforcing the subordination promise even though the senior creditor (the bank) was not a party to the agreement.[40]

130.    In this case, as in the cases discussed above, the bondholders expressly agreed that Current Expense claimants would be paid before them.  That agreement was reflected in Section 505 of the Trust Agreement, which states that "moneys in the General Fund *will be used first* for the payment of the Current Expenses of the System"; Section 507, which limits the bondholders' lien and recourse to "the moneys" in accounts that can only be funded after Current Expenses are paid; and Section 502, where it was agreed that any increase in rates to pay the bonds would first be sufficient "to pay the Current Expenses of the System."  Ex. 3 §§ 505, 507, 502(B).  As in *Geo P. Schinzel*, the bondholders clearly "intended that the supplying creditors should have the first call on any payments made" by PREPA.  16 F.2d at 290.  Allowing PREPA to pay its bondholders ahead of Current Expenses under the RSA would provide the

---

[39]    The Fuel Line Lenders respectfully disagree with *Holly's* to the extent it is read to hold that a "negative" promise cannot be sufficient for subordination.  But regardless, in this case both kinds of promises were made:  the bondholders agreed to be subordinate to Current Expenses (the "affirmative" promise), and PREPA agreed to pay the Fuel Lines before the bonds (the "negative" promise), while providing the bonds with explicit notice of the Fuel Lines' priority.

[40]    Just as *Holly's* does not support the Government Parties' position, none of the other cases cited by the Government Parties (*see* 2d Supp. ¶ 41) holds that a subordination agreement requires a contract between creditors.  Neither *Best Products* nor *Boston Generating* even addressed the issue.  *See In re Best Prods. Co.*, 168 B.R. 35, 69-71 (Bankr. S.D.N.Y. 1994) (issue of whether an agreement between creditors is required was not before the court); *In re Bos. Generating, LLC*, 440 B.R. 302, 319 (Bankr. S.D.N.Y. 2010) (no issue concerning the enforceability of a subordination agreement; language quoted by Government Parties related to whether second lien creditor had "clear[ly] beyond peradventure" waived its right to object to a section 363 sale).  And *In re Howland*, 545 B.R. at 653, rejected the view that an agreement between creditors is required.  The other cases cited by the Government Parties addressed the issue of standing in situations that are not remotely analogous.  *See In re Chi., S.S. & S.B. R.R.*, 146 B.R. 421 (Bankr. N.D. Ill. 1992) (subordination rights granted to particular lenders cannot be asserted by bankruptcy trustee on behalf of all creditors); *In re El Paso Refinery L P*, 171 F.3d 249 (5th Cir. 1999) (same); *In re Thomas*, 459 B.R. 708, 711 (Bankr. E.D. Mich. 2011) (chapter 13 debtor could not challenge validity of subordination agreement between her two lenders).

bondholders, in the words of the Second Circuit, with "a windfall which has no justification in reason, equity or logic." *Credit Indus.*, 366 F.2d at 410.

> **3.     Although the Court does not have to reach the issue, Current Expense claimants are beneficiaries of the Trust Agreement.**

131.    The Government Parties also seek to excuse the bondholders from their agreement to come behind Current Expenses on the theory that the Fuel Line Lenders are not third-party beneficiaries of the Trust Agreement and thus cannot enforce the bonds' subordination.  As explained above, the Court does not have to decide whether there is a "subordination agreement" to deny the Settlement Motion.  *See* Point I.D.1, *supra*.  And cases holding that a "contract between creditors" is not necessary for subordination, *see* Point I.D.2, also support the conclusion that, to enforce a subordination arrangement, it is not necessary to resort to "strained theories of third-party beneficiary," *Credit Indus.*, 366 F.2d at 407.

132.    But if the Court does reach that issue, it should recognize that the Fuel Line Lenders *are* third-party beneficiaries of the Trust Agreement's waterfall provisions.  *See Holly's*, 140 B.R. at 673-74 (under Michigan law, recognizing the bank's right to enforce the manager's subordination agreement as an unnamed third-party beneficiary).  The leading case in Puerto Rico is *Banco Central* v. *Yauco Homes*, 135 D.P.R. 858 (1994).[41]  In *Banco Central*, the seller of a property to a developer took back a mortgage but agreed, in a deed of sale, to "postpone and subordinate" its mortgage to a mortgage securing a construction loan.  *Id.* at 867.  The developer defaulted on its obligations to both the seller and the construction lender, and the Court enforced the subordination at the behest of the construction lender, even though the construction lender was *not* a party to the sale and mortgage agreement.  *Id.*  The Court held that it was *not* necessary

---

[41]    A certified translation of *Banco Central* is attached as Ex. 31.

for the beneficiary of the subordination to be named in the contract; rather, determination of whether "the third party [has] the right to claim fulfillment of the promise, is a question of fact" to be determined based on "the intention of the contracting parties." *Id.* at 866-67.  The court observed that, even "in more questionable cases, a stipulation in favor of a third party has been deemed to exist.  It has been resolved that when A lends to B, agreeing that B would return the money to a third party, it was the intention of the parties to give the third party a right to claim that which is due directly from B." *Id.* at 867.  The court also held that the parties' intent in the case at bar was *not* "questionable"; rather, the language in the deed of sale "*clearly*" supported subordination.  *Id.*; *see also CPA Grp. Int'l Inc.* v. *Am. Int'l Ins. Co. of P.R.*, 2002 WL 31944044, at *11 (D.P.R. May 23, 2002) (third party can enforce a contract "if the benefits afforded to that party can be identified from the provisions of the contract").

133.    Application of *Banco Central* to this case shows that the Fuel Line Lenders are intended beneficiaries of the Trust Agreement.  Here, consistent with the description in *Banco Central*, Party A (the bondholders) lent money to Party B (PREPA), agreeing that if PREPA incurred obligations to Party C, a provider of Current Expense goods or services, Party B would repay Party C first (out of the General Fund).  And the Fuel Line Lenders and other Current Expense claimants repeatedly accepted and relied on that benefit in transacting with PREPA.

134.    In the face of the overwhelming evidence that all parties intended that Current Expense claimants would have priority, the Government Parties argue that the parties' intent should be disregarded based on the Trust Agreement's boilerplate "no third-party beneficiaries" clause.  2d Supp. ¶ 32 (quoting Ex. 3 § 1304).  But that argument also fails.

135.    First, the Supreme Court of Puerto Rico takes a fact-specific approach in determining whether non-parties to an agreement are intended beneficiaries, and will not give

-58-

effect to a boilerplate no-third-party-beneficiary clause where an agreement was designed to induce reliance by particular third parties.  Thus, in *Industrial Equipment Corp.* v. *Builders, Inc.*, the Court ruled that a non-party materialman had the right to claim directly from a surety, notwithstanding a clause in the surety bond stating that "no right of action shall accrue on this bond to or for the use or benefit of any person or corporation other than Owner and Lender herein named."  8 P.R. Offic. Trans. 296, 298, 108 D.P.R. 290 (1979).  As the Court recognized, "[t]o deny him this right would mean to deny effectiveness to the stipulation in favor of a third party."  *Id.* at 298.  The same is true here.  PREPA used (and to this day uses) the priority status of Current Expenses to induce third parties to support and finance PREPA's operations.  As the *UTIER* decision discussed below states, "to assure continuity of operations, it was necessary to specify in the trust that current expenses would be paid first" from PREPA's revenues.  *UTIER* at 72.  Denying those third parties — including the Fuel Line Lenders, the DIP Lender and Freepoint — the right to enforce the priority scheme in the Trust Agreement would retroactively alter the terms on which those parties transacted with PREPA.

136.    In this case, moreover, the Court does not need to disregard or otherwise deny effect to the no-third-party-beneficiary clause in the Trust Agreement, because that clause begins with a carve-out that applies to Current Expense claimants:  "*Except as herein otherwise expressly provided . . . .*"[42]  The Trust Agreement contains various "express" provisions showing the parties' intent to subordinate the bonds to Current Expenses.  Section 505 states that Current Expenses "*will* be paid" before the bonds, and the Trust Agreement (including Section 507) limits the bondholders' lien and recourse to accounts that can only be funded after Current

---

[42]    In *Bayerische Landesbank* v. *Aladdin Capital Management, LLC*, the Second Circuit concluded that the term "herein" in a similar carve-out referred to the entire contract, rather than to the no-third-party beneficiaries clause alone.  692 F.3d 42, 53-54, 56 (2d Cir. 2012).

