# Exhibit 1

**Scotiabank Credit Agreement, as amended**

**EXECUTION COPY**

CREDIT AGREEMENT

dated as of

May 4, 2012

among

PUERTO RICO ELECTRIC POWER AUTHORITY,
as Borrower,

The Lenders Party Hereto

and

SCOTIABANK DE PUERTO RICO,
as Administrative Agent

Confidential

Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE I DEFINITIONS; CONSTRUCTION | | 1 |
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Terms Generally | 11 |
| Section 1.03 | Accounting Terms; GAAP | 11 |
| ARTICLE II THE ADVANCES | | 12 |
| Section 2.01 | Commitment | 12 |
| Section 2.02 | Advances and Borrowings | 12 |
| Section 2.03 | Funding of Borrowings | 13 |
| Section 2.04 | Interest Elections | 14 |
| Section 2.05 | Termination and Reduction of Commitments | 15 |
| Section 2.06 | Repayment of Advances; Evidence of Debt | 15 |
| Section 2.07 | Optional Prepayment of Advances | 16 |
| Section 2.08 | Structuring Fee | 18 |
| Section 2.09 | Interest | 18 |
| Section 2.10 | Alternate Rate of Interest | 19 |
| Section 2.11 | Taxes | 19 |
| Section 2.12 | Payments Generally; Pro Rata Treatment; Sharing of Set-offs | 21 |
| Section 2.13 | Mitigation Obligations; Replacement of Lenders | 22 |
| Section 2.14 | Notes as Current Expenses | 23 |
| Section 2.15 | Change in Circumstances | 23 |
| ARTICLE III REPRESENTATIONS AND WARRANTIES | | 25 |
| Section 3.01 | Organization; Powers | 25 |
| Section 3.02 | Authorization; Enforceability | 25 |
| Section 3.03 | Governmental Approvals; No Conflicts | 25 |
| Section 3.04 | Financial Condition; No Material Adverse Change | 25 |
| Section 3.05 | Properties | 26 |
| Section 3.06 | Litigation and Environmental Matters | 26 |
| Section 3.07 | Compliance with Laws and Agreements | 26 |
| Section 3.08 | Status | 26 |
| Section 3.09 | Taxes | 26 |
| Section 3.10 | Disclosure | 26 |
| Section 3.11 | Resolution; Trust Agreement | 27 |
| Section 3.12 | Repayment | 27 |
| Section 3.13 | No Immunity | 27 |
| Section 3.14 | Tax-Exemption | 27 |
| ARTICLE IV CONDITIONS | | 28 |
| Section 4.01 | Effective Date | 28 |
| Section 4.02 | Conditions Precedent to Each Advance | 29 |
| ARTICLE V AFFIRMATIVE COVENANTS | | 30 |
| Section 5.01 | Financial Statements and Other Information | 30 |

Confidential

PREPA_RSA0028180

Table of Contents (continued)

Page

| | | |
|---|---|---|
| Section 5.02 | Notices of Material Events; Legal Proceedings and Final Determination | 31 |
| Section 5.03 | Existence; Conduct of Business | 31 |
| Section 5.04 | Payment of Obligations | 31 |
| Section 5.05 | Maintenance of Properties; Insurance | 32 |
| Section 5.06 | Books and Records; Inspection Rights | 32 |
| Section 5.07 | Compliance with Laws and the Trust Agreement | 32 |
| Section 5.08 | Use of Proceeds; Future Tax Exempt Status | 32 |
| Section 5.09 | Financial Covenant | 32 |
| Section 5.10 | Tax Exempt Status | 32 |
| Section 5.11 | Operating Account | 33 |

ARTICLE VI NEGATIVE COVENANTS ...... 33

| | | |
|---|---|---|
| Section 6.01 | Liens | 33 |
| Section 6.02 | Fundamental Changes; Sale of Assets | 33 |
| Section 6.03 | Investments, Loans, Advances, Guarantees and Acquisitions | 34 |
| Section 6.04 | Swap Agreements | 34 |
| Section 6.05 | Transactions with Affiliates | 34 |
| Section 6.06 | Restrictive Agreements | 34 |

ARTICLE VII EVENTS OF DEFAULT ...... 35

ARTICLE VIII THE ADMINISTRATIVE AGENT ...... 37

ARTICLE IX MISCELLANEOUS ...... 39

| | | |
|---|---|---|
| Section 9.01 | Notice | 39 |
| Section 9.02 | Waivers; Amendments | 40 |
| Section 9.03 | Indemnity; Damage Waiver | 41 |
| Section 9.04 | Successors and Assigns, Participations and Transfer of the Notes | 42 |
| Section 9.05 | Survival; Reinstatement of Obligations | 45 |
| Section 9.06 | Counterparts; Integration; Effectiveness | 46 |
| Section 9.07 | Severability | 46 |
| Section 9.08 | Right of Setoff | 46 |
| Section 9.09 | Governing Law | 47 |
| Section 9.10 | Waiver of Jury Trial | 47 |
| Section 9.11 | Headings | 47 |
| Section 9.12 | Interest Rate Limitation | 47 |
| Section 9.13 | USA Patriot Act | 47 |
| Section 9.14 | Waiver of Immunity | 47 |
| Section 9.15 | Press Releases and Other Communications | 48 |
| Section 9.16 | Comptroller of Puerto Rico | 48 |

ii

Confidential

PREPA_RSA0028181

SCHEDULES:

Schedule 2.01 Commitments
Schedule 2.04 Existing Indebtedness
Schedule 6.06 Existing Restrictions

EXHIBITS:

Exhibit A      Assignment and Assumption
Exhibit B      Form of Note
Exhibit C      Form of Borrowing Request
Exhibit D      Form of Financial Compliance Certificate

Confidential

PREPA_RSA0028182

<u>CREDIT AGREEMENT</u>

THIS CREDIT AGREEMENT dated as of May 2, 2012 (this "Agreement"), among PUERTO RICO ELECTRIC POWER AUTHORITY, the LENDERS party hereto, and SCOTIABANK DE PUERTO RICO, as Administrative Agent.

The parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CONSTRUCTION

**Section 1.01   Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"<u>ABR Advance</u>" means any Advance or Borrowing bearing interest at a rate determined by reference to the Alternate Base Rate.

 "<u>Adjustment Event</u>" has the meaning assigned to such term in Section 2.09(a).

"<u>Administrative Agent</u>" means Scotiabank de Puerto Rico, in its capacity as administrative agent for the Lenders hereunder and any successor appointed pursuant to Article VIII hereof.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Advance</u>" has the meaning assigned to such term in Section 2.01.

"<u>Advance Repayment Date</u>" means, with respect to each Advance, the date that such Advance is due and payable in accordance with Section 2.06, but in no event later than the Maturity Date.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agreement</u>" has the meaning assigned to such term in the preamble hereof.

"<u>Alternate Base Rate</u>" means a variable per annum reference rate of interest (as announced and adjusted by The Bank of Nova Scotia from time to time) for United States dollar loans made by said bank in the United States and Puerto Rico, with no representation by the Lenders that said rate is the lowest or most favorable rate offered by the Lenders or by The Bank of Nova Scotia.  If The Bank of Nova Scotia ceases to announce a base rate, "Alternate Base Rate" shall mean the rate of interest published in <u>The Wall Street Journal</u> from time to time as the base or prime rate for such particular date.  If more than one base or prime rate is published in <u>The Wall Street Journal </u>for a day, the average of such base or prime rates shall be used, and such average shall be rounded up to the nearest one thousandth of one percent (0.001%).  If <u>The</u>

Confidential

PREPA_RSA0028183

<u>Wall Street Journal</u> ceases to publish the base or prime rate, the Administrative Agent shall select an equivalent publication that publishes such base or prime rate, and if such base or prime rates are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then the Administrative Agent shall select, in its reasonable discretion, a comparable interest rate index. Each change in the Alternate Base Rate shall be effective from and including the date such change is publicly announced as being effective.

"<u>Applicable Percentage</u>" means, with respect to any Lender, the percentage of the total Commitments represented by such Lender's Commitment. If the Commitments have terminated or expired, the Applicable Percentage, with respect to any Lender, shall be the percentage which such Lender's Advances then outstanding constitutes of the aggregate principal amount of all Advances then outstanding.

"<u>Applicable Margin</u>" means 175 basis points; provided that the Applicable Margin shall be increased by the number of basis points set forth in the table below, effective as of the date a downgrade is made by either Moody's or S&P to the long term ratings for Senior Debt, as follows:

| Rating | | | | Spread |
|--------|--------|-----|-----------|------------------|
| Moody's | Baa2 | S&P | BBB | +25 basis points |
| Moody's | Baa3 | S&P | BBB- | +50 basis points |
| Moody's | Below Baa3 | S&P | Below BBB- | +75 basis points |

"<u>Approved Fund</u>" has the meaning assigned to such term in Section 9.04(b)(ii).

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"<u>Availability Period</u>" means the period from and including the Effective Date to but excluding the earlier of (a) May 3, 2013 and (b) the date of termination of the Commitment.

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" means Puerto Rico Electric Power Authority, a public corporation and government instrumentality of the Commonwealth of Puerto Rico.

"<u>Borrowing</u>" means a borrowing made by the Borrower pursuant to **Error! Reference source not found.** consisting of Advances made on the same day by the Lenders ratably according to their respective Commitments.

"<u>Borrowing Request</u>" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

2

PREPA_RSA0028184

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in the Commonwealth are authorized or required by law to remain closed, *provided, however*, that when used in connection with a LIBOR Advance, the term "Business Day" will also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Change in Law" means (i) the introduction, enactment, adoption or phase-in of any Law (or any provision thereof) after the Closing Date; (ii) any change in any Law (or any provision thereof) or in the interpretation or re-interpretation or application thereof by any Governmental Authority after the Closing Date; or (iii) compliance by the Lenders with any request, guideline, decision or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"Charges" has the meaning set forth in Section 9.12.

"Closing Date" means May 4, 2012.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commitment" has the meaning set forth in Section 2.01.

"Commonwealth" means the Commonwealth of Puerto Rico.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Current Expenses" has the meaning given to such term in the Trust Agreement.

"Credit Exposure" means, with respect to any Lender at any time, the then outstanding principal amount of the Advances made by such Lender at such time.

"Date of Taxability" means the date set forth in any Final Determination as the date on which interest on the Advances is deemed to be includable in gross income of the recipients thereof for Federal income tax purposes.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning set forth in Section 2.09.

3

PREPA_RSA0028185

"Determination of Taxability" means any determination, decision, decree or advisement by the Commissioner of the Internal Revenue and District Director of the Internal Revenue or any court of competent jurisdiction, or an opinion obtained by the Administrative Agent, of counsel qualified in such matters, that an Event of Taxability has occurred.  A Determination of Taxability also shall be deemed to have occurred on the first to occur of the following:

(a)    the date when the Borrower provides any notice or files any statement, supplemental statement, or other tax schedule, return or document which discloses that an Event of Taxability has occurred; or

(b)    the effective date of any federal legislation enacted or federal rule or regulation promulgated after the Closing Date that causes an Event of Taxability.

"Dollars" or "$" means lawful money of the United States of America.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Extension Premium" has the meaning set forth in **Error! Reference source not found.**(a).

"Event" or "Events" has the meaning given such terms in Section 2.15.

"Event of Default" has the meaning assigned to such term in Article VII.

"Event of Taxability" means with respect to the Advances: (i) (A) the application of the proceeds of such Advances in such manner that such Advances become "arbitrage bonds" within the meaning of Code Sections 103(b)(2) and 148, with the result that interest on such Advances

4

PREPA_RSA0028186

is or becomes includable in gross income of the recipients thereof for Federal income tax purposes or (B) if as the result of any act, failure to act or use of the proceeds of such Advances or any misrepresentation or inaccuracy in any of the representations, warranties or covenants contained in this Agreement or in any of the Loan Documents by the Borrower or the enactment of any federal legislation or the promulgation of any federal rule or regulation after the Closing Date, the interest on such Advances is or becomes includable in gross income of the recipients thereof for Federal income tax purposes; (ii) any portion of the interest on the Advances paid or payable by the Borrower is (A) not excludable from the gross income of any of the Lenders for Commonwealth income tax purposes or (B) subject to the payment of municipal license taxes or sales and use taxes imposed by the Commonwealth or any of its municipalities; or (C) the Notes cease to be exempt in whole or in part from Commonwealth property taxes.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, the Commonwealth or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located and (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located.

"Existing Credit Facility" means the Credit Agreement dated as of June 17, 2011 among the Authority, as Borrower, the Lenders party thereto and Scotiabank de Puerto Rico, as Administrative Agent.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Final Determination" means the entry of any decree or judgment by a court of competent jurisdiction, or the taking of any official action by the Internal Revenue Service or the Department of the Treasury of the Commonwealth or any Municipality of the Commonwealth, that is final under applicable procedural law and has the effect of a determination that an Event of Taxability has occurred.

"Financial Officer" means the Executive Director, Chief Financial Officer, Treasurer or Assistant Treasurer of the Borrower.

Confidential

PREPA_RSA0028187

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each state thereof, the District of Columbia and the Commonwealth shall be deemed to constitute a single jurisdiction.

"GAAP" means generally accepted accounting principles in the United States of America, including accounting rules prescribed by the Governmental Accounting Standards Board.

"GDB Resolution" means Resolution CE-2012-37 adopted on April 13, 2012 by the Executive Committee of Government Development Bank for Puerto Rico, authorizing a revolving credit facility for the Borrower for a maximum amount up to $500,000,000 from Scotiabank de Puerto Rico.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, territorial or local, including the government of the Commonwealth, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government but excluding the Borrower.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holder" means any assignee or transferee of Scotiabank de Puerto Rico, or a subsequent transferee, under Section 9.04(e) hereof.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations

Confidential

PREPA_RSA0028188

of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Interest Election Request" means a request by the Borrower to continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) the Maturity Date, (b) any date on which the principal of the Advances is paid by reason of repayment, acceleration or otherwise or (c) with respect to each Advance, the last day of each Interest Period therefor.

"Interest Period" means, for any LIBOR Advance or Rollover, the period commencing on the date such LIBOR Advance or Rollover is disbursed or continued as a Rollover or an ABR Advance is converted to a LIBOR Advance; *provided, however,* that each Interest Period shall be for a period equal to 1-week, 1-month, 2-months or 3-months and shall in no event mature after the Maturity Date; *provided, further,* that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the immediately preceding Business Day, and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.

"Investment Obligations" means investments permitted in accordance with the Trust Agreement.

"Law" means any law, rule, regulation, statute, ordinance, judicial precedent or code, including the interpretation thereof by any Governmental Authority charged with its enforcement, interpretation or administration.

"Legal Proceeding" means any action brought by the Borrower contesting the basis of an asserted Determination of Taxability, either directly or in the name of any Lender, up to and including the conclusion of any appellate review.

Confidential

PREPA_RSA0028189

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Lender Group" means, with respect to a Lender, such Lender and all of its Affiliates which also are Lenders.

"LIBOR" means for any Interest Period for each Advance the rate of interest per annum at which deposits of equal (or like) amounts in United States dollars are offered by the principal office of The Bank of Nova Scotia in London, England, to prime banks in the London interbank market at 11:00 a.m. (London time), two Business Days before the first day of each Interest Period, for a period equal to such Interest Period.

"LIBOR Advance" means any Advance bearing interest at a rate determined by reference to the LIBOR Rate.

"LIBOR Funds" means deposits in United States dollars in leading banks in the London interbank market.

"LIBOR Rate" means for any Interest Period for each Advance, LIBOR plus the Applicable Margin.

"LIBOR Rate Reserve Percentage" of any Lender for an Interest Period for any Advance means the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during which any such percentage shall be so applicable) under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for such Lender with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such Interest Period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, the Notes, the Resolution, the GDB Resolution and all documents, instruments and agreements delivered in connection with the foregoing.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and the Subsidiaries taken as a whole, (b) the ability of the Borrower to perform any of its obligations under this Agreement, the Trust Agreement or the Resolution or (c) the rights of or benefits available to the Lenders under this Agreement and the other Loan Documents.

