# Exhibit 2

**Citibank Credit Agreement, as amended**

**(PREPA_RSA0028074-PREPA_RSA0028076 and
PREPA_RSA0028077-PREPA_RSA0028081 UNDER SEAL)**

EXECUTION
VERSION

## TRADE FINANCE FACILITY AGREEMENT

Dated

July 20, 2012

between

## PUERTO RICO ELECTRIC POWER AUTHORITY

and

## CITIBANK, N.A.

Confidential

PREPA_RSA0028086

# TABLE OF CONTENTS

Page

## ARTICLE I
## DEFINITIONS; CONSTRUCTION

Section 1.01.   Defined Terms ................................................................. 1
Section 1.02.   Terms Generally................................................................. 8
Section 1.03.   Accounting Terms; GAAP................................................... 9

## ARTICLE II
## THE ADVANCES

Section 2.01.   Facility ............................................................................. 9
Section 2.02.   Advances .......................................................................... 9
Section 2.03.   Funding of Advances ........................................................ 9
Section 2.04.   Termination and Reduction of Facility Amount............... 10
Section 2.05.   Repayment of Advances; Evidence of Debt ..................... 11
Section 2.06.   Prepayment of Advances ................................................. 11
Section 2.07.   Extension......................................................................... 12
Section 2.08.   Interest............................................................................ 12
Section 2.09.   Taxes ............................................................................... 12
Section 2.10.   Payments Generally ......................................................... 13
Section 2.11.   Mitigation Obligations ..................................................... 14
Section 2.12.   Note as Current Expenses ............................................... 14
Section 2.13.   Change in Circumstances................................................. 14

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES



Section 3.01.   Organization; Powers......................................................... 15
Section 3.02.   Authorization; Enforceability............................................. 15
Section 3.03.   Governmental Approvals; No Conflicts .............................. 15
Section 3.04.   Financial Condition; No Material Adverse Change.............. 15
Section 3.05.   Properties ........................................................................ 16
Section 3.06.   Litigation and Environmental Matters............................... 16
Section 3.07.   Compliance with Laws and Agreements ........................... 16
Section 3.08.   Status............................................................................... 16
Section 3.09.   Taxes ............................................................................... 16
Section 3.10.   Disclosure ........................................................................ 16
Section 3.11.   Resolution; Trust Agreement ........................................... 17
Section 3.12.   Repayment ....................................................................... 17
Section 3.13.   No Immunity..................................................................... 17
Section 3.14.   Tax Exemption.................................................................. 17

## ARTICLE IV
## CONDITIONS PRECEDENT

Section 4.01.   Effective Date .................................................................. 17
Section 4.02.   Conditions Precedent to Each Advance............................. 18

## ARTICLE V
### AFFIRMATIVE COVENANTS

Section 5.01.   Financial Statements; Ratings Change and Other Information......................20
Section 5.02.   Notices of Material Events; Adjustment Events; Legal Proceedings
                and Final Determination ................................................................21
Section 5.03.   Existence; Conduct of Business................................................21
Section 5.04.   Payment of Obligations.............................................................21
Section 5.05.   Maintenance of Properties; Insurance........................................22
Section 5.06.   Books and Records; Inspection Rights .......................................22
Section 5.07.   Compliance with Laws ..............................................................22
Section 5.08.   Use of Proceeds........................................................................22
Section 5.09.   Financial Covenant ...................................................................22
Section 5.10.   Tax Exempt Status ....................................................................22
Section 5.11.   Operating Account ....................................................................22

## ARTICLE VI
### NEGATIVE COVENANTS

Section 6.01.   Liens..........................................................................................22
Section 6.02.   Fundamental Changes................................................................23
Section 6.03.   Investments, Advances, Advances, Guarantees and Acquisitions................23
Section 6.04.   Hedge Agreements ....................................................................23
Section 6.05.   Transactions with Affiliates .......................................................24
Section 6.06.   Restrictive Agreements .............................................................24

## ARTICLE VII
### EVENTS OF DEFAULT

## ARTICLE VIII
### MISCELLANEOUS



Section 8.01.   Notices .......................................................................................26
Section 8.02.   Waivers; Amendments...............................................................27
Section 8.03.   Expenses; Indemnity; Damage Waiver.......................................27
Section 8.04.   Successors and Assigns, Participations and Transfer of the Note ................29
Section 8.05.   Survival; Reinstatement of Obligations ......................................30
Section 8.06.   Counterparts; Integration; Effectiveness....................................30
Section 8.07.   Severability ...............................................................................31
Section 8.08.   Right of Setoff...........................................................................31
Section 8.09.   Governing Law; Jurisdiction; Consent to Service of Process.......................31
Section 8.10.   Waiver of Jury Trial ...................................................................32
Section 8.11.   Headings ....................................................................................32
Section 8.12.   Interest Rate Limitation .............................................................32
Section 8.13.   USA Patriot Act .........................................................................32
Section 8.14.   Language....................................................................................32
Section 8.15.   Waiver of Immunity...................................................................33

EXHIBITS:
Exhibit A       Promissory Note

ii

Exhibit B          Form of Request for Advance
Exhibit C          Trust Agreement



iii

PREPA_RSA0028089

**TRADE FINANCE FACILITY AGREEMENT** dated July 20, 2012, between **PUERTO RICO ELECTRIC POWER AUTHORITY** and **CITIBANK, N.A.**

The parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CONSTRUCTION

**Section 1.01. Defined Terms**. As used in this Agreement, the following terms have the meanings specified below:

"<u>Act</u>" means Act No. 83 of the Legislature of Puerto Rico, approved on May 2, 1991, as amended.

"<u>Advance Due Date</u>" means, with respect to a particular Advance, the 270th day after the date upon which the Advance is funded.

"<u>Advances</u>" means the amounts to be disbursed by the Bank from time to time to the Borrower pursuant to this Agreement.

"<u>Adjustment Event</u>" has the meaning assigned to such term in Section 2.08(a).

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agreement</u>" means this Trade Finance Facility Agreement.



"<u>Aggregate Advances</u>" means, on any day, the total amount of Advances made hereunder and not repaid.

"<u>Applicable Spread</u>" means an amount equal to +170 basis points; provided that the Applicable Spread shall be increased by the number of basis points set forth in the table below, effective as of the date a downgrade is made by either Moody's or S&P to the long term ratings for Senior Debt, as follows:

| Rating | | | | Spread |
|--------|--|--|--|--------|
| Moody's | Baa2 | S&P | BBB | +20 basis points |
| Moody's | Baa3 | S&P | BBB- | +45 basis points |
| Moody's | Below Baa3 | S&P | Below BBB | +70 basis points |

"<u>Available Amount</u>" means, on any day, an amount equal to the Facility Amount outstanding on such day minus the Aggregate Advances outstanding on such day.

Confidential

"Availability Period" means the period from and including the Effective Date to but excluding the earliest of (i) the date which is 270 days after the Closing Date, as such date may be extended, on and subject to the terms of Section 2.07 hereof, (ii) the Maturity Date and (iii) the date of termination of the Facility.

"Bank" means Citibank, N.A., a national banking association organized under the laws of the United States and authorized to do business in the Commonwealth.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Puerto Rico Electric Power Authority, a public corporation and government instrumentality of the Commonwealth.

"Business Day" a day of the year (i) other than a Saturday or Sunday or a general banking holiday in San Juan, Puerto Rico, and (ii) on which dealings are carried on in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Change in Law" means (i) any change in federal, Commonwealth or state law or any changes in regulations or other pronouncements or interpretations by federal, Commonwealth or state agencies, (ii) the enactment, introduction or proposal of any federal legislation, (iii) the enactment, introduction or proposal of any law, rule or regulation of any other governmental body, department or agency (federal, Commonwealth or state), or (iv) the handing down of a judgment, ruling or order issued by any court or administrative body, which in any such case would prohibit (or have the retroactive effect of prohibiting, if enacted, adopted, passed or finalized) any of the Bank from making the Advances or would make the Borrower's execution or performance of this Agreement or use of the proceeds of any Advances illegal or have the retroactive effect of making such use illegal.

"Charges" has the meaning set forth in Section 8.12.

"Closing Date" means July 20, 2012.

"Commonwealth" means the Commonwealth of Puerto Rico.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Current Expenses" has the meaning given such term in the Trust Agreement.

2

PREPA_RSA0028091

"Date of Taxability" means the date set forth in any Final Determination as the date on which interest on the Advances is deemed to be includable in gross income of the recipients thereof for Federal income tax purposes.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means a rate of interest equal to the sum of the following (i) three percent (3%) above the LIBOR Floating Pool Rate and (ii) the Applicable Spread.

"Determination of Taxability" means any determination, decision, decree or advisement by the Commissioner of the Internal Revenue Service and District Director of the Internal Revenue Service or any court of competent jurisdiction, or an opinion obtained by the Bank, of counsel qualified in such matters, that an Event of Taxability has occurred. A Determination of Taxability also shall be deemed to have occurred on the first to occur of the following:

> (a)      the date when the Borrower provides any notice or files any statement, supplemental statement, or other tax schedule, return or document which discloses that an Event of Taxability has occurred; or

> (b)      the effective date of any federal legislation enacted or federal rule or regulation promulgated after the Closing Date that causes an Event of Taxability.

"dollars" or "$" means lawful currency of the United States of America.

"Effective Date" means the Closing Date.



"Environmental Laws" means any federal, state (including, without limitation, the Commonwealth of Puerto Rico), local, national, regional or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

3

PREPA_RSA0028092

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Article VII.

