# Exhibit 22

**Scotiabank Forbearance Agreement, dated July 6, 2014**

*EXECUTION VERSION*

**FORBEARANCE AGREEMENT**

THIS FORBEARANCE AGREEMENT, dated as of July 6, 2014 (this *"Agreement"*), is entered into by and among PUERTO RICO ELECTRIC POWER AUTHORITY (the *"Company"*), SCOTIABANK DE PUERTO RICO (the *"Agent"*) and the LENDERS signatory hereto (each, a *"Lender"* and, together with the Agent, the *"Lenders"*). Each of the foregoing shall be referred to herein as a *"Party"* and collectively as the *"Parties."*

**WITNESSETH:**

WHEREAS, the Company, the Agent and the Lenders have entered into that certain Credit Agreement dated as of May 4, 2012 (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time, the *"Credit Agreement"*);

WHEREAS, pursuant to the Credit Agreement the Lenders have agreed to make, and have made, certain Advances and other extensions of credit to the Company;

WHEREAS, the Company has issued certain bonds that are payable after the payment in full of all Current Expenses;

WHEREAS, certain Defaults and Events of Default have occurred or may occur under Article VII of the Credit Agreement which are set forth in Schedule 1 hereto (each individually, a *"Designated Event of Default"* and collectively, the *"Designated Events of Default"*);

WHEREAS, the Company acknowledges and agrees that, as a result of the existence of the Designated Events of Default, (a) the Agent is entitled to accelerate the Obligations, to seek immediate repayment in full of the Obligations and to exercise any or all of its rights and remedies under the Credit Agreement and applicable law; and (b) the Lenders have no obligation to make any further Advances or other extensions of credit to the Company under the Credit Agreement or otherwise;

WHEREAS, the Company has requested that the Agent and the Lenders temporarily forbear, solely in connection with the Designated Events of Default, in accordance with the terms and subject to the conditions hereof from accelerating the Obligations and commencing any legal proceedings against the Company, including with respect to taking any actions to collect the payment of the Obligations and exercising rights of set-off with respect to Obligations under the Credit Agreement;

WHEREAS, the Required Lenders (as defined in the Credit Agreement) are not willing to waive the Events of Default;

WHEREAS, the Company and Citibank, N.A. (*"Citibank"*) under the Trade Facility Agreement dated July 20, 2012, as amended and supplemented to date (the *"Citibank Facility"*), between the Company and Citibank, N.A. have entered into a forbearance agreement on

substantially similar terms and, in certain cases, on identical terms, as the terms of this Agreement (the *"Citibank Forbearance Agreement"*);

NOW, THEREFORE, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. Incorporation of Recitals; Defined Terms. The Company acknowledges that the Recitals set forth above are true and correct in all material respects. The defined terms in the Recitals set forth above are hereby incorporated into this Agreement by reference. All other capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Credit Agreement.

Section 2. Amounts Owing. The Company acknowledges and agrees that, to the best of its knowledge, the principal amount outstanding under the Credit Agreement is $549,976,142.68 and such amount (together with interest and fees thereon) is due, outstanding and justly and truly owing by the Company without defense, offset or counterclaim.

Section 3. Acknowledgment of Default(s). The Designated Events of Default constitute Events of Default under the Credit Agreement. The Company acknowledges that, because of the Events of Default, the Lenders are permitted and entitled to decline to provide further credit or Advances to the Company, to terminate the commitments, to accelerate the Obligations, and to exercise any other rights or remedies that may be available under the Credit Agreement or under applicable law. The Company represents to the Agent and Lenders that, to the best of its knowledge, there are no Defaults or Events of Default other than the Designated Events of Default.

Section 4. Forbearance; Forbearance Period.
(a) The "*Forbearance Period*" shall commence on the Forbearance Effective Date (as defined below) and end on the date (the "*Forbearance Termination Date*") that is the earlier to occur of (i) 5:00 p.m. (Eastern Time) on July 31, 2014 and (ii) the occurrence of a Forbearance Termination Event (as defined below); *provided* that the Agent, on behalf of the Lenders, shall provide the Company notice of a termination of this Agreement prior to exercising any right of set off with respect to the Obligations under the Credit Agreement; *provided further* that no notice of termination shall be required if the Forbearance Period has terminated pursuant to sub-clause (i) above.

