# Exhibit 23

**Citibank Forbearance Agreement, dated July 6, 2014**

*EXECUTION VERSION*

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT, dated as of July 6, 2014 (this "Agreement"), is entered into by and between PUERTO RICO ELECTRIC POWER AUTHORITY (the "Company") and CITIBANK, N.A. (the "Lender"). Each of the foregoing shall be referred to herein as a "Party" and collectively as the "Parties."

**WITNESSETH:**

WHEREAS, the Company and the Lender have entered into that certain Trade Finance Facility Agreement dated as of July 20, 2012 (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"; capitalized terms used herein and not defined herein shall have the meanings ascribed thereto in the Credit Agreement);

WHEREAS, pursuant to the Credit Agreement the Lender has agreed to make, and has made, certain Advances and other extensions of credit to the Company;

WHEREAS, the Company has issued certain bonds that are payable after the payment in full of all Current Expenses;

WHEREAS, as of June 26, 2014, Moody's Investors Service, Inc. has downgraded the long term rating of the Senior Debt below Ba2, resulting in an Event of Default under Article VII, clause (q) of the Credit Agreement;

WHEREAS, the Company has advised the Lender that it expects to fail to repay those certain Advances coming due on and between July 3, 2014 and August 29, 2014 in the aggregate amount of $146,041,914.24, which failure would give rise to an Event of Default under Article VII, clause (a) of the Credit Agreement;

WHEREAS, the Company acknowledges and agrees that, as a result of the existence of the foregoing Events of Default and the additional Events of Default that may have occurred or may occur as listed on Schedule 1 hereto (collectively, the "Designated Events of Default"), the Lender is entitled to accelerate the Obligations, to seek immediate repayment in full of the Obligations and to exercise any or all of its rights and remedies under the Credit Agreement and applicable law;

WHEREAS, the Lender is not willing to waive the Designated Events of Default;

WHEREAS, the Company has requested that the Lender temporarily forbear, solely by reason of the Designated Events of Default, in accordance with the terms and subject to the conditions hereof, from commencing any legal proceedings against the Company or exercising rights of setoff to collect payment of the Obligations in order to permit an opportunity for negotiation of a possible financial restructuring of the Company;

WHEREAS, in connection with, and in furtherance of, the performance by the Company of its obligations under the Credit Agreement, the Lender agrees to accommodate such requests of the Company, in each case on the terms and subject to the conditions herein set forth;

WHEREAS, the Company and the lenders under the Company's $550 million committed credit agreement with Scotiabank de Puerto Rico, as administrative agent (the ("Scotiabank Facility") have entered into a forbearance agreement on substantially similar terms as the terms of this Agreement (the "Scotiabank Forbearance Agreement");

NOW, THEREFORE, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.  Incorporation of Recitals; Defined Terms.

The Company acknowledges that the Recitals set forth above are true and correct in all material respects. The defined terms in the Recitals set forth above are hereby incorporated into this Agreement by reference.

Section 2.  Amounts Owing.

The Company acknowledges and agrees that, to the best of its knowledge, the principal amount outstanding under the Credit Agreement is $146,041,914.24 and such amount (together with interest and fees thereon) is due, outstanding and justly and truly owing by the Company without defense, offset or counterclaim.

Section 3.  Acknowledgment of Default(s).

The Designated Events of Default constitute Events of Default under the Credit Agreement. The Company acknowledges that, because of the Events of Default, the Lender is permitted and entitled to accelerate the Obligations, and to exercise any other rights or remedies that may be available under the Facility Documents or under applicable law. The Company represents to the Lender that, to the best of its knowledge, there are no Defaults or Events of Default other than the Designated Events of Default.

Section 4.  Forbearance; Forbearance Period.

