# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------- X
:
In re: :
:
THE FINANCIAL OVERSIGHT AND : PROMESA
MANAGEMENT BOARD FOR PUERTO RICO, : Title III
:
     as representative of : Case No. 17-BK-3283 (LTS)
:
THE COMMONWEALTH OF PUERTO RICO *et al.,* : (Jointly Administered)
:
     Debtors.[1] :
-------------------------------------------------------------------- X
:
In re: :
:
THE FINANCIAL OVERSIGHT AND : PROMESA
MANAGEMENT BOARD FOR PUERTO RICO, : Title III
:
     as representative of : Case No. 17-BK-4780 (LTS)
:
PUERTO RICO ELECTRIC POWER AUTHORITY : **This filing relates only to**
: **Case No. 17-BK-4780 (LTS)**
:
     Debtor. :
-------------------------------------------------------------------- X

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO JOINT MOTION OF PUERTO RICO ELECTRIC POWER AUTHORITY AND AAFAF PURSUANT TO BANKRUPTCY CODE SECTIONS 362, 502, 922, AND 928 AND BANKRUPTCY RULES 3012(a)(1) AND 9019 FOR ORDER APPROVING SETTLEMENTS EMBODIED IN RESTRUCTURING SUPPORT AGREEMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 11

I.      JANUARY 10, 2017 PREB RULING.......................................................... 12

II.     PROPOSED SETTLEMENT ...................................................................... 13

      A.     Proposed Settlement Pleadings.......................................................... 14

      B.     Key Terms of Proposed Settlement ................................................... 15

             i.      Securitization Transaction:  Transition Charge and Exchange of
Existing Non-Recourse Bonds for Fully Secured New Bonds ............... 16

             ii.     Full Post-Petition Interest Provision ........................................ 17

             iii.    Accruing Administrative Expense Claim ................................. 18

             iv.    Waiver and Support Fees ......................................................... 19

             v.      Settlement Payments, Increased Settlement Payments, and
Adequate Protection Payments ................................................ 19

             vi.    Securitization Termination and Stipulated Treatment ............................. 21

             vii.   Stipulated Treatment Termination and Surviving Administrative
Claim ....................................................................................... 24

             viii.  Fees and Expenses .................................................................. 25

OBJECTION ........................................................................................................ 26

I.      APPLICABLE LEGAL STANDARD ...................................................... 26

II.     PROPOSED SETTLEMENT DOES NOT REASONABLY VALUE
LITIGATION BEING COMPROMISED .................................................. 30

      A.     Government Parties Have Not Satisfied Burden ................................ 31

      B.     Bondholders Must Overcome Significant Legal and Evidentiary Obstacles
in Lien Challenge ............................................................................. 33

             i.      Scope of Security Is Limited to $8.8 Million Held By the Trustee
as of the Petition Date ............................................................. 34

             ii.     Bondholders' Collateral Cannot Include Covenants and Remedies ........ 38

             iii.    Trust Agreement Does Not Support Claimed Lien on Gross
Revenues .................................................................................. 42

             iv.    Asserted Liens in Purported Extra Collateral Are Not Perfected ........... 44

# TABLE OF CONTENTS
(continued)

**Page**

| | | | | |
|---|---|---|---|---|
| | v. | | Asserted Liens in Purported Extra Collateral, Even if Valid and Perfected, Do Not Render Bondholders Fully Secured Under Bankruptcy Code | 47 |
| | | a. | *Any Lien on Gross Revenues Is Reduced to a Lien on Net Revenues by Section 928 of the Bankruptcy Code* | 48 |
| | | b. | *Any Lien on PREPA's Receipts Attaches Only After Deposited in Specified Accounts* | 50 |
| | | c. | *Any Lien on Gross Revenues Is Not a Lien on Proceeds* | 51 |
| | vi. | | Even if They Prevail on All Legal Arguments, Bondholders Cannot Prove Value of the Impossible Collateral | 52 |
| C. | | | Bondholders Must Overcome Significant Legal and Evidentiary Issues in Receiver Motion | 53 |
| | i. | | Initial Receiver Motion Ruling Suggests Court Will Deny Current Receiver Motion | 53 |
| | ii. | | Receiver Motion Requires Resolution of Lien Challenge, on Which Bondholders Are Unlikely to Prevail | 54 |
| | iii. | | Receiver Motion Is Governed By, and Likely to Be Denied Under, *Sonnax* Factors | 55 |
| | iv. | | In Any Event, the Possibility of Court Granting Receiver Motion Does Not Justify the Proposed Settlement | 57 |
| D. | | | Government Parties Fail to Properly Consider Strength of Parties' Respective Litigation Positions and Likelihood of Success on the Merits | 58 |
| | i. | | Lien Challenge Is an All or Nothing Proposition—For Bondholders | 58 |
| | ii. | | Proposed Settlement Is Worth Less Than Expected Value of Lien Challenge | 60 |
| E. | | | Government Parties Overstate Discount on Bondholders Claims | 63 |
| | i. | | Government Parties' Calculations Fail to Consider All Consideration Paid Under Settlement | 64 |
| | ii. | | Government Parties Improperly Award Bondholders Post-Petition Interest and Underestimate Their Recoveries as a Result | 65 |
| | iii. | | Brownstein Fails to Factor in Downward Trend in Municipal Market Yields, Potentially Further Understating Value Given to Bondholders | 67 |
| III. | | | SPECULATIVE PURPORTED PROMISED LAND BENEFITS DO NOT JUSTIFY PROPOSED SETTLEMENT | 70 |

-ii-

## TABLE OF CONTENTS
(continued)

**Page**

A. Promised Land Benefits Are Outside Scope of Court's Inquiry ......................... 71

B. Promised Land Benefits Are So Dependent on Events Outside Government Parties' Control As to Be Illusory ................................ 73

    i. Proposed Settlement Is Not Necessary for, and Does Not Increase Chances of, Confirmation ............................................. 74

    ii. Proposed Settlement Will Not Lead to Better Conditions for PREPA, its Ratepayers, and/or Puerto Rico ............................. 79

    iii. Unique Features of Securitization Transaction Are Harmful, Not Beneficial, to PREPA ................................................... 83

    iv. Proposed Settlement Is Not Necessary for Transformation .................... 86

C. Promised Land Benefits as Justification for Proposed Settlement Cannot be Reconciled With Stipulated Treatment or Pre-Plan Payments ...................... 89

IV. PROPOSED SETTLEMENT IS NOT FAIR AND EQUITABLE ................................ 91

V. OTHER RULE 9019 FACTORS ALSO MILITATE AGAINST PROPOSED SETTLEMENT ................................................................................. 97

A. No Difficulty Collecting ........................................................ 97

B. Complexity, Cost, and Delay of Litigating Do Not Justify Proposed Settlement ..................................................................... 97

VI. PROPOSED SETTLEMENT IS ILLEGAL *SUB ROSA* PLAN .................................. 102

A. Applicable Legal Standard ..................................................... 103

B. Proposed Settlement Is a *Sub Rosa* Plan ....................................... 104

C. *Sub Rosa* Is Not a Confirmation Issue ......................................... 107

VII. OTHER FEATURES OF PROPOSED SETTLEMENT ARE ILLEGAL OR NOT IN BEST INTERESTS OF PREPA OR ITS CREDITORS ......................................... 108

A. Administrative Expense Claim Cannot Be Approved as a Matter of Law ........ 108

B. Surviving Administrative Claim Cannot Be Approved As a "Break-Up" Fee As a Matter of Law ......................................................... 110

    i. Amount of Surviving Administrative Claim Is Excessive .................... 116

    ii. Government Parties Understate Break-Up Fee By Omitting Retained Payments ....................................................... 118

C. Proposed Settlement Is Designed to Pay, Without Full Disclosure to the Court, Certain Prepetition Claims in Full ...................................... 119

D. Bondholders Should Not Retain RSA Benefits When They Breach RSA ........ 121

# TABLE OF CONTENTS
(continued)

**Page**

E.    Court Cannot Approve Proposed Settlement in Absence of a Fiduciary Out.... 121

F.    Most Favored Nation Clause Is Unreasonable.................................................. 126

VIII.  GOVERNMENT PARTIES DID NOT EXERCISE DUE CARE OR GOOD
FAITH IN NEGOTIATING, AND AGREEING TO, PROPOSED
SETTLEMENT............................................................................................................ 127

A.    Government Parties Conducted Flawed and/or Hasty Approval Process,
and Certain Key Terms Have Never Been Approved....................................... 128

B.    Government Parties Negotiated Proposed Settlement Without Basic
Knowledge of Their Own Rights...................................................................... 131

C.    Government Parties Had an Inadequate Understanding of RSA's Key
Terms ............................................................................................................... 133

D.    Government Parties Failed to Act in Good Faith.............................................. 134

CONCLUSION...................................................................................................................... 135

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 100 Beaver Street Partnership*,
  244 B.R. 185 (Bankr. D. Mass. 2000) ............................................................................28, 29

*1st Farm Credit Services, PCA v. Phillips (In re Phillips)*,
  No. 05-87521, 2007 WL 4179845 (Bankr. C.D. Ill. Nov. 20, 2007).......................................40

*AgriProcessors, Inc v. Fokkena (In re Tama Beef Packing, Inc.)*,
  321 B.R. 496 (B.A.P. 8th Cir. 2005)....................................................................................117

*In re Alleghany Int'l, Inc.*,
  954 F.2d 167 (3d Cir. 1991)................................................................................................59

*In re Am. Cartage, Inc.*,
  656 F.3d 82 (1st Cir. 2011)..............................................................................................27, 28

*American United Mutual Life Insurance Co. v. City of Avon Park*,
  311 U.S. 138 (1940)..........................................................................................................65

*Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.)*,
  382 F.3d 68 (1st Cir. 2004)..............................................................................................27, 58

*In re Bell & Beckwith*,
  44 B.R. 664 (Bankr. N.D. Ohio 1984).................................................................................127

*In re Biolitec, Inc.*,
  528 B.R. 261 (Bankr. D.N.J. 2014) ......................................................................................94

*In re Block*,
  293 B.R. 290 (Bankr. D. R.I. 2003).....................................................................................31

*In re Bos. & Providence R. R. Corp.*,
  673 F.2d 11 (1st Cir. 1982)..............................................................................................28, 29

*In re Breland*,
  No. 16-2272-JCO, 2018 WL 1318954 (Bankr. S.D. Al. Feb. 14, 2018)...............................29

*Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*,
  514 B.R. 790 (Bankr. N.D. Tex. 2014)...............................................................................127

*In re C.P. Del Caribe, Inc.*,
  140 B.R. 320 (Bankr. D. P.R. 1992)...........................................................................73, 91, 109

v

*C.R. Stone Concrete Contractors, Inc. v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)*,
346 B.R. 32 (Bankr. D. Mass. 2006) ...............................................................29, 128

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
181 F.3d 527 (3d Cir. 1999)...........................................................................115

*In re CGE Shattuck*,
LLC, 254 B.R. 5 (Bankr. D.N.H. 2000)...........................................................105

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...............................................................31

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) ......................................................76, 77

*In re City of Detroit*,
No. 13-53846 (Bankr. E.D. Mich.) .................................................1, 100, 101, 102

*In re Connector 2000 Ass'n, Inc.*,
447 B.R. 752 .....................................................................................................76

*Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*,
333 B.R. 30 (S.D.N.Y. 2005)..........................................................................107

*In re Crowthers McCall Pattern, Inc.*,
114 B.R. 877 (Bankr. S.D.N.Y. 1990)......................................................103, 104

*Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.)*,
957 F.2d 1020 (2d Cir. 1992)............................................................................93

*In re Dana Corp.*,
Case No. 06-10354-BRL (Bankr. S.D.N.Y. Aug. 1, 2007) ..........111, 113, 114, 118

*In re Dana Corp.*,
No 06-10354-BRL (Bankr. S.D.N.Y. July 6, 2007) ...........................................114

*Delaware Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*,
527 B.R. 157 (D. Del. 2015)...........................................................34, 50, 78, 105

*In re Delphi Corp.*,
No. 05-44481 (Bankr. S.D.N.Y.) ........................................................111, 113, 118

*In re Delphi Corp.*,
No. 05-44481-rdd (Bankr. S.D.N.Y Dec. 18, 2006)...........................................113

*In re Egolf,*
    102 B.R. 706 (Bankr. N.D. Ind. 1989)..............................................................31, 33

*In re Energy Future Holdings Corp.,*
    575 B.R. 616 (Bankr. D. Del. 2017), *aff'd*, 904 F.3d 298 (3d Cir. 2018), *cert.
    denied sub nom. NextEra Energy, Inc. v. Elliott Assocs., L.P.*, 139 S. Ct. 1620,
    203 L. Ed. 2d 898 (2019).................................................................114, 115

*In re Energy Future Holdings Corp.,*
    904 F.3d 298 (3d Cir. 2018), *cert. denied sub nom. NextEra Energy, Inc. v.
    Elliott Assocs., L.P.*, 139 S. Ct. 1620, 203 L. Ed. 2d 898 (2019) ...................111, 115

*Energy Future Holdings Corp. v. Del. Trust Co.,*
    648 Fed. Appx. 277 (3d Cir. 2016).......................................................105

*In re Enron Corp.,*
    306 B.R. 465 (Bankr. S.D.N.Y. 2004)......................................................56

*In re Everett,*
    No. 10–19457–FJB, 2013 WL 3757283 (Bankr. D. Mass. Jul. 15, 2013).............................59

*In re Exide Techs.,*
    303 B.R. 48 (Bankr. D. Del. 2003) ......................................................87, 91, 92, 97

*Ezenia! Inc. v. Nguyen (In re Ezenia! Inc.),*
    536 B.R. 485 (Bankr. D.N.H. 2015).......................................................59

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    899 F.3d 13 (1st Cir. 2018).............................................................5, 54, 56

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Global Designated
    Activity Co. (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico),*
    385 F. Supp. 3d 138 (D.P.R. 2019).......................................................48

*First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton),*
    18 B.R. 868 (Bankr. D. Colo. 1982) ..............................................*passim*

*In re Fort Wayne Telsat, Inc.,*
    665 F.3d 816 (7th Cir. 2011) ............................................................60

*Franklin High Yield Tax–Free Income Fund v. City of Stockton (In re City of
    Stockton, California),*
    542 B.R. 261 (B.A.P. 9th Cir. 2015).......................................................75

*In re Fryar,*
    570 B.R. 602 (Bankr. E.D. Tenn. 2017) ...................................................104

*In re GHR Companies, Inc.,*
    50 B.R. 925 (Bankr. D. Mass. 1985) ...........................................................................28

*Gowan v. Gardi (In re Gardi),*
    273 B.R. 4 (Bankr. E.D.N.Y. 2002)........................................................................31, 61

*Grella v. Salem Five Cent. Savs. Bank,*
    42 F.3d 26 (1st Cir. 1994)...........................................................................................55

*In re Hansen,*
    No. 12-11907-JMD, 2017 WL 1491765 (Bankr. D. N.H. Apr. 25, 2017) ............................30

*In re Hardeman Cty. Hosp. Dist.,*
    540 B.R. 229 (Bankr. N.D. Tex. 2015)....................................................................76, 77

*In re Heritage Org., L.L.C.,*
    375 B.R. 230 (Bankr. N.D. Tex. 2007)........................................................................31

*Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.),*
    136 F.3d 45 (1st Cir. 1998).........................................................................................28

*In re Innkeepers USA Tr.,*
    442 B.R. 227 (Bankr. S.D.N.Y. 2010)............................................................. *passim*

*Jeffrey v. Desmond,*
    70 F.3d 183 (1st Cir. 1995).......................................................................... *passim*

*Jimenez v. Peninsular & Oriental Steam Navigation Co.,*
    974 F. 2d 221 (1st Cir. 1992)......................................................................................43

*In re Junk,*
    566 B.R. 897 (Bankr. S.D. Ohio 2017)........................................................................30

*Karim v. Bayview Loan Servicing, LLC (In re Karim),*
    No. 17 A 00380, 2018 WL 1230561 (Bankr. N.D. Ill. Mar. 9, 2018) .....................................50

*L&R Dev. & Inv. Corp v. Roman (In re L&R Dev. & Inv. Corp.),*
    No. 16-08792 BKT, 2017 WL 4863013 (Bankr. D.P.R. Oct. 26, 2017) ...............................43

*Laser Realty, Inc. v. Fernandez (In re Fernandez),*
    No. 04-10585 (GAC), 2009 WL 2913685 (Bankr. D.P.R. Mar. 31, 2009) ...........................96

*In re Leiferman,*
    No. 10–40718, 2011 WL 166170 (Bankr. D.S.D. Jan. 19, 2011)..........................................40

*In re Liberia Alma Mater, Inc.,*
    123 B.R. 698 (Bankr. D.P.R. 1991) ..........................................................................109

*In re Lion Capital Grp.,*
    49 B.R. 163 (Bankr. S.D.N.Y. 1985) ...............................................................31, 32

*Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.),*
    No. 13-12098 (CSS), 2017 WL 1508606 (Bankr. D. Del. Apr. 27, 2017) ...................127, 128

*In re Lloyd, Carr & Co.,*
    617 F.2d 882 (1st Cir. 1980) ..................................................................................94

*In re Louise's Inc.,*
    211 B.R. 798 (D. Del. 1997) .........................................................................104, 106

*Louisville Joint Stock Land Bank v. Radford,*
    295 U.S. 555 (1935) ................................................................................................41

*Maloy v. Sigmon (In re Maloy),*
    No. 07-30813, 2009 WL 4800070 (Bankr. W.D.N.C. Dec. 7, 2009) ......................30

*Maxwell Newspapers, Inc. v. Travelers Indem. Co.,*
    170 B.R. 549 (S.D.N.Y. 1994) ..............................................................................29

*In re Miami Metals I, Inc.,*
    603 B.R. 531 (Bankr. S.D.N.Y. 2019) ..................................................91, 102, 103

*Mohns, Inc. v. Wilson,*
    498 B.R. 907 (E.D. Wis. 2013) ..............................................................................60

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),*
    478 F.3d 452 (2nd Cir. 2007) ...............................................................31, 91, 109

*In re Nationwide Sports Distribs., Inc.,*
    227 B.R. 455 (Bankr. E.D. Pa. 1998) ...................................................................134

*In re New York City Off-Track Betting Corp.,*
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) .................................................................111

*In re NII Holdings, Inc.,*
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) .....................................................................30

*Nike Int'l Ltd. v. Athletic Sales, Inc.,*
    760 F. Supp. 22 (D.P.R. 1991) ..............................................................................43

*In re Nortel Networks, Inc.,*
    522 B.R. 491 (Bankr. D. Del. 2014) ......................................................................31

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) .......................................................91

*Official Comm. of Unsecured Creditors of the Commonwealth of P.R. v. Whyte (In
re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   360 F. Supp. 3d 65 (D.P.R. 2019) .......................................................72

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re
Cajun Elec. Power Coop., Inc.)*,
   119 F.3d 349 (5th Cir. 1997) .......................................................104

*In re P & P "Quick Sett" Servs., Inc.*,
   No. 10-14705, 2011 WL 1628023 (Bankr. D.R.I. Apr. 19, 2011)....................................27, 94

*Pena v. Honeywell Int'l, Inc.*,
   923 F.3d 18 (1st Cir. 2019) .......................................................71

*Pennock v. Coe*,
   64 U.S. 117 (1859) .......................................................50

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
   700 F.2d 935 (5th Cir. 1983) .......................................................104

*PREPA v. Ad Hoc Group of PREPA Bondholders*,
   No. 17-2079 (1st Cir. Apr. 6, 2018).......................................................2, 17, 41, 49

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)....................................28

*Prudential Ins. Co. of Am. v. SW Bos. Hotel Venture, LLC (In re SW Bos. Hotel
Venture, LLC)*,
   748 F.3d 393 (1st Cir. 2014) .......................................................66

*Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.)*,
   No. 03-82408, 2007 WL 4556981 (Bankr. C.D. Ill. Dec. 20, 2007) ......................................73

*In re Remsen Partners, Ltd.*,
   294 B.R. 557 (Bankr. S.D.N.Y. 2003) .......................................................30, 73, 91

*In re Robotic Vision Sys., Inc.*,
   2009 WL 1664582 .......................................................30

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016).......................................................29

*In re San Jacinto Glass Indus., Inc.*,
   93 B.R. 934 (Bankr. S.D. Tex. 1988) .......................................................107

*Scott v. Weig*,
    No. 15 CIV. 9691 (RWS), 2018 WL 2254541 (S.D.N.Y. May 17, 2018) ............................73

*Sebelen Medina v. Banco Popular de P.R. (In re Sebelen Medina)*,
    No. 14-06368, 2015 WL 2378975 (Bankr. D.P.R. May 13, 2015)..........................................56

*Serafino v. Hasbro, Inc.*,
    82 F.3d 515 (1st Cir. 1996)..................................................................................................130

*In re Shankman*,
    No. 08-36327, 2010 WL 743297 (Bankr. S.D. Tex. Mar. 2, 2010)..................................73, 74

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
    907 F.2d 1280 (2d Cir. 1990). Cause ........................................................................... *passim*

*Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*,
    225 B.R. 883 (Bankr E.D. Pa. 1998) ......................................................................................39

*In re Stuart*,
    272 F. 938 (6th Cir. 1921) ......................................................................................................61

*Szwak v. Earwood (In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.)*,
    592 F.3d 664 (5th Cir. 2009) ..................................................................................................58

*In re Taylor*,
    190 B.R. 417 (Bankr. D. Col. 1995) .......................................................................................97

*United States Small Bus. Admin. v. Feinsod*,
    347 F. Supp. 3d 147 (E.D.N.Y. 2018) ..................................................................................127

*United States v. AWECO, Inc. (In re AWECO, Inc.)*,
    725 F.2d 293 (5th Cir. 1984) .........................................................................................93, 109

*United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave.,
Brooklyn, N.Y.*,
    55 F.3d 78 (2d Cir. 1995) ......................................................................................................130

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .......................................................................................29

*In re WestPoint Stevens, Inc.*,
    600 F.3d 231 (2d Cir. 2010)..................................................................................................107

*Will v. Northwestern University (In re Nutraquest)*,
    434 F.3d 639 (3rd Cir. 2006) ..........................................................................................86, 97

*Wright v. Union Cent. Life Ins. Co.*,
    311 U.S. 273 (1940)................................................................................................................41

*Wright v. Vinton Branch of Mountain Trust Bank,*
    300 U.S. 440 (1937) .............................................................................................41

**Statutes**

19 L.P.R.A. § 2212(a)(52) ........................................................................................45

19 L.P.R.A. § 2214(a)(1)-(3) ....................................................................................46

19 L.P.R.A. § 2260(a) ...............................................................................................45

19 L.P.R.A. § 2262(b)(1) ..........................................................................................45

19 L.P.R.A. § 2264(a) ...............................................................................................45

19 L.P.R.A. § 2267(a)(2) ...........................................................................................44

11 U.S.C. § 506(a) ...............................................................................................33, 37

Bankruptcy Code section 363 .................................................................................104

Bankruptcy Code section 363(f)(4) ..........................................................................89

Bankruptcy Code section 503(b)(1)(A) ..................................................................111

Bankruptcy Code section 503(b)(3)(D) ..................................................................108

Bankruptcy Code section 506(b) ...............................................................................26

Bankruptcy Code section 541 .................................................................................111

Bankruptcy Code section 544 .............................................................................44, 47

Bankruptcy Code section 544(a) ...............................................................................46

Bankruptcy Code sections 552 and 928 ......................................................................4

Bankruptcy Code section 552(a) ...............................................................................48

Bankruptcy Code section 552(a) ...............................................................................48

Bankruptcy Code section 552(b) ...............................................................................47, 51, 52

Bankruptcy Code section 922 .....................................................................................36

Bankruptcy Code section 928 .............................................................................. *passim*

Bankruptcy Code section 928(a) ................................................................................49

Bankruptcy Code Section 943(b)(7) ..........................................................................76

2014 P.R. Laws 57, § 6.25(b) ........................................................................................................12

UCC § 1-201(b)(35)........................................................................................................................38

UCC § 9-102(a)(12)........................................................................................................................38

UCC § 9-109(a)...............................................................................................................................39

To The Honorable United States District Court Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "<u>Committee</u>")[2] hereby submits the

following objection (the "<u>Objection</u>")[3] to the *Joint Motion of Puerto Rico Electric Power*

*Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and*

*Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the*

*Restructuring Support Agreement and Tolling Certain Limitations Periods* [Docket No. 1235][4]

(together with all supporting documentation, the "<u>9019 Motion</u>").

### PRELIMINARY STATEMENT

> The Court stated earlier and states again that it will not participate in or permit the
> city to perpetuate the very kinds of hasty and imprudent financial decision-making
> that led to the disastrous swaps and COPs transactions. Those practices have
> already caused great harm to the city's creditors and to its citizens. In the Court's
> view, one goal of this Chapter 9 case is to end these practices so that the city can
> truly recover from its past mistakes and move forward, and the Court intends to
> conduct itself accordingly. . . In its eligibility opinion, the Court found that the city
> had entered into a series of bad deals to solve its financial problems. The law says
> that when the city filed this bankruptcy, that must stop. It also says that this Court
> must be the one to stop it, if necessary. It is necessary here.
>
> —Bankruptcy Judge Steven W. Rhodes, January 16, 2014[5]

1.      The settlement proposed by the 9019 Motion (the "<u>Proposed Settlement</u>") is yet

another "bad deal" that PREPA, long plagued by a history of mismanagement and irresponsible

fiscal policy, erroneously believes will finally solve its financial problems. ██████████████

████████████████████████████████████, the Proposed Settlement seeks to

---

[2]    The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and
COFINA.

[3]    In support of the Objection, the Committee has filed contemporaneously herewith the Declaration of Zachary
Zwillinger (the "<u>Zwillinger Declaration</u>") and the Declaration of Scott Martinez (the "<u>Zolfo Cooper
Declaration</u>").

[4]    Unless otherwise noted, all docket references are to the docket for PREPA's Title III case. Capitalized terms
used but not defined herein have the meanings given to them in the 9019 Motion.

[5]    Zwillinger Decl., Ex. 1 (Jan. 16, 2014 Hr'g Tr., *In re City of Detroit*, No. 13-53846 (Bankr. E.D. Mich.)
[Docket No. 2521] (the "<u>Detroit Hearing Transcript</u>"), at 20:16-25, 22:4-11.

restructure approximately $8.5 billion (including prepetition interest) in non-recourse bonds (the "Non-Recourse Bonds") by providing the holders thereof (the "Supporting Holders")[6] approximately $7.3 billion in present value consideration, or ***recoveries of approximately 86% of the face amount of their claims (and, under certain conditions, even greater than 90%).*** In nominal dollars, this results in payments of ***over $20 billion***[7] to the Supporting Holders over the next several decades—in fact, because the new bonds have no maturity date, PREPA could potentially be making payments to the Supporting Holders (including for interest due on past due interest) ***forever***. The Committee, on behalf of PREPA's unsecured creditors, respectfully asks the Court to put an end to PREPA's imprudent decision making and deny the 9019 Motion.

2.      Under Federal Rule of Bankruptcy Procedure 9019, the Proposed Settlement does not merely fall outside the range of reasonableness: it is a terrible deal for PREPA and its non-bondholder creditors. The core consideration PREPA stands to receive in the Proposed Settlement is the (i) compromise of the Oversight Board's adversary complaint challenging the validity and extent of the purported liens securing the Non-Recourse Bonds and asserting that the Bondholders' only collateral (if any) is the limited cash on deposit in certain accounts (the "Lien Challenge")[8] (as of the petition date that cash totaled approximately ***$8.8 million***) and (ii) withdrawal by certain Monolines of their motion for relief from the automatic stay to seek the appointment, under Puerto Rico law, of a receiver for PREPA (the "Receiver Motion" and,

---

[6]   The Supporting Holders include bondholders ("Holders") and monoline insurers (the "Monolines" and, together with the Holders, the "Bondholders") of Non-Recourse Bonds.

[7]   Cash flows are based on the Transition Charge schedule provided in the Definitive RSA and (i) shorter term load projections provided in PREPA's certified fiscal plan dated April 19, 2018 (the "2019 PREPA Fiscal Plan") and (ii) longer term load projections based on Tranche A bonds being repaid in 33 years (as contemplated in the Recovery Plan Term Sheet attached to the RSA).

[8]   *See* [Docket No. 1 in Adv. Pro. No. 19-391-LTS].

together with the Lien Challenge, the "Litigation").[9]  The Government Parties also tout a variety

of other non-economic benefits of the deal, but they are irrelevant to the Court's analysis, not

substantiated by admissible evidence, and/or so highly speculative (because they are contingent

on events outside the Government Parties' control) as to be illusory in most cases.  In the end,

the Court should reject the Proposed Settlement for numerous, independent reasons.

3.     **First, the settlement is far too rich given the strength of the Government**

**Parties' position in the Litigation.**  Under Rule 9019, a recovery for the Bondholders of the

magnitude proposed can be approved only if the Bondholders have, by far, the better arguments

in the Litigation.  Here, the opposite is true: the arguments overwhelmingly favor the

Government Parties.  Indeed, the Oversight Board's Executive Director, speaking as the

Oversight Board's Rule 30(b)(6) representative, has characterized the Government Parties' legal

position as "strong" and that of the Bondholders as "weak" and has conceded that the

Government Parties are more likely than not to ultimately prevail.[10]

4.     The thrust of the Bondholders' position in the Litigation is that they hold

perfected security interests in PREPA's gross (as opposed to net) revenues and, somehow, in

certain covenants and remedies under the Trust Agreement governing the Non-Recourse Bonds

(the "Impossible Collateral").[11]  Based on these purported security interests, the Bondholders

claim they are oversecured by PREPA's future potential revenues.  This argument borders on

frivolous, as it runs afoul of the fundamental principle of law that security interests can only be

---

[9]     *See* Docket No. 975.  The Proposed Settlement will also resolve the July 2017 motion to lift the automatic stay
        filed by a group of Supporting Holders and seeking substantially similar relief of appointing a receiver.  *See*
        Docket No. 74 (the "Initial Receiver Motion").

[10]    Jaresko Decl. ¶¶ 29, 33; *see also* Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 227:4-16) (explaining that having a
        "strong" case means that success is more likely than not)).

[11]    The Impossible Collateral includes specifically the Rate Covenant and the Receiver Remedy (as these terms are
        defined below).

granted in personal property and not remedies and covenants in a credit agreement, which are not

property of the obligor but rather mere obligations of the obligor.  The argument is also

inconsistent with the plain text of the Trust Agreement, which does not even purport to grant a

lien in the Impossible Collateral, but rather limits the Bondholders' collateral to approximately

$8.8 *million* on deposit in certain accounts on the petition date.  Indeed, the financial advisor of

certain of the Supporting Holders *admitted in Congressional testimony that their collateral is*

*limited to "Net Revenues" and does not include either PREPA's gross receipts or the*

*Impossible Collateral*.[12]

     5.     The Bondholders' legal hurdles do not end with the language of the Trust

Agreement and fundamental principles of property law.  The Bondholders must also:

    i.     Show that their alleged security interests are properly perfected (they are not);

    ii.     Overcome sections 552 and 928 of the Bankruptcy Code, which eliminate or reduce any lien they hold on PREPA's gross receipts; and

    iii.     Prove that their purported collateral has value, which is highly difficult, if not impossible, given that PREPA is currently unable to generate meaningful net revenues without raising rates; therefore, the Bondholders would have to establish that (a) PREPA would seek to raise its rates even in the absence of a settlement, (b) Puerto Rico regulators would approve future rate increases sufficient to repay at least a portion of the Non-Recourse Bonds, and (c) such increases would not cause an economic "death-spiral" of PREPA.

     6.     Critically, the Bondholders bear the burden of proof on all of these issues.  The

Government Parties attempt to justify the Proposed Settlement by claiming that the Government

Parties would have to "run the table" in the Litigation to reduce Bondholder recoveries.  The

Government Parties have it backwards.  The Litigation is an "all or nothing" proposition for the

---

[12]   *See* Zwillinger Decl., Ex. 3 (Mar. 22, 2017 Spencer Testimony Before U.S. House Committee on Natural Resources, at 3 (Spencer Ex. 5), at 3).

Bondholders:  the only way they have fully secured claims is if they prevail on every issue.[13]

7.     Meanwhile, the consequences to the Bondholders of losing in the Litigation are devastating.  Because their claims are ***non-recourse***, failure by the Bondholders at any stage will leave them ***with no other allowable claim***, secured or unsecured, beyond the $8.8 million (at most) that makes up their collateral.  Unbelievably, nowhere in any of their three memoranda in support of the Proposed Settlement, totaling 135 pages, or their four witness declarations, do the Government Parties make any mention of the non-recourse nature of the Bondholders' claims.[14]

8.     Courts have explained that the lowest point in the range of reasonableness is determined by relatively straightforward calculations of the expected value of the compromised litigation.  As discussed below, even assuming that each of the various issues in the Lien Challenge is a 50/50 "toss-up" (which is far more generous than reality), application of this rule here means that ***any settlement that fails to reduce the Bondholders' claim of $9.83 billion as of June 2020[15] by at least $7.37 billion is below the lowest point in the range of reasonableness and, therefore, cannot be approved***.

9.     **Second, purported non-economic benefits of the RSA cannot be used to justify the Proposed Settlement**.  The Government Parties argue that the Proposed Settlement provides other forms of non-economic value to PREPA.  These arguments, however, conflict with the position they took in their successful motions *in limine* that all the Court should consider

---

[13]   The issues that control the outcome of the Lien Challenge also control the outcome of the Receiver Motion and vice versa.  Indeed, the First Circuit has expressly instructed that the latter not be considered prior to the former.  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 23 (1st Cir. 2018) ("one of the predicate legal issues was whether and to what extent the bondholders possessed property interests").  Moreover, there is no need to speculate as to how the Court would rule on the Receiver Motion as it already denied such motion two years ago (and not only on section 305 grounds, on which the First Circuit reversed).

[14]   The 36-page Lien Challenge is similarly silent on this issue.

[15]   *See* Brownstein Decl. ¶ 39.

on the 9019 Motion is whether the "disputed secured claims are discounted enough to put the

settlement in the range of reasonableness."[16]  The Government Parties cannot now reverse course

and ask the Court to consider evidence that they themselves have successfully argued is not

relevant.  In any event, the Government Parties have not provided any credible evidence that

these advertised additional benefits will actually occur.

10.     The Government Parties contend[17] that the Proposed Settlement will benefit

PREPA by helping it reach the "promised land" of (i) plan confirmation, (ii) PREPA's

transformation and/or partial privatization (the "Transformation"), and (iii) improved

macroeconomic conditions for PREPA, its ratepayers, and/or Puerto Rico generally (collectively,

the "Promised Land Benefits").  Even if considered, because they are largely dependent on

factors outside the Government Parties' control, these "benefits" are so speculative as to be

illusory, and therefore cannot justify the Proposed Settlement.

11.     For example, the Transition Charge and the allegedly beneficial non-economic

provisions of the new securitization bonds—which the Government Parties claim were key

drivers of the Proposed Settlement—*may never even come into existence*.  If the Government

Parties determine that the RSA is inconsistent with the Transformation, if the Puerto Rico

legislature does not pass required legislation, or if the Government Parties cannot reach an

agreement with the Supporting Holders on definitive securitization documentation, a

"Securitization Termination" may occur, meaning that the securitization structure terminates and

the purported "rate cap" and all the promised non-economic benefits of the new bonds never

---

[16]   Docket Nos. 1300 and 1301, at 2 (together the "Motions in Limine to Exclude Testimony Offered by Non-Profit
Organizations").

