**EXHIBIT 3**

TESTIMONY

OF

STEPHEN J. SPENCER

March 22, 2017

U.S. House Committee on Natural Resources
Subcommittee on Indian, Insular and Alaska Native Affairs

"Oversight Hearing on the Status of the
Puerto Rico Electric Power Authority (PREPA) Restructuring Support Agreement"

Stephen J. Spencer
Managing Director
Financial Restructuring Group
Houlihan Lokey
225 South 6th St. #4950
Minneapolis, MN 55402



EXHIBIT
Spencer 5
10/15/19

## I. Introduction

Chairman LaMalfa, Ranking Member Torres, Resident Commissioner González, and Members of the Subcommittee, thank you for inviting me to testify today regarding the Puerto Rico Electrical Power Authority ("PREPA") and its Restructuring Support Agreement ("RSA") – the "PREPA Transaction."

My name is Stephen J. Spencer. I am testifying on behalf of certain funds managed by Franklin Advisers Inc. ("Franklin") and OppenheimerFunds, Inc. ("Oppenheimer") in connection with their investment in $1.7 billion in bonds issued by PREPA.[1]

Franklin and Oppenheimer are Puerto Rico's largest bondholders and have been among Puerto Rico's largest investors, providing capital to finance critical infrastructure, such as roads, bridges and hospitals for more than 30 years. Over half a million individual retail investors across the United States invested in Puerto Rico bonds through Franklin and Oppenheimer. Untold thousands have invested through other funds, and at least another 340,000 individuals have invested directly in Puerto Rico bonds.

The PREPA Transaction is backed by holders or insurers of about 70% of all of PREPA's financial debt.

Bondholders agreed to a 15% principal haircut, a 5-year holiday on principal payments, and a reduced interest rate – cutting debt service by billions of dollars over the next decade. The PREPA Transaction would be implemented through a proceeding under Title VI of PROMESA.

The PREPA Transaction works because the new bonds would be "securitized" – that is, the new bonds will not be paid out of PREPA's cash flow, but by a separate charge.

Under the PREPA Transaction, total electrical rates paid by Puerto Ricans will be 25% below what Puerto Rican law otherwise requires.

The PREPA Transaction does more than simply refinance PREPA's debt and restore access to capital markets – the first and last goal of PROMESA. The deal also puts PREPA on the path to fiscal responsibility – another goal of PROMESA. The deal also permits public-private partnerships and facilitates necessary capital investment – another goal of PROMESA.

This deal is a crucial step in PREPA's journey from crisis to financial health – a journey from poor maintenance to capital improvement – a journey from Puerto Rico's reliance on diesel fuel to a more diversified energy base that includes cleaner natural gas.

After fourteen months of negotiation, my clients signed the PREPA Transaction in November 2015. The PREPA Transaction was authorized by Puerto Rico's legislature in February 2016, its implementation was approved by Puerto Rico's Energy Commission in the summer of 2016, and its constitutionality was recently upheld by a decision in a local Puerto Rican court.

---

[1] For the PREPA negotiations, I advise both Franklin and Oppenheimer, along with the investment interests of five separate asset investors.

2

In 2016, Congress wrote provisions into PROMESA to help certain voluntary, "preexisting" agreements, like the PREPA Transaction, that were entered into shortly before the passage of PROMESA. As a result, the PREPA Transaction is the only deal exempt from Oversight Board review and is ready to be finalized under PROMESA Title VI.

My clients even agreed to additional concessions in January 2017. To be clear, the January 2017 deal is the deal inked in November 2015; the only changes are concessions by creditors, not by PREPA or Puerto Rico.[2] The deal is executable.

Failure to close this deal would have ramifications far beyond PREPA.

Failure to close a deal negotiated over two years would call into question Puerto Rico's good faith in negotiating other restructurings – of great concern to Franklin and Oppenheimer, who hold over $6 billion of other Puerto Rico bonds.

Failure would damage, if not destroy, Puerto Rico's ability to use securitization as a tool to restructure other entities such as the Puerto Rico Aqueduct and Sewer Authority, which is looking to use the PREPA Transaction as a model.

