CEPR
2 0 1 4

the FRM and shows how the FRM directly, justly, and reasonably to the changes and uncertainties identified in the Commission's Order of September 27, 2016. Dr. Hemphill's additional supplemental direct testimony (PREPA Ex. 17.0) provides additional shall include specific information and concrete examples of how the proposed FRM provides the Commission with the ability to prevent PREPA from incurring in unreasonable or imprudent costs.

Dr. Hemphill's rebuttal testimony (PREPA Ex. 25.0) responds to ICSE-PR witnesses Tom Sanzillo and Cathy Kunkel and addresses the concern raised by intervenors that a rate increase will drive down demand. Dr. Hemphill clarifies that the increased regulatory oversight that Mr. Sanzillo and Ms. Kunkel acknowledge comes with the FRM will provide the Commission with tools to address the challenge of setting just and reasonable base rates. He also details how an FRM would reconcile revenues and expenses to address any drops in load, and notes that the FRM process does not increase rates as compared to traditional ratemaking. He also testified at the technical hearing, providing support for PREPA's proposed FRM and providing details of how the FRM would provide transparency over PREPA's costs and planning process. He further discussed how the FRM would operate and incentives for PREPA to control costs and operate under a budget submitted to the Commission.

*Summary of the Testimony of Ralph Zarumba, Vice President, Concentric Energy Advisors.*

Mr. Zarumba's direct testimony in support of permanent rates presents and supports PREPA's Marginal Cost of Service Study ("MCOSS"). He describes the MCOSS preparation process and details how the MCOSS identifies the value of incremental costs required to serve new load.

Mr. Zarumba's direct testimony in support of temporary rates presents and supports PREPA's proposed temporary rates. He describes the evidence supporting the need for temporary rates and discusses implementation and rate design of the temporary rates, as well as $/kWh increases for each customer class. He also testified on the subject of how to do the provisional rate reconciliation at the technical hearing.

*Summary of the Testimony of Dan T. Stathos, Associate Director, Navigant Consulting Inc.*

Mr. Stathos' direct testimony in support of temporary/provisional rates presents and supports the revenue requirement to support PREPA's then-proposed temporary rates. The proposed temporary rates were based on the same original revenue requirement and revenue deficiency calculated for purposes of establishing new "permanent" rates, so the temporary rates are supported by the same extensive information and materials.

*Summary of the Testimony of Gregory Rivera Chico, Superintendent in the Planning and Research Division, Puerto Rico Electric Power Authority.*

Mr. Rivera's rebuttal testimony responds to issues raised by intervenors, including: financing of capital projects; subsidies; interconnection of generation; solar and storage;

CEPR

renewable energy credits; the IRP Order; and renewables Power Purchase and Operating Agreements. His testimony clarifies the legal and operational issues related to various proposals presented by intervenors.

Mr. Rivera also testified during the technical hearing on numerous subjects as part of multiple panels. During Panel D, Mr. Rivera confirmed that PREPA did not conduct an elasticity study; however, this issue was addressed during Panel E. The revenue and allocation requirements are snap shots in time and do not change with each customer that enters/leaves the system, this would require a constant never-ending rate case. Prior to Act 57-2014, PREPA was not able to negotiate directly with customers; however, there is currently no position that exists to head this role. Anything would have to go through the Executive Director. He also supported PREPA's treatment of various other issues, including subsides.

*Summary of the Testimony of Lucas D. Porter, Managing Consultant, Navigant Consulting Inc.*

Mr. Porter's rebuttal testimony provides data and support for the rebuttal testimony of Messrs. Zarumba and Granovsky (PREPA Ex. 24.0) concerning PREPA's proposed Net Energy Metering credit. His testimony regarding the lifecycle cost analysis of Solar PV provides a foundational quantification of the per kWh price of solar generation that satisfies all capital and operating cost requirements over the life of an asset. The analysis assumes efficient ownership of projects, which in Puerto Rico specifically requires Third-Party Ownership, wherein investors in solar projects take advantage of available incentives provided by the U.S. Federal government. This is a fair assumption, in that the additional capital cost burden is not taken by the people of Puerto Rico. It is also an assumption consistent with reality – in the United States, Third-Party Ownership has been the strong majority of new projects for several years, and, based on interviews and independent research, the same is true for Puerto Rico. His analysis assumes level of profit to equipment providers and project developers, positive returns to owners of the projects that are consistent with returns seen in other jurisdictions, standard contract structure assumptions, and applicable operating expenses. Mr. Porter also testified on these subjects during Panel H at the technical hearing.

*Summary of the Testimony of Ernesto Ramos, PREPA Interim CFO.*

Mr. Ramos testified during the technical hearing regarding, among other things, PREPA's financial condition, restructuring costs, budgeting and budgets, accounting, financial statements, other financial reports.

*Summary of the Testimony of Joseline Estrada Rivera, Forecasting and Statistics Department Manager.*

Ms. Estrada, during the technical hearing, supported PREPA's forecast and underlying econometric models, including the models' consideration of migration effect, energy efficiency, and distributed generation, among other factors. In providing responses to

CEPR 2014

questions about PRASA's preferential rate, Ms. Estrada re-iterated that the avoided cost that results from PRASA's preferential treatment would need to be absorbed by PREPA's other customers. Although PRASA does not consider the preferential rate a subsidy, Ms. Estrada stated that the preferential rate would equate to an approximate $22 million subsidy.

*Summary of the Testimony of Carlos Lauriano Rivera, Transmission & Distribution.*

Amongst other topics, Mr. Lauriano, during the technical hearing, supported PREPA's need for programs to attract and retain good employees and the restrictions Act 66 places on PREPA, particularly salary negotiations. He also supported PREPA's budget estimates for distribution.

*Summary of the Testimony of Martín Pérez García, Director of Generation.*

Mr. Pérez testified during the technical hearings regarding the causes of outages, including the issue of deferred maintenance, which is impacted by budget issues and the reduction in skilled employees. He also testified regarding limited use facilities, generation plans going forward, and the maintenance contracts for Cambalache and San Juan. He also discussed the role of limited use facilities in modeling. The causes of the outage problem in terms of staff shortages and underspending, were large enough causes that would have existed independent of the AOGP maintenance deferral.

*Summary of the Testimony of Juan Tirado, Director of Operations, Administrator of Generation.*

Mr. Tirado, during the technical hearing, identified the steps of the budget request process for Generation and the effects of underfunding on capital projects. He also provided information about PREPA's reduced frequency of preventive maintenance. He testified regarding the limited use units and the plan for those units going forward. For CapEx this year, Mr. Tirado requested approximately $115 million and received approximately $80-$85 million, this shortfall required deferral of certain activities.

*Summary of the Testimony of Faustino Gonzales Quiles, Director, Transmission and Distribution.*

Mr. Gonzales supported PREPA's operational expenses, particularly labor expenses. He testified during the technical hearing regarding PREPA's loss of skilled employees in the transmission, distribution, and customer service area. PREPA lost close to 1000 long term employees, after Law 66's implementation. Many of these personnel had over 25 years of experience with PREPA. PREPA has also lost many employees due to other retirements and employees leaving to go to other jobs or to the US. He also testified about the budget allocation process for transmission and distribution and about the limitations on hiring contractors caused by union restrictions. Mr. Gonzales also confirmed the 22% reduction in workforce experienced by PREPA and discussed this workforce loss in detail, as well as the restrictions imposed by Act 66. He proposed draft incentives plans that could be imposed

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO

once the Act 66 restrictions are no longer in effect. He also discussed what PREPA needs to do to be able to attract the best employment candidates and retain good employees.

*Summary of the Testimony of Roberto Ortiz-Rivera, Administrator, Transmission & Distribution.*

During the technical hearing Mr. Ortiz supported the distribution budget and answered questions regarding PREPA's system of budget and resource allocation. He also provided an explanation of how PREPA utilizes its distribution budget and provided detail about what expenses would be covered by PREPA's blanket budget.

*Summary of the Testimony of Alvin Román, Superintendent, Transmission & Distribution Planning.*

Mr. Román testified during the technical hearing regarding necessary updates and maintenance to PREPA's system, both mechanical and electrical in nature. He also detailed how PREPA is currently prioritizing repairs and maintenance, and stated that it would take more than ten years to complete all the necessary repairs.

*Summary of the Testimony of Carmen Flores, Customer Service Director.*

Ms. Flores supported as part of her testimony during the technical hearing PREPA's treatment of customer service and billing issues, and discussed the management structure in the customer service directorate.

**Commonwealth Energy Public Policy Office**

*Summary of the Testimony of José G. Maeso González, Executive Director.*

Mr. Maeso testimony compared the financial performance of rooftop photovoltaic systems ("PV systems") under the Puerto Rico Electric Power Authority's ("PREPA") current electric service tariff structure with the tariff structure proposed under Case No. CEPR-AP-2015-0001 and two (2) hypothetical alternative rate structures proposed by the CEPPO. The results presented are based in an analysis made by U.S. Department of Energy National Renewable Energy Laboratory (NREL).

