negotiation, drafting, execution, and delivery of the Definitive Documents and Additional Definitive Documents (to the extent relating to treatment of Bonds subject to the RSA). Upon written confirmation of an agreement (which confirmation may be by email and must specifically state that it constitutes an agreement pursuant to this Section 10), after consultation with the Consulting Parties, and, if required by Sections 1(b)(iv)-(v), with the consent of the Consulting Parties, among the Super Majority Uninsured Holders, Assured and each Government Party on, and finalization of, the Definitive Documents, this Definitive RSA shall automatically be deemed amended to replace the corresponding portions of the Recovery Plan Term Sheet with the Definitive Documents as Exhibit C hereto and all references in this Agreement to such portions of the Recovery Plan Term Sheet shall be deemed to be references to the Definitive Documents or Additional Definitive Documents, as applicable.

(b) Subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Definitive RSA, and shall refrain from taking any action that would frustrate the purposes and intent of this Definitive RSA.

**Section 11** **Representations and Warranties**.

(a) <u>Mutual Representations and Warranties</u>. Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date a Supporting Holder becomes a party hereto):

(i) such party has the legal right, power and authority to enter into this Agreement;

(ii) this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application);

(iii) except in the case of an individual, it is duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver, and to perform and observe, the terms and provisions of this Agreement;

(iv) the execution, delivery, performance, and observance of this Agreement by such Party (A) has been duly authorized by all necessary action on the part of such Party, does not and will not conflict with, or result in a violation of, any law applicable to it, and does not require it to obtain any permit, consent, approval, order, or authorization of, or provide notice to or make a filing with, any court, governmental or regulatory agency or authority, or other person or entity that has not been obtained, provided, or made, as applicable, (B) except to the extent modified, stayed or otherwise excused by PROMESA, (1) with respect to FOMB, AAFAF, and PREPA, does not contravene, or constitute a default under any provision of applicable law or regulation or of any agreement, judgment,

45

injunction, order, decree, or other instrument binding on FOMB, AAFAF, or PREPA, as applicable, and (2) with respect to each Party, does not and will not violate, conflict with, or result in the breach of any provision of its organizational or governance documents, and (C) does not and will not result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of, termination, amendment, acceleration, suspension, revocation, or cancellation of any note, bond, mortgage, indenture, contract, agreement, lease, sublease, license, permit, franchise, or other instrument or arrangement to which it is a party, which would materially adversely affect its ability to carry out its obligations under and otherwise observe this Agreement or cause the occurrence of a Stipulated Treatment Termination; provided, however, that clause (C) hereof shall not apply to any note, bond, mortgage, indenture, contract, agreement, lease, sublease, license, permit, franchise, or other instrument or arrangement to which PREPA is a party.

(b) <u>Additional Representations of Supporting Holders</u>. Each Supporting Holder individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, in the case of a Party executing a Joinder Agreement other than in connection with a pending Transfer, as of the date of such Joinder Agreement, and in the case of a Party executing a Joinder Agreement in connection with a pending Transfer of Uninsured Bonds to such joining Party, upon consummation of such pending Transfer of Uninsured Bonds to such joining Party) (each of which is a continuing representation, warranty, and covenant): that it owns or has investment management responsibility for accounts that own Uninsured Bonds in the principal amounts set forth on its respective signature page hereto or its Joinder Agreement (as applicable), which it would be entitled to vote on in a plan (or qualifying modification) solicitation, and that it has not sold, assigned, transferred, participated, or otherwise pledged such Bonds, or any voting, consent, or direction rights related to such Bonds, to any other person or entity that would prevent or adversely affect in any way such Supporting Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed, in each case except as permitted by Section 6(c).

(c) <u>Additional Representation of the Ad Hoc Group Members</u>. Each Ad Hoc Group Member that is party to this Agreement on the RSA Execution Date individually represents and warrants to the other Parties that as of the RSA Execution Date it does not beneficially own or control any Uninsured Bonds in a Qualified Marketmaker capacity.

