**<u>EXHIBIT 10</u>**

Page 1

1

2          UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF PUERTO RICO

4      _____x

       In re:

5

       THE FINANCIAL OVERSIGHT AND              PROMESA

6      MANAGEMENT BOARD FOR PUERTO

       RICO,                               Title III

7          as representative of

8      THE COMMONWEALTH OF PUERTO RICO,

       et al.,

9          Debtors.

       _____x

10     In re:

                                           PROMESA

11     THE FINANCIAL OVERSIGHT AND

       MANAGEMENT BOARD OF PUERTO RICO,      Case No.

12

                                           17 BK 4780-LTS

13

           as representative of

14

       PUERTO RICO ELECTRIC POWER AUTHORITY,

15         Debtor.

       _____x

16     (Caption continued on following page.)

17     * P R O F E S S I O N A L   E Y E S   O N L Y *

18                VIDEOTAPED DEPOSITION

19                        OF

20                  DAVID BROWNSTEIN

21                New York, New York

22           Wednesday, October 16, 2019

23

24     Reported by:

       ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25     JOB NO. 169670

Page 18

1    D. Brownstein - Professional Eyes Only
2  bonds in the tobacco market, which are
3  securitizations and, as you may be aware,
4  secured by payments into states from the
5  tobacco companies that are securing those
6  securitization bonds.
7    Q.  Okay.
8    A.  We looked at securitizations in
9  the utility space, and we looked at where
10  high-yield bonds were trading in the
11  secondary market.
12    Q.  Let me ask you a few questions
13  about that.
14      When you say you looked at the
15  utility space, was that power generation or
16  some other type of utility?
17    A.  Securitizations have been used
18  primarily in the utility space for closures
19  of nuclear power plants.  But they've also
20  been used for issuers such as Long Island
21  Power Authority to finance their legacy
22  assets.
23    Q.  And you believe that those types
24  of bonds in the utility space provide a
25  basis of comparison to arrive at 5.25

Page 19

1    D. Brownstein - Professional Eyes Only
2  percent for the coupon rate on these bonds?
3      MS. SPILLANE:  Objection to form.
4    A.  I believe that all of those
5  securities I mentioned assist in
6  determining what is a fair market value.
7    Q.  Okay.  You indicated, I believe,
8  that you looked at certain high-yield
9  bonds.
10      Were those municipal high-yield
11  bonds?
12    A.  Yes.  Everything we looked at was
13  a municipal.
14    Q.  When did you look -- did you look
15  at all these different bonds at the same
16  period of time?
17    A.  Yes, sir.
18    Q.  Okay.  And when did you look?
19    A.  As we were negotiating the price
20  and the coupon for the bonds, of course
21  there were, as you have seen from
22  documentation, arguments between us and the
23  creditors as to what was the appropriate
24  coupon for the bonds.  And so we needed to
25  justify the coupon we were using.

Page 20

1    D. Brownstein - Professional Eyes Only
2    Q.  Okay.  Can you tell me what
3  period of time this took place?
4    A.  I can't.
5    Q.  Well, can you tell me if it was
6  2018?
7    A.  Yes.
8    Q.  Okay.  So would it be fair to say
9  that the coupon rate was -- or you looked
10  at these other bonds to determine the range
11  in 2018?
12      MR. MASHBERG:  Objection to the
13  form.
14    A.  I would suggest that we were
15  looking at them as we were discussing with
16  the board what was the appropriate rate and
17  as we were making our proposals to the
18  creditors.
19    Q.  Okay.  And do you know the last
20  time that you looked at these different
21  bonds, the utility space bonds, the
22  high-yield bonds, and the tobacco market
23  bonds?
24      MS. SPILLANE:  Objection to form.
25    A.  It would have been prior to the

Page 21

1    D. Brownstein - Professional Eyes Only
2  agreement of the preliminary RSA.
3    Q.  I think that you mentioned with
4  respect to the tobacco securitization
5  bonds, those have -- is it your
6  understanding those have a guaranteed
7  revenue stream?
8      MS. SPILLANE:  Objection to form.
9    A.  They have a revenue stream to the
10  extent it exists.
11    Q.  Okay.  How about with the utility
12  space bonds that you looked at?
13    A.  Those have a guaranteed revenue
14  stream to the extent that there's
15  compliance with the terms of the documents.
16    Q.  Okay.  And the municipal
17  high-yield bonds, did you look at the
18  entire market or specific bonds within that
19  high-yield bond space?
20    A.  We looked at the entire market,
21  including many different types of security
22  structures.
23    Q.  Would it be fair to say that you
24  looked at the entire market or you looked
25  at the entire market and then specific

Page 22

D. Brownstein - Professional Eyes Only
bonds within that market?
          MS. SPILLANE:  Objection to form.
     A.  I don't understand your question.
     Q.  Okay.  I understood, and I could
have misunderstood, that you looked at the
entire high-yield bond market.
          But I want to clarify and make
sure, did you look at individual municipal
high-yield bonds within the high-yield bond
market as well?
          MR. MASHBERG:  Objection to form.
     A.  Your last question was about the
entire market --
     Q.  Yes.
     A.  -- not specifically about the
high-yield market?
     Q.  Right, which is why I want to
clarify.
     A.  To clarify, I said the high-yield
market.
     Q.  Okay.  Are you familiar with the
COFINA bonds?
     A.  Yes.
     Q.  Did you look at the COFINA bonds

Page 23

D. Brownstein - Professional Eyes Only
at all in determining the coupon rate?
          MR. MASHBERG:  Objection to form.
     A.  To go back a step so you
understand, I'm the one who determines the
COFINA yields.
     Q.  Right.
     A.  And, therefore, I would have
taken them into account in my analysis.
     Q.  And when did you determine the
rate for the COFINA bonds?
     A.  At the time that we entered into
the restructuring support agreement in
mediation for COFINA.
     Q.  Okay.  And the bond yields, do
you know what's happening with the bond
yields with respect to -- or let me
rephrase it.
          Do you know whether or not the
COFINA bonds are now trading above par?
     A.  Some of them are, yes.  We've had
a significant amount of luck in the market
because the entire municipal market due to
supply and demand has increased in value
and, therefore, decreased in yield

Page 24

D. Brownstein - Professional Eyes Only
dramatically over the past six months.
     Q.  I'm sorry, six months?
     A.  Yes.
     Q.  Did you update --
     A.  And by the way, I should note
that not all of the bonds are over par now.
Some are below.
     Q.  Right.
          Are the 2058 COFINA bonds over
par?
     A.  I'm sorry, I can't get that
specific for you.  I don't track it on a
daily basis.
     Q.  I appreciate the clarification.
     A.  I believe it's the longest bonds
that are still all below par, just for the
record.
     Q.  Okay.  Thank you.
          Is it your practice to update the
FOMB with respect to the yields -- I'm
sorry, the current interest rates with
respect to the high-yield bond market?
          MS. SPILLANE:  Objection to form.
          MR. MASHBERG:  Objection to form.

