**EXHIBIT 18**

**NEW ISSUE – BOOK-ENTRY ONLY** (SEE RATINGS herein): Moody's: Baa1
S&P: BBB+
Fitch: BBB+

## $650,000,000
## PUERTO RICO ELECTRIC POWER AUTHORITY
### Power Revenue Bonds, Series 2012A
### Power Revenue Refunding Bonds, Series 2012B

The Power Revenue Bonds, Series 2012A and Power Revenue Refunding Bonds, Series 2012B (collectively, the "Bonds") of Puerto Rico Electric Power Authority (the "Authority") are being issued pursuant to a Trust Agreement, dated as of January 1, 1974, as amended, between the Authority and U.S. Bank National Association, New York, New York, successor trustee (the "Trust Agreement"). The Bonds, the outstanding bonds previously issued under the Trust Agreement and any additional bonds that the Authority may from time to time issue under the Trust Agreement are payable solely from the Net Revenues (as described herein) of the Authority's electric generation, transmission and distribution system.

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.

- The Bonds will be registered under the book-entry only system of The Depository Trust Company ("DTC"). Purchasers of the Bonds will not receive certificates evidencing the Bonds.

- Interest on the Bonds will be payable on July 1, 2012 and on each January 1 and July 1 thereafter.

- The Bonds will be subject to redemption, commencing on July 1, 2022, as described herein. See *Mandatory Redemption* and *Optional Redemption* under DESCRIPTION OF THE BONDS for more information.

- The inside cover page contains information concerning the maturity schedule, interest rates and prices or yields of the Bonds.

- The Authority may determine, in its sole discretion, to obtain insurance with respect to some or all of the Bonds. The Underwriters will provide notice on or before the date of pricing if the Authority determines to insure all or any part of the Bonds.

- Prospective investors should consider the information appearing under RISK FACTORS AND INVESTMENT CONSIDERATIONS before making an investment decision.

- *In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Authority described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations. Bond Counsel is further of the opinion that interest on the Bonds is exempt from state, Commonwealth of Puerto Rico and local income taxation. See TAX MATTERS herein.*

- The Authority expects that the Bonds will be available for delivery to DTC on or about May 1, 2012.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel, and certain other conditions. Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

**The Bonds are not a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities or political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions, other than the Authority, shall be liable for the payment of the principal of or interest on the Bonds.**

### Morgan Stanley

| | | |
|---|---|---|
| Citigroup | | J.P. Morgan |
| Barclays | BMO Capital Markets | BofA Merrill Lynch |
| Goldman, Sachs & Co. | Jefferies | Ramirez & Co. Inc. |
| Raymond James | RBC Capital Markets    UBS FS Puerto Rico | Wells Fargo Securities |
| BBVAPR MSD | FirstBank PR Securities | Oriental Financial Services |
| Popular Securities | Santander Securities    Scotia MSD | VAB FINANCIAL |

April 12, 2012

## $650,000,000
## PUERTO RICO ELECTRIC POWER AUTHORITY

### $630,110,000 Power Revenue Bonds, Series 2012A

| Maturity Date July 1, | Principal Amount | Interest Rate | Yield | CUSIP* |
|---|---|---|---|---|
| 2029 | $34,510,000 | 4.80% | 4.82% | 74526QZX3 |
| 2042 | 80,000,000 | 5.05 | 5.08 | 74526QZY1 |

$157,460,000 5.00% Term Bonds due July 1, 2029; Yield: 4.82%[†]; CUSIP* 74526QZZ8
$358,140,000 5.00% Term Bonds due July 1, 2042; Yield: 5.08%; CUSIP* 74526QA28

### $19,890,000 Power Revenue Refunding Bonds, Series 2012B

| Maturity Date July 1, | Principal Amount | Interest Rate | Yield | CUSIP* |
|---|---|---|---|---|
| 2016 | $ 3,345,000 | 2.50% | 2.00% | 74526QA36 |
| 2016 | 16,545,000 | 5.00 | 2.00 | 74526QA44 |

---

[*] Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

[†] Priced at the stated yield to the July 1, 2022 optional redemption date at a redemption price of 100%. See "Redemption" under DESCRIPTION OF THE BONDS herein.

**In connection with this offering, the Underwriters may overallot or effect transactions which stabilize or maintain the market prices of the Bonds offered hereby and of the Authority's outstanding Power Revenue Bonds at levels above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.**

The information set forth herein has been obtained from the Authority, the Commonwealth of Puerto Rico, and other official sources that are believed to be reliable, but it is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth of Puerto Rico since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained herein, and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell, or the solicitation of an offer to buy, nor shall there be any sale of the Bonds offered hereby by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, trust agreements, the Bonds and other documents herein do not purport to be complete. Reference is made to said laws, trust agreements, the Bonds and other documents for a full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Authority and the Trustee.

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Authority. In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially and adversely from those expressed or implied by forward-looking statements.**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ................................................. 1
OVERVIEW .......................................................................... 2
   General ............................................................................ 2
   Summary of Operating Results ........................................... 3
   Capital Improvement Program .......................................... 6
   Strategic Plans to Address the Authority's Challenges ........... 7
RISK FACTORS AND INVESTMENT CONSIDERATIONS ... 15
   The Authority's Financial Condition ................................. 15
   The Authority's ability to charge and collect rates sufficient
      to provide for debt service on the Power Revenue
      Bonds and other indebtedness and meet its operating
      expenses .................................................................. 19
   The Authority's ability to meet its projections of Net
      Revenues ................................................................... 20
   The Trend in Demand for Electricity ................................ 21
   Dependence on Fuel Oil; Fuel Cost Volatility .................... 21
   The Authority's ability to manage substantial construction
      efforts related to its fuel diversification program ............ 22
   The Authority's ability to access the capital markets ........... 23
   The Authority's System may be affected by general
      operating risks and hazards customary in the power
      generation industry.  The Authority may not have
      adequate insurance to cover all these hazards ................. 23
   Weather and Other Uncontrollable Events ......................... 23
   Labor Factors ................................................................ 24
   Changes in Commonwealth Legislation, Competition and
      Self-Generation ........................................................ 24
   Changes in Federal Laws or Regulations .......................... 26
   The Authority's ability to comply with environmental and
      public health standards, maintain self-sufficiency in a
      highly regulated industry and fund capital
      improvements required to comply with these
      regulatory requirements .............................................. 26
   New or Future Environmental Regulatory Requirements ..... 28
   Limited Rights of Bondholders ....................................... 30
   Limited Nature of Ratings; Reductions, Suspension or
      Withdrawal of a Rating ............................................... 30
PLAN OF FINANCING ....................................................... 31
   Series 2012A Bonds ...................................................... 31
   Series 2012B Bonds ...................................................... 31
   Estimated Sources and Uses of Funds for the Bonds ........... 32
SECURITY ......................................................................... 32
   Source of Payment ........................................................ 32
   Flow of Funds under Trust Agreement ............................. 33
   Rate Covenant .............................................................. 34
   Reserve Account ........................................................... 34
   Reserve Maintenance Fund, Self-insurance Fund and
      Capital Improvement Fund .......................................... 35
   Additional Bonds .......................................................... 35
   Subordinate Obligations ................................................. 36
DESCRIPTION OF THE BONDS .......................................... 37
   General ........................................................................ 37
   Book-Entry Only System ................................................ 37
   Discontinuance of the Book-Entry Only System ................. 40
   Optional Redemption ..................................................... 40
   Mandatory Redemption .................................................. 40
   Notice of Redemption .................................................... 41
THE AUTHORITY .............................................................. 41
   Powers ........................................................................ 41
   Management ................................................................. 42
   Subsidiaries ................................................................. 44
   Fiscal Oversight Agreement ........................................... 45
THE SYSTEM ..................................................................... 45
   Generating Facilities ..................................................... 45

**Page**

Transmission and Distribution Facilities ............................ 47
Adequacy of Capacity ................................................... 50
Plans for Fuel Diversification ......................................... 53
Statistical Information ................................................... 57
Historical Capital Improvement and Financing Program ...... 58
Projected Five-Year Capital Improvement and Financing
   Program ................................................................... 58
Rates ......................................................................... 59
Major Clients .............................................................. 61
Fuel ........................................................................... 62
Subsidies and Contributions in Lieu of Taxes .................... 63
Wheeling .................................................................... 65
DEBT ................................................................................ 66
   Lines of Credit – Operational ......................................... 66
   Other Loans and Debt – Subordinated .............................. 66
   Swap Agreements ......................................................... 67
   Principal and Interest Requirements ................................. 69
NET REVENUES AND COVERAGE ..................................... 70
   Management's Discussion and Analysis of Operating
      Results .................................................................... 72
   Projected Net Revenues ................................................. 76
ENVIRONMENTAL MATTERS ........................................... 80
   Environmental Litigation and Administrative
      Proceedings .............................................................. 80
   Compliance Programs .................................................... 84
INSURANCE ...................................................................... 95
   Coverage ..................................................................... 95
   Self-insurance Fund ...................................................... 96
   Fire Prevention Program ................................................ 96
LABOR RELATIONS .......................................................... 96
PENSION PLAN ................................................................. 97
OTHER POST-EMPLOYMENT BENEFITS ........................... 99
LITIGATION ..................................................................... 99
TAX MATTERS ................................................................ 102
   Federal Income Taxes .................................................. 102
   State Taxes ................................................................ 102
   Original Issue Discount ................................................ 102
   Original Issue Premium ................................................ 103
   Ancillary Tax Matters .................................................. 103
   Changes in Law and Post Issuance Events ....................... 104
VERIFICATION OF MATHEMATICAL
   COMPUTATIONS ....................................................... 104
UNDERWRITING ............................................................. 104
MATERIAL RELATIONSHIPS ........................................... 106
LEGAL MATTERS ........................................................... 107
LEGAL INVESTMENT ...................................................... 107
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ....................................................................... 107
INDEPENDENT AUDITORS .............................................. 107
RATINGS ........................................................................ 108
CONTINUING DISCLOSURE ............................................. 108
MISCELLANEOUS ........................................................... 111

APPENDIX I      -   Definitions of Certain Terms and
                        Summary of Certain Provisions of
                        the Trust Agreement .......................... I-1
APPENDIX II     -   Audited Financial Statements ................ II-1
APPENDIX III    -   Letter of the Consulting Engineers ........ III-1
APPENDIX IV   -   Proposed Form of Bond Counsel
                        Opinion ........................................... IV-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

$650,000,000
# PUERTO RICO ELECTRIC POWER AUTHORITY
## Power Revenue Bonds, Series 2012A
## Power Revenue Refunding Bonds, Series 2012B

### INTRODUCTORY STATEMENT

The purpose of this Official Statement of the Puerto Rico Electric Power Authority (the "Authority"), which includes the cover page, the inside cover page, the Appendices hereto and the information incorporated by reference as set forth below, is to furnish information in connection with the issuance and sale by the Authority of its Power Revenue Bonds, Series 2012A (the "Series 2012A Bonds") and its Power Revenue Refunding Bonds, Series 2012B (the "Series 2012B Bonds"; and together with the Series 2012A Bonds, the "Bonds").

Capitalized terms not defined elsewhere in this Official Statement are defined in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

The Bonds will be issued under and secured by a Trust Agreement, dated as of January 1, 1974, as amended (the "Trust Agreement"), between the Authority and U.S. Bank National Association, successor trustee (the "Trustee"). The Bonds, the other Puerto Rico Electric Power Authority Power Revenue Bonds and Power Revenue Refunding Bonds outstanding, and such additional bonds as may be issued from time to time under the Trust Agreement, are hereinafter collectively referred to as the "Power Revenue Bonds."

In order to give potential purchasers of the Bonds general information on the economy of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), this Official Statement incorporates by reference Appendix A to the Official Statement of the Puerto Rico Sales Tax Financing Corporation, dated December 1, 2011, relating to its $1,006,474,702 Sales Tax Revenue Bonds, Senior Series 2011C (the "Commonwealth Economic Report"). The Commonwealth Economic Report was filed by the Puerto Rico Sales Tax Financing Corporation with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org). The Commonwealth Economic Report was not prepared by the Authority, and the Authority does not assume any responsibility for its accuracy or completeness.

Any official statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Economic Report, or any new or revised Commonwealth Economic Report or other document that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Economic Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

## OVERVIEW

**General**

The Authority was created in 1941 as a public corporation and governmental instrumentality of the Commonwealth by Act No. 83 of the Legislative Assembly of Puerto Rico, approved May 2, 1941, as amended (the "Act"). The Authority supplies virtually all of the electric power consumed in the Commonwealth. The Authority is one of the largest municipal utilities in the United States, ranking first in number of customers and revenues among public power utilities. As of June 30, 2011, it served approximately 1.5 million clients and had utility plant in service totaling approximately $11.2 billion, including $4.1 billion of production plant in service and $5.4 billion of transmission and distribution plant in service, all based on original cost. The Authority's production facilities, together with two private co-generation facilities with long-term power purchase contracts with the Authority, have a dependable generating capacity of 5,839 megawatts ("MW"). For the twelve months ended December 31, 2011, the average percentage of the Authority's generating capacity available for service ("equivalent availability"), which includes the two co-generation facilities, was 80.9%. As of December 31, 2011, the Authority had 2,450 circuit miles of transmission lines and 32,548 circuit miles of distribution lines.

Approximately 69% of the Authority's energy generation for fiscal year 2011 was produced by Authority-owned and operated facilities. The Authority owns six major generating plants and a number of smaller facilities with a combined dependable generating capacity of 4,878 MW. Nearly all of these facilities are currently fired with fuel oil, although the Authority has converted the two main units at its Costa Sur generation facility to allow them to use either natural gas or fuel oil and, as part of its capital improvement plan, plans to convert several other units to dual fuel units. In order to allow these facilities to use natural gas, the Authority also plans to develop the infrastructure to transport and deliver natural gas. See *Plans for Fuel Diversification* under THE SYSTEM. The cost of such transportation and delivery infrastructure is not included in the Authority's capital improvement plan.

Approximately 31% of the Authority's energy generation for fiscal year 2011 was purchased from EcoEléctrica, L.P. ("EcoEléctrica") and AES Puerto Rico, L.P. ("AES-PR"), the owners and operators of two independent power production facilities. Under the long-term contract with EcoEléctrica, the Authority purchases 507 MW of dependable generating capacity from a natural gas-fired cogeneration plant built by EcoEléctrica and located in Peñuelas, Puerto Rico, which commenced commercial operation in March 2000. Under the long-term contract with AES-PR, the Authority purchases 454 MW of dependable generating capacity from a coal-fired cogeneration facility built by AES-PR and located in Guayama, Puerto Rico, which commenced commercial operation in November 2002. These contracts have allowed the Authority to reduce its dependence on fuel oil while passing on to EcoEléctrica and AES-PR substantially all of the risks of operating the facilities.

Unless otherwise noted, this Official Statement presents Revenues, Current Expenses and Net Revenues of the Authority as defined in the Trust Agreement and described herein. For purposes of the Trust Agreement, the Authority calculates Revenues, Current Expenses and Net Revenues on an accrual basis. Such calculations differ in several important respects from the Authority's calculations of change in net assets prepared in accordance with generally accepted accounting principles ("GAAP"). For example, Net Revenues under the Trust Agreement are computed excluding depreciation expense, other post-employment benefits expense and the payment of debt service on the Power Revenue Bonds. For a discussion of some of the most significant differences between Net Revenues under the Trust Agreement and change in net assets under GAAP and the treatment of non-cash items under the Trust Agreement, see NET REVENUES AND COVERAGE and Schedule II to the Financial Statements for the fiscal years ended June 30, 2011 and 2010 in Appendix II, which includes a reconciliation of the Authority's change in net assets under GAAP with its Net Revenues under the Trust Agreement.

The Authority's fiscal year begins on July 1 and ends on the following June 30.

## Summary of Operating Results

### Five-Year Period

During the five-year period from fiscal year 2007 through fiscal year 2011, the Authority experienced a net decrease of 10.5% in electric energy sales in kilowatt hours ("kWh"), as shown in the table that follows under the heading "Operating Results." The Authority's sales during this period were adversely affected by the significant increase in oil prices (the average cost of fuel oil per barrel to the Authority increased by 66.7%), the principal source of fuel used in its generating facilities, and a reduction in the level of economic and business activity in the Commonwealth due to a prolonged recession, which commenced in the fourth quarter of fiscal year 2006.

