All Authority facilities required to have FRPs have these plans in place in accordance with EPA regulations.

*Hazardous Substances and Wastes*

The Authority's operations may be regulated or impacted by various federal laws, and their Commonwealth counterparts, related to the handling of hazardous substances and wastes, including petroleum and related substances. Following, we provide a summary of these laws as a background.

The Oil Pollution Act ("OPA") imposes substantial penalties for spills of oil or EPA listed hazardous substances into bodies of water and for the failure to report such spills. In addition, OPA imposes strict liability on certain responsible parties for the cleanup of oil spills in bodies of water. CERCLA, on the other hand, also imposes strict liability to certain potentially responsible parties for damages and remedial action related to contamination caused by hazardous substances. Under CERCLA liability, which is strict, joint and several, can be imposed on any generator of hazardous substances who arranged for disposal or treatment at the affected facility. As such, potentially responsible parties can be held liable for cleanup costs associated with Superfund actions.

CERCLA provides for reporting requirements to cover the release of hazardous substances generally into the environment, including water, land and air. When these substances are processed, stored, or handled, reasonable and prudent measures must be employed to prevent a release to the environment. In addition, pursuant to the Toxic Substances Control Act, EPA has issued regulations imposing stringent requirements for labeling, handling, storing and disposing of polychlorinated biphenyls ("PCB") and associated equipment. There are regulations governing PCB notification and manifesting, restrictions on disposal of drained electrical equipment, spill cleanup, recordkeeping requirements, among other things.

Moreover, under EPCRA, which forms part of CERCLA, entities that store or manage hazardous chemicals in specified quantities must comply with a program of emergency planning and a community right-to-know designed to inform the public about routine chemical hazards present at the facilities. Both programs have stringent enforcement provisions. Among other things, EPCRA requires reporting of hazardous chemicals by means of Tier I and/or Tier II reports that are filed with EPA and other public entities.

Furthermore, pursuant to the Resource Conservation and Recovery Act ("RCRA"), the EPA has the authority to control hazardous waste from the "cradle-to-grave." This includes the generation, transportation, treatment, storage, and disposal of hazardous waste. RCRA also set forth a framework for the management of non-hazardous solid wastes, and includes provisions that enable EPA to address environmental problems that could result from underground tanks storing petroleum and other hazardous substances. Certain waste, including spent boiler cleaning solutions, waste solvents and certain waste oils generated by the Authority may be considered hazardous wastes under RCRA.

*Hazardous Chemicals Reporting*

The Consent Decree required the Authority to submit past due Tier I or Tier II reporting for hazardous chemicals and to continue to file these reports as required by EPCRA. The Authority met these requirements of the Consent Decree and is currently in compliance with Tier II reporting requirements.

### PCB Program

The Authority has completed a ten-year EPA-mandated program to sample and test its oil-filled transformers and other equipment in order to identify and dispose of transformers with more than 49 parts per million (ppm) of PCB.  Pursuant to this program, the Authority has completed the removal and disposal of PCB transformers with PCB concentrations of more than 499 ppm.  The Authority continues with the removal and disposal of transformers with PCB concentrations of between 50 and 499 ppm.  As of March 2012, the Authority had 179 PCB contaminated transformers remaining to be disposed of.  The Authority is in compliance with the regulations governing the handling and disposal of PCB.

As mentioned, the Authority is also in the process of removing PCB impacted soils at its Palo Seco power plant pursuant to an EPA Administrative Agreement and Order on Consent.  For more information on this matter, please see "Environmental Litigation and Administrative Proceedings" above.

### Asbestos Abatement

The Authority identified asbestos containing materials ("ACM") in the insulation of its power plants, at units, control rooms, mezzanines, warehouses, administrative buildings, auxiliary equipment and pipelines.  ACM is regulated under solid waste regulations as well as air quality control regulations (due to its potential to emit harmful particles into the air).  The Authority has developed an ACM removal program which provides for the encapsulation or removal of ACM on an ongoing basis to reduce the risk of exposure.    The Authority is currently in compliance with this program, and continues to work to encapsulate or gradually remove ACM.  The Authority understands that the risk of exposure to ACM is minimal given that most ACM is located in areas that are not accessible to employees.  The removal is conducted gradually and, as conditions allow, given that most ACM can only be removed when units are taken out of operation for repairs and other activities.

### Underground Storage Tank Regulations

Pursuant to RCRA, EPA has issued regulations establishing standards and corrective action requirements applicable to underground storage tanks ("USTs") that store regulated materials, including petroleum and related substances.    EQB has issued regulations essentially mirroring the federal requirements and has been delegated the implementation of this program.  These regulations establish requirements governing registration and operation of USTs and related recordkeeping, among other things.  As previously mentioned, the Consent Decree required the Authority to ensure all USTs at its facilities that were closed met applicable UST closure requirements.    The Authority has met these requirements of the Consent Decree.  The Authority understands that all of the Authority's USTs that are currently in use are in compliance with applicable UST requirements.

### Homeland Security

The Department of Homeland Security ("DHS") has promulgated regulations under the Homeland Security Act of 2002 relating to anti-terrorism standards at major industrial facilities.  Facilities that store or process chemicals in quantities exceeding established thresholds must submit a screening assessment to the DHS.  Based on these assessments, the DHS may impose additional requirements, including a screening vulnerability assessment and a Site Security Plan.

The following Authority generation facilities are subject to the requirements of the Homeland Security Act of 2002 and DHS regulations: San Juan Generation Complex, Aguirre Generation Complex, Palo Seco Power Plant, Cambalache Power Plant, and Mayaguez Mayagüez Power Plant.  As required by

law, these generation facilities are supervised by the US Coast Guard and each one has a designated security officer and a facility security plan.

DHS has also recommended that these Authority generation facilities participate in the Site Assistance Visits program. The Authority has currently scheduled a visit to one of the generation facilities located in Puerto Rico's southern region (i.e., Costa Sur Power Plant or Aguirre Generation Complex). The Authority is also planning to schedule Site Assistance Visits to the Palo Seco Power Plan and the San Juan Generation Complex, subject to the availability of DHS resources. No other requirements have been imposed by the DHS on the Authority or its generation facilities.

### *Capital Improvement Program*

The Authority's capital improvement program for the fiscal year which ended June 30, 2011 included $13.6 million in order to comply with existing Commonwealth and federal environmental laws and regulations, including the South Coast plant related projects in compliance with the CWA sections 316(a) and 316(b) previously discussed. Actual expenditures for the 2011 fiscal year totaled approximately $8.1 million. The Authority's five-year capital improvement program for fiscal years 2012 through 2016 identifies environmental projects valued at $63.5 million. During fiscal year 2012, approximately $10.2 million is budgeted for environmental projects. Approximately one quarter of the 2012 budget is dedicated to asbestos abatement, $3 million is budgeted for the CWA Section 316 projects at the South Coast plant, $1 million is budgeted for the refurbishment of fuel storage tanks at the Aguirre Plant, $1 million is budgeted to the PCB removal action at Palo Seco, and $1 million is budgeted for the SPCC compliance program. The South Coast Section 316 projects are budgeted to cost $23 million over five years ending in fiscal year 2016. The Authority believes it is taking the necessary steps to comply with all applicable environmental laws and regulations and the terms of the Consent Decree requirements, as discussed above.

## INSURANCE

### Coverage

The Authority maintains, among others, insurance policies covering all-risk property (excluding transmission and distribution lines other than underground lines), boiler and machinery and public liability. The combined insurance coverage of these policies is $750 million, consisting of a maximum of $200 million under the all-risk property insurance policy, $175 million under the boiler and machinery insurance policy, an excess layer of $100 million under an all-risk and boiler and machinery insurance policy and $250 million under an excess umbrella policy.

The policies' self-retention in case of earthquake and windstorm losses is $25 million and $75 million, respectively, and $2 million for all other covered risks. The boiler and machinery insurance policy has a $25 million deductible.

The proceeds of the all-risk property and boiler and machinery policies are used prior to drawing upon the Reserve Maintenance Fund or the Self-insurance Fund established under the Trust Agreement.

The Authority's business interruption insurance covers up to $200 million, with the Authority covering the costs of the first 30 days.

The general liability policy covers property damage and bodily injury to third parties with a $75 million aggregate limit in excess of the self-retention limit of $1 million per occurrence. The general liability policy has a $1 million deductible per occurrence with a $2 million aggregate.

As with all electric utilities located on the east coast of the United States, the Authority's transmission and distribution facilities are susceptible to adverse weather conditions, such as hurricanes. The Authority is currently self-insured with respect to property damage for its transmission and distribution systems, as are most U.S. utilities. While the Authority and the Consulting Engineers believe that the Authority's reserves are generally sufficient, there can be no assurance that the Authority will be able to provide adequate coverage for damage that might be incurred as a result of any future adverse weather conditions.

In the Authority's opinion, its insurance coverage adequately protects it against property damage or bodily injury resulting from the possession, operation and maintenance of the System.

The State Insurance Fund, a Commonwealth agency which provides worker's compensation insurance, is funded by mandatory contributions from the Authority.

**Self-insurance Fund**

The Authority has supplemented the Trust Agreement to create a Self-insurance Fund, which is funded from Net Revenues (after deposits to the Sinking Fund and the Reserve Maintenance Fund) in the amounts recommended from time to time by the Consulting Engineers. The Authority has no obligation to make deposits to, or to replenish, the Self-insurance Fund in the event of withdrawals therefrom, except to the extent recommended by the Consulting Engineers. Amounts on deposit in the Self-insurance Fund are also available for the payment of principal of and interest on the Power Revenue Bonds. As of March 20, 2012, approximately $85.0 million was on deposit in the Self-Insurance Fund. See "Disposition of Revenues" under Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Fire Prevention Program**

In an effort to reduce the Authority's risk profile, the Authority continually evaluates industry practices and implements programs geared towards minimizing the Authority's losses. As part of this effort, on March 25, 2010, the Authority implemented a fire prevention program with the principal goal of preventing and minimizing the risks of fire in its power generation plants and protecting the lives of its personnel and its property. The program integrates and standardizes actual fire prevention and protection protocols to safeguard the Authority's personnel and the power generation infrastructure, while having designated and competent staff at each facility. The program dynamically maintains and improves the fire protection equipment in the generating plants and includes on-going training of designated staff at each facility. The designated staff is responsible for the certification and maintenance of the fire protection systems located at the Authority's power plants, the compliance of the operational emergency plan, and coordinating resources for an immediate and effective response facing an emergency.

## LABOR RELATIONS

As of December 31, 2011, the Authority had 8,639 employees. Four local unions represented 5,996 employees. The remaining 2,643 employees were members of the executive, managerial, and administrative staff. The Electrical Industry and Irrigation Workers Union or "UTIER" represented 4,737 employees engaged in operations and maintenance. The Insular Union of Industrial and Electrical Construction Workers or "UITICE" represented 888 construction workers. The Professional Employees Independent Union or "UEPI" represented 365 professional employees. The Electric Power Authority Pilots Union or "UPAEE" represented the 6 pilots employed by the Authority.

The Authority has in effect collective bargaining agreements with each of these unions. The Authority believes that labor relations are stable. The Authority is currently honoring all collective bargaining agreements. The UTIER agreement expires on August 24, 2012. The UITICE agreement expired on January 26, 2011, the UEPI agreement expired on December 13, 2010 and the UPAEE agreement expired on July 2, 2010. The Authority is currently negotiating a new contract with all four unions. These negotiations are in advanced stages. All negotiations are proceeding in an orderly and constructive manner.

Of the Authority's 8,639 employees as of December 31, 2011, 5,823 are employed in the generation, transmission and distribution facilities directorate, 1,541 are employed in the customer service directorate, and the remaining employees are employed in the administrative directorates and other areas. In order to improve the productivity of its employees, the Authority has instituted various programs to reduce absenteeism, increase safety measures, and minimize the level of illegal drug abuse among its employees. In addition, the Authority continues to implement programs to provide both technical and supervisory training to its employees. The Authority believes that the implementation of these programs helps the Authority provide service that is more reliable to its clients.

## PENSION PLAN

The Employees' Retirement System of Puerto Rico Electric Power Authority (the "Retirement System"), a separate trust fund created by the Authority, administers the Authority's defined benefit pension plan, which provides employee retirement and death benefits. The pension plan provides for contributions by both the Authority, based on annual actuarial valuations, and the plan members. The most recent actuarial valuation was conducted as of June 30, 2010. As of June 30, 2010, the Retirement System had 18,008 members, consisting of 9,127 retirees currently receiving benefits, 73 terminated employees entitled to but not yet receiving benefits and 8,808 active members. In addition, the Retirement System had 2,143 beneficiaries. The Authority's accrued liability contributions are determined based on a percentage of covered payroll recommended by the Retirement System's actuaries to liquidate the unfunded actuarial accrued liability over a 30-year period that commenced on June 30, 2010. Covered payroll includes all elements of compensation paid to active employees on which contributions to the Retirement System are made.

