and draft restrictions. The Authority regularly explores alternatives to reduce its exposure to the volatility of fuel prices, such as entering into fixed price fuel supply contracts or derivative contracts for hedging oil prices. The Authority has various commodity hedges in place related to oil prices with different price caps ranging from $108.00 per barrel to $125.00 per barrel. These hedges expire in October 2013.

The Authority's customary inventory of fuel oil covers 40 days of ordinary operations, up from 25 days in the past. Although sources of fuel oil are continually changing as a result of variations in relative price, availability and quality, the Authority has never been forced to curtail service to its clients because of fuel oil shortages. The Authority's total inventory capacity for fuel oil is 4.7 million barrels. On October 23, 2009, the Authority's inventory of fuel oil decreased by 400,000 barrels due to an explosion at the Caribbean Petroleum Corp. ("CAPECO") oil storage facility, which stored this inventory on behalf of the Authority. The Authority's operations were not affected as a result of this explosion and it was immediately able to replace the lost inventory. As of June 30, 2013, the Authority had an inventory of 2.1 million barrels of fuel oil.

The Authority currently receives natural gas at its Costa Sur power plant through an existing pipeline from the EcoEléctrica LNG terminal and pursuant to the SPA with Gas Natural.

Average fuel costs and related costs of production for the five fiscal years ended June 30, 2013 are shown in the following table:

### Fuel Costs

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013[1] |
| Average fuel cost per equivalent barrel (net of handling costs)...... | $ 76.23 | $ 76.55 | $ 95.91 | $ 118.39 | $ 111.17 |
| Number of equivalent barrels used (in millions)................................ | 25.18 | 26.22 | 23.89 | 24.51 | 23.42 |
| Fuel cost (in millions) .................... | $1,919.8 | $2,006.9 | $2,291.4 | $ 2,901.8 | $2,603.6 |
| Net kWh generated (excluding purchased power) (in millions)... | 15,099.4 | 15,652.1 | 14,543.5 | 14,569.7 | 13,781.6 |
| Average net kWh per equivalent barrel ........................................... | 599.7 | 597.0 | 608.8 | 594.4 | 588.4 |
| Average fuel cost per net kWh generated (in cents) .................... | 12.71 | 12.82 | 15.76 | 19.91 | 18.89 |

[1] Unaudited.

## Subsidies and Contributions in Lieu of Taxes

Under the Act, the Authority is required to set aside 11% of its gross revenues from electric energy sales to fund certain government subsidy programs (those provided by laws in effect as of June 30, 2003), pay CILT to the municipalities and, if there is any remaining amount, fund the Authority's capital improvement program. In addition, the Authority is required to provide certain other subsidies consisting principally of a residential fuel subsidy, a residential rate subsidy and a subsidy for hotels, as described below. In order to comply with the Act and ensure that fuel and purchased power costs are fully recovered, the Authority sets its fuel and purchased power rates taking this 11% set-aside into account. As a result, fuel and purchased power charges collected from non-subsidized clients are at least as much as the Authority's fuel and purchased power costs.

*Subsidies*

Under the Act, the Authority is required to provide a subsidy for a portion of fuel charges to qualifying residential clients who use up to 425 kWh monthly or 850 kWh bi-monthly. Residential clients who qualify for the subsidy are billed the full applicable basic charges and fuel adjustment charges, with the applicable subsidy taking the form of a credit against the bill. The Act limits this subsidy to a maximum of $100 million per year and limits the cost of fuel oil used in calculating the amount of such subsidy to a maximum of $30 per barrel. The residential clients must pay any fuel adjustment charge resulting from a price of fuel oil in excess of $30 per barrel. For the fiscal year ended June 30, 2013, there were approximately 214,175 clients or 16% of the total residential classification, who qualified for this subsidy, which amounted to $26.4 million (unaudited). For fiscal years 2014 through 2018, the annual average cost of the residential subsidy is expected to be $21 million.

Act No. 69-2009 provides residents of public housing units the alternative of receiving electric power at a fixed rate. According to the provisions of Act No. 69, the Authority is required to establish a fixed rate for electric power consumption for residents of public housing and provide a payment plan for all residents with past due amounts. Once the Authority has established its fixed rate, residents of public housing that are current with their payments may opt-out of this fixed rate program if their current rate is lower and the Authority may eliminate, as to such clients, all subsidy programs currently in effect. The Authority is also prohibited from suspending service to these residents unless they fail to comply with their payment plan or the payment of the fixed rate. The Authority has approved a fixed rate from $30 to $50 (depending on the number of rooms) for a maximum consumption of 425 kWh. Approximately 40,194 residential clients currently take advantage of this fixed rate. The Authority revenues from clients under the fixed rate amounted to $20.3 million for fiscal year 2013.

Hotels receive a subsidy in an amount equal to 11% of their monthly billing, which has averaged approximately $7.6 million per year for the five fiscal years ended June 30, 2013. In order to receive this subsidy, hotels must maintain the hotel's electric service accounts on a current basis.

The Authority credits the residential fuel and hotel subsidy against the recipient's electric bills rather than first collecting the unsubsidized amount of energy charges and then reimbursing the recipient for the amount of the subsidy.

In addition, the Authority has recently been offering certain discounts and incentives in the form of credits to certain industrial clients, as discussed under *Rates* above.

*Contributions In Lieu of Taxes*

The CILT is intended to compensate the municipalities for foregone tax revenues. The Act provides that the Authority's obligations under the Trust Agreement have priority over the Authority's CILT obligation as well as the Authority's subsidy obligations, none of which is characterized as a Current Expense under the Trust Agreement. The amount of the CILT payable to the municipalities is the greater of the following amounts: (1) 20% of the Authority's Net Revenues (as defined in the Trust Agreement), after deducting from Net Revenues the cost of certain government subsidy programs; (2) actual electric power consumption by the municipalities; and (3) the prior five year average of the CILT paid to the municipalities. The CILT is payable from available Net Revenues in each fiscal year, but under the Act the total amount of the CILT and the other subsidies may not exceed 11% of the Authority's gross revenues for any fiscal year. The Authority is required to pay the CILT no later than November 30 following the end of the fiscal year to which the CILT applies. The Act further provides that the Authority may, at its option, deduct any municipality's receivable that is outstanding at the end of any fiscal year from the CILT payable to such municipality. If the Authority does not have sufficient Net Revenues available in any fiscal year to pay the CILT to the municipalities, the difference is carried

forward for a maximum of three years, at the end of which the Authority is required to pay the remaining balance, subject to the Authority's compliance with its obligations under the Trust Agreement.

While the Authority has the legal right to bill and collect for the consumption of electric energy from the municipalities and to pay the municipalities in the form of a CILT, historically the Authority has instead offset each municipality's energy consumption charges against its CILT, eliminating the need to collect and remit payments. At the end of each fiscal year, the Authority determines the amount of Net Revenues for that fiscal year available to cover the CILT. The amount so determined is applied against any CILT payable from prior fiscal years, beginning with any CILT that has then become immediately due and payable due to the three fiscal year limitation. Any remaining amount of Net Revenues is applied against the CILT for the current fiscal year. At the same time, the Authority reduces its municipalities' receivable by an amount equal to the aggregate amount of the CILT being reduced from its payables.

For fiscal year 2013, the total amount of the CILT due to the municipalities, based on the value of power consumed by the municipalities, was $263.0 million (unaudited). Of this amount, the CILT paid to the municipalities corresponding to fiscal year 2013 was $42.9 million, which was applied by reducing the outstanding municipal accounts receivable balances by that amount. The remaining balance of the CILT for fiscal year 2013 ($220.1 million) is being carried forward for payment over the next three years. During fiscal year 2013, the Authority also paid to the municipalities $88.5 million (unaudited) of outstanding unpaid CILT that had been carried forward for fiscal years 2010, 2011 and 2012, and $10.5 million (unaudited) to amortize the outstanding balance of a note issued to the municipalities as part of the settlement of a lawsuit brought by the municipalities against the Authority. These payments to the municipalities were all made by offsetting the municipalities' electric energy consumption receivables.

Act No. 233-2011, approved December 11, 2011, modifies the CILT formula to exclude from the municipality's electric energy consumption electric energy consumption related to municipal facilities in which for-profit businesses operate and for which the municipalities receive compensation through rent or an entrance fee. The Authority is in the process of implementing the provisions of Act No. 233-2011 by installing additional meters in municipal facilities to be able to determine the consumption that is no longer subject to the CILT. The Authority's preliminary estimate is that Act No. 233-2011 will result in additional collections of approximately, $49 million each fiscal year beginning in 2014. The Authority's projections for the five fiscal years ending June 30, 2018 take into consideration the provisions of Act No. 233-2011.

If the Authority were to pursue the collection of bills for energy consumption by the municipalities, there is no assurance that the Authority in fact would be able to collect such bills or, in some cases, collect such bills from many municipalities that are in a difficult financial position.

### Rural Electrification and Irrigation Systems

The Authority provides certain technical and maintenance services for dams that supply PRASA and some irrigation users. The cost of these services is treated by the Authority as a subsidy.

The following table sets forth the amount of CILT that the Authority expects to pay during the five fiscal years ending on June 30, 2018, and the residential fuel and hotel subsidies that the Authority expects to incur during the five fiscal years ending on June 30, 2018. The amounts appearing on this table for municipalities for fiscal years 2014 through 2018 represent the municipalities' expected electric power consumption, excluding the electric power consumption of facilities that are no longer subject to CILT, in such fiscal years.

| | Fiscal Years Ending June 30 (in thousands) | | | | |
|---|---|---|---|---|---|
| Description | 2014 | 2015 | 2016 | 2017 | 2018 |
| Municipalities (CILT) | $164,703 | $168,815 | $165,375 | $151,438 | $156,610 |
| Hotel Subsidies | 7,949 | 8,099 | 8,098 | 8,215 | 8,119 |
| Subsidies | | | | | |
| Industrial Incentive | 2,203 | 2,937 | 3,671 | 6,425 | 9,179 |
| Irrigation Systems | 5,357 | 5,464 | 5,573 | 5,685 | 5,799 |
| Residential Clients | 20,815 | 20,448 | 21,218 | 21,581 | 22,028 |
| Total | $201,027 | $205,763 | $203,935 | $193,344 | $201,735 |

## Wheeling

Act No. 73-2008 provides that the Authority shall identify and implement a system that permits the operation of a wheeling service mechanism for renewable energy producers by January 2, 2010. Act No. 73 also provides for the creation of a Wheeling Committee, responsible for the implementation of the wheeling system. The Committee of Wheeling engaged Christensen Associates Energy Consulting, LLC, based in Wisconsin, to prepare the Puerto Rico Wheeling System Implementation Plan Study that was delivered to the Authority in December 2009. This study, which included various regulatory proposals regarding the establishment of the system and the applicable tariffs, was reviewed by the Authority and substantial changes were made.

Although the Authority did not meet the deadline established in the Economic Incentives Act, public hearings were held on June 1 and 2, 2010 to consider the Wheeling System Tariffs, Wheeling Transmission Regulation and Wheeling Interconnection Procedure and has adopted a temporary wheeling system tariff structure. The public hearing examiner submitted a final report to the Authority's Governing Board on July 29, 2010. In the report, the examiner recommended approval of the Wheeling Transmission Regulation and Wheeling Interconnection Procedure, but rejected approval of the Wheeling System Tariffs based on lack of information to the public. He recommended further public hearings with enough time for public evaluation. Based on such recommendations, the Authority modified the Wheeling Transmission Tariff Schedules and held new public hearings on June 2 and 3, 2011. The public hearing examiner submitted his report to the Governing Board on July 22, 2011, including various recommendations that are under evaluation by the Authority. Meanwhile, the Authority's Governing Board further extended the temporarily approved wheeling system tariff structure. On November 2, 2012, the Governing Board approved the Wheeling Regulation and the Interconnection for Independent Power Producers Regulations and a pilot program for a period of six months for generation systems with a maximum reserved capacity of 10 MW. Currently, there are no clients utilizing the wheeling service mechanism. See *Changes in Commonwealth Legislation and Market Developments* under INVESTMENT CONSIDERATIONS.

## DEBT

The following table sets forth the Power Revenue Bonds and notes of the Authority (i) outstanding as of June 30, 2013, and (ii) as adjusted for the issuance of the Bonds.

| | Outstanding as of June 30, 2013 | As adjusted for the Issuance of the Bonds |
|---|---|---|
| | (in thousands) | |
| Lines of Credit (operational) | $ 744,379 | $ 744,379 |
| Power Revenue Bonds | 8,048,485 | 8,526,710[*] |
| Other Loans and Debt (subordinated) | 16,543 | 16,543 |
| Total | $ 8,809,407 | $ 9,287,632 |

[*]Includes the payment of principal on July 1, 2013 of $194.9 million.

## Lines of Credit – Operational

As of June 30, 2013, the Authority had two revolving lines of credit provided by private financial institutions for the purchase of fuel oil and power and working capital expenses. These two lines of credit had an initial maximum aggregate amount of $750 million, of which $744.4 million was outstanding as of June 30, 2013. One line of credit had an initial aggregate principal amount of $500 million and matures on August 15, 2013. This line was reduced to $450 million due to one of the syndicate member banks' termination of its $50 million commitment and participation. On August 14, 2013, the Authority renewed this line of credit at the higher aggregate principal amount of $550 million with a new expiration date of August 14, 2014. The other line of credit matures on October 7, 2014. The debt service payments on these lines of credit are Current Expenses payable prior to debt service on the Authority's Power Revenue Bonds.

## Other Loans and Debt – Subordinated

As of June 30, 2013, the Authority had a term loan with a private financial institution that had an outstanding balance of approximately $9.7 million. The term loan is subordinated in payment priority to the Authority's Power Revenue Bonds and is payable from the subordinate obligations fund established under the Trust Agreement, which is funded from the annual Revenues of the Authority remaining after all deposits to the Sinking Fund and the Reserve Maintenance Fund required by the Trust Agreement have been made.

The Authority has lines of credit issued by Government Development Bank which are also subordinate in payment priority to the Authority's Power Revenue Bonds. These two lines of credit were approved for an amount of $100 million and $25.4 million. The first line of credit covers amounts posted as collateral for several outstanding swap transactions, and had an outstanding amount of $6.1 million as of June 30, 2013. See *Swap Agreements* below. The second line of credit covers the rehabilitation of the Isabela Irrigation System, and had an outstanding amount of $743,216 as of June 30, 2013.

## Swap Agreements

As of July 1, 2008, the Authority entered into a basis swap agreement in the notional amount of $1.375 billion (the "Basis Swap Agreement") with an amortization schedule matching certain maturities of the Authority's outstanding Power Revenue Bonds from 2027 to 2037. Under the terms of a master swap agreement, the Authority receives from Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, an affiliate of Goldman, Sachs & Co.) quarterly payments equal to a floating amount applied to said notional amount at a rate equal to 62% of the 3-month London Inter-Bank Offered Rate ("LIBOR") index reset each week plus 29 basis points (hundredths of a percent) and a fixed rate payment of 0.4669% per annum (the "basis annuity"), for the term of the swap in return for quarterly payments by the Authority on such notional amount at a rate based on the Securities Industry and Financial Markets Association ("SIFMA") municipal swap index. The terms of the master swap agreement also require the Authority to post collateral (in cash or securities) in the event the fair value of the swap is negative and exceeds a threshold which is determined by the Authority's credit ratings with Moody's Investors Service ("Moody's") and Standard & Poor's ("S&P"). Based on the Authority's current ratings from Moody's and S& P, the collateral posting threshold is zero.

In January 2012, the Authority terminated $225 million in notional amount under the Basis Swap Agreement in order to reduce its exposure. The Authority received $265,000 from the counterparty in connection with this termination. In May 2012, the Authority entered into novation transactions to transfer from Goldman Sachs $200 million in notional amount to Deutsche Bank and $400 million in notional amount to Royal Bank of Canada. In April 2013 and June 2013, the Authority terminated $100

million in notional amount with Royal Bank of Canada and $50 million in notional amount with Goldman Sachs, respectively. The current outstanding notional of the Basis Swap Agreement is $1.0 billion.

This basis swap provides the Authority the cash flow benefit of the basis annuity in exchange for the Authority taking swap tax and other basis risks tied to the change in the relationship between LIBOR and the SIFMA municipal swap index. Pursuant to the Trust Agreement, regularly scheduled payments to the counterparty by the Authority and payments relating to the termination or other fees, expenses, indemnification or other obligations to the counterparty under the Basis Swap Agreement are subordinate to the Power Revenue Bonds, including the Bonds.

During fiscal years 2009, 2010, 2011, 2012, and 2013, the Authority received $7.9 million, $9.5 million, $9.6 million, $11.1 million, and $9.1 million, respectively, from the counterparties to the basis swap, net of the Authority's payments to the counterparties. Since inception, the Authority has had a maximum collateral posting requirement of $84.2 million in November 2008. As of June 30, 2013, the fair value of the basis swap was negative $7.6 million. Because the collateral posting threshold for this basis swap is zero, the Authority was required to post and, as of June 30, 2013, posted $7.6 million as collateral.

In connection with the issuance of its Power Revenue Refunding Bonds, LIBOR Bonds Series UU (the "LIBOR Bonds") and Power Revenue Refunding Bonds, Muni-BMS Bonds Series UU (the "Muni-BMS Bonds"), the Authority entered into certain interest rate swap agreements (the "Interest Rate Swap Agreements"). The Interest Rate Swap Agreements have a current aggregate notional amount of $411.8 million, matching the principal amount of the associated Power Revenue Refunding Bonds, Series UU. Under the terms of the master swap agreement, the Authority receives from JPMorgan Chase Bank, N.A. and UBS AG (an affiliate of UBS Securities, Inc.) quarterly payments equal to a floating amount based on a rate equal to 67% of LIBOR reset every third month plus a fixed basis point spread (hundredths of a percent), for the term of the swap in return for quarterly payments by the Authority equal to a fixed amount based on a fixed rate, in each case based on a notional amount equal to the principal amount of LIBOR Bonds outstanding. The Authority also receives from JPMorgan Chase Bank, N.A. quarterly payments equal to a floating amount based on a rate equal to 100% of the five-year SIFMA swap rate for the term of swap in return for quarterly payments by the Authority equal to a fixed amount based on a fixed rate, in each case based on a notional amount equal to the principal amount of Muni-BMS Bonds outstanding. As of June 30, 2013, the Interest Rate Swap Agreements had a negative fair value of approximately $70.7 million.

