**<u>EXHIBIT 25</u>**

1

2      IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF PUERTO RICO

4    _____x

     In re:

5

     THE FINANCIAL OVERSIGHT AND              PROMESA

6    MANAGEMENT BOARD FOR PUERTO

     RICO,                                    Title III

7        as representative of

8    THE COMMONWEALTH OF PUERTO RICO,

     et al.,

9        Debtors.

     _____x

10   In re:

11   THE FINANCIAL OVERSIGHT AND

     MANAGEMENT BOARD OF PUERTO RICO,

12

         as representative of

13

     PUERTO RICO ELECTRIC POWER AUTHORITY,

14       Debtor.

     _____x

15

     * P R O F E S S I O N A L   E Y E S   O N L Y *

16

17            VIDEOTAPED DEPOSITION

18                   OF

19       FERNANDO L. BATLLE HERNAIZ

20          New York, New York

21        Friday, October 11, 2019

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 169103

Page 70

1    F. Batlle - Professional Eyes Only
2  before?
3      A.  Yes, I have seen them.
4      Q.  And is it fair to say that in
5  these letters, the members of Congress who
6  wrote them are critical of the definitive
7  RSA?
8      MS. McKEEN:  Objection.  The
9      documents speak for themselves.
10     You can answer.
11     A.  Yes, in this letter, they express
12  their opinion about the RSA and other
13  topics related to Puerto Rico's energy
14  sector.
15     Q.  So among other things, on the
16  second page of the first letter, it says,
17  "The new PREPA RSA also conflicts with
18  Puerto Rico's goal to grow its economy."
19     Do you see that?
20     A.  I'm sorry, where are you, sir?
21     Q.  The third paragraph down.
22     A.  The second page, you said?
23     Q.  Yes.
24     A.  I'm sorry.
25     (Document review.)

Page 71

1    F. Batlle - Professional Eyes Only
2      A.  Yes, I see that, sir.
3      Q.  Do you agree with that statement?
4      MS. DALE:  Objection.
5      A.  No.
6      Q.  Has any analysis been undertaken
7  by PREPA or AAFAF to determine the effect
8  that the RSA has on Puerto Rico's goal to
9  grow its economy?
10     MS. McKEEN:  Objection.  Outside
11     the scope of the 30(b)(6) topics and
12     the topics that the court has said are
13     within the proper scope of the 9019.
14     You can answer if you know.
15     A.  No.
16     Q.  No analysis has been undertaken
17  to that degree?
18     A.  AAFAF did not undertake or PREPA
19  undertake any analysis related to this.
20     Q.  Did anyone else to your
21  knowledge?
22     A.  I don't know.
23     Q.  Let's look at the first page.
24  Sorry for going out of order here.  It
25  says, "National and local policy experts

Page 72

1    F. Batlle - Professional Eyes Only
2  agree that the new PREPA RSA is excessively
3  generous to creditors."
4      Do you see that?
5      A.  Yes, I do.
6      Q.  Do you agree with that statement?
7      A.  No.
8      Q.  So it's your position that the --
9  well, for the record, what is the range of
10  recoveries that the RSA provides to
11  creditors, to the settling bondholders
12  creditors?
13     A.  The RSA establishes a recovery of
14  67.5 percent on tranche A and up to 10
15  percent on tranche B.
16     Q.  So up to 77.5 percent?
17     A.  Potentially, yes.
18     Q.  So in your view, a 77.5 percent
19  recovery is not overly generous to the
20  settling creditors?
21     A.  Well, in my view, given all of
22  the factors that have to be considered, it
23  is something that I believe is reasonable,
24  a reasonable recovery.
25     Q.  When you say "all the factors

Page 73

1    F. Batlle - Professional Eyes Only
2  that have to be considered," what do you
3  mean by that?
4      A.  Well, as I stated earlier in my
5  testimony today, achieving PREPA's
6  transformation is a key objective of the
7  government parties.  And in that context,
8  achieving a resolution to the restructuring
9  of PREPA's debt is, as I've stated before,
10  a key goal of the government parties.
11     As part of that, there was a
12  negotiation that was reached.  And we
13  believe -- when I say "we," the parties
14  that were involved in these negotiations --
15  that the settlement that was reached was a
16  reasonable one.
17     Q.  So let me go back to the 77.5
18  percent recovery.
19     That does not include other
20  components of consideration that are
21  included in the RSA, right?
22     A.  That is correct.  There are other
23  considerations related to the amount of
24  time, for example, that creditors have to
25  wait until the close of this transaction.

Page 74

F. Batlle - Professional Eyes Only

1  F. Batlle - Professional Eyes Only
2  And those are separate from the 67 and a
3  half and the up to 10 percent of tranche B.
4      Q.  That includes, for example,
5  settlement payments?
6      A.  Yes.  There is a settlement
7  charge payment of one cent.
8      Q.  And an administrative claim, for
9  example?
10      A.  Yes.
11      Q.  And a waiver and support fee for
12  certain creditors?
13      A.  Yes.
14      Q.  Anything else I'm missing?
15      A.  Not that I recall, no.
16      Q.  Has PREPA or AAFAF performed any
17  calculation of what the total recovery
18  percentages are as a percentage of the
19  bondholders' prepetition claims once all of
20  those additional components of
21  consideration are added in?
22      A.  Yes.
23      Q.  What was the result?
24      A.  I'm going to have to give you an
25  approximate answer.  I don't recall if that

Page 75

1  F. Batlle - Professional Eyes Only
2  number was probably another 4 percent,
3  maybe 4 and a half percent, somewhere
4  around there, if I recall correctly.
5      Q.  So what you're telling me is all
6  in, roughly 81 or 81 and a half or 82
7  percent?
8      A.  Yeah, but I don't view that as
9  part of the recovery of a bondholders.
10  That is related to an important part of
11  what the RSA accomplishes, which is it
12  allows for the time to take place to have
13  the transformation process finished.
14      Q.  Well, what do you mean it allows
15  for the time --
16      A.  Well --
17      Q.  -- for the transformation to
18  continue?
19          MS. McKEEN:  Let him finish.
20          THE WITNESS:  My apologies.
21      A.  So the transformation process is
22  a complicated process that eventually leads
23  to selecting a proponent that will run the
24  transmission and distribution operations of
25  PREPA.  That process is ongoing.  And that

Page 76

1  F. Batlle - Professional Eyes Only
2  process will probably not be finished until
3  sometime in the summer of 2020.
4          And so in the meantime, what this
5  tries to accomplish, what this attempts to
6  accomplish is to account for that period of
7  time and to provide a compensation to
8  bondholders that have agreed not to pursue
9  any remedies, whatever they are, that they
10  could have against PREPA and the
11  government.
12      Q.  Why are they entitled to that
13  compensation?
14          MS. McKEEN:  Object to the form
15  of the question.
16      A.  That was part of a negotiation
17  between the parties.
18      Q.  Okay.  But why did PREPA and
19  AAFAF agree to that?
20      A.  Because we thought that it was a
21  reasonable request and that it was an
22  important part of being able to find a
23  final, a definitive RSA with the supporting
24  holders.
25      Q.  Why couldn't you have waited to

Page 77

1  F. Batlle - Professional Eyes Only
2  enter into the RSA until the transformation
3  process is ready to close?
4      A.  Because as I have stated earlier,
5  solving PREPA's debt restructuring process
6  is an important part of eliminating the
7  uncertainty related to an ongoing
8  bankruptcy process that would facilitate
9  the billing process for the transformation
10  of PREPA.
11      Q.  So you don't think the
12  transformation process would continue
13  without settlement of the bond claims under
14  the RSA now?
15          MS. McKEEN:  Objection.
16  Misstates testimony.
17      A.  I believe that the signing of the
18  definitive RSA is an important step in
19  providing stability as it relates to the
20  debt part of the transaction that will give
21  more certainty to the bidders that are part
22  of the transformation process.
23      Q.  How do you know that the bidders
24  need more certainty in order to continue
25  the process and eventually execute an

Page 78

```
1          F. Batlle - Professional Eyes Only
2    agreement for the transformation?
3          MS. McKEEN:  Object to the form
4     of the question.
5          A.  If you are part of a process to
6    run an entity like PREPA and you have an
7    open item related to potential endless
8    litigation that could lead to a receiver
9    which will try to run what you're being
10   asked to bid on and the complications that
11   that relates to, I think as a -- if I put
12   myself in the shoes of a bidder, I would
13   like to have certainty about how PREPA will
14   exit from the bankruptcy process.
15         Q.  Have you actually spoken to any
16   of the bidders in the process?
17         A.  I am not part of that process.
18         Q.  Has PREPA or AAFAF?
19         A.  This process is run by the P3
20   Authority, so I wouldn't be able to answer
21   who has had the direct conversations with
22   them.
23         Q.  How long has the transformation
24   process been -- when did it begin?
25         A.  I don't recall the exact date,
```

