**<u>EXHIBIT 26</u>**

# A New Perspective
# on Unfair Discrimination
# in Chapter 11

*by*

*Bruce A. Markell**

Unfair discrimination is something of an orphan in Chapter 11 reorganization practice.[1] While it is indisputable that the Bankruptcy Code permits confirmation of a nonconsensual plan—commonly referred to as "cramdown"—only if the plan "does not discriminate unfairly" against any dissenting class,[2] just what suffices to avoid unfair discrimination is uncertain.[3] In this Article, I outline the murky origins of the provision, its short statutory life in the mid-1930s, its deletion from the corporate reorganization provisions of the Bankruptcy Act in 1938, and its resurrection in the 1978 Bankruptcy Code. I then examine the courts' use of the provision, focusing on tests courts use to find unfair discrimination. After examining these tests, I reject them as being both untrue to the historical origins of the provision and duplicative of other confirmation requirements.

In reformulating a test for unfair discrimination under § 1129(b)(1), I offer the following paradigm: unfair discrimination is best viewed as a horizontal limit on nonconsensual confirmation, in contrast to the vertical limit

---

*Professor of Law, Indiana University School of Law—Bloomington; Of Counsel, Ancel & Dunlap. Professor Markell is the author of Chapter 1129 in 7 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY (15th ed. rev. 1998), which includes a discussion of unfair discrimination. The author would like to thank John D. Ayer, Douglass Boshkoff and Richard F. Broude for taking the time to read prior drafts of this Article, and LaChelle Stepp and David Neboyskey for their research assistance. The views expressed in this Article, however, are the author's alone.

[1] In this Article, the use of Arabic numerals with a chapter designation denotes a chapter of the current Bankruptcy Code (title 11, U.S.C., "the Code"). The use of Roman numerals in the same context denotes a chapter of the Bankruptcy Act of 1898 ("the Act").

[2] Under the Bankruptcy Code, a plan proponent may confirm a Chapter 11 plan of reorganization without the consent of all impaired classes only "if the plan *does not discriminate unfairly*, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1) (1994) (emphasis added).

[3] The uncertain state of the law is demonstrated by Denise Polivy's article appearing in this issue of *The Journal. See* Denise R. Polivy, *Unfair Discrimination in Chapter 11: A Comprehensive Compilation of Current Case Law*, 72 AM. BANKR. L.J. 191 (1998). *See also* Corestates Bank v. United Chem. Techs., Inc., 202 B.R. 33, 47 n.12 (E.D. Pa. 1996) (court notes there are only a "few" cases on the subject, and several of these cases arguably did not involve genuine issues of unfair discrimination). *See infra* note 56.

228        AMERICAN BANKRUPTCY LAW JOURNAL        (Vol. 72

imposed by the requirement that a nonconsensual plan be "fair and equitable." Just as the fair and equitable requirement regulates priority among classes of creditors having higher and lower priorities, creating inter-priority fairness, so the unfair discrimination provision promotes *intra*-priority fairness, assuring equitable treatment among creditors who have the same level of priority.

In particular, I propose that a Chapter 11 plan is presumptively subject to denial of confirmation on the basis of unfair discrimination, even though it provides fair and equitable treatment for all classes, when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

The unfair discrimination in these situations is only presumptive. The plan proponent may overcome the presumption based on different percentage recoveries by showing that a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization. The presumption of unfairness based on differing risks may be overcome by a showing that the risks are allocated in a manner consistent with the prebankruptcy expectations of the parties.

This view consciously rejects the prevailing view that tests the plan to see if it could be confirmed without the proposed discrimination—that is, whether the discrimination is necessary to confirm the plan. Rather, it focuses on the actual value extended to each class, and upon the role of each class in the reorganization.

## I. THE RISE AND FALL OF UNFAIR DISCRIMINATION UNTIL 1978

The statutory prohibition against plans which "discriminate unfairly" has a long history. Since the inception of reorganization practice in this country, prohibitions against "unfair discrimination," or an equivalent verbal formulation, have been part of reorganization practice, and this terminology probably represents a unique contribution of bankruptcy concerns to reorganization law. To see this point, a brief history of the concept of unfair discrimination is in order.

### A. PRACTICE UNDER EQUITY RECEIVERSHIPS

The first reorganizations arose in equity receiverships of large corporations,

in which diverse bodies of secured creditors attempted to recover a portion of their massive investments.[4] The rules were fluid and complex, but followed a standard pattern.[5] The companies in financial distress, usually railroads, were made subject to a receivership. The nominal purpose of the receivership was the foreclosure of the mortgages or other security interests held by secured creditors. These secured creditors were, by and large, holders of what would today be publicly issued bonds.[6]

Since these debts were enormous,[7] the standard foreclosure on the courthouse steps could never have returned a meaningful recovery. In the place of a public auction, "reorganization managers" would form a syndicate of existing bondholders and existing equityholders who were willing and able to purchase the property in foreclosure by canceling their existing indebtedness and infusing new cash to pay other secured creditors.[8] Once acquired by the syndicate, the property would be placed, pursuant to a prenegotiated plan of reorganization, in a new entity, which would then carry on the business of the old debtor. The capital structure of the new entity would have been approved in the receivership. Although the effect of this type of reorganization might have been to eliminate unsecured creditors from participation, the device was not intended to be fraudulent; it simply appeared to all of the proponents that the highest and best use of a railroad with a fixed track was to continue to keep trains running on that track.[9]

Nevertheless, this alliance of secured creditors and equity holders often ran afoul of existing fraudulent transfer laws, and unsecured creditors used those laws to challenge the foreclosure process, contending that the price paid for the railroad by the syndicate was less than fair value.[10] Those skirmishes gave rise to the absolute priority rule, now found in the "fair and equitable" requirement in § 1129(b)(1).[11] Unsecured creditors, however, were

---

[4]By 1915 over one-half of all railroad debt securities had been in default at one time or another. WILLIAM Z. RIPLEY, RAILROADS: FINANCE & ORGANIZATION 374 (1915). Writers during this time seemed to embrace a fairly constant estimate that about one in seven railroads were in receivership at any one time during the later part of the nineteenth century and continuing through the early part of this century. Paul D. Cravath, *Reorganization of Corporations, in* 1 SOME LEGAL PHASES OF CORPORATE FINANCING, REORGANIZATION AND REGULATION 153, 154 (1917); John Franklin Crowell, *Railway Receiverships in the United States,* 7 YALE REV. 319, 319 (1898).

[5]I have previously explored this history in Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations,* 44 STAN. L. REV. 69, 74-84 (1991).

[6]As of 1906, there were over $18 billion of railroad securities outstanding, which included both debt and equity securities. RIPLEY, *supra* note 4, at 62-63.

[7]Of the $18 billion in railroad securities, it was estimated that approximately one-half, or $9 billion, was debt secured by railroad properties. *Id.* at 63, 105-20.

[8]*See* Markell, *supra* note 5, at 75.

[9]*Id.* at 75-76. *See also* 2 ARTHUR STONE DEWING, THE FINANCIAL POLICY OF CORPORATIONS 1238-54 (5th ed. 1953).

[10]*See* Markell, *supra* note 5, at 75-83.

[11]*Id.*

not the only ones who found fault with the procedure. Reorganization plans often took advantage of concentrations of ownership, and isolated minorities of secured creditors or shareholders to their disadvantage and to the advantage of the majority.

*Ring v. New Auditorium Pier Co.*[12] illustrates this tactic. Ring held $5,000 of a $75,000 bond issue secured by an amusement park that was losing money. Other bondholders, primarily one Tilyou, devised a plan whereby the mortgage securing the bonds would be foreclosed and the property sold to a new corporation. This new corporation would be capitalized by issuing $110,000 in new bonds, guaranteed by a solvent company controlled by Tilyou. Old bondholders were approached and were offered the opportunity to exchange their old bonds on a dollar for dollar basis for bonds in the new company.

Tilyou approached Ring with the plan; Ring equivocated on whether he would exchange. Tilyou then proceeded without him, causing a foreclosure of the mortgage—without notice to Ring—and a transfer of the amusement park to the new corporation for a price of $10,000 paid at the foreclosure. Ring was then offered his proportionate share of the $10,000. Instead of taking the $10,000, Ring sued to obtain bonds in the new corporation. In essence, he alleged that he was entitled to share fairly in the "true" sale, as opposed to the foreclosure sale. The court agreed. It essentially found that, in equity, Ring was entitled to the true proceeds of the sale; namely, the bonds in the new corporation given to all the other holders of the old bonds.[13]

In *Ring* and other similar cases,[14] the spurned minorities appealed to the equity origins of the receivership, alleging successfully that equity could not sanction a process that was not open to all. In this protean sense, unfair discrimination began as a device to ensure equal treatment for all creditors and shareholders.[15] This made sense: creditors held debt instruments which were identical; equity holders held undivided interests that were indistinguishable except for the amount held. Thus, the rule arose that reorganization plans—the financing template for the new entity—were fair only if they offered equal participation to all similarly situated creditors and shareholders. And the equality of opportunity had to be real; facially neutral plans that took advantage of

---

[12]77 A. 1054 (N.J. Ch. 1910).

[13]The lack of notice to Ring was essential to the court's opinion. "[A] foreclosure could properly have been utilizable to cut off the interests of any of the bondholders of the old company who, being fully advised of the proposed reorganization, chose to trust to the results of a sale in foreclosure rather than to join in the reorganization scheme. But to serve this last purpose I am clearly of the opinion that such bondholders, before they can be considered as having been cut off, must have been fully notified of all relevant facts." *Id.* at 1059.

[14]*See, e.g.,* Southern Pac. Co. v. Bogert, 250 U.S. 483 (1919); Fearon v. Bankers' Trust Co., 238 F. 83 (3d Cir. 1916); Investment Registry, Ltd. v. Chicago & M.E.R. Co., 212 F. 594 (7th Cir. 1913).

[15]Indeed, Justice Douglas was later to trace the origins of unfair discrimination to the fundamental rule of equality of distribution to creditors. *See infra* note 33.

quirks or other qualities of ownership were condemned,[16] as were plans in which certain creditors received consideration outside of the plan or composition under circumstances in which it appeared that their assent was bought.[17]

The cases thus recognized that regardless of the effect on other classes of creditors and stakeholders, reorganizations had to be fair within each class created. To modern readers, these cases might suggest a neat and appealing dichotomy: vertical equity ("fair and equitable")—preserving expectations among classes of creditors and equity holders of different priority, and horizontal equity (no "unfair discrimination")—preserving expectations that similarly situated creditors and equity holders will receive similar opportunities. However, there clearly was no formal recognition of such a dichotomy in the legal language of the time.[18]

The prevailing looseness of language was present when Congress first opened up the Bankruptcy Act to railroads in 1933. Prior to 1933, railroads were not eligible to be bankrupts under the Bankruptcy Act of 1898. In adding § 77 to the Act, Congress stated that, in order to confirm a plan, the plan could not unfairly discriminate and had to be "fair."[19] A year later, when extending

---

[16]See, for example, *Eagleson v. Pacific Timber Co.*, 270 F. 1008, 1011 (D. Del. 1920), in which the court set aside a corporate reorganization that included: (i) a share for share exchange of common stock; (ii) a purchase of new preferred stock at ten dollars per share; and (iii) a requirement that those holding both common and preferred stock would have to purchase preferred stock before being allowed to exchange their common stock. The court stated the rationale of the decision as follows:

> As the holders of more than half of the common stock . . . had none or practically no preferred stock, while many persons, including the plaintiff and the interveners, held substantially equal amounts of preferred and common stock, it is manifest that the plan of reorganization was for the benefit of the majority, to the detriment of the minority, and consequently unfair and fraudulent.

*Id.*

[17]See, e.g., *Investment Registry*, 212 F. at 605, 608 (dealing with a situation in which controlling bondholders paid off, at a premium, certain dissident bondholders so that they would not bid at a foreclosure sale). In that case, the court refused to confirm the sale (and subsequent reorganization) and stated a general rule for syndicate sales of large enterprises involving dissenting bondholders:

> When such a controversy is on, the chancellor in our opinion not only has the right but owes the duty of being vigilant to see, on the one hand, that a dissenter be not permitted to create a maneuvering value in his bonds by opposing confirmation, and, on the other, that the majority does not use its power, unique in sales of this class, to oppress a helpless minority.

*Id.* at 610. *See also In re* M. & H. Gordon, 245 F. 905, 906 (S.D.N.Y. 1917) (confirmation of composition plan denied where debtor agreed to pay the accounting and investigative expenses of a particular creditor in order to obtain that creditor's vote in favor of the plan); *In re* Weintrob, 240 F. 532, 534 (E.D.N.C. 1917) (confirmation of twenty-five percent composition plan denied where the favorable vote of one claim, necessary for the confirmation, was obtained by purchasing the claim at face value).

