**EXHIBIT 27**

Page 1

```
 1

 2          IN THE UNITED STATES DISTRICT COURT

 3            FOR THE DISTRICT OF PUERTO RICO

 4   _____x
     In re:
 5
     THE FINANCIAL OVERSIGHT AND          PROMESA
 6   MANAGEMENT BOARD FOR PUERTO
     RICO,                           Title III
 7         as representative of

 8   THE COMMONWEALTH OF PUERTO RICO,
     et al.,
 9         Debtors.
     _____x
10   In re:

11   THE FINANCIAL OVERSIGHT AND
     MANAGEMENT BOARD OF PUERTO RICO,
12
           as representative of
13
     PUERTO RICO ELECTRIC POWER AUTHORITY,
14       Debtor.
     _____x
15        * P R O F E S S I O N A L   E Y E S   O N L Y *

16

17                VIDEOTAPED DEPOSITION

18                        OF

19                  DAVID A. SKEEL

20              New York, New York

21           Tuesday, October 8, 2019

22


23


24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 169101
```

Page 50

D. Skeel - Professional Eyes Only
1
2    Q.  But we're talking about July of
3  this year.  So you have no recollection of
4  July of this year?
5    A.  I don't.  I mean, I have hundreds
6  of messages every day.
7    Q.  Speaking of messages -- you're
8  talking about text messages?
9    A.  Emails, phone calls, text
10 messages.
11   Q.  You have a hundred of those?
12   A.  I have a hundred emails.
13   Q.  Okay.  What about text messages?
14   A.  Less --
15      MS. DALE:  What about it?
16 Objection.
17      MR. DESPINS:  You can't have
18 talking objections.  State your
19 objection and then the witness will
20 answer.
21      MS. DALE:  Objection to the form.
22 BY MR. DESPINS:
23   Q.  Tell me about your text messages.
24      MS. DALE:  Objection.
25   A.  I have text messages every day.

Page 51

D. Skeel - Professional Eyes Only
1
2    Q.  Between you and other members of
3  the board?
4    A.  Between me and various people.
5  Sometimes other members of the board,
6  sometimes not.
7    Q.  And other members of the board,
8  if I'm asking you to put aside Ana Matos
9  Santos and Judge Gonzalez, do you have text
10 messages with other members of the board
11 other than those two?
12   A.  Occasionally, yes.
13   Q.  Regarding PREPA?
14   A.  Possibly.
15   Q.  And would it be fair to say board
16 members communicate by text frequently
17 among, you know, between each other?
18      MS. DALE:  Objection.
19   A.  I only know myself.
20   Q.  Well, but you're not
21 communicating with yourself.  So you're
22 communicating with other people?
23   A.  I communicate with other board
24 members, yes.
25   Q.  By text?

Page 52

D. Skeel - Professional Eyes Only
1
2    A.  By text, by phone, by email.
3    Q.  Okay.  And what about other
4  applications, meaning WhatsApp, that type
5  of -- or Telegram, or things like that, do
6  you guys communicate through that?
7    A.  I do not use -- I don't use other
8  applications.
9    Q.  And other board members?
10   A.  I don't know.
11   Q.  Have you received text messages
12 from other board members, again, other than
13 Judge Gonzalez and Ana Matos Santos?
14      MS. DALE:  Objection.  Asked and
15 answered.
16      You can answer it again.
17   A.  Yes.
18   Q.  Including regarding the RSA?
19   A.  I don't remember specifics.
20      MR. DESPINS:  Okay.  Let's go to
21 Tab 21.
22      (Skeel Exhibit 3, Email chain
23 beginning with email dated 7/25/18 from
24 Castiglioni to Brownstein and Skeel
25 with attachments, Bates-stamped

Page 53

D. Skeel - Professional Eyes Only
1
2  FOMB_9019_00006585 through 593, marked
3  for identification, as of this date.)
4  BY MR. DESPINS:
5    Q.  Tell me when you're ready.
6    A.  I'm ready.
7    Q.  Actually the question I'm going
8  to ask you is not about that document yet.
9  I just want to close one loop.
10      Syncora and National were added
11 to the RSA in -- well, when were they added
12 to the RSA?  Do you remember?
13   A.  I don't remember exactly.
14   Q.  Would -- September of 2019 sounds
15 right?
16   A.  It's relatively recently.
17   Q.  All right.  So they were added
18 after the date of the previous text
19 messages that we were looking at?
20   A.  I believe so.
21   Q.  Okay.  Was there a board meeting
22 to approve the joining of National and
23 Syncora to the RSA?
24   A.  I don't remember if there was a
25 final board meeting.  We authorized trying

14 (Pages 50 to 53)



Page 54

1    D. Skeel - Professional Eyes Only
2   to bring them on board.
3       Q.  You authorized trying to bring
4   them on board, but you don't know if there
5   was a vote on it?
6       A.  I don't remember one way or the
7   other.
8       Q.  Well, this would have been in
9   September.  We're in October of 2019 now.
10      A.  I have age-appropriate memory
11  unfortunately.  I don't specifically
12  remember.  If I could go back through our
13  calls, I could -- I'm sure I could refresh
14  my recollection.
15      Q.  Okay.  Going back to the document
16  you have in front of you now.  So this is
17  Bates-stamped, again, FOMB 6885, 6886.
18      A.  Wait a second.
19          MS. DALE:  It's 6585 to 6593.
20          THE WITNESS:  That's what I have.
21          MR. DESPINS:  Oh, I'm sorry.  It
22  keeps going.  Sorry.
23          (Document review.)
24          MS. DALE:  Is that what you have?
25          THE WITNESS:  Yes.  I have what

Page 55

1    D. Skeel - Professional Eyes Only
2   you have.
3          (Document review.)
4          MR. DESPINS:  Sorry.  Let's
5   restate that.  Bates stamps numbers
6   6885 through 6593.
7          MS. DALE:  Luc, I think you're
8   just misstating the number on the
9   bottom, sir.  It's 6585.
10         MR. DESPINS:  Yeah, 6585.  I'm
11  sorry.
12         MS. DALE:  You were saying 6885.
13         MR. DESPINS:  Okay.  I'm sorry.
14  To 6583, right?
15      A.  Wait.
16          (Document review.)
17      A.  Yes, that's what I have.
18      Q.  Look at 6586 at the bottom there.
19          Let's establish the date.  Sorry.
20  The date is -- this is taking place in July
21  of 2018 this time?
22      A.  That's correct.

Page 56

1           D. Skeel - Professional Eyes Only



Page 57

1    D. Skeel - Professional Eyes Only
2       Q.  So what is the upper range of
3   reasonableness in your view?
4       A.  I don't have a specific number.
5   It would depend on all of the features of
6   the deal.
7       Q.  Yeah, but when you sent that
8   email, you knew what the features of the
9   deal were, right, the other features of the
10  deal?
11      A.  I knew what they were at that
12  time.
13      Q.  Okay.  But you were focusing on
14  the percentage recovery to the holders,
15  correct?
16      A.  That was one thing I was focusing
17  on.  I was focusing on other things as
18  well.
19      Q.  Understood.
20          And you just mentioned a few
21  percentages, you know, a minute ago, 75, 80
22  percent or something like that.
23          So given that you knew what the
24  other elements of the deal were, what was
25  your view about the percentage?

Page 58

1   D. Skeel - Professional Eyes Only
2       A.  I said that the percentages that
3   we were talking about were moving up into
4   the upper ranges of my comfort zone.
5       Q.  Which was?
6       A.  I didn't -- I don't have a
7   specific number in mind.  If it was 100
8   percent, I wouldn't be happy.
9       Q.  Okay.  How about 90 percent?
10      A.  I probably wouldn't be happy with
11  that either, but it would depend on what
12  all the features of the deal were.
13      Q.  But as I said, you knew the other
14  features of the deal at this point, right?
15      A.  I knew many of the features of
16  the deal.
17      Q.  Okay.  And how about 85 percent?
18      A.  I don't know what exact number I
19  had in mind.  This was below 85 percent.
20      Q.  Okay.  So let me ask the
21  question:  What do you think the percentage
22  recovery is under the preliminary RSA?
23      A.  The maximum percentage recovery
24  is in the range of 77.5 percent.
25      Q.  Okay.  And what is it under the

Page 59

1   D. Skeel - Professional Eyes Only
2   current RSA?
3       A.  The current, it's in the same
4   general range.  I forget exactly.  I think
5   basically the same.



