**<u>EXHIBIT 34</u>**

NEW ISSUE – FULL BOOK-ENTRY                                                                 See "RATINGS" herein

*In the opinion of Hawkins Delafield & Wood LLP ("Bond Counsel"), under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, (1) interest on the 2017 Restructuring Bonds (as defined herein) is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (2) interest on the 2017 Restructuring Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In addition, in the opinion of Bond Counsel, under existing statutes, interest on the 2017 Restructuring Bonds is exempt from personal income taxes imposed by the State of New York or any political subdivision thereof, and the 2017 Restructuring Bonds are exempt from all taxation directly imposed thereon by or under the authority of the State of New York, except estate or gift taxes and taxes on transfers. See "TAX MATTERS" herein.*

## $369,465,000
# UTILITY DEBT SECURITIZATION AUTHORITY
## RESTRUCTURING BONDS, SERIES 2017

Utility Debt Securitization Authority (the "Issuer"), a special purpose corporate municipal instrumentality of the State of New York (the "State"), is issuing the above-captioned bonds (the "2017 Restructuring Bonds"), for the purpose of allowing the Long Island Power Authority (the "Authority") to retire certain of its outstanding indebtedness. The 2017 Restructuring Bonds will have such scheduled and final maturities, bear interest at such rates, be payable on such dates, and be issued in such denominations as shown on the inside cover of this Official Statement. The 2017 Restructuring Bonds will be subject to redemption prior to maturity as set forth herein.

The 2017 Restructuring Bonds are limited obligations of the Issuer secured by the 2017 Collateral (as defined herein), created pursuant to the Securitization Law (as defined herein) and an irrevocable financing order adopted by the Authority's Board of Trustees on July 26, 2017 ("Financing Order No. 5"). The 2017 Collateral includes, among other things, the pledge to the Trustee (as defined herein) under the Indenture (as defined herein) of the Issuer's right, title and interest in and to the 2017 Restructuring Property (as defined herein) created pursuant to Financing Order No. 5, including the irrevocable right to impose, bill and collect a nonbypassable charge, known as the "2017 Restructuring Charge," required to be paid by retail electric delivery service customers of the Long Island Lighting Company (d/b/a and referred to as "LIPA"), a wholly-owned subsidiary of the Authority, based on the customers' consumption of electricity. The 2017 Restructuring Charges are required to be collected by LIPA, as initial servicer for the Issuer. Pursuant to the Securitization Law and Financing Order No. 5, the 2017 Restructuring Property will be purchased by the Issuer from the Authority with the net proceeds of the sale of the 2017 Restructuring Bonds.

The Securitization Law, together with Financing Order No. 5, require that the 2017 Restructuring Charges are subject to an adjustment, or "true-up," at least annually, and more frequently, if necessary, to ensure the expected collection of amounts required to timely provide all scheduled payments of principal of and interest on the 2017 Restructuring Bonds and related financing costs of the Issuer, as described herein.

**Investing in the 2017 Restructuring Bonds involves risks. See "RISK FACTORS" herein.**

The Bank of New York Mellon (the "Trustee") is Trustee under the Indenture and Paying Agent for the 2017 Restructuring Bonds. Public Financial Management, Inc. has acted as independent financial advisor to the Authority and the Issuer in connection with the structuring and pricing of the 2017 Restructuring Bonds.

---

**MATURITY SCHEDULE – See Inside Cover Page**

---

The 2017 Restructuring Bonds are not an obligation of the Authority or LIPA. The 2017 Restructuring Bonds are not a debt, general obligation or pledge of the faith and credit or taxing power of the State of New York or of any county, municipality or any other political subdivision, agency or instrumentality of the State of New York other than the Issuer as described herein. The 2017 Restructuring Bonds are limited obligations of the Issuer payable solely from the 2017 Collateral (as described herein) including the 2017 Restructuring Charges. The issuance of the 2017 Restructuring Bonds does not obligate the State of New York or any county, municipality or other political subdivision, agency or instrumentality of the State of New York to levy any tax or make any appropriation for the payment of the 2017 Restructuring Bonds. The Issuer has no taxing power.

---

The 2017 Restructuring Bonds are offered when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Hawkins Delafield & Wood LLP, as Bond Counsel to the Issuer. Certain legal matters with respect to the Issuer, the Authority and LIPA will be passed upon by Hawkins Delafield & Wood LLP, as Bond Counsel to the Authority and the Issuer. Certain legal matters with respect to the Issuer, the Authority and LIPA will be passed upon by Squire Patton Boggs (US) LLP, Disclosure Counsel to the Authority and the Issuer. Certain legal matters will be passed upon for the Underwriters by Norton Rose Fulbright US LLP. It is expected that the 2017 Restructuring Bonds will be available for delivery in book-entry-only form through the facilities of The Depository Trust Company ("DTC") against payment in New York, New York, on or about November 21, 2017.

| RBC Capital Markets | Barclays | BofA Merrill Lynch | Citigroup |
|---|---|---|---|
| (Joint Senior Manager – Bookrunner) | (Joint Senior Manager) | (Joint Senior Manager) | (Joint Senior Manager) |

| | | |
|---|---|---|
| Academy Securities, Inc. | Drexel Hamilton LLC | FTN Financial Capital Markets |
| Goldman, Sachs & Co. | J.P. Morgan | Jefferies |
| KeyBanc Capital Markets Inc. | Loop Capital Markets LLC | Morgan Stanley |
| Ramirez & Co., Inc. | Raymond James | Siebert Cisneros Shank & Co., L.L.C. |
| TD Securities | U.S. Bancorp Investments, Inc. | Wells Fargo Securities |

October 25, 2017

**Maturity Schedule**

**$369,465,000**

**UTILITY DEBT SECURITIZATION AUTHORITY**

**RESTRUCTURING BONDS, SERIES 2017**

| Tranche | Principal Amount Offered | Scheduled Maturity Date[†] | Final Maturity Date[†] | Interest Rate | Yield | Public Offering Price | CUSIP* |
|---|---|---|---|---|---|---|---|
| Tranche 1 | $1,695,000 | June 15, 2020 | June 15, 2022 | 5.000% | 1.130% | 109.762%†† | 91802RDJ5 |
| Tranche 2 | $1,740,000 | December 15, 2021 | December 15, 2022 | 5.000% | 1.170% | 111.503%†† | 91802RDK2 |
| Tranche 3 | $10,985,000 | June 15, 2021 | June 15, 2023 | 5.000% | 1.240% | 113.077%†† | 91802RDL0 |
| Tranche 4 | $11,260,000 | December 15, 2021 | December 15, 2023 | 5.000% | 1.310% | 114.565%†† | 91802RDM8 |
| Tranche 5 | $11,440,000 | June 15, 2022 | June 15, 2024 | 5.000% | 1.400% | 115.870%†† | 91802RDN6 |
| Tranche 6 | $11,725,000 | December 15, 2022 | December 15, 2024 | 5.000% | 1.470% | 117.173%†† | 91802RDP1 |
| Tranche 7 | $18,130,000 | June 15, 2023 | June 15, 2025 | 5.000% | 1.540% | 118.389%†† | 91802RDQ9 |
| Tranche 8 | $18,585,000 | December 15, 2023 | December 15, 2025 | 5.000% | 1.600% | 119.581%†† | 91802RDR7 |
| Tranche 9 | $190,000 | June 15, 2024 | June 15, 2026 | 5.000% | 1.670% | 120.628%†† | 91802RDS5 |
| Tranche 10 | $195,000 | December 15, 2024 | December 15, 2026 | 5.000% | 1.730% | 121.662%†† | 91802RDT3 |
| Tranche 11 | $195,000 | June 15, 2025 | June 15, 2027 | 5.000% | 1.800% | 122.540%†† | 91802RDU0 |
| Tranche 12 | $200,000 | December 15, 2025 | December 15, 2027 | 5.000% | 1.870% | 123.334%†† | 91802RDV8 |
| Tranche 13 | $205,000 | June 15, 2026 | June 15, 2028 | 5.000% | 1.940% | 124.043%†† | 91802RDW6 |
| Tranche 14 | $210,000 | December 15, 2026 | December 15, 2028 | 5.000% | 1.990% | 124.856%†† | 91802RDX4 |
| Tranche 15 | $220,000 | June 15, 2027 | June 15, 2029 | 5.000% | 2.040% | 125.605%†† | 91802RDY2 |
| Tranche 16 | $225,000 | December 15, 2027 | December 15, 2029 | 5.000% | 2.090% | 126.292%†† | 91802RDZ9 |
| Tranche 17** | $465,000 | December 15, 2028 | December 15, 2030 | 5.000% | 2.320% | 123.935%††† | 91802REA3 |
| Tranche 18** | $485,000 | December 15, 2029 | December 15, 2031 | 5.000% | 2.380% | 123.328%††† | 91802REB1 |
| Tranche 19** | $510,000 | December 15, 2030 | December 15, 2032 | 5.000% | 2.440% | 122.725%††† | 91802REC9 |
| Tranche 20** | $535,000 | December 15, 2031 | December 15, 2033 | 5.000% | 2.500% | 122.126%††† | 91802RED7 |
| Tranche 21** | $565,000 | December 15, 2032 | December 15, 2034 | 5.000% | 2.560% | 121.530%††† | 91802REE5 |
| Tranche 22** | $595,000 | December 15, 2033 | December 15, 2035 | 5.000% | 2.610% | 121.036%††† | 91802REF2 |
| Tranche 23** | $625,000 | December 15, 2034 | December 15, 2036 | 5.000% | 2.650% | 120.643%††† | 91802REG0 |
| Tranche 24** | $655,000 | December 15, 2035 | December 15, 2037 | 5.000% | 2.680% | 120.349%††† | 91802REH8 |
| Tranche 25** | $63,235,000 | December 15, 2036 | December 15, 2038 | 5.000% | 2.690% | 120.251%††† | 91802REJ4 |
| Tranche 26** | $62,085,000 | December 15, 2037 | December 15, 2039 | 5.000% | 2.720% | 119.958%††† | 91802REK1 |
| Tranche 27** | $69,810,000 | December 15, 2038 | December 15, 2040 | 5.000% | 2.740% | 119.763%††† | 91802REL9 |
| Tranche 28** | $82,700,000 | December 15, 2039 | December 15, 2041 | 5.000% | 2.760% | 119.568%††† | 91802REM7 |

*CUSIP numbers have been assigned by an organization not affiliated with the Issuer or the Authority and are included solely for the convenience of the holders of the 2017 Restructuring Bonds. Neither the Issuer nor the Authority is responsible for the selection or uses of these CUSIP numbers, nor is any representation made as to the correctness of the CUSIP numbers on the 2017 Restructuring Bonds or as indicated above.

