**Maturity Sensitivity**

The rate of principal payments on each tranche of the 2017 Restructuring Bonds, the aggregate amount of each interest payment on each tranche of the 2017 Restructuring Bonds and the actual final Payment Date of each tranche of the 2017 Restructuring Bonds will depend on the timing of the Servicer's receipt of 2017 Restructuring Charges from Customers. Changes in the expected actual final payment of the tranches of the 2017 Restructuring Bonds in relation to variances in actual energy consumption levels (retail electricity delivery service sales) from forecast levels, are shown below.

### Maturity Sensitivity

| Tranche | Scheduled Maturity Date | Forecast Error of 5% | | Forecast Error of 15% | |
|---------|------------------------|---------------------|---------------|----------------------|----------------|
| | | Actual Final Payment | Change (days)* | Actual Final Payment | Change (days)* |
| Tranche 1 | June 15, 2020 | June 15, 2020 | 0 | June 15, 2020 | 0 |
| Tranche 2 | December 15, 2020 | December 15, 2020 | 0 | December 15, 2020 | 0 |
| Tranche 3 | June 15, 2021 | June 15, 2021 | 0 | June 15, 2021 | 0 |
| Tranche 4 | December 15, 2021 | December 15, 2021 | 0 | December 15, 2021 | 0 |
| Tranche 5 | June 15, 2022 | June 15, 2022 | 0 | June 15, 2022 | 0 |
| Tranche 6 | December 15, 2022 | December 15, 2022 | 0 | December 15, 2022 | 0 |
| Tranche 7 | June 15, 2023 | June 15, 2023 | 0 | June 15, 2023 | 0 |
| Tranche 8 | December 15, 2023 | December 15, 2023 | 0 | December 15, 2023 | 0 |
| Tranche 9 | June 15, 2024 | June 15, 2024 | 0 | June 15, 2024 | 0 |
| Tranche 10 | December 15, 2024 | December 15, 2024 | 0 | December 15, 2024 | 0 |
| Tranche 11 | June 15, 2025 | June 15, 2025 | 0 | June 15, 2025 | 0 |
| Tranche 12 | December 15, 2025 | December 15, 2025 | 0 | December 15, 2025 | 0 |
| Tranche 13 | June 15, 2026 | June 15, 2026 | 0 | June 15, 2026 | 0 |
| Tranche 14 | December 15, 2026 | December 15, 2026 | 0 | December 15, 2026 | 0 |
| Tranche 15 | June 15, 2027 | June 15, 2027 | 0 | June 15, 2027 | 0 |
| Tranche 16 | December 15, 2027 | December 15, 2027 | 0 | December 15, 2027 | 0 |
| Tranche 17** | December 15, 2028 | December 15, 2028 | 0 | December 15, 2028 | 0 |
| Tranche 18** | December 15, 2029 | December 15, 2029 | 0 | December 15, 2029 | 0 |
| Tranche 19** | December 15, 2030 | December 15, 2030 | 0 | December 15, 2030 | 0 |
| Tranche 20** | December 15, 2031 | December 15, 2031 | 0 | December 15, 2031 | 0 |
| Tranche 21** | December 15, 2032 | December 15, 2032 | 0 | December 15, 2032 | 0 |
| Tranche 22** | December 15, 2033 | December 15, 2033 | 0 | December 15, 2033 | 0 |
| Tranche 23** | December 15, 2034 | December 15, 2034 | 0 | December 15, 2034 | 0 |
| Tranche 24** | December 15, 2035 | December 15, 2035 | 0 | December 15, 2035 | 0 |
| Tranche 25** | December 15, 2036 | December 15, 2036 | 0 | June 15, 2037 | 182 |
| Tranche 26** | December 15, 2037 | December 15, 2037 | 0 | December 15, 2037 | 0 |
| Tranche 27** | December 15, 2038 | December 15, 2038 | 0 | June 15, 2039 | 182 |
| Tranche 28** | December 15, 2039 | December 15, 2039 | 0 | December 15, 2039 | 0 |

*Number is rounded to whole days.

**Subject to Sinking Fund Payments. See "—Redemption–Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules."

*Assumptions.* For the purposes of preparing the chart above, the following assumptions, among others, have been made: (i) the forecast error stays constant over the life of the 2017 Restructuring Bonds and is equal to an overestimate of electricity consumption of 5% (1.93 standard deviations from the mean) or 15% (10.25 standard deviations from the mean) as stated in the chart above, (ii) the Servicer makes timely and accurate filings to true-up the 2017 Restructuring Charge semi-annually through the Scheduled Maturity Date, (iii) Customers remit all 2017 Restructuring Charges an average of 35 days after such charges are billed, (iv) Customer charge-off rates are held constant at 0.57%, (v) operating expenses are equal to projections, (vi) there is no acceleration of the Final Maturity Date of the 2017 Restructuring Bonds, (vii) none of the 2017 Restructuring Bonds that are subject to optional redemption prior to maturity are optionally redeemed, and (viii) the closing date is November 21, 2017.

The rate of principal payments, the amount of each interest payment and the actual final Payment Date of each tranche of the 2017 Restructuring Bonds will depend primarily on the timing of receipt of collected 2017 Restructuring Charges by the Trustee as adjusted by the True-Up Adjustment mechanism. The aggregate amount of collected 2017 Restructuring Charges and the rate of principal amortization on the 2017 Restructuring Bonds will

depend, in part, on actual energy usage and the rate of delinquencies and write-offs. The 2017 Restructuring Charges are required to be adjusted from time to time based in part on the actual rate of collected 2017 Restructuring Charges. However, there is no assurance that the Servicer or its subcontractor will be able to forecast accurately actual electricity usage and the rate of delinquencies and write-offs or implement adjustments to the 2017 Restructuring Charges that will cause collected 2017 Restructuring Charges to be received at any particular rate. See "RISK FACTORS—Servicing and Operating Risks" and "THE FINANCING ORDER—True-Up Adjustment Mechanism."

The 2017 Restructuring Bonds may be retired later than expected. Except in the event of an acceleration of the Final Maturity Date of the 2017 Restructuring Bonds after an Event of Default, however, the 2017 Restructuring Bonds will not be paid at a rate faster than that contemplated in the Expected Amortization Schedule for each tranche of the 2017 Restructuring Bonds even if the receipt of collected 2017 Restructuring Charges is accelerated. Instead, receipts in excess of the amounts necessary to amortize the 2017 Restructuring Bonds in accordance with the Expected Amortization Schedule, to pay interest and redemption price, if any, and all other Ongoing Financing Costs and any other related fees and expenses and to fund deficiencies in the Operating Reserve Subaccount and the Debt Service Reserve Subaccount will be allocated to the Excess Funds Subaccount. Amounts on deposit in the Excess Funds Subaccount will be taken into consideration in calculating the next True-Up Adjustment. Acceleration of the Final Maturity Date after an Event of Default in accordance with the terms thereof will result in payment of principal earlier than the related Scheduled Maturity Dates.

**Fees and Expenses**

As set forth in the table below, the following annual fees and expenses will be payable from Charge Collections and Investment Earnings before debt service payments are made on the 2017 Restructuring Bonds.

| Recipient | Fees and Expenses Payable |
|---|---|
| Trustee | Trustee fees, indemnity payments (to the extent not in excess of $800,000 in each calendar year) and expense reimbursements |
| Servicer | Servicing Fees not in excess of (i) 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds (plus reimbursement for costs and expenses incurred in carrying out its obligations under the Servicing Agreement) or (ii) 0.60% for a Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets |
| Administrator | $100,000 annually |
| Issuer | Indemnity payments and expense reimbursements |

That portion of the annual Servicing Fee payable to any Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets in excess of the 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be paid after debt service payments are made on the 2017 Restructuring Bonds. Indemnity amounts due to the Trustee in excess of $800,000 in each calendar year shall also be paid after debt service payments are made on the 2017 Restructuring Bonds.

**Redemption**

*Optional Redemption*. The 2017 Restructuring Bonds with a Final Maturity Date prior to December 15, 2030 are not subject to optional redemption prior to maturity at the option of the Issuer. The 2017 Restructuring Bonds with a Final Maturity Date on or after December 15, 2030 are subject to redemption at the option of the Issuer in whole or in part, in any order, from time to time on any Business Day on and after December 15, 2027 upon payment of the redemption price of 100% of the principal amount of the 2017 Restructuring Bonds to be redeemed, together with accrued interest to the redemption date.

*Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules*. The Term Bonds under the Indenture shall be subject to redemption, on and after the applicable dates set forth below from Sinking Fund Payments, at a redemption price of 100% of the principal amount of the applicable Term Bonds to be redeemed, together with accrued interest to the redemption date. On each Scheduled Sinking Fund Redemption Date, the applicable Term Bonds shall be redeemed, from and to the extent of funds available for such purpose, until the Outstanding Amount of such Term Bonds has been reduced to an amount equal to the amount shown below as the Minimum Remaining

Outstanding Amount for such date.  Any amounts paid on the Term Bonds on the Final Maturity Date shall be applied as a payment of a maturity of such Term Bonds and not as a redemption.  The Expected Sinking Fund Schedules below set forth the Scheduled Sinking Fund Redemption Dates, the scheduled Outstanding Amount as of each such date, the scheduled Sinking Fund Payment for each such date and the minimum remaining Outstanding Amount as of such date for each Term Bond.

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-17**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2028 | $465,000 | $230,000 | $235,000 |
| December 15, 2028 | $235,000 | $235,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-18**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2029 | $485,000 | $240,000 | $245,000 |
| December 15, 2029 | $245,000 | $245,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-19**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2030 | $510,000 | $250,000 | $260,000 |
| December 15, 2030 | $260,000 | $260,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-20**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2031 | $535,000 | $265,000 | $270,000 |
| December 15, 2031 | $270,000 | $270,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-21**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2032 | $565,000 | $280,000 | $285,000 |
| December 15, 2032 | $285,000 | $285,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-22**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2033 | $595,000 | $295,000 | $300,000 |
| December 15, 2033 | $300,000 | $300,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-23**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2034 | $625,000 | $310,000 | $315,000 |
| December 15, 2034 | $315,000 | $315,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-24**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2035 | $655,000 | $325,000 | $330,000 |
| December 15, 2035 | $330,000 | $330,000 | $0 |

**EXPECTED SINKING FUND SCHEDULE – TRANCHE-25**

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2036 | $63,235,000 | $31,225,000 | $32,010,000 |
| December 15, 2036 | $32,010,000 | $32,010,000 | $0 |

### EXPECTED SINKING FUND SCHEDULE – TRANCHE-26

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2037 | $62,085,000 | $30,660,000 | $31,425,000 |
| December 15, 2037 | $31,425,000 | $31,425,000 | $0 |

### EXPECTED SINKING FUND SCHEDULE – TRANCHE-27

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2038 | $69,810,000 | $34,475,000 | $35,335,000 |
| December 15, 2038 | $35,335,000 | $35,335,000 | $0 |

### EXPECTED SINKING FUND SCHEDULE – TRANCHE-28

| Scheduled Sinking Fund Redemption Date | Scheduled Outstanding Amount | Scheduled Sinking Fund Payment | Minimum Remaining Outstanding Amount |
|---|---|---|---|
| June 15, 2039 | $82,700,000 | $40,840,000 | $41,860,000 |
| December 15, 2039 | $41,860,000 | $41,860,000 | $0 |

Notwithstanding the foregoing, if an Event of Default under the Indenture shall have occurred and be continuing, the unpaid principal amount of all 2017 Restructuring Bonds and accrued interest thereon may be declared due and payable (see "THE INDENTURE—Events of Default" and "THE INDENTURE—Remedies–Acceleration"). In addition, the 2017 Restructuring Bonds subject to optional redemption may be optionally redeemed (see "—Redemption–Optional Redemption" above).

