past default, such default shall cease to exist, and any Servicer Default arising therefrom shall be deemed to have been remedied for every purpose of the Servicing Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereto.

*Notice of Servicer Default*.  The Servicer shall deliver to the Issuer, the Authority, the Administrator, the Trustee, the Allocation Agent and the Rating Agencies, promptly after having obtained knowledge thereof, but in no event later than 5 Business Days thereafter, written notice in an Officer's Certificate of any event which with the giving of notice or lapse of time, or both, would become a Servicer Default under the Servicing Agreement.

*Amendment to Servicing Agreement*.  The Servicing Agreement may be amended by the Servicer and the Issuer, with the consent of the Trustee and the satisfaction of the Rating Agency Condition.  Promptly after the execution of any such amendment or consent, the Issuer shall furnish written notification of the substance of such amendment or consent to each of the Rating Agencies.

Prior to the execution of any amendment to the Servicing Agreement, the Issuer and the Trustee shall be entitled to receive and rely upon an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by the Servicing Agreement and the Opinion of Counsel referred to in the Servicing Agreement.  The Issuer and the Trustee may, but shall not be obligated to, enter into any such amendment which affects their own rights, duties or immunities under the Servicing Agreement or otherwise.

To amend or modify the Servicing Agreement, the following conditions must be met:

(a)    At least fifteen days prior to the effectiveness of any such amendment or modification and after obtaining the other necessary approvals described above (except that the consent of the Trustee may be subject to the consent of the Holders if such consent is required or sought by the Trustee in connection with such amendment or modification), the Servicer shall have delivered to the Authority written notification of any proposed amendment,

(b)    If the Authority, within fifteen days (subject to extension as provided in clause (c) below) of receiving a notification complying with the necessary approvals as described above, delivers to the office of the person to whom responses are to be delivered a written statement that the Authority might object to the proposed amendment or modification, then such proposed amendment or modification shall not be effective unless and until the Authority subsequently delivers a written statement that it does not object to the proposed amendment or modification,

(c)    If the Authority, within fifteen days of receiving a notification complying with the necessary approvals described above, delivers to the office of the person to whom responses are to be delivered a written statement requesting additional time (up to thirty days) in which to consider the proposed amendment or modification, then such proposed amendment or modification shall not be effective if, within the extended period, the Authority delivers to the office of the person to whom responses are to be delivered a written statement that it does not object to the proposed amendment or modification,

(d)    If the Authority has not delivered written notice that the Authority might object to the proposed amendment or modification within the relevant time period described above, then the Authority shall be deemed not to have any objection and such amendment or modification may become effective upon satisfaction of the other conditions specified above, and

(e)    Following the delivery of a notice to the Authority by the Servicer under clause (b) above, the Servicer and the Issuer shall have the right at any time to withdraw any proposed amendment from consideration.

The Servicer may, with the prior written consent of the Authority, amend the billing procedures in Annex 2 to the Servicing Agreement in writing with prior written notice given to the Trustee, the Issuer and the Rating Agencies, but without the consent of the Trustee, the Issuer, any Rating Agency or any Holder, solely to address changes to the Servicer's method of calculating the 2017 Restructuring Charges as a result of changes to the Servicer's (or its subservicer's) current computerized customer information system, including changes which would replace the remittances contemplated by the estimation procedures set forth in Annex 2 with remittances of Charge Collections determined to have been actually received; provided that any such amendment shall not have a material adverse effect on the Holders.

The Servicer shall promptly provide each of the Rating Agencies and the Authority with a copy of any amendment to the Servicing Agreement.

*Cooperation with Successor.* The Servicer will, on an ongoing basis, cooperate with the Successor Servicer and provide whatever information is, and take whatever actions are, reasonably necessary to assist the Successor Servicer in performing its obligations under the Servicing Agreement.

## ADMINISTRATION AGREEMENT

In addition to the description of certain provisions of the Administration Agreement contained elsewhere herein, the following is a brief summary of certain provisions of the Administration Agreement and does not purport to be comprehensive or definitive. All references herein to the Administration Agreement are qualified in their entirety by reference to the Administration Agreement for the detailed provisions thereof.

**Duties of the Administrator**

To the extent not required to be performed by the Servicer, the Administrator shall perform the Issuer's obligations under each of the Basic Documents and shall prepare or cause any and all documents, reports, filings, instruments, notices, certificates and opinions to be prepared on behalf of the Issuer.  These obligations include:

(a)     confirmation that any non-responding Rating Agency has received the Rating Agency Condition request and request the related Rating Agency Condition confirmation,

(b)     the preparation of or obtaining of the documents required for the authentication of the 2017 Restructuring Bonds and delivery of the same to the Trustee and such other actions on behalf of the Issuer as are necessary for the issuance and delivery of the 2017 Restructuring Bonds,

(c)     causing a Bond Register to be kept and to give the Trustee notice of any changes to the Bond Register,

(d)     the fixing of any special record date and the notification of Holders of any special record dates, Payment Dates and the amount of defaulted interest to be paid, if any,

(e)     advising the Trustee of an election to terminate the book-entry system through a Clearing Agency with respect to the 2017 Restructuring Bonds,

(f)     maintenance of an office or agency in the Borough of Manhattan, the City of New York, New York where 2017 Restructuring Bonds may be surrendered for registration of transfer or exchange, which may be the Trustee,

(g)     causing any newly appointed Paying Agents to deliver to the Trustee instruments regarding funds held in trust,

(h)     directing the Paying Agents to pay to the Trustee all sums held in trust by such Paying Agents,

(i)     preparing all supplements and amendments to the Indenture, filings pursuant to the Securitization Law or Financing Order No. 5, instruments of further assurance and other instruments, in accordance with the Indenture, necessary to protect the 2017 Collateral,

(j)     identifying to the Trustee in an Officer's Certificate any Person that the Issuer has contracted to perform its duties under the Indenture,

(k)     delivering a notice to the Trustee and the Rating Agencies of each Event of Default under the Administration Agreement and each default by the Servicer or Seller of its obligations under the Servicing Agreement or the Sale Agreement, respectively,

(l)     notifying the Trustee and the Authority of the appointment of any Successor Servicer,

(m)     preparing and filing of all documents required under the Securitization Law relating to the transfer of the ownership or security interest in the 2017 Restructuring Property,

(n)     preparing the Officer's Certificate and Independent Certificate relating to the satisfaction and discharge of the Indenture or a Legal Defeasance under the Indenture,

(o)　　　sending a copy of each certificate of compliance delivered to it pursuant to the Servicing Agreement and Annual Accountant's Report delivered to it pursuant to the Servicing Agreement to the Trustee, the Holders and the Rating Agencies and to the Servicer,

(p)　　　furnishing the Trustee with each Record Date and the names and addresses of Holders during any period when the Trustee is not the Registrar,

(q)　　　the opening of one or more segregated trust accounts in the Trustee's name, the preparation of orders, and the obtaining of Opinions of Counsel and the taking of all other actions necessary with respect to investment and reinvestment of funds in the Collection Account including transfer of the Collection Account to an Eligible Institution if it ceases to be maintained at an Eligible Institution,

(r)　　　preparing, obtaining or filing of the instruments, opinions and certificates and other documents required for the release of 2017 Collateral,

(s)　　　appointing Independent registered public accountants for purposes of preparing and delivering the reports or certificates required by the Indenture and, upon any resignation by such firm, providing written notice thereof to the Trustee and promptly appointing a successor thereto that shall also be a firm of Independent registered public accountants,

(t)　　　preparing the Issuer orders and the obtaining of Officer's Certificates with respect to the execution of supplemental bond indentures,

(u)　　　the preparation of new 2017 Restructuring Bonds conforming to any supplemental bond indenture,

(v)　　　in the case of any redemption of 2017 Restructuring Bonds at the direction of the Issuer, giving written notice to the Trustee of the Issuer's direction to redeem such 2017 Restructuring Bonds,

(w)　　　notifying the Trustee of any notice received by the Issuer from the Holders, and

(x)　　　interacting with the Allocation Agent with respect to Excess Remittances and Remittance Shortfalls.

The Administrator shall also furnish the Issuer with ordinary clerical, bookkeeping and other administrative services necessary and appropriate for the Issuer.

In addition to the duties of the Administrator described above, the Administrator shall undertake such other administrative services as may be appropriate, necessary or requested by the Issuer and provide such other services as are incidental to those set forth above or in this paragraph or as the Issuer and Administrator may agree. As part of its administrative services, the Administrator shall obtain and maintain a directors and officers insurance policy covering the trustees of the Issuer (which policy may cover the officers of the Issuer as well), and the Administrator shall pay the premiums therefor as a reimbursable expense under the Administration Agreement to the extent there are insufficient funds on deposit in the Collection Account to pay such premiums when due in accordance with the priorities specified in the Indenture. The Administrator shall not take any non-ministerial action unless the Administrator notifies the Issuer of the proposed action and the Issuer consents to such action.

**Administrator Compensation**

The Administration Agreement provides that the Administrator shall be entitled to an annual fee (the "Administration Fee") of $100,000 in equal semi-annual installments on each Payment Date.

The Issuer will also reimburse the Administrator for all filing fees and expenses, legal fees, fees of outside auditors and other out-of-pocket expenses incurred by the Administrator in the course of performing its duties thereunder. The Administrator's compensation and other expenses payable thereunder shall be paid from the Collection Account in accordance with the Collection Account priorities as stated in the Indenture, and the Administrator shall have no recourse against the Issuer for payment of such amounts other than in accordance with the Collection Account priorities as stated in the Indenture.

**Resignation and Removal of the Administrator**

The Administrator may resign its duties thereunder by providing the Issuer with at least sixty days' prior written notice. The Issuer may remove the Administrator without cause by providing the Administrator with at least sixty days' written notice. At the sole option of the Issuer, the Administrator may be removed immediately upon written notice of termination from the Issuer to the Administrator if the Administrator is in default of the performance of its duties under the Administration Agreement and such default is not cured in accordance with the Administration

Agreement, or is party to a voluntary or involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect or appoints a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Administrator or any substantial part of its property or order the winding-up or liquidation of its affairs.

