"DPS" means the New York Department of Public Service, the staff arm of the PSC.

"DTC" means The Depository Trust Company.

"Eligible Account" means a segregated trust account with an Eligible Institution.

"Eligible Institution" means (a) the corporate trust department of the Trustee so long as any securities of the Trustee have either a short-term credit rating from Moody's of at least "P-1" or a long-term unsecured debt rating from Moody's of at least "A2" and have a credit rating from each other rating agency in one of its generic categories which either signifies either "A2" or "A-1" or higher by Standard & Poor's or "A" or "F1" or higher by Fitch, or (b) a depository institution organized under the laws of the United States of America, any state or the District of Columbia (or any domestic branch of a foreign bank), (i) which has either (A) a long-term issuer rating of "AA-" or higher by Standard & Poor's, "A2" or higher by Moody's, and "A" or higher by Fitch, or (B) a short-term issuer rating of "A-1+" or higher by Standard & Poor's, "P-1" or higher by Moody's, and "F1" or higher by Fitch, or any other long-term, short-term or certificate of deposit rating acceptable to Standard & Poor's, Moody's and Fitch, and (ii) whose deposits are insured by the FDIC. If so qualified under clause (b) above, the Trustee may be considered an Eligible Institution for the purposes of the definition of Eligible Account.

"Eligible Investments" means instruments and investment property denominated in United States currency which meet the criteria described below:

(a)    direct obligations of, or obligations fully and unconditionally guaranteed as to timely payment by, the United States of America,

(b)    demand deposits, time deposits or certificates of deposit and bankers' acceptances of Eligible Institutions (including the Trustee in its commercial capacity),

(c)    commercial paper having, at the time of the investment or contractual commitment, a rating of not less than "A-1" from Standard & Poor's, not less than "P-1" by Moody's and not less than "F1" by Fitch (including commercial paper issued by the Trustee),

(d)    money market funds which have the highest rating from at least two of the Rating Agencies (including funds for which the Trustee or any of its Affiliates is an investment manager or advisor),

(e)    repurchase obligations with respect to any security that is a direct obligation of, or fully guaranteed by, the United States of America or certain of its agencies or instrumentalities, entered into with Eligible Institutions,

(f)    repurchase obligations with respect to any security or whole loan entered into with an Eligible Institution or a registered broker-dealer, acting as principal and that meets certain ratings criteria set forth below:

   (i)    a broker/dealer (acting as principal) registered as a broker or dealer under Section 15 of the Exchange Act (any broker/dealer being referred to in this definition as a "broker/dealer"), the unsecured short-term debt obligations of which are rated at least "P-1" by Moody's, "A-1+" by Standard & Poor's and, if Fitch provides a rating thereon, "F-1+" by Fitch, and the long-term debt obligations of which are rated at least "Aa3" by Moody's, in each case at the time of entering into this repurchase obligation, or

   (ii)    an unrated broker/dealer acting as principal, that is a wholly-owned subsidiary of a non-bank or bank holding company the unsecured short-term debt obligations of which are rated at least "P-1" by Moody's, "A-1+" by Standard & Poor's and, if Fitch provides a rating thereon, "F-1+" by Fitch, and the long-term debt obligations of which are rated at least "Aa3" by Moody's, in each case at the time of purchase so long as the obligations of such unrated broker/dealer are unconditionally guaranteed by such non-bank or bank holding company, and

(g)    any other investment permitted by each of the Rating Agencies, as evidenced by the Issuer Order accompanied by evidence of such permission reasonably satisfactory to the Trustee.

"EMMA" means the Electronic Municipal Market Access system.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

A-4

"Estimated Charge Collections" means the estimated Charge Collections calculated as provided in Annex 2 of the Servicing Agreement.

"Estimated Other Payments" means all payments by or on behalf of Customers other than estimated Charge Collections and any Remittance Shortfalls net of any Excess Remittance.

"Events of Default" means the following, as more fully described in this Official Statement under the heading "THE INDENTURE—Events of Default":

- a failure to pay interest or redemption premium when due (after a cure period),

- a failure to pay principal on the Final Maturity Date,

- a failure to perform a covenant (after a cure period),

- a breach of representations or warranties (after a cure period),

- a voluntary or involuntary bankruptcy Proceeding of the Issuer, or

- an action in violation of Financing Order No. 5 or the State Pledge.

"Excess Funds Subaccount" means one of the four subaccounts of the Collection Account.

"Excess Remittance" means the amount, if any, calculated for a particular Reconciliation Period, by which all Estimated Charge Collections remitted to the Collection Account during such Reconciliation Period exceed Actual Charge Collections received by the Servicer during such Reconciliation Period.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expected Amortization Schedule" means the schedule specifying for each tranche the initial principal amount, the Bond Interest Rate, Scheduled Maturity Date and Final Maturity Date, including the Expected Sinking Fund Schedule for the Term Bonds and the matters specified in the definition thereof, as each appear in this Official Statement under the heading "THE 2017 RESTRUCTURING BONDS—Expected Amortization Schedule" and/or on the inside cover page.

"Expected Sinking Fund Schedule" means a schedule specifying for the Term Bonds, the Scheduled Sinking Fund Redemption Dates, scheduled Outstanding Amounts, scheduled Sinking Fund Payments and minimum remaining Outstanding Amounts, as it appears in this Official Statement under the heading "THE 2017 RESTRUCTURING BONDS—Redemption–Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules."

"FDIC" means the Federal Deposit Insurance Corporation or any successor thereto.

"FERC" means the Federal Energy Regulatory Commission.

"Fiduciary" means the Trustee, the Bond Registrar and each Paying Agent.

"Final Maturity Date" means, with respect to any tranche of 2017 Restructuring Bonds, the respective Final Maturity Date therefor as it appears in the Expected Amortization Schedule in, and on the inside cover page of, this Official Statement.

"Financing Costs" means the Upfront Financing Cost, Ongoing Financing Cost and any of the following:

(a)     interest, principal, and redemption premiums that are payable on the 2017 Restructuring Bonds,

(b)     any payment required under an Ancillary Agreement and any amount required to fund or replenish reserve (including the Operating Reserve Subaccount and the Debt Service Reserve Subaccount) or other accounts established under the terms of the Indenture or any Ancillary Agreement, or other financing documents pertaining to the 2017 Restructuring Bonds,

(c)     any federal, state or local taxes, payment in lieu of taxes, franchise fees or license fees imposed on transition charge revenues, and

(d)     any cost related to issuing 2017 Restructuring Bonds, administering the Issuer and servicing 2017 Restructuring Property and 2017 Restructuring Bonds, or related to the efforts to prepare or obtain approval of Financing Order No. 5, including, without limitation, costs of calculating adjustments

of 2017 Restructuring Charges, Servicing Fees and expenses, Trustee fees and expenses, legal fees and expense, accounting fees and expenses, Administration Fees and expenses, placement fees, underwriting fees, fees and expenses of the Authority's advisors and outside counsel, if any, Rating Agency fees and any other related cost that is approved for recovery in Financing Order No. 5.

"Financing Order No. 5" means the restructuring cost financing order No. 5 adopted by the Authority Trustees on July 26, 2017, which became irrevocable, final and non-appealable on October 20, 2017.

"Financing Party" means any Holder, any party to or beneficiary of an Ancillary Agreement, and any Fiduciary or other Person acting for the benefit of any of the foregoing pursuant to the Indenture.

"Fitch" means Fitch Ratings or any successor thereto.  References to Fitch are effective so long as Fitch is a Rating Agency.

"General Resolution" means the Authority's Electric General Bond Resolution adopted on May 13, 1998.

"General Subaccount" means one of the four subaccounts of the Collection Account.

"Governmental Authority" means any nation or government, any federal, state, local or other political subdivision thereof and any court, administrative agency or other instrumentality or entity exercising executive, legislative, judicial, regulatory or administrative function of government.

"HEFPA" means the Home Energy Fair Practices Act.

"Holder" or "Bondholder" means the Person in whose name a 2017 Restructuring Bond is registered on the Bond Register, and to the extent specified by the Indenture, the owners of bearer 2017 Restructuring Bonds.

"Indenture" or "Trust Indenture" means the Utility Debt Securitization Authority Bond Indenture dated as of the Issuance Date, by and between the Issuer and the Trustee.

"Independent" means, when used with respect to any specified Person, that the Person (a) is in fact independent of the Issuer, any other obligor upon the 2017 Restructuring Bonds, the Seller, the Servicer and any Affiliate of any of the foregoing Persons, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer, any such other obligor, the Seller, the Servicer or any Affiliate of any of the foregoing Persons and (c) is not connected with the Issuer, any such other obligor, the Seller, the Servicer or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

"Independent Certificate" means a certificate or opinion to be delivered to the Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of the Basic Documents, made by an Independent appraiser or other expert appointed by an Issuer order and consented to by the Trustee, and such opinion or certificate shall state that the signer has read the preceding definition of "Independent" and that the signer is Independent within the meaning thereof.

"Insolvency Event" means, with respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days, or (b) the commencement by such Person of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, or the failure by such Person generally to pay its debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Interest Rate" means the interest rate on any Bond.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

A-6

"Investment Earnings" means investment earnings on funds deposited in the Collection Account net of losses and investment expenses.

"IRS" means the Internal Revenue Service.

"Issuance Advice Letter" means the Issuance Advice Letter sent by the Servicer to the Issuer and the Authority pursuant to Financing Order No. 5.

"Issuance Costs" means any of the following:

(a)     any initial payment made on issuance of the 2017 Restructuring Bonds, and any amount required to fund any account required by the Basic Documents in the amounts specified in the Basic Documents, and

(b)     any other costs related to issuance of 2017 Restructuring Bonds, including trustees fees, legal fees and expenses, consulting fees, administrative fees, accounting fees, printing fees, financial advisor fees and expenses, issuer fees, placement and underwriter fees and expenses, capitalized interest, rating agency fees and expenses, stock exchange listing and compliance fees, and filing fees, including costs related to obtaining a financing order.

