Pledge after the Bonds are issued, but before they are fully paid, that (i) constituted a permanent appropriation of a substantial property interest of the holders of the Bonds in the Restructuring Property or denied all economically beneficial or productive use of the Restructuring Property; (ii) destroyed the Restructuring Property, other than in response to so-called emergency conditions; or (iii) substantially reduced, altered or impaired the value of the Restructuring Property so as to unduly interfere with the reasonable expectations of the holders arising from their investment in the Bonds.

There can be no assurance, however, that any award of compensation would be sufficient to pay the full amount of principal of and interest on the Bonds.

## THE FEDERAL CONTRACT CLAUSE

Discussion of the Federal Contract Clause

The Contract Clause of the United States Constitution, Article I, Section 10, provides that "no State shall … pass any … Law impairing the Obligation of Contracts" (the "Federal Contract Clause"). The Federal Contract Clause protects contractual obligations from impairment by enactment of state law. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978); *U.S. Trust Co. v. New Jersey*, 431 U.S. 1 (1977). The Federal Contract Clause is not, however, a complete bar to legislative enactments that have the effect or consequence of altering contractual obligations. "Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state [action]." *Allied Structural Steel*, 438 U.S. at 245 (footnotes omitted). If the state regulation constitutes a substantial impairment, to survive constitutional scrutiny it must be justified by a significant and legitimate public purpose. *Energy Reserve Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *U.S. Trust*, 431 U.S. at 22). Once a legitimate public purpose has been identified, the next inquiry is whether the measure is based "upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id*. at 412. In such inquiry, courts defer to the legislature's judgment as to the necessity and reasonableness of the measure. *U.S. Trust*, 431 U.S. at 23. Moreover, "[t]he State has the 'sovereign right … to protect the … general welfare of the people'" and the courts must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary." *El Paso v. Simmons*, 379 U.S. 497, 508-09 (1965) (citation omitted).

In order for the Federal Contract Clause to apply, the existence of a contractual relationship must be established. The courts have recognized the general presumption that, absent some clear indication that a legislature intends to bind itself contractually, "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) (quoting *Dodge v. Board of Educ.*, 302 U.S. 74, 79 (1937)). This presumption is based on the fact that the legislature's principal function is not to make contracts, but to make laws that establish the policy of the State. Thus, a person asserting the creation of a contract with the State must overcome this presumption.

Although not dispositive, the United States Supreme Court in *U.S. Trust* has concluded that a legislative pledge in a New Jersey statute that was similar to the New York State Pledge and the State Bankruptcy Pledge constituted a contractual obligation of the state:[11] "The intent to make a contract is clear from the statutory language. 'The 2 States covenant and agree with … the holders of any affected bonds …' 1962 N.J. Laws, c. 8, s 6." *U.S. Trust*, 431 U.S. at 18. The Court went on to state in that case that "[i]n return for their promise, the States received the benefit they bargained for: public marketability of Port Authority bonds to finance construction of the World Trade Center and acquisition of the Hudson & Manhattan Railroad. We therefore have no doubt that the 1962 covenant has been properly characterized as a contractual obligation of the two States." *Id*.[12]

---

[11] In *U.S. Trust*, the Supreme Court held that the legislative alteration of the rights and remedies of Port Authority bondholders violated the Federal Contract Clause because the legislation was neither necessary nor reasonable. 431 U.S. at 32.

[12] The Court did note, however, that "[t]he States remain free to exercise their power of eminent domain to abrogate such contractual rights, upon payment of just compensation." *U.S. Trust*, 431 U.S. at 29 n.27.

The "reserved powers" doctrine limits the ability of the State to bind itself contractually in a manner which "surrenders an essential attribute of its sovereignty." *U.S. Trust*, 431 U.S. at 23. Under this doctrine, if a contract limits a state's "reserved powers" - powers that cannot be contracted away - such contract is essentially unenforceable. *Id. See generally United States v. Winstar Corp.*, 518 U.S. 839, 888-90 (1996). Although the scope of these "reserved powers" has not been precisely defined by the courts, case law has established that a state cannot contract away its police powers, *Stone v. Mississippi*, 101 U.S. 814, 817-18 (1880), or its power of eminent domain, *West River Bridge Co. v. Dix.*, 47 U.S. 507, 532-33 (1848). In contrast, the United States Supreme Court has stated that a state's "power to enter into effective financial contracts cannot be questioned." *U.S. Trust*, 431 U.S. at 24.

Under existing case law, neither the New York State Pledge nor the State Bankruptcy Pledge, in our view, limit any "reserved powers" of the State. Neither the New York State Pledge nor the State Bankruptcy Pledge purports to contract away, or constitute a waiver of, the State's power of eminent domain or otherwise restrict the State's ability to legislate for the public welfare or to exercise its police powers. Both the New York State Pledge and the State Bankruptcy Pledge constitute undertakings made by the State not to impair the financial security for the Bonds and was made to gain the capital markets' acceptance of such instruments, which are expressly authorized and are being issued in connection with New York legislation expected to result in cost savings to LIPA's customers. The New York State Pledge, which the Statute explicitly authorizes to be included in the documentation with respect to the Bonds, as well as the State Bankruptcy Pledge, are inducements offered by the State to investors to purchase the Bonds. As such, we believe that the New York State Pledge and the State Bankruptcy Pledge are akin to the type of "financial contract" involved in *U.S. Trust*, which was deemed by the United States Supreme Court to be a promise that revenues and reserves securing the bonds at issue there would not be depleted beyond a certain level. *Id.* at 25. Therefore, upon issuance of the Bonds, it is our opinion that each of the New York State Pledge and the State Bankruptcy Pledge will give rise to a contractual obligation between the State and the Bondholders for purposes of the Contract Clause.

We also believe that the prohibitions applicable to the State under the Federal Contract Clause would apply to actions by the State acting through the PACB. The New York Legislature has delegated certain of its regulatory powers over the Authority and LIPA to the PACB; however, we do not believe that the State, acting indirectly through an agency such as the PACB, could take any action that would substantially limit, alter, impair or reduce the value or amount of the Restructuring Property or the rights of the Bondholders, or that would limit or alter the denial of authority to the Bond Issuer to be a debtor under chapter 9 of the United States Bankruptcy Code or any other provision of the United States Bankruptcy Code, that the State could not take directly without violating its pledge.

