**<u>EXHIBIT 35</u>**

CROSS-SECTOR



## SECTOR IN-DEPTH
18 July 2018

Rate this Research



Analyst Contacts

Jeffrey F. Cassella          +1.212.553.1665
*VP-Sr Credit Officer*
jeffrey.cassella@moodys.com

Tracy Rice                   +1.212.553.4115
*VP-Sr Credit Officer*
tracy.rice@moodys.com

Yian Ning Loh                +1.212.553.7296
*Associate Managing Director*
ning.loh@moodys.com

A. J. Sabatelle              +1.212.553.4136
*Associate Managing Director*
angelo.sabatelle@moodys.com

Michael G. Haggarty          +1.212.553.7172
*Associate Managing Director*
michael.haggarty@moodys.com

Jim Hempstead                +1.212.553.4318
*MD-Utilities*
james.hempstead@moodys.com

Regulated utilities - US

# Utility cost recovery through securitization is credit positive

Utility cost recovery charge (UCRC) securitization, a financing technique used to recover stranded costs, storm costs and other expenses, can be a credit positive tool for regulated utilities. UCRC securitization, whereby utilities issue bonds with lower financing costs that are paid back through a special customer charge, is typically underpinned by state legislation and in recent years has become more versatile and widespread. The ability to use securitization as a tool to recover, often significant, costs related to large or unforeseen developments allows utilities to avoid potentially credit negative events. However, though the mechanism typically benefits utilities and their customers, too much securitization can have negative consequences.

» **Securitization typically benefits utilities and their current customers.** Utilities benefit because they receive an immediate source of cash from the securitization proceeds and are ensured recovery of large costs in a timely manner that may, otherwise, be recovered over a lengthy period of time or denied recovery altogether. Current utility customers benefit because the cost of the securitized debt is lower than the utility's cost of debt, which reduces the impact on their monthly bills.

» **UCRC securitization has become more versatile and prevalent.** Utility securitization became widespread for the recovery of stranded costs following deregulation of the sector in the late 1990s. It is now used to recover costs associated with storm restoration and environmental costs, utility restructuring, deferred fuel costs and renewable energy projects.

» **State law and financing orders strongly protect securitization assets.** There are three major components of a UCRC securitization—state legislation, a financing order and a true-up mechanism—which ultimately protect the assets backing the bonds.

» **Too much securitization can have negative consequences.** The use of securitization removes the utility's opportunity to include the corresponding asset in its rate base and the ability to earn a return on that asset. A significant amount of securitization debt could impact customer bills substantially while hurting the utility's financial flexibility and ability to raise rates for other reasons, such as to recover future costs and investments.

## Securitization typically benefits utilities and their current customers

UCRC securitization was widely used after the deregulation of the utility sector in the late 1990s as a way to finance so-called stranded costs—the shortfall between the market value of utilities' generation assets and their book value when certain states switched to competitive electric supply markets and utilities sold their generation assets. In UCRC securitization, utilities issue bonds with lower financing costs that are paid back through a discrete customer charge. We typically view use of the technique as credit positive for utilities.

A utility benefits from the securitization because it receives an immediate source of cash. The ability to use securitization generally means the utility is allowed to recover all or most of the costs in question in a timely manner. The ability to use securitization as a tool to recover costs related to large or unforeseen developments allows utilities to avoid potentially credit negative events. The utility's ratepayers benefit because customer rates are lower than if the securitization was not utilized and in many cases avert the need for a substantial rate increase. Under state legislation, the utility must show that the savings to its customers on a net present value basis will be higher than they would have been without securitization.

The savings result from the cost of the securitized debt being lower than the utility's unsecuritized cost of debt and much lower than its all-in cost of capital, which reduces the revenue requirement associated with the cost recovery. The special surcharges involved are also spread out over a long period, typically corresponding to the maturity of the securitization bonds. This eases the impact on customer bills when compared with requesting cost recovery from customers through a one-time payment.

Exhibit 1 shows an illustrative example of the potential impact over time on a utility's ratio of cash flow from operations pre-working capital changes (CFO pre-W/C) to debt, all else being equal. Depending on the size of the securitization debt as a proportion of total debt, the impact on a utility's financial metrics can vary. If the securitization is a significant component of total debt then a utility's ratio of CFO pre-W/C to debt could be severely negatively affected.

