**EXHIBIT 43**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
Dana Corporation, et al.,               :   Case No. 06-10354 (BRL)
                                        :
                 Debtors.               :   (Jointly Administered)
                                        :
-----------------------------------------------------------x
```

**ORDER PURSUANT TO 11 U.S.C. §§ 1113**
**AND 1114(e) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,**
**APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED**
**STEELWORKERS AND UNITED AUTOWORKERS,**
**AND PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 AND 507,**
**AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT**
**AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS**

This matter came before the Court on the motion of Dana Corporation ("Dana") and 40

of its domestic direct and indirect subsidiaries (collectively, the "Debtors") dated July 5, 2007

(the "Motion"),[1] for entry of an order (a) pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal

Rule of Bankruptcy Procedure 9019, approving and authorizing the debtors to enter into

settlement agreements, as amended (collectively, as amended, the "Union Settlement

Agreement") with the United Steelworkers ("USW") and the International Union, UAW

("UAW," and together with the USW, the "Unions"), and (b) pursuant to 11 U.S.C. §§ 105(a),

363(b), 364(c), 503 and 507 approving and authorizing the Debtors to enter into:  (i) the Union

Settlement Agreement, (ii) a Plan Support Agreement, as amended, by and among Dana, the

Unions, Centerbridge Capital Partners, L.P. ("Centerbridge") and the creditors set forth on

Exhibit A thereto (the "Plan Support Agreement"), and (iii) an Investment Agreement, dated July

25, 2007, by and among Dana, Centerbridge and CBP Acquisition Co. LLC (as same may be

---

[1]        Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such
terms in the Motion or in the Summary of Changes to the Global Settlement, filed with the Court on July 25, 2007.

amended, the "Investment Agreement"), and related agreements; the Court having reviewed the Motion, the Union Settlement Agreement, the Plan Support Agreement, the Investment Agreement, the statements in support of the Motion filed by the UAW and the Ad Hoc Committee of Noteholders (the "Ad Hoc Noteholders Committee"), the objections of the Official Committee of Unsecured Creditors (the "Committee"), Appaloosa Management, L.P., Brandes Investment Partners, L.P., and the joinders to the Committee's objection filed by Wilmington Trust Company, Timken Company and GK Capital, LLC (collectively, the "Objections"); the Court having heard the objection (the "Other Creditor Objection") of an ad hoc committee of certain unsecured creditors (the "Creditor Ad Hoc Committee") and the statements of counsel and the evidence presented regarding the relief requested in the Motion at a hearing before the Court on July 26, 2007 (the "Hearing"), at which time, based upon modifications made to the relief sought in the Motion as further set forth in the record at the Hearing, the Committee withdrew its objection, Timken Company withdrew its joinder to the Committee's objection and Wilmington Trust Company modified its objection, and all interested parties were offered an opportunity to be heard with respect to the Motion, as modified; and it further appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Hearing and these chapter 11 cases; and after due deliberation thereon; and good and sufficient cause appearing therefore, as explained in an oral opinion at the conclusion of the hearing on the Motion (which is incorporated herein fully by reference), IT IS HEREBY FOUND AND DETERMINED THAT:

Jurisdiction, Notice and Statutory Predicates

        A.      This Court has jurisdiction over the Motion, the transactions contemplated under the Global Settlement and any other ancillary documents and agreements related thereto pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of the Debtors' chapter 11 cases and the Motion

in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

        B.      The notice given by the Debtors of the Motion, the Hearing, and the

Notices of Filing regarding the Investment Agreement and the Summary of Changes to the

Global Settlement, both of which were filed with the Court on July 25, 2007, constitutes proper,

timely, adequate and sufficient notice thereof and complies with the Bankruptcy Code, the

Bankruptcy Rules and all applicable local rules, and no further or other notice is necessary.

        C.      The statutory predicates for the relief granted herein are sections 105(a),

363(b), 364(c), 503, 507, 1113(c) and 1114(e) of title 11 of the United States Code (the

"Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 9019.

