## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In Re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGAMENT BOARD OF PUERTO RICO<br><br>As representative of the Commonwealth of Puerto Rico | Case No. 17-BK-03283 (LTS)<br><br>TITLE III PROMESA |

## MEMORANDUM IN SUPPORT OF ARGUMENTS UNDER THE UNIFORMITY CLAUSE AND INTERNATIONAL LAW

TO THE HONORABLE COURT:

Come now Movants, Xiomara Rivera-Cruz and Carlos Luis Merced-Centeno, by themselves and on behalf of their minor son A.O.M.R., through the undersigned attorneys, and respectfully states as follows:

**PROMESA and the United States Congress Liability**

The *Puerto Rico Oversight, Management, Economic, and Stability Act* (PROMESA), enacted by Congress in 2016, was created with the task of restoring the credit of Puerto Rico by paying a multibillion-dollar debt to bond holders. The debt is estimated at more than 73 billion dollars. An Oversight Board ("the Board") was established, pursuant to PROMESA, to supervise the budget of Puerto Rico. Consisting of members appointed by the President of the United States, the Board rules despite never being elected by the People of Puerto Rico. As such, several lawsuits stressed that the Board unlawfully "usurp[ed] the Commonwealth of

Puerto Rico's political and governmental powers and right to home rule." *Altair Global Credit Opportunities Fund (A), LLC v. United States*, 138 Fed. Cl. 742 (U.S. Claims 2018).

Through the bankruptcy process initiated in 2017, the Board commenced a legislative "taking" of the national budget in order to pay off the debt to bond holders without an official audit. The Board uses the fiscal plan to impose its policy preferences on Puerto Rico's people, overthrowing decades of progress in the fields of State University and public education, labor law, public health, retirement plans, and security, among others. The micromanaged plan encompasses nearly every aspect of life and governmental budget expenditures.

In addition, PROMESA triggered an automatic stay of the commencement or continuation of judicial actions against the Government of Puerto Rico, including lawsuits for civil rights violations pursuant to 42 U.S.C. § 1983.

All of the above occurs while the real actors accountable for the debt remain behind the scenes. Not only the Government of Puerto Rico, but also individual actors and the U.S. Congress, are accountable for the fiscal disruption suffered by the people of Puerto Rico. The Board adopted so-called "austerity measures" to curtail government spending without ever considering the necessity to audit the debt, jeopardizing the wellbeing of the population; the most affected are vulnerable groups, among which are children, disabled individuals, students, workers and the elderly. Let's analyze the historic, economic and legal framework that prompted the failure of structures of self-government and democracy.

**Congressional Background:**

After the Treaty of Paris of 1898, Puerto Rico was ruled by a military government and the Puerto Rican currency was devaluated. On April 12, 1900, the Foraker Act was enacted to institute a civil government. Under the Foraker Act, Congress retained the power to amend or revoke insular legislation.  The inhabitants of Puerto Rico continued to be citizens of Puerto Rico.

On March 2, 1917, President Wilson signed the Jones Act, which declared Puerto Ricans U.S. citizens.  A unique feature of the Jones Act was that "interest payments on bonds issued by Puerto Rico and its subdivisions were exempt from federal income, state, and local taxes, whether the purchasers resided in Puerto Rico or not." *Altair Global Credit Opportunities Fund (A), LLC v. United States*, 138 Fed. Cl. 742, 747 (U.S. Claims 2018). While making Puerto Rico a tax haven for investors, this provision in the Jones Act has cost the government of Puerto Rico millions.

On July 3, 1950, the U.S. government passed Public Law 600, authorizing Puerto Rico to draft its own constitution. 64 Stat. 314 (1950). The Constitution of Puerto Rico was adopted on July 25, 1952, establishing the Commonwealth of Puerto Rico. The next year, the U.S. successfully petitioned the United Nations to remove Puerto Rico from its list of non-self-governing territories. The U.S. thereafter ceased to render reports (pursuant to U.N. Charter, Chapter XI, Art. 73(e)) regarding the administration of the territory. See U.N. G.A. Resolution 748 (VIII) (1953).

