# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>   Debtors.[1] | PROMESA<br><br>Title III<br><br>Case No. 17 BK 3283 (LTS)<br><br>(Jointly Administered) |

**RESPONSE OF ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP. TO INTERIM REPORT AND RECOMMENDATION OF THE MEDIATION TEAM (ECF NO. 9365)**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .........................................................................................................................3

ARGUMENT ...............................................................................................................................5

I. BECAUSE OF "OVERLAPPING KEY ISSUES," THE CLAIM OBJECTIONS AND THE PBA ADVERSARY PROCEEDING SHOULD PROCEED ON THE SAME SCHEDULE................................................................................................5

II. BECAUSE OF "OVERLAPPING KEY ISSUES," ALL LIFT STAY MOTIONS SHOULD BE HEARD ON THE SAME SCHEDULE......................................................10

RESERVATION OF RIGHTS ...................................................................................................14

CONCLUSION.............................................................................................................................14

## **TABLE OF AUTHORITIES**

**Page(s)**

*Assured Guaranty Corp. v. García-Padilla,*
    214 F. Supp. 3d 117 (D.P.R. 2016) .................................................................................13

*In re Montgomery Ward, L.L.C.*,
    469 B.R. 522 (Bankr. D. Del. 2012) ..................................................................................8

*Liona Corp. v. PCH Assocs*,
    804 F.2d 193 (2d Cir. 1986) ..............................................................................................7

*United Air Lines, Inc. v. U.S. Bank N.A.*,
    447 F.3d 504 (7th Cir. 2006) .............................................................................................8

*United Airlines, Inc. v. HSBC Bank USA, N.A.,*
    416 F.3d 609 (7th Cir. 2005) .........................................................................................7, 8

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") hereby submit this response (the "Response")[2] to the Interim Report and Recommendation of the Mediation Team (ECF No. 9365,[3] the "Report" or "Interim Report")[4] as filed on November 27, 2019, and respectfully state as follows:

## PRELIMINARY STATEMENT

1. On November 27, 2019, the Mediation Team filed, on an interim basis, the Report required by this Court's July 24, 2019 Stay Order. The Interim Report seeks to advance these Title III cases by proposing a schedule for the litigation of at least some of the crucial gating issues that will need to be resolved before FOMB is able to develop a plan of adjustment that complies with PROMESA, the Bankruptcy Code, and the United States and Puerto Rico constitutions. Specifically, the gating issues that the Mediation Team rightly chose to prioritize include (i) the validity of the GO Bonds and PBA Bonds that FOMB has sought to challenge, and (ii) whether the Commonwealth's ongoing misappropriation of funds from various public corporations (HTA, PRIFA, and CCDA) and their secured revenue bondholders is illegal and unconstitutional.

2. Assured is generally supportive of the Mediation Team's decision to prioritize these particular gating issues. Nevertheless, Assured files this Response in order to alert the Court to two important issues that should be addressed if the resulting schedule is to fully

---

[2] This Response by Assured is supplementary to the Response to the Interim Report submitted jointly with National Public Finance Guarantee Corporation and the Invesco Funds. See ECF No. 9440.

[3] Unless otherwise indicated, references to ECF numbers in this Response refer to the docket in Case No. 17-3283-LTS.

[4] Capitalized terms not defined in this Response shall have the meanings ascribed to them in the Interim Report and/or the Interim Orders, as applicable.

realize the Stay Order's purpose of avoiding "piecemeal litigation of potentially overlapping key issues."

3. First, the Interim Report recommends that the GO Claim Objections go forward immediately while simultaneously recommending, without explanation, that FOMB and the UCC's related adversary proceeding challenging the status of PBA's leases as "true leases" (Adv. Proc. No. 18-149, the "PBA Adversary Proceeding") be stayed, notwithstanding the facts that (1) the PBA Adversary Proceeding is foundational to the Claim Objections, to the point that many of the legal and factual contentions in the Claim Objections are borrowed nearly verbatim from the complaint in the PBA Adversary Proceeding; and (2) potentially dispositive motions have already been substantially briefed in the PBA Adversary Proceeding on the same issues. The Claim Objections and the PBA Adversary Proceeding represent the paradigmatic case of "overlapping key issues," and the goals of the Stay Order therefore dictate that the PBA Adversary Proceeding should proceed on the same schedule as the Claim Objections. That modification is reflected in the amended draft GO/PBA Order attached as "Exhibit A" hereto.

