## **EXHIBIT C**

**Nos. 18-1165, 1166 (Consolidated)**

# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔯𝔰𝔱 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

---

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO HIGHWAYS & TRANSPORTATION AUTHORITY,

*Debtors*,

---

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States District Court for the District of
Puerto Rico, San Juan in Nos. 3:17-AP-00155-LTS, -00156-LTS
(Hon. Laura Taylor Swain, Judge)*

## BRIEF FOR DEFENDANTS-APPELLEES

MICHAEL A. FIRESTEIN
LARY ALAN RAPPAPORT
PROSKAUER ROSE LLP
2049 Century Park East, Suite 3200
Los Angeles, California 90067
Tel: (310) 557-2900
mfirestein@proskauer.com
lrappaport@proskauer.com

HERMANN D. BAUER
O'NEILL & BORGES LLC
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918
Tel: (787) 764-8181

MARTIN J. BIENENSTOCK
STEPHEN L. RATNER
JEFFREY W. LEVITAN
MARK D. HARRIS
TIMOTHY W. MUNGOVAN
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
mbienenstock@proskauer.com
sratner@proskauer.com
jlevitan@proskauer.com
mharris@proskauer.com
tmungovan@proskauer.com

*Attorneys for Defendants-Appellees The Financial Oversight and Management
Board for Puerto Rico, for itself and as representative for the Commonwealth of
Puerto Rico and the Puerto Rico Highways and Transportation Authority, and
Natalie A. Jaresko*

*(For Continuation of Appearances See Inside Cover)*

Case: 18-1165    Document: 00117521532    Page: 3    Date Filed: 12/06/2018    Entry ID: 6182536

Case:17-03283-LTS  Doc#:9501-3  Filed:12/06/19  Entered:12/06/19 17:20:56  Desc
Exhibit C- Brief for Defendants-Appellees    Page 3 of 77

ASSURED GUARANTY CORPORATION; ASSURED GUARANTY
MUNICIPAL CORPORATION; FINANCIAL GUARANTY INSURANCE
COMPANY; NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,

*Plaintiffs–Appellants*,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
FOR PUERTO RICO; PUERTO RICO FISCAL AGENCY AND FINANCIAL
ADVISORY AUTHORITY; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR
THE PUERTO RICO HIGHWAYS & TRANSPORTATION  AUTHORITY;
RICARDO ROSSELLO NEVARES; GERARDO JOSE PORTELA FRANCO;
CARLOS CONTRERAS-APONTE; JOSE IVAN MARRERO-ROSADO; RAUL
MALDONADO GAUTIER; NATALIE A. JARESKO,

*Defendants–Appellees*,

JOSE B. CARRION, III; ANDREW G. BIGGS; CARLOS M. GARCIA;
ARTHUR J. GONZALEZ; JOSE R. GONZALEZ; ANA J. MATASANTOS;
DAVID A. SKEEL, JR.; CHRISTIAN SOBRINO,

*Defendants*.

JOHN J. RAPISARDI
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Tel: (212) 326-2000
jrapisardi@omm.com

PETER FRIEDMAN
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
pfriedman@omm.com

LUIS MARINI
MARINI PERTRANTONI MUÑIZ, LLC
MCS Plaza
San Juan, San Juan, Puerto Rico 00917
Tel:  (787) 406-8555
lmarini@mpmlawpr.com

ELIZABETH L. MCKEEN
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660
Tel: (949) 823-6900
emckeen@omm.com

*Attorneys for Defendants-Appellees the Puerto Rico Fiscal Agency and Financial
Advisory Authority and Gerardo Portela Franco*

Case: 18-1165    Document: 00117531702    Page: 36    Date Filed: 07/09/2018    Entry ID: 6182536

Case:17-03283-LTS  Doc#:9501-3  Filed:12/06/19  Entered:12/06/19 17:20:56  Desc:
Exhibit C- Brief for Defendants-Appellees    Page 4 of 77

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendants-Appellees are not required to file a corporate disclosure statement under Fed. R. App. P. 26.1 because none of them is a non-governmental corporate party. Defendants-Appellees are all either natural persons or governmental entities.

Case: 18-1165    Document: 00117351732    Page: 4    Date Filed: 12/06/2018    Entry ID: 6182536

Case:17-03283-LTS   Doc#:9501-3   Filed:12/06/19   Entered:12/06/19 17:20:56   Desc:
Exhibit C- Brief for Defendants-Appellees   Page 5 of 77

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 5

STATEMENT OF THE CASE AND FACTS ........................................... 6

STANDARD OF REVIEW ................................................................. 10

SUMMARY OF ARGUMENT ........................................................... 10

ARGUMENT ................................................................................ 12

I.     THE DECISION SHOULD BE AFFIRMED BECAUSE THE COMPLAINT FAILS TO STATE A CLAIM UNDER BANKRUPTCY CODE §§ 922(d) AND 928(a). ................................ 12

    A.    HTA Is Not Required to Turn Over Revenues to Appellants under Sections 922(d) or 928(a). ........................... 12

        1.    The Statutory Text Does Not Require Turnover. .......... 12

        2.    The Statutory Purpose and Scheme Are Inconsistent with a Turnover Requirement. .................. 16

        3.    Appellants' Reliance on Legislative History Is Misplaced. ........................................................... 23

    B.    There Is No Private Right of Action to "Enforce" Bankruptcy Code Sections 922 or 928. .................................. 28

    C.    Policy Arguments Presented by Appellants and Their Amici Do Not Alter the Statute's Meaning. ........................... 31

II.    THE COMPLAINT FAILS TO ALLEGE FACTS ESTABLISHING AN UNAVOIDABLE LIEN AGAINST HTA REVENUES. ............................................................... 34

    A.    Appellants Have Not Alleged Facts Showing a Statutory Lien. ................................................................. 34

    B.    The Complaint Does Not Allege Facts Showing a Perfected Security Interest. ....................................... 38

        1.    The Complaint Does Not Allege Facts Showing Appellants Have a Security Interest ............................. 39

Case:17-03283-LTS    Doc#:9501-3    Filed:12/06/19    Entered:12/06/19 17:20:56    Desc:
Exhibit C- Brief for Defendants-Appellees    Page 6 of 77

2.    The Complaint Does Not Allege Facts Showing
Any Purported Security Interest Was Perfected. ............42

III.    PROMESA SECTION 305 PRECLUDES THE RELIEF
APPELLANTS SEEK. .......................................................................45

A.    Section 305, Like Bankruptcy Code Section 904, Ensures
the Continued Provision of Public Services and Bars
Interference with the Debtors' Use of Revenue........................45

B.    Bankruptcy Code Sections 922 and 928 Are Not "More
Specific" Provisions and Do Not "Trump" PROMESA
Section 305.................................................................................48

C.    The Oversight Board Did Not Consent to Any
Interference with Debtor Property. ..........................................50

D.    The Doctrine of Constitutional Avoidance Is Not
Implicated..................................................................................52

CONCLUSION .................................................................................................55

CERTIFICATE OF COMPLIANCE .......................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)...........................................................28

*Armstrong v. Exceptional Child Ctr., Inc.,*
    135 S. Ct. 1378 (2015)..................................................29, 30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................39

*Association of Retired Employees of City of Stockton v. City of
    Stockton (In re City of Stockton),*
    478 B.R. 8 (Bankr. E.D. Cal. 2012)...............................*passim*

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla,*
    217 F. Supp. 3d 508 (D.P.R. 2016) .....................................54

*Christie Manson & Woods Ltd. v. Minor,*
    465 F. App'x 722 (9th Cir. 2012).......................................43

*City of Little Rock v. Cmty. Chest of Greater Little Rock,*
    163 S.W.2d 522 (Ark. 1942) ..............................................16

*Clark v. Martinez,*
    543 U.S. 371 (2005)...........................................................53

*Dimino v. Sec'y of Mass.,*
    695 N.E.2d 659 (Mass. 1998).............................................52

*DuBay v. Williams,*
    417 F.2d 1277 (9th Cir. 1969) ...........................................44

*Ecker v. Sw. Tampa Storm Sewer Drainage Dist.,*
    75 F.2d 870 (5th Cir. 1935) ...............................................15

*First Nat'l Bank of Boston v. Me. Tpk. Auth.*,
   136 A.2d 699 (Me. 1957)........................................................................52

*Fla. ex rel. Nat'l Disc. Corp. v. Livingston*,
   139 So. 364 (Fla. 1931) ......................................................................16

*Fla. v. City of Lakeland*,
   16 So.2d 924 (Fla. 1943) ....................................................................15

*Franklin Cal. Tax-Free Tr. v. P.R.*,
   805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016) ......................47, 54

*GAF Linden Employees Fed. Credit Union v. Robertson (In re
   Robertson)*,
   232 B.R. 846 (Bankr. D. Md. 1996) ..................................................42

*George v. City of Asheville*,
   80 F.2d 50 (4th Cir. 1935) ..................................................................15

*Grain Merchants of Indiana, Inc. v. Union Bank & Sav. Co., Bellevue,
   Ohio*,
   408 F.2d 209 (7th Cir. 1969) ..............................................................44

*Hartford Underwriters Insurance Co. v. Union Planters Bank*,
   530 U.S. 1 (2000)................................................................................23

*In re Atlas IT Exp. LLC*,
   491 B.R. 192 (B.A.P. 1st Cir. 2013)..................................................21

*In re Ball*,
   No. 05-24915 JAB, 2006 WL 4847274 (Bankr. D. Utah May 4,
   2006) ....................................................................................................36

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014)......................................17, 33

*In re City of Stockton*,
   526 B.R. 35 (Bankr. E.D. Cal. 2015), *aff'd,* 542 B.R. 261 (B.A.P.
   9th Cir. 2015)......................................................................................35

*In re County of Orange*,
   179 B.R. 185 (Bankr. C.D. Cal. 1995) ..............................................50

*In re Curran*,
 855 F.3d 10 (1st Cir. 2017)..................................................................34

*In re Fonseca*,
 542 B.R. 628 (BAP 1st Cir. 2015).......................................................36

*In re Jefferson County, Alabama*,
 474 B.R. 228 (Bankr. N.D. Ala. 2012)...........................................15, 27, 28, 46

*In re Kennewick Public Hosp. Dist.*,
 2017 WL 5619224 (Bankr. E.D. Wash. Nov. 17, 2017) ....................51

*In re Las Vegas Monorail Co.*,
 429 B.R. 317 (Bankr. D. Nev. 2010)..................................................36

*In re N.Y.C. Off-Track Betting Corp.*,
 434 B.R. 131 (Bankr. S.D.N.Y. 2010).................................................47

*In re Richmond Unified Sch. Dist.*,
 133 B.R. 221 (Bankr. N.D. Cal. 1991) ...............................................17

*In re Rodriguez*,
 421 B.R. 356 (Bankr. S.D. Tex. 2009) ...............................................21

*In re Rudler*,
 576 F.3d 37 (1st Cir. 2009).................................................................23

*In re Stern*,
 44 B.R. 15 (Bankr. D. Mass. 1984) ....................................................36

*In re Supreme Beef Processors, Inc.*,
 468 F.3d 248 (5th Cir. 2006) ..............................................................30

*Iriarte v. United States*,
 157 F.2d 105 (1st Cir. 1946)...............................................................49

*Iverson v. City of Boston*,
 452 F.3d 94 (1st Cir. 2006).................................................................28

*Kennewick Public Hosp. Dist. v. Key Govt. Finance, Inc.*,
 No. 4:17-cv-05195-SAB (E.D. Wash. Feb. 22, 2018)........................51

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991)..........................................................................29

*Lopez v. Davis*,
    531 U.S. 230 (2001)..........................................................................23

*Lyda v. City of Detroit* (*In re City of Detroit*),
    841 F.3d 684 (6th Cir. 2016) ..........................................................47

*Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*,
    892 F.2d 575 (7th Cir. 1989) ..........................................................21

*McCulloch v. Maryland*,
    17 U.S. 316 (1819)............................................................................20

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)..........................................................................41

*Northcross v. Bd. of Ed. of Memphis City Sch.*,
    412 U.S. 427 (1973)..........................................................................46

*Patterson v. Carey*,
    363 N.E.2d 1146 (N.Y. 1977)..........................................................52

*Peaje Investments LLC v. The Financial Oversight & Management*
    *Board for Puerto Rico, et al.*,
    845 F.3d 505 (1st Cir. 2017)...................................................40, 53

