UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

      Debtors.

---------------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

**[Response to Docket #9365]**

**RESPONSE AND OBJECTION OF INDIVIDUAL BONDHOLDER TO INTERIM
REPORT AND RECOMMENDATION OF MEDIATION TEAM**

Dated:  December 4, 2019

## TABLE OF CONTENTS

I.     SPECIFIC OBJECTIONS .................................................................................................1

       A.     Notice...................................................................................................................1

       B.     Content of Notices. ..............................................................................................2

       C.     Certification requirements. ..................................................................................4

       D.     Schedule................................................................................................................5

       E.     Measures to at least begin to level the playing field...........................................6

              (1)     Electronic filing ......................................................................................6

              (2)     Timely public access to court hearing transcripts..................................6

              (3)     Website to facilitate access to court filings.............................................9

              (4)     Appointment of an individual bondholders' committee ........................10

       F.     Prevent further diversion of resources to the detriment of
              Commonwealth's Constitutional irrevocable pledge/first claim
              bondholders.........................................................................................................10

       G.     If confidentiality restrictions are maintained by Court order, then there
              should be no use of, or references to, the mediation process in Court
              filings and proceedings. ....................................................................................11

II.    OVERARCHING OBJECTIONS ..................................................................................12

## TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

*County of Moultrie* v. *Rockingham*,
    92 U.S. 631 (1875)..................................................................................................................16

*Mennonite Board of Missions* v. *Adams*,
    462 U.S. 791 (1983)................................................................................................................1

*Press-Enterprise Co.* v. *Superior Court*,
    464 U.S. 501 (1984)................................................................................................................6

*Press-Enterprise Co.* v. *Superior Court*,
    478 U.S. 1 (1986)....................................................................................................................6

*Town of Coloma* v. *Eaves*,
    92 U.S. 484 (1875)................................................................................................................16

*Tulsa Professional Collection Services, Inc.* v. *Pope*,
    485 U.S. 478 (1988)................................................................................................................1

*U.S.* v. *Smith*,
    787 F.2d 111 (3d Cir. 1986) ..................................................................................................6

**Rules and Statutes**

48 U.S.C. § 737.........................................................................................................................19

48 U.S.C. § 2141(b)(1)(N)........................................................................................................19

48 U.S.C. § 2163.......................................................................................................................19

**Hein 12/2019 Declaration and Exhibits A through Z**

[The Declaration follows this Response and Objection; exhibit pages are sequentially numbered beginning 0001]

Peter C. Hein, pro se, submits this Response and Opposition to the Interim Report and Recommendation of the Mediation Team (Docket#9365).

## I.    SPECIFIC OBJECTIONS

Without waiving or limiting the Overarching Objections set out in Point II below and the objections in my prior filings (including those listed in Point II), which I continue to maintain, I note and highlight the following specific objections:

### A.    Notice.

(1)    It appears that no notice (even by email) of the "Interim Report and Recommendation of the Mediation Team" (Docket#9365) has been provided to individual bondholders, not even to those who filed a proof of claim and/or notice of participation (thereby expressing a desire to participate).  Prime Clerk should have been directed to immediately serve Docket#9365 on all bondholders who have filed a proof of claim and/or notice of participation, which could have been done at least by email on the bondholders who have provided their email address.  Due Process requires notice, particularly to known persons. *Tulsa Professional*, 485 U.S. 478, 491 (1988); *Mennonite Board* v. *Adams*, 462 U.S. 791, 795-800 (1983).  The absence of objections by individual bondholders to Docket#9365 cannot be viewed as agreement or even acquiescence, particularly when no notice of Docket#9365 has been provided.

(2)    Docket#9365-1 provides for notice of the Interim Case Management Order and the "Objection Notice" to be deliberately delayed until *after* December 31, 2019.  Docket#9365-1-page-9-to-10-of-23.  These notices should be distributed (including by email) by Prime Clerk forthwith upon their approval.

The 2011 GO Claim Objection (Docket#7057) was filed 5/21/2019.  Proposals for notice to 2011 bondholders go back to 5/29/2019.[1]  Now, over 6 months later, we have a new proposed notice (plus a proposed briefing schedule).  The delays that have occurred since May 2019 in adjudicating the contrived claim objections prejudice individual GO bondholders like me

---

[1] Docket#7154-1.

1

(who are not being paid even as funds are diverted to non-essential expenditures, *see* Point II below).  Furthermore, the delays that have occurred also validate my repeated objections to staying judicial proceedings in favor of mediation.

        While the clock cannot be turned back to May 2019, the Court can direct that clear, comprehensible notices of the 2011 Claim Objection, PBA Claim Objection, Docket#9365 and #9365-1 and the proposed Interim Case Management Order be prepared and be issued forthwith to all GO (and Commonwealth guaranteed) bondholders, including those who have filed proofs of claim and/or notices of participation.