Expenses are paid from the General Fund.  Those "express" provisions show the same intent as

the "postponement" provision in *Banco Central*, which the Supreme Court held was "clearly"

sufficient to protect the senior creditor.  *Id*. at 867.[43]

137.    The Government Parties also rely on the purported ability of PREPA and the

bondholders to amend the Trust Agreement to argue that the Fuel Line Lenders have no

enforcement rights.  2d Supp. ¶ 31.  But the relevant provisions of the Trust Agreement were *not*

amended, as they are essential to PREPA's ability to induce counterparties to transact.  PREPA

recently induced Freepoint to continue financing fuel purchases with the representation that "the

Trust Agreement *has **not** been modified or amended in any way that affects the definition or

priority of 'Current Expense.'*"  Ex. 20 (Freepoint Agreement) Art. XII.I.  PREPA also relied on

the "Current Expense" definition in the DIP credit agreement to induce its DIP Lender to fund

operating expenses during this Title III case.  Dkt. 586-1 § 9-2.  In any event, under Puerto Rico

law, once third parties such as the Fuel Line Lenders have accepted the benefit of a contract, the

contracting parties cannot revoke it.  *See Banco Central*, 135 D.P.R. at 865.[44]

---

[43]    If there is any question regarding the effect of those provisions, the issue should be decided on a full record in
an adversary proceeding, or in the context of a plan, and not in a settlement context lacking both a full record and
full-blown rights and procedures.  *See U.S. Fidelity & Guar. Co.* v. *RR Enters., Inc.*, 2005 WL 2808029, at *4
(D.P.R. Oct. 27, 2005) (dispute of material fact existed where no-third-party beneficiary clause was in tension with
other provisions of agreement); *IV Sols.* v. *United HealthCare Servs., Inc.*, 2017 WL 6372488, at *12 (C.D. Cal.
Sep. 27, 2017) ("The inclusion of a boilerplate 'no third party beneficiaries' clause does not operate to 'disclaim any
intent to benefit third party beneficiaries' where the [agreement] contains other more specific provisions.").

[44]    The cases cited by the Government Parties (*see* 2d Supp. ¶ 32) with respect to third-party-beneficiary clauses do
not support a different result.  In *Real Legacy Assurance Co.* v. *Santori Trucking*, 2008 WL 11357822, at *3 (D.P.R.
2008), the no-third-party-beneficiary clause "only solidifie[d]" the court's conclusion that the remainder of the
contract did not show any intent to confer a benefit on any stranger to the contract; here, in contrast, the Trust
Agreement as a whole overwhelmingly shows an intent to benefit Current Expense claimants, as in *Banco Central*.
And both *Oppenheimerfunds* and *CFIP* applied New York law, which, as those courts interpreted it, has a
presumption that clauses disclaiming any intent to benefit third parties are conclusive; by contrast, the disclaimer
clause here has an exception (as discussed above) and, in any event, the Puerto Rico Supreme Court applies a fact-
based approach that would look to the Trust Agreement as a whole, which clearly reflects an intent to benefit
Current Expense claimants.  *See Oppenheimerfunds Inc.* v. *TD Bank, N.A.*, 2014 N.Y. Slip. Op. 30379(U) (Sup. Ct.
N.Y. Cty. Feb. 10, 2014); *CFIP Master Fund Ltd.* v. *Citibank N.A.*, 738 F. Supp. 2d 450, 478-79 (S.D.N.Y. 2010).

138.    Finally, the Government Parties rely on the decision of the Court of First Instance in *UTIER*.  2d Supp. ¶¶ 9, 24, 33-35, 38, 40.  *UTIER* rejected a Contracts Clause challenge to the "Act for the Revitalization of the Electric Power Authority," which was enacted in connection with PREPA's pre-petition RSA and provided for a Transition Charge to pay financial debt.  The court held that the Transition Charge in that case "will not come from PREPA income or from the general fund" and therefore did not implicate PREPA's contractual obligations, as required for a Contracts Clause claim.  *Id.* at 72-73.[45]  While the Court of First Instance also stated that the employee plaintiffs did not have a "specific remedy" under the Trust Agreement to enforce "priority," 2d Supp. ¶ 38, that statement is not binding on this Court, nor does it bind the Fuel Line Lenders, who were not parties to that litigation.[46]  More significantly, however, the court in *UTIER* agreed that the Trust Agreement's priority scheme is mandatory.  The court concluded that, under the Trust Agreement, "PREPA was ***bound to comply with paying its current expenses before proceeding to pay the bonds***," and that "to assure continuity of operations, it was necessary to specify in the trust that current expenses ***would be paid first***" from PREPA's revenues.  *UTIER* at 72.  *UTIER* is thus consistent with the Fuel Line Lenders' basic position that the Trust Agreement, by limiting the bonds' recourse and lien to accounts that are funded only *after* payment of Current Expenses, *requires* payment of Current Expenses ahead of the bonds.

---

[45]    The Fuel Line Lenders respectfully disagree with this portion of the ruling, as well as any suggestion that Current Expense claimants cannot enforce the Trust Agreement.  Under the RSA, however, there is no question that the bondholders are receiving claims against PREPA itself, including large administrative expense claims.

[46]    Under Puerto Rico law, decisions issued by courts other than the Puerto Rico Supreme Court are binding only on the parties and are not precedential.  *See, e.g.*, *Junta de Residentes* v. *Mercedes*, 2019 PR App. LEXIS 2674, *16, 2019 WL 4493740 (T.C.A. Aug. 30, 2019); *Hiram Quiñones* v. *Administración de Corrección*, 2008 PR App. LEXIS 4105, *2 (T.C.A. Dec. 19, 2008).

## II.    THE SETTLEMENT IMPERMISSIBLY RELEASES OBJECTIONS AND CLAIMS OF THE FUEL LINE LENDERS.

139.    The Government Parties and bondholders have taken the position that the "Lien

Challenge" provisions of the RSA and Proposed Order[47] would release objections and causes of

action in the Fuel Line Lenders' Adversary Proceeding, including in particular the objections to

the bondholders' lien and their claims (Counts 2 and 3) and the plea for equitable subordination

of the bonds' claim (part of Count 4).  Adv. Pro. No. 19-00396 Dkts. 24, 25.  The Court,

however, should not permit the Government Parties to exercise control over and release any of

the objections or claims in the Fuel Line Lenders' Adversary Proceeding.  _First_, unlike a trustee

in a chapter 7 or chapter 11 case — which acts as a _fiduciary for creditors_ in settling claim and

lien objections — the Oversight Board is not a fiduciary for creditors and its interests here are

not aligned with those of creditors.  _Second_, the Fuel Line Lenders have a particularized interest

in prosecuting each of the objections and claims they have asserted.

### A.    The Oversight Board is not a fiduciary for creditors and should not be permitted to settle creditor objections and claims.

140.    Section 502(a) of the Bankruptcy Code provides that "[a] claim . . . is deemed

allowed, unless a party in interest," including a creditor, "objects."  Similarly, section 506(a) of

the Bankruptcy Code and Bankruptcy Rule 3012(a) provide that any party in interest can object

to the secured status of a claim.  _See In re Weinstein Co. Holdings LLC_, 595 B.R. 455, 463-64

(Bankr. D. Del. 2018) (parties in interest have standing to challenge secured status of claim

under section 506(a)).  And section 510 of the Bankruptcy Code permits parties to seek

---

[47]    The Amended Proposed Order provides that "[n]o person or entity . . . other than the Government Parties shall bring a Lien Challenge."  Amend. Proposed Or. ¶ 11; _see also_ RSA ¶ 1(a)(lxvi) (defining "Lien Challenge" as "any action that a Government Party . . . may bring to challenge the liens and claims (including the validity, _priority_, nature or extent of any liens or security interests) related to the Bonds").

subordination of claims, either pursuant to a "subordination agreement" under section 510(a) or under principles of "equitable subordination" under section 510(c).

141.    Despite the Code's unambiguous language authorizing creditors to challenge the claims and liens of other creditors, the First Circuit and some other courts have concluded that in a chapter 7 case, the trustee is generally the proper party to assert objections to claims under section 502(a).  *In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992).  The rationale for this rule is that a chapter 7 trustee (or a debtor in possession in a chapter 11 case) is appointed for the "estate" and represents the creditors to whom section 502 provides standing to object.  The trustee or debtor-in-possession has "*fiduciary duties*" to the "estate and its creditors" and "'acts as the spokesman for all the creditors in the discharge of the trustee's duty."  *Id.* at 1144, 1146, 1147; *accord Czyzewski* v. *Jevic Holding Corp.*, 137 S.Ct. 973, 978 (2017) (under chapter 11, "a fiduciary is installed to manage the estate in the interest of the creditors"); *In re Medomak Canning*, 922 F.2d 895, 902 (1st Cir. 1990) ("unsecured creditors" must "look[] to the Trustee in the first instance *as their fiduciary and representative to vindicate their interests*").

142.    As a fiduciary for creditors, a trustee has "the duty to maximize the value of the estate," *CFTC* v. *Weintraub*, 471 U.S. 343, 352 (1985), and "in turn, to maximize the amount the creditors will get paid," *In re Blasingame*, 920 F.3d 384, 388 (6th Cir. 2019); *accord In re Am. Cartage, Inc.*, 656 F.3d 82, 92 (1st Cir. 2011) (in settling claims, the trustee seeks to obtain "the maximum return for creditors (on whose behalf he toils)" (internal quotation omitted)).  Thus, under *Thompson*, the trustee enjoys "[t]he presumption of adequacy that attaches to representation undertaken *in the performance of a fiduciary duty*," justifying limits on individual creditor standing to object to claims.  *Thompson*, 965 F.2d at 1143, 1147.

143.     The rationale of *Thompson*, whatever its validity in a chapter 7 or chapter 11 case,[48] compels a different conclusion here.  Under PROMESA, there is *no* trustee, there is *no* estate,[49] and the Oversight Board does *not* exercise fiduciary responsibility to object to claims on behalf of creditors.  Indeed, it has no duty at all to maximize creditor recoveries.