Confidential

PREPA_RSA0028190

"Material Indebtedness" means Indebtedness (other than the Advances), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means May 3, 2013.

"Maximum Rate" has the meaning set forth in Section 9.12.

"Moody's" means Moody's Investors Service, Inc.

"Note" means a note substantially in the form of Exhibit B.

"Obligations" has the meaning set forth in Exhibit B.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or the Notes.

"Operating Account" means Account #226902003367 established by the Borrower with the Administrative Agent exclusively for use in connection with this Agreement.

"Participant" has the meaning set forth in Section 9.04(c)(i).

"Permitted Encumbrances" means:

(a)     Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.04;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII; and

Confidential

PREPA_RSA0028191

(f)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

(g)    provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Register" has the meaning set forth in Section 9.04(b)(iv).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Required Lenders" means, at any time, Lenders having Credit Exposures and unused Commitments representing more than 50% of the sum of the total Credit Exposures and unused Commitments at such time; provided that if there are only two Lenders, then "Required Lenders" means both Lenders.

"Resolution" means, collectively, Resolution No. 3909 of the Borrower and the Certificate of Determination dated May 4, 2012 authorizing the Borrowings and providing, among other things, that the Borrowings shall constitute Current Expenses under the Trust Agreement.

"Rollover" means the continuation, for an additional Interest Period, of a LIBOR Advance upon reaching the last day of its current Interest Period.

"Senior Debt" means the senior debt obligations of the Borrower issued under the Trust Agreement that are not guaranteed by any other Person or subject to any other credit enhancement; however, if all senior debt outstanding under the Trust Agreement is guaranteed by another Person or otherwise subject to credit enhancement, the rating of such senior debt will be considered without regard to such guarantee or credit enhancement, as the case may be.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b)

10

that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Transactions" means the execution, delivery and performance of this Agreement and the other Loan Documents, the adoption of the Resolution and the GDB Resolution, the making of the Advances and the use of the proceeds thereof, provided, however, that "Transactions" will not include, or be deemed to include, any transfer, assignment, participation, sale or other disposition of a Note or a Lender's interest therein.

"Trust Agreement" means the Trust Agreement, dated as of January 1, 1974, as amended and supplemented, by and between the Borrower and U.S. Bank National Association, as successor trustee.

**Section 1.02   Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**Section 1.03   Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the

Confidential

PREPA_RSA0028193

operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II

## THE ADVANCES

**Section 2.01   Commitment**.   (a) Each Lender severally agrees, on and subject to the terms and conditions hereinafter set forth, to make advances (each an "Advance") to the Borrower from time to time during the Availability Period, under a revolving line of credit in an aggregate principal amount not to exceed the amount set opposite such Lender's name as its Commitment in Schedule 2.01 or, if such Lender has entered into an Assignment and Assumption, the amount set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 9.04(b)(iv) (such Lender's "Commitment").

(b) If at the time of any Borrowing there is any principal amount outstanding to any Lender under the Existing Credit Facility, then (i) such Lender's Commitment shall be deemed reduced by such outstanding amount; and (ii) all other Lenders' Commitments shall also be deemed reduced so that each Lender will maintain the same percentage share of the total Commitments.

(c) Each Borrowing made by the Borrower under this Section 2.01 shall consist of one or more Advances made on the same day by the Lenders ratably in accordance with their respective Commitments.   Within the foregoing limit and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Borrowings.

**Section 2.02   Advances and Borrowings**.   Each Borrowing shall consist of LIBOR Advances made or continued by the Lenders ratably in accordance with their respective Commitments.   Each Advance shall be in an integral multiple of $1,000,000, and the minimum amount of an Advance shall be $1,000,000; *provided, however,* if less than $1,000,000 is available to the Borrower a LIBOR Advance may be requested by the Borrower in an aggregate amount that is equal to the entire unused balance of each Lender's Commitment.   The failure of any Lender to make any Advance required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and not joint (mancomunado), and no Lender shall be responsible for any other Lender's failure to make Advances as required.

12

PREPA_RSA0028194

**Section 2.03   Funding of Borrowings.**

(a) To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone not later than 11:00 a.m., San Juan, Puerto Rico time, two Business Days before the date of the proposed Borrowing, *provided however,* that the initial LIBOR Advance may be requested prior to 11:00 a.m. on the same day as the initial Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in the form of Exhibit C and signed by the Borrower. Upon fulfillment of the applicable conditions set forth in Article IV, the Administrative Agent and Lenders will make the funds available to the Borrower by funding the Borrower's Operating Account held with the Administrative Agent. Each such telephonic and written Borrowing Request shall specify the following information:

(i)     the amount of the requested Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)   the initial Interest Period selected by the Borrower for the requested Advance, which shall be equal to 1-week, 1-month, 2-months or 3-months; and

(iv)   the Current Expenses to be paid, which Current Expenses shall be evidenced by unpaid invoices or other documentation acceptable to the Administrative Agent, and shall total no less than the amount requested in the Borrowing Request.

If no Interest Period is specified with respect to any LIBOR Advance, then the Borrower shall be deemed to have selected an Interest Period of one month's duration; provided that no Interest Period may be selected which would mature after the Advance Repayment Date.

(b)     Each Lender shall make each Advance to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, San Juan, Puerto Rico time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Advances available to the Borrower by promptly crediting the amounts so received, in like funds, to the Operating Account.

(c)     Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance

13

with banking industry rules on interbank compensation.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Advance included in such Borrowing.

### Section 2.04   Interest Elections

(a)       Each Borrowing initially shall be a LIBOR Advance and shall have an initial Interest Period as specified in such Borrowing Request. The Borrower may thereafter elect to continue such LIBOR Advance for one or more Interest Periods, all as provided in this Section; provided that the Borrower may not select an Interest Period that would mature after the Advance Repayment Date other than a final 1-week Interest Period, and on the last day of such final 1-week Interest Period, the Advance shall become due and payable.

(b)       Not later than 11:00 a.m., San Juan, Puerto Rico time, two Business Days before the end of each Interest Period for each LIBOR Advance, the Administrative Agent shall provide the Borrower with the terms and interest rates available to the Borrower for the next Interest Period.

(c)       To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone, e-mail or facsimile by not later than 2:00 p.m., San Juan, Puerto Rico time, two Business Days before (A) the effective date of such election or (B) the last day of an Interest Period, and the Administrative Agent shall thereupon inform the Lenders of the Borrower's election by 3:00 p.m. on the same date. Each such telephonic, electronic or facsimile Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved and signed by the Borrower.

(d)       Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)       the Borrowing to which such Interest Election Request applies;

(ii)       the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)       that such Borrowing shall be a LIBOR Advance or a Rollover; and

(iv)       the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

(e)       If any such Interest Election Request does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of 1-month; provided, however, if such 1-month Interest Period would mature after the Advance Repayment Date, then such Interest Period shall be deemed to be 1-week; provided, further, that if such 1-week Interest Period shall mature after the Advance Repayment Date, then no additional Interest Period shall be available therafter for such Advance and such Advance shall become due and payable on the

14

PREPA_RSA0028196

last day of such Interest Period. Notwithstanding anything to the contrary contained herein, no LIBOR Advance or Rollover shall mature after the Maturity Date.

(f)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Borrowing at the time specified in clause (b) of this Section 2.04 prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a LIBOR Advance with an Interest Period of 1-month; *provided, however*, if such Interest Period would mature after the Advance Repayment Date, then such LIBOR Advance shall be continued with an Interest Period equal to 1-week; *provided, further,* that if such 1-week Interest Period would mature after the Advance Repayment Date then no additional Interest Period shall be available thereafter for such Advance and such Advance shall become due and payable on the last day of said Interest Period. Notwithstanding anything to the contrary contained herein, no LIBOR Advance or Rollover shall mature after the Maturity Date.

### Section 2.05     Termination and Reduction of Commitments.

(a)     Unless previously terminated, the Commitments shall terminate on the Maturity Date.

(b)     The Borrower may at any time terminate, or from time to time reduce, the Commitments; provided that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000, and (ii) the Borrower shall not terminate or reduce the Commitments if, after giving effect to any concurrent repayment of the Advances in accordance with Section 2.06, the Credit Exposures would exceed the total Commitments.

(c)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section at least five (5) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Commitments shall be permanent.  Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

(d)     If an Event of Default or a Final Determination has occurred, the Commitment shall be automatically and immediately reduced to zero and the Availability Period shall thereupon be terminated.  The Administrative Agent shall give notice to the Borrower of such reduction and termination; however, failure to give such notice shall in no way affect the reduction of the Commitment and the termination of the Availability Period.

### Section 2.06     Repayment of Advances; Evidence of Debt.

Confidential

(a)     The Advances made to the Borrower by each Lender shall be evidenced by a Note payable to the order of such Lender.  The aggregate outstanding principal amount of the Notes shall not exceed FIVE HUNDRED MILLION DOLLARS ($500,000,000).

(b)     Each LIBOR Advance shall be due and payable on the last day of the Interest Period ending closest to six months after disbursement thereof (the "Advance Repayment Date"), determined as provided in Section 2.04.

(c)     Any Advance that, 180 days after the initial disbursement, is an ABR Advance, shall be due and payable on that date.

(d)     The aggregate unpaid principal balance of all outstanding Advances, together with interest thereon shall be payable in full on the Maturity Date.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Advance on its Advance Repayment Date as determined pursuant to Section 2.06(b), but in no event later than the Maturity Date.

(e)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Advance made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(f)     The Administrative Agent shall maintain accounts in which it shall record the amount of each Advance made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof and (iv) the principal amount of any Note issued under Section 9.04(e) hereof, and the name, address and wire transfer instructions and any other account information for the assignee to which such Note will be delivered.

(g)     The entries made in the accounts maintained pursuant to paragraph (b) or of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Advances in accordance with the terms of this Agreement and, in the event of any discrepancy between such entries, the entries in the accounts maintained by the Administrative Agent shall govern.

(h)     The obligations of the Borrower to the Lenders will be evidenced by the Notes.

**Section 2.07   Optional Prepayment of Advances**.

(a)     The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section.

16

PREPA_RSA0028198

(b)     The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) (i) in the case of prepayment of a LIBOR Advance, not later than 11:00 a.m., San Juan, Puerto Rico time, two Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Advance, not later than 11:00 a.m., San Juan, Puerto Rico time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the repayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that if a notice of repayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.05, then such notice of repayment may be revoked if such notice of termination is revoked in accordance with Section 2.05.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial repayment of any Borrowing shall be in an amount not less than $1,000,000 and integral multiples thereof.  Each repayment of a Borrowing shall be made to the Administrative Agent and applied ratably to the Advances included in the prepaid Borrowing.

(c)     All repayments under this Section 2.07 shall be made together with accrued interest as required by Section 2.09 to the date of such repayment on the principal amount prepaid.

(d)     All prepayments under this Section 2.07 shall be made without prepayment penalty or premium, without prejudice to the obligation of the Borrower to pay the amounts required to be paid to the Lenders pursuant to subsection (e) below.

(e)     In the event of (a) the payment of any principal of any LIBOR Advance, other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), or (b) the failure to borrow, continue or prepay any LIBOR Advance on the date specified in any notice delivered pursuant thereto, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Advance had such event not occurred, at the LIBOR Rate that would have been applicable to such Advance, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for such Advance), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would be offered, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the LIBOR market.  A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.  Notwithstanding anything to the contrary herein, this paragraph (e) shall not apply to any LIBOR Advance with an Interest Period of 1-week.

Confidential

PREPA_RSA0028199

**Section 2.08   Structuring Fee.**   The Borrower agrees to pay to the Administrative Agent a fee equal to $150,000 (the "Structuring Fee").  The Structuring Fee shall be payable in immediately available funds no later than [five (5)] Business Days following the Closing Date.

**Section 2.09   Interest**.

(a)   *LIBOR Advances*.  Each Advance shall accrue interest from the date it was made until the full repayment thereof at a fluctuating annual rate equal at all times during each Interest Period for such Advance at LIBOR plus the Applicable Margin; provided however, that commencing on the 91st day after the initial disbursement of the Advance and until full payment thereof, the applicable interest rate shall increase by 25 basis points (the "Extension Premium"). The Administrative Agent shall give the Borrower prompt written notice of the LIBOR Rate that is set for each Interest Period, including the Extension Premium if applicable.

Any adjustment to the Applicable Margin due to a change in any rating of the Senior Debt by Moody's or by S& P (an "Adjustment Event") shall be made by the Administrative Agent, as soon as practicable after receipt by the Administrative Agent of (i) notice from the Borrower provided pursuant to Section 5.02 hereof or (ii) other evidence satisfactory to the Administrative Agent confirming that an Adjustment Event has transpired which gives rise to an adjustment to the Applicable Margin.  Any such adjustment to the Applicable Margin shall be effective as of the date of the occurrence of the Adjustment Event.

(b)   *ABR Advances*.  During the first 90 days after disbursement, ABR Advances shall bear interest at a fluctuating rate per annum equal at all times to the Alternate Base Rate plus the Applicable Spread. Commencing on the 91st day after disbursement, ABR Advances shall bear interest at a fluctuating rate per annum equal at all times to the Alternate Base Rate, plus the Applicable Spread, plus 25 basis points.

(c)   *Default Rate*.  Anything hereunder to the contrary notwithstanding, and without prejudice to any remedies of the Administrative Agent or the Lenders provided hereunder or at law or in equity, the interest rate applicable to the outstanding principal amount of the Advances during any period when an Event of Default, pursuant to clause (a) and (b) under Article VII hereof shall have occurred and be continuing, shall be four percent (4%) over the Alternate Base Rate and (ii) when an Event of Default, other than an Event of Default under clause (a) or (b) of Article VII, shall have occurred and is continuing shall be one percent (1%) over the Alternate Base Rate (the "Default Rate").

(d)   The Administrative Agent shall determine the interest rate for Advances as provided above and shall furnish such rate to the Borrower and the Lenders. No later than the second Business Day preceding each Interest Payment Date, the Administrative Agent shall notify the Borrower in writing or by readily accessible electronic means of the total amount of interest payable on the Advances on such Interest Payment Date.

(e)   Accrued interest on each Advance shall be payable in arrears on each Interest Payment Date for such Advance and upon the earliest of the Maturity Date, the termination of the Commitments and such other date on which the Advances are due and payable hereunder; provided that in the event of any repayment or prepayment of any Advance, accrued

18

interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)     Interest shall be calculated on the basis of a 360-day year for LIBOR Advances and if the Alternate Base Rate is in effect on the basis of a 365-day year, in each case for the actual number of days elapsed.

(g)     Upon a Final Determination, the Administrative Agent shall calculate (i) the amount of interest which accrued on all Advances from the Date of Taxability to the date of the Final Determination and (ii) the amount of interest which would have accrued on all Advances from the Date of Taxability to the date of the Final Determination if the interest rate during such period of calculation had been the sum of the LIBOR Rate (including any Extension Premium) for each such Interest Period for such Advance *plus* an amount equal to any additional costs incurred by the Administrative Agent and the Lenders due to the Final Determination so that net of such additional costs the Administrative Agent and Lenders receive the amount they would have received had no Final Determination been made.  Upon such calculation the Administrative Agent shall make demand on the Borrower for amount equal to an amount by which the amount described in clause (ii) exceeds the amount described in clause (i).  The Borrower shall pay to the Administrative Agent for the benefit of the Lenders as additional interest on the Advances the amount so demanded upon receipt of such demand.

(h)     The obligation of any Lender hereunder to make, fund or maintain Advances bearing interest at the LIBOR Rate shall in all cases be subject to the availability to all of the Lenders of LIBOR funds.

**Section 2.10   Alternate Rate of Interest.**  If prior to the commencement of any Interest Period for any LIBOR Advance the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) such deposits in the relevant amount and for the relevant Interest Period are not available to it, (ii) by reason of circumstances affecting its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBOR Advances, or (iii) the LIBOR Rate will not adequately and fairly reflect the cost to the Administrative Agent or Lender of making or continuing LIBOR Advances for an applicable Interest Period, then the Administrative Agent shall give notice thereof to the Borrower by telephone or telecopy as promptly as practicable thereafter and, until the Lender notifies the Borrower that the circumstances giving rise to such notice no longer exist, (i) such Borrowing (unless prepaid) shall be converted to, an ABR Advance (provided that no such conversion shall be required earlier than the last day of the then-current Interest Period) and (ii) if any Borrowing Request requests a LIBOR Advance, such Borrowing shall be made as an ABR Advance.  The Administrative Agent shall promptly notify the Borrower when the circumstances giving rise to such notice no longer exist, and upon receipt of such notice the Borrower may elect to convert such ABR Advances to LIBOR Advances.