"Event of Taxability" means with respect to the Advances: (i)(A) the application of the proceeds of such Advances in such manner that such Advances become "arbitrage bonds" within the meaning of Code Sections 103(b)(2) and 148, with the result that interest on such Advances is or becomes includable in gross income of the recipients thereof for Federal income tax purposes or (B) if as the result of any act, failure to act or use of the proceeds of such Advances or any misrepresentation or inaccuracy in any of the representations, warranties or covenants contained in this Agreement or in any of the Facility Documents by the Borrower or the enactment of any federal legislation or the promulgation of any federal rule or regulation after the Closing Date, the interest on such Advances is or becomes includable in gross income of the recipients thereof for Federal income tax purposes; (ii) any portion of the interest on the Advances paid or payable by the Borrower is (A) not excludable from the gross income of the Bank for Commonwealth income tax purposes or (B) subject to the payment of municipal license taxes or sales and use taxes imposed by the Commonwealth or any of its municipalities; or (C) the Note ceases to be exempt in whole or in part from Commonwealth property taxes.

"Excluded Taxes" means, with respect to the Bank, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in which its applicable lending office is located and (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located.

"Existing Facility" means the Trade Finance Facility Agreement between the Bank and the Authority, dated July 20, 2011.

"Facility" means the undertaking by the Bank to make Advances under this Agreement on an uncommitted revolving basis in the Facility Amount.

"Facility Amount" means $250,000,000, as such amount may be reduced, on and subject to the terms of Section 2.04.

"Facility Documents" means this Agreement, the Note, the Resolution, the GDB Resolution and all documents, instruments and agreements delivered in connection with the foregoing, as amended or otherwise modified from time to time.

"Final Determination" means the entry of any decree or judgment by a court of competent jurisdiction, or the taking of any official action by the Internal Revenue Service or the Department of the Treasury of the Commonwealth or any Municipality of the Commonwealth, that is final under applicable procedural law and has the effect of a determination that an Event of Taxability has occurred.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds

4

PREPA_RSA0028093

transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Bank from three Federal funds brokers of recognized standing selected by it.

"Financial Officers" means the Executive Director, Chief Financial Officer, Treasurer and Assistant Treasurer of the Borrower.

"Foreign Bank" means any bank that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each state thereof, the District of Columbia and the Commonwealth shall be deemed to constitute a single jurisdiction.

"GAAP" means generally accepted accounting principles in the United States of America, including accounting rules prescribed by the Governmental Accounting Standards Board.

"GDB Resolution" means Resolution EC-2012-63, adopted on July 9, 2012 by the Government Development Bank for Puerto Rico, authorizing this Agreement, the Facility and the Advances and providing, among other things, that obligations of the Borrower with respect to the Facility constitute Current Expenses under the Trust Agreement.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, territorial or local, including the government of the Commonwealth, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government but excluding the Borrower, having jurisdiction over the Borrower, any Subsidiary thereof or the transactions contemplated in this Agreement or the other Facility Documents.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum

5

PREPA_RSA0028094

distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedge Agreements" means any rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, total return swap, credit default swap or any other similar transaction (including any option with respect to any of these transactions) and any other agreement or option involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor, and (k) all obligations of such Person in respect of Hedge Agreements.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Interest Accrual Period" means the period commencing on the first date of each Advance and ending on the earlier of (i) the last calendar day immediately preceding the next succeeding Interest Payment Date, (ii) the Maturity Date and (iii) any date on which the principal of the Advance is paid by reason of prepayment, acceleration or otherwise.

"Interest Payment Date" means (a) the second Business Day of each calendar month, commencing August 2, 2012, (b) the Maturity Date, and (c) any date on which the principal of the Advances is paid by reason of prepayment, acceleration or otherwise.

6

PREPA_RSA0028095

"Investment Obligations" shall have the meaning assigned to that term in the Trust Agreement.

"Legal Proceeding" means any action brought by the Borrower contesting the basis of an asserted Determination of Taxability, either directly or in the name of the Bank, up to and including the conclusion of any appellate review.

"LIBOR Floating Pool Rate" means the average cost of the 30-Day LIBOR Rate during the month immediately preceding the corresponding Interest Payment Date.

"LIBOR Rate" means, on any day (the "Calculation Date"), an interest rate per annum equal to the offered quotation for the rate of interest (expressed out to the fifth decimal place and truncated thereafter) on 30 day deposits of U.S. Dollars in the London interbank market, (the "LIBOR") as published by the British Bankers Association at approximately 11:00 a.m. (London time) on such Calculation Date, as published by nationally recognized financial information services such as Moneyline Telerate, Bloomberg LP and Reuters. The LIBOR Rate for any Calculation Date shall be determined by the Bank. If, as of such Calculation Date, the LIBOR Rate cannot be ascertained on the foregoing basis, such rate shall be the Bank's offered quotation to leading banks in the LIBOR for deposits of U.S. dollars for a period equal to 30 days at 11:00 A.M. (London time) on such Calculation Date.

"LIBOR Rate Reserve Percentage" of the Bank for an interest period for an Advance means the reserve percentage applicable during such interest period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such interest period during which any such percentage shall be so applicable) under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for the Bank with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such interest period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and the Subsidiaries taken as a whole, (b) the ability of the Borrower to perform any of its obligations under this Agreement or the other Facility Documents or (c) the rights of or benefits available to the Bank under this Agreement or the other Facility Documents, to the extent applicable.

"Material Adverse Change" means any material adverse change in the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower or of the Borrower and its Subsidiaries taken as a whole.

7

PREPA_RSA0028096

"Material Indebtedness" means Indebtedness (other than the Advances), or obligations in respect of one or more Hedge Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $10,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Hedge Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Hedge Agreement were terminated at such time.

"Maturity Date" means January 10, 2014, as such date may be extended, on and subject to the terms of Section 2.07.

"Maximum Rate" means the lesser of (i) 12% per annum and (ii) the highest lawful rate permitted by the laws of the Commonwealth.

"Moody's" means Moody's Investors Service, Inc.

"Note" means a promissory note substantially in the form of Exhibit A.

"Obligations" has the meaning set forth in Exhibit A.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or the Note.

"Operating Account" means Account #0400015155 established by the Borrower with the Bank exclusively for use in connection with this Agreement.



"Participant" has the meaning set forth in Section 8.04(b)(i).

"Permitted Liens" means:

> (a)  Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.04;

> (b)  carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

> (c)  pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

> (d)  deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

8

PREPA_RSA0028097

(e)      judgment liens in respect of judgments that do not constitute an Event of Default under clause (l) of Article VII; and

(f)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

provided that the term "Permitted Liens" shall not include any Lien securing Indebtedness.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Request for Advance" means a request by the Borrower for an Advance in accordance with Section 2.03.

"Requisition Invoices" means invoices, purchase orders or other evidence, satisfactory in form and substance to the Bank, of payments due in respect of the purchase by the Borrower of power, fuel oil or liquefied natural gas (LNG) and for payments due to vendors or unaffiliated third parties for other current operating expenses, all constituting Current Expenses under the Trust Agreement.

"Resolution" means, collectively, Resolution No. 3936 of the Borrower, approved on June 29, 2012, and a Certificate of Determination dated the date hereof, signed by the Executive Director of the Authority, authorizing the terms and conditions of this Agreement, the Facility and the Advances and providing, among other things, that the Facility and the Advances shall constitute Current Expenses under the Trust Agreement.

"Senior Debt" means the bonds of the Borrower issued under the Trust Agreement that are not guaranteed by any other Person or subject to any other credit enhancement; however, if all bonds outstanding under the Trust Agreement are guaranteed by another Person or otherwise subject to credit enhancement, the rating of such bonds will be considered without regard to such guarantee or credit enhancement, as the case may be.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the

9

equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Transactions" means the execution, delivery and performance of this Agreement and the other Facility Documents, the adoption of the Resolution and the GDB Resolution, the making of the Advances and the use of the proceeds thereof.

"Trust Agreement" means the Trust Agreement, dated as of January 1, 1974, as amended, by and between the Borrower and U.S. Bank National Association, as successor trustee, a copy of which is attached hereto as Exhibit C.

**Section 1.02. Terms Generally**. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections and Exhibits shall be construed to refer to Articles and Sections of, and Exhibits to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.



**Section 1.03. Accounting Terms; GAAP**. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that if the Borrower notifies the Bank that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Bank notifies the Borrower that the Bank is requesting an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

10

PREPA_RSA0028099

## ARTICLE II

## THE ADVANCES

**Section 2.01. Facility**.  Subject to the terms and conditions set forth herein, including satisfaction of the conditions set forth in Article IV, the Bank may make Advances to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not exceed the Facility Amount.  Within the foregoing limit and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Advances.

**Section 2.02. Advances**.  (a) The Bank may, at its sole discretion, on the terms and conditions hereinafter set forth, make Advances to the Borrower on a revolving basis from time to time.  Each Advance shall be in an integral multiple of $1,000,000, and the minimum amount of an Advance shall be $1,000,000. Each Advance shall be for a term of two hundred seventy (270) days, subject to the prepayment terms of Section 2.06.

(b)       Borrower expressly acknowledges and understands that the credit facility described herein is uncommitted, and, accordingly, the Bank has no obligation or commitment to disburse funds thereunder.  If the Bank determines, in its sole discretion, not to disburse funds under this Agreement, the Bank will provide a written notice to the Borrower of its decision.

**Section 2.03. Funding of Advances**.  (a) Each Advance shall be made on notice given by the Borrower to the Bank no later than 12:00 P.M. (Puerto Rico time) one (1) Business Day before the date of the proposed Advance so requested.  The "Request for Advance" shall be made by facsimile with a document in substantially the form of Exhibit B hereto, confirmed immediately by telephone. Upon fulfillment of the applicable conditions set forth in Article IV, the Bank will make the funds available to the Borrower by funding the Borrower's Operating Account held with the Bank.  Each such written Request for Advance shall (i) include the following information:



(A)       the specific amount of the requested Advance and the specific purpose to which the advanced funds will be applied;

(B)       the date of such Advance, which shall be a Business Day, not less than 270 days prior to the Maturity Date; and

(ii)       be accompanied by copies of unpaid Requisition Invoices the amounts of which are, in the aggregate, at least equal to the amount requested in the Advance.