(b) Each of the Agent and the Lenders agrees that, upon the terms and subject to the conditions set forth herein (and notwithstanding the existence of the Designated Events of Default), during the Forbearance Period, it shall not (A) commence any legal proceedings against the Company to enforce any of its rights and remedies under the Credit Agreement, including with respect to taking any actions to collect payment of Obligations under the Credit Agreement or (B) exercise any rights of setoff solely by reason of the existence of the Designated Events of Default (the "*Forbearance*"). Notwithstanding anything to the contrary herein, the Forbearance shall not prohibit the Agent or any Lender from instituting, commencing, prosecuting, joining, interceding in, supporting or otherwise participating directly or indirectly in any way in any legal

- 2 -

proceedings regarding the validity, enforceability or application of the Public Corporation Debt Enforcement and Recovery Act (the *"Recovery Act"*) or any provision thereof or intervening or otherwise participating in that certain action filed on June 28, 2014, *Franklin California Tax-Free Trust v. Puerto Rico*, Case No. 3:14-cv-01518 (D.P.R.), or in any other lawsuit filed by third parties regarding the Recovery Act (any such legal proceedings, actions or lawsuits, "*Legal Actions*"). The occurrence of any of the following events or circumstances shall constitute a termination event with respect to the Forbearance (each, a "*Forbearance Termination Event*"):

    (i)    the occurrence of an Event of Default under the Credit Agreement that is not a Designated Event of Default;

    (ii)    the Company provides public notice or notice to the Agent and the Lenders of the commencement of the suspension period under chapter 2, or file a petition under chapter 3, of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act;

    (iii)    the occurrence of any default under, or termination of, the Citibank Forbearance Agreement;

    (iv)    any amendment or modification of the Citibank Forbearance Agreement without the express written consent of the Lenders;

    (v)    any default under or amendment, modification or termination of that certain Trust Agreement between the Company and U.S. Bank National Association, as Successor Trustee, dated January 1, 1974 (as amended and supplemented, the "*Trust Agreement*"), including, without limitation, a default under section 802 of the Trust Agreement as a result of the Company making any payments from the General Fund to the credit of the Revenue Fund, Sinking Fund, or any other funds established by sections 506 and 507 of the Trust Agreement, following the occurrence of an Anticipated Payment Default;

    (vi)    a breach by the Company of any of the covenants set forth in this Agreement;

    (vii)    the taking of any action by any holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf against the Company or its assets to commence legal proceedings (other than proceedings solely to contest the constitutional validity of the Recovery Act) or exercise setoff rights, in each case pursuant to such holder's rights with respect to such Material Indebtedness; or

    (viii)    the exercise of the Company's right to terminate this Agreement upon (A) the breach by the Agent or any of the Lenders of any of the covenants set forth herein; (B) the termination of the Citibank Forbearance Agreement; or (C) the initiation, intervention or participation by the Agent or any Lender into a Legal Action.

    (c)    Subject to Section 5 hereof, the Forbearance is limited in nature and nothing contained herein is intended, or shall be deemed or construed (i) to constitute a waiver of any of the Designated Events of Default or any future Defaults or Events of Default or any term or provision of the Credit Agreement or applicable law; or (ii) to establish a custom or course of dealing between the Company, on the one hand, and the Agent and the Lenders, on the other

Cortland_PREPA_00001143

hand. Notwithstanding anything to the contrary herein, the Forbearance shall not prohibit the Agent from instituting, prosecuting or joining in any lawsuit regarding the validity or enforceability of the Recovery Act.