(a)  The "Forbearance Period" shall commence on the Forbearance Effective Date (as defined below) and end on the date (the "Forbearance Termination Date") that is the earlier to occur of (i) 5:00 p.m. (Eastern Time) on July 31, 2014 and (ii) the occurrence of a Forbearance Termination Event (as defined below); provided that the Lender shall provide the Company notice of a termination of this Agreement prior to exercising any right of setoff with respect to the Obligations under the Credit Agreement; provided further that no notice of termination shall be required if the Forbearance Period has terminated pursuant to sub-clause (i) above.

(b)  The Lender agrees that, upon the terms and subject to the conditions set forth herein (and notwithstanding the existence of the Designated Events of Default), during the Forbearance Period, the Lender shall not (A) commence any legal proceedings against the

Company or enforce any of its rights and remedies under the Credit Agreement against the Company or its assets or (B) exercise any rights of setoff in respect thereof solely by reason of the existence of the Designated Events of Default (the "Forbearance"). Notwithstanding anything to the contrary herein, the Forbearance shall not prohibit the Lender from instituting, commencing, prosecuting, joining, interceding in, supporting or otherwise participating directly or indirectly in any way in any legal proceedings regarding the validity, enforceability or application of the Public Corporation Debt Enforcement and Recovery Act (the "Recovery Act") or any provision thereof or intervening or otherwise participating in that certain action filed on June 28, 2014, *Franklin California Tax-Free Trust v. Puerto Rico*, Case No. 3:14-cv-01518 (D.P.R.), or in any other lawsuit filed by third parties regarding the Recovery Act (any such legal proceedings, actions or lawsuits, "Legal Actions"). The occurrence of any of the following events or circumstances shall constitute a termination event with respect to the Forbearance (each, a "Forbearance Termination Event"):

   (i) the occurrence of an Event of Default under the Credit Agreement that is not a Designated Event of Default;

   (ii) the Company provides public notice or notice to the Lender of the commencement of the suspension period under chapter 2, or file a petition under chapter 3, of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act;

   (iii) the occurrence of any default under, or termination of, the Scotiabank Forbearance Agreement;

   (iv) any amendment or modification of the Scotiabank Facility or the Scotiabank Forbearance Agreement without the express written consent of the Lender;

   (v) any default under or amendment, modification or termination of that certain Trust Agreement between the Company and U.S. Bank National Association, as Successor Trustee, dated January 1, 1974 (as amended and supplemented, the "Trust Agreement"), including, without limitation, a default under section 802 of the Trust Agreement as a result of the Company making any payments from the General Fund to the credit of the Revenue Fund, Sinking Fund, or any other funds established by sections 506 and 507 of the Trust Agreement, following the occurrence of an Anticipated Payment Default;

   (vi) a breach by the Company of any of the covenants set forth in this Agreement;

   (vii) the taking of any action by any holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf against the Company or its assets to commence legal proceedings (other than proceedings solely to contest the constitutional validity of the Recovery Act) or exercise setoff rights, in each case pursuant to such holder's rights with respect to such Material Indebtedness; or

3

(viii) the exercise of the Company's right to terminate this Agreement upon (A) the breach by Lender of any of the covenants set forth herein; (B) the termination of the Scotiabank Forbearance Agreement; or (C) the initiation, intervention or participation by the Lender into a Legal Action.

(c) The Forbearance is limited in nature and nothing contained herein is intended, or shall be deemed or construed (i) to constitute a waiver of any of the Designated Events of Default or any future Defaults or Events of Default or any term or provision of the Facility Documents or applicable law or (ii) to establish a custom or course of dealing between the Company, on the one hand, and the Lender, on the other hand, other than as set forth in Section 5. Notwithstanding anything to the contrary herein, the Forbearance shall not prohibit the Lender from instituting, prosecuting or joining in any lawsuit regarding the validity or enforceability of the Recovery Act.