[17]   Additional benefits of the Purported Settlement touted by the Government Parties include the purported "rate
cap" and the allegedly more "benign" remedy and default provisions of the new securitization bonds.

materialize.  Yet, under these circumstances, PREPA is ***still required to provide the same
economic value to the Supporting Holders***, including fully secured allowed claims and upwards
of ***one billion[18]*** in pre-plan consideration.[19]  This result is indefensible.  And, to be clear, there is
a strong likelihood that a Securitization Termination will occur, particularly due to the risk that
required legislation does not pass.  The Puerto Rico legislature is already under immense
pressure to reject the RSA—including from local industry groups and even members of U.S.
Congress, including multiple current presidential candidates, who have sent letters to the
legislature denouncing the deal as too rich for bondholders and asking that it be rejected.
Accordingly, the supposedly critical "rate cap" and the purportedly "unprecedented" terms of the
RSA cannot be used to support the Proposed Settlement because they may never materialize.

12.     The same is true with respect to the Promised Land Benefits of plan confirmation
and Transformation.  These are highly speculative benefits that are subject to the occurrence of
numerous uncertain events, such as the timely receipt of billions of dollars in federal funding and
the passage of additional legislation.  The Proposed Settlement nevertheless provides that
Supporting Holders will receive the same economic treatment even if the Transformation does
not occur.  This outcome is illogical and undermines the Government Parties' contention that
facilitating Transformation was a key motivation for the Proposed Settlement.

13.     **Third, the Proposed Settlement should be denied because it is not in the
paramount interests of creditors.**  The "compromise" embodied by the Proposed Settlement is

---

[18]     *See* Zolfo Cooper Decl., Ex. 1.

[19]     Inexplicably, the Government Parties have made no effort to disclose to the Court the enormous monetary
benefits that the Bondholders will receive if the RSA fails after the Court approves it.  The apparent reason the
consequences of termination have not been disclosed is because the Government Parties, according to their
depositions, had no understanding at the time of approval of the RSA, and do not appear to have any
understanding today, of the magnitude of the various benefits (either in actual payments or claims allowance)
that the Bondholders stand to keep if the settlement terminates.

the result of a one-sided negotiation that is bad for PREPA and even worse for its non-

bondholder creditors.  The Committee, the only fiduciary for unsecured creditors in the PREPA

Title III case, was systematically excluded from negotiations.  The Government Parties have

represented to the Court that the Proposed Settlement will leave the rights of all other PREPA

creditors unprejudiced and unaffected, but this is not true.  To the contrary—and unsurprisingly,

given the purposeful exclusion of all other creditors from the negotiations—the Proposed

Settlement appears to impermissibly restrict PREPA's ability to pay other, non-bondholder

creditors.  The Committee has prepared an expert report detailing the challenges, if not

impossibility, of PREPA generating recoveries for other creditors after implementing the

Proposed Settlement.  For these reasons, the Proposed Settlement renders impossible any

alternative plan of adjustment and forecloses other resolutions of PREPA's myriad problems.

14.     **Fourth, the Proposed Settlement must be rejected because the RSA is an**

**impermissible *sub rosa* plan, not a restructuring support agreement**.  A restructuring support

agreement is not permissible if it purports to require present performance outside of a plan of

adjustment, rather than provide for future agreement.  Here, the RSA contains a variety of

provisions that provide for the impermissible implementation of the Proposed Settlement outside

of a plan, such as the requirement that PREPA make payments to the Supporting Holders in the

amount of the Transition Charge after the Delayed Implementation Date but prior to plan

confirmation.  The Proposed Settlement also locks in other pre-confirmation value—including

administrative claims, post-petition interest, and settlement charges—without a confirmed and

effective plan.  For this reason alone, the Proposed Settlement is illegal and cannot be approved.

15.     **Fifth, the Proposed Settlement contains numerous terms and conditions that**

**are illegal and/or clearly not in PREPA's best interests.**  These provisions alone provide

grounds for the Court to deny the 9019 Motion. In the alternative, even if the Court were

inclined to otherwise approve the Proposed Settlement (it should not be), the Court should at a

minimum strike these provisions. In addition to the indefensible "Securitization Termination"

provision described above, the provisions that should be stricken (or remedied) include:

    i.    the allowance of administrative expense claims of hundreds of millions of
dollars of post-petition interest for the Supporting Holders who are, without a
doubt, undersecured. Because (unlike secured claims) administrative expense
claims are not subject to cramdown, if approved, these administrative expense
claims would impermissibly reorder the Bankruptcy Code's priority scheme
by putting the Supporting Holders in a better position than if they litigated and
prevailed in the Litigation;

    ii.    the Waiver and Support Fees, ███████████████████████
████████████████████. This reality is contrary to the fiction the
Government Parties assert in their papers that these fees were designed to
encourage early adoption of the settlement and to compensate Supporting
Holders for delay in plan confirmation;

    iii.    the "Individual Termination" provision, which allows a Supporting Holder
that materially breaches the RSA—including through willful misconduct—to
retain all interim payments it has received from PREPA under the RSA;

    iv.    the absence of a "fiduciary out," even if the Government Parties determine
that the Proposed Settlement is detrimental to PREPA;

    v.    the "Most Favored Nations" clause that, by the Government Parties' own
admission, may require them to pay the Supporting Holders in full; and

    vi.    the payment of at least $30 million (and likely over $50 million) in fees and
expenses to the Supporting Holders' professionals,[20] even though they are not
entitled to such payments because the Supporting Holders are undersecured.

16.    **Sixth, the record shows that the Government Parties failed to exercise due**

**care in considering and entering into the Proposed Settlement.** ████████████████

████████████████████████████████████████████████

---

[20]    Through an assumed June 30, 2020 effective date of a plan of adjustment.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████   In the case of all the Government Parties, their deliberations lacked a

meaningful analysis of key issues. █████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████   Under these circumstances, the Government

Parties' decision in approving the Proposed Settlement is not entitled to deference.

*   *   *

17.     Ultimately, the Proposed Settlement is deeply flawed, and the Government Parties

have provided no credible justification for the windfall it will provide to the Supporting Holders.

Since the Government Parties filed the 9019 Motion approximately five months ago, the

Committee has tried to resolve its numerous concerns consensually with the Government Parties,

but these efforts have been unsuccessful.  The Committee is therefore duty-bound to object to the

Proposed Settlement on behalf of PREPA's unsecured creditors and respectfully requests that the

9019 Motion be denied for all the reasons discussed herein.

---

[21]   Zwillinger Decl., Ex. 4 (PREPA Executive Session Minutes, dated Apr. 17, 2019 (Batlle Ex. 10),
        PREPA_RSA0027990 - 94, at 93).

[22]   The term "decision-maker" is a bit of a misnomer, as neither PREPA nor AAFAF offered a single government
        official, much less one with authority to make decisions, for deposition.  Rather, the only witness who testified
        on their behalf was Fernando Batlle, their financial advisor.  Christian Sobrino, the former executive director of
        AAFAF, who resigned in July 2019 under a cloud of controversy ██████████████████████████████, was
        also deposed as a third-party witness. ██████████████████████████████████████████████
        ██████████████████████████████████████████████
        Zwillinger Decl., Ex. 5 (Sobrino Dep. Tr. 225:21-229:5, 240:19-241:2).

## BACKGROUND

18.      On July 2, 2017 (the "Petition Date"), the Oversight Board issued a restructuring

certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for

relief for PREPA pursuant to PROMESA section 304(a), commencing this Title III case.

19.      On June 15, 2017, the Office of the United States Trustee for the District of

Puerto Rico (the "U.S. Trustee") filed a *Notice Appointing Creditors Committee for Unsecured

Creditors*.[23]  On August 25, 2017, the U.S. Trustee filed an *Amended Notice of Appointment of

Official Committee of Unsecured Creditors*, which expanded the role of the Committee to be the

official committee for all of the Title III Cases (other than COFINA), including PREPA.[24]

20.      Prior to the Petition Date, the outstanding principal and interest of the Non-

Recourse Bonds issued by PREPA was approximately $8.5 billion. The Non-Recourse Bonds

were issued by PREPA under that certain trust agreement dated as of January 1, 1974 (as

amended and supplemented from time to time, the "Trust Agreement") between PREPA and

U.S. Bank National Association, as successor trustee (the "Trustee").[25]

21.      The Non-Recourse Bonds include $375 million in principal amount of relending

bonds issued in 2016 (the "2016 Relending Bonds").  The 2016 Relending Bonds were sold to

existing holders of Non-Recourse Bonds, and their proceeds were used to make debt service

payments on previously issued Non-Recourse Bonds.  Essentially, the 2016 Relending Bonds

substituted new Non-Recourse Bonds for existing Non-Recourse Bonds (such transaction the

"Prepetition Roll-Up").  The Committee is not aware that the 2016 Relending Bonds have the

---

[23]   *See* Docket No. 338 in Case No. 17-BK-3283-LTS.

[24]   *See* Docket No. 1171 in Case No. 17-BK-3283-LTS.

[25]   Zwillinger Decl., Ex. 6 (Puerto Rico Electric Power Authority to U.S. Bank National Association, Trust
Agreement, dated Jan. 1, 1974, as amended and supplemented through Aug. 1, 2011).

benefit of a structural or legal seniority over other Non-Recourse Bonds.

22.     As of the Petition Date, the total amount outstanding on the Non-Recourse Bonds (including accrued and unpaid interest) was approximately $8.5 billion.  The Non-Recourse Bonds constitute the large majority of PREPA's outstanding prepetition obligations, which total over $10 billion.[26]

## I.      JANUARY 10, 2017 PREB RULING

23.     The Puerto Rico legislature created the Puerto Rico Energy Bureau ("PREB"), through Act 57-2014, to oversee and approve the rates that PREPA charges.  Pursuant to Section 6.25(a) thereof, PREB must assure that PREPA's rates are just, reasonable, and consistent with sound fiscal and operational practices, so as to result in reliable service at the lowest reasonable cost.  PREB considers several factors in determining whether the rate is just and reasonable, including the impact on PREPA's customers and the Commonwealth's economy.[27]

24.     On January 10, 2017, PREB[28] issued an order establishing the revenue requirements and rates for PREPA's 2017 fiscal year (the "PREB Ruling").  In reaching its decision, PREB noted that it was required by law to "take into account" PREPA's level of debt and debt service obligations.  In light of the statutory directive, PREB determined that it lacked the *direct* authority to impose debt relief or a reduction in debt service on PREPA creditors.  It concluded, however, that "*[r]aising PREPA's rates sufficiently to pay the principal and interest currently due on that debt would burden Puerto Rico's economy intolerably.*"[29]  In other words,

---

[26]     *Statement of Oversight Board Regarding PREPA's Title III Case*, ¶ 4 [Docket No. 2].

[27]     *See* 2014 P.R. Laws 57, § 6.25(b) (listing factors).

[28]     Then known as the Puerto Rico Energy Commission (PREC).

[29]     Zwillinger Decl., Ex. 7 (PREB Ruling, dated Jan. 10, 2017, at ¶ 17) (emphasis added).

PREB expressly noted that any rate that would be sufficient to pay the entire existing debt would be an intolerable burden and ***could not*** be approved.

## II.    PROPOSED SETTLEMENT

25.    The Supporting Holders have been attempting to broker a settlement of the Non-Recourse Bonds for years.  Various Bondholders and the Monolines first reached agreement on a restructuring support agreement in December 2015 (the "Pre-Title III RSA").  The Pre-Title III RSA was entered into at a time when the Government Parties had none of the "tools" available to a debtor in a Title III case to challenge and/or limit secured indebtedness under certain circumstances.  This Pre-Title III RSA remained in place until it was rejected by the Oversight Board in connection with commencing PREPA's Title III case.[30]

26.    At some time thereafter, the Oversight Board began engaging an ad hoc group of holders of Non-Recourse Bonds in renewed discussions.  On July 30, 2018, the Oversight Board, AAFAF, PREPA, and the Ad Hoc Group entered into a Preliminary Restructuring Support Agreement (the "Preliminary RSA"), which provided a framework for further negotiations but was not a binding agreement.

27.    After nearly a year of further negotiations, on May 3, 2019, the Oversight Board, AAFAF, PREPA, Assured, and the Ad Hoc Group entered into the binding RSA.  On September

---

[30]    The fact that, unlike the Pre-Title III RSA, the Preliminary RSA and the RSA were negotiated while PREPA was in Title III has significant ramifications. ████████████████████████████

Zwillinger Decl., Ex. 8 (July-Aug. 2018 mobile messages between Skeel and Matosantos (Skeel Ex. 12), FOMB_9019_MOBILE_00000101 - 26, at 23-26).

9, 2019, the Oversight Board announced that, in exchange for certain amendments to the RSA, the remaining monoline insurers, National and Syncora, had signed on to the RSA.

28.     The Committee was not involved in any of the negotiations of the Preliminary RSA or the RSA.[31]  In fact, the Committee learned of the Preliminary RSA only through a press release.  Thereafter, the Committee received only sporadic updates on the status of discussions and certain term sheets and other related documentation exchanged between the Supporting Holders and the Government Parties.  Despite repeated requests, the Oversight Board's advisors declined to include the Committee in active negotiations.

### A.     Proposed Settlement Pleadings

29.     On May 10, 2019, the Movants filed the 9019 Motion, seeking an order approving the Proposed Settlement.  Although the Movants originally noticed the 9019 Motion for a hearing on June 12, 2019, the Court advised the Government Parties at a status conference that the 9019 Motion, as originally filed, did not contain the requisite legal or factual support that would allow the Court to approve the 9019 Motion.  Accordingly, the Court ordered the Government Parties to submit a supplemental memorandum in support of the 9019 Motion including supporting factual declarations.[32]  The Court also directed the Government Parties to submit a revised proposed order clarifying the relief the Government Parties were requesting.

30.     On July 2, 2019, the Government Parties filed their revised Proposed Order[33] and a supplemental memorandum of law purporting to provide—as required by the Court—the legal

---

[31]   There is no dispute with respect to this point.  *See* Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 157:5-9) ("Q: [Was] the Official Committee of Unsecured Creditors part of any of the negotiations of the RSA?  A:  "No, I don't believe they were.").

[32]   *See* June 12, 2019 Hr'g Tr. 153:14-22.

[33]   The "Proposed Order" is the *[Proposed] Order Granting Limited Relief in Respect of Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Periods* [Docket No. 1361-1].

bases in support of the relief requested (the "Supplemental Memo").[34]  The Supplemental Memo

was accompanied by fact declarations (collectively, the "Declarations") of Christian Sobrino

Vega ("Sobrino Declaration") [Docket No. 1429], Natalie Jaresko ("Jaresko Declaration")

[Docket No. 1428]; Frederic Chapados ("Chapados Declaration") [Docket No. 1427]; and David

Brownstein ("Brownstein Declaration") [Docket No. 1426].

31.     The Court held a second status conference on July 11, 2019.  At that conference,

certain lenders that had extended PREPA credit prepetition for the purchase of fuel (the "Fuel

Line Lenders") previewed their argument that (among other things) their claim was senior to the

bond claims held by the Bondholders and that the Proposed Settlement deviated from the pre-

petition priority scheme.  The Court directed the Government Parties to submit supplemental

briefing on this issue, which they did on July 19, 2019 (the "Second Supplemental Memo").[35]

**B.     Key Terms of Proposed Settlement**

32.     The Proposed Settlement consists of two interrelated parts.  The first part is the

proposed settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") of some—but not all—of the litigation involving the Non-Recourse Bonds.

Specifically, the Proposed Settlement contemplates the withdrawal by (i) the Oversight Board of

the Lien Challenge and (ii) certain of the Monolines of the Receiver Motion.  The second part of

the Proposed Settlement is the RSA, which describes the treatment and valuable payments that

Supporting Holders will receive on account of their Non-Recourse Bonds, both before and under

---

[34]   *See Supplemental Memorandum of Law and Facts in Support of Joint Motion of Puerto Rico Electric Power
Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules
3012(A)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement and
Tolling Certain Limitations Periods* [Docket No. 1425].

[35]   See *Second Supplemental Memorandum of Law and Facts in Support of Joint Motion of Puerto Rico Electric
Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy
Rules 3012(A)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement
and Tolling Certain Limitations Periods* [Docket No. 1486].

a plan of adjustment.  The salient terms of this second part of Proposed Settlement, which, as discussed in the accompanying Zolfo Cooper Declaration, provide tremendous economic value to the Supporting Holders, are briefly summarized below.

> i.    Securitization Transaction:  Transition Charge and Exchange of Existing Non-Recourse Bonds for Fully Secured New Bonds

33.    As of the Petition Date, the aggregate outstanding principal and interest amount of the Non-Recourse Bonds was approximately $8.5 billion.  The Proposed Settlement is premised on an exchange of the existing Non-Recourse Bonds for new bonds, divided into "Tranche A" and "Tranche B" bonds (together, the "Securitization Bonds").[36]  Supporting Holders will receive Tranche A bonds equal to 67.5% of the face amount of their claim as of May 1, 2019, as well as contingent Tranche B bonds with a face amount of 10% of their claim as of May 1, 2019. In both instances, the face amount of the Supporting Holders' claims is inflated by the inclusion of approximately $792 million in post-petition interest.[37]

34.    The Securitization Bonds are to be issued by a bankruptcy-remote special purpose entity on terms and conditions set forth in the RSA and related exhibits and term sheets (the "Securitization Transaction").  Key among those terms is a new charge to be imposed on PREPA customers (the "Transition Charge").  The Transition Charge will implement stepped-up rate increases, starting at 2.768 cents per kilowatt hour and—subject to Demand Protections—capped at 4.552 cents per kilowatt hour,[38] and must be approved by the Puerto Rico legislature and by PREB.[39]  If approved by all necessary parties, the Transition Charge will be the source of the

---

[36]   Zwillinger Decl., Ex. 9 (Recovery Plan Term Sheet, II, V-VI).

[37]   *Id.* at IV. n.3.

[38]   *Id.* at III.

[39]   Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 165:10-13) ("Q:  But before that, you agreed with me that any rate increase has to be approved by PREB, right? A: That's what it appears, yes.").

funds to repay, and will secure, the Securitization Bonds.  The Government Parties project that
the Tranche A bonds will be repaid in full in year 33.[40]

### ii.   Full Post-Petition Interest Provision

35.     The RSA requires PREPA to propose a plan of adjustment that provides
Supporting Holders (among many other things) recoveries calculated as a percentage of their
respective "Applicable Bond Claims."  The RSA, in turn, defines Applicable Bond Claims as the
pre-petition claims plus accrued interest from the Petition Date through May 1, 2019.[41]  In other
words, the Proposed Settlement includes in the Supporting Holders' allowed claims 100% of the
post-petition interest accruing on their claims up to May 1, 2019 (the "Full Post-Petition Interest
Provision").  The total amount of such post-petition interest is approximately ***$792 million***.[42]

36.     Although the law provides that only oversecured creditors may receive post-
petition interest, the Oversight Board has consistently taken the position before this Court,[43] even
after the filing of the 9019 Motion,[44] that the Bondholders were either unsecured or
undersecured as of the Petition Date.  Accordingly, as discussed further below, the proposed
payment of post-petition interest to the Supporting Holders is unlawful.

---

[40]   Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 122:7-17).

[41]   *See* Suppl. Mem. ¶ 28.

[42]   The fact that post-petition interest is not being ***paid*** in full does not change that it is being ***allowed*** in full.  By
allowing post-petition interest in full, the Proposed Settlement treats dollars attributable to post-petition interest
the same as every other dollar of the Bondholders' claim, meaning it grants the Bondholders the same recovery
percentage on the nine-billionth dollar of their claim as on the first dollar of their claim.

[43]   *See* Zwillinger Decl., Ex. 11 (*Brief for Debtor-Appellee Financial Oversight and Management Board for Puerto
Rico as Representative of Puerto Rico Electric Power Authority*, at 18, *PREPA v. Ad Hoc Group of PREPA
Bondholders*, No. 17-2079 (1st Cir. Apr. 6, 2018)) ("If the bondholders had collateral value as of PREPA's
petition date, adequate protection would apply . . . [b]ut here, the bondholders' motion admits to 'years of
collections that were inadequate to cover PREPA's costs' [and] [t]he bondholders never alleged any petition
date value, instead focusing on covenants and remedies as collateral, which they are not . . . . Without collateral
that has value, the bondholders are effectively unsecured for now.").

[44]   July 11, 2019 Hr'g Tr. 51:10-12 ("[W]e agree [the Bondholders] are undersecured . . . .").

iii.   Accruing Administrative Expense Claim

37.     The Full Post-Petition Interest Provision only applies to interest from the Petition

Date up to May 1, 2019.  This, however, does not mean that the Bondholders are agreeing to

forego interest after that date.  To the contrary, Supporting Holders—including Supporting

Holders that join as late as December 1, 2019—will receive an administrative expense claim

equal to the interest that would accrue on the to-be-issued Tranche A bonds starting on (i) May 1,

2019 for bondholders that sign on to the RSA by May 31, 2019 and (ii) September 1, 2019 for

bondholders that sign on to the RSA on or after May 31, 2019 and prior to December 1, 2019

(the "Administrative Expense Claim").[45]

38.     According to the June 27, 2019 certified fiscal plan for PREPA, the Tranche A

bonds will pay interest at 5.25%, while the weighted average of the interest rate of the prepetition

Non-Recourse Bonds was a slightly higher 5.33%.[46]  Accordingly, from May 1, 2019 forward,

the Supporting Holders will receive post-petition interest at almost exactly the same rate as

between the Petition Date and April 30, 2019, but will receive the added benefit of having this

post-petition interest treated as an administrative expense claim that must be paid in full before

any plan of adjustment can be confirmed (and, in any plan that the Government Parties would

seek to confirm following a Securitization Termination or a termination of the RSA, in cash).

39.     According to the Government Parties, the Administrative Expense Claim is (i) "a

settlement of the Supporting Holders' claim to post-petition interest," (ii) "a settlement of the

Supporting Holders' pending and potential litigation on account of the [Non-Recourse] Bonds"

and (iii) "compensation to the Supporting Holders for the time lag to plan effectiveness."[47]  None

---

[45]   Zwillinger Decl., Ex. 9 (RSA § 1(a)(xii)).

[46]   *See* Jaresko Decl., Ex. A, 2019 PREPA Fiscal Plan, at 110.

[47]   Suppl. Mem. ¶ 35.

of these purported justifications has merit.

            iv.     Waiver and Support Fees

40.     In addition to accrual of the Administrative Expense Claim, Supporting Holders will receive additional Tranche A Bonds with a face value of $151 million (the "Waiver and Support Fees").[48]  Interest at the rate of 5.25%[49] will accrue on the Waiver and Support Fees, which interest will be granted administrative expense status.  According to the Government Parties, the Waiver and Support Fees are "consideration for early execution of the RSA."[50] The Government Parties, however, do not explain the difference between the "early execution" of the RSA (which purportedly justifies the Waiver and Support Fees) and the "time lag" between the RSA and a plan (which purportedly justifies the Administrative Expense Claim). ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.[51]  Providing a full recovery on certain claims is, of course, not a reasonable settlement of those claims.

            v.     Settlement Payments, Increased Settlement Payments, and Adequate Protection Payments

41.     Approval of the Proposed Settlement by the Court will trigger PREPA's obligation to make monthly "Settlement Payments," which payments will commence on the last day of the month in which the Proposed Order is entered and will continue through (i) a

---

[48]    The RSA provides slightly different Waiver and Support Fees to different types of Supporting Holders (*i.e.*, Holders or Monolines).

[49]    Waiver and Support Fees will accrue interest at the Tranche A Bond interest rate of 5.25% because they will be paid in Tranche A Bond at the Effective Date.

[50]    Suppl. Mem. ¶ 35.

[51]    Zwillinger Decl., Ex. 12 (July 20, 2018 email from Brownstein to Caton (Spencer Ex. 4), AHG-0007582 - 92, at 84).

termination of the RSA, (ii) the Effective Date (*i.e.*, of a plan of adjustment), or (iii) dismissal of

PREPA's Title III case.[52]   The RSA contemplates that the Settlement Payments will be funded

by a one cent per kilowatt hour (1¢/kWh) "Settlement Charge" that will be imposed by PREPA

and paid by its customers prior to any plan of adjustment.[53]

42.      According to the Supplemental Memo, this Settlement Charge allegedly will not

impact non-settling creditors because it (like the Transition Charge) is "a special, new charge

that is being created pursuant to the RSA to deal with PREPA bond debt."[54]   On July 3, 2019,

however, PREPA filed with PREB a *Conditional Motion to Make an Offsetting Change in Base

Rate Charges* seeking to **offset** the Settlement Charge **against the base rate**, rather than add it to

the base rate.[55]   This means that, contrary to the Government Parties' representations to the

Court, the Settlement Charge will be deducted from revenues of PREPA (*i.e.*, the base rate) that

would otherwise be available to satisfy the claims of non-settling creditors.

43.      If a plan of adjustment has not been confirmed by March 31, 2021, PREPA will

start charging its customers the **full amount** of the initial Transition Charge (assuming required

approvals are obtained under Puerto Rico law).[56]   Amounts collected from this pre-plan

Transition Charge would be paid to the Supporting Holders indefinitely, from March 31, 2021

---

[52]   Zwillinger Decl., Ex. 9 (RSA § 1(a)(cxi)).  Confusingly, although the RSA states that the Settlement Payments will not commence until the month in which the Proposed Order is entered, it also states that the Settlement Charge added to customers' bills will be effective as of July 1, 2019. ███████████████████████████

████████████████████████████████████████████████████████  Zwillinger Decl., Ex. 2
(Jaresko Dep. Tr. 34:8-36:5).

[53]   Zwillinger Decl., Ex. 9 (RSA § 1(a)(cix)).

[54]   Suppl. Mem. ¶ 103.

[55]   Zwillinger Decl., Ex. 13 (PREPA's Conditional Motion to Make an Offsetting Change in Base Rate Changes, dated July 3, 2019 (Chapados Ex. 3)).

[56]   Zwillinger Decl., Ex. 9 (RSA § 2(e)).

through the effective date of a plan, the date of another transaction pursuant to which the

Securitization Bond Treatment or Stipulated Treatment is provided, or the occurrence of certain

other termination events[57] (the "Increased Settlement Payments").  The initial Transition Charge

is 2.768 cents per kilowatt hour.  Based on the PREPA Fiscal Plan, this equates to Increased

Settlement Payments of approximately ***$30 million per month***.[58]

44.     PREPA has also obligated itself to make "Adequate Protection Payments" in the

event that no plan of adjustment has been confirmed and/or gone effective by March 31, 2021

and PREPA is otherwise unable to either (i) execute the Securitization Transaction or (ii) provide

the Stipulated Treatment (described below).[59]  These so-called Adequate Protection Payments

are funded from PREPA's general revenues and are set at exactly the same amount as the

Increased Settlement Payments.[60]  PREPA is obligated to make these payments even if it has not

obtained the necessary legislative and/or regulatory approvals for the Transition Charge and even

if PREPA is no longer a party to the RSA due to termination under section 9(d)(vi) of the RSA.[61]

Moreover, RSA grants the Adequate Protection Payments regardless of whether there has been

any decline in the value of the Bondholders' collateral.

vi.     Securitization Termination and Stipulated Treatment

45.     The Government Parties do not have a broad right to terminate the RSA.  Indeed,

they can only terminate the RSA to a limited extent (a "Securitization Termination") if (i) a

---

[57]   Zwillinger Decl., Ex. 9 (RSA § 2(e)(vi)) (Under the RSA, the obligation to make Increased Settlement
       Payments also ends if there occurs a Stipulated Treatment Termination, a termination pursuant to Section
       9(d)(vi) as to PREPA or AAFAF, or dismissal of the Title III Case.  *See* 9019 Mot., Ex. A, Sched 1, RSA §
       2(e)(vi) [Docket No. 1235-1].

[58]   *See* Zolfo Cooper Decl., Ex. 1, n. 4.

[59]   Zwillinger Decl., Ex. 9 (RSA § 2(e)(vii)).

[60]   *Id.* (stating that "Adequate Protection payments are to be made on a monthly basis in an amount equal to the
       amount of Increased Settlement Payments").

[61]   *Id.*

Government Party determines that the "terms and conditions of the Restructuring will impede or have an adverse impact on the Transformation Transaction or that the terms of the Restructuring are inconsistent with the Transformation Transaction,"[62] or (ii) by March 15, 2020, the requisite parties have not reached agreement on certain definitive documentation and all legislation necessary to support the Restructuring[63] has not been enacted.[64]  Given the prior history of failed agreements between the Oversight Board and the governor and legislature, including with respect to Law 80, it is important to point out that each of AAFAF and PREPA have their own Securitization Termination rights, which they can exercise independently of the Oversight Board. Indeed, as recently as October 28, 2019, it was revealed that, due to public backlash over the rate increase, the legislature, has taken action, through legislative action, to block an energy efficiency charge that PREB, pursuant to applicable law, had authorized.[65]  This recent development highlights that the issue of PREPA's rates is a highly political issue in Puerto Rico. Indeed, discussing the proposed Transition Charge, the Governor of Puerto Rico was recently quoted as saying that it would be "'speculative' at the moment to state her position on the Transition Charge."[66]  PREPA and AAFAF's termination rights add another degree of risk to the RSA that cannot be ignored, as no one knows who will be at the helm of AAFAF and PREPA after November 2020 when the gubernatorial election takes place.

---

[62]   Zwillinger Decl., Ex. 9 (RSA § 9(b)(i)).

[63]   As defined in the RSA.

[64]   Zwillinger Decl., Ex. 9 (RSA § 9(b)(ii)).

[65]   *See* Zwillinger Decl., Ex. 14 (Reorg Research Article, "PREPA Rate Issues Spark Legislative Action, Renewed Criticism of RSA," dated Oct. 28, 2019).

[66]   Zwillinger Decl., Ex. 15 (Reorg Research Article, "PREB Halts Energy Efficiency Charge as Legislature Moves to Amend Legislation Changing Energy Efficiency Policy as It Relates to Utility Regulator's Mandate," dated Oct. 24, 2019).

46.     A Securitization Termination means, by definition, that the Restructuring is inconsistent with Transformation or that the Government Parties are unable to pass necessary legislation and/or complete the documentation needed for implementing such Restructuring.  The logical result under either of these circumstances should be the termination of the RSA, with all parties' positions reset to where they were prior to enactment of the RSA.  But that is not what occurs.  Rather, the only obligations that are terminated relate to the requirement to provide Securitization Bonds.  The economics imbedded in the RSA for the benefit of the Supporting Holders all continue, including the Government Parties' obligations to provide the Supporting Holders recovery of 73.25% of the Applicable Bond Claim[67] (*i.e.*, the same projected economic recovery that Supporting Holders would receive if Securitization Bonds were issued) ***plus*** the (i) Settlement Payments, (ii) Increased Settlement Payments, (iii) Adequate Protection Payments, (iv) Waiver and Support Fees, and (v) Administrative Expense Claim (collectively, the "Stipulated Treatment").[68]

47.     Attached as Exhibit 1 to the Zolfo Cooper Declaration is a chart illustrating the payments to Supporting Holders upon various potential Securitization Termination dates. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████[69]

---

[67]  *See* Zwillinger Decl., Ex. 9 (RSA § 2(c)(i)).  As noted above, pursuant to the Full Post-Petition Interest Provision, the Applicable Bond Claim includes 100% of the post-petition interest that would have accrued on the Non-Recourse Bonds.  *See id.* at § 1(a)(xv)).

[68]  *Id.* at § 9(b)(iii)).

[69]  Zwillinger Decl., Ex. 4 (PREPA Executive Session Minutes, dated Apr. 17, 2019 (Batlle Ex. 10), PREPA_RSA0027990 - 94, at 93).

vii.   <u>Stipulated Treatment Termination and Surviving Administrative Claim</u>

48.   The so-called "<u>Stipulated Treatment Termination</u>" (or similar "Individual Termination") is the only circumstance in which the RSA (mostly) terminates and the Government Parties no longer have to provide the Stipulated Treatment.[70]   Critically, however, the Government Parties have no right to trigger such a termination solely because they believe the Proposed Settlement is inconsistent with PREPA's best interests or with the Government Parties' fiduciary obligations.[71]   A Stipulated Treatment Termination will instead only occur due to events that are largely outside the Government Parties' control, such as dismissal of the Title III case.[72]  Notably, the Government Parties do not have the right to invoke a Stipulated Treatment Termination in the event PREPA's Transformation, which is touted by the Government Parties as the primary rationale for the RSA, does not occur.[73]

49.   In the event of a Stipulated Treatment Termination, there is no settlement of the Litigation, and the parties have the same respective rights and remedies as they had prior to execution of the RSA.   Nonetheless, a Stipulated Treatment Termination does not truly terminate the RSA and reset the parties to their original positions.   Instead, the RSA provides that, even in the event of a Stipulated Treatment Termination, the Bondholders will retain all payments made prior to the termination, with the parties reserving all rights as to whether the Settlement Payments, Increased Settlement Payments, or Adequate Protection Payments (as applicable) will be treated as payments of principal, prepetition interest, or post-petition interest.[74]

---

[70]   *See* Zwillinger Decl., Ex. 9 (RSA § 9(c)(iii)).

[71]   *See id*. at § 9(c)(i)(1-7).

[72]   *See id.*

[73]   *See id*. at RSA § 9(b).

[74]   *Id*. at § 9(c)(ii).

50.     The RSA provides that all payments received by the Supporting Holders prior to the Stipulated Treatment Termination will be credited against principal or interest due to them,[75] but this provides PREPA with illusory relief.  Normally, such "application to principal or interest" provisions would be sufficient because it is assumed that creditors will receive recoveries on their claims at least equal to the amounts received as adequate protection during the pendency of the case.  This is not so, however, where the claims are non-recourse.  Because their claims are non-recourse, the Supporting Holders have *no* unsecured claims (to go along with secured claims of potentially only $8.8 million or less).  In this context, "applying" hundreds of millions of dollars of payments to the Supporting Holders' claims is tantamount to giving them a gift.

51.     Moreover, under one scenario in which a Stipulated Treatment Termination occurs—where the Court denies confirmation of a Title III plan of adjustment after two attempts—the Supporting Holders get to *keep* an administrative claim accruing through the date the Court first denied confirmation (the "Surviving Administrative Claim").[76]  The Government Parties attempt to characterize the Surviving Administrative Claim as a break-up fee, but this characterization does not hold up upon scrutiny.

viii.   Fees and Expenses

52.     The RSA provides that Supporting Holders will receive reimbursement of their advisors' professional fees and expenses.[77]  These fees and expenses are likely to exceed $50

---

[75]  *Id.*

[76]  Zwillinger Decl., Ex. 9 (RSA § 2(c)(iv)); Zolfo Cooper Decl., Ex. 2, n. 4.  Exhibit 2 to the Zolfo Cooper Declaration is a chart that illustrates the various payments to Supporting Holders under various potential Stipulated Treatment Termination dates.

[77]  Zwillinger Decl., Ex. 9. (RSA § 22(a)-(b)).

million.  Under section 506(b) of the Bankruptcy Code, however, only oversecured creditors are entitled to payment of their fees by the debtor.