Failure would have ramifications beyond Puerto Rico. It will negatively impact other challenged government entities as diverse as the U.S. Virgin Islands, Guam, the City of Chicago, and the State of Illinois.

Finally, failure to close this deal would be bad for the people of Puerto Rico. The deal puts PREPA on a sound financial footing, but without it, PREPA is approaching imminent default and a liquidity crisis that could turn off the lights with the next operational hiccup or major storm.

We have extended our Restructuring Support Agreement 16 times; the last extension expires nine days from this hearing, on March 31. PROMESA's stay expires May 1.

## II.   PREPA & PREPA Debt

PREPA is a public corporation that generates most of – and delivers all of – the electric power consumed in Puerto Rico. PREPA sets and collects rates for its services to customers. Since 2014, PREPA's rates have been subject to review by the Energy Commission.

Puerto Rican law specifically requires that the Energy Commission approve a rate that is sufficient to cover all debt service on PREPA's bonds.[3]

PREPA has issued approximately $8.3 billion of outstanding revenue bonds to the public. The bonds are secured by PREPA's net revenues from its electric generation and distribution system, as well as reserve accounts held by the trustee. Approximately 30% of PREPA's outstanding debt is insured by three separate monoline insurance companies.

---

[2] See PREPA's draft Fiscal Plan at pages 73-75. *Fiscal Plan*, Commonwealth of Puerto Rico, Puerto Rico Elec. Power Auth., at 73-75 (Feb. 2017) [hereinafter "PREPA's Fiscal Plan"], *available at* http://caribbeanbusiness.com/wp-content/uploads/2017/02/PREPA-Fiscal-Plan.pdf.

[3] Puerto Rico Elec. Power Auth. Organic Act of May 12, 1941, Act No. 83-1941, § 6A(c), as amended.

3

PREPA also owes approximately $700 million in expired lines of credit that were used to purchase fuel for its generation.

### III. Liquidity Crisis and Creditor Organization

PREPA has faced severe internal and external challenges. In the words of its former chief restructuring officer, Lisa Donahue of AlixPartners, PREPA had "a lack of institutionalized processes and procedures, outdated systems and information technology and frequent changes of employee positions and responsibilities with each electoral cycle every four years."[4]

PREPA started experiencing liquidity difficulty due, in part, to its existing rate structure, which charges a fixed "base" rate for non-fuel expenses, like administrative costs and debt service, and a floating rate for fuel costs, which fluctuates with the price of oil.[5]

PREPA's base rate had not changed from 1989 to 2015, even as its costs rose significantly.

PREPA's cash flow further suffered from a serious failure in collections: it persistently allowed individual customers, other public corporations, government agencies, and municipalities to avoid paying their bills.[6]

On June 28, 2014, the government of Puerto Rico enacted Act 71-2014, entitled the Puerto Rico Public Corporation Debt Enforcement and Recovery Act ("DERA").[7] Governor Alejandro García-Padilla and the Puerto Rico Legislative Assembly intended for DERA to provide Puerto Rico with its own insolvency regime for certain large government-owned businesses, including PREPA.[8]

DERA signaled a dramatic escalation of political and financial risk for creditors. PREPA suffered a liquidity crisis as major vendors, including the utility's critical fuel suppliers, refused to ship their products to the Company on standard trade credit terms. Over the following weeks, the situation at PREPA rapidly deteriorated. By the end of July 2014, PREPA's fuel reserves fell to a level where the Company was left with only a few days of fuel supply. PREPA's resources were dangerously depleted, and brownouts were on the horizon as the island approached the peak of hurricane season. At the same time, mostly as a result of surging oil prices, PREPA's all-in rates for consumers rose to a high of approximately 28 cents per kilowatt-hour ("kWh").

---

[4] *PREPA Revitalization Act: Hearing Before the Puerto Rico S. Comm. on Energy Affairs and Water Resources,* 17th Legis. Assemb., 2 (P.R. Nov. 10, 2015) (testimony of Lisa Donahue, Chief Restructuring Officer of PREPA).