The Net Present Value (NPV) of a PV system would be impacted more significantly for the GRS tariff customers, followed by the GSP and GST, in the order of 70% to more than 80% loss. NPV is more sensitive to net charges as the percentage of energy exported increases and as the production-to-consumption ratio approaches 100%. GSS customers are less affected because the proposal does not include a demand charge for this group, their fixed charge is lower than for other business classes and their volumetric charge is already higher. NREL analyzed an alternative tariff proposed by SOEP where demand charges would be discounted in proportion to the energy produced by their PV system and gross consumption charges are

CEPR COMISIÓN DE ENERGÍA DE PUERTO RICO

changed to the net consumption portion. This proposal would produce an NPV similar to that for a PV system with the current rate structure for GSP and GST customers. For GRS customers, any charge different from what they currently experience will be detrimental to the NPV of a PV system. Not even moving the CILT and SUBA charges to the net consumption, do much for increasing the PV system value closer to the current one for GRS customers. Therefore, we conclude that any charge to a GRS customer will be against Act 4-2016 mandate of not being an obstacle to the development of renewable energy projects. For the GSP and GST customers, our proposal can contribute to produce a value to the customer similar of what they experience currently.

**Independent Consumer Protection Office**

*Summary of the Testimony of Guillermo M. Riera, Ph.D.*

The ICPO, through the expertise and testimony of Dr. Guillermo M. Riera, first performed tests to the New Fuel Adjustment Cost Rider ("FCA") using historical and publicly available data. The tests showed the potential of the new formula to overcharge customers because it does not reconcile properly. We compared the true up series with the actual historical series and performed a linear regression analysis to model the potential overcharge. It was recommended that the Commission closely examine this matter and require PREPA to provide test results. Second, the testimony showed that both, PREPA's proposed NEM Credit, and renewable energy contractors' profit, have a direct impact on projects' net present value ("NPV") and simple payback periods ("SPB"). The ICPO recommended that PREPA's NEM Credit may be reduced only to levels that renewable energy contractors' profit reductions (to more reasonable values, closer to 10%) can compensate, in order to maintain renewable energy projects, NPVs and SPBs unchanged. By doing that, a balance of interest is achieved, because the renewable energy sector is motivated to reduce profits to reasonable levels and become more competitive. PREPA does not discourage renewable energy use and may elect to use the new "transparent bill" to show customers the difference between the proposed and approved NEM Credit as a benefit or subsidy to maintain a competitive/robust renewable energy sector; and the economic impact on Non NEM customers' bills is reduced and is maintained to minimum levels.

Lastly, the testimony showed that formula ratemaking ("FRM") designs may weaken due process, are not easy to understand and accept by the public, and do not provide true incentives for cost management and prudence. The ICPO, through the testimony of Dr. Riera, recommended that the Commission to approve a design based on performance with some annual or periodic penalty mechanisms ("APMs").

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

**CEMEX, Inc.**

*Summary of the Testimony of Enrique Alberto García Morelos.*

Mr. García testified that CEMEX is the only producer and supplier of cement, concrete and certain aggregates made in Puerto Rico. The Ponce Plant is the largest cement producer on the island, and one of the most important energy consumers within the industrial sector. CEMEX has already made multiple modifications to its production plant, which included the massive reduction of personnel. As Mr. García stated, CEMEX has requested PREPA to review its electric rates since December 2015, but has been denied twice and referred to this proceeding. Mr. García also expressed that CEMEX is in a less competitive position in the market for cement exporting activities and that a reasonable electricity cost would be $0.14/Kw-hr.

Mr. García also testified that the implications of the proposed rate review, along with the securitization charge and the effect that an increase in oil prices will cause on the PREPA revenues, are enough to destroy the productive activity of the cement industry in Puerto Rico. In general, companies will have to adjust cycles of operation and consider other business models. All of this resulting in a dramatic decrease of the consumption, electrical energy demand, and consequently PREPA revenues. These increases are the perfect formula for the failure of a public monopoly. PREPA has been very conservative in its estimate of decrease in energy demand. For example, CEMEX's exit as a consumer would be equivalent to the exit of more than ten thousand (10,000) Puerto Rican families of the PREPA network immediately. The remainder of the consumer base will experience, without any doubt, further increases to amortize fixed costs, and thus, more and more users will stop their production processes and find new sources of energy generation, shut down of operations, or emigrate from the island.

*Summary of the Testimony of Manuel Reinaldo Valente Agüero.*

Mr. Valente testified about the applicability of the load factor and the challenges to meet the same under the current rate based on energy use. As Mr. Valente affirmed, the cement mill is not operated due to the low sales and does not consume the necessary kilowatts per hour, causing CEMEX to breach the load factor. Mr. Valente expressed that the most recommended scenario to maintain the competitiveness and economic development related to the optimal operation of the plant in Ponce would be to implement a time of use at transmission voltage ("TOU-T") rate. In the alternative, Mr. Valente testified that the best scenario for CEMEX's operation would be the implementation of the LIS rate, modifying the penalty load factor by keeping the 50% of the LIS and high energy usage service at 115 KV - Special ("LIS SR") rates, as previously approved under PREPA Resolution 4036 on September 19, 2013.

Mr. Valente also stated that the proposed rate review could lead to millions of dollars in losses of PREPA revenues. For example, if PREPA does not apply to CEMEX the most competitive rate, CEMEX will need to lower energy consumption in order to maintain operations through the model of a cement importer. Mr. Valente expressed that in August

CEPR COMISIÓN DE ENERGÍA DE PUERTO RICO

2016, CEMEX had to import a boat with clinker (i.e., an intermediate in the process of making cement) for the first time in its history.

**Instituto de Competitividad y Sostenibilidad Energética de Puerto Rico**

*Summary of the Testimony of Victor Glass, Ph.D.*

Dr. Glass testified that a filing should be accessible to interested parties. Those reviewing a filing should have confidence that the data underlying the filing is sound. They should be able to assess the quality of forecasts. They should expect that proposed prices are cost causative. Dr. Glass concluded that PREPA's filing failed in all respects. This because it does not follow a standard filing format. Instead, one must dig through the testimonies of experts to understand the nature of the rate-setting process and the proposed rates. PREPA's experts admitted that the underlying data is not of high quality, and crucial data used for allocating costs among services is not available. Also, forecast evaluation is not done in a consistent manner. It appears that energy cost forecasts have been rather poor. The methodology for setting overall rate changes is basically a cost pass-through to customers. Bondholders and PREPA management bear little risk. The large proposed rate increases could cause price-sensitive customers to migrate away from using PREPA's services that could lead to a death spiral. Large industrial customers may be a key market segment that is at risk for seeking alternative sources of energy. The proposed rate structure moves away from peak-load pricing, which could hurt the development of solar generation. Underlying the filing is the big assumption that the bond agreement will actually take effect. At this point, the likelihood of an agreement is unknown.

The threat of bankruptcy appears to have overwhelmed the thinking of PREPA and its consultants. PREPA has not considered selling assets, which could break up its stranglehold on the power business in Puerto Rico and lessen the industry's need for outside financing by PREPA. Other options have not been considered that are less far-reaching. For example, instead of a cost pass-through methodology, internal incentives could be introduced into PREPA to penalize poor management performance. Also, price caps could be considered for adjusting rates. Recognizing that PREPA could become bankrupt very quickly, interim rates are necessary to keep PREPA solvent. However, during this interim period, the Commission and other interested parties need to work with PREPA, if possible, to develop a new filing process and rate design that will be consistent with improving near-term and long- term efficiency and productivity in Puerto Rico's energy market. The new blueprint could include a major redesign of Puerto Rico's energy market and the introduction of a Puerto Rico Universal Service Program for low-income customers.

*Summary of the Testimony of Ramon J. Cao García, Ph.D.*

Upon examination of documents submitted by PREPA in support of a permanent rate increase in its tariffs, it was found that the documentation was extremely deficient. No information was provided, nor consideration appears to be given, to Marginal Energy Costs, cross-subsidies among PREPA's subsidiaries, and a subjective and arbitrary 5% differential

threshold was established for all rates except public lighting, with no objective criteria. Furthermore, in the documents examined, Mr. Cao was not able to find any consideration about economic consequences of proposed rate increases on the local economy, or even on how they are expected to affect the consumption of electricity, and, hence, on PREPA's revenues after a rate increase. To point out the importance of some of the topics not considered in PREPA's petition, the testimony presents an assessment of expected economic consequences of proposed electricity tariff rates increases. The economic topics considered are: (1) consequences of proposed rates on production costs in eight economic sectors, (2) their effect on Puerto Rico's Real GNP and total employment, (3) the impact of proposed new rates on cost of living, and (4) expected consequences on the quantity of electricity demanded.

To estimate expected consequences of PREPA's proposed increases in tariff rates on the industrial sectors of the economy, it was obtained, from the PR Planning Board, the 2013 Input/Output Transactions Matrix. It was found that the most affected sectors are: (1) wholesale and retail trade, with an increase in cost of intermediate inputs of 1.33%; (2) government, with a 1.09% increase; and (3) manufacture, which face an estimated increase of 0.51%. Then, using a regression equation to forecast real GNP, and assuming an increase of 4.2¢ per kWh in the price of electricity (as per PREPA's Schedule H), it was estimated a reduction of 1.05% in real GNP. This decline is additional to the 2.0% decline forecasted by the PR Planning Board for real GNP in fiscal year 2016-2017. An additional 1.05% contraction in real GNP is going to induce a reduction of 11,075 jobs. That would have raised unemployment rate to 13.1%, on the basis of August 2016 statistics. It was further estimated that a 4.2¢ increase in the price of kWh will cause an expected increase of 1.32% in the Consumer Price Index. In consequence, PREPA's proposed rate increase will result in making the general population 2.36% poorer, aggravating conditions created by the general contraction faced by the Puerto Rican economy since fiscal year 2007, including the 2.0% contraction in real GNP forecasted by the Puerto Rico Planning Board for fiscal year 2017. Since net production of electricity declined by 16.7% between fiscal years 2007 and 2016, it is simply unrealistic to assume that the demand for electricity will somehow remain at the level registered in fiscal year 2014, as PREPA's proposal assumes. For that reason, an aggregate demand function for electricity was computed, finding that an average increase of $0.042 in the price per Kwh, would reduce the quantity demanded by 144.4 million Kwh, or 0.83%. It should be also noted, that a reasonable design for a tariff structure requires for the Utility to know the demand functions corresponding to principal categories of consumers. It appears that PREPA did not tried to get that information.