**Section 12** <u>Disclosure; Publicity</u>. Each Government Party shall endeavor to submit drafts to the Ad Hoc Group<u>, Syncora, National,</u> and Assured of any press releases, public documents, and any and all filings with the SEC, the Municipal Securities Rulemaking Board, or any state or Puerto Rico governmental agency regarding this Definitive RSA or the Restructuring at least two (2) business days, to the extent practicable, before making any such disclosure. Except as required by applicable law or otherwise permitted under the terms of any other agreement between a Party and the applicable Supporting Holder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Supporting Holder), other than advisors to the Government Parties and the Ad Hoc Group, the principal amount or

percentage of Bonds held by the applicable Supporting Holder, in each case, without such Supporting Holder's prior written consent. Notwithstanding the provisions in this Section 12, any Party may disclose, to the extent consented to in writing by a Supporting Holder, such Supporting Holder's individual holdings, and, for the avoidance of doubt, a Supporting Holder shall be permitted to disclose its own individual holdings. Any public filing of this Definitive RSA, with the Title III Court or otherwise, which includes executed signature pages to this Definitive RSA shall include such signature pages only in redacted form with respect to the holdings of each Supporting Holder; provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Title III Court under seal.

**Section 13** **Amendments and Modifications**. ~~The~~

(a) Subject to subsections (b) and (c) of this Section 13, the terms and conditions of this Agreement, including any exhibits, annexes, or schedules to this Agreement, may not be waived, modified, amended, or supplemented without consultation with the Consulting Parties and the written consent of (i) FOMB, (ii) PREPA, (iii) AAFAF, and (iv) the Super Majority Holders ~~and (v) Assured~~, after consultation with the Consulting Parties; provided that the foregoing is subject to the withdrawal rights pursuant to Section 9(a).

(b) The terms and conditions of this Agreement, including any exhibits, annexes, or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the written consent of National if such waiver, modification, amendment, or supplement (a) modifies National's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to National as an Insurer of the National Insured Bonds, or (c) provides for legal rights or obligations of National that are different in any material respect from those of any other Supporting Party.

(c) The terms and conditions of this Agreement, including any exhibits, annexes, or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the written consent of Syncora if such waiver, modification, amendment, or supplement (a) modifies Syncora's economic recovery in a manner different from any other Supporting Holder, (b) alters the economic terms that are specific/unique to Syncora as an Insurer of the Syncora Insured Bonds, or (c) provides for legal rights or obligations of Syncora that are different in any material respect from those of any other Supporting Party.

**Section 14** **Effectiveness**. Except as specifically provided herein, this Definitive RSA shall become effective and binding on the RSA Execution Date; provided that, until entry of the 9019 Order, (i) the 9019 Settlement shall not be effective; (ii) the Government Parties shall have no obligation to impose the Settlement Charge or Increased Settlement Charge; make Settlement Payments, Increased Settlement Payments, or Adequate Protection Payments; or propose a Plan providing for issuance of Securitization Bonds or Stipulated Treatment; and (iii) the Supporting Holders shall not be entitled to Administrative Claims, the Stipulated Treatment, or Waiver and Support Fees and shall not be obligated to vote in favor of any Plan, qualifying modification, exchange, or restructuring. Notwithstanding the foregoing, in the event the Settlement Motion is denied or the 9019 Order is not entered prior to a termination pursuant to Section 9(d)(iii), this Definitive RSA shall be deemed to have been void *ab initio* and shall be of no further force and effect; provided that the obligations of the Government Parties under Section 22 shall survive

with respect to any fees or expenses incurred prior to the date of such denial or termination and required to be reimbursed under the terms of Section 22.

**Section 15**     **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a) THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF, EXCEPT THAT, WITH RESPECT TO THE EXISTENCE, POWERS, LEGAL CAPACITY, AND AUTHORITY OF (I) EACH OF AAFAF AND PREPA, THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO, EXCLUDING THE CONFLICT OF LAWS PRINCIPLES THEREOF, AND (II) AS TO FOMB, THIS AGREEMENT SHALL BE GOVERNED BY PROMESA. Each Party hereto agrees that it shall bring any action or proceeding with respect to any claim arising out of or related to this Agreement in the Title III Court (or a court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter. The Government Parties submit to the jurisdiction of the Chosen Court and irrevocably waive any immunity from suit in the Chosen Court that they may have for any action or proceeding arising out of or relating to this Definitive RSA or the 9019 Order.