Page 25

D. Brownstein - Professional Eyes Only
     A.  No.
     Q.  Do you know what the current
yields are in the high-yield bond market?
          MS. SPILLANE:  Objection to form.
          MR. MASHBERG:  Objection to form.
     A.  I'm sorry, to be clear, there are
thousands of names in the high-yield
municipal market, so I don't understand
your question.
     Q.  If yields come down, is it your
experience that that's a benefit to the
bondholders?
          MS. SPILLANE:  Objection to form.
          MR. MASHBERG:  Objection to form.
     A.  If yields come down, the
beneficiary of that would be the existing
bondholder on that day, correct.
     Q.  When establishing the 5.25
percent, did you sound the market?
     A.  I don't understand your question,
sir.
     Q.  I'll try to rephrase it to be
clear and come back to you.
          In your declaration, you analyzed



Page 26

1  D. Brownstein - Professional Eyes Only
2  the total consideration that was to be paid
3  to supporting holders under the RSA.
4      Is that a fair statement?
5  A.  Yes.
6  Q.  Okay.  Did you negotiate those
7  numbers?  Were you involved in negotiating
8  the percentage and total recoveries under
9  the RSA?
10  A.  Yes.
11  Q.  Now in doing that, did you have a
12  threshold recovery percentage that you
13  would not have exceeded?
14  A.  No.
15  Q.  Now in creating that analysis of
16  the consideration that was paid, did you
17  put -- let me ask you, are you familiar
18  with the terms "settlement payments,"
19  "administrative claims"?  You're familiar
20  with those?
21      MR. MASHBERG:  Objection to form.
22      MS. SPILLANE:  Objection to form.
23  A.  Yes.
24  Q.  Did you put a value on the
25  settlement payments in calculating the

Page 27

1  D. Brownstein - Professional Eyes Only
2  total consideration that would be paid
3  under the RSA?
4      MS. SPILLANE:  Objection to form.
5      MR. NATBONY:  Objection to form.
6  A.  I don't understand your question.
7  Q.  Do you think that settlement
8  payments during the course of negotiations,
9  did that represent a value that you were
10  exchanging in order to arrive at a deal for
11  the RSA?
12      MS. SPILLANE:  Objection to form.
13      MR. MASHBERG:  Objection to form.
14  A.  I still don't understand your
15  question.
16  Q.  In arriving at the RSA, did you
17  analyze the likelihood of different
18  litigation scenarios during the course of
19  negotiations?
20      MR. MASHBERG:  Objection to form.
21      MS. SPILLANE:  Objection to form.
22  A.  I am not a lawyer.  I didn't
23  analyze anything when it comes to legal
24  determinations.
25  Q.  Well, did you take anyone's

Page 28

1  D. Brownstein - Professional Eyes Only
2  determinations and try to ascribe a dollar
3  value it in the course?
4      MS. SPILLANE:  Objection to form.
5      MR. MASHBERG:  Objection to form.
6  A.  I think you need to get a little
7  more specific.
8  Q.  Okay.
9  A.  It's too generic for me.

Page 29

1  D. Brownstein - Professional Eyes Only

Page 30

1   D. Brownstein - Professional Eyes Only



25    Q.   Okay.  Are you done?

Page 31

1   D. Brownstein - Professional Eyes Only
2        A.   Yes.
3        Q.   Thank you.  Thank you for that.
4        I have a couple of questions
5   about that.  You've used the term a few
6   times "creditors."
7        To whom do you refer to, all
8   creditors or someone else or another group?
9        A.   I refer to in the case of this,
10  the negotiations with the creditors, which
11  included the ad hoc group, the three
12  monoline insurers, the fuel line lenders.
13       Q.   Okay.  But PREPA -- are you aware
14  whether or not PREPA has creditors beyond
15  those entities you just identified?
16       A.   Yes, I am.  But what we're
17  talking about here is the structure of the
18  debt that was being issued to replace the
19  existing debt of those creditors.
20       Q.   I understand that.  I had moved
21  on to a different question.  I'm sorry if I
22  was unclear.
23       A.   Okay.
24       Q.   Now those creditors, were any of
25  those creditors involved in any litigation

Page 32

1        D. Brownstein - Professional Eyes Only
2   with respect to claims asserted on behalf
3   of bonds that they had held?
4        MR. NATBONY:  Objection to form.
5        MR. MASHBERG:  Objection to form.
6        A.   I understand that the -- certain
7   of those bond creditors that I was talking
8   about were litigating or had proposed to
9   litigate, I don't know if they started the
10  litigation or not, on a receiver motion to
11  start, which was a right I believe they had
12  under the indenture of trust relating to
13  the revenue bonds outstanding.
14       Q.   Okay.  Are you aware of any
15  claims or positions that the FOMB had taken
16  with respect to the extent or nature of the
17  security that the bondholder creditors
18  claimed?
19       MS. SPILLANE:  Objection to form.
20       MR. MASHBERG:  Objection to form.
21       A.   I believe Proskauer was -- either
22  has or was considering litigating on
23  whether the bondholders had a lien.
24       Q.   Okay.  Now going back to a few
25  moments, did you consider that lien issue

Page 33

1        D. Brownstein - Professional Eyes Only
2   that you just identified in the course of
3   your negotiations?
4        MS. SPILLANE:  Objection to form.
5        A.   We discussed with Proskauer and
6   the board the possible benefits of the lien
7   challenge.  But we also discussed with
8   Proskauer and the board the desire to find
9   a settlement with the creditors for several
10  reasons.  I think I've described some of
11  them.
12       One, the risk of the receiver
13  motion would be that rates would
14  significantly increase and the bondholders
15  would have a true-up mechanism, a rate
16  covenant that would apply as well.
17       Two, that if we were in
18  litigation, it would impact our process of
19  transformation, which was the second
20  critical fact in determining the roadmap to
21  a successful agreement amongst creditors
22  and the board and ultimately all government
23  parties.
24       Q.   Okay.
25       A.   And so in the end here, we tried

Page 34

1  D. Brownstein - Professional Eyes Only
2  to strike the right balance between risks
3  and rewards.
4      Q.  Thank you.
5      With respect to -- you mentioned
6  the risk of the receiver motion.
7      Did anyone evaluate what that
8  risk was?
9      MS. SPILLANE:  Objection to form.
10     A.  We discussed it, but the people
11  who would have evaluated it are Proskauer,
12  not Citi.
13     Q.  I understand that.
14     But did Citi, once that -- if
15  that risk was evaluated, did Citi do
16  anything to ascribe a monetary value or a
17  settlement value to the risk of that
18  receiver motion?
19     MS. SPILLANE:  Objection to form.
20     MR. NATBONY:  Objection as to
21  form.
22     A.  The determination by the
23  government and the board was that there was
24  a risk that we didn't want the public in
25  Puerto Rico to continue to have.  And that

Page 35

1  D. Brownstein - Professional Eyes Only
2  was the determination for negotiating a
3  settlement.
4      Q.  Okay.  So was it the fact the
5  risk existed, not the level of risk?
6      Would that be fair?
7      MS. SPILLANE:  Objection to form.
8      A.  Correct.
9      Q.  Also you mentioned on the second
10  part of your response, litigation -- and I
11  wrote this down, tell me if I'm wrong --
12  could impact, could have an impact?
13     Do you recall that?
14     A.  What I said is what I said.
15     Q.  Okay.
16     A.  I'm not going to recall what I
17  said.
18     Q.  All right.
19     A.  If you want them to read it back,
20  we can do that.
21     Q.  All right.  If the FOMB -- I
22  believe -- if the FOMB had been successful
23  on these lien challenges that we
24  identified, would that have had a positive
25  impact in transformation?

Page 36

1  D. Brownstein - Professional Eyes Only
2      MS. SPILLANE:  Objection to form.
3      MR. MASHBERG:  Objection to form.
4      A.  I have no idea.
5      Q.  Okay.
6      A.  But what I do know is it would
7  have taken a long time, which is what we
8  were trying to avoid.
9      Q.  So would you say that the
10  expediency was a critical factor in the
11  evaluation?
12     MS. SPILLANE:  Objection to form.
13     MR. MASHBERG:  Objection to form.
14     A.  Timing was a factor in our
15  determinations, yes.
16     Q.  Was it an important factor?
17     MS. SPILLANE:  Objection to form.
18     A.  I don't have an answer to that
19  question.
20     Q.  While that's getting handed out,
21  let me ask you, going back to the coupon
22  rate, is that 5.25 percent coupon rate on
23  the bonds locked in?
24     A.  Yes.
25     Q.  Okay.  Any circumstance under

Page 37

1  D. Brownstein - Professional Eyes Only
2  which it can change?
3      A.  Not that I'm aware of.
4      Q.  And I believe with respect to
5  timing, you indicated that when you
6  performed the analysis to come at the 5.25
7  percent, that it was done in 2018?
8      MS. SPILLANE:  Objection to form.
9      A.  I believe so.
10     Q.  Okay.  Is there a reason that the
11  coupon rate wasn't -- or was the coupon
12  rate revisited after the preliminary RSA?
13     A.  Not that I recall.
14     Q.  Do you know why it wasn't?
15     MR. MASHBERG:  Objection to form.
16     A.  We had an agreement.
17     Q.  Was the preliminary RSA binding
18  or unbinding, in your opinion?
19     MS. SPILLANE:  Objection to form.
20     A.  It was binding.
21     Q.  So is it your understanding that
22  the 5.25 percent would have been locked in
23  as of the date of the preliminary RSA or at
24  some other point?
25     A.  I believe it was the preliminary