The Authority's Net Revenues, however, increased from $672.4 million in fiscal year 2007 to $706.0 million in fiscal year 2011, or 5.0%. During this period, the Authority experienced decreases in Net Revenues in fiscal years 2009 and 2011, when compared to the respective prior fiscal years. Principal and Interest Requirements on the Authority's Power Revenue Bonds increased from $455.0 million in fiscal year 2007 to $480.2 million in fiscal year 2011 (which excludes $79.6 million of interest in fiscal year 2011 that was capitalized through the issuance of Power Revenue Bonds).

### Fiscal Year 2011

Net Revenues for fiscal year 2011 were $706.0 million, representing a decrease of $30.6 million, or 4.2%, from Net Revenues for fiscal year 2010. The decrease in Net Revenues was primarily the result of a 3.8% decrease in electric energy sales (in kWh) and increases in maintenance expenses of $11.3 million, or 5.4%, and in transmission and distribution expenses of $15.6 million, or 9.7%. Revenues were $4.4 billion, a 5.9% increase from the prior year as a result of an increase in the revenues from the fuel adjustment charge due to the 14.2% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $3.7 billion for the year, an 8.1% increase from the prior year. Fuel and purchased power expenses, the principal component of the Authority's Current Expenses, are passed on to clients through a separate fuel adjustment charge included in electric service rates. The Authority's revenues from its basic charges (which exclude the fuel adjustment charge) decreased by 3.0% from fiscal year 2010 to fiscal year 2011 as a result of the decrease in electric energy sales. Excluding fuel and purchased power expenses, Current Expenses increased from $728.4 million for fiscal year 2010 to $752.9 million for fiscal year 2011, or 3.4%, as a result of the increases in maintenance and transmission and distribution expenses mentioned above. The increase in these expenses was due in part to increases in salaries pursuant to the collective bargaining agreement with the Authority's principal union. The accrued revenues attributable to the municipalities' consumption and the residential fuel, irrigation system and hotel subsidies increased from $237.8 million for fiscal year 2010 to $251.2 million for fiscal year 2011, or 5.6%. The treatment of the municipalities' consumption and these subsidies, which are included in Revenues although they are not collected, is discussed below and in *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

During fiscal year 2011, accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $932.1 million as of June 30, 2010 to $1.0 billion as of June 30, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge, due to the increase in the cost of fuel, and slower payments by clients. Accounts receivable from government clients increased from $274.7 million as of June 30, 2010 to $287.6 million as of June 30, 2011, of which 78% were considered past due (in excess of 30 days) as of June 30, 2011, compared to

73% as of June 30, 2010. Accounts receivable from general clients (residential, industrial and commercial) increased from $657.4 million as of June 30, 2010 to $720.1 million as of June 30, 2011, of which 8% were past due as of June 30, 2011, compared to 10% as of June 30, 2010.

*Six Months Ended December 31, 2011*

Net Revenues for the six months ended December 31, 2011 were $410.5 million, representing an increase of $75.2 million, or 22.4%, from the same period in the prior year. Net Revenues increased despite a 2.6% decrease in electric energy sales (in kWh), primarily as a result of higher revenues from the fuel and purchased power adjustment charges relative to the increase in the cost of fuel and purchased power due to differences between these adjustment charges, as determined by the Authority's formula, and actual costs of fuel and purchased power for the period. Revenues for the six months ended December 31, 2011 were $2.605 billion, a 23.9% increase from the same period of the prior year, mainly as a result of an increase in the revenues from the fuel adjustment charge due to the 40.3% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the same period in the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $2.195 billion for the period, a 24.1% increase from the same period in the prior year. The increase in Net Revenues during the six month period was also due in part to a decrease in maintenance expenses of $8.8 million, or 7.3%, and a decrease in transmission and distribution expenses of $7.6 million, or 8.1%. During the comparable period of 2010 these expenses had been higher than normal due to poor weather conditions that required higher maintenance and transmission and distribution expenses. Administrative and general expenses of $90.5 million for this period were 1.7% higher than in the comparable period of 2010. The accrued revenues attributable to the municipalities' consumption and the residential fuel, irrigation system and hotel subsidies increased from $118.6 million for the six months ended December 31, 2010 to $141.5 million for the six months ended December 31, 2011, or 19.3%.

Accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $822.5 million as of December 31, 2010 to $994.6 million as of December 31, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge, due to the increase in the cost of fuel, and slower payments by clients. Accounts receivable from government clients (excluding municipalities) increased from $253 million as of December 31, 2010 to $261.8 million as of December 31, 2011, of which 81% were considered past due (in excess of 30 days) as of December 31, 2011, compared to 79% as of December 31, 2010. Accounts receivable from general clients increased from $595.1 million as of December 31, 2010 to $719.5 million as of December 31, 2011, of which 10% were past due as of December 31, 2011, compared to 12% as of December 31, 2010.

The table appearing below summarizes the operating results of the Authority for the five fiscal years ended June 30, 2011 and the six months ended December 31, 2011 and 2010. For purposes of the Trust Agreement, the Authority calculates Revenues and Net Revenues including (i) amounts billed to the Commonwealth's municipalities for electric energy sales that the Authority is legally entitled to collect but historically has not collected because it instead offsets such billings against the contribution in lieu of taxes ("CILT") that the Authority is required to pay the municipalities, and (ii) amounts attributable to a residential fuel subsidy, a hotel subsidy and a rural electrification and irrigation systems subsidy that the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to credit these subsidies directly to customers in their electric energy bills). The amount of the required annual CILT is at least equal to the municipalities' annual electric energy consumption. The aggregate amount of accrued revenues for each period attributable to the municipalities' consumption of electric energy and these subsidies is shown in footnote 1 to the table below. As shown in the table, when these amounts are deducted from Revenues and Net Revenues (shown in the table as adjusted net revenues), the Authority's debt service coverage is reduced significantly. For a discussion of Bond

Counsel's treatment of Revenues and Net Revenues for purposes of the additional bonds test and rate covenant under the Trust Agreement, see *Rate Covenant* and *Additional Bonds* under SECURITY. For a discussion of the CILT and the subsidies provided by the Authority, see *The Authority's Financial Condition – Subsidies and Contributions in Lieu of Taxes* under RISK FACTORS AND INVESTMENT CONSIDERATIONS, *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM, and *Projected Net Revenues* under NET REVENUES AND COVERAGE.

### Operating Results
### (dollars in thousands)

| | | | Fiscal Years Ended June 30 | | | Six Months Ended December 31 | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2010[2] | 2011[2] |
| Revenues[1] | $3,687,385 | $4,369,498 | $4,007,268 | $4,165,733 | $4,411,213 | $2,103,476 | $2,605,492 |
| Less: Current Expenses | 3,014,983 | 3,688,070 | 3,377,772 | 3,429,095 | 3,705,192 | 1,768,201 | 2,195,036 |
| Net Revenues[1] | $ 672,402 | $ 681,428 | $ 629,496 | $ 736,638 | $ 706,021 | $ 335,275 | $ 410,456 |
| Principal and Interest Requirements[3] | $ 455,022 | $ 419,569 | $ 435,042 | $ 397,579 | $ 480,234 | [4] | [4] |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.48 | 1.62 | 1.45 | 1.85 | 1.47 | [4] | [4] |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[5] | 1.04 | 1.09 | 0.92 | 1.25 | 0.95 | [4] | [4] |
| Electric energy sales (in millions of kWh) | 20,672 | 19,602 | 18,516 | 19,235 | 18,501 | 9,671 | 9,421 |
| Percentage change in electric energy sales from prior year | 0.3% | (5.2)% | (5.5)% | 3.9% | (3.8)% | (2.5)% | (2.6)% |
| Peak load (in MW) | 3,604 | 3,546 | 3,351 | 3,404 | 3,406 | 3,406 | 3,303 |
| Percentage change in peak load from prior year | (2.2)% | (1.6)% | (5.5)% | 1.6% | 0.1% | 0.1% | (3.0)% |

[1] Includes revenues attributable to electric energy consumption by municipalities, residential fuel subsidy, hotel subsidy, and rural electrification and irrigation systems subsidy of $198.2 million, $225.1 million, $229.6 million, $237.8 million and $251.2 million for fiscal years 2007, 2008, 2009, 2010 and 2011, respectively, and $118.6 million and $142.7 million for the six months ended December 31, 2010 and 2011, respectively.

[2] Unaudited.

[3] The Principal and Interest Requirements for fiscal years 2008, 2009, 2010 and 2011 have been reduced by the interest that was capitalized through the issuance of Power Revenue Bonds in the amounts of $21.2 million, $37.7 million, $8.4 million and $79.5 million, respectively. The Principal and Interest Requirements for fiscal year 2010 have been adjusted to reflect the restructuring of $73.9 million of the Authority's debt service requirements for such fiscal year through the issuance of Power Revenue Bonds, the proceeds of which were used to pay debt service for that fiscal year. The Principal and Interest Requirements for fiscal year 2011 have been further reduced by the amount of the Federal Build America Bonds subsidy on the Power Revenue Bonds, Series YY and Series EEE, equal to 35% of the interest payable on such Bonds.

[4] Calculated only for full fiscal year.

[5] Excludes from Net Revenues, for purposes of computing this ratio, the basic charges and fuel adjustment charges attributable to energy consumption by the municipal governments as well as the subsidies for energy consumption charges provided by law to certain residential customers and hotels and those subsidies related to rural electrification and irrigation systems, which are not collected.

Although the ratio of adjusted net revenues (net of municipalities' consumption and subsidies) to Principal and Interest Requirements was below 1.00 for fiscal years 2009 and 2011, the Authority made timely payments on its Power Revenue Bonds in such fiscal years. The Authority, however, had to borrow in order to meet all of its operational and financial obligations. See *The Authority's Financial Condition* under RISK FACTORS AND INVESTMENT CONSIDERATIONS and DEBT.

The Authority's rate covenant requires that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that Revenues are sufficient to pay Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all bonds then Outstanding. Pursuant to the accrual method of calculating Revenues and Current Expenses under the Trust Agreement, the Authority is in compliance with the rate covenant, even if the accrued residential fuel, hotel and rural electrification and irrigation subsidies are excluded from Revenues.

For a more detailed discussion of the Authority's operating results for the past five fiscal years, see *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

*Seven Months Ended January 31, 2012*

Net Revenues for the seven months ended January 31, 2012 were $431.3 million, representing an increase of $38.1 million, or 9.7%, from the same period in the prior year.  Net Revenues increased despite a 2.0% decrease in electric energy sales (in kWh), primarily as a result of higher revenues from the fuel and purchased power adjustment charges relative to the increase in the cost of fuel and purchased power due to differences between these adjustment charges, as determined by the Authority's formula, and actual costs of fuel and purchased power for the period.  Revenues for the seven months ended January 31, 2012 were $2.987 billion, a 22.2% increase from the same period of the prior year, mainly as a result of an increase in the revenues from the fuel adjustment charge due to the 39.1% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the same period in the prior year.    Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $2.556 billion for the period, a 24.6% increase from the same period in the prior year.  Excluding fuel and purchased power, Current Expenses during the seven month period increased by $4.5 million, or 1.0%.  The increase in Current Expenses, excluding fuel and purchased power, was mainly due to an increase in administrative and general expenses of $21.4 million, or 21.1%, partly offset by a decrease in maintenance expenses of $11.9 million, or 8.8%.  The increase in administrative and general expenses of $21.4 million for this period was mainly due to extraordinary expenses related to the settlement of certain multi-year disputes with labor unions.

**Capital Improvement Program**

The total cost of the Authority's capital improvement program in fiscal years 2012 through 2016 is estimated to be approximately $1.72 billion, which is $811.7 million less than the cost of the capital improvement program for fiscal years 2007 through 2011.  The Authority's capital expenditures in fiscal years 2007, 2008 and 2009 were at historically high levels principally due to the costs associated with certain production plant construction projects, which were completed in fiscal year 2009.  The Authority expects that substantially all of the cost of the capital improvement program through 2016 will be provided from the issuance of the Bonds, additional Power Revenue Bonds and other borrowings.

Set forth below is a summary of the Authority's historical total capital improvement program for the five fiscal years ended June 30, 2011 and the projected capital improvement program for the five fiscal years ending June 30, 2016.  For a more detailed discussion of the Authority's historical and projected capital improvement program, see *Historical Capital Improvement and Financing Program* and *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

### Capital Improvements
### (dollars in thousands)

| | Fiscal Years | | | |
|---|---|---|---|---|
| **Capital Improvements** | **2007-2011** | **% of Total** | **2012-2016** | **% of Total** |
| Production plant | $1,182,336 | 46.7 | $ 644,308 | 37.5 |
| Transmission facilities | 585,028 | 23.1 | 381,554 | 22.2 |
| Distribution facilities | 589,127 | 23.3 | 453,326 | 26.4 |
| Other[1] | 174,098 | 6.9 | 239,717 | 13.9 |
| Total | $2,530,679 | 100.0 | $1,718,905 | 100.0 |

[1]   Includes land and buildings, general equipment, preliminary surveys and investigations.

As discussed further below, the Authority's capital improvement program through fiscal year 2016 does not include the estimated costs of a proposed 93-miles of underground natural gas pipeline referred to as "Vía Verde" and a proposed offshore natural gas terminal at the Aguirre generation facility,

the two principal infrastructure projects required in order to deliver natural gas to most of the Authority's generation facilities. The Authority estimates that the construction and development costs of the Vía Verde natural gas pipeline will be approximately $450 million, of which approximately $55 million has already been spent. The Authority preliminarily estimates that the construction costs of the Aguirre offshore natural gas terminal will be approximately $175 million. Both of these projects are in the permitting stage. If permits and project financing are obtained, the Authority expects that the construction period for the Vía Verde project will be between 14 and 16 months and that the construction period for the Aguirre offshore terminal will be approximately 12 months.

The Authority, together with Government Development Bank for Puerto Rico ("Government Development Bank"), as fiscal agent, is evaluating various financing structures for these projects. Some of the alternatives being considered include financing these projects on a project finance, off-balance sheet basis or through fuel purchase agreements with third parties for the delivery of natural gas. Under these financing methods, the Authority would pay the capital costs of the projects through service agreements with third parties to construct and/or operate the natural gas facilities. Under these financing alternatives, payments made by the Authority for services related to the natural gas facilities or for the acquisition of natural gas from third parties would constitute a Current Expense under the Trust Agreement and, thus, would be paid prior to debt service payments on the Power Revenue Bonds. In order for payments of services related to the natural gas facilities to qualify as Current Expenses under the Trust Agreement, those facilities have to be usable and in use. Additionally, in order for payments for the acquisition of natural gas to be considered a Current Expense, such fuel must actually be ordered by the Authority, delivered by the third party and used by the Authority. Because natural gas is currently a substantially cheaper source of fuel than oil, and this price differential is projected to continue, the Authority expects that even after recouping the capital costs of the projects through the fuel adjustment charge or other charge, the generation of electricity with natural gas will result in net savings to the Authority's clients, which could also have a positive effect on electric energy demand and the Puerto Rico economy. At present, the Authority estimates that the use of natural gas instead of fuel oil in the Authority's facilities that would be supplied through the Vía Verde and Aguirre projects could result in annual fuel cost savings to the Authority of between $500 million and $1.0 billion by fiscal year 2016, depending on market prices of fuel oil and natural gas, the sourcing of natural gas and the Authority's execution of the plant conversions to dual fuel units that can burn oil and natural gas. For more information on the Vía Verde natural gas pipeline, the Aguirre offshore natural gas terminal, the sourcing of natural gas and the projected savings from the use of natural gas, see *Plans for Fuel Diversification – Conversion of Generating Facilities to Dual Fuel* and *– Transportation of Natural Gas to Puerto Rico and Projected Savings from Natural Gas Diversification Strategy* under THE SYSTEM.

For a more detailed description of the Authority's electric generation, transmission and distribution system and the Authority's historical and projected capital improvement program, see THE SYSTEM.

**Strategic Plans to Address the Authority's Challenges**

The Authority faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the volatility in oil prices. Its principal challenges, some of which are interrelated, are: (i) addressing the decline in electric energy sales; (ii) addressing the volatility of oil costs; (iii) addressing high customer electric power rates; (iv) reducing past due accounts receivables; (v) reducing its operating costs; and (vi) improving its liquidity. The Authority's management is focused on addressing these challenges by continuing with the implementation of a financial stabilization plan and other strategic initiatives.