The contributions recorded by the Authority for fiscal years 2010 and 2011 were $69.9 million and $85.3 million, respectively. All of these contributions have been paid. For fiscal years 2010 and 2011, the recorded contributions represented 19.7% and 23.80%, respectively, of covered payroll. For fiscal year 2012, the Authority's contributions to the Retirement System will be approximately 23.86% of covered payroll. Employee contributions and other withholdings are being paid to the Retirement System on a current basis. As of June 30, 2010, the present value of the Authority's future contributions on account of benefits was approximately $1.4 billion.

The table below shows the funding shortfalls for each of the last five fiscal years for the Retirement System.

**Funding Shortfalls**
**(in millions)**

| Fiscal Year Ending June 30, | Employer and Member Contributions | System Benefit Payments and Administrative Expenses | Net Funding Shortfall |
|---|---|---|---|
| Employees Retirement System | | | |
| 2007 | $109.6 | $(176.9) | $(67.3) |
| 2008 | $112.1 | $(181.0) | $(68.9) |
| 2009 | $116.5 | $(190.6) | $(74.1) |
| 2010 | $106.8 | $(204.3) | $(97.5) |
| 2011 | $122.4 | $(198.6) | $(76.2) |

Unfunded actuarial accrued liability to be borne entirely by the Authority was approximately $1.4 billion as of June 30, 2010.  The actuarial valuation for fiscal year 2010 used a closed amortization period based on a level percent of pay, assumed an investment return of 8.5% per annum, a payroll growth rate of 4% per year, projected salary increases of 4.00% per year, an inflation rate of 3.0% per year, and a remaining amortization period of 30 years for the unfunded accrued liability.

The following table shows, for the five fiscal years ended June 30, 2010, the Retirement System's actuarial accrued liability, unfunded actuarial accrued liability, covered payroll and the ratio of the unfunded actuarial accrued liability to covered payroll.

| Fiscal Years Ending June 30, | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability ("UAAL") | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|
| 2006 | $2,279,988,278 | $ 877,400,654 | $349,182,982 | 251.3% |
| 2007 | 2,313,124,627 | 825,592,169 | 348,928,666 | 236.6% |
| 2008 | 2,336,944,425 | 765,743,108 | 362,892,937 | 211.0% |
| 2009 | 2,497,639,122 | 980,288,838 | 364,402,800 | 269.0% |
| 2010 | 2,816,370,702 | 1,401,686,298 | 357,405,428 | 392.2% |

The following table shows, for the five fiscal years ended June 30, 2010, the Retirement System's actuarial value of assets and market value of assets and the historical funded ratios using the actuarial and market value of assets.  A five-year smoothing of the market value of assets is used for actuarial valuation purposes.  Thus, in a declining market, such as in 2008 and 2009, the actuarial value of assets exceeds the market value of assets as there are unsmoothed losses that are not yet reflected in the actuarial value of assets.

| Fiscal Years Ending June 30, | Actuarial Value of Assets | Market Value of Assets | Funded Ratio (actuarial value) | Funded Ratio (market value) |
|---|---|---|---|---|
| 2006 | $1,402,587,624 | $1,458,002,168 | 61.5% | 63.9% |
| 2007 | 1,487,532,458 | 1,598,941,337 | 64.3% | 69.1% |
| 2008 | 1,571,201,317 | 1,447,914,296 | 67.2% | 62.0% |
| 2009 | 1,517,350,284 | 1,130,683,460 | 60.8% | 45.3% |
| 2010 | 1,414,684,404 | 1,140,467,954 | 50.2% | 40.5% |

The increase in the ratio of the unfunded actuarial accrued liability to covered payroll for fiscal years 2009 and 2010 and the decrease in the funded ratios show deterioration in the financial strength of the Retirement System partly as a result of the effect on the Retirement System's investment portfolio of the general market decline during 2008 and 2009.  During fiscal years 2010 and 2011, however, the Retirement System's investment portfolio had positive returns of approximately 9.5% and 20.4%, respectively.  As of June 30, 2011, the market value of assets increased to $1.3 billion, a 12.8% increase from fiscal year 2010.  As a result of the plan's low funded ratio and the funding shortfalls referred to above, and depending on the actual return on the plan's assets compared to the assumed return in the

actuarial valuation, the Authority may have to increase its annual contribution to the plan in order for the plan to be able to keep making benefit payments at current levels on a long-term basis.

The Retirement System's financial statements are audited by a firm of independent public accountants that does not serve as independent accountants to the Authority.

## OTHER POST-EMPLOYMENT BENEFITS

In addition to the pension benefits, the Authority provides non-pension post-employment benefits to retirees under a Healthcare Plan that consist of a fixed maximum monthly payment to cover medical expenses for retired employees meeting the service eligibility requirements. Based on this Plan's features, it is treated as a single-employer defined benefit healthcare plan. These benefits are funded by the Authority on a "pay-as-you-go basis," which means that there is no reserve or pool of assets against the benefit expenses that the Authority may incur in future years. For fiscal year 2011, the Authority paid $22.1 million for these non-pension post-employment benefits for its eligible retirees, which is included in administrative and general expenses. For fiscal year 2012, these benefits are also expected to amount to $23.9 million.

In accordance with the provisions of GASB Statement No. 45, the Authority is required to quantify and disclose its obligations to pay non-pension post employment benefits to current and future retirees. The most recent actuarial valuation report for these benefits, as of July 1, 2010, reflects a UAAL of $612.7 million with respect to these benefits, and the funding ratio is 0% since, as mentioned previously, these benefits are funded on a "pay-as-you-go basis."

## LITIGATION

*General.* The Authority is a defendant or codefendant in numerous legal proceedings pertaining to matters incidental to its business and typical for an electrical utility of its size and nature, including claims for damages due to electrified wires, failure to supply power and fluctuations in the power supply. Pursuant to the Act, the Authority is authorized to sue and be sued by individuals or legal entities.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors, executive directors and employees of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under the provisions of Act No. 9 in cases before federal court, but in all other cases the Secretary of Justice of the Commonwealth may determine whether, and to what extent, the Commonwealth will assume payment of such judgment. Although the Authority's directors, executive director and employees are covered by the provisions of Act No. 9, Article 19 of Act No. 9 requires the Authority to cover the costs associated with judgments, expenses and attorneys' fees incurred by the Commonwealth in the legal representation of its directors, executive director and employees. To the extent the Authority is unable to cover these costs and expenses, the Authority would be required to reimburse the Commonwealth from future revenues, as provided by the Secretary of the Treasury of the Commonwealth in consultation with the Authority's board of directors.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following paragraphs, as of June 30, 2011, the Authority has included in its financial statements reported liabilities of approximately $23.9 million for awarded and anticipated unfavorable judgments. Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts

claimed against the Authority exceed $700 million; however, the ultimate liability cannot be presently determined. The Authority believes that none of these cases, if decided against the Authority, would have a material adverse effect on the Authority's financial condition or operations.

*Abengoa Litigation.* In May 2000, Abengoa, Puerto Rico, S.E., the Authority's original contractor for the construction of the new generating units (Units 5 and 6) at the San Juan power plant, unilaterally declared a termination of the contract and filed a complaint for breach of contract. The Authority filed a counterclaim for breach of contract and for all damages caused to the Authority by the contract termination. On September 21, 2007, the Regional Administrating Judge for the Superior Court of San Juan certified the case as complex civil litigation pursuant to the Authority's petition. On July 27, 2011, Mr. Angel F. Rossy Garcia, a retired Commonwealth appeals court judge, was named as special master for the case. After his appointment, the special master intervened as a neutral evaluator for purposes of assisting the parties in reaching a potential settlement. The parties filed their respective position papers stating their legal contentions and case theories in August 2011. After reviewing the position papers and meeting separately with each party to discuss the strength and weakness of their respective cases, the parties were unable to reach a settlement agreement. The special master then determined that the contested issues would be resolved at trial and that the case would be bifurcated into two phases: a liability phase that would determine whether the termination was wrongful and a damages phase. The Authority continues to defend this claim vigorously, and has raised various defenses thereto. At the current stage, however, the Authority cannot predict with any certainty the outcome of this case or the range of potential loss, if any. In order to mitigate its possible losses, the Authority entered into an agreement with Washington Engineers P.S.C. for the completion of such generating units, which units entered into service in 2009. Preliminary expert reports have been developed assessing potential damages to be recovered from Abengoa, including excess amounts billed to the Authority prior to the wrongful termination.

*Aguas Puras del Caribe Litigation.* In 2010, Aguas Puras del Caribe filed suit against the Authority alleging that the Authority negotiated in bad faith and created a reasonable expectation that the negotiation of a contract to provide certain of the Authority's generation facilities with demineralized water for a term of 25 years would lead to the execution of a final and binding agreement. Aguas Puras seeks damages of approximately $40 million. The case is currently in the discovery stage.

*CAPECO Litigation.* In 2009, a large fire at a tank farm owned by CAPECO caused major damage to surrounding areas. The Authority stored some of its fuel at this facility. In the aftermath of the fire, numerous claims were filed against CAPECO. Some of the plaintiffs included the Authority as a defendant in these suits, alleging that the Authority failed in its duty (as the owner of fuel stored at the site) to properly monitor CAPECO's operations in the tank farm. All cases are in the initial stages and the Authority intends to vigorously defend against these claims. On August 12, 2010, CAPECO filed for bankruptcy. As a result thereof, all proceedings against CAPECO have been stayed. The proceedings against the Authority continue.

*Comptroller Report Related Litigation.* In June 2004, the Office of the Comptroller of the Commonwealth of Puerto Rico issued a report stating that the Authority overcharged its clients by approximately $49.8 million, and should reimburse this amount to such clients. On June 17, 2004, the President of the Governing Board of the Authority sent a written response to the Comptroller and issued a press release in which the Authority denied that any overcharges were made. The Authority's position is that the Comptroller incorrectly based his conclusion on data that is not relevant to the calculation of the Authority's rates, and that the Authority's rates were properly established in accordance with applicable laws and regulations. In particular, the Authority notes that its tariffs properly take into consideration the cost of the fuel used by the Authority's generating facilities and the cost of the electricity purchased from the two co-generating facilities that sell power to the Authority. See *Rates* under THE SYSTEM above.

After this report was made public, seven lawsuits were filed separately by different plaintiffs against the Authority demanding the reimbursement of such alleged overcharges, but the court ordered that all cases be consolidated. Plaintiffs sought certification of a class in order to proceed as a class action, but such request was denied by the trial court and the denial affirmed by the Court of Appeals (and certiorari was denied by the Puerto Rico Supreme Court). Following denial of certiorari, several of the plaintiffs voluntarily dismissed their cases. Given the failure of the plaintiff to certify a class, it is anticipated that if the suits of the remaining plaintiffs continue to trial, the total amounts awarded would not exceed $1 million. The court also ordered that the case be classified as a complex litigation. The Authority believes that the allegations of the complaints are similar to those made in a previous lawsuit in which the Authority prevailed on the merits of the case.

*Compute All, Inc. Litigation*. In 2008, Compute All, Inc. filed suit against the Authority, alleging breach of contract and damages due to the unlawful termination of a contract pursuant to which Compute All, Inc. would provide the Authority with a computer-based motor vehicle fleet management system, including global positioning system capabilities. Compute All seeks damages of $8.25 million plus the payment of expenses and attorneys' fees. The case is currently in the discovery stage.

*Consumer Billing Litigation*. In 2011, separate lawsuits were filed against the Authority by various consumers claiming damages allegedly caused by incorrect and unlawful billing and invoicing practices. The consumers are claiming damages in excess of $100 million. The Authority has requested that all cases filed by consumers regarding this matter be consolidated, while each respective consumer is currently seeking class certification from the court. The court has neither ruled on the Authority's consolidation request nor on the class certification matter. The Authority believes it is likely that these cases will be consolidated and certified as complex litigation under the local rules. Once the cases are consolidated and certified as complex litigation, the discovery stage of the class certification request will begin. The Authority believes that the allegations of the complaints are similar to those made in a previous lawsuit in which the Authority prevailed on the merits of the case and that these cases should be treated similarly as those described under *Comptroller Report Related Litigation* above. The case is currently in the discovery stage.

*Power Technologies Corp. Litigation*. In 2008, Power Technologies Corp. filed suit against the Authority, alleging that the Authority had withdrawn from a contracting process for a new energy facility, in which Power Technologies was involved, without explanation or justification. Power Technologies seeks damages of $52.4 million. The case is currently in the discovery stage.

*Vitol, Inc. Litigation*. In 2009, the Authority filed suit in Commonwealth court against Vitol, Inc. and certain of its affiliates and subsidiaries seeking a declaratory judgment as to the nullity of a $2 billion fuel supply agreement due to Vitol's failure to disclose certain corruption cases for which it accepted responsibility. Vitol removed this suit to federal court and presented a counterclaim alleging that the Authority owed it approximately $45 million, consisting of $28 million in fuel that was delivered to, and used by, the Authority and approximately $17 million in excise taxes to be reimbursed to Vitol by the Authority. Although the case is currently in the discovery stage, the court has stayed this process until such time as certain motions regarding forum selection have been resolved.