The Authority is subject to collateral posting requirements on the Interest Rate Swap Agreements in the event the fair value of the swap is negative and exceeds a threshold amount. With respect to Interest Rate Swap Agreements that are insured and have a notional amount of $252.9 million, the threshold amount is currently infinite. If the insurer's current ratings were lowered, at the Authority's current ratings the threshold would be $30 million. If the insurer's current ratings were lowered and the Authority's ratings were also downgraded by one notch by Moody's and S&P, the threshold would be zero. Based on the fair value of these swap agreements as of June 30, 2013, the Authority would have been required to post $1.8 million of collateral under the $30 million threshold and would have been required to post $47.5 million of collateral at the zero threshold. With respect to the other Interest Rate Swap Agreements that are uninsured and have a notional amount of $159.0 million, the threshold is zero. As of June 30, 2013, the Authority had posted collateral in the required amount of $23.5 million.

In fiscal year 2010, the Authority adopted Governmental Accounting Standards Board Statement No. 53 - Accounting and Financial Reporting for Derivative Instruments, which requires that the fair value of derivatives be reported in a government entity's financial statements. In order to comply, a journal entry for the amount of $109.9 million was booked to register a Swap Liability and a Deferred Outflow, resulting from the change in the fair market value of the derivative instruments.

**Principal and Interest Requirements**

Principal and Interest Requirements, as used herein and as defined in the Trust Agreement, means for any fiscal year the sum of all principal of, including Amortization Requirements for, and interest on, outstanding Power Revenue Bonds which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year. The following table shows the annual Principal and Interest Requirements for the outstanding Power Revenue Bonds after giving effect to the issuance of the Bonds. The figures for interest and total debt service have been reduced by the interest that was capitalized through prior issuances of Power Revenue Bonds and the issuance of the Bonds in the following amounts: approximately $71.4 million due during fiscal year 2014, $62.1 million during fiscal year 2015 and $23.2 million during fiscal year 2016. The Amortization Requirements are subject to adjustment as provided in the definition thereof. See Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Debt Service Requirements**

| Year Ending Jun 30 | Outstanding Bonds Debt Service[(1)(2)(3)] | The Bonds | | | Total Outstanding Bonds Debt Service[(1)(2)(4)] |
| | | Principal | Interest[(2)(4)] | Total Debt Service[(2)(4)] | |
|---|---|---|---|---|---|
| 2014 | $   577,196,862.14 | $ | $ | $ | $   577,196,862.14 |
| 2015 | 592,935,280.90 | | | | 592,935,280.90 |
| 2016 | 607,216,908.40 | | 23,219,450.00 | 23,219,450.00 | 630,436,358.40 |
| 2017 | 608,909,050.90 | | 46,438,900.00 | 46,438,900.00 | 655,347,950.90 |
| 2018 | 608,908,526.12 | | 46,438,900.00 | 46,438,900.00 | 655,347,426.12 |
| 2019 | 609,268,853.62 | | 46,438,900.00 | 46,438,900.00 | 655,707,753.62 |
| 2020 | 609,272,238.62 | | 46,438,900.00 | 46,438,900.00 | 655,711,138.62 |
| 2021 | 609,272,235.42 | | 46,438,900.00 | 46,438,900.00 | 655,711,135.42 |
| 2022 | 609,270,428.84 | | 46,438,900.00 | 46,438,900.00 | 655,709,328.84 |
| 2023 | 609,272,942.16 | | 46,438,900.00 | 46,438,900.00 | 655,711,842.16 |
| 2024 | 609,269,959.22 | | 46,438,900.00 | 46,438,900.00 | 655,708,859.22 |
| 2025 | 609,248,789.06 | | 46,438,900.00 | 46,438,900.00 | 655,687,689.06 |
| 2026 | 609,273,450.20 | | 46,438,900.00 | 46,438,900.00 | 655,712,350.20 |
| 2027 | 609,272,667.64 | | 46,438,900.00 | 46,438,900.00 | 655,711,567.64 |
| 2028 | 609,269,255.86 | | 46,438,900.00 | 46,438,900.00 | 655,708,155.86 |
| 2029 | 566,484,960.36 | | 46,438,900.00 | 46,438,900.00 | 612,923,860.36 |
| 2030 | 438,855,066.58 | 35,000,000.00 | 46,438,900.00 | 81,438,900.00 | 520,293,966.58 |
| 2031 | 440,671,675.60 | | 43,901,400.00 | 43,901,400.00 | 484,573,075.60 |
| 2032 | 414,203,041.26 | 16,790,000.00 | 43,901,400.00 | 60,691,400.00 | 474,894,441.26 |
| 2033 | 298,959,006.26 | 133,210,000.00 | 42,726,100.00 | 175,936,100.00 | 474,895,106.26 |
| 2034 | 259,803,056.26 | 95,825,000.00 | 33,401,400.00 | 129,226,400.00 | 389,029,456.26 |
| 2035 | 259,570,168.76 | 102,525,000.00 | 26,933,212.50 | 129,458,212.50 | 389,028,381.26 |
| 2036 | 259,864,368.76 | 109,150,000.00 | 20,012,775.00 | 129,162,775.00 | 389,027,143.76 |
| 2037 | 352,285,531.26 | | 12,645,150.00 | 12,645,150.00 | 364,930,681.26 |
| 2038 | 351,075,937.50 | | 12,645,150.00 | 12,645,150.00 | 363,721,087.50 |
| 2039 | 323,271,550.02 | 22,275,000.00 | 12,645,150.00 | 34,920,150.00 | 358,191,700.02 |
| 2040 | 319,383,481.28 | 27,725,000.00 | 11,085,900.00 | 38,810,900.00 | 358,194,381.28 |
| 2041 | 235,672,000.00 | | 9,145,150.00 | 9,145,150.00 | 244,817,150.00 |
| 2042 | 235,675,750.00 | | 9,145,150.00 | 9,145,150.00 | 244,820,900.00 |
| 2043 | | 130,645,000.00 | 9,145,150.00 | 139,790,150.00 | 139,790,150.00 |
| Total | $13,843,633,043.00 | $673,145,000.00 | $960,697,137.50 | $1,633,842,137.50 | $15,477,475,180.50 |

[(1)] The numbers shown are reduced by the interest that was capitalized through prior issuances of Power Revenue Bonds in the amount of $31,476,480 in fiscal year 2014, and $15,738,240 in fiscal year 2015. See "Rate Covenant" under SECURITY.

[(2)] The numbers shown assume that the rate paid on variable rate Power Revenue Bonds is equal to the fixed swap rate on these Bonds. The floating rate on the swaps paid to the Authority is equal to the floating interest rate on such Bonds.

[(3)] As a result of the federal sequester under GRH, the Outstanding Debt Service shown is not reduced by any Federal Subsidy Payments. See "Rate Covenant" under SECURITY.

[(4)] The numbers shown are reduced by the interest that was capitalized through the issuance of the Bonds in the amount of $39,989,052.78 in fiscal year 2014, $46,438,900.00 in fiscal year 2015 and $23,219,450.00 in fiscal year 2016. See "Rate Covenant" under SECURITY.

## NET REVENUES AND COVERAGE

The following table presents the Net Revenues of the Authority under the provisions of the Trust Agreement for the five fiscal years ended June 30, 2013 and the ratio of such Net Revenues to Principal and Interest Requirements on the Power Revenue Bonds. The Authority calculates Revenues, Current Expenses and Net Revenues on the accrual basis. These calculations of Net Revenues differ in several important respects from the Authority's calculations of changes in Net Assets prepared in conformity with GAAP. For example, the calculations of Net Revenues do not include depreciation, interest expense on the Power Revenue Bonds, other post-employment benefits actuarial accruals, and CILT as a deduction in calculating Net Revenues. The figures for Revenues and Net Revenues in this table include the revenues attributable to the residential fuel and hotel energy consumption that are offset by legally mandated subsidies (see footnotes 2 and 3), and the electric consumption charges of the municipalities, against which the Authority applies the CILT (see footnote 3). The debt service coverage is shown as calculated under the Trust Agreement and as then adjusted to reflect the elimination from Net Revenues of energy charges that the Authority offsets by legally mandated subsidies or the CILT.

## Historical Net Revenues and Coverage

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013[1] |
| Average number of clients | 1,458,636 | 1,469,493 | 1,475,126 | 1,473,394 | 1,485,150 |
| Electric energy sales (in millions of kWh) | 18,516 | 19,235 | 18,501 | 18,112 | 17,962 |
| **Source of Net Revenues (dollars in thousands)** | | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential[2] | $1,374,344 | $1,514,413 | $1,579,445 | $1,756,948 | $1,667,141 |
| Commercial[3] | 1,897,022 | 1,959,953 | 2,107,448 | 2,463,747 | 2,417,481 |
| Industrial | 601,985 | 563,915 | 596,046 | 678,083 | 602,263 |
| Other | 112,830 | 116,134 | 123,216 | 132,651 | 134,463 |
| Sub-Total | $3,986,181 | $4,154,415 | $4,406,155 | $5,031,429 | $4,821,348 |
| Revenues from Commonwealth for rural electrification | 19 | - | - | - | - |
| Other operating revenues | 14,641 | 15,915 | 16,595 | 14,126 | 28,405 |
| Other (principally interest earned) | 6,427 | (4,597) | (11,537) | 7,123 | 3,249 |
| Total Revenues | $4,007,268 | $4,165,733 | $4,411,213 | $5,052,678 | $4,853,002 |
| Current Expenses: | | | | | |
| Operations: | | | | | |
| Fuel | 1,919,789 | 2,006,931 | 2,291,386 | 2,901,815 | 2,603,577 |
| Purchased power | 671,849 | 693,724 | 660,872 | 684,148 | 755,828 |
| Other production | 62,271 | 62,697 | 67,451 | 75,829 | 72,744 |
| Transmission and Distribution | 162,334 | 160,796 | 176,369 | 175,815 | 172,316 |
| Customer accounting and Collection | 111,126 | 114,542 | 114,837 | 113,526 | 116,201 |
| Administrative and General | 222,477 | 178,982 | 173,502 | 251,729 | 187,784 |
| Maintenance[4] | 225,107 | 209,516 | 220,775 | 212,403 | 213,865 |
| Other | 2,819 | 1,907 | - | - | - |
| Total Current Expenses | $3,377,772 | $3,429,095 | $3,705,192 | $4,415,265 | $4,122,315 |
| Net Revenues[3] | $ 629,496 | $ 736,638 | $ 706,021 | $ 637,413 | $ 730,687 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[5] | $ 435,042 | $ 397,579 | $ 480,233[6] | $ 327,685[6] | $ 530,717[6] |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.45 | 1.85 | 1.47 | 1.95 | 1.38 |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[7] | 0.92 | 1.25 | 0.95 | 1.07 | 0.82 |

[1] Unaudited.

[2] Includes residential fuel subsidies of $30.6 million, $29.6 million, $26.8 million, $29.2 million and 26.4 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively.  See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

[3] Includes (i) electric energy consumption by municipalities of $187.6 million, $196.5 million, $212.5 million, $244.3 million and $263 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively; and (ii) hotel subsidies of $6.5 million, $6.3 million, $7.4 million, $9.1 million and $8.9 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively.  See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

[4] Includes, for maintenance of generating facilities, $117.3 million, $105.0 million, $107.7 million, $107.9 and $102.2 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively.

[5] The Principal and Interest Requirements for fiscal years 2009, 2010, 2011, 2012 and 2013 have been reduced by the interest that was capitalized through the issuance of Power Revenue Bonds in the amounts of $37.7 million, $8.4 million, $79.5 million, $81.5 million and $67.1 million, respectively.  The Principal and Interest Requirements for fiscal year 2010 and 2012 have been adjusted to reflect the restructuring of $73.9 million and $159 million, respectively, of the Authority's debt service requirements for such fiscal year through the issuance of Power Revenue Bonds, the proceeds of which were used to pay debt service for that fiscal year.

[6] The Principal and Interest Requirements for fiscal years 2011 through 2013 have been reduced by the amount of the Federal Build America Bonds subsidy on the Power Revenue Bonds, Series YY and Series EEE (Issuer Subsidy Build America Bonds), equal to 35% of the interest payable on such Bonds.  See "Rate Covenant" under SECURITY.

[7] Excludes from Net Revenues, for purposes of computing this ratio, the basic charges and fuel and purchased power adjustment charges attributable to energy consumption by the municipal governments as well as the subsidies for energy consumption charges provided by law to certain residential clients and hotels in the amounts set forth in footnotes (2) and (3) above, which are not collected.

Although the ratio of adjusted net revenues (net of municipalities' consumption and subsidies) to Principal and Interest Requirements was below 1.00 for fiscal years 2009, 2011 and 2013, the Authority made timely payments on its Power Revenue Bonds in such fiscal years. The Authority, however, has had to obtain additional borrowings in order to meet all of its operational and financial obligations. See *The Authority's Financial Condition* under RISK FACTORS AND INVESTMENT CONSIDERATIONS.

The Authority's rate covenant requires that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that Revenues are sufficient to pay Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all bonds then Outstanding. Pursuant to the accrual method of calculating Revenues and Current Expenses under the Trust Agreement, the Authority is in compliance with the rate covenant, even if the accrued residential fuel and hotel subsidies are excluded from Revenues.

## Management's Discussion and Analysis of Operating Results

The following represents the Authority's analysis of its operations for the five fiscal years ended June 30, 2013. For additional analysis of the Authority's results of operations, see *Management's Discussion and Analysis* in the Authority's audited financial statements, included as Appendix II.

### Five-Year Period

During the five-year period from fiscal year 2009 through fiscal year 2013, the Authority experienced a net decrease of 3.0% in electric energy sales in kilowatt hours ("kWh"), as shown in the table that follows under the heading "Operating Results." The Authority's sales during this period were adversely affected by the significant increase in the price oil (the average cost of fuel oil per barrel to the Authority increased by 45.8%), the principal source of fuel used in its generating facilities, and a reduction in the level of economic and business activity in the Commonwealth due to a prolonged recession, which commenced in the fourth quarter of fiscal year 2006.

The Authority's Net Revenues increased from $629.5 million in fiscal year 2009 to $730.7 million (unaudited) in fiscal year 2013, or 16.1%. During this period, the Authority experienced decreases in Net Revenues in fiscal years 2009, 2011 and 2012, when compared to the respective prior fiscal years. The change in Net Revenues during this period was the result of a reduction in the demand for electricity due to higher prices of fuel and the effect in Revenues of the Rate Stabilization Account for fiscal year 2012. Principal and Interest Requirements on the Authority's Power Revenue Bonds increased from $435.0 million in fiscal year 2009 to $534.3 million in fiscal year 2013 (which excludes $67.1 million of interest in fiscal year 2013 that was capitalized through the issuance of Power Revenue Bonds). The increase in Principal and Interest Requirements was the result of the issuance of additional Power Revenue Bonds by the Authority.

### Fiscal Year 2013 (unaudited) compared to fiscal year 2012

For the fiscal year ended June 30, 2013, as compared to fiscal year ended June 30, 2012, Net Revenues increased by $93.3 million, or 14.6%. The increase in Net Revenues was primarily the result of a decrease from $79 million for fiscal year 2012 to $53.2 million for fiscal year 2013 in the use of the rate stabilization program to fund the fuel adjustment revenues not billed to certain residential clients. In addition, administrative and general expenses decreased by $63.9 million, or 25.4%, mainly due to $37.2 million of costs related to the cancelled Via Verde Project, which were registered as Current Expenses.

Current Expenses were $4,122.3 million, representing a decrease of 6.6% from the prior year. Fuel and purchased power expenses, the principal component of the Authority's Current Expenses, are passed on to clients through a separate fuel adjustment charge included in electric service rates. The Authority's revenues from its basic charges (which exclude the fuel and purchased power adjustment charges) increased by 3.2% from fiscal year 2012 to fiscal year 2013. Excluding fuel and purchased power expenses, Current Expenses decreased from $829.3 million during fiscal year 2012 to $762.9 million during fiscal year 2013, representing an 8% decrease as a result of the decrease in administrative and general expenses mentioned above and expense control measures implemented by the Authority's management. The accrued revenues attributable to the municipalities' consumption, the residential customer fuel subsidy and hotel subsidy were $298.2 million and $282.5 million for fiscal year ended June 2013 and 2012, respectively. The treatment of the municipalities' consumption and these subsidies, which are included in Revenues although they are not collected, is discussed below and in *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

The Authority implemented a new customer service system in May 2012. As a result, many invoices were rejected or subject to estimation. This situation has increased the level past due receivables or contested receivables. The Authority is taking measures to correct these errors. Among them are a reconfiguration of the customer service system, training of personnel to prevent the rejection of invoices and correction of all government and large customer accounts. In addition, the Authority has increased its collection efforts to reduce past due receivables.

During fiscal year 2013, the accounts receivable from the sale of electric energy (net of the deferred liability to municipalities) increased from $1,083.4 million as of June 30, 2012 to $1,154.3 million as of June 30, 2013. Accounts receivable from government clients (net of the deferred liability to municipalities) increased from $239.4 million as of June 30, 2012 to $277.3 million as of June 30, 2013. Accounts receivable from general clients increased from $844.5 million as of June 30, 2012 to $877.1 million as of June 30, 2013.

**Government Accounts Receivable**

|  | As of June 30, 2012 | | | As of June 30, 2013 | | |
|---|---|---|---|---|---|---|
|  | Current | Past Due | Total | Current | Past Due | Total |
| Government Agencies | $23,056 | $ 22,788 | $ 45,844 | $15,219 | $ 48,009 | $ 63,228 |
| Public Corporations | 33,177 | 160,334 | 193,511 | 16,583 | 197,444 | 214,027 |
| Total | $56,233 | $183,122 | $239,355 | $31,802 | $245,453 | $277,255 |

*Fiscal year 2012 compared to fiscal year 2011*

For the fiscal year ended June 30, 2012, as compared to fiscal year ended June 30, 2011, Net Revenues decreased by $68.6 million, or 9.7%. The decrease in Net Revenues was primarily the result of a 2.1% decrease in electric energy sales (kWh) and $79.4 million in fuel adjustment revenues not billed to the residential clients, which were financed by the Rate Stabilization Account. Current Expenses increased by $710.0 million, or 19.2%. Current Expenses, excluding fuel and purchased power expenses, increased by $76.4 million or 10.1%, mainly due to $37.2 million of costs related to the cancelled Via Verde Project, registered as Current Expenses during fiscal year ended on June 30, 2012.