Page 79

```
1          F. Batlle - Professional Eyes Only
2    but it was after Hurricane Maria.  So it
3    was probably sometime, I would say, early
4    2018, maybe.  First half of 2018.
5          Q.  Was that before or after the
6    execution of the preliminary RSA?
7          A.  I believe it was before the
8    execution of the preliminary RSA.
9          Q.  And I think you said that there
```



Page 80

F. Batlle - Professional Eyes Only

Page 81

F. Batlle - Professional Eyes Only

Page 98

F. Batlle - Professional Eyes Only

1  transaction, it's a combination of what the
2  economic recovery is, but there is also
3  other very important benefits such as a
4  limitation of remedies, such as capping the
5  transition charge, and those are very
6  important considerations as well in
7  addition to the recovery level.
8      Q.   Okay.  So considering that there
9  are these other benefits you believe the
10  RSA has, would an 85 percent recovery to
11  bondholders been reasonable to you?
12          MS. McKEEN:  Objection. Calls
13      for speculation.
14          MR. BEREZIN:  Hypothetical.
15      A.   I believe that the deal structure
16  is a reasonable deal and any other number
17  is irrelevant at this stage.  We struck a
18  deal for 67 and a half with an up
19  additional 10 percent recovery in the
20  tranche B, and we believe that's a
21  reasonable number.
22          I mean, is 85 reasonable? I tell
23  you what I think is reasonable, which is
24  the current agreement.

Page 99

F. Batlle - Professional Eyes Only

1      Q.   So if the current agreement was
2  exactly the same as it is today, except the
3  recovery was instead of 77 and a half
4  percent on the two tranches, a total of 85
5  percent, you don't have a view as to
6  whether or not PREPA or AAFAF would have
7  approved that deal?
8          MS. McKEEN:  Same objections.
9      Calls for speculation.  I'll counsel
10      the witness not to guess or speculate.
11      A.   Yes, I'm not going to speculate
12  whether that be would be a reasonable
13  number or not.  I want to repeat one more
14  time that I believe that the current
15  recovery levels are reasonable, are a
16  reasonable settlement.
17      Q.   So you mentioned these other
18  benefits that you believe the settlement
19  has, including, I think you said, capping
20  the transition charge.  You mentioned other
21  provisions of the new bonds regarding
22  remedies.  And you also mentioned effect on
23  the transformation.
24          Is that fair?

Page 100

F. Batlle - Professional Eyes Only

1      A.   Yes, that's fair.
2      Q.   Did PREPA undertake any effort to
3  quantify the value of each of those other,
4  and I'll call them "non-economic benefits"
5  of the RSA?
6          MS. McKEEN:  Objection to the
7      form of the question.
8      A.   Yes.
9          MS. McKEEN:  You can answer.
10      A.   Yes.
11      Q.   What efforts were undertaken to
12  do that?
13      A.   Well, for example, let's talk
14  about rates.  So under the current RSA, you
15  have a capped rate level that starts
16  slightly under 3 cents and then goes up
17  over time up to 4.55, I believe.  And if
18  you compare that to not having an RSA, for
19  example, and seeing what the debt service
20  would look like, there is a significant
21  difference, meaning the RSA much lower than
22  that.
23          If you take the capping concept
24  and you look at the current RSA, it --

Page 101

F. Batlle - Professional Eyes Only

1  regardless of demand, you will have the
2  same charge, the same transition charge.
3          If you didn't have that kind of a
4  protection, which you did not or you do not
5  under the trust agreement because you have
6  a rate covenant, and you lower demand, all
7  that means is that that -- the equivalent
8  of the transition charge would go up and so
9  -- in a material way, potentially,
10  depending how much demand goes down.
11          So I believe that just that
12  element of it provides significant benefits
13  in the certainty that it provides to
14  ratepayers and in having shifted one of the
15  bigger risks you have, which is demand
16  risk, to bondholders.
17      Q.   So did you quantify that in terms
18  of how much that was worth as far as
19  percentage recoveries to bondholders?
20      A.   No, I did not do a detailed
21  analysis of what it represented for
22  bondholders.
23      Q.   Now you mentioned that in your
24  view, absent the settlement, rates could

Page 102

F. Batlle - Professional Eyes Only

1
2 increase under the existing trust agreement
3 going forward beyond the level that are
4 capped by the transition charge; is that
5 right?
6     A.   That is correct.
7     Q.   Is it your understanding that any
8 increase in rates would have to be approved
9 by the Puerto Rico, the relevant Puerto
10 Rico energy regulator, which is PREB?
11         MS. McKEEN:  Objection to the
12     extent it calls for legal testimony.
13         You can answer if you know.
14     A.   Well, I'm not a regulatory
15 expert, but the PREB has purview every
16 PREPA's activities, and they would probably
17 have to undergo a rate case to approve or
18 disapprove rates.
19     Q.   Okay.  So as the representative
20 for PREPA and AAFAF testifying here today
21 in support of the RSA, do you have an
22 understanding as to whether or not PREB
23 would have actually increased rates going
24 forward under the trust agreement?
25         MS. McKEEN:  Objection.  Calls

Page 103

F. Batlle - Professional Eyes Only

1
2 for speculation.
3         I'm sorry, I just want to make
4     sure I understand the question.
5         Are you asking if he knows what
6     PREB would do?
7         MR. BASSETT:  I'm asking him if
8     he has any understanding of what PREB
9     would do.
10         MS. McKEEN:  Okay.  Calls for
11     speculation.
12         You can answer if you know what
13     PREB would do.
14     A.   I don't know what they would do
15 other than carry out the responsibilities
16 of PREPA's regulator.
17     Q.   Okay.  Did you receive any advice
18 from anyone as to the likelihood that rates
19 would actually increase absent the
20 settlement?
21     A.   No.
22     Q.   So another non-economic -- has
23 PREPA or AAFAF had any conversations with
24 anyone at PREB about the RSA?
25         MS. McKEEN:  Object to the form

Page 104

F. Batlle - Professional Eyes Only

1
2 of the question.
3     A.   I don't know specifically whether
4 PREB or AAFAF have had conversations about
5 the RSA with PREB.
6         MR. LYNCH:  Counsel, sorry to
7     interrupt, but are we at a point where
8     we might be able to downgrade the
9     confidentiality designation back to
10     confidential?
11         MS. McKEEN:  Yes.  And I think
12     since we have come back from our break,
13     there is nothing that I would have
14     designated as attorneys' eyes only.  So
15     for purposes of the transcript, we can
16     stop that designation as of when we
17     went off the record, which I believe
18     was around 11 a.m. ^ RQ
19         MR. LYNCH:  Thank you.  Sorry to
20     interrupt.
21 BY MR. BASSETT:
22     Q.   So back to the other non-economic
23 benefits, as we were calling them, one was
24 the effect of the RSA on the transformation
25 process.

Page 105

F. Batlle - Professional Eyes Only

1
2         Did you undertake any effort to
3 quantify the value of that benefit to PREPA
4 and AAFAF?
5         MS. McKEEN:  Object to the form
6     of the question.
7     A.   As part of our deliberations, we
8 had conversations with counsel where
9 counsel would advise us of the
10 implications, both in time and potential
11 cost, of a prolonged Title III process and
12 the potential litigation related to,
13 including the lien challenge and the
14 receivership.  And that formed part of our,
15 of the information we reviewed as part of
16 our decision-making process.
17     Q.   Okay.  But was it -- did PREPA or
18 AAFAF arrive at any conclusion as to the
19 value of this benefit of the RSA which is
20 its effect on the transformation process in
21 terms of percentage recoveries to
22 bondholders that it would be willing to
23 give in the settlement?
24         MS. McKEEN:  Object to the form
25     of the question.