[18]See, e.g., Swanson v. Barclay Park Corp. (*In re* Barclay Park Corp.), 90 F.2d 595 (2d Cir. 1937) (holding that a plan which allocated equity interests in an insolvent debtor to existing equity holders violated the unfair discrimination provision of § 77B of the Bankruptcy Act).

[19]Act of March 3, 1933, ch. 204, § 77(g), 47 Stat. 1467, 1479.

232        AMERICAN BANKRUPTCY LAW JOURNAL          (Vol. 72

bankruptcy relief to municipalities, Congress added the words "and equitable" to "fair."[20]

A little over a month later, Congress used this revised language in § 77B to the Act, which extended bankruptcy reorganization relief to corporations generally.[21] Section 77B's confirmation requirements mirrored the municipal reorganization act: it required that, to be confirmed, plans had to be "fair and equitable, and not discriminate unfairly."[22] A year later, in 1935, Congress amended the railroad reorganization provision—§ 77—to conform to this formulation.[23] To complete the cycle, after the Supreme Court invalidated the municipal arrangements provisions in 1936,[24] Congress reenacted and slightly changed the provisions in 1937,[25] again using both "fair and equitable" and "unfair discrimination" concepts.[26]

B. DELETION BY THE CHANDLER ACT

In 1938, Congress overhauled the corporate reorganization sections of the Bankruptcy Act. The Chandler Act of 1938[27] repealed the single reorganization section, § 77B, and inserted three new chapters in its place. Congress intended the first, Chapter X, to do the bulk of the work of reorganizing public companies. The second chapter, Chapter XI, continued and formalized the composition provisions formerly found in § 12 of the Act. The third chapter, Chapter XII, dealt primarily with real estate partnerships.

Each of these revisions omitted the prohibition of unfair discrimination, inserting in its place a requirement that "the plan [be] fair and equitable, and feasible." In explaining this omission, the legislative history simply said:

> Subsection (2) of Section 221, derived from Section 77B(f)(1), provides, as a condition to confirmation of a plan, that the judge be satisfied that it is "fair and equitable," and "feasible." Implicit in the former phrase is a prohibition against any unfair discrimination in the plan in favor of any creditors or stockholders and the express statement to that effect in Section 77B is therefore unnecessary.[28]

---

[20]Act of May 24, 1934, ch. 345, § 80(e), 48 Stat. 798.

[21]Act of June 7, 1934, ch. 424, § 77B, 48 Stat. 911, 912.

[22]*Id.* § 77B(f)(1).

[23]Act of Aug. 27, 1935, ch. 774, § 77(e)(1), 49 Stat. 911, 918.

[24]The 1934 provisions were held unconstitutional in *Ashton v. Cameron County Water Improvement District,* 298 U.S. 513 (1936).

[25]The 1937 provisions regarding municipal arrangements were initially placed in Chapter X of the 1898 Act. Act of Aug. 16, 1937, ch. 657, 50 Stat. 654. The Chandler Act moved them to Chapter IX in 1938. Act of June 22, 1938, ch. 575, § 3(a), 52 Stat. 840, 939.

[26]Act of Aug. 16, 1937, ch. 657, § 83(e), 50 Stat. 654.

[27]Act of June 22, 1938, ch. 575, 52 Stat. 840.

[28]S. REP. No. 75-1916, at 35-36 (1938) (Senate Report No. 1916 accompanied H.R. 8046, which was the bill ultimately enacted). *See also* ANALYSIS of H.R. 12889, 74TH CONG. 78 n.2 (Comm. Print 1936) [hereinafter ANALYSIS OF H.R. 12889].

Congress thus collapsed the requirement of no unfair discrimination into the "fair and equitable" requirement,[29] which certainly was consistent with the way commentators of that time seemed to treat the principle.[30]

The Chandler Act did not, however, change the reorganization provisions related to railroads (§ 77, placed in Chapter VIII) or municipal arrangements (placed in Chapter IX). Those sections kept their unfair discrimination components. The developments after 1938 regarding these components are few, but telling as to the core content of unfair discrimination.

### C. UNFAIR DISCRIMINATION IN MUNICIPAL ARRANGEMENTS

During the 1940s, Justice Douglas wrote about the unfair discrimination requirement twice: once in *American United Mutual Life Insurance Co. v. City of Avon Park*,[31] and again in *Mason v. Paradise Irrigation District*.[32]

In *Avon Park*, a city had worked out a refunding plan for outstanding bonds with one R.E. Crummer & Co. Under the plan, Crummer acted as the city's sole agent, absorbed all expenses incident to the refunding, and obtained the necessary consents for the city's arrangement—either by securing votes of the existing bondholders or by purchasing the outstanding bonds and then voting them in favor of the plan. Crummer ultimately bought a number of bonds at an average price of fifty-three percent of face value. When voting time came, the plan received the assent of sixty-nine percent of outstanding bonds, which met the statutory two-thirds requirement.

A creditor challenged the plan. In particular, he challenged Crummer's financial arrangement with the city. The challenge pointed out that Crummer was a creditor of the city, since it held bonds both before and after the solicitation. Under its deal, however, Crummer received more than the new bonds issued in replacement of the old bonds; it also received the fees negotiated with the city (which were to be charged to the surrendering bondholders) and the profits associated with the purchase of the bonds at discount, and then exchanged them at a higher rate under the plan. Although the lower court had approved as reasonable the fees to be charged to the surrendering bondholders, it did not approve the profits Crummer made on exchanges of bonds in the arrangement. In upholding the challenge to Crummer's compensation, Justice Douglas

---

[29]Congress dropped the "fair and equitable" requirement from Chapter XI and Chapter XII arrangements in 1952, without adding back in any notions of unfair discrimination. *See* Act of July 7, 1952, ch. 579, § 35, 66 Stat. 420, 433.

[30]*See, e.g.,* ANALYSIS OF H.R. 12889, *supra* note 28, at 78 n.2 (stating the position of the National Bankruptcy Conference that confirmation standard be simply that the plan be "equitable," on the grounds that "'[e]quitable' would include 'fair', and would also prevent unfair discrimination in favor of any class of creditors or stockholders."); THOMAS FINLETTER, THE LAW OF BANKRUPTCY REORGANIZATION 461-72 (1939); 2 JOHN GERDES, CORPORATE REORGANIZATIONS § 1080 (1936); Note, *Classification of Claims in Debtor Proceedings*, 49 YALE L.J. 881 (1940).

[31]311 U.S. 138 (1940).

[32]326 U.S. 536 (1946).

234     AMERICAN BANKRUPTCY LAW JOURNAL     (Vol. 72

held that the profit Crummer made on its bonds constituted unfair discrimination.[33]

In making this statement, Justice Douglas traced the origins of the unfair discrimination requirement to early compositions and to the bankruptcy policy of ratable distributions to creditors.[34] Since the court below had not passed on the reasonableness of the profits Crummer was to make on the bond and coupon purchases, no one could say with any certainty that Crummer was not using its position with the city to obtain a greater return on its claim as a creditor of the city. As Justice Douglas wrote:

> In absence of a finding that the aggregate emoluments receivable by the Crummer interests were reasonable, measured by the services rendered, it cannot be said that the consideration accruing to them, under or as a consequence of the adoption of the plan, likewise accrued to all other creditors of the same class.[35]

In short, unfair discrimination determinations require courts to consider all consideration received by a creditor on account of its claim, whether explicitly provided for in the plan or not. And, if that consideration is proportionately higher than what is paid to other creditors of the same priority, there is a presumption of unfair discrimination.

Six years later Justice Douglas authored another unfair discrimination opinion under Chapter IX. In *Mason v. Paradise Irrigation District*,[36] the Reconstruction Finance Corporation (RFC) had assisted the Paradise Irrigation District, first by agreeing to lend it money to compromise its bonded indebtedness, and then by buying up outstanding bonds and voting them in favor of the arrangement. Under the arrangement, however, the RFC received new four percent bonds in the principal amount of the cash it advanced to buy the outstanding bonds; those bondholders who did not sell to the RFC received cash

---

[33]As stated by the Court:

> Beyond that is the question of unfair discrimination to which we have adverted. Compositions under Ch. IX, like compositions under the old s. 12, 11 U.S.C.A. s. 30, envisage equality of treatment of creditors. Under that section and its antecedents, a composition would not be confirmed where one creditor was obtaining some special favor or inducement not accorded the others, whether that consideration moved from the debtor or from another. . . . That rule of compositions is but part of the general rule of 'equality between creditors' (Clarke v. Rogers, 228 U.S. 534, 548, 33 S. Ct. 587, 591, 57 L.Ed. 953) applicable in all bankruptcy proceedings. That principle has been imbedded by Congress in Ch. IX by the express provision against unfair discrimination.

*Avon Park*, 311 U.S. at 147.
[34]*Id.*
[35]*Id.* at 148.
[36]326 U.S. 536 (1946).

1998)     UNFAIR DISCRIMINATION: A NEW PERSPECTIVE     235

in the amount of 52.521 percent of their claims.

A nonselling bondholder objected. It argued that the RFC was like Crummer in *Avon Park*—a majority bondholder who was to profit through the purchase of claims and the subsequent exchange of them for valuable interest-bearing obligations. Unlike *Avon Park*, however, Justice Douglas did not see unfair discrimination.

The first point of difference was that the RFC would not make a profit on the principal amount of the bonds. In exchange for each $1,000 bond bought for $525.21, it received $525.21 worth of new bonds.[37] Moreover, unlike *Avon Park*, this arrangement was open and disclosed to all.[38]

In addition, however, the Court advanced a new justification. The RFC had taken a risk in financing the arrangement, and there should be some reward for that risk. If discrimination in treatment was the means of reimbursement for this risk, then that discrimination could not be unfair. As put by the Court:

> The Reconstruction Finance Corporation contributes something that Mason does not. It furnishes the underwriting which makes the refinancing possible. It gives something of value for the preferred treatment which it receives. The other security holders of the same class give nothing new. That difference warrants a difference in treatment.[39]

The Court concluded its unfair discrimination analysis by noting that "it is impossible for us to say that, although a difference in treatment was warranted, any discrimination in favor of the Reconstruction Finance Corporation was so great as to be unfair."[40]

I can find no appellate case from 1946 through 1975 involving the issue of the content of unfair discrimination. In 1975, however, Congress undertook to revise the law of municipal arrangements. In so doing, it retained the unfair discrimination requirement. In explaining this requirement, the House Report on the bill stated:

> This paragraph also requires that the plan not discriminate unfairly in favor of any creditor or class of creditors. This is another aspect of the fair and equitable rule, more specifically

---

[37]This analysis assumes that the four percent face rate on the bonds represented what today would be called a market rate of interest. If the four percent rate represented an above-market rate of return, there would have been a benefit to the RFC in addition to simple repayment of its costs in purchasing the old bonds. The Court recognized this possibility, but found no evidence to support it: "The Reconstruction Finance Corporation receives new and refunding bonds in the face amount of its cash advances. It is, of course, possible that 52.521 cents in cash may not be as advantageous an offer as 52.521 cents in new and refunding bonds. But there is no showing that it is not." *Id.* at 543.

[38]*Id.*

[39]*Id.*

[40]*Id.*

> stated. It prohibits special treatment of any creditor, such as a
> fiscal agent or resident of the taxing district.[41]

As support for this statement, the Report cites *Avon Park*.[42] Congress thus saw some independent content in unfair discrimination, that of preserving equality of treatment through the prohibition of special treatment. This thought, however, was soon to be forgotten.

## II. THE CODE'S RESURRECTION OF UNFAIR DISCRIMINATION

When the job of revising bankruptcy law started in the early seventies, unfair discrimination was something of a lost child. The original Commission Report only twice mentioned the requirement: once in an historical context;[43] and once as a carryover of the requirement for municipal arrangements.[44]

The current version of "unfair discrimination" first appeared mid-way through the enactment of the Code in the House version of the bill;[45] it originally had no counterpart in the Senate version. In its initial version, it did not apply to secured claims or to equity interests.[46] In the floor comments just preceding adoption, the most the sponsors could say was that it was included for "clarity."[47] Just what was clarified is, unfortunately, unclear.

The House Report accompanying the bill which first contained the unfair discrimination language stated that "[t]he criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interests of creditors test."[48] This statement must be seen as odd, given Congress' remarks regarding municipal arrangements just two years earlier, in which unfair discrimination was said to be a derivative of the fair and equitable principle.[49] Moreover, and most puzzlingly, the only examples in the legislative history involve contractual subordination.[50] These examples assume that without the unfair discrimination requirement, a plan proponent could manipulate the consid-

---

[41]H.R. REP. No. 94-686, at 33 (1975).