23      Q.  By the way, at the time of the
24  approval of the preliminary RSA, we're
25  talking about late July 2018, was Elias

Page 60

1   D. Skeel - Professional Eyes Only
2   Sanchez still a representative on the
3   board?  Or I forget his precise title, but
4   was he still the governor's representative
5   on the board at that time?
6       A.  No, he was not.
7       Q.  Did any other member of the board
8   express concerns regarding the preliminary
9   RSA before its approval?
10          MS. DALE:  Objection.  Asked and
11      answered.
12          You can answer it again.
13      A.  At some point before approval, I
14  suspect people raised issues.  I don't
15  remember.  I don't remember specific board
16  members raising specific issues.  But as I
17  said, there were many, many conversations.
18      Q.  Why was the percentage recovery a
19  factor that you were focusing on?
20      A.  My general perspective is PREPA
21  is essential to Puerto Rico's recovery, and
22  I wanted to make sure, to the extent I
23  could, that PREPA only enters into deals
24  that are sustainable.
25      Q.  So your focus on the percentage

Page 61

1   D. Skeel - Professional Eyes Only
2   recovery was not driven by the potential
3   challenges to the bondholders' legal
4   entitlement?
5          MS. DALE:  Objection.
6       A.  It was driven by many factors.
7   That's one.  Legal factors are one.
8   Sustainability is one.
9       Q.  Did you develop a view outside of
10  advice received from counsel regarding the
11  legal challenges to the bondholders'
12  claims?
13      A.  I don't think I can disentangle
14  those two.  We were getting legal advice
15  throughout, and that was shaping what I was
16  thinking.
17      Q.  A minute ago you talked about --
18  you referred to the concept of
19  sustainability or sustainable?  You said
20  that PREPA only enters into deals that are
21  sustainable.
22          Do you remember that?
23      A.  Yes.
24      Q.  What did you mean by that?
25      A.  I mean deals PREPA can afford to

TSG Reporting - Worldwide 877-702-9580

Page 62

1       D. Skeel - Professional Eyes Only
2   pay through time so it can be fully
3   rehabilitated.
4       Q.   From your point of view, was that
5   more important than the discount to reflect
6   legal uncertainties?
7       MS. DALE:  Objection to the form.
8       A.   Yeah, I don't understand.
9       Q.   Okay.  You mentioned -- we were
10  discussing two factors.  The first is the
11  challenge to the bondholders' legal
12  entitlement.
13      Do you understand what we mean by
14  that?
15      A.   Yes.
16      Q.   And then you talked about
17  sustainability for PREPA of the RSA, the
18  ability to sustain these payments.
19      Which one of those two is the
20  most important, in your opinion?
21      MS. DALE:  Objection.
22      A.   They're both important.  They're
23  both -- they define the range of the
24  possible.
25      Q.   The range of reasonableness or

Page 63

1       D. Skeel - Professional Eyes Only
2   the range of possible?  I'm not sure I
3   understand.
4       A.   Can you ask -- I'm not
5   understanding your question.
6       Q.   When you say it "defines the
7   range of the possible," what does that
8   mean?
9       A.   I'm still not really
10  understanding your question.
11      Q.   These are the words you used.
12      What did you mean when you said
13  "the range of the possible"?
14      A.   When we're negotiating a Title
15  III, we have to -- we're trying to
16  restructure the debt to make it
17  sustainable, but we're confined by what the
18  creditors' legal entitlements are.  And
19  those are a couple of key factors that go
20  into the decision-making process.
21      Q.   If the transition charge were not
22  sustainable, again your words, would you
23  have approved the RSA?
24      MS. DALE:  Objection to form.
25      Calls for speculation.

Page 64

1       D. Skeel - Professional Eyes Only
2       A.   Certainly sustainability of the
3   transition charge is a key factor.
4       Q.   Were there any studies done of
5   the sustainability of the issue we just
6   talked about?
7       You mentioned sustainable.  Were
8   there any -- did you get any reports from
9   anyone regarding that issue of
10  sustainability?
11      A.   We got regular reports about
12  projected costs for PREPA.  And in a sense,
13  that -- those are connected.  So what
14  electricity is going to cost.  The fiscal
15  plans make projections about what
16  electricity will cost likely under various
17  scenarios.
18      Q.   And what is the cost of
19  electricity today, ballpark, in Puerto
20  Rico?
21      A.   Right now, I believe it's in the
22  22 cents a kilowatt-hour range.
23      Q.   And what does the board project
24  it will be in the next few years?
25      A.   Current projections range from

Page 65

1       D. Skeel - Professional Eyes Only
2   about 22 to 25 or 26, is my recollection.
3       Q.   Excluding the charge?
4       A.   I believe including the charge,
5   yeah.
6       Q.   Including the charge.  Thank you
7   for clarifying that.
8       Do you have a sense of at what
9   point the price per kilowatt-hour becomes
10  unsustainable?
11      A.   We get projections about that
12  from our advisers.
13      Q.   But I'm asking you what is your
14  sense of --
15      A.   I don't have, sitting here, a
16  particular number in mind.
17      MS. DALE:  Luc, when it's
18  convenient, can we just take a
19  five-minute break?
20      MR. DESPINS:  Sure.  Sure.
21      MS. DALE:  Now?
22      MR. DESPINS:  Hold on a second.
23      Yes, sure.  Let's take a break.
24      THE VIDEOGRAPHER:  The time is
25  11:13.  We are going off the record.

17 (Pages 62 to 65)



Page 70

D. Skeel - Professional Eyes Only
2 (Document review.)
3     A.   Okay.

Page 71

1     D. Skeel - Professional Eyes Only

12     Q.   Okay.  Were you aware when you
13 approved this in July 2018 that the board
14 had taken the position that the bondholders
15 were undersecured on the petition date
16     A.   I was aware that there were
17 potential legal challenges to the secured
18 status, yes.
19     Q.   No, but I'm asking you whether
20 were aware that the board had taken that
21 position in court?
22     A.   I believe so, yes.
23     Q.   Okay.  And since you have some
24 bankruptcy background, what is the link
25 between being undersecured on the petition

Page 72

1     D. Skeel - Professional Eyes Only
2 date in the issue of post-petition interest
3 in your mind?
4          MS. DALE:  Objection.  Calls for
5 a legal conclusion.  Speculation.
6          You're not an expert here.
7     A.   It is a legal issue, obviously.
8     Q.   I understand that, but your --
9 I'm asking you what your understanding of
10 that is as a law professor on bankruptcy
11 issues.
12          MS. DALE:  And I'm reasserting my
13 objections to this to this line of
14 questioning of a fact witness.
15 BY MR. DESPINS:
16     Q.   You can answer.
17     A.   Can you reask the question?
18     Q.   What is the link between
19 creditors being undersecured on the
20 petition date and the issue of entitlement
21 to post-petition interest?
22          MS. DALE:  Objection.
23     A.   If -- my understanding is, if a
24 creditor is undersecured, they are not
25 entitled to post-petition interest.  If

Page 73

1     D. Skeel - Professional Eyes Only
2 they are oversecured, they are.

19  (Pages 70 to 73)



Page 74

1  D. Skeel - Professional Eyes Only
2  ████████████████████
3  BY MR. DESPINS:
4      Q.  You can answer.
5      A.  I don't know.
6      Q.  Do you have a sense of the
7  magnitude of the post-petition interest
8  that is being awarded to the bondholders
9  under the RSA?
10     A.  What do you mean by "magnitude"?
11     Q.  Magnitude, size, amount.
12     A.  I don't.  I know they are -- they
13  will be receiving interest on their
14  restructured bonds on the 67.5.
15     Q.  No, I'm not asking you that.
16         I'm asking you under the RSA, do
17  you understand that the bondholders are
18  entitled to -- are being given an
19  entitlement to post-petition interest?
20         I'm not talking about
21  post-reorganization interest, I'm talking
22  about post-petition interest from the
23  petition date until May of 2019.
24         Do you understand that?
25     A.  Yes, I do.

Page 75

1  D. Skeel - Professional Eyes Only
2      MS. DALE:  Objection to form.
3  BY MR. DESPINS:
4      Q.  And do you know what is the
5  magnitude of that payment, the size of that
6  payment, ballpark?
7      A.  I don't remember.
8      Q.  20 million?  100?  200?
9      A.  I don't know.  If you put a
10  document in front of me, I could see the
11  number, I'm sure.
12     Q.  You don't think that
13  understanding the size of that claim, given
14  what we've just been through regarding the
15  entitlement to post-petition interest, is
16  critical?
17         MS. DALE:  Objection.  Misstates
18  his testimony.
19     A.  Sitting here now, I don't
20  remember what the dollar amount is.
21     Q.  Do you have a sense of -- would
22  you compare it to other things that --
23  other claims or other payments that are
24  receiving under the RSA, how does that
25  amount compare, larger or smaller?