**Subject to Sinking Fund Payments. See "THE 2017 RESTRUCTURING BONDS—Redemption-Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules" in this Official Statement.

[†] If such date is not a Business Day, the next Business Day without additional interest.

[††] Priced at the stated yield to the Scheduled Maturity Date.

[†††] Priced at the stated yield to the December 15, 2027 optional redemption date at the redemption price of par.

The 2017 Restructuring Bonds will accrue interest from their date of delivery to their maturity or prior redemption, as applicable. Interest is payable semi-annually each June 15 and December 15, beginning June 15, 2018, and if such day is not a Business Day, the next Business Day without additional interest.

The 2017 Restructuring Bonds will be issued in denominations of $5,000 or any integral multiple thereof, all to be held in a book-entry only system, registered in the name of Cede & Co., as registered owner and nominee of DTC, which will act as securities depository for the 2017 Restructuring Bonds. See "THE 2017 RESTRUCTURING BONDS—Securities Depository" in this Official Statement.

## ABOUT THIS OFFICIAL STATEMENT

## UTILITY DEBT SECURITIZATION AUTHORITY

### BOARD OF TRUSTEES[*]

**Robert Gurman, Acting Chair**
**Bruce Levy, Committees Chair**

No dealer, broker, salesperson or other person has been authorized by the Issuer, the Authority or the Underwriters to give any information or to make any representation, other than the information and representations contained in this Official Statement, in connection with the offering of the 2017 Restructuring Bonds, and, if given or made, such information or representations must not be relied upon as having been authorized by the Issuer, the Authority or the Underwriters. This Official Statement does not constitute an offer to sell or solicitation of an offer to buy any of the 2017 Restructuring Bonds in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction.

The information set forth herein has been furnished by the Issuer and the Authority, and also includes information obtained from other sources, all of which are believed to be reliable. The information and expressions of opinion contained herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Issuer, the Authority, LIPA and PSEG Long Island (as defined herein) since the date hereof. Such information and expressions of opinion are made for the purpose of providing information to prospective investors and are not to be used for any other purpose or relied on by any other party.

This Official Statement contains statements which, to the extent they are not recitations of historical fact, constitute "forward-looking statements." In this respect, the words "estimate," "project," "anticipate," "expect," "intend," "believe" and similar expressions are intended to identify forward-looking statements.

In connection with the offering of the 2017 Restructuring Bonds, the Underwriters may overallot or effect transactions that stabilize or maintain the market price of the 2017 Restructuring Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.

The Underwriters have provided the following sentence for inclusion in this Official Statement: The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THIS OFFICIAL STATEMENT AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

---

[*] Currently, there is a vacancy on the Board of Trustees.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## TABLE OF CONTENTS

Page

SUMMARY STATEMENT ................................................................................................................. i

INTRODUCTORY STATEMENT ..................................................................................................... 1

PLAN OF FINANCE AND USE OF PROCEEDS ............................................................................ 1

THE SECURITIZATION LAW ......................................................................................................... 1

    Background ...................................................................................................................................... 1

    Purpose of Securitization Law ....................................................................................................... 2

    Authorization of Restructuring Bonds Pursuant to Irrevocable Financing Orders ....................... 2

    Prior Transactions .......................................................................................................................... 2

    2017 Restructuring Property ........................................................................................................... 3

    True-Up Adjustment Mechanism ................................................................................................... 3

    2017 Restructuring Charges are Nonbypassable ........................................................................... 3

    No Right of Set-Off; Partial Payment of Customer Charges ......................................................... 3

    State Pledge .................................................................................................................................... 4

    Trustee's Lien on 2017 Restructuring Property Protected ............................................................. 4

    Right of Sequestration .................................................................................................................... 4

    Transfer Characterized as True Sale ............................................................................................... 4

    Transfer and Ownership of 2017 Restructuring Property is Tax Exempt ....................................... 5

THE FINANCING ORDER ............................................................................................................... 5

    General; Creation of 2017 Restructuring Property; Irrevocability ................................................. 5

    Collection of 2017 Restructuring Charges; Nonbypassability ...................................................... 5

    Terms of the 2017 Restructuring Bonds ........................................................................................ 6

    2017 Restructuring Charges on Customer Bills ............................................................................ 6

    True-Up Adjustment Mechanism ................................................................................................... 7

    Issuance Advice Letter ................................................................................................................... 8

    Servicing Agreement ...................................................................................................................... 8

    Binding on Successors .................................................................................................................... 8

THE 2017 RESTRUCTURING PROPERTY ..................................................................................... 8

    Overview ......................................................................................................................................... 8

    Creation of 2017 Restructuring Property ....................................................................................... 9

    2017 Restructuring Charges ........................................................................................................... 9

THE 2017 RESTRUCTURING BONDS ........................................................................................... 9

    General ............................................................................................................................................ 9

    Interest on the 2017 Restructuring Bonds ..................................................................................... 9

    Principal of the 2017 Restructuring Bonds .................................................................................. 10

    Expected Amortization Schedule ................................................................................................. 11

**TABLE OF CONTENTS**
(continued)

Page

Maturity Sensitivity..........................................................................................................................12

Fees and Expenses...........................................................................................................................13

Redemption .....................................................................................................................................13

Registration and Transfer of the 2017 Restructuring Bonds ..........................................................15

Securities Depository ......................................................................................................................15

Access of Bondholders ...................................................................................................................16

SECURITY FOR THE 2017 RESTRUCTURING BONDS ...................................................................16

Pledge of 2017 Collateral ...............................................................................................................16

Security Interest in 2017 Collateral ................................................................................................17

Lien on 2017 Restructuring Property ..............................................................................................18

Indenture Accounts .........................................................................................................................18

How Funds in the Collection Account Will Be Allocated...............................................................20

Limited Obligation of Issuer ..........................................................................................................21

Legality for Investment ...................................................................................................................21

Additional Bonds.............................................................................................................................21

THE ISSUER...........................................................................................................................................21

Introduction .....................................................................................................................................21

Restricted Purpose...........................................................................................................................22

Management and Fees......................................................................................................................22

Relationship of the Issuer to the Authority and LIPA ....................................................................22

Administration Agreement...............................................................................................................22

THE SELLER...........................................................................................................................................23

General .............................................................................................................................................23

Service Area.....................................................................................................................................23

Relationship of the Authority to LIPA ............................................................................................24

System Operation by the Authority and LIPA ................................................................................25

Authority to Set Electric Rates .......................................................................................................25

Where to Find Information about the Authority...............................................................................26

Relationship between the 2017 Restructuring Bonds and the Authority's Indebtedness ...........27

SERVICER AND ADMINISTRATOR ...................................................................................................27

General .............................................................................................................................................27

Servicing the 2017 Restructuring Bonds.........................................................................................27

Transition to a New Business Model...............................................................................................27

The LIPA Reform Act and the OSA ...............................................................................................28

Servicing Experience.......................................................................................................................30

**TABLE OF CONTENTS**

(continued)

Page

Allocation Account; Remittance of 2017 Restructuring Charges; Reconciliation ........................................ 30

Billing and Collection Policies .................................................................................................................... 31

Revenues, LIPA's Customer Base and Electric Energy Consumption ........................................................ 33

Forecasting Electricity Consumption ......................................................................................................... 34

Loss Experience ......................................................................................................................................... 34

Days Sales Outstanding .............................................................................................................................. 35

Write-Off and Delinquencies Experience .................................................................................................. 35

Where to Find Information About LIPA ..................................................................................................... 35

Where to Find Information regarding PSEG and PSEG Long Island ......................................................... 35

THE TRUSTEE ................................................................................................................................................... 35

RATING AGENCY CONDITION ...................................................................................................................... 36

THE INDENTURE ............................................................................................................................................... 36

Reports to Holders ..................................................................................................................................... 36

Covenants of Issuer .................................................................................................................................... 37

Events of Default ........................................................................................................................................ 40

Remedies—Acceleration ............................................................................................................................ 40

Remedies—Trustee's Rights ...................................................................................................................... 41

Remedies—Optional Possession of 2017 Collateral ................................................................................. 42

Remedies—Limitation of the Rights of Holders ....................................................................................... 42

Voting of the 2017 Restructuring Bonds; Control of Proceedings by Holders .......................................... 42

Waiver of Past Defaults .............................................................................................................................. 43

Modifications of Indenture that Do Not Require the Consent of Holders .................................................. 43

Modifications of Indenture that Require the Consent of Holders ............................................................... 44

Satisfaction and Discharge of Indenture .................................................................................................... 45

Legal Defeasance ....................................................................................................................................... 45

No Recourse to Others ................................................................................................................................ 46

THE SALE AGREEMENT .................................................................................................................................. 46

Sale of the 2017 Restructuring Property .................................................................................................... 47

Seller Representations and Warranties ....................................................................................................... 47

Covenants of the Seller ............................................................................................................................... 48

Indemnification ........................................................................................................................................... 50

Successors to the Seller .............................................................................................................................. 51

Amendment ................................................................................................................................................. 51

THE SERVICING AGREEMENT ...................................................................................................................... 51

General ........................................................................................................................................................ 51

**TABLE OF CONTENTS**
(continued)

Page

| | |
|---|---|
| Servicing Procedures | 51 |
| Servicing Standards and Covenants | 52 |
| True-Up Adjustment Process | 52 |
| Servicing Compensation | 52 |
| Servicer Representations and Warranties | 53 |
| Certificates by Servicer | 54 |
| Servicer Will Indemnify Issuer in Limited Circumstances | 55 |
| Matters Regarding Servicer | 55 |
| Annual Accountant's Report | 56 |
| Servicer Defaults and Remedies | 56 |
| ADMINISTRATION AGREEMENT | 59 |
| Duties of the Administrator | 59 |
| Administrator Compensation | 60 |
| Resignation and Removal of the Administrator | 60 |
| Amendment of the Administration Agreement | 61 |
| Indemnification by the Administrator | 61 |
| Administrator's Liability | 61 |
| AFFILIATIONS AND CERTAIN RELATIONSHIPS | 61 |
| RISK FACTORS | 62 |
| Servicing and Operating Risks | 62 |
| Customer and Delivery Related Risks | 64 |
| Judicial, Legislative or Regulatory Risks | 64 |
| Bankruptcy-Related Risks | 66 |
| Risks Associated with the Unusual Nature of the 2017 Restructuring Property | 70 |
| UNDERWRITING | 71 |
| TAX MATTERS | 72 |
| Opinion of Bond Counsel | 72 |
| Certain Ongoing Federal Tax Requirements and Covenants | 72 |
| Certain Collateral Federal Tax Consequences | 72 |
| Original Issue Discount | 73 |
| Bond Premium | 73 |
| Information Reporting and Backup Withholding | 73 |
| Miscellaneous | 74 |
| CONTINUING DISCLOSURE | 74 |
| RATINGS | 74 |