*Selection of 2017 Restructuring Bonds for Redemption*. If less than all of the 2017 Restructuring Bonds of a tranche are to be redeemed, DTC and the direct participant and, where appropriate, indirect participants will determine the particular eligible 2017 Restructuring Bonds of a tranche to be redeemed in accordance with their procedures as from time to time in effect. If the 2017 Restructuring Bonds are not registered in book-entry only form, the particular 2017 Restructuring Bonds of a tranche to be redeemed will be determined by the Trustee, using such method as it deems fair and appropriate. See "Book-Entry-Only System" in Schedule 1 to this Official Statement.

*Notice of Redemption*. If any of the 2017 Restructuring Bonds are to be redeemed, notice of such redemption is to be mailed by the Trustee to Holders of such 2017 Restructuring Bonds to be redeemed not less than 30 days preceding each redemption date. Any notice of optional redemption may provide that such redemption is conditioned on, among other things, the availability of sufficient moneys on the redemption date.

The Trustee, so long as a book-entry-only system is used for determining ownership of the 2017 Restructuring Bonds, shall send the notice to DTC or its nominee, or its successor. Any failure of DTC or a direct participant or, where appropriate, indirect participants to do so, or to notify a Beneficial Owner of a 2017 Restructuring Bond of such redemption, will not affect the sufficiency or the validity of the redemption of such 2017 Restructuring Bond. The Issuer can make no assurances that DTC, direct participants, indirect participants or other nominees of the Beneficial Owners of the 2017 Restructuring Bonds to be redeemed will distribute such notices to the Beneficial Owners of such 2017 Restructuring Bonds, or that they will do so on a timely basis. See "Book-Entry-Only System" in Schedule 1 to this Official Statement.

### Registration and Transfer of the 2017 Restructuring Bonds

2017 Restructuring Bonds in definitive form will be transferable and exchangeable at the office of the registrar identified in this Official Statement. The Trustee will be the initial registrar. There will be no service charge for any registration or transfer of the 2017 Restructuring Bonds, but the Trustee may require the owner to pay a sum sufficient to cover any tax or other governmental charge.

The Issuer will issue each tranche of the 2017 Restructuring Bonds in the minimum initial denominations set forth in this Official Statement.

### Securities Depository

The 2017 Restructuring Bonds will be available to investors only in book-entry form. DTC will act as securities depository for the 2017 Restructuring Bonds. Bondholders may hold the 2017 Restructuring Bonds through

DTC or in any other manner described in this Official Statement. See Schedule 1 to this Official Statement for a description of DTC and its book-entry-only system that will apply to the 2017 Restructuring Bonds.

As long as the book-entry system is used for the 2017 Restructuring Bonds, as to 2017 Restructuring Bonds held through DTC, the Trustee and the Issuer will give any notice required to be given owners of the 2017 Restructuring Bonds only to DTC. BENEFICIAL OWNERS SHOULD MAKE APPROPRIATE ARRANGEMENTS FOR THE DIRECT PARTICIPANT THROUGH WHOSE DTC ACCOUNT THEIR BENEFICIAL OWNERSHIP INTEREST IS RECORDED TO RECEIVE NOTICES THAT MAY BE CONVEYED TO DIRECT PARTICIPANTS AND INDIRECT PARTICIPANTS.

**Access of Bondholders**

Upon written request of any Bondholder or group of Bondholders, each of whom has held its 2017 Restructuring Bond for at least six months, the Trustee will afford the Bondholder or Bondholders making such request a copy of a current list of Bondholders for purposes of communicating with other Bondholders with respect to their rights under the Indenture unless the Trustee agrees to mail the desired communication, on behalf of and at the expense of the requesting Bondholders, to all Bondholders.

<h3 style="text-align:center">SECURITY FOR THE 2017 RESTRUCTURING BONDS</h3>

The 2017 Restructuring Bonds issued under the Indenture will be non-recourse obligations and are payable solely from and secured solely by a pledge of and lien on the 2017 Restructuring Property and the other 2017 Collateral as provided in the Indenture. No collateral securing the Prior Restructuring Bonds, or future restructuring bonds issued pursuant to separate financing orders, if any, shall be collateral for the 2017 Restructuring Bonds. If and to the extent the 2017 Restructuring Property and the other 2017 Collateral are insufficient to pay all amounts owing with respect to the 2017 Restructuring Bonds, then the Bondholders will have no claim in respect of such insufficiency against the Issuer, the Authority, LIPA or any other person. By the acceptance of the 2017 Restructuring Bonds, the Bondholders waive any such claim.

The Indenture securing the 2017 Restructuring Bonds is separate and distinct from the indentures securing the Prior Restructuring Bonds.

**Pledge of 2017 Collateral**

To secure the payment of principal of and interest on the 2017 Restructuring Bonds, the Issuer will pledge to the Trustee all of its right, title and interest (whether owned on the Issuance Date or thereafter acquired or arising) in and to the following:

- the 2017 Restructuring Property transferred by the Seller to the Issuer pursuant to the Sale Agreement and all proceeds thereof, including the 2017 Restructuring Charges as estimated, determined and adjusted from time to time pursuant to the Servicing Agreement in accordance with Financing Order No. 5,

- the statutory lien pursuant to the Securitization Law,

- the Sale Agreement,

- the Servicing Agreement,

- the Administration Agreement,

- the Collection Account, all subaccounts thereof (except for the Upfront Financing Costs Subaccount) and all amounts or investment property on deposit therein or credited thereto from time to time,

- the security interest with respect to the 2017 Restructuring Property granted by the Seller to the Issuer in the Sale Agreement,

- all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, securities accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind, and other forms of obligations and

receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing, and

- all proceeds in respect of any or all of the foregoing.

The foregoing assets in which the Issuer, as assignee of the Seller, will grant the Trustee a security interest are referred to herein as the "2017 Collateral." See "—How Funds in the Collection Account Will Be Allocated."

The 2017 Collateral does not include:

- any amounts required to be released pursuant to or contemplated by the terms of the Indenture,

- proceeds from the sale of the 2017 Restructuring Bonds required to pay the purchase price of the 2017 Restructuring Property pursuant to the Sale Agreement and the Upfront Financing Costs related to the 2017 Restructuring Bonds as deposited into the Upfront Financing Costs Subaccount (together with any interest earnings thereon), and

- the Prior Restructuring Properties, or any restructuring property that may be created pursuant to any future financing order other than Financing Order No. 5.

**Security Interest in 2017 Collateral**

As provided in the Securitization Law, a valid and enforceable lien and security interest in 2017 Restructuring Property will attach and be perfected at the time the pledge is made. The lien and security interest attach without any physical delivery of 2017 Collateral or other act. The lien and security interest will be valid, binding, and perfected against all parties having claims of any kind in tort, contract or otherwise against the Seller, regardless of whether the parties have notice of the lien and will be superior to any judicial lien or other lien obtained by such parties. The Securitization Law provides that the pledge is continuously perfected and has priority over any other lien created by the operation of law or otherwise that may be created subsequently. Any pledge of the 2017 Restructuring Property will have a perfected security interest in the revenues and proceeds of the 2017 Restructuring Property that are deposited in an account even if those revenues or proceeds are commingled with other funds. The Securitization Law also provides that any other security interest that may apply to the revenues or proceeds of the 2017 Restructuring Property will be terminated when such funds are transferred to a segregated account for the benefit of the Trustee or the Bondholders. Similarly, Financing Order No. 5 provides that the 2017 Restructuring Property may be pledged to secure the payment of the 2017 Restructuring Bonds, all other Ongoing Financing Costs, and other amounts owed pursuant to the transaction documents relating to the 2017 Restructuring Bonds.

Certain items of the 2017 Collateral may not constitute 2017 Restructuring Property and the perfection of the Trustee's security interest in those items of 2017 Collateral would therefore be subject to the UCC or common law and not the Securitization Law. These items consist of the Issuer's rights in:

- the Sale Agreement, the Servicing Agreement, the Administration Agreement and any other Basic Documents,

- the Operating Reserve Subaccount, the Debt Service Reserve Subaccount, or any other funds on deposit in the Collection Account which do not constitute 2017 Restructuring Charge collections together with all instruments, investment property or other assets on deposit therein or credited thereto and all financial assets and securities entitlements carried therein or credited thereto which do not constitute Charge Collections,

- all accounts, chattel paper, deposit accounts, documents, general intangibles, goods, instruments, investment property, letters-of-credit, letter-of-credit rights, money, commercial tort claims and supporting obligations and all of its other property to the extent not 2017 Restructuring Property, and

- proceeds of the foregoing items.

Additionally, any contractual rights the Issuer has against retail electric delivery customers (other than the irrevocable right to impose 2017 Restructuring Charges and rights otherwise included in the definition of 2017 Restructuring Property) would be collateral to which the UCC applies.

As a condition to the issuance of the 2017 Restructuring Bonds, the Issuer must make all filings and take any other action required by the UCC or common law to perfect the lien of the Trustee in all the items included in 2017 Collateral which do not constitute 2017 Restructuring Property. The Issuer will also covenant to take all actions

necessary to maintain or preserve the lien and security interest on a first priority basis. Under the Indenture, the Trustee is required to file any necessary UCC continuation statements. The Issuer will represent, along with the Seller, at the time of issuance of the 2017 Restructuring Bonds, that no prior filing has been made with respect to that party under the terms of the UCC, other than a filing which provides the Trustee with a lien and first priority perfected security interest in the 2017 Collateral.