No resignation or removal of the Administrator shall be effective until a successor Administrator shall have been appointed by the Issuer and shall have agreed in writing to be bound by the terms of the Administration Agreement. The appointment of any successor Administrator shall be effective only after the satisfaction of the Rating Agency Condition with respect to the proposed appointment.

Promptly upon the effective date of its resignation or removal, the Administrator shall be entitled to be paid all fees accrued to it and expenses accrued by it in performance of its duties thereunder through the date of such resignation or removal and to the extent permitted under the Administration Agreement.

**Amendment of the Administration Agreement**

The Administration Agreement may be amended in writing by the Administrator and the Issuer with the written consent of the Trustee, but without the consent of any of the Holders, to cure any ambiguity, to correct or supplement any provisions in the Administration Agreement or for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions in the Administration Agreement or of modifying in any manner the rights of the Holders; provided, that such action shall not, as evidenced by an Officer's Certificate delivered to the Trustee, adversely affect in any material respect the interests of any Holder.

The Administration Agreement may also be amended in writing from time to time by the Administrator and the Issuer with the written consent of the Trustee and, subject to the paragraph directly above, the written consent of the Holders evidencing a majority of the Outstanding Amount of the 2017 Restructuring Bonds, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Administration Agreement or of modifying in any manner the rights of the Holders; provided, however, that no such amendment shall increase, reduce, accelerate or delay the timing of Charge Collections without the consent of the Holders of all the outstanding Bonds.

**Indemnification by the Administrator**

The Administrator shall indemnify the Issuer, the Trustee and their respective trustees, officers, officials, directors, employees and agents for, and defend and hold harmless each such Person from and against, any and all liabilities, obligations, actions, suits, claims, losses, damages, payments, costs or expenses of any kind whatsoever that may be imposed on, incurred by or asserted against such Person as a result of the Administrator's willful misconduct or negligence in the performance of its duties or observance of its covenants arising out of the Agreement.

The indemnification obligations of the Administrator under the Administration Agreement shall survive the termination of the Administrator Agreement and the resignation or removal of the Trustee.

**Administrator's Liability**

Except as provided in the Administration Agreement, the Administrator does not assume any liability other than to render or stand ready to render the services called for in the Administration Agreement and neither the Administrator nor any of its directors, officers, employees, subsidiaries or affiliates shall be responsible for any action of the Issuer or any of the trustees, officers, employees, subsidiaries or affiliates of the Issuer (other than the Administrator itself).

## AFFILIATIONS AND CERTAIN RELATIONSHIPS

Each of the Authority and LIPA may maintain banking relationships in the ordinary course with The Bank of New York Mellon.

## RISK FACTORS

*Please carefully consider all the information included in this Official Statement, including the risks described below before deciding to invest in the 2017 Restructuring Bonds.*

### Servicing and Operating Risks

*Repayment of the 2017 Restructuring Bonds Depends on Performance of LIPA and PSEG Long Island or any Successors*

As Servicer, LIPA will be responsible for monitoring the 2017 Collateral, taking all necessary action in connection with True-Up Adjustments and certain reporting requirements. In its role as T&D System manager under the OSA, PSEG Long Island is responsible for performing a number of functions that are otherwise provided by the Servicer including, among other things, billing and collecting the 2017 Restructuring Charges from Customers, meter reading and forecasting. The Trustee's receipt of Charge Collections, which will be used to make payments on the 2017 Restructuring Bonds, will depend in part on the skill and diligence of PSEG Long Island and LIPA or any successors in performing these functions.

The base term of the OSA expires on December 31, 2025, which is prior to the Final Maturity Date for certain of the 2017 Restructuring Bonds. In addition, the OSA is subject to early termination. See "SERVICER AND ADMINISTRATOR—The OSA" and "—The LIPA Reform Act and the OSA."

If PSEG Long Island ceases to perform the billing and collection functions on behalf of the Servicer pursuant to the terms of the OSA, it might be difficult to find a replacement T&D System manager or a Successor Servicer. Also, any Successor Servicer (or T&D System manager performing servicing functions) might have less experience and ability than PSEG Long Island and might experience difficulties in collecting 2017 Restructuring Charges, in determining appropriate adjustments to the 2017 Restructuring Charges, and billing and/or payment arrangements may change, resulting in delays or disruptions of Charge Collections. A Successor Servicer might charge fees that, while permitted under Financing Order No. 5, are substantially higher than the fees paid to LIPA as the initial Servicer. In the event of the commencement of a case by or against the Servicer or PSEG Long Island under the United States Bankruptcy Code or similar laws, the Servicer and the Trustee might be prevented from effecting a transfer of servicing due to operation of the Bankruptcy Code. Any of these factors and others might delay the timing of payments and may reduce the value of the 2017 Restructuring Bonds.

If LIPA or any successor, or PSEG Long Island or any successor, fails to collect or remit sufficient Charge Collections for any reason, then the Servicer's payments to the Trustee in respect of the 2017 Restructuring Charges might be delayed or reduced. In that event, payments on the 2017 Restructuring Bonds might be delayed or reduced. In addition, the successor owner of all or substantially all, or part, of the T&D System Assets of LIPA serving its Customers may assume the role of Servicer, subject only to the satisfaction of the conditions set forth in the Servicing Agreement. These conditions do not include either Holder consent or, so long as the successor entity assumes the ownership of all of the distribution system business assets of LIPA serving its Customers, satisfaction of the Rating Agency Condition.

Failure by the Authority and PSEG Long Island or a successor to undertake programs intended to maintain and/or improve the T&D System Assets could induce Customers to reduce or avoid 2017 Restructuring Charges by seeking alternatives to purchasing electricity through LIPA's T&D System Assets. That may reduce the total number of Customers paying the 2017 Restructuring Charges and change the relative amounts of 2017 Restructuring Charges on such Customers, all of which would increase the amount and share of 2017 Restructuring Charges billed to the remaining Customers. Such increase may reduce the collectability of the 2017 Restructuring Charges.

*Inaccurate Consumption Forecasting or Unanticipated Delinquencies or Charge-offs Might Reduce Scheduled Payments on the 2017 Restructuring Bonds*

The 2017 Restructuring Charges are calculated based upon forecasted Customer usage, including the effect of delinquencies and charge offs. Under the OSA, PSEG Long Island does the forecasting of electricity consumption. The amount and the rate of Charge Collections will depend in part on actual electricity usage and the amount of collections and write-offs for each rate class. If PSEG Long Island or a successor inaccurately forecasts electricity consumption or uses inaccurate Customer delinquency or charge-off data when setting or adjusting the 2017 Restructuring Charges, there could be a shortfall or material delay in Charge Collections, which might result in missed or delayed payments of principal and interest and lengthened weighted average lives of the 2017 Restructuring Bonds.

See "THE FINANCING ORDER—True-Up Adjustment Mechanism" and "THE SERVICING AGREEMENT — True-Up Adjustment Process."

The Servicer's use of inaccurate delinquency or charge-off rates might result also from, among other things, unexpected deterioration of the economy or changes to law and regulations governing the termination of electric service to Customers in the event of extreme weather, either of which could cause greater delinquencies or charge-offs than expected or force LIPA to grant additional payment relief to more Customers; or the introduction into New York of alternative electricity suppliers who collect the 2017 Restructuring Charges from the Customers, but who may fail to remit Customer charges to the Servicer in a timely manner; or the failure of alternative electricity suppliers to submit accurate and timely information to the Servicer regarding their collections and charge-offs; or any other unanticipated change in law that makes it more difficult for LIPA to terminate service to nonpaying Customers or that requires LIPA to apply more lenient credit standards in accepting Customers.  See "THE SERVICER AND ADMINISTRATOR – Billing and Collection Policies."

*Changes to Billing and Collection Practices May Reduce the Amount of Funds Available for Payments on the 2017 Restructuring Bonds*

The methodology of determining the amount of the 2017 Restructuring Charge billed to each Customer is specified in Financing Order No. 5.  Neither LIPA, nor PSEG Long Island as it performs its billing and collection functions on LIPA's behalf, may change this methodology.  However, subject to applicable law, tariff and regulatory requirements, billing and collection arrangements with each Customer may be changed in a manner that delays or reduces the Servicer's payments to the Trustee in respect of the 2017 Restructuring Charges.  For example, to recover part of an outstanding electricity bill, LIPA may agree to extend a Customer's payment schedule or to write off the remaining portion of the bill.  In that event, collection of 2017 Restructuring Charges may be delayed or reduced until an adjustment is made.  See "SERVICER AND ADMINISTRATOR—Billing and Collection Policies."

*Limits on Rights to Terminate Service to Customers Might Make it More Difficult to Collect the 2017 Restructuring Charges*

To the extent that Customers do not pay for their electric service, LIPA will not be able to collect 2017 Restructuring Charges from these Customers.  HEFPA provides some limitations on the Authority's right to terminate service of Customers who fail to pay their bills.  Historical rates of non-payment are included in the calculations of the 2017 Restructuring Charges, but increases in the rates of non-payment would reduce the Charge Collections of 2017 Restructuring Charges until such 2017 Restructuring Charges are adjusted.