"Issuance Date" means the date the 2017 Restructuring Bonds are authenticated and delivered by the Trustee to or upon the order of the Issuer.

"Issuer" means the Utility Debt Securitization Authority, including any successor thereto.

"Issuer Order" means a written order signed in the name of the Issuer by any one of its authorized officers and delivered to the Trustee.

"Issuer's Annual Report" means an annual report of the Issuer, including, to the extent available, audited annual financial statements.

"kWh" means kilowatt-hour.

"Legal Defeasance" means the ability of the Issuer to terminate all its obligations under the Indenture with respect to the 2017 Restructuring Bonds in certain circumstances.

"Lien" means a security interest, lien, mortgage, charge, pledge, claim, or encumbrance of any kind.

"LILCO" means the Long Island Lighting Company.

"LIPA" means the Long Island Lighting Company, d/b/a LIPA.

"LIPA Reform Act" means the whole of Chapter 173, Laws of New York, 2013, as amended.

"Long Island Choice" means a retail choice program adopted by the Authority in 1998.

"Losses" means (i) any and all amounts of principal and interest on the 2017 Restructuring Bonds not paid when due or when scheduled to be paid in accordance with their terms and the amounts of any deposits by or to the Issuer required to have been made in accordance with the terms of the Basic Documents or Financing Order No. 5 which are not made when so required and (ii) any and all other liabilities, obligations, losses, claims, damages, payments, costs or expenses of any kind whatsoever.

"Mandatory Mid-Year True-Up Adjustment" means the adjustment to the 2017 Restructuring Charges made if after the Mid-Year Review the Servicer projects that the Charge Collections will be insufficient to pay timely principal and interest on the 2017 Restructuring Bonds when due during such Mid-Year Calculation Period pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs during such Mid-Year Calculation Period. The adjustment will become effective on May 15 of such year as the Servicer files its Adjustment Notice.

"Mid-Year Calculation Period" means the period beginning on the June 16 and ending on the following June 15.

"Mid-Year Review" means a mid-year review performed by the Servicer pursuant to the terms of the Servicing Agreement.

"Monthly Servicer Certificate" means the certificate delivered by the Servicer to the Allocation Agent, the Issuer, the Authority and the Bond Trustee on or before the 13th business day of each calendar month, commencing as set forth in the Servicing Agreement.

"Moody's" means Moody's Investors Service, Inc. or any successor to its ratings business. References to Moody's are effective as long as Moody's is a Rating Agency.

"MSRB" means the Municipal Securities Rulemaking Board.

"MW" means megawatt.

"MWh" means megawatt-hour.

"National Grid" means National Grid plc, a mutli-national electric and gas utility company.

"National Grid Subs" means certain of the subsidiaries of National Grid.

"Notice of Default" means either (i) written notice, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25 percent of the Outstanding Amount of the 2017 Restructuring Bonds, specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder or (ii) the date the Issuer has actual knowledge of the default.

"NRSRO" means a nationally recognized statistical rating organization.

"Officer's Certificate" means a certificate signed by a Responsible Officer of the Issuer (or, if so indicated, the Borrower or another Person) under the circumstances described in, and otherwise complying with, the applicable requirements of the Basic Documents, and delivered to the Trustee.

"OID" means the excess of the sum of all amounts payable at the stated maturity of a 2017 Restructuring Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity.

"Ongoing Financing Costs" means all Financing Costs other than Issuance Costs.

"Operating Expenses" means all Ongoing Financing Costs other than principal (including amortization, sinking fund or redemption payments) and redemption premium, if any, and interest on the 2017 Restructuring Bonds and amounts required to replenish each of the subaccounts within the Reserve Subaccount.

"Operating Reserve Subaccount" means one of two subaccounts of the Reserve Subaccount.

"Opinion of Counsel" means one or more written opinions of legal counsel who may, except as otherwise expressly provided in the Basic Documents, be employees of or counsel to the party providing such Opinion of Counsel, which counsel shall be reasonably acceptable to the party receiving such Opinion of Counsel, and which opinion shall be in form and substance reasonably satisfactory to such party. As to any factual matters involved in an Opinion of Counsel, such counsel may rely, to the extent that they deem such reliance proper, upon a certificate or certificates setting forth such matters which have been signed by an official, officer, general partner or authorized representative of a particular Governmental Authority, corporation, firm or other Person or entity.

"Optional True-Up Adjustment" means an adjustment to the 2017 Restructuring Charges permitted to be made pursuant to the True-Up Adjustment mechanism.

"OSA" means the Amended and Restated Operations Services Agreement by and between LIPA and PSEG Long Island, dated December 31, 2013, as further amended from time to time.

"Outstanding" means, as of the date of determination, all 2017 Restructuring Bonds theretofore authenticated and delivered under the Indenture except:

(a)     2017 Restructuring Bonds theretofore canceled by the Bond Registrar or delivered to the Bond Registrar for cancellation,

(b)     2017 Restructuring Bonds or portions thereof the payment for which money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent in trust for the Holders of such 2017 Restructuring Bonds, and

(c)     2017 Restructuring Bonds in exchange for or in lieu of other bonds which have been issued pursuant to the Indenture unless proof satisfactory to the Trustee is presented that any such bonds are held by a bona fide purchaser;

provided, however, that in determining whether the Holders of the requisite Outstanding Amount of the 2017 Restructuring Bonds or any tranche thereof have given any request, demand, authorization, direction, notice, consent or waiver under the Indenture or under any Basic Document, 2017 Restructuring Bonds owned by the Issuer, the Seller or any Affiliate of any of the foregoing Persons shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only 2017 Restructuring Bonds that the Trustee actually knows to be so owned shall be so disregarded.  2017 Restructuring Bonds so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such 2017 Restructuring Bonds and that the pledgee is not the Issuer, any other obligor upon the 2017 Restructuring Bonds, the Seller or any Affiliate of any of the foregoing Persons.

"Outstanding Amount" means the aggregate principal amount of all 2017 Restructuring Bonds or, if the context requires, all 2017 Restructuring Bonds of a tranche, Outstanding at the date of determination.

"PACB" means the New York Public Authorities Control Board, and any successor thereto.

"Paying Agent" or "paying agent" means the Trustee or any successor paying agent or co-paying agent serving as such under the Indenture.  If at any time there is no qualified paying agent serving as such, the Trustee shall act as paying agent under the Indenture.

"Payment Date" means, with respect to any tranche of 2017 Restructuring Bonds, the dates specified as the Scheduled Sinking Fund Redemption Date in the Indenture for the Term Bonds or the Scheduled Maturity Date or the Final Maturity Date in the Expected Amortization Schedule included in this Official Statement; or if any such date is not a Business Day, the next Business Day.

"Person" means any individual, corporation, limited liability company, estate, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof, and includes successors permitted by the Basic Documents.

"Performance Metrics" mean those metrics as defined pursuant to the OSA.

"PFM" means Public Financial Management, Inc.

"Premium Bond" means a premium over the sum of all amounts payable on the 2017 Restructuring Bonds after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates).

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Protected Purchaser" has the meaning specified in Section 8-303 of the UCC.

"PSC" means New York State Public Service Commission.

"PSEG" means Public Service Enterprise Group Incorporated.

"PSEG Long Island" generally means PSEG Long Island LLC, the contracting party under the OSA and its wholly-owned subsidiary dedicated to LIPA's operations.

"Quarterly True-Up Adjustment" means an adjustment to the 2017 Restructuring Charges required to be made quarterly if there are any 2017 Restructuring Bonds outstanding following the last Scheduled Maturity Date of the 2017 Restructuring Bonds.

"Rating Agency" means collectively Moody's, Standard & Poor's or Fitch.  If no such organization or successor is any longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization or other comparable Person designated by the Issuer, notice of which designation shall be given to the Trustee and the Servicer.

"Rating Agency Condition" means, with respect to any action, not less than ten Business Days' prior written notification to each Rating Agency of such action, and written confirmation from each of Standard & Poor's and Moody's to the Servicer, the Trustee and the Issuer that such action will not result in a suspension, reduction or

withdrawal of the then current rating by such Rating Agency of any tranche of the 2017 Restructuring Bonds and that prior to the taking of the proposed action no other Rating Agency shall have provided written notice to the Issuer that such action has resulted or would result in the suspension, reduction or withdrawal of the then current rating of any tranche of 2017 Restructuring Bonds; provided, however, that if within such ten Business Day period, any Rating Agency (other than Standard & Poor's) has neither replied to such notification nor responded in a manner that indicates that such Rating Agency is reviewing and considering the notification, then (i) the Issuer shall be required to confirm that such Rating Agency has received the Rating Agency Condition request, and if it has, promptly request the related Rating Agency Condition confirmation and (ii) if the Rating Agency neither replies to such notification nor responds in a manner that indicates it is reviewing and considering the notification within five Business Days following such second request, the applicable Rating Agency Condition requirement shall not be deemed to apply to such Rating Agency.

"Reconciliation Period" means the twelve-month period ending the last day of the Collection Period preceding the calculation of Remittance Shortfalls or Excess Remittances under the Servicing Agreement; provided, that the initial Reconciliation Period shall commence on the Issuance Date and may be less than twelve months.

"Record Date" means, with respect to a Payment Date, the close of business on the Business Day next preceding such Payment Date; provided, however, that if the 2017 Restructuring Bonds cease to be held in DTC's book-entry only system, the Record Date will be the last Business Day of the calendar month immediately preceding such Payment Date.

"Refunded Debt" means certain of the debt of the Authority that was Outstanding on the Issuance Date and that will be purchased, redeemed, repaid, or defeased with the proceeds of the sale of the 2017 Restructuring Property by the Authority.

"Remittance" means each transfer of estimated Charge Collections or Remittance Shortfalls from the Allocation Account to the Collection Account.

"Remittance Date" means each Business Day on which a Remittance is to be made by the Servicer pursuant to the Servicing Agreement.