<u>Injunctive Relief</u>

In order for a federal court to issue a preliminary injunction, the court must conclude that a petitioner has clearly demonstrated each of the following: (1) that he or she is likely to succeed on the merits; (2) that he or she will suffer irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). While each of these requirements must be met for a preliminary injunction to be issued, in *Winter*, the Supreme Court emphasized the fourth requirement, stating: "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 376-77 (internal quotation marks and citation omitted).

Additionally, the Second Circuit Court of Appeals has developed an alternative standard in order to provide "flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010). Under this alternative standard, the party seeking relief must show "irreparable harm and… sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* The Second Circuit has stated that the burden under their standard is "no lighter" than under the *Winter* standard, but allows for preliminary injunctions when a court "cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.*

C-13

In a challenge to an Impairment Action or a Bankruptcy Authority Action in federal court, the court, in determining whether to grant a permanent injunction, would apply substantially similar factors as it would for a preliminary injunction. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531 (1987); *National City Bank of Indiana, et al., v. Charles W. Turnbaugh,* 367 F. Supp. 2d 805 (D. MD. 2005). However, unlike in connection with a preliminary injunction, where a plaintiff needs only to show a likelihood of a success on the merits, for a court to grant a permanent injunction, a plaintiff must succeed on the merits. *Amoco Production Co.*, 480 U.S. at 546 n.12 (1987).

Opinion as to Federal Contract Clause

While there is no case law which considers the application of the Federal Contract Clause specifically to the Statute, we have considered existing case law concerning the application of the Federal Contract Clause to legislation which reduces or eliminates taxes, public charges or other sources of revenues which support bonds issued by public instrumentalities or private issuers, or which otherwise reduces or eliminates the security for bonds. Based upon our review of relevant judicial authority, as discussed in this opinion, but subject to the qualifications, limitations and assumptions (including the assumption that any Impairment Action would be "substantial") set forth herein, it is our opinion that a reviewing court of competent jurisdiction, in a properly prepared and presented case:

(i)     would conclude that each of the New York State Pledge and the State Bankruptcy Pledge constitutes a contractual relationship between the Bondholders and the State;

(ii)     would conclude that, absent a demonstration that the Impairment Action or the Bankruptcy Action was necessary to further a significant and legitimate public purpose, the Bondholders (or the Indenture Trustee on their behalf) could successfully challenge under the Federal Contract Clause the constitutionality of (a) any Impairment Action determined by such court to substantially limit, alter, impair or reduce the value of the Restructuring Property or the Charges before the Bonds are fully paid and discharged and (b) any Bankruptcy Authority Action; and

(iii) should conclude that permanent injunctive relief is available under federal law to prevent implementation of (a) any Impairment Action determined by such court to limit, alter, impair or reduce the value of the Restructuring Property or the Charges or (b) any Bankruptcy Authority Action, in each case in violation of the Federal Contract Clause; and although sound and substantial arguments support the granting of preliminary injunctive relief, the decision to do so will be in the discretion of the court requested to take such action, which will be exercised on the basis of the considerations discussed herein.

**THE STATE DUE PROCESS CLAUSE**

Discussion of State Due Process Clause

Article I, Section 6 of the State Constitution provides that: "No person shall be deprived of life, liberty or property without due process of law."

Certain contract rights have been held to be protected by the State Due Process Clause.  In *Patterson*, the Court of Appeals applied the State Due Process Clause to uphold bondholders' property rights when the State Legislature rescinded an increase in tolls charged motorists by the Jones Beach State Parkway Authority and provided that future increases could not be imposed unless the Parkway Authority complied with a new four stage review process. According to the *Patterson* court, "the statute deprive[d] the bondholders of property without due process of law in violation of the State Constitution." *Id*. at 719-720.

"Quite apart from any question presented by the Federal impairment clause, the State may not deprive a party to a contract of an essential contractual attribute without due process of law. 'Depriving an owner of property of one of its essential attributes, is depriving him of his property within the constitutional provision' and absent due process, works an impermissible 'forfeiture of the right given by the contract.'" *Patterson,*  41 N.Y.2d at 720 (*citing People ex rel. Manhattan Sav. Inst. of City of N.Y. v. Otis*, 90 N.Y. 48, 52). In *People ex rel. Manhattan Savings Institution,* the legislation at issue attempted to invalidate claims against a bond issuer upon lost bearer bonds by anyone but the recipient of a duplicate bond even though good faith holders in due course presented the negotiable bonds for payment.

C-14

Such possessors of lost bonds were remitted to suing the recipients of the duplicate.  This legislative scheme was invalidated as a deprivation of an essential attribute of the bondholder's rights:

> "a legislative declaration that upon the publication of notice, a negotiable security shall no longer be transferable, is not due process of law, working a forfeiture of the right given by the contract."

*People ex rel. Manhattan Sav. Inst. of City of N.Y.*, 90 N.Y. at 52.

*Patterson* protected the contractual commitment of the Parkway Authority to raise and collect sufficient tolls to punctually pay and redeem the Parkway Authority's bonds.  Because the tolls in *Patterson* were "the sole source of funds for bond repayment," the Court explained that "any limitation on the authority's power to collect a toll sufficient to pay the bonds deprives the bondholders of an essential attribute of their contract with the authority and with the State and jeopardizes their investment." *Patterson,* 41 N.Y.2d at 720.

In addition to the affirmative promise of the Parkway Authority to raise and collect sufficient tolls to pay bondholders, the State had itself pledged "not to limit or alter the rights vested in the authority to the detriment of bondholders." *Id.* at 717. The *Patterson* court stated that "[w]here a statute is challenged on non-procedural grounds as violative of due process, the test is whether there is 'some fair, just and reasonable connection' between the statute and 'the promotion of the health, comfort, safety and welfare of society." *Id.* at 720-21.  Finding that there was no fair, just or reasonable connection between the statutory procedure for increasing tolls and the goal of curtailing traffic congestion, the Court ruled: "the statute is arbitrary and deprives bondholders of a contractual right without due process of law." *Patterson,* 41 N.Y.2d at 721.