Exhibit 1
**Illustrative example of the impact UCRC securitization can have on a utility's ratio of CFO pre-W/C to debt**



*Source: Moody's Investors Service*

In the presentation of securitization debt in our published financial ratios, we make our own assessment of the appropriate credit representation, but in most cases we follow the accounting in audited statements under US Generally Accepted Accounting Principles (GAAP), which in turn considers the terms of enabling legislation. As a result, accounting treatment may vary. In most cases, utilities have been required to consolidate securitization debt under GAAP, even though it is technically non-recourse.

We typically view securitization debt of utilities as on-credit debt, in part because the rates associated with it reduce the utility's headroom to increase rates for other purposes while keeping all-in rates affordable to customers. Thus, where accounting treatment is off balance sheet, we seek to adjust the company's financial ratios by including the securitization debt and related revenues in our analysis. Where the securitized debt is on balance sheet, our credit analysis also considers the significance of financial ratios that

This publication does not announce a credit rating action. For any credit ratings referenced in this publication, please see the ratings tab on the issuer/entity page on www.moodys.com for the most updated credit rating action information and rating history.

exclude securitization debt and related revenues to ensure that the benefits of securitization are not ignored. Since securitization debt amortizes mortgage-style, including it makes financial ratios look worse in early years, when most of the revenue collected goes to pay interest, and better in later years, when most of the revenue collected goes to pay principal.

### CenterPoint Energy Houston Electric has a long history of issuing securitization bonds

In 1999, the Texas legislature adopted the Texas Electric Choice Plan, under which integrated utilities operating within the Electric Reliability Council of Texas, Inc. (ERCOT, Aa3 stable) were required to unbundle their operations into separate retail sales, power generation, and transmission and distribution companies. The legislation provided for a transition period and a true-up mechanism for the utilities to recover stranded and certain other costs resulting from the transition. Those costs were recoverable, after approval by the Public Utility Commission of Texas (PUCT), either through the issuance of securitization bonds or through the implementation of a competition transition charge as a rider to the utility's tariff.

In the early 2000s, CenterPoint Energy Houston Electric, LLC (CEHE, A3 stable) restructured its business in accordance with the new law and its generating stations were sold to third parties. Over the years that followed, CEHE has worked with regulators to obtain recovery of most of its stranded assets and associated costs through the use of securitization bonds and other regulatory mechanisms.

In October 2011, PUCT approved a final order that allowed CEHE to recover an additional $1.695 billion of stranded costs through the use of securitization bonds. In January 2012, CEHE created a new special purpose subsidiary, CenterPoint Energy Transition Bond Company IV, LLC, which issued $1.695 billion of securitization bonds in three tranches with interest rates ranging from 0.9012% to 3.0282% and final maturity dates ranging from April 15, 2018 to October 15, 2025. The securitization bonds will be repaid over time through a charge imposed on customers in CEHE's service territory.

The overall time-weighted interest rate of approximately 2.5% for the securitization bonds was substantially lower than the average rate on CEHE's unsecuritized debt of about 7.66% at that time. The PUCT estimated that the reduced interest charges from the securitization of the stranded costs resulted in savings for CEHE's customers of more than $700 million over the life of the bonds.

Exhibit 2 shows our estimate of the impact on CEHE's ratio of CFO pre-W/C to debt from 2012 through 2017 due to the impact of the $1.695 billion securitization debt. We estimate that the securitization debt had at most a 200-basis-point impact on CEHE's ratio of CFO pre-W/C to debt either positive or negative, depending on the year.

Exhibit 2
**How CEHE's ratio of CFO pre-W/C to debt was impacted by securitization debt from 2012 through 2017**



Source: company's filings, Moody's Investors Service

## UCRC securitization has become more versatile and widespread

UCRC bonds were created after the deregulation of utilities in the late 1990s as a way to finance stranded costs. To date, more than 20 states have used this model to recover not only stranded costs but also costs associated with storm recovery and to a lesser degree environmental restoration, utility restructuring, deferred fuel costs and renewable energy projects.