Procedural Background

        D.      On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.

        E.      The Debtors continue to operate their businesses and manage their

properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

        F.      Pursuant to an order of this Court, the Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered.

        G.      On March 13, 2006, the Office of the United States Trustee for the

Southern District of New York (the "U.S. Trustee") appointed the Committee, pursuant to

section 1102 of the Bankruptcy Code.

        H.      On August 31, 2006, the U.S. Trustee appointed an official committee of

non-union retired employees (the "Retiree Committee"), pursuant to section 1114(d) of the

Bankruptcy Code, and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773).

<u>The Section 1113/1114 Litigation</u>

      I.      Pursuant to section 1113 of the Bankruptcy Code, the Debtors may elect to assume or reject the CBAs.

      J.      On January 31, 2007, the Debtors filed their Motion to Reject their Collective Bargaining Agreements and to Modify their Retiree Benefits pursuant to Sections 1113 and 1114 of the Bankruptcy Code (the "<u>Section 1113/1114 Motion</u>"). The Section 1113 part of the Section 1113/1114 Motion sought the rejection of the CBAs with respect to the Debtors facilities at Auburn Hills, Michigan, Henderson, Kentucky, Marion, Indiana, Fort Wayne, Indiana, and Elizabethtown, Kentucky. The trial on the Section 1113/1114 Motion began on March 12, 2007.

      K.      At the hearing on the Motion, together with the trial on the Section 1113/1114 Motion, which is to be settled by the instant Motion, the Debtors established that:

      a)      The financial performance of the Debtors' U.S. operations has deteriorated dramatically in the recent past, resulting in $2 billion in losses during the past five years.

      b)      A significant portion of the Debtors' U.S. workforce is unionized. As of January 1, 2007, the Debtors had approximately 6,500 union employees. Except for Union employees located at the Debtors' Lima, Ohio and Pottstown, Pennsylvania facilities, which are covered under a master collective bargaining agreement with the UAW (the "<u>UAW Master Agreement</u>"), and Union employees at the Debtors' Toledo, Ohio, Rochester Hills, Michigan, and Longview, Texas facilities, where first collective bargaining agreements have yet to be negotiated with the UAW, the remainder of the Debtors' Union employees are covered by

separate collective bargaining agreements with respect to each facility (together with the UAW
Master Agreement, the "CBAs").

c)      The Debtors provide non-pension retiree benefits (including
hospital, medical, surgical, dental, prescription drug, vision, hearing and life insurance)
(collectively, "Non-Pension Retiree Benefits") to all eligible active and retired Union employees
and/or their spouses and dependents.  As of January 1, 2006, approximately 16,415 individuals
received Non-Pension Retiree Benefits from the Debtors under CBAs (or were active Union
employees currently covered under provisions of CBAs that provide a benefit upon retirement).

d)      As of December 31, 2006, the Debtors' Accumulated Post-
Employment Benefit Obligation ("APBO") for Non-Pension Retiree Benefits for Union
employees and retirees was approximately $1 billion.  As of December 31, 2006, the Debtors'
corresponding periodic cost or expense reflected on their income statement on account of Non-
Pension Retiree Benefits for Union employees and retirees was approximately $63.3 million.

e)      In order to address the mounting losses from their U.S. operations,
in October 2006, the Debtors developed a restructuring plan that would allow the Debtors to
achieve the necessary level of cost savings in order to emerge from chapter 11 as a viable
business.  The Debtors' restructuring plan outlines annual cost savings of approximately $405 to
$540 million, which the Debtors believe they could achieve from five separate areas:  (i)
restructuring unprofitable or below market contracts with customers; (ii) capitalizing on lower
cost manufacturing capabilities by shifting work, where possible, from high-cost operations to
low-cost countries through implementation of a manufacturing footprint optimization ("MFO
Program"); (iii) reducing overhead costs; (iv) reducing their union and non-union labor costs;
and (v) eliminating Non-Pension Retiree Benefits for both union and non-union retirees (as well
as any expectation of future coverage for both union and non-union active employees).