In 1961, Congress removed Puerto Rico's federally-mandated debt limit. See Pub. L. No. 87-121, 75 Stat. 245 (1961) and P.R. CONST. art VI § 8; *Altair Global v. United States*, 138 Fed. Cl. 742 at 747, *supra*. However, additional debt was incurred by several municipalities that were permitted "to borrow between 5 percent and 10 percent of the assessed value of their own, without including Commonwealth debt in the calculation." *Altair Global*, 138 Fed. Cl. at 747 (citing M. JOFFE & J. MARTINEZ, ORIGINS OF THE PUERTO RICO FISCAL CRISIS 12 (2016) (internal quotations omitted).

In 1984, Congress prohibited Puerto Rico's instrumentalities and municipalities from declaring bankruptcy under Chapter 9, Title 11, U.S. Code, see Pub. L. No. 98-353, 98 Stat. 333 (1984), applying a prohibition that does not exist for the states of the Union in violation to the Bankruptcy Uniformity Clause.

In 1996, Congress enacted legislation to gradually phase out the tax-exempt status of corporate income earned in Puerto Rico over a period of 10 years. See Pub. L. No. 104-188, 110 Stat. 1755 (1996) (codified as amended at 26 U.S.C. § 936). After the 10-year term, Puerto Rico's debt was "downgraded and placed on the 'Credit Watch List'." See Press Release, Government Development Bank For Puerto Rico, Moody's Downgrades Puerto Rico's Credit And Keeps It On Its Watchlist (May 8,2006),http://gdb.pr.gov/communications/PressReleases/cpMoodysdowngradesPRcreditMay8-06.pdf.

In 2006, in order to raise revenues, the local government "issued Sales Tax Revenue Bonds, the proceeds of which were deposited into an 'Urgent Interest

Fund', instead of the General Fund." See Urgent Interest Fund Act, 2006 P.R. Laws 91.  (No supervision from Congress was noted). On January 31, 2008, the Board of Trustees of the Employees Retirement System (ERS) issued a "Bond Resolution" pursuant to Act No. 447, providing that any bonds issued thereunder were not obligations of the Commonwealth, its agencies, or its instrumentalities. The ERS issued three series of bonds in the total amount of $2,947,648,342.65.  See *Altair Global*, 138 Fed. Cl. at 748.

On July 6, 2011, the ERS Enabling Act was amended, "authorizing the ERS Board of Trustees to raise additional capital by 'tak[ing] on a loan from any financial institution of the Government of … Puerto Rico or the Federal Government of the United States of America.' Id.; P.R. LAWS ANN. tit. 3, § 779d.

On February 11, 2014, all bonds in Puerto Rico "were rated as non-investment grade or 'junk bonds.' . . . This triggered acceleration clauses requiring redemption of Commonwealth bonds within days that would otherwise have been due in years." *Altair Global*, 138 Fed. Cl at 749 (internal quotations and citations omitted).

Puerto Rico is facing its worst financial crisis. In order to protect the interests of U.S. taxpayers, Congress called upon its "plenary powers" over "territories" (U.S. Const., Art. IV) and enacted "PROMESA", 48 U.S.C. §§ 2101-41. With PROMESA, Congress imposed a supra-governmental and non-elected federal entity over Puerto Rico to enforce this federal law, stripping away the rights of the already limited self-government of Public Law 600 of 1950 and the 1952 Constitution of the

Commonwealth of Puerto Rico.  See In the United States Supreme Court, *Financial Oversight and Management Board of Puerto Rico v. Aurelius et als.*, **CONSOLIDATED OPENING BRIEF FOR PETITIONER UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO, INC., Nos. 18-1334, 18-1475, 18-1496, 18-1514 & 18-1521**. (*Consolidated Opening Brief*)

> "The statute commands the establishment of a non-voted seven-member Financial Oversight and Management Board ("Oversight Board" or "Board") vested with all powers necessary to purportedly provide a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets, but all at the expense of the Puerto Rican People.
> The Oversight Board obliterated the prerogatives of the Commonwealth's elected officials rendering them as mere subordinates of the Board without authority to carry out any substantial political powers as invested in them by the Constitution of the Commonwealth of Puerto Rico." *Id. (Consolidated Opening Brief)*