4. Second, the Interim Report leaves it to this Court to decide whether the scheduling of the PRIFA Lift Stay Motion (ECF No. 7176) should be coordinated with that of other, related Lift Stay Motions, or whether the PRIFA Lift Stay Motion should instead be heard in a "piecemeal" fashion prior to the other, related Lift Stay Motions. As set forth in Section II of the Argument below, the Stay Order itself answers this question: in light of the "overlapping key issues" uniting the PRIFA Lift Stay Motion with the other Lift Stay Motions, the PRIFA Lift Stay Motion should be heard on the same schedule as the other Lift Stay Motions and not in an isolated, "piecemeal" fashion. Accordingly, Assured requests that the hearing on the PRIFA Lift Stay Motion be set for the same date as the hearing on the other Lift Stay Motions. That modification is reflected in the amended draft Revenue Bond Order attached as "Exhibit B" hereto.

## BACKGROUND

5. Assured is Puerto Rico's single largest creditor, with claims totaling over $5 billion dollars arising from its insurance of securities issued by numerous Puerto Rico public entities, including (i) general obligation bonds ("GO Bonds") issued by the Commonwealth of Puerto Rico and (ii) secured revenue bonds issued by (a) HTA, (b) PREPA, (c) PBA, (d) the Puerto Rico Convention Center District Authority ("CCDA"), and (e) the Puerto Rico Infrastructure Financing Authority ("PRIFA"). As such, Assured is a party to numerous proceedings in these Title III cases, including many of the proceedings (collectively, the "Stayed Proceedings") stayed pursuant to the Stay Order.

6. In June 2019, FOMB filed a series of motions (the "Stay Motions") seeking to stay certain of the Stayed Proceedings, purportedly so that FOMB could "garner further support" for a "restructuring framework" set forth in a recently-announced plan support agreement with a small minority of PBA and GO Bondholders. See Adv. Proc. No. 18-149, ECF No. 99 at ¶ 3; see also ECF No. 7640. Assured, as well as other parties in interest, opposed these Stay Motions, asserting that FOMB had failed to carry its burden of justifying a stay. See ECF No. 7892; Adv. Proc. No. 18-149, ECF No. 105.

7. At the July 24, 2019 omnibus hearing, the Court issued its Stay Order (ECF No. 8244). The purpose of the Stay Order was to "avoid piecemeal litigation of potentially overlapping key issues" and "to identify efficiently the issues that must be litigated or otherwise resolved to achieve confirmation of a plan of adjustment for the Commonwealth (and other debtors and potential debtors in Title III proceedings), as well as to prioritize such issues and develop efficient approaches to the resolution of such issues." Id.

8. The Stay Order initially stayed the Stayed Proceedings until November 30, 2019. See Stay Order ¶ A.2. The Court subsequently entered a second order (ECF No. 9016, the "Stay Extension Order") extending the stay until December 31, 2019.

9. The Stay Order authorized the Mediation Team Leader to "facilitate the filing of agreed or substantially agreed scheduling order(s) with respect to . . . the adversary proceedings and contested matters listed in Appendix I [to the Stay Order]." See id. ¶ A.3. In the event the parties to the Stayed Proceedings were unable to "agree or come to substantial agreement with respect to such scheduling orders," the Stay Order authorized the Mediation Team Leader to "file with the Court a report (the 'Report') . . . setting forth the procedural issues as to which substantial consensus has been achieved, any further procedural recommendation of the Mediation Team Leader relating to those issues, and any other recommendations of the Mediation Team Leader regarding an appropriate schedule for the disposition of these adversary proceedings and contested matters . . . ." See id. ¶ A.4.

10. The Stay Extension Order set November 27, 2019 as the deadline for the Mediation Team Leader to file the Report required by the Stay Order. The Mediation Team filed the Interim Report on November 27, 2019. The Interim Report attaches as Exhibits 1 and 2 two proposed interim scheduling orders.