*Peaje Investments LLC v. Garcia-Padilla, et al.*,
    Case No. 16-2365 FAB, 2016 U.S. Dist. LEXIS 153711 (D.P.R.
    Nov. 2, 2016), *aff'd in part, rev'd in part*, 845 F.3d 505 (1st Cir.
    2017) ....................................................................................................40

*Peaje Investments LLC v. Puerto Rico Highways & Transp. Auth.*,
    301 F. Supp. 3d 290 (D.P.R. 2017) ................................................38

*Puget Sound Power & Light Co. v. City of Seattle*,
    271 F. 958 (W.D. Wash. 1921).........................................................16

*RadLAX Gateway Hotel LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)...................................................................48, 49

*Rockney v. Blohorn,*
    877 F.2d 637 (8th Cir. 1989) ............................................................ 46

*San Juan Cable LLC v. P.R. Tele. Co.,*
    612 F.3d 25 (1st Cir. 2010) ............................................................... 29

*Scott v. City of Truth or Consequences,*
    262 P.2d 780 (N.M. 1953) ................................................................ 15

*Smith v. Boise City,*
    18 F. Supp. 385 (D. Idaho 1937) ..................................................... 16

*UAW v. Fortuño,*
    633 F.3d 37 (1st Cir. 2011) ............................................................... 10

*United States v. Gold (In re Avis),*
    178 F.3d 718 (4th Cir. 1999) ............................................................ 44

*Young v.1200 Buena Vista Condos.,*
    477 B.R. 594 (W.D. Pa. 2012) ................................................... 35, 39

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ...................................................................... 29

**STATUTES, CONSTITUTIONS AND RULES**

3 L.P.R.A. § 2121 ................................................................................ 38

3A L.P.R.A. App. III § 5 ...................................................................... 38

9 L.P.R.A. § 2000 ................................................................................ 38

9 L.P.R.A. § 2002 ................................................................................ 38

9 L.P.R.A. § 2004(l) ............................................................................ 37

9 L.P.R.A. § 2012 ...................................................................... 7, 35, 38

9 L.P.R.A. § 2015 ................................................................................ 37

9 L.P.R.A. § 2021 ................................................................................ 35

9 L.P.R.A. § 5681 ................................................................................ 35

13 L.P.R.A. § 31751(a) ...............................................................................................35

19 L.P.R.A. § 2010 ....................................................................................................43

19 L.P.R.A. § 2053 ....................................................................................................43

19 L.P.R.A. § 2212(52) .............................................................................................42

19 L.P.R.A. § 2218 ....................................................................................................43

19 L.P.R.A. § 2267(a) ...............................................................................................42

11 U.S.C. § 101 .........................................................................................30, 34, 39

11 U.S.C. § 362 ................................................................................................*passim*

11 U.S.C. § 363(c)(2) ................................................................................................18

11 U.S.C. § 365(d)(5) ................................................................................................14

11 U.S.C. § 502 .........................................................................................................19

11 U.S.C. § 506 ...........................................................................................19, 22, 36

11 U.S.C. § 542 .........................................................................................................14

11 U.S.C. § 544 ...........................................................................................38, 40, 41, 42

11 U.S.C. § 547(c) .....................................................................................................44

11 U.S.C. § 552 ................................................................................................*passim*

11 U.S.C. § 902 ...................................................................................................8, 40

11 U.S.C. § 904 ................................................................................................*passim*

11 U.S.C. § 922 ................................................................................................*passim*

11 U.S.C. § 926(b) ....................................................................................................26

11 U.S.C. § 927 ....................................................................................................24, 52

11 U.S.C. § 928 ................................................................................................*passim*

11 U.S.C. § 1129 .................................................................19, 33, 52

Fed. R. Civ. P. 12(b)(6) .........................................................................10

PROMESA § 106(e) ...............................................................................29

PROMESA § 301 ...........................................................................*passim*

PROMESA § 304 ...........................................................................6, 50

PROMESA § 305 ...........................................................................*passim*

PROMESA § 314 ...................................................................34, 52, 54

PROMESA § 405 ...........................................................1, 6, 32, 53

PROMESA § 407(a) ...............................................................................29

PROMESA § 601 ...............................................................................29, 43

Puerto Rico Highways and Transportation Authority Act,
   Act No. 74-1965 ......................................................................*passim*

U.C.C. § 9-108 ...................................................................................43

U.C.C. § 9-110 ...................................................................................42

U.C.C. § 9-317(a)(2) .......................................................................38, 42

**OTHER AUTHORITIES**

Black's Law Dictionary, 10th ed. (2014) .......................................16, 37

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 363 (1977).........................17

H.R. Rep. No. 595, 95th Cong., 1st Sess. 314 (1977) .............................34

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 373 (1977).........................44

Leonard Weiser-Varon, Yes, Special Revenue Bonds Remain Special,
   Public Finance Matters, Feb. 26, 2018,
   https://www.lexology.com/library/detail.aspx?g=6ee562eb-d9d0-
   406b-b0e5-1d7608605fd4 ..........................................................31

Case: 18-3363    Document: 003113352762    Page: 25    Date Filed: 10/06/2018

Case 17-03283-LTS    Doc#:9501-3    Filed:12/06/19    Entered:12/06/19 17:20:56    Desc
Exhibit C- Brief for Defendants-Appellees    Page 14 of 77

S. Rep. No. 95-989, 95th Cong., 2d Sess. 88 (1978)...............................................44

## PRELIMINARY STATEMENT

Appellants appeal from an Opinion and Order (the "Decision," ADD1-29) dismissing their Amended Adversary Complaint (the "Complaint") for declaratory and injunctive relief seeking to require Appellee Puerto Rico Highways and Transportation Authority ("HTA"), a Title III debtor under PROMESA, to turn over to Appellants all pre-petition and post-petition revenues. The Decision should be affirmed because the Complaint fails to state a viable claim as the statutes relied on by Appellants, 11 U.S.C. § 922(d) and 11 U.S.C. § 928 (a), do not provide the relief they seek.

The underlying dispute arises from the unprecedented fiscal emergency that led Appellee the Commonwealth of Puerto Rico (the "Commonwealth") and HTA to seek protection under Title III. Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2101-2241, based on the findings it embedded into PROMESA §§ 405(m)(1)-(4) even before Hurricanes Irma and María devastated the Commonwealth: a fiscal emergency exists in Puerto Rico; the Commonwealth government cannot provide its citizens with effective services; the fiscal emergency is accelerating out-migration of Puerto Rico's residents and businesses; and independent oversight is necessary for fiscal management and debt restructuring. As a result of the fiscal crisis and HTA's attendant loss of funding, HTA cannot pay the debt service and

Case: 18-1165    Document: 00117520162    Page: 25    Date Filed: 12/06/2018    Entry ID: 6182536

Case:17-03283-LTS Doc#:9501-3 Filed:12/06/19 Entered:12/06/19 17:20:56 Desc
Exhibit C- Brief for Defendants-Appellees   Page 16 of 77

principal on bonds it issued.  Revenue received by HTA is necessary to operate, maintain and preserve HTA's highways and transportation system. Appellants, who insure bonds issued by HTA and claim they are subrogated to the rights of bondholders, including their alleged rights to purported statutory or "contractual" liens, commenced an adversary proceeding to force HTA to turn over to Appellants all past and future revenues HTA receives from toll roads, excise taxes, fees or other sources.

According to Appellants' Complaint, Bankruptcy Code sections 922(d) and 928(a) mandate the turnover to Appellants of all revenues received by HTA. Appellants contend that, notwithstanding the automatic stay imposed by PROMESA, and premised on the erroneous assumption they hold unavoidable liens against HTA's present and future revenues (which they do not),[1] sections 922(d) and 928(a) allow them to jump ahead of all other claimholders and enforce their purported liens by seizing all HTA's cash on hand and future revenues.  Of course, ordering HTA to divert its revenue to Appellants would nullify the Title III process, and undermine critical infrastructure (Puerto Rico's highways and transportation system) and push the Island's economy into a nosedive.

---

[1] As briefed in the district court and discussed in Point II below, Appellants' failure to allege facts showing an unavoidable lien against HTA revenues itself requires dismissal of the Complaint and affirmance of the Decision.

Case: 18-1933 Document: 00117532163 Page: 17 Date Filed: 12/06/2018 Entry ID: 6182536

Case:17-03283-LTS Doc#:9501-3 Filed:12/06/19 Entered:12/06/19 17:20:56 Desc
Exhibit C- Brief for Defendants-Appellees   Page 17 of 77

Appellants' interpretation of sections 922(d) and 928(a) is wrong, and the allegations of the Complaint are fatally defective.   The Decision should be affirmed because: (i)  neither section 922(d) nor section 928(a) requires municipal debtors to turn over special revenues, as Appellants contend; (ii) Appellants are, at most, general unsecured claimholders who cannot obtain relief under those sections; and (iii) in any event, PROMESA § 305 precludes the relief Appellants seek.

Even assuming, *arguendo*, Appellants had an unavoidable lien, section 922(d) does not afford them the right to the turnover they seek.  As is clear from the plain language of the statute, as well as the legislative scheme of which it is a part, section 922(d) is not a turnover statute.  Section 922(d) is a limited exception to the automatic stay that *permits* secured claimholders (which Appellants are not) to apply special revenues already in their possession to pre-petition debt if such application is otherwise permitted or required, and *permits* a debtor to pay a creditor voluntarily without violating the automatic stay.  Because Appellants lack possession and HTA cannot maintain its transportation system if it turns over the revenues to Appellants, section 922(d) does not entitle Appellants to HTA's money.

Appellants also build their argument on the erroneous assumption that sections 922(d) and 928(a) create a private right of action.  Neither section has any

3

indicia creating such a right of action, nor is there any support for a right of action – which provides an independent reason to dismiss Appellants' claims and corroborates that Congress did not intend those sections to afford a turnover right. Appellants' and their amici's policy arguments about purported damage to the bond markets are speculative and, in any event, inadequate to alter the statutory analysis.

Moreover, the district court properly dismissed the Complaint because it fails to allege facts establishing that Appellants have an unavoidable lien.  Without this cornerstone allegation, Appellants' claims fail.  There are only two potentially available types of liens – statutory liens and consensual liens.   Appellants do not have a statutory lien because HTA's enabling act, which permits the issuance of bonds and pledge of revenues (but does not mandate it), does not create such a lien, nor do the resolutions under which HTA issued the relevant bonds.[2]   The Complaint also fails to allege Appellants have an unavoidable consensual lien in the form of a perfected, consensual security interest.

---

[2] The legal basis for the conclusion that HTA's enabling act and resolutions do not create a statutory lien in favor of bondholders was briefed and argued in the consolidated appeals submitted to this Court on June 5, 2018 in *Peaje Investments LLC v. The Financial Oversight & Management Board for Puerto Rico, et al.*, Case Nos. 17-2165, 17-2166 and 17-2167.

The Opening Brief tries to gloss over this fatal pleading defect by ignoring it, and simply *assuming* Appellants have an unavoidable lien. Appellants' failure to plead an unavoidable lien provides an independent basis to affirm the Decision.

Beyond these defects, PROMESA section 305 precludes the relief sought by Appellants and is independently dispositive of all Appellants' claims. Section 305 deprives the courts of the power to require a Title III debtor to disburse funds, or otherwise interfere with the debtor's governance or use or enjoyment of its revenues and property, absent the Oversight Board's consent, which it has not given.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Do Bankruptcy Code sections 922(d) and/or 928(a) require a debtor to turn over "pledged special revenues" to a secured claimholder, even though the plain language of the statutes does not contain such a requirement?

2. Does the Complaint fail to state a claim predicated on alleged lien violations because it does not adequately allege facts establishing an unavoidable lien?

3. Does PROMESA section 305 preclude the relief sought by Appellants in the Complaint, which would require payment of HTA's revenues to Appellants?

Case: 18-1370    Document: 00117520762    Page: 20    Date Filed: 10/09/2019    Entry ID: 6285776

Case:17-03283-LTS Doc#:9501-3 Filed:12/06/19 Entered:12/06/19 17:20:56 Desc:
Exhibit C- Brief for Defendants-Appellees   Page 20 of 77

## STATEMENT OF THE CASE AND FACTS

In 2016, Congress enacted PROMESA, which included an automatic stay upon enactment, PROMESA section 405(b), and provision for the Oversight Board to commence Title III cases for covered entities, which cases trigger a new automatic stay pursuant to Bankruptcy Code § 362.  PROMESA §§ 301(a), 304(a). The Oversight Board commenced Title III cases for the Commonwealth on May 3, 2017 and HTA on May 21, 2017.  JA97.  After the Title III cases began, no further payments were made regarding the bonds in dispute.[3]  JA211.