        (3)    Publication of the 'Objection Notice" is not designed to reach individual 50-states investors.  Paragraph 14 (Docket#9365-1-page-10-of-23) should be modified to include publication in the *Wall Street Journal*.  Few individual retail investors in the 50 states read the Bond Buyer.  The annual subscription cost appears to be $3432.  Hein-Decl.-Ex.-Q-0056.  Just as publication notice is being given in several publications in Puerto Rico and/or in Spanish, notice should be given in the *Wall Street Journal*, which is an English language publication read by many individual investors in the 50 states—where the vast majority of bondholders are present (Point I.E.(2), below).

## B.    Content of Notices.

        There does not appear to be a proposed form of notice of the Interim Case Management Order; perhaps it is contemplated that that Order will just be sent "as is."  If so, that Order will not be clear or comprehensible to individual bondholders who have not been participants in the confidential mediation that produced Docket #9365 and #9365-1 and thus do not have the background information confidential mediation participants may have.

        The proposed "Objection Notice" (Appendix C-Docket#9365-1-page-14-to-18-of-23) is also not going to be clear to individuals who filed notices of participation (but who to date have not been given the opportunity to meaningfully participate).  The "Objection Notice" is confusing at best.  The outset of the Objection Notice appears focused on 2011 GO and PBA

Bondholders, but on page 2 it provides some limited information about the Case Management Order, *i.e.*, the schedule for briefing related to the GO and PBA Bond Objections. To add to the confusion, the proposed Case Management Order even uses different defined terminology than the Objection Notice. *Compare* #9365-1-page-16-of-23 ("2011 GO Bond Objection, the PBA Bond Objection, and the 2012-2014 GO Bond Objections") *versus* #9365-1-page-5-of-23 ("Claims Objections"). Plus, the Objection Notice says nothing about the GO Lien Challenges and the Clawback Litigation.

A notice comprehensible to individual bondholders—including the 1770+ people who have filed pro se notices of participation,[2] but were not participants in the confidential mediation process that produced #9365 and #9365-1—is required. Among other things:

(a)     There needs to be a clear, plain English (and Spanish translation) explanation of what are the current proceedings affecting bondholders.

(b)     As to the Claims Objections, the Notice needs to explain:

    (i)     What are the Claims Objections?

    (ii)     Who is affected by the Claims Objections?

    (iii)     Is an individual bondholder who contests the Claims Objections required to take action? If so, what and by when?

    (iv)     What is the mailing address of the court to which papers are to be sent? What are the email addresses of any attorneys who are required to be served?

    (v)     If an individual bondholder wishes to set forth such individual's position on the Claims Objections, must the individual file a motion to dismiss or can the individual simply file an opening brief or other statement of position on February 19, 2020 without first filing a motion to dismiss? If a motion to dismiss is required, in

---

[2] Docket#7154-page-3&n.6-of-14.

addition to an opening brief or other statement of position, there
should be a clear statement of what the minimum requirements of a
motion to dismiss are (*e.g.*, "state at the outset of your filing that
you seek the dismissal of the Claims Objections and then state
your reasons for seeking the dismissal").

(c)     The Notices need to explain what the Clawback Litigation is and provide
an alphabetical list of who has been named in the Clawback Litigation, so
someone can determine if they have been named in one of those cases.

(d)     The Notices need to explain what the GO Lien Challenges are and provide
an alphabetical list of who has been named in the GO Lien Challenges (so
someone can tell if they have been named), as well as clear information on
whether an individual needs to file a motion to dismiss in order to file an
opening brief (and, if so, by when).

**C.      Certification requirements.**

I object to the certification requirements in Docket#9365-1 ¶¶ 4 through 6 and to
the imposition of page limits on some bondholders (including those not included in the
confidential process that produced #9365 and #9365-1) that do not apply to all parties.

It is one thing for certain parties to file their papers first, if they are willing and
able to do that.  This makes sense so that other bondholders can read those papers and not
unnecessarily repeat them in their own filings.  But it is simply not appropriate and not consistent
with Due Process (or the First Amendment) to tell anyone who has been sued, or whose bonds
are challenged, that they cannot file papers setting forth their positions, that they cannot make
their own record, and that they must make "certifications" before they file something.

Notably, it is not proposed that the Identified Parties or Certain Interested
Defendants share drafts in advance with all other bondholders, which could reduce the need for
additional submissions.  Recognizing that there are hundreds of interested bondholders and the

4

potential for conflicts of interest among bondholders, and that Identified Parties and Certain Interested Defendants may have legitimate privilege and work product concerns about sharing drafts too widely, I understand why sharing of drafts is not being proposed. Yet the absence of advance sharing of drafts does underscore why placing "certification" requirements on other bondholders, or limits on what other bondholders can do that are not generally applicable to all parties, is not appropriate or constitutional.