144.     The *Thompson* court relied, in large measure, on section 704(a)(5) of the Bankruptcy Code as the statutory basis for its ruling that creditors generally do not have leave to object to the claims of other creditors.  965 F.2d at 1147.  Under that provision, a trustee "shall – if a purpose would be served . . . object to allowance of any claim that is improper."  11 U.S.C. § 704(a)(5).  Section 704(a)(5) is made applicable to chapter 11 cases through its incorporation in sections 1106 and 1107 — which impose the "*the trustee's fiduciary duties*" on a debtor in possession.  *Braunstein* v. *McCabe*, 571 F.3d 108, 124 (1st Cir. 2009); *accord Jevic*, 137 S.Ct. at 978.  But *neither* section 704(a)(5) nor sections 1106 and 1107 are applicable to cases under Title III of PROMESA.  *See* 48 U.S.C. § 2161(a).

145.     PROMESA defines the Oversight Board's mission as fundamentally different from that of a chapter 7 or 11 trustee:  "The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121.  And under Title III, the Oversight Board serves as "the representative of the *debtor*," 48 U.S.C. § 2175(b), as opposed to a bankruptcy trustee, who serves as "the representative of the *estate*,"  11 U.S.C. § 323(a) (not incorporated under PROMESA).  The Oversight Board, in contrast to a trustee, thus has *no* mandate to protect the interests of creditors

---

[48]   Other courts have persuasively disagreed with the *Thompson* approach, even in the chapter 7 or 11 context, based on the plain meaning of section 502(a), which authorizes any "party in interest" to object. *See, e.g.*, *In re Mechanicsburg Fitness, Inc.*, 592 B.R. 798 (Bankr. E.D. Pa. 2018).

[49]   *Gracia-Gracia* v. *Fin. Oversight & Mgmt. Bd.*, 939 F.3d 340, 350 (1st Cir. 2019).

or maximize their recoveries.  The Oversight Board's lack of a fiduciary duty to creditors under

PROMESA is consistent with the treatment of debtors under chapter 9, which omits the same

statutory sections.  *See* 11 U.S.C. § 901(a).  Those omissions have been held to be the reason

why chapter 9 debtors do not have fiduciary responsibilities to their creditors.  *See, e.g.*, *In re*

*Cty. of Orange*, 219 B.R. 543, 557 (Bankr. C.D. Cal. 1997) ("[T]he chapter 9 debtor does not

assume the same fiduciary responsibilities that a trustee has under the Code" because

"[§] 1107(a), which affords the debtor-in-possession with all the rights [and] responsibilities of a

trustee, is not incorporated into chapter 9, nor is § 704 incorporated into chapter 9.").

146.    *Thompson* makes clear that a bankruptcy trustee's exercise of its "fiduciary

dut[ies]" is dispositive on the issue of whether creditors can interpose objections to claims:

> Absent a compelling showing that the chapter 7 trustee *failed or refused to*
> *perform* ***a fiduciary duty*** imposed by the Bankruptcy Code, once the
> trustee arrives at an informed judgment that further prosecution of an
> objection to a proof of claim would be unavailing or counterproductive to
> the chapter 7 estate, the chapter 7 debtor and an individual unsecured
> creditor [lack standing].

965 F.2d at 1148.  As shown, *Thompson* drew a distinction between *the debtor*, which lacks

fiduciary duties and generally cannot object to claims, and *the trustee*, which is "the duly

appointed or elected representative of *all* unsecured creditors."  *Id.* at 1145 (emphasis in

original); *see id.* at 1147 (trustee is "spokesman for all the creditors") (quoting *In re Morrison*,

69 B.R. 586, 589 (Bankr. E.D. Pa. 1987)).[50]

---

[50]   The cases cited in the Second Supplement confirm that a trustee's role in challenging and settling claim and lien objections under sections 502(a) or 506(a) is based on the trustee's status as a fiduciary and creditor representative. *See In re Medomak Canning*, 922 F.2d at 902 (trustee is "fiduciary"); *In re Charter Co.*, 68 B.R. 225, 227 (Bankr. M.D. Fla. 1986) (creditors limited in objecting to claims only when trustee appointed to represent "the interests of all creditors"); *Schreibman* v. *Walter E. Heller & Co.*, 446 F. Supp. 141, 144 (D.P.R. 1978) (trustee "represent[s] all the creditors"), *aff'd sub nom. Walter E. Heller & Co.* v. *Las Colinas Dev. Corp.*, 577 F.2d 723 (1st Cir. 1978) (table); *In re Dow Corning Corp.*, 244 B.R. 721, 751 (Bankr. E.D. Mich. 1999) (relying on trustee's representation of creditors), *rev'd in part*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002).

147.    The Oversight Board's status as a debtor representative, and not a fiduciary for creditors, makes a critical difference on the question of standing to challenge claims and liens. As a fiduciary, a bankruptcy trustee "must display throughout the administration of the case *complete loyalty to the interests of the creditors*." *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 434 (6th Cir. 2004); *see* 7 *Collier on Bankruptcy* § 1108.09[1] (16th ed.) ("[A] chapter 11 trustee . . . owes single-minded devotion to the interests of those on whose behalf the trustee acts."). But, as noted, the Oversight Board has no such duty.  And in this case, the Oversight Board has interests that are quite different from those of creditors.  Most notably, like a chapter 9 debtor — and in stark contrast to a fiduciary bound to *maximize* recoveries for all creditors — the Oversight Board, because of its fealty to ratepayers and to the Commonwealth, has every interest in *limiting* and *capping* the amount of revenue that will have to be raised from ratepayers, regardless of how that may affect unsecured creditors.

148.    The Government Parties' filings confirm that their main goals here are *not* the goals of a creditor fiduciary.  Their primary goal was to protect "PREPA's **rate payers** from unknown and unlimited potential future rate increases," which was purportedly achieved by compensating the bondholders to release their rate covenant.  Supp. ¶ 22.[51]  But PREPA's non-settling creditors have different interests.  In particular, PREPA's compliance with the rate covenant would *increase* revenues and *benefit* Current Expense claimants, because the covenant by its terms encompasses Current Expenses.  *See* Ex. 3 § 502.  PREPA's *creditors* — including

---

[51]    *See* Brownstein Decl. ¶ 69 ("*The value to* **the Commonwealth** *and* **PREPA's ratepayers** *of avoiding an uncapped, floating transition charge or other uncapped rate adjustments* in favor of the RSA's fixed, predictable Transition Charge cannot be overstated.  **This was the Government Parties' primary goal** in negotiating with *Supporting Holders* and, I believe, the RSA achieves the Government Parties' goals for the people and businesses of Puerto Rico."); *see also* Supp. ¶ 23 (benefit to the "island's businesses and residents"); *id.* ¶ 44 (benefit to "ratepayers"); *id.* ¶ 76 (same); *id.* at ¶ 79 (same); *id.* ¶¶ 18-19 (goal to benefit ratepayers).

-66-

the Fuel Line Lenders — would not choose to transfer billions of dollars of value to bondholders to avoid the risk that the rate covenant would be enforced.

149.    Another primary goal of the Government Parties was to avoid appointment of a receiver.  *See* Supp. ¶¶ 9, 43.  But the Government Parties have made clear that, in that respect as well, they did not aim to protect *creditors*.  To the contrary, the Oversight Board has justified the settlement on the basis that "a receiver," unlike the Board, could be "***beholden to creditors' interests***."  Supp. ¶ 80.

150.    Thus, because the Government Parties are not acting as fiduciaries for PREPA's creditors, First Circuit law does not accord them exclusive authority over claim and lien objections involving the bonds.  *See Thompson*, 965 F.2d at 1148 (where bankruptcy trustee is not performing a "fiduciary duty," creditors have the right to object to claims of other creditors).

### B.    The Oversight Board should not be permitted to compromise or release the particularized objections and claims of the Fuel Line Lenders.

151.    Putting aside that the Oversight Board is not a fiduciary for the creditor body as a whole, the Fuel Line Lenders themselves have particularized interests that have not been represented at all.  *Thompson* recognizes that secured creditors, who have specific priority rights, are entitled to object to claims even in a chapter 7 case, because their interests are often not represented by the trustee.  *Id*. at 1147.  Likewise, various courts have recognized that when a creditor can point to a "particularized injury" not shared with all other creditors, that party's ability to object to claims cannot be eliminated by a settlement entered into by the trustee.

152.    A recent decision from the Bankruptcy Court for the District of Colorado is instructive.  In *In re DVR, LLC*, the bankruptcy court explained that, in situations where the trustee adequately represents the interests of creditors, section 502 of the Bankruptcy Code and Bankruptcy Rule 9019 work together "harmoniously," with the trustee empowered to settle claim

objections.  582 B.R. 507, 522 (Bankr. D. Colo. 2018), *aff'd*, 2019 WL 3943883 (D. Colo.

Aug. 21, 2019), *appeal docketed*, No. 19-1360 (10th Cir.).  On the other hand, when creditors

have "individual claims" against other creditors based on theories not shared by the general

creditor base, "neither the trustee, the DIP, nor the bankruptcy court has the authority to settle the

objection, regardless of the powers conferred by Rule 9019."  *Id.* at 512-13, 522.