**Section 2.11   Taxes**.

(a)     Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that

19

after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate.

(f)     If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund or credit of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.11, it shall pay to the Borrower such refund or an amount equal to such credit (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.11 with respect to the Taxes or Other Taxes giving rise to such refund or credit), net of all reasonable out-of-pocket expenses relating to such refund or credit of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower agrees, upon the request of the Administrative Agent or such Lender, to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental

20

PREPA_RSA0028202

Authority.  This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

### Section 2.12   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)   The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or amounts payable under Section 2.11, or otherwise) prior to 12:00 noon, San Juan, Puerto Rico time, on the date when due, in immediately available funds, without set off or counterclaim except as otherwise provided in Section 2.12(f).  All payments to the Administrative Agent shall be made through the Federal Reserve Wire System to JPMorgan Chase Bank-New York, ABA No. 021000021 at the Federal Reserve Bank of New York for credit to Scotiabank de Puerto Rico, account number 001058975.  With respect to payments of principal and interest, payment should be made to the account name and number to be provided by the Administrative Agent to the Borrower, from time to time.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  Payments pursuant to Sections 2.11 and 9.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)   If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)   If any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Advances resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Advances and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Advances of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Advances; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Advances to any assignee or participant, other than to the

21

PREPA_RSA0028203

Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.03(b) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(f)     To the extent permitted by applicable law, the Borrower may offset against any payments due to any Lender under this Agreement or the Notes the amount of any loss suffered by the Borrower as a result of the failure of such Lender to return any monies of the Borrower on deposit with such Lender due to the bankruptcy or insolvency of such Lender. Any such offset may be made only against payments due to the insolvent Lender, when and as the same become due, and no offsets may be made against any amounts due and payable to any other Lender. The Borrower may not exercise any right of setoff with respect to all or any portion of deposits which are insured by the Federal Deposit Insurance Corporation.

(g)     If any scheduled payment of principal and/or interest is not made within 10 days of its due date, the Borrower shall also pay a late charge equal to 5% of such late principal and/or interest payment. Acceptance by the Administrative Agent of any late payment without an accompanying late charge shall not be deemed a waiver of the Administrative Agent's right to collect such late charge or to collect a late charge for any subsequent late payment received.

**Section 2.13   Mitigation Obligations; Replacement of Lenders**.

(a)     If the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices,

22

Confidential

branches or affiliates if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11, or if any Lender defaults in its obligation to fund Advances hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.11 or payments required to be made pursuant to Section 2.11, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**Section 2.14   Notes as Current Expenses.**  The Lenders acknowledge and agree that all obligations hereunder are evidenced by the Notes and constitute Current Expenses under the Trust Agreement, which Current Expenses are subject to the terms and conditions of the Trust Agreement and the Resolution relating to the priority of payments and the right to exercise remedies thereunder.

**Section 2.15   Change in Circumstances**.

(a)     If due to any Change in Law there shall be (i) any increase in the cost to any Lender of making or maintaining the Advances; (ii) any increase in the amount of capital required or maintained, or expected to be maintained, by any Lender and the amount of such capital is increased by or based upon the existence of its Advances or Commitment hereunder; or (iii) any decrease in the effective rate of return on the capital of any Lender of making or maintaining the Advances (each an "Event," collectively, the "Events"), excluding any Events resulting from changes in the basis of taxation of overall net income or overall gross income affecting such Lender (the determination of any and all of the preceding Events being at the affected Lender's sole and absolute discretion with respect to the Advances), then such Lender shall provide the Borrower and the Administrative Agent with a written notice that shall (1) describe in reasonable detail the Event together with the approximate date of the effectiveness thereof, (2) set forth the cost to the Lender in respect of such Event and (3) calculate such amount as the Lender determines in its sole and absolute discretion is necessary to be compensated for the cost of such Event. Such notice or notices may be sent by a Lender in

23

PREPA_RSA0028205

respect of an Event or Events from time to time. The Borrower shall pay directly to the Administrative Agent for the account of the affected Lender from time to time upon such Lender's written demand, the amount sufficient to compensate the Lender for the cost of such Events.

(b)     If any Change in Law shall make it unlawful for any Lender to continue to maintain its Commitment, or for the Borrower to comply with its obligations in respect of Advances by such Lender, the Borrower shall forthwith (or within the period allowed for such payment, if any, prior to the date when such unlawfulness becomes effective), upon such Lender's demand, prepay the outstanding Advances made by such Lender in full, together with accrued interest thereon and payment of any funding-loss compensation required pursuant to Section 2.07(e) above. The affected Lender shall submit to the Borrower and the Administrative Agent a written statement setting forth the basis for determining such amounts.

Any notice pursuant to this Section 2.15, including the certifications made therein, shall be conclusive and binding on the Borrower absent manifest error.

(c)     The Borrower shall pay to each Lender, so long as such Lender shall be required under regulations of the Board of Governors of the Federal Reserve System to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, additional interest on the unpaid principal amount of each Advance of such Lender, from the date of such Advance until such principal amount is paid in full, at an interest rate per annum equal at all times to the remainder obtained by subtracting (i) the LIBOR Rate (plus any Extension Premium, if applicable) for such Interest Period for such Advance from (ii) the rate obtained by dividing such LIBOR Rate (plus any Extension Premium, if applicable) by a percentage equal to 100% minus the LIBOR Rate Reserve Percentage of such Lender for such Interest Period, payable on each date on which interest is payable on such Advance. Such additional interest shall be determined by such Lender and notified to the Borrower through the Administrative Agent.

(d)     Notwithstanding any other provision of this Agreement, if any Lender shall notify the Administrative Agent that the introduction of or any change in, or in the interpretation of, any law or regulation makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for any Lender to perform its obligations hereunder to make LIBOR Advances or to fund or maintain LIBOR Advances, as the case may be, (i) the Administrative Agent shall immediately notify the Borrower in writing of such circumstances, (ii) the obligation of the Lenders to make LIBOR Advances shall be suspended until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist and (iii) all outstanding LIBOR Advances shall automatically be converted into ABR Advances. The Administrative Agent shall promptly notify the Borrower in writing when the circumstances giving rise to such notice no longer exist, and upon receipt of such written notice the Borrower may convert such ABR Advances to LIBOR Advances.

Confidential                                                                                           PREPA_RSA0028206

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

**Section 3.01   Organization; Powers**.  Each of the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

**Section 3.02   Authorization; Enforceability**.   The Transactions are within the Borrower's powers and have been duly authorized by all necessary corporate action on the part of the Borrower.  The Trust Agreement, this Agreement and each other Loan Document to which the Borrower is a party have been duly executed and delivered by the Borrower and constitute legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  The Advances will be treated as Current Expenses under the Trust Agreement, and the Borrower will record the Advances as Current Expenses on its books, records and financial statements.

**Section 3.03   Governmental Approvals; No Conflicts**.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any law or regulation applicable to the Borrower or the organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority applicable to the Borrower, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries except as provided in the Trust Agreement.

**Section 3.04   Financial Condition; No Material Adverse Change**.    (a)       The Borrower has heretofore furnished to the Administrative Agent its consolidated balance sheet and statements of revenues, expenses and changes in net assets and cash flows as of and for the fiscal year ended June 30, 2011, reported on by Ernst & Young LLP, independent public accountants.  Such financial statements present fairly, in all material respects, the financial position and results of operations and, as applicable, cash flows of the Borrower and, as applicable, its consolidated Subsidiaries as of such date and for such periods in accordance with GAAP.

(b)       Since the last date of the period covered by the most recent audited financial statements delivered to the Administrative Agent, there has been no material adverse

25

PREPA_RSA0028207

change in the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries, taken as a whole.

**Section 3.05    Properties**.  Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes and except as permitted pursuant to Section 6.01.

**Section 3.06    Litigation and Environmental Matters**.

(a)    There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement or the Transactions.

(b)    Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

**Section 3.07    Compliance with Laws and Agreements**.  Each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

**Section 3.08    Status**.  Neither the Borrower nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or a public utility holding company under the Public Utility Holding Company Act of 2005.

**Section 3.09    Taxes**.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all taxes required to have been paid by it, except (a) taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

**Section 3.10    Disclosure**.  The Borrower has disclosed to the Administrative Agent all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  The Administrative Agent shall

Confidential

PREPA_RSA0028208

furnish all such information so received from the Borrower to the Lenders. None of the other reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 3.11   **Resolution; Trust Agreement**. The Resolution has been duly adopted by the Borrower and proceedings related thereto have been validly and legally taken. The Notes have been duly and validly authorized in accordance with law. The Notes are valid and binding obligations of the Borrower, payable as Current Expenses from the Puerto Rico Electric Power Authority General Fund established under the Trust Agreement.

Section 3.12   **Repayment**. If the Borrower incurs or issues Indebtedness for the purpose of repaying the Advances and other obligations hereunder, such incurrence or issuance of Indebtedness (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority (other than the Borrower), except such as have been obtained or made and are in full force and effect other than (i) the approval of the Government Development Bank for Puerto Rico which is not expected to be unreasonably withheld or delayed, and (ii) if applicable, the filing of Form 8038-G with the Internal Revenue Service, (b) will not violate any law or regulation applicable to the Borrower or the organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority applicable to the Borrower, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries except as permitted in Section 6.01.

Section 3.13   **No Immunity**. With respect to actions, obligations or contracts which constitute proprietary functions, the Borrower is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues (irrespective of their use or intended use) from (i) suit, (ii) relief by way of injunction, order for specific performance or for recovery of property, or (iii) execution of enforcement of any judgment to which it or its revenues might otherwise be made subject in any suit, action or proceedings relating to this Agreement or the other Loan Documents brought validly in the courts of any jurisdiction and no such immunity (whether claimed or not claimed) may be attributed to the Borrower or its revenues.

Section 3.14   **Tax-Exemption**. All payments of principal and interest under this Agreement and the Notes are exempt from all Commonwealth (including any instrumentality or political subdivision of the Commonwealth) taxes and assessments of any kind or nature, including, without limitation, income taxes, municipal license taxes (patents) and withholding

27

PREPA_RSA0028209

obligations. The Notes are exempt from all Commonwealth (including any instrumentality or political subdivision of the Commonwealth) property taxes.

All representations and warranties made in this Agreement and the other Loan Documents by the Borrower shall be deemed to have been relied upon by the Administrative Agent and each of the Lenders notwithstanding any investigation heretofore or hereafter made by the Administrative Agent or any Lender or on its or their behalf.

## ARTICLE IV

## CONDITIONS

**Section 4.01  Effective Date**. The obligations of the Lenders to make Advances hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02) (the "Effective Date"):

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement, the Notes and each other Loan Document signed in original on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission or electronic scan of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and each other Loan Document to which such party is a party.

(b)     The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of (i) the general counsel to the Borrower and (ii) Nixon Peabody LLP, special counsel to the Borrower ("Special Counsel"), each in form and substance satisfactory to the Lenders. The Borrower hereby requests such counsel to deliver such opinions.

(c)     The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Borrower, the authorization of the Transactions (including but not limited to the adoption of the Resolution and the GDB Resolution) and any other legal matters relating to the Borrower, this Agreement or the Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel.

(d)     The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower confirming, as of the Effective Date (i) compliance with the conditions set forth in paragraphs (b), (c) and (d) of Section 4.02 and (ii) the long term ratings in effect for the Senior Debt by Moody's and S&P is no less than Baa1 and BBB+, respectively.

(e)     The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder, such out of pocket expenses not to exceed $40,000.

Confidential

PREPA_RSA0028210

(f)     The Administrative Agent shall have received evidence of filing of this Agreement and the other Loan Documents with the Office of the Comptroller of the Commonwealth, pursuant to Act No. 18 of the Legislative Assembly of Puerto Rico, approved on October 30, 1979, as amended by Act No. 127 of May 31, 2004.

(g)     The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lenders to make Advances hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 3:00 p.m., San Juan, Puerto Rico time, on May 4, 2012 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

**Section 4.02   Conditions Precedent to Each Advance**.  The obligation of each Lender to make an Advance on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a)     The Borrower shall have notified the Administrative Agent by 11:00 a.m. at least two (2) Business Days in advance of the date of any Borrowing, *provided however*, that the initial LIBOR Advance may be requested prior to 11:00 a.m. on the same day as the initial Borrowing, by providing to the Administrative Agent a Borrowing Request.

(b)     The representations and warranties of the Borrower set forth in this Agreement shall be true and correct on and as of the date of such Borrowing, except to the extent such representations and warranties expressly relate to an earlier date in which case they shall have been true and correct on and as of such earlier date.  For the avoidance of doubt, the representations and warranties contained in Section 3.04(b) shall relate to the most recent audited financial statements delivered to the Administrative Agent immediately prior to such Borrowing.

(c)     At the time of and immediately after giving effect to such Borrowing, no Default under this Agreement or any default, event of default or event which, with notice or lapse of time or both, would constitute a default or an event of default under any other Loan Document shall have occurred and be continuing.

(d)     All actions under the Act which, in the opinion of Special Counsel, shall be necessary in connection with the transactions contemplated hereby and by the other Loan Documents shall have been duly taken and shall be in full force and effect.

(e)     Between the Closing Date and the date of such Borrowing, (i) there shall not have been a Determination of Taxability or Final Determination, (ii) there is no Legal Proceeding pending, and (iii) there shall not have been a Change in Law which would prohibit any Lender from lawfully making its Advance or would make the Borrower's execution of this Agreement or use of the proceeds of any Advances illegal or have the retroactive effect of making such use illegal.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (b), (c), (d) and (e) of this Section.

Confidential

PREPA_RSA0028211

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on the Advances and all fees payable hereunder have been paid in full, the Borrower covenants and agrees with the Lenders that:

**Section 5.01   Financial Statements and Other Information**.   The Borrower will furnish to the Administrative Agent (for delivery to each Lender) and, with respect to paragraphs (d) and (e) below, each Lender:

(a)      within 180 days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of revenues, expenses and changes in net assets and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Ernst & Young LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)      within 60 days after the end of each of the first three fiscal quarters of the fiscal year of the Borrower, (i) its balance sheet and related statements of revenues, expenses and changes in net assets as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied, subject to normal yearend audit adjustments and the absence of footnotes, and (ii) its monthly report to its Governing Board for the last month of such fiscal quarter;

(c)      concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer of the Borrower substantially in the form of Exhibit D hereto (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth in reasonable detail the calculations in Section 5.09 for the most recent four fiscal quarters, and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)      concurrently with any delivery of financial statements under paragraph (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines);

Confidential                                                                    PREPA_RSA0028212

(e)     promptly after the same become publicly available, copies of its annual report and other reports, statements and other materials distributed by the Borrower (i) in connection with any future bond issuances by the Borrower or (ii) to its investors or stakeholders generally;

(f)     promptly after Moody's or S&P shall have announced a change in the rating established or deemed to have been established for the Senior Debt, written notice of such rating change; and

(g)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender may reasonably request.

**Section 5.02   Notices of Material Events or Adjustment Event; Legal Proceedings and Final Determination**.  The Borrower will furnish to the Administrative Agent (for delivery to each Lender) notice, either in writing or in an electronic form of communication acceptable to the Administrative Agent, within 10 days of the Borrower's actual knowledge of any the following:

(a)     the occurrence of any Default or Adjustment Event;

(b)     the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)     the commencement of any Legal Proceeding or the receipt of any Final Determination; and

(d)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**Section 5.03   Existence; Conduct of Business**.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.02.