Funding of an Advance will only be made after the Bank has completed reconciliation of the Requisition Invoices as described in Section 4.02(a).

(b)       Each Request for Advance shall be irrevocable and binding on the Borrower.  The Borrower shall indemnify the Bank against any loss, cost or expense incurred by the Bank as a result of any failure to fulfill, on or before the date specified in the Request for Advance, the applicable conditions set forth in Article IV, including,

11

PREPA_RSA0028100

without limitation, any loss, cost or expense incurred by the reason of the liquidation or reemployment of deposits or other funds acquired by the Bank to fund the Advance when the Advance, as a result of such failure, is not made on such date.

**Section 2.04. Termination and Reduction of Facility Amount**. (a) Unless previously terminated, the Facility shall terminate on the Maturity Date and the Borrower shall pay on the Maturity Date the amount necessary to repay in full all Aggregate Advances and any other unpaid amounts due hereunder.

(b)      The Borrower may at any time terminate, or from time to time reduce, the Facility Amount; provided that each reduction of the Facility Amount shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000.

(c)      The Borrower shall notify the Bank in writing of any election to terminate or reduce the Facility Amount under paragraph (b) of this Section at least five Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Each written notice delivered by the Borrower pursuant to this Section shall be irrevocable.

(d)      If (i) an Event of Default or Final Determination has occurred, (ii) the long term rating of the Senior Debt is reduced below Baa3 by Moody's or below BBB- by S&P, or any of the ratings of the Senior Debt is withdrawn or suspended for any reason or (iii) any of the conditions set forth in Section 5.02 hereof shall have occurred, the Facility Amount shall be automatically and immediately reduced to zero and the Availability Period shall thereupon be terminated.  The Bank shall give notice to the Borrower of such reduction and termination; however, failure to give such notice shall in no way affect the reduction of the Facility Amount and the termination of the Availability Period.

**Section 2.05. Repayment of Advances; Evidence of Debt**.  (a) The Borrower hereby unconditionally promises to pay to the Bank the then unpaid principal amount of each Advance, together with all accrued and unpaid interest thereon, on the Advance Due Date for such Advance and to pay in full the Aggregate Advances, together with all accrued and unpaid interest thereon, on the Maturity Date.

(b)      The Bank shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Bank resulting from each Advance made by the Bank, including the amounts of principal and interest payable and paid to the Bank from time to time hereunder.

(c)      The Bank shall maintain accounts in which it shall record (i) the amount of each Advance made hereunder and (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower hereunder.

(d)      The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Bank to maintain such accounts or any error therein shall not in any manner affect the obligation of the

12

                                                      PREPA_RSA0028101

Borrower to repay the Advances in accordance with the terms of this Agreement and, in the event of any discrepancy between such entries, the entries in the accounts maintained by the Bank shall govern.

(e)     The obligations of the Borrower to the Bank will be evidenced by the Note.

**Section 2.06. Prepayment of Advances**.  (a) The Borrower shall have the right at any time and from time to time to prepay any Advance in whole or in part, without prepayment penalty, subject to prior notice in accordance with paragraph (b) of this Section.

(b)     The Borrower shall notify the Bank by telephone (confirmed by telecopy) of any prepayment hereunder not later than 11:00 a.m., Puerto Rico time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Advance or portion thereof to be prepaid.

(c)     All prepayments under this Section 2.06 shall be made together with accrued interest as required by Section 2.08 to the date of such prepayment on the principal amount paid.

(d)     All prepayments under this Section 2.06 shall be made without prepayment penalty or premium, without prejudice to the obligation of the Borrower to pay the amounts required to be paid to the Bank.

**Section 2.07. Extension.**  The Bank shall conduct and complete not less than 210 nor more than 240 days after the Effective Date, an internal review, on and subject to its then prevailing standards, practices and guidelines, of the general financial condition of the Borrower and as a result of such review may, in its sole and absolute discretion, determine to extend the Availability Period for an additional 270 days and the Maturity Date for an additional 270 days. The Bank may condition any extension of the Availability Period and the Maturity Period as aforesaid on receipt by the Bank of such documents, certificates, resolutions and opinions of counsel (all in form and substance acceptable to the Bank and its counsel) as the Bank deems necessary in connection with any such extension. If the Bank determines to extend the Availability Period and the Maturity Date as aforesaid, it shall provide written notice of such extension to the Borrower within ten (10) Business Days following the 240th day after the Effective Date.  The Borrower expressly acknowledges and agrees that the Bank has no obligation to extend the Availability Period or the Maturity Date and may determine not to do so for any or no reason.

**Section 2.08. Interest**.  (a) The Borrower shall pay interest on the unpaid principal amount of each Advance from the date thereof until such principal amount shall by paid in full, at a rate per annum equal to (i) the sum of LIBOR Floating Pool Rate plus the Applicable Spread or (ii) if an Event of Default shall have occurred and be continuing, the Default Rate. Any adjustment to the Applicable Spread due to a change in any rating of the Senior Debt by Moody's or by S&P (an "Adjustment Event") shall be made by the Bank, as soon as practicable after receipt by the Bank of (i) notice from the Borrower provided pursuant to Section 5.02 hereof or (ii) other evidence satisfactory to the Bank confirming that an Adjustment Event has

13

transpired which gives rise to an adjustment to the Applicable Spread. Any such adjustment to the Applicable Spread shall be effective as of the date of the occurrence of the Adjustment Event.

      (b)    Interest accrued on a monthly basis on each Advance shall be payable on each Interest Payment Date.

      (c)    On the first Business Day of each month, the Bank shall notify the Borrower in writing or by readily accessible electronic means of the total amount of interest payable on the Advances on the Interest Payment Date immediately after such notification date.

      (d)    In the event of any repayment or prepayment of any Advance, accrued interest on the principal amount repaid or prepaid shall be due and payable on the date of such repayment or prepayment.

      (e)    All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

      (f)    Upon a Final Determination, the Bank shall calculate (i) the amount of interest which accrued on all Advances from the Date of Taxability to the date of the Final Determination and (ii) the amount of interest which would have accrued on all Advances from the Date of Taxability to the date of the Final Determination if the interest rate during such period of calculation had been the sum of the LIBOR Rate for each such Interest Period for such Advance plus an amount equal to any additional costs incurred by the Bank due to the Final Determination so that net of such additional costs the Bank receives the amount it would have received had no Final Determination been made. Upon such calculation, the Bank shall make demand on the Borrower for amount equal to an amount by which the amount described in clause (ii) exceeds the amount described in clause (i). The Borrower shall pay to the Bank as additional interest on the Advances the amount so demanded upon receipt of such demand.



      (g)    The calculation of the applicable LIBOR Rate, LIBOR Floating Pool Rate, Default Rate and the other calculations required in this Agreement, as determined by the Bank, shall be conclusive, absent manifest error.

      **Section 2.09.  Taxes**.  (a) Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Bank receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

14

(b)      In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      [To the extent permitted by law, ]the Borrower shall indemnify the Bank, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Bank, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the Bank shall be conclusive absent manifest error.

(d)      As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Bank the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Bank.

(e)      Any Foreign Bank that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate.



(f)      If the Bank determines, in its sole discretion, that it has received a refund or credit of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.09, it shall pay to the Borrower such refund or an amount equal to such credit (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.09 with respect to the Taxes or Other Taxes giving rise to such refund or credit), net of all reasonable out-of-pocket expenses relating to such refund or credit of the Bank and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower agrees, upon the request of the Bank, to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Bank in the event the Bank is required to repay such refund to such Governmental Authority.  This Section shall not be construed to require the Bank to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

**Section 2.10.  Payments Generally**.  (a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or amounts payable under Section 2.09, or otherwise) prior to 12:00 noon, Puerto Rico time, on the date when

Confidential                                                                                                PREPA_RSA0028104

due, in immediately available funds, without set off or counterclaim. Any amount due hereunder shall be made to the Bank's account at Citibank, New York, ABA #021-000-089 for Credit to Citibank Puerto Rico Account Number 10991506, Attn: Treasury Operations Unit - Miguel Lebrón & Melissa Bennett and referencing: "PREPA Loan." Any payment received by the Bank after 12:00 noon, Puerto Rico time, shall be deemed to have been received by the Bank on the next Business Day. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, such debit or payment, as applicable, shall include interest payable for the period of such extension.  All payments hereunder shall be made in dollars; and (b) If at any time insufficient funds are received by and available to the Bank to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder and (ii) second, towards payment of principal then due hereunder.

**Section 2.11. Mitigation Obligations**.  (a) If the Borrower is required to pay any additional amount to the Bank or any Governmental Authority for the account of the Bank pursuant to Section 2.09, then the Bank shall use reasonable efforts to designate a different lending office for funding or booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates if, in the judgment of such Bank, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.09 in the future and (ii) would not subject the Bank to any unreimbursed cost or expense and would not otherwise be disadvantageous to the Bank.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by the Bank in connection with any such designation or assignment.



(b)      If the Borrower is required to pay any additional amount to the Bank or any Governmental Authority for the account of the Bank pursuant to Section 2.09, or if the Bank defaults in its obligation to fund Advances hereunder, then the Borrower may, at its sole expense and effort, upon notice to the Bank, require the Bank to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 8.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations; provided that (i) the Bank shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (ii) in the case of any such assignment resulting from a claim for compensation under Section 2.09 or payments required to be made pursuant to Section 2.09, such assignment will result in a reduction in such compensation or payments.  The Bank shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by the Bank or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**Section 2.12. Note as Current Expenses.**  The Bank and the Borrower acknowledge and agree that all obligations hereunder, as evidenced by the Note, constitute Current Expenses under the Trust Agreement, which Current Expenses are subject to the terms and conditions of the Trust Agreement relating to the priority of payments.