(d) Subject to Section 5 hereof, on the Forbearance Termination Date, without the requirement of any notice to the Company or any other Person: (i) the Forbearance and all agreements set forth in Section 4(a) of this Agreement shall terminate automatically and be of no further force or effect, and (ii) subject to the terms of the Credit Agreement and applicable law, each of the Agent and the Lenders shall be free in its sole and absolute discretion without limitation to proceed to enforce any or all of its rights and remedies set forth in this Agreement, the Credit Agreement and applicable law, including, without limitation, commencing legal proceedings and exercising setoff rights in respect thereof. In furtherance of the foregoing, and notwithstanding the occurrence of the Forbearance Effective Date, the Company acknowledges and confirms that, subject to the Forbearance, all rights and remedies of each of the Agent and each of the Lenders under the Credit Agreement and applicable law with respect to the Company shall continue to be available to the Agent and each the Lenders.

(e) The Company hereby agrees that, during the Forbearance Period, subject to the Forbearance and the other terms and provisions of this Agreement, all of the terms of the Credit Agreement shall remain in full force and effect.

Section 5.   Covenants.
(a)(i)   The Company hereby agrees that, during the Forbearance Period:

(A) The principal amount outstanding under the Citibank Facility shall be at least $146,041,914.24, except as provided in Section 5(a)(i)(C) and 5(a)(i)(H) below;

(B) Any agreement hereinafter executed between Citibank under the Citibank Facility and the Company other than with respect to a DIP Financing (as hereinafter defined) (any such agreement, a "*Citibank Agreement*") shall be on terms acceptable to the Lenders, and any provisions in any such Citibank Agreement that are favorable to such Lenders (if analogous provisions are not already in this Agreement or are in this Agreement in a manner less favorable to the Lenders), shall be deemed automatically incorporated into this Agreement for the benefit of (and modified to be applicable to) the Lenders immediately upon the effectiveness of such Citibank Agreement;

(C) The Company shall continue to make scheduled payments of interest under Section 2.09(c) of the Credit Agreement and the Company shall repay only Specified Advances pursuant to the terms of Section 6 below (for purposes of clarity, the parties hereto hereby agree that such rate of interest equals 4.0% over the Alternate Base Rate); provided, however, that if the rate of interest payable by the Company under the Citibank Facility shall exceed 4.0% over the Alternate Base Rate, the Company shall make payments of interest on the Scotiabank Facility at the rate payable under the Citibank Facility;

(D) The Company will not make any unscheduled payments of interest under the Citibank Facility unless the Company makes any unscheduled interest payment or default interest payment under the Citibank Facility, the Company shall make an equal and ratable

- 4 -

payment of unscheduled interest or default interest, as the case may be, to the Agent under the Credit Agreement;

(E) The Company shall provide the Agent and each of the Lenders with cash flow reports forecasting the Company's budget (including cash receipts and disbursements) through July 31, 2014, updated (including variance reports) on a weekly basis;

(F) The Company shall retain in the General Fund any amounts it is required to retain for the payment of Current Expenses under section 506 of the Trust Agreement;

(G) The Company shall provide the Agent and each of the Lenders with a copy of the operative Annual Budget in accordance with the requirements under the Trust Agreement;

(H) The principal amount outstanding under the Citibank Facility shall not be reduced unless the Company shall make an equal and ratable reduction of the Commitment under the Credit Agreement and no payments or reimbursements of principal will be made to Citibank by or on behalf of the Company under the Credit Facility unless the Company shall make an equal and ratable payment of principal or reimbursement to the Lenders under the Credit Agreement.

(I) The Company shall pay the fees and expenses of the Agent and the Lenders pursuant to the terms of Section 12 hereof.

(a)(ii) From and after the date of this Agreement and until all Obligations under the Credit Agreement have been paid in full, the Company hereby reaffirms, covenants and agrees that (1) the Obligations under the Credit Agreement are *"Current Expenses"* and have first priority in the waterfall structure under the Trust Agreement and (2) it will never institute, join, or support any action or proceeding to challenge, modify or alter the treatment of the Obligations as Current Expenses under the Trust Agreement or otherwise impair the right of the Lenders to be paid the Obligations under the Credit Agreement as first priority in the waterfall under the Trust Agreement, *provided* that nothing herein shall limit the Company's right to seek relief under chapter 2 or 3 of the Recovery Act or the identification of obligations included in a suspension notice or petition thereunder, or the Agent and the Lenders' right to contest any relief sought under the Recovery Act.