(d) Subject to Section 5, on the Forbearance Termination Date, without the requirement of any notice to the Company or any other Person: (i) the Forbearance and all agreements set forth in Section 4(a) of this Agreement shall terminate automatically and be of no further force or effect, and (ii) subject to the terms of the Facility Documents and applicable law, the Lender shall be free in its sole and absolute discretion without limitation to proceed to enforce any or all of its rights and remedies set forth in this Agreement, the Credit Agreement, the other Facility Documents and applicable law including, without limitation, commencing legal proceedings and exercising setoff rights in respect thereof. In furtherance of the foregoing, and notwithstanding the occurrence of the Forbearance Effective Date, the Company acknowledges and confirms that, subject to the Forbearance, all rights and remedies of the Lender under the Facility Documents and applicable law with respect to the Company shall continue to be available to the Lender.

(e) The Company hereby agrees that, during the Forbearance Period, subject to the Forbearance and the other terms and provisions of this Agreement, all of the Facility Documents shall remain in full force and effect.

Section 5. Covenants.

(a) The Company hereby agrees that, during the Forbearance Period:

(i) The Scotiabank Facility shall be fully drawn in an amount of at least $549,976,142.68 except as provided in Section 5(a)(iv) and 5(a)(ix) below;

(ii) Any agreement hereinafter executed between the lenders under the Scotiabank Facility and the Company other than with respect to a DIP Financing (as hereinafter defined) (any such agreement, a "Scotiabank Agreement") shall be on terms acceptable to the Lender, and any provisions in any such Scotiabank Agreement that are favorable to such lenders (if analogous provisions are not already in this Agreement or are in this Agreement in a manner less favorable to the Lender), shall be deemed automatically incorporated into this Agreement for the benefit of (and modified to be applicable to) the Lender immediately upon the effectiveness of the Scotiabank Agreement;

4

(iii) The Company shall continue to make scheduled payments of interest under Section 2.08(a)(i) of the Credit Agreement; <u>provided</u> that notwithstanding anything to the contrary in the Credit Agreement, starting from July 4, 2014, the applicable rate of interest under section 2.08(a)(i) of the Credit agreement shall be deemed to be the higher of (x) the sum of (1) the LIBOR Rate and (2) an amount necessary for such applicable rate of interest to equal the rate then-payable to the lenders under the Scotiabank Facility (including any default interest thereunder and after taking into account any applicable provisions of the Scotiabank Forbearance Agreement) and (y) the sum of (1) the LIBOR Rate and (2) 7.25%;

(iv) In the event that the Company makes any unscheduled principal payment (unless such amounts are immediately re-borrowed under the Scotiabank Facility) or unscheduled interest payment under the Scotiabank Facility, the Company shall make an equal and ratable payment of unscheduled principal (unless such amounts are immediately re-borrowed under the Scotiabank Facility) or unscheduled interest, as the case may be, to the Lender under the Credit Agreement;

(v) The Company shall provide the Lender with cash flow reports forecasting the Company's budget (including cash receipts and disbursements) through July 31, 2014, updated (including with variance reports) on a weekly basis;

(vi) The Company shall retain in the General Fund any amounts it is entitled to retain for the payment of Current Expenses under section 506 of the Trust Agreement;

(vii) The Company shall pay within 10 days of receipt of an invoice all fees and expenses (including attorneys' fees) incurred by the Lender and their counsel in connection with the Credit Agreement, this Agreement and the other instruments and documents being executed and delivered in connection herewith and the transactions contemplated hereby (the Company acknowledges that it will receive summary invoice(s) reflecting only the total amount then due and that such summary invoice(s) will not contain any narrative description of the services provided, and that delivery of such summary invoice(s) shall not in any way constitute a waiver of any right or privilege of the Lender associated with such invoice(s)).

(viii) The Company shall provide the Lender with a copy of the operative Annual Budget in accordance with the requirements under the Trust Agreement; and

(ix) The commitment under the Scotiabank Facility shall not be reduced unless the Company shall make an equal and ratable reduction of the principal amount outstanding under the Credit Agreement and no payments or reimbursements of principal will be made to the lenders under the Scotiabank Facility by or on behalf of the Company unless the Company shall make an equal

Cortland_PREPA_00001411

and ratable payment of principal or reimbursement to the Lender under the Credit Agreement.