## **OBJECTION**

53.     The Government Parties have submitted themselves to the jurisdiction of the Court in connection with the Proposed Settlement.  As stated in the 9019 Motion, "[t]he Oversight Board consents under PROMESA section 305 to the Court's determination of this Motion and its entry of the proposed 9019 Order."[78]  Accordingly, the Court has all requisite power to determine under applicable legal standards whether the requested relief in the 9019 Motion and related proposed order should be authorized (including with respect to property and/or revenues of PREPA) pursuant to PROMESA and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Moreover, and as discussed below, the Court has an independent obligation to assess the Proposed Settlement, which requires the Court to consider all aspects of the Proposed Settlement and the RSA to which it is tied—not just certain of their components. For the reasons set forth below, the 9019 Motion should be denied in its entirety.

## I.     APPLICABLE LEGAL STANDARD

54.     In the First Circuit, courts evaluate the reasonableness of a proposed settlement pursuant to the four "*Jeffrey* factors."  These factors are:

    i.    the probability of success in the litigation being compromised;

    ii.    the difficulties, if any, to be encountered in the matter of collection;

    iii.    the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and

    iv.    the paramount interest of the creditors and a proper deference to their reasonable views.

---

[78]   9019 Mot. ¶ 44.

26

*See In re Am. Cartage, Inc.*, 656 F.3d 82, 92 (1st Cir. 2011) (citing *Jeffrey v. Desmond*, 70 F.3d

183, 185 (1st Cir. 1995); *Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.)*, 382 F.3d 68, 72

(1st Cir. 2004) (same).[79]

55.    "The court's consideration of these factors should demonstrate whether the

compromise is fair and equitable, and whether the claim the debtor is giving up is outweighed by

the advantage to the debtor's estate." *In re Servisense.com, Inc.* 382 F.3d at 72.  Ultimately,

however, the true "benchmark for determining the propriety of a bankruptcy settlement is

whether the settlement is in the best interests of the estate." *In re P & P "Quick Sett" Servs.,*

*Inc.*, No. 10-14705, 2011 WL 1628023, at *1 (Bankr. D.R.I. Apr. 19, 2011).  Accordingly, as

courts in the First Circuit have explained, "[e]ven if it is concluded that the settlement is above

the lowest level of reasonableness, in our discretion we may still deny approval, if not in the best

interest of the estate." *Id.* at *2 (internal quotations omitted).[80]

56.    Critically, and contrary to the Government Parties' invitation to the Court to defer

to their judgment, the ultimate determination that a proposed settlement is fair and equitable is

one that must be made by the court—not the trustee (or, here, the Oversight Board).  The

Supreme Court has emphasized this requirement, stating that the court must make an "informed

and independent judgment as to whether a proposed compromise is fair and equitable" and

---

[79]   While *Jeffrey* sets forth the basic factors for evaluating a Rule 9019 settlement motion in the First Circuit, it
should be noted that *Jeffrey* is distinguishable from PREPA's Title III case because the settlement in *Jeffrey*
was proposed by a chapter 7 trustee serving as a fiduciary for creditors.  Here, there is no such fiduciary (other than
the Committee, acting as fiduciary for unsecured creditors).  The Oversight Board has forsworn that role.  *See*
Zwillinger Decl., Ex. 16 (*Motion of the Financial Oversight and Management Board for Puerto Rico to Dismiss
Plaintiffs' First Amended Adversary Complaint Pursuant to Fed R. Civ. P. 12(B)(1) and 12(B)(6)*, at 30 n.15,
*Pinto Lugo v. United States*, Adv. Proc. No. 18-041-LTS (D.P.R. Aug. 23, 2018) [Docket No. 36]) (arguing that
Oversight Board is not a fiduciary).  Therefore, any deference accorded to a chapter 7 trustee in a chapter 7 case
should not be applied in this case.

[80]   The absence of an "estate" in Title III does not change this analysis, under which the "estate" is simply replaced
by the "debtor."

recognizing that it cannot do so without first "appris[ing] [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) ("TMT Ferry").  As the First Circuit has explained, in approving compromises "the court must act independently, out of its own initiative, for the benefit of all creditors." *In re Bos. & Providence R. R. Corp.*, 673 F.2d 11, 13 (1st Cir. 1982).

57.     Consistent with this standard, the First Circuit has cautioned that while the determination of the trustee to enter into a settlement is entitled to "some deference," the bankruptcy court must satisfy its independent obligation to assess the proposed settlement. *City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011).  A "bankruptcy court cannot blindly take the trustee's word that a settlement is fair and reasonable," and must instead "apprise itself of all facts necessary to evaluate the settlement and make an informed and independent judgment." *Id.* (as modified); *see also Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.),*136 F.3d 45, 50 (1st Cir. 1998) ("bankruptcy court essentially is expected to assess and balance the value of the claims being compromised against the value of the compromise proposal") (as modified).

58.     The court's obligation to independently assess the proposed settlement and "not act as a mere rubber stamp or rely on the trustee's word that the compromise is reasonable," *In re 100 Beaver Street Partnership*, 244 B.R. 185, 187 (Bankr. D. Mass. 2000), has two significant ramifications.  The first is that approval of a settlement must be based on evidence and not "based merely on conclusory statements made by counsel supporting the compromise." *In re GHR Companies, Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985).  It is the trustee's burden to supply that evidence and "demonstrate that the compromise is in the best interests of the estate."

*In re 100 Beaver Street*, 244 B.R. at 187 (citing *In re C.P. Del Caribe, Inc.*, 140 B.R. 320

(Bankr. D. P.R. 1992); *see also C.R. Stone Concrete Contractors, Inc. v. Anderson (In re C.R.*

*Stone Concrete Contractors, Inc.)*, 346 B.R. 32, 49, 51 (Bankr. D. Mass. 2006) ("Because I find

that I do not need to defer to the Trustee's decision to settle and that the *Jeffrey* factors weigh

against accepting the Stipulations, I hold that the Trustee has not met its burden of demonstrating

the benefit of the proposed settlement and deny the Motions to Approve Stipulations.").

59.     The second ramification is that the court must evaluate "all aspects of a proposed

compromise."  *Maxwell Newspapers, Inc. v. Travelers Indem. Co.*, 170 B.R. 549, 550 (S.D.N.Y.

1994).  "[E]ach part of the settlement must be evaluated to determine whether the settlement as a

whole is reasonable."  *In re Washington Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011).

The First Circuit has explained that in evaluating a proposed settlement the "supervising court

must play a quasi-inquisitorial role, ensuring that ***all aspects*** of the reorganization are fair and

equitable."  *In re Bos. & Providence R. R. Corp.*, 673 F.2d at 12 (emphasis added); *see also In re*

*Breland*, No. 16-2272-JCO, 2018 WL 1318954, at *9 (Bankr. S.D. Al. Feb. 14, 2018)

(dismissing 9019 motion without prejudice and advising that motion's renewal would require

"sufficient evidence" and "an accurate assessment of all aspects of a proposed settlement").

60.     This principle is especially applicable to complex, multi-part settlements.  "In a

complex settlement, it is appropriate for the court not only to consider each settled claim

individually . . . but also to consider the reasonableness of the settlement agreement as a whole."

*In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016) (citing *Air Line Pilots*

*Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430

(S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) ("[S]ince the Settlement Agreement is a

global settlement of all the claims, it is not possible to vacate only [part of it.]  The appropriate

inquiry is whether the Settlement Agreement in its entirety is appropriate for the [] estate.")).

## II.    PROPOSED SETTLEMENT DOES NOT REASONABLY VALUE LITIGATION BEING COMPROMISED

61.    The probability of success in the underlying litigation has been called the most

important of the four factors that make up the reasonableness inquiry.  *See In Shuman*, No. 16-

20069, 2018 WL 2996985, at *5 (Bankr. D. Kan. Jun. 12, 2018) (probability of success in

underlying litigation was "most important").[81]  "In considering the probability of success, the

Court should consider legal and evidentiary obstacles of litigating the claim."  *In re Hansen*, No.

12-11907-JMD, 2017 WL 1491765, at *5 (Bankr. D. N.H. Apr. 25, 2017).  Fundamentally, "the

probability-of-success factor requires courts to estimate 'the likely outcome of litigating the

claims proposed to be settled.'"  *In re Junk*, 566 B.R. 897, 912 (Bankr. S.D. Ohio 2017) (quoting

*In re Telesphere Comm'ns., Inc.*, 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994).  While this does not

require ***determination*** of the merits of the compromised claims, it requires the court "to apprise

itself of the merits" of those claims.  *In re Robotic Vision Sys., Inc.*, 2009 WL 1664582, at *3.[82]

62.    It should be obvious that this requires a thorough review of the settled claims.

Indeed, review of the case law demonstrates that courts often engage in a detailed analysis

regarding the strengths of the parties' respective positions in order to arrive at well-supported

estimates of the parties' probability of success.  *See, e.g.*, *In re NII Holdings, Inc.,* 536 B.R. 61,

---

[81]    *See also Maloy v. Sigmon (In re Maloy)*, No. 07-30813, 2009 WL 4800070, at *3 (Bankr. W.D.N.C. Dec. 7, 2009) ("Perhaps the most important factor in determining the adequacy of a proposed settlement is the probability of success the estate would have if it pursued" its claim.); *In re Remsen Partners, Ltd.*, 294 B.R. 557, 566 (Bankr. S.D.N.Y. 2003) ("probability of success in litigation as compared with the benefits of the proposed settlement" is "the key question").

[82]    *See also In re Hansen*, 2017 WL 1491765 at *5 (explaining that in "considering the probability of success . . . the Court is not required to decide the merits [but] rather the Court's assessment is limited to considering the probability that [the Debtor] would succeed on its claims").

122 (Bankr. S.D.N.Y. 2015) ("In considering the likelihood of success on the merits, as

mandated by *Iridium,* the Court has reviewed each of the Settled Claims and Disputes and has

discussed in detail, *supra,* the merits of each category of Disputed Claims.").[83]

### A. Government Parties Have Not Satisfied Burden

63.     The burden of proof is on the "settling parties [who] must set forth the facts in

sufficient detail that a reviewing court could distinguish it from mere boilerplate approval of the

trustee's suggestions."  *In re Lion Capital Grp.*, 49 B.R. 163, 176 (Bankr. S.D.N.Y. 1985)

(quoting *In re Bos. & Providence R.R. Corp.*, 673 F.2d 11 (1st Cir. 1982).  This "detailed

justification" of the settlement should include "detailed analysis of the expected value of this

litigation," including a "statement [on] the probability of success on the merits" and a

"discussion of the applicable case precedents."  *Gowan v. Gardi (In re Gardi)*, 273 B.R. 4, 9

(Bankr. E.D.N.Y. 2002).  The purpose of the analysis is to provide the court some "indication of

how the proposed number was arrived at."  *In re Block*, 293 B.R. 290, 292-93 (Bankr. D. R.I.

2003) (noting it is not sufficient to "reveal[] only that the compromise figure was a negotiated

sum and that [the parties] started much lower").  *Id.* (internal quotation marks omitted).

64.     The Government Parties have not satisfied their burden.  In fact, they have not

"put before the Court [anything] that would indicate the amount of the settlement is based upon

any type of assessment of the relative merits of the parties' conflicting claims."  *In re Egolf*, 102

B.R. 706, 711 (Bankr. N.D. Ind. 1989).  The Government Parties offer no more than the

---

[83]   *See also In re Chemtura Corp.*, 439 B.R. 561, 595-607 (Bankr. S.D.N.Y. 2010) (containing over 10 pages of
discussion of parties' legal position in relation to applicable law with respect to disputes and concluding that
settlements paying 39 and 42 percent of value of creditors' claims were reasonable); *In re Heritage Org.,
L.L.C.*, 375 B.R. 230, 261-78 (Bankr. N.D. Tex. 2007) (over 15 pages of discussion regarding strengths and
weaknesses of defenses and claims subject to settlement); *In re Nortel Networks, Inc.*, 522 B.R. 491, 511
(Bankr. D. Del. 2014) (comparison of case law supporting each side's position to support conclusion that
settlement that split dispute "down the middle" was reasonable where there were persuasive arguments and
authorities on both sides).

boilerplate statement that issues presented in the Litigation are "novel and complex" and "hotly

disputed" and then ask the Court to rely blindly upon their assertions that they considered the

various arguments in the Litigation.  Conspicuously absent from the Government Parties' papers

is any detailed analysis of the key legal issues underlying the parties' positions.[84]

65.     For example, nowhere in the three separate memoranda of law they submitted in

support of the Proposed Settlement do the Government Parties mention the fact that the bonds

are non-recourse to PREPA, let alone offer a substantive analysis of this unique feature and its

impact on the reasonableness of the Proposed Settlement.[85]  The failure to analyze such a key

issue is alone grounds to deny the 9019 Motion.  *See In re Lion Capital Grp.*, 49 B.R. at 189 ("A

court cannot find a settlement by a trustee fits within the lowest bounds of reasonableness where

a facially significant cause of action is glossed over and key facts relevant to others are not

presented even in summary fashion.").

66.     Similarly, although the Government Parties have said that the Proposed

Settlement resolves the Bondholders' assertions that "they are oversecured, entitled to 100 cents

on the dollar (plus interest and fees), and their security extends to covenants under the Trust

Agreement,"[86] they have not meaningfully analyzed these assertions.  Their papers contain no

discussion of the strengths and weaknesses of the Bondholders' arguments or any consideration

(let alone analysis) of what evidence and/or case law the Bondholders may present to support

their claims.  Similarly lacking is any explanation of how the Government Parties ultimately

---

[84]   It is now obvious that the failure to supply this analysis is due to the fact that the Government Parties never
conducted it in the first place.  *See, e.g.*, Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 221:24 - 222:6) (Q: Did you
conduct any probabilistic assessment of the likelihood of outcome in litigation? . . . No. No.").

[85]   The Lien Challenge is similarly silent regarding the non-recourse nature of the Bondholders' claims.

[86]   Suppl. Mem. ¶ 55.

arrived at the purported 73% recovery[87] granted to the Bondholders, and how that number relates to the likelihood of success on the issues being compromised.

67.     Because a proposed settlement must be "founded upon a dispassionate and analytical evaluation of [the] conflicting claims, risks and rewards," *In re Egolf*, 102 B.R. at 711, and because the Government Parties have neglected to provide the Court the tools to perform such an evaluation, the Committee submits the following analysis of the legal and evidentiary obstacles inherent in the Supporting Holders' positions in the Litigation.  This analysis shows that the Proposed Settlement grossly underestimates PREPA's high likelihood of success in the Litigation and ignores that the Litigation could be resolved quickly and cheaply.

**B.      Bondholders Must Overcome Significant Legal and Evidentiary Obstacles in Lien Challenge**

68.     It is a fundamental principle of bankruptcy law that a secured creditor has a secured claim only to the extent of the value of its interest in collateral.  *See* 11 U.S.C. § 506(a). Accordingly, determination of the amount of the Bondholders' secured claims requires a determination of the scope and value of their collateral.  As discussed below, the Bondholders are secured only by PREPA's (i) ***actual*** revenues (*i.e.*, receipts) that are (ii) net of PREPA's expenses ***and*** (iii) are ***actually*** deposited into certain accounts held by the trustee under the Trust Agreement (the "Trustee").  This collateral had a total value of only approximately $8.8 million as of the Petition Date.

69.     To escape this outcome, the Bondholders assert, without legal or factual support, that they are secured by the following two types of additional collateral (the "Purported Extra

---

[87]     According to the Government Parties, 73% is the predicted recovery on Tranche A and B bonds, without accounting for the Administrative Expense Claim, Settlement Payments, and Waiver and Support Fees.  *See* Suppl. Mem. ¶¶ 28-29.  ***As shown herein, however, the Bondholders' actual recovery is much greater***.

Collateral"):[88]  First, the Bondholders assert that they have a lien on all (*i.e.*, gross) revenues of PREPA, not just its net receipts.  They also assert that this security interest extends to future gross revenues, such that they have a ***present*** security interest in PREPA's ***future***, unearned, gross revenues.   Second, the Bondholders assert that their collateral also includes the Impossible Collateral, specifically (i) PREPA's covenant to raise rates as needed to ensure the Non-Recourse Bonds are paid in full (the "Rate Covenant") and (ii) the right to seek appointment of a receiver for PREPA (the "Receiver Remedy").[89]

70.     The Bondholders further assert that, by virtue of this Purported Extra Collateral, they are oversecured and entitled to a secured claim for the full amount of the Non-Recourse Bonds, including post-petition interest.  Each of these assertions is wrong.

    i.     Scope of Security Is Limited to $8.8 Million Held By the Trustee as of the Petition Date

71.     The Non-Recourse Bonds are governed by the Trust Agreement, which sets forth all of the rights and obligations of PREPA, the Trustee, and the Bondholders with respect to the Non-Recourse Bonds.  The Trust Agreement established various funds into which all revenues received by PREPA are supposed to be deposited.  These include the General Fund, into which all of PREPA's receipts are supposed to be deposited, as well as the three accounts comprising the Sinking Fund into which certain net revenues are supposed to be deposited.  The Sinking

---

[88]   The Bondholders have not filed an answer or other response to the Lien Challenge.  The Bondholders' positions, therefore, must be gleaned from statements in various pleadings submitted in connection with other matters.  These pleadings include: (i) the Trustee's objection to the Oversight Board's motion requesting approval of post-petition financing for PREPA [Docket No. 568] (the "Financing Objection"); (ii) the Initial Receiver Motion; (iii) the renewed and currently pending Receiver Motion filed by Monolines National Public Finance Guarantee Corporation, Assured Guaranty Corp, and Syncora Guarantee Corp. seeking similar relief; and (iv) the Bondholders' motion to intervene in the adversary proceeding commenced by the Fuel Line Lenders, as well as the draft motion to dismiss appended thereto, *see* Docket No. 10 in Adv. Pro. No. 19-396.

[89]   This right to exercise the Receiver Remedy may be exercised by the Trustee or by holders of at least 25% of the Non-Recourse Bonds.

Fund is established and held by the Trustee.[90]  Pursuant to section 507 of the Trust Agreement,

this deposit into the Sinking Fund occurs only *after* (i) payment of PREPA's Current Expenses[91]

and (ii) funding of certain reserves for the payment of Current Expenses.

72.     Section 507 further provides that, in addition to the Sinking Fund, revenues

received by PREPA and remaining after payment of, and reserving for, Operating Expenses are

also deposited (in a specified order) in the "Reserve Maintenance Fund," the "Self-insurance

Fund," and the "Capital Improvement Fund" (collectively the "<u>Subordinate Funds</u>" and, together

with the Sinking Fund, the "<u>Specified Accounts</u>").  In other words, (i) only "Net Revenues" (*i.e.*,

net receipts) are ever deposited into the Specified Accounts, and (ii) only some of the Net

Revenues are deposited into the accounts maintained by the Trustee.[92]

73.     To secure PREPA's obligations to the Bondholders, the "Now, Therefore"

paragraph of the Trust Agreement states that PREPA "has pledged and does hereby pledge to the

Trustee the revenues of the System . . . *to the extent provided in this Agreement*."[93]  Thus, as a

straightforward matter of contract law, the Trustee (on behalf of the Bondholders) has, at most, a

security interest in PREPA's receipts only to the extent the Trust Agreement provides.

74.     Section 507(h) is the only section of the Trust Agreement that grants a security

interest.  It provides that:

> The moneys *in the Sinking Fund* shall be held by the Trustee in trust,
> and the moneys *in the [Subordinate Funds]* shall be held by the
> Authority in trust, separate and apart from all other funds of the
> Authority, and . . . *shall be subject to a lien and charge in favor of the*

---

[90]   The three separate accounts comprising the Sinking Fund are the "Bond Service Account," the "Reserve Account," and the "Redemption Account."  *See* Lien Challenge, Ex. A, Trust Agreement, § 507.

[91]   As defined in the Trust Agreement.

[92]   Notwithstanding section 507(h) of the Trust Agreement, which provides that the Sinking Fund will be held by the Trustee and the Subordinate Funds by PREPA, the Self-insurance Fund (or a portion thereof) is held by the Trustee.

[93]   Zwillinger Decl., Ex. 6 (Trust Agreement, at 11-12) (emphasis added).

*holders of the bonds* issued and outstanding under this [Trust]
Agreement and for the further security of such holders until paid out or
transferred, as herein provided.[94]

75.    Stated simply, this means that the scope of the Trustee's security interest is

limited to net receipts that are ***actually deposited*** in one of the Specified Accounts.  Other than

funds that satisfy these two conditions, the Trustee has no security interest (*i.e.*, there is no

collateral).  The Trust Agreement contains no other grant of a security interest in favor of the

Bondholders, and thus there is no grant of a security interest in any of the Purported Extra

Collateral.  Other provisions of the Trust Agreement reinforce that the Non-Recourse Bonds are

secured only by PREPA's Net Revenues.  For example, section 804 of the Trust Agreement

provides that, if the Trustee or the Bondholders (with the requisite majority) were to obtain a

judgment against PREPA, the amounts on deposit in the Specified Accounts are the only assets

from which the judgment could be satisfied.[95]

76.    According to PREPA's audited financial statement for June 30, 2017 (*i.e.*, two

days prior to the Petition Date), Net Revenues in the Specified Accounts held by the Trustee

totaled approximately ***$8.8 million*** at that time.[96]  Accordingly, under the plain language of the

---

[94]   *Id.* at § 507(h) (emphasis added).

[95]   The Committee does not concede that the Bondholders hold a perfected security interest in all of the Specified
Accounts.  To the contrary, and as discussed at paragraph 98, below, because (i) none of the Specified Accounts
are covered by a DACA (as defined below) and (ii) only the Sinking Fund and the Self-insurance Fund are
subject to the Trustee's control, any security interest granted by the Trust Agreement in any Net Revenues
deposited in the Subordinate Funds (other than certain accounts that comprise the Self-insurance Fund) is not
perfected and is, therefore, avoidable.  Moreover, while the parties may dispute the exact impact and/or
limitations of §§ 922 and 928 of the Bankruptcy Code, these sections cannot improve the Bondholders'
collateral position beyond what is granted by the Trust Agreement.

[96]   Zwillinger Decl., Ex. 17 (June 30, 2017 PREPA Audited Financial Statement, at 34).  PREPA also had an
additional $16.1 million held in the "Reserve Maintenance Fund," *id.*, which is one of the Subordinate Accounts
in which section 507(h) of the Trust Agreement granted the Trustee (on behalf of the Bondholders) a security
interest.  However, as discussed below because that deposit account is neither held by the Trustee nor subject to
a DACA, any security interest granted therein is unperfected and, therefore, avoidable.  Accordingly, the value
of the Bondholders' collateral as of the Petition Date and, therefore, the amount of their claim, is limited to the
$8.8 million in deposit accounts held by the Trustee.  Moreover, even with the $16.1 million in the Reserve
Maintenance Fund, the Bondholders' collateral is worth only $25.6 million.

Trust Agreement and pursuant to section 506(a) of the Bankruptcy Code, holders of Non-

Recourse Bonds have, at most, a secured claim against PREPA in the amount of $8.8 million—

the value of their collateral.  And, critically, because the bonds are **non-recourse**, any deficiency

between the amount on deposit in the Specified Accounts and the amount payable on the Non-

Recourse Bonds is uncollectable.  Indeed, the Supporting Holders have conceded "the limited

recourse nature of the [Non-Recourse] Bonds."[97]

77.    Other documentation related to the Non-Recourse Bonds supports this conclusion.

For example, the offering documents for the Non-Recourse Bonds disclose that the bonds are

secured solely by, and payable solely from, "Net Revenues."  The Official Statement, dated April

12, 2012, for PREPA's Power Revenue Bonds, Series 2012A and Power Refunding Bonds,

Series 2012B, states in the opening paragraph on its cover page:  "The Bonds, the outstanding

bonds previously issued under the Trust Agreement and any additional bonds that the Authority

may from time to time issue under the Trust Agreement **are payable solely from the Net**

**Revenues** (as described herein) of the Authority's electric generation, transmission and

distribution system."[98]

78.    In addition, the Trust Agreement is accompanied by a legal opinion, which,

pursuant to section 101 of the Trust Agreement, is required to state that "this Agreement creates

a legally valid and effective pledge of the Net Revenues."  Had the Non-Recourse Bonds been

secured by a lien on the Purported Extra Collateral, a legal opinion as to the validity of such a

security interest would certainly have been required.  It was not.  In addition, the opinion

delivered by bond counsel in connection with each issuance of Non-Recourse Bonds states that

---

[97]   *See* Initial Receiver Mot., at 1.

[98]   Zwillinger Decl., Ex. 18 (Apr. 12, 2012 Official Statement for 2012A Power Revenue Bonds and 2012B Power
Revenue Refunding Bonds) (emphasis added).

the Non-Recourse Bonds are "payable solely from the Sinking Fund," and that the Sinking Fund

is "pledged to and charged with the payment of the principal of and interest on such bonds."[99]

The bond counsel opinions identify no other collateral securing the Non-Recourse Bonds.

Finally, no other collateral is identified in the financing statements filed by the Trustee.[100]

ii.   Bondholders' Collateral Cannot Include Covenants and Remedies

79.     The Trustee has asserted that the covenants and remedies described in the Trust

Agreement—specifically, the Rate Covenant and the Receiver Remedy—are "part of the

collateral value package that secures the [Non-Recourse] Bonds."[101]  The Trustee has also

asserted that the Non-Recourse Bonds are secured by (among other things) "certain covenants,

obligations, and undertakings," as well as by the Receiver Remedy.[102]  Other Bondholders have

made similar claims.[103]  Other than the purported security interest in PREPA's gross revenues

(which was never granted), it is impossible, as a matter of law, for PREPA to have granted a

security interest in the other forms of Purported Extra Collateral even if it so desired.

80.     A debtor can grant a security interest only in property.  This is implicit in the

Uniform Commercial Code's ("UCC") definitions of security interest as an "interest in ***personal***

***property*** or fixtures" and collateral as the "***property*** subject to a security interest."[104]  It is also

implicit in the scope provision of Article 9 of the UCC, which limits Article 9 (and, therefore, the

---

[99]   *See, e.g.,* Zwillinger Decl., Ex. 19 (Official Statement, dated Aug. 15, 2013, for PREPA's Power Revenue
Bonds, Series 2013A) (approving opinion of Sidley Austin LLP, as bond counsel, included as appendix IV).

[100]   *See* Lien Challenge ¶¶ 57 - 62.

[101]   Fin. Obj. ¶ 16.

[102]   *See* Trustee's Master Proof of Claim No. 18449 ("Master POC").

[103]   *See* Receiver Mot., at 27-28.

[104]   *See* UCC § 1-201(b)(35) (emphasis supplied) and UCC § 9-102(a)(12) (emphasis supplied); *see also*
COLLATERAL, Black's Law Dictionary (11th ed. 2019) (defining collateral as "***[p]roperty*** that is pledged as
security against a debt; the ***property*** subject to a security interest or agricultural lien") (emphasis added).

ability to create a security agreement) to transactions that "create[] a security interest in personal property or fixtures."[105]

81.     While a debtor might have property rights in contractual promises made **to the debtor by others**, and thus may be able to grant a security interest in such property, a debtor does not have property rights in its own obligations.  The Rate Covenant and the Receiver Remedy are not **property** of PREPA that can be pledged as security; they are **promises** by PREPA that, like payment of the Non-Recourse Bonds, are secured by the Net Revenues (if any) on deposit in accounts held by the Trustee.  Promises and remedies are not property and, therefore, a security interest cannot be created in them.

82.     Multiple courts have explained this distinction between a covenant and collateral. In *Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*, 225 B.R. 883, 886 n.4 (Bankr E.D. Pa. 1998), the court explained that a "covenant without a pledge granting a security interest is simply a promise, not a security interest."  Based on this distinction, the court held that the covenant at issue (to obtain hazard insurance) was not collateral, emphasizing the difference between the purpose of the covenant as protection of the underlying collateral and "**additional collateral**" (emphasis in original).  *Id.*

83.     In *Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2010), the debtor had issued bonds that were perfected by a security interest in certain accounts.  Importantly, the debtor was not obligated to transfer funds to those accounts until after paying certain operational expenses.  In the event of a default, the debtor was obligated (by a covenant in the indenture) to transfer all funds to the Indenture Trustee, but the lenders had chosen not to have their security interest attach to gross revenues but, instead, to rely on having their security interest "follow the

---

[105]   UCC § 9-109(a).

Indenture's cash flow covenants." *Las Vegas Monorail Co.*, 429 B.R. at 338.  The court explained that while the debtor's failure to comply with these cash flow covenants may have been a default, the default did not render the lenders secured by the funds.  Making this point explicit, *1st Farm Credit Services, PCA v. Phillips (In re Phillips)*, No. 05-87521, 2007 WL 4179845, at *3 (Bankr. C.D. Ill. Nov. 20, 2007), explained that a covenant "is only as valuable as [the debtor's] compliance with it."

84.     This distinction, and the relationship between collateral and covenants, was also the basis for the court's holding in *In re Leiferman*, No. 10-40718, 2011 WL 166170 (Bankr. D.S.D. Jan. 19, 2011).  At issue in that case was a provision of chapter 13 of the Bankruptcy Code that prohibits a debtor from modifying a claim secured only by an interest in the debtor's primary residence.  The debtor in that case argued that its bank (Wells Fargo) was secured by, in addition to the lien on the real property, the "various covenants and agreements" in the mortgage. *Id.* at *2.  In other words, the debtor argued that the covenants were themselves collateral separate and apart from the security interest in the debtor's home—if true, this would allow the debtor to modify Wells Fargo's secured claim.[106]  The court, however, rejected this argument: "Debtor's performance of those covenants and agreements is secured *by* the mortgage; those covenants and agreements are not [themselves] additional security for Wells Fargo's claim." *Id.* at *2 (emphasis in original).  In other words, covenants and agreements are not security interests.

85.     Ignoring this elementary distinction, the Bondholders assert that the Rate Covenant and the Receiver Remedy are constitutionally protected property rights that must be adequately protected in bankruptcy.[107]  As the Government Parties have previously explained in

---

[106]   Because the claim would not be one secured *only* by the debtor's primary residence.

[107]   *See e.g.*, Receiver Mot., at 26-30.

opposing adequate protection for holders of Non-Recourse Bonds at the beginning of PREPA's

case, promises to and remedies of a secured creditor are not protected by the Fifth

Amendment.[108]

86.     In *Louisville Joint Stock Land Bank v. Radford,* there were five rights identified

by the Supreme Court with respect to what a secured creditor possesses, including (i) the right to

retain the lien until the secured indebtedness is paid, (ii) the right to force a judicial sale of the

security, (iii) the right to determine when the sale shall be held, (iv) the right to bid at the sale,

and (v) the right to take control of the property during default.  *Louisville Joint Stock Land Bank

v. Radford*, 295 U.S. 555, 594-95 (1935).  Post-*Radford*, however, the Supreme Court held that a

Bankruptcy Act of 1898 amendment impairing rights (iii) and (v) above was not prohibited by

the Fifth Amendment, illustrating that not all rights of a secured creditor are entitled to be

protected.  *See Wright v. Vinton Branch of Mountain Trust Bank,* 300 U.S. 440, 460-62 (1937).

And, three years later, the Supreme Court held that impairment of rights (ii) and (iv) did not

violate the Fifth Amendment.  *Wright v. Union Cent. Life Ins. Co.*,  311 U.S. 273, 280-81 (1940).

In language that is directly relevant to the Bondholders' claims, the Supreme Court explained

that adequate protection is a safeguard "provided to protect the rights of secured creditors,

throughout the proceedings, to the extent of the value of the property.  There is no constitutional

claim of the creditors to more than that."  *Id.* at 278-79.

---

[108]    *See Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Ad Hoc Group of
PREPA Bondholders, National Public Finance Guaranty Municipal Corp., Assured Guaranty Corp., Assured
Guaranty Municipal Corp., and Syncora Guarantee Inc., for Relief from Automatic Stay*, at 21 [Docket No.
149] ("[A] secured creditor has a constitutionally protected property interest in the value of its collateral, but
other rights are contractual rights not constitutionally protected . . . .").; Zwillinger Decl., Ex. 11 (*Brief for
Debtor-Appellee Financial Oversight and Management Board for Puerto Rico as Representative of Puerto Rico
Electric Power Authority*, at 28, *PREPA v. Ad Hoc Group of PREPA Bondholders,* No. 17-2079 (1st Cir. Apr. 6,
2018)) (same).

87.    In other words, a secured creditor has a constitutionally protected property interest only in the value of its collateral (*e.g.*, Net Revenues deposited in certain accounts).  Other rights (such as the Rate Covenant and the Receiver Remedy) are contractual rights that are not constitutionally protected and cannot be subject to a lien.  Any other ruling would create the bizarre result that a secured creditor is entitled to adequate protection whenever a debtor breaches a covenant to pay its debt, even though, by definition, the debtor will violate that covenant if it is the subject of a chapter 11 or Title III case.

iii.    <u>Trust Agreement Does Not Support Claimed Lien on Gross Revenues</u>

88.    The Trustee has asserted that its lien is not "merely a pledge of the net revenues" and that its "lien extends to all Revenues" of PREPA.[109]  Other Bondholders have made similar assertions.[110]  These assertions rely on certain statements in the Trust Agreement that PREPA's "Revenues" (as opposed to its Net Revenues) have been pledged to secure repayment of the Non-Recourse Bonds.  They rely, in particular on the Trust Agreement's "NOW, THEREFORE" clause and certain language in section 701.  These assertions willfully ignore that in each instance the Trust Agreement unambiguously states that any pledge is subject to the actual description of the security interest granted by and described in section 507, which limits the Trustee's lien to net receipts held by the Trustee.  Specifically:

- The "NOW, THEREFORE," paragraph of the Trust Agreement explains that PREPA "has pledged and hereby does pledge to the Trustee the revenues of the System . . . and other moneys ***to the extent provided in this Agreement*** as security for the payment of the bonds. . . ." (emphasis added).

- Section 701 of the Trust Agreement provides that the Non-Recourse Bonds will "be payable solely from the Revenues and said Revenues are hereby

---

[109]    Fin. Obj. ¶¶ 13-14.  In its Master POC, the Trustee similarly asserted that it holds a lien on (among other things) "all Revenues of the System."  *See* Master POC No. 18449, Ex. A, ¶¶ 6-7(c).

[110]    See Receiver Mot., at 26.

pledged to the payment thereof *in the manner and to the extent hereinabove particularly specified*." (emphasis added).

89.     Whether the Trust Agreement grants holders of Non-Recourse Bonds a security interest in gross revenues is a question of contract interpretation.  Under Puerto Rico law (which governs the Trust Agreement), if "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall also be observed." *L&R Dev. & Inv. Corp v. Roman (In re L&R Dev. & Inv. Corp.)*, No. 16-08792 BKT, 2017 WL 4863013, at *3 (Bankr. D.P.R. Oct. 26, 2017) (subsequent history omitted); *see also Nike Int'l Ltd. v. Athletic Sales, Inc.*, 760 F. Supp. 22, 24 (D.P.R. 1991) ("Where contract terms and clauses are clear and unambiguous courts should abstain from speculating about possible intentions of parties and should interpret them according to their will expressed at the time of its execution.").