[5] Changes in the price of natural gas and purchased power also affect the fuel charge, but to a far lesser degree.

[6] *See generally Accounts Receivable and CILT Report*, FTI Capital Advisors, LLC, 16-17, 29-30 (Nov. 15, 2014) [hereinafter *FTI Report*], *available at* http://www.aeepr.com/Docs/restructuracion/PREPA%20AR%20and%20CILT%20Report%20Final.pdf.

[7] DERA was later struck down by the federal courts as pre-empted by Section 903 of the Bankruptcy Code. *Puerto Rico v. Franklin California Tax Free Trust*, 136 S. Ct. 1938 (2016).

[8] DERA specifically excluded most major municipal issuers of debt in Puerto Rico, other than PREPA, PRASA, and PRHTA. *Governor Alejandro García-Padilla Presents Bill for Debt Enforcement and Recovery of Public Corporations,* Commonwealth of Puerto Rico, Government Development Bank for Puerto Rico, 2 (June 25, 2014), *available at* http://www.gdb-pur.com/documents/06-25-14-PressRelease-RecoveryAct-Final.pdf.

4

To resolve the liquidity crisis and avert the potential for much wider chaos stemming from disruptions in Puerto Rico's power supply, PREPA's major creditors entered into around-the-clock negotiations with the Island's advisors on a potential forbearance agreement.

The major parties to the negotiations included PREPA; the Government Development Bank ("GDB"), Puerto Rico's fiscal agent; an ad hoc group of PREPA bondholders, including Franklin and Oppenheimer, holding over 35% of PREPA bonds (the "Ad Hoc Group"); its monoline insurers; and parties involved in the fuel lines.

### IV. Forbearance Agreement and Business Stabilization

During several weeks in the summer of 2014, PREPA, Puerto Rico (acting through its fiscal agent GDB), and PREPA's major creditors worked to hammer out a compromise. Negotiations resulted in an extended forbearance and consent agreement (the "Forbearance Agreement"), which allowed PREPA to avoid the threat of imminent default.

In return, PREPA agreed to hire a chief restructuring officer and to develop a comprehensive five-year business plan. The objective of the business plan was for PREPA to make detailed financial projections and to identify important operational and structural reforms to be implemented.

The original Forbearance Agreement was executed on August 14, 2014 and was extended 13 times.[9] As part of the Forbearance Agreement, creditors extended liquidity to PREPA to help PREPA stabilize its business. They did so by allowing PREPA to make payments of debt service from reserve accounts instead of from cash from PREPA's general fund, suspending PREPA's obligations to transfer revenues to accounts controlled by the Trustee, and voluntarily agreeing to postpone some of their upcoming principal and interest payments.

### V. Operating Pressures on PREPA Ease

PREPA achieved further stability through favorable developments affecting its operations and financial performance and through reforms implemented by its chief restructuring officer.

PREPA and other island-based electric utilities face challenges that mainland utilities do not. They include an absence of naturally occurring local fuel sources, which means they must rely on imported fuel, primarily fuel oil. Importing gas requires a high-pressure liquefied state, which is much more expensive than gaseous state pipeline deliveries on the mainland. An island utility needs more generating capacity and more individual generating units than a mainland utility does, since a mainland utility can draw from neighboring networks in order to provide

---

[9] *PREPA Reaches Agreements with Creditors*, Commonwealth of Puerto Rico, Government Development Bank for Puerto Rico (Aug. 14, 2014), *available at*
http://www.gdbpr.com/documents/PREPA_Aug14Forbearance_PressRelease_081414_FINAL.pdf. The original Forbearance Agreement can be found at:
http://www.gdbpr.com/documents/BondholderForbearanceAgreementEXECUTED.pdf.

5

reliable service during maintenance or outages.[10] These challenges result in higher rates for island utilities than for mainland utilities.