*Summary of the Testimony of Tom Sanzillo and Cathy Kunkel*

The Kunkel-Sanzillo testimony presented a comparison of PREPA's rates to other jurisdictions in order to illustrate that Puerto Rico is an outlier in terms of the level of rates being proposed relative to the local economic condition. We found that PREPA's proposed rates have a much higher level of debt service embedded in the rates of other large U.S. public power entities. We further noted that PREPA's rates are likely to be higher than forecast in 2017 because of the large underestimation of fuel costs. We believe that PREPA's overestimate of future load, the likely inability to meet poorly documented savings goals and

CEPR
2014

higher debt costs will increase pressure to raise rates beyond what PREPA has projected for future years. We believe it will not be possible to achieve an affordable rate structure without renegotiation of the underlying debt. PREPA, perhaps with the assistance of the PROMESA Board, must renegotiate a better debt deal that is more aligned with economic realities of Puerto Rico. Additionally, we suggest several mechanisms that the Commission could adopt to minimize imprudent expenditures by PREPA, including the oversight model of an Independent Private Sector Inspector General. Our testimony finds that the proposed rate design does not give customers, particularly commercial and industrial classes, the flexibility to lower their own energy costs and to expand the use of renewable energy generation in Puerto Rico. We recommend that open access in transmission and distribution be implemented and that the industrial and commercial tariff designs be weighted less heavily towards demand charges.

While the format of the case before the Puerto Rico Energy Commission has proceeded like a typical rate case in any other jurisdiction, the substance of this case is like no rate case we have seen before. First, a rate case fundamentally requires a certain level of basic trust between a utility and its regulator. The regulator must be able to trust that all budgets and financial information pertinent to the rate request are accurate and will be presented to the Commission without stonewalling. It must be able to trust that the utility's books and records represent a complete picture of the utility's finances. These elements are not present in the current rate case. Regarding PREPA's budget as a whole, Commission's advisors Drs. Fisher and Horowitz noted that "PREPA's provision of documentation to support its capital budget demonstrated gross managerial incompetency" (p. 81) and that "PREPA made so little documentation of the process and values underlying the [operations] budget available to Commission advisors that we have no choice but to consider the budget and the allocation thereof to be, in effect, unsupported" (p. 183).

**Puerto Rico Aqueduct and Sewers Authority**

*Summary of the Testimony of Eng. Lynnette Ramírez Rivera.*

Act 50-2013 was enacted to provide a preferential rate to PRASA, first of 0.22 cents per kilowatt- hour for the first 3 years, and then 0.16 cents per kilowatt-hour from fiscal year 2017 on. This is not a subsidy inasmuch the lower rate would come from savings managed by PREPA on its fuel costs. The public policy of the government of Puerto Rico was to pass those savings to the consumer through a lower rate to be charged by PRASA for its services. PRASA's second largest operating cost is precisely the energy cost, which is around 25% of its total operating costs. Furthermore, Act 50-2013 specifically ordered PRASA to use those energy savings to provide a lower residential rate for its customers. On December of 2015, PREPA notified PRASA of the elimination of the preferential rate. Nonetheless, at that time the power and jurisdiction to modify rates has been transferred to the Puerto Rico Energy Commission. Hence, PREPA did not have the power to eliminate the preferential rate, since that power rests with the Energy Commission. To establish the preferential rate, the Energy Commission has to take into consideration the public policy of Act 50-2013 and of Act 57-

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO

2014; the price of natural gas; and the ability of PREPA to pay its obligations under the Trust Indenture that guarantee PREPA's bonds, among others.

The elimination of a preferential rate for PRASA will have several detrimental effects. First, it will increase PRASA's operational costs. It will also affect PRASA's cost and expense projections. Furthermore, Act 50-2013 contemplated the construction of one or several capital improvement projects with the preferential rate of 16 cents per kilowatt-hour. Since currently PREPA is not charging PRASA this rate, those projects cannot be developed. Act 50-2013 provides that those projects should be of great significance, that they should generate operating efficiencies, that they should consider climate change, and that they provide capacity for future growth, among other factors. Moreover, it will be difficult for PRASA to enter into the bond market to develop its capital improvement projects. Finally, the current PRASA's rate was established taking into consideration PREPA's preferential rate. Thus, if the preferential rate is not put into full force and effect, PRASA would have to consider, as one of its options, a possible increase on its current rates.

**Windmar**

*Summary of the Testimony of Víctor González, President of Windmar.*

In summary, Windmar Group's Testimony was given by its President Mr. Víctor González whom finds the Petition to fall short of meeting Act 57 of 2014's legal mandates and to be contrary to public policy on renewable energy. Víctor González Testimony provides suggestions to the Commission and PREPA regarding rate alternatives that should be considered as part of PREPA's new tariffs. Battery storage, distributed generation, ancillary services provided by renewables and electric cars are upon us and need to be considered now. The suggestions presented in the testimony can help modernize PREPA's grid and move Puerto Rico towards clean energy, conservation, efficiency, reducing fossil fuels, demand response management and promoting localized energy generation by its customers. All of which are required under Act 57-2014.

Regarding PREPA's Petition, the testimony also criticizes PREPA's proposal upon Net Metering Customers and the cost causation and gradualism methods applied by PREPA. Regarding Net Metering he makes reference to legal statutes that were ignored by PREPA's Petition, particularly Act 57-2014, Act 4-2016 and Act 114-2007 and illustrates the lack of evidence to support PREPA's proposed changes to net metering. His testimony is based on years of experience integrating renewables to PREPA's grid. His projects extend from large utility scale photovoltaic systems, including the first ever built on the island, down to industrial, commercial and hundreds of solar distributed generators. Currently Víctor González has installed over 37 megawatts of renewable energy holding 35 of those in their portfolio, consolidating them as an industry leader.

CEPR COMISIÓN DE ENERGÍA DE PUERTO RICO 0 1 4

**Puerto Rico Renewable Energy Contractors & Consultants Association (ACONER)**

*Summary of the Testimony of Edward Previdi, President of ACONER.*

This testimony was presented by Eng. Edward Previdi as President of the Puerto Rico Renewable Energy Contractors & Consultants Association (ACONER). ACONER pursued to enter in this rate review process as an intervenor in order to offer with the primary objective of avoiding that this industry is adversely affected with a new rate structure. From the inception of Act 114 of 2007, which ordered PREPA to establish a net-metering program, Puerto Rico's government policy has been of support to the integration of distributed renewable energy sources. Act 114-2007, as amended by Act 4-2016, specifically states that PREPA and the Puerto Rico Energy Commission (PREC), when proposing and evaluating charges to net metering customers, shall take into account that they are not "excessive or established in such a manner as to constitute an obstacle to the implementation of renewable energy projects". The intention of the rate review legislation was to establish a just and reasonable structure, at the lowest possible cost for all customers but that it would never negatively affect the renewable energy industry.

The viability of the distributed renewable energy market directly depends on the net-metering credit provided by PREPA. PREPA's rate proposal negatively affects the viability of a customer to implement capital improvements through renewable energy sources. Two tendencies, both with the net result of reducing the net-metering credit, stand out: (1) it is proposed that the CILT and Subsidies segregated charges would not be applied to the net-metering credit, and (2) on the four main categories the intended rate structure is one in which the fixed costs, or demand charges, are dramatically increased. A Return-On-Investment (ROI) analysis acquisition of a DG system by customers for the four main categories showed that the application of the credits to net-metering customers as proposed by PREPA would negatively add years to the ROI, ranging from 1.9 years for the acquisition of a system by a GSS customer to 4.4 years by a GSP customer. In order to minimize the negative impact in the renewable distributed energy market, ACONER recommends the following changes to the proposed rate structure: (1) Charges for CILT and subsidies would be billed for net consumption; (2) the basic fixed charges for GRS and GSS would remain the same as under the existing rate structure and the proposed energy consumption rates shall be adjusted accordingly; and (3) the demand charges for GSP and GST shall be kept at the current levels, and the energy consumption charge adjusted accordingly. Besides minimizing the negative impact on renewable energy projects, the basic reasons for those proposed changes to this rate review are: (1) DG penetration in the grid is still at a minimum level; (2) PREPA would still have the opportunity to propose changes in the way DG systems are treated in future rate review processes; (3) the reduction of energy consumption rates by increasing fixed and demand charges would result in discouraging energy efficiency and conservation measures by the customers; (4) although one of PREPA's argument for the proposed treatment to distributed renewable generation is to minimize the effect of remaining customers "subsidizing" net metering customers, ACONER's own calculations using data provided by PREPA show that such impact would actually be minimal; and (5) a series of benefits to the environment, health, etc., which are obtained by generating clean energy as an alternative to fossil fuels, have not been quantified. ACONER therefore

CEPR COMISIÓN DE ENERGÍA DE PUERTO RICO 2014

recommended a comprehensive study to quantify the benefits for PREPA, and for the public, of distributed generation with renewable energy sources.