(b) Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Definitive RSA or the transactions contemplated herein (whether based on contract, tort or any other theory).

(c) The rights and obligations of the Parties under this Agreement and the 9019 Order shall be binding and enforceable against the Parties, and, to the extent necessary, the Government Parties consent for purposes of section 305 of PROMESA to such enforcement by the Chosen Court.

**Section 16**     **Specific Performance/Remedies**. The Parties understand and agree that monetary damages would be an insufficient remedy for any breach of this Definitive RSA by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, without the necessity of proving the inadequacy of monetary damages as a remedy. Specific performance and injunctive or other equitable relief to the extent appropriate and allowed by applicable law and the right to terminate this Definitive RSA in accordance with the terms of this Definitive RSA shall be the sole and exclusive remedies for any breach of this Definitive RSA by any Party. Without limiting the ability of a Party to sue for payment of money owed under this Agreement or the 9019 Order, no person or entity shall be entitled to monetary damages for any breach of this Agreement or the 9019 Order. Each Party hereby waives any requirement for security or the posting of any bond in connection with such remedies.

**Section 17** **Survival**. Subject to entry of the 9019 Order, notwithstanding the termination of this Definitive RSA pursuant to Section 9(d)(vi) (as to PREPA or AAFAF), pursuant to an Individual Termination (as to an individual Supporting Holder), or a Stipulated Treatment Termination (as to all Parties), Sections 9(c) and 15-19(a), 20-22 and 24-31 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

**Section 18** **Headings**. The headings of the sections, paragraphs, and subsections of this Definitive RSA are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Definitive RSA.

**Section 19** **Successors and Assigns; Severability**.

(a) This Definitive RSA is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided that nothing contained in this Section 19 shall be deemed to permit Transfers of the Bonds or any related Claims other than in accordance with the express terms of this Definitive RSA. If any provision of this Definitive RSA, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and the remainder of this Definitive RSA shall continue in full force and effect.

(b) Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Definitive RSA so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**Section 20** **Several, Not Joint, Obligations**. The agreements, representations, warranties, and obligations of the Parties under this Definitive RSA are, in all respects, several and not joint.

**Section 21** **Relationship Among Parties**. Unless expressly stated herein, this Definitive RSA shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof. No Party shall have any responsibility for any trading by any other entity by virtue of this Definitive RSA. Except as expressly set forth in this Definitive RSA, nothing in this Definitive RSA shall be construed to affect any actual or potential claims arising from any obligation of the Government of Puerto Rico or any of its instrumentalities other than PREPA. Except as expressly set forth in this Definitive RSA, nothing in this Definitive RSA shall constitute or be construed as a waiver or release of any claims or causes of action against FOMB, AAFAF, PREPA, or the Government of Puerto Rico or any of its affiliates or instrumentalities prior to the Effective Date.

No Bondholder shall have any liability to any other Bondholder arising from or related to: (i) any extensions of the deadlines set forth herein pursuant to the terms of this Definitive RSA; (ii) the termination of this Definitive RSA pursuant to its terms, whether or not such termination is as to all Supporting Holders; (iii) any waivers, modifications, amendments, or supplements of or to this Definitive RSA; or (iv) the exercise of, or failure to exercise, any other consent, termination, or other rights pursuant to this Definitive RSA or the 9019 Order. This

paragraph shall be included in the 9019 Order.