Page 38

1    D. Brownstein - Professional Eyes Only
2  RSA, but I need to go back and look at all
3  the documents.
4        (Brownstein Exhibit 3, Email
5        chain beginning with email dated
6        4/26/19 from ICG-MKTS, Castiglioni and
7        sent to Batlle and Porter and others
8        with attachments, Bates-stamped
9        CGMIRSA_001458 through 1465, marked for
10       identification, as of this date.)
11  BY MR. ARRASTIA:
12    Q.  Let me ask you if you recognize
13  this is document which I'll mark as
14  Exhibit 3.
15        MR. MASHBERG:  The Bates-stamp
16    number in the record for clarity?
17        MR. ARRASTIA:  Yes, No. 3.
18        MR. MASHBERG:  The Bates.
19        MR. ARRASTIA:  Oh, I'm sorry, the
20    Bates.
21        That begins on 1458, ending on
22    1465, with the prefix CGMIRSA.
23        MR. MASHBERG:  Thank you.
24    A.  I'm sorry, are you asking me if I
25  recognize the email, or the presentation,

Page 39

1    D. Brownstein - Professional Eyes Only
2  or both?
3    Q.  Well, let's start with both.  Do
4  you recognize both?
5        MR. NATBONY:  Objection to form.
6    (Document review.)
7    A.  Yes.
8    Q.  Looking at the PREPA discussion
9  material that begins on Bates No. 1460, if
10  you could look at the last page of that.
11    (Witness complies.)
12    Q.  It's entitled "Benefits and
13  Considerations of the Current PREPA RSA."
14    A.  Um-hmm.
15    Q.  Is that reflective of the type of
16  information that would be given to the
17  board?
18        MS. SPILLANE:  Objection to form.
19    A.  Some of the information that was
20  given to the board.
21    Q.  Okay.  And what other
22  communications would be reflective, not
23  exhaustive, but reflective of the
24  information that would be given to the
25  board regarding the PREPA RSA?

Page 40

1    D. Brownstein - Professional Eyes Only
2        MS. SPILLANE:  Objection to form.
3        MR. MASHBERG:  Objection to form.
4        MR. NATBONY:  Objection to form.
5    A.  We had numerous calls either with
6  the board as a whole or with each
7  individual board member to review all of
8  the concepts embedded in the PREPA RSA.
9    Q.  Okay.
10    A.  The PREPA securitization
11  structure is probably the most complex
12  thing any of us involved have ever seen or
13  hopefully will see in our lifetime.  And
14  the fact is that it took a lot of dialogue
15  with the board and the other advisers to
16  the board and the government to get people
17  comfortable with the terms of it.
18    Q.  Okay.  So would it be fair to say
19  that the other types of communications that
20  would be reflective of the information
21  given to the board would have occurred
22  through phone calls and other verbal
23  communications?
24        MR. MASHBERG:  Objection to form.
25        MS. SPILLANE:  Objection to form.

Page 41

1    D. Brownstein - Professional Eyes Only
2    A.  Some of it, some of it would have
3  been in presentations, of which there were
4  many.
5    Q.  Okay.  Did you keep notes of the
6  phone calls or personal conversations with
7  the board or the individual members of the
8  board?
9    A.  No, I don't keep notes.
10    Q.  On the top right where it says,
11  "Power revenue bonds may be unsecured
12  because perfection was defective,
13  successful litigation could result in lower
14  recoveries" --
15    A.  Um-hmm.
16        MR. MASHBERG:  I'm sorry, where
17    are you?
18        THE WITNESS:  On the last page.
19        MR. ARRASTIA:  Last page of Bates
20    No. 1465.  The title of the page is
21    "Benefits and Considerations of the
22    Current PREPA RSA."
23        MR. MASHBERG:  Got it.
24    A.  Um-hmm.
25    Q.  Okay.  These power revenue bonds

Page 42

```
1        D. Brownstein - Professional Eyes Only
2    -- well, first of all, let me ask you, do
3    you have an understanding of the difference
4    between a nonrecourse and a recourse bond?
5        MS. SPILLANE: Objection to form.
6        A.  I'm not quite sure of your
7    question.  Perhaps you could describe
8    the difference.
9        Q.  Well, are you familiar with the
10   concept that some bonds or some
11   obligations, there is recourse against the
12   issuer in the case of a default; and in
13   other instances, there is no recourse or
14   there is no opportunity to seek a recovery
15   against the issuer in the event of a
16   default?
17       A.  I'm not aware of any revenue
18   bonds that are, as you called them,
19   nonrecourse.
20       Q.  Are you familiar with a sinking
21   fund?
22       MR. MASHBERG:  Objection to form.
23       MS. SPILLANE:  Objection to form.
24       MR. NATBONY:  Same.
25   BY MR. ARRASTIA:
```

Page 43

```
1        D. Brownstein - Professional Eyes Only
2        Q.  That existed at the point of the
3    petition agreement?
4        A.  I don't know what you're asking
5    me.
6        Q.  Okay.  Well, I'm asking if you're
7    familiar with it.  And if you don't know,
8    then --
9        A.  I don't know what you're talking
10   about.
11       Q.  Have you heard of something
12   called the sinking fund with respect to
13   PREPA?
14       A.  Bond issues often have term bonds
15   with sinkers or bond fund where cash flow
16   is received and then paid out by the
17   trustee to the bondholders --
18       Q.  Okay.
19       A.  -- if that's what you're asking
20   about.
21       Q.  Did that exist with respect to
22   these power revenue bonds?
23       A.  PREPA had term bonds with sinkers
24   and sinking funds, yes.
25       Q.  And do you know how much cash was
```

Page 44

```
1        D. Brownstein - Professional Eyes Only
2    in those sinking funds as of the petition
3    date?
4        A.  I don't recall.
5        Q.  Earlier we talked about an actual
6    or potential challenge with respect to the
7    bond claims.
8        Do you know if that had to do
9    with respect to the -- whether or not they
10   were secured or unsecured?
11       MR. MASHBERG:  Objection to form.
12       A.  It had to do with whether they
13   had a lien, which would mean that
14   potentially if funds were transferred into
15   the bond funds or were not transferred in,
16   the bondholders wouldn't have a right to
17   them.  That was what Proskauer's position
18   was.
19       Q.  And just to be clear, so your
20   understanding was -- is that this -- the
21   lien would be on the funds and these term
22   bond sinkers?
23       A.  In the bond funds --
24       MR. MASHBERG:  Objection to form.
25       MS. SPILLANE:  Objection to form.
```

Page 45

```
1        D. Brownstein - Professional Eyes Only
2        A.  -- is what I would tell you.
3        Q.  Did you ever have a conversation
4    with the FOMB with respect to the issue of
5    liens on the term bonds?
6        A.  We had numerous conversations
7    with the board on that topic led by
8    Proskauer.  Since I am not an attorney, I
9    wouldn't be the one making the case for
10   that.
11       MR. MASHBERG:  I would just
12   caution the witness in further
13   questions not to disclose
14   communications with Proskauer to the
15   board at which he was present with
16   regard to any legal advice or legal
17   analysis.  That would be subject to the
18   attorney-client privilege given the
19   role that Citi was playing in this
20   process as an adviser to the board.
21       MR. ARRASTIA:  Thank you for
22   that.  I'm trying to tap dance around
23   it, by the way.
24       MR. LYNCH:  And I would just like
25   to object to that cautioning because it
```



Page 110

1    D. Brownstein - Professional Eyes Only
2   that during a majority of the day, the
3   amount of utilization of PG&E's system, as
4   an example, is very low.
5        But at night, PG&E's requirements
6   go up dramatically in electricity they
7   need.  So they have to maintain systems in
8   place to cover that peak need for the
9   public.  And yet if you think about it, if
10  you're only paying for what you use, then
11  how does PG&E maintain that system and keep
12  that system operating properly 24/7 for the
13  time that people need it off-peak or peak
14  for -- because there's no sun out.
15       So that is what we are telling
16  the public in Puerto Rico that they --
17  clearly we've seen a lot of push back on.
18       If you want to remain on the
19  system and therefore have the right to call
20  on it at will, we have to, PREPA has to
21  maintain it.  Someone has to pay for it.
22  You will cover your share of the legacy
23  debt to cover it.
24       So that's the last piece of the
25  really three pieces of the demand

Page 111

1    D. Brownstein - Professional Eyes Only
2   protections.
3        Q.   Okay.  You mentioned that with
4   respect to the government or
5   instrumentalities paying the power bills,
6   that the government has to own that issue.
7   But it's actually the consumers, government
8   or otherwise, that would have to pay?
9        A.   No.
10       MS. SPILLANE:  Objection to form.