For a discussion of certain considerations affecting an investment in the Bonds, see RISK FACTORS AND INVESTMENT CONSIDERATIONS below.

*Financial Stabilization Plan*

The principal component of the financial stabilization plan is the reduction of operating costs in line with the reduction in electric energy sales (in kWh) in order to maintain adequate operating margins. The principal cost reduction measures included in the plan have been (i) reducing the number of employees through a combination of attrition from voluntary retirement and the elimination of temporary and vacant positions, (ii) reducing retiree health care benefits by adopting changes to the health plan in 2009 that included the imposition of caps on the amount of monthly benefits for all current and future retirees and stricter eligibility requirements, (iii) reducing overtime and miscellaneous expenses, and (iv) implementing enhanced budget controls and expense management in each of the three operational units and support areas (generation, transmission and distribution, and customer service).    These measures, which the Authority began implementing in 2009, resulted in recurring annual savings of approximately \$135 million, consisting of (i) a reduction of 904 employees from January 1, 2009 through December 31, 2011 that has resulted in annual savings of approximately \$56 million, (ii) changes to retiree health care benefits that have reduced actual benefit payments from \$80.9 million for fiscal year 2009 to \$43.3 million for fiscal year 2010 and \$22.1 million for fiscal year 2011, a reduction of \$58.8 million since fiscal year 2009, and (iii) other cost reduction initiatives, such as the reduction of overtime, materials, administrative and miscellaneous expenses, that are expected to result in annual savings of approximately \$20 million.

As a result of various cost reduction measures implemented, the Authority's operating expenses for fiscal year 2011 (excluding fuel and purchased power) decreased by \$33.2 million, or 4.2%, compared to fiscal year 2009, which represented the highest point of historical operating expenses (excluding fuel and purchased power).  The Authority's operating expenses (excluding fuel and purchased power) for fiscal year 2011, however, increased by \$24.5 million, or 3.4%, compared to fiscal year 2010, mainly due to increases in maintenance and transmission and distribution expenses attributable, in part, to increases in salaries pursuant to the collective bargaining agreement with the Authority's principal union.  For the first seven months of fiscal year 2012, the Authority's operating expenses (excluding fuel and purchased power) increased by \$4.5 million, or 1.0%, compared to the same period of fiscal year 2011, mainly due to an increase in administrative and general expenses of \$21.4 million as a result of extraordinary expenses related to the settlement of certain multi-year disputes with labor unions.

In fiscal year 2012, Government Development Bank, as fiscal agent, hired a leading U.S. based consulting and restructuring firm to perform a review of the Authority's operations to further identify opportunities for improving operating efficiency and reducing costs.  An initial assessment is expected to be delivered by the last quarter of fiscal year 2012.

Another component of the financial stabilization plan has been the restructuring of a portion of the Authority's debt service on the Power Revenue Bonds to reduce Principal and Interest Requirements in several fiscal years through the refinancing of principal and interest payments.  During fiscal year 2010, the Authority refinanced approximately \$73.9 million of principal and interest due during such fiscal year.  In addition, the Authority issued Power Revenue Bonds to refinance certain lines of credit with private financial institutions and Government Development Bank that had been used to finance working capital needs of the Authority.  During fiscal year 2012, in connection with the issuance of the Series 2012A Bonds, the Authority expects to repay a Government Development Bank line of credit facility used to pay approximately \$128.4 million of the interest on the Power Revenue Bonds due during such fiscal year and approximately \$29.9 million of the principal of the Power Revenue Bonds due on July 1, 2012. The Authority's projections for fiscal years 2012 through 2016 include the assumption that

interest on the Bonds and all additional Power Revenue Bonds to be issued during this period will be capitalized for a three-year period. The aggregate reductions to Principal and Interest Requirements for each fiscal year during the projection period attributable to capitalized interest are $81.5 million for fiscal year 2012, $67.1 million for fiscal year 2013, $61.2 million for fiscal year 2014, $73.5 million for fiscal year 2015 and $80.9 million for fiscal year 2016.

### Fuel Diversification Strategy

*General.* As opposed to mainland United States utilities, the Authority's energy generation is heavily reliant on fuel oil. As a result of the increase in the price of fuel oil in the past several years, the Authority's retail price for electricity has also increased significantly, which has in turn adversely affected demand for electricity and Puerto Rico's economic growth. In order to address the current high prices of oil as well as the volatility of oil prices, the Authority's management is focused on diversifying fuel sources. Furthermore, new rules adopted by the U.S. Environmental Protection Agency (the "EPA") in 2011 pursuant to the Clean Air Act ("CAA"), which will become effective on April 16, 2012, establish emissions limitations for mercury, non-mercury metallic hazardous air pollutants and acid gases by utility generating units. Although the Authority is still evaluating the impact of this rule, known as the "Mercury and Air Toxics Standards" or "MATS," it believes that in order to comply within the current three-year compliance period, it will have to convert substantially all of its existing generating units to burn natural gas instead of fuel oil. If the Authority were not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it would need to incur significant capital investments to control emissions in order to comply with the MATS within the current compliance schedule without being able to offset these costs with any cost savings on the purchase of fuel. The Authority is still in the process of analyzing the costs of compliance if it is not able to implement the natural gas diversification strategy. While it is not possible for the Authority to determine at this point the exact magnitude or timing of such expenditures, it currently estimates that required capital investments could amount to approximately $631.6 million to $1.26 billion and also result in additional annual recurring expenses related to the operation and maintenance of the emissions control systems. The Authority may not be in a position to fund such additional expenditures without increasing its revenues.

The Authority's fuel diversification strategy has two principal components: (1) convert most of the Authority's existing oil-fired generating units to dual fuel units that can burn either oil or natural gas and develop the necessary natural gas transportation and delivery infrastructure, and (2) purchase power from renewable energy projects. The Authority has already completed the conversion of the two main generating units at the Costa Sur power plant to dual fuel, representing approximately 820 MW of generating capacity, or 14% of the Authority's total dependable generating capacity. The Authority is able to receive natural gas at Costa Sur through an existing pipeline from the EcoEléctrica terminal and has already conducted testing of these units with natural gas. The Authority is in the process of completing other necessary improvements in order to burn up to 100% natural gas at these two Costa Sur units. The Authority expects to commence burning natural gas at Costa Sur in April 2012 and that the full 820 MW of capacity will be fueled with natural gas by April 2013.

The Authority's capital improvement program for fiscal years 2012 through 2016 includes the conversion to dual fuel of the main generating units at the other generation facilities of the Authority, representing approximately 2,420 MW of generating capacity, at an estimated cost of approximately $119.3 million. In order for the Authority to be able to burn natural gas at these other facilities, however, the Authority has to develop the associated natural gas delivery infrastructure. To this end, the Authority has been procuring the permits for Vía Verde, an approximately 93 mile long underground natural gas pipeline system that would transport natural gas from the EcoEléctrica terminal in the south to the San Juan, Palo Seco and Arecibo (Cambalache) generating plants in the north. These plants would represent an aggregate of 1,520 MW of dependable generating capacity that would be fueled with natural gas. The

Authority's preliminary estimate of the cost of the Vía Verde project is approximately $450 million, of which $55 million has already been spent. The Authority has received several of the Puerto Rico permits required for construction. The only remaining permit required to be able to commence construction is the permit from the U.S. Army Corps of Engineers. Several environmental groups have expressed opposition to the project; however, the Authority expects that it will be able to obtain the remaining permit. On March 21, 2012, the Puerto Rico Supreme Court dismissed several consolidated judicial actions against Vía Verde that primarily challenged the Puerto Rico Environmental Quality Board's ("EQB") approval of the final environmental impact statement for the project. If permits and the required project financing are obtained, the Authority expects to complete construction of this project in approximately 14 to 16 months following the receipt of permits and financing.

The Authority's capital improvement program for fiscal years 2012 through 2016 also includes the conversion to natural gas of two of Aguirre's generating units representing 900 MW of capacity, which in addition to 592 MW of capacity that has already been converted to dual fuel at Aguirre, would represent 1,492 MW of dual fuel capacity. In order to deliver natural gas to the Aguirre power plant, which is the largest of the Authority's generating plants, the Authority engaged a leading company in the development of liquefied natural gas ("LNG") storage and regasification infrastructure to conduct a feasibility study for the engineering, procurement, construction and operation of a floating offshore LNG regasification facility. The feasibility study was completed with a positive result. This facility will require permits from the Federal Energy Regulatory Commission ("FERC") and will be subject to a full environmental review and analysis under the National Environmental Policy Act. The Authority has also engaged this company to commence the permitting process, which includes a pre-filing with FERC that has already been submitted, and is currently in negotiations with the company regarding the development of this facility. If the negotiations are satisfactorily completed and the required permits and project financing are obtained, the Authority expects that the cost of this facility will be approximately $175 million and that the construction period will be approximately 12 months.

The Authority is also considering other alternatives to bring natural gas to its main generating facilities. On February 15, 2012, the Governor of Puerto Rico adopted an Executive Order creating a multi-sectoral committee, of which the Authority is a part, to study and submit a report regarding the necessary measures to comply with the new EPA rules and the impact of not complying on the economy (in particular on the manufacturing sector), and to examine all alternatives to transport and deliver natural gas to the Authority's generating plants on the north.

In order to develop renewable energy generation, the Authority had, as of March 1, 2012, signed power purchase agreements with respect to 33 renewable energy projects totaling approximately 1,000 MW of capacity, subject to financing, permitting and other technical requirements. These projects are for renewable energy from solar, wind, waste-to-energy and landfill gas technologies and the agreements provide for the purchase of power at fixed prices that are currently lower than the cost of the Authority's most expensive generation capacity. Over time, however, the cost of purchasing power from these renewable energy facilities could exceed the cost of energy produced by the Authority's natural gas fired units but is expected to remain lower than the cost of fuel oil generation. The cost of purchased power from these facilities will be passed on to the consumer through the purchased power adjustment charge. The Authority's projections for the five fiscal years ending June 30, 2016 assume the Authority will have approximately 650 MW of renewable energy capacity by fiscal year 2016, which, based on expected availability, would represent approximately 10% of its projected energy generation.

The Authority's fuel diversification strategy has the ultimate goal of reducing the dependence on oil for energy generation from 69% for fiscal year 2011 to 41% by 2016 (assuming only the conversion of the Costa Sur power plant to natural gas and the development of the renewable capacity mentioned above) and 10% by 2016 (assuming the completion of Vía Verde and the Aguirre offshore natural gas terminal

that would allow most of the Authority's generating units to burn natural gas and the development of the renewable capacity mentioned above). See *Plans for Fuel Diversification – Conversion of Generating Facilities to Dual Fuel* under THE SYSTEM.

*Transportation of Natural Gas to Puerto Rico and Projected Savings from Natural Gas Diversification Strategy.* During the past decade, liquefied natural gas ("LNG") has been imported to Puerto Rico for use in the EcoEléctrica cogeneration facility, which has an LNG terminal. On March 28, 2012, the Authority entered into a two-year purchase agreement for natural gas in order to provide natural gas to the Authority's Costa Sur power plant, where the Authority has already completed the conversion of the main generating units to dual fuel, and is able to receive natural gas through an existing pipeline from the EcoEléctrica LNG terminal. The LNG that is imported through the EcoEléctrica LNG terminal is currently from non-U.S. sources as the United States does not currently produce LNG in the contiguous 48 states that can be delivered outside the mainland and lacks the infrastructure and facilities required for such production. The Authority's contracted natural gas prices for the Costa Sur plant are based on a discount to the prices of fuel oil, as is typical in international markets.

In recent years, technological advances have allowed energy companies to tap into large previously untouched reserves of natural gas that could allow the U.S. to become a major producer of LNG in the future, but this would require the development of the appropriate infrastructure. While natural gas inside the U.S. mainland is generally transported via pipeline, deliveries to markets that are not accessible via pipelines would require the construction of LNG production facilities to convert the gas into liquid form and transport it via specialized tankers to foreign or domestic overseas destinations. Several companies are planning or evaluating the construction of such liquefaction plants and related facilities in the United States. Whether the infrastructure for the production of a significant amount of LNG from the U.S. mainland will be developed ultimately will depend on market conditions in the coming years and the energy policy of the United States government.

Natural gas, unlike oil, does not trade on a unified world market. Currently, there is a significant differential in the price of natural gas in international markets versus U.S. based prices, with U.S.-based prices being significantly lower. In the future, if the Authority were able to purchase LNG from the U.S. mainland, it would have to transport it in compliance with the Jones Act. The Jones Act generally requires that the transportation of merchandise between two U.S. points (including Puerto Rico) be carried in vessels that are documented in the United States, built in the United States, and owned and operated by U.S. eligible citizens. The Jones Act contains a limited exemption (adopted in 1996) for vessels that transport LNG to Puerto Rico if the vessel (1) is a foreign built vessel that was built before October 19, 1996, or (2) was documented under U.S. flag before that date, even if the vessel was thereafter redocumented under foreign flag before being redocumented under U.S. flag. In either case, the vessels still have to be U.S. owned and U.S. manned. Although there are currently no Jones Act compliant LNG vessels (either directly or within the limited exemption) operating in U.S. coastwise trade, there are some vessels currently in operation (thirteen (13) vessels that were built in U.S. yards and up to twenty-four (24) vessels that were built in non-U.S. shipyards between January 1, 1990 and October 16, 1996) that could potentially meet the previously mentioned limited exemption and be used to transport LNG from one or more future U.S. LNG production facilities to Puerto Rico. Even if such vessels were available, however, the provisions of the Jones Act would have the effect of increasing the cost of transporting LNG from the United States to Puerto Rico, as such vessels would have a higher cost profile than a foreign-flag LNG vessel. In addition, in November 2011, the U.S. Congress passed a law creating another limited exemption from the Jones Act. The law allows three specific LNG vessels (i.e., LNG Gemini, LNG Leo, and LNG Virgo) to transport natural gas between U.S. ports. This exemption may not be useful for LNG transport to Puerto Rico, since the vessels are quite old and are planned to be used as part of a project to transport ethane from Pennsylvania to the Gulf Coast. As a result, these vessels may not be available to transport natural gas between U.S. ports and Puerto Rico.

At the request of the Government of Puerto Rico, the U.S. Government Accountability Office is currently performing a comprehensive study on the Jones Act. After this study is concluded, the Government of Puerto Rico will analyze its findings and, as part of its efforts to reduce the cost of electricity in Puerto Rico, possibly seek from the U.S. Congress a broadening of the current Jones Act exemptions to include newer and more efficient LNG vessels in order to facilitate the transportation of LNG from the U.S. There is no assurance that the current exemptions will be broadened or, if they are broadened, that the Authority would be able to contract for the purchase and transportation of LNG from the U.S. mainland at lower prices than what it would be able to obtain in international markets.

The Authority estimates that the use of natural gas instead of fuel oil in the Authority's facilities that would be supplied through the Vía Verde and Aguirre projects could result in annual fuel cost savings to the Authority of between $500 million and $1.0 billion by fiscal year 2016, depending on market prices of fuel oil and natural gas and on the Authority's execution of the plant conversions to dual fuel units that can burn oil and natural gas. To the extent that LNG is produced in the U.S. mainland and becomes available for delivery to foreign or domestic overseas markets, the price differential with international markets persists, and the Authority is able to secure transportation of such LNG in compliance with the Jones Act, as it may be amended from time to time, the Authority believes its savings from the use of natural gas could be in the upper part of the above-mentioned range. Conversely, to the extent the Authority has to continue purchasing natural gas in international markets, it believes its projected savings may be in the lower portion of this range, unless global prices come down as a result of increased production and exports of U.S. natural gas.

### Reducing Past Due Receivables

In order to improve the Authority's liquidity, the Authority has also made efforts to reduce past due receivables from the government sector. The central government's outstanding balance as of June 30, 2011 was approximately $54.2 million, an increase of $17.0 million compared to $37.2 million as of June 30, 2010, mainly as a result of increases in the price of electricity. Approximately 69% of the balance as of June 30, 2011 was for past due accounts (in excess of 30 days), compared to 59% as of June 30, 2010. As of December 31, 2011, the central government's outstanding balance decreased to $41.8 million, of which 58% represented past due accounts. Also, the public corporations had an outstanding balance of $228.1 million as of June 30, 2011, of which 88% was for past due accounts, compared to $225.7 million and 88% as of June 30, 2010. As of December 31, 2011, the outstanding balance of the public corporations decreased to $209.7 million, of which 85% was for past due accounts. On January 20, 2012, the Authority received a payment of $60 million from the Ports Authority, which at $63.6 million had the largest outstanding balance of all public corporations as of December 31, 2011, mostly for past due invoices. See *Management's Discussion and Analysis of Operating Results* under NET REVENUES AND COVERAGE.