*Ponce Landslide Litigation*. In 2007, 2008 and 2009, six cases were filed against the Authority, PRASA, and other entities alleging damages resulting from landslides in a neighborhood in Ponce. The complaints allege that the Authority caused or contributed to the landslides based on its construction of transmission lines in the area. In total, the six plaintiffs have claimed approximately $19.5 million in damages. These cases, which are in the discovery stage, have been stayed by the court due to the bankruptcy of PRASA's insurer. Once proceedings in this case resume, the Authority will continue with its vigorous defense.

*Environmental Litigation.* Among the cases currently pending, some deal with environmental issues. These are described above in *Environmental Litigation and Administrative Proceedings* under ENVIRONMENTAL MATTERS.

*Litigation Regarding the Bonds.* There is no pending litigation seeking to restrain or enjoin the sale of the Bonds or contesting or affecting the validity of the Bonds, the proceedings of the Authority taken with respect to the authorization, issuance or sale of the Bonds, or the pledge or application of any moneys under the Trust Agreement or the existence or powers of the Authority.

## TAX MATTERS

### Federal Income Taxes

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the resolution authorizing the Bonds and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 (the "Tax Certificate"), the Authority has covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Authority has made certain representations and certifications in the resolution authorizing the Bonds and the Tax Certificate. Bond Counsel will not independently verify the accuracy of those representations and certifications.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Authority described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

### State Taxes

Bond Counsel is also of the opinion that, under existing statutes, interest on the Bonds is exempt from state, Commonwealth and local income taxation. Bond counsel expresses no opinion as to other state, Commonwealth or local tax consequences arising with respect to the Bonds.

### Original Issue Discount

Bond Counsel is further of the opinion that the difference between the principal amount at maturity of the Series 2012A Bonds maturing on July 1, 2029 bearing interest at a rate of 4.80%, July 1, 2042 bearing interest at a rate of 5.00%, and July 1, 2042 bearing interest at a rate of 5.05% (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2012A Bonds. Further, such original issue discount accrues actuarially on a

constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

**Original Issue Premium**

The Bonds maturing on July 1, 2016 bearing interest at a rate of 2.50%, July 1, 2016 bearing interest at a rate of 5.00%, and July 1, 2029 bearing interest at a rate of 5.00% (collectively, the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium). For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year. The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Bonds. Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

**Ancillary Tax Matters**

Ownership of the Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit. Ownership of the Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Bonds. Prospective investors are advised to consult their own tax advisors regarding these rules.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations. In addition, interest on the Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described in the opinion attached as Appendix IV. Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

**Changes in Law and Post Issuance Events**

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Bonds. This could result from changes to Federal or state income tax rates, changes in the structure of Federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Bonds from gross income for Federal or state income tax purposes, or otherwise. For example, in September, 2011, the President released legislative proposals that would, among other things, subject interest on tax-exempt bonds (including the Bonds) to a federal income tax for taxpayers with incomes above certain thresholds for tax years beginning after 2012. It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the Federal or state income tax treatment of holders of the Bonds may occur. Prospective purchasers of the Bonds should consult their own tax advisers regarding the impact of any change in law on the Bonds.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Bonds may affect the tax status of interest on the Bonds. Bond Counsel expresses no opinion as to any Federal, state or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey Demgen & Moore will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Series 2012B Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Bonds, and (2) the computations of yield on both the securities and the Series 2012B Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Series 2012B Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Series 2012B Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $4,153,778.50 from the initial public offering prices of such bonds. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent. The Underwriters will be obligated to purchase all the Bonds, if any such bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed, from time to time, by the Underwriters. The Authority has agreed to indemnify the Underwriters, to the extent permitted by law, against certain liabilities, including liabilities under federal securities laws, or to contribute to payments that the Underwriters may be required to make in respect thereof.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future

perform, various investment banking services for the Authority, the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Authority, the Commonwealth and/or its instrumentalities.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Barclays Capital Inc. and Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of BMO Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal. BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the United States capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto

Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the United States capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities LLC ("Santander Securities") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or United States issuances. Santander Securities and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

RBC Capital Markets, LLC ("RBC") and BBVAPR División de Valores Municipales ("BBVAPR MSD") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, RBC and BBVAPR MSD share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## MATERIAL RELATIONSHIPS

URS Corporation serves as the Consulting Engineers to the Authority under the provisions of the Trust Agreement. The Authority entered into a professional services agreement with Washington Engineers P.S.C., an affiliate of URS Corporation, to provide services to the Authority in connection with the construction of the San Juan 5 and 6 combined cycle generating units completed during fiscal year 2009 and the restoration of the Palo Seco plant following the fires in December 2006.

Citibank, N.A., an affiliate of Citigroup, an underwriter for the Bonds, has provided to the Authority a revolving line of credit for the purchase of fuel oil and power with an approved maximum principal amount of $235 million as of December 31, 2011, of which $150 million was outstanding as of that date.

Scotiabank, an affiliate of Scotia MSD, an underwriter for the Bonds, has provided to the Authority a revolving line of credit for the payment of working capital expenses, with an approved maximum principal amount of $150 million as of December 31, 2011, of which the full amount had been drawn and was outstanding as of that date.

Banco Popular de Puerto Rico ("BPPR"), an affiliate of Popular Securities, Inc., an underwriter for the Bonds, has provided to the Authority a term loans with an aggregate outstanding principal amount of approximately $25.0 million as of December 31, 2011, that is syndicated among BPPR, FirstBank Puerto Rico and Scotiabank. BPPR also has another term loan to the Authority with an aggregate principal amount of $4.9 million as of December 31, 2011.

See also GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO.

## LEGAL MATTERS

The proposed form of opinion of Nixon Peabody LLP, Bond Counsel, is set forth in Appendix IV to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

## INDEPENDENT AUDITORS

The financial statements of the Authority as of and for the years ended June 30, 2011 and 2010 included in Appendix II hereto have been audited by Ernst & Young LLP, San Juan, Puerto Rico, independent auditors, as stated in their report appearing therein.

The prospective financial information included in this Official Statement has been prepared by, and is the responsibility of the management of the Authority. Ernst & Young LLP has neither examined nor compiled the accompanying prospective financial information, and accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto. The Ernst & Young LLP report for fiscal years 2011 and 2010 included in Appendix II to this Official Statement relates to the historical financial information of the Authority. Such report does not extend to the prospective financial information and should not be read to do so.

## RATINGS

The Bonds have been assigned ratings of "Baa1" (stable outlook) by Moody's Investors Service ("Moody's"), "BBB+" (stable outlook) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and "BBB+" (negative outlook) by Fitch Ratings ("Fitch"). Moody's ratings represent a recent downgrade from a rating of "A3." Fitch's prior rating did not have a negative outlook.

These ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies, if in the judgment of any or all, circumstances so warrant. Any such downward revision or withdrawal of either of such ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, see Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating under RISK FACTORS AND INVESTMENT CONSIDERATIONS. The Trust Agreement does not include a covenant by the Authority to maintain a specific rating with respect to the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC, the Authority has covenanted in its resolution authorizing the issuance of the Bonds for the benefit of the Beneficial Owners (as defined in such resolution and, generally, the tax owners of the Bonds):

(a) to file within 275 days after the end of each fiscal year with EMMA (http://emma.msrb.org) established by the MSRB, core financial information and operating data for the prior fiscal year, including (i) the Authority's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority's System and revenues, expenditures, financial operations and indebtedness generally found in this Official Statement (but excluding the Commonwealth Economic Report incorporated by reference herein); and

(b) to file in a timely manner not in excess of 10 business days of the occurrence of the event, with EMMA, notice of failure of the Authority to comply with clause (a) above and notice of any of the following events with respect to the Bonds:

(1) principal and interest payment delinquencies;

(2) non-payment related defaults, if material;

(3) unscheduled draws on debt service reserves reflecting financial difficulties;

(4) unscheduled draws on credit enhancements reflecting financial difficulties;

(5) substitution of credit or liquidity providers, or their failure to perform;

(6) adverse tax opinions or the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax-exempt status of the Bonds;

(7) modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

(8) bond calls, if material, and tender offers;

(9) defeasances;

(10) release, substitution, or sale of property securing repayment of the Bonds, if material;

(11) rating changes;

(12) tender offers;

(13) bankruptcy, insolvency, receivership or similar events;

(14) the consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions other than pursuant to its terms, if material; and

(15) appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to event (4) and (5), the Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

With respect to event (6) and the tax status of the Bonds, see TAX MATTERS.

With respect to event (8), the Authority does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *Mandatory Redemption* under DESCRIPTION OF THE BONDS above, (ii) the only open issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

According to the Rule, event (13) is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the United States Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other event is material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Authority has made similar continuing disclosure covenants in connection with prior bond issuances, and has complied with all such covenants, except that the Authority's audited financial statements for the fiscal year ended June 30, 2009 and material quantitative historical data on the Authority's System and finances were inadvertently not timely filed with EMMA by the deadline of April 1, 2010. The Official Statement for the Series XX Bonds, dated March 26, 2010, contained all the information required to comply with the Authority's continuing disclosure obligation and was filed with EMMA on April 5, 2010 to comply with MSRB rules and on April 13, 2010 specifically to comply with the Authority's continuing disclosure obligation.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority evidence of ownership and a written notice of and request to cure such breach, the Authority shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Authority (such as, but without limitation, the Authority's financial advisor or bond counsel); or

(b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Authority elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing summaries of or references to certain provisions of the Trust Agreement, the various acts and the Bonds are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement (i) a summary of the Trust Agreement, (ii) the financial statements of the Authority for the fiscal years ended June 30, 2011 and 2010, together with the independent accountants' report of Ernst & Young LLP, San Juan, Puerto Rico, (iii) a letter from the Authority's Consulting Engineers, URS Corporation, regarding its opinion as to certain engineering matters in this Official Statement, and (iv) the proposed form of opinion of Nixon Peabody LLP, Bond Counsel.

The information set forth in this Official Statement, except for certain information on the page following the inside cover page and the information appearing in UNDERWRITING, MATERIAL RELATIONSHIPS, Appendices III and IV, and the information pertaining to DTC was supplied by the Authority.  The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with the MSRB through EMMA.

### PUERTO RICO ELECTRIC POWER AUTHORITY

By:  _____ /s/ Otoniel Cruz Carillo _____
Executive Director

111

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX I

## DEFINITIONS OF CERTAIN TERMS AND SUMMARY OF CERTAIN PROVISIONS
## OF THE TRUST AGREEMENT

*This Appendix contains summaries of certain provisions of the Authority's Trust Agreement. This summary is not to be considered a full statement of the terms of the Trust Agreement and accordingly is qualified by reference to such Trust Agreement and subject to the full text thereof. Capitalized terms not otherwise defined herein have the meanings set forth in the Trust Agreement or the Official Statement.*

### DEFINITIONS OF CERTAIN TERMS

The following are definitions of certain terms defined in Section 101 of the Trust Agreement and used in this Official Statement.

"Amortization Accrual" means for any period the amount of an Amortization Requirement that would accrue during such period if such Requirement accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by resolution of the Authority or an agreement supplemental to the Trust Agreement, the monthly accrual in respect of an Amortization Requirement for a term bond shall commence on the first day of each month in the fiscal year for which such Amortization Requirement has been established and shall end on the first day of the month succeeding the relevant Deposit Day.

As applied to the term bonds of any Series, "Amortization Requirement" for any fiscal year means the principal amount fixed or computed for such fiscal year for the retirement of such term bonds by purchase or redemption.

The Amortization Requirements for the term bonds of each Series shall be initially the respective principal amounts for each fiscal year as fixed in a resolution of the Board adopted prior to the issuance of the bonds of such Series; provided, however, that if any additional term bonds of such Series shall be issued under the provisions of the first paragraph of Section 210 of the Trust Agreement, the respective Amortization Requirements for the term bonds of such Series shall be increased in proportion as nearly as may be practicable to the increase in the total principal amount of the term bonds of such Series. The aggregate amount of such Amortization Requirements for the term bonds of each Series shall be equal to the aggregate principal amount of the term bonds of such Series. The Amortization Requirements for the term bonds of each Series shall begin in the fiscal year determined by the Board.

If at the close of any fiscal year the total principal amount of term bonds of any Series retired by purchase or redemption, or prior to the close of such fiscal year called for redemption, shall be in excess of the amount of the Amortization Requirements for the term bonds of such Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds of such Series shall be reduced for such subsequent fiscal years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director in an order filed with the Trustee on or before the 10th day of July following the close of such fiscal year.

If at the close of any fiscal year the total principal amount of term bonds of any Series retired by purchase or redemption, or called for redemption, prior to the close of such fiscal year

I-1

shall be less than the amount or the Amortization Requirements for the term bonds of such Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds of such Series for the next succeeding fiscal year shall be increased by the amount of the excess of such deficiency over the amount then held to the credit of the Redemption Account.

It shall be the duty of the Trustee, on or before the 15th day of July in each fiscal year, to compute the Amortization Requirements for the then current fiscal year for the term bonds of each Series then outstanding. The Amortization Requirement for the then current fiscal year shall continue to be applicable during the balance of such current fiscal year and no adjustment shall be made therein by reason of term bonds purchased or redeemed or called for redemption during such current fiscal year.