Accounts receivable increased from $1,025.4 million as of June 30, 2011 to $1,083.4 million as of June 30, 2012. Of this amount, $239.4 million were due from the Commonwealth central government, public corporations and municipalities (net of the deferred liability to the contribution in lieu of taxes to the municipalities).

*Fiscal year 2011 compared to fiscal year 2010*

Net Revenues for fiscal year 2011 were $706.0 million, representing a decrease of $30.6 million, or 4.2%, from Net Revenues for fiscal year 2010. The decrease in Net Revenues was primarily the result of a 3.8% decrease in electric energy sales (in kWh) and increases in maintenance expenses of $11.3 million, or 5.4%, and in transmission and distribution expenses of $15.6 million, or 9.7%. Revenues were $4.4 billion, a 5.9% increase from the prior year as a result of an increase in the revenues from the fuel adjustment charge due to the 14.2% increase in the costs incurred by the Authority for the purchase of fuel oil during the period, compared to the prior year. Current Expenses, which include fuel and purchased power, maintenance, administrative and general expenses, among others, were $3.7 billion for the year, an 8.1% increase from the prior year. The Authority's revenues from its basic charges (which exclude the fuel adjustment charge) decreased by 3.0% from fiscal year 2010 to fiscal year 2011 as a result of the decrease in electric energy sales. Excluding fuel and purchased power expenses, Current Expenses increased from $728.4 million for fiscal year 2010 to $752.9 million for fiscal year 2011, or 3.4%, as a result of the increases in maintenance and transmission and distribution expenses mentioned above. The increase in these expenses was due in part to increases in salaries pursuant to the collective bargaining agreement with the Authority's principal union. The accrued revenues attributable to the municipalities' consumption and the residential fuel and hotel subsidies increased from $237.8 million for fiscal year 2010 to $251.2 million for fiscal year 2011, or 5.6%. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

During fiscal year 2011, accounts receivable from the sale of electric energy (excluding billings to municipalities) increased from $932.1 million as of June 30, 2010 to $1.0 billion as of June 30, 2011. The increase in accounts receivable was mainly the result of the increase in the fuel adjustment charge, due to the increase in the cost of fuel, and slower payments by clients. Accounts receivable from government clients (excluding municipalities) increased from $274.7 million as of June 30, 2010 to $282.3 million as of June 30, 2011, of which 78% were considered past due (in excess of 30 days) as of June 30, 2011, compared to 73% as of June 30, 2010. Accounts receivable from general clients (residential, industrial and commercial) increased from $657.4 million as of June 30, 2010 to $720.1 million as of June 30, 2011, of which 8% were past due as of June 30, 2011, compared to 10% as of June 30, 2010.

*Fiscal year 2010 compared to fiscal year 2009*

For the fiscal year ended June 30, 2010, as compared to the fiscal year ended June 30, 2009, Net Revenues increased by $107.1 million, or 17.0%. This increase was mainly due to an increase of 3.9% in electric energy sales (kWh), which resulted in an increase of $158.5 million, or 4.0%, in Revenues. Although Current Expenses increased by $51.3 million, or 1.5%, administrative and general expenses decreased by $43.5 million, or 19.6%. Accounts receivable decreased from $1.019 billion as of June 30, 2009 to $976.4 million as of June 30, 2010. Of this total, $373.1 million were due from the Commonwealth central government and the public corporations, a decrease from $471.4 million as of June 30, 2009.

*Fiscal year 2009 compared to fiscal year 2008*

For the fiscal year ended June 30, 2009, as compared to the fiscal year ended June 30, 2008, Net Revenues decreased by $52 million, or 7.6%. This decrease was mainly due to a reduction of 5.5% in electric energy sales (kWh). Revenues decreased by $362 million, or 8.3%, as a result of the reduction in energy sales and a reduction in the price of fuel from $84.18 per barrel in 2008 to $76.23 per barrel in 2009. Current Expenses decreased by $310 million, or 8.4%. Fuel and purchased power expenses, the largest component of Current Expenses, were down by $372 million or 12.6%, partly because of the

reduction in the price of fuel, but also because in 2008 the Authority incurred additional fuel expense resulting from the Palo Seco fire that occurred in December 2006. A portion of this extra cost ($96 million in 2008) is being claimed by the Authority from its insurers and is shown as a separate line item. Maintenance expenses also declined by $23 million or 9.4% when compared with 2008. Accounts receivable as of June 30, 2009, decreased by 3.1%, to $1.019 billion, when compared by 2008. Of this total, $471.3 million were due from the Commonwealth central government and the public corporations, an increase of 31.9% from the previous year.

**Historical Disposition of Net Revenues**
**(in thousands)**

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 |
| **Disposition of Net Revenues** | | | | | |
| Sinking Fund: | | | | | |
| Interest............................................. | $261,486 | $246,072 | $304,778 | $184,263 | $332,503 |
| Principal............................................ | 173,040 | 151,507 | 175,455 | 143,422 | 194,920 |
| Reserve Account................................ | (29,523) | – | – | – | – |
| Reserve Maintenance Fund..................... | – | – | – | – | – |
| Self-insurance Fund............................. | 10,000 | 10,000 | 10,000 | 5,000 | – |
| Capital Improvement Fund ..................... | 4,695 | 63,405 | 17,231 | 15,086 | 16,686 |
| Interest on Notes.................................. | 28,434 | 33,985 | 1,550 | 4,405 | 408 |
| Contributions in lieu of taxes and other uses[1] ....... | 181,364 | 231,669 | 197,007 | 285,237 | 186,170 |
| Net Revenues ........................................ | $629,496 | $736,638 | $706,021 | $637,413 | $730,687 |

[1]  Includes the following amounts attributable to the residential fuel subsidy and the subsidy granted to the hotel industry: $37.1 million, $35.9 million, $34.2 million, $38.3 million and 35.3 million for fiscal years ended June 30, 2009, 2010, 2011, 2012 and 2013, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Since Net Revenues include amounts billed to the municipalities and other subsidies that are not collected, as discussed previously, in some years, the Authority may not have had sufficient cash available to make the deposits and payments shown above as being made prior to the application of "Contributions in lieu of taxes and other uses." In those years, the Authority made some of the deposits and payments from additional borrowings.

## Projected Net Revenues

The main assumptions used by the Authority in preparing the estimates of Net Revenues set forth below are the following:

Revenues  - Projected Revenues from sales of electric energy are based upon economic growth projections for the Commonwealth. The Revenue projections assume that sales in kWh will increase by 1.32%, 0.38%, 1.14%, 1.52% and 1.78% for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively.

Current Expenses  - Projected Current Expenses assume reductions in operating expenses (excluding fuel, purchased power and maintenance expenses) as a result of expense control measures of 2.85% for fiscal year 2018 as compared to fiscal year 2013.

Fuel  - Projected fuel prices are based upon an analysis prepared by the Authority, which takes into consideration the Annual Energy Outlook issued by the United States Department of Energy and the Authority's historical fuel data. The Authority passes through the cost of fuel to its clients. The following table sets forth projected average per equivalent barrel fuel prices:

**Projected Fuel Prices**

| Fiscal Year Ending June 30 | Average Price Per Equivalent Barrel[1] |
|---|---|
| 2014 | 94.96 |
| 2015 | 94.41 |
| 2016 | 88.57 |
| 2017 | 87.15 |
| 2018 | 80.91 |

[1] This is a blended price of No. 2, No. 6 fuel oils and natural gas prices. The prices exclude handling charges.

The following table presents the Authority's estimates of Net Revenues for the five fiscal years ending June 30, 2018, in accordance with the provisions of the Trust Agreement, and the ratio of Net Revenues to Principal and Interest Requirements for Power Revenue Bonds. The figures for Revenues and Net Revenues in this table include the revenues attributable to the residential and hotel energy consumption that are offset by legally mandated subsidies (see footnotes 1 and 2), and the electric consumption charges of the municipalities, against which the Authority applies the CILT (see footnote 2). The debt service coverage is shown as calculated under the Trust Agreement and as then adjusted to reflect the elimination from Net Revenues of energy charges that the Authority offsets by legally mandated subsidies or the CILT. See *Authority's Financial Condition - Subsidies and Contributions in Lieu of Taxes* under INVESTMENT CONSIDERATIONS and *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

The projections set forth in the following table assume that, under power purchase agreements, the Authority will have renewable energy capacity of approximately 300 MW by fiscal year 2014 and 500 MW by fiscal year 2015 through fiscal year 2018. See *Plans for Fuel Diversification* under THE SYSTEM.

The projections take into consideration the conversion to natural gas of units no. 1 and 2 of the Aguirre Power Plant for fiscal year 2016, and the conversion of units 3 and 4, and units 9 and 10, of the Palo Seco and San Juan power plants, respectively, for fiscal year 2017.

The cost of the Aguirre offshore terminal project is not included in the Authority's current capital improvement program for fiscal years 2014-2018. For a discussion of the financing alternatives being considered with respect to the Aguirre offshore terminal project, see *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM.

**Projected Net Revenues and Coverage**

| | Fiscal Year Ending June 30 | | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** |
| Average number of clients | 1,502,841 | 1,520,065 | 1,535,860 | 1,551,657 | 1,567,454 |
| Electric energy sales (in millions of kWh) | 18,199 | 18,268 | 18,476 | 18,767 | 19,091 |
| Authority generation (gross)(in millions of kWh) | 14,590 | 14,085 | 14,346 | 14,668 | 15,108 |
| Purchased generation (gross)(in GWHR) | 7,708 | 8,033 | 8,069 | 8,101 | 8,099 |
| **Sources of Net Revenues** | | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential[1] | $1,642,922 | $1,663,817 | $1,655,368 | $1,675,579 | $1,649,208 |
| Commercial[2] | 2,173,701 | 2,214,832 | 2,214,347 | 2,246,456 | 2,220,105 |
| Industrial | 498,880 | 499,847 | 490,555 | 489,373 | 475,477 |
| Other | 117,529 | 118,362 | 117,322 | 116,665 | 113,897 |
| Theft Recovery[3] | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Sub-Total | 4,463,032 | 4,526,858 | 4,507,592 | 4,558,073 | 4,488,687 |
| Other (principally interest earned) | 31,179 | 31,179 | 31,179 | 31,179 | 31,179 |
| Total Revenues | $4,494,211 | $4,558,037 | $4,538,771 | $4,589,252 | $4,519,866 |
| Current Expenses: | | | | | |
| Operations: | | | | | |
| Fuel | $2,145,911 | $2,100,801 | $2,044,913 | $2,044,304 | $1,934,695 |
| Purchased Power | 805,414 | 903,208 | 932,776 | 963,724 | 995,556 |
| Production | 65,651 | 58,297 | 58,936 | 59,118 | 59,118 |
| Transmission and Distribution | 158,728 | 148,377 | 150,001 | 150,466 | 150,466 |
| Maintenance | 233,425 | 224,894 | 227,357 | 228,061 | 228,061 |
| Client accounting and collection | 115,369 | 111,521 | 112,742 | 113,091 | 113,091 |
| Administration and general | 175,510 | 187,797 | 189,851 | 190,440 | 190,440 |
| Total Current Expenses | $3,700,008 | $3,734,895 | $3,716,576 | $3,749,204 | $3,671,427 |
| Net Revenues | $ 794,203 | $ 823,142 | $ 822,195 | $ 840,048 | $ 848,439 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[4] | $577,197 | $592,935 | $630,437 | $655,348 | $655,347 |
| Ratio of Net Revenues to Principal and Interest Requirements, per Trust Agreement | 1.38 | 1.39 | 1.30 | 1.28 | 1.29 |
| Ratio of adjusted net revenues to Principal and Interest Requirements, net of municipalities' consumption and subsidies[5] | 1.04 | 1.06 | 0.99 | 0.98 | 1.00 |

(1) Includes accrued revenues that will be offset by residential fuel subsidies of approximately $20.8 million, $20.4 million, $21.2 million, $21.6 million and $20.0 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively. See *Subsidies and Contributions in Lieu of Taxes* and *Additional Bonds* under THE SYSTEM.

(2) Includes accrued revenues attributable to (i) electric energy consumption by municipalities of approximately $213.7 million, $216.7 million, $215.8 million, $218.2 million and $214.8 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively; and (ii) energy consumption offset by hotel subsidies of approximately $7.9 million, $8.1 million, $8.1 million, $8.2 million and $8.1 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively. See *Subsidies and Contributions in Lieu of Taxes* and *Additional Bonds* under THE SYSTEM.

(3) Projections based on the Authority's theft recovery initiatives. See *Transmission and Distribution Facilities – Operations* under THE SYSTEM.

(4) Includes debt service requirements for (i) the outstanding Power Revenue Bonds, (ii) the Bonds, and (iii) Power Revenue Bonds expected to be issued in each of fiscal years 2014-2018 to fund the Authority's capital improvement program at an assumed interest rate of 7% with interest capitalized for approximately three years. See *Projected Five-Year Capital Improvement and Financing Program* under THE SYSTEM. The Principal and Interest Requirements in this table are reduced by the interest that was capitalized through the Authority's prior issuances, the Bonds and the interest that is expected to be capitalized with the issuance of additional Power Revenue Bonds in the amounts of $71.5 million, $62.2 million, $23.2 million, $46.9 million and $46.9 million for fiscal years 2014, 2015, 2016, 2017 and 2018, respectively. Actual Principal and Interest Requirements will vary based on the actual principal and interest on the future Power Revenue Bonds and Power Revenue Refunding Bonds issued and no assurance can be given that the amounts shown in the table will be achieved. No deductions against debt service have been made for any Federal Subsidy Payments expected to be received in respect of the Authority's outstanding Build America Bonds during the forecast period. Interest subsidy payments received by the Authority after April 1, 2013 will be used, however, as an offset to and serve to reduce the Authority's interest obligation on its Build America Bonds by the amount received from the United States Government.

(5) Excludes from Net Revenues, for purposes of computing this ratio, the projected revenues attributable to municipal government energy consumption charges (net of projected recoveries as a result of Act No. 233-2011 of $49 million annually from fiscal year 2014 to 2018) and to certain energy consumption charges offset by law by subsidies to residential clients and hotels in the amounts set forth in footnotes (1) and (2) above.

The projections set forth above show an aggregate reduction in operating expenses (excluding fuel and purchased power) by fiscal year 2018 of 2.85% compared to the level of these operating expenses in fiscal year 2013. The expense reduction initiatives include, among others, other cost reduction initiatives, such as a reduction in overtime, materials, administrative and miscellaneous expenses and head count reduction through attrition. There can be no assurance, however, that the Authority will in fact be able to achieve the expected reductions in every year.

The Consulting Engineers reviewed and analyzed the projections of the Authority shown above and based on the assumptions set forth in their letter, the Consulting Engineers have concluded that (i) the methodology used by the Authority in preparing its revenue and capacity projections generally follows accepted utility practice and is appropriate for the Authority, (ii) the Authority's estimates of future growth form a reasonable basis for its projected operating results, and (iii) the Authority's rates should generate sufficient revenues to pay its Current Expenses and debt service and to meet the Trust Agreement obligations for deposits into certain funds from current operating revenues. See Appendix III—*Letter of Consulting Engineers.*

Although the Authority and the Consulting Engineers believe that the assumptions upon which the estimates of Net Revenues are based are reasonable, actual results may differ from the estimates as circumstances change. The Authority's financial projections involve many assumptions, some of which are beyond the control of the Authority, such as the cost of fuel oil and its impact on the level of demand for electricity. In the past, the Authority's projections of Net Revenues have at times materially differed from what the Authority has been able to achieve.

If the Authority is unable to obtain the level of Net Revenues it has projected, it may not be able to meet its Principal and Interest Requirements unless it borrows funds to meet its debt service or implements measures to increase Revenues and/or reduce its Current Expenses. See the discussion in *The Authority's ability to meet its projections of Net Revenues* under RISK FACTORS AND INVESTMENT CONSIDERATIONS for a discussion of factors that can affect the Authority's ability to achieve its projected Net Revenues.

The Authority's projections were not intended to comply with the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial projections. The projections have been prepared on the basis of Net Revenues as defined in the Trust Agreement, which differs in several important respects from the Authority's net income prepared in conformity with GAAP in that they do not include, for example, depreciation, other post-employment benefits actuarial accruals and the CILT as a current expense and do not reflect interest expense on Power Revenue Bonds as a deduction from Net Revenues.

The following table presents the projected disposition of Net Revenues, in the order of priority of payment, for the five fiscal years ending June 30, 2018, in accordance with the provisions of the Trust Agreement.

**Projected Disposition of Net Revenues**
**(in thousands)**

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| **Disposition of Net Revenues** | | | | | |
| Sinking Fund: | | | | | |
| Interest[1] | $358,463 | $364,096 | $391,973 | $403,553 | $391,383 |
| Principal | 204,305 | 214,410 | 224,035 | 237,365 | 249,535 |
| Capital Improvement Fund | 30,408 | 38,873 | 2,252 | 5,786 | 5,786 |
| Contributions in lieu of taxes and other uses[2] | 201,027 | 205,763 | 203,935 | 193,344 | 201,735 |
| Net Revenues | $794,203 | $823,142 | $822,195 | $840,048 | $848,439 |

---

[1] The interest amount is shown net of expected Federal Subsidy Payments because, the Trust Agreement does not prohibit the Authority from applying Federal Subsidy Payments as an offset against its interest obligation on outstanding Build America Bonds once received from the United States Government even though for purposes of determining the required balance of the Reserve Account and the tests for the issuance of additional Power Revenue Bonds, the Authority is not permitted to take any such Federal Subsidy Payments into account as such an offset. See "Rate Covenant" under SECURITY.

[2] Includes the following amounts attributable to the residential fuel subsidy and the subsidy granted to the hotel industry: $28.7 million, $28.5 million, $29.3 million, $29.8 million and $28.0 million for fiscal years ended June 30, 2014, 2015, 2016, 2017 and 2018, respectively. See *Subsidies and Contributions in Lieu of Taxes* under THE SYSTEM.