Page 106

F. Batlle - Professional Eyes Only
1  
2      A.  We did not specifically
3  incorporate the analysis that I just
4  described that was performed with counsel.
5  And I will again repeat that there are
6  non-economic value to being able to provide
7  certainty to the proponents that are
8  bidding for the transformation -- for the
9  operation of the transmission distribution
10  system at PREPA, and that in itself is one
11  of the important reasons why we entered
12  into the RSA.
13      Q.  But just to be clear, yes or no,
14  you did not put a percentage value on that
15  benefit in terms of recoveries to
16  bondholders?
17      A.  No.
18      Q.  You mentioned several times the
19  benefit of resolving certain outstanding
20  litigation, including the receivership
21  litigation; is that right?
22      A.  Yes.
23      Q.  What other litigation does this
24  resolve?
25      There's other litigation with

Page 107

F. Batlle - Professional Eyes Only
1  
2  bondholders, correct?
3      A.  The litigation right now is --
4  you have the receivership motion and lien
5  challenge.  I would defer to counsel for
6  the list of the other litigation.  I
7  don't recall.
8      Q.  In PREPA and AAFAF's
9  consideration of the RSA, did they have an
10  understanding as to the potential best-case
11  outcomes in litigation with the
12  bondholders?
13      MS. McKEEN:  I'll object to the
14      extent the question would require the
15      witness to testify regarding the
16      content of conversations with counsel
17      about the likely outcome of litigation.
18      I'll instruct that the witness
19      can testify "yes" or "no" as to whether
20      there was an understanding, but not
21      what that understanding was.
22      A.  Okay.  Can you repeat your
23  question?
24      Q.  I'll rephrase it.
25      Do you understand that in

Page 108

F. Batlle - Professional Eyes Only
1  
2  litigation with the bondholders, the
3  government parties, including PREPA and
4  AAFAF, have taken the position that the
5  bondholders are unsecured?
6      MS. McKEEN:  I'll object to the
7      extent it calls for the witness to
8      testify regarding legal conclusions and
9      legal positions that have been taken at
10      various litigation.  The position that
11      the parties have taken in that
12      litigation is a matter of public
13      record.
14      MR. BASSETT:  She did not
15      instruct you not to answer.
16      A.  I'll refer you to the public
17  record as to what the government parties'
18  position is.
19      Q.  So you have no understanding --
20  as the representative for PREPA and AAFAF
21  who is here today supporting the
22  settlement, you have no understanding as to
23  the position that PREPA and AAFAF are
24  taking in litigation against the
25  bondholders?

Page 109

F. Batlle - Professional Eyes Only
1  
2      MS. McKEEN:  Objection.
3      Misstates testimony.  It's not what the
4      witness said.
5      A.  I won't agree with that
6  statement, Counsel, and I would refer you
7  to the public record, and that is what the
8  government parties' position is.  I never
9  said I had no understanding.
10      Q.  So do you understand that the
11  government parties have taken the position
12  that the bondholders are unsecured?
13      MS. McKEEN:  Same objection.
14      You can answer if you know.
15      A.  The government parties, as part
16  of their analysis, have determined that
17  there is, yes, a chance that the
18  bondholders are unsecured bondholders.
19      Q.  And if the bondholders are
20  unsecured, do you think that the settlement
21  is reasonable?
22      MS. McKEEN:  Objection.  This
23      calls for legal conclusions and would
24      require the witness to divulge the
25      content of his conversations with

Page 110

F. Batlle - Professional Eyes Only

1     F. Batlle - Professional Eyes Only
2 counsel regarding the likely outcome of
3 litigation, as well as calls for
4 speculation.
5     I'm going to instruct the witness
6 not to answer that question.
7 BY MR. BASSETT:
8     Q.  Did you -- this is a "yes" or
9 "no" question.
10     Did you receive any advice from
11 counsel as to the likelihood of the
12 government parties prevailing in their
13 litigation against the bondholders?
14     MS. McKEEN:  I'll instruct the
15 witness that he can answer that
16 question with a "yes" or "no," but that
17 he cannot reveal the content of any of
18 that advice, if he did receive advice
19 from counsel, about the likelihood of
20 the outcome of litigation.
21     A.  Yes.
22     Q.  How did that advice factor into
23 your decision to approve the RSA?
24     A.  That advice, among other pieces
25 of information, led us to believe that the

Page 111

1     F. Batlle - Professional Eyes Only
2 current RSA is reasonable, and that's why
3 we entered in the current RSA.
4     Q.  Do you have an understanding that
5 the bonds subject to the RSA are
6 nonrecourse?
7     MS. McKEEN:  Objection.  Calls
8 for a legal conclusion.
9     You can answer if you know.
10     That's outside of the scope of
11 the topics.
12     A.  I don't know.
13     Q.  As someone with your experience
14 in the industry, including at GDB and being
15 involved in debt issuances, do you have an
16 understanding, generally, of what it means
17 for a bond to be nonrecourse?
18     A.  Yes, I do.
19     Q.  What is that understanding?
20     A.  That you're recourse is limited
21 to whatever your source of repayment is,
22 generally speaking, obviously.
23     Q.  And according to the testimony
24 you just gave, PREPA and AAFAF, when
25 deciding to approve the RSA, did not have

Page 112

1     F. Batlle - Professional Eyes Only
2 an understanding as to whether or not these
3 bonds are nonrecourse?
4     MS. McKEEN:  Objection.
5 Misstates testimony, Counsel.
6     Do you want to rephrase the
7 question?
8     MR. BASSETT:  No.
9     A.  PREPA and AAFAF were provided
10 with legal advice and that legal advice
11 was --
12     MS. McKEEN:  I'm going to caution
13 the witness not to reveal the content
14 of any communications with counsel.
15 But if you can answer in a way that
16 doesn't reveal the content of those
17 communications, then please do so.
18     A.  All right.  I cannot do so.
19     Q.  So to be clear, you said before
20 you did not have an understanding as to
21 whether or not the PREPA bonds were
22 nonrecourse.  I can read back the
23 testimony.
24     A.  Yes, please read back the
25 testimony.

Page 113

1     F. Batlle - Professional Eyes Only
2     Q.  "Question: Do you have an
3 understanding that the bonds subject to the
4 RSA are nonrecourse?"
5     Your counsel objected.
6     Your answer:  "I don't know."
7     A.  Okay.  If I may, I'd like to take
8 that back and say that I know and that
9 AAFAF and PREPA know.  But as part -- that
10 was part of the conversation with counsel,
11 and so I'm not going to divulge the content
12 of that conversation.
13     Q.  So you were mistaken when you
14 gave that answer previously?
15     A.  You're putting words in my mouth,
16 sir.  I am telling you that I am redacting
17 that comment -- I am taking back that
18 comment that I made and telling you that as
19 part of our deliberation, we received legal
20 advice.  And I've been instructed by
21 counsel not to divulge the contents of
22 those conversations.
23     Q.  So when PREPA and AAFAF approved
24 the RSA, did they have an understanding as
25 to whether or not the bonds were recourse

Page 114

1    F. Batlle - Professional Eyes Only
2  or nonrecourse?
3         MR. HAMERMAN:  Asked and
4  answered.
5         MS. McKEEN:  You can answer the
6  question.
7    A.  Yes.
8    Q.  What was your understanding?
9         MS. McKEEN:  Same objections.
10       You can answer if you know.  It's
11  outside the scope, but you can answer.
12   A.  PREPA's --
13        MR. HAMERMAN:  Objection insofar
14  as it calls for a legal conclusion.
15   A.  It is my understanding that the
16  bonds that we're discussing here today
17  are -- it's the government's position that
18  they are unsecured creditors as part of the
19  -- they're unsecured as part of the
20  position that the government has adopted in
21  the public records.
22   Q.  You did not answer my question.
23   A.  Can you ask the question again,
24  please?
25   Q.  You said that PREPA and AAFAF had

Page 115

1    F. Batlle - Professional Eyes Only
2  an understanding as to whether or not the
3  bonds were recourse are or nonrecourse.
4         I'm asking you were they recourse
5  or nonrecourse?
6         MS. McKEEN:  Same objections.
7         You can answer if you know.
8         MR. HAMERMAN:  Objection insofar
9  as it calls for a legal conclusion.
10  It's not a knowable thing.
11        THE WITNESS:  I'm sorry, sir?
12        MR. HAMERMAN:  I just said it's
13  not a knowable thing.  It's a legal
14  conclusion.
15        MR. LYNCH:  I object to the
16  speechifying and the coaching of the
17  witness.
18   A.  I will limit my statements to
19  saying that I am not going to divulge the
20  contents of our conversations, my
21  conversations, AAFAF and PREPA, with
22  counsel.
23   Q.  A couple of times I believe
24  you -- actually, can we go back and look
25  at, I'm sorry, exhibit -- the document

Page 116

1    F. Batlle - Professional Eyes Only
2  that's been marked as Batlle Exhibit 6.
3         Do you have that, sir?
4    A.  Yes, sir.
5    Q.  Go the second page of that
6  document.  Item No. 5 in the considerations
7  list, if I can direct your attention to
8  that.
9         (Witness complies.)
10   Q.  And this says -- and I'm not
11  going to quote the entire passage, but that
12  "The preliminary RSA provides a more
13  favorable resolution than the transaction
14  contemplated in the original restructuring
15  support agreement."
16        Do you see that?
17   A.  Yes, I do.
18   Q.  And I think you mentioned before
19  that when PREPA and AAFAF were considering
20  the preliminary RSA, they compared it to
21  the prior RSA that existed; is that
22  correct?
23   A.  That is correct.
24   Q.  What prior RSA was that?
25   A.  That was the agreement that was

Page 117

1    F. Batlle - Professional Eyes Only
2  originally agreed to by -- under the García
3  Padilla administration as modified at the
4  beginning of the first few months of 2017
5  by the Rosselló administration.
6    Q.  So I guess what I'm trying to
7  understand is, why did PREPA and AAFAF
8  believe that that was a -- you know, that a
9  comparison between the preliminary RSA and
10  the previous RSA was a relevant thing to
11  consider in determining whether to approve
12  the preliminary RSA?
13   A.  So if you are proposing to enter
14  into this RSA, it is only logical to be
15  able to say whether this is better or not
16  than the prior agreement that was in place.
17  And so to me, it is a very fair and logical
18  analysis to do.
19   Q.  But the fact that it's better
20  than another agreement that was ultimately
21  not approved does not really have any
22  bearing on whether this agreement is
23  reasonable, does it?
24        MS. McKEEN:  Object to the form
25   of the question.