[42]*Id.*

[43]1 COMM'N ON THE BANKR. LAWS OF THE U.S., REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. DOC. No. 93-137, at 255 (1973).

[44]2 *id.* at 269.

[45]*See* H.R. 8200, 95th Cong. § 1129(b)(2)(B)(iv) (1977).

[46]It only appeared in paragraph (2) relating to unsecured claims, and was absent from paragraph (1) relating to secured claims and paragraph (3) relating to equity interests. *See id.*

[47]"The requirement of the House bill that a plan not 'discriminate unfairly' with respect to a class is included for clarity; the language in the House report interpreting that requirement, in context of subordinated debentures, applies equally under the requirements of section 1129(b)(1) of the House amendment." 124 CONG. REC. 32,407 (1978) (statement of Rep. Edwards); *id.* at 34,006 (statement of Sen. DeConcini).

[48]H.R. REP. No. 95-595, at 417 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6373.

[49]*See supra* text accompanying note 41.

[50]H.R. REP. No. 95-595, at 414-18 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6370-74. Indeed, the lack of further guidance is surprising given the review of unfair discrimination in the context of the 1976 revisions to municipal arrangements. *See supra* text accompanying note 41.

eration in a plan involving subordinated debt so as to unfairly discriminate against creditors of equal rank.[51]

The House Report seems to adopt the view that in a classic subordination scenario—in which there are three claims of equal priority, one of which is made senior to another by a subordination agreement, with the remaining claim not affected by the agreement—the only fair way to assess plan consideration is to aggregate all proposed consideration and divide by the amount of the debt owed. Thus, if the three parties are owed $100 each, and the plan proposes to pay thirty dollars with respect to all three classes, then unfair discrimination is present if one party is initially allocated more than ten percent of its claims.[52]

Thus, if the plan proposes to pay twenty dollars to the senior debt and ten dollars to the unsubordinated debt, there is no unfair discrimination. Each class gets a presumptive dividend of ten percent, and the junior class is deemed to have transferred its share to the senior creditor.[53] If, however, the plan proposes to pay fifteen dollars each to the senior debt and to the unsubordinated debt, there is unfair discrimination against the *senior* debt.[54] The unsubordinated debt gets fifteen percent of its claim while the senior debt effectively gets only a 7-1/2 percent dividend on its own claim and on the claim of the junior class to which it is entitled.

Put another way, the House Report appears to assume that evaluation of the plan treatment of subordinated claims should occur before the subordination is given effect. Similarly, if the consideration were increased to $100 to the senior debt (payment in full), with the unsubordinated debt receiving fifty-five dollars and the junior debt receiving five dollars, there would be unfair discrimination against the *junior* debt. The total plan consideration would be $160, for a 53-1/3 percent presumptive recovery. But under the above assumptions, trade debt gets fifty-five percent, and junior debt receives an imputed distribution of 52-1/2 percent. This, asserts the Report, is unfair discrimination.[55]

If all the Report meant to say is that a disparity in percentage recovery is presumptively unfair discrimination, this was a roundabout, almost otiose, way

---

[51] The floor managers of the bill that became the Code confirmed the applicability of the House Report's examples, even though the bill reported on by the House was different from the bill ultimately adopted. "[T]he language in the House report interpreting that requirement, in context of subordinated debentures, applies equally under the requirements of section 1129(b)(1) of the House amendment." 124 CONG. REC. 32,407 (1978) (statement of Rep. Edwards); *id.* at 34,006 (statement of Sen. DeConcini).

[52] H.R. REP. No. 95-595, at 416 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6372.

[53] *See In re* MCorp Fin., Inc., 160 B.R. 941, 960 (S.D. Tex. 1993). Indeed, the court in *MCorp* seemed to believe that there would be no unfair discrimination if there was sharing that skipped nonbankruptcy priorities. "The seniors may share their proceeds with creditors junior to the juniors, as long as the juniors continue to receive at least as much as what they would without the sharing." *Id.*

[54] H.R. REP. No. 95-595, at 417 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6373.

[55] *Id.*

238          AMERICAN BANKRUPTCY LAW JOURNAL          (Vol. 72

of saying it. Subordination is a concept most often used in adjusting priorities among creditors, whether it be subordination adjusting liquidation priorities between secured creditors, or be it subordination of priority imposed upon creditors as a consequence of their prepetition actions. In either case, these typical uses of subordination involve moving the creditor up or down—vertically, as it were—in priority. These types of movement are regulated by § 510(a).[56]

In the unfair discrimination context, however, the presumption is that all similarly situated creditors should share the same priority. Creditors can and do employ subordination agreements to vary this presumption, but the potential confusion resulting from the broad applicability of subordination to both horizontal and vertical relationships makes the congressional examples unfortunate choices for explication. When this layer of unnecessary detail is removed, all the legislative history indicates is that disparities in recovery are presumptively unfair discrimination, not a particularly novel concept.

All of this inquiry leads back to the floor comments indicating that the requirement was reinserted after a forty year hiatus for "clarity." These comments are consistent with the notion that Congress intended nothing novel, and that the search for the proper limits of the rule ought to canvass the past.[57] Yet, given the other additions to the Code, it seems odd that clarity was needed. *Avon Park*'s concern with undisclosed compensation seemed to be met by the expanded definition of "insider" and the inclusion of § 1129(a)(4) and (5) relat-

---

[56]Often, creditors with different liquidation priorities will look at the treatment being offered to other classes and complain that their treatment is different. A secured creditor will think another secured class of claims is receiving more favorable terms, or that unsecured claims are being paid first. *See In re McCall*, No. 93-00632, 1997 WL 428580 (Bankr. D.D.C., May 27, 1997); Jack Friedman, *What Courts Do To Secured Creditors in Chapter 11 Cram Down*, 14 CARDOZO L. REV. 1495, 1502–04 (1993). While these types of claims can be and are raised under the "fair and equitable" requirement, they are not unfair discrimination claims. Unfair discrimination works only among claimants of equal nonbankruptcy priority. Prudential Ins. Co. of Am. v. Monnier (*In re* Monnier Bros.), 755 F.2d 1336 (8th Cir. 1985) (secured creditor's complaint that other secured classes of claims were being paid earlier did not give rise to an unfair discrimination claim); Mutual Life Ins. Co. v. Patrician St. Joseph Partners Ltd. Partnership (*In re* Patrician St. Joseph Partners Ltd. Partnership), 169 B.R. 669 (D. Ariz. 1994) (stretch-out of real estate secured loan on reasonable terms not unfairly discriminatory).

Similarly, if a debtor improperly classifies claims, the appropriate objection is under § 1129(a)(1), not that the plan unfairly discriminates as to the improperly classified claim. *In re Treasure Bay Corp.*, 212 B.R. 520 (Bankr. S.D. Miss. 1997). *But see* Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (*In re* Monarch Beach Venture, Ltd.), 166 B.R. 428 (C.D. Cal. 1993) (case remanded in order for bankruptcy court to determine whether higher rates of interest to be paid to junior lienors discriminated unfairly against senior lender); *In re* The Landing Assocs., Ltd., 157 B.R. 791, 822 (Bankr. W.D. Tex. 1993).

[57]As the Supreme Court has indicated, "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications." Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection, 474 U.S. 494, 501 (1986) (citation omitted). *See also* Pennsylvania Dept. of Pub. Welfare v. Davenport, 495 U.S. 552, 569–79 (1990) (Blackmun, J., dissenting).

ing to the disclosure and approval of insider compensation.[58] Section 510(a) specifically codified recognition of subordination agreements.

Thus, courts interpreting the unfair discrimination prohibition in the context of Chapter 11 cases faced a difficult task.

## III. CASES INTERPRETING UNFAIR DISCRIMINATION UNDER THE CODE

Since the adoption of the Code, unfair discrimination has expanded well beyond the confines of the subordinated debenture example used in the legislative history.[59]

### A. SAME RECOVERY; DIFFERENT TERMS

In many cases plan proponents have proposed equal payment, based on a proportionate recovery of allowed claims, but different payment terms to different classes. If, for example, a large tort claim dwarfs all unsecured claims, including those of trade creditors necessary for the continuation of the debtor, it makes business sense to separately classify the two, and pay the trade or other creditors first or faster.[60] The key, however, has been paying them the same; that is, each class must ultimately recover the same percentage amount of its allowed claim, as adjusted for present value.[61]

### B. DIFFERENT RECOVERY

Sometimes the relative difference in claims between classes is large, or the

---

[58]See also 11 U.S.C. § 1123(a)(4) (1994), which requires all members of a class to receive identical treatment under the plan.

[59]See supra text accompanying notes 50–55. See generally Polivy, supra note 3.

[60]In Steelcase Inc. v. Johnston (In re Johnston), 21 F.3d 323, 328 (9th Cir. 1994), the Ninth Circuit upheld a plan provision that delayed payment of a large disputed claim and created different reserve requirements for different claims, noting that all claims were to be paid in full. See also In re Bouy, Hall & Howard & Assocs., 141 B.R. 784, 793 (Bankr. S.D. Ga. 1992) (permissible to separately classify and pay an unsecured creditor before payment in cash to the secured creditor since the unsecured creditor was a necessary franchisor and had agreed to accept payments over a thirty-six month period in order to cure a default in the franchise agreement).

[61]Johnston, 21 F.3d at 328; Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, 748 F.2d 42, 46 (1st Cir. 1984) (pension fund claim and other general unsecured claims must be treated alike); In re Crosscreek Apartments, Ltd., 213 B.R. 521, 537–38 (Bankr. E.D. Tenn. 1997) (unfairness arises from disparity in present value of recovery, not from proposal to pay trade debt within six months and a lender's deficiency claim within ten years); In re 222 Liberty Assocs., 108 B.R. 971, 990–91 (Bankr. E.D. Pa. 1990) ("Generally speaking, [the prohibition of unfair discrimination] ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.") (quoting In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1987), aff'd, 78 B.R. 407 (S.D.N.Y. 1987), and aff'd sub nom., Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988)); In re Sherwood Square Assocs., 107 B.R. 872, 879 (Bankr. D. Md. 1989) (approving plan that paid general unsecureds 66.6 percent of claims in cash on confirmation and lender's deficiency claim at 66.6 percent rate, over a fifteen year period, upon a finding that an appropriate interest rate was employed).

240     AMERICAN BANKRUPTCY LAW JOURNAL     (Vol. 72

perceived importance of the continued goodwill of one class is high.[62] What-ever the reason, some proponents have proposed plans that not only differ with respect to the terms of repayment, but also differ with respect to the percentage repayment offered. Although courts hold out the possibility that such treatment might be appropriate in some cases, most cases have not upheld this type of differentiation.[63]

Those that have upheld different payment have done so in cases in which the ultimate percentage recovery is close, or if feasibility concerns are involved. Payment from different and possibly contingent sources, for example, may be another cause of differing payment, especially when the source of that repay-ment bears some reasonable relationship to that creditor's claim.[64]

---

[62]For example, see *In re Jersey City Medical Center*, 817 F.2d 1055, 1057, 1061 (3d Cir. 1987), where the court affirmed a plan that classified physicians' claims separately from medical malpractice and general unsecured claims—and paid them at a substantially higher rate—even though each class had the same nonbankruptcy priority. Note, however, that the payments were to come from different sources. *See also In re* Kliegl Bros. Universal Elec. Stage Lighting Co., Inc., 149 B.R. 306, 308 (Bankr. E.D.N.Y. 1992) (better treatment of unsecured claim of union justified on the basis that "the Debtor's ability to continue to operate a union shop is absolutely critical to its ability to function successfully in its industry"); *In re* Richard Buick, Inc., 126 B.R. 840 (Bankr. E.D. Pa. 1991) (priority treatment of vendor claims justified based on testimony that vendor would not deal with reorganized debtor unless claims paid in full); *In re* Rochem, Ltd., 58 B.R. 641, 643 (Bankr. D.N.J. 1985) (separate classification of unliquidated and disputed tort claimant upheld when plan gives tort claimant $50,000 with respect to unliquidated $35,000,000 tort claim and would, over thirty-six months, pay unsecured trade creditors a dividend of fifty percent of their claims of approximately $171,000).