Page 76

1  D. Skeel - Professional Eyes Only
2      MS. DALE:  Objection.
3      A.  The question is the interest as
4  compared to the principal?
5      Q.  No, the interest as opposed to
6  other benefits they are receiving under the
7  RSA, such as settlement payments, fees, et
8  cetera.  If you compare those two, one is
9  bigger than the other?  Same size?
10  Smaller?  Do you have any sense?
11     A.  It depends on the time frame of
12  the settlement payments, and the
13  administrative expense can go on for a
14  while.  I don't know.
15     Q.  You don't know.
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

Page 77

1  D. Skeel - Professional Eyes Only
2  ████████████████████
3  ████████████████████████████
4  ████████████████████████████
5  ████████████████████████████
6  ████████████████████████████
7      Q.  And how did you get comfortable
8  that it was appropriate to include that
9  interest?
10     A.  The ad hoc group was arguing they
11  were entitled to 100 cents on the dollar,
12  plus interest throughout, and that was one
13  of the issues of dispute.
14     Q.  But you know the fuel line
15  lenders -- do you know who they are, the
16  fuel line lenders?  Do you know what I'm
17  talking about?
18     A.  Yes, I do.
19     Q.  Okay.  You know they are claiming
20  to be entitled to 100 cents on the dollar
21  as well, right?
22     A.  Yes, I do.
23     Q.  So why are they not getting
24  post-petition interest?
25         MS. DALE:  Objection to the form

20  (Pages 74 to 77)

Page 78

D. Skeel - Professional Eyes Only
of the question.
    Again, to the extent that
anything -- your answer would implicate
legal advice that you've received, you
have to not -- you cannot disclose
that.
    A.   I would just say they're
different creditors with different claims.
    Q.   But you as a bankruptcy professor
have a sense of an undersecured creditor's
entitlement to receive post-petition
interest?
    MS. DALE:  Objection.
    A.   I have a sense of an undersecured
creditors and a sense of an oversecured
creditors.  Different rights with respect
to interest, yes.
    Q.   And you see at the end of that
paragraph, do you see where it says, "As
you may recall, with respect to the
re-lending bonds..."
    Do you see that sentence?
    A.   Yes, I do.
    Q.   Does that confirm your earlier

Page 79

D. Skeel - Professional Eyes Only
testimony that they're getting 100 cents on
the dollar?
    MS. DALE:  Objection to the form.
Misstates his testimony.
    A.   This is just saying what their
treatment is.  It isn't going into the
bases for the treatment.
    Q.   No, I'm not asking what the bases
is.
    But it says, "We're also agreeing
to transfer them over to the securitization
bonds at par plus accrued."
    What does "par plus accrued" mean
to you?
    A.   To me, that means full payment
plus accrued interest.
    Q.   Okay.  So you testified before
that you would not feel comfortable with
bondholders getting 100 cents on the
dollar?  I thought you said something like
that.
    A.   I will say I would not feel
comfortable with bondholders getting 100
cents -- these bondholders with these

Page 80

D. Skeel - Professional Eyes Only
entitlements getting 100 cents on the
dollar.
    Q.   But some of them are?
    A.   Not for their full claims.
    Q.   Explain that.
    A.   The ad hoc bondholders are not
getting paid 100 cents on the dollar.
    Q.   Oh, so you think the re-lending
bondholders are not ad hoc bondholders?
    A.   That's my point is that the ad
hoc bondholders are -- they're the subject
of the preliminary RSA.  So maybe what I
should say is can you be more specific
about who you're talking about?
    Q.   Well, I'm talking about who
Brownstein is talking about.  He's talking
about the re-lending bonds.  And you seemed
to understand who they were before when we
talked, you know, earlier this morning.
    A.   So you're separating them from
the ad hoc general bond claims?  You're
talking just about re-lending bonds?
    Q.   Well, and this question is
directed at that.  The re-lending bonds are

Page 81

D. Skeel - Professional Eyes Only
apparently getting 100 cents on the dollar.
    Are you comfortable with that?
    A.   I am comfortable with that.
    Q.   And why is that?
    A.   Their payout -- they have an
argument -- their legal argument's about
priority, but they also are being paid for
supporting the plan and for waiving rights
they might otherwise be pursuing.
    Q.   What other rights could they have
other than getting paid in full?
    A.   Rights to object in the Title
III, rights to -- well, I'll just stop
there.
    Q.   But the ad hocs are also waiving
those rights, right?  They're agreeing not
to object.  They're agreeing to the same
things the re-lending bonds are doing,
correct?
    A.   Yes, I think that's correct.
    Q.   Okay.  So what is the distinction
between those two groups?
    A.   I think it's a legal issue that
I'll just leave there.  I mean, our legal

21 (Pages 78 to 81)

---

Page 122

D. Skeel - Professional Eyes Only
1  reflected in that bill in 2021?
2          MS. DALE:  Objection.  Calls for
3      speculation.
4      A.   It would depend on who is paying
5  for those billions of dollars.
6      Q.   But if the Federal Government
7  doesn't pay for them, then it would be on
8  that bill?
9          MS. DALE:  Same objection.
10     A.   It would potentially affect the
11 bill, yes.
12     Q.   Okay.  So how do you know,
13 sitting here today, that that bill in 2021
14 will be sustainable for Puerto Rico?
15         MS. DALE:  Objection.
16     A.   I don't know.  All I know is what
17 we project and what looks like it will be
18 sustainable.
19     Q.   What about other creditors?  You
20 know, we've talked about the bondholders
21 for a while now.
22     Do you know if PREPA has other
23 creditors besides the bondholders?
24     A.   My understanding is, yes, they do

---

Page 123

D. Skeel - Professional Eyes Only
1  have other creditors.
2      Q.   Such as?
3      A.   Such as fuel line lenders.
4      Q.   And how much are they owed,
5  ballpark?  Do you know?
6      A.   Ballpark, 700 million dollars.
7      Q.   And other creditors, other than
8  the fuel line lenders?
9      A.   There are unsecured creditors as
10 general unsecured creditors.  I don't know
11 the magnitude.
12     Q.   So when you approved this
13 transaction, was there any reference to the
14 money owed to the fuel line lenders or to
15 the unsecured creditors?
16     A.   There would have been references,
17 yes.
18     Q.   So we would find that in the
19 presentations?
20     A.   Not necessarily.  But as point of
21 fact, I think there are some references in
22 the presentations.
23     Q.   And what do they say about those
24 creditors?

---

Page 124

D. Skeel - Professional Eyes Only
1      A.   There are references to the fuel
2  line lenders, and the assumptions about
3  them shift from one presentation to the
4  next.
5      Q.   Shift in terms of the size of the
6  fuel line lenders or?
7      A.   Shift in terms of scenarios,
8  scenario payouts.
9      Q.   If these people, just to take the
10 fuel line lenders, get a payout, again,
11 that doesn't come from God, right?  It
12 needs to come from PREPA.  And PREPA is
13 going to charge its customers for that
14 somehow --
15         MS. DALE:  Objection.
16 BY MR. DESPINS:
17     Q.   -- correct?
18         MS. DALE:  Calls for speculation.
19     A.   Presumably, yes.
20     Q.   Okay.  And same thing for
21 unsecured creditors, if there are payouts
22 to unsecured creditors, somehow that's
23 going to have to be paid for by PREPA and
24 therefore passed on to its customers?

---

Page 125

D. Skeel - Professional Eyes Only
1          MS. DALE:  Same objection.
2      A.   Presumably, yes.
3      Q.   But what work did the board do in
4  -- when approving the RSA in terms of
5  determining feasibility of dealing with
6  these other charges; the operating charges
7  with or without federal funding, the fuel
8  line lenders, the unsecured creditors, the
9  pensions?
10         MS. DALE:  Objection.
11         MR. BEREZIN:  Objection.
12 BY MR. DESPINS:
13     Q.   Take us through the process.
14         MS. DALE:  Objection to the form.
15     A.   What process am I taking you
16 through?
17     Q.   The board approved the RSA,
18 correct?
19     A.   Correct.
20     Q.   And you told me that there was a
21 discussion, at least, or references in
22 terms of other creditors, not bondholders,
23 so fuel line lenders, unsecured creditor.
24 We didn't talk about pensions.  I assume

---

Page 126

```
1        D. Skeel - Professional Eyes Only
2    pension was discussed as well?
3            MR. BEREZIN:  Objection to form.
4    BY MR. DESPINS:
5        Q.   Right?
6        A.   The RSA itself was focusing on
7    the participants, primarily on the
8    participants of -- in the RSA.  There is
9    discussion of some of these other factors
10   around the fiscal plan.  The fiscal plan
11   has estimates of operating expenses and
12   things of that sort.
13       Q.   But it doesn't talk about
14   unsecured creditors, does it?
15       A.   I don't believe it talks about
16   unsecured creditors.
17       Q.   Okay.  And you're familiar with
18   the concept of plan feasibility generally?
19       A.   I am familiar with plan
20   feasibility.
21       Q.   So sitting here today, do you
22   have a view about feasibility of a plan for
23   PREPA, a plan of adjustment for PREPA?
24           MS. DALE:  Objection to the form.
25       A.   I'd have to see the plan.  I
```

Page 127

```
1        D. Skeel - Professional Eyes Only
2    would have to see the plan.
3        Q.   She liked that answer better than
4    her interruption.
5            So you would have to see the
6    plan.
7            And therefore, sitting here
8    today, you can't opine on that?  You can't
9    have a view on that?
10       A.   I forget what it is I'm having a
11   view on.
12       Q.   Feasibility of a plan of
13   adjustment for PREPA.
14       A.   I would need to see the plan.
15       Q.   Okay.  Let's talk about the T&D
16   transformation.  I think you listed one of
17   the benefits of the RSA that it could --
18   sorry, I can't even read my own writing.
19   It can be helpful to the T&D process
20   generally.  It's not precisely what you
21   said, but something like that.
22           MS. DALE:  Objection to the form.
23   It misstates the testimony.
24   BY MR. DESPINS:
25       Q.   Okay.  Well, then, you understand
```

Page 128

```
1        D. Skeel - Professional Eyes Only
2    what I was referring to.  Why don't you say
3    it in your own words.
4            MS. DALE:  Objection.  No
5    question pending there.
6        A.   I believe that the RSA could help
7    facilitate a -- the transformation.
```

Page 129

```
1        D. Skeel - Professional Eyes Only
```



TSG Reporting - Worldwide 877-702-9580



TSG Reporting - Worldwide 877-702-9580

Page 134

D. Skeel - Professional Eyes Only



15   Q.  I understand that's their
16  position.  That's my position too.
17       What's your view of whether
18  that's going to happen?
19       MS. DALE:  Objection.  Calls for
20   a legal conclusion.
21       Please do not discuss any
22   information that you might have
23   received from your counsel.  If you can
24   disentangle, you know, just counsel's
25   communications to you on this point, go