## TABLE OF CONTENTS
(continued)

Page

FINANCIAL ADVISOR ................................................................................................................... 75

ABSENCE OF LITIGATION ........................................................................................................... 75

    The Issuer ................................................................................................................................. 75

    The Authority and LIPA .......................................................................................................... 75

LEGAL MATTERS .......................................................................................................................... 75

MISCELLANEOUS .......................................................................................................................... 76

Appendix A  —  Definitions
Appendix B  —  Proposed Form of Approving Opinion of Bond Counsel
Appendix C  —  Proposed Form of Opinion of Bond Counsel Relating to New York and Federal Constitutional
               Matters
Appendix D  —  Proposed Form of Opinion of Bond Counsel Relating to Regulatory Matters
Appendix E  —  Form of the Continuing Disclosure Agreement

Schedule 1 – Book-Entry-Only System

[THIS PAGE INTENTIONALLY LEFT BLANK]

## SUMMARY STATEMENT

*The following information is furnished solely to provide limited introductory information regarding the Utility Debt Securitization Authority (the "Issuer"), the Long Island Power Authority (the "Authority" and in its capacity as the seller of the 2017 Restructuring Property, sometimes referred to herein as the "Seller"), the Long Island Lighting Company ("LIPA," in its capacity as servicer of the 2017 Restructuring Property, sometimes referred to herein as "Servicer" and in its capacity as administrator of the Issuer, sometimes referred to herein as "Administrator"), Public Service Enterprise Group Incorporated ("PSEG"), PSEG Long Island LLC ("PSEG Long Island"), and the 2017 Restructuring Bonds and does not purport to be comprehensive. Such information is qualified in its entirety by reference to the more detailed information and descriptions appearing elsewhere in this Official Statement and should be read together therewith. The offering of the 2017 Restructuring Bonds is made only by means of the entire Official Statement, including the Appendices hereto. No person is authorized to make offers to sell, or solicit offers to buy, the 2017 Restructuring Bonds unless the entire Official Statement is delivered in connection therewith. Terms not defined elsewhere in this Official Statement are used as defined in Appendix A hereto.*

| | |
|---|---|
| *Purpose of the Transaction:* | This issuance of the 2017 Restructuring Bonds by the Issuer will enable the Authority to retire certain of its outstanding indebtedness. See "THE SECURITIZATION LAW" in this Official Statement. |
| *Issuer:* | The Issuer is a special purpose corporate municipal instrumentality, body corporate and politic, political subdivision and public benefit corporation of the State of New York, created by Part B of Chapter 173, Laws of New York, 2013 (the whole of Chapter 173, Laws of New York, 2013, as amended by Chapter 58 of the Laws of New York, 2015, the "LIPA Reform Act" and Part B thereof, the "Securitization Law"). The Issuer has no commercial operations. The Issuer was formed solely to purchase and own restructuring property, to issue bonds which are to be secured by restructuring property, and to perform any activity incidental thereto. The Securitization Law prohibits the Issuer from engaging in any other activity except as specifically authorized by a financing order and provides that the Issuer is not authorized to be a debtor under chapter 9 or any other provision of the Bankruptcy Code. See "—*Transaction Overview*" and "THE SECURITIZATION LAW." The 2017 Restructuring Bonds represent the fifth issuance of restructuring bonds by the Issuer. See "— *Prior Transactions*" and "THE SECURITIZATION LAW — Prior Transactions." |
| *Seller:* | The Authority is a corporate municipal instrumentality and a political subdivision of the State of New York. The Authority has a wholly-owned subsidiary, the Long Island Lighting Company (described below), which does business under the names of LIPA and Power Supply Long Island. |
| *Servicer and its Service Area; Administrator:* | LIPA provides electric transmission and distribution services in a geographical area which includes the New York Counties of Nassau and Suffolk (with certain limited exceptions) and a small portion of Queens County, New York known as the Rockaways. As described in this Official Statement, the Authority and LIPA have entered into agreements with third parties to provide the service and maintenance functions in connection with their operations. |
| | LIPA's service area includes approximately 1.1 million customers and during the period 2012 through 2016 experienced its peak usage of approximately 5,602 MW in the summer of 2013. In the year ending December 31, 2016, approximately 55.0% of LIPA's annual retail revenues were received from residential customers, 43.1% from commercial customers and 1.9% from street lighting, public authorities and certain others. The largest customer in the Service Area (the Long Island Rail Road) accounted for less than 2.0% of total sales and less than 2.0% of revenue. |
| | LIPA, acting as initial servicer pursuant to the Servicing Agreement (as described herein), and any Successor Servicer as provided by Financing Order No. 5 (as |

described herein), will be responsible for the servicing of the 2017 Restructuring Property, including the billing and collection of the 2017 Restructuring Charges securing the 2017 Restructuring Bonds on behalf of the Issuer. LIPA also acts as servicer with respect to the Prior Restructuring Property (as defined herein), pursuant to separate servicing agreements.

The Issuer and LIPA will also enter into an Administration Agreement (the "Administration Agreement") pursuant to which LIPA, acting as Administrator, will perform certain duties on behalf of the Issuer.

*LIPA's Relationship with the Authority and Service Providers:*

The Authority and LIPA are parties to a Financing Agreement (the "Financing Agreement") providing for their respective duties and obligations relating to the financing and operation of the retail electric business in the Service Area. Pursuant to the terms of the Financing Agreement, LIPA conducts the electric business in the Service Area and is responsible for providing service to customers in the Service Area. In order to assist the Authority (acting through LIPA) in providing electric service in the Service Area, the Authority and LIPA have entered into operating agreements, the purpose of which is to provide the Authority and LIPA with the operating personnel and a significant portion of the power supply resources necessary for LIPA to continue to provide electric service in the Service Area. Since January 1, 2014, PSEG Long Island, a wholly-owned subsidiary of PSEG dedicated to LIPA's operations, has provided the T&D System management services including, among other functions, the day-to-day operation and maintenance of the T&D System, customer service, billing and collection, meter reading and forecasting. These services include many of the services that LIPA has contracted to perform as Servicer. Under the OSA (as defined herein), the PSEG Long Island management company is the contracting entity with LIPA and consists of approximately 20 employees, while its wholly-owned subsidiary, the PSEG Long Island service company, consists of approximately 2,350 employees. PSEG Long Island as used herein generally refers to both the management company and the service company, collectively.

*Transaction Overview:*

On June 21, 2013, the New York State Assembly and Senate passed the LIPA Reform Act which, among other things, allows for the retirement of certain outstanding indebtedness of the Authority through the issuance of restructuring bonds by the Issuer. The LIPA Reform Act was signed by the Governor of the State of New York on July 29, 2013, and on August 28, 2013, the time for filing any challenges to the LIPA Reform Act expired with no such challenges having been filed.

On March 30, 2015, the New York State Assembly and Senate adopted Chapter 58 of the Laws of New York, 2015, which amended the Securitization Law to allow for additional issuances of restructuring bonds. On April 13, 2015, the Governor signed such Chapter 58 into law. On May 13, 2015, the time for filing any challenges to the LIPA Reform Act, as amended by such Chapter 58, expired and no such challenges were filed.

Prior to being amended in 2015, the Securitization Law permitted only one issuance of restructuring bonds by the Issuer. In December 2013, the Issuer issued $2,022,234,000 of its Restructuring Bonds, Series 2013T and Series 2013TE (the "2013 Restructuring Bonds").

The Securitization Law, as amended by Chapter 58, permits the Authority's Board of Trustees (the "Authority Trustees") to adopt additional financing orders to, among other things, authorize the creation of additional restructuring property and the issuance of additional restructuring bonds secured by such additional restructuring property in an aggregate amount not to exceed $4.5 billion (inclusive of the 2013 Restructuring Bonds). The Issuer has subsequently issued, pursuant to three subsequent financing orders, three series of restructuring bonds

in an aggregate principal amount of $2,108,205,000, which, after taking into account the 2013 Restructuring Bonds, allows for the issuance of $369,471,000 of additional restructuring bonds under the Securitization Law. See "THE SECURITIZATION LAW — Prior Transactions."

The 2017 Restructuring Bonds are being issued pursuant to Financing Order No. 5. Financing Order No. 5 was approved by the New York Public Authorities Control Board ("PACB") on September 20, 2017 and became irrevocable, final and non-appealable on October 20, 2017. The 2017 Restructuring Property (as defined herein) created by Financing Order No. 5 includes the irrevocable right to impose, bill and collect the 2017 Restructuring Charges (as defined herein) from all Customers (as defined herein).

The Authority is authorized to use the proceeds from the sale of the 2017 Restructuring Property to purchase, redeem, repay or defease certain of its outstanding debt ("Refunded Debt"). See "THE FINANCING ORDER— General; Creation of 2017 Restructuring Property; Irrevocability" in this Official Statement.

The primary transactions underlying the offering of the 2017 Restructuring Bonds are as follows:

- The Issuer will issue the 2017 Restructuring Bonds and use the proceeds thereof to pay the purchase price of the 2017 Restructuring Property to the Authority and to pay costs of issuance and related costs ("Upfront Financing Costs," as further described herein). The 2017 Restructuring Property will serve as the primary security for the 2017 Restructuring Bonds.

- The Authority will use the proceeds from the sale of the 2017 Restructuring Property to purchase, redeem, repay or defease the Refunded Debt.

- LIPA will act as the initial servicer of the 2017 Restructuring Property pursuant to the terms of the Servicing Agreement (as described herein). As described in more detail herein, pursuant to the OSA, PSEG Long Island, among other things, performs the billing and collections, meter reading and forecasting required of the Servicer under the Servicing Agreement.

The 2017 Restructuring Bonds are not obligations of the Trustee, the Authority, LIPA, PSEG Long Island or any of their affiliates. The 2017 Restructuring Bonds are also not a debt and do not constitute a pledge of the faith and credit or taxing power of the State of New York or of any county, municipality, or any other political subdivision, agency or instrumentality of the State of New York other than the Issuer.