**Lien on 2017 Restructuring Property**

Pursuant to the Indenture, the Issuer will pledge to the Trustee all of the Issuer's right, title and interest in and to the 2017 Restructuring Property. Pursuant to the Securitization Law, this pledge will constitute a first priority statutory lien on the 2017 Restructuring Property.

Under the Financing Agreement (described below), LIPA previously transferred to the Authority all of its right, title and interest in and to its revenues to provide security for the Authority's indebtedness. See "THE SELLER – Relationship of the Authority to LIPA." Pursuant to the Authority's General Resolution and the Authority's Electric System General Subordinated Revenue Bond Resolution adopted on May 20, 1998 (the "Subordinated General Resolution"), the Authority issues bonds and other obligations (including swap or other interest rate hedging obligations) that are secured by a lien upon substantially all of the revenues of the Authority. The revenues that are subject to the lien of the Authority's General Resolution and Subordinated General Resolution include, among other things, revenues, rates, fees, charges, and other income and receipts from the operations of any subsidiary of the Authority (including LIPA). The Authority's General Resolution specifically excludes from the revenues that are subject to the lien, amounts constituting "Transition Charges." "Transition Charges," under the General Resolution, are defined as any rates, fees, charges or surcharges relating to the Authority's transmission and distribution system or its customers that are established by an irrevocable rate order or other action in connection with the issuance of debt or other securities other than under the Authority's General Resolution to the extent that those rates, fees, charges or surcharges are pledged as security for such debt or other securities. The Subordinated General Resolution imposes a lien on the same revenues as the General Resolution. Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "transition charges" as defined in the General Resolution and that they are not subject to the lien thereof. In addition, the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens. Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution.

**Indenture Accounts**

Prior to the Issuance Date, the Issuer will open or cause to be opened, at the Trustee's office located at the Corporate Trust Office, or at another Eligible Institution, the Collection Account, which shall be one or more segregated trust accounts in the Trustee's name for the deposit of Charge Collections and all other amounts received with respect to the 2017 Collateral or under the Servicing Agreement. The Collection Account will consist of four Subaccounts: the General Subaccount, the Excess Funds Subaccount, the Reserve Subaccount, and the Upfront Financing Costs Subaccount. The Reserve Subaccount will consist of two subaccounts: the Operating Reserve Subaccount and the Debt Service Reserve Subaccount. Unless the context indicates otherwise, a reference in this Official Statement to the Collection Account means the Subaccounts (including the Subaccounts within the Reserve Subaccount) contained therein. For administrative purposes, the Subaccounts may be established by the Trustee as separate accounts.

The Servicer will remit 2017 Restructuring Charge payments to the Collection Account in the manner described under "THE 2017 RESTRUCTURING BONDS—How Funds in the Collection Account Will Be Allocated."

*Collection Account.* Prior to the initial Payment Date, all amounts in the Collection Account (other than funds deposited into the Operating Reserve Subaccount up to the Required Operating Reserve Level, in the Debt Service Reserve Subaccount up to the Required Debt Service Reserve Level, and in the Upfront Financing Costs Subaccount up to the amount initially deposited therein) shall be allocated to the General Subaccount.

*General Subaccount.* The General Subaccount will hold all funds held in the Collection Account that are not held in the other three subaccounts. The Allocation Agent will transfer to the General Subaccount, on each Business Day, and to the extent that funds are available in the Allocation Account, the estimated amount of Charge Collections and the Remittance Shortfall from the Allocation Account. On each Payment Date, the Trustee will draw on amounts in the General Subaccount to pay the Issuer's expenses and to pay interest and make scheduled

payments on the 2017 Restructuring Bonds, and to make other payments and transfers in accordance with the terms of the Indenture.

*Excess Funds Subaccount*. The Trustee, at the direction of the Servicer, will allocate to the Excess Funds Subaccount Charge Collections available with respect to any Payment Date in excess of amounts necessary to make the payments specified on such Payment Date. The Excess Funds Subaccount will also hold all Investment Earnings on the Collection Account in excess of such amounts.

*Reserve Subaccount*. In connection with the issuance of the 2017 Restructuring Bonds:

- the Authority will deliver to the Trustee for deposit into the Operating Reserve Subaccount an amount equal to the Required Operating Reserve Level, which will be an amount equal to 0.50% of the initial aggregate principal amount of the 2017 Restructuring Bonds; and

- the Issuer will deliver to the Trustee for deposit into the Debt Service Reserve Subaccount an amount from the 2017 Restructuring Bond proceeds equal to the Required Debt Service Reserve Level.

*Upfront Financing Costs Subaccount.* The Upfront Financing Costs Subaccount is to be funded by the proceeds of the 2017 Restructuring Bonds in the amount expected to be used for Upfront Financing Costs as provided in the Issuance Advice Letter. Any amounts in the Upfront Financing Costs Subaccount not required to pay Upfront Financing Costs may be used to pay Ongoing Financing Costs.

The Trustee shall have sole dominion and exclusive control over all money in the Collection Account and shall apply such money as provided in the Indenture. Each account shall remain at all times with a securities intermediary (within the meaning of Section 8-102(a)(14) of the UCC).

Withdrawals from and deposits to each of the foregoing Subaccounts of the Collection Account shall be made as set forth in "—How Funds in the Collection Account Will Be Allocated."

The Collection Account shall at all times be maintained in an Eligible Account and only the Trustee shall have access to the Collection Account for the purpose of making deposits in and withdrawals from the Collection Account in accordance with the Indenture. Funds in the Collection Account shall not be commingled with any other moneys. Funds in the Collection Account may be invested only in "Eligible Investments" that mature or are redeemable at the option of the holder on or prior to the Business Day next preceding the next Payment Date. The Indenture prohibits Eligible Investments credited to the Collection Account from being sold, liquidated or otherwise disposed of at a loss prior to the maturity or redemption date thereof.

Except as provided in the Indenture as described under "General Provisions Regarding the Collection Account," all money deposited from time to time in the Collection Account, all deposits therein pursuant to the Indenture, and all investments made in Eligible Investments with such money, including all income or other gain from such investments, shall be held by the Trustee in the Collection Account as part of the 2017 Collateral (except for amounts in the Upfront Financing Costs Subaccount). The Trustee shall have no liability in respect of losses incurred as a result of the liquidation of any Eligible Investment prior to its stated maturity or its date of redemption or the failure of the Issuer to provide timely written investment direction. All amounts in the Collection Account (except for amounts in the Upfront Financing Costs Subaccount) must be used, to the extent practical, to make the final payments of principal and interest on the 2017 Restructuring Bonds and all other Ongoing Financing Costs or to make refunds to Customers to the same extent such Customers would have been required to pay 2017 Restructuring Charges. When no 2017 Restructuring Bonds remain Outstanding and all Ongoing Financing Costs (including any rebate or other amounts payable to the United States of America under Section 148 of the Code) have been paid, or their payment provided for, in full, then the balance, if any, in the Collection Account (including all subaccounts therein) shall be deposited in the Operating Reserve Subaccount and paid to or at the direction of the Issuer and applied to customer refunds in accordance with Financing Order No. 5. In the event the Issuer issues additional restructuring bonds as permitted by Securitization Law and the Indenture and as described below under "—Additional Bonds" to refund any 2017 Restructuring Bonds, amounts may be withdrawn from the Operating Reserve Subaccount to pay the 2017 Restructuring Bonds to be refunded; provided, however, that immediately after such withdrawal, an amount at least equal in the aggregate to the Required Operating Reserve Level then applicable to the remaining 2017 Restructuring Bonds must remain on deposit in the Operating Reserve Subaccount.

**How Funds in the Collection Account Will Be Allocated**

On each Payment Date, or for any amount payable under clauses (i) through (iv) below, on any Business Day upon which the Trustee receives a written request from the Administrator stating that any of such Operating Expenses payable by the Issuer will become due and payable prior to the next succeeding Payment Date, the Trustee shall pay or allocate all amounts on deposit in the Collection Account (other than amounts on deposit in the Debt Service Reserve Subaccount, which shall be applied solely to amounts payable under clauses (v) through (vii) below), including all earnings thereon, to pay the following amounts, in accordance with the Semi-annual Servicer Certificate, in the following priority:

(i) all fees, costs, expenses (including legal fees and expenses) and, to the extent not in excess of $800,000 in each calendar year, indemnity amounts owed by the Issuer to the Trustee under the applicable Basic Documents shall be paid to the Trustee,

(ii) the Servicing Fee for such Payment Date and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees not in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(iii) the Administration Fee and all unpaid Administration Fees from prior Payment Dates shall be paid to the Administrator,

(iv) the payment of all other Operating Expenses (other than as provided in clauses (viii) and (ix) below) for such Payment Date shall be paid to the Persons entitled to such payment,

(v) (A) first, any overdue interest (together with, to the extent lawful, interest on such overdue interest at the applicable Bond Interest Rate) and (B) second, interest for such Payment Date shall be paid to the Holders,

(vi) principal due and payable on the 2017 Restructuring Bonds as a result of an Event of Default (assuming the 2017 Restructuring Bonds have been declared immediately due and payable) or on the Final Maturity Date of a tranche of the 2017 Restructuring Bonds shall be paid to the Holders,

(vii) principal for such Payment Date will be paid to Holders in accordance with the priorities described in "THE 2017 RESTRUCTURING BONDS—Principal of the 2017 Restructuring Bonds" above,

(viii) indemnity amounts owed by the Issuer to the Trustee to the extent in excess of $800,000 in each calendar year, shall be paid to the Trustee and premiums for directors' and officers' liability insurance for trustees and officers of the Issuer shall be paid to the provider of such insurance, or, if such premium is paid by the Administrator pursuant to the Administration Agreement, the amount of such premium shall be paid to the Administrator in reimbursement thereof,

(ix) the Servicing Fee for such Payment Date, and all unpaid Servicing Fees from prior Payment Dates, to the extent of Servicing Fees in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds in each calendar year, shall be paid to the Servicer,

(x) the amount, if any, by which the Required Debt Service Reserve Level exceeds the amount in the Debt Service Reserve Subaccount as of such Payment Date will be paid or allocated to the Debt Service Reserve Subaccount,

(xi) the amount, if any, by which the Required Operating Reserve Level exceeds the amount in the Operating Reserve Subaccount as of such Payment Date will be paid or allocated to the Operating Reserve Subaccount,

(xii) the amount, if any, by which the amount in the Debt Service Reserve Fund exceeds the Required Debt Service Reserve Level on any Payment Date shall be retained in the Debt Service Reserve Fund until the next Payment Date, at which time such excess amount in the Debt Service Reserve Fund shall be applied to the payment of amounts then due under clauses (v) through (vii) above prior to any other monies available for such purpose and, to the extent that such excess amount exceeds amounts then due under such clause on such next Payment Date, such excess amount shall continue to be held in the Debt Service Reserve Fund and shall be applied under such clause (v) through (vii) above prior to any other monies available for such purpose on succeeding Payment Dates until fully applied; and

(xiii) the balance, if any, will be paid or allocated to the Excess Funds Subaccount for distribution on subsequent Payment Dates.