*The Servicer's Indemnification Obligations Under the Servicing Agreement are Limited and Might Not Be Sufficient to Protect the Investments in the 2017 Restructuring Bonds*

The Servicer is obligated under the Servicing Agreement to indemnify the Issuer and the Trustee (for itself and on behalf of the Holders) only in limited circumstances.  See "THE SERVICING AGREEMENT—Servicer Will Indemnify Issuer in Limited Circumstances."  Neither the Trustee nor the Holders will have the right to accelerate payments on the 2017 Restructuring Bonds as a result of a breach under the Servicing Agreement, absent an event of default under the Indenture as described in "THE INDENTURE—Events of Default."  If the Servicer incurs indemnification obligations, it is not clear where such obligations would rank with other Servicer obligations.  Furthermore, the Servicer might not have sufficient funds available to satisfy its indemnification obligations under the Servicing Agreement.  The Servicer would get funds to pay indemnification obligations from the T&D System rates and other charges.  In the event of substantial Servicer indemnification obligations, payments on the 2017 Restructuring Bonds might be delayed or reduced.

*Delinquent or Partial Payments of Customer Bills May Make Principal Payments on the 2017 Restructuring Bonds Occur Later than Expected*

The amount and the rate of collection of the 2017 Restructuring Charges, together with the related 2017 Restructuring Charge adjustments, will impact whether there is a delay in the scheduled repayments of 2017 Restructuring Bond principal.  If the 2017 Restructuring Charges are collected at a slower rate than expected, the Servicer might have to request adjustments of the 2017 Restructuring Charges.  If those adjustments are not timely and accurate, there may be a delay in payments of principal and interest and a decrease in the value of the 2017 Restructuring Bonds.

*Storm Damage to LIPA's Operations Could Impair Payment of the 2017 Restructuring Bonds*

The Service Area experiences seasonal conditions typical of the northeast United States. Summers are usually hot with high temperatures in excess of 90°F. Winters include snow and icing conditions that can be damaging to overhead power lines. In addition, the Service Area experiences severe storms, including hurricanes, which can be particularly damaging due to Long Island's coastal location. LIPA's operations were disrupted by Superstorm Sandy in 2012. Future storms could have similar or more drastic effects. Transmission and/or distribution and generation facilities could be damaged or destroyed and usage of electricity could be interrupted temporarily, reducing the Charge Collections. There could be longer-lasting weather-related adverse effects on residential and commercial development and economic activity among the Customers, which could cause the 2017 Restructuring Charge to be greater than expected as a percentage of Base Rate Revenues. Legislative action adverse to the Holders might be taken in response, and such legislation, if challenged as violative of the State Pledge, might be defended on the basis of public necessity.

**Customer and Delivery Related Risks**

*Alternatives to Purchasing Electricity Through LIPA's Distribution Facilities or Technological Change Might Make Substitute Energy Sources More Attractive in the Future, and Effect of Net Metering*

Technological developments might result in the introduction of economically attractive alternatives to purchasing electricity through LIPA's T&D System Assets for increasing numbers of Customers. Manufacturers of self-generation facilities may develop smaller-scale, more fuel-efficient and/or more environmentally friendly generating units that can be cost-effective sources of energy for a greater number of Customers. Self-generation is most attractive to Customers who are high load factor energy users, such as hospitals, or manufacturers with multiple shift operations. Currently, there are few such Customers of significant size in the Service Area.

Over time, technological developments might allow greater numbers of Customers to reduce or avoid 2017 Restructuring Charges, which may reduce the total number of Customers paying the 2017 Restructuring Charges and change the relative amounts of 2017 Restructuring Charges on such Customers, all of which would increase the amount and share of 2017 Restructuring Charges billed to the remaining Customers. Such increase may reduce the collectability of the 2017 Restructuring Charges.

LIPA's tariff provides for net metering of certain residential and nonresidential customer-generators of renewable power, such as solar, wind, farm waste, micro-combined heat and power, fuel cells, micro-hydroelectric and hybrids. See "THE FINANCING ORDER – Collection of 2017 Restructuring Charges; Nonbypassability." Subject to the limitations imposed by the Securitization Law (including the State Pledge) and other applicable law, the Authority has from time to time increased the net billing limitation and may in the future make other changes to its tariff that could impact the amount of the 2017 Restructuring Charges that would have to be billed per kilowatt hour. The PSC commenced a proceeding to identify changes to the methodology for compensating customer-generators of renewable power so as to limit the loss of delivery revenue from such transactions. The Authority intends to make comparable changes to its tariff. Nevertheless, over time, net metering could reduce the total number of Customers paying the 2017 Restructuring Charges and change the relative amounts of 2017 Restructuring Charges on such Customers, all of which would increase the amount and share of 2017 Restructuring Charges billed to the paying Customers. Such increase may reduce the collectability of the 2017 Restructuring Charges.

**Judicial, Legislative or Regulatory Risks**

*Future Legislative Action to Change the Securitization Law Could Reduce the Value of the 2017 Restructuring Bonds*

New York does not have a referendum or initiative process by which the Securitization Law may be challenged. Therefore, the only way for the Securitization Law to be changed would be through a legislative action which would be subject to the State Pledge. Constitutional protections against actions that violate the State Pledge should apply to legislation that is passed by the New York State legislature. However, to date, no federal or New York cases addressing the repeal or amendment of securitization provisions such as those contained in the Securitization Law have been decided; consequently, no judicial precedent is directly on point.

There have been cases in which federal courts have applied the Contract Clause of the United States Constitution to strike down legislation regarding similar or analogous matters, such as legislation reducing or eliminating taxes, public charges or other sources of revenues which support bonds issued by public instrumentalities or private issuers, or which otherwise reduces or eliminates the security for bonds. Based upon this case law, Hawkins Delafield & Wood LLP, expects to deliver an opinion in connection with the closing of the offering of the 2017

Restructuring Bonds to the effect that the Holders (or the Trustee acting on their behalf) could successfully challenge under the Contract Clause of the United States Constitution the constitutionality of any repeal or amendment of the Securitization Law or any other action or failure to take any action required by the State Pledge that substantially limits, alters or reduces the value of the 2017 Restructuring Property or the Charges prior to the time that the 2017 Restructuring Bonds are fully paid and discharged, unless such action is necessary to further a significant and legitimate public purpose.

It may be possible for the New York legislature to repeal or further amend the Securitization Law, or for the Authority to amend or revoke Financing Order No. 5, notwithstanding the State Pledge if the legislature or the Authority acts in order to serve a significant and legitimate public purpose, such as protecting the public health and safety or responding to a national or regional catastrophe affecting the Service Area, or if the legislature otherwise acts in the valid exercise of the State's police power. Any such action, as well as the litigation that likely would ensure, might adversely affect the price and liquidity, the dates of payment of interest and principal and the weighted average lives of the 2017 Restructuring Bonds. Moreover, the outcome of any litigation cannot be predicted. Accordingly, the Holders might incur a loss on or delay in recovery of their investment in the 2017 Restructuring Bonds.

In addition, any action of the New York legislature adversely affecting the 2017 Restructuring Property or the ability to impose, charge or collect Charges may be considered a "taking" under the United States or New York Constitutions. Hawkins Delafield & Wood LLP expects to render an opinion in connection with the closing of the offering of the 2017 Restructuring Bonds to the effect that, under the federal and New York Constitutions, respectively, assuming the applicable court determines that the Takings Clause and not the Contract Clause applies, the State would be required to pay just compensation to the Holders if the State undertook a repeal or amendment of the Securitization Law or took any other action or failed to take any action required by the State Pledge after the 2017 Restructuring Bonds are issued but before they are fully paid that (i) constituted a permanent appropriation of a substantial property interest of the Holders in the 2017 Restructuring Property or denied all economically beneficial or productive use of the 2017 Restructuring Property, (ii) destroyed the 2017 Restructuring Property, other than in response to so-called emergency conditions, or (iii) substantially reduced, altered or impaired the value of the 2017 Restructuring Property so as to unduly interfere with the reasonable expectations of the Holders arising from their investment in the 2017 Restructuring Bonds. In examining whether action of the New York legislature amounts to a regulatory taking, both federal and New York State courts will consider the character of the governmental action, the economic impact of the governmental action on the Holders, and the extent to which the governmental action interferes with reasonable investment-backed expectations. There can be no assurance, however, that any award of compensation would be sufficient to pay the full amount of principal of and interest on the 2017 Restructuring Bonds.

The Takings Clauses do not preclude any limitation or alteration of the Securitization Law or Financing Order No. 5 if just compensation is made by law for the protection of the 2017 Restructuring Charges collected pursuant to Financing Order No. 5 and of the Holders. It is unclear what "just compensation" would be afforded to Holders by the State if such limitation or alteration were attempted. Accordingly, no assurance can be given that any such provision would not adversely affect the market value of the 2017 Restructuring Bonds, or the timing or receipt of payments with respect to the 2017 Restructuring Bonds.

The foregoing opinion notes that issues relating to the Contract Clause of the United States and the Takings Clauses of the United States and New York Constitutions are essentially decided on a case by case basis and that the courts' determinations, in most cases, appear to be strongly influenced by the facts and circumstances of the particular case. The opinion described above will be subject to the qualifications included in them. The degree of impairment necessary to meet the standards for relief under a Takings Clause analysis or Contract Clause analysis could be substantially in excess of what a Bondholder would consider material. A form of such opinion is included as Appendix C to this Official Statement.

In addition, the enforcement of any rights against the State under the State Pledge may be subject to the exercise of judicial discretion in appropriate cases and to the limitations on legal remedies against state and local governmental entities in New York. These limitations might include, for example, the necessity to exhaust administrative remedies prior to bringing suit in a court, or limitations on type and locations of courts in which the State may be sued.

*Future Judicial Action Could Reduce the Value of the Holder's Investment in the 2017 Restructuring Bonds*

The 2017 Restructuring Property is the creation of the Securitization Law and Financing Order No. 5. There is uncertainty associated with investing in bonds payable from an asset that depends for its existence on legislation

because there is limited juridical or regulatory experience implementing and interpreting the legislation. Because the 2017 Restructuring Property is a creation of the Securitization Law, any judicial determination affecting the validity of or interpreting the Securitization Law, the 2017 Restructuring Property or the Customer's ability to make payments securing the 2017 Restructuring Bonds might have an adverse effect on the 2017 Restructuring Bonds.