"Remittance Shortfall" means the amount, if any, calculated for a particular Reconciliation Period, by which Actual Charge Collections received by the Servicer during such Reconciliation Period exceed all Estimated Charge Collections remitted to the Collection Account during such Reconciliation Period.

"Required Debt Service Reserve Level" means, as of any date of calculation, an amount equal to the greater of (a) 1.5% of the aggregate principal amount of 2017 Restructuring Bonds then outstanding minus the minimum principal amount of 2017 Restructuring Bonds shown as being expected to be paid on the Expected Amortization Schedule on any Payment Date subsequent to such date of calculation and (b) $0. For the avoidance of doubt, to the extent that no principal amount is shown as being expected to be paid on the Expected Amortization Schedule on any Payment Date subsequent to a date of calculation, the minimum principal amount of 2017 Restructuring Bonds shown as being expected to be paid on the Expected Amortization Schedule on any Payment Date subsequent to such date of calculation for purposes of calculating the Required Debt Service Reserve Level will be $0.

"Required Operating Reserve Level" means, as of any date of calculation, an amount equal to 0.50% of the aggregate principal amount of the 2017 Restructuring Bonds originally issued; provided, however, that if any 2017 Restructuring Bonds are refunded in advance of their maturity as permitted by the Indenture, on and after the date that provision for the payment of the 2017 Restructuring Bonds so refunded has been made pursuant to the Indenture the Required Operating Reserve Level shall be equal to 0.50% of the Outstanding Amount of the 2017 Restructuring Bonds immediately after such date.

"Required Reserve Level" means, as of any date of calculation, the sum of the Required Debt Service Reserve Level and the Required Operating Reserve Level.

"Reserve Subaccount" means one of the four subaccounts of the Collection Account, consisting of the two Subaccounts: the Operating Reserve Subaccount and the Debt Service Reserve Subaccount.

"Responsible Officer" means, with respect to (a) the Issuer, any officer of the Issuer who is authorized to act for the Issuer in matters relating to the Issuer and who is identified on the list of Responsible Officers delivered by the Issuer to the Trustee on the Issuance Date (as such list may be modified or supplemented by the Issuer from time to time thereafter), (b) the Servicer, the President, any Vice President, the Treasurer, an Assistant Treasurer or any duly

authorized officer, (c) the Trustee, any officer within the Corporate Trust Office of such trustee (including the President, any Vice President, Assistant Vice President, Secretary or Assistant Treasurer, Trust Officer or any other officer of the Trustee customarily performing functions similar to those performed by persons who at the time shall be such officers, respectively, and that has direct responsibility for the administration of the Indenture and also, with respect to a particular matter, any other officer to whom such matter is referred to because of such officer's knowledge and familiarity with the particular subject), (d) any other corporation, the Chief Executive Officer, the President, any Vice President, the Chief Financial Officer, the Treasurer, the Assistant Treasurer or any other duly authorized officer of such Person who has been authorized to act in the circumstances, (e) any partnership, any general partner thereof, and (f) any other Person (other than an individual), any duly authorized officer or member of such Person, as the context may require, who is authorized to act in matters relating to such Person.

"Restructuring Costs" means the amount of debt retirement costs and Upfront Financing Costs that the Authority proposes to pay through the sale of the 2017 Restructuring Property and the issuance of the 2017 Restructuring Bonds.

"Rule 15c2-12" or the "Rule" means Rule 15c2-12 of the SEC under the Securities Exchange Act of 1934, as amended.

"Sale Agreement" means Restructuring Property Purchase and Sale Agreement, expected to be dated as of the Issuance Date, between the Issuer and the Seller.

"Scheduled Maturity Date" means, with respect to each tranche of 2017 Restructuring Bonds, the date when all interest and principal are scheduled to be paid with respect to that tranche in accordance with the Expected Amortization Schedule, as specified in the Indenture. For the avoidance of doubt, the Scheduled Maturity Date with respect to any tranche shall be the last Scheduled Payment Date set forth in the Expected Amortization Schedule relating to such tranche.

"Scheduled Payment Date" means each Payment Date on which the principal of the 2017 Restructuring Bonds is scheduled to be paid.

"Scheduled Sinking Fund Payment" means, with respect to the Term Bonds, the Scheduled Sinking Fund Payment therefor as specified in the Expected Sinking Fund Schedule.

"Scheduled Sinking Fund Redemption Date" means, with respect to the Term Bonds, the Scheduled Sinking Fund Redemption Date therefor as specified in the Expected Sinking Fund Schedule.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Depository" means DTC, or its nominee, and its successors.

"Securitization Law" means Part B of the LIPA Reform Act, as amended.

"Seller" means the Authority in its capacity as the seller of the 2017 Restructuring Property.

"Semi-annual Servicer Certificate" means a certificate to be provided by the Servicer to the Issuer, the Trustee, each Rating Agency and the Authority, at least one Business Day before each Payment Date, and indicating:

(a)     the amount to be paid to the Holders of each tranche in respect of principal on such Payment Date in accordance with the Indenture,

(b)     the amount to be paid to the Holders of each tranche in respect of interest on such Payment Date in accordance with the Indenture,

(c)     the projected bond balance and the bond balance for each tranche as of that Payment Date (after giving effect to the payments on such Payment Date),

(d)     the amounts on deposit in the Reserve Subaccount (including the Operating Reserve Subaccount and the Debt Service Reserve Subaccount) as of that Payment Date (after giving effect to the transfers to be made from or into the Reserve Subaccount on such Payment Date)

(e)     the amounts, if any, on deposit in the Excess Funds Subaccount as of that Payment Date (after giving effect to the transfers to be made from or into the Excess Funds Subaccount on such Payment Date),

(f)     the amounts paid to the Trustee since the preceding Payment Date pursuant to the Indenture,

      (g)     the amounts paid to the Servicer since the preceding Payment Date pursuant to the Indenture, and

      (h)     the amount of any other transfers and payments to be made on such Payment Date pursuant to the Indenture.

"Serial Bonds" means Tranche-1 through Tranche-16 of the 2017 Restructuring Bonds, which are not Term Bonds.

"Service Area" means the two counties on Long Island — Nassau County ("Nassau County") and Suffolk County ("Suffolk County") (except for the Nassau County villages of Freeport and Rockville Centre and the Suffolk County village of Greenport, each of which has its individually-owned municipal electric system) — and a portion of the Borough of Queens of The City of New York known as the Rockaways where the Authority, acting through LIPA, provides electric service. For purposes of 2017 Restructuring Bonds and the collection of the 2017 Restructuring Charges, the "Service Area" is defined by the Securitization Law as the service area of LIPA as of July 29, 2013.

"Servicer" means LIPA or any subsequent owner of the T&D Assets.

"Servicer Compliance Certificate" means the annual compliance certificate provided by the Servicer pursuant to the Servicing Agreement.

"Servicer Default" means the occurrence of any one of the following events:

      (a)     any failure by the Servicer to cause payments by or on behalf of Customers received by the Servicer from 2017 Restructuring Charges to be deposited into the Allocation Account or any failure to cause the Allocation Agent to transfer to the Trustee any required Remittance and cause other amounts received from 2017 Collateral to be deposited to the Collections Account that shall continue unremedied for a period of five (5) Business Days after written notice of such failure is received by the Servicer from the Issuer or the Trustee, or

      (b)     any failure by the Servicer duly to observe or perform in any material respect any other covenant or agreement of the Servicer set forth in the Servicing Agreement, which failure:

            (i)     materially and adversely affects the 2017 Restructuring Property or the rights of the Bondholders, and

            (ii)     continues unremedied for a period of 60 days after written notice of such failure has been given to the Servicer by the Issuer, the Authority, the Allocation Agent, the Administrator or the Trustee or after discovery of such failure by an officer of the Servicer, or

      (c)     any representation or warranty made by the Servicer in the Servicing Agreement proves to have been incorrect when made, which has a material adverse effect on the Issuer or the Bondholders and which material adverse effect continues unremedied for a period of 60 days after the date on which written notice thereof has been given to the Servicer by the Issuer, the Authority or the Trustee or after discovery of such failure by an officer of the Servicer, as the case may be, or

      (d)     an Insolvency Event occurs with respect to the Servicer.

"Servicing Agreement" means the Restructuring Property Servicing Agreement, expected to be dated as of the Issuance Date, between the Issuer and the Servicer, as the same may be amended and supplemented from time to time.

"Servicing Fee" means the annual compensation the Issuer will pay to the Servicer for all obligations of the Servicer to be performed under the Servicing Agreement. As long as LIPA is the Servicer, the Servicing Fee shall be 0.05% of the aggregate initial principal amount of the 2017 Restructuring Bonds. The Servicing Fee for any Successor Servicer not affiliated with the owner of the T&D System Assets or performing similar services for the owner of the T&D System Assets may be higher than the Servicing Fee for LIPA; provided, however, that any Servicing Fee in excess of 0.60% of the aggregate initial principal amount of the 2017 Restructuring Bonds shall be subject to approval by the Authority and the Trustee.

"Short-Term Bond" means a 2017 Restructuring Bond with a maturity not longer than one year.

"Sinking Fund Payment" means a payment upon redemption of the Term Bonds on a Payment Date as specified in the applicable Expected Sinking Fund Schedule set forth under "THE 2017 RESTRUCTURING

BONDS—Redemption—Mandatory Sinking Fund Redemption; Expected Sinking Fund Schedules," or a payment without redemption prior to maturity that reduces the Outstanding Amount of such Term Bond to zero.

"Standard & Poor's" or "S&P" means Standard & Poor's Financial Services LLC, a division of S&P Global, or any successor to its ratings business.  References to S&P are effective so long as S&P is a Rating Agency.

"State" means the State of New York.

"State Pledge" means the pledge of the State of New York as described in "THE SECURITIZATION LAW—State Pledge" in this Official Statement.

"Subaccounts" means the subaccounts of the Collection Account, including, without limitation, the subaccounts of the Reserve Subaccount, as described in this Official Statement.