The Bondholders would have a very strong argument based on *Patterson* and the plain meaning of the Statute that the New York State Pledge is "property" warranting the protections afforded by the State Due Process Clause.

As was the case in *Patterson*, the source of payment of the Bonds is limited to revenues derived from the rights protected by the State pledge  set forth in the Statute. The New York State Pledge is very similar to the State pledge at issue in *Patterson*. Indeed, it more clearly and directly expresses the intention to protect the source of payment of the Bonds than the language of the State pledge relating to the Parkway Authority bonds, which was somewhat more generally stated presumably to reflect the nature of the Parkway Authority as an operating entity.  In addition, the fact that the New York State Pledge expressly protects the Restructuring Property, which by the terms of the Statute is "property," also lends substantial support to the argument that the New York State Pledge itself is property for purposes of the State Due Process Clause.

### Opinion as to State Due Process Clause

Based upon our review of relevant judicial authority, including as discussed in this opinion, but subject to the qualifications, limitation and assumptions set forth herein, it is our opinion that, after the Bonds are issued, but before they are fully paid, a reviewing court of competent jurisdiction applying New York law, in a properly prepared and presented case, would conclude that (i) the New York State Pledge creates rights that constitute property within the meaning of the State Due Process Clause, and (ii) an Impairment Action by the State would violate the State Due Process Clause, absent any overriding fair, just and reasonable connection of the Impairment Action to the promotion of the health, comfort, safety and welfare of society.

## INJUNCTIVE RELIEF UNDER STATE LAW

### Discussion of Injunctive Relief Under State Law

The availability of preliminary injunctive relief under New York law is governed by Article 63 of the Civil Practice Law and Rules ("CPLR") and the traditional principles of equity to be applied thereby.  CPLR Section 6301, entitled "Grounds for preliminary injunction and temporary restraining order," authorizes such a remedy to maintain the *status quo* "in any action where it appears that the defendant threatens or is about to do . . . an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual" or "where the

C-15

plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which if committed or continued during the pendency of the action, would produce injury to the plaintiff." N.Y. C.P.L.R. §6301. In each case, a showing is required "that immediate and irreparable injury, loss or damage will result unless the defendant is restrained." *Id.*

Judicial "discretion" permeates all aspects of the inquiry as to whether the application for temporary relief will be granted. "Perhaps the most instructive point about the preliminary injunction is that its granting is discretionary with the court." DAVID D. SIEGEL, NEW YORK PRACTICE § 328 (5th ed. 2015) (citing *Sartwell v. Field*, 68 N.Y. 341 (N.Y.1877)).

> "Under longstanding judicial precedent, the movant in most cases must . . . demonstrate three things: (1) a likelihood of success on the merits of the action; (2) the danger of irreparable injury in the absence of preliminary injunctive relief; and (3) a balance of equities in favor of the moving party. See, e.g. *Nobu Next Door, LLC v. Fine Arts Housing, Inc*., 2005, 4 N.Y. 3d 839, 840, 800 N.Y.S. 2d 48, 49. In applying these requirements, the court must 'weigh a variety of factors', and the matter is committed to the court's sound discretion. *Doe v. Axelrod*, 1988, 73 N.Y. 2d 748, 750, 536 N.Y.S. 2d 44,45 53." V. ALEXANDER, MCKINNEY'S PRACTICE COMMENTARIES, C6301:1, p.12 (2010).

Because the application of the standards for the issuance of a preliminary injunction are committed to the sound discretion of the courts, the prediction of how and when such discretion will in fact be exercised must necessarily be highly dependent upon the exact threatened impact upon bondholder security. We note that the lower court in *Patterson* granted a preliminary injunction, as to which no appeal was taken, against enforcement of the legislation involved in that case without any showing of a possible future payment default. *See Patterson*, 41 N.Y.2d 714.

#### Opinion as to Injunctive Relief Under State Law

Based upon our review of relevant judicial authority, including as discussed in this opinion, but subject to the qualifications, limitation and assumptions set forth herein, it is our opinion that, after the Bonds are issued, but before they are fully paid, a reviewing court of competent jurisdiction applying New York law, in a properly prepared and presented case, should conclude that preliminary injunctive relief is available to maintain the *status quo* pending trial, and that, following the trial, assuming the court determined that the Impairment Action was violative of the State Due Process Clause, permanent injunctive relief should be awarded to protect the New York State Pledge from the Impairment Action absent any overriding health, comfort, safety and welfare of society justification.

## SEVERABILITY OF PROVISIONS OF STATUTE

The Statute provides that the provisions thereof are intended to be severable. In accordance with Section 14 of the Statute, if any section, subdivision, paragraph or subparagraph of the Statute or the application thereof to any person, circumstance or transaction is held by a court of competent jurisdiction to be unconstitutional or invalid, the unconstitutionality or invalidity shall not affect the constitutionality or validity of any other section, subdivision, paragraph or subparagraph of the Statute or its application or validity to any person, circumstance or transaction, including, without limitation, the irrevocability of a restructuring cost financing order issued pursuant to the Statute, the validity of the issuance of restructuring bonds, the imposition of transition charges, the transfer or assignment of restructuring property or the collection and recovery of revenues from transition charges (as such terms are defined in the Statute). Furthermore, in accordance with Section 12 of the Statute, effective on the date the Bonds are issued, if any provision of the Statute is held to be invalid or is invalidated, superseded, replaced, repealed or expires for any reason, that occurrence shall not affect any action allowed under the Statute that is taken by the Authority, LIPA, the Bond Issuer or any owner of T&D system assets, an assignee, a collection agent, a financing party, a holder of restructuring bonds or a party to an ancillary agreement (as such terms are defined in the Statute) and any such action shall remain in full force and effect.