In June 2005, for example, Section 366.8260 of the Florida Statutes was enacted through Senate Bill 1366, allowing the Florida Public Service Commission to authorize the state's utilities to securitize storm recovery costs. Following Hurricanes Katrina, Rita and Wilma in 2005, Arkansas, Louisiana, Mississippi and Texas joined Florida by passing special legislation giving utilities operating in their jurisdictions the option of utilizing securitization for recovery of storm costs. Recently in California, legislators are considering an amended version of Assembly Bill 33 which, as amended, would allow securitization to be used for prudently incurred costs arising from wildfires, a credit positive step for utilities dealing with potentially significant wildfire-related liabilities. Exhibit 3 shows a list of securitizations completed by utilities in recent years.

In each case, with the exception of the Entergy New Orleans LLC's (ENO, Ba1 stable) bond issuance (Aa1 (sf)) in 2015, we rated the securitization bonds Aaa (sf) owing to the strength of the state legislation, including the state's non-impairment pledge, the irrevocable financing order typically from the state public utility commission, credit enhancement consisting of a statutory uncapped true-up adjustment mechanism, the manageable size of the cost recovery charge and the remote likelihood of a successful legal, political or regulatory challenge, among other factors.

The Aa1 (sf) rating on ENO's securitization bond issuance, which is one-notch lower than the typical Aaa (sf) rating, reflects the relative small size and concentration of the ratepayer base from whom the storm recovery charge will be collected. The bonds are exposed to the risk of declines in the rate payer base in the service area of ENO in case of severe events, such as anther severe hurricane.

Exhibit 3
**Moody's rated UCRC securitizations issued since 2012**

| Deal Name | Servicer | Issuance ($ millions) | Year Completed | Rating (sf) | State |
|---|---|---|---|---|---|
| PSNH Funding LLC 3, Series 2018-1 | Public Service Co. of New Hampshire | $636 | 2018 | Aaa | New Hampshire |
| Utility Debt Securitization Authority Restructuring Bonds, Series 2017 | Long Island Power Authority | 369 | 2017 | Aaa | New York |
| Utility Debt Securitization Authority Restructuring Bonds, Series 2016B | Long Island Power Authority | 469 | 2016 | Aaa | New York |
| Duke Energy Florida Project Finance, LLC | Duke Energy Florida LLC | 1294 | 2016 | Aaa | Florida |
| Utility Debt Securitization Authority Restructuring Bonds, Series 2016A | Long Island Power Authority | 637 | 2016 | Aaa | New York |
| Utility Debt Securitization Authority Restructuring Bonds, Series 2015 | Long Island Power Authority | 1002 | 2015 | Aaa | New York |
| Entergy New Orleans Storm Recovery Funding I, L.L.C. | Entergy New Orleans LLC | 99 | 2015 | Aa1 | Louisiana |
| State of Hawaii Department of Business, Economic Development, and Tourism - Green Energy Market Securitization Bonds, 2014 Ser. A | Hawaii Electric Light Company, Inc. and Maui Electric Company, Limited | 150 | 2014 | Aaa | Hawaii |
| Louisiana Local Government Environmental Facilities and Community Development Authority - System Restoration Bonds (Louisiana Utilities Restoration Corporation Project/EGSL), Ser. 2014 (Federally Taxable) | Entergy Gulf States Louisiana, L.L.C. | 71 | 2014 | Aaa | Louisiana |
| Louisiana Local Government Environmental Facilities and Community Development Authority - System Restoration Bonds (Louisiana Utilities Restoration Corporation Project/ELL), Ser. 2014 (Federal Taxable) | EL Investment Company, LLC | 244 | 2014 | Aaa | Louisiana |
| Consumer 2014 Securitization Funding LLC - Senior Secured Securitization Bonds, Series 2014-A | Consumers Energy Company | 378 | 2014 | Aaa | Michigan |
| Utility Debt Securitization Authority Restructuring Bonds Series 2013T and Series 2013TE | Long Island Power Authority | 2022 | 2013 | Aaa | New York |
| Appalachian Consumer Rate Relief Funding LLC - Senior Secured Consumer Rate Relief Bonds | Appalachian Power Company | 380 | 2013 | Aaa | West Virginia |
| Ohio Phase-In-Recovery Funding LLC | Ohio Power Company | 267 | 2013 | Aaa | Ohio |
| FirstEnergy Ohio PIRB Special Purpose Trust 2013 | Cleveland Electric Illuminating Company (The), Ohio Edison Company, Toledo Edison Company | 445 | 2013 | Aaa | Ohio |
| AEP Texas Central Transition Funding III LLC, Senior Secured Transition Bonds | AEP Texas Central Company | 800 | 2012 | Aaa | Texas |
| CenterPoint Energy Transition Bond Company IV, LLC, Series 2012 Senior Secured Transition Bonds | CenterPoint Energy Houston Electric, LLC | 1695 | 2012 | Aaa | Texas |

*Source: Moody's Investor Service*

## State law and financing order strongly protect the securitization assets

There are three major components of a UCRC securitization: state legislation, a financing order and a true-up mechanism, as shown in Exhibit 4. The securitization law and financing order legally protect the assets backing the bonds.