f)       During November and December 2006, the Debtors began discussions and negotiations with the Unions for the purpose of obtaining consensual modifications to the CBAs and Non-Pension Retiree Benefits that would allow the Debtors to achieve the level of cost savings outlined in their restructuring plan.  During this time, the Debtors delivered proposals to the Unions under section 1113 of the Bankruptcy Code with respect to each Union facility (each, a "Section 1113 Proposal").  Similarly, during this time and followed up by revised proposals delivered in January 2007, the Debtors delivered proposals to the Unions under section 1114 of the Bankruptcy Code  with respect to Non-Pension Retiree Benefits (each, a "Section 1114 Proposal").

g)       In summary, the Section 1113 Proposals sought (a) wage modifications at five of the 1113 Facilities; (b) implementation of a "Two Tier" wage structure at all facilities; (c) migration to a customer-directed health benefit program; and (d) modifications to certain work rules and benefits.  The revised Section 1114 Proposals delivered to the Unions contemplated the elimination of Non-Pension Retiree Benefits for Union retirees and active employees and, in its place, the establishment of a VEBA from which participating retirees could receive a subsidy towards the cost of their healthcare.

h)       The modifications proposed by the Debtors and contained in the proposals with respect to their Union labor costs and costs associated with Non-Pension Retiree Benefits represent almost a third of the total savings the Debtors need to achieve, and without such savings, the Debtors will not be able to successfully restructure their U.S. operations.

L.       At the trial on the Section 1113/1114 Motion, the Unions established that in the event the Debtors were granted authorization to reject the CBAs, it was the Unions' intent to strike at facilities covered under the CBAs, and at other unionized facilities without existing CBAs.  Evidence at the Hearing confirmed the reality and significance of that strike threat.

M.      If the Debtors' Section 1113/1114 Motion were granted and the Debtors
granted authority to reject the CBAs, the CBAs would be rendered unenforceable in their entirety.

The Global Settlement

N.      After the trial on the Section 1113/1114 Motion, the Debtors and the
Unions met and conferred on numerous occasions in an attempt to negotiate a consensual
resolution to the Debtors' need for concessions from the Unions on labor costs and Non-Pension
Retiree Benefit obligations.

O.      At the request of the Unions, the negotiations evolved into three party
discussions and negotiations among the Debtors, the Unions and Centerbridge over a potential
framework for the resolution of all issues between the Debtors and the Unions, which would also
provide the Debtors with a source of funding to allow them to meet their obligations to the
Unions under such proposed resolution, as well as emerge from chapter 11 promptly as a
sustainable business.

P.      These discussions led to an agreement between the Debtors, the Unions
and Centerbridge over the proposed terms of a global resolution that would include, among other
things:  (i) the Union Settlement Agreement, which represents a compromise of the litigation
between the Debtors and the Unions and that, more importantly, achieves significant cost savings
that will allow the Debtors to markedly improve their overall EBITDA and address the "cash
burn" of the Debtors' U.S. operations; (ii) the Plan Support Agreement, which sets forth certain
key plan terms that the Unions consider essential to the Debtors' successful emergence from
bankruptcy; and (iii) the Investment Agreement, which provides for an investment in the
reorganized Debtors of up to $750 million, but not less than $500 million, by Centerbridge and
certain creditors of the Debtors, which will enable the Debtors to meet their financial obligations
under the Union Settlement Agreement.

- 7 -

Q.     Following the filing of the Motion, the Debtors, the Unions, Centerbridge, the Committee and the Ad Hoc Noteholders' Committee entered into discussions concerning amendments or modifications to the Global Settlement for the purpose of resolving the objections of the Committee and obtaining the support of the Ad Hoc Noteholder Committee.

R.     In an effort to resolve the objections raised by the Committee and obtain support from the Ad Hoc Noteholders' Committee, the parties subsequently agreed to certain modifications and changes to the Global Settlement, although the key wage and benefit terms set forth in the Global Settlement remain unchanged.

S.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and all transactions contemplated thereunder) are all integral components of the Global Settlement, and without each of these agreements, the Unions would not have agreed to a consensual resolution of all issues with the Debtors.

T.     Subject to the terms of the Plan Support Agreement and the exhibits thereto, the parties have also agreed to work together to complete the formulation and negotiation of a plan of reorganization, and to formulate and facilitate confirmation of a plan in order to consummate the transactions contemplated in the Global Settlement.