PROMESA is a sadly sample of the heritage left by the infamous Insular Cases.  So is *Sánchez-Valle*, 136 S. Ct. 1863 (2016) while recognizing the political subordination of Puerto Rico to the "plenary Powers" of the U.S. Congress.  The *Insular Cases*, "[w]rong when they were decided, they are even more objectionable over a century later." ACLU *Amici in Aurelius, supra*. These cases are grounded in absurd racist theories about the inferiority of different races and should be overruled. Id.

> "Our basic charter cannot be contracted away like this. HN11 LEdHN[11] [11] The Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply. Even when the United States acts outside its borders, its powers are not 'absolute and unlimited" [****79] but are subject "to such restrictions as are expressed in the Constitution.' *Murphy v. Ramsey*, 114 U.S. 15, 44, 5 S. Ct. 747, 29 L. Ed. 47 (1885). Abstaining from questions involving formal sovereignty and territorial

governance is one thing. To hold the political branches have the power to switch the Constitution on or off at will is quite another. The former position reflects this Court's recognition that certain matters requiring political judgments are best left to the political branches. The latter would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.' *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177, 2 L. Ed. 60 (1803)." *Boumediene v. Bush*, 553 U.S. 723 (U.S. June 12, 2008) ACLU *Amici in Aurelius*.

The above background of congressional actions were ignored by prestige law firms in P.R. and abroad, which served as legal and financial advisors to the Commonwealth of Puerto Rico, the Puerto Rican Governmental and Development Bank (PR GDB), and several other private banks and financial institutions that continued the path towards the economic collapse without any kind of accountability.

**Constitutional and International Law Assessment:**

In *Sánchez-Valle*, 136 S. Ct. 1863 (2016), the U.S. Supreme Court, stressing that Puerto Rico is a territory of the United States with no sovereign powers, subject to the so-called "plenary powers" of Congress, recognized that the United States' fiduciary duty under Art. 73(e) of the U.N. Charter never ceased, notwithstanding the 1953 process at the U.N. General Assembly. (UN GA Res. 748 (VIII)). The Supreme Court decision and PROMESA revoked what was previously understood as the acquisition of full measures of self-government by the people of Puerto Rico. After *Sánchez-Valle, supra* and PROMESA, the Oversight Board serves as the "checkmate" to thwart the already discredited constitutional government through the imposition of appointed officials with the power to overrule the

decisions of Puerto Rico's elected Government.   It is undemocratic and unconstitutional.

The international community shares the view that Puerto Rico lacks sovereign powers. UN Special Rapporteur on poverty Phillip Alston, who visited the island after Hurricane María, stressed that the situation in Puerto Rico indicates a lack of self-government.  A/HCR/38/33/Add.1 (referring to PROMESA and the Board).

Puerto Rico remains, effectively, a non-incorporated territory of the United States. For more than 66 years, the United States government has been in breach of its international obligations to Puerto Rico regarding its economic, social and political development.  The U.S.'s failure to render reports under Art. 73(e) of the U.N. Charter for decades constitutes a serious violation of international law. Legal *Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) Notwithstanding Security Council Resolution 276* (1970), Advisory Opinion, I.C.J. Reports 1971, p. 16.  In the case of Puerto Rico, "the principle that the well-being and development of such peoples form 'a sacred trust of civilization' . . .  to promote to the utmost the material and moral well-being and the social progress of the inhabitants" (I.C.J. Reports 1950, p. 131) has not been observed by the United States.  PROMESA is an admission of this statement.