11. Specifically, Exhibit 1 to the Interim Report is a proposed interim scheduling order (ECF No. 9365-1, the "GO/PBA Order") "applicable to contested matters and adversary proceedings implicating (i) the validity of certain challenged series of GO and PBA Bonds and (ii) the secured status of claims on GO and PBA Bonds." See Interim Report at p. 5.

12. Exhibit 2 to the Interim Report is a proposed interim scheduling order (ECF No. 9365-2, the "Revenue Bond Order", and together with the GO/PBA Order, the "Interim Orders") applicable to certain contested matters and adversary proceedings addressing "the rights

-4-

of holders of revenue bonds issued by HTA, PRIFA, and CCDA." See Interim Report at p. 5. The Revenue Bond Order defines the relevant contested matters as the "Lift Stay Motions," and defines the relevant adversary proceedings as the "Revenue Bond Adversary Proceedings."

13. The Stay Extension Order set December 6, 2019 as the deadline for parties to file "responses or objections to the Report." See Stay Extension Order ¶ 3. In accordance with that deadline, Assured now files this Response in order to request two important amendments to the Interim Orders that will fulfill the Stay Order's mandate to "avoid piecemeal litigation" of "overlapping key issues" by (i) allowing the Claim Objections and the PBA Adversary Proceeding to proceed on the same schedule, as reflected in the proposed amended GO/PBA Order attached as Exhibit A to this Response, and (ii) allowing all Lift Stay Motions to be heard on the same schedule, as reflected in the proposed amended Revenue Bond Order attached as Exhibit B to this Response.

**ARGUMENT**

I. **Because Of "Overlapping Key Issues," The Claim Objections And The PBA Adversary Proceeding Should Proceed On The Same Schedule**

14. Assured strongly supports the Mediation Team's recommendation that the GO Claim Objections go forward immediately, because, as FOMB has aptly stated within its Claim Objection itself, **"[t]he issues raised in this [Claim] Objection are gating issues for the Commonwealth's plan of adjustment process**." See ECF No. 4784 (the "FOMB Claim Objection") ¶ 10 (emphasis added). In light of the Mediation Team's recommendation that the Claim Objections proceed immediately, however, it makes little sense that the Mediation Team simultaneously recommends—without explanation—that the PBA Adversary Proceeding be stayed.[5] Indeed, this Court has already recognized the existence of "overlapping key issues"

---

[5] See Interim Report at p. 10 n.10.

-5-

between the FOMB Claim Objection and the PBA Adversary Proceeding, specifically finding in a previous order that "**[t]he [FOMB] Claim Objection builds on the allegations of the PBA Adversary Proceeding.**" See ECF No. 6891 at 3 (emphasis added). In light of these prior findings by the Court, the best way to give effect to the Stay Order and accomplish its objectives of efficiently resolving key issues and preventing piecemeal litigation is to provide for briefing and consideration of both the FOMB Claim Objection and the PBA Adversary Proceeding on a coordinated basis.

15. The prominence of "overlapping key issues" between the FOMB Claim Objection and the PBA Adversary Proceeding can be seen through a comparison of the FOMB Claim Objection to the complaint in the PBA Adversary Proceeding (Adv. Proc. No. 18-149-LTS, ECF No. 1, the "PBA Complaint").[6] Specifically, the FOMB Claim Objection seeks to invalidate certain GO Bonds issued in 2012 and 2014 on the theory that they were allegedly issued in violation of the debt limit provision of the Puerto Rico constitution. In making this argument, the FOMB Claim Objection alleges that PBA Bonds should be deemed GO Bonds and included in the calculation of the debt limit because PBA is a "sham" entity. See FOMB Claim Objection ¶ 65. The FOMB Claim Objection makes clear that its assertion that PBA is a "sham" is linked to the notion that PBA's leases are not true leases by citing to case law from the "true lease" context that urges courts to "look beyond mere form to the circumstances of each case, including the economic