HTA is responsible for developing, operating, and maintaining Puerto Rico's toll road network, major highways, and transportation facilities with the goal of facilitating Puerto Rico's economic development.  JA292, JA294.  HTA incurred the debt at issue through the exercise of powers conferred by the Puerto Rico Highways and Transportation Authority Act, Act No. 74-1965 (codified at 9 L.P.R.A. § 2001 *et seq.*) (the "Enabling Act").

The Enabling Act empowered HTA to adopt a "resolution or resolutions" authorizing HTA to issue and sell bonds which "*may contain* such other terms and

---

[3] Pursuant to the Commonwealth's certified fiscal plan in effect when this adversary proceeding was commenced, the Commonwealth projected a ten-year $66.9 billion gap between revenues and expenses, absent plan-based measures. JA256.  The Commonwealth's economy was contracting at a rate of over 2% annually and its population was shrinking.  JA264.  Public sector debt (excluding pension obligations) totaled $73.8 billion in 2017, at a time when the estimated cash flow available for debt service was well under $1 billion a year.  JA275, JA277.

6

covenants as such resolution or resolutions may provide." 9 L.P.R.A. §§ 2012(a) & (b) (emphasis added). Among other things, "[a]ny resolution or resolutions authorizing any bonds may contain provisions" on a variety of matters that "shall be a part of the *contract* with the holders of the bonds." *Id.* (emphasis added).

HTA adopted resolutions authorizing the issuance and sale of bonds in 1968 (the "'68 Resolution") and 1998 (the "'98 Resolution") (collectively, the "Resolutions"). JA371-438, JA439-525. In parallel provisions, section 401 of each Resolution created a fund with separate accounts for bond service, bond redemptions, and a reserve, and moneys deposited into those accounts are held in trust by a Fiscal Agent. JA417-19, JA494-97.

The Complaint alleges Appellants guaranteed the payment of principal and interest on certain bonds issued under the Resolutions. JA216-17. Appellants assert they have a "gross lien" on revenues from HTA's toll facilities, Commonwealth gasoline and other excise taxes, and Commonwealth vehicle license fees. JA218-19. They claim a subrogated right to payment from those revenue streams for insurance claims paid to bondholders. JA220. Appellants also broadly assert their liens on HTA revenue streams are "statutory and contractual." JA217. Notably, the pleading is devoid of any factual allegation regarding the creation of a "contractual" lien (apart from the permissive language in the Resolutions) or that Appellants have a *perfected* security interest.

In their Complaint (JA209-47), Appellants claim a continuing right to payment based on their alleged lien against HTA's revenue notwithstanding the commencement of the Debtors' Title III cases.  Appellants claim the revenues securing the purported consensual lien are "special revenues" under 11 U.S.C. § 902(2), and their purported lien against those revenues was therefore preserved post-petition under 11 U.S.C. § 928(a).  Appellants also claim HTA's revenues are "pledged special revenues" not subject to a stay of their application to the indebtedness for which they were pledged, JA210, and consequently, that Appellees allegedly "violated" Bankruptcy Code section 922(d) by not applying those funds. JA211-12.  Appellants allege four claims: (i) for a declaration that the failure to remit bond revenues violates sections 922(d) and 928(a), JA241; (ii) for a declaration that funds held in the reserve accounts by the Fiscal Agent were Appellants' "property," JA242; (iii)  for an injunction barring Appellees from "any action that would further violate Sections 922(d) and 928(a)," JA242-43; and (iv) for an injunction requiring Appellees to "remit revenues" pursuant to the same statutes, JA243-44.

The district court granted Appellees' motion to dismiss.  ADD1-29.  The district court held the plain language of section 928(a) "clearly and simply provides that certain pre-petition liens will remain in place after the filing of the petition, notwithstanding Section 552(a)'s general protection of after-acquired

property from pre-petition liens," but section 928(a) "does not address lien enforcement at all" or "address payment of the secured obligation." ADD18.

The district court likewise rejected, based on the statutory text, Appellants' contention that section 922(d) "requires debtors, or third parties holding special revenues, to apply the revenues to outstanding obligations." ADD20. Rather, section 922(d) "makes clear that the automatic stay is not an impediment to continued payment, whether by the debtor or by another party in possession of pledged special revenues, of indebtedness secured by such revenues, if other relevant circumstances permit or require such payments." *Id.* The district court's statutory interpretation is unquestionably correct. Section 922(d) solely renders the automatic stay inapplicable to the "application of pledged special revenues…to payment of indebtedness…." Conversely, sections 362(a)(3) and 362(a)(6) automatically stay, among other things, any "act to collect…a claim" and "any act to obtain possession of property…." Congress clearly left in place the automatic stay against acts to collect and to obtain possession, which it would not have done if it were creating a turnover obligation.

The district court carefully considered and correctly rejected the same arguments Appellants make here regarding the legislative history and statutory scheme. ADD18-19, 21-23. Finally, the district court dismissed the second claim, determining Appellants failed to plead a plausible claim to the reserve funds held

by the Fiscal Agent based on erroneous allegations that Appellants were owners or trust beneficiaries of those funds.  ADD24-29.  To the extent the second claim rested on an alleged lien, the district court held Appellants had neither "alleged facts nor proffered a legal theory" to establish a justiciable claim.  ADD14.[4]

## STANDARD OF REVIEW

The Court reviews a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) *de novo*. *UAW v. Fortuño*, 633 F.3d 37, 40 (1st Cir. 2011).

## SUMMARY OF ARGUMENT

As discussed in Point I, the Complaint fails to state a claim under Bankruptcy Code sections 922(d) and 928(a) because those sections do not grant the relief Appellants seek.  The plain language of section 922(d) merely suspends the automatic stay to permit, but not require, application of pledged special revenues to pay a secured claimholder, and section 928(a) limits Bankruptcy Code section 552 and provides that special revenues remain subject to pre-petition consensual liens after the commencement of the case.  In addition to the plain language, the purpose of municipal restructuring embodied in Chapter 9 and the statutory scheme corroborate that sections 922(d) and 928(a) are not turnover statutes.  The legislative history of the 1988 amendments on which Appellants

---

[4] Appellants have abandoned their ownership and trust theories, because they are not addressed in their Opening Brief.  Appellees do not address those issues here other than to note they were properly rejected below.

improperly rely in the absence of a statutory ambiguity does not alter these conclusions.  Additionally, sections 922(d) and 928(a) do not create private rights of action.  The policy arguments urged by Appellants and their amici also are unpersuasive, and in any event, cannot prevail over the plain meaning of the statutes.

Point II demonstrates the Complaint also fails to allege facts showing Appellants have an unavoidable lien (statutory or consensual) or are anything other than general unsecured claimholders.  Appellants do not have a statutory lien because HTA's Enabling Act did not create any statutory liens and its bond resolutions are not legislation.  The Complaint also does not allege facts showing a security interest in HTA revenues nor the perfection of any such security interest.  Accordingly, sections 922 and 928 are inapplicable and every claim in the Complaint fails.

As discussed in Point III, PROMESA section 305 precludes all relief Appellants seek.  Section 305 bars the courts from entering any stay, order or decree that interferes with Debtors' governmental powers, revenues, or use of their property, without the Oversight Board's consent, which has not been given.  Appellants' contention that Appellees gave consent by commencing this Title III case would apply in every Title III case, rendering section 305 meaningless, contrary to basic rules of statutory construction.  Appellants are also wrong that

11

sections 922(d) and 928(a) are "more specific" than section 305 and therefore "trump" it, because the statutes do not actually conflict. Appellants' contention they should win under the doctrine of constitutional avoidance because they assert they have a Takings claim is without merit because (i) they have not pled a Takings claim and (ii) PROMESA amply protects their constitutional rights without requiring the court to misconstrue sections 922(d) and 928(a).

## ARGUMENT

## I.  THE DECISION SHOULD BE AFFIRMED BECAUSE THE COMPLAINT FAILS TO STATE A CLAIM UNDER BANKRUPTCY CODE §§ 922(d) AND 928(a).

### A.  HTA Is Not Required to Turn Over Revenues to Appellants under Sections 922(d) or 928(a).

#### 1.  The Statutory Text Does Not Require Turnover.

The district court correctly rejected Appellants' primary contention – that Bankruptcy Code section 922(d) requires HTA to turn over revenues securing HTA bonds – because the statute has no such requirement. ADD19-20. Rather, section 922(d) provides:

> Notwithstanding section 362 of [the Bankruptcy Code] and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section [928] of [the Bankruptcy Code] to payment of indebtedness secured by such revenues.

11 U.S.C. § 922(d). Thus, to the extent "application of pledged special revenues in a manner consistent with" section 928 would otherwise be permitted, sections 362

12

and 922(a) do not stay it.  In the words of the district court, section 922(d) "makes clear that the automatic stay is not an impediment to continued payment, whether by the debtor or by another party in possession of pledged special revenues, of indebtedness secured by such revenues, if other relevant circumstances permit or require such payments."  ADD20.

Section 928(a), in turn, "merely exempts consensual prepetition liens on special revenues acquired by the debtor post-petition from Section 552(a) of the Bankruptcy Code, which could otherwise invalidate such liens with respect to revenues acquired post-petition."   ADD18.   It does not require, or dictate the timing of, payment:

> Section 928 does not address lien enforcement at all, nor does it address payment of the secured obligation; it thus neither expressly nor impliedly provides any exception from, inter alia, the stay imposed by Bankruptcy Code Section 362(a)(4) on "any act to … enforce any lien against property of the estate."   Nor does any provision of Section 928 purport to mandate action on the part of the obligor.

*Id.*

In context and by its plain language, section 922(d) *permits* a secured claimholder to apply special revenues in its possession to pre-petition debt, and *permits* a debtor to pay creditors voluntarily during the pendency of the bankruptcy case (which voluntary payments may be applied to the debt by the creditor), without violating the automatic stay.   Section 922(d) does not *mandate* such

payments.  *See* 6 Collier on Bankruptcy ¶ 922.05 (16th ed. 2018) (section 922(d) "does not suggest that its language compels payment of special revenues in the possession of the municipality"); ADD20 (citing Collier).

When Congress wants to command performance, turnover, or payment, it does so expressly.  *See, e.g.*, 11 U.S.C. § 365(d)(5) ("The trustee shall timely perform all of the obligations of the debtor…"); § 542(a) ("…an entity…shall deliver to the trustee"); § 542(b) ("…an entity…shall pay such debt to…").  By contrast, as the district court correctly observed, section 922(d) "simply carves out one type of action (application of revenues) from the automatic stay, without addressing any other constraints that may apply to that action, without any grant of relief from other aspects of the automatic stay, and without imposing a requirement that action be taken."  ADD20.

Moreover, section 922(d) on its face does not negate any of the specific provisions of section 362(a) it would be expected to address if Congress had intended it to provide the broader authorization of lien enforcement Appellants postulate.  For example, section 922(d) does not say that notwithstanding section 362(a)(1), revenue bond holders may commence actions against debtors to force the application of pledged special revenues in their favor.  Nor does section 922(d) state revenue bond holders are free to act to exercise control over property of the estate or to collect a claim, notwithstanding sections 362(a)(2) and (5).  If Congress

had meant to authorize collection or enforcement activities, it would have done so explicitly.

Recognizing that negating a stay of "application" is not the same as directing payment, Appellants try to impose a contorted meaning on the word "application" by citing (at 26-27) cases that reference the term. Only one of those cases involves the Bankruptcy Code, and that case – *In re Jefferson County, Alabama*, 474 B.R. 228, 252 (Bankr. N.D. Ala. 2012) – is inapposite as discussed below. Further, none of those cases suggests "application" in section 922(d) means a turnover. Some of Appellants' cases merely recite that the word "apply" has been used in a few state statutes to require municipalities to allocate funds to interest or other obligations according to state law priorities applicable outside of bankruptcy, but there is no suggestion Congress looked to such cases to guide construction of section 922(d).[5]  Moreover, that "apply" can be used to mean "pay" in some contexts, does not solve Appellants' problem because section 922(d) does not compel application of funds.  It merely provides that application of certain

---

[5] *See Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*, 75 F.2d 870, 872-73 (5th Cir. 1935) (state statute provided funds held by receiver should be "applied" to pay costs, then interest); *George v. City of Asheville*, 80 F.2d 50, 55 (4th Cir. 1935) (state statute required "net revenue" to be "applied" to interest, then principal); *Scott v. City of Truth or Consequences*, 262 P.2d 780, 781 (N.M. 1953) (statute required revenues to be "applied" to maintain utility, then pay interest and fund a sinking fund); *Fla. v. City of Lakeland*, 16 So.2d 924, 925 (Fla. 1943) (state statute created a lien and was intended to ensure "application" of "surplus net revenues to the uses pledged").