The inappropriateness of placing "certification" requirements or other constraints on individual bondholders is also underscored by what happened in the COFINA situation. As I have chronicled in other papers, in the COFINA situation there had been extensive briefing and even oral argument of the legal issues—and then all of a sudden a settlement was hatched in confidential proceedings in which individual bondholders had no role. Negotiating bondholders received special benefits not shared by nonparticipant individual bondholders, who only learned of the secretly negotiated deals after-the-fact. The result has been disastrous for nonparticipating individual investors, while major hedge funds (and others) in many cases have profited, likely to the tune of over a billion dollars in the aggregate. *See, e.g.*, Docket#8427,#7211,#6283, #5041,#4911,#4673,#4606-3-to-#4606-8,#4595,#4585.

It is clear from what happened in the COFINA situation – which FOMB is attempting to reprise again here – that individual bondholders cannot rely on major institutional investors to protect their interests, and that it would be inappropriate to hamstring the rights of individuals to make arguments, submit evidence, or participate as they consider appropriate.

D.    **Schedule.**

The schedule presumes that the major bondholder groups that are seeking dismissal of Claims Objections and responding to the GO Lien Challenges actually actively litigate against those Claims Objections and Lien Challenges. If that situation changes, and the full burden of addressing those matters falls on individual or other modest-sized holders, modifications to the schedule will be required.

5

E.        **Measures to at least begin to level the playing field.**

Steps need to be taken to facilitate the ability of pro se litigants—who do not enjoy the essentially unlimited litigation funding that FOMB and UCC are allowed—to participate (as I have outlined in Docket#7540-page-4-to-15-of-19;#7961-page-14-to-18-of-19; #7732-page-9-to-10-of-10;#6487;#6128).  Absent implementing these measures, FOMB and UCC should not be permitted to proceed in an omnibus fashion.[3]  These steps include:

(1)      **Electronic filing**.  Individual pro se litigants need to be given permission by the Court to electronically file without employing Puerto Rico counsel (which, as I have pointed out, *see* Docket#7961-page-17-of-19,#7961-1-page-52-to-55-of-71, the local rules *do* permit the court to allow).

(2)      **Timely public access to court hearing transcripts**.  It is essential that individuals be able to monitor ongoing proceedings that may affect them through timely electronic access to transcripts of court hearings.  As I have previously urged, transcripts of all proceedings should be posted on Prime Clerk (or a website for participants) as soon as they are prepared and available to the FOMB.[4]

Currently, transcripts are withheld for 90 days from public posting and electronic access.  In the context of this case, which affects individual bondholders throughout the country—including those who purchased pre-PROMESA and are now retroactively being subjected to PROMESA (which I assert is unconstitutional)—the failure to provide prompt public access to hearing transcripts through electronic means violates Due Process and First Amendment and common law rights of public access to court records which, with today's technology, should entail remote electronic access.  *Cf. Press-Enterprise Co.* v. *Superior Court*, 478 U.S. 1, 10-15 (1986); *Press-Enterprise Co.* v. *Superior Court*, 464 U.S. 501, 510-13 (1984); *U.S.* v. *Smith*, 787 F.2d 111, 114-15 (3d Cir. 1986).

---

[3] Docket#7540-page-6-to-7-of-19.
[4] Docket#7540-page-6-to-7-of-19.

6

This is particularly true in light of the Court's repeated practice of setting forth rulings, and the rationale therefore, on a transcript record that is withheld from public disclosure by electronic means for 90 days (rather than incorporating the Court's rationale into a publicly available written decision and order),[5] and the practice of having FOMB and AFAAF/FAFAA provide status updates of concern to all bondholders at the outset of omnibus hearings.[6]

Given today's technology, there is no legitimate reason to withhold hearing transcripts—much less transcripts that reflect rulings and FOMB and AFAAF/FAFAA updates— from prompt public access:

- The Supreme Court makes transcripts of arguments available on its website on a "same-day" basis.[7]

- There is no bona fide concern about confidentiality: Transcripts are withheld for 90 days even if no party requests redaction (plus, it is unclear what would justify redaction of court rulings made in open court or other proceedings that take place in open court without a request for confidential treatment during the hearing itself).

- There is no physical impediment to making the transcripts available by electronic means—rather, the Court withholds *existent* transcripts for 90 days.[8]

Individual bondholders who are appearing pro se to defend against efforts to invalidate their bonds, or who simply wish to monitor the proceedings, should not be required to incur the expense of ordering transcripts simply to get them at the same time as FOMB. In a matter where debtors are on track to expend $2+ billion to try to avoid their debt (funding their litigation out of money that should have first been paid to bondholders), transcripts should be

---

[5] *Compare*-Docket#8694;#6534-*with*-#8691;#6538.
[6] *E.g.*, Docket#8266-page-7-to-15-of-143.
[7] Exhibit R-0059; https://supremecourt.gov/oral_arguments/argument_transcript/2019.
[8] Docket#8691;#6538.

made available on a timely basis to the pro se individuals FOMB is proceeding against, either through the Court docket on Prime Clerk or through a website for participants.