153.     Here, the Fuel Line Lenders have asserted "individual claims" that are *not* shared

by creditors as a whole.  Their complaint alleges that the bondholders' lien and recourse are

limited at most to "Net Revenues," namely, revenues *after* Current Expenses.  The Fuel Line

Lenders further contend that their advances are a Current Expense based on facts unique to them,

and that the moneys needed to pay *them* are not subject to the bondholders' lien or their claim.

154.     The Fuel Line Lenders filed their complaint to vindicate those *individual* interests.

Through the declaratory judgment count and the objections under sections 502(a) and 506(a), *see*

Adv. Pro. No. 19-00396 Dkt. 36 (Counts 1, 2 and 3), they seek a ruling that diverting value to

bondholders, before Current Expenses are paid, would improperly expand the bondholders'

recourse and lien, to the specific detriment of the Fuel Line Lenders as Current Expense

claimants.  This is the kind of *priority-based* claim objection that has been allowed to proceed,

over the objection of a trustee who (unlike the Oversight Board) generally represents creditors,

because it involves the "individual" interests of the "objecting creditor."  *In re DVR*, 582 B.R. at

512-13 (citing *In re C.P. Hall Co.*, 513 B.R. 540, 544-45 (Bankr. N.D. Ill. 2014) and *In re CS

Mining, LLC*, 574 B.R. 259, 281 (Bankr. D. Utah 2017)).

155.     In seeking to usurp and release the Fuel Line Lenders' objections under sections

502 and 506, the Government Parties cite generic case law for the proposition that causes of

action of *a debtor* (such as avoidance actions) cannot be asserted by creditors.  Supp. ¶ 100 &

-68-

n.32.  But an objection to a claim or lien is *not* the same thing as an affirmative claim to augment

the debtor's property, such as an avoidance claim.  The power to bring avoidance claims under

PROMESA is specifically vested in the debtor or a special trustee.  *See* 11 U.S.C. § 926(a).[52]  By

contrast, sections 502 and 506 and Rule 3012 — as well as the case law summarized above —

empower individual creditors to object to claims or liens to protect their own particular interests.

156.    The Government Parties and bondholders have argued that approval of the RSA

will also release the equitable subordination claim in Count 4 of the Amended Complaint.  Adv.

Pro. No. 19-00396 Dkts. 24, 25.  But again, the Government Parties have no authority to release

that particularized claim.  Courts have consistently recognized that claims asserting

particularized subordination rights between creditors, including equitable subordination under

section 510(c), may be asserted only by creditors.[53]  Count 4, accordingly, cannot be released by

agreement of the bondholders and the Government Parties.

157.    Finally, despite insisting that the Amended Proposed Order approves only

"components of the RSA" (Supp. ¶¶ 3-5) and does not approve "the RSA in its entirety"

(*id*. ¶ 46) — and despite claiming at least five times that the Amended Proposed Order will not

impair or affect any cause of action for "turnover" of amounts received by bondholders

(2d Supp. ¶¶ 1, 8, 23, 25, 26) — the Government Parties have inserted a provision into the

Amended Proposed Order that would "exculpate" supporting bondholders for *any* action "in

---

[52]    The Government Parties' citations to cases involving settlements of avoidance actions brought under section 544, which are vested in the debtor under PROMESA, are therefore inapposite.  *See* Supp. ¶ 100.

[53]    *See, e.g.*, *In re Tara Retail Grp., LLC*, 595 B.R. 215, 224-25 (Bankr. N.D. W. Va. 2018) ("'[I]ndividual creditors have an interest in subordination separate and apart from the interests of the estate as a whole [and] should have an opportunity to pursue its separate interest.'" (quoting *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990))); *In re Elrod Holdings Corp.*, 392 B.R. 110, 115 (Bankr. D. Del. 2008) (individual creditor may pursue equitable subordination upon showing of "particularized injury"); *cf. In re Medomak Canning*, 922 F.2d at 902 (recognizing that even in a chapter 7 case, where the trustee is a "fiduciary" for all unsecured creditors, "creditors may sometimes litigate equitable subordination claims separately" to vindicate particular interests).

connection with" or "pursuant to" *any* aspect of the RSA, including "with respect to *payments made by PREPA to Supporting Holders*."  Amend. Proposed Or. ¶ 10.  That provision, by its terms, would appear to insulate the bondholders from any liability, including to the Fuel Line Lenders, for payments received from PREPA.[54]  The proposed order, including the exculpation provision, should not be entered to the extent it would have the effect of releasing, limiting or prejudicing *any* objection or cause of action in the Fuel Line Lenders' Amended Complaint.

### III.   THE GOVERNMENT PARTIES HAVE FAILED TO MEET THEIR BURDEN TO DEMONSTRATE THAT THE SETTLEMENT IS FAIR AND EQUITABLE.

158.    Setting aside the issues raised in Points I and II relating to the particular rights and interests of the Fuel Line Lenders, the Settlement Motion should be denied on the independent ground that the Government Parties have failed to demonstrate that the settlement "fall[s] within the range of reasonable compromises of the claims at issue."  *In re 110 Beaver St. P'Ship*, 244 B.R. 185, 196 (Bankr. D. Mass. 2000).

159.    The burden is on the Government Parties to prove that the proposed settlement "is reasonable and in the best interest of the estate, and should therefore be approved."  *In re C.P. del Caribe, Inc.*, 140 B.R. at 326; *accord In re 110 Beaver St.*, 244 B.R. at 187.  "The court may not act as a mere rubber stamp or rely on the [debtor's] word that the compromise is reasonable."  *In re 110 Beaver St.*, 244 B.R. at 187.  "Rather," under First Circuit law, "the Court must act 'independently, out of its own initiative, *for the benefit of all creditors*.'"  *Id*. (quoting *In re Bos. & Providence R.R. Corp.*, 673 F.2d 11, 13 (1st Cir. 1982)).  In addition, the court must evaluate "*all aspects* of a proposed compromise" to ensure that the arrangement as a whole is fair and

---

[54]   Multiple causes of action in the Amended Complaint would be affected.  For example, Count 5, which is pleaded in the alternative to other causes of action, seeks recovery from the bondholders on the basis that they would be unjustly enriched if they are allowed to receive payments or other value from PREPA before PREPA has borne the cost of $700 million of Fuel Line Advances.  Adv. Pro. No. 19-00396 Dkt. 36 ¶¶ 87-93.

equitable. *Maxwell Newspapers, Inc.* v. *Travelers Indem. Co.*, 170 B.R. 549, 550 (S.D.N.Y.

1994); *accord In re Bos. & Providence R.R.*, 673 F.2d at 12 (the "supervising court must play a

quasi-inquisitorial role, ensuring that *all aspects*" are reasonable).

160.    Courts in the First Circuit look to four factors when analyzing a settlement:

"(i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to

be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the

expense, inconvenience and delay attending it; and (iv) the paramount interest of the creditors

and a proper deference to their reasonable views in the premise." *Jeffrey* v. *Desmond*, 70 F.3d

183, 185 (1st Cir. 1995).[55]

161.    The *Jeffrey* test arises from the Supreme Court's decision in *Protective Committee

for Independent Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424-25

(1968).  The Supreme Court held there that "in every instance," a court evaluating a proposed

settlement must "compare the terms of the compromise with the *likely rewards of litigation*."  *Id.*

at 425.  Thus, the court must be able to come to "an intelligent and objective opinion of the

*probabilities of ultimate success should the claim be litigated*."  *Id.* at 424.

162.    In this case, having concluded that the Settlement Motion had a "fundamental

flaw in the structure of the disclosure process," June 12 Tr. at 152, the Court directed the

Government Parties to supplement the motion with submissions that would provide "a record

sufficient to establish the benchmark range of reasonableness for potential recovery on the

bondholders' claims in order to determine whether the discount to the claims that would be the

result of the settlement in the RSA falls within the range of reasonableness," *id.* at 154:19–24.

---

[55]    The parties agree that difficulty in collection, the second factor, "is not implicated here."  Supp. ¶ 64 n.19.

163.     Although the supplemental submissions transformed a 45-page motion into a 135-page trilogy, the Government Parties still fail to give the Court an adequate basis to compare the settlement with the likely result of litigation.  The filings offer generic statements regarding "litigation's inherent uncertainties," Settlement Mot. ¶ 53, litigation being "costly and time-consuming" and "complex," Supp. ¶¶ 9, 10, and the likelihood of appeals, *id.* ¶ 69.  But the Government Parties have not provided the Court with a basis to answer this question:  Is this settlement, which will commit to a recovery of approximately *86%* on the bondholders' pre-petition claims, within a reasonable range?