**Section 5.04   Payment of Obligations**.  The Borrower will, and will cause each of its Subsidiaries to, pay its obligations, including tax liabilities, that, if not paid, could result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings,

31

PREPA_RSA0028213

(b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.05   Maintenance of Properties; Insurance**.  The Borrower will, and will cause each of its Subsidiaries to, (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain, with financially sound and reputable insurance companies, insurance or self-insure in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

**Section 5.06   Books and Records; Inspection Rights**.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice to the Borrower (and to the Administrative Agent, if the visit is requested by a Lender), to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

**Section 5.07   Compliance with Laws and the Trust Agreement**.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower will comply with its obligations under the Trust Agreement.

**Section 5.08   Use of Proceeds; Future Tax Exempt Status**.  The proceeds of the Advances will be used to finance the Borrower's working capital requirements, classified as Current Expenses (as defined in the Trust Agreement), including but not limited to fuel oil purchases.  No part of the proceeds of any Advance will be used, whether directly or indirectly, (i) to repay any outstanding amounts under the Existing Credit Agreement or any other credit facility used to pay for current expenses or (ii) for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

**Section 5.09   Financial Covenant**.  The Borrower shall at all times fix, charge and collect reasonable rates and charges for use of the services and facilities furnished by the System (as defined in the Trust Agreement) so as to generate Revenues (as defined in the Trust Agreement) that will at all times be sufficient (i) to comply with Section 502(B) of the Trust Agreement and (ii) to pay an amount equal to at least 100% of the principal of and interest on Subordinate Obligations for the next Fiscal Year (as defined in the Trust Agreement).

**Section 5.10   Tax Exempt Status.**  The Borrower covenants for the benefit of the Administrative Agent and each Lender that the Borrower shall not knowingly direct that moneys on deposit in any fund or account in connection with the Advances (whether or not such moneys were derived from the proceeds of the Advances or from any other sources) be used in a manner which will cause the Advances to be classified as "arbitrage bonds" within the meaning of

Confidential                                                                    PREPA_RSA0028214

Section 148 of the Code. Any officer of the Borrower (including its Executive Director, the Director of Finance and the Treasurer) having responsibility with respect to Advances is authorized and directed, alone or in conjunction with any other officer, employee or consultant of the Borrower, to give an appropriate certificate on behalf of the Borrower, for inclusion in the transcript of proceedings for the Advances, setting forth the facts, estimates and circumstances and reasonable expectations pertaining to Section 148 of the Code.

The Borrower hereby covenants that it will file such returns and make payments, if any, required to be made to the United States government pursuant to the Code and to take any actions required in order to establish or maintain the exclusion of the interest on the Borrowings from gross income for federal income tax purposes.

**Section 5.11   Operating Account.**  The Borrower shall maintain the Operating Account and shall deposit therein from time to time funds sufficient to cover its interest payment obligations under this Agreement, which the Administrative Agent may debit from the Operating Account when due.

# ARTICLE VI

## NEGATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on the Advances and all fees payable hereunder have been paid in full, the Borrower covenants and agrees with the Lenders that:

**Section 6.01   Liens.**  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)      Liens under the Trust Agreement;

(b)      Liens on fixed or capital assets acquired, constructed or improved by the Borrower; provided that (i) such Liens secure Indebtedness, including Capital Lease Obligations, of the Borrower incurred to finance the acquisition, construction or improvement of such assets, (ii) such Liens and the Indebtedness secured thereby are incurred contemporaneously with such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets, as the case may be, or $5,000,000 in the aggregate at any time with respect to all such Indebtedness of the Borrower, and (iv) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary; and

(c)      Permitted Encumbrances.

**Section 6.02   Fundamental Changes; Sale of Assets**.  The Borrower will not, and will not permit any Subsidiary to, merge into or consolidate with any other Person, or permit any

33

PREPA_RSA0028215

other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except for mergers between the Borrower and any of its subsidiaries where the Borrower is the surviving entity, if at the time thereof and immediately after giving effect thereto no Default shall have occurred, such transaction could not reasonably be expected to result in a Material Adverse Effect

**Section 6.03   Investments, Loans, Advances, Guarantees and Acquisitions**.   The Borrower will not, and will not permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except:

        (a)    Investment Obligations;

        (b)    investments by the Borrower in the capital stock of its Subsidiaries; and

        (c)    loans or advances made by the Borrower to any Subsidiary and made by any Subsidiary to the Borrower or any other Subsidiary.

**Section 6.04   Swap Agreements**.   The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements existing on the date hereof, (b) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure, including hedges of fuel and power costs of the Borrower, and (c) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

**Section 6.05   Transactions with Affiliates**.   The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and its Subsidiaries not involving any other Affiliate, (c) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests, and (d) transactions permitted pursuant to the Trust Agreement.

**Section 6.06   Restrictive Agreements**.   The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, except as provided in the Trust Agreement, or (b) the ability of any Subsidiary to pay

Confidential

PREPA_RSA0028216

dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.06 (or any extension or renewal of such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

## ARTICLE VII

## EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)     the Borrower shall fail to pay any principal of any Advance or any interest on any Advance when and as the same shall become due and payable, whether at the due date thereof or otherwise;

(b)     the Borrower shall fail to pay any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary in (i) this Agreement or any amendment or modification hereof or waiver hereunder shall prove to have been incorrect when made or deemed made or (ii) any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder shall prove to have been incorrect in any material respect when made or deemed made;

(d)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02, 5.03 (with respect to the Borrower's existence), 5.08 or in Article VI;

(e)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in (i) this Agreement (other than those specified in clause (a), (b) or (d) of this Article), (ii) any other existing or future credit facility with the Administrative Agent or any of its Affiliates or a credit facility with any other financial institution or debt holder, and such failure shall continue unremedied for a period of 30 days after the earlier of the Borrower obtaining actual knowledge thereof or the Borrower receiving notice thereof from the

35

PREPA_RSA0028217

Administrative Agent; provided, however, that if such failure is not capable of being remedied within 30 days and the Borrower is diligently pursuing remediation, such failure continues unremedied for a period 90 days after such notice;

(f)        the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable after giving effect to applicable grace periods and notices;

(g)        any event or condition not referred to in the foregoing clause (f) occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(h)        an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)        the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)        the Borrower or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)        the Borrower denies, to any material extent, its obligations under this Agreement or any related Loan Document or claims any such document or security interest in connection with this Agreement to be invalid or withdrawn in whole or in part;

(l)        one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 shall be rendered against the Borrower, any Subsidiary or any

Confidential

PREPA_RSA0028218

combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment and the same shall not be bonded;

(m)     any amendment to the Trust Agreement adversely effects the priority of payment for any amounts due under this Agreement;

(n)     any material change or development occurs which the Administrative Agent reasonably determines has had or will likely have a Material Adverse Effect;

(o)     total indebtedness of the Borrower to the Administrative Agent and the Lenders pursuant to this Agreement due on demand, shall become immediately due and payable by the Borrower to the Administrative Agent and Lenders on demand;

(p)     any judgment, injunction or decree is entered or issued and becomes enforceable against the Borrower or any property of the Borrower preventing the Borrower from continuing to operate a material portion of its business affairs in the normal course or any creditor takes possession of any material property of the Borrower; or

(q)     an event of default shall have occurred under the Trust Agreement;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments and thereupon the Commitments and the Availability Period shall terminate immediately, and (ii) declare the Advances then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable) and thereupon the principal of the Advances and other amounts so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (h) or (i) of this Article, the Commitments and the Availability Period shall automatically terminate and the principal of the Advances then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

37

PREPA_RSA0028219

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing reasonably believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and reasonably believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the

Confidential

PREPA_RSA0028220

Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facility provided for herein as well as activities as Administrative Agent.

The Administrative Agent may resign at any time, with the consent of the Borrower, by notifying the Lenders and the Borrower. Upon the occurrence of an Event of Default or a Final Determination, the Administrative Agent may immediately resign by notifying the Lenders and the Borrower. The Administrative Agent may be removed, with or without cause, by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor, after consultation with the Borrower; provided, however, that if an Event of Default has occurred and is continuing or a Final Determination has been made, no such consultation with the Borrower shall be required. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in San Juan, Puerto Rico or in the United States, or an Affiliate of any such bank, in any such case having capital and surplus of at least $1 billion. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation or removal hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01 Notice**. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or electronic mail, as follows:

Confidential

PREPA_RSA0028221

(i)      if to the Borrower, to it at 1110 Ponce de Leon Avenue, San Juan, Puerto Rico 00909-3802, Attention of Nelson Morales (Telecopy No. (787) 521-4502, e-mail address: nmorales@aeepr.com);

(ii)      if to the Administrative Agent, to it at Scotiabank Tower, CBC Department, Floor 8, 290 Jesús T. Piñero Ave., San Juan, Puerto Rico 00936-2394, Attention: Irmari Portalatin and Juan Boscio, (Telecopy No. (787) 766-7909, e-mail addresses irmari.portalatin@scotiabank.com and juan.boscio@scotiabank.com, respectively); and

(iii)      if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)      Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)      Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

**Section 9.02  Waivers; Amendments**.  (a) No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of an Advance shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)      Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce or forgive the principal amount of any Advance or reduce the rate of interest thereon, or reduce or forgive any fees payable hereunder, without the written consent of each Lender affected thereby,

Confidential

PREPA_RSA0028222

(iii) postpone the scheduled date of payment of the principal amount of any Advance, or any interest thereon, or any fees payable hereunder, or reduce or forgive the amount of, waive, forgive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.12(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) release any collateral securing the Advances, or (vi) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

**Section 9.03  Indemnity; Damage Waiver**.  (a) To the extent permitted by law, the Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Advance or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee.

(b)  If the indemnification provided for in paragraph (a) of this Section is unavailable to an Indemnitee in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party under such paragraph, in lieu of indemnifying such Indemnitee thereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Borrower and the Administrative Agent or the Lenders from the Advances or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Borrower and of the Administrative Agent or the Lenders in connection with the occurrences that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the Borrower and the Administrative Agent or the Lenders shall be deemed to be in the same respective proportions as the proceeds from the Advances received by the Borrower and the fees received by the Administrative Agent or the interest received by the Lenders bear to the sum of such amounts.  The Borrower, the Administrative Agent and the Lenders agree that it would not be just and equitable if contribution pursuant to this Section were

Confidential

PREPA_RSA0028223

determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in this paragraph. The amount paid or payable by an Indemnitee as a result of the losses, claims, damages and liabilities referred to in this paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnitee in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section, the Administrative Agent and the Lenders shall not be required to contribute any amount in excess of the fees or interest received by the Administrative Agent or the Lender on the Advances, as applicable. No Person guilty of fraudulent misrepresentation shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, (i) each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Advance or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable promptly after written demand therefor.

**Section 9.04   Successors and Assigns, Participations and Transfer of the Notes**. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of any Commitment of such Lender and the Advances at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

A.    the Borrower, provided that no consent of the Borrower shall be required for an assignment to an existing Lender, an Affiliate of an existing Lender or an Approved Fund or, if an Event of Default has occurred and is continuing or if a Final Determination has been made, any other assignee; and

B.    the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of any Commitment to an assignee that is a Lender with a Commitment immediately prior to giving effect to such assignment, an Affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

A.    except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Advances, the amount of the Commitment or Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing or a Final Determination has been made;

B.    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of any Commitment or Advances;

C.    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption;

D.    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate level information (which may contain material non-public information about the Borrower and its related parties or its securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

E.    if any Lender makes an assignment to an Affiliate or an Approved Fund pursuant to this subsection (b) prior to the occurrence of an Event of Default and the Borrower does not consent to such assignment, the Borrower shall not be obligated to reimburse such Affiliate or Approved Fund under Section 2.11 for an amount greater than the amount the Borrower would have been obligated to reimburse such Lender under such sections if such assignment had not occurred; and

43

F.     unless an Event of Default has occurred and is continuing, there shall not be more than three Lender Groups at any one time.

For the purposes of this Section 9.04(b), the term "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have, in addition to any such rights and obligations theretofore held by it, the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.11 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Advances owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder) and any written consent to such assignment required by paragraph (b)(i)(A) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.03(b), 2.12(d) or 9.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

44

PREPA_RSA0028226

(c)      (i)      Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Advances owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower or the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant, or modify or waive any provision in this Agreement which materially and adversely affects the rights or remedies of the Lenders.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.11 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.12(c) as though it were a Lender.

(ii)      A Participant shall not be entitled to receive any greater payment under Section 2.11 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.11 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.11(e) as though it were a Lender.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and its Notes to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)      In order to implement the assignment and participation rights in this Section 9.04, the Administrative Agent may request the Borrower at any time prior to the Maturity Date, to execute a new Note in the form of Exhibit B, and the Borrower agrees to provide the Administrative Agent with such executed Note or Notes within five Business Days of such request.

**Section 9.05  Survival; Reinstatement of Obligations**.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of

45

PREPA_RSA0028227

this Agreement and the making of any Advances, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Advance or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or been terminated.  The provisions of Sections 2.09(h), 2.11 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Advances, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

This Agreement, and the Borrower's Obligations hereunder, shall continue to be effective, or shall be automatically reinstated, as the case may be, if at any time payment in whole or in part of any of the Obligations is rescinded or must otherwise be restored or returned to the Borrower or such other party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to the Borrower, or with respect to any part of its properties or assets or otherwise, all as though such payment had not been made.

**Section 9.06   Counterparts; Integration; Effectiveness**.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 9.07   Severability**.   Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 9.08   Right of Setoff**.   If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each

46

PREPA_RSA0028228

Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

**Section 9.09   Governing Law**.  This Agreement shall be construed in accordance with and governed by the law of the Commonwealth.

**Section 9.10   Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 9.11   Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 9.12   Interest Rate Limitation**.   Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Advance, together with all fees, charges and other amounts which are treated as interest on such Advance under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Advance or which may be contracted for or paid by the Borrower in accordance with applicable law, the rate of interest payable in respect of such Advance, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Advance but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Advances shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

**Section 9.13   USA Patriot Act**.  Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies the Borrower that, pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information, to the extent known to the Borrower, that will allow such Lender to identify the Borrower in accordance with the Act.  The Borrower shall promptly provide such information upon request from any such Lender.

**Section 9.14   Waiver of Immunity**.  The Borrower agrees that it will not assert any immunity (sovereign or otherwise) it may have as a governmental instrumentality against

Confidential

PREPA_RSA0028229

lawsuits brought in contract under the law of the Commonwealth with respect to this Agreement, any of the other Loan Documents or in connection herewith or therewith.

Section 9.15   **Press Releases and Other Communications**.  The parties agree that no news release or public announcement pertaining to this Agreement or the transactions contemplated hereby shall be made by or on behalf of any party hereto without the prior approval of the other party.  Notwithstanding the foregoing, nothing herein shall prohibit any party from making any disclosure that, in the opinion of its counsel, is required by any applicable law or regulation applicable to either the Borrower or the Lender.

Section 9.16   **Comptroller of Puerto Rico**.  No payment under this Agreement, the Notes and the other Loan Documents shall be demanded until such time as this Agreement and the other Loan Documents have been submitted for registration with the Office of the Comptroller of the Commonwealth, pursuant to the provisions of Act. No. 18 of the Legislative Assembly of the Commonwealth, approved October 30, 1975, as amended.

[Signatures follow on next page]

48

Confidential

PREPA_RSA0028230

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO     RICO     ELECTRIC     POWER
AUTHORITY, Borrower

By:_____
Name: Otoniel Cruz Carrillo
Title:   Executive Director


BANCO   BILBAO   VIZCAYA   ARGENTARIA
PUERTO RICO, as Lender


By:_____
Name:         Helen Pardo
Title:         Senior Vice President

By:_____
Name:         Patrick Haggarty
Title:         Executive Vice President


SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent


By:_____
Name:         Diego Masola
Title:         Senior Vice President


[Signature Page to Credit Agreement]

Confidential

EXHIBIT A

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "Assignor") and [Insert name of Assignee] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, supplemented or otherwise modified, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration of the Purchase Price specified below, paid by the Assignee to the Assignor, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.   Assignor:

2.   Assignee:

                                              [and is an Affiliate/Approved Fund of _____
[identify Lender]

3.   Borrower(s):

4.   Administrative Agent:         _____, as the administrative agent under the Credit Agreement

---

1   Select as applicable

Confidential                                     PREPA_RSA0028232

5.　　　Credit Agreement:　　　　　　The Credit Agreement dated as of June __, 2011 among Puerto Rico Electric Power Authority, the Lenders parties thereto, and SCOTIABANK DE PUERTO RICO, as Administrative Agent

6.　　　Assigned Interest:

| Facility | Aggregate Amount of Commitment/ Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans |
|---|---|---|---|
| | IE | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Purchase Price $

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more Credit Contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal, Commonwealth and state securities laws.

Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

A-2

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By_____
Name
Title

ASSIGNEE

[NAME OF ASSIGNEE]

By_____
Name
Title

[Consented to and] Accepted:

[NAME OF ADMINISTRATIVE AGENT], as
Administrative Agent

By_____
Name
Title

[Consented to:][4]

PUERTO RICO ELECTRIC POWER AUTHORITY

By_____
Name
Title

---

[3]  To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.
[4]  To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

A-3

PREPA_RSA0028234

ANNEX 1

Credit Agreement dated as of May 4, 2012 among
Puerto Rico Electric Power Authority, the Lenders parties thereto, and
SCOTIABANK DE PUERTO RICO, as Administrative Agent

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      Representations and Warranties.

1.1.    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and
beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien,
encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all
action necessary, to execute and deliver this Assignment and Assumption and to consummate the
transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any
statements, warranties or representations made in or in connection with the Credit Agreement or
any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness,
sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial
condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in
respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its
Subsidiaries or Affiliates or any other Person of any of their respective obligations under any
Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and
authority, and has taken all action necessary, to execute and deliver this Assignment and
Assumption and to consummate the transactions contemplated hereby and to become a Lender
under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit
Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and
become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of
the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall
have the obligations of a Lender thereunder (in addition to any such obligations theretofore held
by it), (iv) it has received a copy of the Credit Agreement, together with copies of the most
recent financial statements delivered pursuant to Section 3.04 or 5.01 thereof, as applicable, and
such other documents and information as it has deemed appropriate to make its own credit
analysis and decision to enter into this Assignment and Assumption and to purchase the
Assigned Interest, on the basis of which it has made such analysis and decision independently
and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign
Lender, attached to this Assignment and Assumption is any documentation required to be
delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by
the Assignee; and (b) agrees that (i) it will, independently and without reliance on the
Administrative Agent, the Assignor or any other Lender, and based on such documents and
information as it shall deem appropriate at the time, continue to make its own credit decisions in
taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with
their terms all of the obligations which by the terms of the Loan Documents are required to be
performed by it as a Lender.

Annex 1-1

2.      Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the Commonwealth of Puerto Rico.

Confidential

PREPA_RSA0028236

EXHIBIT B

FORM OF NOTE – GENERAL
PUERTO RICO ELECTRIC POWER AUTHORITY

Maturity Date: May 3, 2013

$                                                                                                      [Date]

FOR VALUE RECEIVED, the undersigned, PUERTO RICO ELECTRIC POWER
AUTHORITY, a public corporation and government instrumentality of the Commonwealth of
Puerto Rico (the "Borrower"), hereby unconditionally promises to pay to the order of [   ]   (the
"Lender") in lawful money of the United States of America and in immediately available funds,
the principal amount of [   ] ($[   ]), or, if less, the aggregate unpaid and outstanding principal
amount of the Advances made by the Lender pursuant to the Credit Agreement, dated as of
May 4, 2012 (the "Credit Agreement"), among the Borrower, the lenders party thereto, and
Scotiabank de Puerto Rico, as Administrative Agent, plus any interest, any other amounts due
and payable to the Lender pursuant to and as described in the Credit Agreement (collectively, the
"Obligations").

This promissory note is one of the Notes referred to in the Credit Agreement and is
entitled to the benefits of, and subject to the terms of, the Credit Agreement.  Capitalized terms
used herein without definition have the meanings assigned to them in the Credit Agreement.

This Note shall not be deemed to constitute a debt or obligation of the Commonwealth of
Puerto Rico or any of its municipalities or other political subdivisions other than the Borrower,
and neither the Commonwealth of Puerto Rico nor any such municipalities or other political
subdivisions other than the Borrower are liable for the payment of this Note or interest thereon or
any amounts due under the Credit Agreement, but this Note and the interest thereon and amounts
due under the Credit Agreement shall be payable as provided in the Credit Agreement, the
Resolution (hereinafter defined) and the Trust Agreement (hereinafter defined).

The principal amount hereof is payable on the Maturity Date and otherwise in accordance
with the Credit Agreement.  This Note is subject to prepayment as provided in the Credit
Agreement.

The Borrower further agrees to pay, in lawful money of the United States of America and
in immediately available funds, interest from the date hereof on the unpaid and outstanding
principal amount hereof until such unpaid and outstanding principal amount shall become due
and payable (whether at stated maturity, by acceleration or otherwise) at the rate or rates set forth

Confidential

PREPA_RSA0028237

in the Credit Agreement, and at the times set forth in the Credit Agreement, and the Borrower agrees to pay other Obligations as provided in the Credit Agreement.

This Note shall bear interest at the rate provided in the Agreement.

The date, amount and interest rate of each Advance, and each payment made on account thereof, shall be evidenced by records maintained by the Administrative Agent in the ordinary course of its business. Such records maintained by the Agent shall constitute *prima facie* evidence of the accuracy of the information so recorded in the absence of manifest error, provided that the failure to make such recordation or any error therein shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Credit Agreement in respect of the Advances.  The holder of this Note may, at its option, also record the date and amount of the Advances, the date and amount of each prepayment of principal thereof and the amount of unpaid principal with respect thereto on Schedule 1 annexed hereto and constituting a part hereof, and any such recordation shall constitute prima facie evidence of the accuracy of the information so recorded in the absence of manifest error, provided that the failure of the holder of this Note to make such recordation or any error therein shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Credit Agreement in respect of the Advances.

In case an Event of Default shall occur and be continuing, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, as provided in the Credit Agreement, without presentment, demand for payment, protest or notice of any kind, all of which are expressly waived by Borrower.

The Borrower agrees to pay all costs and expenses, including reasonable attorneys' fees incurred in connection with the interpretation or enforcement of this Note, as permitted by and in accordance with the Credit Agreement.

This Note is payable by the Borrower as a "Current Expense" under the Trust Agreement, dated as of January 1, 1974, as amended and supplemented, by and between the Borrower and the U.S. Bank National Association, as successor trustee (the "Trust Agreement'), pursuant to Resolution No. 3909 adopted by the Borrower on April 12, 2012 and a Certificate of Determination, dated May 4, 2012, executed by the Executive Director of the Authority (collectively, the "Resolution"), and is subject to the terms and provisions set forth in the Trust Agreement relating to Current Expenses.

Confidential

PREPA_RSA0028238

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND IN ACCORDANCE WITH, THE LAW OF THE COMMONWEALTH OF PUERTO RICO.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to bear the manual signatures of the Executive Director and the Secretary of the Authority and its corporate seal to be imprinted hereon, all of the date first set forth above.

PUERTO RICO ELECTRIC POWER AUTHORITY

[Corporate Seal]

By:_____
                 Executive Director

By:_____
                   Secretary

B-3

PREPA_RSA0028239

SCHEDULE 1
TO NOTE

ADVANCES AND PAYMENTS

| Date | Amount of Advances | Amount of Principal Repaid | Unpaid Principal Balance of Advance | Notation Made By |
|------|--------------------|-----------------------------|--------------------------------------|------------------|

Confidential

EXHIBIT C

FORM OF BORROWING REQUEST

[Date]

VIA FACSIMILE NO: 787-766-7909

Scotiabank de Puerto Rico
Hato Rey Commercial banking Center
Scotiabank Tower, 290 Jesús T. Piñero Avenue
Hato Rey, Puerto Rico 00918
Attention:  Juan Boscio
            Irmari Portalatin

Re: Borrowing Request from Puerto Rico Electric Power Authority

This Borrowing Request is being delivered pursuant to Section 2.03 of the Credit Agreement, dated as of May 4, 2012 (the "Agreement") between Puerto Rico Electric Power Authority (the "Borrower"), the lenders party thereto and Scotiabank de Puerto Rico, as Administrative Agent.  All capitalized terms used but not defined herein shall have the meanings specified for such terms in the Agreement.

The Borrower hereby irrevocably requests a Borrowing under the Agreement and the Resolution (as defined in the Agreement) and sets forth the below information in connection therewith:

1.      The aggregate amount of the requested Borrowing is: _____

2.      The Business Day of the requested Borrowing is: _____

3.      The proceeds shall be applied to pay Current Expenses, as defined in the Trust Agreement and evidenced by the attached unpaid invoices or other documentation evidencing the payments due.

4.      The Borrowing shall be a LIBOR Advance for an Interest Period equal to (check one) 1-week____, 1-month ___, 2-months ___ or 3-months ___.

5.      The Borrower certifies that such LIBOR Advance shall not result in such Advance maturing after the earlier of (i) the Advance Repayment Date or (ii) the Maturity Date.

C-1

Confidential                                          PREPA_RSA0028241

The Borrower hereby certifies that the conditions to such Borrowing set forth in Section 4.02 of the Agreement have been satisfied on the date hereof and will be true on the date of the Requested Borrowing.

The Borrower hereby further certifies that the proceeds of the requested Borrowing:

1.      Will be used only to pay Current Expenses, as defined in the Trust Agreement.

2.      The conditions to such Advance set forth in Section 4.02 of the Agreement have been satisfied on the date hereof and will be true on the date of the requested Borrowing.

3.      The proceeds of the Advance will be used only for the purpose of paying Current Expenses, as defined in the Trust Agreement, and evidenced by the attached unpaid invoices or other documentation evidencing the payments due.

4.      Will be used in a manner that is consistent with all provisions of the Agreement.

Dated:                                          PUERTO    RICO    ELECTRIC    POWER
                                                AUTHORITY


By:_____
Name
Title

C-2

## EXHIBIT D

## FORM OF FINANCIAL COMPLIANCE CERTIFICATE

(Pursuant to Section 5.01(c) of the Credit Agreement referred to below)

This certificate is given by Puerto Rico Electric Power Authority (the "Borrower"), pursuant to Section 5.01(c) of that certain Credit Agreement dated as of May 4, 2012 (as restated or amended from time to time, the "Credit Agreement"), among the Borrower, the Lenders from time to time parties thereto and Scotiabank de Puerto Rico, as Administrative Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

The officer executing this certificate is a Financial Officer of the Borrower and as such is duly authorized to execute and deliver this certificate on its behalf. By executing this certificate such officer hereby certifies to the Administrative Agent as follows:

1.    This certificate is prepared as of _____, 201_ (the "Financial Statement Date").

2.    <u>Financial Statements</u>:  Enclosed herewith are true and correct copies of (i) the annual audited financial statements of the Borrower as of the Financial Statement Date (if such date is the last day of the Borrower's fiscal year), prepared in accordance with Section 5.01(a) of the Credit Agreement, or (ii) the quarterly unaudited financial statements of the Borrower as of the Financial Statement Date, prepared in accordance with Section 5.01(b) of the Credit Agreement.

3.    <u>Work Sheets</u>:  Enclosed herewith are true and correct work sheets detailing the method and setting out the calculations used to determine the information referred to in Section 4(a) below.

4.    <u>Representations</u>: The Borrower hereby represents and warrants that as of the Financial Statement Date:

(a)    The Borrower's Revenues of the fiscal year (or fiscal quarter, as applicable) ended on the Financial Statement Date are sufficient (i) to comply with Section 502(B) of the Trust Agreement and (ii) to pay an amount equal to at least 100% of the principal of and interest on Subordinate Obligations (as defined in the Trust Agreement) for said fiscal year (or fiscal quarter, as applicable).

(b)    To the best of my knowledge after due inquiry, no event has occurred and is continuing which constitutes a Default. **[If a Default has occurred and is continuing, include a statement as to the nature thereof and the action which the Borrower has taken or will take with respect thereto.]**

(c)    There has been no change in GAAP or in the application thereof since the Financial Statement Date. **[If any such change has occurred, include a**

D-1

Confidential

**statement as to the nature of such change and its effects on the financial
statements accompanying this certificate.]**

IN WITNESS WHEREOF, I have signed this certificate this ___ day of _____,
201_.

PUERTO RICO ELECTRIC POWER AUTHORITY

By:_____

Title:

D-2

PREPA_RSA0028244

SCHEDULE 2.01
COMMITMENTS

| Lender: | Commitment: |
|---|---|
| SCOTIABANK DE PUERTO RICO | $300,000,000 |
| BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO | $200,000,000 |

1

PREPA_RSA0028245

SCHEDULE 6.06

EXISTING RESTRICTIONS

Confidential

PREPA_RSA0028246

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO   RICO   ELECTRIC   POWER AUTHORITY, Borrower

By:_____

Name:  Otoniel Cruz Carrillo
Title:   Executive Director


BANCO  BILBAO  VIZCAYA  ARGENTARIA PUERTO RICO, as Lender


By:_____
Name:        Helen Pardo
Title:        Senior Vice President

By:_____
Name:        Patrick Haggarty
Title:        Executive Vice President


SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent


By:_____
Name:        Diego Masola
Title:        Senior Vice President

13886297.3

Confidential                                                                                        PREPA_RSA0028247

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO   RICO   ELECTRIC   POWER AUTHORITY, Borrower

By:_____

Name: Otoniel Cruz Carrillo
Title:   Executive Director

BANCO   BILBAO   VIZCAYA   ARGENTARIA PUERTO RICO, as Lender

By:_____
Name:        Helen Pardo
Title:        Senior Vice President

By:_____
Name:        Patrick Haggarty
Title:        Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent

By:_____
Name:        Diego Masola
Title:        Senior Vice President

13886297.3

PREPA_RSA0028248

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO     RICO     ELECTRIC     POWER
AUTHORITY, Borrower

By:_____

Name: Otoniel Cruz Carrillo
Title:   Executive Director

BANCO   BILBAO   VIZCAYA   ARGENTARIA
PUERTO RICO, as Lender

By:_____
Name:          Helen Pardo
Title:          Senior Vice President

By:_____
Name:          Patrick Haggarty
Title:          Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent

By:_____
Name:          Diego Masola
Title:          Senior Vice President

13886297.3

Confidential                                                   PREPA_RSA0028249

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY, Borrower

By:_____

Name: Otoniel Cruz Carrillo

Title:   Executive Director

BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO, as Lender

By:_____

Name:        Helen Pardo

Title:        Senior Vice President

By:_____

Name:        Patrick Haggarty

Title:        Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent

By:_____

Name:        Diego Masola

Title:        Senior Vice President

13886297.3

PREPA_RSA0028250

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO     RICO     ELECTRIC     POWER
AUTHORITY, Borrower

By: _____

Name: Otoniel Cruz Carrillo
Title:   Executive Director


BANCO   BILBAO   VIZCAYA   ARGENTARIA
PUERTO RICO, as Lender


By:_____
Name:            Helen Pardo
Title:            Senior Vice President

By:_____
Name:            Patrick Haggarty
Title:            Executive Vice President


SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent


By:_____
Name:            Diego Masola
Title:            Senior Vice President


13886297.3

PREPA_RSA0028251

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO    RICO    ELECTRIC    POWER
AUTHORITY, Borrower

By: _____

Name: Otoniel Cruz Carrillo
Title:   Executive Director


BANCO   BILBAO   VIZCAYA   ARGENTARIA
PUERTO RICO, as Lender


By:_____
Name:        Helen Pardo
Title:        Senior Vice President

By:_____
Name:        Patrick Haggarty
Title:        Executive Vice President


SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent


By:_____
Name:        Diego Masola
Title:        Senior Vice President

13886297.3

PREPA_RSA0028252

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY, Borrower

By:_____
Name: Otoniel Cruz Carrillo
Title: Executive Director

BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO, as Lender

By: _____
Name: Helen Pardo
Title: Senior Vice President

By: _____
Name: Patrick Haggarty
Title: Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent

By:_____
Name: Diego Masola
Title: Senior Vice President

[Signature Page to Credit Agreement]

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY, Borrower

By:_____

Name: Otoniel Cruz Carrillo

Title:  Executive Director

BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO, as Lender

By:_____

Name:          Helen Pardo

Title:          Senior Vice President

By:_____

Name:          Patrick Haggarty

Title:          Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent

By:_____

Name:          Diego Masola

Title:          Senior Vice President

[Signature Page to Credit Agreement]

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY, Borrower

By:_____
Name: Otoniel Cruz Carrillo
Title:   Executive Director

BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO, as Lender

By:_____
Name:      Helen Pardo
Title:      Senior Vice President

By:_____
Name:      Patrick Haggarty
Title:      Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent

By:_____
Name:      Diego Masola
Title:      Senior Vice President

[Signature Page to Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO   RICO   ELECTRIC   POWER AUTHORITY, Borrower

By:_____
Name:  Otoniel Cruz Carrillo
Title:   Executive Director

BANCO   BILBAO   VIZCAYA   ARGENTARIA PUERTO RICO, as Lender

By:_____
Name:          Helen Pardo
Title:          Senior Vice President

By:_____
Name:          Patrick Haggarty
Title:          Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent

By:_____
Name:          Diego Masola
Title:          Senior Vice President

[Signature Page to Credit Agreement]

Confidential

FIRST AMENDING AGREEMENT
TO
CREDIT AGREEMENT


This First Amending Agreement (the "First Amending Agreement") to that certain Credit Agreement, dated as of May 4, 2012, by and among PUERTO RICO ELECTRIC POWER AUTHORITY (the "Borrower"), the LENDERS party thereto, and SCOTIABANK DE PUERTO RICO, as Administrative Agent (in such capacity, the "Agent") (the "Credit Agreement") is made this 23rd day of October, 2012.