16

**Section 2.13.   Change in Circumstances**.

(a)     If due to any Change in Law there shall be (i) any increase in the cost to the Bank of making or maintaining the Advances; (ii) any increase in the amount of capital required or maintained, or expected to be maintained, by the Bank and the amount of such capital is increased by or based upon the existence of its Advances hereunder; or (iii) any decrease in the effective rate of return on the capital of the Bank of making or maintaining the Advances (each an "Event," collectively, the "Events"), excluding any Events resulting from changes in the basis of taxation of overall net income or overall gross income affecting the Bank (the determination of any and all of the preceding Events being at the Bank's sole and absolute discretion with respect to the Advances), then the Bank shall provide the Borrower with a written notice that shall (1) describe in reasonable detail the Event together with the approximate date of the effectiveness thereof, (2) set forth the cost to the Bank in respect of such Event and (3) calculate such amount as the Lender determines in its sole and absolute discretion is necessary to be compensated for the cost of such Event. Such notice or notices may be sent by the Bank in respect of an Event or Events from time to time. The Borrower shall pay directly to the Bank from time to time upon the Bank's written demand, the amount sufficient to compensate the Bank for the cost of such Events.

(b)     If any Change in Law shall make it unlawful for the Bank to continue to maintain the Facility Amount, or for the Borrower to comply with its obligations in respect of Advances, the Borrower shall forthwith (or within the period allowed for such payment, if any, prior to the date when such unlawfulness becomes effective), upon the Bank's demand, prepay the outstanding Advances in full, together with accrued interest thereon. The Bank shall submit to the Borrower a written statement setting forth the basis for determining such amounts.



Any notice pursuant to this Section 2.13, including the certifications made therein, shall be conclusive and binding on the Borrower absent manifest error.

(c)     The Borrower shall pay to the Bank, so long as the Bank shall be required under regulations of the Board of Governors of the Federal Reserve System to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, additional interest on the unpaid principal amount of each Advance, from the date of such Advance until such principal amount is paid in full, at an interest rate per annum equal at all times to the remainder obtained by subtracting (i) the LIBOR Rate for such interest period for such Advance from (ii) the rate obtained by dividing such LIBOR Rate by a percentage equal to 100% minus the LIBOR Rate Reserve Percentage of the Bank for such interest period, payable on each date on which interest is payable on such Advance.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Bank that:

**Section 3.01. Organization; Powers**. The Borrower is a public corporation and governmental instrumentality of the Commonwealth, duly constituted and existing under the

17

PREPA_RSA0028106

laws of the Commonwealth. Each of the Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and in the Commonwealth, if doing business in such territory, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

**Section 3.02. Authorization; Enforceability**. The Transactions are within the Borrower's powers and have been duly authorized by all necessary corporate action on the part of the Borrower. The Facility Documents to which the Borrower is a party and the Trust Agreement have been duly executed and delivered by the Borrower and constitute legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The Facility and the Advances made thereunder will be treated as Current Expenses under the Trust Agreement.

**Section 3.03. Governmental Approvals; No Conflicts**. The Transactions (a) do not require any consent or approval of, registration or filing, or any other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect and (ii) the filing of this Agreement with the Office of the Comptroller of the Commonwealth of Puerto Rico, as required by applicable law, which filing will be made by the Borrower and evidenced by delivery to the Bank of a certificate in form and substance acceptable to the Bank within five (5) days of the Closing Date, (b) will not violate any law or regulation applicable to the Borrower or the organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority applicable to the Borrower, (c) will  not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries except as provided in the Trust Agreement.

**Section 3.04. Financial Condition; No Material Adverse Change**. (a) The Borrower has heretofore furnished to the Bank (i) its consolidated balance sheet and statements of revenues, expenses and changes in net assets and cash flows as of and for the fiscal year ended June 30, 2011, reported on by Ernst & Young LLP, independent public accountants, and (ii) its balance sheet and statements of revenues, expenses and changes in net assets as of and for each of the first three (3) fiscal quarters during the fiscal year ending June 30, 2012, certified by its Chief Financial Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and, as applicable, cash flows of the Borrower and, as applicable, its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b) Since the last date of the period covered by the most recent audited financial statements delivered to the Bank, there has been no Material Adverse Change.

18

PREPA_RSA0028107

**Section 3.05.  Properties**.  Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes and except as permitted pursuant to Section 6.01.

**Section 3.06.  Litigation and Environmental Matters**.  (a) There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement or the Transactions.

(b)    Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect and, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

**Section 3.07.  Compliance with Laws and Agreements**.  Each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.



**Section 3.08.  Status**.  Neither the Borrower nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or a public utility holding company under the Public Utility Holding Company Act of 2005.

**Section 3.09.  Taxes**.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

**Section 3.10.  Disclosure**.  The Borrower has disclosed to the Bank all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the other reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Bank in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the

19

PREPA_RSA0028108

circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**Section 3.11. Resolution; Trust Agreement**. The Resolution has been duly adopted by the Borrower and proceedings related thereto have been validly and legally taken. The Facility and the Note have been duly and validly authorized and are in accordance with law. The Facility and the Note are valid and binding obligations of the Borrower, payable as Current Expenses from the Puerto Rico Electric Power Authority General Fund established under the Trust Agreement. Attached hereto as Exhibit C is a true correct copy of the Trust Agreement.

**Section 3.12. Repayment**. If the Borrower incurs or issues Indebtedness for the purpose of repaying the Advances and other obligations hereunder, such incurrence or issuance of Indebtedness (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority (other than the Borrower), except such as have been obtained or made and are in full force and effect other than (i) the approval of the Government Development Bank for Puerto Rico which is not expected to be unreasonably withheld or delayed, and (ii) if applicable, the filing of Form 8038-G with the Internal Revenue Service, (b) will not violate any law or regulation applicable to the Borrower or the organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority applicable to the Borrower, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries except as permitted in Section 6.01.

**Section 3.13. No Immunity.** With respect to actions, obligations or contracts which constitute proprietary functions, the Borrower is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues (irrespective of their use or intended use) from (i) suit, (ii) relief by way of injunction, order for specific performance or for recovery of property, or (iii) execution of enforcement of any judgment to which it or its revenues might otherwise be made subject in any suit, action or proceedings relating to this Agreement, the Trust Agreement, to the extent applicable, or the other Facility Documents brought validly in the courts of any jurisdiction and no such immunity (whether claimed or not claimed) may be attributed to the Borrower or its revenues.

**Section 3.14. Tax-Exemption**.    All payments of principal and interest under this Agreement and the Note are exempt from all Commonwealth (including any instrumentality or political subdivision of the Commonwealth) taxes and assessments of any kind or nature, including, without limitation, income taxes, municipal license taxes (patents) and withholding obligations. The Note is exempt from all Commonwealth (including any instrumentality or political subdivision of the Commonwealth) property taxes.

All representations and warranties made in this Agreement and the other Facility Documents by the Borrower shall be deemed to have been relied upon by the Bank notwithstanding any investigation heretofore or hereafter made by the Bank.

Confidential                                                                                                    PREPA_RSA0028109

# ARTICLE IV

## CONDITIONS PRECEDENT

**Section 4.01. Effective Date**. If the Bank has, in its sole discretion, determined to disburse funds under this Agreement, no funds will be available for Advances hereunder until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)     The Bank (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement and each other Facility Document signed on behalf of such party or (ii) written evidence satisfactory to the Bank (which may include telecopy transmission or electronic scan of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and each other Facility Document to which such party is a party.

(b)     The Bank shall have received a favorable written opinion (addressed to the Bank and dated the Effective Date) of (i) the general counsel to the Borrower and (ii) Nixon Peabody LLP, special counsel to the Borrower ("Special Counsel"), addressing such matters that may be requested by the Bank, including, but not limited to an opinion that all payments to be made under the Facility and the Note issued hereunder shall constitute "Current Expenses" under the Trust Agreement. Each such opinion shall be in form and substance satisfactory to the Bank.

(c)     The Bank shall have received such documents and certificates as the Bank or its counsel may reasonably request relating to the organization and existence of the Borrower, the authorization of the Transactions (including but not limited to the adoption of the Resolution and the GDB Resolution) and any other legal matters relating to the Borrower, this Agreement or the Transactions, all in form and substance satisfactory to the Bank and its counsel.



(d)     The Bank shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming, as of the Effective Date (i) compliance with the conditions set forth in paragraphs (b), (c) and (d) of Section 4.02 and (ii) the long term ratings in effect for the Senior Debt by Moody's and S&P is no less than Baa1 and BBB+, respectively.

(e)     The Bank shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(f)     The Bank shall have received evidence of filing of this Agreement with the Office of the Comptroller of the Commonwealth, pursuant to Act No. 18 of the Legislative Assembly of Puerto Rico, approved on October 30, 1979, as amended by Act No. 127 of May 31, 2004.

21

PREPA_RSA0028110

(g)      The Bank shall have received full payment of all amounts due and owing under the Existing Facility.

(h)      The Bank shall be satisfied that as of the Effective Date there shall not have been a Material Adverse Change.

Notwithstanding the foregoing, the obligations of the Bank to make Advances hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 8.02) at or prior to 5:00 p.m., Puerto Rico time, on July 20, 2012 (and, in the event such conditions are not so satisfied or waived, the Facility shall terminate at such time).

**Section 4.02.  Conditions Precedent to Each Advance**.  The availability of an Advance is subject to the satisfaction of the following additional conditions:

(a)      The Borrower shall have notified the Bank by 12:00 P.M. (Puerto Rico time) at least one (1) Business Day in advance of the date of any Advance by providing to the Bank a properly completed Request for Advance. Simultaneously with submitting the Request for Advance, the Borrower shall also provide the Bank with the Requisition Invoices. No later than the Business Day on which the Advance is to be funded, the Borrower will enter payment instructions (the "Payment Instructions") into the CITIDIRECT system directing the disbursement of funds from the Borrower's Operating Account.  Funding of the Advance will not be made until the Bank has reconciled the Payment Instructions with the Request for Advance and the accompanying Requisition Invoices. If Payment Instructions are entered by 11:00 a.m. Puerto Rico time, funding of the Advance will be made on the same Business Day.  If Payment Instructions are entered after 11:00 a.m. Puerto Rico time, funding of the Advance will be made on the next Business Day.