Section 6. <u>Repayment of Advances</u>. The Company shall repay the Advances listed below (the *"Specified Advances"*) on or before the corresponding Advance Repayment Dates set forth in the matrices below during the Forbearance Period (each such repayment date, an *"Applicable Repayment Date"*):

- 5 -

| Specified Advance | Advance Repayment Date |
|---|---|
| $44,000,000.00 | July 9 |
| $41,000,000.00 | July 16 |
| $8,658,859.77 | July 21 |
| $42,867,282.91 | July 21 |

On each such Applicable Repayment Date, after repayment of a Specified Advance or portion thereof, the Company shall make a Borrowing in the amount of such Specified Advance or portion thereof (each, a *"Specified Reborrowing"*) and the Lenders shall lend such Specified Reborrowing by 5:00 p.m. (Eastern time) on that same Applicable Repayment Date pursuant to Section 2.03 of the Credit Agreement (which shall be credited no later than the next business day), notwithstanding (A) any Designated Event of Default, (B) the satisfaction of the conditions precedent set forth in Section 4.02 of the Credit Agreement and (C) any Forbearance Termination Event occurring from the time of repayment of any Specified Advance to the actual funding of the corresponding Specified Reborrowing to the Company.

Section 7. Representations and Warranties.

(a) The Company hereby represents and warrants to the Agent and the Lenders that as of the date hereof:

(i) It has all requisite power and authority to enter into this Agreement and perform its respective obligations under this Agreement;

(ii) The execution, delivery and performance of this Agreement and its obligations hereunder have been duly authorized by all necessary corporate action on its part;

(iii) The execution, delivery and performance of this Agreement by it do not and shall not: (x) violate any provision of law, rule or regulation applicable to it; or (y) violate its enabling legislation, bylaws, or other organizational documents or those of any of its subsidiaries;

(iv) Except with respect to any breach of the Credit Agreement, the execution, delivery and performance of this Agreement by it do not and shall not conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(v) No Event of Default has occurred and is continuing under the Trust Agreement or the bonds issued thereunder; and

(vi) The Obligations under the Credit Agreement are *"Current Expenses"* and have first priority in the waterfall structure under the Trust Agreement.

Cortland_PREPA_00001146

(b) Each of the Agent and the Lenders hereby represents and warrants to the Company that as of the date hereof:

(i) It has all requisite power and authority to enter into this Agreement and perform its respective obligations under, this Agreement;

(ii) The execution, delivery and performance of this Agreement and its obligations hereunder have been duly authorized by all necessary corporate action on its part; and

(iii) The execution, delivery and performance of this Agreement by it do not and shall not: (x) violate any provision of law, rule or regulation applicable to it; (y) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (z) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

Section 8. <u>Conditions to Effectiveness of this Agreement.</u>

This Agreement shall become effective (the date of such effectiveness being referred to herein as the *"Forbearance Effective Date"*) upon the occurrence of each of the following conditions:

(a) The Citibank Forbearance Agreement shall be fully executed and effective on terms no more favorable to Citibank thereunder than the terms set forth in this Agreement with respect to the Agent and the Lenders; and

(b) Execution and delivery of this Agreement by each of the Agent, each of the Lenders and the Company.

Section 9. <u>Effectiveness.</u>

Upon satisfaction of the conditions precedent set forth in Section 8, the Forbearance Effective Date shall be deemed to have occurred.

Section 10. <u>No Waiver and Reservation of Rights.</u> Nothing in this Agreement is intended or shall be deemed or construed to in any way waive, alter or impair the obligations or any of the rights or remedies of the Agent or the Lenders under the Loan Documents or applicable law. Without limiting the generality of the foregoing, nothing in this Agreement extends the maturity of or otherwise affects the enforceability of any obligation under the Credit Agreement. All terms and provisions of the Loan Documents remain in full force and effect, except to the extent expressly modified by this Agreement. The Company acknowledges that the Lenders have made no representations as to what actions, if any, the Lenders will take after the Forbearance Period, and the Lenders and the Agent must and do hereby specifically reserve any and all rights, remedies, and claims they have (after giving effect hereto) with respect to the Events of Default and each other Default that may occur.