(b) From and after the date of this Agreement and until all Obligations under the Credit Agreement have been paid in full, the Company hereby reaffirms, covenants and agrees that (a) the Obligations under the Credit Agreement are "Current Expenses" and have first priority in the waterfall structure under the Trust Agreement and (b) it will never institute, join, or support any action or proceeding to challenge, modify or alter the treatment of the Obligations as Current Expenses under the Trust Agreement or otherwise impair the right of the Lender to be paid the Obligations under the Credit Agreement as first priority in the waterfall under the Trust Agreement; provided that nothing herein shall limit the Company's right to seek relief under chapter 2 or 3 of the Recovery Act or the identification of obligations included in a suspension notice or petition thereunder, or the Lender's right to contest any relief sought under the Recovery Act.

Section 6. Representations and Warranties.

(a) The Company hereby represents and warrants to the Lender that as of the date hereof:

(i) it has all requisite power and authority to enter into this Agreement and perform its respective obligations under this Agreement;

(ii) the execution, delivery and performance of this Agreement and its obligations hereunder have been duly authorized by all necessary corporate action on its part;

(iii) the execution, delivery and performance of this Agreement by it does not and shall not: (x) violate any provision of law, rule or regulation applicable to it; or (y) violate its enabling legislation, bylaws, or other organizational documents or those of any of its subsidiaries;

(iv) except with respect to any breach of the Facility Documents, the execution, delivery and performance of this Agreement by it do not and shall not conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(v) no Event of Default has occurred and is continuing under the Trust Agreement or the bonds issued thereunder; and

(vi) the Obligations under the Credit Agreement are "Current Expenses" and have first priority in the waterfall structure under the Trust Agreement.

(b) The Lender hereby represents and warrants to the Company that as of the date hereof:

6

(i) it has all requisite power and authority to enter into this Agreement and perform its respective obligations under this Agreement;

(ii) the execution, delivery and performance of this Agreement and its obligations hereunder have been duly authorized by all necessary corporate action on its part; and

(iii) the execution, delivery and performance of this Agreement by it do not and shall not: (x) violate any provision of law, rule or regulation applicable to it; (y) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (z) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

Section 7.  <u>Conditions to Effectiveness of this Agreement.</u>

This Agreement shall become effective (the date of such effectiveness being referred to herein as the "<u>Forbearance Effective Date</u>") upon the occurrence of each of the following conditions:

(a) The Scotiabank Forbearance Agreement shall be fully executed and effective on terms acceptable to the Lender; and

(b) Execution and delivery of this Agreement by each of the Lender and the Company.

Section 8.  <u>Effectiveness.</u>

Upon satisfaction of the conditions precedent set forth in Section 7, the Forbearance Effective Date shall be deemed to have occurred, regardless of whether those conditions were satisfied prior to, on or after such time.

Section 9.  <u>Notice of Default.</u>

Immediately upon the occurrence of any default under this Agreement, the Company shall provide notice of the same to the Lender in writing, which notice shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email, as follows:

<u>To the Lender</u>:

Citibank, N.A.
Physical #271 Muñoz Rivera Ave.
6th Floor
San Juan, Puerto Rico 00918
Attn:   Guillermo Gómez, guillermo.gomez@citi.com; and

Citibank, N.A.

Cortland_PREPA_00001413

>388 Greenwich Street
>New York, New York 10013
>Attn:   Tatiana Iliczewa, tatiana.iliczewa@citi.com
>
>with copies to:
>
>Davis Polk & Wardwell LLP
>450 Lexington Avenue
>New York, NY 10017
>Attn:   Donald S. Bernstein (donald.bernstein@davispolk.com) and
>        Brian M. Resnick (brian.resnick@davispolk.com)

All notices given in accordance with the provisions of this section shall be deemed to have been given on the date of receipt.