90.     Here, when the Trust Agreement is read in its entirety, there can be no doubt that the security interest granted under the Trust Agreement is solely applicable to the Net Revenues (if any) deposited in the Specified Accounts.[111]  The Trust Agreement's description of the security interest in section 507 is clear and unambiguous, as are the qualifications in the recitals and in section 701 that any security interest in "Revenues" is subject to section 507.  Indeed, the reference in section 701 to the limited pledge "hereinabove particularly specified" makes sense only as a reference to section 507, which obviously precedes (*i.e.*, is "above") section 701.  By ignoring this language, the Bondholders violate one of the cardinal rules of contract construction, namely that contracts should not be interpreted in a way that renders provisions "meaningless" or mere "surplusage."  *See Jimenez v. Peninsular & Oriental Steam Navigation Co.*, 974 F. 2d 221,

---

[111]   As discussed at paragraph 98, below, of the funds held in the Specified Accounts and arguably subject to the liens granted by the Trust Agreement, only those held by the Trustee (*i.e.*, the Sinking Fund and the Self-insurance Fund) are subject to the Trustee's control and, therefore, arguably perfected.

223 (1st Cir. 1992) ("In construing contract language, we endeavor to render no term

meaningless.") (citations omitted).

91.    Moreover, assertions that the Trust Agreement grants a lien on PREPA's gross

revenues (or in any of the Purported Extra Collateral) are directly contradicted by earlier

statements of certain of the Supporting Holders, some of whom, through their financial advisor,

***admitted in Congressional testimony that their collateral is limited to "Net Revenues" and***

***does not include either PREPA's gross receipts or the Impossible Collateral***[112]; ███████

███████████████████████████████████████████.[113]

iv.    <u>Asserted Liens in Purported Extra Collateral Are Not Perfected</u>

92.    Even if the Trust Agreement purported to grant the Trustee (on behalf of the

Bondholders) liens in the Purported Collateral (it did not), and even if, in the case of the

Impossible Collateral, such liens are technically possible (they are not), any such liens are

unperfected and therefore avoidable under section 544 of the Bankruptcy Code.

93.    Section 544(a) of the Bankruptcy Code[114] grants the trustee the rights and powers

of a hypothetical lien creditor, allowing the trustee to avoid any transfer of the debtor's property

that is voidable by (among other things) a judicial lien creditor.  Under Puerto Rico's version of

Article 9 of the UCC, a "lien creditor" has priority over unperfected security interests.  *See* 19

---

[112]   *See* Zwillinger Decl., Ex. 20 (Spencer Dep. Tr. 79:5 - 79:21) ("Q.  [Your testimony to Congress] nowhere refers
to any security interest of the PREPA bonds in gross revenues of PREPA; it refers to a net revenue security
interest, correct? A. That's the way the language reads, yes. Q. Okay. And was that language, when you wrote
that language and submitted it to the House of Representatives, you did that because you believed it was
accurate, right? A. I believed it was accurate, yes. Q. Do you have any reason today to question its accuracy? A.
I believe this still to be an accurate representation.").

[113]   *See* Zwillinger Decl., Ex. 21 (███████████████, ASSURED-PREPA_000005728, at 731) (███
████████████████████████████████████████████); Zwillinger
Decl., Ex. 22 (█████████████████, ASSURED-PREPA_00005939, at 947) (████████████
█████████████████).

[114]   Section 544 is incorporated into PROMESA.  *See* PROMESA § 301.

L.P.R.A. § 2267(a)(2).  Article 9 further provides that a "lien creditor" means (among other

things) "a trustee in bankruptcy from the date of the filing of the petition."  19 L.P.R.A. §

2212(a)(52).  Finally, section 301(c)(7) of PROMESA provides that the term "trustee" used in

the sections of the Bankruptcy Code incorporated into PROMESA "means the Oversight Board."

Accordingly, the Oversight Board has the ability to avoid unperfected security interests.

94.    The Bondholders do not have a perfected security interest in either the Impossible

Collateral or PREPA's gross revenues.  Therefore, the Oversight Board may avoid any liens that

the Bondholders claim to hold in the Impossible Collateral or PREPA's gross revenues.

95.    First, assuming *arguendo* that the Impossible Collateral is personal property in

which a security interest can be created, any security interest therein would have to be perfected

through the filing of a financing statement under Article 9.[115]  As detailed in the Lien Challenge,

the financing statements filed by the Trustee did not include the Impossible Collateral in its

descriptions of the collateral securing the Non-Recourse Bonds.  Any lien in the Impossible

Collateral is therefore unperfected as a matter of law.

96.    Second, under Article 9, any security interests in gross revenues to be deposited in

PREPA's various bank accounts would have to be perfected by control of those accounts.[116]  *See*

19 L.P.R.A. § 2262(b)(1); *see also* 19 L.P.R.A. § 2264(a).  Control over a deposit account is

obtained if (i) the secured party is the bank with which deposit account is maintained; (ii) the

secured party is the bank's customer with respect to the deposit account, or (iii) the debtor, the

secured party, and the bank have entered into an agreement giving the secured party the requisite

---

[115]  *See* 19 L.P.R.A. § 2260(a) (establishing that, subject to certain exceptions, "a financing statement must be filed to perfect all security interests").

[116]  A security interest in a deposit account can be perfected even without control if the funds credited thereto are identifiable (*i.e.*, traceable) proceeds of some other collateral.  However, the Bondholders have not asserted that PREPA's revenues (*i.e.,* receipts) are the **proceeds** of some other form of collateral.  Instead, they argue that PREPA's gross revenues (*i.e.,* receipts) **are** their collateral.

control over the deposit account (a "<u>DACA</u>").  *See* 19 L.P.R.A. § 2214(a)(1)-(3).

97.     PREPA's moneys, including the gross revenues on which the Trustee and the Bondholders assert a lien, are held in deposit accounts that comprise the following funds and accounts established under the Trust Agreement:

- the General Fund (into which all receipts are deposited and from which PREPA's Current Expenses are paid);

- the Revenue Fund (into which receipts remaining after payment of Current Expenses and the funding of a reserve for the payment of PREPA's Current Expenses—*i.e.*, the Net Revenues—are deposited);

- the Sinking Fund (into which Net Revenues are deposited); and

- the Subordinate Funds (into which remaining Net Revenues are deposited).

98.     The Sinking Fund and the Self-insurance Fund are held by the Trustee and arguably subject to control by the Trustee.  Therefore, the security interest of the Trustee and the Bondholders in the moneys in the Sinking Fund and the Self-insurance Fund is arguably perfected.[117]  None of PREPA's other deposit accounts (including the deposit accounts that comprise the General Fund, the Revenue Fund and the remaining Subordinate Funds), however, is held by the Trustee or subject to a DACA.[118]  Accordingly, any alleged security interest granted by the Trust Agreement in these accounts (and the moneys credited to the accounts) is unperfected and subject to avoidance under section 544(a) of the Bankruptcy Code.

---

[117]   Despite its control of the Self-insurance Fund, any security interest the Trustee may have therein is entirely academic for purposes of the Proposed Settlement.  As of the Petition Date, the balance in the Self-insurance Fund was $0, Zwillinger Decl., Ex. 17 (June 30, 2017 PREPA Audited Financial Statement, at 101), and as of October 18, 2019 the balance in the Self-insurance Fund was $36,032.88.  Zwillinger Decl., Ex. 23 (PREPA cash in bank and time deposit accounts, PREPA-AHBHG0017188).

[118]   As the Trustee testified, "I'm not aware of any deposit account control agreements that U.S. Bank has with respect to PREPA accounts."  Zwillinger Decl., Ex. 24 (Becker Dep. Tr. 203:3-5).

v.     Asserted Liens in Purported Extra Collateral, Even if Valid and Perfected,
Do Not Render Bondholders Fully Secured Under Bankruptcy Code

99.     Even if (i) the Trust Agreement purported to grant the Trustee (on behalf of the
Bondholders) liens on the Purported Extra Collateral (it does not), (ii) in the case of the
Impossible Collateral, such liens were technically possible (they are not), and (iii) such liens
were properly perfected (they are not), such liens would not be, or be even close to, sufficient to
render the Bondholders fully secured and entitled to post-petition interest, as they assert.

100.    Much of the litigation over the Bondholders' alleged secured claim has focused
on whether the Non-Recourse Bonds are secured by a pledge of PREPA's gross revenues.  This
is, undoubtedly, an important issue.[119]  For purposes of evaluating the Proposed Settlement,
however, this issue is relatively unimportant because **there is no legal or factual argument or
outcome that gives the Bondholders even close to a fully secured claim on the strength of their
asserted lien on PREPA's gross revenues**.

101.    This is so for three reasons.  <u>First</u>, even if not avoided under section 544, any
security interest in gross revenues would (i) not exist until such revenues are actually collected
(because section 928 of the Bankruptcy Code does not accelerate the collection of receipts) and
(ii) automatically be reduced to a lien on net revenues pursuant to section 928 of the Bankruptcy
Code.  <u>Second</u>, any security interest in any of PREPA's receipts (gross or net) only attaches if
and when, and to the extent, PREPA deposits them in the Specified Accounts.  <u>Third</u>, because
the asserted security interest in gross revenues is really an asserted security interest in gross
receipts, any security interest in PREPA's gross revenues (*i.e.*, gross receipts) is not a security
interest in proceeds for purposes of section 552(b) of the Bankruptcy Code.

---

[119]   And, as discussed above, a straightforward one: as a matter of contract law, the scope of the security interests
granted by the Trust Agreement do not extend to gross revenues, and as a matter of commercial, UCC, law, any
such security interests are unperfected and, therefore, avoidable under section 544 of the Bankruptcy Code.

a.   *Any Lien on Gross Revenues Is Reduced to a Lien on Net Revenues
by Section 928 of the Bankruptcy Code*

102.   Section 552(a) of the Bankruptcy Code provides that, generally, "property

acquired by the estate or by the debtor after the commencement of the case is not subject to any

lien resulting from any security agreement entered into by the debtor before the commencement

of the case."  As the Court explained in its June 27, 2019 opinion in the ERS case,[120] "[s]ection

552(a) thus establishes a general rule that property acquired by the bankruptcy estate post-

petition is not subject to any lien resulting from a pre-petition security agreement."  Section 552

Op., at 148 (internal citations omitted).  "The purpose of the general rule of invalidating after-

acquired property clauses is to facilitate the debtor's fresh start, rehabilitation, and reorganization

by allowing the debtor to include as much property as possible in the estate to satisfy the claims

of general creditors."  *Id.* (internal citations omitted).

103.   Creating an exception to the general rule established by section 552(a), section

928(a) of the Bankruptcy Code allows liens to arise in and attach to "special revenues acquired

by the debtor after the commencement of the case."  Section 928(b), however, provides that any

such lien in post-petition "special revenues" is "subject to the necessary operating expenses" of

the system or project (*i.e.*, PREPA) from which they are derived.

104.   Accordingly, even if the Bondholders are correct that the Trust Agreement grants

them liens in PREPA's gross receipts (it does not), post-petition, those liens will only arise in

and attach to PREPA's receipts ***net*** of its necessary operating expenses.  In other words,

regardless of whether the Trust Agreement grants a security interest in PREPA's gross receipts,

---

[120]   *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Global Designated Activity Co. (In re Fin.
Oversight & Mgmt. Bd. for Puerto Rico)*, 385 F. Supp. 3d 138 (D.P.R. 2019) (the "Section 552 Opinion").

and even if that security interest is perfected, under section 928(b), the Non-Recourse Bonds will

not be secured by gross receipts that became PREPA's property after the Petition Date.

105.    Finally, the Government Parties argue that section 928 justifies the Proposed

Settlement even on a net basis.  Specifically, they say Bondholders may argue that "PREPA's

cash flows have improved since the Petition Date (meaning, there are net revenues)," thus

allowing their lien to "continue[] to float pursuant to section 928(a) of the Bankruptcy Code."[121]

Moreover, the Government Parties note that net revenues may be positive in the future, such that,

at confirmation "as special revenues backed by a continuing stream of revenue, the full present

value of their future worth must be paid."[122]  There are numerous flaws in these arguments.

106.    As an initial matter, there is no evidence that PREPA has been operating at

anything close to a level where its receipts exceed its operating expenses (assuming such

expenses are actually paid), let alone by anything close to the amount necessary to render the

Bondholders fully secured.  Indeed, in connection with the Initial Receiver Motion, Kevin Lavin,

an advisor to PREPA submitted a declaration stating that "PREPA does not expect to have any

excess revenues after paying the PREPA Current Expenses" based on projections for fiscal year

2018.[123]  Moreover, the Government Parties have separately admitted that PREPA is financially

incapable of implementing necessary repairs to PREPA's grid absent federal assistance.[124]  It

will prove very difficult to value the timing and amount (if any) of future net revenues in light of

---

[121]   *See* Suppl. Mem. ¶¶ 10, 56, 61.

[122]   *See id.*

[123]   *See* Declaration of Kevin Lavin in Support of Opposition of Oversight Board to Initial Receiver Motion [Docket No. 149-1].

[124]   *See Joint Urgent Motion of the Oversight Board, PREPA, and AAFAF to Extend All Applicable Deadlines to Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expenses Claims,* at 11 n.6 [Docket No. 1653] ("PREPA was and remains financially incapable of undertaking the extension grid repairs necessary after Hurricane Maria without public assistance from FEMA.").

the tremendous uncertainty currently facing PREPA.  These are not insignificant issues:  even if this value amounted to, for example, a billion dollars, the Bondholders would still not have even close to a fully secured claim.[125]

    b. *Any Lien on PREPA's Receipts Attaches Only After Deposited in Specified Accounts*

107. Section 928 of the Bankruptcy Code allows liens in special revenues that ***would have arisen*** under the prepetition documents to continue to arise after commencement of the case.  It cannot, however, improve the Bondholders' position by granting them rights not in the Trust Agreement.  As discussed above, section 507(h) of the Trust Agreement only grants liens in moneys actually "***in***" the Sinking Fund and moneys actually "***in***" the Subordinate Funds.[126] Even if the contemplated security interest was in these moneys on a gross basis (it was not), there

---

[125] The Committee disputes that section 928 requires a current valuation of special revenues that may be earned in the future, *ad infinitum*.  As discussed herein, section 928 does not expand creditors rights.  The law has no comprehension of a ***present*** security interest in ***future*** property (as distinct from a present promise to grant, in the future, a security interest in property that will exist and be owned by the debtor).  It is a basic legal maxim (and a dictate of logic and common sense) that "one cannot give what one does not have (in Latin, "*nemo dat qui non habet*").  Thus, "[i]t is impossible on the face to have a vested property right in after-acquired property . . . because, by definition, after-acquired property is a mere contingency.  *First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*, 18 B.R. 868, 870 (Bankr. D. Colo. 1982).  Because a security interest is an interest in property, it cannot exist unless the property itself exists.  Indeed, in the slightly different context of a transfer of ownership of future property, the Supreme Court has explained that "A person cannot grant a thing which he has not . . . ***The thing itself is an impossibility***."  *Pennock v. Coe*, 64 U.S. 117, 128 (1859) (emphasis added).

PREPA's future revenues, special or otherwise, are not currently property of PREPA (or anyone else).  Although PREPA might have a hope, or even an expectation, of future revenue, this hope or expectation does not rise to the level of an existing property interest in which it is possible for PREPA to grant a security interest.  This is why "[a] lien can only bind property that is in existence; liens do not subsist where there is no property to be bound."  *Karim v. Bayview Loan Servicing, LLC (In re Karim)*, No. 17 A 00380, 2018 WL 1230561, at *199 (Bankr. N.D. Ill. Mar. 9, 2018) (internal quotation marks and citations omitted).  It is therefore impossible, as a matter of law, that the Trust Agreement granted a security interest in PREPA's future, unearned, revenues (gross or net, special or otherwise).  Nothing in section 928 of the Bankruptcy Code changes this. Section 928 is not designed to either improve a creditor's position or to change the very nature of property interests.  Indeed, section 928 allows a lien to arise in "special revenues ***acquired*** by the debtor after the commencement of the case" (emphasis added).  This makes sense:  section 928 is an exception to section 552, which is a bankruptcy policy to cut off liens that would, by the operation of contract, otherwise arise in after-acquired property.  But this policy only applies to property that the debtor has actually acquired, as—even without section 552—no creditor can have a lien on property that its debtor has not yet acquired, for the simple reason that such a lien is a legal and logical impossibility.

[126] Zwillinger Decl., Ex. 6 (Trust Agreement § 507(h)) (emphasis added).

can be no dispute that attachment requires both collection and deposit in the Specified Account.

The Bondholders accepted a form of collateral that arises if, and only if, PREPA takes certain

actions and keeps its promises.  Because they cannot enforce these promises, the Bondholders

have no collateral beyond the $8.8 million held by the Trustee.  *See, e.g., Las Vegas Monorail*

*Co.*, 429 B.R. 317, discussed *supra*.

> c.     *Any Lien on Gross Revenues Is Not a Lien on Proceeds*

108.    Section 928's exception that allows creditors' liens to continue to arise in special

revenues acquired after the Petition Date is not the only exception to the Bankruptcy Code's

prohibition on liens in after-acquired property.  Section 552(b) of the Bankruptcy Code permits

security interests in post-petition property if that property is the proceeds of prepetition property

subject to a properly perfected security interest.  "By virtue of this exception, if a security

agreement entered before the commencement of the case extends 'to proceeds, products,

offspring, or profits' of the original collateral, then the security interest continues to apply to the

proceeds and so on, even when they are acquired by the debtor or estate after the bankruptcy case

begins."  Section 552 Op., at 148 (internal citations omitted).  "Significantly, Section 552(b)(1)'s

exception to Section 552(a)'s general rule only extends to 'property of the debtor acquired before

the commencement of the case' and the 'proceeds, products, offspring, or profits of such

property.'"  *Id*. at 149.  "Put another way, Section 552(b)(1) does not extend to the proceeds of

property which itself is acquired after the petition date."  *Id.*

109.    The Bondholders assert that the Trust Agreement grants a lien on PREPA's gross

revenues.  Even if they are correct (they are not), a lien on revenues is distinct from a lien on the

accounts receivable or other right to payment that generates gross revenues:  revenues may be

proceeds of the latter (and protected by section 552(b)) only if the security agreement

specifically grants a security interest in the accounts receivable in the first instance.  A creditor

that has a lien only in revenues (net or gross) **actually collected** (*i.e.*, receipts), as distinct from a

lien on the receivables that gave rise to the collected revenues, does not have a lien on proceeds

for purposes of section 552(b).[127]  Because the Bondholders do not have (or even claim to have)

a security interest in PREPA's receivables, section 552(b)'s proceeds exception does not apply to

their asserted lien on the gross revenues actually collected by PREPA.[128]

vi.    Even if They Prevail on All Legal Arguments, Bondholders Cannot Prove
Value of the Impossible Collateral

110.    Even if they could prove that the Impossible Collateral is "property" and therefore

capable of serving as collateral, the Bondholders (like any secured creditor) would face the issue

of determining the value of that "property."  To that end, uncertainty regarding whether (even if

the automatic stay were lifted) a receiver would be appointed and whether (and to what extent, if

ever) rate increases would be approved by the Puerto Rico regulator will make it difficult (if not

impossible) for the Bondholders to prove the value of the Rate Covenant or the Receiver

Remedy.  Any value that the Rate Covenant (and, by extension, the Receiver Remedy) may have

---

[127]  Consistent with this, the Trust Agreement defines "revenues" as "moneys received by" PREPA.  *See* Zwillinger
Decl., Ex. 6 (Trust Agreement, at 24).

[128]  Even if the Trust Agreement did grant a lien on PREPA's receivables and other rights to payment such that
PREPA's gross revenues could conceivably be proceeds of those rights, and even if those liens were properly
perfected, section 552(b) of the Bankruptcy Code would protect, at most, a limited amount of PREPA's post-
petition revenues.  In its Section 552 Opinion, the Court explained where "the relevant right to payment only
comes into existence as the result of and contemporaneously with post-petition acts, [any] proceeds of that right
are therefore the proceeds of post-petition property," and are thus "outside of the ambit of section 552(b)(1)."
Section 552 Op., at 150.  As applied to the "collection of accounts receivable," the Court explained that such
funds are only proceeds if they are "the collection of receivables generated by the sale or other disposition of
pre-petition property."  *Id.*  As noted by the Section 552 Opinion, case law is clear that "where it is only post-
petition acts which generate an account receivable, those post-petition receivables will not be considered
proceeds because there is no interest in, or connection to, the right in the account receivable created
prepetition."  *Id.* (internal citations omitted).  "Accounts receivable generated after commencement of the case
are in no way proceeds, product, offspring, rents or profits of prepetition accounts receivable."  *Id.* (internal
citations omitted).  Since its July 2, 2017 Petition Date, PREPA has been operating in bankruptcy.  For the
reasons explained in the Section 552 Opinion, as a matter of law, PREPA's gross revenues (i.e., receipts)
collected on account of post-petition services will never qualify as proceeds under section 552(b) and, therefore,
any security interest the Bondholders may have in any of those revenues (*i.e.*, receipts) is limited to the excess
of such revenues (*i.e.*, receipts) over PREPA's net operating expenses.

52

would have to take into account the PREB Ruling's finding that the rate increases necessary to pay the entirety of the Non-Recourse Bonds would create an intolerable economic burden.[129] The Court would also have to consider the capacity of Puerto Rico's economy to support the higher rates that would be required to pay the Bondholders; any uncertainty in this regard would necessarily have an adverse effect on the value of the Impossible Collateral.[130]

## C. Bondholders Must Overcome Significant Legal and Evidentiary Issues in Receiver Motion

111.    On October 3, 2018, certain of the Monolines filed the Receiver Motion, seeking to have the automatic stay lifted, with the ultimate goal of having a receiver appointed for PREPA.  In the Receiver Motion, the Monolines assert that the Rate Covenant and the Receiver Remedy are property rights and part of the collateral package securing the Non-Recourse Bonds. They also argue that the value of their collateral is being harmed by PREPA's misconduct and mismanagement.  The Receiver Motion will likely be denied for several reasons.

### i.    Initial Receiver Motion Ruling Suggests Court Will Deny Current Receiver Motion

112.    On July 18, 2017 (less than three weeks after the Petition Date), a group of bondholders and monoline insurers filed the Initial Receiver Motion, seeking relief from the automatic stay to allow them to seek the appointment of a receiver under the Trust Agreement. As with the current Receiver Motion, key to this argument was the claim that the collateral securing the Non-Recourse Bonds includes (i) PREPA's gross revenues (*i.e.*, receipts), both current and future, (ii) the Rate Covenant, and (iii) the Receiver Remedy.[131]

---

[129]   Zwillinger Decl., Ex. 7 (PREB Ruling, dated Jan. 10, 2017, at ¶ 17).

[130]   This is particularly so in light of the expert report prepared by the Committee demonstrating PREPA's inability to sustain rate increases.

[131]   *See* Docket No. 74.

113.     On September 14, 2017, this Court issued a ruling denying the Initial Receiver

Motion.  Although the Court's order was overturned on appeal, it should leave no doubt as to

how the Court will rule on the current Receiver Motion.  In its order, the Court ruled that section

305 of PROMESA barred the Court from lifting the automatic stay.  The Court also ruled, on an

alternative basis, that even if it had authority to lift the stay, the movants had not demonstrated

cause for the requested relief.  On appeal, the First Circuit reversed, holding that section 305 of

PROMESA did not bar the Court from lifting the stay to allow the movants to seek the

appointment of a receiver under territorial law.[132]  The First Circuit also commented on the

Court's alternative grounds for its ruling, directing the Court on remand to assess "the pre-

petition value of the [B]ondholders' collateral (if any exists)."  *Id.* at 23.

114.     These comments of the First Circuit do not help the Bondholders.  Indeed, even

under the Bondholders' various legal theories, there is no doubt that, on the Petition Date, the

Bondholders' collateral was quite limited, which means that (i) they were undersecured and (ii)

their right to adequate protection would be limited to such limited collateral, to the extent it

declined in value after the Petition Date.  For these reasons, there should be little uncertainty as

to the eventual outcome of the Receiver Motion.

     ii.     <u>Receiver Motion Requires Resolution of Lien Challenge, on Which
Bondholders Are Unlikely to Prevail</u>

115.     "Section 362(d)(1) requires an initial showing of cause by the movant" before a

court will grant relief from the automatic stay.  *Sonnax Indus., Inc. v. Tri Component Prods.*

*Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990).  Cause includes a lack of

adequate protection in a secured creditor's collateral.

---

[132]  *See Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13 (1st Cir. 2018).

116.    As discussed above, the Monolines' collateral, if any, is limited to the $8.8

million held by the Trustee in the accounts designated in the Trust Agreement.  The Monolines

have not introduced any evidence that the value of this collateral is diminishing—to the contrary,

it has been earning interest and has presumably increased in value since the Petition Date.[133]

Thus, the Monolines' interest in these funds (if any) is more than adequately protected.[134]

117.    To be clear, the Monolines are not entitled to relief from the stay to protect their

asserted, but unproven, liens in the Purported Extra Collateral.  The First Circuit has explained

that in considering a motion for relief from the automatic stay, the court should determine

"whether a creditor has a colorable claim to property of the estate."  *Grella v. Salem Five Cent.*

*Savs. Bank*, 42 F.3d 26, 32, 34 (1st Cir. 1994) (further noting that, if an interested party "raises a

defense to a creditor's claim at the relief from stay hearing, the court need not ignore this

defense, but may consider it when deciding to lift the stay").  For all of the reasons discussed

above, the Monolines do not have a colorable claim to the Purported Extra Collateral.

     iii.     <u>Receiver Motion Is Governed By, and Likely to Be Denied Under, *Sonnax*</u>
<u>Factors</u>

118.    The Receiver Motion asserts that "Movants are not required to meet the Second

Circuit's *Sonnax* test to obtain stay relief."[135]  The First Circuit, however, has held otherwise,

stating its "agree[ment] with the parties that the factors identified by the Second Circuit in

*Sonnax* and recited by the Title III court provide a helpful framework for considering whether

---

[133]   Evidence of any other post-petition increases in the amounts on deposit in any of the accounts held by the
Trustee would also require denial of the Receiver Motion.

[134]   The Committee incorporates by reference its objection to the Receiver Motion and its detailed explanation of
why the Receiver Motion cannot be granted.  *See Objection of Official Committee of Unsecured Creditors to
Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty
Municipal Corp., and Syncora Guarantee Inc. for Relief from Automatic Stay to Allow Movants to Seek
Appointment of Receiver* [Docket No. 1151].

[135]   Receiver Mot. ¶ 34.

the Title III court should permit litigation to proceed in a different forum." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d at 23. Application of the *Sonnax* factors to the Receiver Motion demonstrates that it is unlikely to be granted.[136]

119.     It is hard to imagine a form of relief that would interfere with a debtor more than the appointment of a receiver over the operations of PREPA (*Sonnax* factor #2). This is particularly true in light of PREPA's ongoing efforts to finalize Transformation. As noted above, it is technically permissible to lift the automatic stay even when there are questions about the validity of the asserted lien. In this instance, however, the First Circuit has already explained that determination of the balance of harms (*Sonnax* factor #12) requires "some assessment of the pre-petition value of the bondholders' collateral (*if any exists*) [and] whether the bondholders face a threat of uncompensated diminution in such value." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d at 23 (emphasis added). This requires resolution of the Lien Challenge.

120.     On the other hand, if the Court did choose to lift the stay before resolving the Lien Challenge, this would mean that relief from the automatic stay would not result in complete (or even partial) resolution of the issue (*Sonnax* factor #1). Nor do interests of judicial economy and the expeditious and economical resolution of litigation favor relief from the stay (*Sonnax* factor # 10): relief from the stay would require PREPA to oppose the Receiver Remedy in another

---

[136]   The *Sonnax* factors consist of the following: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. *Sebelen Medina v. Banco Popular de P.R. (In re Sebelen Medina)*, No. 14-06368, 2015 WL 2378975, at *4 (Bankr. D.P.R. May 13, 2015). Not all twelve elements will be relevant in every case, nor is a court required to accord equal weight to each element. *In re Enron Corp.*, 306 B.R. 465, 476 (Bankr. S.D.N.Y. 2004).

forum, creating an entire new litigation—litigation that, depending on the outcome of the Lien

Challenge, is likely to be entirely unnecessary.  Finally, relief from the stay would prejudice

other creditors, whose interests would not be represented in another court (*Sonnax* factor #7).

For all these reasons, the Receiver Motion would not be granted by the Court in the first place

and therefore the "settlement" of that motion cannot justify the Proposed Settlement.

### iv.   In Any Event, the Possibility of Court Granting Receiver Motion Does Not Justify the Proposed Settlement

121.    The Government Parties list a number of harms that PREPA would suffer if a

receiver was appointed.[137]  These harms do not justify acceding to a bad deal.  To the contrary,

these harms explain precisely why the Receiver Motion should not, and likely would not, be

granted in the first place.  Additionally, these harms come about only if a receiver is appointed—

an outcome that is not certain even if the Court, notwithstanding these harms, did lift the stay.

Granting the Receiver Motion would only allow the movants to seek the appointment of a

receiver in a Puerto Rico court, which relief is far from guaranteed, especially since the primary

purpose of any such receiver would be to increase electricity rates in Puerto Rico.  Finally, the

Government Parties have admitted that they received no guidance on the crucial question of

whether, even if appointed, a receiver would be able to raise rates and thus harm PREPA.[138]

122.    Finally, the argument that withdrawal of the Receiver Motion justifies the

Proposed Settlement is inherently flawed.  The core of the argument is that appointing a receiver

would have a deleterious impact on PREPA.  Of course, if the Court agrees with this, the

Monolines' likelihood of success in the Receiver Motion is tenuous at best.  On the other hand, if

---

[137]   Suppl. Mem. ¶ 60.  The Committee has opposed the Receiver Motion.

[138]   Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 161:6-162:15); Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 102:7-103:21).

the Court were to agree with the allegations in the Receiver Motion regarding misconduct at

PREPA, then granting the Receiver Motion would benefit PREPA and its creditors.  Either way,

withdrawal of the Receiver Motion provides little support for a finding that the Proposed

Settlement is reasonable and/or in the best interests of PREPA and its creditors.

### D.   Government Parties Fail to Properly Consider Strength of Parties' Respective Litigation Positions and Likelihood of Success on the Merits

123.   The heart of the Proposed Settlement is the decision to settle the Lien Challenge

and grant the Bondholders a recovery of at least 73% of their claim.[139]  The above review of the

parties' respective positions makes clear, however, that this decision fails to properly value the

Lien Challenge and, separately, is based on incorrect legal principles regarding the possible (let

alone probable) outcomes of that litigation and the fact that (unlike the Commonwealth-COFINA

Dispute) the Lien Challenge is not an all or nothing litigation for PREPA.  Accordingly, there is

no basis for the Court to find that "the claim the debtor is giving up is outweighed by the

advantage to the debtor's estate."  *In re Servisense.com, Inc.* 382 F.3d at 72.  The Rule 9019

Motion must, therefore, be denied.

### i.   Lien Challenge Is an All or Nothing Proposition—For Bondholders

124.   A bankruptcy court has wide discretion in determining whether to approve a

proposed settlement under Rule 9019 of the Bankruptcy Code.  This discretion, however, does

not extend to approving settlements that are based on "legally incorrect principles."  *Szwak v.*

*Earwood (In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.)*, 592 F.3d 664, 675 (5th Cir.

2009).  By their own admission, the Government Parties relied on at least two incorrect legal

principles in entering into the Proposed Settlement.

---

[139]   According to the Government Parties, 73% is the predicted recovery on Tranche A and B bonds, without accounting for the Administrative Expense Claim, Settlement Payments, and Waiver and Support Fees.  *See* Suppl. Mem. ¶¶ 28-29.  *As shown herein, however, the Bondholders' actual recovery is much greater*.

125.    As the Government Parties concede, "the 'litigation being compromised' includes the Receiver Motion and all potential litigation that could stem from the Supporting Holders' assertions that they are oversecured, entitled to 100 cents on the dollar (plus interest and fees), and their security extends to covenants under the Trust Agreement."[140]  The Government Parties claim, however, that in order "to reduce Bondholders' recoveries" they "would have to 'run the board,' and be successful in all potential litigations" being compromised.[141]  ***The exact opposite is true, as it is the Supporting Holders that would have to prevail at virtually every turn to see a material improvement in their recovery beyond the $8.8 million held by the Trustee.***

126.    It is a basic principle of bankruptcy law that claim objections are governed by a burden-shifting framework under which the objecting party bears the initial burden of rebutting the presumption of validity that attaches to a properly filed proof of claim.  This initial burden requires "evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Everett*, No. 10-19457-FJB, 2013 WL 3757283, at *5 (Bankr. D. Mass. Jul. 15, 2013) (quoting *In re Alleghany Int'l, Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1991)).  Once a claim is no longer entitled to the prima facie assumption of validity, "the claim-filing creditors bears the ultimate risk of nonpersuasion as to the allowability of the claim. Ultimately, the creditor must demonstrate, by a preponderance of the evidence, that the claim is entitled to allowance."  *Ezenia! Inc. v. Nguyen (In re Ezenia! Inc.)*, 536 B.R. 485, 496 (Bankr. D.N.H. 2015) (quoting *Juniper Dev. Group v. Kahn (In re Hemingway Trans. Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993)); *see also In re Alleghany Int'l, Inc.*, 954 F.2d at 173-174 ("The burden

---

[140]  Suppl. Mem. ¶ 55.

[141]  Suppl. Mem. ¶ 62.

of persuasion is always on the claimant.").  The Committee has filed an objection to the

Trustee's proof of claim demonstrating why the claim is not allowable.[142]

127.    As shown above and discussed in the Claim Objection, the Lien Challenge is an

"all or nothing" proposition for the Bondholders: putting aside what is probable, the only way it

is even possible for the Bondholders to have a fully secured claim is if they prevail at every stage

of the Lien Challenge.  Because their alleged secured claim of $8.5 billion is subject to an

objection, the Bondholders bear the risk of proving every dollar of their claim above the $8.8

million held by the Trustee.  In other words, the Government Parties do not have to actually

prove anything, while the Bondholders have to prove everything.

ii.    <u>Proposed Settlement Is Worth Less Than Expected Value of Lien<br>Challenge</u>

128.    The above detailed review of the Lien Challenge also illustrates, and quantifies,

just how poor of a decision the Proposed Settlement is, and that the value of the claims the

Government Parties are giving up far outweighs the purported benefits to the debtor and its non-

bondholder creditors.

129.    The Seventh Circuit has explained that "[d]etermining the reasonableness of a

settlement requires comparing the amount of the settlement to the net expected gain of seeking a

litigated judgment."  *In re Fort Wayne Telsat, Inc.*, 665 F.3d 816, 820 (7th Cir. 2011).  "The

'expected gain' is the gain if the judgment is favorable, discounted (that is, multiplied) by the

probability of a favorable judgment."  *Id.*; *see also Mohns, Inc. v. Wilson*, 498 B.R. 907, 910

(E.D. Wis. 2013) (same).

---

[142]    *See Objection of Committee to Proof of Claim No. 18449 Filed by U.S. Bank National Association, In its
Capacity as Trustee for Non-recourse PREPA Bonds* [Docket No. 1691] (the "<u>Claim Objection</u>").

130.     Tying this to the lowest range of reasonableness determination required by Rule
9019, one court has explained that an expected value analysis

> demonstrates not only how to go about identifying the variables and
> "doing the math," but it also presents a quantitative method or means
> for demonstrating that a proposed settlement satisfies the formulaic
> limit of the lowest point in the range of reasonableness. ***In other words,
> the lower limit of the decision analysis, if performed properly, may
> serve as the operational definition of the lowest point in the range of
> reasonableness***. Decision analysis, when properly performed, serves
> then as a reality check to test the reasonableness of the assumptions that
> should underlie each settlement because the trustee has to think
> carefully through the components of the analysis and then assign
> probabilities to the most probable range of outcomes.[143]

131.     Here, any rational analysis of the expected value of the Lien Challenge
conclusively demonstrates that the Proposed Settlement falls far below the lowest range of
reasonableness as established by the case law.