Despite these factors, a sustained drop in the price of oil since 2014 allowed PREPA to pass along significant electricity cost savings to customers, including a savings of more than $0.5 billion in fiscal year 2015, an incremental $1.3 billion of savings in fiscal year 2016, and another incremental $0.5 billion of savings in the first four months of fiscal year 2017.[11]

PREPA's financial situation also improved as a result of reforms PREPA's chief restructuring officer and management implemented, which have yielded significant benefits to PREPA and its customers. Over the past two years, PREPA revamped its fuel inventory and fuel procurement procedures, creating a one-time benefit of $36 million and a recurring annual benefit of $23 million.[12] PREPA also developed new ways to combat electricity theft, generating additional revenue of $70 million per year.[13] PREPA improved operational efficiency in other ways by reforming its capital maintenance practices, reducing labor costs through attrition, and improving its billing and collection procedures.[14] These and other initiatives together generated $271 million in one-time cash savings and $254 million in recurring annual savings for PREPA.[15]

---

[10] For more information on the rates of comparable island electric utilities, PREPA's historical rate, and the rate that PREPA's customers are projected to pay after the PREPA Transaction, see attached Annex A, which was prepared by Houlihan Lokey.

[11] *Monthly Report to the Governing Board: June 2015*, Commonwealth of Puerto Rico, Puerto Rico Elec. Power Auth., at 4 (June 2015), *available at* http://www.aeepr.com/INVESTORS/DOCS/Financial%20Information/Monthly%20Reports/2015/June%202015.pdf (listing a total fuel adjustment surcharge for all customer classes of $2,633,256,000 in fiscal year 2013-2014 and $2,129,834,000 in fiscal year 2014-2015); *Monthly Report to the Governing Board: June 2016*, Commonwealth of Puerto Rico, Puerto Rico Elec. Power Auth., at 4 (June 2016), *available at* http://www.aeepr.com/INVESTORS/DOCS/Financial%20Information/Monthly%20Reports/2016/June%202016.pdf (listing a total fuel adjustment surcharge for all customer classes of $1,365,977,000 in fiscal year 2015-2016); *Monthly Report to the Governing Board: November 2016*, Commonwealth of Puerto Rico, Puerto Rico Elec. Power Auth., at 4 (November 2016), *available at* http://www.aeepr.com/INVESTORS/DOCS/Financial%20Information/Monthly%20Reports/2016/November%2020 16.pdf (listing a total fuel adjustment surcharge for all customer classes of $592,656,000 in fiscal year-to-date as of November 2016); Monthly Report to the Governing Board: November 2014, Puerto Rico Elec. Power Auth., at 4 (November 2014), available at http://www.aeepr.com/INVESTORS/DOCS/Financial%20Information/Monthly%20Reports/2014/November%2020 14.pdf (listing a total fuel adjustment surcharge for all customer classes of $1,113,188,000 in fiscal year-to-date as of November 2014).

[12] *Puerto Rico Elec. Power Auth. Operational Transformation: Hearing Before the Puerto Rico S. Comm. on Energy Affairs and Water Resources*, 17th Legis. Assemb., 7 (Oct. 4, 2016) (testimony of Lisa Donahue, Chief Restructuring Officer of PREPA).

[13] *AlixPartners' Hand-Over Strategy to the Governing Board*, Commonwealth of Puerto Rico, Puerto Rico Elec. Power Auth. (Feb. 1, 2017), available at http://www.aeepr.com/jg/docs/PREPA_Exit%20Strategy%2002-01-2017%20final.pdf.

[14] *Puerto Rico Elec. Power Auth. Operational Transformation: Hearing Before the Puerto Rico S. Comm. on Energy Affairs and Water Resources*, 17th Legis. Assemb., 5-13 (Oct. 4, 2016) (testimony of Lisa Donahue, Chief Restructuring Officer of PREPA).

[15] PREPA's Fiscal Plan at 11.

## VI. Negotiating the PREPA Transaction

Building on the Forbearance Agreement, PREPA and its financial creditors began the task of negotiating a comprehensive debt adjustment agreement, which culminated in a series of agreements with the Ad Hoc Group,[16] the fuel line lenders, and two of its monoline insurers[17] in late 2015, and finally with the last of its insurers in June of 2016.[18] These agreements were memorialized in greater detail in a comprehensive Restructuring Support Agreement (the "RSA").