*Summary of the Testimony of Vicente Feliciano, expert witness of ACONER.*

PREPA needs to pay for its operating expenses, new investments and financial expenses. Anything beyond this is a tax on electricity consumption. PREPA is requesting the PREC $503 million to pay for the RSA plus $314 million to pay for the debt that is not part of the RSA for a total of $817 million in annual financial costs. The argument is that a government-owned utility should be assigned whatever it needs to pay its debts and that rates should increase to whatever it takes to pay such debt. Under normal circumstances, this would be the case but Puerto Rico is currently anything but normal. An investor-owned utility shall be assigned by a regulator what is known as a cost of service finance allocation. This would be the assets of the utility times a reasonable rate of return. In the case of PREPA, it would be $6,782 million in assets times 7.8% cost of capital. This 7.8% is the average cost of capital assigned to U.S. utilities over the last five years. The total would amount to $529 million per year. The difference between the $817 million to pay for whatever is owed and the $529 million that would be the reasonable financial cost of an investor-owned utility is a tax on electricity consumption. The tax on electricity consumption would be $288 million per year.

Supporting renewable energy is the stated policy of the Government of Puerto Rico. Some adjustments should be made. Renewable energy has benefits that are not incorporated into the net metering credit. These relate to the environment, health and others. And yet, there was not an attempt by the advisors to the Commission to incorporate this consensus into the net metering credit. One option would be to offer net metering clients credit for subsidies to residences and the irrigation district in lieu of environmental and health credits. The issue of the transition charge, related to debt to pay for fixed assets that are either not used by the net metering customers or used on a limited basis, is something that the Commission should revisit.

**Sunnova**

*Summary of the Testimony of Steven Gabel.*

Sunnova sponsored the testimony of Steven Gabel. Mr. Gabel's pre-filed testimony reviewed certain tariff and policy recommendations proposed by PREPA with respect to a) their reasonableness from a ratemaking perspective; b) their impact on the development of renewable resources in the PREPA service territory; and c) their consistency with established Puerto Rico and national energy policy. Mr. Gabel recommended various adjustments to PREPA's petition including:

1) Current Net Energy Metering (NEM) should continue and the Commission should make no changes to NEM. The proposed change in NEM policy will deter development of on-site renewable energy as a "home grown" clean source of free

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2014

fuel energy for the Commonwealth, while lessening the dependence on imported fossil fuel and inhibiting efforts to diversify the Commonwealth's energy supply.

2) The Commission should carefully evaluate and restrict proposals from PREPA to move its tariff to a greater proportion of revenue through fixed charges, as counter to both cost of service principles and the Commission's mandate to promote renewable energy and energy efficiency.

Finally, Mr. Gabel recommended that the Commission should conduct a more expansive review of PREPA's structure and ratemaking. He recommended that the Commission should consider broader changes to industry structure and ratemaking that would transition the power system to one that is more reliable; stabilizes and reduces energy costs; promotes development of renewable energy, energy efficiency and other advanced clean energy technologies; attracts private sector investment; and increases economic activity.

**Chamber of Commerce**

*Summary of the Testimony of Eng. Gerardo Cosme Núñez.*

The Chamber of Commerce witness testimony served to present an assessment of the perception of some aspects about the rate review. The testimony states that the proposed distribution of revenue requirements presented by PREPA is not just and reasonable and that the Commission should consider other income sources from the commercial and industrial sectors, aside from the energy charge, in order to develop a Cost of Service Study. Also the witness expresses that there is no clear indication as to how PREPA projected its revenues from 2014 to 2017.

**Builders Association "ACPR"**

*Summary of the Testimony of Emilio Colón Zavala.*

The testimony of Mr. Colón Zavala served to expose and submit to the Commission, from ACPR's perspective, the impact of the tariff review proposal over the development, planning and financing of formal housing, within the jurisdiction of Puerto Rico. This in light of the legal and economic context ACPR deem pertinent and relevant, particularly to the development of low-income housing.

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

**Hospital Association "AHPR"**

*Summary of the Testimony of Jaime Gregorio Plá Cortés.*

The testimony of Mr. Plá Cortés served to present the implications of matters deriving from the rate review together with the "hijack" fee proposed by PRPEA, which, in AHPR's opinion, and as to what is reflected in the documentation received by its members, would entail significant increases in non-refundable costs at a time when said industry is in the fragile situation of providing health services in Puerto Rico. In the case of the hospitals and health services, they will not be able to pass on this increase. In an industry that is so competitive that can barely cover costs, an increase would cause it to incur further losses.

**Manufacturer's Association "AIPR"**

*Summary of the Testimony of Rodrigo Masses and Artze.*

Mr. Masses and Artze testimony responds to the need of proving the future effects of the distribution of costs proposed in the manufacturing sector of Puerto Rico, to establish the potential impact of the rate revisions as proposed in the economic development of the country and the non-compliance of Law 57 of May 22, 2014, known as the "Law of Transformation and Energy RELEIF of Puerto Rico" (hereinafter law 57-2014).

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2014

## Summary of Public Comments

To maximize public participation and insight to the process, the Commission held four (4) public hearings during the initial phases of the proceeding. To provide further access to interested parties, all hearings were held in Spanish, three (3) hearings were held outside the metropolitan area and one (1) in San Juan, during flexible hours, and were also live streamed and recorded. The first hearing was held on September 10, 2016 in the City of Mayagüez. A total of nine (9) participants deposed before the Commission. The second public hearing was held on September 12, 2016 in the City of Ponce. A total of eight (8) participants deposed before the Commission. The third hearing was held on September 13, 2016 in the City of Humacao. One (1) participant deposed before the Commission during this hearing. The fourth and last hearing was held on September 14, 2016 in the City of San Juan with a total of ten (10) participants deposing before the Commission.

During these hearings, the Commission heard comments from the public regarding a long list of concerns, which included the following issues.

There was a common and general discomfort and negative perception of PREPA's management and performance. Citizens were generally concerned that an increase in rates, without significant restructuring and changes in management practices, will perpetuate the current precarious fiscal and structural situation of the utility. Overall, the citizens' discomfort and apprehensions are not related to a specific part of PREPA's Petition for Rate Review, but with distrust, a result of years of poor decision making, bad management, political influence and lack of planning. In their perspective, moving forward, mechanisms need to be implemented to hold PREPA accountable for its actions. Additionally, as expressed by the organization *Espacios Abiertos*, there needs to be transparency in the information presented by PREPA as part of their Petition. They requested that PREPA clearly explain how the proposed revenue requirement will be used to improve PREPA's operations, efficiency and the overall performance of the organization, given that as proposed it would result in a rate increase for the consumers.

In improving their performance and securing additional savings to reduce the costs of operating the utility, as part of the comments and recommendations presented to the Commission, citizens expressed that PREPA could continue to make operational savings by reducing the number of external legal and consulting contracts and using their internal personnel. *Espacios Abiertos* expressed that even though specialized consulting is warranted, Puerto Rico and PREPA's fiscal situation does not merit the elevated consultation costs incurred by PREPA.

Also, citizens argued that, in reviewing PREPA's Petition, the Commission cannot limit itself to perform an economic analysis, which only secures revenues to sustain the utility and address its financial obligations. Citizens agree that the Commission needs to perform an evaluation of social needs, which includes an analysis of factors that guarantee the social development of the Island, while it addresses Puerto Rico's electric energy needs. The foregoing in the context that the current social and economic conditions of Puerto Rico's

CEPR COMISIÓN DE ENERGÍA DE PUERTO RICO

citizens cannot sustain an increase in rates and therefore, the distribution of costs needs to consider the overall impact such increase will have on Puerto Rico's economy and its society. Citizens agree that the burden of restructuring PREPA and taking it to fiscal stability should not be carried by the citizens, but that the utility's management and government should be held accountable for the current situation.

Many deponents also address the need to integrate renewables into PREPA's system. Citizens expressed that the Commonwealth's current energy policy promotes the integration of renewables, which so far has been hindered by PREPA. Citizens stressed that the integration of renewables is fundamental to the development of Puerto Rico's electric energy system and that the social benefits provided by such integration surpass the renewable energy system costs. It was expressed that no additional charges should be applied to net metering clients to promote and incentivize the integration of renewables. Therefore, deponents argued that while the current penetration of renewables is minimal, the costs associated with it should be distributed to other customers. They understand this way Puerto Rico's public policy is accomplished and the distribution of costs is warranted by the benefits provided by the integration of renewables.

Finally, National Public Finance Guarantee Corporation ("National") expressed its concern with regards to PREPA's revenue requirement not including the part of PREPA's legacy debt included in the Restructuring Support Agreement ("RSA").[348] Specifically, National expressed its concern regarding the current status of the transition charge[349]. As part of the agreement, several conditions and milestones set forth in the RSA need to be met, and accordingly none of those bonds have yet been defeased as part of the securitization. National's concern arises from PREPA's testimony expressing that there is a high probability that the securitization will not happen before the Commission issues its final order in the instant case. Therefore, National requests that the Commission account for all PREPA's

---

348 National submitted its letter to the Commission after the evidentiary hearing had ended. National was not an intervenor in the proceeding; therefore, other parties had no opportunity to question National witnesses. Under these circumstances, the Commission therefore cannot treat National's submission as technical evidence. The Commission has, however, taken into account bondholder concerns by including in its revenue requirement a reasonable projection of legacy debt and coverage ratio in this proceeding, and by approving the Calculation Methodology and Adjustment Mechanism in the Transition Charge proceeding. When the bondholders and PREPA reach an agreement on the amount of debt to be recovered through the Transition Charge, the Commission will be prepared, on request, to make appropriate adjustments to PREPA's revenue requirement.