**Section 22** **Fees & Expenses**.

(a) (i) The reasonable fees and reasonable expenses of the Ad Hoc Group incurred in connection with the Preliminary RSA, this Definitive RSA, and any documents and transactions relating to or implementing the foregoing on or after July 23, 2018 through the Effective Date (or, if earlier, a Stipulated Treatment Termination), limited to one (1) primary law firm, one (1) municipal bond counsel law firm, one (1) Puerto Rico law firm, one (1) financial advisor, and one (1) utility consultant, shall be reimbursed by PREPA on a monthly basis within sixty (60) days following submission of an invoice and redacted time detail summary to counsel to FOMB, PREPA, and AAFAF and (ii) the reasonable fees and reasonable expenses of the Ad Hoc Group members up to $25 million for the period prior to July 23, 2018, shall be reimbursed on the Effective Date as agreed in connection with the Preliminary RSA.

(b) The reasonable fees and reasonable expenses of Assured incurred in connection with the Preliminary RSA, this Definitive RSA and any documents and transaction relating to or implementing the foregoing on or after August 1, 2018 through the earliest to occur of (i) the Effective Date, (ii) a Stipulated Treatment Termination, or (iii) an Individual Termination as to Assured, limited to one (1) primary law firm, one (1) Puerto Rico law firm, one (1) financial advisor, one (1) municipal bond counsel law firm, and one (1) utility consultant, shall be reimbursed by PREPA on a monthly basis within sixty (60) days following submission of an invoice and redacted time detail summary to counsel to FOMB, PREPA, and AAFAF. The reasonable fees and reasonable expenses of each of Syncora and National incurred in connection with the Preliminary RSA, this Definitive RSA and any documents and transaction relating to or implementing the foregoing on or after August 1, 2018 through the earliest to occur of (i) the Effective Date, (ii) a Stipulated Treatment Termination, or (iii) an Individual Termination as to Syncora or National, as applicable, limited as to each to one (1) primary law firm, one (1) Puerto Rico law firm, one (1) municipal bond counsel law firm, one (1) utility consultant, and one (1) financial advisor and/or consultant, shall be reimbursed by PREPA on a monthly basis within sixty (60) days following submission of an invoice and redacted time detail summary to counsel to FOMB, PREPA, and AAFAF, provided that such fees and expenses of shall not be reimbursed in excess of (x) $500,000 for Syncora for the period prior to June 1, 2019, (y) $1.2 million for National for the period prior to June 1, 2019, and (z) $130,000 monthly for each of Syncora and National.

(c) Reimbursement of reasonable fees and expenses pursuant to Sections 22(a)(i) and 22(b) shall be subject to delivery of all required certifications under Puerto Rico law and accompanied by detailed time records with appropriate redactions.

(d) Payments made pursuant to this Agreement (including reimbursement of fees and expenses pursuant to this Section 22, other than in the case of reimbursement of fees and expenses for services rendered in Puerto Rico) shall not be subject to withholding tax under the Puerto Rico Internal Revenue Code of 2011, as amended.

(e) In the event of a termination by PREPA or AAFAF pursuant to Section 9(d)(vi), the obligation of PREPA or AAFAF to pay any fees that accrue after the effective date

50

of such termination shall terminate, but any fees and expenses incurred after such date and until the earlier of the Effective Date or a Stipulated Treatment Termination or any fees and expenses pursuant to Section 22(a)(ii), in each case to the extent they would otherwise have been due and payable hereunder, shall constitute an Administrative Claim entitled to be paid in cash on the Effective Date of a Plan and, notwithstanding anything herein to the contrary, such Administrative Claim shall survive a Stipulated Treatment Termination.

**Section 23** **Most Favored Nations**.

Other than with respect to the receipt by Assured of the Assured Treatment, by Syncora of the Syncora Treatment or by National of the National Treatment in accordance with the terms hereof, to the extent any holder(s) of Financial Indebtedness receives a treatment under a Plan, qualifying modification, exchange, or restructuring, however funded, more economically favorable than the treatment proposed to be received by the Ad Hoc Group Members or, Assured, Syncora or National then (i) such treatment shall only be allowed and considered consistent with this Agreement if it does not adversely affect the Ad Hoc Group's or, Assured's, Syncora's or National's recoveries, and (ii) additional consideration shall be provided to the Ad Hoc Group, Syncora, National or Assured, as applicable, such that the treatment of the Ad Hoc Group or, Syncora, National, or Assured is at least as favorable as the treatment being provided to such holder(s) of Financial Indebtedness.