Page 112

1    D. Brownstein - Professional Eyes Only

Page 113

1    D. Brownstein - Professional Eyes Only



Page 114

1   D. Brownstein - Professional Eyes Only

---

Page 115

1   D. Brownstein - Professional Eyes Only

17   MS. SPILLANE:  Counsel, if you're
18   reaching a natural stopping place, I
19   think we can break for lunch soon.
20   MR. ARRASTIA:  That's good.  Does
21   this work fine?
22   THE VIDEOGRAPHER:  The time is
23   12:20 p.m. going off the record.
24   (Recess is taken.)
25

---

Page 116

1   D. Brownstein - Professional Eyes Only
2   A F T E R N O O N   S E S S I O N
3   (Time noted:  1:20 p.m.)
4   *   *   *
5   THE VIDEOGRAPHER:  The time is
6   12:59 p.m.  We are on the record.
7
8   D A V I D   B R O W N S T E I N,   resumed
9   and testified as follows:
10   EXAMINATION BY (Cont'd.)
11   MR. ARRASTIA:
12   Q.  Mr. Brownstein, you used the term
13   "true-up" a little bit during your
14   testimony.
15   Could you explain to me what you
16   mean by true-up?
17   A.  Sure.
18   So it's not that different -- in
19   fact, it's identical except for potentially
20   timing -- to a rate covenant for a revenue
21   bond.  So if you look at, as an example,
22   the PREPA indenture, right, PREPA is
23   obligated to maintain rates and charges on
24   the debt sufficient to cover debt service
25   at 1.2 times coverage.

---

Page 117

1   D. Brownstein - Professional Eyes Only
2   In a true-up on a securitization
3   bond, you also have a true-up equivalent of
4   a rate covenant where on a monthly basis,
5   you will adjust the rates and charges that
6   the customers pay so that you have a
7   sufficient amount of money to cover one
8   times, usually, debt service on the
9   upcoming next payment.
10   And the reason that it's one
11   times as opposed to 1.2 has a lot to do
12   with two things.
13   One, the reserve requirement on a
14   securitization, so there's cash there to
15   cover that monthly shortfall if need be,
16   but the constant obligation to adjust the
17   charge monthly as opposed to for revenue
18   bonds where it's generally changed
19   quarterly or semiannually.
20   Q.  Okay.
21   A.  So it's the same concept as we
22   already had and that you'd see in LIPA, you
23   see in California state securitization
24   bonds, things of that sort.
25   Q.  All right.  So -- but the current

Page 118

1  D. Brownstein - Professional Eyes Only
2  PREPA bonds, those have a specific period?
3      A.   They have a rate covenant.
4          MR. MASHBERG:  Objection to form.
5      A.   They have a rate covenant.
6      Q.   Okay.  But do the bonds have a
7  certain period of time, 30 years, 50 years,
8  60 years?  Or can they go on forever?
9      A.   Oh, no, the existing revenue
10  bonds have a final state in maturity, but
11  there is a default when payment due.
12      Q.   Okay.
13      A.   So that's when you can have the
14  creditors require a receiver, as an
15  example, to make sure that you actually
16  comply with the rate covenant, which is the
17  1.2 times.
18      Q.   Okay.
19      A.   But I think what you were asking
20  me, if I can -- just to be clear so I
21  answer your question properly, is what
22  happens at maturity, not on an ongoing
23  basis; is that right?
24      Q.   No.
25      A.   Okay.  Sorry.

Page 119

1  D. Brownstein - Professional Eyes Only
2      Q.   I was just wondering if it had a
3  maturity date.  That's all.  And you
4  answered it.
5      A.   Okay.  In neither case -- they
6  both have maturities, but failure to pay in
7  both cases doesn't allow you to walk away
8  from your liability.
9      Q.   Wait a second.  When you say, I'm
10  sorry, in both cases, what do you mean by
11  "both cases"?
12      A.   Securitization as well as the
13  revenue bonds.
14      Q.   And the revenue bonds do not have
15  the true-up, correct?
16      A.   They have a rate covenant which
17  is stricter and requires that you maintain
18  or you are in default.
19      Q.   Okay.  But is there a provision
20  that if the debt service isn't made, that
21  debt service is carried over?
22      A.   You have an acceleration
23  potentially of the debt.  You have a
24  default and remedies for default under a
25  revenue bond and in case of PREPA.  That's

Page 120

1  D. Brownstein - Professional Eyes Only
2  what we were -- we're arguing over is what
3  are the remedies the bondholders are
4  entitled to, including appointment of a
5  receiver.
6      Q.   Okay.  The Tranche A bonds under
7  the RSA, those have a term, correct?
8      A.   They have a stated term.
9      Q.   Okay.  And -- because you said
10  PREPA bonds, and I want to make sure we're
11  clear.
12          When you say -- when we're
13  talking about them, I'm talking about the
14  bonds contemplated Tranche A --
15      A.   The securitization?
16      Q.   Yes.
17      A.   Okay.
18      Q.   So the debt service, if it's not
19  made in any particular period, does it
20  carry forward?
21      A.   It carries forward.  That's the
22  only right the bondholders have is to, over
23  time, receive repayment.  That time period
24  on Tranche A could be 300 years.  So they
25  have no remedies other than for a failure

Page 121

1  D. Brownstein - Professional Eyes Only
2  by the servicer to charge customers.
3          So if you don't send out bills, I
4  the securitization holder, the bondholder,
5  can force a replacement of the party
6  responsible for sending out those bills.
7      Q.   Okay.
8      A.   So that is the only remedy that
9  you have.  Other than that, you wait to get
10  paid until there's cash flow sufficient.
11  And, again, that cash flow is fixed from
12  customers on a charge per kilowatt-hour,
13  subject to the demand protections we've
14  already talked about.
15      Q.   Okay.  And until the cash flow is
16  sufficient, is it fair to say that as the
17  debt service carries forward, it's interest
18  on interest?
19          MS. SPILLANE:  Objection to form.
20      A.   Yes.
21      Q.   You said Tranche A could be 300
22  years.
23          What do you mean by that?
24      A.   It means that it could take -- as
25  long as it takes to get you repaid, you

Page 122

1    D. Brownstein - Professional Eyes Only
2    will get repaid, but the present value
3    recovery to you, obviously you as a
4    bondholder goes down every day you wait,
5    right?  Because you're not getting your
6    principal back.
7        Q.   Okay.  Now you had -- I believe
8    it was modeled that there's an expectation
9    that the Tranche A bonds will be repaid in
10   33 years?
11       A.   Correct.
12       Q.   Even though it's a 40-year
13   maturity?
14       A.   Correct.
15       Q.   And what sort of load was used in
16   coming up with a repayment in 33 years?
17       A.   The fiscal plan.
18       Q.   Which one?  2018?
19       A.   The April of 2018.  Is that
20   right?
21          MS. SPILLANE:  Answer to your
22       memory if you're not sure.
23       A.   Yes, I think it was 2018.  It
24   could have been -- no, it would have
25   been...