Act 239-2011, adopted on December 11, 2011, provides that each fiscal year the Office of Management and Budget of the Commonwealth shall establish a projection of electricity expenses for agencies whose operations depend on the General Fund and shall coordinate with the Puerto Rico Treasury Department so that the total amount of these expenses is reserved exclusively for these purposes and the monthly payment is sent directly to the Authority at the beginning of each month. In accordance with Act 239-2011, the Puerto Rico Treasury Department is making current payments for electric energy consumption by central agencies of the Commonwealth. While the payment of past due accounts from the government sector is not covered by Act 239-2011, the Authority continues to pursue the collection of all past due accounts from government clients, as discussed above, with the assistance of Government Development Bank, as its fiscal agent.

*Energy Theft Reduction Initiatives*

The Authority is also continuing with the implementation of a more aggressive energy theft reduction program through the use of "smart grid" technologies that reduce the need for door-to-door inspections, among other steps. One of the principal components of this plan is the replacement of old meters with new smart meters that are more resistant to tampering or magnetic interference. The Authority has already installed approximately 110,000 of the new meters, which allow the Authority to perform remote disconnections. In addition, the Authority is implementing data systems and technology solutions that will enable it to identify areas where there are network losses of energy or usage patterns that differ from historical norms, thus allowing the Authority to deploy its resources more efficiently. In addition, Act 235-2011, adopted on December 11, 2011, assigns primary responsibility for investigating illegal appropriation of electric energy to the Special Investigations Unit of the Puerto Rico Department of Justice, with the assistance of the Authority. Acts 237-2011 and 238-2011, also adopted on December 11, 2011, increase the criminal and administrative penalties for tampering with the electric energy system. During fiscal year 2011, theft recovery initiatives resulted in theft-related billings of approximately $27 million and collections of approximately $13.4 million. The Authority's various theft recovery initiatives are expected to result in $25 million of annual revenues for fiscal year 2012 and $30 million in annual revenues for fiscal years 2013 through 2016, as reflected in the Authority's five-year projections. See *Transmission and Distribution Facilities – Operations* under THE SYSTEM.

*Reduce CILT*

The Authority is required to compensate municipalities for foregone tax revenue related to the Authority's properties by paying a CILT. The amount of the required annual CILT is at least equal to the municipalities' annual electric energy consumption. While the Authority is legally entitled to collect from the municipalities their electric energy consumption bills, the Authority for many years has followed the practice of not pursuing the collection of energy bills from the municipalities, and instead it offsets such bills against the CILT. Many municipalities have taken advantage of the current CILT formula to subsidize for-profit ventures located in municipal facilities. Act 233-2011, approved December 11, 2011, modifies the CILT formula to exclude from the municipality's electric energy consumption the consumption related to municipal facilities in which for-profit businesses operate and for which the municipalities receive compensation through rent or an entrance fee. The Authority is in the process of implementing the provisions of Act 233-2011 by installing additional meters in municipal facilities to be able to determine the consumption that is no longer subject to the CILT. The Authority's preliminary estimate is that Act 233-2011 will result in additional collections of approximately $15 million in fiscal year 2013, $20 million in fiscal year 2014, $25 million in fiscal year 2015 and $30 million in fiscal year 2016. The Authority's projections for the five fiscal years ending June 30, 2016 take into consideration the provisions of Act 233-2011. See *Projected Net Revenues* under NET REVENUES AND COVERAGE. For more information regarding contributions in lieu of taxes, see *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

*Efficiency of Capital Improvement Program*

The decrease in the demand for electricity and the completion of certain key projects in the production plants has allowed the Authority to reduce the sizes of, and to refocus, its capital improvement program for fiscal years 2012 through 2016. The Authority is refocusing its capital improvement program away from the historical trend of capacity expansion and towards diversifying the fuel sources for its generating units, improving the reliability of its production capacity and the efficiency of its transmission and distribution system. In establishing its capital improvement program, the Authority reviewed potential projects to select and prioritize those that it believes will enable it to reduce costs and improve its operating efficiency. As a result, the Authority has been able to reduce its capital

improvement program from $2.5 billion for fiscal years 2007 through 2011 to a projected $1.72 billion for fiscal years 2012 through 2016. The Consulting Engineers have examined the projected capital improvement program and found it to be reasonable. As discussed previously, however, these amounts exclude (i) the costs of the Vía Verde natural gas pipeline and the Aguirre offshore natural gas terminal, which are necessary to reduce the Authority's cost of fuel and comply with the MATS, and (ii) the costs of complying with the MATS if the natural gas conversion projects cannot be completed. See *Transmission and Distribution Facilities* and *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

*Fuel Procurement Model*

As another measure to decrease the cost of fuel oil, the Authority, together with Government Development Bank, as fiscal agent, is evaluating the restructuring of the Authority's fuel oil procurement process in order to achieve efficiencies and savings that can result in a lower cost of fuel oil. The Authority and Government Development Bank, with the assistance of outside firms, are evaluating the current fuel oil procurement model and the terms of the purchase contracts to determine the extent to which a more flexible model and different purchase terms may result in the Authority paying a lower price for fuel oil. The Authority also believes that payment delays by the Authority in the purchase of fuel oil beyond the stipulated contract terms have also resulted in higher prices offered by the suppliers. An important goal of this process is to establish a procurement model that will attract more interested parties and reduce the delay in payments to suppliers, thus resulting in lower fuel oil prices to the Authority due to increased competition in the fuel supply process. Act 234-2011, adopted on December 11, 2011, provides greater flexibility to the Authority to purchase fuel without a competitive bidding process when Government Development Bank, as fiscal agent, is involved in the negotiation of the terms of the purchase contracts. Act 234-2011 will permit the Authority to implement the new fuel oil procurement model. The Authority has already commenced implementing this initiative on a short-term basis for some of its fuel oil purchases, which has resulted in some savings, and expects to implement the new procurement model for all of the Authority's fuel oil purchases by July 2012.

In addition, the Authority, together with Government Development Bank, continues to regularly explore alternatives to reduce its exposure to the volatility of fuel prices, such as entering into derivative contracts for hedging oil prices. To date, the Authority has no hedges related to oil prices in effect. See *Fuel* under THE SYSTEM.

## RISK FACTORS AND INVESTMENT CONSIDERATIONS

AN INVESTMENT IN THE BONDS INVOLVES A DEGREE OF RISK.  SET FORTH BELOW IS A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE BONDS. EACH PROSPECTIVE INVESTOR SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW IN ORDER TO MAKE A DECISION AS TO THE CREDIT-WORTHINESS OF THE AUTHORITY AND MUST EXAMINE ITS FINANCIAL CONDITION IN ORDER TO MAKE A JUDGMENT AS TO ITS ABILITY TO BEAR THE RISK OF AN INVESTMENT IN THE BONDS.

THE FOLLOWING DISCUSSION OF RISK FACTORS IS INTENDED ONLY AS A SUMMARY AND DOES NOT PURPORT TO IDENTIFY ALL THE RISK FACTORS THAT MAY AFFECT THE AUTHORITY'S ABILITY TO PAY DEBT SERVICE ON THE AUTHORITY'S POWER REVENUE BONDS.  PROSPECTIVE INVESTORS ARE ADVISED TO REVIEW ALL THE INFORMATION IN THIS OFFICIAL STATEMENT IN EVALUATING AN INVESTMENT IN THE BONDS.

ANY ONE OR MORE OF THE FACTORS DISCUSSED AND OTHERS COULD ADVERSELY AFFECT THE AUTHORITY'S OPERATIONS, REVENUES AND EXPENSES TO AN EXTENT THAT CANNOT BE DETERMINED AT THIS TIME, COULD ADVERSELY AFFECT THE AUTHORITY'S ABILITY TO COMPLY WITH ITS OBLIGATIONS AND COULD LEAD TO A DECREASE IN THE MARKET VALUE AND/OR THE LIQUIDITY OF THE AUTHORITY'S POWER REVENUE BONDS.  THERE IS NO ASSURANCE THAT OTHER FACTORS WILL NOT BE MATERIAL IN THE FUTURE.

### The Authority's Financial Condition

The Authority's financial condition has been adversely affected by a variety of factors, some of which are described below.

#### Operating Losses Pursuant to GAAP

For the three fiscal years ended June 30, 2009, 2010 and 2011, the Authority incurred losses before contributed capital of $163.0 million, $219.8 million and $286.0 million, respectively, in accordance with GAAP.  These losses reflect the continuation of a historical trend of net losses that have resulted in a deficit in the Authority's consolidated net assets of $169.5 million as of June 30, 2011.  This means that, as of June 30, 2011, the Authority's total liabilities of $10.1 billion exceed its total assets of $9.9 billion.  As of December 31, 2011, the Authority had unconsolidated net assets (on a stand-alone basis, excluding the Authority's subsidiaries) of negative $296.1 million (unaudited).

The Authority's operating expenses (as reported in its audited financial statements) for fiscal year 2011 (excluding depreciation and the cost of fuel oil and purchased power) of $793.1 million were $25.8 million, or 3.4%, higher than for fiscal year 2010, and $50.8 million, or 6.8%, higher than for fiscal year 2009.  As discussed above, operating expenses under GAAP differ from Current Expenses under the Trust Agreement mainly because Current Expenses exclude depreciation expense, other post employment benefits expense, and debt service payments on Power Revenue Bonds and other subordinated debt. Other post employment benefits expense was $27.5 million and $27.4 million for fiscal years 2010 and 2011, respectively.  Depreciation expense was $355.4 million and $350.7 million for fiscal years 2010 and 2011, respectively.  The Authority is analyzing the status of its depreciable assets to review whether the Authority's accumulated depreciation aligns with the reduction in value and estimated useful life of these assets.  This analysis may result in an adjustment to the Authority's annual depreciation rates.

For the six month period ending on December 31, 2011, unaudited operating expenses (excluding depreciation and the cost of fuel oil and purchased power) decreased 3.9%, from $397.6 million for the six month period ended December 31, 2010 to $382.2 million for the same period in fiscal year 2011.

### Subsidies and Contributions in Lieu of Taxes

The Authority includes in Revenues and Net Revenues, for purposes of complying with its requirements under the Trust Agreement, amounts billed to the Commonwealth's municipalities for electric energy sales to the municipalities that the Authority is legally entitled to collect but historically has not collected because it instead offsets such billings against its CILT obligation. The Authority also includes in Revenues and Net Revenues amounts attributable to (i) a residential fuel subsidy and a hotel subsidy that the Authority also does not collect because it is required by law to credit such amounts directly to the customers in their electric energy bills and (ii) amounts attributable to a rural electrification and irrigation system subsidy that the Authority is legally entitled to collect from the Commonwealth but historically has not billed and collected. For a detailed description of the Authority's obligation to make CILT payments and provide these and other subsidies, and the procedures followed by the Authority to comply with such obligations, see *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

The annual CILT is equal to, at a minimum, the municipality's actual electric energy consumption and is payable only from Net Revenues available after provision is made for debt service and other Trust Agreement obligations in each fiscal year. The Authority is legally entitled to collect the municipalities' electric energy consumption bills on a current basis and defer the payment of the CILT until November 30 following the end of the fiscal year. The Act provides that the Authority's obligations under the Trust Agreement have priority over the Authority's obligation to make any CILT payment. Historically, however, the municipalities have not been paying for their electricity on a current basis and the Authority has followed the practice of not pursuing the collection of the municipalities' bills and instead it offsets the outstanding bills against the CILT. This practice, which the Act provides is at the option of the Authority, has affected the Authority's liquidity and its ability to meet its financial obligations. If the Authority were to change this practice and enforce its legal right to require the municipalities to pay their bills on a current basis, however, there is no assurance that the Authority in fact would be able to collect such bills or, in some cases, collect such bills from municipalities that are in a difficult financial position.

In fiscal years 2010 and 2011, the Authority's Revenues from sales of electricity to municipalities were $196.5 million and $212.5 million, respectively, and the aggregate amount of the residential fuel, rural electrification and irrigation system, and hotel subsidies included in Revenues was $41.3 million and $38.7 million, respectively. The sum of the sales of electricity to municipalities and these subsidies ($237.8 million for fiscal year 2010 and $251.2 million for fiscal year 2011) represented approximately 32.3% and 35.6%, respectively, of the Authority's Net Revenues for the corresponding periods. That sum is expected to be $250.3 million, or 29.1% of projected Net Revenues, by fiscal year 2016, as the Authority is implementing measures to reduce the consumption of the municipalities subject to the CILT. The historical and projected Revenues from sales of electricity to municipalities and the residential fuel, rural electrification and irrigation system, and hotel subsidies are set forth in footnotes to the tables titled Historical Net Revenues and Coverage and Projected Net Revenues and Coverage appearing under NET REVENUES AND COVERAGE. Because the determination of Revenues and Net Revenues under the Trust Agreement is on an accrual basis, the Authority is able to include the municipalities' consumption and the subsidies in Revenues even though it does not collect the same. If those Revenues were excluded from the calculation of Net Revenues, the Authority's ratio of Net Revenues to Principal and Interest Requirements would be reduced significantly. In some of the prior years, that ratio was below 1.00. For a discussion of Bond Counsel's treatment of Revenues and Net Revenues for purposes of the additional

bonds test and rate covenant under the Trust Agreement, see *Rate Covenant* and *Additional Bonds* under
SECURITY.

As mentioned above, Act 233-2011 modifies the CILT formula to exclude from the
municipality's electric energy consumption electric energy consumption related to municipal facilities in
which for-profit businesses operate and for which the municipalities receive compensation through rent or
an entrance fee. The Authority's preliminary estimate is that Act 233-2011 will result in additional
collections of approximately $15 million in fiscal year 2013, $20 million in fiscal year 2014, $25 million
in fiscal year 2015 and $30 million in fiscal year 2016. The Authority's projections for the five fiscal
years ending June 30, 2016 take into consideration the provisions of Act 233-2011. There is no assurance
that the Authority will be able to achieve these additional collections.

### Funding of Capital Improvements

Substantially all of the Authority's capital improvement program has been and is expected to
continue to be financed through the issuance of Power Revenue Bonds and other borrowings. This has
caused the Authority's level of indebtedness and related debt service requirements to increase
significantly as well.

The Authority's Consulting Engineers have recommended that the Authority increase the amount
of its capital improvement program funded from internally-generated sources to at least 16%. The
Authority is not expected to achieve this goal in the next five fiscal years.

### Liquidity; Government Accounts Receivable; Operational Lines of Credit

During fiscal years 2010 and 2011, the Authority experienced a deterioration of its liquidity.
Among the factors that affected the Authority's liquidity were the increase in the level of accounts
receivable during fiscal years 2010 and 2011, the higher level of operating expenses relative to decreasing
or constant revenues and the Authority's practice of not collecting the municipalities' electric
consumption receivables and offsetting such receivables against the CILT.

As of December 31, 2011, accounts receivable from the central government and public
corporations amounted to $251.4 million, consisting of $41.8 million from the central government and
$209.7 million from public corporations, of which 58% and 85%, respectively, represented past due
amounts.

Due to liquidity constraints, the Authority has had an increasing need to use lines of credit from
Government Development Bank and private financial institutions to finance its operational expenses,
including the purchase of fuel oil. In fiscal year 2011, the Authority borrowed $310 million to cover
operating expenses. As of December 31, 2011, the Authority had in place two one-year revolving credit
facilities provided by private financial institutions, with a maximum aggregate amount of $385 million
and an outstanding balance of $300 million as of December 31, 2011 ($285 million as of January 31,
2012). These lines of credit mature in June 2012 and July 2012. In addition, on March 8, 2012, the
Authority obtained an additional $50 million revolving credit facility from Government Development
Bank to allow the Authority to make timely payment to suppliers of fuel oil under the new fuel
procurement process currently implemented for a portion of the Authority's fuel oil purchases that began
on a short-term basis in March 2012. This line of credit expires in June 2012. See *Notes* and *Government
Development Bank – Lines of Credit* under DEBT.

Repayment of these and future lines of credit to cover operational expenses is treated as a Current Expense under the Trust Agreement, which is entitled to be paid before debt service on the Power Revenue Bonds.