"Annual Budget" means the Authority's budget of Current Expenses and Capital Expenditures for a fiscal year adopted pursuant to the provisions of the Trust Agreement.

"Board" means the governing board of the Authority as constituted from time to time and defined in the Act, or if said Board shall be abolished then the Board, body or officer succeeding to the principal functions thereof or to whom the powers of the Authority shall be given by law.

"Build America Bonds" means a series of bonds designated as "Build America Bonds" by the Authority for purposes of Section 54AA of the Code and for which the Authority has irrevocably elected pursuant to Section 54AA(g) of the Code to receive the Federal Subsidy from the United States Treasury in connection therewith under Section 6431 of the Code and apply it in accordance with the provisions of the resolution or resolutions adopted by the Board authorizing the issuance of such bonds.

"Current Expenses" means the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to capital expenditures, engineering expenses relating to operations and maintenance, fees and expenses of the Trustee and the Paying Agents, legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by the Authority under the provisions of the Trust Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of the Authority and applicable in the circumstances, but shall not include any deposits to the credit of the Sinking Fund, the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self-insurance Fund and the Capital Improvement Fund.

"Deposit Day" means the date specified in the Trust Agreement as the date by which all of the moneys then held to the credit of the Revenue Fund shall be withdrawn by the Treasurer and deposited in the manner set forth under "Disposition of Revenues" herein.

"Designated Maturity Bonds" means the indebtedness incurred by the Authority under the terms of a separate trust agreement or resolution, which indebtedness has a maturity of at least ten (10) years and is secured, as to the unamortized principal thereof, on a subordinate basis to the bonds and for which (i) no amortization of principal has been established or (ii) the aggregate amount of the amortized principal that has been established is less than the principal

amount of the indebtedness; provided that interest on said indebtedness and any amortized principal of said indebtedness may be payable on a parity, respectively, with interest on bonds and Amortization Requirements on term bonds, in which case said interest and amortized principal shall be included in the calculation of Principal and Interest Requirements on bonds for purposes of the Trust Agreement and shall otherwise be deemed to be, and be payable as, interest and Amortization Requirements on bonds for purposes of the Trust Agreement.

"Extendible Maturity Bonds" means bonds the maturities of which, by their terms, may be extended by and at the option of the bondholder or the Authority.

"Federally Subsidized Bonds" means either Build America Bonds or Other Subsidy Bonds or both, as the case may be.

"Federal Subsidy" means a payment made by the Secretary of the Department of Treasury to or for the account of the Authority pursuant to the Code in respect of a series of bonds constituting Federally Subsidized Bonds. Any Federal Subsidy to be received by the Authority in respect of such series of bonds shall be identified as such in the resolution authorizing the issuance of such series of bonds to which it relates.

"Federal Subsidy Payments" means the amount of Federal Subsidy actually paid to and received by the Trustee in respect of an interest payment for the series of Federally Subsidized Bonds to which it relates. Such Federal Subsidy Payments shall be deposited directly into the Bond Service Account in the Sinking Fund.

"Government Obligations" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government including securities evidencing ownership interests in such obligations or in specified portions thereof (which may consist of specific portions of the principal of or interest on such obligations), (ii) bonds, debentures or notes issued by any of the following Federal agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association, Federal Land Banks, or the Federal National Mortgage Association (including participation certificates issued by such Association) and (iii) all other obligations issued or unconditionally guaranteed as to principal and interest by an agency or person controlled or supervised by and acting as an instrumentality of the United States Government pursuant to authority granted by the Congress.

"Improvements" means improvements, renewals and replacements of the System or any part thereof and such extensions and additions thereto as may be necessary or desirable, in the judgment of the Board, to keep the same in proper condition for the safe, efficient and economic operation thereof and to integrate into the System any unit or part thereof, and shall include such electric-power projects as may be authorized to be acquired or constructed by the Authority under the provisions of the Act and such improvements, renewals and replacements of such properties and the System and such extensions and additions thereto as may be necessary or desirable for continuous and efficient service to the public, which shall be financed in whole or in substantial part from the proceeds of bonds issued under the provisions of the Trust Agreement or from moneys deposited to the credit of the Construction Fund or the Renewal and Replacement Fund.

"Independent Consultant" means the consultant or consulting firm or corporation at the time employed by the Authority under the provisions of the Trust Agreement to perform and carry out the duties of the Independent Consultant under the Trust Agreement.

"Interest Accrual" means for any period the amount of interest that would accrue during such period if such interest accrued ratably on the basis of a year consisting of twelve (12) thirty-day months.  Unless otherwise provided by resolution of the Authority or an agreement supplemental to the Trust Agreement, the monthly accrual in respect of interest on the bonds shall commence on the later to occur of the date of issue of the bonds of such Series and the date that is six months prior to the due date of such interest and shall end on the first day of the month following the relevant Deposit Day.

"Investment Obligations" means (i) Government Obligations, (ii) obligations of any state or territory of the United States or political subdivision thereof (other than obligations rated lower than the three highest grades by a nationally recognized rating agency), (iii) repurchase agreements with commercial banks fully secured by Government Obligations and (iv) any other investment obligations permitted for governmental instrumentalities under the laws of the Commonwealth which are rated, on the date of investment therein, in any of the three highest grades by a nationally recognized rating agency or which are collateralized by any other Investment Obligations described in the Trust Agreement

"Net Revenues" means, for any particular period, the amount of the excess of the Revenues for such period over the Current Expenses for each period.

"Other Subsidy Bonds" means bonds for which a subsidy or other payment made by the Secretary of the Department of Treasury may be made in respect of such bonds other than under Section 6431 of the Code.

"Prerefunded Municipals" means any bonds or other obligations of any state of the United States of America or Puerto Rico or of any agency, instrumentality or local governmental unit of any such state or Puerto Rico (a) which are (x) not callable prior to maturity or (y) as to which irrevocable instructions have been given to the trustee of such bonds or other obligations by the obligor to give due notice of redemption and to call such bonds or other obligations for redemption on the date or dates specified in such instructions, (b) which are secured as to principal, redemption premium, if any, and interest by a fund consisting only of cash or Government Obligations or Time Deposits, secured in the manner set forth in the Trust Agreement, which fund may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (c) as to which the principal of and interest on such Government Obligations or Time Deposits, secured in the manner set forth in the Trust Agreement, which have been deposited in such fund, along with any cash on deposit in such fund are sufficient to pay principal of and interest and redemption premium, if any, on the bonds or other obligations on the maturity date or dates thereof or on the redemption date or dates specified in the irrevocable instructions referred to in clause (a) above, as appropriate.

"Principal Accrual" means for any period the amount of principal that would accrue during such period if such principal accrued ratably on the basis of a year consisting of twelve (12) thirty-day months.   Unless otherwise provided by resolution of the Authority or an agreement supplemental to the Trust Agreement, the monthly accrual in respect of the principal of serial bonds shall commence on the first day of the twelfth month preceding the due date of such principal and shall end on the first day of the month succeeding the relevant Deposit Day,

"Principal and Interest Requirements" means, for any fiscal year, as applied to the bonds of any Series issued under the Trust Agreement, the sum of:

(a)   the amount required to pay the interest on all outstanding bonds of such Series which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year,

(b)   the amount required to pay the principal of all outstanding serial bonds of such Series which is payable after July 31 in such fiscal year and on or prior to July 31 in the following fiscal year, and

(c)   the Amortization Requirement for the term bonds of such Series for such fiscal year.

The Principal and Interest Requirements for the bonds of any Series issued under the Trust Agreement shall be determined, as required from time to time, by the Trustee.   In computing the Principal and Interest Requirements for any fiscal year for the bonds of any Series, the Trustee shall assume that an amount of the term bonds of such Series equal to the Amortization Requirement for the term bonds of such Series for such fiscal year will be retired by purchase or redemption on July 1 in the following fiscal year.

Principal and Interest Requirements on bonds shall be deemed to include the amount required to pay interest on outstanding Designated Maturity Bonds and any amortized principal of said Designated Maturity Bonds for any fiscal year, if said interest and amortized principal are payable, under the trust agreement or resolution providing for said Designated Maturity bonds, on a parity with interest and Amortization Requirements on bonds.

To the extent all or a portion of the principal of, Amortization Requirements for or interest on, any bonds of any Series are payable from moneys irrevocably set aside or deposited irrevocably for such purpose with a bank or trust company (which may include the Trustee) or from Investment Obligations irrevocably set aside or deposited irrevocably for such purpose with is bank or trust company (which may include the Trustee) or Time Deposits, secured in the manner set forth in the Trust Agreement, and irrevocably set aside for such purpose, the principal of and the interest on which when due will provide sufficient moneys to make such payments, such principal, Amortization Requirements or interest shall not be included in determining Principal and Interest Requirements; provided, however, that for purposes of compliance with the Authority's rate covenant (see "Rate Covenant" herein) said definition shall include any interest payable from any amount deposited to the credit of the Bond Service Account in the Sinking Fund from the proceeds of bonds to pay interest to accrue thereon.   The Executive Director or his designee shall deliver to the Trustee a certificate describing the principal of,

I-5

Amortization Requirements for and interest on any bonds for which moneys, Investment Obligations or Time Deposits have been set aside or deposited as described in this paragraph, and stating that such principal, Amortization Requirements and interest should not be included in determining the Principal and Interest Requirements. Upon request of the Trustee, the Authority shall cause to be delivered to the Trustee a certificate of an independent verification agent as to the sufficiency of the maturing principal amounts of any Investment Obligations or Time Deposits, together with interest thereon, set aside or deposited to pay said principal, Amortization Requirements and interest.

For purposes of determining the maximum Principal and Interest Requirements for purposes of the Trust Agreement and the aggregate Principal and Interest Requirements in the covenant as to rates contained in the Trust Agreement, on the date of issuance of a Federally Subsidized Bonds and for so long as the Trustee shall receive the scheduled amount of the Federal Subsidy Payments on or before such interest is payable, all or a portion of the interest in respect of one or more series of Federally Subsidized Bonds shall be excluded from the calculation of the Principal and Interest Requirement if, and to the extent that the interest thereon is payable from a Federal Subsidy. Notwithstanding the foregoing, if the Trustee shall not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within thirty (30) of the date such Federal Subsidy Payments were scheduled to be received under the then current applicable law and regulations, then from and after the occurrence of such failure to receive such Federal Subsidy and until such Federal Subsidy Payments shall resume and all prior deficiencies are cured, the exclusion from the calculation of the Principal and Interest Requirement set forth in the preceding sentence shall no longer be effective for purposes of determining the maximum Principal and Interest Requirements for purposes of the Trust Agreement and the aggregate Principal and Interest Requirements in the covenant as to rates contained in the Trust Agreement.

"Reserve Account Insurance Policy" and "Reserve Account Letter of Credit" mean (1) the insurance policy, surety bond or other acceptable evidence of insurance, if any, or (2) the irrevocable, transferable letter of credit, if any, respectively, to be deposited in the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, for the purpose of making the payments required to be made from the Reserve Account under the Trust Agreement. The issuer providing such insurance or letter of credit shall be a municipal bond insurer or a banking association, bank or trust company or branch thereof whose policy or bond or letter of credit results in the rating of municipal obligations secured by such policy or bond or such letter of credit, respectively, to be rated, at the time of deposit into the Reserve Account, in one of the three highest grades by (i) either Standard & Poor's Corporation or its successor, or Moody's Investors Service, Inc. or its successor or (ii) if both such corporations shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, a nationally recognized rating agency.

"Revenues" means all money received by the Authority in connection with or as a result of its ownership or operation of the System, including the income derived by the Authority from the sale of electricity generated or distributed by the System, any proceeds of use and occupancy insurance on the System or any part thereof and income from the investment of moneys under the Trust Agreement, except income from the investment of moneys in the Construction Fund,

the Capital Improvement Fund and the Subordinate Obligations Fund to the extent such income has been derived from the investment of moneys in such Fund to be used to pay Subordinate Obligations incurred to pay the cost of any work or properties which have not been included by the Authority as part of the System as provided in "Disposition of Revenues" below, and the Reserve Maintenance Fund which shall be deemed to be a part of said Funds, respectively.

"Subordinate Obligations" means any obligations of the Authority incurred as provided in "Disposition of Revenues" below.

"System" means all the properties presently owned and operated by the Authority as a single integrated system, together with all works and properties which may be after the date of the Trust Agreement acquired or constructed by the Authority in connection with the production, distribution or sale of electric energy and the acquisition or construction of which shall be financed in whole or in part from the proceeds of bonds issued under the provisions of the Trust Agreement or from moneys deposited to the credit of the Construction Fund, the Capital Improvement Fund or from Subordinate Obligations to the extent such works and properties have been included by the Authority as part of the System as provided in "Disposition of Revenues" below.

"Time Deposits" means time deposits, certificates of deposit or similar arrangements with the Trustee, Government Development Bank for Puerto Rico or any bank or trust company which is a member of the Federal Deposit Insurance Corporation having a combined capital and surplus aggregating not less than $100,000,000.