Since Net Revenues include amounts billed to the municipalities and other subsidies that are not collected, as discussed previously, in some years, the Authority may not have sufficient cash available to make the deposits and payments shown above as being made prior to the application of "Contributions in lieu of taxes and other uses." In those years, the Authority may have to make some of the deposits and payments from additional borrowings.

## LEGISLATION

*Economic Incentives Act*

The Commonwealth has identified high energy costs as one of the main factors affecting Puerto Rico's competitiveness and has made the adoption of a new energy policy an important part of its economic development initiatives. Act No. 73-2008, also known as the "Economic Incentives Act," created the Puerto Rico Energy Affairs Administration, a new government agency under the Department of Economic Development and Commerce in charge of developing and implementing a new energy policy for Puerto Rico. The Economic Incentives Act provides, among other things, for tax credits against Puerto Rico income tax equal to a percentage of the payments made to the Authority for the net consumption of energy related to business operations. These credits are available to any business that is an industrial client of the Authority and has been designated as an eligible business by the Secretary of the Department of Economic Development and Commerce with the endorsement of the Executive Director of the Puerto Rico Industrial Development Company and the Secretary of the Treasury Department of Puerto Rico. These tax credits will be covered from moneys from the Commonwealth's General Fund and payments from the Authority.

The Economic Incentives Act provides that the Authority's cost of the tax credit will be absorbed by the Authority through a reduction in operational costs, increased efficiencies, revenues generated through "wheeling" and reductions in the cost of generating or purchasing energy. The Economic Incentives Act expressly provides that the Authority's cost in providing the tax credit shall not be subsidized by or passed through, either directly or indirectly, to the clients of the Authority, nor

shall such costs cause a reduction in employment or in the payroll of the Authority. If during the 10-year term of the tax credit the average cost of energy is reduced to 10 cents per kWh for a period of two consecutive years, the tax credit will terminate.

The Authority expects to pay its portion of the cost of the tax credit from Revenues in a given year, but only after the application of Revenues to pay Current Expenses and debt service on the Authority's outstanding bonds in such given year, and after certain debt service, maintenance, capital improvement and self-insurance reserves are funded as required under the Trust Agreement. To date, the Authority has only incurred administrative costs related to the Economic Incentives Act. The Authority estimates that it will incur costs related to the Economic Incentives Act of approximately $70 million in the five years ending in fiscal year 2018.

The Economic Incentives Act mandated the introduction of "wheeling" for renewable energy producers by January 2, 2010 and created a committee in charge of the implementation of a wheeling system. Under a wheeling system, the Authority must make available its transmission and distribution system to third party renewable energy generators. Although the Authority did not meet the deadline established in the Economic Incentives Act, public hearings were held on June 1 and 2, 2010 to consider the Wheeling System Tariffs, Wheeling Transmission Regulation and Wheeling Interconnection Procedure. The examiner recommended approval of the Wheeling Transmission Regulation and Wheeling Interconnection Procedure, but rejected approval of the Wheeling System Tariffs based on lack of information to the public. He recommended further public hearings with enough time for public evaluation. Based on such recommendations, the Authority modified the Wheeling Transmission Tariff Schedules and held new public hearings on June 2 and 3, 2011. The public hearing examiner submitted his report to the Governing Board on July 22, 2011, including various recommendations that are under evaluation by the Authority. The Authority is also currently revising the Wheeling Regulation and Wheeling Interconnection Procedure. These regulations implement the wheeling system at transmission voltage level (115kV and 38kV). The Authority is planning to evaluate the implementation of the wheeling system at the distribution voltage level (13kV).

Under the Economic Incentives Act, if the Authority and a third party power generator do not agree on the wheeling rates within a period of 60 days, the Executive Director of the Energy Affairs Administration has the authority to appoint an arbitrator to determine, approve and establish the rates to be paid to the Authority by the third party power generator. See *Wheeling* under THE SYSTEM.

*Act for a Public Policy for Energy Diversification Through Sustainable and Alternative Renewable Energy*

On July 19, 2010, the Commonwealth enacted Act No. 82-2010, also known as the "Act for a Public Policy for Energy Diversification Through Sustainable and Alternative Renewable Energy". Act No. 82-2010 requires the Authority to meet prescribed targets of energy generation from renewable sources by specified dates, as follows: 12% of energy sales from renewable energy production by 2015 and 15% of energy sales from renewable energy production by 2020, with a requirement to establish a plan to reach 20% of energy sales from renewable energy production by 2035. Act No. 82-2010 also establishes Renewable Energy Certificates as a legally recognized asset that can be purchased, sold, traded and transferred separately from electric power and used to meet the renewable energy targets and creates a Renewable Energy Commission with the power to implement and supervise compliance with Act No. 82-2010. The Authority had signed power purchase agreements with respect to sixty-three (63) renewable energy projects totaling approximately 1,660.8 MW of capacity to comply with the law. However, the Authority is conducting a Renewable Energy Source Integration Study in order to evaluate the impact of the executed PPOAs in the reliability of the system. The Authority can be

subject to the imposition of fines if the noncompliance with the Renewable Portfolio Standard is not justified. The Authority, as a retail energy provider, needs to demonstrate to the Commission's satisfaction all of the reasonable and good faith efforts were made to try to comply with the Renewable Portfolio Standard for the calendar year under review.

Concurrently with the enactment of Act No. 82-2010, the Commonwealth enacted Act No. 83-2010, known as the Green Energy Incentives Act, which provides cash and further tax incentives to promote the development of renewable energy projects. It is too early to determine what impact Act No. 82-2010 and Act No. 83-2010 will have on the Authority, but existing or new legislation that would reduce the Authority's electric energy sales could have a material impact on the Authority's operations and financial condition.

### Net Metering Act

The Authority is currently subject to "net metering" legislation under Act No. 114-2007, as amended, also known as the "Net Metering Act," which allows residential and small business clients who have developed and operate their own generation to sell any excess power they produce back to the Authority. Currently, net metering applies to Authority clients that are interconnected to the Authority's transmission or sub-transmission system and are generating from 25kW to 5 MW of renewable energy in accordance with the requirements established in the Authority's Regulation for the Interconnection of Generators to the Electric Transmission and Sub-Transmission System for the Net Metering Program (Regulation No. 8374 of July 9, 2013).

### Recent Legislation

*Act No. 50-2013.* On July 1, 2013 Act No. 50-2013 was signed into law by the Governor. Act No. 50-2013 establishes a preferential "all in" rate for electricity to PRASA. The initial preferential rate will be twenty two (22) cents per kilowatt hour for fiscal years 2014, 2015 and 2016, which will be further reduced to sixteen (16) cents per kilowatt hour for fiscal year 2017 until the average rate that the Authority charges to its clients is less than sixteen (16) cents per kilowatt hour. Said preferential rate is to be applied prospectively to all of PRASA's invoices without regard to the type of electric service provided to PRASA. Pursuant to Act No. 50-2013, if the Authority achieves an average energy cost for all Puerto Rico that is less than the applicable preferential rate, as documented in the Authority's audited financial statements, then the Authority will reduce the preferential rate to the average power for all Puerto Rico, according to the computation for the corresponding year. The Authority will annually review the average energy cost for all Puerto Rico and will determine if the preferential rate should decrease. The preferential rate is, however, capped at 750 million kilowatt hours per fiscal year. PRASA's consumption of electricity from the Authority in excess of this cap would be invoiced by the Authority at the average cost of energy charged to clients in the previous year as reflected in the most recent audited financial statements of the Authority. Act No. 50-2013 grants the Authority the power to revoke or modify the preferential rate if deemed necessary and prudent, following the processes provided in the applicable laws and the public policy established in Act No. 50-2013, or when determined necessary to meet its obligations under the Trust Agreement.

*Act No. 1-2013.* Act No. 1-2013, also known as the "Jobs Now Act of 2013," was signed into law by the Governor on February 10, 2013. Act No. 1-2013 granted certain businesses the ability to use certain credits against their electric bill payable to the Authority. Eligible businesses that hired employees that were unemployed before such hiring would be entitled to a credit per employee hired to be used to pay such eligible business' electric bill. Said credit would be up to $2,000 if the hiring occurs between January 1, 2013 and December 31, 2013, up to $1,000 if the hiring occurs between January 1, 2014 and March 31, 2014 and up to $500 if the hiring occurs between April 1, 2014 and

June 30, 2014. The eligible business would reduce its payment of electricity bills to the Authority in the aggregate amount of the credits it holds. The credits can only be used by the eligible business and cannot be transferred.

Pursuant to this structure the Authority would not receive cash payment from the eligible business in the amount of the credits used by the eligible business. However, Act No. 1-2013 states that the Authority will be reimbursed for those amounts by the Secretary of the Treasury from the Commonwealth's General Fund. Act No. 1-2013 requires the Authority and the Treasury Department to adopt a joint regulation to establish the procedure to effectuate such reimbursement to the Authority by the Treasury Department. Such regulation is in the process of being drafted and has not been adopted by the Authority and the Treasury Department.

While those moneys are held by the Commonwealth at the Treasury Department such moneys can be used by the Commonwealth for the payment of the interest and amortization of the public debt, as provided in Section 8 of Article VI of the Commonwealth's Constitution. Pursuant to this Section 8 of Article VI of the Constitution the Commonwealth is empowered to use its "available resources" to pay the interest and amortization of the public debt before making other payments or disbursements. In the event that the available resources of the Commonwealth are insufficient to cover all obligations the Commonwealth may use available resources that are earmarked for other purposes (e.g., payments to public employees or to suppliers, receivables) to pay the interest and amortization of the public debt.

## ENVIRONMENTAL MATTERS

The Authority's Environmental Protection and Quality Assurance Division is responsible for ensuring the Authority's compliance with all applicable federal and Commonwealth environmental laws and regulations. The Division is in charge of developing and implementing a comprehensive program and plans to improve the Authority's performance in all applicable environmental media, taking into account new regulatory requirements as well as alleged instances of noncompliance cited any environmental protection agencies.

### Environmental Litigation and Administrative Proceedings

*Consent Decree*

In 1992, the EPA conducted a multimedia inspection of the Authority's facilities and identified several alleged instances of non-compliance related to the Authority's air, water and oil spill prevention control and countermeasures compliance programs, among other things. As a result, the EPA filed a complaint against the Authority on October 27, 1993 seeking injunctive relief and the imposition of penalties for alleged violations of the CAA, the CWA, the Emergency Planning and Community Right-to-Know Act ("EPCRA"), the Comprehensive Response, Compensation and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA"). To settle the complaint, the Authority and the EPA entered into a consent decree (the "Consent Decree") approved by the United States federal court in March 1999.

The Consent Decree covered alleged violations with respect to the Authority's electric power generating plants of Aguirre, Palo Seco, San Juan and Costa Sur, as well as the Authority's main transmission center of Monacillo in San Juan. Under the terms and conditions of the Consent Decree, the Authority was required to: (i) implement measures to ensure that the operation of its generating units complies with the opacity standards applicable to air emissions under the PREQB's Regulation for the Control of Atmospheric Pollution ("PRRCAP"), among other things, including the refurbishment of generating units and the implementation of operation and maintenance programs (termed, "Air

Compliance Programs"); (ii) achieve and maintain compliance with the CWA and NPDES permit requirements by implementing certain upgrades and modifications of the discharges of each power plant; (iii) operate its facilities in compliance with Oil Spill Prevention and Spill Prevention Control and Countermeasure ("SPCC") requirements, including the preparation and implementation of SPCC plans for all of the power plants and the transmission center, as well as the implementation of a construction and maintenance program to modify these facilities to achieve compliance; (iv) achieve compliance with EPCRA requirements by filing hazardous chemical reporting forms that were not filed when due in the past (known as "Tier I/Tier II" forms) and conduct any current and future filings; (v) achieve compliance with CERCLA and EPCRA with respect to potential releases from its facilities by implementing an in-house hazardous material spill training for employees and contractors; and (vi) achieve compliance with RCRA's underground storage tank requirements by ensuring that all underground storage tanks at its facilities were closed or removed in compliance with these requirements.

As part of the Air Compliance Program, the Authority is required to combust fuel with low sulfur content, as per the Consent Decree's Fuel Quality Program, in order to achieve compliance with air emission opacity standards. Furthermore, under the Consent Decree, the Authority was required to pay a civil penalty of $1.5 million, and implement additional compliance projects amounting to $4.5 million, which include $1 million to hire an independent party ("Environmental Review Contractor") to review the Authority's compliance and implementation of the terms and conditions required under the Consent Decree and inform the general public and different communities about it, $100,000 for Fire Department hazmat training, and $3.4 million to implement an environmental restoration and protection project in Las Cucharillas Marsh in Cataño. The University of Puerto Rico's Graduate School of Public Health was subsequently hired as the Environmental Review Contractor. The Consent Decree shall terminate upon the Authority's: (1) compliance with the Decree's projects; (2) full payment of the civil penalty; (3) implementation of Additional Environmental Projects; and (4) payment of all stipulated penalties with no stipulated penalties outstanding, owed or disputed.

In 2004, to settle a dispute regarding the interpretation and application of the method for performing opacity readings (EPA's Method-9) and the alleged violations to the opacity standards by the Authority, the EPA and the Authority entered into a Consent Decree Modification of the original agreement. In addition to the original requirements, the Authority was required to (1) perform EPA sanctioned visible emissions readings; (2) use diesel fuel (number 2 fuel oil) during cold startups in the generating units of Costa Sur, Aguirre, Palo Seco and San Juan; (3) reduce the sulfur content (0.50%/weight or less) in fuel oil No. 6 (Bunker C) used in the generating units of Costa Sur, Aguirre, Palo Seco and San Juan; (4) implement and conduct a nitrogen oxide ($NO_X$) emissions reduction program for the Costa Sur, Aguirre and Palo Seco generating units; and (5) modify the optimal operating ranges originally set for all of the Authority's units under the Consent Decree, among others. The Authority also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs (Las Cucharillas Marsh environmental restoration and protection and the Environmental Review Contractor) under the Consent Decree.

Since September 2004, there has been no legal action in the United States federal court or any administrative proceeding against the Authority regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of noncompliance. Noncompliance events must be disclosed to EPA in the corresponding quarterly report. Ordinarily, when a covered noncompliance event occurs, the Authority pays the stipulated penalty within sixty (60) days of the end of each reporting quarter in order to benefit from a 50% discount of the applicable stipulated penalty provided for under the Consent Decree.

The Authority has had some difficulties fully complying with the opacity limits, particularly during the startup/shutdown of the generating units and during malfunction periods. From March 1999 until the first quarter of 2013, stipulated penalties attributable to non-compliance with the Consent Decree have totaled $1.06 million, of which $0.70 million are related to non compliance with the opacity emission limits (based on the 50% discount allowed under the Consent Decree). The Authority has devoted great efforts at complying with the Consent Decree.

### Other Proceedings

In 1997, as a result of an inspection carried out by the EPA and the PREQB at the Authority's Palo Seco power plant, the EPA issued an Administrative Order (the "RI/FS Order") for the investigation and possible remediation of seven (7) areas identified by the EPA at the Palo Seco power plant and the Palo Seco General Warehouse (Depot). The RI/FS Order required the Authority to carry out a Remedial Investigation/Feasibility Study ("RI/FS"). The RI/FS required under the RI/FS Order is designed to: (1) determine the nature and extent of contamination and any threat to the public health, welfare, or environment caused by any release or threatened release of hazardous substances, pollutants, or contaminants at or from the site; and (2) determine and evaluate alternatives for the remediation or control of the release or threatened release of hazardous substances, pollutants or contaminants at or from the site. The RI was completed and submitted to the EPA for evaluation. The Authority was notified by EPA that the FS will not be required and that EPA would issue a "No Action" Record of Decision ("ROD"), with a follow-up review in five years. Public hearings will be scheduled to get public comments on this ROD.

The information gathered in the RI indicated the presence of free product (Separate Phase Hydrocarbons or "SPH") in several monitoring wells. The analysis of this product reflected a low concentration of polychlorinated biphenyls ("PCB"). In 2008, the Authority and the EPA entered into an Administrative Agreement and Order on Consent for a Removal Action (CERCLA 02 2008 2022) (the "AOC") requiring the Authority to provide an enhanced delineation and accurate identification of areas of PCBs contamination, implement removal activities to address the PCBs-contaminated oil layer and soils, and perform confirmatory sampling. The Authority completed the activities of delineation and identification of PCBs-containing SPH. By letter dated December 13, 2011, EPA notified the Authority that no further removal action was required at the site and requested that the Authority submit its final removal action report to EPA. The EPA further indicated that, upon receipt of this final report, EPA would issue a site closeout letter.

The matters that are pending the close of the RI/FS Order are the issuance of a final closing letter from the EPA and the submittal from EPA of a request for reimbursement of costs. The AOC has been closed. To date, the Authority has not received any request for reimbursement of costs from the EPA. However, if it does receive any such request, the Authority will remit payment to EPA as required by the applicable orders. The Authority believes there are no other matters related to these orders that could potentially result in other enforcement proceedings.

In 2002, the Authority received a "Special Notice Concerning Remedial Investigation/Feasibility Study for Soil at the Vega Baja Solid Waste Disposal Superfund Site." The EPA identified the Authority and six (6) other entities as "potentially responsible parties," as defined in the CERCLA. In 2003, the Authority agreed to join the other potentially responsible parties in an AOC for a RI/FS, with the understanding that such agreement did not constitute an acceptance of responsibility. The Authority and other settling defendants, with the EPA's oversight, completed a RI pertaining to the Operable Unit 2 (related to soil contamination) of the site on April 2, 2009, and a FS on July 29, 2010. In April 2004, the EPA issued a ROD determining that no remedial action was required with respect to the groundwater at the site (referred to as Operable Unit 1). In September 2010, the EPA issued a ROD establishing the remedial alternatives to address soil contamination (Operable Unit 2). The Authority and other

potentially responsible parties have been negotiating with the EPA and the U.S. Department of Justice ("DOJ") the terms of a settlement agreement covering the responsibilities of the different parties for response actions, including post remedial operations and maintenance, as well as reimbursement of costs incurred by the EPA and DOJ for response actions at the site. The Authority has reached an agreement with EPA to settle this matter by contributing $1.3 million (composed of Past Response Costs of $900,000 and Landfill Remediation Costs of $400,000) for such efforts to be paid in four (4) payments, with the understanding that it is not admitting to any liability. This settlement amount has been authorized to be paid by the Authority's Governing Board. In April 25, 2013, the Consent Decree became effective. As of this date, the Authority has disbursed the amount of $702,902 and is currently in compliance with the agreement with the EPA.