Page 122

F. Batlle - Professional Eyes Only

1
document, just a couple of other questions
2
on another topic.
3
        So you mentioned that Mr. Sobrino
4
was the lead negotiator outside of advisers
5
for PREPA and AAFAF on the RSA, correct?
6
    A.  Correct.
7
    Q.  How often did you communicate
8
with Mr. Sobrino about the RSA?
9
    A.  Regularly.  I mean, depending on
10
whether there were issues to be discussed,
11
we had, we had communication.
12
    Q.  And how did you communicate?
13
    A.  Typically with Nancy Mitchell,
14
who was the lead counsel.  And it could
15
have been any combination of either phone
16
calls or other electronic means.
17
    Q.  When you say "other electronic
18
means," does that include text messages?
19
    A.  Yes.
20
    Q.  How often did you text with
21
Mr. Sobrino?
22
    A.  You know, as needed.  I can't
23
tell you that it was every day.  Maybe
24
sometimes every day, sometimes not.  I
25

Page 123

F. Batlle - Professional Eyes Only

1
mean, so as needed.
2
    Q.  Regarding the RSA?
3
    A.  Regarding the RSA.
4
    Q.  Did you provide all the texts
5
that you had with Mr. Sobrino to counsel in
6
connection with our document request?
7
    A.  Yes, I did.
8
    Q.  You're not aware of any texts you
9
may have had with Mr. Sobrino that were not
10
provided to counsel?
11
    A.  No, I'm not aware of any that
12
wasn't provided.
13
    Q.  Any that were deleted from your
14
phone?
15
    A.  No.
16
    Q.  Did you communicate with
17
Mr. Sobrino by any chat applications such
18
as Telegram?
19
    A.  Yes, at times, yes, too.
20
    Q.  How often?
21
    A.  In as needed.  It was one of the
22
ways that he communicated with people.  And
23
so as needed, I would communicate with him.
24
    Q.  How would you decide to
25

Page 124

F. Batlle - Professional Eyes Only

1
communicate via Telegram versus text, for
2
example?
3
    A.  I wouldn't say there was any real
4
logic.  Many times it was just the way he
5
asked.  He would ask maybe a question or
6
where are you or whatever the topic might
7
have been.  And it could have been through
8
either of the two means.  I don't really
9
know how to answer what was the --
10
    Q.  Is one easier than the other?
11
    A.  I don't know.
12
    Q.  There weren't certain topics that
13
you discussed with him on Telegram and
14
others that you discussed on texts and
15
others that you discussed on email?
16
    A.  No, I don't think there was any
17
selection of anything.  It was just the way
18
he communicated.
19
    Q.  Did you provide all of your
20
telegram chat messages with Mr. Sobrino to
21
counsel?
22
    A.  Yes, I did.
23
    Q.  Are you aware of any -- are you
24
aware of any Telegram conversations you had
25

Page 125

F. Batlle - Professional Eyes Only

1
with Mr. Sobrino that had been deleted or
2
that at one time existed but no longer
3
exist?
4
    A.  Yeah, there could have been --
5
not being an expert, but the way sometimes
6
you would form groups and those groups you
7
could be removed from or not, and there
8
were probably some that at some point were,
9
because the topic was no longer relevant or
10
could have been deleted, that yes.
11
    Q.  So you may have had Telegram
12
conversations with Mr. Sobrino that no
13
longer exist and therefore you did not
14
provide to counsel?
15
    A.  I mean, I guess, theoretically,
16
yes, I just don't recall whether there were
17
any of them that were deleted related to
18
the topics that were here.
19
    Q.  Okay.
20
    A.  And I did not have any control
21
about that, right?
22
    Q.  And this is after -- this is
23
after I think you said you received a hold
24
notice regarding this litigation?
25

Page 126

F. Batlle - Professional Eyes Only

1      F. Batlle - Professional Eyes Only
2          MS. McKEEN:  Object to the form
3      of the question.
4          A.  Yeah, I provided, sir -- I'm here
5      to be truthful and honest, obviously under
6      oath about what I know, and I think I
7      provided everything that I had.
8          Q.  Okay.  But there may have been
9      some that you didn't?
10         A.  Well, I provided what I had.
11             MS. McKEEN:  And I'll just object
12         to the form of the question.  It may
13         have been some that you didn't what?
14             MR. BASSETT:  Provide to counsel
15         because they no longer existed.
16         A.  Well, I don't know if in those
17     chats that I'm saying that could have been
18     deleted, if there were any contents related
19     to my deposition here today, but I provided
20     everything I had.
21         Q.  Did you communicate with
22     Mr. Sobrino by any other means other than
23     texts and Telegram, other chat apps, et
24     cetera?
25         A.  No.  As I said, I communicated

Page 127

F. Batlle - Professional Eyes Only

1      F. Batlle - Professional Eyes Only
2      through either email, Telegram, text, or
3      phone, or in person.
4          Q.  Did you communicate with anyone
5      else regarding the RSA by text?
6          A.  I did with counsel, with Nancy
7      Mitchell, and probably with Maria DiConza
8      as well.  And there might have been some
9      communication with maybe the Citi advisers,
10     namely, David Brownstein.  But whatever
11     communications I had in my phone related to
12     this, to the topics of this deposition, I
13     turned over to counsel.
14         Q.  Okay.  And just back to Telegram
15     for one second, do you understand that you
16     could have saved conversations that
17     occurred on Telegram if you had wanted to,
18     right?
19         A.  I don't --
20             MS. McKEEN:  Objection to form of
21         the question.
22     BY MR. BASSETT:
23         Q.  You don't have any understanding
24     of that?
25         A.  No, I don't know.

Page 128

F. Batlle - Professional Eyes Only

1      F. Batlle - Professional Eyes Only
2          Q.  To what extent have you
3      communicated with José Ortiz, PREPA's CEO,
4      regarding the RSA?
5          A.  I did not have direct
6      communication with Mr. Ortiz about the RSA.
7          Q.  You've never had any
8      communications with him?
9          A.  No, not about the RSA.
10         Q.  About the proposed
11     transformation?
12         A.  No.  Very limited, if any, direct
13     conversations about it.
14         Q.  What was Mr. Ortiz's role in the
15     negotiation and approval of the RSA?
16         A.  Mr. Ortiz's role in the
17     negotiation of the RSA was very limited.
18     He was the CEO of PREPA.  Mr. Sobrino kept
19     him and the board of PREPA abreast of what
20     was going on, but he did not have a direct
21     involvement in the negotiations of the RSA.
22         Q.  Okay.  Let's go back to what's
23     been marked as Exhibit 9.
24             Do you recognize this document,
25     Mr. Batlle?

Page 129

F. Batlle - Professional Eyes Only

1      F. Batlle - Professional Eyes Only
2          A.  Yes, I do.
3          Q.  And who is -- this is an email
4      sent by Eduardo Muñoz.  Who is that?
5          A.  Mr. Arosemena was a member of the
6      board of PREPA.  He was a government
7      employee.  If I recall correctly, he was at
8      that time in the Secretary of State agency,
9      and he also acted as secretary of the board
10     of PREPA.
11         Q.  And he's sending this email to --
12     is that -- the people listed in the "to"
13     field there, are those the PREPA governing
14     board members?
15         A.  Yes.
16         Q.  And this email was sent on
17     April 16, 2019.  And then it says, "Just
18     received the documents for tomorrow's 10
19     a.m. meeting on the PREPA RSA.  Please let
20     us know if you need anything from our end."
21             Do you see that?
22         A.  Yes, I see that.
23         Q.  First of all, is it your
24     understanding that the meeting to approve
25     the PREPA RSA occurred the next day, on