[63]*Crosscreek Apartments*, 213 B.R. at 537-38 (unfair discrimination to pay trade debt in full in cash within six months while providing that lender's unsecured deficiency would be paid in full, without inter-est, over ten years out of excess cash flow; court assumed that without payment of interest, lender's present value recovery would approximate only one-half of its allowed claim); *In re* Barney and Carey Co., 170 B.R. 17, 26-27 (Bankr. D. Mass. 1994) (unfair discrimination to pay in full deficiency claims guaran-teed by insiders while paying trade creditors only fifteen percent of their claims). *See also In re* Aztec Co., 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989) (unfair discrimination to pay insider unsecured claims in full while paying nonrecourse deficiency claim three percent); *In re* ARN LTD. Ltd. Partnership, 140 B.R. 5, 13 (Bankr. D.D.C. 1992) (disallowing proposed zero payment to tenants and stating "[t]hat the debtor views the claimants as disgruntled tenants who are a nuisance to the debtor's reorganization efforts is simply not a basis for such discrimination, and no showing has been made that the plan could not succeed were the [tenants] accorded the same treatment as [other unsecured creditors]."). *Cf. In re* Cranberry Hill Assocs. Ltd. Partnership, 150 B.R. 289, 291 (Bankr. D. Mass. 1993) (cannot pay trade creditors in full on confirmation in cash, while purporting to pay deficiency in full over nine years without interest, and then only if property is sold; lack of interest and uncertainty of payment makes present value of payments less than 100 percent, and discrimination resulting therefrom is unfair).

[64]See, for example, *In re Jersey City Medical Center*, 817 F.2d at 1057, which affirmed the confirmation of a plan that: (i) separately classified physicians' claims, medical malpractice claims and general unsecured claims, even though each class had the same priority; and (ii) paid 100 percent of the physicians' claims, but only thirty percent of the claims of the other classes. It may have been significant that the payments were to come from different sources. *See also In re* Sacred Heart Hosp., 182 B.R. 413, 421 n.8 (Bankr. E.D. Pa. 1995) (permissible to separately classify and provide different treatment for unsecured claims that have recourse to insurance from unsecured claims that do not have such recourse). Similar treatment has been held unfair discrimination when a portion of the payment is to come from insiders of the debtor. *See 222 Liberty Assocs.*, 108 B.R. at 990-91 (court will not confirm proposal to pay unsecured classes two percent under plan, and then general partner would pay creditors with recourse in full over time).

## C. Different Recovery Based on Different Contribution to Reorganization

Frequently some classes of claims or interests will contribute new money or concessions to effect a reorganization.[65] These contributions can be recognized through separate classification and different treatment of the contributing classes' claims or interests. Whether such discrimination "discriminate[s] unfairly" against the noncontributing classes is an issue distinct from the propriety of the separate classification, and one upon which bankruptcy courts have not yet reached a consensus.[66]

## D. Insiders

Insiders can often use their influence to obtain favorable treatment of their claims. When the different treatment of the noninsider claim is proposed for the sole purpose of favoring the insider at the expense of the noninsider, the discrimination is unfair.[67] On the other hand, if a plan proposed by creditors separately classifies and gives worse treatment to insider claims, the classification may be upheld on the basis of the imputed superior knowledge of insiders, or upon the fact that trade credit stands on a different basis than do most insider claims.[68]

## IV. THE PROPER SCOPE OF UNFAIR DISCRIMINATION

In the varying circumstances noted in the preceding section of this Article,

---

[65]*See, e.g.,* Mason v. Paradise Irrigation Dist., 326 U.S. 536 (1946), discussed *supra* notes 36–40 and accompanying text.

[66]*Compare In re* HRC Joint Venture, 187 B.R. 202, 204, 212 (Bankr. S.D. Ohio 1995) (joint proponent of plan, the City of Cincinnati, received more favorable treatment on its deficiency claim than did senior lender; differences in contributions—the city had waived part of its claim—noted and used as a basis for sustaining discrimination), *with In re* Shadow Bay Apartments, Ltd., 157 B.R. 363, 366 (Bankr. S.D. Ohio 1993) (alleged waiver of administrative claim insufficient to justify retention of one general partner's interest, when another general partner was required to make a cash contribution in order to retain its interest).

[67]*See In re* Woodbrook Assocs., 19 F.3d 312, 321 (7th Cir. 1994) ("The meager 5% distribution, if any, on [the noninsider claims], given the full payment of [the insider claims], clearly suggests from our perspective, as it did from the perspective of the courts below, that this plan was the 'three dollar bill.'"); *In re Aztec,* 107 B.R. at 589 (unfair discrimination to pay insider unsecured claims in full while paying nonrecourse deficiency claim three percent). *See also Barney and Carey Co.,* 170 B.R. at 26–27 (unfair discrimination to pay lenders' deficiency claims in full and trade creditors fifteen percent when insiders had guaranteed full amount of lenders' debt).

[68]*See* Brinkley v. Chase Manhattan Mortgage & Realty Trust (*In re* LeBlanc), 622 F.2d 872, 879 (5th Cir. 1980) (upholding a secured creditor's Chapter XII plan that paid unsecured claims of trade creditors forty percent and paid unsecured insider claims nothing; court notes different status of trade creditors); *In re* 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (same rationale applied to a creditor's Chapter 11 plan). *But see ARN LTD.,* 140 B.R. at 13 ("Separate classification on the basis of the insider or equity holder status of the creditor does not alone warrant unequal treatment unless equitable subordination principles apply.").

courts have struggled to formulate an objective test of unfair discrimination.[69] Some courts have cited to Professor Kenneth Klee's early formulation of the standard: "In a nutshell, if the plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly with respect to the dissenting class."[70] Most courts, however, have borrowed the standard used in Chapter 13 cases under § 1322(b). I believe that this borrowing is inappropriate.

A. THE SHORTCOMINGS OF THE CURRENT AMBANC/AZTEC PROPERTIES STANDARD

The most widely used objective test is the one recently adopted by the Ninth Circuit in *Liberty National Enterprises v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa Ltd. Partnership),*[71] and best developed by Judge Keith Lundin in *In re Aztec Co.*[72] In *Aztec,* relying on Chapter 13 cases, Judge Lundin formulated the inquiry as a four-part examination:

> (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against.[73]

1. *The Redundancies*

Many courts have criticized these elements.[74] These critiques run along the following lines. The first element, a reasonable basis for discrimination, would

---

[69]Before beginning an analysis of any "tests," however, it should be kept in mind that it is the rare case that turns solely on "unfair discrimination." Given the plethora of confirmation requirements, discussions of unfair discrimination are typically short, and appear to be added to already good reasons to grant or deny confirmation. Thus, they may not be as sharply drawn as they might if looked at as the sole reasons for denying or granting confirmation.

[70]Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 AM. BANKR. L.J. 133, 142 (1979). Professor Klee's article was cited by the court in *In re Mortgage Investment Co.,* 111 B.R. 604, 614 (Bankr. W.D. Tex. 1990).

[71]115 F.3d 650, 656-57 (9th Cir. 1997).

[72]107 B.R. 585 (Bankr. M.D. Tenn. 1989).

[73]*Id.* at 590. *See also 11,111, Inc.,* 117 B.R. at 478; *In re* Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re* Rochem, Ltd., 58 B.R. 641, 643 (Bankr. D.N.J. 1985); 1 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 4.61, at 4-132 to 4-133 (2d ed. 1994 & Supp. 1996) (collecting Chapter 13 cases).

[74]*See In re* 203 N. LaSalle St. Ltd. Partnership, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd,* 195 B.R. 692 (N.D. Ill. 1996), *aff'd,* 126 F.3d 955 (7th Cir. 1997), *cert. granted,* 118 S. Ct. 1674 (May 4, 1998); *In re* Brown, 152 B.R. 232, 235-37 (Bankr. N.D. Ill.), *rev'd on other grounds sub nom.,* McCullough v. Brown, 162 B.R. 506 (N.D. Ill. 1993); *In re* Furlow, 70 B.R. 973, 977-78 (Bankr. E.D. Pa. 1987) (criticizing four-part test and stating that appropriate test is that "different treatment is permissible if and only if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan"). *See also In re* 222 Liberty Assocs., 108 B.R. 971, 991-92 (Bankr. E.D. Pa. 1990). Indeed, Judge Lundin himself has stated that the Chapter 13 cases in this area are "ridiculously complicated." 1 LUNDIN, *supra* note 73, § 4.81, at 4-178.

seem to be subsumed in some part by not only the second element, whether confirmation is dependent on the discrimination, but also by other confirmation requirements. Many courts inquire as to the reasonableness of the discrimination, for example, when determining the propriety of separate classification.[75] Indeed, many courts have explicitly adopted a standard that requires legitimate reasons for classification in any case,[76] and the National Bankruptcy Review Commission has endorsed a standard that any classification must be supported by a rational business justification.[77]

The same redundancy argument would seem to apply to the third element; i.e., whether the discrimination is proposed in good faith, since that is an explicit confirmation requirement.[78] If not redundant, it adds new questions to the confirmation process regarding the treatment of a particular class, when the general good faith standard simply looks at whether the plan, as a whole, is consistent with the purposes of Chapter 11. To add a separate inquiry, not found in the text, in order to avoid unfair discrimination would be to tinker with a policy decision already made.

The fourth element, examination of the treatment of the class discriminated against, is necessarily undertaken when examining the second element, i.e., whether the discrimination is necessary for confirmation. Although not explicit, this factor seems to anticipate that, in those cases in which the discrimination is not absolutely necessary, the amount of difference in treatment can be substantively assessed by the court. To assess the nature of the discrimination, however, the court will have to have some standard or test against which to compare the proposed treatment. That standard, however, is what the test of unfair discrimination is supposed to provide. In short, by implicitly imbedding the test within this factor, the court needs to know the result of the test to be applied before its application.

The test thus boils down to whether the proposed discrimination has a

---

[75]Improper classification is a basis for objecting to confirmation under § 1129(a)(1). Section 1129(a)(1) tests whether the plan complies with the provisions of title 11, which includes classification under § 1122. *See* 7 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY, ¶ 1129-03[1], at 1129-25 (15th ed. rev. 1998).

[76]*See, e.g.,* Aetna Cas. and Surety Co. v. U.S. Bankruptcy Court (*In re* Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996); Boston Post Rd. Ltd. Partnership v. Federal Deposit Ins. Corp. (*In re* Boston Post Rd. Ltd. Partnership), 21 F.3d 477, 483 (2d Cir. 1994); Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (*In re* Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1991); *In re* Kliegl Bros. Universal Elec. Stage Lighting Co., Inc., 149 B.R. 306 (Bankr. E.D.N.Y. 1992). One bankruptcy court noted that "separate classification for valid business reasons is uniformly accepted." *In re* SM 104 Ltd., 160 B.R. 202, 217 n.32 (Bankr. S.D. Fla. 1993).

[77]*See* NAT'L BANKR. REV. COMM'N, BANKRUPTCY: THE NEXT TWENTY YEARS § 2.4.16 (1997). The NBRC Report contains an exhaustive survey of the current state of the law on classification. *Id.* at 567–89.

Obviously, unfair discrimination issues recede into virtual nothingness if courts do not permit separate classification of creditors having the same nonbankruptcy priority, and this Article assumes that some form of intra-class division is appropriate and in force.

[78]*See* 11 U.S.C. § 1129(a)(3) (1994) (plan must be proposed in good faith).

244          AMERICAN BANKRUPTCY LAW JOURNAL          (Vol. 72

reasonable basis and is necessary for reorganization.[79] Given the general policy represented by such a requirement, that of fair allocation of reorganization value among claimants with equal nonbankruptcy liquidation priorities, this seems to have some merit. But that merit comes with baggage from other chapters, and with tests and inquiries that are either irrelevant or redundant.

### 2. The Inapposite Background of Chapter 13

The *Ambanc/Aztec* standard relies upon Chapter 13 cases for its unfair discrimination standard.[80] The initial allure of borrowing from Chapter 13 is strong; there are far more cases under § 1322(b)(1), and the language is similar.[81] There are, however, good reasons to create and adopt a separate standard for Chapter 11. First and foremost, the procedural role of unfair discrimination in Chapter 13 is different from that of unfair discrimination in Chapter 11. Moreover, unfair discrimination in Chapter 11 is both narrower and broader than in Chapter 13: a Chapter 13 plan may affect unsecured creditors of a codebtor, where a Chapter 11 plan may not; Chapter 11 unfair discrimination includes equity interests, and Chapter 13 applies only to individuals. Finally, Chapter 13 lacks the fair and equitable standard from which unfair discrimination is derived, and thus, for the most part, lacks the historical understandings that shaped unfair discrimination in Chapter 11. Each of these is explored below.

### a. The Procedural Difference

Initially, the different roles unfair discrimination plays in Chapter 11 and Chapter 13 should be noted. In Chapter 13, unfair discrimination appears in the section describing permissible plan provisions. That is, it appears in the section expressly permitting the debtor to classify differently various types of unsecured claims.