Page 135

1       D. Skeel - Professional Eyes Only
2   ahead.
3       A.  Yeah, I was about to say I didn't
4  think that was your position.
5       Q.  No, no, it's my position as to my
6  claims that I should be paid in full as
7  well.
8       A.  But not your position as to the
9  unsecured creditors' claims.
10       Q.  No, no.  That's what I meant.
11       A.  It may show up somewhere else.
12       Q.  So --
13       MS. DALE:  Does everybody want to
14   clarify the record?
15       (Laughter.)
16  BY MR. DESPINS:
17       Q.  But there was a question pending.
18       So my question was, what do you
19  believe occurs if there's no RSA, the board
20  litigates with the bondholders, they
21  prevail, and what do you think happens at
22  that point to the kilowatt her hour rates
23  charged to customers?
24       MS. DALE:  Same objections.
25       A.  If all that happens, I believe

Page 136

1       D. Skeel - Professional Eyes Only
2  they end up going up.
3       Q.  For the full amount that's owed
4  to the bondholders?
5       A.  Correct.
6       Q.  Okay.  And the analyses you've
7  seen reflect that?  Meaning, some of the
8  scenarios you've seen that were represented
9  to you reflect that scenario?
10       A.  Yes.
11       Q.  Okay.  And do you know if rate
12  increases need to be approved by a
13  regulator in Puerto Rico?
14       A.  I believe they do, yes.
15       Q.  Okay.  And do you believe that
16  regulatory would increase the rates full
17  tilt to pay the bondholders in full?
18       MS. DALE:  Objection.
19       A.  Again, I don't know.
20       Q.  Don't you think that that's a
21  critical part of the analysis when you look
22  at the scenario we've been discussing?
23       MS. DALE:  Objection.
24       A.  There are a variety of elements
25  that matter a lot.  That matters.  The rate

Page 137

1       D. Skeel - Professional Eyes Only
2  covenant in the bond indenture also
3  matters.
4       Q.  So tell me about the rate
5  covenants.
6       How do you think that's relevant?
7       A.  Because if the bonds went back to
8  their original status quo, they have a
9  right to seek a receiver and to ask for
10  rate increases to pay them.
11       Q.  Well, that's if they're
12  unimpaired on their plan.
13       But you don't think that --
14       A.  You just said the premise of this
15  question was --
16       Q.  No.
17       A.  -- that they get everything they
18  asked for.
19       Q.  No.  The premise was, you
20  litigate with them and you lose the issue
21  of whether -- of the scope of their
22  security interest and all that.
23       And so the question I have for
24  you is, you're not under the impression
25  that their rate covenant and the

35 (Pages 134 to 137)

Page 138

1  D. Skeel - Professional Eyes Only
2  receivership covenants somehow would ride
3  through Chapter 11, are you?
4  MS. DALE:  Objection.
5  A.  No.
6  MR. HAMERMAN:  Objection.
7  A.  You premised the question on them
8  getting everything they asked for.  So if
9  they got everything they asked for, they
10  would get that too.
11  You can change your premise.
12  Q.  No, the premise was the
13  litigation regarding the scope and the
14  extent of the security interest.  And if we
15  lose that litigation, what happens then?
16  A.  They get paid in full, plus
17  interest.
18  Q.  Because you think the PREB would
19  increase the rates as necessary to pay them
20  in full?
21  A.  I am not speculating about what
22  PREB would do.
23  Q.  Well, you are if you're saying
24  they're getting paid in full.
25  You're saying PREB would increase

Page 139

1  D. Skeel - Professional Eyes Only
2  the rates?
3  A.  I'm saying they -- if the lien
4  challenge litigation were unsuccessful,
5  they would have an entitlement to 100 cents
6  on the dollar, plus interest, and I'm not
7  speculating as to whether and how they
8  would get that.



Page 140

1  D. Skeel - Professional Eyes Only

11  MR. DESPINS:  Can we take a
12  ten-minute break -- oh, actually, it's
13  1.  Should we take a lunch break?  I
14  didn't realize it was that late.
15  MS. DALE:  Let's just go off the
16  record.
17  THE VIDEOGRAPHER:  The time is
18  12:51 p.m.  Going off the record.
19  (Recess is taken.)
20
21
22
23
24
25

Page 141

1  D. Skeel - Professional Eyes Only
2  A F T E R N O O N   S E S S I O N
3  (Time noted:  1:27 p.m.)
4  *   *   *
5  D A V I D   S K E E L, J.R.,  resumed and
6  testified as follows:

12  THE VIDEOGRAPHER:  The time is
13  1:27 p.m.  We are on the record.
14  EXAMINATION BY (Cont'd.)
15  MR. DESPINS:

Page 142

1    D. Skeel - Professional Eyes Only



22    Q.   Okay.  Going back to the
23   Brownstein declaration, paragraph --
24    MS. DALE:  5.
25    THE WITNESS:  Thanks.

Page 143

1    D. Skeel - Professional Eyes Only
2   BY MR. DESPINS:
3    Q.   -- 29, if you could read that and
4   let me know when you're ready.
5    MS. DALE:  Page 11.
6    THE WITNESS:  Thank you.
7    (Document review.)
8   BY MR. DESPINS:
9    Q.   So you see there is a reference
10   to supporting holders having to stay
11   patiently on the sidelines and wait until
12   the effective date of the confirmed plan
13   before receiving the new securitization
14   bonds.
15    Do you see the reference to that?
16    A.   Yes, I do.
17    Q.   And do you understand that is the
18   basis pursuant to which these supporting
19   holders are receiving some form of
20   consideration under the RSA?
21    MS. DALE:  Objection to the form
22   of the question.
23    A.   I'm not following the question.
24    Q.   Okay.  So basically, according to
25   Mr. Brownstein, they have to wait on the

Page 144

1    D. Skeel - Professional Eyes Only
2   sidelines until plan confirmation.
3    And is your understanding that
4   they are receiving payments or claims to
5   compensate them for that or to incentivize
6   them to do that?
7    A.   Yes.  This paragraph doesn't say
8   that, but that is my understanding.
9    Q.   Okay.  So, again, you are a
10   bankruptcy professor.
11    Do you know of that standard as a
12   basis to pay creditors pre-confirmation of
13   a plan?
14    MS. DALE:  Objection to the form.
15   Outside the scope.  Seeking -- it's
16   speculative, potentially seeking a
17   legal conclusion.
18    A.   Can you reask the question?
19    Q.   So the question is, is that a
20   legal basis to be receiving pre-plan
21   confirmation distributions?
22    MS. DALE:  Same objections.
23    A.   And I'm not sure what you mean,
24   is that a legal basis.
25    Q.   The fact that you have to wait

Page 145

1    D. Skeel - Professional Eyes Only
2   until confirmation to get paid, is that a
3   legal basis to award pre-plan confirmation
4   distributions to creditors?
5    MS. DALE:  Objection.  Seeks a
6   legal conclusion.  Speculative.
7    A.   It seems to me that that might be
8   a factor you would take into account.
9    Q.   But I'm talking from a legal
10   point of view.
11    Let me ask you this:  Are
12   creditors, in your understanding, entitled
13   to receive pre-plan distributions in
14   bankruptcy --
15    MS. DALE:  Objection.  Calling
16   for a legal conclusion.
17   BY MR. DESPINS:
18    Q.   -- generally.
19    MS. DALE:  Speculative.  Outside
20   the scope of this deposition.
21    A.   It depends on what you're talking
22   about.  If they are oversecured, they are
23   entitled to receive interest payments.
24    Q.   Prior to confirmation?
25    A.   That varies by impression, but I

TSG Reporting - Worldwide 877-702-9580

Page 146

D. Skeel - Professional Eyes Only
1   D. Skeel - Professional Eyes Only
2   don't know.  I don't know when they get
3   them.
4       Q.   Okay.  Other than that,
5   oversecured, do you know any other basis to
6   make payments, pre-confirmation payments to
7   creditors in a bankruptcy case?
8       MS. DALE:  Same set of
9   objections.
10      A.   Not that I can think of sitting
11  here right now.
12      Q.   Okay.  Let's talk about the legal
13  issues that are being settled here in the
14  RSA.
15      Did you ever see -- I'm not
16  asking you what it said, but did you ever
17  see a probabilistic analysis, and by that,
18  I mean a percentage of this issue, we have
19  a 50 percent chance of winning; this issue,
20  we have a 80 percent chance of winning; or
21  anything of the sort before approving the
22  RSA?
23      MS. DALE:  You can answer that
24  "yes" or "no."
25      A.   No, not a probabilistic --

Page 147

1   D. Skeel - Professional Eyes Only
2       Q.   Okay.
3       A.   Not a probabilistic estimate with
4   numbers attached to it.
5       Q.   Okay.  With percentages attached
6   to it?
7       A.   With percentages attached to it.
8       Q.   Thank you.
9       And what about the worst-case
10  scenario?  You've talked about best-case,
11  worse-case.
12      What is your understanding of the
13  worst-case scenario for the bondholders,
14  now, focusing on their downside?
15      First of all, did you ever see
16  such an analysis?  Not what it said, just
17  whether you saw such an analysis?
18      A.   When you say "saw such an
19  analysis," you mean with probabilities
20  attached to it or just --
21      Q.   No, generally, now.  I'm moving
22  off of the percentage issue.  I'm just
23  asking whether you've ever seen an analysis
24  of the worst-case scenario from the
25  bondholders' point of view?