*Prior Transactions:*   The Issuer has previously issued five series of restructuring bonds (the "Prior Restructuring Bonds") pursuant to four restructuring cost financing orders (the "Prior Financing Orders") adopted by the Authority. The Issuer used the proceeds of the Prior Restructuring Bonds authorized by the Prior Financing Orders to purchase the restructuring property created by the related Prior Financing Order (each restructuring property created pursuant to each Prior Restructuring Order is a "Prior Restructuring Property" and all are collectively referred to herein as the "Prior Restructuring Properties"), including related restructuring charges (the restructuring charges related to the Prior Restructuring Property created by each Prior Restructuring Order being referred to herein as "Prior Restructuring Charges"). The Prior Restructuring Property created by each Prior Financing Order was pledged by the Issuer to the payment of the related Prior Restructuring Bonds. The Authority used the net proceeds from the sale of each Prior Restructuring Property to retire debt and other obligations of the Authority. **The Prior Restructuring Property created pursuant to each**

iii

**Prior Financing Order secures only the related Prior Restructuring Bonds and does not secure the other Prior Restructuring Bonds or the 2017 Restructuring Bonds.** Pursuant to the Prior Financing Orders, the Issuer issued $4,130,529,000 aggregate amount of restructuring bonds.

| Prior Financing Order and Date of Adoption | Related Prior Restructuring Bonds | Original Principal Amount |
|---|---|---|
| Financing Order No. 1, adopted October 3, 2013 | Series 2013T and Series 2013TE | $2,022,324,000 |
| Financing Order No. 2, adopted June 26, 2015 | Series 2015 (the "2015 Restructuring Bonds") | $1,002,115,000 |
| Financing Order No. 3, adopted June 26, 2015 | Series 2016A (the "2016A Restructuring Bonds") | $636,770,000 |
| Financing Order No. 4, adopted June 26, 2015 | Series 2016B (the "2016B Restructuring Bonds") | $469,320,000 |

*2017 Restructuring Bond Structure:*

The 2017 Restructuring Bonds will be issued in one series, which is secured by the 2017 Collateral (as defined herein).

The 2017 Restructuring Bonds will be issued in tranches. Tranche-1 through Tranche-16 are Serial Bonds under the Indenture and Tranche-17 through Tranche-28 are Term Bonds under the Indenture. The 2017 Restructuring Bonds with a Final Maturity Date prior to December 15, 2030 are not subject to redemption prior to maturity at the option of the Issuer. The 2017 Restructuring Bonds with a Final Maturity Date on or after December 15, 2030 are subject to redemption prior to maturity at the option of the Issuer beginning on December 15, 2027. See "THE 2017 RESTRUCTURING BONDS—Redemption" in this Official Statement.

The 2017 Restructuring Bonds are scheduled to pay principal semi-annually and sequentially. See "THE 2017 RESTRUCTURING BONDS—Expected Amortization Schedule" in this Official Statement.

*Use of Proceeds:*

The 2017 Restructuring Bonds are being issued to provide the Issuer with funds to purchase the 2017 Restructuring Property from the Authority and to pay the Upfront Financing Costs. The Authority will use the sales proceeds of the 2017 Restructuring Property to retire the Refunded Debt. See "PLAN OF FINANCE AND USE OF PROCEEDS" in this Official Statement.

*True-Up Adjustment Mechanism:*

As required by the Securitization Law and Financing Order No. 5, the 2017 Restructuring Charges will be adjusted at least annually and, if determined by the Servicer in connection with a mid-year review process to be necessary, semi-annually or more frequently, to ensure that the expected collections of the 2017 Restructuring Charges are adequate to timely pay all scheduled payments of principal and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs when due. In addition, if, after the mid-year review process, the Servicer determines that an adjustment is not required, the Servicer may voluntarily elect to adjust the 2017 Restructuring Charges to correct for over-collections. Following the last Scheduled Maturity Date of the 2017 Restructuring Bonds, if any such 2017 Restructuring Bonds remain outstanding after such Scheduled Maturity Date, the Servicer is also required to make True-Up Adjustments quarterly to ensure that Charge Collections will be sufficient to pay timely principal and interest, and all other Ongoing Financing Costs, due on the next Payment Date. Financing Order No. 5 also permits the Servicer to make True-Up Adjustments more frequently at any time as necessary to ensure the

iv

|  | timely scheduled payments of principal and interest on the 2017 Restructuring Bonds, and all other Ongoing Financing Costs when due.  Financing Order No. 5 does not cap the level of 2017 Restructuring Charges that may be imposed on Customers as a result of the True-Up Adjustments.  Through the True-Up Adjustment, all Customers cross share in the liabilities of all other Customers for the payment of 2017 Restructuring Charges.  See "THE FINANCING ORDER—True-Up Adjustment Mechanism" in this Official Statement. |
|---|---|
| *Nonbypassable 2017 Restructuring Charges:* | The Securitization Law mandates that the 2017 Restructuring Charges are irrevocable, nonbypassable consumption-based charges.  "Nonbypassable" means that the 2017 Restructuring Charges shall be collected from Customers, as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, even if such Customer also produces some of its own electricity or purchases electric generation services from a provider of electric generation services who is not the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA.  Certain Customers that self-generate eligible renewable power will only be responsible for paying 2017 Restructuring Charges based upon their "net-billed" consumption.  See "THE FINANCING ORDER—Collection of 2017 Restructuring Charges; Nonbypassability" and "RISK FACTORS—Customer and Delivery Related Risks" in this Official Statement. |
| *State Pledge:* | The State has pledged in the Securitization Law that it will not in any way take or permit any action that limits, alters or impairs the value of the 2017 Restructuring Property, or, except as required by the True-Up Adjustment mechanism, reduce, alter, or impair the 2017 Restructuring Charges to be imposed, collected and remitted to Holders until the principal and interest in connection with the 2017 Restructuring Bonds and all other Ongoing Financing Costs have been paid and performed in full.  See "THE SECURITIZATION LAW—State Pledge" and "RISK FACTORS" in this Official Statement. |
| *Trustee:* | The Bank of New York Mellon.  See "THE TRUSTEE" in this Official Statement for a description of the Trustee and its duties and responsibilities under the Indenture. |
| *Servicing Fee:* | The annual servicing fee (the "Servicing Fee") relating to the 2017 Restructuring Bonds payable to LIPA, as the initial Servicer, or to any Successor Servicer affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets, shall be 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds.  In addition, the Servicer will also be reimbursed for its expenses incurred in carrying out its obligations under the Servicing Agreement.  The annual Servicing Fee for any Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets may be higher than the Servicing Fee for LIPA; provided, however, that any Servicing Fee in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be subject to approval by the Authority and the Trustee. |
| *Parties to Transaction and Responsibilities:* | The following chart represents a general summary of the parties to the transactions underlying the offering of the 2017 Restructuring Bonds, their roles and their various relationships to the other parties: |



*Flow of Funds to Bondholders:*   The following chart represents a general summary of the flow of Customer payments (including 2017 Restructuring Charges as well as other charges which are not security for the 2017 Restructuring Bonds, including the Prior Restructuring Charges, which are distributed from the Allocation Account described below to the trustees for each of the Prior Restructuring Bonds).



*Priority of Payments:*   On each Payment Date, or for any amount payable under clauses (i) through (iv) below, on any Business Day upon which the Trustee receives a written request from the Administrator stating that any of such Operating Expenses payable by the Issuer will become due and payable prior to the next succeeding Payment Date, the Trustee shall pay or allocate all amounts on deposit in the Collection Account (other than amounts on deposit in the Debt Service Reserve Subaccount, which shall be applied solely to amounts payable under clauses (v) through (vii) below), including all earnings thereon, to pay the following amounts, in accordance with the Semi-annual Servicer Certificate, in the following priority:

        (i)     all fees, costs, expenses (including legal fees and expenses) and, to the extent not in excess of $800,000 in each calendar year, indemnity amounts owed by the Issuer to the Trustee

under the applicable Basic Documents shall be paid to the Trustee,

(ii)    the Servicing Fee for such Payment Date and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees not in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(iii)   the Administration Fee and all unpaid Administration Fees from prior Payment Dates shall be paid to the Administrator,

(iv)    the payment of all other Operating Expenses (other than as provided in clauses (viii) and (ix) below) for such Payment Date shall be paid to the Persons entitled to such payment,

(v)     (A) first, any overdue interest (together with, to the extent lawful, interest on such overdue interest at the applicable Bond Interest Rate) and (B) second, interest due on such Payment Date shall be paid to the Holders,

(vi)    principal due and payable on the 2017 Restructuring Bonds as a result of an Event of Default (assuming the 2017 Restructuring Bonds have been declared immediately due and payable) or on the Final Maturity Date of a tranche of the 2017 Restructuring Bonds shall be paid to the Holders,

(vii)   principal for such Payment Date will be paid to the Holders in accordance with the priorities described in "THE 2017 RESTRUCTURING BONDS—Principal of the 2017 Restructuring Bonds" in this Official Statement,

(viii)  indemnity amounts owed by the Issuer to the Trustee to the extent in excess of $800,000 in each calendar year shall be paid to the Trustee and premiums for directors' and officers' liability insurance for trustees and officers of the Issuer shall be paid to the provider of such insurance, or, if such premium is paid by the Administrator pursuant to the Administration Agreement, the amount of such premium shall be paid to the Administrator in reimbursement thereof,

(ix)    the Servicing Fee for such Payment Date, and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(x)     the amount, if any, by which the Required Debt Service Reserve Level (as defined herein) exceeds the amount in the Debt Service Reserve Subaccount (as defined herein) as of such Payment Date will be paid or allocated to the Debt Service Reserve Subaccount,

(xi)    the amount, if any, by which the Required Operating Reserve Level (as defined herein) exceeds the amount in the Operating Reserve Subaccount (as defined herein) as of such Payment Date will be paid or allocated to the Operating Reserve Subaccount,

(xii)   the amount, if any, by which the amount in the Debt Service Reserve Fund exceeds the Required Debt Service Reserve

Level on any Payment Date shall be retained in the Debt Service Reserve Fund until the next Payment Date, at which time such excess amount in the Debt Service Reserve Fund shall be applied to the payment of amounts then due under clauses (v) through (vii) above prior to any other monies available for such purpose and, to the extent that such excess amount exceeds amounts then due under such clause on such next Payment Date, such excess amount shall continue to be held in the Debt Service Reserve Fund and shall be applied under such clauses (v) through (vii) above prior to any other monies available for such purpose on succeeding Payment Dates until fully applied; and

(xiii) the balance, if any, will be paid or allocated to the Excess Funds Subaccount (as defined herein) for distribution on subsequent Payment Dates.

See "SECURITY FOR THE 2017 RESTRUCTURING BONDS—How Funds in the Collection Account Will Be Allocated" in this Official Statement.

*Security:*  The 2017 Restructuring Bonds are secured only by the 2017 Collateral, consisting primarily of the 2017 Restructuring Property and funds on deposit in the Collection Account for the 2017 Restructuring Bonds and related subaccounts (except for the Upfront Financing Costs Subaccount). The 2017 Collateral does not include the Prior Restructuring Properties, including any of the Prior Restructuring Charges, or any other restructuring property created or any other restructuring charges imposed by any financing orders other than Financing Order No. 5.