If on any Payment Date, or for any amounts payable under clauses (i) through (iv) above, on any Business Day, funds on deposit in the General Subaccount are insufficient to make the payments contemplated in clauses (i) through (ix) above, the Trustee shall (i) first, draw from amounts on deposit in the Excess Funds Subaccount and (ii) second, draw from amounts on deposit in the Operating Reserve Subaccount, in each case, up to the amount of such shortfall in order to make the payments contemplated by clauses (i) through (ix) above. In addition, if on any Payment Date, funds on deposit in the General Subaccount, together with moneys available in the Excess Funds Subaccount and the Operating Reserve Subaccount, are insufficient to make the payments contemplated by clauses (v) through (vii) above, the Trustee shall then draw from amounts on deposit in the Debt Service Reserve Subaccount, up to the amount of such shortfall in order to make the payments contemplated by such clauses (v) through (vii) above. In addition, if on any Payment Date funds on deposit in the General Subaccount are insufficient to make the allocations contemplated by clause (x) above, the Trustee shall draw from amounts on deposit in the Excess Funds Subaccount to make such allocations. If on any Payment Date funds on deposit in the Collection Account are insufficient to make the transfers contemplated by clause (v), (vi) or (vii) above, the Trustee will allocate the funds drawn pursuant to the first and second sentences of this paragraph among the tranches pro rata as provided above.

**Limited Obligation of Issuer**

**The 2017 Restructuring Bonds are not an obligation of the Authority, LIPA or any Successor Servicer. The 2017 Restructuring Bonds are not a debt, general obligation or a pledge of the faith and credit or taxing power of the State of New York or of any county, municipality or any other subdivision, agency or instrumentality of the State of New York. The 2017 Restructuring Bonds are limited obligations of the Issuer payable solely from the 2017 Collateral including the 2017 Restructuring Charges. The issuance of the 2017 Restructuring Bonds does not obligate the State of New York or any county, municipality or other political subdivision, agency or instrumentality of the State of New York to levy any tax or make any appropriation for the payments of the 2017 Restructuring Bonds. The Issuer has no taxing power.**

**Legality for Investment**

With respect to the 2017 Restructuring Bonds, the Securitization Law provides that the 2017 Restructuring Bonds are securities in which all public officers and bodies of the State and all municipalities, all insurance companies and associations, banks, trust companies, savings banks and savings associations, investment companies and other persons carrying on a banking business, all trusts, estates and guardianships and all other persons who are authorized to invest obligations of the State, may properly and legally invest. The 2017 Restructuring Bonds are also securities which may be deposited with public officers and bodies of the State and all municipalities for any purpose for which such obligations of the State are authorized.

**Additional Bonds**

The Indenture provides that the Issuer may issue or incur additional bonds, notes or other obligations, for any purpose and secured as provided by the Laws of the State, other than by the 2017 Collateral, provided that the Rating Agency Condition has been satisfied. See "THE SECURITIZATION LAW — Prior Transactions."

**THE ISSUER**

**Introduction**

The Issuer is a special purpose corporate municipal instrumentality of the State of New York created by subdivision 1 Section 4 of the Securitization Law and further described in Financing Order No. 5. The Securitization Law restricts the Issuer from engaging in activities other than those described in this section. The Issuer does not have any employees.

The Issuer's assets consist or will consist of:

- the Prior Restructuring Properties (which secures only the applicable Prior Restructuring Bonds authorized by the related Prior Financing Order that created such Prior Restructuring Property) and all rights and interests under the documents relating to such Prior Restructuring Properties,

- the 2017 Restructuring Property,

- its rights under the Sale Agreement, under the Administration Agreement and under the bill of sale delivered by the Authority pursuant to the Sale Agreement,

- its rights under the Servicing Agreement and any subservicing, agency, administration, intercreditor or collection agreements executed in connection with such Servicing Agreement,

- the Collection Account and all subaccounts of such Collection Account,

- all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing, and

- all payments on or under and all proceeds in respect of any or all of the foregoing.

The Indenture provides that the 2017 Restructuring Property will be pledged by the Issuer to the Trustee to secure its obligations in respect of the 2017 Restructuring Bonds. Pursuant to the Indenture, the collected 2017 Restructuring Charges remitted to the Trustee by the Servicer must be used to pay principal and interest on the 2017 Restructuring Bonds, all other Ongoing Financing Costs and the Issuer's other obligations specified in the Indenture.

**Restricted Purpose**

The Issuer is authorized only to:

(i)     issue restructuring bonds and use the proceeds thereof to purchase or acquire, and to own, hold and use restructuring property or to pay or fund upfront financing costs,

(ii)    contract for the servicing of restructuring property and restructuring bonds and for administrative services, and

(iii)   pledge restructuring property to secure restructuring bonds and pay all ongoing financing costs relating to the restructuring property and restructuring bonds.

The Securitization Law does not permit the Issuer to engage in any activities not directly related to these purposes, including issuing securities (other than restructuring bonds), borrowing money or making loans to other persons.

Under the Securitization Law, the Issuer is expressly prohibited from filing a petition for relief under chapter 9 of the Bankruptcy Code, which, as discussed elsewhere in this Official Statement, is the only chapter of the Bankruptcy Code potentially available for the Issuer.  With respect to the Issuer, its status as a municipality and the state law prohibition against its filing of a case under chapter 9 would result in the Issuer having no access to relief under the Bankruptcy Code.  It would remain subject to applicable state law concerning debtors and creditors.

**Management and Fees**

The Issuer's business is managed by a board consisting of three trustees appointed by the Governor of the State of New York.  There is currently one vacancy.  The trustees may not be trustees, directors, officers or employees of the Authority, LIPA or any successor owner of the T&D System Assets.  However, officers and employees of the Authority or LIPA may be officers or employees of the Issuer.  The Issuer has appointed the Chief Executive Officer, Chief Financial Officer and the General Counsel and Secretary of the Authority to the positions of Chief Executive Officer, Chief Financial Officer and Secretary, respectively, with the Issuer.

The trustees have staggered terms with one trustee serving for four years, one serving for five years and one serving for six years.  All successor trustees shall serve for terms of six years.  In the event of a vacancy, the Governor of the State of New York shall appoint a successor to serve the remainder of the unexpired term.

The trustees do not receive any salary or other compensation except for reimbursement for actual and necessary expenses incurred in the performance of official duties.

Under the Securitization Law, each trustee has a fiduciary duty to act in the best interest of the Issuer and the Governor may remove any trustee for inefficiency, neglect of duty or misconduct in office.

**Relationship of the Issuer to the Authority and LIPA**

The Securitization Law requires the Issuer to keep its assets and liabilities separate and distinct from the Authority, LIPA, and any other entity.

**Administration Agreement**

LIPA will, pursuant to an Administration Agreement between LIPA and the Issuer, provide administrative services to the Issuer, including services relating to the preparation of documents it might be required to file under

applicable law. The Issuer will pay LIPA an annual administration fee of $100,000 payable in semi-annual installments on each Payment Date. In addition to the Administration Fee, the Issuer will reimburse the Administrator for expenses it incurs in connection with services it performs under the Administration Agreement.

## THE SELLER

### General

The Authority will be the seller of the 2017 Restructuring Property, which the Issuer will pledge to secure the 2017 Restructuring Bonds. The Authority is a corporate municipal instrumentality and a political subdivision of the State of New York, exercising essential governmental and public powers. As such, the Authority should be found to constitute a "municipality" eligible for bankruptcy relief only under chapter 9 of the Bankruptcy Code. Among the requirements for a municipality to commence a case under chapter 9 is the requirement that it be specifically authorized by state law to be a debtor under chapter 9. The Authority is explicitly authorized to file a petition under chapter 9 pursuant to its enabling legislation. See "RISK FACTORS—Bankruptcy-Related Risks."

### Service Area

*General.* The Authority became the retail supplier of electric service in the Service Area on May 28, 1998 by acquiring LILCO as a wholly-owned subsidiary of the Authority through a merger. Since such acquisition, LILCO has done business under the names LIPA and Power Supply Long Island. The Authority, acting through LIPA, provides electric service in the Service Area. For purposes of the 2017 Restructuring Bonds and collection of the 2017 Restructuring Charges, the "Service Area" is defined by the Securitization Law as the service area of LIPA as of July 29, 2013.

LIPA's service area includes approximately 1.1 million customers and during the period 2012 through 2016 experienced its peak usage of approximately 5,602 MW in the summer of 2013. In the year ending December 31, 2016, approximately 55.0% of LIPA's annual retail revenues were received from residential customers, 43.1% from commercial customers and 1.9% from street lighting, public authorities and certain others. The largest customer in the Service Area (the Long Island Rail Road) accounted for less than 2.0% of total sales and less than 2.0% of revenue. In addition, the ten largest customers in the Service Area accounted for approximately 7.0% of total sales and less than 6.0% of revenue.

*Service Area Demographics.* The Service Area consists of Nassau and Suffolk Counties in Long Island (with certain limited exceptions) and a small portion of Queens in New York City known as the Rockaways. According to Bureau of Labor Statistics data, the population of the Service Area (excluding the Rockaways portion) was approximately 2.9 million as of December 31, 2016, which represents very modest growth since December 31, 2010. As of December 31, 2016, the Authority had approximately 1.1 million customers in the Service Area, which was relatively stable as compared to December 31, 2010.

Long Island is a significant regional economy that benefits from its proximity to Manhattan, but also generates its own income, employment, and regional output. Long Island's assets include a highly skilled labor force, close proximity to New York City, over 20 colleges, universities and two/three year colleges and core research institutions, such as Brookhaven National Laboratory, Cold Spring Harbor Laboratory, and the technology and science developmental centers at Stony Brook and Farmingdale Universities that specialize in the areas of biotechnology, computer sciences, wireless and internet technologies, and energy. Long Island also has a highly desirable suburban life style that attracts many individuals to live, work and vacation within the area.