Other states and the District of Columbia have passed securitization laws, and some of these laws have been challenged by judicial actions. To date, none of these challenges has succeeded, but future judicial challenges might be made. An unfavorable decision regarding another state's securitization law would not automatically invalidate the Securitization Law or Financing Order No. 5, but, whether or not the statute was specifically tailored to a public entity issuer, such an unfavorable decision might provoke a challenge to the Securitization Law, establish a legal precedent for a successful challenge to the Securitization Law or heighten awareness of the political and other risks of the 2017 Restructuring Bonds, and in that way may limit the liquidity and value of the 2017 Restructuring Bonds. Therefore, legal activity in other states may indirectly affect the value of a Holder's investment in the 2017 Restructuring Bonds.

### *The Issuer Will Not be in Breach of Any Representation or Warranty as a Result of a Change in Law*

The Issuer will not be in breach of any representation or warranty as a result of a change in the law by means of a legislative enactment or constitutional amendment. The Seller will not agree in the Sale Agreement and the initial Servicer and any Successor Servicer will not agree in its Servicing Agreement to institute any action or Proceeding to block or overturn any attempts to cause a repeal, modification or supplement to the Securitization Law that would be adverse to the Issuer, Trustee or Holder. See "THE SALE AGREEMENT—Covenants of the Seller" and "THE SERVICING AGREEMENT—Servicing Procedures." In addition, there are no assurances that if either the Seller or Servicer choose to take such an action, any such action would be successful.

### *The Issuer is Not Obligated to Indemnify the Holders for Changes in Law*

Neither the Issuer, the Authority nor the Servicer will indemnify the Holders for any changes in the law, including any federal preemption or repeal or amendment of the Securitization Law, that may affect the value of the 2017 Restructuring Bonds. Except as described above with respect to an action or Proceeding that would be adverse to the Issuer, Trustee or Holder, pursuant to the Servicing Agreement, at the request of the Trustee, the Servicer will take such legal or administrative actions, including without limitation defending against or instituting and pursuing legal actions and appearing or testifying at hearings or similar Proceedings, as may be reasonably necessary to block or overturn any attempts to cause a repeal of, modification of or supplement to the Securitization Law or Financing Order No. 5, or the Issuance Advice Letter that would be materially adverse to the Trustee or the Holders. However, there are no assurances that the Servicer would be able to take this action or that any such action would be successful.

### *Challenges to the Transaction*

While the time for filing any challenges to the LIPA Reform Act expired and no such challenges were filed, it is possible that interested parties may still seek to find some basis to challenge the LIPA Reform Act, the issuance of the 2017 Restructuring Bonds or specific aspects of the transaction. For example, notwithstanding that (a) Financing Order No. 5 contains a conclusion of law that the 2017 Restructuring Charges are "transition charges" as defined in the General Resolution and that they are not subject to the lien thereof, (b) Hawkins Delafield & Wood LLP expects to render an opinion in connection with the issuance of the 2017 Restructuring Bonds to the effect that the 2017 Restructuring Charges are not subject to the lien of the General Resolution or the Subordinated General Resolution, and (c) the Authority will make a representation in the Sale Agreement to the effect that it is transferring the 2017 Restructuring Property free of any Liens, it is possible that holders of bonds issued by the Authority or other creditors or stakeholders may nonetheless attempt to assert that the 2017 Restructuring Charges are subject to the lien of the General Resolution or the Subordinated General Resolution. Though no such claims have been raised to date, any litigation making such assertion could affect the market price of the 2017 Restructuring Bonds.

## Bankruptcy-Related Risks

### *Bankruptcy Relief is Not Available to the Issuer, but it is Available to the Authority and to the Servicer*

With respect to the Issuer, its status as a municipality and the state law prohibition against its filing of a case under chapter 9 would result in the Issuer having no access to relief under the Bankruptcy Code. It would remain subject to applicable state law concerning debtors and creditors. The Authority is a corporate municipal instrumentality and a political subdivision of the State of New York and is explicitly authorized to file a petition under chapter 9 pursuant to its enabling legislation. Also as described elsewhere in this Official Statement, LIPA is a

corporation eligible to be the subject of a voluntary or involuntary petition in a liquidation case under chapter 7 of the Bankruptcy Code or a reorganization case under chapter 11 of the Bankruptcy Code.

*If the Servicer Were a Debtor in a Bankruptcy Proceeding, the Servicer Could Elect to Reject the Servicing Agreement and Any Resulting Delay in the Appointment of a Replacement or Successor Servicer Could Disrupt the Billing and Collection of the 2017 Restructuring Charges, Thus Delaying the Payment on the 2017 Restructuring Bonds*

Among the powers given to a debtor in such a bankruptcy case is the right to "assume" or "reject" any unexpired lease or "executory contract." While not defined in the Bankruptcy Code, an "executory contract" is generally said to be a bilateral agreement as to which material performance remains for both parties at the time the bankruptcy case is commenced. The Servicing Agreement would likely be found to be an executory contract. If LIPA, as debtor, elected to reject the Servicing Agreement as permitted under the Bankruptcy Code, the Servicing Agreement would no longer be enforceable against LIPA, as Servicer, and the Issuer, or the Trustee as the Issuer's assignee, would have only general unsecured claims against LIPA for the damages resulting from such rejection. Such claims would be subject to being discharged in the bankruptcy case and no assurance can be given as to what percentage of their claims unsecured creditors would receive in the bankruptcy case.

In the event of a bankruptcy of the Servicer, the Servicing Agreement provides for the appointment of a Successor Servicer. However, the automatic stay in effect during a Servicer bankruptcy might delay or prevent a Successor Servicer's replacement of the Servicer. Even if a Successor Servicer is permitted to be appointed to replace the Servicer, a successor may be difficult to obtain and may not be capable of performing all of the duties that LIPA as Servicer was capable of performing. Furthermore, should the Servicer enter into bankruptcy, it may be permitted to stop acting as Servicer.

*The Authority Will Commingle the 2017 Restructuring Charges with Other Revenues That Are Collected For It, Which Might Make Such Commingled Amounts Unavailable to Pay Amounts Owing on the 2017 Restructuring Bonds*

PSEG Long Island, on behalf of the Servicer, bills and collects all charges due from Customers and payable to the Authority, as well as restructuring charges, including the 2017 Restructuring Charges and the Prior Restructuring Charges. The Servicer is required to deposit, or cause to be deposited, into the Allocation Account, created by the Authority, the Charge Collections and the other amounts due on account of their customer bills, where they are commingled with other revenues collected that are not 2017 Restructuring Charges, as well as the Prior Restructuring Charges. On each Business Day, to the extent that funds are available in the Allocation Account, the Allocation Agent will transfer the estimated amount of Charge Collections from the Allocation Account to the Collection Account.

The Securitization Law provides that the relative priority of a lien created under the Securitization Law is not affected by the commingling of 2017 Restructuring Charges arising with respect to the 2017 Restructuring Property with other amounts. In the event of a bankruptcy of the Authority, a party in interest in the bankruptcy might assert, and a court might rule, that the 2017 Restructuring Charges commingled with the Authority's own funds prior to and as of the date of bankruptcy were property of the Authority as of that date, rather than the Issuer's property. If the court so rules, then the court might also rule that the Trustee has only a general unsecured claim against the Authority for the amount of commingled 2017 Restructuring Charges held as of that date and could not recover the commingled 2017 Restructuring Charges held as of the date of the bankruptcy.

*The Sale of 2017 Restructuring Property Might Be Construed as a Financing and Not a Sale in the Authority's Bankruptcy Case, Which Conclusion Might Delay or Limit Payments on the 2017 Restructuring Bonds*

The Authority will represent and warrant that the transfer of the 2017 Restructuring Property in accordance with the Sale Agreement constitutes a true and valid sale and assignment of that 2017 Restructuring Property by the Authority to the Issuer. It will be a condition of closing for the sale of the 2017 Restructuring Property pursuant to the Sale Agreement that the Issuer will take the appropriate actions under the Securitization Law, including an informational filing of a UCC financing statement with the Secretary of State of New York. According to the Securitization Law, any pledge of the 2017 Restructuring Property or proceeds thereof shall be perfected, valid and binding from the time when the pledge is made. The description of the 2017 Restructuring Property in any security agreement and any financing statement must refer to the Securitization Law and Financing Order No. 5. No instrument needs to be recorded in order to perfect the lien on the 2017 Restructuring Property. However, as described herein, the Issuer will cause a financing statement and any necessary continuation statements, which in the case of the 2017

Restructuring Property shall be for informational purposes only, describing the pledge and referring to Financing Order No. 5 and the 2017 Restructuring Property under Article 9 of the UCC.

A bankruptcy court generally follows state property law on issues such as those addressed by the state law provisions referred to above. However, a bankruptcy court does not follow state law if it determines that the state law is contrary to a paramount federal bankruptcy policy or interest. In the event of a bankruptcy filing by the Authority, if a party in interest in the bankruptcy were to take the position that the transfer of the 2017 Restructuring Property to the Issuer pursuant to that Sale Agreement was a financing transaction and not a true sale under applicable creditors' rights principles, there can be no assurance that a court would not adopt this position.

The parties have attempted to mitigate the impact of a possible recharacterization of a sale of 2017 Restructuring Property as a financing transaction under applicable creditors' rights principles. The Sale Agreement will provide that if the transfer of the applicable 2017 Restructuring Property is thereafter recharacterized by a court as a financing transaction and not a true sale, the transfer by the Authority will be deemed to have granted to the Issuer and the Trustee a first priority security interest in all the Authority's right, title and interest in and to the 2017 Restructuring Property and all proceeds thereof. As a result of the Issuer causing a UCC financing statement to be filed, the Issuer would, in the event of a recharacterization, be a secured creditor of the Authority with a lien on the 2017 Restructuring Property and all proceeds thereof.