"Subordinated General Resolution" means the Authority's Electric System General Subordinated Revenue Bond Resolution adopted on May 20, 1998.

"Successor Servicer" is a successor to the Servicer designated or appointed pursuant to the terms of the Servicing Agreement.

"T&D System" is the electric transmission and distribution systems retained by LIPA as part of the acquisition in 1998.

"T&D System Assets" means the physically integrated system of electric transmission and distribution facilities (and other general property and equipment in connection therewith) owned by LIPA as of July 29, 2013, or thereafter acquired for use by LIPA or its successors in providing retail electric delivery to Customers in the Service Area.

"Termination Notice" means written notice by the Trustee or the Holders of a majority of the outstanding principal amount of the 2017 Restructuring Bonds to the Servicer (and the Trustee if given by the Holders) terminating all the rights and obligations (other than the indemnity obligations and the obligation to continue performing its functions as Servicer until a Successor Servicer is appointed) of the Servicer under the Servicing Agreement.

"Term Bonds" means 2017 Restructuring Bonds the retirement of which shall be provided for from scheduled periodic redemptions prior to maturity.  Tranche-17 through Tranche-28 are Term Bonds.

"Tranche" means all 2017 Restructuring Bonds designated as being of the same tranche issued and delivered on original issuance in a simultaneous transaction, and any bonds thereafter delivered in lieu thereof or in substitution therefor pursuant to the Indenture

"Treasury Regulations" means the regulations, including proposed or temporary regulations, promulgated under the Internal Revenue Code.  References to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"True-Up" means a mechanism required by the Securitization Law and Financing Order No. 5 whereby the Servicer will provide a notice to the Issuer and the Authority of an intention to make an adjustment to the applicable 2017 Restructuring Charges based on actual collected 2017 Restructuring Charges and updated assumptions by the Servicer as to future collections of 2017 Restructuring Charges.

"True-Up Adjustment" means each of the Annual True-Up Adjustment, the Mandatory Mid-Year True-Up Adjustment, the Voluntary Mid-Year True-Up Adjustment and the Optional True-Up Adjustment.

"Trust Estate" means the 2017 Collateral pledged to the Trustee.

"Trustee" means The Bank of New York Mellon.

"UCC" means, unless the context otherwise requires, the Uniform Commercial Code, as in effect in the State of New York, as amended from time to time.

"Underwriter" means each underwriter of the 2017 Restructuring Bonds.

"Unsolicited Ratings" means ratings on the 2017 Restructuring Bonds issued by an NRSRO other than the NRSRO hired by the seller.

"Upfront Financing Cost" means the expenses associated with preparing and obtaining approval of Financing Order No. 5, the funding of the Operating Reserve Subaccount, the Debt Service Reserve Subaccount and the fees and expenses associated with the structuring, marketing and issuance of the 2017 Restructuring Bonds, including counsel fees payable by the Authority, the Issuer or the Underwriters, advisory fees payable by the Authority, underwriting fees and expense, original issue discount, rating agency fees, Trustee fees (including counsel fees), escrow agent fees, accounting and auditing fees, printing and marketing expenses, compliance fees, filing fees, listing fees, bond issuance charges, fees and expenses of the Authority's advisors and outside counsel, any taxes or payments in lieu of taxes payable by the Issuer or the Authority with respect to the issuance of the 2017 Restructuring Bonds or the sale of the 2017 Restructuring Property and the amounts advanced by the Authority for the payment of any of the foregoing.

"Upfront Financing Costs Subaccount" means one of the four subaccounts of the Collection Account.

"Voluntary Mid-Year True-Up Adjustment" means the adjustment to the 2017 Restructuring Charges made if after the Mid-Year Review the Servicer determines that a Mandatory Mid-Year True-Up is not required by nevertheless voluntarily elects to file a Notice of Adjustment (i) to correct for any over-collections to date and anticipated to be experienced up to the end of the following Mid-Year Calculation Period and (ii) to ensure that the expected collections of the Charge are adequate to pay timely principal and interest on the Bonds when due pursuant to the Expected Amortization Schedule and to make timely payment on all other Ongoing Financing Costs, in each case during such Mid-Year Calculation Period.  The adjustment will become effective on May 15 of such year as the Servicer files its Adjustment Notice.

"Written Notice", "written notice" or "notice in writing" means notice in writing which may be delivered by hand or first class mail and also means electronic transmission.

APPENDIX B

PROPOSED FORM OF APPROVING OPINION OF BOND COUNSEL

[LETTERHEAD OF HAWKINS DELAFIELD & WOOD LLP]

November __, 2017

Utility Debt Securitization Authority
c/o Long Island Power Authority
333 Earle Ovington Blvd.
Uniondale, NY  11553

Ladies and Gentlemen:

We have acted as Bond Counsel to the Utility Debt Securitization Authority (the "Bond Issuer") in connection with the issuance of $369,465,000 Restructuring Bonds, Series 2017 (the "Bonds") by the Bond Issuer, a special purpose corporate municipal instrumentality of the State of New York (the "State") constituting a body corporate and politic, a political subdivision of the State and a public benefit corporation. In such capacity, we have examined such law and such certified proceedings, certifications, and other documents as we have deemed necessary to render this letter. In such examination, we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals and the conformity with originals of all documents submitted to us as copies thereof.

The Bonds are authorized and issued pursuant to Part B of Chapter 173, Laws of New York, 2013, as amended (the "Act"), a resolution of the Bond Issuer adopted September 29, 2017 (the "Resolution"), and a Bond Indenture, dated as of November __, 2017 (the "Bond Indenture"), by and between the Bond Issuer and The Bank of New York Mellon, as trustee (the "Bond Trustee"). The Bonds are dated, mature, are payable, bear interest and are subject to redemption, all as provided in the Bond Indenture.

Capitalized terms used herein and not defined herein are used as defined in the Bond Indenture.

We have relied, with your consent, upon the opinion of Buchanan Ingersoll & Rooney PC, counsel to the Trustee, as to the enforceability of the Bond Indenture against the Trustee.

Subject to the foregoing, we are of the opinion that:

1.     The Bond Issuer is duly created and is validly existing as a special purpose corporate municipal instrumentality, constituting a body corporate and politic, a political subdivision of the State and a public benefit corporation, under the laws of the State, including the Act.  Under the laws of the State, including the Constitution of the State, and under the Constitution of the United States, the Act is valid with respect to all provisions thereof material to the subject matters of this opinion letter.

2.     Pursuant to the Act, the Bond Issuer has the power and authority to adopt the Resolution, to execute and deliver the Bond Indenture, the Sale Agreement, the Servicing Agreement and the Administration Agreement and to issue the Bonds.

3.     The Resolution has been duly adopted by the Bond Issuer.

4.      The Bond Indenture has been duly authorized, executed and delivered by the Bond Issuer and is a valid and binding agreement of the Bond Issuer, enforceable against the Bond Issuer in accordance with its terms.

5.      The Bonds have been duly and validly authorized and issued by the Bond Issuer in accordance with provisions of the Act and the Bond Indenture and are valid and binding obligations of the Bond Issuer, payable only out of the Collateral pledged for such payment by the Bond Issuer under the Bond Indenture, subject to the provisions of the Bond Indenture permitting the prior application of moneys held under the Bond Indenture for the purposes and on the terms and conditions set forth therein.

6.      By operation of subdivision 2 of Section 7 of the Act, the provisions of the Bond Indenture create a first priority Statutory Lien on the Collateral in favor of the Bond Trustee for the benefit of the Bondholders, and the Statutory Lien is valid, perfected and enforceable against the Bond Issuer and all third parties without any further public notice. The description of the Restructuring Property in the Bond Indenture is sufficient for purposes of the Statutory Lien and the Act.

7.      Pursuant to the Act, no Bond shall constitute a debt, general obligation or a pledge of the faith and credit or taxing power of the State or of any county, municipality or any other political subdivision, agency or instrumentality of the State. The Act further provides that the issuance of the Bonds does not obligate the State or any county, municipality or any other political subdivision, agency or instrumentality of the State to levy any tax or make any appropriation for payment of the principal of or interest on the Bonds.

8.      The Sale Agreement, the Servicing Agreement and the Administration Agreement (the "Ancillary Agreements") are valid and binding agreements of the Bond Issuer, enforceable against the Bond Issuer in accordance with their respective terms.

9.      Any authorization by, registration with, consent of, or approval by, any governmental agency, board, or commission that is necessary for the execution, delivery and issuance by the Bond Issuer of the Bonds, and the execution and delivery by the Bond Issuer of the Bond Indenture and the Ancillary Agreements, has been obtained.

10.     Under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described below, (i) interest on the Bonds is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering the opinions in this paragraph 10, we have relied upon and assumed (i) the material accuracy of the representations, statements of intention and reasonable expectations, and certifications of fact, contained in the Tax Certificates delivered on the date hereof by the Bond Issuer, the Authority and LIPA with respect to the use of proceeds of the Bonds and the investment of certain funds, and other matters affecting the exclusion of interest on the Bonds from gross income for federal income tax purposes under Section 103 of the Code, and (ii) compliance by the Bond Issuer, the Authority and LIPA with procedures and covenants set forth in such Tax Certificates and with the tax covenants set forth in the Bond Indenture, the Sale Agreement and the Servicing Agreement as to such matters. Under the Code, failure to comply with such procedures and covenants may cause the interest on the Bonds to be included in gross income for federal income tax purposes, retroactive to the date of issuance of the Bonds, irrespective of the date on which such noncompliance occurs or is ascertained.

11.     Under existing statutes, interest on the Bonds is exempt from personal income taxes imposed by the State or any political subdivision thereof (including The City of New York), and the Bonds are exempt from all taxation directly imposed thereon by or under the authority of the State, except estate or gift taxes and taxes on transfers.