## VOTER REFERENDA OR INITIATIVE

Under Article III, Section 1 of the State Constitution, the legislative power of the State is vested in the State senate and assembly. Under the existing State Constitution and under existing statutes and court decisions, there is no provision for a voter initiative or referendum for the purpose of amending or repealing the Statute.

\*    \*    \*    \*

We note that judicial analysis of issues relating to the Federal Takings Clause, the State Takings Clause and the retroactive effect to be given to judicial decisions has typically proceeded on a case-by-case basis and that a court's determination, in most instances, is strongly influenced by the facts and circumstances of the particular case, many of which cannot be known at this time.  We further note that there are no reported controlling judicial precedents of which we are aware directly on point.  Our analysis is necessarily a reasoned application of judicial decisions involving similar or analogous circumstances.  Moreover, the application of equitable principles (including the availability of injunctive relief or the issuance of a stay pending appeal) is subject to the discretion of the court which is asked to apply them.  We cannot predict the facts and circumstances which will be present in the future and may be relevant to the exercise of such discretion.  Consequently, there can be no assurance that a court will follow our reasoning or reach the conclusions which we believe current judicial precedent supports.  None of the foregoing opinions is intended to be a guaranty as to what a particular court would actually hold; rather, each such opinion is only an expression as to the decision a court ought to reach if the issue were properly prepared and presented to it and the court followed what we believe to be the applicable legal principles under existing judicial precedent.  The recipients of this letter should take these considerations into account in analyzing the risks associated with the Transaction.

The opinions set forth above are given as of the date hereof and we disavow any undertakings or obligations to advise you of any changes in the law (whether constitutional, statutory, regulatory or judicial) which may hereafter occur or any facts or circumstances that may hereafter occur or come to our attention that could affect such opinions.

This opinion is solely for your benefit in connection with the Transaction and may not be relied upon, used or circulated by, quoted, or otherwise referred to by, nor may copies hereof be delivered to, any other person without our prior written approval, except that a copy of this opinion may be included in any transcript of proceedings and documents relating to the Bonds.

No attorney-client relationship has existed between you and our firm in connection with the foregoing matters, and no relationship shall exist by virtue of this letter.

Very truly yours,

Schedule I

Standard & Poor's Ratings Group
55 Water Street
New York, New York  10041

Moody's Investors Services, Inc.
7 World Trade Center
250 Greenwich Street
New York, New York  10007

Fitch Ratings, Inc.
33 Whitehall Street
New York, New York  10004

RBC Capital Markets LLC,
  as Representative of the Underwriters
200 Vesey Street
9th Floor
New York, New York  10281

## APPENDIX D

### PROPOSED FORM OF OPINION OF BOND COUNSEL
### RELATING TO REGULATORY MATTERS

**[LETTERHEAD OF HAWKINS DELAFIELD & WOOD LLP]**

November __, 2017

To Each Person Listed on
the Attached Schedule I

Re:  Opinion Regarding Regulatory Matters

Ladies and Gentlemen:

We have acted as Bond Counsel to Long Island Power Authority, a corporate municipal instrumentality, body corporate and politic and a political subdivision of the State of New York (the "Authority") and the Utility Debt Securitization Authority, a special purpose corporate municipal instrumentality, body corporate and politic, political subdivision and public benefit corporation of the State of New York (the "Bond Issuer"), in connection with, among other things, the transfer and sale by the Authority of all of its right, title and interest in, to and under certain restructuring property to the Bond Issuer, as more fully described below, the issuance by the Bond Issuer of the Bonds referred to below and the other related transactions referred to and described below.

Pursuant to Part B of Chapter 173 of the State of New York Laws of 2013 (the "Original Statute"), as amended by Chapter 58 of the Laws of New York, 2015 (the "Amendment") (the Original Statute as amended by the Amendment is hereinafter referred to as the "Statute"), the Authority is authorized to adopt restructuring cost financing orders with respect to the creation of restructuring property (as defined in the Statute) in connection with the issuance of restructuring bonds (as defined in the Statute) by the Bond Issuer pursuant to such restructuring cost financing orders.  In connection with the issuance of the Bonds by the Bond Issuer on the date hereof, the Authority adopted Restructuring Cost Financing Order No. 5 on July 26, 2017 ("Financing Order No. 5") that, among other things, authorized the creation and sale of restructuring property (the restructuring property created pursuant to Financing Order No. 5 hereinafter referred to as the "Restructuring Property") which includes the irrevocable right to impose, bill, collect and receive certain nonbypassable transition charges (as adjusted from time to time pursuant to Financing Order No. 5, the "Charges") from all individuals and legally-recognized entities taking electric delivery service in the geographical area within which Long Island Lighting Company, a New York corporation now a subsidiary of the Authority doing business under the name LIPA ("LIPA") provided electric transmission and distribution service as of July 29, 2013 (such customers, the "Customers," and such geographic area, the "Service Area"). The Bonds will be secured by a statutory lien and a security interest in the Restructuring Property, together with certain other property of the Bond Issuer.

The Bond Issuer was created pursuant to section 4 of the Statute on July 29, 2013.

## THE TRANSACTION

On the date hereof, the Authority is selling the Restructuring Property to the Bond Issuer under the Restructuring Property Purchase and Sale Agreement dated as of November __, 2017 between the Authority and the Bond Issuer (the "Sale Agreement") for an amount in cash (the "Net Proceeds"). Under the Restructuring Property Servicing Agreement dated as of November __, 2017 between LIPA, in its capacity as Servicer, and the Bond Issuer (the "Servicing Agreement"), LIPA has agreed to service the Restructuring Property. Under the Administration Agreement dated as of November __, 2017 between LIPA, as Administrator (the "Administrator"), and the Bond Issuer, LIPA has agreed to perform certain administrative services on behalf of the Bond Issuer (the "Administration Agreement").

On the date hereof, the Bond Issuer is issuing its Restructuring Bonds, Series 2017 (the "Bonds"), under the Bond Indenture dated as of November __, 2017 (the "Indenture") between the Bond Issuer and The Bank of New York Mellon, as Bond Trustee (the "Bond Trustee").