Exhibit 4
**UCRC securitization has three major components**



*Source: Moody's Investors Service*

The state legislature typically passes a law authorizing the utility to finance the recovery of certain costs through the issuance of securitization bonds. The legislation authorizes the creation of a property right allowing the issuer to collect special charges from customers which are used to repay the bonds. Bondholders receive protection through a non-impairment pledge, under which the state pledges that it will not take any actions that alter the charges or the law until the bonds have been repaid in full.

The legislation also mandates an irrevocable financing order, typically issued by the state public utility commission, which means the state cannot change or revoke the financing order once it is issued. The order authorizes the transaction servicer, typically the utility, on behalf of the issuer of the debt, to charge and collect the special surcharges from the utility's ratepayer base.

The securitization law and the financing order mandate a true-up adjustment mechanism under which the servicer must adjust the charges at least annually to ensure the collection of adequate funds to provide for timely payments on the securitization bonds. The securitization law also establishes the issuer of the debt as a bankruptcy-remote special purpose entity (SPE), and the utility sells the securitized asset (the property right) to the SPE via a true sale transaction. The assets are thus legally isolated from the utility. The SPE issues the bonds and uses the proceeds to acquire the asset. The SPE then uses the charge collected from the utility's customers to pay debt service until the bonds are repaid in full. The utility receives the proceeds from the bond issuance.

## Too much securitization can also have negative consequences

While the use of securitization does provide more timely recovery of costs for the utility, there can be some downside. In cases where utilities use securitization to recover stranded costs, the mechanism requires utilities to give up the opportunity to include the corresponding asset in its rate base as well as the ability to earn a return on that asset. This diminishes the utility's future earnings power and cash flow generation.

A significant amount of securitization debt could represent a substantial portion of the utility's customer bills. This would not only raise customer rates but could also prevent regulators from approving rate increases in the future, out of concern that rates are rising too much. This could in turn affect the utility's capital investments and the ability to add any such investments to rate base and earn on a return on them.

In addition, since the surcharge on customer bills used to pay off the securitization bonds will typically exist for several years, any new customers in the utility's service territory will be subject to this surcharge. As a result, future customers will be paying for costs related to historical occurrences, which may deter new commercial and industrial businesses from moving into the service territory if rates become less competitive.

Further, customer rates or cash flow used to service securitization debt is senior and has a higher legal priority to the utility's remaining cash flow generation. As such, securitization bondholders would have a senior claim in a liability waterfall during times of financial distress. So a significant amount of securitization debt within a capital structure could put secured and unsecured debt holders at risk of less than full recovery in a bankruptcy filing.

**Pacific Gas & Electric's securitization during bankruptcy in the early 2000's demonstrates the enforceability and resiliency of the legal structure**

In 1997, Pacific Gas & Electric Company (PG&E, A3 negative) issued $2.9 billion of securitization bonds after obtaining approval by the California Public Utility Commission to recover stranded asset costs associated with the state's utility deregulation. When PG&E filed for bankruptcy on 6 April 2001, both the company and bankruptcy court respected the bankruptcy-remote structure of the securitization that the parties had established in order to isolate the assets of PG&E's securitization from PG&E's bankruptcy estate. PG&E remained the servicer of the transaction and continued to collect and remit the securitization payment. The securitization cash flows were not affected by the bankruptcy due to a build-up in the reserve fund and the base level of customer consumption used to calculate the 2001 tariff remained relatively stable. For these reasons among others, the Aaa (sf) rating on PG&E's stranded costs recovery securitization bonds was maintained throughout the company's bankruptcy.