U.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement, and the transactions contemplated thereby, represent a substantial milestone and pave the way towards the Debtors' reorganization by resolving the issues surrounding the Debtors' union labor and legacy costs that threatened to impact the Debtors' ability to emerge successfully from chapter 11.

V.     Absent approval of the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and the transactions contemplated thereby), the Debtors' ability to negotiate consensual modifications to the CBAs and Non-Pension Retiree

Benefits is questionable. Substantial risks to the estate (in terms of, among other things, delay and labor unrest) exist in the absence of the Global Settlement.

W.       The Global Settlement allows the Debtors to meaningfully restructure their Union labor costs, eliminate their legacy obligations, implement their MFO Program, which collectively represent a savings of approximately $220 million on an annual basis, and which savings are essential to produce a long-term, viable business.

X.       The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement are fair, reasonable and equitable and in the best interests of the Debtors' estates.

Y.       The Global Settlement has a proper business justification and constitutes an important step towards the Debtors' confirmation of a plan of reorganization. As such, the Global Settlement is neither an evasion of the plan confirmation process, nor does it constitute a *sub rosa* plan of reorganization.

Z.       The Debtors' decision to enter into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement represents a sound exercise of their business judgment, is consistent with their fiduciary duties and is based on good, sufficient and sound business purposes and justifications.

AA.       The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement were all negotiated at arms' length and in good faith by all parties, and the parties' entry into or performance under the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement do not violate any law, including the Bankruptcy Code, and do not give rise to any claim or remedy against the parties thereto, except as may be expressly set forth in this Order or in such agreements.

BB.     The entry into, and performance under, the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the Debtors do not constitute the solicitation of a vote on a plan of reorganization.

CC.     The provisions in the Investment Agreement for the payment of the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee are integral parts of the transactions contemplated by the Investment Agreement, and without any one of these provisions, Centerbridge would not enter into the Investment Agreement.

DD.     The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee.  The Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee are each fair and reasonable and provide a benefit to the Debtors' estates.

EE.     The Debtors' payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee on the terms and conditions provided for in the Investment Agreement are (a) actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and (c) reasonable and appropriate in light of, among other things, (i) the size and nature of the Investment, (ii) the substantial efforts that are being expended by Centerbridge and (iii) the benefits that Centerbridge is providing to the Debtors' estates.

FF.     The Break-Up Fee, Expense Reimbursement and the Commitment Fee pursuant to the terms of the Investment Agreement were incurred in good faith, as such term is used in section 363(m) of the Bankruptcy Code, and the priorities extended to Centerbridge pursuant to this Order shall be entitled to all of the protections provided herein or otherwise contemplated hereby.

GG.     The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest in these cases.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is GRANTED in its entirety.

2.     Any objection (including the Objections and the Other Creditor Objection), joinder to any objection or reservation of rights related to the Motion not withdrawn or otherwise resolved as set forth in this Order is hereby OVERRULED.

3.     The Debtors are hereby authorized, but not directed, to execute, deliver and implement the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of such agreements, and such agreements and documents shall be binding and enforceable against the Debtors and their estates and the other parties thereto in accordance with their terms and subject to the conditions therein; provided, however, that notwithstanding its effectiveness or anything to the contrary in the Union Settlement Agreement or this Order, neither the Union Settlement Agreement nor any of the CBAs shall be assumed, or deemed assumed, by the Debtors unless and until a chapter 11 plan or reorganization shall have been confirmed by order of this Court and substantially consummated.

4.     The Union Settlement Agreement constitutes a valid and binding amendment to the CBAs with authorized representatives of all individuals who were or are in a bargaining unit represented by the UAW or USW, as permitted by section 1113 of the Bankruptcy Code or otherwise.

5.     The Union Settlement Agreement constitutes a valid and binding amendment to existing retiree health and welfare benefits, as permitted by section 1114 of the Bankruptcy Code or otherwise.