Under international law, *Sánchez-Valle, supra*, and PROMESA, the U.S. has "an ongoing fiduciary duty to Puerto Rico pending the latter's full decolonization." Steven P. Lausell Recurt, <u>The Song Remains the Same: The United States'</u>

Fiduciary Duty to Puerto Rico as a Basis for Legal Responsibility (May 26, 2016) (Master thesis, Lund University, Sweden).  It requires "that the United States act exclusively in the best interests of Puerto Rico" creating the conditions for economic, social and political development. Mostly due to the United States' breach of its fiduciary duty, "Puerto Rico's stunted development model has finally collapsed." *Id*. U.S. policy in Puerto Rico is the true cause of the present economic disruption.  *Id*.

In the well-known opinion of the U.S. Supreme Court The Paquete Habana, 175 U.S. 677, 700 (1900) it is stressed that:  "'International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction….'" In addition, the U.S. Constitution, *Art. VI*, Sec. 2 states that: "'[A]ll Treaties made… under the Authority of the United States, shall be the Supreme Law of the Land …." (emphasis added) as well as the *Restatement (Third) of the Foreign Relations Law*, Sec. 111 (1986) stating that: "'International law and international agreements of the United States are the law of the United States and supreme over the law of the several States.'" This doctrine has been reaffirmed in *Filartiga vs. Pena-Irala*, 630 F.2d 876, 877-78 (2d Cir. 1980).

International instruments and treaties like the United Nations Charter and the International Covenant on Civil and Political Rights (ICCPR) shall be considered part of the "supreme law of the land" in the U.S.A.  They don't even need a domestic text of application, according to the U.S. Supreme Court jurisprudence since *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829), which is cited by the U.S.A.

9

itself in their Report of February 9, 2000, par. 56 filed before the *Committee Against Torture* of the United Nations. CAT/C/28/Add. 5.

Moreover, the U.S.A. has accepted the jurisdiction of the *Human Rights Committee* by filling its first report under Art. 40 of the I.C.C.P.R. in 1994. *CCPR/C/81/Add.4*, 24 August 1994.

The objections of the *Human Rights Committee* regarding the *reservation, declarations and understandings* made by the U.S. Government in its Report, *CCPR/C/79/Add.50*, p. 3, pars. 14 and 15, 7 April 1995 to this international treaty are of great concern regarding the obligations of all states that have ratified this international instrument.

*Paragraph 15* states:

"The Committee regrets that members of the judiciary at the federal, state and local levels have not been made fully aware of the obligations undertaken by the State party (U.S.A.) under the Covenant, and that judicial continuing education programmes do not include knowledge of the Covenant and discussion of its implementation. Whether or not courts of the United States eventually declare the Covenant to be non-self-executing, information about its provisions should be provided to the judiciary."

As stressed by Judge Edward D. Re, as early as 1804, the Supreme Court recognized that "an act of congress ought never to be construed to violate the law of nations if any other possible construction remains."

Under United States constitutional law "while the supremacy clause provides that treaties are the Law of the Land-even without any congressional initiative - some treaties are so drafted that they require congressional action before they have domestic legal entailment." Laurence H. Tribe, *American Constitutional Law*,

Mineola, New York, The Foundation Press, 1978, p. 167. At footnote 3 it is stressed that "Of course such a treaty may be binding upon the United States as a matter of international law even before congress act." *See Foster v. Neilsen*, *supra*; John A. Jackson, *Status of Treaties in Domestic Legal Systems: A Policy Analysis*, 86 The American Journal of International Law 310 (1992).

Accordingly, PROMESA cannot be used as a shield by the U.S. Congress in order to escape its international obligations to Puerto Rico under Art. 73(e) of the U.N. Charter and Art. 1 of the ICCPR, ratified by the U.S. since 1992.

**The Bankruptcy Uniformity Clause:**

"The Congress shall have the power... [t]o establish ... uniform Laws on the subject of Bankruptcies throughout the Unites States...." U.S. CONST. Art. I, § 8, cl. 4.  PROMESA violates the Uniformity Clause of the Constitution by too narrowly drawing insolvency laws for the island and its instrumentalities. This classification is inherently suspect, and not an appropriate application of Congressional authority.  PROMESA, ostensibly acts as the Bankruptcy clause for the island and its instrumentalities (e.g. cities, public utilities). Having been modeled on Chapter 9 of the United States Bankruptcy Code, there are significant differences between how an instrumentality may seek relief from within a state, than how Puerto Rico and its instrumentalities may.