---

[6] Notably, the UCC's Claim objection to certain GO Bonds issued in 2011 (ECF No. 7057, the "UCC Claim Objection") relies on the same legal theories and factual allegations as the FOMB Claim Objection, and expressly "incorporates by reference paragraphs from the [FOMB Claim Objection]." See UCC Claim Objection ¶ 3. In particular, the UCC Claim Objection incorporates paragraphs 39-55 and 65-86 of the FOMB Claim Objection (see UCC Claim Objection ¶¶ 5, 27), and those incorporated paragraphs include the FOMB Claim Objection's arguments, based on the factors identified in "true lease" case law, that PBA is a "sham" (see FOMB Claim Objection ¶ 65) because its leases allegedly lack the indicia of "true leases" (see, e.g., FOMB Claim Objection ¶¶ 41-42, 47-48, 54, 67, 81-82). Therefore, the "key issues" in the UCC Claim Objection overlap with the "key issues" in the PBA Complaint to the same extent as the "key issues" in the FOMB Claim Objection, and both Claim Objections should proceed on the same schedule as the PBA Adversary Proceeding.

substance of the transaction, to determine whether a 'true lease' exists for purposes of the Code". See FOMB Claim Objection ¶¶ 81-82. The FOMB Claim Objection's opening paragraphs focus on the theory that PBA's facilities are only "purportedly leased" (see FOMB Claim Objection ¶ 2) to the Commonwealth and other government entities, while insinuating that the "purported leases" in fact lack the indicia of true leases. See FOMB Claim Objection ¶¶ 1-6. In turn, the PBA Complaint, in nearly identical language, alleges that the PBA leases are only "purported leases" (see PBA Complaint ¶ 1) and "seeks a declaratory judgment that the [PBA] Leases are not 'true leases' but, rather, disguised financing transactions." See PBA Complaint ¶ 2. Accordingly, both the FOMB Claim Objection and the PBA Adversary Proceeding focus centrally on the critical and determinative contention that PBA's leases are not "true leases."

16. Furthermore, the FOMB Claim Objection borrows many of its factual assertions nearly verbatim from the PBA Complaint to support its argument that PBA is a "sham" because the PBA leases are not true leases. The common denominator amongst these factual assertions is that they relate to the factors used by courts in order to determine whether leases are "true leases." See FOMB Claim Objection ¶ 68-86.

17. For example, both the FOMB Claim Objection and the PBA Complaint allege that the rents owed under the PBA leases are required to be sufficient to service debt on the PBA Bonds as such debt becomes due and payable. See FOMB Claim Objection ¶ 47; PBA Complaint ¶ 18. Courts have explained that a connection between rental payments and debt service is a factor considered in determining whether a purported lease is a "true lease." See, e.g., United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609, 617 (7th Cir. 2005) (basing a finding that a transaction was not a "true lease" in part on the fact that "the 'rent' is measured not by the market value of the [property's acreage] but by the amount . . . borrowed"); Liona Corp. v. PCH Assocs., 804 F.2d 193, 199 (2d Cir. 1986) (explaining that where "rental payments are, in

truth, payments of principal and interest on a secured loan involving a sale of real estate, there is no true lease".); In re Montgomery Ward, L.L.C., 469 B.R. 522, 530 (Bankr. D. Del. 2012) (explaining that when analyzing the economic realities of a transaction such as a lease courts must consider whether rental payments "are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property.").

18. Furthermore, the FOMB Claim Objection and the PBA Complaint both emphasize that the PBA leases require the continued payment of rent even if the leased facilities have been sold or destroyed. See FOMB Claim Objection ¶ 48; PBA Complaint ¶ 29. Such a provision is known as a "hell or high water" clause, and courts have explained that such clauses are "further evidence that the 'rent' [paid on a lease] is not payment for the value of using the facilities but rather is for the value of the money borrowed". United Air Lines, Inc. v. U.S. Bank N.A., 447 F.3d 504, 506, 509 (7th Cir. 2006); see also United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609, 617 (7th Cir. 2005) (basing a finding that a transaction was not a "true lease" in part on the presence of a "hell or high water clause").[7]