15

Case: 18-1165    Document: 00117522762    Page: 29    Date Filed: 10/09/2018    Entry ID: 6182536

Case:17-03283-LTS  Doc#:9501-3  Filed:12/06/19  Entered:12/06/19 17:20:56  Desc
Exhibit C- Brief for Defendants-Appellees   Page 30 of 77

revenues is not a stay violation. Appellants' other cases show even less.[6] None

construes the term "application" in a manner relevant to or controlling in this case.

Additionally, the relevant usage of "apply" attested in dictionaries focuses

on the purpose for which funds are employed. *See, e.g.*, Black's Law Dictionary,

10th ed. (2014), at 120 (defining "apply" as "To employ for a limited purpose

<apply payments to a reduction in interest>"). Thus, the absence of a stay on

application does not translate into a command to "transfer" or "pay," as the district

court implicitly recognized in holding "[n]othing in the language of Section 922(d)

requires debtors … to apply the revenues to outstanding obligations." ADD20.[7]

## 2. The Statutory Purpose and Scheme Are Inconsistent with a Turnover Requirement.

Reading section 922(d) as permissive rather than mandatory is consistent

with the plain language of the statute, and is the only construction consistent with

the purpose of section 922 and the broader statutory scheme. *E.g.*, ADD22. The

---

[6] *See Smith v. Boise City*, 18 F. Supp. 385, 387-88 (D. Idaho 1937) (reviewing bondholder remedies for nonpayment); *Puget Sound Power & Light Co. v. City of Seattle*, 271 F. 958, 964-65 (W.D. Wash. 1921) (same); *City of Little Rock v. Cmty. Chest of Greater Little Rock*, 163 S.W.2d 522, 524 (Ark. 1942) (unlawful to divert utility's revenues to a charitable cause contrary to indenture); *Fla. ex rel. Nat'l Disc. Corp. v. Livingston*, 139 So. 364, 365 (Fla. 1931) (granting mandamus to require municipality to pay interest).

[7] Amicus Securities Industry and Financial Markets Association asserts (at 19) the "market has always understood" section 922(d) to require turnover, but it does not cite a single authority or fact to support this assertion (which, in any event, is irrelevant to statutory construction).

16

"primary purpose of debt restructure for a municipality is not future profit, but rather continued provision of public services." *In re City of Detroit*, 524 B.R. 147, 248 (Bankr. E.D. Mich. 2014) (quoting *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999)); *see also In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ("Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather, to meet the special needs of a municipal debtor."); H.R. Rep. No. 95-595, 95th Congress, 1st Session 363 (1977) ("the primary purpose of Chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims").

In keeping with that primary purpose, Chapter 9 and PROMESA include provisions barring courts from interfering with a debtor's governmental powers, property, revenues, or use and enjoyment of income-producing property. *See* 11 U.S.C. § 904; PROMESA § 305. The impact of section 305 is discussed below in Point III; here, it suffices to say that construing section 922(d) as permissive, and not as a turnover statute, is the only way to harmonize section 922(d) with section 305. As the district court found, a "narrow, straightforward reading of Section 922(d) is consistent with Section 904 of the Bankruptcy Code and, as relevant here, Section 305 of PROMESA and gives adequate effect to both sections." ADD22. This analysis follows the principle that statutes should be read to harmonize their

Case: 18-1003    Document: 00117532762    Page: 50    Date Filed: 10/09/2019    Entry ID: 6292670

Case:17-03283-LTS Doc#:9501-3 Filed:12/06/19 Entered:12/06/19 17:20:56 Desc
Exhibit C- Brief for Defendants-Appellees   Page 32 of 77

various sections. *Id.* (citing *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986); *United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 751-52 (1st Cir. 1985)).

To the same effect, Chapter 9 and PROMESA both omit 11 U.S.C. § 363(c)(2), which bars debtors from using cash collateral without the secured lender's consent or court approval. Congress's choice to permit municipal and Title III debtors to use cash collateral without such approval corroborates that sections 922(d) and 928(a) are not intended to require such collateral be turned over to a secured lender.

Both of Appellants' arguments regarding the statutory scheme are unavailing. First, invoking the canon that statutes should not be construed to treat any of their provisions as surplusage, they argue (at 24-25) section 922(d) would be "superfluous" if it did not require debtors to apply special revenues to pay bondholders, because, they say, a debtor is always free to voluntarily apply funds to pay an obligation. This argument fails. As properly construed by the district court, section 922(d) performs a distinct and necessary function. It permits a creditor in possession of the collateral to apply it to pay the secured indebtedness (assuming such application is otherwise permitted or required) – an application that would otherwise be barred by the stay, as the district court observed. ADD20. Section 922(d) also allows a debtor to apply pledged special revenues to payment of the claims for which they are encumbered, but other provisions of the

Bankruptcy Code show a mandatory application of special revenues would be inconsistent with them.  For instance, sections 502(b)(2) and 506(b) disallow post-petition interest except to the extent the creditor is oversecured.   Section 1129(b)(2)(A) (incorporated by PROMESA section 301(a)) allows the debtor to impose a new note with different terms or two other treatments on holders of secured claims.  It would make no sense that Congress would allow a debtor to impose a new note with a new interest rate on its creditors, while requiring payment of the original interest rate throughout the case, which may last a few years.  Moreover, in some cases, section 502(b)(2) would block the accrual of interest in the first place when the special revenues are not large enough to oversecure the outstanding bonds.  Then, any mandatory turnovers of special revenues would be principal repayments.  But, there is no reason Congress would require principal repayments during the case when it allows principal repayment to be stretched out under a plan of adjustment pursuant to section 1129(b)(2)(A)(i).

Legislative history suggests the drafters were less sanguine than Appellants that a debtor is always free to apply pledged special revenues to pay secured debt.  The Senate Report comments "the use of an automatic stay may be contrary to Section 904 and interfere with the government, affairs and the municipality's use

or enjoyment of income-producing property." JA568.[8] The only reasonable explanation of this comment is the committee believed the stay could bar debtors from applying pledged special revenues to pay secured debt voluntarily, and section 922(d) relieves municipal debtors from that constraint, thereby working hand-in-glove with section 904. Section 922(d) confirms a debtor may voluntarily apply pledged special revenues to pay the debt. Even assuming, *arguendo*, a debtor could do this without section 922(d), no rule of statutory construction precludes 922(d) from confirming that right for the avoidance of doubt, in addition to conferring on creditors who hold the collateral a right they otherwise would not have. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. 316, 420-21 (1819) (law served to "remove all doubts" on an issue).

Appellants argue (at 22) that the "notwithstanding" clause at the beginning of section 922(d) enables all bondholders to "enforce their liens." According to Appellants, there would be no need for section 922(d) "to cross-reference sections 362 and 922(a) if section 922(d) were not intended to permit revenue bondholders to enforce their liens or claims against the debtor free from the constraints of both sections." Appellants read too much into the word "notwithstanding" and assume

---

[8] As discussed further in Point 1.A.3, Appellants' reliance on legislative history goes beyond what the law permits when a statute is unambiguous, and attempts to rewrite the statute. To the extent legislative history may be used, it is significant Congress was concerned about potential interference with a debtor's governance.

20

Case: 18-1559   Document: 00117520102   Page: 54   Date Filed: 12/06/2018   Entry ID: 6182536

Case: 17-03283-LTS   Doc#: 9501-3   Filed: 12/06/19   Entered: 12/06/19 17:20:56   Desc
Exhibit C- Brief for Defendants-Appellees   Page 35 of 77

the conclusion – that section 922(d) enables lien enforcement.  All section 922(d) says is that notwithstanding the automatic stay against enforcement of liens against taxes or assessments owed to the debtor, there is no "stay of application of pledged special revenues…to payment of indebtedness…."  Section 362(a) stays lien enforcement against the debtor's property the same as section 922(a)(2) stays lien enforcement against taxes and assessments owed to the debtor.  The district court's interpretation properly gives effect to the "notwithstanding" clause, by acknowledging that the statute permits "application" of pledged special revenues by those who hold them (whether the debtor or the secured party), where otherwise permissible.[9]  ADD20.

Second, Appellants argue (at 5-6) that "[i]f the application of special revenues were merely at the debtor's option, then section 928(b) would be unnecessary – the debtor could always choose to retain enough of the revenues to cover expenses."  That argument ignores the impact of section 928(b).  It does not

---

[9] The cases Appellants cite (at 22-23) in an effort to demonstrate the automatic stay "does not apply to debtors" do not support Appellants' "notwithstanding" argument.  Two merely hold the debtors did not violate the stay by suing, an act calculated to benefit the estate.  *See Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *In re Atlas IT Exp. LLC*, 491 B.R. 192, 195 (B.A.P. 1st Cir. 2013).  In the third, *In re Rodriguez*, 421 B.R. 356, 367 (Bankr. S.D. Tex. 2009), the issue was not, as Appellants suggest (at 23), whether "voluntary mortgage payments by the debtor" violated section 362(a), but rather whether a *creditor* violated the stay by misapplying payments the debtor voluntarily made.  There was no holding about the effect of the stay on the debtor.

simply allow the debtor to use revenues for the transportation system. Section 506(a) shows the amount of a secured claim turns on the value of the collateral for the claim. Section 928(b) reduces the amount of the creditors' secured claim by limiting the collateral to the difference between the revenues and the necessary operating expenses. Without section 928(b), the creditors would have a secured claim for all the revenues used to pay those expenses. No statutory language is "unnecessary" under this construction.

Section 928(b) ensures a municipal debtor may elect to apply revenues to pay necessary operating expenses subject to court determinations, in the event of a dispute, over which expenses are "necessary." Interpreting sections 922(d) and 928(a) as requiring turnover of revenues would raise more questions than answers regarding the import of section 928(b). For example, is the debtor required to turn over all revenues and the creditors refund amounts to pay necessary expenses? Does the debtor pay only revenues after expenses are paid? Are all revenues held in escrow pending a determination of which expenses are "necessary"? Conversely, interpreting 922(d) as permissive (i) harmonizes the sections while achieving the primary purpose of a municipal debt restructuring – the continuation of municipal services – and (ii) avoids a conflict with PROMESA section 305.

Appellants' observation (at 40) that section 928(a) uses the word "shall," and "shall" is a mandatory term, misses the mark. The relevant inquiry is *what* is

mandated by the provision; the provision mandates that post-petition special revenues that would be subject to liens from pre-petition security agreements shall be subject to such liens. Appellants have not alleged Appellees failed to do anything the statute actually says they "shall" do, so *Lopez v. Davis*, 531 U.S. 230, 241 (2001) and other cases Appellants cite about the construction of "shall" are irrelevant.

### 3.    Appellants' Reliance on Legislative History Is Misplaced.

Appellants and their amici rely extensively on legislative history in an effort to infer a right to *require* payment that does not exist in the plain language of sections 922(d) or 928(a). Courts do not consult legislative history unless a statute is ambiguous, which is not the case here. ADD17 (citing *Perez-Olivo v. Chavez*, 394 F.3d 45, 49-51 (1st Cir. 2005)). "If the statute's language is plain, 'the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.'" *In re Rudler*, 576 F.3d 37, 44 (1st Cir. 2009) (quoting *Lamie v. United States*, 540 U.S. 526, 534 (2004)); *see also Hartford Underwriters Insurance Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241(1989), quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

Even if the legislative history is considered, it does not support Appellants' contentions. It merely shows, as the district court observed (ADD21), that

Congress enacted section 922(d) to enable municipal debtors to pay bondholders without violating the automatic stay of the Bankruptcy Code. Congress was concerned the automatic stay could prevent a debtor from voluntarily paying pledged special revenues toward bonds secured by those special revenues.[10] Legislative history does not express any intent to remove the protection of the automatic stay in other respects.

Section 928(a) was "intended to negate Section 552(a)" but "go no further." ADD19 (citing JA559).[11] The Senate Report explained:

> As a practical matter, even though Section 552 of the Bankruptcy Code provides that the pledge is terminated, given the mandate of the law and the practical reality of municipal finance, a municipality might well attempt to ignore that provision and continue to pay bondholders as originally promised…. Such disregard for Section 552 can lead to a problem in obtaining confirmation of a plan of adjustment….

JA553.

---

[10] According to the House Report, "new subsection (d) to section 922 states that the automatic stay of Bankruptcy Code section 362 does not operate to stay *paying* pledged revenues, consistent with new section 927 of the Bankruptcy Code, to the revenue bondholders holding liens on such revenues." JA593 (emphasis added). *See also* n. 11, *infra*.