Compensation of court reporters can be specified by the Court, and paid by debtor, in a fair manner, but any reporter-compensation issues should not be used as an excuse for withholding transcripts from public electronic access and thereby denying individual bondholders a practical means of following, on a timely basis, proceedings that may impact upon them.

- As noted in Point II below, Court-approved fees for numerous counsel and consultants representing debtors, their instrumentalities and their *un*secured creditor committees are running at a rate of $200+ *million*/year (annualized based on $295 million reported by fee examiner through 9/30/18),[9] and the aggregate costs of Puerto Rico's debt-avoidance efforts are on track to exceed $2 *billion*.[10]

- Any incremental cost to provide timely electronic access to hearing transcripts would likely be less than the court-approved $470,000+ paid for services through 5/15/2019 to "Kroma Advertising," "Communications Advisor" to the *un*secured creditors committee, which is helping the *un*secured creditors committee publicize its efforts to challenge bond claims, assisting with "public relations," "monitoring Puerto Rico media" and "providing translations of press materials."[11]

Individual bondholders from around the country cannot be expected to travel to San Juan to review a transcript at the courthouse. The Broker-Dealer's Report – PR (6/13/2019) from Puerto Rico's Office of the Commissioner of Financial Institutions indicates that on-island holdings of GO and PBA bonds are only about $820 million face value GO and $281 million face value PBA—less than 6% of the face value outstanding.[12]

---

[9] Docket#4370-page-3-to-4-of-16.
[10] Docket#4673-page-12-to-13-of-17;#4585-page-36-to-37-of-43.
[11] Docket#9216-page-16-of-20;#8753-1-page-1-of-1;#8002-page-4-to-5,15-to-17-of-19.
[12] For on-island holdings:  *See* Hein-Decl.-Ex.-S,T-0060-62; go to ocfi.pr.gov; the "List of "Public Notices" includes "Broker-Dealers Special Report—Puerto Rico Bonds June 2019".  For

8

Finally, transcripts are necessary to enable pro se participants to cite to prior proceedings in their filings.

At the very least, the Court should promptly post audio recordings of all hearings. The U.S. Supreme Court and First Circuit do this.[13]  The Bankruptcy Courts in the PG&E (posted on Prime Clerk) and Detroit bankruptcies have done this.[14]  Posting audio recordings is not a substitute for making the transcripts promptly available by electronic means, but is better than the current situation where pro se litigants and members of the public have to wait 90 days or travel to the courthouse in San Juan to learn the particulars of what happened at a hearing.

While Court Solutions provides a means for attorneys who have entered an appearance to listen to hearings by telephone, Court Solutions charges a $70 per hearing fee and a motion is required for a pro se litigant to participate—even on a "listen-only" basis—through Court Solutions.[15]  Court Solutions is not a substitute for the posting of free audio recordings of hearings—as used by the U.S. Supreme Court and First Circuit, and also used in the PG&E and City of Detroit bankruptcies.

(3)     **Website to facilitate access to court filings**.  FOMB's proposal for a "GO Claim Objection Website" (Docket#7154-page-9-to-10-of-14) appears to have been dropped from the latest proposed Interim Case Management Order.[16]  Such a website could be used to facilitate access to hearing transcripts.[17]  The apparent dropping of even FOMB's own proposal made in May 2019—before the Court stayed proceedings and ordered mediation—represents an unexplained retrogression in relation to the ability of individual bondholders to monitor proceedings.

---

amount of good faith and credit bonds and notes: *see* Hein-Decl.-Ex.-U-at-p.-33-0072 (excerpts from 2014 O.S.)

[13] Hein-Decl.-Ex.-V-0075,W-0077.

[14] Hein-Decl.-Ex.-X-0080,Y-0085.

[15] Hein-Decl.-Ex.-Z;Docket#6534.

[16] Docket#9365-1-page-2-to-11-of-23.

[17] Docket#7961-page-17-of-19.

(4)     **Appointment of an individual bondholders' committee.**  The solution

to any concern about the practicality of allowing hundreds of individuals to meaningfully

participate in these proceedings is not to impede individual participation.  Rather, the solution is

to appoint a committee to represent individual bondholders and other bondholders related to

individuals (*e.g.*, trusts or retirement accounts controlled by an individual) with modest holdings

of Commonwealth general obligation bonds—as I previously requested (Docket#6128;#6487),

but which the court denied (Docket#6534).