164.     The need for the Court to be adequately informed about the justification for a proposed settlement is particularly acute in a Title III case, where the settlement proponent is *not* a fiduciary for creditors.  In a chapter 7 or chapter 11 case, courts often give "some deference" to the trustee or debtor proposing the settlement.  *In re Moorhead Corp.*, 208 B.R. 87, 89 (B.A.P. 1st Cir. 1997).  But any such deference is warranted only because the trustee or debtor-in-possession is "entrusted" with assets for creditors and can only accept a settlement if he or she "believes" it "will net the maximum return for the creditors (on whose behalf he toils)."  *In re Am. Cartage, Inc.*, 656 F.3d 82, 92 (1st Cir. 2011).  The Oversight Board, as shown in Point II, has no similar fiduciary constraints, and its judgment is not entitled to deference.[56]

---

[56]     *See also, e.g.*, *In re Whispering Pines Estates, Inc.*, 370 B.R. 452, 461 (B.A.P. 1st Cir. 2007) (rejecting application of deferential standard to plan releases proposed by a non-fiduciary, rather than a "fiduciary having authority and responsibility to act for the" estate and creditors); *In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 461 (Bankr. E.D. Pa. 1998) (rejecting settlement between creditors and debtor in possession to resolve motion to appoint to trustee because, while a debtor in possession is typically a "fiduciary acting on behalf of the bankruptcy estate," in a trustee litigation, "the interests of the debtor-in-possession may not be aligned with those of the bankruptcy estate").

-72-

### A.   The Government Parties have not shown that the bondholders have a probability of success that justifies the recovery provided in the RSA.

165.    The Government Parties estimate that the settlement in the RSA will result in a 67.5% to 77.5% recovery for bondholders, plus administrative expense claims worth 4.23% of the bond claims (based on a June 30, 2020 effective date) and fees worth 1.62% of the claims, for a total recovery of 78.8%.  Brownstein Decl. ¶¶ 35-36.  These recovery levels are based on *par plus accrued interest* through May 1, 2019.  The calculation thus assumes the highly contested conclusion that the bondholders are oversecured and therefore entitled to post-petition interest.  When compared with the bondholders' claim as of the petition date, the recovery to the bondholders is approximately 86.2%; the bondholders will recover approximately $7.3 billion on their $8.48 billion in claims.  *See supra* ¶¶ 45-55.

166.    The Government Parties identify the "litigation being compromised" as (i) "all potential litigation that could stem from the Supporting Holders' assertion they are oversecured, entitled to 100 cents on the dollar (plus interest and fees), and their security extends to covenants under the Trust Agreement," and (ii) "the Receiver Motion."  Supp. ¶ 55.  But they have not even tried to show that the bondholders have anywhere close to an 86% chance of success in that litigation, or that the expense of litigation could justify a $7.3 billion payout.

### 1.   The bondholders' arguments regarding the extent of their collateral are weak and do not justify a high recovery.

167.    In addressing the "probability of success" (*Jeffrey* factor #1), the Government Parties identify the arguments the bondholders "may" put forward to support their assertion that they are oversecured, and they articulate ways in which PREPA will supposedly benefit from the settlement as compared to continued litigation.  *Id.* ¶¶ 56-60, 61-63.  But they provide *no* rationale for settling the dispute regarding the bondholders' security position at a level that assumes a high likelihood of success for the bondholders.

168.    Likewise, in addressing complexity, expense and delay (*Jeffrey* factor #3), the

Government Parties recite the bondholders' position that they are oversecured, but again resort to

vague generalities, proclaiming that "there is substantial litigation risk, as there always is in any

complex litigation," and that if the bondholders lose, an "appeal would certainly follow."

*Id.* ¶ 70.  In *TMT Trailer*, the Supreme Court held that "bare statement[s] of conclusion" like

these were insufficient to support a settlement.  390 U.S. at 434 ("Litigation and delay are always

the alternative to settlement, and whether that alternative is worth pursuing necessarily depends

upon a reasoned judgment as to the probable outcome of litigation.").[57]

169.    The Government Parties cannot support their settlement with anything more than

those generalities, because their Lien Challenge complaint states a strong case that the

bondholders' lien and recourse are limited to the Sinking Fund accounts, which hold at most $16

million.  The Government Parties have a simple textual position:  Section 701 of the Trust

Agreement provides that PREPA's revenues are "pledged to the payment" of the bonds only "*to*

*the extent hereinabove particularly specified*."  And the only "particularly specified" pledge is in

Section 507, which limits the bondholders' lien to those specific accounts.

170.    The Government Parties offer no explanation why they are overwhelmingly likely

to *lose* on this issue, as the level of the settlement implies.  Instead, they argue that "[e]ven if the

Government Parties were to succeed . . . Bondholders would still potentially hold unsecured

claims and would be provided with *pro rata* recoveries under a Plan."  Supp. ¶ 61.  But the

discussion of "potential" unsecured claims ignores the fact that, as shown in Point I, the bonds do

not have recourse to PREPA or its General Fund.  And the Government Parties do not explain

---

[57]    *See also, e.g.*, *In re Warwick Lumber & Supply Co.*, 153 B.R. 12, 13 (Bankr. D.R.I. 1993) ("[B]oilerplate
language to the effect that 'litigation is expensive and therefore this settlement is in the best interest of the estate,' or
that the proposed settlement should be approved because 'the defendant has denied all of the allegations in the
complaint,' will be deemed insufficient.").

why, putting recourse aside, they would enter into a partial pre-plan settlement with just a subset of unsecured (non-priority) creditors.

171.    For their part, the bondholders have never articulated a legal theory that would support their enormous recovery under the RSA.  To the contrary, their legal position is strained and hard to understand.  The bondholders' main argument is that "their collateral consists of a statutory receiver remedy . . . and certain covenants, including the Rate Covenant."  Supp. ¶ 70. But the Government Parties have multiple decisive answers to that argument.

172.    Under Puerto Rico's U.C.C., a security interest can only attach to "collateral" that "the debtor has rights in . . . ."  19 L.P.R.A. § 2233(b)(2).  But under the Trust Agreement, the covenants and receiver remedy are "an obligation or liability of PREPA"; they are not rights of PREPA "in which PREPA can grant a security interest."  Adv. Pro. No. 19-00391 Dkt. 1 (Gov't Pls.' Compl.) ¶¶ 43, 104-14.  In addition, a security agreement must "provide[] a description," 19 L.P.R.A. § 2233(b)(3)(A), that "reasonably identifies the collateral," *id.* § 2218(a).  No language in the Trust Agreement grants a lien on covenants or the receiver remedy.  And even if the bondholders had somehow been granted a security interest in the rate or receiver covenants or remedies, that lien was not perfected.  As the Government Parties correctly point out, "[n]one of [the bondholders'] Financing Statements identify the Covenants and Remedies as collateral." Gov't Pls.' Compl. ¶ 62.

173.    Beyond all this, PREPA's enabling statute authorizes it to grant security interests in its "contracts, revenues, and income *only*."  22 L.P.R.A. § 196(o); *see also id.* § 206(e)(1).  "It does not provide PREPA with the power to grant a security interest in PREPA's statutory rate-making ability, rights under covenants, or any other of its rights or remedies."  Gov't Pls.' Compl. ¶ 37.  The bondholders have no cogent response.  The statute refutes their position.

174.    The cases cited in the bondholders' receiver motions also do not support their
position regarding the scope of their collateral.  The bondholders cite Takings Clause and
Contracts Clause law, or state law analogues, for propositions such as "[c]ontract rights are a
form of property and as such may be taken for a public purpose provided that just compensation
is paid."[58]  None of their cases hold that a party obligated by a covenant can grant a lien on it, let
alone under Puerto Rico law.

## 2.    Dismissal of the Receiver Motion does not justify the settlement.

175.    The Government Parties tout dismissal of the Receiver Motion as a major benefit
of the RSA.  *See* Supp. ¶ 60.  But the Government Parties have not even tried to demonstrate that
the bondholders have any likelihood of success; to the contrary, they concede that "the motion is
*unlikely* to be successful." *Id.*

176.    The First Circuit has made clear that, to prevail on the Receiver Motion, the
bondholders would first have to prevail on "predicate legal issues," including "whether and to
what extent [they] possessed property interests." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899
F.3d 13, 23 (1st Cir. 2018).  But the bondholders face the same challenges on the Receiver
Motion as they do in showing they are oversecured.  As shown above, the plain text of the Trust
Agreement limits their lien to "moneys in the Sinking Fund" (§ 507), and even if the lien were
somehow any broader, they have no basis to assert a lien either on covenants or revenues prior to
payment of all Current Expenses (including the Fuel Lines).  Thus, as the Government Parties
themselves have argued, the proponents of the Receiver Motion cannot show that their collateral

---

[58]    *U.S. Trust Co. of N.Y.* v. *New Jersey*, 431 U.S. 1, 19 n.16 (1977); *First Nat'l Bank of Bos.* v. *Me. Turnpike Auth.*, 136 A.2d 699 (Me. 1957); *Dimino* v. *Sec'y of Commonwealth*, 695 N.E.2d 659, 663-64 & n.4 (Mass. 1998); *Patterson* v. *Carey*, 363 N.E.2d 1146, 1151-53 (N.Y. 1977).

"faces a threat of uncompensated diminution as a result of the automatic stay." Dkt. 1233 (MTD
Receiver Mot.) ¶ 32.

177.    Once again, therefore, there is a profound disconnect between the recovery being
handed to the bondholders and the weakness of their position.  There is also no explanation of
how, even if a receiver were likely to be appointed, the replacement of PREPA management with
a receiver could justify diversion of *billions* of dollars to bondholders.  Again, no creditor
fiduciary would pay over 85 cents on the dollar on over $8 billion of debt to protect PREPA's
current leadership, even if replacement were likely (which it is not).