WITNESSETH:

WHEREAS, the Borrower, the Lenders and the Agent entered into the Credit Agreement, pursuant to which the Lenders granted to the Borrower certain revolving credit facility. All capitalized terms used herein and not otherwise defined, are used with the same meanings given to such terms in the Credit Agreement.

WHEREAS, the parties have agreed to amend the Credit Agreement to increase the number of permitted Lender Groups, as more fully set out below.

NOW THEREFORE, the parties hereby amend the Credit Agreement under the following:


TERMS AND CONDITIONS

1.   <u>Increase in Number of Permitted Lender Groups.</u>

Section 9.04(b)(ii)(F) is hereby amended to read as follows:

> F.   *unless an Event of Default has occurred and is continuing, there shall not be more than four Lender Groups at any one time.*

2.   <u>All Other Provisions Applicable.</u>

The Credit Agreement, as changed, altered, amended or modified by this First Amending Agreement, shall continue in full force and effect and is hereby in all respects ratified and confirmed and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically provided for herein. All terms, conditions, covenants and undertakings of the Loan Documents and all other instruments executed and/or delivered in connection therewith not expressly amended, substituted or otherwise revoked by the terms hereof, remain in full force and effect.

Confidential

- 2 -

3.      References to Agreement.

All references in the Credit Agreement to the "Agreement" shall now mean the Credit Agreement, as amended by this First Amending Agreement; and all references to "Credit Documents" shall now include this First Amending Agreement.

4.      No Novation.

The foregoing modification shall not be construed nor does it constitute an extinctive novation of the Borrower's Obligations under the Credit Agreement.

5.      Inconsistent Terms.

If any provision of this First Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this First Amending Agreement shall prevail and be paramount.

6.      Execution in Counterparts.

This First Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

(SIGNATURE PAGE FOLLOWS)

PREPA_RSA0034316

- 3 -

IN WITNESS WHEREOF, the parties hereto have caused this First Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower

By:_____
Name: Josué Antonio Colón Ortiz
Title:   Acting Executive Director

BANCO BILBAO VIZCAYA ARGENTARIA
PUERTO RICO, as Lender

By:_____
Name:     Helen Pardo
Title:     Senior Vice President

By:_____
Name:     Patrick Haggarty
Title:     Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent

By:_____
Name:     Diego Masola
Title:     Senior Vice President

- 3 -

IN WITNESS WHEREOF, the parties hereto have caused this First Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower

By:_____
Name: Josué Antonio Colón Ortiz
Title:   Acting Executive Director

BANCO BILBAO VIZCAYA ARGENTARIA
PUERTO RICO, as Lender

By:_____
Name:        Helen Pardo
Title:        Senior Vice President

By:_____
Name:        Patrick Haggarty
Title:        Executive Vice President

SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent

By:_____
Name:        Diego Masola
Title:        Senior Vice President

Confidential

PREPA_RSA0034318

- 3 -

IN WITNESS WHEREOF, the parties hereto have caused this First Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY, Borrower

By:_____
Name: Josué Antonio Colón Ortiz
Title:   Acting Executive Director


BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO, as Lender


By:_____
Name:        Helen Pardo
Title:        Senior Vice President

By:_____
Name:        Patrick Haggarty
Title:        Executive Vice President


SCOTIABANK DE PUERTO RICO, as Lender and Administrative Agent


By:_____
Name:        Diego Masola
Title:        Senior Vice President

SECOND AMENDING AGREEMENT
TO
CREDIT AGREEMENT

This Second Amending Agreement (the "<u>Second Amending Agreement</u>") to that certain Credit Agreement, dated as of May 4, 2012, by and among PUERTO RICO ELECTRIC POWER AUTHORITY (the "<u>Borrower</u>"), the LENDERS party thereto, and SCOTIABANK DE PUERTO RICO, as Administrative Agent (in such capacity, the "<u>Agent</u>") (the "Credit Agreement") is made as of April 25, 2013.

WITNESSETH:

WHEREAS, the Borrower, the Lenders and the Agent entered into the Credit Agreement, pursuant to which the Lenders granted to the Borrower certain revolving credit facility.

WHEREAS, the Credit Agreement was amended by a *First Amending Agreement to Credit Agreement* dated October 23, 2012 (the "<u>First Amending Agreement</u>").

WHEREAS, all capitalized terms used herein and not otherwise defined, are used with the same meanings given to such terms in the Credit Agreement, as amended by the First Amending Agreement.



WHEREAS, the parties have agreed to further amend the Credit Agreement to (i) grant a waiver and extension to the term to deliver certain financial documents, and (ii) extend the Maturity Date, all as more fully set out below; as well as to acknowledge that Oriental Bank has become a Lender, as successor by merger to Banco Bilbao Vizcaya Argentaria Puerto Rico.

NOW THEREFORE, the parties hereby execute this Second Amending Agreement under the following:

TERMS AND CONDITIONS

1.    <u>Delivery of Financial Information.</u>

The Borrower was required under Section 5.01(a) of the Credit Agreement to furnish to the Administrative Agent, by December 31, 2012, its audited consolidated balance sheet and related statements of revenues, expenses and changes in net assets and cash flows for the fiscal year ended June 30, 2012, together with the related certificates required by subsections (c) and (d) of Section 5.01. At the Borrower's request the Administrative Agent and all Lenders hereby waive the Borrower's failure to comply with said term, and extend until April 30, 2013 the term granted by Section 5.01, subsections (a), (c) and (d), to provide the financial statements and certificates required by said subsections with respect to the fiscal year ended June 30, 2012.

Cortland_PREPA_00001729

Second Amending Agreement
Puerto Rico Electric Power Authority
April 25, 2013
Page - 2 -

2.      Extension of Maturity Date.

At the Borrower's request, the Administrative Agent and all Lenders agree to extend the Maturity Date to June 30, 2013. Accordingly, the definition of "Maturity Date" contained in Section 1.01 of the Credit Agreement is hereby amended to read as follows:

*"Maturity Date"* means June 30, 2013.

3.      Limited Effect of Waiver and Consent.

The Borrower acknowledges that, in accordance with Section 9.02(a) of the Credit Agreement, the waiver and consent granted herein to the Borrower's departure from the established terms of the Credit Agreement, is effective only in this specific instance and for the purpose for which it is given. No inference is to be drawn from this Second Amending Agreement that the Lenders will grant any waiver, consent or extension in any other instance or with respect to any other terms of the Credit Agreement.

4.      Allonges to Notes.



Concurrently herewith the Borrower has executed and delivered to the Agent four allonges, substantially in the form of Exhibit A to this Second Amending Agreement, referencing the four Notes issued by the Borrower to the order of the Lenders. The Agent shall forthwith deliver each allonge to its corresponding Lender, who will then attach the allonge to the Note issued by the Borrower to such Lender, thereby evidencing the extension to the Maturity Date of the Notes granted by this Second Amending Agreement.

5.      Extension Fee.

The Lenders grant the foregoing waiver, consent and extension to the Maturity Date in consideration of the payment by the Borrower to the Agent, for the pro-rata benefit of the Lenders, of an extension fee in the sum of $312,500, the receipt of which the Agent acknowledges on this date.

6.      Acknowledgement of Successor Lender.

The parties acknowledge that Oriental Bank, as the surviving entity of a merger with Banco Bilbao Vizcaya Argentaria Puerto Rico effective as of December 18, 2012, succeeded by operation of law to all rights and obligations of Banco Bilbao Vizcaya Argentaria Puerto Rico as Lender in respect of the Credit Agreement and all other Loan Documents.

7.      All Other Provisions Applicable.

The Credit Agreement, as changed, altered, amended or modified by this Second Amending Agreement, shall continue in full force and effect and is hereby in all respects ratified and confirmed and the rights and obligations of all parties thereunder shall not be affected or

Cortland_PREPA_00001730

Second Amending Agreement
Puerto Rico Electric Power Authority
April 25, 2013
Page - 3 -

prejudiced in any manner except as specifically provided for herein. All terms, conditions, covenants and undertakings of the Loan Documents and all other instruments executed and/or delivered in connection therewith not expressly amended, substituted or otherwise revoked by the terms hereof, remain in full force and effect.

8.      References to Agreement.

All references in the Credit Agreement to the "Agreement" shall now mean the Credit Agreement, as amended by the First Amending Agreement and this Second Amending Agreement; and all references to the "Credit Documents" shall now include this Second Amending Agreement.

9.      No Novation.



The foregoing modifications to the terms of the Credit Agreement shall not be construed nor do they constitute an extinctive novation of the Borrower's Obligations under the Credit Agreement.

10.     Inconsistent Terms.

If any provision of this Second Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this Second Amending Agreement shall prevail and be paramount.

11.     Execution in Counterparts.

This Second Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

(SIGNATURE PAGES FOLLOW)

Cortland_PREPA_00001731

Second Amending Agreement
Puerto Rico Electric Power Authority
April 25, 2013
Page - 4 -

IN WITNESS WHEREOF, the parties hereto have caused this Second Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower

By:_____
Name:
Title:

SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent

By:_____
Name:
Title:

ORIENTAL BANK, as successor by merger to
BANCO BILBAO VIZCAYA ARGENTARIA
PUERTO RICO, as Lender

By:_____
Name: Patrick J. Haggarty Phillips
Title:   SVP – Wholesale Banking

By:_____
Name: Helen M. Pardo Hernández
Title:   SVP – Corporate & Institutional Banking

(SIGNATURES CONTINUE ON FOLLOWING PAGE)

Cortland_PREPA_00001732

Second Amending Agreement
Puerto Rico Electric Power Authority
April 25, 2013
Page - 4 -

IN WITNESS WHEREOF, the parties hereto have caused this Second Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower

By:_____
Name: Juan F. Alicea Flores
Title: Executive Director

SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent

By:_____
Name:
Title:

ORIENTAL BANK, as successor by merger to
BANCO BILBAO VIZCAYA ARGENTARIA
PUERTO RICO, as Lender

By:_____
Name: Patrick J. Haggarty Phillips
Title:   SVP – Wholesale Banking

By:_____
Name: Helen M. Pardo Hernández
Title:   SVP – Corporate & Institutional Banking

(SIGNATURES CONTINUE ON FOLLOWING PAGE)

Second Amending Agreement
Puerto Rico Electric Power Authority
April 25, 2013
Page - 4 -

IN WITNESS WHEREOF, the parties hereto have caused this Second Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower


By:_____
Name:
Title:


SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent


By:_____
Name:
Title:


ORIENTAL BANK, as successor by merger to
BANCO BILBAO VIZCAYA ARGENTARIA
PUERTO RICO, as Lender


By:_____
Name: Patrick J. Haggarty Phillips
Title:   SVP – Wholesale Banking

By:_____
Name: Helen M. Pardo Hernández
Title:   SVP – Corporate & Institutional Banking

**(SIGNATURES CONTINUE ON FOLLOWING PAGE)**

Cortland_PREPA_00001734

Second Amending Agreement
Puerto Rico Electric Power Authority
April 25, 2013
Page - 5 -

(SIGNATURE PAGE CONTINUED)

BANCO SANTANDER PUERTO RICO, as Lender

By:_____

Name: Lilian Díaz Bento, SVP

Title:   Director, Institutional Banking

By:_____

Name: Jorge R. García Arroyo

Title:   Senior  Relationship  Manager,  Institutional
Banking

BANCO POPULAR DE PUERTO RICO, as
Lender

By:_____

Name:

Title:

Cortland_PREPA_00001735

Second Amending Agreement
Puerto Rico Electric Power Authority
April 25, 2013
Page - 5 -

(SIGNATURE PAGE CONTINUED)

BANCO SANTANDER PUERTO RICO, as Lender

By:_____
Name: Lilian Díaz Bento, SVP
Title:   Director, Institutional Banking

By:_____
Name: Jorge R. García Arroyo
Title:   Senior Relationship Manager, Institutional
           Banking

BANCO POPULAR DE PUERTO RICO, as
Lender

By:_____
Name: Liza M. Lúgaro Rodríguez
Title:   VP & Credit Manager, Corporate Banking

Cortland_PREPA_00001736

PREPA Officers and Seal Certificate

| Office-Officer | Commencement of Term | Expiration of Term |
|---|---|---|
| Chairman and Member<br>Harry Rodríguez-García | January 15, 2013 | June 17, 2014 |
| Vice Chairman and Member<br>Edgardo J. Fábregas-Castro | July 7, 2012 | June 17, 2013 |
| Member<br>Roberto A. Volckers-Esteves | November 18, 2011 | June 17, 2013 |
| Member<br>Andrés E. Salas-Soler | April 17, 2012 | June 17, 2016 |
| Member<br>Norma Burgos-Andújar | December 29, 2012 | June 17, 2014 |
| Member<br>Gabriel Hernández-Rodríguez | December 28, 2012 | February 1, 2015 |
| Member<br>Agustín Irizarry-Rivera | June 11, 2012 | September 11, 2013 |
| Member<br>Juan E. Rosario-Maldonado | June 11, 2012 | September 11, 2013 |
| Member<br>Miguel A. Torres-Díaz | | Indefinite |
| Executive Director<br>Juan F. Alicea-Flores | | Indefinite |
| General Counsel<br>Jorge A. Concepción-Rivera | | Indefinite |
| Director of Finance<br>Luis Figueroa-Baez | | Indefinite |
| Treasurer<br>Ariel R. Tirado-Rivera | | Indefinite |
| Secretary<br>María M. Méndez-Rivera | | Indefinite |

María M. Méndez-Rivera
Corporate Secretary

Seal

ALLONGE

To the Note in the principal sum of $200,000,000 issued by
Puerto Rico Electric Power Authority to the order of Scotiabank de Puerto Rico
dated as of October 23, 2012 (the "Note")

Pursuant to that certain *Second Amending Agreement to Credit Agreement* dated as of
April 25, 2013, between the issuer of this Note and the Lenders party thereto, the Maturity Date
of this Note has been extended to June 30, 2013.

All provisions of the Note not expressly modified by this allonge remain in full force and
effect and are hereby confirmed by Puerto Rico Electric Power Authority.

In San Juan, Puerto Rico, as of April 25, 2013.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to
bear the manual signatures of the Executive Director and the Secretary of the Authority and its
corporate seal to be imprinted hereon, all as of the date set forth above.