(b)      The representations and warranties of the Borrower set forth in this Agreement shall be true and correct on and as of the date of such Advance, except to the extent such representations and warranties expressly relate to an earlier date in which case they shall have been true and correct on and as of such earlier date.   For the avoidance of doubt, the representations and warranties contained in Section 3.04(b) shall relate to the most recent audited financial statements delivered to the Bank immediately prior to such Advance.

(c)      At the time of and immediately after giving effect to such Advance, no Default under this Agreement or any default, event of default or event which, with notice or lapse of time or both, would constitute a default or an event of default under any other Facility Document shall have occurred and be continuing.

(d)      At the time of and immediately after giving effect to such Advance, the Senior Debt shall not be rated less than "BBB-"by S&P or "Baa3" by Moody's.

(e)      All actions under the Act and under other applicable law which, in the opinion of Special Counsel (or such other special counsel as may be appointed by the Borrower and accepted by the Bank), shall be necessary in connection with the

22

PREPA_RSA0028111

transactions contemplated hereby and by the other Facility Documents, shall have been duly taken and shall be in full force and effect.

(f)     Between the Closing Date and the date of such Advance, (i) there shall not have been a Determination of Taxability or Final Determination, (ii) there is no Legal Proceeding pending, (iii) there shall not have been a Change in Law which would prohibit the Bank from lawfully making its Advance or would make the Borrower's execution of this Agreement or use of the proceeds of any Advances illegal or have the retroactive effect of making such use illegal and (iv) there shall not have been an event which in the judgment of the Bank constitutes a Material Adverse Change.

The acceptance of each Advance by the Borrower shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (b), (c), (d), (e) and (f) of this Section.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Facility has expired or been terminated and the principal of and interest on the Advances and all fees payable hereunder have been paid in full, the Borrower covenants and agrees with the Bank that:

**Section 5.01. Financial Statements; Ratings Change and Other Information**.   The Borrower will furnish to the Bank:

(a)     within 180 days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of revenues, expenses and changes in net assets and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Ernst & Young LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;



(b)     (i) within 60 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its balance sheet and related statements of revenues, expenses and changes in net assets as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) within thirty days after the end of each calendar month, its monthly report to its Governing Board for such month;

Confidential

PREPA_RSA0028112

(c)       concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth in reasonable detail the calculations in Section 5.09 for the most recent four fiscal quarters, and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)       concurrently with any delivery of financial statements under paragraph (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(e)       promptly after the same become publicly available, copies of its annual report, its annual budget, and other reports, statements and other materials distributed by the Borrower to its investors, bondholders or stakeholders generally;

(f)       promptly after Moody's or S&P shall have announced a change in the rating established or deemed to have been established for the Senior Debt, written notice of such rating change; and

(g)       promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the Bank may reasonably request.

**Section 5.02. Notices of Material Events; Adjustment Events; Legal Proceedings and Final Determination**.  The Borrower will furnish to the Bank prompt notice, either in writing or in an electronic form of communication acceptable to the Bank, within 10 days of the Borrower's actual knowledge of any the following:

(a)       the occurrence of any Default or Adjustment Event;

(b)       the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)       the commencement of any Legal Proceeding or the receipt of any Final Determination; and

(d)       any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

24

PREPA_RSA0028113

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**Section 5.03. Existence; Conduct of Business**.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.02.

**Section 5.04. Payment of Obligations**.  The Borrower will, and will cause each of its Subsidiaries to, pay its obligations, including tax liabilities, that, if not paid, could result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.05. Maintenance of Properties; Insurance**.  The Borrower will, and will cause each of its Subsidiaries to, (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain, with financially sound and reputable insurance companies, insurance or self-insure in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

**Section 5.06. Books and Records; Inspection Rights**.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Bank, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

**Section 5.07. Compliance with Laws**.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower will comply with its obligations under the Trust Agreement.

**Section 5.08. Use of Proceeds**.  The proceeds of the Advances will be used exclusively to fund purchases of power, fuel oil and liquefied natural gas (LNG) and for payments due to vendors or other unaffiliated third parties for other current operating expenses, all constituting Current Expenses under the Trust Agreement and the Borrower shall deliver to the Bank Requisition Invoices as a condition to each Advance.  No part of the proceeds of any Advance

Confidential

PREPA_RSA0028114

will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

**Section 5.09.  Financial Covenant.**  The Borrower shall at all times fix, charge and collect reasonable rates and charges for use of the services and facilities furnished by the System (as defined in the Trust Agreement) so as to generate Revenues (as defined in the Trust Agreement) that will at all times be sufficient (i) to comply with Section 502 of the Trust Agreement and (ii) to pay an amount equal to at least 100% of the principal of and interest on Subordinate Obligations for the next Fiscal Year (as defined in the Trust Agreement).

**Section 5.10.  Tax Exempt Status.**  The Borrower covenants for the benefit of the Bank that the Borrower shall not knowingly direct moneys on deposit in any fund or account in connection with the Advances (whether or not such moneys were derived from the proceeds of the Advances or from any other sources) be used in a manner which will cause the Advances to be classified as "arbitrage bonds" within the meaning of Section 148 of the Code. Any officer of the Borrower (including its Executive Director, the Director of Finance and the Treasurer) having responsibility with respect to Advances is authorized and directed, alone or in conjunction with any other officer, employee or consultant of the Borrower, to give an appropriate certificate on behalf of the Borrower, for inclusion in the transcript of proceedings for the Advances, setting forth the facts, estimates and circumstances and reasonable expectations pertaining to Section 148 of the Code.

The Borrower hereby covenants that it will file such returns and make payments, if any, required to be made to the United States government pursuant to the Code and to take any actions required in order to establish or maintain the exclusion of the interest on the Advances from gross income for federal income tax purposes.



**Section 5.11.  Operating Account**.  The Borrower shall maintain the Operating Account and shall deposit therein from time to time funds sufficient to cover its interest payment obligations under this Agreement, which the Bank may debit from the Operating Account when due.

## ARTICLE VI

## NEGATIVE COVENANTS

Until the Facility has expired or been terminated and the principal of and interest on the Advances and all fees payable hereunder have been paid in full, the Borrower covenants and agrees with the Bank that:

**Section 6.01.  Liens**.  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

      (a)      Liens under the Trust Agreement;

26

PREPA_RSA0028115

(b)        Liens on fixed or capital assets acquired, constructed or improved by the Borrower; provided that (i) such Liens secure Indebtedness, including Capital Lease Obligations, of the Borrower incurred to finance the acquisition, construction or improvement of such assets, (ii) such Liens and the Indebtedness secured thereby are incurred contemporaneously with such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets, as the case may be, or $5,000,000 in the aggregate at any time with respect to all such Indebtedness of the Borrower, and (iv) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary; and

(c)        Permitted Liens.

**Section 6.02. Fundamental Changes**.  The Borrower will not, and will not permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except for mergers between the Borrower and any of its subsidiaries where the Borrower is the surviving entity, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and such transaction could not reasonably be expected to result in a Material Adverse Effect.

**Section 6.03. Investments, Advances, Advances, Guarantees and Acquisitions**.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any Advances or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except:

(a)        Investment Obligations;

(b)        investments by the Borrower in the capital stock of its Subsidiaries; and

(c)        loans or advances made by the Borrower to any Subsidiary and made by any Subsidiary to the Borrower or any other Subsidiary.

**Section 6.04. Hedge Agreements**.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Hedge Agreement, except (a) Hedge Agreements existing on the date hereof, (b) Hedge Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure, including hedges of fuel and power costs of the Borrower, and (c) Hedge Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

27

PREPA_RSA0028116

**Section 6.05.  Transactions with Affiliates**.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and its Subsidiaries not involving any other Affiliate, (c) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests, and (d) transactions permitted pursuant to the Trust Agreement.

**Section 6.06.  Restrictive Agreements**.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, except as provided in the Trust Agreement, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay Advances or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (iv) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.



# ARTICLE VII

# EVENTS OF DEFAULT

It will be considered an Event of Default if any of the following events shall occur:

(a)    the Borrower shall fail to pay any principal of any Advance or any interest on any Advance when and as the same shall become due and payable, whether at the due date thereof or otherwise;

(b)    the Borrower shall fail to pay any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary in (i) this Agreement or any amendment or modification hereof or waiver hereunder shall prove to have been incorrect when made or deemed made or (ii) any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification

28

hereof or waiver hereunder shall prove to have been incorrect in any material respect when made or deemed made;

(d)        the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02, 5.03 (with respect to the Borrower's existence), 5.08 or in Article VI;

(e)        the Borrower shall fail to observe or perform any covenant, condition or agreement contained in (i) this Agreement (other than those specified in clause (a), (b), (d), (l) and (m) of this Article), (ii) any other existing or future credit facility with the Bank or a credit facility with any other financial institution or debt holder, and such failure shall continue unremedied for a period of 30 days after the earlier of the Borrower obtaining actual knowledge thereof or the Borrower receiving notice thereof from the Bank to the Borrower; provided, however, that if such failure is not capable of being remedied within 30 days and the Borrower is diligently pursuing remediation, such failure continues unremedied for a period 90 days after such notice;

(f)        the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable after giving effect to applicable grace periods and notices;



(g)        any event or condition not referred to in the foregoing clause (f) occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(h)        an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)        the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator,

29

                                                      PREPA_RSA0028118

conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)      the Borrower or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)      the Borrower denies, to any material extent, its obligations under this Agreement or any Facility Document or claims any such document or security interest in connection with this Agreement to be invalid or withdrawn in whole or in part;