Cortland_PREPA_00001147

Section 11. <u>Release</u>. FOR VALUE RECEIVED, INCLUDING WITHOUT LIMITATION, THE AGREEMENTS OF THE LENDERS IN THIS AGREEMENT, THE COMPANY HEREBY RELEASES THE AGENT AND EACH LENDER, ITS CURRENT AND FORMER SHAREHOLDERS, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, AND PROFESSIONAL ADVISORS (COLLECTIVELY, THE "RELEASED PARTIES") OF AND FROM ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS OF EVERY KIND OR NATURE WHATSOEVER, BOTH IN LAW AND IN EQUITY, KNOWN OR UNKNOWN, WHICH THE COMPANY HAS OR EVER HAD AGAINST ANY OF THE RELEASED PARTIES PRIOR TO, THROUGH, AND INCLUDING THIS DATE, ARISING FROM OR RELATING TO THE EXISTING CREDIT AGREEMENT BETWEEN THE COMPANY AND THE LENDERS, EXCEPT TO THE EXTENT THAT ANY SUCH DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS ARE FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE RELEASED PARTIES.

Section 12. <u>Fees and Expenses.</u> The Company shall also pay within ten (10) days of receipt of an invoice all fees and expenses (including attorneys' fees) incurred by the Agent, the other Lenders and their counsel in connection with this Agreement and the other instruments and documents being executed and delivered in connection herewith and the transactions contemplated hereby (the Company acknowledges that it will receive summary invoice(s) reflecting only the total amount then due and that such summary invoice(s) will not contain any narrative description of the services provided, and that delivery of such summary invoice(s) shall not in any way constitute a waiver of any right or privilege of the Agent and the Lenders associated with such invoice(s)).

Section 13. <u>No Third-Party Beneficiaries.</u>

This Agreement shall be binding upon and inure to the benefit of each Party hereto and their respective successors and assigns. No Person other than the Parties hereto, their respective successors and assigns shall have rights hereunder or be entitled to rely on this Agreement, and all other third-party beneficiary rights are hereby expressly disclaimed.

Section 14. <u>Successors and Assigns.</u>

This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other Person without the express written consent of all of the other Parties.

Section 15. <u>Severability.</u>

The invalidity, illegality or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction.

Cortland_PREPA_00001148

Section 16. <u>Governing Law, Jurisdiction; Waiver of Jury Trial.</u>

(a) This Agreement shall be governed by and construed in accordance with the laws of the state of New York, other than with respect to Section 5(a)(i)(C), Section 5(a)(ii), Section 6, Section 11 and Section 20 hereof (together, the "*PR Law Provisions*"), which shall be governed by and construed in accordance with the laws of the Commonwealth as set forth in Section 9.09 of the Credit Agreement. The Company, the Agent and the Lenders hereby consent to the non-exclusive jurisdiction of the state courts located in State of New York in the County of New York, the United States District Court for the Southern District of New York and the United States District Court for the District of Puerto Rico in connection with any suit, action, or proceedings with respect to this Agreement, other than with respect to any suit, action, or proceedings with respect to the PR Law Provisions. Nothing herein shall affect Section 9.09 of the Credit Agreement.

(b) Section 9.10 of the Credit Agreement shall apply and be in full force and effect as to this Agreement.

Section 17. <u>Amendments.</u>

The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, without the express prior written consent of all of the Parties.

Section 18. <u>Good Faith Cooperation; Further Assurances.</u>

The Parties agree to execute and deliver from time to time such other documents and take such other actions as may be reasonably necessary, without payment of further consideration, in order to effectuate the Forbearance. The Parties shall cooperate with each other and with their respective counsel in good faith in connection with any steps required to be taken as part of their respective obligations under this Agreement.