Section 10.   No Waiver, Etc.

Nothing in this Agreement is intended or shall be deemed or construed to in any way waive, alter or impair the obligations or any of the rights or remedies of the Lender under the Facility Documents or applicable law. Without limiting the generality of the foregoing, nothing in this Agreement extends the maturity of or otherwise affects the enforceability of any obligation under the Credit Agreement. All terms and provisions of the Facility Documents remain in full force and effect, except to the extent expressly modified by this Agreement. The Company acknowledges that the Lender has made no representations as to what actions, if any, the Lender will take after the Forbearance Period, and the Lender must and does hereby specifically reserve any and all rights, remedies, and claims it has (after giving effect hereto) with respect to the Events of Default and each other Default that may occur.

Section 11.   Release.

FOR VALUE RECEIVED, INCLUDING WITHOUT LIMITATION, THE AGREEMENTS OF THE LENDER IN THIS AGREEMENT, THE COMPANY HEREBY RELEASES THE LENDER, ITS CURRENT AND FORMER SHAREHOLDERS, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, AND PROFESSIONAL ADVISORS (COLLECTIVELY, THE "RELEASED PARTIES") OF AND FROM ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS OF EVERY KIND OR NATURE WHATSOEVER, BOTH IN LAW AND IN EQUITY, KNOWN OR UNKNOWN, WHICH THE COMPANY HAS OR EVER HAD AGAINST ANY OF THE RELEASED PARTIES PRIOR TO, THROUGH, AND INCLUDING THIS DATE, ARISING FROM OR RELATING TO THE EXISTING CREDIT AGREEMENT BETWEEN THE COMPANY AND THE LENDER, EXCEPT TO THE EXTENT THAT ANY SUCH DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS ARE FOUND IN A FINAL, NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE RELEASED PARTIES.

Section 12. No Third-Party Beneficiaries.

This Agreement shall be binding upon and inure to the benefit of each Party hereto and their respective successors and assigns. No Person other than the Parties hereto, their respective successors and assigns shall have rights hereunder or be entitled to rely on this Agreement, and all other third-party beneficiary rights are hereby expressly disclaimed.

Section 13. Successors and Assigns.

This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other Person without the express written consent of all of the other Parties.

Section 14. Severability.

The invalidity, illegality or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction.

Section 15. Governing Law, Jurisdiction; Waiver of Jury Trial.

(a) This Agreement shall be governed by and construed in accordance with the laws of the state of New York, other than with respect to Section 5(a)(iii), Section 5(b), Section 11 and Section 19 hereof, which shall be governed by and construed in accordance with the laws of the Commonwealth as set forth in Section 8.09(a) of the Credit Agreement. Nothing herein shall affect Section 8.09(a) of the Credit Agreement.

(b) Section 8.09(b), (c) and (d) and Section 8.10 of the Credit Agreement shall apply in full force and effect as to this Agreement, other than with respect to any suit, action, or proceedings solely with respect to Section 5(b), Section 11 or Section 19 hereof.

Section 16. Amendments.

The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, without the express prior written consent of all of the Parties.

Section 17. Good Faith Cooperation; Further Assurances.

The Parties agree to execute and deliver from time to time such other documents and take such other actions as may be reasonably necessary, without payment of further consideration (subject to Section 5(a)(vii)), in order to effectuate the Forbearance. The Parties shall cooperate with each other and with their respective counsel in good faith in connection with any steps required to be taken as part of their respective obligations under this Agreement.

Section 18. Prior Negotiations; Entire Agreement.

9

This Agreement constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, and no Party shall be liable or bound to any other Party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

Section 19. Right of First Refusal.