132.     As explained above, the only way it is even theoretically possible for the
Supporting Holders to have a fully secured claim is for them to prevail on their argument that the
Non-Recourse Bonds are secured by liens in the Impossible Collateral. As further explained
above, the only way the Bondholders will have a properly perfected lien on any of the
Impossible Collateral is if they prevail on a series of standalone legal issues.

133.     The Committee respectfully submits that, for each of these issues, the likelihood
of success tilts heavily against the Bondholders. However, assuming, *arguendo*, that the
litigation risk for each of these issues is a 50/50 split,[144] simple math dictates that the

---

[143]   *In re Gardi*, 273 B.R. at 18 (emphasis in original). The *Gardi* court also noted that "[d]ecision analysis has
been applied to the analysis of settlements in litigation as part of the law and economics approach for over thirty
years." 273 B.R. at 18 n.11. In truth, this approach dates back almost 100 years. In *In re Stuart*, 272 F. 938,
942 (6th Cir. 1921), the court approved a compromise under the Bankruptcy Act where the compromise was
expected to result in a recovery "three-fourths as great" as what the objectors could have expected even "after
successful litigation."

[144]   The Oversight Board's Executive Director's has described the Government Parties' position as "strong" and
that of the Bondholders as "weak" and has conceded that the Government Parties are more likely than not to

Bondholders have only a *12.5% chance* of having an enforceable and perfected lien on either the

Rate Covenant or the Receiver Remedy.[145]

134.    Even if the Bondholders prevail on this 12.5% chance, all they will have is a

ruling that the Impossible Collateral is property in which they have a lien.  To have a fully

secured claim (as asserted), the Bondholders would then be confronted with the difficulties in

valuing the Impossible Collateral.  Applying the same overly generous 50/50 assumption to the

question of the whether the Bondholders can successfully demonstrate that the value of a lien on

any of the Impossible Collateral is greater than $8.5 billion means that there is only a 6.25%

chance that the Bondholders will prevail on their theory that they are oversecured.[146]

135.    According to the Brownstein Declaration, assuming a June 30, 2020 plan

effective date, the Bondholders' asserted fully secured claim will ultimately be for over $9.8

billion.[147]  Pursuing, and succeeding on, the Lien Challenge would therefore result in a "benefit"

---

ultimately prevail.  Jaresko Decl. ¶¶ 29, 33; *see also* Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 227:4-16)
(explaining that the definition of having a "strong" case is believing that success is more likely than not).

[145]   If the litigation risk was 60/40 in favor of the Government Parties, the likelihood of a perfected lien on any of
the asserted Impossible Collateral drops to 6.4%; at 70/30, the Bondholders have only a 2.7% chance that they
have an enforceable and perfected lien on any of the asserted Impossible Collateral.  *To be clear*, the Committee
does not concede that the Lien Challenge (and, by application, Receiver Motion) issues are even close to a
50/50 "coin-toss," or even a 60/40 split in favor of the Government Parties.

[146]   The Committee acknowledges some additional complexity to these calculations not addressed above.  For
example, it is theoretically possible that even if the Bondholders cannot prove that any single component of the
Impossible Collateral is worth enough to render them oversecured, the overall value of all of the Impossible
Collateral may do so.  However, that would require the Bondholders to first prove that they have properly
perfected liens in both of the classes of "property" alleged to be their Impossible Collateral.  Under the assumed
50/50 litigation risk, the likelihood of this is **1.56%** ([.125] [.125] = .015625, or 1.56%).  Another complexity is
that—unlike the legal and contractual questions relevant to the scope of the Bondholders' collateral— the issue
of value is not all encompassing: the Committee understands that, if they get to that point, any value in the
Purported Extra Collateral will represent an incremental value to the Bondholders' position beyond the $8.8
million held by the Trustee on the Petition Date.  However, the issue at hand is not whether the Bondholders
may be able to incrementally improve their position.  The issue is what is the likelihood that they will be able to
prove such a significant improvement in their position that it makes sense to give them at least 73% of their
claim (and really much more) instead of $8.8 million.  Ultimately, the above discussion of the various legal and
factual issues involved in the Lien Challenge (and, by application, the Receiver Motion) makes clear that, even
assuming an overly generous 50/50 litigation split at every issue, this outcome is exceedingly unlikely.

[147]   *See* Brownstein Decl., at 16, Table 2.

of at least $9.8 billion to PREPA and its creditors.[148]  Accordingly, even under the generous and

unreasonable assumption that every litigable issue is a 50/50 split, the net expected value of the

Lien Challenge to PREPA is approximately $7.37 billion.[149]  Applying this same 50/50 split to

the question of whether the Bondholders can show that the value of the Purported Extra

Collateral is sufficient to render them fully secured, as asserted, increases the expected value of

the Lien Challenge to PREPA to $8.60 billion.[150]

136.    In other words, the Bondholders would have to agree to a reduction in their claim

of $7.37 to $8.60 billion to show that the Proposed Settlement is greater than the net expected

value of the Lien Challenge and, therefore, within the lowest range of reasonableness.  The

Proposed Settlement, of course, does not even come close to this.

### E.    Government Parties Overstate Discount on Bondholders Claims

137.    The Government Parties assert, in multiple instances, that the Proposed

Settlement reduces the Bondholders' claim by between $2 and $3 billion.[151]  Even if true there is

---

[148]  Because the Lien Challenge would disallow the Bondholders' secured claim to the extent it exceeds the value of their $8.8 million in collateral held by the Trustee on the Petition Date, PREPA would obtain the full benefit of the $9.83 billion, without the need to execute on a judgment or otherwise worry about the difficulty of collecting.

[149]  The maximum recovery to PREPA is $9.83 billion.  If successful, the Lien Challenge would result in a benefit of that amount (less $8.8 million) to PREPA and its creditors.  Because $8.8 million is a non-material percentage of $9.83 billion, for the purposes of these calculations, the value of success in the Lien Challenge can be considered $9.83 billion.  As noted above, under the generous and unreasonable assumption that every litigable issue is a 50/50 split, the Bondholders have only a 12.5% chance of having an enforceable and perfected lien on any of the Impossible Collateral.  This means that, at best, and putting aside the difficult questions of valuation, there is a 25% chance that the Bondholders will have a (i) current, and properly perfected, lien on PREPA's future, unearned revenues (net or gross) **or** (ii) a lien on either the Rate Covenant or the Receiver Remedy.  In turn, this means that PREPA's probability of total success in the Lien Challenge is 75%.  Because .75 (the probability of success in the Lien Challenge) multiplied by the $9.83 billion (the benefit to PREPA and its creditors of the Lien Challenge, if successful) equals $7.37 billion, the expected value of the Lien Challenge is $7.37 billion (i) under the generous and unreasonable 50/50 assumption and (ii) without accounting for questions of value.

[150]  Adding another 50/50 litigation issue reduces the Bondholders' overall likelihood of success to 12.5%, which also means that PREPA's likelihood of limiting the Bondholders' secured claim to $8.8 million is 87.5%.  $9.83 billion multiplied (or discounted) by .875 equals $8.60 billion.

[151]  *See*, *e.g.*, Suppl. Mem. ¶¶ 36, 58, 75.

no rational valuation of the Lien Challenge that makes even a $3 billion discount sufficient.  In any event, the Government Parties overstate the discount the Bondholders are supposedly accepting, which means that the Proposed Settlement is even worse than it appears.

> i.   Government Parties' Calculations Fail to Consider All Consideration Paid Under Settlement

138.    The Brownstein Declaration states, unequivocally, that:

> "The Tranche A and B bond will yield a recovery of ***no more than 77.5% of the bond claims*** (with accrued and unpaid interest from the Petition Date through May 1, 2019). . . .[152]

This is demonstrably false.

139.    Table 2 of the Brownstein Declaration states that the total claims, with interest through May 1, 2019, are $9,300,344,424.  Table 1 of the Brownstein Declaration states that in the scenario where the Tranche B bonds return their highest possible value, Bondholders will receive $6,277,732,486 on account of Tranche A bond and an additional $930,034,442 on account of the Tranche B bonds, for a total of $7,207,766,928.  This means that the Bondholders will have obtained the purported highest possible recovery of 77.5% of their claim through May 1, 2019 ***solely on account of their recoveries from the Securitization Bonds***.

140.    Of course, the Securitization Bonds are not the entirety of the Bondholders' recoveries.  The Government Parties have also promised to pay Waiver and Support Fees and the Administrative Expense Claim (plus interest), as well as the Settlement Payments.[153]  According to the same Table 1 of the Brownstein Declaration, these additional payments total $544,844,661, bringing the Bondholders' total recovery up to $7,752,611,589—or 83.4% of the

---

[152]   Brownstein Decl. ¶ 34 (emphasis added).

[153]   Zwillinger Decl., Ex. 9 (RSA §§ 4 (a)-(c), 2(d)(iii), 2(d)(i)).

bond claims with accrued and unpaid interest through May 1, 2019.[154]  In other words, ***even taken at face value, the Brownstein Declaration understates the maximum recovery by over $544 million, or almost 6%***.[155]

        ii.      <u>Government Parties Improperly Award Bondholders Post-Petition Interest and Underestimate Their Recoveries as a Result</u>

141.    Brownstein also deflates his calculations by improperly assuming the Bondholders' claims included post-petition interest.  This is major legal flaw in the Proposed Settlement generally.  It is a basic principle of bankruptcy law that claims for post-petition interest and professional fees are disallowed unless the creditor is (i) a secured creditor (ii) whose collateral is worth more than the amount of its debt on the Petition Date.  As discussed above, as of the Petition Date, the Bondholders were secured by collateral worth, at most, $8.8 million.[156]  Therefore, they are not entitled to post-petition interest.

---

[154]  The Government Parties are likely to argue that their statement that the maximum recovery on bond claims is 77.5% is not a misrepresentation because this additional $544 million is not recovery on the Bondholders' "bond claims," but rather fees paid in consideration for the Bondholders' support of the RSA.  This argument must fail.  As an initial matter, the Court should see through such a transparent attempt to recharacterize half a billion dollars in transfers to the holders of Non-Recourse Bonds.  If anything is clear, it is that the claimants do not care what their recovery is called—so long as they get what they want.  Moreover, the Government Parties have already conceded the falsity of this argument, as they have justified the Settlement Payments and the Administrative Expense Claim as a settlement of the Bondholders' claim to post-petition interest and of pending and potential litigation on account of the Non-Recourse Bonds.  *See* Suppl. Mem. ¶ 35.

[155]  Under Supreme Court precedent, the Government Parties and the Bondholders are not entitled to pick and choose what payments are considered part of their recovery.  As Bankruptcy Judge Markell (Ret.) has explained, court are required to "consider all consideration received by a creditor on account of its claim, whether explicitly provided for in the plan or not."  Zwillinger Decl., Ex. 26 (Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 227, 234 (1998)) (discussing *American United Mutual Life Insurance Co. v. City of Avon Park*, 311 U.S. 138 (1940)).

Moreover, even when taking these extra payments into account, the Government Parties continue to understate the recovery.  *See* Zwillinger Decl., Ex. 25 (Battle Dep. Tr. 74:16-75:7) (stating that the recovery percentage, including all additional components are put in, is 81-82%, because the additional components are worth 4-4.5%.).

███████████████████████████████████████████████████████

Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 56:18-58:19).

[156]  The Committee acknowledges that to the extent the amount on deposit with the Trustee has increased in the post-petition period, the Bondholders' secured claim may have increased accordingly (provided that PREPA has paid its necessary operating expenses under section 928(b)).  However, unless and until the amount held by the

142.     Nonetheless, the Proposed Settlement provides the Bondholders ***full recognition of their post-petition interest*** from the Petition Date until May 1, 2019 and payment of an additional $393 million from May 1, 2019 through a presumed effective date of June 30, 2020 (such amounts to be paid in cash and/or in kind).[157]   Moreover, these payments will be granted administrative expense priority[158]—a right that the Bondholders would never receive under their prepetition documents, regardless of the scope and value of their collateral.

143.     To the extent the Bondholders would contend that potential eventual increases in the value of the collateral could support their claim to post-petition interest, this is incorrect.  The First Circuit has explained that an increase in the value of collateral over the course of a case does not retroactively render a creditor oversecured from the petition date.  *See Prudential Ins. Co. of Am. v. SW Bos. Hotel Venture, LLC (In re SW Bos. Hotel Venture, LLC)*, 748 F.3d 393, 411 (1st Cir. 2014) (rejecting notion that post-petition sale price established creditor was oversecured on the petition date for purposes of establishing measuring date for accrual of post-petition interest).  Accordingly, any post-petition developments or any valuation performed at confirmation is irrelevant, as neither provide any legal basis for the payment of post-petition interest (or the payment of professional fees, discussed further below), which is impermissible under basic principles of bankruptcy law.

144.     Additionally, it is inherently inconsistent for the Government Parties to allow $792 million in post-petition interest and likely pay over $50 million in professional fees while simultaneously arguing that the Receiver Motion may be granted.  The Receiver Motion ***could***

---

Trustee totals over $8.5 billion, any increase will only incrementally increase the Bondholders' secured claim—but cannot entitle them to payment of post-petition interest or fees.

[157]   *See* Brownstein Decl., at Table 1.

[158]   Zwillinger Decl., Ex. 9 (RSA § 2(d)(iii)).

***not be granted*** if the Bondholders were entitled to post-petition interest.  As purportedly secured

creditors, movants in the Receiver Motion will be entitled to stay relief only if, and to the extent,

their collateral is being harmed.  If, as they contend, their collateral is worth more than their

claim (*i.e.*, there is an equity cushion), they will not be entitled to stay relief.  However, if there

is no equity cushion, as a matter of law, they are not entitled to post-petition interest.  Instead of

a settlement (with each side feeling some pain), full recognition of the post-petition interest

allows the Bondholders to eat their cake and have it too.

145.    The Committee recognizes that the Bondholders have asserted that they are

oversecured, and therefore entitled to post-petition interest.  However, by including 100% of the

asserted post-petition interest (*i.e.*, $792 million) in the Bondholders' allowed claim, and

granting the last dollar of the Bondholders' claim the same recovery as the first dollar of the

Bondholders' claim, the Government Parties have surrendered—not settled—this issue.

iii.    <u>Brownstein Fails to Factor in Downward Trend in Municipal Market
Yields, Potentially Further Understating Value Given to Bondholders</u>

146.    To understand the effect of yield on creditor recoveries, some background on

yield dynamics is helpful.  When the coupon (or interest) rate on a bond is equal to the yield on

that bond, *i.e.*, the return on the bond over its lifetime, the present value of the cash flows

discounted at the yield is equal to the face value (or par value) of the bond.  If, however, the

yield established in the market for the bond is lower than the coupon rate offered by the bond,

the present value of the bond's cash flows will be higher than the par value of the bond, *i.e.*, it

will have a premium value relative to its par value.

147.    As applied to the Securitization Bonds, the Brownstein Declaration assumes a

yield of 5.25% on the Tranche A bonds that offer a coupon rate of 5.25%.[159]  Since the expected

yield and the coupon rate on the Tranche A bonds are the same, the present value of the future

cash flows on Tranche A bonds would equal the face amount on the Tranche A bonds.[160]

148.    Determination of the appropriate yield is, therefore, critical to any analysis of the

Bondholders' recovery. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [161]

149.    Moreover, David Brownstein has conceded that this fear is not groundless, as, in

his deposition, he acknowledged that the overall municipal market and Puerto Rico specific

credits such as COFINA have improved significantly over the past few months, "dramatically"

pushing municipal bond yields downward (yields decrease when bond prices increase).[162]

150.    Nonetheless, and inexplicably, Citi has not revisited its assumptions about the

appropriate yield since agreeing to the Preliminary RSA in July 2018.  Even more troubling, the

only explanation for this failure is Brownstein's admitted, and incorrect, belief that the interest

rate agreed to in the Preliminary RSA was binding.[163]

151.    Besides being an indefensible failure to properly negotiate their own deal, the

continued utilization of the 5.25% yield and 5.25% interest rate could have significant effects on

the Bondholders' actual recoveries.  The ranges below show the possible effect of failing to

---

[159]  Brownstein Decl. ¶ 53.

[160]  Brownstein Decl. ¶ 37.

[161]  Zwillinger Decl., Ex. 8 (July-Aug. 2018 mobile messages between Skeel and Matosantos (Skeel Ex. 12),
FOMB_9019_MOBILE_00000101 - 26, at 21).

[162]  Zwillinger Decl., 10 (Brownstein Dep. Tr. 23:19-24:2) ("Q:  Do you know whether or not the COFINA bonds
are now trading above par?  A. Some of them are, yes. We've had a significant amount of luck in the market
because the entire municipal market due to supply and demand has increased in value and, therefore, decreased
in yield dramatically over the past six months.").

[163]  *See id.* at 37:17-38:3.

revisit the yield analysis, and how (given the undisputed downward trend in the high yield municipal market) that failure could impact the value delivered to the Bondholders through the Tranche A Bonds:[164]

- At a 5.00% yield, Bondholder recoveries could range from 75% to 86%;

- At a 4.75% yield, Bondholder recoveries could range from 79% to 88%;[165]

- At a 4.50% yield, Bondholder recoveries could range from 83% to 90%.

152.    Moreover, these figures portray the possible effect of failing to revisit the yield analysis while ignoring the other flaws apparent on the face of the Brownstein Declaration.  For example, ***when calculating the recovery on the Bondholders' claims as of the Petition Date, the recovery scenarios discussed above may increase to an astronomical 99%.***

153.    In apparent recognition of the fact that they are receiving an above-market interest rate on the bonds, the Supporting Holders negotiated for and obtained 10-year call protection as part of the Proposed Settlement.  This "no-call" feature means PREPA is not able to call (*i.e.*, repay) the Securitization Bonds for the purpose of refinancing them at a lower interest rate until 10 years after their issuance.  This provision, another boon for the Supporting Holders, ensures that their above-market rate is locked in for a decade, regardless of market trends.  In fact, as the Bondholders have conceded, the lower the assumed yield, the more valuable the call protection becomes to them.[166]

---

[164]  Implied recovery ranges are based off the Applicable Bond Claim.  For purposes of this analysis, yield percentage on Tranche B bonds remain at 7.00%.

[165]  Notably, upon information and belief, certain bonds issued as part of the COFINA settlement have  recently traded in the market with yields below 5%.

[166]  Zwillinger Decl., Ex. 9 (Recovery Plan Term Sheet, VIII); *see also* Zwillinger Decl., Ex. 20 (Spencer Dep. Tr. 101:5-13) (explaining that "if the bonds trade at a premium, then the call protection has value").

### III.    SPECULATIVE PURPORTED PROMISED LAND BENEFITS DO NOT JUSTIFY PROPOSED SETTLEMENT

154.    Presumably because they know the Proposed Settlement falls far short of the standard for approving a Rule 9019 settlement and, therefore, cannot be defended as a stand-alone settlement of the Litigation, the Government Parties attempt to justify the deal they have struck by pointing to a number of purported benefits, which (according to the Government Parties) can only be obtained through the RSA.  The Government Parties take this position even though they previously argued that all the Court should consider is whether the "the disputed secured claims are discounted enough to put the settlement in the range of reasonableness."[167]

155.    Specifically, the Government Parties now claim that the Proposed Settlement enables PREPA to reach the "Promised Land" of (i) a confirmable plan that avoids the "confirmation risks" posed by the Bondholders, (ii) Transformation, and (iii) economic growth and stability caused by the promise of a lower present value of debt payments and by the removal of the specter of unforeseen rate increases and receiver remedies.  Specifically with regards to the third of these "benefits", the Government Parties are explicitly clear that two of their three self-professed "key objectives" in negotiating and, ultimately, agreeing to the Proposed Settlement were to cap increases of electricity prices for debt payments and to transform the existing debt into new debt with no receiver remedy, rate covenant, or payment default remedies.[168]

156.    There are, however, three distinct flaws in the argument that the Promised Land Benefits justify the Proposed Settlement.

---

[167]    Motions in Limine to Exclude Testimony Offered by Non-Profit Organizations, at 2 [Docket Nos. 1300 and 1301].

[168]    *See* Suppl. Mem. ¶ 1.

### A.     Promised Land Benefits Are Outside Scope of Court's Inquiry

157.     By pointing to the Promised Land Benefits, the Government Parties seek to deflect focus from review of the Proposed Settlement as a standalone settlement of the Lien Challenge by having the Court focus on other, "big picture" interests.[169]  These purported benefits do not support the purported reasonableness of the settlement.

158.     As an initial matter, the Government Parties should be judicially estopped from relying on the Promised Land Benefits.  In the First Circuit, "[t]he purpose of judicial estoppel is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system."  *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 34 (1st Cir. 2019) (internal references omitted).  It applies where a "litigant's earlier and later positions [are] clearly inconsistent" and "the estopped party [successfully] persuaded a court to accept its prior position."  *Id.*  Here, shortly after filing the 9019 Motion, the Government Parties filed motions *in limine* to exclude certain evidence offered in opposition to the 9019 Motion, including evidence related to the settlement's effect on Puerto Rico's economic recovery.[170]  The motions argued that the "hearing on approval of the RSA should focus only on whether the disputed secured claims are discounted enough to put the settlement in the range of reasonableness."[171]  The Court granted the motions.  Because the Government Parties argued successfully that the only relevant issue is the amount of the discount, the Government Parties should be judicially estopped from relying on anything other than the discount to justify the Proposed Settlement.

---

[169]   Indeed, in purporting to demonstrate that the Proposed Settlement is in the paramount interests of creditors, the Government Parties almost entirely discuss its impact on "ratepayers" and other "stakeholders" as opposed to creditors.

[170]   Motions in Limine to Exclude Testimony Offered by Non-Profit Organizations, at 2 [Docket Nos. 1300 and 1301].

[171]   *Id.* at 2.

159.    The Government Parties' request for the Court to consider the Promised Land
Benefits is also inconsistent with other decisions of this Court.  In approving the
Commonwealth-COFINA settlement, the Court rejected similar arguments (from objectors)
based on "stakeholder" interests:  "The *Jeffrey* requirement that the Court give proper deference
to the reasonable views of creditors does *not* require the Court to weigh concerns about the
Commonwealth's overall financial prospects."[172]

160.    This principle was also the basis for the Court's recent ruling limiting the scope of
the Committee's discovery in connection with the Proposed Settlement, in which the Court held
that the "factual macroeconomic issues attendant to full implementation and confirmation of a
plan based on the agreements embodied in the RSA . . . are outside of the evidentiary parameters
that the Court has, in the exercise of its discretion, set in connection with the 9019 Motion."[173]

161.    This ruling affirmed Magistrate Judge Dien's determination that information
"concerning the sustainability of rate increases and the overall feasibility of the settlement as a
whole or of any eventual Title III plan of adjustment" would not be part of the Court's
determination of whether the Proposed Settlement "the Court has been asked to approve fall[s]
below the lowest point in the range of reasonableness."[174]

162.    The Court also affirmed that the Declarations do not "purport to establish the
feasibility of the settlement or a resulting plan of adjustment, the sustainability of rate increases,

---

[172]  *Official Comm. of Unsecured Creditors of the Commonwealth of P.R. v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 360 F. Supp. 3d 65, 78 (D.P.R. 2019).

[173]  *Memorandum Order Granting Motion for Protective Order and Order In Limine Precluding Evidence in Connection with 9019 Motion,* at 5 [Docket No. 1543].

[174]  *See Memorandum Order Regarding Official Committee of Unsecured Creditors' Urgent (I) Objections to Magistrate Judge's August 2, 2019 Order on Motion to Compel and (II) Alternative Motion to Strike and To Exclude Out-of-Scope Declaration Testimony and Related Evidence,* at 11 [Docket No. 1652].  The Committee reserves all rights with regard to this ruling and the issues addressed therein.

the feasibility of the proposed transformation, or the anticipated macroeconomic effects of the

RSA."[175]  If the Declarations do not even purport to establish these points, the Government

Parties cannot rely on them to justify their Settlement Motion.

> **B.      Promised Land Benefits Are So Dependent on Events Outside Government
> Parties' Control As to Be Illusory**

163.    To the extent that the Government Parties choose to rely on the Promised Land

Benefits as support for the reasonableness of the Proposed Settlement, the evidentiary burden is

theirs to show that such benefits have materialized, or will materialize.  *In re C.P. del Caribe,*

*Inc.*, 140 B.R. 320, 326 (Bankr. D.P.R. 1992) ("proponents of a compromise and settlement have

the burden of persuading the court that the proposal is reasonable and in the best interest of the

estate").  As common sense dictates, courts will not approve settlements whose promised

benefits are illusory.  Accordingly (and intuitively) courts should consider the stated benefits of

any proposed compromise and verify that those benefits will, or are likely to, actually be

realized.  *See, e.g.*, *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.)*, No. 03-82408,

2007 WL 4556981, at *1 (Bankr. C.D. Ill. Dec. 20, 2007) (settlement "must be denied" where

"careful review leads to the conclusion that the benefits are illusory"); *In re Remsen Partners,*

*Ltd.*, 294 B.R. at 566 (court could not approve settlement where, among other things, "benefits of

promptly securing the proposed settlement are, in any event, illusory for the creditors").[176]

164.    Importantly, the court's review of the likelihood of the promised benefits of the

compromise includes an analysis of contingencies that are not, in and of themselves, within the

court's purview.  In *In re Shankman*, No. 08-36327, 2010 WL 743297, at *5 (Bankr. S.D. Tex.

---

[175]  *Id.* at 17.

[176]  The common sense requirement that a court-approved settlement actually provide the promised substantial
benefits applies to non-bankruptcy settlements as well.  *See, e.g.*, *Scott v. Weig*, No. 15 CIV. 9691 (RWS), 2018
WL 2254541, at *5 (S.D.N.Y. May 17, 2018) ("reforms contemplated by the Proposed Settlement fail to
provide substantial benefits, and therefore render the Proposed Settlement illusory").

Mar. 2, 2010), the promised benefit to the estate, and the justification for the settlement, was a

$100,000 payment to the estate.  The Court noted, however, that this payment would never be

made unless the debtor earned income; that the debtor's ability to earn income was dependent on

his being licensed in his profession; that his ability to be licensed was dependent on a vacatur, of

another court's order; and, finally, that this vacatur was unlikely.  *Id.* at *4.  The court concluded

that "the promised benefits to the estate are wholly illusory" and rejected the settlement.  *Id.*

165.    As in these cases, careful review of each of the Promised Land Benefits

demonstrates that they are either speculative, overstated, simply incorrect, or not actually made

possible by the Proposed Settlement.[177]  In short, the Promised Land Benefits are largely

illusory, and certainly do not justify the Proposed Settlement and payment of at least 73% of the

Bondholders' claims when such claims, in all likelihood, are limited to the $8.8 million in

collateral held by the Trustee.[178]

> i.    Proposed Settlement Is Not Necessary for, and Does Not Increase Chances
> of, Confirmation

166.    The Bondholders' confirmation objections do not justify the Proposed Settlement.

According to the Government Parties, "[w]ith respect to confirmation, creditors would argue that

Title III's best interest test requires the Court to consider what creditors would recover under

Puerto Rico law, which requires rates be adjusted to cover debt service on the bonds and related

---

[177]    These cases also explain why the Committee's arguments regarding the "Promised Land Benefits" are
consistent with the Court's October 10, 2019 ruling regarding the scope of the hearing on the Proposed
Settlement.  The Committee is not asking the Court to determine, in a vacuum, the feasibility of the Proposed
Settlement (including the Transition Charge) or the plan of adjustment contemplated therein.  Nor is it asking
the Court to make any findings about the broader macroeconomic impact of the Proposed Settlement.  Instead,
the Committee notes simply that the Government Parties have consistently proclaimed that in entering into the
Proposed settlement they were principally guided by their need to obtain certain of the Promised Land Benefits.
To that end, the Committee believes that the Court should consider the likelihood that those self-professed key
objectives will, or will not, be realized (even for reasons outside the Government Parties' control).

[178]    According to the Government Parties, 73% is the predicted recovery on Tranche A and B bonds, without
accounting for the Administrative Expense Claim, Settlement Payments, and Waiver and Support Fees.  *See*
Suppl. Mem. ¶¶ 28-29.  ***As shown herein, however, the Bondholders' actual recovery is much greater***.

obligations."[179]  The Government Parties argue that the Proposed Settlement allows them to "avoid future confirmation risks by having creditors agree in advance to cap their allowed claims at material discounts."[180]  This is wrong for numerous reasons.[181]

167.    The Government Parties voice their concern that holders of Non-Recourse Bonds would object to confirmation and argue that "Title III's best interest test requires the Court to consider what creditors would recover under Puerto Rico law, which requires rates be adjusted to cover debt service on the bonds and related obligations"[182] (the "Best Interests Objection").  The flaw in this argument is that it is contrary to applicable case law, which has uniformly "conclude[d] that the 'best interests' test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors."  *Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton, California)*, 542 B.R. 261, 286 (B.A.P. 9th Cir. 2015).[183]  As explained by the court overseeing Detroit's bankruptcy, "the question is whether the plan is in the best interests of creditors as a whole.  Confirmation may not be denied simply because some creditors may do

---

[179]  Suppl. Mem. ¶56.

[180]  *Id*.

[181]  The Committee is mindful of the Court's directive to refrain from turning the hearing on the Proposed Settlement into a "mini-confirmation hearing."  At the same time, however, the Government Parties have emphasized the settlement of future confirmation objections as a basis for the approval of the Proposed Settlement.  It is incumbent, therefore, on the Committee (and the Court) to determine the reasonableness of this aspect of the Proposed Settlement, including the likelihood of success of these future confirmation objections.  Alternatively, if the Court believes that confirmation issues should be left for confirmation, then it should exclude the Government Parties' claim that the settlement of such issues justifies the Proposed Settlement.

[182]  Suppl. Mem. ¶ 56.

[183]  Although the Government Parties mention this flaw in the Best Interests Objection, they merely pay lip service to it and fail to cite the above case law, thereby creating the impression that a bondholder objection to confirmation based on the best interests of creditors requirement has more validity than the law supports.  This is symptomatic of the Government Parties' approach to all legal issues being settled:  it was "the fact the risk existed, not the level of risk" that existed that led the Government Parties to enter into the settlement.  *See* Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 35:4-8).

better upon dismissal.  ***The plain language of the statute compels this result***.”  *In re City of*

*Detroit*, 524 B.R. 147, 216-17 (Bankr. E.D. Mich. 2014) (emphasis added).[184]

168.   The fact that PROMESA is a new statute does not create reason to believe that the

Best Interests Objection will apply any differently in Title III.  For one, while the statutes are not

identical, it cannot validly be argued that case law interpreting chapter 9 and applying it to

municipal bankruptcies is not relevant to, or helpful to a court trying to interpret, PROMESA.

This is particularly true of the best interests of creditors tests of the two statutes, which are

closely related.  Section 943(b)(7) of the Bankruptcy Code requires a court to confirm a chapter

9 plan of adjustment if, among other things, it “is in the best interests of creditors and is

feasible.”  Using similar language, section 314(b)(7) of PROMESA instructs the court to confirm

a Title III plan of adjustment if, among other things, “the plan is feasible and in the best interests

of creditors, which shall require the court to consider whether available remedies under the non-

bankruptcy laws and constitution of the territory would result in a greater recovery for the

creditors than is provided by such plan.”  The language added by PROMESA asks whether non-

bankruptcy remedies would result in a “greater recovery for the creditors”—like in chapter 9, the

word “creditors” is plural.  By referring to a single recovery for all creditors, the statute strongly

implies that the analysis is collective, and asks how a plan impacts all creditors as a whole.

169.   Even if holders of Non-Recourse Bonds were entitled to their state-law recoveries

(they are not), it is simply not true that Puerto Rico law “***requires*** rates be adjusted to cover debt

service on the bonds and related obligations.”[185]  Rates would not be increased unless and until

---

[184]   *See also In re Hardeman Cty. Hosp. Dist.*, 540 B.R. 229, 241 (Bankr. N.D. Tex. 2015) (“The Plan is in the best
interests of Creditors because it provides Creditors, ***as a whole***, with a better alternative than dismissal of the
Chapter 9 Case.”) (emphasis added); *In re Connector 2000 Ass’n, Inc.*, 447 B.R. 752, 766 (Bankr. D.S.C. 2011
(plan proponents “establish[ed] that the Plan affords ***all creditors*** the potential for the greatest economic return”
and was, therefore, “in the best interests of creditors . . . .”) (emphasis added).

[185]   Suppl. Mem. ¶ 56 (emphasis added).

approved by the applicable regulatory authorities.  The Government Parties, however, have ignored that what the Bondholders would receive outside of a plan is far from certain even under Puerto Rico law—and would have the Court do the same.[186]

170.   Even if, under PROMESA, the Bondholders are entitled to the full measure of their recovery under non-bankruptcy law (they are not), **and** even if that recovery included guaranteed rate increases (it does not), the Court would still have grounds to overrule a best interests of creditors objection to confirmation.  "The Supreme Court has described the right to compel a municipality to raise taxes to satisfy judgments against it as an 'empty right to litigate,' particularly in times of economic crisis."  *In re City of Detroit*, 524 B.R. at 214 (internal citations omitted).  Similarly, in *In re Hardeman*, the court noted that the right to compel an increase in taxes was an "empty right to litigate," especially where increased taxes would "likely add to the population decline."  *In re Hardeman Cty. Hosp. Dist.*, 540 B.R at 243.  This applies equally to the right to litigate against PREPA, especially where increased rates may (i) never be approved and (ii) lead to the decline PREPA's customer base and revenues.

171.   The Government Parties also argue that, as part of their Best Interests Objection, holders of Non-Recourse Bonds will argue that valuation of secured claims for confirmation purposes is a "far different inquiry" than valuation for other purposes, such as a motion for relief from the automatic stay.[187]  Specifically, the Bondholders (according to the Government Parties) will claim that (i) at confirmation they are entitled to the present value of the collateral securing the Non-Recourse Bonds and (ii) such value will include the present value of all potential future positive Net Revenues.  Even if true (it is not), this does not justify the Proposed Settlement.

---

[186]   Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 136:11-19) (acknowledging that he does not know if rates would increase absent a settlement).

[187]   Suppl. Mem. ¶ 61.

172.    As explained above, section 928 does not revoke the general rule that collateral in the *present* cannot include *future* property (including special revenues) that has not yet, and may never, come into existence; nor does it accelerate the collection of those revenues (*i.e.,* receipts).[188]  Accordingly, the value of that collateral in the present also cannot include the hypothetical future property.  Additionally, as also explained above, even if the value at confirmation must be determined based on the present value of potential future positive net revenues, the difficulties inherent in that valuation make it highly unlikely that the Bondholders' secured claim at confirmation will be greater (let alone more than $8.5 billion greater) than their $8.8 million secured claim based on the value of their collateral at the Petition Date.  Finally, as also explained above, PREPA's ability to prevent any future attachment of a security interest by declining to deposit any future receipts in the Sinking Fund means that PREPA can ensure that potential future revenues (*i.e.,* receipts) never become part of the Bondholders' collateral.