### A. *Economic Components of the PREPA Transaction*

The RSA contemplates the creation of a new, special purpose, bankruptcy-remote public corporation called the PREPA Revitalization Corporation ("PREPARC") through the enactment of new legislation. (The necessary Puerto Rican legislation passed in February 2016 and is discussed more fully below.) That new legislation grants PREPARC the authority to levy a mandatory, non-bypassable securitization charge (a "transition charge") on customers' electric bills. The transition charge is collected by PREPA but does not belong to PREPA.[19] PREPARC will issue new securitization bonds secured by the transition charge. PREPARC has no operations and will have an independent board.

This securitization structure is based on widely used public utility "stranded cost" securitizations, which have been used in New York, California, Louisiana, and several other states.

The transition charge is based on historical energy usage and will have a quarterly "true-up" to adjust the transition charge upwards or downwards to ensure, on the one hand, that the charge always covers debt service and, on the other, that customers are not charged more than is required for debt service. The transition charge and true-up mechanism were approved by Puerto Rico's public utility commission (the "Energy Commission"), as discussed below. At current oil prices, the transition charge plus the PREPA charges to customers for electricity are less than historical electricity costs and the rates at other comparable island utilities.[20]

The major components of the transformation of PREPA's debt under the PREPA Transaction are:

- Uninsured PREPA Bonds. Uninsured bondholders will exchange existing uninsured PREPA bonds for new PREPARC securitization bonds. In exchange for the protections the securitization offers, **bondholders will accept an**

---

[16] *PREPA Reaches Agreement with Ad Hoc Bondholder Group*, Commonwealth of Puerto Rico, Puerto Rico Elec. Power Auth. (Sept. 2, 2015), *available at* http://www.aeepr.com/aeepr2009/noticiasread.asp?r=DLGZEKPRAG.

[17] *Assured Guaranty and PREPA Enter Restructuring Support Agreement*, Assured Guaranty Ltd. Investor Relations and Corporate Communications (Dec. 24, 2015), *available at* http://www.businesswire.com/news/home/20151223005779/en.

[18] *PREPA Reaches Agreement with Its Creditors*, Commonwealth of Puerto Rico, Puerto Rico Elec. Power Auth. (June 30, 2016), *available at* http://www.aeepr.com/aeepr2009/noticiasread.asp?r=UUOHMSWEVE.

[19] In addition to serving as PREPARC's servicer, PREPA will continue its usual functions, including energy generation and distribution and assessing and collecting rates related to the same.

[20] See Annex A.

7

> exchange ratio of 85% of the par value of the original bonds: that is, bondholders would voluntarily take a 15% haircut in the principal amount of their bonds. The new securitization bonds would have a 5-year principal moratorium and a reduced interest rate.[21]
>
> - Monolines. Two of the monoline insurers[22] will receive the benefit of securitization bonds issued by PREPARC, referred to as "mirror bonds," that will economically defease the existing insured PREPA bonds. These insured bonds will be paid out of the transition charge, rather than out of PREPA's revenues. In exchange, these monolines will provide surety bonds to fund a portion of the debt service reserve funds.[23] Those reserve funds will help the securitization bonds achieve higher ratings and correspondingly lower interest rates, provide further stability for bondholders, and reduce PREPARC's need for cash reserves to cover potential shortfalls in bond payments.

The PREPA Transaction produces substantial savings on debt service by reducing outstanding principal of uninsured PREPA bonds by 15%, lowering the interest rate, and offering a 5-year moratorium on principal payments. Under the terms of the PREPA Transaction, total debt service is reduced by approximately $1.1 billion in the first 5 years and $1.7 billion in the first decade.[24]

The passage of PROMESA in 2016 generated additional savings for PREPA. It meant that PREPA could use Title VI of PROMESA – which was drafted to accommodate voluntary, "preexisting" agreements such as the PREPA Transaction – to apply the deal it reached with the Ad Hoc Group to all uninsured bondholders, not just those bondholders who were part of the RSA.