349 The calculation methodology and adjustment mechanism for the transition charge was approved by the Commission on June 21, 2016 in docket number CEPR-AP-2016-0001. This transition charge mechanism is designed to reduce costs for PREPA's customers. Bondholders holding approximately $7.170 billions of existing PREPA debt, with an estimated weighted average interest rate of 5.86 percent, have agreed to reduce that debt. By means of the transition charge, the existing debt will be replaced by "Restructured Debt".

CEPR

currently non-defeased debt obligations[350] in PREPA's revenue requirement for fiscal year 2017 and corresponding base rates. National recommends that once the securitization process becomes effective, the base rates can be adjusted downward to reflect the discount achieved through the restructuring.[351]

350 Debt held by creditors participating in the securitization and creditors not participating in the securitization.

351 While it is true that the debt that has not been defeased through the securitization process is still part of PREPA's obligations, which must be covered by its rates, it is also true that while the RSA is still in effect, PREPA's obligation to pay such debt is deferred. It is such deferral of the obligation that exempts PREPA from including the debt comprised in the RSA in the revenue requirement for fiscal year 2017 ("FY2017"). Therefore, although both presumptions are true (that the debt is still PREPA's obligation, but there is no obligation to pay for it in 2017) there is a common overall expectation recognized by PREPA and intervenors participating in this proceeding that the restructuring of the debt, as set forth in the RSA, will proceed. Consequently, for the purpose of the revenue requirement for FY2017, the Commission assumes that the payment for the debt included in the RSA is not an expected expense for 2017.

# Attachment 1: Determination of Total Revenue Requirement and Change in Base Rates

Puerto Rico Electric Power Authority
Determination of Total Revenue Requirement and Change in Base Rates
(Thousands of Dollars)

Commission Attachment 1
Page 1 of 1

| Line No. | Description | PREPA Proposed FY2017 (A) | Commission Adjustments (B) | Total Adjusted Results (C) | Base Rates: Commission Adjusted Results (D) | Adjusted FY2017 Fuel and Purchase Power Adjustor Revenue & Expense (E) |
|---|---|---|---|---|---|---|
| 1 | **Operating Expenses** | | | | | |
| 2 | Fuel | $ 655,968 | $ 461,305 | $ 1,117,273 | | $ 1,117,273 |
| 3 | Purchased Power | $ 819,907 | $ - | $ 819,907 | | $ 819,907 |
| 4 | Generation Expenses | $ 122,411 | $ 30,549 | $ 152,960 | $ 152,960 | |
| 5 | Transmission Expenses | $ 34,222 | $ 3,914 | $ 38,136 | $ 38,136 | |
| 6 | Distribution Expenses | $ 169,277 | $ 19,004 | $ 188,281 | $ 188,281 | |
| 7 | Customer Billing Expenses | $ 84,945 | $ 389 | $ 85,334 | $ 85,334 | |
| 8 | Administrative and General Expenses | $ 148,897 | $ (16,602) | $ 132,295 | $ 132,295 | |
| 9 | Bad Debt Expense | $ 85,384 | $ 12,000 | $ 97,384 | $ 97,384 | |
| 10 | Energy Administration Assessment | $ 5,800 | $ (5,800) | $ - | $ - | |
| 11 | **Subtotal Operating Expenses** | $ 2,126,811 | $ 504,759 | $ 2,631,570 | $ 694,390 | $ 1,937,180 |
| 12 | | | | | | |
| 13 | **Subsidies** | | | | | |
| 14 | Energy Administration Assessment | | $ 5,800 | $ 5,800 | $ 5,800 | |
| 15 | Contribution to Municipalities (CILT) | $ 51,784 | $ - | $ 51,784 | $ 51,784 | |
| 16 | Public Lighting | $ 93,241 | $ - | $ 93,241 | $ 93,241 | |
| 17 | Special Customer Subsidies | $ 75,071 | $ (37,170) | $ 37,901 | $ 37,901 | |
| 18 | **Subtotal Subsidies** | $ 220,096 | $ (31,370) | $ 188,726 | $ 188,726 | |
| 19 | | | | | | |
| 20 | Debt Service (Principal & Interest) | $ 314,390 | $ - | $ 314,390 | $ 314,390 | |
| 21 | Debt Service Coverage | | $ 125,756 | $ 125,756 | $ 125,756 | |
| 22 | **Subtotal Debt Service and Coverage** | $ 314,390 | $ 125,756 | $ 440,146 | $ 440,146 | |
| 23 | | | | | | |
| 24 | **Ratepayer Funding of Capital Expenditures** | $ 336,558 | $ (183,096) | $ 153,462 | $ 153,462 | |
| 25 | | | | | | |
| 26 | **Subtotal PREPA Base Rate Revenue Requirement** | $ 2,997,855 | $ 416,049 | $ 3,413,904 | $ 1,476,724 | |
| 27 | | | | | | |
| 28 | **Revenue and Other Income** | | | | | |
| 29 | Other Income | $ (38,925) | $ - | $ (38,925) | $ (38,925) | |
| 30 | Fuel and Purchased Power Adjustor Revenue | $ (1,658,287) | $ (461,305) | $ (2,119,592) | $ (182,412) | $ (1,937,180) |
| 31 | Base Rate Revenue at Current Rates | $ (1,078,387) | $ - | $ (1,078,387) | $ (1,078,387) | |
| 32 | **Subtotal Revenue and Other Income** | $ (2,775,599) | $ (461,305) | $ (3,236,904) | $ (1,299,724) | $ (1,937,180) |
| 33 | | | | | | |
| 34 | **PREPA Base Rate Revenue Deficiency (Excess)** | **$ 222,256** | **$ (45,256)** | **$ 177,000** | **$ 177,000** | **$ -** |
| 35 | | | | | | |
| 36 | **PREPARC Securitization (Transition Charge) Revenue Requirement - Note [b]:** | | | | | |
| 37 | Debt Service for Securitization | $ 394,237 | $ - | $ 394,237 | | |
| 38 | Gross-Up for Collections Lag and Uncollectible Revenue | $ 109,027 | $ - | $ 109,027 | | |
| 39 | **PREPARC (SPV) Revenue Requirement** | $ 503,264 | $ - | $ 503,264 | | |
| 40 | | | | | | |
| 41 | **Total PREPA and PREPARC Revenue Requirements** | $ 3,501,119 (a) | $ 416,049 | $ 3,917,168 | | |

**Notes and Source**

Col.A: PREPA Schedule A-1 REV with reclassification of selected items for presentation clarity

[a] PREPA shows this amount on its Schedule A-1 REV net of PREPA's Other Income:

| | | |
|---|---|---|
| **Total PREPA and PREPARC Revenue Requirements** | $ 3,501,119 | Line 40 |
| Other Income | $ (38,925) | Line 28 |
| **Total PREPA and PREPARC Revenue Requirements per PREPA** | $ 3,462,194 | PREPA Schedule A-1 REV |

[b] The method for determining the PREPARC revenue requirement for the new securitized bonds to be issued and the method for determining the Transition Charge rates related to that was addressed and approved by the Commission in Case No. CEPR-AP-2016-0001.

Col.B: See Commission Attachment 2 for a summary of adjustments and Commission Attachment 3 for additional details.

Cols. D and E: The Commission has determined that PREPA's fuel and purchased power expenses will be collected through the fuel and purchased power adjustors.

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

# Attachment 2: Summary of Commission Adjustments to FY2017 Revenue Requirement

Puerto Rico Electric Power Authority
Summary of Commission Adjustments to FY2017 Revenue Requirement

Commission Attachment 2
Page 1 of 1

(Thousands of Dollars)