Notwithstanding the foregoing, none of the Ad Hoc Group and, Syncora, National or Assured shall not object pursuant to this Section 23 if holders of Financial Indebtedness (other than Uninsured Bonds) receive the same treatment with the same terms as the Ad Hoc Group is receiving, so long as such treatment does not adversely affect the Ad Hoc Group's or, Assured's, Syncora's or National's recoveries. Adjustments to coupons and par on the bonds received by such holder(s) of Financial Indebtedness are authorized, so long as total cash flow payable each year remains the same (with proportional adjustments for the varying claim sizes of varying legacy debt claims), and so long as such treatment shall not adversely affect the Ad Hoc Group's or, Assured's, Syncora's, or National's recoveries.

**Section 24** **Preservation of Rights**. Except as expressly provided in this Agreement or the 9019 Order, the Parties expressly reserve all rights, contractual or otherwise, under Title III or any other provision of PROMESA or any other law or regulation. Upon an Individual Termination (as to an individual Supporting Holder), a Stipulated Treatment Termination (as to each Party), or a termination pursuant to 9(d)(vi) (as to AAFAF or PREPA), subject to Section 9(c), (i) no such Party shall be precluded, by virtue of having been a Party to this Agreement or otherwise having engaged in negotiations regarding the Restructuring, 9019 Settlement or other matters related to this Agreement, from exercising any and all rights, whether contractual or otherwise, in connection with any proceeding under Title III or under any other provision of PROMESA or any other law or regulation, (ii) no provision of this Agreement, the 9019 Order or other document related to this Agreement, the Restructuring or the 9019 Settlement or statement made during the negotiations thereof, shall be used against any such Party in any proceeding under Title III or any other provision of PROMESA or otherwise, provided that a Section 9(d)(vi) termination as to AAFAF and PREPA shall have no effect on any remaining Parties' rights with respect to any other remaining party hereunder and in the 9019 Order and ability to enforce such rights, and (iii) each such Party shall be restored to its original position.

51

Notwithstanding the generality of the foregoing in this Section 24, except as otherwise provided in this Agreement, no Party shall be precluded from asserting any right, and each Party shall preserve each of its rights and shall not be impeded by this Agreement from bringing before any applicable court any available averment, defenses or priority allegation, or from challenging or contesting any such rights, whether under such law or otherwise, on any grounds.

**Section 25** **Prior Negotiations; Entire Agreement**. This Definitive RSA, including the exhibits, annexes and schedules hereto, constitutes the entire agreement of the Parties and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that all confidentiality agreements executed between one or more Parties before the execution of this Definitive RSA shall continue in full force and effect. Without limitation of the foregoing, the Preliminary RSA is superseded by this Definitive RSA and terminated in its entirety and shall be of no further force and effect.

**Section 26** **Counterparts**. This Definitive RSA may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Definitive RSA delivered by PDF shall be deemed to be an original for the purposes of this paragraph.

**Section 27** **Notices**. All notices hereunder shall be deemed given if they are made in writing and delivered by electronic mail, courier, or registered or certified mail (postage prepaid, return receipt requested) (and if by any method other than electronic mail, then with a copy by electronic mail) to the following addresses (or at such other addresses as shall be specified by like notice):

    (i)    if to PREPA or AAFAF, to:

O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
Attention: Nancy Mitchell, Maria DiConza, and Matthew Hinker
Email: nmitchell@omm.com; mdiconza@omm.com; mhinker@omm.com

    (ii)    if to FOMB, to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attention: Martin J. Bienenstock, Paul V. Possinger, and Ehud Barak
Email: mbienenstock@proskauer.com; ppossinger@proskauer.com; ebarak@proskauer.com

    (iii)    if to the Ad Hoc Group, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas

        New York, New York 10036
Attention: Amy Caton, Alice J. Byowitz, and Steven Segal
Email: acaton@kramerlevin.com; abyowitz@kramerlevin.com; ssegal@kramerlevin.com.