Page 123

1    D. Brownstein - Professional Eyes Only
2        I'm terrible with dates.  I
3    apologize.
4        Q.   Not a problem.
5        Has --
6        A.   But it's in the RSA.  Somewhere
7    it says it.
8        Q.   Okay.  Has that load calculation
9    changed, do you know, from 2018 to 2019?
10       A.   Yes.
11       Q.   How has it changed?
12       A.   Well, there's been several
13   additional fiscal plans since then.  And I
14   believe in some of them, it has gone down
15   more before it started going up.  And in
16   others, it went up.  It is based on the
17   numbers when we struck a deal.
18       Q.   And hasn't been revisited since
19   striking that deal?
20       A.   Correct.
21       Q.   Now I look back at this handy
22   electronic device, and I realize that I
23   wasn't very clear.
24          You had asked me to give you a
25   definition of nonrecourse.  When I looked

Page 124

1    D. Brownstein - Professional Eyes Only
2    at it, I was not accurate.
3        So we talked about the PREPA
4    bonds and you asked me for a definition.
5    So if we use my definition that nonrecourse
6    is a secured loan that's secured by a
7    pledge of collateral and recourse allows an
8    issuer to collect from collateral or any
9    other assets of the issuer, do you have an
10   understanding as to whether or not the
11   PREPA bonds are recourse or nonrecourse?
12          MS. SPILLANE:  Objection to form.
13          MR. MASHBERG:  Objection.
14          MR. NATBONY:  Objection.
15       A.   We could try one more time if you
16   want to try and help me understand your
17   definition.
18       Q.   Sure.
19       A.   I'm not trying to be difficult.
20   I don't understand.
21       Q.   That's okay.  That's fine.  And I
22   don't think that you are, by the way.
23          Let me ask you this way:  The
24   PREPA bonds, there were certain claims as
25   to security.

Page 125

1    D. Brownstein - Professional Eyes Only
2        Do you know or do you have an
3    understanding as to what they were secured
4    by?
5        A.   Well, they have a rate covenant,
6    right?
7        Q.   Okay.
8        A.   Which requires that the -- that
9    PREPA charge the customer base to cover
10   debt service at 1.2 times.
11       Q.   Okay.
12       A.   So whether they have -- what I
13   can't answer for you, because I'm not a
14   lawyer, is whether having a lien or not
15   having a lien on the debt service funds
16   changes in any way, shape, or form whether
17   they're entitled to the revenue charge
18   against the system.  And clearly the
19   indenture requires that excess money, after
20   payment of certain expenses, flows through
21   to the debt service fund.
22          So I'm not in a position to
23   answer for you in any way, shape, or form
24   whether in fact that creates a secured or
25   an unsecured position because of what

Page 126

1    D. Brownstein - Professional Eyes Only
2  arguably people are considering is a
3  challenge with a lien.
4    Q.   Okay.
5    A.   All right?  I don't know how to
6  help you with that.
7    Q.   And I want to make sure that --
8  because we talked about those definitions
9  before.
10    And so this debt, let's see, that
11  you just referred to, debt service fund,
12  that is the sinking fund account or
13  something else?
14    MS. SPILLANE:  Objection to form.
15    MR. NATBONY:  Objection.
16    A.   So if you look at the indenture,
17  it specifically outlines the different
18  trust accounts there are.  And the debt
19  service fund is where all the cash flows to
20  pay debt service on the bonds when due.
21    Q.   Okay.
22    A.   That's how I understand it.
23    Q.   And so it hasn't come into your
24  analysis whether or not -- or what
25  collateral might have been subjected to a

Page 127

1    D. Brownstein - Professional Eyes Only
2  lien?
3    MS. SPILLANE:  Objection to form.
4    MR. HAMERMAN:  Objection to form.
5    A.   No.
6    Q.   Have you ever you finalized the
7  securitization cash flow?
8    MS. SPILLANE:  Objection to form.
9    MR. MASHBERG:  Objection to form.
10    A.   The only portion of the
11  transaction from our perspective that isn't
12  finalized is what will be the charge
13  necessary to cover the total debt service
14  which depends on when the Commonwealth and
15  PREPA put in place charges that will be
16  paid by the customer base.
17    Q.   Okay.
18    A.   If you look at the RSA, the
19  expectation is there would be a one cent
20  charge going into effect in July of 2019
21  that would be a credit against interest
22  due.  And the longer we wait to put that in
23  place, the higher we're accruing on that
24  effectively and have to pay it.
25    Q.   Okay.

Page 128

1    D. Brownstein - Professional Eyes Only
2    A.   Right?
3    So that is the only portion that
4  is an unknown.
5    Q.   Okay.  I'll get back to that.
6    So if that is the only unknown,
7  would it be fair to say that the load that
8  was used from the 2018 fiscal plan is the
9  load that will be used in finalizing any
10  cash flow for the securitization?
11    A.   As I said, everything else I
12  believe is in place and finalized.
13    Q.   So you mentioned that one cent
14  charge.
15    Is it your understanding that
16  that was supposed to be or intended to be
17  in effect prior to this date?
18    MR. NATBONY:  Objection as to
19  form.
20    MS. SPILLANE:  Objection.
21    A.   I believe so.  I mean, we'd have
22  to look at the RSA, but I believe it's in
23  there with a specific date.
24    Q.   Do you have an understanding of
25  when it might be?

Page 129

1    D. Brownstein - Professional Eyes Only
2    A.   I don't.
3    Q.   Can you tie it to anything in
4  this process, a 9019 hearing, confirmation,
5  plan of adjustment?
6    A.   Can I tie it how?  What do you
7  mean by that?
8    Q.   In other words, you might not
9  have a date.  You might not be able to tell
10  me December 3rd, 2021, but you might be
11  able to say it would be around the same
12  time as this other event even if you don't
13  know what that date will be.
14    A.   It was expected to be July 2019.
15  There is no other date.  That is the date.
16    Q.   So that one cent per
17  kilowatt-hour, is that expected -- is that
18  accruing interest?
19    A.   No.  It was a reduction against
20  the interest we owe on the bonds between
21  now and settlement.
22    Q.   Now when this is implemented --
23  let me rephrase it.
24    If this one cent reduction is
25  implemented, upon the first payment, would



Page 146

D. Brownstein - Professional Eyes Only
1
2    A.  I think that's --
3         MS. SPILLANE:  Objection to form.
4    A.  -- a question not for me.  I'm
5  not a lawyer.
6    Q.  Well, do you have an
7  understanding?
8    A.  I think it's a question not for
9  me as to how you accomplish it.  You're
10 asking a legal conclusion --
11   Q.  No, I'm not.
12   A.  -- and I'm not going to provide
13 one.  I don't -- I'm not in that business.
14   Q.  And that's why I'm not asking
15 one, sir.
16        I'm just asking, do you have a
17 view?
18   A.  I believe from my discussions
19 with -- so, no, I'm not prepared to respond
20 to your question.
21   Q.  Okay.  So in your experience
22 working in this field, you have no
23 viewpoint as to how revenue bonds or
24 another obligation can be incurred that
25 isn't prohibited by this?

Page 147

D. Brownstein - Professional Eyes Only
1
2         MR. HAMERMAN:  Objection to form.
3         MS. SPILLANE:  Objection to form.
4    A.  That would be based on my
5  discussions with counsel, so I'm not going
6  to respond.
7    Q.  Okay.  Are you aware of any
8  provision in the RSA that allows PREPA to
9  impose additional charges or issue
10 additional debt to repay other legacy
11 obligations without bondholder consent?
12        MR. HAMERMAN:  Objection.
13        MR. MASHBERG:  Objection to form.
14   A.  Again, I would suggest to you
15 that those are discussions that I'm not in
16 a position to discuss with you.
17   Q.  Okay.  Are you aware of anything
18 in the RSA that talks about -- that just
19 uses the words additional charges or
20 additional debt to repay legacy
21 obligations?
22        MS. SPILLANE:  Objection to form.
23        MR. NATBONY:  Objection.
24        MR. MASHBERG:  Object to the
25 form.