### Refinancing of Debt Service Payments

The Authority's financial situation has forced the Authority to engage in a restructuring of its debt service requirements. During fiscal year 2010, the Authority refinanced approximately $73.9 million of principal and interest due during such fiscal year. In addition, the Authority issued Power Revenue Bonds to refinance certain lines of credit with private financial institutions and Government Development Bank that had been used to finance working capital needs of the Authority. During fiscal year 2012, in connection with the issuance of the Series 2012A Bonds, the Authority expects to repay a Government Development Bank line of credit facility used to pay approximately $128.4 million of the interest on the Power Revenue Bonds due during such fiscal year and approximately $29.9 million of the principal of the Power Revenue Bonds due on July 1, 2012. The Authority's projections for fiscal years 2012 through 2016 include the assumption that interest on the Bonds and all additional Power Revenue Bonds to be issued during this period will be capitalized for a three-year period. The aggregate reductions to Principal and Interest Requirements for each fiscal year during the projection period attributable to capitalized interest are $81.5 million for fiscal year 2012, $67.1 million for fiscal year 2013, $61.2 million for fiscal year 2014, $73.6 million for fiscal year 2015 and $80.9 million for fiscal year 2016.

The restructuring of current debt service payments increases the Authority's debt service obligations in future years.

### Funding of Pension Liabilities

The employees of the Authority participate in a defined benefit pension plan which provides retirement and death benefits. The Authority's pension plan faces a number of financial difficulties, as reflected in its large unfunded actuarial accrued liability ("UAAL"), which amounted to $1.4 billion as of the June 30, 2010 actuarial valuation, and low funded ratio of 50.2% as of June 30, 2010, based on the actuarial value of the plan's assets. The funded ratio as of June 30, 2010 based on the market value of the plan's assets was 40.5%. Furthermore, the plan has been subject to historical funding shortfalls, and these funding shortfalls are expected to continue. For fiscal years 2009, 2010 and 2011, the employer and employee contributions to the plan amounted to $116.5 million, $106.8 million and $122.4 million, respectively, while annual benefit payments amounted to $190.2 million, $203.9 million and $198.3 million, respectively.

As a result of the plan's low funded ratio and the funding shortfalls referred to above, and depending on the actual return on the plan's assets compared to the assumed return in the actuarial valuation, the Authority may have to increase its annual contribution to the plan in order for the plan to be able to keep making benefit payments at current levels on a long-term basis. This additional contribution would result in an increase in the Authority's Current Expenses before the payment of debt service on the Power Revenue Bonds. For more information regarding pension liabilities affecting the Authority, see PENSION PLAN. Any required increase in the Authority's annual contribution may adversely affect the Authority's ability to meets its other obligations.

### Sale of Hydroelectric Facilities

The Authority is considering the sale of its hydroelectric generating assets, which currently represent 100 MW of generating capacity, to the Puerto Rico Aqueduct and Sewer Authority ("PRASA") because it believes that PRASA can better maximize the use of these assets. For fiscal year 2011, the

Authority's hydroelectric generating assets accounted for 149.8 million kWh, or 0.66% of the Authority's total generation. Currently, hydroelectric generation represents approximately 22% of PRASA's annual energy consumption (664.7 million kWh for fiscal year 2011). The Authority, with the assistance of Government Development Bank and outside firms, is currently evaluating the impact of this transaction on the Authority, including by performing a valuation to ensure that the transaction is fair to both public corporations. While this transaction would result in the Authority receiving a purchase price for these assets and eliminating the associated operating expenses, it would result in a reduction of future revenues from PRASA as PRASA would be meeting part of its energy consumption from the generating capacity of the hydroelectric assets. The fiscal years 2012 through 2016 projections of Net Revenues included in this Official Statement do not include the impact of this transaction as such impact is currently under evaluation. PRASA is the Authority's largest consumer of electric energy and its electric consumption generated $139.0 million in revenues to the Authority for fiscal year 2011. Under the provisions of the Trust Agreement, the Authority would be permitted to sell these assets only if its ratio of Net Revenues to maximum aggregate annual Principal and Interest Requirements is not reduced due to such transfer. The Authority is also evaluating the potential sale or transfer to PRASA of certain irrigation assets.

**The Authority's ability to charge and collect rates sufficient to provide for debt service on the Power Revenue Bonds and other indebtedness and meet its operating expenses**

The imposition and collection by the Authority of rates, fees and charges for the services of the System provide the only security for payment of the Power Revenue Bonds, but are subject to being applied first to the payment of Current Expenses, which are the operating expenses of the System.

The Revenues of the Authority are dependent on the rates which it charges and the revenues it collects from its customers. The inability of or failure by the Authority to charge rates that produce, and to collect, sufficient Revenues could result in the Authority being unable to cover its Current Expenses or to meet coverage requirements or debt service payments on its Power Revenue Bonds. The Authority is able to adjust rates, subject to it complying with certain public hearing and review procedures, as described in *Rates* under THE SYSTEM. The Authority has not increased basic charges since 1989. However, because the cost of fuel and purchased power is passed along to clients through a fuel adjustment charge, the cost of electricity to clients has increased significantly during the past several years. The high level of the current fuel adjustment charge limits the Authority's ability to increase its basic rate without further affecting the demand for electricity.

The Authority's ability to increase its rates and/or collect additional Revenues from its customers is also affected by economic conditions and population trends in the Commonwealth. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. In its most recent projections, the Puerto Rico Planning Board (the "Planning Board") projects a decrease in real gross national product of 1.0% for fiscal year 2011 and an increase of 0.7% for fiscal year 2012. Electric energy sales in kWh have experienced a declining trend during the past five years. A continued slowdown in the economy or a low rate of economic growth will adversely affect the Authority's ability to maintain or increase its Net Revenues as electric energy consumption may remain constant or continue to decrease. In addition, the population of the Commonwealth decreased from 2000 to 2010 and decreased further from 2010 to 2011. If this trend continues, the Authority's ability to maintain or increase its Revenues and its capacity to comply with debt service obligations may be adversely affected.

The Authority expects that if it is able to implement its fuel diversification strategy, it will be able to reduce its fuel adjustment charges. This, in turn, may result in higher demand for electricity and may stimulate economic growth.

**The Authority's ability to meet its projections of Net Revenues**

The Authority's ability to generate sufficient Net Revenues to meet its Principal and Interest Requirements during the projected period of fiscal years 2012 through 2016 is based on meeting the assumptions underlying its projections, several of which involve factors beyond the control of the Authority. One of the key assumptions is the Authority's cost of residual and distillate fuel, which have been and continue to be very volatile. The Authority's projections assume that for fiscal year 2012, its blended cost for the two fuel oils will average $117.09 per barrel and that the average price of oil during the five year period ending 2016 will be $108.31 per barrel. However, since the price of fuel oil has kept increasing since the Authority completed its projections, it may currently be higher that what the Authority assumed in its projections. The price of oil is dependent on a number of exogenous factors, including political factors affecting the supply of crude oil, which are impossible to predict. See *Projected Net Revenues* under NET REVENUES AND COVERAGE.

If Current Expenses of the Authority should experience a significant increase without a corresponding increase in rates and charges, the Authority's Net Revenues and its debt service coverage could be negatively affected. These expenses will be significantly influenced by the performance of management and their ability to execute on the strategic initiatives discussed above, as well as by external circumstances, such as the outcome of litigation against the Authority, changes in regulatory policy or legislation (such as the implementation of the MATS), changes in uncontrollable costs (such as fuel and insurance), and the necessity to carry out unexpected repairs or replacements, any of which could have a material adverse financial effect on the Authority. There can be no assurance that the Authority's projections of Current Expenses will not be substantially exceeded.

The projections of Net Revenues prepared by the Authority for the five fiscal year period from 2012 through 2016, which show that the Authority is able to meet the coverage requirements of the Trust Agreement (based on the Trust Agreement's accrual method), are also premised in part on the inclusion as Revenues of the municipalities consumption of electric energy and certain subsidies that the Authority does not collect. When these revenues are eliminated from Revenues and Net Revenues, the Authority's debt service coverage is reduced significantly as shown in the preceding *Operating Results* table and in the table of "Historical Net Revenues and Coverage" appearing under NET REVENUES AND COVERAGE. Such projections are also premised on the expectation that the Authority will be able to reduce operating expenses (excluding maintenance), principally in administrative and general expenses and production plant and transmission and distribution expenses, by approximately 19% by fiscal year 2016, compared to fiscal year 2011. There can be no assurance, however, that the Authority will in fact be able to achieve the expected reductions in every year. If such projected reductions are not achieved, the Authority's ability to meet its debt service obligations may be adversely affected, unless the Authority is able to implement other revenue raising measures or there is a higher than projected increase in demand for electricity.

Even if the projections for fiscal years 2012 through 2016 are met, the Authority's ability to obtain sufficient Net Revenues to pay an increasing amount of debt service on the Power Revenue Bonds beyond fiscal year 2016 (see *Principal and Interest Requirements* under DEBT) will ultimately depend on its ability to execute the strategic initiatives described herein and/or implement further revenue raising or expense reduction measures.

The Authority's financial projections involve many assumptions, some of which are beyond the control of the Authority, such as the cost of fuel oil and its impact on the level of demand for electricity. In the past, the Authority's projections of Net Revenues have at times materially differed from what the Authority has been able to achieve.

If the Authority's financial results do not meet the various assumptions underlying the projections, its ability to generate sufficient Net Revenues to pay debt service on the Power Revenue Bonds after paying its Current Expenses may be adversely affected. In addition, its ability to continue funding its capital improvement program to improve the System, execute on its fuel diversification strategy and comply with its regulatory requirements may also be adversely affected. The inability to comply with its regulatory obligations may result in additional monetary penalties and other adverse consequences.

**The Trend in Demand for Electricity**

During fiscal years 2008 and 2009, the Authority experienced a decrease in electric energy sales (in kWh) as a result of the ongoing economic recession in Puerto Rico and the high rates charged to the Authority's clients, which are the result of the combination of the high cost of fuel oil and the Authority's dependence on fuel oil for 69% of its power production. For fiscal years 2008 and 2009, when Puerto Rico's real gross national product decreased by 2.8% and 3.7%, respectively, the Authority's electric energy sales decreased by 5.2% and 5.5%, respectively. Residential, industrial and commercial energy sales were all negatively impacted during these two fiscal years. During fiscal year 2010, however, the Authority experienced an increase in electric energy sales compared with fiscal year 2009. This increase mainly occurred in the residential sector, which experienced an increase of 10.8%, partly attributable to lower fuel oil prices during the first six months of fiscal year 2010 (which averaged $83.05 per barrel) compared with the price of fuel oil during the first six months of fiscal year 2009 (which averaged $97.35 per barrel). During fiscal year 2011, electric energy sales (in kWh) decreased 3.8% compared to fiscal year 2010, with all customer categories experiencing the downward trend. During the first six months of fiscal year 2012, compared to the first six months of fiscal year 2011, electric energy sales (in kWh) have decreased in all segments, with the largest decreases experienced in the residential and industrial sectors, which experienced declines of 3.4% and 3.3%, respectively. The Authority believes the reduction in demand during this period is principally due to the increase in the cost of fuel oil, which is passed on to the Authority's clients.

The Authority is projecting declines in electric energy sales (in kWh) of 3.03% and 1.11% for fiscal years 2012 and 2013, respectively, and increases of 0.32%, 1.07% and 1.52% for fiscal years 2014, 2015 and 2016, respectively. The increases for the last three fiscal years are expected to result from improved economic conditions in Puerto Rico and the stabilization of fuel prices through the fuel diversification strategies contemplated in the projections. To address the expected decreases in the level of demand for electricity during fiscal years 2012 and 2013, the Authority's management has been implementing the financial stabilization and fuel diversification plan previously disclosed that aims to reduce operational costs to bring them in line with the expected energy sales. The Authority projects that the price of fuel oil will average $108.31 thru 2016. If the price of fuel oil remains at current levels or increases, however, it is expected that the Authority may continue to experience a decrease in sales.

For more information regarding the historical and projected sales and revenues of the Authority, see NET REVENUES AND COVERAGE.

**Dependence on Fuel Oil; Fuel Cost Volatility**

Approximately 69% of the Authority's energy generation for fiscal year 2011 was produced by oil-fueled units. The Authority's dependence on oil, contrary to the situation of mainland United States utilities, has resulted in the Authority's electricity rates being among the highest of all United States utilities. For the first six months of fiscal year 2012, the Authority's average retail price of electricity was $0.27 per kWh.

The Authority's main operating expense is the cost of fuel oil. Fuel oil expenses amounted to $2.3 billion, or 61.8% of Current Expenses, for fiscal year 2011, and $2.0 billion, or 58.5% of Current Expenses, for fiscal year 2010. During the last five fiscal years, there has been significant volatility in the price of oil. The average cost per barrel to the Authority was $57.55 for fiscal year 2007, $84.18 for fiscal year 2008, $76.23 for fiscal year 2009, $76.55 for fiscal year 2010 and $95.91 for fiscal year 2011. For the first six months of fiscal year 2012, the average cost per barrel was $117.01, compared to $83.05 for the comparable period of fiscal year 2011, an increase of 40.9%.

Since the cost of fuel is passed on to the Authority's clients on a current basis through a fuel adjustment charge, the Authority's dependence on fuel oil has resulted in overall increases and significant volatility in the cost of energy to the Authority's customers during the last five fiscal years. The increased cost of energy, in turn, has a negative impact on Puerto Rico's economy and has contributed to the reduced demand for electricity discussed above. The Authority's management is focused on diversifying fuel sources, with the goal of reducing the dependence on oil for energy generation from 65% today to 41% by 2016 (assuming the conversion of the Costa Sur power plant to natural gas and the development of the renewable energy capacity previously mentioned) and 10% on a long-term basis (once the Vía Verde and Aguirre offshore natural gas terminal are online). In order to achieve this reduction, the Authority plans to convert existing oil-fired facilities to allow them to use either fuel oil or natural gas, build a pipeline system to transport natural gas to several of the Authority's generating plants, and build an offshore terminal to supply natural gas to the Aguirre plant. The Authority's ability to achieve these plans, however, is subject to factors beyond its control such as completion of the permitting process and obtaining financing for these projects.

The Authority has also entered into power purchase agreements with developers of renewable energy projects with the long-term goal of increasing the use of renewable energy and complying with the renewable energy portfolio standards described below. As of March 1, 2012, the Authority had signed power purchase agreements with respect to 33 renewable energy projects totaling approximately 1,000 MW of capacity. All of these agreements are subject to financing, permitting and other technical requirements. Four of the renewable energy projects have already obtained private financing commitments and have commenced construction. The Authority's projections for the five fiscal years ending June 30, 2016 assume the Authority will have approximately 650 MW of renewable energy capacity by fiscal year 2016, which, based on expected availability, would represent approximately 10% of its projected energy generation. There is no assurance that these renewable energy projects will be completed or come on line by fiscal year 2016. These renewable energy projects, while reducing the cost of energy below the current levels of costs based on fuel oil, may result in costs of energy that are higher than the cost of generation through the burning of natural gas. See *Plans for Fuel Diversification* under THE SYSTEM.

For more information regarding the fuel used by the Authority for its generating units, see *Fuel* under THE SYSTEM.

**The Authority's ability to manage substantial construction efforts related to its fuel diversification program**

Although the Authority's five-year capital improvement program is smaller than the Authority's capital improvement program for the prior five years, the Authority is embarking on an aggressive fuel diversification plan in order to lower the cost of electricity and meet regulatory requirements. The Authority has engaged external companies to assist in the development of some of these projects. The implementation of projects of this magnitude at multiple generating plants and the integration into the system of several renewable energy projects, however, is technically complex and elevates the operational risks and the need for superior execution. Although the Authority has successfully implemented and

managed a larger capital improvement program in the past, there can be no assurance that the Authority will be able to successfully implement a capital improvement and fuel diversification program of this magnitude on a timely basis, on budget and without adverse consequences to the System. The Authority's financial condition and results of operations could be materially adversely affected if it is unable to successfully manage these plans as well as the risks inherent in operating and improving its facilities.

**The Authority's ability to access the capital markets**

As a capital intensive company, the Authority relies on access to the capital markets and other borrowings. The Authority regularly accesses capital markets and other private borrowings, from Government Development Bank and private financial institutions, to finance its activities, for both capital improvement and working capital purposes. The Authority expects to continue to need access to such capital and borrowings for its ongoing capital improvement program, which is substantial, and for working capital purposes. The Authority's ability to arrange financing as well as its ability to refinance debt and make scheduled payments of principal and interest are dependent on numerous factors, including the Authority's levels of indebtedness, maintenance of acceptable credit ratings, its financial performance, liquidity and cash flow, and other market conditions. The Authority's inability to obtain additional financing from time to time would have a material adverse effect on its liquidity, operations and its ability to meet all of its obligations.