**Security for the Power Revenue Bonds**

The Power Revenue Bonds are secured by a pledge from the Authority to the Trustee of the Revenues of the System and other moneys to the extent provided in the Trust Agreement as security for the payment of the Power Revenue Bonds and the interest and the redemption premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such Power Revenue Bonds. (Trust Agreement, Section 701).

The Power Revenue Bonds shall not be deemed to constitute a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions. (Trust Agreement, Section 701).

**Issuance of Bonds Other than Refunding Bonds**

The Trust Agreement provides for the issuance of Power Revenue Bonds for Improvements, including the repayment of advances therefor, to provide moneys for deposit to the Reserve Account in the Sinking Fund (the "Reserve Account") and for any proper corporate purpose of the Authority (other than for the purpose of refunding outstanding Power Revenue Bonds), subject to the conditions and limitations in the Trust Agreement. Power Revenue Bonds may be issued, if among other things:

     (i)    the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months immediately preceding the date of the issuance of such bonds, adjusted to reflect the then current rate schedule, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds, and

     (ii)    the estimated average annual Net Revenues for each of the five fiscal years immediately following the fiscal year in which the issuance of such bonds occurs, adjusted to reflect the then current rate schedule and any rate schedule the Authority has covenanted to put in effect during such five fiscal years, shall be not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued. (Trust Agreement, Sections 208 and 209).

**Issuance of Refunding Bonds**

The Trust Agreement provides for the issuance of Power Revenue Bonds to refund or redeem prior to or at their maturities all or any part of the outstanding bonds of any Series issued under the Trust Agreement, including the payment of any redemption premium, accrued interest and financing costs and for the purpose of providing moneys for deposit to the credit of the Reserve Account, subject to the conditions and limitations set forth in the Trust Agreement. Power Revenue Refunding Bonds may be issued under the Trust Agreement if, among other things, either (i) the earnings tests described above under the caption "Issuance of Bonds Other than Refunding Bonds" for the issuance of bonds under the Trust Agreement (except that effect is given to the retirement of the bonds to be refunded) are satisfied or (ii) the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued (after giving effect to the

retirement of the bonds to be refunded) shall be less than the maximum aggregate Principal and Interest Requirements on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued). The proceeds of Power Revenue Refunding Bonds shall, to the extent practicable, be invested and reinvested by the Trustee, with the approval of the Executive Director, in Government Obligations, Prerefunded Municipals or in Time Deposits, secured in the manner set forth in the Trust Agreement, and the moneys so invested shall be available for use when required. (Trust Agreement, Section 210).

**Funds and Accounts**

*General Fund*

A special fund is created pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority General Fund" (the "General Fund"). The Authority covenants that all Revenues, other than income from investments made under the provisions of the Trust Agreement, will be deposited as received in the General Fund. The Authority covenants that moneys in the General Fund will be used first for the payment of Current Expenses of the System, and that, if the amount expended in any fiscal year for Current Expenses shall exceed the amount provided therefor in the Annual Budget, the Authority will report such excess and the reasons therefor to the Consulting Engineers and to the Trustee as soon as practicable but not later than the end of the sixth month following the month in which such excess shall have occurred. (Trust Agreement, Sections 503 and 505).

*Revenue Fund*

A special fund is created pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority Power Revenue Fund" (the "Revenue Fund"). The Treasurer of the Authority is required to transfer, on or before the 15th day of each month, from the General Fund to the Revenue Fund an amount equal to the amount of all moneys held in the General Fund on the last day of the preceding month less an amount to be held as a reserve for Current Expenses as the Treasurer may determine, equal to not more than one-sixth (1/6th) of the amount shown by the Annual Budget to be necessary for Current Expenses for the current fiscal year, such transfer to be made on the books of the Authority as of the close of the preceding month. (Trust Agreement, Section 506).

*Sinking Fund, Reserve Maintenance Fund, Self-insurance Fund, Capital Improvement Fund and Subordinate Obligations Fund*

A special fund is created pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund" (sometimes referred to in this Appendix I as the "Sinking Fund"). There are three separate accounts created in the Sinking Fund and designated the "Bond Service Account," "Reserve Account" and "Redemption Account." Four additional special funds are created  pursuant to the Trust Agreement and designated the "Puerto Rico Electric Power Authority Reserve Maintenance Fund" (sometimes referred to in this Appendix I as the "Reserve Maintenance Fund"), the "Puerto Rico Electric Power Authority Self-insurance Fund" (sometimes referred to in this Appendix I as the "Self-insurance Fund"), the "Puerto Rico Electric Power Authority Capital Improvement Fund" (sometimes referred to in this Appendix I as the "Capital Improvement Fund") and the "Puerto Rico Electric Power Authority Subordinate Obligations Fund" (sometimes referred to in this Appendix I as the "Subordinate Obligations Fund"). (Trust Agreement, Section 507).

**Disposition of Revenues**

On or before the 25th day of each month, the Treasurer shall withdraw from the Revenue Fund, all the moneys then in such Fund (less any amount equal to the amount of Federal Subsidy Payments that have not been received as of the 25th of the month preceding the Interest Payment Date to which such Federal Subsidy Payments relate, which amount will be held in the Revenue Fund and (x) if the Federal Subsidy Payment has not been received by the Authority by such Interest Payment Date, transferred to the Bond Service Account on the Interest Payment Date and applied to the payment of interest on Bonds or (y) if the Federal Subsidy Payment has been received by the Authority on or before such Interest Payment Date, remain on deposit in the Revenue Fund for application in accordance with the provisions below in the following calendar month) and deposit the moneys so withdrawn to the credit of the following Accounts and Funds in the following order:

1.　　to the credit of the Bond Service Account such amount thereof (or the entire sum so withdrawn if less than the required amount) as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of (i) the Interest Accrual on all the outstanding Power Revenue Bonds to and including the first day of the next calendar month, and (ii) the Principal Accrual on the outstanding serial bonds of each Series of outstanding Power Revenue Bonds to and including the first day of the next calendar month;

2.　　to the credit of the Redemption Account such amount, if any, of any balance remaining after making the deposit as described in Paragraph 1 above, (or the entire balance if less that the required amount) as may be required to make the amount then to the credit of the Redemption Account equal to the Amortization Accrual for the term bonds of each Series of Power Revenue Bonds then outstanding to and including the first day of the next calendar month;

3.    to the credit of the Reserve Account such amount, if any, of the balance remaining after making the deposits described in paragraphs 1 and 2 above (or the entire balance if less than the required amount) as may be required to make the amount then to the credit of the Reserve Account, including the amount of any Reserve Account Insurance Policy or any Reserve Account Letter of Credit therein, equal to the interest payable on all outstanding Power Revenue Bonds within the next ensuing 12 months; provided, however, that the monthly deposit in respect of any Series of Power Revenue Bonds, other than refunding bonds, issued under the Trust Agreement need not exceed 1/60 of the amount of the increase in the interest payable within the next ensuing 12 months resulting from the issuance of bonds of such Series, and provided, further, that if the amount so deposited in any month to the Reserve Account shall be less than the required amount for such month, the requirement therefor shall nevertheless be cumulative and the amount of any deficiency in any month shall be added to the amount otherwise required to be deposited in each month thereafter until such time as the deficiency is made up and provided, however, that in the case of Federally Subsidized Bonds, the amount of interest deemed to be payable on such bonds from the date of issuance of such Federally Subsidized Bonds and for so long as the Trustee shall receive the scheduled amount of the Federal Subsidy Payments on or before such interest shall be payable shall exclude the amount of interest to be paid from the Federal Subsidy and provided further, however, that if the Trustee shall not receive the scheduled amount of the Federal Subsidy Payments on or before the date interest on such Federally Subsidized Bonds is payable or within thirty (30) of the date such Federal Subsidy Payments were scheduled to be received under the then current applicable law and regulations,, then for purposes of the calculation of interest to be credited to the Reserve Account, the amount shall be equal to the interest payable on the bonds of each Series issued hereunder within the next twelve (12) months;

4.    to the credit of the Reserve Maintenance Fund, such amount, if any, of any balance remaining after making the deposits described in paragraphs 1, 2 and 3 above (or the entire balance if less than the required amount) as may be recommended by the Consulting Engineers; provided that the monthly requirements for deposit to the Reserve Maintenance fund shall be cumulative, and provided further that in the event that the Authority shall covenant in respect of any Subordinate Obligation to limit the monthly deposit to the Reserve Maintenance Fund as described in Subordinate Obligations Fund below, the monthly deposit required by this paragraph shall be equal to the least of

(i)    the amount described above in this paragraph,

(ii)    $400,000, and

(iii)    an amount that when added to the amount then on deposit in the Reserve Maintenance Fund shall make the total amount on deposit equal to $10,000,000;

5.    to the credit of one or more special accounts in the Subordinate Obligations Fund, such amount, if any, of any balance remaining after making the deposits described under paragraphs 1, 2, 3 and 4 above (or the entire balance if less than

the required amount) that together with funds then on deposit in the Subordinate Obligations Fund will make the total amount then on deposit equal to any amounts required to be paid or accrued with respect to any Subordinate Obligations prior to the Deposit Day of the next succeeding month from or to the Subordinate Obligations Fund;

6. if the Authority shall have covenanted pursuant to the Trust Agreement with respect to Subordinate Obligations to limit its deposit to the Reserve Maintenance Fund in accordance with the provisions of the second proviso of paragraph 4 above and in fact the deposit to said Fund pursuant to paragraph 4 was limited to the amount described in clause (ii) or (iii) of such paragraph, the Reserve Maintenance Fund, such amount of any balance remaining after making the deposits described under paragraphs 1, 2, 3, 4 or 5 above (or the entire balance if less than the required amount) as may be required to make the total amount deposited in the Reserve Maintenance Fund in such month equal to the amount described in clause (i) of clause (4) above;

7. to the credit of the Self-insurance Fund, any balance remaining after making the deposits described in paragraphs 1, 2, 3, 4, 5 and 6 above as the Consulting Engineers shall from time to time recommend; and

8. to the credit of the Capital Improvement Fund such amount of any balance remaining after making deposits described under paragraphs 1, 2, 3, 4, 5, 6 and 7 above as the Consulting Engineers shall from time to time recommend; provided that the monthly requirements for deposit to the Capital Improvement Fund shall be cumulative.

Any balance remaining after making the deposits under paragraphs 1 through 8 above may be used for any lawful purpose of the Authority. (Trust Agreement, Section 507).

If amounts applied to the payment of interest and principal on bonds are paid by a credit or liquidity facility issuer, the amounts deposited in the Bond Service Account allocable to said payment (other than a payment of the purchase price of bonds pursuant to a "put") may be paid to said credit or liquidity facility issuer. (Trust Agreement, Section 509).

Moneys in the Reserve Account shall be used by the Trustee first for the purpose of paying the interest on the Power Revenue Bonds and maturing principal of serial bonds whenever and to the extent moneys in the Bond Service Account are insufficient for such purposes and thereafter for the purpose of making the deposits to the Redemption Account described in paragraph 2 above whenever the withdrawals from the Renewal and Replacement Fund or the Revenue Fund, as the case may be, are insufficient for such purpose. Excess moneys in the Reserve Account shall be transferred to the Bond Service Account or may be used to reduce any Reserve Account Insurance Policy or Reserve Account Letter of Credit.

The Authority may deposit a Reserve Account Insurance Policy or Reserve Account Letter of Credit into the Reserve Account, in lieu, or in partial satisfaction, of any required deposit into the Reserve Account. Any reimbursement obligation in respect of a drawing under a Reserve Account Insurance Policy or Reserve Account Letter of Credit may be secured by a lien on Revenues not inconsistent with the provisions of the Trust Agreement and shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required

thereunder), on any date on which moneys are required to be paid out of the Reserve Account pursuant to the Trust Agreement. If a disbursement is made under any Reserve Account Insurance Policy or Letter or Credit, the Authority shall be obligated either to reinstate the amount of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement or to deposit into the Reserve Account moneys, in accordance with the provisions of the Trust Agreement, in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, or a combination of such alternatives. The Authority may at any time substitute (i) all or a portion of the moneys held to the credit of the Reserve Account with a Reserve Account Insurance Policy or Reserve Account Letter of Credit, (ii) all or a portion of any Reserve Account Insurance Policy on deposit in the Reserve Account with moneys or a Reserve Account Letter of Credit, or a combination of such alternatives, or (iii) all or a portion of any Reserve Account Letter of Credit on deposit in the Reserve Account with moneys or a Reserve Account Insurance Policy, or a combination of such alternatives. Any moneys on deposit in the Reserve Account in substitution of which a Reserve Account Insurance Policy or Reserve Account Letter of Credit is deposited shall, to the extent not required to fund any deficiencies in the amount then required to be on deposit in the Reserve Account, be released and immediately paid over to the Authority to be used by the Authority for any proper corporate purpose. Prior to the expiration date of any Reserve Account Insurance Policy or Reserve Account Letter of Credit then on deposit to the credit of the Reserve Account the Authority shall (x) cause the term of such Reserve Account Insurance Policy or Reserve Account Letter of Credit to be extended, (y) replace any such Reserve Account Insurance Policy with moneys (which may include, without limitation, moneys available under the Reserve Account Insurance Policy or from any other source available for such purpose) or a Reserve Account Letter of Credit, or a combination of such alternatives, or (z) replace any such Reserve Account Letter of Credit with moneys (which may include, without limitation, moneys available under the Reserve Account Letter of Credit or from any other source available for such purpose) or a Reserve Account Insurance Policy, or a combination of such alternatives; provided that in the event that the Authority has not extended or replaced the expiring Reserve Account Insurance Policy or Reserve Account Letter of Credit by the fifth business day prior to its date of expiration, the expiring Reserve Account Insurance Policy or Reserve Account Letter of Credit shall, on such date, be drawn upon and the moneys so made available shall thereupon be deposited in the Reserve Account. (Trust Agreement, Section 510).