In December 2004, the EPA sent a request for information to the Authority and to other potentially responsible parties that did business with certain recycling companies regarding the release of pollutants by these recycling companies in a Toa Baja superfund site. The EPA has stated that it is particularly interested in entities that disposed of batteries at this site. The Authority has responded to the request for information, stating that it only sold scrap metal to these recycling companies. The Authority does not believe it has any liability regarding this site. In September 2006, EPA issued a Record of Decision determining that the groundwater at the site does not pose an unacceptable risk to the public health or environment and, therefore, no action is required with respect to the groundwater. EPA then continued to investigate potential buried waste and contaminated soil associated with the Site to determine the magnitude and extent of contamination in soil conducted the removal of disposed battery cases, contaminated soil and other debris. According to EPA's Superfund Information Systems website, a combined RI/FS is underway. At this time, we have no knowledge that the EPA has initiated, or intends to initiate, any action against the Authority concerning this matter.

**Compliance Programs**

The Authority continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

*Air Quality Compliance*

The CAA is a comprehensive federal law that addresses the nation's air quality and the stratospheric ozone layer, and authorizes the EPA to implement and enforce regulations reducing air pollutant emissions. Under the CAA, the EPA is authorized to establish and enforce limits on certain air pollutants from various sources, including utilities. Pursuant to the CAA, the EPA promulgated primary and secondary national ambient air quality standards ("NAAQS") with respect to certain air pollutants, including particulate matter ("PM"), sulfur dioxide ("$SO_2$"), and nitrogen oxide ("$NO_X$"). These standards are to be achieved by the application of control strategies developed by the States (including Puerto Rico) and included in implementation plans that must be approved by EPA to be effective. The PREQB has adopted a State Implementation Plan which was approved by EPA, generally designed to achieve the NAAQS.

The CAA also establishes a permit program (known as the "Title V operating permit program") for large industrial and commercial sources that release pollutants into the air above a specified threshold, known as "major sources." Operating permits include information on which pollutants are being released, the maximum amount that can be released, and the steps the source's owner or operator is required to take to reduce pollution. Responsibility for the Title V operating permit program in Puerto Rico was delegated to the PREQB.

The CAA requires new major stationary sources of air pollution and certain modifications to these sources to obtain an air permit before commencing construction. This permitting process is known as the New Source Review ("NSR"). The NSR program applies to sources that are located in areas that meet the NAAQS (known as "attainment areas"), areas that do not meet the NAAQS (known as "nonattainment areas") and areas that are unclassifiable with respect to the NAAQS. Permits for sources located in attainment or unclassifiable areas are issued under the Prevention of Significant Deterioration ("PSD") permit program. The purpose of the PSD program is to prevent the development of new nonattainment areas, among other things.

The Authority's power plants are subject to the Title V operating permit program under the CAA. Most of these power plants have their corresponding Title V permits in effect, except for the gas turbine facilities at Yabucoa, Mayagüez and the Palo Seco power plants. The permits for Yabucoa and Mayagüez expired, but the Authority timely submitted the respective renewal applications for both permits to the PREQB, which effectively extended their coverage during the renewal period. In addition, the Authority submitted a request to modify the Mayagüez permit for the replacement of four (4) old single cycle gas turbine units with four new aero derivative gas turbine units, which request is still being processed by PREQB. These applications are currently reviewed by the PREQB and in the additional information request stage. The permit application for the Palo Seco power plant was filed with PREQB in 1996, but the agency has not issued a final permit as of this date. The application is currently reviewed by the PREQB and in the additional information request stage. This permit application was filed within the filing term provided for by the regulation to activate coverage of the activities covered by the application while the application is in process. The permit is expected to be issued during the next fiscal year. Finally, although still within its original effective term, the Authority has also applied for the renewal of the Aguirre power complex permit in order to ensure extension of coverage under the permit after its expiration date in February 2013.

Generally, the Authority is in compliance with its Title V permits and matters covered by the Consent Decree between EPA and the Authority, dated March 19, 1999, as modified in June 2004, which is currently in effect for the Authority's four (4) steam power plants (San Juan, Palo Seco, Aguirre and Costa Sur). Among other things, this Consent Decree covers alleged past noncompliance with opacity requirements and requires the use of fuel oil with low sulfur content (equal to or less than 0.50% by weight) in the Authority's steam power plants (San Juan, Palo Seco, Aguirre and Costa Sur) or implement technologies that would achieve emissions equivalent to the use of such fuel. The Authority has had some difficulties fully complying with opacity limits during the generating units startup/shutdown and malfunction periods. For more details on these issues, see "Environmental Litigation and Administrative Proceedings" above.

During fiscal year 2007, the Authority completed projects to reduce $NO_X$ emissions at the Palo Seco, Aguirre and Costa Sur steam generating units. As a condition of receiving certain construction and operational permits for the repowering project, the San Juan steam generating units had previously been modified to reduce $NO_X$ emissions. The Authority and EPA monitor compliance with the lower NOx emissions requirements. The Authority is currently in compliance with the $NO_X$ requirements, which are verified by annual testing on units at Costa Sur, Palo Seco and Aguirre, and in San Juan units by the installation and maintenance of continuous emissions monitoring systems ("CEMS").

During the past fiscal year, the Authority reported achieving compliance in excess of 99% with its in-stack opacity requirements and its Air Compliance Program. As required by the Consent Decree's Air Compliance Program, the Authority also submitted and performed all quarterly quality assurance and quality control ("QA/QC") tests and reports regarding the excess oxygen and opacity monitors for all the applicable units, as well as the RATA tests for the Cambalache and the San Juan power plant CEMS.

The Authority continues its efforts to use fuel oil No. 6 (Bunker C) with sulfur content equal to or less than 0.50% per weight in all of its steam generating units, which contributes to maintain the current air quality standards.

In order to address current and future air pollution environmental laws and regulations, such as MATS, the Authority is in the process of converting its major steam generating units to burn both oil and natural gas. If the Authority is unable to convert these units (including completing the natural gas delivery infrastructure), it may need to incur significant capital investments to control emissions in order to continue to comply with the current and new air pollutant standards.

*MATS Regulation*

EPA has issued new regulations related to the requirements of Sections 111 and 112 of the CAA. Section 111 of the CAA requires EPA to set emissions limits for major new stationary sources referred to as New Source Performance Standards ("NSPS") regulations. Section 112 of the CAA requires the EPA to issue technology-based standards for major sources and certain area sources for hazardous air pollutants ("HAPs"). The categories and subcategories of sources to be regulated under these provisions are listed in Section 112(c) of the CAA. For these sources, the EPA is required to establish emissions standards that require the maximum degree of reduction in emissions of HAPs. These emissions standards are commonly referred to as maximum achievable control technology ("MACT") standards. Section 112(b) of the CAA contains a list of those pollutants that must be regulated as HAPs pursuant to CAA Section 112, and requires the EPA Administrator to periodically review this list and, where appropriate, revise the list by adding pollutants which present or may present a threat of adverse human health effects or adverse environmental effects.

In 2008, in response to a United States federal court decision and a related consent decree, the EPA decided to regulate coal- and oil-fired electric utility steam generating units ("EGUs"), under Section 112(c) of the CAA. The EPA also subsequently proposed under Section 112 air toxic standards for these EGU's that reflect the application of MACT consistent with the requirements of the CAA. This proposal was published in the Federal Register on May 3, 2011 and was signed into a final rule (with minor modifications) on December, 16, 2011.

In connection with the Section 111 standards, on February 27, 2006, EPA promulgated amendments to the NSPS for PM, $SO_2$, and $NO_X$ contained in the standards of performance for EGU's. EPA was subsequently sued for these amendments, and on September 2, 2009, was granted a voluntary remand without vacatur of these amendments. The final revisions to these amendments were approved on December 16, 2011, along with the Section 112 air toxic standards discussed above.

On February 16, 2012, EPA published in the Federal Register the final CAA Section 112 rule and the new CAA Section 111 standards. With respect to Section 112, EPA established HAPs standards (known as, "National Emission Standards for Hazardous Air Pollutants" or "NESHAP") for coal and oil-fired EGUs to meet new standards for toxic air pollutants reflecting the application of the MACT requirements. These standards, known as MATS, are geared at reducing these types of emissions from new and existing coal and oil-fired EGUs. The standards mainly address emissions of mercury, arsenic, chromium, nickel, and acid gases, including hydrochloric acid ("HCl") and hydrofluoric acid ("HF").

MATS apply to EGUs larger than 25 megawatts that burn coal or oil for the purpose of generating electricity for sale and distribution through the national grid to the public. Existing EGU's generally will have up to four years if they need it to comply with MATS. This includes the three years provided to all sources by the CAA, and an additional year that may be granted by the PREQB, as needed, for technology installation. In essence, the rule establishes: (i) numerical emission limits for mercury,

PM, and HCI for all existing coal-fired EGUs; (ii) numerical emission limits for PM, HCl and HF for existing and new oil-fired EGUs, but compliance for HCl and HF may also be achieved by limiting the moisture content of the oil; (iii) alternative numeric emission standards, including $SO_2$ (as an alternate to HCl), individual non-mercury metal air toxics (as an alternate to PM), and total non-mercury metal air toxics (as an alternate to PM) for certain subcategories of power plants; and (iv) work practices, instead of numerical limits, to limit emissions of organic air toxics, including dioxin/furan, from existing and new coal and oil-fired power plants, which require annual performance test program for each unit to ensure optimal combustion.

As for Section 111, EPA revised the NSPS for fossil fuel-fired EGU's. This NSPS revised the standards that new coal and oil-fired power plants must meet for PM, $SO_2$, and $CO_2$, by establishing revised numerical emission limits for these. These standards apply to EGUs that burn fossil fuel to produce steam.

The new rule establishing MATS and the NSPS, which, as mentioned, was published in the Federal Register in February 16, 2012, became effective on April 16, 2012.

The Authority estimates that without the conversion of its oil fired generating capacity to natural gas, it will be required to install MACT to comply with MATS. The MACT for these units could consist of various retrofitted emission control systems, such as filter baghouses, wet or dry electric precipitators and flue gas desulfurization equipment associated with ancillary systems. The Authority would have until April 16, 2015, unless granted deadline extensions as provided by law, to install, test and operate the MACT. Therefore, the Authority determined that in order to comply with MATS, it will have to convert some of its existing generating units to burn natural gas. If the Authority were not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it would need to make significant capital investments to control emissions in order to comply with MATS without being able to offset these costs with any cost savings on the purchase of fuel.

The Authority has already converted the Costa Sur power plant generating units 5 and 6, which are expected to be in compliance with MATS by the initial compliance date of April 16, 2015. According to MATS, EGU's owners and operators can request a one-year extension from PREQB for control equipment installation purposes. Owners and operators can also request a second one-year extension from the EPA for those units that are determined to be critical to the reliability of the electrical system based on the EPA's December 2011 Enforcement Policy for Use of Clean Air Act Section 113(a) Administrative Orders in Relation to Electric Reliability and the Mercury and Air Toxics Standard. In order to obtain this extension, an early notice of compliance plan must be filed with PREQB.

On April 16, 2013, the Authority submitted a MATS Early Notice Compliance Plan to the Planning Authority (the Puerto Rico's Planning Board), the PREQB and the EPA as part of the process of pursuing a second, one-year extension for the Palo Seco (units 3 and 4) and San Juan (units 9 and 10) power plants. Compliance dates for these units with MATS requirements are subject to the natural gas delivery infrastructure that needs to be developed and implemented by the beginning of the second quarter of 2017. According to the plan, the Aguirre power plant units 1 and 2 are expected to be in compliance by the first quarter of 2016, for which the Authority will only seek a one-year extension with the PREQB. The plan also states the Authority's intent to declare some of the Costa Sur (units 3 and 4), San Juan (units 7 and 8) and Palo Seco (units 1 and 2) units as LULOF's, since retrofitting efforts to convert these units would not be cost effective based on their power generation capacity and reduced efficiency.

*GHG Regulations*

On April 2, 2007, the U.S. Supreme Court (the "Court") issued a CAA decision in Massachusetts v. Environmental Protection Agency, 549 U.S. 497 (2007) concluding that GHG meet the CAA definition of an air pollutant and are subject to regulation under the CAA.  More specifically, the Court found that the CAA authorizes the EPA to regulate tailpipe greenhouse gas emissions if the EPA determines they cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. The Court remanded the case to the EPA to make such an "endangerment determination," which is the statutory prerequisite to authorizing regulations.

In response to the decision, on July 30, 2008, the EPA issued an Advance Notice of Proposed Rulemaking titled "Regulating Greenhouse Gases under the Clean Air Act." This Advance Notice sought comments regarding GHG regulation under the CAA. The Advance Notice also suggested that the EPA in the future would consider using an existing provision of the CAA to impose energy efficiency standards on electric generating units to reduce greenhouse gases. The comment period closed in November 28, 2008, with parties filing thousands of comments both in favor of and opposed to using the CAA as a tool to address GHG. Many parties filed comments that supported comprehensive climate change regulation such as cap and trade to address GHG, but opposed the EPA regulation under the existing CAA due to the unavoidable adverse consequences of using the CAA to regulate GHG.  On April 17, 2009, the EPA, in response to the Massachusetts decision, issued proposed "endangerment" and "cause or contribute" findings for greenhouse gases under Section 202(a) of the CAA.  On May 19, 2009, the EPA issued a notice of intent to regulate GHG emissions for cars and trucks under Section 202 of the CAA, following up on the Massachusetts decision discussed above.

On September 15, 2009, the EPA and the Department of Transportation's National Highway Safety Administration proposed a national program to reduce GHG emissions and improve fuel economy for new cars and trucks sold in the United States. On September 30, 2009, the EPA proposed new thresholds for GHG emissions that define when CAA permits under the NSR and Title V operating permits programs would be required. According to the EPA, the proposed thresholds would tailor these permit programs to limit which facilities would be required to obtain permits and would cover nearly 70% of the nation's largest stationary source GHG emitters, including power plants, refineries, and cement production facilities, while shielding small businesses and farms from permitting requirements.

Subsequently, the EPA issued a number of rulemakings and announcements to lay a potential framework for GHG regulation under the CAA and future legislation.  On October 30, 2009, the EPA issued a final rule requiring mandatory monitoring in 2010 and reporting of GHG emissions beginning in 2011 for virtually all industrial source categories across the country.  This final rule does not require control of GHG, rather it requires only that sources above certain threshold levels monitor and report emissions. Additionally, the EPA stated that this rulemaking does not indicate that the agency has made any final decisions on pending actions. The EPA stated that the mandatory GHG reporting program will provide the agency, other government agencies, and outside stakeholders with economy-wide data on facility-level (and in some cases corporate-level) GHG emissions, which should assist in future policy development.

On December 7, 2009, the EPA issued the final "endangerment" and "cause or contribute" findings regarding GHG under Section 202(a) of the CAA. The EPA received several Petitions for Reconsideration of the Endangerment and Cause or Contribute Findings. Although the findings did not themselves impose any requirements on industry or other entities, this action was a prerequisite to finalizing the EPA's proposed GHG emission standards for light-duty vehicles, which the EPA proposed in a joint proposal, including the Department of Transportation's proposed standards on September 15, 2009.  On April 1, 2010, EPA and the Department of Transportation's National Highway Safety

Administration issued the first national rule limiting GHG emissions from cars and light trucks. The requirements of this rule took effect on January 2, 2011.

On May 29, 2010, the EPA completed its reconsideration of a memorandum of December 18, 2009, entitled "EPA's interpretation of regulations that determine pollutants covered by the federal PSD program." In this action, the EPA confirmed that any new pollutant that the EPA may regulate becomes covered under the PSD program on the date when the EPA rule regulating that new pollutant takes effect. Accordingly, EPA clarified that the compliance date for GHG was January 2, 2011 when the rule applicable to mobile sources took effect.

On May 13, 2010, the EPA issued a final rule setting thresholds for GHG emissions that define when permits under the NSR-PSD and Title V operating permit programs are required for new and existing facilities. This final rule "tailors" the requirements of these CAA permitting programs to limit which facilities will be required to obtain PSD and Title V operating permits, and is known as the "tailoring rule". Under this rule, the following dates and limits will apply:

1)      January 2, 2011 through June 30, 2011: Existing PSD sources undertaking projects that will increase GHG emissions in excess of 75,000 tons per year will be subject to the PSD review for GHG and would require implementation of the Best Available Control Technology ("BACT") for the emission source. In a similar manner, existing Title V sources will be subjected to Title V requirements for GHG if a project exceeds 75,000 tons per year.

2)      July 1, 2011 through June 30, 2013: In addition to step one above, any source that undertakes a new project that exceeds 100,000 tons per year of GHG emissions will be subject to PSD and Title V requirements.

On April 13, 2012, the EPA issued a proposed rule setting new source performance standards ("NSPS") for GHG emissions for new affected fossil-fuel EGUs. The proposed requirements are strictly limited to new sources, would require new fossil fuel-fired EGUs greater than 25 megawatt electric (MWe) to meet an output-based standard of 1,000 pounds of $CO_2$ per megawatt-hour (lbm $CO_2$/MWh), based on the performance of widely used natural gas combined cycle ("NGCC") technology. The EPA is not proposing standards of performance for existing EGUs whose $CO_2$ emissions increase as a result of installation of pollution controls for conventional pollutants. Existing EGUs will require the revisions of state plans (SIPs) to establish emission guidance instead of emission limitations

In connection with the EPA rule requiring GHG's reporting, in March 2013, the GHG's Mandatory Report Year 2012 was submitted via electronic submission to EPA. The report contains the General Stationary Fuel Combustion Sources section (Subpart C of the rule) emission report for all of the Authority's electric power plants and the Electric Transmission and Distribution Equipment section (Subpart DD) which includes emissions of sulfur hexafluoride from electric power sources.