Page 130

1    F. Batlle - Professional Eyes Only
2    April 17, 2019?
3        A.   Yes.  That is my recollection,
4    yes.
5        Q.   And then these documents were
6    being sent to the board members at
7    9:43 p.m. on the 16th; is that right?
8        A.   That's what this email has as
9    their sent date, yes.
10       Q.   Do you have any reason to believe
11   that that's not accurate?
12       A.   It's what the document says.
13       Q.   So the documents that are
14   attached to this email includes a
15   presentation entitled "PREPA Restructuring
16   Support Agreement Overview."
17           Is that right?
18       A.   Yes.
19       Q.   And also attached is a copy of
20   the draft RSA; is that right?
21           (Document review.)
22       Q.   It's after the presentation?
23       A.   Yes.  Looks like the draft, yes.
24           MS. McKEEN:  And I'll just note
25       for the record that that document

Page 131

1    F. Batlle - Professional Eyes Only
2    that's attached is pretty voluminous
3    and obviously the witness hasn't had
4    time to go through to make sure every
5    page is included and things like that.
6    We'll obviously accept your
7    representation for the record.
8        MR. BASSETT:  Sure.  Yeah, this
9    is a complete copy of what was produced
10   to us in discovery.
11   BY MR. BASSETT:
12       Q.   Was a copy of the draft RSA
13   provided to the board members prior to this
14   email to which it is attached here?
15       A.   I do not know what Mr. Sobrino
16   provided to the board members prior to this
17   meeting.  His interaction -- I was not part
18   any interaction he had with board members.
19       Q.   But you're here today as the
20   representative of PREPA and AAFAF, correct?
21       A.   Yes, I am.
22       Q.   And I think you even told me
23   that, although your counsel wouldn't let
24   you answer, that you had -- you had --
25   wouldn't let you answer as to the content,

Page 132

1    F. Batlle - Professional Eyes Only
2    you had had discussions with Mr. Sobrino
3    about the RSA, correct?
4        A.   That is correct.
5        Q.   So you don't know as PREPA's or
6    AAFAF's representative whether or not board
7    members received a copy of the draft RSA
8    prior to this email?
9        A.   No.  Based on my conversation
10   with Mr. Sobrino, we didn't discuss this
11   specifically.
12           MS. McKEEN:  I'll counsel the
13       witness not to divulge the contents of
14       your conversation with Mr. Sobrino on
15       which lawyers were present.
16   BY MR. BASSETT:
17       Q.   Okay.  So you're unprepared --
18   just to be clear, you are you're unprepared
19   to answer that question today because you
20   don't know?
21           MS. McKEEN:  Counsel, I think
22       that misstates the witness' testimony.
23       A.   I disagree with your
24   characterization that I am unprepared.  I
25   am letting you know that I don't know

Page 133

1    F. Batlle - Professional Eyes Only
2    whether in another context or prior to this
3    or physically or in an electronic
4    communication Mr. Sobrino provided this
5    document to the other board members.
6        Q.   Do you know whether anyone at
7    PREPA or AAFAF or their advisers discussed
8    the RSA with board members prior to the
9    meeting that occurred on April 17, 2019?
10       A.   So part of my answer would refer
11   to my conversation with Mr. Sobrino which
12   has privileged contents, so I won't answer
13   that.
14           MS. McKEEN:  I want to be clear
15       about my instruction to the witness.
16           I don't want you to give
17       testimony about the conversation
18       itself, but to the extent the purpose
19       of that conversation was to educate you
20       to give testimony here at this
21       deposition today, if there is
22       information that you learned from
23       Mr. Sobrino that would help you answer
24       that question, you may testify as to
25       what you know now on behalf of AAFAF

Page 134

F. Batlle - Professional Eyes Only

1  and PREPA.  If that knowledge is based
2  in part on that conversation, that's
3  okay.
4      Does that make sense to you?  Do
5  you understand that distinction?  So if
6  the contents of that conversation will
7  help you answer Mr. Bassett's question,
8  please do so.
9      THE WITNESS:  Okay.
10     A.  So it is my understanding that
11 Mr. Sobrino had informed board members
12 about the progress of the negotiations
13 related to the RSA.  And formally, as part
14 of a board meeting, it is my understanding
15 that the document you have here was the
16 document that was used to explain in more
17 detail to board members the RSA.
18     Q.  When you said it's your
19 understanding that Mr. Sobrino had informed
20 board members about the progress of the
21 negotiations related to the RSA, when did
22 he do that?
23     A.  I don't know which specific
24 meetings or whether it was outside of the

Page 135

F. Batlle - Professional Eyes Only

1  formal meetings that -- board meetings that
2  took place, but he did have conversations
3  with them about the progress of the RSA
4  negotiations.
5      This was, as you know, a very
6  public topic and so as part of his duties,
7  he would keep people abreast of what was
8  happening.
9      Q.  Were each of those conversations
10 or meetings, or in whatever context they
11 occurred, with all of the board members?
12     A.  I don't know.
13     Q.  And, again, you don't know when
14 these conversations took place?
15     A.  No, I do not know.
16     Q.  Was the RSA, to your knowledge,
17 discussed at any prior board meetings of
18 PREPA or AAFAF?
19     A.  The RSA, my understanding was
20 that this was the only formal presentation
21 that was made to discuss the RSA at the
22 board level, both at AAFAF and PREPA.
23     Q.  Can I now please direct your
24 attention to what's been marked as Batlle

Page 136

F. Batlle - Professional Eyes Only

1  Exhibit 10.  Go ahead and take your time to
2  familiarize yourself with this document, if
3  you need it.
4      (Document review.)
5      Q.  Whenever you're ready,
6  Mr. Batlle.  I'm not going to ask you about
7  every single line in the document.
8      A.  So I'll let you know.  I'm still
9  on the next to last page.
10     (Document review.)
11     A.  I am ready.
12     Q.  So is it your understanding,
13 Mr. Batlle, that what I've handed you
14 that's been marked as Exhibit 10 is a copy
15 of the minutes from the meeting that
16 occurred on April 17, 2019?
17     A.  Yes.
18     Q.  The meeting began at 10:25 a.m.
19 in the morning; is that right?
20     A.  That is what the minutes say,
21 yes.
22     Q.  And I think the minutes close by
23 saying the meeting adjourned at 12:04 p.m.;
24 is that right?

Page 137

F. Batlle - Professional Eyes Only

1      A.  Yes, that's what the minutes say.
2      Q.  So according to the minutes, the
3  meeting lasted about an hour and a half?
4      A.  Approximately, yes.
5      Q.  So after having -- you attended
6  the meeting, correct?
7      A.  Yes, I was present in that
8  meeting.
9      Q.  After having reviewed the minutes
10 and after having been at the meeting, do
11 these minutes accurately reflect what
12 occurred at the meeting, in your view?
13     A.  Yeah, that what I can recall
14 today of the meeting in April, I think it
15 does.
16     Q.  Do you see anything that is
17 inaccurate?
18     A.  Not really.
19     Q.  Anything that was discussed that
20 is not mentioned in these minutes?
21     A.  Well, this document was discussed
22 in the meetings.
23     Q.  Okay.
24     MS. McKEEN:  Nick, can we take a

Page 138

1    F. Batlle - Professional Eyes Only
2  quick break?
3     MR. BASSETT:  Yeah, sure.
4     MS. McKEEN:  Okay.  Can we go off
5  the record?
6     THE VIDEOGRAPHER:  The time is
7  12:19 p.m.  We are going off the
8  record.
9     (Recess is taken.)
10    (Batlle Exhibit 11, Document
11  entitled "Commonwealth of Puerto Rico,
12  Puerto Rico Electric Power Authority
13  Governing Board Resolution Definitive
14  Restructuring Support Agreement
15  Resolution Number 4695, Tomás Torres,
16  Board Member Consumers Representative,
17  dissenting," Bates-stamped
18  PREPA_RSA0027814 through 278817, marked
19  for identification, as of this date.)
20    (Batlle Exhibit 12, Letter dated
21  5/7/19 from Tomás Torres to Eli Diaz
22  Atienza, Bates-stamped PREPA_RSA0028029
23  through 28033, marked for
24  identification, as of this date.)
25    (Batlle Exhibit 13, Email dated

Page 139

1    F. Batlle - Professional Eyes Only
2  5/22/19 from Cintron Solla to Fernando
3  Batlle,, Bates-stamped PREPA_RSA0029338
4  through 29338 with attached
5  TransPerfect translation certification,
6  marked for identification, as of this
7  date.)
8     THE VIDEOGRAPHER:  The time is
9  12:30 p.m.  We are on the record.
10  BY MR. BASSETT:
11    Q.  Mr. Batlle, are you familiar with
12  the demand protections that exist under the
13  RSA?
14    A.  Yes, I am.
15    Q.  And would you consider that to be
16  a material part of the RSA?
17     MS. McKEEN:  Object to the form
18  of the question.
19    A.  It is a part of the RSA.
20    Q.  It could lead to the increase in
21  rates going forward in the event of
22  non-payment by certain customers.
23     Is that generally your
24  understanding?
25    A.  That is -- it could lead to the