The role of the prohibition against "discriminat[ing] unfairly" is to temper this freedom. This prohibition affects confirmation under § 1325(a)(1), which requires compliance with all provisions of Chapter 13 to confirm a plan, including § 1322(b)(1). In short, no Chapter 13 plan can be confirmed if it unfairly discriminates, even if a majority of all classes of creditors would have approved it. This serves as a protection for unsecured creditors in a Chapter

---

[79]*Cf. 203 N. LaSalle St.*, 190 B.R. at 585–86 ("First, any discrimination must be supported by a legally acceptable rationale . . . . Second, the extent of the discrimination must be necessary in light of the rationale.").

[80]Judge Lundin in *Aztec* was explicit in his reliance. *See In re* Aztec Co., 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989). In *Ambanc*, the Ninth Circuit relied on Chapter 11 precedent from the Ninth Circuit Bankruptcy Appellate Panel, which in turn relied on Chapter 13 cases. Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. Partnership *(In re* Ambanc La Mesa Ltd. Partnership), 115 F.3d 650, 656 (9th Cir. 1997) (citing AMFAC Distribution Corp. v. Wolff *(In re* Wolff), 22 B.R. 510 (B.A.P. 9th Cir. 1982)). *Wolff* in turn was a business Chapter 13 case. *Id.* at 511.

[81]Section 1322(b)(1) provides that a plan may "designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated . . . ." 11 U.S.C. § 1322(b)(1). *See generally* LUNDIN, *supra* note 73, §§ 4.59–4.81.

13; these creditors do not vote for the plan and may only object to its terms if they do so in a timely fashion.[82]

Chapter 11 is different. In Chapter 11, all impaired creditors and interest holders vote. They express their preferences through that franchise. As a consequence, a Chapter 11 plan may propose discrimination against a class that could be characterized as unfair. If, however, that class accepts the plan (and thus accepts the arguably unfairly discriminatory treatment), no dissenting member of that class may raise unfair discrimination as a bar to confirmation. Put another way, unfair discrimination can only be raised by a dissenting *class*, not a dissenting *creditor*. In this context, contrary to Chapter 13, Chapter 11 plans which discriminate unfairly can be confirmed—it all depends on the creditors' vote.

There is thus a much different role for unfair discrimination in Chapter 11. Since it protects only dissident classes, instead of all creditors, it is much less paternalistic in application. It protects expectations of creditors and interest holders that those entities have said, by their negative votes, have not been met. This augurs for a tougher standard than in Chapter 13, since the Chapter 13 standard has to handle those cases in which holdouts or dissenters raise unfair discrimination as an absolute right, and thus adopt a more general standard. In short, the Chapter 11 standard protects classes of creditors who have rejected the proposed treatment, while Chapter 13 protects all creditors, and may thus arrogate to any individual creditor (or the standing trustee) the ability to holdup confirmation if a court adopts a strict test of unfair discrimination.

b. The Scope Difference

The unfair discrimination provisions of the two chapters also handle different types of claims. Section 1322(b)(1) expressly permits different treatment for those consumer claims upon which the debtor is only liable as a codebtor. No such distinction is made in Chapter 11. The legislative history behind this concession indicates that the provision had little legal or historical basis, but was inserted to legitimize what Congress saw to be inevitable in Chapter 13 cases: favoring claims on which the debtor is co-liable because the codebtors are likely to be friends or family.[83]

Chapter 11 does not have a codebtor provision. But its prohibition of unfair discrimination affects more than just unsecured creditors. In Chapter 11, unfair discrimination may protect unsecured creditors *and* equity holders, and perhaps some secured creditors.[84] Indeed, much of the history of unfair dis-

---

[82]*See* 11 U.S.C. § 1325(b)(1).

[83]*See* 8 KING ET AL., *supra* note 75, at ¶ 1301.LH.

[84]Although secured creditors typically comprise their own class, a class of secured creditors can exist in which each member of the class holds bonds or other securities secured by an indivisible interest in some collateral. Unfair discrimination issues could arise if the plan classifies some bondholders separately from the main body, and then proposes to treat that class differently.

crimination deals with discrimination against or in favor of groups of equity holders, and that history has carried into the present day.[85] With the different treatments that can be devised for classes of equity holders, the unfair discrimination standard has to be pliable enough to treat readjustments of those classes.

c. The Difference Regarding "Fair and Equitable" Treatment of Claims

Finally, and most importantly, Chapter 13 lacks any requirement that a Chapter 13 plan be "fair and equitable." This means that Chapter 13 plans need not satisfy the absolute priority standard or any other uncodified component of that rule.[86] Yet unfair discrimination grew as part of the fair and equitable standard, and much of its history and lore is bound up in cases developing and discussing that standard.[87] Even though unfair discrimination was eliminated from corporate reorganizations in 1938, it remained part of railroad reorganizations under § 77, and municipal adjustments under old Chapter IX, until the adoption of the Code in 1978; and both of these also retained the fair and equitable standard.

Thus, were one to try to determine the legitimate heir to the line of unfair discrimination cases before 1978, it would be the Chapter 11 standard, and not the Chapter 13 standard. Moreover, given the different roles each plays, there is every reason to believe that the standards should be different.

B. THE DESIRED CONTENT OF UNFAIR DISCRIMINATION IN CHAPTER 11

1. *The Beginning of a Standard—What Unfair Discrimination Does Not Have to Fix*

When the prohibition of unfair discrimination in Chapter 11 is viewed in the context of its history and its place in the Bankruptcy Code, it must be seen as a test with a definite mission, but a mission that is not defined by reference to unfair discrimination in Chapter 13. Since the legislative history regarding the resurrection of unfair discrimination is, unfortunately, more confusing than illuminating, the question arises as to how to proceed. Perhaps the analysis is best done by engaging in the process Professor Vern Countryman used when defining executory contracts in bankruptcy, which he analogized to elephant sculpture—start with the historical definition of unfair discrimination and remove those aspects which are obsolete or which have been subsumed by other confirmation requirements.[88]

The Code, for example, introduced confirmation requirements addressing Justice Douglas' concerns in *Avon Park*. Insider compensation, and other

---

[85]*See supra* text accompanying notes 15–18.

[86]*See* 7 KING ET AL., *supra* note 75, at ¶ 1129.04[4].

[87]*See supra* text accompanying notes 12–42.

[88]Professor Countryman's exact words were: "Obtain a large piece of stone. Take a hammer and chisel and knock off everything that doesn't look like an elephant." Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN. L. REV. 439, 460 n.85 (1973).

compensation to be paid to anyone receiving property under the plan must be disclosed and approved.[89] The "best interests" test was made applicable to all creditors,[90] and the fair and equitable rule was made applicable only to dissenting classes.[91]

Thus, Chapter 11 provided a method for allocating reorganization value; that is, since every participant was guaranteed an amount equal to at least the amount of its Chapter 7 dividend, the surplus preserved by reorganization was left for negotiation. The rules of that negotiation are minimal, and found in the confirmation requirements: get consent and meet the other twelve confirmation requirements, or cram down. Cramdown, in turn, still meant meeting the twelve other confirmation requirements, but it also meant preserving vertical and horizontal expectations. Vertical expectations were the province of the fair and equitable rule, with its focus on allocating value to classes in a manner consistent with prebankruptcy priorities. Horizontal expectations among creditors and interest holders of similar priority were left to the unfair discrimination requirement.

### 2. *The Remaining Problem—Horizontal Control*

The chore assigned to unfair discrimination is thus narrow, but important. It had long been a tenet of reorganization law, particularly among unsecured creditors, that readjustment of debts to preserve the debtor were normal and expected; that was the basis of compositions and Chapter XI arrangements. Given that under the Code all individual participants are to receive at least their Chapter 7 entitlement, the test for unfair discrimination applied to these reallocations of value could stand on a different footing. Rather than allowing each creditor to assert unfair discrimination, the drafters of the Code made unfair discrimination a class right. Thus, it is possible, as said before, to have a plan that unfairly discriminates but nevertheless is confirmable notwithstanding the objection of a dissident (and outvoted) class member.

In this respect, it is key that the fair and equitable requirement covers questions of proper allocation of reorganization value among classes having different priorities. The absolute priority component of that rule sets forth fairly understandable terms for allocating reorganization value among secured creditors, unsecured creditors and equity holders.[92] It is also important that § 1129(a)(4) and (a)(5) codified the requirement that there be disclosure and approval of any compensation paid in connection with the plan. Creditors have an individual right to be assured that they will receive at least as much as in a Chapter 7, that there will be a feasible plan proposed in good faith, and that all creditors

---

[89]*See* 11 U.S.C. §§ 1129(a)(4) & (5) (1994).

[90]*See id.* § 1129(a)(7).

[91]*See id.* § 1129(b)(1).

[92]*See* 7 KING ET AL., *supra* note 75, at ¶ 1129.04.

of the same class will receive the same treatment.[93] They know that at least one impaired, noninsider class has voted for the plan.[94]

What does this leave us? As I have indicated above, these requirements go a long way towards protecting creditors from discrimination among creditors having the same priorities. But nothing in this catalog of requirements goes directly to such types of discrimination. That is the current role for the unfair discrimination requirement in § 1129(b)(1).

Understanding the problems presented by this type of discrimination, however, requires an examination of the methods in which plan proponents may disadvantage dissenting classes. These methods include not only obvious allocation of lower payments, but also contractual provisions in reorganization securities allocating risk at levels not anticipated prepetition.

### 3. Defining and Matching Value

As emphasized by *Avon Park*, the starting point for unfair discrimination analysis is in equality of treatment.[95] Although expanded by *Mason*, the essence of fair treatment thus lies in equal payment. Under the Bankruptcy Code, that translates into receipt of the same percentage recovery. This recovery, however, needs to be adjusted for present value; a present payment of fifty percent of a claim can be worth far more than payment of the full claim amount in ten years.[96] Through use of present value analysis, the present value of a stream of payments can be calculated, and that is the benchmark measurement for comparison.[97]

### 4. Defining and Matching Risk

All creditors and interest holders take some risk and assume some uncertainty with any debtor. How much risk and uncertainty they take, and their corresponding reward for it, is usually a consensual matter. Unsecured creditors take short-term credit risks; debenture holders take longer-term risk; and, equity security holders are in for the long haul, with the greater risk ordinarily accompanied by greater potential reward.

Businesses and other entities usually have institutional preferences for the risk/reward balance they take. They become comfortable with handling this

---

[93]*See* 11 U.S.C. § 1129(a)(7) (best interests test); *id.* § 1129(a)(11) (feasibility); *id.* § 1129(a)(3) (good faith); *id.* § 1123(a)(4) (requiring that all members of every class receive equal treatment).

[94]*See id.* § 1129(a)(10).

[95]American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 147 (1940).

[96]Thus, assuming a ten percent interest rate, a present payment of only thirty-nine dollars would be worth $100 in ten years. The Bankruptcy Code imports present value analysis by requiring the plan, to be confirmed under § 1129(b) to return to each dissenting class "deferred cash payments totaling at least the allowed amount of such claim, *of a value, as of the effective date of the plan.*" 11 U.S.C. § 1129(b)(2)(A)(i)(II) (emphasis added) (secured claims). *See id.* § 1129(b)(2)(B)(i) (unsecured claims); *id.* § 1129(b)(2)(C)(i) (interests).

[97]*See* 7 KING ET AL., *supra* note 75, at ¶ 1129.06[1].

level of risk, and become repeat players in pricing it. All that can change in a reorganization. All creditors may be asked to take equity securities in order to provide the debtor with a sound capital structure. If all creditors receive such securities, there is no basis for complaint about discrimination. But if only certain classes of unsecured creditors are allocated equity, and others receive debt securities with much lower risk, questions of unfair discrimination arise.

In determining whether such discriminations are legitimate, courts should look at two different types of risk—the first characterized by the type of reorganization security offered and the second by the maturity or length of time until the investment is returned. These risks then can be compared to the risk that the dissenting class assumed prebankruptcy. In not all cases, however, will a mismatch of value or risk produce unfair discrimination. The next section addresses these points.

### C. Revising the Standard for Unfair Discrimination

In keeping with the historical origins of the requirement and the concerns which have surfaced in recent cases, there still is a role for unfair discrimination. That role is in regulating the expectations of possible treatment in reorganizations among creditors having the same nonbankruptcy priorities. I think these expectations are best explained using the concepts of value and risk; that is, of the balance between risk and reward.