Page 148

1   D. Skeel - Professional Eyes Only
2       A.   I believe I have.
3       Q.   Okay.
4       A.   We've had lots of discussion of
5   the different possibilities.
6       Q.   Okay.  And I want to be careful.
7   I'm not asking you to reveal what that
8   presentation was, but rather whether you
9   recall seeing any mention of the words
10  "nonrecourse"?
11      A.   I don't know if the specific
12  words were there.  Certainly the objection
13  argues that there is very limited recourse.
14      Q.   When you refer to the objection,
15  are you talking about the July 2nd
16  complaint?
17      A.   Yes.
18      Q.   Okay.  Fair enough.
19      Do you understand the term
20  "nonrecourse" as a term of art in
21  bankruptcy?
22      A.   Yes, I do understand it.
23      Q.   Like a claim that is nonrecourse,
24  you understand what that means?
25      A.   Yes, I do.

Page 149

1   D. Skeel - Professional Eyes Only
2       Q.   Just in your -- what does it
3   mean, your understanding of it?
4       A.   Ordinarily, a nonrecourse claim
5   is a claim where the creditor is entitled,
6   it's usually a secured creditor, is
7   entitled to seek recovery from its
8   collateral but not from anywhere else.
9       Q.   And is that relevant in this
10  case, that term?  Is that applicable in
11  this context, in the PREPA case?
12      MS. DALE:  Objection to the form
13  of the question and to the extent
14  seeking a legal conclusion.
15      A.   I don't know if that specific
16  concept is.  The core argument or one of
17  the core arguments in the lien objection
18  has a similar form.  The core argument is
19  that the creditors are entitled to only to
20  funds that are in the sinking fund.
21      Q.   Yeah, but you understand that
22  when you're a nonrecourse, you don't even
23  have an unsecured claim?
24      MS. DALE:  Objection.
25      A.   Ordinarily if you're nonrecourse,

38 (Pages 146 to 149)

Page 150

1       D. Skeel - Professional Eyes Only
2    you do have a claim.
3        Q.  Okay.  That's your understanding?
4        A.  A core claim.
5        Q.  Pardon?
6        A.  You have a core claim.
7        Q.  So, for example, in this case,
8    the bondholders are owed more or less 8
9    billion or so.
10          Your understanding is that even
11   if we were successful in avoiding all their
12   liens, they would still have an unsecured
13   claim for 8 billion and change?
14       A.  They would argue they do.  I know
15   there is an argument they would -- I
16   believe there is an argument that they
17   would not even have that but that is
18   contested, is my understanding.
19       Q.  What would be that argument that
20   they don't even have that?
21       A.  I can't construct it here.
22       Q.  And what would be their argument?
23   That they have such a claim, an unsecured
24   claim?
25       A.  Ordinarily, you have an unsecured

Page 151

1        D. Skeel - Professional Eyes Only
2    claim.  You have a claim if you're owed
3    money by an entity.
4          Are we putting aside this for
5    now?
6        Q.  Yes, for now.
7          (Skeel Exhibit 7, Text messages
8        dated 8/31/18 to Skeel, Bates-stamped
9        FOMB_9019_MOBILE_00000127 through 143,
10       marked for identification, as of this
11       date.)
12   BY MR. DESPINS:
13       Q.  So if you can read that and let
14   us know when you're ready.
15          (Witness complies.)
16       A.  Okay.
17       Q.  Can you --
18          MR. DESPINS:  First of all, let's
19       identify this.  I apologize.  So it's
20       FOMB 00127 through to 143.  It starts
21       with -- these appear to be text
22       messages between Ana Matos Santos and
23       Professor Skeel, with the first one
24       being on August 31st, 2018.
25   BY MR. DESPINS:

Page 152



Page 153



TSG Reporting - Worldwide 877-702-9580



TSG Reporting - Worldwide 877-702-9580



Page 162

1      D. Skeel - Professional Eyes Only

Page 163

1      D. Skeel - Professional Eyes Only

Page 164

1      D. Skeel - Professional Eyes Only
9          Q.  So let's go through that scenario
10     for a second.  Let's assume in June of next
11     year, I don't know, the transformation is
12     disappointing or they all bail out.  We are
13     talking about again T&D transformation now.
14     And the board says, well, it doesn't make
15     sense to do this deal anymore.
16         Do you have a sense of how much
17     money or benefits would have been given to
18     the bondholders at that point?
19         MS. DALE:  Objection.  Calls for
20     speculation.
21     A.  I don't know exactly.
22     Q.  Well, 5 million?
23     A.  I don't have a guess of exactly
24     what would be given them by then.
25     Q.  So you don't know if it's 100

Page 165

1      D. Skeel - Professional Eyes Only
2      million, 200 million, 500 million, a
3      billion?
4          A.  I don't know what the number is.
5          Q.  Are you still supporting this
6      deal today?
7          A.  Yes, I am.
8          Q.  But you don't know what the
9      amounts are?
10         A.  I know what the amounts under the
11     deal are.  I don't know -- I don't know
12     what the exact payments would be by some
13     future date that you've picked.
14         Q.  No, I'm not asking you for exact
15     payments.  I won't hold you to 100 million.
16     You know, I'll give you 100 million leeway.
17         So 5 million, 100 million, 200
18     million, a billion?
19         A.  I don't know.  I mean, I could
20     guess, but I don't know.
21         MS. DALE:  Or he could show you a
22     document, which he chooses not to do.
23     BY MR. DESPINS:
24         Q.  Did you ever see a presentation
25     showing the payments that the bondholders,

42 (Pages 162 to 165)

Page 166

D. Skeel - Professional Eyes Only

1     D. Skeel - Professional Eyes Only
2  or the benefits and payments the
3  bondholders would retain if the board
4  decided no transformation, no T&D
5  transformation?
6     A.  Can you clarify the rest -- the
7  other states of the world?  Has the RSA
8  been approved in 2019 --
9     Q.  Yeah, RSA is approved today, and
10 we're in 2020 and, oh, my God, the T&D
11 process didn't go well, unfortunately.  So
12 the board decides we're not going forward
13 with the transformation and -- first of
14 all, do you understand that the board can
15 do that, can back out of this deal?
16    A.  They can.  There are -- at that
17 point you're describing, there are
18 provisions that define what happens based
19 on why you back out.
20    Q.  Did you ever see a presentation
21 that showed what happened under that
22 scenario of, you know, what -- that shows
23 how much the board would have doled out to
24 the bondholders and -- under that scenario?
25    MS. DALE:  Objection.

Page 167

1     D. Skeel - Professional Eyes Only
2     A.  We have seen presentations or
3  discussions of what the default and
4  backing-out provisions provide for.
5     Q.  No, I understand that.  I am sure
6  you have seen provisions that describe
7  that.  But we have not seen produced any
8  document that shows the dollars associated
9  with a, what I call, a busted deal.
10       Do you know what I mean by that?
11 A failure to proceed with the T&D
12 transaction.
13    A.  And what is the question?
14    Q.  Have you ever seen one?
15    A.  Not one that shows specific
16 dollars that I am aware of.
17    Q.  Okay.  Is that irrelevant to you?
18    A.  What's most relevant to me are
19 what are the provisions and what generally
20 they provide for.
21    Q.  Just to be clear, when I was
22 asking these questions about a busted deal,
23 you understand that under the RSA, there is
24 a mechanism for the board not to proceed
25 with the securitization transaction?

Page 168

1     D. Skeel - Professional Eyes Only
2     A.  Yes, I'm aware of that provision.
3     Q.  Okay.  And that's what we've been
4  talking about?
5     A.  I assumed as much --
6     Q.  Okay.  Okay.
7     A.  -- but that wasn't the question
8  you asked me.
9     Q.  But, okay, that's what you were
10 responding to?
11    A.  I was responding to the questions
12 you were asking me.
13    Q.  Okay.  Well, so let me ask you
14 the same questions.
15       What's your understanding of what
16 -- what is the understanding what happens
17 if a securitization termination occurs?
18    A.  There is a stipulated treatment
19 under the RSA.
20    Q.  Okay.  So that -- these are the
21 questions that were asking you about the
22 amounts payable and all that?
23    A.  Right.
24    Q.  Is that what you're responding
25 to?