The 2017 Restructuring Property consists primarily of the irrevocable contract right to impose, bill, and collect the nonbypassable consumption-based 2017 Restructuring Charges from all existing and future retail electric customers taking electric transmission or distribution service within the Service Area (as defined herein) from LIPA, the Authority or any of its successors or assignees ("Customers"). For a description of the 2017 Restructuring Property and the 2017 Restructuring Charges, see "THE 2017 RESTRUCTURING PROPERTY" in this Official Statement.

*Credit Ratings:*  The Issuer expects the 2017 Restructuring Bonds will receive credit ratings of "Aaa (sf)" by Moody's, "AAA (sf)" by S&P, and "AAAsf" by Fitch. It is a condition to the issuance of the 2017 Restructuring Bonds that such ratings are received.

*Minimum Denomination:*  $5,000 or any integral multiples thereof.

*Reports to Bondholders:*  Pursuant to the Servicing Agreement and the Continuing Disclosure Agreement, the Servicer will provide regular reports prepared by the Servicer containing information concerning, among other things, the Issuer and the 2017 Collateral. See "CONTINUING DISCLOSURE."

*Payment Dates and Interest Accrual:*  Semi-annually, June 15 and December 15. Interest will be calculated on a 30/360 basis. The first scheduled Payment Date is June 15, 2018. If a Payment Date is not a Business Day, then payment will be made on the next Business Day without additional interest.

*Scheduled Maturity Dates and Final Maturity Dates:*  A scheduled principal payment amount of the 2017 Restructuring Bonds is payable on each Payment Date, as shown herein. Failure to pay a scheduled principal payment on any Payment Date or the entire outstanding amount of the 2017 Restructuring Bonds of any tranche by the final Scheduled Maturity Date will not result in a default with respect to that tranche. The failure to pay the

|  | entire outstanding principal balance of the 2017 Restructuring Bonds of any tranche will result in a default only if such payment has not been made by the Final Maturity Date for the tranche. |
|---|---|
| *Tax Treatment:* | Interest on the 2017 Restructuring Bonds is excluded from gross income for federal income tax purposes. Interest on the 2017 Restructuring Bonds is exempt from personal income taxes imposed by the State of New York or any political subdivision thereof. See "TAX MATTERS" in this Official Statement. |
| *Restructuring Charges as a Portion of Customers' Total Electric Bill:* | The initial 2017 Restructuring Charge for the 2017 Restructuring Bonds is expected to represent approximately 0.81% of the total bill received by an average 1,000 kWh residential Customer. Combined with the Prior Restructuring Charges, the restructuring charges are expected to represent approximately 9.46% of the total bill received by an average 1,000 kWh residential Customer. |
| *Expected Settlement:* | The closing will be on or about November 21, 2017, settling through DTC. |
| *Legality for Investment:* | Pursuant to the Securitization Law, the 2017 Restructuring Bonds are legal investments for all governmental units, financial institutions, insurance companies, fiduciaries, and other persons located in the State that require statutory authority regarding legal investment. |
| *Risk Factors:* | **Potential investors should consider carefully the risk factors beginning on page 62 of this Official Statement before investing in the 2017 Restructuring Bonds.** |

[THIS PAGE INTENTIONALLY LEFT BLANK]

$369,465,000
**UTILITY DEBT SECURITIZATION AUTHORITY**
**RESTRUCTURING BONDS, SERIES 2017**

**INTRODUCTORY STATEMENT**

This Official Statement is provided to furnish information in connection with the issuance by the Issuer of its $369,465,000 2017 Restructuring Bonds. The 2017 Restructuring Bonds will be issued pursuant to the Indenture. Terms not defined elsewhere herein are used as defined in Appendix A hereto.

The 2017 Restructuring Bonds will be secured primarily by the 2017 Restructuring Property, which will primarily consist of the Authority's irrevocable right to impose, bill and collect a nonbypassable consumption-based 2017 Restructuring Charge from Customers. See "THE 2017 RESTRUCTURING PROPERTY." 2017 Restructuring Charges are set and periodically adjusted, as discussed below, to collect amounts sufficient to pay principal of and interest on the 2017 Restructuring Bonds on a timely basis and all other Ongoing Financing Costs. See "THE FINANCING ORDER—True-Up Adjustment Mechanism."

The 2017 Restructuring Charges will be collected by (or on behalf of) LIPA, as the initial Servicer, pursuant to the terms of a Servicing Agreement between LIPA and the Issuer. As described herein, the Authority and LIPA have entered into operating agreements, the purpose of which is to provide the Authority and LIPA with the operating personnel and a significant portion of the power supply resources necessary for LIPA to continue to provide electric service in the Service Area. Since January 1, 2014, PSEG Long Island has been the T&D System manager pursuant to the OSA (as defined herein). As used herein, the term "OSA" means the Amended and Restated Operations Services Agreement by and between LIPA and PSEG Long Island, as may be further amended and in effect from time to time. As T&D System manager, PSEG Long Island performs a number of the functions that would otherwise be performed by the Servicer as described in more detail herein. See "SERVICER AND ADMINISTRATOR—Servicing the 2017 Restructuring Bonds" in this Official Statement.

Brief descriptions of the Issuer, the Authority, LIPA, the Securitization Law, Financing Order No. 5, the 2017 Restructuring Bonds, the Sale Agreement, the Servicing Agreement, the Administration Agreement, and the Indenture are included in this Official Statement. Those descriptions and summaries do not purport to be comprehensive or definitive. Certain information relating to DTC and the book-entry only system has been furnished by DTC. Appendix B, Appendix C, and Appendix D contain the proposed forms of certain opinions to be delivered in connection with the issuance and delivery of the 2017 Restructuring Bonds. The descriptions of the 2017 Restructuring Bonds and other documents are qualified in their entirety by reference to them. Copies of documents relating to the 2017 Restructuring Bonds may be obtained at the designated office of the Trustee, 101 Barclay Street-Floor 7-West, New York, New York 10286.

**PLAN OF FINANCE AND USE OF PROCEEDS**

The proceeds of the 2017 Restructuring Bonds will be used by the Issuer to pay to the Authority the purchase price of the 2017 Restructuring Property and to pay certain Upfront Financing Costs. The Authority will use the monies received from the sale of the 2017 Restructuring Property to purchase, redeem, repay or defease the Refunded Debt.

Upfront Financing Costs incurred in connection with the issuance and sale of the 2017 Restructuring Bonds and the creation and acquisition of the 2017 Restructuring Property, net of underwriting discounts and commissions of $1,783,590.12, net of the deposit to the Operating Reserve Subaccount of $1,847,325.00 and net of the deposit to the Debt Service Reserve Subaccount of $5,541,975.00, are estimated to be approximately $1,196,617.56. The Operating Reserve Subaccount will be funded directly by a deposit made by Authority from its own available moneys to the Trustee. In addition, to the extent actual Upfront Financing Costs exceed the amount of proceeds of the 2017 Restructuring Bonds available to pay such Upfront Financing Costs, the Authority will make an additional contribution to pay such amount.

**THE SECURITIZATION LAW**

**Background**

On June 21, 2013, the New York State Assembly and Senate passed the LIPA Reform Act, codified as Chapter 173, Laws of New York. The Securitization Law is Part B of the LIPA Reform Act. The Securitization Law was signed on July 29, 2013, and on August 28, 2013, the time for filing any challenges to the LIPA Reform Act

1

expired and no such challenges were filed.  On March 30, 2015, the New York State Assembly and Senate adopted Chapter 58 of the Laws of New York, 2015 to permit, among other things, the adoption by the Authority Trustees of additional restructuring resolutions and the issuance by the Issuer of additional restructuring bonds in an aggregate principal amount not to exceed $4.5 billion less any previously issued restructuring bonds.  On April 13, 2015, the Governor signed such Chapter 58 into law.  On May 13, 2015, the time for filing any challenges to the LIPA Reform Act, as amended by such Chapter 58, expired and no such challenges were filed.  The Securitization Law allows the Authority to finance the redemption, payment and retirement of its Refunded Debt through the issuance of restructuring bonds by the Issuer.  The Authority, acting through LIPA, provides electric service in its service area which includes two counties on Long Island, New York ("Long Island") – Nassau County ("Nassau County") and Suffolk County ("Suffolk County") (except for the Nassau County villages of Freeport and Rockville Centre and the Suffolk County village of Greenport, each of which has its individually-owned municipal electric system) – and a portion of the Borough of Queens of The City of New York known as the Rockaways (the "Service Area").  For purposes of the 2017 Restructuring Bond financing, the "Service Area" is defined by the Securitization Law and is set as the service area of LIPA as of July 29, 2013.

## Purpose of Securitization Law

The Securitization Law created the Issuer.  The purpose of the Securitization Law is to provide a legislative foundation for its issuance of restructuring bonds to allow the Authority to retire a portion of its outstanding indebtedness.  The issuance of restructuring bonds, including the 2017 Restructuring Bonds, and the retirement of certain of the Authority's indebtedness are expected to result in savings to Customers on a net present value basis.

## Authorization of Restructuring Bonds Pursuant to Irrevocable Financing Orders

The Securitization Law authorizes the Authority to adopt financing orders approving the issuance of restructuring bonds.  The Securitization Law also provides that any financing order will be irrevocable after the time for any appeal to such financing order has lapsed.  The Securitization Law requires that the proceeds of the restructuring bonds be used by the Issuer to purchase restructuring property from the Authority and to pay or fund upfront financing costs.  It also requires that the Authority use the proceeds of the restructuring bonds it receives from its sale of the restructuring property to the Issuer only to pay approved restructuring costs which include, according to Financing Order No. 5, the costs of repurchasing, redeeming, repaying or defeasing certain of the Authority's outstanding indebtedness and upfront financing costs, and if funds remain after the approved restructuring costs are paid, to refund or credit to consumers any such surplus, to the extent practical.