The Long Island economy benefits from high average personal income and a service-based economy. According to recent data published by the U.S. Bureau of the Census and Bureau of Labor Statistics, the Long Island median household income is substantially above the national average.

The table below shows Long Island's unemployment rate as compared with the national and State unemployment rates for the periods shown:

**Service Area Unemployment – Average Annual**

| Year | US[1] | NY[2] | Nassau-Suffolk[2] |
|------|------|------|------|
| 2012 | 8.1% | 8.5% | 7.4% |
| 2013 | 7.4% | 7.7% | 6.2% |
| 2014 | 6.2% | 6.3% | 5.1% |
| 2015 | 5.3% | 5.3% | 4.6% |
| 2016 | 4.9% | 4.4% | 4.2% |

*Sources:*

1. Bureau of Labor Statistics: http://www.bls.gov/data/ (not seasonally adjusted data)
2. New York State Department of Labor: http://www.labor.ny.gov/stats/ (not seasonally adjusted data)

*Retail Choice.* Under current law, Customers may purchase energy from third party providers. In 1998, the Authority adopted a retail choice program (called "Long Island Choice") which is intended to offer electric customers the opportunity to choose an electric energy supplier other than LIPA. The program is available to all customers in the Service Area. As of July 2017, other suppliers were selling electricity to 11,059 commercial customers in the Service Area representing a total coincident peak load of 295 MW. PSEG Long Island and the Authority have undertaken a "collaborative" review of the Long Island Choice program organized by the DPS (as defined below) and with the participation of other interested parties in 2016. At calendar year end 2015, DPS initiated "MATTER 15-02754 – In the Matter of Examining the Potential Benefits of Retail Competition for Long Island Electric Customers," which invited comments on the potential benefits to customers of retail competition in the Long Island electricity market. According to DPS, its objective in the proceeding is to investigate potential benefits to customers and examine what reforms, if any, are needed to achieve them. On May 18, 2016, DPS provided that the comment period established in the Long Island participatory process is extended until 30 days after the resolution of matters raised in the Order Resetting Retail Energy Markets and Establishing Further Process, issued by the PSC on February 23, 2016 in Cases 15-M-0127, 12-M-0476 and 98-M-1343 (the "Regulated Utilities Retail Choice Proceedings"). The Regulated Utilities Retail Choice Proceedings are still pending, having been delayed by litigation. Neither the Authority nor the Issuer can make a prediction as to the resolution of the Regulated Utilities Retail Choice Proceedings or effect, if any, new or revised State or federal laws addressing retail and commercial competition will have on ongoing implementation of retail competition.

A Customer must pay 2017 Restructuring Charges as long as such Customer is connected to the T&D System Assets and is taking electric delivery service in the Service Area, regardless of whether such Customer produces some of its own electricity or purchases electric generation services from a provider of electric generation services who is not the owner of the T&D System Assets and even if the T&D System Assets are no longer owned by LIPA.

*Municipalization.* In addition, local governments may consider municipalization as a means to lower the cost of electric service. If municipalization were to occur, it would likely require condemnation of the T&D System Assets or construction of duplicate electric transmission and distribution facilities. Since the acquisition of LIPA by the Authority in 1998, no municipalizations have occurred in the Service Area.

**Relationship of the Authority to LIPA**

LIPA is a New York corporation and a wholly-owned subsidiary of the Authority. Pursuant to LIPA's organizational documents, the Authority conducts and manages LIPA's business and affairs. Accordingly, LIPA is controlled by the Authority. The Authority is governed by a Board of Trustees (the "Authority Trustees"). There are nine members of the Authority's Board of Trustees. Pursuant to the Public Authorities Law and as set forth in the Authority's By-laws, five (5) Trustees of the Authority constitute a quorum for the transaction of any business or the exercise of any power of the Authority and the Authority only has the power to act by a vote of five (5) Trustees.

The Authority and LIPA are parties to the Financing Agreement providing for their respective duties and obligations relating to the financing and operation of the retail electric business in the Service Area. Pursuant to the terms of that Financing Agreement, the Authority is to issue all debt necessary for the Authority and LIPA. This debt includes all bonds and subordinated indebtedness issued and to be issued. The proceeds of all such debt are to be treated as being loaned to LIPA, which is to repay such loans from the revenues it receives from its electric business. To secure the loans, LIPA has pledged all of its revenues to the Authority, which has, in turn, pledged such revenues

as security for such debt. These revenues consist of charges imposed upon and being paid by the same Customers who will pay the 2017 Restructuring Charges. However, the 2017 Restructuring Charges are Transition Charges and, therefore, are not subject to the lien securing the Authority's indebtedness. See "THE SELLER—Relationship Between the 2017 Restructuring Bonds and the Authority's Existing Indebtedness" below.

Pursuant to the terms of the Financing Agreement, LIPA conducts the electric business in the Service Area and is responsible for providing service to customers in the Service Area. The Authority and LIPA are also parties to an administrative services agreement pursuant to which the Authority provides personnel, personnel-related services and other services necessary for LIPA to provide electric service in the Service Area.

**System Operation by the Authority and LIPA**

In order to assist the Authority (acting through LIPA) in providing electric service in the Service Area, the Authority and LIPA have entered into operating agreements, the purpose of which is to provide the Authority and LIPA with the operating personnel and a significant portion of the power supply resources necessary for LIPA to continue to provide electric service in the Service Area. From 1998 through 2013, the service providers were generally the National Grid Subs and their predecessors, with some exceptions.

After the acquisition, a National Grid Sub was the T&D System manager pursuant to a Management Services Agreement (the "MSA"), which expired at the end of 2013. T&D System management services included, among other functions, the day-to-day operation and maintenance of the T&D System, customer service, billing and collection, meter reading and forecasting. As described below under "—Transition to a New Business Model," the Authority transitioned to a new business model first adopted by the Authority Trustees in late 2011 and modified in response to the requirements of the LIPA Reform Act, which had an impact on the Authority's relationship with its service providers. Since January 1, 2014, PSEG Long Island has been the service provider pursuant to the OSA. Under the OSA, the PSEG Long Island management company is the contracting entity with LIPA.

**Authority to Set Electric Rates**

Under the Securitization Law, the 2017 Restructuring Charges and any adjustments thereto are not subject to review or regulation by the New York State Department of Public Service ("DPS"), the staff arm of the PSC.

The Authority is empowered under its enabling statute to set rates for electric service in the Service Area without obtaining the approval of the PSC, DPS or any other State regulatory body. Under the LIPA Reform Act, on or before February 1, 2015, the Authority and PSEG Long Island were required to submit to the DPS a three-year rate proposal for rates and charges to take effect on or after January 1, 2016. After the 2016-2018 period, the Authority and PSEG Long Island are required to submit a proposed rate increase for DPS review if it would increase the rates and charges by an amount that would increase the Authority's annual revenues by more than 2.5%. In addition, the Authority may place rates in effect on an interim basis, and such interim rates are subject to prospective adjustment only. The Authority retains final rate setting power.

On January 30, 2015, a three-year rate plan for the period 2016-2018 was submitted by PSEG Long Island and the Authority for review by DPS. PSEG Long Island and the Authority's original submission on January 30, 2015 proposed rate increases of $72.7 million, $74.3 million, and $74.3 million for the years 2016, 2017 and 2018, respectively, for a cumulative revenue requirement increase of $441.0 million over the three year period. On September 28, 2015, DPS submitted its rate recommendation to the Authority's Board (the "Recommendation"). Documents relating to the rate plan filing can be found at DPS's website (www.dps.ny.gov) under PSEG Long Island Electric Rate Case (Case # 15-00262) at: http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=47329&MNO=15-00262. In addition, certain information relating to the rate plan filing can be found on the Financials tab of the Authority's website (www.lipower.org) at: http://www.lipower.org/financials.html. Information on those websites is not included by specific cross-reference herein.

Throughout the proceeding, PSEG Long Island, the Authority, the DPS staff and other parties proposed and updated revenue requirement positions. PSEG Long Island and the Authority's incremental rate request as of the time of the DPS Recommendation was $58.2 million, $72.2 million, and $68.1 million for the years 2016, 2017 and 2018, respectively, for a cumulative increase of $387.2 million or 5.4%. The Recommendation was for the Authority to set rates designed to increase revenues by $30.4 million in 2016, $77.6 million in 2017, and $79.0 million in 2018, respectively, which rates represent a cumulative revenue requirement increase of $325.4 million or 5.0%. At those

proposed levels, the Authority's overall electric revenues, including power supply costs, would have increased by approximately 0.8%, 2.1%, and 2.1%, respectively.

The Three Year Rate Plan adopted the "Public Power Model" of rate-setting proposed by PSEG Long Island and the Authority, which makes use of the debt service coverage method in determining revenue requirements. For the Authority this entails transitioning from the historical use of a $75 million net income target to fixed obligation coverage targets (including capitalized leases) on Authority issued debt of 1.20x, 1.30x, 1.40x in 2016, 2017, and 2018 (and 1.45x in 2019, after the Three Year Rate Plan). The net income to fixed obligation coverage for 2016 was approximately 1.26x. When the Issuer's restructuring bonds are included, those coverage ratio targets are a minimum of 1.15x, 1.20x, and 1.25x in 2016, 2017, and 2018, respectively. Depreciation expense, amortization of the acquisition adjustment and of other regulatory assets, as well as the difference between the accrual expense and actual required cash contributions to PSEG Long Island OPEBs, are non-cash expenses excluded from the Authority's methodology for calculating the coverage calculation. The Three Year Rate Plan also included as a credit rating target to raise the Authority's credit ratings to A2 by Moody's, A by S&P, and A by Fitch over five years. Furthermore, the filing sought through increasing fixed obligation coverage targets to bring down the level of debt funding as a percentage of its annual capital program to 64% or less over five years. Neither the Authority nor the Issuer can predict whether any such targets will be realized.

The Recommendation also includes an annual update process to adjust delivery rates higher or lower to reflect measurable changes in certain specified projected costs ("Staged Updates") during the three years of the rate and plan and a permanent cost reconciliation mechanism (the "Delivery Service Adjustment") to reconcile certain specified projected costs to actual costs in each year.

The Staged Updates provide for updating electric rates at the beginning of each year for items that are subject to variability due to external factors including, among others: debt service (also subject to the Delivery Service Adjustment); certain components of the costs of the Power Supply Agreement with National Grid (which, effective January 2017, are recovered through the Power Supply Charge and removed from the Staged Update and Delivery Service Adjustment); property-based PILOTs; and certain other legal or regulatory changes. Projections are updated each autumn, subject to DPS review, and presented to the Authority Trustees as part of the annual budget process. The Authority's Staged Update for 2017 resulted in rates that raised the 2017 revenues net of fuel from the $2,111,416,000 set forth in the Recommendation to $2,112,167,000, an increase of $751,000.