If the Issuer were determined to have only a security interest in the 2017 Restructuring Property, the Issuer would be subject to the risks of a secured creditor in a bankruptcy case. As a result, repayment of the 2017 Restructuring Bonds might be significantly delayed and a plan of reorganization in the bankruptcy might permanently modify the amount and timing of payments to the Issuer of the Charge Collections and therefore the amount and timing of funds available to the Issuer to pay the Holders. However, the law does provide that the value of the creditor's perfected lien must be maintained.

If the transaction is recharacterized as a financing rather than a true sale and if the Issuer fails to otherwise perfect its interest in the 2017 Restructuring Property sold pursuant to the Sale Agreement, the Issuer would be an unsecured creditor of the Authority whose claims would be subject to being discharged in the bankruptcy case. No assurance can be given as to what percentage of their claims unsecured creditors would receive in any bankruptcy case involving the Authority.

*In a Proceeding in Which the Authority is a Debtor, the Bankruptcy Court Could Conclude that the 2017 Restructuring Property Comes Into Existence Only as Customers Take Delivery of Electricity, Which Could Impair the Issuer's Interest in Such 2017 Restructuring Property, Thus Impacting the Collection of the 2017 Restructuring Charges*

The Authority will represent in the Sale Agreement, and the Securitization Law provides, that the 2017 Restructuring Property sold pursuant to such Sale Agreement constitutes an existing, present property right on the date that it is first transferred and pledged in connection with the issuance of the 2017 Restructuring Bonds. Further, as described above, a bankruptcy court generally follows state property law on issues such as those addressed by the state law provisions referred to above. Nevertheless, no assurance can be given that, in the event of a bankruptcy of the Authority, a court would not rule that the applicable 2017 Restructuring Property comes into existence only as Customers use electricity.

If a court were to accept the argument that the applicable 2017 Restructuring Property comes into existence only as Customers use electricity, no assurance can be given that a security interest in favor of the Bondholders would attach to the 2017 Restructuring Charges in respect of electricity consumed after the commencement of the bankruptcy case or that the 2017 Restructuring Property has been sold to the Issuer. If it were determined that the 2017 Restructuring Property had not been sold to the Issuer, and the security interest in favor of the Bondholders did not attach to the applicable 2017 Restructuring Charges in respect of electricity consumed after the commencement of the bankruptcy case, then the Issuer would have an unsecured claim against the Authority. If so, there would be delays and/or reductions in payments on the 2017 Restructuring Bonds. Whether or not a court determined that 2017 Restructuring Property had been sold to the Issuer pursuant to a Sale Agreement, no assurances can be given that a court would not rule that any 2017 Restructuring Charges relating to electricity consumed after the commencement of the bankruptcy could not be transferred to the Issuer or the Trustee.

Regardless of whether the Authority is the debtor in a bankruptcy case, if a court were to accept the argument that 2017 Restructuring Property sold pursuant to the Sale Agreement comes into existence only as customers take delivery of electricity, a tax or government lien or other nonconsensual lien on property of the Authority arising before

that 2017 Restructuring Property came into existence could have priority over the Issuer's interest in that 2017 Restructuring Property. Adjustments to the 2017 Restructuring Charges may be available to mitigate this exposure, although there may be delays in implementing these adjustments.

*The Financing Structure Would Present a Case of First Impression under the Bankruptcy Code*

No court has ever considered this type of financing in the context of a petition brought under the Bankruptcy Code. If the Authority or LIPA were to become a debtor in a bankruptcy case, a court could conclude that the remittance of the restructuring charges by the Authority to the Trustee is subordinate to the payment of certain expenses of the Authority or LIPA.

*Certain Contractual Claims Against the Authority Might be Limited in Case of a Bankruptcy of the Authority*

If the Authority were to become a debtor in a bankruptcy case, claims, including indemnity claims, by the Issuer or the Trustee against the Authority as Seller under the Sale Agreement and the other documents executed in connection therewith would be unsecured claims that would be subject to being discharged in the bankruptcy case. In addition, a party in interest in the bankruptcy may request that the bankruptcy court estimate any contingent claims that the Issuer or the Trustee have against the Authority. That party may then take the position that these claims should be estimated at zero or at a low amount because the contingency giving rise to these claims is unlikely to occur. If a court were to hold that the indemnity provisions were unenforceable, the Issuer would be left with a claim for actual damages against the Authority based on breach of contract principles. The actual amount of these damages would be subject to estimation and/or calculation by the court.

No assurances can be given as to the result of any of the above-described actions or claims. Furthermore, no assurance can be given as to what percentage of their claims, if any, unsecured creditors would receive in any bankruptcy case involving the Authority.

*The Bankruptcy of the Authority Might Limit the Remedies Available to the Trustee*

Upon an event of default under the Indenture, the Securitization Law permits the Trustee to enforce the security interest in the 2017 Restructuring Property sold pursuant to the Sale Agreement in accordance with the terms of the Indenture. In this capacity, the Trustee is permitted to request a New York court to order the sequestration and payment to Holders of the 2017 Restructuring Bonds of all revenues arising from the applicable 2017 Restructuring Charges. There can be no assurance, however, that a New York court judge would issue this order after a Seller bankruptcy in light of the automatic stay provisions of Section 362 of the United States Bankruptcy Code. In that event, the Trustee may under the Indenture seek an order from the bankruptcy court lifting the automatic stay with respect to this action by a New York court judge and an order requiring an accounting and segregation of the revenues arising from the 2017 Restructuring Property sold pursuant to the Sale Agreement.

*A Bankruptcy of LIPA and/or the Authority Might Result in Consolidation of LIPA's or the Authority's Assets and Liabilities with Those of the Issuer, Potentially Causing Losses or Delays in Payments on the 2017 Restructuring Bonds*

If LIPA and/or the Authority were to become a debtor in a bankruptcy case, a party in interest might attempt to substantively consolidate the assets and liabilities of LIPA, the Authority and the Issuer. The Issuer and the Authority have taken steps to attempt to minimize this risk. See "THE ISSUER – Relationship of the Issuer to the Authority and LIPA" in this Official Statement. However, no assurance can be given that if LIPA and/or the Authority were to become a debtor in a bankruptcy case, a court would not order that the Issuer's assets and liabilities be substantively consolidated with those of LIPA and/or the Authority. Such substantive consolidation could cause payment of the claims of the beneficial owners of the 2017 Restructuring Bonds to be subject to substantial delay and to adjustment in timing and amount under a plan of reorganization in the bankruptcy case.

*In a Bankruptcy of the Authority, the Remittances of the 2017 Restructuring Charges by Servicer Prior to the Date of the Bankruptcy Should Not Constitute Preferences, But Resolution of Such Issues Could Delay the Payments on the 2017 Restructuring Bonds*

In most bankruptcy cases, a payment by the debtor on account of antecedent debt may constitute a preference under bankruptcy law. Any payment within 90 days of the filing of the bankruptcy petition (or within one year if the remittance was on account of antecedent debt owed to an insider) that constitutes a preference could be avoidable, and the funds could be required to be returned to the bankruptcy estate of the debtor.

Transfers to a secured creditor of collateral in which the creditor has a perfected first lien are not subject to recovery as a preference. Moreover, in a chapter 9 case, transfers made to or for the benefit of a holder of a note or a bond, and on account of such note or bond, are not recoverable as a preference. As a result, notwithstanding a chapter 9 filing by the Authority, payments received by the Trustee or the Holders prior to the filing of the bankruptcy case should not be recoverable as preferences. However, any such action could result in a delay of the recovery of the 2017 Restructuring Charges.

### Risks Associated with the Unusual Nature of the 2017 Restructuring Property

*The Holders May Experience Material Payment Delays Because the Source of Funds for Payment is Limited.*

The 2017 Restructuring Bonds will be solely the obligation of the Issuer and will not be a debt of or a pledge of the faith and credit of the State or any political or governmental unit thereof, including the PSC or the Public Authorities Control Board. The 2017 Restructuring Bonds shall be nonrecourse to the credit or any assets of the State and to the credit or, except for the 2017 Restructuring Property, any assets of the Issuer. The 2017 Restructuring Bonds shall be limited obligations of the Issuer, payable solely out of the 2017 Restructuring Property, including the rights to bill and collect 2017 Restructuring Charges, derived from or in connection with the Sale Agreement (including all sums deposited in any Collection Account from time to time pursuant to the Sale Agreement or the Indenture, except for amounts in the Upfront Financing Costs Subaccount) and, in certain events, out of amounts obtained through the exercise of any remedy provided for in the Indenture. The 2017 Restructuring Bonds shall never be paid out of any other funds of the Issuer except such 2017 Restructuring Property. No recourse under the 2017 Restructuring Bonds shall be had against any past, present or future officer or director of the Issuer. The 2017 Restructuring Bonds shall never be paid in whole or in part out of any funds raised or to be raised by taxation or out of any other revenues or assets of the Issuer or the State except the collateral pledged by the Indenture. The principal of and interest on the 2017 Restructuring Bonds and all other amounts owing under the Indenture are secured, as set forth in the Indenture, by an assignment by the Issuer of certain of its rights under the Sale Agreement, including a pledge of certain of the revenues derived from and in connection with the Sale Agreement.

The 2017 Restructuring Bonds are not insured or guaranteed by LIPA, including in its capacity as the Servicer, or by any of its affiliates, the Trustee or by any other person or entity. Thus, Holders must rely for payment solely upon the Securitization Law, Financing Order No. 5 and state and federal constitutional rights to enforcement of the Securitization Law and Financing Order No. 5, the 2017 Restructuring Property, including the rights to bill and collect the 2017 Restructuring Charges, and Charge Collections and funds on deposit under the Indenture held by the Trustee.