We call your attention to the fact that the enforceability of rights and remedies with respect to the Bonds, the Bond Indenture and the Ancillary Agreements may be limited by bankruptcy, insolvency, reorganization,

moratorium, fraudulent transfer and other laws relating to or affecting the rights of creditors generally, whether heretofore or hereafter enacted, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), including that the availability of specific performance or injunctive relief is subject to the discretion of the court before which any such proceeding is brought.

Except as stated in paragraphs 10 and 11 above, we express no opinion regarding any other federal or state tax consequences with respect to the Bonds. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion from gross income for federal income tax purposes of interest on the Bonds, or under state and local tax law.

We express no opinion herein as to the accuracy, adequacy, sufficiency or completeness of any financial or other information that has been or will be supplied to purchasers or prospective purchasers of the Bonds.

This letter is rendered solely with regard to the matters expressly opined on above and does not consider or extend to any documents, agreements, representations or other material or matters of any kind not specifically opined on above. No other opinions are intended nor should they be inferred.

This letter is issued as of the date hereof, and we assume no obligation to update, revise or supplement this letter to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law, or in interpretations thereof, that may hereafter occur, or for any other reason whatsoever.

Very truly yours,

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX C

### PROPOSED FORM OF OPINION OF BOND COUNSEL
### RELATING TO NEW YORK AND FEDERAL CONSTITUTIONAL MATTERS

**[LETTERHEAD OF HAWKINS DELAFIELD & WOOD LLP]**

November __, 2017

To Each Person Listed on
the Attached Schedule I

    Re:  Utility Debt Securitization Authority Restructuring Bonds;
        <u>Certain Federal and New York State Constitutional and Statutory Issues</u>

Ladies and Gentlemen:

    We have acted as bond counsel to the Utility Debt Securitization Authority (the "Bond Issuer") and the Long Island Power Authority (the "Authority") in connection with the issuance of the Bond Issuer's Utility Debt Restructuring Bonds, Series 2017 (the "Bonds") described below, the proceeds of which will be used by the Bond Issuer to purchase from the Authority all of the Authority's right, title and interest in certain restructuring property (as so transferred, the "Restructuring Property"), as more fully described below, and the other related transactions referred to and described below.

    The Bonds will be secured by a statutory lien on and a security interest in the Restructuring Property, together with certain other property of the Bond Issuer.  Generally, "restructuring property" is a property right created under Part B of Chapter 173 of the Laws of New York, 2013, as amended by Chapter 58 of the Law of New York, 2015 (the "Statute"), pursuant to a restructuring cost financing order adopted by the Authority.  The Authority approved and adopted Restructuring Cost Financing Order No. 5 on July 26, 2017 (the "Financing Order No. 5"), that, among other things, authorized the creation and sale of the Restructuring Property, which includes the irrevocable right to impose, bill, collect and receive certain non-bypassable transition charges (as adjusted from time to time pursuant to Financing Order No. 5, the "Charges") from all individuals and legally-recognized entities taking electric delivery service in the geographic area within which Long Island Lighting Company, doing business under the name LIPA ("LIPA"), provided electric transmission and distribution service as of July 29, 2013 (such individuals and entities, the "Customers," and such geographic area, the "Service Area").

    The Bond Issuer was created by Section 4 of the Statute on July 29, 2013, as a special purpose corporate municipal instrumentality, body corporate and politic, political subdivision and public benefit corporation of the State of New York (the "State").

### THE TRANSACTION

    On the date hereof, the Authority is selling the Restructuring Property to the Bond Issuer under the Restructuring Property Purchase and Sale Agreement dated as of November __, 2017, between the Authority and the Bond Issuer and the related Bill of Sale dated November __, 2017 (such Sale Agreement and Bill of Sale, together, the "Sale Agreement"), for an amount in cash.  Under the Restructuring Property Servicing Agreement dated as of November __, 2017, between the Authority, in its capacity as Servicer, and the Bond Issuer (the "Servicing Agreement"), the Authority has agreed to service the Restructuring Property.  Under the Administration Agreement

dated as of November __, 2017, between LIPA, as Administrator (the "Administrator"), and the Bond Issuer, the Administrator has agreed to perform certain administrative services on behalf of the Bond Issuer (the "Administration Agreement").

On the date hereof, the Bond Issuer is issuing the Bonds under the Bond Indenture dated as of November __, 2017 (the "Indenture"), between the Bond Issuer and The Bank of New York Mellon, as Indenture Trustee (the "Indenture Trustee"). The Charges are the only source of payment of debt service on the Bonds under the Indenture other than a debt service reserve fund initially funded with Bond proceeds.

Pursuant to the Bond Purchase Agreement dated October 25, 2017 (the "Bond Purchase Agreement"), between the Bond Issuer and RBC Capital Markets LLC, as representative of the several underwriters named therein, such underwriters have agreed to purchase the Bonds from the Bond Issuer.

As used herein, the term "Transaction Documents" means, collectively, the Sale Agreement, the Servicing Agreement, the Administration Agreement, the Bonds, the Indenture and the Bond Purchase Agreement, and "Transaction" means the transactions contemplated by the Transaction Documents. Capitalized terms used herein that are not otherwise defined shall have the meanings assigned to them in the Indenture.

## FACTS AND ASSUMPTIONS

In connection with the opinions set forth below, we have examined and relied upon originals or copies, certified or otherwise identified to our satisfaction, of the following:

a) the Statute;

b) Financing Order No. 5;

c) the Transaction Documents; and

d) such other documents relating to the Transaction as we have deemed necessary or advisable as a basis for such opinions.

We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such records of the Authority, LIPA and the Bond Issuer, agreements, certificates of public officials, certificates of officers, trustees or other representatives of the Authority, LIPA, the Bond Issuer and others, and such other documents, certificates and records as we have deemed necessary or appropriate as a basis for the opinions set forth herein. We have made no independent investigation of the facts referred to herein, and with respect to such facts, we have relied, for the purpose of rendering the opinions set forth herein and except to the extent any such information constitutes a statement of legal conclusion expressed in such opinions or as otherwise stated herein, exclusively on the factual statements contained and matters provided for in the documents referenced above, including the factual representations, warranties and covenants contained therein as made by the respective parties thereto and on certificates of the Authority, LIPA and the Bond Issuer and their respective directors or trustees, as the case may be, officers and other representatives and of public officials.

In our examination, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies and the authenticity of the originals of such latter documents. In making our examination of these documents, we have assumed: that each of the parties to such documents is duly organized and validly existing under the laws of its jurisdiction of organization and each party to the Transaction Documents is authorized to do business and is in good standing in each other jurisdiction in which it is required to be authorized to do business; that the parties to such documents had the power, corporate or other, to enter into and perform all obligations thereunder; and the due authorization by all requisite action, corporate or other, the due execution and delivery by the parties of the Transaction Documents, and the validity and binding effect thereof upon such parties and the enforceability thereof against such parties.

C-2

We express no opinion herein as to the laws of any jurisdiction other than the federal laws of the United States of America currently in effect and the laws of the State currently in effect.

## OPINIONS REQUESTED

The Authority has requested that we furnish to you our opinions as to:

(1)  whether a court would find a compensable taking under the takings clause of the Fifth Amendment of the United States Constitution (the "Federal Takings Clause") if (a) it concludes that the rights of the Bondholders to the Restructuring Property (hereinafter, the "Rights") are property of a type protected by the Federal Takings Clause and (b) the State undertook a repeal or amendment of the Statute or took any other action or failed to take any action required by the New York State Pledge (as defined below) (any such repeal, amendment, action or inaction is herein referred to as an "Impairment Action") after the Bonds are issued but before they are fully paid that, without paying just compensation to the Bondholders, (i) permanently appropriates the Rights or denies all economically productive use of the Rights; or (ii) destroys the Rights, other than in response to emergency conditions; or (iii) substantially reduces, alters or impairs the value of the Rights, if the law unduly interferes with the Bondholders' reasonable investment-backed expectations;

(2)  whether a court would find a compensable taking under the takings clause of Article 1, Section 7 (the "State Takings Clause") of the Constitution of the State (the "State Constitution") if (a) it concludes that the Rights are property of a type protected by the State Takings Clause and (b) the State engages in an Impairment Action that, without paying just compensation to the Bondholders, (i) permanently appropriates the Rights or denies all economically productive use of the Rights; or (ii) destroys the Rights, other than in response to emergency conditions; or (iii) substantially reduces, alters or impairs the value of the Rights, if the law unduly interferes with the Bondholders' reasonable investment-backed expectations;

(3)  whether the New York State Pledge (as defined below) and the State Bankruptcy Pledge (as defined below) create a contractual relationship between the State and the Bondholders;

(4)  whether the Bondholders could successfully challenge under the Contract Clause of the United States Constitution the constitutionality of (i) an Impairment Action that limits, alters, impairs or reduces the value of the Restructuring Property or the Charges prior to the time that the Bonds are fully paid and discharged or (ii) any action by the State that limits or alters the denial of authority to the Bond Issuer to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code (any such action is herein referred to as a "Bankruptcy Authority Action");

(5)  whether preliminary injunctive relief would be available under federal law to delay implementation of (i) an Impairment Action that limits, alters, impairs or reduces the value of the Restructuring Property or the Charges pending final adjudication of a claim challenging such Impairment Action under the Contract Clause, or (ii) a Bankruptcy Authority Action, and assuming a favorable final adjudication of such claim, whether relief would be available to prevent permanently the implementation of such Impairment Action or Bankruptcy Authority Action;

(6)  whether a court would conclude that the New York State Pledge (as defined below) creates rights which are considered to be property within the meaning of the due process clause, Article 1, § 6 (the "State Due Process Clause") of the State Constitution;

(7)  whether a court would conclude that Bondholders (or the Bond Trustee on their behalf) could successfully challenge under the State Due Process Clause an Impairment Action, that after the Bonds are issued, but before they are fully paid, (i) permanently appropriates the Rights or denies all economically productive use of the Rights; or (ii) destroys the Rights, other than in response to emergency conditions; or (iii) substantially reduces, alters or impairs the value of the Rights, if the

law unduly interferes with the Bondholders' reasonable investment-backed expectations (other than a law passed by the Senate and Assembly of the State (the "State Legislature") in the valid exercise of the State's police power necessary to safeguard the public, health, safety and welfare);

(8) whether preliminary injunctive relief would be available under State law to delay implementation of an Impairment Action that limits, alters, impairs or reduces the value of the Restructuring Property or the Charges pending final adjudication of a claim challenging such Impairment Action under the State Due Process Clause and assuming a favorable final adjudication of such claim, whether relief would be available to prevent permanently the implementation of such Impairment Action;

(9) whether the provisions of the Statute are severable; and

(10) whether voters in the State have authority to amend or repeal the Statute by voter initiatives or referenda.