Pursuant to the Bond Purchase Agreement dated October 25, 2017 (the "Bond Purchase Agreement") between the Bond Issuer and RBC Capital Markets, LLC, as representative of the several initial purchasers named therein (the "Initial Purchasers"), such Initial Purchasers have agreed severally to purchase the Bonds from the Bond Issuer.

As used herein, the term "Transaction Documents" means, collectively, the Sale Agreement, the Servicing Agreement, the Administration Agreement, the Bonds, the Indenture and the Bond Purchase Agreement, and "Transaction" means the transactions contemplated by the Transaction Documents. Capitalized terms used herein that are not otherwise defined shall have the meanings assigned to them in the Indenture.

## FACTS AND ASSUMPTIONS

In connection with rendering the opinions set forth below, we have examined and, as to various factual matters, relied upon originals or copies, certified or otherwise identified to our satisfaction, of the following:

i.       the by-laws of the Bond Issuer;

ii.      the Transaction Documents;

iii.     a certified copy of certain resolutions of the Board of Trustees of the Authority, dated July 26, 2017;

iv.      the Issuance Advice Letter dated October __, 2017, filed with the Authority by the Servicer and confirmed and approved by an Authority Designee.

v.       the Statute; and

vi.      Financing Order No. 5.

We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such records of the Bond Issuer, LIPA and the Authority, agreements, certificates of public officials, certificates of officers or other representatives of the Bond Issuer, LIPA and the Authority and others, and such other documents, certificates and records as we have deemed necessary or appropriate as a basis for the opinions set forth herein. We have made no independent investigation of the facts referred to herein, and with respect to such facts, we have relied, for the purpose of rendering this opinion and, except to the extent such statement constitutes a statement of a legal conclusion expressed in this opinion or as otherwise stated herein, exclusively on the factual statements contained and matters provided for in all of the closing documents delivered in connection with the closing of the Transaction, the documents referenced above, including the factual representations, warranties and covenants contained therein as made by the respective parties thereto. In our examination, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original

documents of all documents submitted to us as certified or photostatic copies, and the authenticity of the originals of such latter documents.

As used herein, the phrase "to our knowledge" with respect to the existence or absence of facts is intended to signify that, while we have made no specific inquiry or other independent examination to determine the existence or absence of such facts, the attorneys in this firm who were actively involved in the Transaction have obtained no actual knowledge to the contrary regarding such facts.

Our opinions herein with respect to the Statute are limited to the Statute as in effect on the date hereof. We express no opinion herein as to the laws of any jurisdiction other than the laws of the State.

For purposes of the opinion expressed in the first sentence of Paragraph No. 2, we have relied solely on our review of the Statute, as set forth in Part B of Chapter 173, State of New York Laws, 2013, as amended.

## OPINIONS

Based on the foregoing facts and assumptions being correct and continuing to be correct at all relevant times, and subject to the qualifications, limitations and assumptions set forth herein and while courts may differ and no cases interpreting the transfer of the Restructuring Property under the Statute have been decided, it is our opinion that a reviewing court, in a properly prepared and presented case, relying on the facts on which we have relied and giving them the proper weight and authority, properly applying the Statute to the Transaction would conclude that:

1.      Financing Order No. 5 was duly authorized and issued by the Authority in accordance with all applicable State laws, rules and regulations (including the Statute); Financing Order No. 5 and the process by which it was issued comply with all applicable State laws, rules and regulations, including the Statute; and Financing Order No. 5 is in full force and effect and is final and nonappealable.

2.      The Original Statute and the Amendment have each been duly enacted by the Legislature of the State in accordance with all applicable State laws, and other than the Amendment, the Statute has not been amended, repealed or rescinded and is in full force and effect. To our knowledge, the validity of the Statute is not the subject of any pending litigation or appeal.

3.      Financing Order No. 5, among other things, (i) authorizes and approves the issuance of the Bonds, (ii) authorizes the creation and sale of the Restructuring Property to the Bond Issuer, (iii) authorizes the owner of the Restructuring Property to impose, bill and collect the Charges, (iv) authorizes the Bond Issuer to pledge the Restructuring Property as security for the repayment of the Bonds, (v) authorizes LIPA to serve as initial Servicer for the Issuer, and (vi) authorizes periodic adjustments of the Charges, and the paragraphs of Financing Order No. 5 authorizing the foregoing are irrevocable.

4.      The Restructuring Property may be transferred, sold, conveyed or assigned to the Bond Issuer, and includes the rights and interests under Financing Order No. 5 described in Ordering Paragraph 11 of Financing Order No. 5.

5.      Section 9 of the Statute includes an explicit pledge binding on the State (the "State Pledge") that the State will not take or permit any action that impairs the value of the Restructuring Property, or, except for periodic adjustments required to be made pursuant to the adjustment mechanism specified in Financing Order No. 5, reduces, alters, or impairs the Charges until the principal, interest and premium, if any, and any other Ongoing Financing Costs (as defined in Financing Order No. 5) have been paid in full. The State Pledge is applicable to the Transaction.

6.      The Bonds are "restructuring bonds" within the meaning of the Statute and the Bonds are entitled to the protections provided under the Statute and Financing Order No. 5, and the Bond Trustee on behalf of the holders of the Bonds shall be, to the extent permitted by State of New York and federal law and the Indenture, entitled to enforce the protections of the Statute and Financing Order No. 5.

7.    The Restructuring Property sold to the Bond Issuer pursuant to the Sale Agreement, including the irrevocable right to impose, collect and receive Charges and the revenues and collections from the Charges, is "restructuring property" within the meaning of the Statute.

8.    The Bond Issuer has acquired the Authority's rights with respect to the Restructuring Property.

9.    The transaction involving the sale of the Restructuring Property constitutes a true sale thereof other than for federal, state and local income and franchise tax purposes.

10.    The Transaction, as contemplated by the Transaction Documents, conforms to Financing Order No. 5 in all material respects.