The bankruptcy remoteness of securitization transactions is stronger than that of other, purely corporate asset-backed securities for several reasons including the explicit recognition, by state legislation, of the right to collect the special surcharge from customers as well as the first lien on the asset that is often granted by statute upon its transfer. The consumption-based fee is imposed on ratepayers and is not dependent on a particular electrical supplier. The fee is not affected if the servicer becomes bankrupt. The underlying legislation usually requires that any successor to the original utility (due to bankruptcy, reorganization, merger, or acquisition) must satisfy all obligations of the original utility, including the collection of the special surcharge. The right to collect the special surcharge is irrevocable and cannot be altered by either the state utility commission or the state.

In January 2005, PG&E issued $1.9 billion of securitization known as energy recovery bonds (ERBs). The securitization financing accelerated the company's collection of the regulatory asset that was created as part of PG&E's bankruptcy. A second securitization financing was completed in late 2005 which enabled PG&E to largely recover the entire regulatory asset. This was another example where securitization was used as a tool to significantly reduce the uncertainty and length of time in the recovery of significant costs, a credit positive, while also reducing costs for customers by keeping rates lower over the long-term.

## Moody's related publications

**Sector In-Depth:**

» Power generation - US: Coal, nuclear plant closures continue CO2 decline but power market impact muted 14 June 2018

» Offshore Wind is Ready for Prime Time 29 March 2018

» Tax Reform is Credit Negative for Regulated Utilities Sector, but Impact Varies by Company 24 January 2018

» Cross-Sector – US: FAQ on the Credit Impact of New Tax Law 24 January 2018

» Cross-Sector – US: Corporate Tax Cut is Credit Positive, While Effects of Other Provisions Vary by Sector 21 December 2017

» Regulated Electric & Gas Utilities – US: Insulating Utilities from Parent Contagion Risk is Increasingly a Focus of Regulators 18 September 2017

» Renewable Energy - Global: Falling Cost of Renewables Reduces Risks to Paris Agreement Compliance 6 September 2017

» Renewable Energy – Global: Renewables Sector Risks Shift as Competition Reduces Reliance on Government Subsidy 6 September 2017

» Utility Cost Recovery Charge Securitizations - US: True-up Mechanism Mitigates Risk Of Volatility in Electrical Consumption 6 April 2017

» Beyond Stranded Cost Recovery: New Cost Recovery Bonds Represent Variations on Stranded Cost Bonds 10 November 2008

» 2001 Review and 2002 Outlook: Stranded Utility Costs Securitization Credit Issues In Spotlight; "Lights Out?" 11 January 2002

» Illinois Stranded Utility Costs Securitizations: Are all Transactions Created Equal? 11 December 1998

## Outlook:

» Regulated utilities - US: 2019 outlook shifts to negative due to weaker cash flows, continued high leverage 18 June 2018

**Rating Methodologies:**

» Regulated Electric and Gas Utilities 23 June 2017

» Regulated Electric and Gas Networks 16 March 2017

» U.S. Electric Generation & Transmission 15 April 2013

» Natural Gas Pipelines 6 July 2018

» Moody's Global Approach to Rating Securities Backed by Utility Cost Recovery Charges 22 June 2015

To access any of these reports, click on the entry above. Note that these references are current as of the date of publication of this report and that more recent reports may be available. All research may not be available to all clients.

**MOODY'S INVESTORS SERVICE**

CROSS-SECTOR

© 2018 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. AND ITS RATINGS AFFILIATES ("MIS") ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MOODY'S PUBLICATIONS MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

MOODY'S CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS OR MOODY'S PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER. ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT INTENDED FOR USE BY ANY PERSON AS A BENCHMARK AS THAT TERM IS DEFINED FOR REGULATORY PURPOSES AND MUST NOT BE USED IN ANY WAY THAT COULD RESULT IN THEM BEING CONSIDERED A BENCHMARK.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process or in preparing the Moody's publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any rating, agreed to pay to Moody's Investors Service, Inc. for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Additional terms for Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be reckless and inappropriate for retail investors to use MOODY'S credit ratings or publications when making an investment decision. If in doubt you should contact your financial or other professional adviser.

Additional terms for Japan only: Moody's Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any rating, agreed to pay to MJKK or MSFJ (as applicable) for appraisal and rating services rendered by it fees ranging from JPY200,000 to approximately JPY350,000,000.

MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.

REPORT NUMBER    1128247



**Moody's**

**INVESTORS SERVICE**