6.  Unless terminated in accordance with Appendix R thereof, the Union Settlement Agreement shall be binding upon any chapter 11 trustee that may be subsequently appointed in the Debtors' chapter 11 cases.

7.  The Union Settlement Agreement shall be held to resolve all individual claims filed by Union retirees or employees arising from or with respect to the (i) modifications of the CBAs, as provided for in the Union Settlement Agreement, (ii) the termination of Non-Pension Retiree Benefits, and/or (iii) the termination of long-term disability benefits ("LTD Benefits", as that term is used in the Union Settlement Agreement) to the extent that such individual claim asserts a demand for continued benefits.  It is understood that (i) the Debtors may rely upon the Union Settlement Agreement as a basis for objecting to individual claims to the extent that such individual claims are addressed by the Union Settlement Agreement, and, (ii) the Debtors may effect such resolution through filing with the Bankruptcy Court objections to such claims on notice to the individual claimants.

8.  The entry into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not constitute the solicitation of a vote on a plan of reorganization, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the Debtors, the Unions, Centerbridge and/or any creditor of the Debtors that executes the Plan Support Agreement; provided, however, that except as may otherwise be agreed upon (including in the Plan Support Agreement, the Investment Agreement and the Union Settlement Agreement), nothing in this Order shall prejudice any party in interest's right to object to approval of the disclosure statement or confirmation of a plan of reorganization and this Order shall have no preclusive effect (whether by res judicata or otherwise) in connection with any such objection.

9.      Nothing in this Order shall prejudice the right of the Committee to object to the proposed payment of any financing fee to Miller Buckfire.

10.      Pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code, the Debtors are authorized and directed to pay the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee (each if applicable), in accordance with its terms and as and when required by the Investment Agreement, without further order of the Court.  Each of the Break-Up Fee, Expense Reimbursement, the Termination Fee and Commitment Fee (each if applicable) shall constitute allowed superpriority administrative expenses pursuant to sections 364(c)(1), 503(b)(l)(A) and 507(a)(l) of the Bankruptcy Code having a priority over all other administrative claims other than any such claims of the Debtors' postpetition lenders.

11.      The process for the receipt and consideration of any proposed Alternative Minority Investment, Alternative Majority Investment, Alternative Transaction or Alternative Stand-Alone Plan (each as defined in the Investment Agreement and each, an "Alternative Proposal") (collectively, the "Bid Process"), shall be as follows:

a)      Each party that is designated as a Qualified Potential Investor (as such term is defined in the Alternative Proposal Procedures) shall be provided a confidentiality agreement (each, an "Acceptable Confidentiality Agreement") in the form attached to this Order as Exhibit A.  Each Qualified Potential Investor shall also be provided the Alternative Proposal Procedures, the form of which is attached to this Order as Exhibit B;

b)      Subject to the conditions, qualifications and terms contained in the Alternative Proposal Procedures, each Qualified Potential Investor that executes an Acceptable Confidentiality Agreement shall be granted access to information and a virtual data room consistent with the Alternative Proposal Procedures;

        c)      The Debtors shall reasonably cooperate with any Potential Investor that has executed an Acceptable Confidentiality Agreement in connection with assisting such party in formulating an Alternative Proposal;

        d)      Qualified Potential Investors (as such term is defined in the Alternative Proposal Procedures) that are interested in submitting an Alternative Proposal shall submit their preliminary indications of interest (each, an "Indication of Interest") so as to be actually **received on or before 5:00 p.m. (EST) on August 17, 2007**, by:  (a) counsel to the Debtors, Jones Day, 222 East 41st Street, New York, NY 10017, Attn:  Corinne Ball, Esq., E-mail: cball@jonesday.com; (b) Miller Buckfire, 250 Park Avenue, 17th Floor, New York, NY 10177, Attn:  Richard Morgner, E-mail: richard.morgner@millerbuckfire.com; and (c) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., E-mail: tmayer@kramerlevin.com, and Matthew Williams, E-mail: mjwilliams@kramerlevin.com.  The Debtors will provide copies of Indications of Interest to third parties consistent with the Alternative Proposal Procedures.