**Uniformity Clause Background:**

Shortly after ratifying the Constitution, the Bankruptcy Clause was understood to grant Congress the power to enforce uniformity, but that states

should be granted leniency and unfettered authority to determine and enact insolvency laws within their respective jurisdictions. (64 Case w. Res. 319, 339).

In 1898, coincidentally during the Spanish-American War, a new Act was implemented that began the modern era of uniform federal bankruptcy laws. It would remain the basis of the Bankruptcy Code, barring updates, until it was repealed in 1978. (Act of July 1, 1898, ch. 541. 30 Stat. 544 (repealed 1978)) As the framework for a national bankruptcy statute came into effect, the Court began to limit the clause's powers and define its boundaries. *Louisville joint Stock Land Bank v. Redford*, 295 U.S. 555, at 589 (1935); *Ashton v. Cameron Cnty. Water Improvement Dist. No. One*, 298 U.S. 513 (1936); *United States v. Berkins*, 304. U.S. 27, at 54 (1938); *Wright v. Union C. Life Ins. Co.*, 304 U.S. 502, 513 (1938).

With little changes after the New Deal, the bankruptcy of the railroad industry spurred Congress to act again. 1970 saw the creation of the Commission on the Bankruptcy Law of the United States. Among their findings, was a recommendation for the implementation of *uniformity*. Before legislation could pass addressing the Commission's concerns, Congress addressed the failing railway industry in an attempt to restructure it. The Regional Rail Reorganization Act of 1973 called specifically for the creation of a special court to address specific debtors (Railroads), with specific debtor rules for the industry. Several complaints emerged challenging the constitutionality on uniformity grounds. While the Court initially allowed the exception to uniformity, it later overturned its decision that bankruptcy laws must at least apply uniformly to a defined class of debtors. "To survive

Scrutiny under the bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." (*Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 475 (1982)). Puerto Rico is a debtor similar to the states or even other territories of the U.S., where uniformity should be observed.

While this seems to justify a regional, narrow, understanding of the uniformity clause, that allows for a certain sector, in certain regions, access to unique insolvency proceedings, it does not preclude the inherently suspect nature of narrowly drawn bankruptcy laws. "Recitation of a general purpose does not justify narrow application to a single debtor where, as here, the purpose does not explain the non-uniform treatment." (*Id.* at 446) The issue is why Congress makes a distinction to treat Puerto Rico different from the states and other territories as a debtor? The answer: to allow a ***taking*** of the governmental budget.

**Argument**:

The legal framework under which Puerto Rico's economy collapsed was mostly designed by laws enacted by the U.S. Congress.  PROMESA is no exception.  PROMESA was modeled on the Bankruptcy Code.  But unlike Chapter 9 of the Code, which grants a state's instrumentalities (e.g., cities) access to the Code, PROMESA allows not only the territory's instrumentalities but also the central government to initiate a debt adjustment proceeding.  This by itself violates the Bankruptcy Clause of the Constitution, which requires that Congress pass "uniform Laws on the subject of Bankruptcies throughout the United States."

> "The complexity of the implementation of PROMESA responds
> to a hybrid of provisions from Chapter 9 and 11 of the Bankruptcy

Code with other territorial provisions throughout the Act. Contrary to Chapter 9, PROMESA allows not only the territory's instrumentalities, but the central government to initiate a debt adjustment proceeding based on fiscal plans and budgets approved *at the sole discretion* of the Oversight Board."