19. As additional evidence of the overlap between the FOMB Claim Objection and PBA Complaint, the FOMB Claim Objection borrows additional facts from the PBA Complaint, including its assertions that (i) PBA is governed by a board, the members of which, are, directly or by virtue of holding executive branch positions, appointed by the Puerto Rico Governor; (ii) the PBA leases provide that any disputes between the PBA and its lessees will be resolved by the Governor; and (iii) the PBA leases terminate on the date on which the principal of

---

[7] As reflected in Assured's Rule 12(c) motion for judgment on the pleadings pending in the PBA Adversary Proceeding (Adv. Proc. No. 18-149-LTS, ECF No. 63, the "PBA 12(c) Motion"), Assured's position is that FOMB and the UCC have failed to establish that the PBA leases are disguised financings rather than "true leases" because FOMB and the UCC have failed to allege, in both the Claim Objections and the PBA Complaint, that the Commonwealth or other tenants actually acquire title to the leased premises, which is a hallmark of a "disguised financing." See, e.g., PBA 12(c) Motion § I.B.

and interest on the PBA Bonds have been repaid in full.  See FOMB Claim Objection ¶ 41, 42, 54; PBA Complaint ¶ 14, 32, 40.

20. Finally, it is worth noting that permitting the PBA Adversary Proceeding to proceed on the same schedule as the Claim Objections will not impose significant additional burdens on the parties, because a motion under Rule 12(c) for judgment on the pleadings filed by Assured[8] is already pending in the PBA Adversary Proceeding and is fully briefed except for Assured's reply, which is already substantially drafted.  Indeed, far from imposing additional burdens, permitting the PBA 12(c) Motion to go forward on the same schedule as the Claim Objections will reduce duplication and increase efficiency, because issues already fully briefed in the context of the PBA 12(c) Motion (such as the standards for determining whether the PBA leases constitute "true leases") would otherwise need to be re-briefed in the context of the Claim Objections, whereas if the PBA Adversary Proceeding is being heard on the same schedule the parties may be able to at least partially rely on their prior briefs with respect to the PBA 12(c) Motion when arguing the "true lease" issues central to the Claim Objections.[9]  For this reason as well, the Stay Order's goals of efficiency and avoidance of "piecemeal litigation" can be best achieved if the Claim Objections and the PBA Adversary Proceeding proceed together and on a coordinated schedule.

---

[8] See Adv. Proc. No. 18-149-LTS, ECF No. 63.

[9] Although hearing the PBA 12(c) Motion on the same schedule as the Motions to Dismiss the Claim Objections will likely produce efficiencies by reducing the need to re-brief legal issues already fully briefed in relation to the PBA 12(c) Motion, it is unlikely that a decision granting the Motions to Dismiss the Claim Objections would in and of itself dispose of or moot the PBA Adversary Proceeding, because the focus at the Motion to Dismiss and Motion for Judgement on the Pleadings stage is on the sufficiency of the allegations contained in a particular pleading, and the Claim Objections and PBA Complaint, despite substantial overlap, do constitute separate pleadings.  Therefore, if the Court were to first hear the Motions to Dismiss the Claim Objections and were to dismiss the Claim Objections due to the insufficiency of the allegations contained therein, the Court would nonetheless still need to also consider the PBA Complaint at a later date and rule on the sufficiency of its allegations.  This risk of disjointed separate proceedings at different points in time can be avoided by allowing the Claim Objections and the PBA Adversary Proceeding to proceed on the same schedule.