[11] Appellants (at 43-44) fault the district court for citing this language without the Senate committee's next sentence: "[i]n other words, it is not intended to create new rights that otherwise would not exist under state law and constitutional provisions." JA559. But, adding this sentence changes nothing. The legislative history does not transform section 928(a) from a provision preserving liens into one negating the automatic stay or requiring payments.

24

Appellants attempt to turn the legislative history into a retrenchment of the automatic stay by quoting it selectively and misleadingly. For example, they argue (at 31, citing JA558) Congress was worried that without section 922(d) the stay would prevent "any post-petition collection activities against the debtor" and thereby delay "application of pledged special revenues." Appellants strategically omit from their quotation of the Senate Report a key phrase indicating the committee was focusing on "application of the debtor's *funds held by a secured lender* to secure indebtedness." JA558 (emphasis added). The full paragraph of the Senate Report actually suggests Congress was particularly focused on the "application of the debtor's funds held by a secured lender to secure indebtedness," which supports the district court's analysis.[12]

---

[12] The full paragraph states:

> The automatic stay of Bankruptcy Code Section 362 is extremely broad, preventing any post-petition collection activities against the debtor, including application of the debtor's *funds held by a secured lender* to secure indebtedness. This provision is overly broad in Chapter 9, requiring the delay and expense arising from a request for relief from the automatic stay to accomplish what many state statutes mandate: the application of pledged revenues after payment of operating expenses to the payment of secured bonds. The automatic stay should specifically be inapplicable to the *payment* of such revenues. The Bankruptcy Court could retain the power to enjoin application of proceeds, however, upon a specific showing of need, for example, where a secured creditor was about to apply proceeds in a matter inconsistent with policies of the proposed new section.

JA558 (emphasis added).

To the same effect, this paragraph concludes by observing that the "Bankruptcy Court could retain the power to enjoin application of proceeds … for example, where a secured creditor was about to apply proceeds in a matter inconsistent with policies of the proposed new section." JA558. That remark makes sense if Congress was concerned in section 922(d) with a "secured creditor" that *possesses* the "proceeds," as the district court recognized, ADD20, but makes no sense if the statute were focused on lien enforcement.

Citing a sentence where the Senate Report says "[i]n this context, 'pledged revenues' includes funds in the possession of the bond trustee as well as other pledged revenues," JA560, Appellants (at 32) contend the reference to "other pledged revenues" means Congress intended creditors to be able to apply funds "not yet in the possession of the secured creditor or indenture trustee." Unlike the statute, the committee's language is ambiguous; it is unclear what the committee was contemplating by using the phrase "other pledged revenues." Nonetheless, it certainly does *not* imply that section 922(d) means funds "not yet" in the creditor's possession *must* be turned over to the creditor. If the committee had meant this sentence to suggest a turnover requirement, it would have said so explicitly. Moreover, the paragraph begins by describing Bankruptcy Code section 926(b), under which payments to bondholders are not avoidable as preferences, which

suggests the committee was focusing on voluntary payments by the debtor, together with application of collateral by creditors or trustees in possession.

Appellants mistakenly rely on *In re Jefferson County, Ala.*, 474 B.R. 228 (Bankr. N.D. Ala. 2012) to argue section 922(d) compels payment of pledged special revenues. As the district court explained, *Jefferson County* is inapposite. ADD23. In *Jefferson County*, it was undisputed the creditors had a first priority lien. 474 B.R. at 251-52. Here, as discussed in Point II, below, Appellants failed to allege an unavoidable lien. The contested revenues in *Jefferson County* were to be paid in accordance with the pre-petition financing documents. Warrant-holders held a security interest against revenues prior to their deposit with a trustee. *Id.* at 251 (lien covered "monies *required to be deposited* in a debt service fund and a reserve fund . . ." (emphasis added)). By contrast, Appellants' claimed collateral is limited to moneys *deposited* with the fiscal agent.

Moreover, in *Jefferson County*, the county did not contest turning over post-petition revenues if the court determined they were covered by the lien. Where the warrant-holders held a lien against future net revenues required to be turned over, the court ruled section 922(d)'s reference to pledged special revenues included the future net revenues. 474 B.R. at 274. Here, the dispute is not about *what* revenues are covered by the purported lien, but *whether* section 922(d) creates an enforceable obligation to turn over *any* revenues in the first place. That issue was

27

not decided in *Jefferson County*. "No issue of refusal to pay" was presented, as the question was "what funds qualified as pledged special revenues pursuant to Sections 922(d) and 928 of the Bankruptcy Code." ADD23. Neither the legislative history Appellants cite, nor the *Jefferson County* decision that relies on it, supports Appellants' argument.

### B. There Is No Private Right of Action to "Enforce" Bankruptcy Code Sections 922 or 928.

The Complaint also fails to state a claim because there is no cognizable private right or claim to "enforce" sections 922 or 928. The absence of such a right disposes of the entire Complaint and confirms Appellants' interpretation of sections 922 and 928 is wrong. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). By their terms, neither section 922 nor section 928 creates a private right of action. A court therefore may not entertain a claim under their provisions unless they "clearly evince[] congressional intent to bestow" a right of action that was not created expressly. *Iverson v. City of Boston*, 452 F.3d 94, 100 (1st Cir. 2006).

As the Supreme Court recently reiterated, "[i]f the statute itself does not display an intent to create a private remedy, then a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy

Case: 18-1165    Document: 00117525163    Page: 42    Date Filed: 12/06/2019    Entry ID: 6302536

Case:17-03283-LTS   Doc#:9501-3   Filed:12/06/19   Entered:12/06/19 17:20:56   Desc
Exhibit C- Brief for Defendants-Appellees   Page 43 of 77

matter, or how compatible with the statute." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) (quoting *Sandoval*, 532 U.S. at 286-87); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365 (1991) (Scalia, J., concurring) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals."). Where a provision is silent about creating a cause of action, there is a strong presumption that none exists. *San Juan Cable LLC v. P.R. Tele. Co.*, 612 F.3d 25, 30 (1st Cir. 2010).

This presumption is especially strong here because Congress has shown elsewhere it knows how to create a private right of action to remedy stay violations. *See* 11 U.S.C. § 362(k)(1). It created another one in PROMESA to remedy certain inter-debtor transfers. PROMESA § 407(a). *See also* PROMESA § 601(n)(2) ("Notwithstanding [PROMESA § 106(e)], there shall be a cause of action to challenge unlawful application of this section."). Appellants incorrectly *assume* the existence of a right of action when they assert (at 28) section 922(d) "is a mandatory process that creditors may sue to enforce." They cite no authority and ignore the contrast between section 922(d) and sections 362(k)(1) and 407(a).

There is no evidence Congress intended to create a private right of action under sections 922 or 928. Section 922(d) merely discusses the application of the automatic stay in a case involving a municipal debtor. Section 922 says nothing

29

about any party's substantive rights.  Because it lacks "the sort of rights-creating language needed to imply a private right of action," section 922 does not evince any intent by Congress to create a private right of action.   *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015).

Section 928 likewise does not create any substantive rights.   It merely describes the circumstances under which a lien created by contract under state law continues to apply to property acquired after the filing of a municipal bankruptcy. 11 U.S.C. § 928.  Indeed, section 928 could not create a right to a lien because a lien is a property right, 11 U.S.C. § 101(37), and "bankruptcy law is not itself a source of property rights."  *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 255 (5th Cir. 2006) (citing *Butner v. United States*, 440 U.S. 48, 54–55 (1979)).  In the absence of specific rights-creating language, there can be no cause of action under section 922 or 928.  *See Armstrong*, 135 S. Ct. at 1387.

Conversely, the omission of a private right of action demonstrates Congress did not intend sections 922(d) and 928 (a) to require the turnover of revenues.  If Congress meant for those sections to create a turnover right – rather than simply permit application of pledged special revenues to pay secured creditors, and negate the effect of section 552(a) – Congress would have created a private right of action. Appellants' construction of sections 922(d) and 928(a) as turnover statutes fails to make sense of what Congress chose to include and exclude from the statute, while

the district court's construction harmonizes the entire statute, as the law requires.
*See* ADD22 (citing *La. Pub. Serv. Comm'n*, 476 U.S. at 370; *Ven-Fuel*, 758 F.2d at
751-52).

### C.    Policy Arguments Presented by Appellants and Their Amici Do Not Alter the Statute's Meaning.

Appellants and their amici assert that affirming the Decision would damage
the municipal bond market; National Federation of Municipal Analysts ("NFMA")
even suggests (at 6-7) the entire $4.5 trillion projection of infrastructure repair
nationwide hangs in the balance because the Decision will frighten away
bondholders.   But neither cites any *fact* suggesting the Decision has had any
impact on the bond market.[13]   By contrast, other commentators have observed
municipal debtors often have incentives to voluntarily turn over special revenues.
*See, e.g.*, Leonard Weiser-Varon, Yes, Special Revenue Bonds Remain Special,
Public              Finance              Matters,              Feb. 26,              2018,
https://www.lexology.com/library/detail.aspx?g=6ee562eb-d9d0-406b-b0e5-
1d7608605fd4.  The Decision's lesson is simply that, before purchasing bonds, an
investor should be certain there is a statutory lien (*i.e.*, a statute using mandatory

---

[13] NFMA's estimate (at 21-22) of the future impact of the Decision is not
supported by a single fact.  NFMA merely offers its self-serving "understanding of
the market."  Such *ipse dixit* speculation should be disregarded.

"shall language" to create a lien in favor of bondholders) or a properly drafted and perfected security interest.[14]

Perhaps more telling is what Appellants do not discuss, namely, what if they had their way?!  If HTA turned over to Appellants the revenues it undisputedly uses to maintain Puerto Rico's transportation system, then what?  How is the Commonwealth supposed to operate?  Appellants' silence is tantamount to their position:  pay us in full and go find the money for transportation somewhere else. This runs headlong into Congress' findings set forth in PROMESA section 405(m) – Puerto Rico is unable to provide effective services as a result of its fiscal emergency.  Appellants are not the only creditors who take that position.

Appellants contend (at 29-30, 37) the 1988 amendments to the Bankruptcy Code adding sections 922 and 928 were intended to facilitate municipalities' access to credit by reassuring revenue bondholders of their ability to collect.  To some extent, that may be right.  Some debtors, such as Jefferson County, have the cash to pay bondholders.  Thus, allowing such payments to be made when the debtor can afford them does help bondholders.  The voluntariness in section 922(d)

---

[14] Assured, like other bondholders, has made the same "sky is falling" arguments before.  *See, e.g.*, *In re City of Detroit, Mich.*, Case No. 13-53846 (Bankr. E.D. Mich.), ECF No. 4674 (May 12, 2014), ¶¶ 86-87 (Assured contending approval of cram down of bondholders would drive up municipal bond interest rates).  But none of those dire predictions has come true in the four years since *Detroit* – and Appellants point to no evidence it has.

does not render the legislative history untrue.  In any event, as discussed in Point I.A, above, legislative history is not consulted when a statute is unambiguous.  Even if Congress's general motives in the 1988 amendments included reassuring revenue bondholders, that did not displace the overarching purpose of chapter 9 (and now PROMESA) to preserve municipal debtors' ability to serve their constituents, *see, e.g.*, *City of Detroit*, 524 B.R. at 248.  Moreover, to the extent reassuring revenue bondholders was part of the legislative balance, the Decision's construction provides such reassurance by making section 552 inapplicable in certain circumstances.

Appellants also fallaciously argue (at 44 n.15 and 51-2) that because special revenue bonds are non-recourse, the Decision's analysis leaves them in a "worse position than unsecured creditors."  As shown in Point II, below, based upon the Complaint's allegations, Appellants *are* unsecured; they have not adequately alleged (and cannot allege) a statutory lien or that they created and perfected a security interest.  Even assuming, *arguendo*, Appellants had adequately alleged an unavoidable lien, their inability to obtain the relief sought in the Complaint would not leave them worse off than unsecured creditors.  If Appellants had unavoidable liens, absent an agreement, their claims would receive the treatment afforded secured claimholders under Bankruptcy Code section 1129(b)(2), and any plan of adjustment Appellees submit would have to meet the requirement that it be "in the

best interests of creditors."  PROMESA § 314(b)(6).  Until then, if Appellants had an unavoidable lien and a basis to allege their collateral were not adequately protected, they could move for stay relief.  They have not done so.[15]

## II. THE COMPLAINT FAILS TO ALLEGE FACTS ESTABLISHING AN UNAVOIDABLE LIEN AGAINST HTA REVENUES.

The Complaint fails to allege facts establishing Appellants have an unavoidable lien (statutory or consensual) against HTA revenues entitling them to relief.  Although the Decision did not reach this ground, the failure to plead an unavoidable lien – either a statutory lien or a perfected security interest – is an independent ground to affirm dismissal of the Complaint.  *In re Curran*, 855 F.3d 10, 25 n.1 (1st Cir. 2017) (affirming motion to dismiss on other grounds).