As I previously proposed, if the Court is not prepared to order the appointment of

the requested committee of individual and other bondholders related to individuals (*e.g.*, trusts or

retirement accounts) with modest holdings of Puerto Rico general obligation bonds, but believes

all general obligation bondholders should be included on one bondholder committee, then the

Court should direct the United States Trustee to at least ensure appropriate representation on

such a bondholder committee of individual and other bondholders related to individuals with

modest holdings, including individuals in the 50 states.[18]

As I previously asserted, FOMB and UCC should not be permitted to proceed in

an omnibus fashion unless a bondholder committee is appointed.[19]

**F.     Prevent further diversion of resources to the detriment of Commonwealth's
        Constitutional irrevocable pledge/first claim bondholders.**

The delays in bringing, and repeated efforts to avoid proceeding to an

adjudication of, Claims Objections and GO Lien Challenges underscore the need to restrain any

disbursements by the Commonwealth not in fact required for payment for truly essential current

services until FOMB's contrived issues are resolved and payment of the Commonwealth's GO

debt resumes.  There is simply no justification for the ongoing expenditures of funds on

advertisement, representation and artistic services contracts, consulting contracts, Christmas

bonuses to public employees, ongoing payment of fees of debtors and *un*secured creditors, and

---

[18] Docket#6128-page-9-to-10-of-11.
[19] Docket#7540-page-6-of-19.

other non-essential spending, while Constitutional irrevocable pledge/first claim debt goes unpaid.  These, and all other diversions of funds that the Commonwealth irrevocably pledged to bondholders, and on which bondholders have a first claim, must cease.

Among other things, as previously noted, I object to any payment of any litigation expenses for counsel for FOMB, the Commonwealth or the UCC, until the default on the GO bonds (and Commonwealth guaranteed bonds) is cured and payments on the bonds are brought up to date.[20]

### G.     If confidentiality restrictions are maintained by Court order, then there should be no use of, or references to, the mediation process in Court filings and proceedings.

I object to the use of confidential mediation instead of adjudication on a public record, as discussed below in Point II.  However, if confidentiality restrictions are maintained by court order that restrict persons from disclosing what occurred in mediation, then at the very least the confidentiality must be maintained consistently and there should be no reference to what occurred in mediation, what resulted from the mediation or the asserted robust nature of the mediation process by anyone in any papers filed in court or in any hearing.  If there are such references—as has already occurred (most recently in Docket#9365 itself)—all persons should be relieved of any confidentiality restrictions.  Otherwise, as has occurred, mediation confidentiality is a one-way street and is used as both a sword and a shield by proponents of the confidential mediation process:  The outcome or asserted robust nature of the mediation process is advanced to enhance its credibility, but the full facts of what transpired in that process and whether it in fact was robust are not knowable because confidentiality restrictions preclude a full revelation of the facts.

---

[20] *E.g.*, Docket#6128-1-page-6-of-11; #6151-page-2-of-3; #7540-page-10-to-11-of-l9.

## II.    OVERARCHING OBJECTIONS

I reiterate my opposition to the Court's stay orders and to the use of mediation instead of adjudication to resolve issues in this matter.  Puerto Rico sold billions of dollars of bonds to investors throughout the country, including to many individual retail investors (including me).

Puerto Rico represented that "[t]he good faith, credit and taxing power of the Commonwealth are ***irrevocably pledged*** for the prompt payment of the principal and interest on the Bonds," and "[t]he Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a ***first claim*** on available Commonwealth resources."[21]

It is bad enough that—

- PROMESA is sought to be applied retroactively to abrogate the property and other rights of pre-PROMESA purchasers.  (I object to this as contrary to the terms of PROMESA and, if not contrary to the terms of PROMESA, as unconstitutional).

- In the over three years the FOMB has been in place, Puerto Rico has spent literally hundreds of millions of dollars for debt avoidance.  Indeed:

  o Court-approved fees for numerous counsel and consultants representing debtors, their instrumentalities and their *un*secured creditor committees are running at a rate of $200+ *million*/year (annualized based on $295 million reported by fee examiner through 9/30/18).[22]

  o While I am not aware of subsequent aggregate fee data being disclosed by the fee examiner or the Court, Title III fees appear to be continuing unabated, with about 70 applications per 4-month compensation period.[23]

---

[21] Docket#4913-page-2-of-10, *quoting* cover of 2012A Official Statement, emphasis added (Hein-Decl.-Ex.-A attached hereto); *see also* Docket#7540-page-4,15-to-18-of-19;#4913-page-2-to-4,6-to-7-of-10; Motion to dismiss filed by certain GO bondholders in, *e.g.*, Adversary 19-00291, Docket#10 (Points I, IV and V).
[22] Docket#4370-page-3-to-4-of-16.
[23] Docket#9262-page-7-to-8-of-159.

- ○ Aggregate costs of Puerto Rico's debt-avoidance efforts are on track to exceed $2 *billion*.[24]

- ○ Brown Rudnick, retained as "Claims Counsel" (Docket#7756), seeks interim compensation for the period through September 30, 2019 that will bring its total fees and expenses up to $7,903,613 for the 10 months since its retention on November 28, 2018.[25]

- ○ Paul Hastings, retained as counsel to the Official Committee of *Un*secured Creditors, has sought approximately $50,856,983 million in compensation through September 30, 2019.[26]

- ○ The court has even approved $470,000+ for services through 5/15/2019 to "Kroma Advertising," "Communications Advisor" to the *un*secured creditors committee, which is assertedly helping the *un*secured creditors committee publicize its efforts to challenge bond claims and assist with "public relations,"[27] as well as "monitoring Puerto Rico media" and "providing translations of press materials."[28]  Kroma's latest fee application will bring its compensation above $500,000.[29]

- Puerto Rico has been paying every imaginable expense *other than* the bonds that under Puerto Rico's Constitution have a first claim on available resources.  Since the FOMB has been in place, billions of dollars have been spent on costs that under

---

[24] Docket#4673-page-12-to-13-of-17;#4585-page-36-to-37-of-43.