178.    Regardless, the Government Parties' argument regarding the Receiver Motion
does not hold together.  The Government Parties insist that dismissal of the Receiver Motion is
beneficial to PREPA because it would be damaging to PREPA if a receiver were appointed.
Supp. ¶ 60.  But it is the Court that would determine whether to grant relief from the stay, and in
doing so it will assess the harm that could result from such appointment.  If the Court credits the
allegations of ongoing "mismanagement and political interference" (*id.* ¶ 68), PREPA would not
be harmed, and indeed could be benefited, by appointment of a receiver.  By contrast, if the
Court does not credit those allegations and instead agrees with the Government Parties that
appointment of a receiver would be harmful to the debtor, the bondholders are quite unlikely to
persuade the Court to lift the stay.[59]  Either way, avoiding the possibility that this Court would
grant the Receiver Motion does not justify a multi-billion dollar value transfer to bondholders.

---

[59]    The Fuel Line Lenders respectfully join in the arguments put forward by the Official Committee of Unsecured
Creditors as to why the Receiver Motion has little prospect of success under the "*Sonnax* factors" that, according to
the First Circuit, are to guide the Court in considering whether to grant relief from the automatic stay to permit the
receiver litigation to proceed.  *In re Fin. Oversight & Mgmt. Bd.*, 899 F.3d at 23.

**B.**     **The settlement is not in the paramount interest of creditors.**

**1.**     **Non-settling creditors strongly oppose the settlement.**

179.     In seeking approval of the RSA on the basis that it is in "the paramount interest of
creditors" and reflects "a proper deference to their reasonable views" (*Jeffrey* factor #4), the
Government Parties argue that the settlement is "in the best interests of holders of PREPA's
largest liability—its Bondholders." Supp. ¶¶ 73-74.  They also argue that "ratepayers" and
"citizens" will benefit from a settlement that avoids "risk and downside." *Id*. ¶¶ 76-80.  Yet the
Government Parties offer almost no defense of the settlement from the point of view of creditors
*other* than the bondholders.  They state, in cursory fashion, that the RSA is "in the best interests
of PREPA's objecting creditors" because the "Supporting Holders have agreed to a substantial
discount on their bond claims." *Id*. ¶ 75.  This argument, however, simply assumes that the
objecting creditors (in particular the Fuel Line Lenders) are not entitled to be paid before the
bonds receive even a discounted recovery.  It also assumes that the claims have a risk-adjusted
value of no less than $7.3 billion — or over 86% of the bonds' claims as of the petition date.
That has not remotely been demonstrated.

180.     Under longstanding law, Rule 9019 requires consideration of creditor interests
*other than* those of the settling creditors.  As the Fifth Circuit has observed, "looking only to the
fairness of the settlement as between the debtor and the settling claimant contravenes a basic
notion of fairness.  An estate might be wholly depleted in settlement of junior claims—depriving
senior creditors of full payment—and still be fair as between the debtor and the settling creditor."
*In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984).  Courts are therefore bound to consider
the "reasonable views" of non-settling creditors.  *In re Hallet*, 33 B.R. 564, 566 (Bankr. D. Me.
1983); *see, e.g.*, *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 837 (Bankr. D. Del. 2008)
("[N]ot only does this Court need to afford paramount consideration to the interests of creditors,

-78-

but that consideration should focus particularly on the fairness of a settlement *to those parties who did not partake in the settlement*."); *In re Biolitec*, 528 B.R. at 270 ("While it may be assumed that the settlement is in the best interest of [the settling creditor], the Court must analyze the effect of the settlement on all parties to the bankruptcy proceeding, and not simply the [settling] largest creditor. . . ."); *In re Nortel Networks, Inc.*, 522 B.R. 491, 512-13 (Bankr. D. Del. 2014) ("The focus . . . is not on the fairness of the settlement to those who signed the agreement, but to those affected by the agreement.").

181.    The fact that the Creditors' Committee (the only creditor fiduciary), the Fuel Line Lenders and PREPA's unions all oppose the RSA is highly probative.  As the First Circuit concluded in a pre-Code case denying approval of a settlement:  "If the compromise was manifestly in the best interest of the estate, we think this would be apparent to at least some of the [non-settling] creditors and their counsel."  *In re Lloyd, Carr & Co.*, 617 F.2d 882, 891 (1st Cir. 1980); *see also In re Hallet*, 33 B.R. at 566 ("That [unsecured creditors] object is significant since they are the ones most likely either to benefit from successful litigation or to bear the loss should the litigation result in an unfavorable outcome for the estate.").

182.    The views of non-settling creditors should carry particular weight in this case, where the Government Parties have not attempted to reach a comprehensive resolution with those creditors.  Courts in this district and beyond have considered the debtor's efforts to negotiate with *all* creditors when considering a pre-plan settlement.  *See, e.g.*, *In re Miami Metals*, 603 B.R. at 534 (rejecting settlement where objectors were not given an opportunity to "participate in negotiations"); *In re Biolitec*, 528 B.R. at 271-72 (rejecting settlement where "parties other than those to the settlement did not receive . . . the opportunity to negotiate or vote

on the settlement's provisions"); *In re C.P. del Caribe*, 140 B.R. at 327 (rejecting settlement with a term that "would endanger debtors' negotiations with" a significant creditor).

183.    The views of non-settling creditors are entitled to deference for an additional reason as well.  The Government Parties assured the Court that the pre-plan Settlement Payments to be made to bondholders will not "affect[] the recoveries of other creditors of PREPA." Supp. ¶ 103.  The basis for that assurance was that those payments "are coming from **new—not existing**—charges."  Settlement Mot. ¶ 68.  The Government Parties further stated in their Supplemental Memorandum that the "recoveries of other creditors of PREPA" will not be affected because PREPA would "**only**" pay the bondholders "out of a **special, new charge**." Supp. ¶ 103.  But in a motion filed with the Energy Bureau (just one day after the Supplemental Memorandum), PREPA sought to "offset" the new Settlement Charge with a reduction in base rates in *exactly* the amount of the Settlement Charge.  *See* Ex. 26 at 3.  That motion belies any claim that the Settlement Payments will be funded solely out of a "new charge" and demonstrates that, contrary to what the Government Parties told the Court, PREPA is trying to impose the full cost of the settlement on *non*-settling creditors.[60]

184.    Finally, it bears emphasis that, in defending the settlement, the Government Parties repeatedly seek to deflect focus from the interests of *creditors* to other interests.  Most of their argument on the fourth *Jeffrey* factor discusses the settlement's impact on "ratepayers" and other "stakeholders" rather than on creditors.[61]  In *Whyte*, however, this Court rejected similar

---

[60]    PREPA blocked deposition testimony regarding the rate motion, asserting that it was irrelevant.  On October 24, 2019, Judge Dein granted the Fuel Line Lenders' motion to compel a deposition regarding the Government Parties' "central factual assertions" that the Settlement Payments will be funded by a new charge and will not prejudice non-settling creditors.  Dkt. 1678 at 6.  The deposition has not yet taken place; the Fuel Line Lenders reserve all rights to supplement this objection based on that deposition and any other developments, including additional discovery.

[61]    *See* Supp. ¶ 78 (touting the RSA's impact on PREPA's Transformation, "a critical initiative" that "will redound to the benefit of all of *Puerto Rico's stakeholders*"); *id.* ¶ 79 ("[T]he RSA benefits *PREPA's ratepayers* by

arguments (from objectors) based on "stakeholder" interests:  "The *Jeffrey* requirement that the
Court give proper deference to the reasonable views of creditors does *not* require the Court to
weigh concerns about the Commonwealth's overall financial prospects."  360 F. Supp. 3d at 78.
Here, too, benefits to other debtors and ratepayers fall outside the purview of the *Jeffrey* test.  By
contrast, the interests of "creditors" are at the heart of the *Jeffrey* test and, as shown by the
objections, the Government Parties have not protected those interests.

### 2.    The settlement prevents non-settling creditors from recovering and effectively provides a veto to bondholders.

185.    Beyond its favorable treatment of the bondholders, the RSA contains provisions
that will prevent or deter PREPA from paying the claims of non-settling creditors.  For that
reason as well, the settlement is adverse to the "paramount interest" of creditors.  In addition, the
settlement improperly "coerces one result for adopting a reorganization plan."  *In re Cloverleaf
Enters., Inc.*, 2010 WL 1445487, at *3.

186.    The Government Parties claim that the RSA "does not give the Supporting
Holders veto rights over any Plan or over other creditors' treatments — it just limits how PREPA
can alter the Supporting Holders' treatment."  2d Supp. ¶ 18.  They claim further that page 14 of
the Securitization Term Sheet "permit[s] creation of other charges to pay other legacy debt,"
including the Fuel Lines.  *Id.*

187.    Those claims cannot be reconciled with the filed RSA.  The provision cited by the
Government Parties — the "Other Charges" section of the Securitization Term Sheet (on page
14) — provides that "*[s]ubject to any restrictions in the Securitization Trust Agreement*, the
Government Parties may establish other transition charges, statutory charge, or other tax or

---

protecting against rate spikes . . . ."); *id.* ¶ 80 (arguing the securitization's "no payment default" structure "benefits
*all PREPA's stakeholders and Puerto Rico's citizens*" in contrast to a "receiver potentially beholden to *creditors'
interests*"); *see also id.* ¶¶ 75-77 (citing benefits to PREPA's "stakeholders" and "ratepayers").

revenue stream, to provide for the payment of legacy obligations."  At this stage, however, there

is no Securitization Trust Agreement; there is only a "Securitization Term Sheet."  And the

Securitization Term Sheet severely restricts PREPA's ability to repay the Fuel Line Lenders.