PUERTO RICO ELECTRIC POWER
AUTHORITY

By: _____
Executive Director

By: _____
Secretary

ALLONGE

To the Note in the principal sum of $200,000,000 issued by
Puerto Rico Electric Power Authority to the order of
Banco Bilbao Vizcaya Argentaria Puerto Rico
dated May 4, 2012 (the "Note")

Pursuant to that certain *Second Amending Agreement to Credit Agreement* dated as of
April 25, 2013, between the issuer of this Note and the Lenders party thereto, (i) the Maturity
Date of this Note has been extended to June 30, 2013; and (ii) the Authority acknowledges that
Oriental Bank became the payee of this Note as successor in interest to Banco Bilbao Vizcaya
Argentaria Puerto Rico, by virtue of a merger effective December 18, 2012.

All provisions of the Note not expressly modified by this allonge remain in full force and
effect and are hereby confirmed by Puerto Rico Electric Power Authority.

In San Juan, Puerto Rico, as of April 25, 2013.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to
bear the manual signatures of the Executive Director and the Secretary of the Authority and its
corporate seal to be imprinted hereon, all as of the date set forth above.

PUERTO RICO ELECTRIC POWER
AUTHORITY

By: _____
        Executive Director

By: _____
        Secretary

ALLONGE

To the Note in the principal sum of $50,000,000 issued by
Puerto Rico Electric Power Authority to the order of
Banco Popular de Puerto Rico
dated as of October 23, 2012 (the "Note")

Pursuant to that certain *Second Amending Agreement to Credit Agreement* dated as of April 25, 2013, between the issuer of this Note and the Lenders party thereto, the Maturity Date of this Note has been extended to June 30, 2013.

All provisions of the Note not expressly modified by this allonge remain in full force and effect and are hereby confirmed by Puerto Rico Electric Power Authority.

In San Juan, Puerto Rico, as of April 25, 2013.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to bear the manual signatures of the Executive Director and the Secretary of the Authority and its corporate seal to be imprinted hereon, all as of the date set forth above.

PUERTO RICO ELECTRIC POWER
AUTHORITY

By:_____
                    Executive Director

By:_____
                    Secretary

Cortland_PREPA_00001740

ALLONGE

To the Note in the principal sum of $50,000,000 issued by
Puerto Rico Electric Power Authority to the order of
Banco Santander Puerto Rico
dated as of October 23, 2012 (the "Note")

Pursuant to that certain *Second Amending Agreement to Credit Agreement* dated as of April 25, 2013, between the issuer of this Note and the Lenders party thereto, the Maturity Date of this Note has been extended to June 30, 2013.

All provisions of the Note not expressly modified by this allonge remain in full force and effect and are hereby confirmed by Puerto Rico Electric Power Authority.

In San Juan, Puerto Rico, as of April 25, 2013.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to bear the manual signatures of the Executive Director and the Secretary of the Authority and its corporate seal to be imprinted hereon, all as of the date set forth above.

PUERTO RICO ELECTRIC POWER
AUTHORITY

By: _____
       Executive Director

By: _____
       Secretary

THIRD AMENDING AGREEMENT
TO
CREDIT AGREEMENT


This Third Amending Agreement (the "Third Amending Agreement") to that certain Credit Agreement dated as of May 4, 2012, by and among PUERTO RICO ELECTRIC POWER AUTHORITY (the "Borrower"), the LENDERS party thereto, and SCOTIABANK DE PUERTO RICO, as Administrative Agent (in such capacity, the "Agent") (the "Original Credit Agreement") is made as of June 28, 2013.

WITNESSETH:

WHEREAS, the Borrower, the Lenders and the Agent entered into the Credit Agreement, pursuant to which the Lenders granted to the Borrower a certain revolving credit facility.

WHEREAS, the Credit Agreement was amended by a *First Amending Agreement to Credit Agreement* dated October 23, 2012 (the "First Amending Agreement"), and by a *Second Amending Agreement* dated April 25, 2013 (the "Second Amending Agreement"). The Original Credit Agreement, the First Amending Agreement and the Second Amending Agreement are herein collectively referred to as the "Credit Agreement."

WHEREAS, all capitalized terms used herein and not otherwise defined, are used with the same meanings given to such terms in the Credit Agreement.

WHEREAS, the parties have agreed to amend further the Credit Agreement to extend the Maturity Date, *inter alia*, all as more fully set out below.

NOW THEREFORE, the parties hereby execute this Third Amending Agreement under the following:

TERMS AND CONDITIONS

1.   Extension of Maturity Date.

At the Borrower's request, the Administrative Agent and all Lenders agree to extend the Maturity Date to August 15, 2013. Accordingly, the definition of "Maturity Date" contained in Section 1.01 of the Credit Agreement is hereby amended to read as follows:

"Maturity Date" means August 15, 2013.

Cortland_PREPA_00001742

Third Amending Agreement
Puerto Rico Electric Power Authority
June 28, 2013
Page - 2 -

2.    Allonges to Notes.

Concurrently herewith the Borrower has executed and delivered to the Agent three allonges, substantially in the form of Exhibit A to this Third Amending Agreement, referencing the three Notes issued by the Borrower to the order of the Lenders. The Agent shall forthwith deliver each allonge to its corresponding Lender, who will then attach the allonge to the Note issued by the Borrower to such Lender, thereby evidencing the extension to the Maturity Date of the Notes granted by this Third Amending Agreement.

3.    Extension Fee.

The Lenders grant the foregoing consent and extension to the Maturity Date in consideration of the payment by the Borrower to the Agent, for the pro-rata benefit of the Lenders, of an extension fee in the sum of $281,250, the receipt of which the Agent acknowledges on this date.

4.    Lender Consent.

The Lenders hereby consent to the Borrower paying the sum of $50,000,000 to Banco Santander Puerto Rico, a former lender under the Credit Agreement, in full settlement of its obligations thereto. Consequently, *Schedule 2.01* to the Credit Agreement is replaced with a new *Schedule 2.01* that is attached hereto.

5.    All Other Provisions Applicable.

The Credit Agreement, as changed, altered, amended or modified by this Third Amending Agreement, shall continue in full force and effect, and is hereby in all respects ratified and confirmed, and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically provided for herein. All terms, conditions, covenants and undertakings of the Loan Documents and all other instruments executed and delivered in connection therewith, not expressly amended, substituted or otherwise revoked by the terms hereof, remain in full force and effect.

6.    References to Agreement.

All references in the Credit Agreement to the "Agreement" shall now mean the Credit Agreement, as amended by the First Amending Agreement, the Second Amending Agreement and this Third Amending Agreement; and all references to the "Credit Documents" shall now include this Third Amending Agreement.

Cortland_PREPA_00001743

Third Amending Agreement
Puerto Rico Electric Power Authority
June 28, 2013
Page - 3 -

7.    No Novation.

       The terms and conditions of this Third Amending Agreement shall not be construed as, nor do they constitute, an extinctive novation of the Borrower's Obligations under the Credit Agreement.

8.    Inconsistent Terms.

       If any provision of this Third Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this Third Amending Agreement shall prevail and be paramount.

9.    Execution in Counterparts.

       This Third Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

       IN WITNESS WHEREOF, the parties hereto have caused this Third Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower

by: _____

Name: JUAN F. ALICEA FLORES
Title: EXECUTIVE DIRECTOR


SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent


by: _____
Name:
Title:


(SIGNATURES CONTINUE ON FOLLOWING PAGE)

Cortland_PREPA_00001744

Third Amending Agreement
Puerto Rico Electric Power Authority
June 28 2013
Page - 3 -

8.    Inconsistent Terms.

If any provision of this Third Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this Third Amending Agreement shall prevail and be paramount.

9.    Execution in Counterparts.

This Third Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Third Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower


by:_____
Name:
Title:


SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent

by:_____
Name: JOSE A. MALDONADO
Title: VICE PRESIDENT


**(SIGNATURES CONTINUE ON FOLLOWING PAGE)**

Cortland_PREPA_00001745

Third Amending Agreement
Puerto Rico Electric Power Authority
June 2₈, 2013
Page - 4 -

(SIGNATURE PAGE CONTINUED)

BANCO POPULAR DE PUERTO RICO, as
Lender

by:_____
Name:
Title:

ORIENTAL BANK, as Lender

by:_____
Name: Patrick J. Haggarty Phillips
Title:   SVP – Wholesale Banking

By:_____
Name:  Helen M. Pardo Hernández
Title:   SVP – Corporate & Institutional Banking

Cortland_PREPA_00001746

Third Amending Agreement
Puerto Rico Electric Power Authority
June 28, 2013
Page - 4 -

(SIGNATURE PAGE CONTINUED)

BANCO POPULAR DE PUERTO RICO, as Lender

by: _____
Name: Adlin M. Rodríguez González
Title: Commercial Relationship Officer

ORIENTAL BANK, as Lender

by: _____
Name: Patrick J. Haggarty Phillips
Title:   SVP – Wholesale Banking

By: _____
Name: Helen M. Pardo Hernández
Title:   SVP – Corporate & Institutional Banking

Cortland_PREPA_00001747

Third Amending Agreement
Puerto Rico Electric Power Authority
June 28, 2013
Page - 5 -

SCHEDULE 2.01
COMMITMENTS

Scotiabank de Puerto Rico                $200,000,000
Oriental Bank                            $200,000,000
Banco Popular de Puerto Rico             $50,000,000

Cortland_PREPA_00001748

Third Amending Agreement
Puerto Rico Electric Power Authority
June 28, 2013
Page - 6 -

Exhibit A

### ALLONGE

Pursuant to that certain *Third Amending Agreement to Credit Agreement* dated as of June 28, 2013, between the maker of this Note and the Lenders party thereto, the Maturity Date of this Note has been extended to August 15, 2013.

All provisions of the Note not expressly modified by this allonge remain in full force and effect, and are hereby ratified by Puerto Rico Electric Power Authority.

In San Juan, Puerto Rico, as of June 28, 2013.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to bear the manual signatures of the Executive Director and the Secretary of the Authority and its corporate seal to be imprinted hereon, all as of the date set forth above.

PUERTO RICO ELECTRIC POWER
AUTHORITY

by: ___Juan F. Alicea Flores_____
Executive Director

by: _____
Secretary

Cortland_PREPA_00001749

**Execution Copy**

FOURTH AMENDING AGREEMENT
TO
CREDIT AGREEMENT

This Fourth Amending Agreement (the "Fourth Amending Agreement") to that certain Credit Agreement dated as of May 4, 2012 (the "Original Credit Agreement"), by and among PUERTO RICO ELECTRIC POWER AUTHORITY (the "Borrower"), the LENDERS party thereto, and SCOTIABANK DE PUERTO RICO, both as Lender and as Administrative Agent, made as of August 14, 2013 and effective August 15, 2013,

WITNESSETH:

WHEREAS, the Borrower, the Lenders and the Agent entered into the Credit Agreement, pursuant to which the Lenders granted to the Borrower a certain revolving credit facility; and

WHEREAS, the Credit Agreement was amended by a *First Amending Agreement to Credit Agreement* dated October 23, 2012 (the "First Amending Agreement"), by a *Second Amending Agreement* dated April 25, 2012 (the "Second Amending Agreement") and by a *Third Amending Agreement* dated June 28, 2013. The Original Credit Agreement, the First Amending Agreement, the Second Amending Agreement and the Third Amending Agreement are herein collectively referred to as the "Credit Agreement"; and

WHEREAS, all capitalized terms used herein and not otherwise defined, are used with the same meanings given to such terms in the Credit Agreement; and

WHEREAS, the parties have agreed to amend further the Credit Agreement, all as more fully set out below;

NOW THEREFORE, in consideration of the premises, the parties hereby execute this Fourth Amending Agreement under the following:

TERMS AND CONDITIONS

1. Definition of "Applicable Margin" and "Applicable Spread."

The definition of the term "Applicable Margin" in Section 1.01 of the Credit Agreement is amended to read as follows:

> *"Applicable Margin" and "Applicable Spread," used interchangeably, shall be that to be determined based on the following grid, as per the lower of the long term ratings issued and in effect at the applicable time by Moody's and S&P for Senior Debt:*

PREPA_RSA0031657

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 2 -

| *Moody's* | *S&P* | *Advances up to 90 days* | *Rollover Premium* |
|-----------|-------|--------------------------|--------------------|
| *Baa2* | *BBB* | *275 basis points* | *+50 basis points* |
| *Baa3* | *BBB-* | *300 basis points* | *+50 basis points* |
| *Ba1* | *BB+* | *475 basis points* | *+75 basis points.* |

2. Definition of "Default Rate."

The definition of the term "Default Rate" in Section 1.01 of the Credit Agreement is amended to read as follows:

*"Default Rate" has the meaning set forth in Section 2.09(c).*

3. Definition of "Event of Taxability."

The definition of the term "Event of Taxability" in Section 1.01 of the Credit Agreement is amended to read as follows:

> *"Event of Taxability" shall mean with respect to the Advances: (i) the enactment of any federal legislation or the promulgation of any federal rule or regulation after the Closing Date, which would have the effect of causing the interest on such Advances to be or become includable in gross income of the recipients thereof for Federal income tax purposes; (ii) any portion of the interest on the Advances paid or payable by the Borrower is (A) not excludable from the gross income of any of the Lenders for Commonwealth income tax purposes or (B) subject to the payment of municipal license taxes or sales and use taxes imposed by the Commonwealth or any of its municipalities; or (C) the Notes cease to be exempt in whole or in part from Commonwealth property taxes.*

4. Definition of "Event Taxes."

The following definition of "Event Taxes" is added to Section 1.01 of the Credit Agreement:

> *"Event Taxes" shall mean additional Taxes resulting from the occurrence of an Event of Taxability."*

5. Definition of "GDB Resolution."

The definition of the term "GDB Resolution" in Section 1.01 of the Credit Agreement is amended to read as follows:

Confidential

> *"GDB Resolution" means such resolutions adopted by the Board of Directors or the Executive Committee of the Government Development Bank for Puerto Rico, authorizing the Advances as set forth in the Agreement.*

6. Definition of "Maturity Date."

The definition of the term "Maturity Date" in Section 1.01 of the Credit Agreement is amended to read as follows:

> *"Maturity Date" means August 14, 2014.*

7. Definition of "Resolution."

The definition of "Resolution" in Section 1.01 of the Credit Agreement is amended to read as follows:

> *"Resolution" means, collectively, such resolutions and certificates of determination of the Borrower authorizing the Borrowings and providing, among other things, that the Borrowings shall constitute Current Expenses under the Trust Agreement.*

8. Definition of "Taxes."

The definition of "Taxes" in Section 1.01 of the Credit Agreement is amended to read as follows:

> *"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including Other Taxes.*

9. Interest.

9.1. Section 2.09(b) of the Credit Agreement is amended to read as follows:

> *(b) ABR Advances. ABR Advances shall bear interest at a fluctuating rate per annum equal at all times to the Alternate Base Rate plus the Applicable Spread.*

9.2. Section 2.09(c) of the Credit Agreement is amended to read as follows:

> *(c) Default Rate. Anything hereunder to the contrary notwithstanding, and without prejudice to any remedies of the Administrative Agent or the Lenders provided hereunder or at law or in equity, the interest rate*

*applicable to the outstanding principal amount of the Advances during any period—*

*(i) when an Event of Default shall have occurred and be continuing, and/or*

*(ii) when and for so long as Moody's long term rating for Senior Debt is lower than Ba1 or S&P's long term rating for Senior Debt is lower than BB+,*

*shall be four percent (4%) over the Alternate Base Rate (the "Default Rate").*

10. Taxes.

   10.1. Section 2.11(a) of the Credit Agreement is amended to read as follows:

   *(a) Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.*

   10.2. The following subsection is added immediately after Section 2.11(f) of the Credit Agreement:

   *(g) Upon occurrence of an Event of Taxability, Event Taxes that were considered Excluded Taxes prior thereto shall be considered to be Indemnified Taxes.*

11. Effective Date.

   Section 4.01(d) of the Credit Agreement is amended to read as follows:

   *(d) The Administrative Agent shall have received a certificate, dated the Effective Date, and again as of the date of the Fourth Amending Agreement, signed by the Executive Director, a Vice President or a Financial Officer of the Borrower confirming (i) compliance with the conditions set forth in paragraphs (b), (c) and (d) of Section 4.02 and*

PREPA_RSA0031660

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 5 -

*(ii) the long term ratings in effect for the Senior Debt by Moody's and S&P is no less than Baa3 and BBB, respectively.*

12. <u>Deletion of Sections</u>.