(l)      one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 shall be rendered against the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment and the same shall not be bonded;

(m)      any amendment to the Trust Agreement adversely affects the priority of payment for any amounts due under this Agreement;

(n)      any material change or development occurs which the Bank reasonably determines has had or will likely have a Material Adverse Effect;



(o)      any judgment, injunction or decree is entered or issued and becomes enforceable against the Borrower or any property of the Borrower preventing the Borrower from continuing to operate a material portion of its business affairs in the normal course or any creditor takes possession of any material property of the Borrower;

(p)      an event of default shall have occurred under the Trust Agreement; or

(q)      the long term rating of the Senior Debt is reduced below Baa3 by Moody's or below BBB- by S&P, or any of the ratings of the Senior Debt is withdrawn or suspended for any reason

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Bank may, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Available Amount under the Facility and the Availability Period shall terminate immediately, and (ii) declare the Advances then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable) and thereupon the principal of the Advances and other amounts so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described

30

PREPA_RSA0028119

in clause (h) or (i) of this Article, the Available Amount and the Availability Period shall automatically terminate and the principal of the Advances then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

## ARTICLE VIII

## MISCELLANEOUS

**Section 8.01. Notices**. (a) Except in the case of notices and other communications expressly permitted herein to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)      if to the Borrower, to it at P.O. Box 364267, San Juan, Puerto Rico 00936-4267 or 1110 Ponce de Leon Avenue, San Juan, Puerto Rico 00909-3802, Attention of Jose A. Roque Torres, Treasurer; Phone: (787) 521-4608 ; and

(ii)      if to the Bank, to it at 270 Munoz Rivera Ave., 6th Floor, San Juan, Puerto Rico 00918, Attention of Abigail Ayala; Phone (787) 766-1236.

(b)      Notices and other communications to the Bank hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Bank; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Bank.  The Bank or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.



(c)      Any party hereto may change its address or telecopy number for notices and other communications hereunder by written notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

**Section 8.02. Waivers; Amendments**. (a) No failure or delay by the Bank in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Bank hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of an Advance shall not be

31

PREPA_RSA0028120

construed as a waiver of any Default, regardless of whether the Bank may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Bank.

**Section 8.03. Expenses; Indemnity; Damage Waiver**.  (a) The Borrower shall pay an amount not to exceed $30,000 to the Bank for out-of-pocket expenses (including legal expenses) incurred by the Bank and its Affiliates (whether or not the transactions contemplated hereby shall be consummated).



(b)     To the extent permitted by law, the Borrower shall indemnify the Bank and each Related Party of the Bank (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Advance or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)     If the indemnification provided for in paragraph (b) of this Section is unavailable to an Indemnitee in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party under such paragraph, in lieu of indemnifying such Indemnitee thereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Borrower and the Bank from the Advances or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Borrower and of the Bank in connection with the occurrences that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the Borrower and the Bank shall be deemed to be in the same respective proportions as the proceeds from the Advances received by the Borrower and the interest received by the Bank bear to the sum of such amounts.  The Borrower and the Bank agree that it would not be just and equitable if contribution pursuant to this Section were determined by pro rata allocation or by any other method of allocation that does not

32

PREPA_RSA0028121

take account of the equitable considerations referred to in this paragraph.  The amount paid or payable by an Indemnitee as a result of the losses, claims, damages and liabilities referred to in this paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnitee in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section, the Bank shall not be required to contribute any amount in excess of the interest received by the Bank on the Advances.  No Person guilty of fraudulent misrepresentation shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(d)      To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Advance or the use of the proceeds thereof.

(e)      All amounts due under this Section shall be payable promptly after written demand therefor.

**Section 8.04. Successors and Assigns, Participations and Transfer of the Note**.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Bank (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) the Bank may assign or otherwise transfer its rights or obligations hereunder in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of the Bank) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)(i)      The Bank may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Facility, the Note and the Advances at the time owing to it, with the prior consent of the Borrower, which consent shall not be unreasonably withheld, and shall be delivered to the Bank within ten (10) Business Days after the Bank shall have notified the Borrower of such potential assignment. The Bank may sell participations to one or more other entities (a "Participant") in all or a portion of the Bank's rights and obligations under this Agreement (including all or a portion of its Facility and the Advances owing to it); provided that (A) the Bank's obligations under this Agreement shall remain unchanged, (B) the Bank shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which the Bank sells such a participation shall provide that the Bank shall retain the sole right to enforce this

33

PREPA_RSA0028122

Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that the Bank will not, without the consent of the Participant, agree to any amendment, modification or waiver that affects such Participant, or modify or waive any provision in this Agreement which materially and adversely affects the rights or remedies of the Bank. Subject to paragraph (b)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.09 to the same extent as if it were the Bank and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were the Bank, provided that such Participant agrees to be subject to Section 2.10(c) as though it were the Bank.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.09 than the Bank would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Bank if it were the Bank shall not be entitled to the benefits of Section 2.09 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.09(e) as though it were the Bank.

(c)    The Bank may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the Note to secure obligations of the Bank, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Bank from any of its obligations hereunder or substitute any such pledgee or assignee for the Bank as a party hereto.

(d)    In order to implement the assignment and participation rights in this Section 8.04, the Bank may request the Borrower at any time prior to the Maturity Date, to execute a new Note in the form of Exhibit B, and the Borrower agrees to provide the Bank with such executed Note or Notes within five Business Days of such request.

**Section 8.05. Survival; Reinstatement of Obligations**.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Advances, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Bank may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Advance or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Facility has not expired or been terminated. The provisions of Sections 2.09 and 8.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of

34

PREPA_RSA0028123

the Advances, the expiration or termination of the Facility or the termination of this Agreement or any provision hereof.

This Agreement, and the Borrower's Obligations hereunder, shall continue to be effective, or shall be automatically reinstated, as the case may be, if at any time payment in whole or in part of any of the Obligations is rescinded or must otherwise be restored or returned to the Borrower or such other party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to the Borrower, or with respect to any part of its properties or assets or otherwise, all as though such payment had not been made.

Section 8.06. **Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Bank and when the Bank shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 8.07. **Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.



Section 8.08. **Right of Setoff**.  If an Event of Default shall have occurred and be continuing, the Bank and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Bank or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by the Bank, irrespective of whether or not the Bank shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of the Bank under this Section are in addition to other rights and remedies (including other rights of setoff) which the Bank may have.

Section 8.09. **Governing Law; Jurisdiction; Consent to Service of Process**.  (a) This Agreement shall be construed in accordance with and governed by the law of the Commonwealth.

(b)      The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to (i) the exclusive jurisdiction of the United States District Court of the

35

Southern District of New York and the United States District Court for the District of Puerto Rico, and any appellate court from any thereof) and (ii) if for any reason the Federal Court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in New York County, and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court. Each of the parties hereto agrees that a final non-appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Bank may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c)     The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.



**Section 8.10. Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 8.11. Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 8.12. Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Advance, together with all fees, charges and other amounts which are treated as interest on such Advance under applicable law

36

(collectively the "Charges"), shall exceed the Maximum Rate, the rate of interest payable in respect of such Advance, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Advance but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Bank in respect of other Advances or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Bank.

**Section 8.13.  USA Patriot Act**.  The Bank is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and hereby notifies the Borrower that, pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information, to the extent known to the Borrower, that will allow such Bank to identify the Borrower in accordance with the Act.  The Borrower shall promptly provide such information upon request from any such Bank.

**Section 8.14.  Language**.  All notices, requests and other communication under this Agreement and the other Facility Documents and to the extent applicable, the Trust Agreement, including all information required to be furnished to the Bank pursuant to Section 5.01, shall be in the English language.

**Section 8.15.  Waiver of Immunity.**  The Borrower agrees that it will not assert any immunity (sovereign or otherwise) it may have as a governmental instrumentality against lawsuits brought in contract under the law of the Commonwealth with respect to this Agreement, any of the other Facility Documents or to the extent applicable, the Trust Agreement, or in connection herewith or therewith.



[signatures follow on next page]

37

Confidential

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, as Borrower

By: _____

Name: Josué Antonio Colón Ortiz
Title: Acting Executive Director

CITIBANK, N.A., as Bank

By: _____

Name: Abigail Ayala
Title: Vice President

Affidavit # _1936_

Sworn and subscribed before me by; Abigail Ayala, as Vice President of Citibank, N.A., of legal age, married, resident of Caguas, Puerto Rico and who is personally known to me, this 20th of July of 2012 and by Josué Antonio Colón Ortiz, as the Acting Executive Director of the Puerto Rico Electric Power Authority, of legal age, married, resident of Caguas, Puerto Rico and who I have identified by his Commonwealth of Puerto Rico Driver's License # _167 4772_ in San Juan Puerto Rico this 20th day of July of 2012.

_____
Notary Public

[Signature page to the Trade Finance Facility Agreement]

Confidential

**EXHIBIT A**

<u>PROMISSORY NOTE</u>
(Trade Finance Facility Agreement)

PUERTO RICO ELECTRIC POWER AUTHORITY

Maturity Date: January 10, 2014

$250,000,000                                                          July 20, 2012

FOR VALUE RECEIVED, the undersigned, PUERTO RICO ELECTRIC POWER AUTHORITY, a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "<u>Borrower</u>"), hereby unconditionally promises to pay to the order of Citibank, N.A. (the "<u>Bank</u>") in lawful money of the United States of America and in immediately available funds, the principal amount of two hundred fifty million dollars ($250,000,000), or, if less, the aggregate unpaid and outstanding principal amount of the Advances made by the Bank pursuant to the Trade Finance Facility Agreement, dated July 20, 2012 (the "<u>Agreement</u>"), between the Borrower and the Bank, plus any interest, any other amounts due and payable to the Bank pursuant to and as described in the Agreement (collectively, the "<u>Obligations</u>").  The terms and conditions established in the Agreement in regard to the Obligations will govern and be applicable to this Note.