Section 19. <u>Prior Negotiations; Entire Agreement.</u>

This Agreement constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, and no Party shall be liable or bound to any other Party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

Section 20. <u>Right of First Refusal.</u>

In the event that, from the date hereof to and including the later of (i) July 31, 2014 or (ii) the end of the Forbearance Period (the "*ROFR Period*"), the Company agrees to any financing arrangement wherein advances will be made under the provisions of the Recovery Act permitting funding on a priority or super-priority basis (or similar law providing for the restructuring of the Company's obligations under Puerto Rico law) (a "*DIP Financing*"), the Company shall provide immediate notice to the Agent of such DIP Financing (the "*DIP Financing Notice*") and the

Lenders or any group of Lenders shall have the option in their discretion, to (x) become the lender(s) under that financing arrangement on the terms set forth in the agreement describing said financing arrangement (with the commitments under such financing arrangement to be allocated pro rata among the Lenders and the lender under the Citibank Facility exercising its right to participate in such financing arrangement (each, an "*Exercising Lender*"), such that each Exercising Lender's proportionate share of such financing facility shall be determined by dividing the principal amount outstanding to such Exercising Lender under the Credit Agreement or the Citibank Facility, as applicable, by the aggregate principal amount outstanding to all Exercising Lenders under the Credit Agreement and the Citibank Facility, <u>provided</u>, that if the Exercising Lenders agree on an alternative allocation, then such alternative allocation shall govern), or (y) propose equivalent or better terms of financing to the Company.  Notwithstanding the foregoing, the ROFR Period shall terminate in the event that (A) the Forbearance Period terminates pursuant to Section 4(b)(viii)(C) hereof or (B) the Company notifies the Agent and the Lenders of the Agent and the Lenders' material breach of this Agreement and such breach is not cured. Upon written notice to the Company from the Agent, the parties shall negotiate, execute and deliver a financing agreement incorporating the terms previously agreed to by the Company with any other lender(s) under such DIP Financing, *provided* that such agreement is entered into within ten (10) Business Days of receipt by the Agent of the DIP Financing Notice; *provided*, *further*, that in the event that the Agent receives the DIP Financing Notice on a date which is less than 10 Business Days prior to the end of the ROFR Period (the "*Notice Date*"), the Forbearance Period shall be automatically extended by ten (10) Business Day period starting from the Notice Date, unless the Agent and the Lenders have provided notice that they will not participate in the DIP Financing.  Further, concurrently with the execution of this Agreement the Company shall provide to the Agent and the Lenders copies of any proposals, term sheets, or commitments that the Company has received and is willing to accept for financing arrangement(s) with the Company wherein advances will be made under the provisions of the Recovery Act permitting funding on a priority or super-priority basis (or similar law providing for the restructuring of the Company's obligations under Puerto Rico law) (each such proposal, a "*DIP Financing Proposal*").  Further, the Company shall provide to the Agent and the Lenders, within one business day after receipt, copies of any DIP Financing Proposal that the Company may receive.

Section 21.    <u>Information and Financial Data</u>.

(a)    The Company agrees to provide to the Agent and the Lenders, on or before July 8, 2014 at 5:00 p.m. (Eastern time), the following information with respect to the month of June 2014:

    (i)    Report on the aging for government receivables and payables for major suppliers;

    (ii)    Fuel inventory reporting;

    (iii)    Fuel and power purchases reporting;

    (iv)    Payment to suppliers.

Cortland_PREPA_00001150

(b)  During the Forbearance Period, the Company agrees to provide to the Agent and the Lenders on a weekly basis the following information:

(i)  Report on cash on hand; and

(ii)  Report on weekly collections.

(c)  Further, the Company agrees to promptly provide to the Agent and the Lenders such additional financial and other information that the Agent and the Lenders may reasonably request.