In the event that, from the date hereof to and including the later of (i) July 31, 2014 or (ii) the end of the Forbearance Period (the "ROFR Period"), the Company agrees to any financing arrangement wherein advances will be made under the provisions of the Recovery Act permitting funding on a priority or super-priority basis (or similar law providing for the restructuring of the Company's obligations under Puerto Rico law) (a "DIP Financing"), the Company shall provide immediate notice to the Lender of such DIP Financing (the "DIP Financing Notice") and the Lender shall have the option in its discretion, to (x) become a lender under that financing arrangement on the terms set forth in the agreement describing said financing arrangement (with the commitments under such financing arrangement to be allocated pro rata among the Lender and any of the lenders under the Scotiabank Facility exercising their right to participate in such financing arrangement (each, an "Exercising Lender"), such that each Exercising Lender's proportionate share of such financing facility shall be determined by dividing the principal amount outstanding to such Exercising Lender under the Credit Agreement or the Scotiabank Facility, as applicable, by the aggregate principal amount outstanding to all Exercising Lenders under the Credit Agreement and the Scotiabank Facility, provided, that if the Exercising Lenders agree on an alternative allocation, then such alternative allocation shall govern), or (y) propose equivalent or better terms of financing to the Company. Notwithstanding the foregoing, the ROFR Period shall terminate in the event that (A) the Forbearance Period terminates pursuant to Section 4(b)(viii) hereof or (B) the Company notifies the Lender of its material breach of this Agreement and such breach is not cured. Upon written notice to the Company from the Lender, the parties shall negotiate, execute and deliver a financing agreement incorporating the terms previously agreed to by the Company with any other lender(s) under such DIP Financing; provided that such agreement is entered into within 10 Business Days of receipt by the Lender of the DIP Financing Notice; provided further that in the event that the Lender receives the DIP Financing Notice on a date which is less than 10 Business Days prior to the end of the ROFR Period (the "Notice Date"), the Forbearance Period shall be automatically extended by 10 Business Day period starting from the Notice Date, unless the Lender has provided notice that it will not participate in the DIP Financing. Further, concurrently with the execution of this Agreement the Company shall provide to the Lender copies of any proposals, term sheets, or commitments that the Company has received and is willing to accept for financing arrangement(s) with the Company wherein advances will be made under the provisions of the Recovery Act permitting funding on a priority or super-priority basis (or similar law providing for the restructuring of the Company's obligations under Puerto Rico law) (each such proposal, a "DIP Financing Proposal"). Further, the Company shall provide to the Lender, within one business day after receipt, copies of any DIP Financing Proposal that the Company may receive.

Section 20. Information and Financial Data.

10

(a) The Company agrees to provide to Lender, on or before July 8, 2014 at 5:00 p.m. (Eastern time), the following information with respect to the month of June 2014:

(i) Report on the aging for government receivables and payables for major suppliers;

(ii) Fuel inventory reporting;

(iii) Fuel and power purchases reporting;

(iv) Payment to suppliers.

(b) During the Forbearance Period, the Company agrees to provide to the Lender on a weekly basis the following information:

(i) Report on cash on hand; and

(ii) Report on weekly collections.

(c) Further, the Company agrees to promptly provide to the Lender such additional financial and other information that the Lender may reasonably request.

Section 21. <u>Interpretation.</u>

This Agreement is the product of negotiations of the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

Section 22. <u>Representation by Counsel.</u>

Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the Forbearance as contemplated herein. Accordingly, any rule of law or legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Section 23. <u>Confidentiality; Announcements.</u>

(a) Each of the Company and the Lender (i) acknowledges that the existence and terms of this Agreement and, in the case of the Lender, any and all information relating to the Company (including, without limitation, any information shared by the Company in connection with discussions on the financial restructuring of the Company and any and all information provided by the Company in compliance with the information covenants of this Agreement) constitute confidential information and (ii) agrees not to disclose any such information to any Person without the prior written consent of the other party, except to any of its directors, officers, employees, affiliates, agents, attorneys, auditors or advisors (solely to the extent necessary for it to perform its obligations under this Agreement) or in connection with