173.    Further, the Government Parties have not provided any evidence to support their claim that the Proposed Settlement increases the likelihood of confirmation.  In fact, it does the opposite.  The Proposed Settlement is premised on the Transition Charge and related legislative approval that will be necessary to implement such charges and the Securitization Bonds.  The Government Parties, however, have specifically excluded approval of the Transition Charge from the Proposed Settlement and ignored (and would have the Court ignore) the need for legislative approval.  They have also agreed that they will provide the Bondholders the same payments regardless of whether the Transition Charge is approved.  The outcome of these choices is that the Government Parties have entered into a settlement that guarantees payments of billions of dollars from funds that may never come into existence.  By definition, this creates a

---

[188]   *See* footnote 125 *supra.*

feasibility risk that did not exist prior to the settlement, and it is inconsistent to present the Court

with such a settlement and still claim that the settlement makes confirmation *more* likely.

Moreover, the expert report of Julia Frayer, served contemporaneously with the filing of this

Objection, demonstrates that, even if approved, the Transition Charge is not feasible.

ii.    Proposed Settlement Will Not Lead to Better Conditions for PREPA, its
       Ratepayers, and/or Puerto Rico

174.    The Government Parties assert that several features of the Securitization

Transaction are so special and unique that the amount of debt PREPA issues to the Supporting

Holders does not matter.  Specifically, these special features include the absence of a default

provision if the Transition Charge is insufficient to meet debt payments under the Securitization

Bonds and the elimination of related remedies such as appointing a receiver and/or seeking to

have electricity rates raised by the PREB.  The Government Parties also believe that using an

SPV as the ultimate issuer of the Securitization Bonds is a benefit because, according to the

Government Parties, it eliminates the risk of a subsequent PREPA bankruptcy.  These benefits

are almost entirely illusory.

175.    As an initial matter, it is simply not true that the Securitization Transaction

protects consumers from rate increases.[189]  It is more accurate to say that rate increases are

already built in, as the Transition Charge already requires decades of rate increases.  This, in and

of itself, is an unusual feature of utility bonds that benefits the Bondholders, but not PREPA or

its rate-payers.  In fact, this is a sunk cost that PREPA and its rate payers must abide by

regardless of its future economic performance and/or energy demand, which means that a future

Title III is not off the table because bondholder legacy debt is merely one factor that the

---

[189]   The Committee is not arguing macroeconomics.  Feasibility of the Government Parties' eventual plan is clearly
relevant if they tout future confirmation as a key benefit of the Proposed Settlement.

Government Parties would consider in connection with a future Title III case. ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ [190]

176.     Nor is it true that the Securitization Transaction avoids unexpected rate increases. To the contrary, the RSA expressly provides that depending on the outcome of certain assumptions the Transition Charge "*will need to be adjusted*."[191]  Nor are these the only adjustments:  the Transition Charge can, and in fact will, increase if (i) certain customers are provided subsidies or exemptions from paying full electric rates, (ii) municipal customers (such as the government or its instrumentalities) fail to pay their own power bills in full, and/or (iii) the general public fails to pay their bills in full (subject to a non-payment allowance of 1.5%).[192] Although the Government Parties gloss over the Demand Protections generally, it is clear that the Transition Charge will very likely increase over time.  Critically and as noted above, these circumstances include non-payment by municipal customers or collective non-payment above a system-wide 1.5% threshold.  Based on historical information,[193] and on the Supporting Holders' own allegations,[194] both of these are virtual certainties, and will result in even higher rates on PREPA's customers.  Particularly egregious is that non-payment by municipalities will lead to higher rates on non-municipal customers, allowing municipalities to shift the risk of non-

---

[190]  *See* Zwillinger Decl., Ex. 28 (Apr. 26, 2019 email from Castiglioni to Batlle and Porter and copying others (Skeel Ex. 9), CGMIRSA_001458 - 65, at 65); Zwillinger Decl., Ex. 29 (Apr. 16, 2019 email from Arosemena Muñoz to Diaz Atienza and bcc'ing Maldonado Molina (Batlle Ex. 9), PREPA_RSA0029990 - 30085, at 003).

[191]  Zwillinger Decl., Ex. 9 (Recovery Plan Term Sheet, III. (a), n. 2) (emphasis added).

[192]  Zwillinger Decl., Ex. 9 (Demand Protection Term Sheet, at I-A-5 to I-A-6).

[193]  Zwillinger Decl., Ex. 30 (Mar. 28, 2019 email from Brownstein to Batlle (Batlle Ex. 15), PREPA_RSA0029088 - 91).

[194]  *See* Receiver Mot., at 10 (detailing issues of general non-collection and non-payment by municipal and governmental customers).

payment to Puerto Rico's citizens and businesses (*e.g.*, non-grandfathered behind-the-meter generation customers).

177.    The Government Parties assert that this is unlikely because once Transformation is achieved, a concessionaire is unlikely to allow non-payment to continue and will, instead, cut off service to non-paying customers.[195]  The Court should not consider this a valid or viable cure to the deeply flawed Demand Protections, as there is no support for this argument.  For one, what the concessionaire may or may not do is, at this point, entirely conjecture and whether a concessionaire will take actions that PREPA purportedly would not have is entirely unknown.

178.    Even if it so desired, absent legislative changes not contemplated by the Proposed Settlement, a concessionaire will not be able to cut off service to customers without complying with the applicable Puerto Rico statutory and regulatory requirements, which, among other things, prohibit disconnection of service while an objected electricity bill is under advisement under PREPA's administrative process.[196]  Moreover, these statutory and regulatory requirements prohibit the suspension of electric service to a variety of critical facilities such as police stations, fire departments, hospitals, and schools in the event of non-payment.[197]  In addition, cutting off service to non-paying customers could significantly lengthen the time period for repayment of Tranche A Bonds.  Because these bonds have no definite maturity and must be repaid even if it takes hundreds of years, and not the 33 years that the Government Parties posit,

---

[195]   *See* Brownstein Decl. ¶ 44.

[196]   *See* Zwillinger Decl., Ex. 31 (Energy Commission of Puerto Rico, Regulation on the Procedure for Bill Review and Suspension of Electric Service Due to Failure to Pay, § 6.04)**.**

[197]   Zwillinger Decl., Ex. 32 (Act 57-2014, Section 2.6 (amending section 6(z) of Act No. 83 of 1941, as amended, to prohibit regulations from providing for the suspension of services to a public corporation where essential public services may be affected)); Zwillinger Decl., Ex. 33 (Excerpt from PREB Regulation 8818, Section 5.08 (including certified translation)) (prohibiting PREPA from suspending service to critical municipal facilities such as hospitals, senior care centers, corporations or business that provide public services related to healthcare and health facilities, public safety services, police, and schools absent a directive by the applicable municipality).

this means that PREPA's ratepayers will be paying more, for longer, than promised.

179.    The other purported "benefits" of the structure of the Securitization Transaction are similarly illusory.  For example, the Brownstein Declaration discusses purported benefits stemming from the lower present value of debt repayments if and when Securitization Bonds are issued.[198]  These purported benefits are based on the false premise that rates would be increased to pay Non-Recourse Bonds in full, in cash, but there is no evidence supporting that assertion. To the contrary, PREB has explained that increasing rates to the level required to satisfy all legacy debt would intolerably burden Puerto Rico's economy.[199]

180.    Most importantly, the purported benefit of not having a rate covenant feature or other true-up mechanism in the Securitization Bonds is also misleading for the following reasons: (i) the rate increases are already built into the scheduled Transition Charge; (ii) the Tranche A Bonds never terminate unless paid in full, in cash; (iii) if the Transition Charge is insufficient to make payments as the debt amortizes, interest continues to accrue on top of interest (interest on interest); and (iv) if customers do not pay for their electricity usage in full and as billed, the Demand Protections kick in and rates increase even above the "capped" Transition Charge.  In fact, the Demand Protections cover some, but not all, of the reasons that a true-up adjustment is included in other utility securitizations.[200]  These features—as well as the way they interact with each other—inevitably eliminate or reduce the benefit to PREPA of not having a rate covenant.

---

[198]   *See* Brownstein Decl. ¶¶ 53-54.

[199]   *See* Zwillinger Decl., Ex. 7 (PREB Ruling, dated Jan. 10, 2017).

[200]   The offering documents for many utility securitizations disclose that through the true-up adjustment, "all Customers [of the utility] cross share in the liabilities of other Customers" for the payment of the securitizations charges.  *See e.g.*, Zwillinger Decl., Ex. 34 (Oct. 25, 2017 Official Statement for the $369,365,000 Utility Debt Securitization Authority Restructuring Bonds, at v).

181.    By providing for debt with an indefinite maturity, interest compounding on top of interest, and a Transition Charge above the purportedly capped amount, the Proposed Settlement extracts a penalty from PREPA's ratepayers in connection with paying off the Securitization Bonds.  In fact, this settlement can expose ratepayers to a 300 year (or longer) payment.[201]

      iii.    Unique Features of Securitization Transaction Are Harmful, Not Beneficial, to PREPA

182.    The Government Parties are correct that the Securitization Transaction contains certain features that are highly unusual, if not entirely unique, in a securitized utility bond issuance.  However, these terms are actually harmful to PREPA and its ratepayers.

183.    As explained, the lack of a definite maturity date[202] (i) means that PREPA can be paying on the Securitization Bonds for "300 years,"[203] (ii) which payments will total billions and billions of dollars, the effect of which is (iii) to reduce, if not eliminate, the benefit to PREPA of there being no true-up or rate covenant in the Securitization Bonds.  Making this worse is that the absence of a definite maturity date is entirely unprecedented in utility securitization bonds.[204] Indeed, while the Ad Hoc Group's financial advisor stated that he believed other municipal bonds may have had this feature, he admitted that he was not aware of any municipal bonds with this feature (aside from tobacco bonds), including specifically any power bonds, water and sewer

---

[201]    Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 120:21-121:2).

[202]    *See* Zwillinger Decl., Ex. 9 (Securitization Term Sheet, at 2) (stating that "maturity of Tranche A Bonds (including accrual and compounding of interest as set forth in the RSA/Plan Term Sheet) will extend beyond their stated final maturity and such Tranche A Bonds will remain outstanding if not paid in full on the stated final maturity until all principal of, and accrued and unpaid interest on, the Tranche A Bonds is paid in full").

[203]    *See* Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 120:21-121:2).

[204]    The Committee has reviewed the offering documents pertaining to 17 utility securitizations that are listed in the Report, dated July 18, 2018, by Moody's Investors Service entitled "Utility cost recovery through securitization is credit positive" but which notes that "too much securitization can also have negative consequences."  All of these offering documents are publicly available, and a copy of this Report is attached as Exhibit 35 to the Zwillinger Declaration.

bonds, or highway bonds. [205]

184.    Another departure from the terms of utility securitizations is the breadth of the

statutory non-impairment covenant required in connection with the Securitization Bonds.  In

addition to covenanting and "pledging," to and for the benefit of the holders of the Securitization

Bonds, that the Government Parties will not take or permit any action that limits, alters, or

reduces the Transition Charges or impairs the rights or remedies of the holders of, or the security

for, the Securitization Bonds, the Government Parties' statutory non-impairment covenant:  (i)

restricts the imposition of charges, taxes, or other fees on electricity other than those directly

associated with PREPA's System; (ii) restricts debt secured by any rights or interest in electric

rates or charges; (other than the Securitization Bonds and the Transition Charge) to certain

indebtedness permitted by the trust agreement under which the Securitization Bonds are issued

(the "Securitization Trust Agreement"); and (iii) restricts any action that causes interest on any

tax-exempt Securitization Bond to become taxable.[206]  These three restrictions are referred to,

collectively, as the "Additional Non-Impairment Covenant Restrictions").

185.    The "hardwiring" of the Additional Non-Impairment Covenant Restrictions

means that any change in the Additional Non-Impairment Covenant Restrictions requires (i)

unanimous consent of the holders of all outstanding Securitization Bonds, and (ii) action by the

Puerto Rico legislature.  Similarly, any waiver of any breach of any Additional Non-Impairment

Covenant Restriction requires unanimous consent of the holders of all outstanding Securitization

Bonds.

---

[205]    *See* Zwillinger Decl., Ex. 20 (Spencer Dep. Tr. 72:16-76:6).

[206]    *See* Zwillinger Decl., Ex. 9 (Securitization Protections, V.A.3-5).  *See also* Zwillinger Decl., Ex. 9
(Securitization Protections, V.A. generally) (using language indicative of a statutory non-impairment covenant).

186.    Apart from the impracticality of the "hardwiring," the proscription against electricity charges that are not directly related to PREPA's System impairs the financial flexibility of the Commonwealth for the indefinite term of the Securitization Bonds.  In addition, that proscription renders electricity charges unavailable as a source of payment for legacy obligations other than the Non-Recourse Bonds and moots, at least with respect to electricity charges, the provision of the RSA (the "RSA Charges Provision") that states:  "Subject to any restrictions in the Securitization Trust Agreement, the Government Parties may establish other transition charges, statutory charge, or other tax or revenue stream, to provide for the payment of legacy obligations."[207]  It also raises an issue with respect to whether the RSA Charges Provision purports to apply to, or restrict, charges that are unrelated to the provision of electricity service.

187.    Lastly, the Securitization Bonds depart from utility securitizations by including a "permitted indebtedness" covenant that:  (i) is applicable to parties (*i.e.*, the Commonwealth, not only PREPA) other than the SPV that issues the securitization bonds and the "sponsor" that services the securitization charges; (ii) restricts all indebtedness to indebtedness that is payable from a dedicated funding charge added to, or derived from, the electricity rate; and (iii) prevents the imposition of that dedicated funding charge (and the issuance of the related indebtedness) unless doing so is projected "not to decrease the projected collections of the Transition Charge."[208]  The RSA does not specify who makes the projection (or how, or in accordance with what standards, if any, that person does so).  The "permitted indebtedness" covenant impairs, for the indefinite term of the Securitization Bonds, the financial flexibility of PREPA (and the party

---

[207]   Zwillinger Decl., Ex. 9 (Securitization Term Sheet, at 14).

[208]   *Id.* at 9-12.

or parties to Transformation) to finance necessary capital expenditures of PREPA's System.[209]

188.    Because the Securitization Transaction utilizes an SPV, the Bondholders will be insulated from any future Title III case for PREPA while simultaneously maintaining the benefit of this web of obligations—highly unusual in a true SPV structure—running from both PREPA to the SPV and from PREPA to the Bondholders even after the consummation of the Securitization Transaction.  This is particularly troubling in light of fact that, notwithstanding the Government Parties' claims that the Proposed Settlement protects PREPA from a future Title III case, the expert report of Julia Frayer, served contemporaneously with the filing of this Objection, demonstrates that this is not true.  Instead, PREPA is likely to find itself in Title III again (a likelihood that is increased by the Transition Charge and its impact on overall demand for electricity).

iv.    Proposed Settlement Is Not Necessary for Transformation[210]

189.    The Government Parties urge that the Proposed Settlement "removes the cloud of receivership that **may** impact a potential operator's interest in investing in PREPA."[211]  As observed in a different aspect of approving a Rule 9019 compromise, "[i]t is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation."  *Will v. Northwestern University (In re Nutraquest)*, 434 F.3d 639, 646 (3rd Cir. 2006).  By the same

---

[209]  The "permitted indebtedness" covenant does not apply if the Securitization Bonds are (i) rated at least investment grade at the time of issuance of additional indebtedness, and (ii) the rating agencies confirm that the issuance of the additional indebtedness will not adversely affect the ratings on the Securitization Bonds. ███████████████████████████████████████████████████████████ Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 115:10-16). ███████████████████████████████████████████████████████████

[210]  To be clear, the Committee does not oppose Transformation and all other critical projects to modernize PREPA and make it work for the people of Puerto Rico.

[211]  Suppl. Mem. ¶ 93 (emphasis added).

token, it is almost certainly true that settling significant litigation will make investors marginally more interested in investing in a debtor (it is noteworthy, however, that the Government Parties are unwilling even to commit themselves to that, saying only that it "may" do so).  Because this is almost always true, it is also true that (as with costs) this factor alone does "not form a sufficient basis for approval of the settlement."  *In re Exide Techs.*, 303 B.R. 48, 71 (Bankr. D. Del. 2003).  In fact, Oversight Board Executive Director Natalie Jaresko has conceded that the Proposed Settlement should not be connected to Transformation, as, at best, the connection is "a distant link" that is "not a direct step nor one that defines further success."[212]  Moreover, the particular facts of the Transformation, and the tremendous uncertainty regarding both if and when it will happen, make it even less appropriate to justify the Proposed Settlement based on the impact it "may" have on Transformation.

190.    Conspicuously absent from the 9019 Motion and its supporting papers is any mention of how the actual potential operators bidding on the Transformation feel about the Proposed Settlement.  One would assume that, if such operators believe the Proposed Settlement (as opposed to a simple "free and clear" Court order) is necessary for them to continue to participate in the Transformation process, the Government Parties would have asked them to testify accordingly.  Instead, the Government Parties entered into a stipulation with the Committee in which they agreed not to rely on any statements, actions, or other representations of potential operators in exchange for the Committee's agreement to withdraw the third-party discovery requests it had served on such parties.[213]

---

[212]  *See* Zwillinger Decl., Ex. 36 (July 27, 2018 email from Vizcarrondo to Jaresko and copying others (Jaresko Ex. 9), FOMB_9019_00004698 - 701).

[213]  Zwillinger Decl., Ex. 37 (July 9, 2019, *Stipulation Concerning Certain Discovery and Evidence Relating To Concessionaires in Connection with Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(A)(I) and 9019 for*

191.    The Oversight Board has very recently admitted that Transformation cannot occur

unless certain federal funding is received.[214]  PREB has also announced that the earliest date for

closing a Transformation deal is the second quarter of 2020,[215] █████████████████████

████[216]  It is, therefore, "difficult to understand what the rush is."  *In re Innkeepers USA Tr*.,

442 B.R. 227, 233 (Bankr. S.D.N.Y. 2010) (declining to approve plan support agreement).  Even

if this mid-2020 closing date could be achieved, the Government Parties have agreed that they

will ***not*** (i) proceed with Transformation if it prevents the Government Parties from providing

the Stipulated Treatment or (ii) enter into a Transformation transaction and close such

transaction and/or sell any generation assets used in PREPA's operations until the effective date

of a plan of adjustment.  This makes Transformation entirely dependent on a confirmation

order—and not on this Proposed Settlement.  It also makes Transformation entirely dependent on

the issues that will not be resolved at this stage, but at confirmation (such as feasibility).[217]

Indeed, the witness for the Puerto Rico government entity responsible for the transformation

testified that potential bidders care only about a confirmation order and do not care about the

---

*Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling Certain
Limitations Period*).

[214]  *See* Zwillinger Decl., Ex. 38 (Excerpt from a publicly filed PREPA mediation-related document (Jaresko Ex.
11), at 23) (stating that "[a]vailability of Federal Funds is a critical piece of PREPA's ability to modernize the
grid system while keeping rates at an affordable level" and "[c]larity on federal funding clarity is essential for
the transaction."); *see also* Zwillinger Decl., Ex. 39 (███████████████████████████████████
████████████████████████████████, PRP3_OCUC_00013514 - 756, at § 4.5(h)) (███████████████
████████).

[215]  *See* Zwillinger Decl., Ex. 40 (Reorg Research Article, "Puerto Rico Energy Regulator Expects to Issue Final
Order on PREPA T&D Concession During Q2 2020," dated Sept. 16, 2019) ("The Puerto Rico government's
energy market regulator expects to issue a final order on a system operator for the Puerto Rico Electric Power
Authority's transmission and distribution system sometime in the second quarter of calendar 2020, Puerto Rico
Energy Bureau President Edison Avilés told lawmakers this morning").

[216]  *See* Zwillinger Decl., Ex. 41 (Chapados Dep. Tr. 215:10-216:6); *see also* Zwillinger Decl., Ex. 27 (Skeel Dep.
Tr. 128:8-17) (███████████████████████████).

[217]  *See* Zwillinger Decl., Ex. 41 (Chapados Dep. Tr. 216:23-217:2) (█████████████████████████████████
███████████.

substance of the Proposed Settlement.[218]  The simple and unavoidable truth is that the Proposed

Settlement is neither essential nor necessary for Transformation.[219]

### C.  Promised Land Benefits as Justification for Proposed Settlement Cannot be Reconciled With Stipulated Treatment or Pre-Plan Payments

192.    The third flaw in pointing to the Promised Land Benefits as justification for the

Proposed Settlement is that it is inherently illogical and actually undermines the Proposed

Settlement.  In proclaiming the Promised Land Benefits of the Proposed Settlement, the

Government Parties are really arguing that the benefit of the Proposed Settlement is not the

supposed discount on the Bondholders' claim.  Rather, the real benefit of, and indeed the

justification for, the Proposed Settlement is the manner in which the Bondholders' recovery is

delivered through the Proposed Settlement, and specifically the Securitization Bond Treatment

(including the purported lack of "true-up" adjustment, the SPV structure, the lack of a rate

covenant, and the non-default provisions).

193.    Under this theory, the Court should not consider the ***amount*** of money being

delivered to the Bondholders, but rather the ***vehicle*** for the delivery of that money.  This is why,

by the Government Parties' own admission, the first two of the key objectives for the Proposed

Settlement related to the Promised Land Benefits are improved macroeconomic conditions for

PREPA and Puerto Rico by changing the type—not necessarily the amount—of PREPA's

---

[218]  Zwillinger Decl., Ex. 42 (Fontanes Dep. Tr. 73:17-20) ("For our purposes, it's not the substance of the RSA, it's the fact that we get a confirmation order, the RSA is approved.  It's part of the process, It's not the substance. We didn't negotiate this.  We weren't part of it.  We weren't involved.  The substance of us is irrelevant for our transaction").

[219]  At best, it is marginally helpful for Transformation.  As discussed above, however, this cannot justify the Proposed Settlement.  Moreover, Transformation can be achieved without the Proposed Settlement.  Courts issue free and clear orders routinely in bankruptcy, and the assets involved in Transformation can be transferred through such a mechanism without the Proposed Settlement.  Nor could the Bondholders realistically block such a structure, as section 363(f)(4) of the Bankruptcy Code allows assets to be transferred free and clear of any lien if those liens are subject to a bona fide dispute (such as the Lien Challenge).

debt.[220]  Indeed, this point is made explicitly in the Brownstein Declaration, which states that "the debt to be issued under the RSA is wholly different from the existing debt and is so much more benign that its amount matters less because consumers are protected against rate increases."[221]

194.    In the event of a Securitization Termination, none of this remains true (if it ever was).  A Securitization Termination not only causes PREPA to lose all the purported benefits of the Securitization Bonds, it also means that the RSA is *actively harmful* to Transformation.  As the Brownstein Declaration has effectively conceded, if the recovery to the Bondholders is not through the structure of the Securitization Bonds, then the amount of that recovery certainly matters—and cannot be justified.  The more importance the Government Parties attach to the Promised Land Benefits, the more illogical it is to provide the Supporting Holders the Stipulated Treatment that guarantees them all of the benefits of the Proposed Settlement even if the Promised Land Benefits are never obtained.  To nonetheless provide the Bondholders with the exact same recovery while obtaining none of the purported benefits that allegedly drove the decision to enter into the Proposed Settlement in the first place is dumbfounding.[222]

195.    Making matters worse is the fact that the Government Parties have agreed to pay the Settlement Payments, the Increased Settlement Payments, the Adequate Protection Payments, and (possibly) the Administrative Expense Claim even before a plan is confirmed.  Nor can any

---

[220]  *See* Suppl. Mem. ¶ 1 (listing three key objectives of Proposed Settlement, including "(i) it caps the amount electricity prices can be raised to pay debt; (ii) it transforms the existing debt into new debt having no receiver remedy, no rate covenant, and no payment default remedies . . . .").

[221]  Brownstein Decl. ¶ 31.

[222]  Further, in conceding that the amount paid to the Bondholders does not matter, the Government Parties have effectively conceded that it does not matter whether the Proposed Settlement, standing alone, is reasonable or fair and equitable.  However, the Government Parties have cited no authority in support of the proposition inherent in this argument (and explicit in the Brownstein Declaration) that a settlement can be approved regardless of how much the debtor has decided to pay.

of these payments be disgorged in the event a plan of adjustment consistent with the Proposed

Settlement is never confirmed.  As with the Stipulated Treatment, the Government Parties have

agreed to the transfer of over one billion dollars in benefits even if they never get to what, by

their own admission, is the key justification for the Proposed Settlement.  "The Court [should be]

troubled by such sequencing in light of the allegations by certain [objectors] that the Plan is

unconfirmable."  *In re Miami Metals I, Inc.*, 603 B.R. 531, 537 (Bankr. S.D.N.Y. 2019).

## IV.   PROPOSED SETTLEMENT IS NOT FAIR AND EQUITABLE

196.    "Other than an assessment of the merits," the paramount interests of creditors "is

the most important consideration."  *In re Remsen Partners, Ltd.*, 294 B.R., at 566.  The

paramount interests of creditors test looks to "each affected class's relative benefits 'and the

degree to which creditors either do not object to or affirmatively support the proposed

settlement.'"  *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating

LLC)*, 478 F.3d 452, 462 (2nd Cir. 2007).  "The court should emphasize the paramount interests

of the creditors and give proper deference to their reasonable objections."  *In re C.P. del Caribe,

Inc.*, 140 B.R., at 325.

197.    The focus of this inquiry is on the impact of a compromise on non-settling parties.

"[N]ot only does this Court need to afford paramount consideration to the interests of creditors,

but that consideration should focus particularly on the fairness of a settlement to those parties

who did not partake in the settlement."  *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 837

(Bankr. D. Del. 2008).  Accordingly, courts should not approve a settlement that "serves the

interests of" its proponents but "is not in the interests of" other creditors.  *Id*. at 838.

198.    Courts are particularly reluctant to approve settlements over the objections of

non-participating creditors where the official committee also opposes the proposed settlement.

*See In re Exide Techs.*, 303 B.R., at 70 ("An important element in many of the cases in which

courts approved [a] plan settlement[] that had not been negotiated with the opposing party is that

the settlements **were** negotiated with and/or supported by the Creditors Committee . . . .")

(emphasis added).  Because "unsecured creditors are not voluntary investors in the Debtor []

their position on the settlement, under these circumstances is entitled to ***substantial weight***."  *Id.*

(emphasis added).  Here, the consistent exclusion of the Committee from all negotiations relating

to the Proposed Settlement taints those negotiations.

199.    More importantly, the specific provisions of the Proposed Settlement demonstrate

the role the Committee could, and should, have played in these negotiations and why courts are

so concerned about protecting the interests of non-settling creditors.[223]  Knowing that a

settlement cannot forfeit control over a plan or provide a veto to the Bondholders over other

creditor recoveries, the Government Parties adamantly assert that the Proposed Settlement does

not have those effects:  according to the Government Parties, the "RSA does ***not*** give the

Supporting Holders veto rights over any Plan or over other creditors' treatments."[224]  In support

of this claim, the Government Parties point to page 14 of the Securitization Term Sheet, which

they characterize as "permitting creation of other charges to pay other legacy debt."[225]

---

[223]   The unique nature of this case makes the exclusion of the Committee (and all other non-bondholder creditors) even more egregious.  While charged with acting as the representative of PREPA, the Oversight Board, as noted in the Fuel Line Lenders' objection to the 9019 Motion, is arguably not a fiduciary for PREPA's creditors. Indeed, the Oversight Board has argued elsewhere that it is not a fiduciary for the debtor (and, certainly, for its creditors).  *See* Zwillinger Decl., Ex. 16 (*Motion of the Financial Oversight and Management Board for Puerto Rico to Dismiss Plaintiffs' First Amended Adversary Complaint Pursuant to Fed R. Civ. P. 12(B)(1) and 12(B)(6)*, at 30 n.15, *Pinto Lugo v. United States,* Adv. Proc. No. 18-041-LTS (D.P.R. Aug. 23, 2018) [Docket No. 36]).  Accordingly, regardless of whether the law imposes on the Oversight Board an obligation to pursue the best possible recovery for PREPA and/or its creditors, the Court can be sure that the Oversight Board did not see fit to consider non-settling creditors in its negotiations.  This means that, unlike a chapter 11 where creditors' interests are always, at least in theory, represented in every negotiation involving a debtor, ***there was not a single entity involved in the negotiations of the Proposed Settlement that represented the interests of non-settling creditors, let alone on a fiduciary basis***.

[224]   Second Suppl. Mem. ¶ 18 (emphasis in original).

[225]   *Id.*

200.     What the Government Parties, however, conspicuously neglect to mention is that this provision allows the establishment of additional transition charges "subject to any restrictions in the Securitization Trust Agreement."  The Securitization Trust Agreement has not been written yet.[226]  The term sheet, however, suggests that it may include limitations on the ability to establish additional charges.  In fact, Schedule 1-B of that same Securitization Term Sheet (titled "Securitization Protections") provides that the Securitization Agreement will include a number of covenants, including a covenant against any surcharges for the payment of non-pension legacy debt—*i.e.*, general unsecured creditors.[227]

201.     Presumably because none of PREPA's other creditors or stakeholders support it, the Government Parties' first and primary argument is that because the Proposed Settlement "is in the best interests of holders of PREPA's largest liability"[228] it is, by definition, in the paramount interests of creditors.  Benefit to the Bondholders, however, is irrelevant to the paramount interests of creditors analysis.  As the Fifth Circuit has explained, "looking only to the fairness of the settlement as between the debtor and the settling claimant contravenes a basic notion of fairness."  *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984).  Accordingly, "the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval."  *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.)*, 957 F.2d 1020, 1026 (2d Cir. 1992).

---

[226]   If it has been written, it has not yet been made public or otherwise shared with the Committee.

[227]   This covenant includes a carve-out only with respect to the payment of pensions.  David Brownstein asserted during his deposition that the Government Parties would find a way to settle with other creditors, including through the imposition of an additional charge if necessary; however, he declined to say that the Supporting Holders would not have a consent right over any such settlement.  Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 147:7-16; 150:12-19; 151:14-23).

[228]   Suppl. Mem. ¶ 74.

202.    The fact that the Bondholders may be the largest single creditor does not change

this fundamental fact.  "While it may be assumed that the settlement is in the best interest of [the

participating creditor], the Court must analyze the effect of the settlement on all parties to the

bankruptcy proceeding, ***and not simply the largest creditor***, when making its reasonableness

determination."  *In re Biolitec, Inc.*, 528 B.R. 261, 270 (Bankr. D.N.J. 2014) (emphasis added).

Because the Government Parties "fail[] to show how the [Proposed Settlement] benefits anyone

other than" its proponents, the Proposed Settlement cannot be approved.  *In re P & P "Quick*

*Sett" Servs., Inc.*, 2011 WL 1628023, at *2.

203.    Lacking any non-bondholder creditor support, the Government Parties claim that

the fact that more and more Bondholders are signing on to the RSA is evidence that the deal

"constitutes a fair compromise from ***all parties'*** perspective."[229]  It should be obvious that all (or

most) Bondholders is not synonymous with "all parties."  To the contrary, ***not one single***

***creditor or other stakeholder that does not hold Non-Recourse Bonds supports the Proposed***

***Settlement***.  As the First Circuit has noted:  "If the compromise was manifestly in the best

interest of the estate, we think this would be apparent to at least some of the creditors and their

counsel."  *In re Lloyd, Carr & Co.*, 617 F.2d 882, 891 (1st Cir. 1980) (denying approval of

proposed settlement).

204.    If anything, the fact that more and more Bondholders have signed on to the RSA,

while all other creditors oppose it, is evidence that the Bondholders have done the math and

figured out that the Proposed Settlement is a great deal for them.  The Government Parties,

ironically, are correct about one thing:  the Bondholders and PREPA's other creditors and

---

[229]   Suppl. Mem. ¶ 74 (emphasis added).

stakeholders have come to the same conclusion about who benefits from the Proposed

Settlement.

205.    Neither are the Government Parties' other arguments compelling.  The

Government Parties rely heavily on this Court's earlier decision applying the paramount interests

of creditors factor to the settlement of the Commonwealth-COFINA Dispute.  However, their

arguments actually demonstrate why the paramount interests requirement is not satisfied here.

206.    As noted by the Government Parties, the Court approved the settlement of the

Commonwealth-COFINA Dispute "because it found (i) creditors will receive a substantial

portion of sales tax revenues, (ii) the risk of a judgment that might have left creditors with none

of the sales tax revenues was negated, and (iii) creditors will benefit from relief from costly

litigation that would otherwise continue and eat away at the financial resources available to

service the Commonwealth's obligations."[230]  The Government Parties also note that the Court's

ruling was consistent with the First Circuit's *American Cartage* decision approving a settlement

that "allowed the trustee to distribute something to creditors" because in "bankruptcy, as in life

half a loaf is sometimes better than none."[231]

207.    What the Government Parties fail to understand, however, is that the bases for

both this Court's approval of the Commonwealth-COFINA Dispute and the First Circuit's

*American Cartage* ruling are precisely why the Proposed Settlement is not in the paramount

interests of creditors.  Settlement of the Commonwealth-COFINA Dispute freed up billions of

dollars of future tax revenues for the benefit of the Commonwealth and ***all*** of its creditors.  The

Proposed Settlement does not do that; in fact, it dedicates resources only to Supporting Holders.

---

[230]   Suppl. Mem. ¶ 73.

[231]   *Id.* (citing *In re Am. Cartage, Inc.*, 656 F.3d 82, 93 (1st Cir. 2011).

And unlike the settlement in *American Cartage*, the Proposed Settlement does not provide for

any distribution to creditors.  To use the First Circuit's analogy, half a loaf may be better than no

loaf—but the Proposed Settlement does not provide even a slice to creditors other than the

Bondholders.  And in *In re Fernandez*, a case cited by the Government Parties, the court

explained that a settlement was beneficial to general unsecured creditors because it paved the

way to a plan "***and the attendant distribution to all other creditors***."  *Laser Realty, Inc. v.*

*Fernandez (In re Fernandez)*, No. 04-10585 (GAC), 2009 WL 2913685, at *3 (Bankr. D.P.R.

Mar. 31, 2009) (emphasis added).

208.    Furthermore, unlike the settlements approved in *American Cartage* and in the

Commonwealth-COFINA Dispute, the alternative to the Proposed Settlement is not "no loaf."

The Commonwealth-COFINA Dispute was an "all or nothing" litigation for the Commonwealth

in which, if it lost, it would lose out on every dollar of the tax revenues.  As discussed in detail

above, the Lien Challenge is not an all or nothing litigation from the standpoint of PREPA.

Instead, PREPA could lose on a number of the disputed issues and it (and its other creditors)

would still be in a significantly better position than under the Proposed Settlement.  Finally, the

Committee was extensively involved in the settlement of the Commonwealth-COFINA Dispute,

and it is not a coincidence that in that settlement (unlike here) ***all*** creditors stood to benefit.

209.    Accordingly, the only similarity between the Proposed Settlement and the

settlement of the Commonwealth-COFINA Dispute is that it will cut down on litigation costs.

This is obviously true of every settlement and cannot form a significant basis for settlement,

especially where (as discussed above) the costs of litigation are exponentially outstripped by

both the cost of the Proposed Settlement and the potential benefit of litigation.  Further, as

discussed below, the Proposed Settlement will decrease the debtor's litigation costs only to the

96

extent that those costs would have exceeded the $50 million in fees and expenses likely payable
to the Supporting Holders.