Without the PREPA Transaction, PREPA's rates would go up substantially from where they are today and where they would be after the PREPA Transaction is completed in order to pay the full 100% of debt service at existing interest rates, as required by Puerto Rican law.

---

[21] The full terms of the exchange offer can be found in the RSA at Annex D and Schedule I-B thereto. *See* PREPA Public Disclosure, Electronic Municipal Market Access, Municipal Securities Rulemaking Board, Exhibit A (June 30, 2016), *available at* http://emma.msrb.org/ES1020690.pdf.

[22] PREPA's third monoline insurer, Syncora Guarantee Inc. ("Syncora"), agreed to a variety of different treatments of the PREPA bonds that it insures or owns. The full terms of Syncora's treatment can be found in the RSA at Annex D and at Schedule II-A thereto. *See* PREPA Public Disclosure, Electronic Municipal Market Access, Municipal Securities Rulemaking Board, Exhibit A (June 30, 2016), *available at* http://emma.msrb.org/ES1020690.pdf.

[23] The full terms of their treatment can be found in the RSA at Annex D and Schedule II thereto. *See* PREPA Public Disclosure, Electronic Municipal Market Access, Municipal Securities Rulemaking Board, Exhibit A (Mar. 15, 2016), *available at* http://emma.msrb.org/ES1000543.pdf.

[24] See Attachment 3.03 of the PREPARC Verified Petition for Restructuring Order. In re: Puerto Rico Electric Power Authority Revitalization Corporation Verified Petition for Restructuring Order, No. CEPR-AP-2016-0001, Petition for Restructuring Order, Attachment 3.03 (April 7, 2016), *available at* http://energia.pr.gov/wp-content/uploads/2016/04/TransitionCharge-2.pdf.

### B. *Noneconomic Components of the PREPA Transaction*

The RSA also contains several key noneconomic components. These include improvements related to (i) operations, (ii) governance, (iii) collections and billing processes, (iv) statutorily mandated subsidies, including a contribution in lieu of taxes ("CILT"), (v) a new rate structure and approval by the Energy Commission of a new PREPA rate, and (vi) a capital investment plan, including Energy Commission approval of a new integrated resources plan and moving forward with public-private partnerships.

PREPA has a documented history of political interference compromising its decision making.[25] The top 200 PREPA administrative positions, as well as – until recently – the majority of the board of directors, are political appointees.[26] The large number of patronage positions at PREPA ensures that politics and political connections heavily influence corporate decision making and can stymie necessary reforms to PREPA.

Politics has also played a central role in PREPA's historical mismanagement, from procurement scandals for key goods and services such as fuel oil, to basic mismanagement like PREPA's failure to collect over $150 million for energy consumed by other government agencies.[27,28]

The RSA allows PREPA to use debt service relief from the PREPA Transaction to support PREPA's operational restructuring initiatives through modernization of PREPA's aging power generation platform and other contractual, structural and managerial reforms. Modernization will also give PREPA flexibility to integrate alternative energy sources.

The RSA also helps PREPA provide for necessary capital expenditures, as required under PROMESA. PREPA now has the opportunity to invest in highly efficient conventional generation assets, natural gas generation assets, and renewable generation assets of its choosing, which could add greater diversity and stability to power price and supply. Going forward, Puerto Rico will benefit from more stable, lower cost power generation – *but* the PREPA Transaction is a key predicate. Without it, PREPA will not have sufficient funding to commit to these investment initiatives without a far greater increase in electric rates resulting from higher interest costs. Disputes with creditors, including litigation over creditor rights, could deter private capital commitments the Governor has stated he intends to seek.

---

[25] Charles R. Babcock, *Alleged Puerto Rican Bribery Money Will Be Returned*, Wash. Post (Dec. 9, 1980), https://www.washingtonpost.com/archive/politics/1980/12/09/alleged-puerto-rican-bribery-money-will-be-returned/a46e8a90-09df-454c-84fc-a9e9b45bb0d3.