| Line No. | Description | Total Commission Adjustments (A) | Debt Service Coverage Ratio Margin (1) | Ratepayer Contributions for FY2017 CapEx Funding (2) | Reclassification of FY2017 CapEx to Generation Maint. Exp. (3) | Special Customer Subsidies Double Count (4) | Fuel Expense Forecast (5) | Operating Expense Needed for Safe & Reliable Operation (6) | Fines and Penalties Expense Not Incurred (7) Note A | Bad Debt Expense (8) Note B | Reconnection Fee Revenue Held to Cost (9) | Subsidies and Expenses (10) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Operating Expenses** | | | | | | | | | | | |
| 2 | Fuel | $ 461,305 | | | | | $ 461,305 | | | | | |
| 3 | Purchased Power | $ - | | | | | | | | | | |
| 4 | Generation Expenses | $ 30,549 | | | $ 16,000 | | | $ 14,175 | | | $ 374 | |
| 5 | Transmission Expenses | $ 3,914 | | | | | | $ 3,809 | | | $ 105 | |
| 6 | Distribution Expenses | $ 19,004 | | | | | | $ 18,487 | | | $ 517 | |
| 7 | Customer Billing Expenses | $ 389 | | | | | | | | | $ 260 | $ 129 |
| 8 | Administrative and General Expenses | $ (16,602) | | | | | | $ (17,057) | | | $ 455 | |
| 9 | Bad Debt Expense | $ 12,000 | | | | | | | | $ 12,000 | | |
| 10 | Energy Administration Assessment | $ (5,800) | | | | | | | | | | $ (5,800) |
| 11 | **Subtotal Operating Expenses** | $ 504,759 | $ - | $ - | $ 16,000 | $ - | $ 461,305 | $ 19,414 | $ - | $ 12,000 | $ 1,711 | $ (5,671) |
| 12 | | | | | | | | | | | | |
| 13 | **Subsidies** | | | | | | | | | | | |
| 14 | Energy Administration Assessment | $ 5,800 | | | | | | | | | | $ 5,800 |
| 15 | Contribution to Municipalities (CILT) | $ - | | | | | | | | | | |
| 16 | Public Lighting | $ - | | | | | | | | | | |
| 17 | Special Customer Subsidies | $ (37,170) | | | | $ (37,041) | | | | | | $ (129) |
| 18 | **Subtotal Subsidies** | $ (37,170) | $ - | $ - | $ - | $ (37,041) | $ - | $ - | $ - | $ - | $ - | $ (129) |
| 19 | | | | | | | | | | | | |
| 20 | Debt Service (Principal & Interest) | $ - | | | | | | | | | | |
| 21 | Debt Service Coverage | $ 125,756 | $ 125,756 | | | | | | | | | |
| 22 | **Subtotal Debt Service and Coverage** | $ 125,756 | $ 125,756 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,541 |
| 23 | | | | | | | | | | | | |
| 24 | **Ratepayer Funding of Capital Expenditures** | $ (183,096) | | $ (183,096) | | | | | | | | |
| 25 | | | | | | | | | | | | |
| 26 | **Subtotal PREPA Base Rate Revenue Requirement** | $ 410,249 | $ 125,756 | $ (183,096) | $ 16,000 | $ (37,041) | $ 461,305 | $ 19,414 | $ - | $ 12,000 | $ 1,711 | $ (259) |
| 27 | | | | | | | | | | | | |
| 28 | **Revenue and Other Income** | | | | | | | | | | | |
| 29 | Other Income | $ - | | | | | | | | | | |
| 30 | Fuel and Purchased Power Adjustor Revenue | $ (461,305) | | | | | $ (461,305) | | | | | |
| 31 | Base Rate Revenue at Current Rates | $ - | | | | | | | | | | |
| 32 | **Subtotal Revenue and Other Income** | $ (461,305) | $ - | $ - | $ - | $ - | $ (461,305) | $ - | $ - | $ - | $ - | $ - |
| 33 | | | | | | | | | | | | |
| 34 | PREPA Base Rate Revenue Deficiency (Excess) | $ (51,056) | $ 125,756 | $ (183,096) | $ 16,000 | $ (37,041) | $ - | $ 19,414 | $ - | $ 12,000 | $ 1,711 | $ (259) |
| 35 | | | | | | | | | | | | |
| 36 | **PREPARC Securitization (Transition Charge) Revenue Requirement** | | | | | | | | | | | |
| 37 | Debt Service for Securitization | $ - | | | | | | | | | | |
| 38 | Gross-Up for Collections Lag and Uncollectible Revenue | $ - | | | | | | | | | | |
| 39 | **PREPARC (SPV) Revenue Requirement** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 40 | | | | | | | | | | | | |
| 41 | **Total PREPA and PREPARC Revenue Requirements** | $ 410,249 | $ 125,756 | $ (183,096) | $ 16,000 | $ (37,041) | $ 461,305 | $ 19,414 | $ - | $ 12,000 | $ 1,711 | $ (259) |

**Notes and Source**

Col A: Sum of Adjustments accepted by the Commission

Columns (1) through (10): See Commission Attachment 3 (which updates Smith and Dady Ex. 5 for the Commission's decisions). The Commission's decision about Reconnection Fee revenue is reflected in column 9 and on Commission Attachment 3, page 9.

Note A: PREPA indicated during the hearing that it had not included any amount for fines or penalties in its FY2017-based revenue requirement so there is no need for this adjustment

Note B: Updated for the impact of the Commission's decisions on other adjustments

CEPR 2014

# Attachment 3: Commission Adjustments to FY2017 Revenue Requirements

Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements

Commission Attachment 3
Page 1 of 10

Reflect Debt Service Coverage
(Thousands of Dollars)

| Line No. | Description | Amount (A) | Reference |
|---|---|---|---|
| | **Calculation of Debt Service Coverage** | | |
| 1 | PREPA Debt Service (Principal and Interest) | $ 314,390 | PREPA Schedule A-1 REV |
| 2 | Debt Service Coverage Ratio | 1.4 x | Commission Advisor Hill |
| 3 | Debt Service Coverage | $ 440,146 | |
| | **Summary** | | |
| 4 | PREPA Debt Service (Principal and Interest) | $ 314,390 | Line 1 |
| 5 | Debt Service Coverage Margin | $ 125,756 | Line 3 - Line 1 |
| 6 | **Total Debt Service and Debt Service Coverage** | $ 440,146 | |
| 7 | **Adjustment to Provide for 1.4x Debt Service Coverage Margin** | **$ 125,756** | Line 5 |

**Notes and Source**

This adjustment is to recognize a Debt Service Coverage Ratio (DSCR) margin based on the DSCR recommendation of Commission Advisor Stephen Hill

CEPR
2014



Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements

Adjust Amount of Ratepayer Contributions for FY2017 Capital Expenditure Funding
(Thousands of Dollars)

| Line No. | Description | | | Amount (A) | Reference |
|---|---|---|---|---|---|
| 1 | PREPA Requested Ratepayer Funding of FY2017 Capital Expenditures | | | $ 336,558 | PREPA Schedule A-1 REV |
| | **Commission Advisor Adjustments** | | | | |
| 2 | Adjust for amount recognized in DSCR Margin | | | $ (125,756) | Note A |
| 3 | Limit Ratepayer Funding of Aguirre Offshore Gas Port (AOGP) in FY2017 to amount approved in the Commission's IRP Order | | | $ (41,340) | Note B |
| 4 | Adjust PREPA FY2017 Capital Expenditures for Meters (PIV 16677) | | | | Note C |
| | Reclassify Certain PREPA Capital Expenditures as Generation O&M Expense: | | | | |
| | | PREPA PIV # | Description | | |
| 5 | | 15880 | Major Inspection "C" Unit 1-3 Cambalache | $ (4,000) | Note D |
| 6 | | 16945 | Combined Cycle Improvement U-5 San Juan Steam Plant | $ (6,000) | Note D |
| 7 | | 16946 | Combined Cycle Improvement U-6 CSJ | $ (6,000) | Note D |
| 8 | **Total Commission Advisor Adjustments to Ratepayer Funding of FY2017 CapEx** | | | **$ (183,096)** | Sum of lines 2 through 6 |
| 9 | Adjusted Ratepayer Funding of PREPA FY2017 Capital Expenditures | | | $ 153,462 | Note E |

**Notes and Source**

This adjustment reflects Commission Advisor adjustments to the amount of PREPA's requested FY2017 ratepayer funding of Capital Expenditures

[A] A portion of PREPA's proposed FY2017 Capital Expenditures is covered by the DSCR margin recommended by Commission Advisor Hill See page 1 of this schedule.

[B] Commission Advisors Fisher and Horowitz recommend limiting FY2017 capital expenditures for the AOBP to the amount allowed in the Commission's IRP Order:

| | Amount in Dollars | Reference |
|---|---|---|
| PREPA Proposed FY2017 Capital Expenditures for AOGP | $ 56,339,808 | PREPA Schedule F-3 REV |
| AOGP capital spending authorized in the Commission's IRP Order | $ 15,000,000 | Fisher/Horowitz Expert Report |
| FY2017 AOGP capital expenditure adjustment | $ 41,339,808 | Fisher/Horowitz Expert Report |

[C] Commission Advisors Fisher and Horowitz recommend limiting PREPA's Capex for FY2017 capital expenditures from capital to exclude an amount of costs that is estimated for AMI meters. The Commission did not accept that adjustment.

[D] Commission Advisors Fisher and Horowitz recommend reclassifying certain FY2017 capital expenditures from capital to generation O&M. This reflects such reclassification of the following PREPA proposed FY2017 capital expenditures:

[E] Having current year ratepayer funding of PREPA's Capital Expenditures is not recommended as a permanent component of PREPA's revenue requirment methodology. As explained in the Hill and Smith/Dady reports, including this as a component of PREPA's base rate revenue requirement should only continue until PREPA has restored financial viability and can access external capital markets at reasonable cost to finance its CapEx. At that point, PREPA debt service and a DSCR would continue to be included in the determination of PREPA's base rate revenue requirement, and the special ratepayer-funding of CapEx would cease.

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4



Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements

Reflect Relcassification of Certain PREPA Proposed FY2017 Capital Expenditures to Generation Maintenance Expense
(Thousands of Dollars)

| Line No. | Description | | Amount (A) | Reference |
|---|---|---|---|---|
| | Reflect Reclassification of Certain PREPA Proposed FY2017 Capital Expenditures to Generation Maintenance Expense to Increase Generation Maintenance Expense | | | |
| | PREPA Project (PIV) | Description | | |
| 1 | 15880 | Major Inspection "C" Unit 1-3 Cambalache | $ 4,000 | Note A |
| 2 | 16945 | Combined Cycle Improvement U-5 San Juan Steam Plant | $ 6,000 | Note A |
| 3 | 16946 | Combined Cycle Improvement U-6 CSJ | $ 6,000 | Note A |
| 4 | | | | |
| 5 | Increase to Generation Maintenance Expense for Reclassification | | $ 16,000 | |

**Notes and Source**

This adjustment reflects Commission Advisor adjustments to the amount of PREPA's requested FY2017 ratepayer funding of Capital Expenditures

[A] Commission Advisors Fisher and Horowitz recommend reclassifying certain FY2017 capital expenditures from capital to generation O&M. This reflects such reclassification of the PREPA proposed FY2017 capital expenditures listed above

Additonal source for dollar amounts: PREPA Schedule F-3 REV

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements

Commission Attachment 3
Page 4 of 10

Remove Double-Count of Special Customer Subsidies and Revenue at Current Rates
(Thousands of Dollars)

| Line No. | Description | Amount (A) | Reference |
|---|---|---|---|
| | **Special Customer Subsidies** | | |
| 1 | General Agricultural Service Tariff | $ (525) | Note A |
| 2 | Low-Income Consumer Subsidies (RH3, LRS), and | $ (16,439) | Note A |
| 3 | Fixed Public Housing Rate (RFR Tariff) | $ (20,077) | Note A |
| 4 | Adjustment to Special Customer Subsidies | $ (37,041) | Notes A and B |

**Notes and Source**

[A] This adjustment reflects an adjustment identified by Commission Advisor Chernick to remove a double-count identified in PREPA's filing of certain Special Customer Subsidies and Revenue at Current Rates.