(iv)    if to Assured, to:

        Assured Guaranty Corp. and Assured Guaranty Municipal Corp.
1633 Broadway
New York, NY 10019
Attention: Kevin J. Lyons and Terence Workman
Email: klyons@agltd.com; tworkman@agltd.com

        -and-

        Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281
Attention: Mark C. Ellenberg, Ivan Loncar, and Thomas J. Curtin
Email: mark.ellenberg@cwt.com; ivan.loncar@cwt.com; thomas.curtin@cwt.com

(v)    if to Syncora, to:

        Syncora Guarantee Inc.
555 Madison Avenue, 11th Floor
New York, NY 10022
Attention: James W. Lundy, Jr.
Email: james.lundy@scafg.com

        -and-

        Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention: My Chi To and Elie J. Worenklein
Email: mcto@debevoise.com; eworenklein@debevoise.com

(vi)    if to National, to:

        National Public Finance Guarantee Corporation
1 Manhattanville Road, Suite 301
Purchase, NY 10577
Attention: Gary Saunders
Email: gary.saunders@mbia.com

        -and-

>Weil, Gotshal & Manges LLP
>767 Fifth Avenue
>New York, NY 10153-0119
>Attention: Marcia Goldstein and Debora Hoehne
>Email: marcia.goldstein@weil.com; debora.hoehne@weil.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by mail or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission. For purposes of this Agreement, notices and other communications may be delivered by a Party or by its authorized representatives. Any notice provided to an individual Supporting Holder hereunder must also be provided to the Required Parties and the Consulting Parties.

(b) If this Agreement is terminated as to any Government Party, Assured, Syncora, National, or the Ad Hoc Group, FOMB shall publish notice of such withdrawal or termination on its website and PREPA shall file a notice with EMMA not later than one (1) business day after receipt of such notice.

(c) Unless otherwise mutually agreed to by the Required Parties, after consultation with the Consulting Parties, this Agreement, and each amendment hereto, shall be posted by FOMB on its website and PREPA shall file a notice with EMMA not later than one (1) business day after the execution and delivery hereof and thereof, subject to the confidentiality restrictions contained herein, including Section 12.

**Section 28** **Settlement Discussions**. This Definitive RSA is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. This Definitive RSA and all negotiations relating thereto shall be deemed to be settlement discussions covered by Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic. Further, other than in a proceeding to enforce or implement this Definitive RSA's terms (or the terms of the 9019 Order), no Party shall offer into evidence this Definitive RSA, or any negotiations relating thereto. If this Definitive RSA is terminated, for any reason, no Party shall use any of the terms in this Definitive RSA against the other Party other than for enforcing its remedies under this Definitive RSA and to extent provided.

**Section 29** **No Solicitation; Adequate Information**. This Definitive RSA is not and shall not be deemed to be a solicitation for consents to a Plan, qualifying modification, exchange, or restructuring. The votes of the holders of Claims against PREPA will not be solicited until such holders who are entitled to vote on Plan have received the required solicitation in accordance with PROMESA. In addition, this Definitive RSA does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

**Section 30** **No Waiver**. The failure or neglect by a Party to enforce any rights under this Agreement will not be deemed a waiver of that Party's rights. No waiver of satisfaction of or

nonperformance of an obligation under this Agreement will be effective unless in writing and signed by the Party granting the waiver.

**Section 31** <u>**Representation by Counsel**</u>. The Parties agree that they have each been represented by legal counsel during the negotiation and execution of this Definitive RSA and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Signature pages follow.]*

**Schedule 2**

## RECOVERY PLAN TERM SHEET

Capitalized terms used herein without definition shall have the meanings given such terms in the Definitive RSA to which this Recovery Plan Term Sheet is attached.

I. **Acceleration of Bonds**.

The Plan and Confirmation Order shall accelerate all of the Uninsured Bonds and Insured Bonds ~~to the extent such Bonds are insured by a party to the RSA~~ as of the Effective Date, with the same effect and treatment as if all of the Bonds were accelerated under the terms of the Trust Agreement. For the avoidance of doubt, the payment obligations of the applicable bond insurer under any Bond Insurance Agreement shall not be accelerated unless otherwise explicitly elected by such bond insurer.