Page 148

D. Brownstein - Professional Eyes Only
1
2    A.  I believe what you're asking, if
3  I can put this into my words for a moment,
4  is, is there mechanism here under which we
5  can provide funding for the UCC.
6    Q.  Among other things, that is a
7  subset of the question.
8    A.  And based on discussions with
9  counsel, I believe there is.
10   Q.  Okay.
11   A.  Okay?  But that's as far as I
12 will go today.
13   Q.  Would it be fair to say that you
14 still believe -- that you believe that
15 after the execution of the RSA, there would
16 still be value in PREPA sufficient to pay
17 creditors other than the supporting
18 bondholders?
19        MS. SPILLANE:  Objection to form.
20        MR. HAMERMAN:  Objection to form.
21        MR. NATBONY:  Objection to form.
22        MR. MASHBERG:  Same.
23   A.  I believe there is always a
24 roadmap available to accomplish goals if
25 you want to accomplish them.  That's why we

Page 149

D. Brownstein - Professional Eyes Only
1
2  have this RSA with bond creditors on PREPA.
3    Q.  I'm sorry, I don't understand.
4         Do you mean to say that this RSA
5  reflects the fact that -- or your belief
6  that -- what?  I'm sorry.  I'm confused.  I
7  don't understand.
8    A.  That's okay.  Let me say it, try
9  and say it a little better for you.
10   Q.  How about different?  I'm not
11 going to categorize that.
12   A.  What I am saying is that this RSA
13 is very complicated and was clearly very
14 difficult to negotiate.  If we could
15 accomplish this when we wanted to, we can
16 clearly accomplish a roadmap to settlements
17 with other creditors if we choose to.
18   Q.  Okay.  Do you know if the FOMB
19 has chosen to do that?
20        MS. SPILLANE:  Objection to form.
21        MR. MASHBERG:  Objection.
22        To the extent that your answer
23 would implicate any communications with
24 lawyers or the FOMB, I would ask that
25 your counsel direct you not to answer

Page 150

1      D. Brownstein - Professional Eyes Only
2  the question.
3        MS. SPILLANE:  Do you have an
4  answer based on things other than
5  legal --
6        MR. ARRASTIA:  Well, I just asked
7  if.  I didn't ask him the substance.
8     A.  Well, unfortunately, all of my
9  dialogue would involve both the board and
10  Proskauer; so I think for now, I need to
11  not answer that.
12     Q.  Do you know if the RSA that you
13  negotiated requires bondholder consent to
14  reach a settlement with other creditors?
15        MS. SPILLANE:  Objection to form.
16        MR. NATBONY:  Objection.
17        MR. HAMERMAN:  Objection.
18     A.  Under circumstances, yes.  Under
19  others, no.
20     Q.  Okay.  What circumstances yes?
21        MR. HAMERMAN:  Same objection.
22        MR. NATBONY:  Same.  Calls for a
23  legal conclusion.
24     A.  Yeah, as I said earlier, I mean,
25  your line of questioning continues to be

Page 151

1      D. Brownstein - Professional Eyes Only
2  based on my dialogue with counsel.  And,
3  therefore, I'm going to have to decline to
4  give you a response right now.
5     Q.  I'm asking you what's in a
6  document that's public that you negotiated.
7  I'm asking you if you think it's in this
8  document.
9     A.  I believe it is.  And, again,
10  that is based on dialogue with counsel.  So
11  I'm going to have to leave it there.
12     Q.  Okay.
13     A.  Okay?
14     Q.  Have you read something in this
15  document that indicates to you that you
16  need shareholder consent to reach a
17  settlement with other creditors?
18        MS. SPILLANE:  Objection to form.
19        MR. MASHBERG:  Objection to form.
20        MR. HAMERMAN:  Objection.
21        MR. NATBONY:  Objection.
22     A.  What I understand is that the
23  fuel line lenders' counsel believes we do.
24     Q.  Does anyone else, that you know?
25        MR. HAMERMAN:  Same objection.

Page 152

1      D. Brownstein - Professional Eyes Only
2        MS. SPILLANE:  Objection.
3        MR. MASHBERG:  Same objection.
4     A.  I will answer the way I answered
5  it a moment ago because I think that's the
6  best answer I can give to be helpful.
7        I believe that to the extent we
8  want to solve a problem, we can accomplish
9  that goal.
10        MR. ARRASTIA:  Why don't we take
11  a quick break.  Let me look through my
12  notes, please.
13        THE VIDEOGRAPHER:  The time is
14  1:41 p.m.  We are off the record.
15        (Recess is taken.)
16        THE VIDEOGRAPHER:  The time is
17  2:03 p.m.  We are back on the record.
18  BY MR. ARRASTIA:
19     Q.  Let me go back and clear up a
20  couple of things where I wasn't certain.
21        You had talked a little bit about
22  RSA bonds that were currently trading at a
23  discount to par.
24        Do you recall that?
25     A.  Yes.

Page 153

1      D. Brownstein - Professional Eyes Only
2     Q.  All right.  Is that discount to
3  par, do you know if that's related -- or
4  let me put it this way:  Do you know if
5  those bonds bear the risk that the RSA
6  won't be approved and those bonds won't be
7  issued?
8        MS. SPILLANE:  Objection to form.
9        MR. HAMERMAN:  Objection.
10     A.  There are loads of components as
11  to why their value is less than par, and
12  that clearly has a role in it as well.
13     Q.  Okay.
14     A.  The bigger role is that as a
15  credit, there is a limited number of buyers
16  who can buy it from the current owners
17  because of the structure.
18     Q.  Okay.  If those -- if the RSA is
19  approved and those bonds are issued, will
20  the pool of potential buyers grow?
21     A.  No.  Unfortunately, it's about
22  credit, not about legals.
23     Q.  Have you evaluated how much of a,
24  of the factor, the fact that the RSA might
25  not be approved and the bonds issued, have

Page 154

D. Brownstein - Professional Eyes Only

1  you analyzed how much of a factor that is
2  in the trading value?
3  MS. SPILLANE:  Objection to form.
4  A.  I'm an investment banker.  I'm
5  not a trader, okay?
6  Q.  So from that, I take it that you
7  haven't done that analysis?  It's not in
8  your bailiwick?
9  A.  Correct.
10  I think it would be more in the
11  bailiwick of an AlixPartners to do for you.
12  Q.  Okay.  And your projection is
13  that once these bonds are issued, that they
14  will, based on the 2018 load, they will
15  perform well?
16  MS. SPILLANE:  Objection to form.
17  MR. MASHBERG:  Objection to form.
18  MR. HAMERMAN:  Objection.
19  A.  No.
20  Q.  Okay.  So why don't you think
21  that they will perform -- well, let me ask
22  you this:  These were 40-year maturity
23  bonds, correct?
24  A.  Yes.

Page 155

D. Brownstein - Professional Eyes Only

1  Q.  And you have calculated an
2  expectation that they will be paid off in
3  33 years?
4  A.  No, I have not done a calculation
5  that expectations are they will be paid in
6  33 years.
7  Q.  Okay.  And where did that
8  expectation come from?
9  A.  That is based on the fiscal
10  plan's numbers.  And using those numbers,
11  we structured to, based on the numbers,
12  have the bonds amortized within 33 years,
13  the Tranche A bonds.
14  Q.  Sorry, just to be clear, Tranche
15  A, right?
16  A.  Um-hmm.  That's what I said.
17  Q.  What you say and what I hear are
18  not always the same.  But thank you.
19  Now when we talked about the
20  permitted indebtedness, you said that you
21  were in a room with counsel and -- when
22  some of the items were discussed.
23  Which counsel are you referring
24  to?