**The Authority's System may be affected by general operating risks and hazards customary in the power generation industry. The Authority may not have adequate insurance to cover all these hazards.**

The operation of power generation facilities is a potentially dangerous activity that involves many operating risks, including transmission disruptions and constraints, equipment failures and shortages, and system limitations, degradation and interruption. The Authority's operations are also subject to risks of human performance and workforce capabilities. There can be no assurance that the Authority's insurance will be sufficient or effective under all circumstances or protect against all hazards to which the Authority may be subject, or that insurance coverage will continue to be available on terms similar to those presently available, or at all. The Authority has a number of older facilities with potentially higher risks of failure or outage than an average plant. Under the Trust Agreement, the Authority maintains a Self-insurance Fund for paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement. The Self-insurance Fund had a balance of $85 million as of March 20, 2012.

**Weather and Other Uncontrollable Events**

Puerto Rico is an island located in an area subject to tropical storms, hurricanes and earthquakes. If a major natural disaster were to strike Puerto Rico, the System and customers' homes may experience substantial damage and a resulting interruption in service. Such events may materially adversely affect the Authority's ability to provide service and collect Revenues. Repair and maintenance of the System may also be subject to availability of key materials. The Authority has taken steps to mitigate the impact of tropical storms, including implementation of a hurricane preparedness plan and securing insurance coverage where available and contracts with suppliers providing for emergency inventories. The Authority also has an ongoing plan for the gradual burying of distribution lines in order to make them less susceptible to damage from weather related events.

If all, substantially all or any portion of the System is damaged or destroyed by any casualty, there is no assurance that casualty insurance proceeds or other proceeds (if available) will be sufficient to repair or replace such property. Even if applicable insurance coverages are adequate, there is no assurance that such damage or destruction would not have a material adverse effect on the ability of the Authority to provide electric energy service to its customers or on the Revenues of the Authority. The interruption of electric energy service for a prolonged period of time may have an adverse impact on the Authority's Revenues.

**Labor Factors**

The Authority is currently negotiating new collective bargaining agreements with its four unions. Three of the collective bargaining agreements have expired and the fourth, with its largest union, expires on August 24, 2012. While the Authority's relations with its labor unions are considered satisfactory at this time, these may be adversely affected by issues arising as a result of the bargaining process or other labor disputes. The Authority has experienced prior episodes of labor unrest that included work stoppages and occasional incidents of sabotage to its facilities. The ability of the Authority and its labor unions to continue the current spirit of cooperation and consultation will facilitate the Authority's meeting its financial and operating objectives and projections. Should these relations deteriorate, however, and recurrent work stoppages occur, it is possible that this may have an adverse effect on the ability of the Authority to provide electric power services to its customers or on the Revenues of the Authority. See LABOR RELATIONS.

**Changes in Commonwealth Legislation, Competition and Self-Generation**

The Commonwealth has identified high energy costs as one of the main factors affecting Puerto Rico's competitiveness and has made the adoption of a new energy policy an important part of its economic development initiatives. Act No. 73-2008, also known as the Economic Incentives Act, Puerto Rico's most recent tax incentives legislation, also created the Puerto Rico Energy Affairs Administration, a new government agency under the Department of Economic Development and Commerce in charge of developing and implementing a new energy policy for Puerto Rico. The Economic Incentives Act provides, among other things, for tax credits against Puerto Rico income tax equal to a percentage of the payments made to the Authority for the net consumption of energy related to business operations. These credits are available to any business that is an industrial client of the Authority and has been designated as an eligible business by the Secretary of the Department of Economic Development and Commerce with the endorsement of the Executive Director of the Puerto Rico Industrial Development Company and the Secretary of the Puerto Rico Treasury Department. These tax credits will be covered from moneys from the Commonwealth's General Fund and payments from the Authority.

The Economic Incentives Act provides that the Authority's cost of the tax credit will be absorbed by the Authority through a reduction in operational costs, increased efficiencies, revenues generated through "wheeling" and reductions in the cost of generating or purchasing energy. The Economic Incentives Act expressly provides that the Authority's cost in providing the tax credit shall not be subsidized by or passed through, either directly or indirectly, to the customers of the Authority, nor shall such costs cause a reduction in employment or in the payroll of the Authority. If during the 10-year term of the tax credit the average cost of energy is reduced to 10 cents per kWh for a period of two consecutive years, the tax credit will terminate.

The Authority expects to pay its portion of the cost of the tax credit from Revenues in a given year, but only after the application of Revenues to pay Current Expenses and debt service on the Authority's outstanding bonds in such given year, and after certain debt service, maintenance, capital improvement and self-insurance reserves are funded as required under the Trust Agreement. To date, the

Authority has only incurred administrative costs related to the Economic Incentives Act. The Authority estimates that it will incur costs related to the Economic Incentives Act of approximately $70 million in the five years ending in fiscal year 2016.

The Economic Incentives Act mandated the introduction of "wheeling" by January 2, 2010 and created a committee in charge of the implementation of a wheeling system. Under a wheeling system, the Authority must make available its transmission and distribution system to third party power generators. Although the Authority did not meet the deadline established in the Economic Incentives Act, public hearings were held on June 1 and 2, 2010 to consider the Wheeling System Tariffs, Wheeling Transmission Regulation and Wheeling Interconnection Procedure. The examiner recommended approval of the Wheeling Transmission Regulation and Wheeling Interconnection Procedure, but rejected approval of the Wheeling System Tariffs based on lack of information to the public. He recommended further public hearings with enough time for public evaluation. Based on such recommendations, the Authority modified the Wheeling Transmission Tariff Schedules and held new public hearings on June 2 and 3, 2011. The public hearing examiner submitted his report to the Board of Directors on July 22, 2011, including various recommendations that are under evaluation by the Authority. The Authority is also currently revising the Wheeling Regulation and Wheeling Interconnection Procedure. These regulations implement the wheeling system at transmission voltage level (115kV and 38kV). The Authority is planning to evaluate the implementation of the wheeling system at the distribution voltage level (13kV).

Under the Economic Incentives Act, if the Authority and a third party power generator do not agree on the wheeling rates within a period of 60 days, the Executive Director of the Energy Affairs Administration has the authority to appoint an arbitrator to determine, approve and establish the rates to be paid to the Authority by the third party power generator. See *Wheeling* under THE SYSTEM.

On July 19, 2010, the Commonwealth enacted Act No. 82-2010, known as the Act for a Public Policy for Energy Diversification Through Sustainable and Alternative Renewable Energy. Act No. 82-2010 requires the Authority to meet prescribed targets of energy generation from renewable sources by specified dates, as follows: 12% of energy sales from renewable energy production by 2015 and 15% of energy sales from renewable energy production by 2020, with a requirement to establish a plan to reach 20% of energy sales from renewable energy production by 2035. Act No. 82-2010 also establishes Renewable Energy Certificates as a legally recognized asset that can be purchased, sold, traded and transferred separately from electric power and used to meet the renewable energy targets and creates a Renewable Energy Commission with the power to implement and supervise compliance with Act No. 82-2010. Failure to comply with the renewable energy targets could result in the imposition of fines. The Authority is taking measures to comply with Act No. 82-2010, such as entering into power purchase agreements with developers of renewable energy projects, but it is too early to determine whether the Authority will be able to comply with the requirements of Act No. 82-2010.

Concurrently with the enactment of Act No. 82-2010, the Commonwealth enacted Act No. 83-2010, known as the Green Energy Incentives Act, which provides cash and further tax incentives to promote the development of renewable energy projects. It is too early to determine what impact Act No. 82-2010 and Act No. 83-2010 will have on the Authority, but existing or new legislation that would reduce the Authority's electric energy sales could have a material impact on the Authority's operations and financial condition.

New methods of producing low cost electricity and self-generation by certain industrial or commercial customers are other factors that could affect the Authority. The Authority is currently subject to "net metering" legislation under Act No. 114-2007, also known as the Net Metering Act, which allows residential and small business customers with their own generation to sell power back to the Authority.

Current net metering applies to residential owners generating up to 25 kW and commercial clients generating up to 1 MW. The Net Metering Act is under review by the Legislative Assembly to increase the net metering limits to 1 MW for commercial clients connected to the distribution voltage and 5MW to commercial clients connected to the transmission voltage. The Authority cannot determine with certainty what effects these factors will have on its business operations, but the effects are unlikely to be significant in the short-term. The Authority's management, however, is focused on reducing the cost of power to its customers in order to make it more competitive in a market environment.

Any new legislation that promotes competition in the energy sector in Puerto Rico or affects the Authority's rate-setting independence could have a material impact on the Authority's operations and financial condition. The Authority cannot predict at this time whether any additional legislation or rules will be enacted by the Commonwealth that will affect the Authority's operations or financial condition.

**Changes in Federal Laws or Regulations**

The electric utility industry in the United States mainland has changed from a regulated monopoly business to a deregulated competitive industry. FERC has mandated wholesale wheeling and open access for transmission facilities owned by utilities that engage in interstate commerce. Many states have enacted or proposed laws and regulations that are designed to (i) ensure open access to transmission facilities to promote wholesale power supply competition and (ii) phase in retail competition. The requirements of FERC, including those regarding wholesale wheeling, are generally not applicable to the Authority because it is not engaged in transactions in interstate commerce. In addition, there are currently no wholesale clients in the Commonwealth, although the Authority is required to offer a wheeling service. As a result, the Authority has operated as a monopoly in the sale of electricity in Puerto Rico which has allowed it to charge rates determined by reference to their costs of service rather than by competitive forces. This may change, however, as a result of the "wheeling" initiatives discussed above. The Authority remains subject to the mandatory purchase obligation and other legal requirements in the Public Utility Regulatory Policies Act of 1978 ("PURPA"), which requires the Authority to purchase energy from certain generators at the Authority's avoided costs. Changes in Federal legislation, market development and other factors, however, could expose the Authority to competition.

**The Authority's ability to comply with environmental and public health standards, maintain self-sufficiency in a highly regulated industry and fund capital improvements required to comply with these regulatory requirements**

Electric utilities are subject to continuing environmental regulation, which may change from time to time. These changes may arise from continuing legislative, regulatory and judicial action. Compliance with these regulations may require modification of existing facilities, require additional capital and operating expenditures, cause a reduction in operating levels, and create barriers to new facility development. Failure to comply with these regulations could result in penalties or in the shutdown of generating units that are not in compliance.

The environmental aspects of the Authority's operations are regulated primarily by the EPA and the EQB under federal and Commonwealth statutes and associated rules and regulations. In the past, there have been various instances of non-compliance by the Authority with U.S. federal and Commonwealth environmental laws and regulations, which have resulted in monetary penalties, injunctive relief and criminal action against the Authority. The Authority is currently operating under a consent decree (the "Consent Decree") related to regulatory issues arising under federal environmental laws. For more information regarding the Consent Decree and other administrative proceedings, please see ENVIRONMENTAL MATTERS.

There are no assurances that the federal and Commonwealth agencies regulating environmental matters will not bring additional enforcement actions under existing statutes, the Consent Decree or other current administrative proceedings, which could require additional, unexpected capital and/or operating expenditures. For more information regarding the Authority's compliance with environmental laws and regulations, please see ENVIRONMENTAL MATTERS.

The Authority has budgeted for compliance with the Consent Decree and other applicable environmental requirements (other than new and future regulations discussed further below) approximately $63.5 million for fiscal years 2012 through 2016. The actual cost of compliance and the Authority's total capital expenditures may vary substantially depending on, among other things, (i) the availability of an adequate pool of qualified contractors to carry out needed projects, (ii) the inflationary environment with respect to the costs of labor and supplies needed to implement the compliance program, (iii) weather conditions that could adversely affect construction schedules and consumption patterns, (iv) population trends and political and economic developments in Puerto Rico that could adversely impact the collection of operating revenues, (v) the willingness of the EPA to cooperate with respect to various issues that may arise as the Authority implements its remedial plans, (vi) the possibility of new environmental legislation or regulations affecting the Authority's facilities and operations, (vii) unanticipated costs or potential modifications to projects resulting from requirements and limitations imposed by environmental laws and regulations and (viii) the inherent uncertainty involved in capital improvement projects of the magnitude undertaken by the Authority.

There can be no assurance that the actual cost of compliance will not be significantly higher than the Authority's current estimate (budgeted amount), nor can any assurances be given that the Authority will be able to comply fully with the terms of the Consent Decree and avoid the imposition of additional monetary penalties. In addition, in order to comply with the Consent Decree and achieve compliance with new regulations, the Authority may need to implement necessary capital improvements. In order to fund these capital improvements, the Authority may need to issue additional indebtedness beyond the amounts currently projected to be issued. The burden of such additional debt and other obligations may require the implementation of revenue raising and/or expense reduction measures. No assurances can be given that the Authority will be able to finance, through the issuance of bonds or otherwise, the estimated costs of the needed capital improvement during the next five years or of any additional capital improvement requirements that may be imposed on the Authority, or that rate increases will be implemented on a timely basis to support any such additional obligations.

In addition, although new or future environmental regulatory requirements may provide for a period of time to achieve compliance with, or provide a plan to comply, such regulatory requirements may also require additional capital and operating expenditures. For more information on these regulatory requirements, see "New or Future Environmental Regulatory Requirements" and ENVIRONMENTAL MATTERS. It is not possible for the Authority to determine at this point the magnitude of these expenditures.

With respect to the new EPA regulations governing air emissions known as the MATS, discussed further below, the Authority will be required to reduce emissions of hazardous air pollutants (including mercury) by 90%. In order to comply with these requirements, the Authority will be required to make significant capital investments, which the Authority currently estimates could cost between $631.6 million to $1.26 billion and would also result in additional annual recurring significant expenses related to the operation and maintenance of the emissions control systems. Therefore, the Authority believes that in order to comply with the MATS, it will have to convert substantially all of its existing generating units to burn natural gas, a cleaner burning fuel, instead of fuel oil. In addition, conversion to natural gas may also be required for the Authority to comply with current or future laws or regulations governing greenhouse gas emissions. If the Authority were not able to convert its existing units to natural gas

(including completing the natural gas delivery infrastructure), then it would need to make significant capital investments without being able to offset these costs with any cost savings on the purchase of fuel. It is possible that the Authority may not be in a position to fund such additional expenditures. For more information on these and other future regulatory requirements, see "New or Future Environmental Regulatory Requirements" and ENVIRONMENTAL MATTERS.

Although the Authority is committed to bringing its facilities and operations into compliance with applicable law, it is expected that the Authority will continue to pay stipulated penalties and to make additional capital expenditures (some not included in current capital improvement program) in the future under its existing Consent Decree and to comply with new environmental requirements. No assurance can be given, however, that the amounts budgeted for payment of stipulated penalties will be in all cases sufficient to cover potential civil, administrative or criminal liabilities or that the capital improvement program for the next five years will result in regulatory compliance. However, the Authority believes it is taking the necessary steps to substantially comply with applicable environmental laws and regulations in the near future.

For a more detailed description of the environmental matters affecting the Authority, see ENVIRONMENTAL MATTERS.

**New or Future Environmental Regulatory Requirements**

There are new regulatory developments under the CAA and the Clean Water Act ("CWA"), some of which may have a significant adverse effect on the Authority's operations and expenditures. These developments are summarized below and discussed in more detail under ENVIRONMENTAL MATTERS.

*New Developments under the CAA- Mercury and Air Toxics Standards and Greenhouse Gas ("GHG") Emissions*

The EPA has recently finalized regulations pursuant to various provisions of the CAA, namely-the MATS and new requirements related to GHG emissions that may have a significant adverse effect on the Authority.