Moneys in the Reserve Maintenance Fund shall be used only for the purpose of paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, including major items of equipment. The Reserve Maintenance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Bond Service Account, Redemption Account and the Reserve Account are insufficient for such purpose. (Trust Agreement, Section 512).

Moneys in the Self-insurance Fund shall he used only for the purpose of paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the Trust Agreement. See "Insurance" below. The Self-insurance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the

Bond Service Account, Redemption Account and the Reserve Account and in the Reserve Maintenance Fund are insufficient for such purpose. (Trust Agreement, Section 512A).

Moneys in the Capital Improvement Fund shall be used only for the purpose of paying the cost of anticipated extensions and Improvements which cost has not otherwise been provided for from the proceeds of Power Revenue Bonds issued under the provisions of the Trust Agreement. The Capital Improvement Fund also serves as an additional reserve for the payment of principal of and the interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the Bond Service Account, Redemption Account and the Reserve Account, in the Reserve Maintenance Fund and in the Self-insurance Fund are insufficient for such purpose. (Trust Agreement, Section 512B).

*Construction Fund*

A special fund is created and designated the "Puerto Rico Electric Power Authority Power System Construction Fund" (the "Construction Fund"). The proceeds of any Power Revenue Bonds issued for the purpose of paying the cost of Improvements, together with the moneys received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the Reserve Account, (iii) deposited in the Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the Construction Fund and by the Authority in trust. (Trust Agreement, Sections 208 and 401).

Payments from the Construction Fund are made by the Executive Director or by any officer or employee of the Authority designated by him for such purpose. (Trust Agreement, Section 402).

**Rate Covenant**

The Authority covenants that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that the Revenues will be at all times sufficient to pay the Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any amount deposited in the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year.

The Authority further covenants that if at any time the Revenues shall not be sufficient to satisfy the foregoing covenant as to rates, it will revise the rates and charges for the services and facilities furnished by the System and, if necessary, it will revise its regulations in relation to the collection of bills for such services and facilities, so that such deficiency will be made up before the end of the next ensuing fiscal year. Should any deficiency not be made up in such next ensuing fiscal year, the requirement therefor, shall be cumulative and the Authority shall continue to revise such rates until such deficiency shall have been completely made up. (Trust Agreement, Section 502).

**Build America Bonds**

With respect to Build America Bonds, the Authority covenants to file, or cause to be filed, a Form 8038-CP with the Internal Revenue Service not less than 45 days and not more than 90 days prior to the date interest on the Build America Bonds shall be payable, as provided in Notice 2010-26 issued by the Internal Revenue Service, so long as filing such form is a condition to receipt of the Federal Subsidy prior to the date such interest shall be payable. In the event that the Internal Revenue Service shall amend or revise the guidance provided in Notice 2010-26, the Authority agrees that it shall take all such actions as are necessary to ensure receipt of the Federal Subsidy. The only effect of any failure to comply with Section 713 of the Trust Agreement shall be that the Federal Subsidy to which such failure relates shall no longer be excluded from the calculation of Principal and interest Requirements. (Trust Agreement, Section 713).

**Investment of Funds**

The Trust Agreement provides for the following types of investments:

        (a)    Government Obligations;

        (b)    Investment Obligations; and

        (c)    Time Deposits.

Moneys in the Bond Service Account, the Redemption Account and the Revenue Fund shall be invested and reinvested by the Trustee or by the Authority, as the case may be, in Government Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when such moneys will be required for the purposes intended, or in Time Deposits; provided, that each such Time Deposit shall permit the moneys so placed to be available for use when required for the purposes intended.

Any moneys in the Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Account shall be invested and reinvested by the Trustee or the Authority, as the case may be, in Investment Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, in the case of the Construction Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Maintenance Fund, not later than the respective dates when the moneys invested will be required for the purposes intended, and in the case of the Reserve Account, as to approximately 50% of such moneys, not later than five years after the date of such investment, and as to the balance of such moneys, as directed by order of the Executive Director or other authorized officer of the Authority pursuant to the Trust Agreement. In lieu of such investments, moneys in the Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Account may be invested in Time Deposits which shall permit the moneys so placed to be available for use at the times provided for investments in Investment Obligations. (Trust Agreement, Section 602).

Any moneys in the Self-insurance Fund may also be invested by the Authority in any investments authorized by law for the Retirement System of the Employees of the Government for Puerto Rico and its Instrumentalities, but the Authority shall invest not less than the smaller of $25,000,000 and the entire balance in such Fund in Investment Obligations with an average weighted maturity of not more than three years.

Prior to investing any moneys in the Self-insurance Fund in other than Investment Obligations, the Authority shall obtain an Independent Consultant's report pursuant to the Trust Agreement recommending what portion of moneys held in the Self-insurance Fund the Authority shall maintain invested in Investment Obligations and shall, after duly considering the report, formally adopt, subject to the consent of Government Development Bank for Puerto Rico, and maintain an investment policy first determining the minimum portion of the moneys held for the credit of the Self-insurance Fund to remain invested in Investment Obligations and then setting forth prudent investment principles, considerations and goals, including liquidity, diversification of assets, safety and rate or rates of return, that will govern the investment strategies and goals for the balance of the moneys held for credit of the Self-insurance Fund and shall advise the Trustee in writing of those investments other than Investment Obligations that are authorized by said investment policy. (Trust Agreement, Section 602).

## Accounting

The Authority covenants that its accounts will be kept according to standard practices for public utility systems similar to the properties and business of the Authority and applicable in such circumstances, of all items of cost and expenditures relating to the System and each integral unit of the System, the Revenues collected and the application of the Revenues. The Authority further covenants that in the first month of each fiscal year it will cause an audit for the preceding fiscal year to be made of its books and accounts pertaining to the System by an independent firm of certified public accountants of suitable experience and responsibilities and widely known in the United States and approved by the Trustee. (Trust Agreement, Section 710).

## Release of Property

The Authority covenants that so long as any Power Revenue Bonds shall be outstanding under the Trust Agreement and except as permitted under the Trust Agreement it will not sell, lease or otherwise dispose of or encumber the System or any part thereof and will not create or permit to be created any charge or lien on the Revenues ranking equally with or prior to the charge or lien on the Revenues of the Power Revenue Bonds issued under and secured by the Trust Agreement. The Authority may, however, from time to time, sell machinery, fixtures, apparatus, tools, instruments or other movable property or materials if the Authority shall determine that such articles are no longer needed or useful in connection with the construction or operation and maintenance of the System. Any such moneys received may be applied to replace any such properties sold or disposed of or shall be deposited in the Redemption Account or the Construction Fund at the option of the Authority; provided that in connection with the issuance of bonds the Authority may secure its obligations to the provider of a credit or liquidity facility securing such bonds on a parity with the bonds. Other property forming part of the Systems, not needed or serving no useful purpose in connection with the System, may be sold, leased or

transferred provided the proceeds of which shall be deposited in the Redemption Account or the Construction Fund and the rentals be deposited in the Revenue Fund.

Notwithstanding the immediately preceding paragraph, the Authority may abandon, sell, lease or transfer any property forming a part of the System, if, among other things, the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months next preceding the date of such abandonment, sale, lease or transfer, adjusted to give effect to such abandonment, sale, lease or transfer and any replacement and to reflect the rate schedule then in effect, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all Power Revenue Bonds outstanding and if the Reserve Account is fully funded.  Any transferee of said property may be considered in lieu of or in addition to the Authority for purposes of such coverage if among other things the transferee agrees to assume the Authority's obligations under the Trust Agreement.  Said coverage test need not be met if the transferee is a public corporation or other governmental entity provided the coverage is not reduced due to such transfer. The proceeds of such sale shall be deposited in the Redemption Account or in the Construction Fund, at the option of the Authority, or shall be applied to the replacement of the property so sold.  The rentals under any such lease shall be deposited in the Revenue Fund.

In addition, the Authority may lease portions of the System or grant licenses, easements and other rights or make contracts or other arrangements for operation or use of the System, if certain reports and certificates of the Consulting Engineers are provided that confirm, among other things, that operational covenants will be binding on the lessee or other contracting entity and that the lease, contract, license, easement or other arrangement provides for rent or other payments that are projected to be sufficient with other projected Net Revenues of the System to make all payments of the Principal and Interest Requirements for all Power Revenue Bonds. Rents received under any such lease, contract, license, easement or other arrangements shall be deposited to the credit of the Revenue Fund. (Trust Agreement, Section 712).

**Insurance**

The Authority covenants that it will at all times carry insurance, in a responsible insurance company or companies authorized and qualified under the laws of Puerto Rico to assume the risk thereof, covering such properties belonging to the System as are customarily insured, and against loss or damage from such causes as are customarily insured against, by companies engaged in similar business.

The Authority covenants that, immediately after any loss or damage, it will cause its engineers to prepare plans and specifications for repairing, replacing or reconstructing the damaged or destroyed property, and will forthwith proceed with the repair, replacement or reconstruction of the damaged or destroyed property unless it shall determine that the repair, replacement or reconstruction of such property is not essential to the efficient operation of the System.  Proceeds of all insurance shall be deposited in the Redemption Account or, at the option of the Authority, the Construction Fund unless the Authority shall be prevented from doing so by conditions beyond its control or unless the holders of 51% in aggregate principal amount of the Power Revenue Bonds then outstanding under the Trust Agreement shall otherwise direct. (Trust Agreement, Section 707).

I-17

### Consulting Engineers and Independent Consultant

The Authority covenants that so long as any of the Power Revenue Bonds are outstanding under the Trust Agreement it will employ as Consulting Engineers an independent engineer or engineering firm or corporation having a wide and favorable repute in the United States for skill and experience in the construction and operation of electric systems. It shall be the duty of the Consulting Engineers to prepare and file an annual report with the Authority and the Trustee on or before the 1st day of each November setting forth their recommendations as to any necessary or advisable revisions of rates and charges and such other advices and recommendations as they may deem desirable. It shall be the duty of the Consulting Engineers to include in such report their recommendations as to the amount to be deposited in the Reserve Maintenance Fund, the Capital Improvement Fund and the Self-insurance Fund. (Trust Agreement, Section 706).

The Authority covenants that so long as any Power Revenue Bonds are outstanding under the Trust Agreement it will employ as Independent Consultant one or more independent firms having a wide and favorable repute in the United States for expertise in risk management and other insurance matters related to the construction and operation of electric systems. It shall be the duty of the Independent Consultant to prepare and file with the Authority and the Trustee at least biennially on or before the first day of November a report setting forth its recommendations, based on a review of the insurance then maintained by the Authority in accordance with the Trust Agreement and the status of the Self-insurance Fund, of any changes in coverage, including its recommendations of policy limits and deductibles and self-insurance, and investment strategies for the Self-insurance Fund. (Trust Agreement, Sections 706 and 707).

### Modifications

The Authority and the Trustee may, without the consent of the holders of the Power Revenue Bonds, enter into such supplemental agreements as shall not be inconsistent with the Trust Agreement, (i) to cure any ambiguity, to correct or supplement any provision in the Trust Agreement which may be inconsistent with any other provision therein, to make any other provisions which shall not be inconsistent with the provisions of the Trust Agreement, provided such action shall not adversely affect the interest of the bondholders, or (ii) to grant to or confer upon the Trustee for the benefit of the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders or the Trustee, or (iii) to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the Trust Agreement other conditions, limitations and restrictions thereafter to be observed, or (iv) to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power reserved to or conferred upon the Authority by the Trust Agreement.

At least thirty (30) days prior to the execution of any supplemental agreement for any of the purposes described in the immediately preceding paragraph, the Trustee shall cause a notice of the proposed execution of such supplemental agreement to be mailed to all registered owners of Power Revenue Bonds and to all bondholders of record. Such notice shall briefly set forth the nature of the proposed supplemental agreement and shall state that copies thereof are on file at the principal office of the Trustee for inspection by all bondholders. A failure on the part of the

Trustee to mail the notice required by the Trust Agreement shall not affect the validity of such supplemental agreement. (Trust Agreement, Section 1101).