As for the "tailoring rule," at this moment, the Authority believes that this rule may require taking measures to reduce GHG emissions, but it is still evaluating the extent of such reductions. One of the alternatives identified to achieve this reduction is the installation of carbon sequestration technology, but this technology does not appear to be feasible for the Authority. In addition, as a result of this rule, the Authority may have to conduct an evaluation of impacts to endangered species, which could potentially require a formal consultation under Section 7 of the Endangered Species Act. The Authority is currently evaluating the extent of this evaluation, if any.

In light of the costs associated with carbon reduction technologies, the Authority believes that the best alternative to achieve lower GHG emissions, as well as to comply with the MATS regulation, is the conversion of some of its existing units to burn natural gas, thereby reducing the use of fuel oil. If the Authority is not able to convert its existing units to natural gas (including completing the natural gas delivery infrastructure), it may need to make significant capital investments to control GHG emissions without being able to offset these costs with any costs savings on the purchase of fuel.

On a related matter, in the spring and summer of 2009 the U.S. House Energy and Commerce Committee advanced a comprehensive climate change bill that would impose economy-wide cap and trade on virtually all industrial sectors, including electricity generation. The Energy and Commerce Committee approved H.R. 2454 on May 21, 2009, and the full House of Representatives passed H.R. 2454 on June 26, 2009. H.R. 2454 would have required existing coal-fired power plants to obtain "allowances" for each ton of GHG emissions, and thus effectively create a "price of carbon." The number of available allowances would have been decreased over future years, increasing the price. It is generally understood that newer facilities that are more energy efficient or which are adaptable to a mix of various conventional and alternative fuels as well as carbon capture and sequestration, will be at a competitive advantage in a cap and trade framework compared to less efficient facilities. Further, H.R. 2454 would have preempted much of, but not all of, the EPA's authority to regulate GHG emission from coal-fired power plants under the CAA. Despite the approval of H.R. 2454 by the House, this bill was never passed into law. Although this bill was not enacted into law, the possibility exists that the United States Congress may decide in the future to enact legislation addressing GHG. At this time, it is not entirely clear what the level of future regulation of these emissions will be, or the costs associated with it.

On June 25, 2013, the President of the United States issued a Climate Action Plan. The Plan proposes to cut carbon pollution in the United States, prepare the nation for the impacts of climate change, and lead international efforts to combat global climate change. The President instructed the EPA to issue standards, regulations, or guidelines to address carbon pollution from modified, reconstructed, and existing power plants and build on local efforts to move toward a cleaner power sector. As proposed, the EPA is requested to (1) issue proposed carbon pollution standards by no later than June 1, 2014; (2) issue final standards, by no later than June 1, 2015; and (3) include in the guidelines addressing existing power plants a requirement that States submit to EPA the implementation plans required under section 111(d) of the Clean Air Act and its implementing regulations by no later than June 30, 2016. As of the date of this Official Statement, it is uncertain what the proposed or final GHG emission limits will be. The Authority, as well as other affected utilities, will be following very closely the development of these orders and the impact to its generating units.

*Water Quality Compliance*

The CWA is a comprehensive federal law governing water pollution. Section 301 of the CWA prohibits the discharge of pollutants, including thermal discharges, from point sources (which include any discrete conveyances from industrial facilities) into waters of the United States (which includes bodies of water in Puerto Rico), except as authorized under the National Pollutant Discharge Elimination System ("NPDES") permit program. Although EPA may delegate the NPDES permitting program authority to the States, EPA has retained this authority in Puerto Rico. However, the PREQB is the regulatory agency responsible for issuance of water quality certificates, which are incorporated to the final NPDES permits by the EPA.

With respect to water thermal discharges, Section 316(a) of the CWA authorizes EPA to establish effluent limitations for these types of discharges. In addition, Section 316(b) of the CWA requires that NPDES permits for cooling water intake structures ensure that the location, design, construction, and capacity of these structures reflect the best technology available to minimize adverse environmental impacts, which include the impingement and entrainment of fish and egg larvae. As mentioned, impingement refers to the killing of these aquatic organisms by being pinned against intake screens and other parts of the facility, and entrainment refers to the killing of these aquatic organisms by being sucked into the cooling water structures.

The Authority's power plants have discharges associated with their process water systems, cooling water systems and storm water discharges. For these discharges, the Authority's power plants have to comply with NPDES permits and their limits under the CWA. The Authority holds NPDES permits under the CWA for all of its power plants, which are currently in effect or under renewal within the applicable regulatory renewal period, which affords continued coverage under applicable regulations.

Under the Consent Decree with EPA, dated March 19, 1999, the Authority was required to abate water pollution at its four (4) major power plants (Aguirre, San Juan, Costa Sur, and Palo Seco) by implementing certain upgrades and modifications to the discharges of these power plants. The Authority has completed the compliance plans for abating water pollution at all of the mentioned plants, according to the Consent Decree stipulations and requirements.

Section 316(a) of the CWA allows EPA to impose alternative effluent limitations for the control of the thermal component of a discharge (in other words, a thermal variance from the otherwise applicable effluent limit). According to EPA regulations, in order to get a thermal variance, a permit holder must demonstrate that the otherwise applicable thermal discharge effluent limit is more stringent than necessary to assure the protection and propagation of the water body's balanced, indigenous population of shellfish, fish and wildlife. The Authority requested EPA to grant a thermal variance under Section 316(a) for the San Juan power plant. The EPA granted this request and incorporated the alternate temperature limit in this power plant's NPDES permit, which permit has an effective date of April 1, 2007.

The EPA also included, as a compliance requirement for the San Juan power plant NPDES permit, the performance of thermal plume studies and a biological monitoring program under Section 316(a) of the CWA. The EPA also requested the performance of a Comprehensive Demonstration Study (CDS) under Section 316(b) of the CWA, which requires complying with performance standards for entrainment and impingement at the power plant's cooling water intake water structures. On March 13, 2010, the Authority submitted the plans for the thermal plume study and the biological monitoring program to the EPA and is currently waiting for its approval. On March 31, 2008, the Authority submitted an *Impingement and Entrainment Characterization Study and Current Status Report* for the EPA's evaluation. The Authority also submitted a *Post-Repowering Verification Study Work Plan* on June 30, 2008. The Authority is waiting for the EPA's approval of such plans in order to perform the thermal plume studies and biological monitoring program. In general, the Authority is up to date in meeting the requirements of this NPDES permit.

With respect to the Costa Sur power plant, the renewed NPDES permit issued by EPA in 2009 requires the Authority to construct an offshore outfall discharge pipe so that the thermal discharges can mix with the ocean's cooler waters in the Guayanilla Bay in order to meet temperature water quality standards. The current outfall pipe discharges into a cove at the shoreline. The permit requires the Authority to submit progress reports every six (6) months, and to meet a compliance schedule with interim effluent limits and several interim milestones that must be met during the period leading to the construction of the new discharge pipe. The estimated capital cost for this project is approximately $60

million.  The Authority is also required to develop a construction mitigation plan to minimize environmental impacts during the construction of the new discharge pipe.  The permit further requires that the location design, construction, and capacity of the cooling water intake structure reflects the best technology available to minimize adverse environmental impacts, which includes compliance with impingement and entrainment performance standards to reduce biota mortality, as per Section 316(b) of the CWA.  The Authority already performed some operational measures at the Costa Sur power plant to reduce impingement and entrainment, such as increasing the condenser circulating water traveling screens rotation and reducing the screen wash operation pressure. The Authority is also in the process of designing improvements to the fish return system of the screen wash wastewater discharge.

As per the Costa Sur power plant's NPDES permit, the Authority is required to perform a Detailed Engineering and Environmental Review ("DEER") of the alternatives available for the cooling water discharge that meets the water temperature standard or otherwise qualifies for a waiver request under Section 316(a) of the CWA.  In addition, in accordance with the compliance schedule, the Authority submitted a Draft Environmental Impact Statement ("DEIS") for the cooling water discharge alternatives to the Puerto Rico Permits Management Office in October 2011.  From the findings in the DEIS, the Authority selected the alternative with the least environmental impact, consisting of the reduction of the cooling water temperature to a range of 96° to 98° by restoring some of the Guayanilla Bay historic flow and improving the Costa Sur generating units 5 and 6 condensers. The DEIS will be subject to the comments of federal and local agencies.  The estimated capital cost of the selected alternative is approximately \$7 million.  The completion of these Costa Sur projects is not expected until fiscal year 2018.  In January 2013, the Authority submitted the final environmental assessment for the cooling water discharge temperature reduction alternative to the Puerto Rico Permits Office.  The Authority is in compliance with the requirements of the compliance plan for this power plant.

The Authority submitted to the EPA a Low Impact Demonstration for a Section 316(a) variance for the cooling water discharge at the Palo Seco power plant.  The Authority also submitted an Intermittent Flow Application to the PREQB under the agency's water quality regulations and is negotiating with the PREQB and the EPA to include a temperature limit to the water quality certificate for the cooling water discharge in compliance with the Section 316(a) thermal variance requirements.

On February 24, 2011, the EPA issued an Administrative Compliance Order (CWA-02-2010-3119) against the Authority regarding the alleged noncompliance with effluent limitations in the San Juan power plant's NPDES, which is primarily related to nickel, copper, mercury, fecal coliforms and flow parameter limits.  The Administrative Compliance Order requires the Authority to submit to the EPA a compliance plan to achieve compliance with the alleged violations and to implement it within 180 days from the date of entry of the Order.  The Authority submitted the required compliance plan and completed all actions required under the plan. Although the Authority has achieved improvements in the compliance record for this power plant for fiscal year 2012, certain deviations from the effluent limitations for Outfalls 002 and 003 have occurred.  In order to address this situation, the Authority is in a procurement process for the installation of an advanced treatment technology in order to convert the discharges of these outfalls into storm water discharges only.  The Authority has notified EPA about the proposed actions and does not anticipate additional enforcement action related to the Administrative Compliance Order.  As of this date, the EPA has not assessed any penalties against the Authority related to this matter.

As of December 2011, the Authority has achieved a level of compliance with CWA regulations (NPDES permits, Drinking Water Act program, Oil Pollution Act (FRP and operations manual), and SPCC regulations) in excess of 99%.

*Proposed Regulation under the CWA*

Pursuant to consent decrees with other environmental organizations, the EPA has issued past rulemaking under Section 316(b) of the CWA in three (3) phases. Existing large electric generating utilities were addressed in the Phase II rulemaking, finalized in February 2004. Existing small electric generating units and all manufacturing facilities were addressed in the Phase III rulemaking, finalized in June 2006. However, the Phase II rulemaking and a portion of the Phase III rulemaking were subject to a legal challenge and remanded to EPA for reconsideration. As a result, on April 20, 2011, EPA published a new draft rule pertaining to Section 316(b) of the CWA. Compliance with this rule is established in reference to the date of issuance of the final rule. According to the terms of a settlement agreement, EPA was required to sign the final rule by July 27, 2012. The final rule was not signed by EPA at the proposed date. EPA has signed an agreement with Riverkeeper (the "Third Amendment") and expects to finish the rule by November 4, 2013. Therefore, the compliance date with the rule is anticipated to occur at some time after that date.

The new proposed regulation has three (3) components. First, existing facilities that withdraw at least 25 percent of their water from an adjacent body of water exclusively for cooling purposes and have a design intake flow of greater than 2 million gallons per day would be subject to an upper limit on fish impingement. In order to comply with this requirement, the facility was given the option of choosing technologies that would be best suited to address the problem or reduce its cooling water intake velocity to 0.5 feet per second. Second, existing facilities that withdraw very large amounts of water (at least 125 million gallons per day) would be required to conduct studies to help their permitting authority determine the site-specific controls, if any, would be required to reduce the number of aquatic organisms that are sucked into the cooling water systems, also known as entrainment. Third, new units that add electrical generation capacity at an existing facility would be required to add technology that is equivalent to closed-cycle cooling which may be achieved by integrating a closed-cycle system into the design of the new unit or making other design changes with equivalent results.

The Authority has a proposal to implement an impingement and entrainment control technology at the Costa Sur power plant consisting of the installation of aquatic filter barriers. This includes the verification sampling for impingement and entrainment. On June 1, 2011, the Authority prepared and submitted to EPA a Plan of Action ("POA") for the Costa Sur power plants. The POA will recommend steps for impingement and entrainment reduction. Based on the steps that have been and will be taken, the Authority understands that it will be able to comply with the existing NPDES permit conditions.

*Underground Injection Control Regulation*

EPA regulations in 40 C.F.R. Parts 144 to 147 establish requirements governing the protection of ground water. In accordance with these requirements, EPA regulates the construction, operation, permitting, and closure of underground injection control facilities. These consist of injection wells used to place fluids underground for storage or disposal. This implementation and enforcement of this regulatory program was delegated to the PREQB, who has issued regulations governing these types of well referred to as underground injection control facilities.

The Authority has septic systems installed for sanitary discharges for which it does not have underground injection control permits. The Authority prepared a compliance plan to achieve compliance with PREQB's underground injection control regulations, which plan was approved by PREQB. The compliance plan provides for the closure of 39 septic systems located in different power plants. The schedule for closure is tied to the completion of connections to PRASA's sewer system. As of December 2009, the Authority has completed the connection of sanitary discharges to PRASA's system at the San Juan, Aguirre and Palo Seco power plants. The Costa Sur power plant's sanitary discharge system was

connected to PRASA's system at the beginning of fiscal year 2010.  As a result, the Authority is currently engaged in the closing of septic tanks at all of its power plants and is in the process of sampling and analyzing the septic systems at Aguirre, San Juan and Palo Seco.  The Authority has completed the sampling activities at the Aguirre and San Juan power plants.  The analysis reports were submitted to the PREQB for its review and approval prior to beginning of the closure activities.  The Authority is in compliance with the requirements of the compliance plan approved by the PREQB.

### Spill Prevention Control and Countermeasures Plan

Under Section 311 of the CWA, EPA has issued regulations setting requirements for the prevention, preparedness, and response to oil discharges at specific non-transportation related facilities.  To prevent oil from reaching navigable waters and adjoining shorelines, as well as to contain discharges of oil, the regulation requires these facilities to develop and implement SPCC Plans and establish procedures, methods and equipment requirements.  Some facilities are also required to implement Facility Response Plans ("FRP") depending on the fuel storage capacity and risk of harm to navigable waters and the extent of risk they represent with respect to an oil spill to a body of water.

Pursuant to the terms of the Consent Decree, the Authority was required to implement a Spill Prevention Maintenance and Construction Program ("SPMCP").  This program included major overhauls to dikes and fuel tanks.  As of December 2009, the Authority completed all compliance projects under the SPMCP of the Consent Decree, in accordance with the established scope of work.

The Authority has a program to comply with new SPCC requirements that became effective on November 10, 2011 and addresses the containment of potential leakage from oil containing electrical equipment in its distribution substations.  The Authority has already implemented the monitoring and inspection requirements under these new regulations (40 C.F.R. §112.7(k)).  Notwithstanding the foregoing, during fiscal year 2011, the Authority completed the installation of spill response material at all its substations.  In addition, it completed the construction of secondary containments at 36 of the 54 substations located near bodies of water.  The Authority has budgeted $1.5 million for the completion of this program.

### Hazardous Substances and Wastes

The Authority's operations are regulated or impacted by various federal and state laws related to the handling and disposal of hazardous substances and wastes, including petroleum and related substances.

The Oil Pollution Act ("OPA") imposes substantial penalties for oil or EPA listed hazardous substance spills into bodies of water and for the failure to report such spills.  In addition, OPA imposes strict liability on certain responsible parties for the cleanup of oil spills in bodies of water.  On the other hand, CERCLA also imposes strict liability to certain potentially responsible parties for damages and remedial action related to contamination caused by hazardous substances.  Under CERCLA, liability can be imposed on any generator of hazardous substances who has arranged for disposal or treatment at the affected facility.  As such, potentially responsible parties can be held liable for cleanup costs associated with EPA's Superfund actions.

CERCLA provides for reporting requirements to cover the release of hazardous substances into the environment, including water, soil and air. When these substances are processed, stored, or handled, reasonable and prudent measures must be employed to prevent a release to the environment. In addition, pursuant to the Toxic Substances Control Act ("TSCA"), EPA has issued regulations imposing stringent requirements for labeling, handling, storing and disposing of PCBs and the associated equipment. There are regulations governing PCBs notification and documentation, restrictions on disposal of drained electrical equipment, spill cleanup, and recordkeeping requirements, among others.

Under CERCLA, the EPCRA entities that store or manage hazardous chemicals in specified quantities must comply with a program of emergency planning and a community right-to-know plan designed to inform the public about routine chemical hazards present at the facilities. Both programs have stringent enforcement provisions. Among other things, EPCRA requires reporting of hazardous chemicals by means of Tier I and/or Tier II reports that are annually filed with EPA and other public entities.

Pursuant to the Resource Conservation and Recovery Act ("RCRA"), the EPA has the authority to control hazardous waste from the "cradle-to-grave." perspective. This includes the generation, transportation, treatment, storage, and disposal of hazardous waste. RCRA also set forth a framework for the management of non-hazardous solid wastes, and includes provisions that enable EPA to address environmental problems that could result from underground tanks storing petroleum and other hazardous substances. Certain waste, including used boiler cleaning solutions, waste solvents and certain waste oils generated by the Authority may be considered hazardous wastes under RCRA.

### Hazardous Chemicals Reporting

The Consent Decree required the Authority to submit past due Tier I or Tier II reporting for hazardous chemicals and to continue to file these reports as required by EPCRA. The Authority met these requirements and is currently in compliance with Tier II reporting requirements.

### PCB Program

In 2000, the Authority completed a ten-year EPA-mandated program to sample and analyze the oil used in its oil-filled transformers and other equipment in order to identify and properly dispose of such PCB equipment. Pursuant to this program, the Authority has completed the replacement and disposal of transformers with PCB concentrations of more than 500 ppm. The Authority continues with the replacement and disposal of transformers with PCB concentrations between 50 and 499 ppm.

### Asbestos Abatement

The Authority identified asbestos containing materials ("ACM") in the insulation used on its power plants, specifically at generating units, control rooms, mezzanines, warehouses, administrative buildings, auxiliary equipment and pipelines. ACM is regulated under the solid waste regulations, as well as air quality control regulations, due to its potential to emit harmful particles into the atmosphere. The Authority has developed and runs an ACM removal program, which provides for the encapsulation or removal of ACM, on an ongoing basis, to reduce the risk of exposure. The Authority is in compliance with this program, and continues to work to gradually remove all ACM from its facilities, given that most ACM can only be removed when generating units are taken out of service for maintenance repairs and other activities.