Page 140

1    F. Batlle - Professional Eyes Only
2  increase for government parties
3  specifically going forward, yes.
4    Q.  All right.  So the Demand
5  Protection Term Sheet could not result in
6  an increase in rates for PREPA's
7  non-government customers?
8     MS. McKEEN:  Objection.
9  Misstates testimony.
10    A.  Can you repeat the question?
11    Q.  I thought what you said was that
12  the Demand Protection Term Sheet, the way
13  it works, it could result in an increase in
14  the rates of government customers going
15  forward under certain circumstances?
16    A.  I'm sorry, say that again.  You
17  said in the rate of government customers?
18    Q.  Yes.
19    A.  No.
20     Can you repeat your question?  I
21  want to make sure I'm being responsive to
22  what you're asking.
23    Q.  Yes.  Right.
24     Is it your understanding that the
25  Demand Protection Term Sheet, the way it

Page 141

1    F. Batlle - Professional Eyes Only
2  works is that under certain circumstances,
3  the transition charge, which is otherwise
4  capped, could be increased in subsequent
5  years for all of PREPA's customers?
6    A.  There is a provision that if
7  there is delinquency of government
8  entities, the first 1.5 percent of that
9  delinquency is absorbed by creditors, but
10  if there is anything above that, then there
11  would be an adjustment to the transition
12  charge for that amount, yes.
13    Q.  It's not just nonpayment by
14  government parties, though, right; it's
15  nonpayment by any customer?
16    A.  No, it's a government.
17    Q.  Only the government parties?
18    A.  If you allow me, let me...
19    (Document review.)
20    Q.  In the interest of time, I'll
21  withdraw the question.
22    A.  Okay.
23     MS. McKEEN:  Counsel, if the
24  witness would like to clarify his
25  answer, I think we should let him do

Page 142

F. Batlle - Professional Eyes Only
1   that.
2
3       MR. BASSETT:  Okay.
4   BY MR. BASSETT:
5       Q.  You want to clarify your answer?
6       MS. McKEEN:  Did you want to --
7   it seemed like you were looking at the
8   document to try to refresh your
9   recollection.
10      THE WITNESS:  There is nothing
11  anything in here that I thought might
12  help me refresh my memory.  No, there's
13  nothing here.
14      MS. McKEEN:  And if there is
15  another document that would be helpful
16  to you to refresh your recollection,
17  you can let Mr. Bassett know.
18      A.  Yeah.  Well, there is a -- in the
19  term sheet, there is a specific section
20  that addresses this, and I'm just trying to
21  recall the specific circumstances under
22  that transition charge would change.  And I
23  specifically recall the government parties,
24  but I'd like to be able to read that
25  section before completing my answer.

Page 143

F. Batlle - Professional Eyes Only
1
2       Q.  Okay.  Let me direct your
3   attention back to Exhibit 11.
4       Oh, I'm sorry.  That's the wrong
5   number.  I apologize.  It is Exhibit 9.
6   I'm sorry.
7       A.  Okay.
8       Q.  I'm looking specifically at the
9   presentation that was provided in advance
10  of the board meeting.  If you go to page 9
11  of that presentation.
12      A.  Okay.
13      Q.  At the bottom, it says, "certain
14  items not yet agreed."
15      It has demand protections and
16  securitization protections and the form of
17  9019 motion in order.
18      Do you see that?
19      A.  Yes.
20      Q.  What are the securitization
21  protections?
22      A.  Those were items related to the
23  actual vehicle through which the transition
24  charge would -- it was enacted that also
25  required -- those were the basis for them,

Page 144

F. Batlle - Professional Eyes Only
1
2   the legislation that would be required to
3   enable the implementation of the RSA.
4       Q.  So when the boards of PREPA and
5   AAFAF met and approved the RSA, they did
6   not have in front of them the demand
7   protections or the securitization
8   protections; is that right?
9       A.  That is correct because the
10  documents were not yet agreed to.
11      Q.  How could the board approve a
12  transaction without having these aspects of
13  it to consider?
14      A.  Because the most material aspects
15  of this settlement are included in the
16  definitive RSA document and were explained
17  through this presentation to board members.
18      Q.  Are the protections in the demand
19  protections and the securitization
20  protections material in your view?
21      MS. McKEEN:  Objection.  Object
22  to the form of the question.  Calls for
23  legal testimony.
24      A.  They are part of the agreement.
25  I mean, they are part of what was needed to

Page 145

F. Batlle - Professional Eyes Only
1
2   be agreed with the supporting bondholders
3   to finish the RSA.
4       Q.  Are they material parts of the
5   agreement?
6       MS. McKEEN:  Same objections.  I
7   don't know what you mean by "material."
8   BY MR. BASSETT:
9       Q.  Are they important?
10      A.  They are part of the deal.
11  Without them, the deal would not have been
12  able to be consummated or signed.
13      Q.  Who decided what provisions of
14  the RSA needed to be finalized prior to
15  this meeting?
16      A.  I don't understand the question.
17      Q.  I'll ask a different question.
18      Did the board of either PREPA or
19  AAFAF approve the Demand Protection Term
20  Sheet and the securitization protections at
21  a subsequent date?
22      A.  No.
23      Q.  Can you go to the last page of
24  that PowerPoint presentation, please?  I'm
25  sorry, it's not going to be the last page;

Page 146

1       F. Batle - Professional Eyes Only
2   it's going to be the last page before
3   getting to the annex of RSA terms.
4           (Document review.)
5       MS. McKEEN:  Counsel, would you
6   giving the Bates number for the record,
7   please?
8       MR. BASSETT:  Sure.  The Bates
9   number for the record is
10  PREPA_RSA003003.
11          (Document review.)
12      A.  Okay.
13      Q.  First of all, there is an annex
14  of RSA terms here, right, behind that?
15      A.  Yes.
16      Q.  And did you go through all of
17  that in the meeting in that hour and a
18  half?
19      A.  I don't recall whether we
20  specifically went through each single page
21  of this document, but there was a
22  discussion about this document, and there
23  were interactions between the board members
24  and Mr. Sobrino and the other participants
25  of the meeting.  And they asked all the

Page 147

1       F. Batlle - Professional Eyes Only
2   questions that -- they were given an
3   opportunity to ask further questions needed
4   to ask.
5       Q.  Is it fair to say that any
6   discussion of particular provisions in any
7   level of detail would likely be reflected
8   on the minutes?
9       MS. McKEEN:  Objection.
10      A.  I mean, I don't -- I didn't write
11  those minutes, so I cannot tell you what's
12  the standard for PREPA's --
13      Q.  But you --
14      A.  Yeah, but I don't know whether
15  PREPA's -- you know, some of the stuff is,
16  was discussed, but it doesn't necessarily
17  mean everything was discussed.  Or it
18  doesn't really reflect everything that was
19  discussed in the meeting, so...
20      Q.  Were there any discussions of key
21  terms in any level of detail that you will
22  recall having that are aren't reflected on
23  the minutes?
24      A.  I don't recall whether there were
25  specific questions or discussions around

Page 148

1       F. Batle - Professional Eyes Only
2   the key terms.
3       Q.  Okay.  On 003, I just want to ask
4   you a couple of questions.
5           There is a statement here that
6   says, "The securitization structure is
7   favorable as it provides bondholder limited
8   defaults and remedies only against SPV."
9           Do you see that?
10      A.  Yes, I do.
11      Q.  Are you familiar with the concept
12  of a securitization termination under the
13  RSA?
14      A.  I have to review the term again
15  in the RSA if you allow me.
16      Q.  Without -- okay.
17          (Document review.)
18      Q.  Can I ask a different question
19  and see if it helps?
20      A.  Sure.
21      Q.  Do you have an understanding,
22  sir, that there is a situation in which
23  under the RSA, the securitization structure
24  can be terminated, but the bondholders
25  still receive the same benefits in terms of

Page 149

1       F. Batlle - Professional Eyes Only
2   secured allowed claims in the amount of 73
3   and a quarter percent and other benefits
4   such as settlement payments and
5   administrative claims?
6       A.  Yes, that is correct.  That is
7   Section 9 of the definitive RSA document
8   that is included in the -- as part of
9   Exhibit 9.
10      Q.  So in that scenario, you're still
11  giving the bondholders the benefits of the
12  recoveries that the RSA provides, but the
13  government's not getting the benefits of
14  the securitization structure, right?
15      MS. McKEEN:  Object to the form
16  of the question.
17          You can answer.
18      A.  All this says is that if a
19  government party terminates this agreement
20  because somebody wakes up one morning and
21  says I don't want to do this agreement,
22  then bondholders would be entitled to the
23  stipulated treatment that is described in
24  this section.
25      Q.  You said that if someone wakes up