#### 1. A Proposed Test

I propose that a court should not confirm a nonconsensual plan, even if it provides fair and equitable treatment for all classes, when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

Under the third factor, discrimination is presumptively unfair in two circumstances. First, unfairness is presumptively present if the plan specifies materially different percentage recoveries for two classes having the same priority. If, for example, a plan gave an assenting class of trade creditors consideration, measured in terms of present value, equal to ninety percent of their claims, while giving a dissenting class of bank deficiency claims consideration worth only five percent, unfairness would presumptively exist. Second, a plan that allocates to dissenting classes plan consideration containing risks materially greater than those assumed under the plan by other similar assenting classes is also presumptively unfair. This second presumption exists even if the plan pays each class the same percentage recovery on its prepetition claims. This later

type of unfairness could occur, for example, if a plan allocated common stock to a dissenting class of trade creditors, while giving short term secured notes to an assenting insider class of unsecured creditors.

In either case—disparity of recovery or disparity of risk—the plan proponent can rebut the presumption of unfairness by proving that the difference in treatment is attributable to differences in the prepetition status of the creditors. In the case of a difference in the present value of the recovery, the presumption may also be overcome by a demonstration that contributions will be made by the assenting classes to the reorganization, and that these contributions are commensurate with the different treatment. In such cases, while discrimination exists, it is not unfair.

### a. Of Discrimination—The Tie to Priorities

The gateway issue for unfair discrimination is the presence of "discrimination." I use that term to mean differential treatment of claims that have identical priorities, and it is captured by item (2) of the proposed test. As an example, creating a class of trade creditors and a class of tort claimants would not of itself create discrimination unless each class was offered materially different plan treatment. If the plan proponent offered holders of trade debt short-term notes while offering tort creditors stock, however, the plan would discriminate, since both are unsecured creditors with the same priority, and the plan treatment for each would be different. Similarly, creating two classes of interest holders for common stock—one which will contribute new value and one which will not—would also create discrimination.

The priority used as a basis of comparison is priority under the Bankruptcy Code, not nonbankruptcy priority. The difference occurs for those claims which receive preference under the Code, such as the claims of certain employees or tax claims.[98] As a consequence, a plan proponent could propose a plan under which priority unsecured tax claims are paid in full, even though other, nonpriority claims are not, without discrimination. Indeed, better practice suggests that such priority claims may not be classified because of the special treatment they receive.[99]

What is not covered in this simple definition is almost as important as what is covered. Since it is a goal of bankruptcy law to simplify capital structures, a plan that offers all unsecured creditors stock in satisfaction of their prepetition claims does not create discrimination—all creditors of equal nonbankruptcy priority would receive the same treatment. In addition, since the test looks to the bankruptcy priority of the claimants, different treatment for classes having dissimilar priority is not discrimination, at least for purposes of § 1129(b)(1). Thus, a plan which pays secured creditors faster than unse-

---

[98] The priorities are contained in 11 U.S.C. § 507(a)(2)- (9).

[99] See 7 KING ET AL., supra note 75, at ¶ 1122.03[4][b].

cured creditors is not discriminatory, nor is a plan which does the reverse, and pays trade creditors sooner than secured creditors.[100]

As many courts have noted, discrimination alone is not enough. The discrimination proposed must be "unfair." This concept, at least in the context of § 1129(b)(1), is given substance by the presumptions against disparate treatment and the aligned concepts of value and risk.

### b. Unfair Discrimination—Of Disparate Treatment

As Justice Douglas indicated in *Avon Park*,[101] the origins of unfair discrimination are partly in the bankruptcy goal of equality of treatment. Ensuring equality thus becomes a test to ensure that each claimant receives substantively the same treatment. Thus, the historical prescription for unfair discrimination cases in equity receiverships was an offer open to all members of the same class.[102] Under the statutory regimes of the 1930s, and continuing with railroad reorganizations and municipal arrangements thereafter, the touchstone was equal or similar value in plan securities received. Under the Code, most cases have found that equivalent treatment is a necessary starting point for the unfair discrimination analysis.[103]

Thus, cases in which disparate treatment has been proposed without any countervailing justification have been rightly rejected.[104] Equality of recovery, however, is merely a starting point. Plan proponents can tinker with debt and equity securities so that ultimate payouts are identical in terms of present value, but the hardships entailed in receiving those payouts are not.[105]

### c. Unfair Discrimination—Of Materially Different Risks

Plan treatment is limited only by the imagination of the parties involved. While this has a salutary effect in allowing flexibility in reorganization, it also opens up potential changes in relationships not possible or anticipated outside

---

[100]There is a subtle form of discrimination tolerated by this usage. The Code disallows certain otherwise valid nonbankruptcy claims to further fairness and reorganization. *See* 11 U.S.C. § 502(b)(3)-(8). Since a plan typically only provides for distributions with respect to allowed claims, the holders of such claims will have the amount of their otherwise valid nonbankruptcy claims reduced before any discrimination inquiry begins.

[101]American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 147 (1940).

[102]*See supra* text accompanying notes 12–18.

[103]*See supra* text accompanying notes 60–61.

[104]*See supra* text accompanying note 63.

[105]Steelcase Inc. v. Johnston (*In re* Johnston), 21 F.3d 323, 328 (9th Cir. 1994); Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (*In re* U.S. Truck Co.), 800 F.2d 581 (6th Cir. 1986); *In re* 222 Liberty Assocs., 108 B.R. 971, 990–91 (Bankr. E.D. Pa. 1990) ("Generally speaking, [the prohibition of unfair discrimination] ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.") (quoting *In re* Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1987), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *and aff'd sub nom.*, Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988)); *In re* Sherwood Square Assocs., 107 B.R. 872, 879 (Bankr. D. Md. 1989) (confirming plan where general unsecureds paid 66.6 percent of claims in cash on confirmation and lender's deficiency claim also paid at 66.6 percent rate, but over fifteen year period).

of bankruptcy. Trade creditors, for example, rarely bargain for stock in their customers, although such an outcome is not uncommon in bankruptcy. The plan proponent's power to shape the necessary contours of an effective (and feasible) reorganization also carries with it the power to drastically alter the expectations and assumptions of creditors and shareholders alike.

These expectations and assumptions are typically embodied in the risk inherent in the instrument evidencing the prepetition claim or interest. Trade creditors have short-term maturities; debenture holders have long-term expectations. Preferred shareholders assume that their dividends will be paid before common shareholders take anything. If the reorganization alters these common understandings, there is a separate assumption protected by "unfair discrimination:" that if a plan provides new treatment in a reorganization, that treatment will be uniformly applied and administered unless otherwise necessary to the reorganization itself. Put another way, a holder of an unsecured claim starts out with the assumption that he or she will get what every other unsecured creditor gets. This notion is protected by the general equality principle in bankruptcy,[106] as given effect by the strong-arm powers,[107] preferences,[108] and the requirement that each creditor be paid pro rata along with all other creditors.[109] As a consequence, if a plan gives a dissenting class of trade creditors long-term notes, and pays off everyone else in cash, there should be a presumption of unfair discrimination even if there is a judicial determination that the notes had a present value equal to their face value.

As with all things practical, however, there are exceptions made and concessions given to preserve the reorganization effort. Administrative convenience classes are permitted to enable realistic payments to be made to smaller creditors.[110] Ordinary course of business exceptions protect many recipients of prepetition payments.[111] And claims which are necessary to the reorganization effort may sometimes be paid early.[112]

When it comes to structuring payments under a plan of reorganization, prebankruptcy assumptions are protected by the unfair discrimination principle. Should the plan proponent wish to create separate classes of claimants whose bankruptcy priorities are the same, it may.[113] What it does with that separate classification, however, is a different matter. If the treatment preserves

---

[106]*American United*, 311 U.S. at 147.
[107]*See* 11 U.S.C. § 544(a) (1994).
[108]*See id.* § 547.
[109]*See id.* § 726(b).
[110]*See id.* § 1122(b).
[111]*See id.* § 547(c)(2).
[112]*See* Russell A. Eisenberg & Francis F. Gecker, *The Doctrine of Necessity and Its Parameters*, 73 MARQ. L. REV. 1 (1989).
[113]This assumes, of course, that relevant law permits separate classes for claims that have the same nonbankruptcy priority. *See supra* notes 75–76.

the prebankruptcy expectations, or appropriately rewards contributions to reorganization, it should be permitted; if it unjustifiably frustrates those expectations, it should not. Again, the creditors' expectations regarding risk—as compared to the nature of the consideration they are given under a plan and the time until payment—can be measured with reference to the risks the claimants were willing to assume before bankruptcy.

There are two basic concerns. First, creditors gather experience and expertise in pricing risk and uncertainty of the types of credit they extend through their normal business operations. Trade creditors understand the risk of selling goods on short-term credit; banks are more experienced at longer-term credit. They also come to understand how to hold, manage and sell such debt. When a plan allocates plan consideration to classes, and that allocation contains risks that the class is unfamiliar with, the odds are that the class will mismanage it. With respect to equity distributed in a reorganization, for example, trade creditors may dump the stock too soon, and banks may have to sell it. Thus, the return or value ascribed to the consideration at plan confirmation may not be realized in practice.

The second point builds on an assumption inherent in the first: that courts can accurately price plan consideration, particularly reorganization securities. In reorganization, of course, the court determines these values, aided by the testimony of experts for each side.[114] It also does so with an explicit goal of determining intrinsic or inherent value; pure market value is often eschewed because of a policy of not penalizing creditors for the market's underappreciation of debtors in bankruptcy.[115] Moreover, in every reorganization case, the court makes a determination as to whether the reorganized debtor will need further financial reorganization—whether the plan proposed is feasible.[116] This finding, however, is subject to a relatively low standard, that of a preponderance of the evidence.[117] This may be accepted practice for civil cases, but this level of comfort or proof

---

[114]For a good explanation of value in the corporate reorganization context, see Peter V. Pantaleo & Barry W. Ridings, *Reorganization Value*, 51 BUS. LAW. 419 (1996).

[115]As stated by the Third Circuit in *In re Penn Central Transportation Co.*, 596 F.2d 1102, 1115–16 (3d Cir. 1979):

> That argument [that market value should not be used] has considerable force when the securities in issue represent equity in, or long term interest bearing obligations of, a reorganized debtor. In such cases, the market value of the security will depend
> – upon the investing public's perception of the future prospects of the enterprise. That perception may well be unduly distorted by the recently concluded reorganization and the prospect of lean years for the enterprise in the immediate future. Use of a substitute "reorganization value" may under the circumstances be the only fair means of determining the value of the securities distributed.

*See also In re* New York, New Haven and Hartford R.R. Co., 4 B.R. 758, 792 (D. Conn. 1980) ("The stigma of bankruptcy alone is a factor that will seriously depress the market value of a company's securities."); *In re* Missouri Pacific R.R. Co., 39 F. Supp. 436, 445–46 (E.D. Mo. 1941).

[116]*See* 11 U.S.C. § 1129(a)(11).

[117]*See* 7 KING ET AL., *supra* note 75, at ¶ 1129.03[11].

may not correspond to the level of comfort mandated by the market; it could be too strict or, more likely, too weak. Deviations in either direction, however, will result in inaccurate pricing. In a strong sense, this is simply another instance of the age-old reorganization problem of judicial versus market determinations of value.

For purposes of unfair discrimination, however, I think courts can compare levels of risk accepted prepetition with the risk offered in the plan. If a dissenting class is offered long-term maturities when it was a short-term prepetition lender, and if another similar class is offered short term securities, then discrimination is present.

### 2. The Irrelevance of "Necessary" Discrimination

Tests such as the *Ambanc/Aztec* standard[118] that question whether a plan can be confirmed without the proposed discrimination, or that in some way require the discrimination to be "necessary for the reorganization" are, in my opinion, fatally flawed. These tests, by incorporating some form of a necessity requirement implicitly assume that different plans are commensurate for purposes of the unfair discrimination inquiry.[119] Put another way, to state that discrimination is necessary implies that there exists a "confirmable" plan (although not necessarily the one proposed), and the proposed discrimination is an element of it.

However, this implication makes any test of necessity meaningless, because discrimination is never necessary. Any nonindividual Chapter 11 case theoretically is capable of confirmation through plans which do not discriminate. For example, a court could confirm a liquidation plan, or it could confirm a plan that extinguished all claims and interests, created one class of new equity interests, and then distributed those interests pro rata to creditors and equity holders. With such a plan, which could be confirmed in any case, discrimination is wholly absent.

It is more likely that the necessity tests are really concerned with relative feasibility. The question becomes: Is discrimination of the type proposed necessary for the feasibility of the plan? The problem with this inquiry is that it is too self-referential. A plan is what the plan proponent makes it. There can be many different plans—that is one of the strengths of Chapter 11 practice—

[118]See supra text accompanying notes 71-73.