Page 169

1     D. Skeel - Professional Eyes Only
2     A.  You were asking what I took to be
3  more open-ended questions, and I was having
4  trouble figuring out what you were asking.
5     Q.  Okay.  So let's go through that.
6       Do you know under that scenario
7  we just described how much money the
8  bondholders would have received --
9     A.  I don't.  I know what the
10 percentage payment is, more or less.
11    Q.  I understand.
12       But -- and when I was asking you
13 have you ever seen presentations showing
14 the dollar amounts at different points in
15 time when you exercised that right, have
16 you ever seen that, I think the answer was
17 no, but I want to confirm that's what you
18 meant.
19    A.  I don't believe I have.
20    Q.  Okay.  What's your understanding
21 of when a securitization termination can be
22 exercised?
23    A.  My understanding is when the
24 government -- if the government parties
25 were to determine that the securitization

43 (Pages 166 to 169)

Page 170

D. Skeel - Professional Eyes Only

1  would interfere with the transformation, it
2  can exercise that.
3  Q. Okay. And is the board the only
4  party that has the right to terminate on
5  that basis?
6  A. I believe any of the government
7  parties can terminate.
8  Q. What is your level of comfort
9  that the other government parties would not
10 exercise that right?
11 MS. DALE: Objection to the form
12 of the question.
13 A. I believe that the government
14 parties want this transformation to go
15 forward. Comfort is never 100 percent, but
16 I have a relatively high degree of comfort.
17 Q. Do you remember Law 80? Does
18 that ring a bell?
19 A. Yes, it does.
20 Q. So in that case the governor and
21 the board agreed on something that should
22 happen with the legislature and that didn't
23 happen, correct?
24 A. That is correct.

Page 171

D. Skeel - Professional Eyes Only

1  Q. And does that lead you to believe
2  that the outcome of a determination on this
3  issue by other government parties is not
4  predictable?
5  MS. DALE: Objection.
6  A. I wouldn't say that. That was a
7  particular set of facts and the government
8  responded in a particular way.
9  Q. Which governor agreed to the RSA,
10 what you called the permanent RSA, the
11 May 2019 RSA?
12 A. The governor, when it was agreed
13 to, was Governor Rosselló.
14 Q. Why did the government get a
15 termination right?
16 A. I don't know. Yeah, I don't
17 know.
18 Q. Could the next governor exercise
19 a termination right? And by that, I mean
20 the securitization termination right.
21 A. It's not keyed to the governor.
22 There are government -- I don't believe. I
23 believe it's keyed to AAFAF and PREPA.
24 Q. Okay. But who controls PREPA?

Page 172

D. Skeel - Professional Eyes Only

1  A. That's debatable.
2  Q. So tell me, who controls it?
3  A. PREPA could terminate the RSA.
4  Q. And you don't think the governor
5  has any impact on that?
6  A. I didn't say that.
7  Q. Okay. What is your belief? That
8  the governor could dictate that result?
9  A. I'm not going to speculate about
10 lines of authority.
11 (Skeel Exhibit 10, Email dated
12 5/21/19 from Battle to CEO@aafaf.pr.gov
13 with attachments, Bates-stamped
14 PREPA_RSA0028795, marked for
15 identification, as of this date.)
16 (Document review.)
17 BY MR. DESPINS:
18 Q. So same thing, if you could
19 review, but I will direct you to certain
20 pages, but tell me when you're ready.
21 (Witness complies.)
22 A. Okay.
23 Q. So just to identify the document,
24 starting at 28795, PREPA 28795 through

Page 173

D. Skeel - Professional Eyes Only

1  PREPA 2810 -- no, 28810, 28810. Sorry.

TSG Reporting - Worldwide 877-702-9580



Page 174

1    D. Skeel - Professional Eyes Only

Page 175

1    D. Skeel - Professional Eyes Only

23   questions.  I'll admit that I'm not sure
24   whether we covered that precisely, but
25   you'll tell me if we have.

---

Page 176

1    D. Skeel - Professional Eyes Only
2        When you approved the RSA, did
3    you consider the effect of the RSA on other
4    creditors, meaning, non-bondholders?  By
5    that I mean, fuel line lenders --
6        MR. HAWKINS:  Asked and answered.
7    BY MR. DESPINS:
8        Q.  -- pensions or unsecured
9    creditors?
10       MR. HAWKINS:  Objection.  Asked
11   and answered.  You spent a lot of time
12   on that?
13       MS. DALE:  True, but...
14       MR. DESPINS:  Okay, but he can
15   still answer the question.
16       A.  We focused primarily on the
17   signatories to the RSA.
18       Q.  Okay.  So did you ever consider
19   whether this deal could leave other
20   creditors with no recoveries in the PREPA
21   case?
22       A.  In general terms, I think we
23   probably did.  I don't remember.
24       Q.  In general terms, how would you
25   have done that?

---

Page 177

1    D. Skeel - Professional Eyes Only
2        A.  Well, at various points, we
3    talked about implications for fuel line
4    lenders and different possible payouts to
5    fuel line lenders, but we focused primarily
6    on the signatories.
7        Q.  But let's put aside the fuel
8    lenders for now, and let's talk about the
9    unsecured creditors.
10       What discussions were there about
11   the impact of this RSA on unsecured
12   creditors?
13       A.  I don't remember.
14       Q.  You don't remember any?
15       A.  I do not.
16       Q.  Okay.  Did you understand when
17   you were approving the RSA that you were
18   giving the bondholders a veto over some
19   form of distributions to unsecured
20   creditors?
21       MS. DALE:  Objection.
22       MR. HAWKINS:  Objection.
23       A.  I don't know.

---

TSG Reporting - Worldwide 877-702-9580



Page 178

D. Skeel - Professional Eyes Only

Page 179

D. Skeel - Professional Eyes Only

11    Q.  Is that something that is
12  important to you?
13    A.  It's something I would take into
14  consideration if it were presented to me as
15  something to be deciding about.
16    Q.  But was it presented to you?
17    A.  I don't know.  And I note on
18  that, I don't know that we ever saw this
19  document.  This may well have been a
20  document that was prepared for PREPA.  Citi
21  has been working both with the government
22  and with us, so I don't know that I've ever
23  seen this particular document before.
24    Q.  But you've seen the RSA itself,
25  right?

Page 180

1       D. Skeel - Professional Eyes Only
2    A.  I've seen the RSA, yes.
3    Q.  And you saw the schedules to the
4  RSA, the attachments to the RSA?
5    A.  I think I have seen them.
6    Q.  Okay.  Sitting here today, do you
7  have any sense of whether there is -- there
8  could be any distributions to unsecured
9  creditors after the RSA is approved?
10      MS. DALE:  Objection.
11    A.  I don't know.
12    Q.  Have you ever seen -- strike
13  that.
14      You're familiar with
15  restructuring support agreements generally,
16  not in this case, but generally?  You're
17  familiar with that concept?
18    A.  Yes, I am.
19    Q.  Or a Plan Support Agreement?
20  That rings a bell?
21    A.  Yes, it does.
22    Q.  Have you ever seen a Plan Support
23  Agreement or a Restructuring Support
24  Agreement that provides for
25  pre-confirmation distributions of this

Page 181

1       D. Skeel - Professional Eyes Only
2  magnitude?  By "this," I mean --
3      MS. DALE:  Objection to form.
4  BY MR. DESPINS:
5    Q.  -- as contemplated by the RSA.
6    A.  I don't know.
7      MR. DESPINS:  Let's circulate
8  this.  That's going to be?
9      THE REPORTER:  11.
10      THE WITNESS:  Are we finished
11  with this (indicating)?
12      MR. DESPINS:  For now, yes.
13      (Skeel Exhibit 11, PREPA RSA -
14  Bondholders' Recoveries Based on David
15  Brownstein's Declaration, not
16  Bates-stamped, marked for
17  identification, as of this date.)
18      (Document review.)
19      MS. DALE:  Luc, there is no Bates
20  on this.  Is this something that was
21  prepared --
22      MR. DESPINS:  No.  I'll describe
23  it in a second.
24      MS. DALE:  Okay.  Thank you.
25      (Document review.)

Page 182

D. Skeel - Professional Eyes Only
1       A.   Okay.
2       Q.   Okay.  So this is a document that
3   was generated by our financial advisers,
4   but it is a complete copy of the schedules
5   contained in the Brownstein declaration
6   other than for the shaded lines at the
7   bottom.
8       Do you see there is two shaded
9   percentages columns at the bottom?
10      A.   Yes, I do.
11      Q.   Okay.  So other than that, the
12  rest is just exactly out of the Brownstein
13  declaration.
14      A.   Okay.
15      Q.   So the first thing is you know
16  that there are two types of securities
17  being given to the bondholders under the
18  RSA, correct?
19      A.   Yes, I do.
20      Q.   Okay.  So there are the A bonds
21  and the B bonds?
22      A.   Correct.
23      Q.   Okay.  And what is your
24  understanding of the expectation regarding
25

Page 183

D. Skeel - Professional Eyes Only
1   the payments to be received by bondholders
2   under the A bonds?
3       A.   The expectations in terms of what
4   we believe will happen?
5       Q.   Yes.
6       A.   We believe they will eventually
7   pay off.
8       Q.   And if I'm not mistaken, before
9   lunch you mentioned, was it, 33 years or
10  something like that?
11      A.   It's something, 33, 34, I think
12  are our most recent calculations.
13      Q.   Okay.  And what about the B
14  bonds, what is your expectation there?
15      A.   The expectation is that they
16  won't pay off in full.  And that's the
17  middle column that you have is based on the
18  expectations.
19      Q.   Okay.  Do you see the difference
20  on top there between the claims of the
21  bondholders with post-petition interest or
22  without post-petition interest?  This is
23  one little i and two little i on the top.
24  Do you see the difference?  9.3 --
25