## Prior Transactions

As authorized by the Securitization Law, as amended by Chapter 58 of the Laws of New York 2015, the Issuer has previously issued five series of restructuring bonds (the "Prior Restructuring Bonds") pursuant to four restructuring cost financing orders (the "Prior Financing Orders") adopted by the Authority.  The Issuer used the proceeds of the Prior Restructuring Bonds authorized by the Prior Financing Orders to purchase the restructuring property created by the related Prior Financing Order (each restructuring property created pursuant to each Prior Restructuring Order is a "Prior Restructuring Property" and all are collectively referred to herein as the "Prior Restructuring Properties"), including related restructuring charges (the restructuring charges related to the Prior Restructuring Property created by each Prior Restructuring Order being referred to herein as "Prior Restructuring Charges").  The Prior Restructuring Property created by each Prior Financing Order was pledged by the Issuer to the payment of the related Prior Restructuring Bonds.  The Authority used the net proceeds from the sale of each Prior Restructuring Property to retire debt and other obligations of the Authority.  **The Prior Restructuring Property created pursuant to each Prior Financing Order secures only the related Prior Restructuring Bonds and does not secure the other Prior Restructuring Bonds or the 2017 Restructuring Bonds.**

[Remainder Intentionally Blank]

Pursuant to the Prior Financing Orders, the Issuer issued $4,130,529,000 aggregate principal amount of restructuring bonds.

| Prior Financing Order and Date of Adoption | Related Prior Restructuring Bonds | Original Principal Amount |
|---|---|---|
| Financing Order No. 1, adopted October 3, 2013 | Series 2013T and Series 2013TE | $2,022,324,000 |
| Financing Order No. 2, adopted June 26, 2015 | Series 2015 (the "2015 Restructuring Bonds") | $1,002,115,000 |
| Financing Order No. 3, adopted June 26, 2015 | Series 2016A (the "2016A Restructuring Bonds") | $636,770,000 |
| Financing Order No. 4, adopted June 26, 2015 | Series 2016B (the "2016B Restructuring Bonds") | $469,320,000 |

The issuance of the 2017 Restructuring Bonds will effectively exhaust the Issuer's authority to issue restructuring bonds under the amended Securitization Law. Any additional issuances of restructuring bonds would require legislative action and would be separately secured by distinct collateral pursuant to a new financing order and new transaction documents, including a separate trust indenture.

**2017 Restructuring Property**

The Securitization Law authorizes the creation and sale of restructuring property which will include the irrevocable right to impose, bill and collect restructuring charges from Customers. The 2017 Restructuring Bonds are secured by and payable from the restructuring property created by Financing Order No. 5 (the "2017 Restructuring Property").

**True-Up Adjustment Mechanism**

The Securitization Law requires the Authority to include in any financing order a mechanism requiring that restructuring charges be reviewed and adjusted at least annually and if determined to be necessary, semi-annually or more frequently, to ensure that the expected collection of the restructuring charges is adequate to timely pay all scheduled payments of principal and interests on the applicable restructuring bonds and all other ongoing financing costs when due. The Securitization Law provides that, once restructuring bonds are issued, any adjustments to the related restructuring charge may only be challenged as to mathematical errors in the calculation. See "THE FINANCING ORDER—True-Up Adjustment Mechanism" and "THE SERVICING AGREEMENT—True-Up Adjustment Process" herein.

**2017 Restructuring Charges are Nonbypassable**

The Securitization Law provides that the 2017 Restructuring Charges are irrevocable and nonbypassable. "Nonbypassable" as set forth in the Securitization Law and Financing Order No. 5 means that a Customer is obligated to pay 2017 Restructuring Charges and may not avoid payment of such charges as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, even if such Customer produces its own electricity or purchases electric generation services from a provider of electric generation services who is not the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA. Customers that self-generate eligible renewable power will only be responsible for paying 2017 Restructuring Charges based upon their "net-billed" consumption. See "THE 2017 RESTRUCTURING PROPERTY" in this Official Statement.

**No Right of Set-Off; Partial Payment of Customer Charges**

The obligation to pay the restructuring charges, including the 2017 Restructuring Charges, is not subject to any right of set-off in connection with the bankruptcy of the Servicer or any other entity. If any Customer does not pay the full amount of any bill to the Servicer, the amount paid by the Customer will be applied pro rata between the restructuring charges and the other charges, based on the percentage of the overall bill of such charges, unless the Customer specifies that a greater proportion of such payment is to be allocated to the restructuring charges, except that other charges are to be reduced by the amount of any set-off, counterclaim, surcharge or defense.

**State Pledge**

As a provision of the Securitization Law, the State has pledged to and agreed with the Issuer, the Authority, the Holders, and other Financing Parties that, until the 2017 Restructuring Bonds and any Ancillary Agreements have been paid and performed in full, the State shall not:

(1)     take or permit any action that limits, alters or impairs the value of the 2017 Restructuring Property,

(2)     in any way impair the rights and remedies of the Authority, the Issuer, LIPA, the Holders or any other Financing Parties or the security for such 2017 Restructuring Bonds or Ancillary Agreements, or

(3)     except as permitted in connection with a true-up adjustment mechanism authorized by the Securitization Law and set forth in Financing Order No. 5, reduce, alter, or impair 2017 Restructuring Charges that are to be imposed, collected, and remitted for the benefit of the Authority, the Issuer, the Holders and other Financing Parties, as applicable, until any and all principal and interest, all other Ongoing Financing Costs and all amounts to be paid to any assignee or Financing Party under any Ancillary Agreement in connection with the 2017 Restructuring Bonds have been fully paid or performed in full.  See "RISK FACTORS."

**Trustee's Lien on 2017 Restructuring Property Protected**

The Securitization Law provides that the lien on the 2017 Restructuring Property will be perfected, valid and binding from the time when the pledge is made.  The pledge is made in favor of the Trustee for the benefit of the Bondholders.  The security interest will attach without any physical delivery of collateral or other act and such security interest shall (i) be valid, binding and perfected against all parties having claims of any kind in tort, contract or otherwise, regardless of whether the parties have notice of the lien and (ii) constitute a continuously perfected security interest and have priority over any other lien, created by operation of law or otherwise, that may subsequently attach to the 2017 Restructuring Property or those rights or interests.

The Securitization Law provides that the priority of security interests in the 2017 Restructuring Property will not be affected by:

- commingling of funds arising from 2017 Restructuring Charges with other funds, or
- any application of the True-Up Adjustment under Financing Order No. 5.

See "RISK FACTORS—Risks Associated with the Unusual Nature of the 2017 Restructuring Property."

**Right of Sequestration**

The Securitization Law provides that if the Authority, LIPA or any third-party biller defaults in the required payment of 2017 Restructuring Charges collected by it, a New York court, upon application by an interested party and without limiting any other remedies available to that applicant, is required to order the sequestration and payment of the collections for the benefit of Bondholders, any assignee, and any Financing Party.

**Transfer Characterized as True Sale**

The Securitization Law provides that, if the governing documentation in a transaction approved in a financing order states that the transfer is a sale or other absolute transfer, the Authority's transfer of the 2017 Restructuring Property to the Issuer is a "true sale" under New York law and not a pledge or other financing (other than for federal, state and local income and franchise tax purposes).  See "THE SALE AGREEMENT" and "RISK FACTORS—Risks Associated with Potential Bankruptcy Proceedings."  The Securitization Law also provides that the characterization of the sale, assignment or transfer as an absolute transfer and true sale and the corresponding characterization of the property interest of the Issuer shall not be adversely affected or impaired by, among other things, the occurrence of any of the following:

- commingling of revenues or other proceeds from 2017 Restructuring Charges with other amounts,
- retention by the Seller of a partial or residual interest in the 2017 Restructuring Property or the right to recover costs associated with taxes, payments in lieu of taxes, franchise fees or license fees imposed on the collection of 2017 Restructuring Charges,
- any recourse that the Issuer may have against the Seller,
- any indemnification rights, obligations or repurchase rights made or provided by the Seller,

4

- the obligation of the Seller to collect 2017 Restructuring Charges on behalf of an assignee,

- the treatment of the sale, assignment or transfer for tax, financial reporting or other purposes,

- any subsequent order of the Seller amending Financing Order No. 5, or

- any application of the True-Up Adjustment mechanism provided in the Securitization Law.

**Transfer and Ownership of 2017 Restructuring Property is Tax Exempt**

The Securitization Law provides that the transfer and ownership of 2017 Restructuring Property and the imposition, billing, and collection of 2017 Restructuring Charges are exempt from all taxes and similar charges imposed by the State or any county, municipal corporation, school district, local authority or other subdivision.

### THE FINANCING ORDER

**General; Creation of 2017 Restructuring Property; Irrevocability**

The 2017 Restructuring Bonds will be issued pursuant to Financing Order No. 5. Financing Order No. 5 permits the Issuer to issue, in one or more series, additional restructuring bonds in an aggregate amount not to exceed $369,471,000, the remaining amount authorized by the Securitization Law. Financing Order No. 5 authorizes: (a) the creation of the 2017 Restructuring Property, (b) the sale of the 2017 Restructuring Property by the Authority to the Issuer, (c) the imposition, billing and collection of the 2017 Restructuring Charges on, to and from the Customers in the Service Area, (d) the issuance and sale of restructuring bonds in an aggregate principal amount not to exceed the Remaining Authorized Amount, (e) the use by the Issuer of the proceeds from the sale of the 2017 Restructuring Bonds to pay the purchase price of the 2017 Restructuring Property and the Upfront Financing Costs, and (f) the use by the Authority of the proceeds of the sale of the 2017 Restructuring Property to purchase, redeem, repay, or defease the Refunded Debt. The Securitization Law required the Authority to submit Financing Order No. 5 to the PACB for its approval. The PACB approved Financing Order No. 5 on September 20, 2017. The PACB has no authority to reconsider Financing Order No. 5. Pursuant to the Securitization Law, Financing Order No. 5 became irrevocable, final and non-appealable on October 20, 2017.

Under Financing Order No. 5, the Servicer has the right to impose, bill and collect (on behalf of the Issuer) 2017 Restructuring Charges, which right is included in the 2017 Restructuring Property sold to the Issuer. As provided in the Securitization Law, Financing Order No. 5 is irrevocable and is not subject to modification or termination, and acknowledges that the State of New York has pledged not to take or permit any action that limits, alters or impairs the value of the 2017 Restructuring Property or, except as required by the true-up adjustment mechanism, reduce, alter or impair the 2017 Restructuring Charges that are imposed, billed or collected for the benefit of the Bondholders, any assignee, and any Financing Parties until all principal of and interest on the 2017 Restructuring Bonds, all other Ongoing Financing Costs, and all amounts to be paid to an assignee or Financing Party under certain agreements entered into in connection with the 2017 Restructuring Bonds are paid or performed in full. See "RISK FACTORS."

**Collection of 2017 Restructuring Charges; Nonbypassability**

Financing Order No. 5 provides that the Customers are responsible for paying the 2017 Restructuring Charges as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, even if such Customer produces its own electricity or purchases electric generation services from a provider of electric generation services other than the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA. Financing Order No. 5 authorizes the Servicer to collect 2017 Restructuring Charges from such Customers. See "SERVICER AND ADMINISTRATOR—Revenues, LIPA's Customer Bases and Electric Energy Consumption—Electricity Delivered to Customers, Total Electricity Delivery Service Revenues and Customers." Certain Customers that self-generate eligible renewable power will only be responsible for paying 2017 Restructuring Charges based upon their "net-billed" consumption.