The Delivery Service Adjustment provides cost recovery for certain items that can vary significantly due to external factors, which items include, among others: debt service (variances in interest rates, capital expenditures and savings derived from the Issuer's financings) and storm expenditures (variances from the approximately $34 million per year budgeted for storm expenses in base rates). The Delivery Service Adjustment are calculated through the end of September each year, which allows for the bill impact to be known in advance of annual budget approval. Any adjustment would be reviewed by DPS for accuracy and implemented on the following January 1st and reviewed by DPS.

In addition, the Recommendation affirmed the Authority's use of a "Revenue Decoupling Mechanism." The Authority's Board initially modified its tariff to establish a Revenue Decoupling Mechanism in March 2015 as an "Adjustment to Rates and Charges," which PSEG Long Island is authorized to calculate and update each year according to the pre-defined terms of the tariff. All six of the major New York state electric utilities have Revenue Decoupling Mechanisms within their tariffs for delivery service. Mechanically, Revenue Decoupling Mechanisms function by comparing actual revenues with authorized revenues and crediting (or collecting) any differences due to (or from) customers in a subsequent period; it is intended to cover all sources of variances in delivery service revenues including, among other things, any net lost revenues attributable to the implementation of energy efficiency or net metering programs, any revenue variances (positive or negative) caused by weather patterns, and revenue variances (positive or negative) that result from changes in economic conditions.

**Where to Find Information about the Authority**

The Authority periodically files documents with the Electronic Municipal Market Access system ("EMMA"). In addition, for convenience, further information about the Authority can be found on the Authority's website (www.lipower.org). No documents filed with EMMA or information on the Authority's website is included by specific cross-reference herein.

**Relationship between the 2017 Restructuring Bonds and the Authority's Indebtedness**

The Authority's secured indebtedness is secured by a lien on all of its revenues, rates, fees, charges, and other income and receipts from the operations of any of its subsidiaries; provided, however, that, among other things, "Transition Charges" are not subject to that lien. Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "Transition Charges" and that they are not subject to the lien of the General Resolution. In addition, the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens. See "SECURITY FOR THE 2017 RESTRUCTURING BONDS – Lien on 2017 Restructuring Property" in this Official Statement. Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution.

## SERVICER AND ADMINISTRATOR

**General**

As described herein, LIPA is a wholly-owned subsidiary of the Authority, which owns and operates the electric transmission and distribution system located in the Service Area, and the Authority and LIPA have entered into operating agreements with third parties, which provide the Authority and LIPA with the operating personnel and resources necessary for LIPA to continue to provide electric service in the Service Area. LIPA is a New York corporation and is eligible to be the subject of a voluntary or involuntary petition in a liquidation case under chapter 7 of the Bankruptcy Code or a reorganization case under chapter 11 of the Bankruptcy Code.

**Servicing the 2017 Restructuring Bonds**

LIPA will, pursuant to a Servicing Agreement between LIPA and the Issuer, provide services to the Issuer in connection with the servicing of the 2017 Restructuring Property, 2017 Restructuring Charges, and the 2017 Restructuring Bonds. The Issuer will pay LIPA, as Servicer, the Servicing Fee which shall be 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds and is intended to be the estimated incremental cost of performing the Services required by the Servicing Agreement. The Servicing Fee for any Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets may be higher than the Servicing Fee for LIPA; provided, however, that any Servicing Fee in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be subject to approval by the Authority and the Trustee. In addition to the Servicing Fee, the Issuer will reimburse the Servicer for expenses it incurs in connection with the services it performs under the Servicing Agreement. As described herein, pursuant to the OSA, PSEG Long Island will provide many of the Servicer functions on behalf of LIPA, including, among other things, billing and collection, meter reading and forecasting.

**Transition to a New Business Model**

In connection with the expiration of the MSA, the Authority determined that it was desirable to solicit proposals that would provide for, at a minimum, a different delivery structure under which the T&D System Assets would be operated and maintained by a separate subsidiary of the selected service provider that would be dedicated to the Authority's electric business, and thus better aligned to the Authority's goals. Following a competitive process to select a new service provider, on December 15, 2011, the Authority's Trustees authorized the execution of two agreements to transition to a new business model. First, it authorized LIPA to enter into an Operations Services Agreement between LIPA and PSEG Long Island for PSEG Long Island to provide operations, maintenance and related services for the T&D System beginning on January 1, 2014. Second, it authorized LIPA to enter into a two-year Transition Services Agreement ("TSA") with PSEG Long Island, which expired on December 31, 2013.

The subsequent implementation of the LIPA Reform Act required the transfer of substantial operational duties and obligations to PSEG Long Island and greater operational flexibility for PSEG Long Island to carry out its related duties. In response to the LIPA Reform Act, LIPA re-negotiated the OSA with PSEG Long Island to address the changed relationship between the parties in connection with the provision of electric service in LIPA's service area. PSEG Long Island's scope of services and LIPA's reserved rights have been adjusted to reflect the shift in operations, management and policy making responsibilities while assuring LIPA's oversight rights. In addition, effective January 1, 2014, PSEG Long Island became the brand name provider for electric service in the service area. PSEG Long Island also assumed certain power supply management, fuel procurement and related services on January 1, 2015 that had been provided by others. Further information about PSEG and PSEG Long Island can be found at

http://www.psegliny.com.  No information on that website is included herein.  See "—The LIPA Reform Act and the OSA" below.

The LIPA Reform Act also requires that staffing at the Authority be kept at levels only necessary to ensure that the Authority is able to meet obligations with respect to its bonds and notes and all applicable statutes and contracts, and to oversee the activities of PSEG Long Island.  The Authority's Executive Management team includes the following: Chief Executive Officer (Thomas Falcone); Chief Financial Officer (Joseph A. Branca) General Counsel and Secretary (Jon R. Mostel); Vice President of Operations Oversight (Rick Shansky); Vice President of Financial Oversight (Kenneth Kane); Vice President of Policy and Strategy (Bobbi O'Connor); Chief Information Officer (vacant); Controller (Donna Mongiardo); Director of Human Resources and Administration (Barbara Ann Dillon); Director of Audit (Kathleen Mitterway); Director of Customer Service Oversight and Stakeholder Relations (Michael Deering); Director of Rates and Regulation (Justin Bell); Special Counsel for Ethics, Risk and Compliance (James Miskiewicz); and Director of Public Information (Sidhartha Nathan).

**The LIPA Reform Act and the OSA**

The LIPA Reform Act imposed new substantive obligations on any service provider and effectively shifted the major operational and policy-making responsibilities for the T&D System, including significant responsibilities relating to capital expenditures, budgets and emergency response, from LIPA to PSEG Long Island. Consistent with this approach, the LIPA Reform Act requires that staffing at the Authority be kept at levels only necessary to ensure that the Authority is able to meet obligations with respect to its bonds and notes and all applicable statutes and contracts, and to oversee the activities of PSEG Long Island.  The LIPA Reform Act requires PSEG Long Island to prepare and maintain an emergency response plan to assure the reasonably prompt restoration of service in the case of an emergency event and establish separate responsibilities of the Authority and the service provider; submit for review to DPS a report detailing PSEG Long Island's planned capital expenditures; consider, consistent with maintaining system reliability, renewable generation and energy efficiency program results and options in establishing capital plans; and submit to DPS for review, data, information and reports on PSEG Long Island's actual performance related to the metrics in the OSA, including the Authority's evaluation thereof, prior to the Authority's determination of PSEG Long Island's annual incentive compensation.

Implementation of the LIPA Reform Act required the transfer of substantial operational duties and obligations to PSEG Long Island and greater operational flexibility for PSEG Long Island to carry out its related duties.  In response to the LIPA Reform Act, LIPA re-negotiated the operations services agreement with PSEG Long Island to address the changed relationship between the parties in connection with the provision of electric service in LIPA's Service Area.  The resulting OSA has a term of 12 years, expiring December 31, 2025 and provides that if PSEG Long Island achieves certain levels of performance based on criteria specified in the OSA during the first 10 years, the parties will negotiate in good faith an eight year extension of the OSA on substantially similar terms and conditions.

*The following is a brief summary of certain provisions of the OSA.  This summary does not purport to be complete and reference is made to the OSA for full and complete statements of such agreement and all provisions. The OSA has been filed with the MSRB's EMMA and is included by specific cross-reference herein.  For convenience, a copy of the OSA can also be found on the Authority's website (www.lipower.org) under the caption "Reports and Contracts."*

*Compensation.*  The OSA provides for an annual fixed component of the management services fee of $36.3 million in 2014 and 2015, which increases to $58 million in 2016 and thereafter (prorated as appropriate and indexed in accordance with the OSA).  In addition, the OSA provides for an annual incentive compensation pool of $5.44 million in 2014 and 2015, which increases to $8.7 million in 2016 and thereafter (in each case expressed in 2011 dollars, prorated as appropriate and indexed in accordance with the OSA).  The incentive compensation pool is earned based on favorable performance relative to the Performance Metrics contained in the OSA.  Generally, costs and expenses (without any mark-up or profit) incurred by PSEG Long Island in the course of providing operations services are treated as "Pass-Through Expenditures" under the OSA.

*Performance Metrics.* The Performance Metrics in the OSA are designed to encourage PSEG Long Island to achieve LIPA's desired performance levels, which is generally first quartile performance as determined by agreed industry peer benchmarks. The Performance Metrics are structured both to maintain good performance and improve poor performance, through two distinct types of Performance Metrics, "Maintenance Metrics" and "Improvement Metrics." Maintenance Metrics are those Performance Metrics for which satisfactory performance levels are currently

28

being achieved. The goal of Maintenance Metrics is to incent continued satisfactory performance (generally, first quartile). Improvement Metrics are those Performance Metrics for which current performance is unsatisfactory. The goal of Improvement Metrics (generally, first quartile) is to incent improved performance over time. To date, PSEG Long Island has completed three years of T&D operations and made substantial progress toward achieving or maintaining the Performance Metrics described above, as well as substantially improved LIPA's standing in the J.D. Power Residential and Business customer satisfaction surveys. Under certain circumstances, the parties may agree to amend the Performance Metrics.