*Foreclosure of the Trustee's Lien on the 2017 Restructuring Property Securing the 2017 Restructuring Bonds Might Not be Practical, and Acceleration of the 2017 Restructuring Bonds Before Maturity Might have Little Practical Effect*

Under the Securitization Law and the Indenture, the Trustee or the Holders have the right to foreclose or otherwise enforce the lien on the 2017 Restructuring Property securing the 2017 Restructuring Bonds. However, in the event of foreclosure, there is likely to be a limited market, if any, for the 2017 Restructuring Property. Therefore, foreclosure might not be a realistic or practical remedy. Moreover, although principal of the 2017 Restructuring Bonds will be due and payable upon acceleration of the 2017 Restructuring Bonds before maturity, the 2017 Restructuring Charges may not be accelerated and the nature of the 2017 Collateral will result in principal of the 2017 Restructuring Bonds being paid as funds become available. If there is an acceleration of the 2017 Restructuring Bonds, all tranches of the 2017 Restructuring Bonds will be paid pro rata; therefore some tranches might be paid earlier than expected and some tranches might be paid later than expected.

*The Credit Ratings Are Not an Indication of the Expected Rate of Payment of Principal on the 2017 Restructuring Bonds*

The 2017 Restructuring Bonds are expected to receive credit ratings from three nationally recognized statistical rating organizations ("NRSROs"). A rating is not a recommendation to buy, sell or hold the 2017 Restructuring Bonds. The ratings merely analyze the probability that the Issuer will repay the principal amount of the 2017 Restructuring Bonds at each Final Maturity Date (which is later than the related Scheduled Maturity Date) and will make timely interest payments. The ratings are not an indication that the rating agencies believe that principal payments are likely to be paid on time according to the Expected Amortization Schedule.

Under Rule 17g-5 of the Securities Exchange Act of 1934, NRSROs providing the sponsor of a security with the requisite certification will have access to all information posted on a website by the sponsor for the purpose of

determining the initial rating of such security and monitoring the rating after the Issuance Date in respect of the 2017 Restructuring Bonds. As a result, an NRSRO other than the NRSRO hired by the sponsor (the "hired NRSRO") may issue ratings on the 2017 Restructuring Bonds ("Unsolicited Ratings"), which may be lower, and could be significantly lower, than the ratings assigned by the hired NRSROs. The Unsolicited Ratings may be issued prior to, or after, the Issuance Date in respect of the 2017 Restructuring Bonds. Issuance of any Unsolicited Rating will not affect the issuance of the 2017 Restructuring Bonds. Issuance of an Unsolicited Rating lower than the ratings assigned by the hired NRSRO on the 2017 Restructuring Bonds might adversely affect the value of the 2017 Restructuring Bonds and, for regulated entities, could affect the status of the 2017 Restructuring Bonds as a legal investment or the capital treatment of the 2017 Restructuring Bonds. Investors in the 2017 Restructuring Bonds should consult with their legal counsel regarding the effect of the issuance of a rating by a non-hired NRSRO that is lower than the rating of a hired NRSRO. None of the Authority, the Issuer, the Underwriters or any of their affiliates will have any obligation to inform the Holders of any Unsolicited Ratings assigned after the date of this Official Statement. In addition, if the Issuer or the Authority fail to make available to a non-hired NRSRO any information provided to any hired rating agency for the purpose of assigning or monitoring the ratings on the 2017 Restructuring Bonds, a hired NRSRO could withdraw its ratings on the 2017 Restructuring Bonds, which could adversely affect the market value of the 2017 Restructuring Bonds and/or limit the Holder's ability to resell its Bonds.

*If the Ratings on the 2017 Restructuring Bonds are Withdrawn or Revised, the Value of your Bonds may be Adversely Affected*

The ratings on the 2017 Restructuring Bonds may be withdrawn or revised, which may have an adverse effect on the market price of the 2017 Restructuring Bonds. A security rating is not a recommendation to buy, sell or hold the 2017 Restructuring Bonds. The ratings are assessments by the respective Rating Agencies of the likelihood that interest and principal on the 2017 Restructuring Bonds will be paid on a timely basis. Ratings on the 2017 Restructuring Bonds may be lowered, qualified or withdrawn at any time without notice.

*The Absence of a Secondary Market for the 2017 Restructuring Bonds Might Limit the Ability to Resell the 2017 Restructuring Bonds*

The Underwriters for the 2017 Restructuring Bonds might assist in resales of the 2017 Restructuring Bonds, but they are not required to do so. A secondary market for the 2017 Restructuring Bonds might not develop. If a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow a Holder to resell any of its 2017 Restructuring Bonds.

## UNDERWRITING

The Underwriters listed on the cover page of this Official Statement, for which RBC Capital Markets, LLC is acting as the lead book-running manager, have agreed, jointly and severally and subject to certain conditions, including satisfaction of the rating agency conditions with respect to the Prior Restructuring Bonds, to purchase the 2017 Restructuring Bonds from the Issuer at an underwriters' discount of $1,783,590.12. The initial public offering prices of the 2017 Restructuring Bonds may be changed from time to time by the Underwriters.

The 2017 Restructuring Bonds may be offered and sold to certain dealers (including the Underwriters and other dealers depositing 2017 Restructuring Bonds into investment trusts) at prices lower than such public offering prices.

Certain of the Underwriters have entered into distribution agreements with other broker-dealers for the distribution of the 2017 Restructuring Bonds at the initial public offering prices. Such agreements generally provide that the relevant Underwriter will share a portion of its underwriting compensation or selling concession with such broker-dealers.

The Underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage and other financial and non-financial activities and services. The Underwriters and their respective affiliates have provided, and may in the future provide, a variety of these services to the Issuer and the Authority and to persons and entities with relationships with the Issuer and the Authority, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates, officers, directors and employees may purchase, sell or hold a broad array of investments and actively trade securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account

and for the accounts of their customers, and such investment and trading activities may involve or relate to assets, securities and/or instruments of the Issuer and the Authority (directly, as collateral securing other obligations or otherwise) and/or persons and entities with relationships with the Issuer and the Authority. The Underwriters and their respective affiliates may also communicate independent investment recommendations, market color or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and may at any time hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments.

## TAX MATTERS

**Opinion of Bond Counsel**

In the opinion of Bond Counsel, under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, (i) interest on the 2017 Restructuring Bonds is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Code, and (ii) interest on the 2017 Restructuring Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering its opinion, Bond Counsel has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Issuer, the Authority and LIPA in connection with the 2017 Restructuring Bonds, and Bond Counsel has assumed compliance by the Issuer, the Authority and LIPA with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the 2017 Restructuring Bonds from gross income under Section 103 of the Code.

In addition, in the opinion of Bond Counsel, under existing statutes, interest on the 2017 Restructuring Bonds is exempt from personal income taxes imposed by the State of New York or any political subdivision thereof, and the 2017 Restructuring Bonds are exempt from all taxation directly imposed thereon by or under the authority of the State of New York, except estate or gift taxes and taxes on transfers.

Bond Counsel expresses no opinion regarding any other federal or state tax consequences with respect to the 2017 Restructuring Bonds. Bond Counsel renders its opinion under existing statutes and court decisions as of the issue date, and assumes no obligation to update, revise or supplement its opinion to reflect any action thereafter taken or not taken, or any facts or circumstances that may thereafter come to its attention, or changes in law or in interpretations thereof that may thereafter occur, or for any other reason. Bond Counsel expresses no opinion on the effect of any action thereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion from gross income for federal income tax purposes of interest on the 2017 Restructuring Bonds, or under state and local tax law.

**Certain Ongoing Federal Tax Requirements and Covenants**

The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the 2017 Restructuring Bonds in order that interest on the 2017 Restructuring Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the 2017 Restructuring Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the federal government. Noncompliance with such requirements may cause interest on the 2017 Restructuring Bonds to become included in gross income for federal income tax purposes retroactive to their issue date, irrespective of the date on which such noncompliance occurs or is discovered. The Issuer, the Authority and LIPA have covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the 2017 Restructuring Bonds from gross income under Section 103 of the Code.

**Certain Collateral Federal Tax Consequences**

The following is a brief discussion of certain collateral federal income tax matters with respect to the 2017 Restructuring Bonds. It does not purport to address all aspects of federal taxation that may be relevant to a particular owner of a 2017 Restructuring Bond. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the 2017 Restructuring Bonds.

Prospective owners of the 2017 Restructuring Bonds should be aware that the ownership of such obligations may result in collateral federal income tax consequences to various categories of persons, such as corporations

(including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is excluded from gross income for federal income tax purposes. Interest on the 2017 Restructuring Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

**Original Issue Discount**

"Original issue discount" ("OID") is the excess of the sum of all amounts payable at the stated maturity of a 2017 Restructuring Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity.  In general, the "issue price" of a maturity means the first price at which a substantial amount of the 2017 Restructuring Bonds of that maturity was sold (excluding sales to bond houses, brokers, or similar persons acting in the capacity as underwriters, placement agents, or wholesalers).  In general, the issue price for each maturity of 2017 Restructuring Bonds is expected to be the initial public offering price set forth on the cover page of this Official Statement.  Bond Counsel further is of the opinion that, for any 2017 Restructuring Bonds having OID (a "Discount Bond"), OID that has accrued and is properly allocable to the owners of the Discount Bonds under Section 1288 of the Code is excludable from gross income for federal income tax purposes to the same extent as other interest on the 2017 Restructuring Bonds.

In general, under Section 1288 of the Code, OID on a Discount Bond accrues under a constant yield method, based on periodic compounding of interest over prescribed accrual periods using a compounding rate determined by reference to the yield on that Discount Bond.  An owner's adjusted basis in a Discount Bond is increased by accrued OID for purposes of determining gain or loss on sale, exchange, or other disposition of such 2017 Restructuring Bond.  Accrued OID may be taken into account as an increase in the amount of tax-exempt income received or deemed to have been received for purposes of determining various other tax consequences of owning a Discount Bond even though there will not be a corresponding cash payment.