## PLEDGE AND AGREEMENT OF THE STATE

The Statute provides in Section 9 that the State "pledges to and agrees with" the holders of restructuring bonds, which includes the Bondholders:

> that the state will not in any way take or permit any action that limits, alters or impairs the value of restructuring property or, except as required by the adjustment mechanism described in the restructuring cost financing order, reduce, alter or impair transition charges that are imposed, collected and remitted for the benefit of the owners of restructuring bonds, any assignee, and all financing entities, until any principal, interest and redemption premium in respect of restructuring bonds, all ongoing financing costs and all amounts to be paid to an assignee or financing party under an ancillary agreement are paid or performed in full.

(The above-quoted provisions are herein referred to as the "New York State Pledge.") Section 9 also permits any issuer of restructuring bonds "to include the [New York State] pledge … in the restructuring bonds, ancillary agreements and documentation related to the issuance and marketing of the restructuring bonds." We note that the New York State Pledge is set forth in the Bonds and in the Indenture, that the existence of the New York State Pledge is disclosed in the preliminary and final Official Statements for the Bonds furnished to prospective investors and that the obligation of the Underwriters to purchase the Bonds is conditioned upon the inclusion of the New York State Pledge in the Bonds and in the Indenture.

The Statute also provides in Section 4(3) that "[t]he restructuring bond issuer shall not be authorized to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code" and that the State "pledges, contracts and agrees with owners of restructuring bonds issued by restructuring bond issuer that the state will not limit or alter the denial of authority to the restructuring bond issuer to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code." The foregoing pledge is herein referred to as the "State Bankruptcy Pledge".

## THE FEDERAL TAKINGS CLAUSE

Discussion of the Federal Takings Clause

The Federal Takings Clause of the Fifth Amendment of the United States Constitution states, "nor shall private property be taken for public use, without just compensation." The Fourteenth Amendment of the United States Constitution makes the Fifth Amendment, including the Federal Takings Clause, applicable to any state action, *Chicago, Burlington & Quincy Railroad Co. v. City of Chicago*, 166 U.S. 226, 240 (1897), which would include actions of both the New York Legislature and the New York Public Authorities Control Board ("PACB"). The Federal

Takings Clause applies to governmental takings of both tangible and intangible property. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984). To the extent relevant here, takings cases can generally be divided into two distinct categories: physical takings, where the government physically occupies, or takes title to, private property, and regulatory takings, where the government regulates the use of private property. *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992). Physical takings cases, even when there has been minimal "permanent physical occupation of real property," generally require that compensation be paid without a specific inquiry into the interests advanced. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 435, 438 n.16 (1982); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). On the other hand, regulatory takings cases, in most instances,[1] necessarily entail "complex factual assessments of the purposes and economic effects of government actions" before a court will award compensation. *Yee*, 503 U.S. at 522-23. *See also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) (noting that the United States Supreme Court has been unable to develop any "set formula" for analyzing and evaluating Federal Takings Clause claims, and that the Court's conclusion will depend largely upon the particular circumstances of a particular case). A claimant in a regulatory takings case will generally recover compensation only if the government has regulated the private property at issue to such a degree that a particular property owner has been deprived of the economic use of that property and "unfairly singled out" to bear a burden that is more properly "borne by the public as a whole." *Yee*, 503 U.S. at 522-23. *See also Armstrong v. United States*, 364 U.S. 40, 49 (1960) (finding that the purpose of the Federal Takings Clause is to restrain the government by, among other things, preventing the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

Regulatory takings can affect two distinct property types: tangible property, such as real property or equipment, and intangible property, such as trade secrets and, presumably, Restructuring Property. In order to determine whether any governmental action triggers a compensable regulatory taking of intangible property under the Federal Takings Clause, a court must determine, first, whether the claimants have a property interest for purposes of the Federal Takings Clause.[2] If so, the court must then determine whether the government's action effects a compensable taking of that protected property interest. *Ruckelshaus*, 467 U.S. at 1000-01.[3]

A court's response to a Federal Takings Clause challenge will be affected by the nature of any Impairment Action. An Impairment Action with respect to the Bonds could take many forms, including, among others, legislation that (i) repeals the New York State Pledge, (ii) invalidates the imposition of the Charges or (iii) changes the regulatory framework for setting utility rates in such a way that the change adversely impacts the collection of the Charges. A discussion of applicable principles that courts have applied in analyzing the effect of an alleged taking follows.

A.    Is there a property interest for purposes of the Federal Takings Clause?

The United States Supreme Court has held that property other than real property and tangible personal property is entitled to the protections afforded by the Federal Takings Clause. *Ruckelshaus*, 467 U.S. at 1003. An independent source, such as state law or existing rules, however, and not the United States Constitution, must create the protected property right. *Ruckelshaus*, 467 U.S. at 1001; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980); *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). In *Ruckelshaus*, the Court determined that trade secrets that are cognizable under state law constitute property rights for purposes of the Federal Takings Clause, noting that:

---

[1] The United States Supreme Court has recognized, however, that in regulatory takings cases where a governmental regulation permanently deprives a property owner of all "economically beneficial or productive use of land," a *per se* compensable taking exists which warrants compensation without any complex analysis. *Lucas*, 505 U.S. at 1015. The Court, however, has declined to apply this hard and fast rule to regulatory takings which may temporarily deprive a property owner of all economically beneficial or productive use of land. *Tahoe-Sierra Preservation Council. Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002).

[2] The existence of a protected property interest would generally be assumed and, therefore, would not be a significant issue, for courts assessing Federal Takings Clause claims involving real property and tangible personal property.

[3] A court would not reach these issues unless the purported taking is for public use, or is rationally related to a conceivable public purpose, because the State does not have the power to take a private citizen's property except for public use or such a public purpose. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 231-32, 240 (1984).

> the Court has found other kinds of intangible interests to be property for purposes
> of the Fifth Amendment's Taking Clause. *See, e.g., Armstrong v. United States*,
> 364 U.S. 40, 44, 46 (1960) (materialman's lien provided for under Maine law
> protected by Taking Clause); *Louisville Joint Stock Land Bank v. Radford*, 295
> U.S. 555, 596-602 (1935) (real estate lien protected); *Lynch v. United States*, 292
> U.S. 571, 579 (1934) (valid contracts are property within meaning of the Taking
> Clause).

467 U.S. at 1003. *See also, Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310 (1989) (recognizing that a utility's right to a fair return on investment is a property right for purposes of the Federal Takings Clause); *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003) (finding that a state law requiring that interest on lawyers' trust fund accounts be transferred to a separate account to pay for legal services for the needy was more akin to a physical taking of property and thus warranted the application of *per se* rules as opposed to the ad hoc factual analysis of regulatory takings; the Supreme Court had previously held in *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998), that such interest was the private property of the owner of the principal). In holding that an Environmental Protection Agency regulation requiring companies to divulge trade secrets effected a compensable taking with respect to certain trade secrets, the *Ruckelshaus* Court had to determine if the trade secrets constituted a property interest for purposes of the Federal Takings Clause. In this latter connection, the Court noted that "[t]rade secrets have many of the characteristics of more tangible forms of property. A trade secret is assignable…. A trade secret can form the res of a trust, … and it passes to a trustee in bankruptcy." *Ruckelshaus*, 467 U.S. at 1002 (citations omitted). A court should undertake a similar analysis of, and reach a similar conclusion regarding, the Restructuring Property in determining whether it constitutes "property" for purposes of the Federal Takings Clause.

The decision in *U.S. Trust Co. v. New Jersey*, 431 U.S. 1 (1977), involved a legislative covenant, similar in nature to the New York State Pledge, made to Port Authority bondholders by the New Jersey Legislature, pledging that the revenues supporting the subject Port Authority bonds would not be diverted for unauthorized purposes. This covenant was later repealed by the New Jersey Legislature, which repeal the Supreme Court found to impair the contract rights of the bondholders. *U.S. Trust*, 431 U.S. at 19. The Supreme Court then indicated in dicta that "[c]ontract rights are a form of property" that, if taken, would require the payment of just compensation. *Id*. at n.16. Thus, the Bondholders would have a strong argument based on *Ruckelshaus*, *U.S. Trust* and the Statute that the Restructuring Property is "property" warranting the protections afforded by the Federal Takings Clause.[4]

The cases discussed above provide strong support for the position that the Rights are property for purposes of the Federal Takings Clause. As discussed above, the nature of any Impairment Action would, however, certainly influence a court's analysis of whether a compensable taking exists. The factors a court might examine to determine whether such State action would rise to the level of a "taking" are considered below.

        B.      <u>If there is a property interest, does the Impairment Action effect a taking of that property interest for purposes of the Federal Takings Clause</u>?

Once a court determined that the Rights constitute "property" for purposes of the Federal Takings Clause, it would then examine whether the alleged Impairment Action constituted a regulatory taking mandating the payment of just compensation. In *Lingle v. Chevron USA*, 544 U.S. 528, 538-39 (2005), the Supreme Court identified two categories where regulatory action that does not entail a physical taking of property nonetheless constitutes *per se* takings — regulations that involve a permanent physical invasion of property and regulations that deprive the owner of all economically beneficial or productive use of the property — and a third category of other regulatory action that does not constitute *per se* takings.