11.    As provided in sections 7.1(f) and 8.2(b) of the Statute, any successor owner of the T&D System Assets and any successor Servicer shall be bound by the requirements of the Statute and shall perform and satisfy all obligations of a Servicer in the same manner and to the same extent under Financing Order No. 5 as did LIPA, as the initial Servicer, including, without limitation, the obligation to impose, bill and collect the Charges and to pay such collections to the person entitled to receive the Charge revenues. As provided in sections 8 and 15 of the Statute, Financing Order No. 5 is also binding on any other entity responsible for billing and collecting Charges on behalf of the Bond Issuer and any successor regulator to the Authority.

12.    Pursuant to Ordering Paragraph 12 of Financing Order No. 5 and Annex 1 to the Servicing Agreement, the Servicer is authorized to file True-Up Adjustments to the Charges to the extent necessary to ensure the timely recovery of revenues sufficient to provide for the payment of all principal of and interest on the Bonds and all other approved Financing Costs (as defined in Financing Order No. 5).

### QUALIFICATIONS

Our opinions are limited to the specific issues addressed and are limited in all respects to laws and facts existing on the date of this letter. The opinions expressed above do not constitute a guarantee of the outcome of any particular litigation, and there can be no assurance that action will not be taken in federal or state court challenging the constitutionality of the provisions of the Statute relating to the Bonds. Moreover, there can be no assurance that there will be no action by the State which might constitute a violation of the State Pledge. Furthermore, given the lack of judicial precedent directly on point, and the novelty of the Transaction, the outcome of any litigation cannot be predicted with any degree of certainty. In the event of any claim or state action which adversely impacts the rights of the Bondholders, costly and time-consuming litigation might ensue, adversely affecting, at least temporarily, the price and liquidity of the Bonds.

The foregoing opinions are expressly subject to there being no material change in the law, and there being no additional facts which would materially affect the assumptions set forth herein. The opinions set forth above are given as of the date hereof and we disavow any undertakings or obligations to advise you of any changes in the law (whether constitutional, statutory, regulatory or judicial) which may hereafter occur or any facts or circumstances that may hereafter occur or come to our attention that could affect such opinions.

This opinion is solely for your benefit in connection with the Transaction and may not be relied upon, used or circulated by, quoted, or otherwise referred to by, nor may copies hereof be delivered to, any other person without our prior written approval, except that a copy of this opinion may be included in any transcript of documents and proceedings relating to the Bonds.

Very truly yours,

Schedule I

Standard & Poor's Ratings Group
55 Water Street
New York, New York  10041

Moody's Investors Services, Inc.
7 World Trade Center
250 Greenwich Street
New York, New York  10007

Fitch Ratings, Inc.
33 Whitehall Street
New York, New York  10004

RBC Capital Markets LLC,
 as Representative of the Underwriters
200 Vesey Street, 9th Floor
New York, New York  10281

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX E

### FORM OF THE CONTINUING DISCLOSURE AGREEMENT

This Continuing Disclosure Agreement, dated as of November ___, 2017 (the "Continuing Disclosure Agreement"), is made by the Utility Debt Securitization Authority (the "Issuer") and Long Island Lighting Company, d/b/a LIPA, in its capacity as Servicer (the "Servicer"), pursuant to the Servicing Agreement, dated November ____, 2017 (the "Servicing Agreement"), between the Issuer and the Servicer, and is being delivered in connection with the issuance and sale by the Issuer of its $369,465,000 2017 Restructuring Bonds (the "2017 Restructuring Bonds") pursuant to the terms of that certain Bond Indenture, dated as of November ___, 2017, between the Issuer and The Bank of New York Mellon, as Bond Trustee (as the same may be amended and supplemented from time to time, the "Indenture"), between the Issuer and the Trustee. Capitalized terms used but not defined herein shall have the meanings given such terms in the Indenture.

Article I.        Definitions

(a)  "Annual Accountant's Report" has the meaning given such term in Section 3.07(a) of the Servicing Agreement.

(b)  "Annual Financial Information" means the Annual Accountant's Report and the Annual Servicer Information.

(c)  "Annual Servicer Information" means the Semi-Annual Servicer Certificates and the tabular information presented in the Official Statement under the headings "Servicer and Administrator – Credit Policy," "– Billing Process," "– Revenues," "– LIPA's Customer Base and Electric Energy Consumption," "– Forecasting Electricity Consumption," "– Loss Experience," "– Days Sales Outstanding" and "– Write-Off and Delinquencies Experience."

(d)  "Counsel" means Hawkins Delafield & Wood LLP or other nationally recognized bond counsel or counsel expert in federal securities laws, in each case acceptable to the Issuer and the Servicer.

(e)  "Compliance Certificate" shall mean the annual certificate as to compliance delivered pursuant to Section 3.06 of the Servicing Agreement.

(f)  "EMMA" means the MSRB's Electronic Municipal Market Access system or its successor.

(g)  "MSRB" means the Municipal Securities Rulemaking Board established pursuant to the provisions of Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended, or any successor thereto or to the functions of the MSRB contemplated by this Continuing Disclosure Agreement.

(h)  "Notice Event" means any of the following events with respect to the 2017 Restructuring Bonds:

   (i)    principal and interest payment delinquencies;

   (ii)   non-payment related defaults, if material;

   (iii)  unscheduled draws on debt service reserves reflecting financial difficulties;

   (iv)   unscheduled draws on credit enhancements reflecting financial difficulties;

   (v)    substitution of credit or liquidity providers, or their failure to perform;

   (vi)   adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the 2017 Restructuring Bonds, or other material events affecting the tax status of the 2017 Restructuring Bonds;

   (vii)  modifications to rights of Bondholders, if material;

   (viii) bond calls, other than bond calls relating to mandatory sinking fund redemptions, if material, and tender offers;

   (ix)   defeasances;

   (x)    release, substitution, or sale of property securing repayment of the 2017 Restructuring Bonds, if material;

E-1

(xi)     rating changes;

(xii)    bankruptcy, insolvency, receivership or similar event of the Issuer[1];

(xiii)   the consummation of a merger, consolidation, or acquisition involving the Issuer or the sale of all or substantially all of the assets of the Issuer, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

(xiv)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

(i)     "Notice Event Notice" means written or electronic notice of a Notice Event.