        e)      Only those Continuing Potential Investors (as such term is defined in the Alternative Proposal Procedures) who, on or before August 24, 2007, are invited to submit a Final Proposal Letter (each, a "Final Proposal Letter") shall submit a final, binding proposal to the parties identified in subparagraph (d) above so as to be actually **received by all parties on or before 5:00 p.m. (EST) on September 21, 2007**.  The Debtors will provide copies of Final Proposals to third parties consistent with the Alternative Proposal Procedures.

        f)      Dana's board of directors will consider all timely received Final Proposal Letters during the week of September 24, 2007,

g)      On or before September 25, 2007, the Debtors may provide to the
Unions the notices contemplated by Sections 1 and 3(a)(ii) of Appendix R to the Union
Settlement Agreement, a copy of which is attached to this Order as Exhibit C;

h)      In the event that the Unions have withheld consent requested by
the Debtors to an Alternative Proposal, the Debtors, the Unions and the Committee shall move
expeditiously through the arbitration process outlined in Appendix R to the Union Settlement
Agreement in accordance with the terms of such Appendix R; and

i)      The hearing to consider the Debtors' disclosure statement on any
plan of reorganization for the Debtors (as same may be amended as a result of the Bid Process)
shall be held on **Tuesday, October 23, 2007, at 10:00 a.m.**, subject to any extension of such
hearing date that may be necessary to provide for the five (5) business day time period specified
in Section 4.10 of the Investment Agreement.  In the event that the Debtors have decided to
proceed with an Alternative Proposal, the Debtors shall advise the Court of their intention to
terminate the Investment Agreement at the hearing to consider the Debtors' disclosure statement.

12.      So long as the Debtors adhere to the Bid Process described in
paragraph 11 above or amend any plan of reorganization then on file with this Court to
incorporate the terms of any Alternative Proposal (an "Amended Plan"), the Committee, the Ad
Hoc Noteholders Committee (or its members), Centerbridge or the Unions shall not: (i) challenge
directly or indirectly, or support any motion challenging or seeking to terminate, the Debtors'
exclusive right to to file a plan of reorganization or solicit acceptances thereto; (ii) allege or
construe an Amended Plan to be a new plan of reorganization such that the Debtors would lose
their exclusive rights to file or solicit acceptance to such plan, as amended; (iii) take any action
or make any other suggestion in any forum to limit or terminate the exclusive rights of the
Debtors to file a plan of reorganization or solicit acceptances thereon in the event that the

Debtors amend their plan of reorganization to incorporate the terms of any Alternative Proposal; or (iv) file a competing plan of reorganization on or before December 4, 2007.

13. Upon the Union Settlement Agreement becoming effective, the Unions shall withdraw with prejudice their appeal in respect of the Debtors' executive compensation, annual incentive plan and long-term incentive plan that is currently pending in the United States District Court for the Southern District of New York.

14. This Order is a final and non-interlocutory order and is immediately subject to appeal pursuant to 28 U.S.C § 158(a).

15. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

16. The requirement under Local Rule 9013-l(b) for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

17. For purposes of determining whether a creditor shall be deemed a "Qualified Investor" (as such term is defined in the Investment Agreement), (i) the Bondholder Record Date shall be August 13, 2007 and (ii) the Trade Claims Record Date shall be the date of the entry of an order confirming the Debtors' plan of reorganization.

18. Notwithstanding anything to the contrary in the Global Settlement, any signatory to the Plan Support Agreement, who is also a member of the Committee, shall be deemed to execute the Plan Support Agreement in its individual capacity only and not as a member of the Committee, and nothing contained in this Order or the Global Settlement shall be deemed to limit the free and unrestricted performance of such signatory's duties as a member of the Committee, including without limitation, any consideration, formulation or action with respect to any competing plan of reorganization or alternative transaction.

- 16 -

19.     The terms of this Order govern the terms of the Global Settlement.  To the

extent the terms of this Order conflict with the terms of the Global Settlement, the terms of this

Order shall be deemed to apply.

Dated: New York, New York
       August 1, 2007

                                 /s/Burton R. Lifland_____
                                 HONORABLE BURTON R. LIFLAND
                                 UNITED STATES BANKRUPTCY JUDGE