The Board is the *only* authorized to determine that a territorial entity is 'covered', 48 U.S.C. § 2121(d)(1)(a); to issue, at its sole discretion, a restructuring certification, *Id*. § 2146; to become the 'representative of the debtor,' *Id*. § 2175(b), to file the petition, *Id*. § 2164(a)(1), a plan of adjustment, *Id*. § 2172(a)(2), and otherwise generally submit filings in relation to the case with the court, *Id*. § 2172(a)(3). In a Chapter 9 proceeding, the debtor needs no representative and manages the proceedings before the bankruptcy court, whereas under PROMESA, the Oversight Board runs all matters of the Title III proceedings as a representative of the debtor. Thus, the Oversight Board's powers go beyond a possible comparison of it with a State in a Chapter 9." (***Consolidated Opening Brief***)

PROMESA instituted the creation of a fiscal control board, an oversight panel, with the ability to trump local, elected official's financial decision making. (48 U.S.C. § 2121) Where as trustee as used in Chapter 9 bankruptcy refers to the debtor, they refer to the oversight board in PROMESA. This is an indication of the extent to which the Board can retain ownership and control over the island's property; *de facto*: an ***illegal taking*** of the Commonwealth's budget.

When drafting PROMESA, Puerto Rico was not given an opportunity to choose its application. Other territories were originally planned to be under the statue at the request of the governor. However, the finalized bill only applied to Puerto Rico. The insular cases notwithstanding, this classification demands a justification for the clear violation of the uniformity clause. Congress would not have the ability to pass a bankruptcy law for an individual state, but given the unique nature of Puerto Rico's "sovereignty", deems itself authorized to do so for an

unincorporated territory. Even still, the class of debtors does not include all unincorporated territories, so within its own narrow classification, the Uniformity clause is not met.

In spite of the wide powers of the U.S. Congress under the Commerce Clause, states retain a level of "sovereignty" from the federal government, with the exception of the enumerated powers. Territorial power is limited, with the national (federal) government as the general sovereign. However, as the U.S. Supreme Court has recognized Congress in 1952 "relinquished its control over [the Commonwealth's] local affairs[,] grant[ing] Puerto Rico a measure of autonomy comparable to that possessed by the States." *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U. S. 572, 597, 96 S. Ct. 2264, 49 L. Ed. 2d 65 (1976); see id., at 594, 96 S. Ct. 2264, 49 L. Ed. 2d 65.

In *Puerto Rico v. Sánchez Valle*, 136 S. Ct. 1863 (U.S. June 9, 2016) it was argued that while Congress is granted leeway to afford the island whatever sovereignty (in the colloquial sense) it deems prudent, Puerto Rico will never have sovereign prosecutorial power. Under PROMESA, Puerto Rico neither has fiscal or finance powers.

*Sanchez Valle* and PROMESA deleted Congressional actions granting Puerto Rico control over its own affairs, including its finances under Public Law 600 and the Puerto Rico Constitution. Congress must justify its usurpation of Puerto Rico's government "to control its local affairs[,] grant[ing] [the commonwealth] a measure of autonomy comparable to that possessed by the States." (*Examining Bd. of Eng.* at

594.) If Congress insists in treating Puerto Rico as a property under the "Territory Clause", pursuant to the insular cases, it should also comply with its international obligations and fiduciary duty to Puerto Rico under At. 73(e) of the U.N. Charter and recognize its fiscal obligation to pay the debt. The fiduciary duty of the U.S. Government is covered by the right to self-determination of peoples as a ***customary and peremptory*** norm of internationals law, covered under both the U.N. Charter and the I.C.C.P.R. ratified by the U.S. since 1992.

To further illustrate this point, while Congress is clearly authorized to govern the territories in the means it deems necessary and proper, it cannot ignore international and constitutional protections or limitations, including the Uniformity Clause, on a whim.

> "Our basic charter cannot be contracted away like this. The Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply. Even when the United States acts outside its borders, its powers are not 'absolute and unlimited' but are subject 'to such restrictions as are expressed in the Constitution.' *Murphy v. Ramsey*, 114 U.S. 15, 44, 5 S. Ct. 747, 29 L. Ed. 47 (1885). Abstaining from questions involving formal sovereignty and territorial governance is one thing. To hold the political branches have the power to switch the Constitution on or off at will is quite another." *Boumediene v. Bush*, 553 U.S. 723 (U.S. June 12, 2008)