## II. Because Of "Overlapping Key Issues," All Lift Stay Motions Should Be Heard On The Same Schedule

21. In the Interim Report and the Revenue Bond Order, the Mediation Team left it to this Court to decide an issue important to Assured and all other revenue bondholders, namely whether, in light of the "overlapping key issues" uniting all of the Lift-Stay Motions, those Lift-Stay Motions should be heard together in a coordinated fashion, or whether instead—as FOMB appears to prefer—the PRIFA Lift Stay Motion should be heard in an inefficient, "piecemeal" fashion prior to the other Lift Stay Motions. Specifically, the Revenue Bond Order currently leaves open the date of the hearing on the PRIFA Lift Stay Motion, thereby leaving open the issue of whether the PRIFA Lift Stay Motion will be heard at the same time as, or separately from, the related Lift Stay Motions. See Revenue Bond Order ¶ 1.a. Meanwhile, in the Interim Report, the Mediation Team notes that the "Mediation Team understands that Ambac Assurance Corporation and the FOMB disagree as to whether Ambac may amend the PRIFA Lift Stay Motion. The FOMB, as the Mediation Team understands it, takes the position that a hearing on the PRIFA Lift Stay Motion should take place as soon as possible, as previously briefed. In contrast, the Mediation Team understands that Ambac takes the position that it has a right to file an amended lift stay motion and proceed forward fully on the amended motion. **The Court will likely have to decide how and when the PRIFA Lift Stay Motion (or an amended version of that motion) should be heard**." Interim Report at p. 6 n.7 (emphasis added).

22. Like Ambac, Assured is a party to the PRIFA Lift Stay Motion,[10] and Assured fully supports Ambac's right to amend the PRIFA Lift Stay Motion as well as Assured's own right to join such an amended motion. Regardless of whether the PRIFA Lift Stay Motion is amended or not, however, it simply makes no sense for the PRIFA Lift Stay Motion to be heard

---

[10] See ECF No. 8024 (Assured joinder to PRIFA Lift Stay Motion).

-10-

separately from, and prior to, the other Lift Stay Motions in light of the "overlapping key issues" that unite all of the Lift Stay Motions. The overwhelming preponderance of such "overlapping key issues" can be seen from a comparison of the two Lift Stay Motions filed to date, namely the HTA Lift Stay Motion and the PRIFA Lift Stay Motion. Such a comparison reveals "overlapping key issues" to include the following:

- **Clawback Order:** Both Lift Stay Motions involve excise taxes that the Commonwealth has been unlawfully diverting and confiscating since November 2015, initially pursuant to a "Clawback Order" issued on November 30, 2015. See, e.g., HTA Lift Stay Motion ¶ 16; PRIFA Lift Stay Motion ¶ 20.

- **Moratorium Laws and Orders:** Both Lift Stay Motions implicate the Moratorium Laws and Moratorium Orders under which the Commonwealth purported to perpetuate its diversion and confiscation of the excise taxes following expiration of the initial Clawback Order. See, e.g., HTA Lift Stay Motion ¶¶ 17-18; PRIFA Lift Stay Motion ¶ 22, 24.

- **Section 303 of PROMESA:** Both Lift Stay Motions note that the Moratorium Laws and Moratorium Orders are expressly preempted by Section 303 of PROMESA. See, e.g., HTA Lift Stay Motion ¶ 19; PRIFA Lift Stay Motion ¶ 23.

- **Diminution of Property Value:** Both Lift Stay Motions argue that the Commonwealth's unlawful diversion and confiscation of the excise taxes has resulted in diminution in the value of the property securing the revenue bonds. See, e.g., HTA Lift Stay Motion ¶ 63; PRIFA Lift Stay Motion ¶ 43.

- **Entitlement to Adequate Protection:** Both Lift Stay Motions argue that movants are entitled to adequate protection as a result of the Commonwealth's illegal diversion and confiscation of the collateral securing the revenue bonds. See, e.g., HTA Lift Stay Motion ¶¶ 35-36; PRIFA Lift Stay Motion ¶ 46.

- **"Clawback" Conditions:** Both Lift Stay Motions argue that the conditions to a valid "clawback" of the excise taxes under Article VI, Section 8 of the Puerto Rico constitution have not been satisfied. See, e.g., HTA Lift Stay Motion ¶ 11 and n.4; PRIFA Lift Stay Motion ¶¶ 25, 74-75.

- **First Circuit Caselaw Regarding Statutorily-Created Property Interests:** Both Lift Stay Motions observe that, under controlling First

Circuit precedent, the statutes requiring transfer of the applicable excise taxes to HTA or PRIFA, respectively, give rise to a property interest in favor of HTA or PRIFA, as applicable. See, e.g., HTA Lift Stay Motion ¶¶ 46-50; PRIFA Lift Stay Motion ¶¶ 35-36.