### A. Appellants Have Not Alleged Facts Showing a Statutory Lien.

A statutory lien is a lien "arising *solely* by force of a statute on specified circumstances or conditions."  11 U.S.C. § 101(53) (incorporated into PROMESA by PROMESA § 301) (emphasis added).  Unlike a consensual lien, a statutory lien "arises automatically, and is not based on an agreement to give a lien or on judicial action."  H.R. Rep. No. 595, 95th Cong., 1st Sess. 314 (1977).  The language of the statute giving rise to the lien must be express, automatic, and mandatory: *i.e.,* self-

---

[15] Appellants argue (at 45) "the decision below subverts the purpose of section 928(b)" because that section applies only "during the pendency of a case," not after plan confirmation.  Likewise, the benefit to creditors of sections 922(d) and 928(a), where applicable, may be specific to the life of the case.  But, that is no reason to misconstrue them.

executing "shall" language or its equivalent. *In re City of Stockton*, 526 B.R. 35, 57 (Bankr. E.D. Cal. 2015) (lien created where language provided lienholder "shall have a lien" on the assets of a terminated contracting agency), *aff'd*, 542 B.R. 261 (B.A.P. 9th Cir. 2015); *Young v.1200 Buena Vista Condos.*, 477 B.R. 594, 599 (W.D. Pa. 2012) (statute provided that lienholder "has a lien").  No such statute exists here.

Appellants contended below they have a statutory lien against Commonwealth gasoline and other excise taxes, and Commonwealth vehicle license fees based on the Enabling Act and Resolutions.[16]  Pltfs. Mem. In Opp. to Defts. Motion to Dismiss, ECF No. 70 at 21-22.  But, the Enabling Act specifically and only *authorizes* HTA to issue bonds with certain terms by resolution.  9 L.P.R.A. § 2012.  There is no mandatory rights-creating language in the statute. The *permission* granted by the Enabling Act to pledge particular funds does not *mandate* that funds be pledged.  9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. § 31751(a).  The Enabling Act does not require HTA to use excise taxes and vehicle license fees for HTA bonds.  The Enabling Act does not create a statutory lien; rather it authorizes HTA to create a lien by voluntarily later agreeing to do so.

---

[16] Appellants do not adequately plead a statutory lien against toll revenues. *See* Complaint ¶¶ 32, 34-37, 52, 83, JA217-19, 223-24, 232-33.  But, even if they did, no such lien exists for the reasons stated in the text.

35

*In re Fonseca,* 542 B.R. 628 (BAP 1st Cir. 2015), cited by Appellants in opposing the motion to dismiss, ECF No. 70 at 23-24, does not hold otherwise. There, the statute created setoff rights, providing that a retiring employee's entitlement to payment for accumulated leave "shall be" subject to withholding for certain obligations, giving rise to a statutory lien on the leave payment.  542 B.R. at 637-38.  Under Bankruptcy Code section 506(a)(1), setoff rights are treated as secured claims.  Other authorities addressing statutes giving rise to statutory liens consistently reference mandatory, rights-creating language in the statute.  *See, e.g., In re Ball*, No. 05-24915 JAB, 2006 WL 4847274, *3 (Bankr. D. Utah May 4, 2006) ("An attorney *shall have a lien* for the balance of compensation due from a client….") (emphasis added); *In re Las Vegas Monorail Co*., 429 B.R. 317, 329 (Bankr. D. Nev. 2010) ("The principal of, the interest on and any prior redemption premiums due in connection with the bonds issued pursuant to NRS 349.400 to 349.670, inclusive, *are payable from*, *secured by a pledge of*, *and constitute a lien on* the revenues out of which the bonds have been made payable…." (emphasis added)); *In re Stern*, 44 B.R. 15, 18 (Bankr. D. Mass. 1984) ("The unit owner's share of the common expenses *shall constitute a lien* upon his unit and *shall be enforced* in the manner provided in section five of the chapter 254.") (emphasis added).  The Enabling Act does not contain mandatory, self-executing language creating a lien.

36

Case: 18-1663     Document: 00117522162     Page: 50     Date Filed: 12/06/2019     Entry ID: 6182536

Case:17-03283-LTS   Doc#:9501-3   Filed:12/06/19   Entered:12/06/19 17:20:56   Desc:
Exhibit C- Brief for Defendants-Appellees   Page 51 of 77

Below, Appellants argued language in the Enabling Act stating certain revenues "shall be used solely for the payment" of HTA obligations was sufficient to create a lien.  ECF No. 70.  This language, however, appears in a proviso to the authorization granted to HTA to pledge the revenues.  It is not a pledge.  It is nothing more than a promise to pay.  Indeed, if it were read to be a pledge, then every promise to pay would create a lien.  Moreover, the language only applies when, pursuant to the authority granted to HTA to do so, there has been a consensual pledge (grant of security interest).  This language does not mandate or create a lien.

Other provisions of the Enabling Act on which Appellants relied below, *id.*, are no more helpful.  Section 2004(l) "empowers" HTA to borrow money, issue bonds, and pledge funds to secure those bonds.  9 L.P.R.A. § 2004(l).  This provision is also permissive rather than mandatory or self-executing.  Section 2015 explains that HTA bonds are nonrecourse and the funds HTA may use to pay the bonds are those "pledged for the payment of such bonds" – plainly to ensure the bonds do not become general obligations of HTA or the Commonwealth.  9 L.P.R.A. § 2015.  These statutes do not, by themselves, command that anything be pledged or that a lien is thereby created.

Nor can Appellants rely on the Resolutions, which are not statutes and cannot create a statutory lien.  *See* Statute, Black's Law Dictionary (10th ed. 2014)

("A law passed by a legislative body; specif. legislation enacted by any lawmaking body, such as a legislature, administrative board, or municipal court"). HTA is a public corporation overseen by the Executive Branch. 3A L.P.R.A. App. III § 5; 9 L.P.R.A. 2002. Only Puerto Rico's Legislature has the power to enact statutes. P.R. Const. art. III § 1. A resolution passed by HTA does not have statutory force and cannot give rise to a statutory lien. *See Peaje Investments LLC v. Puerto Rico Highway & Transp. Auth.*, 301 F. Supp. 3d 290, 298-99 (D.P.R. 2017).[17]

### B. The Complaint Does Not Allege Facts Showing a Perfected Security Interest.

The Complaint also fails to allege facts showing Appellants have an unavoidable lien in the form of a perfected security interest. Indeed, Appellants do not allege they have a security interest, let alone a perfected security interest.[18]

---

[17] Resolutions are different from regulations. The Enabling Act expressly distinguishes "regulations" (§ 2000) from "resolutions" (§ 2012). Section 2012(b) states "bonds may be authorized by resolution or resolutions of the Authority…." It does not state that bonds can be authorized by "regulation." The "Resolutions" at issue here are unquestionably resolutions – not regulations. Puerto Rico law prescribes procedures necessary to promulgate a regulation. *See, e.g.,* 3 L.P.R.A. §§ 2121 (publishing in a general circulation newspaper), 2122 (opportunity for public comment). None of these procedures was followed in creating the Resolutions because they are not regulations. These procedures are not pro forma — they are for the protection of the public due to the legal status that regulations have.

[18] A holder of an unperfected security interest is an unsecured claimholder in bankruptcy. 11 U.S.C. § 544; UCC § 9-317(a)(2).

38

### 1. The Complaint Does Not Allege Facts Showing Appellants Have a Security Interest

The Complaint does not allege Appellants have a security interest and does not even contain the term "security interest."  Appellants assert only the legal conclusion they have "statutory and contractual liens" and, pursuant to the Enabling Act and Resolutions, a "gross lien," on the toll revenues, excise taxes and vehicle license fees.  JA217-18.  These conclusory allegations are legally deficient as Appellants omit factual allegations explaining the supposed bases for those purported liens. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim).

By definition, a lien may not be both a "statutory lien" and a "security interest."  11 U.S.C. § 101(53) (statutory lien "does not include security interest"); *see also Young,* 477 B.R. at 598 (holding a lien "cannot be both a statutory lien and a security interest").  Regardless of what property interest is permissible or conceivable, or that Appellants contend they have in their briefs, Appellants failed *to plead* a security interest in any HTA revenues and the dismissal should therefore be affirmed.

Appellants incorrectly asserted below that this Court and the district court previously determined HTA bondholders have a security interest in HTA revenues.

39

Opp. 18-19 (citing *Peaje Investments LLC v. Garcia-Padilla, et al.*, Case No. 16-2365 FAB, 2016 U.S. Dist. LEXIS 153711 (D.P.R. Nov. 2, 2016), *aff'd in part, rev'd in part*, 845 F.3d 505 (1st Cir. 2017)).  There was no such determination.  In part of his decision, Judge Besosa summarized the bondholders' *allegations*, including the allegation defendants diverted pledged revenues securing the repayment of HTA bondholders.  *Peaje,* 2016 U.S. Dist. LEXIS 153711, at *7-8.  The court's recitation of plaintiffs' allegations is not a finding.  This Court affirmed Judge Besosa's denial of Peaje's motion, but reversed as to certain plaintiffs whose moving papers "presented sufficient *allegations* to entitle them to a hearing."  *Peaje Investments LLC*, 845 F.3d at 509 (emphasis added).  This Court's determination that those plaintiffs' allegations were sufficient to warrant a hearing is not a finding they had the lien rights they claimed.

The issues presented on this appeal – whether plaintiffs pled a security interest and, if so, whether it was perfected – were not presented to Judge Besosa or this Court in *Peaje*, which occurred in the context of a motion to lift the PROMESA stay.  That action was decided well before the filing of the Commonwealth's and HTA's Title III cases, and thus before the application of PROMESA's incorporated Bankruptcy Code sections, including sections 544, 552, 902, 922 and 928 (made applicable by PROMESA § 301(a)).  In the pre-Title III lift-stay motions, the Commonwealth and HTA did not have the status and powers

of hypothetical judicial lien creditors under section 544, and the question of whether those plaintiffs had a perfected security interest had no significance.  Now, it has major significance.

For similar reasons, Appellees are not estopped from challenging whether Appellants have a security interest or perfected it.  At no point before Judge Besosa or the First Circuit did the appellees involved in those cases assert or admit the HTA bondholders had a perfected security interest.  They argued only with respect to the "alleged" security interest, which is not a concession such a security interest exists.  *See, e.g., Peaje Investments LLC*, Case No. 3:16-cv-02365 FAB, ECF No. 30, at 8, 11-12 (opposition to the lift-stay motion stating "Assuming, *arguendo*, that movant could show a security interest" and referencing an "alleged" security interest).  The argument in *Peaje* was not "directly inconsistent" with challenging the existence of an unavoidable lien here because that issue was not presented in the context of the lift-stay motion.  *See, New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (doctrine of estoppel may apply only where two positions taken by a party are directly inconsistent).  Any contention to the contrary is not supported by the record.

## 2.    The Complaint Does Not Allege Facts Showing Any Purported Security Interest Was Perfected.

The Complaint also fails to allege *perfection* of any purported security interest.  As noted above, the holder of an *unperfected* security interest is an *unsecured* claimholder in bankruptcy 11 U.S.C. § 544; UCC § 9-317(a)(2). Moreover, pursuant to Puerto Rico's UCC, an unperfected security interest would be subordinate to the rights of the Oversight Board as trustee for the debtors, and effectively nullified. 19 L.P.R.A. §§ 2267(a), 2212(52) (An unperfected security interest is subordinate to the rights of "a person that becomes a lien creditor," which includes a trustee in bankruptcy.).  PROMESA makes the Oversight Board the Debtors' bankruptcy trustee in their Title III cases for purposes of each applicable Bankruptcy Code section referring to a trustee.  PROMESA § 301(c)(7). Subordination of an unperfected security interest to the rights of a bankruptcy trustee under the UCC renders the creditor unsecured.  *GAF Linden Employees Fed. Credit Union v. Robertson (In re Robertson)*, 232 B.R. 846, 850-51 (Bankr. D. Md. 1996).  Thus, Appellants' failure to allege perfection of an unavoidable security interest renders them unsecured claimholders here.