[25] Docket#9316-page-2-of-391;#7756-page-2,4-5-of-58;#5705-page-2-of-25.  While Brown Rudnick's latest fee application totals 391 pages, it does not appear to clearly disclose the total compensation requested since the inception of its work.  The "Summary of Monthly Fee Statements" is "for this Compensation Period Only."  Docket#9316-page-4-of-391.

[26] Docket#9219-pages-7-to-9-of-76, including holdback amounts.  While Paul Hastings' latest fee application totals 934 pages, there appears to be no clear bottom line statement of how much total compensation and fees have been sought to date; one must add up various monthly or compensation period numbers.

[27] Docket#8753-1-page-1-of-1;#8002-page-4-to-5,15-to-17-of-19.

[28] Docket#9216-page-16-of-20.

[29] Docket#9216-page-5-of-20.

Puerto Rico's Constitution are not to be paid unless its irrevocable pledge/first claim
bonds are paid first, including:

o   Thousands of public relations, advertising, "representation," artistic services and
    consulting contracts have been entered into, costing in the aggregate well over
    $1 billion since May 3, 2017 (when FOMB authorized the filing of the
    Commonwealth's Title III Petition, Docket#1-page-4-of-16).[30]

    oo   The Puerto Rico Comptroller's database shows 6063 "Advertising
         representation or artistic services" contracts, aggregating $181,109,121 since
         May 3, 2017.[31]  This includes 799 contracts aggregating $35,173,010 since
         proceedings were stayed on 7/24/2019.[32]

    oo   Change the "service category" to "consulting", and one finds 5990 consulting
         contracts, aggregating $1,413,017,407 since May 3, 2017.[33]  This includes
         606 contracts aggregating $134,072,158 since proceedings were stayed on
         7/24/2019.[34]

o   Hundreds of millions of dollars of Christmas bonuses to public employees, so (per
    the Governor) public employees are "able to buy their gifts and enjoy the holiday
    season".[35]  (Attendance, however, does not seem to be as high a priority as

---

[30] Hein-Decl.-Ex.-B,C,D,E-0021-0026;Docket#4585-page-36&n.15-of-43;#4606-3-page-11-of-
13-¶¶46-47;#4606-8-page-107-to-163-of-180;#4673-page-12-to-13-of-17;#4934-1;#7961-page-
10-to-14-of-19;#7961-1-page-2,9-to-23-of-71;#8308-page-13-to-14-of-17;#8308-1-page-2-to-7-
of-7. *See* https://contratos.ocpr.gov.pr (Office of Comptroller of Puerto Rico, Registry of
Contracts).
[31] Hein Ex. B-0021, C-0022-23.  Type into Google "contratos.ocpr.gov.pr"; in "Service
Category" scroll down and click on "Advertising, representation or artistic services"; in field for
"Effective Date" select May 3, 2017 to December 1, 2019.
[32] Hein-Decl.-Ex.-F-0027,G-0028-29.
[33] Hein-Decl.-Ex.-D-0024,E-0025-26.  Type into Google "contratos.ocpr.gov.pr"; in "Service
Category" scroll down and click on "Consulting"; in field for "Effective Date" select May 3,
2017 to December 1, 2019.
[34] Hein-Decl.-Ex.-H-0030,I-0031-32.
[35] *E.g.*, Hein-Decl.-Ex.-J-0033 (11/5/2019 FOMB letter to Puerto Rico OMB); Hein Ex. K-0040
(11/20/2019 FOMB letter to Univ. Puerto Rico);Hein Ex. L-0043 (report of Governor's

Christmas bonuses.  The most recent Attendance Report on the AFAAF/FAFAA website shows "Employees working (%)" in 2019 ranged from as low as 26.29% working to as high as 79.30% working.  Eight weeks in 2019 showed "employees working" in the 20s or 30s percent.)[36]

- The (inexplicable) payment of tens of millions to the counsel and the "communications advisor" for *un*secured creditors (as set forth above), even as bondholders who had been given the Commonwealth's "irrevocable pledge" and a "first claim" on available resources get nothing—not even interest.