188.    First, the Securitization Term Sheet *excludes* the Fuel Lines from the categories of

"Additional Permitted Indebtedness" that can be incurred by PREPA or the entity that will issue

the Securitization Bonds.  *See* Ex. 4, Ex. C, Annex A at 9-12.  As a result, PREPA cannot borrow

to pay or refinance the Fuel Lines or even issue new debt instruments to the Fuel Line Lenders.

Second, the Securitization Term Sheet prevents PREPA from imposing "charges" or "fees" on

electricity "other than those directly associated with operation of the System," except "charges

supporting Permitted Indebtedness and otherwise as permitted by the Securitization Trust

Agreement."  *Id.* at Sch. I-B, I-B-5, ¶ V.4.  Without the ability to refinance the Fuel Lines, to

distribute new debt to the lenders, or to impose an additional charge to repay them (which would

in any event require issuance of debt if the payments are to be made over time), PREPA has tied

its own hands in paying the Fuel Lines.  The bondholders would need to agree to amend those

provisions — meaning that they effectively have a veto over Fuel Line recoveries.

189.    The MFN provision, which requires the supporting bondholders to receive

treatment at least as favorable as the Fuel Lines, again targets the Fuel Line Lenders.  *Id.* § 23.

As a result of the MFN, each dollar paid to the Fuel Lines beyond what the bonds are receiving

would require an additional *twelve dollars* for the bondholders.  PREPA, therefore, has

compromised its ability to pay the Fuel Lines at a level that respects their priority position.  And,

once again, bondholder consent would be needed to amend that provision.

190.    Significantly, the bondholders could receive the recovery agreed to in the RSA

without those provisions prejudicing the Fuel Lines.  As the Oversight Board admits, including a

charge sufficient to pay the Fuel Lines would not materially alter the economics of the RSA.  *See*

2d Supp. Ex. B.  Nonetheless, the RSA parties chose to include the above-referenced MFN —

which would dramatically increase the cost of paying the Fuel Lines in full (or more than the

bonds).  While the Government Parties want to frame the issue as whether PREPA will have

"enough resources" to pay the Fuel Lines (Supp. ¶ 51), which the Court has said is not

"pertinent" now, *Whyte*, 360 F. Supp. at 78, that is not the issue:  rather, the issue is that, in

multiple ways, the RSA *prevents* and *restricts* the Government Parties from paying the Fuel

Lines, thus preempting the plan process.  As in another case where a settlement was denied

because it provided particular creditors with undue "control" over the plan process, this

settlement is so tainted "with provisions unrelated to the [disputed] issue that it cannot be fairly

denoted a Rule 9019 compromise."  *In re Louise's Inc.*, 211 B.R. 798, 802 (D. Del. 1997).[62]

## IV.    THE SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT AWARDS MASSIVE ADMINISTRATIVE EXPENSE CLAIMS WITHOUT ANY BASIS.

191.    Approval of the RSA will obligate PREPA to pay the Supporting Holders

hundreds of millions of dollars as administrative expenses, regardless of whether other creditors

are paid and regardless of when PREPA emerges from Title III.  The obligations include:

    (i)      post-petition interest that would accrue (from May 1, 2019) at 5.25% on 67.5% of the accrued balance of the bonds, estimated to be $27.4 million per month;

    (ii)     Waiver and Support Fees of approximately $151 million; and

    (iii)    the fees and expenses of numerous law firms and financial advisors for the settling bondholders.

192.    The Government Parties rely on section 503 of the Bankruptcy Code in seeking to

justify these administrative expense claims.  *See, e.g.*, Supp. ¶ 83.  The requirements of section

---

[62]    For similar reasons, as the Creditors' Committee persuasively argues, the RSA constitutes a *sub rosa* plan.  The Fuel Line Lenders respectfully join in the Committee's arguments on that issue.

503 are "construed strictly," *In re Hopkinton Indep. Sch., Inc.*, 499 B.R. 158, 162 (Bankr. D.N.H.

2013), and "[t]he burden of proving entitlement as an administrative expense . . . rests with the

party requesting it[,]" *In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir. 1992).  Here, the

rationales offered by the Government Parties for the award of administrative expense claims

under section 503 do not survive scrutiny.

### A.    The administrative expense claims are not reimbursement for "actual, necessary expenses" in connection with a "substantial contribution."

193.    To justify the grant of these extraordinary pre-plan payments and claims, the

Government Parties primarily rely on section 503(b)(3)(D), which provides for reimbursement of

"the actual, necessary expenses" that have been "incurred" in making a "substantial

contribution."  *See* Supp. ¶ 93.  But the settling bondholders have not made a "substantial

contribution" by entering into what they believe is a favorable settlement, and the amounts they

would receive under the RSA are not on account of "actual, necessary expenses."

194.    Because "the purpose of § 503(b)(3)(D) is to encourage activities that will benefit

the estate as a whole," *In re Columbia Gas Sys., Inc.*, 224 B.R. 540, 548 (Bankr. D. Del. 1998),

in order to obtain administrative expense status on account of a "substantial contribution," a

creditor must first prove that "its actions resulted in an actual and demonstrable benefit to the

debtor's estate and the creditors," *In re Oxford Homes, Inc.*, 204 B.R. 264, 268 n.16 (Bankr. D.

Me. 1997) (internal quotation marks omitted).  This benefit must flow from "*extraordinary

creditor actions* which lead directly to significant and tangible benefits to the creditors, debtor, or

the estate."  *Id.*  "[C]reditors must overcome the presumption that they are acting in their own

self-interest, and not for the benefit of the estate as a whole . . . ."  *Id.*  "[E]fforts by [settling

creditors] to settle their own claims are not properly characterized as a substantial contribution to

the case."  *In re AmFin Financial Corp.*, 468 B.R. 827, 834 (Bankr. N.D. Ohio 2012).  Rather,

making a substantial contribution requires "a *'direct benefit' for all creditors as a primary*

*motivation*," and not "simply incidental benefits from the creditor's normal basic desire to

protect its own interests." *In re Dilberto*, 164 B.R. 1, 3 (Bankr. D.N.H. 1993).

195.    In *Columbia Gas System*, for example, the court declined to approve substantial

contribution claims for parties involved in settlements the debtors described as "[t]he

[c]ornerstone" of the plan. 224 B.R. at 546. The court found that the settling claimants "had a

*strong self-interest* in supporting the . . . settlement." *Id.* at 549. The court contrasted this with a

situation in which a creditor's conduct increased distributions to *non-settling* creditors: a

substantial contribution claim might be warranted where the settling creditor "compromised its

own claim and created a plan which paid creditors more than the debtor's proposed plan . . . or

dramatically improved treatment" of *other creditors. Id.* at 548.

196.    Here, the bondholders have not taken "'unusual' or 'extraordinary' actions" to

benefit *other* creditors. *Id.* at 548. Indeed, the Government Parties have argued that it is

irrelevant whether the settlement leaves anything for other creditors. *See* Supp. ¶¶ 101-04.

197.    The Government Parties point to the bondholders' "forbearance from exercising

any rights under the Bonds," which "removes the cloud of receivership," as a substantial

contribution. *Id.* ¶ 93. But the bondholders are not pursuing some greater good by halting their

efforts to obtain a receiver. Rather, they are dropping their motion in exchange for PREPA's

agreement to drop strong objections to their claims and to pay them the vast majority of what

they claim to be owed. In any event, even if "remov[ing] the cloud of receivership . . . *may*

impact a *potential* operator's interest in investing in PREPA," as the Government Parties claim,

*id.* ¶ 93, such a speculative and indirect benefit is not a substantial contribution. *See In re Pub.*

*Serv. Co. of N.H.*, 160 B.R. 404, 453 (Bankr. D.N.H. 1993) (rejecting substantial contribution claims where "any benefit to the estate is at best indirect").

198.    The speculative nature of the "benefit" from the bondholders' forbearance is highlighted by the fact that, as the Government Parties have acknowledged, the securitization transaction contemplated by the RSA is subject to approval by Puerto Rico's legislature and the PREB.  Supp. ¶¶ 3, 47.  Those approvals may or may not occur.  In similar circumstances, where a debtor proposed to award a termination fee in connection with a plan support agreement, the court held that "[p]ayment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction cannot provide an *actual benefit* to a debtor's estate sufficient to satisfy" section 503(b)(3)(D).  *In re Energy Future Holdings Corp.*, 575 B.R. 616, 635 (Bankr. D. Del. 2017), *aff'd*, 904 F.3d 298 (3d Cir. 2018), *cert. denied sub nom. NextEra Energy, Inc.* v. *Elliott Assocs. L.P.*, 139 S.Ct. 1620 (2019).  Given the need for concrete, demonstrable benefits to support a substantial contribution claim, courts have also held that "substantial contribution applications are heard *only at the end of the case*," when the parties and court have "as much information as possible . . . of the extent of the benefits constituting the asserted substantial contribution."  *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 662 n.130 (Bankr. S.D.N.Y.), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).