12.1. The title and text of Section 5.10 of the Credit Agreement are deleted, and Section 5.10 is marked "Reserved."

12.2. The text of clause (o) in Article VII of the Credit Agreement is deleted, and clause (o) is marked "Reserved."

13. <u>Notes</u>.

Concurrently herewith the Borrower has executed and delivered to the Administrative Agent four Notes substantially in the form of *Exhibit A* to this Fourth Amending Agreement, each made payable to the order of one Lender. The Agent shall forthwith deliver each Note to its corresponding Lender. Concurrently herewith each Lender holding a Note made by the Borrower pursuant to the Original Credit Agreement returns (through the Administrative Agent) said Note to the Borrower for cancellation.

14. <u>Lender Commitments</u>.

The Lender commitments are hereby restructured as per new *Schedule 2.01* attached hereto. Consequently, *Schedule 2.01* to the Credit Agreement is replaced thereby.

15. <u>Additional Reporting Requirement</u>:

The Borrower shall furnish to the Administrative Agent (for delivery to each Lender) a notification of any filing pertaining to any planned bond issue and continuing disclosure pursuant to Municipal Securities Rulemaking Board requirements.

16. <u>Structuring Fee</u>.

The Borrower shall pay to the Administrative Agent a structuring fee of $150,000.

17. <u>All Other Provisions Applicable</u>.

The Credit Agreement, as changed, altered, amended or modified by this Fourth Amending Agreement, shall continue in full force and effect, and is hereby in all respects ratified and confirmed, and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically provided for herein. All terms, conditions, covenants and undertakings of the Loan Documents and all other instruments executed and delivered in connection therewith, not expressly amended, substituted or otherwise revoked by the terms hereof, remain in full force and effect.

Confidential

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 6 -

18. <u>References to Agreement</u>.

All references in the Credit Agreement to the "Agreement" shall now mean the Credit Agreement, as amended by the First Amending Agreement, the Second Amending Agreement, the Third Amending Agreement and this Fourth Amending Agreement; and all references to the "Credit Documents" shall now include this Fourth Amending Agreement.

19. <u>No Novation</u>.

The terms and conditions of this Fourth Amending Agreement shall not be construed as, nor do they constitute, an extinctive novation of the Borrower's obligations under the Credit Agreement.

20. <u>Inconsistent Terms</u>.

If any provision of this Fourth Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this Fourth Amending Agreement shall prevail and be paramount.

21. <u>Execution in Counterparts</u>.

This Fourth Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

Puerto Rico Electric Power Authority
as Borrower

Scotiabank de Puerto Rico
as Lender and Administrative Agent

by: _____

by: _____

Juan F. Alicea Flores:
Executive Director:

Name:
Title:

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 6 -

18. References to Agreement.

All references in the Credit Agreement to the "Agreement" shall now mean the Credit Agreement, as amended by the First Amending Agreement, the Second Amending Agreement, the Third Amending Agreement and this Fourth Amending Agreement; and all references to the "Credit Documents" shall now include this Fourth Amending Agreement.

19. No Novation.

The terms and conditions of this Fourth Amending Agreement shall not be construed as, nor do they constitute, an extinctive novation of the Borrower's obligations under the Credit Agreement.

20. Inconsistent Terms.

If any provision of this Fourth Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this Fourth Amending Agreement shall prevail and be paramount.

21. Execution in Counterparts.

This Fourth Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

Puerto Rico Electric Power Authority
as Borrower

Scotiabank de Puerto Rico
as Lender and Administrative Agent

by:

by:

Name:

Name:  JOSE MALDONADO

Title:

Title:  VICE PRESIDENT

Confidential

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 7 -

Oriental Bank
as Lender

by: _____

Name:   Patrick J. Haggarty
Title:    Senior Vice President

by: _____

Name:   Helen M. Pardo
Title:    Senior Vice President

Banco Popular de Puerto Rico
as Lender

by: _____

Name:
Title:

FirstBank Puerto Rico
as Lender

by: _____

Name:
Title:

Confidential

PREPA_RSA0031664

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 7 -

Oriental Bank
as Lender

by:                                                    by:

Name:                                                  Name:
Title:                                                 Title:


Banco Popular de Puerto Rico
as Lender

by: _____

Name: Adlin M. Rodríguez González
Title: Assistant Vice-President


FirstBank Puerto Rico
as Lender

by:

Name:
Title:

PREPA_RSA0031665

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 7 -

Oriental Bank
as Lender

by:                                              by:


Name:                                            Name:
Title:                                           Title:


Banco Popular de Puerto Rico
as Lender


by:


Name:
Title:


FirstBank Puerto Rico
as Lender


by:

Name:  Felipe Lebron
Title:   Vice President

Confidential

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 8 -

**Exhibit A**


PUERTO RICO ELECTRIC POWER AUTHORITY

NOTE

DATED: August 15, 2013                    Maturity Date: August 15, 2014


Principal Amount
Not to Exceed:                    MILLION DOLLARS ($            )


FOR VALUE RECEIVED, the undersigned, PUERTO RICO ELECTRIC POWER AUTHORITY, a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Borrower"), hereby unconditionally promises to pay to the order of _____ (the "Lender") in lawful money of the United States of America and in immediately available funds, the principal amount of _____ MILLION DOLLARS ($            ) or, if less, the aggregate unpaid and outstanding principal amount of the Advances made by the Lender pursuant to the Credit Agreement, dated as of May 4, 2012, as amended (the "Credit Agreement"), among the Borrower, the lenders party thereto, and Scotiabank de Puerto Rico, as Administrative Agent, plus any interest, any other amounts due and payable to the Lender pursuant to and as described in the Credit Agreement (collectively, the "Obligations").

This promissory note is one of the Notes referred to in the Credit Agreement and is entitled to the benefits, and subject to the terms, of the Credit Agreement. Capitalized terms used herein without definition have the meanings assigned to them in the Credit Agreement.

This Note shall not be deemed to constitute a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions other than the Borrower, and neither the Commonwealth of Puerto Rico nor any such municipalities or other political subdivisions other than the Borrower are liable for the payment of this Note or interest thereon or any amounts due under the Credit Agreement, but this Note and the interest thereon and amounts due under the Credit Agreement shall be payable as provided in the Credit Agreement, the Resolution (hereinafter defined) and the Trust Agreement (hereinafter defined).

The principal amount hereof is payable on the Maturity Date and otherwise in accordance with the Credit Agreement. This Note is subject to prepayment as provided in the Credit Agreement.

Confidential

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 9 -

The Borrower further agrees to pay, in lawful money of the United States of America and in immediately available funds, interest from the date hereof on the unpaid and outstanding principal amount hereof until such unpaid and outstanding principal amount shall become due and payable (whether at stated maturity, by acceleration or otherwise) at the rate or rates and at the times set forth in the Credit Agreement, and the Borrower agrees to pay other Obligations as provided in the Credit Agreement.

The date, amount and interest rate of each Advance, and each payment made on account thereof, shall be evidenced by records maintained by the Administrative Agent in the ordinary course of its business. Such records maintained by the Agent shall constitute *prima facie* evidence of the accuracy of the information so recorded in the absence of manifest error, provided that the failure to make such recordation or any error therein shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Credit Agreement in respect of the Advances. The holder of this Note may, at its option, also record the date and amount of the Advances, the date and amount of each prepayment of principal thereof and the amount of unpaid principal with respect thereto on Schedule 1 annexed hereto and constituting a part hereof, and any such recordation shall constitute *prima facie* evidence of the accuracy of the information so recorded in the absence of manifest error, provided that the failure of the holder of this Note to make such recordation or any error therein shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Credit Agreement in respect of the Advances.

In case an Event of Default shall occur and be continuing, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, as provided in the Credit Agreement, without presentment, demand for payment, protest or notice of any kind, all of which are expressly waived by Borrower.

The Borrower agrees to pay all costs and expenses, including reasonable attorneys' fees incurred in connection with the interpretation or enforcement of this Note, as permitted by and in accordance with the Credit Agreement.

This Note is payable by the Borrower as a "Current Expense" under the Trust Agreement dated as of January 1, 1974, as amended and supplemented, by and between the Borrower and U.S. Bank National Association, as successor trustee (the "Trust Agreement'), pursuant to Resolution No. 3909 adopted by the Borrower on April 12, 2012 and a Certificate of Determination dated May 4, 2012, executed by the Executive Director of the Authority (collectively, the "Resolution"), and is subject to the terms and provisions set forth in the Trust Agreement relating to Current Expenses.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND IN ACCORDANCE WITH, THE LAW OF THE COMMONWEALTH OF PUERTO RICO.

Confidential

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 10 -

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to bear the manual signatures of the Executive Director and the Secretary of the Authority and its corporate seal to be imprinted hereon, all of the date first set forth above.

PUERTO RICO ELECTRIC POWER AUTHORITY

[Corporate Seal]

By:_____
          Executive Director

By:_____
               Secretary

Confidential

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 11 -

SCHEDULE 1
TO NOTE
ADVANCES AND PAYMENTS

| Date | Amount of Advances | Amount of Principal Repaid | Unpaid Principal Balance of Advance | Notation Made By |
|------|--------------------|-----------------------------|-------------------------------------|------------------|

Confidential

PREPA_RSA0031670

Fourth Amending Agreement
Puerto Rico Electric Power Authority
August 14, 2013
Page - 12 -

Schedule 2.01

COMMITMENTS

| | |
|---|---|
| Scotiabank de Puerto Rico | $200,000,000 |
| Oriental Bank | $200,000,000 |
| Banco Popular de Puerto Rico | $75,000,000 |
| FirstBank Puerto Rico | $75,000,000 |
| Total | $550,000,000 |

Confidential

FIFTH AMENDING AGREEMENT
TO
CREDIT AGREEMENT


This Fifth Amending Agreement (the "Fifth Amending Agreement") to that certain Credit Agreement dated as of May 4, 2012 (the "Original Credit Agreement"), by and among PUERTO RICO ELECTRIC POWER AUTHORITY (the "Borrower"), the LENDERS party thereto, and SCOTIABANK DE PUERTO RICO, both as Lender and as Administrative Agent, made as of November 12, 2013,

WITNESSETH:

WHEREAS, the Borrower, the Lenders and the Agent entered into the Credit Agreement, pursuant to which the Lenders granted to the Borrower a certain revolving credit facility.

WHEREAS, the Credit Agreement was amended by a *First Amending Agreement to Credit Agreement* dated October 23, 2012, by a *Second Amending Agreement* dated April 25, 2013, by a *Third Amending Agreement* dated June 28, 2013, and by a *Fourth Amending Agreement* dated August 14, 2013. The Original Credit Agreement and all of the amending agreements referenced in this paragraph are herein collectively referred to as the "Credit Agreement".

WHEREAS, all capitalized terms used herein and not otherwise defined, are used with the same meanings given to such terms in the Credit Agreement.

WHEREAS, the parties have agreed to amend further the Credit Agreement to modify the method of calculating the funding-loss compensation payable by the Borrower to the Lenders upon optional prepayment of Advances, all as more fully set out below.

NOW THEREFORE, in consideration of the premises, the parties hereby execute this Fifth Amending Agreement under the following:

TERMS AND CONDITIONS

1. Optional Prepayment of Advances.

Section 2.07(e) is amended to read as follows. For ease of reference, added text is shown in **bold**, and deleted text is shown in ~~strikethrough~~:

(e)        In the event of (a) the payment of any principal of any LIBOR Advance, other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), or (b) the failure to borrow,

Fifth Amending Agreement
Puerto Rico Electric Power Authority
November 12, 2013
Page - 2 -

continue or prepay any LIBOR Advance on the date specified in any notice delivered pursuant thereto, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. Such loss, cost or expense to any Lender shall be deemed to include an amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Advance had such event not occurred, **computed at the LIBOR component** of ~~at~~ the LIBOR Rate that would have been applicable to such Advance, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for such Advance), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would be offered, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the LIBOR market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof. Notwithstanding anything to the contrary herein, this paragraph (e) shall not apply to any LIBOR Advance with an Interest Period of 1-week.

2.  <u>All Other Provisions Applicable</u>.

The Credit Agreement, as changed, altered, amended or modified by this Fifth Amending Agreement, shall continue in full force and effect, and is hereby in all respects ratified and confirmed, and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically provided for herein. All terms, conditions, covenants and undertakings of the Loan Documents and all other instruments executed and delivered in connection therewith, not expressly amended, substituted or otherwise revoked by the terms hereof, remain in full force and effect.

3.  <u>References to Agreement</u>.

All references in the Credit Agreement to the "Agreement" shall now mean the Credit Agreement, as amended by all previous amending agreements referenced in the preamble hereof, and by this Fifth Amending Agreement; and all references to the "Credit Documents" shall now include this Fifth Amending Agreement.

4.  <u>No Novation</u>.

The terms and conditions of this Fifth Amending Agreement shall not be construed as, nor do they constitute, an extinctive novation of the Borrower's obligations under the Credit Agreement.

Confidential

Fifth Amending Agreement
Puerto Rico Electric Power Authority
November 12, 2013
Page - 3 -

5. Inconsistent Terms.

  If any provision of this Fifth Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this Fifth Amending Agreement shall prevail and be paramount.

6. Execution in Counterparts.

  This Fifth Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

  IN WITNESS WHEREOF, the parties hereto have caused this Fifth Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower

by: _____
Name: Juan F. Alicea-Flores_____
Title:   Executive Director_____


SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent


by:_____
Name: José A. Maldonado-Dávila_____
Title:   Vice-President_____


(SIGNATURES CONTINUE ON FOLLOWING PAGE)

Fifth Amending Agreement
Puerto Rico Electric Power Authority
November 12, 2013
Page - 3 -

5. <u>Inconsistent Terms</u>.

If any provision of this Fifth Amending Agreement is inconsistent or conflicts with any provision of the Credit Agreement, the relevant provision of this Fifth Amending Agreement shall prevail and be paramount.

6. <u>Execution in Counterparts</u>.

This Fifth Amending Agreement may be executed by its signatories in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Fifth Amending Agreement to be duly executed by their respective authorized officers as of the date first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, Borrower

by:_____
Name: <u>Juan F. Alicea-Flores</u>
Title: <u>Executive Director</u>

SCOTIABANK DE PUERTO RICO, as Lender and
Administrative Agent

by:_____
Name: <u>José A. Maldonado-Dávila</u>
Title: <u>Vice-President</u>

(SIGNATURES CONTINUE ON FOLLOWING PAGE)

Confidential

Fifth Amending Agreement
Puerto Rico Electric Power Authority
November 12, 2013
Page - 4 -

(SIGNATURE PAGE CONTINUED)

BANCO POPULAR DE PUERTO RICO, as
Lender

by: _____
Name: Adlin M. Rodríguez González
Title:   Assistant Vice-President

ORIENTAL BANK, as Lender

by:_____
Name:_____
Title:  _____

By:_____
Name: _____
Title:  _____

FIRSTBANK PUERTO RICO, as Lender

by:_____
Name: _____
Title:  _____

Confidential

Fifth Amending Agreement
Puerto Rico Electric Power Authority
November 12, 2013
Page - 4 -

(SIGNATURE PAGE CONTINUED)

BANCO POPULAR DE PUERTO RICO, as
Lender

by:_____

Name: _____

Title: _____

ORIENTAL BANK, as Lender

by:_____

Name:   Patrick J. Haggarty

Title:   Senior Vice President

By:_____

Name:   Helen M. Pardo

Title:   Senior Vice President

FIRSTBANK PUERTO RICO, as Lender

by:_____

Name: _____

Title: _____

Confidential

Fifth Amending Agreement
Puerto Rico Electric Power Authority
November 12, 2013
Page - 4 -

(SIGNATURE PAGE CONTINUED)

BANCO POPULAR DE PUERTO RICO, as
Lender


by:_____

Name: _____

Title: _____


ORIENTAL BANK, as Lender


by:_____

Name: _____

Title: _____

By:_____

Name: _____

Title: _____


FIRSTBANK PUERTO RICO, as Lender


by:_____

Name: __Felipe Lebron_____

Title: __Vice President_____

Confidential