This promissory note is the Note referred to in the Agreement and is entitled to the benefits of, and subject to the terms of, the Agreement.  Capitalized terms used herein without definition have the meanings assigned to them in the Agreement.

This Note shall not be deemed to constitute a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions, other than the Borrower, and neither the Commonwealth of Puerto Rico nor any such municipalities or other political subdivisions other than the Borrower are liable for the payment of this Note or interest thereon or any amounts due under the Agreement, but this Note and the interest thereon and amounts due under the Agreement shall be payable as provided in the Agreement, the Resolution (hereinafter defined) and the Trust Agreement (hereinafter defined).

The principal amount hereof is payable on the Maturity Date and otherwise in accordance with the Agreement.  This Note is subject to prepayment as provided in the Agreement.

The Borrower further agrees to pay, in lawful money of the United States of America and in immediately available funds, interest from the date hereof on the unpaid and outstanding principal amount hereof until such unpaid and outstanding principal amount shall become due and payable (whether at stated maturity, by acceleration or otherwise) at the LIBOR Floating Pool Rate (hereinafter described) or at such other rate as set forth in the Agreement, and at the times set forth in the Agreement, and the Borrower agrees to pay other Obligations as provided in the Agreement.

The Borrower shall pay interest on the unpaid principal amount of each Advance from the date thereof until such principal amount shall be paid in full, at a rate per annum equal at all times during each Interest Period to the sum of (i) LIBOR Floating Pool Rate plus the Applicable Spread or (ii) if an Event of Default shall have occurred and be continuing, the Default Rate (as defined in the Agreement.) Interest

                                                          PREPA_RSA0028128

accrued on a monthly basis on each Advance shall be payable on the second Business Day of the following month during such periods or, if earlier, on the last day of each Interest Period or on the date such Advance is paid in full. The Applicable Spread shall be 170 basis points.

"LIBOR Floating Pool Rate" means the average cost of 30-day LIBOR Rate during the month immediately preceding the corresponding Interest Payment Date.

"LIBOR Rate" means, on any day (the "Calculation Date"), an interest rate per annum equal to the offered quotation for the rate of interest (expressed out to the fifth decimal place and truncated thereafter) on deposits of U.S. Dollars for 30 days in the London interbank market, (the "LIBOR") as published by the British Bankers Association at approximately 11:00 a.m. (London time) on such Calculation Date, as published by nationally recognized financial information services such as Moneyline Telerate, Bloomberg LP and Reuters. The LIBOR Rate for any Calculation Date shall be determined by the Bank. If, as of such Calculation Date, the LIBOR Rate cannot be ascertained on the foregoing basis, such rate shall be the Bank's offered quotation to leading banks in the LIBOR for deposits of U.S. dollars for a period equal to 30 days at 11:00 A.M. (London time) on such Calculation Date.

The holder of this Note is authorized to record the date and amount of the Advances, the date and amount of each prepayment of principal thereof and the amount of unpaid principal with respect thereto on <u>Schedule 1</u> annexed hereto and constituting a part hereof, and any such recordation shall constitute *prima facie* evidence of the accuracy of the information so recorded in the absence of manifest error, *provided* that the failure of the holder of this Note to make such recordation or any error therein shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Agreement in respect of the Advances.



In case an Event of Default, as defined in the Agreement, shall occur and be continuing, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, as provided in the Agreement, without presentment, demand for payment, protest or notice of any kind, all of which are expressly waived by Borrower.



The Borrower acknowledges that irrespective of the total amount of this Note and of the amount of the Advances made hereunder at any time, the Bank is under no obligation to make Advances to the Borrower and there is no existing commitment for the Bank to make Advances hereunder except when the Bank deems appropriate.

The Borrower agrees to pay all costs and expenses, including reasonable attorneys' fees incurred in connection with the interpretation or enforcement of this Note, as permitted by and in accordance with the Agreement.

This Note is payable by the Borrower as a "Current Expense" under the Trust Agreement, dated as of January 1, 1974, as amended, by and between the Borrower and U.S. Bank Trust National Association, as successor trustee (the "<u>Trust Agreement</u>"), pursuant to Resolution No. 3936 of the Borrower (the "Resolution"), and is subject to the terms and provisions set forth in the Trust Agreement relating to Current Expenses.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND IN ACCORDANCE WITH, THE LAW OF THE COMMONWEALTH OF PUERTO RICO.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Note to bear the manual signature of the Chief Financial Officer of the Authority and its corporate seal to be imprinted hereon, all of the date first set forth above.

A-2

PREPA_RSA0028129

PUERTO RICO ELECTRIC POWER AUTHORITY

[Corporate Seal]

By: _____

Name: Josué Antonio Colón Ortiz

Title: Acting Executive Director

Affidavit No. _____

Acknowledged and subscribed to before me by the following person who I have identified by his Commonwealth of Puerto Rico Driver's License #_____; Josué Antonio Colón Ortiz, of legal age, married, executive, and a resident of Caguas, Puerto Rico, as Acting Executive Director of Puerto Rico Electric Power Authority.  In San Juan, Puerto Rico, this 20th day of July, 2012.

_____

NOTARY PUBLIC

PREPA_RSA0028130

**EXHIBIT B**

**FORM OF REQUEST FOR ADVANCE**

[Date]

*VIA FACSIMILE NO: 787-766-2051*

**Citibank, N.A.**

Attention: Joanna Arias/Treasury

Re: Request for Advance from Puerto Rico Electric Power Authority

This Request for Advance is being delivered pursuant to Section 2.03 of the Trade Finance Facility Agreement, dated July 20, 2012 (the "Agreement") between Puerto Rico Electric Power Authority (the "Borrower") and Citibank, N.A. All capitalized terms used but not defined herein shall have the meanings specified for such terms in the Agreement.




The undersigned Financial Officers (as defined in the Agreement) of the Borrower, on behalf of the Borrower, hereby irrevocably requests an Advance under the Agreement and the Resolution (as defined in the Agreement) and sets forth the following information in connection with such request:

1.      The aggregate amount of the requested Advance is $_____, consisting of individual amounts equal to:

$_____,

$_____, and

$_____.

2.      The Business Day of the requested Advance is: _____ and the Advance Due Date is: _____.

3.      The purpose of the requested Advance is to provide the Borrower with funds needed to make payment of the attached unpaid Requisition Invoices.

The, undersigned, on behalf of the Borrower, hereby certifies that:

1.      [_____] and [_____ are authorized Financial Officers of the Borrower;

2.      the conditions to such Advance set forth in Section 4.02 of the Agreement have been satisfied on the date hereof and will be true on the date of the Request to Advance;

3.    the proceeds of the Requested Advance will be used only for the purpose of paying the attached unpaid Requisition Invoices, which represent amounts currently due and unpaid for the purchase of [_____];
and

4.    the proceeds of the Requested Advance will be used in a manner that is consistent with all provisions of the Agreement.

Dated: _____

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

Confidential

## EXHIBIT C

## TRUST AGREEMENT

PREPA_RSA0028133

EXECUTION COPY

# FIRST AMENDMENT TO TRADE FINANCE FACILITY AGREEMENT

dated

July 20, 2012

between

## PUERTO RICO ELECTRIC POWER AUTHORITY

and

## CITIBANK, N.A.

May 13, 2013

4836-5568-9235.11

Confidential

**THIS FIRST AMENDMENT** (this "First Amendment") to that certain **TRADE FINANCE FACILITY AGREEMENT** dated July 20, 2012, between **PUERTO RICO ELECTRIC POWER AUTHORITY** (the "Borrower"), and **CITIBANK, N.A.**, (the "Bank"), is made this 13th day of May, 2013.

**WHEREAS,** the parties hereto have previously entered into a Trade Finance Facility Agreement, dated July 20, 2012 (the "Original Agreement," and, collectively with this First Amendment, the "Agreement"), pursuant to which the Bank agreed from time to time to make Advances to the Borrower on an uncommitted basis in the Facility Amount subject to the terms and conditions set forth therein;

**WHEREAS**, the unpaid principal amount of the Advances outstanding under the Agreement as of the date of this First Amendment is $250,000,000; and

**WHEREAS,** the parties now desire to extend the Availability Period and the Maturity Date, and modify certain of the terms and conditions of the Agreement as set forth in this First Amendment.

**The parties hereto agree as follows**:

*Section 1.*   Capitalized terms used herein without definition shall have the meaning assigned to such terms in the Agreement.  The rules of interpretation set forth in the Agreement shall apply to this First Amendment.

*Section 2*.   The definition of "Agreement" set forth in Section 1.01 of the Agreement is hereby amended in its entirety as follows:

"Agreement" means this Trade Finance Facility Agreement, as amended.

*Section 3.*   The definition of "Applicable Spread" set forth in Section 1.01 of the Agreement is hereby amended in its entirety as follows:

"Applicable Spread" means an amount equal to +250 basis points; provided that the Applicable Spread shall be increased by the number of basis points set forth in the table below, effective as of the date a downgrade is made by either Moody's or S&P to the long term ratings for Senior Debt, as follows:

| Rating | | | | Spread |
|---|---|---|---|---|
| Moody's | Baa3 | S&P | BBB- | +30 basis points |
| Moody's | Below Baa3 | S&P | Below BBB- | +50 basis points |

*Section 4.*   The Definition of "Availability Period" set forth in Section 1.01 of the Agreement is hereby amended in its entirety as follows:

"Availability Period" means, the period from and including the Effective Date to and including the earliest of (i) January 10, 2014 or (ii) the date of termination of the Facility.

1

Confidential

**Section 5.** The definition of "Effective Date" set forth in Section 1.01 of the Agreement is hereby amended in its entirety as follows:

"Effective Date" means, for purposes of this First Amendment, the date that the First Amendment is approved by the Borrower, the Government Development Bank for Puerto Rico and the Bank, and is fully executed.