Section 22.  <u>Notice of Default.</u>

Immediately upon the occurrence of any default under this Agreement, the Company shall provide notice of the same to the Lender in writing, which notice shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email, as follows:

To the Agent on behalf of the Lenders:

Scotiabank de Puerto Rico
290 Jesus T. Pinero Avenue, 8th Floor
San Juan, Puerto Rico  00918
Attn:  Senior Vice President & Head of Commercial Banking Unit

with copies to:

Chapman and Cutler LLP
111 West Monroe
Chicago, Illinois 60603
Attn:   Jim Heiser at Email Address: heiser@chapman.com
Attn:   David Field at Email Address: dfield@chapman.com

All notices given in accordance with the provisions of this section shall be deemed to have been given on the date of receipt.

Section 23.  <u>Confidentiality; Announcements.</u>

(a)  Each of the Company, the Agent and each of the Lenders (i) acknowledges that the existence and terms of this Agreement and, in the case of the Agent and each of the Lenders, any and all information relating to the Company (including, without limitation, any information shared by the Company in connection with discussions on the financial restructuring of the Company and any and all information provided by the Company in compliance with the information covenants of this Agreement) constitute confidential information and (ii) agrees not to disclose any such information to any Person without the prior written consent of the other parties except to any of its directors, officers, employees, affiliates, agents, attorneys, auditors or advisors (solely to the extent necessary for it to perform its obligations under this Agreement) or any other Person in connection with a syndication, assignment or participation under the Credit

Agreement or in connection with syndicating a DIP Financing (collectively, the "*Authorized Persons*"); *provided* that it shall inform each such Authorized Persons of the confidential nature of the information and shall direct each such Authorized Person to treat such information in accordance with the terms of this paragraph (a); and provided further that it shall also be permitted to disclose such information (i) to the extent required by any law, rule or regulation or by any subpoena or similar judicial and/or administrative order, or other regulatory authority (including any self-regulatory organization having jurisdiction or claiming to have jurisdiction over either party), or (ii) to the extent that such information is or becomes generally available to the public other than as a result of disclosure by it or its Authorized Persons.

(b) Neither the Company, the Agent nor any of the Lenders will issue or make any reports, statements or releases to the public or generally to the employees, customers, suppliers or other Persons with whom such party has significant business relationships with respect to this Agreement or the transactions contemplated hereby without the consent of the other parties, which consent shall not unreasonably withheld; it being understood, for the avoidance of doubt, that each of the Company, the Agent and the Lenders will obtain the other parties' prior approval of any press release to be issued in connection with this Agreement or the transactions contemplated hereby.

Section 24.  Survival.

All covenants set forth in Section 5(a)(ii) hereof shall survive the execution and delivery of this Agreement and shall remain in full force and effect as long as any Obligations remain outstanding under the Credit Agreement. The respective covenants and agreements of the parties set forth in this Agreement shall be considered to have been relied upon by the Agent, the Lenders and the Company, as applicable, and each party shall remain liable for any breach thereof notwithstanding the prior termination of this Agreement.

Section 25.  Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by electronic mail in portable document format (.pdf) shall be effective as delivery of an original executed counterpart of this Agreement.

Section 26.  Section Titles.

The section and subsection titles contained in this Agreement are included for convenience only, shall be without substantive meaning or content of any kind whatsoever, and are not a part of the agreement between the Company, on the one hand, and the Agent and the Lenders, on the other hand. Any reference in this Agreement to any *"Section"* refers, unless the context otherwise indicates, to a section of this Agreement.

Section 27.  Interpretation.

Cortland_PREPA_00001152

This Agreement is the product of negotiations of the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

Section 28. <u>Representation by Counsel</u>.

Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the Forbearance as contemplated herein. Accordingly, any rule of law or legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: *(signature)*
Name: Juan F. Alicea-Flores
Title: Executive Director

SCOTIABANK DE PUERTO RICO, as Agent and as Lender

By:
   Name:
   Title:

BANCO POPULAR DE PUERTO RICO, as Lender

By:
   Name:
   Title:

ORIENTAL BANK, as Lender

By:
   Name:
   Title:

FIRSTBANK PUERTO RICO, as Lender

By:
   Name:
   Title:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____
   Name: _____
   Title: _____

SCOTIABANK DE PUERTO RICO, as Agent and as Lender

By: _____
   Name: _____
   Title: _____

BANCO POPULAR DE PUERTO RICO, as Lender

By: *Liza M. Lugaro* (signature)
   Name: Liza M. Lugaro
   Title: Vice President.