11

syndicating a DIP Financing (collectively, the "Authorized Persons"); provided that it shall inform each such Authorized Persons of the confidential nature of the information and shall direct each such Authorized Person to treat such information in accordance with the terms of this paragraph (a); and provided further that it shall also be permitted to disclose such information (i) to the extent required by any law, rule or regulation or by any subpoena or similar judicial and/or administrative order, or other regulatory authority (including any self-regulatory organization having jurisdiction or claiming to have jurisdiction over either party), or (ii) to the extent that such information is or becomes generally available to the public other than as a result of disclosure by it or its Authorized Persons.

(b)     Neither the Company nor the Lender will issue or make any reports, statements or releases to the public or generally to the employees, customers, suppliers or other Persons with whom such party has significant business relationships with respect to this Agreement or the transactions contemplated hereby without the consent of the other party, which consent shall not unreasonably withheld; it being understood, for the avoidance of doubt, that each of the Company and the Lender will obtain the other party's prior approval of any press release to be issued in connection with this Agreement or the transactions contemplated hereby.

Section 24.     Survival.

All covenants set forth in Section 5(b) hereof shall survive the execution and delivery of this Agreement and shall remain in full force and effect as long as any Obligations remain outstanding under the Credit Agreement. The respective covenants and agreements of the parties set forth in this Agreement shall be considered to have been relied upon by the Lender and the Company, as applicable, and each party shall remain liable for any breach thereof notwithstanding the prior termination of this Agreement.

Section 25.     Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by electronic mail in portable document format (.pdf) shall be effective as delivery of an original executed counterpart of this Agreement.

Section 26.     Section Titles.

The section and subsection titles contained in this Agreement are included for convenience only, shall be without substantive meaning or content of any kind whatsoever, and are not a part of the agreement between the Company, on the one hand, and the Lender, on the other hand. Any reference in this Agreement to any "Section" refers, unless the context otherwise indicates, to a section of this Agreement.

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow*]

Cortland_PREPA_00001418

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____
Name: Juan F. Alicea-Flores
Title: Executive Director

**CITIBANK, N.A.**

By: _____
Name: Nancy Rochford
Title: Vice President

Cortland_PREPA_00001419

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By:_____
    Name: Juan F. Alicea-Flores
    Title: Executive Director

**CITIBANK, N.A.**

By: *[signature]*
    Name: Nancy Rochford
    Title: Vice President

# SCHEDULE 1

# DESIGNATED DEFAULTS AND EVENTS OF DEFAULT

1. Any Default or Event of Default under clause (d) of Article VII of the Credit Agreement, solely with respect to any failure to comply with Section 5.02(a) of the Credit Agreement in relation to the Company's obligation to give notice within 10 days of (A) the change in the Company's Senior Debt rating by Moody's or S&P's (an Adjustment Event) and (B) a Default due to such change in Senior Debt rating resulting in the counterparties under certain interest rate swap agreements, constituting Material Indebtedness under the Credit Agreement, having the right to cause the corresponding Indebtedness to become due prior to their respective scheduled maturities under the Credit Agreement.

2. Any Default or Event of Default under clause (f) of Article VII of the Credit Agreement.

3. Any Default or Event of Default under clause (g) of Article VII of the Credit Agreement.

4. Any Default or Event of Default under sub-clause (vi) of clause (i) of Article VII of the Credit Agreement (solely with respect to relief under the Public Corporation Debt Enforcement and Recovery Act (the "<u>Recovery Act</u>")).[1]

5. Any Default or Event of Default under clause (j) of Article VII of the Credit Agreement.

---

[1] Nothing in this Agreement shall be construed as an admission by either the Lender or the Company as to the characterization of the Recovery Act, nor shall anything in this Agreement be construed as an acknowledgment that a proceeding under the Recovery Act falls within the scope of either clause (h) or (i) of Article VII of the Credit Agreement.