## V.   OTHER RULE 9019 FACTORS ALSO MILITATE AGAINST PROPOSED SETTLEMENT

210.   The Proposed Settlement also fails the remaining prongs of the reasonableness
inquiry.

### A.   No Difficulty Collecting

211.   This factor supports a settlement where, even if successful, the debtor may
encounter difficulty collecting on a judgment, thereby limiting the potential benefit of
proceeding with the compromised litigation.  The Litigation, however, does not contemplate the
recovery by PREPA of specific funds, so this factor weighs against the Proposed Settlement.

### B.   Complexity, Cost, and Delay of Litigating Do Not Justify Proposed Settlement

212.   "It is axiomatic that settlement will almost always reduce the complexity and
inconvenience of litigation."  *In re Nutraquest, Inc.*, 434 F.3d, at 646.  Because reduction in the
cost and delay of litigation is "present in most litigation," where it is the "only factor that weighs
in favor of approving the settlement," this factor does "not outweigh the other factors" and does
"not form a sufficient basis for approval of the settlement."  *In re Exide Techs.*, 303 B.R. at 71.
Moreover, "[w]hile private parties may settle their controversies on any terms which may be
mutually satisfactory, this is not necessarily the case in the bankruptcy context."  *In re Taylor*,
190 B.R. 417 (Bankr. D. Col. 1995).  "Consequently, the terms of any settlement require some
more reasonable basis than expediency and the desire to terminate complex and troublesome
litigation."  *Id.* (citing *In re Chicago Rapid Transit, Co.*, 196 F.2d 484 (7th Cir. 1952) (internal
quotation marks omitted).  The prospect of an appeal similarly applies to virtually every

litigation, and there is no cognizable legal theory upon which a bankruptcy settlement can be approved on the basis of the trustee's desire to avoid appellate litigation.

213.     Accordingly, even if this factor weighed in favor of the Proposed Settlement it would not justify its approval.  Furthermore, under the circumstances of this case, which involves the resolution of more than $8.5 billion in bond claims, the complexity of the issues and the related cost and delay that would result from continuing to litigate the Lien Challenge and the Receiver Motion are not nearly as significant as the Government Parties claim.

214.     Despite the enormous amount of money at stake, many of the issues presented by the Lien Challenge are not particularly complex or unusual.  As discussed above, litigation of the Lien Challenge will require the Court to determine:

- as a matter of contract interpretation, the scope of the collateral securing the Non-Recourse Bonds and whether the Trust Agreement granted a security interest in gross revenues, a current security interest in future, unearned, revenues, or a security interest in the Rate Covenant and the Receiver Remedy;

- if the Trust Agreement does provide for security interests in these forms of collateral, whether these security interests have been properly perfected;

- if the Trust Agreement does provide for security interests in these forms of collateral, whether it is even possible to have a current security interest in future, unearned, revenues, or any security interest in a covenant or a remedy; and

- if the Trust Agreement does provide for security interests in these forms of collateral, the present value of that collateral.

215.     The majority of these issues—contract interpretation and scope of collateral, questions of perfection, and value of collateral—are relatively straightforward questions that will require little, if any, additional documents or testimonial evidence, and are of a type that bankruptcy courts around the country deal with daily.  Even the more unusual issues relating to the asserted security interests in the Impossible Collateral are likely to be resolved by the

decidedly mundane issues of contract interpretation and perfection.  If the Trust Agreement did

not purport to grant a security interest in any of the Impossible Collateral, or (even if it did) if

these purported security interests were not properly perfected prepetition, the Court will have no

need to address the theoretical issue of whether such security interests are possible as a matter of

law.  Moreover, other than the question of value, all of these issues are legal issues that can and

should be resolved without lengthy discovery, trial, or evidentiary hearings.[232]

216.    The Receiver Motion is similarly straightforward.  As an initial matter, the First

Circuit has already made clear its belief that determination of the scope of the collateral securing

the Non-Recourse Bonds is a predicate issue that should be addressed before the Receiver

Motion is resolved.  Accordingly, the same issues of scope and value of collateral that make up

the Lien Challenge (and will determine whether the Proposed Settlement is fair and equitable)

are likely to also resolve the Receiver Motion.

217.    Even if the Court were inclined to rule on the Receiver Motion before resolving

the Lien Challenge, the Receiver Motion—as both the Court and the First Circuit have already

recognized—is governed by the *Sonnax* factors.  Bankruptcy courts deal with lift stay motions

and the *Sonnax* factors also on a daily basis, and they pose no special complexity.

218.    Nor does the cost of litigating the Lien Challenge support the Proposed

Settlement.  The straightforward nature of these issues, combined with the predominance of legal

(as opposed to factual) issues, will constrain costs.  Costs will also be limited by fact that the

Lien Challenge has already been filed and by the multiple rounds of briefing filed in connection

---

[232]  Because they are cash, valuing the Net Revenues held in the deposit accounts held by the Trustee presents no
difficulty.  The question of value, therefore, will become complicated only if the Court agrees with the
Bondholders' novel argument that the collateral securing the Non-Recourse Bonds includes the Impossible
Collateral and that those security interests were properly perfected.

with the Receiver Motion.[233]

219.    Most importantly, the costs of litigation must be measured against the amount at stake.  Here, where the Government Parties seek to award the Supporting Holders *a minimum* of $6.8 billion, the cost of the Litigation pales against the cost of the Proposed Settlement.[234]  The court's thorough explanation of this issue in the Detroit bankruptcy is directly applicable.

220.    In *Detroit*, the court was asked to approve a settlement that would have required the debtor to pay approximately $165 million on an asserted liability of $247 million (*i.e.*, approximately 67%).  If successful on the compromised claims, the city stood to eliminate all liability, and possibly recover up to $300 million.  The Court concluded that the expenses involved with litigating these claims "would be undoubtedly substantial *but, given the amount of money at stake, relatively insignificant*."[235]  To be sure, the amount at stake in *Detroit* was high—yet it cannot compare to the billions of dollars that are at stake in the Lien Challenge.

221.    Nor does any delay caused by litigating the Lien Challenge or the Receiver Motion justify, or even weigh in favor of, the Proposed Settlement.  As an initial matter, the same considerations regarding the lack of complexity and cost will also help minimize delay.

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[236] ███

---

[233]   The Committee notes that numerous depositions have already been taken in connection with the Receiver Motion and this Proposed Settlement, further limiting the cost (and delay) of litigation.

[234]   Includes repayment of Tranche A bonds in the amount of $6,277,732,486 plus Waiver and Support Fees in the amount of $151,079,902 plus Administrative Claim / Settlement Payments (from May 1, 2019 to July 1, 2020) in the amount of $393,764,759.  *See* Brownstein Decl., at 15, Table 1.  This number is, even by the Government Parties' calculations, the minimum amount Bondholders will recover under the Proposed Settlement.  Even according to the Government Parties, however, the likely recovery is even greater.

[235]   Zwillinger Decl., Ex. 1 (Detroit Hr'g Tr. 19:24-20:1).

[236]   *See* Zwillinger Decl., Ex. 41 (Chapados Dep. Tr. 214:5-10) (████████████████████████████████
████████████).

██████████████████████████████████████████████████████ The
Government Parties have acknowledged repeatedly, including as recently as October 17, 2019,
that billions of dollars in federal funding—which PREPA still has yet to receive and indeed may
never fully receive—are being counted on for the Transformation and that the lack of certainty
surrounding the federal funding is causing delays in the Transformation process.[237] ████████

████████████████████████████████████████████████████████████

█████████████████████████████████████.[238]  There is simply no need for
urgency given where the Transformation stands.  Further, even assuming any urgency does exist
(which it does not), such urgency would be entirely of the Government Parties' own creation, as
they could have litigated against the Bondholders over twelve months ago.

222.    The *Detroit* court's conclusion that the costs of litigation were insignificant in
light of the amount potentially left on the table recognized that litigation would also create non-
financial costs.  The court noted that while certain of the issues inherent in the city's claims
could "be promptly resolved by [the] Court through summary judgment," it was less clear "how
quickly appeals would be resolved."[239]  The court further noted that other issues were very fact-
intensive and would "require substantial discovery, some perhaps even international in scope,
and that litigation might take years if the city decides to pursue that."[240]

223.    Unlike the proposed settlement in *Detroit*, the vast majority of the issues involved
in the Lien Challenge are legal issues that could be resolved through summary judgment.  Nor is

---

[237]  *See* Zwillinger Decl., Ex. 38 (Excerpt from a publicly filed PREPA mediation-related document (Jaresko Ex.
11), at 23) ("Availability of Federal Funds is a critical piece of PREPA's ability to modernize the grid system
while keeping rates at an affordable level").

[238]  See Zwillinger Decl., Ex. 41 (Chapados Dep. Tr. 72:4-13) (████████████████████████████
████████████); *id.* at 73:3-6. (████████████████████).

[239]  Zwillinger Decl., Ex. 1 (Detroit Hr'g Tr. 19:3-14).

[240]  *Id.* at 19:17-19.

there the possibility of international discovery.  Further, section 106(b) of PROMESA specifically requires all appellate courts—up to and including the Supreme Court—to "expedite to the greatest possible extent the disposition" of any appeal.  If the hundreds of millions of dollars at stake in *Detroit* justified litigation that "might take years," *a fortiori* the billions of dollars at stake in the Lien Challenge and the tremendous benefit PREPA's customers stand to gain from a successful resolution of the Lien Challenge justify the time that would be spent in its litigation—especially when that litigation involves almost entirely legal issues and any appeal would be expedited by statute.

224.    Finally, the Committee notes the irony of the Government Parties' claim that the Proposed Settlement will reduce their litigation costs when the RSA will likely require the Government Parties to pay over $50 million[241] of the Supporting Holders' professional fees and expenses, fees that they have no right to receive.  Litigating the Lien Challenge will certainly be expensive—but it takes a special kind of boldness to tout the cost-saving effect of the Proposed Settlement while agreeing to pay over $50 million of your adversaries' litigation costs.

## VI.    PROPOSED SETTLEMENT IS ILLEGAL *SUB ROSA* PLAN

225.    The Bankruptcy Court for the Southern District of New York recently denied a settlement motion based on its "concern[s] about the timing of the benefits under" the proposed settlement.  *In re Miami Metals I, Inc.*, 603 B.R., at 537.  The court explained that

> *certain features of the [proposed] Settlement automatically come into effect on the Settlement Date*, whereas others are triggered if and only if the Plan, as set forth under the Plan Support Agreement, is confirmed.  The Court is troubled by such sequencing in light of the allegations by certain [objecting parties] that the Plan is unconfirmable . . . ***Thus, the current formulation of the Settlement ensures that the Senior Lenders will reap the full benefit of the Settlement on the Settlement Effective Date, regardless of whether or when the Plan is confirmed*** . . . By contrast, the Debtors' estates and

---

[241]   *See* Zolfo Cooper Decl., Ex. 1, n. 6, 7 and 8.

> Customers will suffer if the Plan fails because their benefits are conditioned
> on the Plan becoming effective.

*Id.* (emphasis added).

226.    One could not ask for a clearer exposition of how a restructuring support agreement is meant to function, and why courts should not approve an RSA that requires full performance by the debtor even without the promised benefits.[242]  A restructuring support agreement is a "promise to agree."  It documents a current promise between the debtor and the supporting creditors about what each of those parties will do ***in the future***:  in exchange for the supporters' promise to support a plan that contains certain terms, the debtor promises to propose a plan with those terms.  However, the key feature of an RSA is that it is all about future performance.  An RSA that purports to make immediate, and permanent, changes is not a future promise—it is a plan.  Accordingly, courts have long held that debtors (or creditors) cannot undermine the terms and policies of the Bankruptcy Code through pre-plan transactions that predetermine the terms of a plan without complying with the Bankruptcy Code's protections and requirements for a plan.

### A.      Applicable Legal Standard

227.    As an initial matter, determination of whether a proposed settlement (or RSA) is a *sub rosa* plan is separate from analysis of whether the settlement satisfies the relevant 9019 standards.  "Consideration of such transactions is, therefore, bifurcated."  *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 855 (Bankr. S.D.N.Y. 1990).  Whether a proposed settlement is a good, or even great, deal for a debtor therefore has no bearing on a *sub rosa* analysis.  Even if the "applicable statutory and/or judicial standards [have been] met, the

---

[242]   Indeed, Oversight Board Member David Skeel has testified that he is unaware of any basis to make pre-confirmation payments.  Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 146:4-11).

proposed transaction will not, however, be approved" if it is a *sub rosa* plan "***either in fact or in effect***." *Id.* (emphasis added).

228.    Originally promulgated in connection with sales under section 363 of the Bankruptcy Code, *see, e.g.*, *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*, 700 F.2d 935, 940 (5th Cir. 1983) ("debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa"), courts have made clear that the prohibition on *sub rosa* transactions applies equally to a proposed settlement under Bankruptcy Rule 9019. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997) (Bankruptcy Code "does not authorize the trustee to enter [into] a settlement if the result amounts to a *sub rosa* plan"); *see also In re Fryar*, 570 B.R. 602, 610 (Bankr. E.D. Tenn. 2017) ("[to] approve a settlement which is a sub rosa plan . . . would be an abuse of the bankruptcy court's discretion"); *In re Louise's Inc.*, 211 B.R. 798, 801 (D. Del. 1997) (denying approval of settlement and finding that terms of proposed settlement "exceed[ed] the boundaries of a Rule 9019 compromise").

229.    In determining whether a proposed transaction is really a *sub rosa* plan, courts consider whether the proposed settlement has "the practical effect of dictating some of the terms of any future reorganization plan," *Braniff*, 700 F.2d at 940, whether the proposed settlement exceeds the scope of the settling parties' dispute, whether the proposed settlement would dispose of virtually all of the debtor's assets, and whether the rights of any creditors are restricted or altered.

## B.    Proposed Settlement Is a *Sub Rosa* Plan

230.    Critically, bankruptcy courts in the First Circuit have explained that the "closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court

must give to that matter." *In re CGE Shattuck*, LLC, 254 B.R. 5, 12 (Bankr. D.N.H. 2000).

"The degree of Court scrutiny" of a proposed pre-plan transaction "must be elastic—becoming

more strict and searching the nearer the transaction gets to the heart of the reorganization plan

process." *Id.* (citing *In re Public Serv. Co. of N.H.*, 90 B.R 575, 582 (Bankr. D.N.H. 1988)).

231.    This principle also explains the holding in *Delaware Tr. Co. v. Energy Future

Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157 (D. Del. 2015).

In that case, the district court affirmed the bankruptcy court's approval of the debtors' settlement

with certain first lien lenders.  Rejecting appellant's argument that the settlement was a *sub rosa*

plan, the court explained that the *sub rosa* argument was based on considering the settlement "in

conjunction with all parts of the Global Settlement." *Id.* at 168.  However, the debtors ultimately

"withdr[ew] the Global Settlement" leaving "only the First Lien Settlement remain[ing]"

operative." *Id.*  The implication is clear: had the debtors continued to pursue a broad global

settlement, as opposed to the narrower settlement of only the first lien issues, the *sub rosa*

question would have been reanimated, and likely resolved differently.

232.    The Oversight Board cites the Third Circuit's subsequent opinion affirming the

district court's ruling in *Energy Future*, which it characterizes as affirming a "holistic

settlement."[243]  But this ignores a key aspect of the district court's ruling which, as discussed

above, was based precisely on the narrow—not holistic—nature of the settlement ultimately

sought.  Indeed, the word "holistic" appears neither in the district court opinion nor the Third

Circuit's subsequent ruling.  *See Energy Future Holdings Corp. v. Del. Trust Co.*, 648 Fed.

Appx. 277, 285 (3d Cir. 2016).  As applied here, the *Energy Future* ruling means that

determination of whether the Proposed Settlement is a *sub rosa* plan requires analysis of the

---

[243] Suppl. Mem. ¶ 83.

entirety of the Proposed Settlement. In this way, the Proposed Settlement is better compared to the settlement in *Energy Future* **before** the Global Settlement was withdrawn.

233. The Proposed Settlement goes far beyond simply settling the Litigation and agreeing on an allowed claim. Taken as a whole, it addresses matters and dictates terms that may be set forth only in the context of a plan of adjustment. The breadth of the Proposed Settlement demonstrates that it is a global settlement that resolves all, or essentially all, of the economics of PREPA's restructuring and is so replete "with provisions unrelated to the [disputed] issue that it cannot be fairly denoted a Rule 9019 compromise." *In re Louise's Inc.*, 211 B.R. at 802. These provisions are so wide-ranging and dictate most, if not all, of the important and central terms of any plan of adjustment that they should be considered the plan itself. Indeed, if this is not a *sub rosa* plan, it is hard to imagine what is, as nearly every element of PREPA's restructuring would be pre-wired if the Proposed Settlement were granted.

234. For example, the Delayed Implementation Date allows implementation of the Transition Charge outside of a plan of adjustment.[244] However, the Transition Charge is at the heart of the Proposed Settlement and any proposed plan and, as such, its feasibility, as well as the impact thereon if the Transition Charge is not approved, should be tested through the standards for confirming a plan of adjustment and should not be locked into place prior to confirmation. Similarly, the Proposed Settlement locks in payments—including administrative claims, post-petition interest, and settlement payments—without a confirmed and effective plan of adjustment.[245] Moreover, by prohibiting additional charges for non-pension legacy debt, it restricts the debtor's use of its assets separate from the assets used to consummate the Proposed

---

[244] *See* Zwillinger Decl., Ex. 9 (RSA § 2(e)(i)).

[245] *See id.* at § 2(d)).

Settlement.[246] ████████████████████████████████████████████

████████████████████████████████████████████.[247]

235.    Finally, these provisions are all exacerbated by the (i) Government Parties'
obligation to provide the Stipulated Treatment, (ii) lack of a fiduciary out, and (iii) fact that the
pre-confirmation payments cannot be disgorged even though the provisions of the RSA that
purports to credit the payments against the Supporting Holders' claims do not work where those
claims are non-recourse.  Taken together, the various provisions of the Proposed Settlement
show that the Restructuring has crossed the line separating a promise to support a plan to be filed
in the future and an actual, *sub rosa*, plan in the present.

C.    ***Sub Rosa* Is Not a Confirmation Issue**

236.    The Committee notes that—as Your Honor has explained—the Bankruptcy Code
"authorizes the alteration of objecting creditors' rights **through the plan confirmation process**."
*Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30,
54 (S.D.N.Y. 2005) (Swain, J.) (emphasis added)  Therefore, pre-plan distributions (such as the
massive benefits being transferred to the Supporting Holders) are not appropriate where they are
"in derogation of affected creditors' interests."  *Id.* at 52.[248]  This is particularly so where (like
here) the benefiting creditors' claim is subject to a dispute.[249]

---

[246]    *See* Zwillinger Decl., Ex. 9 (Securitization Protections, V.A.4).

[247]    *See* Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 210:13-17).

[248]    While it reversed other aspects of this decision, on appeal, the Second Circuit Court of Appeals agreed that the
transaction approved by the Bankruptcy Court was not permitted by the prepetition inter-creditor agreement
and, therefore, did not address the pre-plan distributions from a Bankruptcy Code perspective.  *See In re
WestPoint Stevens, Inc.*, 600 F.3d 231, 259 (2d Cir. 2010) ("Because we conclude that the distributions to the
Second Lien Lenders were not authorized by the Intercreditor Agreement, we need not decide whether the lien
release, claim satisfaction, and distribution provisions could be permitted under a section 363(b) sale.").

[249]    *Id.* at 52-53 (discussing *In re San Jacinto Glass Indus., Inc.,* 93 B.R. 934, 942-43 (Bankr. S.D. Tex. 1988)).

237.     The Committee is mindful of the Court's directive to refrain from turning the hearing on the Proposed Settlement into a "mini-confirmation hearing."  Whether or not the Proposed Settlement creates a *sub rosa* plan is entirely separate from whether the Proposed Settlement is premised on a plan of adjustment that is ultimately unconfirmable.  Indeed, some of the terms may ultimately be found to be proper under a plan, and others not.  Regardless, the plan process may not be short-circuited, or all of the contours of a plan of adjustment pre-ordained, pursuant to a Rule 9019 motion.  It is to that—and the attendant subversion of the Bankruptcy Code's requirements for disclosure, solicitation, voting, and a confirmation hearing—that the Committee objects.

## VII.   OTHER FEATURES OF PROPOSED SETTLEMENT ARE ILLEGAL OR NOT IN BEST INTERESTS OF PREPA OR ITS CREDITORS

238.     In addition to failing to satisfy the *Jeffrey* factors, the Proposed Settlement should be denied because—in addition to the indefensible "Securitization Termination" provision described above—numerous of its provisions cannot be approved as a matter of law.[250]

### A.   Administrative Expense Claim Cannot Be Approved as a Matter of Law

239.     The Government Parties concede that they are seeking Court approval of the Administrative Expense Claim.[251]  The only statutory authority they cite is section 503(b)(3)(D) of the Bankruptcy Code, which provides that creditors are entitled to reimbursement of the "actual, necessary expenses" they "incurred" in making a "substantial contribution in a [bankruptcy] case."  This section of the Bankruptcy Code, however, cannot be the basis for approval of the Administrative Expense Claim for all the reasons set forth in the Objection of the

---

[250]   Even if the Court is otherwise inclined to approve the Proposed Settlement, it should at a minimum strike these provisions.

[251]   *See* Suppl. Mem. ¶ 94.

Fuel Line Lenders, which is incorporated by reference herein.

240.    Separately, the Administrative Claim is illegal because it reorders the Bankruptcy
Code's priority scheme by using a "settlement" to give the Bondholders even greater rights than
they would have if they were to litigate, and prevail in, the Lien Challenge.  Indeed, a secured
claim can be crammed down, but an administrative claim cannot.  It is beyond dispute that a
settlement cannot impact bankruptcy priorities.  As the Second Circuit has explained, "whether a
particular settlement's distribution scheme complies with the Code's priority scheme must be ***the
most important factor*** for the bankruptcy court to consider when determining whether a
settlement is 'fair and equitable' under Rule 9019" and "***will often be the dispositive factor***."  *In
re Iridium Operating, LLC*, 478 F.3d at 464; *see also In re AWECO*, 725 F.2d at 298 ("[A]
bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the
court concludes that priority of payment will be respected as to objecting senior creditors.").

241.    Bankruptcy courts in the District of Puerto Rico have, accordingly, declined to
approve pre-plan settlements that would result in even a *potential* deviation from a pre-
bankruptcy priority scheme.  In *In re C.P. del Caribe, Inc.*, 140 B.R. at 326-27, the court found
that a settlement between a debtor and a tax authority was not "fair and equitable" because it
would pay the tax authority outside of a plan ahead of Chrysler Financial, a creditor of equal or
higher priority.  The court held that "in the settlement context, 'fair and equitable' means that the
settlement reasonably accords with the competing interests' relative priorities."  *Id.*; *see also
In re Liberia Alma Mater, Inc.*, 123 B.R. 698, 699 (Bankr. D.P.R. 1991) (declining to approve a
settlement between a debtor and a purported secured creditor where it "recognize[d] a lien whose
very existence is questionable" and proposed to "satisfy that purported lien on a manner which
may alter the scheme payments set forth in the Code").

242.    As noted above, the Administrative Expense Claim is structured to provide

Bondholders the interest that would, in theory, be accruing on the Securitization Bonds.

Moreover, it begins to accrue immediately after the parties have agreed to "stop" accruing post-

petition interest on the pre-petition Non-Recourse Bonds.  The Administrative Expense Claim,

therefore, is a proxy for post-petition interest on the Non-Recourse Bonds, but will receive the

added benefit of having this post-petition interest treated as an administrative expense claim that

must be paid in full (and, in the event of a Securitization Termination, in cash) before any plan of

adjustment can be confirmed.  This gives the Bondholders an administrative priority claim that

they could never have even if they prevailed on their claim that they are oversecured, reorders

the Bankruptcy Code's priority scheme, and cannot be approved.

### B.    Surviving Administrative Claim Cannot Be Approved As a "Break-Up" Fee As a Matter of Law

243.    The Government Parties have advanced a second argument to justify the

Administrative Expense Claim (or at least a portion thereof).  Specifically, they argue that the

Surviving Administrative Claim that is payable if the RSA is terminated as a result of the

Government Parties inability to confirm the plan contemplated by the Proposed Settlement, can

be justified as a "break-up fee."[252]  This is wrong.[253]

244.    As a preliminary matter, the Government Parties cannot justify the provision of

the Surviving Administrative Claim under any section of the Bankruptcy Code.  As demonstrated

by the very cases cited by the Government Parties, the statutory bases for an administrative

---

[252] Suppl. Mem. ¶ 95.

[253] Even Oversight Board Member David Skeel has acknowledged that these fees cannot be justified as a break-up fee.  *See* Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 232:10-20) ("Q. Okay. And the board here, in pleadings filed with the court, has analyzed, as described, if you will, the payments that the bondholders get to keep as a breakup fee.  So my first question to you is, is that the way the board perceived these payments when it approved the RSA?  A. That's not the way I think of them. I think breakup fee would be a very loose description.").

expense claim on account of a break-up or other termination fee is section 503(b)(1)(A) of the

Bankruptcy Code.[254]  That section, however, does not apply to Chapter 9 or Title III cases

because in such cases there is no estate.[255]

245.    There is also no practical justification for a break-up fee in connection with the

settlement proposed by the Government Parties.  In the prototypical break-up fee arrangement,

the fee is paid to a stalking horse bidder that loses at an auction of the debtor's assets.  The

break-up fee is designed to encourage the stalking horse bidder (typically, a "stranger" to the

case) to provide a baseline bid in the auction; assuming the amount of the fee is reasonable,

allowance of the break-up fee is appropriate because the stalking horse bidder added value to the

estate by encouraging other parties to bid up the price.[256]

246.    Similarly, break-up fees can also be found where parties inject new money into a

debtor's capital structure to support a plan of reorganization.  As in the sale context, the break-up

fee attracts and retains the plan funder (again, typically a "stranger" to the case), protecting it

---

[254]  *See* Zwillinger Decl., Ex. 43 (*Order Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, Approving Settlement Agreements with the United Steelworkers and United Autoworkers, and Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507, Authorizing the Debtors to Enter Into Plan Support Agreement, Investment Agreement and Related Agreements,* ¶ 10, *In re Dana Corp.*, Case No. 06-10354-BRL, (Bankr. S.D.N.Y. Aug. 1, 2007) [Docket No. 5879]) (allowing payment of break-up fee and other fees as administrative expenses under section 503(b)(1)(A)); Zwillinger Decl., Ex. 44 (*Order Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code, In re Delphi Corp.*, Case No. 05-44481-RDD (Bankr. S.D.N.Y. Jan. 12, 2007) [Docket No. 6589]) (same).

[255]  *See In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010) ("Because a chapter 9 debtor's property remains its own and does not inure into a bankruptcy estate as provided by section 541 of the Bankruptcy Code, there can be no administrative expenses for 'the actual and necessary costs of preserving the estate' as contemplated by section 503(b)(1)(A) of the Bankruptcy Code.").

[256]  *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018), *cert. denied sub nom. NextEra Energy, Inc. v. Elliott Assocs., L.P.*, 139 S. Ct. 1620, 203 L. Ed. 2d 898 (2019) (noting that break-up fee could benefit the estate by (1) promoting competitive bidding, (2) inducing "a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely," and (3) "assuring that a bidder 'adhered to its bid rather than abandoning its attempt to purchase'" (quoting *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) and *In re Reliant Energy Channelview LP*, 594 F.3d 200, 207 (3d Cir. 2010))).

from the risk that the debtor will decide to enter into an alternative transaction that is better for the debtor but may cause the plan funder to lose the benefit of its bargain and compensating it for the time and resources it has invested in the process.  These fees can be rationalized because the new money provided by the plan funder makes possible a reorganization with a better outcome for estates and stakeholders than would otherwise be possible—such as recoveries for unsecured creditors.  Moreover, though there may not be an auction in this scenario, the debtor can still accept an alternative transaction to get a better outcome for the estate.

247.    The situation here is quite different.  The Bondholders are not "strangers" that are bringing in value to the case; instead, they are just protecting their claim under the RSA.  Nor are the Bondholders providing new money to support PREPA's reorganization that will help fund recoveries for other stakeholders.  The Supporting Holders are simply agreeing to a settlement of their prepetition claims at a minimal discount and to support a plan of adjustment consistent with that settlement, while enjoying a variety of other forms of consideration, such as administrative claims and Settlement Payments to "sweeten the pot."  In other words, the Supporting Holders are taking care of themselves, and handsomely, but they are not contributing anything to PREPA that will benefit other stakeholders.

248.    Another important difference is that the Surviving Administrative Claim is not designed to protect the Supporting Holders' bargain in the event that the Government Parties "jilt" the Bondholders and decide to engage in an alternative transaction.  Indeed, the Surviving Administrative Claim only arises in one scenario: if "the Oversight Board fail[s] to confirm a Plan containing the Stipulated Treatment after multiple good faith efforts," [257] and a Government

---

[257]   Suppl. Mem. ¶ 95.

Party then exercises its election to terminate the RSA.[258]

249.    The Surviving Administrative Claim, therefore, does not protect the Supporting

Holders from a higher bid or an alternative transaction, but from the Court's judgment that the

plan that they want is improper.  In other words, it puts a multi-million dollar "gun" to the

Court's head at plan confirmation time.  Similarly, the Government Parties' "election" to

terminate the RSA is not really an election at all, but a forced termination caused by their failure

to confirm a plan—twice!  ***The break-up fee agreed to by the Government Parties is really***

***nothing more than a fee paid to the Supporting Holders to support an unconfirmable plan***.

Creditors are not entitled to "plan-denial fees."

250.    The Government Parties cite to orders in *Delphi* and *Dana*, in which the

bankruptcy court authorized break-up fees in connection with a plan support agreement.

However, those cases illustrate all of the distinctions discussed above.  In *Delphi*, Judge Drain

explained that "alternative transaction fees and the like" were not appropriate where "stalking

horse bidders were so imbedded in the capital structure already that they did not need further

incentive to make their proposal."[259]  Additionally, in *Delphi*, the supporting holders had

committed to purchase over $1.4 billion of common and preferred stock in the reorganized

debtor, there were recoveries to other classes of creditors and stakeholders, and the break-up fee

was an "Alternate Transaction Fee"[260] payable if the debtors entered into another deal, as

---

[258]   *See* Zwillinger Decl., Ex. 9 (RSA § 9(c)(i)(6)).

[259]   *See* Zwillinger Decl., Ex. 45 (Jan 12. 2007 Hr'g Tr. 118:10-18, *In re Delphi Corp.*, No. 05-44481 (Bankr.
S.D.N.Y.) [Docket No. 7118]).

[260]   Zwillinger Decl., Ex. 46 (*Expedited Motion for Order Authorizing and Approving the Equity Purchase and
Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and
the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b), and 1125(e) of the Bankruptcy
Code*, ¶¶ 43, 57, 58, *In re Delphi Corp.*, No. 05-44481-rdd (Bankr. S.D.N.Y Dec. 18, 2006) [Docket No. 6179]
(the "Delphi PSA Motion")).

opposed to simply serving as a "busted deal" fee. Similarly, in *Dana*, the recipient of the break-up fee committed to purchase $500 million of preferred stock and use reasonable efforts to identify purchasers of (and backstop) up to $250 million of additional preferred stock, unsecured creditors received a recovery, and the $15 or $22.5 million break-up fee would be owed if there was an alternative transaction.[261]

251.    The Surviving Administrative Claim is actually analogous to the fee that was denied in the *Energy Future Holdings* ("EFH") case. *In re Energy Future Holdings Corp*., 575 B.R. 616 (Bankr. D. Del. 2017), *aff'd*, 904 F.3d 298 (3d Cir. 2018), *cert. denied sub nom. NextEra Energy, Inc. v. Elliott Assocs., L.P*., 139 S. Ct. 1620, 203 L. Ed. 2d 898 (2019). *EFH* involved a termination fee in connection with a plan support agreement and merger agreement (collectively, the "NextEra Transaction") where the break-up fee was payable to a putative purchaser, NextEra, upon a rejection of the NextEra Transaction by the Public Utility Commission of Texas ("PUCT"), and the subsequent termination of the NextEra Transaction by the debtors.

252.    The bankruptcy court initially allowed the fee. On reconsideration, however, the court denied the break-up fee, explaining that it had not initially understood that the fee was payable to NextEra even if the PUCT declined to approve the NextEra Transaction and the

---

[261]    Zwillinger Decl., Ex. 47 (*Motion of Debtors and Debtors In Possession for Entry of an Order (A) Approving Settlement Agreements with the United Steelworkers and United Autoworkers, Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, and (B) Authorizing the Debtors to Enter Into Plan Support Agreement, Investment Agreement and Related Agreements, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 and 507*, ¶ 39, *In re Dana Corp.*, No 06-10354-BRL (Bankr. S.D.N.Y. July 6, 2007) [Docket No. 5645] (the "Dana PSA Motion")); Zwillinger Decl., Ex. 48 (*Notice of Filing of Summary of Changes to the Global Settlement in Connection with Motion of Debtors and Debtors in Possession for Entry of an Order (A) Approving Settlement Agreements with the United Steelworkers and United Autoworkers, Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, and (B) Authorizing the Debtors to Enter into Plan Support Agreement, Investment Agreement and Related Agreements, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 and 507*, at 7, *In re Dana Corp.*, No 06-10354-BRL (Bankr. S.D.N.Y. July 25, 2007) [Docket No. 5810] (the "Dana Amended PSA Summary")).

debtors (as opposed to NextEra) terminated the merger agreement.  The court explained that

"*[p]ayment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction cannot provide an actual benefit to a debtor's estate sufficient to satisfy*" the applicable standard for approval of break-up fees in the Third Circuit.[262]  *Id.* at 635 (emphasis added).[263]

253.    The Surviving Administrative Claim suffers from same flaw highlighted in *EFH*. Just as in *EFH*, the Surviving Administrative Claim is payable when a tribunal (this Court) declines to approve a plan of adjustment containing the Stipulated Treatment and the debtors terminate the agreement.  In this context, the Surviving Administrative Claim provides no benefit to the estate—PREPA is simply back where it started, with no confirmed plan and no settlement between it and the Bondholders.  The only difference is the massive amounts of money owed to the Bondholders.  The fact that the prospect of receiving the Surviving Administrative Claim

---

[262]   In the Third Circuit, that standard is found in *In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 535. ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

[263]   The court also focused on another factor that exacerbated the problem it had identified: after the transaction was rejected by the PUCT, NextERA had no incentive to terminate the merger agreement on its own (in which case the break-up fee would not be payable).  Because the merger agreement had no time limit for PUCT approval, NextEra "would never be required to terminate and could simply wait for mounting financial pressures to force the Debtors to do so instead." *Id.* at 625.  In fact, NextEra was incentivized "to pursue multiple motions for reconsideration [of the PUCT's decision] and a fruitless appeal strategy to force the Debtors to terminate the Merger Agreement to pursue an alternative transaction." *Id*. at 635.  Just as in EFH, following failure to confirm a plan there is no incentive for the Supporting Holders to agree to a Stipulated Treatment Termination without a break-up fee (as section 9(d)(i)of the RSA appears to allow them to do).  This is because absent a Stipulated Treatment Termination, the Supporting Holders will continue to receive Settlement Payments (followed by Increased Settlement Payments), and their Administrative Claim will continue to accrue. Moreover, the Bondholders receive the Surviving Administrative Claim only if the Government Parties exercise the Stipulated Treatment Termination and trigger the break-up fee.  Affirming the bankruptcy court, the Third Circuit declined to reach the question of whether payment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction failed the *O'Brien* standard in every instance. Nonetheless, the court clearly agreed with the bankruptcy court's logic, holding that under circumstances in *EFH* (and here) where the debtor is incentivized to terminate and trigger the payment of the fee following failure to obtain approval for the transaction, the termination fee "would provide no benefit to the estates*"* and "would in fact be detrimental."  *In re Energy Future Holdings Corp*., 904 F.3d 298, 314 (3d Cir. 2018), *cert. denied sub nom. NextEra Energy, Inc. v. Elliott Assocs., L.P*., 139 S. Ct. 1620, 203 L. Ed. 2d 898 (2019).

may have helped to keep the Supporting Holders "hanging around" during the time period

between the approval of the RSA and attempted confirmation will not have benefited the

Government Parties in any way—this time will have been time spent leading PREPA down a

road to nowhere.