[26] Section 4(a) of Act No. 83 of May 2, 1941, as amended through Act 57-2014 (22 L.P.R.A. § 194(a)), states that six of the nine PREPA Board members are appointed by the Governor. PREPA's 200 top managers are also politically appointed and change with every administration, according to the testimony of PREPA's chief restructuring officer: "[I]t's the top two hundred (200) people in that organization that switch out every four (4) years; so you've got no continuity for long-term strategic or financial planning." *Puerto Rico Electric Power Authority Business Plan and Recovery Plan: Hearing Before the Puerto Rico S. Comm. on Energy Affairs and Water Resources*, 17th Legis. Assemb., 84 (Apr. 14, 2015) (testimony of Lisa Donahue, Chief Restructuring Officer of PREPA).

[27] *See generally* Amended Complaint, *Marrero Rolon v. Autoridad de Energia Electrica a/k/a P.R. Elec. Power Auth.*, No. 15-cv-1167, Docket No. 367 (D.P.R. Aug. 5, 2016).

[28] The FTI Report showed that PREPA had $151.5 million of receivables 120+ days old. *See FTI Report*, at 16.

9

The PREPA Transaction will also allow PREPA to fulfill one of the critical goals of PROMESA: regaining access to the capital markets. The issuance of new securitization bonds under the PREPA Transaction will mark Puerto Rico's first major new issuance of long-term financing since the passage of DERA locked it out of the capital markets. Securitization financing is a well understood structuring technique with an excellent track record of helping other utilities to service legacy debt obligations at lower cost.[29] All but one of the major securitizations from 2006-2014 were rated AAA, according to a 2015 Moody's report on the universe of utility securitizations.[30] By executing the PREPA Transaction, PREPA and the Island will be taking a major step toward reducing the political risk that has prevented Puerto Rico from issuing any new debt financing and will be compliant with one of the fundamental elements of PROMESA: restoring Puerto Rico's access to the capital markets on reasonable terms. The structure and regulatory approval process for the new securitization bonds is something that Puerto Rico can emulate in other new bond issues.

Finally, the PREPA Transaction is being executed within the legal and regulatory framework established by Puerto Rico's executive and legislative branches and can and should be executed pursuant to Title VI of PROMESA.

### VII. Energy Commission Approval

As part of a full and transparent process, the Energy Commission reviewed PREPARC's petition seeking approval of the securitization mechanism for the proposed bond exchange under the PREPA Transaction. After extensive public hearings, the Energy Commission approved the transition charge in a voluminous report that found that the petition complied with all the requirements of Puerto Rican law.[31]

On January 10, 2017, the Energy Commission approved PREPA's rate case. The Energy Commission ruling confirms that "[t]he restructured debt costs will be recovered in a separate charge which is lower than the costs would be without restructuring."[32] PREPA's Fiscal Plan illustrates that the PREPA Transaction eliminates what would otherwise be an immediate rate hike of approximately 25% to close a substantial status quo rate deficit.[33]

---

[29] For further reading on benefits of securitization financing, see Chris Mauro, *US Municipal Focus: Municipal Securitization – A New Financing Trend in the Municipal Market?*, RBC Capital Markets (Nov. 6, 2014), *available at* https://www.rbccm.com/municipalfinance/file-826934.pdf.

[30] *Pre-Sale Report: Entergy New Orleans Storm Recovery Funding I, L.L.C.*, Moody's Investor Service (July 13, 2015). The exception is one issuer that was rated AA by Moody's.

[31] In re: Pet. for Approval of Transition Order Filed by the PREPA Revitalization Corp., No. CEPR-AP-2015-0002, Restructuring Order (June 21, 2016), *available at* http://energia.pr.gov/wp-content/uploads/2016/06/21-junio-2016-Restructuring-Order-English-1.pdf.

[32] In re: Puerto Rico Electric Power Authority Rate Review. CEPR-AP-2015-0001, Final Resolution and Order (Jan. 10, 2017), *available at* http://energia.pr.gov/wp-content/uploads/2017/01/10-enero-2017-Restructuring-Order-English-1.pdf.