Commission Advisor Chernick has identified the following double counts in his detailed review of PREPA's proposed Special Customer Subsidies and PREPA's revenue at existing rates:

| Amount (in dollars) | Rates Affected by the Rate Discount |
|---|---|
| $524,933 | for the General Agricultural Service Tariff, |
| $16,438,851 | for Low-Income Consumer Subsidies (RH3, LRS), and |
| $20,076,641 | for the Fixed Public Housing Rate (RFR Tariff) |
| $37,040,425 | Total amount counted by PREPA in Special Customer Subsidies and reflected by PREPA in revenue at current rates |

[B] An alternative way of removing the impact of the double-count identified by Commission Advisor Chernick would be to add the dollar amount identified above to PREPA's base rate revenue at current rates.

CEPR
COMISION DE ENERGIA DE PUERTO RICO
2 0 1 4

Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements



Adjust Fuel Expense Forecast
(Thousands of Dollars)

| Line No. | Description | Amount (A) | Reference |
|---|---|---|---|
| 1 | Fuel Expense | $ 461,305 | Note A |
| 2 | Fuel Adjustor Revenue | $ (461,305) | Note B |
| 3 | Net Impact on Base Rate Revenue Requirement | $ - | Notes A and B |

Notes and Source

[A] This adjustment reflects an adjustment to Fuel Expense recommended by Commisson Advisors Horowitz and Fisher

[B] Because PREPA's Fuel Adjustor will be recovering fluctuations in Fuel Expense via its Fuel Adjustor an equal amount is being added to Fuel Revenue Currently, PREPA's Fuel Adjustor recovers more than the Fuel Expense due to the inclusion of a 0.89 factor in the denominator; however, under both PREPA's recommendation and the Commission Advisors' recommendations, that factor (for CILT) is being removed from PREPA's Fuel (and Purchased Power) Adjustors, prospectively, effective with the new base rates established in the current PREPA rate case

[C] The Commission has determined that PREPA will recover its Fuel Expenses through the Fuel Adjustor and its Purchased Power Expenses through the Purchased Power Adjustor, rather than recovering a base amount of Fuel and Purchased Power Expense through Base Rates

CEPR COMISIÓN DE ENERGÍA DE PUERTO RICO 2 0 1 4



Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements

Adjust Operating and Maintenance Expense for Synapse Recommended Levels for Safe and Reliability Operation of the Electric Utility
(Millions of Dollars)

| Line No. | Description | Labor Expense (A) | Non-Labor Expense (B) | Total Operating Expenses (C) |
|---|---|---|---|---|
| 1 | Generation Expense | $ 9.680 | $ 4.495 | $ 14.175 |
| 2 | Transmission Expense | $ 3.330 | $ 0.479 | $ 3.809 |
| 3 | Distribution Expense | $ 16.115 | $ 2.372 | $ 18.487 |
| 4 | Admininstrative and General Expense | $ (17.057) | | $ (17.057) |
| 5 | Net Impact on Base Rate Revenue Requirement | $ 12.068 | $ 7.346 | $ 19.414 |

**Notes and Source**

[A] This adjustment reflects an adjustment to PREPA's proposed FY2017 Operating Expenses recommended by Commisson Advisors Horowitz and Fisher to assure that there is an adequate O&M Expense budget for the safe and reliabile operation of the electric system

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements



Remove Budgeted FY2017 Expense Amount for Fines and Penalties
(Millions of Dollars)

| Line No. | Description | Operating Expense Adjustment | Reference |
|---|---|---|---|
| 1 | Admininstrative and General Expense | Note A | PREPA Response to CEPR-Rs-05-31 |

**Notes and Source**

PREPA's response to CEPR-RS-05-31 indicates that for FY2017 PREPA budgeted $624,446 in account 923 for the concept of stipulated fines and penalties that may occur for non-compliance with federal and state environmental laws and regulations. PREPA's response to CEPR-RS-05-32, however, indicates that for FY2017 PREPA has not received any notifications of related to environmental deviations or other matters.

Note A: PREPA indicated during the hearing that it had not included any amount for fines or penalties in its FY2017-based revenue requirement, so there is no need for this adjustment.

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2014



Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements

Bad Debt Expense
(Thousands of Dollars)

| Line No. | Description | Amount (A) | Reference |
|---|---|---|---|
| | **Commission Advisor Adjustments to Net Revenue Requirement** | | |
| 1 | Total Commission Advisor Adjustments on Net Revenue Requirement | $ 404,049 | See below |
| 2 | Uncollectible Factor | 2.97% | PREPA Filing Detail |
| 3 | Bad Debt Expense | $ 12,000 | Note A |

**Notes and Source**

This adjustment is to recognize the impact on Bad Debt Expense from the Commission's other adjustments to PREPA's net revenue requirement

| | Adjustments from Commission Attachment 2, Line 25 | Amount |
|---|---|---|
| 4 | Debt Service Coverage Ratio Margin | $ 125,756 |
| 5 | Adjust Amount of Ratepayer Contributions for FY2017 Capital Expenditure Funding | $ (183,096) |
| 6 | Reflect Relcassification of Certain PREPA Proposed FY2017 Capital Expenditures to Generation Maintenance Expense | $ 16,000 |
| 7 | Remove Double-Count of Special Customer Subsidies and Revenue at Current Rates | $ (37,041) |
| 8 | Adjust Fuel Expense Forecast | $ 461,305 |
| 9 | Adjust Operating and Maintenance Expense for Synapse Recommended Levels for Safe and Reliability Operation of the Electric Utility | $ 19,414 |
| 10 | Remove Budgeted FY2017 Expense Amount for Fines and Penalties | $ - |
| 11 | Puerto Rico Electric Power Authority | $ 1,711 |
| 12 | Total Commission Advisor Adjustments on Net Revenue Requirement | $ 404,049 |

Note A: The impact on Bad Debt Expense has been recalculated to reflect the impact of the Commission's decisions on other adjustments

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements



Reconnection Fee Revenue - Impact on PREPA's FY2017 Operating Expenses If the Reconnection Fee Increase is Held to the Cost of Reconnection

| Line No. | Description | Totals (A) | Increase (B) | Reference |
|---|---|---|---|---|
| | **I. Annual Revenue from Reconnection Fee as Estimated by PREPA** | | | |
| | Annual revenue for reconnection fee: | | | |
| 1 | at current tariff | $ 5,100,000 | | |
| 2 | at cost based rates | $ 10,646,760 | $ 5,546,760 | CEPR-RS-05-21(d) |
| 3 | at PREPA proposed rates (which would be beyond PREPA's cost) | $ 15,300,000 | $ 10,200,000 | CEPR-RS-05-21(d) |
| 4 | Ratio (Revenue increase at above cost rates vs revenue increase at cost-based rates) | | 0.5438 | Line 2 / Line 3 |
| | **II. Adjustment to Remove Above Cost Portion** | | | |
| 5 | Above cost portion | | 0.4562 | 1 - cost ratio (on line 4) |
| 6 | Increasing Deconnection Charges - reflected for FY2017 by PREPA | | $ 3,750,000 | CEPR-RS-01-14 & PREPA summary of Customer Service Performance Improvements Also see Table below |
| 7 | Removal of above-cost portion - applied to $3.75 million assumed by PREPA PREPA reflected the $3.75 million as a reduction to expense - removal of the above-cost portion thus increases PREPA's proposed expenses | | $ 1,710,750 | Line 5 x Line 6 |

**III. Adjust FY2017 Expenses in same manner that PREPA Reflected the "Customer Service Performance Improvements" in its Revenue Requirement Calculation**

| Line No. | Component | Source for percentages | Percent (C) | Expense Adjustment (Dollars) (D) | Expense Adjustment ($000) (E) |
|---|---|---|---|---|---|
| 8 | Generation Expenses | Smith-Dady Report page 34, Table 12 and PREPA's Rate Case Financial Model - see below | 21.87% | $ 374,119 | $ 374 |
| 9 | Transmission Expenses | | 6.11% | $ 104,592 | $ 105 |
| 10 | Distribution Expenses | | 30.24% | $ 517,356 | $ 517 |
| 11 | Customer Billing Expenses | | 15.18% | $ 259,614 | $ 260 |
| 12 | Administrative and General Expenses | | 26.60% | $ 455,069 | $ 455 |
| 13 | Total Adjustment to Expenses | | 100.00% | $ 1,710,750 | $ 1,711 |