II. **Supporting Holder Exchange**.

The Supporting Holders shall commit to exchange (or commit to cause an exchange, as applicable) all of their Bonds, whenever acquired, for Securitization Bonds on the Effective Date, on the terms and in the manner set forth herein.

II. **Securitization Bonds**.[1]

a) The SPV shall issue Securitization Bonds, in the tranches provided below, secured by the Transition Charge.

b) The Securitization Bonds shall be issued on the Effective Date.

III. **Transition Charge**.

a) The transition charge allocable to outstanding power revenue and revenue refunding bonds issued by PREPA under the Trust Agreement (the "**Transition Charge**")[2] shall be set at the following levels:

---

[1] In the event of conflict with these terms, the terms of the Securitization Term Sheet, attached to the Recovery Plan Term Sheet as Annex A, relating to the Securitization Bonds shall govern.

[2] The calculation of the Transition Charge (including the TC Cap) set forth in this Recovery Plan Term Sheet assumes (i) 100% of the Bonds are exchanged, (ii) interest accrues on Bonds until May 1, 2019 calculated at prior stated interest rates for each CUSIP, (iii) interest stops accruing on all power revenue bonds on May 1, 2019, (iv) the Administrative Claim for the Tranche A interest accrues for the benefit of all Bonds beginning May 1, 2019 as provided in the Definitive RSA, (v) any portion of the Administrative Claim not paid through the Settlement Charge is satisfied in Tranche A Bonds, (vi) the transaction closes on June 30, 2020, and (vii) the Settlement Charge is paid as provided herein. To the extent these assumptions are not correct or have to be modified, the Transition Charge (including the TC Cap) will need to be adjusted in connection with the issuance of the Securitization Bonds. The Transition Charge amounts (including the TC Cap) set forth above also do not include (i) the Assured Treatment, National Treatment, or Syncora Treatment or any premium paid to Assured, National, or Syncora, (ii) the costs of administration of the securitization vehicle (including costs such as trustee fees and servicer fees), or (iii) the Assured swap, and the Transition Charge will need to be adjusted in connection with the issuance of the Securitization Bonds to take those items into account.

    (i)    2.768 c/kWh for Years 1-3 [FY21-FY23]

    (ii)    2.957 c/kWh for Years 4-8 [FY24-FY28]

    (iii)    3.242 c/kWh in Year 9 [FY29]

    (iv)    3.323 c/kWh in Year 10 [FY30]

    (v)    3.406 c/kWh in Year 11 [FY31]

    (vi)    3.492 c/kWh in Year 12 [FY32]

    (vii)    3.579 c/kWh in Year 13 [FY33]

    (viii)    3.668 c/kWh in Year 14 [FY34]

    (ix)    3.760 c/kWh in Year 15 [FY35]

    (x)    3.854 c/kWh in Year 16 [FY36]

    (xi)    3.950 c/kWh in Year 17 [FY37]

    (xii)    4.049 c/kWh in Year 18 [FY38]

    (xiii)    4.150 c/kWh in Year 19 [FY39]

    (xiv)    4.254 c/kWh in Year 20 [FY40]

    (xv)    4.361 c/kWh in Year 21 [FY41]

    (xvi)    4.470 c/kWh in Year 22 [FY42]

    (xvii)    4.552 c/kWh in Year 23 [FY43]

    (xviii) 4.552 c/kWh in Year 24 [FY44] and thereafter through Transition Charge Termination

    b)    The Transition Charge allocable to the Bonds shall begin on the earlier of the Title III plan Effective Date or the Delayed Implementation Date and shall be capped at 4.552 c/kWh (the "**TC Cap**").