Page 156

D. Brownstein - Professional Eyes Only

1  A.  Counsels to both AAFAF and the
2  board.
3  So perhaps I can make this a
4  little easier and give you one of the
5  examples of how I believe we can issue debt
6  to cover other liabilities.
7  And if you were to go to the back
8  of the RSA, which you've given us, and
9  let's go to 14, which is right before
10  Schedule I-A.  Let's see, so what does that
11  mean it is?  It would be way in the back --
12  MS. SPILLANE:  Annex A?
13  THE WITNESS:  Annex A.  Thank you
14  for finding that so quickly for me.
15  A.  Annex A, the Recovery Plan Term
16  Sheet.
17  MR. LYNCH:  Where are we?
18  THE WITNESS:  Annex A.  It's in
19  the back.  It's like 15 pages from the
20  end at most.
21  MS. SPILLANE:  It's a chart form.
22  A.  It's a chart form.  This is
23  the --
24  Q.  Let me make sure we're on the

Page 157

D. Brownstein - Professional Eyes Only

1  same page.
2  A.  Sorry.
3  Q.  Is it this (indicating)?
4  A.  So it's Annex A to Recovery Plan
5  Term Sheet.
6  Q.  Right.
7  A.  And then please go to page 14.
8  You found it?
9  Q.  Yeah.  The next page is I-A-1.
10  A.  The next page is I-A-1, correct.
11  Q.  That helps.
12  MR. LYNCH:  Thank you.
13  A.  Take a look at "Other Charges."
14  Q.  Okay.
15  (Document review.)
16  A.  Did you find it?
17  Q.  Oh, no, I've got it.
18  A.  Okay.
19  Q.  Is there something else or is
20  that what you wanted to point out?
21  A.  No.  That's an example of, as I
22  have said, I believe there are mechanisms
23  we could use to finance legacy charges.
24  Q.  Okay.  Now so let me ask you

Page 158

D. Brownstein - Professional Eyes Only
1   D. Brownstein - Professional Eyes Only
2   this:  It says, "Subject to any
3   restrictions of the securitization trust
4   agreement."
5        A.   Um-hmm.
6        Q.   Is it your understanding that
7   that includes the Certain Covenants
8   position that we looked at starting on 1B4?
9   Or 1B4 doesn't apply to the provision you
10  just shared with us?
11       MS. SPILLANE:  Objection to the
12  extent it calls for a legal
13  conclusions.
14       MR. NATBONY:  Objection.
15       MR. HAMERMAN:  Objection.
16       A.   What I would do is suggest,
17  Counsel, that you all take a look at the
18  section and the others.  And, as I've said,
19  I believe there is a roadmap to doing what
20  we need to do to get to a successful
21  conclusion of PREPA so that we can help the
22  people of Puerto Rico with their recovery.
23       Q.   Okay.
24       A.   And in case you're not aware of
25  it, I'm one of those people, Counselor.

Page 159

1   D. Brownstein - Professional Eyes Only
2        Q.   I appreciate your suggestion.
3        I was just asking if it is your
4   understanding, your belief, that these
5   other charges, the section you shared with
6   us, is still applicable in light of the
7   certain covenants that we talked about on
8   I-B-4 and IB5?
9        MR. NATBONY:  Objection to form.
10       MS. SPILLANE:  Objection.  Calls
11  for a legal conclusion.
12       A.   And I continue to give you the
13  same answer I've given you.
14       Q.   You do not have an understanding?
15       MR. NATBONY:  Objection to form.
16       A.   I've given you the answer that
17  I've given you, which is I believe there's
18  a roadmap to accomplishing the goals that
19  we'd need to accomplish here.
20       Q.   And you're suggesting that this
21  is the roadmap?
22       A.   No, I'm suggesting --
23       MR. MASHBERG:  Objection.
24  Mischaracterizes.
25       MS. SPILLANE:  Objection to form.

Page 160

1   D. Brownstein - Professional Eyes Only
2        A.   -- it's one of many places where
3   we can utilize this document to accomplish
4   whatever goals we need to accomplish for
5   the benefit of PREPA and the people of
6   Puerto Rico.
7        Q.   All right.  Speaking of
8   creditors, are you currently engaged in any
9   conversations with other creditors other
10  than the bondholders as to this roadmap
11  that you discussed?
12       A.   No.
13       Q.   Is that because they refuse to
14  engage or some other reason?
15       MS. SPILLANE:  Objection to form.
16       MR. MASHBERG:  Objection to form.
17       A.   I believe the fuel line lenders
18  understand where the government parties are
19  today as it relates to PREPA.  And I
20  believe with respect to the UCC, we're
21  trying to determine what actually -- who
22  your clients are and what your claims are.
23       Q.   Thank you.
24       You mentioned government parties.
25  Let me talk to you a little bit about

Page 161

1   D. Brownstein - Professional Eyes Only
2   government.
3        I had asked you and you had
4   shared with me that you didn't know when
5   government approval might be forthcoming,
6   but I failed to ask you, do you know if --
7        A.   Government approval of what?  I'm
8   sorry.  I know you asked --
9        Q.   I'm sorry.  Of the RSA.
10       A.   Government approval of the RSA?
11       MS. SPILLANE:  Legislative
12  approval?
13       A.   They've approved it.
14       You meant legislation.
15       Q.   Legislation.  I'm sorry.  We're
16  using different terms as to government.  I
17  mean the legislature.
18       I asked you and you told you
19  didn't know when the legislature might?
20       A.   Correct.
21       Q.   Do you know if it will approve
22  it?
23       MR. MASHBERG:  Objection to form.
24       A.   I'm not on the legislature, so I
25  wouldn't know.

Page 350

D. Brownstein - Professional Eyes Only

1
2  that?
3      A.  Um-hmm.
4      Q.  Okay.  Did the government parties
5  have a goal of advancing the interests of
6  PREPA's creditors in connection with the
7  RSA?
8          MS. SPILLANE:  Objection to form.
9      A.  I don't understand your question.
10         MR. NATBONY:  Objection as to
11  form.
12     A.  PREPA is in bankruptcy.  Our goal
13  is to make sure we utilize that to create
14  the most beneficial restructuring that we
15  can given our very difficult requirements,
16  including the cap charge, the duration
17  before execution will occur of the plan of
18  adjustment, and the other provisions of the
19  RSA, such as no acceleration rates.
20     Q.  Under the RSA, if it's approved
21  and PREPA somehow generates significant
22  unexpected revenue or savings before a plan
23  is confirmed, the benefit of those revenues
24  or savings would go to ratepayers, right?
25         MR. NATBONY:  Objection.

Page 351

D. Brownstein - Professional Eyes Only

1
2          MS. SPILLANE:  Objection to form.
3          MR. HAMERMAN:  Objection to form.
4          MR. MASHBERG:  Objection to form.
5      A.  I'm sorry, I don't -- I believe
6  what you asked is in the event prior to the
7  plan being confirmed there are additional
8  revenues available at PREPA above the
9  required interest under the RSA that goes
10  to the RSA participants, that that money
11  would flow back to the ratepayers.
12         If that's what you're asking, I
13  don't know where it would flow, but if
14  there was excess after what's required
15  under the RSA to be paid to the
16  bondholders, I believe that money would be
17  the property of PREPA.
18     Q.  Did you have a chance to read
19  those forbearance agreements that I showed
20  you before we broke at one point?
21     A.  No.
22     Q.  Do you understand -- without
23  looking at them, because I don't want to
24  take the time, but are you able to answer
25  this question without looking at it?