The MATS were published on February 16, 2012 and will become effective on April 16, 2012, with a three-year compliance period as described below. The MATS are new standards promulgated by the EPA on existing electric utility steam generating units ("EGUs") larger than 25 megawatts that burn coal or oil for purpose of generating electricity for sale and distribution through the national grid to the public. These standards require these EGUs, among other things, to reduce emissions of mercury, arsenic, chromium, nickel and acid gases by the imposition of more stringent emissions limits that reflect the application of maximum achievable control technology ("MACT"). Existing EGU's generally will have up to four years if they need it to comply with the MATS. This includes the three years provided to all sources by the CAA, and an additional year that may be granted by the EQB, as needed, for technology installation. At the same time the MATS were promulgated, revised standards for new coal and oil-fired power plants, called New Source Performance Standards ("NSPS"), were also promulgated imposing more stringent numerical limits on particulate matter, sulfur dioxide and nitrogen oxides. The NSPS will also enter into effect on April 16, 2012. For a complete description of these regulatory developments, please see *Compliance Matters – MATS Regulation* under ENVIRONMENTAL MATTERS.

Although the Authority is still evaluating the impact of the MATS, it estimates that without a conversion of its oil fired generating capacity to natural gas, it will be required to install MACT on its oil-

fired units. The MACT for these units could consist of various retrofitted emission control systems, such as filter baghouses and flue gas desulfurization equipment associated with ancillary systems. The Authority would have until April 2015 to install the MACT, and the capital costs associated with this effort are estimated between $631.6 million to $1.26 billion. Therefore, the Authority believes that in order to comply with the MATS, it will have to convert substantially all of its existing generating units to burn natural gas instead of fuel oil. If the Authority were not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it would need to make significant capital investments to control emissions in order to comply with the MATS without being able to offset these costs with any cost savings on the purchase of fuel.

In addition to the recent MATS regulation, in the past five years, certain judicial and regulatory events have set a framework for GHG emissions regulations under the CAA and potential future legislation. After a Supreme Court decision essentially holding that GHGs are air pollutants that may be regulated under the CAA and various related administrative rulemakings and pronouncements, on October 30, 2009, the EPA issued a final rule requiring mandatory monitoring in 2010 and reporting of GHGs emissions beginning in 2011 for virtually all industrial source categories across the United States. This rule does not require control of GHGs, but rather requires sources above certain threshold levels to monitor and report emissions. When it issued this rule, the EPA stated that this program would provide data for future policy development on the subject.

After other agency pronouncements, on May 13, 2010, the EPA issued a final rule setting thresholds for GHG emissions that define when certain permits issued under the CAA are required for new and existing facilities. In essence, this new rule would require certain existing air emissions sources that will increase GHG emissions beyond certain established thresholds to implement Best Available Control Technology and have their permits subject to additional review. For more details on the background and substance of this rule and the GHG reporting rule discussed above, please see *Compliance Matters – GHG Regulations* under ENVIRONMENTAL MATTERS.

The Authority submitted its first report on GHG emissions as required by the GHG reporting rule on September 2011. In 2012, the report will be submitted in March 2012. As for the GHG threshold rule, at this moment, the Authority believes that this rule may require it to take measures to reduce GHG emissions, but it is still evaluating the extent of such reductions. One of the alternatives identified to achieve this reduction is the installation of carbon sequestration technology, but this technology does not appear to be feasible for the Authority. In addition, as a result of this rule, the Authority may have to conduct an evaluation of impacts to endangered species, which could potentially require a formal consultation under Section 7 of the Endangered Species Act. The Authority is currently evaluating the extent of this evaluation, if any.

In light of the costs associated with carbon reduction technologies, the Authority believes that the best alternative to achieve lower GHG emissions is to convert its existing units to burn natural gas instead of fuel oil. If the Authority is not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it may need to make significant capital investments to control GHG emissions without being able to offset these costs with any costs savings on the purchase of fuel.

It must be noted that, in 2009, the House of Representatives of the United States Congress proposed legislation (H.R. 2454) that, among other things, would have required existing coal-fired power plants to obtain "allowances" for each ton of GHG emissions, and thus effectively create a "price of carbon." This proposed legislation would also have pre-empted the EPA's authority to regulate GHG emissions. For more details on this proposed legislation, please see *Compliance Matters – GHG Regulations* under ENVIRONMENTAL MATTERS. Although this proposed legislation did not become

law, it raises the possibility that the United States Congress may in the future decide to take action on this subject.

In light of the above, the Authority is unable to predict whether and when the EPA or the United States Congress ultimately will impose additional regulations and restrictions on GHGs, and if so, what their content and form or effect would be. At this time, it is not entirely clear what the level of future regulation of emissions will be, or the costs associated with that regulation. However, any such costs could be material to the Authority.

### New Developments under the CWA

On April 20, 2011, the EPA published a draft rule proposing the imposition of additional requirements on cooling water intake structures regulated under Section 316(b) of the CWA. The draft rule would: (i) establish of an upper limit on how many fish can be killed by impingement (that is, by being pinned against intake screens or other parts of the facility) for those existing facilities with a design intake flow of greater than 2 million gallons per day; (ii) require facilities withdrawing water in very large quantities (at least 125 million gallons per day) to conduct studies to determine whether and what site-specific controls, if any, would be required to reduce the number of entrained aquatic organisms (that is, those aquatic organisms that are sucked into the cooling intake water system); and (iii) require new units added to existing facilities to add a closed-cycle technology. For more details on this proposed rule, see *Compliance Matters – Proposed Regulations under the CWA* under ENVIRONMENTAL MATTERS.

The Authority has a proposal to implement an impingement and entrainment control technology at the South Coast and Palo Seco power plants (aquatic filter barriers), that includes verification sampling for impingement and entrainment. In addition, the Authority is preparing a Plan of Action ("POA") for San Juan and South Coast power plants to be submitted to EPA on June 1, 2012. The POA will recommend steps for impingement and entrainment reduction. The Authority has also budgeted some funds in the capital improvements program for implementing control technologies for impingement and entrainment. Although there is no assurance that the Authority will be able to comply with proposed rule, based on the steps that have been and will be taken, the Authority understands that it will be able to comply with the proposed rule.

## Limited Rights of Bondholders

The holders of Power Revenue Bonds have no mortgage or other lien on the physical assets of the Authority and have no rights to direct management changes, continuity or decisions except in the case of bringing suit to compel compliance with the Rate Covenant as described under *Rate Covenant* in SECURITY.

In the event of a default by the Authority, the ability of the Trustee to raise sufficient funds to pay the principal of and interest on Power Revenue Bonds will depend upon the exercise of various remedies specified by the Trust Agreement. Under existing law, those remedies are often subject to discretion and delay and may not be readily available or may be limited. Equitable principles may also delay or otherwise adversely affect the enforcement of Bondholders' rights.

## Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating

Any rating assigned to the Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Bonds on their respective maturity or mandatory redemption dates. Any rating of the Bonds is not a recommendation to purchase, hold or sell such Bonds and such rating will not address the marketability of such Bonds, their market

price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Authority. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Bonds. Finally, the Trust Agreement does not include a covenant by the Authority to maintain a specific rating with respect to outstanding Power Revenue Bonds.

## PLAN OF FINANCING

### Series 2012A Bonds

The Authority is issuing the Series 2012A Bonds pursuant to the Trust Agreement to (i) finance a portion of the cost of various projects under its capital improvement program, (ii) repay certain advances made to the Authority by Government Development Bank under a line of credit facility to (a) pay a portion of the interest due on January 1, 2012 and July 1, 2012 on the Authority's outstanding Power Revenue Bonds and (b) pay a portion of the principal due on July 1, 2012 on the Authority's outstanding Power Revenue Bonds, (iii) fund a deposit to the Reserve Account in the Puerto Rico Electric Power Authority Revenue Bonds Interest and Sinking Fund, (iv) pay capitalized interest on the Series 2012A Bonds through January 1, 2015, and (v) pay the costs of issuance of the Series 2012A Bonds.

### Series 2012B Bonds

The Authority is issuing the Series 2012B Bonds pursuant to the Trust Agreement to (i) provide funds, together with other available moneys, to refund the following bonds of the Authority (the "Refunded Bonds") on the redemption dates and at the redemption prices set forth below plus accrued interest to the redemption dates, or pay such Refunded Bonds at maturity, and (ii) pay the costs of issuance of the Series 2012B Bonds.

| Refunded Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date July 1, | Redemption Price (% of Par) | Redemption Date |
|---|---|---|---|---|---|
| Power Revenue Bonds, Series II | $21,345,000 | 5.375% | 2016 | 101% | July 1, 2012 |

The refunding will permit the Authority to realize savings on its debt service requirements on Power Revenue Bonds outstanding under the Trust Agreement. The Authority will deposit the net proceeds of the Series 2012B Bonds with the Trustee, as escrow agent, under the terms of an escrow deposit agreement. The net proceeds of the Series 2012B Bonds will be invested in Government Obligations, the principal of and interest on which when due will provide moneys sufficient to pay the principal of or the redemption price of the Refunded Bonds and the interest coming due on the Refunded Bonds through their date of redemption or maturity date, as applicable.

Upon the deposit with the Trustee, the Refunded Bonds will, in the opinion of Bond Counsel, no longer be outstanding under the provisions of the Trust Agreement and the Refunded Bonds will thereupon be defeased. In rendering the foregoing opinion, Bond Counsel will rely on the report of Causey Demgen & Moore, as verification agent, dated the date of delivery of the Series 2012B Bonds, relating to the verification of certain mathematical computations with respect to the moneys and Government Obligations deposited with the escrow agent under the terms of the escrow deposit agreement.

The Authority expects to issue additional Power Revenue Bonds in fiscal years 2013 through 2016 to fund the Authority's capital improvement program. See *Projected Five-Year Capital Improvement and*

*Financing Program* under THE SYSTEM. No assurance can be given that any such Power Revenue Bonds will be issued for such purposes.

**Estimated Sources and Uses of Funds for the Bonds**

| Sources | |
|---|---|
| Principal Amount of the Bonds | $650,000,000.00 |
| Net Original Issue Discount | (597,329.70) |
| Other Available Moneys[1] | 382,431.25 |
| **Total Sources** | $649,785,101.55 |
| **Uses** | |
| Deposit to Construction Fund | $359,529,035.56 |
| Payment of line of credit | 161,900,900.00 |
| Deposit to Escrow Fund for the Refunded Bonds | 22,129,518.03 |
| Deposit to Reserve Account | 17,183,417.27 |
| Capitalized Interest | 82,555,885.00 |
| Underwriters' Discount and Other Costs of Issuance[2] | 6,486,345.69 |
| **Total Uses** | $649,785,101.55 |

[1] Derived from moneys on deposit in the Bond Service Account of the Sinking Fund to pay debt service on the Refunded Bonds.
[2] Includes legal, printing and other financing expenses.

## SECURITY

The Power Revenue Bonds are not a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions, other than the Authority, and neither the Commonwealth nor any such municipalities or other political subdivisions, other than the Authority, are liable thereon, nor shall the Power Revenue Bonds be payable out of any funds other than those of the Authority as further described herein.

**Source of Payment**

The Power Revenue Bonds are payable solely from the Revenues of the System after payment of the Current Expenses of the Authority and any reserve therefor. For purposes of the Trust Agreement and this Official Statement, "System" means all the properties owned and operated by the Authority as a single integrated system in connection with the production, distribution or sale of electric energy, the acquisition or construction of which was financed in whole or in part from the proceeds of Power Revenue Bonds or from the proceeds of bonds issued under a previous indenture, or from moneys deposited to certain accounts established under the Trust Agreement, or (to the extent specified by the Authority) from certain subordinated obligations; "Revenues" means all moneys received by the Authority as a result of the ownership or operation of the System, including any income derived by the Authority from the sale of electricity generated or distributed by the System, any proceeds of certain insurance, and certain investment income; and "Current Expenses" means the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System. The Authority has covenanted to deposit in the Sinking Fund a sufficient amount of such Revenues (after payment of Current Expenses) to pay the principal of and the interest on all the Power Revenue Bonds and to provide a reserve therefor. See Appendix I—*Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement*, which should be read in conjunction herewith.

## Flow of Funds under Trust Agreement

The following schematic representation is provided only to guide readers and does not purport to be complete.



(1) Monthly deposits to the Bond Service Account and the Redemption Account for all Power Revenue Bonds bearing at a fixed rate are capped at 1/6 of the interest due within the next six months and 1/12 of the principal due within the next twelve months and 1/12 of the Amortization Requirements for the current fiscal year.

## Rate Covenant

The Authority has covenanted in the Trust Agreement to fix, charge and collect reasonable rates and charges so that Revenues of the System will be sufficient to pay Current Expenses and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any accrued interest thereon for such fiscal year.

For purposes of the Trust Agreement and application of the rate covenant, Revenues include the accrued amounts attributable to the residential fuel, hotel and rural electrification and irrigation systems subsidies, which the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to provide a credit for such amounts in its recipients' billing), and the accrued electric consumption charges of the municipalities, which the Authority is legally authorized to collect but does not because it follows the practice of applying them as an offset against the CILT obligation. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM. In delivering their approving opinion, Bond Counsel will take into consideration and will rely on the fact that, although the Authority includes the accrued residential fuel, hotel and rural electrification and irrigation system subsidies in the calculation of Revenues for purposes of the rate covenant, even if these amounts were excluded from such calculation, the rate covenant described above will be satisfied. In the future, the Authority will review with Bond Counsel the treatment of these subsidies as Revenues for Trust Agreement purposes and consider their conclusions in the computation of Net Revenues.

In addition, for purposes of calculating Principal and Interest Requirements under the rate covenant and the additional bonds tests described below, the Accreted Value of any capital appreciation bonds of the Authority on their maturity dates must be included as principal due and payable on said maturity dates. The Accreted Value at any date of a capital appreciation bond currently outstanding equals the original principal amount of such capital appreciation bond plus the interest accrued from its date of issuance to such date, based upon the interest rate used to calculate the yields thereof, compounded in the manner provided in the Trust Agreement, and for future issues of capital appreciation bonds will be determined as provided in the respective resolutions of the Authority authorizing such issues. In addition, interest payable with respect to Build America Bonds and other Federally Subsidized Bonds is calculated net of the Federal Subsidy Payment as described under "Reserve Account" below. See "Rate Covenant" in Appendix I—*Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

## Reserve Account

The Authority has covenanted in the Trust Agreement to accumulate in the Reserve Account an amount equal to the interest payable on all outstanding Power Revenue Bonds within the next 12 months, provided that for Power Revenue Bonds issued for other than refunding purposes, the amount to be so deposited in any month, as set forth in "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement,* need not exceed one-sixtieth of the amount of the increase in the interest payable within the next 12 months resulting from the issuance of such Power Revenue Bonds. In connection with the capital appreciation bonds of the Authority, the minimum amount required to be on deposit in the Reserve Account with respect to the interest accrued thereon is to be derived from the interest rate used to calculate the assumed yields through their maturity times the Accreted Value of such Power Revenue Bonds determined in the manner provided in the Trust Agreement on the valuation date therefor occurring on or after the first day of the twelfth month succeeding the date of calculation.

In connection with a series of Build America Bonds or other Federally Subsidized Bonds, the amount of interest deemed to be payable on such bonds within the next twelve months for purposes of the calculation of interest to be credited to the Reserve Account shall exclude the amount of interest to be paid from the Federal Subsidy Payment; provided, however, that if the Trustee does not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within 30 days of the date such Federal Subsidy Payments were scheduled to be received, then for purposes of such calculation the amount of interest to be credited to the Reserve Account shall be equal to the interest payable on the bonds within the next twelve months.

As of March 20, 2012, approximately $382.3 million was on deposit to the credit of the Reserve Account. The amount required to be accumulated in the Reserve Account will be approximately $399.3 million after giving effect to the issuance of Power Revenue Bonds issued for non-refunding purposes within the previous 60 months and the issuance of the Bonds. In accordance with the provisions of the Trust Agreement, the Authority will transfer any excess amount on deposit from time to time in the Reserve Account to the Bond Service Account of the Sinking Fund.