The holders of not less than 60% in aggregate principal amount of the Power Revenue Bonds at the time outstanding shall have the right, from time to time (anything contained in the Trust Agreement to the contrary notwithstanding), to consent to and approve the execution by the Authority and the Trustee of such agreement or agreements supplemental to the Trust Agreement as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to, repealing or rescinding, in any particular, any of the terms or provisions contained in the Trust Agreement or in any supplemental agreement; provided, however, that nothing contained in the Trust Agreement shall permit, or be construed as permitting, (a) an extension of the maturity of principal or interest on any Power Revenue Bond, or (b) a reduction in the principal amount of any Power Revenue Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of the Revenues other than any lien and pledge created by the Trust Agreement, or (d) a preference or priority of any Power Revenue Bond or Bonds over any other Power Revenue Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Power Revenue Bonds required for consent to such supplemental agreement. (Trust Agreement, Section 1102).

### Events of Default and Remedies of Bondholders

Among the events described in the Trust Agreement as "events of default" are the following:

(a) payment of the principal of and redemption premium, if any, on any of the Power Revenue Bonds shall not be made when the same shall become due and payable, or

(b) payment of any installment of interest on any of the Power Revenue Bonds shall not be made when the same shall become due and payable, or

(c) the Authority shall for any reason be rendered incapable of fulfilling its obligations under the Trust Agreement, or

(d) the Authority shall default in the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the Power Revenue Bonds or in the Trust Agreement on the part of the Authority to be performed, including meeting any Amortization Requirement, and such default shall continue for thirty (30) days after written notice specify such default and requiring same to be remedied shall have been given to the Authority by the Trustees which may give such notice in its discretion and shall give such notice at the written request of 10% in aggregate principal amount of the bonds then outstanding, or

(e) if notice has been received by the Trustee and the Authority from the bank or lending institution providing a credit or liquidity facility or other entity insuring, guaranteeing or providing for payments of principal or interest in respect of any Power Revenue Bonds that an event of default has occurred under the agreement underlying said facility or a failure of said bank or other financial or lending institution or other entity to

make said facility available or to reinstate the interest component of said facility in accordance with its terms, to the extent said notice or failure is established as an event of default under the terms of the resolution authorizing the issuance of Power Revenue Bonds secured by the credit or liquidity facility).  (Trust Agreement, Section 802)

In the event of the happening and continuance of any event of default specified in the Trust Agreement the Trustee may, and upon the written request of the holders of not less than 20% in aggregate principal amount of all Power Revenue Bonds then outstanding shall, declare the principal of the Power Revenue Bonds then outstanding to be due and payable, and, providing it shall be indemnified to its satisfaction, the Trustee may, and upon the written request of the holders of not less than 10% in aggregate principal amount of the Power Revenue Bonds then outstanding shall, proceed to protect and enforce its rights and the rights of the bondholders under the Trust Agreement by such suits, actions or special proceedings in equity or at law, or by such proceedings in the office of any board or officer having jurisdiction, either for the appointment of a receiver of the System as authorized by the Act or for the specific performance of any covenant or agreement or for the enforcement of any proper legal or equitable remedy, as the Trustee shall deem most effectual to protect and enforce the rights aforesaid; provided, however, that the Trustee shall not be required to proceed for the appointment of a receiver unless it shall have received the written request of the holders of not less than 25% in aggregate principal amount of such bonds then outstanding. (Trust Agreement, Sections 803, 804 and 902).

It is the intent of the Trust Agreement that all proceedings shall be instituted and maintained for the benefit of all holders of outstanding Power Revenue Bonds.  (Trust Agreement, Section 809).

**Defeasance**

The Trust Agreement provides that if, when the Power Revenue Bonds shall have become due and payable or shall have been duly called for redemption or irrevocable instructions to call said bonds for redemption or payment shall have been given by the Authority to the Trustee, the whole amount of the principal and the interest and the premium, if any, so due and payable upon all of the Power Revenue Bonds then outstanding shall be paid or sufficient moneys, or Government Obligations or Prerefunded Municipals or Time Deposits secured in the manner set forth in the Trust Agreement, the principal of and the interest on which when due will provide sufficient moneys, shall be held by the Trustee or the Paying Agents for such purpose under the provisions of the Trust Agreement, and provision shall be made for paying all other sums payable by the Authority, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, determine and become void, and the Trustee in such case, on demand of the Authority, shall release the Trust Agreement.  (Trust Agreement, Section 1201).

**Bonds Not Deemed Outstanding**

The Power Revenue Bonds and portions of Power Revenue Bonds which have been duly called for redemption pursuant to the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or payment at or prior to maturity have been given to the Trustee in form satisfactory to it, and for the payment of principal or the redemption price and

I-20

the accrued interest of which sufficient moneys, or Government Obligations or Prerefunded Municipals or Time Deposits secured in the manner set forth in the Trust Agreement, shall be held in separate accounts by the Trustee or by the Paying Agents in trust for the holders of the bonds or portions thereof to be paid or redeemed, all as provided in the Trust Agreement, shall not thereafter be deemed to be outstanding under the provisions of the Trust Agreement. (Trust Agreement, Section 307).

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX II**



FINANCIAL STATEMENTS, REQUIRED
SUPPLEMENTARY INFORMATION AND
SUPPLEMENTAL SCHEDULES

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)
Years Ended June 30, 2011 and 2010
With Report of Independent Auditors

**ᴲᴵ ERNST & YOUNG**

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Financial Statements, Required Supplementary Information and Supplemental Schedules

Years Ended June 30, 2011 and 2010

# Contents

Financial Section

Report of Independent Auditors ............................................................................................... 1
Management's Discussion and Analysis.................................................................................. 3

Audited Financial Statements

Balance Sheets.......................................................................................................................... 17
Statements of Revenues, Expenses and Changes in Net Assets.............................................. 19
Statements of Cash Flows ........................................................................................................ 20
Notes to Audited Financial Statements.................................................................................... 22

Required Supplementary Information

Schedule I – Supplementary Schedule of Funding Progress..................................................... 87

Supplemental Schedules

Notes to Schedules II-VII – Information Required by the 1974 Agreement ............................. 88
Schedule II – Supplemental Schedule of Source and Disposition of
  Net Revenues under the Provisions of the 1974 Agreement.................................................. 89
Schedule III – Supplemental Schedule of Sources and Disposition of
  Net Revenues under the Provisions of the 1974 Agreement.................................................. 90
Schedule IV – Supplemental Schedule of Funds under the Provisions
  of the 1974 Agreement.......................................................................................................... 91
Schedule V – Supplemental Schedule of Changes in Cash and
  Investments by Funds – June 30, 2011 ................................................................................. 92
Schedule V – Supplemental Schedule of Changes in Cash and
  Investments by Funds – June 30, 2010 ................................................................................. 94
Schedule VI – Supplemental Schedule of Changes in Long-Term
  Debt and Current Portion of Long-Term Debt ..................................................................... 96

Financial Section

1112-1313725

[THIS PAGE INTENTIONALLY LEFT BLANK]



**Ernst & Young LLP**
1000 Scotiabank Plaza, 10th Floor
273 Ponce de León Avenue
San Juan, Puerto Rico 00917

Tel: +1 787 759 8212
Fax: +1 787 753 0808
www.ey.com

### Report of Independent Auditors

To the Governing Board of the
Puerto Rico Electric Power Authority

We have audited the accompanying financial statements of the Puerto Rico Electric Power
Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of and for
the years ended June 30, 2011 and 2010, as listed in the table of contents. These financial
statements are the responsibility of the Authority's management. Our responsibility is to express
an opinion on these financial statements based on our audits. We did not audit the financial
statements of PREPA Networks, Inc. (PREPA.Net) (a blended component unit), which financial
statements reflect total assets constituting approximately .3% and .2% of total assets as of
June 30, 2011 and 2010, and revenues constituting .2% of total revenues for the years then
ended. Those financial statements were audited by other auditors whose report has been
furnished to us, and our opinion, insofar as it relates to the amounts included for PREPA
Holdings and PREPA.Net, is based solely on the reports of the other auditors.

We conducted our audits in accordance with auditing standards generally accepted in the United
States and the standards applicable to financial audits contained in *Government Auditing
Standards,* issued by the Comptroller General of the United States. Those standards require that
we plan and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. We were not engaged to perform an audit of the
Authority's internal control over financial reporting. Our audit included consideration of internal
control over financial reporting as a basis for designing audit procedures that are appropriate in
the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the
Authority's internal control over financial reporting. Accordingly, we express no such opinion.
An audit also includes examining, on a test basis, evidence supporting the amounts and
disclosures in the financial statements, assessing the accounting principles used and significant
estimates made by management, and evaluating the overall financial statement presentation. We
believe that our audits and the reports of the other auditors provide a reasonable basis for our
opinion.

In our opinion, based on our audits, and the reports of the other auditors, the financial statements
referred to above present fairly, in all material respects, the financial position of the Authority as
of June 30, 2011 and 2010, and the changes in its financial position and its cash flows for the
years then ended in conformity with U.S. generally accepted accounting principles.

1112-1313725

1

A member firm of Ernst & Young Global Limited



As more fully described in Note 19 to the financial statements, the July 1, 2009 net assets balances and contributed capital for the year ended June 30, 2010, have been restated to correct an error in previously issued financial statements in the accounting for contributed capital. Our audit report on the June 30, 2010 financial statements, dated January 31, 2011, should not be relied upon due to this misstatement. The previously issued report is replaced by this opinion.

In accordance with *Government Auditing Standards*, we have also issued our report, dated December 23, 2011, on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audits.

Management's Discussion and Analysis on pages 3 through 16 and the required supplementary information disclosed on page 87 is not a required part of the basic financial statements but is supplementary information required by the Governmental Accounting Standards Board (GASB). We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audits were conducted for the purpose of forming an opinion on the financial statements of the Puerto Rico Electric Power Authority. The supplemental information included in Schedules II - VI is presented for purposes of additional analysis and is not a required part of the basic financial statements. The supplemental information included in Schedules II - VI has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole, and is prepared in accordance with the terms of the 1974 Agreement (described herein).

*Ernst & Young LLP*

December 23, 2011

Stamp No. 2614231
affixed to
original of
this report.

2

1112-1313725

A member firm of Ernst & Young Global Limited

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

Year Ended June 30, 2011

This section of the financial report of the Puerto Rico Electric Power Authority (the Authority) presents the analysis of the Authority's financial performance during the fiscal years ended June 30, 2011, 2010 and 2009. As management of the Authority, we offer readers of the financial statements this narrative overview and analysis of the financial activities. We recommend readers to consider the information herein presented in conjunction with the financial statements that follow this section.

**Financial Highlights**

- Operating income for fiscal year ended June 30, 2011 was $326.9 million representing a decrease of 6.1 percent for the fiscal year ended June 30, 2010. For the fiscal years ended June 30, 2010, it was $348.1 million representing a decrease of 1.2 percent for the fiscal year ended June 30, 2009.

- Operating expenses increased by $272.7 million or 7.1 percent for the fiscal year ended June 30, 2011; increased by $172.9 million or 4.7 percent and decreased by $530.7 million or 12.7 percent for the fiscal years ended June 30, 2010 and 2009, respectively, when compared to previous fiscal years.

- The Authority's Net Utility Plant for the fiscal year ended June 30, 2011 increased by $79.8 million or 1.2 percent. For the fiscal year ended 2010 the increase was $129.2 million or 2.0 percent.

- Total assets and deferred outflows increased by $644.8 million, increased by $208.6 million and decreased by $346.1 million, or 6.9 percent increase, 2.3 percent increase and 3.7 percent decrease, respectively, for the fiscal years ended June 30, 2011, 2010 and 2009.

- For the fiscal year ended June 30, 2011, as compared to the fiscal year ended June 30, 2010 and June 30, 2009, accounts receivable increased by 17.8 percent, from $1,085.1 million to $1,277.9 million and decreased by 3.7 percent from $1,126.9 million to $1,085.1 million, respectively. The increase in 2011 was mainly due to a delay in collections from the government sector.

- Accounts receivable from the governmental sector increased 34.3 percent from $345.5 million on June 30, 2010 to $464.1 million on June 30, 2011, and decreased 26.7 percent from $471.4 million on June 30, 2009 to $345.5 million on June 30, 2010.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management´s Discussion and Analysis (continued)

**Financial Highlights (continued)**

- The Authority's net assets decreased by $272.4 million (264.7 percent), $129.7 million (55.8 percent) and $139.0 million (37.4 percent) as a result of operations during fiscal years ended June 30, 2011, 2010 and 2009, respectively. As of June 30, 2011, the Authority is in a net deficit position.

- Ratios of fuel and purchased power adjustment revenues to total operating revenues were 75 percent for 2010-2011, 72.7 percent for 2009-2010 and 72.8 percent for 2008-2009.

- Ratios of fuel oil and purchased power expense to total operating expense (excluding depreciation expense) were 78.8 percent for 2010-2011, 77.9 percent for 2009-2010 and 77.7 percent for 2008-2009.