*Underground Storage Tank Regulations*

Pursuant to RCRA, EPA has issued regulations establishing standards and corrective action requirements applicable to underground storage tanks ("USTs") that store regulated materials, including petroleum and related substances. PREQB has issued regulations similar to the federal requirements and has been delegated the implementation of this program. These regulations establish requirements governing registration and operation of USTs, as well as the related recordkeeping, among other things. As previously mentioned, the Consent Decree required the Authority to ensure that all closed USTs at its facilities meet the applicable UST closure requirements. The Authority has met these requirements as stipulated under the Consent Decree. The Authority understands that all of the Authority's USTs that are currently in use are in compliance with applicable UST requirements.

*Homeland Security*

The Department of Homeland Security ("DHS") has promulgated regulations under the Homeland Security Act of 2002 relating to anti-terrorism standards at major industrial facilities. Facilities that store or process chemicals in quantities exceeding established thresholds must submit a screening assessment to the DHS. Based on these assessments, the DHS may impose additional requirements, including a screening vulnerability assessment and a Site Security Plan.

The following Authority generation facilities are subject to the requirements of the Homeland Security Act of 2002 and DHS regulations: San Juan Generation Complex, Aguirre Generation Complex, Palo Seco Power Plant, Cambalache Power Plant, and Mayaguez Mayagüez Power Plant. As required by law, these generation facilities are supervised by the US Coast Guard and each one has a designated security officer and a facility security plan.

DHS has also recommended that these Authority generation facilities participate in the Site Assistance Visits program. The Authority has currently scheduled a visit to one of the generation facilities located in Puerto Rico's southern region (i.e., Costa Sur Power Plant or Aguirre Generation Complex). The Authority is also planning to schedule Site Assistance Visits to the Palo Seco Power Plan and the San Juan Generation Complex, subject to the availability of DHS resources. No other requirements have been imposed by the DHS on the Authority or its generation facilities.

*Capital Improvement Program*

The Authority's capital improvement program for the fiscal year which ended June 30, 2013 included $8.1 million in order to comply with existing Commonwealth and federal environmental laws and regulations, including the Costa Sur power plant related projects in compliance with the CWA Sections 316(a) and 316(b) previously discussed. Actual expenditures for the 2013 fiscal year totaled approximately $2.1 million. The Authority's five-year capital improvement program for fiscal years 2014 through 2018 identifies environmental projects valued at $62.8 million. During fiscal year 2014, approximately $12.6 million is budgeted for environmental projects. Approximately one eighth of the 2014 budget is dedicated to asbestos abatement, $1.3 million is budgeted for effluent tank construction at the San Juan power plant, $5 million is budgeted for the CWA Section 316 projects at the Costa Sur power plant, $1 million is budgeted for the NPDES compliance program at the San Juan power plant, $1 million is budgeted for the continuous emissions monitoring systems and $1 million is budgeted for the SPCC compliance program. The Costa Sur power plant Section 316 projects are budgeted to cost $27 million over five years ending in fiscal year 2018. The Authority believes it is taking the necessary steps to comply with all applicable environmental laws and regulations and the terms of the Consent Decree requirements, as discussed above.

# INSURANCE

## Coverage

The Authority maintains, among others, insurance policies covering all-risk property (excluding overhead transmission and distribution lines), boiler and machinery and public liability. The combined insurance coverage of property and boiler and machinery policies is $750 million, consisting of a maximum of $200 million under the all-risk property insurance policy, $200 million under the boiler and machinery insurance policy, an excess layer of $100 million under an all-risk and boiler and machinery insurance policy and $250 million under an excess property policy.

The policies' deductible in case of earthquake losses is $25 million, $45 million in the case of windstorm losses, and $2 million for all other covered risks. The Authority retained $7.5 million of the first $25 million of all covered risks. The boiler and machinery insurance policy has a $10 million deductible.

The proceeds of the all-risk property and boiler and machinery policies are used prior to drawing upon the Reserve Maintenance Fund or the Self-insurance Fund established under the Trust Agreement.

The Authority's business interruption insurance covers up to $200 million, with the Authority covering the costs of the first 30 days. The Self-insurance Fund can be used to pay insurance policies deductibles under these policies.

The general liability policy covers property damage and bodily injury to third parties with a $75 million aggregate limit in excess of the self-retention limit of $1 million per occurrence. The general liability policy has a $1 million deductible per occurrence with a $3 million aggregate.

As with all electric utilities located on the east coast of the United States, the Authority's transmission and distribution facilities are susceptible to adverse weather conditions, such as hurricanes. The Authority is currently self-insured with respect to property damage for its transmission and distribution systems, as are most U.S. utilities. While the Authority and the Consulting Engineers believe that the Authority's reserves are generally sufficient, there can be no assurance that the Authority will be able to provide adequate coverage for damage that might be incurred as a result of any future adverse weather conditions.

In the Authority's opinion, its insurance coverage adequately protects it against property damage or bodily injury resulting from the possession, operation and maintenance of the System.

The State Insurance Fund, a Commonwealth agency which provides worker's compensation insurance, is funded by mandatory contributions from the Authority.

## Self-insurance Fund

The Authority has supplemented the Trust Agreement to create a Self-insurance Fund, which is funded from Net Revenues (after deposits to the Sinking Fund and the Reserve Maintenance Fund) in the amounts recommended from time to time by the Consulting Engineers. The Authority has no obligation to make deposits to, or to replenish, the Self-insurance Fund in the event of withdrawals therefrom, except to the extent recommended by the Consulting Engineers. Amounts on deposit in the Self-insurance Fund are also available for the payment of principal of and interest on the Power Revenue Bonds. As of June 30, 2013, approximately $91.9 million was on deposit in the Self-Insurance Fund. See "Disposition of

Revenues" under Appendix I— *Definitions of Certain Terms and Summary of Certain Provisions of the Trust Agreement.*

**Fire Prevention Program**

In an effort to reduce the Authority's risk profile, the Authority continually evaluates industry practices and implements programs geared towards minimizing the Authority's losses. As part of this effort, on March 25, 2010, the Authority implemented a fire prevention program with the principal goal of preventing and minimizing the risks of fire in its power generation plants and protecting the lives of its personnel and its property. The program integrates and standardizes actual fire prevention and protection protocols to safeguard the Authority's personnel and the power generation infrastructure, while having designated and competent staff at each facility. The program dynamically maintains and improves the fire protection equipment in the generating plants and includes on-going training of designated staff at each facility. The designated staff is responsible for the certification and maintenance of the fire protection systems located at the Authority's power plants, the compliance of the operational emergency plan, and coordinating resources for an immediate and effective response facing an emergency.

## LABOR RELATIONS

The Authority has in effect collective bargaining agreements with four unions. The Authority believes that labor relations are stable. The Authority is currently honoring all collective bargaining agreements.

The collective bargaining agreement between the Authority and UITICE, the construction workers union representing 839 employees, expired on January 26, 2011. On April 18, 2013, the negotiations of the collective bargaining agreement ended and the agreement was ratified by UITICE's assembly of members. The collective bargaining agreement was approved by the Authority's Governing Board at its July 18, 2013 meeting and is expected to be signed on July 29, 2013. The term of this agreement is from January 27, 2011 until January 27, 2017.

The collective bargaining agreement between the Authority and UTIER, the operations and maintenance workers union representing 4,717 employees, expired on August 24, 2012. The collective bargaining agreement between the Authority and UEPI, the professional and technical workers union representing 360 employees, expired on December 13, 2010. In addition, the collective bargaining agreement between the Authority and UPAEE, the pilots workers union representing 6 employees, expired on July 2, 2010. The Authority is currently negotiating new agreements with all three unions. These negotiations are in advanced stages. All negotiations are proceeding in an orderly and constructive manner.

As of June 30, 2013, the Authority has 8,465 employees, of which 5,440 are employed in the generation, transmission and distribution directorates; 1,571 are employed in the customer service directorate, and the remaining employees are employed in the administrative directorates and other areas. In order to improve the productivity of its employees, the Authority has instituted various programs to reduce absenteeism, increase safety measures, and minimize the level of illegal drug abuse among its employees. In addition, the Authority continues to implement programs to provide both technical and supervisory training to its employees. The Authority believes that the implementation of these programs helps the Authority provide more reliable service to its clients.

## PENSION PLAN

The Employees' Retirement System of Puerto Rico Electric Power Authority (the "Retirement System"), a separate trust fund created by the Authority, administers the Authority's defined benefit pension plan, which provides employee retirement and death benefits. The pension plan provides for contributions by both the Authority, based on annual actuarial valuations, and the plan members. The most recent actuarial valuation was conducted as of June 30, 2012. As of June 30, 2012, the Retirement System had 17,579 members, consisting of 8,950 retirees currently receiving benefits, 29 terminated employees entitled to but not yet receiving benefits and approximately 8,500 active members. In addition, the Retirement System had 2,025 beneficiaries. The Authority's accrued liability contributions are determined based on a percentage of covered payroll recommended by the Retirement System's actuaries to liquidate the unfunded actuarial accrued liability over a 28-year period that commenced on June 30, 2012. Covered payroll includes all elements of compensation paid to active employees on which contributions to the Retirement System are made.

The contributions recorded by the Authority for fiscal years 2011 and 2012 were $85.3 million and $85.4 million, respectively. For fiscal years 2011 and 2012, the recorded contributions represented 23.80% and 23.86%, respectively, of covered payroll. The contributions recorded as of June 30, 2013 were $89.4 million (unaudited) and represent 25.78% of covered payroll. For fiscal year 2014, the Authority's contributions to the Retirement System will be approximately 29.29% of covered payroll. As of June 30, 2012, the present value of the Authority's future contributions on account of benefits was approximately $1.7 billion.

The table below shows the funding shortfalls for each of the last five fiscal years for the Retirement System.

### Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions | System Benefit Payments and Administrative Expenses | Net Funding Shortfall |
|---|---|---|---|
| Employees Retirement System | | | |
| 2008 | $112.1 | $(181.0) | $(68.9) |
| 2009 | $116.5 | $(190.6) | $(74.1) |
| 2010 | $106.8 | $(204.3) | $(97.5) |
| 2011 | $122.4 | $(198.6) | $(76.2) |
| 2012 | $123.5 | $(204.3) | $(80.8) |

Unfunded actuarial accrued liability to be borne entirely by the Authority was approximately $1.7 billion as of June 30, 2012. The actuarial valuation for fiscal year 2012 used a closed amortization period based on a level percent of pay, assumed an investment return of 8.5% per annum, a payroll growth rate of 4% per year, projected salary increases of 4.00% per year, an inflation rate of 3.0% per year, and a remaining amortization period of 28 years for the unfunded accrued liability.

The following table shows, for the five fiscal years ended June 30, 2012, the Retirement System's actuarial accrued liability, unfunded actuarial accrued liability, covered payroll and the ratio of the unfunded actuarial accrued liability to covered payroll.

| Fiscal Years Ending June 30, | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability ("UAAL") | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|
| 2008 | 2,336,944,425 | 765,743,108 | 362,892,937 | 211.0% |
| 2009 | 2,497,639,122 | 980,288,838 | 364,402,800 | 269.0% |
| 2010 | 2,816,370,702 | 1,401,686,298 | 357,405,428 | 392.2% |
| 2011 | 2,875,438,109 | 1,512,637,608 | 361,198,851 | 418.8% |
| 2012 | 2,986,298,926 | 1,700,883,058 | 364,981,549 | 466.0% |

The following table shows, for the five fiscal years ended June 30, 2012, the Retirement System's actuarial value of assets and market value of assets and the historical funded ratios using the actuarial and market value of assets. A five-year smoothing of the market value of assets is used for actuarial valuation purposes. Thus, in a declining market, such as in 2009, 2010 and 2011, the actuarial value of assets exceeds the market value of assets as there are unsmoothed losses that are not yet reflected in the actuarial value of assets.

| Fiscal Years Ending June 30, | Actuarial Value of Assets | Market Value of Assets | Funded Ratio (actuarial value) | Funded Ratio (market value) |
|---|---|---|---|---|
| 2008 | 1,571,201,317 | 1,447,914,296 | 67.2% | 62.0% |
| 2009 | 1,517,350,284 | 1,130,683,460 | 60.8% | 45.3% |
| 2010 | 1,414,684,404 | 1,140,467,954 | 50.2% | 40.5% |
| 2011 | 1,362,800,501 | 1,286,583,761 | 47.4% | 44.7% |
| 2012 | 1,285,415,868 | 1,233,267,200 | 43.0% | 41.3% |

The increase in the ratio of the unfunded actuarial accrued liability to covered payroll for fiscal years 2009 and 2010 and the decrease in the funded ratios show deterioration in the financial strength of the Retirement System partly as a result of the effect on the Retirement System's investment portfolio of the general market decline during 2008, 2009 and 2010. During fiscal years 2011 and 2012, however, the Retirement System's investment portfolio had positive returns of approximately 20.4% and 2.9%, respectively. As a result of the plan's funded ratio and the funding shortfalls referred to above, and depending on the actual return on the plan's assets compared to the assumed return in the actuarial valuation, the Authority modifies its annual contribution to the plan in order for the plan to be able to keep making benefit payments at current levels on a long-term basis.

The Retirement System's financial statements are audited by a firm of independent public accountants that does not serve as independent accountants to the Authority.

### OTHER POST-EMPLOYMENT BENEFITS

In addition to the pension benefits, the Authority provides non-pension, post-employment benefits to retirees under a Healthcare Plan that consist of a fixed maximum monthly payment to cover medical expenses for retired employees meeting the service eligibility requirements. Based on this Plan's features, it is treated as a single-employer defined benefit healthcare plan. These benefits are funded by the Authority on a "pay-as-you-go basis," which means that there is no reserve or pool of assets against the benefit expenses that the Authority may incur in future years. The Authority paid $21.5 million and $23.3 million (unaudited) for these non-pension post-employment benefits for its eligible retirees for the fiscal years 2012 and 2013, respectively, which is included in administrative and general expenses.

In accordance with the provisions of GASB Statement No. 45, the Authority is required to quantify and disclose its obligations to pay non-pension post employment benefits to current and future retirees. The most recent actuarial valuation report for these benefits, as of July 1, 2010, reflects a UAAL of $612.7 million with respect to these benefits, and the funding ratio is 0% since, as mentioned previously, these benefits are funded on a "pay-as-you-go basis."

## LITIGATION

*General.*  The Authority is a defendant or codefendant in numerous legal proceedings pertaining to matters incidental to its business and typical for an electrical utility of its size and nature, including claims for damages due to electrified wires, failure to supply power and fluctuations in the power supply. Pursuant to the Act, the Authority is authorized to sue and be sued by individuals or legal entities.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors, executive directors and employees of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them.  There is no limitation on the amount of the judgment that may be paid under the provisions of Act No. 9 in cases before federal court, but in all other cases the Secretary of Justice of the Commonwealth may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.  Although the Authority's directors, executive director and employees are covered by the provisions of Act No. 9, Article 19 of Act No. 9 requires the Authority to cover the costs associated with judgments, expenses and attorneys' fees incurred by the Commonwealth in the legal representation of its directors, executive director and employees.  To the extent the Authority is unable to cover these costs and expenses, the Authority would be required to reimburse the Commonwealth from future revenues, as provided by the Secretary of the Treasury of the Commonwealth in consultation with the Authority's board of directors.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following paragraphs, as of June 30, 2013, the Authority has included in its financial statements reported liabilities of approximately $20.3 million for awarded and anticipated unfavorable judgments.  Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed against the Authority exceed $700 million; however, the ultimate liability cannot be presently determined.  The Authority believes that none of these cases, if decided against the Authority, would have a material adverse effect on the Authority's financial condition or operations.

*Abengoa Litigation.*  In May 2000, Abengoa, Puerto Rico, S.E., the Authority's original contractor for the construction of the new generating units (Units 5 and 6) at the San Juan power plant, unilaterally declared a termination of the contract and filed a complaint for breach of contract. The Authority filed a counterclaim for breach of contract and for all damages caused to the Authority by the contract termination. On September 21, 2007, the Regional Administrating Judge for the Superior Court of San Juan certified the case as complex civil litigation pursuant to the Authority's petition. On July 27, 2011, Mr. Angel F. Rossy Garcia, a retired Commonwealth appeals court judge, was named as special master for the case.  After his appointment, the special master intervened as a neutral evaluator for purposes of assisting the parties in reaching a potential settlement.  The parties filed their respective position papers stating their legal contentions and case theories in August 2011.  After reviewing the position papers and meeting separately with each party to discuss the strength and weakness of their respective cases, the parties were unable to reach a settlement agreement.  The special master then determined that the contested issues would be resolved at trial and that the case would be bifurcated into two phases: a liability phase that would determine whether the termination was wrongful and a damages phase.

The special master has recited the actions to be taken before the final pretrial conference. Abengoa and the Authority have identified their preliminary list of witnesses expected to testify in the first phase of the trial on the issue of wrongful termination/breach of contract, including their respective experts.

The surety company, American International Insurance Company, now AIG Puerto Rico Insurance, has not yet announced their witnesses but has manifested its position that any special defenses to joint and several liability under the performance bond be litigated during the second phase, in the event the Authority prevails against Abengoa. This approach has not yet been agreed upon or determined by the special master.

The Authority understands that it has significant probabilities of prevailing on the merits of its counterclaim against Abengoa and the surety based on the evidence collected during the discovery and case evaluation. A status hearing was held on July 12, 2013. The parties must submit a Joint Pretrial Report by November 27, 2013. The Pretrial Conference is set for December 13, 2013.

In order to mitigate its possible losses, the Authority entered into an agreement with Washington Engineers P.S.C. for the completion of the generating units, said units having entered into service in 2009. Expert reports have been developed assessing potential damages to be recovered from Abengoa, including excess amounts billed to the Authority prior to the wrongful termination.