Page 154

F. Batle - Professional Eyes Only
1
2  a stipulated treatment termination under
3  the RSA?
4      A.  Yes.
5      Q.  And do you have an understanding
6  that in the event of a stipulated treatment
7  termination, the bondholders are entitled
8  to retain any settlement payments that
9  they've received under the agreement
10  following that termination?
11      MR. HAMERMAN:  Objection insofar
12  as it calls for a legal conclusion.
13      A.  I don't know what they would be
14  entitled at the end because it is my
15  understanding that the stipulated
16  treatment, the shape it takes would end up
17  being determined in a court process, I
18  believe.
19      Q.  You don't have an understanding
20  under the RSA whether or not in the event
21  of -- for example, let's say, let's say a
22  bondholder breaches the RSA and a
23  termination event occurs.
24          Do you have an understanding
25  whether the bondholder who breaches the RSA

Page 155

F. Batle - Professional Eyes Only
1
2  is entitled to retain any consideration
3  that it's received in the form of
4  settlement payments?
5      MS. McKEEN:  Objection.  Calls
6  for speculation and calls for a legal
7  conclusion.
8      A.  No, I don't recall what -- that
9  specific termination, but I refer you to
10  the document.
11      Q.  Now we may -- I may walk you
12  through the document, but I won't do that
13  right now.
14          Back to Exhibit 10, please.
15      A.  Yes.
16      Q.  I'd like to direct your attention
17  to page 3 of the minutes.
18          By the way, whenever it
19  references Mr. Sobrino here, it has atty,
20  period, before.
21          What is that?
22      A.  It is my understanding that is
23  the abbreviation for attorney.
24      Q.  Mr. Sobrino is an attorney?
25      A.  That is my understanding.

Page 156

F. Batle - Professional Eyes Only
1
2      Q.  But was he acting as an attorney
3  in these discussions?
4      MS. McKEEN:  I'll object.
5      You can answer if you know.
6      A.  My understanding is Mr. Sobrino
7  was acting in his capacity as a government
8  officer, not as an attorney.
9      Q.  Okay.  So at the top of page 3,
10  actually, the second line down -- actually,
11  let me go up above that.
12          It's -- the first line of that
13  page says, "In the original RSA, there
14  would have been an exchange of 85 percent
15  for the ad hoc and 100 percent for the
16  insurers."
17          Do you see that?
18      A.  Yes, I do.

24      Q.  I think we talked this about a
25  little bit earlier, but if 85 percent for

Page 157

F. Batle - Professional Eyes Only
1
2  the ad hoc and 100 percent for the insureds
3  -- insurers was too high and that the
4  recoveries under the RSA are, in your view,
5  not too high, at what point is there -- at
6  what point is it too high?
7      MS. McKEEN:  Objection.  Asked
8  and answered.
9      MS. DALE:  Calls for speculation.
10      A.  As I have repeatedly said today,
11  we made a determination that this RSA at 67
12  and a half, plus up to a potential
13  additional 10 percent on the tranche B
14  bondholder was a reasonable settlement.

22      Q.  What is your understanding of
23  what it means that the claims are
24  accumulating?
25      A.  That interest due on the bonds



Page 158

1    F. Batlle - Professional Eyes Only
2  continues to accumulate.
3    Q.   Continues to accumulate even
4  though PREPA is now subject to a Title III
5  proceeding?
6    MS. McKEEN:  I'll object to the
7  extent it calls for legal testimony.
8    You can answer if you know.
9  BY MR. BASSETT:
10   Q.   A Title III case.
11   A.   Under a Title III case, if you
12 are a secured bondholder, you continue to
13 accrue after filing.
14   Q.   So it's your understanding, as
15 the representative of PREPA and AAFAF, that
16 in a Title III case, all secured creditors
17 continue to accrue interest post filing?
18   MS. McKEEN:  I'm going to object
19 the question.  Calls for a legal
20 conclusion of a witness who is not a
21 lawyer.
22   You can answer if you know, but I
23 don't want you to speculate.
24   A.   Generally speaking, that is the
25 case.  That is my understanding.

Page 159

1    F. Batlle - Professional Eyes Only
2    MS. McKEEN:  I'm sorry, Fernando.
3    Could whoever is on the line
4  please mute yourself.  We can hear your
5  background noise.  Thank you.
6  BY MR. BASSETT:
7    Q.   And is it your understanding that
8  these bonds are secured?
9    A.   There is a -- bondholders argue
10 that they are.  And that is part of the
11 potential litigation that is out there.
12   Q.   I just want to clarify because
13 you answered maybe in your personal
14 capacity instead as the representative of
15 PREPA and AAFAF.
16   But as a representative of PREPA
17 and AAFAF who is here to testify about the
18 RSA, including the process by which it was
19 approved, at this meeting and as you sit
20 here today, it's your understanding that in
21 a Title III case, secured claims continue
22 to accrue interest after the Title III
23 petition date?
24   MS. McKEEN:  Same objections.
25   Asked and answered.  Calls for legal

Page 160

1    F. Batlle - Professional Eyes Only
2  testimony.
3    You can answer if you know, but I
4  don't want you to speculate.
5    A.   I'm not going to speculate about
6  that, sir.
7    Q.   Okay.  And in this meeting,
8  Mr. Sobrino was using the accumulation of
9  interest as one of the reasons why the
10 settlement should be approved, right, to
11 avoid that, correct?
12   A.   Well, it's a statement that he
13 makes and is reflected in the minutes.  It
14 is in the minutes, yes.
15   Q.   Do you know what it means for a
16 bondholder to be oversecured or
17 undersecured?
18   MS. McKEEN:  Calls for legal
19 testimony.  Outside the scope.
20   You can answer to the extent that
21 you know.
22   A.   Yes, I know what the definition
23 of that is.
24   Q.   And what is your understanding?
25   A.   If you're oversecured or

Page 161

1    F. Batlle - Professional Eyes Only
2  undersecured, it means whether you have
3  sufficient -- you're covered by sufficient
4  collateral.
5    Q.   Do you have any understanding as
6  to whether or not bondholders or any other
7  creditors' oversecured or undersecured
8  status bears on its entitlement to receive
9  interest after a filing date?
10   MS. McKEEN:  I'm going to object
11 to the question on the grounds that it
12 calls for testimony of a legal nature.
13 And I'm going to further instruct the
14 witness not to answer to the extent his
15 understanding as to that issue is
16 informed by conversations or advice
17 that he may have received from counsel.
18   A.   Yes, my understanding of that is
19 by information I received from counsel.
20   Q.   Yes or no question:  Did you
21 receive advice from counsel as to whether
22 or not the bonds were oversecured or
23 undersecured on the Title III petition date
24 and the consequences of that?
25   MS. McKEEN:  I'm going to further

## Page 162

1  F. Batlle - Professional Eyes Only
2  object since we've been discussing
3  there is debate as to whether they're
4  secured at all.  But I'll allow the
5  witness to answer as to whether or not
6  he had conversations with counsel about
7  this issue generally, if he can answer
8  on a "yes" or "no" basis.
9      A.  Yes, I've had conversations
10  generally.
11      Q.  Can you go to page 4, please?
12          (Witness complies.)



## Page 163

1  F. Batlle - Professional Eyes Only



21      Q.  Why did you say that?
22      A.  I said that because this is a
23  transaction that involves a significant
24  amount of different stakeholders, creditor
25  groups with different perspectives.  It is

## Page 164

1      F. Batlle - Professional Eyes Only
2  in the middle of a very politically charged
3  environment.  And so the deliberative
4  process related to a -- one of the largest
5  utilities in the U.S. under an unproven
6  statute like PROMESA creates for many
7  complexities.  And so what I was trying to
8  say in relation to that is that the process
9  to get into this RSA was one -- was a very
10  complex one and time-consuming one.
11      Q.  And is the resulting transaction
12  complex?
13      A.  No, the result of the transaction
14  is a settlement that helps PREPA exit Title
15  III.  The professionals that are involved
16  in the process get paid to deal with the
17  complexities of this.  So the end result is
18  a settlement that is not complex to
19  explain, but getting there was a complex
20  process.
21      Q.  You don't think this is a complex
22  transaction to explain?
23      A.  I just said that it is a very --
24  it was a complex transaction, and I stand
25  by my comment.