[119]Plans clearly can be and are compared by creditors. But that is a different inquiry than the inquiry courts conduct to see if the plan is minimally acceptable—that is, whether the plan is fair and equitable and whether it avoids unfair discrimination. These judicial inquiries examine whether the proposed plan meets a minimum set of requirements, not whether tinkering will produce a "better" plan. Each creditor and equity holder formulates its own normative judgment as to which of two plans is better; the Code, however, does not provide for the court to make that sort of normative judgment at the confirmation stage, providing instead for a comparative inquiry—the plan proposed is compared to the minimum Code requirements, and the court either confirms or denies confirmation based upon this examination and comparison. Only after there are two confirmable plans does the Code provide a normative standard for a judge to use in selecting between or among plans. See 11 U.S.C. § 1129(c).

each one of which is feasible under the standards set forth in § 1129(a)(11). Injecting an inquiry as to whether the proposed discrimination is necessary essentially boils down to an inquiry as to whether the discrimination proposed is necessary not for general feasibility, but to achieve a level of feasibility possessed by the proposed plan.

Thus viewed, these tests seem to look at whether the involuntary treatment accorded the dissenting class is outweighed by having a plan of reorganization that is as feasible as the one proposed. Although this could be a required inquiry that one might desire if writing on a blank slate, that is not what we have. Plans are often integrated and negotiated devices, in which asking whether the plan can be preserved by changing a class' treatment is akin to asking whether a square can do without one of its sides and still be a square.

The history of unfair discrimination is a history of comparing prepetition status to reorganization treatment, without regard to relative levels of feasibility.[120] The remedy for those who want a different treatment has been to ask them to propose an alternative plan. So long as the discrimination is consistent with prepetition expectations, or legitimately rewards contributions to the reorganization, then the discrimination is permissible. Whether the plan proposed is feasible is a separate, independent, inquiry.

There is certainly justification for this stance. All plans have to return at least as much as a Chapter 7 liquidation would to each creditor.[121] That means that Chapter 11 redistributes the going concern surplus after each creditor receives what it would if the debtor had elected liquidation. The voting rules and the class-wide, as opposed to individual creditor, application of the fair and equitable and the unfair discrimination rules are components of this fact. Focusing on relative levels of feasibility, as alternate standards appear to do, intrudes upon the plan proponent's discretion in structuring the discussion and negotiations over this surplus. In short, it recuts the deal given to dissenting classes in the Code.

### 3. *The Role of Contributions to the Reorganization*

There is more to unfair discrimination than the relative positions of participants before and after reorganization. Participants in a reorganization plan often will further the reorganization plan through quick compromise. That these types of contributions are made, often when unnecessary, is explicitly recognized by the Code.[122]

---

[120]*See supra* text accompanying notes 12–42.

[121]*See* 11 U.S.C. § 1129(a)(7).

[122]Section 503(b)(3)(D) allows entities not paid by the estate to receive reimbursement of their expenses if they make a "substantial contribution" to the Chapter 11 case. *See* 11 U.S.C. § 503(b)(3)(D). These expenses may include attorneys' fees. *See id.* § 503(b)(4). Section 503(b)(3) also permits administrative priority recovery for creditors who recover property for the benefit of the estate, *see id.* § 503(b)(3)(B), and for creditors who contribute to the prosecution of a criminal case related to the debtor's business or property, *see id.* § 503(b)(3)(C).

Such contributions have also long been recognized as a reasonable basis for different plan treatment consistent with the unfair discrimination principle. For example, in *Mason v. Paradise Irrigation District*,[123] as discussed above,[124] the Supreme Court upheld special treatment in a Chapter IX arrangement, allowing greater consideration to be paid to the Reconstruction Finance Corporation than to other bondholders, due to the RFC's underwriting of the reorganization. In dealing with the unfair discrimination argument, Justice Douglas said the following:

> But as we have seen, he who furnishes new capital to a distressed enterprise has long been accorded preferred treatment. The Reconstruction Finance Corporation contributes something that Mason does not. It furnishes the underwriting which makes the refinancing possible. It gives something of value for the preferred treatment which it receives. The other security holders of the same class give nothing new. That difference warrants a difference in treatment.[125]

As authority for this proposition, Justice Douglas cited none other than his own *Case v. Los Angeles Lumber Products*.[126]

Cases under the Code have carried this distinction further. In *In re The Leslie Fay Cos.*,[127] for example, the court authorized continuing management to be issued stock options, the vesting of which was linked to postconfirmation performance.[128] Again, this may be discrimination—the plan gives one group of creditors something it does not give others with the same nonbankruptcy priority—but it is hardly unfair given the contribution to the success of the reorganization.[129]

Disputes, however, have arisen with respect to different treatment based upon alleged contributions by insiders. In some cases, trade creditors have been accorded preference over insiders given their contributions to the reorganization.[130] The more common gambit, however, is to favor insiders—be they credi-

---

[123]326 U.S. 536 (1946).

[124]*See supra* text accompanying notes 36–40.

[125]326 U.S. at 543.

[126]*See id. Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939) is often cited as the source of new value principles for the fair and equitable requirement of nonconsensual confirmation. *See generally* Markell, *supra* note 5.

[127]207 B.R. 764 (Bankr. S.D.N.Y. 1997).

[128]*Id.* at 791.

[129]As the court noted, "[m]anagement contracts are a permissible way to effectuate a corporate reorganization." *Id.* (citations omitted).

[130]*See* Brinkley v. Chase Manhattan Mortgage & Realty Trust (*In re* LeBlanc), 622 F.2d 872, 879 (5th Cir. 1980) (upholding creditor plan which paid unsecured claims of trade creditors forty percent and unsecured insider claims nothing); *In re* 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (same). *But see In re* ARN LTD. Ltd. Partnership, 140 B.R. 5, 13 (Bankr. D.D.C. 1992) ("Separate classification on the basis of the insider or equity holder status of the creditor does not alone warrant unequal treatment unless equitable subordination principles apply.").

tors or equity holders. These plans have foundered on inadequate showings that the proposed contribution was worth the discrimination; in the words of *Mason*, the contribution was not a difference worth different treatment.[131]

### D. Unfair Discrimination Under the Proposed Test

The test proposed for unfair discrimination is not only theoretically more sound than current tests, it is consistent with the reported cases on the topic. In this section, I sketch some common circumstances and assess whether they present legitimate claims of unfair discrimination.

#### 1. *Disparities in Ultimate Recovery*

The test proposed permits different plan treatment of trade claims and debenture claims, and of short-term lenders and long-term lenders. This may be discrimination, but the critical question is whether the discrimination is unfair. Under the test, discrimination will be presumptively unfair if it results in materially different recovery as measured by the present value percentage recovery on claims. This portion of the rule incorporates existing case law and the equity rule regarding fair offers in equity receiverships.[132]

There can be, however, plans which permit different recoveries to different classes. First and foremost, a different recovery may be premised upon a class' contribution to reorganization, subject to acceptable proof that the difference in treatment is supported by the class' contribution.[133]

It also may be that the differences in recovery do not unsettle prebankruptcy legal expectations. This could be the case, for example, if there is nonrecourse debt. Outside of Chapter 11 (in Chapter 7 or under state law), the value of a deficiency claim on a nonrecourse secured claim is zero. In Chapter 11, however, it has value.[134] Different treatment of such deficiency claims has thus been approved since no nonbankruptcy expectations are hindered; indeed, any rec-

---

[131]*In re* Graphic Communications, Inc., 200 B.R. 143 (Bankr. E.D. Mich. 1996) (unfair discrimination when plan proposed to pay noninsider ten percent and insider 100 percent, with the difference based on an insider guarantee of cash flow deficiencies, estimated at $15,000; the company had revenues of over $440,000 and net income of $39,000 in the seven-month period preceding the bankruptcy).

[132]*See* Steelcase Inc. v. Johnston (*In re* Johnston), 21 F.3d 323, 328 (9th Cir. 1994); Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (*In re* U.S. Truck Co.), 800 F.2d 581 (6th Cir. 1986); Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, 748 F.2d 42 (1st Cir. 1984) (pension fund claim and other general unsecured claims must be treated alike); *In re* 222 Liberty Assocs., 108 B.R. 971, 990– 91 (Bankr. E.D. Pa. 1990) ("Generally speaking, [the prohibition of unfair discrimination] ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes") (quoting *In re* Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1987), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *and aff'd sub nom.*, Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988)); *In re* Sherwood Square Assocs., 107 B.R. 872, 879 (Bankr. D. Md. 1989) (confirming plan where general unsecureds paid 66.6 percent of claims in cash on confirmation and lender's deficiency claim also paid at 66.6 percent rate, but over fifteen year period).

[133]*See* Mason v. Paradise Irrigation Dist., 326 U.S. 536 (1946). *See also supra* text accompanying notes 127–131.

[134]*See* 11 U.S.C. § 1111(b) (1994).

ognition will increase recovery.[135] This could also occur with respect to other types of claims.[136]

### 2. Differences Between Insiders and Arm's Length Creditors

As explored above, unfair discrimination arose as a device to ensure fair promulgation of reorganization offers to similarly situated creditors and equity-holders.[137] Many times, the proponent of plans which were not fairly offered were insiders attempting to secure to themselves unfair advantages, or outsiders attempting to punish insiders.

Insiders continue to search for ways to profit in reorganization, and outsiders continue to attempt to retaliate against insiders. With respect to control and discrimination by insiders, plans have been promulgated which attempt to segregate creditors into two groups: a small group of core creditors friendly to the insider, and a larger group of claims, facially different from the core group, and usually not kindly disposed towards the insiders. The outsider group usually consists of a lender's deficiency claim, but could also be a tort or similar claim held by a competitor. Not surprisingly, the plan rewards the core group with a higher percentage recovery, and allocates to the outsider group a much lower percentage recovery.

This situation is the one in which modern cases most clearly reflect the classic unfair discrimination decisions. Discrimination is present due to the creation of two classes which have the same priority, and which will receive different treatment from the debtor under the plan. That discrimination is unfair since the reorganization securities issued represent a much deeper discount to one class (which has dissented) than to the other, with no prepetition differ-

---

[135]*See In re* 203 N. LaSalle St. Ltd. Partnership, 126 F.3d 955, 969 (7th Cir. 1997) ("[T]he disparity between [the trade claims and the nonrecourse deficiency claim], with the trade creditors receiving 100 percent and Bank America receiving sixteen percent, is not unfair. Bank America does better than it would have under Chapter 7, and the trade creditors do no worse. Additionally, the plan called for the payment of the bank's unsecured deficiency claim before any insider creditor would be paid. Finally, the bankruptcy court concluded that this discrimination is narrowly tailored to meet the requirements of the 'best interest' test. We believe that this explanation adequately explains the difference in treatment between the two classes of unsecured claims, and the bankruptcy court did not clearly err in refusing to find this discrimination unfair."), *cert. granted*, 118 S. Ct. 1674 (May 4, 1998). *See also In re* Woodbrook Assocs., 19 F.3d 312, 317-320 (7th Cir. 1994); Travelers Ins. Co. v. Bryson Properties XVIII (*In re* Bryson Properties XVIII), 129 B.R. 440, 445 (M.D.N.C. 1991) ("Where legal claims are sufficiently different as to justify a difference in treatment under a reorganization plan, reasonable differences in treatment are permissible."), *rev'd on other grounds*, 961 F.2d 496 (4th Cir. 1992); *In re* Rivers End Apartments, Ltd., 167 B.R. 470, 487- 88 (Bankr. S.D. Ohio 1994).

[136]The Code, for example, limits certain claims for rent. *See* 11 U.S.C. § 502(b)(6). In the case of an insolvent Chapter 11 lessee whose plan is a joint plan with an affiliated guarantor of that lease, the treatment of such claims could potentially qualify for different treatment. *See* 4 KING ET AL., *supra* note 75, at ¶ 502.03[7](f).