Page 184

D. Skeel - Professional Eyes Only
1       A.   I see it.  I'm just looking.
2       Q.   Okay.
3       (Document review.)
4       A.   Yes, I see those numbers.
5       Q.   Okay.  So you testified before
6   that your understanding of the recovery
7   percentage to the bondholders was in the 73
8   percent range or so.
9       Is that fair?
10      MS. DALE:  Objection.  Misstates
11  his testimony.
12  BY MR. DESPINS:
13      Q.   Well, please correct me.
14      A.   My expectation -- or our expect
15  -- my understanding of our expectation with
16  the recovery of principal of the
17  bondholders is that they will recover in
18  full on the A bonds and roughly half on the
19  B bonds, a little more than half.
20      Q.   No, no, I understand that.
21      What I'm saying is that in terms
22  of their percentage recovery compared to
23  their pre-petition position, I thought I,
24  and correct me if I'm wrong, I thought I
25

Page 185

D. Skeel - Professional Eyes Only
1   heard you state that you thought it was in
2   the 73 percent range or something like
3   that?
4       A.   I was speaking of the principal
5   recovery, or I meant to be.
6       Q.   Principal, you mean, principal
7   without --
8       A.   Not factoring the interest into
9   it.  Their principal as of the commencement
10  of the RSA, of the payout under the RSA.
11      Q.   Okay.  Well, I think there is a
12  disconnect there because if you use only
13  their principal amount, and I agree that
14  should be the measure, their recovery in
15  the middle of the column is 86.2 percent.
16      Are you sure you don't mean
17  principal plus interest?
18      A.   Well, the number I'm thinking of
19  is the principal plus accrued -- percentage
20  of the principal plus accrued interest as
21  of May 20, 2019.
22      Q.   Okay.  Thank you.
23      So that's the 78.8 figure in the
24  middle column?
25

47 (Pages 182 to 185)

Page 186

D. Skeel - Professional Eyes Only
1
2    By the way, if those figures are
3  wrong, I'm not going to hold you to this,
4  but I think that's the math.
5     A.  I'm trusting your math.
6     Q.  Not my math.  Never trust my
7  math.
8     A.  I'm trusting somebody's math.
9        MS. DALE:  Yup.
10        (Document review.)
11     A.  I mean, I'm not following whether
12  it's including the --
13     Q.  Yes, that's why the dates are
14  different.  Do you see --
15     A.  Yeah --
16     Q.  -- it says --
17     A.  -- that's post.
18     Q.  Exactly.  So if you include the
19  post-petition interest, they're getting
20  78.8 percent.  That's what Mr. Brownstein
21  is saying.  And the total recovery, if you
22  include post-petition interest, is 86.2
23  percent, again, based on Mr. Brownstein's
24  numbers.
25     A.  But that's not what he said.

Page 187

D. Skeel - Professional Eyes Only
1
2  That's you calculated?
3     Q.  No, he did not calculate the
4  numbers, but all the other numbers are
5  there.  So this is purely mathematics.  So
6  it's the application of these numbers.
7        So my question to you is, are you
8  comfortable with this range of you, know,
9  either 78.8 or 86.2 percent of their
10  claims, that's in the middle scenario,
11  expected cash flow to Tranche B.
12        MS. DALE:  Objection to the form
13     of the question.
14     A.  These numbers that you've added,
15  you are calculating -- you're looking at
16  different things than what we were looking
17  at.  We were looking -- we're looking --
18  you're adding -- you appear to be adding in
19  the administrative claim from May 2019 to
20  2020, the waiver and support fee.  So you
21  are adding things into the numbers.
22     Q.  No, no, those numbers are all in
23  Mr. -- we can confirm that.  If you take
24  the Brownstein declaration, you will see
25  there are schedules.

Page 188

D. Skeel - Professional Eyes Only
1
2        MS. DALE:  No. 5.
3  BY MR. DESPINS:
4     Q.  Page 15 and 16, do you see the
5  claim is there for 393.8 -- well, 393.764,
6  page 15, paragraph 37.
7        (Document review.)
8     A.  Okay.  Go ahead.
9     Q.  Okay.  So just to be clear, we're
10  not -- we're using his numbers, just
11  putting percentages on them depending on
12  whether you include -- you measure this
13  including post-petition interest or not.
14        So my question to you is, are
15  you, focusing on the middle column, the
16  percentages that are there, 78.8 percent
17  and 86.2 percent, are you comfortable that
18  this did not exceed your upper range of
19  recovery?
20     A.  I am comfortable, yes.  As I
21  said, this is adding things -- this is
22  adding everything up.
23     Q.  Well, don't you agree that is the
24  right way to do it?
25     A.  That may be the right endpoint.

Page 189

D. Skeel - Professional Eyes Only
1
2  It's not the right -- the start point, in
3  my view, is what is the claim and what
4  percentage of the claim.  And this is
5  adding several things on top of that.  It's
6  adding the administrative claim for the
7  next year, we're in the middle of the year,
8  and the waiver and support fee as well.
9     Q.  So that should not be included,
10  in your view?
11     A.  It should be included in your
12  ultimate conclusion, yes.
13     Q.  Okay.  But your testimony is that
14  these percentages have not exceeded your
15  upper end of the range?
16     A.  That is correct.
17     Q.  Even the one at 86.2 percent?
18     A.  That is correct.  You're looking
19  at this differently than I would look at
20  it, but seeing these numbers, yes, I'm
21  comfortable with this.
22     Q.  Would you be comfortable at 90
23  percent?
24     A.  What we're basing this analysis
25  against is a claim that they're entitled to

48 (Pages 186 to 189)



Page 190

```
 1          D. Skeel - Professional Eyes Only
 2     100 cents on the dollar, interest
 3     throughout from the beginning to the end of
 4     time.  And the RSA, in my view, is a
 5     significant reduction of that.
 6          Q.  Well, we're talking about, if
 7     it's 90 percent, then the discount is 10
 8     percent.
 9          Do you think that is significant
10     given the legal issues here?
11          MR. HAWKINS:  Objection to form.
12     A.  Yes, the way -- yeah.
13     Q.  Okay.
14          MS. DALE:  When it's convenient,
15     can we take another break?
16          MR. DESPINS:  Sure.  Now if you
17     want.
18          THE VIDEOGRAPHER:  The time is
19     2:33 p.m.  We are off the record.
20          (Recess is taken.)
21          THE VIDEOGRAPHER:  The time is
22     2:48 p.m.  We are back on the record.
23          (Skeel Exhibit 12, Text messages
24     beginning with text messaged dated
25     7/13/18 from Matosantos to Skeel,
```

Page 191

```
 1          D. Skeel - Professional Eyes Only
 2     Bates-stamped FOMB_9019_MOBILE_00000101
 3     through 126, marked for identification,
 4     as of this date.)
 5          (Document review.)
 6     BY MR. DESPINS:
 7     Q.  Tell me when you're ready.
 8     A.  Okay.
 9     Q.  That's Exhibit 12, correct?
10     A.  That's what it says.
```

Page 192

```
 1          D. Skeel - Professional Eyes Only
```

Page 193

```
 1          D. Skeel - Professional Eyes Only
```



Page 194

1    D. Skeel - Professional Eyes Only

10    MS. DALE:  Well, wait for a
11  question.
12    MR. DESPINS:  Okay.
13  BY MR. DESPINS:

Page 195

1    D. Skeel - Professional Eyes Only
2    Q.   Well, she's talking about the
3  Citibank folks, so...
4    A.   The odds are pretty good --
5    Q.   Okay.
6    A.   -- it's a reference to David
7  Brownstein, but I do not know.

Page 196

1    D. Skeel - Professional Eyes Only

Page 197

1    D. Skeel - Professional Eyes Only

17    Q.   So how does that work?  If the
18  interest rate is higher than needed to be
19  trading at par, then there is a higher
20  recovery than the 100 cents?  Is that the
21  way it works?
22    MS. DALE:  Objection to form.
23  BY MR. DESPINS:
24    Q.   Or you tell me what you mean by
25  that.

TSG Reporting - Worldwide 877-702-9580



**Page 198**

D. Skeel - Professional Eyes Only
1
2     A.   What I mean by here is we're
3   negotiating the interest rate, and we're
4   determining what the final interest rate is
5   going to be.  And I would prefer 5 over
6   5.25.
7     Q.   Because 5.25 got you to over 80?
8     A.   From -- if 5 is the correct
9   number, then 5.25 implies a higher
10  recovery.
11    Q.   And you said it's over 80 and
12  that was not acceptable to you, correct?
13        MS. DALE:  Objection.
14    A.   That's not what that text says.
15  The text says I was a little queazy about
16  the shift.  And I am now persuaded that
17  that 5.25 is a good number.
18    Q.   Really?  How so?
19    A.   I am persuaded that a market
20  number probably would have been a bit
21  higher than that.
22    Q.   And how do you know that?
23    A.   From discussions about the RSA.
24    Q.   Did you ever -- did you get comps
25  from Citi on this issue?