The Authority's tariff provides for net metering of certain residential and nonresidential customer-generators of renewable power, such as solar, wind, farm waste, micro-combined heat and power, fuel cells, micro-hydroelectric and hybrids. The amount of net metering permitted is established by the tariff. The net meters measure only the net amount of electricity provided to or by the customer-generator using the T&D System Assets.

Until recently, the tariff imposed limits on the amounts of rated generating capacity that an eligible customer-generator may have. The tariff further provided that the Authority would sign contracts with eligible customer-generators on a first come-first served basis until the total rated generating capacity of all such customer-generators

in the Service Area was equal to 153,000 kilowatts (approximately 3% percent of the Authority's reference year (2005) peak load) for non-wind customer-generators and 15,300 kilowatts for wind customer-generators. In 2014, the New York State Public Service Commission (the "PSC") has increased the cap for the regulated utilities to 6%, but more recently indicated that the appropriate mechanism to compensate customers with renewable generation is a topic for its Reforming the Energy Initiative ("REV") which was commenced in April 2014 to reform the State's energy industry and regulatory practices.  The PSC ordered the regulated utilities to accept all applications for net metering without regard to a cap, while the ongoing REV proceeding establishes the appropriate compensation mechanism. On March 9, 2017, the PSC adopted the first phase of its net metering successor plan (*see* Order on Net Energy Metering Transition, Phase One of Value of Distributed Energy Resources, And Related Matters, New York Public Service Commission Case 15-E-0751 (the "Phase One Order")), which provides a new mechanism for utility compensation of certain distributed energy resources interconnected after March 9, 2017.  Under the Phase One Order, large commercial customers will be compensated with a value stack comprised of values for energy, capacity, environmental, and demand reduction costs.  The Phase One Order also provided that new community distributed generation projects added during the first phase should not impact each utility's net annual revenue by more than 2%.  Notwithstanding the fact that the Authority is not subject to PSC jurisdiction, consistent with the PSC direction to regulated utilities, the Authority expects to implement the PSC's net metering successor plan within the Service Territory, including value stack compensation for large commercial customers.  The Authority also expects to implement net metering grandfathering provisions, which as applied to the Authority will provide that (i) eligible customers interconnected or substantially interconnected by January 1, 2018 will remain as such for the life of those customers' system and (ii) eligible mass market customers who become substantially interconnected after January 1, 2018 and by January 1, 2020 will be eligible for the existing net metering framework, but with a 20-year sunset.  As of the date hereof, the Authority has net metering arrangements with eligible customer-generators in the Service Area equal to approximately 5.6% of the Authority's reference year (2005) peak load.  The Authority does not expect to reach the Phase One Order's 2% revenue-based cap on new community distributed generation projects and currently has only one active application from such projects.

Financing Order No. 5 does not cap any of the ongoing costs that may be recovered through the 2017 Restructuring Charge, and there is no cap on the level of 2017 Restructuring Charges that may be imposed on Customers through the true-up adjustment mechanism, which is designed to assure the expected collection of amounts required to pay scheduled principal and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs on a timely basis.  Accordingly, such 2017 Restructuring Charges may continue to be imposed, billed and collected until the 2017 Restructuring Bonds and all Ongoing Financing Costs are paid in full, without any specified time limit.  Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "Transition Charges" as defined in the Authority's Electric System General Revenue Bond Resolution adopted on May 13, 1998 (the "General Resolution"), and that they are not subject to the lien of the General Resolution.  In addition, the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens.  Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution.

**Terms of the 2017 Restructuring Bonds**

Financing Order No. 5 provides certain parameters for the issuance of the 2017 Restructuring Bonds, including that there will be a Scheduled Maturity Date and a Final Maturity Date for each tranche (that will not be more than two years following the Scheduled Maturity Date), provided that no Final Maturity Date will be later than 30 years from the date of issuance and the final scheduled maturity of any 2017 Restructuring Bonds shall be no later than the final scheduled maturity date of the Authority bonds to be purchased, redeemed or defeased with the proceeds of such 2017 Restructuring Bonds.  As described below, the Issuance Advice Letter will confirm the final interest rates and certain other terms for the 2017 Restructuring Bonds.

**2017 Restructuring Charges on Customer Bills**

The Servicer will disclose on each Customer's monthly bill by a footnote or other description the amount of the 2017 Restructuring Charge or the amount of the 2017 Restructuring Charge per kWh.  Such description will include a statement that the 2017 Restructuring Charge is payable to the Issuer.  The calculation of the initial 2017 Restructuring Charge will be set forth in the Issuance Advice Letter.  See "THE 2017 RESTRUCTURING PROPERTY—2017 Restructuring Charges."

**True-Up Adjustment Mechanism**

During the life of the 2017 Restructuring Bonds, the Servicer will calculate and adjust the 2017 Restructuring Charges at least annually (each, an "Annual True-Up Adjustment"), effective each November 15, commencing with November 15, 2018, to correct for any over-collections or under-collections to the end of the then current Annual Calculation Period (the next succeeding December 15) and to ensure that the 2017 Restructuring Charge during the period commencing on each November 15 and ending on the following November 14 is adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs due during the period beginning on the next December 16 and ending on the following December 15 (each an "Annual Calculation Period"). Before April 15, 2018 and April 15 of each year thereafter, the Servicer is also required to perform a mid-year review (each, a "Mid-Year Review") to ensure that the expected collections of 2017 Restructuring Charges are adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due and to make timely payment on all other Ongoing Financing Costs to the end of the then current Annual Calculation Period (the next succeeding December 15). If a Mid-Year Review results in a projection that the Charge Collections will be insufficient to make such payments, the Servicer must file a notice of adjustment (the "Mandatory Mid-Year True-Up Adjustment") to ensure that the 2017 Restructuring Charge during the period beginning on May 15 and ending on the following May 14 is adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs due during the period beginning on the next June 16 and ending on the following June 15 (each such period a "Mid-Year Calculation Period"). If it is determined that a Mandatory Mid-Year True-Up is not required, the Servicer may nevertheless voluntarily elect to file a notice of adjustment (i) to correct for any over-collections to date and anticipated to be experienced up to the end of the then current Mid-Year Calculation Period and (ii) to ensure that the 2017 Restructuring Charge during the period beginning on May 15 and ending on the following May 14 is adequate to pay timely principal and interest on the Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs due during the next Mid-Year Calculation Period (a "Voluntary Mid-Year True-Up Adjustment"). Any such notice of adjustment for a Mandatory Mid-Year True-Up or a Voluntary Mid-Year True-Up shall be filed no later than April 15 of such calendar year, to be effective on May 15 of such calendar year.

The Servicer may file a true-up adjustment more frequently at any time to ensure that the expected collections of the 2017 Restructuring Charges are adequate to pay timely principal and interest on the 2017 Restructuring Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs (each, an "Optional True-Up Adjustment"). In addition, following the last Scheduled Maturity Date of the 2017 Restructuring Bonds, if and so long as any such 2017 Restructuring Bonds remain outstanding after such Scheduled Maturity Date, the Servicer is also required to make such true-up adjustments quarterly to ensure that Charge Collections will be sufficient to pay timely principal and interest, and all other Ongoing Financing Costs due on the next Payment Date (each, a "Quarterly True-Up Adjustment" and, together with Annual True-Up Adjustments, Mandatory Mid-Year True-Up Adjustments, Voluntary Mid-Year True-Up Adjustments, and Optional True-Up Adjustments, a "True-Up Adjustment"). The Quarterly True-Up Adjustments will be set at levels estimated to generate revenues sufficient to pay all principal and interest on the 2017 Restructuring Bonds on the next Payment Date, together with all other Ongoing Financing Costs.

The adjustments to the 2017 Restructuring Charges will continue until principal of and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs have been paid or performed in full.

There is no cap on the amount of 2017 Restructuring Charges that may be imposed on Customers as a result of a True-Up Adjustment.

The Servicer must file with the Authority and the Issuer, approximately 30 days before the effective date of an adjustment, an Adjustment Notice to the 2017 Restructuring Charge during which period the Authority may confirm the mathematical accuracy of the Servicer's adjustment. Each True-Up Adjustment will go into effect on a bills rendered basis on a date which is no earlier than 30 days subsequent to the date of submission of the Adjustment Notice. In the event any correction is necessary to a True-Up Adjustment due to mathematical errors in the calculation of the adjustment or otherwise is necessary, the adjustment to the mathematically incorrect 2017 Restructuring Charge adjustment will take effect no sooner than the billing cycle in the month that begins at least five days after the Authority notifies the Servicer of its determination that the calculation of such True-Up Adjustment is mathematically inaccurate.

**Issuance Advice Letter**

By no later than three Business Days following the pricing date for the 2017 Restructuring Bonds and prior to their issuance, the Servicer will, as required under Financing Order No. 5, file with the Authority and the Issuer an Issuance Advice Letter, pursuant to which the Servicer will:

- calculate the expected savings to Customers from the financing,

- estimate the Ongoing Financing Costs,

- determine and specify the initial 2017 Restructuring Charge, and

- evidence the final terms on which the 2017 Restructuring Bonds will be issued.

A designee of the Authority is authorized under Financing Order No. 5 to review and approve the Issuance Advice Letter for the purpose of confirming that the stated terms are consistent with Financing Order No. 5. This designee's approval and confirmation shall constitute the Authority's approval and confirmation, and will be final and incontestable, without need for further action by the Authority.

**Servicing Agreement**

In Financing Order No. 5, the Issuer and LIPA were authorized to enter into the Servicing Agreement described under "The Servicing Agreement" in this Official Statement. Pursuant to the OSA, PSEG Long Island is the T&D System manager and performs, among other things, the billing and collection, meter reading and forecasting required by the Servicing Agreement on behalf of the Servicer. LIPA is responsible for taking all necessary action in connection with True-Up Adjustments and certain reporting requirements. See "SERVICER AND ADMINISTRATOR—Servicing the 2017 Restructuring Bonds" and "THE SERVICING AGREEMENT—Servicing Procedures" in this Official Statement.

**Binding on Successors**

Financing Order No. 5 and the 2017 Restructuring Charges authorized in Financing Order No. 5 are binding on the Authority, LIPA, any successor to the Authority or LIPA and any Successor Servicer to LIPA.

**THE 2017 RESTRUCTURING PROPERTY**

**Overview**

The 2017 Restructuring Property of the Authority consists generally of its property, rights and interests under Financing Order No. 5, including the Authority's irrevocable right:

- to impose, bill and collect irrevocable, nonbypassable 2017 Restructuring Charges from each Customer, and

- to adjust those 2017 Restructuring Charges, in accordance with the true-up adjustment mechanism set forth in Financing Order No. 5, in an amount sufficient to pay principal and interest on its 2017 Restructuring Bonds and all other Ongoing Financing Costs approved under Financing Order No. 5.