*Operations Services*. PSEG Long Island is required to provide operations services for the T&D System on behalf of LIPA at all times in accordance with the standards set forth in the OSA. Under the OSA, except for certain rights and responsibilities reserved to LIPA, PSEG Long Island assumes and undertakes the rights and responsibilities for management, operation and maintenance of the T&D System and the establishment of policies, programs and procedures with respect thereto, including: all electric transmission, distribution and load servicing activities for the safe and reliable operation and maintenance of the T&D System; day-to-day operation of the T&D System; engineering activities; preparation of recommended capital plan and monitoring of approved annual capital budget; preparation of long- and short-range planning analyses and forecasts; customer services; finance, accounting, budgeting, longer-term financial forecasting and treasury operations related to the T&D System; and other general activities such as information technology, human resources, procurement, implementation of emergency response and reporting. Under the OSA, LIPA retains continuing oversight responsibilities and obligations with respect to the operation and maintenance of the T&D System consistent with the LIPA Reform Act. LIPA's specific rights and responsibilities with respect to the T&D System include, among other things: the right to determine all T&D System rates and charges; the right to review and approve the consolidated budget pursuant to the procedures outlined in the OSA, and the LIPA Reform Act; responsibility for financing the business and operations of the Authority and LIPA; compliance with any financing documents and administration of debt service for all debt of the Authority and LIPA; and overall responsibility for the Authority's and LIPA's legal matters, including reporting and related legal compliance.

In addition to the expansion of operational duties and obligations of PSEG Long Island under the OSA as compared with the prior service provider, PSEG Long Island is now the retail brand for electric service on Long Island.

*Additional Services*. Effective January 1, 2015, a PSEG Long Island affiliate also assumed certain power supply management, fuel procurement and related services.

*Termination of OSA*. The OSA contains customary events of default, including bankruptcy, payment failures and failure to perform material obligations under the agreement, as well as cure rights. The OSA may be terminated upon an event of default that has not been timely cured. In the event of a bankruptcy-related event of default under the OSA, the OSA terminates immediately without further action by the non-defaulting party. For payment defaults or, in the case of PSEG Long Island and certain of its affiliates only, credit support-related defaults, the non-defaulting party may terminate upon not less than fifteen Business Days' written notice to the other party. For other events of default, the non-defaulting party must generally provide not less than ninety Business Days' written notice prior to termination. Immediately upon the expiration or any earlier termination of the OSA, the PSEG Long Island service company will transfer all of the membership interests in the PSEG Long Island service company and all corporate books and records to LIPA or, at LIPA's direction, its designee at no cost to LIPA or its designee. LIPA and PSEG Long Island will mutually agree upon such instruments, agreements and other documents as may be reasonably necessary to effect such transfer.

*Additional Service Provider Termination Rights*. Under the OSA, PSEG Long Island may terminate the agreement in the event of either a (i) LIPA Privatization, (ii) LIPA Municipalization or (iii) Change in Regulatory Law (all as defined in the OSA) (each, a "PSEG Long Island Termination Event"). If a PSEG Long Island Termination Event occurs and PSEG Long Island exercises its right to terminate the OSA, the termination notice period would generally extend for 12 or 14 months (depending on the nature of the PSEG Long Island Termination Event). Under the OSA, LIPA has the option to extend the effective date of any such termination for up to 6 months. In addition, if LIPA is unable to procure and contract with a successor service provider prior to the termination date of the OSA, LIPA could seek to commence an arbitration proceeding under the OSA on the grounds, among others, that termination of the OSA under such circumstances would be contrary to the public interest and should, therefore, be deferred.

If the OSA is terminated due to a PSEG Long Island Termination Event, it may be difficult for LIPA to obtain a successor T&D System manager prior to the termination date of the OSA (as it may be extended) and there can be no assurance that LIPA will be able to do so. In such event, the OSA provides that PSEG Long Island transfer to, and

LIPA would take ownership of, the PSEG Long Island service subsidiary. LIPA would then perform the PSEG Long Island billing and collection function with the subsidiary company employees.

*Additional LIPA Termination Rights*. LIPA may also terminate the OSA at any time if LIPA is privatized or operation of LIPA's T&D System is "fully municipalized" upon not less than six months' notice. In addition, in the event of a "Change of Control" of PSEG Long Island or certain affiliated entities, LIPA has the right to terminate the OSA upon not less than thirty days' notice. Beginning in the third contract year, LIPA also has the additional right to terminate the OSA if PSEG Long Island fails to satisfy either the major storm or the minimum performance level metric in the then-current contract year and any one of the preceding two (2) contract years upon not less than six months' prior written notice. If LIPA exercises the right to terminate the OSA as set forth in this paragraph, it must set forth in its written termination notice a termination date which cannot exceed 12 months following the date of such notice.

## Servicing Experience

LIPA has acted as servicer of the Prior Restructuring Property created in accordance with each of the Prior Financing Orders, commencing in January 2014 in connection with the Prior Restructuring Properties securing the 2013 Restructuring Bonds. To date, the Servicer has complied with its obligations under each of the servicing agreements relating to Prior Restructuring Properties, including timely performance of its obligations relating to the True-Up Adjustment Process.

In addition, the 2013 Restructuring Bonds, the 2015 Restructuring Bonds, the 2016A Restructuring Bonds and the 2016B Restructuring Bonds have been paid in accordance with the expected amortization schedules therefor. For the first four months of 2016, billings and collections of the restructuring charges securing the 2013 Restructuring Bonds and the 2015 Restructuring Bonds, respectively, were approximately 5.2% below forecast principally due to unseasonably warm winter weather and greater than expected energy efficiency. On April 15, 2016, the Servicer in its capacity as servicer for such restructuring bonds, issued notices of adjustment applicable to those restructuring charges, which adjustments reflected the lower than expected billings and collections. Those adjustments were effective on May 15, 2016. In order to pay a portion of the June 15, 2016 debt service payment obligation relating to the 2013 Restructuring Bonds, $2,422,557.92 from the then-current reserve balance of $10,128,254.86 was withdrawn from the reserve subaccount. In order to pay a portion of the June 15, 2016 debt service payment obligation relating to the 2015 Restructuring Bonds, $863,695.48 from the then-current 2015 reserve balance of $20,054,812.42 was withdrawn from the operating reserve subaccount. The notices of adjustment issued on April 15, 2016 contemplated the lower than forecast sales and the need to replenish the amounts then projected to be withdrawn from the reserves with amounts to be collected from the adjusted restructuring charges. Those reserves were replenished from such adjusted restructuring charges.

## Allocation Account; Remittance of 2017 Restructuring Charges; Reconciliation

*Allocation Account; Daily Remittances*. The Authority has established an Allocation Account that holds all Customer payments until the checks clear and allocations can be made. The Allocation Account is administered by an Allocation Agent designated by the Authority for the benefit of the Trustee, the trustees for each of the Prior Restructuring Bonds, and the trustee under the Authority's General Resolution (as defined herein). The Authority itself will continue to act as the Allocation Agent.

The Servicer is required to cause all payments from Customers (including Charge Collections) to be deposited into the Allocation Account. Customer revenues which are not directly paid into the Allocation Account by Customers and are otherwise received by the Servicer must be deposited into the Allocation Account within two Business Days' receipt by the Servicer or the Authority. On each Business Day, the Allocation Agent is required to transfer to the Trustee for deposit into the Collection Account the amount of Charge Collections estimated to have been received and deposited into the Allocation Account. Such amount is referred to as "Daily Remittances." The remaining funds in the Allocation Account on each such Business Day will be transferred to the Authority's revenue account.

### Reconciliation of Actual versus Estimated Charges

Pursuant to the Servicing Agreement, within fifteen days prior to the date on which it files an Adjustment Notice with the Authority, the Servicer is required to calculate and report the amount of Actual Charge Collections during the prior Reconciliation Period as compared to the Estimated Charge Collections in that period. The Servicer is also required to calculate the amount of any Excess Remittance or Remittance Shortfall for that prior Reconciliation Period.

If a Remittance Shortfall exists, the Servicer will cause the Allocation Agent to make a supplemental remittance from the Allocation Account to the Collection Account within two Business Days after such calculation. If an Excess Remittance exists, the Servicer will cause the Excess Remittance to be corrected as soon as practicable by either (1) reducing the amount of each Daily Remittance from the Allocation Account until the balance of the Excess Remittance has been reduced to zero, or (2) causing payment of the amount of the Excess Remittance to the Servicer (for deposit in the revenue fund established under the Authority's General Resolution) from the General Subaccount or the Excess Funds Subaccount, if necessary.

**Billing and Collection Policies**

*Credit Policy*

The provision of electric service to Service Area customers by the Authority is governed by the Home Energy Fair Practices Act ("HEFPA"), which is Article 2 of the New York Public Service Law. Pursuant to § 11.12 of HEFPA, deposits can be required from residential customers in a number of circumstances, such as for seasonal or short-term service or for Customers who have filed for bankruptcy. The deposit can be as much as twice the average monthly bill for a calendar year. The Customer may pay the deposit in installments and the Customer earns interest on the deposit for as long as the Authority holds that amount. The deposit is automatically returned to the Customer if the Customer is not delinquent in the payment of bills during the one year period from the payment of the deposit.

All new commercial accounts require a deposit, and the HEFPA Rules allow the Authority to request a deposit from an existing, commercial Customer "whose financial condition is such that it is likely that the customer may default in the future; provided, however, that the utility must have reliable evidence of such condition, such as a report from accepted financial reporting services or credit reporting agencies." LIPA's service provider, PSEG Long Island, subscribes to DNBi, a web-based subscription service that monitors the changing risk conditions of commercial customers in the Authority's portfolio. An algorithm can be customized in conjunction with Dun & Bradstreet which combines several elements that are used to determine which Customers are at high risk for default.

The table below indicates the numbers and dollars of deposits from residential and commercial Customers held by the Authority at the beginning of the past 5 years. Approximately 13% of the average monthly revenue for 2016 was secured with a cash deposit. This calculation does not include non-cash securities, such as security bonds and letters of credit.

**Deposits on Hand from Residential and Commercial Customers**

| Beginning of: | Number of Deposits | Dollars of Deposits (in thousands) |
|---|---|---|
| 2013 | 31,202 | $34,218 |
| 2014 | 32,706 | $36,404 |
| 2015 | 33,837 | $35,818 |
| 2016 | 34,755 | $36,239 |
| 2017 | 35,195 | $35,676 |

*Billing Process*

LIPA's billing process is managed by PSEG Long Island. Bills are generated in a three-step process: meter reading, bill calculation, and bill printing and mailing. Meters are read on a bi-monthly cycle for approximately 978,000 residential and small commercial Customers (85% of Customers). Meters are read on a monthly cycle for approximately 72,000 larger commercial demand-metered Customers (6% of Customers) and approximately 99,000 residential Customers with special situations such as electric space heating and solar (9% of Customers). The majority of LIPA's meters are read manually by meter readers, except for approximately 61,500 accounts (5% of Customers) that are read using (i) hand-held remote sensing (ERTS) (17,200), and (ii) Smart Meter technologies (44,301, which accounts for approximately 32.3% of sales). LIPA currently expects to convert entirely to Smart Meter technologies over the next four years.