Owners of Discount Bonds should consult their own tax advisors with respect to the treatment of original issue discount for federal income tax purposes, including various special rules relating thereto, and the state and local tax consequences of acquiring, holding, and disposing of Discount Bonds.

**Bond Premium**

In general, if an owner acquires a 2017 Restructuring Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the 2017 Restructuring Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond").  In general, under Section 171 of the Code, an owner of a Premium Bond must amortize the bond premium over the remaining term of the Premium Bond, based on the owner's yield over the remaining term of the Premium Bond determined based on constant yield principles (in certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond).  An owner of a Premium Bond must amortize the bond premium by offsetting the qualified stated interest allocable to each interest accrual period under the owner's regular method of accounting against the bond premium allocable to that period.  In the case of a Premium Bond, if the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is a nondeductible loss.  Under certain circumstances, the owner of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the owner's original acquisition cost.  Owners of any Premium Bonds should consult their own tax advisors regarding the treatment of bond premium for federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, amortization of bond premium on, sale, exchange, or other disposition of Premium Bonds.

**Information Reporting and Backup Withholding**

Information reporting requirements apply to interest paid on tax-exempt obligations, including the 2017 Restructuring Bonds.  In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or if the recipient is one of a limited class of exempt recipients.  A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required

to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing a 2017 Restructuring Bond through a brokerage account has executed a Form W-9 in connection with the establishment of such account, as generally can be expected, no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the 2017 Restructuring Bonds from gross income for federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a refund or a credit against the owner's federal income tax once the required information is furnished to the Internal Revenue Service.

**Miscellaneous**

Tax legislation, administrative actions taken by tax authorities, or court decisions, whether at the federal or state level, may adversely affect the tax-exempt status of interest on the 2017 Restructuring Bonds under federal or state law or otherwise prevent beneficial owners of the 2017 Restructuring Bonds from realizing the full current benefit of the tax status of such interest. In addition, such legislation or actions (whether currently proposed, proposed in the future, or enacted) and such decisions could affect the market price or marketability of the 2017 Restructuring Bonds.

Prospective purchasers of the 2017 Restructuring Bonds should consult their own tax advisors regarding the foregoing matters.

## CONTINUING DISCLOSURE

In the Continuing Disclosure Agreement, pursuant to Rule 15c2-12 under the Exchange Act ("Rule 15c2-12"), LIPA, as Servicer and designated agent for the Issuer, will covenant for the sole benefit of the Holders (and, to the extent specified in the Continuing Disclosure Agreement, the beneficial owners) of the 2017 Restructuring Bonds and subject (except to the extent expressly provided in the Servicing Agreement) to the remedial provisions of the Basic Documents, to provide the information described therein in a timely manner, to the Municipal Securities Rulemaking Board ("MSRB") through EMMA, in the electronic form prescribed by the MSRB. A copy of the form of the Continuing Disclosure Agreement is attached hereto as Appendix E.

The Issuer has determined that no financial or operating data concerning the Issuer is material to an evaluation of the offering of the 2017 Restructuring Bonds or to any decision to purchase, hold or sell the 2017 Restructuring Bonds and the Issuer will not provide any such information. As discussed above, the Servicer, as the designated agent of the Issuer, has covenanted in the Servicing Agreement to undertake all responsibilities for providing any continuing disclosure to the Holders of the Outstanding Bonds, and the Issuer shall have no responsibility to the Holders of the 2017 Restructuring Bonds or any other person with respect to Rule 15c2-12.

## RATINGS

The 2017 Restructuring Bonds are expected to be assigned ratings of "Aaa (sf)" by Moody's, "AAA (sf)" by S&P, and "AAAsf" by Fitch. It is a condition to the issuance of the 2017 Restructuring Bonds that such ratings are received.

The respective ratings by Fitch, Moody's and S&P of the 2017 Restructuring Bonds reflect only the views of such organizations and any desired explanation of the significance of such ratings and any outlooks or other statements given by the Rating Agencies with respect thereto should be obtained from the Rating Agency furnishing the same, at the following addresses: Fitch, Inc., 33 Whitehall Street, New York, New York 10004; Moody's Investors Service, Inc., 7 World Trade Center, 250 Greenwich Street, New York, New York 10007; and Standard & Poor's Ratings Services, 55 Water Street, New York, New York 10041. Generally, a Rating Agency bases its rating and outlook (if any) on the information and materials furnished to it and on investigations, studies and assumptions of its own. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. No person is obligated to maintain the rating on any 2017 Restructuring Bonds and, accordingly, there is no assurance that such ratings for the 2017 Restructuring Bonds will continue for any given period of time or that any of such ratings will not be revised downward or withdrawn entirely by any of the Rating Agencies, if, in the judgment of such Rating Agency or Agencies, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect on the liquidity and the market price of the 2017 Restructuring Bonds. In general, ratings address credit risk and do not represent any assessment of any particular rate of principal payments on the 2017 Restructuring Bonds other than the payment in full of each tranche of the 2017 Restructuring Bonds by the Final Maturity Date as well as the timely payment of interest.

Under Rule 17g-5 of the Exchange Act, NRSROs providing the sponsor with the requisite certification will have access to all information posted on a website by the sponsor for the purpose of determining the initial rating and monitoring the rating after the Issuance Date in respect of the 2017 Restructuring Bonds.  As a result, an NRSRO other than a hired NRSRO may issue unsolicited ratings on the 2017 Restructuring Bonds ("Unsolicited Ratings"), which may be lower, and could be significantly lower, than the ratings assigned by the hired NRSROs.   The Unsolicited Ratings may be issued prior to, or after, the Issuance Date in respect of the 2017 Restructuring Bonds. Issuance of any Unsolicited Rating will not affect the issuance of the 2017 Restructuring Bonds.  Issuance of an Unsolicited Rating lower than the ratings assigned by the hired NRSRO on the 2017 Restructuring Bonds might adversely affect the value of the 2017 Restructuring Bonds and, for regulated entities, could affect the status of the 2017 Restructuring Bonds as a legal investment or the capital treatment of the 2017 Restructuring Bonds.  Investors in the 2017 Restructuring Bonds should consult with their legal counsel regarding the effect of the issuance of a rating by a non-hired NRSRO that is lower than the rating of a hired NRSRO.

A portion of the fees paid by the Issuer to a NRSRO which is hired to assign a rating on the 2017 Restructuring Bonds is contingent upon the issuance of the 2017 Restructuring Bonds.  In addition to the fees paid by the Issuer to a NRSRO at closing on the 2017 Restructuring Bonds, the Issuer will pay a fee to the NRSRO for ongoing surveillance for so long as the 2017 Restructuring Bonds are outstanding.  However, no NRSRO is under any obligation to continue to monitor or provide a rating on the 2017 Restructuring Bonds.

## FINANCIAL ADVISOR

Public Financial Management, Inc. ("PFM") serves as the independent financial advisor to the Issuer and the Authority, respectively, in connection with the structuring, marketing and sale of the 2017 Restructuring Bonds, including the timing and conditions of issuance, and other such financial guidance as requested by the PFM.   Although PFM performed an active role in the drafting of this Official Statement and other related transaction documents, PFM has not independently verified any of the information set forth herein.

## ABSENCE OF LITIGATION

### The Issuer

There is not now pending, or to the knowledge of the Issuer, threatened, any litigation against the Issuer restraining or enjoining the issuance or delivery of the 2017 Restructuring Bonds or questioning the validity of the 2017 Restructuring Bonds or the Proceedings or authority under which they are issued.  Neither the creation, organization or existence, nor the title of the present members and officers of the Issuer to their respective office, is being challenged or questioned.  There is no litigation pending, or to the knowledge of the Issuer, threatened, against the Issuer which in any manner questions the right of the Issuer to enter into the Indenture or to secure the 2017 Restructuring Bonds in the manner provided in the Indenture or to issue the 2017 Restructuring Bonds in the manner provided in the Indenture and the Securitization Law.  There is no action, suit, Proceeding or investigation, at law or in equity, before any court, public body or other body pending, or to its knowledge, threatened against or affecting the Issuer, wherein an unfavorable decision, ruling or finding would materially adversely affect the transactions under the Indenture or the performance of the obligations of the Issuer under the Indenture.

### The Authority and LIPA

There is not now pending, or to the knowledge of the Authority or LIPA threatened, any litigation against the Authority or LIPA restraining or enjoining the issuance or delivery of the 2017 Restructuring Bonds or questioning the validity of the 2017 Restructuring Bonds or the Proceedings or authority under which they are issued.   There is no litigation pending, or to the knowledge of the Authority or LIPA threatened, against the Authority or LIPA which in any manner questions the right of the Authority or LIPA to enter into the Basic Documents to which each is a party. There is no action, suit, Proceeding or investigation, at law or in equity, before any court, public body or other body pending, or to the knowledge of Authority or LIPA threatened, against or affecting it wherein an unfavorable decision, ruling or finding would materially adversely affect the transactions under the Basic Documents or the performance of the obligations of the Authority or LIPA under the Basic Documents to which each is a party.

## LEGAL MATTERS

Certain legal matters relating to the 2017 Restructuring Bonds, including certain federal income tax matters, will be passed on by Hawkins Delafield & Wood, LLP, Bond Counsel to the Authority and the Issuer, respectively. Certain other legal matters relating to the 2017 Restructuring Bonds will be passed on by Squire Patton Boggs (US)

LLP, Disclosure Counsel to the Authority and the Issuer, respectively, by Jon R. Mostel, General Counsel to the Authority, and by Norton Rose Fulbright US LLP, Underwriters' Counsel.

## MISCELLANEOUS

This Official Statement includes, among other things, descriptions of (i) the Issuer, the Authority, and LIPA and (ii) the terms of the 2017 Restructuring Bonds, the Basic Documents, and certain provisions of the Securitization Law.  Such descriptions are not complete and all such descriptions and references thereto are qualified by reference to each such document, copies of which may be obtained from the Issuer.