In the cases that fall into the third category that have asserted a regulatory taking of real property or tangible personal property, the courts have generally made an ad hoc factual determination of the takings allegations based on an examination of the following factors:

---

[4] Indeed, Section 7 of the Statute characterizes Restructuring Property as an existing, present property right, which, while not dispositive, supports the conclusion that the Restructuring Property is property for purposes of the Federal Takings Clause.

1.        the character of the government action;

2.        the economic impact of the regulation; and

3.        the extent to which the regulation interfered with distinct investment-backed expectations.

*Penn Central*, 438 U.S. at 124.

While the *Penn Central* case involved a regulatory taking of tangible property,[5] the United States Supreme Court has also applied these principles when analyzing Federal Takings Clause claims related to intangible property. For instance, in *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986), the Court examined a statute that imposed liability on an employer who withdrew from a multi-employer pension plan to pay to the pension plan the employer's proportionate share of such pension plan's unfunded vested benefits. The Court relied on the factors set forth in *Penn Central* to analyze the takings claim. *Connolly*, 475 U.S. at 224-25. Similarly, in *Ruckelshaus*, the Court applied the *Penn Central* factors to an alleged regulatory taking of "intangible" trade secrets. *Ruckelshaus*, 467 U.S. at 1005. More recently, in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the Court applied the *Penn Central* analysis in its Federal Takings Clause review of a federal statute that charged coal companies that had provided voluntary pension plans for miners with the costs of providing benefits under a new plan.

The first factor of the *Penn Central* analysis — the character of the government action —entails a consideration of whether the action can be characterized as a physical invasion by the government, as opposed, for example, to the implementation of a public program adjusting the benefits and burdens of economic life to promote the common good. *Penn Central*, 438 U.S. at 124. This, in turn, leads some courts to an assessment of the extent to which the government action furthered an important public policy. *Id*. at 127.[6] The second *Penn Central* factor assesses whether the economic impact of the State action rises to the level of serious economic harm. *Id*. at 124.[7] The final *Penn Central* factor examines whether the State action interferes with reasonable investment-backed expectations. *Id*. A reasonable investment-backed expectation must be more than a "mere unilateral expectation or an abstract need." *Webb's Fabulous Pharmacies*, 449 U.S. at 161.

In Federal Takings Clause cases, the United State Supreme Court has analyzed one or more of these factors to varying degrees and in varying ways. For example, in *Connolly*, where the Court ultimately held that there was no taking for purposes of the Fifth Amendment, the Court found that the interference with property rights arose "from a public program that … promotes the common good," not from a physical invasion or permanent appropriation of the assets, and that the legislation in dispute contained a "significant number of provisions" that moderated and mitigated the economic impact of the statute. *Connolly*, 475 U.S. at 225-26. Moreover, the Court found no interference with reasonable investment-backed expectations. *Id*. at 226-27.

Thus, to determine whether a compensable taking had occurred, the court would determine whether to apply principles developed in the real property context to an analysis of the Impairment Action. Those principles would require a determination of whether the Impairment Action denied the Bondholders all economically beneficial or productive use of the Restructuring Property, under circumstances such as a legislative ban on the use of the Restructuring Property for the timely payments of principal and interest on the Bonds. If all economically beneficial

---

[5] In *Penn Central*, the court found that the New York Landmarks Law did not effect a taking of a private property owner's real property where not all of the owner's property was affected by restrictions on use and the State was acting pursuant to its police power.

[6] The simple determination that a government action advances an important public policy is not dispositive, however. Even though all private property is held subject to the sovereign power of the state, including its police power, "if a regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393,415 (1922).

[7] There are certain instances, however, in which the economic impact of the government action is so severe that the claimant is deprived of all economically beneficial or productive use of property. In such instances, the Court has generally held that compensation is warranted. See discussion of *Lucas v. South Carolina Coastal Council* in note 1, above. Even in *Lucas*, however, the Court left open the possibility that even a total elimination of a property's economically productive use was permissible and would not warrant compensation if the regulation or law in question would "duplicate the result that could have been achieved in the courts by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." 505 U.S. at 1029.

or productive use of the Restructuring Property were not denied, the court would undertake an ad hoc factual inquiry by considering the factors enumerated in *Penn Central* in an analysis of the Impairment Action, in which event the court would assess:

1.      the character of the government action;

2.      the economic impact of the regulation,[8] including whether the State's action would prevent timely payment of the Bonds; and

3.      the extent to which the regulation interfered with reasonable investment-backed expectations.

With respect to the Rights, although the character and effect of any future Impairment Action cannot be known at this time, and any such Impairment Action would likely not constitute a physical invasion and, presumably, would ostensibly be in furtherance of an important public policy, any such Impairment Action that prevented the payment of the Bonds would likely be found to have a serious economic impact on the Bondholders. In any event, it seems that an Impairment Action that prevented the timely payment of principal and interest on the Bonds would interfere with the Bondholders' investment-backed expectations because timely payment of the Bonds is the primary expectation of the Bondholders. Additionally, the New York State Pledge itself gives rise to these reasonable investment-backed expectations on the part of the Bondholders. The United States Supreme Court has held that a government "guarantee" of confidentiality could form the basis for such an expectation. *Ruckelshaus*, 467 U.S. at 1011. The Bondholders could argue that they would not have invested in the Bonds in the absence of the government "guarantee" contained in the New York State Pledge and, thus, in accordance with *Ruckelshaus*, the New York State Pledge created reasonable investment-backed expectations. The State has gone to great lengths to give credence to the New York State Pledge, including authorizing its inclusion on the Bonds. Therefore, we believe that it is reasonable for the Bondholders who have invested their funds in the Bonds to expect that the Legislature will honor the New York State Pledge.[9]

Opinion as to Federal Takings Clause.

Based on our review of relevant judicial authority, as discussed in this opinion, but subject to the qualifications, limitation and assumptions (including the assumption that any Impairment Action would be "substantial") set forth herein, it is our opinion that a reviewing court of competent jurisdiction applying federal law, in a properly prepared and presented case, would conclude that the State would be required to pay just compensation to the Bondholders if the State undertook an Impairment Action in contravention of the New York State Pledge after the Bonds are issued, but before they are fully paid, that (i) constituted a permanent appropriation of a substantial property interest of the Bondholders in the Restructuring Property or denied all economically beneficial or productive use of the Restructuring Property; (ii) destroyed the Restructuring Property, other than in response to so-called

_____

[8] Even where the economic impact is severe, compensation may not be required if the action is taken in response to so-called emergency conditions. *See, e.g., United States v. Caltex (Philippines) Inc.*, 344 U.S. 149, 154 (1952) (relying, in part, on the common law, which had "long recognized that in time of imminent peril - such as when fire threatened a whole community - the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved," the court found no taking when the U.S. military destroyed private oil facilities in the Philippines to prevent the Japanese from taking control of the facilities during World War II). *See also Dames & More v. Regan*, 453 U.S. 654 (1981) (no compensable taking resulting from executive order nullifying attachments on Iranian assets and permitting those assets to be transferred out of the country); *United States v. Pacific Railroad*, 120 U.S. 227 (1887) (no compensation required due to exigencies of war when the military destroyed private bridges to prevent the confederates from using them); *American Mfrs. Mut. Ins. Co. v. United States*, 453 F.2d 1380, 1381 (Ct. Cl. 1972) (compensation not required when private vessel was "destroyed as part of the fortunes of war and by actual and necessary military operations in attacking and defending against enemy forces").

[9] Because many factors could have an impact on the market price of the Bonds, maintenance of the market price of the Bonds might be considered a unilateral expectation of the Bondholders, and not a reasonable, investment-backed expectation. *See U.S. Trust Co.*, 431 U.S. at 19. If so, an Impairment Action affecting only this "unilateral expectation" might not constitute a compensable taking.

emergency conditions; or (iii) substantially reduced, altered or impaired the value of the Restructuring Property so as to unduly interfere with the reasonable expectations of the Bondholders arising from their investment in the Bonds.

There can be no assurance, however, that any award of compensation would be sufficient to pay the full amount of principal of and interest on the Bonds.

## THE STATE TAKINGS CLAUSE

Discussion of the State Takings Clause.

The State Takings Clause, in Article 1, Section 7(a) of the State Constitution, provides that, "[p]rivate property shall not be taken for public use without just compensation." Its text is nearly identical to the Federal Takings Clause discussed above. As a result, New York courts have used United States Supreme Court decisions as a basis for their interpretation of the State Takings Clause. *See, e.g, Consumers Union U.S., Inc. v. State of New York*, 5 N.Y.3d 327, 806 N.Y.S.2d 99  (N.Y. 2005), *Birnbaum v. State* 73 N.Y.2d 638, 543 N.Y.S.2d 23 (N.Y.1989), *Putnam County Nat. Bank v. City of New York* 37 A.D.3d 575, 829 N.Y.S.2d 661 (N.Y. App. Div. 2 Dept. 2007). For example, in *Consumers Union*, the New York Court of Appeals, as have many other U.S. and state courts, applied the test used in *Penn. Central* as the basis for its analysis under a State Takings Clause claim. Following *Penn. Central*, once a court determines that the rights constitute "property" for purposes of a takings analysis, it should make an *ad hoc* factual determination of takings allegations based on an examination of (i) the character of the government action; (ii) the economic impact of the regulation; and (iii) the extent to which the regulation interfered with distinct investment-backed expectations. *See Penn. Central,* 438 U.S. at 124. *See, e.g. Consumers' Union,* 5 N.Y.3d 327;  *Lingle,* 544 U.S. 528.

As under the Federal Takings Clause, a court's response to a State Takings Clause challenge will be affected by the nature of any Impairment Action.  An Impairment Action with respect to the Bonds could take many forms, including, among others, legislation that (i) repeals the New York State Pledge, (ii) invalidates the imposition of the Charges or (iii) changes the regulatory framework for setting utility rates in such a way that the change adversely impacts the collection of the Charges.  A discussion of applicable principles that courts have applied in analyzing the effect of an alleged taking follows.