(j)     "Official Statement" means the Official Statement, dated October 25, 2017, relating to the 2017 Restructuring Bonds.

(k)     "Reports to Holders" means the reports provided to Holders by the Bond Trustee pursuant to Section 6.06(b) of the Indenture.

(l)     "Rule" means Rule 15c2 12 promulgated by the SEC under the Securities Exchange Act of 1934, as amended (17 CFR Part 240, §240.15c2 12), as in effect on the effective date hereof, including any official interpretations thereof.

(m)     "SEC" means the United States Securities and Exchange Commission.

(n)     "Semi-Annual Servicer Certificates" has the meaning given such term in Section 3 of Annex I to the Servicing Agreement.

(o)     "State" means the State of New York.

Article II.     The Undertaking

Section 2.01     Purpose.  This Continuing Disclosure Agreement is being executed, delivered and made solely to assist the underwriters of the 2017 Restructuring Bonds in complying with subsection (b)(5) of the Rule.

Section 2.02     Undertaking.  In accordance with Section 7.12 of the Servicing Agreement, the Servicer shall, as designated agent of the Issuer, for the sole benefit of the Bondholders (and, to the extent specified in this Article II, the beneficial owners) of the Outstanding Bonds, provide, in a timely manner, to the MSRB, through EMMA, in the format and including such identifying information as shall be prescribed by the MSRB:

(a)     not later than 180 days following the end of each fiscal year of the Issuer (x) an annual report of the Issuer, including, to the extent available, the Annual Accountant's Report and Compliance Certificate and (y) the Annual Servicer Information;

(b)     not later than 30 days after the applicable Payment Date, the Report to Holders; and

(c)     if a Notice Event occurs, in a timely manner not in excess of ten (10) business days after the occurrence of such Notice Event, a Notice Event Notice to the MSRB.

Section 2.03     Annual Accountant's Report.  If, and to the extent prepared, the contents, presentation and format of the Annual Accountant's Report may thereafter be modified from time to time as determined in the judgment of the Issuer to conform to changes to the Rule to disclosure principles or practices and legal requirements followed by or applicable to the Issuer, provided that such modification shall comply with the requirements of the Rule.  The annual financial statements of the Issuer for each fiscal year shall be prepared in accordance with generally accepted accounting principles in effect from time to time or mandated State statutory principles.

---

[1] Note to clause (xii):  For the purposes of the event identified in clause (xii) above, the event is considered to occur when any of the following occur:  the appointment of a receiver, fiscal agent or similar officer for the Issuer in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or government authority has assumed jurisdiction over substantially all of the assets or business of the Issuer, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Issuer.  As provided in the Securitization Law, the Issuer is not authorized to file for bankruptcy under Chapter 9 of the U.S. Bankruptcy Code.

Section 2.04    Limitations on Liability.  The Servicer does not undertake to provide such notice with respect to: (x) credit enhancement if the enhancement is added after the primary offering of the 2017 Restructuring Bonds, the Issuer does not apply for or participate in obtaining the enhancement, and the enhancement is not described in the applicable official statement of the Issuer; or (y) tax exemption other than pursuant to the Act or the Securitization Law.

Section 2.05    Remedies.

(a)     In addition to the Trustee's and Holders' remedies specified in the Basic Documents, any beneficial owner of the 2017 Restructuring Bonds described in this Section may bring a Proceeding to enforce this Continuing Disclosure Agreement without acting in concert if (1) such owner shall have filed with the Servicer evidence of beneficial ownership and written notice of, and request to cure, the alleged breach, (2) the Servicer shall have failed to comply within a reasonable time, and (3) such beneficial owner stipulates that (A) no challenge is made to the adequacy of any information provided in accordance with this Continuing Disclosure Agreement and (B) no remedy is sought other than substantial performance of this Continuing Disclosure Agreement.  To the extent permitted by law, each beneficial owner agrees that all such proceedings shall be instituted only as specified herein, and for the equal benefit of all such owners of the Outstanding Bonds benefited by the same or a substantially similar undertaking.

(b)     For the purposes of this Section, a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such security, except that a person who in the ordinary course of business is a pledgee of securities under a written pledge agreement shall not be deemed to be the beneficial owner of such pledged securities until the pledgee has taken all formal steps to declare a default and determines that the power to dispose or to direct the disposition of such pledged securities will be exercised, provided that:

(i)     the pledge agreement is bona fide;

(ii)    the pledgee is:

1)     a broker or dealer registered under § 15 of the Exchange Act;

2)     a bank as defined in § 3(a)(6) of the Exchange Act;

3)     an insurance company as defined in § 3(a)(19) of the Exchange Act;

4)     an investment company registered under § 8 of the Investment Company Act;

5)     an investment adviser registered under § 203 of the Investment Advisers Act of 1940;

6)     an employee benefit plan, or pension fund which is subject to the provisions of ERISA or an endowment fund;

7)     a parent holding company, provided the aggregate amount held directly by the parent, and directly and indirectly by its subsidiaries which are not persons specified in items (1) through (6) of this clause (ii) does not exceed 1% of the securities of the subject class;

8)     a group, provided that all the members are persons specified in items (1) through (7) of this clause (ii); and

(iii)   the pledge agreement, prior to default, does not grant to the pledgee the power to dispose or direct the disposition of the pledged securities, other than the grant of such power(s) pursuant to a pledge agreement under which credit is extended subject to Regulation T (12 CFR 220.1 to 220.8) and in which the pledgee is a broker or dealer registered under § 15 of the Exchange Act.

(c)     Any amendment of this Continuing Disclosure Agreement may only be entered into:

    (i)     if all or any part of the Rule, as interpreted by the staff of the SEC at the date hereof, ceases to be in effect for any reason and the Issuer and the Servicer elect that this Continuing Disclosure Agreement shall be deemed terminated or amended (as the case may be) accordingly, or

    (ii)    if:

        1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Issuer and the Servicer, as the case may be, or type of business conducted,

        2)     this Continuing Disclosure Agreement, as amended, would have complied with the requirements of the Rule at the date hereof, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and

        3)     the amendment does not materially impair the interests of the Holders of each affected Tranche of 2017 Restructuring Bonds, as determined by parties unaffiliated with the Issuer and the Servicer (such as, but without limitation, counsel to the Issuer and the Servicer) or by Holder consent pursuant to the Basic Documents.