The Seventh Circuit has succinctly described the two main areas the Bankruptcy Clause cannot classify uniquely: "The first is arbitrary regional differences in the provisions of the bankruptcy code. The second is private Bankruptcy Bills—that is, bankruptcy laws limited to a single debtor, or equivalent." (*Matter of Reese*, 91 F.3d 37 (7th Cir. 1996))

PROMESA treats Puerto Rico as both. The only regional area being affected, and the only unincorporated territory singled out. This is an arbitrary distinction and a clear violation of the Uniformity Clause.  At no point in history, has there been a federal push for specific bankruptcy Code for each state. Whenever Congress acted, it acted to unify a disparate scheme. For most of history, the states were allowed to construct their own schemes, and only until recently has the uniformity clause been given the importance we've seen today. The only times, it has attempted, see railroad in North East, have been overturned by the Supreme Court for lack of uniformity.

Under Court precedent, whether the class of debtor Congress drew when designed PROMESA was one of geographical origin or as an industry in need, the classification of Puerto Rico alone among the unincorporated territories, violates the very reason for a Uniformity Clause in the Constitution. PROMESA allows for the declaration of an exclusive bankruptcy of the entire insular government, thus permitting an ***illegal taking*** of the budget of Puerto Rico and resulting in a human rights crisis.  PROMESA is unconstitutional for not complying with the Bankruptcy Uniformity Clause, the Fifth Amendment to the U.S. Constitution and the U.N. Charter of 1945.  International law and treaties are part of the Law of the Land.

**The Insular Cases are Bad Law:**

PROMESA is no more than a desperate act of Congress to avoid its fiduciary duty under international law and its accountability for the economic crises in Puerto Rico.   The U.S. government remains as the main source of liability.

Reparation of grievances is paramount in order to repair more than a Century of unequal and discriminatory treatment very well illustrated in the insular cases. The insular cases are the fragile legal framework for PROMESA.  We cannot argue about the creation of PROMESA pursuant to the "Territory Clause" of the U.S. Constitution without referring to the insular cases.

The position of the ACLU regarding the insular cases has been argued before the US Supreme Court and submitted to the US Congress.  Accordingly, this Court should reject the use of a discredited line of Supreme Court decisions in current and future court cases. See, *e.g.*, *Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment, LLC, et al.*, 18-1334 (2019).  Decided between 1901 and 1922, the Insular Cases held that certain constitutional provisions do not apply to the then-recently acquired U.S. island territories.  The cases devised an untenable distinction between *incorporated* and *unincorporated* U.S. territories, and decided— without constitutional grounding—that the Constitution applied in full in *incorporated* territories on the path to statehood, while its protections and limitations applied only in part to territories as Puerto Rico. *Boumediene v. Bush*, 553 U.S. 723,757 (2008).

It is broadly accepted now that these cases entrenched imperialism-era concerns over extending constitutional protections to people of color.  At the time, prominent members of Congress from both parties did not want the Constitution to apply fully to these territories because their residents were not Anglo-Saxon, and believed they were therefore unfit to enjoy its full benefits. *See* Brief for the ACLU

as Amicus Curiae, at pp. 19-20, *Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment, LLC, et al.*, 18-1334 (2019).

In that principal decision, speaking of Puerto Rico, Justice White warned against admitting an "unknown island, peopled with an uncivilized race" that is "absolutely unfit to receive citizenship." *Downes v. Bidwell*, 182 U.S. 282, 306 (1901) (White, J., concurring).  His reasoning: "If the conquered are a fierce, savage and restless people," the United States could "govern them with a tight [] rein so as to curb their impetuosity, and to keep them under subjection." *Id*. At 302 (quotation marks omitted). Through these cases, the Supreme Court decided that the Constitution would not fully "follow the flag" into annexed lands.  To reach this conclusion, the Supreme Court expressly relied on racist assumptions about the inferiority of the newly acquired territories' inhabitants. Id. At 18.

Almost 120 years later, the Constitution still applies only in part in U.S. island territories despite that most of their native-born residents are U.S. citizens. "Unlike those born in the United States' other current territorial possessions… section 308(l) of the Immigration Nationality Act of 1952 designates persons born in American Samoa as non-citizen nationals." *Tuaua v. United States*, 788 F.3d 300, 302 (D.C. Cir. 2015).