- **Section 552:** Both Lift Stay Motions explain why Section 552 of the Bankruptcy Code does not apply to the applicable pledged revenues. See, e.g., HTA Lift Stay Motion ¶¶ 52-54; PRIFA Lift Stay Motion ¶ 54.

- **Nature of "Special Revenues":** Both Lift Stay Motions address the nature of "special revenues" as defined by the Bankruptcy Code. See, e.g., HTA Lift Stay Motion ¶ 55; PRIFA Lift Stay Motion ¶¶ 55-56.

23. FOMB's opposition (ECF No. 7827, the "PRIFA Opposition" or "PRIFA Opp.") to the PRIFA Lift Stay Motion likewise implicates many of these same "overlapping key issues." For example, the PRIFA Opposition focuses its arguments centrally on what it calls "the Commonwealth's (clawback) powers under Section 8 of Article VI of the Puerto Rico Constitution" (PRIFA Opp. ¶ 6) and on the so-called "police powers" with which FOMB has sought to justify the Moratorium Laws and Orders. See PRIFA Opp. ¶ 7. Indeed, FOMB openly acknowledges in the PRIFA Opposition that its arguments related to "clawback" and "police powers" relate not just to PRIFA, but rather to "**certain Commonwealth instrumentalities**" more generally, "**including PRIFA**." See PRIFA Opp. ¶ 41 (emphasis added); see also id. ("The Commonwealth provided the [pledged revenues] to **the instrumentalities** subject to its rights to retain such revenues under certain circumstances pursuant to section 8 of Article VI of the Puerto Rico Constitution . . . and police powers") (emphasis added). FOMB likewise attempts to deny in the PRIFA Opposition that the statutes requiring transfer of rum tax revenues to PRIFA create a property interest, in the process addressing the same First Circuit cases recognizing statutorily-created property interests that are relied on in the HTA and PRIFA Lift Stay Motions themselves.

-12-

See, e.g., PRIFA Opp. ¶¶ 8, 111; see also HTA Lift Stay Motion ¶¶ 46-50; PRIFA Lift Stay Motion ¶ 36.[11]

24. Notably, FOMB expressly identifies all of the above-cited issues addressed in the PRIFA Opposition as being *within* the scope of the hearing on the PRIFA Lift Stay Motion, "limited to the legal issues of standing and secured status" (see ECF No. 7420), that the Court originally scheduled for July 24. See PRIFA Opposition at 1 ("[T]his Opposition **is limited to the legal issues of standing and secured status**.") (emphasis added). As a result, FOMB cannot plausibly argue that a hearing limited to the issues originally scheduled for July 24 would somehow be lacking in "overlapping key issues" relevant to the HTA Lift Stay Motion. On the contrary, even such a limited hearing would plainly be replete with such "overlapping key issues," and for that reason no such hearing should occur until the HTA Lift Stay Motion can be heard as well.

25. Furthermore, although the CCDA Lift Stay Motion has not been filed yet, that motion will necessarily also implicate all of the "overlapping key issues" identified above. In that context, it is worth noting that Assured and Ambac have been challenging the Commonwealth's confiscation of HTA, PRIFA, *and* CCDA revenues since 2016, when Assured and Ambac together filed a complaint in the U.S. District Court for the District of Puerto Rico that challenged the Commonwealth's diversion and confiscation of all three types of excise tax revenue (HTA, PRIFA, and CCDA), and that survived a motion to dismiss before being stayed by the enactment of PROMESA. See Assured Guaranty Corp. v. García-Padilla, 214 F. Supp. 3d 117 (D.P.R. 2016). Moreover, hearing the PRIFA Lift Stay Motion in an isolated manner prior to, and

---

[11] Moreover, even FOMB's contractual arguments in the PRIFA Opposition are not necessarily limited to PRIFA, as FOMB leans heavily, in its strained interpretation of the PRIFA Trust Agreement, on contractual language similar to language FOMB has previously relied upon in its efforts to attack HTA bondholders' liens under the HTA resolutions. Compare PRIFA Opp. ¶ 67 with, e.g., Assured Guaranty Corp. v. Fin. Oversight Mgmt. Bd. for Puerto Rico, Case No. 18-1165 (1st Cir. July 9, 2018), Brief For Defendants-Appellees at 43 (attached hereto as "Exhibit C").

separately from, the other Lift Stay Motions could effectively deprive HTA and CCDA bondholders of their right to litigate the key issues identified above to the extent rulings with respect to those issues in the context of the PRIFA Lift Stay Motion are issued before HTA and CCDA bondholders even have an opportunity to be heard.