Even if a security interest were alleged, it would cover only the collateral the operative security agreement "reasonably identifies."  UCC §§ 9-110 (former) and

9-203 (former), 19 L.P.R.A. §§ 2010 and 2053 (former);[19] *Christie Manson & Woods Ltd. v. Minor*, 465 F. App'x 722, 724 (9th Cir. 2012) (security agreement providing secured party had a security interest in "any property in our [the secured party's] possession" did not "reasonably identif[y]" assets and did not create a security interest in property not in the secured party's possession).

Here, Appellants do not identify any operative security agreement. Moreover, any pledge in a hypothetical security agreement would be limited by the terms of the Resolutions.  Section 501 of each of the Resolutions limits any pledge to "moneys *deposited with the Fiscal Agent...*" and § 601 of each of the Resolutions limits any pledge "to the extent hereinabove particularly specified…." (emphasis added).  As in *Christie Manson & Woods,* 465 F. App'x 722, the so-called "stream" of revenues Appellants seek would not be covered by the scope of any security interest created by the Resolutions.

Additionally, there is no possible security interest in HTA revenues generated post-petition because there is no present "stream" of collateral.  The "stream" theory derived from cases decided under the Bankruptcy Act holding that rights to payment acquired by the debtor during the preference period were not preferences if the security interest was created in the so-called stream and attached

---

[19]  Former Article 9 was in effect in the Commonwealth at the time any hypothetical security interest might have been perfected.  The same rule applies under current Article 9, UCC § 9-108, 19 L.P.R.A. § 2218.

Case: 18-1963    Document: 00117520162    Page: 58    Date Filed: 12/06/2018    Entry ID: 6182536

Case:17-03283-LTS Doc#:9501-3 Filed:12/06/19 Entered:12/06/19 17:20:56 Desc
Exhibit C- Brief for Defendants-Appellees    Page 58 of 77

to a stream – such as revolving inventory or receivables – before the preference period. The Bankruptcy Code legislatively overruled this fictional "stream" concept by creating a netting-type rule to protect secured parties with an interest in a pool of receivables or inventory.  "Paragraph (5) [of Bankruptcy Code § 547(c)] codifies the improvement in position test, and thereby 'overrules' cases such as *DuBay v. Williams*, 417 F.2d 1277 (9th Cir. 1969), and *Grain Merchants of Indiana, Inc. v. Union Bank & Sav. Co., Bellevue, Ohio*, 408 F.2d 209 (7th Cir. 1969)."  H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 373 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 88 (1978).  Because no "stream" exists for preference purposes, no "stream" can exist for post-petition purposes.  Any possible security interest in HTA revenues, had Appellants alleged one, would attach only as those revenues came into existence, and would not extend to revenues generated after filing of the Title III cases, pursuant to 11 U.S.C. § 552 (unless section 928(a) applies, which it does not).[20]

---

[20] Nor could there be a *statutory* lien against HTA revenues acquired post-petition. *United States v. Gold* (*In re Avis*), 178 F.3d 718, 723-24 (4th Cir. 1999) (statutory lien does not attach to post-petition assets).

### III. PROMESA SECTION 305 PRECLUDES THE RELIEF APPELLANTS SEEK.

#### A. Section 305, Like Bankruptcy Code Section 904, Ensures the Continued Provision of Public Services and Bars Interference with the Debtors' Use of Revenue.

The relief sought by Appellants is also precluded by PROMESA § 305, as such relief necessarily would interfere with Debtors' ability to use revenue and use or enjoy income-producing property without the Oversight Board's consent. The district court recognized the applicability and effect of § 305 in dismissing Appellants' Second Claim. ADD28. Section 305 also disposes of all Appellants' claims.

Section 305 is entitled "Limitation on Jurisdiction and Powers of the Court" and employs language nearly identical to 11 U.S.C. § 904:

> Subject to the limitations set forth in titles I and II of this Act, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with –
>
> > (1) any of the political or governmental powers of the debtor;
> >
> > (2) any of the property or revenues of the debtor; or
> >
> > (3) the use or enjoyment by the debtor of any income-producing property.

PROMESA § 305.[21]

Courts interpreting section 904 have repeatedly held it deprives a court of any power to order a municipal debtor to turn over property or revenues to a creditor during the pendency of a Chapter 9 case absent the debtor's express consent. Judge Klein's analysis of section 904's extensive limitations in *Association of Retired Employees of City of Stockton v. City of Stockton* (*In re City of Stockton*), 478 B.R. 8 (Bankr. E.D. Cal. 2012), is instructive.

Stockton commenced its Chapter 9 case in 2012. To balance the 2012 fiscal budget, the Stockton city council imposed significant cost-cutting measures, including a unilateral reduction in retiree health benefits. *Id.* at 14. Retired city employees moved for a preliminary injunction prohibiting Stockton from implementing the reduction or requiring the city to continue payment of such benefits. The *Stockton* court concluded it lacked jurisdiction to grant the requested injunction as a matter of law because it would necessarily require the court to interfere with the debtor's "property or revenues," in violation of section 904. *Id.* at 20. As a practical matter, "[c]oercively preserving a status quo that entails

---

[21] Given their near-identical language, Congress plainly intended section 305 to operate in the same manner as section 904, as recognized below. ADD21-22. *Northcross v. Bd. of Ed. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) ("The similarity of language in [the statutes] is, of course, a strong indication that the two statutes should be interpreted *pari passu*."); *Rockney v. Blohorn*, 877 F.2d 637, 640 (8th Cir. 1989).

payment of money from the City's treasury interferes with the City's choice to suspend such payments" because the "contents of the City's treasury are 'property or revenues'" for purposes of section 904.  *Id.* at 21.  The same is true here.

Similarly, in *Lyda v. City of Detroit* (*In re City of Detroit*), 841 F.3d 684, 696 (6th Cir. 2016), the Sixth Circuit affirmed a holding that, under section 904, it lacked jurisdiction to order injunctive and declaratory relief directing the Chapter 9 debtor city not to terminate residential customers' water service for non-payment, because such an order would interfere with the city's governmental powers, property, revenues, and use and enjoyment of income-producing property.  *Id.*; *see also Franklin Cal. Tax-Free Tr. v. P.R.*, 805 F.3d 322, 341-42 (1st Cir. 2015) (section 904 "preserve[s] the power of political authorities to set their own domestic spending priorities, without restraint from the bankruptcy court" (citation omitted)), *aff'd*, 136 S. Ct. 1938 (2016); *Jefferson County*, 474 B.R. at 272 (under section 904 the "Court cannot force payment of the Net Revenues"); *In re N.Y.C. Off-Track Betting Corp.*, 434 B.R. 131, 140 (Bankr. S.D.N.Y. 2010) ("Section 904's command is clear.  A bankruptcy court may not interfere with a chapter 9 debtor's political or governmental powers, or the use of the debtor's property, without the debtor's consent.").

As the district court recognized (ADD28), the relief requested by Appellants would necessarily interfere with the Debtors' governmental and political powers

47

and their property or revenues, without the Oversight Board's consent.  Appellants
seek declaratory and injunctive relief requiring Debtors to apply all of HTA's
revenues to pay bond debt service without regard to the continued operation and
maintenance of the highways and transportation system, which provides necessary
services and facilitates economic development, or the Commonwealth's right to
use "clawback funds" as needed.  Such relief would be directly contrary to section
305.

Appellants assert (at 35-37 & n.11) section 305 should not be construed to
prevent payment of revenues in the Reserve Accounts, but they give no reason
based on the text and policy of section 305 why such funds should be treated
differently from other HTA revenues for purposes of that provision.  Contrary to
Appellants' assertion, Appellees have not "conceded" such funds are pledged
special revenues; that proposition is contested, as the record (*e.g.*, A529) shows.

### B.    Bankruptcy Code Sections 922 and 928 Are Not "More Specific" Provisions and Do Not "Trump" PROMESA Section 305.

Appellants erroneously argue (at 49) that sections 922(d) and 928 are "more
specific" than PROMESA section 305 and "trump" it to the extent they conflict.
That canon of construction applies only where "a general permission or prohibition
is contradicted by a specific prohibition or permission."  *RadLAX Gateway Hotel
LLC v. Amalgamated Bank*, 566 U.S. 639, 639 (2012).  The canon comes into play

only "when there are two conflicting statutes upon the same subject, one general and the other specific…." *Iriarte v. United States*, 157 F.2d 105, 108 (1st Cir. 1946). Thus, in *RadLAX*, a general prohibition on confirming a chapter 11 plan without consent of all creditor classes was overcome by a specific permission, in a subparagraph of the same section, for confirmation via "cramdown" under three circumstances. 566 U.S. at 639.

Sections 922 and 928 are not on the same subject as section 305, and the provisions are not in conflict. Section 305, like Bankruptcy Code section 904, imposes an "absolute" restriction on the Court's power to issue orders that interfere with governmental power and property. *See In re City of Stockton*, 478 B.R. at 17. In Title III, such interference is permissible only if the Oversight Board consents, or the plan of adjustment provides. PROMESA § 305. Section 922 deals with the automatic stay and application of special revenues, and section 928(a) deals with the attachment of a security interest on special revenues. ADD18-20. These sections are not turnover statutes that would allow a court to order the diversion of assets and do not mandate any affirmative relief that conflicts with PROMESA § 305.

**C.      The Oversight Board Did Not Consent to Any Interference with Debtor Property.**

Section 305 also permits court interference only where "the Oversight Board consents or the plan [of adjustment] so provides."  Appellants illogically assert (at 46-48) section 305 "does not apply" because, by filing the Title III case, the Oversight Board consented to any interference the Court may order.  Section 305 is part of Title III of PROMESA and by Appellants' logic, would never apply if filing a Title III case waives its protections.  Appellants' interpretation would effectively write Section 305 out of PROMESA. Further, section 305 limits the Court's power to interfere with governmental powers or debtor property "in the case," and therefore expressly applies to Title III cases filed under PROMESA § 304.

Appellants' assertion (at 46-47, citing ECF No. 46 at 9, 18 n.7) that Appellees gave "actual consent" to orders interfering with Debtors' governance, property and revenue is nonsense.  The cited document, Appellees' moving brief below, merely notes that *if*, counterfactually, Appellants had a perfected security interest they could enforce, such enforcement would be subject to netting under section 928(b).  A municipal debtor does not "consent" to injunctions disposing of its property by making such hypothetical observations, *arguendo*, in a brief.

Appellants' reliance (at 49) on *dicta* from *In re County of Orange*, 179 B.R. 185, 190 (Bankr. C.D. Cal. 1995) – a case that did not address the application of 11

50

U.S.C. §§ 922 or 928 or any provision of PROMESA – is misplaced as the municipal debtor explicitly consented to the court's jurisdiction to order adequate protection. *Id.* at 190. Similarly, Appellants (at 47) also miss the mark with *In re Kennewick Public Hosp. Dist.,* 2017 WL 5619224, at *5 (Bankr. E.D. Wash. Nov. 17, 2017), because there the issue was whether the court could order adequate protection, and in any event, the very bankruptcy court order cited by Appellants was stayed by the district court pending appeal on the ground section 904 (nearly identical to 305) only allows stay relief when the municipality consents or the plan provides. *Kennewick Public Hosp. Dist. v. Key Govt. Finance, Inc.,* No. 4:17-cv-05195-SAB, ECF No. 20 (E.D. Wash. Feb. 22, 2018) (copy appended hereto). Appellants have not sought adequate protection, so the balance between such relief and section 305 is not presented.

Appellants' reference (at 48) to *Stockton* fares no better. As discussed above, the *Stockton* court denied a motion seeking an injunction requiring the city to continue paying health benefits because "§ 904 forbids the court from using any of its powers to 'interfere with' property or revenues of a chapter 9 debtor." *In re City of Stockton*, 478 B.R. at 13. Further, *Stockton* found section 904 "has reduced the latitude within which the court can act" to the point where the limitations upon a court's power are "'absolute.'" 478 B.R. at 17.

Appellants' argument (at 48) that in a brief on a different appeal certain Appellees "asserted that provisions pertaining to treatment of claims and administrative matters (including, notably, section 927) … do not conflict with [] PROMESA section 305" is erroneous.  Section 927, as a limitation on recourse, does not interfere with a municipality's revenue, governance or property, so statements about it cannot concede any principle relevant here.