- Because nothing has been paid on the Commonwealth's GO (and guaranteed) bonds, cash balances continue to accumulate—even despite continued non-essential expenditures.  The Commonwealth's TSA cash balance now exceeds $8.3 billion (Hein Ex. N-0050), and overall cash balances exceed $15.4 billion (Hein Ex. O-0053).[37]

- The Commonwealth is not even earning interest on its $8.3+ billion TSA cash balance.[38]

- FOMB has failed to ensure prompt issuance of audited financial statements; as of this date, the last issued audited Commonwealth financial statement, for the fiscal year ending June 30, 2016, came out on May 3, 2019, 1037 days after the close of the

---

statement re: paying Christmas bonuses;Docket#4585-page-36&n.16-of-43;#4606-page-11-of-13;#4606-page-164-to-166-of-180.
[36] Hein Ex. M-0046-48.
[37] Excerpts are attached in Hein Ex. N and O.  Full versions of the TSA report and summary of account balances are available on the AAFAF website, under the Publications and Reports tab.
[38] Docket#7211-1-page-26-to-27-of-146;#7961-page-11-to-12-of-19;#7961-1-page-56-to-71-of-71.  Contract 2018-00172 between Banco Popular and the PR Treasury provides in Section 7, last sentence: "The BANK will not pay interest to the CUSTOMER … ."  Docket#7961-1-page-60-of-71.  The contract references account 030-049458 (#7961-1-page-57-of-71), also referred to in Circular Letter 1300-33-18, Item 8.c (#7961-1-page-69-of-71).  The contract and circular are signed by Raul Maldonado.  (To find the contract, go to contratos.ocpr.gov.pr; specify "1031 Department of Finance" in "Government entity" and "Banco Popular" in "Contractor".  Scroll down to 2018-000172.  Click on green "Documents" icon in right column.)

fiscal year ended June 30, 2016.  By contrast, before the Commonwealth adopted a

refusal-to-pay-bonds strategy, the time from close of fiscal year end to issuance of

audited financials was 365 days.[39]

- Tax reductions and "incentives" for favored parties are repeatedly adopted or

    continued[40]—even as the Commonwealth refuses to pay its GO (and Commonwealth

    guaranteed) debt, and ignores the statutory and Constitutional "irrevocable pledge"

    and "first claim" of bondholders on available resources, and even as the FOMB,

    complicit in this refusal, does nothing to force payment.

- Reports of mismanagement and corruption multiply.[41]

Yet there still have not been substantive legal rulings on the contrived excuses for

avoiding payment of the Commonwealth's Constitutional irrevocable pledge/first claim debt.

The Supreme Court has criticized tactics akin to those employed by FOMB here—stating that "it

would be tolerating a fraud" (*County of Moultrie* v. *Rockingham*, 92 U.S. 631, 637 (1875)) to

sanction the "dishonesty" (*Town of Coloma* v. *Eaves*, 92 U.S. 484, 485 (1875)) of a government

that issues bonds, takes the money and then claims the bonds do not have to be repaid because

the government itself (assertedly) lied to bondholders.  The contrived excuses for avoiding

payment are hollow indeed:

- The Government Development Bank for Puerto Rico, in its official website

    discussion of Puerto Rico's GO debt, was express that the constitutional "**debt**

    **limitation has never been reached.**"[42]

---

[39] Hein Ex. P-0054; *Compare* June 30, 2016 financials (opinion is dated May 3, 2019) *with* June 30, 2013 financials (opinion is dated June 30, 2014).  Docket#7961-1-page-33-to-34,35-to-36-of-71.

[40] #7961-page-13-to-14-of-19;#7961-1-page-37-to-51-of-71;#7211-1-page-25-to-26,81-to-90-of-146;#4606-8-page-167-to-170;#4585-page-35-to-37-of-43.

[41] #7961-page-13-of-19;#7961-1-page-30-to-31-of-71.

[42] Docket#7961-1-page-7-of-71, 6/24/2019 screenshot from GDB website, p. 2 (emphasis added).  Type into Google "Investor Resources – Government Development Bank Puerto Rico – Tax Exempt Securities by Issuer"; click on "Commonwealth".  *See also* Docket#7732-page-8-to-9-of-10.

- In a section of the Official Statements on "Debt Limitation," information was provided concerning compliance with the constitutional debt limitation.[43] The debt limit is described as a limit on what may "be issued" (Hein-Decl.-Ex.-A-0008-p.14). The 2012A Official Statement stated that the calculated amount for annual debt service equaled 13.2% of the average of the adjusted preliminary internal revenues for the fiscal year ended June 30, 2010 and the preliminary internal revenues for the fiscal year ended June 30, 2011 (*id*. Ex. A-0010-p.16). This was well below the 15% level beyond which direct obligations of the Commonwealth evidenced by good faith and credit bonds or notes "shall not be issued" (*id*. Ex. A-0008-p.14). Indeed, it was noted that on certain other assumptions the percentage would be even lower, 12.7% (*id*. Ex. A-0010-p.16).
  - The "Debt Limitation" section evidenced apparent care by Puerto Rico officials and advisers that Puerto Rico not issue debt in excess of its debt limit.
  - Nothing in the Official Statement told potential purchasers that they (the purchasers) were responsible for calculating the limit on what amount of debt Puerto Rico could issue or were at risk of losing their investment if Puerto Rico's calculations were retrospectively claimed or determined to be wrong.
- As stated on the cover of the Official Statements, Puerto Rico's bond counsel were providing an opinion, and the bonds were "subject to approval of legality" by bond counsel. Hein-Decl.-Ex.-A-0001, cover. In addition, certain legal matters would be passed upon by underwriter's counsel based in San Juan, Puerto Rico. Hein-Decl.-Ex.-A, cover. The proposed form of opinion of bond counsel was annexed as Appendix II (Hein-Decl.-Ex.-A-0019). The opinion of bond counsel stated that "The Act and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations

---

[43] *E.g.*, Docket#4913-page-3-of-10, *citing*, 2012A O.S. pp. 14-16;Hein-Decl.-Ex.-A-0008-10.

of the Commonwealth for the payment of the principal of and the interest on the

Bonds, to which the good faith, credit and taxing power of the Commonwealth are

pledged."[44]

Now, after over three years of the FOMB and over two and one-half years of the Title III

process, instead of court rulings and adjudications, we appear to be witnessing a reprise of the

COFINA process where a confidential mediation process—which did not include 50-states

individual investors—was used to determine who got paid what, in lieu of actual judicial rulings

on a public record. Motions to address key legal issues in the COFINA case had been fully

briefed and argued, but judicial decision was deferred so the determination of who got paid what

could be made in a confidential mediation process.[45] The 50-states individual investors who did

not participate in that confidential mediation process ended up being devastated, while

participants in that process greatly benefited.

My position is that all proceedings related to efforts to evade or avoid Puerto Rico's debt

to the detriment of investors, including individual investors like me, must be conducted through

court adjudication on a public record subject to public access and scrutiny, and appellate review

if necessary. The confidential mediation process that has been used excludes individual

investors from meaningful and effective participation and also precludes individual investors

from even following the confidential mediation proceedings. Confidential mediation provides no

contemporaneous public record. Confidential mediation is subject to abuse for the benefit of

favored parties and to the detriment of nonparticipants, as occurred in the COFINA situation.

Confidential mediation may be appropriate to facilitate the resolution of *private* disputes where

*all* parties to the dispute agree to the process and participate (and are not bound unless they agree

to be bound). But it has no place in a situation like this where thousands of individual

---

[44] Hein Ex. A-0019; Docket#4913-page-3-of-10.
[45] Docket#4595-page-4-to-5-of-21 (citing-Adv.Proc.17-257-Docket#434; *see also*
#492;#539;#543;#544). In addition, the court declined, to certify the legality/validity question to
Commonwealth's Supreme Court. Adv.Proc.17-257-Docket#483.

18

bondholders are not even able to follow what is transpiring in the confidential process, much less have a meaningful ability to participate.

The "game" FOMB is playing is to (1) begin invalidation proceedings to create a (contrived) "litigation" risk excuse that can be used in another secret "negotiation" process (like that used in the COFINA situation), and/or in Plan confirmation, to bolster FOMB's efforts to cut some part of the debt, yet (2) (as in the COFINA situation) avoid a final legal adjudication, which would reject FOMB's assertions.

FOMB's attempt to reprise its COFINA strategy—side-step adjudication of rights and instead use secret negotiations, in which special benefits are used to marshal support for a plan, followed by votes on a plan by self-interested parties who receive special benefits, all at the expense of unrepresented individual investors who bought pre-PROMESA—should be rejected.

I refer the Court to my position stated on the record on July 24, 2019 (transcript filed July 25, 2019 #8266-Tr.-85:23-to-86:9), and my prior filings, including in particular, #9096, #8308,#8146,#7961,#7732,#7540,#6487,#6151,#6128,#5377,#5103,#4913, as well as #8626, #8487,#8427,#7211,#6283,#5041,#4934,#4911,#4673,#4606,#4595,#4585.

My objections include violations of the Takings, Due Process, Contract, Ex Post Facto, Equal Protection, Privileges and Immunities, Bankruptcy and Appointments Clauses of the U.S. Constitution and the First Amendment public right of access to court proceedings; violations of the similar provisions of the Puerto Rico Constitution as well as Article VI, § 8, thereof; and violations of 48 U.S.C. §§737, 2141(b)(1)(N) and 2163, other provisions of PROMESA and the Bankruptcy Code.

*     *     *

I assert and reserve all procedural and substantive rights and objections, including failure to serve, failure to properly serve, failure to serve motions, and my positions that the FOMB members were appointed in violation of the Appointments Clause (and thus FOMB's actions are void and these proceeding should be dismissed) and that PROMESA is unconstitutional because,

19

among other reasons, it is not a "uniform" law "on the subject of bankruptcies throughout the United States".

December 4, 2019

Respectfully Submitted,

Peter C. Hein, Pro Se
101 Central Park West, Apt. 14E
New York, NY  10023
petercheinsr@gmail.com