199.    In any event, there are no "*expenses*" here that are both "*actual*" and "*necessary*" for which the proposed administrative expense claims will reimburse the bondholders.  "Under section 503(b)(3)(D), a finding of substantial contribution is only the first step.  After such a finding, the Court must determine whether an applicant's expenses were actual and necessary. The applicant must provide sufficient details of each expense incurred for which reimbursement is sought."  *In re Summit Metals, Inc.*, 379 B.R. 40, 54 (Bankr. D. Del. 2007); *accord In re*

*Sentinel Mgmt. Grp., Inc.*, 404 B.R. 488, 498 (Bankr. N.D. Ill. 2009). Section 503(b)(3)(D) is an expense reimbursement statute, not an alternate source of payment for creditors. Here, the proposed payments to bondholders are based on the *interest* that would hypothetically accrue on their bonds if they were oversecured; they have nothing to do with actual or necessary expenses.[63] To the contrary, the bondholders' actual fees and expenses are intended to be reimbursed *in addition* to the "substantial contribution" claims. *See* Ex. 4 § 22.

### B. The administrative expense claim to be awarded upon failure to confirm a plan cannot be approved as a "break-up fee."

200.    The Government Parties advance a second theory to justify payment of the Administrative Claims in one circumstance: namely, where the RSA is approved but "the Oversight Board fail[s] to confirm a Plan containing the Stipulated Treatment after multiple good faith efforts." Supp. ¶ 95. In that circumstance, the RSA provides that the bondholders will receive "Surviving Administrative Claims," guaranteeing them post-petition interest all the way through multiple confirmation hearings. The Government Parties argue that those administrative expense claims are a *break-up fee. See id.*; 2d Supp. ¶ 20 n.9. This argument does not hold up.

201.    Break-up fees are designed to encourage competitive bidding on a debtor's assets. They are used to "convince a 'white knight' to enter the bidding by providing some form of

---

[63]    The Government Parties do not cite any authority that supports their use of section 503(b)(3)(D). *See* Supp. ¶ 93 n.29. The "Consummation Costs" awarded as part of the COFINA plan are nothing like the administrative claims here. As the COFINA confirmation order makes clear, the Oversight Board submitted factual declarations aimed at demonstrating that creditors had made a substantial contribution and tying the Consummation Costs to *actual* fees and expenses incurred by those parties. Nor was there a separate agreement to reimburse fees and expenses. *See* Case No. 17-3283 Dkt. 5053 ¶¶ 70-71 ("The Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to exceed the 'net' cost of the Consummation Costs of approximately $140 million."). The other cited cases all *undermine* the Government Parties' position. *See In re Washington Lane Assoc.*, 79 B.R. 241, 244 (Bankr. E.D. Pa. 1987) (reviewing attorney timesheets and denying reimbursement for those services that "were designed to protect [the creditor's] interest and provided, at best, only an indirect benefit to the estate"); *In re Celotex Corp.*, 227 F.3d 1336, 1339-41 (11th Cir. 2000) (reimbursing attorney for professional services); *In re Baldwin-United Corp.*, 79 B.R. 321, 337-44 (S.D. Ohio 1987) (emphasizing that "[a]n incidental benefit to the estate or the estate's creditors will not provide the basis for an award from the estate," and *denying* reimbursement for activities that did not provide a substantial contribution).

compensation for the risks it is undertaking."  *In re O'Brien Envtl. Energy*, *Inc.*, 181 F.3d 527,

533 (3d Cir. 1999).  A break-up fee is fixed at an agreed sum, and it is typically paid only if an

auction results in a bid that exceeds the original bidder's bid plus the amount of the fee.  *See In

re Energy Future Holdings Corp.*, 575 B.R. at 635 ("Allowance of a termination or break-up fee

when a debtor chooses to pursue a higher and better offer is appropriate.").

202.    The Surviving Administrative Claims in this case bear no resemblance to a break-

up fee.  The bondholders have agreed to discontinue difficult litigation in exchange for a

commitment to pay them the vast majority of what they claim to be owed, and regardless of

when or whether a plan is confirmed.  Far from improving the recovery of creditors as a whole

by locking themselves up, the bondholders are protecting for their own benefit a desirable deal

that pays nothing to other creditors.  In addition, in contrast to a break-up fee, which is a fixed

amount payable out of a higher bid, the administrative expense claim here accumulates

indefinitely, without limit, until there have been multiple failures to achieve plan confirmation.

203.    Finally, the statutory authority for the award of break-up fees is inapplicable

under PROMESA.  Section 503(b)(1)(A) provides for administrative claims for "the actual,

necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  But there is

no bankruptcy estate under chapter 9 or Title III, because section 541 is not incorporated.  *See

Gracia-Gracia* v. *Fin. Oversight & Mgmt. Bd.*, 939 F.3d 340, 349 (1st Cir. 2019) (relying on

absence of section 541 to hold that "there is no 'estate' in the PROMESA context").  As various

courts have held with respect to chapter 9, the lack of an estate means that there cannot be

"actual and necessary costs of preserving the estate," as required under section 503(b)(1)(A).  *In

re N.Y.C. Off-Track Betting Corp.*, 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010); *accord* 6 *Collier*

*on Bankruptcy* § 901.04[13][a] (16th ed.).  That law applies with equal force to Title III.  For that reason as well, a break-up fee cannot be awarded under section 503(b)(1)(A).[64]

### C.   The administrative expense claims would improperly expand the bondholders' recourse.

204.     The administrative expense claims are also improper because they expand the bondholders' recourse.  The administrative expense claims correspond exactly to the post-petition interest that would be payable on the bonds' (reduced) claim starting on May 1, 2019.  The bondholders, accordingly, are plainly being paid on account of pre-petition debt.  As discussed in Point I, however, PREPA's bondholders have *no recourse* to PREPA for payment on the bonds; rather, the recourse is limited to specific accounts.

205.     The award of the administrative expense claims thus transforms the bondholders' non-recourse debt into recourse obligations of PREPA.  That expansion of the bondholders' preexisting rights is not a proper use of an administrative claim.  *See In re Jefferson Cty.*, 474 B.R. 228, 272 n.16 (Bankr. N.D. Ala. 2012) (where creditor's recourse was limited to "Net Revenues," in order "[t]o maintain the nonrecourse nature of payment of debt secured solely by a pledge of revenues for a project or system such as the County's, the only [available] source of periodic [cash] payments . . . that does not convert, at least in part, the nonrecourse nature of the transaction into a general obligation of the municipality is from monies from or grant of a lien on the pledged special revenues.  *The same is true for an administrative claim*.").[65]

### CONCLUSION

206.     The Settlement Motion should be denied on the grounds set forth above.

---

[64]     The only authorities cited by the Government Parties are approvals of break-up fees in chapter 11 cases pursuant to section 503(b)(1)(A).  *See In re Dana Corp.*, No. 06-10354, at ¶ EE (Bankr. S.D.N.Y. Aug. 1, 2007), ECF No. 5879; *In re Delphi Corp.*, 05-44481, at ¶ 7 (Bankr. S.D.N.Y. Jan. 12, 2007), ECF No. 6589.

[65]     For the same reason, as described in Point I, the cash payments under the RSA are improper because they convert non-recourse debt into recourse obligations of PREPA.

Dated:  October 30, 2019

Respectfully submitted,

 _/s/ Nayuan Zouairabani_
Nayuan Zouairabani
USDC-PR No. 226411
MCCONNELL VALDÉS LLC
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico  00918
P.O. Box 364225
San Juan, Puerto Rico  00936-4225
Telephone:  (787) 250-5604
Facsimile:  (787) 759-9225
Email:  nzt@mcvpr.com

 _/s/ Emil A. Kleinhaus_
Richard G. Mason (admitted _pro hac vice_)
Amy R. Wolf (admitted _pro hac vice_)
John F. Lynch (admitted _pro hac vice_)
Emil A. Kleinhaus (admitted _pro hac vice_)
Angela K. Herring (admitted _pro hac vice_)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
Email:  rgmason@wlrk.com

*Attorneys for Cortland Capital Market
Services LLC, as Administrative Agent*

 _/s/ Jose L. Ramirez-Coll_
Jose L. Ramirez-Coll
USDC-PR No. 221702
ANTONETTI, MONTALVO
& RAMIREZ-COLL
P.O. Box 13128
San Juan, Puerto Rico  00908
Telephone:  (787) 977-0303
Facsimile:  (787) 977-0323
Email:  jramirez@amrclaw.com

 _/s/ Bryce L. Friedman_
Bryce L. Friedman (admitted _pro hac vice_)
Nicholas Baker (admitted _pro hac vice_)
Sarah E. Phillips (admitted _pro hac vice_)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502
Email:  bfriedman@stblaw.com

*Attorneys for SOLA LTD, Solus Opportunities
Fund 5 LP, Ultra Master LTD, and Ultra NB
LLC*