**Section 6**. The definition of "Facility Documents" set forth in Section 1.01 of the Agreement is hereby amended in its entirety to read as follows:

"Facility Documents" means this Agreement, the First Amendment, the Note, the Resolution, the GDB Resolution and all other documents, instruments and agreements delivered in connection with the foregoing, as amended or otherwise modified from time to time.

**Section 7.** The definition of "First Amendment" set forth below is hereby added to Section 1.01 of the Agreement:

"First Amendment" means that certain First Amendment to Trade Finance Facility Agreement dated May 13, 2013, between the Borrower and the Bank.

**Section 8.**   The definition of "GDB Resolution" set forth in Section 1.01 of the Agreement is hereby amended in its entirety as follows:

"GDB Resolution" means, collectively, Resolution EC-2012-63, adopted on July 9, 2012 by the Government Development Bank for Puerto Rico, authorizing this Agreement, the Facility and the Advances and providing, among other things, that obligations of the Borrower with respect to the Facility constitute Current Expenses under the Trust Agreement; and Resolution 10028, adopted on May 2, 2013 by the Government Development Bank for Puerto Rico approving the First Amendment.

**Section 9.** The definition of "Maturity Date" set forth in Section 1.01 of the Agreement is hereby amended in its entirety to read as follows:

"Maturity Date" means for purposes of this First Amendment, October 7, 2014.

**Section 10**.  The definition of "Resolution" as set forth in Section 1.01 of the Agreement is hereby amended in its entirety to read as follows:

"Resolution" means, collectively, Resolution No. 3936 of the Borrower, approved on June 29, 2012, authorizing the terms and conditions of this Agreement, the Facility and the Advances, and providing, among other things, that the Facility and the Advances shall constitute Current Expenses under the Trust Agreement; and Resolution No. 4022 of the Borrower authorizing the execution of the First Amendment.

**Section 11.** Section 2.07 is hereby amended in its entirety as follows:

2

Confidential

PREPA_RSA0028143

Section 2.07. Extension.  Not less than 210 nor more than 240 days after the Effective Date, the Bank may consider conducting an internal review, on and subject to its then prevailing standards, practices and guidelines, of the general financial condition of the Borrower and as a result of such review, may, in its sole and absolute discretion, determine to extend the Availability Period or the Maturity Date, or both, in each case for such additional period as the Bank may determine at the time.  The Bank may condition any extension as aforesaid on receipt by the Bank of such documents, certificates, resolutions and opinions of counsel (all in form and substance acceptable to the Bank and its counsel) as the Bank deems necessary in connection with any such extension.  The Borrower expressly acknowledges and agrees that the Bank has no obligation to conduct an internal review and further if such review is undertaken, has no obligation to extend the Availability Period or the Maturity Date and may determine not to do so for any or no reason.

*Section 12.*     The introductory sentence of Section 4.02 is hereby amended in its entirety as follows:

"An Advance may be made only during the Availability Period and, further, is subject to the satisfaction of the following additional conditions:"

*Section 13.*     Section 5.12 as set forth below is hereby added to Article V of the Agreement:

**Section 5.12.**  Parity Covenant. In the event that the Borrower has entered into, is simultaneously entering into or shall at any time, directly or indirectly, enter into or otherwise consent to any contract or agreement (or any amendment, supplement or modification thereto) under which, directly or indirectly, any Person or Persons (each, an "Other Credit Provider") undertakes to purchase any Indebtedness of the Borrower or to make, loan or provide funds, liquidity or credit enhancement to the Borrower with respect to any such Indebtedness, or under which, directly or indirectly, the obligation of the Borrower to reimburse such Other Credit Provider is secured by the Indebtedness of the Borrower (each, an "Other Facility"), which Other Facility (or amendment, supplement or modification thereto) gives or grants to any Other Credit Provider (a) covenants (including, without limitation, all other covenants such as financial covenants, financial covenant levels or financial covenant testing periods) or events of default which are more restrictive or more favorable to such Other Credit Provider which is a party to such Other Facility or (b) additional or greater rights or remedies (including, without limitation, more stringent or shorter periods of time that must elapse prior to such Other Credit Provider's right to exercise remedies under such Other Facility upon the occurrence of a default or event of default thereunder) and/or a shorter amortization period for bonds or other securities purchased pursuant to a draw upon a liquidity or credit facility (such more favorable covenants or greater rights or remedies in (a) and (b), each a "More Favorable Provision"), in each case than are given or granted to the Bank hereunder, then simultaneously with the execution of such Other Facility, the Borrower shall provide the Bank a copy of the Other Facility and the More Favorable Provision(s), and such More Favorable Provision(s) shall automatically be incorporated into this Agreement for so long as such Other Facility remains in effect.  The Borrower shall promptly enter into an amendment to this Agreement to include such More Favorable Provision(s) for so long as such Other Facility remains in effect (provided that the Bank shall maintain the benefit of the More Favorable Provision(s) even if the Borrower fails to provide such amendment.)

3

4836-5568-9235.11

Confidential                                                                                          PREPA_RSA0028144

**Section 14.**   The Borrower shall pay an amount not to exceed ($25,000) in respect of fees and expenses of the legal counsel to the Bank incurred in connection with this First Amendment and the transactions contemplated hereby, including the mandatory prepayment of the Advances.

**Section 15**.   This First Amendment shall not become effective until such time as the Borrower satisfies each of following conditions:

(a)   The Bank (or its counsel) shall have received from each party hereto either (i) a counterpart of this First Amendment or (ii) written evidence satisfactory to the Bank (which may include telecopy transmission of a signed signature page of this First Amendment) that such party has signed a counterpart of this First Amendment.

(b)   The Bank shall have received a favorable written opinion (addressed to the Bank and dated as of the date of this First Amendment) of (i) the general counsel to the Borrower and (ii) Nixon Peabody LLP, special counsel to the Borrower (the "Special Counsel"), each in form and substance satisfactory to the Bank.

(c)   The Bank shall have received (i) copies of the Resolution of the Borrower and of the Government Development Bank for Puerto Rico relating to the authorization of this First Amendment and the transactions contemplated hereby and (ii) such other documents and certificates as the Bank or its counsel may reasonably request relating to the organization, existence and good standing of the Borrower, the authorization of this First Amendment and the transactions contemplated hereby, and any other legal matters relating to the Borrower, this First Amendment or the transactions contemplated hereby, all in form and substance satisfactory to the Bank and its counsel.

(d)   The Bank shall have received a certificate, dated as of the date of the First Amendment and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the following conditions:

(i)   The representations and warranties of the Borrower set forth in the Agreement shall be true and correct on and as of the date of the First Amendment, except to the extent such representations and warranties expressly relate to an earlier date in which case they shall have been true and correct on and as of such earlier date.   For the avoidance of doubt, the representations and warranties contained in Section 3.04(b) of the Agreement shall relate to the most recent audited financial statements delivered to the Bank immediately prior to the First Amendment.

(ii)   As of the effective date of the First Amendment, no Default under the Agreement or any default, event of default or event which, with notice or lapse of time or both, would constitute a default or an event of default under any other Facility Document shall have occurred and be continuing.

(e)   The Bank shall have received all fees and other amounts due and payable on or prior to the date of the First Amendment, including (i) to the extent invoiced,

4

Confidential                                                                                                PREPA_RSA0028145

reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower under the Agreement and (ii) all fees and expenses of the legal counsel to the Bank incurred in connection with this First Amendment and the transactions contemplated hereby.

(f)     All actions under the Act which, in the opinion of Special Counsel, shall be necessary in connection with the transactions contemplated by the First Amendment shall have been duly taken and shall be in full force and effect.

(g)     Between the Effective Date and the date of this First Amendment, (i) there shall not have been a Determination of Taxability, an Event of Taxability, or Final Determination, (ii) there is no Legal Proceeding pending, and (iii) there shall not have been a Change in Law which would prohibit the Bank from lawfully making its Advances or would make the Borrower's execution of the First Amendment or use of the proceeds of any Advance illegal or have the retroactive effect of making such use illegal.

(h)     The Bank shall have received official evidence of the filing of the final and fully executed First Amendment to the Trade Facility Agreement within the Office of the Comptroller of Puerto Rico as established by local law.

**Section 16**.  Other than the terms and provisions of the Agreement modified by this First Amendment, all other provisions of the Agreement shall remain unchanged and shall continue in full force and effect.

**Section 17**.  Upon satisfaction of all conditions set forth in Section 13 above, this First Amendment shall become effective on the date of execution and delivery hereof by the parties.

**Section 18.**  This First Amendment may be signed in counterparts.

5

4836-5568-9235.11

Confidential                                                      PREPA_RSA0028146

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

PUERTO RICO ELECTRIC POWER
AUTHORITY, as Borrower

By: _____
Name: Juan F. Alicea-Flores
Title: Executive Director

Affidavit 3,237

Sworn and subscribed before me by; Juan F. Alicea-Flores, as the Executive Director of the Puerto Rico Electric Power Authority, of legal age, married, resident of Caguas, Puerto Rico and who I have identified by his Commonwealth of Puerto Rico Driver's License# _____1194304_____ in San Juan Puerto Rico this 13th day of May of 2013.

_____
Notary Public

EXENTO PAGO ARANCEL
**LEY** 47
4 DE JUNIO DE 1982

6

4836-5568-9235.11

Confidential

PREPA_RSA0028147

CITIBANK, N.A., as Bank

By: _____

Name:  Rodolfo Zamora

Title:  Vice President

Affidavit#  2185

Sworn and subscribed before me by;  Rodolfo Zamora as Vice President of Citibank, N.A., of legal age, married, resident of San Juan, Puerto Rico and who is personally known to me, this thirteenth of May of 2013.

_____
Notary Public



[Signature Page to First Amendment to Trade Finance Facility Agreement]

7

4836-5568-9235.11

Confidential