ORIENTAL BANK, as Lender

By: _____
   Name: _____
   Title: _____

FIRSTBANK PUERTO RICO, as Lender

By: _____
   Name: _____
   Title: _____

- 14 -

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____
    Name: _____
    Title: _____

SCOTIABANK DE PUERTO RICO, as Agent and as Lender

By: _____
    Name: _RICARDO FISHMAN_
    Title: _VICE PRESIDENT_

BANCO POPULAR DE PUERTO RICO, as Lender

By: _____
    Name: _____
    Title: _____

ORIENTAL BANK, as Lender

By: _____
    Name: _____
    Title: _____

FIRSTBANK PUERTO RICO, as Lender

By: _____
    Name: _____
    Title: _____

Case:17-03283-LTS   Doc#:9069-22   Filed:10/31/19   Entered:10/31/19 00:23:25   Desc:
Exhibit 22   Page 18 of 20

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____
   Name: _____
   Title: _____

SCOTIABANK DE PUERTO RICO, as Agent and as Lender

By: _____
   Name: _____
   Title: _____

BANCO POPULAR DE PUERTO RICO, as Lender

By: _____
   Name: _____
   Title: _____

ORIENTAL BANK, as Lender

By: _____*Patrick J. Hagarty*_____
   Name: __*Patrick J. Hagarty*__
   Title: __*Executive Vice President*__

FIRSTBANK PUERTO RICO, as Lender

By: _____
   Name: _____
   Title: _____

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____

   Name: _____

   Title: _____

SCOTIABANK DE PUERTO RICO, as Agent and as Lender

By: _____

   Name: _____

   Title: _____

BANCO POPULAR DE PUERTO RICO, as Lender

By: _____

   Name: _____

   Title: _____

ORIENTAL BANK, as Lender

By: _____

   Name: _____

   Title: _____

FIRSTBANK PUERTO RICO, as Lender

By: _*[signature]*_

   Name: LAWRENCE ODELL

   Title: Executive Vice President / General Counsel

[NEWYORK 2915939_5]

Cortland_PREPA_00001158

## SCHEDULE 1

### DESIGNATED DEFAULTS AND EVENTS OF DEFAULT

1. Any Default or Event of Default under clause (d) of Article VII of the Credit Agreement, solely with respect to any failure to comply with Section 5.02(a) of the Credit Agreement in relation to the Company's obligation to give notice within 10 days of (a) the change in the Company's Senior Debt (an Adjustment Event), specifically (i) Moody's Investors Service change of its rating of the Company's Senior Debt to *"Ba2"* on February 7, 2014, (ii) Standard & Poor's Ratings Service change of its rating of the Company's Senior Debt to *"BBB-"* on June 18, 2014 and (b) a Default due to such change in Senior Debt rating resulting in the counterparties under certain interest rate swap agreements or Citibank under the Citibank Facility, each constituting Material Indebtedness under the Credit Agreement, having the right to cause the corresponding Indebtedness to become due.

2. Any Default or Event of Default under clause (f) of Article VII of the Credit Agreement with respect to the Citibank Facility and certain interest rate swap agreements mentioned under item 1 above.

3. Any Default or Event of Default under clause (g) of Article VII of the Credit Agreement with respect to the Citibank Facility and certain interest rate swap agreements as a result of the Designated Default listed under item 2 above.

4. Any Default or Event of Default under sub-clause (vi) of clause (i) of Article VII of the Credit Agreement (solely with respect to relief under the Public Corporation Debt Enforcement and Recovery Act (the "*Recovery Act*")).[1]

5. Any Default or Event of Default under clause (j) of Article VII of the Credit Agreement.

---

[1] Nothing in this Agreement shall be construed as an admission by either the Agent, the Lenders or the Company as to the characterization of the Recovery Act, nor shall anything in this Agreement be construed as an acknowledgment that a proceeding under the Recovery Act falls within the scope of either clause (h) or (i) of Article VII of the Credit Agreement.