254.     Moreover, as existing creditors of PREPA—and contrary to new money buyers or

lenders—the Bondholders have no choice but to "hang around" until confirmation if they want to

receive a distribution.  Given these circumstances, the Surviving Administrative Claim should be

disallowed because it cannot provide any benefit to the estate.

i.     Amount of Surviving Administrative Claim Is Excessive

255.     Even if a break-up fee were appropriate in these circumstances (it is not), and the

Surviving Administrative Claim provides a benefit to PREPA's estate, it should be disallowed as

excessive.  Typically, break-up fees are fixed sums (or fixed percentages), and are evaluated in

comparison to the funds that a purchaser or plan funder is contributing to the debtor's estate,

whether in the form of a purchase price or an equity investment, and those proposing the fee

provide evidence that the fee falls within a reasonable range for the type of transaction at issue.

256.     Here, the Surviving Administrative Claim is not a fixed sum, but grows over

time—it is calculated as the Administrative Claim (net of settlement payments) owed to the

Supporting Holders that has accrued through the date the Court first denies confirmation of a

plan.  That amount, depending on the number of Supporting Holders owed the Administrative

Claim, will be massive by the time a plan has been proposed and denied.  For example, assuming

90% of Bondholders sign the RSA such that they begin accruing the Administrative Claim by

May 1, 2019, and the remaining 10% of bondholders sign the RSA before December 1, 2019, by

the end of September 2020 the Administrative Claim net of settlement payments will have

reached approximately $375 million dollars, and by the end of March 2021, that amount will

have reached $490 million.[264]

257.    The Bondholders are not purchasing PREPA's assets or providing new money to

fund a plan.  There is, therefore, no obvious point of comparison for the reasonableness of the

Surviving Administrative Claim as a break-up fee.  The Committee submits that the closest

proxy, however, is the discount to the Supporting Holders' claims, as this effectively is

consideration paid, or value to PREPA contributed by, the Supporting Holders.

258.    Assuming a plan is presented and denied by the end of September 2020, then, the

reasonableness of the Surviving Administrative Claim is determined by comparing it to the

discount to the Supporting Holders' claims.[265]  That discount varies depending on the number of

bondholders who sign the RSA and become Supporting Holders.  However, even assuming a

high discount of $3.0 billion and a Surviving Administrative Claim of $375 million (*i.e.*, the

combination of numbers most favorable to the Government Parties),[266] the proposed break-up fee

will equal ***12.5% of the applicable transaction amount***.  This is vastly greater than the break-up

fees typically awarded in the published decisions and even in the cases cited by the Movants,[267]

---

[264]   *See* Zolfo Cooper Decl. Ex. 2.

[265]   Effectively, this is the primary form of consideration paid by the Supporting Holders in exchange for the
favorable settlement of their claims, though there are other forms of consideration as well, such their agreement
to vote in favor of the plan, which are more difficult to monetize.

[266]   Using the lowest possible numerator and the highest possible denominator will result in the lowest possible
percentage for the Surviving Administrative Claim.

[267]   *See e.g.*, *In re Dura Auto. Sys.*, Inc., No. 06-11202 (KJC), 2007 WL 7728109, at *91 (Bankr. D. Del. Aug. 15,
2007) (listing cases and break-up fee amounts between 2% and 3%); *AgriProcessors, Inc v. Fokkena (In re
Tama Beef Packing, Inc.)*, 321 B.R. 496, 498 (B.A.P. 8th Cir. 2005) (break-up fees "usually limited to one to
four percent of the purchase price"); Zwillinger Decl., Ex. 46 (Delphi PSA Mot. ¶¶ 43, 57) ($100 million break-
up fee in connection with $1.4 billion equity investment (approximately 7%)); Zwillinger Decl., Ex. 47-48
(Dana PSA Mot. ¶ 39, at 30, 36, Dana Amended PSA Summary, at 7) ("The Break-Up Fee of $15 million or
$22.5 million (depending on the type of alternative transaction the Debtors decide to pursue) represents 3 and
4.5 percent, respectively of the proposed Investment."); 3 Collier on Bankruptcy ¶ 363.02[7] (16th 2019)
("Courts have adopted as a rule of thumb a limitation on a breakup or topping fee of about 3 percent of the
consideration the buyer will pay for the assets, including assumption of liabilities, although courts have
approved higher amounts, up to about 5 percent of the consideration, in unusual circumstances.").

and should be denied as unreasonable.[268]

        ii.    Government Parties Understate Break-Up Fee By Omitting Retained Payments

259.    The Government Parties have characterized the Surviving Administrative Claim as the break-up fee payable to the Supporting Holders. They further argue that the Surviving Administrative Claim (and, therefore, the break-up fee) is payable only in one specific circumstance: namely a Stipulated Treatment Termination under section 9(c)(i)(6) of the RSA. The truth, however, is that the Supporting Holders receive a break-up fee under any type of Stipulated Treatment.

260.    The RSA provides that in the event of any Stipulated Treatment Termination, the Supporting Holders will retain all prior Settlement Payments, Increased Settlement Payments, Adequate Protection Payments, and any payments made on the Administrative Expense Claim (the "Retained Payments").[269] Depending on the date of the Stipulated Treatment, these Retained Payments can range from $70 to $255 million between June 30, 2020 and June 30, 2021[270] in cash payments the Supporting Holders will retain even after the RSA is terminated, plus professional fees.

261.    The Government Parties may defend these huge payments by arguing that the

---

[268] Nor is the Surviving Administrative Claim justified by the award of certain "commitment" or "termination" fees in the *Delphi* and *Dana* cases. These fees were premised on **new investment** in the debtors, as opposed to merely the settlement of a prepetition creditor's claim, and the amounts at issue cannot be compared to the amount of the Surviving Administrative Expense Claim here. *Delphi* involved a commitment fee of 1.75% of a total $1.2 billion preferred stock investment and a commitment fee of 2.5% of a total $2.205 billion equity backstop (much of which was contingent on certain investors approving a key settlement agreement between the company and other parties and the approval of a disclosure statement). Zwillinger Decl., Ex. 46 (Delphi PSA Mot. ¶ 38-39.). And *Dana* involved a commitment fee of 1% or 1.4% in relation to a $250 million commitment to purchase preferred stock, depending on the circumstances of termination. Zwillinger Decl., Ex. 48 (Dana Amended PSA Summary, at 7).

[269] Zwillinger Decl., Ex. 9 (RSA § 9(c)(ii)).

[270] *See* Zolfo Cooper Decl., Ex. 2 (this amount does not include fees and expenses payable to the Supporting Holders' advisors).

Retained Payments will be credited against the Supporting Holders' claims on account of the Non-Recourse Bonds.  This is disingenuous.  As is appropriate, in the event of a Stipulated Treatment Termination, the parties' settlement is undone and the Lien Challenge will be revived.  This, of course, means that the Bondholders will be back in the position of having to prove that their claim on account of their Non-Recourse Bonds is worth more than the $8.8 million held by the Trustee.  And, because of the non-recourse nature of their claims, there is the real possibility that they will recover nothing more than $8.8 million held by the Trustee.  However, ***no matter the result of that litigation, the Supporting Holders will have received between $70 and $255 million in Retained Payments even in the absence of a settlement under Rule 9019***.  Under any standard, this is an outsized and totally unreasonable diversion of value to the Non-Recourse Bonds.

### C. Proposed Settlement Is Designed to Pay, Without Full Disclosure to the Court, Certain Prepetition Claims in Full

262.    As noted above, the Non-Recourse Bonds include the 2016 Relending Bonds, with a face amount of $375 million outstanding ($464.9 million including post-petition interest).  The Proposed Settlement is designed to give the 2016 Relending Bonds a 100% recovery thereon.  The below chart illustrates how this 100% recovery is achieved via the Waiver and Support Fees.[271]

---

[271]    A copy of this chart, including explanations of its calculations, is attached as **Exhibit 3** to the Zolfo Cooper Declaration.



263.    Nor can the Government Parties credibly dispute that the purpose of the Waiver

and Support Fee is to grant 100% recovery to this group of Supporting Holders. ▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[272]    Additionally, the Recovery Plan

Term Sheet to the Preliminary RSA states that the Waiver and Support fees are in exchange for

"waiver of claims unique to the issuance of the 2016 PREPA Bonds."[273]

264.    This was also conceded by David Brownstein at his deposition, where he

explained that these 2016 Relending Bonds are receiving preferential treatment because Citi

"didn't want to be the party that dishonored" a pre-petition agreement to re-pay these bonds in

full.[274]  This rationale, of course, is not a legal justification to pay pre-petition creditors 100%.[275]

It is inconsistent and capricious, as the promise to repay in full would extend to all pre-petition

creditors.  Even worse, the Government Parties have tried to hide this from the Court and from

---

[272]  Zwillinger Decl., Ex. 12 (July 20, 2018 email from Brownstein to Caton (Spencer Ex. 4), AHG-0007582 - 92, at 84).

[273]  Zwillinger Decl., Ex. 49 (July 30, 2018 Preliminary RSA, Recovery Term Sheet, final page).

[274]  Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 355:8-9).

[275]  It is also disingenuous: all creditors—including the general unsecured creditors—are the beneficiaries of pre-petition promises to pay them in full.

other creditors:  according to the Government Parties, the Waiver and Support Fees are "consideration for early execution of the RSA."[276]  This is now revealed to be patently false: the Waiver and Support Fees are no more than an impermissible way to pay certain Supporting Holders—the only ones at the table for the negotiation of the Proposed Settlement—100% on certain prepetition claims.

### D.   Bondholders Should Not Retain RSA Benefits When They Breach RSA

265.   The RSA provides that Supporting Holders receive the Settlement Payments, the Increased Settlement Payments and (possibly) payment on the Administrative Expense Claim even before a Plan is confirmed, and retain these payments even if one never is.[277] Unbelievably, the RSA also provides that Supporting Holders retain these payments even if the RSA is terminated as a result of a "Bondholder Breach."[278]

### E.   Court Should Not Approve Proposed Settlement in Absence of Fiduciary Out

266.   Courts will not approve a decision made by the debtor or trustee that "prohibits the Debtors from taking action consistent with their fiduciary obligations."  *In re Innkeepers USA Trust*, 442 B.R. at 235.  Specifically in the context of a restructuring support agreement, a provision that "curtails [the] effectiveness" of a fiduciary out demonstrates that such decision was not made with due care.  *Id.* at 235 (finding debtors lacked "honest interest in exercising due care" where debtors agreed to restriction on acting consistent with fiduciary obligations).  "For

---

[276]   Suppl. Mem. ¶ 35.

[277]   *See* Zwillinger Decl., Ex. 9 (RSA § 9(c)(ii)).  As explained below (i) these pre-confirmation payments cannot be approved in a restructuring support agreement and (ii) render the RSA an illegal *sub rosa* plan.

[278]   Such a "Bondholder Breach" occurs where (prior to or after a Securitization Termination) a Supporting Holder (a) commences or joins in certain litigation related to PREPA, including, inter alia, seeking relief from the automatic stay or adequate protection; or (b) takes any action that has a material adverse effect on any Transformation Transaction; or (c) where there is a breach by a Supporting Holder of certain covenants under the RSA or certain representation are untrue as to such Supporting Holder.  *See* Zwillinger Decl., Ex. 9 (RSA § 1(a)(xxxiv-xxxvi)).

this reason, restructuring support agreements ***must contain a 'fiduciary out'*** that releases the debtor from its obligations under the agreement if the obligations the agreement imposes are inconsistent with its fiduciary duties."[279]

267.     The RSA does not contain a fiduciary out.  There is no provision of the RSA that allows the Government Parties to terminate the RSA if they determine that it is inconsistent with their fiduciary obligations and the best interests of PREPA and its creditors.  To the contrary, if the Government Parties were presented with a deal that was holistically better for PREPA and the residents of Puerto Rico, they would still be stuck with the deal they struck with the Supporting Holders.  More importantly under the particular facts of this deal, the Government Parties would be stuck with this deal even if they determine that it is actively detrimental to PREPA.[280]  Nor is it difficult to imagine how such a circumstance could arise, as (for example) it is certainly possible that a potential Transformation process does not bear fruit.  In fact, even if the Transformation process fails completely, the ***Government Parties would have no "out" available to them, but would be locked into the RSA***.

268.     ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[279]   Zwillinger Decl., Ex. 50 (*Other Plan-Confirmation Issues and Beyond*, 41st Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy & Business Reorganization, Sept. 12, 2015) (emphasis added).

[280]   In most instances, a fiduciary out preserves the debtor's ability to take advantage of a better deal.  However, it is equally necessary to preserve the debtor's ability to escape a deal that before consummation it determines would actually harm it.



269.

281 ████████████████████████████████████████████████████████████████

282  Zwillinger Decl., Ex. 51 (Jan. 28, 2019 email from Shannahan to Gana, ASSURED-PREPA-9019
MOTION_00034736 - 37).

283  Id.

284  Zwillinger Decl., Ex. 52 (July 28, 2018 email from Mitchell to Byowitz and copying others,
PREPA_RSA0028512 - 21, at 12).

285  The Oversight Board's obligation to obtain a fiduciary out to preserve the possibility of a better deal for PREPA
(or to protect PREPA from going forward with a deal that is determined to be harmful in light of changed
circumstances) is derived from its fiduciary obligation *to PREPA*.  This does not, however, make the Oversight
Board a fiduciary to ***PREPA's creditors*** (such as general unsecured creditors or the Fuel Line Lenders).  As

270.     The only provision in the RSA even vaguely resembling a fiduciary out is the "Securitization Termination," which can be exercised by the Government Parties in the event that it is determined by any of them that (i) the Proposed Settlement is inconsistent with Transformation or (ii) on or after March 15, 2020, the parties have not reached agreement on definitive securitization documentation and all necessary legislation for the Proposed Settlement has not been enacted.[286]

271.     This provision is not a true fiduciary out for two reasons.  First, it fails to consider PREPA's best interests as a whole.  Instead, it is limited to Transformation, which is only a narrow (albeit important) aspect of PREPA's reorganization.  As noted above, however, the Government Parties' determination that any other aspect of the Proposed Settlement is inconsistent with PREPA's best interests, or can be improved upon, is not grounds for a termination.[287]

272.     Second, and more importantly, Securitization Termination would not extricate the Government Parties from their deal with the Supporting Holders or relieve them of the obligations that they have determined are incompatible with PREPA's best interests including the hundreds of millions of dollars PREPA is required to pay to the Supporting Holders.  To the contrary, a Securitization Termination simply triggers the Stipulated Treatment, designed to

---

explained in the Fuel Line Lenders' objection to the 9019 Motion, the Committee is the only fiduciary for PREPA's unsecured creditors.

[286]   Zwillinger Decl., Ex. 9 (RSA § 9(b) (i)-(ii)).

[287]   It is the Government Parties' obligation to ensure that they can terminate the RSA and take a better deal if presented.  It is not the Committee's burden to propose or otherwise present such a deal.  That being said, the Committee notes that (i) several Fuel Line Lenders also hold significant amounts of Non-Recourse Bonds, (ii) holders of Non-Recourse Bonds and the Monolines also hold billions of dollars of other Commonwealth debt, (iii) at least one of the holders of Non-Recourse Bonds also holds over $87 million in trade debt, and (iv) the Proposed Settlement is not supported by PREPA's largest union—all of which raise the possibility of some other coalition of creditors presenting the Government Parties with an alternative to the RSA and the Proposed Settlement.

ensure Supporting Holders receive the same economic treatment regardless—including

recoveries equal to the face value of the Securitization Bonds that were to have been issued, as

well as the Settlement Payments, the Increased Settlement Payments, the Administrative

Expense Claim, the Waiver and Support fees, and all other payments.[288]  Further, the fact that the

Government Parties may exercise their Securitization Termination rights if any aspect of the deal

is inconsistent with Transformation leads to the bizarre result that, even after a Securitization

Termination, the very basis for termination still applies.  For example, if the Government Parties

determine that the Settlement Payments or the Adequate Protection Payments are inconsistent

with Transformation, those aspects of the deal remain in place even after a Securitization

Termination.

273.    This demonstrates that the Securitization Termination and the Stipulated

Treatment were designed to protect the Supporting Holders, at great cost to PREPA.  Although

the Government Parties' witnesses inexplicably claimed to have no knowledge of the nature or

magnitude of consideration paid to Supporting Holders in the event of a Securitization

Termination,[289] the reason they did not obtain a **<u>true</u>** fiduciary out is clear:  it would put the

Bondholders' benefits at risk.  The problem with this, of course, is that fiduciary outs—indeed,

restructuring support agreements themselves—are supposed to protect the debtor, not its

creditors.  For this reason, the *Innkeepers USA* court held that a restructuring support agreement

whose fiduciary out was designed to ensure the best possible recovery for the creditor, as

opposed to protecting the debtor, could not be approved.  *See* 442 B.R. at 235.  The court

---

[288]  Zwillinger Decl., Ex. 9 (RSA §§ 9(b)(iii)) (describing consequences of Securitization Termination); *id.* at 2(c)(ii) (defining Stipulated Treatment).

[289]  *See* Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 164:9-169:19).

explained that it was "aware of no other court-approved plan support agreement which contains

such a provision" (*i.e.*, a fiduciary out that is designed to protect the creditor, not the debtor).  *Id.*

### F.      Most Favored Nation Clause Is Unreasonable

274.     The Proposed Settlement does not include the Fuel Line Lenders and, while the

Fuel Line Lenders have contended that the settlement undermines their priority position, the

outcome of this dispute is not yet known.  What the RSA does provide, however, is a "Most

Favored Nation" clause that states that if the Fuel Line Lenders (or certain other creditors)

receive a greater recovery than Supporting Holders, the Government Parties are obligated to

increase the Supporting Holders' recovery so that it is at least as favorable.[290]

275.     In the Second Supplemental Memo, the Government Parties attempt to explain

how this provision does not restrict the recovery the Fuel Line Lenders may receive, or otherwise

dictate their treatment outside of a plan of adjustment.  According to the Government Parties,

there is no impermissible impact on the Fuel Line Lenders (or other creditors) because if the Fuel

Line Lenders are required to be paid in full, the Government Parties can simply comply with the

Fuel Line Lenders' priority and the most favored nation clause, or terminate the RSA for failure

to confirm a plan.  The Government Parties, however, make no effort to explain how it is

reasonable to agree to a deal that includes this most favored nation clause.

276.     If the Fuel Line Lenders are correct that a plan may not be confirmed unless they

are paid ahead of the Non-Recourse Bonds, there are only two possible outcomes.  The first is

that the Government Parties ***pay 100% of the face value of the Non-Recourse Bonds***.  The

second is that the Government Parties terminate the RSA, in which case they will ***still have to

pay the Stipulated Treatment***.

---

[290]   Zwillinger Decl., Ex. 9 (RSA § 23).

277.     In other words, the Proposed Settlement, and all of its purported justifications and

benefits, simply go away if the Fuel Line Lenders have to be paid in full to confirm a plan.  But,

in that event, the Bondholders still receive the benefits of the Proposed Settlement.  This means

that the Government Parties are insulating the Bondholders from the downside of the priority

dispute with the Fuel Line Lenders.  This is unreasonable from any perspective.

## VIII.   GOVERNMENT PARTIES DID NOT EXERCISE DUE CARE OR GOOD FAITH IN NEGOTIATING, AND AGREEING TO, PROPOSED SETTLEMENT

278.     The Government Parties would have the Court believe that approval of the

Proposed Settlement requires nothing more than deference to their business judgment.  However,

not all decisions are reasonable.  A decision is a "reasonable business judgment decision" only if,

at the very least, it is a (i) business decision, that was made with (ii) due care, (iii)

disinterestedness, and (iv) good faith.  *In re Innkeepers USA Tr.*, 442 B.R., at 233.  To determine

whether to settle litigation claims, the "duty of due care requires that a [trustee]'s decision be

made on the basis of reasonable diligence in gathering and considering material information."

*United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 159 (E.D.N.Y. 2018).[291]

Stated simply, the "duty of due care, therefore, requires directors to make decisions on an

informed basis."  *Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings,*

*Inc.),* No. 13-12098 (CSS), 2017 WL 1508606, at *6 (Bankr. D. Del. Apr. 27, 2017).  A trustee's

obligation to act with due care is particularly strong in performing the activities "in which the

Bankruptcy Code allow him discretion."  *In re Bell & Beckwith*, 44 B.R. 664, 666 (Bankr. N.D.

Ohio 1984).

279.     The business judgment protections are earned "by meeting minimum standards of

---

[291]  *See also Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*, 514 B.R. 790, 814 (Bankr. N.D. Tex. 2014) (duty of good care "requires officers and directors to manage the company's affairs with diligence and prudence").

care in the ***process*** by which [] decisions are made." *In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, at *5 (emphasis in original) (subsequent history omitted).[292]  The evidence reveals that the Government Parties (and their advisors) relied on a deeply flawed process in negotiating and entering into the Proposed Settlement.

### A.    Government Parties Conducted Flawed and/or Hasty Approval Process, and Certain Key Terms Have Never Been Approved

280.



[294]

281.

---

292  *See also C.R. Stone Concrete Contractors, Inc. v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)*, 346 B.R. 32, 50 (Bankr. D. Mass. 2006) ("For these reasons I cannot characterize the Trustee's investigation as diligent, and I will accord little weight to the Trustee's determination that the Stipulations are in the best interest of the estate.").

293  *See* Zwillinger Decl., Ex. 29 (Apr. 16, 2019 email from Arosemena Muñoz to Diaz Atienza and bcc'ing Maldonado Molina (Batlle Ex. 9), PREPA_RSA0029990 - 30085); *see also* Zwillinger Decl., Ex. 53 (Apr. 17, 2019 Torres Dissent to PREPA Governing Board Resolution Number 4695 (Batlle Ex. 11), PREPA_RSA0027814 - 17, at 14); Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 129:23-130:12).

294  *Id.*

295



.[296]  The
April 17 meeting was (and remains) the only occasion on which any presentation with respect to
the RSA was provided to the PREPA and AAFAF boards.[297]

282.

to date, neither PREPA's nor AAFAF's board has approved the Demand

Protection Term Sheet or the Securitization Term Sheet.[300]

Zwillinger Decl., Ex. 4 (Apr. 17, 2019 PREPA Executive Session Minutes (Batlle Ex. 10),
PREPA_RSA0027990 - 94, at 993).

[296]  *Id.*

[297]  *See* Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 135:17-23) ("Q. Was the RSA, to your knowledge, discussed at
any prior board meetings of PREPA or AAFAF?  A. The RSA, my understanding was that this was the only
formal presentation that was made to discuss the RSA at the board level, both at AAFAF and PREPA.").

[298]  Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 166:10-168:18).

[299]  Zwillinger Decl., Ex. 53 (Apr. 17, 2019 Torres Dissent to PREPA Governing Board Resolution Number 4695
(Batlle Ex. 11), PREPA_RSA0027814 - 17); Zwillinger Decl., Ex. 54 (May 7, 2019 letter from Torres to Diaz
Atienza (Batlle Ex. 12), PREPA_RSA0028029 - 33).

[300]  *See* Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 144:4:10) ("Q. So when the boards of PREPA and AAFAF met
and approved the RSA, they did not have in front of them the demand protections or the securitization

283.     The Committee anticipates that the Oversight Board will argue that the process

followed by the debtor PREPA is irrelevant because the Oversight Board acts as the trustee for

PREPA, and that argument would have some superficial appeal but for the fact that PREPA has

been granted termination rights not subject to Oversight Board override and that PREPA is a co-

movant on the 9019 Motion.

284.     Notably, in the litigation of the 9019 Motion, neither PREPA nor AAFAF has

presented any government official (much less an actual decision maker) to testify as to the merits

of the Proposed Settlement and the process that led to its approval.  PREPA and AAFAF's only

witness was their financial advisor, Fernando Batlle, who of course has no decision-making

authority—and indeed no role at all other than to advise PREPA and AAFAF.  Christian

Sobrino, the person who was the decision maker for both PREPA and AAFAF prior to his

sudden resignation, also testified as a third-party witness.



*See Serafino v. Hasbro, Inc.*, 82 F.3d

515, 519 (1st Cir. 1996) (adverse inference and certain other penalties are permissible in

response to invocation of Fifth Amendment privilege); *United States v. Certain Real Prop. &*

*Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995) (party

asserting privilege must "bear the consequence of lack of evidence").

---

protections; is that right? A. That is correct because the documents were not yet agreed to."); *id*. at 145:18-22
("Did the board of either PREPA or AAFAF approve the Demand Protection Term Sheet and the securitization
protections at a subsequent date [*i.e.*, after April 17]? A. No.").

### B.      Government Parties Appear to Have Negotiated Proposed Settlement Without Basic Knowledge of Their Own Rights

285.    A particularly glaring failure in the Government Parties' negotiations involves the 5.25% coupon rate on the Tranche A Bonds.[301]  This rate was initially determined by Citibank ("Citi") in connection with the Preliminary RSA in 2018, and was based on an analysis of market rates or "yields" *at that time*.  At his deposition, David Brownstein of Citi (the chief architect of the Proposed Settlement) acknowledged that, since Citi's 2018 analysis, yields in the market have decreased materially, signaling a corresponding increase in bond prices.  Nevertheless, Brownstein testified that he (and Citi) did not revisit their analysis of the appropriate interest rate in 2019 before signing the definitive RSA.  He said they did not do so because the Government Parties were already bound to the rate to which they had agreed in the context of the Preliminary RSA.[302]  This, of course, is untrue, because the Preliminary RSA was, by its terms, not binding.[303]  Accordingly, the Oversight Board's key advisor negotiated, and ultimately agreed to, the Proposed Settlement while operating under an incorrect understanding of the Oversight Board's own basic, and undisputed, rights and obligations.

286.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[301]   Zwillinger Decl., Ex. 9 (Recovery Plan Term Sheet, V.(a)(ii)).

[302]   Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 37:10-20).

[303]   The Preliminary RSA allowed the Government Parties to terminate simply if they decided not to support any provision of the term sheet (such as the yield) and contained no consequence for termination.  Indeed, principals at the Oversight Board and AAFAF knew that this was the case.  *See* Zwillinger Decl., Ex. 36 (July 27, 2018 email from Vizcarrondo to Jaresko and copying others (Jaresko Ex. 9), FOMB_9019_00004698 - 701, at 98) (Natalie Jaresko stating that the preliminary RSA "is a step in the direction of agreement, not an agreement"); Zwillinger Decl., Ex. 55 (July 29, 2018 memorandum from Portela Franco to Executive Committee of Board of Directors of AAFAF (Batlle Ex. 6), PREPA_RSA0030157 - 159, at 158) ████████████████████████ ██████).

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████[304]   Nonetheless, the Oversight Board did not seize the

opportunity roughly a year later to adjust the coupon rate based on the market conditions then

existing; nor did their advisor see fit to advise them of such market conditions.[305]

287.   ***Most troubling of all, the Government Parties entered into the Proposed***

***Settlement based simply on the existence of "risk" without performing a basic analysis of the***

***<u>level</u> of risk involved in the Lien Challenge and the Receiver Motion:  by their own admission,***

***"it was the fact that the risk existed, not the level of risk" that led the Government Parties to***

***enter into the Proposed Settlement***.[306]

288.   It goes without saying that one cannot reasonably settle a litigation without

understanding the likelihood and consequences of losing that litigation.  To the extent the

Government Parties did conduct any assessment of their litigation prospects, it cuts against their

position.  The Oversight Board has acknowledged in the papers it filed in support of the 9019

Motion that the Government Parties' position in the litigation is "strong" and that the

Bondholders' position is "weak."[307]  Based on these statements, the Oversight Board conceded in

---

[304]   Zwillinger Decl., Ex. 8 (July-Aug. 2018 mobile messages between Skeel and Matosantos (Skeel Ex. 12), FOMB_9019_MOBILE_00000101 - 26, at 21).  The impact of the coupon rate on the Proposed Settlement, and how it is likely to result in significantly greater Bondholder recoveries, is discussed below.

[305]   Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 24:20-25:2).  If the conceded downward trend in municipal yields holds, the 5.25% coupon rate will be ***above-market*** and therefore the new bonds will likely trade ***above par*** if the Proposed Settlement is approved.  Because the effect of lower yields is to increase the recovery to Bondholders, this undermines the Oversight Board's argument that the Proposed Settlement achieves a $2 to $3 billion reduction.

[306]   *See* Zwillinger Decl., Ex. 10 (Brownstein Dep. Tr. 35:4-8); Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 221:24 - 222:6) (Q: Did you conduct any probabilistic assessment of the likelihood of outcome in litigation? . . . No. No.").

[307]   *See* Jaresko Decl. ¶¶ 29, 33.

its deposition that the Government Parties are at least 50% likely to prevail in the litigation, which makes their agreement to such a rich deal in favor of the Bondholders nonsensical.[308]

### C. Government Parties Had an Inadequate Understanding of RSA's Key Terms

289.    It should be obvious that the Government Parties could not properly evaluate and enter into the Proposed Settlement without an understanding of certain key terms of the deal or basic aspects of the settled claims.  Yet discovery (including deposition testimony) has revealed that various key people involved in the negotiation and approval of the Proposed Settlement lacked knowledge of even the most basic elements of the deal that the Government Parties now rely upon in support of its approval.  For example, Natalie Jaresko, the Executive Director of the Oversight Board, did not know answers to fundamental questions about the RSA two weeks *after* its approval, including whether it requires legislative approval or how best to explain its impact on the people of Puerto Rico.[309]  Perhaps even more troublingly, the only member of (and decision-maker for) the Oversight Board who testified in connection with the 9019 Motion had no understanding of the total consideration being paid to the Supporting Holders.[310]

290.    Other key negotiators and decision-makers of the Government Parties (i) did not even know whether the Non-Recourse Bonds were recourse[311]; (ii) had a limited understanding of the difference between pre- and post-petition interest, despite the hundreds of millions of dollars of post-petition interest that the RSA proposes to pay[312]; and/or (iii) had received no specific advice or guidance regarding whether rates would actually be raised absent a settlement,

---

[308]   *See* Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 227:4-16) (stating that probability of success was more than 50%).

[309]   *See* Zwillinger Decl., Ex. 56 (May 16, 2019 mobile messages between Jaresko and Zayas (Jaresko Ex. 13), FOMB_9019_MOBILE_00000088 - 95).

[310]   *See* Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 75:4-76:14; 164:9-169:19).

[311]   Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 111:4-12); Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 148:18-151:3).

[312]   Zwillinger Decl., Ex. 27 (Skeel Dep. Tr. 74:6-76:15); Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 203:5-205:17); Zwillinger Decl., Ex. 25 (Batlle Dep. Tr. 158:14-160:6).

despite relying on the risk of such purported rate increases as a key reason for the settlement.[313]

These revelations show that most, if not all, of the reasons that the Government Parties now offer

as purported support for the 9019 Motion are convenient, post-hoc justifications that were not in

the minds of decision-makers at the time they considered and approved the transaction.

### D.   Government Parties Failed to Act in Good Faith

291.   The Government Parties also failed to negotiate the Proposed Settlement in good

faith.  The *sine qua non* of good faith is transparency, and the exclusion of other creditors from

the negotiation process is an indication of bad faith.  *See In re Innkeepers USA Tr.*, 442 B.R., at

233 (finding that "the Debtors have not shown that they acted good faith in . . . (ii) providing

transparency to their creditors" where "[v]irtually all of the other parties in interest . . . complain

of being shut out of the process").  As noted above, the Committee was consistently excluded

from negotiations of the Proposed Settlement.  ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████.[314]

---

[313]   Zwillinger Decl., Ex. 2 (Jaresko Dep. Tr. 176:11-179:6).

[314]   There is also reason to question whether PREPA and AAFAF were disinterested.  "[W]hen a bankruptcy trustee
or debtor in possession seeks court approval of a compromise under Rule 9019(a), it does so as the fiduciary
acting on behalf of the bankruptcy estate.  Its interests in the litigation sought to be compromised are those of
the bankruptcy estate; the interests asserted by the particular creditor or third party in the litigation are viewed in
opposition with those of the estate."  *In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 461 (Bankr. E.D. Pa.
1998).  On the other hand, a motion to appoint a trustee due to the misconduct of the debtor in possession by
definition argues that "the interests of the estate will benefit by such relief."  *Id.* at 462.  In such circumstances,
it is possible that, in opposing such a motion, the debtor is acting to protect its own interests and "not [acting] in
its fiduciary capacity."  *Id.*  "Given the alignment of interests in litigation seeking the appointment of a
bankruptcy trustee on the grounds of [misconduct] by debtor's management," there is reason to doubt that the
debtor "can seek court approval under Rule 9019(a) to compromise this litigation."  *Id.*  Here, the Receiver
Motion has asserted significant misconduct and improper political motivation by PREPA and AAFAF.  The
Committee has opposed the Receiver Motion.  Nonetheless, it is fair to question whether any of the motivation
for the Proposed Settlement (which strongly favors the Bondholders) is to avoid the allegations of misconduct
raised by the Receiver Motion, regardless of the best interests of PREPA's non-Bondholder creditors or even
PREPA itself.  Further, any argument that this concern is addressed by the fact that the Oversight Board (if not
PREPA and AAFAF) can be expected to act in PREPA's best interests is defeated by the fact that the RSA
provides for independent termination rights to PREPA and AAFAF, clearly indicating that the interests of the
Oversight Board and the other Government Parties may diverge.

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully requests that this Court deny the relief

requested in the 9019 Motion and related proposed Order.

Dated:  October 30, 2019

/s/ Luc A. Despins                    .
PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
Pedro A. Jimenez,  Esq.
James B. Worthington,  Esq. *(Pro Hac Vice)*
Zachary S. Zwillinger,  Esq. *(Pro Hac Vice)*
Shlomo  Maza, Esq.
200 Park Avenue
New York, New York 10166
Tel:  (212) 318-6000
lucdespins@paulhastings.com
pedrojimenez@paulhastings.com
jamesworthington@ paulhastings.com
zacharyzwillinger@paulhastings.com
shlomomaza@paulhastings.com

Nicholas  A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington,  D.C. 20005
Tel:  (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors (except for
COFINA and PBA)*[315]

- and -

---

[315]   Paul Hastings LLP does not represent the Committee with respect to any statements in this Motion regarding
Citigroup Global Markets, Inc.

*/s/ John Arrastia*

John H. Genovese, Esq. (*Pro Hac Vice*)
John Arrastia, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
GENOVESE JOBLOVE & BATTISTA, P.A
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Special Litigation Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors (except for COFINA and PBA) with Respect to Claims against Citibank*

- and -


*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434
Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors (except for COFINA and PBA)*