[33] PREPA's Fiscal Plan at 41.

### VIII. The PREPA Revitalization Act and Validation Proceedings

The PREPA Transaction required the passage of new legislation in order to successfully transform PREPA. This included provisions that would allow for operational reform, enable the securitization structure to reduce PREPA's debt load, and set forth the process by which the Energy Commission reviews the PREPARC transition charge and the PREPA rate. The portions of the legislation dealing with the securitization structure are modeled on structures that allow entities to recover similar "stranded cost" charges from utility customers in other states, such as the restructuring charge assessed on Long Island Power Authority customers in New York.

On November 4, 2015, members of the Puerto Rico Senate introduced legislation that would later become the PREPA Revitalization Act. Over the course of several months, legislative committees held hearings on the proposed legislation and received testimony from parties with different views on the PREPA Transaction. House legislators seeking to refine the legislation crafted and obtained passage of amendments to the bill. The legislation as amended was then debated on the floor of both legislative chambers, passed by both chambers, and signed into law as the PREPA Revitalization Act on February 16, 2016.

The PREPA Revitalization Act contemplates the initiation of lawsuits by interested parties to challenge and, by a court order finding in favor of the securitization structure, the validation of the transactions contemplated under the RSA. Such validation proceedings are frequently used in municipal financing, including in the public utility context, in many U.S. states.

A critical component of the PREPA Transaction is the delivery of certain legal opinions as a condition to the issuance of the securitization bonds. The delivery of those legal opinions is dependent on the successful and expeditious completion of the validation proceedings.

The past few months have seen positive developments in the validation proceedings. In one of the cases, a Puerto Rico court upheld the PREPA Revitalization Act; this decision is now on appeal in the Supreme Court. Another group of cases challenging the Energy Commission's decision have been consolidated and will be briefed over the next few months. The remaining cases have been dismissed.

### IX. Challenges Ahead

Almost three years into the PREPA restructuring process, numerous important accomplishments and the majority of requisite steps to complete the deal have already been achieved.

Years have been spent putting the PREPA Transaction into action. But the PREPA Transaction is now in jeopardy.

The Oversight Board extended PROMESA's stay from February 15 to May 1 by certifying that an additional 75 days were needed "to seek to complete a voluntary process under title VI of this Act,"[34] but as of this date neither PREPA nor AFAAF have delivered a proposed "modification" under Title VI or commenced a "voluntary process under Title VI."

---

[34] Puerto Rico Oversight, Management and Economic Security Act of 2016, Pub. L. No. 114-187, § 405(d)(1)(B).

The RSA is currently set to expire on March 31 – just nine days after this hearing. The current Administration has refused to commit to the terms of the PREPA Transaction – even though PREPA's former chief restructuring officer warned that bondholders would likely recover 100% of claims on their revenue bonds in litigation.[35]

The consequences for rejecting the PREPA Transaction could be dire. At the very least, it will delay needed capital investment to upgrade the depreciated and inefficient generation infrastructure absent a significant increase in electric rates. More troubling, an expiration of the RSA in 9 days could precipitate another collapse in trade credit, draining PREPA of potentially hundreds of millions in liquidity virtually overnight. Unlike the 2014 liquidity crisis, PREPA has already spent cash in bondholder reserve accounts, leaving the company with no potentially available cash resources to purchase fuel, creating a very real possibility of rolling brownouts or outright service disruption as Puerto Rico enters its seasonal highpoint in electricity demand.

And finally, Puerto Rico has to communicate to the federal government, national and international markets that it can abide by its laws, its contracts, and the good-faith negotiations it enters with its bondholders; that there is certainty in doing business on the Island regardless of which political party is controlling the government. That is the way Puerto Rico will dig itself out of its fiscal crisis and return to a path of economic prosperity, which we all as American citizens want to see.

---

[35] *Donahue Warns of Dire Consequences if PREPA Deal Collapses*, Reorg Research (Dec. 1, 2016), *available at* http://platform.reorg-research.com/app#company/1869/intel/view/28192.