**IV. Referenced Tables from Smith-Dady Report**

Percentage of FY2014 O&M Expense by Category

| Description | FY2014 | To Col. C Above Ratio |
|---|---|---|
| Generation Expenses | $ 160,541,902 | 21.87% |
| Transmission Expenses | $ 44,882,530 | 6.11% |
| Distribution Expenses | $ 222,007,607 | 30.24% |
| Customer Billing Expenses | $ 111,405,645 | 15.18% |
| Administrative and General Expenses | $ 195,279,419 | 26.60% |
| Total | $ 734,117,183 | 100.00% |

Source: PREPA's Rate Case Financial Model
Smith-Dady Report page 34, Table 12

Summary of Non-Fuel Performance Improvements

| Description | Amount | |
|---|---|---|
| **Customer Service** | | |
| Increasing Disconnection Costs | $ 3,750,000 | To Line |
| Theft Recoveries and Reduced T&D Loss | $ 20,000,000 | |
| Total Customer Service Related Savings | $ 23,750,000 | |
| **Procurement** | | |
| Fleet and Shops | $ 17,500,000 | |
| Procurement and Inventory | $ 37,500,000 | |
| Total Procurement Related Savings | $ 55,000,000 | |
| **Other (Net)** | | |
| Medical Benefit Savings | $ 14,000,000 | |
| Headcount Reduction | $ 10,000,000 | |
| Total Other (Net) Related Savings | $ 24,000,000 | |
| Total Non-Labor Performance Improvements | $ 102,750,000 | |

Smith-Dady Report page 33, Table 11

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

Commission Attachment 3
Page 10 of 10

Puerto Rico Electric Power Authority
Commission Adjustments to FY2017 Revenue Requirements

Reclassification of Energy Commission Assessment and Direct Debit Credit and PREPA Claimed Subsidies Error
(Thousands of Dollars)

| Line No. | Description | Total Amount (A) | Subsidies (B) | Operating Expenses (C) | Footnote Reference | Attachment 2 Reference |
|---|---|---|---|---|---|---|
| | **I. Energy Commission Assessment** | | | | | |
| 1 | Operating Expenses | $ (5,800) | | $ (5,800) | Note A | Att 2, L.10 |
| 2 | Subsidies | $ 5,800 | $ 5,800 | | Note A | Att 2, L.14 |
| 3 | Net Adjustment | $ - | | | Note A | |
| | **II. Direct Debit Credit** | | | | | |
| 4 | Operating Expenses | $ 129 | | $ 129 | Note B | Att 2, L.7 |
| 5 | Subsidies | $ (129) | $ (129) | | Note B | Att 2, L.17 |
| 6 | Net Adjustment | $ - | | | Note B | |
| | **III. PREPA Claimed CILT and Subsidies Pass-Through Error** | | | | | |
| 7 | PREPA Claimed error from Subsidies | $ - | $ - | | Note C | Att 2, L.17 |
| | **IV. Net Adjustment** | | | | | |
| 8 | Net Adjustment affecting PREPA's Revenue Requirement | $ - | $ 5,671 | $ (5,671) | | |

**Notes and Source**

[A] The Commission has determined that the Energy Commission Assessment will be recovered through the Subsidies Rider (as required by statute).

[B] The Commission has determined that the Direct Debit Credit is an Operating Expense, not a component of the Subsidies

[C] PREPA Brief at 70 claimed that there was a $643k error. The Commission was not able to verify this and has not accepted this adjustment. The Commission has reconciled the Subsidies amounts as shown on Attachment 4. The Subsidies amounts, as adjusted by the Commission, reconcile to the amount reflected in the revenue requirement without any need for PREPA's claimed correction.

CEPR
COMISIÓN DE ENERGÍA DE PUERTO RICO
2 0 1 4

# Attachment 4: Contribution in Lieu of Taxes and Subsidies Adjustments

Puerto Rico Electric Power Authority

Commission Attachment 4
Page 1 of 2

Contribution in Lieu of Taxes and Subsidies Adjustments

Summary of PREPA As-Filed Contribution in Lieu of Taxes and Subsidies

| Line No. | Description | As filed by PREPA Amount | | Per PREPA Filing (in $000) | |
|---|---|---|---|---|---|
| 1 | Contribution to Municipalities | $ 51,783,821 | | $ 51,784 | |
| 2 | Public Lighting | $ 93,240,901 | | $ 93,241 | |
| 3 | Special Customer Subsidies | $ 75,071,020 | | $ 75,071 | |
| 4 | Total | $ 220,095,742 | [A] | $ 220,096 | [A] |
| | | | | | |
| 5 | CILT Subsidy Recovery in FCA and PPCA | $ 182,411,548 | | | |
| 6 | CILT Subsidy Recovery Required in Base Rates | $ 37,685,194 | | | |
| 7 | Total | $ 220,096,742 | [A] | | |

**Notes and Source**

Source: PREPA Schedules A-1 REV and L-2 (L 000002) FY2017
PREPA response to CEPR-RS-01-11
PREPA Ex. 4.0 at page 11
[A] See Commission Attachment 1, column A, line 18

CEPR COMISION DE ENERGIA DE PUERTO RICO 2 0 1 4

Puerto Rico Electric Power Authority
Contribution in Lieu of Taxes and Subsidies Adjustments

Commission Attachment 4
Page 2 of 2

| Line No. | Subsidies/Credits | PREPA FY 2017 Estimate (A) | | Amount in "Subsidy Rider" (B) | | Reflected As An Operating Expense (C) | Removed PREPA's Double Count (D) |
|---|---|---|---|---|---|---|---|
| 1 | Life-Preserving Equipment | $ 2,547,894 | | $ 2,547,894 | | | |
| 2 | General Agricultural Service | $ 524,933 | | | | | $ 524,933 |
| 3 | Analog Rate | $ 5,521,495 | | $ 5,521,495 | | | |
| 4 | Low-Income Tariffs | | | | | | |
| 5 | LRS Tariff | $ 15,416,766 | | | | | $ 15,416,766 |
| 6 | RH3 Tariff | $ 1,022,085 | | | | | $ 1,022,085 |
| 7 | Hotel 11% Discount | $ 5,463,401 | | $ 5,463,401 | | | |
| 8 | Rural Aqueducts on GRS | $ 4,220 | | $ 4,220 | | | |
| 9 | Irrigation District Deficit | $ 4,152,000 | | $ 4,152,000 | | | |
| 10 | Residential Fuel Subsidy | $ 18,630,971 | | $ 18,630,971 | | | |
| 11 | Condo Common Areas | $ 1,321,289 | | $ 1,321,289 | | | |
| 12 | Direct Debit Credit | $ 129,428 | | | | $ 129,428 | |
| 13 | Downtown 10% Subsidy | $ 1,775 | | $ 1,775 | | | |
| 14 | RFR Tariff | $ 20,076,641 | | | | | $ 20,076,641 |
| 15 | Act 73 Income Tax Credit | $ 258,121 | | $ 258,121 | | | |
| 16 | **Other Subsidy Categories** | | | | | | |
| 17 | Public Lighting | $ 93,241,901 | | $ 93,241,901 | | | |
| 18 | Energy Commission | $ 5,800,000 | | $ 5,800,000 | | | |
| 19 | **Subtotal - Subsidies** | $ 174,112,921 | | $ 136,943,067 | | | |
| 20 | **Unquantified PREPA Claimed Subsidies** | | | | | | |
| 21 | Load-Retention Rider | tbd | | | | | |
| 22 | **Contribution in Lieu of Taxes** | $ 51,783,821 | | $ 51,783,821 | | | |
| 23 | **TOTALS CILT and Subsidies** | $ 225,896,742 | | $ 188,726,888 | | $ 129,428 | $ 37,040,425 |
| 24 | | | | | | | |
| 25 | **Categories:** | | | | | | |
| 26 | Public Lighting | $ 93,241,901 | [1] | $ 93,241,901 | | $ - | $ - |
| 27 | Contribution in Lieu of Taxes | $ 51,783,821 | [1] | $ 51,783,821 | | $ - | $ - |
| 28 | Special Customer Subsidies | $ 75,071,019 | [1] | $ 37,901,166 | | $ 129,428 | $ 37,040,425 |
| 29 | **SUBTOTAL** | $ 220,096,741 | [1] | $ 182,926,888 | | $ 129,428 | $ 37,040,425 |
| 30 | Energy Commission | $ 5,800,000 | | $ 5,800,000 | | $ - | $ - |
| 31 | **TOTALS** | $ 225,896,741 | | $ 188,726,888 | [2] | $ 129,428 | $ 37,040,425 |
| 32 | | | | | | | |
| 33 | **DIFFERENCE, COMMISSION ADJUSTED VS. PREPA FILED** | | | $ (37,169,853) | | $ 37,169,853 | |
| | | | | Col.B - Col.A Total | | Cols. C & D Totals | |

**Notes and Source**

Col.A: Commission Advisor Paul Chernick Report, page 87, Table 9, Summary of Characteristics of PREPA-Claimed Subsidies
[1] Also see Commission Attachment 4, page 1, for PREPA's as-filed amounts
Col.B: Commission Adjusted Subsidies
[2] Compare line 33 column B Total with

| | |
|---|---|
| Commission Adjusted Subsidies amount per Attachment 1, column D | $ 188,725,572 |
| Difference (rounding) | 1,316 |
| Percent difference | 0.0007% |

Col.C: Reclassified expense, see Commission Attachment 3, page 10
Col.D: PREPA Double-Count removed, see Commission Attachment 3, page 4