IV.    **Exchange Ratio**.[3]

    a)    Tranche A Bonds: 67.5% of principal amount of outstanding Bonds subject to the

---

[3] As used in "Exchange Ratio," the principal amount of Supporting Holders' Claims to be calculated to include (i) accrued and unpaid interest on the existing Bonds through an assumed exchange date of May 1, 2019 (which interest, in the case of a series of Assured Insured Bonds that bear interest at a floating interest rate, will be calculated based on the fixed rate under the related interest rate swap), and (ii) in the case of a series of Assured Insured Bonds that bear interest at a floating interest rate, the mark-to-market amount (the "**Swap MTM Amount**")

exchange plus, at the option of the Government Parties to the extent such Administrative Claim is not being paid in cash, 100% of any Administrative Claim being satisfied with Tranche A Bonds.

      b)     Tranche B Bonds: 10% of principal amount of outstanding Bonds subject to the exchange. The Tranche B Bonds shall not be required to be tax-exempt.[4]

      c)     With respect to Assured, Syncora and National, the Exchange Ratio shall be subject to the Assured Treatment, the Syncora Treatment and the National Treatment, as applicable.

V.    **Tranche A Bonds**.

      a)     There will be a tranche of Securitization Bonds known as the Tranche A Bonds (the "**Tranche A Bonds**"), with the following maturities and coupons:

on the related interest rate swap as of the Effective Date (or such earlier date as negotiated by the Government Parties with the swap counterparties and Assured). As a result, Assured shall be entitled to receive additional Tranche A and B Bonds on account of the Swap MTM Amounts based on the same Exchange Ratio that is applicable to its claim with respect to Assured Insured Bonds. Such Swap MTM Amounts will be mutually agreed to between the Government Parties and Assured, provided that, if the parties cannot agree to such Swap MTM Amounts, then such amounts will be determined by obtaining actionable quotations from at least three swap dealers in accordance with Section 6(e) of the respective interest rate swap agreements (assuming that PREPA is the defaulting party for such purpose).

On the Effective Date, the Assured Insured Interest Rate Swaps will be extinguished and PREPA's obligation thereunder will be satisfied by the treatment accorded to Assured on account of such interest rate swaps as described in this Term Sheet. Assured will have the option to (i) continue making net scheduled payments under the insurance policies insuring the Assured Insured Interest Rate Swaps or (ii) accelerate its obligations thereunder by paying the termination payment to the respective swap counterparties.

Notwithstanding the foregoing, in lieu of receiving additional Tranche A and B Bonds on account of the Swap MTM Amounts as described above, Assured may elect, if agreed by Assured and the swap counterparties, to insure a security to be issued by the issuer of the Securitization Bonds that (i) is delivered to the counterparties to the Assured Insured Interest Rate Swaps with PREPA in exchange for their agreement to the extinguishment of the Assured Insured Interest Rate Swaps, the cancellation of the respective swap insurance policies and the release of all of their claims thereunder, (ii) entitles the holder of such security to receive periodic payments that are equal to the fixed amounts that the respective interest rate swap counterparty would have been entitled to receive under the respective interest rate swap if floating rates were zero at all times during the term of such swap and the respective fixed rate were equal to the difference between the actual fixed rate under such swap and the on-market fixed rate (the "**Market Fixed Rate**") for an interest rate swap otherwise having the same terms as such swap, and (iii) is secured by a Transition Charge segregated from the Transition Charges securing Assured Securitization Bonds and other Securitization Bonds, with any excess revenues from such Transition Charge securing future payments under such security or being used to prepay such future payments if such prepayment is allowed in the definitive documentation. If Assured makes such election, the Market Fixed Rate will be the fixed rate agreed to among the Government Parties, Assured and the respective swap counterparties, provided that, if the parties cannot agree to such fixed rate, then such Market Fixed Rate will be determined by obtaining actionable quotations from at least three swap dealers to enter into an offsetting interest rate swap pursuant to which such swap dealers would be paying such fixed rate. If Assured makes such election, Assured will be entitled to receive premium payments with respect to the insurance policy wrapping such security that for each year during which such security is outstanding are equal to 0.5% per annum of the aggregate payments payable under such security in such year.

---

[4] To the extent it has no economic effect on PREPA, the Tranche A and Tranche B Bonds shall be allocated in satisfaction of Bond principal and interest, whenever accrued, in the most tax-efficient manner.