Page 352

D. Brownstein - Professional Eyes Only

1
2      Would you understand a
3  forbearance of Citi on its fuel line loan
4  to amount in effect to a re-lending of the
5  amounts due under the Citi fuel line loan?
6          MR. MASHBERG:  Objection to form.
7          MS. SPILLANE:  Objection to form.
8          MR. NATBONY:  Objection.
9          MR. HAMERMAN:  Objection.
10     A.  Well, first of all, I haven't
11  looked at it.  But, again, if your question
12  is about re-lending, let's make sure you
13  understand what happened with the
14  bondholders.
15     Q.  Sure.
16     A.  As I understand it from PREPA's
17  adviser at the time, Lisa Donahue, that the
18  concern was that in the event PREPA
19  defaulted on its bonds, they would not be
20  able to purchase fuel.  It wasn't a
21  function of whether they would have money
22  to purchase it or not.  What I understood
23  was that the fuel sellers would walk away.
24         So this was a matter of keeping
25  the lights on in Puerto Rico.  And so what

Page 353

D. Brownstein - Professional Eyes Only

1
2  happened was PREPA used cash it had to pay
3  bondholders their P&I other than the
4  signatories to the RSA, which included
5  Assured, National, Syncora and the ad hoc
6  group.  So each of them agreed to lend
7  PREPA money so that they had sufficient
8  money to pay debt service on their bonds.
9          What I don't know is whether, but
10  I don't believe so, that the fuel line
11  loans were in the same position.  But those
12  are questions for Lisa Donahue, not me.
13     Q.  Okay.  Let me direct your
14  attention to paragraph 36 of your
15  declaration.
16     A.  Um-hmm.
17     Q.  It says -- I'll wait until you
18  have it.
19     A.  Yes.
20     Q.  It says there, "In negotiating
21  the terms of the RSA, it was also necessary
22  to compensate supporting holders in
23  consideration of their prepetition
24  re-lending bonds that remain outstanding
25  and forbearance from exercising any rights

Page 354

1   D. Brownstein - Professional Eyes Only
2   or remedies or seeking stay relief to do so
3   pending implementation of the RSA."
4       It goes on from there.
5       A.   Um-hmm.
6       Q.   What I'd like to know is why was
7   it necessary, in your view, to compensate
8   them for that?
9       A.   Because what Lisa had agreed to
10  with the fuel line -- I mean with the
11  bondholders was that she would pay them
12  back at par on those loans, plus accrued,
13  very quickly after those loans were made
14  and that the purpose was, again, to keep
15  the lights on in Puerto Rico.
16      So we were honoring the deal that
17  the restructuring officer of PREPA had
18  agreed to with the fuel line lenders -- I
19  mean with the bondholders.
20      Q.   Was it legally necessary in your
21  view to compensate the re-lenders the way
22  that PREPA has done under the RSA?
23      MS. SPILLANE:  Objection.  Calls
24  for a legal conclusion.
25      MR. NATBONY:  Objection to form.

Page 355

1   D. Brownstein - Professional Eyes Only
2       A.   I can't answer that question.  I
3   don't know.  But what I'm telling you is
4   that that was the business deal the
5   restructuring officer of PREPA agreed to
6   with the bondholders to make sure the
7   lights remained on in Puerto Rico, and we
8   didn't want to be the party that dishonored
9   that agreement to dishonor the agreement
10  that she had struck.
11      Q.   Are you aware of Citi selling its
12  fuel line loan?
13      A.   I know that Citi has sold its
14  fuel line loan, yes.
15      Q.   Were you involved in the process
16  that led to the sale of that loan?
17      A.   No.  That would have been done by
18  an organization in Citi called IRM, which
19  is our restructuring arm, which works
20  independent from any other any other arm at
21  Citi.  So they would not have engaged us in
22  that dialogue.
23      Q.   Why don't I ask -- you were
24  talking about IRM and whether --
25      A.   IRM would have done the sale of

Page 356

1   D. Brownstein - Professional Eyes Only
2   that asset through third parties, never
3   through our organization, through lawyers
4   who are not part of our organization, and
5   therefore we would have no role or dialogue
6   on that topic.
7       Q.   And just so I'm clear, would they
8   also be the ones to decide whether it was
9   desirable for Citi to sell the fuel line
10  loan?
11      A.   Correct.
12      Q.   Okay.  And you had no involvement
13  in the decision, regardless how it was
14  executed, to sell the Citi fuel line loan
15  is that --
16      A.   Well, again, they have their own
17  counsel.  They do their own analysis as to
18  credit risk and make a determination as to
19  whether to sell with outside counsel and
20  inside counsel of their choosing, who has
21  no tentacles to the business side of Citi.
22      Q.   Okay.  Please --
23      A.   That's how banks work.
24      Q.   Please turn to paragraph 25.
25      A.   Of what document?

Page 357

1   D. Brownstein - Professional Eyes Only
2       Q.   Of your declaration.
3       And just generally, you describe
4   in paragraphs 25 through 29 what you say
5   were the objectives of the government
6   parties in connection with the, the
7   negotiation with the RSA; is that fair?
8       A.   Um-hmm.  Yes.
9       Q.   When were those objectives
10  decided upon?
11      A.   At the time that the board first
12  engaged with the signatories to the RSA.
13      Q.   How was -- how was it
14  communicated -- how were those objectives
15  communicated to you?
16      A.   By the board in a meeting as we
17  prepared our proposal together to the RSA
18  signatories, the original RSA signatories,
19  to request that they agree to certain
20  changes to the RSA in advance of the
21  board's vote on whether to approve the RSA
22  or not.
23      Q.   Are the objectives reflected in
24  any documents?
25      A.   I'm sorry, are the objectives?

Page 358

1    D. Brownstein - Professional Eyes Only
2    Q.   The objectives that are described
3    in paragraphs 25 through 29, is the
4    communication of those objectives reflected
5    in any documents?
6    A.   In the RSA itself.
7    Q.   I'm talking about from the
8    beginning of the negotiation of the RSA.
9    A.   Yes.  We submitted a presentation
10   to all of the creditors, including your
11   clients, with changes that we proposed in
12   order to proceed with the original RSA.
13       Do you not have that?
14   Q.   I very well may.
15   A.   Okay.
16   Q.   Do you agree that bondholders
17   before -- while the fuel lines were being
18   paid, do you agree that bondholders derived
19   a benefit from PREPA being able to buy
20   fuel?
21       MS. SPILLANE:  Objection to form.
22       MR. MASHBERG:  Objection to form.
23   A.   No.
24   Q.   You were talking before about how
25   PREPA would go dark if it couldn't buy

Page 359

1    D. Brownstein - Professional Eyes Only
2    fuel, right?
3    A.   Yes.
4    Q.   Did the provision of the fuel
5    line credit benefit PREPA by permitting
6    PREPA to buy fuel?
7    A.   No.
8    Q.   Why not?
9    A.   Because that's not what its
10   purpose was.  It was a timing drag of 90
11   days, right?
12       It was all about a cash flow
13   need.  It wasn't about actually paying into
14   a default to make sure that the lights
15   didn't go off.  It's very different.
16   Q.   Let's go to paragraph 29 of your
17   declaration.
18       (Witness complies.)
19   Q.   And this is a paragraph that
20   talks about the transformation of PREPA,
21   correct?
22   A.   Correct.
23   Q.   And I'll start with the second
24   sentence.  It says, "This goal ran in
25   tandem with the other goals to reduce the

Page 360

1    D. Brownstein - Professional Eyes Only
2    overall financial burden and risk on PREPA
3    and its ratepayers but added an additional
4    key component to any agreement that would
5    be reached to avoid disruption to the
6    transformation bid process.  Supporting
7    holders would have to stay patiently on the
8    sidelines and wait to the effective date of
9    a confirmed plan of adjustment before
10   receiving the new securitization bonds."
11       Do you see that?
12   A.   Um-hmm.
13   Q.   Why do they needed to stay
14   patient eventually on the sidelines, the
15   supporting holders?
16   A.   Because there is no way to
17   consummate the issuance of debt for them
18   without the plan of adjustment.  And the
19   plan of adjustment would not go to court
20   until we had the operator or concessionaire
21   on board and could, as I said earlier
22   today, make sure that we were protecting
23   them against liability for prior actions at
24   PREPA.
25   Q.   And why can't that happen after

Page 361

1    D. Brownstein - Professional Eyes Only
2    confirmation?
3    A.   Because it's only through that
4    court that we can provide them those
5    protections.
6    Q.   Can you help me understand that?
7    A.   I'm not a lawyer, so I think that
8    I would recommend you speak to lawyers
9    about the reasons behind that.
10   Q.   What liabilities would a
11   transformation partner be concerned about
12   succeeding to if it were -- if it were not
13   involved in the -- you know, in the plan
14   confirmation --
15       MS. SPILLANE:  Objection to form.
16   BY MR. LYNCH:
17   Q.   -- if a bid process were to
18   happen after the plan confirmation?
19       MR. MASHBERG:  Objection to form.
20   A.   I'm sorry, if I take over a
21   company and that company has liabilities
22   that spring up that were prior liabilities
23   after the day I acquired the company, I
24   still have liabilities for it.
25   Q.   What prior liabilities would --