**Reserve Maintenance Fund, Self-insurance Fund and Capital Improvement Fund**

The Trust Agreement establishes the Reserve Maintenance Fund, the Self-insurance Fund and the Capital Improvement Fund. Revenues are deposited monthly into each of such Funds after the required deposits into the Sinking Fund as set forth in the schematic representation above for purposes of (a) paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, including major items of equipment, in the case of the Reserve Maintenance Fund, (b) paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement, in the case of the Self-insurance Fund, and (c) paying the cost of anticipated extensions and improvements which cost has not otherwise been provided for from the proceeds of the Power Revenue Bonds, in the case of the Capital Improvement Fund. Each of these Funds serves as an additional reserve for the payment of principal of and interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Sinking Fund (including the Reserve Account) are insufficient for such purpose. As of March 20, 2012, the balances of the Reserve Maintenance Fund and the Self-insurance Fund were $15.0 million and $85.0 million, respectively. As of March 20, 2012, there was no money on deposit in the Capital Improvement Fund. See "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Additional Bonds**

Additional Power Revenue Bonds may be issued under the Trust Agreement for the purpose of paying all or any part of the cost of any improvements to the System or for any other proper corporate purpose of the Authority; provided that, among other requirements, Net Revenues (as defined in the Trust Agreement) of the Authority for 12 consecutive months out of the preceding 18 months, adjusted to reflect rates in effect on the date of issuance of such bonds, shall be not less than 120% of maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding, and that the average annual Net Revenues for the five fiscal years succeeding the issuance of such bonds, adjusted to reflect any rate schedule the Authority has covenanted to put in effect during such five fiscal years, as estimated by the Authority and approved by its Consulting Engineers, shall be not less than 120% of the maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding and the Power Revenue Bonds then to be issued.

For purposes of the additional bonds test, Net Revenues include the accrued amounts attributable to the residential fuel, hotel and rural electrification and irrigation systems subsidies, which the Authority does not collect (in the case of the residential fuel and hotel subsidies, the Authority is required by law to provide a credit for such amounts in its recipients' billing), and the accrued electric consumption charges of the municipalities, which the Authority is legally authorized to collect but does not because it follows the practice of applying them as an offset against the CILT obligation. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM. In delivering their approving opinion, Bond Counsel will take into consideration and will rely on the fact that, although the Authority includes the accrued residential fuel, hotel and rural electrification and irrigation systems subsidies in the calculation of Net Revenues, even if these amounts were excluded from such calculation, the additional bonds test described above will be satisfied. In the future, the Authority will review with Bond Counsel the treatment of the subsidies as Revenues for Trust Agreement purposes and consider their conclusions in the computation of Net Revenues.

Power Revenue Refunding Bonds may also be issued under the Trust Agreement for the purpose of refunding all or any part of the outstanding Power Revenue Bonds of any series; provided that, among other requirements, either (i) the earnings tests described above for the issuance of additional Power Revenue Bonds are satisfied (except that effect is given to the retirement of the bonds to be refunded) or (ii) the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued (after giving effect to the retirement of the bonds to be refunded) shall be less than the maximum aggregate Principal and Interest Requirements on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued). See "Issuance of Power Revenue Bonds - Sections 208, 209 and 210 of the Trust Agreement" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

Under the additional bonds test of the Trust Agreement, Net Revenues (including the residential fuel, hotel and rural electrification and irrigation systems subsidies) for the twelve months ended December 31, 2011 of $781 million were 131% of the maximum aggregate annual Principal and Interest Requirements of $594.8 million on all outstanding Power Revenue Bonds (including the Bonds). Estimated average annual Net Revenues (including the residential fuel, hotel and rural electrification and irrigation systems subsidies) for the five fiscal years ending June 30, 2017 of $837 million would be 141% of the maximum aggregate annual Principal and Interest Requirements of $594.8 million on all outstanding Power Revenue Bonds (including the Bonds). If the accrued amounts attributable to the residential fuel, hotel and rural electrification and irrigations systems subsidies were excluded, the percentages set forth in the preceding sentence would be 125% and 135%, respectively. The amount of Principal and Interest Requirements for fiscal years 2012, 2013, 2014 and 2015 has been reduced by the interest that was capitalized through the Authority's issuance of its Power Revenue Bonds, Series XX (the "Series XX Bonds"), Power Revenue Bonds, Series ZZ (the "Series ZZ Bonds"), Power Revenue Bonds, Series CCC (the "Series CCC Bonds"), Power Revenue Refunding Bonds, Series DDD (the "Series DDD Bonds"), and the Bonds in the following amounts: approximately $81.5 million due during fiscal year 2012, $67.1 million due during fiscal year 2013, $31.5 million in fiscal year 2014, and $15.8 million in fiscal year 2015. See NET REVENUES AND COVERAGE.

**Subordinate Obligations**

The Authority may incur or issue obligations for any proper corporate purpose secured by a pledge of moneys in the Subordinate Obligations Fund. If the Authority incurs any such obligations, Net Revenues of the Authority must be deposited monthly to the credit of the Subordinate Obligations Fund (after the required deposits have been made to the Sinking Fund and the Reserve Maintenance Fund) in amounts sufficient to pay such obligations as they become due.

The Authority may, in connection with the incurrence of any such obligations, limit the deposit to the Reserve Maintenance Fund as described above to not more than $400,000 per month, notwithstanding any higher amounts recommended by the Authority's Consulting Engineers. If such deposit is so limited, the Authority will be required, immediately after each monthly deposit to the Subordinate Obligations Fund, to deposit to the Reserve Maintenance Fund (and prior to any deposits to the Self-insurance Fund and the Capital Improvement Fund) the lesser of the amount remaining in the Revenue Fund and the amount of any such deficiency.

Unless a particular project financed with any such obligations is specified by the Authority as being part of the System, any revenues attributable to such project will not be pledged to the payment of Power Revenue Bonds and any expenses associated with such project will not be payable from Revenues as Current Expenses of the System. *See* "Disposition of Revenues" in Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

As of December 31, 2011, the Authority had approximately $29.9 million aggregate outstanding principal amount of subordinate obligations. See DEBT.

## DESCRIPTION OF THE BONDS

**General**

The Bonds will bear interest at such rates and will mature on the dates and in the principal amounts set forth on the inside cover page of this Official Statement. The Bonds will be dated their date of delivery. Interest on the Bonds will be payable on each January 1 and July 1, commencing on July 1, 2012.

*Form of Bonds*

Principal of and premium, if any, and interest on the Bonds will be payable in the manner described below under "Book-Entry Only System." The Bonds are being issued in fully registered form and, when issued, are to be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC is to act as securities depository for the Bonds. Individual purchases of interests in the Bonds will be made in book-entry form only, in denominations of $5,000 or any multiple thereof. Purchasers of such interests will not receive definitive Bonds. Principal, redemption premium, if any, and interest are payable directly to DTC by the Trustee. Upon receipt of such payments, DTC will remit such principal and interest to the DTC Participants (as such term is hereinafter defined) for subsequent disbursement to the purchasers of beneficial interests in the Bonds.

**Book-Entry Only System**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate

will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example,

Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this Section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority believes to be reliable, but the Authority takes no responsibility for the accuracy thereof.

NONE OF THE AUTHORITY, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

## Discontinuance of the Book-Entry Only System

DTC may discontinue providing its services as depository with respect to the Power Revenue Bonds at any time by giving reasonable notice to the Authority or the Trustee.   Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository).   In that event, bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Power Revenue Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate trust office of the Trustee in New York, New York; (iii) interest on the Power Revenue Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Authority maintained by the Trustee; (iv) the Power Revenue Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Power Revenue Bonds will be registrable and the Power Revenue Bonds may be exchanged at the corporate trust office of the Trustee in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

## Optional Redemption

The Series 2012A Bonds that mature after July 1, 2022 may be redeemed at the option of the Authority prior to maturity, from any available moneys (except moneys deposited in the Sinking Fund in respect of an Amortization Requirement), upon not less than 30 days' prior notice by mail, either in whole or in part, in such order of maturity as directed by the Authority, on any date not earlier than July 1, 2022, at a redemption price equal to the principal amount of the Series 2012A Bonds to be redeemed plus accrued interest to the redemption date, without premium.

The Series 2012B Bonds are not subject to redemption prior to maturity.

## Mandatory Redemption

The Series 2012A Bonds maturing on July 1, 2029 and bearing interest at a rate of 5.00% and July 1, 2042 and bearing interest at a rate of 5.00% will be redeemed in part on July 1, 2028 and 2041, respectively, and on each July 1 thereafter for which there is an Amortization Requirement in respect of such Series 2012A Bonds, in amounts equal to the Amortization Requirements for such Series 2012A Bonds (less the principal amount of any Series 2012A Bonds retired by purchase and otherwise subject to adjustment as provided in the Trust Agreement), from moneys in the Sinking Fund, at a redemption price equal to the principal amount of the Series 2012A Bonds to be redeemed plus accrued interest to the redemption date, without premium, in the years and amounts set forth below:

| | Annual Sinking Fund Requirements for Series 2012A Bonds due July 1, | |
|---|---|---|
| Year | 2029[*] | 2042[†] |
| 2028 | $  12,400,000 | |
| 2029 | 145,060,000[‡] | |
| 2030 | | |
| 2031 | | |
| 2032 | | |
| 2033 | | |
| 2034 | | |
| 2035 | | |
| 2036 | | |
| 2037 | | |
| 2038 | | |
| 2039 | | |
| 2040 | | |
| 2041 | | $213,725,000 |
| 2042 | | 144,415,000[‡] |

[*] Bearing interest at a rate of 5.00%.
[†] Bearing interest at a rate of 5.00%.
[‡] Maturity

**Notice of Redemption**

Notice of redemption shall be mailed by the Trustee, not less than thirty (30) days nor more than sixty (60) days prior to the redemption date, to the Holders of Bonds called for redemption at their addresses appearing on the bond registration books of the Trustee.  The Trustee shall also give notice of redemption by overnight mail or carrier service to the Authority, and such securities depositories and/or securities information services as shall be designated by the Authority.

**THE AUTHORITY**

The Authority was created as a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth by the Act.

The Authority was created for the purpose of conserving, developing and utilizing the water and power resources of the Commonwealth in order to promote the general welfare of the Commonwealth. It supplies virtually all the electricity consumed in Puerto Rico and is one of the largest municipal utilities in the United States, ranking first in number of customers and revenues among public power utilities.

The executive offices of the Authority are located at 1110 Ponce de Leon Avenue, San Juan, Puerto Rico 00907, telephone number (787) 521-4666.

**Powers**

The Authority has broad powers under the Act, including, among others: to make contracts; to acquire properties by eminent domain or otherwise; to borrow money and to issue bonds for any of its corporate purposes; to secure the payment of its bonds and all other obligations by pledge of its revenues; to determine, fix, alter, charge and collect reasonable rates, fees, rentals and other charges for use of its facilities; and to have complete control and supervision of its properties and activities. In addition, the Authority has the power to create, acquire and maintain corporations, partnerships or subsidiary corporations.

**Management**

The Act provides that the Governing Board of the Authority (the "Board") shall be composed of nine members. The Secretary of Transportation and Public Works of the Commonwealth serves *ex officio* as a member of the Board, and six other members are appointed by the Governor with the advice and consent of the Senate of Puerto Rico. The remaining two members are client representatives elected directly by the Authority's clients. Members of the Board serve for a term of four years and members who are not *ex officio* can be reappointed or reelected. There is currently one vacancy on the Board. The members of the Board are set forth below.

| Name | Principal Occupation | Term Ends |
|------|---------------------|-----------|
| José Ortiz Vázquez, P.E., Chairman | Executive President, Puerto Rico Aqueduct and Sewer Authority | (1) |
| José A. Pérez Canabal, P.E. | Engineer | June 2013 |
| Jerome Garffer | Investment Management | June 2014 |
| Rubén A. Hernández-Gregorat, P.E. | Secretary of Transportation and Public Works | Ex Officio |
| Andrés Salas Soler, Esq. | Attorney | February 2014 |
| Eugenio Torres-Oyola | Certified Public Accountant | February 2015 |
| Maria A. Veras-Fernández[*] | Education Administration Officer | (2) |
| Roberto Volckers Esteves, P.E. | Former Director of the Electric System at the Authority | (1) |

---

[1] Mr. Ortiz Vázquez and Mr. Volckers Esteves were appointed by the Governor in November 2011 and are pending confirmation by the Senate.

[2] Mrs. Veras Fernández's term ended in October 2009, but she will continue to serve as a member of the Governing Board until her successor is appointed.

The Board appoints an Executive Director who is the chief executive officer of the Authority and is responsible for the general operation of the Authority.

*Otoniel Cruz Carrillo* was appointed Executive Director on October 3, 2011. Mr. Cruz has 28 years of service with the Authority. Prior to this appointment, he was the Director of Customer Service. Mr. Cruz has also occupied various positions in Client Service, Budget, Finance and the Authority's Employees Retirement System. Mr. Cruz is also President of the Employees Retirement System's Board of Trustees. Mr. Cruz holds a Master in Business Administration degree with a concentration in finance.

Other principal officers of the Authority include the following:

*Nelson Morales,* Director of Finance, was appointed to this position on October 3, 2011. Prior to his appointment at the Authority, Mr. Morales was the Chief Financial Officer for the Puerto Rico Ports Authority from May 2010 to September 2011 and Deputy Executive Director at the Municipal Revenues Collection Center from May 2009 to May 2010. Prior to joining the public sector, Mr. Morales held various management positions for over 20 years in the financial services industry in Puerto Rico and on Wall Street, with Lehman Brothers, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Citigroup Financial Services Corporation.

*Raúl Burgos Santiago*, Director of Transmission and Distribution, is a Professional Electrical Engineer. During his 28 years of service with the Authority, Mr. Burgos has occupied various positions, including Head of the Electrical Distribution Division, Regional Administrator of Technical Operations in Caguas and Ponce, and Superintendent – Distribution Engineering Department.

*Josué A. Colón Ortiz,* Director of Generation, is a Professional Mechanical Engineer with 24 years of service at the Authority. During that time, he has occupied various positions, including Mechanical Design Engineer, Maintenance Engineer, Head of the Power Plants Maintenance Projects Department, Electrical System Outage Manager, Superintendent of the Mechanical Maintenance Machine Shops, Head of the Palo Seco Power Plant and Director of the Electric System.

From January 13, 2009 to October 2010 he occupied the position of Generation, Transmission and Distribution Director, with a new organizational model that consolidated in one area the Engineering Directorate, the Electric System Directorate and the Transmission and Distribution Directorate. This area was responsible for the generation, transmission and distribution of the electric energy in Puerto Rico.

Since September 2010, he is the Director of Generation in charge of the electric system, and member of the Vía Verde Project Committee.

*Félix Echeandía Costa,* Director of Customer Service, was appointed to this position on October 3, 2011. Mr. Echeandía has 27 years of service with the Authority. Prior to this appointment, he was the Head of the Customer Service Division and also occupied various positions at the Authority, including Government Accounts Manager, Commercial Business Process Analyst and Financial Analyst. Mr. Echeandía holds a Master in Business Administration with a concentration in Accounting.

*Justo González,* Director of Planning and Environmental Protection, is a Professional Engineer with 23 years of service with the Authority. During his tenure, Mr. González has occupied various positions at the Authority, including the following positions at the Aguirre Steam Plant: Steam Plant Operation Manager, Acting Power Plant Manager, Power Plant Operation Engineer, Steam Plant Outage Coordinator and Steam Plant Shift Engineer.

*Richard Cruz-Franqui, Esq.,* Director of Legal Affairs, was appointed to this position on November 27, 2011. Prior to his appointment at the Authority, Mr. Cruz was an attorney in private practice and also held positions at the Employees Retirement System of the Government of Puerto Rico and the Department of Education. Mr. Cruz holds a Juris Doctor from the Interamerican University of Puerto Rico and a Bachelor of Science degree from the University of Puerto Rico.

*Astrid I. Rodriguez Cruz,* Director of Human Resources and Labor Affairs, holds a Juris Doctor and a Bachelor's Degree in Business Administration, with a concentration in Industrial Management, and has approximately 13 years of service with the Authority. She has occupied various positions at the Authority, including Head of the Opinion, Legislation and Contract Division, Director of Human Resources, and Acting General Counsel.

The Authority retains the firm of URS Corporation, successor to the Washington Division of URS Corporation, as the consulting engineers (the "Consulting Engineers") to perform certain responsibilities under the Trust Agreement. Washington Division of URS Corporation was formed in November 2007 following the acquisition by URS Corporation of Washington Group International, Inc. In January 2010, URS Corporation elected to use only its corporate name to identify all its operating divisions. The Consulting Engineer's responsibilities include submitting an annual report to the Trustee by November 1 of each year setting forth their recommendations: (a) as to any necessary or advisable revisions of the Authority's rates and charges, (b) as to the amount that should be deposited monthly by the Authority during the ensuing fiscal year to the credit of various funds established under the Trust Agreement for the purposes specified in the Trust Agreement, and (c) as to any advice and recommendations as they deem advisable. The most recent Consulting Engineers report is the Thirty-Eighth Annual Report for fiscal year 2011. A copy of this report is available on the Authority's website