- The increase in the fuel adjustment revenues and fuel expense for fiscal year 2011 as compared to 2010 of $322.9 million and $284.5 million, respectively, was mainly due to an increase in the average fuel oil price per barrel of $19.36 (25.3%). The increase in the fuel adjustment revenues and fuel expense for fiscal year 2010 as compared to 2009 of 94.4 million and 87.1 million, respectively, was mainly due to an increase in the average fuel oil price per barrel of $0.32 (0.4%). In addition, the decrease in the fuel adjustment revenues and fuel expense for fiscal year 2009 as compared to 2008 of $311.6 million and $383.2 million, respectively, was mainly due to a decrease in the average fuel oil price per barrel of $7.95 (9.4%) and a decrease of 2.2 million (7.9%) in the consumption of fuel oil barrels for 2008-2009.

- The decrease in the purchased power adjustment revenue and expense of $37.3 million and $32.8 million, respectively, was due to a decrease of 179,662MWh (or 2.6 percent) purchase power for fiscal 2011 when compared to fiscal 2010. The increase in the purchased power adjustment revenue and expense of $24.9 million and $21.9 million, respectively, was due to an increase of 243,159 MWh (or 3.6 percent) purchase power for fiscal 2010 when compared to fiscal 2009. The increase in the purchased power adjustment revenue and expense of $6.9 million and $10.8 million, respectively, was mainly due to an increase of 1.0 cent (9.9 percent) per kWh in the average price of purchased power for fiscal 2009 when compared to 2008.

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Management´s Discussion and Analysis (continued)

**Plans to Address the Authority's Challenges**

The Authority faced a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the volatility in oil prices. Its principal challenges, some of which are interrelated, are: (i) addressing the decline in electric energy sales; (ii) addressing the volatility of oil costs; (iii) addressing high customer electric power rates; (iv) reducing government accounts receivables; and (v) improving its liquidity.

The Authority's management focused on addressing these challenges by implementing a financial stabilization plan and other strategic initiatives. The principal component of the financial stabilization plan was the reduction of operating costs in line with the reduction in electric energy sales in order to maintain adequate operating margins.

The principal cost reduction measures included in the plan are (i) reducing the number of employees through a combination of attrition from voluntary retirement and the elimination of temporary and vacant positions, (ii) reducing retiree health care benefits, and (iii) reducing overtime and miscellaneous expenses. The Authority has already implemented measures that are expected to result in recurring annual savings consisting of (i) a reduction of employees from January 1, 2010 through June 30, 2011, (ii) changes to retiree health care benefits and (iii) other cost reduction initiatives, such as the reduction of overtime and miscellaneous expenses, that are expected to result in annual savings of approximately $30 million.

**Via Verde Pipeline**

The Via Verde Pipeline is a planned natural gas network that will supply energy from North to South Puerto Rico. Proposed by the Island government more than 20 years ago, it found new backing under current Puerto Rican Governor Luis Fortuño. Via Verde is expected to save Puerto Rican consumers more than $1 billion in energy costs annually, and will cut carbon emissions by an average of 64 percent. This pipeline is part of PREPA's commitment to green energy on the Island and to weaning the Island off of much more expensive imported crude oil.

The pipeline itself will cost $74 million to build, part of an overall project cost of $450 million that includes the conversion of several oil-fired power plants to natural gas. Via Verde's capacity will help the Island secure long-term energy savings through the purchase of a 30-year futures contract for natural gas. Further, natural gas is valued as a "clean-burning" fuel, accounting for just 10 percent of the world's carbon emissions.

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Management's Discussion and Analysis (continued)

**Customer Care and Billing Project**

On February 2010 the contracts for the implementation and Quality Control respectively, of this Oracle based System were signed with PWC Consulting and AAC Consulting. The purpose of this implementation is to replace the Customer Service System installed in the early 1980's. This new system will be capable of providing detailed information on PREPA's wide customer base, as well as serving as the energy sales Accounts Receivable Subsidiary Ledger. It will also improve the quality of this important information and enhance the financial analysis currently performed using a variety of tools. The system is expected to be commissioned by December 2012. It is part of our commitment to use technology to improve customer services quality, financial performance and operational efficiency.

**Overview of Financial Report**

Management's Discussion and Analysis (MD&A) of operating results serves as an introduction to the basic financial statements and supplementary information. Summary financial statement data, key financial and operational indicators used in the Authority's strategic plan, projected capital improvement program, operational budget and other management tools were used for this analysis.

**Required Financial Statements**

The financial statements report the financial position and operations of Puerto Rico Electric Power Authority and its blended component units, Puerto Rico Irrigation Systems and PREPA Holdings LLC as of and for the year ended June 30, 2011, which include a Balance Sheet, Statement of Revenues, Expenses and Changes in Net Assets, Statement of Cash Flows and the notes to financial statements.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management´s Discussion and Analysis (continued)

**Required Financial Statements (continued)**

PREPA Networks, Corp. issues a separate financial report that includes audited financial statements. That report may be obtained by writing to PREPA Networks, Corp. City View Plaza Suite 803, Guaynabo, Puerto Rico 00968.

The Balance Sheet presents the financial position of the Authority and provides information about the nature and amount of resources and obligations at year-end.

The Statement of Revenues, Expenses and Changes in Net Assets presents the results of the business activities over the course of the fiscal year and information as to how the net assets changed during the fiscal year.

The Statement of Cash Flows shows changes in cash and cash equivalents, resulting from operating, non-capital and capital financing, and investing activities, which include cash receipts and cash disbursement information, without consideration of the depreciation of capital assets.

The notes to the financial statements provide information required and necessary to the understanding of material information of the Authority's financial statements. These notes present information about the Authority's significant accounting policies, significant account balances and activities, risk management, obligations, commitments and contingencies, and subsequent events.

The financial statements were prepared by the Authority's management from the detail accounting books and records.

## Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Management´s Discussion and Analysis (continued)

**Financial Analysis**

The Authority's net assets decreased by $272.4 million for the fiscal year ended June 30, 2011 and decreased by $129.7 million and $139.0 million for the fiscal years ended June 30, 2010 and 2009, respectively. Our analysis below focuses on the Authority's net assets and changes in net assets during the year.

### Authority's Net Assets
*(In thousands)*

|  | | As Restated | |
| --- | --- | --- | --- |
|  | **2011** | **2010** | **2009** |
| Current, non-current and other assets | **$ 3,119,743** | $ 2,554,764 | $ 2,475,320 |
| Capital assets | **6,812,602** | 6,732,790 | 6,603,593 |
| Total assets | **$ 9,932,345** | $ 9,287,554 | $ 9,078,913 |
|  | | | |
| Long-term debt outstanding | **$ 7,895,288** | $ 7,572,024 | $ 6,628,867 |
| Other liabilities | **2,206,552** | 1,612,597 | 2,217,407 |
| Total liabilities | **$10,101,840** | $ 9,184,621 | $ 8,846,274 |
|  | | | |
| Net assets (deficit): | | | |
| Invested in capital assets, net of related debt | **$   17,070** | $   161,389 | $   212,853 |
| Restricted | **77,606** | 136,053 | 233,208 |
| Unrestricted | **(264,171)** | (194,509) | (213,422) |
| Total net assets (deficit) | **$  (169,495)** | $   102,933 | $   232,639 |

A significant portion of the Authority's net assets (deficit) is restricted and represents resources that are subject to external restrictions on how they may be used. An additional portion of the Authority's net assets reflects its investment in capital assets, less any related debt used to acquire those assets that is still outstanding.

Net assets (deficit) invested in utility plant, net of related debt decreased from $161.4 million in 2009-2010 to $17.1 million in 2010-2011, mainly due to decreases in the financing of construction expenditures to compensate for a reduction in the construction activity.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management´s Discussion and Analysis (continued)

**Financial Analysis (continued)**

Restricted assets for capital and debt service requirements decreased from $136.1 million as of June 30, 2010 to $77.6 million as of June 30, 2011. The decrease was mainly due to a decrease in the reserve account. As allowed by the 1974 Trust Agreement, cash reserves in excess of required balances were transferred to debt service accounts.

Changes in the Authority's net assets can be determined by reviewing the following condensed Statements of Revenues, Expenses and Changes in Net Assets.

**Authority's Changes in Net Assets**
*(In thousands)*

|  | Year Ended June 30 | | |
|  | 2011 | 2010 | 2009 |
|  |  | *(As restated)* | |
| Operating revenues | **$4,422,997** | $4,171,493 | $4,002,713 |
| Other income | **4,087** | 11,160 | 25,326 |
| Total revenues | **4,427,084** | 4,182,653 | 4,028,039 |
| Operating expenses | **4,096,080** | 3,823,396 | 3,650,490 |
| Interest expense, net | **370,251** | 346,653 | 326,165 |
| Total expenses | **4,466,331** | 4,170,049 | 3,976,655 |
| (Loss) income before contribution in lieu of taxes and other and contributed capital | **(39,247)** | 12,604 | 51,384 |
| Contribution in lieu of taxes and other | **(246,758)** | (232,431) | (224,792) |
| Loss before contributed capital | **(286,005)** | (219,827) | (173,408) |
| Contributed capital | **13,577** | 90,121 | 34,390 |
| Change in net assets | **(272,428)** | (129,706) | (139,018) |
| Net assets at beginning of year, *as restated* | **102,933** | 232,639 | 371,657 |
| Net assets at end of year, *as restated* | **$ (169,495)** | $   102,933 | $   232,639 |

For fiscal year ended June 30, 2011, as compared to June 30, 2010, net assets decreased by $272.4 million. The reduction in net assets was mainly due to an increase in operating expenses of $272.7 million, mainly due to an increase of $284.5 net of a decrease of $4.7 million in the fuel expenses and depreciation expenses, respectively, as well as increases in interest expense and contribution in lieu of taxes.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management´s Discussion and Analysis (continued)

**Financial Analysis (continued)**

The Authority's management has taken the following expense control measures:

The Authority reduced the number of employees through a combination of attrition from voluntary retirement and the elimination of temporary and vacant positions. In addition, the Authority is still enforcing the new staff hiring freeze implemented in January 2009.

The Authority's management has also identified the following strategies to stabilize the cost of energy:

- Revenue diversification – Net income generated from two recently created subsidiaries will be used to find a revenue stabilization fund to reduce fuel price volatility.
- Fuel diversification – The Authority is in the process of evaluating generating units that use fuel oil to convert them to burn coal and natural gas.
- Reducing energy theft – The Authority has implemented an energy theft reduction program through the use of smart grid technologies and increasing the unannounced door-to-door visits.

For the fiscal year ended June 30, 2010, as compared to June 30, 2009, net assets decreased by $129.7 million. The reduction in net assets was mainly due to an increase in operating expenses of $172.9, mainly due to increases of $38.9 million and $37.8 million in the administrative and general and depreciation expenses, respectively, as well an increase in interest expense and contribution in lieu of taxes.

For the fiscal year ended June 30, 2009, as compared to June 30, 2008, net assets decreased by $139.0 million. The decrease in net assets was mainly due to a reduction of 1,085.8 MWh in sales of electric energy, which represented $59.6 million in basic rate revenues. In addition, revenues decreased due to a decline in the price of fuel of $7.95 per barrel, which is billed to clients as pass-through in their electric bills. Expenses decreased mainly due to a reduction in the price of fuel and an adjustment to other pension obligation expenses, resulting from the modification of health benefits to retired employees.

Puerto Rico Electric Power Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management´s Discussion and Analysis (continued)

**Capital Assets and Debt Administration**

*Capital Assets*

The Authority's capital assets were restated in order to account for prior years contributed capital which was not accounted for. The total amount of the restatement was $206,549 and was divided as follows (in thousands):

|  | 2010 | 2009 |
|---|---|---|
| Capital assets | **$22,821** | $225,578 |

Investment in capital assets as of June 30, 2011, 2010 and 2009, amounts to approximately $6,813 million, $6,733 million, and $6,604 million (net of accumulated depreciation), respectively. This investment in capital assets includes land, generation, transmission and distribution systems, buildings, fixed equipment, furniture, fixtures and equipment. The total increases in the Authority's investment in capital assets (net of accumulated depreciation) were 1.2 percent, 2.0 percent, and 3.8 percent for 2010-2011, 2009-2010, and 2008-2009, respectively.

A substantial portion of the capital expenditures for production plant in fiscal year ended June 30, 2011, 2010 and 2009, was spent on the rehabilitation and life extension of generating plants in order to achieve and maintain higher levels of availability, reliability and efficiency.

Major capital assets projects during fiscal years 2010 and 2011 included the following:

- The Authority replaced the four 21 MW combustion turbines with new four 55MW dual fuel aero-derivative combustion turbines, which represent a net increase in capacity of approximately 136 MW over the replaced combustion turbines and they will generate electricity more efficiently. The first two combustion turbines were installed in fiscal year 2010 and the remainders two were installed and in service on fiscal year 2011.

- The Authority modified the eight 50 MW combustion turbines of Aguirre Combined Cycle Plant to enable them to burn natural gas or light distillate. This conversion to dual capability was completed in fiscal year 2010. The Authority evaluates various alternatives to supply natural gas to the plant.

1112-1313725

11