*Aguas Puras del Caribe Litigation.* In 2010, Aguas Puras del Caribe filed suit against the Authority alleging that the Authority negotiated in bad faith and created a reasonable expectation that the negotiation of a contract to provide certain of the Authority's generation facilities with demineralized water for a term of 25 years would lead to the execution of a final and binding agreement. Aguas Puras seeks damages of approximately $40 million. The case was voluntarily dismissed by plaintiff. Plaintiff and the Authority are currently in the process of engaging in extrajudicial settlement negotiations of plaintiff's claim.

*CAPECO Litigation.* In 2009, a large fire at a tank farm owned by CAPECO caused major damage to surrounding areas. The Authority stored some of its fuel at this facility. In the aftermath of the fire, numerous claims were filed against CAPECO. Some of the plaintiffs included the Authority as a defendant in these suits, alleging that the Authority failed in its duty (as the owner of fuel stored at the site) to properly monitor CAPECO's operations in the tank farm. All cases are in the initial stages and the Authority intends to vigorously defend against these claims. On August 12, 2010, CAPECO filed for bankruptcy. As a result thereof, all proceedings against CAPECO have been stayed. The proceedings against the Authority continue.

*Compute All, Inc. Litigation.* In 2008, Compute All, Inc. filed suit against the Authority, alleging breach of contract and damages due to the unlawful termination of a contract pursuant to which Compute All, Inc. would provide the Authority with a computer-based motor vehicle fleet management system, including global positioning system capabilities. Compute All seeks damages of $8.25 million plus the payment of expenses and attorneys' fees. The case is currently in the discovery stage. The Authority filed a motion for summary judgment arguing that plaintiff's allegations are time-barred, because they constitute a tort claim and not a contract claim. Plaintiff opposed the Authority's motion. The court scheduled a hearing for August 16, 2013 to hear arguments on these motions.

*Consumer Litigation.* In 2011, separate lawsuits were filed against the Authority by various consumers claiming damages allegedly caused by incorrect and unlawful billing and invoicing practices.

These lawsuits have been consolidated and certified as complex litigation, as requested by the Authority. The consumers are claiming damages in excess of $100 million and requested that the case be certified as a class action. The Authority filed its Reply in opposition to the class certification request.

Discovery proceedings have begun.

In 2011 a federal class action lawsuit was filed claiming that the Authority's rate schedules, including subsidies granted to various groups, violate federal antitrust law, specifically the Robinson-Patman Act, and the religious freedom clause of the First Amendment to the United States Constitution by discriminating against certain customers who are not entitled to subsidies and requiring certain customers to associate with persons of different religious or political views by subsidizing those views through the Authority's lower electric rates to such persons. The amount claimed is unspecified.

The Authority believes the claims are without merit because several elements of the Robinson-Patman Act that plaintiffs must prove do not exist in the Authority's case, including that it does not sell electricity in interstate commerce and because the Authority's subsidies are mandated by Commonwealth legislation rather than independent Authority actions.

Discovery proceedings have begun.

In 2011, a civil lawsuit was filed against the Authority and its directors in federal court in Puerto Rico, by eight private individuals and one local private corporation, claiming violations of the Racketeer Influenced and Corrupt Organizations Act (the "RICO Act"), including unlawful use of an enterprise to launder money generated by a pattern of racketeering activity, unlawfully acquiring or maintaining an interest in an enterprise through a pattern of racketeering activity, unlawful manipulation of an enterprise for purposes of engaging in, concealing, or benefiting from a pattern of racketeering activity, unlawful conspiracy to violate the RICO Act and conspiracy to advance a money-laundering scheme. Neither the United States federal government nor the Commonwealth government is a party in this civil lawsuit. The amount claimed is unspecified. Plaintiffs have also asked the federal court to allow them to be the representatives of a class consisting of all consumers of the electricity sold by the Authority from 2007 to the present. On September 25, 2012, the federal court dismissed all of the above claims except those claims regarding conspiracy to advance a money laundering scheme and conspiracy for acquiring an interest in an enterprise.

The federal court has not yet ruled on the issue of class certification. The Authority believes that class certification will not be granted because the grounds advanced by plaintiffs are the same as those made in a prior, unrelated Commonwealth court lawsuit against the Authority in which class certification was denied on facts very similar to those in this RICO Act lawsuit.

Discovery proceedings have begun.

The Authority believes that the undismissed RICO Act claims are without merit because the plaintiffs will be unable to prove the necessary elements of those claims, in particular those that require a showing that the Authority conspired through its employees to violate the RICO Act, or that its directors or Board members obtained any interest in the Authority (other than their board position).

*Power Technologies Corp. Litigation.* In 2008, Power Technologies Corp. filed suit against the Authority, alleging that the Authority had withdrawn from a contracting process for a new energy facility, in which Power Technologies was involved, without explanation or justification. Power Technologies seeks damages of $52.4 million. The case was voluntarily dismissed by plaintiff. Plaintiff and the Authority are currently in the process of engaging in extrajudicial settlement negotiations of plaintiff's claim.

*Vitol, Inc. Litigation.* In 2009, the Authority filed suit in Commonwealth court against Vitol, Inc. and certain of its affiliates and subsidiaries seeking a declaratory judgment as to the nullity of a $2 billion fuel supply agreement due to Vitol's failure to disclose certain corruption cases for which it accepted responsibility. Vitol removed this suit to federal court and presented a counterclaim alleging that the

Authority owed it approximately $45 million for delivered fuel and related excise taxes. Although the case is currently in the discovery stage, the court has stayed this process until such time as certain motions regarding forum selection have been resolved.

On November 28, 2012, the Authority filed a second complaint against Vitol in the Commonwealth Court of First Instance seeking essentially the same remedies sought in the first action but as to four other contracts, after discovery revealed the date in which Vitol learned of the investigations in the corruption cases. Vitol also removed this action to the U.S. District Court for the District of Puerto Rico. The Authority claims approximately $3.5 billion in the aggregate. Vitol has resolved the claim for the $17 million in excise taxes and has stated that it will amend its counterclaim to dismiss that claim. Discovery in the case is closed. The parties have submitted motions for summary judgment against each other and are in the process of filing their respective oppositions thereto.

*Ponce Landslide Litigation.* In 2007, 2008 and 2009, six cases were filed against the Authority, PRASA, and other entities alleging damages resulting from landslides in a neighborhood in Ponce. The complaints allege that the Authority caused or contributed to the landslides based on its construction of transmission lines in the area. In total, the six plaintiffs have claimed approximately $19.5 million in damages. These cases, which are in the discovery stage, have been stayed by the court due to the bankruptcy of PRASA's insurer. Once proceedings in this case resume, the Authority will continue with its vigorous defense.

*Asbestos Litigation.* In the case of Jorge Martínez, et al. v. AEE, fifty-five plaintiffs, former Authority employees, claim that they have health problems due to the Authority's intentional failure to comply with federal and local laws regarding asbestos materials. In particular, plaintiffs claim that, during a certain time-frame, in which the Authority had the obligation to take measures regarding asbestos materials in its facilities, the Authority failed to comply with its duty to protect the plaintiffs from asbestos exposure. Plaintiffs claim $320,960,000.00 in damages.

The Authority alleged employer's immunity but the courts held that a hearing on the merits of said defense was necessary before ruling on the matter of the Authority's alleged gross negligence. After the hearing as to the alleged negligence, held on several dates in July and August 2013, the Court requested that the parties submit legal briefs, which the parties are in the process of filing. If the Authority prevails on the employer immunity defense, the case will be dismissed. If the Authority does not prevail on said defense, the case will proceed to trial on negligence and damages as to every particular plaintiff.

*Environmental Litigation.* Among the cases currently pending, some deal with environmental issues. These are described above in *Environmental Litigation and Administrative Proceedings* under ENVIRONMENTAL MATTERS.

*Litigation Regarding the Bonds.* There is no pending litigation seeking to restrain or enjoin the sale of the Bonds or contesting or affecting the validity of the Bonds, the proceedings of the Authority taken with respect to the authorization, issuance or sale of the Bonds, or the pledge or application of any moneys under the Trust Agreement or the existence or powers of the Authority.

## TAX MATTERS

### Federal Income Taxes

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which must continue to be satisfied after the issuance of the Bonds in order that interest on the Bonds be not included in gross income for federal income tax purposes. The failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of Issuance. The Authority has covenanted to comply with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds.

In the opinion of Bond Counsel, subject to continuing compliance by the Authority with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be includable in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. Interest on the Bonds will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. Bond Counsel expresses no opinion as to the effect of any change to any document pertaining to the Bonds or any action taken or not taken when such change is made or action is taken or not taken without its approval or in reliance upon the advice of counsel other than such firm with respect to the exclusion from gross income of the interest on the Bonds for federal income tax purposes. Bond Counsel is further of the opinion that under the provisions of the Acts of Congress now in force, the Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral tax consequences to certain taxpayers, including without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations doing business in the United States, certain S Corporations with excess passive income, individual recipients of Social Security or railroad retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax exempt obligations, and taxpayers eligible for the earned income tax credit.

The Code contains other provisions that could result in tax consequences, upon which Bond Counsel expresses no opinion, as a result of ownership of the Bonds or the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income. Ownership of tax exempt obligations such as the Bonds may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to the applicability and impact of any such collateral consequences.

### Original Issue Discount

The excess, if any, of the amount payable at maturity of any maturity of the Bonds purchased as part of the initial public offering over the issue price thereof constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity of the Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. In general, the issue price of a maturity of the Bonds is the first price at which a substantial amount of Bonds of that maturity was sold

(excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Discount Bonds for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed herein. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of such substantially identical Bonds is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount with respect to such Discount Bond and with respect to state, Commonwealth, and local tax consequences of owning and disposing of such Discount Bond.

**Bond Premium**

The excess, if any, of the tax basis of a Bond purchased as part of the initial public offering to a purchaser (other than a purchaser who holds such Bonds as inventory, stock in trade or for sale to clients in the ordinary course of business) over the amount payable at maturity of that Bond is "bond premium." Bond premium is amortized over the term of such Bond for federal income tax purposes (or, in the case of a bond with bond premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond). An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable bond premium attributable to each taxable year such Bond is held. The amortizable bond premium on such Bond attributable to a taxable year is not deductible for federal income tax purposes; however, bond premium is treated as an offset to qualified stated interest received on such Bond. Owners of such Bonds should consult their tax advisors with respect to the determination for federal income tax purposes of the treatment of bond premium upon sale, redemption or other disposition of such Bonds and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Bonds.

**Backup Withholding**

Interest paid on tax-exempt obligations will be subject to information reporting in a manner similar to interest paid on taxable obligations. Although such reporting requirement does not, in and of itself, affect the excludability of interest on the Bonds from gross income for federal income tax purposes, such reporting requirement causes the payment of interest on the Bonds to be subject to backup withholding if such interest is paid to beneficial owners who (a) are not "exempt recipients," and (b) either fail to provide certain identifying information (such as the beneficial owner's taxpayer identification number) in the required manner or have been identified by the IRS as having failed to report all interest and dividends required to be shown on their income tax returns. Generally, individuals are not exempt

recipients, whereas corporations and certain other entities generally are exempt recipients. Amounts withheld under the backup withholding rules from a payment to a beneficial owner would be allowed as a refund or a credit against such beneficial owner's federal income tax liability provided the required information is furnished to the IRS.

**Future Developments**

Future or pending legislative proposals, if enacted, regulations, rulings or court decisions may cause interest on the Bonds to be subject, directly or indirectly, to federal income taxation or to State, Commonwealth or local income taxation, or may otherwise prevent beneficial owners from realizing the full current benefit of the tax status of such interest. Legislation or regulatory actions and future or pending proposals may also affect the economic value of the federal, state, Commonwealth or local tax exemption or the market value of the Bonds. Prospective purchasers of the Bonds should consult their tax advisors regarding any future, pending or proposed tax legislation, regulations, rulings or litigation as to which Bond Counsel expresses no opinion.

For example, various proposals have been made in Congress and by the President (the "Proposed Legislation"), which, if enacted, would subject interest on bonds that is otherwise excludable from gross income for federal income tax purposes, including interest on the Bonds, to a tax payable by certain bondholders that are individuals, estates or trusts with adjusted gross income in excess of thresholds specified in the Proposed Legislation. It is unclear if the Proposed Legislation will be enacted, whether in its current or an amended form, or if other legislation that would subject interest on the Bonds to a tax or cause interest on the Bonds to be included in the computation of a tax, will be introduced or enacted. Prospective purchasers should consult their tax advisors as to the effect of the Proposed Legislation, if enacted, in its current form or as it may be amended, or such other legislation on their individual situations.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $4,305,117.34 from the initial public offering prices of such Bonds. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent. The Underwriters will be obligated to purchase all the Bonds, if any such Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed, from time to time, by the Underwriters. The Authority has agreed to indemnify the Underwriters, to the extent permitted by law, against certain liabilities, including liabilities under federal securities laws, or to contribute to payments that the Underwriters may be required to make in respect thereof.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Authority, Government Development Bank, the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit

default swaps) for their own account and for the accounts of their clients and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Authority, the Commonwealth and/or its instrumentalities.

Certain of the Underwriters have entered into distribution agreements with other Underwriters or certain broker-dealers (that have not been designated by the Authority as Underwriters) for the distribution of the Bonds at the original offering prices. Such agreements generally provide that the relevant Underwriter will share a portion of its underwriting compensation or selling concession with one or more of such broker-dealers.

## MATERIAL RELATIONSHIPS

URS Corporation serves as the Consulting Engineers to the Authority under the provisions of the Trust Agreement. The Authority entered into a professional services agreement with Washington Engineers P.S.C., an affiliate of URS Corporation, to provide services to the Authority in connection with the construction of the San Juan 5 and 6 combined cycle generating units completed during fiscal year 2009 and the restoration of the Palo Seco plant following the fires in December 2006.

Citibank, N.A., an affiliate of Citigroup, an underwriter of the Bonds, has provided to the Authority a revolving line of credit for the purchase of fuel oil and power with an approved maximum principal amount of $250 million as of June 30, 2013, of which $249.1 million was outstanding as of that date.

Scotiabank (for which Scotia MSD is a Separately Identifiable Division (SID)), an underwriter of the Bonds, is the Administrative Agent of a syndicate of banks that has provided to the Authority a revolving line of credit for the payment of working capital expenses, with an approved maximum amount of $500 million as of June 30, 2013. The commitment of Scotiabank in the line of credit is $200 million. Oriental Bank, an affiliate of Oriental Financial Services, an underwriter of the Bonds, had a commitment of $200 million in the same line of credit. Banco Popular de Puerto Rico ("BPPR"), an affiliate of Popular Securities, Inc., and Banco Santander, an affiliate of Santander Securities, both underwriters of the Bonds, each had a commitment in the amount of $50 million in the same line of credit. The outstanding balance of the line of credit was $495.2 million on June 30, 2013. Banco Santander terminated its commitment and participation in the line of credit on July 1, 2013. SEE DEBT.

Banco Popular de Puerto Rico ("BPPR"), an affiliate of Popular Securities, Inc., an underwriter of the Bonds, has another term loan to the Authority with an aggregate principal amount outstanding of $9.7 million as of June 30, 2013.

See also GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO.

## LEGAL MATTERS

The proposed form of opinion of Sidley Austin LLP, Bond Counsel, is set forth in Appendix IV to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank and its subsidiaries and affiliates.

## INDEPENDENT AUDITORS

The financial statements of the Authority as of and for the years ended June 30, 2012 and 2011 included in Appendix II hereto have been audited by Ernst & Young LLP, San Juan, Puerto Rico, independent auditors, as stated in their report appearing therein.

The prospective financial information included in this Official Statement has been prepared by, and is the responsibility of the management of the Authority. Ernst & Young LLP has neither examined nor compiled the accompanying prospective financial information, and accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto. The Ernst & Young LLP report for fiscal years 2012 and 2011 included in Appendix II to this Official Statement relates to the historical financial information of the Authority. Such report does not extend to the prospective financial information and should not be read to do so.

## RATINGS

The Bonds have been assigned ratings of "Baa3" (negative outlook) by Moody's Investors Service ("Moody's"), "BBB" (stable outlook) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and "BBB-" (stable outlook) by Fitch Ratings ("Fitch").

These ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies, if in the judgment of any or all, circumstances so warrant. Any such downward revision or withdrawal of either of such ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. The Trust Agreement does not include a covenant by the Authority to maintain a specific rating with respect to the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC, the Authority has covenanted in its resolution authorizing the issuance of the Bonds for the benefit of the Beneficial Owners (as defined in such resolution and, generally, the tax owners of the Bonds):

(a)     to file within 275 days after the end of each fiscal year with EMMA (http://emma.msrb.org) established by the MSRB, core financial information and operating data for the prior fiscal year, including (i) the Authority's audited financial statements, prepared in accordance with

generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority's System and revenues, expenditures, financial operations and indebtedness generally found in this Official Statement (but excluding the Commonwealth Economic Report incorporated by reference herein); and

(b)   to file in a timely manner not in excess of 10 business days of the occurrence of the event, with EMMA, notice of failure of the Authority to comply with clause (a) above and notice of any of the following events with respect to the Bonds:

(1)   principal and interest payment delinquencies;

(2)   non-payment related defaults, if material;

(3)   unscheduled draws on debt service reserves reflecting financial difficulties;

(4)   unscheduled draws on credit enhancements reflecting financial difficulties;

(5)   substitution of credit or liquidity providers, or their failure to perform;

(6)   adverse tax opinions or the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax-exempt status of the Bonds;

(7)   modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

(8)   bond calls, if material, and tender offers;

(9)   defeasances;

(10)   release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)   rating changes;

(12)   tender offers;

(13)   bankruptcy, insolvency, receivership or similar events;

(14)   the consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions other than pursuant to its terms, if material; and

(15)   appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to event (4) and (5), the Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

With respect to event (6) and the tax status of the Bonds, see TAX MATTERS.

With respect to event (8), the Authority does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *Mandatory Redemption* under DESCRIPTION OF THE BONDS above, (ii) the only open issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the Securities and Exchange Act of 1934, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

According to the Rule, event (13) is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the United States Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other event is material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority evidence of ownership and a written notice of and request to cure such breach, the Authority shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)      the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Authority (such as, but without limitation, the Authority's financial advisor or bond counsel); or

(b)      all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of the Bonds ceases to be in effect for any reason, and the Authority elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.