## Page 165

1      F. Batlle - Professional Eyes Only
2      I think that you can explain it,
3  and this document's intention was to do
4  that, the document that you're referencing,
5  Exhibit 9.  If you're going to go line by
6  line and then start explaining every single
7  detail, yes, it can be complex; I'm not
8  going to deny that.  But in the end, this
9  was something that was reached with the
10  support of very sophisticated advisers on
11  both sides.  And, yes, it is complex, but
12  you can sit down and explain it in a
13  relatively simple way in terms of what it
14  achieves.
15      Q.  Go to on the top of the next
16  page, please.
17          (Witness complies.)
18      Q.  This says, "To provide for
19  additional time" -- and I'll let you read
20  it.  I'm just going to paraphrase here for
21  the sake of expediency.
22          Is it fair to say that there was
23  a member of the PREPA governing board who
24  voiced a concern about the amount of time
25  that the board members had to consider the





## Page 206

F. Batlle - Professional Eyes Only

1
2  Q.  What I've handed you is an email
3  chain Bates-stamped PREPA_RSA0029088.
4      Mr. Batlle, you appear to be
5  copied on at least one of these emails
6  which -- one or more of these emails which
7  were exchanged in March of 2019.
8      Can you just tell me generally,
9  did you recall this email exchange, first
10 of all?
11     A.  Yes, after reviewing it here, I
12 recall seeing this graph, yes.
13     Q.  And can you tell me generally
14 what's going on?  This looks to be an
15 exchange primarily between people at Citi
16 and people at Ankura where certain
17 information is being shared.
18     Can you just tell me what this
19 related to?
20     A.  This is related to the -- what's
21 called here the collection curve, I
22 believe.  And it relates to the payment,
23 customer payments and the amount of
24 collections.  And it reflects both the
25 total amount and then the amount excluding

## Page 207

F. Batlle - Professional Eyes Only

1
2  the government.
3      Q.  And if you go to that chart that
4  appears on that email that's the second
5  from the top in the document and then the
6  text above it, it says this is from James
7  Castiglioni.
8      Who is that?
9      A.  James Castiglioni is part of the
10 Citi team that advises the board.
11     Q.  Okay.  And then his email was
12 later forwarded to you by David Brownstein.
13     But in this his email, he says,
14 "If I understand this, the percentage
15 collection of all clients is 76 percent for
16 the time period 7/1/2012 through
17 11/1/2018."
18     Do you see that?
19     MS. McKEEN:  Objection.  The
20 document speaks for itself.
21     A.  That's what the email says.
22     Q.  Do you have an understanding as
23 to whether or not that is an accurate
24 statement as to the percentage collections
25 for PREPA during that time period?

## Page 208

F. Batlle - Professional Eyes Only

1
2      A.  No, I'd have to -- if you're
3  asking me for my understanding, I have to
4  look at the spreadsheet where these numbers
5  come from.
6      Q.  Who prepared the spreadsheet?
7      A.  That spreadsheet was prepared by
8  PREPA, if I read this correctly.
9      The second page attaching the
10 collection current analysis prepared by
11 PREPA.
12     Q.  So as the representative of PREPA
13 and AAFAF and someone who was involved in
14 the RSA, do you have an understanding of
15 what the general collection rate was for
16 PREPA over this time period that's
17 addressed in this email?
18     A.  I have a general understanding
19 based on the numbers included in this
20 email, yes.
21     Q.  Does the number 76 percent sound
22 accurate to you during that time period?
23     A.  It sounds low, but that's what
24 the numbers reflect.
25     Q.  Did PREPA do any analysis as to

## Page 209

F. Batlle - Professional Eyes Only

1
2  what it expects the collection rate to be
3  moving forward?
4      A.  Well, it is the expectation of
5  the government that as part of this
6  transformation, the selected entity that
7  will run the T&D operation will have the
8  right incentives to make sure that
9  collections are as high as possible.  100
10 percent being the optimal level and that is
11 the expectation.
12     Q.  It's expected that collections
13 will become 100 percent?
14     A.  No, I'm saying that an optimal
15 level would be to be at 100 percent.  I'm
16 not saying that they're going to go to 100
17 percent.
18     Q.  Was any analysis performed as to
19 what's realistically expected?
20     A.  No.
21     Q.  Do you have an understanding of
22 whether or not the -- strike that.

Page 210

F. Batlle - Professional Eyes Only



Page 211

F. Batlle - Professional Eyes Only

Page 212

F. Batlle - Professional Eyes Only

8    THE VIDEOGRAPHER:  The time is
9  2:34 p.m.  Off the record.
10    (Recess is taken at this time.)
11    THE VIDEOGRAPHER:  The time is
12  2:43 p.m.  We are on the record.
13    MR. BASSETT:  Mr. Batlle, I do
14  not have any additional questions for
15  you at this point in the deposition.
16  As I discussed with your counsel in the
17  hallway, I'm not waiving whatever right
18  I might have to ask another question or
19  two later.  I don't anticipate doing
20  that, but I just wanted to put on the
21  record that I reserve the time.
22  EXAMINATION BY
23  MR. LYNCH:
24    Q.  Good afternoon, Mr. Batlle.
25    A.  Good afternoon.

Page 213

1    F. Batlle - Professional Eyes Only
2    Q.  My name is John Lynch.  I work at
3  Wachtell Lipton Rosen & Katz.  We are
4  counsel for Cortland Capital Market
5  Services LLC.
6    Thank you for being here.  I
7  appreciate your questions -- your answers
8  to our questions.
9    Just a couple of follow-ups on
10  your background.
11    Did you do anything -- when did
12  you graduate from Northeastern?
13    A.  1989.
14    Q.  And did you do anything between
15  1989 and the time you went to Harvard
16  Business School?
17    A.  Yes, I did.
18    Q.  What did you do?
19    A.  I worked for a firm that was
20  called Metmore Financial, which is was one
21  of the leading mortgage banks in Puerto
22  Rico, and I was there as assistant to the
23  CEO.
24    Q.  How long were you there?
25    A.  I was there literally from the

Page 214

1    F. Batlle - Professional Eyes Only
2  time that I graduated from undergrad at
3  Northeastern and the time shortly before I
4  started Harvard Business School, so three
5  years give or take.
6    Q.  Okay.  You started Harvard
7  Business School, I guess, in the fall of
8  '92?
9    A.  Yes.
10    Q.  Okay.  And you're not a lawyer,
11  right?
12    A.  I am not a lawyer.
13    Q.  Are you an investment banker?
14    A.  I am not an investment banker.
15    Q.  What do you call yourself when
16  people ask you what do you do for a living?
17    A.  I am financial adviser.
18    Q.  Okay.  Is that a consultancy
19  role?
20     MS. McKEEN:  Objection.
21  BY MR. LYNCH:
22    Q.  What do you mean by financial
23  adviser?
24    A.  I advise clients on matters
25  related to financial issues that include

Page 215

1    F. Batlle - Professional Eyes Only
2  restructurings.
3    Q.  And how long have you been doing
4  that?
5    A.  I have been with Ankura for two
6  and a half years now, approximately.
7    Q.  You didn't do that before you
8  came to Ankura; is that correct?
9    A.  Before I came to Ankura, I was
10  CEO of a broker-dealer called Santander
11  Securities.  And as part of that role, I
12  had a unit that did advise clients in
13  financial matters, and I had oversight over
14  that unit.
15    Q.  What else did Santander
16  Securities do while you were CEO?  What
17  other lines of business was it engaged in?
18    A.  Santander Securities was engaged
19  in retail brokerage.  It also had an arm or
20  a subsidiary that did asset management and
21  the incidental business around the
22  securities, retail securities business,
23  mostly.
24    Q.  I may have this wrong, so forgive
25  me and correct me, please, but I believe I

Page 216

1    F. Batlle - Professional Eyes Only
2  heard you testify this morning that you may
3  have had some involvement with PREPA in
4  connection with a bond offering while at
5  Santander Securities.
6     Do I have that right?
7    A.  Yes, I think I said that, yeah.
8    Q.  What was that?
9    A.  And I don't --
10     MS. McKEEN:  I just object.  I
11  think it misstates the witness'
12  testimony.
13     MR. LYNCH:  That's why I asked
14  the question.
15    A.  Well, what I think I said is,
16  while I was at the GDB, I did have a
17  participation.  When I was at Santander
18  Securities, there were potentially clients
19  that had bonds, PREPA bonds.  And I'd have
20  to look back at the dates.  We might have
21  been part of a syndicate of banks that
22  might have sold PREPA bonds, but I don't
23  recall whether for the time period that I
24  was there, there was a bond issue.  There
25  is a possibility there was, but I don't

Page 217

1    F. Batlle - Professional Eyes Only
2  recall.
3    Q.  What's the precise time frame or
4  as precise as you can recall that you were
5  at Santander Securities?
6    A.  So I joined Santander Securities
7  in 2011, probably June, July time frame.
8  July, probably.  And I left Santander
9  Securities late, probably late third
10  quarter of 2016, Septemberish type of --
11  September, October.
12    Q.  And you were there continually
13  that begin date to the end date; is that
14  right?
15    A.  Correct.
16    Q.  Okay.  In your career as a
17  financial adviser, do you have any
18  particular specialty?
19    A.  No.  I am versed in financial
20  matters generally.
21    Q.  Do you have any particular
22  geography that you cover?
23    A.  So for part of my career, I was
24  based in Puerto Rico.  And then after I
25  joined Santander Securities, I -- in 2013,