[137]*See supra* text accompanying notes 12-17.

ences or postpetition contributions to justify the disparity.[138]

A possible exception occurs if the insider contributes to the reorganization, and the lender does not. If the ability to contribute was uniformly offered, and if the benefits are disclosed and reasonable, the taint of unfairness is removed by the lender's election not to participate. Plans which do not allow participation on a uniform basis, however, are likely to discriminate unfairly,[139] unless offering the benefits of the participation to the dissenting class would impair feasibility, as if equity ownership were offered to a competitor, or if something about the dissenting class' ownership of the reorganization securities would present a legal barrier to continued existence.[140]

Insiders sometimes unduly favor such creditors, as in those cases in which they have guaranteed, or are liable as general partners, for the claims held by the assenting class. In such cases, for the same reasons as explored above, such discrimination is unfair to the extent that it allocates, either directly or indirectly, reorganization value from the estate to the guaranteed class to pay debts for which insiders are liable.[141]

Finally, plans proposed by noninsiders which attempt to allocate smaller recoveries to insiders also may unfairly discriminate. The primary question in such circumstances is whether there is discrimination at all: insiders' debt claims often are properly recharacterized as equity interests, or there may be other reasons to believe that the debt was never intended to be repaid as a pure debt. If this can be done, there is no discrimination, and hence no unfair discrimina-

---

[138]*See, e.g., Woodbrook*, 19 F.3d at 321 ("The meager 5% distribution, if any, on [the noninsider claims], given the full payment of [the insider claims], clearly suggests from our perspective, as it did from the perspective of the courts below, that this plan was the 'three dollar bill.'"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (unfair discrimination to pay insider unsecured claims in full while paying nonrecourse deficiency claim three percent). If the ultimate recovery is the same, however, different treatment has been upheld, *In re Sherwood Square Assocs.*, 107 B.R. 872, 879 (Bankr. D. Md. 1989) (general unsecureds paid 66.6 percent of claims in cash on confirmation; lender's deficiency claim also paid at 66.6 percent rate, but over fifteen year period), but only upon a proper showing that the deferred payments are truly equivalent in value to the present ones. *See also In re* Cranberry Hill Assocs. Ltd. Partnership, 150 B.R. 289, 291 (Bankr. D. Mass. 1993) (cannot pay trade creditors in full on confirmation in cash, while purporting to pay deficiency in full over nine years without interest, and then only if property is sold; lack of interest and uncertainty of payment make present value of payments less than 100 percent, and discrimination resulting therefrom is unfair).

[139]*See, e.g., In re* Graphic Communications, Inc., 200 B.R. 143 (Bankr. E.D. Mich. 1996).

[140]It could be, for example, that issuing stock to the dissenting class might affect some tax benefits sought by the plan, or that members of the dissenting class are ineligible for the benefits distributed under the plan, as in the unlikely case of distributing ownership interests in a plane registered in the United States when the dissenting class is comprised wholly of non-United States citizens and would otherwise hold a majority interest in the plane.

[141]*See, e.g., In re* Barney and Carey Co., 170 B.R. 17, 26–27 (Bankr. D. Mass. 1994) (unfair discrimination to pay lenders' deficiency claims in full and trade creditors fifteen percent when insiders had guaranteed full amount of lenders' debt); *In re* 222 Liberty Assocs., 108 B.R. 971, 990–91 (Bankr. E.D. Pa. 1990) (court will not confirm proposal to pay unsecured classes two percent under plan, and then general partner would pay creditors with recourse in full over time).

AMERICAN BANKRUPTCY LAW JOURNAL      (Vol. 72

tion.[142] If the claims cannot be recharacterized, then there is discrimination, and the character of the risk and uncertainties assumed needs to be investigated.[143]

### 3. Differences Between Debt Whose Holders Make a Contribution to the Reorganization, and Other Debt

Many plan proponents have attempted to discriminate between classes on the basis of the necessity of one class—and the nonnecessity of the other—to reorganization. Quite often, the claim is made that trade or other debt needs to be paid at a higher rate than other debt, such as debt related to borrowed money (as opposed to debt incurred for goods or services supplied).

Such claims can be sustained, but only under narrow circumstances. The discrimination is present once trade or similar claims receive different treatment. If that treatment represents better payment, then the discrimination is presumptively unfair. Yet sometimes payment in full of trade claims is necessary to reorganize. If so, however, then the dissenting class is entitled to at least some proof that the value represented by the participation of the favored class in the reorganization is equivalent to the disparity in treatment. For example, if any reorganization would completely fail without participation by the favored class, then the maximum value of the participation is the going concern value. A showing of the value of the participation is necessary to distinguish a situation of genuine need for discrimination from a ruse designed to channel reorganization value to friends.[144]

### 4. Differences Between Voluntary Debt and Tort Claims

Debt comes in many forms. Traditionally, the type of debt administered in bankruptcy was voluntarily-created debt, either for borrowed money or for goods or services provided. Indeed, under the Bankruptcy Act, only "provable claims" could be subject to the discharge, and this was interpreted to exclude unliquidated tort claims.[145] With the expansive nature of the definition of "claim"

---

[142]See, e.g., Brinkley v. Chase Manhattan Mortgage & Realty Trust (In re LeBlanc), 622 F.2d 872, 879 (5th Cir. 1980) (upholding plan which paid unsecured claims of trade creditors forty percent and which paid unsecured insider claims nothing); In re 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (same).

[143]In re ARN LTD. Ltd. Partnership, 140 B.R. 5, 13 (Bankr. D.D.C. 1992) ("Separate classification on the basis of the insider or equity holder status of the creditor does not alone warrant unequal treatment unless equitable subordination principles apply.").

[144]In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc. 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (better treatment of unsecured claim of union was justified on the basis that "the Debtor's ability to continue to operate a union shop is absolutely critical to its ability to function successfully in its industry."); In re Bouy, Hall & Howard & Assocs., 141 B.R. 784, 793 (Bankr. S.D. Ga. 1992) (permissible to separately classify and pay unsecured creditor before payment in cash to secured creditor since unsecured creditor was necessary franchisor and had agreed to accept cure payments over thirty-six month period); In re Richard Buick, Inc., 126 B.R. 840 (Bankr. E.D. Pa. 1991) (priority treatment of vendor claims justified based on testimony that vendor would not deal with reorganized debtor unless claims paid in full).

[145]Section 14 of the Bankruptcy Act discharged "debts," which were in turn limited by § 1(14) to any claims "provable in bankruptcy." Sections 57d and 63d of the Act, however, presumptively did not allow unliquidated or contingent claims to be provable. See 3 JAMES WM. MOORE ET AL., COLLIER ON BANKRUPTCY ¶ 57.15 (14th ed. 1977).

as used in the Code, questions of appropriate treatment of involuntary debt arise.

In most of the celebrated cases of this nature, unfair discrimination issues do not arise since the claims are scheduled to be paid in full, and any difference in treatment has been related to the practical problems of establishing and liquidating the claim.[146] Where tort claims are not proposed to be paid in full, there may be critical issues of disparate—and detrimental—treatment for involuntary claims.[147]

Consistent with the test, plans which do not purport to pay such involuntary claims are presumptively nonconfirmable under the unfair discrimination standard. There is no reason to prefer voluntary claims over involuntary claims based on prepetition expectations; indeed, there is every reason to believe that tort claimants have, if anything, a higher expectation of payment.[148]

The exception here, of course, will be claims necessary to preserve reorganization value. If, for example, the good will of a key union is necessary for the profitability of the reorganized debtor, and that necessity is proved by the plan proponent, then it is not unfair to return to that union more than its aliquot share of reorganization value since its efforts were responsible for the increase in that value. Again, however, it is critical that the plan proponent demonstrate that such commensurate value exists; otherwise, the historic presumption against such differential payment will be sufficient reason to deny confirmation.[149]

### 5. Differences Related to Availability of Other Sources of Payment

Estate assets may not be equally available to all creditors. Insurance, for example, may be an asset of the estate, but the proceeds of that insurance may be only available to those injured by the debtor or the estate. In such cases, the plan will maximize returns to creditors by allocating the special assets to those creditors who have recourse to it under nonbankruptcy law.[150] Such plans will

---

[146]Indeed, the plans confirmed in the *A.H. Robins* and *Johns-Manville* cases assumed that the plan consideration would pay all tort claims in full. *See In re* A.H. Robins Co., 880 F.2d 709, 720 (4th Cir. 1989); Note, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings*, 96 HARV. L. REV. 1121, 1128-33 (1983).

[147]*In re* Rochem, Ltd., 58 B.R. 641, 643 (Bankr. D.N.J. 1985) (separate classification of unliquidated and disputed tort claimant upheld when plan gives tort claimant $50,000 with respect to unliquidated $35,000,000 tort claim and would, over 36 months, pay unsecured trade creditors a dividend of fifty percent of their claims of approximately $171,000). Under the proposed analysis, *Rochem* can be justified only if the higher payment of trade claims was commensurate with the value of the participation of trade creditors in the reorganization.

[148]*In re* Eagle-Picher Indus., Inc., 203 B.R. 256 (S.D. Ohio 1996) (permissible to separately classify tort claimants, and to provide for different payment scheme to such claimants upon election, when all creditors ultimately to receive the same percentage recovery).

[149]Note that issues of unfair discrimination do not enter into consideration of whether equity interests can contribute to the reorganization. That is a question, as I have framed it, of vertical equity, and the province of those cases discussing the new value corollary to the absolute priority rule. *See* Markell, *supra* note 5; 7 KING ET AL., *supra* note 75, at ¶ 1129.04[4][c].

[150]*See supra* note 64.

also pass muster under the "best interests" test because the disparity in consideration will mirror the result in a nonbankruptcy liquidation.

This may be discrimination, since there are two different recoveries for creditors of the same priority, but the discrimination is not unfair. If the different resources existed prebankruptcy, or are created by acts of nonplan proponents, then the risk and expectations of the dissenting class cannot be frustrated by the plan's allocation. Indeed, if the plan varied treatment from what would result in Chapter 7, the plan proponent could not confirm the plan because of a violation of the best interest of creditors test.[151] Creditors who take fifty percent on the dollar, for example, cannot complain that tort claimants receive full payment, because the debtor's structure prebankruptcy would have permitted this disparity, and that is what they would have received in a Chapter 7 liquidation.

A different result might arise for penalty claims or claims arising from punitive damages. The difference in priority between these types of claims is wholly a creature of bankruptcy law.[152] Take the following example. A debtor engaged in selling goods to the public is sued prepetition for consumer fraud. To settle the litigation, it agrees that it will fund a reserve to pay all such claims. This payment, however, taxes its reserves to the limits, and the resulting cash flow crunch forces it to file. If its plan proposed to pay defrauded consumers from that fund in the plan at a higher rate than a dissenting class of trade creditors, there would be unfair discrimination.[153]

The discrimination would exist in the different treatment and the lack of any justification for taking estate money and paying it to defrauded consumers over disgruntled trade creditors. Both the trade creditors and the consumers are unsecured creditors under the law, and payment of the consumers would not seem to further reorganization in the manner contemplated by *Mason Irrigation District* and its progeny.[154]

## CONCLUSION

Unfair discrimination is an important restriction on nonconsensual plans. Its history and current usage protects the horizontal expectations of classes of creditors and shareholders; that is, it ensures that they will receive equal treatment in a reorganization, or will be able to force those receiving disparate treatment to justify the disparity in terms of prebankruptcy expectations or value contributed to the reorganization.

---

[151]*See* 11 U.S.C. § 1129(a)(7) (1994).

[152]*See id.* § 726(a)(4), (5).

[153]This assumes that the estate could bring the fund into the estate through its avoiding powers, *see, e.g., id.* § 548(a)(2), or through rejection and rescission of the contract creating the settlement fund, *see id.* § 365.

[154]*See supra* text accompanying notes 123–131.

1998)    UNFAIR DISCRIMINATION: A NEW PERSPECTIVE    263

The rule comes to us from equity reorganizations and from congressional modifications of the reorganization provisions of the Bankruptcy Act in the 1930s. Although absent from corporate reorganizations during the forty year period between 1938 and 1978, its presence in the current Code is part of the scheme of reorganization in which plan proponents seek to allocate the reorganization value of a financially distressed debtor. Along with the better known fair and equitable rule, it protects classes from improper exclusion in the reorganization process, and from explicit or implicit attempts to allocate reorganization value on bases other than the debt or equity holdings of the members of any class.

As with the fair and equitable requirement, however, the unfair discrimination rule is infused with notions that voluntary contributions to reorganization ought to be rewarded. Thus, the requirement only restricts "unfair" discrimination, not all discrimination. Consistent with the presumptive rules of equality of treatment, risks and benefits of the reorganization can be redistributed in accordance with the value of the contribution and still not run afoul of the unfair discrimination rule.

In this way, bankruptcy courts can mold plans to fit the business needs of financially distressed debtors while at the same time honoring the legitimate expectations of creditors and shareholders. By looking to the relation between prepetition debt and plan consideration, and to the contributions of various classes of creditors, courts can ensure fair plans for all without, as required under the current majority scheme, becoming enmeshed in relative feasibility considerations and normative decisions regarding the propriety of divisions made by the plan proponent. This furthers the role of the bankruptcy judge as an arbiter of conflicting claims, and reduces the need to pass judgment on the worth of individual reorganizations.

264       AMERICAN BANKRUPTCY LAW JOURNAL          (Vol. 72

———————