**Page 199**

D. Skeel - Professional Eyes Only
1
2     You know what I mean by comps,
3   right?
4     A.   I do.
5     I don't know whether we got -- we
6   got advice about appropriate discount rate,
7   or, yeah, interest rates.
8     Q.   And to be clear, right, if you
9   issue a debt instrument at five and a
10  quarter percent but the yield is really
11  lower than that, then that's additional
12  recovery, isn't it?
13    A.   Say that again.
14        MS. DALE:  Objection to the form.
15  BY MR. DESPINS:
16    Q.   If a debt instrument is issued at
17  a five and a quarter percent but the yield
18  on such instrument is less than five and a
19  quarter percent, what is the impact of that
20  discrepancy on the recovery to the
21  creditors holding such instrument?
22        MS. DALE:  Objection to the form.
23    A.   Yeah, I'm not following what you
24  mean by the yield.  I think we can reach a
25  meeting of the minds on the point you're

**Page 200**

D. Skeel - Professional Eyes Only
1
2   trying to make, but I'm not following what
3   you mean by when -- in your reference to
4   yield.
5     Q.   Well, is that what you meant by
6   saying, "It looks to me to put the
7   potential recovery over 80 percent from the
8   perspective of a 5 percent rate"?
9     A.   If 5 percent, as you are right,
10  is your baseline, a 5.25 discount rate
11  implies a higher recovery, yes.
12    Q.   So when you signed the -- or
13  approved the permanent RSA in May 2019, did
14  you re-up your analysis of that issue you
15  just addressed in that text message?
16        MS. DALE:  Objection to the form.
17    A.   The issue of the appropriate
18  interest rate has been a constant topic of
19  conversation, so we're talking about it.
20  This was going into the preliminary RSA --
21    Q.   Yup.
22    A.   -- and we would have talked about
23  it as well with the permanent RSA.
24    Q.   Well, it's not a topic of
25  discussion of today, is it?

**Page 201**

D. Skeel - Professional Eyes Only
1
2     A.   Now it is.
3     (Laughter.)
4     Q.   Good one.  Yes, it is.
5     I'm saying that your not having a
6   debate over the appropriate interest rate
7   these days, are you?
8     A.   No.  We, I think, did settle and
9   have settled on 5.25 as an appropriate
10  interest rate.

TSG Reporting - Worldwide 877-702-9580



Page 226

D. Skeel - Professional Eyes Only

Page 227

D. Skeel - Professional Eyes Only

Page 228

D. Skeel - Professional Eyes Only

9      (Skeel Exhibit 18, Email chain
10   beginning with email dated 1/28/19 from
11   Shannahan to Gana, Bates-stamped
12   ASSURED-PREPA-9019- MOTION_00034736
13   through 34737, marked for
14   identification, as of this date.)
15      MR. DESPINS:  I'll just describe,
16   this is Exhibit 18, Assured-PREPA
17   Document 34736 and 34737, an email from
18   Andrew Shannahan to Jorge Gana at
19   Assured.
20      MS. DALE:  He doesn't have the
21   document.
22      (Discussion off the record.)
23   BY MR. DESPINS:
24      Q.  I'm not going to ask a question.
25   Just read it.

Page 229

D. Skeel - Professional Eyes Only
1
2      A.   Should I read it?
3         (Document review.)
4      A.   Okay.

TSG Reporting - Worldwide 877-702-9580

Page 230

D. Skeel - Professional Eyes Only
Q. Okay. Let's talk about the
stipulated treatment provision. You
mentioned that a few minutes ago.
What happens during -- if that
provision is triggered to the payments
received by the bondholders, for example?
A. I assume they keep them as part
of a stipulated treatment. So the payments
received up to that point.
Q. Why do you assume that?
A. Because I don't have the document
in front of me to, to give myself complete
confidence of that answer.
Q. But why would you assume the
opposite?
A. Because the stipulated treatment
gives them 73 -- I think it's 73.25
percent, and I assume or -- yeah, I assume
that that also includes they would keep the
payments they received up to that point.
Q. Did the board ever ask for
clawback rights? You understand what I
mean in this context by clawback rights?
We're not talking about the clawback bonds

Page 231

D. Skeel - Professional Eyes Only
now, we're talking about --
A. I'll try to be very careful how
we talk about clawbacks because it means so
many things.
Q. Actually, it doesn't mean
clawback anyway, but that is a different
topic.
So in this context, when we're
focusing on the payments received by the
bondholders, did the Oversight Board
request that the payments be subject to
disgorgement or a clawback?
MS. DALE: Objection to the form.
A. I just don't remember if that was
a subject of conversation.
Q. Do you derive any comfort from
the fact that if they keep the payment,
they are applied against their claims, the
payments are applied against their claims?
Do you derive any comfort from that
provision?
A. I just don't remember. I mean, I
would need to work through the provision.
Q. Okay. So switching topics now,

Page 232

D. Skeel - Professional Eyes Only
you're familiar with the concept of a
breakup fee?
A. Yes, I am.
Q. In the mergers and acquisitions
context?
A. Yes, I am.
Q. And --
A. I've written about them.
Q. Okay. And the board here, in
pleadings filed with the court, has
analyzed, as described, if you will, the
payments that the bondholders get to keep
as a breakup fee.
So my first question to you is,
is that the way the board perceived these
payments when it approved the RSA?
A. That's not the way I think of
them. I think breakup fee would be a very
loose description.
Q. Typically a breakup fee would
be -- what would be the range from a
percentage point of view of a breakup fee?
MS. DALE: Objection. Calls for
speculation. Out of context.

Page 233

D. Skeel - Professional Eyes Only
BY MR. DESPINS:
Q. You've written articles about
this, so...
A. I can tell you what it is in
Delaware. In Delaware, it's 3 or 4 percent
of the deal price.
Q. Thank you. Okay.
A. Not in bankruptcy.
Q. Okay. You think it's higher or
lower in bankruptcy?
MS. DALE: Objection.
A. I don't know.
Q. Okay. But in the event -- were
you ever provided with comps for what a
breakup fee would be in a bankruptcy case
before you approved the RSA?
A. I don't recall being given comps.
Q. Comps for a breakup fee?
A. Comps for a breakup fee.
Q. Okay. What's your understanding
of the effect of the RSA on the solar power
industry in Puerto Rico?
A. It's hard to answer that
question. What do you mean what the effect

TSG Reporting - Worldwide 877-702-9580

D. Skeel - Professional Eyes Only

1  is?
2
3     Q.  Have you heard any complaints by
4  solar power industry representatives about
5  the effect of the RSA on their business?
6     A.  We may have.  We've gotten
7  communications from people in the
8  renewables space, so we may have heard
9  criticisms.  I don't remember specifically.
10    Q.  Well, do you understand the
11 nature of their criticism of the RSA?
12    A.  I don't remember.
13    Q.  Okay.
14       MR. DESPINS:  Tab 49.
15       (Skeel Exhibit 19, Email dated
16    101/119 from Reorg Alert to Zwillinger,
17    not Bates-stamped, marked for
18    identification, as of this date.)
19       (Document review.)
20 BY MR. DESPINS:
21    Q.  Just you feel free to read the
22 entire thing, but I'm going to ask you
23 about what's starting with the last
24 sentence of page 1 of this document and the
25 carryover paragraph and the paragraph after

D. Skeel - Professional Eyes Only

1     that, but I don't want to limit your
2
3  review.  I just think we can save some time
4  if you focus on this.
5     A.  Okay.  I'll read a little bit in
6  each direction.
7     Q.  Okay.  So while you're doing
8  that, this is not Bates-stamped, but it's a
9  reorg research article dated October 1st,
10 2019.
11       (Document review.)
12    A.  Okay.
13    Q.  There is a reference in there, it
14 seems to be a quote so -- it says, "Marrero
15 indicated that the PREPA Restructuring
16 Support Agreement is among debt
17 restructuring proposals that are being
18 looked at, at least in part, in the context
19 of the filing of the Commonwealth plan."
20       Is this news to you?
21    A.  News in what sense?
22       MS. DALE:  Objection to form.
23 BY MR. DESPINS:
24    Q.  Well, it seems that the
25 government and AAFAF have signed the RSA,

D. Skeel - Professional Eyes Only

1  the permanent RSA on May 3rd, 2019, and the
2
3  amendment, I assume they've also signed the
4  amendment that was done in September.
5       So I'm reading this and I'm
6  wondering what is he talking about?  I
7  mean, what is the government doing?
8       MS. DALE:  Objection to the form.
9       Do you have any idea what he's
10 talking about?
11       MR. DESPINS:  I don't.
12    A.  I don't.  He just seems to be
13 saying that now that the Commonwealth plan
14 has been filed, they needed to kind of look
15 at the big picture and look at all of the
16 other agreements that are underway.
17    Q.  But then the next sentence, you
18 know, or a little further down says,
19 "Obviously there are some transactions
20 where we have to look at the details to see
21 whether they have to be revisited, improved
22 or reconsidered in light of the
23 circumstance, and that's what we're doing,
24 Marrero said.
25       "That's exactly why, for example,

D. Skeel - Professional Eyes Only

1  we have decided to extend the PREPA RSA
2
3  twice, already to just have the time, for
4  further analysis added Marrero, who
5  indicated the analysis has centered on what
6  terms and conditions might need to be
7  revisited and which creditors should be
8  consulted."
9       So my question to you is, is the
10 government on board with the RSA or not?
11       MS. DALE:  Object to the form.
12    A.  I believe they are.  I mean, he
13 goes on to say he doesn't know which
14 restructuring deal, PREPA or the
15 Commonwealth's, he thinks will get done
16 first, but said AAFAF is equally committed
17 to all deals.
18    Q.  Okay.  So you are not aware of
19 any renegotiations or reconsideration by
20 the government of the RSA as you sit here
21 today?
22    A.  I am not.
23    Q.  Okay.
24       MR. DESPINS:  We'll take, if
25 that's okay with your counsel, a