The 2017 Restructuring Property also includes all revenues, collections, claims, payments, money or proceeds from the 2017 Restructuring Charges.

The Issuer will purchase the 2017 Restructuring Property from the Seller. The 2017 Restructuring Bonds are secured primarily by the 2017 Restructuring Property. The 2017 Restructuring Property is not a receivable and, as the primary collateral securing the 2017 Restructuring Bonds, is not a pool of receivables. Charge Collections from the 2017 Restructuring Charges, as such charges may be adjusted pursuant to the True-Up Adjustment mechanism, will be used to pay principal of and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs approved under Financing Order No. 5. These irrevocable nonbypassable charges will be included in the Customers' bills, and will be collected until the 2017 Restructuring Bonds and all Ongoing Financing Costs are paid in full. 2017 Restructuring Charges may not be reduced, altered or impaired except for periodic adjustments, in accordance with the True-Up Adjustment mechanism, to correct over-collections or under-collections to ensure the recovery of amounts sufficient to timely pay principal of and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs. All revenues and collections from 2017 Restructuring Charges provided for in Financing Order No. 5 are part of the 2017 Restructuring Property.

**Creation of 2017 Restructuring Property**

Under Financing Order No. 5, the 2017 Restructuring Property is created simultaneous with its sale to the Issuer. The 2017 Restructuring Property is a property right consisting generally of the irrevocable right to impose, bill and collect 2017 Restructuring Charges from Customers, the right to adjust those 2017 Restructuring Charges and the right to all revenues, collections, claims, payments, money or proceeds of or arising from the 2017 Restructuring Charges and the property, rights and interests created under Financing Order No. 5. The 2017 Restructuring Bonds will be secured by the 2017 Restructuring Property, as well as the other 2017 Collateral described under "THE SECURITY FOR THE 2017 RESTRUCTURING BONDS—Pledge of 2017 Collateral."

**2017 Restructuring Charges**

The 2017 Restructuring Charges will be set and adjusted thereafter as necessary to generate revenues required:

- to pay fees and expenses related to the servicing and collection and retirement of the 2017 Restructuring Bonds including, without limitation, fees and expenses related to Trustee costs, rating agency surveillance fees, legal and accounting fees which are included in the Ongoing Financing Costs, as well as adjustments for dealing with estimated and actual costs,

- to pay interest on the 2017 Restructuring Bonds,

- to pay principal of each tranche of such 2017 Restructuring Bonds according to the Expected Amortization Schedule,

- to replenish the Operating Reserve Subaccount and the Debt Service Reserve Subaccount to the Required Operating Reserve Level and the Required Debt Service Reserve Level, respectively, and

- to pay all additional fees, costs and charges and all other Ongoing Financing Costs approved under Financing Order No. 5.

## THE 2017 RESTRUCTURING BONDS

**General**

The 2017 Restructuring Bonds will be dated the Issuance Date and interest thereon will be payable on the dates set forth on the inside cover page of this Official Statement. The initial principal amount, Scheduled Maturity Dates, Final Maturity Dates and Interest Rate of each tranche of 2017 Restructuring Bonds is set forth on the inside cover page of this Official Statement.

The 2017 Restructuring Bonds will be issued in denominations of $5,000 or any integral multiple thereof.

The 2017 Restructuring Bonds originally will be issued solely in book-entry only form to DTC or its nominee, Cede & Co., to be held in DTC's book-entry only system. So long as the 2017 Restructuring Bonds are held in the book-entry only system, DTC or its nominee will be the registered owner of the 2017 Restructuring Bonds for all purposes of the Indenture, the 2017 Restructuring Bonds and this Official Statement. For purposes of this Official Statement, DTC or its nominee, and its successors, are referred to as the "Securities Depository." See "—Securities Depository" below.

The Bank of New York Mellon is the Trustee under the Indenture and also is the Bond Registrar, Authenticating Agent and Paying Agent for the 2017 Restructuring Bonds.

Payments on the 2017 Restructuring Bonds will be made to the holders of the 2017 Restructuring Bonds as of the Record Date, or special record date, as established in the Indenture. If any Payment Date or special payment date specified for any payments to Bondholders is not a Business Day, the Trustee will make payments scheduled to be made on the next succeeding Business Day and no interest will accrue during the intervening period.

**Interest on the 2017 Restructuring Bonds**

Interest on the 2017 Restructuring Bonds will be calculated on the basis of a 360-day year of twelve 30-day months and will be paid to the Holder as of the Business Day preceding each Payment Date, June 15 and December 15, beginning June 15, 2018, in immediately available funds by wire transfer as long as the Securities Depository is the Holder and otherwise subject to a minimum holding on the Payment Date. If any interest on the 2017 Restructuring Bonds is due on a non-Business Day, it will be made on the next Business Day, and no additional interest will accrue as a result.

9

The failure to pay accrued interest on any Payment Date (even if the failure is caused by a shortfall in 2017 Restructuring Charges received) will result in an Event of Default for the 2017 Restructuring Bonds unless such failure is cured within five Business Days. Any interest not paid when due (plus interest on the defaulted interest at the applicable interest rate to the extent lawful) will be payable to the Bondholders on a special record date as provided in the Indenture and the Administration Agreement.

**Principal of the 2017 Restructuring Bonds**

Scheduled payments of principal on each tranche of the 2017 Restructuring Bonds are reflected on the Expected Amortization Schedule below.

To the extent funds are available in the Collection Account (other than funds in the Upfront Financing Costs Subaccount), principal payments shall be made on each Payment Date in accordance with the priority of payment set forth below under the heading "SECURITY FOR THE 2017 RESTRUCTURING BONDS—How Funds in the Collection Account Will Be Allocated," with scheduled payments of principal of the 2017 Restructuring Bonds being made to the Holders of the 2017 Restructuring Bonds in order of their Final Maturity Dates.

No principal payment on any tranche of 2017 Restructuring Bonds shall be made on any Payment Date prior to the payment in full of all of the principal of all tranches of such 2017 Restructuring Bonds with an earlier Final Maturity Date and no principal payments on any tranche of 2017 Restructuring Bonds shall be made until interest due on all 2017 Restructuring Bonds on such Payment Date is paid in full. No principal payment shall be made on any Tranche-1 through Tranche-16 prior to the Scheduled Maturity Date for such 2017 Restructuring Bonds. Notwithstanding the foregoing, if an Event of Default under the Indenture should occur and be continuing, the unpaid principal amount of all 2017 Restructuring Bonds and the accrued interest thereon may be declared immediately due and payable (see "THE INDENTURE—Events of Default" and "THE INDENTURE—Remedies–Acceleration"). In addition, the 2017 Restructuring Bonds subject to optional redemption may be optionally redeemed (see "—Redemption–Optional Redemption" below).

Partial payments of any scheduled payments will be allocated within 2017 Restructuring Bonds of a particular tranche pro rata. Partial payments of any scheduled payments will be allocated between tranches of 2017 Restructuring Bonds with the same Final Maturity Date on a pro rata basis.

The entire unpaid principal balance of each tranche of the 2017 Restructuring Bonds will be due and payable on the Final Maturity Date for the tranche. It shall not constitute an Event of Default if Bonds are not paid earlier in accordance with the Expected Amortization Schedule (so long as all available amounts held under the Indenture are applied in accordance with its provisions).

The Trustee will make each payment other than the final payment with respect to any 2017 Restructuring Bonds to the holders of record of the 2017 Restructuring Bonds of the applicable tranche on the Record Date for that Payment Date. The Trustee will make the final payment for each tranche of 2017 Restructuring Bonds, however, only upon presentation and surrender of the 2017 Restructuring Bonds of that tranche at the office or agency of the Trustee specified in the notice given by the Trustee of the final payment. The Trustee will mail notice of the final payment to the Bondholders no later than five days prior to the final Payment Date, specifying the date set for the final payment and the amount of the payment.

[Remainder Intentionally Blank]

The Expected Amortization Schedule is set forth below for each tranche of the 2017 Restructuring Bonds.

**Expected Amortization Schedule**

| Tranche | Initial Principal Amount | Scheduled Maturity Date[†] | Final Maturity Date[†] |
|---|---|---|---|
| Tranche 1 | $1,695,000 | June 15, 2020 | June 15, 2022 |
| Tranche 2 | $1,740,000 | December 15, 2020 | December 15, 2022 |
| Tranche 3 | $10,985,000 | June 15, 2021 | June 15, 2023 |
| Tranche 4 | $11,260,000 | December 15, 2021 | December 15, 2023 |
| Tranche 5 | $11,440,000 | June 15, 2022 | June 15, 2024 |
| Tranche 6 | $11,725,000 | December 15, 2022 | December 15, 2024 |
| Tranche 7 | $18,130,000 | June 15, 2023 | June 15, 2025 |
| Tranche 8 | $18,585,000 | December 15, 2023 | December 15, 2025 |
| Tranche 9 | $190,000 | June 15, 2024 | June 15, 2026 |
| Tranche 10 | $195,000 | December 15, 2024 | December 15, 2026 |
| Tranche 11 | $195,000 | June 15, 2025 | June 15, 2027 |
| Tranche 12 | $200,000 | December 15, 2025 | December 15, 2027 |
| Tranche 13 | $205,000 | June 15, 2026 | June 15, 2028 |
| Tranche 14 | $210,000 | December 15, 2026 | December 15, 2028 |
| Tranche 15 | $220,000 | June 15, 2027 | June 15, 2029 |
| Tranche 16 | $225,000 | December 15, 2027 | December 15, 2029 |
| Tranche 17* | $465,000 | December 15, 2028 | December 15, 2030 |
| Tranche 18* | $485,000 | December 15, 2029 | December 15, 2031 |
| Tranche 19* | $510,000 | December 15, 2030 | December 15, 2032 |
| Tranche 20* | $535,000 | December 15, 2031 | December 15, 2033 |
| Tranche 21* | $565,000 | December 15, 2032 | December 15, 2034 |
| Tranche 22* | $595,000 | December 15, 2033 | December 15, 2035 |
| Tranche 23* | $625,000 | December 15, 2034 | December 15, 2036 |
| Tranche 24* | $655,000 | December 15, 2035 | December 15, 2037 |
| Tranche 25* | $63,235,000 | December 15, 2036 | December 15, 2038 |
| Tranche 26* | $62,085,000 | December 15, 2037 | December 15, 2039 |
| Tranche 27* | $69,810,000 | December 15, 2038 | December 15, 2040 |
| Tranche 28* | $82,700,000 | December 15, 2039 | December 15, 2041 |

*Subject to Sinking Fund Payments.  See "—Redemption-Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules" below.

[†] If such date is not a Business Day, the next Business Day without additional interest.

[Remainder Intentionally Blank]