Once the meter readings are received, bills are calculated and generated by PSEG Long Island and transmitted to a vendor for printing and mailing. The billing cycle differs from the meter reading cycle in that many residential Customers that have their meters read bi-monthly receive bills on a monthly basis. Approximately 869,000 residential

Customers receive monthly bills which, combined with the approximately 95,000 commercial accounts that are billed monthly, makes a total of 964,000 Customers (84% of Customers) that receive bills monthly rather than bi-monthly.

Most of the Customers pay their bills by U.S. Mail. Payments are mailed to a Long Island address where they are retrieved and processed by a vendor working on behalf of PSEG Long Island. Payments are processed to a lock-box which deposits the receipts into the Allocation Account. All other forms of payment are also deposited directly into an Authority bank account when they are processed or received.

### Customer Remittance Payments Processed in 2016 by Type

| Type of Payment | Items (in thousands) | Dollars (in millions) |
|---|---|---|
| US Mail/Lockbox | 3,981 | $1,613 |
| Internet | 1,338 | 308 |
| Home Banking | 2,768 | 578 |
| Direct Debit | 1,074 | 249 |
| In-house Processing | 31 | 113 |
| Pay Agents | 9 | 4 |
| Pay by Phone | 316 | 107 |
| Interactive Voice Recognition | 754 | 157 |
| Customer Office | 446 | 148 |
| Large Customers ACH | 3 | 57 |
| Energy Assistance | 37 | 8 |
| Collection Agencies | 10 | 2 |
| Credit Card | 222 | 55 |
| | 10,989 | $3,399 |

*Collection Policy*

LIPA's collection process is managed by PSEG Long Island. Collection practices, including the ability to terminate (disconnect) service, are governed by HEFPA. LIPA's bills are due immediately and payable in 20 days to avoid late payment charges and other collection activities. Bill notices and outbound telephone calls may begin as early as 30 days after a bill is issued, if payment is not received. To conform to HEFPA requirements, a series of notices will appear on the bills for delinquent Customers, indicating that service may be terminated if payment is not received. The Customer must also be offered a deferred payment agreement for outstanding arrears. The standard deferred payment agreement requires payment of up to 15% of the bill, and monthly payments of the balance over ten months, plus the payment of all current charges going forward. Customers that do not make payment of their outstanding arrears or enter into a deferred payment agreement are subject to termination of service (disconnection) for non-payment. To execute the termination, a field visit is performed to offer a final opportunity to make the payment, evaluate the situation from a safety perspective and, if called for, immediately disconnect the Customer.

The ability to terminate is also restricted by weather conditions, in accordance with HEFPA. During warm weather (i.e. summer) conditions, residential service cannot be terminated when the temperature-humidity (heat) index has reached 95 degrees for two consecutive days or the temperature has been 100 degrees for any length of time or heat advisory or excessive heat warnings have been issued. During cold weather (winter) conditions, residential service will not be terminated if the high temperature of the day does not rise above 32 degrees. Between November 1st and April 15th, PSEG Long Island must attempt to contact the customer via telephone or in person 72 hours prior to termination and the field staff must recheck the location on the following day if there was no contact made at the time of termination.

Significant efforts are made through the collections process to avoid both Customer termination, if possible, and write-offs, to the extent practical. PSEG Long Island performs significant outbound calling efforts and field collection visits to give Customers every opportunity to make payment on outstanding balances. Larger commercial Customers are also visited by collections and key account representatives to explore other possible avenues for bringing the account up-to-date. Payment agreements and referrals to the appropriate social service agencies are also used to maximize the payment of outstanding arrears for residential Customers. In the event that a final bill is issued (either because the Customer left the premises without paying their outstanding balances or PSEG Long Island

terminated service), an effort is made to identify any new location within the Service Area where the Customer may have moved, and have the outstanding arrears transferred there, and the balance due may be assigned to an outside collection agency for early action. Final accounts are written off to bad debt expense approximately 120 to 150 days after the final bill has been issued. Once the account is written off, the unpaid balances are generally assigned to one of the service provider's collection agencies that pursue additional collection activities in exchange for a percentage share of the recovery. Net recoveries are returned to LIPA and credited against bad debt expense.

**Revenues, LIPA's Customer Base and Electric Energy Consumption**

LIPA's Customer base consists of four primary revenue reporting classes: residential, commercial, street lighting, and other public authorities.

The following tables show the electricity delivered to Customers, total retail electricity delivery service revenues and the number of Customers for each of the customer rate classes noted below for the year ending December 31, 2016 and each of the four preceding years. There can be no assurance that the retail electricity delivery service sales, retail electric revenues and number of Customers or the composition of any of the foregoing will remain at or near the levels reflected in the following tables.

**Electricity Delivered to Customers,**
**Total Billed Retail Electricity Delivery Service Revenues and Customers**

**Retail Electric Usage (As Measured by Billed GWh Sales)**
**by Customer Rate Class and Percentage Composition**

| Customer Rate Class | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential | 9,735 | 48.9% | 9,536 | 47.8% | 9,390 | 47.7% | 9,611 | 48.2% | 9,463 | 48.3% |
| Commercial | 9,666 | 48.4% | 9,786 | 49.2% | 9,700 | 49.3% | 9,730 | 48.8% | 9,582 | 48.9% |
| Street Lighting | 169 | 0.8% | 158 | 0.8% | 156 | 0.8% | 144 | 0.7% | 130 | 0.6% |
| Other Public Authorities | 383 | 1.9% | 437 | 2.2% | 441 | 2.2% | 441 | 2.2% | 425 | 2.2% |
| Total Retail | 19,953 | 100.0% | 19,917 | 100.0% | 19,687 | 100.0% | 19,926 | 100.0% | 19,600 | 100.0% |

**Total Billed Retail Electricity Delivery Service Revenue by Customer Rate Class and Percentage Composition**
**(Dollars in Millions)**

| Customer Rate Class | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential | $1,854 | 54.2% | $1,955 | 54.4% | $1,948 | 53.4% | $1,886 | 54.4 % | $1,844 | 55.0% |
| Commercial | 1,499 | 43.7% | 1,603 | 44.6% | 1,603 | 44.0% | 1,491 | 43.5% | 1,448 | 43.1% |
| Street Lighting | 25 | 0.7% | 26 | 0.7% | 40 | 1.1% | 23 | 0.7% | 20 | 0.6% |
| Other Public Authorities | 49 | 1.4% | 10 | 0.3% | 56 | 1.5% | 50 | 1.5% | 45 | 1.3% |
| Total Retail | $3,427 | 100.0% | $3,594 | 100.0% | $3,647 | 100.0% | $3,430 | 100.0% | $3,357 | 100.0% |

**Service Territory Average Number of Metered Customers**
**and Percentage Composition**

| Customer Rate Class | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential | 997,940 | 89.2% | 996,442 | 89.3% | 999,565 | 89.3% | 1,002,942 | 89.3% | 1,005,751 | 89.3% |
| Commercial | 115,128 | 10.3% | 114,692 | 10.3% | 114,663 | 10.2% | 114,648 | 10.2% | 115,033 | 10.2% |
| Street Lighting | 5,356 | 0.5% | 5,018 | 0.4% | 4,963 | 0.4% | 5,451 | 0.5% | 5,479 | 0.5% |
| Other Public Authorities | 131 | 0.0% | 131 | 0.0% | 131 | 0.0% | 131 | 0.0% | 129 | 0.0% |
| Total Retail | 1,118,555 | 100.0% | 1,116,283 | 100.0% | 1,119,322 | 100.0% | 1,123,172 | 100.0% | 1,126,392 | 100.0% |

**Forecasting Electricity Consumption**

     The table below shows information relating to the forecasted and actual electricity delivered by customer class and on an aggregate basis, as well as the applicable variances, in each case for the years shown.

**Annual Forecast Variance For Ultimate Electric Delivery (MWh)**

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Residential** | | | | | |
| Forecast | 9,971,900 | 9,799,521 | 9,809,663 | 9,562,411 | 9,584,560 |
| Actual | 9,735,407 | 9,536,152 | 9,389,926 | 9,611,160 | 9,463,401 |
| Variance (%) | -2.37% | -2.69% | -4.28% | 0.51% | -1.26% |
| **Commercial** | | | | | |
| Forecast | 10,025,904 | 10,039,942 | 9,867,433 | 9,935,481 | 10,251,721 |
| Actual | 9,666,106 | 9,800,324 | 9,700,047 | 9,730,214 | 9,581,965 |
| Variance (%) | -3.59% | -2.39% | -1.70% | -2.07% | -6.53% |
| **Street Lighting** | | | | | |
| Forecast | 173,188 | 164,907 | 153,510 | 149,224 | 148,219 |
| Actual | 169,394 | 157,579 | 156,139 | 143,541 | 130,027 |
| Variance (%) | -2.19% | -4.44% | 1.71% | -3.81% | -12.27% |
| **Other Public Authorities** | | | | | |
| Forecast | 443,160 | 456,200 | 427,552 | 430,004 | 434,335 |
| Actual | 382,710 | 437,038 | 440,950 | 440,724 | 424,597 |
| Variance (%) | -13.64% | -4.20% | 3.13% | 2.49% | -2.24% |
| **TOTAL** | | | | | |
| Forecast | 20,614,152 | 20,460,570 | 20,258,158 | 20,077,119 | 20,418,835 |
| Actual | 19,953,617 | 19,931,093 | 19,687,062 | 19,925,639 | 19,599,991 |
| Variance (%) | -3.20% | -2.59% | -2.82% | -0.75% | -4.01% |

**Loss Experience**

     The following table sets forth information relating to the annual net charge-offs for LIPA, including net charge-offs of Customers as part of LIPA's annual charge-off reconciliation process, prepared in accordance with the current metrics provided for in the OSA for all years.

**Net Charge-Offs as a Percentage of Total Billed Retail Electricity Service Revenues**

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Electric Revenues Billed ($000) | 3,413,091 | 3,834,255 | 3,753,765 | 3,572,133 | 3,427,943 |
| Net Charge-Offs ($000) | 19,750 | 20,969 | 24,659 | 23,948 | 19,646 |
| Percentage of Revenue Billed | 0.58% | 0.55% | 0.66% | 0.67% | 0.57% |