The agreements with the Holders are fully set forth in the Indenture.  This Official Statement is not to be construed as a contract with the purchasers of the 2017 Restructuring Bonds or of any other obligations of the Issuer.

This Official Statement has been executed on behalf of the Issuer.

**UTILITY DEBT SECURITIZATION AUTHORITY**

By:   /s/ Thomas Falcone
        Chief Executive Officer

## APPENDIX A

### Definitions

*Terms not defined elsewhere in this Official Statement are used as defined in this Appendix A.*

"2017 Restructuring Bonds" means the bonds to be issued by the Issuer pursuant to Financing Order No. 5.

"2017 Collateral" means as the context may require all of the Issuer's right, title and interest (whether owned at the Issuance Date or thereafter acquired or arising) in and to (a) the 2017 Restructuring Property (created pursuant to Sections 5 and 7 of the LIPA Reform Act and Ordering Paragraph 11 of Financing Order No. 5) transferred by the Seller to the Issuer pursuant to the Sale Agreement and all proceeds thereof, including 2017 Restructuring Charges as estimated, determined and adjusted from time to time pursuant to the Servicing Agreement in accordance with Financing Order No. 5, (b) the statutory lien pursuant to the Securitization Law, (c) the Sale Agreement, (d) the Servicing Agreement, (e) the Administration Agreement, (f) the Collection Account (including, subject to limitation set forth below, all subaccounts thereof) and all amounts or investment property on deposit therein or credited thereto from time to time, (g) the security interest with respect to the 2017 Restructuring Property granted by the Seller to the Issuer in the Sale Agreement, (h) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, securities accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing, and (i) all proceeds of the foregoing; it being understood that the following do not constitute 2017 Collateral:  (1) any amounts required to be released pursuant to or contemplated by the terms of the Indenture and (2) proceeds from the sale of the 2017 Restructuring Bonds required to pay the purchase price of the 2017 Restructuring Property paid pursuant to the Sale Agreement and the Upfront Financing costs related to the 2017 Restructuring Bonds as deposited into the Upfront Financing Costs Subaccount (together with any interest earnings thereon).

"2017 Restructuring Charge" means an irrevocable, nonbypassable charge required to be paid by the Customers.

"2017 Restructuring Property" means all of the property, rights and interests, including the irrevocable right to impose, bill and collect the 2017 Restructuring Charges, of the Authority established pursuant to Financing Order No. 5 that are transferred to the Issuer pursuant to the Sale Agreement.

"2017 Restructuring Property Documentation" means all documents relating to the 2017 Restructuring Property, including copies of Financing Order No. 5 and all documents filed with the Authority in connection with any True-Up Adjustment and computational records relating thereto.

"Acquisition Discount" means the excess of the stated redemption price of a Short-Term Bond at maturity over the holder's tax basis therefor.

"Actual Charge Collections" means the Charge Collections actually deposited into the Allocation Account.

"Adjustment Notice" means any filing made with the Authority by the Servicer on behalf of the Issuer to set or adjust the 2017 Restructuring Charge, including the Issuance Advice Letter.

"Administration Agreement" means the Administration Agreement, expected to be dated as of the Issuance Date, between the Issuer and LIPA, as amended and supplemented from time to time.

"Administration Fee" means an annual fee of $100,000 entitled to the Administrator under the Administration Agreement.

"Administrator" means LIPA, or any successor administrator under the Administration Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Scheduled Debt Service" means, for any period and as of any date of calculation, an amount equal to the principal of and interest on any Outstanding 2017 Restructuring Bonds scheduled to be payable during such period, in accordance with the Expected Amortization Schedule.

"Allocation Account" means the deposit accounts or other accounts designated by the Authority from time to time and controlled by the Allocation Agent, into which all payments from or on behalf of Customers are deposited and from which transfers of estimated Charge Collections and Remittance Shortfalls are to be made to the Collection Account and transfers of Estimated Other Payments are to be made to appropriate accounts of the Authority.  Initially, the Allocation Account shall refer to the clearing account[s] that have been established by the Authority with J.P. Morgan Chase Bank.

"Allocation Agent" means the entity designated by the Authority (which may be the Authority) that agrees to control the Allocation Account in trust for the benefit of the Trustee and the Authority Trustee, to accept all payments from or on behalf of Customers for deposit into the Allocation Account, to notify the Servicer on each Business Day of the amount deposited into the Allocation Account on the preceding Business Day, and, to the extent that funds are available in the Allocation Account, to transfer the estimated Charge Collections and Remittance Shortfalls from the Allocation Account to the Collection Account as instructed by the Servicer or the Trustee in writing and to transfer the Estimated Other Payments as instructed by the Authority or the Authority Trustee.

"Ancillary Agreement" means any bond, insurance policy, letter of credit, reserve account, surety bond, swap arrangement, hedging arrangement, liquidity or credit support arrangement, or other financial arrangement entered into in connection with the issuance or payment of the 2017 Restructuring Bonds.

"Annual True-Up Adjustment" means the adjustment to the 2017 Restructuring Charges that is required to be made annually pursuant to the True-Up mechanism.

"Authenticating Agent" means the Trustee and any agent appointed by the Trustee to serve in that role.

"Authority" means the Long Island Power Authority, a corporate municipal instrumentality of the State of New York, and any successor thereto.

"Authority Designee" means one or more officers of the Authority to review and approve, as and on behalf of the Authority, the Issuance Advice Letter, the pricing terms of the 2017 Restructuring Bonds, the amounts of the Restructuring Costs, expected Upfront Financing Costs and expected Ongoing Financing Costs, the net present value savings, the terms of the Basic Documents and take such other actions as are authorized in the final order.

"Authority Trustees" means the Authority's Board of Trustees.

"Back-Up Security Interest" means a security interest in the 2017 Restructuring Property to secure a payment obligation incurred by the Seller in respect of the amount paid by the Issuer to the Seller pursuant to the Sale Agreement.

"Bankruptcy Code" or "Federal Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended from time to time.

"Base Rate Revenues" include electricity usage service charges and demand service charges.

"Basic Documents" means, collectively, the Indenture, the Servicing Agreement, the Administration Agreement, the Sale Agreement, the Continuing Disclosure Agreement, and all other documents and certificates delivered in connection therewith.

"Beneficial Owner" or "beneficial owner" of a security means any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such security, except that a person who in the ordinary course of business is a pledgee of securities under a written pledge agreement shall not be deemed to be the beneficial owner of such pledged securities until the pledgee has taken all formal steps to declare a default and determines that the power to dispose or to direct the disposition of such pledged securities will be exercised, provided that:

(a)     the pledge agreement is bona fide,

(b)     the pledgee is:

        (i)     a broker or dealer registered under § 15 of the Exchange Act,

(ii)     a bank as defined in § 3(a)(6) of the Exchange Act,

(iii)    an insurance company as defined in § 3(a)(19) of the Exchange Act,

(iv)    an investment company registered under § 8 of the Investment Company Act,

(v)     an investment adviser registered under § 203 of the Investment Advisers Act of 1940,

(vi)    an employee benefit plan, or pension fund which is subject to the provisions of ERISA or an endowment fund,

(vii)   a parent holding company, provided the aggregate amount held directly by the parent, and directly and indirectly by its subsidiaries which are not persons specified in items (A) through (F) of this clause (2) does not exceed 1% of the securities of the subject class, or

(viii)  a group, provided that all the members are persons specified in items (A) through (G) of this clause (2), and

(c)     the pledge agreement, prior to default, does not grant to the pledgee the power to dispose or direct the disposition of the pledged securities, other than the grant of such power(s) pursuant to a pledge agreement under which credit is extended subject to Regulation T (12 CFR 220.1 to 220.8) and in which the pledgee is a broker or dealer registered under § 15 of the Exchange Act.

"Bond Counsel" means Hawkins Delafield & Wood LLP.

"Bond Interest Rate" means, with respect to any tranche of 2017 Restructuring Bonds, the Interest Rate specified in the Indenture.

"Bond Purchase Agreement" means the Bond Purchase Agreement, dated October 25, 2017, between the Issuer and the underwriters named therein.

"Bond Register" means the register providing for the registration of the 2017 Restructuring Bonds and transfers and exchanges thereof.

"Bond Registrar" means the registrar at any time of the Bond Register.  The initial Bond Registrar shall be the Trustee.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions in New York, New York, are, or DTC is, authorized or obligated by law, regulation or executive order to remain closed.

"Charge Collections" means the payments of the 2017 Restructuring Charges by or on behalf of Customers.

"Clearing Agency" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Collection Account" means one or more segregated trust accounts in the Trustee's name for the deposit of 2017 Restructuring Property and all other amounts received with respect to the 2017 Collateral or under the Servicing Agreement.

"Continuing Disclosure Agreement" means the Continuing Disclosure Agreement, expected to be dated as of the Issuance Date, between the Issuer and LIPA as Servicer, a copy of a form of which is attached as Appendix E to this Official Statement.

"Corporate Trust Office" means the principal office of the Trustee at which, at any particular time, its corporate trust business shall be administered, which office as of the Issuance Date is located at The Bank of New York Mellon, 101 Barclay Street-Floor 7-West, New York, New York 10286, or at such other address as the Trustee may designate from time to time by notice to the Holders of 2017 Restructuring Bonds and the Issuer, or the principal corporate trust office of any successor trustee by like notice.

"Customers" means all existing and future retail electric customers connected to the T&D System Assets and taking electric transmission or distribution service within the Service Area from LIPA, the Authority or any of its successors or assignees in the Service Area.

"Debt Service Reserve Subaccount" means one of two subaccounts of the Reserve Subaccount.

"Discount Bond" means any 2017 Restructuring Bonds having OID.

A-3