A.      Is there a property interest for purposes of the State Takings Clause?

In order to hold that Impairment Actions constitute a compensable taking, a reviewing court would need to conclude that the Rights are property of a type protected by the State Takings Clause.  Courts in New York have found contractual rights to be "property" that merits protection under the State Takings Clause.  The Court of Appeals has held that under the State Constitution, the right of a contractor for the performance of a public work to prospective profits within his contract is a species of property within the protection of State Takings Clause. *See Danolds v. State*, 89 N.Y. 36 (N.Y. 1882).  The Court of Appeals has also held that a right to plant an oyster bed under public waters is a private right, and that the destruction of the bed by sewage discharged thereon from a sewer of a town is a direct invasion of a private right and taking of private property within the meaning of State Takings Clause. *See Huffmire v. City of Brooklyn* 162 N.Y. 584 (N.Y. 1900).  A New York court has also found that ordinances granting town residents exclusive rights to town fisheries constitute "property" that could not be taken without compensation. *See State v. Freeholders and Commonalty of Southampton*, 99 A.D.2d 804, 472 N.Y.S.2D 394 (N.Y. App. Div. 2 Dept. 1984).

New York courts have regularly looked to whether a state action has impaired investment-backed expectations of property owners in order to determine whether a regulatory taking has occurred.  *See Consumers Union, 5* N.Y.3d 327. *See also Matter of Smith v. Town of Mendon*, 4 N.Y.3d 1, 789 N.Y.S.2d 696 (N.Y. 2004).  As noted above, it is well established under federal law that investment-backed expectations can be property for the purposes of the takings analysis; however, an independent source, such as state law or existing rules, and not the United States Constitution, must create the protected property right.

In *Patterson v. Carey*, 41 N.Y.2d 714, 395 N.Y.S.2d 411 (N.Y. 1977), the Court of Appeals applied the State Due Process Clause to uphold bondholders' property rights when the State Legislature rescinded an increase in tolls charged motorists by the Jones Beach State Parkway Authority and provided that future increases could not be imposed

unless the Parkway Authority complied with a new four stage review process. Bondholders brought suit asserting that the modification of the toll revenue stream backing their bonds was an unconstitutional deprivation of "property," such property being not only rights relating to the imposition of tolls and their collection, but also the State pledge itself. The New York Court of Appeals held in their favor, finding that the State had violated the State Due Process Clause. See *Patterson,* 41 N.Y.2d 720. Although the case was decided under the State Due Process Clause, it would be reasonable to expect similar reasoning as to the existence of a property interest with respect to a claim brought under the State Takings Clause.

More directly, the Statute expressly creates the Restructuring Property as a property right under State law for purposes of the Transaction: "Restructuring property shall constitute a vested, presently existing property right notwithstanding the fact that the value of the property right will depend on further acts that have not yet occurred, including but not limited to, consumers remaining or becoming connected to the (T&D) system assets and taking electric delivery service, the imposition and billing of transition charges, or, in those instances where consumers are customers of LIPA or any successor owner of the T&D system assets, such owner performing certain services." 2013 N.Y. LAWS ch. 173 §2 ¶13. *See also* 2013 N.Y. LAWS ch. 173 §7(1)(a).

The cases discussed above, together with the Statute, provide strong support for the position that the rights of the Bondholders in the Restructuring Property are property for purposes of the State Takings Clause. As discussed, however, the nature of any Impairment Action would certainly influence a court's analysis of whether a compensable taking exists. Some of the factors a court might examine to determine whether such State action would rise to the level of a "taking" are considered below.

        B.        <u>If there is a property interest, does the Impairment Action effect a taking of that property interest for purposes of the State Takings Clause?</u>

In determining whether an Impairment Action constitutes a taking, a reviewing court would evaluate the nature of the governmental action and weigh the public purpose served thereby against the degree to which it interferes with bondholders' "legitimate property interests" or distinct "investment-backed expectations." *Consumers Union,* 5 N.Y.3d at 358. "Governmental regulation of private property effects a taking if it is so onerous that its effect is tantamount to a direct appropriation or ouster." *Id* at 357. In *Patterson,* the Court of Appeals based its determination under the State Due Process Clause partly on investors' expectations, finding that "[s]ince the toll is the sole source of funds for bond repayment, any limitation on the authority's power to collect a toll sufficient to pay the bonds deprive[d] the bondholders of an essential attribute of their contract with the authority and with the State and jeopardize[d] their investment." *Patterson,* 41 N.Y.2d at 720.

As discussed above, although the United States Supreme Court has indicated that regulatory actions generally will be deemed *per se* takings for Fifth Amendment purposes where government requires an owner to suffer a permanent physical invasion of her property, *see Loretto,* 458 U.S. 419, or where regulations completely deprive an owner of "all economically beneficial us[e]" of her property, *Lucas*, 505 U.S. at 1019, the *Consumers Union* court suggested that the application of *Loretto* is limited to a "direct physical invasion" of property. *See Consumers Union,* 5 N.Y.3d at 359. Moreover, because the three inquiries reflected in *Loretto*, *Lucas*, and *Penn Central* all aim to identify regulatory actions that are functionally equivalent to a direct appropriation of or ouster from private property, each of them focuses upon the severity of the burden that government imposes upon property rights. *See Lingle*, 544 U.S. at 530. A New York court would be unlikely to find a compensable taking without an inquiry into the nature of any Impairment Action, balanced against investment-backed expectations of Bondholders.

Bondholders would have a strong argument that distinct, investment-backed obligations were formed by the Statute, which contains the New York State Pledge providing that the State will not in any way take or permit any action that limits, alters or impairs the value of the Restructuring Property or, except as required by the adjustment mechanism described in Financing Order No. 5, reduce, alter or impair Charges until all principal, interest and redemption premium, if any, in respect of the Bonds, all Ongoing Financing Costs and all amounts to be paid to an assignee or financing party under an ancillary agreement are paid or performed in full. Among other factors which might be noted in support of such an argument, the New York State Pledge is included in the Bonds and in the Indenture as part of an express contract with the holders of the Bonds. The New York State Pledge is also described

in the Official Statement and the inclusion of the New York State Pledge in the Indenture and the Bonds is a condition to the obligation of the underwriters to purchase the Bonds under the Bond Purchase Agreement.

If the State enacts a law that imposes an Impairment Action without paying just compensation to the Bondholders, the Bondholders would likely argue that they would not have invested in the Bonds in the absence of the State's undertaking contained in the New York State Pledge and, therefore, that the New York State Pledge created distinct, investment-backed expectations. *See Consumers' Union*, 5 N.Y.3d at 327.

To determine whether a compensable taking had occurred, a reviewing court would consider applying principles developed in the land use context to an analysis of the rights of the Bondholders. Those principles would require an analysis of whether the State action denied the Bondholders all economically beneficial or productive use of the rights, such as preventing the use of the Rights to pay the Bonds. *See Consumers' Union*, 5 N.Y.3d at 327 (applying principles developed in *Lingle* and *Penn. Central*).

A court's response to a State Takings Clause challenge will be affected by the nature of the action taken to impair the Rights, which could include legislation that: (i) repeals or alters the New York State Pledge; (ii) prevents the imposition of the Charges; (iii) revises the regulatory basis for establishing the Charges in such a way that adversely impacts the collection of the Charges; (iv) diverts the Rights from payment of the Bonds to other public purposes; or (v) adversely affects the assets that generated the Charges.

Because the New York jurisprudence has suggested that an inquiry into Bondholders' investment-backed expectations is necessary for a takings determination, our opinion assumes that an Impairment Action, by its nature, would impact the economic interests of Bondholders with a magnitude sufficient to constitute an undue interference with Bondholders' economic interests and Bondholders' distinct, investment-backed expectations.

As discussed above in connection with the Federal Takings Clause, it seems that an Impairment Action that prevented the timely payment of principal and interest on the Bonds would interfere with the Bondholders' investment-backed expectations because timely payment of the Bonds is the primary expectation of the Bondholders. Additionally, as discussed above, the New York State Pledge itself gives rise to these reasonable investment-backed expectations on the part of the Bondholders. Therefore, for the reasons discussed above, we believe that it is reasonable for the Bondholders who have invested their funds in the Bonds to expect that the State Legislature will honor the New York State Pledge.[10]

However, New York courts have concluded that the just compensation which the State Constitution, Article I, Section 7(a), requires to be paid to the owner of property taken under the power of eminent domain cannot be reduced to inflexible formulas or inexorable rules. *See Saratoga Water Services, Inc. v. Saratoga County Water Authority*, 83 N.Y.2d 205, 608 N.Y.S.2d 952 (N.Y. 1994) referencing *Matter of City of New York (Fifth Ave. Coach Lines)*, 18 N.Y.2d 212, 218, 273 N.Y.S.2d 52 (N.Y. 1966). Although the Court of Appeals has stated that "just compensation puts the property owner in the same relative position it would have enjoyed had the taking not occurred," *520 East 81st Street Associates v. State*, 99 N.Y.2d 43, 750 N.Y.S.2d 833 (N.Y. 2002), there can be no assurance that any award of just compensation by a reviewing court would be sufficient to pay the full amount of principal of and interest on the Bonds.

Opinion as to State Takings Clause

Based on our review of relevant judicial authority, as discussed in this opinion, but subject to the qualifications, limitation and assumptions (including the assumption that any Impairment Action would be "substantial") set forth herein, it is our opinion that a reviewing court of competent jurisdiction applying New York law, in a properly prepared and presented case, would conclude that the State would be required to pay just compensation to the Bondholders if the State undertook an Impairment Action in contravention of the New York State

---

[10] Because many factors could have an impact on the market price of the Bonds, maintenance of the market price of the Bonds might be considered a unilateral expectation of the Bondholders, and not a reasonable, investment-backed expectation. *See U.S. Trust Co.*, 431 U.S. at 18. If so, an Impairment Action affecting only this "unilateral expectation" might not constitute a compensable taking.