Section 2.06    Additional Information.  Nothing in this Continuing Disclosure Agreement shall be deemed to prevent the Issuer or the Servicer from disseminating any other information, using the means of dissemination set forth in this Continuing Disclosure Agreement or any other means of communication, or including any other information in any Annual Financial Information or Notice Event Notice, in addition to that which is required by this Continuing Disclosure Agreement.  If the Issuer or the Servicer choose to include any information in any Annual Financial Information or Notice Event Notice in addition to that which is specifically required by this Continuing Disclosure Agreement, the Issuer and the Servicer shall have no obligation under this Continuing Disclosure Agreement to update such additional information or include it in any future Annual Financial Information or Notice Event Notice.

Article III.     Operating Rules

Section 3.01    Reference to Other Documents.  It shall be sufficient for purposes of Section 2.02 hereof if the Servicer provides Annual Financial Information by specific reference to documents (i) available to the public on the MSRB Internet Web site (currently, www.emma.msrb.org) or (ii) filed with the SEC.  The provisions of this Section shall not apply to Notice Event Notices pursuant to Section 2.02(iv) hereof.

Section 3.02    Submission of Information.  Annual Financial Information may be set forth or provided in one document or a set of documents, and at one time or in part from time to time.

Section 3.03    Dissemination Agents.  The Servicer may from time to time designate an agent to act on its behalf in providing or filing notices, documents and information as required of the Servicer under this Continuing Disclosure Agreement, and revoke or modify any such designation.

Section 3.04    Transmission of Notices, Documents and Information.

(a)     Unless otherwise required by the MSRB, all notices, documents and information provided to the MSRB shall be provided to EMMA, the current Internet Web address of which is www.emma.msrb.org.

(b)     All notices, documents and information provided to the MSRB shall be provided in an electronic format as prescribed by the MSRB (currently, portable document format (pdf) which must be word searchable except for non-textual elements) and shall be accompanied by identifying information as prescribed by the MSRB.

E-4

Article IV.     Effective Date, Successor Servicer, Termination and Execution

Section 4.01     Effective Date.  This Continuing Disclosure Agreement and the provisions hereof shall be effective upon the issuance of the 2017 Restructuring Bonds.

Section 4.02     Successors Servicer.  As provided in Sections 6.04(b) and 7.12 of the Servicing Agreement, the duties of LIPA under this Continuing Disclosure Agreement shall be performed by any Successor Servicer appointed under the terms of the Servicing Agreement.

Section 4.03     Termination.

(a)     The Servicer's obligations under this Continuing Disclosure Agreement shall terminate with respect to the 2017 Restructuring Bonds of a Tranche upon a Legal Defeasance pursuant to Section 4.01 of the Indenture, prior redemption or payment in full of such 2017 Restructuring Bonds of a Tranche.

(b)     This Continuing Disclosure Agreement, or any provision hereof, shall be null and void in the event that the Issuer and the Servicer (1) receives an Opinion of Counsel to the effect that those portions of the Rule which require this Continuing Disclosure Agreement, or such provisions, as the case may be, do not or no longer apply to the 2017 Restructuring Bonds, whether because such portions of the Rule are invalid, have been repealed, or otherwise, as shall be specified in such opinion, and (2) deliver copies of such opinion to the MSRB.

Section 4.04     Counterparts.  This Continuing Disclosure Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute but one and the same agreement.

[Signature Page to Continuing Disclosure Agreement Follows]

UTILITY DEBT SECURITIZATION AUTHORITY

By: _____
      Name:
      Title:

LONG ISLAND LIGHTING COMPANY

By: _____
      Name:
      Title:

## SCHEDULE 1

### Book-Entry-Only System

*The Role of DTC.*  Cede & Co., as nominee for DTC, will hold the 2017 Restructuring Bonds.

*The Function of DTC.*  DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC.  DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts.  This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations.   DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC").  DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies.  DTCC is owned by the users of its regulated subsidiaries.  Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's Rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission.  More information about DTC can be found at www.dtcc.com.

*The Rules for Transfers Among DTC.*  Transfers between DTC participants will occur in accordance with DTC rules.

*DTC Will Be the Holder of the 2017 Restructuring Bonds.*  Purchases of the 2017 Restructuring Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2017 Restructuring Bonds on DTC's records.  The ownership interest of each actual purchaser of each 2017 Restructuring Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records.  Beneficial Owners will not receive written confirmation from DTC of their purchase.  Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.  Transfers of ownership interests in the 2017 Restructuring Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the 2017 Restructuring Bonds, except in the event that use of the book-entry system for the 2017 Restructuring Bonds is discontinued.

To facilitate subsequent transfers, all 2017 Restructuring Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC.  The deposit of the 2017 Restructuring Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not affect any change in beneficial ownership.  DTC has no knowledge of the actual Beneficial Owners of the 2017 Restructuring Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2017 Restructuring Bonds are credited, which may or may not be the Beneficial Owners.  The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the 2017 Restructuring Bonds unless authorized by a Direct Participant in accordance with DTC's Money Market Instrument ("MMI") Procedures.  Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date.  The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to

whose accounts the 2017 Restructuring Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal and interest payments on the 2017 Restructuring Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC.  DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Issuer, on payable date in accordance with their respective holdings shown on DTC's records.  Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Issuer, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the 2017 Restructuring Bonds at any time by giving reasonable notice to the Issuer.  Under such circumstances, in the event that a successor depository is not obtained, note certificates are required to be printed and delivered.

The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository).  In that event, note certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuer believes to be reliable, but the Issuer takes no responsibility for the accuracy thereof.

UTILITY DEBT SECURITIZATION AUTHORITY • RESTRUCTURING BONDS, SERIES 2017