While the Supreme Court has limited the *Insular Cases*' reach and stressed that they should not be expanded, (*See, e.g., Reid v. Covert*, 354 U.S. 1, 14 (1957) (plurality op.) ("[N]either the [*Insular Cases*] nor their reasoning should be given any further expansion."); *see also id*. ("The concept that the Bill of Rights and other

constitutional protections… are inoperative when they become inconvenient… would destroy the benefit of a written Constitution….") courts continue to consider and cite them in cases for the overstated proposition that only "fundamental" rights apply in the territories. *E.g., Tuaua v. United States*, 951 F. Supp. 2d 88, 94-95 (D.D.C. 2013) ("In an unincorporated territory…only certain 'fundamental' constitutional rights are extended to its inhabitants."), *aff'd*, 788 F.3d 300 (D.C. Cir. 2015).

This Court may repudiate the offensive and archaic racial views expressed in those cases and PROMESA about the residents of Puerto Rico. This racist policy is also used by the U.S. Congress against American Samoa, the Commonwealth of Northern Mariana Islands, Guam, and the U.S. Virgin Islands. This Court should take a stand against the outdated racist and imperial rationale that underpins the *Insular Cases*, as applied through the "Territory Clause" of the U.S. Constitution and declare PROMESA unconstitutional.

## CONCLUSION

A stay of the judicial proceedings placed this litigation in an indefinite procedural limbo, leaving Plaintiffs without any permanent equitable relief and unfairly prejudicing their ability to present their case should there be a trial. PROMESA creates a civil-rights-free zone in the territory of Puerto Rico. It also creates an economic and social disruption through an *illegal taking* of the governmental budget, jeopardizing a wide range of human rights and the Rule of Law, while the accountability of the U.S. Congress remains in a limbo.

PROMESA is no more than a desperate act of Congress to avoid its fiduciary duty under international law: to respect the "sacred trust of civilization" for the "material and moral well-being" of the people of Puerto Rico.  It is a shield to avoid its accountability for the economic crises in Puerto Rico.  A duty exists to investigate the debt with the benefit of a forensic audit, but the U.S. Congress has a great deal of responsibility regarding the debt. Reparation of grievances is paramount in order to repair more than a Century of unequal, racist and discriminatory treatment very well illustrated in the insular cases.

The unique financial crisis in Puerto Rico that PROMESA is intended to deal with should not be used as free pass for individual government actors to violate fundamental rights, nor should constitute an additional burden for litigants in Puerto Rico to have access to a fair judicial remedy in federal court.

Respectfully submitted, in San Juan Puerto Rico, this 26th day of November 2019.

*S/FERMÍN L. ARRAIZA-NAVAS*
FERMÍN L. ARRAIZA-NAVAS
USDC-PR 215705

WILLIAM RAMIREZ-HERNANDEZ
American Civil Liberties Union
 of Puerto Rico
Union Plaza
416 Ponce de León Avenue, Suite 1105
San Juan, PR 00918
Tel: 787-753-8493
Fax: 787-753-4268
E-mail: farraiza@aclu.org

*S/WILMA REVERON-COLLAZO*
WILMA REVERÓN-COLLAZO
for ACLU of Puerto Rico
USDC-PR No. 204802
PO Box 9023317
San Juan, PR 00902-3317
Tel. 787-613-4038
Email: wilmarc@prtc.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this same date, I have electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to all attorneys of record. Counsel certifies that a copy of the foregoing Memorandum will be serve by email to: Jose A. Contreras, Esq., US Attorney, jose.a.contreras@usdoj.gov; Joel Torres-Ortiz, Esq., joeltorres@justicia.pr.gov; Rafael B. Fernandez Castaner, Esq., rfernandez@justicia.pr.gov; Jaime J. Zampierollo-Vila, Esq., jzampierollo.distrito@gmail.com.

*S/FERMÍN L. ARRAIZA NAVAS*
USDC-PR 215705