26. In past filings, FOMB has attempted to justify the separate, piecemeal litigation of the PRIFA Lift Stay Motion by pointing to the scheduling order (ECF No. 7420) for the July 24 hearing that the Court entered on July 13, 2019, *before* the entry of the Stay Order. See ECF No. 9015 ¶ 7. Obviously, however, any previous scheduling orders entered by the Court with respect to matters listed in Appendix I to the Stay Order were superseded by the Court's entry of the Stay Order itself, because that order mandated that the scheduling of all matters "listed in Appendix I" be made subject to mediation and to a new scheduling order to be entered by the Court following a hearing with respect to the Mediation Team's Report. See Stay Order ¶ A.7; Stay Extension Order ¶ 4.[12] This Court should schedule the Lift Stay Motions in a coordinated manner that achieves the Stay Order's goals of efficiency and avoidance of "piecemeal" litigation.

## RESERVATION OF RIGHTS

27. Assured reserves all of its rights with respect to the Interim Report, the Interim Orders, and any Amended Report, including specifically the right to join in or oppose any other responses or objections to the Interim Report, Interim Orders, and/or any Amended Report.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Court should enter the Interim Orders substantially in the form attached to the Interim Report, but as amended to (i) allow the

---

[12] Notably, both FOMB and Ambac agreed at the July 24 omnibus hearing to submit the PRIFA Lift Stay Motion to mediation pursuant to the Stay Order. See July 24, 2019 Hr'g Tr., ECF 8266, at 71:23-24 ("MR BIENENSTOCK: . . . "Ambac and the Oversight Board are happy to put the PRIFA issue into that mediation."); see also id. at 84:3.

-14-

Claim Objections and the PBA Adversary Proceeding to proceed on the same schedule, as reflected in the proposed amended GO/PBA Order attached as Exhibit A hereto, and (ii) allow all Lift Stay Motions to be heard on the same schedule, as reflected in the proposed amended Revenue Bond Order attached as Exhibit B hereto.

Dated: December 6, 2019
New York, New York

| CASELLAS ALCOVER & BURGOS P.S.C. | CADWALADER, WICKERSHAM & TAFT LLP |
|---|---|
| /s/ *Heriberto Burgos Pérez* | /s/ *Howard R. Hawkins, Jr.* |
| Heriberto Burgos Pérez | Howard R. Hawkins, Jr.* |
| USDC-PR No. 204,809 | Mark C. Ellenberg* |
| Ricardo F. Casellas-Sánchez | William Natbony* |
| USDC-PR No. 203,114 | Ellen M. Halstead* |
| Diana Pérez-Seda | Thomas J. Curtin* |
| USDC–PR No. 232,014 | Casey J. Servais* |
| E-mail: hburgos@cabprlaw.com | 200 Liberty Street |
|       rcasellas@cabprlaw.com | New York, New York 10281 |
|       dperez@cabprlaw.com | Tel.: (212) 504-6000 |
| | Fax: (212) 406-6666 |
| P.O. Box 364924 | Email: howard.hawkins@cwt.com |
| San Juan, PR 00936-4924 |       mark.ellenberg@cwt.com |
| Tel.: (787) 756-1400 |       bill.natbony@cwt.com |
| Fax: (787) 756-1401 |       ellen.halstead@cwt.com |
| |       thomas.curtin@cwt.com |
| *Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* |       casey.servais@cwt.com |
| | * admitted pro hac vice |
| | *Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* |

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, 6th day of December, 2019.

By: /s/ *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
* admitted pro hac vice

-16-