### D.  The Doctrine of Constitutional Avoidance Is Not Implicated.

Appellants erroneously argue (at 50-55) that under the doctrine of constitutional avoidance, the Court should construe sections 922(d) and 928 to require HTA to pay them, to avoid reaching "serious and avoidable concerns under the Takings Clause and Due Process Clause."  This argument fails because Appellants have not pled a violation of either clause; they merely make a few passing references.  JA223, JA235.[22]

Appellants' constitutional avoidance argument also fails because they misunderstand the doctrine.  It does not, as Appellants apparently believe, require a court to misread statutes for the benefit of a party asserting a constitutional claim.

---

[22] State court cases cited by Appellants (at 53) to argue bond revenues are "protected property interests" are inapposite.  Here, no property interest has been established, or is being "taken," and any unavoidable lien would be treated in a plan of adjustment in accordance with PROMESA § 314(b) Bankruptcy Code § 1129(b)(2)(A).  *Cf. Dimino v. Sec'y of Mass.*, 695 N.E.2d 659, 663-64 (Mass. 1998) (addressing abrogation of bondholder rights outside of bankruptcy); *Patterson v. Carey*, 363 N.E.2d 1146, 1151 (N.Y. 1977) (same); *First Nat'l Bank of Boston v. Me. Tpk. Auth.*, 136 A.2d 699, 720-22 (Me. 1957) (same).

Rather, the doctrine applies if, after applying ordinary textual analysis, a statute is found susceptible of more than one construction. *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Here, as shown in Points I and II, Appellants are wrong about the meaning of sections 922(d) and 928(a), and their contention they are secured claimholders with "property" at risk of being "taken." There is no constitutional issue to avoid.

It is *Appellants' argument* that violates the canon by asking the Court to assume their constitutional rights are in peril, when they have demonstrated nothing of the sort. The Complaint does not establish the elements of a claim under the Takings Clause or the Due Process Clause, and Appellants have statutory remedies that would protect any property interest, if they had pled one. For example, Appellants could move for stay relief. Indeed, in *Peaje*, 845 F.3d at 511-12, this Court cited the doctrine of constitutional avoidance when it held relief from the original PROMESA § 405 stay was potentially available to Assured, if Assured could establish the predicates for such relief.[23] The way to avoid serious

---

[23] Appellants assert (at 51) the district court held in the PREPA receiver decision that section 305 precludes stay relief. In fact, the district court expressly stated section "does not preclude all relief from the automatic stay." *In re PREPA*, Case No. 17-04780 (D.P.R. Sept. 14, 2017), ECF No. 299, at 11. Moreover, the district court went to great lengths to limit its ruling about section 305 to the facts in that case where the creditors having a lien against net revenues, were seeking to invoke a receivership that would take over the unencumbered assets (the whole utility), change the board, change management, change employees, and seek rate hikes that

constitutional issues is to apply actual, existing statutory remedies, not to invent illusory private rights of action. *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 531 (D.P.R. 2016) ("in drafting PROMESA, Congress intentionally provided many of the tools needed to deal effectively with the 'unconstitutional' conduct that plaintiffs collectively challenge"). Another way to avoid unnecessarily deciding constitutional issues (and misreading statutes) is to recognize PROMESA § 314 is designed to ensure creditors' constitutional rights are not impaired, and require Appellants to await the submission of a plan. Appellants are not being "depriv[ed]" of a "forum to raise a constitutional issue" (at 55). They are merely required to avail themselves of the procedures the law provides.

Appellants erroneously argue (at 55) that because Puerto Rico is not a state with Tenth Amendment rights, PROMESA § 305 should not be construed as section 904 would be construed in a chapter 9 case. Whatever considerations Congress weighed when it enacted section 904 and, later, section 305, it made them essentially identical, and they should be applied accordingly. *Franklin*, 805 F.3d at 341 ("Congress was quite clear in the Bankruptcy Code that Puerto Rico

---

could thwart Puerto Rico's recovery. On those facts, the court ruled section 305 barred that specific stay relief.

was to be treated like a state"). Clearly, Congress wanted to provide the Commonwealth the same deference it provides the States with section 904.

## CONCLUSION

For all of the foregoing reasons, the district court's order should be affirmed.

Dated:  July 9, 2018

Respectfully submitted,

*/s/ Timothy W. Mungovan*

MICHAEL A. FIRESTEIN
LARY ALAN RAPPAPORT
PROSKAUER ROSE LLP
2049 Century Park East, Suite 3200
Los Angeles, California 90067
Tel: (310) 557-2900
mfirestein@proskauer.com
lrappaport@proskauer.com

MARTIN J. BIENENSTOCK
STEPHEN L. RATNER
JEFFREY W. LEVITAN
MARK D. HARRIS
TIMOTHY W. MUNGOVAN
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
mbienenstock@proskauer.com
sratner@proskauer.com
jlevitan@proskauer.com
mharris@proskauer.com
tmungovan@proskauer.com

HERMANN D. BAUER
O'NEILL & BORGES LLC
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918
Tel: (787) 764-8181

*Attorneys for Defendants-Appellees The Financial Oversight and Management Board for Puerto Rico, for itself and as representative for the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority, and Natalie A. Jaresko*

JOHN J. RAPISARDI
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Tel: (212) 326-2000
jrapisardi@omm.com

PETER FRIEDMAN
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
pfriedman@omm.com

LUIS MARINI
MARINI PERTRANTONI MUÑIZ, LLC
MCS Plaza
San Juan, San Juan, Puerto Rico 00917
Tel: (787) 406-8555
lmarini@mpmlawpr.com

ELIZABETH L. MCKEEN
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660
Tel: (949) 823-6900
emckeen@omm.com

*Attorneys for Defendants-Appellees the Puerto Rico Fiscal Agency and Financial Advisory Authority and Gerardo Portela Franco*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(5) and 32(a)(7)(B).  This brief contains 12,966 words, excluding those exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief was prepared in a proportionally spaced 14-point Times New Roman font.

*/s/ Timothy W. Mungovan*
Timothy W. Mungovan

# **CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing

document with the United States Court of Appeals for the First Circuit by using the

CM/ECF system, which will send notifications of such filing to all CM/ECF

counsel of record.


Dated:  July 9, 2018

/s/ *Timothy W. Mungovan*
　　Timothy W. Mungovan

# ADDENDUM

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 22, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KENNEWICK PUBLIC HOSPITAL DISTRICT,<br><br>    Debtor and Appellant,<br><br>    v.<br><br>PHILIPS MEDICAL CAPITAL, LLC,<br><br>    Creditor and Appellee. | No. 4:17-cv-05195-SAB<br><br>**ORDER GRANTING EMERGENCY MOTION FOR STAY OF PHILIPS ORDER PENDING APPEAL** |

Before the Court is Kennewick Public Hospital District's ("District") Emergency Motion for Stay of Philips Order Pending Appeal. ECF No. 3. A hearing on the motion was held on February 20, 2018, in Yakima, Washington. The District was represented by Jack Cullen. Philips Medical Capital ("Philips") was represented by Bruce Borrus. At the hearing, the Court granted the District's motion. This Order memorializes the Court's oral ruling.

**Procedural Background**

On November 29, 2017, the Bankruptcy Court granted Philips relief from the automatic stay. The District has appealed that decision and the Court is awaiting the completion of the parties' briefing on that appeal. In the meantime, the District filed an emergency motion asking the Court to stay the Bankruptcy Court's order.

//

**ORDER GRANTING EMERGENCY MOTION FOR STAY OF PHILIPS ORDER PENDING APPEAL ~ 1**

Case: 18-35935, 12/06/2019, ID: 11513664, DktEntry: 35-3, Page 76 of 78
Case 4:19-cv-05181-SAB   ECF No. 5   filed 12/06/19   PageID.684   Page 2 of 2
Case 17-03283-LTS   Doc#9501-3   Filed:12/06/19   Entered:12/06/19 17:20:56   Desc
Exhibit C- Brief for Defendants-Appellees   Page 75 of 77

### Motion Standard

1    "Motions for stay pending appeal or for other relief pending appeal must

2 ordinarily be presented to the bankruptcy court in the first instance, before the

3 movant may seek relief from the [Bankruptcy Appellate Panel] or the district

4 court, as the case may be." *In re Ho*, 265 B.R. 603, 604 (B.A.P. 9th Cir. 2001).

5 "Where the bankruptcy court has already denied a stay . . . the appellate court's

6 review is limited to a simple determination of whether the bankruptcy court

7 abused its discretion." *In re North Plaza, LLC*, 395 B.R. 113, 118 (S.D. Cal.

8 2008). "The abuse of discretion standard on review of the bankruptcy court's order

9 denying a stay encompasses a de novo review of the law and a clearly erroneous

10 review of the facts with respect to the underlying issues." *Id*.

11    In determining whether to grant a stay, courts in the Ninth Circuit adhere to

12 a sliding-scale balancing of four traditional factors: (1) whether the applicant has

13 made a strong showing it is likely to succeed on the merits; (2) whether the

14 applicant will suffer irreparable injury absent a stay; (3) whether issuance of the

15 stay will injure other parties interested in the proceeding; and (4) the public

16 interest. *In re Vandenberg,* No. 09–bk–23387, 2012 WL 1854298, at *2 (Bankr.

17 D. Ariz. May 21, 2012) (citations omitted); *see also Nken v. Holder*, 556 U.S. 418,

18 434 (2009). The first two factors are the most critical, but a failure on any one

19 factor requires the court to deny the application for a stay. *In re Irwin,* 338 B.R.

20 839, 843 (E.D. Cal. 2006) (citations and internal quotation marks omitted);

21    (1) *Whether the applicant has made a strong showing that it is likely to*

22    *succeed on the merits*

23    The District has shown it has a strong likelihood of success on the merits of

24 its claim. The Court reads 11 U.S.C. § 904 as limiting the application of

25 § 362(d)(1) to apply in only two situations: (1) when the municipality consents;

26 and (2) when the plan provides. *See In re City of Stockton, Cal*., 478 B.R. 8, 20

27 (Bankr. E.D. Cal. 2012). Here, the District has not consented and as such,

**ORDER GRANTING EMERGENCY MOTION FOR STAY OF PHILIPS
ORDER PENDING APPEAL ~ 2**

Case: 18-60038  04/01/2019  ID: 11261253  DktEntry: 12  Page: 76 of 77

Case 4:17-cv-03283-LTS  Doc # 9501-3  Filed: 12/06/19  Entered: 12/06/19 17:20:56  Desc
Exhibit C- Brief for Defendants-Appellees   Page 76 of 77

compelling payments and granting relief from the stay is not authorized under the Bankruptcy Code. Moreover, it is not clear whether Philips is even entitled to adequate protection under the Bankruptcy Code.

> *(2) Whether the applicant will suffer irreparable injury absent a stay*

The District has shown it will suffer irreparable injury absent a stay. It is uncontroverted that if Philips repossesses its equipment, including MRI machines, anesthesia machines and workstations, pulmonary analyzers, hospital beds, exam tables, stretchers, defibrillators, blood bank and lab refrigerators and freezers, and other equipment crucial for patient care, the District will be forced to close.

> *(3) Whether issuance of the stay will injure other parties interested in the proceeding*

The harm to Philips, while tangible, is temporary, as Philips' interests under the Leases in question are already provided for under the Bankruptcy Code, which contemplates a plan for payment of creditor's claims and specifically the acceptance or rejection of the leases under 11 U.S.C. § 365.

(4) *The public interest*

The District has demonstrated that the public interest weighs heavily in favor of staying enforcement of the Bankruptcy Court's order pending appeal. The District operates two hospitals, multiple urgent and outpatient care centers, and employs over 1,000 people. Its closure would negatively impact the Tri-Cities region.

//

//

//

//

//

//

//

**ORDER GRANTING EMERGENCY MOTION FOR STAY OF PHILIPS ORDER PENDING APPEAL ~ 3**

1    Accordingly, **IT IS HEREBY ORDERED**:

2    1.   The District's Emergency Motion to Stay Philips Order Pending Appeal,

3    ECF No. 3, is **GRANTED**.

4    2.   Enforcement of the Bankruptcy Court's Order and Findings of Fact and

5    Conclusions of Law granting Appellee Philips Medical Capital, LLC relief from

6    the automatic stay under 11 U.S.C. § 362(d) is **stayed** pending appeal. The District

7    is not required to post a bond.

8    **IT IS SO ORDERED.**  The Clerk of Court is directed to enter this Order

9    and forward copies to counsel.

10    **DATED** this 22nd day of February 2018.



Stanley A. Bastian
United States District Judge

**ORDER GRANTING EMERGENCY MOTION FOR STAY OF PHILIPS ORDER PENDING APPEAL ~ 4**